```
 1              IN THE UNITED STATES DISTRICT COURT
            FOR THE EASTERN DISTRICT OF PENNSYLVANIA
 2                        -  -  -

 3    LISA BARBOUNIS              :  CIVIL ACTION NO.
                                 :  19-cv-05030
 4      v.                       :
                                 :
 5    THE MIDDLE EAST FORUM, DANIEL :
      PIPES and GREG ROMAN       :
 6                               :
        and                      :
 7                               :
      DANIEL PIPES, THE MIDDLE EAST :
 8    FORUM and GREG ROMAN       :
                                 :
 9      v.                       :
                                 :
10    LISA BARBOUNIS             :  STATUS CONFERENCE

11    _____

                                 James A. Byrne U.S. Courthouse
12                               Via videoconference
                                 Philadelphia, PA 19106
13                               December 4, 2020
                                 Commencing at 10:04 a.m.
14    _____

15            BEFORE THE HONORABLE JOSHUA D. WOLSON

16    _____

17

18

19
                          -  -  -
20

                  Ann Marie Mitchell, CRR, RDR, RMR
21                     Official Court Reporter
                         (267) 299-7250
22

23    Proceedings taken stenographically and prepared utilizing
      computer-aided transcription
24

25
```

```
 1   APPEARANCES:

 2

 3   FOR THE              DEREK SMITH LAW GROUP, PLLC
     PLAINTIFF/COUNTER    BY:  SETH D. CARSON, ESQUIRE
 4   DEFENDANT            1835 Market Street
                          Suite 2950
 5                        Philadelphia, Pennsylvania 19103
                          (215) 391-4790
 6                        seth@dereksmithlaw.com

 7

 8   FOR THE              COZEN O'CONNOR
     DEFENDANTS/COUNTER   BY:  DAVID J. WALTON, ESQUIRE
 9   CLAIMANTS            BY:   JONATHAN R. CAVALIER, ESQUIRE
                          BY:   LEIGH ANN BENSON, ESQUIRE
10                        One Liberty Place
                          1650 Market Street, Suite 2800
11                        Philadelphia, Pennsylvania 19103
                          (215) 665-2000
12                        dwalton@cozen.com
                          jcavalier@cozen.com
13                        lbenson@cozen.com

14

15   FOR THE              SIDNEY L. GOLD & ASSOCIATES, PC
     DEFENDANT/COUNTER    BY:  SIDNEY L. GOLD, ESQUIRE
16   CLAIMANT GREG        BY:   WILLIAM REISER, ESQUIRE
     ROMAN                Eleven Penn Center, Suite 515
17                        1835 Market Street
                          Philadelphia, Pennsylvania 19103
18                        (215) 569-1999
                          sgold@discrimlaw.net
19                        breiser@discrimlaw.net

20

21

22                              -  -  -

23

24

25
```

1          (Court called to order at 10:04 a.m.)

2          THE COURT:  Good morning.

3          So I called this hearing to address sanctions issues.

4     I have issued a series of orders through the course of the last

5     six or seven weeks in this case, and I want to get a handle on

6     compliance with those orders, and also talk about big picture

7     where things stand, and then try to sort out what, if any,

8     remedies are appropriate.

9          So I want to start with this.  Mr. Carson, on November

10    the 17th, I issued an order to show cause concerning sanctions

11    in the case.  And I laid out sanctions that I was considering.

12    It's Document 77 on the docket.

13         I laid out the sanctions I was considering, and I

14    required responses by November the 20th.  And you never

15    responded to that order.

16         So just on its face, why shouldn't I just enter the

17    sanctions that I laid out in that order to show cause given the

18    lack of a response?

19         I can't hear you, Mr. Carson.

20         MR. CARSON:  Can you hear me now?

21         THE COURT:  Yes.

22         MR. CARSON:  So the first thing is, is that I did file

23    a motion for reconsideration on the order.

24         When that order came out, it was in the midst of doing

25    I guess depositions, and I just fell behind on my email and I

1   just -- on my emails and I didn't see the -- I didn't see the

2   deadline.

3          And I -- you know what I mean?  I'm just working on

4   this case alone, and ultimately, I filed a motion for

5   reconsideration.

6          And I think it's pretty clear that based on just the

7   facts, that there hasn't been any discovery violations in this

8   case, not one.

9          THE COURT:  I'm not -- we're not there yet.  Okay?

10         I'm troubled, Mr. Carson, because -- I don't

11   understand the explanation that -- I mean, I understand falling

12   behind on your emails, but when courts issue orders, you need

13   to read the orders.  And when courts impose deadlines, you need

14   to comply with the deadlines.

15         I presume you saw that there was a filing from the

16   defendants in response to my order to show cause, which I think

17   was Document 80 on the docket.

18         I just don't understand how when an order to show

19   cause comes out, it can just go unnoticed.  That, frankly,

20   doesn't make a lot of sense to me.

21         And it -- you couple that with the fact that -- and I

22   want to be clear, your motion for reconsideration is not

23   directed at the issue that led to my order to show cause.

24         So my order to show cause was triggered by the fact

25   that on November 13th I issued an order.  That's the order to

1    which your motion is directed.

2         But your motion is directed to the portion of that or

3    two portions of that order:  One that deals with text message

4    production and one that deals with an award of attorney fees.

5         What it's not directed at and also what it doesn't

6    address, Mr. Carson, is the fact that on November 13th, my

7    order said that you needed to start providing me with daily

8    updates on your progress on doing document review.  And I

9    didn't get any updates from you.  Not a single one.  Right?

10        And so then I issue an order to show cause saying you

11   haven't complied with my order.  And I still didn't get any

12   updates from you.

13        So -- and I know that you didn't just miss that

14   obligation, because it wasn't just something that popped up in

15   an email or in an ECF notice, it's something we went over on

16   the record in a hearing.

17        So you didn't comply with that order either.  And then

18   that's what led to my order to show cause.

19        So why weren't you complying with my order?

20        MR. CARSON:  Well, I think that my motion for

21   reconsideration does address that.  It does address the images

22   too.  So --

23        THE COURT:  It doesn't -- no.  It addresses your

24   efforts to produce the images, Mr. Carson.  Okay?  And we'll

25   talk about that.

1          But it doesn't address the fact that on November 13th

2    I issued an order.  The order says, okay -- and we talked about

3    this, as I said, on the record.  It says, "It is FURTHER

4    ORDERED" -- and this is Document 74 on the docket.  "It is

5    FURTHER ORDERED that starting today, and every day thereafter,

6    Plaintiff's Counsel shall submit a daily status report to the

7    Court via email to" Chambers of -- to the email address,

8    Chambers of Judge Wolson, "that sets forth the following

9    information:  1) how many documents you reviewed that day; 2)

10   how many documents were produced that day; and 3) how much time

11   he spent reviewing and/or producing documents that day."

12          You didn't submit a status report on the 13th, right,

13   which is the date of the order.  You didn't submit a status

14   report over that weekend.  You didn't submit a status report

15   the following Monday.  I issued an order to show cause.  And

16   you continued not to issue status reports.

17          You knew that that order was there.  Right?

18          And your reconsideration order doesn't say I should

19   never have to submit daily status reports, does it?

20          MR. CARSON:  It doesn't say that.

21          THE COURT:  And you didn't comply with my order.

22   Right?

23          MR. CARSON:  I did not send you daily status reports.

24          THE COURT:  So why didn't you comply with my order?

25          MR. CARSON:  I mean, because I'm not represented by

1  anyone today, just -- what I will -- I don't know what I feel

2  feeling comfortable saying.

3          But what I would say is it was not -- it was not

4  because I read your order and chose not to comply.  That is not

5  what happened, Your Honor.  It just isn't.

6          THE COURT:  Whether you read it and chose not to

7  comply or didn't pay attention to it -- I mean, again, this

8  didn't come out of nowhere, Mr. Carson.  This is something that

9  I raised with you on -- I mean, the order was November 13th,

10  but there was a hearing November 13th, right, that the order

11  came from.

12          And at the end of that hearing, I took a break, and

13  then I came back and I read to you into the record what I

14  wanted to do.  And I told you that I wanted you to provide

15  these emails updates, these daily updates.  Right?

16          So I'm just befuddled at the idea that I told you and

17  then I issued an order telling you to do it, requiring you to

18  do it, and you just didn't do it.

19          So I don't know whether that is I consciously chose

20  not to do it or what other way you would describe it, but at

21  some level you disregarded my order.  And then you disregarded

22  the order to show cause saying, hey, I really meant it.

23          Tell me why you're not complying.

24          MR. CARSON:  Your Honor, I guess what I just want you

25  to know is I absolutely did not just disregard your order

1  consciously.  The entire time I was working diligently on

2  trying to figure out what to do with these images.

3        I think that, you know, there's a lot of evidence to

4  demonstrate that of the date of that hearing, which was a

5  Friday morning, until the present, you know, my entire practice

6  has been trying to figure out what to do with these images.

7  You know, there's a lot of them, and I thought that I was

8  complying with the order by putting that much time and effort

9  into working on the images.

10        THE COURT:  I don't know how you could have thought

11  you were complying with the order.  Yes, I wanted you to do the

12  work, Mr. Carson, but I wanted you to tell me what was going

13  on.  And the reason I wanted to do that was, A, so I made sure

14  there was progress being made, and B, to give me an opportunity

15  to be involved if there was something I needed to be involved

16  with as we were coming up on the discovery cutoff.

17        Instead, I didn't hear from you basically until

18  discovery ended.  You sent me an update at the time that you

19  filed your motion for reconsideration, and that was, you know,

20  the evening of the 25th, which was the day of the discovery

21  cutoff.

22        MR. CARSON:  And then I sent a few updates after that.

23        THE COURT:  And you sent updates after that.  But you

24  didn't send updates during the discovery period, which is

25  expressly what I ordered you to do.

1          And the fact that you didn't do it, you didn't comply

2  with that requirement and then you didn't respond to the order

3  to show cause, just tells me that you're not really paying

4  attention.

5          You may think you're complying with the spirit of what

6  I'm trying to do, but that's not how court orders work.  You

7  don't get to divine what the spirit of the order is and then

8  try to comply with that.  You've got to comply with what I

9  said.  And if there's some reason you can't comply, you've got

10  to tell me that, not just ignore it.  That's how it's got to

11  work.

12          And it's not how it worked here.  And that's the first

13  reason that, you know, we're having this hearing, is because

14  I'm looking at this docket and I see a consistent disregard of

15  my orders.

16          I'll give you a chance, Mr. Carson, on this particular

17  issue.  Tell me why that's not sanctionable conduct.

18          MR. CARSON:  Yes.  What I would suggest is that there

19  is no -- there's -- I mean, first, I don't think there's been

20  any prejudice to defendants in any way because I didn't send

21  those updates.

22          I know that the order -- I understand that -- today

23  that that's what the order says, but, you know, there's no way

24  that anyone could have gotten through the images that were --

25  that I was ordered to go through faster than what I've done.  I

1    mean, it just wouldn't be possible.

2              THE COURT:  I'm not interested yet -- we're going to

3    get to the images.  I'm not interested yet in the images.

4              And I hear your prejudice argument, Mr. Carson.  But

5    I've got to tell you that there's a concern that from my end is

6    bigger than the question of prejudice to the defendants and

7    frankly is bigger than the prosecution of this case.  Right?

8    It strikes fundamentally at the justice system and at the

9    system of law.

10             When judges issue orders, they have to be complied

11   with and the parties are not just free to disregard them.  You

12   can come back to me, and if there's a problem with compliance,

13   you can tell me and we can talk about that.  But you cannot

14   come back to me and just say later, well, it didn't hurt

15   anybody so I didn't really have to comply.  That's not how our

16   system has to work.  Our system has to work in a way that there

17   is compliance.

18             And again, here what I was asking for, right now what

19   we're talking about, what led to the order to show cause and

20   then subsequently to this hearing is in no small part the

21   simple lack of daily updates.  Okay?

22             And I don't care what you say about the challenge of

23   reviewing the documents or anything else.  All the things that

24   you tell me now that you were doing for the last three or four

25   weeks and all of the things that you reported to me in the

1  status update on the 25th that you provided, those are things

2  that I should have been hearing along the way.  Right?  That

3  was the express purpose of requiring the daily updates.

4         So if you had said to me in a daily update, I haven't

5  reviewed any documents today but I've been on the phone with

6  Cornerstone exploring ways to speed up the review of images,

7  for example, that would have been an update that would have

8  been useful to me and meaningful and in compliance with my

9  order.  Okay?

10         But you deprived me of that information.  You ignored

11  a court order.  And so just regardless of prejudice, I think

12  that there's a bigger issue, as I said.  And that is that I

13  need to know that when I issue an order, you're going to comply

14  with it.

15         MR. CARSON:  Your Honor, can I tell you something else

16  that might be relevant?

17         THE COURT:  Yeah.

18         MR. CARSON:  So the paralegal I work with today, his

19  name is Jason.

20         Jason, he works with two lawyers here, and the other

21  lawyer is Erica Shikunov.  And Erica Shikunov has a case that

22  she's litigating against the Middle East Forum.

23         So like we've tried to I guess put up like a wall

24  between us, just so that we can say that, you know, like, we're

25  not sharing information behind -- I mean, like that everything

1   is being done as if we were like two different firms.

2          And so part of that was that Jason would only work on

3   Erica's case.

4          So he's the person I sort of always relied to, when

5   like orders come through, to like talk about those orders.  And

6   I didn't realize because of this wall he was just not telling

7   me about orders from -- in this case, like he was sort of just

8   disregarding them.  And I think he thought he was doing the

9   right thing by doing that, but at the same time, you know what

10  I mean, that's one of the reasons I didn't see the orders.

11         THE COURT:  So I have two reactions to that,

12  Mr. Carson.

13         One is I get what you're saying, but, you know, the

14  issue is ultimately yours.

15         MR. CARSON:  Yeah, I understand that.

16         THE COURT:  It's not your paralegal's.  Right?

17         Secondly, though, I come back to, you know, this issue

18  of the daily reports.  Okay?

19         Set aside the order to show cause for a second.  You

20  say you missed that in the email stream.  I mean, again, I

21  understand maybe not seeing it as it came in, but at some point

22  your practice has to be that you're looking at things that have

23  an ECF email address because that's how courts issue orders in

24  this day and age.  And you know in this particular case that,

25  A, I've been actively involved over the last six or seven

1   weeks, and B, that you're coming up on the discovery cutoff.

2            But even beyond that, okay, again, I'm looking at the

3   transcript now from November 13.  And November 13th is the

4   hearing that leads to the order.

5            And I said on the record, okay, I said, the last

6   thing, Mr. Carson, once I get a report from Cornerstone, I

7   said, it may be that there's not much left to review once the

8   attachments are produced, but to the extent that there are

9   still media files that need to be produced, I want to see daily

10   updates on the progress of the that.  And I want those by email

11   to my Chambers.

12           So I'm going to get a report from you on Monday about

13   what's out there.

14           Hopefully what you can tell me is both what's out

15   there in the way of media files but also how many of them are

16   attachments that are going to be produced and what's going to

17   be left for review.

18           And you say to me, how am I going to get you that

19   information?

20           And I say, you're going to email me to the Chambers

21   account, Mr. Carson.  You're going to copy counsel on the case

22   how many files you've reviewed on a daily basis so that I have

23   information about the progress that's being made.  I want to

24   know the files that have been reviewed and the amount of time

25   that's spent reviewing them on a daily basis.  And you're going

1   to send emails to my Chambers account telling me that.

2          This wasn't just an order.  This wasn't something that

3   a paralegal had to see and alert you to.  This is something you

4   and I had a direct dialogue about.

5          And --

6          MR. CARSON:  And the parties did email a status update

7   that following week.  Right?

8          THE COURT:  Yeah, I got a status update, which is a

9   separate requirement.  But I told you I wanted daily updates.

10  The exchange we just had that I read to you was for daily

11  updates.  And I didn't get them.  Right?

12         And that's not on your paralegal.  None of this is on

13  your paralegal.

14         MR. CARSON:  No.  I don't put any of it -- I wasn't

15  suggesting it was his fault.  But like the reason why -- the

16  way that I just found out about that, that like -- was

17  absolutely because of this hearing.  You know, the hearing was

18  something I just knew, you know, that I had this Friday on my

19  mind.

20         So the other -- I think it was yesterday, actually, or

21  might have been the day before when I looked at my calendar and

22  I didn't see the hearing on my calendar, I was like, you know,

23  what the heck, why isn't -- you know, that's an important

24  hearing.  If I didn't remember it, that could be a real

25  problem.

1          So I went to say something to Jason about it, and

2     that's when I just found out he wasn't putting things on my

3     calendar for any MEF case.  So I didn't know that was

4     happening.

5          THE COURT:  But again, it doesn't matter.  You and I

6     had conversation about it.  And I'm pretty sure you ordered the

7     transcript.  I'm pretty sure I saw that.

8          MR. CARSON:  I have a transcript.

9          THE COURT:  So you knew it was a requirement that I

10    imposed.  Regardless -- maybe you forgot, but there was a point

11    in time where you knew that that was a requirement that I

12    imposed, and you didn't comply with it.

13         MR. CARSON:  I was at the hearing.

14         THE COURT:  There's no question about that.

15         I don't know yet -- and we'll go through some other

16    stuff today and then I'll figure out what the remedy is for

17    that, but it's clear to me on the record that you knew about my

18    orders.  And frankly, to the extent you didn't know about the

19    order requiring the response to the order to show cause, that's

20    more than just negligence from my perspective.

21         You get ECF notices from a court, you've got to look

22    at them.  It's kind of basic.

23         And, you know, so whether you had actual knowledge or

24    just constructive knowledge of that requirement, I don't know.

25    I don't have to decide whether you actually read the order.

1  The purpose of giving ECF notices is so that you have

2  constructive knowledge.  And you didn't, and you didn't respond

3  to the order to show cause.

4          Let me ask then, you know, there's some other issues

5  that are raised in the defendants' submission in response to

6  the order to show cause and that also seem to suggest that

7  there was noncompliance with my order, at least my November

8  13th order.  And we'll get into some of the early orders as we

9  go through today.

10          So I'm going to come back to the text messages in a

11  minute.

12          Attachments.  There was an order that you produce

13  attachments with metadata for previously produced documents and

14  that that had to be done by November 18th.

15          Did that happen?

16          MR. CARSON:  The order -- the order was I had to

17  authorize Cornerstone to do it.

18          THE COURT:  It's ultimately your job to make a

19  production.  Cornerstone is not some independent party here.

20          MR. CARSON:  They're the only party with the metadata,

21  Your Honor.  They're the only people that have it.

22          THE COURT:  What did you do to make sure Cornerstone

23  made the production?

24          MR. CARSON:  I contacted them and told them to produce

25  it.

1        THE COURT:  Did you follow up to see if they produced

2   it?

3        MR. CARSON:  They refused to produce it.  They will

4   not produce that information in this case.  They will not do

5   it.

6        THE COURT:  So we'll get to that in a minute.

7        Did you -- there's discussion in the report that you

8   were, I would say, not terribly involved in the discussions

9   with Cornerstone on the 13th, and then on the 17th -- that you

10  didn't talk to them at all on the 13th because you had another

11  deposition going on, and then on the 17th you were on for about

12  ten minutes and then hung up and then left the Cozen lawyers --

13  and I have to look and see whether Mr. Gold or his colleagues

14  were also on, but left the defense lawyers to talk to

15  Cornerstone alone; is that right?

16       MR. CARSON:  Yes and no.  I wasn't invited to the call

17  on the 13th.  That's wasn't a call -- that was just a call that

18  those guys had with Cornerstone without me.  It wasn't set up

19  to be a conference call.

20       THE COURT:  I have an email here where Mr. Walton

21  emails you and says -- and two people from Cornerstone asking

22  to speak as soon as possible.

23       And you wrote back, saying, I don't think I'll be able

24  to talk until Monday.  Right?

25       Mr. Walton says, we really need to discuss it today.

1  And so then they went ahead without you because you weren't

2  available.

3         MR. CARSON:  I was in a deposition that whole day.

4         THE COURT:  Right.  You told me that at the hearing,

5  and I told you that I still needed you to find a way to make

6  yourself available to have conversations.  Right?

7         MR. CARSON:  Yeah, by Monday.  And we did have a

8  conversation by Monday.

9         THE COURT:  Okay.  And on Monday how long were you on

10 the phone with Cornerstone?

11        MR. CARSON:  15 minutes.

12        THE COURT:  The call continued.  Why didn't you stay

13 on?

14        MR. CARSON:  We all agreed that I had provided enough

15 information, that Dave was -- I mean, it wasn't that everyone

16 was asking me to stay on.  I got on the call, we had a

17 conversation, we talked about everything, I told Cornerstone

18 that they were a totally -- had my authorization to finish

19 talking to Dave, if Dave had a lot more questions.  And Dave

20 decided to stay on because had more questions and stayed on to

21 talk to them.

22        I was part of the call, and we did talk about

23 everything.  And he did explain exactly what the issues were

24 during that call, and I did respond to it all.

25        THE COURT:  Did you give to the defendants or propose

1   a schedule for producing text messages at that time?

2            MR. CARSON:  Did I do what?

3            THE COURT:  Give them a proposed schedule for

4   production of text messages that I ordered?

5            MR. CARSON:  I don't even -- no.  But they didn't

6   provide -- by the time that that conversation happened, I don't

7   think I even had the list of text messages I had to provide

8   yet.

9            THE COURT:  Set aside that conversation.  Okay?

10           So my order of November 13th, Mr. Carson, said that

11  there was some intermediate deadlines because I wanted things

12  to move.  Right?

13           And then what I said was -- pull up the order again.

14           So we talked about the production of documents -- of

15  attachments.  You said Cornerstone refused to do that.

16           Then I said you were to provide to me a status report

17  with regard to a schedule for producing text messages pursuant

18  to the requirements that I had already ordered.

19           MR. CARSON:  We did that.

20           THE COURT:  They gave you a list of text

21  conversations.  Right?

22           MR. CARSON:  Yeah.

23           THE COURT:  And you were supposed to provide them with

24  a schedule to get them produced.

25           They did ultimately give you a list.  Right?

1          MR. CARSON:  Yeah.  There was about 578 threads on the

2   list.

3          THE COURT:  What did you do to give them a schedule to

4   produce?

5          MR. CARSON:  Your Honor, the only people with those

6   text messages is Cornerstone.  The only people in the world

7   that have those text messages are Cornerstone.  There's nobody

8   else in the world.  Lisa doesn't have them.  I don't have them.

9          I talked -- I had plenty of conversations -- me and

10  Dave Walton have been -- were in direct communication that

11  entire time.  We had several conversations on the telephone.

12  We traded electronic communications.  And I responded to it

13  all.

14         And we sat on the phone, and I tried -- like he had --

15  we pulled up the list together that they gave me, the entire --

16  the entire Excel spreadsheet.  And I sat there and tried to

17  figure out with him on the phone whether or not I could respond

18  to it.

19         And I explained to him, there's no way I could do it.

20  I don't even have these text messages.

21         THE COURT:  I'm going to shift gears a little, go a

22  little out of my planned order then, because I keep hearing

23  Cornerstone, Mr. Carson.  I've heard it throughout the case.

24  You invoke Cornerstone.  They have the data, they're the ones

25  who have to produce, they refuse to do things.  Okay?

1          And then I got this status update from the parties in

2    which I was told, well, Cornerstone hasn't been retained in

3    this case.  Is that right?

4          MR. CARSON:  I guess that's what the status update

5    says.

6          THE COURT:  Is that right?  Did you retain Cornerstone

7    in this case?

8          MR. CARSON:  No.  Defendants are paying for

9    Cornerstone.

10         THE COURT:  In this case or in the trade secret case?

11         MR. CARSON:  Just period.  They're covering all the

12   bills for Cornerstone.  I have not been -- and that was part of

13   an agreement, because we -- frankly, plaintiff couldn't afford

14   it.

15         THE COURT:  I thought Cornerstone -- the report I got

16   was that Cornerstone had only been engaged pursuant to Judge

17   Sanchez's order in the trade secret case.  Is that right,

18   Mr. Carson?

19         MR. CARSON:  That's what Cornerstone's position is, is

20   that they can't do discovery -- they're fine with producing

21   discovery as long as it's in -- as long as it's parallel to

22   what they're doing in the other case.

23         THE COURT:  I assume there's some engagement letter

24   with Cornerstone somewhere.  Right?

25         MR. CARSON:  Not -- I don't have one.

 1          THE COURT:  There's no agreement with Cornerstone to

 2  be hired?

 3          MR. CARSON:  Not between --

 4          THE COURT:  You don't have any kind of contractual

 5  terms?

 6          MR. CARSON:  No, not -- I don't have one, no.

 7          THE COURT:  Mr. Gold, you're in the trade secret case.

 8          Is there an engagement letter with Cornerstone?

 9          MR. GOLD:  To my recollection there is, Your Honor.

10  However, it is strictly related to the trade secret case.

11          And Cornerstone is not a vendor of the -- of the

12  Middle East Forum.  Cornerstone is a neutral party that was

13  brought in to kind of facilitate the discovery in the trade

14  secret case.

