```
 1      IN THE UNITED STATES DISTRICT FOR THE EASTERN
                   DISTRICT OF PENNSYLVANIA
 2


 3


 4


 5   LISA BARBOUNIS,
                                  )
 6                    Plaintiff   ) 2:19-cv-05030-JDW
                                  )
 7                 vs.            )
                                  )
 8   MEF, et al,                  )
                                  )
 9                    Defendant   )


10


11                               --oOo--


12


13   DEPONENT:        LISA BARBOUNIS

14   TAKEN BY:        Defendant

15   DATE/TIME:       Tuesday, February 9, 2021

16
     PLACE:           Zoom Videoconference
17
     REPORTER:        Joyce A. Wise, RMR
18                    Notary Public

19


20   APPEARANCES:

21   DEREK SMITH LAW GROUP, PLLC
     BY: Seth D. Carson, Esquire
22   1835 Market Street
     Suite 2950
23   Philadelphia, PA 19103
     215.391.4790
24   seth@DerekSmithLaw.com
```

```
 1   Counsel for Plaintiff

 2

 3

     COZEN O'CONNOR
 4   BY: Jonathan R. Cavalier, Esquire
     One Liberty Place, 1650
 5   Market Street, Suite 2800
     Philadelphia, PA 19103
 6   215.665.2776
     jcavalier@cozen.com
 7
     Counsel for Defendant
 8

 9

10   SIDNEY L. GOLD & ASSOCIATES, PC
     BY: Sidney L. Gold, Esquire
11   Eleven Penn Center
     Suite 515
12   1835 Market Street
     Philadelphia, PA 19103
13   215.569.1999
     sgold@discrimlaw.net
14
     Counsel for Defendant
15
     ALSO PRESENT:
16     Matthew Mainen

17     Mark Fink, Esquire
         Middle Eastern Forum In-house Counsel
18

19     Daniel Pipes

20     Greg Roman

21     William Rieser

22     Leigh Ann Benson

23     Jason Brockman

24     Paul D'Ambra, Video Specialist
```

INDEX TO DEPONENT

EXAMINATION                                    PAGE

By Mr. Cavalier ......................5


                                        INDEX OF

EXHIBITS

DEPOSITION                              PAGE
        (Exhibits retained by counsel)
A: Text message chain ...............182

B: Photo ...........................184

C: House Resume Bank ...............247

D: Text message chain ..............271

E: What's App messages .............311

G: Screen Shot .....................361

Deposition of Lisa Barbounis                                    Lisa Barbounis v. Middle Eastern Forum, et. al.

Page 4

1   THE VIDEOGRAPHER:  We are now on.
2   the record.
3   Today's date is February 9, 2021,
4   and the time is 10:13 a.m. Eastern.
5   This is the recorded video
6   deposition of Lisa Barbounis in the
7   matter of Lisa Barbounis versus MEF, et
8   al, in the United States District Court
9   of the Eastern District of Pennsylvania,
10  Civil Action Number 2:19-CV-05030-JDW.
11  My name is Paul D'Ambria from
12  Everest Court Reporting.  I'm the video
13  specialist.
14  The court reporter today is Joyce
15  Wise, also with Everest Court Reporting.
16  All counsel appearing today will
17  be noted on the stenographic record.
18  Will the court reporter please
19  swear in the witness?
20  LISA REYNOLDS BARBOUNIS,
21  called upon by Defendant to give testimony, being
22  duly sworn or affirmed by me, testified as
23  follows:
24              *    *    *    *    *

Page 5

1   MR. CAVALIER:  Seth, are you ready
2   to go?
3   MR. CARSON:  Yes.
4   EXAMINATION
5   BY MR. CAVALIER:
6   Q.   Good morning, Ms. Barbounis.
7   It's good to see you again.
8   A.   Hello.
9   Q.   As you recall, my name is John
10  Caviler.  I'm a lawyer with Cozen O'Connor and I
11  represent the Middle East Forum and Greg Roman.
12  We're here today to re-open your
13  deposition.  It seems every time you and I sit
14  down to talk, there's some big political news
15  going on.
16  The last as I seem to recall, it
17  was the election.  Today it's impeachment.
18  It's been, I guess, what, three
19  months or so since your last deposition?
20  It was on November 4th.  And I
21  know that you've given other testimony in this
22  case.
23  But just for the sake of the
24  record, I'll run you through some of the same

Page 6

1   instructions that we talked about last time
2   before we start.
3   You remember last time I told you
4   that if you need to take a break at any point in
5   time today, you should feel absolutely free to do
6   so.
7   The only thing I would ask is if
8   there is a question pending, that we complete the
9   answer to that question before we break.
10  I will tell you today that I am
11  somewhat under the weather myself, so I'm going
12  to need to ask you for the same courtesy.
13  I can tell you that I'm certainly
14  going to need to take my own share of breaks
15  today.
16  So I will -- I'll try to keep them
17  as short, but hopefully, you know, I would ask
18  you for the same consideration in terms of when
19  and how we need to break.
20  So as I said before, your first
21  deposition in this case was November 4th.
22  Do you recall that deposition?
23  A.   Yes.
24  Q.   Did you -- have you read your

Page 7

1   deposition transcript?
2   A.   No.
3   Q.   Any particular reason why not?
4   A.   I mean, I know what happened, so
5   there's no reason to.
6   Plus, I don't want to re-live
7   that.
8   Q.   Okay.  So, again, like we talked
9   about last time, let's try not to talk over each
10  other today since we're on video as opposed to
11  sitting down at a conference table.
12  The court reporter's life is hard
13  enough trying to do this when we're all in the
14  same room, it's doubly hard over Zoom.
15  So for her sake, and for all of
16  our sanities, I'll do my very best not to cut you
17  off or interrupt your answers.
18  And I'd ask you to try to wait for
19  me to state my question before you begin your
20  answer, just so there's a clear record.
21  You're represented today by Mr.
22  Carson again.
23  Is that correct?
24  A.   Yes.

Page 8

Q. Okay. Did you prepare at all for today?

A. No.

Q. Did you speak to Mr. Carson at any point in the last several days about your deposition?

A. Not about my deposition, except for what time it was and a Zoom and to make sure that I was on time.

But I talk to him all the time.

Q. Okay. So did you review any documents for today?

A. No.

Q. Did you review any of your prior testimony -- well, let me back up and ask you about your prior testimony.

So we've established that you were deposed by me on November 4th in this matter.

It's my understanding you've also given testimony in what I will refer to as the trade secrets action, which I'm about to define.

We talked a little bit about this last time.

Do you know what I'm referring to

Page 9

if I refer to the trade secrets action?

A. Yes. One of the many frivolous lawsuits that have been filed against me.

Q. Okay. So we'll talk about that in a second.

But that's the case before Judge Sanchez in which the Middle East Forum has brought claims against you alleging that you misappropriated trade secrets and the like.

Correct?

A. That they did bring that case against me? That's correct.

Q. Okay. And so when we refer to the trade secrets action, we're all in agreement that we're referring to that particular action before Judge Sanchez.

A. Yes, we're all on the same page.

Q. Okay. My understanding is you gave testimony in that case, is that correct?

A. I believe so.

They're all blurring together now, but, yes, I believe so.

Q. Okay. Other than the deposition that we did together on November 4th and the

Page 10

testimony that you gave in that case, have you given any other sworn testimony with respect to the Middle East Forum in any way?

A. Yes, I have.

Q. Can you tell me about that?

A. What would you like to know about it?

Q. When did it occur?

A. Oh, I do know when it occurred, the day after the attack on my work -- attack on the Capitol.

Q. Okay. And was that a deposition?

A. I believe so, yes.

Q. Okay. Do you remember who took your deposition on that day?

A. A woman.

Q. Was that Molly DiBianca?

A. Yes, that's her name.

Q. Have you reviewed that transcript since you gave that deposition?

A. No, I have not. It's been pretty hectic since the attack on the Capitol.

Q. Okay. Okay. So, again, just going back to the instructions, you're

Page 11

represented here today by Seth Carson.

As you'll remember from the last time and from your various experience giving testimony and doing these depositions, there'll be some objections today.

To the extent Mr. Carson has an objection, we'll both try to allow him to verbalize the objection for the record.

But as always, unless he instructs you not to answer, you're still expected to answer the question, subject to his objection.

Is that fair?

A. Yes.

Q. Okay. Any particular reason why you're unable to tell me the truth today?

A. No, I can always tell the truth and I always do.

Q. Any medication that would prevent you from telling the truth or affect your recollection?

A. No, sir.

Q. Okay. So since we touched on it earlier, let me ask you a little bit about this trade secrets action.

Page 12

You said it was a frivolous case?

A.    Correct.

Q.    What do you mean by that?

A.    It's a case that was brought only in retaliation against me for filing this claim against Greg Roman.

But it would have never happened if they didn't do that.  And a lot of what is accused of me in there is not only fabricated, but twisted into something nefarious.

Q.    And you're aware, correct, that as part of the hearing in that case -- let's strike that.

You gave testimony in the hearing before Judge Sanchez where he considered the Middle East Forum's motion for a preliminary injunction, correct?

A.    Correct.

Q.    And are you aware that he issued an opinion after that hearing making certain rulings in that case?

A.    I heard about it, but I haven't read it.

Q.    Okay.  So I want to ask you some

Page 13

questions about that opinion and to see if it affects your view that the case that the Middle East Forum filed was frivolous.

But before I do that, you mentioned that it was brought only -- and I don't want to put words in your mouth, Seth will correct me, you said earlier that it was brought only because of your action against the Forum?

A.    Correct.

Q.    So just to clarify that, it's your belief -- I'll ask the question.

Is part of your retaliation claim in this case the fact that the Forum filed that lawsuit against you?

MR. CARSON:  Objection.

THE DEPONENT:  I don't understand the question.  Say that again?

MR. CARSON:  Can you guys here me?

THE DEPONENT:  Yeah, we can hear you, Seth.

MR. CARSON:  I'm going to object, because it calls for a legal conclusion.  The civil action complaint speaks for itself.  So does the second charge of

Page 14

discrimination that was filed.

BY MR. CAVALIER:

Q.    Are you familiar with the complaint that you filed in this case?

A.    I'm familiar with them, yes.

Q.    Have you read it?

A.    Which one?

Q.    The latest amended complaint that you filed.

A.    Yeah -- I discussed them with Seth on the phone and then I signed them.

Q.    Okay.  Have you read it though?

MR. CARSON:  Asked and answered.

THE DEPONENT:  I don't know. Maybe.  There's so many papers.  I am honestly so busy.

You have no idea how busy I am --

BY MR. CAVALIER:

Q.    I didn't get the last part of your answer.  I'm sorry.

A.    I have so many -- there's so many things, like I have no idea what I read, what I didn't.  There's claims coming in that I, you know -- there's all kinds of stuff happening in.

Page 15

And like I said, I have two little kids and an exhausting job.  And I don't have time to, you know, go over -- go over everything with a fine toothed comb, so...

Q.    Okay.  So you talked about the complaint with Seth, but you don't know if you read it?

A.    I might have.  I might not.  I don't remember honestly.

Q.    Okay.  Do you know whether part of your claim for retaliations against the Middle East Forum is derived from the fact that they filed that trade secrets action against you?

MR. CARSON:  Objection.  Calls for a legal conclusion.  The complaint, the charge of discrimination speak for themselves.

She can answer to the extent she understands the questions, understands the law.

THE DEPONENT:  I don't know about the law.  But I know that they are ongoing harassing me.

I mean, we have a private

Deposition of Lisa Barbounis                                    Lisa Barbounis v. Middle Eastern Forum, et. al.

Page 16

1  detective following me around from the
2  Middle East Forum that has identified
3  themself as such to multiple people that
4  I know.
5       So they are continuing to harass
6  me over and over and over again.
7  BY MR. CAVALIER:
8       Q.   Well, let's talk about that then
9  for a second.
10      You said that you have a private
11 detective following you around, but talking to
12 other people about you?
13      A.   Correct.
14      Q.   Let me break that down.
15      How is there a private detective
16 following you around?  What do you mean by that?
17      MR. CARSON:  Object to form.  How
18 is a private detective following you
19 around, you can answer if you understand
20 the question.
21      THE DEPONENT:  So people that,
22 like, I don't -- that I hardly interact
23 with at all -- you know, you guys have
24 asked me in deposition about other people

Page 17

1  and, you know, like, there's somebody
2  that I barely interact with, so how you
3  guys would even know that is one.
4       But they've called, say, my
5  husband's assistant, Sky, and they said
6  to her -- they said to her, we're here --
7  I'm a private investigator, has Lisa
8  Reynolds Barbounis ever harassed you or
9  whatever.
10      They called multiple people and
11 then it's gotten back to me that they
12 were a private investigator and that they
13 are investigating me on behalf of Greg
14 Roman and the Middle East Forum.
15 BY MR. CAVALIER:
16      Q.   Have you ever been contacted by a
17 private investigator?
18      A.   I have not been contacted.  Isn't
19 that the point, they're supposed to do
20 behind-the-scene surveillance on me and then just
21 reach out to other people?
22      Q.   So who has told you that they've
23 been contacted by a private investigator?
24      MR. CARSON:  Objection.

Page 18

1       THE DEPONENT:  Sky and a couple
2  other people.  I can't remember their
3  names exactly.
4       But there was another guy that
5  said that he was contacted.
6  BY MR. CAVALIER:
7       Q.   Who's Steve?
8       A.   A friend of mine.
9       Q.   Did he tell you that directly?
10      A.   Yes.
11      Q.   Sky tell you that directly?
12      A.   Yeah.
13      Q.   And what did Sky say the private
14 detective said to her?
15      MR. CARSON:  Objection.  Asked and
16 answered.
17      THE DEPONENT:  I already told you
18 what she said.
19      She said, have you -- I'm calling
20 on behalf of -- I'm a private
21 investigator.  Has Lisa Reynolds
22 Barbounis ever harassed you?
23 BY MR. CAVALIER:
24      Q.   And that's all she said to you?

Page 19

1       MR. CARSON:  Objection.  Asked and
2  answered.
3       THE DEPONENT:  Yeah.  Her and I --
4  like, we don't really, like, get along.
5  So, yeah.
6  BY MR. CAVALIER:
7       Q.   Okay.  Did you say anything to
8  her?
9       A.   No.  Thanks for letting me know.
10      Q.   How about Steve, what did he say
11 to you?
12      A.   That was so long ago I don't even
13 remember.  He said that, like, he does that kind
14 of stuff for a living.
15      He said, you can tell people are
16 following me and stuff.  I said, I don't even
17 know how you're brought into this.  I talked to
18 you like three times last year.
19      Q.   Did he say the private detective
20 actually spoke to him?
21      A.   I believe so.
22      Q.   Okay.  Did he say what the private
23 detective said to him?
24      MR. CARSON:  Objection.  Asked and

Deposition of Lisa Barbounis                                    Lisa Barbounis v. Middle Eastern Forum, et. al.

Page 20

1 answered.

2      THE DEPONENT:  Honestly, this was

3 like in October.

4      There's so many things going on

5 with this case, it's just exhausting.  I

6 don't remember every word that they said,

7 but, yeah, it's been brought to my

8 attention on numerous occasions.

9 BY MR. CAVALIER:

10     Q.    Are there any other people that

11 you can recall sitting here today that have told

12 you they've been contacted by a private

13 detective?

14     A.    There was one other person, but I

15 can't remember who it was.  I'm trying to think.

16 I'm sitting here trying to think.

17     Q.    Okay.

18     A.    If I remember, I'll let you know.

19     Q.    You said earlier that you don't

20 get along with Sky.

21     A.    Yes.

22     Q.    Why not?

23     A.    Because -- I have a rule in my --

24 in our home that when me and Vasille were, you

Page 21

1 know, on our break or whatever we were doing,

2 that you don't bring other people that you're

3 seeing around your children.

4      And so I let her know that and she

5 violated that and he did, too.  But now that

6 has -- we're all under a mutual agreement.  Plus,

7 I don't even think he's dating her -- I know he's

8 not dating her anymore.

9      But she's still his assistant.  So

10 I just don't want somebody who my husband had a

11 relationship around my kids.  I wouldn't do that

12 to him, so -- my kids.

13     I wouldn't put them in that

14 position, so...

15     Q.    Okay.  Are there any other things

16 that you can consider harassment by the Forum

17 that have occurred?

18     MR. CARSON:  Objection.  Calls for

19 a legal conclusion.  Answering that

20 question would take her about six hours.

21     Do you want her to go through it

22 all from beginning to end?

23     Is that your question?

24     Do you want her to justify right

Page 22

1 now to all the harassment from Middle

2 Eastern Forum from day one?

3      MR. CAVALIER:  I wasn't finished

4 my question.

5      MR. CARSON:  Okay.

6 BY MR. CAVALIER:

7      Q.    My question is, are there any

8 other instances of what you call harassment in

9 your words that you can think of that the Middle

10 East Forum engaged enduring this same time

11 period?

12     MR. CARSON:  What time frame are

13 we talking about?

14     MR. CAVALIER:  The time frame that

15 she says that people were telling her

16 they were contacted by a private

17 detective.

18     MR. CARSON:  She didn't identify a

19 time frame, so I think we need to

20 identify a time frame.

21     MR. CAVALIER:  I asked her.  She

22 said this was like October.

23     MR. CARSON:  So your question --

24 in October of 2021 -- or I'm sorry,

Page 23

1 strike that.

2      In October of 2020 -- was there --

3 is the question in October of 2020 are

4 there any other examples of harassment by

5 the Middle East Forum?  Is that your

6 question?

7 BY MR. CAVALIER:

8      Q.    No.

9      The question is, in or about this

10 same time frame that you referenced, that you

11 said people were contacting you, saying that they

12 were contacted by a private detective of the

13 Middle East Forum, are there any other examples

14 of the harassments that you mentioned that

15 occurred?

16     A.    You mean the private investigator?

17     MR. CARSON:  I'm going to object.

18 It calls for a legal conclusion.  The

19 word harassment is a legal concept.

20     To the extent that she understands

21 the question, understands what you mean,

22 she can answer.

23 BY MR. CAVALIER:

24     Q.    For the record, I'm using the

Deposition of Lisa Barbounis                    Lisa Barbounis v. Middle Eastern Forum, et. al.

Page 24

witness' words.

MR. CARSON:  The word has a legal connotation, what is and what isn't harassment is defined by courts.

But to the extent she understands the question, she can certainly answer to what she feels is harassment in or around October of 2020.

THE DEPONENT:  As far as the harassment regarding the private investigator, I don't remember any more of that.

BY MR. CAVALIER:

Q.    Okay.  Since you filed your amended complaint, can you name any other instances of harassment that you claim the Middle East Forum has engaged in?

A.    Yes.

MR. CARSON:  Objection.  Same objection as before.

You can answer.

THE DEPONENT:  There's plenty, but, yes, they -- Daniel Pipes, when he asked me to meet with him at 30th Street

Page 25

Station told me that if I didn't drop my claims, that he was going to file a RICO case against me.

It is my understanding that it has been filed because an employee -- or a contractor of MEF told -- was the one that brought it to my attention.

So not my lawyer.  I haven't been served.  But other people have been coming to me saying, the Middle East Forum filed a RICO case on you.

I think that was, like, last week.

BY MR. CAVALIER:

Q.    Who told you about that?

A.    Grayson Levy.

Q.    Do you know how he found out about that?

A.    That it was on the court docket or something.

Q.    Okay.  Did you have a conversation about the RICO lawsuit?

A.    I just said they're just unbelievable.

Q.    What did he say about the lawsuit?

Page 26

A.    He laughed.  He said, I can't believe they're going this far.  This is crazy.

Q.    Did you discuss any of the contents of the lawsuit with Grayson Levy?

A.    No.  He just said, go read it and he sent me the link, I believe.  But I haven't read it because I don't have time.

Q.    You said you haven't been served with that lawsuit yet?

A.    Correct.  I have not.

Q.    Is it correct then that you don't have counsel representing --

A.    I do not have counsel for that because I have not been served.

Q.    Okay.  What's your reaction to that?

MR. CARSON:  Objection.  Object to form.

What do you mean by what's her reaction?  What does that even mean?

MR. CAVALIER:  You can answer.

MR. CARSON:  You can answer, if you know.

THE DEPONENT:  I'm going to ask

Page 27

you a follow-up question.  Was -- do you want to know how that makes me feel?  Is that what you want to know?

BY MR. CAVALIER:

Q.    I want to know what your reaction was to Grayson Levy calling you and telling you that Middle East Forum had filed a RICO lawsuit?

MR. CARSON:  Objection.  She already testified to what her and Grayson Levy said.

THE DEPONENT:  I thought you were done, Seth.

MR. CARSON:  Yes.  I'm basically done.  If you understand the question, you can answer.

THE DEPONENT:  Sorry.  The question was how -- what was my reaction, is that what the question was?

BY MR. CAVALIER:

Q.    What was your reaction to Grayson Levy calling you and telling you that the Middle East Forum filed a RICO lawsuit?

A.    I thought, more of the same.  Here we go.  Just more crap from them.

Deposition of Lisa Barbounis                                    Lisa Barbounis v. Middle Eastern Forum, et. al.

Page 28

Just another thing to pile on top
of my plate.  They're trying to break me.  That's
what I thought.

Q.    Does it concern you at all?

MR. CARSON:  Objection.  Object to
form.  Go ahead.  You can answer.

THE DEPONENT:  Of course.  Because
it damages my reputation.  Anytime I have
to go -- like if I need to find another
job or I'm gonna go speak on a panel,
anybody that Googles me sees all these
ridiculous claims about me.

BY MR. CAVALIER:

Q.    Well, if you haven't read it, how
do you know they're ridiculous claims?

MR. CARSON:  Objection.

THE DEPONENT:  Because I have
never done anything, misappropriated any
funds, got any money from anywhere extra,
anywhere, and have never pertake in
conspiratorial things.

I know what a RICO lawsuit is, a
civil one.

It's criminal racketeering.  I

Page 29

mean, I'm a mother of two, who's never
gotten in trouble in her entire life.

No, I'm not a criminal
conspiratorial person.

BY MR. CAVALIER:

Q.    I'm sorry.  I didn't mean to
interrupt you.

A.    No, I just -- I know that I've
never done anything wrong or illegal.

MR. CARSON:  Are these even -- is
this why we're here today?

I mean, if you're gonna waste your
time on this, feel free.

You guys have seven hours.  If
this is how you want to spend it, please
proceed.

BY MR. CAVALIER:

Q.    Do you understand that a civil
complaint filed against you is not the same as a
criminal charge, correct?

MR. CARSON:  Objection.  Calls for
a legal conclusion.

A civil RICO case action does
include criminal -- requires criminal

Page 30

acts.

So everything she just said is
entirely accurate.  And your question
demonstrates a misunderstanding of what a
civil RICO case is.

But to the extent that it calls
for a legal conclusion, you can answer
the question.

THE DEPONENT:  I am not concerned
about winning that case.  I believe that
I would.

I am concerned that it's in the
public sphere and a tarnish to my name.

And even if the case -- even if we
do win it, you Google it, that's what
will come up when you do my name.

So that is forever on the
internet.  Forever.  Even if I win,
they're gonna say, oh, she was involved
in that.

There's always gonna be
speculation around that no matter what
happens.

And I think that that is

Page 31

disgusting.  And I will -- and I will win
that case, but it's gonna harm me for the
rest of my life.

BY MR. CAVALIER:

Q.    Just to be clear for the record,
and I don't mean to ask this in a flippant way.

But you're confident that you're
going to win a case that you haven't been served
with or read?

MR. CARSON:  Objection.
Objection.  You don't have to answer
that.

BY MR. CAVALIER:

Q.    That's your testimony?

MR. CARSON:  Lisa, I'm directing
her not to answer that question.  It's
designed to embarrass and harass her.

It's a ridiculous question --

MR. CAVALIER:  I'm trying to find
out why she knows so much about the
lawsuit if she says she had a 30-second
conversation --

MR. CARSON:  Lisa, Lisa, there's
no question pending.  And she doesn't

Page 32

1  have to answer the last question.
2      Please continue with the next
3  question.
4  BY MR. CAVALIER:
5      Q.   Have you talked with anyone else
6  about this lawsuit?
7      MR. CARSON:  Objection.  Calls for
8  attorney/client privilege.  You don't
9  have to answer.
10     THE DEPONENT:  Only my mother,
11 that they filed a new one.  That's it.
12 BY MR. CAVALIER:
13     Q.   I don't want to know anything
14 about the substance of your conversation.
15     Have you talked to Seth about that
16 lawsuit?
17     MR. CARSON:  Object.  Objection.
18 She's not going to answer that question.
19     What are you asking her right now?
20     MR. CAVALIER:  I'm asking her
21 whether she's ever spoken to an attorney
22 about the lawsuit.
23     MR. CARSON:  Objection.  She just
24 absolutely, positively does not have to

Page 33

1  answer that question based on
2  attorney/client privilege.
3  BY MR. CAVALIER:
4      Q.   I'll ask the question again.
5      I don't want to know what you
6  talked about.  I don't want to know any details
7  about of the conversation.
8      The question is simply, have you
9  spoken to an attorney about that?
10     MR. CARSON:  Objection.  Do not
11 answer the question.
12     MR. CAVALIER:  That's an improper
13 instruction.
14     MR. CARSON:  Well, I'm instructing
15 her not to answer the question.  You want
16 to call Judge Wilson and have a ruling,
17 we can do it.
18     MR. CAVALIER:  We're gonna get
19 close to that today.
20     MR. CARSON:  That's fine.  Well,
21 let's do it now, if you want.
22     You can tell Judge Wilson you're
23 asking her whether she talked to an
24 attorney and what she talked to the

Page 34

1  attorney about.
2      MR. CAVALIER:  I specifically said
3  I'm not asking her what she talked about.
4      MR. CARSON:  The question is, did
5  you talk to her about the RICO case.
6  That is asking her what the conversation
7  was about.
8      She's not gonna answer that
9  question.
10     MR. CAVALIER:  That's absolutely
11 not true.
12     MR. CARSON:  Okay.  She is not
13 answering.  I'm instructing her not to
14 answer.
15     MR. CAVALIER:  All right.  We'll
16 come back to that.
17 BY MR. CAVALIER:
18     Q.   Who else have you talked to about
19 the RICO lawsuit?
20     MR. CARSON:  Objection to the
21 extent it calls for her to answer,
22 whether or not she had a conversation
23 with an attorney, I'm directing her not
24 to answer.

Page 35

1      If she talked to any other
2  non-attorneys about the lawsuit, she can
3  answer that.
4      THE DEPONENT:  I just told my
5  mother and she said, don't worry about
6  it, the truth is on your side.  And I
7  said okay.  But I still worry about it.
8  BY MR. CAVALIER:
9      Q.   And you worry about it because, as
10 you said before, it's on the public record,
11 correct?
12     MR. CARSON:  Objection.  Asked and
13 answered.  You can answer again.
14     THE DEPONENT:  Yes.
15 BY MR. CAVALIER:
16     Q.   Because having a lawsuit filed
17 against you that contains things that you believe
18 are not true can be harmful to you, correct?
19     MR. CARSON:  Objection.  Asked and
20 answered.  You can answer.
21     THE DEPONENT:  Yes.
22 BY MR. CAVALIER:
23     Q.   Like, for example, if someone were
24 to file a lawsuit falsely claiming that they were

Page 36

1 sexually assaulted by someone, that could harm
2 that person's reputation?
3          MR. CARSON:  Objection.  I'm
4     instructing her not to answer the
5     question.  That's designed to embarrass
6     and harass.
7          Don't answer.
8          MR. CAVALIER:  Explain how that's
9     intended to embarrass and harass.
10         MR. CARSON:  You're suggesting
11    that her -- that a lawsuit she filed in
12    which is supported by how many witnesses,
13    is somehow predicated on things that
14    didn't happen.
15         My client was sexually assaulted
16    twice by your client.  And your question
17    indicates that she made that up.
18         It's designed to embarrass her.
19    It's designed to harass her.  It's
20    designed to belittle her.  It's designed
21    to subject her to further verbal abuse.
22         And I'm not going to allow her to
23    answer that question.
24         MR. CAVALIER:  Having now heard

Page 37

1 your attorney's speech, I'll let you know
2 and I'll represent that I'm not even
3 talking about your lawsuit that you --
4          MR. CARSON:  Yeah, you are.
5          MR. CAVALIER:  No, I'm not.
6          MR. CARSON:  So generally -- so
7     ask the question again and I'll listen to
8     it and respond.
9 BY MR. CAVALIER:
10    Q.    This question is based on what you
11 just told me about the harm that it could bring
12 to you being accused in a public lawsuit.
13         Isn't it then fair to say, for
14 example, that someone, not you, but someone
15 accusing someone falsely of sexual assault in a
16 public lawsuit could bring harm to that person's
17 reputation?
18         MR. CARSON:  Objection.
19    Objection.
20         If you're asking her if some other
21    person made a false allegation of sexual
22    assault and filed a lawsuit based on that
23    false allegation, if that would cause the
24    person to whom -- to whom the lawsuit

Page 38

1 named as the person who committed the
2 sexual assault, if you're asking that
3 hypothetical, where the person made
4 everything up, if that would cause the
5 person harm, she can answer that yes or
6 no.
7          MR. CAVALIER:  That's exactly what
8     I'm asking.
9          MR. CARSON:  Good question, John.
10         You can answer it, Lisa, yes or
11    no.
12         THE DEPONENT:  I take anything
13    that is filed publicly to -- I think
14    there's a responsibility for whoever
15    files a lawsuit to be honest and truthful
16    at all times.
17         And I think that people who make
18    false accusations are terrible people.
19 BY MR. CAVALIER:
20    Q.    And a person -- a terrible person,
21 to use your words, making those false allegations
22 would do great harm to the subject of those false
23 allegations, correct?
24         MR. CARSON:  Objection.

Page 39

1 Objection.
2          Are we still talking about the
3     hypothetical person who filed -- who made
4     up a sexual assault claim?  Is that what
5     we're still talking about?
6          MR. CAVALIER:  Yes.
7          MR. CARSON:  So to the extent this
8     is about a hypothetical person who made
9     up sexual assault claim and then filed it
10    online and it never really happened, you
11    can answer that.
12         MR. CAVALIER:  That is precisely
13    what we are talking about.
14         MR. CARSON:  John, let's just take
15    a minute and think about what we're doing
16    right now.
17         Are you ever going to be able to
18    use any of this in a courtroom?
19         Or is this just a complete waste
20    of time right now?
21         Why don't we move on and try to
22    get this done.  I have other things I can
23    do today.
24         I don't need to waste my time with

Page 40

this nonsense.

MR. GOLD: For the record, this is Sid Gold.

You've got to let John finish the question. Let her just answer it.

Otherwise, we got to call the Judge.

MR. CARSON: That's fine. We can call the Judge.

MR. GOLD: These objections are speaking objections. You're arguing with counsel.

Just let her answer the question and we'll move on.

MR. CARSON: No. No. I'm not just going to allow her to answer the question.

MR. GOLD: But you're just speaking -- you're making speaking objections and it's just not --

MR. CARSON: Mr. Gold, I'm pointing out the absurdity of the question.

MR. GOLD: But absurdity is not a

Page 41

proper objection.

MR. CARSON: No. But form is.

And I'm making sure the record is clear, but we're not talking about Lisa, that we're not talking about anything that actually ever happened --

MR. GOLD: Well, I think you are speaking -- I think --

MR. CARSON: -- in the universe in which we live in.

MR. GOLD: You know what?

Again, if you can refrain, the best you can, that would be helpful. Otherwise we're going to be here all day again, you know.

MR. CARSON: Yeah. I mean, like I said, you guys want to waste your time inventing things that never happened in the universe we live in, and if that's the deposition you want to take today, I'm just going to make sure that the record is very clear that that's what we're doing.

MR. GOLD: You've made -- that's

Page 42

the seventh time you said it. I think seven is enough.

MR. CARSON: I'm going to say it for every question that's asked.

MR. GOLD: Well, if you do, we'll have to go to the Judge.

MR. CARSON: I would love to.

MR. GOLD: You would love to.

Well, you may have your dream come true in a few minutes.

MR. CARSON: Like I just said, I think that's a great idea.

MR. CAVALIER: I'm gonna repeat the question.

BY MR. CAVALIER:

Q.   With the acknowledgment that I am in no way, shape or form speaking about your particular claim, the question is, again, having now heard that long soliloquy from your counsel, if someone, not you, but someone were to include in a publicly-filed complaint a false allegation of sexual assault, that would do great harm to the subject of that allegation, correct?

MR. CARSON: I'm going to object

Page 43

to the form. This is a hypothetical question. It never happened.

And subject to that objection, you can answer his question.

The question is, would it do great harm to the person?

THE DEPONENT: Hypothetically speaking, yes.

BY MR. CAVALIER:

Q.   And in that same hypothetical, the same would be true for an allegation relating to sexual trafficking, correct?

MR. CARSON: Objection. Calls for a legal conclusion.

To the extent that there was sexual trafficking claims ever in this case, which were removed pursuant to an agreement by the parties, she can answer if she knows what those claims are.

I would suggest that they were entirely justified and they could have easily stayed in the case.

But to the extent that she understands what the sexual trafficking

Page 44

1  laws are, she can answer.
2        The hypothetical question that
3  never happened in this universe.
4        Go ahead, Lisa.  We can't hear
5  you.
6        THE DEPONENT:  I can't even
7  remember what the question was.
8  BY MR. CAVALIER:
9     Q.    You know, I can understand that.
10       The question is, under the same
11 hypothetical, not talking about your lawsuit or
12 your claims or anything that you said, just in
13 general, if someone were falsely accused in a
14 complaint of sexual trafficking, that would do
15 great harm to that person, correct?
16       MR. CARSON:  I'm going to object
17 based on the fact that it calls for a
18 legal conclusion.
19       MR. CAVALIER:  You've already
20 stated your objection.
21       THE DEPONENT:  Forget it, guys.
22       MR. CARSON:  The sexual
23 trafficking laws are-- require a legal
24 analysis with elements.

Page 45

1        To the extent she understands what
2  those are and to the extent that it's a
3  hypothetical, she can answer the
4  question.
5        THE DEPONENT:  Okay.  So --
6  BY MR. CAVALIER:
7     Q.    Just answer the question.
8     A.    A, it would depend on the context.
9  It would depend on the context.
10       But if there -- everything aside,
11 in this hypothetical world of yours, everything
12 aside, and somebody just did an international
13 lawsuit, whatever, sure.
14    Q.    And by the way, since your counsel
15 decided to give multiple speeches there asking
16 whether we're going to be here all day and
17 whether he -- you know, I think he said he had
18 better things to do.
19       You realize that we're only here
20 today because you and your counsel violated court
21 orders, correct?
22       MR. CARSON:  Objection.  The
23 question's designed to embarrass and
24 harass her.

Page 46

1        You don't have to answer that
2  question.
3        MR. CAVALIER:  All right.  I'll
4  withdraw the question.  Let's look at the
5  order.
6        MR. CARSON:  I mean, this is how
7  you want to spend the next 20 minutes?
8        We're about to go off the record
9  guys.  It's almost 11, just to keep an
10 eye on the clock.
11 BY MR. CAVALIER:
12    Q.    Can you see that document?
13    A.    Uh-huh.
14    Q.    Have you seen this document
15 before?
16    A.    Huh-uh.  No.
17    Q.    Do you see where it says the Court
18 issued valid orders in this case, including ECF
19 Number 6974?
20       MR. CARSON:  Objection.  You just
21 want to take a minute and just have her
22 read the whole thing?
23       MR. CAVALIER:  Sure.  She can read
24 the whole thing.

Page 47

1        MR. CARSON:  Lisa, why don't you
2  just take a minute and read the whole
3  thing.
4        THE DEPONENT:  Can I take a break
5  and read it?  Or do I have to read it,
6  like, right now?
7        MR. CARSON:  No, read it on the
8  record.
9        THE DEPONENT:  It's hard to read
10 on the tiny screen here.
11       Okay.  I read it.  I read it.
12 Sorry.
13       MR. CARSON:  It's five pages.
14 Just read the whole thing.
15       THE DEPONENT:  You just went too
16 far --
17 BY MR. CAVALIER:
18    Q.    I don't want you to -- you can
19 read the whole thing --
20       MR. CARSON:  No.  No.  If she is
21 going to answer a question about the
22 document, I want her to read it all.
23       MR. CAVALIER:  All right.  Fair
24 enough.

Deposition of Lisa Barbounis                          Lisa Barbounis v. Middle Eastern Forum, et. al.

Page 48

THE DEPONENT:  I would like to know what it says -- I mean, now that I'm here, I guess.

MR. CAVALIER:  Go ahead.

THE DEPONENT:  I read quickly, so we'll be okay.

MR. CAVALIER:  I know you do. Take your time -- as much time as you need.

Let me know when you want me to scroll. Or the court reporter or the video tech can give me control of the document.

THE DEPONENT:  It's fine.  I'll be quick.  I'll just tell you next.  Okay. Hold on.

Okay.  You can scroll up.

MR. CARSON:  I think you went past the top.

THE DEPONENT:  I got it.  Okay.

BY MR. CAVALIER:

Q.    So the question is then -- do you see this line here?

Actually just read paragraph six.

Page 49

That's the question.

You see here where the Court says that defendants shall notify the plaintiff's counsel if there's good cause to re-open the deposition?

A.    If they believe good cause.

MR. CARSON:  Also, I think -- I'm gonna object.  Maybe if you're gonna ask her questions about this document, you should explain how we got here.

Because we didn't get here because the Court found good cause to re-open any depositions.

THE DEPONENT:  I remember how we got here.  I mean, I know -- I didn't -- never saw this document.  But I have an idea of what is going on here, because I remember from the $50 per day fine thing, so...

BY MR. CAVALIER:

Q.    That was my question.

My first question is, have you ever read this document before today.  You said no.

Page 50

Secondly, as long as you understand why we're here, we can be done with this document.

A.    Yeah.  I mean, I understand why you guys have made it that we are here.  But I don't think that the reason is justified.

But that's not for me to decide.

MR. CAVALIER:  Okay.  Seth, this is a natural break point, if you want to take your 11:00?

MR. CARSON:  It's 10:50.  We can go for another five minutes, if you want. It's up to you.

THE DEPONENT:  Unless you need that break because you're not feeling well, Mr. Caviler.

MR. CAVALIER:  I mean, I'm never feeling well today, but if you want to keep going, we'll keep going.

MR. CARSON:  I just -- because I'm probably going to be -- unless you want it to be, like, a 20-minute break, I'm cool to keep going for another --

THE DEPONENT:  Do you have the

Page 51

Corona Virus?

MR. CAVALIER:  That's fine.

I hope not.

BY MR. CAVALIER:

Q.    So then I'll just -- I'll use this time to ask you a couple questions about the order in the Sanchez case.

Do you remember that we were talking earlier about the trade secrets case?

A.    Yes.

Q.    And I think we got to the point where either you or your counsel acknowledged that it was part of your retaliation from this lawsuit, correct?

A.    Yes.

Q.    And you believe that claim, that the trade secret's case is frivolous, I think you said?

A.    Yes.

Q.    Okay.  Have you ever read the opinion in -- that Judge Sanchez issued on January 11 in the trade secrets case?

A.    No.

Q.    Are you aware that in that

Deposition of Lisa Barbounis                               Lisa Barbounis v. Middle Eastern Forum, et. al.

Page 52

opinion, Judge Sanchez said that there is a
reasonable likelihood that the Forum will succeed
on the merits of its breach of contract and
misappropriation of trade secrets claims against
you?

MR. CARSON:  I'm going to object
to the question in that it --

THE DEPONENT:  Yeah, I don't even
understand --

MR. CARSON:  Lisa, let me finish
the objection.

THE DEPONENT:  Oh, sorry.  I want
to --

MR. CARSON:  I want to object to
the form of the question, to the extent
that she understands it and to the extent
that it calls for a representation of
facts that are false.

But to the extent that you
understand the question, you can answer.

THE DEPONENT:  So you were talking
about Judge Sanchez's ruling, that it may
be or something on the merits, is that
what you said?

Page 53

BY MR. CAVALIER:

Q.    Yeah.  I'm asking you whether you
are aware of the fact that Judge Sanchez held
that the Forum had established a reasonable
likelihood of success on the merits of its claims
against you in the trade secrets?

MR. CARSON:  I'm going to object
one more time.

Mr. Caviler, we didn't even argue
that point.

We won the motion based the
irreparable harm argument.  That's the
only argument we made.

So you're asking her questions
about an argument that -- we just
conceded, because we knew we could win on
irrepairable harm.

So to the extent that she
understands the question, she can answer.

MR. CAVALIER:  Seth, I'm going to
ask you to stop with the speeches,
because we are going to be here all day.

MR. CARSON:  You're trying to
trick her into saying things that are

Page 54

just wrong.

MR. CAVALIER:  Seth, how -- I'm
asking her if she has awareness of
something.

MR. CARSON:  All right.  Why don't
we explain that --

MR. CAVALIER:  If the answer's no,
the answer's no.

MR. CARSON:  Why don't you show
her the order?  Show her the order.

MR. CAVALIER:  All right.

MR. CARSON:  The order speaks for
itself, where defendant's motion was
denied -- or plaintiff's motion was
denied.

THE DEPONENT:  Can I just say
something?  I just want to finish what I
was going to say.

MR. CAVALIER:  Sure.

MR. CARSON:  Well, there's no
question pending, Lisa.  So wait.  Just
wait.

BY MR. CAVALIER:

Q.    What were you gonna say?

Page 55

MR. CARSON:  No.  No.  No.  Wait.
wait for the question.

THE DEPONENT:  I want you to
repeat back what the question was.

MR. CARSON:  Yes.  Thank you.

BY MR. CAVALIER:

Q.    The question is, are you aware of
the fact that Judge Sanchez issued an order in
which he determined that the Middle East Forum
established a reasonable likelihood of success on
its trade secrets claim?

A.    Reasonable and likelihood --

MR. CARSON:  Lisa, wait.
You've got to wait for the
objections.

THE DEPONENT:  You already
objected to this --

THE REPORTER:  Excuse me.

THE DEPONENT:  I'm taking a break.
I'm taking a break.

MR. CAVALIER:  You're blaming me
for this, Seth?

MR. CARSON:  No, I'm not.  But I
guess we're going to go off the record.

Page 56

I'll take my call.

MR. CAVALIER:  How long do we need?

MR. CARSON:  Probably about until 11:10.

MR. CAVALIER:  All right.  We'll go back on at 11:10.

THE VIDEOGRAPHER:  The time is 10:54 a.m.

We are off the record.

(Recess taken.)

THE VIDEOGRAPHER:  The time is 11:20 a.m.

We are back on the record.

MR. CAVALIER:  Before I start, I'm gonna pick up on what you just said there and I think it's only fair to caution you that you need to control your speaking objections.

You need to give the witness a chance to answer the questions.  And more importantly, you need to give me a chance to get my questions out.

MR. CARSON:  If I'm not giving you

Page 57

an opportunity to finish your question, I will definitely keep that in mind.  I'm not trying to cut you off at all.

I'm gonna put the objections on the record that I think are appropriate.  And then after that, my client will answer, unless I instruct her not to.

MR. CAVALIER:  I appreciate that but at the same time, I think you spoke to me or the witness during the first hour of this deposition.

And I'm just letting you know that we're not going to tolerate the speaking objections all day.

MR. CARSON:  Maybe you should consider the questions that are being asked in the first hour then.

MR. CAVALIER:  It doesn't matter how bad my questions are.  Speaking objections are improper regardless.

MR. CARSON:  It does matter, though.

It matters a lot what the questions are, so...

Page 58

MR. CAVALIER:  Well, I will ask you, in accordance with the rules, to simply state your objection concisely and to allow the witness to answer the question, unless you're instructing her otherwise.

MR. CARSON:  I would suggest that there's -- this doesn't even need to be a seven-hour deposition, since you've already done about eight-and-a-half hours with her.

You've also done, I think, another seven hours with her.

I think she's probably testified in all -- to everything you've asked today, I think she probably already testify about.  And that you're just going through the same stuff again, which is not the reason why Judge Wilson ordered that depositions should be opened.

And so if you guys want to get down to business and ask questions related to why we're actually here today

Page 59

and not about MEF's cinematics' universe and hypothetical situations that never happened, then we can probably get wrapped up pretty quickly.

MR. CAVALIER:  Well, it's my deposition.  So I'll take it where I want to go.

Secondly, the reason it's taking so long is because of the speaking objections that you're giving.

And third, we covered two major topics during the first hour.  One of which was a December 4th order.  One of which was a January 11th order.

Neither of which were in existence the last time we sat down for this deposition.

So I disagree with your characterization of the questions and the time frame.

But regardless, it's my prerogative, I'll take the deposition where I want to go.

I was just letting you know that

Page 60

1  we're not going to do the speaking
2  objections for the remainder of our time
3  here.
4       And hopefully, if we don't, we can
5  make the court reporter's life easier and
6  we can move this along.
7       MR. CARSON:  I absolutely do not
8  know what you mean by it's my deposition.
9       This is not a deposition that
10 belongs to you.  It is not your
11 deposition.  It's Lisa Barbounis'
12 deposition and I am her counsel.
13      So, first, I don't agree that it's
14 your deposition.
15      And second, one of the orders that
16 you asked questions about isn't even an
17 order that was -- is in this case.
18      So, you know, I think that if you
19 want to ask questions about the reason
20 why we're here today, then we can get
21 through this quicker.
22      So with that in mind, I would ask
23 you to proceed.
24      MR. CAVALIER:  Well, it's in this

Page 61

1  case because your client put it in this
2  case.
3  BY MR. CAVALIER:
4       Q.   But, regardless, Ms. Barbounis,
5  were you surprised to hear that you had been sued
6  under RICO by the Forum?
7       A.   Yes.  I mean, yes and no.  Yes,
8  because I really didn't -- I know, like, I never
9  did anything to constitute that.
10      But, no, because they are always,
11 you know, trying to push on and Daniel Pipes made
12 it clear in our meeting -- yeah, they're always
13 trying to, like, keep putting pressure on me to
14 get rid of this case.
15      And Daniel Pipes made that clear
16 in my meeting with him at 30th Street Station.
17      He said, you know, -- what did he
18 say?
19      He said that he was gonna put this
20 case on me and that this could all go away.  And
21 that I'm a nice person.  But, like, it's out of
22 principle and out of this and his reputation.
23      And they are gonna -- if I don't
24 drop the cases, that he is going to -- going to

Page 62

1  file that lawsuit.
2       Q.   So he told you that this lawsuit
3  was going to be filed, correct?
4       A.   Oh, yeah.  Yeah.
5       Well, he threatened me with it.
6       Q.   Well, he told you it was going to
7  be filed?
8       A.   No, he said -- he said, if you
9  drop your cases, I'll scuttle it.  I will not --
10 that was his word, scuttle.  Because, you know, I
11 don't use that word.
12      He said he would scuttle the case
13 if I dropped mine.  He said, however, if not,
14 we're gonna keep coming and we're gonna drop more
15 cases on you.
16      Q.   Okay.  Did you record that meeting
17 with Daniel Pipes?
18      A.   Nope.  He had my phone as a matter
19 of fact.  I turned my phone off in front of him.
20      And I will tell you this, the
21 agreement was, he asked me to -- that we meet in
22 a secret place, that nobody else would be there
23 and that -- that both our phones would be turned
24 off.

Page 63

1       I turned my phone off and handed
2  it to him in front of him.  And he couldn't get
3  his phone to magically turn off.
4       So I don't know what he did.  But
5  I certainly did not record that meeting, because
6  it would, A, be a violation of law and I don't
7  break laws.
8       Q.   But you do record people?
9       A.   I have recorded people, yes.
10      Q.   Without their consent?
11      A.   In the states where it's legal to
12 do that, yes, sir.
13      Q.   And without their knowledge?
14      A.   Correct, where it's legal to do
15 so.
16      Q.   Did you ever record Marnie Meyer
17 without her knowledge?
18      A.   Yes.  But I made her aware after
19 the fact.
20      Q.   After the fact?
21      A.   Correct.
22      Q.   Where --
23      A.   That was at the direction of
24 Matthew Bennett anyway.

Page 64

Q.   Where were you when you recorded Marnie Meyer?

A.   At work.

Q.   In Pennsylvania?

A.   Correct.

Q.   And how did you record Marnie Meyer?

A.   We were in the office and she was on a speaker phone.

Q.   How long after you recorded her did you let her know that you had made the recording?

A.   Not very long after, I don't believe.  I don't remember.  But I did -- we talked about it.  Probably right when we made up.  That's how me and Marnie were.  We had that love/hate relationship.

Q.   But before you made up, you had recorded her without her knowledge or consent, correct?

A.   Uh-huh.  Yes.  I'm sorry.  The court reporter needs a yes.  Yes.

Q.   Did you ever record any other MEF employees without their knowledge or consent?

Page 65

A.   Not without their knowledge or consent, no.

Q.   I want to talk to you about the Sanchez order that we were talking about before the break.

Can you see that document?

A.   Yes.

Q.   Have you ever seen that document before?

A.   You showed it to me right before the break.

Q.   Before today?

A.   No.  I knew it existed.

Q.   What do you mean you knew it existed?

A.   My lawyer told me that Judge Sanchez ruled on the hearing that I testified in.

Q.   Okay.  But you never -- you decided that you didn't find it necessary to review the order?

MR. CARSON:  Objection.  Argumentative.

THE DEPONENT:  My lawyer and I speak routinely and so -- and I have full

Page 66

faith and confidence in him and so what we discuss is not -- I have a very busy lifestyle.  Two little kids.  I work many hours.

And honestly, since the beginning -- since -- especially since this order, but we've had a crazy work situation with the insurrection of the Capitol and Officer Sitnick dying, who I knew.

And like it's been a very -- very complicated and busy time, especially now with the impeachment trial beginning.

BY MR. CAVALIER:

Q.   Are you involved in the impeachment trial at all?

A.   No.  But my boss, I have to make statements and follow it and pay attention.

And there's constituents calling all the time that need a response.

Q.   Okay.  We'll talk a little bit about that later.

Just to be clear here, I want to show you this sentence.

Page 67

And to the extent you want to read all or part of this order, just let me know and you're welcome to do that.

MR. CARSON:  Yeah, I would direct her to just take your time and just go through the entire order before you answer any questions and not read the one sentence that was highlighted for you.

THE DEPONENT:  I read pretty quickly.  I can get through this.

MR. CAVALIER:  I was trying to give your counsel the benefit of the doubt here by highlighting the sentence that he gave a nice long speaking objection about earlier that says that the Middle East Forum's motion was denied.

But if you want to read more than that, you're welcome to.

MR. CARSON:  Again, I'll recommend that you just review the document.

THE DEPONENT:  I'm just going to review it.  Thank you.  If everybody will just give me a minute.

Page 68

BY MR. CAVALIER:

Q.    Let me know when you want to scroll.

A.    Thank you, sir.

Okay.  I'm good.

How long is this document, just out of curiosity?

Q.    Thirteen pages long -- it's not quite 13 pages.  I think it's 11 pages long with actual text on it.

A.    Okay.  Yeah, I know all this.  You can just keep scrolling.  Okay.  I'm -- go ahead.

You can scroll up, please.  Okay.  Keep going, sir.

Q.    I'd ask you to pay special attention to this section, because this is what we're going to be talking about.

A.    I understand.  I can figure out what the important parts are.

You can go ahead, sir.

Okay.  Keep going.  Okay.

Oh, wait.  Can you scroll up just one moment, please?

Okay.  Keep going, please.

Page 69

That's funny.  Okay.

Okay.

Okay.

Okay.

Keep going.

MR. CARSON:  I think there's a way to just give her --

THE DEPONENT:  That's fine.  I'm almost done.  It's fine.  I read very quickly.  I'm almost done.

Okay, sir.  Keep going.

All right.

Stop.

Sorry about that.

Okay.

Okay.

That's fine.  Thank you.

BY MR. CAVALIER:

Q.    Okay.  So having now read the January 8th, 2021, order, issued by Judge Sanchez, what is your understanding of what this order means?

MR. CARSON:  Objection.  Calls for a legal conclusion.

Page 70

You can answer.

THE DEPONENT:  Okay.  My -- my -- my understanding of this document is that a preliminary injunction would be so that you could take everything off, like delete everything from my phone that, like, came up in your search match, which also included random things, like pictures of my family and things like that, and other things that I use for work.

But that, you know, there wasn't shown to be immediate harm.  Like, it wasn't me having these things on my phone would not -- or wherever I had it would not have -- does not cause MEF immediate harm; so therefore, you guys don't get to delete everything in my phone.

BY MR. CAVALIER:

Q.    Would you agree with me that according to this order, Judge Sanchez found that the Middle East Forum had established a reasonable likelihood of success on its trade secrets claims against you?

Page 71

MR. CARSON:  Objection.  Calls for a legal conclusion.

You can answer if you understand the question.

THE DEPONENT:  So it's my understanding that he -- that a likelihood is not guaranteed, number one.

And number two, there were times in that deposition where, you know, he -- there were things that were evidence in that case that wasn't, like, presented so -- in the thing -- like I just -- the part where I said, oh, that's funny, he said that Amy Meckenberg, where her proposal that she submitted to MEF themselves, said she wasn't a competitor and was there to highlight the voices like organizations like MEF.

And I was their communications director and that was my job.

So when we have those things, like this doesn't -- this doesn't -- to me a likelihood is not guaranteed and so, you know, just because he ruled that given on

Page 72

the short testimony that was given that
day, I do not believe that it was there.
        And you're innocent until proven
guilty.  So this does not, you know,
guarantee MEF that they -- that they
do -- that, like, I did anything wrong,
so...
BY MR. CAVALIER:
    Q.    And listen, as it happens, we
agree on that.
        I'm certainly not insinuating that
this is a final determination on the merits of
that case.
        But it is fair to say, I think --
you gave a rather long answer there, and I don't
mean to make you repeat yourself.
        But quoting from the Judge's
order, it's fair to say that he found a
reasonable likelihood of success, right?
        MR. CARSON:  Objection.  Asked and
answered.  That was the exact question
you just asked.
        Lisa, if you want to repeat the
answer, go ahead.

Page 73

        THE DEPONENT:  The answer is
that's what he wrote.  That doesn't mean
that given the evidence that this isn't
frivolous or ridiculous, because it still
is.
BY MR. CAVALIER:
    Q.    So -- but Judge Sanchez didn't
rule that it was frivolous, correct?
    A.    I don't know what his defini --
        MR. CARSON:  Objection.  Wait.  I
object.  Argumentative.  Object to form.
You can answer.
        THE DEPONENT:  Judge Sanchez does
not have -- did not have, in this
hearing, a clear picture of everything,
because I was limited to what people
asked me and what was presented.
        So that's why this needs to --
that's why this is proceeding.
BY MR. CAVALIER:
    Q.    When you say you were limited to
what people asked you, you gave a direct
examination conducted by your counsel in that
case, correct?

Page 74

        MR. CARSON:  Objection.  You can
answer.
        THE DEPONENT:  Correct.
        However, when I started to speak
about certain things, Judge Sanchez and
the other lawyer made -- like limited me
on those responses.
        There was one time where Judge
Sanchez said, we're not going to go here,
we're not doing this, we're not doing
that.  And then he just continued.
        So, I mean, he's the boss, so
that's fine.  But there was definitely a
point in there where I was trying to
address this specific part and I wasn't
able to testify about it.
BY MR. CAVALIER:
    Q.    Did you argue before Judge Sanchez
that this case was frivolous and filed only
because the Middle East Forum was trying to
retaliate against you?
        MR. CARSON:  I'm going to object.
Lisa didn't make any arguments.  Her
counsel did.

Page 75

        MR. CAVALIER:  She's the party,
Seth.
        MR. CARSON:  And so it calls for a
legal conclusion.
        And to the extent she understands
the question -- I object to the form,
too -- you can answer.
        THE DEPONENT:  I honestly don't
remember.
        I mean, I do remember that part,
but I don't remember what I -- what we --
I just was remembering answering the
questions that were asked of me.
BY MR. CAVALIER:
    Q.    Would you agree with me that if
the Middle East Forum ultimately prevails on his
trade secrets claims, then they are, by
definition, not frivolous?
        MR. CARSON:  I'm going to object
to that.  It calls for a legal
conclusion.  It's also a hypothetical.
I'll object to the form.  You can answer.
        THE DEPONENT:  I forget the
question.

Deposition of Lisa Barbounis                 Lisa Barbounis v. Middle Eastern Forum, et. al.

Page 76

BY MR. CAVALIER:
Q.   The question is, do you agree with
me that if the Middle East Forum ultimately
prevails on its trade secrets claims against you,
then they are by definition not frivolous?
MR. CARSON:  Same objection.  You
can answer.
THE DEPONENT:  I don't know if
that's the legal standard for frivolous
or not.
What I do know is that there have
been -- in the history of the court
system, there have been many cases that
have been found wrong or -- you know,
there's even people sentenced to death
that were wrongfully convicted.
And so I still think that no
matter what the outcome of this case is,
that this is a frivolous and wrong and
harassing lawsuit.
BY MR. CAVALIER:
Q.   Is it fair to say that Judge
Sanchez disagrees with that statement?
MR. CARSON:  Objection.  You want

Page 77

her to testify -- wait.  Wait.  Wait.
You're asking her to testify to
what a judge thinks?
To the extent you know what Judge
Sanchez thinks, you can answer the
question.
THE DEPONENT:  Well, that was
gonna be my answer.  I don't know what
Sanchez thinks.
All I know is what he wrote.  And
this case has not been decided.  And when
it is decided, maybe we can make an
accurate decision on what Judge Sanchez
thinks.
BY MR. CAVALIER:
Q.   Having now read Judge Sanchez's
order, do you agree that Judge Sanchez found that
the Middle East Forum's donor lists and
prospective donors constitutes trade secrets?
MR. CARSON:  Objection.  The order
speaks for itself.  It calls for a legal
conclusion.  Object to the form.
You can answer.
THE DEPONENT:  I would agree that

Page 78

a donor list is considered a trade
secret.  Personally I would agree with
that.
BY MR. CAVALIER:
Q.   And Judge Sanchez agrees with that
as well, correct?
MR. CARSON:  Objection.  The order
speaks for itself.
THE DEPONENT:  I don't know what
he agrees with.  I just know what he
wrote.
MR. CARSON:  Just for the court
reporter, if there's an objection, you
got to slow this thing down a little.
THE DEPONENT:  I keep forgetting
you're objecting.  It's hard to hear you
sometimes.
MR. CARSON:  I'm sorry.  Same
objection as last time.
Calls for legal conclusion asking
what the Judge thinks.  Object to form.
You can answer.
THE DEPONENT:  Like I said, he
said from what he had so far, that it

Page 79

was.
However, I never gave a donor
list -- a complete donor list to anyone,
nor do I have access to it, nor did I
ever have access to it.
So the list that I gave was stuff
that you could get from the internet.
And we established that.
BY MR. CAVALIER:
Q.   But Judge --
A.   As a matter of fact, I think it
said in the ruling there --
MR. CARSON:  Wait for a question.
THE DEPONENT:  I'll wait for a
question.
BY MR. CAVALIER:
Q.   But Judge Sanchez said in his
order that the donor information sent to Amy
Meckenberg on April 11, 2019, was not public
information, correct?
A.   Negative.  It says right under
there, further discovery may shed light on
whether -- hold on -- stop scrolling.
Further discovery may shed light

Page 80

on whether all the information contained in the
donor list was, in fact, publicly and readily
available to Meckenberg.
        So, therefore, the Judge -- the
Judge ruled that there's further investigation
needed.
        So it still may very well be, in
the Court's eyes, frivolous.
    Q.   Where do you go from what you just
said to frivolous?
        MR. CARSON:  Objection.
Argumentative.
        You can answer.
        THE DEPONENT:  Because I didn't do
anything wrong.  And this lawsuit is
trying to twist an innocuous thing that I
actually did to help the Middle East
Forum into something nefarious.
BY MR. CAVALIER:
    Q.   Still you would agree with me,
would you not, that Judge Sanchez wrote that the
forum has presented sufficient evidence to
demonstrate a likelihood of success on its claim
that the donor information was a trade secret,

Page 81

correct?
        MR. CARSON:  Objection.  The
document speaks for itself.  You can
answer whether or not the sentence
says --
        THE DEPONENT:  Answered this a
whole million times.
        That is -- that statement is just
saying that they have a likelihood to
proceed.  Right?
        But it still needs further
investigation.
        I mean, it's very clear.  The
document is very clear.  And I don't know
why I have to keep answering the same
question over and over again.
        You're not going to get, yes, I
agree with you out of it, because I
don't.
BY MR. CAVALIER:
    Q.   But Judge Sanchez could have
written, for example, the Middle East Forum has
presented no evidence to demonstrate a likelihood
of success on its claim, and therefore, its claim

Page 82

is frivolous?
    A.   He could have --
        MR. CARSON:  Wait.  Wait.
Objection.
        I think we're back into the MEF
cinematic universe where we're going on
hypothetical?  So I object to the form.
        You can answer.
        THE DEPONENT:  And that's where I
was going to go.  Could have, should
have.  I don't know what he could have
done, what he may have done.
        I'm not a legal expert.  I don't
know what the technicalities are.  I
don't know what he is supposed to write.
I'm not a judge.
        All I know is that I never did
anything nefarious ever to the Middle
East Forum.  And they are making me out
to be something that isn't true.
BY MR. CAVALIER:
    Q.   What is your understanding of what
the Forum is demanding in its effort to obtain a
preliminary injunction against you?

Page 83

        MR. CARSON:  Objection.  Calls for
a legal conclusion.  Calls for
speculation.  Object to the form.
        You can answer.
        THE DEPONENT:  So they --
they're -- what they say their intent is
is for me to get rid of any information
that I have pertaining to MEF on my
phone.
        However, in that -- in their
request, they wanted to get rid of all of
the things that hit on search terms.
        However, there was many things
that hit under the search terms given
that were unrelated to this case.  Many.
        And we're talking about, like,
thousands and thousands of things that
were unrelated to this case.
        Just because they hit because it
had the letters M-E it or something
else, doesn't mean that it's relevant to
MEF.
        So you can't just go in my
documents and erase half my life because

Page 84

it came up on some erroneous search term.

BY MR. CAVALIER:

Q.    You, at least, agree then that they have the right to have you remove the documents that are actually MEF documents?

MR. CARSON:  Objection.  Calls for a legal conclusion.  Object to the form. This document speaks for itself.

You can answer if you understand what he's asking you.

THE DEPONENT:  I understand that I am -- what I do understand about this is that I am willing to delete or whatever -- I happily will delete any MEF documents or anything that I have.  I do not want them.  I do not need them.

But you do not get to go into my entire phone and erase half my life.  And so if -- you know, that's it.  Like that is it.

Like I don't -- there is no circumstance where you get to, you know, erase pictures of my kids from when they were three weeks old.

Page 85

BY MR. CAVALIER:

Q.    Right.

But if -- for example, a third party was hired to go through your information and delete only that which was MEF's and not your personal information, you wouldn't have a problem with that then, right?

MR. CARSON:  I'm gonna object to the form.

THE DEPONENT:  Hypothetically speaking --

MR. CARSON:  Let me put the objection on.

THE DEPONENT:  Hurry up.

MR. CARSON:  I will object to the form of the question.  It's hypothetical again.

You can answer.

THE DEPONENT:  But anyway, like I said, hypothetically speaking, if it was easy, then, yeah, there would be no problem with that.

However, we have been told numerous times that that is not -- that

Page 86

they have -- the hits were anything -- the agreement was to erase anything that came up on the hits for the search terms. And the search terms included far more than what was MEF documents.

And we've tried to work with your side to have this corrected.  And -- and I've done my -- we've done our share.

You guys want to go into my phone and delete everything.  You have passwords to everything in my phone.  You have all of my personal information dating back to further than this case starts.  Further back from my employment with MEF.  You have everything.

And the funny thing is, it only turned up one -- this whole thing is on the Judge's order is on one e-mail sent in 2019 while I still worked for the Middle East Forum.

We're not talking about -- the Judge ruled on one.  I was in there on that hearing.  And he said the only thing that MEF showed is that she sent one

Page 87

e-mail that was -- that could qualify as this.

That's what he said, one e-mail that could qualify as this.

And -- and honestly, it was during my time of employment to help the Middle East Forum.

And so this is all boiling down to one e-mail while I was still employed in April, or whatever month it was, of 2019.

One document.  One e-mail.

BY MR. CAVALIER:

Q.    Regardless of your views on what evidence showed and didn't show in front of Judge Sanchez --

A.    I'm going by what Judge Sanchez said.  Were you in that hearing?  I don't remember.

MR. CARSON:  Let him get the question out.

BY MR. CAVALIER:

Q.    You would agree with me, though, would you not, that separate and apart from your personal information, whatever mechanism is

Deposition of Lisa Barbounis                    Lisa Barbounis v. Middle Eastern Forum, et. al.

Page 88

agreed to to remove the information, that the
Forum does have a right to have you remove Middle
East Forum information from your personal
devices, correct?

MR. CARSON: I'm gonna object
again. Asked and answered. Object to
the form. Calls for a legal conclusion.

There's also a litigation hold on
this case, which would preclude her from
doing what you're talking about.

To the extent that she can answer,
she can. Lisa, you can answer the
question.

THE DEPONENT: I don't want -- I
don't know how to answer this question,
because I don't want MEF information on
my phone. I don't want it. I want
nothing to do with them.

So if I could do it where I don't
have to get my -- like that my stuff
wouldn't be touched, then I would
happily, happily, happily sit in a room
with whatever third party you want and go
over the documents.

Page 89

No. Like, you know, they can have
whatever they want. I don't want it.
Don't want it.

BY MR. CAVALIER:
Q. Okay. Did you ever instruct
Patricia McNulty to wipe her MEF notepad?

MR. CARSON: Objection. Assuming
facts not in evidence.

MR. CAVALIER: Assuming facts not
in evidence is not a proper objection.

MR. CARSON: Yeah, it is. It's a
form objection. It totally is. Assuming
facts not in evidence. Lack of
foundation. Object to the form.

MR. CAVALIER: Foundation is not a
proper objection in a deposition.

MR. CARSON: It actually is. It's
a form objection. Foundation and
assuming facts not in evidence, those are
the two types of form.

MR. CAVALIER: Then say object to
form.

MR. CARSON: No, I'm gonna tell ya
-- I'm gonna explain the basis for my

Page 90

objection.

MR. CAVALIER: I don't need you to
explain it.

THE DEPONENT: I heard your side
do that, too. Sorry, sir.

MR. CARSON: Yeah. Look --

MR. CAVALIER: You never heard me
make a form objection in a deposition.

MR. CARSON: I will put the
objections on the record that I feel are
appropriate.

So the objection is noted.

To the extent that you understand
the question, you can answer.

BY MR. CAVALIER:
Q. After your counsel's soliloquy,
did you even remember the question?
A. Something about instructing
Patricia McNulty to do something.
Q. Did you ever instruct Tricia
McNulty to wipe an MEF iPad?

MR. CARSON: Same objection. You
can answer.

THE DEPONENT: Marnie Meyer told

Page 91

us to wipe and get all our personal
information off of our devices, to
restore them to factory settings so that
people could use them.

When I logged into -- when I
logged into my iPad. Right? Or the MEF
iPad, I did so with my personal iCloud,
which you guys have complete access to.
Okay?

So I did that. But to save -- to
keep me protected from Greg Roman knowing
all my passwords and all my stuff, I had
to take my personal information off of
the iPad.

And since I was not there to do
it, I asked her to do it for me, because
that is what you're supposed to do.

My personal information. Taking
me off the iCloud thing so that they
don't have access to my personal
pictures, my personal e-mail, my personal
passwords to my bank accounts.

All that stuff is saved on your
iCloud and, no, MEF is not entitled to

Page 92

that.
BY MR. CAVALIER:
Q.    When did you give her that instruction?
A.    I don't remember.
Q.    Was it before or after you left the Forum?
A.    It was probably after I left the Forum.
Q.    Did you think it was proper for you to be storing personal information of the MEF corporate iCloud?
A.    We were told to.
MR. CARSON:  I'm going to object to the question as argumentative.  Object to form.
THE DEPONENT:  It's not storing -- it's not storing personal information.
There were times where I needed to purchase things, like equipment, for work and things like that.
And we did so out of our Amazon accounts.  And so for us to -- for me to do that and order it on the iPad and to

Page 93

do other things and to use an iPad, you have to log in with your iCloud.  That's how it works.
And that is what we were instructed to do.  When he handed me the iPad, set it up, log into your iCloud, it's yours, blah, blah, blah.
So, yes.  Yes, I do think it's proper, because that's what I was told to do.  That was in answer to your question.
BY MR. CAVALIER:
Q.    Did you tell anybody other than Patricia McNulty that you were issuing that instruction?
MR. CARSON:  Objection.  What instruction are we talking about?
BY MR. CAVALIER:
Q.    The instruction to clear the information from the corporate iPad.
MR. CARSON:  Objection.  You keep using words like clear and wipe.  That's not what she testified to.  So I'll object to the form.
You can answer.

Page 94

THE DEPONENT:  The question was -- court reporter, can repeat the question for me, please?
BY MR. CAVALIER:
Q.    The question is, at the time you gave Patricia McNulty the instruction to delete your personal information from the MEF corporate iPad, did you tell anyone else at MEF that you were giving her that instruction?
A.    Okay.  So, A, I didn't speak to anybody other than Tricia McNulty after -- I really didn't -- well, regularly, didn't speak to anybody after the -- after that.
And it was Tricia McNulty who alerted me that my personal information was still on the iPad.
So she's the reason -- and I said oh, can you please take it off.
I mean, she alerted me that my personal info was still on that iPad, because I didn't remember.  And she brought it to my attention.
And so I said, oh, thanks.  Take it off.  Yes.  I don't want Greg Roman having my

Page 95

personal information.
He's already knee deep in all my whole life.
Q.    Well, I mean, if it was already on the corporate iPad, he already had access to it, didn't he?
A.    Right.  But when -- you don't understand what a tyrant Greg is.
Okay?
So when -- you do anything wrong, like quit or, you know, -- or whatever, do something Greg doesn't like -- and he didn't have access to it while it was in my possession.
So, like, that was given to me as my iPad.  And it was at my desk and I always had it, like, when I worked there.
When I left, I forgot to take my personal information off of it.  So they were going to use it, the MEF iPad, which was when they gave it to me, just like they gave me a computer.
So when I took my information off -- so when I had it, Greg didn't have access to the MEF iPad.  We put our stuff -- all the

Page 96

stuff, though, that was on that iPad is now in
your hands.

It was my iCloud, because you
can't save things to it particularly. It was in
my iCloud or it was on the MEF One Drive.

So, no, like, you guys have
anything that would be in there. All that was
doing in that moment was protecting me from
having Greg have my personal credit card,
banking, family, e-mail, all that.

There's nothing wrong with that.

Q.   So you deleted your iCloud account
because you didn't want MEF --

A.   I didn't delete an iCloud account.
I deleted -- I took my iCloud account off of that
device.

Well, I didn't. I asked Tricia to
do it.

But I took it off that device.
All iCloud stuff is still -- you have it. You
guys have all the log-ins and passwords to it.
You have it all. It's still there.

The iCloud exists.

All I did was remove my personal

Page 97

information, my log-in credentials and all that
stuff off of that device.

MR. CARSON: Yeah. I also don't
appreciate questions where you totally
mischaracterize her prior testimony.

So I'm just going to object to the
whole question that you just asked.

BY MR. CAVALIER:

Q.   You didn't review the information
before you instructed Patricia McNulty to take it
off the iPad, correct?

MR. CARSON: I'll object to the
form.

What information are you talking
about? Review what?

MR. CAVALIER: The information in
your iCloud.

MR. CARSON: What do you mean --
John, what -- your question demonstrates
an utter lack of understanding, which
seems purposeful for the testimony of my
client just said. There was no
information.

She testified that she just

Page 98

removed the log-in credentials so that
you couldn't access her iCloud from a
certain device that she didn't have
access to it anymore.

THE DEPONENT: Right.

MR. CARSON: Her testimony was
pretty clear, and the record will
demonstrate that. So I think that we've
covered this subject.

And I think any more questions
about this are in improper. But you can
ask her and I'll just put the objection
on the record.

BY MR. CAVALIER:

Q.   Are you aware of the fact that
when you sign in into an iCloud account on an
iPad, the iPad will download information from
that iCloud account and store it locally until
iCloud account is removed?

MR. CARSON: Objection. Assuming
facts not in evidence. You can answer.

THE DEPONENT: I am not aware of
that.

I thought that it's all

Page 99

cloud-based and it's in the cloud and it
accesses the cloud. It doesn't download
any information to the machine itself.
And that's how you save on storage.

So I think that your
characterization of that is incorrect.

BY MR. CAVALIER:

Q.   Did you review the contents of the
iCloud account before you instructed Patricia
McNulty to remove the iCloud account from the MEF
laptop?

A.   It's e-mail and password.

MR. CARSON: I objected. And
Lisa, go ahead.

THE DEPONENT: It's an e-mail and
password.

What is there to review?

BY MR. CAVALIER:

Q.   It's a simple yes or no question.

Did you review the contents of
your iCloud account before you instructed
Patricia McNulty to remove access to that account
from the MEF corporate iPad?

MR. CARSON: I'm gonna object to

Page 100

1  the question.  Object to the form.  You
2  can answer.
3      THE DEPONENT:  Yes, I removed -- I
4  knew my -- I reviewed my e-mail and
5  password, yes.
6  BY MR. CAVALIER:
7      Q.    Did you review the contents of
8  your iCloud account before instructing Patricia
9  McNulty to remove that account from the MEF
10 corporate iPad?
11     MR. CARSON:  Objection.  That's
12 the same question you just asked twice.
13 Asked and answered.
14     Lisa, go ahead.
15     THE DEPONENT:  Did I -- sorry.
16 So I'm understanding your question
17 to be, did I scour through every single
18 thing on my iCloud, including all of my
19 20,000 pictures and my 20,000 messages
20 and my 20,000 e-mails and my 20,000,
21 whatever, Google drive documents?  Did I
22 do that?
23     No, I'm sorry.
24

Page 101

1  BY MR. CAVALIER:
2      Q.    Now, you brought up Google Drive.
3  Google Drive is not part of iCloud, correct?
4      A.    Yes, actually it is.
5      What happens is, when you log
6  into -- when you log into your iCloud, it stores
7  all your apps.  Okay?
8      And when your apps are stored
9  there -- okay.  When your apps are stored in the
10 thing, when it re-populates -- so say I take my
11 device right now, right?  My phone.  And I have
12 an app on there, which is Google Drive.  Right?
13     When I take that app and I log in
14 with my user name and password for iCloud, and I
15 put it on another device, say I get a new phone,
16 say I get whatever, okay, that information from
17 there, it will bring the app and all the contents
18 of the app back onto my phone.
19     Q.    Locally?
20     A.    No.  From the cloud.
21     Q.    Right.
22     It comes from the cloud and is
23 stored on your phone --
24     A.    It is not stored on your phone.

Page 102

1      Q.    Do you think --
2      MR. CARSON:  Guys, finish this
3  question, then I need to use the
4  restroom.
5      THE DEPONENT:  Sir, if that was
6  the case -- if that was the case -- let
7  me finish.
8      If that was the case, that it
9  stored the information locally, then I
10 would have no storage space in my phone
11 whatsoever, because I have 30,000
12 pictures on my phone.
13     You only get 168 gigabytes of
14 storage on an iPhone.  So if it stored it
15 locally, my phone would not be able to
16 operate, given the capacity -- its memory
17 capacity.
18     MR. CARSON:  Hold on.  With that,
19 let's take a five-minute break or
20 bathroom break.
21     MR. CAVALIER:  Yeah, I'm good with
22 that, as long as you make it 10.  You
23 know I don't like five-minute breaks.
24     THE VIDEOGRAPHER:  The time is

Page 103

1  12:02  p.m.
2      We're off the record
3      The time is 12:16 p.m.
4      (Recess taken.)
5      THE VIDEOGRAPHER:  We are back on
6  the record.
7  BY MR. CAVALIER:
8      Q.    Ms. Barbounis, did you instruct
9  Patricia McNulty to, quote, delete my pictures,
10 end quote, from the MEF corporate backup?
11     A.    I mean, you seem to be quoting me,
12 so I guess so.
13     Q.    Okay.
14     MR. CARSON:  Well, Lisa, don't
15 guess.
16     If you remember doing it, then say
17 you remember.  If not, then just say and
18 let them know that.  Don't guess.
19     THE DEPONENT:  I'm sorry.  I don't
20 remember.  I shouldn't be guessing.  I
21 don't actually remember.
22 BY MR. CAVALIER:
23     Q.    That's all right.  That's always a
24 fair answer.

Deposition of Lisa Barbounis                                    Lisa Barbounis v. Middle Eastern Forum, et. al.

Page 104

1    At the time -- well, let me ask
2  you this.
3         Does August, September 2019 strike
4  you as an accurate time frame as to when you gave
5  Patricia McNulty this instruction?
6    A.    I got my job at the end of August.
7  So probably.
8    Q.    Okay.  At that point in time had
9  you and Patricia McNulty discussed your claims
10  against the Middle East Forum that you brought in
11  this case?
12    A.    I don't know.
13    Q.    Do you know whether or not at that
14  time Patricia McNulty was contemplating an action
15  against the Middle East Forum?
16    A.    I think we already filed in court.
17  I don't know.
18    Q.    So I'll represent to you -- well,
19  I'll ask it to you this way.
20         If Patricia McNulty had already
21  filed in court, did you think it was appropriate
22  to be giving a plaintiff in an action against MEF
23  an instruction to delete information from an MEF
24  device?

Page 105

1         MR. CARSON:  I'm gonna object.
2    She already testified that the
3    information wasn't deleted.
4         Go ahead, Lisa.
5         THE DEPONENT:  You asked me
6    whether I think it's proper.
7         I think it is proper when it was
8    the policy to remove our personal iCloud
9    information from the devices, that that
10    is what I asked -- I didn't instruct her,
11    I asked her to do it.
12         So, I mean, I didn't instruct --
13    like, I have no -- you know, supervisory
14    anything over Tricia McNulty.
15         If I asked her to do something, I
16    asked her to do it.  And she has the full
17    wherewithal to make that decision on her
18    own.
19  BY MR. CAVALIER:
20    Q.    Do you know whether or not she
21  did, in fact, carry out your request?
22    A.    I believe that she did.  I don't
23  know for a fact, because I never had access to
24  anything after that.

Page 106

1    Q.    Did you produce information from
2  your Facebook account in this case?
3    A.    Yes.
4    Q.    Are you certain of that?
5    A.    Yes.
6    Q.    My understanding is that you are
7  going to be making a production of your Facebook
8  information in the trade secrets case at some
9  point today, is that correct?
10         MR. CARSON:  Objection.
11         THE DEPONENT:  I guess so.  I
12    don't know.
13  BY MR. CAVALIER:
14    Q.    If I represent to you that you
15  have not -- or we have never received any
16  Facebook information in this case, will you agree
17  to produce to us the Facebook information that
18  you're producing in the trade secrets case?
19         MR. CARSON:  I'm going to object.
20    I'm gonna instruct her not to answer that
21    question.  It's something she has to talk
22    to me about.
23         THE DEPONENT:  I just want to make
24    it clear for the record that I gave Kep

Page 107

1    Secum or whoever it is the people that is
2    doing this.
3         I gave them all of my Facebook
4    data and log in information not once, not
5    twice, but threes times.  They have
6    everything.  They have access to my full
7    Facebook.
8  BY MR. CAVALIER:
9    Q.    When did you give them that
10  information?
11    A.    Multiple times.  I gave it to him
12  then when the first request for discovery came
13  in.  And then the guy, Kevin or Kyle or whatever
14  his name is, called me and said, hey, we didn't
15  get to pull this one part, because, you know,
16  it's connected with Congressman Weber's account
17  or whatever.
18         And then he was, like, can you
19  give me the log in again.  And do two factor
20  authentication again and I did.
21         And then he called me back and
22  asked me to do it a third time.  That has to
23  be -- the last time that happened was months ago.
24  My brother got married in the beginning of

Page 108

1  December and I remember it being around that
2  time, because I was, like, -- like doing stuff
3  from my brother's wedding.
4      Q.   Beginning of December 2020?
5      A.   That was the last time that I did
6  it.
7           But originally before that it had
8  to have been six, seven, eight months before
9  that.  Like -- yeah.
10          I mean, I've given them the log-in
11 credentials on numerous occasions.
12     Q.   Okay.  So as far as you know, it's
13 your belief sitting here today in the deposition
14 that you have produced the information from your
15 Facebook page to us in this case?
16     A.   Hundred percent.  Yes, sir.
17     Q.   Okay.  Can you describe for me
18 the -- if you need to define these terms, that's
19 fine -- but the hierarchy or the chain of command
20 at MEF in 2018 and 2019?
21     A.   The chain of command?
22     Q.   Yes.
23     A.   It was a very weird kind of thing.
24 Marnie at one point laid out with -- Greg and

Page 109

1  Marnie laid out an organizational chart.
2           And it was Greg at the top, then
3  like -- like, Marnie, me -- like, Marnie -- well,
4  kind of -- I had my own, like, box over to the
5  side, because I was Greg's assistant.
6           And then, like, -- so they were
7  kind of, like, -- like all on the same level, but
8  it was, like, I was over to the side.
9           And then, like, it went down and
10 it was Marnie, Matt, and then the people that are
11 underneath them.
12     Q.   Okay.  So let's talk about those
13 people.
14          So you said Greg Roman at the top
15 for all intents and purposes, it's actually
16 Daniel Pipes at the top of the chain, right?
17     A.   For all intents and purposes, Greg
18 Roman made all the decisions and even kept Daniel
19 Pipes out of a lot of those decisions, including
20 the website and how much money he was spending
21 and all that kind of stuff.
22          He didn't inform Greg Roman about
23 our benefit -- or Greg Roman didn't inform Daniel
24 Pipes about other benefit packages.

Page 110

1           Greg was always the boss and he
2  still is.
3      Q.   Well, let's be accurate and not
4  exaggerate or engage in hyperbole here.
5           You said Greg made all the
6  decisions.  You don't know that to be the case,
7  correct?
8      A.   Okay.  That's fair.
9           I do not know that he made every
10 single, solitary decision.
11          But I can tell you, that for all
12 the big decisions that I witnessed in that place
13 from working there for two years, that Greg made
14 the ultimate decision.
15          And if Daniel disagreed with him
16 even, that they would argue it out or whatever
17 and Greg would always triumph.
18     Q.   Okay.  And so, again, just so
19 we're all clear for the record, you know that
20 about those decisions because you -- that Greg
21 made, because you were either a part of those
22 decisions or you were present when Greg was
23 making them, correct?
24     A.   Yes.  And I was -- well, not -- I

Page 111

1  was not a part of them.  So that's not -- that's
2  an improper characterization.
3           I witnessed them, yes.  And
4  then -- and then I also was instructed not to go
5  to Daniel.
6           I actually got in trouble via
7  e-mail once for going to Daniel -- or copying him
8  on an e-mail when it was Greg was supposed to be
9  there.  We were very -- Greg isolated us from
10 Daniel very much.
11     Q.   How much interaction did you have
12 with Daniel Pipes while you were at the Forum?
13     A.   Probably -- I mean, over e-mail?
14 A lot.
15          But he was in and out of the
16 office.  Hardly there at all.  Because Greg was
17 like, you know, ran the show.
18          Daniel Pipes specifically said
19 that he likes to do -- you know, speak and write
20 and read and research.  And that he is not
21 interested in anything administrative whatsoever.
22     Q.   Still, it's fair to say, is it
23 not, that to the extent that Daniel Pipes is
24 making decisions that you did not observe, you

Deposition of Lisa Barbounis                                    Lisa Barbounis v. Middle Eastern Forum, et. al.

Page 112

1  wouldn't know that he was making them, correct?
2      A.    Let's say this again.
3          I have watched Greg Roman make
4  major huge, huge, decisions for MEF without the
5  input of Daniel Pipes whatsoever on multiple
6  occasions.
7          So Greg Roman ran the show.
8      Q.    I understand what you're saying
9  with respect to what you observed.
10         But if you didn't observe --
11     A.    I don't know what I don't know.
12     Q.    Right.
13         So you don't know whether Daniel
14 Pipes was making decisions that did or did not
15 involve Greg Roman, unless you were there to
16 observe it, correct?
17     A.    Correct.
18         However, I have witnessed on
19 multiple occasions Greg Roman making decisions
20 that Daniel Pipes had no knowledge of and still
21 to this day Dr. Pipes has confirmed he had no
22 knowledge of those decisions.
23     Q.    You say that in a way -- and I
24 don't mean to read into your tone here, so if I'm

Page 113

1  misreading you, then forgive me.
2          But you say that -- you give that
3  answer in a way that makes me think that you are
4  of the belief that Greg doing so, making those
5  decisions without input from Daniel Pipes, was
6  somehow wrong or improper.
7          Am I correct on that?
8      A.    I'm just stating the facts.
9      Q.    Okay.  So for all you know then,
10 sitting here today, Greg Roman making those
11 decisions without Daniel Pipe's input may have
12 been entirely in accordance with Daniel Pipes'
13 wishes?
14     A.    Not true.  Because Daniel Pipes
15 had written an e-mail and said to us that he did
16 not know about our health insurance, that Greg
17 was doing -- that Greg was paying half of it.
18         And he wrote an e-mail to all
19 staff saying that he was unaware of this.  He
20 does not believe that -- he doesn't believe in
21 giving anybody benefits.
22         He thinks we are all adults --
23 these are his words.  We are all adults.  We can
24 make our financial decisions on our own.

Page 114

1          And so then he retracted our
2  benefits to only paying a third and then was
3  going to phase them out.  He did not know that.
4          He also did not know, and he put
5  this in an e-mail as well, that Greg Roman spent
6  $400,000 on an e-mail -- I mean, on a new website
7  platform.
8          Now, he knew we were upgrading the
9  website.  He didn't know how much was spent.
10 When he found out, not only was he horrified, he
11 told us all about it, that he did not know that
12 that was there.
13         He has admitted to numerous things
14 that Greg has done that he knew nothing about.
15     Q.    Okay.  So that's -- that-- I just
16 heard you talk about two decisions that Greg made
17 without Daniel's knowledge.
18     A.    There were so many of them.  I
19 couldn't sit here and list them all day.  We
20 would be here forever.
21     Q.    But my question to you is more
22 broad than that.
23         You talked earlier about many
24 decisions, lots of things that Greg Roman was

Page 115

1  doing without Daniel Pipes' knowledge, major
2  decisions, huge things.
3          You've now named two that,
4  according to you, based on what you heard from
5  Daniel Pipes, you believe that Daniel Pipes was
6  not aware of or disagreed with.
7          Are there any other major
8  decisions that are of the type that you're
9  referencing that Greg made without the approval,
10 authorization or input from Daniel Pipes?
11         MR. CARSON:  Object to form.
12         THE DEPONENT:  I mean, there were
13     others.  You know, getting rid of
14     employees comes to mind.
15         I can't give you specifics,
16     because I don't remember all the details.
17     But those were the two that I remember,
18     like, because Daniel Pipes had such a
19     negative reaction to it.  Like they're
20     the two that stick out in my mind.
21         But, you know, like, I can't
22     recall all of them honestly.  There's so
23     many.
24         It's like how many times have I

Deposition of Lisa Barbounis                              Lisa Barbounis v. Middle Eastern Forum, et. al.

Page 116

1  eaten at McDonald's?
2  BY MR. CAVALIER:
3      Q.   So --
4      A.   I don't know.  So many.
5      Q.   Okay.  So if I go back to the
6  chain of command of the hierarchy that we were
7  talking about before, from an organizational
8  standpoint, Daniel Pipes is the president of the
9  Middle East Forum, correct?
10     A.   Correct.
11     Q.   And regardless of what you
12 observed with respect to the decision-making
13 progress, Daniel Pipes was Greg Roman's boss,
14 correct?
15     A.   Correct.  Kind of.
16     Q.   Greg Roman reported to Daniel
17 Pipes?
18     A.   They were more like equals, but
19 yes.
20     Q.   Can Greg Roman fire Daniel Pipes
21 if he wanted to?
22     A.   No.  You're right there.  That's
23 fair.
24     Q.   Could Daniel Pipes fire Greg Roman

Page 117

1  if he wanted to?
2      A.   If he wanted to, he should have.
3      Q.   Did he have that power?
4      A.   Yes.
5      Q.   So then they're not really equals,
6  correct?
7      A.   That's fair.  Yes.
8      Q.   So below Daniel Pipes is Greg
9  Roman, correct?
10     A.   Yes.
11     Q.   Okay.  Is there anyone else at
12 Greg Roman's level below Daniel Pipes on that
13 tier of the hierarchy?
14     A.   No.
15     Q.   Okay.  So tell me the names of the
16 people who were below Greg Roman in the corporate
17 hierarchy at MEF while you were there?
18     A.   Marnie Meyer, Mark Fink, Matthew
19 Bennett, Sam Westrout, Oren Litman -- Oren.
20          Who else?  I'm trying to think of
21 everybody's name.
22          Winfield Meyers.  I'm trying to
23 think of all the project directors.  I mean,
24 there was a host of people.  Thelma Prosser,

Page 118

1  Goodrob.
2          I mean, there's a whole list of
3  people.
4      Q.   Okay.  So from your perspective,
5  those people you just named, the project
6  directors, they are -- they are your, for lack of
7  a better word, equals in the hierarchy at the
8  Middle East Forum?
9      A.   No, they're not.
10     Q.   Okay.  Then I thought my question
11 to you was, tell me the people, other than you,
12 who are at that tier of the hierarchy at the
13 Middle East Forum?
14     A.   I wasn't under that tier.
15          I was in a separate category all
16 of my own, as I described to you before.  I was
17 Greg's assistant and so I reported -- and so this
18 was a reporting hierarchy.
19     Q.   Okay.
20     A.   So I was his assistant; therefore,
21 like -- like, the project directors have people
22 who report to them.  Okay?
23          I didn't have anybody to report to
24 me.  I was -- Greg Roman was my direct

Page 119

1  supervisor, because I was his secretary.  I was
2  his assistant.
3      Q.   Okay.
4      A.   So nobody was, like, -- I was in a
5  little category floating over there by myself.
6      Q.   Okay.  But you reported directly
7  to Greg, correct?
8      A.   Correct.  Because he was my boss.
9  Correct.
10     Q.   And the project directors that you
11 just listed for me, they also reported to Greg?
12     A.   Correct.  But they could give me
13 work.
14     Q.   Sure.
15     A.   And, like, they assigned me things
16 and I was responsible to them, too.
17          So, like, -- so to say that, like,
18 if I did something wrong to, like, or whatever
19 with the project directors, then, you know, like,
20 they would have the ability to reprimand me.  And
21 then take it to Greg or whomever to whatever,
22 like, to implement disciplinary action.
23          So they were above me.
24     Q.   Did you consider them your

Case 2:19-cv-05030-JDW   Document 110-2   Filed 03/02/21   Page 33 of 193

Deposition of Lisa Barbounis                                    Lisa Barbounis v. Middle Eastern Forum, et. al.

1  superiors?
2      A.    I didn't consider them my equals.
3      Q.    Did you consider them your
4  superiors?
5      A.    Yes.
6      Q.    Okay.  Was Marnie Meyer considered
7  a project director?
8      A.    Oh, no.  She was Human Resources
9  and Chief Financial Officer.
10     Q.    Okay.  And was she Director of
11 Human Resources?
12     A.    Correct, yes.
13     Q.    So even though Human Resources
14 isn't a project, so to speak, she was still, at
15 least in your view, co-equal to the other project
16 directors in the hierarchy?
17     A.    Correct.  And she was above me.
18 That's very much accurate, yeah.
19     Q.    Okay.  Okay.  Did you ever have
20 anyone reporting to you during your time at the
21 Middle East Forum?
22     A.    Not until later.  And reporting is
23 like -- yeah.  So Delany Yoncheck, Marnie and I
24 had, like, split her for some time.  Like, you

1  know, Marnie would get her for some financial
2  things.  And I would -- she would do some
3  communicationy things and website, like, tasks
4  for us.
5          And so, yeah, she reported to me
6  so that, like, she didn't have to interact with
7  Greg.  But I wasn't technically her boss.  Was
8  just who was, like, somebody who was giving her
9  guidance and using her, you know, -- using her
10 work product to further whatever we were doing.
11 Whatever directive, like, Greg needed.
12         Greg would be, like, tell Delaney
13 to do this and so I would tell Delaney to do
14 that.  I'm like the middleman.
15     Q.    Okay.  So help me understand a
16 little bit more about that relationship.
17         You said you weren't like her
18 boss.
19         I mean, were you her superior
20 within the organization?
21     A.    I guess I was -- yeah, like, if
22 you look at things like seniority, I guess I'm
23 higher than her.
24     Q.    And you could give her tasks to

1  do, right?
2      A.    Correct.
3      Q.    And if she did a poor job or
4  refused to do them or what have you, did you have
5  the authority to reprimand her?
6      A.    I only had the authority to tell
7  Greg and then he would reprimand her.
8      Q.    Okay.  And generally speaking, had
9  you done so, would he take that instruction and
10 act on it?
11     A.    I don't know what he would have
12 done, because Delaney was a very good person.  So
13 I never had that thing.  So I don't know.
14     Q.    Okay.  Who else, other than --
15 well, I'll ask the question this way.
16         What was Delaney's role at the
17 Forum when she was reporting -- I don't want to
18 put words in your mouth.
19         When Delaney was doing work for
20 you, who -- what was her role?
21     A.    Well, we were always trying to
22 kind of, like, figure that out, because she was
23 doing checks and things for Marnie and she was
24 helping with, like, the donation side of things.

1          And she was helping with the radio
2  show and helping get articles placed and all that
3  stuff.
4      Q.    Okay.  Did she start as an intern?
5      A.    Yes, she did.
6      Q.    Was she ultimately hired for
7  full-time work?
8      A.    I think that she got hired -- I
9  don't really remember the specifics, but I think
10 she got hired hourly.
11     Q.    Okay.
12     A.    I don't know if that's full-time,
13 but hourly.
14     Q.    Okay.  Fair enough.
15         Is it fair to say that Delaney
16 Yonchek was the lowest level of employee at the
17 Middle East Forum?
18     A.    I guess, yeah.
19     Q.    She didn't have anybody reporting
20 to her, correct?
21     A.    No, she did not.
22     Q.    Okay.  Can you tell me the names
23 of the other people at the Forum during your time
24 there who were at Delaney's level, the lowest

Page 124

level?

A.   I mean, it's, like, such a weird set up, because it's not really -- so it would be only really Katrina and Delaney, because, like, Thelma only reported to Daniel Pipes, but she didn't have the same authority as the project directors.

Q.   Okay.

A.   She didn't really report to anyone else.

So, like, it's kind of like a strange thing.  Like Judy Goodrob was, like, she does the Middle East Quarterly.  And she doesn't really report to anybody but Daniel Pipes and Greg Roman.

But, like, she doesn't -- but she's certainly not higher then, you know, -- like she's not --

Q.   She's not equal to Marnie Myers, for example?

A.   Yeah.  Yes.  Yeah.

Q.   Even though she reports directly to Daniel Pipes?

A.   Right.

Page 125

Q.   Okay.  So from what I gather from you, what you're telling me is the hierarchy at the Middle East Forum was not a neat, ordinary pyramid, with lines drawn from each level to the bottom.

It was a little bit more scattered, so to speak, the reporting relationships?

A.   I guess.

Q.   Okay.

A.   I don't know.  I don't know.  Like, I don't know how to answer that.  I don't know.  I can't conceptualize it, so...

Q.   There's no right answer.

Again, I'm just --

A.   I'm not trying to give you a right answer.  Like, I guess.

Q.   Okay.  You said Delaney was a good employee?

A.   Yes.

Q.   What are -- so give me a sense of that.  Why was she a good employee?

A.   There was things that Delaney did as a young thing that were, like, you know, she

Page 126

would mess up on things or she would do something silly or here or there.

Delaney always tried hard, wanted to do the right thing, wanted to learn and be better.  And she had great ideas sometimes.

And there were times where she would -- she would read every single article and she was just really, like, devoted.  Like she wanted to do a good job.

Granted, it was her first job ever.  So, of course, she's going to make mistakes and not be perfect.  She was a good employee.  She had a good heart.  She was a good kid.

Q.   Okay.  By the way, just to be clear, we're all talking about these reporting relationships.

There's a distinction between who was reporting to Greg pre November 1, 2018, and post November 1, 2018, correct?

A.   We were all still reporting to Greg.

Q.   Well, tell me what you mean by that.

Page 127

A.   So, for example, I was told that I wasn't to have communication with Greg and he wasn't my direct supervisor; however, I was mandated to be on these project directors calls where he would assign me tasks and, you know, still have to communicate with me.  And everything really still flowed through Greg.

There was a point where I even called Daniel Pipes and I said, the staff is concerned.  I remember where I was standing.  I was standing by that white marble thing in the lobby.  And I was talking to Daniel Pipes on the phone.

I said, the staff is concerned that you're still making all your decisions and Greg's still running the show.

And he admitted on the phone that, yes, I still take advice from Greg.  I trust and value his opinions and we need Greg.

I mean, he was always there and involved and Daniel -- Daniel admitted that to me.

Q.   Well, of course.  I mean, he was still an employee of the Forum, correct?

Deposition of Lisa Barbounis                    Lisa Barbounis v. Middle Eastern Forum, et. al.

Page 128

A.    No, it was more than that. Like -- it was more than that.

He was able to give directives and if those directives were not followed through or people complained about those directives or anything like that, it would not be Greg that was in trouble for us.  It would always be us getting in trouble, because Greg gave us directives, even though he wasn't supposed to be supervising us.

Q.    Was he giving them to you directly?

A.    Yes.

Q.    How?

A.    On the project directors' calls, over e-mail.

Q.    Did you consider yourself to be reporting to Greg during this time?

A.    I mean, for all intents and purposes, Daniel -- like, there was plenty of times where I started reporting to Daniel Pipes for sure.

But I was still actually actively reporting to Greg Roman as well.  I mean, he would say, Lisa, what's going on with the radio

Page 129

show and blah, blah, blah.  And like give me directives.

Or, Lisa, I need to you do this. Or, Lisa, how come the IW articles aren't going out.  Whatever.

And it turns out, he was trying to trap me in that.  And he gave a directive three months before that they weren't to go out.

So, yes, he was still very much actively involved and actively supervising.

Q.    Did you have a problem with that?

A.    Yes.

Q.    Why?

A.    Because -- because Greg would, you know, continue his -- the same harassing, awful behavior.

Like I just gave you an example. He was completely retaliatory and disgusting. And even then, like, I had to go to a radio show with him, right?

And he called us all usurpers.  Or used the usurper thing, gave like this eye.  And then he would still look me and be gross with me whenever I did see him. He's gross. He's a

Page 130

terrible human.

And he continued to harass -- he tried to get me fired on things.  He would say, Daniel Pipes, this isn't happening, blah, blah, blah.

And then like on a -- we would discuss one.

Here's the example.  We would discuss something on the project directors' call, one of them was why the IW articles or newsletters or something weren't going out.  I don't remember what the specific thing was.  But it was with IW.

And so I said -- and so Greg's, like, yeah, it's fine, blah, blah, blah, blah. We'll make whatever decision.

And then Daniel Pipes was not on that phone call.  And I had been on the phone with Sam right afterwards, who runs IW.

And so then I get an e-mail from Daniel Pipes saying, how come the IW articles haven't gone out, blah, blah, blah, since you started, like, being in charge of putting them out.

Page 131

And I said, it was -- and so I said, nobody did it before me.  Four people have done this before me, never did, blah, blah, blah.

So I went to the person who got rehired, that who was in the office who did that.  And he pulled up the e-mail and said, no, three months ago they said we're not doing this anymore.

So Greg -- and he was, like, -- and Daniel and Greg were both on the e-mail thread.

And so when Daniel pressured me on it, I said, it's on the e-mail thread that we weren't doing this.  The whole thing was Greg is doing this retaliation.

He knew that Daniel wouldn't remember.  And so he's like, Lisa's not doing her job, to get me fired -- even though that there was a directive not to -- there was a directive not to do what he was accusing me of doing.

And Daniel Pipes wouldn't have known about that.  He said Greg came to him and said, it's come to -- Greg brought to my attention that you're not putting out the IW

Deposition of Lisa Barbounis                                    Lisa Barbounis v. Middle Eastern Forum, et. al.

Page 132

1  articles.
2       And I was, like, there was a
3  directive from three months ago for us not to.
4  And then Daniel Pipes left it alone and never
5  contacted me about it again, because he knew that
6  that was true.
7       So, yes, Greg Roman was still
8  making decisions.  Still trying to get me fired.
9  Still leering at me when he did see me.  He was
10 still always inappropriate.
11      Q.   You told me earlier that in your
12 view, Greg Roman was the one really in charge in
13 the Forum, correct?
14      A.   Correct.  There's a perfect
15 example of that.
16      Q.   If he wanted you fired, couldn't
17 he have just fired you?
18      MR. CARSON:  Object to form.
19      THE DEPONENT:  I don't know what
20 Greg Roman's motives were for not firing
21 me but there has to be cause and I was a
22 very good employee.
23 BY MR. CAVALIER:
24      Q.   What do you mean there has to be

Page 133

1  cause?
2       MR. CARSON:  I'm just gonna
3  object.  It calls for a legal conclusion,
4  speculation.  It's hypothetical.
5  Objection.  You can answer.
6       THE DEPONENT:  What would he fire
7  me for if I'm good at my job?  There's
8  never been a performance issue.  What
9  would be the grounds for firing me?
10 BY MR. CAVALIER:
11      Q.   In Pennsylvania, you don't need
12 grounds for firing somebody.  You can fire
13 somebody if you don't like the color of the tie
14 they're wearing.
15      MR. CARSON:  Objection.
16      THE DEPONENT:  Again --
17      MR. CARSON:  Wait.  Wait.  Wait.
18      THE DEPONENT:  Go ahead, Seth.
19 Sorry.
20      MR. CARSON:  I'm gonna object
21 based on form.
22      It calls for a legal conclusion
23 to what is and what is not an employee at
24 will and the exceptions to that.

Page 134

1       To the extent you know the answer,
2  you can answer the question.
3       THE DEPONENT:  Listen, I am not --
4  I'm not gonna hear, like, take -- presume
5  Greg -- Greg Roman's, you know, reasons
6  for not firing me or firing me.
7       I do know that he engaged in
8  retaliatory behavior to me non-stop and I
9  know this because I experienced it.
10 BY MR. CAVALIER:
11      Q.   Is every instance of disagreement
12 that you've had with Greg Roman post November 1,
13 2018, an instance of retaliation?
14      MR. CARSON:  I'm gonna object to
15 the extent that that question is
16 argumentative and it's also misstating
17 prior testimony.
18      Do you really want her to answer
19 that question?  Do you want to rephrase
20 it?
21      MR. CAVALIER:  I'd like -- if you
22 could answer, I'd like to hear your
23 answer.
24      MR. CARSON:  I think the question

Page 135

1  is, is every time you disagreed with Greg
2  Roman an example of harassment or
3  retaliation?
4       THE DEPONENT:  Of course not.  But
5  this isn't the case of disagreements.
6       He can say, hey, I don't think
7  that this should be worded that way and
8  that's fine.  That's not what he was
9  doing.
10      He was engaged in a campaign of
11 putting me -- like I said, in this
12 particular example, with the project
13 directors' call, on the call everything
14 was fine.  We had the conversation.
15      Then he went to Daniel, said
16 something different.  Didn't give him all
17 the information and with the intention of
18 making me look bad.
19      And then when I had the evidence
20 to back it up, Daniel Pipes let it go.
21      That is an instance of
22 retaliation.
23 BY MR. CAVALIER:
24      Q.   Well, you said Daniel Pipes let it

Page 136

go.  I mean, he agreed with you that you didn't
do anything wrong, correct?
          MR. CARSON:  I'm gonna object.
Argumentative.
          THE DEPONENT:  Actually, I don't
know what he agreed to or didn't agree
to, because after I wrote that, he never
responded to me at all.
BY MR. CAVALIER:
     Q.    But the issue went away, right?
You weren't disciplined or anything?
          MR. CARSON:  Objection.  You can
answer.
          THE DEPONENT:  What are you gonna
discipline me for if there's proof that I
didn't do anything wrong?
BY MR. CAVALIER:
     Q.    Well, so I agree with you.
          But it sounds like you had a
disagreement with Greg Roman.  You brought the
evidence to his boss and the issue went away.
          MR. CARSON:  Object to form.
Argumentative.  Assuming facts not in
evidence.  Misstating prior testimony.

Page 137

You can answer.
          THE DEPONENT:  That's what I was
just saying.  You mischaracterized what I
said.  It wasn't a disagreement.
          It was, was this being done, how
comes it wasn't being done.  Sam said,
we're not going to do this.  We decided
we're not gonna do this.
          Then he went and said something
completely different to Daniel Pipes.
There was not a disagreement.  We didn't
disagree about anything.  If he wanted me
to put the articles out, I would have put
the articles out.  That's not what
happened.
          You mischaracterized that whole
story.
BY MR. CAVALIER:
     Q.    Well, I understand all of that.
          But your testimony was that you
thought Greg was doing that to try to get you
fired.
          Correct?
          MR. CARSON:  Go ahead.  You can

Page 138

answer that question.
          THE DEPONENT:  Yes.
          MR. CARSON:  Was Greg doing that
to get you fired?
BY MR. CAVALIER:
     Q.    Okay.  But you weren't fired?
     A.    (No audible response.)
          MR. CARSON:  We can't hear you,
Lisa.  Say that again.
          THE DEPONENT:  Yes.
BY MR. CAVALIER:
     Q.    You weren't fired for this,
correct?
          MR. CARSON:  Or were you fired?
          THE DEPONENT:  I was not fired.
Actually, kind of.
          I mean they gave me -- the
conditions were so terrible and so long,
I, like, had to quit.  I didn't want to
quit.
          I loved the mission.  I'm a
mission-oriented person.  It was in
Philly.  It was near my kids.
          I didn't want to have to go find a

Page 139

new job.  Do you know how hard it is for
conservative people to find a
conservative job in Philadelphia?  Like
almost impossible.  I didn't want to
quit, I had to, because they were so
freaking awful.
BY MR. CAVALIER:
     Q.    We're talking about the issue
about the radio show here.
     A.    This was ongoing.  This happened
all the time.  And it wasn't about the radio
show.  You just mischaracterized it again.  It
was about the IW articles.
     Q.    Okay.  So let's talk about the IW
articles.  You brought it to Daniel Pipes's
attention.
          You thought Greg was doing it,
because he was trying to get you fired, correct?
     A.    Correct.
     Q.    But you were not fired for that,
correct?
          MR. CARSON:  Objection.  Asked and
answered.  Go ahead.
          THE DEPONENT:  Correct.

Deposition of Lisa Barbounis                                    Lisa Barbounis v. Middle Eastern Forum, et. al.

Page 140

BY MR. CAVALIER:

Q.    So the issue was then resolved favorably from your perspective, correct?

MR. CARSON:  Objection.

THE DEPONENT:  You're mischaracterizing what I'm saying. Trying to get someone fired and it not happening is still harassment.

BY MR. CAVALIER:

Q.    I'm not talking about harassment.

A.    Well, what are you talking about?

Q.    I'm just asking you whether the issue was resolved favorably to you.

A.    It wasn't resolved because nobody addressed it.  Daniel Pipes didn't say, oh, I'm sorry, Lisa, that, like, -- you know, I got poor information.  He just ignored me like I was nothing.  That's how he treated everyone.

MR. CARSON:  I also didn't say objection.  Argumentative.

THE DEPONENT:  Sorry, Seth.

BY MR. CAVALIER:

Q.    How do you know he just ignored you?  How do you know what he did?

Page 141

A.    Because he ignored me.  He never brought it up again.

Q.    How do you know he didn't bring it up to other people and solve the problem?

A.    He ignored me.

Then he should have said to me as a good leader, Lisa, I am sorry that this was brought to my attention in this way.  You are correct.  And I'll resolve it.

That's what a normal manager does. But they don't think that of you.

Like women there are beneath them and so they don't need to give you any explanation.  They don't need to let you know that it's been taken care of.

And I said to him, I said, he's lying about me.  And -- or what's gonna happen about that?  And Daniel Pipes never responded. Never responded.

Q.    Do you agree with me that in a typical employee/employer relationship there are disagreements between employers and supervisors?

MR. CARSON:  Objection.

THE DEPONENT:  You are

Page 142

mischaracterizing it.

BY MR. CAVALIER:

Q.    I'm not mischaracterizing anything you just told me.  I'm asking you a general question.

MR. CARSON:  So I'm gonna object based on form, hypothetical.

You can answer whether or not in any normal employee/employer relationship there with be disagreements.

THE DEPONENT:  Yes.  There are -- hypothetically or whatever you guys want to say, there can be -- there's often disagreements between employees and employers, yes.

BY MR. CAVALIER:

Q.    Do you think Greg -- do you think Greg Roman was a difficult boss?

A.    I think Greg was a terrible boss.

Q.    Okay.  So with that said, can you give me one instance where you had a disagreement over work with Greg that you would not categorize as harassment or retaliation?

A.    There's plenty.  We disagreed

Page 143

on -- okay.  So there was -- Greg and Daniel had wanted Tommy Robinson to come over in November. I think it was 2018 or '19.  I think it was '19. No, '18.  '18.  2018.

November 2018 they wanted Tommy Robinson to come over and do a panel at Congress and they asked me to help with his Visa.

And I had requested that Greg keep it under wraps so that we -- so that we wouldn't publicize it while I'm working on the back end to try to, like, work the back channels to help with this Visa application, you know, that -- that it not be public, because then both governments would get pressure from external people.

And we had a disagreement about that.  And he decided to put the press release out anyway, that we were working on this Visa and that Tommy Robinson was supposed to come to this event in November.

We disagreed on that.  That wasn't retaliation.  That was structure.  That was what, he, as the director, wanted to do.  That wasn't retaliation.  That was a different way of -- that's a disagreement, a different way of wanting

Page 144

1  it to happen.
2      Q.    Okay.  So what makes one -- let's
3  just talk specifically about the issue you just
4  described for me and the issue we just talked
5  about a few minutes ago.
6          Okay?
7          MR. CARSON:  So is there a
8      question?
9  BY MR. CAVALIER:
10     Q.    Yeah.
11         The question is, what makes one
12 retaliation and harassment and one not?
13         MR. CARSON:  I'm gonna object to
14     the form of the question.  Calls for a
15     legal conclusion.
16         To the extent you understand what
17     the legal definition of harassment and
18     retaliation is, you can answer.
19         THE DEPONENT:  One, it's having a
20     disagreement.  And two is reporting
21     untruths to me to the president of the
22     organization, untruths about my work.
23         That's the difference.
24

Page 145

1  BY MR. CAVALIER:
2      Q.    Okay.  So the fact that he told
3  Daniel something you believe is untrue about your
4  work makes -- makes --
5      A.    Not that I believe it was untrue.
6  It was untrue.
7      Q.    I understand that.  But that's the
8  distinction.  That's what makes it retaliation
9  from your --
10         MR. CARSON:  Objection.  Again, it
11     calls for a legal conclusion to the
12     extent she understands the legal
13     definition of retaliation.
14 BY MR. CAVALIER:
15     Q.    You can answer.
16     A.    That is the difference.  He lied
17 about me.
18         What intention -- what intention
19 did he have to lie about me to his boss, when he
20 clearly understood the whole thing, because we
21 had talked about it earlier that day on the
22 project directors' call?
23         What was the purpose of lying
24 about it to Daniel Pipes?

Page 146

1      Q.    And these two events, based on
2  what you told me, happened around the same time
3  as one another?
4      A.    No.
5      Q.    I thought you told me that the --
6      A.    November 2018 was the Tommy
7  Robinson thing.  And I think -- I can't remember
8  exactly, but it was sometime before Greg Roman
9  came back, you know, like -- not came back, but,
10 like, was allowed to have his official title of
11 director, although nothing changed before then.
12         So I would say it was probably
13 between January -- because I didn't start doing
14 the output of those articles until January.
15         So it had to be between January
16 and March or April.
17     Q.    Okay.  Did it upset that he lied
18 to Daniel Pipes about you?
19         MR. CARSON:  Objection.  You can
20     answer.
21         THE DEPONENT:  Yes.
22 BY MR. CAVALIER:
23     Q.    Did you think about quitting?
24         MR. CARSON:  Objection.  You can

Page 147

1  answer.
2          THE DEPONENT:  I thought about
3  quitting multiple times over the course
4  of working at the Middle East Forum.
5          However, the reason that I stayed
6  was because, like I said, there are not
7  very many job opportunities for
8  conservative people in Philadelphia.
9          It was close to my family.  Close
10 to my children.
11         And now that I was forced to
12 leave, I have -- I live two-and-a-half
13 hours away from my children so that I
14 could get a job here, so that I could
15 work.
16 BY MR. CAVALIER:
17     Q.    Did you tell Daniel Pipes that you
18 believe that Greg's actions in this respect were
19 retaliation?
20     A.    Yes.
21     Q.    Did you tell Daniel Pipes that you
22 believed that his actions were retaliation that
23 was a result of the complaints that you lodged
24 against him in November of 2018?

Page 148

A.  I told Daniel Pipes on multiple occasions that I believed that Greg to be retaliating against me and he never responded.

Q.  Other than this incident that we're discussing, were there any other instances of retaliation that Greg Roman directed toward you between November of 2018 and May of 2019?

A.  Yes, there were so, so many.

MR. CARSON:  Same objection as before.  Calls for a legal conclusion.

You can answer.

THE DEPONENT:  There's so much.

BY MR. CAVALIER:

Q.  Tell me about them.

A.  I mean, I'll be here all day.

We'll be here into next week if I could, you know, clearly remember the specifics of all of them.  I'm trying to remember another one.

But I had written to Daniel on multiple occasions about it via e-mail.

I remember one time, and I don't remember the cause of it, but I said to him, I feel like that you guys are trying to, you know,

Page 149

like, -- like have a list of things that you can put on to, like, fire me about and none of them are true.  And I keep coming back to you and telling you that, like, they aren't true.  And I prove it.  And then I don't hear anything.

And he didn't respond to that either.  I mean, I went to Daniel, like, a bunch of times.  Nothing ever happened.

Q.  I understand you're saying you went to Daniel a bunch of times.

My question to you is, you talked about one instance where Greg, according to you, gave Daniel incorrect or false information about you in your view in order to retaliate against you and try to get you fired.

A.  Correct.

Q.  Okay.  Can you tell me about another incident that occurred during this same time window, between November of 2018 and May 2019, that Greg was retaliating against you?

MR. CARSON:  Objection to the extent it calls for a legal conclusion.

You can answer.

THE DEPONENT:  Yeah, I believe

Page 150

that there were many more, because I remember writing e-mails.  I just don't remember the specifics of exactly what they were.  Honestly, I don't.

I remember writing multiple e-mails to Daniel in that time period and I don't remember the specifics.

If I had copies of the e-mails in front of me, I'm sure it would jog my memory.

BY MR. CAVALIER:

Q.  Is there anything else as we sit here right now that stands out in your head as being as of a severe level as that other incident that we talked about?

MR. CARSON:  Objection.  Wait.  Wait.  Object to form.

THE DEPONENT:  I actually remember there being a worse one than that and for some reason, like, it's escaping me now.  I don't know why I can't remember.

But there was one that was worse and I was, like, I cannot believe this is happening.

Page 151

And I, for the life of me -- listen -- and I remember being, like, angered by it.  And I don't remember -- I can't tell you right now for some reason.

Maybe it will come to me in a couple minutes.  You know how you, like, forget stuff like that once in a while?

There is one that I remember is worse and I'm trying to remember what it was.

BY MR. CAVALIER:

Q.  That's fair.  And if you think of it, I'd ask you to let me know and we can talk about it.

A.  Yeah, if it comes in, I'll be, like, oh, yeah, I remember.  I promise.

Again, there was another one that I remember being worse than that one.  I don't know if that one is the one that's coming into my head.

Q.  Do you remember whether there were disagreements that you had with Greg during this same time period that you would not consider to be retaliation, other than the one that we

Deposition of Lisa Barbounis                                    Lisa Barbounis v. Middle Eastern Forum, et. al.

Page 152

discussed before?

MR. CARSON: Objection to the extent that, like the previous question, calls for a legal conclusion.

If you understand what retaliation is, you can answer.

THE DEPONENT: I believe so. I mean, like, you know, we would -- I would write drafts of things that would go out and then Greg would correct them. I wouldn't totally like it. I'd write back. Like those types of things. And they're normal.

BY MR. CAVALIER:

Q. Okay. How would you describe generally your job -- well, strike that.

How were you feeling in general about your job at MEF during this time period?

A. You know, it's hard to have confidence in your job when people keep lying about your performance. And, you know, you start to feel really negative about, you know, being good at something when every thing is a freaking uphill battle.

Page 153

And, you know, they put me -- because they didn't want me, quote, being Greg's assistant, they put me into a position, like, there's nothing really here else for you to do.

So if Greg's not gonna be the, quote, director and you can't report to him, we're either going to have to let you go or we're going to have to make you do something we have a need for, which was, you know, back end of the website.

I mean, I am not a technical person. I don't have experience in coding. I don't have experience on posting to back ends of websites -- or I didn't at the time.

And so it made me feel -- it made me feel, like, not great, you know. And I pride myself on being a really good employee. But I was learning as I go. And I was trying my hardest. But, you know, but the expectations versus reality.

And it's the same thing that Daniel Pipes had said to me with Ahman. They gave her -- they said, Ahman Patel -- and Daniel Pipes said this to myself directly -- that they

Page 154

gave her a position that they knew she couldn't do, so that she would go herself. And they were doing the same thing to me.

And I expressed that to Daniel Pipes. And he said to me, he goes, well, I knew about that situation with Ahman and that's not what we're doing to you. I signed off on doing that to Ahman.

But why would you admit to somebody that that's what you're doing to them? And really that's what it felt like.

They knew I didn't -- there was one point where, you know, where Greg was telling me -- I mean, this was right away, this was in January, that I should take a coding class and I needed to do this and this. And he would instruct me on what to do on the back end of the website. Sometimes it would be right and sometimes it would be wrong.

Daniel Pipes would say, well, why did this format look like this? I'm like, that's how Greg told me to do it. And then, you know, Greg would change his mind -- or change his mind or maybe he wasn't telling me directly.

Page 155

Like, they were purposefully trying to set me up for a job that I couldn't do. Of course it made me feel terrible.

Q. Okay. You just said earlier they said to you that, you know, if Greg wasn't around and you were Greg's assistant and there was nothing else you could do, they would have to let you go. Right? That's what you said?

A. Well, because they didn't want to fire me -- he said this. He said, I don't want to fire you because you complained about Greg.

Q. But couldn't they have just easily fired you by saying, Greg's not around anymore, sorry, you're Greg's assistant, you don't have a job?

MR. CARSON: Objection. Argumentative.

You can answer.

THE DEPONENT: Daniel Pipes said to me, you reported -- you reported Greg Roman for sexual harassment. We can't just fire you.

BY MR. CAVALIER:

Q. Hold on a second. Hold on a

Page 156

second.

Your testimony is that Daniel Pipes said to you, you complained about Greg Roman for sexual harassment, we can't just fire you?

A.   In other words, yeah.  I don't remember what they were, but that was the intent of his statement, yeah.

And it was, like -- it was, like, when we were trying to figure out a job for me.

Q.   Are you layering your interpretation onto what Daniel Pipes actually said to you there?

A.   I don't know what that means.

MR. CARSON:  Objection. Argumentative.

BY MR. CAVALIER:

Q.   Do you remember what Daniel Pipes actually said to you at that point in time?

A.   It was along those lines.  I don't remember verbatim.

But we were trying to figure out what to do and I said to him, I don't know how to do this.  And then Greg said, Lisa seems

Page 157

resistent because in one text I said to him -- we were trying to figure out what for me -- like to do -- like what there was for me to do.  And this was right -- this was, like, in January.  Right after, like, Greg was removed.

And they decided to do the back end of the website.  Well, Greg had to teach me the back end of the website.

And I remember him being, like, very argumentative to me.  And maybe I should take a computer class in my own time.

And then I said, Greg, I don't know.  This is all Greek to me.  I'm just gonna wait for the instructional stuff from whoever I was taking the training with.

And then -- and then he reported to Daniel, because I said that it was all Greek to me.  My husband's Greek, right?

But it's, like, all Greek to me.  That I was going to wait for that, that I -- he didn't think that I was -- he told Daniel I wasn't fully invested in this transition.

And Daniel wrote me a reprimanding e-mail, like, are you?  Because Greg says you're

Page 158

not.  And if you're not, you know, willing to -- of course I was willing to be a hundred percent on it.  But, like, it's something brand new to me.

And this was a repeated pattern. Like this is all the time.

And, like, that's another example of him trying to get me fired.

Like, you know, -- he took what I said, it's all Greek to me out of context and then reported to Daniel that I was being -- what do you call it?  I was being, like, insubordinate or I was being, like, not a team player.  He was using it in negative connotation when it was like I'm gonna wait for the people to train me.

Because, A, I didn't want to also have interaction with Greg Roman when I was told I wouldn't have to.

BY MR. CAVALIER:

Q.   Okay.  Well, I'm gonna come back to that.

But you just said -- you just said that you were told you wouldn't have to have interaction with Greg Roman, because you didn't want to.

Page 159

It's true, though, that you then truly thereafter asked for him to be brought back, correct?

MR. CARSON:  Objection.  You can answer.

THE DEPONENT:  I asked for Greg Roman to come back months later.  And the reason that I asked for Greg Roman to come back is because Daniel Pipes was floundering with -- he's not an administrative person.  He's not whatever.

And Matt Bennett had talked to me and he's like, Greg learned his lesson. I still talk to Greg.

You know, if, like -- we're looking for a director.  Nobody seems to meet Daniel's qualifications.  We're kind of spinning out of control here.

Daniel feels more secure with him. You know, maybe we should bring him back and let -- or you should make the -- inquire to bring him back.

And Greg will be appreciative,

Case 2:19-cv-05030-JDW   Document 110-2   Filed 03/02/21   Page 43 of 193

Deposition of Lisa Barbounis                                   Lisa Barbounis v. Middle Eastern Forum, et. al.

Page 160

1 learn his lesson and not subject you to
2 the same crap over and over again.
3        And I was like that seems
4 reasonable.  If I did something wrong and
5 I had a conscious and I knew I did
6 something wrong, I would feel sorry and
7 change my behavior.
8        But that's not what happened.  He
9 brought Greg back and he got worse.
10 BY MR. CAVALIER:
11    Q.    I don't mean to be flippant here,
12 but based on what you're describing to me it
13 seems like for a company that's trying every
14 which way to fire you, they're really bending
15 over backwards to not fire you.
16        MR. CARSON:  I'm gonna object.
17 You're mischaracterizing her prior
18 testimony.  She never said the company
19 was trying to fire her.
20        I'll object to the form.
21 BY MR. CAVALIER:
22    Q.    I'll expound on it.
23        You said with respect to this
24 website project that Greg went to Daniel and told

Page 161

1 him that you weren't fully invested in the
2 project in an effort to get you fired.
3        Is that an accurate description of
4 your testimony?
5    A.    Well, this wasn't, like, a -- this
6 wasn't, like, a one-time thing that, like, -- if
7 you tell somebody, like, they don't seem
8 whatever, but it was -- he was -- Greg was doing
9 these things over and over again to build up in
10 Daniel's mind here that I was a terrible person,
11 get what he ultimately wanted, was me out.
12    Q.    Why do you believe that Greg would
13 have had to engage in this kind of a campaign
14 against you for something as simple as having you
15 fired if he had so much power?
16        MR. CARSON:  Objection.
17 Speculative.  Form.
18        You can answer.
19        THE DEPONENT:  Because Daniel
20 Pipes is -- I don't know honestly.
21        I don't know.  But that's what was
22 happening.
23        Okay.  So even if he wasn't trying
24 to get me fired, which I believe he was,

Page 162

1 but what would be the point of constantly
2 telling the boss false things -- like,
3 you know, the president false things and
4 taking them out of context over and over
5 again?
6        Was that to, like, make me feel
7 good?  Was it to -- was it to harass me?
8 Was it to get my fired?
9        It certainly wasn't for anything
10 positive.
11 BY MR. CAVALIER:
12    Q.    Maybe he's just a bad boss, no?
13        MR. CARSON:  Objection.
14 Argumentative.  You can answer.
15        THE DEPONENT:  No, sir.
16 BY MR. CAVALIER:
17    Q.    So, again, I'll ask the question
18 in a different way that maybe will help you
19 answer it.
20        So we have Greg, all powerful,
21 within MEF, you know, the guy, the decision
22 maker, master manipulator, as you called him,
23 brilliant with respect to playing people off of
24 one another and getting his way.  And all of

Page 163

1 these things that you've testified to in the
2 past.
3        Why do you think he would have
4 gone through so much trouble to try and get you
5 fired instead of just firing you?
6    A.    Okay.  Wait a minute.
7        MR. CARSON:  Look, I'm gonna
8 object to the form of the question.
9        Calls for speculation.  You're
10 asking her to testify about what was in
11 Greg Roman's head.
12        To the extent she knows, she can
13 answer.
14        THE DEPONENT:  Greg did not start
15 that telling Daniel Pipes things about me
16 at all until -- until we reported Greg.
17        So that was a change in his
18 behavior.  That was retaliatory.
19        He did not -- he was not that bad
20 boss that you want to claim -- that
21 you're trying to insinuate here before
22 that.
23        He never -- he would only say good
24 things to Daniel Pipes prior to -- to us

Page 164

1 reporting him.
2        Then -- excuse me.  I'm not
3 finished.
4 BY MR. CAVALIER:
5    Q.    Go ahead.
6    A.    Then when -- then when we reported
7 Greg and Greg was supposed to be not there or not
8 reporting to us, that's when these instances kept
9 coming in and coming in, coming in.
10        That didn't happen before.
11        Before that, Greg was hitting on
12 me and being inappropriate with me and whatever.
13        That new behavior, okay, that
14 retaliatory behavior began after we reported Greg
15 Roman.
16    Q.    Before the meeting in early
17 November of 2015, whenever Greg -- or 2018, I'm
18 sorry, whenever Greg had an issue with your work
19 performance, he would come to you about it,
20 right?
21    A.    No, actually.  No.  No.  As a
22 matter of fact, if he had any issue with what I
23 was doing, he would usually tell Marnie to tell
24 me, because he didn't want me to, like, not like

Page 165

1 him or whatever.
2        I don't know what his reasoning
3 was.  That was an assumption.  But, like, no,
4 because I remember saying to Marnie, are you the
5 Human Resources Director or are you my boss?
6        Because if Greg has a problem with
7 my work, maybe he should discuss it with me.
8    Q.    Is it your testimony that prior to
9 November 1st, 2018, Greg Roman never came to you
10 with a problem?
11        MR. CARSON:  Objection.  Not what
12    she said.  You can answer.
13        THE DEPONENT:  There were times
14    where, like you characterized before, we
15    had disagreements about things.
16        But I was always pretty good at my
17    job.  And there wasn't really any
18    complaints.  And I have no documentation
19    in my personnel file of anything that I
20    ever did wrong.
21 BY MR. CAVALIER:
22    Q.    Okay.  But just like in any normal
23 employer/employee supervisory relationship, you
24 had issues about the work that was being done at

Page 166

1 certain times and you talked about it, correct?
2 Is that accurate?
3        MR. CARSON:  Objection.  Object to
4    form.
5        THE DEPONENT:  You are, again,
6    mischaracterizing my testimony.
7        He said things that were untrue
8    and twisted things that I said and sent
9    them to somebody else.
10        When there were ever questions
11    about my work --
12 BY MR. CAVALIER:
13    Q.    Before --
14    A.    I'm not finished.  You're talking
15 about the wrong time period here.
16    Q.    No, I'm not talking about any time
17 period.
18    A.    Can I just finish my answer?
19    Q.    Sure.
20        As long as you're answering the
21 question I asked.
22    A.    I am trying to answer the question
23 that you asked.
24        The question that you asked was --

Page 167

1 do you want to repeat it?
2    Q.    The question was, prior to the
3 November 1st meeting, isn't it fair to say that
4 like any normal employer/employee,
5 supervisor/supervisee, you had discussions about
6 your work?
7        MR. CARSON:  Object to form.
8    Mischaracterization of prior testimony.
9        THE DEPONENT:  And, again, I will
10    say that the -- we are talk -- you are
11    talking about two different things.
12        If he was unhappy with my work and
13    he would say something to Marnie, it was
14    something legitimate.
15        It was, I didn't do something fast
16    enough.  And it was legitimate.
17        What happened after
18    November 2019 --
19 BY MR. CAVALIER:
20    Q.    That's not my question.
21    A.    Excuse me.  I'm not finished.
22    Q.    You're answering a question I
23 didn't answer.
24    A.    It doesn't matter.  This is part

Deposition of Lisa Barbounis                                      Lisa Barbounis v. Middle Eastern Forum, et. al.

Page 168

1  of my answer.  And you know that that's okay and
2  you're not allowed to cut me off.
3          MR. CARSON:  Why don't you finish
4      this question and we'll take like a
5      five-minute little breather.
6          MR. CAVALIER:  That's fine, Seth.
7  BY MR. CAVALIER:
8      Q.    The question was only about -- I'm
9  going to ask you the question that you want to
10  answer.  But I'm trying to keep the record clean.
11          So, again, you talked about what
12  Greg said to Marnie at certain points.  That's
13  not what I'm asking you.
14          It's a very simple question.  And,
15  I mean, you seem to be thinking I'm trying to
16  trick you here.
17          It's a very basic question.
18          Did you and Greg Roman, prior to
19  November 1st, 2018, ever have discussions about
20  your work for the Middle East Forum?
21      A.    Of course.  He's my boss.
22      Q.    Of course.  He's your boss.
23          After November 1st, 2018, he was
24  not allowed to have those discussions with you,

Page 169

1  correct?
2      A.    He did anyway.
3      Q.    When?
4      A.    Via e-mail.  For the normal
5  discussions about my work, okay, that was done
6  on -- he was allowed to contact us during normal
7  business hours and via e-mail.
8          So if he didn't like something
9  that I did or he was unhappy with some of my work
10  product he would tell me.
11      Q.    Right.
12      A.    He would tell me.  Okay.
13          However, what he did that was
14  different was make things up and tell Daniel
15  instead of coming to me.  That's what he did.  He
16  did both things.
17          The only thing that was new, the
18  new behavior, was that he was lying to Daniel
19  Pipes about stuff about me.
20      Q.    Good.  Then this is useful.  This
21  is why I am asking the questions.  Now I
22  understand where you're coming from.
23          So it's that lying to Daniel Pipes
24  between November 1st, 2018, and May of 2019, that

Page 170

1  constitutes retaliation in your mind?
2          MR. CARSON:  Objection.  Object to
3      form.  You can answer.
4          THE DEPONENT:  Yes.
5  BY MR. CAVALIER:
6      Q.    Okay.
7          MR. CAVALIER:  Do you want to take
8      a break, Seth?
9          MR. CARSON:  Yeah, I think just a
10      little breather would help.
11          THE DEPONENT:  Yeah, I have to go
12      to the bathroom anyway.
13          MR. CAVALIER:  Do you want to take
14      10?
15          MR. CARSON:  Yeah, 10 minutes is
16      good.
17          THE VIDEOGRAPHER:  The time is
18      1:13 p.m.
19          We are off the record.
20          The time is 1:34 p.m.
21          (Recess taken.)
22          THE VIDEOGRAPHER:  We are back on
23      the record.
24

Page 171

1  BY MR. CAVALIER:
2      Q.    Okay.  When we left off,
3  Ms. Barbounis, we were talking about the period
4  of time between November 1st, 2018, and May of
5  2019.
6          During that time period, were you
7  ever disciplined by the Middle East Forum?
8      A.    What do you mean by disciplined?
9      Q.    Were you ever issued a written
10  reprimand, for example, by the Middle East Forum
11  for your employment?
12      A.    I was actually written a couple
13  and then when I responded to them -- when I
14  responded to them, they seemed to disappear,
15  because I countered what they said, so...
16      Q.    Okay.  So when I asked you if you
17  had been reprimanded, you said that you received
18  them and responded to them.
19          What exactly are you talking
20  about?
21      A.    Like, for example, Mark Fink wrote
22  me a reprimand about attending the National
23  Conservative -- the National Conservative
24  Conference in Washington, D.C.

Page 172

And he wrote this huge, whole long four paragraph e-mail to me about how I was told that I had to convey my political -- my political dealings or things like that with them, with the Middle East Forum, and I didn't do that.

And it had been brought to his attention by Daniel Pipes that I was -- attended this conference.

And so then I responded to that e-mail by saying, Daniel Pipes gave me permission. And I gave him the screenshots of the permission that Daniel Pipes gave to me.

And then he never replied to me either.

So that was a written reprimand, but when I showed him that I had already received permission from Daniel Pipes, nobody said anything after that again.

Q.    Okay.

A.    So yes and no.

Q.    Okay. So you call that a reprimand, that sounds like it was an e-mail questioning your employment performance in a certain area.

Page 173

A.    That's why I said, what do you mean by reprimand? What do you mean by --

Q.    Was there ever a written reprimand placed in your file regarding any of your employment activities?

A.    No.

Q.    Okay. Was your salary ever reduced?

A.    No.

Q.    Were you ever placed on probation?

A.    No.

Q.    Were you ever put on a performance improvement plan?

A.    No.

Q.    Were your responsibilities ever reduced?

A.    Yes.

Q.    In what way?

A.    When -- so they had an employee that had quit and come back. And Daniel hired him. And then they started reducing -- giving him most of my work and reducing my work.

And I had said something to Daniel Pipes about it. And he just said that -- that

Page 174

Gary, who got the work, was more accomplished in this area and so that they were -- they were giving him, like -- honestly, he been doing -- that's who did our website for, like, 10 years, uploading the things as the MEF online editor.

He had been doing it for a very long time and so that he said that, you know, he has been doing this and we're gonna take it away.

And so then there were times where I said, Daniel, then, like, what I am going to be doing if Gary is doing all my work?

So, yes, my job and my responsibilities were diminished, correct. Yes.

Q.    This is the same -- the same website responsibilities you were telling me about earlier?

A.    Correct.

Q.    Did you have a problem with the fact that they were taking the website responsibilities and giving them back to Gary?

A.    Yeah. I mean, I was starting to, like, understand it and enjoy it. And I always knew and I told Daniel in the beginning when he asked me if I was all in, I was all in.

Page 175

And I thought I was doing a pretty good job. Granted, there was a learning curve. But I wanted to forward the mission of MEF, so yeah.

Q.    Is it fair to say then that Gary was more experienced in that area than you were?

A.    Gary was more experienced, yes. That's fair.

Q.    Is it fair to say that he had more skills in that area than you did?

A.    Yes, he did.

Q.    And despite the fact that they took this responsibility away from you, again, your salary wasn't reduced as a result, correct?

A.    This was in a very short time frame before I left, but yeah.

Q.    Okay. So that's a great point. When did this occur? Because, again, remember we're talking about November 1 through May 8th of 2019.

A.    I don't remember when Gary got hired.

Remember, I left in, like, August. But I don't remember when Gary got

Deposition of Lisa Barbounis        Lisa Barbounis v. Middle Eastern Forum, et. al.

Page 176

1 hired, but it was a slow progression.  Like they
2 would give him a little and they would give him a
3 little more, give him a little more.
4     Q.    Okay.
5     A.    And, you know, --
6     Q.    Okay.  And then just to be clear,
7 at no time during your employment at the Middle
8 East Forum were you ever fired, correct?
9     A.    Was I asked to leave?  No.  Never.
10     Q.    Okay.  And you were never forced
11 to leave?
12     A.    I was forced to leave.
13     Q.    Well, you were never told to
14 leave?
15     A.    That's exactly what I said, I was
16 never asked to leave or told to leave.
17     Q.    Right.
18     Did you feel like you were doing a
19 good job with the website at MEF?
20     A.    Like anybody else, there were
21 times where I had doubt and I was upset with some
22 things, like, sometimes, you know, -- like
23 anything that you're trying to learn and be good
24 at, there are times where you're, like, I suck at

Page 177

1 this, I need to get better.
2     And honestly there were times
3 where I needed -- it was new.  All new to me.  I
4 never did anything like this in my entire life.
5     So, yeah, of course, there were
6 plenty of times where I was frustrated and it was
7 harder than expected or there was websites -- it
8 got easier after we moved from one platform to
9 another, but yeah.
10     Q.    Do you think that the Forum had a
11 legitimate reason for transferring those
12 responsibilities to Gary?
13     A.    No, at that point -- by the time
14 Gary got there, I was getting pretty good at
15 that.
16     Q.    But not as good as Gary?
17     A.    I mean, that's subjective.
18     Q.    Right.
19     But you just told me earlier that
20 Gary had more skills in that area and more
21 experience.
22     A.    Well, Gary had been doing it for a
23 long time.
24     Q.    Right.

Page 178

1     A.    That doesn't mean necessarily just
2 because he's been doing it a long time doesn't
3 mean it's better, he's better at it.  But I'm
4 just saying, like, Gary had been doing it.  And
5 that's the excuse that they used.  But like I
6 said, that's subjective.
7     Q.    Well --
8     A.    By that time, I was getting pretty
9 good at it.
10     Q.    You're saying, it's subjective as
11 to whether he was better at it than you, but it's
12 not subjective as to whether he had more
13 experience and more skills, correct?
14     A.    Skills is relative, but more
15 experience is accurate.
16     Q.    Okay.  And to be clear, this is
17 what he was doing for the Forum before he left,
18 correct?
19     A.    Part of it, yes.  Yes.  I will add
20 he left because of Greg.
21     Q.    Why did he leave?
22     A.    He saw how everybody was being
23 treated.
24     Q.    Was Gary being treated poorly?

Page 179

1     A.    No.  Gary and Greg just constantly
2 had -- I don't think Gary was treated poorly at
3 all.
4     Gary and Greg just had differences
5 in opinions of how things should run.  And so
6 Gary said, I like my way and so I'm going to
7 leave.
8     Q.    Okay.  Can you give me an example
9 of what you mean by that?
10     A.    That's all I really remember.
11     Q.    Okay.  And yet he then decided to
12 come back?
13     A.    Yeah.  He said he came back
14 because he liked the mission and liked Daniel.
15     Everybody that does this work is
16 mission driven.  That's the kind of industry it
17 is.
18     Q.    Does Gary have a Master's in
19 Middle East studies?
20     A.    I don't know.
21     Q.    Do you know where he went to
22 school?
23     A.    I do not know.
24     Q.    Do you know how long Gary has been

Page 180

1  engaged in the --
2      A.   I don't know much about Gary, to
3  be honest.
4      Q.   Okay.  How long did the Gary work
5  for the Forum before he resigned the first time?
6      A.   I don't know.
7      Q.   Okay.  Do you think that the
8  Middle East Forum giving Gary the
9  responsibilities of the website back was
10  retaliation against you?
11          MR. CARSON:  Objection.  Calls for
12      a legal conclusion.
13          THE DEPONENT:  I wasn't -- that
14      was a Daniel Pipes decision.  And I
15      don't -- I didn't -- I don't know -- I
16      don't know the motives behind that, so I
17      can't -- I can't say what is or isn't.
18          At the time there were -- there
19      were instances where it felt like that
20      and there were times that it didn't.  So
21      I don't know.  The answer to that is I
22      don't know.
23  BY MR. CAVALIER:
24      Q.   Do you have any reason to believe

Page 181

1  or any factual information that would indicate
2  that the decision made by Daniel Pipes to give
3  those responsibilities to Gary was related to
4  your complaints about Greg Roman?
5      A.   I don't -- I don't know.
6      Q.   Well, the question is whether you
7  have any information?
8      A.   I don't know.  Maybe if I scoured
9  through my old MEF e-mails, I would remember.
10  But I don't know.  I don't remember.
11      Q.   So sitting here today, you're not
12  aware that you have any information that would
13  indicate that that decision by Daniel Pipes was
14  tied in any way to your complaint about Greg
15  Roman --
16      A.   Again, I don't know.
17      Q.   Did that transfer of
18  responsibilities to Gary have anything to do with
19  your decision to quit Middle East Forum?
20      A.   No.
21      Q.   Okay.  Just pulling up a document.
22  Give me one second.
23          Can you see that document?
24      A.   Can I see the document?

Page 182

1          I cannot -- I can see it.  I can't
2  read the writing on it.
3      Q.   I can blow it up for you.
4          But I just want to identify it
5  first.
6          MR. CAVALIER:  Can I have this
7      marked as Exhibit A?
8          (Deposition Exhibit A marked.)
9          THE DEPONENT:  I can't see what
10      any of that is.
11  BY MR. CAVALIER:
12      Q.   Yeah, I'll blow it up for you.  I
13  know you can't.
14          Let's just identify the document
15  and figure out what it is.
16          So this is a text message change.
17          Do you know what I mean when I say
18  a text message chain?
19      A.   Yes, I do.  Yeah.
20      Q.   And let's just identify it for the
21  record.  See this number up top?  See my cursor
22  --
23      A.   That's me.  I see it.  That's me
24  and Delaney.  I'm very.  I understand?

Page 183

1      Q.   No, I know you get it.
2          But it's important for the record
3  that we identify the document so it's clear what
4  we're talking about.
5          Okay?
6      A.   Uh-huh.
7      Q.   So then it's fair to say this is a
8  text message chain between you and Delaney,
9  right?
10      A.   Yes.
11      Q.   Starts, it appears, on May 29,
12  2019, and runs through June 2nd, 2019, correct?
13      A.   Uh-huh.
14      Q.   Okay.  To be fair, we'll start at
15  the top.
16          This is dated 5/30/2019, from
17  Delaney to you.  You're talking about what, I
18  don't know.  Doesn't really matter, because I
19  want to go down to this text message and talk
20  about it.
21          Can you see that or do you need me
22  to make it big?
23      A.   I see it.  It's a picture.
24      Q.   Yes.  So I'm gonna blow it up.

Page 184

We'll identify the picture.
So it's a picture file here.  I'm
gonna bring up --
A.    I think it's a picture of Ben
Baird, if I'm looking right.
Q.    So I will either ask you to
confirm or I will represent to you, if you're
more comfortable with it, that picture there
marked file name IMG_4311.HEIC is this picture,
which mark as Exhibit B.
A.    Yep.
(Deposition Exhibit Number B
marked.)
BY MR. CAVALIER:
Q.    Do we agree that's the same
picture?
A.    Yep.
Q.    We talked a little bit about this
picture in the last deposition.
I want to ask you some more
questions about it.
Who is that in the picture?
A.    Benjamin Baird.
Q.    When was it taken?

Page 185

A.    Whatever that date is -- whatever
is the date on that -- 5 -- 5/30/2019.
Q.    Okay.  I think that's the date the
message was sent.
But to the best of your
recollection, does that date seem like the date
you would have taken that picture?
A.    Sure, I guess.  I don't remember.
Q.    Okay.
A.    I mean, I remember that's when I
was at the -- an event in D.C.
Q.    Okay.  And Ben Baird was a Middle
East Forum employee, correct?
A.    No.
Q.    Was he a Middle East Forum
contractor?
A.    Nope.
Q.    Did he do work for the Middle East
Forum?
A.    He was a fellow and a contributor.
Q.    Educate me on the distinction
you're drawing between a fellow and an employee.
A.    A fellow is like a grantee.  They
can do whatever they want, as long as at the end

Page 186

of what they do, they cite that they are -- that
they are affiliated with the Middle East Forum.
Whereas, like, -- so, whereas, an
employee would be subject to, you know, like,
directives and things, like -- so what Benjamin
Baird would do is he would write an article on
his own time about his on topic, as long as it
was, like, related to the Middle East studies or
Islam or Islamism or anything like that.
And then he would just say at the
bottom, the requirement is at the bottom for
whatever work he does -- and that work does not
get checked by Daniel or Greg or anybody.
But then at the bottom he would
say, you know, fellow at the Middle East Forum.
Q.    Was he paid by the Middle East
Forum?
A.    I think he -- I don't know his
exact agreement.  Some fellows were paid.  Some
fellows aren't paid.
Q.    Do you know whether he was subject
to the Middle East Forum's policies and
procedures?
A.    I don't know.

Page 187

Q.    You said you don't know?
A.    I do not know.
Q.    Okay.
A.    I'm not involved in his, like --
you know, in his agreements.
Q.    Where did he do his work for the
Middle East Forum physically?
A.    At his home.
Q.    Where is his home?
A.    I believe in Ohio.
Q.    Okay.
A.    It wasn't work for the Middle East
Forum.
It was his work and then he
would -- he would have done that on his own.  So
he, like, -- I don't know how to explain this to
you, because you don't seem to understand.
But, like, say he writes an
article for the Jerusalem Post.  Okay?  That
would be an article he gets paid for to do by the
Jerusalem Post.
His agreement with MEF is just
that he says that he's affiliated with them.
That's what he did.

Page 188

So it's not work for -- like,
Middle East Forum doesn't assign him work.
They may now, because he's an
employee now.  But that's not what he was when he
was there.
He would produce his own articles
and just say I'm affiliated with MEF.
Q.    Do you know when he applied to
become an employee at MEF?
A.    I don't.
Q.    Are you certain that he was not an
employee on May 30th, 2019?
A.    I don't believe he was an employee
until after I left, because I remember him saying
to me later, oh, I got the job.  I believe.
Q.    Okay.  And just to be clear for
the record, this appears to be, what, June, July,
August -- three months approximately before you
left?
A.    It was May.
Q.    Right.
A.    Right.
So he was not an employee of MEF
at this time.

Page 189

Q.    Right.  I understand that.
But what I'm saying to you, this
message that you sent was sent approximately
three months or so before you left the Forum?
A.    Yeah.
Q.    Okay.  Did you ever set up any
interviews for Ben Baird?
A.    Yes.
Q.    Where?
A.    With One American News Network.
Q.    When?
A.    I don't remember the date.
Q.    What capacity did you set that
interview up for him in?
A.    I don't remember.  I don't
actually remember if I actually did it.
I know I went with him, but I
don't know if they asked to speak to him on their
own or they asked me to find them someone to
speak on the topic.
I don't really remember how all
that worked honestly.
He may have gotten that interview
on his own.  But I did go with him there to the

Page 190

interview.  And I don't even think I went in MEF
capacity.  I just went.
Q.    I don't understand the distinction
you're drawing there.
You're saying -- you say you went
to the interview with him.  He's an MEF fellow.
You're at this point in time Director of
Communications for MEF.
A.    He also worked for another
publication.  He was an actual employee of
another organization at the time.
That's not how this works.
Q.    Right.
But the interview that was set up
for him, it was set up with your involvement?
A.    I don't know that.  I don't
remember that.
But even if it was, there are
plenty of other things that, like, for example,
my old boss, Congressman Costello, asked me to
set up interviews, too, right?
But he's never talking about
Middle East studies or anything related.
I don't remember what the topic

Page 191

Ben was talking about either.
But, like, if I did -- if I did
that for somebody else, that's not in an MEF
capacity.
Like that would be, like, oh, you
know -- I do that for people now and it's not in
the capacity of my current job.
It's I have connections.  We have
connections.  And if somebody needs assistance,
like it wouldn't have been in a MEF capacity, I
don't believe anyway.  Like I said, I don't know
the circumstances about the interview.  I don't
remember.
Q.    Were you the Director of
Communications for the Middle East Forum at this
point?
A.    First of all, I was only Director
of Communications in name only and there's an
e-mail to that effect.
Q.    Was your title the Director of
Communications at the Middle East Forum at this
point?
A.    Not internally, only externally.
Q.    Externally was your title

Deposition of Lisa Barbounis                              Lisa Barbounis v. Middle Eastern Forum, et. al.

Page 192

1  Direction of Communications for Middle East Forum
2  at this point in time?
3      A.   Yes.
4      Q.   Did you set up interviews for
5  Middle East Forum fellows as the Director of
6  Communications during this period of time?
7      A.   Occasionally.  But I don't know if
8  this is one of them.
9      Q.   Right.
10      But he -- Ben Baird is an MEF
11  fellow, correct?  Or was during this period of
12  time?
13      A.   Is, yes.
14      Q.   Okay.  So then how are you of the
15  belief that this may not have been an interview
16  that you set up through your capacity as the
17  communications director for the Middle East
18  Forum?
19      A.   Because I also set up interviews
20  for Sidney Watson, who was unaffiliated with the
21  Middle East Forum, at the time.  And I didn't do
22  it in my capacity as an MEF employee.
23      I also organized events for Jack
24  Corsovek in another capacity as my Republican

Page 193

1  committee woman thing.
2      I mean, there's plenty of ways
3  that I do things outside -- advocacy outside that
4  is unrelated to MEF.
5      Q.   But then there is related to MEF,
6  correct?
7      MR. CARSON:  Objection.
8      THE DEPONENT:  I just answered
9  this.  He was an official employee of
10  another organization.
11  BY MR. CAVALIER:
12      Q.   Right.
13      But those other people that you
14  just mentioned as setting up interviews on your
15  own time, unrelated to MEF, they were not MEF
16  fellows, correct?
17      A.   Rahiem Kasam is.  And he's an
18  unpaid fellow.  He is.
19      And there were plenty of things
20  that, like, he, you know, he wanted to talk to
21  people, even though Rahiem has more connections
22  than I do.
23      But if Rahiem Kasam, as a fellow,
24  who doesn't get paid or whatever his situation

Page 194

1  is, decides he wants to set up his own interview
2  somewhere else, if he doesn't want to use the MEF
3  capacity, he doesn't have to.
4      So this, again, is -- may or may
5  not have been in an official capacity.
6      And by the way, the date that
7  you're talking about, this was for the National
8  Conservative Conference.  And I don't think this
9  had anything to do with an interview.  If I
10  remember correctly, which, like I said, it's
11  hazy.
12      Q.   I don't even understand, what
13  doesn't have anything to do with an interview?
14      A.   The date of the text messages that
15  you are showing me.
16      Q.   Yeah.
17      We're not talking about the text
18  messages having anything to did with an
19  interview.
20      A.   Then why are they up on the
21  screen?  I thought that's what the line of the
22  questioning was.  I'm confused.
23      Q.   Well, we're going to get to the
24  text messages.  But we were just asking whether

Page 195

1  you set up interviews for Ben Baird as Director
2  of Communications?
3      A.   I don't remember.  And my answer
4  again to that is I don't remember if I did it as
5  Director of Communications.
6      MR. CARSON:  And also, just object
7      to calling her Director of Communications
8      when she testified that that was a title
9      that she was permitted to use externally
10      only and she was notified that she was
11      never really a Director of
12      Communications.
13      THE DEPONENT:  Correct.
14  BY MR. CAVALIER:
15      Q.   Why does the distinction matter to
16  you as to whether you set this interview up in
17  your capacity as Director of Communications --
18      A.   Because the whole point -- because
19  the whole point is that they're acting like they
20  did me some big favor and they didn't.  Like they
21  didn't do anything.
22      They were actually derogatory
23  about the whole thing.  So whenever -- you
24  have -- in my previous depositions, you guys have

Deposition of Lisa Barbounis                                    Lisa Barbounis v. Middle Eastern Forum, et. al.

Page 196

1 said to me, you know, well, didn't you get --
2 didn't you get a -- what is it?  Like, didn't
3 you -- weren't you rewarded by getting a higher
4 position?  But I wasn't.  That's all fake.
5    Q.   I'm not even talking about your
6 position.
7    A.   You did, though, before.
8 Previously.  You personally did before.  And so
9 that's -- that's what I'm thinking about.
10       MR. CARSON:  Yeah, I also want to
11    just object to what -- the distinction
12    she's making is a factual distinction.
13       So it's important to make sure the
14    record is clear.
15 BY MR. CAVALIER:
16    Q.   The question is a simple one.
17       It's why -- why does the
18 distinction matter to you as to whether you set
19 this interview up with Ben Baird that we're
20 talking about in your capacity as an MEF employee
21 or not?
22    A.   Because you asked me if I did as
23 an employee or not and I'm saying I don't know.
24    Q.   Okay.

Page 197

1    A.   Okay.  The distinction is one you
2 asked.
3       You said, did you set this up as
4 an MEF employee.  And I said, I don't know.  And
5 you asked me, how do I not know.  So I explained
6 it to you.
7    Q.   I didn't ask you how you didn't
8 know.  But --
9    A.   You did.
10    Q.   -- you seem to place a great deal
11 of importance on that distinction when I was
12 just --
13    A.   I'm just trying to keep the facts
14 straight, because you seem to be -- in my
15 opinion, you seem to be confusing a lot of
16 things.  And you clearly don't understand how the
17 process of the fellowship works.
18    Q.   You did, however, submit a resume
19 to your current employer stating that you
20 arranged 90 interviews for MEF personnel in your
21 capacity as Director of Communications, correct?
22    A.   So I said in there, and if you
23 look at those words correctly, assisted.
24       Meaning, as I was doing them and

Page 198

1 as Delaney Yonchek was doing them, I supervised
2 her.
3       So, yeah, I assisted in that many.
4 Correct.
5    Q.   You didn't draw the distinction
6 there --
7    A.   Oh, I did draw the distinction
8 there.  I did absolutely draw the distinction
9 there.
10    Q.   You didn't say that I set up 90
11 interviews, some of which were in my capacity as
12 Director of Communications for MEF and some of
13 which were in my own personal time, for my own
14 personal need.
15    A.   For brevity -- oh, no, because
16 that's not what I was saying.
17       And in my capacity, I did set up
18 over -- with -- I said I assisted in setting up
19 90.
20       I did not say on my own time.  I
21 didn't even reference my own time in that,
22 because this is not an own time thing.
23       And I still do stuff on my own
24 time and my job is aware of it, just like before.

Page 199

1    Q.   And so we're clear, though, in
2 that same resume, you listed your title as
3 Director of Communications for MEF?
4    A.   That was my outward title.
5    Q.   Right.
6       So it wasn't purely in name?
7       MR. CARSON:  Objection.
8    Argumentative.
9       THE DEPONENT:  What was the word
10    you used?
11       MR. CARSON:  We all know what --
12    you can answer.  Go ahead.
13       THE DEPONENT:  Go ahead.
14 BY MR. CAVALIER:
15    Q.   So it wasn't purely in name only
16 if you were using it for your resume.
17       MR. CARSON:  Objection.
18    Argumentative.  Assuming facts not in
19    evidence.
20       THE DEPONENT:  I certainly gained
21    the experience of actually being a
22    Director of Communications.  And so the
23    only way to convey that was the title.
24

Page 200

BY MR. CAVALIER:
Q.   Right.
     And so you believed that you were qualified and entitled to use that title on your resume, right?
     MR. CARSON:  Objection.
     THE DEPONENT:  Well, if I put anything else, when the website said it, even though Daniel Pipes didn't, whatever, it would look inconsistent.
     To the outside world, that's what the title was.
BY MR. CAVALIER:
Q.   I understand that.
     But you didn't put it on the website --
A.   It doesn't seem that way.
Q.   You didn't put it on the website, right?
A.   What?
Q.   Your title as Director of Communications, you didn't --
A.   I actually did put it on the website.

Page 201

Q.   Okay.  Fair enough.
     So the website, though, is not something that you send affirmatively to future potential employers, correct?
A.   Well, when they Google you and you come up --
     MR. CARSON:  The question is, do you send the website to potential employers?
     THE DEPONENT:  Sometimes.
BY MR. CAVALIER:
Q.   Okay.  Fair enough.
     I'm just going to ask the questions.
     Do you believe your resume is an accurate representation of your work history?
A.   Of my work history and my capability, correct.
Q.   Correct.
     So then it's, at least in your opinion, it's fair and accurate to describe yourself as the Director of Communications to a future employer?
     MR. CARSON:  Objection.

Page 202

Argumentative.  The record speaks for itself.
     THE DEPONENT:  I guess.  Whatever you want.
BY MR. CAVALIER:
Q.   It's a simple question.
A.   No, not.
     MR. CARSON:  She answered the question though.
     She explained to you that she was not provided any -- anything but the ability to let people on the outside know that that's what her title was.
BY MR. CAVALIER:
Q.   Well, so taking your counsel's representation there, that if all it was was a fake title that you could let people on the outside know about, don't you think it was misleading for future potential employers if you were telling them that you were Director of Communications?
A.   No.  And I'll tell you why it wasn't.
     MR. CARSON:  Objection.  You can

Page 203

answer though.  Object to form.
     THE DEPONENT:  No.  Because I did the work of a Director of Communications.
     However, I didn't have the --
the -- what is it called?  The -- how do I explain this?
     Like the capability to make executive decisions.  However -- or be -- or get a salary increase.  Whatever.
     But I did operate in that capacity as the only person in the whole office who was doing communications.
     So while -- and here's the other thing.  And it's not misleading, because when it's on the website as that and I would -- what would I have put as my title, right?
     Because I didn't -- then I had zero title.  So I would just write Middle East Forum with no title?
     Like that was the agreed upon title to the outside world, even though I did not have the authority that a normal Director of Communications would have,

Page 204

1      yet I was the only one doing
2 communications in the office.
3 BY MR. CAVALIER:
4     Q.   Okay.  So if I understand you
5 correctly, they gave you the title externally.
6 You were doing the work of a communications
7 director.
8     A.   Uh-huh.
9     Q.   You gained the experience of a
10 communications director.
11     A.   Correct.
12     Q.   You thought you were entitled to
13 use the title communications director to the
14 outside world, including on resumes, and yet your
15 testimony is that you believed that it was
16 nevertheless a fake title?
17     MR. CARSON:  Objection.
18 Argumentative.
19     THE DEPONENT:  You're
20 mischaracterizing fake title.
21     What I'm saying is, I have an
22 e-mail from Daniel that says, you will,
23 to the outside world, be the Director of
24 Communications, yet internally, we know

Page 205

1 that that is just -- I forget what his
2 exact words were.  But it's in an e-mail.
3     That was just -- that it's just
4 for outside world purposes only.  You
5 have no authority in this organization.
6 BY MR. CAVALIER:
7     Q.   Did you get a bonus as a result of
8 your --
9     A.   I did not get a bonus for being
10 the Director of Communication.
11     Everybody there received a bonus
12 and the bonus was received after that time I told
13 you I talked to Daniel Pipes and I said, the
14 staff is concerned that Greg Roman is still
15 influencing all the decisions and making all the
16 decisions.
17     And with Matt leaving and Stacy
18 gone and Greg nowhere to be found, and you
19 swimming around in administrative work, I said,
20 everybody is taking on extra responsibility and
21 extra workload.
22     And then Daniel Pipes' resolution
23 to that was to give everyone a bonus for the
24 extra work that they were picking up from the

Page 206

1 lack of three employees.
2     Q.   Were you supervising Delaney
3 Yonchek in your role doing communications for
4 Middle East Forum?
5     A.   Part of the time.  And then Marnie
6 was part of the time.
7     Q.   Just so we're clear, you are the
8 Director of Communications in your current role
9 now, correct?
10     A.   Correct.
11     Q.   Do you think that listing the fact
12 that you were Director of Communications for the
13 Middle East Forum on your resume helped you get
14 that job?
15     MR. CARSON:  I'm just going to
16 object.
17     I don't even know where you're
18 going with this line of questioning.
19     She can answer your question.  I'm
20 going to object to the form.  I'm going
21 to object based on the fact that it seems
22 like all you're trying to do is embarrass
23 her and ridicule her and suggest that she
24 lied to her current employer.

Page 207

1     I'm considering telling her not to
2 answer the question.  She's allowed to
3 answer this one.
4     MR. CAVALIER:  Actually, she is
5 suggesting the exact opposite.  But if
6 you can answer the question.
7     MR. CARSON:  You can answer the
8 question.
9     THE DEPONENT:  The thing that I
10 did was, when I interviewed with Car
11 McMichael for the Director of
12 Communications position, I explained to
13 her exactly all of this.  All of this.
14     I explained to her what I did,
15 what it was, the authority I had, the
16 authority I didn't have.
17     So they were very aware of what it
18 was.  The reason that I actually got that
19 job is because I was very good to my
20 previous intern that works in Fred
21 Upton's office and she passed along my
22 resume.
23     And they had been interviewing
24 Communication Directors for like three

Page 208

1  months.  And the boss said he liked my
2  passion.
3        So, no, the title had nothing to
4  do with it.  My passion did.
5  BY MR. CAVALIER:
6        Q.    Well, you don't know that the
7  title had nothing to do with it, right?
8        I mean, I'm not just talking
9  about the title.
10       What I'm saying to you is this.
11 You just said to me, I explained everything about
12 the title and my duties as Director of
13 Communications for the Middle East Forum,
14 correct, that's what you said?
15       A.    I explained that to Car McMichael,
16 yes.
17       Q.    And yet they hired you, correct?
18       A.    Correct.  Because I -- because I
19 was capable of doing the work.  Not because just
20 because I had --
21       MR. CARSON:  The question was, did
22    they hire you?  Yes or no.
23       THE DEPONENT:  Yes.  But it had
24 nothing to do --

Page 209

1        MR. CARSON:  That's just it.
2    Done.  Next question.
3  BY MR. CAVALIER:
4        Q.    Right.
5        They hired you.  And they made you
6  Director of Communications, correct?
7        MR. CARSON:  Yes or no.
8        THE DEPONENT:  Yes.
9  BY MR. CAVALIER:
10       Q.    So why are you so insistent on
11 calling this a hollow title at the Middle East
12 Forum, if you put it on your resume and you did
13 the responsibilities, you did the job, and it got
14 you another job as the Director of
15 Communications?
16       MR. CARSON:  I'm going to object.
17    Why don't you read the counterclaims that
18    you filed against her?
19       I'm going to object based on form,
20    calls for a legal conclusion.  And she
21    can answer the question.
22       THE DEPONENT:  I don't know.
23 BY MR. CAVALIER:
24       Q.    Isn't it fair to say that you were

Page 210

1  legitimately the Director of Communications for
2  the Middle East Forum?
3        MR. CARSON:  Object to form.  You
4    can answer the question.
5        THE DEPONENT:  No.
6  BY MR. CAVALIER:
7        Q.    No?
8        Despite all that, when you were
9  Director of Communications for Middle East Forum
10 form, that was a fake title.  But now you're
11 Director of Communications --
12       MR. CARSON:  How many times are we
13    going to go through this?
14 BY MR. CAVALIER:
15       Q.    -- for Congressman Weber and
16 that's a real thing?
17       A.    Correct.
18       MR. CARSON:  Objection.  She's
19    explained to you that the reason for her
20    testimony is because it's an e-mail she
21    received from Daniel Pipes where he told
22    her you're not really the Director of
23    Communications.
24       MR. CAVALIER:  Okay.  I just want

Page 211

1  to make it clear.  I just didn't
2  understand why you were --
3        MR. CARSON:  Well, it's because of
4    the counterclaims you guys filed.
5  BY MR. CAVALIER:
6        Q.    All right.  Back to the exhibit
7  you have on your screen.
8        MR. CARSON:  You guys are accusing
9    her of a breach of fiduciary duty.  She
10   never had a fiduciary duty.  She was a
11   secretary.
12 BY MR. CAVALIER:
13       Q.    Do you believe that you never had
14 a fiduciary duty to the Middle East Forum?
15       MR. CARSON:  Objection.  Calls for
16   a legal conclusion.
17       Do you even know what a fiduciary
18 duty is, Lisa?
19       THE DEPONENT:  Well, I did have a
20   real estate license at one point.  So,
21   yes, I do know what a fiduciary duty is.
22       And, no, I did not have a
23 fiduciary duty to the Middle East Forum.
24       However, I will say as an employee

Page 212

1  of an organization, people have some
2  moral responsibilities.
3  BY MR. CAVALIER:
4      Q.   Did you have a duty of loyalty to
5  the Middle East Forum?
6          MR. CARSON:  Objection.  Calls for
7  a legal conclusion.
8          Do you know what a duty of loyalty
9  is?
10         THE DEPONENT:  I do not what a
11 duty of loyalty is.
12 BY MR. CAVALIER:
13     Q.   Do you feel like you had an
14 obligation to be truthful with the Middle East
15 Forum about things pertaining to your employment?
16     A.   I believe I have an obligation to
17 be truthful at all times, so that would include
18 at work.
19     Q.   Okay.  I'm gonna direct you back
20 to the exhibit we have up on the screen.
21     A.   Uh-huh.
22     Q.   What is this message here that's
23 dated May 30th, 2019?
24     A.   It appears to be a picture.

Page 213

1      Q.   Right.
2          And as we established it's a
3  picture of Ben Baird sleeping in what appears to
4  be in a hotel room.
5      A.   I don't know if he was sleeping.
6  Probably just relaxing, but yeah.
7      Q.   Okay.  And just, again, we don't
8  have to belabor this point.  But you, for a
9  period of time, in or about May of 2019,
10 maintained a sexual relationship with Ben Baird,
11 correct?
12         MR. CARSON:  I'm going to object
13     to the question and direct her not to
14     answer it.
15         THE DEPONENT:  I don't know if I
16     maintained a sexual relationship --
17         MR. CARSON:  You don't have to
18     answer the question.
19         THE DEPONENT:  I don't know
20     actually.
21 BY MR. CAVALIER:
22     Q.   Did you sexual --
23         MR. CARSON:  You can ask the
24     question.  Ask the question and I'll get

Page 214

1  the objection on the record.
2  BY MR. CAVALIER:
3      Q.   Did you have a sexual relationship
4  with Ben Baird in or around May of 2019?
5          MR. CARSON:  I'm gonna object.
6          Objection based on the question is
7      designed to embarrass and harass.
8          There's Federal Rules of Civil
9      Procedure that provide my client's sexual
10     proclivities are not admissible and,
11     therefore, this question can only be
12     embarrassing.
13         Based on that, I'm gonna instruct
14     her not answer the question.  I'm gonna
15     continue these objections.  And I'll just
16     note the prior objection from here on in.
17 BY MR. CAVALIER:
18     Q.   I'm going to read you a quote from
19 your prior deposition and I want you to tell me
20 if it's true or false.
21         Quote, the only reason that I had
22 sex with anybody was because the Middle East
23 Forum damaged my freakin emotional state, end
24 quote.

Page 215

1          Is that a true statement?
2          MR. CARSON:  Objection.  You can
3      answer whether or not that's true.
4          THE DEPONENT:  That is something
5      that I believed -- yeah, that is
6      something I believed.  Yes.
7          I think that MEF really put my
8      mental state in a downward spiral.  And I
9      was, you know, unfortunately, looking for
10     self-validation and worth through things
11     that were unhealthy.
12         MR. CAVALIER:  Counsel, it's
13     clearly a relevant question.  So I'm
14     going to ask it again.
15         MR. CARSON:  It does not become
16     relevant because of that quote.
17         MR. CAVALIER:  It does.
18         MR. CARSON:  My client's --
19         MR. CAVALIER:  I'm going to ask
20     the question again.  And if you instruct
21     her not to answer, we're going to call
22     the Judge.
23         MR. CARSON:  Okay.  We can do that
24     then.  Let's call.

Page 216

BY MR. CAVALIER:
Q.    The question is very simply, and again, you've already spoken about this in your prior deposition.  I just want to make it clear for the transcript.
Did you or did you not maintain a sexual relationship for some period of time with Ben Baird in or around May of 2019?
MR. CARSON:  I'm going to object --
THE DEPONENT:  You keep adding a date to it and I'm telling you, I don't know.  Because there were times where I hung out with Ben Baird and I didn't sleep with him.
BY MR. CAVALIER:
Q.    Okay.  Then I'm asking, because --
A.    I don't know the dates.
If you want to ask me if I've ever maintained a sexual relationship with Ben Baird, yes.
MR. CARSON:  Lisa, wait.  Wait.  Let's do this right in the order.
We're not just screaming --

Page 217

THE DEPONENT:  All right.  Go in the right order.
BY MR. CAVALIER:
Q.    Yeah, I didn't ask a question, but that's fine.
The only reason I care about the date, is I'm trying to understand the context of this photograph.
Do you recall what -- what, where or how it came about that you took a photograph of Ben Baird in what appears to be the bed of a hotel room on or about May 30th, 2019?
Well, you can see from --
MR. CARSON:  Object to form.  What is that -- what are you asking her?  How, where or when, is that three questions?
MR. CAVALIER:  I'm asking her to describe the circumstances of this photograph.
MR. CARSON:  It looks like she took a picture.
What do you mean the circumstances?

Page 218

BY MR. CAVALIER:
Q.    The circumstances -- this wasn't -- you're not in the office when this photograph was taken, right?
A.    Nor was I probably at work when that photograph --
Q.    I agree.
That's all I'm trying to figure out is the context in which you took this photograph.
A.    I don't even know, because there were times I hung out with Ben Baird in a hotel room where I didn't sleep with.  So I don't know, if that's what you're implying.
I don't know if I slept with him that time.
MR. CARSON:  Lisa, listen to the question.
BY MR. CAVALIER:
Q.    That's fine.  I'm not asking you that.
I'm just asking whether you understand or know, as we sit here today, what prompted this photograph.

Page 219

A.    And three times I said I don't know.
Q.    Okay.
Did he know you took the photograph?
A.    Yes.
Q.    At the time?
A.    Yes.
MR. CARSON:  Lisa, don't guess.
Do you know whether he --
THE DEPONENT:  I know that he did.
BY MR. CAVALIER:
Q.    Okay.  Did he know --
A.    Because I said, look how cute you look.
Q.    Okay.  I'm gonna take down Exhibit B and go back to Exhibit A.
A.    I think I even sent him a copy of the picture.
Q.    Well, if you did, you haven't produced that to us, so I will ask you to do that.
A.    I said if I did.  I might have even is what I said.

Deposition of Lisa Barbounis                                    Lisa Barbounis v. Middle Eastern Forum, et. al.

Page 220

1    MR. CARSON:  You have every
2  message she's ever sent.
3    What are you talking about?
4    MR. CAVALIER:  I don't have that
5  one.
6    MR. CARSON:  Let me put it like
7  this.  There are no messages Lisa has
8  that we haven't sent you.
9    MR. CAVALIER:  We don't have the
10 Facebook messages.
11   THE DEPONENT:  Yes, you do.
12   MR. CARSON:  Lisa, stop.
13   When I would -- when you say --
14 you asked us to please send us that, the
15 answer is, we cannot send you anything
16 else, because there's no other evidence
17 in existence that we can possibly get our
18 hands on that you -- that we have that
19 you don't have.
20   MR. CAVALIER:  She volunteered
21 that she may have even sent it to Ben.
22   All I'm saying is, if she did, we
23 didn't get it.
24   So if it exists --

Page 221

1    MR. CARSON:  If she sent it, you
2  would have gotten it.
3    MR. CAVALIER:  Okay.
4    MR. CARSON:  Never in my life have
5  I seen such broad discovery.
6    You guys still complain.  It's
7  hilarious.
8  BY MR. CAVALIER:
9    Q.   Why did you send this photograph
10 to Delaney Yonchek?
11   A.   I don't remember.
12   Q.   What possible reason could you
13 have had to send this photo Delaney Yonchek?
14   A.   I'm not going to speculate on my
15 reason from something that happened in 2019.
16   I don't know if there was a
17 context behind it.  I don't know if we had a
18 conversation before.  I don't remember.
19   Q.   Was there anything in this text
20 chain that would give you any idea what the
21 context was?
22   A.   It says, that was fast.  You won't
23 believe where I am.
24   Q.   Scroll up and look at it.  See if

Page 222

1  you can derive the context then.
2    A.   Okay.  That will be helpful.
3    Q.   Why don't you take a minute and
4  I'm going to take you to the top of the 5/30
5  messages.
6    You can take a look.  Let me know
7  when I need to scroll.
8    A.   Okay.
9    Q.   Just for the record, you're
10 talking about work here, right?  Did you not send
11 Delaney articles?
12   A.   Correct.
13   I thought that it was tomorrow
14 that I was telling them.  I don't know what that
15 means.
16   Okay.
17   No, I'm sorry.
18   Okay.
19   Well, good.  I didn't realize
20 until now.
21   My bad.  I was gonna do them on
22 the flight, but, of course, wifi was out.
23   Okay.
24   Daniel Pipes already hates me and

Page 223

1  I'm drunk, so, okay, yeah.
2    Oh, boy.
3    Okay.
4    Okay.
5    Okay.
6  BY MR. CAVALIER:
7    Q.   She's asking you here, just again
8  for the record, to bring up her salary to Greg
9  and Daniel Pipes.
10   Is she looking for a raise or
11 something at that point?
12   A.   Probably.  I mean, everybody
13 asked -- everybody there was, like, always afraid
14 to go to Greg and Daniel about everything.
15   And so I got asked to talk to
16 people about -- a lot about stuff.  All kinds of
17 stuff.
18   Q.   All right.  And you were, at least
19 in part, supervising her at this point, so it
20 makes sense for her to go to you about her salary
21 concerns, correct?
22   A.   Like I said, everybody went to me
23 to get messages to them.
24   Q.   Right.  I understand that.

Page 224

But at least with respect to Delaney, she was reporting, at least in part, to you at this point, so it makes sense for her to say, hey, I got a salary concern?

A.   If you think it makes sense, then it makes sense.

Q.   Was she, in fact, reporting to you at this point in time?

A.   Partially.  It could have made sense for her to go to Marnie or Greg herself.  He was her supervisor.

Technically she reported directly to him, but --

Okay.

Okay.

Okay.

Okay.

Q.   So now we're back to the relevant piece.

I'm assuming here you say, that was fast, you won't believe where I am, referring to the fact that you're with Ben, correct?

A.   Correct.

Q.   Okay.  And then she says, there

Page 225

were only six of them -- there were only six and two of them were obvious skips, referring to what you were talking about work-related above, correct?

A.   Correct.

Q.   And she says, where, answering your question about where you are.

A.   Okay.

Q.   Okay?

Then you send a picture.

A.   Okay.

Q.   Okay.  So with that added context, sitting here today, do you know why you would have sent Delaney Yonchek a picture of Ben Baird asleep in a hotel room?

A.   I clearly said, do you know where I am, so I clearly wanted her to know that I was with Ben.

Q.   Why would you have wanted her to know that you were with Ben?

A.   I have no idea.  Probably because we're friends and we talk about stuff.

Q.   Okay.  Do you talk about your sex life at all?

Page 226

A.   Not normally, but there was no implication about sex there.

There were times we'd talk about her sex life, but --

Q.   Pardon me?

A.   There were times -- I mean, friends talk about things, all kinds of things when they're outside of work but there were times.

I think there were times where we both talked about each other.  She had a bad hinge date where it turned out three dates in that the person was a transvestite and she didn't know what to do and how to do anything about it.

So, like, you know, things happen in life.

Q.   Okay.  Just to be clear though, I mean, you're not denying that this photograph that you sent to Delaney Yonchek of Ben Baird appearing to be asleep in a hotel room bed was entirely free of any sexual connotation, correct?

A.   I actually -- if I'm correct, I think this is from the National Conservative Conference.  Because I was off that day.  And I

Page 227

was trying to make sure that the articles were going out, if I'm not mistaken.

And I actually didn't sleep with him on this event.  Now, did we hang out and was I in his hotel room when we went back in between things to like relax after we ate and stuff?  Yeah.

But I didn't sleep with him at that conference, number one.

Number two, yeah, like -- I think that's when this was.  If I looked up the date of the National Conservative Conference from 2019, I think that's what this was.

Q.   Okay.  But with that said, I mean, you're sending this to Delaney Yonchek without any of the context that you just gave me.

Do you think it would be fair for Delaney Yonchek to receive it and assume that there was a sexual context to it?

A.   Delaney Yonchek would not assume stuff like that.  I think she would just find it funny that I was hanging out with Ben Baird, because she used to think that Ben Baird was attractive.

Page 228

Q.   Okay.  So, again, I want to be very clear about this.

Your testimony here is that sending this photograph of Ben Baird asleep or apparently asleep in what appears to be a hotel room bed was just to show Delaney that you were hanging out with a buddy?

A.   Correct.

Q.   Who you also happened to have a sexual relationship with at some point in time?

MR. CARSON:  I'm gonna object based on before, but you can say yes or no to it.

THE DEPONENT:  Correct.  But I'm not here to, like, judge what Delaney's inference was.

BY MR. CAVALIER:

Q.   I'm not asking you to judge what Delaney's inference was.

I'm asking you to tell me about the context, or lack thereof, in which this photo was sent?

A.   Which I just did.

Q.   So you don't think this text

Page 229

message to Delaney has any sexual undertones or context or anything?

A.   If somebody sent that to me --

MR. CARSON:  Wait, wait, Lisa.  Let me just say this.

THE DEPONENT:  No.

MR. CARSON:  So I'm going to object based on the fact that that question -- I'm going to object based on the objection that this question has now been asked and answered about five times.

I think we're belaboring the point, to say the least, over a totally inconsequential fact that will never see the light of a courtroom, that is totally irrelevant, that is protected by Rape Shield and is just designed to embarrass and harass.

So, you know, I think we should probably move from the Benjamin Baird photo.

But, you know, you can answer the last question, I guess.

MR. CAVALIER:  I'll just only note

Page 230

for the record that I have absolutely no idea what Rape Shield laws have to do with this civil lawsuit, but --

MR. CARSON:  Well, what they have to do is read the Federal Rules of Civil Procedure, which provide that in a civil or criminal case, you cannot make the witness' sexual proclivities -- you can't use that as evidence.  That's what Rape Shield is.

MR. CAVALIER:  Again, I'll say for the record that you can't introduce it as evidence out of the blue, but when the witness claims that all of her sexual --

THE DEPONENT:  I didn't say all.

MR. CAVALIER:  -- communications were directly caused by the defendant in the lawsuit, they are relevant.

But in any event, I'll withdraw --

MR. CARSON:  You don't get to decide thought that legally, do you?

MR. CAVALIER:  I agree with you and neither do you.

MR. CARSON:  No, actually we are

Page 231

the ones that get to decide that.  That's exactly what we get to decide.  It's totally within our realm of control what we present as evidence.

THE DEPONENT:  Anyway, can we proceed?

MR. CAVALIER:  I'll leave that to the Judge to decide.

BY MR. CAVALIER:

Q.   But in any event, do you think Delaney Yonchek could have been uncomfortable receiving this photo from you?

A.   No.

Q.   You don't think that's a possibility?  Why not?  Why not?

A.   Because I don't.

Q.   You're her supervisor sending her a photograph of a sleeping half-dressed man in a bed.

A.   He's not half-dressed.

Q.   Okay.  He's wearing an undershirt.

MR. CARSON:  Well, you can see he's wearing a shirt.  He's wearing pants.  That makes him fully dressed.

Case 2:19-cv-05030-JDW   Document 110-2   Filed 03/02/21   Page 61 of 193

Deposition of Lisa Barbounis                                    Lisa Barbounis v. Middle Eastern Forum, et. al.

Page 232

So objection to form, assuming facts not in evidence.

BY MR. CAVALIER:

Q.   Strike the question.

The question is, do you think it was appropriate to send her this photograph?

A.   I don't think it was inappropriate.

Q.   Okay.  Did you know that Delaney Yonchek was deposed the other day in this case?

A.   Sure.

Q.   Do you know she testified --

A.   I knew she was being deposed.  I didn't know she was.  Like, I knew she was going to be deposed.  But I didn't know when or that it happened already.

Q.   Do you know that she testified during this deposition?

A.   No, I did not know that.

MR. CARSON:  I'm going to object. The answer is, did you know?

THE DEPONENT:  No, I did not know.

BY MR. CAVALIER:

Q.   Now that you know, do you regret

Page 233

send thing the photo?

A.   Of course.  I don't know why she would have thought that though, so I'm a little miffed.  But I am -- I'm sorry that she did say that feel way.

Q.   Did you ever send photos of this type -- of this type, I mean of men who you had a relationship with to other MEF employees?

A.   Probably not, no.  Maybe Tricia. Me and Tricia shared -- we talked about a lot. But I don't think so.  I don't know.  Maybe.

Q.   Do you think this was a violation of MEF policy?

A.   Sending a picture of a man?  No.

MR. CAVALIER:  How long have we been going for, Seth?  Want to take five?

MR. CARSON:  Yeah, that's fine.

MR. CAVALIER:  All right.  Why don't we just take five.

MR. CARSON:  It's 2:30.  We started around 10:10.

MR. CAVALIER:  Do you want to take lunch -- do you want to take a legitimate lunch break?

Page 234

THE VIDEOGRAPHER:  The time is 2:23 p.m.  We are off the record.

(Lunch recess.)

THE VIDEOGRAPHER:  The time is 2:58 and we are back on the record.

BY MR. CAVALIER:

Q.   I'm gonna put Exhibit A back up on the screen.

Can you see that document?

A.   Yes.

Q.   Okay.  So I just want to run you through briefly the rest of these -- the rest of this text message chain with Delaney.

So you send the picture.  She then says, oh my God, that's why you're in D.C.  You say, I had a train home for 3:55.  I missed it. Hence the drinking.

She then asks, ha, ha, is he still as obsessed with you?

Do you know what she meant by that?

A.   He had a crush on me.

MR. CARSON:  Object to the form. Opinion testimony.

Page 235

THE DEPONENT:  I don't know what she meant.  But he had a crush on me, so that's what I assumed she meant.

BY MR. CAVALIER:

Q.   Okay.  So you had talked about his crush on you before, correct?

A.   Well, I didn't talk about it before.  I mean, he was clear and he told people at the Middle East Forum Gala that he had a crush on me.  Multiple people.  Not just me.  So...

Q.   So sitting here today, before May 30th of 2019, do you know whether or not you discussed Ben Baird's crush on you with Delaney Yonchek?

A.   I don't know.

Q.   Okay.  And you respond yes, wants to have babies with me.  I'm assuming that's you acknowledging the fact that he does, indeed, have a crush on you?

A.   Correct, he did.

Q.   She says, shut up.

You say, not kidding.  It's not happening.

I'm assuming the fact that he

Deposition of Lisa Barbounis                          Lisa Barbounis v. Middle Eastern Forum, et. al.

Page 236

wanted to have babies with you -- well, Ill ask
the question.  Strike all that.
          Wants to have babies with you.
Was that literal?
          A.    No, I --
          MR. CARSON:  Objection.  You can
answer.
          THE DEPONENT:  It was clearly
figurative.  That's why I said it's not
happening.
BY MR. CAVALIER:
          Q.    Okay.  But just to be clear, I
mean, we're talking it was figurative on his part
as well.
          I mean, obviously you're being
figurative here, but at least as far as you know,
Ben Baird never actually did want to have
children with you, correct?
          A.    I mean, he pretty much told me he
was in love with me.  So I don't know.
          Q.    Okay.  Delaney says, yikes.
          You say, have a good vacation.
          And then she asks you, does he
know this is just a fun-type-of-deal with him,

Page 237

correct?
          A.    Yeah.
          Q.    She's referring there to your
sexual relationship with Ben Baird, right?
          MR. CARSON:  Objection.  Again,
you're asking her opinion on what Delaney
meant.  You can answer if you know.
          THE DEPONENT:  First of all, I
don't know if she's talking about the
sexual part or friendship or what.
          But at that point, I had stopped
sleeping with him, so it's clear that it
says it's not happening.
BY MR. CAVALIER:
          Q.    Well, it says it's not happening
above, the fact -- the comment about having
babies with you, it's not happening?
          A.    Right.  It's not happening.
          Q.    But the question is, here -- I
mean --
          A.    I don't know what she meant by
that.  If you want to keep going, we'll see.
          Q.    If she was just asking you, is
this just a buddy-buddy relationship with Ben,

Page 238

then she wouldn't have needed to ask whether it
was just-for-fun-type of deal, correct?
          MR. CARSON:  Objection.
Argumentative.  Object to form.
          THE DEPONENT:  Like I don't know
what her intent of that was.  You know
what I mean?
          Clearly, you know, like with Ben,
it was -- he was falling for me
definitely harder than I was interested
in him at the time.
BY MR. CAVALIER:
          Q.    Right.
          And so she's referencing something
that she knows about, whether it was a discussion
with you, a discussion --
          A.    That's his assumption.  That's not
fact.
          Q.    Whose assumption?
          A.    Yours.
          Q.    Well, I'm asking you -- okay, so
how did you interpret this comment?
          A.    I just told you, I don't know.
          MR. CARSON:  I'm just going to put

Page 239

the same objection on the record.  You're
asking her opinion about what someone
else meant.
BY MR. CAVALIER:
          Q.    Does it make sense to you that if
Delaney understood your relationship with Ben
Baird to be one of friendship, she would ask
whether it was a just-for-fun-type of deal with
him?
          MR. CARSON:  Object to the form of
the question.
          THE DEPONENT:  I don't know about
you, but I had fun with my friends.
BY MR. CAVALIER:
          Q.    Right.
          But do you have friends that ask
you whether you have fun with your friends?
          MR. CARSON:  Objection.
          THE DEPONENT:  Yeah.
BY MR. CAVALIER:
          Q.    You have friends that ask you
whether --
          A.    Do you know how guys that are in
my life that I'm friends with and do want to have

Page 240

a relationship with me and then people say, well, like, are you just friends with him or does he know that you're just, like, here to have fun and not, like, whatever.  And I don't sleep with them.

There's a ton.  That happens quite often actually.

Q.   Right.  But she's not saying --

A.   That's your assumption.

Q.   Yeah.  But she's not saying here, does he know that you're not gonna sleep with him.

A.   Do you know that's not what she was saying?  Because I don't.

Q.   Well, I know what she said.

MR. CARSON:  The document speaks for itself.  So let's move on.

THE DEPONENT:  Yeah, what do you want to know?  I don't know what her assumption was.  I did not know what she meant.  I don't know.

Go back up to what it said.

Excuse me, you're scrolling too fast.  You want me -- I said I don't know

Page 241

what he knows, because I don't.

BY MR. CAVALIER:

Q.   Okay.

A.   There's my answer.  I don't know what he knows, because I don't know.

Q.   So here you're going back talking about work, right?  Forget this hell hole?

A.   Forget this hell hope?

Q.   Down here you correct yourself, hell hole.

A.   Oh, okay.

Q.   You're talking about MEF there, right?

A.   Probably.  I'm telling her to have fun on her vacation, forget this hell hole.

Q.   You go back to telling her about some other casual stuff.

Okay.  But there's nothing in this text string where you refer to Ben Baird as just a friend.

MR. CARSON:  Objection.  Do you want her to read the entire thread to confirm --

MR. CAVALIER:  I thought we just

Page 242

did.

THE DEPONENT:  I thought we just said that I said in there, I don't know what he knows.

And clearly I wasn't interested, at that time, in pursuing a full-time committed relationship with him.

BY MR. CAVALIER:

Q.   We're not talking about a full-time committed relation.

A.   I don't know what you're talking about, because this is the stupidest text message I've ever read.

Q.   Well, it's your text message thread.

MR. CARSON:  What's the relevance of any of this?

THE DEPONENT:  I don't know.

BY MR. CAVALIER:

Q.   The relevance is I'm trying to ask you whether or not sitting here today, and under oath, your testimony is that you're not aware of whether Delaney Yonchek knew or did not know you were engaged in a sexual relationship with Ben

Page 243

Baird on or about May of 2019.

MR. CARSON:  Objection.  You're asking her what Delaney may or may not know?

MR. CAVALIER:  Yes.

MR. CARSON:  Okay.  Well, if she knows what Delaney knows, then she can answer.

THE DEPONENT:  I'll tell you this.  I will tell you this.

Whatever day the Middle East Form Gala was, which was prior to this, Benjamin Baird had made his interest in me known, not just to me, to a bunch of people that attended the gala.

It was clearly known that he was romantically interested in me.

Does this signify that she thinks it's a sexual nature?  Or does she think it's a crushy thing?  Or that I just like the attention?  I don't know.

But clearly I don't know if she thinks that I've had a sexual relation with him.  I don't remember what she knew

Page 244

or didn't know.

BY MR. CAVALIER:

Q.   Okay.  And just to be clear, having nothing to do with these text messages, just in general, did you ever have a discussion with Delaney Yonchek where you made it known to her that you were engaged in a sexual relationship with Ben Baird?

A.   I don't think I've ever said to her I had sex with Ben Baird.  I don't think I did.  No.

Q.   That wasn't the question.

The question is --

A.   Well, then how else would it be clear?

Q.   Did you ever have a conversation --

A.   I could tell her that I went on dates with him.

Does that mean I slept with him?

Q.   Well, that's what I'm asking you.

A.   I'm telling you, I do not think that I ever told her that I had sex with him ever.

Page 245

Q.   Did you ever say anything to her that would lead her to reasonably believe that you had sex with him?

A.   I don't know what she would reasonably believe or not.  So I don't know.

Q.   Okay.  Do you think, based on the conversations that you had with her, it would be fair for Delaney Yonchek to assume that you were engaged in a sexual relationship with Ben Baird at this time?

MR. CARSON:  I'm just going to object to the form of that question for obvious reasons.

THE DEPONENT:  No.

BY MR. CAVALIER:

Q.   That would not be fair if she believed that?

MR. CARSON:  Objection.  Asked and answered.

BY MR. CAVALIER:

Q.   Is that your testimony?

A.   My testimony is --

MR. CARSON:  She just said no.

THE DEPONENT:  My testimony is

Page 246

that I do not believe from -- from these text messages and from my recollection that I ever told her that I had sexual -- like an actual -- that I had sex with Benjamin Baird.

She knew there was romantic interest there.

BY MR. CAVALIER:

Q.   Okay.  Who's Mike Yoder to you?

A.   Mike Yoder, he is a lawyer and he is friends with Sidney, my friend, and he's my friend, kind of.

I actually don't know Mike much, but yeah.

Q.   Has he ever represented you in a case?

A.   He has done several legal things for me.

Q.   Who's Patrick Sandman?

A.   Patrick Sandman is another lawyer friend of mine and he's also given me legal advice.

Q.   We'll come back to that.

A.   On multiple occasions.

Page 247

Q.   I have something to share here. Just a second.  I want to go to another document.

Give me one second here to pull up the document.

A.   I'm just curious.  I have a question for you, sir.

MR. CARSON:  Do you want to go off the record?

THE DEPONENT:  Yeah, I mean, just real quick.  I just have a question.

My understanding is --

THE VIDEOGRAPHER:  Off the record 3:08 p.m.

The time is 3:09 p.m.

We are back on the record.

BY MR. CAVALIER:

Q.   I want to wrap this up with you as well here, so I'm going to share this document.

This is going to be marked as an exhibit.  I guess it's Exhibit C, correct?

(Deposition Exhibit C marked.)

BY MR. CAVALIER:

Q.   I don't want to belabor this, so I'm going to ask you to read -- first of all, can

Page 248

1 you identify this?
2    A.   It looks like the House Resume
3 Bank.
4         It looks like the House Resume
5 Bank.
6    Q.   Would it help you if I scroll
7 through it real briefly?
8    A.   It says what it is at the top.
9 Resume Bank.
10   Q.   Okay.  So I'm just going to slowly
11 scroll this so you can get a sense of what the
12 document is.
13        If you want to read any of it,
14 which you're probably gonna want to do after I
15 ask the question, that's fine.
16        But just for our sake here, this
17 is -- this is, in fact, the resume that you
18 submitted for your current position with the
19 House of Representatives, correct?
20   A.   Incorrect.
21   Q.   Okay.  Tell me why I'm incorrect.
22   A.   Okay.  So there's what's known as
23 a resume bank within the House of Representatives
24 and members can go pull from there if they're

Page 249

1 having a hard time finding an employee.
2         My resume was -- for my current
3 position was never, like, obtained through this
4 or anything like that.
5         It was sent from Stephanie
6 DeMarco, who works for Congressman Upton's
7 office, directly to Erica Lafave, who then sent
8 it on to my chief of staff.
9         So my work doesn't -- my office
10 doesn't participate in the resume bank for the
11 U.S. House of Representatives and that is not
12 where my resume or application came from my
13 current job.
14   Q.   Okay.  Fair enough.
15        So your current job got your
16 resume from a different source.
17        Was it the same resume that you
18 submitted to the resume bank?
19   A.   Probably not.  I think that I
20 submitted my resume to the resume bank earlier,
21 but maybe, maybe not.  But I think -- can you
22 look at the date on that?
23   Q.   Sure.
24   A.   Yeah.  I don't think that I even

Page 250

1 applied to Upton's office until after that.  So
2 there's likely that there were changes to it,
3 because I got my job in less than a week with
4 interviewing, so...
5    Q.   I don't follow you there.
6         Why would getting your job in less
7 than a week with interviewing lead you to believe
8 that changes were made to your resume?
9    A.   Because I'm constantly updating my
10 resume and asking people for input and revisions
11 and things like that.  I mean, I do that all the
12 time.
13   Q.   So looking at this resume here in
14 front of you, can you identify --
15   A.   If we can go side by side and line
16 by line, but it's probably generally the same.
17 But I'm not sure that it's completely exactly the
18 same.
19   Q.   What was your hire date for your
20 current job?
21   A.   August 19.
22   Q.   Okay.  Does August 6, 2019, sound
23 familiar?
24   A.   I did not get hired on that date.

Page 251

1 I started my job on August 19th.
2    Q.   Okay.  You started your job --
3 wait.  You're saying not August of '19, you're
4 say August 19th?
5    A.   Yeah.  That was the date of my
6 hire.  I started on August 19th.
7    Q.   I understand.
8         Does it sound correct to you that
9 then would you have gotten your offer to start
10 that job on August 6th, 2019?
11   A.   I don't know about that.  I don't
12 know.  I don't remember.
13   Q.   Okay.  So nevertheless, regardless
14 of whether you made changes to the resume that
15 you submitted to your current position or not,
16 you submitted this resume to the Resume Bank of
17 the House, correct?
18   A.   Correct.
19   Q.   Was it true at the time you
20 submitted it?
21   A.   Yeah, I guess.
22        What do you mean was it true?
23   Q.   Was everything in it true?
24   A.   Yeah.

Page 252

Q.   Okay.  And, in fact, you certified here that all of the information in your resume is correct and complete and then in capital letters it says here, I understand that any falsification or omission of any information constitutes grounds for any House of Representatives employer to not employ me or to dismiss me from employment, correct?

A.   Correct.

Q.   So you made an effort to make sure your resume was true and complete, correct?

A.   I also just clicked buttons and didn't read any of that.  But sure.

Q.   You didn't read any of this?

MR. CARSON:  Objection.

THE DEPONENT:  No, I didn't.  Who reads that?  You just sign -- you just click the initials in the boxes and then you hit send.

BY MR. CAVALIER:

Q.   Okay.

A.   Nobody does that.

MR. CARSON:  Can you guys hear me?

MR. CAVALIER:  Yes.

Page 253

THE DEPONENT:  Yes.

MR. CARSON:  Please listen for my objections.

BY MR. CAVALIER:

Q.   Okay.  So we now have your resume up that you submitted to the House bank.

I'm going to ask you to take a second to read the summary and experience sections here.

A.   Uh-huh.

Q.   And I want you to tell me anything in there that is not correct.

MR. CARSON:  We can't see it. Can we make it bigger?

THE DEPONENT:  I'm gonna have to hold my thing up.

MR. CAVALIER:  How's that?  Do you need it bigger?

MR. CARSON:  A little better.

THE DEPONENT:  You can scroll down, please.

BY MR. CAVALIER:

Q.   Sure.

A.   Correct.  It's all right.

Page 254

Q.   It's all correct?

A.   Uh-huh.

Q.   Okay.  I want to show you one other part of it.

You probably can't read that. It's probably too small.

A.   I got it.  It's my cover letter.

Q.   Yes.

A.   Uh-huh.

Q.   Can you take a look at that and tell me anything that you note that is incorrect?

A.   None of it.

Q.   Well, I'd like you to read it for the record to make sure that --

MR. CARSON:  She wrote it, didn't she?

BY MR. CAVALIER:

Q.   Take a minute and read it and let me know if anything in there is incorrect.

A.   Nothing's incorrect.

Q.   I'm gonna ask you about this Wall Street Journal reference here.

Do you remember what that's in reference to?

Page 255

A.   No.  But here's how this works.

So we have a --

MR. CARSON:  He didn't ask how it works.  He just said, do you remember what it's about.

Yes or no, do you remember?

BY MR. CAVALIER:

Q.   So how do you know it's correct?

A.   I know it's correct, because I don't remember the exact article that we got placed in the Wall Street Journal.  However, when I -- even when I was not a communications director in name only, when I was Greg's assistant, we would have requests come in all the time.  And what we do is, we'd have requests come in all the time but we also have a running spreadsheet in Monday.com that could be filtered through by type and organization.

And from when I started helping Delaney with that, back in June of 2019, you can sort it and it will tell you -- it will sort it and tell you every outlet.  You can sort it by outlet.  You can sort it by author.  You can sort it by whatever.

Page 256

And so I went in and from the
dates I started helping with that I calculated
them all up.

Q.   So that's how you got to 1128
articles --

A.   Yes.

MR. CARSON:  That's a pretty
accurate way of doing that.

THE DEPONENT:  That was actually
from our report that Mark Fink asked me
to write.  And those are the numbers that
I also submitted to Mark Fink for our
general operating support.

That is correct.

BY MR. CAVALIER:

Q.   Okay.  So that's where you got the
number.

A.   Uh-huh.

Q.   How did you then get the piece you
wrote here, where it says from D.C.'s Influential
Hill to the Wall Street Journal from the
Washington Times to Foreign Policy?

A.   Because they were all on the list.

Q.   Okay.  So you went through the

Page 257

list and you saw that those names were on it?

A.   Yes.  And because, like, I was
overseeing Delaney as she would ask me how to
write things, and so whatever was on the list was
going through me or Delaney.

Q.   Okay.  So whether it went through
you and Delaney, that, for you, was enough for
you to list that as part of this 1128 articles?

A.   Absolutely.  Because not only
that, she would ask me how to pitch things, how
to write things.  And I would correct all her
e-mails.

I was an integral part in helping
me and helping Delaney and Middle East Forum get
those things done.

Q.   And because she was your
subordinate, right?  I mean, she was doing that
work underneath you, correct?

MR. CARSON:  Objection.  That
question has been asked nine times today.
You can answer the question again.

THE DEPONENT:  It was more
collaborative at that point, because I
had started that before -- when I was

Page 258

still Greg's assistant.  Quote, unquote,
assistant, yes.

BY MR. CAVALIER:

Q.   Okay.  But my point is, to the
extent that Delaney is doing work placing
articles that you're referencing here, to the
extent she was working under you, it's fair for
you to state on your resume that you helped place
those articles?

A.   Correct.

Q.   Okay.  Do you have any specific
recollection sitting here today what the two
articles were that were placed with the Wall
Street Journal during your time with the forum?

MR. CARSON:  Objection.  Asked and
answered.  You can answer.

THE DEPONENT:  Clearly do not.

BY MR. CAVALIER:

Q.   How about same answer for the
Hill?

A.   Yeah, I clearly don't.

This was from what we wrote from
the GOS report that I submitted to Mark Fink and
I believe was used, so -- in our general

Page 259

operating support thing.

So, you know, it wasn't questioned
at the time and it certainly wasn't questioned
now.  It was, like, our standard language.

Q.   Okay.  But sitting here today, I
mean, I want to ask a very specific, very narrow
question.

Sitting here today, do you -- can
you state with any certainty that you, in fact,
placed or helped to place an article in the Wall
Street Journal?

A.   Very likely.  But I don't remember
off the top of my head.  What is the point of
this?  I'm confused.

Q.   The point is to find out --

MR. CARSON:  He's trying to call
you a liar is the point.  And the fact is
you used a computerized system that seems
to be infallible to come up with the
numbers and so now he is looking for a
way to continue calling you a liar.

I guess to the extent you
understand what he is saying, you can
answer.

Deposition of Lisa Barbounis                                    Lisa Barbounis v. Middle Eastern Forum, et. al.

Page 260

1   MR. CAVALIER:  Well, with that
2   improper, inappropriate and ridiculous --
3   MR. CARSON:  The questions are
4   what's inappropriate.  But we can
5   continue.
6   BY MR. CAVALIER:
7   Q.    Do you need me to restate the
8   question?
9   A.    No.  Like I said, it was likely,
10  like I said, how I got the number and the outlets
11  were sorting it by date in our Monday.com source
12  thing.
13          So those were from Monday.com in
14  between those date ranges.
15  Q.    Do you remember ever talking to
16  Daniel Pipes about any work with the Wall Street
17  Journal?
18  A.    I don't.
19  Q.    Do you remember ever talking to
20  anybody at the Wall Street Journal about an
21  article for the Middle East Forum?
22  A.    I remember reaching out to their
23  staff to set up meetings and things like that,
24  but other than that, I don't recall specifics.

Page 261

1          We did this all the time, so I
2   don't recall every specific time.
3          Like you said, there's 1100 there.
4   Q.    Well, I'm only talking about the
5   Wall Street Journal.
6   A.    I don't remember.
7   Q.    Do you ever remember reaching out
8   to them at all?
9   A.    I believe I did reach out to them
10  but I don't remember when.
11  Q.    Do you remember who you would
12  reach out to?
13  A.    No.
14  Q.    Do you remember speaking with
15  anybody from the Wall Street Journal during your
16  time at Middle East Forum?
17  A.    Likely.  I mean, like, I -- I
18  speak with people -- like right now, Fox News,
19  the lady just asked me for an interview on Fox
20  News.  I have no idea what her name was.  I mean,
21  I respond to interview requests all the time.
22  Q.    I understand that you're saying
23  that it's likely that you did so, but what I'm
24  asking you --

Page 262

1   A.    I do not remember.  That is my
2   answer for the tenth time.
3          MR. CARSON:  It doesn't say -- the
4   thing doesn't say she talked to people at
5   Fox News.  It says she helped with
6   those --
7          MR. CAVALIER:  I never said that
8   it said that.  It's just a question.
9          THE DEPONENT:  Like I said, I
10  don't remember.
11  BY MR. CAVALIER:
12  Q.    Aside from your counsel's
13  long-winded speaking objections, is there some
14  reason, sitting here today, that you're finding
15  these questions to be offensive?
16  A.    No, I'm just tired, Buddy.  I
17  worked a 10-hour day yesterday and we're here
18  talking about if I remember something from
19  before, like, and I don't even remember the
20  two -- the two people I talked to yesterday.
21          There's a guy that was just in my
22  e-mail just now, Mario Diaz, that was asking for
23  an interview with the Congressman.  I can't even
24  tell you what outlet he's from.

Page 263

1          There's so many of them.  So it's
2   exhausting for you to keep asking me the same
3   questions over and over again when I tell you I
4   don't remember.
5          MR. CARSON:  It's even more
6   exhausting when it has zero, literally
7   zero, connection why we're here today.
8          You're looking at the resume that
9   was posted in a resume bank at the job
10  she has now.
11          There's no connection with the
12  instant matter.  There's no connection
13  with the counterclaims.
14          MR. CAVALIER:  Fortunately I get
15  to determine what I want to ask her.
16          MR. CARSON:  Go ahead.
17          THE DEPONENT:  I don't know.
18          MR. CARSON:  Waste the whole day
19  talking about something -- you know, it's
20  just --
21          THE DEPONENT:  Keep going.
22          MR. CARSON:  It's really
23  offensive, because everyone here is busy
24  and we're wasting the entire day on

Page 264

1  questions that have nothing to do with
2  the reason why we're actually here.
3      So I guess we'll continue doing
4  it.
5      THE DEPONENT:  There is a sexual
6  harassment case and now you're asking me
7  about the Wall Street Journal.
8  BY MR. CAVALIER:
9      Q.    Ms. Barbounis, you understand, do
10 you not, that it's relevant to your credibility
11 when on the one hand you play up your
12 experience --
13     A.    So you are trying to call me a
14 liar.
15     MR. CARSON:  Yeah.  Exactly.  Here
16 we go.
17     THE DEPONENT:  I'm ready.
18 BY MR. CAVALIER:
19     Q.    You understand it's relevant to
20 your credibility, if you are, in fact, playing up
21 your responsibilities to a future employer while
22 playing them down to benefit your lawsuit,
23 correct?
24     You understand how that is

Page 265

1  relevant advance?
2      MR. CARSON:  Objection.
3  Argumentive.
4      THE DEPONENT:  You do
5  understand --
6      MR. CARSON:  Lisa, wait.  Don't
7  talk over me.
8      THE DEPONENT:  Sorry.  I didn't
9  know you weren't done.
10     MR. CARSON:  No.  You don't have
11 to answer that question.  It's
12 argumentive.  It has nothing to do with
13 this case.  It's just designed to harass
14 you and you don't have to answer it.
15     MR. CAVALIER:  It's designed to
16 respond to your counsel's improper
17 speaking objection.
18 BY MR. CAVALIER:
19     Q.    But you do understand that, do you
20 not?
21     MR. CARSON:  You're not raising
22 credibility issues.  You're showing her a
23 resume where she said she helped on an
24 article.  She told you the exact way --

Page 266

1  the basis for including this information
2  was a computer program.
3      That's where you go, all right,
4  next topic.
5      But instead we're here for another
6  20 minutes talking about her resume for
7  her current job and whether or not she
8  ever spoke with someone at the Wall
9  Street Journal.
10     MR. CAVALIER:  Seth, we're here
11 for 20 minutes, because you keep
12 launching these soliloquies and
13 objections.
14     MR. CARSON:  That's absolutely not
15 why we're here.  But go ahead.
16     MR. CAVALIER:  Not to mention when
17 I ask a very simple, straight forward
18 question, like who did you talk to there
19 and I get a speech in response --
20     THE DEPONENT:  Not an I don't
21 remember.  You kept asking me over and
22 over again.
23     MR. CARSON:  How much more do we
24 have on the resume?

Page 267

1      MR. CAVALIER:  However much I want
2  to get into.
3      THE DEPONENT:  That's really
4  professional, too.
5  BY MR. CAVALIER:
6      Q.    Where you say additionally I
7  arranged for 27 of our experts to be interviewed
8  92 times by A-1 media outlets on both radio and
9  television, are any of those 27 experts Middle
10 East Forum fellows?
11     A.    Yes.
12     Q.    And where you say the connections
13 that you have made and maintained with members of
14 the press over the years may be one of my biggest
15 contributions to effectively assist in forwarding
16 the members' objectives?
17     A.    Correct.
18     Q.    Those connections to the press
19 that you're referencing are connections that you
20 made during your work at the Forum, correct?
21     A.    Guys, you don't live in a bubble.
22 I mean, I made connections with press.  And I'm
23 friendly with them.
24     Like, for example, I made a

Page 268

connection with the press in England and I still maintain friendships with those people and I was there on my own time. It had nothing to do with MEF. And so that I have maintained over the years.

When I worked in Congressman Costello's office, I made relationships with the press.

MR. CARSON: Lisa, it was a yes or no question. He said the connections made with the press were things that you did when you were at the Forum. The answer is yes.

THE DEPONENT: My point is -- my point is --

MR. CARSON: He didn't ask you for an explanation though. Just say yes or no.

THE DEPONENT: I want to get out of here, too. I'm sorry. Go ahead, go.

MR. CARSON: I guess MEF is insinuating that they own the press now, too.

Page 269

BY MR. CAVALIER:

Q. I'm not insinuating anything. I'm asking you whether you made connections with the press at the Middle East Forum.

A. Some of them, yes. Some.

Q. Is there something about that question that you find objectionable?

A. Yes.

MR. CARSON: I do.

THE DEPONENT: I do, yes.

MR. CAVALIER: Why?

MR. CARSON: Because the question insinuates that the Middle East Forum has some sort of claim to the connections with the press.

THE DEPONENT: I agree.

MR. CARSON: What is the point of the question?

MR. CAVALIER: I would love to understand how the question, did you make connections with the press, has any kind of a connotation --

THE DEPONENT: Well, then what was your purpose for asking?

Page 270

MR. CARSON: John, one of the Middle East Forum's claims in the trade secrets case is that Lisa Barbounis isn't allowed to share information about press contacts with other people.

THE DEPONENT: Correct.

MR. CARSON: They're literally claiming that somebody's e-mail address is a member of the press is a trade secret. It's ludicrous. It's absurd. That's the basis for being objectionable.

MR. CAVALIER: Regardless of what's going on in the trade secrets case, this question has nothing to do with that. It's a simple, straightforward question.

MR. CARSON: Let's just get through this. Yes or no.

BY MR. CAVALIER:

Q. Whether you made connections to the present during your time with the Middle East Forum?

A. Some of my connections were made during my time at Middle East Forum.

Page 271

Q. Okay.

MR. CAVALIER: I think this is Exhibit D.

THE DEPONENT: Okay.

(Deposition Exhibit Number D marked.)

BY MR. CAVALIER:

Q. This is a text message chain. We can identify it. But I'll represent to you that it's a text message chain between you and Tricia McNulty.

Does that look correct to you?

And you can read through some of it, all of it, if you want to. I don't think you want to read all 77 pages.

But does that seem to be correct to you?

A. Sure. I mean, I don't see where it says Tricia's name anywhere. Anywhere at all actually.

Q. Well, do you have any reason to doubt my representation to you this is a document that we got in the production of this case?

A. Yes. You've done nothing but

Deposition of Lisa Barbounis                                Lisa Barbounis v. Middle Eastern Forum, et. al.

Page 272

1 disparage me intentionally over and over again.
2       Q.    All right.  So let's identify the
3 document.
4             Let me know -- well, I'll tell you
5 what.
6             You can read it and you can let me
7 know you feel comfortable identifying it as your
8 text message change with Tricia McNulty.
9       A.    Okay.  Slow down.
10      Q.    I'll note that this was produced
11 by your counsel.
12      A.    Now it says McNulty.  I said I
13 didn't see her name.  Now I see her name.  Now I
14 know who it's with.
15            Okay.  Keep going.
16      Q.    Can we now agree that this is a
17 chain of documents --
18            MR. CARSON:  I can represent, too,
19      that McNulty 207 is a Bates stamp that I
20      put on the document and produced in the
21      Patricia McNulty versus MEF case.  And
22      this does look like a thread that I
23      produced.
24            THE DEPONENT:  Okay.  Then, yes, I

Page 273

1       agree that that's what this is.
2 BY MR. CAVALIER:
3       Q.    Okay.  So you see here it's
4 dated -- I'm gonna ask you about specific
5 segments of this text chain.
6             Okay?
7       A.    Yeah.
8       Q.    This first one is dated
9 November 3rd.  I'll make it a little bigger for
10 you, so you can see it easier.
11            And just so we're clear, on this
12 text thread, Patricia is in blue and you're in
13 gray, correct?
14      A.    Okay.
15      Q.    Do you agree with that?
16      A.    Sure.
17      Q.    Okay.  On 11/3/18 at 10:47 a.m.,
18 Tricia says to you, did you see that e-mail about
19 Monday morning.  You say, yes, there's a couple
20 emogis.
21            She says, oh, God, I hate it.
22            You say, I know.  I don't know
23 what is happening.
24            Do you know what that is in

Page 274

1 reference to?
2       A.    Absolutely no idea.
3             MR. CARSON:  Look at the date.
4             THE DEPONENT:  Oh, the date.
5             I would guess that would be our --
6       that meeting that we had -- I'm guessing,
7       though, still that that would be a
8       meeting that we had about Greg Roman and
9       all.
10 BY MR. CAVALIER:
11      Q.    Okay.  So as you best you know,
12 this was in reference to the November of 2018
13 meeting, the all-hands meeting that's been
14 referred to in this case, correct?
15      A.    Okay.
16      Q.    Okay.  Same day, you ask her --
17 you send her a link to a D.C. Young Republicans
18 event?
19      A.    Uh-huh.
20      Q.    2018 Holiday Gala?
21      A.    Uh-huh.
22      Q.    And you ask, want to go if we
23 still have jobs?
24      A.    Right.

Page 275

1       Q.    What did you mean by that?
2       A.    Exactly what it said.  Like, if we
3 all don't get fired for, you know, ratting on
4 Greg Roman.
5       Q.    Did you think you were gonna get
6 fired for ratting on Greg Roman?
7       A.    Absolutely.
8       Q.    Why did you think that?
9       A.    Because Daniel Pipes was so
10 entrenched with Greg Roman, like, you know,
11 nothing -- like anything Greg Roman could do was,
12 like, gold.  And so they would, you know, -- he
13 would always want to keep Greg over us.
14      Q.    Okay.  But just for the record,
15 this November of 2018 meeting was the first time
16 you ever voiced those complaints to Daniel Pipes,
17 correct?
18      A.    Listen, you live in that
19 atmosphere, you know what it's like.  That's all
20 I'm going to say.
21      Q.    Well, I appreciate that.  But
22 that's actually not an answer to the question.
23      A.    It isn't?  What was the question
24 then?

Page 276

Q.   The question is, did you ever complain to Daniel Pipes about Greg Roman before the November of 2018 meeting?

A.   No.

Q.   So it's fair to say then that you didn't know how he would react to a complaint about Greg Roman prior to that pointed in time?

A.   Well, my suspicions were confirmed when I did complain.

Q.   I thought you told us that you were not fired as a result of your complaint?

A.   I wasn't fired.  I sat there and sobbed after he came in my office and said, priests have been accused of more and get to keep their jobs.

So Greg will be staying.  And then I -- he left and I walked into the middle room and I sobbed like a child uncontrollably where it was, like, the -- because I knew that it was only going to get worse from there.

And that nothing that we said made a difference with Daniel Pipes, because Greg was his whatever.  Meal ticket.  Equal.  Whatever he was.  His chosen child.  I don't know.

Page 277

Q.   Did you tell Daniel Pipes that you wanted Greg Roman fired?

A.   Yes, in the office.  In my office.

Q.   Then come May you wanted him back?

MR. CARSON:   Objection.

THE DEPONENT:   We've already been over this.

I didn't want him back.  And it was supposed to be a probationary period anyway.  And then when people complained to Daniel, he again said it was us mooning.

Now, come on.  Sorry.  I didn't mean to be adversarial.  This is the same stuff over and over again.

BY MR. CAVALIER:

Q.   Did you still have your job at the time that the D.C. Young Republican's Gala came around?

A.   We ended up not going.  It was sold out.  But probably.  Probably in December.

Q.   All right.  Moving to 11/4.

A.   Uh-huh.

Q.   Well, first, let me get this out

Page 278

of the way.

November 3rd, 2018, you get a message from Tricia that says, Neil just sent me a text that says, hey, T-bone, how's it going.

Do you have any idea what that means?

A.   She was probably talking about -- like her current fiancee, they were -- they were in the beginning stages of dating around this time.

So I'm sure she was unhappy that he sent her a text message saying, hey, T-bone.

Q.   Okay.  You said, I hope you didn't answer.  And then you say, I'm not signing this NDA.  I haven't sent it yet, but --

A.   And then I sent my response.

Q.   You sent your response to Tricia?

A.   Correct.

Q.   Okay.

A.   About what I was gonna write to Daniel.

Q.   Did you ever end up writing that to Daniel?

A.   I did.

Page 279

Q.   Okay.  Can you describe for me what concern you had with the NDA that he was putting in front of you?

A.   I know it's here on the screenshot, but I need you to describe it.

A.   There was a new clause in there that would prohibit us from seeking an attorney in general.

And I didn't -- like and at that point we didn't even -- I certainly didn't want to engage in a lawsuit for a various amount of reasons.

And -- but I didn't like that he was taking the option completely away from us to have no recourse.  Should I need to have recourse, I didn't have to.

Q.   Okay.  So you read the NDA at this point in time?

A.   The new one, correct.

Q.   Right.

You had a problem with it, correct?

A.   Correct.

Q.   And you voiced that problem to

Page 280

1  Daniel Pipes, correct?
2      A.   Correct.
3      Q.   And he then revised the NDA to
4  account for your issue, correct?
5      A.   Incorrect.
6      Q.   How is that incorrect?
7      A.   He said he agreed and I didn't
8  have to sign it.
9      Q.   So here a little further down, you
10 say, Matt said just sign it, don't be stupid.
11 They are doing this for Greg, not for us.  But do
12 we trust them?  I just talked to Marnie.  She
13 isn't signing it either.
14         You're referring to Marnie Meyer
15 there?
16     A.   Yeah.
17     Q.   Okay.  So you guys are all talking
18 about this NDA at this point in time, correct?
19     A.   Correct.
20     Q.   And here you say Delaney doesn't
21 want to sign it either.  Obviously messages from
22 them.
23     A.   That's messages from Ovi.  It's
24 something to make her feel better.  It's a joke

Page 281

1  of some sort.
2      Q.   Right.  Who is Ovi?
3      A.   A friend of mine from Australia.
4      Q.   It says here, tell Tricia to
5  message me.
6         Does Tricia know Ovi?
7      A.   Yeah, so Tricia and Ovi, like, had
8  talked on the phone a couple of times before,
9  like -- like I had said, she had just started
10 dating Neil at this point.
11        And before that, she was talking
12 to Ovi to date him.  And so he said, tell Tricia
13 to call me again.  Because they had, I think,
14 stopped talking for a little bit.
15     Q.   Okay.  And he says here that he's
16 interested, right?  She's hot, blonde, eyes,
17 smart.  That's from Ovi?
18     A.   Yeah.
19     Q.   And you said you sent this to sort
20 of make her feel better, correct?
21     A.   She thought Ovi was attractive and
22 clearly he thought she was attractive.
23     Q.   Okay.  Is he banned from entering
24 the U.S.?

Page 282

1      A.   No.
2      Q.   Okay.  So after some discussion
3  about Ovi, and then I just asked you about this
4  earlier, but at 11:06 same day, 11/4/18, you say,
5  all good, DP, I'm assuming that means Daniel
6  Pipes, amended the NDA.  I'm signing.
7      A.   So -- correct.  So apparently he
8  said he took out that clause or whatever.
9         But then he also told me in an
10 e-mail that I didn't have to sign it and I did
11 not sign a new NDA that day.
12     Q.   That day?
13     A.   Or at all.
14         I've never signed a new NDA from
15 the time I got hired.  I didn't sign the amended
16 one.  I didn't sign anything after my original
17 NDA.
18     Q.   Okay.  Do you know if Patricia
19 signed one?
20     A.   I don't think so.
21     Q.   Do you know if Delaney signed one?
22     A.   I don't think she did.
23     Q.   Do you know if Katrina Brady
24 signed one?

Page 283

1      A.   I don't think any of us did.
2      Q.   Okay.  And as you said, here he
3  says later, we can't really tell, there's no
4  header, but at the bottom, given it says Daniel,
5  looks like you're sending Patricia a copy of an
6  e-mail that Daniel Pipes sent to you about the
7  NDA, correct?
8      A.   Uh-huh.
9      Q.   Okay.  And is this e-mail
10 capturing what you just described to me about the
11 fact that you had a prior NDA, making the second
12 NDA unnecessary, according to Daniel Pipes?
13     A.   Uh-huh.
14     Q.   Same exhibit, a little further
15 down.
16         The next day, 11/5, out of the
17 blue you say, I'm so ducking sad.
18         She says, why.
19         You say, I'm just so sad, I don't
20 know.
21         And then she -- she sends you a
22 long text about what you're gonna do in the
23 future in working with Daniel Pipes in a
24 different light, where he can see that you do

Page 284

good work and solidify your importance to him.

Q.   What are you guys talking about there?

A.   Exactly what it says.  I was sad, having a bad day.  She was, like, I think all this is draining.

She said, that's what you're left with.  But I think it's going to only be up from here.

You're gonna get a fancy title you're proud of.  You'll be immersed in content.  Sure, not in the way you want.  But this is a good stepping stone to that.

Oh, we were talking about my -- she was talking about me doing the web editing.  And apparently at this time, this is before we discussed my title, they were talking about calling me the online editor.

Q.   Is that a title that you wanted?

A.   No.

Q.   Why not?

A.   Because I don't do online editing.  I don't edit websites.  And I didn't even know how to at that point.

Page 285

Q.   All right.

A.   And it was sad.

Q.   Why was it sad?

A.   Because, you know, I worked my whole life to write legislation.  I went to school and worked previously to write legislation and do policy.

It wasn't to edit articles and take the HDML code and put it up on a website.

I mean, I went to a Ivy league school to do policy.

Q.   Were you doing policy in your job at the Middle East Forum?

A.   Absolutely was, yeah.

Q.   So the policy part of it was what you were more interested in?

A.   Uh-huh.  Still am.

Q.   Same exhibit, November 10th.  I'll give you a second to read those two texts.

A.   Looks like me being upset over a boy.

Q.   Do you remember what boy?

A.   Given the time period here, it's

Page 286

probably Daniel Thomas.

Q.   Just for the record, that's McNulty 225, that page of Exhibit D.

Same exhibit on McNulty 241.

On 11/20/18.  Can you take a second and read that text from you to Patricia McNulty?

A.   I don't know

Q.   I'm sorry?

A.   Yeah, I don't even remember what that's about.

Q.   Do you know what she was referring to when she said you saw her rolling her eyes at you while you were talking that day?

A.   I have no idea.  I don't even remember this.  Because I, like, never get in an argument with Tricia.  Rare.  I don't know what this is about.

Q.   You say here that you know that she's not happy with your behavior and the Danny thing.

A.   I have no idea what that means.  I swear to God I have no idea.

Q.   Is the Danny thing the thing you

Page 287

just mentioned about Danny Thomas?

A.   She just didn't like Danny Thomas anyway.  She just always thought he wasn't good enough for me.

Q.   Okay.  Do you know what she talks about when she references -- strike that.

Do you know what you're talking about when you say you know she's not happy with your behavior?

A.   No.  I'm actually curious.  I'm sitting here wondering what that would be about.

Q.   Okay.  And she says here that she's hurting your feelings and you don't like it, correct?

A.   That's what it says, yeah.

Q.   All right.

A.   I have no idea what this is about, so I'm gonna read what she says.

Q.   Yeah, let's read what she says.

A.   This is a very strange conversation.  It's not ringing -- it's honestly not ringing a bell.

It looks like I was talking a lot about, like, -- like there was some time where

Page 288

1  Daniel liked my writing and he would, like, send
2  it back with no, like, red edits.
3        He's a sharp -- like, he's a
4  editor and when he writes, it's like -- you know,
5  you get nervous.
6        And I was probably excited that I
7  wrote something that he didn't correct.  And
8  maybe being braggy and she didn't like that
9  behavior.  That's what it looks like.
10      Q.    Okay.  And it also looks like
11 she's mentioning that you only are ever talking
12 about Tommy and Danny and Ovi and Cassandra and
13 all these shiny people, she says.
14      A.    That are so much more interesting.
15      Yeah, I think for, like, a time,
16 you know, like, with anything else in your life,
17 you talk about the new things that are going on.
18      So, I guess, that she was upset
19 that I was talking about that and not whatever
20 else.  But like I said, when you have new things
21 going on, that's what you talk about.
22      Q.    And she says here to you, London
23 is better, I get it.  They are better, I get it.
24      A.    I never thought they were better,

Page 289

1  by the way.
2        Tricia is like my angel.  And,
3  like, I think she's an admirable person that I
4  look up to.  So for her to feel that way makes me
5  feel sad.
6        Q.    Okay.  But is it then fair to
7  assume at this point that you were talking to
8  Patricia a lot about the things in London that
9  you liked?
10      A.    I mean, I did like a lot of things
11 about London.
12      I'm like that, though.  I just
13 went to Texas and I just talked for an hour about
14 what I liked.  Like, I just talked for months
15 about what I liked about Texas and how much and
16 how great it was.
17      I do that no matter where I go
18 that's new.  I'm very excitable, you know.  Happy
19 person.
20      Q.    Okay.  This was during the period
21 of time that you were traveling, at least,
22 somewhat frequently to London, correct?
23      A.    I don't know the date of this
24 particular one.  I know you had it, but I didn't

Page 290

1  remember.
2        11/20, yeah, about that.  It was
3  like -- it was before I actually, like, started
4  having a real relationship with Danny.  Yeah.
5        Q.    Okay.
6        A.    Not a real relationship.  Like an
7  active relationship.
8        Q.    Okay.
9        MR. CARSON:  I object to that
10      question.
11 BY MR. CAVALIER:
12      Q.    And just because I want to give
13 you a chance to fully explain, do you think you
14 were only talking about being excited about the
15 relationship with Danny?
16      Or were you also talking about the
17 work that you were doing in London for Tommy?
18      A.    Probably -- I mean, like -- I
19 liked that work.
20      Q.    And you were excited about it?
21      A.    Yeah, I was good at it.
22      Q.    Same exhibit.  And for the record
23 this is McNulty 276.
24      A.    That was funny.

Page 291

1        Q.    Yeah, I'm assuming that was a
2  joke, that Danny's midnight confessions thing?
3        A.    Well, it was funny, because it's a
4  sex store.
5        Q.    Right.
6        But more relevantly 12/28/18,
7  you're sending her a screen shot.  Looks like --
8  is that an Instagram screen shot?
9        A.    No.  It looks like a -- maybe it
10 is.  I don't know.  I guess maybe it is an
11 Instagram screen shot.
12      MR. CARSON:  What are we talking
13      about, this right here?
14      THE DEPONENT:  The screen shot.
15      It could be just from my phone.  I don't
16      know if that is.  I guess it looks like
17      Instagram.
18 BY MR. CAVALIER:
19      Q.    Not that it matters.
20      But in any event, this is a
21 message that you got and screen captured from
22 Jasmine Bishop, correct?
23      A.    Yes.
24      Q.    Okay.  And she's asking for a

Deposition of Lisa Barbounis                                    Lisa Barbounis v. Middle Eastern Forum, et. al.

Page 292

1  chat?
2      A.    She's always asking for a chat.
3      Q.    Do you recall why you would have
4  screen shotted that and sent it to Patricia?
5      A.    Well, because I knew it was
6  Danny's -- well, at the time I knew it was
7  Danny's ex-girlfriend, whom he has kids with, and
8  she's reaching out to me, which was always a pain
9  in the butt.
10     Q.    Do you know whether this was the
11 first time that she ever reached out to you?
12     A.    I don't remember the first time
13 she reached out to me.  Could have been before
14 then.  Could have been after.  I don't know.
15     Q.    And she responds, oh, geez, did
16 you talk to her, question mark.
17            You said, not yet, but I will.
18            She says, I'm dying to know what
19 she wants to talk about.
20            She says, so bizarre all around.
21            So is it fair to say that at this
22 point Patricia knew about your relationship with
23 Danny and who Jasmine Bishop was?
24     A.    Yes.

Page 293

1      Q.    Okay.  Is that something you
2  discussed frequently?
3      A.    Occasionally.  I mean -- here's
4  the deal.  I didn't engage in -- like, the first
5  time I even ever, you know -- Danny tried to kiss
6  me on October 23rd.
7            I remembered the date, because me
8  and my mom had left the next day for England.
9            And then Danny was, you know,
10 trying to court me, basically, over a certain
11 amount of, like -- like months.
12            And it was -- it was refreshing to
13 hear wonderful things about yourself over and
14 over and over again.
15            And then I visited there
16 afterwards.  But there was no actual, like,
17 relationship at that point.
18            But Jaz had always asked me about
19 lots of things.  She asked me if he was sleeping
20 with other girls.  She heard rumors that he was
21 doing this and doing that.  And, like, before she
22 even asked him about a relationship with me, she
23 came to me about other chicks.  So, I mean, she's
24 crazy.

Page 294

1      Q.    Okay.
2      A.    Like actually certifiable with a
3  diagnosis insane.
4      Q.    So were you talking to Jasmine
5  Bishop before you started a relationship with
6  Danny Thomas?
7      A.    Yeah, I think so.
8      Q.    Okay.  And just to tie this up.
9            You're also sending Patricia the
10 conversation you had with Danny about Jasmine
11 Bishop's message here, correct?
12     A.    Right.
13     Q.    And this is McNulty 277.
14            And you're asking Danny, do you
15 want me to answer her.
16            And he responds -- I'm assuming
17 that's a typo, it says, yes, talk to her --
18     A.    That's how he talks.  You talk to
19 her, make her understand you're helping me with
20 my development, PA to Tommy, et cetera.
21     Q.    And then a little sweaty guy
22 emoji?
23     A.    That's a crying emoji.
24     Q.    Looks like he's crying out of his

Page 295

1  scalp to me.
2            But I'll take your word for it.
3  You certainly would know better than me.
4            So why -- what does that mean?
5      A.    He wanted -- like, so she's -- Jaz
6  was always so crazy and jealous.
7            I remember one time we were out
8  with, like, Tommy.  And this was before, again,
9  anything happened.
10           And they weren't even together,
11 because they break up and on and off again all
12 the time.
13           That she made Danny show her his
14 location and Facetime her immediately, so she
15 knew exactly where he was.
16           He's like, we don't even live
17 together.  Like, I'm living in London.  She was
18 always just like that.  She would threaten her
19 own life and the kids and whatever.
20           So I was like, do you want me to
21 talk to her, you know.  And at this point,
22 probably, I don't know what date this is, but we
23 didn't like, you know, -- what date was this
24 thing?  Like, yeah, this is still November.  I

Page 296

don't know when I went over there.

Q.   End of December.

A.   Beginning of December.

Yeah, so, like, we weren't -- we didn't have a physical relationship at this point.  And I really was trying to help Danny grow and be better as a person and, like -- yeah, I mean, that's all -- that's all accurate.

Q.   You didn't have a physical relationship with Danny Thomas at the end of December of 2018?

A.   At the end of December I did, yeah, yeah, yeah.  I thought this was dated November.

Q.   I think it's dated 12/28.

A.   Oh, I was looking at 11/20.  Oh, yeah, so I probably did have a romantic relationship with him at this point.

Q.   Okay.

A.   Again, I definitely did if that's the end of December, yeah.

Q.   So he's saying, talk to Jasmine and you know --

A.   Which I was doing all those

Page 297

things.  That's true.

Q.   Right.  Right.

But he's saying, talk to her and make her understand that nothing's going on between us.

A.   Just calm her down.  Because he was saying that she was, like, she threatens to -- and he's told me this on numerous occasions, that Jaz threatens to kill herself, that she threatens to OD, that she takes it out on the kids.

They both confirmed these things back and forth.  I mean, this was, like, a whole unfortunate saga.  But, like, Jasmine sent me pictures of her face and feet beaten to a pulp accusing Danny of it.

So, you know, she was like, I'm not staying with him.  Blah, blah, blah.

Like, there were so many things that were involved in this crazy relationship they had that, like, you know, I just wanted her to have -- and in other texts, I even tried to help, say go get a job.  If you reach out to these people, like, in your community, there's

Page 298

grant programs and there's this and that, like through England's social services program.

It can build you up and you don't need to rely on anybody.  Like, I did nothing -- there was times that she really infuriated me, but I would also still try to help this girl, because her situation was tragic.  And this is when I was starting to realize how bad news Danny was.

Q.   Right.

And we talked about this during your last deposition.  I don't want to belabor the point.

But you just mentioned that sometimes she would drive you crazy.  I think you said sometimes she'd make you furious.  I mean, you guys got into it pretty heatedly at points, yes?

A.   Do you know that she was already blowing up my phone and private messages last week?  I didn't answer her.  Like, that girl's crazy.

Q.   She reached out to you last week?

A.   Huh?

Page 299

Q.   She messaged you last week?

A.   She sent me, like, a request for thing.  I never responded.

Q.   Okay.  And at certain points, you guys made threats against each other, correct?

A.   No.

Q.   All right.  We can talk a little bit more about that.

But what I really want to know is, did it concern you at all that she was, as I think you put it, certifiably insane with a diagnosis, and was involved with this person who you had a relationship with?  Did that concern you?

A.   It's called life.

Q.   What does that mean?

A.   I mean, like --

MR. CARSON:  The question is, did it concern you?  Yes or no.  Did it concern you?

THE DEPONENT:  No.  He asked what that means.  It didn't.  That did not concern me.  That's life.

Page 300

BY MR. CAVALIER:
Q.   Did you ever have a concern that she was going to hurt Danny?
A.   No.
Q.   Did you ever have a concern that she was gonna try to hurt you?
A.   No.
Q.   Did you ever have a concern that she was going to try to hurt her kids because of your relationship with Danny?
A.   It's all a lot of drama.
MR. CARSON:  Yes or no.
THE DEPONENT:  I don't remember is my answer.
MR. CARSON:  Did you ever have a concern that she hurt her kids, because --
THE DEPONENT:  I don't remember. I just said it again.  I don't remember.
BY MR. CAVALIER:
Q.   Okay.  So there were times when you insulted her over messaging, correct?
A.   Yes.
Q.   So if she was certifiably insane,

Page 301

what was the -- what was the goal that you had in mind in lobbing those insults at her?
MR. CARSON:  Objection.  Are you representing Jasmine Bishop now?
THE DEPONENT:  I have sometimes an extraordinarily -- extraordinary drive to defend myself.
BY MR. CAVALIER:
Q.   Okay.  Sitting here today, do you think maybe you overreacted?
MR. CARSON:  Objection, argumentative.  You don't have to answer that.
BY MR. CAVALIER:
Q.   What was the answer?
MR. CARSON:  I'm instructing her not to answer.
MR. CAVALIER:  She already answered.  I just --
MR. CARSON:  I didn't hear her, but I'm objecting based on -- the question is argumentative only, designed to embarrass, ridicule and harass.

Page 302

BY MR. CAVALIER:
Q.   Are you gonna abide by your counsel's objection?
A.   I don't remember the question honestly.
Q.   The question is, do you think you overreacted?
MR. CARSON:  Objection.  Do not answer.
BY MR. CAVALIER:
Q.   Since she already answered, I don't think we need to belabor that point.
Same document.  This is McNulty 291.
She texts you here.
Boo, I'm definitely going to start looking, fuck this underappreciated bullshit.
In January 2019, do you know whether Patricia McNulty was actively looking for another job?
A.   I don't remember.
Q.   In January of 2019, were you looking for another job?
A.   I don't remember.

Page 303

Q.   A little further down you send the -- I don't know what you want to call that, the --
A.   Shocked face.
Q.   The what face?
A.   Shocked.
Q.   Shocked face.  Okay.
A.   That's a surprise face.
Q.   Surprise face, that works.
And then you send her, looks like a photograph of a computer screen from someone named Will Chamberlain, sending you a friend request on Facebook.
A.   Uh-huh.
Q.   So -- and then a laugh -- cry, laughing emoji.
Can you explain to me what you guys were talking about there?
A.   I have no idea.
Q.   Who's Will Chamberlain?
A.   He's a reporter -- not a reporter. He's like a lawyer and he owns a publication.
Q.   Okay.  And here she says, a very long, loud laugh, I guess you could call that.

Page 304

Says, guess you couldn't have been that bad.  And you say, it was bad in the morning.

What are you referring to?

A.    Maybe the night that we hung out on New Year's Eve and I got drunk and probably didn't like what I said or something.  I don't know.

Q.    Did you have a sexual relationship with Will Chamberlain?

MR. CARSON:  I'm instructing her not to answer that question, designed to embarrass and harass.  No relevance.

MR. CAVALIER:  We disagree on relevance.  I think it's an improper instruction.  But we'll decide if we need to do anything about that later.

THE DEPONENT:  Okay.

MR. CARSON:  There's only one reason to delve into her sex life.

BY MR. CAVALIER:

Q.    Same document.  McNulty 292.  This is a screen shot of a conversation with Danny Thomas, correct?

A.    Yeah.

Page 305

Q.    You say to him, I'm telling you right now, don't ever call me again and don't let me see you in Brussels.

He responds, I LOL.

You say, I mean it.  You can keep the money.

A.    Right.

Q.    What are you talking about there?

A.    So right before Christmas, Danny Thomas sent me a text message and it is said, hey, and he showed me a screen shot of flights.  And he's like, I need to ask a big favor.  He said I need to ask a little favor.  I said, it looks like a big one to me.

I said, what is it?

He said, I need to go to Germany with Tommy.  And my Monday is coming in from Paypal and -- my money is coming in from Paypal, like from donations that he was getting from whatever he was doing.  But he sent me a screen shot and said, see, it doesn't clear til here.

And I said, fine.  I'll send it to you, but make sure you pay me back on Thursday when it clears.  Because the thing said it

Page 306

cleared.

Then that Thursday came and then he didn't.  And then the next day came and he didn't pay me back.

So at this point I was thinking, I'm never gonna freakin see the money I lent him anyway, so just screw it.

Q.    After that you say to Patricia, I'm so hot right now, I'm about to say, expect those dick pics any day.

What does that mean?

A.    I don't know what it really means.  Hot means angry.

Q.    Right.

A.    I don't know what I meant by expect those dick pics any day.

Oh, because he -- because that's how Danny would try to make up with things.  He would try to send pictures of his thing, like, hey, baby, I want you, so...

Q.    Okay.  So explain then your text to Tricia.  I'm not sure I follow how that relates.

A.    Because that's what he does.  It's

Page 307

like a routine.  It's kind of, like, you know how like if you were to fight with somebody and they have like a thing that they always do.  Like Vasille will be like, you know, if I got in an argument with him in two days, he would get me, like, flowers from -- where would he get my flowers from?  What do call it?

MR. CARSON:  I would go with the guys gets you flowers versus sending you dick pics.

THE DEPONENT:  Stop.  You know what I am saying.  But Vasille would get mad and he'd get me flowers from Whole Foods.  And if we're fighting, I'd be like, I'd better expect those flowers, like.

That's just what that is.  It's like a joke.

BY MR. CAVALIER:

Q.    I see.  I see what you're saying.  So you're not -- you're not -- you're not saying here, like, hey, Danny, expect dick pics any day.

What you're really saying is,

Page 308

1  like, you're being and asshole and I expect you
2  to apologize?
3      A.   Yeah.  But I didn't even send it
4  to him.  I sent it to her.  But like that's the
5  joke, yeah.
6      Q.   Right.  I got it.
7      A.   Oh, and then she says, you can't
8  do that, he's got hot pictures of you, too.  But,
9  like, I wasn't threatening that.
10     Q.   Okay.  I mean, in fairness,
11 though, if you continue to read down here, it
12 seems like you're pretty angry, though, right?
13     A.   Oh, definitely angry.  I forget
14 what I was angry about.  But I was angry at Danny
15 a lot, so yeah.
16          This is a continuation of that
17 conversation with him.  The deal is like, thanks,
18 Babe.  Sorry.  Stop.
19     Q.   Right.
20          So you're saying -- you're making
21 a threat to him here where you say, if you -- if
22 you make me angrier --
23     A.   Oh, I'm gonna tell Jaz.  Yeah.
24     Q.   Right.

Page 309

1          And then you say to him, you have
2  no right to treat me with disrespect like that
3  after I've done fucking everything for you.
4          To your point he says, well,
5  thanks, babe.  And you say, don't fucking babe
6  me.
7          You're having a go at me for
8  someone talking shit.
9          Do you have anything -- does this
10 help you remember what this dispute was about?
11     A.   I don't remember what that dispute
12 was about.  Probably like him being on Snapchat
13 and sending D pics to girls.
14     Q.   Do you know what you mean here
15 when you say, I've done fucking everything for
16 you?
17     A.   Yeah, I'll tell you what I did for
18 that kid.
19          Every time he needed help on
20 anything, Lisa, how does this video sound.  He
21 would ask me to, like, review his YouTube videos.
22 He would ask me for advice on everything.
23          He would, you know, like, ask me
24 to help him with all kinds of things.  Like, you

Page 310

1  know, hey, Lis, what do you think about this
2  idea, what do you think about that?  What do you
3  think about -- how was this video?  Can you help
4  me edit this video?
5          Then, like, he wanted to interview
6  these people in Paris and he started interviewing
7  the people in Paris.
8          So then he gave me the footage to,
9  like, help edit.  So I edited the footage for
10 him, like, as a favor, and he wound up never even
11 putting it on YouTube.
12          Like so I did work for nothing.
13     Q.   Okay.
14     A.   I helped him all the time.  And I
15 counseled him and I would tell him, hey, you
16 spelled that wrong, delete that.  Or I would fix
17 his tweets or whatever he needed.
18          I mean, over and over again I
19 helped that kid.
20     Q.   Okay.  And that that included
21 helping him with money, yes?
22     A.   Only that one time.  That was the
23 only time I ever helped him with money was --
24 well, I also in Brussels, one time, because he

Page 311

1  was embarrassing me, I helped him with money.
2          But I lent him money there.  And
3  the only time I ever gave money -- or anything to
4  Danny without expectation of return is when he
5  had clothes and we were going out to dinner and
6  he looked like crap.  And I said, go get a
7  blazer.  I don't have time for this.  I've got to
8  get ready.
9          So that is the only time that
10 there's ever been money between Danny and I.
11     Q.   Okay.
12     A.   And there is, you know, like --
13 well, whatever.
14          (Deposition Exhibit E marked.)
15 BY MR. CAVALIER:
16     Q.   This is a new exhibit.  I think
17 it's Exhibit E.
18          Can you read that or is that too
19 small?
20     A.   It's small, but if I get close
21 enough, I'm getting it.  If you want to enlarge
22 it, though, that would be helpful.
23     Q.   We'll blow it up and take it in
24 pieces.

Deposition of Lisa Barbounis                                 Lisa Barbounis v. Middle Eastern Forum, et. al.

Page 312

1    A.    Okay.
2    Q.    As you can see here, based on what
3  I'm highlighting, this is a production from your
4  phone.
5    A.    Right.  On What's App to somebody
6  in England.
7    Q.    Whose number is this?
8    A.    I don't know.  I don't remember.
9  I don't know numbers off the top of my head.  I'm
10 sure you'll tell me.
11   Q.    If I represent to you that that's
12 Tommy Robinson's number, do you have any reason
13 to doubt that?
14   A.    Probably not.
15   Q.    Okay.  You see here that these
16 conversations took place, with the exception of
17 the last one, on March 7, 2019?
18   A.    Okay.  I'm, like, getting down
19 here so I can read it.  Can you move over though,
20 so I can read what the actual messages are?
21   Q.    Yeah, actually I'm looking at
22 these now.  They're from two different people.  I
23 don't want to mislead you.  So I want to be clear
24 here.

Page 313

1         This number here, I'm gonna
2  represent to you that's Jasmine Bishop's number.
3         Does that ring a bell?
4    A.    Yeah.
5    Q.    Okay.  And I want to represent to
6  you that these numbers here are from Tommy
7  Robinson.
8         Do you see that?
9    A.    Okay.
10   Q.    Do you see that distinction
11 between the two numbers?
12   A.    Yeah, I do.
13   Q.    So what I want to talk about are
14 these messages at --
15   A.    Uh-huh.
16   Q.    -- over here.  So, again, you can
17 still see the numbers here, so we can reference
18 these first three as being from --
19   A.    I get it.  Can you move over so I
20 can read all the words?
21   Q.    Sure.  I just wanted to make
22 sure you saw which numbers are which.
23   A.    I get it.  The first three are
24 hers.

Page 314

1         MR. CARSON:  Still can't see all
2  the words.
3         THE DEPONENT:  Yeah.
4         MR. CARSON:  You got to move it
5  over more.
6         MR. CAVALIER:  That's weird.  You
7  can see it on my screen.
8         THE DEPONENT:  There you go.  Now
9  you're good.
10 BY MR. CAVALIER:
11   Q.    Can you read the first three
12 messages for me?
13   A.    Yes.  But just so I want to be
14 clear here, because I just read them while we
15 here -- like I said, I read fast -- those
16 messages, there are messages -- lots of messages
17 missing in between and after them.
18   Q.    Okay.
19   A.    Because I remember this
20 conversation.  Lots of messages missing in
21 between them.
22   Q.    Right.
23         And by the way, I'm not -- I'm
24 not -- I'm not trying to represent to you that

Page 315

1  these are a continuous stream of messages in any
2  way.
3         Okay?
4    A.    Well, but to understand these
5  messages, you need the messages that correspond
6  with them.
7    Q.    That's fine.  And we can talk
8  about that later if we need to.
9         But I don't think I need to do
10 that to ask these simple specific questions.
11   A.    Okay.
12   Q.    I note for the record, too, that
13 again, these messages were produced to us in this
14 way, so it's not that we are -- we didn't
15 manufacture this document.
16         We didn't set it up or create it
17 this way.  It's the way --
18   A.    They -- but you have the entire
19 text string from these.  Like Kep Secum does or
20 whatever.  And you have the ability to put these
21 in correct context.
22   Q.    Maybe.  I don't know that I would
23 agree with you there.
24         But for the sake of this

Page 316

deposition, this is the way we're gonna try to
walk through it.

        I'm just curious as to whether you
know, looking at this, what these text messages
refer to.

        And specifically I'm talking about
the first three -- again, not a continuous
string.  Three separate messages.

        Do you know what they're referring
to?

    A.    Yes.

    Q.    What are they referring to?

    A.    Jasmine was mad at Danny for
something, either it was me or a new girl or
something.  I don't remember the exact thing.
But she started to say that Danny
stole money from MEF.  This is a claim that, you
know, she throws out there.

        However, she throws lots of claims
out there.

        And so she was trying to say --
and I said, be careful -- what I was trying to
tell her was, like, be careful, because these are
serious allegations.  This is what you would hear

Page 317

from the beginning of this conversations.

        Be careful because they are
serious allegations.  She said something else.  I
don't remember what it was.

        And here it says, and I didn't
know about the money that he took from MEF until
you told me.

        It was always in the back of my
mind, because it didn't add up, the whole Vinny
and you thing.

        But he said you were crazy and
would do anything to destroy him.  And I wanted
to believe him.

        Now that I'm obligated to tell my
work, what do I do?  That's theft.

        And so I asked her, which you
don't see in here, for proof.

        Give me something that I can go to
my people about.

        And then she said something -- to
the fact about, like, the house or some money she
referenced.

        I said, that's $7 he stole from
MEF then and Tommy.  And I said, but -- I said,

Page 318

the one here says, but not that he got it from
MEF money.

        And so what you're saying -- what
you're missing in between those two, not that he
got it from MEF money, she was telling me about
the apartment that they moved in -- like the new
house that they moved into and that he got a car.

        And then she walked back her
claims.  And she said, well, I just got off the
phone with his mother.  And apparently they gave
him the money for the car.  And I didn't know
about that.  I guess they didn't want me to know.

        So this is me trying to get her to
give me evidence, because it is, it's me trying
to show her, like, yo, this is a substantial
claim that you're making.  And I -- and I would
want, as a moral responsibility, to tell my
employer about this.

        But I need the evidence.  And
you're missing the part where I ask her for
evidence and she walks back her claim.

    Q.    What did you mean here when you
said to her, it was always in the back of my
mind, because it didn't add up?

Page 319

    A.    Because when the Vinny thing
happened, remember?  And we talked about this
earlier.  Vinny and this guy Jan, in the
beginning, in June, had asked for payment for
work that they did or didn't do and that was
nevertheless.

        And there were e-mails back and
forth from -- or maybe it was e-mails or -- I
don't know where -- where the messages were from.
But they were in writing somewhere.  Between me
and Danny about, you know, just pay these guys.

        And I had talked to Greg about it.
And then -- and I said, Danny said, I spent --
what he said to me at the point was, he was,
like, you know, I put all the -- we were asking
him to give, I think, 900 pounds to Jan -- I
think those numbers are right -- to Jan and Vinny
for whatever work or whatever.

        I said, it's just worth it to make
it go away.  Whatever is left over, pay them.

        And he goes, I already spent
what's left over.  So I told Greg he already
spent what's left over.  He doesn't have it left
over.  So you pay Jan and Vinny.  And he did.

Deposition of Lisa Barbounis                                    Lisa Barbounis v. Middle Eastern Forum, et. al.

Page 320

But I didn't understand why he didn't have 9,000 -- 900 pounds left over.

So -- but that's not 7,000. That's 900.

And Greg knew that. He took that extra money and that's why Greg and Marnie paid him -- paid Jan directly.

Q. At the point in time here where you were conversing with Jasmine Bishop, was she living with Danny Thomas?

A. He's in and out of there so much, I don't know.

Q. Okay. They have kids together?

A. He was not living there when I met him.

Q. Right. No, I know.

But do you know if they were living together in March?

A. I don't.

Q. So I ask because it talks about -- you just talked about the fact that they moved into a new house.

A. No. They moved into that house apparently in June.

Page 321

Q. June of what?

A. June of 2018.

Q. You said 2018?

A. Yes.

Q. Okay.

A. And then -- whatever. And then he told me later that they moved into that house.

But then he kicked her -- she kicked him out a bunch of times or he left a bunch of times.

I mean, they were in and out all the time. I think they get their furniture from a charity shop and they live hard.

Q. And as a matter of fact, that was one of the insults that you threw at Jasmine Bishop at one point?

A. Probably.

Q. Jasmine and Danny have kids together, right?

A. Yeah. Three.

Q. And like you just said, they live hard, right?

A. Yeah.

Q. So is it fair then to say that

Page 322

it's not in Jasmine's best interests to tell you that the father of their mutual children may have stolen $7,000 from your employer, correct?

A. Did you ever hear --

MR. CARSON: Object to the form of the question.

You want her to speculate again here? You can --

THE DEPONENT: Did you ever hear the saying there is no wrath as strong as a woman scorned?

BY MR. CAVALIER:

Q. I have, indeed, heard that saying. Many times as it relates to this case.

A. So, you know, Jasmine was saying crazy things about lots of people.

Jasmine, at one point, told me that she was going to make up lies about Tommy Robinson and go to the papers about them to get back at Danny.

Well, that would cut off his income. But she didn't care about his income. She cared about him cheating on her. And if he was still out working for Danny Thomas -- or

Page 323

working with Tommy Robinson, then he wouldn't be home.

Q. So at this point in time -- and by this point in time, I mean March 7, 2019, you hear this from Jasmine and you then message Tommy Robinson, correct?

A. Uh-huh.

Q. Okay. And after saying a couple things, you say, I'm going to walk away from all of this.

I recently found out some potentially messy things. And I have to deal with demos MEF and I have to back away until I figure it all out.

A. Right.

Q. And I tell MEF, which I think I'm obligated to, it's not good. Plus I have Jaz harassing me. I'm out.

A. Okay.

Q. So at this point you brought up the potentially stolen money to Tommy Robinson, correct?

A. Correct.

Q. Okay. So you thought -- you, at

Deposition of Lisa Barbounis                                   Lisa Barbounis v. Middle Eastern Forum, et. al.

Page 324

1 least, thought enough of the allegation to raise
2 it with him?
3       A.    At the time.
4             If you look at the date stamps, I
5 mean, it's the same day.
6       Q.    Right.
7       A.    I said, I don't know until I
8 figure it all out, because she walked back her
9 comments and I have to look into it.
10      Q.    Right.
11            So how did you look into it?
12      A.    She told me that she would send me
13 bank documents and statements and she never did.
14      Q.    Did you -- so she didn't send you
15 this stuff.
16            But did you look into it in any
17 other way?
18      A.    Well, I questioned Danny.  And
19 this was part of the reason that I was
20 questioning Tommy, did he know anything about it.
21 I asked Danny himself.  I asked Jaz again.
22            I mean, they're the only recourses
23 I have to figure it out at that point.
24      Q.    Didn't you think that the Forum

Page 325

1 might have resources that could help you figure
2 it out?
3       A.    I didn't want to involve the Forum
4 in a baseless rumor if that was the case.
5             You don't just go spreading rumors
6 and making trouble that are unnecessary.
7             Trust me, Greg wouldn't have loved
8 that.
9       Q.    Just to be clear, it's a rumor
10 that turned out to be true, right?
11            MR. CARSON:  Whoa, whoa, whoa.
12 Objection.
13            What do you mean it turned out to
14 be true?  What are you talking about?
15 BY MR. CAVALIER:
16      Q.    You're aware that Danny Thomas has
17 admitted to taking that money, right?
18            MR. CARSON:  No.  I'm not aware
19 of.
20            What we are aware of is that Danny
21 Thomas saying that Greg called him on the
22 phone and said that if you admit to it,
23 we'll sort you out afterwards with a wink
24 and a nod.

Page 326

1             So we're aware of that.
2             Is that what you're talking about?
3             MR. CAVALIER:  Are you also aware
4 that Danny Thomas has stated clearly and
5 unequivocally that no bribe or other
6 compensation was offered for any
7 testimony in this case?
8             MR. CARSON:  Yeah, no, that didn't
9 happen.
10            MR. CAVALIER:  Okay.
11            MR. CAVALIER:  Yeah.  And you show
12 me -- you show me a statement in this
13 case where Danny Thomas admitted to it.
14 That's not part of this case.
15            THE DEPONENT:  Anyway, to your
16 question, I still do not know if that
17 money was taken.
18            I have no evidence that it was
19 takenI have no proof.  And I would love
20 to see evidence if that was the case.
21            MR. CARSON:  Did Danny Thomas
22 return the money?  Has the Forum asked
23 for it to be returned?
24            MR. CAVALIER:  I'll ask questions.

Page 327

1             MR. CARSON:  Yeah.
2 BY MR. CAVALIER:
3       Q.    Does the fact that the Forum is
4 pursuing avenues of legal relief against Danny
5 Thomas change your answer to my last question?
6             MR. CARSON:  Objection.  Assuming
7 facts not in evidence.
8             Show me that, too.
9             THE DEPONENT:  Doesn't matter what
10 it is.  I still to this day, and at the
11 time of this text messages, and at the
12 time that I worked at MEF, I didn't know
13 if he took the money or not.
14            And it turned out to be true, it
15 turned out to be true.  But I'm not going
16 around making claims without evidence.
17 BY MR. CAVALIER:
18      Q.    Because it's important to have
19 really solid evidence before you accuse someone
20 of wrongdoing, correct?
21            MR. CARSON:  There's been
22 extensive discovery done.  I haven't
23 received any documents from anybody
24 showing that there's been an admission

Page 328

1  made or that there's been unequivocal --
2  we have a recording from Danny Thomas of
3  an amount that we produced to you.
4        If you have more stuff to produce
5  in discovery, I don't know that -- I
6  don't know that you can produce it at
7  this point.
8        But we will certainly look at it
9  and then make a decision how to handle
10 it.
11 BY MR. CAVALIER:
12     Q.    The question is, it's important to
13 have really solid evidence before accusing
14 someone of wrongdoing, correct?
15     A.    Agree.
16     Q.    Especially criminal wrongdoing?
17     A.    Yeah.
18     Q.    Correct?
19     A.    Yes.
20           MR. CARSON:  We're in the MEF
21 cinematic again with those questions?
22           Object to form.  Hypothetical.
23           Those questions are based on
24 something that never happened.

Page 330

1      Q.    I'll ask you first.
2            Do you stand by all three of those
3  statements?
4      A.    Yes.
5      Q.    And is the entire basis that you
6  have for making those statements the recording of
7  Danny Thomas speaking to Tommy Robinson that your
8  attorney just referenced?
9      A.    There's more.
10     Q.    What's the more?
11     A.    Manufactured evidence.
12           We were in a deposition and Greg,
13 in our own deposition, compiled and manufactured
14 evidence and Mr. Gold admitted at the end of the
15 thing that we were right.
16           And that was the direct -- that is
17 the direct definition of manufacturing evidence.
18     Q.    So your testimony -- your
19 testimony here today is that part of your -- the
20 basis for your allegation in paragraph 46 is the
21 fact that recordings between you and Jasmine
22 Bishop were compiled together into a single
23 recording?
24     A.    No.

Page 329

1            MR. CAVALIER:  Oh.
2  BY MR. CAVALIER:
3      Q.    As your attorney put it, as part
4  of the Middle East Forum cinematic universe, this
5  is your complaint in this case.  Your amended
6  complaint.
7            And looking at page 486, you
8  allege that defendants have manufactured false
9  evidence in their coordinated retaliatory attack
10 on plaintiff Lisa Barbounis.
11           Did I read that correctly?
12     A.    Correct.
13     Q.    And in paragraph 47, you allege
14 the defendants have engaged in criminal conduct
15 by promising to pay for testimony in their
16 coordinated retaliatory attack on Lisa Barbounis.
17           Did I read that correct?
18     A.    Yep.
19     Q.    And in paragraph 48, you say,
20 defendants have provided false and misleading
21 information to potential witnesses in order to
22 incite retaliatory behavior.
23           Did I read that correct?
24     A.    Correct.

Page 331

1            MR. CARSON:  Objection.  That's
2  not what she just said.
3            Go ahead.  You can answer.
4            THE DEPONENT:  No.  That's what I
5  was trying to say.  No.  That is not what
6  I said.
7            I said that Greg took bits and
8  pieces of multiple different
9  conversations, mended them together in
10 the worst possible light and used it as
11 evidence.
12           And then even Sidney Gold -- and
13 we said, hey, this a compilation.  You
14 can't do that.
15           And Sidney Gold even said at the
16 end, you were right and I am sorry.
17 BY MR. CAVALIER:
18     Q.    You said use that as evidence, all
19 that was done with that document was you were
20 just asked questions about it, correct?
21     A.    No.
22           MR. CARSON:  The record speaks for
23 itself.
24           THE DEPONENT:  I suggest you look

Page 332

1  it up, sir, because you can ask your --
2  BY MR. CAVALIER:
3      Q.    Well, you're calling -- you're
4  saying manufactured false evidence in a
5  coordinated retaliatory attack.
6          How is that evidence --
7      A.    One of the ways that they did
8  that --
9          MR. CARSON:  It's also not an
10         exclusive list.  And she has an attorney
11         who helps her draft these things.  And
12         she already told you she stands by
13         everything.
14 BY MR. CAVALIER:
15     Q.    So you agree with me, though, that
16 you have alleged that the Middle East Forum has
17 engaged in criminal conduct by promising to pay
18 for testimony in a coordinated retaliatory attack
19 against you, correct?
20     A.    First of all, apparently Danny was
21 bragging all over England that Greg was going to
22 pay him.  So I don't know if he retracted his
23 statement or didn't.
24         But, you know, multiple accounts

Page 333

1  from multiple people say Danny was bragging all
2  over that he was gonna get paid to testify
3  against me.
4      Q.    Isn't it true that you had more
5  information and evidence that Danny Thomas had
6  stolen money from the Middle East Forum in March
7  of 2019 than you do to support your claim that
8  MEF has engaged in criminal conduct against you?
9          MR. CARSON:  Objection.
10         Argumentative.  Assuming facts not in
11         evidence.  Object to the form.
12         THE DEPONENT:  No.
13 BY MR. CAVALIER:
14     Q.    How did you get the recording
15 between Danny Thomas and Tommy Robinson?
16     A.    It was a friend in England gave it
17 to me.
18     Q.    How?
19     A.    They sent it.
20         MR. CARSON:  What do you mean how?
21 BY MR. CAVALIER:
22     Q.    Sent it to you how?
23         MR. CARSON:  Wait a minute.  What
24 do you mean how?

Page 334

1      Q.    Did they record it on an audiotape
2  and mail it to you?  Did they text it to you?
3  Did they e-mail it to you?
4      A.    They texted it to me.
5      Q.    Texted it to you.
6          Who texted it to you?
7      A.    Tommy Robinson or Danny Barker.  I
8  forget which one it was.
9      Q.    Did they say anything about it?
10     A.    No, not that I recall.  I don't
11 remember.
12     Q.    Out of the blue, through an audio
13 recording, via text and left it at that?
14     A.    They know that I'm a good person.
15 And that Danny Thomas is a freakin liar.  And
16 they think what is being done to me is horrific.
17     Q.    Did he say that to you?
18     A.    People say that all the time.  I
19 get tons of messages all the time.  And I'm sure
20 that that person said that.
21     Q.    When you say that person, are we
22 talking about Tommy Robinson?
23     A.    I don't remember.  It was Tommy or

Page 335

1  Danny Barker.
2      Q.    You don't remember who sent you
3  the audio recording --
4      A.    There were two people -- excuse
5  me.  There were two people that I was talking to
6  about it.  And I don't remember exactly which one
7  it was.  I'm thinking it was Tommy, but I'm not a
8  hundred percent sure.
9      Q.    Okay.  So regardless of who sent
10 it to you, you've talked about the audio
11 recording with Tommy, correct?
12     A.    Yeah.
13     Q.    And you said you also talked about
14 the audio recording with Barker, correct?
15     A.    Correct.
16     Q.    Is there any reason why you
17 haven't turned over those communications?
18         MR. CARSON:  Objection.  She said
19         she talked to them.  What communications?
20         She didn't record the conversations.
21 BY MR. CAVALIER:
22     Q.    Did you talk to them by text?
23     A.    No.  I talked to them on the
24 phone.

Deposition of Lisa Barbounis                          Lisa Barbounis v. Middle Eastern Forum, et. al.

Page 336

1  Q.    But who sent you the recording by
2  text?
3  A.    Probably Tommy.
4  Q.    Right.
5  A.    That doesn't mean he texted me
6  about it.  We called and he goes, I'll send it to
7  you.
8  Q.    Okay.  Is there a reason you
9  haven't produced the text messages --
10        MR. CARSON:  I did.  We sent you
11    the recordings.
12        THE DEPONENT:  We sent you the
13    recordings.  That's it.
14  BY MR. CAVALIER:
15  Q.    You didn't produce any text
16  message that shows him sending it to you.
17        MR. CARSON:  Objection.
18    Argumentative.
19        THE DEPONENT:  We produced the
20    evidence.
21  BY MR. CAVALIER:
22  Q.    You produced the recording.
23        MR. CARSON:  Correct.
24        Where are we going right now?

Page 337

1        MR. CAVALIER:  I want the text
2    message that transmitted the recording.
3        MR. CARSON:  We'll look at it and
4    we'll get back to you.
5        I mean, it is the end of discovery
6    though.
7        THE DEPONENT:  You have the
8    recording.
9        MR. CARSON:  We'll look and we'll
10    produce -- we can -- I'll represent to
11    you that we'll take a look and we'll
12    produce any communications with Jan Tommy
13    Robinson.
14        MR. CAVALIER:  That's fair enough.
15    As long as I have your representation on
16    that.
17        MR. CARSON:  I can look.
18        MR. CAVALIER:  This is a natural
19    time to take five, Seth.
20        Do you mind if I take five?
21        MR. CARSON:  Yeah, that's good.
22        MR. CAVALIER:  Off the record.
23        THE VIDEOGRAPHER:  The time is
24    4:29 p.m.  We are off the record.

Page 338

1        The time is 4:49 p.m.
2        We are back on the record.
3  BY MR. CAVALIER:
4  Q.    So earlier you testified that you
5  did not -- you do not believe that you ever had a
6  fiduciary duty to the Middle East Forum, is that
7  correct?
8  A.    Correct.
9  Q.    Do you think you had a duty to
10  report your suspicions that Danny Thomas stole
11  money from the Forum, even if those suspicions
12  ultimately turned out to be incorrect?
13        MR. CARSON:  Objection.  She never
14    testified that she had suspicions.
15        You can answer.
16  BY MR. CAVALIER:
17  Q.    Well, let me strike that question.
18  Back up a little bit.
19        You had suspicions that Danny
20  Thomas stole money from the Middle East Forum,
21  correct?
22  A.    I wouldn't classify them as
23  suspicions.  I had this crazy girl.  I didn't
24  know what was true or not.  And I wanted to get

Page 339

1  to the bottom of it.
2  Q.    All right.  But even before she
3  messaged you claiming that Danny Thomas stole
4  money from the Forum, you had some suspicion that
5  something wasn't right, correct?
6        MR. CARSON:  Objection.
7        THE DEPONENT:  Well, I did.  And I
8    brought that to Greg's attention back in
9    June when we were talking about paying
10    Jan and -- when we were paying Jan and
11    Vinny or whatever.  And Greg's like,
12    don't worry about it, just pay them.
13  BY MR. CAVALIER:
14  Q.    And the Vinny thing that you
15  referred to, he warned you that Danny Thomas
16  might have stolen money back in 2018, correct?
17        MR. CARSON:  Objection.
18        THE DEPONENT:  No.  He was just
19    saying he wasn't getting paid and that
20    Danny was, like, a loser.  And he thinks
21    he's an undercover -- what did he think
22    he was?  He thought he was undercover
23    grass, as he called.  Like an informant
24    for the FBI or whatever they had going on

Deposition of Lisa Barbounis                          Lisa Barbounis v. Middle Eastern Forum, et. al.

Page 340

over there.

It was very bizarre.

BY MR. CAVALIER:

Q.    So your testimony is that Vinny did not voice any suspicion to you that Danny Thomas might have misappropriated money from that grant?

A.    The whole thing with Vinny over and over again, which was such insane nonsense, that, like, I -- and, you know, he said that he got his -- his stuff, like his -- like originally from Jasmine, like where he got -- where he got that from was Jasmine.

Because Jasmine was reaching out in the beginning to everyone trying to throw Danny under the bus.

So I don't know -- and, like, I still didn't.

And, again, when Vinny wasn't trying to warn me, he was telling me what Jaz said and he believed him, like I said, to be an undercover agent, and you couldn't get a word in edgewise.

Vinny -- if you were to see how he

Page 341

was, you would know.

Q.    So you had the Vinny conversation. You had, whether we want to call it --

A.    The Vinny conversation stemmed from Jasmine. Let's be clear.

Q.    Okay.  Fine.

But prior to March of 2019, you had at least some suspicion, or if you want to use another word, I'm welcoming you to give it to me, that something wasn't right with that grant money, vis-a-vis Danny Thomas, correct?

MR. CARSON:  Objection.

THE DEPONENT:  I didn't know if anything wasn't right with the grant money.  I didn't know if -- like, if there was something not right with Danny as a person or relationship or all that stuff.

And I didn't like the way Danny handled some things with the demonstration.  And that's why I was the one that requested that the money go through Rahiem Kasam the second time, because I thought he would execute it

Page 342

more -- less lost trust, like less half-assed.

BY MR. CAVALIER:

Q.    Okay.  So then in March of 2019, Jasmine comes along and tells you that Danny stole 7,000 from Middle East Forum, correct?

A.    And immediately walked it back. That is correct.

Q.    When you say walks it back, how?

A.    She said now I don't know -- she specifically said in her text message, now I don't know.  Now his mom's telling me he got $2,000 from them for the car and they didn't want me to know.

So it was, like, she was assuming that he got that money from them, when his mother just admitted he got $2,000 from them.

And it's in that text feed that you already have in your possession.

Q.    Did it occur to you that perhaps Jasmine recognized that reporting the father of her children for theft might have negative consequences for her?

MR. CARSON:  Objection.  Asking

Page 343

what Jasmine might have recognized.

You can answer if you know who Jasmine is.

THE DEPONENT:  My point is this that, like, whatever she recognized or didn't recognize, didn't matter.

She was nuts all the time.  And you couldn't take a thing -- she would say one thing and then the next day it was something completely different and it was non-stop.

First she would be, like, Lisa, you're so right, you're the only person that understands.

Then she would be, like, you're a this, you're a that, you're whatever.

It was non-stop, back and forth. Like, you couldn't -- everything that she said at one point and another time she totally negated the other way.

It was awful.

BY MR. CAVALIER:

Q.    Okay.  So you're saying she was all over the place?

Page 344

1  A.  Yeah.
2  Q.  Okay.  But given that, didn't you
3  think you had an obligation to let your employer
4  know that somebody had, at least, made the
5  allegation?
6  MR. CARSON:  Objection.  Asked and
7  answered.
8  THE DEPONENT:  No, because I
9  didn't believe her.
10 BY MR. CAVALIER:
11 Q.  Did you investigate it at all?
12 MR. CARSON:  Objection.  Asked and
13 answered.
14 BY MR. CAVALIER:
15 Q.  Other than talking about it with
16 Jasmine, did you do anything to investigate the
17 allegation?
18 MR. CARSON:  Objection.  Asked and
19 answered.  You can explain again.
20 THE DEPONENT:  Like I said, I
21 asked Tommy if he heard anything about
22 it.
23 I asked -- I specifically asked
24 Tommy if he knew about it or whatever and

Page 345

1  Tommy said he didn't.  He was in prison
2  at the time.  He didn't hear anything
3  retroactively.
4  I asked Jasmine again.  She walked
5  them back.
6  I asked a bunch of people.  But I
7  don't know what else there was physically
8  for me to do.
9  I requested his bank statements on
10 numerous occasions.  He denied it to me.
11 So there was nothing left for me
12 to do.  There was no way to prove it.
13 There would be no way for MEF to prove
14 it.
15 And I don't think that it was even
16 in the grant money that now that, like,
17 you know, we're going back over what the
18 grant is, I don't think that there was --
19 I don't know what the exact terms of the
20 grant agreement were.
21 But I don't think that they had a
22 specified dollar amount, other than
23 getting the demo off successfully, which
24 happened.  And if that included Danny

Page 346

1  getting a salary for that, then that's
2  what it included.  I don't know.
3  BY MR. CAVALIER:
4  Q.  If you didn't know, wouldn't it
5  have been best just to ask the Forum?
6  A.  I originally brought up the money
7  situation to Greg with the Jan thing.  And I
8  said, I don't know what Danny did with the
9  remaining.  He said, he's out.  These people are
10 saying they've served the $900.  He said, forget
11 about it.  Don't worry about Danny.  Just pay it.
12 MR. CAVALIER:  Guys, I apologize.
13 I need to step off for literally 30
14 seconds.
15 Can I get 30 seconds off the
16 record real quick?  I'll be very quick.
17 You don't need to go anywhere.
18 THE VIDEOGRAPHER:  The time is
19 4:56 p.m.
20 The time is 5:10 p.m.
21 Back on the record.
22 BY MR. CAVALIER:
23 Q.  So we've talked a little bit about
24 your involvement with Tommy Robinson.  And I just

Page 347

1  want to get a little bit more background from you
2  on that.
3  So your involvement with his
4  campaign started when?
5  A.  I don't know.  March or May.
6  Q.  Of what year?
7  A.  2019.  Okay.
8  Q.  Well, okay.
9  And so when was the first time you
10 went to England to work on his campaign?
11 A.  Around that time.
12 Q.  Okay.  Did you work on him -- did
13 you work with him on his European Parliament
14 campaign?
15 A.  That's what I'm talking about.
16 Q.  Okay.  Does it make sense if I
17 tell you that was sometime in May of 2019?
18 A.  Yeah, that makes sense.
19 Q.  So from June 2019 to August of
20 2019, do you remember what you were doing for him
21 then?
22 A.  The campaign was over.  I don't
23 think I was doing anything for him.  Let me just
24 think.

Deposition of Lisa Barbounis                           Lisa Barbounis v. Middle Eastern Forum, et. al.

Page 348

We had -- I don't think there was really anything specifically that I was doing for him at that time.

Q.   Were you holding yourself out as doing communications work for him?

A.   I was doing communication work for him, like, you know, like, as a volunteer basis.

Q.   Okay.  And was that true during the June 2019 to August 2019 time period?

A.   I mean, like, I don't know if I ever really necessarily, like, stopped.  Like, if he needed something, communication-wise right now, I would help him.

Q.   Okay.

A.   But he hasn't, because he's dealing with his own stuff right now.

Q.   What do you mean by that?

A.   He's got, like, -- he's not, like, advocating stuff.

I think he's just trying to, like, you know, make sure his wife and his kids are safe.

Q.   Okay.  And you had issues with Daniel Pipes and instructions to you with respect

Page 349

to your work with Tommy Robinson around this time, correct?

A.   Yes and no.

Q.   What do you mean by yes and no?

A.   I mean, like, there's -- there were times where I would say to him, like, Tommy wants political, like, advice or whatever and so I did this.

And he was, like, oh, good.  I'm glad that -- they need somebody reasonable to talk to, I'm glad it was you.

And then around the time of the election, you know, Daniel Pipes was sending me messages and telegrams saying, you know, oh, keep me abreast of the situation, let me know what's going on about this, let me know what's going on about that, did you hear about the outcome of the election?  Do we have news yet?

So, like, yes and no.  So that he would say certain things in, like, you know, e-mail correspondence and stuff like that.  And then he would text me, like, asking him to give him status updates, because he wanted Tommy to have a favorable outcome.

Page 350

Q.   Okay.  Did he ever restrict your involvement with Tommy Robinson?

A.   There were times where he did and there were times where he didn't.

He would be like, I'd be loathed to tell you politically, like, what to do -- tell you what to do on your personal time.

But, you know, -- and then there was another time where he said, I would limit you to your political activity without doing it without speaking to us.  And so I said, okay.

And then, you know, after that, I had talked to him about some political stuff I was doing and he said, well, I can't tell you what to do with your own time.  Please proceed with caution.

So yes and no.

Q.   Do you think that was a reasonable position for him to have as the president of the Middle East Forum?

A.   It was a confusing one for him -- for me that I thought that he held, because if I'm doing it on my own time, which I clearly was, and I was also not getting paid for it, clearly

Page 351

was, then it, like, legally was not blurring the line between the 501C issue.  So I didn't understand what his aversion was when he had encouraged me before to help Tommy with these matters on my own time.

Q.   Did you ever voice that to him?

A.   I did.

Q.   And what was his response?

A.   Again, I get silence from him quite a bit.

Q.   Okay.  So just to be clear, I understand that you were confused by what you're calling his vacillating positions, for lack of a better word.

But do you think it's reasonable for him as the president of the Middle East Forum to have concerns about an employee of the Middle East Forum being publicly involved in something like the Tommy Robinson campaign?

A.   I do.  Because a lot of times in the media, things are twisted and manipulated and things like that.

But, yeah, I think -- I think that that's a reasonable position.

Deposition of Lisa Barbounis                              Lisa Barbounis v. Middle Eastern Forum, et. al.

Page 352

Q.    Okay.  So then while you were
confused by his position, to be fair, and I
understand what you mean when you say that, but
while you were confused by his position, did you
have any problems with it?

A.    I mean -- I don't know what that
means.

I had problem, like, knowing,
like, am I, am I not?  Whatever.  You know, it
was more the problem stemmed from confusion.

And did I want to continue
helping?  Yeah.  Like the reason the Middle East
Forum wanted to help Tommy Robinson in the first
place, he is forwarding the objectives that we
were working towards.

Q.    Did you think that Daniel Pipes'
position on this issue was in any way unfair to
you?

A.    I think what I do on my personal
time is my personal time.  I don't remember -- I
don't remember if I felt that it was unfair.

Q.    Okay.  Is Tommy Robinson aligned
with the Proud Boys?

A.    I don't think so.  I know he did a

Page 353

video.

I mean, the thing with the Proud
Boys is, like, some of their missions overlap
into other things and some parts don't.  So, you
know, it is what it is.

Q.    So just for two record, and for my
own knowledge, who are the Proud Boys?

A.    The Proud Boys were originally
started by a guy named Gavin McGuiness, who was
actually friends with Tommy.

And then he made some statements
and -- that were like -- like leading -- like,
saying, like, you know, we're gonna beat people
up and stuff like that.

And then he resigned or something
like that, Gavin did, and was kicked off, like,
whatever.

And then they got labeled, like, a
terrorists organization or something like that.

And then -- and they were -- you
know, like, they -- a part of the people -- like
the left has ANTIFA and the right has Proud Boys
and they clash and fight and all kinds of weird
stuff.

Page 354

Q.    Okay.  So a couple questions there
to just follow-up.

You said they were labeled a
terrorist organization.  Labeled by who?

A.    I believe the FBI.

Q.    Do you think they're a terrorist
organization?

A.    Do I think that they are?

I mean, I don't know their inner
workings of it at all.  But the Proud Boys that I
have seen in the streets and stuff like that,
they're just like regular people that want to,
you know, not have ANTIFA burn down their cities.

Q.    Do you think -- just to build on
what you said earlier, just to clarify something
for me.

Do you think that the Proud
Boys -- is it fair to describe the Proud Boys as
the right wing equivalent of the left wing
ANTIFA?

A.    I think ANTIFA is way worse.  Way
worse.

Like, the only time the Proud Boys
engage in, like, physical activity of any sort is

Page 355

when, like -- they'll come to a Trump rally, say,
and then ANTIFA comes and starts fighting with
them and they may protect people.

They do not, like, go out in the
street and publicly riot and -- or assault people
while they're having dinner just on the streets
of Washington, D.C.

They do not engage in any violence
ever that isn't preempted by ANTIFA.  They're
more like a protection group.

Q.    Okay.

A.    I mean, and there's proof to that.
Like, they don't riot.

Q.    Do you think they have any
responsibility for the January 6th events at the
Capitol?

A.    I saw a lot of different groups
there.  I was there, as I'm sure you know.

I saw ANTIFA there.  I saw Proud
Boys there.  I saw people that associate with the
Proud Boys there.

I see -- I saw all kinds of people
at the event at the Capitol.

Q.    Just -- again, just for the

Deposition of Lisa Barbounis                    Lisa Barbounis v. Middle Eastern Forum, et. al.

Page 356

1 record, were you in the Capitol on January 6th?
2      A.    I was not in the Capitol.  I was
3 around the Capitol.  I had a woman that I saw.  A
4 last minute -- not a last minute.  She was, like,
5 coming down with her husband.  They looked like
6 they were in their 60s.
7            And he been -- clearly had been
8 affected by gas or whatever.  And so her and I
9 were talking.  And I said, were you in there?
10 Tell me what was happening, because my co-workers
11 and things were in the building.
12           And so she was explaining it to me
13 and she showed me a picture of this woman who
14 stole Nancy Pelosi's name placard.
15           So I took a picture of her phone
16 with my phone.  And then she said, oh, you want
17 it?  She was, like, I've got tons of video, so
18 she air dropped it to me, which I forwarded to
19 the FBI, along with all the footage I took from
20 the perimeter of the building time stamped.
21           Like, so the times that she's in
22 that building, like, you can hear me on the voice
23 on the other side, outside, way further back in
24 the crowd filming.

Page 357

1            So I was not in the Capitol, but I
2 do have footage, intense footage, from inside the
3 Capitol.
4      Q.    And so you were -- so you weren't
5 inside the building, but you were -- you were
6 there?
7      A.    Correct.
8      Q.    Okay.
9      A.    I was trying to get to work
10 actually.
11     Q.    Right.  No, I know.
12           And just, again, so the record's
13 clear, you work in the Capitol building?
14     A.    Well, I don't work in the Capitol
15 building.  I work in Cannon House office
16 building, which is, you know, like attached to
17 the building via underground tunnels and directly
18 across the street, but the Cannon was not
19 attacked; however, it was shut down, which is why
20 I couldn't get in the building.
21     Q.    Were you there all day?
22     A.    Pretty much.  Even into the
23 evening.
24     Q.    Where do you work?  Physically, I

Page 358

1 mean?
2      A.    In Cannon House office building.
3      Q.    Okay.  Where is that in relation
4 to the Capitol?
5      A.    Across the street.  And also
6 connected by tunnels.
7      Q.    Okay.  Does Tommy Robinson's
8 connection to the Proud Boys bother you at all?
9      A.    Like, I don't even think -- he's
10 not affiliated by any means.  He's not part of
11 the Proud Boys.
12     Q.    Right.  But he's friends with the
13 guys who lead them, correct?
14     A.    I don't know if he is friends with
15 them.
16           Like, they don't hang out on the
17 weekends.  I'm sure they know each.  I believe
18 that somebody told me that he just did a video
19 with them, like an interview or something.
20           But I didn't see it.
21           But I don't know what his -- I
22 don't discuss the Proud Boys with Tommy ever.  I
23 don't think I ever have.
24           I did ask one of Tommy's contacts

Page 359

1 for -- for a -- I did ask one of Tommy Robinson's
2 contacts for the leader of the Proud Boys'
3 information, because a panel that I'm speaking on
4 in April wanted to invite Enrique Toro, whatever
5 the hell his name is, to be a speaker there.
6            They always bring people from the
7 right and the left.  It's like a four people
8 panel discussions.  And then they hash out big
9 topics of the day from all walks.  It's called
10 The Better Discourse Event.
11     Q.    Okay.  And who's Enrique Terio?
12     A.    I think he is the leader of the
13 Proud Boys.
14     Q.    Okay.  I want to just show you an
15 exhibit here.
16     A.    I have his phone number.
17     Q.    Do you know him?
18     A.    I don't know him.  I've never met
19 him, no.
20     Q.    Have you ever spoken to him?
21     A.    Have I ever spoken to?  No, I have
22 never spoken to him.
23     Q.    Okay.
24     A.    I do have his phone number though.

Page 360

Q.   And I'm showing you -- I think this is Exhibit F, we'll mark it as.

A.   Yes.  Is this the thing he did with him?  I heard he did the --

(Deposition Exhibit F marked.)

BY MR. CAVALIER:

Q.   For the record, can you identify the two people pictured here?

A.   Tommy's on the right and I believe that's Enrique on the left.

Q.   Okay.  And when you say this is the event that you were referring to, it looks like it's something captioned The Right View?

A.   Yeah, I don't know what that is.

Q.   Okay.

A.   Somebody in passing told me, like, Tommy just did an interview or something with Enrique and that's all I know.

Q.   Okay.  Sorry.  Give me one second. I have a document.

A.   While we're doing that, can I just run and grab a glass of water?

Q.   Of course you can.

We can stay on the record as long

Page 361

as you're quick.

A.   Yeah, stay on the record.  Two seconds.  I'm back.  I'm sorry.

Q.   No problem.

All right.  I'm gonna show you another document here in a second.

Sorry.  Give me one second.  I don't know why this document's not popping up.

These Zoom depositions are killing me.

A.   You're not the only one.

(Deposition Exhibit G marked.)

BY MR. CAVALIER:

Q.   Okay.  All right.  Showing you an exhibit that we will mark as Exhibit G, I believe.

This appears to be another screen shot from the same event.

A.   Okay.

Q.   Can you take me through -- there are pictures of eight -- what appear to be individuals.

Can you walk me through anybody that you can identify in this picture?

Page 362

A.   The only person that I recognize from this picture is up on the top left-hand coroner is Danny Tomo and on the bottom left-hand corner is Tommy Rothlinson.

And I don't know if that's Enrique at the top middle, but it look it's like the same -- he looks honestly lighter.  But it looks like the same window setting from before.

So that's it.  I don't know anybody else.

Q.   Okay.  You don't know who this is in the middle left with the -- what appears to be the union jacket behind him?

A.   I didn't really see his face to be fair.  It's, like, blurry and looks like a big bald guy.

Q.   I agree with that description.

And you don't know who the guy in the middle is?

A.   No, he doesn't look familiar.

Q.   Okay.

A.   But these are really blurry on my end.  I don't know if they're clear on your --

Q.   No, it's a screen shot.  It's not

Page 363

great pictures.  So I was just --

A.   Sorry.

Q.   No, that's no problem.

Do you still manage Tommy Robinson's Telegram account?

A.   I never managed his Telegram account.

Q.   Do you manage any of his social media accounts?

A.   No, he doesn't have any social media accounts other than Telegram.

Q.   Do you maintain any of his communications platforms?

A.   No, not anymore.  I never really did his communication platforms.

I would occasionally answer some press e-mails for him or go through some e-mails, like, looking -- helping him look for stories that would come into, like, the info box.

But I never managed his social media like that.

Q.   Okay.  You currently work for Congressman Randy Weber, correct?

A.   Correct.

Page 364

Q.    Do you handle interviews and press for him?

A.    Yes.

Q.    Has that always been the case since you started working there?

A.    Yes.

Q.    Just to be clear, you said you never met -- I think his name is Enrique Torio?

A.    Correct.

Q.    Have you ever met with any of the Proud Boys?

A.    I met a bunch of them one of the nights that I was out filming with one of my friends who's a contributor for Newsmax.

There was a ton out.  It's the night that one of the Proud Boys got stabbed by ANTIFA in Washington, D.C.  I met like a ton of them.

Q.    Do you remember what night --

A.    I don't remember their names, but I met them.

Q.    Do you remember what night that was?

A.    I don't know.  Maybe three weeks

Page 365

before December 20th or something.  It was like the -- the second --

MR. CARSON:  Don't guess.  If you don't know, just say I don't know.

THE DEPONENT:  I'm just trying to give a time frame.  It's like around then.

BY MR. CAVALIER:

Q.    Okay.  Does Tommy Robinson -- scratch that.

Does Danny Thomas still work with Tommy Robinson?

A.    I have no idea.

Q.    Do you have any reason to believe that he might not?

A.    I mean, weren't they just on a video together you just showed me?  I don't know.

Q.    Okay.  I'm asking you.

Are you familiar with the group that goes by the name The Oath Keepers?

A.    I mean, I heard it loosely thrown around.  I don't know anything about them.

Q.    Do you know who they are or what they do?

Page 366

A.    I think that they're political in some right, but I don't know how.

Q.    Okay.  Do you know of a group that goes by the name the Boogaloo Boys?

A.    I've heard of the Boogaloo Boys.  I just actually watched a video on them a couple weeks ago, which I thought was interesting.  I think they were at some capitol in Ohio.  They were having an armed protest.

And there was -- like one of the Boogaloo Boys had like a Black Lives Matters shirt and the other one had like the gay pride flag in there.

And they were sitting there talking about how they're there just to prevent government overreach or something like that.

But I don't know much about them because I don't know much about them.  They're not in the news as frequently as, say, the Proud Boys or ANTIFA.

Q.    Have you ever met any of them?

A.    I don't think so, no.

Q.    Okay.  I want to ask you about something that you said earlier.

Page 367

When you were outside the Capitol and you were observing what was going on, I think you said there were members of the Proud Boys there.  There were members of the ANTIFA there.  There were a lot of people there.

Who do you think is responsible for the events of January 6th?

MR. CARSON:  Why are we asking these questions?  What's going on right now?

MR. CAVALIER:  Because I'm curious.

MR. CARSON:  You're just curious about her political views?

MR. CAVALIER:  Yeah.

THE DEPONENT:  I have an answer, if you want?

MR. CARSON:  Yeah, you can answer but I'm gonna cut this line of questioning --

THE DEPONENT:  It's not like I haven't put most of these views out in public anyway.

MR. CARSON:  I would suggest this

Deposition of Lisa Barbounis                                    Lisa Barbounis v. Middle Eastern Forum, et. al.

Page 368

1  is not idle curiosity.
2        THE DEPONENT:  I understand that.
3  But this is how I feel about the whole
4  situation.
5        I think that Donald Trump turned
6  up the rhetoric.  I do.
7        Do you think I think that his
8  speech -- his speech rises to the level
9  of incitement from everything that I've
10  studied and read?  No.
11        Do I think that the individual
12  people who made poor decisions to enter
13  the Capitol should be -- not to enter the
14  Capitol, to break and to bust into the
15  Capitol were actually wrong and I can a
16  110 percent condemn the violence.  And
17  those people made their own decisions.
18        It was apparently pre-planned
19  according to news reports and Facebook
20  and the FBI.
21        And that then they had their own
22  motives.  And I don't know if those
23  people were disenfranchised, like, you
24  know, Trump voters or if it was ANTIFA.

Page 369

1        But I will tell you that I did see
2  ANTIFA things, like black umbrellas and
3  stuff.
4        And from what I've known about
5  these groups and whatever, that nobody
6  ahead of time that is a Trump supporter
7  would have blown up -- put a bomb out in
8  front of the RNC.
9        The only people that would have
10  put both a pipe bomb in front of the RNC
11  and DNC is most likely an anarchist.
12        So I don't know who is exactly
13  responsible.  I think that everybody
14  should be held accountable for their
15  behavior the day of the Capitol.
16  BY MR. CAVALIER:
17        Q.    We talked a little bit about Amy
18  Meckleberg in your last deposition.  So we don't
19  have to rehash all of that background.
20        But I wanted to ask you what your
21  relationship with Amy Meckleberg is like today?
22        A.    She's my friend.  My very good
23  friend.
24        Q.    So part of my curiosity, I read

Page 370

1  recently that she said that the Capitol
2  insurrection was planned by ANTIFA.
3        Do you agree with that statement?
4        A.    I don't -- I don't.  Because I
5  don't have any information.
6        I don't know who it was planned
7  by, because I don't have -- I'm not privy to that
8  information.  So I certainly don't make
9  statements like that.
10        I said ANTIFA was there.  I also
11  saw legit Trump supports there, too.  And I saw
12  them engaging in violence.
13        So I can't say that it was solely
14  ANTIFA.  I don't know who planned it.  I do know
15  that John Sullivan, who I've seen out at multiple
16  riots and things like that, has his own, from his
17  own video testimony, telling a female journalist
18  that he was with, I told you it was going to
19  happen.  I told you I couldn't tell you much.
20  But I told you this was going to happen.
21        And he is straight up -- he has
22  made speeches at ANTIFA protests -- I mean, at
23  Black Lives Matter and ANTIFA protests where he
24  was asked to speak as an organizer.

Page 371

1        Q.    Okay.
2        A.    But I like I said, there were
3  definitely Trump people involved.
4        It's kind of --it kind of felt
5  like mob mentality took over.
6        Like one person decided they were
7  going to do it and everybody was, like, oh, this
8  might be a good idea.
9        And by the time a lot of people
10  even got to the doors, the Capitol Police had
11  just said, all right, we're not going to fight
12  them, we don't have enough people to arrest them.
13  Because once you arrest, you have to arrest them.
14  So they couldn't do that.
15        And they were basically outmanned.
16  And so they were -- at one point they were just
17  opening the doors and being nice to the people so
18  that they didn't get hurt.
19        So I think that a lot of people
20  that came secondary, in the secondary wave, after
21  Trump -- because the insurrection started
22  happening -- like the breaching of the Capitol
23  started happening before Donald Trump ever
24  finished speaking.

Page 372

And so the people that marched from where he was speaking, it would at least take 20 to 30 minutes to get from the Elipse to the Capitol -- and so those people, the doors would have already been broken and already been breached and already opened.

So I think that a lot of them -- like you see that poor little old granny, she was -- was like, I've never been in the Capitol before.

You see pictures -- they're taking pictures, like, I've never been in this place before.

And I think that, you know, they weren't of sound mind. It was more of like a mob mentality thing.

I don't think that everybody who crossed the line -- that walked into that Capitol was, you know, part of some pre-planned or thought that they were, you know, inciting -- or were being insurrectionists.

Q.    Okay. So the question was, do you agree with the statement that Meckleberg made and I'm going to take that answer to mean that you

Page 373

don't agree with it.

A.    Yeah, I probably don't agree with that, no.

Q.    Okay. When was the last time you spoke to Danny Thomas? And by spoke, just so we're clear, by phone or by text?

A.    It feels like a year maybe. Maybe more.

Q.    When was the last time you spoke with Jasmine Bishop?

A.    Has to be well over six to eight months, I believe. Something like that. Like it's been a long time. Maybe more -- maybe more than that. I don't know.

Q.    Do you remember what you talked about the last time you spoke?

A.    I was helping her -- I remembered that her mother -- she was calling me -- I was at home in Philly and she was calling me crying because her mother was doing really bad. She, like, relapsed or something bad happened to her.

And Jaz had left Danny and the kids. And she was crying and saying that he went back to some other girl. I don't remember.

Page 374

She was crying. And then she was like I'm -- she was, like, I just want to jump on a plane right now and I want to come to America. And I was like, well, when the COVID stuff comes, you can come visit, no problem, blah, blah, blah.

And so then I remember, like right after then, Danny had texted me something crazy. And I said, here, Jaz, just so you know, I think this is from Danny. He texted me. I don't want to anything -- to have anything to do with him. I'm just letting you know that he texted me again.

And she goes, oh, Danny's the least of your worries. Wait until you see what Greg Roman has in store for you.

And then I never talked to her again.

Q.    Okay. So prior to the last time you spoke with Jasmine Bishop, Jasmine spoke with MEF and provided documents to them, right?

A.    I did not -- I did not know any of that at any time that I was speaking to Jaz.

Q.    Did you know that she had spoken to Greg at any point in time when you were

Page 375

speaking to?

A.    I did not. I didn't find that out until deposition.

Actually, I didn't even know she actually did speak with you until just this second.

But I knew that from the deposition that -- that Danny did.

Q.    So Jasmine Bishop never told you that she spoke with Greg?

A.    I think she said I've been in contact with them and wait until you see what he has in store for you. But I didn't know what that meant.

Q.    Right. But you learned that from Jasmine, right? Not at the deposition?

A.    Yeah. But you just said, like, she provided documents and was whatever, whatever the words you used. And I did not know that until basically like now.

Q.    Okay. But you knew she had spoken to MEF?

A.    Yeah. But she had -- again, she's also said that she spoken to them a million times

Page 376

before when she hadn't.  And she also takes back
her story all the time, so -- she told me she
spoke to Greg and -- Greg and Daniel like two
years ago, too.  And she didn't.

Q.    So did you ask her why she would
talk to Greg?

A.    No, I just figured, if anybody is
talking to Greg, they are up to trouble and I'm
not going to talk to them anymore.

Anybody who has a connection with
Greg, I don't want to deal with.

Q.    When did you arrive at that
conclusion?

A.    What do you mean?

Q.    When did you decide that anybody
who had a connection with Greg was somebody that
you didn't want to talk to?

A.    Pretty much when I left the Middle
East Forum.

Q.    Do you know someone named Calan
Robinson?

A.    I met Calen -- I knew two Calens.
I don't know if the other -- I don't know his
last name.

Page 377

But the one that I think that
you're referring to, Calan Robinson, was the one
that used to work for Tommy Robinson.  I met him
one time at a dinner in Brussels.

Q.    What did he do for Tommy?

A.    He did video, I believe.  Or
production or something.

Because he didn't work with Tommy
at the time I did, because there were some lofty
things that were said about him or -- that Tommy
knew that he did or something like that.  And
they stopped working together while -- like
before -- well, while Tommy was in jail.

And when Tommy was released, they
did not -- they didn't work together again from
what I was told.

Q.    So I'm not sure I understood you
there.

Why didn't they work together
again?

A.    Apparently there was -- there was,
like, rumors around, like, they had access to
Tommy's donation accounts.

And while he was in prison, they

Page 378

were supposed to be advocating on his behalf.
And then Tommy was under the impression, or
something like that, that they were taking those
donation monies and using them for their own
benefit.

I think there's proof of that, but
I'm not a hundred percent sure.

Q.    And can you put a time frame on
that at all?

A.    Juneish, I guess.  June of 2018.
Or no, probably before that, because Tommy was
arrested before then.

MR. CARSON:  If you can't, you
can't.  If you don't know, you don't
know.  If you know, then tell him.

MR. CAVALIER:  Yeah, I'm not
looking for an exact date.

THE DEPONENT:  It was when Tommy
Robinson was in prison for journalism.

BY MR. CAVALIER:

Q.    Okay.  Are you aware that Calan
Robinson reached out to the Middle East Forum
about this case?

A.    He doesn't even know me.

Page 379

Q.    Is that a no?

A.    Yeah, no, I was not aware.

MR. CARSON:  How would we be aware
of that?

THE DEPONENT:  I met Calen one
time.  You know that Calen has, like, a
vendetta against Tommy, too, right?

BY MR. CAVALIER:

Q.    What do you mean by that?

A.    Calan and George -- there was like
this whole thing with the BBC panorama and Calan
and George had disclosed things to Tommy.

And then were getting, like,
threatened by, like, Hope Not Hate, or something
like that, this organization in England.

And Tommy put their statements --
and they agreed to it.  They put their statements
in a documentary.  And then I guess they got
backlash or whatever for it afterwards.

And they have not -- I don't think
they've mended their relationship since then.  So
there's a big, long -- there's all kinds of
information if you want to look that up.
Lawrence Southern wrote a whole piece on it or

Page 380

1  something.
2      Q.    Do a lot of people have vendettas
3  against Tommy Robinson?
4      A.    I'm sure.
5          There's a lot of people that have
6  vendettas against congressmen.  When you're a
7  public person, absolutely.
8      Q.    You just mentioned a George in
9  your answer to my last question.
10     A.    No, I didn't.  I said I'm sure.
11     Q.    No, I mean -- in the question that
12 I asked you before that.
13     A.    Oh, Calan and George were a team.
14     Q.    Right.  So all I want to know is
15 George who?
16     A.    I don't know -- do I know his last
17 name?  Calan and George.  I just know it was
18 Calen and George.
19     Q.    George Egler?
20     A.    No.
21     Q.    Different George?
22     A.    Yeah.
23     Q.    Okay.
24     A.    George Egler is like old.  The

Page 381

1  other George is, like, real young.
2      Q.    Just to back up real quickly.
3          Do you -- so you're Director of
4  Communications for Congressman Randy Weber right
5  now, correct?
6      A.    Yeah.
7      Q.    Do you also manage his campaign
8  social media fundraising?
9      A.    Not his fundraising.  But his
10 campaign social media and some of the messaging.
11 Not all of it.
12     Q.    Okay.  Are you paid separately for
13 that?
14     A.    I am.
15     Q.    Okay.  And so that's not part of
16 your core job as Director of Communications?
17     A.    I mean, it's part of my job.
18     Q.    Okay.
19     A.    Because of the way I have to do
20 campaign work on my own time, and you can hire a
21 certain amount of people to work on the campaign,
22 like, that are actual staff members, as long as
23 they do their work on their own time.  And I get
24 a nominal portion -- like a get a nominal amount

Page 382

1  of money for doing that.
2      Q.    What's nominal?
3      A.    I get $500 a month.
4      Q.    Okay.  And how much time do you
5  spend in a given month doing that?
6      A.    Some months I spend a lot of time.
7  Some months I spend less.
8          But I definitely spend a good
9  amount of time doing it.
10     Q.    Okay.  So can you give me just a
11 brief description of what your job is in managing
12 the social media?  What do you do?
13     A.    It's not just social media.
14 There's all kinds of stuff.  So, like, the budget
15 for, you know, should we spend more on digital
16 advertising?  The strategy behind it.  Managing
17 the Facebook comments that come in.  Managing the
18 campaign e-mail.  Managing the, you know,
19 interaction between the chief of staff and the
20 vendors and the fundraising team and coordinating
21 of that kind of stuff.
22          It's a very complicated thing.
23 Especially in an election year.
24     Q.    You manage the congressman's

Page 383

1  social media accounts?
2      A.    Yes.  Like I'm responsible for
3  hiring the company that puts out small -- well, I
4  put out some content and then we hired a company
5  that puts out some content.
6      Q.    Well, so just -- again, by way of
7  example, like if I'm on Twitter tonight and see a
8  Tweet from Congressmen Weber, is that something
9  you would have written or posted?
10     A.    So there are some tweets that I
11 post for him.  But, like, largely he posts his
12 own social media all the time.
13          He actually had an accidental post
14 the other night that I deleted for him, but he
15 wrote it.
16     Q.    Okay.  Okay.  So I think you said
17 you do manage it, but you're not the sole person
18 who operates it?
19     A.    No.  Like -- I pretty much am the
20 sole person who operates his Facebook and his
21 Instagram.  But his Twitter, he tweets on his own
22 often and retweets on his own often.  More than
23 I'd like him to.
24     Q.    Okay.  Who's Danny Barker?

Page 384

A.    Barker.  He was a long-time friend of Tommy Robinson and did security work for him off and on for the last, like, I guess, 10 years, I guess.  Maybe longer, maybe shorter.  Something like that.

Q.    Okay.  Did you have a relationship with him?

A.    Not a sexual one.  A friendship.

Q.    Okay.  When did that friendship begin?

A.    When we started working on the campaign.

Q.    So that would have been early 2019?

A.    Uh-huh.  May, I think you said.

Q.    Okay.  I want you to look at a document here real quick.  Just give me a second to pull it up.

All right.  So this is a What's App message chain.

A.    For Barker.

Q.    For Barker?

A.    Yeah.

Q.    Do you recognize this phone

Page 385

number?

A.    I don't recognize anybody's phone number.

Q.    Okay.

MR. CARSON:  Aren't these messages supposed to be attorney's eyes only?

MR. CAVALIER:  No.

MR. CARSON:  Yeah, they are.  I mean --

MR. CAVALIER:  Do you want to go off the record and discuss that?

MR. CARSON:  I mean, we didn't discuss any of this stuff, so --

MR. CAVALIER:  Pardon me?  I couldn't hear you.

MR. CARSON:  There was no discussion about removing that designation from any of these, not one.  Not any of the ones we saw today.

MR. CAVALIER:  I don't -- first of all, there's so many issues with that objection, I'm not even really sure where to start.

Some of the stuff we looked at was

Page 386

produced in McNulty, which has nothing to do with the AEO designation.

I'm gonna offer this to you again, do you want to go off the record to discuss this?

MR. CARSON:  Yeah, I think we should seal this part of the --

MR. CAVALIER:  We can seal them, too, if you'd like.

MR. CARSON:  There's nothing here to discuss.

MR. CAVALIER:  Is that the easiest way to do it, Seth, do you want to seal it?

There's nothing in here that's going to be incredibly sensitive that I think you're concerned about.

MR. CARSON:  Okay.

MR. CAVALIER:  Well, we can seal it if you'd like.  I have no problem with that.

MR. CARSON:  Yeah, I think we should treat the deposition transcript as a confidential document.

Page 387

MR. CAVALIER:  Why don't we do that and then you and I can have a conversation after the fact, if there's anything you're worried about within in it, we can deal with it that way.

MR. CARSON:  Okay.

MR. CAVALIER:  Is that fair?

THE DEPONENT:  I'm sorry I'm sitting like this.  My head and my neck are just killing me.

MR. CAVALIER:  That's okay.  I'm just going to note for the record here, too, this was a document that was produced prior to the AEO order that came out of Wolf's.

That's why I'm saying, like, there's a lot of different documents we looked at here today and I just wanted to note for the record what they are.

THE DEPONENT:  I don't even know an AEO order is.

BY MR. CAVALIER:

Q.    There's some documents that have been produced in this case that are AEO,

Deposition of Lisa Barbounis                                    Lisa Barbounis v. Middle Eastern Forum, et. al.

Page 388

1 attorney's eyes only --
2    A.    Okay.
3    Q.    -- meaning that unless and until
4 they're some kind of discussion or waiver, they
5 can only be shared with outside counsel.
6         This document was produced before
7 that order, but again, I think once we get into
8 it, you'll see there's not the issue that your
9 counsel's worried about anyway.
10        But we can take that when it
11 comes.
12        Okay?
13        First thing I want to ask, can you
14 see this document okay?  Can you read it?
15   A.    Yeah, for the most part.
16   Q.    Okay.  I'll pop it up one more.
17 So I want to ask you about this
18 here on May 9th, 2019.
19   A.    Uh-huh.
20   Q.    Danny Barker asks you, I'm in
21 agony, do you got any good pain killers?  Your
22 answer is, I do.  I have narcotics.  Ha, ha, what
23 do you got?
24   A.    I always have that.  Yep.

Page 389

1    Q.    I'm sorry, you said what?
2    A.    Yep.  I have, like -- because of
3 my kidney problems and stuff like that, I have
4 like Toradol on hand all the time.
5    Q.    Okay.  Why was -- why were you
6 telling Danny Barker that?
7    A.    He asked me.  I'm in agony.  I
8 don't remember how he got hurt.  Maybe something
9 happened to him, but like, whatever.
10   Q.    Did you give him some of the meds?
11   A.    I don't even know if I was there
12 then.  I probably was, but I probably didn't
13 though.
14   Q.    But you don't remember?
15   A.    No.  But if he was, like, legit
16 hurt or something, I mean, I wouldn't be opposed
17 to giving him a Toradol, if he didn't feel good.
18   Q.    Okay.  There's a lot of references
19 in this document to husband and wife.
20   A.    Yes.
21   Q.    I'm assuming that that's
22 colloquial.  But I wanted to ask you what that
23 meant and why you guys referred to each other
24 that way.

Page 390

1    A.    We just -- Danny was somebody I
2 got along with really, really well.  We never had
3 an intimate relationship.  I never kissed him.  I
4 missed him so much.  I love him like a brother.
5         I have a friend here, James, who I
6 hang out with all the time, too.  I always joke
7 around, he's my boyfriend.  But he's not.  Like,
8 I've never had sex or kissed him either.
9         But Danny and I are really close
10 and we were really, really fond of each other.
11 But we were never romantically interested.  This
12 is just us being goof and fun.
13        He's a sweet guy.  I feel bad for
14 him.
15   Q.    Why do you feel bad for him?
16   A.    It's just a hard life.  Like a lot
17 of the guys over there do.  They live paycheck to
18 paycheck.  And they struggle.  And they're always
19 just trying to do the right thing.  And sometimes
20 life knocks them down.  And Danny is one of them.
21 He is a sweet, sweet guy.
22   Q.    Okay.  So here we have you telling
23 Danny Barker that you love him for being there
24 for you and you're acknowledging you're being

Page 391

1 sappy but you're happy that he's in your life.
2    A.    Uh-huh.
3    Q.    He writes back and says, I'll
4 always be there for you.  I wish I could have
5 told you when you were over there.
6    A.    Uh-huh.
7    Q.    You write back to him, I was just
8 telling my girl what an amazing person you are.
9 I really wish I lived there.
10   A.    Uh-huh.
11   Q.    What do you mean by that?
12   A.    Just had such a good, like, -- the
13 people that I met over there, you know, while --
14 even though that they were, like, you know --
15 even though they were, like, sometimes rough and
16 tumble like that, like deep down they had these
17 really amazing hearts.
18        And to me, like, you know,
19 sometimes I wish I grew up knowing people that
20 had that genuineness about them.
21        There's part of me that, like, you
22 know, wished in, like, some other life I lived
23 there.  And, like, I grew up and my kids had
24 little British accents.  It would have been

Deposition of Lisa Barbounis                                Lisa Barbounis v. Middle Eastern Forum, et. al.

Page 392

adorable, you know.
    Q.    Okay.
    A.    I still wish my kids had little
British accents.  Like that Santa Claus kid.
    I can't even do a good British
accent.  I would never survive.
    Q.    Just going to the right page here.
    MR. CARSON:  This is why we never
get done.
    THE DEPONENT:  What do we got
left?  Like a half an hour?
    MR. CAVALIER:  I was just going to
ask the reporter that in a second.
BY MR. CAVALIER:
    Q.    Okay.  Same document.
    A.    Uh-huh.
    Q.    You're talking with Danny.
    Here you say, he asks how are you
feeling today.
    You say, a little.  Just think I
don't give a fuck.  And he says, about what?  You
say, work.  I want to quit.
    A.    Uh-huh.
    Q.    And Danny says, come there.  You

Page 393

say, I hate my boss.  He is a bad person.  We may
be opening an office in London.
    I pray they give it to me to run.
If I didn't have the kids, I would have quit and
stayed and found a job there.
    A.    All true.
    Q.    Okay.  Tell me about this
statement you may be opening an office in London.
    A.    So Greg -- not Greg.  Was it
Daniel?  Greg.  One of them.  I forget who it
was.
    But they were talking about
expanding operations to London, to Europe, in
general.  And we were talking about a proposal to
expand MEF and -- to expand MEF and they asked me
to -- to write it up.
    And I think, like, I asked input
from Sam.  I asked input from people, like, who
the big players were.  There was, like, that back
and forth, a bunch of e-mails about, like, they
wanted me to, like, organize what companies we'd
talk to, would we do it from a grassroots
approach?  Would we do a top-down approach, where
we would work with, like, government officials?

Page 394

    And we went back and forth.  And I
couple -- I wrote a draft of a proposal and then
another one and then another one.
    I think that Daniel even liked it.
And for a minute they were considering it.  And I
was like if I got -- if they let me run it, that
would be awesome.  Because I could go back and
forth, be with the cool people and bring my kids.
Maybe have my kids go over to England and start
from a little voice learning how to have that
little British accent.
    Q.    Was the fact that MEF was
opening -- was considering opening up a London
office a confidential issue for them?
    A.    Not that I'm aware of.
    Q.    Who else did you share the notion
that MEF was considering opening up a London
office with?
    A.    I think I asked -- because Amy
knows all those people in the box party that they
wanted -- I think I asked a bunch of people,
because Daniel was asking me to identify in each
state -- he had like these four, like, the
Bezigrad states or whatever -- maybe it was more

Page 395

than that.
    And he asked me to identify the
key players in the party and then to get their
contact information.  And a lot of that
information is hard to get.
    I mean, you're talking about the
leader, like Sallavanti in Italy.  Like, it's not
easy to get his phone number.  But Amy has that
kind of contacts.  She always did.
    So I definitely asked her for
help.  I asked Sam for help.  Westshop who works
with MEF.
    I think I asked Janice Atkinson
for a couple contacts.  I mean, I asked a bunch
of people for contacts, because that's what they
wanted me to do.
    Q.    Did you share internal MEF
documents with those people?
    A.    I don't think so.
    Q.    Did you share a document titled
MEF Europe with Amy Meckleberg?
    A.    Yeah.  I think I was asking her
for input.
    I mean, that's my draft of what

Page 396

1  I'm gonna submit.  Asking her if she thinks it's
2  a good idea, since she works with those parties
3  all the time.
4         It's not an internal document.
5  It's my draft.
6     Q.    Did you ever, at this point in
7  time or any other, consider taking a job working
8  for a PR consultancy firm?
9     A.    I had an interview.  And then I
10 found out that they work with Mohammed Bin Salman
11 and they wanted me based in DuBai, even though
12 they had an office in America and London.
13        And that wasn't of interest to me.
14 And then when I talked to -- when I had an
15 introductory interview, I basically let the woman
16 know that on the phone and then we stopped
17 talking about it.
18    Q.    What part of that was not of
19 interest to you?
20    A.    Well, living in Dubai, Mohammed
21 Bin Salman.
22        At first when I had originally
23 talked to her, like the very first time before
24 the official interview, she said that she had an

Page 397

1  office in London, Dubai and in the U.S. and that,
2  you know, most times that people could split
3  those things or, you know, work out of one area
4  but travel to those.
5         And so that was of interest to me.
6  But then when I spoke with her, she was more
7  interested in having the main hub be in Saudi
8  Arabia and I wasn't interested in that.
9     Q.    Did you ever create a Facebook
10 page profile with the name Oliva Estranimkis?
11    A.    I don't even know what that last
12 name is.
13    Q.    I can spell it you for.
14 E-S-T-R-A-N-I-M-K-I-S.
15    A.    Maybe, I don't know.  I don't
16 know.
17    Q.    You don't remember that?
18    A.    I don't remember that.
19        MR. CAVALIER:  Okay.  So listen, I
20 want to ask the -- I want to go off the
21 record for a minute and ask the court
22 reporter how long we've been going.
23        THE VIDEOGRAPHER:  The time is
24 5:59 p.m.

Page 398

1         We are off the record.
2         The time is 6:12 p.m.
3         Back on the record.
4  BY MR. CAVALIER:
5     Q.    Ma'am, are the skills that you
6  learned at the Forum helping you perform your job
7  duties right now?
8     A.    Some of them.  Most though came
9  from institutional knowledge from Congressman
10 Costello's office, because it's on the Hill.
11 It's a different venue.
12    Q.    How is your life going right now?
13        MR. CARSON:  How's what?  What's
14 the question?
15 BY MR. CAVALIER:
16    Q.    My question is how is your life
17 going right now?
18    A.    Hard.
19    Q.    Why is it hard?
20    A.    I'm away from my kids a lot.
21 Money's tight because of the extra whole nother
22 apartment to pay for.
23        I have a demanding job that I
24 love.  And I love my boss.  I love my co-workers.

Page 399

1         But it's not easy.  Like the other
2  day, my daughter was leaving to go home, like,
3  back to Philly because she had school and she was
4  crying that she wanted me to be there in the
5  morning to do her hair.  And that breaks my
6  heart.
7     Q.    You said you love your job right
8  now?
9     A.    I do.  I love my boss.
10    Q.    You like your boss, too?
11    A.    I love him.
12    Q.    Is it safe to say then that you
13 prefer your current job than your job at MEF?
14    A.    Oh, that's safe to say.
15    Q.    And you would not, if given the
16 opportunity, give up your current job to go back
17 to work for the Middle East Forum, correct?
18    A.    You would have to -- over my dead
19 body would I ever go back to Middle East Forum.
20    Q.    Have you taken any vacations
21 recently?
22    A.    A bunch.
23    Q.    Where to?
24    A.    Texas, Puerto Rico, Wisconsin.

Page 400

Q.    When did you go to Texas?

A.    A bunch of times.  Like in the beginning of Corona Virus shutdown.

Q.    How many times have you gone to Texas over the past year?

A.    I think two for work -- maybe three for work.  Two for personal.

Q.    How do you get there?

A.    Fly.

Q.    When did you go to Wisconsin?

A.    When did I go to Wisconsin?  Right around the DNC in August.

Q.    Who did you go to Wisconsin with?

A.    Myself.

Q.    For vacation?

A.    Yeah.  I was going to watch a panel discussion.

Q.    And where else besides Texas and Wisconsin did you go on vacation?

A.    Puerto Rico.

Q.    When did you go to Puerto Rico?

A.    March and December.

Q.    March and what?

A.    December.

Page 401

Q.    So you've been to Puerto Rico twice over the past year?

A.    Yeah.  Oh, and I went to Florida, too.

Q.    Okay.  And when did you go to Florida?

A.    Right before Christmas.

Q.    Okay.  Who did you go to Florida with?

A.    My friend James.

Q.    Okay.  Where do you know James from?

A.    James is a Newsmax -- actually, he is an official employee of Newsmax now.  He was a contributor.

And he asked me to go with him to help film.  And since my kids had Corona virus at the time and I couldn't be around them, and my mother-in-law and my husband, I said, let's go.

Q.    Okay.  And you said you were doing video work for him but still you consider that a vacation, correct?

A.    Yeah.  I'm not getting paid.  I do a lot of things that are work-related for fun.

Page 402

That -- I do a lot of things that people would consider work, I do that for fun.  Like filming or editing or writing things for people.

Q.    Okay.  And who did you go to Puerto Rico with?

A.    Brian Coyne.

Q.    Both times?

A.    Yep.

Q.    How long did you stay the first time you went?

A.    Like a bunch of days.  I think like 20 days or something crazy.

Q.    Okay.  And how about the second time you went, how many days?

A.    Three or four, I think.

Q.    Okay.  How did you get there?

A.    I flew.

Q.    Private?

A.    No.  Oh, you mean like -- like a commercial airline.

Q.    Both times?

A.    Yep.

Q.    Did you stay at a resort?

A.    Yeah.  Both time -- well, yeah,

Page 403

like -- well, one we stayed -- the one time we stayed at a hotel and then an AirBNB.

And then the second time then we were at one resort and we went back -- he currently, until his, like, new apartment in Puerto Rico is ready, occupies the presidential suite of the El San Juan Hotel.

Q.    Does Brian Coyne have access to a private plane?

A.    He just got one, yeah.

Q.    Have you ever been on it?

A.    Nope.

Q.    So do you get paid more now in your current job than you did at the Forum?

A.    Yes.  But it doesn't matter, because my expenses are actually -- like I have less money to spend at the end of every month.

As a matter of fact, it's so bad that usually the last two weeks of the month, I don't have any money at all.

Q.    Okay.  But it sounds like, and you can correct me if anything I'm about to say is wrong, but you work in a job that you love, you're getting paid more money, you've been on

Page 404

1  vacations over the past year, multiple times to
2  Texas, to Wisconsin, to Florida, and to Puerto
3  Rico twice.
4          It seems like your life's in a
5  pretty good spot right now.
6          No?
7      A.   I guess from the outward opinion,
8  if you look at it like that.  But the answer's
9  no.
10     Q.   All right.  So tell me why it's
11 not.
12     A.   I just explained to you.
13         My kids are not near me.
14         Right?
15         My daughter is having emotional
16 issues from me being separated from her.  So much
17 that we started counseling for my daughter.
18         She goes down here in D.C.,
19 Virginia area every other Saturday.  We are
20 having disputes about where the kids are gonna go
21 to school full-time, either down here.  We are
22 interviewing for another school down here.
23         I have, you know, all these lovely
24 lawsuits.  My life is exponentially not better.

Page 405

1  As a matter of fact, like I said, in order to
2  have my kids down here as much, I needed the
3  place that I'm staying in, which I moved outside
4  of the Washington, D.C. in order to do and
5  that -- at a reduced cost of what rent is.
6          And even then, I'm struggling to
7  make ends meet.  Like last month, the last
8  week -- work last week of the month is the way
9  that you get paid in the House only has -- you
10 only get -- what do you call it?  You get paid
11 once a month and I was eating like Ramen.
12     Q.   Okay.  But you're -- the fact that
13 you live in D.C., that's not something that you
14 blame MEF for, correct?
15     A.   I think that there are - I had
16 difficulty before I worked for MEF as I knew
17 Congressman Costello was transitioning, like, out
18 of Congress, that there are hardly any, unless
19 you go out to Western Pennsylvania, jobs for
20 conservatives.
21         And I came up against that quite a
22 bit.  And then, you know, I had put out resumes
23 before even when I was in my search for MEF as
24 part of the motivation at working originally at

Page 406

1  MEF, too, is that they are one of the places to
2  call me back and it was a conservative
3  organization.  I was, like, yes.
4          But there isn't the opportunity
5  there.  And a lot of these political jobs don't
6  translate well to, like, regular people jobs.
7          I mean, you don't know about
8  franking requirements?  You know what I'm saying?
9  Or when the blackout periods are.  That's the
10 institution knowledge that I was going to have
11 from working in Congress.
12         So it was very difficult.  And I
13 knew that if I left the Middle East Forum, which
14 is part of the reason why I stayed, that really
15 the only opportunity would be -- for me would be
16 in D.C. and that is exactly what happened.
17         I got a job quickly in D.C.,
18 because this market is more set to my skill set.
19     Q.   Do you have a real estate license?
20     A.   I used to.  It expired.
21     Q.   Is there any particular reason
22 that you couldn't have renewed that license and
23 worked in real estate in Philadelphia if you
24 wanted to?

Page 407

1      A.   You have to have upfront money to
2  do that.  And then you have to pay money to get
3  it out of escrow.  And then take two human
4  educations classes.
5          And I'm not even sure if my thing
6  is even in escrow.  I believe that it can stay
7  there for a couple years.
8          But I didn't keep up with my
9  continuing education classes, so I'd have to take
10 the exam all over again and pay money to get my
11 license and get a thing.
12         And let me tell you, the market
13 isn't really great.  You can ask my husband.
14     Q.   Speaking of which, your husband
15 does do real estate, correct?
16     A.   Correct.
17     Q.   So he could have helped you with
18 all that, right?
19     A.   What do you mean help me?  What,
20 be a real estate agent?
21         I'm not -- I was never good at,
22 nor did I ever make any money -- sufficient money
23 being a real estate agent.
24         Some people are not fit for

Deposition of Lisa Barbounis                    Lisa Barbounis v. Middle Eastern Forum, et. al.

Page 408

1  certain jobs.  And, no, that would have taken --
2          Think about it.
3          You would have go to school again.
4  You have to take the test again.  That would take
5  months and months and months of not being
6  employed to do that.
7          Q.    Well, and to your point, you're
8  good at your job for the Congressman, right?
9          A.    Yes.  That's what I went to school
10  for.  Yes.
11          Q.    Okay.  So what I'm trying to
12  figure out from you is whether you blame the
13  Middle East Forum for the fact that you're
14  working in what you described as a great job for
15  a boss you love in D.C.?
16          A.    What I blame Middle East Forum for
17  is for their abusive behavior towards me as an
18  employee while I was working there.
19          And would I have loved to have
20  stayed there and finish the good work that I
21  thought MEF was doing and stay in Philly near my
22  family and things like that?  Yeah.
23          Or would I have had time to, like
24  you know, ease my way into taking a longer job

Page 409

1  search and things like that?
2          No, but I had to get out of there
3  because it was insane.
4          Q.    Okay.  I understand that's what
5  you're saying is the reason behind your decision
6  to resign.
7          But that was now, what, 18 months
8  ago?
9          A.    Now I'm shell shocked.  I'm
10  afraid.  I said this to somebody else.
11          So Congressman Costello asked me
12  the other day, like, Lis, you worked for Randy
13  for, like, ever.  Like, what do you plan to do?
14  Where are you going to go next?
15          I see bigger and greater things
16  for you.  And I said, no, I'm not going anywhere
17  ever, because I have a healthy work environment
18  and I'm so shell shocked because Ryan Costello's
19  office was a good office.
20          And then I went and left for the
21  Middle East Forum and it was horrific.
22          And, honestly, so I'm legit afraid
23  to make a move.  Americans for Prosperity reached
24  out to me.  And I'm afraid to go anywhere else,

Page 410

1  because at least I know these people are safe and
2  mentally good people.
3          I'm definitely afraid to change
4  jobs a hundred percent.
5          Q.    I understand that.
6          But my question wasn't -- you said
7  earlier that you love your job.  You love your
8  boss.
9          And what I'm trying to figure out
10  is whether you're blaming the Middle East Forum
11  for your current job, the fact that you work for
12  Congressmen Weber?
13          A.    What do you mean by blame?
14          MR. CARSON:  Object to the
15  question.  Object to the form.
16          THE DEPONENT:  What I'm doing
17  is -- I'm not blaming them for anything.
18          What I'm blaming them for is the
19  way they treated me and what they did to
20  my, like, my mental capacity and all
21  kinds of other things.
22          I'm blaming them for having my
23  director physically assault me and, you
24  know, -- and then my -- the president of

Page 411

1  the organization thinks that it's fine.
2  BY MR. CAVALIER:
3          Q.    Well, just to be clear, part of
4  your stress in working at MEF was your difficult
5  relationship with Marnie Meyer, correct?
6          MR. CARSON:  Objection.  Assuming
7  facts not in evidence.
8          THE DEPONENT:  I did have a
9  difficult relationship with Marnie Meyer
10  and it was created by Greg.
11  BY MR. CAVALIER:
12          Q.    Was that stressful for you?
13          A.    Yeah.
14          Q.    Okay.  I just want to talk about
15  what you said there, because it's important that
16  I understand the distinction you're drawing.
17          You blame -- I think you just said
18  you blame Middle East Forum for making your life
19  a living hell while you worked there, correct?
20          A.    Yes.
21          Q.    Do you blame the Middle East Forum
22  for any of your current circumstances relating to
23  your job?
24          A.    If that job -- if my direct boss,

Page 412

1 Greg Roman, was not a nightmare, I would have
2 stayed there forever and I would not be in D.C.
3        You tell me what that means.  I
4 don't know what you're trying get at but that's
5 the truth.
6    Q.    Are you happy working in D.C.?
7    A.    Part of me is and part of me
8 isn't.
9        I said I love my job and I love my
10 boss.  But do I not like being away from my
11 children.
12        I hate it as a matter of fact.
13    Q.    What is your goal in pursuing this
14 lawsuit?
15    A.    Justice.
16    Q.    Define justice for me.
17    A.    Greg Roman paying for his actions.
18    Q.    Monetarily?
19    A.    Being held --
20        MR. CARSON:  Objection.
21 Objection.  Calls for a legal conclusion.
22 It's also argumentative.
23        What other -- you want to suggest
24 some other form of resolution?  We'd be

Page 413

1 happy to listen to it.
2        But so far as we know monetarily
3 is the only option available to us, so,
4 yes.
5 BY MR. CAVALIER:
6    Q.    What does being held responsible
7 look like to you?
8    A.    I think that Greg Roman should be
9 punished by the Middle East Forum and held
10 accountable for misbehavior.
11    Q.    Punished how?
12    A.    Fired hopefully.  I said that to
13 Daniel Pipes, when he was trying to extort me.
14    Q.    Pardon me?
15    A.    When he was trying to extort me at
16 30th Street Station.
17    Q.    Let's talk about that for a
18 second.
19        Why do you say that he was trying
20 to extort you?
21    A.    Because that's definitely --
22        MR. CARSON:  I'm just gonna object
23 to the extent it calls for a legal
24 conclusion as to what extortion is.

Page 414

1        MR. CAVALIER:  Your witness used
2 the words.  I'm relying on her
3 definition.
4        MR. CARSON:  To the extent she
5 understands, she's welcome to answer the
6 question.  Although I think it's pretty
7 obvious, the textbook definition of
8 extortion, what happened that day.
9        But, you know, we'll get to that
10 later.
11        Lisa, you can answer the question.
12        THE DEPONENT:  He said come meet
13 me, 30th Street Station.  I want to
14 discuss our mutual problem.
15        And then we started -- so he said,
16 make sure your phones are off.  And I'll
17 come up with a settlement agreement and
18 whatever so that we can both get rid of
19 these mutual problems without our
20 lawyers, because they just keep causing
21 trouble.
22        So I get there.  Turn my own off.
23 Do everything he says.  He says he thinks
24 I'm a fine person and that, like, you

Page 415

1 know, he doesn't think I'm a bad person.
2        He thinks highly of me.  All this
3 nonsense.
4        And then he says, if you don't
5 crop these cases and testify against
6 Tricia and Marnie and help him with the
7 other cases, then he's gonna file a RICO
8 criminal racketeering case on me.
9        By the way, which if you ever look
10 at my finances, you know, all of them
11 from forever, I've never gotten an extra
12 penny of anything from anywhere from
13 anyone ever.
14        So tell me how that's possible?
15 He extorted me.  That's what he did.
16 BY MR. CAVALIER:
17    Q.    He met with you to discuss the
18 resolution of your lawsuit against the Middle
19 East Forum?
20        MR. CARSON:  Let him get the
21 question out.
22        But what you just described is
23 literally the definition of extortion.
24        But go ahead.

Deposition of Lisa Barbounis                                Lisa Barbounis v. Middle Eastern Forum, et. al.

Page 416

BY MR. CAVALIER:

Q.   Isn't it true that during your meeting that you just described, you discussed the resolution of your lawsuit against the Middle East Forum and the Middle East Forum's lawsuits against you?

MR. CARSON:  I'm gonna object. But you can answer.

THE DEPONENT:  A very poor mischaracterization.

He said that we have resources that you do not have.  He said to me, I understand how much debt that you're in. What we can do for you is we can pay for your debt resolution and solve your problem with any debt that you have.

If you drop this, we'll pay for the lawyers to get you out of debt -- out of your debt whoas.

And if you -- and we'll scuttle the RICO case that we're thinking about dropping on you.  And that we'll do -- and that we'll do that if you testify against Marnie and Tricia.

Page 417

That's what he said.

BY MR. CAVALIER:

Q.   Did he ask you to testify falsely?

MR. CARSON:  Objection.  Object to the form of the question.

The witness can answer.

THE DEPONENT:  Everything that I have said about what happened is a hundred percent true.

And not only that, right, like, so everything's true.  And then if he wants me to help them testify against them, that would be the only thing that would be left to do is lie, which I would never do.

BY MR. CAVALIER:

Q.   Did you tell him that?

A.   Yeah.  I told him that multiple times.  I said under no circumstances.  And that was in a -- so he drew up -- he even drew up an agreement.

Q.   Did he ask you to testify falsely against the other plaintiffs against the Forum?

MR. CARSON:  Objection.  She just

Page 418

explained that if she testified truthfully against it, it wouldn't be helpful to the Middle East Forum.

THE DEPONENT:  Thank you.

BY MR. CAVALIER:

Q.   Did he ask you to testify falsely?

MR. CARSON:  You can answer what your understanding was.

THE DEPONENT:  He implied.

BY MR. CAVALIER:

Q.   How was it implied?

A.   Because like I said, if I testified, saying everything that I've been telling you, it would certainly not help the Middle East Forum.  If anything, it would hurt them.

And so if he wanted me to testify against them, then it would be -- then I would have to fabricate my thing.

Q.   Did you get any indication from Daniel Pipes, other than your own supposition, that he was asking you to testify untruthfully?

MR. CARSON:  Objection.  She just answered that question.  Literally that

Page 419

same exact question.

You can ask it a hundred times, you're going to get the same answer.

BY MR. CAVALIER:

Q.   So it's fair to say -- I'll withdraw the question.

It's fair to say then that you assumed that because Daniel Pipes asked you to testify that he wanted you to testify falsely?

MR. CARSON:  Objection again. You can answer.

THE DEPONENT:  Again, what other -- if I've been doing nothing but consistently telling the truth, what would there be to help his case?

BY MR. CAVALIER:

Q.   Maybe he just wanted you to testify truthfully.

A.   Testify truthfully that Greg Roman assaulted us and that freaking Daniel Pipes did nothing about it?

Okay.

Q.   Well, I mean that's not true.  We know that, right?

Page 420

MR. CARSON:  Wait.  Wait.  Wait.
What?
THE DEPONENT:  Do we?
BY MR. CAVALIER:
Q.   Yeah.
We know that it's not true that
Daniel Pipes did nothing about it.
MR. CARSON:  I don't know that.
But objection.  Assuming facts not in
evidence.  Object to form.
You can answer.
BY MR. CAVALIER:
Q.   Is it your position that Daniel
Pipes did nothing about the complaints that you
and the other Forum plaintiffs levied in November
of 2018?
A.   Nothing to relieve the burden of
Greg Roman.
It was not effective.  And when we
told him it wasn't effective, he didn't do
anything about it.
Q.   So ineffective that you then asked
to bring him back into the office.
A.   Again, I explained to you --

Page 421

MR. CARSON:  Objection.  It's not
even a question.
THE DEPONENT:  We're going around
in a circle here.
BY MR. CAVALIER:
Q.   So I want to go back to my
original question.
You said you hoped to get justice
and I asked you what that meant to you and you
said seeing Greg Roman punished, fired.
Do you have any other goals in
bringing this lawsuit?
A.   That's my goals.
Q.   Your goal in this lawsuit --
A.   And it's also to protect anybody
else that would be -- you know, that had this
happen.
That was actually -- listen, it's
very hard for a conservative women in the world
of Me Too to come out and say, listen, this
happened to me, too.  That is very hard for me to
do.
And it is very negative.  That
whole idea of it is very negative in the

Page 422

connotation of, like, this political environment
that I'm in.
Okay.  So it was a big, huge deal
for me to do that.  And part of the reason is
somebody had said to me, if somebody had done
what you -- like going forward and tell the truth
about him, this would have never happened to you.
And I think about my little girl
and I think about this happening to other people
and what I would -- how irate I would be if it
happened to any -- anybody younger that I knew
that grew up and was, like, that and that is
another reason.
I do not want this to ever happen
again.  And the more we shed light on it and the
more we talk about it and the more we talk about
how it's not just and right and wrong and then
the better this world will be.
Q.   So your purpose in bringing this
lawsuit is to make the world a better place?
A.   Part of it, yeah.
MR. CARSON:  Objection.
Argumentative.
THE DEPONENT:  Fine.  That's true,

Page 423

though.
I don't know if you know much
about me.  But you will know that I am
consistent in my principles.
And I will tell you that the whole
reason that I do the job that I do and
the reason that I worked for Middle East
Forum was not for a paycheck.
I can go in the private sector
right now and make double the money.
Okay?
But you have to do something that
is contributing to society.  And that was
always the way.
That was always the way when I
worked at Middle East Forum, too.  You
have to do something that you believe is
contributing to society.
Instead of just, you know,
catching a buck on some poor, helpless
girl who has been sexually assaulted.
BY MR. CAVALIER:
Q.   If the Forum fired Greg Roman,
would that satisfy you with respect to this

Page 424

1  lawsuit?
2      MR. CARSON:  Objection.  I'm just
3  gonna object.  These questions are very
4  inappropriate.
5      THE DEPONENT:  What do you want
6  from me?
7      MR. CARSON:  He wants to be able
8  to argue to the Judge that he can play
9  for a jury that --
10     MR. CAVALIER:  Improper, Seth,
11 again.
12     THE DEPONENT:  I know what he
13 wants.
14     MR. CARSON:  Which he will never
15 be allowed to do, which is why these
16 questions are inappropriate entirely.
17     MR. CAVALIER:  I just want
18 truthful questions to my answer.
19     THE DEPONENT:  I just gave you a
20 truthful answer.
21     MR. CARSON:  We all know what this
22 lawsuit is about.
23     This lawsuit is about justice and
24 the way our civil justice system

Page 425

1  identifies and defines justice is through
2  monetary fines.
3      That's how we regulate the system.
4      THE DEPONENT:  Wait.
5      Do women that are raped, right,
6  raped and beat, do they bring cases
7  because they want the money?
8      Did Breanna Taylor's family bring
9  a case because they wanted the money?  Or
10 because they thought that the court
11 system was neglect in their actions -- or
12 the police station?
13     I mean, you tell me -- you tell me
14 what the reason is for -- for these type
15 of lawsuits and the reason that
16 they're -- the function that they're set
17 up for this way.
18     This is my recourse.  The only
19 recourse I have.
20 BY MR. CAVALIER:
21     Q.   Are you equating yourself to a
22 rape victim?
23     A.   I'm going with your line of
24 reasoning that anybody who has suffered sexual

Page 426

1  harassment, sexual assault, sexual anything, it
2  is not -- is only doing it for the money and not
3  just justice.
4      MR. CARSON:  I also object to it
5  being argumentative, because she actually
6  is equated to a rape victim.
7      MR. CAVALIER:  By you.
8      MR. CARSON:  By us, you're right,
9  by the case.
10     MR. CAVALIER:  No, by you.  Not by
11 her own words.
12     THE DEPONENT:  I'm a sexual
13 assault victim.  I have not been raped.
14 BY MR. CAVALIER:
15     Q.   So you brought up Breanna Taylor.
16 She got $12 million, correct?
17     A.   I don't know how much she got
18 honestly.
19     Q.   I'll represent to you that she got
20 $12 million.
21     MR. CARSON:  We don't know that.
22     THE DEPONENT:  Her family did.
23 BY MR. CAVALIER:
24     Q.   Correct.  Because she was killed.

Page 427

1      A.   Okay.
2      MR. CARSON:  Where are we going --
3  BY MR. CAVALIER:
4      Q.   At one point you demanded
5  $27 million from the Forum.
6      MR. CARSON:  I'm gonna go ahead
7  and object.  That's not true.
8      THE DEPONENT:  That's not true.
9  That's not even remotely true.
10 BY MR. CAVALIER:
11     Q.   So you're not demanding $27
12 million?
13     MR. CARSON:  Whoa, whoa, Lisa,
14 wait.  Just wait.
15     Our initial disclosures speak for
16 themselves and we're not going to talk
17 about settlement numbers right here.
18     MR. CAVALIER:  I'm not asking in
19 term of settlement.  I'm asking in terms
20 of the amount of money that would be
21 justice for you.
22     MR. CARSON:  She's not going to
23 answer that question.
24     THE DEPONENT:  You're right.  I'm

Page 428

1 not going to answer that.
2 BY MR. CAVALIER:
3   Q.   Why not?
4   A.   Because I don't --
5      MR. CARSON:  She's not going to
6 answer that question because she doesn't
7 understand the question.
8      And because the question is
9 designed to embarrass and harass her.
10 Has nothing to do with why we are here
11 today.  It's totally irrelevant.
12      Never gonna go in front of a jury.
13 You can't talk about settlement
14 discussion and negotiations and demands
15 and offers.  All protected information.
16      So we're just arguing now for no
17 reason.
18      MR. CAVALIER:  I don't know why
19 you think I'm talking about settlement
20 discussions.
21      MR. CARSON:  You're asking her
22 what her demand was, how much she asked
23 for.
24      THE DEPONENT:  And that's not even

Page 429

1 what I asked for.
2      MR. CARSON:  Lisa, you don't have
3 to say anything.
4      The initial disclosure that we
5 filed or that we provided speak for
6 themselves.
7      MR. CAVALIER:  That's not what I'm
8 asking.  But I'll re-ask the question
9 again and you can levy your objection
10 again.
11 BY MR. CAVALIER:
12   Q.   My question is -- how much -- you
13 said you want to get justice out of this lawsuit.
14      My question to you is how much
15 money is justice?
16      MR. CARSON:  I'm going to object.
17 The amount of money that is determined
18 will be determined by the jury in this
19 case.
20 BY MR. CAVALIER:
21   Q.   If a jury awards you a dollar,
22 would you consider that justice?
23      MR. CARSON:  Objection.  You don't
24 have to answer.

Page 430

1      You don't know have to answer.
2 It's argumentative.
3      THE DEPONENT:  I don't know.  It
4 would depend.  I don't know.
5 BY MR. CAVALIER:
6   Q.   That's a fair answer.
7      MR. CARSON:  Her answer is subject
8 to my objection.
9 BY MR. CAVALIER:
10   Q.   Have you ever spoken to Tiffany
11 Lee?
12   A.   No.
13   Q.   You made allegations in your
14 complaint concerning Tiffany Lee.
15      How did those allegations come to
16 be in your complaint?
17      MR. CARSON:  I'm gonna object and
18 tell her not answer based on
19 attorney/client privilege.
20 BY MR. CAVALIER:
21   Q.   This is a yes or no question.
22      Is the sole source of your
23 information relating to Tiffany Lee your
24 attorneys?

Page 431

1      MR. CARSON:  You can say yes or no
2 to that.
3      THE DEPONENT:  No.
4 BY MR. CAVALIER:
5   Q.   What are the other sources of your
6 information relating to Tiffany Lee?
7   A.   Greg Roman's own words.  Matt
8 Bennett's words.  A bunch of peoples' words.
9 Daniel Pipes' words.
10   Q.   Did -- strike that.
11      When you worked with Congressman
12 Costello, did his wife ever tell you to stay away
13 from her husband?
14   A.   No.
15   Q.   Did you ever try to hire a hacker?
16   A.   No.
17   Q.   Did you ever talk to Lisa -- or to
18 Patricia about hiring a hacker?
19   A.   I said a hacker was hired and that
20 was-ism  if actually -- you want me to explain
21 what that is --
22      MR. CARSON:  I mean, we did this
23 during the last deposition.
24      THE DEPONENT:  For your own

Deposition of Lisa Barbounis

Lisa Barbounis v. Middle Eastern Forum, et. al.

Page 432

clarification, I'll do it again.

Mark Fink and Daniel Pipes were interested in suing Facebook on behalf of Tommy Robinson.

Facebook had erased Tommy Robinson's account.  Okay.  Fine.

We petitioned Facebook for Tommy Robinson's old data.  They were reluctant to give it back.  Reluctant.  Reluctant. Reluctant.  Reluctant.

So Tommy said that he hired -- or he was trying to get somebody he knew was a hacker to break in and get, like, his old data back, so that we could prove in court that what MEF was saying wasn't true.  Whatever.

That never came to fruition.  I finally got a congressional contact in the Facebook world from my congressional contacts that I had prior to MEF and I got them to supply the data and give to it Mark Fink.

All at the direction of the Middle East Forum, by the way.

Page 433

BY MR. CAVALIER:

Q.    Did you ever help Tommy Robinson to try to get a Visa?

A.    Yep.  Again, at the direction of the Middle East Forum.

Q.    Well, did you ever help or try to help Tommy Robinson get a Visa after you left the Middle East Forum?

A.    No.

Q.    Since --

A.    He has not even reapplied.

Q.    Have you tried to assist Tommy Robinson in getting a Visa since you've worked for Congressman Weber?

A.    No.

Q.    Does the Congressman know about this litigation?

A.    Yes.  You served him.  Or you served me at his office and you served him.  So, yeah, he is well aware.

And he was well aware from the time I got hired.  I told him the day that I got --

MR. CARSON:  I'm also troubled by

Page 434

these types of questions.

THE DEPONENT:  But he is aware.

MR. CARSON:  I think I've done probably depositions in 50 cases in the last 12 months.

Never, not once has anyone asked these types of questions of any of my clients.

They're designed to harass. They're designed threaten.  They're designed to embarrass.  They're totally insignificant.

What does it matter if he knows about it?  What possibly could that have to do with this case?

It's a threat.  It's a veiled threat, you know.  And we have a -- we have a hard stop at 7.

So if you want to spend the next 17 minutes threatening my client, we'll just stop now.

MR. CAVALIER:  The hard stop is at 7:17, first of all.

Secondly --

Page 435

MR. CARSON:  You told me that when you took the last 12-minute break that -- you said would be five minutes.

THE DEPONENT:  Correct.

MR. CAVALIER:  The hard stop is at 7:17.

MR. CARSON:  I'm letting you know what time we are stopping.

MR. CAVALIER:  Then we can come back later for the last 17 minutes, if you want to stop at 7.

Seth, beyond that, I take issue with the fact that you're extremely loose on the record with throwing around allegations against my clients, and counsel, including but not limited to me.

And I'm gonna caution you --

MR. CARSON:  You don't have to caution me.

MR. CAVALIER:  I am cautioning you from doing that.

MR. CARSON:  You don't have to. I'll save you --

MR. CAVALIER:  In the history of

Page 436

1  this case --
2       MR. CARSON:  What you just did is
3  a threat.
4       MR. CAVALIER:  If you have an
5  issue with my conduct, you're welcome to
6  file a motion.  That's how we handle it.
7       MR. CARSON:  If you want to spend
8  the last 17 minutes threatening my
9  client, we can stop now.
10      MR. CAVALIER:  I mean, last week
11  you called Mr. Roman a rapist on the
12  record.
13      MR. CARSON:  Well, what do you
14  call it when you compel a young child, a
15  girl, who's barely, you know, barely 20
16  years old, to have sex with you and you
17  hold a piece of paper that she signed
18  over her head?
19      And the next time you try to have
20  sex with that person and you don't have a
21  piece paper to hold over her head, she
22  doesn't want to have sex with you?
23      What do you call that?  That seems
24  like compulsion to me.

Page 437

1       MR. CAVALIER:  We're talking about
2  facts not in evidence.  And here I
3  thought that was yet another verbal typo
4  by you.  You're actually standing behind
5  that.
6       MR. CARSON:  That feels very rapey
7  to me.
8       THE DEPONENT:  Leah Murville
9  admitted to me that that is what
10  happened.
11      MR. CAVALIER:  So you're standing
12  behind the fact that you called Mr. Roman
13  a rapist on the record?
14      MR. CARSON:  The record speaks for
15  itself.
16      MR. CAVALIER:  I tend to agree
17  with you there, sir.
18      MR. CARSON:  You're right.
19  BY MR. CAVALIER:
20      Q.   What did you speak to Leah about?
21      A.   About her thing with Greg.
22      Q.   When did you speak with her?
23      A.   At least a year or two ago.  2017.
24  I don't remember.

Page 438

1       Q.   Tell me about the conversation.
2  How did it start?
3       A.   That Greg Roman is going around
4  telling people that you had sex with him.  Did
5  you?
6            She said what happened.
7            She said they were drinking at a
8  party or at some networking event or something in
9  Israel.  He said, I have to finish -- after they
10  were drinking, he said, I have to finish your
11  intern paperwork.
12           Why don't you come up to my room
13  and I'll sign it there.  And then they had sex.
14  And then she said that she never wanted anything
15  to do with him again, but she didn't want to talk
16  about it anymore.
17      Q.   When did this conversation happen?
18      A.   I believe it was in 2000 -- I
19  don't know.  I don't know, a long time -- at
20  least a year or two ago.
21      Q.   While you were still at the Forum?
22      A.   I think so, yeah.
23      Q.   Did she tell you that Greg Roman
24  raped her?

Page 439

1       A.   You just heard the story.  She
2  said she never wanted to hear from him again.
3       Q.   Did she say Greg Roman raped her?
4       A.   Did not use those words, no.  But
5  you're -- but, you know, that, like, -- she's an
6  intern.
7            A position of power saying come up
8  to my room and I'll sign your paperwork to your
9  school so you get school credit for your
10  internship and winds up sleeping with the girl
11  and then she doesn't want anything to do with him
12  after that?
13           You tell me what you think that
14  is.
15      Q.   Frankly, I think it's a long way
16  from rape, but that's just me.
17           You're aware that when Greg Roman
18  signed those papers for her, she was no longer an
19  MEF employee or an intern?
20      MR. CARSON:  Objection.
21      THE DEPONENT:  Her internship
22  would not have been finalized had he not
23  signed those papers.
24

Deposition of Lisa Barbounis                                                                         Lisa Barbounis v. Middle Eastern Forum, et. al.

Page 440

BY MR. CAVALIER:
    Q.    When you talked to Leah Murville,
did you believe she had been raped?
    A.    I believe she was forced into a
very uncomfortable situation, yes.
    Q.    Do you believe she was raped?
        MR. CARSON:  Asked and answered.
Objection.
        MR. CAVALIER:  It wasn't answered.
        MR. CARSON:  Yes, she said I
believe -- we can read back the
transcript.
        I believe she was forced in a very
uncomfortable situation.  Yes, that was
her answer.
BY MR. CAVALIER:
    Q.    Do you believe every uncomfortable
sexual situation is rape?
        MR. CARSON:  Objection.
Argumentative.
        THE DEPONENT:  I think we
established from the Me Too movement that
casting couches and the behavior of Harry
Weinstein is predatory and that is

Page 441

exactly what Greg Roman has displayed in
that event.
        So you tell me what Harry
Weinstein is.  Is he a rapist?
BY MR. CAVALIER:
    Q.    Do you believe every uncomfortable
situation is rape?
        MR. CARSON:  Do you really want
her to answer that question?  Do you
believe that every uncomfortable
situation is rape?  That's his question,
Lisa.
        THE DEPONENT:  That's hypothetical
and I don't know.
BY MR. CAVALIER:
    Q.    So did you come out of your
conversation with Leah Murville believing that
she been raped by Greg Roman?
        MR. CARSON:  Objection.  Asked and
answered.
        THE DEPONENT:  I told her that I
was very concerned about her.  And I
don't know.  I still even don't know.
        A lot of people are afraid to

Page 442

actually say I didn't want to do it.  I
was raped.  So I don't know.
        But I was very concerned that Greg
Roman was a rapist at that point in time,
yeah.
        Do I know for a fact that he raped
her or not?  I don't.
        Does my gut tell me that what he
did to that poor girl was wrong?  And
that had he never had that paperwork, he
would have never had sex with her?  Does
my gut tell me that?  Yes.
        So I don't know if he's a rapist,
but my intuition tells me --
BY MR. CAVALIER:
    Q.    Did you go to Daniel Pipes?
        MR. CARSON:  Objection.  You have
the document where they reported it to
Daniel Pipes.
        Like, you can answer.
BY MR. CAVALIER:
    Q.    Did you go Daniel Pipes and tell
him that Greg Roman raped Leah Murville?
        MR. CARSON:  Objection.  Asked and

Page 443

answered.
        But you can answer.
        THE DEPONENT:  Again.  Again, I'm
not the one.  I was very concerned about
her.  I was very concerned about her.
        But I'm not the one that wrote up
the agreement.
        I'm not the one that did those --
that thing.
        And the reason why I didn't was
because I don't go around, unless I have
proof, reporting things to people that
aren't true.
        Now, you're forcing me under oath
to answer these questions.  Okay.  But I
normally don't go around and say, guess
what, I think Greg Roman raped a girl,
because that's what I think.
        Okay.  I don't --
BY MR. CAVALIER:
    Q.    That's your counsel that does
that?
        MR. CARSON:  Objection, the record
speaks for itself.

Page 444

THE DEPONENT: That's not a question. Don't even answer him.

BY MR. CAVALIER:

Q.   I'm asking you if you agree with your counsel that Greg Roman is a rapist?

MR. CARSON: Objection.

MR. CAVALIER: It's now on the record at two different depositions that your counsel has made and I'm asking you if --

MR. CARSON: I didn't use the word rape today.

Whoa, whoa, wait, wait, wait.

First, let me object. I didn't use the word rape today. You did.

All right. Second of all, the transcript from the last deposition is going to speak for itself.

So, third of all, I'm gonna object that that question is designed to embarrass and harass.

You're insulting me. You're insulting her. So you don't have to answer that question.

Page 445

THE DEPONENT: And I'm also -- excuse me. I will say something.

He has never said that in any of my depositions, so I'm not gonna speak to something that you say that he said in another deposition, because I never heard him say that.

I can't agree with what he thinks. I don't know what he thinks about Greg Roman. That's it.

BY MR. CAVALIER:

Q.   I'm not gonna belabor this point anymore. But he just said, less than a few minutes ago, what would you call it when someone takes a child, a young girl of but 20, puts her in an uncomfortable situation and pressures her into sex.

A.   I don't think he said pressured her or any of those words.

MR. CARSON: Objection. That's not even a question. Object to the form and she's not gonna answer statements.

BY MR. CAVALIER:

Q.   Don't you think that's a very

Page 446

serious allegation?

MR. CARSON: Objection. You can answer if you think it's a serious allegation.

You know, like our complaint speaks for itself. The record speaks for itself.

THE DEPONENT: I don't think we filed any official documents that call him a rapist.

BY MR. CAVALIER:

Q.   No. But you've called him many things, correct?

MR. CARSON: Objection. We haven't called him anything. We have stated facts.

BY MR. CAVALIER:

Q.   Right.

So if you believed that Greg Roman was a rapist, it's fair to assume that that would have been in your complaint, right?

A.   Oh, no. No. I only put things in the complaint --

MR. CARSON: Lisa, just wait.

Page 447

Just objection. All right. Object to the form of the question. It's argumentative. Assuming facts not in evidence. Calls for a legal conclusion.

THE DEPONENT: Evidence-based, Buddy.

BY MR. CAVALIER:

Q.   Right. Right.

And you have no evidence that Greg Roman is a rapist, correct?

A.   I have some evidence, none of which I think is substantial enough to call him a rapist.

Q.   Fine.

Which is why it's not in your complaint.

A.   Right. Just like that's the same reason why I didn't tell MEF about Danny and this money, because there wasn't substantial information to accuse people of that.

MR. CARSON: It's -- there's also stating incorrect facts, what I described --

THE DEPONENT: Don't worry about

Page 448

it.

MR. CARSON:  -- is what's in the complaint.

Go ahead.

BY MR. CAVALIER:

Q.  Who's George Egler?

A.  Some man that had been working with Tommy a bunch back and forth.  And he, like, gives his opinion a lot to, like, Tommy and what Tommy should do and things like that.

Q.  I'm not sure I understand.

A.  Because I don't -- really don't understand -- I don't know what George Egler, what his actual job is.

I know that, like, during the Tommy campaign, he would, like, e-mail me what he thinks, like, press releases, the way they should go out or the way, you know, we should word things or frame things.

And he sends me, like, these long paragraphs.  Well, he doesn't really anymore, but -- about, like, MEF and things he saw in the news.

And, you know, that's the extent

Page 449

of what I know about George Egler.  I met him in person one time.  We had a conversation about Tommy and that was it.

Q.  What's your relationship with him today?

A.  Nothing.  I haven't spoken to him in forever.

Q.  Okay.

A.  He's a nice man.

Q.  Do you recall talking to him about your work with Tommy?

A.  Yeah.  That's the only reason he was talking to me.  He's, like, a long-time Tommy reporter person.  Tommy is the one who gave him my information.

Q.  Do you recall talking to him about your desire to move to England?

A.  Probably.  I liked England.  Just like I wanted to move to Texas last month.  Or in March.  I always want to move somewhere.

Q.  Why did you want to move to Texas?

A.  Texas is great.  They're no Corona Virus.  No restrictions.  Just want to move. Take my kids with me and move.

Page 450

But I really don't want to live in Texas.  It's always like a fleeting little fantasy I have.

I get excited about things.  I wanted to move to France when I was 25 because I went there one time on a weekend trip.  Ireland, too, I think in grad school.

I could move to Texas if I really wanted to.

MR. CARSON:  What are we doing right now?

THE DEPONENT:  I don't know.  He's not saying anything and I'm tired.

MR. CARSON:  I know.

If we are gonna take one-minute breaks in between every question, I think it means we're done.

MR. CAVALIER:  You can think whatever you want.  It's done when I say it's done.

MR. CARSON:  It's not done when you say it's done, actually.  It's done when it's done.

And we've been here since 10 this

Page 451

morning.  So it's nine hours.  And the reason it's taken nine hours is because every hour you've taken a break because you weren't ready to do the deposition today.

MR. CAVALIER:  I very much appreciate the comedy in you telling me how to be a lawyer, but --

MR. CARSON:  I mean, that's you. I need to get myself organized. That's why the last 12-minute break that you said would be five minutes occurred.

BY MR. CAVALIER:

Q.  Who is Cassandra Fairbanks?

A.  A friend of mine.

Q.  What does she do?

A.  She's a reporter.

Q.  What does she report on?

A.  All kinds of things.

Q.  Does she report on things having to do with the Middle East Forum?

A.  I'm sure she does, yeah.  I think she just wrote an article about it.

Q.  Have you ever been a source for

Page 452

1  one of her stories?
2      A.    Let me just tell you something.  I
3  know where you're going with this.  So if you
4  want, I'll tell you.
5          MR. CARSON:  Answer yes or no.
6          THE DEPONENT:  No.
7          Cassandra Fairbanks -- I met her
8  with Tommy Robinson.  I met her while she
9  was covering one of things one of the
10  times I was over in England.  That's how
11  we met.
12          She's very good friends with
13  Tommy.  She's very good friends with
14  everybody that is over in England.
15  That's how I met her.
16          I met her in England, not here in
17  America, number one.
18          Number two is, she has a feed, an
19  RSS feed or whatever it is, Google alerts
20  kind of thing, for Tommy Robinson.
21          When she saw that hit piece that
22  they put out on me two days before
23  Christmas that had specific information
24  from our private deposition testimony or

Page 453

1  whatever, she's, like, she knew the whole
2  thing.
3          She knew the whole thing.  She
4  knew about the tapes.  She knew about
5  everything way before.  She's known
6  everything about it since day one,
7  because she's my friend -- like my actual
8  friend.  Our kids play together.
9          Okay.  She knows about MEF and all
10  that stuff.  And so it was not my
11  decision for her to write that piece.
12          Don't you dare start assuming that
13  that was on me.  That was on you.
14  BY MR. CAVALIER:
15      Q.    I wasn't assuming anything.  I
16  just asked if you've ever been a source for her
17  story.
18      A.    We know what you're doing.
19  Please, sir.
20      Q.    I'll ask the question again.
21      A.    No.
22      Q.    Have you ever been a source for
23  Cassandra Fairbanks on a story?
24      A.    No.

Page 454

1      Q.    Have you ever talked to Cassandra
2  Fairbanks about this case?
3      A.    Yes.
4      Q.    What have you talked about?
5      A.    Multiple occasions.  All of it.
6          I've been talking about this case
7  with people that are close to me, because it's so
8  stressful since -- since I filed it.
9      Q.    What people?
10      A.    My friends.  I'm a human being
11  that has friends.  Friends.  I have tons of
12  friends.
13      Q.    Who are they?  Who have you spoken
14  to about this case?
15      A.    Everybody.  My mom.  My dad.  Amy.
16  My brother.  His wife.  Everybody.  Everybody
17  that I am friends with.
18          My work -- all of my work
19  colleagues, because they were there when you guys
20  served me.
21          I mean, it's not like you guys
22  aren't putting it out there.
23          The people that I come in contact
24  with that ask me about it, I tell them.

Page 455

1      Q.    What do you tell them?
2      A.    What do you mean what do I tell
3  them?
4          Depends on what question they ask
5  me.
6          I mean, do you want me to sit here
7  and talk about -- I don't remember all of it.
8  Again, like the McDonald thing --
9          MR. CARSON:  You said you don't
10  remember all of it.  Let's keep it
11  moving.
12          THE DEPONENT:  I don't know.
13  BY MR. CAVALIER:
14      Q.    Well, do you give them your
15  interpretation of what's going on in the
16  litigation?
17      A.    What other -- what other
18  interpretation is there other than the facts?
19      Q.    Well, I'm assuming you don't
20  just -- don't hand them the complaint and say,
21  hear, read for yourself, right?
22      A.    There have been times where people
23  ask me and I said, look, it's online, if you want
24  to read it, go read it.

Deposition of Lisa Barbounis                                    Lisa Barbounis v. Middle Eastern Forum, et. al.

Page 456

There are other times where former employees from Middle East Forum -- I didn't tell them anything about it. They called me up and said, hey, I read the complaint. You need any help? I would love to testify against them. They did the same thing to me.

Q.   Who are those people?

A.   Samantha Mandeles.

Q.   Okay. That's one.

A.   Grayson Levy.

Q.   Okay. Anyone else?

A.   E.J. Kimbel. I mean, I could keep going. These people all contact me. They all read the docket. They didn't get it from me.

Q.   Yeah, I would like to know who all the people are.

A.   I just told you who they are.

Q.   Well, you told me three. And then you said you could keep going.

I'd like you to keep going.

A.   Yeah, so Grayson -- Grayson, E.J., I believe Cliff.

Who else did I just say? Cassandra read the docket. What's her face?

Page 457

Samantha Mandeles, Benjamin Baird.

And I can't remember all of them, but all these people have said, I saw the complaints about you. Ahman Patel.

A bunch of people.

Q.   Okay. Your testimony is that they all reached out to you offering to help?

MR. CARSON: Objection. That wasn't her testimony.

You can answer.

THE DEPONENT: My thing is that they reach out to me. Most of them said, I'm so sorry, if you need anything, you want us to testify about how Greg Roman was, let us know. And most of all of them said it.

Now, Grayson didn't say that and -- Grayson didn't say that and neither did Benji.

But Benji was, like, I'm sorry. Benjamin was the one that said, hey, Lisa, weird stuff is going on with Greg's access and all, like, your husband's stuff in the LexusNexus program.

Page 458

People are concerned because they know that Greg's wrong.

BY MR. CAVALIER:

Q.   So what did Grayson talk about with you?

A.   Nothing. He just said, hey, they filed a RICO case. We talked about this earlier today.

Q.   I'm asking if he said anything else. You said he reached out to you.

A.   This is ridiculous.

Q.   He just reached out to you and said, hey, head's up, they filed a RICO case and that was it?

A.   He goes -- no, he said --

MR. CARSON: We already did this today. This is how we started.

THE DEPONENT: He's like, Lis, they did -- they're filing a RICO case against you. Did you know that? And I was, like, what? He said, it was filed four days ago. Whatever day that was.

And I was like, well, I haven't been served. I haven't heard anything

Page 459

about it. He said, well, read it online. And I think he sent me the link to it.

And I was like -- and he's like, they're insane. And I said, I know. I said, do you still work there? He said, kind of.

BY MR. CAVALIER:

Q.   Did he tell you anything about what he thought of the case other than that it's ridiculous?

A.   No.

MR. CARSON: Ridiculous is a pretty good descriptor, don't you think, for the RICO case?

MR. CAVALIER: Do you have any idea how bad you look on a transcript, Seth?

THE DEPONENT: Who cares?

MR. CARSON: You want to tell me what your opinion is? Go ahead.

All right. We are at 7:01. We've been on the record for 11 hours -- I'm sorry, for nine hours.

THE DEPONENT: We already talked

Page 460

about this.

MR. CARSON:  We've been here since 10.  Sorry.

MR. CAVALIER:  I'll let your counsel finish.

MR. CARSON:  Currently, let's just take a recount.  Okay?

It is 7:01.  We started at 10.  So that's nine hours.

The reason why we're still here is because of all these breaks that we took today, so that you could get organized, which we accommodated you on.

If you have any other questions, besides insulting me, insulting my client, threatening my client, we'll give you another five minutes.

But, you know, you've got to wrap this up.

MR. CAVALIER:  Can the court reporter please let us know how much time remains in the seven hours for this deposition?

THE VIDEOGRAPHER:  The last break

Page 461

we were at five hours and 55 minutes.

So if we go to 7:17, like you had mentioned, that would be seven hours.

THE DEPONENT:  That's 15 minutes in case anybody needed the math.

MR. CARSON:  The last break you promised would be five minutes and it was 12 minutes and it was so that you could get yourself organized.  So I think that time should count.

MR. CAVALIER:  You're just wasting more time, Seth.  And believe me, do not have a debate with me about coming back from breaks late or showing up for depositions late.

MR. CARSON:  That gives you three minutes.

THE DEPONENT:  You guys are all wasting time now.

MR. CAVALIER:  I'm telling you, if your counsel hadn't been speechifying all day, we would have been well done.

THE DEPONENT:  You're speechifying right this minute.

Page 462

BY MR. CAVALIER:

Q.    I'm answering your counsel.

A.    You keep on one upping everybody.

MR. CAVALIER:  We're going until I'm done.

MR. CARSON:  We're gonna go until -- we are not going to go until you're done.

BY MR. CAVALIER:

Q.    Have you ever spoken to any reporter about this case?

A.    A lot of reporters reached out to me.  I think I said -- I responded to one in the Daily Mail.  He didn't give me a chance to answer.

I do not -- I think my exact words were, I did not know, I do not know and I still do not know about any misappropriated funds.  That's the only thing I've ever said.

Q.    What reporters reached out to you?

A.    The Daily Mail, the Times, the Sun, an affiliate for one of the English ones here in -- based in LA.  A bunch.  A ton.

Q.    When did that start?

Page 463

A.    December 21st, 22nd, I think.  Maybe earlier.

Q.    When was the last time it happened?

A.    Well, recently I believe.

Q.    And you said you only said to them --

A.    That one thing.

I said, you didn't let -- you didn't give me an opportunity to respond -- because apparently, like, they at Twitter messaged me to get -- to ask me something.

And I -- like the way Twitter works, that if they're not already your friend, it goes into, like, a message request.

And I'm hardly on Twitter.  And I certainly don't check my message requests like that.

So I think one of their things was, like, -- they sent me the thing like a couple days before they published the article.  And they never, like, even waited for a response from me.

So I said, you never even got --

Case 2:19-cv-05030-JDW   Document 110-2   Filed 03/02/21   Page 119 of 193

Deposition of Lisa Barbounis                          Lisa Barbounis v. Middle Eastern Forum, et. al.

Page 464

you never even waited to hear from me, I said.
But in any event, I don't know anything about
misappropriated funds.  I didn't then.  And I
still do not today.  That's all I said.
       But I will say what's funny is
that private pictures that turned up in the
telegraph, private pictures of me and Danny Tioro
that turned up in Telegraph that only we have in
deposition.  It was me, my lawyer and you guys.
       I've never put them on social
media.  Isn't it funny how that turned up in
there?
       Isn't it funny that they have a
quote from Daniel Pipes in the Times article?
And isn't it funny that they started talking
about their relationship with Danny Tomo and
whatever happened to it, but they specifically
reference in there that they haven't had a
comment from Danny Tomo or Jasmine Bishop.
       So where did they get their
information from the story from?  Certainly not
me.  Certainly not from my legal counsel.
Certainly not from Danny Tomo or Jasmine Bishop,
because they quoted it.

Page 465

       But there is a quote in there from
Daniel Pipes.  And there is stuff from our
private depositions that are in that hearing --
or, I mean, in that article.  Two days before
Christmas.  And they put my boss' picture in
there.
       MR. CARSON:  For the record, those
   pictures were turned over subject to a
   protective order.
       THE DEPONENT:  They were.
BY MR. CAVALIER:
   Q.    Have you read the counterclaims in
this case?
   A.    Again --
   Q.    I asked you this earlier in your
deposition and you said no.  So between that
deposition and now, have you read the
counterclaims?
   A.    No, I told you, I'm not reading
this stuff.
       I talk to my attorney.  I don't
have time to read, you know, 70 pages of stuff.
       As a matter of fact, the one time
you guys made a counterclaim, I heard it was so

Page 466

bad that I had my husband read it and just give
me the synopsis, because it hurt me to hear
anything, lies like that, printed about me in
black and white.
       I'm not good at that.
   Q.    Have you reviewed --
   A.    Painful to relive this.  I have to
relive this all the time.  It's painful to think
about it.
       This is a very painful process.
And the fact that you are -- the way that you try
to undermine things and to twist things and to
make it worse, and then to see the things that
you lie and make up about me, it's very, very
painful.
       I'm sorry that you don't like that
answer.  But that's the truth.
       And so I'm not reading everything
that you guys write about me, because I can't.
It hurts too much.  It's an effective cognitive
dissonance.
   Q.    Have you read the counterclaim
exhibits in the case?
   A.    No.

Page 467

   Q.    Are you still seeing your
psychiatrist?
   A.    Kind of.  I'm still -- I'm in
between, because she is helping me find a new one
that -- you know, she's not supposed to be -- my
one was not supposed to be long-term, and --
Stephanie.
       And she's helping me find a new
one that is gonna be able to, like, take me on
long time.
       It's very hard to get a therapist
for long-term thing.
   Q.    Why -- I'm not following you.  Why
isn't she supposed to be long-term?
   A.    My therapist is part of a, like,
med management program through Mindula.  And
they're not meant to be for extended periods of
time.  That's just not what they -- they're like,
if you're making progress and you're getting
better, that's their goal and then they move on.
       But since I'm pretty much, like,
hovering in the same area with ups and downs, she
recommended that -- and she got a promotion.  She
recommended that I go to somebody else.

Page 468

She did not love the trauma therapist that I was working with that I originally went to, Joanne Kim.  She didn't love her too much because she didn't really give structure.

And so we have been working on finding a new one.  So that's what we're gonna do.

Q.    When was the last time you saw Stephanie?

A.    I don't remember.  It's all a blur.

I've been hovering with doctor appointments.  I was just in the ER last Thursday for another kidney stone, a kidney infection.

I have follow-up appointments through there.  Podiatry appointments.

My kids have had COVID.  It's been like -- and the Capitol was raided.  Like, it's been a while.

And not due to not needing to go to her.  If anything, I still need to go to her.

But it's just been a legit role.  My mom was just in the hospital for her kidney

Page 469

stones and had a surgery.

I am doing a million things on top of all these lawsuits and, you know, sometimes I'm the last priority.  And my kids come first.

Q.    Okay.  And I respect the fact that you can't give me an exact date as to the last time you saw Stephanie.

But can you give me a ballpark?  Was it in fall?  Was it in summer?

A.    No, it was like a month or so ago.

Q.    Okay.  That's why I'm asking.

Are you planing to see Stephanie again?

A.    Stephanie and I are communicating via e-mail.  And I have to, like, find another one and she reports to my doctor, Dr. Max O'Shalim.

Q.    You said he's your doctor.  What kind of doctor is he?

A.    My regular primary care.  That's how I got her in the first place.

Q.    Okay.  So her reports go to your primary care.

Does your primary care then manage

Page 470

your treatment collectively?

A.    No, she gives her -- she's not like a -- she's like an intake -- I don't know how to explain what she is.

She goes over the stuff that she talks about with me.  She talks to a psychiatrist.  They speak about recommending medication.

Then they give what their recommendations are to my doctor and he actually prescribes it.

Q.    Okay.  Have you -- so I'm a little unclear.

A.    I'm sill taking medicine, if that's what you're asking.

Q.    Okay.  What medicine are you still taking?

A.    I'm taking Zoloft 50-milligram and Adderall.

Q.    Okay.  And those are long-term meds, correct?

A.    Uh-huh.

Q.    Do you remember meeting with a Dr. Barbara Ziv?

Page 471

A.    Yeah.

Q.    You say that with a chuckle.

Why do you do that?

MR. CARSON:  Objection.  I didn't hear any chuckle.

THE DEPONENT:  Barbara Ziv, I didn't read her report, but I heard that she -- I don't know.

I don't think I've ever seen her report.  But I heard that she had fabricated some stuff about another patient of hers, so...

BY MR. CAVALIER:

Q.    What did you hear?

MR. CARSON:  Objection.  Don't answer the question.  It's attorney/client privilege.

BY MR. CAVALIER:

Q.    You're claiming privilege?

MR. CARSON:  I'm not going to tell you what I told her.  Yeah.  I'm claiming privilege.

Next question.

Deposition of Lisa Barbounis                                    Lisa Barbounis v. Middle Eastern Forum, et. al.

Page 472

THE DEPONENT:  He is right to claim privilege.  Trust me.

BY MR. CAVALIER:

Q.    Oh, I think the Court might have to figure that out.

MR. CARSON:  They will.  All right.  They will figure it out.

Due to attorney/client privilege, she's not going to answer the next question.

BY MR. CAVALIER:

Q.    Other than Mr. Carson, do you have any information that Dr. Barbara Ziv fabricated information about a patient?

A.    I don't.

MR. CARSON:  Objection.  The only way that she could answer that question is if she's violating attorney/client privilege.

BY MR. CAVALIER:

Q.    The question is other than anything she spoke with you about, does she have any information or evidence?

MR. CARSON:  The only information

Page 473

that she has related to Dr. Ziv and her fabricated report came through me.

THE DEPONENT:  I have --

MR. CARSON:  You can answer the question.

THE DEPONENT:  I have asked to see her report, which I haven't had the opportunity to have or review at the moment.

But I would like -- I -- that woman had said some kind things to me during that -- that thing.

She said that how I was feeling was understandable even at a point.  So I'm very curious to read that.  And I would love to read it.

But until I read that report that she wrote on me, I don't have anything to discuss with you about Barbara Ziv.

BY MR. CAVALIER:

Q.    Is there any reason that you haven't read it yet?  Just too busy?

A.    I just haven't had the opportunity.

Page 474

Did you not just hear me say that?

Q.    When did you get it?

MR. CARSON:  Objection.

THE DEPONENT:  I don't know.

MR. CARSON:  What does it matter?  What are we talking about here?  I mean, whatever.

If you want to spend the last minute or two asking about the report, go ahead.

MR. CAVALIER:  I'll take your suggestion.  Let's do that.

THE DEPONENT:  Is this her report?

BY MR. CAVALIER:

Q.    Yes.  The report that you haven't read, right?

You've never seen this before?

MR. CARSON:  Take your time and read the whole thing before you answer any questions.

THE DEPONENT:  I absolutely will.

MR. CAVALIER:  I would love it if you read the whole thing.

THE DEPONENT:  Go ahead.  Keep

Page 475

going.

Okay.

MR. CARSON:  Can you scroll back up a little?  I wasn't done that last paragraph.

THE DEPONENT:  Please go back up.

MR. CARSON:  Go back up a little bit, please?

Thank you.

THE DEPONENT:  Okay.  I don't know.

You can move on.

MR. CARSON:  All right.  You can go to the next page.

Whoa, you went too far.

MR. CAVALIER:  So you guys are aware, if you're going to read this, you're going to read the whole thing.  It's 33 pages long and I'm gonna ask one question about it when we're done.

THE DEPONENT:  Just ask the question, because I remember what I said to her.  I'll read it later.

MR. CARSON:  Well, I don't want

Page 476

her really answering questions --

THE DEPONENT: Well, let's see what the question is and see if I need the context of the whole thing to read it.

Probably get this over with. We got one minute. I don't want to have to come back.

MR. CARSON: We're not coming back.

BY MR. CAVALIER:

Q. I would like you to read the conclusions.

Actually, I'd like you to first read this paragraph and then review the conclusions.

A. She's hired by you to give the report that you want. Anyway, I'll read it.

Q. Let me know when you're done reading the highlighted portion.

A. That is not true at all. This is so crazy. This is crazy. I'm done.

Q. Do you agree that you do not display any psychiatric symptoms that can be

Page 477

attributed to your tenure at the Middle East Forum?

MR. CARSON: Objection. Wait. Wait. I'm gonna put an objection on the record. Okay?

So the objection is you're asking her to make a medical diagnosis of herself. I object to the form of the question.

You can answer if you understand --

THE DEPONENT: I'll tell you exactly --

MR. CARSON: -- what the actual symptoms are.

THE DEPONENT: I'll tell you exactly what I disagree with in her.

Okay. Mrs. Barbounis' life currently is little changed from her life when she was working at Middle East Forum. False. False. It is un -- it is remarkably different. It is remarkably different.

So that line right there, not

Page 478

true.

MR. CARSON: I mean, if you gave her an opportunity --

THE DEPONENT: Mrs. Barbounis' life is little changed from her life when she was working at MEF.

Really? Because I live in a different state. I don't live in the same building with my kids.

I don't live in the same -- my kids go to two different schools. I work at a completely different job.

So that line right there is a hundred percent false.

BY MR. CAVALIER:

Q. My question was, do you agree that you do not display any psychiatric symptoms that can be attributed to your tenure at Middle East Forum?

MR. CARSON: I put an objection on the record that you're asking her to make a medical diagnosis.

To the extent she can, she can try to answer.

Page 479

THE DEPONENT: I do not agree with that statement, because for the 10 years -- the 10 years prior to working at MEF, I did not need psychiatric evaluations.

I was wonderful at my job. I had none of this up and down nonsense.

When I worked in Congress for --

BY MR. CAVALIER:

Q. I'm gonna cut you off --

A. Excuse me. For Gerlach before then, no.

You don't get to cut me off. I'm sorry, sir.

Q. I'm going to ask the last question here.

MR. CARSON: She wasn't done her answer. You've got to let her finish her answer.

THE DEPONENT: I'll let you have your extra time to ask me one more question. Let me finish my --

MR. CARSON: No, I don't agree to that. It's 7:17.

Page 480

1      The deposition --
2      THE DEPONENT:  So let me finish my
3 answer and you can have your one more
4 question.
5      MR. CARSON:  No.
6      MR. CAVALIER:  I agree to that.
7 Go ahead.
8      MR. CARSON:  No more questions.
9      You can finish your answer.  But
10 we're done after that.
11      MR. CAVALIER:  No, I'm lthe
12 witness' invitation.  You're welcome to
13 --
14      MR. CARSON:  No.  No.  No.  We are
15 done.  7:17.  You got your seven hours.
16 We're done.
17 BY MR. CAVALIER:
18    Q.   Ma'am, you're welcome to finish
19 your answer if you want to.  If you choose not
20 to, that's fine, too.
21    A.   I don't even remember where we
22 were now.
23      MR. CARSON:  All right.
24

Page 481

1 BY MR. CAVALIER:
2    Q.   Do you agree that you have
3 problems related to self-esteem and emotional
4 regulation and unrelated to and not exacerbated
5 by events of the Middle East Forum?
6    A.   They were certainly exacerbated by
7 --
8      MR. CARSON:  Wait.  Wait.  Wait.
9 Wait.  Yeah.  I'm gonna object to the
10 question, in that once again you're
11 calling for her to make medical
12 diagnoses.  She's not an expert.  She's
13 is not here to give her opinion.  She is
14 here to talk about facts.  It's a yes or
15 no question.
16      Do you agree with line number two?
17      THE DEPONENT:  No.
18      MR. CARSON:  Okay.  We're all
19 done.
20      MR. CAVALIER:  We're done.
21      THE REPORTER:  Mr. Carson, would
22 you like a copy?
23      MR. CARSON:  Yeah.  I'll take a
24 copy.

Page 482

1      THE VIDEOGRAPHER:  This closes the
2 deposition.  7:17.
3
4

1    COUNTY OF LANCASTER          :
                                  : SS
2    COMMONWEALTH OF PENNSYLVANIA:

3              I, Joyce A. Wise, RMR, Court Reporter

4    and Notary Public, do hereby certify that LISA

5    REYNOLDS BARBOUNIS, the witness, personally

6    appeared before me, being first duly sworn or

7    affirmed to testify to the truth, the whole

8    truth, and nothing but the truth, in answer to

9    the oral questions propounded to him by the

10   attorneys for the respective parties, testified

11   as set forth in the foregoing deposition.

12             I further certify that before taking of

13   said deposition, the above witness was duly sworn

14   or affirmed, that the questions and answers were

15   taken down stenographically by the said Joyce A.

16   Wise, RMR, approved and agreed to, and afterwards

17   reduced to print by means of computer-aided

18   transcription under the direction of the

19   aforesaid Reporter.

20             In testimony whereof, I have hereunto

21   subscribed my hand this 15th day of February

22   2021.

23                        _____
                                  Joyce A. Wise, RMR
24                                Notary Public

## WORD INDEX

< $ >
**$12** 426:*16, 20*
**$2,000** 342:*13, 17*
**$27** 427:*5, 11*
**$400,000** 114:*6*
**$50** 49:*18*
**$500** 382:*3*
**$7** 317:*23*
**$7,000** 322:*3*
**$900** 346:*10*

< 1 >
**1** 126:*19, 20* 134:*12*
175:*19*
**1:13** 170:*18*
**1:34** 170:*20*
**10** 102:*22* 170:*14, 15*
174:*4* 384:*3* 450:*24*
460:*3, 8* 479:*2, 3*
**10:10** 233:*21*
**10:13** 4:*4*
**10:47** 273:*17*
**10:50** 50:*11*
**10:54** 56:*9*
**10-hour** 262:*17*
**10th** 285:*18*
**11** 46:*9* 51:*22* 68:*9*
79:*19* 459:*22*
**11/20** 290:*2* 296:*16*
**11/20/18** 286:*5*
**11/3/18** 273:*17*
**11/4** 277:*22*
**11/4/18** 282:*4*
**11/5** 283:*16*
**11:00** 50:*10*
**11:06** 282:*4*
**11:10** 56:*5, 7*
**11:20** 56:*13*
**110** 368:*16*
**1100** 261:*3*
**1128** 256:*4* 257:*8*
**11th** 59:*14*
**12** 434:*5* 461:*8*
**12/28** 296:*15*
**12/28/18** 291:*6*
**12:02** 103:*1*
**12:16** 103:*3*

**12-minute** 435:*2*
451:*11*
**13** 68:*9*
**15** 461:*4*
**15th** 483:*21*
**1650** 2:*4*
**168** 102:*13*
**17** 434:*20* 435:*10*
436:*8*
**18** 143:*4* 409:*7*
**182** 3:*9*
**1835** 1:*22* 2:*12*
**184** 3:*10*
**19** 143:*3* 250:*21*
251:*3*
**19103** 1:*23* 2:*5, 12*
**19th** 251:*1, 4, 6*
**1st** 165:*9* 167:*3*
168:*19, 23* 169:*24*
171:*4*

< 2 >
**2:19-cv-05030-JDW**
1:*6* 4:*10*
**2:23** 234:*2*
**2:30** 233:*20*
**2:58** 234:*5*
**20** 46:*7* 266:*6, 11*
372:*3* 402:*12* 436:*15*
445:*15*
**20,000** 100:*19, 20*
**2000** 438:*18*
**2015** 164:*17*
**2017** 437:*23*
**2018** 108:*20* 126:*19,
20* 134:*13* 143:*3, 4, 5*
146:*6* 147:*24* 148:*7*
149:*19* 164:*17* 165:*9*
168:*19, 23* 169:*24*
171:*4* 274:*12, 20*
275:*15* 276:*3* 278:*2*
296:*11* 321:*2, 3*
339:*16* 378:*10*
420:*16*
**2019** 79:*19* 86:*19*
87:*10* 104:*3* 108:*20*
148:*7* 149:*20* 167:*18*
169:*24* 171:*5* 175:*20*
183:*12* 188:*12*
212:*23* 213:*9* 214:*4*

**216**:*8* **217**:*12* **221**:*15*
**227**:*12* **235**:*12* **243**:*1*
**250**:*22* **251**:*10*
**255**:*20* **302**:*18, 22*
**312**:*17* **323**:*4* **333**:*7*
**341**:*7* **342**:*4* **347**:*7,
17, 19, 20* **348**:*9*
**384**:*14* **388**:*18*
**2020** 23:*2, 3* 24:*8*
108:*4*
**2021** 1:*15* 4:*3* 22:*24*
69:*20* 483:*22*
**207** 272:*19*
**20-minute** 50:*22*
**20th** 365:*1*
**215.391.4790** 1:*23*
**215.569.1999** 2:*13*
**215.665.2776** 2:*6*
**21st** 463:*1*
**225** 286:*3*
**22nd** 463:*1*
**23rd** 293:*6*
**241** 286:*4*
**247** 3:*11*
**25** 450:*5*
**27** 267:*7, 9*
**271** 3:*12*
**276** 290:*23*
**277** 294:*13*
**2800** 2:*5*
**29** 183:*11*
**291** 302:*14*
**292** 304:*21*
**2950** 1:*22*
**2nd** 183:*12*

< 3 >
**3:08** 247:*13*
**3:09** 247:*14*
**3:55** 234:*16*
**30** 346:*13, 15* 372:*3*
**30,000** 102:*11*
**30-second** 31:*21*
**30th** 24:*24* 61:*16*
188:*12* 212:*23*
217:*12* 235:*12*
413:*16* 414:*13*
**311** 3:*13*
**33** 475:*19*

**361** 3:*14*
**3rd** 273:*9* 278:*2*

< 4 >
**4:29** 337:*24*
**4:49** 338:*1*
**4:56** 346:*19*
**46** 330:*20*
**47** 329:*13*
**48** 329:*19*
**486** 329:*7*
**4th** 5:*20* 6:*21* 8:*18*
9:*24* 59:*13*

< 5 >
**5** 3:*4* 185:*2*
**5/30** 222:*4*
**5/30/2019** 183:*16*
185:*2*
**5:10** 346:*20*
**5:59** 397:*24*
**50** 434:*4*
**501C** 351:*2*
**50-milligram** 470:*18*
**515** 2:*11*
**55** 461:*1*

< 6 >
**6** 250:*22*
**6:12** 398:*2*
**60s** 356:*6*
**6974** 46:*19*
**6th** 251:*10* 355:*15*
356:*1* 367:*7*

< 7 >
**7** 312:*17* 323:*4*
434:*18* 435:*11*
**7,000** 320:*3* 342:*6*
**7:01** 459:*21* 460:*8*
**7:17** 434:*23* 435:*6*
461:*2* 479:*24* 480:*15*
482:*2*
**70** 465:*22*
**77** 271:*15*

< 8 >
**8th** 69:*20* 175:*20*

Deposition of Lisa Barbounis                                    Lisa Barbounis v. Middle Eastern Forum, et. al.

**< 9 >**
**9** 1:*15* 4:*3*
**9,000** 320:2
**90** 197:*20* 198:*10, 19*
**900** 319:*16* 320:2, *4*
**92** 267:*8*
**9th** 388:*18*

**< A >**
**a.m** 4:*4* 56:9, *13*
*273:17*
**A-1** 267:*8*
**abide** 302:2
**ability** 119:*20*
*202:12* 315:*20*
**able** 39:*17* 74:*16*
*102:15* 128:*3* 424:7
*467:9*
**abreast** 349:*15*
**absolutely** 6:*5* 32:*24*
*34:10* 60:7 198:*8*
*230:1* 257:9 266:*14*
*274:2* 275:7 285:*14*
*380:7* 474:*21*
**absurd** 270:*10*
**absurdity** 40:22, *24*
**abuse** 36:*21*
**abusive** 408:*17*
**accent** 392:6 394:*11*
**accents** 391:*24* 392:*4*
**access** 79:*4, 5* 91:*8,*
*20* 95:5, *13, 23* 98:2,
*4* 99:22 105:*23*
*107:6* 377:22 403:*8*
*457:23*
**accesses** 99:2
**accidental** 383:*13*
**accommodated**
*460:13*
**accomplished** 174:*1*
**account** 96:*12, 14, 15*
*98:16, 18, 19* 99:9, *10,*
*21, 22* 100:8, *9* 106:2
*107:16* 280:*4* 363:5,
*7* 432:6
**accountable** 369:*14*
*413:10*
**accounts** 91:22
*92:23* 332:24 363:9,
*11* 377:23 383:*1*

**accurate** 30:*3* 77:*13*
*104:4* 110:*3* 120:*18*
*161:3* 166:2 178:*15*
*201:16, 21* 256:8
*296:8*
**accusations** 38:*18*
**accuse** 327:*19* 447:*20*
**accused** 12:9 37:*12*
*44:13* 276:*14*
**accusing** 37:*15*
*131:20* 211:8 297:*16*
*328:13*
**acknowledged** 51:*12*
**acknowledging**
*235:18* 390:*24*
**acknowledgment**
*42:16*
**act** 122:*10*
**acting** 195:*19*
**Action** 4:*10* 8:*21*
*9:1, 14, 15* 11:*24*
*13:8, 23* 15:*13* 29:*23*
*104:14, 22* 119:*22*
**actions** 147:*18, 22*
*412:17* 425:*11*
**active** 290:*7*
**actively** 128:*22*
*129:10* 302:*19*
**activities** 173:*5*
**activity** 350:*10*
*354:24*
**acts** 30:*1*
**actual** 68:*10* 190:*10*
*246:4* 293:*16* 312:*20*
*381:22* 448:*14* 453:7
*477:14*
**add** 178:*19* 317:9
*318:24*
**added** 225:*12*
**Adderall** 470:*19*
**adding** 216:*11*
**additionally** 267:*6*
**address** 74:*15* 270:*8*
**addressed** 140:*15*
**administrative**
*111:21* 159:*11*
*205:19*
**admirable** 289:*3*
**admissible** 214:*10*

**admission** 327:*24*
**admit** 154:9 325:*22*
**admitted** 114:*13*
*127:17, 21* 325:*17*
*326:13* 330:*14*
*342:17* 437:*9*
**adorable** 392:*1*
**adults** 113:22, *23*
**advance** 265:*1*
**adversarial** 277:*14*
**advertising** 382:*16*
**advice** 127:*18*
*246:22* 309:22 349:7
**advocacy** 193:*3*
**advocating** 348:*19*
*378:1*
**AEO** 386:2 387:*14,*
*21, 24*
**affect** 11:*19*
**affiliate** 462:*22*
**affiliated** 186:2
*187:23* 188:7 358:*10*
**affirmatively** 201:*3*
**affirmed** 4:*22* 483:7,
*14*
**aforesaid** 483:*19*
**afraid** 223:*13*
*409:10, 22, 24* 410:*3*
*441:24*
**agent** 340:22 407:*20,*
*23*
**ago** 19:*12* 107:*23*
*131:7* 132:*3* 144:5
*366:7* 376:*4* 409:*8*
*437:23* 438:*20*
*445:14* 458:22
*469:10*
**agony** 388:*21* 389:7
**agree** 60:*13* 70:*20*
*72:10* 75:15 76:2
*77:17, 24* 78:2 80:*20*
*81:18* 84:*3* 87:22
*106:16* 136:6, *18*
*141:20* 184:*15* 218:7
*230:22* 269:*16*
*272:16* 273:*1, 15*
*315:23* 328:*15*
*332:15* 362:*17* 370:*3*
*372:23* 373:*1, 2*
*437:16* 444:*4* 445:*8*

*476:23* 478:*16* 479:*1,*
*23* 480:*6* 481:2, *16*
**agreed** 88:*1* 136:*1, 6*
*203:21* 280:7 379:*17*
*483:16*
**agreement** 9:*14* 21:6
*43:18* 62:*21* 86:2
*186:19* 187:22
*345:20* 414:*17*
*417:21* 443:7
**agreements** 187:*5*
**agrees** 78:5, *10*
**ahead** 28:6 44:*4*
*48:4* 68:*12, 20* 72:*24*
*99:14* 100:*14* 105:*4*
*133:18* 137:*24*
*139:23* 164:5 199:*12,*
*13* 263:*16* 266:*15*
*268:20* 331:*3* 369:6
*415:24* 427:6 448:*4*
*459:20* 474:*10, 24*
*480:7*
**Ahman** 153:22, *23*
*154:6, 8* 457:*4*
**air** 356:*18*
**AirBNB** 403:2
**airline** 402:*20*
**al** 1:*8* 4:*8*
**alerted** 94:*15, 19*
**alerts** 452:*19*
**aligned** 352:22
**allegation** 37:*21, 23*
*42:21, 23* 43:*11*
*324:1* 330:*20* 344:5,
*17* 446:*1, 4*
**allegations** 38:*21, 23*
*316:24* 317:*3* 430:*13,*
*15* 435:*15*
**allege** 329:*8, 13*
**alleged** 332:*16*
**alleging** 9:*8*
**all-hands** 274:*13*
**allow** 11:7 36:22
*40:16* 58:*4*
**allowed** 146:*10*
*168:2, 24* 169:6
*207:2* 270:*4* 424:*15*
**amazing** 391:*8, 17*
**Amazon** 92:22

amended 14:8 24:15
282:6, 15 329:5
America 374:3
396:12 452:17
American 189:10
Americans 409:23
amount 279:11
293:11 328:3 345:22
381:21, 24 382:9
427:20 429:17
Amy 71:14 79:18
369:17, 21 394:19
395:8, 21 454:15
analysis 44:24
anarchist 369:11
angel 289:2
angered 151:3
angrier 308:22
angry 306:13 308:12,
13, 14
Ann 2:22
answer 6:9 7:20
11:10, 11 14:20
15:18 16:19 23:22
24:6, 21 26:21, 22
27:15 28:6 30:7
31:11, 16 32:1, 9, 18
33:1, 11, 15 34:8, 14,
21, 24 35:3, 13, 20
36:4, 7, 23 38:5, 10
39:11 40:5, 13, 16
43:4, 18 44:1 45:3, 7
46:1 47:21 52:20
53:19 56:21 57:7
58:4 67:7 70:1 71:3
72:15, 24 73:1, 12
74:2 75:7, 22 76:7
77:5, 8, 23 78:22
80:13 81:4 82:8
83:4 84:9 85:18
88:11, 12, 15 90:14,
23 93:10, 24 98:21
100:2 103:24 106:20
113:3 125:12, 14, 17
133:5 134:1, 2, 18, 22,
23 136:13 137:1
138:1 142:8 144:18
145:15 146:20 147:1
148:11 149:23 152:6
155:18 159:5 161:18

162:14, 19 163:13
165:12 166:18, 22
167:23 168:1, 10
170:3 180:21 195:3
199:12 203:1 206:19
207:2, 3, 6, 7 209:21
210:4 213:14, 18
214:14 215:3, 21
220:15 229:22
232:21 236:7 237:7
241:4 243:8 257:21
258:16, 19 259:24
262:2 265:11, 14
268:13 275:22
278:14 294:15
298:21 300:14
301:12, 15, 17 302:9
304:11 327:5 331:3
338:15 343:2 363:16
367:16, 18 372:24
380:9 388:22 414:5,
11 416:8 417:6
418:7 419:3, 11
420:11 424:18, 20
427:23 428:1, 6
429:24 430:1, 6, 7, 18
440:15 441:9 442:20
443:2, 15 444:2, 24
445:22 446:3 452:5
457:10 462:15
466:17 471:16 472:9,
17 473:4 474:19
477:10 478:24
479:18, 19 480:3, 9,
19 483:8
answered 14:13
18:16 19:2 20:1
35:13, 20 72:21 81:6
88:6 100:13 139:23
193:8 202:8 229:11
245:19 258:16
301:19 302:11 344:7,
13, 19 418:24 440:7,
9 441:20 443:1
Answering 21:19
34:13 75:12 81:15
166:20 167:22 225:6
462:2 476:1
answers 7:17 483:14

answer's 54:7, 8
404:8
ANTIFA 353:22
354:13, 20, 21 355:2,
9, 19 364:17 366:20
367:4 368:24 369:2
370:2, 10, 14, 22, 23
anybody 28:11
93:12 94:11, 13
113:21 118:23
123:19 124:14
176:20 186:13
214:22 260:20
261:15 298:4 327:23
361:23 362:10 376:7,
10, 15 421:15 422:11
425:24 461:5
anybody's 385:2
anymore 21:8 98:4
131:13 155:13 363:14
376:9 438:16 445:13
448:21
Anytime 28:8
anyway 63:24 85:19
143:17 169:2 170:12
191:11 231:5 277:10
287:3 306:7 326:15
367:23 388:9 476:18
apart 87:23
apartment 318:6
398:22 403:5
apologize 308:2
346:12
App 3:13 101:12, 13,
17, 18 312:5 384:20
apparently 228:5
282:7 284:16 318:10
320:24 332:20
368:18 377:21
463:11
appear 361:21
APPEARANCES
1:20
appeared 483:6
appearing 4:16
226:20
appears 183:11
188:17 212:24 213:3
217:11 228:5 361:17
362:12

application 143:12
249:12
applied 188:8 250:1
appointments 468:14,
16, 17
appreciate 57:8 97:4
275:21 451:7
appreciative 159:24
approach 393:23
appropriate 57:5
90:11 104:21 232:6
approval 115:9
approved 483:16
approximately
188:18 189:3
apps 101:7, 8, 9
April 79:19 87:10
146:16 359:4
Arabia 397:8
area 172:24 174:2
175:6, 10 177:20
397:3 404:19 467:22
argue 53:9 74:18
110:16 424:8
arguing 40:11 428:16
argument 53:12, 13,
15 286:17 307:5
Argumentative 65:22
73:11 92:15 134:16
136:4, 23 140:20
155:17 156:16
157:10 162:14 199:8,
18 202:1 204:18
238:4 301:12 333:10
336:18 412:22
422:23 426:5 430:2
440:20 447:3
Argumentative 80:12
265:3, 12 301:22
arguments 74:23
armed 366:9
arranged 197:20
267:7
arrest 371:12, 13
arrested 378:12
arrive 376:12
article 126:7 186:6
187:19, 20 255:10
259:10 260:21

Case 2:19-cv-05030-JDW   Document 110-2   Filed 03/02/21   Page 128 of 193

Deposition of Lisa Barbounis                                    Lisa Barbounis v. Middle Eastern Forum, et. al.

265:24  451:23
463:21  464:14  465:4
**articles**  123:2  129:4
130:10, 21  132:1
137:13, 14  139:13, 15
146:14  188:6  222:11
227:1  256:5  257:8
258:6, 9, 13  285:8
**aside**  45:10, 12
262:12
**Asked**  14:13  16:24
18:15  19:1, 24  22:21
24:24  35:12, 19  42:4
57:17  58:15  60:16
62:21  72:20, 22
73:17, 22  75:13  88:6
91:16  96:17  97:7
100:12, 13  105:5, 10,
11, 15, 16  107:22
139:22  143:7  159:2,
6, 8  166:21, 23, 24
171:16  174:24  176:9,
16  189:18, 19  190:20
196:22  197:2, 5
220:14  223:13, 15
229:11  245:18
256:10  257:20
258:15  261:19  282:3
293:18, 19, 22  299:21
317:16  319:4  324:21
326:22  331:20  344:6,
12, 18, 21, 23  345:4, 6
370:24  380:12  389:7
393:15, 17, 18  394:19,
21  395:2, 10, 11, 13,
14  401:16  409:11
419:8  420:22  421:9
428:22  429:1  434:6
440:7  441:19  442:24
453:16  465:15  473:6
**asking**  32:19, 20
33:23  34:3, 6  37:20
38:2, 8  45:15  53:2,
14  54:3  77:2  78:20
84:10  140:12  142:4
163:10  168:13
169:21  194:24
216:17  217:15, 17
218:20, 22  223:7
228:18, 20  237:6, 23

238:21  239:2  243:3
244:21  250:10
261:24  262:22  263:2
264:6  266:21  269:3,
24  291:24  292:2
294:14  319:15
342:24  349:22
365:18  367:8  394:22
395:22  396:1  418:22
427:18, 19  428:21
429:8  444:4, 9  458:9
469:11  470:15  474:9
477:6  478:21
**asks**  234:18  236:23
388:20  392:18
**asleep**  225:15
226:20  228:4, 5
**assault**  37:15, 22
38:2  39:4, 9  42:22
355:5  410:23  426:1,
13
**assaulted**  36:1, 15
419:20  423:21
**asshole**  308:1
**assign**  127:5  188:2
**assigned**  119:15
**assist**  267:15  433:12
**assistance**  191:9
**assistant**  17:5  21:9
109:5  118:17, 20
119:2  153:3  155:6,
14  255:14  258:1, 2
**assisted**  197:23
198:3, 18
**associate**  355:20
**ASSOCIATES**  2:10
**assume**  227:18, 20
245:8  289:7  446:20
**assumed**  235:3  419:8
**Assuming**  89:7, 9, 12,
19  98:20  136:23
199:18  224:20  232:1
235:17, 24  282:5
291:1  294:16  327:6
333:10  342:15
389:21  411:6  420:9
447:3  453:12, 15
455:19
**assumption**  165:3

238:17, 19  240:9, 20
**ate**  227:6
**Atkinson**  395:13
**atmosphere**  275:19
**attached**  357:16
**attack**  10:10, 22
329:9, 16  332:5, 18
**attacked**  357:19
**attended**  172:7
243:15
**attending**  171:22
**attention**  20:8  25:7
66:18  68:16  94:22
131:24  139:16  141:8
172:7  243:21  339:8
**attorney**  32:21  33:9,
24  34:1, 23  279:7
329:3  330:8  332:10
465:21
**attorney/client**  32:8
33:2  430:19  471:17
472:8, 18
**attorneys**  430:24
483:10
**attorney's**  37:1
385:6  388:1
**attractive**  227:24
281:21, 22
**attributed**  477:1
478:18
**audible**  138:7
**audio**  334:13  335:3,
10, 14
**audiotape**  334:2
**August**  104:3, 6
175:23  188:18
250:21, 22  251:1, 3, 4,
6, 10  347:19  348:9
400:12
**Australia**  281:3
**authentication**  107:20
**author**  255:23
**authority**  122:5, 6
124:6  203:23  205:5
207:15, 16
**authorization**  115:10
**available**  80:3  413:3
**avenues**  327:4
**aversion**  351:3
**awards**  429:21

**aware**  12:11, 19
51:24  53:3  55:7
63:18  98:15, 22
115:6  181:12  198:24
207:17  242:22
325:16, 18, 20  326:1,
3  378:21  379:2, 3
394:15  433:20, 21
434:2  439:17  475:17
**awareness**  54:3
**awesome**  394:7
**awful**  129:15  139:6
343:21

**< B >**
**Babe**  308:18  309:5
**babies**  235:17  236:1,
3  237:17
**baby**  306:20
**back**  8:15  10:24
17:11  34:16  55:4
56:7, 14  82:5  86:13,
14  101:18  103:5
107:21  116:5  135:20
143:10, 11  146:9
149:3  152:12  153:9,
13  154:17  157:6, 8
158:19  159:3, 7, 9, 21,
23  160:9  170:22
173:20  174:20
179:12, 13  180:9
211:6  212:19  219:17
224:18  227:5  234:5,
7  240:22  241:6, 16
246:23  247:15
255:20  277:4, 8
288:2  297:13  305:23
306:4  317:8  318:8,
21, 23  319:7  322:20
323:13  324:8  337:4
338:2, 18  339:8, 16
342:7, 9  343:17
345:5, 17  346:21
356:23  361:3  373:24
376:1  381:2  391:3, 7
393:19  394:1, 7
398:3  399:3, 16, 19
403:4  406:2  420:23
421:6  432:9, 14
435:10  440:11  448:8

461:*13*  475:*3, 6, 7*
476:*8, 10*
**background**  347:*1*
369:*19*
**backlash**  379:*19*
**backup**  103:*10*
**backwards**  160:*15*
**bad**  57:*19*  135:*18*
162:*12*  163:*19*
222:*21*  226:*11*  284:*5*
298:*8*  304:*1, 2*
373:*20, 21*  390:*13, 15*
393:*1*  403:*18*  415:*1*
459:*16*  466:*1*
**Baird**  184:*5, 23*
185:*12*  186:*6*  189:*7*
192:*10*  195:*1*  196:*19*
213:*3, 10*  214:*4*
216:*8, 14, 20*  217:*11*
218:*12*  225:*14*
226:*19*  227:*22, 23*
228:*4*  229:*20*  236:*17*
237:*4*  239:*7*  241:*19*
243:*1, 13*  244:*8, 10*
245:*9*  246:*5*  457:*1*
**Baird's**  235:*13*
**bald**  362:*16*
**ballpark**  469:*8*
**Bank**  3:*11*  91:*22*
248:*3, 5, 9, 23*  249:*10,*
*18, 20*  251:*16*  253:*6*
263:*9*  324:*13*  345:*9*
**banking**  96:*10*
**banned**  281:*23*
**Barbara**  470:*24*
471:*6*  472:*13*  473:*19*
**BARBOUNIS**  1:*5, 13*
4:*6, 7, 20*  5:*6*  17:*8*
18:*22*  60:*11*  61:*4*
103:*8*  171:*3*  264:*9*
270:*3*  329:*10, 16*
477:*18*  478:*4*  483:*5*
**barely**  17:*2*  436:*15*
**Barker**  334:*8*  335:*1,*
*14*  383:*24*  384:*1, 21,*
*22*  388:*20*  389:*6*
390:*23*
**based**  33:*1*  37:*10, 22*
44:*17*  53:*11*  115:*4*
133:*21*  142:*7*  146:*1*

160:*12*  206:*21*
209:*19*  214:*6, 13*
228:*12*  229:*8, 9*
245:*6*  301:*21*  312:*2*
328:*23*  396:*11*
430:*18*  462:*23*
**baseless**  325:*4*
**basic**  168:*17*
**basically**  27:*13*
293:*10*  371:*15*
375:*20*  396:*15*
**basis**  89:*24*  266:*1*
270:*11*  330:*5, 20*
348:*7*
**Bates**  272:*19*
**bathroom**  102:*20*
170:*12*
**battle**  152:*24*
**BBC**  379:*11*
**beat**  353:*13*  425:*6*
**beaten**  297:*15*
**bed**  217:*11*  226:*20*
228:*6*  231:*19*
**began**  164:*14*
**beginning**  21:*22*
66:*6, 13*  107:*24*
108:*4*  174:*23*  278:*9*
296:*3*  317:*1*  319:*4*
340:*15*  400:*3*
**behalf**  17:*13*  18:*20*
378:*1*  432:*3*
**behavior**  129:*1*
134:*8*  160:*7*  163:*18*
164:*13, 14*  169:*18*
286:*20*  287:*9*  288:*9*
329:*22*  369:*15*
408:*17*  440:*23*
**behind-the-scene**
17:*20*
**belabor**  213:*8*
247:*23*  298:*12*
302:*12*  445:*12*
**belaboring**  229:*12*
**belief**  13:*11*  108:*13*
113:*4*  192:*15*
**believe**  9:*20, 22*
10:*13*  19:*21*  26:*2, 6*
30:*10*  35:*17*  49:*6*
51:*16*  64:*14*  72:*2*
105:*22*  113:*20*  115:*5*

145:*3, 5*  147:*18*
149:*24*  150:*23*  152:*7*
161:*12, 24*  180:*24*
187:*10*  188:*13, 15*
191:*11*  201:*15*
211:*13*  212:*16*
221:*23*  224:*21*  245:*2,*
*5*  246:*1*  250:*7*
258:*24*  261:*9*  317:*13*
338:*5*  344:*9*  354:*5*
358:*17*  360:*9*  361:*16*
365:*14*  373:*12*  377:*6*
407:*6*  423:*17*  438:*18*
440:*3, 4, 6, 11, 13, 17*
441:*6, 10*  456:*22*
461:*12*  463:*5*
**believed**  147:*22*
148:*2*  200:*3*  204:*15*
215:*5, 6*  245:*17*
340:*21*  446:*19*
**believing**  441:*17*
**belittle**  36:*20*
**bell**  287:*22*  313:*3*
**belongs**  60:*10*
**Ben**  184:*4*  185:*12*
189:*7*  191:*1*  192:*10*
195:*1*  196:*19*  213:*3,*
*10*  214:*4*  216:*8, 14,*
*20*  217:*11*  218:*12*
220:*21*  224:*22*
225:*14, 18, 20*  226:*19*
227:*22, 23*  228:*4*
235:*13*  236:*17*  237:*4,*
*24*  238:*8*  239:*6*
241:*19*  242:*24*  244:*8,*
*10*  245:*9*
**bending**  160:*14*
**beneath**  141:*12*
**benefit**  67:*12*  109:*23,*
*24*  264:*22*  378:*5*
**benefits**  113:*21*  114:*2*
**Benjamin**  184:*23*
186:*5*  229:*20*  243:*13*
246:*5*  457:*1, 21*
**Benji**  457:*19, 20*
**Bennett**  63:*24*
117:*19*  159:*13*
**Bennett's**  431:*8*
**Benson**  2:*22*

**best**  7:*16*  41:*13*
185:*5*  274:*11*  322:*1*
346:*5*
**better**  45:*18*  118:*7*
126:*5*  177:*1*  178:*3,*
*11*  253:*19*  280:*24*
281:*20*  288:*23, 24*
295:*3*  296:*7*  307:*15*
351:*14*  359:*10*
404:*24*  422:*18, 20*
467:*20*
**beyond**  435:*12*
**Bezigrad**  394:*24*
**big**  5:*14*  110:*12*
183:*22*  195:*20*
305:*12, 14*  359:*8*
362:*15*  379:*22*
393:*19*  422:*3*
**bigger**  253:*14, 18*
273:*9*  409:*15*
**biggest**  267:*14*
**Bin**  396:*10, 21*
**Bishop**  291:*22*
292:*23*  294:*5*  301:*4*
320:*9*  321:*16*  330:*22*
373:*10*  374:*19*  375:*9*
464:*19, 23*
**Bishop's**  294:*11*
313:*2*
**bit**  8:*22*  11:*23*
66:*21*  121:*16*  125:*6*
184:*18*  281:*14*  299:*8*
338:*18*  346:*23*  347:*1*
351:*10*  369:*17*
405:*22*  475:*8*
**bits**  331:*7*
**bizarre**  292:*20*  340:*2*
**Black**  366:*11*  369:*2*
370:*23*  466:*4*
**blackout**  406:*9*
**blah**  93:*7*  129:*1*
130:*4, 5, 15, 22*  131:*3*
297:*18*  374:*5*
**blame**  405:*14*
408:*12, 16*  410:*13*
411:*17, 18, 21*
**blaming**  55:*21*
410:*10, 17, 18, 22*
**blazer**  311:*7*
**blonde**  281:*16*

Case 2:19-cv-05030-JDW   Document 110-2   Filed 03/02/21   Page 130 of 193

Deposition of Lisa Barbounis                                    Lisa Barbounis v. Middle Eastern Forum, et. al.

blow  182:*3*, *12*
  183:*24*  311:*23*
blowing  298:*20*
blown  369:*7*
blue  230:*13*  273:*12*
  283:*17*  334:*13*
blur  468:*12*
blurring  9:*21*  351:*1*
blurry  362:*15*, *22*
body  399:*19*
boiling  87:*8*
bomb  369:*7*, *10*
bonus  205:*7*, *9*, *11*, *12*,
  *23*
Boo  302:*16*
Boogaloo  366:*4*, *5*, *11*
boss  66:*17*  74:*12*
  110:*1*  116:*13*  119:*8*
  121:*7*, *18*  136:*21*
  142:*18*, *19*  145:*19*
  162:2, *12*  163:*20*
  165:*5*  168:*21*, *22*
  190:*20*  208:*1*  393:*1*
  398:*24*  399:*9*, *10*
  408:*15*  410:*8*  411:*24*
  412:*10*  465:*5*
bother  358:*8*
bottom  125:*5*  186:*11*,
  *14*  283:*4*  339:*1*
  362:*3*
box  109:*4*  363:*19*
  394:*20*
boxes  252:*18*
boy  223:2  285:*22*, *23*
boyfriend  390:*7*
Boys  352:*23*  353:*3*, *7*,
  *8*, *22*  354:*10*, *18*, *23*
  355:*20*, *21*  358:*8*, *11*,
  *22*  359:2, *13*  364:*11*,
  *16*  366:*4*, *5*, *11*, *20*
  367:*3*
Brady  282:*23*
bragging  332:*21*
  333:*1*
braggy  288:*8*
brand  158:*3*
breach  52:*3*  211:*9*
breached  372:*6*
breaching  371:*22*

break  6:*4*, *9*, *19*
  16:*14*  21:*1*  28:2
  47:*4*  50:*9*, *15*, *22*
  55:*19*, *20*  63:*7*  65:*5*,
  *11*  102:*19*, *20*  170:*8*
  233:*24*  295:*11*
  368:*14*  432:*13*  435:2
  451:*3*, *11*  460:*24*
  461:*6*
breaks  6:*14*  102:*23*
  399:*5*  450:*16*  460:*11*
  461:*14*
Breanna  425:*8*
  426:*15*
breather  168:*5*
  170:*10*
brevity  198:*15*
Brian  402:*6*  403:*8*
bribe  326:*5*
brief  382:*11*
briefly  234:*12*  248:*7*
brilliant  162:*23*
bring  9:*11*  21:2
  37:*11*, *16*  101:*17*
  141:*3*  159:*21*, *23*
  184:*3*  223:*8*  359:*6*
  394:*8*  420:*23*  425:*6*,
  *8*
bringing  421:*12*
  422:*19*
British  391:*24*  392:*4*,
  *5*  394:*11*
broad  114:*22*  221:*5*
Brockman  2:*23*
broken  372:*5*
brother  107:*24*
  390:*4*  454:*16*
brother's  108:*3*
brought  9:*8*  12:*4*
  13:*5*, *7*  119:*17*  20:*7*
  25:*7*  94:*21*  101:*2*
  104:*10*  131:*23*
  136:*20*  139:*15*  141:*2*,
  *8*  159:2  160:*9*  172:*6*
  323:*20*  339:*8*  346:*6*
  426:*15*
Brussels  305:*3*
  310:*24*  377:*4*
bubble  267:*21*
buck  423:*20*

buddy  228:*7*  262:*16*
  447:*6*
buddy-buddy  237:*24*
budget  382:*14*
build  161:*9*  298:*3*
  354:*14*
building  356:*11*, *20*,
  22  357:*5*, *13*, *15*, *16*,
  *17*, *20*  358:2  478:*9*
bullshit  302:*17*
bunch  149:*7*, *10*
  243:*14*  321:*9*, *10*
  345:*6*  364:*12*  393:*20*
  394:*21*  395:*14*
  399:*22*  400:2  402:*11*
  431:*8*  448:*8*  457:*5*
  462:*23*
burden  420:*17*
burn  354:*13*
bus  340:*16*
business  58:*23*  169:*7*
bust  368:*14*
busy  14:*16*, *17*  66:*2*,
  12  263:*23*  473:*22*
butt  292:*9*
buttons  252:*12*

< C >
Calan  376:*20*  377:*2*
  378:*21*  379:*10*, *11*
  380:*13*, *17*
calculated  256:*2*
Calen  376:*22*  379:*5*,
  *6*  380:*18*
Calens  376:*22*
call  22:*8*  33:*16*  40:*6*,
  *9*  56:*1*  130:*9*, *18*
  135:*13*  145:*22*
  158:*11*  172:*21*
  215:*21*, 24  259:*16*
  264:*13*  281:*13*  303:*2*,
  24  305:*2*  307:*7*
  341:*3*  405:*10*  406:*2*
  436:*14*, *23*  445:*14*
  446:*9*  447:*12*
called  4:*21*  17:*4*, *10*
  107:*14*, *21*  127:*9*
  129:*21*  162:*22*  203:*5*
  299:*15*  325:*21*  336:*6*
  339:*23*  359:*9*  436:*11*

437:*12*  446:*12*, *15*
  456:*3*
calling  18:*19*  27:*6*,
  *21*  66:*19*  195:*7*
  209:*11*  259:*21*
  284:*18*  332:*3*  351:*13*
  373:*18*, *19*  481:*11*
calls  13:22  15:*14*
  21:*18*  23:*18*  29:*21*
  30:*6*  32:*7*  34:*21*
  43:*13*  44:*17*  52:*17*
  69:*23*  71:*1*  75:*3*, *20*
  77:*21*  78:*20*  83:*1*, *2*
  84:*6*  88:*7*  127:*4*
  128:*14*  133:*3*, *22*
  144:*14*  145:*11*
  148:*10*  149:*22*  152:*4*
  163:*9*  180:*11*  209:*20*
  211:*15*  212:*6*  412:*21*
  413:*23*  447:*4*
calm  297:*6*
campaign  135:*10*
  161:*13*  347:*4*, *10*, *14*,
  *22*  351:*19*  381:*7*, *10*,
  *20*, *21*  382:*18*  384:*12*
  448:*16*
Cannon  357:*15*, *18*
  358:*2*
capability  201:*18*
  203:*7*
capable  208:*19*
capacity  102:*16*, *17*
  189:*13*  190:*2*  191:*4*,
  *7*, *10*  192:*16*, *22*, *24*
  194:*3*, *5*  195:*17*
  196:*20*  197:*21*
  198:*11*, *17*  203:*10*
  410:*20*
capital  252:*3*
Capitol  10:*11*, *22*
  66:*9*  355:*16*, *23*
  356:*1*, *2*, *3*  357:*1*, *3*,
  *13*, *14*  358:*4*  366:*8*
  367:*1*  368:*13*, *14*, *15*
  369:*15*  370:*1*  371:*10*,
  22  372:*4*, *9*, *18*
  468:*19*
captioned  360:*13*
captured  291:*21*
capturing  283:*10*

Case 2:19-cv-05030-JDW   Document 110-2   Filed 03/02/21   Page 131 of 193

Deposition of Lisa Barbounis                                Lisa Barbounis v. Middle Eastern Forum, et. al.

**Car** 207:*10* 208:*15*
318:*7, 11* 342:*13*
**card** 96:*9*
**care** 141:*15* 217:6
322:*22* 469:*20, 23, 24*
**cared** 322:*23*
**careful** 316:22, *23*
317:2
**cares** 459:*18*
**carry** 105:*21*
**Carson** 1:*21* 5:*3*
7:22 8:*4* 11:*1, 6*
13:*15, 18, 21* 14:*13*
15:*14* 16:*17* 17:24
18:*15* 19:*1, 24* 21:*18*
22:5, *12, 18, 23* 23:*17*
24:2, *19* 26:*17, 22*
27:8, *13* 28:5, *16*
29:*10, 21* 31:*10, 15,*
*23* 32:7, *17, 23* 33:*10,*
*14, 20* 34:4, *12, 20*
35:*12, 19* 36:*3, 10*
37:4, *6, 18* 38:9, *24*
39:*7, 14* 40:8, *15, 21*
41:2, *9, 16* 42:*3, 7, 11,*
*24* 43:*13* 44:*16, 22*
45:22 46:*6, 20* 47:*1,*
*7, 13, 20* 48:*18* 49:7
50:*11, 20* 52:*6, 10, 14*
53:7, *23* 54:5, *9, 12,*
*20* 55:*1, 5, 13, 23*
56:*4, 24* 57:*15, 21*
58:7 60:7 65:*21*
67:4, *20* 69:6, *23*
71:*1* 72:20 73:*10*
74:*1, 22* 75:3, *19*
76:6, *24* 77:20 78:*7,*
*12, 18* 79:*13* 80:*11*
81:2 82:*3* 83:*1* 84:6
85:8, *12, 15* 87:*19*
88:5 89:*7, 11, 17, 23*
90:6, *9, 22* 92:*14*
93:*15, 20* 97:*3, 12, 18*
98:6, *20* 99:*13, 24*
100:*11* 102:2, *18*
103:*14* 105:*1* 106:*10,*
*19* 115:*11* 132:*18*
133:2, *15, 17, 20*
134:*14, 24* 136:*3, 12,*
*22* 137:24 138:*3, 8,*

*14* 139:22 140:*4, 19*
141:*23* 142:6 144:*7,*
*13* 145:*10* 146:*19, 24*
148:9 149:*21* 150:*16*
152:2 155:*16* 156:*15*
159:*4* 160:*16* 161:*16*
162:*13* 163:7 165:*11*
166:*3* 167:7 168:*3*
170:2, *9, 15* 180:*11*
193:7 195:6 196:*10*
199:*7, 11, 17* 200:6
201:7, *24* 202:8, *24*
204:*17* 206:*15* 207:7
208:*21* 209:*1, 7, 16*
210:*3, 12, 18* 211:*3, 8,*
*15* 212:6 213:*12, 17,*
*23* 214:5 215:2, *15,*
*18, 23* 216:9, *22*
217:*14, 20* 218:*17*
219:9 220:*1, 6, 12*
221:*1, 4* 228:*11*
229:*4, 7* 230:*4, 20, 24*
231:22 232:*20*
233:*17, 20* 234:*23*
236:6 237:5 238:*3,*
*24* 239:*10, 18* 240:*16*
241:*21* 242:*16* 243:*2,*
*6* 245:*11, 18, 23*
247:7 252:*15, 23*
253:2, *13, 19* 254:*15*
255:*3* 256:7 257:*19*
258:*15* 259:*16* 260:*3*
262:*3* 263:*5, 16, 18,*
*22* 264:*15* 265:2, *6,*
*10, 21* 266:*14, 23*
268:9, *16, 21* 269:9,
*12, 17* 270:*1, 7, 17*
272:*18* 274:*3* 277:5
290:*9* 291:*12* 299:*18*
300:*12, 15* 301:*3, 11,*
*16, 20* 302:8 304:*10,*
*18* 307:8 314:*1, 4*
322:5 325:*11, 18*
326:8, *11, 21* 327:*1, 6,*
*21* 328:20 331:*1, 22*
332:9 333:9, *20, 23*
335:*18* 336:*10, 17, 23*
337:3, *9, 17, 21*
338:*13* 339:6, *17*
341:*12* 342:24 344:*6,*

*12, 18* 365:*3* 367:8,
*13, 18, 24* 378:*13*
379:*3* 385:5, *8, 12, 16*
386:6, *10, 18, 22*
387:6 392:8 398:*13*
410:*14* 411:6 412:*20*
413:22 414:*4* 415:*20*
416:7 417:*4, 24*
418:7, *23* 419:*10*
420:*1, 8* 421:*1*
422:22 424:2, *7, 14,*
*21* 426:*4, 8, 21* 427:*2,*
*6, 13, 22* 428:5, *21*
429:*2, 16, 23* 430:7,
*17* 431:*1, 22* 433:*24*
434:*3* 435:*1, 7, 18, 22*
436:2, *7, 13* 437:6, *14,*
*18* 439:*20* 440:7, *10,*
*19* 441:8, *19* 442:*17,*
*24* 443:*23* 444:6, *11*
445:*20* 446:2, *14, 24*
447:*21* 448:2 450:*10,*
*14, 21* 451:9 452:5
455:9 457:8 458:*16*
459:*12, 19* 460:2, *6*
461:6, *16* 462:6
465:7 471:*4, 15, 20*
472:6, *12, 16, 24*
473:*4* 474:*3, 5, 18*
475:3, *7, 13, 24* 476:9
477:*3, 14* 478:2, *20*
479:*17, 23* 480:5, *8,*
*14, 23* 481:8, *18, 21,*
*23*
**case** 5:22 6:*21* 9:6,
*11, 19* 10:*1* 12:*1, 4,*
*12, 21* 13:2, *13* 14:*4*
20:5 25:*3, 11* 29:23
30:5, *10, 14* 31:2, *8*
34:5 43:*17, 22* 46:*18*
51:7, *9, 17, 22* 60:*17*
61:*1, 2, 14, 20* 62:*12*
71:*11* 72:*13* 73:24
74:*19* 76:*18* 77:*11*
83:*15, 18* 86:*13* 88:9
102:6, *8* 104:*11*
106:2, *8, 16, 18*
108:*15* 110:6 135:*5*
230:7 232:*10* 246:*16*
264:6 265:*13* 270:*3,*

*14* 271:*23* 272:*21*
274:*14* 322:*14* 325:*4*
326:7, *13, 14, 20*
329:*5* 364:*4* 378:*23*
387:*24* 415:8 416:*21*
419:*15* 425:9 426:9
429:*19* 434:*15* 436:*1*
454:2, *6, 14* 458:7, *13,*
*19* 459:9, *14* 461:*5*
462:*11* 465:*13*
466:23
**cases** 61:*24* 62:9, *15*
76:*13* 415:5, *7* 425:6
434:*4*
**Cassandra** 288:*12*
451:*14* 452:7 453:*23*
454:*1* 456:24
**casting** 440:*23*
**casual** 241:*17*
**catching** 423:*20*
**categorize** 142:22
**category** 118:*15*
119:5
**cause** 37:*23* 38:*4*
49:*4, 6, 12* 70:*16*
132:*21* 133:*1* 148:*23*
**caused** 230:*17*
**causing** 414:*20*
**caution** 56:*17*
350:*16* 435:*17, 19*
**cautioning** 435:*20*
**Cavalier** 2:*4* 3:*4*
5:*1, 5* 14:2, *18* 16:7
17:*15* 18:6, *23* 19:6
20:9 22:*3, 6, 14, 21*
23:7, *23* 24:*13* 25:*13*
26:*21* 27:*4, 19* 28:*13*
29:5, *17* 31:*4, 13, 19*
32:*4, 12, 20* 33:*3, 12,*
*18* 34:2, *10, 15, 17*
35:8, *15, 22* 36:8, *24*
37:5, *9* 38:7, *19* 39:6,
*12* 42:*13, 15* 43:9
44:8, *19* 45:6 46:*3,*
*11, 23* 47:*17, 23* 48:*4,*
*7, 21* 49:*20* 50:8, *17*
51:2, *4* 53:*1, 20* 54:2,
*7, 11, 19, 23* 55:6, *21*
56:2, *6, 15* 57:8, *18*
58:*1* 59:5 60:*24*

61:*3*  66:*14*  67:*11*
68:*1*  69:*18*  70:*19*
72:8  73:6, *20*  74:*17*
75:*1, 14*  76:*1, 21*
77:*15*  78:*4*  79:*9, 16*
80:*19*  81:*20*  82:*21*
84:2  85:*1*  87:*12, 21*
89:*4, 9, 15, 21*  90:2, *7,
15*  92:2  93:*11, 17*
94:*4*  97:*8, 16*  98:*14*
99:*7, 18*  100:*6*  101:*1*
102:*21*  103:*7, 22*
105:*19*  106:*13*  107:8
116:2  132:*23*  133:*10*
134:*10, 21*  135:*23*
136:*9, 17*  137:*18*
138:*5, 11*  139:*7*
140:*1, 9, 22*  142:2, *16*
144:*9*  145:*1, 14*
146:*22*  147:*16*
148:*13*  150:*11*
151:*11*  152:*14*
155:*23*  156:*17*
158:*18*  160:*10, 21*
162:*11, 16*  164:*4*
165:*21*  166:*12*
167:*19*  168:6, *7*
170:*5, 7, 13*  171:*1*
180:*23*  182:6, *11*
184:*14*  193:*11*
195:*14*  196:*15*
199:*14*  200:*1, 13*
201:*11*  202:5, *14*
204:*3*  205:6  207:*4*
208:*5*  209:*3, 9, 23*
210:6, *14, 24*  211:*5,
12*  212:*3, 12*  213:*21*
214:2, *17*  215:*12, 17,
19*  216:*1, 16*  217:*3,
17*  218:*1, 19*  219:*12*
220:*4, 9, 20*  221:*3, 8*
223:6  228:*17*  229:*24*
230:*11, 16, 22*  231:*7,
9*  232:*3, 23*  233:*15,
18, 22*  234:6  235:*4*
236:*11*  237:*14*
238:*12*  239:*4, 14, 20*
241:2, *24*  242:8, *19*
243:5  244:2  245:*15,
20*  246:8  247:*16, 22*

252:*20, 24*  253:*4, 17,
22*  254:*17*  255:*7*
256:*15*  258:*3, 18*
260:*1, 6*  262:*7, 11*
263:*14*  264:8, *18*
265:*15, 18*  266:*10, 16*
267:*1, 5*  269:*1, 11, 19*
270:*12, 19*  271:*2, 7*
273:2  274:*10*  277:*16*
290:*11*  291:*18*  300:*1,
20*  301:*8, 14, 18*
302:*1, 10*  304:*13, 20*
307:*19*  311:*15*  314:*6,
10*  322:*12*  325:*15*
326:*3, 10, 24*  327:2,
*17*  328:*11*  329:*1, 2*
331:*17*  332:2, *14*
333:*13, 21*  334:*1*
335:*21*  336:*14, 21*
337:*1, 14, 18, 22*
338:*3, 16*  339:*13*
340:*3*  342:*3*  343:*22*
344:*10, 14*  346:*3, 12,
22*  360:6  361:*13*
365:8  367:*11, 15*
369:*16*  378:*16, 20*
379:8  385:*7, 10, 14,
20*  386:8, *12, 19*
387:*1, 7, 11, 22*
392:*12, 14*  397:*19*
398:*4, 15*  411:2, *11*
413:*5*  414:*1*  415:*16*
416:*1*  417:2, *16*
418:*5, 10*  419:*4, 16*
420:*4, 12*  421:*5*
423:*22*  424:*10, 17*
425:*20*  426:*7, 10, 14,
23*  427:*3, 10, 18*
428:2, *18*  429:*7, 11,
20*  430:*5, 9, 20*  431:*4*
433:*1*  434:*22*  435:*5,
9, 20, 24*  436:*4, 10*
437:*1, 11, 16, 19*
440:*1, 9, 16*  441:*5, 15*
442:*15, 21*  443:*20*
444:*3, 7*  445:*11, 23*
446:*11, 17*  447:*7*
448:*5*  450:*18*  451:*6,
13*  453:*14*  455:*13*
458:*3*  459:*7, 15*

460:*4, 20*  461:*11, 20*
462:*1, 4, 9*  465:*11*
471:*13, 18*  472:*3, 11,
20*  473:*20*  474:*11, 14,
22*  475:*16*  476:*11*
478:*15*  479:*9*  480:*6,
11, 17*  481:*1, 20*
**Caviler**  5:*10*  50:*16*
53:*9*
**Center**  2:*11*
**certain**  12:*20*  74:*5*
98:*3*  106:*4*  166:*1*
168:*12*  172:*24*
188:*11*  293:*10*  299:*4*
349:*20*  381:*21*  408:*1*
**certainly**  6:*13*  24:6
63:*5*  72:*11*  124:*17*
162:*9*  199:*20*  259:*3*
279:*10*  295:*3*  328:8
370:8  418:*14*  463:*17*
464:*21, 22, 23*  481:6
**certainty**  259:*9*
**certifiable**  294:2
**certifiably**  299:*11*
300:*24*
**certified**  252:*1*
**certify**  483:*4, 12*
**cetera**  294:*20*
**chain**  3:*9, 12*  108:*19,
21*  109:*16*  116:6
182:*18*  183:8  221:*20*
234:*13*  271:8, *10*
272:*17*  273:5  384:*20*
**Chamberlain**  303:*12,
20*  304:*9*
**chance**  56:*21, 22*
290:*13*  462:*14*
**change**  154:*23*  160:*7*
163:*17*  182:*16*  272:8
327:*5*  410:*3*
**changed**  146:*11*
477:*19*  478:*5*
**changes**  250:2, *8*
251:*14*
**channels**  143:*11*
**characterization**
59:*19*  99:6  111:2
**characterized**  165:*14*
**charge**  13:*24*  15:*16*

29:*20*  130:*23*  132:*12*
**charity**  321:*13*
**chart**  109:*1*
**chat**  292:*1, 2*
**cheating**  322:*23*
**check**  463:*17*
**checked**  186:*13*
**checks**  122:*23*
**chicks**  293:*23*
**Chief**  120:*9*  249:*8*
382:*19*
**child**  276:*18, 24*
436:*14*  445:*15*
**children**  21:*3*  147:*10,
13*  236:*18*  322:2
342:*22*  412:*11*
**choose**  480:*19*
**chosen**  276:*24*
**Christmas**  305:*9*
401:*7*  452:*23*  465:*5*
**chuckle**  471:2, *5*
**cinematic**  82:6
328:*21*  329:*4*
**cinematics**  59:*1*
**circle**  421:*4*
**circumstance**  84:*22*
**circumstances**  191:*12*
217:*18, 23*  218:2
411:*22*  417:*19*
**cite**  186:*1*
**cities**  354:*13*
**Civil**  4:*10*  13:*23*
28:*23*  29:*18, 23*  30:*5*
214:8  230:*3, 5, 6*
424:*24*
**claim**  12:*5*  13:*12*
15:*11*  24:*16*  39:*4, 9*
42:*18*  51:*16*  55:*11*
80:*23*  81:*24*  163:*20*
269:*14*  316:*17*
318:*16, 21*  333:*7*
472:2
**claiming**  35:*24*
270:8  339:*3*  471:*19,
21*
**claims**  9:*8*  14:*23*
25:2  28:*12, 15*  43:*16,
19*  44:*12*  52:*4*  53:*5*
70:*24*  75:*17*  76:*4*

104:9  230:14  270:2
316:19  318:9  327:16
clarification  432:1
clarify  13:10  354:15
clash  353:23
class  154:15  157:11
classes  407:4, 9
classify  338:22
Claus  392:4
clause  279:6  282:8
clean  168:10
clear  7:20  31:5
41:4, 22  61:12, 15
66:23  73:15  81:13,
14  93:18, 21  98:7
106:24  110:19
126:16  176:6  178:16
183:3  188:16  196:14
199:1  206:7  211:1
216:4  226:17  228:2
235:8  236:12  237:12
244:3, 15  273:11
305:21  312:23
314:14  325:9  341:5
351:11  357:13
362:23  364:7  373:6
411:3
cleared  306:1
clearly  145:20
148:17  197:16
215:13  225:16, 17
236:8  238:8  242:5
243:16, 22  258:17, 21
281:22  326:4  350:23,
24  356:7
clears  305:24
click  252:18
clicked  252:12
client  36:15, 16  57:6
61:1  97:22  434:20
436:9  460:16
clients  434:8  435:15
client's  214:9  215:18
Cliff  456:22
clock  46:10
close  33:19  147:9
311:20  390:9  454:7
closes  482:1
clothes  311:5

cloud  99:1, 2  101:20,
22
cloud-based  99:1
code  285:9
coding  153:12  154:15
co-equal  120:15
cognitive  466:20
collaborative  257:23
colleagues  454:19
collectively  470:1
colloquial  389:22
color  133:13
comb  15:4
come  30:16  34:16
42:9  129:4  130:21
131:23  143:2, 6, 18
151:5  158:19  159:7,
9  164:19  173:20
179:12  201:6  246:23
255:14, 15  259:19
277:4, 13  355:1
363:19  374:3, 5
382:17  392:24
414:12, 17  421:20
430:15  435:9  438:12
439:7  441:16  454:23
469:4  476:8
comedy  451:7
comes  101:22  115:14
137:6  151:15  342:5
355:2  374:4  388:11
comfortable  184:8
272:7
coming  14:23  25:10
62:14  149:3  151:19
164:9  169:15, 22
305:17, 18  356:5
461:13  476:9
command  108:19, 21
116:6
comment  237:16
238:22  464:19
comments  324:9
382:17
commercial  402:20
committed  38:1
242:7, 10
committee  193:1
COMMONWEALTH

483:2
communicate  127:6
communicating
469:14
communication  127:2
205:10  207:24  348:6
363:15
communications
71:19  190:8  191:15,
18, 21  192:1, 6, 17
195:2, 5, 7, 12, 17
197:21  198:12  199:3,
22  200:22  201:22
202:21  203:3, 12, 24
204:2, 6, 10, 13, 24
206:3, 8, 12  207:12
208:13  209:6, 15
210:1, 9, 11, 23
230:16  255:12
335:17, 19  337:12
348:5  363:13  381:4,
16
communication-wise
348:12
communicationy
121:3
community  297:24
companies  393:21
company  160:13, 18
383:3, 4
compel  436:14
compensation  326:6
competitor  71:16
compilation  331:13
compiled  330:13, 22
complain  221:6
276:2, 9
complained  128:5
155:11  156:3  277:10
complaint  13:23
14:4, 8  15:6, 15
24:15  29:19  42:21
44:14  181:14  276:6,
11  329:5, 6  430:14,
16  446:5, 21, 23
447:16  448:3  455:20
456:4
complaints  147:23
165:18  181:4  275:16
420:14  457:4

complete  6:8  39:19
79:3  91:8  252:3, 11
completely  129:18
137:10  250:17
279:14  343:10
478:12
complicated  66:12
382:22
compulsion  436:24
computer  95:21
157:11  266:2  303:11
computer-aided
483:17
computerized  259:18
conceded  53:16
concept  23:19
conceptualize  125:13
concern  28:4  224:4
279:2  299:10, 13, 19,
20, 23  300:2, 5, 8, 16
concerned  30:9, 12
127:10, 14  205:14
386:17  441:22  442:3
443:4, 5  458:1
concerning  430:14
concerns  223:21
351:17
concisely  58:3
conclusion  13:22
15:15  21:19  23:18
29:22  30:7  43:14
44:18  69:24  71:2
75:4, 21  77:22  78:20
83:2  84:7  88:7
133:3, 22  144:15
145:11  148:10
149:22  152:4  180:12
209:20  211:16  212:7
376:13  412:21
413:24  447:4
conclusions  476:13,
16
condemn  368:16
conditions  138:18
conduct  329:14
332:17  333:8  436:5
conducted  73:23
conference  7:11
171:24  172:8  194:8

Case 2:19-cv-05030-JDW    Document 110-2    Filed 03/02/21    Page 134 of 193

Deposition of Lisa Barbounis                                    Lisa Barbounis v. Middle Eastern Forum, et. al.

226:24  227:9, *12*
**confessions**  291:*2*
**confidence**  66:*1*
152:*20*
**confident**  31:*7*
**confidential**  386:*24*
394:*14*
**confirm**  184:*7*
241:*23*
**confirmed**  112:*21*
276:8  297:*12*
**confused**  194:22
259:*14*  351:*12*  352:2,
*4*
**confusing**  197:*15*
350:*21*
**confusion**  352:*10*
**Congress**  143:*6*
405:*18*  406:*11*  479:8
**congressional**  432:*18*,
*19*
**Congressman**  107:*16*
190:*20*  210:*15*  249:6
262:*23*  268:6  363:*23*
381:*4*  398:9  405:*17*
408:8  409:*11*  431:*11*
433:*14*, *16*
**congressman's**  382:*24*
**congressmen**  380:*6*
383:8  410:*12*
**connected**  107:*16*
358:6
**connection**  263:7, *11*,
*12*  268:*1*  358:8
376:*10*, *16*
**connections**  191:*8*, *9*
193:*21*  267:*12*, *18*, *19*,
*22*  268:*10*  269:*3*, *14*,
*21*  270:20, *23*
**connotation**  24:*3*
158:*13*  226:2*1*
269:22  422:*1*
**conscious**  160:*5*
**consent**  63:*10*  64:*19*,
*24*  65:2
**consequences**  342:*23*
**conservative**  139:2, *3*
147:8  171:*23*  194:8
226:*23*  227:*12*  406:2

421:*19*
**conservatives**  405:*20*
**consider**  21:*16*
57:*16*  119:*24*  120:2,
*3*  128:*16*  151:*23*
396:*7*  401:*21*  402:*2*
429:22
**consideration**  6:*18*
**considered**  12:*15*
78:*1*  120:6
**considering**  207:*1*
394:5, *13*, *17*
**consistent**  423:*4*
**consistently**  419:*14*
**conspiratorial**  28:2*1*
29:*4*
**constantly**  162:*1*
179:*1*  250:9
**constituents**  66:*19*
**constitute**  61:*9*
**constitutes**  77:*19*
170:*1*  252:6
**consultancy**  396:8
**contact**  169:6  375:*12*
395:*4*  432:*18*  454:2*3*
456:*13*
**contacted**  17:*16*, *18*,
*23*  18:*5*  20:*12*  22:*16*
23:*12*  132:*5*
**contacting**  23:*11*
**contacts**  270:*5*
358:*24*  359:2  395:*9*,
*14*, *15*  432:*20*
**contained**  80:*1*
**contains**  35:*17*
**contemplating**  104:*14*
**content**  284:*11*
383:*4*, *5*
**contents**  26:*4*  99:*8*,
*20*  100:*7*  101:*17*
**context**  45:8, *9*  158:*9*
162:*4*  217:*7*  218:*9*
221:*17*, *21*  222:*1*
225:*12*  227:*16*, *19*
228:2*1*  229:2  315:2*1*
476:*4*
**continuation**  308:*16*
**continue**  32:2
129:*15*  214:*15*

259:2*1*  260:*5*  264:*3*
308:*11*  352:*11*
**continued**  74:*11*
130:2
**continuing**  16:*5*
407:9
**continuous**  315:*1*
316:*7*
**contract**  52:*3*
**contractor**  25:*6*
185:*16*
**contributing**  423:*13*,
18
**contributions**  267:*15*
**contributor**  185:*20*
364:*14*  401:*15*
**control**  48:*12*  56:*18*
159:*19*  231:*3*
**conversation**  25:*20*
31:22  32:*14*  33:7
34:6, *22*  135:*14*
221:*18*  244:*17*
287:2*1*  294:*10*
304:*23*  308:*17*
314:*20*  341:2, *4*
387:*3*  438:*1*, *17*
441:*17*  449:2
**conversations**  245:7
312:*16*  317:*1*  331:9
335:20
**conversing**  320:9
**convey**  172:*3*  199:*23*
**convicted**  76:*16*
**cool**  50:*23*  394:8
**coordinated**  329:9, *16*
332:5, *18*
**coordinating**  382:*20*
**copies**  150:*8*
**copy**  219:*18*  283:*5*
481:22, *24*
**copying**  111:*7*
**core**  381:*16*
**corner**  362:*4*
**Corona**  51:*1*  400:*3*
401:*17*  449:22
**coroner**  362:*3*
**corporate**  92:*12*
93:*19*  94:7  95:*5*
99:*23*  100:*10*  103:*10*
117:*16*

**correct**  7:*23*  9:*10*, *12*,
*19*  12:2, *11*, *17*, *18*
13:7, *9*  16:*13*  26:*10*,
*11*  29:20  35:*11*, *18*
38:2*3*  42:2*3*  43:*12*
44:*15*  45:2*1*  51:*14*
62:*3*  63:*14*, *21*  64:*5*,
*20*  73:8, *24*  74:*3*
78:*6*  79:20  81:*1*
88:*4*  97:*11*  101:*3*
106:9  110:7, *23*
112:*1*, *16*, *17*  113:7
116:9, *10*, *14*, *15*
117:6, *9*  119:7, *8*, *9*,
*12*  120:*12*, *17*  122:2
123:*20*  126:20
127:*24*  132:*13*, *14*
136:2  137:2*3*  138:*13*
139:*18*, *19*, *21*, *24*
140:*3*  141:9  149:*16*
152:*10*  159:*3*  166:*1*
169:*1*  174:*13*, *17*
175:*14*  176:8  178:*13*,
*18*  183:*12*  185:*13*
192:*11*  193:6, *16*
195:*13*  197:2*1*  198:*4*
201:*4*, *18*, *19*  204:*11*
206:9, *10*  208:*14*, *17*,
*18*  209:6  210:*17*
213:*11*  222:*12*
223:2*1*  224:22, *23*
225:*4*, *5*  226:2*1*, *22*
228:8, *14*  235:6, *20*
236:*18*  237:*1*  238:2
241:9  247:20  248:*19*
251:8, *17*, *18*  252:*3*, *8*,
*9*, *11*  253:*12*, *24*
254:*1*  255:8, *9*
256:*14*  257:*11*, *18*
258:*10*  264:2*3*
267:*17*, *20*  270:*6*
271:*12*, *16*  273:*13*
274:*14*  275:*17*
278:*18*  279:*19*, *22*, *23*
280:*1*, *2*, *4*, *18*, *19*
281:*20*  282:*7*  283:*7*
287:*14*  288:*7*  289:22
291:22  294:*11*  299:*5*
300:22  304:2*3*
315:2*1*  322:*3*  323:6,

22, 23 327:20 328:14,
18 329:12, 17, 23, 24
331:20 332:19
335:11, 14, 15 336:23
338:7, 8, 21 339:5, 16
341:11 342:6, 8
349:2 357:7 358:13
363:23, 24 364:9
381:5 399:17 401:22
403:22 405:14
407:15, 16 411:5, 19
426:16, 24 435:4
446:13 447:10
470:21
**corrected** 86:7
**correctly** 194:10
197:23 204:5 329:11
**correspond** 315:5
**correspondence**
349:21
**Corsovek** 192:24
**cost** 405:5
**Costello** 190:20
405:17 409:11
431:12
**Costello's** 268:7
398:10 409:18
**couches** 440:23
**Counsel** 2:1, 6, 13, 17
3:8 4:16 26:12, 13
40:12 42:19 45:14,
20 49:4 51:12 60:12
67:12 73:23 74:24
215:12 272:11 388:5
435:16 443:21 444:5,
9 460:5 461:21
462:2 464:22
**counseled** 310:15
**counseling** 404:17
**counsel's** 90:16
202:15 262:12
265:16 302:3 388:9
**count** 461:10
**counterclaim** 465:24
466:22
**counterclaims** 209:17
211:4 263:13 465:12,
18
**countered** 171:15
**COUNTY** 483:1

**couple** 18:1 51:6
151:6 171:12 273:19
281:8 323:8 354:1
366:6 394:2 395:14
407:7 463:21
**course** 28:7 126:11
127:23 135:4 147:3
155:3 158:2 168:21,
22 177:5 222:22
233:2 360:23
**Court** 4:8, 12, 14, 15,
18 7:12 25:18 45:20
46:17 48:11 49:2, 12
60:5 64:22 76:12
78:12 94:2 104:16,
21 293:10 397:21
425:10 432:15
460:20 472:4 483:3
**courtesy** 6:12
**courtroom** 39:18
229:15
**courts** 24:4
**Court's** 80:8
**cover** 254:7
**covered** 59:11 98:9
**covering** 452:9
**COVID** 374:4 468:18
**co-workers** 356:10
398:24
**Coyne** 402:6 403:8
**COZEN** 2:1 5:10
**crap** 27:24 160:2
311:6
**crazy** 26:2 66:7
293:24 295:6 297:20
298:15, 22 317:11
322:16 338:23 374:7
402:12 476:22
**create** 315:16 397:9
**created** 411:10
**credentials** 97:1
98:1 108:11
**credibility** 264:10, 20
265:22
**credit** 96:9 439:9
**criminal** 28:24 29:3,
20, 24 230:7 328:16
329:14 332:17 333:8
415:8

**crop** 415:5
**crossed** 372:18
**crowd** 356:24
**crush** 234:22 235:2,
6, 9, 13, 19
**crushy** 243:20
**cry** 303:15
**crying** 294:23, 24
373:19, 23 374:1
399:4
**curiosity** 68:7 368:1
369:24
**curious** 247:5
287:10 316:3 367:12,
13 473:15
**current** 191:7
197:19 206:8, 24
248:18 249:2, 13, 15
250:20 251:15 266:7
278:8 399:13, 16
403:14 410:11
411:22
**currently** 363:22
403:5 460:6 477:19
**cursor** 182:21
**curve** 175:2
**cut** 7:16 57:3 168:2
322:21 367:19
479:10, 13
**cute** 219:14

**< D >**
**D.C** 171:24 185:11
234:15 274:17
277:18 355:7 364:17
404:18 405:4, 13
406:16, 17 408:15
412:2, 6
**D.C.'s** 256:20
**dad** 454:15
**Daily** 462:14, 21
**damaged** 214:23
**damages** 28:8
**D'Ambra** 2:24
**D'Ambria** 4:11
**Daniel** 2:19 24:23
61:11, 15 62:17
109:16, 18, 23 110:15
111:5, 7, 10, 12, 18, 23
112:5, 13, 20 113:5,

11, 12, 14 115:1, 5, 10,
18 116:8, 13, 16, 20,
24 117:8, 12 124:5,
14, 23 127:9, 12, 21
128:19, 20 130:4, 17,
21 131:10, 12, 16, 21
132:4 135:15, 20, 24
137:10 139:15
140:15 141:18 143:1
145:3, 24 146:18
147:17, 21 148:1, 20
149:7, 10, 13 150:6
153:22, 23 154:4, 20
155:19 156:2, 12, 18
157:17, 21, 23 158:10
159:9, 20 160:24
161:19 163:15, 24
169:14, 18, 23 172:7,
10, 12, 17 173:20, 23
174:10, 23 179:14
180:14 181:2, 13
186:13 200:9 204:22
205:13, 22 210:21
222:24 223:9, 14
260:16 275:9, 16
276:2, 22 277:1, 11
278:21, 23 280:1
282:5 283:4, 6, 12, 23
286:1 288:1 348:24
349:13 352:16 376:3
393:10 394:4, 22
413:13 418:21 419:8,
20 420:7, 13 431:9
432:2 442:16, 19, 22
464:14 465:2
**Daniel's** 114:17
159:18 161:10
**Danny** 286:20, 24
287:1, 2 288:12
290:4, 15 292:23
293:5, 9 294:6, 10, 14
295:13 296:6, 10
297:16 298:8 300:3,
10 304:23 305:9
306:18 307:22
308:14 311:4, 10
316:13, 16 319:11, 13
320:10 321:18
322:20, 24 324:18, 21
325:16, 20 326:4, 13,

Case 2:19-cv-05030-JDW   Document 110-2   Filed 03/02/21   Page 136 of 193

Deposition of Lisa Barbounis                                    Lisa Barbounis v. Middle Eastern Forum, et. al.

21 327:4 328:2
330:7 332:20 333:1,
5, 15 334:8, 16 335:1
338:10, 19 339:3, 15,
20 340:5, 16 341:11,
16, 19 342:5 345:24
346:8, 11 362:3
365:11 373:5, 22
374:7, 9 375:8
383:24 388:20 389:6
390:1, 9, 20, 23
392:17, 24 447:18
464:7, 16, 19, 23
**Danny's** 291:2 292:6,
7 374:13
**dare** 453:12
**data** 107:4 432:8, 14,
21
**date** 4:3 185:1, 2, 3,
6 189:12 194:6, 14
216:12 217:7 226:12
227:11 249:22
250:19, 24 251:5
260:11, 14 274:3, 4
281:12 289:23 293:7
295:22, 23 324:4
378:17 469:6
**DATE/TIME** 1:15
**dated** 183:16 212:23
273:4, 8 296:13, 15
**dates** 216:18 226:12
244:19 256:2
**dating** 21:7, 8 86:13
278:9 281:10
**daughter** 399:2
404:15, 17
**day** 10:10, 15 22:2
41:14 45:16 49:18
53:22 57:14 72:2
112:21 114:19
145:21 148:15
226:24 232:10
243:11 262:17
263:18, 24 274:16
282:4, 11, 12 283:16
284:5 286:14 293:8
306:3, 10, 16 307:23
324:5 327:10 343:9
357:21 359:9 369:15
399:2 409:12 414:8

433:22 453:6 458:22
461:22 483:21
**days** 8:5 307:5
402:11, 12, 14 452:22
458:22 463:21 465:4
**dead** 399:18
**deal** 197:10 238:2
239:8 293:4 308:17
323:12 376:11 387:5
422:3
**dealing** 348:16
**dealings** 172:4
**death** 76:15
**debate** 461:13
**debt** 416:13, 15, 16,
18, 19
**December** 59:13
108:1, 4 277:21
296:2, 3, 11, 12, 21
365:1 400:22, 24
463:1
**decide** 50:7 230:21
231:1, 2, 8 304:15
376:15
**decided** 45:15 65:19
77:11, 12 137:7
143:16 157:6 179:11
371:6
**decides** 194:1
**decision** 77:13
105:17 110:10, 14
130:16 162:21
180:14 181:2, 13, 19
328:9 409:5 453:11
**decision-making**
116:12
**decisions** 109:18, 19
110:6, 12, 20, 22
111:24 112:4, 14, 19,
22 113:5, 11, 24
114:16, 24 115:2, 8
127:15 132:8 203:8
205:15, 16 368:12, 17
**deep** 95:2 391:16
**defend** 301:7
**Defendant** 1:9, 14
2:6, 13 4:21 230:17
**defendants** 49:3
329:8, 14, 20
**defendant's** 54:13

**define** 8:21 108:18
412:16
**defined** 24:4
**defines** 425:1
**defini** 73:9
**definitely** 57:2 74:13
238:10 296:20
302:16 308:13 371:3
382:8 395:10 410:3
413:21
**definition** 75:18
76:5 144:17 145:13
330:17 414:3, 7
415:23
**Delaney** 121:12, 13
122:12, 19 123:15
124:4 125:18, 23
126:3 182:24 183:8,
17 198:1 206:2
221:10, 13 222:11
224:2 225:14 226:19
227:15, 18, 20 228:6
229:1 231:11 232:9
234:13 235:13
236:21 237:6 239:6
242:23 243:3, 7
244:6 245:8 255:20
257:3, 5, 7, 14 258:5
280:20 282:21
**Delaney's** 122:16
123:24 228:15, 19
**Delany** 120:23
**delete** 70:6, 18 84:13,
14 85:5 86:10 94:6
96:14 103:9 104:23
310:16
**deleted** 96:12, 15
105:3 383:14
**delve** 304:19
**demand** 428:22
**demanded** 427:4
**demanding** 82:23
398:23 427:11
**demands** 428:14
**DeMarco** 249:6
**demo** 345:23
**demonstrate** 80:23
81:23 98:8
**demonstrates** 30:4

97:19
**demonstration** 341:21
**demos** 323:13
**denied** 54:14, 15
67:17 345:10
**denying** 226:18
**depend** 45:8, 9 430:4
**Depends** 455:4
**DEPONENT** 1:13
3:2 13:16, 19 14:14
15:21 16:21 18:1, 17
19:3 20:2 24:9, 22
26:24 27:11, 16 28:7,
17 30:9 32:10 35:4,
14, 21 38:12 43:7
44:6, 21 45:5 47:4, 9,
15 48:1, 5, 14, 20
49:14 50:14, 24 52:8,
12, 21 54:16 55:3, 16,
19 65:23 67:9, 22
69:8 70:2 71:5 73:1,
13 74:3 75:8, 23
76:8 77:7, 24 78:9,
15, 23 79:14 80:14
81:6 82:9 83:5
84:11 85:10, 14, 19
88:14 90:4, 24 92:17
94:1 98:5, 22 99:15
100:3, 15 102:5
103:19 105:5 106:11,
23 115:12 132:19
133:6, 16, 18 134:3
135:4 136:5, 14
137:2 138:2, 10, 15
139:24 140:5, 21
141:24 142:11
144:19 146:21 147:2
148:12 149:24
150:18 152:7 155:19
159:6 161:19 162:15
163:14 165:13 166:5
167:9 170:4, 11
180:13 182:9 193:8
195:13 199:9, 13, 20
200:7 201:10 202:3
203:2 204:19 207:9
208:23 209:8, 22
210:5 211:19 212:10
213:15, 19 215:4
216:11 217:1 219:11

Deposition of Lisa Barbounis                                    Lisa Barbounis v. Middle Eastern Forum, et. al.

220:*11*  228:*14*  229:6
230:*15*  231:5  232:22
235:*1*  236:8  237:8
238:5  239:*12, 19*
240:*18*  242:2, *18*
243:9  245:*14, 24*
247:9  252:*16*  253:*1,
15, 20*  256:9  257:22
258:*17*  262:9  263:*17,
21*  264:5, *17*  265:4, 8
266:*20*  267:3  268:*14,
19*  269:*10, 16, 23*
270:6  271:4  272:24
274:4  277:6  291:*14*
299:*21*  300:*13, 18*
301:5  304:*17*  307:11
314:*3, 8*  322:9
326:*15*  327:9  331:*4,
24*  333:*12*  336:*12, 19*
337:7  339:7, *18*
341:*13*  343:4  344:*8,
20*  365:5  367:*16, 21*
368:2  378:*18*  379:5
387:8, *20*  392:*10*
410:*16*  411:8  414:*12*
416:9  417:7  418:*4, 9*
419:*12*  420:*3*  421:3
422:*24*  424:5, *12, 19*
425:*4*  426:*12, 22*
427:8, *24*  428:*24*
430:*3*  431:*3, 24*
434:2  435:*4*  437:8
439:*21*  440:*21*
441:*13, 21*  443:3
444:*1*  445:*1*  446:8
447:5, *24*  450:*12*
452:6  455:*12*  457:11
458:*18*  459:*18, 24*
461:*4, 18, 23*  465:*10*
471:6  472:*1*  473:*3, 6*
474:*4, 13, 21, 24*
475:6, *10, 21*  476:2
477:*12, 16*  478:*4*
479:*1, 20*  480:2
481:*17*
**deposed**  8:*18*  232:*10,
13, 15*
**DEPOSITION**  3:8
4:6  5:*13, 19*  6:*21, 22*
7:*1*  8:6, 7  9:23

10:*12, 15, 20*  16:*24*
41:*20*  49:5  57:*11*
58:9  59:6, *17, 22*
60:8, *9, 11, 12, 14*
71:9  89:*16*  90:8
108:*13*  182:8  184:*12,
19*  214:*19*  216:4
232:*18*  247:*21*  271:5
298:*12*  311:*14*  316:*1*
330:*12, 13*  360:5
361:*12*  369:*18*  375:*3,
8, 16*  386:23  431:*23*
444:*17*  445:6  451:*4*
452:*24*  460:23  464:9
465:*16, 17*  480:*1*
482:2  483:*11, 13*
**depositions**  11:*4*
49:*13*  58:*20*  195:*24*
361:9  434:*4*  444:8
445:*4*  461:*15*  465:*3*
**DEREK**  1:*21*
**derive**  222:*1*
**derived**  15:*12*
**derogatory**  195:22
**describe**  108:*17*
152:*15*  201:*21*
217:*18*  279:*1, 5*
354:*18*
**described**  118:*16*
144:*4*  283:*10*  408:*14*
415:22  416:*3*  447:*23*
**describing**  160:*12*
**description**  161:*3*
362:*17*  382:11
**descriptor**  459:*13*
**designation**  385:*18*
386:2
**designed**  31:*17*  36:5,
*18, 19, 20*  45:*23*
214:7  229:*17*  265:*13,
15*  301:22  304:*11*
428:9  434:9, *10, 11*
444:*20*
**desire**  449:*17*
**desk**  95:*15*
**despite**  175:*12*  210:8
**destroy**  317:*12*
**details**  33:6  115:*16*

**detective**  16:*1, 11, 15,
18*  18:*14*  19:*19, 23*
20:*13*  22:*17*  23:*12*
**determination**  72:*12*
**determine**  263:*15*
**determined**  55:9
429:*17, 18*
**development**  294:*20*
**device**  96:*16, 19*
97:2  98:*3*  101:*11, 15*
104:*24*
**devices**  88:*4*  91:2
105:9
**devoted**  126:8
**diagnoses**  481:*12*
**diagnosis**  294:*3*
299:*12*  477:7  478:22
**Diaz**  262:22
**DiBianca**  10:*17*
**dick**  306:*10, 16*
307:*10, 23*
**difference**  144:*23*
145:16  276:22
**differences**  179:*4*
**different**  135:*16*
137:*10*  143:*23, 24*
162:*18*  167:*11*
169:*14*  249:*16*
283:*24*  312:22  331:8
343:*10*  355:*17*
380:*21*  387:*17*
398:*11*  444:8  477:22,
*23*  478:8, *11, 12*
**difficult**  142:*18*
406:*12*  411:*4, 9*
**difficulty**  405:*16*
**digital**  382:*15*
**diminished**  174:*13*
**dinner**  311:5  355:6
377:*4*
**direct**  67:*4*  73:22
118:*24*  127:3  212:*19*
213:*13*  330:*16, 17*
411:*24*
**directed**  148:6
**directing**  31:*15*  34:*23*
**direction**  63:*23*
192:*1*  432:*23*  433:*4*
483:*18*

**directive**  121:*11*
129:7  131:*19*  132:*3*
**directives**  128:*3, 4, 5,
8*  129:2  186:5
**directly**  18:*9, 11*
119:6  124:22  128:*11*
153:*24*  154:*24*
224:*12*  230:*17*  249:7
320:7  357:*17*
**director**  71:*20*  120:7,
*10*  143:22  146:*11*
153:6  159:*17*  165:5
190:7  191:*14, 17, 20*
192:5, *17*  195:*1, 5, 7,
11, 17*  197:*21*  198:*12*
199:*3, 22*  200:*21*
201:22  202:*20*  203:*3,
24*  204:7, *10, 13, 23*
205:*10*  206:8, *12*
207:*11*  208:*12*  209:6,
*14*  210:*1, 9, 11, 22*
255:*13*  381:*3, 16*
410:*23*
**directors**  117:*23*
118:6, *21*  119:*10, 19*
120:*16*  124:7  127:*4*
128:*14*  130:9  135:*13*
145:22  207:*24*
**disagree**  59:*18*
137:*12*  304:*13*
477:*17*
**disagreed**  110:*15*
115:6  135:*1*  142:*24*
143:*20*
**disagreement**  134:*11*
136:*20*  137:*4, 11*
142:*21*  143:*15, 24*
144:*20*
**disagreements**  135:5
141:22  142:*10, 14*
151:22  165:*15*
**disagrees**  76:*23*
**disappear**  171:*14*
**disciplinary**  119:22
**discipline**  136:*15*
**disciplined**  136:*11*
171:7, *8*
**disclosed**  379:*12*
**disclosure**  429:*4*

disclosures 427:15
Discourse 359:10
discovery 79:22, 24
  107:12 221:5 327:22
  328:5 337:5
discrimination 14:1
  15:16
discuss 26:3 66:2
  130:7, 9 165:7
  358:22 385:11, 13
  386:5, 11 414:14
  415:17 473:19
discussed 14:10
  104:9 152:1 235:13
  284:17 293:2 416:3
discussing 148:5
discussion 238:15, 16
  244:5 282:2 385:17
  388:4 400:17 428:14
discussions 167:5
  168:19, 24 169:5
  359:8 428:20
disenfranchised
  368:23
disgusting 31:1
  129:18
dismiss 252:8
disparage 272:1
display 476:24
  478:17
displayed 441:1
dispute 309:10, 11
disputes 404:20
disrespect 309:2
dissonance 466:21
distinction 126:18
  145:8 185:21 190:3
  195:15 196:11, 12, 18
  197:1, 11 198:5, 7, 8
  313:10 411:16
DISTRICT 1:1 4:8, 9
DNC 369:11 400:12
docket 25:18 456:14,
  24
doctor 468:13
  469:16, 18, 19 470:10
document 46:12, 14
  47:22 48:13 49:9, 16,
  23 50:3 65:6, 8
  67:21 68:6 70:3

81:3, 14 84:8 87:11
  181:21, 23, 24 182:14
  183:3 234:9 240:16
  247:2, 4, 18 248:12
  271:22 272:3, 20
  302:13 304:21
  315:15 331:19
  360:20 361:6 384:17
  386:24 387:13 388:6,
  14 389:19 392:15
  395:20 396:4 442:18
documentary 379:18
documentation
  165:18
documents 8:12
  83:24 84:5, 15 86:5
  88:24 100:21 272:17
  324:13 327:23
  374:20 375:18
  387:17, 23 395:18
  446:9
document's 361:8
doing 11:4 21:1
  39:15 41:23 74:10
  88:10 96:8 103:16
  107:2 108:2 113:4,
  17 115:1 121:10
  122:19, 23 131:7, 14,
  15, 17, 20 135:9
  137:21 138:3 139:17
  146:13 154:3, 7, 10
  161:8 164:23 174:3,
  6, 8, 11 175:1 176:18
  177:22 178:2, 4, 17
  197:24 198:1 203:12
  204:1, 6 206:3
  208:19 256:8 257:17
  258:5 264:3 280:11
  284:15 285:12
  290:17 293:21
  296:24 305:20
  347:20, 23 348:2, 5, 6
  350:10, 14, 23 360:21
  373:20 382:1, 5, 9
  401:20 408:21
  410:16 419:13 426:2
  435:21 450:10
  453:18 469:2
dollar 345:22 429:21
Donald 368:5 371:23

donation 122:24
  377:23 378:4
donations 305:19
donor 77:18 78:1
  79:2, 3, 18 80:2, 24
donors 77:19
doors 371:10, 17
  372:4
double 423:10
doubly 7:14
doubt 67:13 176:21
  271:22 312:13
download 98:17 99:2
downs 467:22
downward 215:8
DP 282:5
Dr 112:21 469:16
  470:23 472:13 473:1
draft 332:11 394:2
  395:24 396:5
drafts 152:9
draining 284:6
drama 300:11
draw 198:5, 7, 8
drawing 185:22
  190:4 411:16
drawn 125:4
dream 42:9
dressed 231:24
drew 417:20
drinking 234:17
  438:7, 10
Drive 96:5 100:21
  101:2, 3, 12 298:15
  301:6
driven 179:16
drop 25:1 61:24
  62:9, 14 416:17
dropped 62:13
  356:18
dropping 416:22
drunk 223:1 304:5
DuBai 396:11, 20
  397:1
ducking 283:17
due 468:21 472:8
duly 4:22 483:6, 13
duties 208:12 398:7

duty 211:9, 10, 14, 18,
  21, 23 212:4, 8, 11
  338:6, 9
dying 66:9 292:18

< E >
E.J 456:12, 21
earlier 11:23 13:7
  20:19 51:9 67:15
  114:23 132:11
  145:21 155:4 174:16
  177:19 249:20 282:4
  319:3 338:4 354:15
  366:24 410:7 458:7
  463:2 465:15
early 164:16 384:13
ease 408:24
easier 60:5 177:8
  273:10
easiest 386:12
easily 43:22 155:12
East 5:11 9:7 10:3
  12:16 13:3 15:12
  16:2 17:14 22:10
  23:5, 13 24:17 25:10
  27:7, 22 55:9 67:16
  70:22 74:20 75:16
  76:3 77:18 80:17
  81:22 82:19 86:20
  87:7 88:3 104:10, 15
  116:9 118:8, 13
  120:21 123:17
  124:13 125:3 147:4
  168:20 171:7, 10
  172:5 176:8 179:19
  180:8 181:19 185:13,
  15, 18 186:2, 8, 15, 16,
  22 187:7, 12 188:2
  190:23 191:15, 21
  192:1, 5, 17, 21
  203:20 206:4, 13
  208:13 209:11 210:2,
  9 211:14, 23 212:5,
  14 214:22 235:9
  243:11 257:14
  260:21 261:16
  267:10 269:4, 13
  270:2, 21, 24 285:13
  329:4 332:16 333:6
  338:6, 20 342:6

350:*20*  351:*16, 18*
352:*12*  376:*19*
378:*22*  399:*17, 19*
406:*13*  408:*13, 16*
409:*21*  410:*10*
411:*18, 21*  413:*9*
415:*19*  416:*5*  418:*3,
15*  423:*7, 16*  432:*24*
433:*5, 8*  451:*21*
456:*2*  477:*1, 20*
478:*18*  481:*5*
**EASTERN**  1:*1*  2:*17*
4:*4, 9*  22:*2*
**easy**  85:*21*  395:*8*
399:*1*
**eaten**  116:*1*
**eating**  405:*11*
**ECF**  46:*18*
**edgewise**  340:*23*
**edit**  284:*23*  285:*8*
310:*4, 9*
**edited**  310:*9*
**editing**  284:*15, 22*
402:*3*
**editor**  174:*5*  284:*18*
288:*4*
**edits**  288:*2*
**Educate**  185:*21*
**education**  407:*9*
**educations**  407:*4*
**effect**  191:*19*
**effective**  420:*19, 20*
466:*20*
**effectively**  267:*15*
**effort**  82:*23*  161:*2*
252:*10*
**Egler**  380:*19, 24*
448:*6, 14*  449:*1*
**eight**  108:*8*  361:*21*
373:*11*
**eight-and-a-half**
58:*10*
**either**  51:*12*  110:*21*
149:*7*  153:*7*  172:*14*
184:*6*  191:*1*  280:*13,
21*  316:*14*  390:*8*
404:*21*
**El**  403:*7*
**election**  5:*17*  349:*13,

18*  382:*23*
**elements**  44:*24*
**Eleven**  2:*11*
**Elipse**  372:*3*
**e-mail**  86:*18*  87:*1, 3,
9, 11*  91:*21*  96:*10*
99:*12, 15*  100:*4*
111:*7, 8, 13*  113:*15,
18*  114:*5, 6*  128:*15*
130:*20*  131:*6, 10, 13*
148:*21*  157:*24*  169:*4,
7*  172:*2, 10, 22*
191:*19*  204:*22*  205:*2*
210:*20*  262:*22*  270:*8*
273:*18*  282:*10*  283:*6,
9*  334:*4*  349:*21*
382:*18*  448:*16*
469:*15*
**e-mails**  100:*20*  150:*2,
6, 8*  181:*9*  257:*12*
319:*7, 8*  363:*17*
393:*20*
**embarrass**  31:*17*
36:*5, 9, 18*  45:*23*
206:*22*  214:*7*  229:*17*
301:*23*  304:*12*  428:*9*
434:*11*  444:*21*
**embarrassing**  214:*12*
311:*1*
**emogis**  273:*20*
**emoji**  294:*22, 23*
303:*16*
**emotional**  214:*23*
404:*15*  481:*3*
**employ**  252:*7*
**employed**  87:*9*  408:*6*
**employee**  25:*5*
123:*16*  125:*19, 22*
126:*13*  127:*24*
132:*22*  133:*23*
153:*17*  173:*19*
185:*13, 22*  186:*4*
188:*4, 9, 12, 13, 23*
190:*10*  192:*22*  193:*9*
196:*20, 23*  197:*4*
211:*24*  249:*1*  351:*17*
401:*14*  408:*18*
439:*19*
**employee/employer**
141:*21*  142:*9*

**employees**  64:*24*
115:*14*  142:*14*  206:*1*
233:*8*  456:*2*
**employer**  197:*19*
201:*23*  206:*24*  252:*7*
264:*21*  318:*18*  322:*3*
344:*3*
**employer/employee**
167:*4*
**employers**  141:*22*
142:*15*  201:*4, 9*
202:*19*
**employment**  86:*14*
87:*6*  171:*11*  172:*23*
173:*5*  176:*7*  212:*15*
252:*8*
**employor/employee**
165:*23*
**encouraged**  351:*4*
**ended**  277:*20*
**ends**  153:*13*  405:*7*
**enduring**  22:*10*
**engage**  110:*4*  161:*13*
279:*11*  293:*4*  354:*24*
355:*8*
**engaged**  22:*10*  24:*17*
134:*7*  135:*10*  180:*1*
242:*24*  244:*7*  245:*9*
329:*14*  332:*17*  333:*8*
**engaging**  370:*12*
**England**  268:*1*
293:*8*  312:*6*  332:*21*
333:*16*  347:*10*
379:*15*  394:*9*  449:*17,
18*  452:*10, 14, 16*
**England's**  298:*2*
**English**  462:*22*
**enjoy**  174:*22*
**enlarge**  311:*21*
**Enrique**  359:*4, 11*
360:*10, 18*  362:*5*
364:*8*
**enter**  368:*12, 13*
**entering**  281:*23*
**entire**  29:*2*  67:*6*
84:*18*  177:*4*  241:*22*
263:*24*  315:*18*  330:*5*
**entirely**  30:*3*  43:*21*
113:*12*  226:*21*
424:*16*

**entitled**  91:*24*  200:*4*
204:*12*
**entrenched**  275:*10*
**environment**  409:*17*
422:*1*
**equal**  124:*19*  276:*23*
**equals**  116:*18*  117:*5*
118:*7*  120:*2*
**equated**  426:*6*
**equating**  425:*21*
**equipment**  92:*20*
**equivalent**  354:*19*
**ER**  468:*14*
**erase**  83:*24*  84:*18,
23*  86:*2*
**erased**  432:*5*
**Erica**  249:*7*
**erroneous**  84:*1*
**escaping**  150:*20*
**escrow**  407:*3, 6*
**especially**  66:*6, 12*
328:*16*  382:*23*
**Esquire**  1:*21*  2:*4, 10,
17*
**established**  8:*17*
53:*4*  55:*10*  70:*22*
79:*8*  213:*2*  440:*22*
**estate**  211:*20*  406:*19,
23*  407:*15, 20, 23*
**Estranimkis**  397:*10*
**E-S-T-R-A-N-I-M-K-I-
S**  397:*14*
**et**  1:*8*  4:*7*  294:*20*
**Europe**  393:*13*
395:*21*
**European**  347:*13*
**evaluations**  479:*5*
**Eve**  304:*5*
**evening**  357:*23*
**event**  143:*19*  185:*11*
227:*4*  230:*19*  231:*10*
274:*18*  291:*20*
355:*23*  359:*10*
360:*12*  361:*18*  438:*8*
441:*2*  464:*2*
**events**  146:*1*  192:*23*
355:*15*  367:*7*  481:*5*
**Everest**  4:*12, 15*
**everybody**  67:*23*
178:*22*  179:*15*

205:*11*, *20*  223:*12*, *13*,
*22*  369:*13*  371:*7*
372:*17*  452:*14*
454:*15*, *16*  462:*3*
**everybody's**  117:*21*
**everything's**  417:*11*
**evidence**  71:*10*  73:*3*
80:*22*  81:*23*  87:*14*
89:*8*, *10*, *13*, *19*  98:*21*
135:*19*  136:*21*, *24*
199:*19*  220:*16*  230:*9*,
*13*  231:*4*  232:*2*
318:*14*, *19*, *21*  326:*18*,
*20*  327:*7*, *16*, *19*
328:*13*  329:*9*  330:*11*,
*14*, *17*  331:*11*, *18*
332:*4*, *6*  333:*5*, *11*
336:*20*  411:*7*  420:*10*
437:*2*  447:*4*, *9*, *11*
472:*23*
**Evidence-based**  447:*5*
**exacerbated**  481:*4*, *6*
**exact**  72:*21*  186:*19*
205:*2*  207:*5*  255:*10*
265:*24*  316:*15*
345:*19*  378:*17*  419:*1*
462:*16*  469:*6*
**exactly**  18:*3*  38:*7*
146:*8*  150:*3*  171:*19*
176:*15*  207:*13*  231:*2*
250:*17*  264:*15*  275:*2*
284:*4*  295:*15*  335:*6*
369:*12*  406:*16*  441:*1*
477:*13*, *17*
**exaggerate**  110:*4*
**exam**  407:*10*
**EXAMINATION**  3:*3*
5:*4*  73:*23*
**example**  35:*23*  37:*14*
81:*22*  85:*3*  124:*20*
127:*1*  129:*17*  130:*8*
132:*15*  135:*2*, *12*
158:*6*  171:*10*, *21*
179:*8*  190:*19*  267:*24*
383:*7*
**examples**  23:*4*, *13*
**exception**  312:*16*
**exceptions**  133:*24*
**excitable**  289:*18*

**excited**  288:*6*  290:*14*,
*20*  450:*4*
**exclusive**  332:*10*
**Excuse**  55:*18*  164:*2*
167:*21*  178:*5*  240:*23*
335:*4*  445:*2*  479:*11*
**execute**  341:*24*
**executive**  203:*8*
**ex-girlfriend**  292:*7*
**exhausting**  15:*2*
20:*5*  263:*2*, *6*
**Exhibit**  182:*7*, *8*
184:*10*, *12*  211:*6*
212:*20*  219:*16*, *17*
234:*7*  247:*20*, *21*
271:*3*, *5*  283:*14*
285:*18*  286:*3*, *4*
290:*22*  311:*14*, *16*, *17*
359:*15*  360:*2*, *5*
361:*12*, *15*
**EXHIBITS**  3:*7*, *8*
466:*23*
**existed**  65:*13*, *15*
**existence**  59:*15*
220:*17*
**exists**  96:*23*  220:*24*
**expand**  393:*15*
**expanding**  393:*13*
**expect**  306:*9*, *16*
307:*15*, *22*  308:*1*
**expectation**  311:*4*
**expectations**  153:*19*
**expected**  11:*10*  177:*7*
**expenses**  403:*16*
**experience**  11:*3*
153:*12*, *13*  177:*21*
178:*13*, *15*  199:*21*
204:*9*  253:*8*  264:*12*
**experienced**  134:*9*
175:*6*, *7*
**expert**  82:*13*  481:*12*
**experts**  267:*7*, *9*
**expired**  406:*20*
**Explain**  36:*8*  49:*10*
54:*6*  89:*24*  90:*3*
187:*16*  203:*6*  290:*13*
303:*17*  306:*21*
344:*19*  431:*20*  470:*4*
**explained**  197:*5*
202:*10*  207:*12*, *14*

208:*11*, *15*  210:*19*
404:*12*  418:*1*  420:*24*
**explaining**  356:*12*
**explanation**  141:*14*
268:*17*
**exponentially**  404:*24*
**expound**  160:*22*
**expressed**  154:*4*
**extended**  467:*17*
**extensive**  327:*22*
**extent**  11:*6*  15:*18*
23:*20*  24:*5*  30:*6*
34:*21*  39:*7*  43:*15*, *23*
45:*1*, *2*  52:*15*, *16*, *19*
53:*18*  67:*1*  75:*5*
77:*4*  88:*11*  90:*13*
111:*23*  134:*1*, *15*
144:*16*  145:*12*
149:*22*  152:*3*  163:*12*
258:*5*, *7*  259:*22*
413:*23*  414:*4*  448:*24*
478:*23*
**external**  143:*14*
**externally**  191:*23*, *24*
195:*9*  204:*5*
**extort**  413:*13*, *15*, *20*
**extorted**  415:*15*
**extortion**  413:*24*
414:*8*  415:*23*
**extra**  28:*19*  205:*20*,
*21*, *24*  320:*6*  398:*21*
415:*11*  479:*21*
**extraordinarily**  301:*6*
**extraordinary**  301:*6*
**extremely**  435:*13*
**eye**  46:*10*  129:*22*
**eyes**  80:*8*  281:*16*
286:*13*  385:*6*  388:*1*


**< F >**
**fabricate**  418:*19*
**fabricated**  12:*9*
471:*11*  472:*13*  473:*2*
**face**  29:*15*  303:*4*, *5*,
*7*, *8*, *9*  362:*14*  456:*24*
**Facebook**  106:*2*, *7*, *16*,
*17*  107:*3*, *7*  108:*15*
220:*10*  303:*13*
368:*19*  382:*17*

383:*20*  397:*9*  432:*3*,
*5*, *7*, *19*
**Facetime**  295:*14*
**fact**  13:*13*  15:*12*
44:*17*  53:*3*  55:*8*
62:*19*  63:*19*, *20*
79:*11*  80:*2*  98:*15*
105:*21*, *23*  145:*2*
164:*22*  174:*19*
175:*12*  206:*11*, *21*
224:*7*, *22*  229:*8*, *14*
235:*18*, *24*  237:*16*
238:*18*  248:*17*  252:*1*
259:*9*, *17*  264:*20*
283:*11*  317:*21*
320:*21*  321:*14*  327:*3*
330:*21*  387:*3*  394:*12*
403:*18*  405:*1*, *12*
408:*13*  410:*11*
412:*12*  435:*13*
437:*12*  442:*6*  465:*23*
466:*11*  469:*5*
**factor**  107:*19*
**factory**  91:*3*
**facts**  52:*18*  89:*8*, *9*,
*13*, *19*  98:*21*  113:*8*
136:*23*  197:*13*
199:*18*  232:*2*  327:*7*
333:*10*  411:*7*  420:*9*
437:*2*  446:*16*  447:*3*,
*22*  455:*18*  481:*14*
**factual**  181:*1*  196:*12*
**fair**  11:*12*  37:*13*
47:*23*  56:*17*  72:*14*,
*18*  76:*22*  103:*24*
110:*8*  111:*22*  116:*23*
117:*7*  123:*14*, *15*
151:*12*  167:*3*  175:*5*,
*8*, *9*  183:*7*, *14*  201:*1*,
*12*, *21*  209:*24*  227:*17*
245:*8*, *16*  249:*14*
258:*7*  276:*5*  289:*6*
292:*21*  321:*24*
337:*14*  352:*2*  354:*18*
362:*15*  387:*7*  419:*5*,
*7*  430:*6*  446:*20*
**Fairbanks**  451:*14*
452:*7*  453:*23*  454:*2*
**fairness**  308:*10*
**faith**  66:*1*

Case 2:19-cv-05030-JDW   Document 110-2   Filed 03/02/21   Page 141 of 193

Deposition of Lisa Barbounis                                    Lisa Barbounis v. Middle Eastern Forum, et. al.

**fake** 196:*4* 202:*17* 204:*16, 20* 210:*10*

**fall** 469:*9*

**falling** 238:*9*

**false** 37:*21, 23* 38:*18, 21, 22* 42:*21* 52:*18* 149:*13* 162:2, *3* 214:*20* 329:8, *20* 332:*4* 477:*21* 478:*14*

**falsely** 35:*24* 37:*15* 44:*13* 417:*3, 22* 418:*6* 419:*9*

**falsification** 252:*5*

**familiar** 14:*3, 5* 250:*23* 362:*20* 365:*19*

**family** 70:*9* 96:*10* 147:*9* 408:*22* 425:*8* 426:*22*

**fancy** 284:*10*

**fantasy** 450:*3*

**far** 24:*9* 26:*2* 47:*16* 78:*24* 86:*4* 108:*12* 236:*16* 413:*2* 475:*15*

**fast** 167:*15* 221:*22* 224:*21* 240:*24* 314:*15*

**father** 322:*2* 342:*21*

**favor** 195:*20* 305:*12, 13* 310:*10*

**favorable** 349:*24*

**favorably** 140:*3, 13*

**FBI** 339:*24* 354:*5* 356:*19* 368:*20*

**February** 1:*15* 4:*3* 483:*21*

**Federal** 214:*8* 230:*5*

**feed** 342:*18* 452:*18, 19*

**feel** 6:*5* 27:*2* 29:*13* 90:*10* 148:*24* 152:*22* 153:*15, 16* 155:*3* 160:*6* 162:*6* 176:*18* 212:*13* 233:*5* 272:*7* 280:*24* 281:*20* 289:*4, 5* 368:*3* 389:*17* 390:*13, 15*

**feeling** 50:*15, 18* 152:*17* 392:*19*

473:*13*

**feelings** 287:*13*

**feels** 24:7 159:*20* 373:7 437:*6*

**feet** 297:*15*

**fellow** 185:*20, 22, 23* 186:*15* 190:*6* 192:*11* 193:*18, 23*

**fellows** 186:*19, 20* 192:*5* 193:*16* 267:*10*

**fellowship** 197:*17*

**felt** 154:*11* 180:*19* 352:*21* 371:*4*

**female** 370:*17*

**fiancee** 278:*8*

**fiduciary** 211:*9, 10, 14, 17, 21, 23* 338:*6*

**fight** 307:2 353:*23* 371:*11*

**fighting** 307:*14* 355:*2*

**figurative** 236:*9, 13, 16*

**figure** 68:*18* 122:*22* 156:*10, 22* 157:*2* 182:*15* 218:*8* 323:*14* 324:*8, 23* 325:*1* 408:*12* 410:*9* 472:*5, 7*

**figured** 376:*7*

**file** 25:*2* 35:*24* 62:*1* 165:*19* 173:*4* 184:*2, 9* 415:*7* 436:*6*

**filed** 9:*3* 13:*3, 13* 14:*1, 4, 9* 15:*13* 24:*14* 25:*5, 11* 27:*7, 22* 29:*19* 32:*11* 35:*16* 36:*11* 37:*22* 38:*13* 39:*3, 9* 62:*3, 7* 74:*19* 104:*16, 21* 209:*18* 211:*4* 429:*5* 446:*9* 454:*8* 458:*7, 13, 21*

**files** 38:*15*

**filing** 12:*5* 458:*19*

**film** 401:*17*

**filming** 356:*24* 364:*13* 402:*2*

**filtered** 255:*17*

**final** 72:*12*

**finalized** 439:*22*

**finally** 432:*18*

**finances** 415:*10*

**financial** 113:*24* 120:*9* 121:*1*

**find** 28:*9* 31:*19* 65:*19* 138:*24* 139:*2* 189:*19* 227:*21* 259:*15* 269:*7* 375:*2* 467:*4, 8* 469:*15*

**finding** 249:*1* 262:*14* 468:*7*

**fine** 15:*4* 33:*20* 40:*8* 48:*14* 49:*18* 51:*2* 69:*8, 9, 17* 74:*13* 108:*19* 130:*15* 135:*8, 14* 168:*6* 217:*5* 218:*20* 233:*17* 248:*15* 305:*22* 315:*7* 341:*6* 411:*1* 414:*24* 422:*24* 432:*6* 447:*14* 480:*20*

**fines** 425:*2*

**finish** 40:*4* 52:*10* 54:*17* 57:*1* 102:2, *7* 166:*18* 168:*3* 408:*20* 438:*9, 10* 460:*5* 479:*18, 22* 480:*2, 9, 18*

**finished** 22:*3* 164:*3* 166:*14* 167:*21* 371:*24*

**Fink** 2:*17* 117:*18* 171:*21* 256:*10, 12* 258:*23* 432:*2, 22*

**fire** 116:*20, 24* 133:*6, 12* 149:*2* 155:*10, 11, 22* 156:*4* 160:*14, 15, 19*

**fired** 130:*3* 131:*18* 132:*8, 16, 17* 137:*22* 138:*4, 6, 12, 14, 15* 139:*18, 20* 140:*7* 149:*15* 155:*13* 158:*7* 161:*2, 15, 24* 162:*8* 163:*5* 176:*8* 275:*3, 6* 276:*11, 12* 277:*2* 413:*12* 421:*10* 423:*23*

**firing** 132:*20* 133:*9, 12* 134:*6* 163:*5*

**firm** 396:*8*

**first** 6:*20* 49:*22* 57:*10, 17* 59:*12* 60:*13* 107:*12* 126:*10* 180:*5* 182:*5* 191:*17* 237:*8* 247:*24* 273:*8* 275:*15* 277:*24* 292:*11, 12* 293:*4* 313:*18, 23* 314:*11* 316:*7* 330:*1* 332:*20* 343:*12* 347:*9* 352:*13* 385:*20* 388:*13* 396:*22, 23* 402:*9* 434:*23* 444:*14* 469:*4, 21* 476:*14* 483:*6*

**fit** 407:*24*

**five** 47:*13* 50:*12* 229:*11* 233:*16, 19* 337:*19, 20* 435:*3* 451:*12* 460:*17* 461:*1, 7*

**five-minute** 102:*19, 23* 168:*5*

**fix** 310:*16*

**flag** 366:*13*

**fleeting** 450:*2*

**flew** 402:*17*

**flight** 222:*22*

**flights** 305:*11*

**flippant** 31:*6* 160:*11*

**floating** 119:*5*

**Florida** 401:*3, 6, 8* 404:*2*

**floundering** 159:*10*

**flowed** 127:*7*

**flowers** 307:*6, 7, 9, 13, 15*

**Fly** 400:*9*

**follow** 66:*18* 250:*5* 306:*22*

**followed** 128:*4*

**following** 16:*1, 11, 16, 18* 19:*16* 467:*13*

**follows** 4:*23*

**follow-up** 27:*1* 354:*2* 468:*16*

**fond** 390:*10*

**Foods** 307:*14*

footage 310:8, 9
356:19 357:2
forced 147:11
176:10, 12 440:4, 13
forcing 443:14
foregoing 483:11
Foreign 256:22
forever 30:17, 18
114:10 412:2 415:11
449:7
Forget 44:21 75:23
151:7 205:1 241:7, 8,
15 308:13 334:9
346:10 393:10
forgetting 78:15
forgive 113:1
forgot 95:17
form 16:17 26:18
28:6 41:2 42:17
43:1 52:15 73:11
75:6, 22 77:22 78:21
82:7 83:3 84:7 85:9,
16 88:7 89:12, 14, 18,
20, 22 90:8 92:16
93:23 97:13 100:1
115:11 132:18
133:21 136:22 142:7
144:14 150:17
160:20 161:17 163:8
166:4 167:7 170:3
203:1 206:20 209:19
210:3, 10 217:14
232:1 234:23 238:4
239:10 243:11
245:12 322:5 328:22
333:11 410:15
412:24 417:5 420:10
445:21 447:2 477:8
format 154:21
former 456:1
forth 297:13 319:8
343:17 393:20 394:1,
8 448:8 483:11
Fortunately 263:14
Forum 2:17 5:11
9:7 10:3 13:3, 8, 13
15:12 16:2 17:14
21:16 22:2, 10 23:5,
13 24:17 25:11 27:7,
22 52:2 53:4 55:9

61:6 70:22 74:20
75:16 76:3 80:18, 22
81:22 82:19, 23
86:20 87:7 88:2, 3
92:7, 9 104:10, 15
111:12 116:9 118:8,
13 120:21 122:17
123:17, 23 125:3
127:24 132:13 147:4
168:20 171:7, 10
172:5 176:8 177:10
178:17 180:5, 8
181:19 185:13, 15, 19
186:2, 15, 17 187:7,
13 188:2 189:4
191:15, 21 192:1, 5,
18, 21 203:20 206:4,
13 208:13 209:12
210:2, 9 211:14, 23
212:5, 15 214:23
235:9 257:14 258:14
260:21 261:16
267:10, 20 268:12
269:4, 13 270:22, 24
285:13 324:24 325:3
326:22 327:3 329:4
332:16 333:6 338:6,
11, 20 339:4 342:6
346:5 350:20 351:16,
18 352:13 376:19
378:22 398:6 399:17,
19 403:14 406:13
408:13, 16 409:21
410:10 411:18, 21
413:9 415:19 416:5
417:23 418:3, 15
420:15 423:8, 16, 23
427:5 432:24 433:5,
8 438:21 451:21
456:2 477:2, 21
478:19 481:5
Forum's 12:16
67:16 77:18 186:22
270:2 416:5
forward 175:3
266:17 422:6
forwarded 356:18
forwarding 267:15
352:14

found 25:16 49:12
70:21 72:18 76:14
77:17 114:10 205:18
323:11 393:5 396:10
foundation 89:14, 15,
18
Four 131:2 172:2
359:7 394:23 402:15
458:22
Fox 261:18, 19 262:5
frame 22:12, 14, 19,
20 23:10 59:20
104:4 175:16 365:6
378:8 448:19
France 450:5
franking 406:8
Frankly 439:15
freakin 214:23
306:6 334:16
freaking 139:6
152:23 419:20
Fred 207:20
free 6:5 29:13
226:21
frequently 289:22
293:2 366:19
friend 18:8 241:20
246:11, 12, 21 281:3
303:12 333:16
369:22, 23 384:1
390:5 401:10 451:15
453:7, 8 463:14
friendly 267:23
friends 225:22 226:7
239:13, 16, 17, 21, 24
240:2 246:11 353:10
358:12, 14 364:14
452:12, 13 454:10, 11,
12, 17
friendship 237:10
239:7 384:8, 9
friendships 268:2
frivolous 9:2 12:1
13:3 51:17 73:4, 8
74:19 75:18 76:5, 9,
19 80:8, 10 82:1
front 62:19 63:2
87:14 150:9 250:14
279:3 369:8, 10

428:12
fruition 432:17
frustrated 177:6
fuck 302:17 392:21
fucking 309:3, 5, 15
full 65:24 105:16
107:6
full-time 123:7, 12
242:6, 10 404:21
fully 157:22 161:1
231:24 290:13
fun 239:13, 17 240:3
241:15 390:12
401:24 402:2
function 425:16
fundraising 381:8, 9
382:20
funds 28:19 462:18
464:3
funny 69:1 71:13
86:16 227:22 290:24
291:3 464:5, 11, 13,
15
fun-type-of-deal
236:24
furious 298:16
furniture 321:12
further 36:21 79:22,
24 80:5 81:11 86:13,
14 121:10 280:9
283:14 303:1 356:23
483:12
future 201:3, 23
202:19 264:21
283:23

< G >
gained 199:20 204:9
Gala 235:9 243:12,
15 274:20 277:18
Gary 174:1, 11, 20
175:5, 7, 21, 24
177:12, 14, 16, 20, 22
178:4, 24 179:1, 2, 4,
6, 18, 24 180:2, 4, 8
181:3, 18
gas 356:8
gather 125:1
Gavin 353:9, 16

gay 366:12

geez 292:15

general 44:13 142:4 152:17 244:5 256:13 258:24 279:8 393:14

generally 37:6 122:8 152:16 250:16

genuineness 391:20

George 379:10, 12 380:8, 13, 15, 17, 18, 19, 21, 24 381:1 448:6, 13 449:1

Gerlach 479:11

Germany 305:16

getting 115:13 128:7 162:24 177:14 178:8 196:3 250:6 305:19 311:21 312:18 339:19 345:23 346:1 350:24 379:13 401:23 403:24 433:13 467:19

gigabytes 102:13

girl 298:6 316:14 338:23 373:24 391:8 422:8 423:21 436:15 439:10 442:9 443:17 445:15

girls 293:20 309:13

girl's 298:21

give 4:21 45:15 48:12 56:20, 22 67:12, 24 69:7 92:3 107:9, 19 113:2 115:15 119:12 121:24 125:16, 21 128:3 129:1 135:16 141:13 142:21 176:2, 3 179:8 181:2, 22 205:23 221:20 247:3 285:19 290:12 317:18 318:14 319:16 341:9 349:22 360:19 361:7 365:6 382:10 384:17 389:10 392:21 393:3 399:16 432:9, 21 455:14 460:16 462:14 463:10 466:1

468:4 469:6, 8 470:9 476:17 481:13

given 5:21 8:20 10:2 71:24 72:1 73:3 83:14 95:14 102:16 108:10 246:21 283:4 285:24 344:2 382:5 399:15

gives 448:9 461:16 470:2

giving 11:3 56:24 59:10 94:9 104:22 113:21 121:8 128:10 173:21 174:3, 20 180:8 389:17

glad 349:10, 11

glass 360:22

go 5:2 15:3 21:21 26:5 27:24 28:6, 9, 10 42:6 44:4 46:8 48:4 50:12 55:24 56:7 59:7, 23 61:20 67:5 68:12, 20 72:24 74:9 80:9 82:10 83:23 84:17 85:4 86:9 88:23 99:14 100:14 105:4 111:4 116:5 129:8, 19 133:18 135:20 136:1 137:24 138:24 139:23 152:9 153:7, 18 154:2 155:8 164:5 170:11 183:19 189:24 199:12, 13 210:13 217:1 219:17 223:14, 20 224:10 240:22 241:16 247:2, 7 248:24 250:15 263:16 264:16 266:3, 15 268:20 274:22 289:17 297:23 305:16 307:8 309:7 311:6 314:8 317:18 319:20 322:19 325:5 331:3 341:22 346:17 355:4 363:17 385:10 386:4 394:7, 9 397:20 399:2, 16, 19 400:1, 10, 11, 13, 19, 21 401:5, 8, 16, 19

402:4 404:20 405:19 408:3 409:14, 24 415:24 421:6 423:9 427:6 428:12 442:16, 22 443:11, 16 448:4, 18 455:24 459:20 461:2 462:6, 7 467:24 468:21, 22 469:22 474:9, 24 475:6, 7, 14 478:11 480:7

goal 301:1 412:13 421:14 467:20

goals 421:11, 13

God 234:15 273:21 286:23

goes 154:5 319:21 336:6 365:20 366:4 374:13 404:18 458:15 463:15 470:5

going 5:15 6:11, 14 10:24 13:21 20:4 23:17 25:2 26:2, 24 31:8 32:18 36:22 39:17 40:16 41:14, 21 42:3, 24 44:16 45:16 47:21 49:17 50:19, 21, 23 52:6 53:7, 20, 22 54:18 55:24 57:13 58:18 60:1 61:24 62:3, 6 67:22 68:14, 17, 21, 24 69:5, 11 74:9, 22 75:19 81:17 82:6, 10 87:16 92:14 95:19 97:6 106:7, 19 111:7 114:3 126:11 128:24 129:4 130:11 137:7 153:7, 8 157:20 168:9 174:10 179:6 194:23 201:13 206:15, 18, 20 209:16, 19 210:13 213:12 214:18 215:14, 19, 21 216:9 221:14 222:4 227:2 229:7, 9 232:14, 20 233:16 237:22 238:24 241:6 245:11 247:18, 19, 24 248:10 253:7 257:5

263:21 270:13 272:15 275:20 276:20 277:20 278:4 284:8 288:17, 21 297:4 300:3, 9 302:16 311:5 322:18 323:9 327:15 332:21 336:24 339:24 345:17 349:16 367:2, 9 370:18, 20 371:7, 11 372:24 376:9 386:16 387:12 392:7, 12 397:22 398:12, 17 400:16 406:10 409:14, 16 419:3 421:3 422:6 425:23 427:2, 16, 22 428:1, 5 429:16 438:3 444:18 452:3 455:15 456:13, 19, 20 457:22 462:4, 7 471:20 472:9 475:1, 17, 18 479:15

GOLD 2:10 40:2, 3, 10, 18, 21, 24 41:7, 11, 24 42:5, 8 275:12 330:14 331:12, 15

gonna 28:10 29:12 30:19, 21 31:2 33:18 34:8 42:13 49:8 54:24 56:16 57:4 61:19, 23 62:14 77:8 85:8 88:5 89:23, 24 99:24 105:1 106:20 133:2, 20 134:4, 14 136:3, 14 137:8 141:17 142:6 144:13 153:5 157:13 158:14, 19 160:16 163:7 174:8 183:24 184:3 212:19 214:5, 13, 14 219:16 222:21 228:11 234:7 240:11 248:14 253:15 254:21 273:4 275:5 278:20 283:22 284:10 287:18 300:6 302:2 306:6 308:23 313:1 316:1 333:2 353:13 361:5 367:19 386:3 396:1 404:20

413:22  415:7  416:7
424:3  427:6  428:12
430:17  435:17
444:19  445:4, 12, 22
450:15  462:6  467:9
468:7  475:19  477:4
479:10  481:9
**Good**  5:6, 7  38:9
49:4, 6, 12  68:5
102:21  122:12
125:18, 22  126:9, 12,
13  132:22  133:7
141:7  152:23  153:17
162:7  163:23  165:16
169:20  170:16  175:2
176:19, 23  177:14, 16
178:9  207:19  222:19
236:22  282:5  284:1,
13  287:3  290:21
314:9  323:17  334:15
337:21  349:9  369:22
371:8  382:8  388:21
389:17  391:12  392:5
396:2  404:5  407:21
408:8, 20  409:19
410:2  452:12, 13
459:13  466:5
**Goodrob**  118:1
124:12
**goof**  390:12
**Google**  30:15  100:21
101:2, 3, 12  201:5
452:19
**Googles**  28:11
**GOS**  258:23
**gotten**  17:11  29:2
189:23  221:2  251:9
415:11
**government**  366:16
393:24
**governments**  143:13
**grab**  360:22
**grad**  450:7
**granny**  372:8
**grant**  298:1  340:7
341:10, 14  345:16, 18,
20
**Granted**  126:10
175:2

**grantee**  185:23
**grass**  339:23
**grassroots**  393:22
**gray**  273:13
**Grayson**  25:15  26:4
27:6, 9, 20  456:10, 21
457:17, 18  458:4
**great**  38:22  42:12,
22  43:5  44:15  126:5
153:16  175:17
197:10  289:16  363:1
407:13  408:14
449:22
**greater**  409:15
**Greek**  157:13, 17, 18,
19  158:9
**Greg**  2:20  5:11
12:6  17:13  91:11
94:24  95:8, 12, 23
96:9  108:24  109:2,
14, 17, 22, 23  110:1, 5,
13, 17, 20, 22  111:8, 9,
16  112:3, 7, 15, 19
113:4, 10, 16, 17
114:5, 14, 16, 24
115:9  116:13, 16, 20,
24  117:8, 12, 16
118:24  119:7, 11, 21
121:7, 11, 12  122:7
124:15  126:19, 22
127:2, 7, 18, 19  128:6,
8, 17, 23  129:14
131:9, 10, 14, 22, 23
132:7, 12, 20  134:5,
12  135:1  136:20
137:21  138:3  139:17
142:17, 18, 19, 22
143:1, 8  146:8  148:2,
6  149:12, 20  151:22
152:10  154:13, 22, 23
155:5, 11, 20  156:3,
24  157:5, 7, 12, 24
158:16, 23  159:6, 8,
14, 15, 24  160:9, 24
161:8, 12  162:20
163:11, 14, 16  164:7,
11, 14, 17, 18  165:6, 9
168:12, 18  178:20
179:1, 4  181:4, 14
186:13  205:14, 18

223:8, 14  224:10
274:8  275:4, 6, 10, 11,
13  276:2, 7, 16, 22
277:2  280:11  319:12,
22  320:5, 6  325:7, 21
330:12  331:7  332:21
346:7  374:15, 24
375:10  376:3, 6, 8, 11,
16  393:9, 10  411:10
412:1, 17  413:8
419:19  420:18
421:10  423:23  431:7
437:21  438:3, 23
439:3, 17  441:1, 18
442:3, 23  443:17
444:5  445:9  446:19
447:9  457:14
**Greg's**  109:5  118:17
127:16  130:14
147:18  153:2, 5
155:6, 13, 14  255:13
258:1  339:8, 11
457:22  458:2
**grew**  391:19, 23
422:12
**gross**  129:23, 24
**grounds**  133:9, 12
252:6
**GROUP**  1:21
355:10  365:19  366:3
**groups**  355:17  369:5
**grow**  296:7
**guarantee**  72:5
**guaranteed**  71:7, 23
**guess**  5:18  48:3
55:24  103:12, 15, 18
106:11  121:21, 22
123:18  125:9, 17
185:8  202:3  219:9
229:23  247:20
251:21  259:22  264:3
268:21  274:5  288:18
291:10, 16  303:24
304:1  318:12  365:3
378:10  379:18  384:3,
4  404:7  443:16
**guessing**  103:20
274:6
**guidance**  121:9

**guilty**  72:4
**gut**  442:8, 12
**guy**  18:4  107:13
162:21  262:21
294:21  319:3  353:9
362:16, 18  390:13, 21
**guys**  13:18  16:23
17:3  29:14  41:17
44:21  46:9  50:5
58:22  70:17  86:9
91:8  96:6, 21  102:2
142:12  148:24
195:24  211:4, 8
221:6  239:23  252:23
267:21  280:17  284:2
298:17  299:5  303:18
307:9  319:11  346:12
358:13  389:23
390:17  454:19, 21
461:18  464:9  465:24
466:19  475:16

**< H >**
**ha**  234:18  388:22
**hacker**  431:15, 18, 19
432:13
**hair**  399:5
**half**  83:24  84:18
113:17  392:11
**half-assed**  342:2
**half-dressed**  231:18,
20
**hand**  264:11  389:4
455:20  483:21
**handed**  63:1  93:5
**handle**  328:9  364:1
436:6
**handled**  341:20
**hands**  96:2  220:18
**hang**  227:4  358:16
390:6
**hanging**  227:22
228:7
**happen**  36:14
141:17  144:1  164:10
226:15  326:9  370:19,
20  421:17  422:14
438:17
**happened**  7:4  12:7
39:10  41:6, 18  43:2

Deposition of Lisa Barbounis                                    Lisa Barbounis v. Middle Eastern Forum, et. al.

44:*3*  59:*3*  107:*23*
137:*15*  139:*10*  146:2
149:8  160:8  167:*17*
221:*15*  228:9  232:*16*
295:9  319:2  328:*24*
345:*24*  373:*21*  389:9
406:*16*  414:8  417:8
421:*21*  422:7, *11*
437:*10*  438:6  463:4
464:*17*

**happening**  14:*24*
130:*4*  140:8  150:*24*
161:22  235:*23*
236:*10*  237:*13*, *15*, *17*,
*18*  273:*23*  356:*10*
371:22, *23*  422:9
**happens**  30:*23*  72:9
101:*5*  240:6
**happily**  84:*14*  88:22
**happy**  286:*20*  287:8
289:*18*  391:*1*  412:6
413:*1*
**harass**  16:*5*  31:*17*
36:*6*, 9, *19*  45:*24*
130:2  162:7  214:7
229:*18*  265:*13*
301:*23*  304:*12*  428:9
434:9  444:*21*
**harassed**  17:8  18:22
**harassing**  15:*23*
76:*20*  129:*15*  323:*18*
**harassment**  21:*16*
22:*1*, 8  23:*4*, *19*  24:*4*,
7, *10*, *16*  135:2  140:8,
*10*  142:*23*  144:*12*, *17*
155:*21*  156:*4*  264:6
426:*1*
**harassments**  23:*14*
**hard**  7:*12*, *14*  47:9
78:*16*  126:*3*  139:*1*
152:*19*  249:*1*  321:*13*,
22  390:*16*  395:*5*
398:*18*, *19*  421:*19*, *21*
434:*18*, 22  435:*5*
467:*11*
**harder**  177:7  238:*10*
**hardest**  153:*19*
**harm**  31:2  36:*1*
37:*11*, *16*  38:*5*, 22

42:22  43:6  44:*15*
53:*12*, *17*  70:*13*, *17*
**harmful**  35:*18*
**Harry**  440:*23*  441:*3*
**hash**  359:8
**hate**  273:*21*  379:*14*
393:*1*  412:*12*
**hates**  222:*24*
**hazy**  194:*11*
**HDML**  285:9
**head**  150:*13*  151:*20*
163:*11*  259:*13*  312:9
387:9  436:*18*, 21
**header**  283:*4*
**head's**  458:*13*
**health**  113:*16*
**healthy**  409:*17*
**hear**  13:*19*  44:*4*
61:*5*  78:*16*  134:*4*, 22
138:8  149:*5*  252:*23*
293:*13*  301:*20*
316:*24*  322:*4*, 9
323:*5*  345:2  349:*17*
356:22  385:*15*  439:2
455:*21*  464:*1*  466:2
471:*5*, *14*  474:*1*
**heard**  12:22  36:*24*
42:*19*  90:*4*, 7  114:*16*
115:*4*  293:*20*  322:*13*
344:*21*  360:*4*  365:*21*
366:*5*  439:*1*  445:6
458:*24*  465:*24*  471:7,
*10*
**hearing**  12:*12*, *14*, *20*
65:*17*  73:*15*  86:*23*
87:*17*  465:*3*
**heart**  126:*13*  399:6
**hearts**  391:*17*
**heatedly**  298:*17*
**hectic**  10:22
**he'd**  307:*13*
**held**  53:*3*  350:22
369:*14*  412:*19*  413:6,
9
**hell**  241:7, 8, *10*, *15*
359:*5*  411:*19*
**Hello**  5:8
**help**  80:*17*  87:6
121:*15*  143:7, *11*
162:*15*  170:*10*  248:6

296:6  297:*23*  298:6
309:*10*, *19*, *24*  310:*3*,
9  325:*1*  348:*13*
351:*4*  352:*13*  395:*11*
401:*17*  407:*19*  415:6
417:*12*  418:*14*
419:*15*  433:2, 6, 7
456:*5*  457:7
**helped**  206:*13*  258:8
259:*10*  262:*5*  265:*23*
310:*14*, *19*, *23*  311:*1*
407:*17*
**helpful**  41:*13*  222:2
311:22  418:*3*
**helping**  122:*24*
123:*1*, 2  255:*19*
256:2  257:*13*, *14*
294:*19*  310:*21*
352:*12*  363:*18*
373:*17*  398:6  467:*4*,
8
**helpless**  423:*20*
**helps**  332:*11*
**hereunto**  483:*20*
**hey**  107:*14*  135:6
224:*4*  278:*4*, *12*
305:*11*  306:*20*
307:22  310:*1*, *15*
331:*13*  456:*4*  457:*21*
458:6, *13*
**hierarchy**  108:*19*
116:6  117:*13*, *17*
118:7, *12*, *18*  120:*16*
125:2
**higher**  121:*23*
124:*17*  196:*3*
**highlight**  71:*17*
**highlighted**  67:8
476:*20*
**highlighting**  67:*13*
312:*3*
**highly**  415:2
**hilarious**  221:7
**Hill**  256:*21*  258:*20*
398:*10*
**hinge**  226:*12*
**hire**  208:22  250:*19*
251:6  381:*20*  431:*15*
**hired**  85:*4*  123:6, 8,
*10*  173:*20*  175:22

176:*1*  208:*17*  209:*5*
250:*24*  282:*15*  383:*4*
431:*19*  432:*11*
433:22  476:*17*
**hiring**  383:*3*  431:*18*
**history**  76:*12*  201:*16*,
*17*  435:*24*
**hit**  83:*12*, *14*, *19*
252:*19*  452:*21*
**hits**  86:*1*, *3*
**hitting**  164:*11*
**Hold**  48:*16*  79:*23*
88:8  102:*18*  155:*24*
253:*16*  436:*17*, 21
**holding**  348:*4*
**hole**  241:7, *10*, *15*
**Holiday**  274:*20*
**hollow**  209:*11*
**home**  20:*24*  187:8, 9
234:*16*  323:2  373:*19*
399:2
**honest**  38:*15*  180:*3*
**honestly**  14:*16*  15:9
20:2  66:*5*  75:8  87:*5*
115:22  150:*4*  161:*20*
174:*3*  177:2  189:22
287:*21*  302:*5*  362:7
409:22  426:*18*
**hope**  51:*3*  241:8
278:*13*  379:*14*
**hoped**  421:8
**hopefully**  6:*17*  60:*4*
413:*12*
**horrific**  334:*17*
409:*21*
**horrified**  114:*10*
**hospital**  468:*24*
**host**  117:*24*
**hot**  281:*16*  306:9, *13*
308:8
**hotel**  213:*4*  217:*12*
218:*12*  225:*15*
226:*20*  227:*5*  228:*5*
403:2, 7
**hour**  57:*11*, *17*  59:*12*
289:*13*  392:*11*  451:*3*
**hourly**  123:*10*, *13*
**hours**  21:*20*  29:*14*
58:*10*, *13*  66:*4*
147:*13*  169:7  451:*1*,

2  459:22, 23  460:9,
22  461:1, 3  480:15
**House**  3:11  248:2, 4,
19, 23  249:11  251:17
252:6  253:6  317:21
318:7  320:22, 23
321:7  357:15  358:2
405:9
**hovering**  467:22
468:13
**How's**  253:17  278:4
398:13
**hub**  397:7
**huge**  112:4  115:2
172:1  422:3
**Huh**  298:24
**Huh-uh**  46:16
**Human**  120:8, 11, 13
130:1  165:5  407:3
454:10
**Hundred**  108:16
158:2  335:8  378:7
410:4  417:9  419:2
478:14
**hung**  216:14  218:12
304:4
**Hurry**  85:14
**hurt**  300:3, 6, 9, 16
371:18  389:8, 16
418:15  466:2
**hurting**  287:13
**hurts**  466:20
**husband**  21:10
356:5  389:19  401:19
407:13, 14  431:13
466:1
**husband's**  17:5
157:18  457:23
**hyperbole**  110:4
**hypothetical**  38:3
39:3, 8  43:1, 10  44:2,
11  45:3, 11  59:2
75:21  82:7  85:16
133:4  142:7  328:22
441:13
**Hypothetically**  43:7
85:10, 20  142:12


**< I >**

**iCloud**  91:7, 19, 24
92:12  93:2, 6  96:3, 5,
12, 14, 15, 20, 23
97:17  98:2, 16, 18, 19
99:9, 10, 21  100:8, 18
101:3, 6, 14  105:8
**idea**  14:17, 22  42:12
49:17  221:20  225:21
230:2  261:20  274:2
278:5  286:15, 22, 23
287:17  303:19  310:2
365:13  371:8  396:2
421:24  459:16
**ideas**  126:5
**identified**  16:2
**identifies**  425:1
**identify**  22:18, 20
182:4, 14, 20  183:3
184:1  248:1  250:14
271:9  272:2  360:7
361:24  394:22  395:2
**identifying**  272:7
**idle**  368:1
**ignored**  140:17, 23
141:1, 5
**Ill**  236:1
**illegal**  29:9
**IMG_4311.HEIC**
184:9
**immediate**  70:13, 16
**immediately**  295:14
342:7
**immersed**  284:11
**impeachment**  5:17
66:13, 16
**implement**  119:22
**implication**  226:2
**implied**  418:9, 11
**implying**  218:14
**importance**  197:11
284:1
**important**  68:19
183:2  196:13  327:18
328:12  411:15
**importantly**  56:22
**impossible**  139:4
**impression**  378:2
**improper**  33:12
57:20  98:11  111:2

113:6  260:2  265:16
304:14  424:10
**improvement**  173:13
**inappropriate**  132:10
164:12  232:8  260:2,
4  424:4, 16
**incident**  148:4
149:18  150:14
**incite**  329:22
**incitement**  368:9
**inciting**  372:20
**include**  29:24  42:20
212:17
**included**  70:8  86:4
310:20  345:24  346:2
**including**  46:18
100:18  109:19
204:14  266:1  435:16
**income**  322:22
**inconsequential**
229:14
**inconsistent**  200:10
**incorrect**  99:6
149:13  248:20, 21
254:11, 19, 20  280:5,
6  338:12  447:22
**increase**  203:9
**incredibly**  386:16
**INDEX**  3:2, 6
**indicate**  181:1, 13
**indicates**  36:17
**indication**  418:20
**individual**  368:11
**individuals**  361:22
**industry**  179:16
**ineffective**  420:22
**infallible**  259:19
**infection**  468:15
**inference**  228:16, 19
**influencing**  205:15
**Influential**  256:20
**info**  94:20  363:19
**inform**  109:22, 23
**informant**  339:23
**information**  79:18, 20
80:1, 24  83:7  85:4, 6
86:12  87:24  88:1, 3,
16  91:2, 13, 18  92:11,
18  93:19  94:7, 15
95:1, 18, 22  97:1, 9,

14, 16, 23  98:17  99:3
101:16  102:9  104:23
105:3, 9  106:1, 8, 16,
17  107:4, 10  108:14
135:17  140:17
149:13  181:1, 7, 12
252:2, 5  266:1  270:4
329:21  333:5  359:3
370:5, 8  379:23
395:4, 5  428:15
430:23  431:6  447:20
449:15  452:23
464:21  472:13, 14, 23,
24
**infuriated**  298:5
**In-house**  2:17
**initial**  427:15  429:4
**initials**  252:18
**injunction**  12:17
70:4  82:24
**inner**  354:9
**innocent**  72:3
**innocuous**  80:16
**input**  112:5  113:5,
11  115:10  250:10
393:17, 18  395:23
**inquire**  159:23
**insane**  294:3  299:11
300:24  340:9  409:3
459:4
**inside**  357:2, 5
**insignificant**  434:12
**insinuate**  163:21
**insinuates**  269:13
**insinuating**  72:11
268:22  269:2
**insistent**  209:10
**Instagram**  291:8, 11,
17  383:21
**instance**  134:11, 13
135:21  142:21
149:12
**instances**  22:8  24:16
148:5  164:8  180:19
**instant**  263:12
**institution**  406:10
**institutional**  398:9
**instruct**  57:7  89:5
90:20  103:8  105:10,

*12* 106:*20* 154:*17*
214:*13* 215:*20*
**instructed** 93:5
97:*10* 99:9, *21* 111:*4*
**instructing** 33:*14*
34:*13* 36:*4* 58:5
90:*18* 100:8 301:*16*
304:*10*
**instruction** 33:*13*
92:4 93:*14, 16, 18*
94:6, 9 104:5, *23*
122:9 304:*15*
**instructional** 157:*14*
**instructions** 6:*1*
10:*24* 348:*24*
**instructs** 11:9
**insubordinate** 158:*11*
**insulted** 300:*22*
**insulting** 444:*22, 23*
460:*15*
**insults** 301:2 321:*15*
**insurance** 113:*16*
**insurrection** 66:*8*
370:2 371:*21*
**insurrectionists**
372:*21*
**intake** 470:*3*
**integral** 257:*13*
**intended** 36:9
**intense** 357:2
**intent** 83:6 156:7
238:6
**intention** 135:*17*
145:*18*
**intentionally** 272:*1*
**intents** 109:*15, 17*
128:*18*
**interact** 16:*22* 17:2
121:6
**interaction** 111:*11*
158:*16, 23* 382:*19*
**interest** 243:*13*
246:7 396:*13, 19*
397:5
**interested** 111:*21*
238:*10* 242:5 243:*17*
281:*16* 285:*16*
390:*11* 397:7, 8
432:3

**interesting** 288:*14*
366:7
**interests** 322:*1*
**intern** 123:4 207:*20*
438:*11* 439:6, *19*
**internal** 395:*17*
396:4
**internally** 191:*23*
204:*24*
**international** 45:*12*
**internet** 30:*18* 79:7
**internship** 439:*10, 21*
**interpret** 238:22
**interpretation** 156:*12*
455:*15, 18*
**interrupt** 7:*17* 29:7
**interview** 189:*14, 23*
190:*1, 6, 14* 191:*12*
192:*15* 194:*1, 9, 13,*
*19* 195:*16* 196:*19*
261:*19, 21* 262:*23*
310:5 358:*19* 360:*17*
396:*9, 15, 24*
**interviewed** 207:*10*
267:7
**interviewing** 207:*23*
250:*4, 7* 310:6
404:*22*
**interviews** 189:7
190:*21* 192:*4, 19*
193:*14* 195:*1* 197:*20*
198:*11* 364:*1*
**intimate** 390:*3*
**introduce** 230:*12*
**introductory** 396:*15*
**intuition** 442:*14*
**inventing** 41:*18*
**invested** 157:*22*
161:*1*
**investigate** 344:*11, 16*
**investigating** 17:*13*
**investigation** 80:5
81:*12*
**investigator** 17:7, *12,*
*17, 23* 18:*21* 23:*16*
24:*11*
**invitation** 480:*12*
**invite** 359:*4*
**involve** 112:*15* 325:*3*

**involved** 30:*19*
66:*15* 127:*21* 129:*10*
187:*4* 297:*20* 299:*12*
351:*18* 371:*3*
**involvement** 190:*15*
346:*24* 347:3 350:2
**iPad** 90:*21* 91:6, 7,
*14* 92:*24* 93:*1, 6, 19*
94:*8, 16, 20* 95:5, *15,*
*19, 24* 96:*1* 97:*11*
98:*17* 99:*23* 100:*10*
**iPhone** 102:*14*
**irate** 422:*10*
**Ireland** 450:*6*
**irrelevant** 229:*16*
428:*11*
**irrepairable** 53:*17*
**irreparable** 53:*12*
**Islam** 186:*9*
**Islamism** 186:*9*
**isolated** 111:*9*
**Israel** 438:*9*
**issue** 133:8 136:*10,*
*21* 139:8 140:2, *13*
144:*3, 4* 164:*18, 22*
280:*4* 351:2 352:*17*
388:8 394:*14* 435:*12*
436:5
**issued** 12:*19* 46:*18*
51:*21* 55:8 69:*20*
171:9
**issues** 165:*24* 265:*22*
348:*23* 385:*21*
404:*16*
**issuing** 93:*13*
**Italy** 395:7
**its** 52:3 53:5 55:*11*
70:*23* 76:4 80:*23*
81:*24* 82:*23* 102:*16*
**Ivy** 285:*10*
**IW** 129:4 130:*10, 13,*
*19, 21* 131:*24* 139:*13,*
*14*

**< J >**
**Jack** 192:*23*
**jacket** 362:*13*
**jail** 377:*13*
**James** 390:5 401:*10,*
*11, 13*

**Jan** 319:*3, 16, 17, 24*
320:7 337:*12* 339:*10*
346:7
**Janice** 395:*13*
**January** 51:*22* 59:*14*
69:*20* 146:*13, 14, 15*
154:*15* 157:*4* 302:*18,*
*22* 355:*15* 356:*1*
367:*7*
**Jasmine** 291:*22*
292:*23* 294:*4, 10*
296:*22* 297:*14* 301:*4*
313:2 316:*13* 320:*9*
321:*15, 18* 322:*15, 17*
323:5 330:*21* 340:*12,*
*13, 14* 341:5 342:*5,*
*21* 343:*1, 3* 344:*16*
345:*4* 373:*10* 374:*19*
375:*9, 16* 464:*19, 23*
**Jasmine's** 322:*1*
**Jason** 2:*23*
**Jaz** 293:*18* 295:5
297:*9* 308:*23* 323:*17*
324:*21* 340:*20*
373:22 374:8, *22*
**jcavalier@cozen.com**
2:6
**jealous** 295:*6*
**Jerusalem** 187:*19, 21*
**Joanne** 468:*3*
**job** 15:2 28:*10*
71:*20* 104:6 122:*3*
126:9, *10* 131:*18*
133:7 139:*1, 3* 147:7,
*14* 152:*16, 18, 20*
155:2, *15* 156:*10*
165:*17* 174:*12* 175:2
176:*19* 188:*15* 191:7
198:24 206:*14*
207:*19* 209:*13, 14*
249:*13, 15* 250:*3, 6,*
*20* 251:*1, 2, 10* 263:9
266:7 277:*17* 285:*12*
297:*23* 302:*20, 23*
381:*16, 17* 382:*11*
393:5 396:7 398:*6,*
*23* 399:*7, 13, 16*
403:*14, 23* 406:*17*
408:8, *14, 24* 410:7,
*11* 411:*23, 24* 412:9

423:6  448:14  478:12
479:6
**jobs**  274:23  276:15
405:19  406:5, 6
408:1  410:4
**jog**  150:9
**John**  5:9  38:9
39:14  40:4  97:19
270:1  370:15
**joke**  280:24  291:2
307:18  308:5  390:6
**Jonathan**  2:4
**Journal**  254:22
255:11  256:21
258:14  259:11
260:17, 20  261:5, 15
264:7  266:9
**journalism**  378:19
**journalist**  370:17
**Joyce**  1:15  4:14
483:3, 15, 23
**Juan**  403:7
**Judge**  9:6, 16  12:15
33:16, 22  40:7, 9
42:6  51:21  52:1, 22
53:3  55:8  58:19
65:16  69:20  70:21
73:7, 13  74:5, 8, 18
76:22  77:3, 4, 13, 16,
17  78:5, 21  79:10, 17
80:4, 5, 21  81:21
82:16  86:22  87:14,
16  215:22  228:15, 18
231:8  424:8
**Judge's**  72:17  86:18
**Judy**  124:12
**July**  188:17
**jump**  374:2
**June**  183:12  188:17
255:20  319:4  320:24
321:1, 2  339:9
347:19  348:9  378:10
**Juneish**  378:10
**jury**  424:9  428:12
429:18, 21
**just-for-fun-type**
238:2  239:8
**Justice**  412:15, 16
421:8  424:23, 24

425:1  426:3  427:21
429:13, 15, 22
**justified**  43:21  50:6
**justify**  21:24

**< K >**
**Kasam**  193:17, 23
341:23
**Katrina**  124:4
282:23
**keep**  6:16  46:9
50:19, 23  57:2  61:13
62:14  68:12, 14, 21,
24  69:5, 11  78:15
81:15  91:11  93:20
143:8  149:3  152:20
168:10  197:13
216:11  237:22  263:2,
21  266:11  272:15
275:13  276:14  305:5
349:14  407:8  414:20
455:10  456:12, 19, 20
462:3  474:24
**Keepers**  365:20
**Kep**  106:24  315:19
**kept**  109:18  164:8
266:21
**Kevin**  107:13
**key**  395:3
**kicked**  321:8, 9
353:16
**kid**  126:14  309:18
310:19  392:4
**kidding**  235:22
**kidney**  389:3  468:15,
24
**kids**  15:2  21:11, 12
66:3  84:23  138:23
292:7  295:19  297:11
300:9, 16  320:13
321:18  348:21
373:23  391:23  392:3
393:4  394:8, 9
398:20  401:17
404:13, 20  405:2
449:24  453:8  468:18
469:4  478:9, 11
**kill**  297:9
**killed**  426:24

**killers**  388:21
**killing**  361:9  387:10
**Kim**  468:3
**Kimbel**  456:12
**kind**  19:13  108:23
109:4, 7, 21  116:15
122:22  124:11
138:16  159:18
161:13  179:16
246:12  269:21  307:1
371:4  382:21  388:4
395:9  452:20  459:6
467:3  469:19  473:11
**kinds**  14:24  223:16
226:7  309:24  353:23
355:22  379:22
382:14  410:21
451:19
**kiss**  293:5
**kissed**  390:3, 8
**knee**  95:2
**knew**  53:16  65:13,
14  66:10  100:4
114:8, 14  131:16
132:5  154:1, 5, 12
160:5  174:23  232:13,
14  242:23  243:24
246:6  276:19  292:5,
6, 22  295:15  320:5
344:24  375:7, 21
376:22  377:11
405:16  406:13
422:11  432:12  453:1,
3, 4
**knocks**  390:20
**know**  5:21  6:17  7:4
8:24  10:6, 9  14:14,
24  15:3, 6, 10, 21, 22
16:4, 23  17:1, 3  19:9,
17  20:18  21:1, 4, 7
25:16  26:23  27:2, 3,
5  28:15, 22  29:8
32:13  33:5, 6  37:1
41:11, 15  44:9  45:17
48:2, 7, 10  49:15
57:12  59:24  60:8, 18
61:8, 11, 17  62:10
63:4  64:11  67:2
68:2, 11  70:12  71:9,
24  72:4  73:9  76:8,

11, 14  77:4, 8, 10
78:9, 10  81:14  82:11,
14, 15, 17  84:19, 22
88:15  89:1  95:11
102:23  103:18
104:12, 13, 17  105:13,
20, 23  106:12  107:15
108:12  110:6, 9, 19
111:17, 19  112:1, 11,
13  113:9, 16  114:3, 4,
9, 11  115:13, 21
116:4  119:19  121:1,
9  122:11, 13  123:12
124:17  125:11, 12, 13,
24  127:5  129:15
132:19  134:1, 5, 7, 9
136:6  139:1  140:16,
23, 24  141:3, 14
143:12  146:9  148:17,
24  150:21  151:6, 13,
19  152:8, 19, 21, 22
153:1, 9, 16, 19
154:13, 22  155:5
156:14, 23  157:13
158:1, 8  159:16, 21
161:20, 21  162:3, 21
165:2  168:1  174:7
176:5, 22  179:20, 21,
23, 24  180:2, 6, 15, 16,
21, 22  181:5, 8, 10, 16
182:13, 17  183:1, 18
186:4, 15, 18, 21, 24
187:1, 2, 5, 16  188:8
189:17, 18  190:16
191:6, 11  192:7
193:20  196:1, 23
197:4, 5, 8  199:11
202:12, 18  204:24
206:17  208:6  209:22
211:17, 21  212:8
213:5, 15, 19  215:9
216:13, 18  218:11, 13,
15, 23  219:2, 4, 10, 11,
13  221:16, 17  222:6,
14  225:13, 16, 17, 20
226:14, 15  229:19, 22
232:9, 12, 14, 15, 17,
19, 21, 22, 24  233:2,
11  234:20  235:1, 12,
15  236:16, 20, 24

237:7, 9, 21  238:5, 6, 8, 23  239:12, 23 240:3, 11, 13, 15, 19, 20, 21, 24  241:4, 5 242:3, 11, 18, 23 243:4, 21, 22  244:1 245:4, 5  246:13 251:11, 12  254:19 255:8, 9  259:2 263:17, 19  265:9 272:4, 7, 14  273:22, 24  274:11  275:3, 10, 12, 19  276:6, 24 279:4  281:6  282:18, 21, 23  283:20  284:23 285:4  286:8, 12, 17, 19  287:5, 7, 8  288:4, 16  289:18, 23, 24 291:10, 16  292:10, 14, 18  293:5, 9  295:3, 21, 22, 23  296:1, 23 297:17, 21  298:19 299:9  302:18  303:2 304:7  306:12, 15 307:1, 4, 11  309:14, 23  310:1  311:12 312:8, 9  315:22 316:4, 9, 18  317:6 318:11, 12  319:9, 11, 15  320:12, 16, 17 322:15  324:7, 20 326:16  327:12  328:5, 6  332:22, 24  334:15 338:24  340:10, 17 341:1, 13, 15  342:10, 12, 14  343:2  344:4 345:7, 17, 19  346:2, 4, 8  347:5  348:7, 10, 21 349:13, 14, 15, 16, 20 350:8, 12  352:6, 9, 24 353:5, 13, 21  354:9, 13  355:18  357:11, 16 358:14, 17, 21  359:17, 18  360:14, 18  361:8 362:5, 9, 11, 18, 23 364:24  365:4, 17, 22, 23  366:2, 3, 17, 18 368:22, 24  369:12 370:6, 14  372:14, 19, 20  373:14  374:8, 11,

21, 23  375:4, 13, 19 376:20, 23  378:14, 15, 24  379:6  380:14, 16, 17  382:15, 18  387:20 389:11  391:13, 14, 18, 22  392:1  396:16 397:2, 3, 11, 15, 16 401:11  404:23 405:22  406:7, 8 408:24  410:1, 24 412:4  413:2  414:9 415:1, 10  419:24 420:6, 8  421:16 423:2, 3, 19  424:12, 21  426:17, 21  428:18 430:1, 3, 4  433:16 434:17  435:7  436:15 438:19  439:5  441:14, 23  442:2, 6, 13  445:9 446:5  448:13, 15, 18, 24  449:1  450:12, 14 452:3  453:18  455:12 456:15  457:15  458:2, 20  459:4  460:18, 21 462:17, 18  464:2 465:22  467:5  469:3 470:3  471:8  474:4 475:11  476:19
**knowing**  91:11 352:8  391:19
**knowledge**  63:13, 17 64:19, 24  65:1 112:20, 22  114:17 115:1  353:7  398:9 406:10
**known**  131:22 243:14, 16  244:6 248:22  369:4  453:5
**knows**  31:20  43:19 163:12  238:15  241:1, 5  242:4  243:7 394:20  434:13  453:9
**Kyle**  107:13

**< L >**
**LA**  462:23
**labeled**  353:18  354:3, 4

**Lack**  89:13  97:20 118:6  206:1  228:21 351:13
**lady**  261:19
**Lafave**  249:7
**laid**  108:24  109:1
**LANCASTER**  483:1
**language**  259:4
**laptop**  99:11
**largely**  383:11
**late**  461:14, 15
**latest**  14:8
**laugh**  303:15, 24
**laughed**  26:1
**laughing**  303:16
**launching**  266:12
**LAW**  1:21  15:20, 22 63:6
**Lawrence**  379:24
**laws**  44:1, 23  63:7 230:2
**lawsuit**  13:14  25:21, 24  26:4, 9  27:7, 22 28:22  31:21  32:6, 16, 22  34:19  35:2, 16, 24 36:11  37:3, 12, 16, 22, 24  38:15  44:11 45:13  51:14  62:1, 2 76:20  80:15  230:3, 18  264:22  279:11 412:14  415:18  416:4 421:12, 14  422:20 424:1, 22, 23  429:13
**lawsuits**  9:3  404:24 416:5  425:15  469:3
**lawyer**  5:10  25:8 65:16, 23  74:6 246:10, 20  303:22 451:8  464:9
**lawyers**  414:20 416:18
**layering**  156:11
**lead**  245:2  250:7 358:13
**leader**  141:7  359:2, 12  395:7
**leading**  353:12
**league**  285:10
**Leah**  437:8, 20 440:2  441:17  442:23

**learn**  126:4  160:1 176:23
**learned**  159:14 375:15  398:6
**learning**  153:18 175:2  394:10
**leave**  147:12  176:9, 11, 12, 14, 16  178:21 179:7  231:7
**leaving**  205:17  399:2
**Lee**  430:11, 14, 23 431:6
**leering**  132:9
**left**  92:6, 8  95:17 132:4  171:2  175:16, 23  178:17, 20  188:14, 19  189:4  276:17 284:7  293:8  319:20, 22, 23  320:2  321:9 334:14  345:11 353:22  354:19  359:7 360:10  362:12 373:22  376:18 392:11  406:13 409:20  417:14  433:7
**left-hand**  362:2, 3
**legal**  13:22  15:15 21:19  23:18, 19  24:2 29:22  30:7  43:14 44:18, 23  63:11, 14 69:24  71:2  75:4, 20 76:9  77:21  78:20 82:13  83:2  84:7 88:7  133:3, 22 144:15, 17  145:11, 12 148:10  149:22  152:4 180:12  209:20 211:16  212:7  246:17, 21  327:4  412:21 413:23  447:4  464:22
**legally**  230:21  351:1
**legislation**  285:5, 6
**legit**  370:11  389:15 409:22  468:23
**legitimate**  167:14, 16 177:11  233:23
**legitimately**  210:1
**Leigh**  2:22
**lent**  306:6  311:2

Case 2:19-cv-05030-JDW   Document 110-2   Filed 03/02/21   Page 150 of 193

Deposition of Lisa Barbounis                                   Lisa Barbounis v. Middle Eastern Forum, et. al.

**lesson** 159:*14* 160:*1*
**letter** 254:7
**letters** 83:*20* 252:*4*
**letting** 19:9 57:*12*
59:*24* 374:*11* 435:7
**level** 109:7 117:*12*
123:*16, 24* 124:*1*
125:4 150:*14* 368:8
**levied** 420:*15*
**Levy** 25:*15* 26:*4*
27:6, *10, 21* 429:9
456:*10*
**LexusNexus** 457:*24*
**liar** 259:*17, 21*
264:*14* 334:*16*
**Liberty** 2:*4*
**license** 211:*20*
406:*19, 22* 407:*11*
**lie** 145:*19* 417:*14*
466:*14*
**lied** 145:*16* 146:*17*
206:*24*
**lies** 322:*18* 466:*3*
**life** 7:*12* 29:2 31:*3*
60:5 83:*24* 84:*18*
95:*3* 151:*1* 177:*4*
221:*4* 225:*24* 226:*4,*
*16* 239:*24* 285:5
288:*16* 295:*19*
299:*15, 23* 304:*19*
390:*16, 20* 391:*1, 22*
398:*12, 16* 404:*24*
411:*18* 477:*18, 19*
478:5
**life's** 404:*4*
**lifestyle** 66:*3*
**light** 79:22, *24*
229:*15* 283:*24*
331:*10* 422:*15*
**lighter** 362:7
**liked** 179:*14* 208:*1*
288:*1* 289:9, *14, 15*
290:*19* 394:*4* 449:*18*
**likelihood** 52:2 53:5
55:*10, 12* 70:*23* 71:*7,*
*23* 72:*19* 80:*23* 81:*9,*
*23*
**likes** 111:*19*
**limit** 350:9

**limited** 73:*16, 21*
74:6 435:*16*
**line** 48:*23* 194:*21*
206:*18* 250:*15, 16*
351:2 367:*19* 372:*18*
425:*23* 477:*24*
478:*13* 481:*16*
**lines** 125:*4* 156:*20*
**link** 26:6 274:*17*
459:2
**Lis** 310:*1* 409:*12*
458:*18*
**LISA** 1:*5, 13* 4:6, 7,
*20* 17:7 18:*21* 31:*15,*
*23* 38:*10* 41:4 44:*4*
47:*1* 52:*10* 54:*21*
55:*13* 60:*11* 72:*23*
74:*23* 88:*12* 99:*14*
100:*14* 103:*14* 105:*4*
128:*24* 129:*3, 4*
138:9 140:*16* 141:7
156:*24* 211:*18*
216:*22* 218:*17* 219:9
220:7, *12* 229:*4*
265:6 268:9 270:*3*
309:*20* 329:*10, 16*
343:*12* 414:*11*
427:*13* 429:2 431:*17*
441:*12* 446:*24*
457:*22* 483:*4*
**Lisa's** 131:*17*
**list** 78:*1* 79:*3, 6*
80:2 114:*19* 118:2
149:*1* 256:*23* 257:*1,*
*4, 8* 332:*10*
**listed** 119:*11* 199:2
**listen** 37:7 72:9
134:*3* 151:2 218:*17*
253:2 275:*18* 397:*19*
413:*1* 421:*18, 20*
**listing** 206:*11*
**lists** 77:*18*
**literal** 236:*4*
**literally** 263:6 270:7
346:*13* 415:*23*
418:*24*
**litigation** 88:8
433:*17* 455:*16*
**Litman** 117:*19*

**little** 8:22 11:*23*
15:*1* 66:*3, 21* 78:*14*
119:5 121:*16* 125:6
168:5 170:*10* 176:2,
*3* 184:*18* 233:*3*
253:*19* 273:9 280:9
281:*14* 283:*14*
294:*21* 299:7 303:*1*
305:*13* 338:*18*
346:*23* 347:*1* 369:*17*
372:8 391:*24* 392:*3,*
*20* 394:*10, 11* 422:8
450:2 470:*12* 475:*4,*
*7* 477:*19* 478:5
**live** 41:*10, 19* 147:*12*
267:*21* 275:*18*
295:*16* 321:*13, 21*
390:*17* 405:*13* 450:*1*
478:7, 8, *10*
**lived** 391:9, *22*
**Lives** 366:*11* 370:*23*
**living** 19:*14* 295:*17*
320:*10, 14, 18* 396:*20*
411:*19*
**loathed** 350:5
**lobbing** 301:2
**lobby** 127:*12*
**locally** 98:*18* 101:*19*
102:9, *15*
**location** 295:*14*
**lodged** 147:*23*
**lofty** 377:9
**log** 93:2, *6* 101:*5, 6,*
*13* 107:*4, 19*
**logged** 91:5, *6*
**log-in** 97:*1* 98:*1*
108:*10*
**log-ins** 96:*21*
**LOL** 305:*4*
**London** 288:*22*
289:8, *11, 22* 290:*17*
295:*17* 393:2, *8, 13*
394:*13, 17* 396:*12*
397:*1*
**long** 19:*12* 42:*19*
50:*1* 56:2 59:9
64:*10, 13* 67:*14* 68:*6,*
*8, 9* 72:*15* 102:22
138:*18* 166:*20* 172:*1*
174:7 177:*23* 178:2

179:*24* 180:*4* 185:*24*
186:7 233:*15* 283:22
303:*24* 337:*15*
360:*24* 373:*13*
379:*22* 381:22
397:*22* 402:9 438:*19*
439:*15* 448:*20*
467:*10* 475:*19*
**longer** 384:*4* 408:*24*
439:*18*
**long-term** 467:*6, 12,*
*14* 470:*20*
**long-time** 384:*1*
449:*13*
**long-winded** 262:*13*
**look** 46:*4* 90:*6*
121:22 129:*23*
135:*18* 154:*21* 163:7
197:*23* 200:*10*
219:*14, 15* 221:24
222:6 249:22 254:*10*
271:*12* 272:22 274:*3*
289:*4* 324:*4, 9, 11, 16*
328:8 331:*24* 337:*3,*
*9, 11, 17* 362:6, *20*
363:*18* 379:*23*
384:*16* 404:8 413:7
415:9 455:*23* 459:*16*
**looked** 227:*11* 311:6
356:5 385:*24* 387:*18*
**looking** 159:*17*
184:5 215:9 223:*10*
250:*13* 259:*20* 263:8
296:*16* 302:*17, 19, 23*
312:*21* 316:*4* 329:7
363:*18* 378:*17*
**looks** 217:*20* 248:2,
*4* 283:5 285:*21*
287:*23* 288:9, *10*
291:7, 9, *16* 294:24
303:*10* 305:*14*
360:*12* 362:7, *15*
**loose** 435:*13*
**loosely** 365:*21*
**loser** 339:*20*
**lost** 342:*1*
**lot** 12:8 57:*23*
109:*19* 111:*14*
197:*15* 223:*16*
233:*10* 287:*23* 289:8,

*10* 300:*11* 308:*15*
351:*20* 355:*17* 367:*5*
371:*9, 19* 372:*7*
380:2, *5* 382:6
387:*17* 389:*18*
390:*16* 395:4 398:*20*
401:*24* 402:*1* 406:*5*
441:*24* 448:*9* 462:*12*
**lots** 114:*24* 293:*19*
314:*16, 20* 316:*19*
322:*16*
**loud** 303:*24*
**love** 42:7, *8* 152:*11*
236:*20* 269:*19*
326:*19* 390:*4, 23*
398:*24* 399:7, *9, 11*
403:*23* 408:*15* 410:7
412:*9* 456:*5* 468:*1, 3*
473:*16* 474:22
**love/hate** 64:*17*
**loved** 138:*21* 325:7
408:*19*
**lovely** 404:*23*
**lowest** 123:*16, 24*
**loyalty** 212:*4, 8, 11*
**lthe** 480:*11*
**ludicrous** 270:*10*
**lunch** 233:*23, 24*
234:*3*
**lying** 141:*17* 145:*23*
152:*20* 169:*18, 23*

**< M >**
**Ma'am** 398:*5* 480:*18*
**machine** 99:*3*
**mad** 307:*13* 316:*13*
**magically** 63:*3*
**mail** 334:*3* 462:*14*,
*21*
**main** 397:*7*
**Mainen** 2:*16*
**maintain** 216:*6*
268:2 363:*12*
**maintained** 213:*10,*
*16* 216:*20* 267:*13*
268:*4*
**major** 59:*11* 112:*4*
115:*1, 7*
**maker** 162:*22*

**making** 12:*20* 38:*21*
40:*19* 41:*3* 82:*19*
106:7 110:*23* 111:*24*
112:*1, 14, 19* 113:*4,*
*10* 127:*15* 132:*8*
135:*18* 196:*12*
205:*15* 283:*11*
308:*20* 318:*16* 325:6
327:*16* 330:6 411:*18*
467:*19*
**man** 231:*18* 233:*14*
448:7 449:*9*
**manage** 363:*4, 8*
381:7 382:*24* 383:*17*
469:*24*
**managed** 363:*6, 20*
**management** 467:*16*
**manager** 141:*10*
**managing** 382:*11, 16,*
*17, 18*
**mandated** 127:*4*
**Mandeles** 456:*8*
457:*1*
**manipulated** 351:*21*
**manipulator** 162:*22*
**manufacture** 315:*15*
**manufactured** 329:*8*
330:*11, 13* 332:*4*
**manufacturing**
330:*17*
**marble** 127:*11*
**March** 146:*16*
312:*17* 320:*18* 323:*4*
333:6 341:7 342:*4*
347:*5* 400:*22, 23*
449:*20*
**marched** 372:*1*
**Mario** 262:*22*
**Mark** 2:*17* 117:*18*
171:*21* 184:*10*
256:*10, 12* 258:*23*
292:*16* 360:2 361:*15*
432:2, *22*
**marked** 182:7, *8*
184:*9, 13* 247:*19, 21*
271:6 311:*14* 360:*5*
361:*12*
**Market** 1:*22* 2:*5, 12*
406:*18* 407:*12*

**Marnie** 63:*16* 64:2,
*6, 16* 90:*24* 108:*24*
109:*1, 3, 10* 117:*18*
120:6, *23* 121:*1*
122:*23* 124:*19*
164:*23* 165:*4* 167:*13*
168:*12* 206:*5* 224:*10*
280:*12, 14* 320:6
411:5, *9* 415:6
416:*24*
**married** 107:*24*
**master** 162:*22*
**Master's** 179:*18*
**match** 70:7
**math** 461:*5*
**Matt** 109:*10* 159:*13*
205:*17* 280:*10* 431:7
**matter** 4:7 8:*18*
30:22 57:*18, 21*
62:*18* 76:*18* 79:*11*
164:22 167:*24*
183:*18* 195:*15*
196:*18* 263:*12*
289:*17* 321:*14* 327:*9*
343:6 370:*23* 403:*15,*
*18* 405:*1* 412:*12*
434:*13* 465:*23* 474:*5*
**matters** 57:*23*
291:*19* 351:*5* 366:*11*
**Matthew** 2:*16* 63:24
117:*18*
**Max** 469:*16*
**McDonald** 455:*8*
**McDonald's** 116:*1*
**McGuiness** 353:*9*
**McMichael** 207:*11*
208:*15*
**McNulty** 89:6 90:*19,*
*21* 93:*13* 94:6, *11, 14*
97:*10* 99:*10, 22*
100:9 103:9 104:*5, 9,*
*14, 20* 105:*14* 271:*11*
272:8, *12, 19, 21*
286:3, *4, 7* 290:*23*
294:*13* 302:*13, 19*
304:*21* 386:*1*
**M-E** 83:*20*
**Meal** 276:*23*
**mean** 7:*4* 12:*3*
15:24 16:*16* 23:*16,*

*21* 26:*19, 20* 29:*1, 6,*
*12* 31:6 41:*16* 46:6
48:2 49:*15* 50:*4, 17*
60:8 61:7 65:*14*
72:*16* 73:2 74:*12*
75:*10* 81:*13* 83:*21*
94:*19* 95:*4* 97:*18*
103:*11* 105:*12*
108:*10* 111:*13*
112:*24* 114:6 115:*12*
117:*23* 118:2 121:*19*
124:2 126:*23* 127:*20,*
*23* 128:*18, 23* 132:*24*
136:*1* 138:*17* 148:*15*
149:7 152:8 153:*11*
154:*14* 160:*11*
168:*15* 171:*8* 173:2
174:*21* 177:*17* 178:*1,*
*3* 179:9 182:*17*
185:*10* 193:2 208:8
217:22 223:*12* 226:6,
*18* 227:*14* 233:7
235:8 236:*13, 15, 19*
237:*20* 238:7 244:*20*
247:*9* 250:*11* 251:22
257:*17* 259:6 261:*17,*
*20* 267:22 271:*18*
275:*1* 277:*14* 285:*10*
289:*10* 290:*18* 293:*3,*
*23* 295:*4* 296:8
297:*13* 298:*16*
299:*16, 17* 305:*5*
306:*11* 308:*10*
309:*14* 310:*18*
318:22 321:*11* 323:*4*
324:*5, 22* 325:*13*
333:*20, 24* 336:*5*
337:*5* 348:*10, 17*
349:*4, 5* 352:*3, 6*
353:2 354:*9* 355:*12*
358:*1* 365:*16, 21*
370:22 372:*24*
376:*14* 379:*9* 380:*11*
381:*17* 385:*9, 12*
389:*16* 391:*11* 395:*6,*
*14, 24* 402:*19* 406:*7*
407:*19* 410:*13*
419:*23* 425:*13*
431:22 436:*10* 451:*9*
454:*21* 455:2, *6*

456:*12*  465:*4*  474:*6*
478:*2*
**Meaning**  197:*24*
388:*3*
**means**  69:*22*  156:*14*
222:*15*  278:*6*  282:*5*
286:*22*  299:*22*
306:*12, 13*  352:*7*
358:*10*  412:*3*  450:*17*
483:*17*
**meant**  234:*20*  235:*2,
3*  237:*7, 21*  239:*3*
240:*21*  306:*15*
375:*14*  389:*23*  421:*9*
467:*17*
**mechanism**  87:*24*
**Meckenberg**  71:*14*
79:*19*  80:*3*
**Meckleberg**  369:*18,
21*  372:*23*  395:*21*
**med**  467:*16*
**media**  267:*8*  351:*21*
363:*9, 11, 21*  381:*8,
10*  382:*12, 13*  383:*1,
12*  464:*11*
**medical**  477:*7*
478:*22*  481:*11*
**medication**  11:*18*
470:*8*
**medicine**  470:*14, 16*
**meds**  389:*10*  470:*21*
**meet**  24:*24*  62:*21*
159:*18*  405:*7*  414:*12*
**meeting**  61:*12, 16*
62:*16*  63:*5*  164:*16*
167:*3*  274:*6, 8, 13*
275:*15*  276:*3*  416:*3*
470:*23*
**meetings**  260:*23*
**MEF**  1:*8*  4:*7*  25:*6*
64:*23*  70:*16*  71:*15,
18*  72:*5*  82:*5*  83:*8,
22*  84:*5, 14*  86:*5, 15,
24*  88:*16*  89:*6*  90:*21*
91:*6, 24*  92:*11*  94:*7,
8*  95:*19, 24*  96:*5, 13*
99:*10, 23*  100:*9*
103:*10*  104:*22, 23*
108:*20*  112:*4*  117:*17*
152:*18*  162:*21*  174:*5*

175:*3*  176:*19*  181:*9*
187:*22*  188:*7, 9, 23*
190:*1, 6, 8*  191:*3, 10*
192:*10, 22*  193:*4, 5,
15*  194:*2*  196:*20*
197:*4, 20*  198:*12*
199:*3*  215:*7*  233:*8,
13*  241:*12*  268:*4, 21*
272:*21*  316:*17*  317:*6,
24*  318:*2, 5*  323:*13,
16*  327:*12*  328:*20*
333:*8*  345:*13*  374:*20*
375:*22*  393:*15*
394:*12, 17*  395:*12, 17,
21*  399:*13*  405:*14, 16,
23*  406:*1*  408:*21*
411:*4*  432:*15, 20*
439:*19*  447:*18*
448:*22*  453:*9*  478:*6*
479:*4*
**MEF's**  59:*1*  85:*5*
**member**  270:*9*
**members**  248:*24*
267:*13, 16*  367:*3, 4*
381:*22*
**memory**  102:*16*
150:*10*
**men**  233:*7*
**mended**  331:*9*
379:*21*
**mental**  215:*8*  410:*20*
**mentality**  371:*5*
372:*16*
**mentally**  410:*2*
**mention**  266:*16*
**mentioned**  13:*5*
23:*14*  193:*14*  287:*1*
298:*14*  380:*8*  461:*3*
**mentioning**  288:*11*
**merits**  52:*3, 23*  53:*5*
72:*12*
**mess**  126:*1*
**message**  3:*9, 12*
182:*16, 18*  183:*8, 19*
185:*4*  189:*3*  212:*22*
220:*2*  229:*1*  234:*13*
242:*12, 14*  271:*8, 10*
272:*8*  278:*3, 12*
281:*5*  291:*21*  294:*11*
305:*10*  323:*5*  336:*16*

337:*2*  342:*11*  384:*20*
463:*15, 17*
**messaged**  299:*1*
339:*3*  463:*12*
**messages**  3:*13*
100:*19*  194:*14, 18, 24*
220:*7, 10*  222:*5*
223:*23*  244:*4*  246:*2*
280:*21, 23*  298:*20*
312:*20*  313:*14*
314:*12, 16, 20*  315:*1,
5, 13*  316:*4, 8*  319:*9*
327:*11*  334:*20*  336:*9*
349:*14*  385:*5*
**messaging**  300:*22*
381:*10*
**messy**  323:*12*
**met**  320:*14*  359:*18*
364:*8, 10, 12, 17, 21*
366:*21*  376:*22*  377:*3*
379:*5*  391:*13*  415:*17*
449:*1*  452:*7, 8, 11, 15,
16*
**Meyer**  63:*16*  64:*2, 7*
90:*24*  117:*18*  120:*6*
280:*14*  411:*5, 9*
**Meyers**  117:*22*
**Middle**  2:*17*  5:*11*
9:*7*  10:*3*  12:*16*  13:*2*
15:*11*  16:*2*  17:*14*
22:*1, 9*  23:*5, 13*
24:*16*  25:*10*  27:*7, 21*
55:*9*  67:*16*  70:*22*
74:*20*  75:*16*  76:*3*
77:*18*  80:*17*  81:*22*
82:*18*  86:*20*  87:*6*
88:*2*  104:*10, 15*
116:*9*  118:*8, 13*
120:*21*  123:*17*
124:*13*  125:*3*  147:*4*
168:*20*  171:*7, 10*
172:*5*  176:*7*  179:*19*
180:*8*  181:*19*  185:*12,
15, 18*  186:*2, 8, 15, 16,
22*  187:*7, 12*  188:*2*
190:*23*  191:*15, 21*
192:*1, 5, 17, 21*
203:*19*  206:*4, 13*
208:*13*  209:*11*  210:*2,
9*  211:*14, 23*  212:*5,

14*  214:*22*  235:*9*
243:*11*  257:*14*
260:*21*  261:*16*  267:*9*
269:*4, 13*  270:*2, 21,
24*  276:*17*  285:*13*
329:*4*  332:*16*  333:*6*
338:*6, 20*  342:*6*
350:*20*  351:*16, 17*
352:*12*  362:*6, 12, 19*
376:*18*  378:*22*
399:*17, 19*  406:*13*
408:*13, 16*  409:*21*
410:*10*  411:*18, 21*
413:*9*  415:*18*  416:*4,
5*  418:*3, 15*  423:*7, 16*
432:*23*  433:*5, 8*
451:*21*  456:*2*  477:*1,
20*  478:*18*  481:*5*
**middleman**  121:*14*
**midnight**  291:*2*
**miffed**  233:*4*
**Mike**  246:*9, 10, 13*
**million**  81:*7*  375:*24*
426:*16, 20*  427:*5, 12*
469:*2*
**mind**  57:*2*  60:*22*
115:*14, 20*  154:*23*
161:*10*  170:*1*  301:*2*
317:*9*  318:*24*  337:*20*
372:*15*
**Mindula**  467:*16*
**mine**  18:*8*  62:*13*
246:*21*  281:*3*  451:*15*
**minute**  39:*15*  46:*21*
47:*2*  67:*24*  163:*6*
222:*3*  254:*18*  333:*23*
356:*4*  394:*5*  397:*21*
461:*24*  474:*9*  476:*7*
**minutes**  42:*10*  46:*7*
50:*12*  144:*5*  151:*6*
170:*15*  266:*6, 11*
372:*3*  434:*20*  435:*3,
10*  436:*8*  445:*14*
451:*12*  460:*17*  461:*1,
4, 7, 8, 17*
**misappropriated**  9:*9*
28:*18*  340:*6*  462:*18*
464:*3*
**misappropriation**

Case 2:19-cv-05030-JDW   Document 110-2   Filed 03/02/21   Page 153 of 193

Deposition of Lisa Barbounis                                    Lisa Barbounis v. Middle Eastern Forum, et. al.

52:4
**misbehavior** 413:10
**Mischaracterization** 167:8 416:10
**mischaracterize** 97:5
**mischaracterized** 137:3, 16 139:12
**mischaracterizing** 140:6 142:1, 3 160:17 166:6 204:20
**mislead** 312:23
**misleading** 202:19 203:14 329:20
**misreading** 113:1
**missed** 234:16 390:4
**missing** 314:17, 20 318:4, 20
**mission** 138:21 175:3 179:14, 16
**mission-oriented** 138:22
**missions** 353:3
**misstating** 134:16 136:24
**mistaken** 227:2
**mistakes** 126:12
**misunderstanding** 30:4
**mob** 371:5 372:15
**Mohammed** 396:10, 20
**Molly** 10:17
**mom** 293:8 454:15 468:24
**moment** 68:23 96:8 473:9
**mom's** 342:12
**Monday** 273:19 305:17
**Monday.com** 255:17 260:11, 13
**Monetarily** 412:18 413:2
**monetary** 425:2
**money** 28:19 109:20 305:6, 18 306:6 310:21, 23 311:1, 2, 3, 10 316:17 317:6, 21 318:2, 5, 11 320:6 323:21 325:17

326:17, 22 327:13 333:6 338:11, 20 339:4, 16 340:6 341:11, 15, 22 342:16 345:16 346:6 382:1 403:17, 20, 24 407:1, 2, 10, 22 423:10 425:7, 9 426:2 427:20 429:15, 17 447:19
**Money's** 398:21
**monies** 378:4
**month** 87:10 382:3, 5 403:17, 19 405:7, 8, 11 449:19 469:10
**months** 5:19 107:23 108:8 129:8 131:7 132:3 159:7 188:18 189:4 208:1 289:14 293:11 373:12 382:6, 7 408:5 409:7 434:5
**mooning** 277:12
**moral** 212:2 318:17
**morning** 5:6 273:19 304:2 399:5 451:1
**mother** 29:1 32:10 35:5 318:10 342:16 373:18, 20
**mother-in-law** 401:19
**motion** 12:16 53:11 54:13, 14 67:16 436:6
**motivation** 405:24
**motives** 132:20 180:16 368:22
**mouth** 13:6 122:18
**move** 39:21 40:14 60:6 229:20 240:17 312:19 313:19 314:4 409:23 449:17, 19, 20, 21, 23, 24 450:5, 8 467:20 475:12
**moved** 177:8 318:6, 7 320:21, 23 321:7 405:3
**movement** 440:22
**Moving** 277:22 455:11
**multiple** 16:3 17:10 45:15 107:11 112:5,

19 147:3 148:1, 21 150:5 235:10 246:24 331:8 332:24 333:1 370:15 404:1 417:18 454:5
**Murville** 437:8 440:2 441:17 442:23
**mutual** 21:6 322:2 414:14, 19
**Myers** 124:19

**< N >**
**name** 4:11 5:9 10:18 24:15 30:13, 16 101:14 107:14 117:21 184:9 191:18 199:6, 15 255:13 261:20 271:19 272:13 356:14 359:5 364:8 365:20 366:4 376:24 380:17 397:10, 12
**named** 38:1 115:3 118:5 303:12 353:9 376:20
**names** 18:3 117:15 123:22 257:1 364:20
**Nancy** 356:14
**narcotics** 388:22
**narrow** 259:6
**National** 171:22, 23 194:7 226:23 227:12
**natural** 50:9 337:18
**nature** 243:19
**NDA** 278:15 279:2, 17 280:3, 18 282:6, 11, 14, 17 283:7, 11, 12
**near** 138:23 404:13 408:21
**neat** 125:3
**necessarily** 178:1 348:11
**necessary** 65:19
**neck** 387:9
**need** 6:4, 12, 14, 19 22:19 28:9 39:24 48:9 50:14 56:3, 18, 20, 22 58:8 66:20 84:16 90:2 102:3

108:18 127:19 129:3 133:11 141:13, 14 153:9 177:1 183:21 198:14 222:7 253:18 260:7 279:5, 15 298:4 302:12 304:15 305:12, 13, 16 315:5, 8, 9 318:19 346:13, 17 349:10 451:10 456:4 457:13 468:22 476:3 479:4
**needed** 80:6 92:19 121:11 154:16 177:3 238:1 309:19 310:17 348:12 405:2 461:5
**needing** 468:21
**needs** 64:22 73:18 81:11 191:9
**nefarious** 12:10 80:18 82:18
**negated** 343:20
**Negative** 79:21 115:19 152:22 158:13 342:22 421:23, 24
**neglect** 425:11
**negotiations** 428:14
**Neil** 278:3 281:10
**Neither** 59:15 230:23 457:19
**nervous** 288:5
**Network** 189:10
**networking** 438:8
**never** 12:7 28:18, 20 29:1, 9 39:10 41:18 43:2 44:3 49:16 50:17 59:2 61:8 65:18 79:2 82:17 90:7 105:23 106:15 122:13 131:3 132:4 133:8 136:7 141:1, 18, 19 148:3 160:18 163:23 165:9 172:13 176:9, 10, 13, 16 177:4 190:22 195:11 211:10, 13 221:4 229:14 236:17 249:3 262:7 282:14 286:16 288:24 299:3 306:6 310:10 324:13

328:24  338:13
359:18, 22  363:6, 14,
20  364:8  372:9, 12
374:16  375:9  390:2,
3, 8, 11  392:6, 8
407:21  415:11
417:14  422:7  424:14
428:12  432:17  434:6
438:14  439:2  442:10,
11  445:3, 6  463:22,
24  464:1, 10  474:17
**nevertheless** 204:16
251:13  319:6
**new** 32:11  101:15
114:6  139:1  158:3
164:13  169:17, 18
177:3  279:6, 19
282:11, 14  288:17, 20
289:18  304:5  311:16
316:14  318:6  320:22
403:5  467:4, 8  468:7
**news** 5:14  189:10
261:18, 20  262:5
298:8  349:18  366:19
368:19  448:23
**newsletters** 130:11
**Newsmax** 364:14
401:13, 14
**nice** 61:21  67:14
371:17  449:9
**night** 304:4  364:16,
19, 22  383:14
**nightmare** 412:1
**nights** 364:13
**nine** 257:20  451:1, 2
459:23  460:9
**nod** 325:24
**nominal** 381:24
382:2
**non-attorneys** 35:2
**nonsense** 40:1  340:9
415:3  479:7
**non-stop** 134:8
343:11, 17
**Nope** 62:18  185:17
403:12
**normal** 141:10
142:9  152:13  165:22
167:4  169:4, 6
203:23

**normally** 226:1
443:16
**Notary** 1:18  483:4,
24
**note** 214:16  229:24
254:11  272:10
315:12  387:12, 19
**noted** 4:17  90:12
**notepad** 89:6
**nother** 398:21
**Nothing's** 254:20
297:4
**notified** 195:10
**notify** 49:3
**notion** 394:16
**November** 5:20  6:21
8:18  9:24  126:19, 20
134:12  143:2, 5, 19
146:6  147:24  148:7
149:19  164:17  165:9
167:3, 18  168:19, 23
169:24  171:4  175:19
273:9  274:12  275:15
276:3  278:2  285:18
295:24  296:14
420:15
**Number** 4:10  46:19
71:7, 8  182:21
184:12  227:9, 10
256:17  260:10  271:5
312:7, 12  313:1, 2
359:16, 24  385:1, 3
395:8  452:17, 18
481:16
**numbers** 256:11
259:20  312:9  313:6,
11, 17, 22  319:17
427:17
**numerous** 20:8
85:24  108:11  114:13
297:8  345:10
**nuts** 343:7

**< O >**
**oath** 242:22  365:20
443:14
**object** 13:21  16:17
23:17  26:17  28:5
32:17  42:24  44:16
49:8  52:6, 14  53:7

73:11  74:22  75:6, 19,
22  77:22  78:21  82:7
83:3  84:7  85:8, 15
88:5, 6  89:14, 21
92:14, 15  93:23  97:6,
12  99:24  100:1
105:1  106:19  115:11
132:18  133:3, 20
134:14  136:3, 22
142:6  144:13  150:17
160:16, 20  163:8
166:3  167:7  170:2
195:6  196:11  203:1
206:16, 20, 21  209:16,
19  210:3  213:12
214:5  216:10  217:14
228:11  229:8, 9
232:20  234:23  238:4
239:10  245:12  290:9
322:5  328:22  333:11
410:14, 15  413:22
416:7  417:4  420:10
424:3  426:4  427:7
429:16  430:17
444:14, 19  445:21
447:1  477:8  481:9
**objected** 55:17  99:13
**objecting** 78:16
301:21
**objection** 11:7, 8, 11
13:15  15:14  17:24
18:15  19:1, 24  21:18
24:19, 20  26:17  27:8
28:5, 16  29:21  31:10,
11  32:7, 17, 23  33:10
34:20  35:12, 19  36:3
37:18, 19  38:24  39:1
41:1  43:3, 13  44:20
45:22  46:20  52:11
58:3  65:21  67:15
69:23  71:1  72:20
73:10  74:1  76:6, 24
77:20  78:7, 13, 19
80:11  81:2  82:4
83:1  84:6  85:13
89:7, 10, 12, 16, 18
90:1, 8, 12, 22  93:15,
20  98:12, 20  100:11
106:10  133:5, 15
136:12  139:22  140:4,

20  141:23  145:10
146:19, 24  148:9
149:21  150:16  152:2
155:16  156:15  159:4
161:16  162:13
165:11  166:3  170:2
180:11  193:7  199:7,
17  200:6  201:24
202:24  204:17
210:18  211:15  212:6
214:1, 6, 16  215:2
229:10  232:1  236:6
237:5  238:3  239:1,
18  241:21  243:2
245:18  252:15
257:19  258:15  265:2,
17  277:5  301:3, 11
302:3, 8  325:12
327:6  331:1  333:9
335:18  336:17
338:13  339:6, 17
341:12  342:24  344:6,
12, 18  385:22  411:6
412:20, 21  417:4, 24
418:23  419:10  420:9
421:1  422:22  424:2
429:9, 23  430:8
439:20  440:8, 19
441:19  442:17, 24
443:23  444:6  445:20
446:2, 14  447:1
457:8  471:4, 15
472:16  474:3  477:3,
4, 6  478:20
**objectionable** 269:7
270:11
**objections** 11:5
40:10, 11, 20  55:15
56:19  57:4, 14, 20
59:10  60:2  90:10
214:15  253:3  262:13
266:13
**objectives** 267:16
352:14
**obligated** 317:20
323:17
**obligation** 212:14, 16
344:3
**observe** 111:24
112:10, 16

Deposition of Lisa Barbounis                                                Lisa Barbounis v. Middle Eastern Forum, et. al.

observed  112:9
116:12
observing  367:2
obsessed  234:19
obtain  82:23
obtained  249:3
obvious  225:2
245:13  414:7
obviously  236:15
280:21
Occasionally  192:7
293:3  363:16
occasions  20:8
108:11  112:6, 19
148:2, 21  246:24
297:9  345:10  454:5
occupies  403:6
occur  10:8  175:18
342:20
occurred  10:9  21:17
23:15  149:18  451:12
O'CONNOR  2:1
5:10
October  20:3  22:22,
24  23:2, 3  24:8
293:6
OD  297:10
offensive  262:15
263:23
offer  251:9  386:3
offered  326:6
offering  457:7
offers  428:15
office  64:8  111:16
131:5  203:11  204:2
207:21  218:3  249:7,
9  250:1  268:7
276:13  277:3  357:15
358:2  393:2, 8
394:14, 18  396:12
397:1  398:10  409:19
420:23  433:19
Officer  66:9  120:9
official  146:10  193:9
194:5  396:24  401:14
446:9
officials  393:24
Oh  10:9  30:19
52:12  62:4  68:22
71:13  94:18, 23

120:8  140:15  151:16
188:15  191:5  198:7,
15  223:2  234:15
241:11  273:21  274:4
284:14  292:15
296:16  306:17  308:7,
13, 23  329:1  349:9,
14  356:16  371:7
374:13  380:13
399:14  401:3  402:19
446:22  472:4
Ohio  187:10  366:8
Okay  7:8  8:1, 11
9:4, 13, 18, 23  10:12,
14, 23  11:14, 22
12:24  14:12  15:5, 10
19:7, 22  20:17  21:15
22:5  24:14  25:20
26:15  34:12  35:7
45:5  47:11  48:6, 15,
17, 20  50:8  51:20
62:16  65:18  66:21
68:5, 11, 12, 13, 21, 24
69:1, 2, 3, 4, 11, 15, 16,
19  70:2  89:5  91:9
94:10  95:9  101:7, 9,
16  103:13  104:8
108:12, 17  109:12
110:8, 18  113:9
114:15  116:5  117:11,
15  118:4, 10, 19, 22
119:3, 6  120:6, 10, 19
121:15  122:8, 14
123:4, 11, 14, 22
124:8  125:1, 10, 18
126:15  138:6  139:14
142:20  143:1  144:2,
6  145:2  146:17
149:17  152:15  155:4
158:19  161:23  163:6
164:13  165:22  168:1
169:5, 12  170:6
171:2, 16  172:19, 21
173:7  175:17  176:4,
6, 10  178:16  179:8,
11  180:4, 7  181:21
183:5, 14  185:3, 9, 12
187:3, 11, 19  188:16
189:6  192:14  196:24
197:1  201:1, 12

204:4  210:24  212:19
213:7  215:23  216:17
219:3, 13, 16  221:3
222:2, 8, 16, 18, 23
223:1, 3, 4, 5  224:14,
15, 16, 17, 24  225:8, 9,
11, 12, 23  226:17
227:14  228:1  231:21
232:9  234:11  235:5,
16  236:12, 21  238:21
241:3, 11, 18  243:6
244:3  245:6  246:9
248:10, 21, 22  249:14
250:22  251:2, 13
252:1, 21  253:5
254:3  256:16, 24
257:6  258:4, 11
259:5  271:1, 4  272:9,
15, 24  273:3, 6, 14, 17
274:11, 15, 16  275:14
278:13, 19  279:1, 17
280:17  281:15, 23
282:2, 18  283:2, 9
287:5, 12  288:10
289:6, 20  290:5, 8
291:24  293:1  294:1,
8  296:19  299:4
300:21  301:9  303:7,
23  304:17  306:21
308:10  310:13, 20
311:11  312:1, 15, 18
313:5, 9  314:18
315:3, 11  320:13
321:5  323:8, 19, 24
326:10  335:9  336:8
341:6  342:4  343:23
344:2  347:7, 8, 12, 16
348:8, 14, 23  350:1,
11  351:11  352:1, 22
354:1  355:11  357:8
358:3, 7  359:11, 14,
23  360:11, 15, 19
361:14, 19  362:11, 21
363:22  365:9, 18
366:3, 23  371:1
372:22  373:4  374:18
375:21  378:21
380:23  381:12, 15, 18
382:4, 10  383:16, 24
384:6, 9, 16  385:4

386:18  387:6, 11
388:2, 12, 14, 16
389:5, 18  390:22
392:2, 15  393:7
397:19  401:5, 8, 11,
20  402:4, 13, 16
403:21  405:12
408:11  409:4  411:14
419:22  422:3  423:11
427:1  432:6  443:15,
19  449:8  453:9
456:9, 11  457:6
460:7  469:5, 11, 22
470:12, 16, 20  475:2,
10  477:5, 18  481:18
old  84:24  181:9
190:20  372:8  380:24
432:8, 14  436:16
Oliva  397:10
omission  252:5
once  107:4  111:7
151:7  371:13  388:7
405:11  434:6  481:10
one-minute  450:15
ones  231:1  385:19
462:22
one-time  161:6
ongoing  15:23
139:10
online  39:10  174:5
284:18, 22  455:23
459:1
oOo  1:11
opened  58:21  372:6
opening  371:17
393:2, 8  394:13, 17
operate  102:16
203:10
operates  383:18, 20
operating  256:13
259:1
operations  393:13
opinion  12:20  13:1
51:21  52:1  197:15
201:21  234:24  237:6
239:2  404:7  448:9
459:20  481:13
opinions  127:19
179:5
opportunities  147:7

Case 2:19-cv-05030-JDW  Document 110-2  Filed 03/02/21  Page 156 of 193

Deposition of Lisa Barbounis                                    Lisa Barbounis v. Middle Eastern Forum, et. al.

opportunity 57:1
399:16 406:4, 15
463:10 473:8, 24
478:3
opposed 7:10 389:16
opposite 207:5
option 279:14 413:3
oral 483:9
order 46:5 51:7
54:10, 12 55:8 59:13,
14 60:17 65:4, 20
66:7 67:2, 6 69:20,
22 70:21 72:18
77:17, 20 78:7 79:18
86:18 92:24 149:14
216:23 217:2 329:21
387:14, 21 388:7
405:1, 4 465:9
ordered 58:20
orders 45:21 46:18
60:15
ordinary 125:3
Oren 117:19
organization 121:20
144:22 190:11
193:10 205:5 212:1
255:18 353:19 354:4,
7 379:15 406:3
411:1
organizational 109:1
116:7
organizations 71:18
organize 393:21
organized 192:23
451:10 460:12 461:9
organizer 370:24
original 282:16 421:7
originally 108:7
340:11 346:6 353:8
396:22 405:24 468:3
O'Shalim 469:17
outcome 76:18
349:17, 24
outlet 255:22, 23
262:24
outlets 260:10 267:8
outmanned 371:15
output 146:14
outside 193:3 200:11
202:12, 18 203:22

204:14, 23 205:4
226:8 356:23 367:1
388:5 405:3
outward 199:4 404:7
overlap 353:3
overreach 366:16
overreacted 301:10
302:7
overseeing 257:3
Ovi 280:23 281:2, 6,
7, 12, 17, 21 282:3
288:12
owns 303:22

< P >
p.m 103:1, 3 170:18,
20 234:2 247:13, 14
337:24 338:1 346:19,
20 397:24 398:2
PA 1:23 2:5, 12
294:20
packages 109:24
PAGE 3:3, 8 9:17
108:15 286:3 329:7
392:7 397:10 475:14
pages 47:13 68:8, 9
271:15 465:22
475:19
paid 186:16, 19, 20
187:20 193:24 320:6,
7 333:2 339:19
350:24 381:12
401:23 403:13, 24
405:9, 10
pain 292:8 388:21
Painful 466:7, 8, 10,
15
panel 28:10 143:6
359:3, 8 400:17
panorama 379:11
pants 231:24
paper 436:17, 21
papers 14:15 322:19
439:18, 23
paperwork 438:11
439:8 442:10
paragraph 48:24
172:2 329:13, 19
330:20 475:5 476:15
paragraphs 448:21

Pardon 226:5
385:14 413:14
Paris 310:6, 7
Parliament 347:13
part 12:12 13:12
14:19 15:10 51:13
67:2 71:13 74:15
75:10 101:3 107:15
110:21 111:1 167:24
178:19 206:5, 6
223:19 224:2 236:13
237:10 254:4 257:8,
13 285:15 318:20
324:19 326:14 329:3
330:19 353:21
358:10 369:24
372:19 381:15, 17
386:7 388:15 391:21
396:18 405:24
406:14 411:3 412:7
422:4, 21 467:15
Partially 224:9
participate 249:10
particular 7:3 9:15
11:14 42:18 135:12
289:24 406:21
particularly 96:4
parties 43:18 396:2
483:10
parts 68:19 353:4
party 75:1 85:4
88:23 394:20 395:3
438:8
passed 207:21
passing 360:16
passion 208:2, 4
password 99:12, 16
100:5 101:14
passwords 86:11
91:12, 22 96:21
Patel 153:23 457:4
patient 471:12
472:14
Patricia 89:6 90:19
93:12 94:6 97:10
99:9, 22 100:8 103:9
104:5, 9, 14, 20
272:21 273:12
282:18 283:5 286:6
289:8 292:4, 22

294:9 302:19 306:8
431:18
Patrick 246:19, 20
pattern 158:4
Paul 2:24 4:11
pay 66:18 68:15
305:23 306:4 319:11,
20, 24 329:15 332:17,
22 339:12 346:11
398:22 407:2, 10
416:14, 17
paycheck 390:17, 18
423:8
paying 113:17 114:2
339:9, 10 412:17
payment 319:4
Paypal 305:18
PC 2:10
Pelosi's 356:14
pending 6:8 31:24
54:21
Penn 2:11
PENNSYLVANIA
1:1 4:9 64:4 133:11
405:19 483:2
penny 415:12
people 16:3, 12, 21,
24 17:10, 21 18:2
19:15 20:10 21:2
22:15 23:11 25:9
38:17, 18 63:8, 9
73:16, 22 76:15 91:4
107:1 109:10, 13
117:16, 24 118:3, 5,
11, 21 123:23 128:5
131:2 139:2 141:4
143:14 147:8 152:20
158:14 162:23 191:6
193:13, 21 202:12, 17
212:1 223:16 235:8,
10 240:1 243:15
250:10 261:18 262:4,
20 268:2 270:5
277:10 288:13
297:24 310:6, 7
312:22 317:19
322:16 333:1 334:19
335:4, 5 345:6 346:9
353:13, 21 354:12
355:3, 5, 20, 22 359:6,

7 360:8  367:5
368:12, 17, 23  369:9
371:3, 9, 12, 17, 19
372:1, 4  380:2, 5
381:21  391:13, 19
393:18  394:8, 20, 21
395:15, 18  397:2
402:1, 3  406:6
407:24  410:1, 2
422:9  438:4  441:24
443:12  447:20  454:7,
9, 23  455:22  456:7,
13, 16  457:3, 5  458:1
**peoples** 431:8
**percent** 108:16
158:2  335:8  368:16
378:7  410:4  417:9
478:14
**perfect** 126:12
132:14
**perform** 398:6
**performance** 133:8
152:21  164:19
172:23  173:12
**perimeter** 356:20
**period** 22:11  150:6
151:23  152:18
166:15, 17  171:3, 6
192:6, 11  213:9
216:7  277:9  285:24
289:20  348:9
**periods** 406:9  467:17
**permission** 172:11,
12, 17
**permitted** 195:9
**person** 20:14  29:4
37:21, 24  38:1, 3, 5,
20  39:3, 8  43:6
44:15  61:21  122:12
131:4  138:22  153:12
159:11  161:10
203:11  226:13  289:3,
19  296:7  299:12
334:15, 21, 22  341:17
343:13  362:1  371:6
380:7  383:17, 20
391:8  393:1  414:24
415:1  436:20  449:2,
14

**personal** 85:6  86:12
87:24  88:3  91:1, 7,
13, 18, 20, 21  92:11,
18  94:7, 15, 20  95:1,
18  96:9, 24  105:8
198:13, 14  350:7
352:19, 20  400:7
**Personally** 78:2
196:8  483:5
**personnel** 165:19
197:20
**person's** 36:2  37:16
**perspective** 118:4
140:3
**pertaining** 83:8
212:15
**pertake** 28:20
**petitioned** 432:7
**phase** 114:3
**Philadelphia** 1:23
2:5, 12  139:3  147:8
406:23
**Philly** 138:23  373:19
399:3  408:21
**phone** 14:11  62:18,
19  63:1, 3  64:9  70:6,
14, 18  83:9  84:18
86:9, 11  88:17
101:11, 15, 18, 23, 24
102:10, 12, 15  127:13,
17  130:18  281:8
291:15  298:20  312:4
318:10  325:22
335:24  356:15, 16
359:16, 24  373:6
384:24  385:2  395:8
396:16
**phones** 62:23  414:16
**Photo** 3:10  221:13
228:21  229:21
231:12  233:1
**photograph** 217:8, 10,
19  218:4, 6, 10, 24
219:5  221:9  226:18
228:4  231:18  232:6
303:11
**photos** 233:6
**physical** 296:5, 9
354:24

**physically** 187:7
345:7  357:24  410:23
**pick** 56:16
**picking** 205:24
**pics** 306:10, 16
307:10, 23  309:13
**picture** 73:15  183:23
184:1, 2, 4, 8, 9, 16, 19,
22  185:7  212:24
213:3  217:21  219:19
225:10, 14  233:14
234:14  356:13, 15
361:24  362:2  465:5
**pictured** 360:8
**pictures** 70:9  84:23
91:21  100:19  102:12
103:9  297:15  306:19
308:8  361:21  363:1
372:11, 12  464:6, 7
465:8
**piece** 224:19  256:19
379:24  436:17, 21
452:21  453:11
**pieces** 311:24  331:8
**pile** 28:1
**pipe** 369:10
**Pipes** 2:19  24:23
61:11, 15  62:17
109:16, 19, 24  111:12,
18, 23  112:5, 14, 20,
21  113:5, 12, 14
115:1, 5, 10, 18  116:8,
13, 17, 20, 24  117:8,
12  124:5, 14, 23
127:9, 12  128:20
130:4, 17, 21  131:21
132:4  135:20, 24
137:10  140:15
141:18  145:24
146:18  147:17, 21
148:1  153:22, 24
154:5, 20  155:19
156:3, 12, 18  159:9
161:20  163:15, 24
169:19, 23  172:7, 10,
12, 17  173:24  180:14
181:2, 13  200:9
205:13, 22  210:21
222:24  223:9  260:16
275:9, 16  276:2, 22

277:1  280:1  282:6
283:6, 12, 23  348:24
349:13  352:16
413:13  418:21  419:8,
20  420:7, 14  431:9
432:2  442:16, 19, 22
464:14  465:2
**Pipe's** 113:11
**Pipes's** 139:15
**pitch** 257:10
**placard** 356:14
**PLACE** 1:15  2:4
62:22  110:12  197:10
258:8  259:10  312:16
343:24  352:14
372:12  405:3  422:20
469:21
**placed** 123:2  173:4,
10  255:11  258:13
259:10
**places** 406:1
**placing** 258:5
**Plaintiff** 1:6  2:1
104:22  329:10
**plaintiffs** 417:23
420:15
**plaintiff's** 49:3  54:14
**plan** 173:13  409:13
**plane** 374:3  403:9
**planing** 469:12
**planned** 370:2, 6, 14
**plate** 28:2
**platform** 114:7  177:8
**platforms** 363:13, 15
**play** 264:11  424:8
453:8
**player** 158:12
**players** 393:19  395:3
**playing** 162:23
264:20, 22
**please** 4:18  29:15
32:2  68:13, 23, 24
94:3, 18  220:14
253:2, 21  350:15
453:19  460:21  475:6,
8
**plenty** 24:22  128:19
142:24  177:6  190:19
193:2, 19
**PLLC** 1:21

Case 2:19-cv-05030-JDW   Document 110-2   Filed 03/02/21   Page 158 of 193
Deposition of Lisa Barbounis
Lisa Barbounis v. Middle Eastern Forum, et. al.

**Plus** 7:6  21:6
323:17
**Podiatry** 468:17
**point** 6:4  8:5  17:19
50:9  51:11  53:10
74:14  104:8  106:9
108:24  127:8  154:13
156:19  162:1  175:17
177:13  190:7  191:16,
22  192:2  195:18, 19
211:20  213:8  223:11,
19  224:3, 8  228:10
229:13  237:11
257:23  258:4  259:13,
15, 17  268:14, 15
269:17  279:10, 18
280:18  281:10
284:24  289:7  292:22
293:17  295:21  296:6,
18  298:13  302:12
306:5  309:4  319:14
320:8  321:16  322:17
323:3, 4, 20  324:23
328:7  343:4, 19
371:16  374:24  396:6
408:7  427:4  442:4
445:12  473:14
**pointed** 276:7
**pointing** 40:22
**points** 168:12
298:17  299:4
**Police** 371:10  425:12
**policies** 186:22
**policy** 105:8  233:13
256:22  285:7, 11, 12,
15
**political** 5:14  172:3
349:7  350:10, 13
366:1  367:14  406:5
422:1
**politically** 350:6
**poor** 122:3  140:16
368:12  372:8  416:9
423:20  442:9
**poorly** 178:24  179:2
**pop** 388:16
**popping** 361:8
**portion** 381:24
476:20

**position** 21:14  153:3
154:1  196:4, 6
207:12  248:18  249:3
251:15  350:19
351:24  352:2, 4, 17
420:13  439:7
**positions** 351:13
**positive** 162:10
**positively** 32:24
**possession** 95:13
342:19
**possibility** 231:15
**possible** 221:12
331:10  415:14
**possibly** 220:17
434:14
**post** 126:20  134:12
187:19, 21  383:11, 13
**posted** 263:9  383:9
**posting** 153:13
**posts** 383:11
**potential** 201:4, 8
202:19  329:21
**potentially** 323:12, 21
**pounds** 319:16  320:2
**power** 117:3  161:15
439:7
**powerful** 162:20
**PR** 396:8
**pray** 393:3
**pre** 126:19
**precisely** 39:12
**preclude** 88:9
**predatory** 440:24
**predicated** 36:13
**preempted** 355:9
**prefer** 399:13
**preliminary** 12:16
70:4  82:24
**prepare** 8:1
**pre-planned** 368:18
372:19
**prerogative** 59:22
**prescribes** 470:11
**PRESENT** 2:13
110:22  231:4  270:21
**presented** 71:11
73:17  80:22  81:23

**president** 116:8
144:21  162:3  350:19
351:16  410:24
**presidential** 403:6
**press** 143:16  267:14,
18, 22  268:1, 8, 11, 22
269:4, 15, 21  270:4, 9
363:17  364:1  448:17
**pressure** 61:13
143:14
**pressured** 131:12
445:18
**pressures** 445:16
**presume** 134:4
**pretty** 10:21  59:4
67:9  98:7  165:16
175:1  177:14  178:8
236:19  256:7  298:17
308:12  357:22
376:18  383:19  404:5
414:6  459:13  467:21
**prevails** 75:16  76:4
**prevent** 11:18  366:15
**previous** 152:3
195:24  207:20
**Previously** 196:8
285:6
**pride** 153:16  366:12
**priests** 276:14
**primary** 469:20, 23,
24
**principle** 61:22
**principles** 423:4
**print** 483:17
**printed** 466:3
**prior** 8:14, 16  97:5
134:17  136:24
160:17  163:24  165:8
167:2, 8  168:18
214:16, 19  216:4
243:12  276:7  283:11
341:7  374:18  387:14
432:20  479:3
**priority** 469:4
**prison** 345:1  377:24
378:19
**private** 15:24  16:10,
15, 18  17:7, 12, 17, 23
18:13, 20  19:19, 22
20:12  22:16  23:12,

16  24:10  298:20
402:18  403:9  423:9
452:24  464:6, 7
465:3
**privilege** 32:8  33:2
430:19  471:17, 19, 22
472:2, 8, 19
**privy** 370:7
**probably** 50:21  56:4
58:14, 16  59:3  64:15
92:8  104:7  111:13
146:12  213:6  218:5
223:12  225:21
229:20  233:9  241:14
248:14  249:19
250:16  254:5, 6
277:21  278:7  286:1
288:6  290:18  295:22
296:17  304:5  309:12
312:14  321:17  336:3
373:2  378:11  389:12
434:4  449:18  476:6
**probation** 173:10
**probationary** 277:9
**problem** 85:6, 2
129:11  141:4  165:6,
10  174:18  279:21, 24
352:8, 10  361:4
363:3  374:5  386:20
414:14  416:16
**problems** 352:5
389:3  414:19  481:3
**Procedure** 214:9
230:6
**procedures** 186:23
**proceed** 29:16  60:23
81:10  231:6  350:15
**proceeding** 73:19
**process** 197:17
466:10
**proclivities** 214:10
230:8
**produce** 106:1, 17
188:6  328:4, 6
336:15  337:10, 12
**produced** 108:14
219:21  272:10, 20, 23
315:13  328:3  336:9,
19, 22  386:1  387:14,

*24* 388:6
**producing** 106:*18*
**product** 121:*10*
169:*10*
**production** 106:*7*
271:*23* 312:*3* 377:7
**professional** 267:*4*
**profile** 397:*10*
**program** 266:2
298:2 457:*24* 467:*16*
**programs** 298:*1*
**progress** 116:*13*
467:*19*
**progression** 176:*1*
**prohibit** 279:7
**project** 117:*23* 118:*5,
21* 119:*10, 19* 120:*7,
14, 15* 124:6 127:*4*
128:*14* 130:9 135:*12*
145:22 160:*24* 161:2
**promise** 151:*16*
**promised** 461:7
**promising** 329:*15*
332:*17*
**promotion** 467:*23*
**prompted** 218:*24*
**proof** 136:*15* 317:*17*
326:*19* 355:*12* 378:6
443:*12*
**proper** 41:*1* 89:*10,
16* 92:*10* 93:9 105:6,
7
**proposal** 71:*15*
393:*14* 394:2
**propounded** 483:9
**prospective** 77:*19*
**Prosperity** 409:*23*
**Prosser** 117:*24*
**protect** 355:*3* 421:*15*
**protected** 91:*11*
229:*16* 428:*15*
**protecting** 96:8
**protection** 355:*10*
**protective** 465:9
**protest** 366:9
**protests** 370:22, *23*
**proud** 284:*11*
352:*23* 353:2, 7, 8, 22
354:*10, 17, 18, 23*
355:*19, 21* 358:8, *11,*

*22* 359:2, *13* 364:*11,
16* 366:*19* 367:*3*
**prove** 149:5 345:*12,
13* 432:*14*
**proven** 72:*3*
**provide** 214:9 230:6
**provided** 202:*11*
329:*20* 374:*20*
375:*18* 429:5
**psychiatric** 476:*24*
478:*17* 479:*4*
**psychiatrist** 467:2
470:7
**Public** 1:*18* 30:*13*
35:*10* 37:*12, 16*
79:*19* 143:*13* 367:*23*
380:7 483:*4, 24*
**publication** 190:*10*
303:22
**publicize** 143:*10*
**publicly** 38:*13* 80:2
351:*18* 355:5
**publicly-filed** 42:*21*
**published** 463:*21*
**Puerto** 399:*24*
400:*20, 21* 401:*1*
402:5 403:6 404:2
**pull** 107:*15* 247:*3*
248:*24* 384:*18*
**pulled** 131:6
**pulling** 181:*21*
**pulp** 297:*15*
**punished** 413:9, *11*
421:*10*
**purchase** 92:*20*
**purely** 199:6, *15*
**purpose** 145:*23*
269:*24* 422:*19*
**purposeful** 97:*21*
**purposefully** 155:*1*
**purposes** 109:*15, 17*
128:*19* 205:*4*
**pursuant** 43:*17*
**pursuing** 242:6
327:*4* 412:*13*
**push** 61:*11*
**put** 13:6 21:*13* 57:*4*
61:*1, 19* 85:*12* 90:9
95:*24* 98:*12* 101:*15*
114:*4* 122:*18* 137:*13*

143:*16* 149:2 153:*1,
3* 173:*12* 200:7, *15,
18, 23* 203:*16* 209:*12*
215:7 220:6 234:7
238:*24* 272:*20* 285:9
299:*11* 315:*20*
319:*15* 329:*3* 367:22
369:7, *10* 378:8
379:*16, 17* 383:*4*
405:22 446:22
452:22 464:*10* 465:5
477:*4* 478:*20*
**puts** 383:*3, 5* 445:*15*
**putting** 61:*13*
130:*23* 131:*24*
135:*11* 279:*3* 310:*11*
454:22
**pyramid** 125:*4*

< Q >
**qualifications** 159:*18*
**qualified** 200:*4*
**qualify** 87:*1, 4*
**Quarterly** 124:*13*
**question** 6:8, 9 7:*19*
11:*11* 13:*11, 17*
16:*20* 21:*20, 23* 22:*4,
7, 23* 23:*3, 6, 9, 21*
24:6 27:*1, 14, 17, 18*
30:*3, 8* 31:*16, 18, 24*
32:*1, 3, 18* 33:*1, 4, 8,
11, 15* 34:*4, 9* 36:*5,
16, 23* 37:7, *10* 38:9
40:*5, 13, 17, 23* 42:*4,
14, 18* 43:2, *4, 5* 44:2,
7, 10* 45:*4, 7* 46:2, *4*
47:*21* 48:22 49:*1, 21,
22* 52:7, *15, 20* 53:*19*
54:*21* 55:2, *4, 7* 57:*1*
58:5 71:*4* 72:*21*
75:6, *24* 76:2 77:6
79:*13, 15* 81:*16*
85:*16* 87:*20* 88:*13,
15* 90:*14, 17* 92:*15*
93:*10* 94:*1, 2, 5* 97:*7,
19* 99:*19* 100:*1, 12,
16* 102:*3* 106:*21*
114:*21* 118:*10*
122:*15* 134:2, *15, 19,
24* 138:*1* 142:5

144:*8, 11, 14* 149:*11*
152:*3* 162:*17* 163:8
166:*21, 22, 24* 167:2,
20, 22* 168:*4, 8, 9, 14,
17* 181:6 196:*16*
201:7 202:6, 9
206:*19* 207:2, *6, 8*
208:*21* 209:2, *21*
210:*4* 213:*13, 18, 24*
214:6, *11, 14* 215:*13,
20* 216:2 217:*4*
218:*18* 225:7 229:9,
*10, 23* 232:*4, 5* 236:2
237:*19* 239:*11*
244:*12, 13* 245:*12*
247:6, *10* 248:*15*
257:*20, 21* 259:7
260:8 262:8 265:*11*
266:*18* 268:*10* 269:7,
12, 18, 20* 270:*14, 16*
275:22, *23* 276:*1*
290:*10* 292:*16*
299:*18* 301:22 302:*4,
6* 304:*11* 322:6
326:*16* 327:5 328:*12*
338:*17* 372:22 380:9,
*11* 398:*14, 16* 410:6,
*15* 414:6, *11* 415:*21*
417:5 418:*24* 419:*1,
6* 421:2, 7* 427:*23*
428:6, 7, 8* 429:8, *12,
14* 430:*21* 441:9, *11*
444:2, *20, 24* 445:*21*
447:2 450:*16* 453:*20*
455:*4* 471:*16, 23*
472:*10, 17, 21* 473:5
475:*20, 22* 476:*3*
477:9 478:*16* 479:*15,
22* 480:*4* 481:*10, 15*
**questioned** 259:2, *3*
324:*18*
**questioning** 172:*23*
194:22 206:*18*
324:*20* 367:*20*
**questions** 13:*1* 15:*19*
49:9 51:6 53:*14*
56:*21, 23* 57:*16, 19,
24* 58:*23* 59:*19*
60:*16, 19* 67:7 75:*13*
97:*4* 98:*10* 166:*10*

169:*21*   184:*21*
201:*14*   217:*16*   260:*3*
262:15   263:*3*   264:*1*
315:*10*   326:24
328:*21, 23*   331:*20*
354:*1*   367:*9*   424:*3,*
*16, 18*   434:*1, 7*
443:*15*   460:*14*
474:*20*   476:*1*   480:*8*
483:*9, 14*

**question's**   45:*23*
**quick**   48:*15*   247:*10*
346:*16*   361:*1*   384:*17*
**quicker**   60:*21*
**quickly**   48:*5*   59:*4*
67:*10*   69:*10*   381:*2*
406:*17*
**quit**   95:*11*   138:*19,*
*20*   139:*5*   173:*20*
181:*19*   392:22   393:*4*
**quite**   68:*9*   240:*6*
351:*10*   405:*21*
**quitting**   146:*23*
147:*3*
**quote**   103:*9, 10*
153:*2, 6*   214:*18, 21,*
*24*   215:*16*   258:*1*
464:*14*   465:*1*
**quoted**   464:*24*
**quoting**   72:*17*   103:*11*

**< R >**
**racketeering**   28:*24*
415:*8*
**radio**   123:*1*   128:*24*
129:*19*   139:*9, 11*
267:*8*
**Rahiem**   193:*17, 21,*
*23*   341:*23*
**raided**   468:*19*
**raise**   223:*10*   324:*1*
**raising**   265:*21*
**rally**   355:*1*
**Ramen**   405:*11*
**ran**   111:*17*   112:*7*
**random**   70:*8*
**Randy**   363:*23*   381:*4*
409:*12*
**ranges**   260:*14*

**Rape**   229:*16*   230:*2,*
*9*   425:22   426:*6*
439:*16*   440:*18*   441:*7,*
*11*   444:*12, 15*
**raped**   425:*5, 6*
426:*13*   438:*24*   439:*3*
440:*3, 6*   441:*18*
442:*2, 6, 23*   443:*17*
**rapey**   437:*6*
**rapist**   436:*11*   437:*13*
441:*4*   442:*4, 13*
444:*5*   446:*10, 20*
447:*10, 13*
**Rare**   286:*17*
**ratting**   275:*3, 6*
**reach**   17:*21*   261:*9,*
*12*   297:*23*   457:*12*
**reached**   292:*11, 13*
298:*23*   378:22
409:*23*   457:*7*   458:*10,*
*12*   462:*12, 20*
**reaching**   260:22
261:*7*   292:*8*   340:*14*
**react**   276:*6*
**reaction**   26:*15, 20*
27:*5, 17, 20*   115:*19*
**read**   6:*24*   12:*23*
14:*6, 12, 22*   15:*7*
26:*5, 7*   28:*14*   31:*9*
46:22, *23*   47:*2, 5, 7, 9,*
*11, 14, 19, 22*   48:*5, 24*
49:*23*   51:*20*   67:*1, 7,*
*9, 18*   69:*9, 19*   77:*16*
111:*20*   112:*24*   126:*7*
182:*2*   209:*17*   214:*18*
230:*5*   241:22   242:*13*
247:*24*   248:*13*
252:*13, 14*   253:*8*
254:*5, 13, 18*   271:*13,*
*15*   272:*6*   279:*17*
285:*19*   286:*6*   287:*18,*
*19*   308:*11*   311:*18*
312:*19, 20*   313:*20*
314:*11, 14, 15*   329:*11,*
*17, 23*   368:*10*   369:*24*
388:*14*   440:*11*
455:*21, 24*   456:*4, 14,*
*24*   459:*1*   465:*12, 17,*
*22*   466:*1, 22*   471:*7*
473:*15, 16, 17, 22*

474:*16, 19, 23*   475:*17,*
*18, 23*   476:*4, 12, 15,*
*18*
**readily**   80:*2*
**reading**   465:*19*
466:*18*   476:*20*
**reads**   252:*17*
**ready**   5:*1*   264:*17*
311:*8*   403:*6*   451:*4*
**real**   210:*16*   211:*20*
247:*10*   248:*7*   290:*4,*
*6*   346:*16*   381:*1, 2*
384:*17*   406:*19, 23*
407:*15, 20, 23*
**reality**   153:*20*
**realize**   45:*19*   222:*19*
298:*8*
**really**   19:*4*   39:*10*
61:*8*   94:*12*   117:*5*
123:*9*   124:*3, 4, 9, 14*
126:*8*   127:*7*   132:*12*
134:*18*   152:22   153:*4,*
*17*   154:*11*   160:*14*
165:*17*   179:*10*
183:*18*   189:*21*
195:*11*   210:22   215:*7*
263:22   267:*3*   283:*3*
296:*6*   298:*5*   299:*9*
306:*12*   307:*24*
327:*19*   328:*13*   348:*2,*
*11*   362:*14, 22*   363:*14*
373:*20*   385:22   390:*2,*
*9, 10*   391:*9, 17*
406:*14*   407:*13*   441:*8*
448:*12, 21*   450:*1, 8*
468:*4*   476:*1*   478:*7*
**realm**   231:*3*
**reapplied**   433:*11*
**re-ask**   429:*8*
**reason**   7:*3, 5*   11:*14*
50:*6*   58:*19*   59:*8*
60:*19*   94:*17*   147:*5*
150:*20*   151:*4*   159:*8*
177:*11*   180:*24*
207:*18*   210:*19*
214:*21*   217:*6*   221:*12,*
*15*   262:*14*   264:*2*
271:*21*   304:*19*
312:*12*   324:*19*
335:*16*   336:*8*   352:*12*

365:*14*   406:*14, 21*
409:*5*   422:*4, 13*
423:*6, 7*   425:*14, 15*
428:*17*   443:*10*
447:*18*   449:*12*   451:*2*
460:*10*   473:*21*
**reasonable**   52:*2*
53:*4*   55:*10, 12*   70:*23*
72:*19*   160:*4*   349:*10*
350:*18*   351:*15, 24*
**reasonably**   245:*2, 5*
**reasoning**   165:*2*
425:*24*
**reasons**   134:*5*
245:*13*   279:*12*
**recall**   5:*9, 16*   6:22
20:*11*   115:22   217:*9*
260:*24*   261:*2*   292:*3*
334:*11*   449:*10, 16*
**receive**   227:*18*
**received**   106:*15*
171:*17*   172:*16*
205:*11, 12*   210:*21*
327:*23*
**receiving**   231:*12*
**Recess**   56:*11*   103:*4*
170:*21*   234:*3*
**recognize**   343:*6*
362:*1*   384:*24*   385:*2*
**recognized**   342:*21*
343:*1, 5*
**recollection**   11:*20*
185:*6*   246:*2*   258:*12*
**recommend**   67:*20*
**recommendations**
470:*10*
**recommended**   467:*23,*
*24*
**recommending**   470:*7*
**record**   4:*2, 17*   5:*24*
7:*20*   11:*8*   23:*24*
31:*5*   35:*10*   40:*2*
41:*3, 22*   46:*8*   47:*8*
55:*24*   56:*10, 14*   57:*5*
62:*16*   63:*5, 8, 16*
64:*6, 23*   90:*10*   98:*7,*
*13*   103:*2, 6*   106:*24*
110:*19*   168:*10*
170:*19, 23*   182:*21*
183:*2*   188:*17*   196:*14*

202:*1*  214:*1*  222:*9*
223:*8*  230:*1, 12*
234:2, *5*  239:*1*  247:*8,*
*12, 15*  254:*14*  275:*14*
286:*2*  290:*22*  315:*12*
331:*22*  334:*2*  335:*20*
337:*22, 24*  338:*2*
346:*16, 21*  353:*6*
356:*1*  360:*7, 24*
361:*2*  385:*11*  386:*4*
387:*12, 19*  397:*21*
398:*1, 3*  435:*14*
436:*12*  437:*13, 14*
443:*23*  444:*8*  446:*6*
459:*22*  465:*7*  477:*5*
478:*21*
**recorded**  4:*5*  63:*9*
64:*1, 10, 19*
**recording**  64:*12*
328:*2*  330:*6, 23*
333:*14*  334:*14*  335:*3,*
*11, 14*  336:*1, 22*
337:*2, 8*
**recordings**  330:*21*
336:*11, 13*
**record's**  357:*12*
**recount**  460:*7*
**recourse**  279:*15, 16*
425:*18, 19*
**recourses**  324:*22*
**red**  288:*2*
**reduced**  173:*8, 16*
175:*14*  405:*5*  483:*17*
**reducing**  173:*21, 22*
**refer**  8:*20*  9:*1, 13*
241:*19*  316:*5*
**reference**  198:*21*
254:*22, 24*  274:*1, 12*
313:*17*  464:*18*
**referenced**  23:*10*
317:*22*  330:*8*
**references**  287:*6*
389:*18*
**referencing**  115:*9*
238:*14*  258:*6*  267:*19*
**referred**  274:*14*
339:*15*  389:*23*
**referring**  8:*24*  9:*15*
224:*21*  225:*2*  237:*3*
280:*14*  286:*12*  304:*3*

316:*9, 12*  360:*12*
377:*2*
**refrain**  41:*12*
**refreshing**  293:*12*
**refused**  122:*4*
**regarding**  24:*10*
173:*4*
**regardless**  57:*20*
59:*21*  61:*4*  87:*13*
116:*11*  251:*13*
270:*12*  335:*9*
**regret**  232:*24*
**regular**  354:*12*
406:*6*  469:*20*
**regularly**  94:*12*
**regulate**  425:*3*
**regulation**  481:*4*
**rehash**  369:*19*
**rehired**  131:*5*
**relapsed**  373:*21*
**related**  58:*24*  181:*3*
186:*8*  190:*23*  193:*5*
473:*1*  481:*3*
**relates**  306:*23*  322:*14*
**relating**  43:*11*
411:*22*  430:*23*  431:*6*
**relation**  242:*10*
243:*23*  358:*3*
**relationship**  21:*11*
64:*17*  121:*16*  141:*21*
142:*9*  165:*23*  213:*10,*
*16*  214:*3*  216:*7, 20*
228:*10*  233:*8*  237:*4,*
*24*  239:*6*  240:*1*
242:*7, 24*  244:*8*
245:*9*  290:*4, 6, 7, 15*
292:*22*  293:*17, 22*
294:*5*  296:*5, 10, 18*
297:*20*  299:*13*
300:*10*  304:*8*  341:*17*
369:*21*  379:*21*  384:*6*
390:*3*  411:*5, 9*  449:*4*
464:*16*
**relationships**  125:*8*
126:*17*  268:*7*
**relative**  178:*14*
**relax**  227:*6*
**relaxing**  213:*6*
**release**  143:*16*

**released**  377:*14*
**releases**  448:*17*
**relevance**  242:*16, 20*
304:*12, 14*
**relevant**  83:*21*
215:*13, 16*  224:*18*
230:*18*  264:*10, 19*
265:*1*
**relevantly**  291:*6*
**relief**  327:*4*
**relieve**  420:*17*
**relive**  466:*7, 8*
**re-live**  7:*6*
**reluctant**  432:*8, 9, 10*
**rely**  298:*4*
**relying**  414:*2*
**remainder**  60:*2*
**remaining**  346:*9*
**remains**  460:*22*
**remarkably**  477:*22*
**remember**  6:*3*  10:*14*
11:*2*  15:*9*  18:*2*
19:*13*  20:*6, 15, 18*
24:*11*  44:*7*  49:*14, 18*
51:*8*  64:*14*  75:*9, 10,*
*11*  87:*18*  90:*17*  92:*5*
94:*21*  103:*16, 17, 20,*
*21*  108:*1*  115:*16, 17*
123:*9*  127:*10*  130:*12*
131:*17*  146:*7*  148:*17,*
*18, 22, 23*  150:*2, 3, 5,*
*7, 18, 21*  151:*2, 3, 8, 9,*
*16, 18, 21*  156:*7, 18,*
*21*  157:*9*  165:*4*
175:*19, 21, 23, 24*
179:*10*  181:*9, 10*
185:*8, 10*  188:*14*
189:*12, 15, 16, 21*
190:*17, 24*  191:*13*
194:*10*  195:*3, 4*
221:*11, 18*  243:*24*
251:*12*  254:*23*  255:*4,*
*6, 10*  259:*12*  260:*15,*
*19, 22*  261:*6, 7, 10, 11,*
*14*  262:*1, 10, 18, 19*
263:*4*  266:*21*  285:*23*
286:*10, 16*  290:*1*
292:*12*  295:*7*  300:*13,*
*18, 19*  302:*4, 21, 24*
309:*10, 11*  312:*8*

314:*19*  316:*15*  317:*4*
319:*2*  334:*12, 24*
335:*2, 6*  347:*20*
352:*20, 21*  364:*19, 20,*
*22*  373:*15, 24*  374:*6*
389:*8, 14*  397:*17, 18*
437:*24*  455:*7, 10*
457:*2*  468:*11*  470:*23*
475:*22*  480:*21*
**remembered**  293:*7*
373:*17*
**remembering**  75:*12*
**remotely**  427:*9*
**remove**  84:*4*  88:*1, 2*
96:*24*  99:*10, 22*
100:*9*  105:*8*
**removed**  43:*17*  98:*1,*
*19*  100:*3*  157:*5*
**removing**  385:*17*
**renewed**  406:*22*
**rent**  405:*5*
**re-open**  5:*12*  49:*4, 12*
**repeat**  42:*13*  55:*4*
72:*16, 23*  94:*2*  167:*1*
**repeated**  158:*4*
**rephrase**  134:*19*
**replied**  172:*13*
**re-populates**  101:*10*
**report**  118:*22, 23*
124:*9, 14*  153:*6*
256:*10*  258:*23*
338:*10*  451:*18, 20*
471:*7, 10*  473:*2, 7, 17*
474:*9, 13, 15*  476:*18*
**reported**  116:*16*
118:*17*  119:*6, 11*
121:*5*  124:*5*  155:*20*
157:*16*  158:*10*
163:*16*  164:*6, 14*
224:*12*  442:*18*
**REPORTER**  1:*15*
4:*14, 18*  48:*11*  55:*18*
64:*22*  78:*13*  94:*2*
303:*21*  392:*13*
397:*22*  449:*14*
451:*17*  460:*21*
462:*11*  481:*21*  483:*3,*
*19*
**reporters**  462:*12, 20*
**reporter's**  7:*12*  60:*5*

Case 2:19-cv-05030-JDW   Document 110-2   Filed 03/02/21   Page 162 of 193

Deposition of Lisa Barbounis                                    Lisa Barbounis v. Middle Eastern Forum, et. al.

**Reporting** 4:*12*, *15*
118:*18* 120:*20*, *22*
122:*17* 123:*19* 125:*7*
126:*16*, *19*, *21* 128:*17*,
*20*, *23* 144:*20* 164:*1*,
*8* 224:2, *7* 342:*21*
443:*12*

**reports** 124:*22*
368:*19* 469:*16*, *22*

**represent** 5:*11* 37:2
104:*18* 106:*14* 184:*7*
271:*9* 272:*18* 312:*11*
313:2, *5* 314:*24*
337:*10* 426:*19*

**representation** 52:*17*
201:*16* 202:*16*
271:*22* 337:*15*

**Representatives**
248:*19*, *23* 249:*11*
252:*7*

**represented** 7:*21*
11:*1* 246:*15*

**representing** 26:*12*
301:*4*

**reprimand** 119:*20*
122:5, *7* 171:*10*, *22*
172:*15*, *22* 173:2, *3*

**reprimanded** 171:*17*

**reprimanding** 157:*23*

**Republican** 192:*24*

**Republicans** 274:*17*

**Republican's** 277:*18*

**reputation** 28:*8* 36:2
37:*17* 61:22

**request** 83:*11*
105:*21* 107:*12* 299:2
303:*13* 463:*15*

**requested** 143:8
341:22 345:*9*

**requests** 255:*14*, *15*
261:*21* 463:*17*

**require** 44:*23*

**requirement** 186:*11*

**requirements** 406:8

**requires** 29:*24*

**research** 111:*20*

**resign** 409:*6*

**resigned** 180:*5*
353:*15*

**resistent** 157:*1*

**resolution** 205:*22*
412:*24* 415:*18* 416:*4*,
*15*

**resolve** 141:*9*

**resolved** 140:2, *13*, *14*

**resort** 402:*23* 403:*4*

**Resources** 120:8, *11*,
*13* 165:5 325:*1*
416:*11*

**respect** 10:2 112:*9*
116:*12* 147:*18*
160:*23* 162:*23* 224:*1*
348:*24* 423:*24* 469:5

**respective** 483:*10*

**respond** 37:8 149:*6*
235:*16* 261:*21*
265:*16* 463:*10*

**responded** 136:8
141:*18*, *19* 148:*3*
171:*13*, *14*, *18* 172:*9*
299:*3* 462:*13*

**responds** 292:*15*
294:*16* 305:*4*

**response** 66:*20*
138:*7* 266:*19* 278:*16*,
*17* 351:8 463:*22*

**responses** 74:*7*

**responsibilities**
173:*15* 174:*13*, *15*, *20*
177:*12* 180:*9* 181:*3*,
*18* 209:*13* 212:2
264:*21*

**responsibility** 38:*14*
175:*13* 205:*20*
318:*17* 355:*15*

**responsible** 119:*16*
367:6 369:*13* 383:2
413:*6*

**rest** 31:*3* 234:*12*

**restate** 260:*7*

**restore** 91:*3*

**restrict** 350:*1*

**restrictions** 449:*23*

**restroom** 102:*4*

**result** 147:*23* 175:*14*
205:*7* 276:*11*

**Resume** 3:*11* 197:*18*
199:2, *16* 200:*5*
201:*15* 206:*13*
207:22 209:*12* 248:2,

*4*, *9*, *17*, *23* 249:2, *10*,
*12*, *16*, *17*, *18*, *20*
250:8, *10*, *13* 251:*14*,
*16* 252:2, *11* 253:5
258:*8* 263:8, *9*
265:*23* 266:6, *24*

**resumes** 204:*14*
405:*22*

**retained** 3:8

**retaliate** 74:*21*
149:*14*

**retaliating** 148:*3*
149:*20*

**retaliation** 12:5
13:*12* 51:*13* 131:*15*
134:*13* 135:*3*, *22*
142:*23* 143:*21*, *23*
144:*12*, *18* 145:*8*, *13*
147:*19*, *22* 148:*6*
151:*24* 152:5 170:*1*
180:*10*

**retaliations** 15:*11*

**retaliatory** 129:*18*
134:8 163:*18* 164:*14*
329:9, *16*, *22* 332:5,
*18*

**retracted** 114:*1*
332:22

**retroactively** 345:*3*

**return** 311:*4* 326:22

**returned** 326:*23*

**retweets** 383:*22*

**review** 8:*11*, *14*
65:20 67:*21*, *23* 97:9,
*15* 99:8, *17*, *20* 100:*7*
309:*21* 473:8 476:*15*

**reviewed** 10:*19*
100:*4* 466:*6*

**revised** 280:*3*

**revisions** 250:*10*

**rewarded** 196:*3*

**REYNOLDS** 4:*20*
17:8 18:*21* 483:5

**rhetoric** 368:*6*

**RICO** 25:2, *11*, *21*
27:7, 22 28:22 29:*23*
30:5 34:5, *19* 61:6
399:*24* 400:*20*, *21*
401:*1* 402:5 403:*6*

404:*3* 415:*7* 416:*21*
458:*7*, *13*, *19* 459:*14*

**rid** 61:*14* 83:7, *11*
115:*13* 414:*18*

**ridicule** 206:*23*
301:*23*

**ridiculous** 28:*12*, *15*
31:*18* 73:4 260:2
458:*11* 459:*10*, *12*

**Rieser** 2:*21*

**right** 21:*24* 32:*19*
34:*15* 39:*16*, *20* 46:*3*
47:6, *23* 54:5, *11*
56:6 64:*15* 65:*10*
69:*12* 72:*19* 79:*21*
81:*10* 84:*4* 85:2, *7*
88:2 91:6 95:7 98:5
101:*11*, *12*, *21* 103:*23*
109:*16* 112:*12*
116:22 122:*1* 124:*24*
125:*14*, *16* 126:*4*
129:*20* 130:*19*
136:*10* 150:*13* 151:*4*
154:*14*, *18* 155:*8*
157:*4*, *18* 164:*20*
169:*11* 176:*17*
177:*18*, 24 183:*9*
184:5 188:*21*, *22*
189:*1* 190:*13*, *21*
192:9 193:*12* 199:5
200:2, *5*, *19* 203:*17*
208:*7* 209:*4* 211:*6*
213:*1* 216:*23* 217:*1*,
*2* 218:*4* 222:*10*
223:*18*, 24 233:*18*
237:*4*, *18* 238:*13*
239:*15* 240:8 241:*7*,
*13*, *20* 253:24 257:*17*
261:*18* 266:*3* 272:2
274:24 277:22
279:*20* 281:2, *16*
285:*1* 287:*16* 291:5,
*13* 294:12 297:2
298:*10* 299:*7* 305:2,
*7*, *9* 306:9, *14* 308:6,
*12*, *19*, 24 309:2
312:5 314:22 319:*17*
320:*16* 321:*19*, *22*
323:*15* 324:6, *10*
325:*10*, *17* 330:*15*

Case 2:19-cv-05030-JDW   Document 110-2   Filed 03/02/21   Page 163 of 193
Deposition of Lisa Barbounis
Lisa Barbounis v. Middle Eastern Forum, et. al.

331:16  336:4, 24
339:2, 5  341:10, 14,
16  343:13  348:12, 16
353:22  354:19
357:11  358:12  359:7
360:9, 13  361:5, 14
366:2  367:9  371:11
374:3, 6, 20  375:15,
16  379:7  380:14
381:4  384:19  390:19
392:7  398:7, 12, 17
399:7  400:11  401:7
404:5, 10, 14  407:18
408:8  417:10  419:24
422:17  423:10  425:5
426:8  427:17, 24
437:18  444:16
446:18, 21  447:1, 8,
17  450:11  455:21
459:21  461:24  472:1,
7  474:16  475:13
477:24  478:13
480:23
**ring** 313:3
**ringing** 287:21, 22
**riot** 355:5, 13
**riots** 370:16
**rises** 368:8
**RMR** 1:15  483:3, 16,
23
**RNC** 369:8, 10
**Robinson** 143:2, 6, 18
146:7  313:7  322:19
323:1, 6, 21  330:7
333:15  334:8, 23
337:13  346:24  349:1
350:2  351:19  352:13,
22  365:9, 12  376:21
377:2, 3  378:19, 22
380:3  384:2  432:4
433:2, 7, 13  452:8, 20
**Robinson's** 312:12
358:7  359:1  363:5
432:6, 8
**role** 122:16, 20
206:3, 8  468:23
**rolling** 286:13
**Roman** 2:20  5:11
12:6  17:14  91:11
94:24  109:14, 18, 22,

23  112:3, 7, 15, 19
113:10  114:5, 24
116:16, 20, 24  117:9,
16  118:24  124:15
128:23  132:7, 12
134:12  135:2  136:20
142:18  146:8  148:6
155:21  156:4  158:16,
23  159:7, 8  164:15
165:9  168:18  181:4,
15  205:14  274:8
275:4, 6, 10, 11  276:2,
7  277:2  374:15
412:1, 17  413:8
419:19  420:18
421:10  423:23
436:11  437:12  438:3,
23  439:3, 17  441:1,
18  442:4, 23  443:17
444:5  445:10  446:19
447:10  457:14
**Roman's** 116:13
117:12  132:20  134:5
163:11  431:7
**romantic** 246:6
296:17
**romantically** 243:17
390:11
**room** 7:14  88:22
213:4  217:12  218:13
225:15  226:20  227:5
228:6  276:17  438:12
439:8
**Rothlinson** 362:4
**rough** 391:15
**routine** 307:1
**routinely** 65:24
**RSS** 452:19
**rule** 10:23  73:8
**ruled** 65:17  71:24
80:5  86:22
**rules** 58:2  214:8
230:5
**ruling** 33:16  52:22
79:12
**rulings** 12:21
**rumor** 325:4, 9
**rumors** 293:20
325:5  377:22

**run** 5:24  179:5
234:11  360:22  393:3
394:6
**running** 127:16
255:16
**runs** 130:19  183:12
**Ryan** 409:18

**< S >**
**sad** 283:17, 19  284:4
285:2, 3  289:5
**safe** 348:22  399:12,
14  410:1
**saga** 297:14
**sake** 5:23  7:15
248:16  315:24
**salary** 173:7  175:14
203:9  223:8, 20
224:4  346:1
**Sallavanti** 395:7
**Salman** 396:10, 21
**Sam** 117:19  130:19
137:6  393:18  395:11
**Samantha** 456:8
457:1
**San** 403:7
**Sanchez** 9:7, 16
12:15  51:7, 21  52:1
53:3  55:8  65:4, 17
69:21  70:21  73:7, 13
74:5, 9, 18  76:23
77:5, 9, 13, 17  78:5
79:17  80:21  81:21
87:15, 16
**Sanchez's** 52:22
77:16
**Sandman** 246:19, 20
**sanities** 7:16
**Santa** 392:4
**sappy** 391:1
**sat** 59:16  276:12
**satisfy** 423:24
**Saturday** 404:19
**Saudi** 397:7
**save** 91:10  96:4
99:4  435:23
**saved** 91:23
**saw** 49:16  178:22
257:1  286:13  313:22
355:17, 19, 20, 22

356:3  370:11  385:19
448:22  452:21  457:3
468:9  469:7
**saying** 23:11  25:10
53:24  81:9  112:8
113:19  130:21  137:3
140:6  149:9  155:13
165:4  172:10  178:4,
10  188:14  189:2
190:5  196:23  198:16
204:21  208:10
220:22  240:8, 10, 14
251:3  259:23  261:22
278:12  296:22  297:3,
7  307:12, 20, 22, 24
308:20  318:3  322:10,
13, 15  323:8  325:21
332:4  339:19  343:23
346:10  349:14
353:13  373:23
387:16  406:8  409:5
418:13  432:15  439:7
450:13
**says** 22:15  31:21
46:17  48:2  49:2
67:15  79:21  81:5
157:24  187:23
204:22  221:22
224:24  225:6  234:15
235:21  236:21
237:13, 15  248:8
252:4  256:20  262:5
271:19  272:12
273:18, 21  278:3, 4
281:4, 15  283:3, 4, 18
284:4  287:12, 15, 18,
19  288:13, 22  292:18,
20  294:17  303:23
304:1  308:7  309:4
317:5  318:1  391:3
392:21, 24  414:23
415:4
**scalp** 295:1
**scattered** 125:7
**school** 179:22  285:6,
11  399:3  404:21, 22
408:3, 9  439:9  450:7
**schools** 478:11
**scorned** 322:11

Case 2:19-cv-05030-JDW   Document 110-2   Filed 03/02/21   Page 164 of 193

Deposition of Lisa Barbounis                                    Lisa Barbounis v. Middle Eastern Forum, et. al.

**scour**  100:*17*
**scoured**  181:*8*
**scratch**  365:*10*
**screaming**  216:*24*
**Screen**  3:*14*  47:*10*
  194:*21*  211:7  212:*20*
  234:8  291:7, *8, 11, 14,*
  *21*  292:4  303:*11*
  304:*22*  305:*11, 20*
  314:7  361:*17*  362:*24*
**screenshot**  279:*5*
**screenshots**  172:*11*
**screw**  306:*7*
**scroll**  48:*11, 17*  68:*3,*
  *13, 22*  221:*24*  222:7
  248:6, *11*  253:*20*
  475:*3*
**scrolling**  68:*12*
  79:*23*  240:*23*
**scuttle**  62:*9, 10, 12*
  416:*20*
**seal**  386:7, *8, 13, 19*
**search**  70:7  83:*12,*
  *14*  84:*1*  86:*3, 4*
  405:*23*  409:*1*
**second**  9:*5*  13:*24*
  16:*9*  60:*15*  155:*24*
  156:*1*  181:*22*  247:2,
  *3*  253:8  283:*11*
  285:*19*  286:6  341:*23*
  360:*19*  361:6, 7
  365:2  375:6  384:*17*
  392:*13*  402:*13*  403:*3*
  413:*18*  444:*16*
**secondary**  371:*20*
**Secondly**  50:*1*  59:8
  434:*24*
**seconds**  346:*14, 15*
  361:*3*
**secret**  62:*22*  78:2
  80:*24*  270:*10*
**secretary**  119:*1*
  211:*11*
**secrets**  8:*21*  9:*1, 9,*
  *14*  11:*24*  15:*13*  51:*9,*
  *22*  52:4  53:6  55:*11*
  70:*24*  75:*17*  76:4
  77:*19*  106:8, *18*
  270:*3, 13*

**secret's**  51:*17*
**section**  68:*16*
**sections**  253:*9*
**sector**  423:*9*
**Secum**  107:*1*  315:*19*
**secure**  159:*20*
**security**  384:*2*
**see**  5:7  13:*1*  46:*12,*
  *17*  48:*23*  49:2  65:6
  129:*24*  132:*9*  181:*23,*
  *24*  182:*1, 9, 21, 23*
  183:*21, 23*  217:*13*
  221:*24*  229:*14*
  231:*22*  234:*9*  237:*22*
  253:*13*  271:*18*
  272:*13*  273:*3, 10, 18*
  283:*24*  305:*3, 21*
  306:*6*  307:*20*  312:2,
  *15*  313:*8, 10, 17*
  314:*1, 7*  317:*17*
  326:*20*  340:*24*
  355:*22*  358:*20*
  362:*14*  369:*1*  372:*8,*
  *11*  374:*14*  375:*12*
  383:7  388:*8, 14*
  409:*15*  466:*13*
  469:*12*  473:6  476:2,
  *3*
**seeing**  21:*3*  421:*10*
  467:*1*
**seeking**  279:*7*
**seen**  46:*14*  65:8
  221:5  354:*11*  370:*15*
  471:*9*  474:*17*
**sees**  28:*11*
**segments**  273:*5*
**self-esteem**  481:*3*
**self-validation**  215:*10*
**send**  201:*3, 8*  220:*14,*
  *15*  221:*9, 13*  222:*10*
  225:*10*  232:6  233:*1,*
  *6*  234:*14*  252:*19*
  274:*17*  288:*1*  303:*1,*
  *10*  305:*22*  306:*19*
  308:*3*  324:*12, 14*
  336:*6*
**sending**  227:*15*
  228:*4*  231:*17*  233:*14*
  283:*5*  291:7  294:*9*

303:*12*  307:*9*  309:*13*
  336:*16*  349:*13*
**sends**  283:*21*  448:*20*
**seniority**  121:*22*
**sense**  125:*21*  223:*20*
  224:*3, 5, 6, 10*  239:*5*
  248:*11*  347:*16, 18*
**sensitive**  386:*16*
**sent**  26:*6*  79:*18*
  86:*18, 24*  166:*8*
  185:*4*  189:*3*  219:*18*
  220:2, *8, 21*  221:*1*
  225:*14*  226:*19*
  228:*22*  229:*3*  249:*5,*
  *7*  278:*3, 12, 15, 16, 17*
  281:*19*  283:6  292:*4*
  297:*14*  299:2  305:*10,*
  *20*  308:*4*  333:*19, 22*
  335:2, *9*  336:*1, 10, 12*
  459:2  463:*20*
**sentence**  66:*24*  67:*8,*
  *13*  81:*4*
**sentenced**  76:*15*
**separate**  87:*23*
  118:*15*  316:*8*
**separated**  404:*16*
**separately**  381:*12*
**September**  104:*3*
**serious**  316:*24*  317:*3*
  446:*1, 3*
**served**  25:*9*  26:*8, 14*
  31:8  346:*10*  433:*18,*
  *19*  454:*20*  458:*24*
**services**  298:*2*
**set**  93:*6*  124:*3*
  155:*2*  189:*6, 13*
  190:*14, 15, 21*  192:*4,*
  *16, 19*  194:*1*  195:*1,*
  *16*  196:*18*  197:*3*
  198:*10, 17*  260:*23*
  315:*16*  406:*18*
  425:*16*  483:*11*
**Seth**  1:*21*  5:*1*  11:*1*
  13:*6, 20*  14:*10*  15:6
  27:*12*  32:*15*  50:*8*
  53:*20*  54:2  55:*22*
  75:2  133:*18*  140:*21*
  168:*6*  170:*8*  233:*16*
  266:*10*  337:*19*
  386:*13*  424:*10*

435:*12*  459:*17*
  461:*12*
**seth@DerekSmithLaw**
**.com**  1:*24*
**setting**  193:*14*
  198:*18*  362:*8*
**settings**  91:*3*
**settlement**  414:*17*
  427:*17, 19*  428:*13, 19*
**seven**  29:*14*  42:2
  58:*13*  108:*8*  460:*22*
  461:*3*  480:*15*
**seven-hour**  58:*9*
**seventh**  42:*1*
**severe**  150:*14*
**sex**  214:*22*  225:*23*
  226:2, *4*  244:*10, 23*
  245:*3*  246:*4*  291:*4*
  304:*19*  390:*8*  436:*16,*
  *20, 22*  438:*4, 13*
  442:*11*  445:*17*
**sexual**  37:*15, 21*
  38:2  39:*4, 9*  42:*22*
  43:*12, 16, 24*  44:*14,*
  *22*  155:*21*  156:*4*
  213:*10, 16, 22*  214:*3,*
  *9*  216:7, *20*  226:*21*
  227:*19*  228:*10*  229:*1*
  230:8, *14*  237:*4, 10*
  242:*24*  243:*19, 23*
  244:7  245:*9*  246:*3*
  264:*5*  304:*8*  384:*8*
  425:*24*  426:*1, 12*
  440:*18*
**sexually**  36:*1, 15*
  423:*21*
**sgold@discrimlaw.net**
  2:*13*
**shape**  42:*17*
**share**  6:*14*  86:*8*
  247:*1, 18*  270:*4*
  394:*16*  395:*17, 20*
**shared**  233:*10*  388:*5*
**sharp**  288:*3*
**shed**  79:*22, 24*
  422:*15*
**she'd**  298:*16*
**shell**  409:*9, 18*
**Shield**  229:*17*  230:*2,*

*10*

**shiny** 288:*13*

**shirt** 231:*23* 366:*12*

**shit** 309:*8*

**Shocked** 303:*4*, *6*, *7*
409:*9*, *18*

**shop** 321:*13*

**short** 6:*17* 72:*1*
175:*15*

**shorter** 384:*4*

**Shot** 3:*14* 291:7, *8*,
*11*, *14* 304:22 305:*11*,
*21* 361:*18* 362:*24*

**shotted** 292:*4*

**show** 54:9, *10* 66:*24*
87:*14* 111:*17* 112:7
123:2 127:*16* 129:*1*,
*19* 139:*9*, *12* 228:6
254:*3* 295:*13* 318:*15*
326:*11*, *12* 327:8
359:*14* 361:*5*

**showed** 65:*10* 86:*24*
87:*14* 172:*16* 305:*11*
356:*13* 365:*17*

**showing** 194:*15*
265:22 327:*24* 360:*1*
361:*14* 461:*14*

**shown** 70:*13*

**shows** 336:*16*

**shut** 235:*21* 357:*19*

**shutdown** 400:*3*

**Sid** 40:*3*

**side** 35:6 86:7 90:*4*
109:*5*, *8* 122:*24*
250:*15* 356:*23*

**SIDNEY** 2:*10*
192:*20* 246:*11*
331:*12*, *15*

**sign** 98:*16* 252:*17*
280:*8*, *10*, *21* 282:*10*,
*11*, *15*, *16* 438:*13*
439:*8*

**signed** 14:*11* 154:7
282:*14*, *19*, *21*, *24*
436:*17* 439:*18*, *23*

**signify** 243:*18*

**signing** 278:*14*
280:*13* 282:6

**silence** 351:*9*

**sill** 470:*14*

**silly** 126:2

**simple** 99:*19* 161:*14*
168:*14* 196:*16* 202:6
266:*17* 270:*15*
315:*10*

**simply** 33:8 58:*3*
216:2

**single** 100:*17* 110:*10*
126:7 330:22

**sir** 11:*21* 63:*12*
68:*4*, *14*, *20* 69:*11*
90:5 102:5 108:*16*
162:*15* 247:6 332:*1*
437:*17* 453:*19*
479:*14*

**sit** 5:*13* 88:22
114:*19* 150:*12*
218:*23* 455:6

**Sitnick** 66:*9*

**sitting** 7:*11* 20:*11*,
*16* 108:*13* 113:*10*
181:*11* 225:*13*
235:*11* 242:*21*
258:*12* 259:5, *8*
262:*14* 287:*11* 301:*9*
366:*14* 387:*9*

**situation** 66:*8* 154:6
193:*24* 298:7 346:7
349:*15* 368:*4* 440:5,
*14*, *18* 441:*7*, *11*
445:*16*

**situations** 59:2

**six** 21:*20* 48:*24*
108:*8* 225:*1* 373:*11*

**skill** 406:*18*

**skills** 175:*10* 177:*20*
178:*13*, *14* 398:*5*

**skips** 225:2

**Sky** 17:*5* 18:*1*, *11*,
*13* 20:20

**sleep** 216:*15* 218:*13*
227:*3*, *8* 240:*4*, *11*

**sleeping** 213:*3*, *5*
231:*18* 237:*12*
293:*19* 439:*10*

**slept** 218:*15* 244:*20*

**slow** 78:*14* 176:*1*
272:*9*

**slowly** 248:*10*

**small** 254:6 311:*19*,
*20* 383:*3*

**smart** 281:*17*

**SMITH** 1:*21*

**Snapchat** 309:*12*

**sobbed** 276:*13*, *18*

**social** 298:2 363:*8*,
*10*, *20* 381:*8*, *10*
382:*12*, *13* 383:*1*, *12*
464:*10*

**society** 423:*13*, *18*

**sold** 277:*21*

**sole** 383:*17*, *20*
430:22

**solely** 370:*13*

**solid** 327:*19* 328:*13*

**solidify** 284:*1*

**soliloquies** 266:*12*

**soliloquy** 42:*19* 90:*16*

**solitary** 110:*10*

**solve** 141:*4* 416:*15*

**somebody** 17:*1*
21:*10* 45:*12* 121:*8*
133:*12*, *13* 154:*10*
161:7 166:*9* 191:*3*, *9*
229:*3* 307:2 312:*5*
344:*4* 349:*10* 358:*18*
360:*16* 376:*16* 390:*1*
409:*10* 422:*5* 432:*12*
467:*24*

**somebody's** 270:*8*

**somewhat** 6:*11*
289:22

**sorry** 14:*20* 22:*24*
27:*16* 29:6 47:*12*
52:*12* 64:*21* 69:*14*
78:*18* 90:*5* 100:*15*,
*23* 103:*19* 133:*19*
140:*16*, *21* 141:7
155:*14* 160:6 164:*18*
222:*17* 233:*4* 265:*8*
268:*20* 277:*13* 286:*9*
308:*18* 331:*16*
360:*19* 361:*3*, *7*
363:*2* 387:*8* 389:*1*
457:*13*, *20* 459:*23*
460:*3* 466:*16* 479:*14*

**sort** 255:*21*, *22*, *23*
269:*14* 281:*1*, *19*

**325:23** 354:*24*

**sorting** 260:*11*

**sound** 250:22 251:*8*
309:*20* 372:*15*

**sounds** 136:*19*
172:22 403:*21*

**source** 249:*16*
260:*11* 430:22
451:*24* 453:*16*, *22*

**sources** 431:*5*

**Southern** 379:*24*

**space** 102:*10*

**speak** 8:*4* 15:*16*
28:*10* 65:*24* 74:*4*
94:*10*, *12* 111:*19*
120:*14* 125:7 189:*18*,
*20* 261:*18* 370:*24*
375:*5* 437:*15* 429:*5*
437:*20*, *22* 444:*18*
445:*4* 470:*7*

**speaker** 64:*9* 359:*5*

**speaking** 40:*11*, *19*
41:*8* 42:*17* 43:*8*
56:*18* 57:*13*, *19* 59:*9*
60:*1* 67:*14* 85:*11*, *20*
122:*8* 261:*14* 262:*13*
265:*17* 330:*7* 350:*11*
359:*3* 371:*24* 372:*2*
374:22 375:*1* 407:*14*

**speaks** 13:*23* 54:*12*
77:*21* 78:*8* 81:*3*
84:*8* 202:*1* 240:*16*
331:22 437:*14*
443:*24* 446:*6*

**special** 68:*15*

**Specialist** 2:*24* 4:*13*

**specific** 74:*15*
130:*12* 258:*11* 259:6
261:*2* 273:*4* 315:*10*
452:*23*

**specifically** 34:2
111:*18* 144:*3* 316:6
342:*11* 344:*23* 348:2
464:*17*

**specifics** 115:*15*
123:*9* 148:*17* 150:*3*,
*7* 260:*24*

**specified** 345:22

**speculate** 221:*14*
322:*7*

speculation 30:22
83:3 133:4 163:9
Speculative 161:17
speech 37:1 266:19
368:8
speeches 45:15
53:21 370:22
speechifying 461:21,
23
spell 397:13
spelled 310:16
spend 29:15 46:7
382:5, 6, 7, 8, 15
403:17 434:19 436:7
474:8
spending 109:20
spent 114:5, 9
319:13, 21, 23
sphere 30:13
spinning 159:19
spiral 215:8
split 120:24 397:2
spoke 19:20 57:9
266:8 373:5, 9, 16
374:19 375:10 376:3
397:6 472:22
spoken 32:21 33:9
216:3 359:20, 21, 22
374:23 375:21, 24
430:10 449:6 454:13
462:10
spot 404:5
spreading 325:5
spreadsheet 255:17
SS 483:1
stabbed 364:16
Stacy 205:17
staff 113:19 127:9,
14 205:14 249:8
260:23 381:22
382:19
stages 278:9
stamp 272:19
stamped 356:20
stamps 324:4
stand 330:2
standard 76:9 259:4
standing 127:10, 11
437:4, 11

standpoint 116:8
stands 150:13 332:12
start 6:2 56:15
123:4 146:13 152:21
163:14 183:14 251:9
302:16 385:23 394:9
438:2 453:12 462:24
started 74:4 128:20
130:23 173:21
233:21 251:1, 2, 6
255:19 256:2 257:24
281:9 290:3 294:5
310:6 316:16 347:4
353:9 364:5 371:21,
23 384:11 404:17
414:15 458:17 460:8
464:15
starting 174:21 298:8
starts 86:14 183:11
355:2
state 7:19 58:3
214:23 215:8 258:8
259:9 394:23 478:8
stated 44:20 326:4
446:16
statement 76:23
81:8 156:8 215:1
326:12 332:23 370:3
372:23 393:8 479:2
statements 66:18
324:13 330:3, 6
345:9 353:11 370:9
379:16, 17 445:22
STATES 1:1 4:8
63:11 394:24
stating 113:8 197:19
447:22
Station 25:1 61:16
413:16 414:13
425:12
status 349:23
stay 360:24 361:2
402:9, 23 407:6
408:21 431:12
stayed 43:22 147:5
393:5 403:1, 2
406:14 408:20 412:2
staying 276:16
297:18 405:3

stemmed 341:4
352:10
stenographic 4:17
stenographically
483:15
step 346:13
Stephanie 249:5
467:7 468:10 469:7,
12, 14
stepping 284:13
Steve 18:7 19:10
stick 115:20
stole 316:17 317:23
338:10, 20 339:3
342:6 356:14
stolen 322:3 323:21
333:6 339:16
stone 284:13 468:15
stones 469:1
stop 53:21 69:13
79:23 220:12 307:11
308:18 434:18, 21, 22
435:5, 11 436:9
stopped 237:11
281:14 348:11
377:12 396:16
stopping 435:8
storage 99:4 102:10,
14
store 98:18 291:4
374:15 375:13
stored 101:8, 9, 23,
24 102:9, 14
stores 101:6
stories 363:18 452:1
storing 92:11, 17, 18
story 137:17 376:2
439:1 453:17, 23
464:21
straight 197:14
266:17 370:21
straightforward
270:16
strange 124:12
287:20
strategy 382:16
stream 315:1
Street 1:22 2:5, 12
24:24 61:16 254:22
255:11 256:21

258:14 259:11
260:16, 20 261:5, 15
264:7 266:9 355:5
357:18 358:5 413:16
414:13
streets 354:11 355:6
stress 411:4
stressful 411:12
454:8
strike 12:12 23:1
104:3 152:16 232:4
236:2 287:6 338:17
431:10
string 241:19 315:19
316:8
strong 322:10
structure 143:21
468:5
struggle 390:18
struggling 405:6
studied 368:10
studies 179:19 186:8
190:23
stuff 14:24 19:14, 16
58:18 79:6 88:20
91:12, 23 95:24 96:1,
20 97:2 108:2
109:21 123:3 151:7
157:14 169:19
198:23 223:16, 17
225:22 227:6, 21
241:17 277:15
324:15 328:4 340:11
341:18 348:16, 19
349:21 350:13
353:14, 24 354:11
369:3 374:4 382:14,
21 385:13, 24 389:3
453:10 457:22, 24
465:2, 20, 22 470:5
471:11
stupid 280:10
stupidest 242:12
subject 11:11 36:21
38:22 42:23 43:3
98:9 160:1 186:4, 21
430:7 465:8
subjective 177:17
178:6, 10, 12
submit 197:18 396:1

**submitted** 71:*15*
248:*18* 249:*18, 20*
251:*15, 16, 20* 253:*6*
256:*12* 258:*23*
**subordinate** 257:*17*
**subscribed** 483:*21*
**substance** 32:*14*
**substantial** 318:*15*
447:*12, 19*
**succeed** 52:*2*
**success** 53:*5* 55:*10*
70:*23* 72:*19* 80:*23*
81:*24*
**successfully** 345:*23*
**suck** 176:*24*
**sued** 61:*5*
**suffered** 425:*24*
**sufficient** 80:*22*
407:*22*
**suggest** 43:*20* 58:*7*
206:*23* 331:*24*
367:*24* 412:*23*
**suggesting** 36:*10*
207:*5*
**suggestion** 474:*12*
**suing** 432:*3*
**Suite** 1:*22* 2:*5, 11*
403:*7*
**Sullivan** 370:*15*
**summary** 253:*8*
**summer** 469:*9*
**Sun** 462:*22*
**superior** 121:*19*
**superiors** 120:*1, 4*
**supervised** 198:*1*
**supervising** 128:*9*
129:*10* 206:*2* 223:*19*
**supervisor** 119:*1*
127:*3* 224:*11* 231:*17*
**supervisor/supervisee**
167:*5*
**supervisors** 141:*22*
**supervisory** 105:*13*
165:*23*
**supply** 432:*21*
**support** 256:*13*
259:*1* 333:*7*
**supported** 36:*12*
**supporter** 369:*6*
**supports** 370:*11*

**supposed** 17:*19*
82:*15* 91:*17* 111:*8*
128:*9* 143:*18* 164:*7*
277:*9* 378:*1* 385:*6*
467:*5, 6, 14*
**supposition** 418:*21*
**sure** 8:*8* 41:*3, 21*
45:*13* 46:*23* 54:*19*
119:*14* 128:*21* 150:*9*
166:*19* 185:*8* 196:*13*
227:*1* 232:*11* 249:*23*
250:*17* 252:*10, 13*
253:*23* 254:*14*
271:*18* 273:*16*
278:*11* 284:*12*
305:*23* 306:*22*
312:*10* 313:*21, 22*
334:*20* 335:*8* 348:*21*
355:*18* 358:*17*
377:*17* 378:*7* 380:*4,*
*10* 385:*22* 407:*5*
414:*16* 448:*11*
451:*22*
**surgery** 469:*1*
**surprise** 303:*8, 9*
**surprised** 61:*5*
**surveillance** 17:*20*
**survive** 392:*6*
**suspicion** 339:*4*
340:*5* 341:*8*
**suspicions** 276:*8*
338:*10, 11, 14, 19, 23*
**swear** 4:*19* 286:*23*
**sweaty** 294:*21*
**sweet** 390:*13, 21*
**swimming** 205:*19*
**sworn** 4:*22* 10:*2*
483:*6, 13*
**symptoms** 476:*24*
477:*15* 478:*17*
**synopsis** 466:*2*
**system** 76:*13* 259:*18*
424:*24* 425:*3, 11*

**< T >**
**table** 7:*11*
**take** 6:*4, 14* 21:*20*
38:*12* 39:*14* 41:*20*
46:*21* 47:*2, 4* 48:*8*
50:*10* 56:*1* 59:*6, 22*

67:*5* 70:*5* 91:*13*
94:*18, 23* 95:*17*
97:*10* 101:*10, 13*
102:*19* 119:*21* 122:*9*
127:*18* 134:*4* 154:*15*
157:*11* 168:*4* 170:*7,*
*13* 174:*8* 219:*16*
222:*3, 4, 6* 233:*16, 19,*
*22, 23* 253:*7* 254:*10,*
*18* 285:*9* 286:*5*
295:*2* 311:*23* 337:*11,*
*19, 20* 343:*8* 361:*20*
372:*3, 24* 388:*10*
407:*3, 9* 408:*4*
435:*12* 449:*24*
450:*15* 460:*7* 467:*9*
474:*11, 18* 481:*23*
**TAKEN** 1:*14* 56:*11*
103:*4* 141:*15* 170:*21*
184:*24* 185:*7* 218:*4*
326:*17* 399:*20* 408:*1*
451:*2, 3* 483:*15*
**takenI** 326:*19*
**takes** 297:*10* 376:*1*
445:*15*
**talk** 5:*14* 7:*9* 8:*10*
9:*4* 16:*8* 34:*5* 65:*3*
66:*21* 106:*21* 109:*12*
114:*16* 139:*14* 144:*3*
151:*13* 159:*15*
167:*10* 183:*19*
193:*20* 223:*15*
225:*22, 23* 226:*3, 7*
235:*7* 265:*7* 266:*18*
288:*17, 21* 292:*16, 19*
294:*17, 18* 295:*21*
296:*22* 297:*3* 299:*7*
313:*13* 315:*7* 335:*22*
349:*11* 376:*6, 9, 17*
393:*22* 411:*14*
413:*17* 422:*16*
427:*16* 428:*13*
431:*17* 438:*15* 455:*7*
458:*4* 465:*21* 481:*14*
**talked** 6:*1* 7:*8* 8:*22*
15:*5* 19:*17* 32:*5, 15*
33:*6, 23, 24* 34:*3, 18*
35:*1* 64:*15* 114:*23*
144:*4* 145:*21* 149:*11*
150:*15* 159:*13* 166:*1*

168:*11* 184:*18*
205:*13* 226:*11*
233:*10* 235:*5* 262:*4,*
*20* 280:*12* 281:*8*
289:*13, 14* 298:*11*
319:*2, 12* 320:*21*
335:*10, 13, 19, 23*
346:*23* 350:*13*
369:*17* 373:*15*
374:*16* 396:*14, 23*
440:*2* 454:*1, 4* 458:*7*
459:*24*
**talking** 16:*11* 22:*13*
37:*3* 39:*2, 5, 13* 41:*4,*
*5* 44:*11* 51:*9* 52:*21*
65:*4* 68:*17* 83:*16*
86:*21* 88:*10* 93:*16*
97:*14* 116:*7* 126:*16*
127:*12* 139:*8* 140:*10,*
*11* 166:*14, 16* 167:*11*
171:*3, 19* 175:*19*
183:*4, 17* 190:*22*
191:*1* 194:*7, 17*
196:*5, 20* 208:*8*
220:*3* 222:*10* 225:*3*
236:*13* 237:*9* 241:*6,*
*12* 242:*9, 11* 260:*15,*
*19* 261:*4* 262:*18*
263:*19* 266:*6* 278:*7*
280:*17* 281:*11, 14*
284:*2, 14, 15, 17*
286:*14* 287:*7, 23*
288:*11, 19* 289:*7*
290:*14, 16* 291:*12*
294:*4* 303:*18* 305:*8*
309:*8* 316:*6* 325:*14*
326:*2* 334:*23* 335:*5*
339:*9* 344:*15* 347:*15*
356:*9* 366:*15* 376:*8*
392:*17* 393:*12, 14*
395:*6* 396:*17* 428:*19*
437:*1* 449:*10, 13, 16*
454:*6* 464:*15* 474:*6*
**talks** 287:*5* 294:*18*
320:*20* 470:*6*
**tapes** 453:*4*
**tarnish** 30:*13*
**tasks** 121:*3, 24* 127:*5*
**Taylor** 426:*15*

Deposition of Lisa Barbounis

Lisa Barbounis v. Middle Eastern Forum, et. al.

**Taylor's**  425:*8*
**T-bone**  278:*4, 12*
**teach**  157:*7*
**team**  158:*12*  380:*13*
  382:*20*
**tech**  48:*12*
**technical**  153:*11*
**technicalities**  82:*14*
**technically**  121:*7*
  224:*12*
**Telegram**  363:*5, 6, 11*
**telegrams**  349:*14*
**telegraph**  464:*7, 8*
**television**  267:*9*
**tell**  6:*10, 13*  10:*5*
  11:*15, 16*  18:*9, 11*
  19:*15*  33:*22*  48:*15*
  62:*20*  89:*23*  93:*12*
  94:*8*  110:*11*  117:*15*
  118:*11*  121:*12, 13*
  122:*6*  123:*22*  126:*23*
  147:*17, 21*  148:*14*
  149:*17*  151:*4*  161:*7*
  164:*23*  169:*10, 12, 14*
  202:*22*  214:*19*
  228:*20*  243:*9, 10*
  244:*18*  248:*21*
  253:*11*  254:*11*
  255:*21, 22*  262:*24*
  263:*3*  272:*4*  277:*1*
  281:*4, 12*  283:*3*
  308:*23*  309:*17*
  310:*15*  312:*10*
  316:*23*  317:*14*
  318:*17*  322:*1*  323:*16*
  347:*17*  350:*6, 14*
  356:*10*  369:*1*  370:*19*
  378:*15*  393:*7*  404:*10*
  407:*12*  412:*3*  415:*14*
  417:*17*  422:*6*  423:*5*
  425:*13*  430:*18*
  431:*12*  438:*1, 23*
  439:*13*  441:*3*  442:*8,
  12, 22*  447:*18*  452:*2,
  4*  454:*24*  455:*1, 2*
  456:*2*  459:*8, 19*
  471:*20*  477:*12, 16*
**telling**  11:*19*  22:*15*
  27:*6, 21*  125:*2*  149:*4*
  154:*13, 24*  162:*2*

163:*15*  174:*15*
202:*20*  207:*1*  216:*12*
222:*14*  241:*14, 16*
244:*22*  305:*1*  318:*5*
340:*20*  342:*12*
370:*17*  389:*6*  390:*22*
391:*8*  418:*14*  419:*14*
438:*4*  451:*7*  461:*20*
**tells**  342:*5*  442:*14*
**tend**  437:*16*
**tenth**  262:*2*
**tenure**  477:*1*  478:*18*
**Terio**  359:*11*
**term**  84:*1*  427:*19*
**terms**  6:*18*  83:*12, 14*
  86:*3, 4*  108:*18*
  345:*19*  427:*19*
**terrible**  38:*18, 20*
  130:*1*  138:*18*  142:*19*
  155:*3*  161:*10*
**terrorist**  354:*4, 6*
**terrorists**  353:*19*
**test**  408:*4*
**testified**  4:*22*  27:*9*
  58:*14*  65:*17*  93:*22*
  97:*24*  105:*2*  163:*1*
  195:*8*  232:*12, 17*
  338:*4, 14*  418:*1, 13*
  483:*10*
**testify**  58:*17*  74:*16*
  77:*1, 2*  163:*10*  333:*2*
  415:*5*  416:*23*  417:*3,
  12, 22*  418:*6, 17, 22*
  419:*9, 18, 19*  456:*5*
  457:*14*  483:*7*
**testimony**  4:*21*  5:*21*
  8:*15, 16, 20*  9:*19*
  10:*1, 2*  11:*4*  12:*14*
  31:*14*  72:*1*  97:*5, 21*
  98:*6*  134:*17*  136:*24*
  137:*20*  156:*2*  160:*18*
  161:*4*  165:*8*  166:*6*
  167:*8*  204:*15*  210:*20*
  228:*3*  234:*24*  242:*22*
  245:*21, 22, 24*  326:*7*
  329:*15*  330:*18, 19*
  332:*18*  340:*4*  370:*17*
  452:*24*  457:*6, 9*
  483:*20*

**Texas**  289:*13, 15*
  399:*24*  400:*1, 5, 18*
  404:*2*  449:*19, 21, 22*
  450:*2, 8*
**Text**  3:*9, 12*  68:*10*
  157:*1*  182:*16, 18*
  183:*8, 19*  194:*14, 17,
  24*  221:*19*  228:*24*
  234:*13*  241:*19*
  242:*12, 14*  244:*4*
  246:*2*  271:*8, 10*
  272:*8*  273:*5, 12*
  278:*4, 12*  283:*22*
  286:*6*  305:*10*  306:*21*
  315:*19*  316:*4*  327:*11*
  334:*3, 14*  335:*22*
  336:*2, 9, 15*  337:*1*
  342:*11, 18*  349:*22*
  373:*6*
**textbook**  414:*7*
**texted**  334:*5, 6, 7*
  336:*5*  374:*7, 9, 11*
**texts**  285:*20*  297:*22*
  302:*15*
**Thank**  55:*5*  67:*23*
  68:*4*  69:*17*  418:*4*
  475:*9*
**Thanks**  19:*9*  94:*23*
  308:*17*  309:*5*
**theft**  317:*15*  342:*22*
**Thelma**  117:*24*  124:*5*
**themself**  16:*3*
**therapist**  467:*11, 15*
  468:*2*
**thereof**  228:*21*
**thing**  6:*7*  28:*1*
  46:*22, 24*  47:*3, 14, 19*
  49:*18*  71:*12*  78:*14*
  80:*16*  86:*16, 17, 23*
  91:*19*  100:*18*  101:*10*
  108:*23*  122:*13*
  124:*12*  125:*24*  126:*4*
  127:*11*  129:*22*
  130:*12*  131:*14*
  145:*20*  146:*7*  152:*23*
  153:*21*  154:*3*  161:*6*
  169:*17*  193:*1*  195:*23*
  198:*22*  203:*14*  207:*9*
  210:*16*  233:*1*  243:*20*
  253:*16*  259:*1*  260:*12*

262:*4*  286:*21, 24*
291:*2*  295:*24*  299:*3*
305:*24*  306:*19*  307:*3*
316:*15*  317:*10*  319:*1*
330:*15*  339:*14*  340:*8*
343:*8, 9*  346:*7*  353:*2*
360:*3*  372:*16*  379:*11*
382:*22*  388:*13*
390:*19*  407:*5, 11*
417:*13*  418:*19*
437:*21*  443:*9*  452:*20*
453:*2, 3*  455:*8*  456:*6*
457:*11*  462:*19*  463:*8,
20*  467:*12*  473:*12*
474:*19, 23*  475:*18*
476:*4*
**things**  14:*22*  20:*4*
  21:*15*  28:*21*  35:*17*
  36:*13*  39:*22*  41:*18*
  45:*18*  53:*24*  70:*8, 9,
  10, 14*  71:*10, 21*  74:*5*
  83:*12, 13, 17*  92:*20,
  21*  93:*1*  96:*4*  114:*13,
  24*  115:*2*  119:*15*
  121:*2, 3, 22*  122:*23,
  24*  125:*23*  126:*1*
  130:*3*  149:*1*  152:*9,
  12*  161:*9*  162:*2, 3*
  163:*1, 15, 24*  165:*15*
  166:*7, 8*  167:*11*
  169:*14, 16*  172:*4*
  174:*5*  176:*22*  179:*5*
  186:*5*  190:*19*  193:*3,
  19*  197:*16*  212:*15*
  215:*10*  226:*7, 15*
  227:*6*  246:*17*  250:*11*
  257:*4, 10, 11, 15*
  260:*23*  268:*11*
  288:*17, 20*  289:*8, 10*
  293:*13, 19*  297:*1, 12,
  19*  306:*18*  309:*24*
  322:*16*  323:*9, 12*
  332:*11*  341:*20*
  349:*20*  351:*21, 22*
  353:*4*  356:*11*  369:*2*
  370:*16*  377:*10*
  379:*12*  397:*3*  401:*24*
  402:*1, 3*  408:*22*
  409:*1, 15*  410:*21*
  443:*12*  446:*13, 22*

448:*10, 19, 22*  450:*4*
451:*19, 20*  452:*9*
463:*19*  466:*12, 13*
469:*2*  473:*11*
**think**  20:*15, 16*  21:7
22:*9, 19*  25:*12*  30:*24*
38:*13, 17*  39:*15*  41:*7,
8*  42:*1, 12*  45:*17*
48:*18*  49:*7*  50:*6*
51:*11, 17*  56:*17*  57:*5,
9*  58:*12, 14, 16*  60:*18*
68:*9*  69:*6*  72:*14*
76:*17*  79:*11*  82:*5*
92:*10*  93:*8*  98:*8, 10*
99:*5*  102:*1*  104:*16,
21*  105:*6, 7*  113:*3*
117:*20, 23*  123:*8, 9*
134:*24*  135:*6*  141:*11*
142:*17, 19*  143:*3*
146:*7, 23*  151:*12*
157:*21*  163:*3*  170:*9*
177:*10*  179:*2*  180:*7*
184:*4*  185:*3*  186:*18*
190:*1*  194:*8*  202:*18*
206:*11*  215:*7*  219:*18*
224:*5*  226:*10, 23*
227:*10, 13, 17, 21, 23*
228:*24*  229:*12, 19*
231:*10, 14*  232:*5, 7*
233:*11, 12*  243:*19*
244:*9, 10, 22*  245:*6*
249:*19, 21, 24*  271:*2,
14*  275:*5, 8*  281:*13*
282:*20, 22*  283:*1*
284:*5, 8*  288:*15*
289:*3*  290:*13*  294:*7*
296:*15*  298:*15*
299:*11*  301:*10*  302:*6,
12*  304:*14*  310:*1, 2, 3*
311:*16*  315:*9*  319:*16,
17*  321:*12*  323:*16*
324:*24*  334:*17*  338:*9*
339:*21*  344:*3*  345:*15,
18, 21*  347:*23, 24*
348:*1, 20*  350:*18*
351:*15, 23*  352:*16, 19,
24*  354:*6, 8, 14, 17, 21*
355:*14*  358:*9, 23*
359:*12*  360:*1*  364:*8*
366:*1, 8, 22*  367:*2, 6*

368:*5, 7, 11*  369:*13*
371:*19*  372:*7, 14, 17*
374:*8*  375:*11*  377:*1*
378:*6*  379:*20*  383:*16*
384:*15*  386:*6, 17, 22*
388:*7*  392:*20*  393:*17*
394:*4, 19, 21*  395:*13,
19, 22*  400:*6*  402:*11,
15*  405:*15*  408:*2*
411:*17*  413:*8*  414:*6*
415:*1*  422:*8, 9*
428:*19*  434:*3*  438:*22*
439:*13, 15*  440:*21*
443:*17, 18*  445:*18, 24*
446:*3, 8*  447:*12*
450:*7, 16, 18*  451:*22*
459:*2, 13*  461:*9*
462:*13, 16*  463:*1, 19*
466:*8*  471:*9*  472:*4*
**thinking**  168:*15*
196:*9*  306:*5*  335:*7*
416:*21*
**thinks**  77:*3, 5, 9, 14*
78:*21*  113:*22*  243:*18,
23*  339:*20*  396:*1*
411:*1*  414:*23*  415:*2*
445:*8, 9*  448:*17*
**third**  59:*11*  85:*3*
88:*23*  107:*22*  114:*2*
444:*19*
**Thirteen**  68:*8*
**Thomas**  286:*1*  287:*1,
2*  294:*6*  296:*10*
304:*23*  305:*10*
320:*10*  322:*24*
325:*16, 21*  326:*4, 13,
21*  327:*5*  328:*2*
330:*7*  333:*5, 15*
334:*16*  338:*10, 20*
339:*3, 15*  340:*6*
341:*11*  365:*11*  373:*5*
**thought**  27:*11, 23*
28:*3*  98:*24*  118:*10*
137:*21*  139:*17*  146:*5*
147:*2*  175:*1*  194:*21*
204:*12*  222:*13*
230:*21*  233:*3*  241:*24*
242:*2*  276:*10*  281:*21,
22*  287:*3*  288:*24*
296:*13*  323:*24*  324:*1*

339:*22*  341:*24*
350:*22*  366:*7*  372:*20*
408:*21*  425:*10*  437:*3*
459:*9*
**thousands**  83:*17*
**thread**  131:*11, 13*
241:*22*  242:*15*
272:*22*  273:*12*
**threat**  308:*21*  434:*16,
17*  436:*3*
**threaten**  295:*18*
434:*10*
**threatened**  62:*5*
379:*14*
**threatening**  308:*9*
434:*20*  436:*8*  460:*16*
**threatens**  297:*7, 9, 10*
**threats**  299:*5*
**three**  5:*18*  19:*18*
84:*24*  129:*7*  131:*6*
132:*3*  188:*18*  189:*4*
206:*1*  207:*24*  211:*6*
219:*1*  226:*12*  313:*18,
23*  314:*11*  316:*7, 8*
321:*20*  330:*2*  364:*24*
400:*7*  402:*15*  456:*18*
461:*16*
**threes**  107:*5*
**threw**  321:*15*
**throw**  340:*15*
**throwing**  435:*14*
**thrown**  365:*21*
**throws**  316:*18, 19*
**Thursday**  305:*23*
306:*2*  468:*14*
**ticket**  276:*23*
**tie**  133:*13*  294:*8*
**tied**  181:*14*
**tier**  117:*13*  118:*12,
14*
**Tiffany**  430:*10, 14,
23*  431:*6*
**tight**  398:*21*
**time**  4:*4*  5:*13*  6:*1, 3,
5*  7:*9*  8:*8, 9, 10, 23*
11:*3*  15:*3*  22:*10, 12,
14, 19, 20*  23:*10*  26:*7*
29:*13*  39:*20, 24*
41:*17*  42:*1*  48:*8*
51:*6*  53:*8*  56:*8, 12*

57:*9*  59:*16, 20*  60:*2*
66:*12, 20*  67:*5*  74:*8*
78:*19*  87:*6*  94:*5*
102:*24*  103:*3*  104:*1,
4, 8, 14*  107:*22, 23*
108:*2, 5*  120:*20, 24*
123:*23*  128:*17*  135:*1*
139:*11*  146:*2*  148:*22*
149:*19*  150:*6*  151:*23*
152:*18*  153:*14*
156:*19*  157:*11*  158:*5*
166:*15, 16*  170:*17, 20*
171:*4, 6*  174:*7*
175:*15*  176:*7*  177:*13,
23*  178:*2, 8*  180:*5, 18*
186:*7*  188:*24*  190:*7,
11*  192:*2, 6, 12, 21*
193:*15*  198:*13, 20, 21,
22, 24*  205:*12*  206:*5,
6*  213:*9*  216:*7*
218:*16*  219:*7*  224:*8*
228:*10*  234:*1, 4*
238:*11*  242:*6*  245:*10*
247:*14*  249:*1*  250:*12*
251:*19*  255:*15, 16*
258:*14*  259:*3*  261:*1,
2, 16, 21*  262:*2*  268:*3*
270:*21, 24*  275:*15*
276:*7*  277:*18*  278:*10*
279:*18*  280:*18*
282:*15*  284:*16*
285:*24*  287:*24*
288:*15*  289:*21*  292:*6,
11, 12*  293:*5*  295:*7,
12*  309:*19*  310:*14, 22,
23, 24*  311:*3, 7, 9*
320:*8*  321:*12*  323:*3,
4*  324:*3*  327:*11, 12*
334:*19, 20*  337:*19, 23*
338:*1*  341:*23*  343:*7,
19*  345:*2*  346:*18, 20*
347:*9, 11*  348:*3, 9*
349:*2, 12*  350:*7, 9, 15,
23*  351:*5*  352:*20*
354:*23*  356:*20*  365:*6*
369:*6*  371:*9*  373:*4, 9,
13, 16*  374:*18, 22, 24*
376:*2*  377:*4, 9*  378:*8*
379:*6*  381:*20, 23*
382:*4, 6, 9*  383:*12*

389:*4*  390:*6*  396:*3, 7,
23*  397:*23*  398:2
401:*18*  402:*10, 14, 24*
403:*1, 3*  408:*23*
433:*22*  435:*8*  436:*19*
438:*19*  442:*4*  449:2
450:*6*  460:*21*  461:*10,
12, 19*  463:*3*  465:*22,
23*  466:*8*  467:*10, 18*
468:*9*  469:*7*  474:*18*
479:*21*
**times**  19:*18*  38:*16*
71:*8*  81:7  85:*24*
92:*19*  107:*5, 11*
115:*24*  126:*6*  128:*20*
147:*3*  149:*8, 10*
165:*13*  166:*1*  174:*9*
176:*21, 24*  177:*2, 6*
180:*20*  210:*12*
212:*17*  216:*13*
218:*12*  219:*1*  226:*3,
6, 9, 10*  229:*11*
256:*22*  257:*20*  267:*8*
281:*8*  298:*5*  300:*21*
321:*9, 10*  322:*14*
349:*6*  350:*3, 4*
351:*20*  356:*21*
375:*24*  397:*2*  400:*2,
4*  402:*7, 21*  404:*1*
417:*19*  419:*2*  452:*10*
455:*22*  456:*1*  462:*21*
464:*14*
**tiny**  47:*10*
**Tioro**  464:*7*
**tired**  262:*16*  450:*13*
**title**  146:*10*  191:*20,
24*  195:*8*  199:*2, 4, 23*
200:*4, 12, 21*  202:*13,
17*  203:*17, 19, 20, 22*
204:*5, 13, 16, 20*
208:*3, 7, 9, 12*  209:*11*
210:*10*  284:*10, 17, 19*
**titled**  395:*20*
**today**  4:*14, 16*  5:*12,
17*  6:*5, 10, 15*  7:*10,
21*  8:*2, 12*  11:*1, 5, 15*
20:*11*  29:*11*  33:*19*
39:*23*  41:*20*  45:*20*
49:*23*  50:*18*  58:*16,
24*  60:*20*  65:*12*

106:*9*  108:*13*  113:*10*
181:*11*  218:*23*
225:*13*  235:*11*
242:*21*  257:*20*
258:*12*  259:*5, 8*
262:*14*  263:*7*  301:*9*
330:*19*  369:*21*
385:*19*  387:*18*
392:*19*  428:*11*
444:*12, 15*  449:*5*
451:*5*  458:*8, 17*
460:*12*  464:*4*
**Today's**  4:*3*
**told**  6:*3*  17:*22*
18:*17*  20:*11*  25:*1, 6,
14*  35:*4*  37:*11*  62:*2,
6*  65:*16*  85:*23*  90:*24*
92:*13*  93:*9*  114:*11*
127:*1*  132:*11*  142:*4*
145:*2*  146:*2, 5*  148:*1*
154:*22*  157:*21*
158:*16, 22*  160:*24*
172:*2*  174:*23*  176:*13,
16*  177:*19*  205:*12*
210:*21*  235:*8*  236:*19*
238:*23*  244:*23*  246:*3*
265:*24*  276:*10*  282:*9*
297:*8*  317:*7*  319:*22*
321:*7*  322:*17*  324:*12*
332:*12*  358:*18*
360:*16*  370:*18, 19, 20*
375:*9*  376:*2*  377:*16*
391:*5*  417:*18*  420:*20*
433:*22*  435:*1*  441:*21*
456:*17, 18*  465:*19*
471:*21*
**tolerate**  57:*13*
**Tommy**  143:*2, 5, 18*
146:*6*  288:*12*  290:*17*
294:*20*  295:*8*  305:*17*
312:*12*  313:*6*  317:*24*
322:*18*  323:*1, 5, 21*
324:*20*  330:*7*  333:*15*
334:*8, 23, 24*  335:*7,
11*  336:*3*  337:*12*
344:*21, 24*  345:*1*
346:*24*  349:*1, 6, 23*
350:*2*  351:*4, 19*
352:*13, 22*  353:*10*
358:*7, 22*  359:*1*

360:*17*  362:*4*  363:*4*
365:*9, 12*  377:*3, 5, 8,
10, 13, 14*  378:*2, 11,
18*  379:*7, 12, 16*
380:*3*  384:*2*  432:*4, 5,
7, 11*  433:*2, 7, 12*
448:*8, 9, 10, 16*  449:*3,
11, 13, 14*  452:*8, 13,
20*
**Tommy's**  358:*24*
360:*9*  377:*23*
**Tomo**  362:*3*  464:*16,
19, 23*
**tomorrow**  222:*13*
**ton**  240:*6*  364:*15, 17*
462:*23*
**tone**  112:*24*
**tonight**  383:*7*
**tons**  334:*20*  356:*17*
454:*11*
**toothed**  15:*4*
**top**  28:*1*  48:*19*
109:*2, 14, 16*  182:*21*
183:*15*  222:*4*  248:*8*
259:*13*  312:*9*  362:*2,
6*  469:*2*
**top-down**  393:*23*
**topic**  186:*7*  189:*20*
190:*24*  266:*4*
**topics**  59:*12*  359:*9*
**Toradol**  389:*4, 17*
**Torio**  364:*8*
**Toro**  359:*4*
**totally**  89:*12*  97:*4*
152:*11*  229:*13, 15*
231:*3*  343:*20*  428:*11*
434:*11*
**touched**  11:*22*  88:*21*
**trade**  8:*21*  9:*1, 9, 14*
11:*24*  15:*13*  51:*9, 17,
22*  52:*4*  53:*6*  55:*11*
70:*23*  75:*17*  76:*4*
77:*19*  78:*1*  80:*24*
106:*8, 18*  270:*2, 9, 13*
**trafficking**  43:*12, 16,
24*  44:*14, 23*
**tragic**  298:*7*
**train**  158:*14*  234:*16*
**training**  157:*15*

**transcript**  7:*1*  10:*19*
216:*5*  386:*23*  440:*12*
444:*17*  459:*16*
**transcription**  483:*18*
**transfer**  181:*17*
**transferring**  177:*17*
**transition**  157:*22*
**transitioning**  405:*17*
**translate**  406:*6*
**transmitted**  337:*2*
**transvestite**  226:*13*
**trap**  129:*7*
**trauma**  468:*1*
**travel**  397:*4*
**traveling**  289:*21*
**treat**  309:*2*  386:*23*
**treated**  140:*18*
178:*23, 24*  179:*2*
410:*19*
**treatment**  470:*1*
**trial**  66:*13, 16*
**Tricia**  90:*20*  94:*11,
14*  96:*17*  105:*14*
233:*9, 10*  271:*10*
272:*8*  273:*18*  278:*3,
17*  281:*4, 6, 7, 12*
286:*17*  289:*2*  306:*22*
415:*6*  416:*24*
**Tricia's**  271:*19*
**trick**  53:*24*  168:*16*
**tried**  86:*6*  126:*3*
130:*3*  293:*5*  297:*22*
433:*12*
**trip**  450:*6*
**triumph**  110:*17*
**trouble**  29:*2*  111:*6*
128:*7, 8*  163:*4*  325:*6*
376:*8*  414:*21*
**troubled**  433:*24*
**true**  34:*11*  35:*18*
42:*10*  43:*11*  82:*20*
113:*14*  132:*6*  149:*3,
4*  159:*1*  214:*20*
215:*1, 3*  251:*19, 22,
23*  252:*11*  297:*1*
325:*10, 14*  327:*14, 15*
333:*4*  338:*24*  348:*8*
393:*6*  416:*2*  417:*9,
11*  419:*23*  420:*6*
422:*24*  427:*7, 8, 9*

Case 2:19-cv-05030-JDW   Document 110-2   Filed 03/02/21   Page 171 of 193
Deposition of Lisa Barbounis
Lisa Barbounis v. Middle Eastern Forum, et. al.

432:*16*  443:*13*
476:*21*  478:*1*
**truly**  159:*2*
**Trump**  355:*1*  368:*5,
24*  369:*6*  370:*11*
371:*3, 21, 23*
**trust**  127:*18*  280:*12*
325:*7*  342:*1*  472:*2*
**truth**  11:*15, 16, 19*
35:*6*  412:*5*  419:*14*
422:*6*  466:*17*  483:*7,
8*
**truthful**  38:*15*
212:*14, 17*  424:*18, 20*
**truthfully**  418:*2*
419:*18, 19*
**try**  6:*16*  7:*9, 18*
11:*7*  39:*21*  137:*21*
143:*11*  149:*15*  163:*4*
298:*6*  300:*6, 9*
306:*18, 19*  316:*1*
431:*15*  433:*3, 6*
436:*19*  466:*11*
478:*23*
**trying**  7:*13*  20:*15,
16*  28:*2*  31:*19*  53:*23*
57:*3*  61:*11, 13*  67:*11*
74:*14, 20*  80:*16*
117:*20, 22*  122:*21*
125:*16*  129:*6*  132:*8*
139:*18*  140:*7*  148:*18,
24*  151:*9*  153:*18*
155:*2*  156:*10, 22*
157:*2*  158:*7*  160:*13,
19*  161:*23*  163:*21*
166:*22*  168:*10, 15*
176:*23*  197:*13*
206:*22*  217:*7*  218:*8*
227:*1*  242:*20*  259:*16*
264:*13*  293:*10*  296:*6*
314:*24*  316:*21, 22*
318:*13, 14*  331:*5*
340:*15, 20*  348:*20*
357:*9*  365:*5*  390:*19*
408:*11*  410:*9*  412:*4*
413:*13, 15, 19*  432:*12*
**Tuesday**  1:*15*
**tumble**  391:*16*
**tunnels**  357:*17*  358:*6*
**turn**  63:*3*  414:*22*

**turned**  62:*19, 23*
63:*1*  86:*17*  226:*12*
325:*10, 13*  327:*14, 15*
335:*17*  338:*12*  368:*5*
464:*6, 8, 11*  465:*8*
**turns**  129:*6*
**Tweet**  383:*8*
**tweets**  310:*17*
383:*10, 21*
**twice**  36:*16*  100:*12*
107:*5*  401:*2*  404:*3*
**twist**  80:*16*  466:*12*
**twisted**  12:*10*  166:*8*
351:*21*
**Twitter**  383:*7, 21*
463:*11, 13, 16*
**two**  15:*1*  29:*1*  59:*11*
66:*3*  71:*8*  89:*20*
107:*19*  110:*13*
114:*16*  115:*3, 17, 20*
144:*20*  146:*1*  167:*11*
225:*2*  227:*10*  258:*12*
262:*20*  285:*20*  307:*5*
312:*22*  313:*11*  318:*4*
335:*4, 5*  353:*6*  360:*8*
361:*2*  376:*3, 22*
400:*6, 7*  403:*19*
407:*3*  437:*23*  438:*20*
444:*8*  452:*18, 22*
465:*4*  474:*9*  478:*11*
481:*16*
**two-and-a-half**  147:*12*
**type**  115:*8*  233:*7*
255:*18*  425:*14*
**types**  89:*20*  152:*12*
434:*1, 7*
**typical**  141:*21*
**typo**  294:*17*  437:*3*
**tyrant**  95:*8*

**< U >**
**U.S**  249:*11*  281:*24*
397:*1*
**Uh-huh**  46:*13*  64:*21*
183:*6, 13*  204:*8*
212:*21*  253:*10*  254:*2,
9*  256:*18*  274:*19, 21*
277:*23*  283:*8, 13*
285:*17*  303:*14*
313:*15*  323:*7*  384:*15*

388:*19*  391:*2, 6, 10*
392:*16, 23*  470:*22*
**ultimate**  110:*14*
**ultimately**  75:*16*
76:*3*  123:*6*  161:*11*
338:*12*
**umbrellas**  369:*2*
**un**  477:*21*
**unable**  11:*15*
**unaffiliated**  192:*20*
**unaware**  113:*19*
**unbelievable**  25:*23*
**unclear**  470:*13*
**uncomfortable**
231:*11*  440:*5, 14, 17*
441:*6, 10*  445:*16*
**uncontrollably**  276:*18*
**underappreciated**
302:*17*
**undercover**  339:*21,
22*  340:*22*
**underground**  357:*17*
**undermine**  466:*12*
**underneath**  109:*11*
257:*18*
**undershirt**  231:*21*
**understand**  13:*16*
16:*19*  27:*14*  29:*18*
44:*9*  50:*2, 4*  52:*9, 20*
68:*18*  71:*3*  84:*9, 11,
12*  90:*13*  95:*8*  112:*8*
121:*15*  137:*19*
144:*16*  145:*7*  149:*9*
152:*5*  169:*22*  174:*22*
182:*24*  187:*17*  189:*1*
190:*3*  194:*12*  197:*16*
200:*14*  204:*4*  211:*2*
217:*7*  218:*23*  223:*24*
251:*7*  252:*4*  259:*23*
261:*22*  264:*9, 19, 24*
265:*5, 19*  269:*20*
294:*19*  297:*4*  315:*4*
320:*1*  351:*3, 12*
352:*3*  368:*2*  409:*4*
410:*5*  411:*16*  416:*13*
428:*7*  448:*11, 13*
477:*11*
**understandable**
473:*14*

**understanding**  8:*19*
9:*18*  25:*4*  69:*21*
70:*3*  71:*6*  82:*22*
97:*20*  100:*16*  106:*6*
247:*11*  418:*8*
**understands**  15:*19*
23:*20, 21*  24:*5*  43:*24*
45:*1*  52:*16*  53:*19*
75:*5*  145:*12*  343:*14*
414:*5*
**understood**  145:*20*
239:*6*  377:*17*
**undertones**  229:*1*
**unequivocal**  328:*1*
**unequivocally**  326:*5*
**unfair**  352:*17, 21*
**unfortunate**  297:*14*
**unfortunately**  215:*9*
**unhappy**  167:*12*
169:*9*  278:*11*
**unhealthy**  215:*11*
**union**  362:*13*
**UNITED**  1:*1*  4:*8*
**universe**  41:*9, 19*
44:*3*  59:*1*  82:*6*
329:*4*
**unnecessary**  283:*12*
325:*6*
**unpaid**  193:*18*
**unquote**  258:*1*
**unrelated**  83:*15, 18*
193:*4, 15*  481:*4*
**untrue**  145:*3, 5, 6*
166:*7*
**untruthfully**  418:*22*
**untruths**  144:*21, 23*
**updates**  349:*23*
**updating**  250:*9*
**upfront**  407:*1*
**upgrading**  114:*8*
**uphill**  152:*24*
**uploading**  174:*5*
**upping**  462:*3*
**ups**  467:*22*
**upset**  146:*17*  176:*21*
285:*21*  288:*18*
**Upton's**  207:*21*
249:*6*  250:*1*
**use**  38:*21*  39:*18*
51:*5*  62:*11*  70:*10*

Case 2:19-cv-05030-JDW   Document 110-2   Filed 03/02/21   Page 172 of 193

Deposition of Lisa Barbounis                                    Lisa Barbounis v. Middle Eastern Forum, et. al.

91:*4*  93:*1*  95:*19*
102:*3*  194:2  195:*9*
200:*4*  204:*13*  230:*9*
331:*18*  341:*9*  439:*4*
444:*11*, *15*
**useful**  169:*20*
**user**  101:*14*
**usually**  164:*23*
403:*19*
**usurper**  129:*22*
**usurpers**  129:*21*
**utter**  97:*20*

< V >
**vacation**  236:*22*
241:*15*  400:*15*, *19*
401:*22*
**vacations**  399:*20*
404:*1*
**vacillating**  351:*13*
**valid**  46:*18*
**value**  127:*19*
**various**  11:*3*  279:*11*
**Vasille**  20:*24*  307:*4*,
*12*
**veiled**  434:*16*
**vendetta**  379:*7*
**vendettas**  380:*2*, *6*
**vendors**  382:*20*
**venue**  398:*11*
**verbal**  36:*21*  437:*3*
**verbalize**  11:*8*
**verbatim**  156:*21*
**versus**  4:*7*  153:*20*
272:*21*  307:*9*
**victim**  425:22  426:*6*,
*13*
**Video**  2:*24*  4:*5*, *12*
7:*10*  48:*12*  309:*20*
310:*3*, *4*  353:*1*
356:*17*  358:*18*
365:*17*  366:*6*  370:*17*
377:*6*  401:*21*
**Videoconference**  1:*15*
**VIDEOGRAPHER**
4:*1*  56:*8*, *12*  102:*24*
103:*5*  170:*17*, *22*
234:*1*, *4*  247:*12*
337:*23*  346:*18*

397:*23*  460:*24*  482:*1*
**videos**  309:*21*
**view**  13:2  120:*15*
132:*12*  149:*14*
360:*13*
**views**  87:*13*  367:*14*,
*22*
**Vinny**  317:*9*  319:*1*,
*3*, *17*, *24*  339:*11*, *14*
340:*4*, *8*, *19*, *24*  341:2,
*4*
**violated**  21:*5*  45:*20*
**violating**  472:*18*
**violation**  63:*6*  233:*12*
**violence**  355:*8*
368:*16*  370:*12*
**Virginia**  404:*19*
**Virus**  51:*1*  400:*3*
401:*17*  449:*23*
**Visa**  143:*7*, *12*, *17*
433:*3*, *7*, *13*
**vis-a-vis**  341:*11*
**visit**  374:*5*
**visited**  293:*15*
**voice**  340:*5*  351:*6*
356:22  394:*10*
**voiced**  275:*16*  279:*24*
**voices**  71:*17*
**volunteer**  348:*7*
**volunteered**  220:*20*
**voters**  368:*24*
**vs**  1:*7*

< W >
**wait**  7:*18*  54:*21*, *22*
55:*1*, *2*, *13*, *14*  68:*22*
73:*10*  77:*1*  79:*13*, *14*
82:*3*  133:*17*  150:*16*,
*17*  157:*14*, *20*  158:*14*
163:*6*  216:22  229:*4*
251:*3*  265:*6*  333:*23*
374:*14*  375:*12*  420:*1*
425:*4*  427:*14*  444:*13*
446:*24*  477:*3*, *4*
481:*8*, *9*
**waited**  463:*22*  464:*1*
**waiver**  388:*4*
**walk**  316:2  323:*9*
361:*23*

**walked**  276:*17*  318:*8*
324:*8*  342:*7*  345:*4*
372:*18*
**walks**  318:*21*  342:*9*
359:*9*
**Wall**  254:*21*  255:*11*
256:*21*  258:*13*
259:*10*  260:*16*, *20*
261:*5*, *15*  264:*7*
266:*8*
**want**  7:*6*  12:*24*
13:*6*  21:*10*, *21*, *24*
27:*2*, *3*, *5*  29:*15*
32:*13*  33:*5*, *6*, *15*, *21*
41:*17*, *20*  46:*7*, *21*
47:*18*, *22*  48:*10*  50:*9*,
*12*, *18*, *21*  52:*12*, *14*
54:*17*  55:*3*  58:22
59:*6*, *23*  60:*19*  65:*3*
66:*23*  67:*1*, *18*  68:*2*
72:*23*  76:*24*  84:*16*
86:*9*  88:*14*, *16*, *17*, *23*
89:*2*, *3*  94:*24*  96:*13*
106:*23*  122:*17*
134:*18*, *19*  138:*19*, *24*
139:*4*  142:*12*  153:*2*
155:*9*, *10*  158:*15*, *24*
163:*20*  164:*24*  167:*1*
168:*9*  170:*7*, *13*
182:*4*  183:*19*  184:*20*
185:*24*  194:*2*  196:*10*
202:*4*  210:*24*  214:*19*
216:*4*, *19*  228:*1*
233:*16*, *22*, *23*  234:*11*
236:*17*  237:22
239:*24*  240:*19*, *24*
241:22  247:*2*, *7*, *17*,
*23*  248:*13*, *14*  253:*11*
254:*3*  259:*6*  263:*15*
267:*1*  268:*19*  271:*14*,
*15*  274:22  275:*13*
277:*8*  279:*10*  280:*21*
284:*12*  290:*12*
294:*15*  295:*20*
298:*12*  299:*9*  303:*2*
306:*20*  311:*21*
312:*23*  313:*5*, *13*
314:*13*  318:*12*, *17*
322:*7*  325:*3*  337:*1*
341:*3*, *8*  342:*13*

347:*1*  352:*11*  354:*12*
356:*16*  359:*14*
366:*23*  367:*17*  374:2,
*3*, *9*  376:*11*, *17*
379:*23*  380:*14*
384:*16*  385:*10*  386:*4*,
*13*  388:*13*, *17*  392:22
397:*20*  411:*14*
412:*23*  414:*13*  421:*6*
422:*14*  424:*5*, *17*
425:*7*  429:*13*  431:*20*
434:*19*  435:*11*  436:*7*,
*22*  438:*15*  439:*11*
441:*8*  442:*1*  449:*20*,
*21*, *23*  450:*1*, *19*
452:*4*  455:*6*, *23*
457:*14*  459:*19*  474:*8*
475:*24*  476:*7*, *18*
480:*19*
**wanted**  83:*11*
116:*21*  117:*1*, *2*
126:*3*, *4*, *9*  132:*16*
137:*12*  143:*2*, *5*, *22*
161:*11*  175:*3*  193:*20*
225:*17*, *19*  236:*1*
277:*2*, *4*  284:*19*
295:*5*  297:*21*  310:*5*
313:*21*  317:*12*
338:*24*  349:*23*
352:*13*  359:*4*  369:*20*
387:*18*  389:22
393:*21*  394:*21*
395:*16*  396:*11*  399:*4*
406:*24*  418:*17*  419:*9*,
*17*  425:*9*  438:*14*
439:*2*  449:*19*  450:*5*,
*9*
**wanting**  143:*24*
**wants**  194:*1*  235:*16*
236:*3*  292:*19*  349:*7*
417:*11*  424:*7*, *13*
**warn**  340:*20*
**warned**  339:*15*
**Washington**  171:*24*
256:22  355:*7*  364:*17*
405:*4*
**was-ism**  431:*20*
**waste**  29:*12*  39:*19*,
*24*  41:*17*  263:*18*

Case 2:19-cv-05030-JDW   Document 110-2   Filed 03/02/21   Page 173 of 193

Deposition of Lisa Barbounis                                    Lisa Barbounis v. Middle Eastern Forum, et. al.

wasting  263:24
461:11, 19
watch  400:16
watched  112:3  366:6
water  360:22
Watson  192:20
wave  371:20
way  10:3  31:6
42:17  45:14  69:6
104:19  112:23  113:3
122:15  126:15  135:7
141:8  143:23, 24
160:14  162:18, 24
173:18  179:6  181:14
194:6  199:23  200:17
233:5  256:8  259:21
265:24  278:1  284:12
289:1, 4  314:23
315:2, 14, 17  316:1
324:17  341:19
343:20  345:12, 13
352:17  354:21
356:23  381:19  383:6
386:13  387:5  389:24
405:8  408:24  410:19
415:9  423:14, 15
424:24  425:17
432:24  439:15
448:17, 18  453:5
463:13  466:11
472:17
ways  193:2  332:7
wearing  133:14
231:21, 23
weather  6:11
web  284:15
Weber  210:15
363:23  381:4  383:8
410:12  433:14
Weber's  107:16
website  109:20
114:6, 9  121:3
153:10  154:18  157:7,
8  160:24  174:4, 15,
19  176:19  180:9
200:8, 16, 18, 24
201:2, 8  203:15
285:9
websites  153:14

177:7  284:23
wedding  108:3
week  25:12  148:16
250:3, 7  298:21, 23
299:1  405:8  436:10
weekend  450:6
weekends  358:17
weeks  84:24  364:24
366:7  403:19
Weinstein  440:24
441:4
weird  108:23  124:2
314:6  353:23  457:22
welcome  67:3, 19
414:5  436:5  480:12,
18
welcoming  341:9
well  8:15  16:8
28:14  33:14, 20  41:7
42:5, 9  50:16, 18
54:20  58:1  59:5
60:24  62:5, 6  77:7
78:6  80:7  94:12
95:4  96:17  103:14
104:1, 18  109:3
110:3, 24  114:5
122:15, 21  126:23
127:23  128:23
135:24  136:18
137:19  140:11
152:16  154:5, 20
155:9  157:7  158:19
161:5  176:13  177:22
178:7  181:6  194:23
196:1  200:7  201:5
202:15  208:6  211:3,
19  217:13  219:20
222:19  230:4  231:22
235:7  236:1, 14
237:15  238:21  240:1,
15  242:14  243:6
244:14, 21  247:18
254:13  260:1  261:4
269:23  271:21  272:4
275:21  276:8  277:24
291:3  292:5, 6  309:4
310:24  311:13  315:4
318:9  322:21  324:18
332:3  338:17  339:7
347:18  350:14  357:14

373:11  374:4  377:13
383:3, 6  386:19
390:2  396:20  402:24
403:1  406:6  408:7
411:3  419:23  433:6,
20, 21  436:13  448:21
455:14, 19  456:18
458:23  459:1  461:22
463:5  475:24  476:2
went  47:15  48:18
109:9  131:4  135:15
136:10, 21  137:9
149:7, 10  160:24
179:21  189:17  190:1,
2, 5  223:22  227:5
244:18  256:1, 24
257:6  285:5, 10
289:13  296:1  347:10
373:23  394:1  401:3
402:10, 14  403:4
408:9  409:20  450:6
468:3  475:15
We're  5:12  7:10, 13
9:14, 15, 17  17:6
21:6  29:11  33:18
39:5, 15  41:4, 5, 14,
23  45:16, 19  46:8
50:2  55:24  57:13
58:24  60:1, 20  62:14
68:17  74:9, 10  82:5,
6  83:16  86:21  103:2
110:19  126:16  131:7
137:7, 8  139:8  148:5
153:7  154:7  159:16,
18  174:8  175:19
183:4  194:17, 23
196:19  199:1  206:7
215:21  216:24
224:18  225:22
229:12  236:13  242:9
262:17  263:7, 24
264:2  266:5, 10, 15
273:11  307:14  316:1
326:1  328:20  345:17
353:13  360:21
371:11  373:6  416:21
421:3  427:16  428:16
437:1  450:17  460:10
462:4, 6  468:7

475:20  476:9  480:10,
16  481:18, 20
Western  405:19
Westrout  117:19
Westshop  395:11
we've  8:17  66:7
86:6, 8  98:8  277:6
346:23  397:22
450:24  459:21  460:2
whatsoever  102:11
111:21  112:5
whereof  483:20
wherewithal  105:17
white  127:11  466:4
Whoa  325:11  427:13
444:13  475:15
whoas  416:19
wife  348:21  389:19
431:12  454:16
wifi  222:22
William  2:21
willing  84:13  158:1,
2
Wilson  33:16, 22
58:19
win  30:15, 18  31:1, 8
53:16
window  149:19  362:8
winds  439:10
Winfield  117:22
wing  354:19
wink  325:23
winning  30:10
wipe  89:6  90:21
91:1  93:21
Wisconsin  399:24
400:10, 11, 13, 19
404:2
Wise  1:15  4:15
483:3, 16, 23
wish  391:4, 9, 19
392:3
wished  391:22
wishes  113:13
withdraw  46:4
230:19  419:6
witness  4:19  24:1
56:20  57:10  58:4
230:8, 14  414:1

417:6  480:12  483:5,
13
**witnessed**  110:12
111:3  112:18
**witnesses**  36:12
329:21
**Wolf's**  387:15
**woman**  10:16  193:1
322:11  356:3, 13
396:15  473:11
**women**  141:12
421:19  425:5
**won**  53:11
**wonderful**  293:13
479:6
**wondering**  287:11
**word**  20:6  23:19
24:2  62:10, 11  118:7
199:9  295:2  340:22
341:9  351:14  444:11,
15  448:18
**worded**  135:7
**words**  13:6  22:9
24:1  38:21  93:21
113:23  122:18  156:6
197:23  205:2  313:20
314:2  375:19  414:2
426:11  431:7, 8, 9
439:4  445:19  462:16
**work**  10:10  64:3
66:3, 7  70:11  86:6
92:20  119:13  121:10
122:19  123:7  142:22
143:11  144:22  145:4
147:15  164:18  165:7,
24  166:11  167:6, 12
168:20  169:5, 9
173:22  174:1, 11
179:15  180:4  185:18
186:12  187:6, 12, 14
188:1, 2  201:16, 17
203:3  204:6  205:19,
24  208:19  212:18
218:5  222:10  226:8
241:7  249:9  257:18
258:5  260:16  267:20
284:1  290:17, 19
310:12  317:15  319:5,
18  347:10, 12, 13
348:5, 6  349:1  357:9,

13, 14, 15, 24  363:22
365:11  377:3, 8, 15,
19  381:20, 21, 23
384:2  392:22  393:24
396:10  397:3  399:17
400:6, 7  401:21
402:2  403:23  405:8
408:20  409:17
410:11  449:11
454:18  459:5  478:11
**worked**  86:19  95:16
189:22  190:9  262:17
268:6  285:4, 6
327:12  405:16
406:23  409:12
411:19  423:7, 16
431:11  433:13  479:8
**working**  110:13
143:10, 17  147:4
258:7  283:23  322:24
323:1  352:15  364:5
377:12  384:11  396:7
405:24  406:11
408:14, 18  411:4
412:6  448:7  468:2, 6
477:20  478:6  479:3
**workings**  354:10
**workload**  205:21
**work-related**  225:3
401:24
**works**  93:3  190:12
197:17  207:20  249:6
255:1, 4  303:9
395:11  396:2  463:14
**world**  45:11  200:11
203:22  204:14, 23
205:4  421:19  422:18,
20  432:19
**worried**  387:4  388:9
**worries**  374:14
**worry**  35:5, 7, 9
339:12  346:11
447:24
**worse**  150:19, 22
151:9, 18  160:9
276:20  354:21, 22
466:13
**worst**  331:10
**worth**  215:10  319:19

**wound**  310:10
**wrap**  247:17  460:18
**wrapped**  59:4
**wraps**  143:9
**wrath**  322:10
**write**  82:15  111:19
152:9, 11  186:6
203:19  256:11  257:4,
11  278:20  285:5, 6
391:7  393:16  453:11
466:19
**writes**  187:18  288:4
391:3
**writing**  150:2, 5
182:2  278:22  288:1
319:10  402:3
**written**  81:22  113:15
148:20  171:9, 12
172:15  173:3  383:9
**wrong**  29:9  54:1
72:6  76:14, 19  80:15
95:10  96:11  113:6
119:18  136:2, 16
154:19  160:4, 6
165:20  166:15
310:16  368:15
403:23  422:17  442:9
458:2
**wrongdoing**  327:20
328:14, 16
**wrongfully**  76:16
**wrote**  73:2  77:10
78:11  80:21  113:18
136:7  157:23  171:21
172:1  254:15  256:20
258:22  288:7  379:24
383:15  394:2  443:6
451:23  473:18

**< Y >**
**ya**  89:23
**Yeah**  13:19  14:10
18:12  19:3, 5  20:7
37:4  41:16  50:4
52:8  53:2  61:12
62:4  67:4  68:11
85:21  89:11  90:6
97:3  102:21  108:9
120:18, 23  121:5, 21
123:18  124:21

130:15  144:10
149:24  151:15, 16
156:6, 8  170:9, 11, 15
174:21  175:4, 16
177:5, 9  179:13
182:12, 19  189:5
194:16  196:10  198:3
213:6  215:5  217:4
223:1  227:7, 10
233:17  237:2  239:19
240:10, 18  246:14
247:9  249:24  251:5,
21, 24  258:21  264:15
273:7  280:16  281:7,
18  285:14  286:10
287:15, 19  288:15
290:2, 4, 21  291:1
294:7  295:24  296:4,
7, 13, 17, 21  304:24
308:3, 5, 15, 23
309:17  312:21  313:4,
12  314:3  321:20, 23
326:8, 11  327:1
328:17  335:12
337:21  344:1  347:18
351:23  352:12
360:14  361:2  367:15,
18  373:2  375:17, 23
378:16  379:2  380:22
381:6  384:23  385:8
386:6, 22  388:15
395:22  400:16  401:3,
23  402:24  403:10
408:22  411:13
417:18  420:5  422:21
433:20  438:22  442:5
449:12  451:22
456:15, 21  471:1, 21
481:9, 23
**year**  19:18  347:6
373:7  382:23  400:5
401:2  404:1  437:23
438:20
**years**  110:13  174:4
267:14  268:5  376:4
384:3  407:7  436:16
479:3
**Year's**  304:5

Case 2:19-cv-05030-JDW   Document 110-2   Filed 03/02/21   Page 175 of 193

Deposition of Lisa Barbounis                                    Lisa Barbounis v. Middle Eastern Forum, et. al.

**Yep**  184:*11, 17*
 329:*18*  388:*24*  389:*2*
 402:*8, 22*  433:*4*
**yesterday**  262:*17, 20*
**yikes**  236:*21*
**yo**  318:*15*
**Yoder**  246:*9, 10*
**Yoncheck**  120:*23*
**Yonchek**  123:*16*
 198:*1*  206:*3*  221:*10,
13*  225:*14*  226:*19*
 227:*15, 18, 20*  231:*11*
 232:*10*  235:*14*
 242:*23*  244:*6*  245:*8*
**young**  125:*24*
 274:*17*  277:*18*  381:*1*
 436:*14*  445:*15*
**younger**  422:*11*
**YouTube**  309:*21*
 310:*11*

**< Z >**
**zero**  203:*19*  263:*6, 7*
**Ziv**  470:*24*  471:*6*
 472:*13*  473:*1, 19*
**Zoloft**  470:*18*
**Zoom**  1:*15*  7:*14*  8:*8*
 361:*9*

Deposition of Lisa Barbounis                                      Lisa Barbounis v. Middle Eastern Forum, et. al.

## WORD LIST

**< $ >**
**$12**  *(2)*
**$2,000**  *(2)*
**$27**  *(2)*
**$400,000**  *(1)*
**$50**  *(1)*
**$500**  *(1)*
**$7**  *(1)*
**$7,000**  *(1)*
**$900**  *(1)*

**< 1 >**
**1**  *(4)*
**1:13**  *(1)*
**1:34**  *(1)*
**10**  *(10)*
**10:10**  *(1)*
**10:13**  *(1)*
**10:47**  *(1)*
**10:50**  *(1)*
**10:54**  *(1)*
**10-hour**  *(1)*
**10th**  *(1)*
**11**  *(5)*
**11/20**  *(2)*
**11/20/18**  *(1)*
**11/3/18**  *(1)*
**11/4**  *(1)*
**11/4/18**  *(1)*
**11/5**  *(1)*
**11:00**  *(1)*
**11:06**  *(1)*
**11:10**  *(2)*
**11:20**  *(1)*
**110**  *(1)*
**1100**  *(1)*
**1128**  *(2)*
**11th**  *(1)*
**12**  *(2)*
**12/28**  *(1)*
**12/28/18**  *(1)*
**12:02**  *(1)*
**12:16**  *(1)*
**12-minute**  *(2)*
**13**  *(1)*
**15**  *(1)*
**15th**  *(1)*

**1650**  *(1)*
**168**  *(1)*
**17**  *(3)*
**18**  *(3)*
**182**  *(1)*
**1835**  *(2)*
**184**  *(1)*
**19**  *(4)*
**19103**  *(3)*
**19th**  *(3)*
**1st**  *(6)*

**< 2 >**
**2:19-cv-05030-JDW**
 *(2)*
**2:23**  *(1)*
**2:30**  *(1)*
**2:58**  *(1)*
**20**  *(7)*
**20,000**  *(4)*
**2000**  *(1)*
**2015**  *(1)*
**2017**  *(1)*
**2018**  *(28)*
**2019**  *(41)*
**2020**  *(4)*
**2021**  *(5)*
**207**  *(1)*
**20-minute**  *(1)*
**20th**  *(1)*
**215.391.4790**  *(1)*
**215.569.1999**  *(1)*
**215.665.2776**  *(1)*
**21st**  *(1)*
**225**  *(1)*
**22nd**  *(1)*
**23rd**  *(1)*
**241**  *(1)*
**247**  *(1)*
**25**  *(1)*
**27**  *(2)*
**271**  *(1)*
**276**  *(1)*
**277**  *(1)*
**2800**  *(1)*
**29**  *(1)*
**291**  *(1)*
**292**  *(1)*
**2950**  *(1)*

**2nd**  *(1)*

**< 3 >**
**3:08**  *(1)*
**3:09**  *(1)*
**3:55**  *(1)*
**30**  *(3)*
**30,000**  *(1)*
**30-second**  *(1)*
**30th**  *(8)*
**311**  *(1)*
**33**  *(1)*
**361**  *(1)*
**3rd**  *(2)*

**< 4 >**
**4:29**  *(1)*
**4:49**  *(1)*
**4:56**  *(1)*
**46**  *(1)*
**47**  *(1)*
**48**  *(1)*
**486**  *(1)*
**4th**  *(5)*

**< 5 >**
**5**  *(2)*
**5/30**  *(1)*
**5/30/2019**  *(2)*
**5:10**  *(1)*
**5:59**  *(1)*
**50**  *(1)*
**501C**  *(1)*
**50-milligram**  *(1)*
**515**  *(1)*
**55**  *(1)*

**< 6 >**
**6**  *(1)*
**6:12**  *(1)*
**60s**  *(1)*
**6974**  *(1)*
**6th**  *(4)*

**< 7 >**
**7**  *(4)*
**7,000**  *(2)*
**7:01**  *(2)*
**7:17**  *(6)*

**70**  *(1)*
**77**  *(1)*

**< 8 >**
**8th**  *(2)*

**< 9 >**
**9**  *(2)*
**9,000**  *(1)*
**90**  *(3)*
**900**  *(3)*
**92**  *(1)*
**9th**  *(1)*

**< A >**
**a.m**  *(4)*
**A-1**  *(1)*
**abide**  *(1)*
**ability**  *(3)*
**able**  *(6)*
**abreast**  *(1)*
**absolutely**  *(13)*
**absurd**  *(1)*
**absurdity**  *(2)*
**abuse**  *(1)*
**abusive**  *(1)*
**accent**  *(2)*
**accents**  *(2)*
**access**  *(15)*
**accesses**  *(1)*
**accidental**  *(1)*
**accommodated**  *(1)*
**accomplished**  *(1)*
**account**  *(18)*
**accountable**  *(2)*
**accounts**  *(7)*
**accurate**  *(12)*
**accusations**  *(1)*
**accuse**  *(2)*
**accused**  *(4)*
**accusing**  *(5)*
**acknowledged**  *(1)*
**acknowledging**  *(2)*
**acknowledgment**  *(1)*
**act**  *(1)*
**acting**  *(1)*
**Action**  *(13)*
**actions**  *(4)*
**active**  *(1)*

Deposition of Lisa Barbounis                                    Lisa Barbounis v. Middle Eastern Forum, et. al.

actively  *(4)*
activities  *(1)*
activity  *(2)*
acts  *(1)*
actual  *(9)*
add  *(3)*
added  *(1)*
Adderall  *(1)*
adding  *(1)*
additionally  *(1)*
address  *(2)*
addressed  *(1)*
administrative  *(3)*
admirable  *(1)*
admissible  *(1)*
admission  *(1)*
admit  *(2)*
admitted  *(8)*
adorable  *(1)*
adults  *(2)*
advance  *(1)*
adversarial  *(1)*
advertising  *(1)*
advice  *(4)*
advocacy  *(1)*
advocating  *(2)*
AEO  *(4)*
affect  *(1)*
affiliate  *(1)*
affiliated  *(4)*
affirmatively  *(1)*
affirmed  *(3)*
aforesaid  *(1)*
afraid  *(6)*
agent  *(3)*
ago  *(13)*
agony  *(2)*
agree  *(41)*
agreed  *(7)*
agreement  *(11)*
agreements  *(1)*
agrees  *(2)*
ahead  *(27)*
Ahman  *(5)*
air  *(1)*
AirBNB  *(1)*
airline  *(1)*
al  *(2)*
alerted  *(2)*

alerts  *(1)*
aligned  *(1)*
allegation  *(11)*
allegations  *(7)*
allege  *(2)*
alleged  *(1)*
alleging  *(1)*
all-hands  *(1)*
allow  *(4)*
allowed  *(7)*
amazing  *(2)*
Amazon  *(1)*
amended  *(5)*
America  *(3)*
American  *(1)*
Americans  *(1)*
amount  *(9)*
Amy  *(8)*
analysis  *(1)*
anarchist  *(1)*
angel  *(1)*
angered  *(1)*
angrier  *(1)*
angry  *(5)*
Ann  *(1)*
answer  *(212)*
answered  *(26)*
Answering  *(9)*
answers  *(2)*
answer's  *(3)*
ANTIFA  *(17)*
anybody  *(24)*
anybody's  *(1)*
anymore  *(9)*
Anytime  *(1)*
anyway  *(14)*
apart  *(1)*
apartment  *(3)*
apologize  *(2)*
App  *(7)*
apparently  *(9)*
appear  *(1)*
APPEARANCES  *(1)*
appeared  *(1)*
appearing  *(2)*
appears  *(8)*
application  *(2)*
applied  *(2)*
appointments  *(3)*

appreciate  *(4)*
appreciative  *(1)*
approach  *(2)*
appropriate  *(4)*
approval  *(1)*
approved  *(1)*
approximately  *(2)*
apps  *(3)*
April  *(4)*
Arabia  *(1)*
area  *(8)*
argue  *(4)*
arguing  *(2)*
argument  *(5)*
Argumentative  *(25)*
Argumentive  *(4)*
arguments  *(1)*
armed  *(1)*
arranged  *(2)*
arrest  *(3)*
arrested  *(1)*
arrive  *(1)*
article  *(12)*
articles  *(19)*
aside  *(3)*
Asked  *(104)*
asking  *(67)*
asks  *(4)*
asleep  *(4)*
assault  *(10)*
assaulted  *(4)*
asshole  *(1)*
assign  *(2)*
assigned  *(1)*
assist  *(2)*
assistance  *(1)*
assistant  *(12)*
assisted  *(3)*
associate  *(1)*
ASSOCIATES  *(1)*
assume  *(5)*
assumed  *(2)*
Assuming  *(24)*
assumption  *(5)*
ate  *(1)*
Atkinson  *(1)*
atmosphere  *(1)*
attached  *(1)*
attack  *(7)*

attacked  *(1)*
attended  *(2)*
attending  *(1)*
attention  *(11)*
attorney  *(10)*
attorney/client  *(6)*
attorneys  *(2)*
attorney's  *(3)*
attractive  *(3)*
attributed  *(2)*
audible  *(1)*
audio  *(4)*
audiotape  *(1)*
August  *(14)*
Australia  *(1)*
authentication  *(1)*
author  *(1)*
authority  *(7)*
authorization  *(1)*
available  *(1)*
avenues  *(1)*
aversion  *(1)*
awards  *(1)*
aware  *(27)*
awareness  *(1)*
awesome  *(1)*
awful  *(3)*

< B >
Babe  *(3)*
babies  *(4)*
baby  *(1)*
back  *(106)*
background  *(2)*
backlash  *(1)*
backup  *(1)*
backwards  *(1)*
bad  *(19)*
Baird  *(33)*
Baird's  *(1)*
bald  *(1)*
ballpark  *(1)*
Bank  *(14)*
banking  *(1)*
banned  *(1)*
Barbara  *(4)*
BARBOUNIS  *(19)*
barely  *(3)*
Barker  *(10)*

based (24)
baseless (1)
basic (1)
basically (5)
basis (6)
Bates (1)
bathroom (2)
battle (1)
BBC (1)
beat (2)
beaten (1)
bed (4)
began (1)
beginning (12)
behalf (4)
behavior (14)
behind-the-scene (1)
belabor (5)
belaboring (1)
belief (4)
believe (64)
believed (9)
believing (1)
belittle (1)
bell (2)
belongs (1)
Ben (35)
bending (1)
beneath (1)
benefit (5)
benefits (2)
Benjamin (7)
Benji (2)
Bennett (3)
Bennett's (1)
Benson (1)
best (6)
better (22)
beyond (1)
Bezigrad (1)
big (11)
bigger (4)
biggest (1)
Bin (2)
Bishop (12)
Bishop's (2)
bit (15)
bits (1)
bizarre (2)

Black (4)
blackout (1)
blah (25)
blame (7)
blaming (5)
blazer (1)
blonde (1)
blow (4)
blowing (1)
blown (1)
blue (4)
blur (1)
blurring (2)
blurry (2)
body (1)
boiling (1)
bomb (2)
bonus (5)
Boo (1)
Boogaloo (3)
boss (28)
bother (1)
bottom (7)
box (3)
boxes (1)
boy (3)
boyfriend (1)
Boys (23)
Brady (1)
bragging (2)
braggy (1)
brand (1)
breach (2)
breached (1)
breaching (1)
break (27)
breaks (6)
Breanna (2)
breather (2)
brevity (1)
Brian (2)
bribe (1)
brief (1)
briefly (2)
brilliant (1)
bring (15)
bringing (2)
British (4)
broad (2)

Brockman (1)
broken (1)
brother (3)
brother's (1)
brought (22)
Brussels (3)
bubble (1)
buck (1)
buddy (3)
buddy-buddy (1)
budget (1)
build (3)
building (11)
bullshit (1)
bunch (17)
burden (1)
burn (1)
bus (1)
business (2)
bust (1)
busy (6)
butt (1)
buttons (1)

< C >
Calan (7)
calculated (1)
Calen (4)
Calens (1)
call (29)
called (19)
calling (13)
calls (38)
calm (1)
campaign (14)
Cannon (3)
capability (2)
capable (1)
capacity (19)
capital (1)
Capitol (26)
captioned (1)
captured (1)
capturing (1)
Car (5)
card (1)
care (6)
cared (1)
careful (3)

cares (1)
carry (1)
Carson (477)
case (97)
cases (8)
Cassandra (6)
casting (1)
casual (1)
catching (1)
categorize (1)
category (2)
cause (9)
caused (1)
causing (1)
caution (4)
cautioning (1)
Cavalier (459)
Caviler (3)
Center (1)
certain (13)
certainly (18)
certainty (1)
certifiable (1)
certifiably (2)
certified (1)
certify (2)
cetera (1)
chain (15)
Chamberlain (3)
chance (4)
change (8)
changed (3)
changes (3)
channels (1)
characterization (3)
characterized (1)
charge (5)
charity (1)
chart (1)
chat (2)
cheating (1)
check (1)
checked (1)
checks (1)
chicks (1)
Chief (3)
child (4)
children (7)
choose (1)

Deposition of Lisa Barbounis                                    Lisa Barbounis v. Middle Eastern Forum, et. al.

chosen *(1)*
Christmas *(4)*
chuckle *(2)*
cinematic *(3)*
cinematics *(1)*
circle *(1)*
circumstance *(1)*
circumstances *(6)*
cite *(1)*
cities *(1)*
Civil *(11)*
claim *(19)*
claiming *(5)*
claims *(19)*
clarification *(1)*
clarify *(2)*
clash *(1)*
class *(2)*
classes *(2)*
classify *(1)*
Claus *(1)*
clause *(2)*
clean *(1)*
clear *(44)*
cleared *(1)*
clearly *(18)*
clears *(1)*
click *(1)*
clicked *(1)*
client *(9)*
clients *(2)*
client's *(2)*
Cliff *(1)*
clock *(1)*
close *(6)*
closes *(1)*
clothes *(1)*
cloud *(4)*
cloud-based *(1)*
code *(1)*
coding *(2)*
co-equal *(1)*
cognitive *(1)*
collaborative *(1)*
colleagues *(1)*
collectively *(1)*
colloquial *(1)*
color *(1)*
comb *(1)*

come *(40)*
comedy *(1)*
comes *(8)*
comfortable *(2)*
coming *(15)*
command *(3)*
comment *(3)*
comments *(2)*
commercial *(3)*
committed *(3)*
committee *(1)*
COMMONWEALTH *(1)*
communicate *(1)*
communicating *(1)*
communication *(5)*
communications *(48)*
communication-wise *(1)*
communicationy *(1)*
community *(1)*
companies *(1)*
company *(4)*
compel *(1)*
compensation *(1)*
competitor *(1)*
compilation *(1)*
compiled *(2)*
complain *(3)*
complained *(4)*
complaint *(23)*
complaints *(6)*
complete *(6)*
completely *(6)*
complicated *(2)*
compulsion *(1)*
computer *(4)*
computer-aided *(1)*
computerized *(1)*
conceded *(1)*
concept *(1)*
conceptualize *(1)*
concern *(12)*
concerned *(11)*
concerning *(1)*
concerns *(2)*
concisely *(1)*
conclusion *(32)*
conclusions *(2)*

condemn *(1)*
conditions *(1)*
conduct *(4)*
conducted *(1)*
conference *(7)*
confessions *(1)*
confidence *(2)*
confident *(1)*
confidential *(2)*
confirm *(1)*
confirmed *(3)*
confused *(5)*
confusing *(2)*
confusion *(1)*
Congress *(4)*
congressional *(2)*
Congressman *(15)*
congressman's *(1)*
congressmen *(3)*
connected *(2)*
connection *(7)*
connections *(13)*
connotation *(5)*
conscious *(1)*
consent *(4)*
consequences *(1)*
conservative *(10)*
conservatives *(1)*
consider *(11)*
consideration *(1)*
considered *(3)*
considering *(4)*
consistent *(1)*
consistently *(1)*
conspiratorial *(2)*
constantly *(3)*
constituents *(1)*
constitute *(1)*
constitutes *(3)*
consultancy *(1)*
contact *(6)*
contacted *(8)*
contacting *(1)*
contacts *(7)*
contained *(1)*
contains *(1)*
contemplating *(1)*
content *(3)*
contents *(5)*

context *(16)*
continuation *(1)*
continue *(8)*
continued *(2)*
continuing *(2)*
continuous *(1)*
contract *(1)*
contractor *(2)*
contributing *(2)*
contributions *(1)*
contributor *(3)*
control *(4)*
conversation *(21)*
conversations *(5)*
conversing *(1)*
convey *(2)*
convicted *(1)*
cool *(2)*
coordinated *(4)*
coordinating *(1)*
copies *(1)*
copy *(4)*
copying *(1)*
core *(1)*
corner *(1)*
Corona *(4)*
coroner *(1)*
corporate *(8)*
correct *(211)*
corrected *(1)*
correctly *(1)*
correspond *(1)*
correspondence *(1)*
Corsovek *(1)*
cost *(1)*
Costello *(4)*
Costello's *(3)*
couches *(1)*
Counsel *(29)*
counseled *(1)*
counseling *(1)*
counsel's *(6)*
count *(1)*
counterclaim *(2)*
counterclaims *(5)*
countered *(1)*
COUNTY *(1)*
couple *(13)*
course *(13)*

**Court** (26)
**courtesy** (1)
**courtroom** (2)
**courts** (1)
**Court's** (1)
**cover** (1)
**covered** (2)
**covering** (1)
**COVID** (2)
**co-workers** (2)
**Coyne** (2)
**COZEN** (2)
**crap** (3)
**crazy** (14)
**create** (2)
**created** (1)
**credentials** (3)
**credibility** (3)
**credit** (2)
**criminal** (11)
**crop** (1)
**crossed** (1)
**crowd** (1)
**crush** (6)
**crushy** (1)
**cry** (1)
**crying** (6)
**curiosity** (3)
**curious** (6)
**current** (17)
**currently** (4)
**cursor** (1)
**curve** (1)
**cut** (7)
**cute** (1)

**< D >**
**D.C** (15)
**D.C.'s** (1)
**dad** (1)
**Daily** (2)
**damaged** (1)
**damages** (1)
**D'Ambra** (1)
**D'Ambria** (1)
**Daniel** (149)
**Daniel's** (3)
**Danny** (87)
**Danny's** (4)

**dare** (1)
**data** (4)
**date** (29)
**DATE/TIME** (1)
**dated** (6)
**dates** (4)
**dating** (5)
**daughter** (3)
**day** (45)
**days** (9)
**dead** (1)
**deal** (9)
**dealing** (1)
**dealings** (1)
**death** (1)
**debate** (1)
**debt** (5)
**December** (13)
**decide** (7)
**decided** (9)
**decides** (1)
**decision** (13)
**decision-making** (1)
**decisions** (25)
**deep** (2)
**defend** (1)
**Defendant** (6)
**defendants** (4)
**defendant's** (1)
**define** (3)
**defined** (1)
**defines** (1)
**defini** (1)
**definitely** (11)
**definition** (8)
**Delaney** (45)
**Delaney's** (4)
**Delany** (1)
**delete** (11)
**deleted** (4)
**delve** (1)
**demand** (1)
**demanded** (1)
**demanding** (3)
**demands** (1)
**DeMarco** (1)
**demo** (1)
**demonstrate** (3)
**demonstrates** (2)

**demonstration** (1)
**demos** (1)
**denied** (4)
**denying** (1)
**depend** (3)
**Depends** (1)
**DEPONENT** (290)
**deposed** (4)
**DEPOSITION** (63)
**depositions** (10)
**DEREK** (1)
**derive** (1)
**derived** (1)
**derogatory** (1)
**describe** (7)
**described** (7)
**describing** (1)
**description** (3)
**descriptor** (1)
**designation** (2)
**designed** (18)
**desire** (1)
**desk** (1)
**despite** (2)
**destroy** (1)
**details** (2)
**detective** (10)
**determination** (1)
**determine** (1)
**determined** (3)
**development** (1)
**device** (7)
**devices** (3)
**devoted** (1)
**diagnoses** (1)
**diagnosis** (4)
**Diaz** (1)
**DiBianca** (1)
**dick** (4)
**difference** (3)
**differences** (1)
**different** (22)
**difficult** (4)
**difficulty** (1)
**digital** (1)
**diminished** (1)
**dinner** (3)
**direct** (9)
**directed** (1)

**directing** (2)
**direction** (5)
**directive** (5)
**directives** (6)
**directly** (12)
**director** (47)
**directors** (13)
**disagree** (4)
**disagreed** (5)
**disagreement** (8)
**disagreements** (6)
**disagrees** (1)
**disappear** (1)
**disciplinary** (1)
**discipline** (1)
**disciplined** (3)
**disclosed** (1)
**disclosure** (1)
**disclosures** (1)
**Discourse** (1)
**discovery** (7)
**discrimination** (2)
**discuss** (13)
**discussed** (7)
**discussing** (1)
**discussion** (8)
**discussions** (6)
**disenfranchised** (1)
**disgusting** (2)
**dismiss** (1)
**disparage** (1)
**display** (2)
**displayed** (1)
**dispute** (2)
**disputes** (1)
**disrespect** (1)
**dissonance** (1)
**distinction** (15)
**DISTRICT** (4)
**DNC** (2)
**docket** (3)
**doctor** (5)
**document** (47)
**documentary** (1)
**documentation** (1)
**documents** (17)
**document's** (1)
**doing** (85)
**dollar** (2)

Donald *(2)*
donation *(3)*
donations *(1)*
donor *(7)*
donors *(1)*
doors *(3)*
double *(1)*
doubly *(1)*
doubt *(4)*
download *(2)*
downs *(1)*
downward *(1)*
DP *(1)*
Dr *(5)*
draft *(4)*
drafts *(1)*
draining *(1)*
drama *(1)*
draw *(3)*
drawing *(3)*
drawn *(1)*
dream *(1)*
dressed *(1)*
drew *(2)*
drinking *(3)*
Drive *(7)*
driven *(1)*
drop *(5)*
dropped *(2)*
dropping *(1)*
drunk *(2)*
DuBai *(3)*
ducking *(1)*
due *(2)*
duly *(3)*
duties *(2)*
duty *(11)*
dying *(2)*

< E >
E.J *(2)*
earlier *(21)*
early *(2)*
ease *(1)*
easier *(3)*
easiest *(1)*
easily *(2)*
East *(126)*
EASTERN *(5)*

easy *(3)*
eaten *(1)*
eating *(1)*
ECF *(1)*
edgewise *(1)*
edit *(4)*
edited *(1)*
editing *(3)*
editor *(3)*
edits *(1)*
Educate *(1)*
education *(1)*
educations *(1)*
effect *(1)*
effective *(3)*
effectively *(1)*
effort *(3)*
Egler *(5)*
eight *(3)*
eight-and-a-half *(1)*
either *(12)*
El *(1)*
election *(4)*
elements *(1)*
Eleven *(1)*
Elipse *(1)*
e-mail *(44)*
e-mails *(11)*
embarrass *(13)*
embarrassing *(2)*
emogis *(1)*
emoji *(3)*
emotional *(3)*
employ *(1)*
employed *(2)*
employee *(30)*
employee/employer *(2)*
employees *(6)*
employer *(8)*
employer/employee *(1)*
employers *(5)*
employment *(8)*
employor/employee *(1)*
encouraged *(1)*
ended *(1)*
ends *(2)*

enduring *(1)*
engage *(6)*
engaged *(11)*
engaging *(1)*
England *(13)*
England's *(1)*
English *(1)*
enjoy *(1)*
enlarge *(1)*
Enrique *(6)*
enter *(2)*
entering *(1)*
entire *(8)*
entirely *(5)*
entitled *(3)*
entrenched *(1)*
environment *(2)*
equal *(2)*
equals *(4)*
equated *(1)*
equating *(1)*
equipment *(1)*
equivalent *(1)*
ER *(1)*
erase *(4)*
erased *(1)*
Erica *(1)*
erroneous *(1)*
escaping *(1)*
escrow *(2)*
especially *(4)*
Esquire *(4)*
established *(7)*
estate *(6)*
Estranimkis *(1)*
E-S-T-R-A-N-I-M-K-I-S *(1)*
et *(3)*
Europe *(2)*
European *(1)*
evaluations *(1)*
Eve *(1)*
evening *(1)*
event *(14)*
events *(5)*
Everest *(2)*
everybody *(16)*
everybody's *(1)*
everything's *(1)*

evidence *(46)*
Evidence-based *(1)*
exacerbated *(2)*
exact *(12)*
exactly *(19)*
exaggerate *(1)*
exam *(1)*
EXAMINATION *(3)*
example *(18)*
examples *(2)*
exception *(1)*
exceptions *(1)*
excitable *(1)*
excited *(4)*
exclusive *(1)*
Excuse *(8)*
execute *(1)*
executive *(1)*
ex-girlfriend *(1)*
exhausting *(4)*
Exhibit *(28)*
EXHIBITS *(3)*
existed *(1)*
existence *(2)*
exists *(2)*
expand *(2)*
expanding *(1)*
expect *(5)*
expectation *(1)*
expectations *(1)*
expected *(2)*
expenses *(1)*
experience *(10)*
experienced *(3)*
expert *(2)*
experts *(2)*
expired *(1)*
Explain *(13)*
explained *(10)*
explaining *(1)*
explanation *(2)*
exponentially *(1)*
expound *(1)*
expressed *(1)*
extended *(1)*
extensive *(1)*
extent *(35)*
external *(1)*
externally *(4)*

Deposition of Lisa Barbounis                                      Lisa Barbounis v. Middle Eastern Forum, et. al.

| | | | |
|---|---|---|---|
| **extort** *(3)* | **feet** *(1)* | **floundering** *(1)* | **frivolous** *(14)* |
| **extorted** *(1)* | **fellow** *(8)* | **flowed** *(1)* | **front** *(9)* |
| **extortion** *(3)* | **fellows** *(5)* | **flowers** *(5)* | **fruition** *(1)* |
| **extra** *(8)* | **fellowship** *(1)* | **Fly** *(1)* | **frustrated** *(1)* |
| **extraordinarily** *(1)* | **felt** *(4)* | **follow** *(3)* | **fuck** *(2)* |
| **extraordinary** *(1)* | **female** *(1)* | **followed** *(1)* | **fucking** *(3)* |
| **extremely** *(1)* | **fiancee** *(1)* | **following** *(6)* | **full** *(3)* |
| **eye** *(2)* | **fiduciary** *(7)* | **follows** *(1)* | **full-time** *(5)* |
| **eyes** *(5)* | **fight** *(3)* | **follow-up** *(3)* | **fully** *(4)* |
| | **fighting** *(2)* | **fond** *(1)* | **fun** *(7)* |
| **< F >** | **figurative** *(3)* | **Foods** *(1)* | **function** *(1)* |
| **fabricate** *(1)* | **figure** *(15)* | **footage** *(5)* | **fundraising** *(3)* |
| **fabricated** *(4)* | **figured** *(1)* | **forced** *(5)* | **funds** *(3)* |
| **face** *(8)* | **file** *(9)* | **forcing** *(1)* | **funny** *(10)* |
| **Facebook** *(17)* | **filed** *(33)* | **foregoing** *(1)* | **fun-type-of-deal** *(1)* |
| **Facetime** *(1)* | **files** *(1)* | **Foreign** *(1)* | **furious** *(1)* |
| **fact** *(52)* | **filing** *(2)* | **forever** *(6)* | **furniture** *(1)* |
| **factor** *(1)* | **film** *(1)* | **Forget** *(11)* | **further** *(13)* |
| **factory** *(1)* | **filming** *(3)* | **forgetting** *(1)* | **future** *(5)* |
| **facts** *(21)* | **filtered** *(1)* | **forgive** *(1)* | |
| **factual** *(2)* | **final** *(1)* | **forgot** *(1)* | **< G >** |
| **fair** *(43)* | **finalized** *(1)* | **form** *(63)* | **gained** *(2)* |
| **Fairbanks** *(4)* | **finally** *(1)* | **format** *(1)* | **Gala** *(5)* |
| **fairness** *(1)* | **finances** *(1)* | **former** *(1)* | **Gary** *(25)* |
| **faith** *(1)* | **financial** *(3)* | **forth** *(8)* | **gas** *(1)* |
| **fake** *(5)* | **find** *(13)* | **Fortunately** *(1)* | **gather** *(1)* |
| **fall** *(1)* | **finding** *(3)* | **Forum** *(154)* | **Gavin** *(2)* |
| **falling** *(1)* | **fine** *(28)* | **Forum's** *(6)* | **gay** *(1)* |
| **false** *(17)* | **fines** *(1)* | **forward** *(3)* | **geez** *(1)* |
| **falsely** *(7)* | **finish** *(17)* | **forwarded** *(1)* | **general** *(8)* |
| **falsification** *(1)* | **finished** *(5)* | **forwarding** *(2)* | **generally** *(4)* |
| **familiar** *(5)* | **Fink** *(8)* | **found** *(11)* | **genuineness** *(1)* |
| **family** *(6)* | **fire** *(12)* | **foundation** *(3)* | **George** *(14)* |
| **fancy** *(1)* | **fired** *(31)* | **Four** *(6)* | **Gerlach** *(1)* |
| **fantasy** *(1)* | **firing** *(6)* | **Fox** *(3)* | **Germany** *(1)* |
| **far** *(9)* | **firm** *(1)* | **frame** *(11)* | **getting** *(19)* |
| **fast** *(5)* | **first** *(39)* | **France** *(1)* | **gigabytes** *(1)* |
| **father** *(2)* | **fit** *(1)* | **franking** *(1)* | **girl** *(12)* |
| **favor** *(4)* | **five** *(12)* | **Frankly** *(1)* | **girls** *(2)* |
| **favorable** *(1)* | **five-minute** *(3)* | **freakin** *(3)* | **girl's** *(1)* |
| **favorably** *(2)* | **fix** *(1)* | **freaking** *(3)* | **give** *(60)* |
| **FBI** *(4)* | **flag** *(1)* | **Fred** *(1)* | **given** *(16)* |
| **February** *(3)* | **fleeting** *(1)* | **free** *(3)* | **gives** *(3)* |
| **Federal** *(2)* | **flew** *(1)* | **frequently** *(3)* | **giving** *(13)* |
| **feed** *(3)* | **flight** *(1)* | **friend** *(17)* | **glad** *(2)* |
| **feel** *(23)* | **flights** *(1)* | **friendly** *(1)* | **glass** *(1)* |
| **feeling** *(5)* | **flippant** *(2)* | **friends** *(20)* | **go** *(141)* |
| **feelings** *(1)* | **floating** *(1)* | **friendship** *(4)* | **goal** *(4)* |
| **feels** *(4)* | **Florida** *(4)* | **friendships** *(1)* | **goals** *(2)* |

God  (3)
goes  (10)
going  (174)
GOLD  (17)
gonna  (95)
Good  (62)
Goodrob  (2)
goof  (1)
Google  (7)
Googles  (1)
GOS  (1)
gotten  (6)
government  (2)
governments  (1)
grab  (1)
grad  (1)
granny  (1)
grant  (7)
Granted  (2)
grantee  (1)
grass  (1)
grassroots  (1)
gray  (1)
Grayson  (11)
great  (14)
greater  (1)
Greek  (5)
Greg  (200)
Greg's  (16)
grew  (3)
gross  (2)
grounds  (3)
GROUP  (4)
groups  (2)
grow  (1)
guarantee  (1)
guaranteed  (2)
guess  (35)
guessing  (2)
guidance  (1)
guilty  (1)
gut  (2)
guy  (11)
guys  (42)

< H >
ha  (4)
hacker  (4)
hair  (1)

half  (4)
half-assed  (1)
half-dressed  (2)
hand  (4)
handed  (2)
handle  (3)
handled  (1)
hands  (2)
hang  (3)
hanging  (2)
happen  (11)
happened  (34)
happening  (16)
happens  (4)
happily  (4)
happy  (6)
harass  (16)
harassed  (2)
harassing  (4)
harassment  (19)
harassments  (1)
hard  (20)
harder  (2)
hardest  (1)
harm  (13)
harmful  (1)
Harry  (2)
hash  (1)
hate  (4)
hates  (1)
hazy  (1)
HDML  (1)
head  (8)
header  (1)
head's  (1)
health  (1)
healthy  (1)
hear  (26)
heard  (19)
hearing  (8)
heart  (2)
hearts  (1)
heatedly  (1)
hectic  (1)
he'd  (1)
held  (6)
hell  (6)
Hello  (1)
help  (33)

helped  (10)
helpful  (4)
helping  (15)
helpless  (1)
helps  (1)
hereunto  (1)
hey  (15)
hierarchy  (9)
higher  (3)
highlight  (1)
highlighted  (2)
highlighting  (2)
highly  (1)
hilarious  (1)
Hill  (3)
hinge  (1)
hire  (5)
hired  (16)
hiring  (2)
history  (4)
hit  (5)
hits  (2)
hitting  (1)
Hold  (9)
holding  (1)
hole  (3)
Holiday  (1)
hollow  (1)
home  (7)
honest  (2)
honestly  (17)
hope  (4)
hoped  (1)
hopefully  (3)
horrific  (2)
horrified  (1)
hospital  (1)
host  (1)
hot  (4)
hotel  (9)
hour  (6)
hourly  (2)
hours  (16)
House  (17)
hovering  (2)
How's  (3)
hub  (1)
huge  (5)
Huh  (1)

Huh-uh  (1)
Human  (7)
Hundred  (8)
hung  (3)
Hurry  (1)
hurt  (9)
hurting  (1)
hurts  (1)
husband  (8)
husband's  (3)
hyperbole  (1)
hypothetical  (17)
Hypothetically  (4)

< I >
iCloud  (27)
idea  (21)
ideas  (1)
identified  (1)
identifies  (1)
identify  (15)
identifying  (1)
idle  (1)
ignored  (4)
Ill  (1)
illegal  (1)
IMG_4311.HEIC  (1)
immediate  (1)
immediately  (2)
immersed  (1)
impeachment  (3)
implement  (1)
implication  (1)
implied  (2)
implying  (1)
importance  (2)
important  (6)
importantly  (1)
impossible  (1)
impression  (1)
improper  (9)
improvement  (1)
inappropriate  (7)
incident  (3)
incite  (1)
incitement  (1)
inciting  (1)
include  (3)
included  (5)

including  (6)
income  (2)
inconsequential  (1)
inconsistent  (1)
incorrect  (11)
increase  (1)
incredibly  (1)
INDEX  (2)
indicate  (2)
indicates  (1)
indication  (1)
individual  (1)
individuals  (1)
industry  (1)
ineffective  (1)
infallible  (1)
infection  (1)
inference  (2)
influencing  (1)
Influential  (1)
info  (2)
inform  (2)
informant  (1)
information  (71)
infuriated  (1)
In-house  (1)
initial  (2)
initials  (1)
injunction  (3)
inner  (1)
innocent  (1)
innocuous  (1)
input  (8)
inquire  (1)
insane  (6)
inside  (2)
insignificant  (1)
insinuate  (1)
insinuates  (1)
insinuating  (3)
insistent  (1)
Instagram  (4)
instance  (5)
instances  (5)
instant  (1)
institution  (1)
institutional  (1)
instruct  (10)
instructed  (5)

instructing  (8)
instruction  (11)
instructional  (1)
instructions  (3)
instructs  (1)
insubordinate  (1)
insulted  (1)
insulting  (4)
insults  (2)
insurance  (1)
insurrection  (3)
insurrectionists  (1)
intake  (1)
integral  (1)
intended  (1)
intense  (1)
intent  (3)
intention  (3)
intentionally  (1)
intents  (3)
interact  (3)
interaction  (4)
interest  (5)
interested  (10)
interesting  (2)
interests  (1)
intern  (5)
internal  (2)
internally  (2)
international  (1)
internet  (2)
internship  (2)
interpret  (1)
interpretation  (3)
interrupt  (2)
interview  (22)
interviewed  (2)
interviewing  (5)
interviews  (9)
intimate  (1)
introduce  (1)
introductory  (1)
intuition  (1)
inventing  (1)
invested  (2)
investigate  (2)
investigating  (1)
investigation  (2)
investigator  (7)

invitation  (1)
invite  (1)
involve  (2)
involved  (9)
involvement  (4)
iPad  (21)
iPhone  (1)
irate  (1)
Ireland  (1)
irrelevant  (2)
irrepairable  (1)
irreparable  (1)
Islam  (1)
Islamism  (1)
isolated  (1)
Israel  (1)
issue  (17)
issued  (6)
issues  (5)
issuing  (1)
Italy  (1)
its  (10)
Ivy  (1)
IW  (8)

< J >
Jack  (1)
jacket  (1)
jail  (1)
James  (4)
Jan  (9)
Janice  (1)
January  (13)
Jasmine  (33)
Jasmine's  (1)
Jason  (1)
Jaz  (10)
jcavalier@cozen.com
  (1)
jealous  (1)
Jerusalem  (2)
Joanne  (1)
job  (71)
jobs  (7)
jog  (1)
John  (7)
joke  (5)
Jonathan  (1)
Journal  (11)

journalism  (1)
journalist  (1)
Joyce  (5)
Juan  (1)
Judge  (45)
Judge's  (2)
Judy  (1)
July  (1)
jump  (1)
June  (11)
Juneish  (1)
jury  (4)
just-for-fun-type  (2)
Justice  (11)
justified  (1)
justify  (1)

< K >
Kasam  (3)
Katrina  (2)
keep  (41)
Keepers  (1)
Kep  (2)
kept  (3)
Kevin  (1)
key  (1)
kicked  (3)
kid  (4)
kidding  (1)
kidney  (4)
kids  (31)
kill  (1)
killed  (1)
killers  (1)
killing  (2)
Kim  (1)
Kimbel  (1)
kind  (25)
kinds  (10)
kiss  (1)
kissed  (2)
knee  (1)
knew  (38)
knocks  (1)
know  (570)
knowing  (3)
knowledge  (12)
known  (7)
knows  (12)

Kyle  *(1)*

**< L >**
LA  *(1)*
labeled  *(3)*
Lack  *(6)*
lady  *(1)*
Lafave  *(1)*
laid  *(2)*
LANCASTER  *(1)*
language  *(1)*
laptop  *(1)*
largely  *(1)*
late  *(2)*
latest  *(1)*
laugh  *(2)*
laughed  *(1)*
laughing  *(1)*
launching  *(1)*
LAW  *(4)*
Lawrence  *(1)*
laws  *(4)*
lawsuit  *(44)*
lawsuits  *(5)*
lawyer  *(10)*
lawyers  *(2)*
layering  *(1)*
lead  *(3)*
leader  *(4)*
leading  *(1)*
league  *(1)*
Leah  *(5)*
learn  *(3)*
learned  *(3)*
learning  *(3)*
leave  *(10)*
leaving  *(2)*
Lee  *(4)*
leering  *(1)*
left  *(35)*
left-hand  *(2)*
legal  *(44)*
legally  *(2)*
legislation  *(2)*
legit  *(4)*
legitimate  *(4)*
legitimately  *(1)*
Leigh  *(1)*
lent  *(2)*

lesson  *(2)*
letter  *(1)*
letters  *(2)*
letting  *(5)*
level  *(8)*
levied  *(1)*
Levy  *(7)*
LexusNexus  *(1)*
liar  *(4)*
Liberty  *(1)*
license  *(1)*
lie  *(3)*
lied  *(3)*
lies  *(2)*
life  *(32)*
life's  *(1)*
lifestyle  *(1)*
light  *(6)*
lighter  *(1)*
liked  *(10)*
likelihood  *(11)*
likes  *(1)*
limit  *(1)*
limited  *(4)*
line  *(12)*
lines  *(2)*
link  *(3)*
Lis  *(3)*
LISA  *(54)*
Lisa's  *(1)*
list  *(13)*
listed  *(2)*
listen  *(11)*
listing  *(1)*
lists  *(1)*
literal  *(1)*
literally  *(5)*
litigation  *(3)*
Litman  *(1)*
little  *(42)*
live  *(14)*
lived  *(2)*
Lives  *(2)*
living  *(7)*
loathed  *(1)*
lobbing  *(1)*
lobby  *(1)*
locally  *(4)*
location  *(1)*

lodged  *(1)*
lofty  *(1)*
log  *(7)*
logged  *(2)*
log-in  *(3)*
log-ins  *(1)*
LOL  *(1)*
London  *(13)*
long  *(38)*
longer  *(3)*
long-term  *(4)*
long-time  *(2)*
long-winded  *(1)*
look  *(39)*
looked  *(5)*
looking  *(16)*
looks  *(18)*
loose  *(1)*
loosely  *(1)*
loser  *(1)*
lost  *(1)*
lot  *(32)*
lots  *(6)*
loud  *(1)*
love  *(25)*
love/hate  *(1)*
loved  *(3)*
lovely  *(1)*
lowest  *(2)*
loyalty  *(3)*
lthe  *(1)*
ludicrous  *(1)*
lunch  *(3)*
lying  *(5)*

**< M >**
Ma'am  *(2)*
machine  *(1)*
mad  *(2)*
magically  *(1)*
mail  *(3)*
main  *(1)*
Mainen  *(1)*
maintain  *(3)*
maintained  *(5)*
major  *(4)*
maker  *(1)*
making  *(26)*
man  *(4)*

manage  *(6)*
managed  *(2)*
management  *(1)*
manager  *(1)*
managing  *(4)*
mandated  *(1)*
Mandeles  *(2)*
manipulated  *(1)*
manipulator  *(1)*
manufacture  *(1)*
manufactured  *(4)*
manufacturing  *(1)*
marble  *(1)*
March  *(11)*
marched  *(1)*
Mario  *(1)*
Mark  *(12)*
marked  *(10)*
Market  *(5)*
Marnie  *(29)*
married  *(1)*
master  *(1)*
Master's  *(1)*
match  *(1)*
math  *(1)*
Matt  *(5)*
matter  *(26)*
matters  *(4)*
Matthew  *(3)*
Max  *(1)*
McDonald  *(1)*
McDonald's  *(1)*
McGuiness  *(1)*
McMichael  *(2)*
McNulty  *(31)*
M-E  *(1)*
Meal  *(1)*
mean  *(159)*
Meaning  *(2)*
means  *(14)*
meant  *(1)*
mechanism  *(1)*
Meckenberg  *(3)*
Meckleberg  *(4)*
med  *(1)*
media  *(12)*
medical  *(3)*
medication  *(2)*
medicine  *(2)*

**meds** *(2)*
**meet** *(5)*
**meeting** *(14)*
**meetings** *(1)*
**MEF** *(106)*
**MEF's** *(2)*
**member** *(1)*
**members** *(6)*
**memory** *(2)*
**men** *(1)*
**mended** *(2)*
**mental** *(2)*
**mentality** *(2)*
**mentally** *(1)*
**mention** *(1)*
**mentioned** *(7)*
**mentioning** *(1)*
**merits** *(4)*
**mess** *(1)*
**message** *(30)*
**messaged** *(3)*
**messages** *(33)*
**messaging** *(2)*
**messy** *(1)*
**met** *(19)*
**Meyer** *(9)*
**Meyers** *(1)*
**Middle** *(132)*
**middleman** *(1)*
**midnight** *(1)*
**miffed** *(1)*
**Mike** *(3)*
**million** *(7)*
**mind** *(13)*
**Mindula** *(1)*
**mine** *(5)*
**minute** *(15)*
**minutes** *(21)*
**misappropriated** *(5)*
**misappropriation** *(1)*
**misbehavior** *(1)*
**Mischaracterization** *(2)*
**mischaracterize** *(1)*
**mischaracterized** *(3)*
**mischaracterizing** *(6)*
**mislead** *(1)*
**misleading** *(3)*
**misreading** *(1)*

**missed** *(2)*
**missing** *(4)*
**mission** *(4)*
**mission-oriented** *(1)*
**missions** *(1)*
**misstating** *(2)*
**mistaken** *(1)*
**mistakes** *(1)*
**misunderstanding** *(1)*
**mob** *(1)*
**Mohammed** *(2)*
**Molly** *(1)*
**mom** *(3)*
**moment** *(3)*
**mom's** *(1)*
**Monday** *(2)*
**Monday.com** *(3)*
**Monetarily** *(2)*
**monetary** *(1)*
**money** *(52)*
**Money's** *(1)*
**monies** *(1)*
**month** *(10)*
**months** *(20)*
**mooning** *(1)*
**moral** *(2)*
**morning** *(5)*
**mother** *(7)*
**mother-in-law** *(1)*
**motion** *(6)*
**motivation** *(1)*
**motives** *(3)*
**mouth** *(2)*
**move** *(19)*
**moved** *(7)*
**movement** *(1)*
**Moving** *(2)*
**multiple** *(19)*
**Murville** *(4)*
**mutual** *(4)*
**Myers** *(1)*

**< N >**
**name** *(27)*
**named** *(6)*
**names** *(5)*
**Nancy** *(1)*
**narcotics** *(1)*
**narrow** *(1)*

**National** *(5)*
**natural** *(2)*
**nature** *(1)*
**NDA** *(12)*
**near** *(3)*
**neat** *(1)*
**necessarily** *(2)*
**necessary** *(1)*
**neck** *(1)*
**need** *(52)*
**needed** *(11)*
**needing** *(1)*
**needs** *(4)*
**nefarious** *(3)*
**negated** *(1)*
**Negative** *(7)*
**neglect** *(1)*
**negotiations** *(1)*
**Neil** *(2)*
**Neither** *(3)*
**nervous** *(1)*
**Network** *(1)*
**networking** *(1)*
**never** *(90)*
**nevertheless** *(3)*
**new** *(26)*
**news** *(10)*
**newsletters** *(1)*
**Newsmax** *(3)*
**nice** *(4)*
**night** *(5)*
**nightmare** *(1)*
**nights** *(1)*
**nine** *(5)*
**nod** *(1)*
**nominal** *(3)*
**non-attorneys** *(1)*
**nonsense** *(4)*
**non-stop** *(3)*
**Nope** *(3)*
**normal** *(8)*
**normally** *(2)*
**Notary** *(3)*
**note** *(7)*
**noted** *(2)*
**notepad** *(1)*
**nother** *(1)*
**Nothing's** *(2)*
**notified** *(1)*

**notify** *(1)*
**notion** *(1)*
**November** *(32)*
**Number** *(23)*
**numbers** *(9)*
**numerous** *(6)*
**nuts** *(1)*

**< O >**
**oath** *(3)*
**object** *(96)*
**objected** *(2)*
**objecting** *(2)*
**objection** *(180)*
**objectionable** *(2)*
**objections** *(16)*
**objectives** *(2)*
**obligated** *(2)*
**obligation** *(2)*
**observe** *(3)*
**observed** *(2)*
**observing** *(1)*
**obsessed** *(1)*
**obtain** *(1)*
**obtained** *(1)*
**obvious** *(3)*
**obviously** *(2)*
**Occasionally** *(3)*
**occasions** *(10)*
**occupies** *(1)*
**occur** *(3)*
**occurred** *(5)*
**O'CONNOR** *(2)*
**October** *(7)*
**OD** *(1)*
**offensive** *(2)*
**offer** *(2)*
**offered** *(1)*
**offering** *(1)*
**offers** *(1)*
**office** *(27)*
**Officer** *(2)*
**official** *(6)*
**officials** *(1)*
**Oh** *(40)*
**Ohio** *(2)*
**Okay** *(377)*
**old** *(8)*
**Oliva** *(1)*

Case 2:19-cv-05030-JDW   Document 110-2   Filed 03/02/21   Page 187 of 193

Deposition of Lisa Barbounis                                    Lisa Barbounis v. Middle Eastern Forum, et. al.

omission  *(1)*
once  *(8)*
one-minute  *(1)*
ones  *(3)*
one-time  *(1)*
ongoing  *(2)*
online  *(6)*
oOo  *(1)*
opened  *(2)*
opening  *(6)*
operate  *(2)*
operates  *(2)*
operating  *(2)*
operations  *(1)*
opinion  *(13)*
opinions  *(2)*
opportunities  *(1)*
opportunity  *(8)*
opposed  *(2)*
opposite  *(1)*
option  *(2)*
oral  *(1)*
order  *(34)*
ordered  *(1)*
orders  *(3)*
ordinary  *(1)*
Oren  *(2)*
organization  *(13)*
organizational  *(2)*
organizations  *(1)*
organize  *(1)*
organized  *(4)*
organizer  *(1)*
original  *(2)*
originally  *(7)*
O'Shalim  *(1)*
outcome  *(3)*
outlet  *(3)*
outlets  *(2)*
outmanned  *(1)*
output  *(1)*
outside  *(14)*
outward  *(2)*
overlap  *(1)*
overreach  *(1)*
overreacted  *(2)*
overseeing  *(1)*
Ovi  *(9)*
owns  *(1)*

**< P >**
p.m  *(13)*
PA  *(4)*
packages  *(1)*
PAGE  *(9)*
pages  *(7)*
paid  *(16)*
pain  *(2)*
Painful  *(4)*
panel  *(5)*
panorama  *(1)*
pants  *(1)*
paper  *(2)*
papers  *(4)*
paperwork  *(3)*
paragraph  *(7)*
paragraphs  *(1)*
Pardon  *(3)*
Paris  *(2)*
Parliament  *(1)*
part  *(48)*
Partially  *(1)*
participate  *(1)*
particular  *(7)*
particularly  *(1)*
parties  *(3)*
parts  *(2)*
party  *(6)*
passed  *(1)*
passing  *(1)*
passion  *(2)*
password  *(4)*
passwords  *(4)*
Patel  *(2)*
patient  *(2)*
Patricia  *(25)*
Patrick  *(2)*
pattern  *(1)*
Paul  *(2)*
pay  *(17)*
paycheck  *(3)*
paying  *(5)*
payment  *(1)*
Paypal  *(2)*
PC  *(1)*
Pelosi's  *(1)*
pending  *(3)*
Penn  *(1)*

**PENNSYLVANIA**  *(6)*
penny  *(1)*
people  *(126)*
peoples  *(1)*
percent  *(8)*
perfect  *(2)*
perform  *(1)*
performance  *(5)*
perimeter  *(1)*
period  *(16)*
periods  *(2)*
permission  *(3)*
permitted  *(1)*
person  *(43)*
personal  *(27)*
Personally  *(3)*
personnel  *(2)*
person's  *(2)*
perspective  *(2)*
pertaining  *(2)*
pertake  *(1)*
petitioned  *(1)*
phase  *(1)*
Philadelphia  *(6)*
Philly  *(4)*
phone  *(42)*
phones  *(2)*
Photo  *(6)*
photograph  *(14)*
photos  *(1)*
physical  *(3)*
physically  *(1)*
pick  *(1)*
picking  *(1)*
pics  *(5)*
picture  *(24)*
pictured  *(1)*
pictures  *(16)*
piece  *(7)*
pieces  *(2)*
pile  *(1)*
pipe  *(1)*
Pipes  *(106)*
Pipe's  *(1)*
Pipes's  *(1)*
pitch  *(1)*
placard  *(1)*
PLACE  *(14)*
placed  *(6)*

places  *(1)*
placing  *(1)*
Plaintiff  *(4)*
plaintiffs  *(2)*
plaintiff's  *(2)*
plan  *(2)*
plane  *(2)*
planing  *(1)*
planned  *(3)*
plate  *(1)*
platform  *(2)*
platforms  *(2)*
play  *(3)*
player  *(2)*
players  *(2)*
playing  *(3)*
please  *(16)*
plenty  *(7)*
PLLC  *(1)*
Plus  *(3)*
Podiatry  *(1)*
point  *(73)*
pointed  *(1)*
pointing  *(2)*
points  *(3)*
Police  *(2)*
policies  *(1)*
policy  *(7)*
political  *(10)*
politically  *(1)*
poor  *(7)*
poorly  *(2)*
pop  *(1)*
popping  *(1)*
portion  *(2)*
position  *(16)*
positions  *(1)*
positive  *(1)*
positively  *(1)*
possession  *(2)*
possibility  *(1)*
possible  *(3)*
possibly  *(2)*
post  *(6)*
posted  *(2)*
posting  *(1)*
posts  *(1)*
potential  *(4)*
potentially  *(2)*

pounds  (2)
power  (3)
powerful  (1)
PR  (1)
pray  (1)
pre  (1)
precisely  (1)
preclude  (1)
predatory  (1)
predicated  (1)
preempted  (1)
prefer  (1)
preliminary  (3)
prepare  (1)
pre-planned  (2)
prerogative  (1)
prescribes  (1)
PRESENT  (4)
presented  (4)
president  (6)
presidential  (1)
press  (16)
pressure  (2)
pressured  (2)
pressures  (1)
presume  (1)
pretty  (19)
prevails  (2)
prevent  (2)
previous  (3)
Previously  (2)
pride  (2)
priests  (1)
primary  (3)
principle  (1)
principles  (1)
print  (1)
printed  (1)
prior  (22)
priority  (1)
prison  (3)
private  (25)
privilege  (9)
privy  (1)
probably  (42)
probation  (1)
probationary  (1)
problem  (17)
problems  (4)

Procedure  (2)
procedures  (1)
proceed  (5)
proceeding  (1)
process  (2)
proclivities  (2)
produce  (8)
produced  (14)
producing  (1)
product  (2)
production  (4)
professional  (1)
profile  (1)
program  (4)
programs  (1)
progress  (2)
progression  (1)
prohibit  (1)
project  (16)
promise  (2)
promised  (1)
promising  (2)
promotion  (1)
prompted  (1)
proof  (6)
proper  (7)
proposal  (3)
propounded  (1)
prospective  (1)
Prosperity  (1)
Prosser  (1)
protect  (2)
protected  (3)
protecting  (1)
protection  (1)
protective  (1)
protest  (1)
protests  (2)
proud  (21)
prove  (4)
proven  (1)
provide  (2)
provided  (5)
psychiatric  (3)
psychiatrist  (2)
Public  (11)
publication  (2)
publicize  (1)
publicly  (4)

publicly-filed  (1)
published  (1)
Puerto  (7)
pull  (4)
pulled  (1)
pulling  (1)
pulp  (1)
punished  (3)
purchase  (1)
purely  (2)
purpose  (1)
purposeful  (1)
purposefully  (1)
purposes  (4)
pursuant  (1)
pursuing  (3)
push  (1)
put  (49)
puts  (3)
putting  (7)
pyramid  (1)

< Q >
qualifications  (1)
qualified  (1)
qualify  (2)
Quarterly  (1)
question  (248)
questioned  (3)
questioning  (5)
questions  (46)
question's  (1)
quick  (6)
quicker  (1)
quickly  (6)
quit  (8)
quite  (4)
quitting  (2)
quote  (11)
quoted  (1)
quoting  (2)

< R >
racketeering  (1)
radio  (6)
Rahiem  (4)
raided  (1)
raise  (2)
raising  (1)

rally  (1)
Ramen  (1)
ran  (2)
random  (1)
Randy  (3)
ranges  (1)
Rape  (11)
raped  (12)
rapey  (1)
rapist  (10)
Rare  (1)
ratting  (2)
reach  (5)
reached  (10)
reaching  (4)
react  (1)
reaction  (6)
read  (100)
readily  (1)
reading  (3)
reads  (1)
ready  (5)
real  (15)
reality  (1)
realize  (3)
really  (60)
realm  (1)
reapplied  (1)
re-ask  (1)
reason  (46)
reasonable  (11)
reasonably  (2)
reasoning  (2)
reasons  (3)
recall  (12)
receive  (1)
received  (7)
receiving  (1)
Recess  (4)
recognize  (4)
recognized  (3)
recollection  (4)
recommend  (1)
recommendations  (1)
recommended  (2)
recommending  (1)
record  (85)
recorded  (5)
recording  (13)

Deposition of Lisa Barbounis                                    Lisa Barbounis v. Middle Eastern Forum, et. al.

recordings *(3)*
record's *(1)*
recount *(1)*
recourse *(4)*
recourses *(1)*
red *(1)*
reduced *(5)*
reducing *(2)*
refer *(5)*
reference *(7)*
referenced *(3)*
references *(2)*
referencing *(4)*
referred *(3)*
referring *(12)*
refrain *(1)*
refreshing *(1)*
refused *(1)*
regarding *(2)*
regardless *(8)*
regret *(1)*
regular *(3)*
regularly *(1)*
regulate *(1)*
regulation *(1)*
rehash *(1)*
rehired *(1)*
relapsed *(1)*
related *(7)*
relates *(2)*
relating *(4)*
relation *(3)*
relationship *(45)*
relationships *(3)*
relative *(1)*
relax *(1)*
relaxing *(1)*
release *(1)*
released *(1)*
releases *(1)*
relevance *(4)*
relevant *(8)*
relevantly *(1)*
relief *(1)*
relieve *(1)*
relive *(2)*
re-live *(1)*
reluctant *(5)*
rely *(1)*

relying *(1)*
remainder *(1)*
remaining *(1)*
remains *(1)*
remarkably *(2)*
remember *(143)*
remembered *(2)*
remembering *(1)*
remotely *(1)*
remove *(8)*
removed *(5)*
removing *(1)*
renewed *(1)*
rent *(1)*
re-open *(3)*
repeat *(6)*
repeated *(1)*
rephrase *(1)*
replied *(1)*
re-populates *(1)*
report *(19)*
reported *(15)*
REPORTER *(19)*
reporters *(2)*
reporter's *(2)*
Reporting *(21)*
reports *(4)*
represent *(13)*
representation *(5)*
Representatives *(4)*
represented *(2)*
representing *(2)*
reprimand *(9)*
reprimanded *(1)*
reprimanding *(1)*
Republican *(1)*
Republicans *(1)*
Republican's *(1)*
reputation *(4)*
request *(6)*
requested *(3)*
requests *(4)*
require *(1)*
requirement *(1)*
requirements *(1)*
requires *(1)*
research *(1)*
resign *(1)*
resigned *(2)*

resistent *(1)*
resolution *(5)*
resolve *(1)*
resolved *(3)*
resort *(1)*
Resources *(6)*
respect *(10)*
respective *(1)*
respond *(6)*
responded *(10)*
responds *(3)*
response *(7)*
responses *(1)*
responsibilities *(11)*
responsibility *(5)*
responsible *(5)*
rest *(3)*
restate *(1)*
restore *(1)*
restrict *(1)*
restrictions *(1)*
restroom *(1)*
result *(4)*
Resume *(37)*
resumes *(2)*
retained *(1)*
retaliate *(2)*
retaliating *(2)*
retaliation *(21)*
retaliations *(1)*
retaliatory *(9)*
retracted *(2)*
retroactively *(1)*
return *(2)*
returned *(1)*
retweets *(1)*
review *(14)*
reviewed *(3)*
revised *(1)*
revisions *(1)*
rewarded *(1)*
REYNOLDS *(4)*
rhetoric *(1)*
RICO *(24)*
rid *(5)*
ridicule *(2)*
ridiculous *(8)*
Rieser *(1)*
right *(200)*

ring *(1)*
ringing *(2)*
riot *(2)*
riots *(1)*
rises *(1)*
RMR *(4)*
RNC *(2)*
Robinson *(35)*
Robinson's *(6)*
role *(5)*
rolling *(1)*
Roman *(77)*
Roman's *(6)*
romantic *(2)*
romantically *(1)*
room *(12)*
Rothlinson *(1)*
rough *(1)*
routine *(1)*
routinely *(1)*
RSS *(1)*
rule *(2)*
ruled *(1)*
rules *(3)*
ruling *(3)*
rulings *(1)*
rumor *(2)*
rumors *(3)*
run *(6)*
running *(2)*
runs *(2)*
Ryan *(1)*

< S >
sad *(6)*
safe *(4)*
saga *(1)*
sake *(4)*
salary *(7)*
Sallavanti *(1)*
Salman *(2)*
Sam *(5)*
Samantha *(2)*
San *(1)*
Sanchez *(28)*
Sanchez's *(2)*
Sandman *(2)*
sanities *(1)*
Santa *(1)*

Deposition of Lisa Barbounis                                    Lisa Barbounis v. Middle Eastern Forum, et. al.

sappy *(1)*
sat *(2)*
satisfy *(1)*
Saturday *(1)*
Saudi *(1)*
save *(4)*
saved *(1)*
saw *(19)*
saying *(58)*
says *(56)*
scalp *(1)*
scattered *(1)*
school *(11)*
schools *(1)*
scorned *(1)*
scour *(1)*
scoured *(1)*
scratch *(1)*
screaming *(1)*
Screen *(19)*
screenshot *(1)*
screenshots *(1)*
screw *(1)*
scroll *(11)*
scrolling *(3)*
scuttle *(4)*
seal *(4)*
search *(8)*
second *(25)*
secondary *(2)*
Secondly *(3)*
seconds *(3)*
secret *(4)*
secretary *(2)*
secrets *(19)*
secret's *(1)*
section *(1)*
sections *(1)*
sector *(1)*
Secum *(2)*
secure *(1)*
security *(1)*
see *(64)*
seeing *(3)*
seeking *(1)*
seen *(7)*
sees *(1)*
segments *(1)*
self-esteem *(1)*

self-validation *(1)*
send *(23)*
sending *(12)*
sends *(2)*
seniority *(1)*
sense *(10)*
sensitive *(1)*
sent *(41)*
sentence *(4)*
sentenced *(1)*
separate *(3)*
separated *(1)*
separately *(1)*
September *(1)*
serious *(4)*
served *(10)*
services *(1)*
set *(24)*
Seth *(26)*
seth@DerekSmithLaw
.com *(1)*
setting *(3)*
settings *(1)*
settlement *(5)*
seven *(7)*
seven-hour *(1)*
seventh *(1)*
severe *(1)*
sex *(18)*
sexual *(42)*
sexually *(3)*
sgold@discrimlaw.net
*(1)*
shape *(1)*
share *(8)*
shared *(2)*
sharp *(1)*
shed *(3)*
she'd *(1)*
shell *(2)*
Shield *(3)*
shiny *(1)*
shirt *(2)*
shit *(1)*
Shocked *(5)*
shop *(1)*
short *(3)*
shorter *(1)*
Shot *(10)*

shotted *(1)*
show *(21)*
showed *(7)*
showing *(6)*
shown *(1)*
shows *(1)*
shut *(2)*
shutdown *(1)*
Sid *(1)*
side *(9)*
SIDNEY *(6)*
sign *(11)*
signed *(9)*
signify *(1)*
signing *(3)*
silence *(1)*
sill *(1)*
silly *(1)*
simple *(8)*
simply *(3)*
single *(4)*
sir *(15)*
sit *(6)*
Sitnick *(1)*
sitting *(17)*
situation *(13)*
situations *(1)*
six *(6)*
skill *(1)*
skills *(5)*
skips *(1)*
Sky *(5)*
sleep *(6)*
sleeping *(6)*
slept *(2)*
slow *(3)*
slowly *(1)*
small *(4)*
smart *(1)*
SMITH *(1)*
Snapchat *(1)*
sobbed *(2)*
social *(11)*
society *(2)*
sold *(1)*
sole *(3)*
solely *(1)*
solid *(2)*
solidify *(1)*

soliloquies *(1)*
soliloquy *(2)*
solitary *(1)*
solve *(2)*
somebody *(25)*
somebody's *(1)*
somewhat *(1)*
sorry *(40)*
sort *(10)*
sorting *(1)*
sound *(4)*
sounds *(3)*
source *(6)*
sources *(1)*
Southern *(1)*
space *(1)*
speak *(22)*
speaker *(2)*
speaking *(26)*
speaks *(13)*
special *(1)*
Specialist *(2)*
specific *(8)*
specifically *(8)*
specifics *(6)*
specified *(1)*
speculate *(2)*
speculation *(4)*
Speculative *(1)*
speech *(4)*
speeches *(3)*
speechifying *(2)*
spell *(1)*
spelled *(1)*
spend *(11)*
spending *(1)*
spent *(5)*
sphere *(1)*
spinning *(1)*
spiral *(1)*
split *(2)*
spoke *(13)*
spoken *(13)*
spot *(1)*
spreading *(1)*
spreadsheet *(1)*
SS *(1)*
stabbed *(1)*
Stacy *(1)*

Deposition of Lisa Barbounis                                    Lisa Barbounis v. Middle Eastern Forum, et. al.

**staff** *(8)*
**stages** *(1)*
**stamp** *(1)*
**stamped** *(1)*
**stamps** *(1)*
**stand** *(1)*
**standard** *(2)*
**standing** *(4)*
**standpoint** *(1)*
**stands** *(2)*
**start** *(14)*
**started** *(27)*
**starting** *(2)*
**starts** *(3)*
**state** *(8)*
**stated** *(3)*
**statement** *(10)*
**statements** *(10)*
**STATES** *(4)*
**stating** *(3)*
**Station** *(5)*
**status** *(1)*
**stay** *(7)*
**stayed** *(8)*
**staying** *(3)*
**stemmed** *(2)*
**stenographic** *(1)*
**stenographically** *(1)*
**step** *(1)*
**Stephanie** *(6)*
**stepping** *(1)*
**Steve** *(2)*
**stick** *(1)*
**stole** *(7)*
**stolen** *(4)*
**stone** *(2)*
**stones** *(1)*
**stop** *(12)*
**stopped** *(5)*
**stopping** *(1)*
**storage** *(3)*
**store** *(4)*
**stored** *(6)*
**stores** *(1)*
**stories** *(2)*
**storing** *(3)*
**story** *(6)*
**straight** *(3)*
**straightforward** *(1)*

**strange** *(2)*
**strategy** *(1)*
**stream** *(1)*
**Street** *(21)*
**streets** *(2)*
**stress** *(1)*
**stressful** *(2)*
**strike** *(9)*
**string** *(3)*
**strong** *(1)*
**structure** *(2)*
**struggle** *(1)*
**struggling** *(1)*
**studied** *(1)*
**studies** *(3)*
**stuff** *(52)*
**stupid** *(1)*
**stupidest** *(1)*
**subject** *(11)*
**subjective** *(4)*
**submit** *(2)*
**submitted** *(10)*
**subordinate** *(1)*
**subscribed** *(1)*
**substance** *(1)*
**substantial** *(3)*
**succeed** *(1)*
**success** *(6)*
**successfully** *(1)*
**suck** *(1)*
**sued** *(1)*
**suffered** *(1)*
**sufficient** *(2)*
**suggest** *(6)*
**suggesting** *(2)*
**suggestion** *(1)*
**suing** *(1)*
**Suite** *(4)*
**Sullivan** *(1)*
**summary** *(1)*
**summer** *(1)*
**Sun** *(1)*
**superior** *(1)*
**superiors** *(2)*
**supervised** *(1)*
**supervising** *(4)*
**supervisor** *(4)*
**supervisor/supervisee**
  *(1)*

**supervisors** *(1)*
**supervisory** *(2)*
**supply** *(1)*
**support** *(3)*
**supported** *(1)*
**supporter** *(1)*
**supports** *(1)*
**supposed** *(13)*
**supposition** *(1)*
**sure** *(43)*
**surgery** *(1)*
**surprise** *(2)*
**surprised** *(1)*
**surveillance** *(1)*
**survive** *(1)*
**suspicion** *(3)*
**suspicions** *(6)*
**swear** *(2)*
**sweaty** *(1)*
**sweet** *(3)*
**swimming** *(1)*
**sworn** *(4)*
**symptoms** *(3)*
**synopsis** *(1)*
**system** *(5)*

**< T >**
**table** *(1)*
**take** *(69)*
**TAKEN** *(14)*
**takenI** *(1)*
**takes** *(3)*
**talk** *(56)*
**talked** *(53)*
**talking** *(99)*
**talks** *(5)*
**tapes** *(1)*
**tarnish** *(1)*
**tasks** *(3)*
**Taylor** *(1)*
**Taylor's** *(1)*
**T-bone** *(2)*
**teach** *(1)*
**team** *(3)*
**tech** *(1)*
**technical** *(1)*
**technicalities** *(1)*
**technically** *(2)*
**Telegram** *(3)*

**telegrams** *(1)*
**telegraph** *(2)*
**television** *(1)*
**tell** *(99)*
**telling** *(31)*
**tells** *(2)*
**tend** *(1)*
**tenth** *(1)*
**tenure** *(2)*
**Terio** *(1)*
**term** *(2)*
**terms** *(8)*
**terrible** *(7)*
**terrorist** *(2)*
**terrorists** *(1)*
**test** *(1)*
**testified** *(16)*
**testify** *(21)*
**testimony** *(43)*
**Texas** *(12)*
**Text** *(44)*
**textbook** *(1)*
**texted** *(7)*
**texts** *(3)*
**Thank** *(6)*
**Thanks** *(4)*
**theft** *(2)*
**Thelma** *(2)*
**themself** *(1)*
**therapist** *(3)*
**thereof** *(1)*
**thing** *(91)*
**things** *(124)*
**think** *(230)*
**thinking** *(5)*
**thinks** *(16)*
**third** *(6)*
**Thirteen** *(1)*
**Thomas** *(28)*
**thought** *(34)*
**thousands** *(2)*
**thread** *(6)*
**threat** *(4)*
**threaten** *(2)*
**threatened** *(2)*
**threatening** *(4)*
**threatens** *(3)*
**threats** *(1)*
**three** *(25)*

Deposition of Lisa Barbounis                                    Lisa Barbounis v. Middle Eastern Forum, et. al.

threes *(1)*
threw *(1)*
throw *(1)*
throwing *(1)*
thrown *(1)*
throws *(2)*
Thursday *(3)*
ticket *(1)*
tie *(2)*
tied *(1)*
tier *(3)*
Tiffany *(4)*
tight *(1)*
time *(241)*
times *(60)*
tiny *(1)*
Tioro *(1)*
tired *(2)*
title *(29)*
titled *(1)*
today *(55)*
Today's *(1)*
told *(69)*
tolerate *(1)*
Tommy *(79)*
Tommy's *(3)*
Tomo *(4)*
tomorrow *(1)*
ton *(4)*
tone *(1)*
tonight *(1)*
tons *(3)*
toothed *(1)*
top *(14)*
top-down *(1)*
topic *(4)*
topics *(2)*
Toradol *(2)*
Torio *(1)*
Toro *(1)*
totally *(9)*
touched *(2)*
trade *(23)*
trafficking *(5)*
tragic *(1)*
train *(2)*
training *(1)*
transcript *(7)*
transcription *(1)*

transfer *(1)*
transferring *(1)*
transition *(1)*
transitioning *(1)*
translate *(1)*
transmitted *(1)*
transvestite *(1)*
trap *(1)*
trauma *(1)*
travel *(1)*
traveling *(1)*
treat *(2)*
treated *(5)*
treatment *(1)*
trial *(2)*
Tricia *(21)*
Tricia's *(1)*
trick *(2)*
tried *(6)*
trip *(1)*
triumph *(1)*
trouble *(8)*
troubled *(1)*
true *(39)*
truly *(1)*
Trump *(8)*
trust *(5)*
truth *(11)*
truthful *(5)*
truthfully *(3)*
try *(21)*
trying *(67)*
Tuesday *(1)*
tumble *(1)*
tunnels *(2)*
turn *(2)*
turned *(16)*
turns *(1)*
Tweet *(1)*
tweets *(3)*
twice *(5)*
twist *(2)*
twisted *(3)*
Twitter *(5)*
two *(45)*
two-and-a-half *(1)*
type *(5)*
types *(4)*
typical *(1)*

typo *(2)*
tyrant *(1)*

< U >
U.S *(3)*
Uh-huh *(27)*
ultimate *(1)*
ultimately *(5)*
umbrellas *(1)*
un *(1)*
unable *(1)*
unaffiliated *(1)*
unaware *(1)*
unbelievable *(1)*
unclear *(1)*
uncomfortable *(7)*
uncontrollably *(1)*
underappreciated *(1)*
undercover *(3)*
underground *(1)*
undermine *(1)*
underneath *(2)*
undershirt *(1)*
understand *(63)*
understandable *(1)*
understanding *(12)*
understands *(13)*
understood *(3)*
undertones *(1)*
unequivocal *(1)*
unequivocally *(1)*
unfair *(2)*
unfortunate *(1)*
unfortunately *(1)*
unhappy *(3)*
unhealthy *(1)*
union *(1)*
UNITED *(2)*
universe *(6)*
unnecessary *(2)*
unpaid *(1)*
unquote *(1)*
unrelated *(5)*
untrue *(4)*
untruthfully *(1)*
untruths *(2)*
updates *(1)*
updating *(1)*
upfront *(1)*

upgrading *(1)*
uphill *(1)*
uploading *(1)*
upping *(1)*
ups *(1)*
upset *(4)*
Upton's *(3)*
use *(19)*
useful *(1)*
user *(1)*
usually *(2)*
usurper *(1)*
usurpers *(1)*
utter *(1)*

< V >
vacation *(5)*
vacations *(2)*
vacillating *(1)*
valid *(1)*
value *(1)*
various *(2)*
Vasille *(3)*
veiled *(1)*
vendetta *(1)*
vendettas *(2)*
vendors *(1)*
venue *(1)*
verbal *(2)*
verbalize *(1)*
verbatim *(1)*
versus *(4)*
victim *(3)*
Video *(16)*
Videoconference *(1)*
VIDEOGRAPHER
*(15)*
videos *(1)*
view *(5)*
views *(1)*
Vinny *(13)*
violated *(2)*
violating *(1)*
violation *(2)*
violence *(3)*
Virginia *(3)*
Virus *(4)*
Visa *(6)*
vis-a-vis *(1)*

Deposition of Lisa Barbounis                                    Lisa Barbounis v. Middle Eastern Forum, et. al.

visit  *(1)*
visited  *(1)*
voice  *(4)*
voiced  *(2)*
voices  *(1)*
volunteer  *(1)*
volunteered  *(1)*
voters  *(1)*
vs  *(1)*

**< W >**
wait  *(50)*
waited  *(2)*
waiver  *(1)*
walk  *(3)*
walked  *(6)*
walks  *(3)*
Wall  *(11)*
want  *(191)*
wanted  *(48)*
wanting  *(1)*
wants  *(8)*
warn  *(1)*
warned  *(1)*
Washington  *(5)*
was-ism  *(1)*
waste  *(5)*
wasting  *(3)*
watch  *(1)*
watched  *(2)*
water  *(1)*
Watson  *(1)*
wave  *(1)*
way  *(67)*
ways  *(2)*
wearing  *(4)*
weather  *(1)*
web  *(1)*
Weber  *(6)*
Weber's  *(1)*
website  *(22)*
websites  *(3)*
wedding  *(1)*
week  *(10)*
weekend  *(1)*
weekends  *(1)*
weeks  *(4)*
Weinstein  *(2)*
weird  *(5)*

welcome  *(6)*
welcoming  *(1)*
well  *(127)*
went  *(38)*
We're  *(96)*
Western  *(1)*
Westrout  *(1)*
Westshop  *(1)*
we've  *(11)*
whatsoever  *(3)*
whereof  *(1)*
wherewithal  *(1)*
white  *(2)*
Whoa  *(8)*
whoas  *(1)*
wife  *(4)*
wifi  *(1)*
William  *(1)*
willing  *(3)*
Wilson  *(3)*
win  *(5)*
window  *(2)*
winds  *(1)*
Winfield  *(1)*
wing  *(2)*
wink  *(1)*
winning  *(1)*
wipe  *(4)*
Wisconsin  *(6)*
Wise  *(5)*
wish  *(4)*
wished  *(1)*
wishes  *(1)*
withdraw  *(3)*
witness  *(12)*
witnessed  *(3)*
witnesses  *(2)*
Wolf's  *(1)*
woman  *(7)*
women  *(3)*
won  *(1)*
wonderful  *(2)*
wondering  *(1)*
word  *(14)*
worded  *(1)*
words  *(22)*
work  *(103)*
worked  *(18)*
working  *(25)*

workings  *(1)*
workload  *(1)*
work-related  *(2)*
works  *(11)*
world  *(10)*
worried  *(2)*
worries  *(1)*
worry  *(6)*
worse  *(9)*
worst  *(1)*
worth  *(2)*
wound  *(1)*
wrap  *(2)*
wrapped  *(1)*
wraps  *(1)*
wrath  *(1)*
write  *(16)*
writes  *(3)*
writing  *(7)*
written  *(8)*
wrong  *(23)*
wrongdoing  *(3)*
wrongfully  *(1)*
wrote  *(19)*

**< Y >**
ya  *(1)*
Yeah  *(153)*
year  *(9)*
years  *(10)*
Year's  *(1)*
Yep  *(8)*
yesterday  *(2)*
yikes  *(1)*
yo  *(1)*
Yoder  *(2)*
Yoncheck  *(1)*
Yonchek  *(16)*
young  *(6)*
younger  *(1)*
YouTube  *(1)*

**< Z >**
zero  *(3)*
Ziv  *(5)*
Zoloft  *(1)*
Zoom  *(4)*