15          However, the Forum was paying Cornerstone, but

16  Cornerstone was never retained in this case, to either be our

17  expert, nor was Cornerstone ever retained to be Mr. Carson's

18  expert.  So --

19          And Cornerstone is limited in terms of the information

20  it can disclose or the data it can produce by virtue of Judge

21  Sanchez's order, who, by the way, kept Cornerstone as a neutral

22  party.  And basically they -- the information that's been

23  uploaded to their platform is discoverable by the attorneys in

24  that case, who happens to be Mr. Carson as well.

25          But Cornerstone has nothing to do with this case.  And

1    to the extent to which the information is parallel to the

2    information that they produced in the trade secret case,

3    Mr. Carson is -- you know, has access to it, but Mr. Carson has

4    never retained an e-vendor in this case.

5              MR. WALTON:  That's right.

6              THE COURT:  Okay.  So this is where I have some

7    problems, Mr. Carson, because when you say to things to me like

8    Cornerstone refused to produce documents with attachments or

9    produce documents with metadata, okay, it's not Cornerstone's

10   obligation to do that.  It's your obligation.

11             MR. CARSON:  Right, Your Honor.  The parties agreed --

12   there's a reason why we agreed to use the discovery from the

13   trade secret case in this case, and that's because all the

14   keywords -- it's all the same parties, it's all the same

15   entities.  So we have hundreds of thousands of documents that

16   form a super broad production in the other case, and we both --

17   and the parties agreed, like, why not try to parlay that for

18   this case.

19             THE COURT:  Mr. Carson, I'm all for -- Mr. Carson, I'm

20   all for agreements that create efficiencies.

21             MR. CARSON:  Right.

22             THE COURT:  And that's fine.  But it doesn't absolve

23   you of your discovery obligations in this case.

24             MR. CARSON:  Your Honor --

25             THE COURT:  And so -- and so you can't say to me, oh,

1  we agreed to use Cornerstone, who is engaged in Judge Sanchez's

2  case.

3         I mean, I haven't studied them, but I did pull the

4  orders from Judge Sanchez's case where he directs you to use

5  Cornerstone.

6         Here's the thing.  Ultimately, it's not my problem.

7  Okay?  It's your problem how you get the defendants the data to

8  which they're entitled.  But they are entitled, not just

9  because of my order but because of the Federal Rules of Civil

10 Procedure, to metadata that will allow them to the parent-child

11 relationships of ESI that you have produced.  And I don't

12 care --

13        Mr. Carson, I can see you, so I can see you smirking

14 at me and rolling your eyes.

15        MR. CARSON:  Your Honor, I'm by no means smirking at

16 you and rolling my eyes.  What I am doing is expressing

17 frustration, because I don't even know what that means, what

18 the parent-child relationship is, and --

19        THE COURT:  That's part of the problem.  It is your

20 responsibility to know that.

21        MR. CARSON:  But, Your Honor --

22        THE COURT:  First of all, we raised this at an earlier

23 hearing.  We talked about it.  So if you didn't know what it

24 meant, you either had to ask or go educate yourself.

25        MR. CARSON:  Right.  And today I think I have an

1  understanding, but the order that you issued on November 13th,

2  there is only one company on the planet that can comply with

3  that order, and that's Cornerstone.  Like there's nobody --

4  because your order was to -- for text messages to be produced

5  based on snippets that Cornerstone produced.  So you didn't

6  just order, Your Honor, that plaintiff had to produce text

7  threads generally.  What you ordered is that plaintiff had to

8  produce text threads for hits based on a discovery production

9  that Cornerstone originally produced.

10         THE COURT:  Right.  Because you have told me

11  throughout the case that you have been relying on Cornerstone.

12  Okay?  So for me to now find out that somehow Cornerstone is

13  not your vendor -- I don't care who's paying them, okay --

14  they're not your vendor and they don't have to do what you say

15  is problematic.  Because my -- the discovery obligations in

16  this case are not the discovery obligations in the trade secret

17  case.

18         MR. CARSON:  But Your Honor, the parties agreed to do

19  it that way.  You're blaming me for an agreement the parties

20  made.  Like we got to this point because the parties worked it

21  out that we were going to do it this way.  And then Your

22  Honor --

23         THE COURT:  Mr. Carson, if you've agreed to use

24  Cornerstone in this case, that's fine with me.  Okay?

25         Unless you can show me an agreement that you've agreed

1  to be bound in this case by the confidentiality orders and

2  other restrictions that exist in the trade secret case, then

3  that's not the same as using Cornerstone.

4          And if you need to use Cornerstone in this case

5  differently than they are being used in Judge Sanchez's case,

6  then you need to make arrangements for that to happen.

7          And if you need cost sharing, if you need something

8  like that, then you needed to talk to the defendants and raise

9  it with me.  You never have.

10          MR. CARSON:  I mean, we -- Your Honor, we don't even

11  have those text messages.  I mean, the text messages on the

12  list, it's a list of text messages -- first of all, it's not a

13  list of text messages.  So that's not what it is.  It's a list

14  of every electronic communication snippet from every method

15  of -- from every social media app, every email, every

16  electronic message that was sent on like nine different

17  platforms.

18          There is only one party on the plant that has access

19  to that information.  There's --

20          THE COURT:  Mr. Carson, where did Cornerstone get that

21  data?

22          MR. CARSON:  From a dump that was done on cell phones

23  in February.

24          THE COURT:  And whose cell phones were they?

25          MR. CARSON:  They were Lisa's.

1          THE COURT:  They're still her phones.

2          MR. CARSON:  I don't even know if she has them

3     anymore.  She has --

4          THE COURT:  Either she has them or Cornerstone has

5     them.  Right?

6          MR. CARSON:  No.  I --

7          THE COURT:  Or whoever this -- there was a third

8     party, right, at some point that I saw that Judge Sanchez had

9     ordered I guess to do the forensic imaging of the phones; is

10    that right?

11         MR. CARSON:  Yeah.  They haven't been involved for a

12    while.  It's Capsicum.

13         THE COURT:  Someone has the phones.  Or if they don't

14    have the phones, then the phones were destroyed, which is a

15    problem too.  But one of two things is true.  Okay?  Either,

16    one, the phones exist and Ms. Barbounis has the right to access

17    them because they're hers to make productions of data in this

18    case, whether it's through Cornerstone or another vendor.  So

19    you can say to me, we don't have the text messages, but that's

20    not quite right, because the phones exist and they belong to

21    Ms. Barbounis.

22         MR. CARSON:  Your Honor, accessing 567 threads on

23    the -- I mean, we looked on her phone, because all this is done

24    when you update an iPhone.  It doesn't matter what phone you

25    have, it updates, you known what I mean, all your information.

1        So like we looked on her phone.  She doesn't even have

2   568 threads of messages.

3        THE COURT:  Okay.  But the data that Cornerstone has

4   is data that they extracted from Ms. Barbounis's phone.  Right?

5        MR. CARSON:  Not just her phones -- from her phones.

6   From her social media accounts, from her email accounts, from

7   her cloud-based storage accounts.  It's more than just her

8   phones.

9        THE COURT:  But it all came from her accounts.  Right?

10   Her phones, her account.

11        MR. CARSON:  Right.

12        THE COURT:  It all belongs to her.  Cornerstone may be

13   holding it, but it seems to me she has a right to it too.

14        If she doesn't have a right to it, to get it from

15   Cornerstone, because I don't know what the terms of your

16   agreement with Cornerstone are, then some other vendor can go

17   through the exact same exercise.

18        Now, I agree with you from an efficiency standpoint

19   that it makes no sense to start over with a new vendor and ask

20   a new vendor to go make the same forensic images and the same

21   forensic collection because that's a time-consuming and

22   expensive process.

23        MR. CARSON:  Like $30,000.

24        THE COURT:  So if you look at it in this case and

25   said, we're not going to go do that again, we're going to start

1  with that universe of materials that Cornerstone has, that's

2  fine.  And that makes eminent sense to me.  Okay?

3         But then you get to the next step, because that's your

4  starting universe of materials to produce.  But then from that

5  universe you've got a production that gets made in the trade

6  secret case and you've got a production that has to get made in

7  this case.  And there may be overlap.  Right?  If you think

8  about the Venn diagram of them, they may be overlapped, they

9  may be substantially overlapped.  But they're not the same, and

10  they're not subject to the same protective orders or anything

11  else.

12         And if Cornerstone hasn't been engaged to do the work

13  in this case to provide the production in this case, even to

14  the extent it's overlapping with what's done in the trade

15  secret case, then they should have been, because that's where

16  we seem to have a problem.

17         MR. CARSON:  I know.  They refuse to be, though.  I

18  told them to.

19         THE COURT:  No, no, no.  They refuse to take the

20  action, because you don't have an engagement letter with them

21  for this case.

22         MR. CARSON:  No.  That's not right.  They refuse to

23  allow me to engage them.

24         THE COURT:  Okay.  Well, then that's -- I guess that's

25  because of the nature of their engagement in the trade secret

1   case.

2         MR. CARSON:  That's right.

3         THE COURT:  Then you needed to get some other vendor

4   in.

5         MR. CARSON:  But that's not what you ordered, Your

6   Honor.  You order was that we go to Cornerstone and ask them to

7   do this.

8         THE COURT:  And Mr. Carson, this is why I asked for

9   regular updates, so we could deal with this and not be a

10  week-and-a-half after the close of discovery and dealing with

11  this.

12        And I don't disagree with you, Mr. Carson.  And I've

13  said it before in this case, that to some extent the delays in

14  this case and the problems that we've encountered are problems

15  from -- that are to some extent of the defendants' making too,

16  because there was a substantial delay in raising a lot of these

17  issues.  They shouldn't have been raised in October.  They

18  should have been pressed through in June, July, and I should

19  have been hearing about them in -- I understand early, early in

20  the discovery process it was early days of the pandemic.  I'm

21  sure that people were looking around, going, I don't know what

22  to do with myself.  That's fine.

23        There was ample time after we realized things were

24  going to progress for everybody to push forward on these

25  issues, and they didn't.  And I understand that.  And I don't

1    disagree with that point.

2           But that doesn't absolve you of your obligations,

3    Mr. Carson, to comply with discovery in the case.

4           So if Cornerstone is saying to you that they won't be

5    involved in this case and they're not going to allow you to

6    direct them to make productions in this case of the things that

7    are relevant in this case and that I am ordering produced in

8    this case, then someone has to.  Okay?

9           And whether that means getting another -- if they

10   don't want to do it, I don't think I need a third party neutral

11   in this case.  Okay?  I can see why a trade secret case is very

12   differently positioned than this case, and I can see how Judge

13   Sanchez would have gotten there.  That's not what this case is

14   about.  This case is not just about discovery, and it's not

15   about what Ms. Barbounis had on her devices.  And so I'm not

16   interested in appoint ing a third-party neutral in this case.

17          But that doesn't mean that there isn't a need for an

18   e-discovery vendor.  Most cases have a need for an e-discovery

19   vendor.  Most complicated, complex litigation does these days.

20   And, you know, that's why we've gotten to where we are in terms

21   of the discovery problems that we have.

22          Let me ask, since we're talking about Cornerstone,

23   Mr. Walton, does Cozen have access to the Cornerstone platform?

24          MR. WALTON:  Does Cozen have access to the Junto

25   platform?  No.  That's in the trade secret case.

1          But we have our own Relativity environment, which we

2    have uploaded some of the material that's on Junto into our

3    Relativity.

4          THE COURT:  And how are you getting it from Junto?

5          Are you -- there was some reference in one of your

6    emails to Mr. Carson making productions via Dropbox.  I don't

7    know whether you're doing that.  I don't know whether

8    Mr. Gold's folks who were involved in the trade secret case are

9    pulling stuff down and then loading it back up for you.

10         How is that happening?

11         MR. WALTON:  No.  Cornerstone is sending it to us.

12         THE COURT:  Okay.

13         MR. WALTON:  The Dropbox came from Seth.  Seth -- I'm

14   sorry, Mr. Carson.

15         Mr. Carson has a Dropbox that he produces discovery

16   via Dropbox.  And so he produced the text messages in his

17   Dropbox.  And the way he produces them, he just throws them in

18   there, and then we have to go in there and kind of find them.

19         And so I believe we -- I shouldn't say we.

20         We got the text messages Wednesday before

21   Thanksgiving, around midnight, like 68 threads.  It took us

22   until Tuesday to find them on the Dropbox, the following

23   Tuesday.  And then we had downloaded those into our Relativity

24   environment.  And we've been going through those.  And we found

25   some pretty explosive stuff.  But that's 68 threads out of the

1  568 that we created the spreadsheet for.

2          THE COURT:  So when you get things from the Junto

3  platform, Mr. Walton, is it coming -- is it stuff -- and I

4  don't know who knows the answer to this.

5          Is it coming because Cornerstone has deemed that it is

6  able to provide it to you subject to the terms of whatever

7  confidentiality orders exist in the trade secret case?  How is

8  it that Cornerstone is able to produce some things to you and I

9  guess not other things?

10         MR. WALTON:  Well, first of all, it's not coming from

11  the Junto platform.  The Junto platform is like Relativity.

12  They -- I just want to make it clear.

13         They have images that they've searched and they have

14  filtered and everything else.

15         THE COURT:  So they're sending you some sort of a file

16  with an appropriate load file, probably in some sort of

17  Concordance back end load file that allows you to load it into

18  Relativity.  Is that right?

19         MR. WALTON:  Yes, sir.  And so they gave us -- this

20  goes back into June and July and everything, where we were

21  having -- where we agreed initially that we would use the trade

22  secret production to see what's in there first; because like

23  you said, it was the most efficient way of doing it.

24         And there was a lot of back and forth about us getting

25  access to it.  We finally got access to it.  And just they did

1   it kind of as -- I don't want to say as a favor.  They didn't

2   feel comfortable with it, but they just said, well, okay, we

3   can give you what we produced in the trade secret case.  And

4   that's why we still have problems with the text message

5   bubbles, for example, because as per Judge Sanchez's order,

6   that's all they were allowed to do.

7          So when we say to them, hey, we need to get the full

8   text threads, they say, hey, we feel uncomfortable about that

9   because Judge Sanchez said we're only allowed to give the

10  bubbles.

11         Do you know what I mean by bubbles?

12         THE COURT:  Yes.  I get it, as opposed to -- the

13  individual single -- whether it's an SMS or MMS message --

14         MR. WALTON:  Yes.

15         THE COURT:  -- as opposed to the complete thread.

16         MR. WALTON:  Yes.  And that's just an example, Your

17  Honor, of the type of problems that we run into, because then

18  they're like, we don't want to do anything that is in violation

19  of Judge Sanchez's order.

20         Now, they did tell me -- and I disagree with

21  Mr. Carson on this -- that Mr. Carson could have hired them and

22  we would waive the conflict to the extent that there was any.

23         They said the most comfortable way of them dealing

24  with it is for Mr. Carson to get his own vendor.  They would

25  give the images over to the vendor, just the raw images,

1   that --

2           And just so you know, the images were taken from

3   Capsicum in like February, and then those images were ordered

4   handed over to Cornerstone.  So those images of the phones were

5   taken back in February.

6           Now, Mr. Carson could either take the phones that he

7   currently has and the Google accounts and the social accounts

8   and give them to a brand new vendor and start over, or he could

9   hire Cornerstone to do a piece of it and then get his own

10  vendor.

11          But we ran into problems with Cornerstone because

12  we're paying for Cornerstone.  And, you know --

13          THE COURT:  Let me be clear.  When you say we --

14          MR. WALTON:  MEF.

15          THE COURT:  -- is Cozen paying them?

16          MEF is paying them.

17          MR. WALTER:  No, MEF.

18          THE COURT:  Cozen is not, because Cozen doesn't have a

19  relationship with them because they're only in the trade secret

20  case?

21          MR. WALTON:  Not on this case.  That's exactly right.

22          THE COURT:  Okay.  I think I understand the dynamic.

23          Again, these issues would have been much easier to

24  sort through in August and September than they are now given

25  where the case is.

1          Okay.  I want to sort of step back on a couple of

2   things and then kind of work my way back forward.

3          So let me get a status update on some of the other

4   issues that are floating around in the case to make sure I know

5   where things stand and what's still out there as an issue.

6          There was a letter -- I guess, Mr. Walton, you sent me

7   a letter right before Thanksgiving as your weekly update saying

8   that the parties were still working on scheduling depositions.

9          What depositions are still --

10          MR. WALTON:  One of the depositions is Marnie Meyer.

11   She's the fourth plaintiff that's represented by Ms. Shikunov.

12   And we're not involved in that case.

13          THE COURT:  We being who?

14          MR. WALTON:  We being Cozen.  Clark Hill is involved

15   in that case as the defense firm.

16          Am I talking loud enough?  Can you hear me?

17          THE COURT:  Yeah, you're fine.

18          MR. WALTON:  I'm sorry.  I'm sorry, Your Honor.

19          And that there's a pending motion for DQ, for

20   disqualification, against Eric Shikunov in that case.  So she

21   doesn't feel comfortable producing Marnie Meyer and

22   representing her until that motion for DQ is resolved.  And

23   that's in front of Judge Gallagher.  And so I don't know when

24   that's going to be resolved, but that's been fully briefed,

25   from my understanding.  So that's one thing.

1          And another thing is we've been trying to serve

2     subpoenas on third-party witnesses.  We haven't been successful

3     doing that.  But the most important one is Marnie Meyer.

4          And then the other, I've asked Mr. Carson, we need to

5     depose Ms. Brady and Ms. Yonchek.  They were initial plaintiffs

6     that Mr. Carson represented.  We've gotten some other

7     documents, but we've gotten documents afterwards, and we have

8     not taken their depositions in the Barbounis case.  I've asked

9     Mr. Carson if he still represents them, and I don't believe I

10    got a response to that.  We've sent a couple emails on that.

11    So we're trying to figure out of we need to subpoena them or

12    whether we can get them produced through Mr. Carson.

13         THE COURT:  Let me ask a couple questions.

14         All the depositions that were scheduled in the October

15    26th order have happened?

16         MR. WALTON:  Yes, sir.

17         THE COURT:  Okay.  And I know there were some third

18    parties who -- at the time who you were still working on.

19         Let me look.  I think I had asked for a status update

20    on the third parties.  Let me look and see what that said.

21         So I guess my question is for you, Mr. Walton, with

22    respect to Ms. Brady and Ms. Yonchek, obviously we've known

23    about them for a while.  I think I had some discovery issues

24    early on with the subpoena to Ms. Yonchek that I dealt with.

25         It doesn't look like they were raised as potential

1  deponents back in October, so why are they still -- why are you

2  dealing with them now?

3          MR. WALTON:  We're just getting text messages

4  involving them from Ms. Barbounis.  And we've decided that

5  there's some stuff that we didn't have previously that we'd

6  like to ask them about.

7          THE COURT:  So it's based on recent productions?

8          MR. WALTON:  Yes, sir.

9          THE COURT:  All right.  Well, you guys will have to

10  talk, and if you can agree on scheduling the depositions, then

11  that's fine.  If you can't, I guess you'll put it in front of

12  me and I'll decide whether or not what's in there constitutes

13  good cause to let you take the depositions or not.  You know,

14  certainly the timing may be, but the question is what the

15  substance is too.

16          All right.  There has been throughout the case

17  discussion about Telegram and Ms. Barbounis's Telegram account.

18          I assume based on the last things that I've seen that

19  there's been no production of information in Telegram; is that

20  correct?

21          MR. WALTON:  Yes, sir.

22          THE COURT:  What has been done to try to collect data

23  from Telegram, to try to get information out of Ms. Barbounis's

24  account?

25          Mr. Carson, I'm going to start with you on this one.

1          MR. CARSON:  Sure.  I've had a conversation -- I've

2   had several conversations with Cornerstone about this.

3          You can't produce -- you can't pull down data from

4   Telegram apparently.  It's because -- I mean, it's because

5   Telegram doesn't use user name and passcodes.  The only way to

6   get into a Telegram account is through a telephone.  So I think

7   that there's also -- the same issue exists with Signal and I

8   think Wickr too he said, where you can't get that

9   information --

10         THE COURT:  Let me --

11         MR. CARSON:  -- through a dump.

12         THE COURT:  -- make sure I understand that.

13         You can get it from a telephone.

14         MR. CARSON:  Right.

15         THE COURT:  I presume that means the identity it's

16   using is either something on the SIM card, like an ISIM number

17   or something like that; is that right?

18         MR. CARSON:  I think what he said was you can get it

19   through a telephone, so if there was information from Telegram

20   available, it would have been on -- then it would have been

21   part of the information that was taken when the phones were

22   imaged in February.

23         THE COURT:  Is Telegram information stored locally on

24   the phone, or is it stored on some server somewhere?  I assume

25   it's the latter, but I don't know.

1    MR. CARSON:  I think that the only way to get it is
2    through imaging a phone is what he said.  You can't like -- you
3    can't go onto their server somewhere and download it from a
4    server.
5          THE COURT:  No.  I know you can't just go onto their
6    server.
7          But my question is -- I mean, Facebook data, to use
8    something that we're all more familiar with, is not stored
9    locally on your device.
10         MR. CARSON:  Right.
11         THE COURT:  It's stored, you know, in the cloud.  But
12   if I access it from my device, then I can -- there are settings
13   that allow me to pull it down.
14         And, you know, I think I've seen that you're pulling
15   down things like WhatsApp messages and things like that.
16         MR. CARSON:  Right.
17         THE COURT:  Those are all the same thing.  None of
18   that is stored locally.  It's all stored on servers.
19         MR. CARSON:  That's the difference.  With Facebook, my
20   client could get on the phone with Cornerstone and give them
21   her credentials and get them logged in so they can pull it
22   down.  Telegram, you can't do it like that.
23         THE COURT:  Why can't they -- but if she gives them
24   access to her phone, either --
25         MR. CARSON:  That's -- go ahead.

1        THE COURT:  -- either she or you with the phone open
2   can get into her Telegram account.  Right?
3        MR. CARSON:  I think what they said is that they did
4   do that, and if there -- and there's a declaration to this
5   somewhere, that if there was no Telegram messages produced
6   through the production when the phones were imaged, then that
7   means there was none on the phone, that they didn't exist.
8        THE COURT:  Mr. Walton, you're shaking your head.
9   What's your understanding of this?
10       MR. WALTON:  We have downloaded text -- I'm sorry,
11  Telegram accounts.  There's a desktop client that you can go
12  and you can download it, from like a desktop, a laptop.
13       THE COURT:  And what are the credentials that you use
14  to get in then, because --
15       MR. WALTON:  User name and password.  That's my
16  understanding.  I mean, that's how we got them, and we have --
17       THE COURT:  And have you provided it -- have you
18  talked to Mr. Carson about that and given him access to the
19  desktop client?
20       MR. WALTON:  Well, it has to be the desktop client on
21  her computer or a computer that she goes and --
22       THE COURT:  Right.  But I assume the desktop client is
23  something you just download somewhere.  Right?
24       MR. WALTON:  I believe so, Your Honor.  I mean --
25       THE COURT:  Have you given him the link or app store

1   name -- I don't know if it's an app store in Windows 10 or

2   what, but whatever it is, have you given Mr. Carson the

3   information he needs to pull down that client?

4          MR. WALTON:  No, Your Honor.  He's -- we haven't had

5   many conversations about Telegram.  I've just been told by him

6   he can't get it, essentially.

7          THE COURT:  All right.  Mr. Carson, I want you to talk

8   to Mr. Walton.  I want you to look into pulling down that

9   client, that desktop client, and see if you can pull down the

10  Telegram data.  You know, if you want to talk to Cornerstone

11  and see if they'll do it for you, you're welcome to.  But

12  again, they're not working in this case, so it's your

13  obligation, and you can figure out how you want to fulfill it.

14  Okay?

15         MR. WALTON:  I actually had a conversation with Rob

16  from Cornerstone last night about it, just so I could offer

17  like, you know, accurate information today.  And they will not

18  let me engage them.  They just won't.

19         THE COURT:  They won't let what you, engage them?

20         MR. CARSON:  Engage them for anything.

21         THE COURT:  Look, it's your obligation.  So, you know,

22  whether you do it yourself, whether you engage another vendor

23  to help you or what, I want to figure out whether or not -- you

24  know, I'm not going to sit here -- I hear what you're all

25  saying.

1          I haven't used Telegram.  I'm not going to start using

2     it.  And so I'm going to leave it to you guys to figure it out,

3     but I'm going to want some clarity as to what the outcome of

4     the process is.

5          If Ms. Barbounis -- I'd be surprised, Mr. Carson, I

6     will just say, if there's not some sort of log-in information.

7     Typically, you know, most device -- most messaging services

8     have at least a single-factor authentication, where you log in

9     with a user name and password.

10          It may be that once you've done that once on your

11     device, that either the thumbprint or face ID, depending how

12     recent the device is, allows to you maintain that log-in.

13          And it wouldn't shock me if there's some sort of

14     two-factor authentication, where you get, you know, a text

15     message to get a code to put in so that you can reconfirm,

16     because that's fairly typical in the event of lost credentials

17     and things like that as a security device.

18          And I just -- I'd be surprised if the answer were once

19     anybody gets into your phone, they can have access to your

20     Telegram without some sort of -- you know, even if you decided

21     to take the risk of storing the log-in.  There's got to be a

22     log-in somewhere.

23          MR. CARSON:  Your Honor --

24          MR. GOLD:  Your Honor --

25          THE COURT:  One at a time.  Hold on.  One at a time.

1          I was talking to Mr. Carson.  Let him respond, and
2   then I'm happy to hear from you.
3          MR. CARSON:  My response isn't that important.
4          I was going to say, the way I understood it is from
5   your phone you tell them what the phone number is and then they
6   send you a code and you type that code in and that's how it
7   goes into the account.
8          THE COURT:  Right.  Well, that's a form of two-factor
9   authentication.  And that may be able to be done even not on
10  the phone itself.  Right?
11         I mean if you log on onto a client on the desktop and
12  say this is my phone number and you get the text message and
13  you punch the code into your desktop client, you may still have
14  access to the messaging services.
15         And again, it wouldn't surprise me, Mr. Carson, just
16  as logic dictates that a lot of these messaging services do
17  offer some sort of desktop client so that people can use them
18  when they're not remote, particularly if the idea is to use it
19  in a business environment.  But you'll look into it, and you'll
20  update me.
21         I'm going to want you guys to update me by next Friday
22  on what you find with that.
23         You know, let me know.  Obviously the ideal report
24  that I get from you is we did it and it's done; but if there
25  are steps to be done, I want to know what this process is, but

1    I want to know what you find as you look into it.  Okay?

2          MR. CARSON:  Your Honor, just for clarity, you're not

3    ordering that her entire Telegram account has to be produced,

4    just the messages relevant to the case?

5          THE COURT:  I want relevant messages produced.  Right.

6          Mr. Gold, go ahead.

7          MR. GOLD:  Your Honor happens to be correct.  You can

8    export the Telegram messages from any desktop by using the

9    two-factor authorization.  It can be done by --if Mr. Carson

10   himself has done this in the Delaney Yonchek case.  And he has

11   accessed those Telegram messages for us back in April, so he

12   knows how to get the messages.  Somebody has to go on a desktop

13   and use that information and access the information.

14         THE COURT:  I don't need to wade into --

15         MR. CARSON:  I don't remember.

16         THE COURT:  -- whether it has happened or not.

17         And I don't know what the circumstances were with

18   Ms. Yonchek or Ms. Brady -- or Ms. Delaney, rather.

19         But you guys will talk.  My gut instinct is there's a

20   way to do it, but, you know, you need to figure that out.

21         Okay.  There was an issue when we were on the last

22   hearing with some documents that, Mr. Walton, you said had been

23   produced with redactions.

24         Has that issue been cleared up?  Do you know what was

25   produced with redactions and what the basis for the redactions

1   were, or have they been produced in an unredacted way, or is it

2   still outstanding?

3          MR. WALTON:  I understand the basis of the redactions.

4   The redactions have not been resolved.

5          The issue involves Cornerstone again, Your Honor, in

6   that they were ordered by Judge Sanchez only to produce the

7   messages, just the message with the hit.

8          So for example, if there was a Twitter DM and there's

9   a whole string of Twitter messages, if there's one that has the

10  hit, that's all that they were supposed to produce.

11         So what they did on the Twitter DMs is they went

12  through and they manually redacted.  Same with the Instagram

13  DMs, they manually redacted everything.  That's the way they

14  had to do it from --

15         I'm sorry if you hear my dogs barking in the

16  background.

17         THE COURT:  If wouldn't be a virtual hearing without

18  someone's dogs, Mr. Walton.  It's okay.

19         MR. CARSON:  I have two kids on Zoom school and three

20  dogs, so just bear with me.

21         So that is -- that's the reason why they have the

22  redactions, Your Honor.

23         THE COURT:  Okay.  All right.  Well, you guys are

24  going to have to work that out.  And again, this goes to one of

25  these issues with the fact that you've got Cornerstone

1  laboring, you know, in the trade secret case.  And that

2  doesn't -- the fact that they're laboring in the trade secret

3  case doesn't change the discovery obligations in this case.

4       And then we've talked about the text messages, so I

5  know where that stands, although I guess, Mr. Carson, you had

6  suggested there were some conversations you had with Mr. Walton

7  about the text messages.

8       Has there been any kind of resolution that I need to

9  know about, or is it still an open issue?

10       MR. CARSON:  I think it's an open issue.  The one

11  thing I would just suggest is that -- so I did produce 70 text

12  threads, which is more text threads by ten times than I think

13  I've ever produced in any other case I've ever worked on.

14       And I think that -- I only had these 70 text messages,

15  because back a year ago when we were trying different things,

16  we tried -- we did like a test run to see how we could get --

17  how could we produce information.  And we tried to like use a

18  few keywords, like "MEF."

19       And so I had these text threads just in a folder from

20  then.  I just produced them, I didn't read half of them, in

21  accordance with Your Honor's order.  Even though I filed a

22  motion for reconsideration, which I would argue that the

23  production is subject to that motion and Your Honor's ruling on

24  that motion, I produced them.

25       And I don't know -- like, you know, if there's 578

1   text threads that were -- that they want access to, and they

2   want access to the entire text thread plus all the metadata and

3   attachments, I just think there should be some kind of offer of

4   relevance, because I can't imagine that that many text threads

5   is relevant to the case.  I mean, it just happens to be threads

6   that hit on keywords.

7          And a lot of -- I mean --

8          THE COURT:  Okay.  I understand what that is,

9   Mr. Carson.  I'm going to come back to reconsideration, which

10  is essentially what you're leading into right now.

11         MR. CARSON:  Okay.

12         THE COURT:  Let me just see -- okay.

13         The other issue that I haven't I guess touched on,

14  Mr. Carson, I know I got updates from you about your review of

15  the images you had.  And it sounds like you found a workaround

16  and --

17         MR. CARSON:  I did.

18         THE COURT:  Are you done?

19         MR. CARSON:  I've -- I'm not done, but I'm like

20  95 percent there.

21         So I produced today -- they might not have even seen

22  them yet.  I produced today like 1,350 images that I think are

23  relevant that I would not feel comfortable certifying that -- I

24  have a certification about producing those, so, like, I

25  produced those.

1          There were -- I made 13 binders of images from all --
2    from the whatever, 100,000 images.  And so I got through 12 of
3    them.  So there's one more binder I didn't get through before
4    the hearing today.
5          THE COURT:  Okay.  And then there was an issue,
6    Mr. Carson, with media files, not just images but audio
7    recordings.
8          Where does that stand?
9          MR. CARSON:  Yeah.  They are also -- they are also
10   part of that -- the 13 binders.
11         I haven't gone through all the images yet.  After I
12   get through the images, there's a substantial amount of media
13   files then.  I think --
14         I can't imagine at least one of them won't have to be
15   produced.
16         THE COURT:  I'm a little confused when you say
17   binders, because --
18         MR. CARSON:  They're binders I made.
19         So what happened is they sent me like, you know, like
20   12 folders with like 10,000 to 15,000 messages or images -- or
21   files, I should say, not images, files in each one.  Some of
22   them are media files.  Most of them are images.
23         THE COURT:  So did you have the audio files
24   transcribed?  What do you mean, they're in the binders?
25         MR. CARSON:  What I mean is that I haven't even gotten

1  to all the images yet.  And after I get to the images, I have

2  to work through the audio files.

3          THE COURT:  How many audio files are there?

4          MR. CARSON:  I'll estimate that there are probably

5  500.  That's a total estimate.

6          THE COURT:  And are they typically like two-minute

7  conversations or are they 30-minute things?

8          MR. CARSON:  Some of them are -- most of them, I would

9  say, the average is probably like 25 seconds, you know.  Some

10  of them are a little longer, some are shorter.

11          THE COURT:  Okay.  So they won't take -- I mean, it's

12  not a nothing job, but it's not days and days and days.  Right?

13          MR. CARSON:  I think I can get through it maybe today.

14          THE COURT:  Okay.  All right.  Mr. Walton?

15          MR. WALTON:  I think there's more like 3,000, Your

16  Honor.  And I think --

17          MR. CARSON:  If there is, it's because I didn't count

18  them all.

19          MR. WALTON:  No.  I'm not saying he's lying.  I'm

20  saying it's more like 3,000.

21          And just so you know, the audio messages,

22  Ms. Barbounis would have a practice of saying kind of voice

23  messages like you and I might use text.  Okay?

24          THE COURT:  Uh-huh.

25          MR. CARSON:  She would do a lot of it through voice

1  messages.  So they're not voicemails, but they're voice memos.

2         THE COURT:  Are they audio texts that she sends as

3  SMSs, is that what you mean?  Or is she just storing audio

4  recordings that either she emails to someone or she texts to

5  someone as an attachment?

6         MR. CARSON:  Yeah.  There's a way you can do it in

7  WhatsApp and there's a way you can do it in these other

8  services she's using.

9         They are not -- it's not her dictating to Siri and

10 then Siri sends it out as text.

11        THE COURT:  No.  I understand.  If you're in your

12 iMessage app, for example, and you hit the voice recording

13 button and then you record the text and it shows up on my end

14 as an audio file.

15        MR. WALTON:  Yes.  Exactly.

16        THE COURT:  Understood.

17        MR. CARSON:  Apparently that's how they do it in the

18 UK.  People instead of texting, they send these voicemails.  So

19 like I guess she got used to doing it like that.  And they're

20 there.

21        THE COURT:  Let me turn to reconsideration, because

22 you were getting into it, Mr. Carson.

23        And I did read your motion for reconsideration that

24 you filed on the 25th.

25        I'm going to tell you my thinking on it, Mr. Carson,

1  and then I'm going to let you respond.

2           I didn't order this production just because I

3  concluded that there was relevance, that everything was

4  necessarily relevant.  But I did reach the conclusion that all

5  of these terms -- all of these text strings had some relevance,

6  because they had a hit on a search term.  And the search terms

7  are things that, for whatever reason and whatever the process

8  was -- and it may have been in the trade secret case.  But

9  that's how you guys decided to identify a universe of

10  materials.  And so if the only thing I've got in front of me

11  that identifies a universe of materials that is facially

12  potentially relevant, okay, so we start from that point.

13           And then the decision to order their production in

14  their entirety was frankly done because -- it was a sanction,

15  Mr. Carson, because I determined that any objections had been

16  waived, that things were not being done to fulfill the

17  discovery obligation of actually reviewing the text threads.

18  And again, I understand that the production of them took place

19  pursuant to whatever restrictions were in place in the trade

20  secret case.  But as I said, there's a universe of material to

21  start with in this case.  It may overlap with what's in the

22  trade secret case, but the obligations to produce are

23  different, and so I ordered their production in their entirety

24  for that reason.  So it's not just I decided, oh, it's all

25  relevant.

1          I recognize there were privacy issues that were at

2    stake.  I know that's a big part of what you are saying in your

3    motion.  It comes up several times that these are private and,

4    you know, maybe you shouldn't be ordering their production.  I

5    think I addressed that when I ordered the production in the

6    first place, because -- and I'm looking back now at the

7    transcript from November the 13th.  And I'm going to find the

8    right page.

9          But what I said to you at the time was that I

10   recognized that the requirement to produce all of the text

11   messages was likely to be overbroad, that it was likely to

12   capture material that was, you know, not necessarily relevant.

13         I said, page 44 of the transcript, I said, I'm doing

14   this because there doesn't seem to be a process to review.

15   There doesn't seem to have been a sound e-discovery process in

16   place in this case, so I think objections have been waived.  If

17   there were privilege issues, I assume they were logged.

18         And then I said, going forward -- what I said to you

19   at the time was you're going to have to have a really good

20   reason to explain to me, not just that it's burdensome, not

21   just that it's intrusive, but you're going to have to explain

22   to me what you did to fulfill your discovery obligations in

23   this case through an evaluation of metadata and email threading

24   or text threading in order to produce stuff with context.

25         And I also said to you that if you were getting into

1   stuff that was overbroad, I understood that, I understood the

2   concern, and that the way to deal with that was by a protective

3   order.

4          And I stand by that.  It seems to me that the issue --

5   concern about privacy is one that can be handled by agreeing to

6   a protective order with the defendants, treat it on an

7   attorneys' eyes only basis, you know, and put a provision in

8   that says -- you know, I don't want to tread on Judge Sanchez's

9   case, so whatever is produced in this case can only be used in

10  this case.  Put that in the protective order.  And frankly, you

11  know, I'll just --

12         I'll short-circuit all of this.  Given the order that

13  I've entered as to text messages, I do think there's good cause

14  under Pansy for that type of protective order to preserve the

15  privacy of the information in the first instance.  I recognize

16  that there's going to be stuff that is out of the scope of this

17  case that's going to be produced, and I recognize that there's

18  material that's probably private and sensitive.

19         But we are where we are in this case, and I need this

20  stuff produced.  And Mr. Carson, I think to ask you to start

21  going through all those text messages is going to slow us down

22  enormously.  And so what we're going to do is -- and I'm going

23  to give you a chance to respond to this.

24         But I want the text messages produced.  I'm going to

25  order that the text messages that are produced pursuant to this

1   order be treated on an attorneys' eyes only basis by all

2   counsel.  They cannot be shown to clients.  I am open to

3   motions to modify that if there are portions of text messages

4   that you think need to be shown to clients.  We will tackle

5   questions of what to do with material that's used in motions

6   later.

7         If you're going to file -- if you're going to submit

8   any portion of these text messages to -- in connection with a

9   motion as a court filing or if you're going to submit them --

10  well, I'm not going to deal with trial right now.

11        But if you're going to submit them as an attachment to

12  any kind of submission to me that would be on the public

13  docket, then you have an obligation first to meet and confer to

14  try and work out whether it should be filed -- whether or not

15  they can -- confidentiality can be waived or whether you think

16  confidentiality is even necessary.

17        If you don't have an agreement, then whoever is

18  submitting the text messages needs to do so by filing a motion

19  to keep them under seal.  And I will look at them with an eye

20  towards the privacy interests that are implicated and decide

21  whether to keep them under seal.

22        I'm not insensitive to the question, Mr. Carson, about

23  the privacy interests here.

24        If they go right to the core of the case, then I think

25  that may have been put at issue and maybe there's not a privacy

1   interest that needs to be preserved.  If there's stuff that --

2   you know, sometimes you have text messages where there's

3   different conversations going on in the same few messages.  And

4   if there's stuff there that does implicate a privacy interest,

5   and you guys want to -- and if it's irrelevant and you want to

6   redact it to submit it to me, that's fine.

7          If you can't agree on that, put it in with a motion to

8   seal, and I'll look at whether we can seal all or part of it.

9   Okay?

10          But that's my inclination as to how to deal with it

11   and to deal with the privacy interests while still -- and

12   balance the privacy interests against this and otherwise to

13   deny reconsideration and require you to produce the text

14   messages.  And you're going to have to figure out how to do

15   that by working with either Cornerstone or some other vendor.

16          But I'm open to hearing you on the issue, Mr. Carson.

17   It's your motion, and I want to give you a chance to respond.

18   That's not my final ruling.  That's just -- in California they

19   would call it a tentative ruling or New Jersey they would call

20   it a tentative ruling and give you a chance to weigh in.  So

21   let's treat it that way.

22          I can't hear you, Mr. Carson.

23          MR. CARSON:  I don't -- can you hear me now?

24          THE COURT:  I can.

25          MR. CARSON:  I don't know why my computer does that.

1          My suggestion would be that I just think -- there's

2    568 text threads that were indicated or identified by the

3    defendants.  And it seems to me that that's like every text

4    thread she's ever sent in her entire life.  You know, it's like

5    she -- we've kind of looked at her phone.  We can't find that

6    many text threads on her phone, so I don't know where they're

7    coming from.  But to produce every single text conversation

8    with every single person that she's ever known for the last

9    whatever amount of years and then produce the entire thread in

10   its entirety just seems to be not in any way proportional to

11   this case.

12         THE COURT:  Well, you know, the proportionality

13   concerns would have rung far more true to me, Mr. Carson, if

14   this issue had been raised earlier.

15         We are now, you know, more than a week past the close

16   of discovery and I'm still trying to sort this out.  And so

17   from a proportionality standpoint, I hear what you're saying,

18   but I also think that the way to navigate that proportionality

19   here is to deal with it with a protective order.

20         So in some respects, you benefit.  Right?  You don't

21   haven't to spend the time sorting through them and trying to

22   navigate what is and isn't relevant.  You're going to shift

23   that burden to Mr. Walton and his folks, and they'll figure out

24   what it is.  And, you know, I don't know if it's 568 separate

25   threads.  You know, I don't know given the way Cornerstone did

1   it that maybe some of these hits are in the same thread.  And

2   so I don't really know.

3           But I think that -- I hear what you're saying about

4   sort of weighing privacy and proportionality, but I do think

5   there's an expediency to doing it this way.  There is some

6   facial reason to think that these text threads are relevant,

7   and given where we are in the case, I think that the way to do

8   it is by letting them look at it subject to the restrictions

9   I've imposed.  I am going to preserve Ms. Barbounis's

10  confidentiality, at least as to the stuff that may be

11  overbroad.

12          So, you know, I guess I'm -- what I'm going to say,

13  what my order will say, Mr. Carson, is that I'm granting in

14  part and denying in part the motion for reconsideration.  And

15  I'll say this in an order today.

16          Granted in part in that the production of text

17  messages is subject to the confidentiality provisions that I've

18  laid out on the record and otherwise denied.  Okay?

19          Mr. Walton?

20          MR. WALTON:  Yes.  I'm sorry to raise my hand like

21  that, Your Honor.  I don't know how else to do it.

22          THE COURT:  It's okay.

23          MR. WALTON:  May I be heard on your proposed order?

24          I have a request.

25          THE COURT:  Yes.

1          MR. CARSON:  We gave Mr. Carson a list, actually, of

2     about 2,000 threads, and we've cut it to 568 because we figured

3     1,500 of them were duplicates the way that Cornerstone ran

4     their report.  Okay?

5          And in the interest of full disclosure, Your Honor, we

6     have shown two of those threads to Mr. Roman, and I can tell

7     you which ones they are, two of the 68 that we got already.

8     And we won't show him any more after this order, but I wanted

9     to be up front about that.  Okay?

10         Number two, Mr. -- I understand putting the burden on

11    us, but my request would be that Mr. Carson should have to

12    identify the string, which strings he considers to be AEO,

13    because clearly most of them shouldn't be AEO because they're

14    clearly work related.

15         For example -- now, if he wants to do that with the

16    ones involving her mom, her husband, treat those as AEO, that's

17    fine.  But if she's texting people in England, for example, for

18    work that she was doing on MRI (ph) and that's all her texts

19    for England would be, they shouldn't be treated as AEO.

20    Respectfully, Your Honor, they shouldn't be treated as AEO

21    initially, because they clearly aren't AEO.  They're clearly

22    work related.

23         She has text messages with the plaintiffs in this case

24    or the other claimants.  That's something that shouldn't be

25    AEO, that we would assert shouldn't initially be AEO, because

1    it's going to add a huge burden on us.  We've got summary

2    judgment coming up on the 18th.  We have to file our motion for

3    summary judgment in addition to doing all this.

4           So I would respectfully request, Your Honor, that as a

5    first step Mr. Carson be required to identify which threads he

6    wants to treat as AEO.  We'll separate those, keep those AEO, I

7    won't show those to my client, but that we have non-AEO threads

8    too.

9           Am I making sense, Your Honor?

10          THE COURT:  You're making sense, but -- and here's my

11   issue with it.

12          So I hear what you're saying.  The practical reality,

13   Mr. Walton, as you know as well as I do is that in most of

14   these cases, you have a protective order in place, people push

15   out their productions and they wildly overdesignate things as

16   AEO.

17          MR. WALTON:  Yeah.

18          THE COURT:  And, you know, here I have a situation

19   where I'm ordering production of these text messages, you know,

20   frankly, out of expediency --

21          MR. WALTON:  Yes.

22          THE COURT:  -- because of where we find ourselves.

23   And, you know, where we find ourselves, as I've said again and

24   again, is not solely a function of what -- the way Mr. Carson

25   has conducted discovery here.

1          And so I think that, going back to sort of the typical
2    example, there's lots of documents in a typical production that
3    are designated attorneys' eyes only and they shouldn't be but
4    no one cares.  Right?
5          MR. WALTON:  Yes.
6          THE COURT:  Because they're just not all that
7    important in the case.
8          MR. WALTON:  Yes.
9          THE COURT:  And I think we're going to have a lot of
10   that here too.  And so what I think we're going to do in the
11   first instance, your client is not going to be the one to look
12   at these things.  You and your team are.
13         You're going to look at them.  And these provisions
14   are going to look like they would -- my order is going to look
15   like a typical protective order would.  You're going to have a
16   meet and confer obligation to identify for Mr. Carson anything
17   that you think shouldn't be AEO.
18         Ultimately, if you bring that dispute to me, okay, if
19   you guys can't work it out and you bring the dispute to me, the
20   burden is going to be on you, Mr. Carson, to justify the
21   attorneys' eyes only designation.  Okay?
22         But in the first instance, there's going to be a
23   default that these threads are subject to an attorneys' eyes
24   only designation.
25         Mr. Walton, you're going to identify the stuff that

1  you want to be able to show to your client.  You'll go to

2  Mr. Carson.

3       Mr. Carson, you'll look at it.  If you still have a

4  good faith basis, you're going to explain that to Mr. Walton.

5  And then if you guys can't reach an agreement --

6       And again, my expectation is that for a lot of these

7  threads, you know, as with any text thread, if you produce the

8  whole thing, there's going to be all kinds of chaff that you

9  can treat as attorneys' eyes only and then a few messages on a

10 few days and times that are the wheat, so to speak, and that

11 maybe shouldn't be attorneys' eyes only because it's both core

12 to the case and consistent with the kinds of things that

13 Ms. Barbounis has already put in the public domain, you know.

14 And you'll agree to exclude those from the attorneys' eyes only

15 designation.  And then you can slice and dice the text chain

16 and show your client the relevant portions.

17       MR. WALTON:  Okay.

18       THE COURT:  That's how I'm envisioning the process

19 playing out.  In my order I'll put some provisions that would

20 mirror what you would typically see in a protective order along

21 these lines in terms of meet and confer obligations so that

22 there's some temporal limits to how long you can take back and

23 forth before you've got to tee the dispute up before me.

24       I will tell you, I mean, you should all know, I'm sure

25 you all do know because you've been down this road before, I,

1   like everybody else down here, really, really dislike those

2   kinds of disputes.  You know, my approach to it when I get them

3   is not uncommonly to look at this and say, a pox on all your

4   houses and try to figure out some solution that then follows up

5   with that thought.  So do your best to work it out.

6           But if you can't, if there's really something there

7   where Ms. Barbounis is saying no, this is really sensitive, and

8   you're saying, no, we've really got to be able to show it to

9   our client -- and again, one thing you can consider as a

10  compromise on that issue, because, you know, it's certainly

11  something I've done many times and probably you've seen,

12  Mr. Walton, and have done as well.

13          If it's just a question of showing it, for example, to

14  MEF's in-house counsel, you know, that may be a compromise

15  where -- because he's an officer of the court too.

16          MR. WALTON:  Yes, he is.

17          THE COURT:  And so if he's subject -- if you agree and

18  stipulate that he's subject to my order on this, maybe,

19  Mr. Carson, you can get over just him seeing it, subject to his

20  agreement, you know, to be bound by the protective order.

21          Think about that.  I'm not telling you you have to do

22  that, I'm not putting that in place right now, but maybe that's

23  a way you can get around it, because my guess is he's the one

24  you're going to be talking about summary judgment theories with

25  and things like that, Mr. Walton, but I don't know.

```
 1          MR. WALTON:  Yes.  A quick question, Your Honor, just
 2   from a mechanical standpoint.
 3          If we have an objection that we can't work out and we
 4   need to bring that to your attention, should we do that under
 5   seal?  Should we file that motion under seal, or should we
 6   draft the motion in a way that doesn't get into the specifics
 7   of the message?
 8          THE COURT:  Yes.  Don't submit the whole thing under
 9   seal.
10          MR. WALTON:  In general?  In general?
11          THE COURT:  Describe it in general purposes.
12   Probably -- I mean, what I would do -- and what I think is
13   normal in those cases is you would submit the document for an
14   in camera review.
15          MR. WALTON:  Yes.  If you ordered that.
16          THE COURT:  I'll do that.
17          MR. WALTON:  If you read the brief --
18          THE COURT:  Yes, I'll read the brief.  If it's not
19   obvious -- I presume if you guys can't work it out, hopefully
20   it won't be obvious.  If it's obvious and you can't work it
21   out, I'll be unhappy.
22          But at that point, then I will -- I'll probably order
23   an in camera submission.  That's what I've done when these have
24   cropped up the couple times that I've had them crop up.
25          MR. WALTON:  So if we have an objection, we will keep
```

1   it general to Your Honor, and then it's up to you to order an

2   in camera review if you want to do that?

3            THE COURT:  Yes, yes.

4            MR. WALTON:  Okay.

5            MR. CARSON:  I have a more important question.

6            Where are we going to get these texts from?

7            THE COURT:  That's on you, Mr. Carson.  So again, you

8   need to figure out -- and you need to go back -- if Cornerstone

9   is going to put their foot down and say that because -- I mean,

10  I'm not appointing them in this case.  Okay?

11           So if Cornerstone is going to come back and they're

12  going to say -- let me put it this way:  I'm not going to

13  appoint Cornerstone in this case unless you all put your heads

14  together and want to stipulate to having Cornerstone appointed

15  as a third-party neutral.  If you want to do that, I guess I'm

16  open to it, because I'm interested in expediency.  Okay?  I

17  have some concerns about doing it just because, you know, I

18  don't love the idea of them being a neutral, and I think I'm

19  putting -- I'm not interested in trying to coordinate with

20  Judge Sanchez and, you know, have the two of us tap dance

21  around each other's orders.  But if Cornerstone thinks they can

22  comply with both sets of orders and you guys want to stipulate

23  to that, then submit me a stipulation and I'll look at it.

24           Otherwise, I think the answer is you're going to have

25  to get a vendor involved who is going to get the files from

1    Concordance -- or from Cornerstone with, you know, the

2    appropriate Concordance load files, get them loaded up and make

3    them available to you.

4           And, you know, it may be that Cornerstone is not

5    comfortable producing them.  But maybe they're comfortable just

6    turning them over to Mr. Walton for him to load into

7    Relativity.  You know, I don't know.  But maybe they don't deem

8    that as production.  I don't see why it's different than

9    producing to a vendor.  They may see it as different as

10   producing it to a vendor, I don't know.  So you guys will have

11   to figure that out, Mr. Carson.  Okay?

12          Mr. Walton?

13          MR. WALTON:  I have a point of confusion.

14          THE COURT:  Yes.

15          MR. WALTON:  Mr. Carson produced 68 text threads to us

16   via his Dropbox.

17          THE COURT:  I thought he said that he had pulled those

18   through -- I don't know what method.  And you'll have to

19   discuss that with him.  But he had pulled those before

20   Cornerstone and whatever that other entity was got involved.

21          MR. WALTON:  Capsicum.

22          THE COURT:  Yes.  And I think so he -- it sounds

23   like -- is that right, Mr. Carson, you had sort of pulled those

24   at the outset?

25          MR. CARSON:  I may have one or two others that like --

1  there was like -- you know, like naked pictures in the threads

2  that I didn't -- or things like that.  And I just wanted to

3  wait for you to rule on the motion for reconsideration before I

4  produced them.

5        THE COURT:  Yep.

6        MR. WALTON:  But I'm still confused, Your Honor, as to

7  where those text messages came from and why that's different

8  from the other 500.  I'm just confused on that point.

9        MR. CARSON:  I can explain that.

10       So they came from Capsicum, and I got them like months

11 and months ago when we did like a test run.  And I think we

12 used five keywords to try to figure out if there was a way --

13 because this is back when there was like 300,000 fields in like

14 an Excel spreadsheet.  And this is what got Judge Sanchez

15 upset.

16       So I just -- I was trying to a way to get you

17 something in connection with the Court's order.

18       MR. WALTON:  Okay.

19       MR. CARSON:  And I found them, and I produced

20 everything that I had.

21       THE COURT:  Maybe that's the simplest way to do this,

22 Mr. Carson.  And I don't know.  I'm going to leave this to you

23 guys to work out.

24       But if Capsicum still has forensic images of the

25 phone, they may be the source to go to quickly to get this done

1  and get them back involved, because they may be able to do

2  that.  If it's just a question of taking an image that they

3  have and loading it back into a database, you may be able to do

4  that in a couple days.  So, you know, consider that as well.

5  Okay?

6        But I'm not going to tell you who exactly is going to

7  make the messages available.  You guys need to do that.

8        MR. CARSON:  Can I redact like the naked pictures and

9  things like that?

10       THE COURT:  Talk to Mr. Walton.  I mean, I'm confident

11  the answer is yes, but talk to Mr. Walton about that.  Okay?

12  The only downside to that, Mr. Carson, is then you've got some

13  time to spend going through it.  Right?  And you've got to

14  balance that.  I want this done, you know, relatively quickly.

15       MR. CARSON:  Yes.  I understand that.

16       THE COURT:  Okay.

17       Mr. Walton, you alluded to this, and I want to get

18  some clarity on it.  You are anticipating summary judgment

19  motions?

20       MR. WALTON:  Yes.  At least partial.

21       MR. CARSON:  I'm going to file one too on the

22  counterclaim.

23       THE COURT:  On the counterclaim, okay.

24       Will yours be partial or fully dispositive in your

25  expectation, Mr. Carson?

1          MR. CARSON:  I've never filed one before, so I don't
2     really know how to answer that.  Mine is going to be just on
3     the counterclaims.
4          THE COURT:  Right.  But to dispose of all the
5     counterclaims in their entirety?
6          MR. CARSON:  Yes, yes.
7          THE COURT:  Okay.  All right.
8          MR. GOLD:  Your Honor?
9          THE COURT:  Yes, Mr. Gold.
10         MR. GOLD:  We're in a little bit of a problem here,
11    because Mr. Carson has failed to comply with the Court's orders
12    with regard to discovery and turning over information.
13         We've been severely impaired in terms of prosecuting
14    our counterclaims, so now I find it suspicious that Mr. Walton
15    would now file a motion for summary judgment, given the fact --
16         THE COURT:  I think you mean Mr. Carson.
17         MR. GOLD:  I mean Mr. Carson now wants to file a
18    motion for summary judgment on the counterclaims when he's
19    withheld crucial evidence that has left us severely prejudiced
20    in terms of information we're seeking with regard to
21    prosecuting the counterclaims against his clients.
22         So I have a problem with that.  And I have the same
23    problem with regard to the employment cases.
24         He seems to be benefitting from the Court's preclusion
25    order that he can't use this information.  On the other hand,

1  we need this information desperately.  The summary judgment

2  deadline is fast approaching, and I just think he's gaining

3  some unfair advantage by having taken this position where he

4  steadfastly violates court orders and deadlines and et cetera.

5  So I --

6        THE COURT:  Mr. Gold, I hear you.  I mean, at bottom,

7  that was the purpose of the hearing today.  It wasn't just a

8  status conference.  It was a sanctions hearing.  I'm looking to

9  alleviate prejudice.  I'm looking to keep the case moving.  I'm

10  looking to resolve some of these issues.

11        MR. CARSON:  Can I respond to what Mr. Gold just said,

12  Your Honor, please?

13        THE COURT:  No.  I understand why you want to,

14  Mr. Carson, but I'm concerned we're just going to get into a

15  back and forth about what did and didn't happen.

16        MR. CARSON:  No.  I just wanted to point out one

17  thing, is that defendants have never served discovery requests

18  to me in connection with their counterclaims, not one.  Not one

19  interrogatory, not one document request, so --

20        THE COURT:  Well, you know --

21        MR. CARSON:  -- I don't know how I could be in

22  violation of not giving information subject to the

23  counterclaims when they're never submitted anything.

24        MR. GOLD:  Your Honor, it's electronic discovery that

25  we need.  That's the discovery.

 1          THE COURT:  I hear you.  I hear you.  I understand the

 2   issue -- the distinction.

 3          I've covered what I think was sort of teed up by the

 4   order to show cause and the various issues.  I need to take a

 5   few minutes to just think about what I want to do about them,

 6   and so we're going to take a recess for -- we'll call it 10

 7   minutes.  So we'll be back at 11:45.

 8          Here's what I'm going to do.  I'm going to leave the

 9   meeting going and turn off my camera and mute myself.  You guys

10   can do the same.

11          Mr. Gold and Mr. Walton, if you have some desire and

12   need to talk to each other now since you're co-defendants, I

13   can set up a breakout room, or you can just step away and call

14   each other.  You tell me.

15          MR. WALTON:  We can step away and call each other.

16          MR. GOLD:  We'll call each other.

17          THE COURT:  Okay.  That's fine.

18          Let's go off the record now, and we'll take a recess.

19   Please be back at 11:45.  Okay?

20          (Recess at 11:38 a.m. until 11:57 a.m.)

21          THE COURT:  I've had a chance to think about this.

22          I think that the record is pretty clear here that the

23   plaintiff and Mr. Carson probably more directly has not

24   complied with my orders on discovery in the case and has also

25   not been diligent in fulfilling obligations for e-discovery in

1  this case in particular, you know, and it's not clear to me

2  that he fully understands that or what the obligations are.

3        So here's what I want to do.  I do think some -- I

4  think sanctions are appropriate.  I think that the record shows

5  that there was at a minimum a reckless disregard if not a

6  willful disregard of my orders.  And so I do think a contempt

7  finding is appropriate well.  But, you know, I want to somewhat

8  mitigate it, and I'm most interested in moving the case forward

9  and getting things done in a way that's both expedient and

10  fair.

11        So Mr. Carson had said he thought he could be done

12  with the production of text messages and audio files in

13  relatively short order.  That's going to be done by December

14  the 8th, which is next Tuesday.  And Mr. Carson, you're going

15  to certify that it's been done on the docket.

16        Plaintiff needs to engage an e-discovery vendor in

17  this case.  It's clear to me that, I mean, Cornerstone is just

18  not able to fulfill that obligation.  Again, if you all want to

19  stipulate and talk to Cornerstone and then stipulate that

20  Cornerstone is going to fulfill that role, I'm willing to have

21  that happen, but there needs to be an e-discovery vendor who is

22  specifically engaged in this case.  And it's plaintiff's

23  obligation to do that because it's her discovery burden.

24        So I want a report by next Tuesday, December the 8th,

25  that plaintiff has engaged an e-discovery vendor.  I want to

1   know who it is.  And want to know the process that's been put

2   in place with that e-discovery vendor to obtain the universe of

3   potentially responsive documents.

4        And so, again, that will come in by way of

5   certification on the record on the 8th.

6        With respect to some of those issues that the

7   e-discovery vendor is going to have to tackle, there's

8   Telegram.  I want -- Mr. Walton, I want you to provide the

9   information about the desktop client to Mr. Carson, preferably

10  today, on how to pull down Telegram.

11       I want -- this may be somewhat new to the vendor,

12  whether it's Capsicum or Cornerstone or someone else, but I

13  want a report by next Friday, the 11th, on what the vendor has

14  determined or what you, Mr. Carson, have determined is

15  accessible from Telegram based on your exploration of that

16  desktop client.  And then I want a production of accessible,

17  responsive Telegram data by December 18th, which is two weeks

18  from today.

19       And for each of those deadlines, I'm going to get the

20  report on the 11th, and then the 18th I want a certification

21  from the plaintiff that responsive accessible Telegram data has

22  been produced.

23       And again, I'm saying responsive, Mr. Carson.  It's

24  not every message that's in Telegram.  But if it's responsive

25  and relevant in this case, I want it produced.

1           With respect to the documents that were redacted, and
2    I gather they were redacted based on whatever confidentiality
3    restrictions Cornerstone's laboring under in the trade secret
4    case, I want that universe of documents, the unredacted
5    versions, to be provided to the new vendor.
6           I want a report that that has happened by next Friday.
7    And I want -- you know, again, that should be certified,
8    that -- by next Friday, the vendor has those materials.
9           And then I want a production made by December the 18th
10   of that material.  I'm not saying there can't be any redactions
11   because I don't know what's in those documents.  But
12   Mr. Carson, if you're going to redact stuff from that
13   production, you either need to confer with Mr. Walton and
14   Mr. Gold about it and talk about things that you referenced,
15   for instance, pictures that may be inappropriate to produce or
16   things like that.  I don't know if any of that is in these
17   Twitter DMs and Instagram DMs and things like that.  If there
18   is and you talk to them and get an agreement, that's fine.  You
19   can redact that.  Otherwise, if you have a basis, a legal basis
20   to redact something, you need to provide them with a log of the
21   redaction that you've made as well.
22          And I want that production done by the December 18th,
23   and I want a certification on the docket.
24          I recognize that this may prompt the defendants to
25   want to reopen some of the depositions that they've taken based

1    on the information that gets produced to them.

2            By December the 23rd, I want the defendants to tell

3    Mr. Carson if there are any depositions that they propose to

4    reopen based on information that has been produced to them.

5            If you guys can reach agreement, then that's fine.  If

6    you can't reach an agreement, then by January the 4th, I want a

7    motion from the defendants laying out their good cause from

8    what has been produced recently to reopen the depositions.  I

9    want you guys to work in good faith on that issue.  And so I'm

10   telling you now that if I get a motion on that issue as to

11   whether or not there's good cause to reopen a deposition,

12   whoever is the prevailing party, the loser is going to pay for

13   that motion.  So hopefully you guys can work it out amongst

14   yourselves.

15           And if a deposition is reopened, if there's good

16   cause, and if you guys can't work it out amongst yourselves,

17   then I'm going to order the plaintiff to pay for that

18   deposition, including the time spent preparing and taking it by

19   the defendants.

20           MR. CARSON:  For what deposition, Your Honor?

21           THE COURT:  Any deposition that is reopened as a

22   result of information that is produced as part of this process,

23   Mr. Carson.  So if there's information that gets produced now

24   that gives the defendants good cause to reopen a deposition,

25   then particularly if it comes to me, then I'm going to order

1   the plaintiff to pay for the defendants' time preparing for and

2   taking that deposition because they're having to do it a second

3   time.

4          And then as I said, I'm finding that contempt is

5   appropriate here.  I think that generally with contempt what

6   courts do is -- or not generally, but often what they do is

7   they impose a monetary penalty that is intended to ensure

8   compliance with their orders.

9          I'm going to do that here, but I'm going to suspend

10  it.

11         So I've put these deadlines in place.  To the extent

12  that these deadlines don't get met, then the contempt sanction

13  is going to drop in.  And it's going to be $50 a day until

14  there's compliance.

15         Mr. Carson, if you run into problems with compliance,

16  this is not a situation where it is better to beg for

17  forgiveness.  This is one where you need to ask for permission.

18  So if there's a problem, you can -- it doesn't have to be a

19  formal motion.  Okay?  Letters are fine on this issue.  But you

20  need to get a letter in advance and tell me what the problem

21  you're encountering is so I know and I can modify the contempt

22  sanction accordingly.  Okay?

23         MR. CARSON:  Yes.

24         THE COURT:  I mean, if you're working in good faith

25  and I see you're running into legitimate obstacles, I'm willing

1  to hear that out.  But if you blow past these deadlines, then

2  I'm not.

3          MR. CARSON:  Okay.

4          THE COURT:  And the last thing, and again, this goes

5  to sort of the contempt and sanctions issue.  Well, I guess I

6  should say we outlined to some extent on the production of text

7  messages, that they will be produced subject to confidentiality

8  provisions.  And I will outline those.  We outlined them on the

9  record.  I'll outline them in a little more detail in my order

10 so that you have them consistent with what we've discussed on

11 the record here.

12          And then the last thing is, Mr. Carson, I'm troubled

13 by what seems to be some lack of facility with some of the core

14 e-discovery concepts that have given rise to where we find

15 ourselves here, and so I'm going to order you to take six hours

16 of CLE on e-discovery -- really e-discovery basics.  Those

17 would be in addition to the CLE hours you need to take to

18 fulfill your Pennsylvania Bar requirements.  I want you to take

19 those 6 hours by March 31st and get me a certification that

20 you've done so.

21          So that's my order.  Or I mean, that's my ruling.

22 I'll reduce it to an order hopefully later today.

23          The last thing then that that leaves is summary

24 judgment.  You know, I think it's in my own interest at this

25 point to push off the summary judgment deadlines a little bit,

1   because the alternative is I'm going to get summary judgment

2   motions and then a bunch of supplements.  And frankly, I'm

3   interested in reducing, not increasing, the amount of paper I

4   get.

5          So what we're going to do given this schedule -- and

6   the other thing, you know all this, there's not going to be a

7   trial date any time soon.  I mean, I don't know when I'm going

8   to get you a trial date in this case, assuming that it gets

9   past summary judgment.

10         MR. CARSON:  Your Honor, will it be 2021 sometime, do

11  you think?

12         THE COURT:  Honestly, Mr. Carson, I don't know.  I

13  mean, some of that is going to depend -- I don't know when I

14  can get you trials, trial dates.  And then once I can, as a

15  practical matter, you're going to be towards the back of the

16  queue.  And so I don't know once I can get people trial dates,

17  maybe they'll start settling.  But if they don't, you know,

18  it's going to take me a while to work through that backlog.

19  And that includes I've got some cases that I picked up both

20  from Delaware and New Jersey that need to be tried in those

21  districts.

22         And so it could be.  It could be 2022.  I'm not saying

23  it will be.  It's certainly not going to be -- there's no way,

24  for your planning purposes, it's going to be in the first half

25  of 2021.  I'd be surprised, very surprised, if it's in the

1    third quarter of 2021.  So you're probably looking at the back

2    half of 2021, the back end of 2021 or 2022 as a practical

3    matter.

4          MR. CARSON:  I'm sorry, Your Honor.  Is the reason why

5    we're in the back of the queue because criminal trials are

6    going to go first?

7          THE COURT:  No.  It's because I'm going to take people

8    up in the order in which they were trial ready in all

9    likelihood.

10          I'm not saying that definitively.  For instance, it's

11    not inconceivable that I'll slot in some cases that are one-

12    and two-day trials ahead of longer ones that might have been

13    waiting longer, but I don't have the sense that this is going

14    to be a case that's a one- or two-day trial if it goes to

15    trial.

16          So, you know, the logistics of slotting in a longer

17    trial are harder.  And even once I start trials, Mr. Carson, I

18    don't know that we're going to be just every judge at the

19    courthouse willy-nilly able to schedule trials and call a jury.

20    Right?  We might be having to share space and things like that.

21          So all of that is going to have an impact.  You know,

22    it's not singling you out.  It's where we are with everybody

23    this day and age, unfortunately.

24          MR. CARSON:  I understand.  Thank you.

25          THE COURT:  So, you know, I don't want to let this

1  slip too far, but there's a fair amount to do.  I don't know

2  how many depositions there are to be reopened.  Hopefully not a

3  lot.  I mean, hopefully a lot of this stuff that will be

4  produced is, you know, part and parcel of what has already been

5  explored at depositions.  And I don't want the defendants

6  gilding the lily here in terms of what needs to reopened.  It

7  has got to be significant that you found something, not just

8  that you found something in order to justify reopening a

9  deposition.

10        So let's have summary judgment be January 29.  Okay?

11  And I'll modify the scheduling order.  That will give you some

12  time to work on the motions based on what you know now.  It

13  will give you some time to get things scheduled to the extent

14  there is stuff that needs to be scheduled.  And it will give

15  you time to, you know, get back transcripts.

16        I don't think these depositions, to the extent they

17  get reopened, are going to be real long, and so I think you can

18  get the deposition transcripts turned around pretty quickly and

19  get them incorporated into whatever you're doing in the way of

20  summary judgment.

21        All right.  I think that covers everything.

22        Mr. Carson, anything else you need to bring up?

23        MR. CARSON:  Yes.  Just I don't think we addressed --

24  at the last hearing you imposed -- you said that I had to pay

25  for the cost of their motion.

1          THE COURT:  Yes.

2          MR. CARSON:  And I think after we look at the record,

3     it's pretty clear that they filed a motion inappropriately.

4          Their motion was based on discovery that both parties

5     got at the exact same time and that at no time did anyone

6     ever -- and I filed a motion for reconsideration on this issue.

7          No one ever contacted me to even tell me -- I found

8     out about the deficiencies in their motion for sanctions.  They

9     didn't --

10         THE COURT:  I think -- Mr. Carson, I think a lot of

11    what was there and the reason I entered the order that I did

12    was because I concluded that you had not been compliant with

13    your discovery obligations.  I think the record today is

14    consistent with that.  So I'm going to deny that aspect of the

15    reconsideration as well.

16         MR. CARSON:  All right.

17         THE COURT:  Okay?

18         MR. CARSON:  When we look at it, there wasn't even

19    enough time between the time that we got the discovery and the

20    time they filed their motion, there wasn't even enough time in

21    hours to even complete the -- the --

22         THE COURT:  But Mr. Carson, again, this is one of

23    those things where you can't beg forgiveness, you've got to ask

24    permission.  And I concluded at the last hearing that you had

25    violated both discovery obligations and my orders.  I think the

1   record still bears that out, so I'm not going to reconsider.

2            MR. CARSON:  Okay.

3            THE COURT:  Okay?

4            Anything else?

5            MR. CARSON:  Oh.

6            THE COURT:  Yes?

7            MR. CARSON:  Your Honor, I did write a couple things

8   down to ask you about.

9            Can you put as part of the order that defendants have

10  to identify -- I don't even know what redactions they're

11  talking about.  Can they identify the documents that they're

12  talking about that they want unredacted?

13           THE COURT:  I think they have, but that's fine.

14  Mr. Walton, tell Mr. Carson --

15           MR. WALTON:  We can do that.

16           THE COURT:  -- what the Bates range is.  Give him the

17  Bates range.  Okay.

18           MR. CARSON:  And then the other thing is, is I think

19  the only outstanding issue after today are the text messages.

20           If I can figure out a way to work with Cornerstone to

21  get those produced, can I attempt that?

22           THE COURT:  I don't think it's the only outstanding

23  issue.

24           Again, as I said, if you all can agree to use

25  Cornerstone for that, that's fine.  There's the pictures -- did

1   I not say -- mention the text messages when I went through

2   this?  The text messages need to be -- I'm sorry.  The images

3   and audio files need to be done by next Tuesday.

4          MR. CARSON:  Right.

5          THE COURT:  The text messages, I need a report from --

6   if you can do it with Cornerstone, great.  I want a report as

7   part of what you're getting me from the vendor, if you get a

8   new vendor involved, by December the 11th.  That should include

9   the report on text messages as well.

10         And then I want the text messages produced by the 18th

11  as well.  And that should get certified.

12         Mr. Carson, if you can work with Cornerstone to

13  obviate the need to get a new vendor in place for any of these

14  issues and you can get the production out -- my ultimate goal

15  is not a full employment act for e-discovery vendors.  It is to

16  get the relevant materials out to the defendants.

17         And so if you can find a way to work with Cornerstone

18  to get that done either by engaging them directly in this case,

19  because that may have some cost savings, or by just persuading

20  them to do it, it's fine.  Okay?  And then that should be part

21  of the certification I get on Tuesday then, on the 8th, because

22  the order is going to require you to certify that you've gotten

23  me a vendor and what the process is to obtain and produce the

24  documents.

25         If the certification is I've spoken with Cornerstone

1  and either engaged them or they've agreed to produce all this

2  stuff, that's fine with me.  Okay?

3           MR. CARSON:  Yes, Your Honor.  Thank you.

4           THE COURT:  Okay.  Mr. Walton, anything else?

5           MR. WALTON:  Yes, Your Honor.  I have to ask this just

6  for the benefit of my client.

7           Are we -- is the Court planning to order our costs and

8  fees for our participation in the events including -- you know,

9  subsequent to your prior order granting the fees including this

10 hearing?

11          THE COURT:  No.

12          MR. WALTON:  Okay.

13          THE COURT:  I'm not.  Okay?  They were different

14 issues.  This was -- as I said, this was -- I mean, obviously

15 we got into a lot of discovery, but it was also motivated by

16 the issue of compliance with the request for daily updates.

17 And I don't think that was quite as much of an issue for your

18 client as it was for me just from sort of a juris prudential,

19 sort of court administration standpoint, so no.

20          MR. WALTON:  Okay.  Thank you, Your Honor.

21          THE COURT:  Yep.

22          Mr. Gold, anything else?

23          MR. GOLD:  No, Your Honor.  Thank you very much.

24 Appreciate it.

25          THE COURT:  Thanks everybody.

1          We're going to stand adjourned, and I'll look for your

2     updates.

3          Thank you.  Have a good weekend.

4          (Proceedings concluded at 12:20 p.m.)

5

6

7

8          I certify that the foregoing is a correct transcript

9     from the record of proceedings in the above-entitled matter.

10

11     *Ann Marie Mitchell*_____

12     Ann Marie Mitchell, CRR, RDR, RMR
       Official Court Reporter

13
       Date:  11th day of December, 2020

14

15

16

17

18

19

20

21

22

23

24

25

**$30,000** [1] - 28:23
**$50** [1] - 76:13
**1** [1] - 6:9
**1,350** [1] - 48:22
**1,500** [1] - 59:3
**10** [2] - 42:1, 71:6
**10,000** [1] - 49:20
**100,000** [1] - 49:2
**10:04** [1] - 3:1
**11:38** [1] - 71:20
**11:45** [2] - 71:7, 71:19
**11:57** [1] - 71:20
**11th** [4] - 73:13, 73:20, 83:8, 85:13
**12** [2] - 49:2, 49:20
**12:20** [1] - 85:4
**13** [3] - 13:3, 49:1, 49:10
**13th** [14] - 4:25, 5:6, 6:1, 6:12, 7:9, 7:10, 13:3, 16:8, 17:9, 17:10, 17:17, 19:10, 25:1, 53:7
**15** [1] - 18:11
**15,000** [1] - 49:20
**17th** [3] - 3:10, 17:9, 17:11
**18th** [7] - 16:14, 60:2, 73:17, 73:20, 74:9, 74:22, 83:10
**2** [1] - 6:9
**2,000** [1] - 59:2
**2020** [1] - 85:13
**2021** [5] - 78:10, 78:25, 79:1, 79:2
**2022** [2] - 78:22, 79:2
**20th** [1] - 3:14
**23rd** [1] - 75:2
**25** [1] - 50:9
**25th** [3] - 8:20, 11:1, 51:24
**26th** [1] - 37:15
**29** [1] - 80:10
**3** [1] - 6:10
**3,000** [2] - 50:15, 50:20
**30-minute** [1] - 50:7
**300,000** [1] - 67:13
**31st** [1] - 77:19
**44** [1] - 53:13
**4th** [1] - 75:6
**500** [2] - 50:5, 67:8
**567** [1] - 27:22
**568** [5] - 28:2, 33:1, 57:2, 57:24, 59:2
**578** [2] - 20:1, 47:25
**6** [1] - 77:19
**68** [4] - 32:21, 32:25, 59:7, 66:15
**70** [2] - 47:11, 47:14
**74** [1] - 6:4
**77** [1] - 3:12
**80** [1] - 4:17
**8th** [4] - 72:14, 72:24, 73:5, 83:21

**95** [1] - 48:20
**a.m** [3] - 3:1, 71:20
**able** [10] - 17:23, 33:6, 33:8, 44:9, 62:1, 63:8, 68:1, 68:3, 72:18, 79:19
**above-entitled** [1] - 85:9
**absolutely** [2] - 7:25, 14:17
**absolve** [2] - 23:22, 31:2
**access** [15] - 23:3, 26:18, 27:16, 31:23, 31:24, 33:25, 40:12, 40:24, 41:18, 43:19, 44:14, 45:13, 48:1, 48:2
**accessed** [1] - 45:11
**accessible** [3] - 73:15, 73:16, 73:21
**accessing** [1] - 27:22
**accordance** [1] - 47:21
**accordingly** [1] - 76:22
**account** [9] - 13:21, 14:1, 28:10, 38:17, 38:24, 39:6, 41:2, 44:7, 45:3
**accounts** [7] - 28:6, 28:7, 28:9, 35:7, 41:11
**accurate** [1] - 42:17
**act** [1] - 83:15
**action** [1] - 29:20
**actively** [1] - 12:25
**actual** [1] - 15:23
**add** [1] - 60:1
**addition** [2] - 60:3, 77:17
**address** [7] - 3:3, 5:6, 5:21, 6:1, 6:7, 12:23
**addressed** [2] - 53:5, 80:23
**addresses** [1] - 5:23
**adjourned** [1] - 85:1
**administration** [1] - 84:19
**advance** [1] - 76:20
**advantage** [1] - 70:3
**AEO** [13] - 59:12, 59:13, 59:16, 59:19, 59:20, 59:21, 59:25, 60:6, 60:7, 60:16, 61:17
**afford** [1] - 21:13
**afterwards** [1] - 37:7
**age** [2] - 12:24, 79:23
**ago** [2] - 47:15, 67:11
**agree** [6] - 28:18, 38:10, 56:7, 62:14, 63:17, 82:24
**agreed** [10] - 18:14, 23:11, 23:12, 23:17, 24:1, 25:18, 25:23, 25:25, 33:21, 84:1
**agreeing** [1] - 54:5
**agreement** [11] - 21:13, 22:1, 25:19, 25:25, 28:16, 55:17, 62:5, 63:20, 74:18, 75:5, 75:6
**agreements** [1] - 23:20
**ahead** [4] - 18:1, 40:25, 45:6, 79:12
**alert** [1] - 14:3

**alleviate** [1] - 70:9
**allow** [4] - 24:10, 29:23, 31:5, 40:13
**allowed** [2] - 34:6, 34:9
**allows** [2] - 33:17, 43:12
**alluded** [1] - 68:17
**alone** [2] - 4:4, 17:15
**alternative** [1] - 78:1
**amount** [5] - 13:24, 49:12, 57:9, 78:3, 80:1
**ample** [1] - 30:23
**Ann** [1] - 85:12
**answer** [5] - 33:4, 43:18, 65:24, 68:11, 69:2
**anticipating** [1] - 68:18
**app** [4] - 26:15, 41:25, 42:1, 51:12
**appoint** [2] - 31:16, 65:13
**appointed** [1] - 65:14
**appointing** [1] - 65:10
**appreciate** [1] - 84:24
**approach** [1] - 63:2
**approaching** [1] - 70:2
**appropriate** [6] - 3:8, 33:16, 66:2, 72:4, 72:7, 76:5
**April** [1] - 45:11
**argue** [1] - 47:22
**argument** [1] - 10:4
**arrangements** [1] - 26:6
**aside** [2] - 12:19, 19:9
**aspect** [1] - 81:14
**assert** [1] - 59:25
**assume** [5] - 21:23, 38:18, 39:24, 41:22, 53:17
**assuming** [1] - 78:8
**attachment** [2] - 51:5, 55:11
**attachments** [7] - 13:8, 13:16, 16:12, 16:13, 19:15, 23:8, 48:3
**attempt** [1] - 82:21
**attention** [3] - 7:7, 9:4, 64:4
**attorney** [1] - 5:4
**attorneys** [1] - 22:23
**attorneys'** [8] - 54:7, 55:1, 61:3, 61:21, 61:23, 62:9, 62:11, 62:14
**audio** [10] - 49:6, 49:23, 50:2, 50:3, 50:21, 51:2, 51:3, 51:14, 72:12, 83:3
**August** [1] - 35:24
**authentication** [3] - 43:8, 43:14, 44:9
**authorization** [2] - 18:18, 45:9
**authorize** [1] - 16:17
**available** [5] - 18:2, 18:6, 39:20, 66:3, 68:7
**average** [1] - 50:9
**award** [1] - 5:4

**background** [1] - 46:16
**backlog** [1] - 78:18
**balance** [2] - 56:12, 68:14
**Bar** [1] - 77:18
**Barbounis** [9] - 27:16, 27:21, 31:15, 37:8, 38:4, 43:5, 50:22, 62:13, 63:7
**Barbounis's** [4] - 28:4, 38:17, 38:23, 58:9
**barking** [1] - 46:15
**based** [12] - 4:6, 25:5, 25:8, 28:7, 38:7, 38:18, 73:15, 74:2, 74:25, 75:4, 80:12, 81:4
**basic** [1] - 15:22
**basics** [1] - 77:16
**basis** [9] - 13:22, 13:25, 45:25, 46:3, 54:7, 55:1, 62:4, 74:19
**Bates** [2] - 82:16, 82:17
**bear** [1] - 46:20
**bears** [1] - 82:1
**befuddled** [1] - 7:16
**beg** [2] - 76:16, 81:23
**behind** [3] - 3:25, 4:12, 11:25
**belong** [1] - 27:20
**belongs** [1] - 28:12
**benefit** [2] - 57:20, 84:6
**benefitting** [1] - 69:24
**best** [1] - 63:5
**better** [1] - 76:16
**between** [3] - 11:24, 22:3, 81:19
**beyond** [1] - 13:2
**big** [2] - 3:6, 53:2
**bigger** [3] - 10:6, 10:7, 11:12
**bills** [1] - 21:12
**binder** [1] - 49:3
**binders** [5] - 49:1, 49:10, 49:17, 49:18, 49:24
**bit** [2] - 69:10, 77:25
**blaming** [1] - 25:19
**blow** [1] - 77:1
**bottom** [1] - 70:6
**bound** [2] - 26:1, 63:20
**Brady** [3] - 37:5, 37:22, 45:18
**brand** [1] - 35:8
**break** [1] - 7:12
**breakout** [1] - 71:13
**brief** [2] - 64:17, 64:18
**briefed** [1] - 36:24
**bring** [4] - 61:18, 61:19, 64:4, 80:22
**broad** [1] - 23:16
**brought** [1] - 22:13
**bubbles** [3] - 34:5, 34:10, 34:11
**bunch** [1] - 78:2
**burden** [5] - 57:23, 59:10,

60:1, 61:20, 72:23
**burdensome** [1] - 53:20
**business** [1] - 44:19
**button** [1] - 51:13
**calendar** [3] - 14:21, 14:22,
15:3
**California** [1] - 56:18
**camera** [4] - 64:14, 64:23,
65:2, 71:9
**cannot** [2] - 10:13, 55:2
**Capsicum** [6] - 27:12, 35:3,
66:21, 67:10, 67:24, 73:12
**capture** [1] - 53:12
**card** [1] - 39:16
**care** [3] - 10:22, 24:12, 25:13
**cares** [1] - 61:4
**Carson** [97] - 3:9, 3:19, 4:10,
5:6, 5:24, 7:8, 8:12, 9:16,
10:4, 12:12, 13:6, 13:21,
19:10, 20:23, 21:18, 22:24,
23:3, 23:7, 23:19, 24:13,
25:23, 26:20, 30:8, 30:12,
31:3, 32:6, 32:14, 32:15,
34:21, 34:24, 35:6, 37:4,
37:6, 37:9, 37:12, 38:25,
41:18, 42:2, 42:7, 43:5, 44:1,
44:15, 45:9, 47:5, 48:9,
48:14, 49:6, 51:22, 51:25,
52:15, 54:20, 55:22, 56:16,
56:22, 57:13, 58:13, 59:1,
59:11, 60:5, 60:24, 61:16,
61:20, 62:2, 62:3, 63:19,
65:7, 66:11, 66:15, 66:23,
67:22, 68:12, 68:25, 69:11,
69:16, 69:17, 70:14, 71:23,
72:11, 72:14, 73:9, 73:14,
73:23, 74:12, 75:3, 75:23,
76:15, 77:12, 78:12, 79:17,
80:22, 81:10, 81:22, 82:14,
83:12
**CARSON** [120] - 3:20, 3:22,
5:20, 6:20, 6:23, 6:25, 7:24,
8:22, 9:18, 11:15, 11:18,
12:15, 14:6, 14:14, 15:8,
15:13, 16:16, 16:20, 16:24,
17:3, 17:16, 18:3, 18:7,
18:11, 18:14, 19:2, 19:5,
19:19, 19:22, 20:1, 20:5,
21:4, 21:8, 21:11, 21:19,
21:25, 22:3, 22:6, 23:11,
23:21, 23:24, 24:15, 24:21,
24:25, 25:18, 26:10, 26:22,
26:25, 27:2, 27:6, 27:11,
27:22, 28:5, 28:11, 28:23,
29:17, 29:22, 30:2, 30:5,
39:1, 39:11, 39:14, 39:18,
40:1, 40:10, 40:16, 40:19,
40:25, 41:3, 42:20, 43:23,
44:3, 45:2, 45:15, 46:19,
47:10, 48:11, 48:17, 48:19,

49:9, 49:18, 49:25, 50:4,
50:8, 50:13, 50:17, 50:25,
51:6, 51:17, 56:23, 56:25,
59:1, 65:5, 66:25, 67:9,
67:19, 68:8, 68:15, 68:21,
69:1, 69:6, 70:11, 70:16,
70:21, 75:20, 76:23, 77:3,
78:10, 79:4, 79:24, 80:23,
81:2, 81:16, 81:18, 82:2,
82:5, 82:7, 82:18, 83:4, 84:3
**Carson's** [1] - 22:17
**case** [115] - 3:5, 3:11, 4:4,
4:8, 10:7, 11:21, 12:3, 12:7,
12:24, 13:21, 15:3, 17:4,
20:23, 21:3, 21:7, 21:10,
21:17, 21:22, 22:7, 22:10,
22:14, 22:16, 22:24, 22:25,
23:2, 23:4, 23:13, 23:16,
23:18, 23:23, 24:2, 24:4,
25:11, 25:16, 25:17, 25:24,
26:1, 26:2, 26:4, 26:5, 27:18,
28:24, 29:6, 29:7, 29:13,
29:15, 29:21, 30:1, 30:13,
30:14, 31:3, 31:5, 31:6, 31:7,
31:8, 31:11, 31:12, 31:13,
31:14, 31:16, 31:25, 32:8,
33:7, 34:3, 35:20, 35:21,
35:25, 36:4, 36:12, 36:15,
36:20, 37:8, 38:16, 42:12,
45:4, 45:10, 47:1, 47:3,
47:13, 48:5, 52:8, 52:20,
52:21, 52:22, 53:16, 53:23,
54:9, 54:10, 54:17, 54:19,
55:24, 57:11, 58:7, 59:23,
61:7, 62:12, 65:10, 65:13,
70:9, 71:24, 72:1, 72:8,
72:17, 72:22, 73:25, 74:4,
78:8, 79:14, 83:18
**cases** [6] - 31:18, 60:14,
64:13, 69:23, 78:19, 79:11
**cell** [2] - 26:22, 26:24
**certainly** [3] - 38:14, 63:10,
78:23
**certification** [7] - 48:24,
73:5, 73:20, 74:23, 77:19,
83:21, 83:25
**certified** [2] - 74:7, 83:11
**certify** [3] - 72:15, 83:22,
85:8
**certifying** [1] - 48:23
**cetera** [1] - 70:4
**chaff** [1] - 62:8
**chain** [1] - 62:15
**challenge** [1] - 10:22
**Chambers** [5] - 6:7, 6:8,
13:11, 13:20, 14:1
**chance** [5] - 9:16, 54:23,
56:17, 56:20, 71:21
**change** [1] - 47:3
**child** [2] - 24:10, 24:18

**chose** [3] - 7:4, 7:6, 7:19
**circuit** [1] - 54:12
**circumstances** [1] - 45:17
**Civil** [1] - 24:9
**claimants** [1] - 59:24
**clarity** [3] - 43:3, 45:2, 68:18
**Clark** [1] - 36:14
**CLE** [2] - 77:16, 77:17
**clear** [9] - 4:6, 4:22, 15:17,
33:12, 35:13, 71:22, 72:1,
72:17, 81:3
**cleared** [1] - 45:24
**clearly** [4] - 59:13, 59:14,
59:21
**client** [20] - 40:20, 41:11,
41:19, 41:20, 41:22, 42:3,
42:9, 44:11, 44:13, 44:17,
60:7, 61:11, 62:1, 62:16,
63:9, 73:9, 73:16, 84:6,
84:18
**clients** [3] - 55:2, 55:4, 69:21
**close** [2] - 30:10, 57:15
**cloud** [2] - 28:7, 40:11
**cloud-based** [1] - 28:7
**co** [1] - 71:12
**co-defendants** [1] - 71:12
**code** [4] - 43:15, 44:6, 44:13
**colleagues** [1] - 17:13
**collect** [1] - 38:22
**collection** [1] - 28:21
**comfortable** [7] - 7:2, 34:2,
34:23, 36:21, 48:23, 66:5
**coming** [7] - 8:16, 13:1, 33:3,
33:5, 33:10, 57:7, 60:2
**communication** [2] - 20:10,
26:14
**communications** [1] - 20:12
**company** [1] - 25:2
**complete** [2] - 34:15, 81:21
**complex** [1] - 31:19
**compliance** [8] - 3:6, 10:12,
10:17, 11:8, 76:8, 76:14,
76:15, 84:16
**compliant** [1] - 81:12
**complicated** [1] - 31:19
**complied** [3] - 5:11, 10:10,
71:24
**comply** [17] - 4:14, 5:17,
6:21, 6:24, 7:4, 7:7, 9:1, 9:8,
9:9, 10:15, 11:13, 15:12,
25:2, 31:3, 65:22, 69:11
**complying** [5] - 5:19, 7:23,
8:8, 8:11, 9:5
**compromise** [2] - 63:10,
63:14
**computer** [3] - 41:21, 56:25
**concepts** [1] - 77:14
**concern** [3] - 10:5, 54:2, 54:5
**concerned** [1] - 70:14

**concerning** [1] - 3:10
**concerns** [2] - 57:13, 65:17
**concluded** [4] - 52:3, 81:12,
81:24, 85:4
**conclusion** [1] - 52:4
**Concordance** [2] - 33:17,
66:1, 66:2
**conduct** [1] - 9:17
**conducted** [1] - 60:25
**confer** [4] - 55:13, 61:16,
62:21, 74:13
**conference** [2] - 17:19, 70:8
**confident** [1] - 68:10
**confidentiality** [8] - 26:1,
33:7, 55:15, 55:16, 58:10,
58:17, 74:2, 77:7
**conflict** [1] - 34:22
**confused** [3] - 49:16, 67:6,
67:8
**confusion** [1] - 66:13
**connection** [2] - 55:8, 67:17,
70:18
**consciously** [2] - 7:19, 8:1
**consider** [2] - 63:9, 68:4
**considering** [2] - 3:11, 3:13
**considers** [1] - 59:12
**consistent** [4] - 9:14, 62:12,
77:10, 81:14
**constitutes** [1] - 38:12
**constructive** [2] - 15:24,
16:2
**consuming** [1] - 28:21
**contacted** [2] - 16:24, 81:7
**contempt** [6] - 72:6, 76:4,
76:5, 76:12, 76:21, 77:5
**context** [1] - 53:24
**continued** [2] - 6:16, 18:12
**contractual** [1] - 22:4
**conversation** [4] - 15:6,
18:8, 18:17, 19:6, 19:9, 39:1,
42:15, 57:7
**conversations** [9] - 18:6,
19:21, 20:9, 20:11, 39:2,
42:5, 47:6, 50:7, 56:3
**coordinate** [1] - 65:19
**copy** [1] - 13:21
**core** [3] - 55:24, 62:11, 77:13
**Cornerstone** [91] - 11:6,
13:6, 16:17, 16:19, 16:22,
17:9, 17:15, 17:18, 17:21,
18:10, 18:17, 19:15, 20:6,
20:7, 20:23, 20:24, 21:2,
21:6, 21:9, 21:12, 21:15,
21:16, 21:24, 22:1, 22:8,
22:11, 22:12, 22:15, 22:16,
22:17, 22:19, 22:21, 22:25,
23:8, 24:1, 24:5, 25:3, 25:5,
25:9, 25:11, 25:12, 25:24,
26:3, 26:4, 26:20, 27:4,
27:18, 28:3, 28:12, 28:15,

28:16, 29:1, 29:12, 30:6, 31:4, 31:22, 31:23, 32:11, 33:5, 33:8, 35:4, 35:9, 35:11, 35:12, 39:2, 40:20, 42:10, 42:16, 46:5, 46:25, 56:15, 57:25, 59:3, 65:8, 65:11, 65:13, 65:14, 65:21, 66:1, 66:4, 66:20, 72:17, 72:19, 72:20, 73:12, 82:20, 82:25, 83:6, 83:12, 83:17, 83:25
**Cornerstone's** [3] - 21:19, 23:9, 74:3
**correct** [3] - 38:20, 45:7, 85:8
**cost** [3] - 26:7, 80:25, 83:19
**costs** [1] - 84:7
**counsel** [3] - 13:21, 55:2, 63:14
**Counsel** [1] - 6:6
**count** [1] - 50:17
**counterclaim** [2] - 68:22, 68:23
**counterclaims** [7] - 69:3, 69:5, 69:14, 69:18, 69:21, 70:18, 70:23
**couple** [7] - 4:21, 36:1, 37:10, 37:13, 64:24, 68:4, 82:7
**course** [1] - 3:4
**court** [6] - 9:6, 11:11, 15:21, 55:9, 70:4, 84:19
**Court** [2] - 3:1, 85:12
**Court's** [3] - 67:17, 69:11, 69:24
**courthouse** [1] - 79:19
**courts** [4] - 4:12, 4:13, 12:23, 76:6
**covered** [1] - 71:3
**covering** [1] - 21:11
**covers** [1] - 80:21
**Cozen** [7] - 17:12, 31:23, 31:24, 35:15, 35:18, 36:14
**create** [1] - 23:20
**created** [1] - 33:1
**credentials** [3] - 40:21, 41:13, 43:16
**criminal** [1] - 79:5
**crop** [1] - 64:24
**cropped** [1] - 64:24
**CRR** [1] - 85:12
**crucial** [1] - 69:19
**cut** [1] - 59:2
**cutoff** [3] - 8:16, 8:21, 13:1
**daily** [15] - 5:7, 6:6, 6:19, 6:23, 7:15, 10:21, 11:3, 11:4, 12:18, 13:9, 13:22, 13:25, 14:9, 14:10, 84:16
**dance** [1] - 65:20
**data** [13] - 20:24, 22:20, 24:7, 26:21, 27:17, 28:3, 28:4,

38:22, 39:3, 40:7, 42:10, 73:17, 73:21
**database** [1] - 68:3
**date** [4] - 6:13, 8:4, 78:7, 78:8
**Date** [1] - 85:13
**dates** [2] - 78:14, 78:16
**Dave** [5] - 18:15, 18:19, 20:10
**days** [7] - 30:20, 31:19, 50:12, 62:10, 68:4
**deadline** [1] - 4:2, 70:2
**deadlines** [9] - 4:13, 4:14, 19:11, 70:4, 73:19, 76:11, 76:12, 77:1, 77:25
**deal** [6] - 30:9, 54:2, 55:10, 56:10, 56:11, 57:19
**dealing** [3] - 30:10, 34:23, 38:2
**deals** [2] - 5:3, 5:4
**dealt** [1] - 37:24
**December** [8] - 72:13, 72:24, 73:17, 74:9, 74:22, 75:2, 83:8, 85:13
**decide** [3] - 15:25, 38:12, 55:20
**decided** [5] - 18:20, 38:4, 43:20, 52:9, 52:24
**decision** [1] - 52:13
**declaration** [1] - 41:4
**deem** [1] - 66:7
**deemed** [1] - 33:5
**default** [1] - 61:23
**defendants** [19] - 4:16, 9:20, 10:6, 18:25, 21:8, 24:7, 26:8, 54:6, 57:3, 70:17, 71:12, 74:24, 75:2, 75:7, 75:19, 75:24, 80:5, 82:9, 83:16
**defendants'** [3] - 16:5, 30:15, 76:1
**defense** [2] - 17:14, 36:15
**deficiencies** [1] - 81:8
**definitively** [1] - 79:10
**Delaney** [2] - 45:10, 45:18
**Delaware** [1] - 78:20
**delay** [1] - 30:16
**delays** [1] - 30:13
**demonstrate** [1] - 8:4
**denied** [1] - 58:18
**deny** [2] - 56:13, 81:14
**denying** [1] - 58:14
**deponents** [1] - 38:1
**depose** [1] - 37:5
**deposition** [11] - 17:11, 18:3, 75:11, 75:15, 75:18, 75:20, 75:21, 75:24, 76:2, 80:9, 80:18
**depositions** [14] - 3:25, 36:8, 36:9, 36:10, 37:8, 37:14, 38:10, 38:13, 74:25, 75:3,

75:8, 80:2, 80:5, 80:16
**deprived** [1] - 11:10
**describe** [2] - 7:20, 64:11
**designated** [1] - 61:3
**designation** [3] - 61:21, 61:24, 62:15
**desire** [1] - 71:11
**desktop** [13] - 41:11, 41:12, 41:19, 41:20, 41:22, 42:9, 44:11, 44:13, 44:17, 45:8, 45:12, 73:9, 73:16
**desperately** [1] - 70:1
**destroyed** [1] - 27:14
**detail** [1] - 77:9
**determined** [3] - 52:15, 73:14
**device** [6] - 40:9, 40:12, 43:7, 43:11, 43:12, 43:17
**devices** [1] - 31:15
**diagram** [1] - 29:8
**dialogue** [1] - 14:4
**dice** [1] - 62:15
**dictates** [1] - 44:16
**dictating** [1] - 51:9
**difference** [1] - 40:19
**different** [9] - 12:1, 26:16, 47:15, 52:23, 56:3, 66:8, 66:9, 67:7, 84:13
**differently** [2] - 26:5, 31:12
**diligent** [1] - 71:25
**diligently** [1] - 8:1
**direct** [3] - 14:4, 20:10, 31:6
**directed** [4] - 4:23, 5:1, 5:2, 5:5
**directly** [2] - 71:23, 83:18
**directs** [1] - 24:4
**disagree** [3] - 30:12, 31:1, 34:20
**disclose** [1] - 22:20
**disclosure** [1] - 59:5
**discoverable** [1] - 22:23
**discovery** [50] - 4:7, 8:16, 8:18, 8:20, 8:24, 13:1, 21:20, 21:21, 22:13, 23:12, 23:23, 25:8, 25:15, 25:16, 30:10, 30:20, 31:3, 31:14, 31:18, 31:21, 32:15, 37:23, 47:3, 52:17, 53:15, 53:22, 57:16, 60:25, 69:12, 70:17, 70:24, 70:25, 71:24, 71:25, 72:16, 72:21, 72:23, 72:25, 73:2, 73:7, 77:14, 77:16, 81:4, 81:13, 81:19, 81:25, 83:15, 84:15
**discuss** [2] - 17:25, 66:19
**discussed** [1] - 77:10
**discussion** [2] - 17:7, 38:17
**discussions** [1] - 17:8
**dislike** [1] - 63:1
**dispose** [1] - 69:4

**dispositive** [1] - 68:24
**dispute** [3] - 61:18, 61:19, 62:23
**disputes** [1] - 63:2
**disqualification** [1] - 36:20
**disregard** [5] - 7:25, 9:14, 10:11, 72:5, 72:6
**disregarded** [2] - 7:21
**disregarding** [1] - 12:8
**distinction** [1] - 71:2
**districts** [1] - 78:21
**divine** [1] - 9:7
**DM** [1] - 46:8
**DMs** [4] - 46:11, 46:13, 74:17
**docket** [7] - 3:12, 4:17, 6:4, 9:14, 55:13, 72:15, 74:23
**document** [5] - 5:8, 64:13, 70:19
**Document** [3] - 3:12, 4:17, 6:4
**documents** [20] - 6:9, 6:10, 6:11, 10:23, 11:5, 16:13, 19:14, 23:8, 23:9, 23:15, 37:7, 45:22, 61:2, 73:3, 74:1, 74:4, 74:11, 82:11, 83:24
**dogs** [3] - 46:15, 46:18, 46:20
**domain** [1] - 62:13
**done** [30] - 9:25, 12:1, 16:14, 26:22, 27:23, 29:14, 38:22, 43:10, 44:9, 44:24, 44:25, 45:9, 45:10, 48:18, 48:19, 52:14, 52:16, 63:11, 63:12, 64:23, 67:25, 68:14, 72:9, 72:11, 72:13, 72:15, 74:22, 77:20, 83:3, 83:18
**down** [14] - 32:9, 39:3, 40:13, 40:15, 40:22, 42:3, 42:8, 42:9, 54:21, 62:25, 63:1, 65:9, 73:10, 82:8
**download** [3] - 40:3, 41:12, 41:23
**downloaded** [2] - 32:23, 41:10
**downside** [1] - 68:12
**DQ** [2] - 36:19, 36:22
**draft** [1] - 64:6
**drop** [1] - 76:13
**Dropbox** [7] - 32:6, 32:13, 32:15, 32:16, 32:17, 32:22, 66:16
**dump** [2] - 26:22, 39:11
**duplicates** [1] - 59:3
**during** [2] - 8:24, 18:24
**dynamic** [1] - 35:22
**e-discovery** [13] - 31:18, 53:15, 71:25, 72:16, 72:21, 72:25, 73:2, 73:7, 77:14, 77:16, 83:15
**e-vendor** [1] - 23:4

**early** [5] - 16:8, 30:19, 30:20, 37:24
**easier** [1] - 35:23
**East** [2] - 11:22, 22:12
**ECF** [4] - 5:15, 12:23, 15:21, 16:1
**educate** [1] - 24:24
**efficiencies** [1] - 23:20
**efficiency** [1] - 28:18
**efficient** [1] - 33:23
**effort** [1] - 8:8
**efforts** [1] - 5:24
**either** [15] - 5:17, 22:16, 24:24, 27:4, 27:15, 35:6, 39:16, 40:24, 41:1, 43:11, 51:4, 56:15, 74:13, 83:18, 84:1
**electronic** [4] - 20:12, 26:14, 26:16, 70:24
**email** [13] - 3:25, 5:15, 6:7, 12:20, 12:23, 13:10, 13:20, 14:6, 17:20, 26:15, 28:6, 53:23
**emails** [8] - 4:1, 4:12, 7:15, 14:1, 17:21, 32:6, 37:10, 51:4
**eminent** [1] - 29:2
**employment** [2] - 69:23, 83:15
**encountered** [1] - 30:14
**encountering** [1] - 76:21
**end** [5] - 7:12, 10:5, 33:17, 51:13, 79:2
**ended** [1] - 8:18
**engage** [6] - 29:23, 42:18, 42:19, 42:20, 42:22, 72:16
**engaged** [6] - 21:16, 24:1, 29:12, 72:22, 72:25, 84:1
**engagement** [4] - 21:23, 22:8, 29:20, 29:25
**engaging** [1] - 83:18
**England** [2] - 59:17, 59:19
**enormously** [1] - 54:22
**ensure** [1] - 76:7
**enter** [1] - 3:16
**entered** [2] - 54:13, 81:11
**entire** [9] - 8:1, 8:5, 20:11, 20:15, 20:16, 45:3, 48:2, 57:4, 57:9
**entirety** [4] - 52:14, 52:23, 57:10, 69:5
**entities** [1] - 23:15
**entitled** [3] - 24:8, 85:9
**entity** [1] - 66:20
**environment** [3] - 32:1, 32:24, 44:19
**envisioning** [1] - 62:18
**Eric** [1] - 36:20
**Erica** [2] - 11:21
**Erica's** [1] - 12:3

**ESI** [1] - 24:11
**essentially** [2] - 42:6, 48:10
**estimate** [2] - 50:4, 50:5
**et** [1] - 70:4
**evaluation** [1] - 53:23
**evening** [1] - 8:20
**event** [1] - 43:16
**events** [1] - 84:8
**evidence** [2] - 8:3, 69:19
**exact** [2] - 28:17, 81:5
**exactly** [4] - 18:23, 35:21, 51:15, 68:6
**example** [9] - 11:7, 34:5, 34:16, 46:8, 51:12, 59:15, 59:17, 61:2, 63:13
**Excel** [2] - 20:16, 67:14
**exchange** [1] - 14:10
**exclude** [1] - 62:14
**exercise** [1] - 28:17
**exist** [5] - 26:2, 27:16, 27:20, 33:7, 41:7
**exists** [1] - 39:7
**expectation** [2] - 62:6, 68:25
**expediency** [3] - 58:5, 60:20, 65:16
**expedient** [1] - 72:9
**expensive** [1] - 28:22
**expert** [2] - 22:17, 22:18
**explain** [5] - 18:23, 53:20, 53:21, 62:4, 67:9
**explained** [1] - 20:19
**explanation** [1] - 4:11
**exploration** [1] - 73:15
**explored** [1] - 80:5
**exploring** [1] - 11:6
**explosive** [1] - 32:25
**export** [1] - 45:8
**express** [1] - 11:3
**expressing** [1] - 24:16
**expressly** [1] - 8:25
**extent** [3] - 13:18, 15:18, 23:1, 29:14, 30:13, 30:15, 34:22, 76:11, 77:6, 80:13, 80:16
**extracted** [1] - 28:4
**eye** [1] - 55:19
**eyes** [10] - 24:14, 24:16, 54:7, 55:1, 61:3, 61:21, 61:23, 62:9, 62:11, 62:14
**face** [2] - 3:16, 43:11
**Facebook** [2] - 40:7, 40:19
**facial** [1] - 58:6
**facially** [1] - 52:11
**facilitate** [1] - 22:13
**facility** [1] - 77:13
**fact** [8] - 4:21, 4:24, 5:6, 6:1, 9:1, 46:25, 47:2, 69:15
**factor** [4] - 43:8, 43:14, 44:8, 45:9

**facts** [1] - 4:7
**failed** [1] - 69:11
**fair** [2] - 72:10, 80:1
**fairly** [1] - 43:16
**faith** [3] - 62:4, 75:9, 76:24
**falling** [1] - 4:11
**familiar** [1] - 40:8
**far** [2] - 57:13, 80:1
**fast** [1] - 70:2
**faster** [1] - 9:25
**fault** [1] - 14:15
**favor** [1] - 34:1
**February** [4] - 26:23, 35:3, 35:5, 39:22
**Federal** [1] - 24:9
**fees** [3] - 5:4, 84:8, 84:9
**fell** [1] - 3:25
**few** [6] - 8:22, 47:18, 56:3, 62:9, 62:10, 71:5
**fields** [1] - 67:13
**figure** [16] - 8:2, 8:6, 15:16, 20:17, 37:11, 42:13, 42:23, 43:2, 45:20, 56:14, 57:23, 63:4, 65:8, 66:11, 67:12, 82:20
**figured** [1] - 59:2
**file** [11] - 3:22, 33:15, 33:16, 33:17, 51:14, 55:7, 60:2, 64:5, 68:21, 69:15, 69:17
**filed** [6] - 4:4, 8:19, 47:21, 51:24, 55:14, 69:1, 81:3, 81:6, 81:20
**files** [16] - 13:9, 13:15, 13:22, 13:24, 49:6, 49:13, 49:21, 49:22, 49:23, 50:2, 50:3, 65:25, 66:2, 72:12, 83:3
**filing** [3] - 4:15, 55:9, 55:18
**filtered** [1] - 33:14
**final** [1] - 56:18
**finally** [1] - 33:25
**fine** [17] - 21:20, 23:22, 25:24, 29:2, 30:22, 36:17, 38:11, 56:6, 59:17, 71:17, 74:18, 75:5, 76:19, 82:13, 82:25, 83:20, 84:2
**finish** [1] - 18:18
**firm** [1] - 36:15
**firms** [1] - 12:1
**first** [15] - 3:22, 9:12, 9:19, 24:22, 26:12, 33:10, 33:22, 53:6, 54:15, 55:13, 60:5, 61:11, 61:22, 78:24, 79:6
**five** [1] - 67:12
**floating** [1] - 36:4
**folder** [1] - 47:19
**folders** [1] - 49:20
**folks** [2] - 32:8, 57:23
**follow** [1] - 17:1
**following** [4] - 6:8, 6:15, 14:7, 32:22

**follows** [1] - 63:4
**foot** [1] - 65:9
**foregoing** [1] - 85:8
**forensic** [4] - 27:9, 28:20, 28:21, 67:24
**forgiveness** [2] - 76:17, 81:23
**forgot** [1] - 15:10
**form** [2] - 23:16, 44:8
**formal** [1] - 76:19
**forth** [4] - 6:8, 33:24, 62:23, 70:15
**Forum** [3] - 11:22, 22:12, 22:15
**forward** [4] - 30:24, 36:2, 53:18, 72:8
**four** [1] - 10:24
**fourth** [1] - 36:11
**frankly** [8] - 4:19, 10:7, 15:18, 21:13, 52:14, 54:10, 60:20, 78:2
**free** [1] - 10:11
**Friday** [6] - 8:5, 14:18, 44:21, 73:13, 74:6, 74:8
**front** [4] - 36:23, 38:11, 52:10, 59:9
**frustration** [1] - 24:17
**fulfill** [6] - 42:13, 52:16, 53:22, 72:18, 72:20, 77:18
**fulfilling** [1] - 71:25
**full** [3] - 34:7, 59:5, 83:15
**fully** [3] - 36:24, 68:24, 72:2
**function** [1] - 60:24
**fundamentally** [1] - 10:8
**FURTHER** [2] - 6:3, 6:5
**gaining** [1] - 70:2
**Gallagher** [1] - 36:23
**gather** [1] - 74:2
**gears** [1] - 20:21
**general** [4] - 64:10, 64:11, 65:1
**generally** [3] - 25:7, 76:5, 76:6
**gilding** [1] - 80:6
**given** [11] - 3:17, 35:24, 41:18, 41:25, 42:2, 54:12, 57:25, 58:7, 69:15, 77:14, 78:5
**goal** [1] - 83:14
**GOLD** [9] - 22:9, 43:24, 45:7, 69:8, 69:10, 69:17, 70:24, 71:16, 84:23
**Gold** [9] - 17:13, 22:7, 45:6, 69:9, 70:6, 70:11, 71:11, 74:14, 84:22
**Gold's** [1] - 32:8
**Google** [1] - 35:7
**granted** [1] - 58:16
**granting** [2] - 58:13, 84:9

**great** [1] - 83:6
**guess** [17] - 3:25, 7:24, 11:23, 21:4, 27:9, 29:24, 33:9, 36:6, 37:21, 38:11, 47:5, 48:13, 51:19, 58:12, 63:23, 65:15, 77:5
**gut** [1] - 45:19
**guys** [20] - 17:18, 38:9, 43:2, 44:21, 45:19, 46:23, 52:9, 56:5, 61:19, 62:5, 64:19, 65:22, 66:10, 67:23, 68:7, 71:9, 75:5, 75:9, 75:13, 75:16

**half** [4] - 30:10, 47:20, 78:24, 79:2
**hand** [2] - 58:20, 69:25
**handed** [1] - 35:4
**handle** [1] - 3:5
**handled** [1] - 54:5
**happy** [1] - 44:2
**harder** [1] - 77:17
**head** [1] - 41:8
**heads** [1] - 65:13
**hear** [17] - 3:19, 3:20, 8:17, 10:4, 36:16, 42:24, 44:2, 46:15, 56:22, 56:23, 57:17, 58:3, 60:12, 70:6, 71:1, 77:1
**heard** [2] - 20:23, 58:23
**hearing** [27] - 3:3, 5:16, 7:10, 7:12, 8:4, 9:13, 10:20, 11:2, 13:4, 14:17, 14:22, 14:24, 15:13, 18:4, 20:22, 24:23, 30:19, 45:22, 46:17, 49:4, 56:16, 70:7, 70:8, 80:24, 81:24, 84:10
**heck** [1] - 14:23
**help** [1] - 42:23
**Hill** [1] - 36:14
**himself** [1] - 45:10
**hire** [1] - 35:9
**hired** [2] - 22:2, 34:21
**hit** [5] - 46:7, 46:10, 48:6, 51:12, 52:6
**hits** [2] - 25:8, 58:1
**hold** [1] - 43:25
**holding** [1] - 28:13
**honestly** [1] - 78:12
**Honor** [46] - 7:5, 7:24, 11:15, 16:21, 20:5, 22:9, 23:11, 23:24, 24:15, 24:21, 25:6, 25:18, 25:22, 26:10, 27:22, 30:6, 34:17, 36:18, 41:24, 42:4, 43:23, 43:24, 45:2, 45:7, 46:5, 46:22, 50:16, 58:21, 59:5, 59:20, 60:4, 60:9, 64:1, 65:1, 67:6, 69:8, 70:12, 70:24, 75:20, 78:10, 79:4, 82:7, 84:3, 84:5, 84:20, 84:23
**Honor's** [2] - 47:21, 47:23

**hopefully** [6] - 13:14, 64:19, 75:13, 77:22, 80:2, 80:3
**hours** [4] - 77:15, 77:17, 77:19, 81:21
**house** [1] - 63:14
**houses** [1] - 63:4
**huge** [1] - 60:1
**hundreds** [1] - 23:15
**hung** [1] - 17:12
**hurt** [1] - 10:14
**husband** [1] - 59:16
**ID** [1] - 43:11
**idea** [3] - 7:16, 44:18, 65:18
**ideal** [1] - 44:23
**identified** [1] - 57:2
**identifies** [1] - 52:11
**identify** [7] - 52:9, 59:12, 60:5, 61:16, 61:25, 82:10, 82:11
**identity** [1] - 39:15
**ignore** [1] - 60:19
**ignored** [1] - 11:10
**image** [1] - 68:2
**imaged** [2] - 39:22, 41:6
**images** [30] - 5:21, 5:24, 8:2, 8:6, 8:9, 9:24, 10:3, 11:6, 28:20, 33:13, 34:25, 35:2, 35:3, 35:4, 48:15, 48:22, 49:1, 49:2, 49:6, 49:11, 49:12, 49:20, 49:21, 49:22, 50:1, 67:24, 83:2
**imagine** [2] - 48:4, 49:14
**imaging** [2] - 27:9, 40:2
**iMessage** [1] - 51:12
**impact** [1] - 79:21
**impaired** [1] - 69:13
**implicate** [1] - 56:4
**implicated** [1] - 55:20
**important** [5] - 14:23, 37:3, 44:3, 61:7, 65:5
**impose** [2] - 4:13, 76:7
**imposed** [4] - 15:10, 15:12, 58:9, 80:24
**in-house** [1] - 63:14
**inappropriate** [1] - 74:15
**inappropriately** [1] - 81:3
**inclination** [1] - 56:10
**include** [1] - 83:8
**includes** [1] - 78:19
**including** [3] - 75:18, 84:8, 84:9
**inconceivable** [1] - 79:11
**incorporated** [1] - 80:19
**increasing** [1] - 78:3
**independent** [1] - 16:19
**indicated** [1] - 57:2
**individual** [1] - 34:13
**information** [36] - 6:9, 11:10, 11:25, 13:19, 13:23, 17:4,

18:15, 22:19, 22:22, 23:1, 23:2, 26:19, 27:25, 38:19, 38:23, 39:9, 39:19, 39:21, 39:23, 42:3, 42:17, 43:6, 45:13, 47:17, 54:15, 69:12, 69:20, 69:25, 70:1, 70:22, 73:9, 75:1, 75:4, 75:22, 75:23
**ing** [1] - 31:16
**initial** [1] - 37:5
**insensitive** [1] - 55:22
**Instagram** [2] - 46:12, 74:17
**instance** [5] - 54:15, 61:11, 61:22, 74:15, 79:10
**instead** [2] - 8:17, 51:18
**instinct** [1] - 45:19
**intended** [1] - 76:7
**interest** [4] - 56:1, 56:4, 59:5, 77:24
**interested** [7] - 10:2, 10:3, 31:16, 65:16, 65:19, 72:8, 78:3
**interests** [4] - 55:20, 55:23, 56:11, 56:12
**intermediate** [1] - 19:11
**interrogatory** [1] - 70:19
**intrusive** [1] - 53:21
**invited** [1] - 17:16
**invoke** [1] - 20:24
**involved** [13] - 8:15, 12:25, 17:8, 27:11, 31:5, 32:8, 36:12, 36:14, 65:25, 66:20, 68:1, 83:8
**involves** [1] - 46:5
**involving** [2] - 38:4, 59:16
**iPhone** [1] - 27:24
**irrelevant** [1] - 56:5
**ISIM** [1] - 39:16
**issue** [36] - 4:12, 4:23, 5:10, 6:16, 9:17, 10:10, 11:12, 11:13, 12:14, 12:17, 12:23, 36:5, 39:7, 45:21, 45:24, 46:5, 47:9, 47:10, 48:13, 49:5, 54:4, 55:25, 56:16, 57:14, 60:11, 63:10, 71:2, 75:9, 75:10, 76:19, 77:5, 81:6, 82:19, 82:23, 84:16, 84:17
**issued** [7] - 3:4, 3:10, 4:25, 6:2, 6:15, 7:17, 25:1
**issues** [16] - 3:3, 16:4, 18:23, 30:17, 30:25, 35:23, 36:4, 37:23, 46:25, 53:1, 53:17, 70:10, 71:4, 73:6, 83:14, 84:14
**itself** [1] - 44:10
**January** [2] - 75:6, 80:10
**Jason** [4] - 11:19, 11:20, 12:2, 15:1
**Jersey** [2] - 56:19, 78:20

**job** [2] - 16:18, 50:12
**judge** [1] - 79:18
**Judge** [16] - 6:8, 21:16, 22:20, 24:1, 24:4, 26:5, 27:8, 31:12, 34:5, 34:9, 34:19, 36:23, 46:6, 54:8, 65:20, 67:14
**judges** [1] - 10:10
**judgment** [13] - 60:2, 60:3, 63:24, 68:18, 69:15, 69:18, 70:1, 77:24, 77:25, 78:1, 78:9, 80:10, 80:20
**July** [2] - 30:18, 33:20
**June** [2] - 30:18, 33:20
**Junto** [6] - 31:24, 32:2, 32:4, 33:2, 33:11
**juris** [1] - 84:18
**jury** [1] - 79:19
**justice** [1] - 10:8
**justify** [2] - 61:20, 80:8
**keep** [6] - 20:22, 55:19, 55:21, 60:6, 64:25, 70:9
**kept** [1] - 22:21
**keywords** [4] - 23:14, 47:18, 48:6, 67:12
**kids** [1] - 46:19
**kind** [11] - 15:22, 22:4, 22:13, 32:18, 34:1, 36:2, 47:8, 48:3, 50:22, 55:12, 57:5
**kinds** [3] - 62:8, 62:12, 63:2
**knowledge** [3] - 15:23, 15:24, 16:2
**known** [3] - 27:25, 37:22, 57:8
**knows** [2] - 33:4, 45:12
**laboring** [3] - 47:1, 47:2, 74:3
**lack** [3] - 3:18, 10:21, 77:13
**laid** [4] - 3:11, 3:13, 3:17, 58:18
**laptop** [1] - 41:12
**last** [13] - 3:4, 10:24, 12:25, 13:5, 38:18, 42:16, 45:21, 57:8, 77:4, 77:12, 77:23, 80:24, 81:24
**latter** [1] - 39:25
**law** [1] - 10:9
**lawyer** [1] - 11:21
**lawyers** [3] - 11:20, 17:12, 17:14
**laying** [1] - 75:7
**leading** [1] - 48:10
**leads** [1] - 13:4
**least** [5] - 16:7, 43:8, 49:14, 58:10, 68:20
**leave** [3] - 43:2, 67:22, 71:8
**leaves** [1] - 77:23
**led** [3] - 4:23, 5:18, 10:19
**left** [5] - 13:7, 13:17, 17:12, 17:14, 69:19

**legal** [1] - 74:19
**legitimate** [1] - 76:25
**letter** [6] - 21:23, 22:8, 29:20, 36:6, 36:7, 76:20
**letters** [1] - 76:19
**letting** [1] - 58:8
**level** [1] - 7:21
**life** [1] - 57:4
**likelihood** [1] - 79:9
**likely** [2] - 53:11
**lily** [1] - 80:6
**limited** [1] - 22:19
**limits** [1] - 62:22
**lines** [1] - 62:21
**link** [1] - 41:25
**Lisa** [1] - 20:8
**Lisa's** [1] - 26:25
**list** [10] - 19:7, 19:20, 19:25, 20:2, 20:15, 26:12, 26:13, 59:1
**litigating** [1] - 11:22
**litigation** [1] - 31:19
**load** [5] - 33:16, 33:17, 66:2, 66:6
**loaded** [1] - 66:2
**loading** [2] - 32:9, 68:3
**locally** [3] - 39:23, 40:9, 40:18
**log** [7] - 43:6, 43:8, 43:12, 43:21, 43:22, 44:11, 74:20
**log-in** [4] - 43:6, 43:12, 43:21, 43:22
**logged** [2] - 40:21, 53:17
**logic** [1] - 44:16
**logistics** [1] - 79:16
**look** [23] - 15:21, 17:13, 28:24, 37:19, 37:20, 37:25, 42:8, 42:21, 44:19, 45:1, 55:19, 56:8, 58:8, 61:11, 61:13, 61:14, 62:3, 63:3, 65:23, 81:2, 81:18, 85:1
**looked** [4] - 14:21, 27:23, 28:1, 57:5
**looking** [9] - 9:14, 12:22, 13:2, 30:21, 53:6, 70:8, 70:9, 70:10, 79:1
**loser** [1] - 75:12
**lost** [1] - 43:16
**loud** [1] - 36:16
**love** [1] - 65:18
**lying** [1] - 50:19
**maintain** [1] - 43:12
**manually** [2] - 46:12, 46:13
**March** [1] - 77:19
**Marie** [1] - 85:12
**Marnie** [3] - 36:10, 36:21, 37:3
**material** [6] - 32:2, 52:20, 53:12, 54:18, 55:5, 74:10

**materials** [6] - 29:1, 29:4, 52:10, 52:11, 74:8, 83:16
**matter** [5] - 15:5, 27:24, 78:15, 79:3, 85:9
**mean** [43] - 4:3, 4:11, 6:25, 7:7, 7:9, 9:19, 10:1, 11:25, 12:10, 12:20, 18:15, 24:3, 26:10, 26:11, 27:23, 27:25, 31:17, 34:11, 39:4, 40:7, 41:16, 41:24, 44:11, 48:5, 48:7, 49:24, 49:25, 50:11, 51:3, 62:24, 64:12, 65:9, 68:10, 69:16, 69:17, 70:6, 72:17, 76:24, 77:21, 78:7, 78:13, 80:3, 84:14
**meaningful** [1] - 11:8
**means** [5] - 24:15, 24:17, 31:9, 39:15, 41:7
**meant** [2] - 7:22, 24:24
**mechanical** [1] - 64:2
**media** [7] - 13:9, 13:15, 26:15, 28:6, 49:6, 49:12, 49:22
**meet** [3] - 55:13, 61:16, 62:21
**meeting** [1] - 71:9
**MEF** [5] - 15:3, 35:14, 35:16, 35:17, 47:18
**MEF's** [1] - 63:14
**memos** [1] - 51:1
**mention** [1] - 83:1
**message** [9] - 5:3, 26:16, 34:4, 34:13, 43:15, 44:12, 46:7, 64:7, 73:24
**messages** [59] - 16:10, 19:1, 19:4, 19:7, 19:17, 20:6, 20:7, 20:20, 25:4, 26:11, 26:12, 26:13, 27:19, 28:2, 32:16, 32:20, 38:3, 40:15, 41:5, 45:4, 45:5, 45:8, 45:11, 45:12, 46:7, 46:9, 47:4, 47:7, 47:14, 49:20, 50:21, 50:23, 51:1, 53:11, 54:13, 54:21, 54:24, 54:25, 55:3, 55:8, 55:18, 56:2, 56:3, 56:14, 58:17, 59:23, 60:19, 62:9, 67:7, 68:7, 72:12, 77:7, 82:19, 83:1, 83:2, 83:5, 83:9, 83:10
**messaging** [3] - 43:7, 44:14, 44:16
**met** [1] - 76:12
**metadata** [6] - 16:13, 16:20, 23:9, 24:10, 48:2, 53:23
**method** [2] - 26:14, 66:18
**Meyer** [3] - 36:10, 36:21, 37:3
**Middle** [2] - 11:22, 22:12
**midnight** [1] - 32:21
**midst** [1] - 3:24

**might** [6] - 11:16, 14:21, 48:21, 50:23, 79:12, 79:20
**mind** [1] - 14:19
**mine** [1] - 69:2
**minimum** [1] - 72:5
**minute** [3] - 16:11, 17:6, 50:6
**minutes** [4] - 17:12, 18:11, 71:5, 71:7
**mirror** [1] - 62:20
**miss** [1] - 5:13
**missed** [1] - 12:20
**Mitchell** [1] - 85:12
**mitigate** [1] - 72:8
**MMS** [1] - 34:13
**modify** [3] - 55:3, 76:21, 80:11
**mom** [1] - 59:16
**Monday** [6] - 6:15, 13:12, 17:24, 18:7, 18:8, 18:9
**monetary** [1] - 76:7
**months** [2] - 67:10, 67:11
**morning** [2] - 3:2, 8:5
**most** [12] - 31:18, 31:19, 33:23, 34:23, 37:3, 43:7, 49:22, 50:8, 59:13, 60:13, 72:8
**motion** [35] - 3:23, 4:4, 4:22, 5:1, 5:2, 5:20, 8:19, 36:19, 36:22, 47:22, 47:23, 47:24, 51:23, 53:3, 55:9, 55:18, 56:7, 56:17, 58:14, 60:2, 64:5, 64:6, 67:3, 69:15, 69:18, 75:7, 75:10, 75:13, 76:19, 80:25, 81:3, 81:4, 81:6, 81:8, 81:20
**motions** [5] - 55:3, 55:5, 68:19, 78:2, 80:12
**motivated** [1] - 84:15
**move** [1] - 19:12
**moving** [2] - 70:9, 72:8
**MR** [182] - 3:20, 3:22, 5:20, 6:20, 6:23, 6:25, 7:24, 8:22, 9:18, 11:15, 11:18, 12:15, 14:6, 14:14, 15:8, 15:13, 16:16, 16:20, 16:24, 17:3, 17:16, 18:3, 18:7, 18:11, 18:14, 19:2, 19:5, 19:19, 19:22, 20:1, 20:5, 21:4, 21:8, 21:11, 21:19, 21:25, 22:3, 22:6, 22:9, 23:5, 23:11, 23:21, 23:24, 24:15, 24:21, 24:25, 25:18, 26:10, 26:22, 26:25, 27:2, 27:6, 27:11, 27:22, 28:5, 28:11, 28:23, 29:17, 29:22, 30:2, 30:5, 31:24, 32:11, 32:13, 33:10, 33:19, 34:14, 34:16, 35:14, 35:17, 35:21, 36:10, 36:14, 36:18, 37:16, 38:3, 38:8, 38:21, 39:1, 39:11, 39:14,

39:18, 40:1, 40:10, 40:16, 40:19, 40:25, 41:3, 41:10, 41:15, 41:20, 41:24, 42:4, 42:15, 42:20, 43:23, 43:24, 44:3, 45:2, 45:7, 45:15, 46:3, 46:19, 47:10, 48:11, 48:17, 48:19, 49:9, 49:18, 49:25, 50:4, 50:8, 50:13, 50:15, 50:17, 50:19, 50:25, 51:6, 51:15, 51:17, 56:23, 56:25, 58:20, 58:23, 59:1, 60:17, 60:21, 61:5, 61:8, 62:17, 63:16, 64:1, 64:10, 64:15, 64:17, 64:25, 65:4, 65:5, 66:13, 66:15, 66:21, 66:25, 67:6, 67:9, 67:18, 67:19, 68:8, 68:15, 68:20, 68:21, 69:1, 69:6, 69:8, 69:10, 69:17, 70:11, 70:16, 70:21, 70:24, 71:15, 71:16, 75:20, 76:23, 77:3, 78:10, 79:4, 79:24, 80:23, 81:2, 81:16, 81:18, 82:2, 82:5, 82:7, 82:15, 82:18, 83:4, 84:3, 84:5, 84:12, 84:20, 84:23
**MRI** [1] - 59:18
**mute** [1] - 71:9
**naked** [2] - 67:1, 68:8
**name** [5] - 11:19, 39:5, 41:15, 42:1, 43:9
**nature** [1] - 29:25
**navigate** [2] - 57:18, 57:22
**necessarily** [2] - 52:4, 53:12
**necessary** [1] - 55:16
**need** [39] - 4:12, 4:13, 11:13, 13:9, 17:25, 26:4, 26:6, 26:7, 31:10, 31:17, 31:18, 34:7, 37:4, 37:11, 45:14, 45:20, 47:8, 54:19, 55:4, 64:4, 65:8, 68:7, 70:1, 70:25, 71:4, 71:12, 74:13, 74:20, 76:17, 76:20, 77:17, 78:20, 80:22, 83:2, 83:3, 83:5, 83:13
**needed** [5] - 5:7, 8:15, 18:5, 26:8, 30:3
**needs** [7] - 42:3, 55:18, 56:1, 72:16, 72:21, 80:6, 80:14
**negligence** [1] - 15:20
**neutral** [6] - 22:12, 22:21, 31:10, 31:16, 65:15, 65:18
**never** [8] - 3:14, 6:19, 22:16, 23:4, 26:9, 69:1, 70:17, 70:23
**New** [2] - 56:19, 78:20
**new** [7] - 28:19, 28:20, 35:8, 73:11, 74:5, 83:8, 83:13
**next** [8] - 29:3, 44:21, 72:14, 72:24, 73:13, 74:6, 74:8, 83:3
**night** [1] - 42:16

**nilly** [1] - 79:19
**nine** [1] - 26:16
**nobody** [2] - 20:7, 25:3
**non** [1] - 60:7
**non-AEO** [1] - 60:7
**noncompliance** [1] - 16:7
**none** [3] - 14:12, 40:17, 41:7
**normal** [1] - 64:13
**nothing** [2] - 22:25, 50:12
**notice** [1] - 5:15
**notices** [2] - 15:21, 16:1
**November** [14] - 3:9, 3:14,
4:25, 5:6, 6:1, 7:9, 7:10,
13:3, 16:7, 16:14, 19:10,
25:1, 53:7
**nowhere** [1] - 7:8
**number** [4] - 39:16, 44:5,
44:12, 59:10

**objection** [2] - 64:3, 64:25
**objections** [2] - 52:15, 53:16
**obligation** [10] - 5:14, 23:10,
42:13, 42:21, 52:17, 55:13,
61:16, 72:18, 72:23
**obligations** [12] - 23:23,
25:15, 25:16, 31:2, 47:3,
52:22, 53:22, 62:21, 71:25,
72:2, 81:13, 81:25
**obstacles** [1] - 76:25
**obtain** [2] - 73:2, 83:23
**obviate** [1] - 83:13
**obvious** [3] - 64:19, 64:20
**obviously** [3] - 37:22, 44:23,
84:14
**October** [3] - 30:17, 37:14,
38:1
**offer** [3] - 42:16, 44:17, 48:3
**officer** [1] - 63:15
**Official** [1] - 85:12
**often** [1] - 76:6
**once** [8] - 13:6, 13:7, 43:10,
43:18, 78:14, 78:16, 79:17
**one** [42] - 4:8, 5:3, 5:4, 5:9,
12:10, 12:13, 21:25, 22:6,
25:2, 26:18, 27:15, 27:16,
32:5, 36:10, 36:25, 37:3,
38:25, 43:25, 46:9, 46:24,
47:10, 49:3, 49:14, 49:21,
54:5, 61:4, 61:11, 63:9,
63:23, 66:25, 68:21, 69:1,
70:16, 70:18, 70:19, 76:17,
79:11, 79:14, 81:7, 81:22
**ones** [4] - 20:24, 59:7, 59:16,
79:12
**open** [6] - 41:1, 47:9, 47:10,
55:2, 56:16, 65:16
**opportunity** [1] - 8:14
**opposed** [2] - 34:12, 34:15
**order** [114] - 3:1, 3:10, 3:15,
3:17, 3:23, 3:24, 4:16, 4:18,
4:23, 4:24, 4:25, 5:3, 5:7,

5:10, 5:11, 5:17, 5:18, 5:19,
6:2, 6:13, 6:15, 6:17, 6:18,
6:21, 6:24, 7:4, 7:9, 7:10,
7:17, 7:21, 7:22, 7:25, 8:8,
8:11, 9:2, 9:7, 9:22, 9:23,
10:19, 11:9, 11:11, 11:13,
12:19, 13:4, 14:2, 15:19,
15:25, 16:3, 16:6, 16:7, 16:8,
16:12, 16:16, 19:10, 19:13,
20:22, 21:17, 22:21, 24:9,
25:1, 25:3, 25:4, 25:6, 30:6,
34:5, 34:19, 37:15, 47:21,
52:2, 52:13, 53:24, 54:3,
54:6, 54:10, 54:12, 54:14,
54:25, 55:1, 57:19, 58:13,
58:15, 58:23, 59:8, 60:14,
61:14, 61:15, 62:19, 62:20,
63:18, 63:20, 64:22, 65:1,
67:17, 69:25, 71:4, 72:13,
75:17, 75:25, 77:9, 77:15,
77:21, 77:22, 79:8, 80:8,
80:11, 81:11, 82:9, 83:22,
84:7, 84:9
**ORDERED** [2] - 6:4, 6:5
**ordered** [13] - 8:25, 9:25,
15:6, 19:4, 19:18, 25:7, 27:9,
30:5, 35:3, 46:6, 52:23, 53:5,
64:15
**ordering** [4] - 31:7, 45:3,
53:4, 60:19
**orders** [26] - 3:4, 3:6, 4:12,
4:13, 9:6, 9:15, 10:10, 12:5,
12:7, 12:10, 12:23, 15:18,
16:8, 24:4, 26:1, 29:10, 33:7,
65:21, 65:22, 69:11, 70:4,
71:24, 72:6, 76:8, 81:25
**originally** [1] - 25:9
**otherwise** [4] - 56:12, 58:18,
65:24, 74:19
**ourselves** [3] - 60:22, 60:23,
77:15
**outcome** [1] - 43:3
**outline** [2] - 77:8, 77:9
**outlined** [2] - 77:6, 77:8
**outset** [1] - 66:24
**outstanding** [3] - 46:2,
82:19, 82:22
**overbroad** [3] - 53:11, 54:1,
58:11
**overdesignate** [1] - 60:15
**overlap** [2] - 29:7, 52:21
**overlapped** [2] - 29:8, 29:9
**overlapping** [1] - 29:14
**own** [4] - 32:1, 34:24, 35:9,
77:24
**p.m** [1] - 85:4
**page** [2] - 53:8, 53:13
**pandemic** [1] - 30:20
**Pansy** [1] - 54:14
**paper** [1] - 78:3

**paralegal** [4] - 11:18, 14:3,
14:12, 14:13
**paralegal's** [1] - 12:16
**parallel** [2] - 21:21, 23:1
**parcel** [1] - 80:4
**parent** [2] - 24:10, 24:18
**parent-child** [2] - 24:10,
24:18
**parlay** [1] - 23:17
**part** [17] - 10:20, 12:2, 18:22,
21:12, 24:19, 39:21, 49:10,
53:2, 56:8, 58:14, 58:16,
75:22, 80:4, 82:9, 83:7,
83:20
**partial** [2] - 68:20, 68:24
**participation** [1] - 84:8
**particular** [3] - 9:16, 12:24,
72:1
**particularly** [2] - 44:18,
75:25
**parties** [13] - 10:11, 14:6,
21:1, 23:11, 23:14, 23:17,
25:18, 25:19, 25:20, 36:8,
37:18, 37:20, 81:4
**party** [11] - 16:19, 16:20,
22:12, 22:22, 26:18, 27:8,
31:10, 31:16, 37:2, 65:15,
75:12
**passcodes** [1] - 39:5
**password** [2] - 41:15, 43:9
**past** [3] - 57:15, 77:1, 78:9
**pay** [5] - 7:7, 75:12, 75:17,
76:1, 80:24
**paying** [7] - 9:3, 21:8, 22:15,
25:13, 35:12, 35:15, 35:16
**penalty** [1] - 76:7
**pending** [1] - 36:19
**Pennsylvania** [1] - 77:18
**people** [11] - 16:21, 17:21,
20:5, 20:6, 30:21, 44:17,
51:18, 59:17, 60:14, 78:16,
79:7
**per** [1] - 34:5
**percent** [1] - 48:20
**period** [2] - 8:24, 21:11
**permission** [2] - 76:17,
81:24
**person** [2] - 12:4, 57:8
**perspective** [1] - 15:20
**persuading** [1] - 83:19
**ph** [1] - 59:18
**phone** [22] - 11:5, 18:10,
20:14, 20:17, 27:23, 27:24,
28:1, 28:4, 39:24, 40:2,
40:20, 40:24, 41:1, 41:7,
43:19, 44:5, 44:10, 44:12,
57:5, 57:6, 67:25
**phones** [16] - 26:22, 26:24,
27:1, 27:9, 27:13, 27:14,
27:16, 27:20, 28:5, 28:8,

28:10, 35:4, 35:6, 39:21,
41:6
**picked** [1] - 78:19
**picture** [1] - 3:6
**pictures** [4] - 67:1, 68:8,
74:15, 82:25
**piece** [1] - 35:9
**place** [9] - 52:18, 52:19,
53:6, 53:16, 60:14, 63:22,
73:2, 76:11, 83:13
**plaintiff** [10] - 21:13, 25:6,
25:7, 36:11, 71:23, 72:16,
72:25, 73:21, 75:17, 76:1
**Plaintiff's** [1] - 6:6
**plaintiff's** [1] - 72:22
**plaintiffs** [2] - 37:5, 59:23
**planet** [1] - 25:2
**planned** [1] - 20:22
**planning** [2] - 78:24, 84:7
**plant** [1] - 26:18
**platform** [6] - 22:23, 31:23,
31:25, 33:3, 33:11
**platforms** [1] - 26:17
**playing** [1] - 62:19
**plenty** [1] - 20:9
**plus** [1] - 48:2
**point** [11] - 12:21, 15:10,
25:20, 27:8, 31:1, 52:12,
64:22, 66:13, 67:8, 70:16,
77:25
**popped** [1] - 5:14
**portion** [2] - 5:2, 55:8
**portions** [3] - 5:3, 55:3,
62:16
**position** [2] - 21:19, 70:3
**positioned** [1] - 31:12
**possible** [2] - 10:1, 17:22
**potential** [1] - 37:25
**potentially** [2] - 52:12, 73:3
**pox** [1] - 63:3
**practical** [3] - 60:12, 78:15,
79:2
**practice** [3] - 8:5, 12:22,
50:22
**preclusion** [1] - 69:24
**preferably** [1] - 73:9
**prejudice** [5] - 9:20, 10:4,
10:6, 11:11, 70:9
**prejudiced** [1] - 69:19
**preparing** [2] - 75:18, 76:1
**present** [1] - 8:5
**preserve** [2] - 54:14, 58:9
**preserved** [1] - 56:1
**pressed** [1] - 30:18
**presume** [3] - 4:15, 39:15,
64:19
**pretty** [7] - 4:6, 15:6, 15:7,
32:25, 71:22, 80:18, 81:3
**prevailing** [1] - 75:12

**previously** [2] - 16:13, 38:5
**privacy** [10] - 53:1, 54:5, 54:15, 55:20, 55:23, 55:25, 56:4, 56:11, 56:12, 58:4
**private** [2] - 53:3, 54:18
**privilege** [1] - 53:17
**problem** [12] - 10:12, 14:25, 24:6, 24:7, 24:19, 27:15, 29:16, 69:10, 69:22, 69:23, 76:18, 76:20
**problematic** [1] - 25:15
**problems** [8] - 23:7, 30:14, 31:21, 34:4, 34:17, 35:11, 76:15
**Procedure** [1] - 24:10
**Proceedings** [1] - 85:4
**proceedings** [1] - 85:9
**process** [11] - 28:22, 30:20, 43:4, 44:25, 52:7, 53:14, 53:15, 62:18, 73:1, 75:22, 83:23
**produce** [29] - 5:24, 16:12, 16:24, 17:3, 17:4, 20:4, 20:25, 22:20, 23:8, 23:9, 25:6, 25:8, 29:4, 33:8, 39:3, 46:6, 46:10, 47:11, 47:17, 52:22, 53:10, 53:24, 56:13, 57:7, 57:9, 62:7, 74:15, 83:23, 84:1
**produced** [48] - 6:10, 13:8, 13:9, 13:16, 16:13, 17:1, 19:24, 23:2, 24:11, 25:4, 25:5, 25:9, 31:7, 32:16, 34:3, 37:12, 41:5, 45:3, 45:5, 45:23, 45:25, 46:1, 47:13, 47:20, 47:24, 48:21, 48:22, 48:25, 49:15, 54:9, 54:17, 54:20, 54:24, 54:25, 66:15, 67:4, 67:19, 73:22, 73:25, 75:1, 75:4, 75:8, 75:22, 75:23, 77:7, 80:4, 82:21, 83:10
**produces** [2] - 32:15, 32:17
**producing** [9] - 6:11, 19:1, 19:17, 21:20, 36:21, 48:24, 66:5, 66:9, 66:10
**production** [31] - 5:4, 16:19, 16:23, 19:4, 19:14, 23:16, 25:8, 29:5, 29:6, 29:13, 33:22, 38:19, 41:6, 47:23, 52:2, 52:13, 52:18, 52:23, 53:4, 53:5, 58:16, 60:19, 61:2, 66:8, 72:12, 73:16, 74:9, 74:13, 74:22, 77:6, 83:14
**productions** [5] - 27:17, 31:6, 32:6, 38:7, 60:15
**progress** [5] - 5:8, 8:14, 13:10, 13:23, 30:24
**prompt** [1] - 74:24

**proportional** [1] - 57:10
**proportionality** [4] - 57:12, 57:17, 57:18, 58:4
**propose** [2] - 18:25, 75:3
**proposed** [2] - 19:3, 58:23
**prosecuting** [2] - 69:13, 69:21
**prosecution** [1] - 10:7
**protective** [10] - 29:10, 54:2, 54:6, 54:10, 54:14, 57:19, 60:14, 61:15, 62:20, 63:20
**provide** [9] - 7:14, 19:6, 19:7, 19:16, 19:23, 29:13, 33:6, 73:8, 74:20
**provided** [4] - 11:1, 18:14, 41:17, 74:5
**providing** [1] - 5:7
**provision** [1] - 54:7
**provisions** [4] - 58:17, 61:13, 62:19, 77:8
**prudential** [1] - 84:18
**public** [2] - 55:12, 62:13
**pull** [8] - 19:13, 24:3, 39:3, 40:13, 40:21, 42:3, 42:9, 73:10
**pulled** [4] - 20:15, 66:17, 66:19, 66:23
**pulling** [3] - 32:9, 40:14, 42:8
**punch** [1] - 44:13
**purpose** [3] - 11:3, 16:1, 70:7
**purposes** [2] - 64:11, 78:24
**pursuant** [4] - 19:17, 21:16, 52:19, 54:25
**push** [3] - 30:24, 60:14, 77:25
**put** [16] - 11:23, 14:14, 38:11, 43:15, 54:7, 54:10, 55:25, 56:7, 62:13, 62:19, 65:9, 65:12, 65:13, 73:1, 76:11, 82:9
**putting** [5] - 8:8, 15:2, 59:10, 63:22, 65:19
**quarter** [1] - 79:1
**questions** [4] - 18:19, 18:20, 37:13, 55:5
**queue** [2] - 78:16, 79:5
**quick** [1] - 64:1
**quickly** [3] - 67:25, 68:14, 80:18
**quite** [2] - 27:20, 84:17
**raise** [2] - 26:8, 58:20
**raised** [6] - 7:9, 16:5, 24:22, 30:17, 37:25, 57:14
**raising** [1] - 30:16
**ran** [2] - 35:11, 59:3
**range** [2] - 82:16, 82:17
**rather** [1] - 45:18
**raw** [1] - 34:25
**RDR** [1] - 85:12

**reach** [4] - 52:4, 62:5, 75:5, 75:6
**reactions** [1] - 12:11
**read** [10] - 4:13, 7:4, 7:6, 7:13, 14:10, 15:25, 47:20, 51:23, 64:17, 64:18
**ready** [1] - 79:8
**real** [2] - 14:24, 80:17
**reality** [1] - 60:12
**realize** [1] - 12:6
**realized** [1] - 30:23
**really** [13] - 7:22, 9:3, 10:15, 17:25, 53:19, 58:2, 63:1, 63:6, 63:7, 63:8, 69:2, 77:16
**reason** [12] - 8:13, 9:9, 9:13, 14:15, 23:12, 46:21, 52:7, 52:24, 53:20, 58:6, 79:4, 81:11
**reasons** [1] - 12:10
**recent** [2] - 38:7, 43:12
**recently** [1] - 75:8
**recess** [3] - 71:6, 71:18, 71:20
**reckless** [1] - 72:5
**recognize** [4] - 53:1, 54:15, 54:17, 74:24
**recognized** [1] - 53:10
**recollection** [1] - 22:9
**reconfirm** [1] - 43:15
**reconsider** [1] - 82:1
**reconsideration** [15] - 3:23, 4:5, 4:22, 5:21, 6:18, 8:19, 47:22, 48:9, 51:21, 51:23, 56:13, 58:14, 67:3, 81:6, 81:15
**record** [17] - 5:16, 6:3, 7:13, 13:5, 15:17, 51:13, 58:18, 71:18, 71:22, 72:4, 73:5, 77:9, 77:11, 81:2, 81:13, 82:1, 85:9
**recording** [1] - 51:12
**recordings** [2] - 49:7, 51:4
**redact** [5] - 56:6, 68:8, 74:12, 74:19, 74:20
**redacted** [4] - 46:12, 46:13, 74:1, 74:2
**redaction** [1] - 74:21
**redactions** [8] - 45:23, 45:25, 46:3, 46:4, 46:22, 74:10, 82:10
**reduce** [1] - 77:22
**reducing** [1] - 78:3
**reference** [1] - 32:5
**referenced** [1] - 74:14
**refuse** [4] - 20:25, 29:17, 29:19, 29:22
**refused** [3] - 17:3, 19:15, 23:8
**regard** [4] - 19:17, 69:12, 69:20, 69:23

**regardless** [2] - 11:11, 15:10
**regular** [1] - 30:9
**related** [3] - 22:10, 59:14, 59:22
**relationship** [2] - 24:18, 35:19
**relationships** [1] - 24:11
**relatively** [2] - 68:14, 72:13
**Relativity** [5] - 32:1, 32:3, 32:23, 33:11, 33:18, 66:7
**relevance** [3] - 48:4, 52:3, 52:5
**relevant** [15] - 11:16, 31:7, 45:4, 45:5, 48:5, 48:23, 52:4, 52:12, 52:25, 53:12, 57:22, 58:6, 62:16, 73:25, 83:16
**relied** [1] - 12:4
**relying** [1] - 25:11
**remedies** [1] - 3:8
**remedy** [1] - 15:16
**remember** [2] - 14:24, 45:15
**remote** [1] - 44:18
**reopen** [5] - 74:25, 75:4, 75:8, 75:11, 75:24
**reopened** [5] - 75:15, 75:21, 80:2, 80:6, 80:17
**reopening** [1] - 80:8
**report** [18] - 6:6, 6:12, 6:14, 13:6, 13:12, 17:7, 19:16, 21:15, 44:23, 59:4, 72:24, 73:13, 73:20, 74:6, 83:5, 83:6, 83:9
**reported** [1] - 10:25
**Reporter** [1] - 85:12
**reports** [4] - 6:16, 6:19, 6:23, 12:18
**represented** [3] - 6:25, 36:11, 37:6
**representing** [1] - 36:22
**represents** [1] - 37:9
**request** [5] - 58:24, 59:11, 60:4, 70:19, 84:16
**requests** [1] - 70:17
**require** [2] - 56:13, 83:22
**required** [2] - 3:14, 60:5
**requirement** [6] - 9:2, 14:9, 15:9, 15:11, 15:24, 53:10
**requirements** [2] - 19:18, 77:18
**requiring** [3] - 7:17, 11:3, 15:19
**resolution** [1] - 47:8
**resolve** [1] - 70:10
**resolved** [3] - 36:22, 36:24, 46:4
**respect** [3] - 37:22, 73:6, 74:1
**respectfully** [2] - 59:20, 60:4
**respects** [1] - 57:20
**respond** [9] - 9:2, 16:2,

18:24, 20:17, 44:1, 52:1, 54:23, 56:17, 70:11
**responded** [2] - 3:15, 20:12
**response** [6] - 3:18, 4:16, 15:19, 16:5, 37:10, 44:3
**responses** [1] - 3:14
**responsibility** [1] - 24:20
**responsive** [5] - 73:3, 73:17, 73:21, 73:23, 73:24
**restrictions** [4] - 26:2, 52:19, 58:8, 74:3
**result** [1] - 75:22
**retain** [1] - 21:6
**retained** [4] - 21:2, 22:16, 22:17, 23:4
**review** [8] - 5:8, 11:6, 13:7, 13:17, 48:14, 53:14, 64:14, 65:2
**reviewed** [4] - 6:9, 11:5, 13:22, 13:24
**reviewing** [4] - 6:11, 10:23, 13:25, 52:17
**rise** [1] - 77:14
**risk** [1] - 43:21
**RMR** [1] - 85:12
**road** [1] - 62:25
**Rob** [1] - 42:15
**role** [1] - 72:20
**rolling** [2] - 24:14, 24:16
**Roman** [1] - 59:6
**room** [1] - 71:13
**rule** [1] - 67:3
**Rules** [1] - 24:9
**ruling** [5] - 47:23, 56:18, 56:19, 56:20, 77:21
**run** [4] - 34:17, 47:16, 67:11, 76:15
**rung** [1] - 57:13
**running** [1] - 76:25
**Sanchez** [6] - 27:8, 31:13, 34:9, 46:6, 65:20, 67:14
**Sanchez's** [8] - 21:17, 22:21, 24:1, 24:4, 26:5, 34:5, 34:19, 54:8
**sanction** [3] - 52:14, 76:12, 76:22
**sanctionable** [1] - 9:17
**sanctions** [9] - 3:3, 3:10, 3:11, 3:13, 3:17, 70:8, 72:4, 77:5, 81:8
**sat** [2] - 20:14, 20:16
**savings** [1] - 83:19
**saw** [3] - 4:15, 15:7, 27:8
**schedule** [7] - 19:1, 19:3, 19:17, 19:24, 20:3, 78:5, 79:19
**scheduled** [3] - 37:14, 80:13, 80:14
**scheduling** [3] - 36:8, 38:10, 80:11

**school** [1] - 46:19
**scope** [1] - 54:16
**seal** [7] - 55:19, 55:21, 56:8, 64:5, 64:9
**search** [2] - 52:6
**searched** [1] - 33:13
**second** [2] - 12:19, 76:2
**secondly** [1] - 12:17
**seconds** [1] - 50:9
**secret** [25] - 21:10, 21:17, 22:7, 22:10, 22:14, 23:2, 23:13, 25:16, 26:2, 29:6, 29:15, 29:25, 31:11, 31:25, 32:8, 33:7, 33:22, 34:3, 35:19, 47:1, 47:2, 52:8, 52:20, 52:22, 74:3
**security** [1] - 43:17
**see** [23] - 4:1, 9:14, 12:10, 13:9, 14:3, 14:22, 17:1, 17:13, 24:13, 31:11, 31:12, 33:22, 37:20, 42:9, 42:11, 47:16, 48:12, 62:20, 66:8, 66:9, 76:25
**seeing** [2] - 12:21, 63:19
**seeking** [1] - 69:20
**seem** [4] - 16:6, 29:16, 53:14, 53:15
**send** [6] - 6:23, 8:24, 9:20, 14:1, 44:6, 51:18
**sending** [2] - 32:11, 33:15
**sends** [2] - 51:2, 51:10
**sense** [6] - 4:20, 28:19, 29:2, 60:9, 60:10, 79:13
**sensitive** [2] - 54:18, 63:7
**sent** [8] - 8:18, 8:22, 8:23, 26:16, 36:6, 37:10, 49:19, 57:4
**separate** [3] - 14:9, 57:24, 60:6
**September** [1] - 35:24
**series** [1] - 3:4
**serve** [1] - 37:1
**served** [1] - 70:17
**server** [4] - 39:24, 40:3, 40:4, 40:6
**servers** [1] - 40:18
**services** [4] - 43:7, 44:14, 44:16, 51:8
**set** [4] - 12:19, 17:18, 19:9, 71:13
**Seth** [2] - 32:13
**sets** [2] - 6:8, 65:22
**settings** [1] - 40:12
**settling** [1] - 78:17
**seven** [2] - 3:5, 12:25
**several** [3] - 20:11, 39:2, 53:3
**severely** [2] - 69:13, 69:19
**shaking** [1] - 41:8
**shall** [1] - 6:6

**share** [1] - 79:20
**sharing** [2] - 11:25, 26:7
**shift** [2] - 20:21, 57:22
**Shikunov** [4] - 11:21, 36:11, 36:20
**shock** [1] - 43:13
**short** [2] - 54:12, 72:13
**short-circuit** [1] - 54:12
**shorter** [1] - 50:10
**show** [23] - 3:10, 3:17, 4:16, 4:18, 4:23, 4:24, 5:10, 5:18, 6:15, 7:22, 9:3, 10:19, 12:19, 15:19, 16:3, 16:6, 25:25, 59:8, 60:7, 62:1, 62:16, 63:8, 71:4
**showing** [1] - 63:13
**shown** [3] - 55:2, 55:4, 59:6
**shows** [2] - 51:13, 72:4
**Signal** [1] - 39:7
**significant** [1] - 80:7
**SIM** [1] - 39:16
**simple** [1] - 10:21
**simplest** [1] - 67:21
**single** [5] - 5:9, 34:13, 43:8, 57:7, 57:8
**single-factor** [1] - 43:8
**singling** [1] - 79:22
**Siri** [2] - 51:9, 51:10
**sit** [1] - 42:24
**situation** [2] - 60:18, 76:16
**six** [3] - 3:5, 12:25, 77:15
**slice** [1] - 62:15
**slip** [1] - 80:1
**slot** [1] - 79:11
**slotting** [1] - 79:16
**slow** [1] - 54:21
**small** [1] - 10:20
**smirking** [2] - 24:13, 24:15
**SMS** [1] - 34:13
**SMSs** [1] - 51:3
**snippet** [1] - 26:14
**snippets** [1] - 25:5
**social** [3] - 26:15, 28:6, 35:7
**solely** [1] - 60:24
**solution** [1] - 63:4
**someone** [5] - 27:13, 31:8, 51:4, 51:5, 73:12
**sometime** [1] - 78:10
**sometimes** [1] - 56:2
**somewhat** [2] - 72:7, 73:11
**somewhere** [6] - 21:24, 39:24, 40:3, 41:5, 41:23, 43:22
**soon** [2] - 17:22, 78:7
**sorry** [8] - 32:14, 36:18, 41:10, 46:15, 58:20, 79:4, 83:2
**sort** [19] - 3:7, 12:4, 12:7, 33:15, 33:16, 35:24, 36:1,

43:6, 43:13, 43:20, 44:17, 57:16, 58:4, 61:1, 66:23, 71:3, 77:5, 84:18, 84:19
**sorting** [1] - 57:21
**sound** [1] - 53:15
**sounds** [2] - 48:15, 66:22
**source** [1] - 67:25
**space** [1] - 79:20
**specifically** [1] - 72:22
**specifics** [1] - 64:6
**speed** [1] - 11:6
**spend** [2] - 57:21, 68:13
**spent** [3] - 6:11, 13:25, 75:18
**spirit** [2] - 9:5, 9:7
**spoken** [1] - 83:25
**spreadsheet** [3] - 20:16, 33:1, 67:14
**stake** [1] - 53:2
**stand** [5] - 3:7, 36:5, 49:8, 54:4, 85:1
**standpoint** [4] - 28:18, 57:17, 64:2, 84:19
**stands** [1] - 47:5
**start** [12] - 3:9, 5:7, 28:19, 28:25, 35:8, 38:25, 43:1, 52:12, 52:21, 54:20, 78:17, 79:17
**starting** [2] - 6:5, 29:4
**status** [16] - 6:6, 6:12, 6:13, 6:14, 6:16, 6:19, 6:23, 11:1, 14:6, 14:8, 19:16, 21:1, 21:4, 36:3, 37:19, 70:8
**stay** [3] - 18:12, 18:16, 18:20
**stayed** [1] - 18:20
**steadfastly** [1] - 70:4
**step** [5] - 29:3, 36:1, 60:5, 71:13, 71:15
**steps** [1] - 44:25
**still** [20] - 5:11, 13:9, 18:5, 27:1, 34:4, 36:5, 36:8, 36:9, 37:9, 37:18, 38:1, 44:13, 46:2, 47:9, 56:11, 57:16, 62:3, 67:6, 67:24, 82:1
**stipulate** [5] - 63:18, 65:14, 65:22, 72:19
**stipulation** [1] - 65:23
**storage** [1] - 28:7
**store** [2] - 41:25, 42:1
**stored** [6] - 39:23, 39:24, 40:8, 40:11, 40:18
**storing** [2] - 43:21, 51:3
**stream** [1] - 12:20
**strictly** [1] - 22:10
**strikes** [1] - 10:8
**string** [2] - 46:9, 59:12
**strings** [2] - 52:5, 59:12
**studied** [1] - 24:3
**stuff** [17] - 15:16, 32:9, 32:25, 33:3, 38:5, 53:24, 54:1, 54:16, 54:20, 56:1,

56:4, 58:10, 61:25, 74:12,
80:3, 80:14, 84:2
**subject** [11] - 29:10, 33:6,
47:23, 58:8, 58:17, 61:23,
63:17, 63:18, 63:19, 70:22,
77:7
**submission** [3] - 16:5, 55:12,
64:23
**submit** [12] - 6:6, 6:12, 6:13,
6:14, 6:19, 55:7, 55:9, 55:11,
56:6, 64:8, 64:13, 65:23
**submitted** [1] - 70:23
**submitting** [1] - 55:18
**subpoena** [2] - 37:11, 37:24
**subpoenas** [1] - 37:2
**subsequent** [1] - 84:9
**subsequently** [1] - 10:20
**substance** [1] - 38:15
**substantial** [2] - 30:16, 49:12
**substantially** [1] - 29:9
**successful** [1] - 37:2
**suggest** [3] - 9:18, 16:6,
47:11
**suggested** [1] - 47:6
**suggesting** [1] - 14:15
**suggestion** [1] - 57:1
**summary** [13] - 60:1, 60:3,
63:24, 68:18, 69:15, 69:18,
70:1, 77:23, 77:25, 78:1,
78:9, 80:10, 80:20
**super** [1] - 23:16
**supplements** [1] - 78:2
**supposed** [2] - 19:23, 46:10
**surprise** [1] - 44:15
**surprised** [4] - 43:5, 43:18,
78:25
**suspend** [1] - 76:9
**suspicious** [1] - 69:14
**system** [4] - 10:8, 10:9,
10:16

**tackle** [2] - 55:4, 73:7
**tap** [1] - 65:20
**team** [1] - 61:12
**tee** [1] - 62:23
**teed** [1] - 71:3
**Telegram** [26] - 38:17, 38:19,
38:23, 39:4, 39:5, 39:6,
39:19, 39:23, 40:22, 41:2,
41:5, 41:11, 42:5, 42:10,
43:1, 43:20, 45:3, 45:8,
45:11, 73:8, 73:10, 73:15,
73:17, 73:21, 73:24
**telephone** [4] - 20:11, 39:6,
39:13, 39:19
**temporal** [1] - 62:22
**ten** [2] - 17:12, 47:12
**tentative** [2] - 56:19, 56:20
**term** [1] - 52:6
**terms** [11] - 22:5, 22:19,
28:15, 31:20, 33:6, 52:5,

52:6, 62:21, 69:13, 69:20,
80:6
**terribly** [1] - 17:8
**test** [2] - 47:16, 67:11
**text** [71] - 5:3, 16:10, 19:1,
19:4, 19:7, 19:17, 19:20,
20:6, 20:7, 20:20, 25:4, 25:6,
25:8, 26:11, 26:12, 26:13,
27:19, 32:16, 32:20, 34:4,
34:8, 38:3, 41:10, 43:14,
44:12, 47:4, 47:7, 47:11,
47:12, 47:14, 47:19, 48:1,
48:2, 48:4, 50:23, 51:10,
51:13, 52:5, 52:17, 53:10,
53:24, 54:13, 54:21, 54:24,
54:25, 55:3, 55:8, 55:18,
56:2, 56:13, 57:2, 57:3, 57:6,
57:7, 58:6, 58:16, 59:23,
60:19, 62:7, 62:15, 66:15,
67:7, 72:12, 77:6, 82:19,
83:1, 83:2, 83:5, 83:9, 83:10
**texting** [2] - 51:18, 59:17
**texts** [4] - 51:2, 51:4, 59:18,
65:6
**Thanksgiving** [2] - 32:21,
36:7
**The court** [176] - 3:2, 3:21,
4:9, 5:23, 6:6, 6:21, 6:24,
7:6, 8:10, 8:23, 10:2, 11:17,
12:11, 12:16, 14:8, 15:5,
15:9, 15:14, 16:18, 16:22,
17:1, 17:6, 17:20, 18:4, 18:9,
18:12, 18:25, 19:3, 19:9,
19:20, 19:23, 20:3, 20:21,
21:6, 21:10, 21:15, 21:23,
22:1, 22:4, 22:7, 23:6, 23:19,
23:22, 23:25, 24:19, 24:22,
25:10, 25:23, 26:20, 26:24,
27:1, 27:4, 27:7, 27:13, 28:3,
28:9, 28:12, 28:24, 29:19,
29:24, 30:3, 30:8, 32:4,
32:12, 33:2, 33:15, 34:12,
34:15, 35:13, 35:15, 35:18,
35:22, 36:13, 36:17, 37:13,
37:17, 38:7, 38:9, 38:22,
39:10, 39:12, 39:15, 39:23,
40:5, 40:11, 40:17, 40:23,
41:1, 41:8, 41:13, 41:17,
41:22, 41:25, 42:7, 42:19,
42:21, 43:25, 44:8, 45:5,
45:14, 45:16, 46:17, 46:23,
48:8, 48:12, 48:18, 49:5,
49:16, 49:23, 50:3, 50:6,
50:11, 50:14, 50:24, 51:2,
51:11, 51:16, 51:21, 56:24,
57:12, 58:22, 58:25, 60:10,
60:18, 60:22, 61:6, 61:9,
62:18, 63:15, 63:17, 64:8,
64:11, 64:16, 64:18, 65:3,
65:7, 66:14, 66:17, 66:22,

67:5, 67:21, 68:10, 68:16,
68:23, 69:4, 69:7, 69:9,
69:16, 70:6, 70:13, 70:20,
71:1, 71:17, 71:21, 75:21,
76:24, 77:4, 78:12, 79:7,
79:25, 81:1, 81:10, 81:17,
81:22, 82:3, 82:6, 82:13,
82:16, 82:22, 83:5, 84:4,
84:7, 84:11, 84:13, 84:21,
84:25
**theories** [1] - 63:24
**thereafter** [1] - 6:5
**they've** [3] - 33:13, 74:25,
84:1
**thinking** [1] - 51:25
**thinks** [1] - 65:21
**third** [8] - 27:7, 31:10, 31:16,
37:2, 37:17, 37:20, 65:15,
79:1
**third-party** [3] - 31:16, 37:2,
65:15
**thousands** [1] - 23:15
**thread** [8] - 34:15, 48:2, 57:4,
57:9, 58:1, 62:7
**threading** [2] - 53:23, 53:24
**threads** [27] - 20:1, 25:7,
25:8, 27:22, 28:2, 32:21,
32:25, 34:8, 47:12, 47:19,
48:1, 48:4, 48:5, 52:17, 57:2,
57:6, 57:25, 58:6, 59:2, 59:6,
60:5, 60:7, 61:23, 62:7,
66:15, 67:1
**three** [2] - 10:24, 46:19
**throughout** [3] - 20:23,
25:11, 38:16
**throws** [1] - 32:17
**thumbprint** [1] - 43:11
**time-consuming** [1] - 28:21
**timing** [1] - 38:14
**today** [21] - 6:5, 7:1, 9:22,
11:5, 11:18, 15:16, 16:9,
17:25, 24:25, 42:17, 48:21,
48:22, 49:4, 50:13, 58:15,
70:7, 73:10, 73:18, 77:22,
81:13, 82:19
**together** [2] - 20:15, 65:14
**took** [3] - 7:12, 32:21, 52:18
**total** [1] - 50:5
**totally** [1] - 18:18
**touched** [1] - 48:13
**towards** [2] - 55:20, 78:15
**trade** [25] - 21:10, 21:17,
22:7, 22:10, 22:13, 23:2,
23:13, 25:16, 26:2, 29:5,
29:14, 29:25, 31:11, 31:25,
32:8, 33:7, 33:21, 34:3,
35:19, 47:1, 47:2, 52:8,
52:19, 52:22, 74:3
**traded** [1] - 20:12
**transcribed** [1] - 49:24

**transcript** [6] - 13:3, 15:7,
15:8, 53:7, 53:13, 85:8
**transcripts** [2] - 80:15, 80:18
**tread** [1] - 54:8
**treat** [5] - 54:6, 56:21, 59:16,
60:6, 62:9
**treated** [3] - 55:1, 59:19,
59:20
**trial** [9] - 55:10, 78:7, 78:8,
78:14, 78:16, 79:8, 79:14,
79:15, 79:17
**trials** [5] - 78:14, 79:5, 79:12,
79:17, 79:19
**tried** [6] - 11:23, 20:14,
20:16, 47:16, 47:17, 78:20
**triggered** [1] - 4:24
**troubled** [2] - 4:10, 77:12
**true** [2] - 27:15, 57:13
**try** [8] - 3:7, 9:8, 23:17,
38:22, 38:23, 55:14, 63:4,
67:12
**trying** [10] - 8:2, 8:6, 9:6,
37:1, 37:11, 47:15, 57:16,
57:21, 65:19, 67:16
**Tuesday** [6] - 32:22, 32:23,
72:14, 72:24, 83:3, 83:21
**turn** [2] - 51:21, 71:9
**turned** [1] - 80:18
**turning** [2] - 66:6, 69:12
**Twitter** [4] - 46:8, 46:9,
46:11, 74:17
**two** [19] - 5:3, 11:20, 12:1,
12:11, 17:21, 27:15, 43:14,
44:8, 45:9, 46:19, 50:6, 59:6,
59:7, 59:10, 65:20, 66:25,
73:17, 79:12, 79:14
**two-day** [2] - 79:12, 79:14
**two-factor** [3] - 43:14, 44:8,
45:9
**two-minute** [1] - 50:6
**type** [3] - 34:17, 44:6, 54:14
**typical** [4] - 43:16, 61:1,
61:2, 61:15
**typically** [3] - 43:7, 50:6,
62:20
**UK** [1] - 51:18
**ultimate** [1] - 83:14
**ultimately** [6] - 4:4, 12:14,
16:18, 19:25, 24:6, 61:18
**uncomfortable** [1] - 34:8
**uncommonly** [1] - 63:3
**under** [7] - 54:14, 55:19,
55:21, 64:4, 64:5, 64:8, 74:3
**understood** [4] - 44:4, 51:16,
54:1
**unfair** [1] - 70:3
**unfortunately** [1] - 79:23
**unhappy** [1] - 64:21
**universe** [8] - 29:1, 29:4,
29:5, 52:9, 52:11, 52:20,

73:2, 74:4
**unless** [2] - 25:25, 65:13
**unnoticed** [1] - 4:19
**unredacted** [3] - 46:1, 74:4, 82:12
**up** [27] - 5:14, 8:16, 11:6, 11:23, 13:1, 17:1, 17:12, 17:18, 19:13, 20:15, 32:9, 45:24, 51:13, 53:3, 59:9, 60:2, 62:23, 63:4, 64:24, 65:1, 66:2, 71:3, 71:13, 78:19, 79:8, 80:22
**update** [14] - 8:18, 11:1, 11:4, 11:7, 14:6, 14:8, 21:1, 21:4, 27:24, 36:3, 36:7, 37:19, 44:20, 44:21
**updates** [19] - 5:8, 5:9, 5:12, 7:15, 8:22, 8:23, 8:24, 9:21, 10:21, 11:3, 13:10, 14:9, 14:11, 27:25, 30:9, 48:14, 84:16, 85:2
**uploaded** [2] - 22:23, 32:2
**upset** [1] - 67:15
**useful** [1] - 11:8
**user** [3] - 39:5, 41:15, 43:9
**various** [1] - 71:4
**vendor** [33] - 22:11, 23:4, 25:13, 25:14, 27:18, 28:16, 28:19, 28:20, 30:3, 31:18, 31:19, 34:24, 34:25, 35:8, 35:10, 42:22, 56:15, 65:25, 66:9, 66:10, 72:16, 72:21, 72:25, 73:2, 73:7, 73:11, 73:13, 74:5, 74:8, 83:7, 83:8, 83:13, 83:23
**vendors** [1] - 83:15
**Venn** [1] - 29:8
**versions** [1] - 74:5
**via** [4] - 6:7, 32:6, 32:16, 66:16
**violated** [1] - 81:25
**violates** [1] - 70:4
**violation** [2] - 34:18, 70:22
**violations** [1] - 4:7
**virtual** [1] - 46:17
**virtue** [1] - 22:20
**voice** [4] - 50:22, 50:25, 51:1, 51:12
**voicemails** [2] - 51:1, 51:18
**wade** [1] - 45:14
**wait** [1] - 67:3
**waiting** [1] - 79:13
**waive** [1] - 34:22
**waived** [3] - 52:16, 53:16, 55:15
**wall** [2] - 11:23, 12:6
**WALTER** [1] - 35:17
**WALTON** [52] - 23:5, 31:24, 32:11, 32:13, 33:10, 33:19, 34:14, 34:16, 35:14, 35:21,

36:10, 36:14, 36:18, 37:16, 38:3, 38:8, 38:21, 41:10, 41:15, 41:20, 41:24, 42:4, 42:15, 46:3, 50:15, 50:19, 51:15, 58:20, 58:23, 60:17, 60:21, 61:5, 61:8, 62:17, 63:16, 64:1, 64:10, 64:15, 64:17, 64:25, 65:4, 66:13, 66:15, 66:21, 67:6, 67:18, 68:20, 71:15, 82:15, 84:5, 84:12, 84:20
**Walton** [31] - 17:20, 17:25, 20:10, 31:23, 33:3, 36:6, 37:21, 41:8, 42:8, 45:22, 46:18, 47:6, 50:14, 57:23, 58:19, 60:13, 61:25, 62:4, 63:12, 63:25, 66:6, 66:12, 68:10, 68:11, 68:17, 69:14, 71:11, 73:8, 74:13, 82:14, 84:4
**wants** [3] - 59:15, 60:6, 69:17
**ways** [1] - 11:6
**Wednesday** [1] - 32:20
**week** [3] - 14:7, 30:10, 57:15
**week-and-a-half** [1] - 30:10
**weekend** [2] - 6:14, 85:3
**weekly** [1] - 36:7
**weeks** [4] - 3:5, 10:25, 13:1, 73:17
**weigh** [1] - 56:20
**weighing** [1] - 58:4
**welcome** [1] - 42:11
**WhatsApp** [2] - 40:15, 51:7
**wheat** [1] - 62:10
**whole** [4] - 18:3, 46:9, 62:8, 64:8
**Wickr** [1] - 39:8
**wildly** [1] - 60:15
**willful** [1] - 72:6
**willing** [2] - 72:20, 76:25
**willy** [1] - 79:19
**willy-nilly** [1] - 79:19
**Windows** [1] - 42:1
**withheld** [1] - 69:19
**witnesses** [1] - 37:2
**Wolson** [1] - 6:8
**workaround** [1] - 48:15
**works** [1] - 11:20
**world** [2] - 20:6, 20:8
**write** [1] - 82:7
**wrote** [1] - 17:23
**year** [1] - 47:15
**years** [1] - 57:9
**yesterday** [1] - 14:20
**Yonchek** [5] - 37:5, 37:22, 37:24, 45:10, 45:18
**yourself** [3] - 18:6, 24:24, 42:22
**yourselves** [2] - 75:14, 75:16

**Zoom** [1] - 46:19