Case 2:19-cv-05030-JDW   Document 110-3   Filed 03/02/21   Page 1 of 157

Deposition of Patricia McNulty                    Lisa Barbounis v. Middle Eastern Forum, et. al.

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA


LISA BARBOUNIS,                ) CIVIL ACTION - LAW
                               )
          Plaintiff            )
                               )
-vs-                           ) NO. 2:19-cv-05030
                               )
THE MIDDLE EAST FORUM, et      )
al.,                           )
                               )
          Defendants           )
_____    X


                    *   *   *


          The recorded video deposition of PATRICIA

McNULTY, taken remotely via Zoom, on Friday,

February 5, 2021, beginning at 10:12 a.m., before

Carrie A. Kaufman, Registered Professional Reporter

and Notary Public in and for the Commonwealth of

Pennsylvania.

Deposition of Patricia McNulty                           Lisa Barbounis v. Middle Eastern Forum, et. al.

```
A P P E A R A N C E S:


On behalf of the Plaintiff:
          DEREK SMITH LAW GROUP, PLLC
          BY:  SETH D. CARSON, ESQ. (Via Zoom)
          1835 Market Street, Suite 2950
          Philadelphia, PA 19103
          (215) 391-4790
          seth@dereksmithlaw.com


On behalf of the Middle East Forum and Gregg Roman:
          COZEN O'CONNOR
          BY:  JONATHAN R. CAVALIER, ESQ. (Via Zoom)
          One Liberty Place
          1650 Market Street - Suite 2800
          Philadelphia, PA 19103
          (215) 665-2776
          jcavalier@cozen.com


On behalf of Gregg Roman:
          SIDNEY L. GOLD & ASSOCIATES, P.C.
          BY:  SIDNEY L. GOLD, ESQ. (Via Zoom)
               WILLIAM RIESER, ESQ. (Via Zoom)
          1835 Market Street, Suite 515
          Philadelphia, PA 19103
          (215) 569-1999
          sgold@discrimlaw.net


Also Present:
          Alex Held (Via Zoom)
          Everest Court Reporting
          Video Specialist

          Gregg Roman (Via Zoom)
          Daniel Pipes (Via Zoom)
          Matthew Mainen (Via Zoom)
          Marc Fink (Via Zoom)
```

```
                     WITNESS INDEX

WITNESS                              PAGE NUMBER

Patricia McNulty

     Examination by Mr. Cavalier. . . . . . . . . 5
     Examination by Mr. Gold. . . . . . . . . . 91




                   INDEX OF EXHIBITS


Exhibits 1 - 66     Text Messages


(Exhibits retained by counsel.)
```

Deposition of Patricia McNulty                               Lisa Barbounis v. Middle Eastern Forum, et. al.

Page 4

1    THE VIDEO SPECIALIST: We are now
2  on the record. Today's date is February
3  5th, 2021, and the time is 10:12 a.m.
4  Eastern.
5    This is the recorded video
6  deposition of Patricia McNulty in the
7  matter of Lisa Barbounis versus Middle
8  East Forum, et al., United States
9  District Court, Eastern District of
10 Pennsylvania, Civil Action Number
11 2:19-CV-05030-JDW.
12    My name is Alex Held, and I'm the
13 video specialist from Everest Court
14 Reporting. The court reporter today is
15 Carrie Kaufman also from Everest Court
16 Reporting. All counsel appearing today
17 will be noted on the stenographic
18 record.
19    Will the court reporter please
20 swear in the witness.
21    - - -
22    P A T R I C I A   M c N U L T Y
23    WAS CALLED AND HAVING BEEN DULY SWORN
24    WAS EXAMINED AND TESTIFIED AS FOLLOWS:
25    - - -

Page 5

1    MR. CAVALIER: Seth, are you good
2  to go?
3    MR. CARSON: Yeah, I'm good.
4    MR. CAVALIER: Okay. I just
5  didn't want to start while -- without
6  making sure you were able to hear.
7    - - -
8    EXAMINATION
9  BY MR. CAVALIER:
10   Q.   Good morning, Ms. McNulty. My name is
11 Jon Cavalier. I'm a lawyer with Cozen O'Connor here
12 in Philadelphia, and I represent the Middle East
13 Forum and Gregg Roman in the litigation that you
14 brought against them.
15       You'll also note that Mr. Sid Gold and
16 Mr. Bill Rieser are in this deposition as well. I'm
17 going to ask you some questions to begin this morning
18 and then I'm going to turn it over to Mr. Gold and
19 Mr. Rieser who are also going to have questions for
20 you. Okay?
21   Q.   I understand you've been deposed before
22 in these cases. Do you recall how many times you've
23 sat for a deposition?
24   A.   Twice before -- three -- three times
25 before.

Page 6

1    Q.   Okay. Have you ever been deposed
2  outside of what I'll call the Middle East Forum
3  cases?
4    A.   No.
5    Q.   Okay. So you've already been given the
6  instructions for depositions, and I'm sure at this
7  point the process has become familiar to you, but
8  I'll run you through a couple things just as a
9  reminder since we are on Zoom for this deposition
10 rather than in person and that creates some
11 difficulties and some headaches that we'll be able to
12 get through but just for the sake of a reminder.
13       It's obviously even more important
14 today that you and I try not to talk over each other.
15 I promise that I will do my best to let you finish
16 every one of your answers, and I would ask that in
17 return you let me finish my questions before you try
18 to answer, even if you anticipate where I'm going,
19 even if the answer seems obvious; is that fair?
20   A.   Sure.
21   Q.   Okay. If you do --
22       MR. CAVALIER: By the way, there's
23 some really really loud background
24 noise.
25       THE COURT REPORTER: Yeah, I'm

Page 7

1  getting a lot of interference also.
2       MR. CAVALIER: Okay. It actually
3  sounds pretty good now. Is that good on
4  your end, Carrie?
5       THE COURT REPORTER: Yeah, it does
6  seem better now. Thank you.
7       MR. CAVALIER: Okay. Okay. Sorry
8  about that.
9  BY MR. CAVALIER:
10   Q.   Additionally, waiting for me to get my
11 question out will give your counsel time to object to
12 the question if he wants to. You may hear him object
13 today, you probably will, but to the extent he simply
14 objects to my question, because we're in a deposition
15 as opposed to a trial, you're still expected to
16 answer the question unless he instructs you
17 specifically not to answer. Is that fair?
18   A.   Okay.
19   Q.   Okay. We need verbal answers today,
20 which you're already doing good with. Head nods --
21 even though we are on video, things like head nods or
22 other gestures don't register for the court reporter
23 who is taking down everything that you say today.
24 That transcript is the most important thing to come
25 out of today, so it's very important that your

Deposition of Patricia McNulty                                    Lisa Barbounis v. Middle Eastern Forum, et. al.

Page 8

1 answers, whether they be yes, no, or a detailed
2 answer, are accurately transcribed by the court
3 reporter. Her job is hard enough in regular times
4 where we're all sitting in the same room, but when
5 we're doing this over Zoom it's doubly hard. So it's
6 really important for both of us that we answer
7 verbally in a way that the court reporter can
8 understand so that she can take down our words.
9 Okay?
10     A.    Okay.
11     Q.    If you need a break today, just say so.
12 This is not an endurance test. You're always welcome
13 to take a break, get up, walk around, two minutes,
14 five minutes. If you get hungry or you want to get a
15 drink, that's all fine, too. The only thing I would
16 ask is if there -- to the extent there is a question
17 pending, that we finish up the answer to that
18 question before we break. But you're welcome to take
19 a break at any time.
20         Is there any reason today that you
21 won't be able to tell the truth or any other
22 condition that you might be dealing with that would
23 affect your memory?
24     A.    No.
25     Q.    Okay. Are you represented here today?

Page 9

1     A.    Yes.
2     Q.    And who is your counsel?
3     A.    Seth.
4     Q.    Seth Carson?
5     A.    Correct.
6     Q.    Okay. Did you prepare for today's
7 deposition at all?
8     A.    I spoke with Seth.
9     Q.    And when did you do that?
10     A.    Yesterday and this morning.
11     Q.    And how long did you speak with Seth
12 for yesterday?
13     A.    Maybe an hour.
14     Q.    Okay. And how long did you speak with
15 him for this morning?
16     A.    20 minutes maybe.
17     Q.    Did you review any documents?
18     A.    We didn't review any documents, no.
19     Q.    Okay. You said that you've been
20 deposed in these cases I think you said two or three
21 times before today?
22     A.    Three I think.
23     Q.    Three? Have you looked at your -- the
24 transcripts that were produced from those prior
25 depositions?

Page 10

1     A.    No.
2     Q.    Have you read them?
3     A.    No.
4     Q.    Did you ever discuss them with anybody?
5     A.    No.
6     Q.    Did you ever talk about your prior
7 depositions with anybody?
8     A.    No.
9     Q.    Okay. Just give me one second here to
10 get my documents together. I want to share some
11 things with you today.
12         Ms. McNulty, do you know what I mean
13 when I reference something called discovery in civil
14 litigation?
15     A.    I believe so. Anything that's been
16 handed over.
17     Q.    Okay. So you understand that as part
18 of the civil process the parties to litigation are
19 required to share documents with each other pursuant
20 to what I'll refer to as discovery requests from each
21 side, correct?
22     A.    Correct. Yes.
23     Q.    Okay. And you're aware that the
24 defendants in this -- in your action that you brought
25 against the Forum and Mr. Roman have served discovery

Page 11

1 requests on you in this case, correct?
2     A.    Yes.
3     Q.    Okay.
4         MR. CARSON: No, that's not true.
5 What you just said is not true.
6         MR. CAVALIER: Let me rephrase
7 that.
8 BY MR. CAVALIER:
9     Q.    You're aware that the defendants, the
10 Forum -- let me back up actually.
11         Do you understand that when I say the
12 Forum I'm referring to the Middle East Forum?
13     A.    Yes.
14     Q.    So it's fair for today's purposes that
15 to the extent I say the Forum or MEF we'll know what
16 each other is talking about, correct?
17     A.    Yes.
18     Q.    Okay. And to address your counsel's
19 objection, you understand, do you not, that in the
20 case that you filed against the Forum and Mr. Roman
21 the Forum has issued discovery requests to you,
22 correct?
23     A.    We have to provide discovery for that
24 case.
25     Q.    Okay.

Deposition of Patricia McNulty                                    Lisa Barbounis v. Middle Eastern Forum, et. al.

Page 12

1    A.    Right.
2    Q.    I'm going to show them to you, but
3 sitting here this morning do you recall offhand
4 whether you've ever seen the discovery requests that
5 the Forum served on you?
6    A.    No, I haven't.
7    Q.    Okay.
8       MR. CARSON:  I'm going to object.
9 She receives them when I receive them.
10 So, yes, she has, the answer to the
11 question is yes, she received them the
12 day I got them in an e-mail from
13 defendants.
14       MR. CAVALIER:  Seth, are you
15 answering the question for your witness?
16       MR. CARSON:  Yeah, I am, because
17 you're not going to trick her into
18 saying things she doesn't understand.
19       MR. CAVALIER:  I'm going to show
20 her a document --
21       MR. CARSON:  Patricia, when I
22 receive discovery -- Patricia, when I
23 receive discovery requests and you and I
24 go over them, that's you receiving them.
25 Okay?  Just so you understand what he's

Page 13

1 trying to ask you.
2       THE WITNESS:  Okay.
3       MR. CAVALIER:  I'm not trying to
4 trick her.  I'm going to show her the
5 documents.
6       MR. CARSON:  Okay.  Well, let's
7 just be clear for the record.
8       MR. CAVALIER:  We're going to be
9 clear, but we need the record to be
10 clear what the witness's answer --
11       MR. CARSON:  Well, I think we're
12 clear now, now that I cleared it up, I
13 think she could answer, so go ahead.
14 BY MR. CAVALIER:
15    Q.    I'm going to try to share this with
16 you.  Hopefully it works.
17       Can you see that document, Ms. McNulty?
18    A.    Yes.
19    Q.    How do I give you control of this.
20       I think I just gave you control of the
21 document.  Can you see if it works?  Can you scroll
22 up and down through this document?
23    A.    Yes, I can.
24    Q.    Okay.  So then I'm going to ask you
25 whether you've seen this document before, but I want

Page 14

1 you to take your time and look at it to the extent
2 you need to to identify it before you answer.
3    A.    Yes, I believe this is one of the ones
4 that I went through with my lawyer.
5    Q.    Okay.  And when you say you went
6 through this with your lawyer, I do not want to know
7 what you talked about with Seth, but I would like to
8 know when you recall going through this with your
9 lawyer.
10    A.    It was a couple weeks ago.
11    Q.    Okay.
12       MR. CARSON:  Object -- yeah, and
13 I'm going to object.  We're not going to
14 answer any other questions about how we
15 went -- or how we went through
16 discovery.  So if you want to ask the
17 questions for the record, I can continue
18 to object, I'm going to instruct her not
19 to answer those questions.
20       MR. CAVALIER:  I'm not sure I
21 understand the scope or the basis of
22 your objection, but I'll just keep
23 asking --
24       MR. CARSON:  You're not going to
25 ask her when, how long, how, you're not

Page 15

1 going to -- you're not going to do that,
2 and she's not going to answer those
3 questions based on privilege.
4       MR. CAVALIER:  How about you let
5 me ask the question and then if you have
6 an objection you can state it for the
7 record.
8       MR. CARSON:  Okay.  Well, I had an
9 objection that I just put on the record
10 where she answered and -- so I objected,
11 privilege, I didn't want her to answer,
12 my phone was on mute, so the last
13 question there is an objection on the
14 record to the last question, privilege.
15 BY MR. CAVALIER:
16    Q.    Ms. McNulty, I see that you're still
17 scrolling through the document.  I don't want to ask
18 you a question if you're looking at it, but when
19 you're done let me know and I'll move on to the next
20 question.
21    A.    I'm done.
22    Q.    Okay.  So, for the record, this
23 document is your answers to our first request for
24 production of documents.  Do you understand what I
25 mean when I say that?

Page 16

A.   Yes.
Q.   Okay.  And, again, just for the record, the way this is formatted you'll see our request here, I highlighted Request Number 1, for example, and then your response below that.  Do you see that?
A.   Uh-huh.
Q.   Okay.  Do you remember whether you read this document before it was served on defendants in this case?
MR. CARSON:  Objection.
Don't answer.
Privilege.
MR. CAVALIER:  The question is whether she remembers reviewing a document and you're --
MR. CARSON:  Yeah, because if the way she read it is that I read it to her, then it's privileged, and so she's not going to answer the question.
MR. CAVALIER:  So you're -- you're saying on the record that the fact that you read her discovery responses to her --
MR. CARSON:  No, I didn't say that.  I said if the answer to the

Page 17

question is that I read it to her, she can't answer.  Privilege.  She's not going to tell you things I said to her.  Just --
Patricia -- the objection is on the record.  Do not answer.
Next question, please.
BY MR. CAVALIER:
Q.   Did you review your responses to our discovery requests before sending it out to us?
MR. CARSON:  Objection.
Do not answer.
Privilege.
Next question.
MR. CAVALIER:  I'm going to need you -- Seth, I'm going to need you to explain the basis of your --
MR. CARSON:  Same basis as the last question.
MR. CAVALIER:  Pardon me?
MR. CARSON:  Same basis as the last question.
MR. CAVALIER:  So I want to be very very clear about this for the record.  You're not -- you're

Page 18

instructing her not to verify whether she reviewed her own discovery responses --
MR. CARSON:  I'm telling her not to say anything that I said to her, and if the answer requires her to confirm communications between counsel and a named -- and a named plaintiff in another case and a witness in this case, she's not going to answer it.  She's not going to tell you those things.
MR. CAVALIER:  I'm not asking her for any communication between the two of you, and I'll say for the record, Ms. McNulty, I do not want to hear about anything that you and your counsel talked about.  I'm not asking you to describe communications.  I'm not asking you the substance of those communications.  The question is very simple.  Did you review your responses to our discovery before serving them.
MR. CARSON:  The answer to the -- there is an objection on the record.  Privilege.  To answer that question she would have to tell you about

Page 19

communications between me and her.
MR. CAVALIER:  Seth, you understand that just because you convey information to a client doesn't automatically make that information privileged, correct?
MR. CARSON:  No, that is incorrect.  It actually does, particularly when the communication is between only attorney and client and it relates directly to the case in pending litigation.
MR. CAVALIER:  So your position is if I tell my client the sky is blue, that is now privileged?
MR. CARSON:  No, my position is if I go over discovery requests and we review them together and I read them to her, that -- all those conversations are privileged.
MR. CAVALIER:  I'm not asking you what you talked about with her.  I'm not asking her about what you reviewed.  All I'm asking --

Case 2:19-cv-05030-JDW   Document 110-3   Filed 03/02/21   Page 8 of 157

Deposition of Patricia McNulty                    Lisa Barbounis v. Middle Eastern Forum, et. al.

Page 20

MR. CARSON: If she says --

MR. CAVALIER: For the record, her discovery responses are not verified. Okay? This is a simple procedural matter. You didn't verify --

MR. CARSON: Yeah, exactly, so why don't you get me to send you a verification. I can do it right now.

MR. CAVALIER: We've tried to do that for months and it hasn't happened. I'm trying to find out whether she looked --

MR. CARSON: You have not tried to do that for months. It's a ridiculous thing to even say. Not tried to do it for months. Not tried to do it once.

MR. CAVALIER: Seth, there have been plenty of ridiculous things --

MR. CARSON: I can't think of one --

MR. CAVALIER: You know what, I'm not going to --

MR. CARSON: Forward me the e-mail where you told me that you needed me to send over a verification.

Page 21

BY MR. CAVALIER:

Q. The question is, did you review your discovery responses for accuracy before you served them?

MR. CARSON: Objection. Privilege.

MR. CAVALIER: All right. We'll table that one for now. Trying to do this quick, but we'll get it --

MR. CARSON: I mean, we'll send you a verification. They were reviewed, I can confirm they were reviewed by her and me, and we would be happy to send you a verification. I would have sent one already if you would have just e-mailed me and said, hey, we need a verification. That's the point of discovery is working together to try to get through these issues and not make it more difficult. Instead of just sending an e-mail, hey, Seth, we need a verification, hey, Seth, we don't have a verification, instead of doing that you want to file motions with the Court, sanctions, and ask dumb -- ask protected

Page 22

questions of my client. Just -- you know what I mean, it's just not the way discovery is supposed to work and that's why we are where we are right now.

BY MR. CAVALIER:

Q. Ms. McNulty, are you aware -- with that preamble from your counsel about how discovery is supposed to work, are you aware that you've been found to be in civil contempt by a judge of the Eastern District of Pennsylvania for discovery violation?

MR. CARSON: Objection. Privilege.

MR. CAVALIER: Again, I need you to explain how her awareness of something is privileged or not.

MR. CARSON: If the way she became aware requires her to tell you about communications between she and I, then it's privileged.

MR. CAVALIER: Seth, awareness -- I'm not asking her how she became --

MR. CARSON: It's also not material at all to the reason why we're here today, by the way, has nothing to

Page 23

do with Lisa Barbounis's case. Why don't you call Judge Wolson right now and ask him if you can ask that question.

MR. CAVALIER: Seth, if you want -- you and I have an agreement in place that these depositions are unlimited in scope. That's why we let you off the hook from having to pay for our fees.

MR. CARSON: Right. I mean, if you want to try to take advantage of the situation, I'm going to push back. Okay?

MR. CAVALIER: I'm trying to ask --

MR. CARSON: Next question.

MR. CAVALIER: -- a simple question about whether or not she's aware --

MR. CARSON: Next question.

MR. CAVALIER: You gave a big speech on the record about how discovery is supposed to work, and I'm wondering whether your client based on that speech that you just gave is aware that she's

Deposition of Patricia McNulty                                                      Lisa Barbounis v. Middle Eastern Forum, et. al.

Page 24

1  been held in civil contempt by a judge
2  in the Eastern District.
3       MR. CARSON:  There's a privilege
4  objection.  Privilege.  Next question.
5       MR. CAVALIER:  Her awareness of a
6  fact is not privileged, Seth.
7       MR. CARSON:  It is if it requires
8  her telling you that the reason she
9  became aware is because of
10  communications between attorney and
11  client.
12       MR. CAVALIER:  Seth, I'm not
13  asking her to tell me how she became
14  aware.  I'm not asking her to tell me
15  who told her.  I'm not even asking her
16  if anybody told her.  I'm simply asking
17  her whether she's aware of a fact.  That
18  is the most basic type of deposition
19  question that is not privileged and you
20  can possibly get.
21       MR. CARSON:  My objection is
22  noted.
23       MR. CAVALIER:  Your objection is
24  noted, but your instructions --
25       MR. CARSON:  I'll let her say that

Page 25

1  she's aware that she knows that there's
2  a motion filed.  She hasn't actually
3  been held in -- no one has been held in
4  contempt yet, the Court hasn't actually
5  finalized any ruling, but -- she can say
6  yes or no to the question I guess so we
7  can move on.
8  BY MR. CAVALIER:
9       Q.   Ms. McNulty, can you read what I've
10  just highlighted for the record?
11       A.   Can I make this bigger?
12       Q.   Yeah, sure, I'll make it bigger for
13  you.
14       A.   Yes, I can read it.
15       Q.   It says:  Plaintiff is found in civil
16  contempt for failing to comply with Judge Brody's
17  October 15th, 2020, discovery order, Doc 33.
18           Did I read that correctly?
19       A.   Yes.
20       Q.   Having read that to you and without
21  asking at all whether you spoke to your counsel about
22  this issue, is it fair to say that you are aware that
23  you have been found in civil contempt for failing to
24  comply with discovery orders?
25       MR. CARSON:  You can say yes to

Page 26

1  that, Patricia, if you want.
2       THE WITNESS:  Yes.
3       MR. CARSON:  You can answer that
4  one.
5       MR. CAVALIER:  Okay.
6  BY MR. CAVALIER:
7       Q.   I want to go back to your responses to
8  our discovery requests over here, and I want to talk
9  about a couple of these, but first I want to talk
10  about Request for Documents Number 21.  The request
11  is for copies of applications, application forms,
12  business cards, postcards, letters, or documents you
13  received from any potential employer, headhunter, or
14  employment agency since your employment with the
15  Forum ended.
16           What did you do, other than speaking
17  with your counsel, what did you do to try and gather,
18  search for, copies of any application forms, business
19  cards, postcards, letters, or documents that you
20  received from any potential employer, headhunter, or
21  employment agency since your employment with the
22  Forum ended?
23       A.   The only -- we looked in my LinkedIn
24  because that was the only thing I used at that time,
25  but they were all quick applies, so there was --

Page 27

1       Q.   Okay.
2       A.   -- nothing to actually --
3       THE COURT REPORTER:  Excuse me.
4  There's a lot of interference and it's
5  affecting my ability to be able to hear
6  clearly.
7       Okay.  Thank you.
8       MR. CARSON:  It's going to happen
9  when I take mute off.  I have my
10  three-year-old in the bathtub.
11  BY MR. CAVALIER:
12       Q.   Ms. McNulty, I think you said that you
13  used -- you searched LinkedIn?
14       A.   Yes.
15       Q.   Okay.  Do you still use LinkedIn?
16       A.   I have it.  I don't really use it.
17       Q.   Okay.  Do you remember offhand -- and,
18  again, to be clear, this is not a memory test.  I'm
19  not trying to trap you in some kind of a memory gap
20  here.  With that said, I'm wondering whether offhand
21  you recall whether you discovered any documents when
22  you searched LinkedIn that would be responsive to
23  this request.
24       A.   I don't believe I did.
25       Q.   Okay.  I want to look at the response

Page 28

that you did give to this request, the written
response here, and that is this. It says: Plaintiff
is not in possession of any documents related to this
request. Plaintiff objects to providing defendants
with documents related to Congressman Randy Weber, as
plaintiff's employment with Congressman Weber does
not require plaintiff to produce to defendants
plaintiff's business cards or other cards.

    MR. CARSON: What's the point of
this question right now.

BY MR. CAVALIER:

    Q.   That's actually my question to you.
You don't work for Congressman Randy Weber, correct?

    MR. CARSON: You guys provided
verbatim the exact same discovery
request to two different people. I
mean, it's clear what happened. She
doesn't work for Congressman Randy
Weber. You guys know she doesn't work
for Congressman Randy Weber. What's the
point of these questions.

    MR. CAVALIER: Seth, that's
exactly --

    MR. CARSON: Is there any --

    MR. CAVALIER: -- the point of

Page 29

these questions is that --

    MR. CARSON: Is there any reason
to ask any of them? This isn't even a
deposition in her case. Unless you guys
want to turn it into that and then we
can just continue and then we won't do
another one. Is that what you want to
do?

    MR. CAVALIER: I'm trying to find
out what happened here. That's why I'm
asking the question.

    MR. CARSON: All right. Yeah,
you're trying to find out. You did a
lot to find out before today.

    You can answer the question. The
question I think is do you work for
Congressman Randy Weber.

    THE WITNESS: No.

BY MR. CAVALIER:

    Q.   And you never have, correct?

    A.   No.

    Q.   Did you read this response before it
was served?

    MR. CARSON: Objection.
Don't answer.

Page 30

Privilege.

    MR. CAVALIER: Question is whether
she read something and that's
privileged?

    MR. CARSON: Yeah. Yeah. If the
way she read it is that it was read to
her by me, then she can't answer.
Privilege.

    MR. CAVALIER: I don't even
understand what that means.

    MR. CARSON: It's privileged.
Do not answer.
Next question.

    MR. CAVALIER: Seth, again, I just
want to be very clear on this. You're
instructing her not to answer a question
about whether she read something.

    MR. CARSON: I'm instructing her
not to answer the question if the reason
why she read it it was a communication
between counsel and his client.

    MR. CAVALIER: Well, I would hope
the reason --

    MR. CARSON: And therefore it's
privileged.

Page 31

    MR. CAVALIER: I would hope the
reason why she -- okay. Let me scratch
that.

BY MR. CAVALIER:

    Q.   Ms. McNulty, when you serve responses
to discovery requests, is it important to you that
they are accurate?

    MR. CARSON: Objection. I served
them. I mean, what are we doing right
now. You want -- if you want to turn
this into a deposition today for
Patricia, too, and we want to agree
she's not going to appear again, we
could continue down this road. If not,
we're going to move on. It's up to you.

    MR. CAVALIER: Seth, I'm not going
to engage with you in a debate about
every objection you make. The question
is --

    MR. CARSON: No, I'm -- no, what
I'm saying to you right now is that
she's not going to answer the question
unless we agree that she doesn't have to
appear again for the hours that you're
taking up asking her questions about a

Page 32

case that we're not here to talk about.

MR. CAVALIER: Seth, the hours I'm taking up. You've spoken more on this record than I have. I would have been done by now.

MR. CARSON: Right. Uh-huh. Well, if you want to make that agreement and then I will shut up --

MR. CAVALIER: No, I'm not going to make an agreement. That's not how this works. You don't get to -- you don't get to throw a fit all over the record and then leverage me into an agreement --

MR. CARSON: You also don't get to ask her questions about a case that we're not here to talk about today.

MR. CAVALIER: Seth, you represented to me in writing repeatedly that the scope of these depositions would be unlimited and in exchange for that we agreed to waive the attorneys fees sanction that you were ordered to pay us as a result of the fact that --

MR. CARSON: Never ordered to pay.

Page 33

You never won an argument saying that we had to pay that. So please don't misstate the facts or the history. Never ordered to pay, first off. Second off, every single e-mail that I sent you, the subject line of that e-mail was Lisa Barbounis V. The Middle East Forum. I never sent you an e-mail in Patricia McNulty V. The Middle East Forum where I said you can ask whatever you want. Clearly whatever you want meant whatever you want related to the reason why we're doing the deposition, and it doesn't -- it doesn't increase the scope to everything in the universe as you seem to have interpreted my statement.

MR. CAVALIER: Seth, your statement was literally, and this is a quote, you can ask whatever you want, I'm not going to stop you.

MR. CARSON: Right. Subject line Lisa Barbounis V. The Middle East Forum. And you can ask whatever you want, but you're not going to spend hours trying to embarrass her and waste time on a

Page 34

case that we're not here to talk about, that has nothing to -- we're not -- I mean, she's appearing today as a witness in Lisa Barbounis's case. What are you doing.

MR. CAVALIER: Seth, I could get into a multitude of reasons why this is relevant and why it goes to her credibility, why --

MR. CARSON: Why it's relevant --

MR. CAVALIER: -- why this is the more efficient way of doing this, but I'm not obligated to do that, and I'm not going to waste the witness's time on the record going through all that. I would have been done this line of questioning by now.

MR. CARSON: Why it's relevant whether or not there was language from another case in the responses that were served, has nothing to do --

MR. CAVALIER: Goes to her credibility.

MR. CARSON: -- with credibility.

MR. CAVALIER: Goes to her

Page 35

credibility --

MR. CARSON: Get the heck out of here.

THE COURT REPORTER: One at a time, please.

MR. CARSON: It does not go to credibility.

I didn't hear. Someone just said something?

THE COURT REPORTER: Yes, please talk one at a time. You're cancelling each other out when you talk at the same time.

BY MR. CAVALIER:

Q. The question is, is it important, Ms. McNulty, for you to supply accurate answers to discovery requests?

MR. CARSON: Objection. Privilege.

You can answer.

Objection, form; objection, assuming facts not in evidence; objection, lack of foundation.

You can answer whether or not it's important to you to be accurate, yes or

Page 36

1  no.
2        THE WITNESS:  Yes.
3        MR. CARSON:  Next question.
4  BY MR. CAVALIER:
5        Q.    So then my question is, can you explain
6  how this answer ended up in your response to our
7  discovery request?
8        MR. CARSON:  Objection.
9        Don't answer.
10       It's designed to embarrass and
11  harass the witness.  It ended up there
12  obviously because someone missed
13  something.  It's clear why it ended up
14  there.  And she's not going to answer
15  questions designed only to embarrass and
16  harass.
17       Do not answer.
18       Next question, please.
19       THE COURT REPORTER:  It's hard to
20  understand what you're saying,
21  Mr. Carson.
22       MR. CARSON:  The question is
23  designed only to embarrass and harass,
24  it has no bearing on why we're here, no
25  relevance to the case, there's only one

Page 37

1  reason to ask it, to harass and
2  embarrass.  She's not going to do that.
3  I'm instructing her not to answer.
4  Let's go to the next question, please.
5  BY MR. CAVALIER:
6        Q.    So this is Question Number 22, and do
7  you see that it contains the same reference to
8  Congressman Randy Weber?
9        A.    Yes.
10       Q.    Question Number 23, all
11  correspondences, written communications, or documents
12  offering you employment that you have received from
13  any persons since October 16th, 2017.
14       The response, do you see here that it
15  also refers to Congressman Randy Weber?
16       A.    Yes.
17       Q.    And so try and move this along, you
18  would agree with me, would you not, that the
19  responses to those questions are not accurate,
20  correct?
21       A.    Yes.
22       Q.    So given that -- what I've just showed
23  you, isn't it fair to say that your responses to our
24  document requests are not reliable?
25       MR. CARSON:  Objection.

Page 38

1        Don't answer that question.
2        It's designed only to embarrass
3  and harass.
4        Next question, please.
5  BY MR. CAVALIER:
6        Q.    Do you think that we can trust the
7  accuracy of your written discovery responses?
8        MR. CARSON:  Same objection.
9        Don't answer.
10  BY MR. CAVALIER:
11       Q.    How many e-mail addresses have you used
12  since 2017?
13       A.    Three I think.
14       Q.    Can you list them for me?
15       A.    My personal e-mail, the Middle East
16  Forum e-mail, and my current work e-mail.
17       Q.    Okay.  And can you state for the record
18  what the actual e-mail addresses are?
19       MR. CARSON:  She'll state them off
20  the record.
21       MR. CAVALIER:  Pardon?
22       MR. CARSON:  She'll state them off
23  the record.  We're not going to put her
24  personal e-mail addresses on the record.
25       THE WITNESS:  Am I stating them

Page 39

1  off the record now?
2        MR. CARSON:  Just don't answer.
3  We'll give them to him off the record.
4        MR. CAVALIER:  I guess I could do
5  it this way then.
6        MR. CARSON:  We're going to
7  object.  Do not show her any personal
8  e-mail addresses on the record.  Do not
9  ask her to confirm any personal e-mail
10  addresses on the record.  She's not
11  going to do it.  And we're telling you
12  right now we do not want that to be on
13  the record.
14       MR. CAVALIER:  Seth, what is the
15  point of that objection?  You don't -- I
16  mean, I got it --
17       MR. CARSON:  Yeah, we don't -- we
18  don't want her personal e-mail addresses
19  to end up on a public docket.
20       MR. CAVALIER:  Well, I'm sorry
21  that you don't want her personal e-mail
22  addresses to end up on a public docket.
23  This is not the docket.  It's the
24  deposition.
25       MR. CARSON:  Yeah, and your client

Page 40

has shown the propensity to try to use
--

THE COURT REPORTER:  I can't hear
you, Mr. Carson.

MR. CARSON:  -- the public docket
--

THE COURT REPORTER:  Can't hear
you.

MR. CARSON:  Your client has shown
a propensity in his attempt to use the
public docket to stalk people and to
harass people and to try to get people
fired and -- and we would appreciate if
we could just talk about any personal
e-mail addresses off the record.  If you
still want to do it --

MR. CAVALIER:  Well, now that
you've --

MR. CARSON:  -- based on my
objection, you go ahead and do it, but
--

MR. CAVALIER:  Now that you've put
--

MR. CARSON:  -- we're telling you
that we prefer not to.

Page 41

MR. CAVALIER:  Now that you've put
yet more untrue inflammatory and
defamatory allegations on the record --

MR. CAVALIER:  It's objectively
true.  It's objectively true.  Your
client offered to pay someone for
testimony, took an entire -- took an
entire statement from the person, and
then put the entire statement on the
docket when he told the guy he was going
to give him a, quote/unquote, wink and a
nod and sort him out afterwards if he
answered the questions that way, and
then he put the entire conversation on
the docket.  It's objectively true what
I just said.

MR. CAVALIER:  So I just want to
be very clear for the record.  You think
that that statement you just made is
appropriate but you're instructing your
witness not to provide an e-mail address
on the record?

MR. CARSON:  She'll provide it,
she'll provide it all you want, we just
prefer to do it off the record so it

Page 42

doesn't end up on the docket.  That's
all.

MR. CAVALIER:  So your allegations
of criminal conduct -- unsupported
allegations that we've asked you for
evidence to support many many times are
okay --

MR. CARSON:  I sent you the
recording -- I sent you a recording of
the person whose statement was posted on
the docket.  What do you mean you asked
for evidence that we haven't provided.

BY MR. CAVALIER:

Q.  Ms. McNulty, is
patricia.mcnulty1@gmail.com an e-mail address that
you've used within the last three years?

MR. CARSON:  Objection.

THE WITNESS:  No.

BY MR. CAVALIER:

Q.  You've never used that -- you haven't
used that e-mail address in the last three years.

MR. CARSON:  Objection.  Asked and
answered.

MR. CAVALIER:  I'm giving your
witness a chance to make sure that she's

Page 43

accurate, Seth.

MR. CARSON:  Objection.  Asked and
answered.

BY MR. CAVALIER:

Q.  You can answer it.

MR. CARSON:  You can answer again.

THE WITNESS:  No, I have a new
Gmail -- I think that one gets like --
if anybody were to have used it from
years ago it would get filtered in, but
I haven't used it in the past three
years.

BY MR. CAVALIER:

Q.  Okay.  So it's an old e-mail address
that forwards to your current e-mail address,
correct?

A.  Correct.

Q.  Have you used the e-mail address
UNICOMP77@hotmail.com over the last three years?

A.  No.

Q.  Have you used an e-mail address that's
reasonably similar to the address that I just read
you?

A.  No.

MR. CARSON:  Objection.  Asked and

Page 44

1  answered.
2  BY MR. CAVALIER:
3      Q.    How about the e-mail address
4  TRISHAEEEE@hotmail.com?
5      A.    No.  I have an old one that's similar,
6  but, again, not something I use.
7      Q.    So then is the old one that's similar
8  -- you said you have an old one that's similar but
9  you don't use it anymore?
10     A.    Uh-huh.
11     Q.    When was the last time you used it, do
12 you remember?
13     A.    I don't remember.
14     Q.    Has it been within the last five years?
15     A.    Maybe.
16     Q.    Has it been within the last three
17 years?
18         MR. CARSON:  Objection.  Asked and
19 answered.
20         MR. CAVALIER:  It's literally a
21 different question.
22         MR. CARSON:  You said have you
23 used this in the last three years and
24 then you just said --
25         MR. CAVALIER:  I said have you

Page 45

1  used it in the last five years.
2          MR. CARSON:  -- have you used it
3  in the last three years.
4          MR. CAVALIER:  I said --
5          MR. CARSON:  Yeah, and then you
6  just said three years again.  Objection;
7  asked and answered.
8          Patricia, you can answer the same
9  question --
10         MR. CAVALIER:  Seth, you need to
11 get --
12         MR. CARSON:  -- that he's asking
13 you twice.
14         MR. CAVAILER:  -- ahold of
15 yourself.  You need to get ahold of
16 yourself, first of all.
17         MR. CARSON:  Yeah, thank you for
18 the instruction.  I don't take
19 instructions from defense counsel,
20 though.  Objection; asked and answered.
21         MR. CAVALIER:  It would be wise to
22 do so.
23         MR. CARSON:  Patricia, you're
24 welcome -- yeah.  Thank you.  Again, I
25 don't take advice from defense counsel.

Page 46

1          MR. CAVALIER:  Seth, listen, stop
2  puking all over my record and let me
3  speak.  I asked --
4          MR. CARSON:  No, I'm going to
5  continue the way I'm going.  I'm going
6  to continue just like this.  So --
7          MR. CAVALIER:  I asked her whether
8  she used --
9          MR. CARSON:  The objection --
10         MR. CAVALIER:  -- the e-mail
11 address --
12         MR. CARSON:  The objection --
13         MR. CAVALIER:  -- in the last five
14 years --
15         MR. CARSON:  The objection is
16 noted.  Asked and answered.
17         You can answer again.
18         MR. CAVALIER:  I asked her whether
19 she used the e-mail address within the
20 last five years.  She said maybe.
21         MR. CARSON:  And then you said the
22 last three years.
23         MR. CAVALIER:  That's correct.
24 That's literally --
25         MR. CARSON:  And she had already

Page 47

1  answered --
2          MR. CAVALIER:  -- a different
3  question.
4          MR. CARSON:  -- that question.
5  No, it wasn't.  You already -- you
6  showed it to her and said did you use
7  this in the last three years.  That was
8  your opening question.
9          MR. CAVALIER:  No, it was --
10         MR. CARSON:  She's welcome to
11 answer it again.
12         MR. CAVALIER:  -- it was five
13 years.
14 BY MR. CAVALIER:
15     Q.    Ms. McNulty, do you understand that
16 there is a difference between five years and three
17 years?
18         MR. CARSON:  Objection.
19         Don't answer.
20         Embarrass and harass.
21         Do not answer that question.
22 BY MR. CAVALIER:
23     Q.    Do you understand that?  Because
24 apparently --
25         MR. CARSON:  Don't answer.

Page 48

BY MR. CAVALIER:

Q.    -- your counsel doesn't, so I'm just trying to move this along.

MR. CARSON:  Don't answer. She's welcome to answer the question about three years.  It's just she already answered it.  But she's welcome to answer it again.

THE WITNESS:  It would still get e-mails, but I don't use it.

BY MR. CAVALIER:

Q.    I don't understand the distinction that you're drawing there.

A.    It's old, so there is, like, repeated subscribed e-mails that would still come there, but I don't send e-mails from it.

Q.    Do you have a general sense of the last time you sent any e-mails from it?

MR. CARSON:  Objection.  Asked and answered.

BY MR. CAVALIER:

Q.    You can answer.

A.    I don't.

Q.    Did you ever send MEF information to that e-mail address?

Page 49

A.    No.

THE COURT REPORTER:  Any what information?

MR. CAVALIER:  MEF information.

BY MR. CAVALIER:

Q.    Do you use Instagram?

A.    Yes.

Q.    What e-mail address do you have associated with your Instagram account?

A.    I don't remember.  I would have to look.

Q.    Do you use Facebook?

A.    Yes.

Q.    Do you know what e-mail address is associated with your Facebook account?

A.    I don't.

Q.    Do you use Facebook Messenger?

A.    I have.  I don't use it now.

Q.    Do you remember when the last time you used it was?

A.    I don't.

Q.    Have you used it since you -- since the last time that you worked for the Forum?

A.    I don't remember.  I would have to look.

Page 50

Q.    Did you look at your Facebook account when you were looking for information responsive to --

MR. CARSON:  Guys, I got to do like a five-minute break.  All right? Could we go off the record for five minutes, please?

MR. CAVALIER:  That's fine.  I'll withdraw the question.  If you're going to take five, then I want to take ten.

MR. CARSON:  All right.  Thank you.

MR. CAVALIER:  All right.  Back on a couple minutes after 11.

THE VIDEO SPECIALIST:  Off the record.

(A brief recess was taken from 10:52 a.m. to 11:08 a.m.)

THE VIDEO SPECIALIST:  The time is 11:08 a.m. Eastern.  We are back on the record.

BY MR. CAVALIER:

Q.    Okay.  Ms. McNulty, we were talking when we left off I think about Instagram.

THE COURT REPORTER:  Too much

Page 51

interference.

MR. CARSON:  I think we already asked questions about Instagram.

MR. CAVALIER:  I couldn't hear what was just said.

THE COURT REPORTER:  Neither could I.

Go ahead, it's better now.

BY MR. CAVALIER:

Q.    I think when we left off we were talking about Instagram, and I just wanted to ask you a couple questions about that and some other platforms.

Correct me if I'm wrong, but I believe you said you did use Instagram?

A.    Yes.

Q.    And you told me that you weren't sure what e-mail address was associated with your Instagram account; is that correct?

A.    Correct.

Q.    Okay.  I'm going to ask you to provide that through your counsel once we're done today.

What is the username that you use --

MR. CARSON:  Yo, guys -- you guys got to go back.  You guys got to go back

Page 52

1  and start over.  The host -- you guys
2  can't mute my microphone.  I understand
3  there might be background noise, but you
4  can't mute it.  I have to be able to put
5  objections on the record.  So please
6  don't do that again, whoever did that.
7  I was talking the whole time, so you're
8  going to have to go back and redo the
9  last few questions.
10      MR. CAVALIER:  Well, I certainly
11  didn't mute your microphone, but --
12      MR. CARSON:  I don't care who did
13  it, I'm just saying don't do it.
14  BY MR. CAVALIER:
15      Q.   Ms. McNulty, I apologize.  I'll go back
16  and ask the same questions again.
17      You testified earlier that you do use
18  Instagram, correct?
19      A.   Correct.
20      MR. CARSON:  Objection.  Asked and
21  answered.
22      MR. CAVALIER:  Are you really
23  objecting asked and answered after you
24  just made me go back and ask the
25  questions again?

Page 53

1      MR. CARSON:  No, because you asked
2  those questions before we took the
3  break, so, yeah, objection, asked and
4  answered.
5  BY MR. CAVALIER:
6      Q.   And I believe you testified --
7      MR. CARSON:  Jon, you're the one
8  who is going back and -- you're going to
9  go back and do testimony we just got
10  done doing the last 20 minutes.
11  BY MR. CAVALIER:
12      Q.   And I believe you testified earlier
13  that you don't recall the e-mail address that you
14  used with your Instagram account; is that correct?
15      MR. CARSON:  Objection.  Asked and
16  answered.
17      THE WITNESS:  Correct.
18  BY MR. CAVALIER:
19      Q.   Do you know the username that you use
20  with Instagram?
21      MR. CARSON:  Objection.  She's not
22  going to tell you her username on the --
23  she'll say it off the record.
24  BY MR. CAVALIER:
25      Q.   All right, so we have a representation

Page 54

1  from you, Ms. McNulty, and your counsel that you'll
2  provide the e-mail address and the username for your
3  Instagram account off the record after this
4  deposition is over?
5      MR. CARSON:  Yeah.
6      MR. CAVALIER:  Seth, is that
7  correct?
8      MR. CARSON:  Correct.
9  BY MR. CAVALIER:
10      Q.   Have you ever used Instagram to speak
11  to Lisa Barbounis?
12      A.   Yes.
13      Q.   Do you recall the subject of those
14  conversations?
15      A.   I don't.
16      Q.   When was the last time you used
17  Instagram to speak with Lisa Barbounis?
18      A.   I don't remember.
19      Q.   Was it more than a year ago?
20      A.   I don't remember.
21      Q.   Have you ever used Instagram to speak
22  to anyone about the Middle East Forum?
23      A.   No.
24      Q.   Have you ever used Instagram to speak
25  to Lisa Barbounis about anything having to do with

Page 55

1  the Middle East Forum?
2      A.   No, I don't think so.
3      Q.   Have you ever used Instagram to speak
4  to anyone about your lawsuit against the Middle East
5  Forum?
6      A.   No.
7      Q.   You testified earlier that you do use
8  Facebook, correct?
9      A.   Correct.
10      Q.   And do you recall the e-mail address
11  that you use with Facebook?
12      MR. CARSON:  Objection.  Asked and
13  answered.
14      THE WITNESS:  I don't remember.
15  BY MR. CAVALIER:
16      Q.   Do you know offhand the username that
17  you use with Facebook?
18      MR. CARSON:  She'll say it off the
19  record, please.
20      MR. CAVALIER:  Same
21  representation, Seth?  You'll provide it
22  off the record after --
23      MR. CARSON:  Same representation.
24  BY MR. CAVALIER:
25      Q.   Have you ever used Facebook to speak

Page 56

1  with Lisa?
2      A.   Yes.
3      Q.   Do you remember the subject of those
4  conversations?
5      A.   I don't remember.
6      Q.   Have you ever used Facebook to discuss
7  --
8          (Brief interruption.)
9  BY MR. CAVALIER:
10     Q.   Have you ever used Facebook to talk
11 about the Middle East Forum?
12     A.   I don't think so, no.
13     Q.   Have you ever used Facebook to speak
14 with Delaney Yonchek?
15     A.   I don't remember.
16     Q.   Have you ever used Facebook to speak
17 with Marnie Meyer or Marnie O'Brien?
18     A.   I don't remember.
19     Q.   Have you ever used Facebook to speak
20 with Caitriona Brady?
21     A.   I don't remember.
22     Q.   Have you ever used Facebook to speak
23 with any other Middle East Forum employee?
24     A.   I don't remember.
25     Q.   Do you use Twitter?

Page 57

1      A.   I have a Twitter.  I don't actually
2  tweet from it.
3      Q.   Do you use it to communicate with
4  people?
5      A.   No.
6      Q.   Do you know the e-mail address that you
7  used to sign up for a Twitter account?
8      A.   Not offhand, no.
9      Q.   Do you know your Twitter username?
10         MR. CARSON:  Same representation.
11 BY MR. CAVALIER:
12     Q.   Have you ever tweeted at all about
13 anything ever?
14     A.   Yeah.
15     Q.   Do you know the last time you tweeted?
16     A.   I don't remember.
17     Q.   Was it within the last year?
18     A.   I don't remember.
19     Q.   Can you give any approximation at all
20 as to the last time you think you tweeted anything?
21     A.   No, I don't remember.
22     Q.   Have you ever tweeted about Cinnamon
23 Stillwell?
24     A.   Not that I remember.
25     Q.   Have you ever tweeted about Winfield

Page 58

1  Myers?
2      A.   Not that I remember.
3      Q.   When you were responding to defendant's
4  requests for documents did you look at your Twitter
5  account to see whether there was any relevant
6  information that might be responsive to those
7  requests?
8      A.   Yes.
9      Q.   And did you find anything that was
10 responsive?
11     A.   No.
12     Q.   How about for Facebook, when you were
13 responding to defendant's document requests did you
14 look at your Facebook account to see if there was any
15 information that might be responsive?
16     A.   Yes.
17     Q.   And did you find anything that was
18 responsive?
19     A.   No.
20     Q.   When you were reviewing your Facebook
21 account -- let me back up because I can't remember
22 which one you said you used to speak -- did you use
23 Instagram or Facebook to speak with Lisa Barbounis?
24     A.   I've spoken to her on Instagram I know.
25     Q.   Okay.  So when you were responding to

Page 59

1  defendant's document requests did you look at your
2  Instagram account to determine whether it contained
3  any potentially responsive information?
4      A.   Yes.
5      Q.   And did you find any information that
6  might be responsive to defendant's requests?
7      A.   No.
8      Q.   When you were reviewing your Instagram
9  account to determine whether there was any responsive
10 information in it did you review the communications
11 that you had with Lisa Barbounis?
12     A.   Yes.
13     Q.   And you determined that those
14 communications with Lisa Barbounis were not
15 responsive to defendant's requests?
16         MR. CARSON:  I'm just going to
17     object based on privilege.  Those
18     determinations were made together.  But
19     she can answer the question.
20         THE WITNESS:  Yes.
21 BY MR. CAVALIER:
22     Q.   Yes, you determined they were not
23 responsive?
24     A.   Correct.
25     Q.   Do you remember why you determined they

Deposition of Patricia McNulty                                    Lisa Barbounis v. Middle Eastern Forum, et. al.

Page 60

1  were not responsive?
2       MR. CARSON:  Objection.
3  Privilege.  I don't think she could
4  answer that one.
5       THE COURT REPORTER:  What did you
6  say, Mr. Carson?
7       MR. CARSON:  I don't think she can
8  answer that one because only reason she
9  would have made a determination was at
10  the advice of counsel.  She can say that
11  if she wants.
12  BY MR. CAVALIER:
13      Q.   Do you remember when you --
14      MR. CARSON:  She can't say what
15  the substance of that is.
16  BY MR. CAVALIER:
17      Q.   Do you remember when you reviewed those
18  communications with Lisa Barbounis on Instagram?
19      A.   I don't remember exactly when it was.
20      Q.   Was it last month?
21      A.   Months ago, plural.
22      Q.   Would it have been sometime in the
23  second half of 2020?
24      A.   I don't remember exactly when it was.
25      Q.   Do you remember the contents of those

Page 61

1  communications?
2       MR. CARSON:  Obj- -- wait, what
3  communications?
4       MR. CAVALIER:  The communications
5  with Lisa Barbounis.
6       MR. CARSON:  You can answer that.
7       THE WITNESS:  I mean, not exactly.
8  It was just like about memes and gifs
9  and things on Instagram, nothing
10  substantial in any way.
11  BY MR. CAVALIER:
12      Q.   Is Lisa Barbounis a friend of yours?
13      A.   Yes.
14      Q.   How often do you talk to her?
15      A.   Now?  Maybe once a month, every couple
16  weeks.
17      Q.   Did Lisa Barbounis ever share pictures
18  of men that she was dating with you on Instagram?
19      A.   I don't remember.
20      Q.   Do you have a Snapchat account?
21      A.   Yes.
22      Q.   Do you still use it?
23      A.   No.
24      Q.   Do you remember when the last time you
25  used it was?

Page 62

1       A.   I opened up pictures from other people
2  within the past couple weeks.
3       Q.   Okay.  I'm assuming you're making a
4  distinction between using Snapchat and opening up
5  pictures, so --
6       A.   Yes.  I don't --
7       Q.   -- let me -- let me ask a better
8  question.  When was the last time you sent something
9  out via Snapchat?
10      A.   I don't remember.  Years ago maybe.
11      Q.   Okay.  But you said you've opened up
12  pictures on Snapchat, so I'm assuming that means that
13  people have sent you messages on Snapchat?
14      A.   Yes.
15      Q.   Okay.  Do you remember when the last
16  time that occurred?
17      A.   This week.
18      Q.   And who do you receive messages from on
19  Snapchat?
20      A.   Personal friends.
21      Q.   Any current or former MEF employees?
22      A.   No.
23      Q.   Do you use Snapchat to speak with Lisa
24  Barbounis?
25      A.   No.

Page 63

1       Q.   Do you recall the e-mail address that
2  you used to sign up for your Snapchat account?
3       A.   I don't.
4       Q.   Do you know your username on Snapchat?
5       A.   Yes.
6       MR. CARSON:  Same representation?
7       MR. CAVALIER:  That's fine, Seth.
8       MR. CARSON:  Isn't the point of
9  Snapchat that the messages all erase,
10  though?
11      MR. CAVALIER:  I didn't hear you.
12      MR. CARSON:  Do you use any of
13  these apps, but isn't the point -- isn't
14  Snapchat the one where the messages all
15  erase?
16      MR. CAVALIER:  I couldn't tell
17  you.
18      MR. CARSON:  I don't know either.
19  All right.
20  BY MR. CAVALIER:
21      Q.   Do you use an e-mail address
22  tmcnulty82@gmail.com?
23      A.   Yes.
24      Q.   Is that a current e-mail address?
25      A.   Yes.

Deposition of Patricia McNulty                                      Lisa Barbounis v. Middle Eastern Forum, et. al.

Page 64

1    Q.    Do you use WhatsApp?
2    A.    Yes.
3    Q.    Do you recall the e-mail address or
4  phone number that you used to sign up with -- for
5  WhatsApp?
6    A.    Yes, the phone number.
7    Q.    Okay.  You don't have to give it to me.
8  We can use the same --
9         MR. CAVALIER:  Same
10  representation, Seth?
11        MR. CARSON:  Yes.
12        MR. CAVALIER:  Okay.
13  BY MR. CAVALIER:
14    Q.    Have you used WhatsApp to speak with
15  Lisa Barbounis?
16    A.    Yes.
17    Q.    When was the last time you used
18  WhatsApp to speak with Lisa?
19    A.    I don't know.  Years ago.
20    Q.    When you were reviewing your documents
21  for responsiveness to defendant's discovery requests,
22  did you look at your WhatsApp account to determine
23  whether it contained any responsive communications?
24    A.    Yes.
25    Q.    Did you determine that -- did you

Page 65

1  review those communications with Lisa in an effort to
2  determine if they were responsive?
3    A.    Yes.
4    Q.    And you determined that they were not
5  responsive?
6    A.    With counsel.
7    Q.    Do you -- have you ever used WhatsApp
8  to speak with a person named Raheem Kassam?
9    A.    I don't remember.
10    Q.    Have you used WhatsApp to speak with
11  any other MEF employees?
12    A.    Not that I remember.
13    Q.    Have you used WhatsApp to speak with
14  any MEF contractors?
15    A.    Not that I remember.
16    Q.    Have you used WhatsApp to speak with
17  any MEF board members?
18    A.    I don't think so, no, not that I
19  remember.
20    Q.    Have you used Snapchat to talk to any
21  -- I'm sorry, have you used WhatsApp to talk to any
22  MEF donors?
23    A.    Not that I know of, no.
24    Q.    Do you use Signal?
25    A.    No.

Page 66

1    Q.    Have you ever used Signal?
2    A.    No.
3    Q.    How many current phone numbers do you
4  have?
5    A.    One.
6    Q.    Is that a cell phone?
7    A.    Yes.
8    Q.    Is that the same cell phone number that
9  you had when you were at the Middle East Forum?
10    A.    Yes.
11    Q.    Do you have a landline phone?
12    A.    No.
13    Q.    Do you use any cloud-based storage
14  systems?
15    A.    Not that I can think of.
16    Q.    Do you use iCloud?
17    A.    I mean, it comes with an iPhone I
18  believe, so I guess yes.
19    Q.    Okay.  So I don't want to put words in
20  your mouth then, but is it fair to say that to the
21  extent you use iCloud you use it just as an automatic
22  default setting on your phone?
23    A.    Yes, if it's a default setting on my
24  phone, then yes, but I don't actively use it that I
25  know of.

Page 67

1    Q.    Okay.  So you don't -- you don't
2  specifically and intentionally transfer documents to
3  your iCloud account.
4    A.    No.
5    Q.    Okay.  Do you know if you back up your
6  phone via iCloud?
7    A.    I don't know.
8    Q.    Do you use Google Drive?
9    A.    I don't use it.  I have one.  I don't
10  use it currently, no.
11    Q.    Do you know when the last time you used
12  it was?
13    A.    Years ago.
14    Q.    Do you know what e-mail addresses you
15  used in association with your Google Drive and your
16  iCloud account?
17    A.    iCloud, no.  Google Drive, yes.
18    Q.    Okay.
19         MR. CAVALIER:  Seth, same
20  representation?
21         MR. CARSON:  Yeah, I think it's
22  the e-mail account you guys already
23  said, but yeah.
24         MR. CAVALIER:  It may well be, I
25  just -- I mean, I didn't want to create

Page 68

the issue if I didn't have to.

MR. CARSON:  Yeah.  Same representation.

BY MR. CAVALIER:

Q.    Did you use the Google Drive account when you were working at the Forum?

A.    The Gmail account?

Q.    The Google Drive account.

A.    Yes.

Q.    Did you search that account to determine whether it contained any documents responsive to defendant's discovery requests?

A.    Yes.

Q.    Did you find any responsive documents?

A.    No, I don't think so.

Q.    Do you use Dropbox?

A.    No.

Q.    Have you ever used Dropbox?

A.    Yes.

Q.    When was the last time you used it?

A.    With my lawyer.

Q.    Not counting that, when was the last time you used it?  Nothing having to do with you or your lawyer.  When was the last time you used it for nonlegal purposes?

Page 69

A.    When I was still an employee with MEF.

Q.    Did you store MEF documents on the Dropbox?

A.    Yes.

Q.    Did you search the Dropbox to determine whether it contained any responsive information to defendant's discovery requests?

A.    It was an MEF Dropbox account.  I don't have access to it.

Q.    Okay.  Did you ever have a personal Dropbox account?

A.    No.

Q.    Okay.  Has Lisa Barbounis ever shared with you WhatsApp communications or chats that she's had with other people?

A.    I don't remember.

Q.    Do you remember if she's ever shared WhatsApp chats with you that she had with Danny Thomas?

A.    I don't remember.

Q.    Do you remember whether she sent you the entirety of her WhatsApp chats with Danny Thomas in 2018, 2019, and 2020?

A.    I don't think so.

Q.    If she did send that information to

Page 70

you, would you still have access to it?

A.    Yes.

MR. CAVALIER:  Seth, through -- I'll just ask you so that we can avoid the issue.  I'm going to ask that she check to determine whether she does have that information and if so I would ask that it be produced.

MR. CARSON:  Yeah, if she has it, we'll give it to you, again.

MR. CAVALIER:  Okay.

BY MR. CAVALIER:

Q.    Did you lose your phone in fall of 2018?

A.    Yes.

Q.    Can you describe for me the circumstances surrounding that?

A.    I left it at a bar and when I went back to get it it was taken.

Q.    Was it ever found?

A.    No.

Q.    Did you ever take steps to try to recover it?

A.    Only using Find My Phone.

Q.    And was that unsuccessful?

Page 71

A.    Yes.

Q.    And what kind of phone was it that was lost?

A.    It was an iPhone.

Q.    Do you remember the date on which you lost it?

A.    I don't remember the exact date.

Q.    Can you tell me what steps you took to replace the phone?

A.    I went to the Verizon store and bought a new one.

Q.    Did they set it up for you at the Verizon store?

A.    Yes.

Q.    Do you know whether the contents of the phone were restored?

A.    I'm not sure what was restored and what wasn't.

Q.    Okay.  So then is it fair to say that some things were restored but maybe not everything?

A.    Yes.

Q.    Were the photos restored?

A.    Some.  Not all of them.

Q.    Okay.  How about the e-mail?

A.    Well, e-mails attach to the accounts,

Page 72

1  not the phone.
2      Q.   Okay.  So you were still able to access
3  your e-mail going back before you lost your phone.
4      A.   Correct.
5      Q.   Okay.  How about text messages, were
6  they recovered?
7      A.   I don't remember what was and what
8  wasn't with text messages.
9      Q.   Do you remember whether your text
10 messages with Lisa Barbounis were recovered?
11     A.   I don't remember.
12     Q.   How about other text messages, do you
13 have any recollection as to whether some or all were
14 recovered?
15         MR. CARSON:  Objection.
16         THE WITNESS:  I don't remember.
17 BY MR. CAVALIER:
18     Q.   Do you remember whether the text
19 messages -- the text messages that you had with your
20 sister were recovered?
21     A.   I don't remember.
22     Q.   Just to be clear for the record, your
23 sister is Megan McNulty?
24         THE COURT REPORTER:  Excuse me.
25 Can you repeat the question?  There was

Page 73

1  interference.
2          MR. CAVALIER:  Sure.
3  BY MR. CAVALIER:
4      Q.   The question for the record is, your
5  sister's name is Megan McNulty, correct?
6      A.   Correct.
7      Q.   And to be clear again for the record,
8  the question I'm asking is whether your text messages
9  with your sister Megan were ever recovered after you
10 lost your phone.
11         MR. CARSON:  Objection.  Asked and
12     answered.
13         THE WITNESS:  I don't remember.
14 BY MR. CAVALIER:
15     Q.   Do you remember whether your text
16 messages with Gregg Roman were recovered?
17     A.   I don't remember.
18     Q.   Do you remember whether your text
19 messages with Marnie Meyer were recovered?
20     A.   I do not.
21     Q.   Do you remember whether your text
22 messages with Matt Bennett were recovered?
23     A.   I don't remember.
24     Q.   How about your text messages with
25 Delaney Yonchek?

Page 74

1      A.   I don't remember.
2      Q.   When you handed -- when you reviewed
3  your text messages and produced some of them in
4  response to defendant's requests for documents, did
5  you check to see how far back they went?
6      A.   Not that I remember.
7      Q.   So it looks -- I'll represent to you
8  that based on what we can tell from looking at the
9  text messages it looks like some of them go back
10 prior to the date that you lost your phone and some
11 of them do not, and I'm just trying to figure out
12 whether you have any idea why that is the case.
13     A.   I don't.  Maybe if it was specific
14 people, I would know, but I'm not sure which ones
15 wouldn't go back and which ones would.
16     Q.   So your communications with Lisa
17 Barbounis only go back to the time that you lost your
18 phone.  Do you have any idea why that is?
19     A.   I know it was around that time, it was
20 right around the end of October, beginning of
21 November, that Matt Bennett had erased a lot of
22 things from my phone, text messages, and
23 correspondence that he had and it's possible that he
24 deleted with Lisa too.
25     Q.   Okay.  But your text -- based on what

Page 75

1  we can see, your texts with Matt go back to 2017.  So
2  is there any reason why -- and I'll ask you some more
3  questions about this in a bit, but is there any
4  reason that you can think of why Matt Bennett would
5  delete your conversations with Lisa Barbounis from
6  your phone but not the conversations between you and
7  Matt?
8          MR. CARSON:  Objection.  Object to
9      form.  You're asking --
10         THE WITNESS:  I don't --
11         MR. CARSON:  -- her opinion about
12     something she said she doesn't know
13     about right now?  Is that the question?
14 BY MR. CAVALIER:
15     Q.   You can answer.
16         MR. CARSON:  Is that -- I mean,
17     I'm -- clarify what the question is.
18     You're asking her opinion about the
19     thing she said she doesn't remember,
20     right?
21         MR. CAVALIER:  No, she said that
22     -- when I asked her why her
23     conversations with Lisa Barbounis only
24     go back to the time that she lost her
25     phone, she said that this was right

Deposition of Patricia McNulty                                    Lisa Barbounis v. Middle Eastern Forum, et. al.

Page 76

1 around the time that Matt Bennett may
2 have deleted information from her phone,
3 and I'm asking her why it might be that
4 the conversations she had with Matt
5 Bennett go back before, into 2017, but
6 the conversations with Lisa Barbounis
7 cut off as of that date in 2018.
8 BY MR. CAVALIER:
9     Q.    The question is --
10         MR. CARSON:  Yeah.  That's not
11 what she said.
12 BY MR. CAVALIER:
13     Q.    The question is, do you have any idea
14 --
15         MR. CARSON:  She said she doesn't
16 know; she was guessing.
17         MR. CAVALIER:  Seth, please stop
18 testifying --
19         MR. CARSON:  She said she has no
20 idea.
21         MR. CAVALIER:  Her answers are on
22 the record.
23         MR. CARSON:  I'm correcting your
24 misrepresentation of her previous
25 testimony.  Her previous testimony is

Page 77

1 that she didn't know.
2 BY MR. CAVALIER:
3     Q.    The question is, do you have --
4         MR. CARSON:  You asked her to
5 guess.
6 BY MR. CAVALIER:
7     Q.    For the fifth time, the question is, do
8 you have any idea why Matt Bennett would delete text
9 messages between you and Lisa Barbounis but not text
10 messages between you and Matt Bennett?
11         MR. CARSON:  Objection.  Form.
12 Again, hypothetical based on something
13 she doesn't even know happened, so go
14 ahead, you can answer it based on that.
15         THE WITNESS:  I don't know what he
16 deleted and what he didn't, but I --
17 except for the fact that I know he
18 deleted my conversation -- my text
19 conversation with just me and him
20 directly, so I don't have any
21 conversations with just me and Matt
22 Bennett on my phone.
23 BY MR. CAVALIER:
24     Q.    Do you know -- well, let me just ask it
25 this way.  Do you know for a fact sitting here today

Page 78

1 whether Matt Bennett deleted any communications that
2 you had with Lisa Barbounis?
3     A.    I don't, no.
4     Q.    Did you ever speak with your sister
5 Megan about your work at MEF?
6     A.    Not my work, no.
7     Q.    I'm not sure I understand the
8 distinction that you're drawing there.
9     A.    I didn't talk about MEF work, donors,
10 projects, things I was working on, no.
11     Q.    Okay.  Did you speak with her about
12 your employment at MEF?
13     A.    I spoke to her about how I was feeling
14 at times.
15     Q.    Anything beyond how you were feeling at
16 times?
17     A.    Just actions of other employees there
18 and how it made me feel.  That's pretty much it.
19     Q.    And how would you speak to Megan about
20 those things?
21     A.    I mean, I was unhappy and uncomfortable
22 with the actions that were taking place, and so I'm
23 sure I conveyed that.
24     Q.    What methods did you use, what
25 communication platforms did you use, to speak with

Page 79

1 your sister about those things?
2     A.    I only ever spoke to her about those
3 things in person --
4     Q.    You never texted --
5     A.    -- that I remember.
6     Q.    You never texted with her about those
7 things?
8     A.    No, not that I remember.
9     Q.    Who is Neal Weinstein?
10     A.    My fiance.
11     Q.    And how long have you known Neal?
12     A.    Since August of 2018.
13     Q.    Did you ever speak with Neal about how
14 you were feeling at MEF?
15     A.    Yes.
16     Q.    Did you ever speak with Neal about your
17 lawsuit?
18     A.    No.
19     Q.    What methods of communication did you
20 use when you were speaking with Neal about your
21 feelings with respect to MEF?
22     A.    Again, we were in person.
23     Q.    Did you ever text with him about it?
24     A.    No, not about work, that I remember.
25     Q.    Did your sister ever -- did your sister

Page 80

1  Megan ever send you a text message containing screen
2  shots of your conversations with Lisa Barbounis?
3      A.    Not that I remember.  I sent her screen
4  shots.
5      Q.    And what were those -- what were those
6  screen shots of?
7      A.    You just asked me about specific screen
8  shots, right?
9      Q.    Yes.
10     A.    Between myself and Lisa.
11     Q.    Okay.  And you said you sent them to
12  your sister?
13     A.    Yes.
14     Q.    How did you send them?
15     A.    By phone, by text.
16     Q.    So I'm a little confused because I
17  thought earlier when I was asking you about your
18  communications with your sister you told me that you
19  didn't text with her about the Forum or the lawsuit
20  or your feelings, that you always did that in person.
21     A.    Yeah.  I sent her the screen shots, we
22  didn't talk about anything else.
23     Q.    Is there any particular reason why you
24  sent her the screen shots?
25     A.    Because Matt was deleting things from

Page 81

1  my phone, and I thought that they were important not
2  to be deleted.
3      Q.    Okay.  Did you -- is there any
4  particular reason why you didn't produce those
5  messages that you sent to your sister?
6          MR. CARSON:  Objection.  The
7      messages were produced.
8  BY MR. CAVALIER:
9      Q.    Let me ask the question this way.
10  Since you -- you read -- as you testified to earlier,
11  you read defendant's requests for production of
12  documents and you searched your text messages for
13  documents that were responsive.  You would agree with
14  me, would you not, that those text messages that you
15  sent your sister containing screen shots of
16  conversations relating to Lisa Barbounis would indeed
17  be responsive, correct?
18         MR. CARSON:  Objection.  The
19     screen shots were produced, again, but I
20     will -- she could answer whether or not
21     they're responsive.  Since they were
22     produced, I'm not sure where you're
23     going.
24  BY MR. CAVALIER:
25     Q.    Those text messages that you sent your

Page 82

1  sister containing the screen shots, they would be
2  responsive, correct?
3          MR. CARSON:  He's asking you
4      whether the screen shots that we
5      produced were responsive.
6          THE WITNESS:  Yes.
7  BY MR. CAVALIER:
8      Q.    Okay.  And, to be clear, I'm asking you
9  whether the text messages that you sent to your
10  sister containing the screen shots would be
11  responsive.
12         MR. CARSON:  Objection.  Asked and
13     answered.
14  BY MR. CAVALIER:
15     Q.    You can answer.
16         MR. CARSON:  I don't -- what
17     distinction are you making?  She just
18     answered that question.  She literally
19     -- you just asked the same question
20     twice in a row.
21         MR. CAVALIER:  No, there is a
22     distinction between what you're saying
23     and what I'm asking, Seth.  The question
24     is --
25         MR. CARSON:  Okay.

Page 83

1  BY MR. CAVALIER:
2      Q.    I'll ask it this way.  You've seen
3  screen shots between -- we're talking about screen
4  shots of conversations between you and Lisa
5  Barbounis; you understand that, correct?
6      A.    Yes.
7      Q.    And those screen shots exist as an
8  image, correct?
9      A.    Correct.
10         MR. CARSON:  You guys produced the
11     screen shots, too, I believe.
12  BY MR. CAVALIER:
13     Q.    And at some point you're testifying
14  that you sent those screen shots to your sister
15  Megan, correct?
16     A.    Correct.
17     Q.    So we have the screen shots and then we
18  have the message sent to your sister containing the
19  screen shots.
20         MR. CARSON:  The message is the
21     screen shots.  She just said that.
22  BY MR. CAVALIER:
23     Q.    So my question --
24         MR. CARSON:  It feels like you're
25     trying to trick her.

Page 84

1    MR. CAVALIER:  No.
2    MR. CARSON:  She told you she
3  didn't -- there was nothing but the
4  screen shots sent.  The screen shots
5  were the message.  The screen shots were
6  produced.  Therefore, she's produced the
7  screen shots that you're trying to say
8  she didn't produce.
9    MR. CAVALIER:  I'm not trying to
10  say anything.  I'm trying to ask a
11  question.
12    MR. CARSON:  Yeah, you said is
13  there a reason why the screen shots
14  weren't produced.  They were produced.
15    MR. CAVALIER:  That's not what I
16  asked.
17    MR. CARSON:  Well, you did -- that
18  was a question a few minutes ago.
19  BY MR. CAVALIER:
20    Q.    The question is -- well, I'll say it
21  this way.  You didn't produce the messages that you
22  sent to your sister containing the screen shots.  Do
23  you think those --
24    MR. CARSON:  Incorrect.
25  BY MR. CAVALIER:

Page 85

1    Q.    -- messages would be responsive?
2    MR. CARSON:  Objection.  Assuming
3  facts in evidence.  Incorrect statement.
4  She did produce them.
5    MR. CAVALIER:  All right.  Well,
6  then I'll ask it this way.
7  BY MR. CAVALIER:
8    Q.    Do you think that the text messages
9  that you sent to your sister containing the screen
10  shots of conversations with Lisa Barbounis are
11  responsive to defendant's document requests?
12    A.    The text -- the screen shots are, yes.
13    Q.    So you don't think the message
14  transmitting them to your sister is responsive?
15    MR. CARSON:  The screen shot is
16  the message.  You're talking about the
17  same thing and trying to make it --
18    MR. CAVALIER:  Okay.  Well, then
19  let me --
20    MR. CARSON:  -- out to be two
21  different things.
22    MR. CAVALIER:  -- let me dig into
23  it a little more.
24  BY MR. CAVALIER:
25    Q.    So did you just -- so what you're -- I

Page 86

1  don't want to put words in your mouth so I'll ask the
2  question.  Did you just blindly send pictures or
3  screen shots of your communications with Lisa
4  Barbounis to your sister without explanation or
5  reason?
6    A.    Yes.
7    MR. CARSON:  Objection.
8  BY MR. CAVALIER:
9    Q.    What did she say in response?
10    A.    She didn't say anything, that I
11  remember.
12    Q.    Was there a conversation that you had
13  with your sister in advance of sending her these
14  screen shots so that she would know that they would
15  be coming?
16    A.    Not that I remember.
17    Q.    Was there a conversation you had with
18  your sister after she received the screen shots about
19  what they were?
20    A.    I mean, we talked about, again, just
21  bad behavior at work, but in general not -- yes.
22    Q.    So when you sent the screen shots to
23  your sister what was her response to them?
24    A.    She didn't respond anything by text
25  that I remember.

Page 87

1    Q.    She didn't say what are these, why are
2  you sending these to me, what am I supposed to do
3  with these?
4    A.    Not that I remember.
5    MR. CARSON:  Objection.
6  BY MR. CAVALIER:
7    Q.    Is it a common practice for you to send
8  screen shots of conversations that you had with other
9  people to your sister?
10    MR. CARSON:  Objection.
11    THE WITNESS:  No.
12  BY MR. CAVALIER:
13    Q.    Did you think it was strange that your
14  sister didn't respond to the text messages sending
15  the screen shots?
16    MR. CARSON:  Objection.  Form.
17    THE WITNESS:  No, she knows I
18  would tell her if she needed to know
19  anything or if there was anything more.
20  BY MR. CAVALIER:
21    Q.    Did you instruct her on what to do with
22  them?
23    A.    I don't remember.
24    Q.    Did you ever at any point tell her,
25  hey, I'm sending these to you so that you can hold

Page 88

1 onto them for me?
2     A.    I don't remember.
3     Q.    Did you ever tell her that you were
4 sending them to her because you were worried that
5 Matt Bennett was going to delete information from
6 your phone?
7     A.    I don't remember.
8     Q.    Did you ever tell your sister to send
9 the screen shots back to you?
10    A.    I don't remember.
11    Q.    Do you remember when you sent the
12 screen shots to your sister?
13    A.    I don't remember.
14    Q.    So were the conversations that you had
15 with Lisa Barbounis that were the subject of the
16 screen shots actually deleted from your phone?
17    A.    I think so.
18          MR. CARSON:  Well --
19          THE WITNESS:  I don't remember.
20 BY MR. CAVALIER:
21    Q.    Okay.  So you -- as your counsel has
22 repeatedly said over the last couple minutes, the
23 screen shots were produced, so how -- if you sent
24 them to your sister and the conversations were
25 ultimately deleted, how did you end up producing

Page 89

1 those screen shots?
2          MR. CARSON:  Objection.
3    Privilege.
4          You can answer.  It's privileged.
5    You can answer without waiving any
6    attorney-client privilege.  The -- they
7    were produced because she gave them to
8    me and I gave them to you.
9          MR. CAVALIER:  Right.
10         MR. CARSON:  You guys produced
11    them, too -- you guys produced them,
12    too, I believe.
13 BY MR. CAVALIER:
14    Q.    The question is how --
15         MR. CARSON:  You have the screen
16    shots that you keep asking her about.
17 BY MR. CAVALIER:
18    Q.    The question is how are they in your
19 possession so that you can give them to your counsel?
20         MR. CARSON:  You can answer if you
21    know.
22         THE WITNESS:  I had them from my
23    sister.  I sent them to her.
24 BY MR. CAVALIER:
25    Q.    Right.  But then I asked you a few

Page 90

1 minutes ago whether you ever asked your sister to
2 send them back to you and you told me that you
3 couldn't remember.
4     A.    Because you can get any pictures that
5 you sent to anyone from your phone.  They don't have
6 to send them back to you.  You just go in the photos.
7     Q.    So you're saying the screen shots were
8 still in your stored photos.
9     A.    They would have been in the -- there's
10 data between you and anyone you talk to on an iPhone.
11    Q.    So do you still then have the messages
12 that you sent to your sister transmitting those
13 screen shots today?
14    A.    Yes.
15         MR. CAVALIER:  I'm going to ask,
16    Seth, that you produce those to us.
17         MR. CARSON:  Yeah, I think we did,
18    but I'll look and if they're not
19    produced, I'll produce it.
20 BY MR. CAVALIER:
21    Q.    Did Lisa ever ask you to send those
22 screen shots back to her?
23    A.    I don't remember.
24    Q.    Do you remember whether you ever did,
25 in fact, send the screen shots to Lisa?

Page 91

1     A.    I don't remember.
2          MR. CAVALIER:  Seth, give me five.
3    Okay?
4          MR. CARSON:  Yeah.
5          MR. CAVALIER:  All right.
6    Sorry, off the record.
7          THE VIDEO SPECIALIST:  Off the
8    record.
9          (A brief recess was taken from
10    11:53 a.m. to 12:05 p.m.)
11         THE VIDEO SPECIALIST:  The time is
12    12:05 p.m. Eastern.  We are back on the
13    record.
14         MR. CAVALIER:  Okay.  Ms. McNulty,
15    I don't have any further questions for
16    you today, but my colleague Sid Gold is
17    going to ask you some questions from
18    here, so that's all I have.
19         THE WITNESS:  Okay.
20                 - - -
21              EXAMINATION
22 BY MR. GOLD:
23    Q.    Good afternoon.  I think you and I have
24 had a meeting before when I took your deposition, and
25 this afternoon I'm going to ask you some questions

Page 92

regarding your relationship with Lisa Barbounis, and what I'm going to do, I'm going to show you some text messages that you and Lisa had exchanged over the years and see if I can ask some questions about those text messages.

Because this deposition is being taken over Zoom, there may be situations where I may interrupt an answer that you may be giving to one of my questions, and that's not intentional on my part. I apologize in advance if I cut you off and -- I want to make sure you finish your answer.

I also have a tendency to talk a little fast, so I'm deliberately trying to slow it down so that you can understand my questions and the court reporter can transcribe the testimony.

Are those ground rules pretty clear?

A.    Yes.

Q.    Okay.  And --

MR. GOLD:  Could you please put up Exhibit 1 for me?

BY MR. GOLD:

Q.    Ms. McNulty, I'm going to ask you to take a few seconds and read this -- the exchange of text messages that you had with Lisa Barbounis back in December of 2017, and there are some portions

Page 93

therein that I highlighted, and my questions are probably going to deal with the highlighted portions.

MR. GOLD:  So, Matt, if you can scroll down or --

MR. MAINEN:  Are you guys seeing all that, the highlighted text?

MR. GOLD:  Yeah.

MR. MAINEN:  Okay.

THE WITNESS:  Yeah.

MR. GOLD:  You can keep going, Matt.

Go ahead, Matt, you can move quickly here.

BY MR. GOLD:

Q.    Ms. McNulty, if you can just indicate when you're -- when you've completed reading those messages and you're ready to scroll down, just say "please scroll down."

MR. MAINEN:  Court reporter, can you mute number ending in 4848?  It's making static.

THE COURT REPORTER:  Maybe the tech can do that.  I'm not sure how to do that.

MR. MAINEN:  Okay.

Page 94

THE WITNESS:  You can scroll down.

THE VIDEO SPECIALIST:  That number is Mr. Carson.

Mr. Carson, if you are not going to object to anything, I understand that you need to at times, but in the meantime could you mute your mic?

MR. CARSON:  My mic is muted. Also my number doesn't end in 4848.

THE VIDEO SPECIALIST:  Could the number ending in 4848 either mute themselves or allow me to mute them.

MR. FINK:  I am muted.  You can mute it on your end.

MR. CARSON:  If I wasn't muted, you would be hearing my three-year-old reading a book right now.

THE VIDEO SPECIALIST:  Understood. Thank you.

MR. GOLD:  Keep going.

THE WITNESS:  Okay.

Okay.

MR. MAINEN:  That concludes Exhibit 1.  Would you like me to keep going?

Page 95

MR. GOLD:  No.  Stop there.

BY MR. GOLD:

Q.    Okay, Ms. McNulty, I just have a few questions.  I guess the first question I have is, was it typical for Lisa to send you text messages when she was under the influence of drugs or narcotics?

MR. CARSON:  Objection.  You're asking my client whether or not Lisa did drugs and then sent her messages?  How would she know that?

MR. GOLD:  No, no, my question was is it -- is it typical for Lisa to have sent Ms. McNulty text messages while she was under the influence of drugs.

MR. CARSON:  Object to form. You can answer if you know.

THE WITNESS:  No, I think she was sick in this -- when she was referring to this, that's why she was taking anything.

THE COURT REPORTER:  Ms. McNulty, do you mind repeating what you just said?

THE WITNESS:  I said no, she was mentioning being sick when she was

Deposition of Patricia McNulty                                    Lisa Barbounis v. Middle Eastern Forum, et. al.

Page 96

1  taking medications, so I assume that's
2  the reason.
3  BY MR. GOLD:
4      Q.   And do you recall what her illness was?
5      A.   I don't, no.
6      Q.   Is that the only time you ever had a
7  conversation with her where she revealed to you that
8  she was under the influence of drugs or narcotics?
9      A.   That I can remember offhand, yes.
10     Q.   And do you know what the drug Percocet
11 is?
12     A.   Not really, no.
13     Q.   You don't know that it's a painkiller?
14     A.   I was just going to say I think it's a
15 painkiller, but --
16     Q.   Okay.  And Zofran, do you know whether
17 that's an antianxiety drug?
18     A.   I'm not sure.
19     Q.   Okay.  And if you go down to the --
20 throughout that message she's actually so high that
21 she claims that she couldn't take a phone call from
22 Gregg Roman.  Do you read that?
23     A.   I interpreted that as because she was
24 sick and the way she was feeling, but --
25     Q.   Well, the way -- what it says is that

Page 97

1  she's so legit high that she can't take the call from
2  Gregg Roman, not because she's ill.
3      A.   Well, it doesn't say that in this
4  sentence.
5      Q.   Pardon me?
6      A.   They're separate.  She was talking
7  about the way she was feeling from the medication
8  above that but then she was also talking about being
9  sick and then she said that she can't talk to him
10 like that right now, so --
11     Q.   Well, if she was sick why was she at
12 the hairdresser?  If you know.
13     A.   I don't know.
14     Q.   In terms of your interrelationship and
15 conversations with Lisa, were there times when you
16 thought she was not being truthful with you?
17     A.   Not that I can recall.
18     Q.   Today how would you characterize your
19 relationship with Lisa Barbounis?
20     A.   We're friends.
21     Q.   What does that mean?
22     A.   We talk every now and again, check in
23 on each other and see how the other one is doing.
24     Q.   How many times during the course of a
25 week do you and Lisa text each other?

Page 98

1      A.   Right now it's maybe like once a month.
2      Q.   Back when you were working for MEF
3  approximately how many times did you text with Lisa
4  Barbounis?
5      A.   Probably at least five days out of the
6  week.
7      Q.   You mean five -- you say five days out
8  of the week?
9      A.   Probably.
10     Q.   Not on weekends?
11     A.   I don't know what days they were, I'm
12 just -- I think at least five out of the seven days
13 of the week we probably texted.
14     Q.   And what percentage of those text
15 messages occurred during work hours?
16     A.   I don't know.
17     Q.   But you would text Lisa at work,
18 correct?
19     A.   Sometimes.  It's hard to tell what's
20 work hours and what's not considering we had flex
21 hours.
22     Q.   Well, was Lisa Barbounis ever the --
23 did you ever notice or witness that Lisa was under
24 the influence of drugs when she was working for MEF;
25 that is, working in the office?

Page 99

1      A.   No, I didn't.
2      Q.   Did -- were you aware that Lisa
3  Barbounis would give her prescription drugs to other
4  employees at MEF?
5      A.   No.  I don't think so.
6      Q.   Were you aware that Lisa Barbounis was
7  taking certain drugs, prescribed drugs, while she was
8  working for MEF?
9      A.   Yes.
10     Q.   To the best of your recollection what
11 was she taking?
12     A.   Adderall.  That's the only thing I
13 knew.
14     Q.   Okay.  Did you ever see her give any
15 Adderall to any of her coworkers?
16     A.   I didn't see it, no.
17     Q.   And as far as -- do you know why Lisa
18 was taking Adderall?
19     A.   I don't know the exact reason, no.
20     Q.   What do you know?
21     A.   I know she was prescribed it.
22     Q.   What?
23     A.   I know that she was prescribed it, but
24 I don't know what her doctor prescribed it for.
25     Q.   She never told you she suffered from

Deposition of Patricia McNulty                                    Lisa Barbounis v. Middle Eastern Forum, et. al.

Page 100

1  ADD or ADHD?
2      A.    Maybe.
3      Q.    Are you saying you think she might have
4  been or maybe she told you that?
5      A.    She might have told me that.
6      Q.    Okay.  Did you have an occasion to read
7  Lisa Barbounis's deposition in this matter?
8      A.    No.
9      Q.    Did Lisa Barbounis talk to you after
10 her deposition in this matter?
11     A.    No.
12     Q.    When is the last time you spoke with
13 Lisa Barbounis?
14     A.    I don't remember exactly.  I would have
15 to look.  A couple weeks ago.
16     Q.    Yesterday?  Would it have been
17 yesterday?
18     A.    No.
19     Q.    The day before?
20     A.    No.
21     Q.    The day before that?
22     A.    No.
23     Q.    So you haven't spoken to her this week?
24     A.    No.
25     Q.    And how about last week?

Page 101

1      A.    No.
2      Q.    Did you -- when I say -- also I'm
3  including text message, did you text her this week?
4      A.    No.
5      Q.    You didn't tell her you were being
6  deposed today?
7      A.    No.
8          MR. CARSON:  I didn't tell her
9  either.
10 BY MR. GOLD:
11     Q.    Did you read the previous deposition
12 that you had given in this case, ma'am?
13     A.    No.
14     Q.    Did you -- did you get a copy of it?
15     A.    No.
16     Q.    Okay.
17          MR. GOLD:  Would you please put up
18 Exhibit 2?
19 BY MR. GOLD:
20     Q.    Why don't you read the highlighted
21 portions, ma'am, and then I'll ask some questions
22 about it.
23     A.    Okay.
24     Q.    It looks like this is a text message
25 from Lisa on January the 4th, 2018, and looks like

Page 102

1  you suggested that Lisa stay home from work because
2  of her family commitments and you said that Gregg has
3  kids, he would understand that.  Do you recall that
4  conversation at all?
5      A.    Not -- I mean, I'm reading it now, but
6  I don't remember it, no.
7      Q.    Okay.  Would it be fair to say that, at
8  least your impression, that Gregg would accommodate
9  an employee who needed to be out of work because they
10 had to care for their children?
11     A.    I would hope so.
12     Q.    Okay.
13     A.    Seeing that he's a dad.
14     Q.    And did -- was there ever an occasion
15 where you needed to have some kind of an
16 accommodation to stay home and -- do you have
17 children?  I'm sorry.  Do you have children?
18     A.    I don't yet, no.
19     Q.    Okay.  But if you had to stay home and
20 take care of your parents or whatever, there would be
21 an accommodation for you for that I assume?
22     A.    I don't know.
23     Q.    Well, has Gregg ever -- have you ever
24 asked for an accommodation at work where you were
25 turned down by Gregg Roman?

Page 103

1      A.    I don't know if I ever asked for an
2  accommodation.
3      Q.    Do you know of any -- any employee that
4  ever asked for an accommodation such as having to
5  take care of their children or their parents or
6  because they were ill who were denied such an
7  accommodation?
8      A.    I don't know.
9      Q.    Okay.
10          MR. GOLD:  Please put up Exhibit
11 3, please.
12 BY MR. GOLD:
13     Q.    And read the highlighted portion.
14     A.    Okay.
15     Q.    Okay.  And it's a text message that is
16 dated February 2nd, 2018.  Lisa sent the text message
17 to you I believe.  It says:  I've had it with Marnie.
18 I do not trust her.
19          What was your understanding of the
20 relationship that Lisa and Marnie had while working
21 for MEF?
22     A.    I mean, I think it changed during
23 parts, but I know that a lot of people didn't trust
24 her when we first started working there, and I think
25 Lisa felt that too.

Case 2:19-cv-05030-JDW   Document 110-3   Filed 03/02/21   Page 29 of 157

Deposition of Patricia McNulty                                    Lisa Barbounis v. Middle Eastern Forum, et. al.

Page 104

Q.    And why is that?  Why didn't they trust her?

A.    I mean, I can't speak to exactly why everyone else didn't trust her.  I mean, it's their --

Q.    Well, do you know why Lisa --

A.    -- their thoughts.

Q.    How about why -- do you know why Lisa didn't trust her?

A.    I mean, at that time we were -- one, Matt was telling us not to trust Marnie, that he thought that she and Gregg had a close relationship and that they were --

Q.    They were what?

A.    That the two of them were kind of against everyone else.

Q.    What do you mean by that?

A.    That they wanted to at points get Lisa fired or show that she was doing things wrong even if she wasn't.

Q.    And is this based on what Lisa told you or based on your own observations?

A.    It was based on what Lisa told me, what Marnie talked about later, what Matt talked about.

Q.    Why don't you tell me what Lisa told

Page 105

you.

A.    I mean, I don't remember every single stage of the way.  I know that --

Q.    Just give me what -- give me what you can recall.

A.    I know the culmination was when Marnie and her were talking about how Marnie had said that Gregg had instructed Marnie to watch Lisa and tell him what she was doing at all times during the day if he wasn't in the office, what time she got in, what time she left, and that Marnie had had a conversation about possibly firing her.

Q.    Why was there -- Marnie had a conversation with Lisa about firing Lisa or --

A.    No, Marnie had a conversation with -- I don't remember exactly who it was, Stacey Roman and I think Matt was there, too, based on what Gregg was telling her.

Q.    When did that conversation take place to the best of your recollection?

A.    The fall of 2018, but I don't know exactly when.

Q.    Okay.  And would that have been at or about the time you had that -- the meeting with Daniel Pipes?

Page 106

A.    Would have been before then, but I don't --

Q.    Before then.

A.    -- again, I don't know exactly what the time line was.

Q.    Well, you know what is meant by the term at-will employment, correct?  Do you know what that term means?

A.    Yes.

Q.    Okay.  Means you can fire somebody for any reason you want, right?  Correct?

A.    To an extent.

MR. CARSON:  What term are we talking about --

MR. GOLD:  At-will employment.

MR. CARSON:  Okay.  Thank you.

BY MR. GOLD:

Q.    What do you mean by to an extent?

A.    I mean, I don't think you can fire people for being a female per se.

Q.    Well, was she fired because she was a female?

A.    She wasn't fired.

Q.    Okay.  So of course the -- you cannot fire somebody because they're a female or whether

Page 107

they're -- because of their race or disability or age, but beyond that you understand that an employer can fire anybody they want at any time without any warning or notice, correct?

A.    That is correct.

MR. CARSON:  Objection.  Calls for a legal conclusion.

You can answer.

BY MR. GOLD:

Q.    So at the time you thought that -- are you telling me that Gregg Roman was going to fire Lisa, is that what you're trying to tell me?

A.    I'm saying that there were conversations that were had that Lisa found out about.

Q.    What were the conversations?

A.    I don't know exactly what they were.  I wasn't in them.

Q.    How do you know about them then?

A.    Because Marnie had said that she was talking to Gregg about the possibility.

Q.    The possibility of what?

A.    Of firing Lisa.

Q.    Okay.  So who revealed that to you?

Matt Bennett?

Page 108

A.   I don't remember exactly which one of
them it was first.  I know they had all talked about
it -- the conversation happening, but I don't
remember who told me first.

Q.   Okay.  So somebody told you that Gregg
had had a conversation with Marnie about terminating
Lisa sometime in the fall of 2018, correct?

A.   Not that he had a conversation with her
about firing, that he had been asking Marnie to watch
her and write things down if he thought -- if she was
doing anything wrong, he wanted her to -- or write
down everything that Lisa was doing throughout the
day so that he could find a reason to fire her.

Q.   And, again, that's based on -- who told
you that?

A.   I don't know who it was that told me
first.  I know that Matt, Marnie, and Lisa had all
talked about it.

Q.   Okay.  And, in fact, she was never
terminated, correct?

A.   Correct.

Q.   And do you know of any such notes that
Marnie wrote down about any surveillance of Lisa
Barbounis's activity at MEF?

A.   I don't know.

Page 109

Q.   So when you -- so were you present for
this conversation between Marnie, Lisa, and Matt
Bennett?

A.   I was -- I don't know if they had a
conversation the three of them together.  I know that
Marnie had talked about it to Lisa and I, I know Matt
had talked about it happening to me, but I don't know
if they had the three of them a conversation
together.

Q.   Someone told you that Marnie was
instructed to take notes about you and see if there
was a reason to terminate you as well?

A.   No.

Q.   Well, you says about me.  What did you
--

A.   Not that I knew of.

Q.   What did you mean by about me?

A.   I don't know what you're referring to.

Q.   You just said it was about me.  That's
what I heard.

A.   No, I don't think I did.

Q.   Okay.

MR. CARSON:  I actually heard
that, too, Patricia, maybe we just
misunderstood what you said.  I heard

Page 110

the same thing.
BY MR. GOLD:

Q.   What --

MR. CARSON:  Just clarify.

THE WITNESS:  Talk about it to me?
BY MR. GOLD:

Q.   Yeah, what -- let me just -- what I
understood you to say, and I'm not saying -- I may
have misheard you, but -- misinterpreted what you
said, but first said there was a conversation with
Matt, Marnie, Lisa, and -- about Marnie keeping
surveillance on Lisa --

A.   The conversation -- the only
conversation I mentioned was the conversation --
sorry to interrupt.  Should I let you finish
before --

Q.   Go ahead.

A.   -- clarifying?

The only conversation I mentioned was
the one that I know of that happened when Marnie,
Stacy, and Matt were in our conference room talking
about the possibility of firing Lisa.  The other
things were like one-on-one conversations where
Marnie had told me -- or Marnie had told Lisa and I
together I think, about Gregg instructing her to find

Page 111

reasons to get her fired, and Matt was a singular
conversation where he confirmed that -- where he was
telling me that Marnie had told him the same thing.

Q.   And when did those conversations take
place?  Fall of 2018?

A.   Yes, I believe so.

Q.   Are we talking September?  October?
November?

A.   I'm not sure exactly when it was.

Q.   So when you heard this news that Gregg
and Marnie I guess were scheming to get you fired did
you report that to Daniel Pipes?

A.   Well, it was about Lisa, not me.

Q.   I thought you just said that she was
also instructed to keep tabs on you.

A.   No, no one told me that.

Q.   Well, you just said that.

A.   No.

Q.   It's the same place we were before.
You said there were conversations between Matt and
Marnie where they were going to -- she was instructed
by Gregg to build a tab on Lisa to possibly get her
fired, then you said there's a second conversation
where you were the target of some surveillance by
Marnie.

Deposition of Patricia McNulty                                    Lisa Barbounis v. Middle Eastern Forum, et. al.

Page 112

1   A.   No, I never talked about a second
2  conversation.
3   Q.   So Gregg was not trying to get you
4  fired, correct?
5   A.   I mean, at that time not that I knew.
6   Q.   Okay.  So -- and, again --
7   A.   I knew he kept tabs on everybody,
8  but --
9   Q.   Well, how do you know that?
10   A.   -- that was --
11   Q.   How do you know?
12   A.   -- he would even -- he would even tell
13  me that he would look to see when people got in and
14  when they left and count how many times they went to
15  the bathroom and --
16   Q.   What's so --
17   A.   -- stuff like that.
18   Q.   What's so nefarious about that?  I
19  mean, you were working there.  If people are --
20  wouldn't you want to know where people are, if
21  they're not in the office?
22   A.   But we -- one, we had flex hours, so it
23  wasn't a 9 to 5 job, it shouldn't have mattered, as
24  long as you --
25   Q.   Well --

Page 113

1   A.   -- did your work and got your time in,
2  and, two, he would tell me that he would judge people
3  on if they were the first to leave in the day.
4   Q.   Let me cut to the chase.  Do you know
5  whether Lisa was ever given any written warning or
6  placed on probation because she was not in attendance
7  at work on a given day or had gone to the ladies'
8  room on a given day?
9   A.   I don't know if she was or not.
10   Q.   Were you ever disciplined for going to
11  the ladies' room or not being the first one in the
12  office or the first one to leave?
13   A.   I mean, Gregg yelled about it, but --
14   Q.   My question is, were you ever
15  disciplined, were you ever put on probation, put on
16  performance improvement plan, given a last chance
17  agreement, told that you'll be fired the next time
18  you go into the ladies' room, did that ever happen to
19  you?
20   MR. CARSON:  Objection.  Asked and
21  answered.
22  BY MR. GOLD:
23   Q.   Go ahead.  Answer.
24   A.   No, I was never told outright that I
25  would be fired -- but I -- no.

Page 114

1   Q.   And you weren't fired, you left on your
2  own volition, correct?
3   MR. CARSON:  Objection.
4   THE WITNESS:  I did leave because
5  of the way I felt, yes.
6  BY MR. GOLD:
7   Q.   And you had a job before you left MEF,
8  correct?
9   A.   I did, yes, I made sure of that.
10   Q.   You were looking for a job while you
11  were working at MEF, correct?
12   A.   Yes, because it was a place I couldn't
13  work anymore.
14   Q.   Okay.  So where are you working now?
15   A.   Russell Reynolds.
16   Q.   And where were you working when you
17  left MEF?
18   A.   The same place.
19   Q.   And does Neal Goldstein work at that
20  place as well?
21   A.   Who?
22   Q.   Who is your fiance?
23   A.   No, he does not.
24   Q.   You know who Neal Goldstein is, right?
25   A.   No, Neal Weinstein is my fiance.

Page 115

1   Q.   Neal Weinstein.  Okay.  I get -- I
2  always get the names wrong.  So does Neal Weinstein
3  work at that place as well?
4   A.   No, he does not.
5   Q.   What do you do for that establishment?
6   A.   I'm a project coordinator.
7   Q.   So what was your perception in the fall
8  of 2018 in terms of the relationship that Lisa had
9  with Marnie?
10   A.   I mean, it was very tumultuous until
11  they started talking to each other about what was
12  going on.
13   Q.   Well, what was going on?  I mean, when
14  they started talking to each other about starting a
15  lawsuit or what is it that was going on?
16   A.   No, I know that they -- there was
17  little trust until they got into a fight in the
18  office one day and Gregg had told Lisa to file a
19  complaint against Marnie and then separately told
20  Marnie to do the same thing to Lisa but also told
21  Marnie that he didn't know anything about that, and
22  the two of them started talking about what Gregg had
23  said and how he had lied to each of them in that way
24  and then they started figuring out how he was playing
25  each of them, and then the relationship was better.

Page 116

Q.   Were those actions -- assuming Gregg did that, which I'm not -- I don't know whether that's truthful or not.  Even if he had, you would agree that wasn't sex discrimination, correct?

MR. CARSON:  Objection.

You can answer.

THE WITNESS:  I don't know why he was doing it.

BY MR. GOLD:

Q.   Okay.  Did you ask him?

A.   No.

Q.   Well, did you bring these issues up when you met with Daniel Pipes in November of 2018?

A.   I didn't bring up the fight between Lisa and Marnie.  That was theirs, it wasn't mine.

Q.   Okay.  And you could have brought it up if you wanted to, correct?

A.   Yes, but I knew that they were talking to him about it.

Q.   You knew they were talking to Daniel Pipes about it?

A.   Yes.

Q.   Okay.  And do you know when those conversations took place?

A.   The beginning of November 2018.  I

Page 117

don't know the exact date.

Q.   Okay.  Now, Marnie as I understand it -- was she the head of HR?

A.   Correct.

Q.   Did Marnie ever -- best of your knowledge did -- did you ever go to Marnie to complain about anything that was happening in the workplace since she was HR?

A.   I told her a few things that had happened with Matt later on, but, again, for a good portion of the beginning Matt -- we thought Matt was our friend and he was telling us not to trust her and that it wasn't a true HR that she wouldn't use anything we told her to help us, that she would just help Gregg to get us fired.

Q.   Nobody got fired, though, so what are you talking about?

MR. CARSON:  Objection.

BY MR. GOLD:

Q.   It seems like a lot of the -- it seems like you -- you seem to have interpreted a lot of things that Gregg did or perhaps others did there as being calculated to get someone fired.  Nobody was ever fired.

MR. CARSON:  Objection.

Page 118

BY MR. GOLD:

Q.   Do you know if --

MR. CARSON:  There's no question that's pending.

BY MR. GOLD:

Q.   -- anybody -- was anybody at MEF ever fired for complaining about Gregg Roman?

A.   Not while I was there, but we were told -- we were made to believe that the threat was there and because of the things he said and told us and --

Q.   Okay.  So the answer is no --

A.   -- he told us --

Q.   -- correct?  During your tenure at --

MR. CARSON:  Objection.

BY MR. GOLD:

Q.   During your tenure at MEF was anyone ever fired because of a complaint they made about Gregg Roman?

A.   No.

Q.   Now, when did you tell Marnie about Matt?

A.   I don't remember exactly when it was.

Q.   It would have been -- would not have been in the fall of 2018, would have been later?

A.   I told her something about a

Page 119

conversation, an uncomfortable conversation that had happened in the winter of 2018 I remember.

Q.   Okay.

A.   And then everything would have been later after that.

Q.   Would that have occurred sometime in March of 2018?

A.   March -- no.

Q.   I'm sorry, March of 2019.

A.   Would what have happened in March of --

Q.   When you went to -- when you went to Marnie to complain about Matt.

A.   I told you -- I mentioned something in December of 2018.

Q.   And what about thereafter?

A.   I don't think I said anything until after he had left because nothing -- nothing happened.

Q.   Okay.  He left in March of 2019?

A.   Yes.

Q.   And you were at his going away party at the Continental, correct?

A.   We went to lunch, yes.

Q.   Well, didn't you invite Matt to the Continental for the going away party?

Deposition of Patricia McNulty                                    Lisa Barbounis v. Middle Eastern Forum, et. al.

Page 120

A.   It wasn't a going away party, it was a last lunch, and I don't know who invited -- who came up with the idea or --

Q.   Last lunch for who?

A.   For Matt.

Q.   Okay.  So instead of a going away party, it was a last lunch party, right?

A.   It wasn't exactly a party, it was just a lunch.

Q.   Well, didn't you ask Matt about getting a job at the -- at ZOA?

A.   I did not, no.

Q.   You did not.

MR. GOLD:  Could you put up Exhibit 65 for me, Matt?

MR. MAINEN:  Yeah, sure, it's going to take about 30 seconds to get that up, so --

MR. GOLD:  Okay.  That's fine.

MR. MAINEN:  I'll do that now.

MR. GOLD:  Okay.  Great.

And if the witness needs to take a break, just let me know.  I'm not trying to -- you have a right to take a break if you need a break.

Page 121

THE WITNESS:  Okay.

MR. CARSON:  Sidney, just to let you know, Patricia is actually eight months pregnant right now.

MR. GOLD:  Oh, really?  Great.  Congratulations.  I hope everything is working out well.

THE WITNESS:  Thank you.

MR. GOLD:  Girl or boy, don't you know yet?

THE WITNESS:  It's a girl.

MR. GOLD:  You're lucky.  Although they say boys love their moms more than their dads.  I can attest to that.  And I think Seth can, too.

MR. CARSON:  I probably can, yeah.  Me and my mother are pretty close.

MR. GOLD:  Are you in your eighth month, I take it, or nine -- down to the wire or --

THE WITNESS:  I'm eight months.

MR. GOLD:  Okay.  Great.

MR. MAINEN:  All right.  I'll be sharing my screen now of Exhibit 65.

MR. GOLD:  Thank you.

Page 122

BY MR. GOLD:

Q.   While we're waiting, during that time period of November 2018 did Marnie ever complain to you about Gregg Roman?

A.   I don't remember.

Q.   Did Lisa ever share with you her thoughts about Marnie's relationship with Gregg in November 2018?

A.   In November of 2018?

Q.   Yeah.

A.   I don't think so.

Q.   Was there a point in time when Lisa did share her thoughts about Marnie's relationship with Gregg?

A.   Just that they were -- in the beginning anyway that they were close and --

Q.   Well, Gregg was the director and Marnie was the head of HR, correct?

A.   Correct.

Q.   So what you mean by close, I mean, they were coworkers?

A.   That they were very friendly.

Q.   Okay.  They were what friendly?

A.   I'm sorry, what was that?

Q.   You said friendly, what was the word

Page 123

before friendly, I couldn't hear that.

A.   Very friendly.

Q.   Very friendly.  Okay.  Very friendly in terms of socializing together or very friendly in terms of work?

A.   Work and a kinship outside of work I think.

Q.   What do you know about their relationship outside of work?

A.   I don't know much about their relationship outside of work.

Q.   So why did you just say they had a relationship outside of work?

A.   I think -- well, Matt told us anyway for a long time in the beginning that Marnie and Gregg were close friends and that anything that was said to Marnie would really just go straight to Gregg.

Q.   And that's Matt again.  Did he give you any examples of that when he made that statement?

A.   I don't remember.

Q.   All right.  Let's go now to 65.  Why don't you read the various -- the text message exchange and -- just so you know, this -- I believe these text messages were exchanged at the Continental

Page 124

during that last luncheon for Matt.  I'm sorry, it was after the luncheon with Matt.

   A.   Okay.

     MR. GOLD:  Do you want to scroll down, Matt?

     THE WITNESS:  Okay.

     MR. GOLD:  Okay.  Scroll down.  Is that it?  Keep going.

     THE WITNESS:  Okay.

     MR. GOLD:  Is that it, Matt?  No.  Keep going.

     THE WITNESS:  Okay.  The yellow -- sorry.  Are we just going to the yellow or keep going?

BY MR. GOLD:

   Q.   And, by the way, which is your phone number there, Ms. McNulty?

   A.   The one ending in 1968.

   Q.   Okay.

   A.   Okay.

     Okay.

     MR. MAINEN:  Hey, Sid, that concludes the messages on March 8th.

     MR. GOLD:  Okay.

BY MR. GOLD:

Page 125

   Q.   So, Ms. McNulty, I had suggested that this -- the text messages were exchanged after the luncheon at the Continental.  I want to be clear, I don't want to suggest that, but do you have any recollection as to whether it was before or after the luncheon?

   A.   I think it was after.

   Q.   Okay.  And who was attendance at that particular -- at the luncheon?

   A.   I think it was Matt, Lisa, myself, Caitriona, and Delaney.

   Q.   And Marnie was not present?

   A.   I don't think so.

   Q.   There is some discussion here about a vote that was taken.  Do you have a recollection about that?

   A.   Yes.

   Q.   Tell me about that, please.

   A.   Daniel wanted to appoint somebody as head of the office with Matt gone, and he asked us -- he said he didn't want to make the decision himself, and so he asked us each to vote for someone anonymously and let him know our choice.

   Q.   And who was that?

   A.   Lisa was voted.

Page 126

   Q.   Okay.  And from what I gather from this text -- these text messages, I guess -- not to make it into a primary fight, was she running against Marnie for that position so to speak?

   A.   It was -- it could have been any one of us.

   Q.   Okay.  Well, did Marnie expect to be the person so designated?

   A.   I'm not sure if -- I guess reading from those she expected to be, reading from what she mentioned to Lisa, but I didn't know that at the time.

   Q.   Why wasn't Marnie at that luncheon, if you know?

   A.   I don't know.

   Q.   If you look at the yellow entry, it looks like you said:  Whatever, Matt told me yesterday was shit talking up a storm when they were in their offices with the door closed.  Telling Daniel that it's like an episode of survival in the office --

     I guess you meant Survivor, right?

   A.   Yes.

   Q.   -- and we're all walking around trying not to make eye contact with her --

Page 127

     I guess meaning Marnie, correct?

   A.   Yes.

   Q.   -- because we all know we did wrong "voting against her."

     Could you tell me what you meant by that text message?

   A.   It was just what Matt had told me.

   Q.   And -- I'm not sure I understand.  Can you tell me what you understood that -- what Matt said to you?

   A.   I was only repeating what he had told me that he heard through the wall from Daniel -- Daniel's office in a conversation with Daniel and Marnie that she was upset about the office dynamics at the moment.

   Q.   So at least until March of 2019 this tension that had existed between Lisa and Marnie seems to still be pretty intense in March of 2019; would that be accurate?

   A.   It looked like it was then, yes.

   Q.   And when you say someone to be head of the office, were you talking about someone who would be a point person of sorts between the employees and Daniel Pipes?

   A.   He didn't end up appointing anyone in

Deposition of Patricia McNulty                          Lisa Barbounis v. Middle Eastern Forum, et. al.

Page 128

the end, he just took it all back, so I'm -- we never
actually knew what the exact details of what the
person would do, if it was just kind of managing the
office and the people in there or if it was reporting
back to him, I'm not sure.

Q.     Let me understand this then.  You had
this election, you went to the Continental, Lisa was
chosen over Marnie, and then you're saying it was --
it never happened?

A.     It never happened.

Q.     And how do you know that?

A.     Because Daniel told us that he wasn't
going to select anybody.

Q.     Okay.  And at that point is that when
-- if I'm not mistaken, according to my time line,
Gregg was invited back to the office, correct?

A.     It was in March of 2019.  I don't know
exactly when it was.

Q.     Well, when did --

A.     Yeah, I think it was around the same.

Q.     It looks like this text message is
dated March 8th, 2019.

A.     It was around the same time that Matt
left, so, yes, I guess.

Q.     Okay.  So Matt left, and do you know

Page 129

why Matt left?

A.     He took another job.

Q.     And you have no recollection of asking
Matt whether there was a position for you in that
other job, correct?

A.     I do not, no.

Q.     Did you have any conversations with
Matt after he left MEF?

A.     Yes.

Q.     When?

A.     I don't know exactly when.  I know he
had called me a few times after he left to tell me
things that were happening at MEF that he found out
about through Gregg.

Q.     When was that conversation?

A.     I don't know exactly when they were.

Q.     Would it have been before you left MEF?

A.     Yes.

Q.     Okay.  And you left when?

A.     September of 2019.

Q.     So from the point in time March until
September did you place any phone calls to Matt after
he left?

A.     I don't remember.  I know he called me
a few times.  I don't remember if I ever called him

Page 130

back or called him in response to a message.  I don't
remember.

Q.     Okay.  But then you remember speaking
with him in -- after September 2019?

A.     No.

Q.     Well, you just -- you said you spoke to
him after September -- after you left.

A.     No, after he left.  Not after I left.

Q.     After Matt -- okay.  So you don't
recall having any conversations with Matt after he
left up until the point in time when you left,
correct?

A.     No, I do remember having conversations
with him after he left.

Q.     Okay.  What did he tell you --

A.     Not after I left.

Q.     I'm sorry.  I misunderstood.  Apology.
What did he tell you in those
conversations?

A.     There was a conversation where he told
me about Gregg calling him and being upset about
another accusation being made against him in the
office, and they were trying to figure out what the
accusation could have been or who it was made by, and
there was a conversation that I remember where he

Page 131

called me to tell me he had heard somebody had
returned back, had been hired back, and that he had
also heard that the -- that they were going to hire
for a new director of development, his old position,
and that that job description was being made.

Q.     And if I'm not mistaken, that was a
position that you had wanted, correct?

A.     At that time, correct.

Q.     You were the acting director?

A.     Correct, at that time.

Q.     And who was it that was hired back, do
you know?

A.     It was Gary.  I can't think of his last
name right now.

Q.     Was he hired before you had left?

A.     Yes.

Q.     Okay.  And how did you feel about that?

A.     I didn't -- about him being hired back?

Q.     Yeah, about Gary getting the job versus
you.

A.     No, he didn't get that job, he was just
hired back to MEF.

Q.     So no one became the -- what -- the
director of development before you left.

A.     No, they were -- they were actively

Case 2:19-cv-05030-JDW   Document 110-3   Filed 03/02/21   Page 36 of 157

Deposition of Patricia McNulty                                    Lisa Barbounis v. Middle Eastern Forum, et. al.

Page 132

looking to hire but not -- no one was hired before I left.

Q.    Okay.  And did you apply for that job as well?

A.    I did.

Q.    So we're up to March of 2019 where this relationship between Marnie and Lisa at best appears to be somewhat strained, and I think you testified that at some point their relationship took a turn for the better.  Do you know when that was?

A.    I mean, they had a good relationship before this argument about the office point and they were fine afterwards, too, as far as I know.

Q.    Okay.  So even though I believe in this -- these text messages there is evidence that Marnie was quite angry that she wasn't selected for that position and Lisa was, you're telling me the relationship between them was still quite good?

A.    Yeah, didn't -- they didn't stay upset with each other for very long.  Especially since --

Q.    Now, Gregg Roman was out of the office between November 2018 and March 2019, correct?

A.    Correct.

Q.    And at that juncture he was no longer in a supervisory role, correct?

Page 133

A.    He was still in a senior position but not in a I guess you could say supervisory role, even though --

Q.    He was not in a --

A.    -- he did still supervise our work.

Q.    Okay.  He was not in a supervisory role, correct?

THE COURT REPORTER:  I apologize. I didn't hear the end of that answer.

MR. GOLD:  I'm sorry.  Go ahead.

THE WITNESS:  Where I said he still supervised our work?

BY MR. GOLD:

Q.    You're saying what -- during the period of November 2018 to March of 2019 he was supervising your work?

A.    Yes, he was telling us what we needed to do, when we needed to do it by, if he needed -- if it -- we needed to do more, if it wasn't done well or needed to be done again, he was still telling us all those things, yes.

Q.    He was not in the office, though, correct?

A.    He was not in the office during that time, no.

Page 134

Q.    Okay.  And isn't it true that there were tensions between Marnie and Lisa during the time when Gregg Roman was out of the office between March of 2019 -- I'm sorry, between November of 2018 and March of 2019?

A.    I don't know when exactly their tensions were --

Q.    Do you have any recollection -- do you have any idea what the relationship was between Lisa and Marnie during that time period of November 2018 and March 2019?

A.    I don't remember.

Q.    Were there any -- you say you can't remember -- you don't remember when their -- when they had these tensions or -- what is it you don't remember?

A.    Yeah, I don't remember when they had their tensions.  I mean, they were short-lived, but I don't remember when they were.

Q.    Based on your observations, what do you think the problem was between Marnie and Lisa, if you know?

A.    I don't know.

MR. GOLD:  Okay.  Let's go back to exhibit -- let's go to Exhibit 4.

Page 135

BY MR. GOLD:

Q.    I mean, Lisa -- one thing we do know that as of February 2018 Lisa said I had it with Marnie and I don't trust her.  You recall that, correct?

A.    I don't remember if that was the date, but I remember --

Q.    That's the date of the text message that I just showed you, Exhibit 3.

A.    Weren't we just looking at text messages from March?

Q.    We're now moving back to Exhibit 3.

MR. GOLD:  Could you put that on the board?

THE WITNESS:  I don't remember the date that --

MR. GOLD:  Yeah, let's put that -- yeah, we're off the one from the Continental, now we're back to the one from Exhibit 3 from February 2nd, 2018. Are you there, Matt?

MR. MAINEN:  Yeah, I'm putting it up right now.

MR. GOLD:  All right.

BY MR. GOLD:

Page 136

Q.   And do you see the date of that --
these text messages, they were February 1st, 2018?

A.   Uh-huh.

Q.   February 2nd, 2018. Lisa says: I've
had it with Marnie. I do not trust her. I told her
about the thing with Gregg and she went right to Matt
to see if he knew. Like why talk about it? I
fucking told you it happened. But I can't say
anything because it would throw Matt under the bus.
Why was she even -- do you know why she
was concerned about throwing Matt under the bus?

A.   I mean, at that time we thought Matt
was our biggest advocate, always looking out for us
and --

Q.   Well, if that's true, then why would
you -- why would she be talking about throwing Matt
under the bus because he went right to -- rather,
Marnie went right to Matt?

MR. GOLD: Scroll down.

THE WITNESS: I'm not sure what --
what the question is.

MR. GOLD: Yeah.

BY MR. GOLD:

Q.   Well, she says -- you say to her:  Yo.
Agreed. And if you're gonna preach about how HR

Page 137

works.

Lisa says: Exactly.

And then you say: I will never vent to
her about work things ever again, I honestly even
talk about good, no work talk with her. I feel like
things get misconstrued or she goes straight to Gregg
with it.

So it's pretty clear you had a pretty
bad relationship with Marnie as well, or you had lost
trust with Marnie, correct?

A.   Yes, at that time, Matt was telling us
--

Q.   And you began to lose trust with Matt,
right?

A.   Much later, yeah.

MR. GOLD: Scroll down.

BY MR. GOLD:

Q.   And you say -- she said to you: I have
a bad habit of taking things as a direct assault.
Would you agree that Lisa was a little
bit paranoid about Marnie?

A.   I don't know if she was paranoid about
Marnie. I don't know.

Q.   Do you know what she means by -- well,
you say: Yeah, I know the feeling.

Page 138

She says: I have a bad habit of taking
things as a direct assault.
You respond: Yeah, I know the feeling,
but I would just take --

A.   Yeah, about taking things as a direct
assault, not about being paranoid.

Q.   Well, direct -- well -- okay. Talking
to Marnie -- I think she -- she conceded that she
thought her relationship with Marnie there were some
-- any actions Marnie took against her was a direct
assault. Would you agree with that?

A.   I don't think Marnie took any actions
against her.

Q.   Well, you say: I know the feeling.
What were you -- what were you
referring to?

A.   About taking things as a direct result,
didn't even have anything to do with work, just that
I can relate to that feeling.

Q.   You're just talking generally about
life in general?

A.   Yeah.

Q.   Well, you say here: Yeah, I know the
feeling, haha, but I would just take this as a live
and learn experience, can't talk about everything

Page 139

with everyone and now you have a better idea of where
those boundaries lie there.

And then she responds: I don't know
why this made me think of you.

MR. GOLD: And then keep going
down. We're now into Exhibit 4. So
let's -- why don't you take a -- put
Exhibit 4 up there and let's have her
please read that, the highlighted
portion.

THE WITNESS: Okay.

MR. GOLD: Keep going. Is that
the end of it?

THE WITNESS: Okay.

BY MR. GOLD:

Q.   So do you recall the context in which
this conversation took place back in February of
2018?

A.   That's when Lisa found out that Marnie
was being instructed to watch her and take notes on
her.

Q.   Well, you're the one who say, well,
she's like your babysitter, correct?

A.   I questioned. That's a question.

Q.   Why did you say that?

Deposition of Patricia McNulty                    Lisa Barbounis v. Middle Eastern Forum, et. al.

Page 140

1    A.   Because that's not normal workplace
2  environmental action.
3    Q.   So why didn't you go make a complaint
4  to Daniel Pipes?
5    A.   We had been told a lot of things in the
6  beginning about complaining to different people, one
7  we were told not to talk to Daniel at all.
8    Q.   Who told you that?  Who told you that?
9    A.   Gregg had told us that.
10   Q.   When?
11   A.   Within the first month of working
12 there.  That everything was to go through --
13   Q.   And how did that come about?
14   A.   He just told us flat out that we should
15 never be talking to Daniel or e-mailing Daniel
16 without, one, at minimum he should be cc'd if it was
17 an e-mail, and that he was the boss.  I mean, I think
18 we've talked about all this before, but that -- that
19 he was the head honcho and that nothing was to go
20 above him.
21   Q.   But eventually in November you did have
22 conversations with Daniel Pipes, correct?
23   A.   Correct.
24   Q.   So you -- whatever may have been said,
25 you did it anyway in November 2018, you met with

Page 141

1  Daniel Pipes.
2    A.   He came to my office, which is how the
3  first time I told him about any of this, yes.
4    Q.   Well, instead of -- did you ever go to
5  Marnie and complain as -- since she was the head of
6  HR if you had any complaints?
7    A.   Again, like the -- like you're showing
8  in these text messages, we were told that -- by Matt,
9  again, that HR just tells exactly what happens to
10 everyone.
11   Q.   You could have taken a pad of paper and
12 written a complaint to anybody you wanted, you could
13 have written it to Matt, correct?
14   A.   Matt had also told us about what had
15 happened to Tiffany Lee and had warned us against --
16   Q.   What year was that?
17   A.   That he told me or that Tiffany Lee --
18   Q.   No, when was Tiffany Lee working for
19 MEF?
20   A.   I don't know the exact dates.  I know
21 it was -- that's how he got his job position, because
22 he took over for her when she left.
23   Q.   Yeah.
24   A.   But he had warned us that she had
25 complained and everyone was told to lie against her

Page 142

1  and the same thing would happen to us and everybody
2  would just defend Gregg and --
3    Q.   Tiffany Lee filed a complaint with the
4  Pennsylvania Commission, she had a lawyer, and she
5  withdrew the case.  So have you had any conversations
6  with Tiffany Lee within the last two, three years?
7          MR. CARSON:  Objection.  What you
8      said is absolutely false, but you can
9      continue --
10         MR. GOLD:  That is true.  She
11     withdrew her claim.  She didn't get a
12     nickel.
13         MR. CARSON:  Not true.
14         MR. GOLD:  It is true.  Call Kevin
15     Lovitz.  You'll find out.
16 BY MR. GOLD:
17   Q.   So tell me --
18         MR. CARSON:  Yeah --
19 BY MR. GOLD:
20   Q.   -- what -- what is it -- what is it you
21 know --
22         MR. CARSON:  -- I know exactly
23     what happened because --
24         MR. GOLD:  You were probably --
25         MR. CARSON:  -- our firm

Page 143

1  represented her --
2          MR. GOLD:  -- representing her --
3          THE COURT REPORTER:  I can't hear
4      anybody.  I can't hear anybody.
5          MR. GOLD:  Seth, were you
6      representing Tiffany Lee?
7          MR. CARSON:  Our firm did.
8          MR. GOLD:  Okay.  What did she
9      recover?
10         MR. CARSON:  I don't think that's
11     the point.  She never withdrew any
12     claims.
13         MR. GOLD:  She filed a complaint
14     with the commission.  That's true,
15     correct?
16         MR. CARSON:  She filed with the
17     EEOC, she filed --
18         MR. GOLD:  Right?
19         MR. CARSON:  -- a right to sue
20     letter and decided not to pursue claims
21     in federal court.  That is not
22     withdrawing claims.
23         MR. GOLD:  So did she ever pursue
24     a claim ever beyond that?
25         MR. CARSON:  It's my understanding

Deposition of Patricia McNulty                                    Lisa Barbounis v. Middle Eastern Forum, et. al.

Page 144

1  that she decided not to pursue the
2  claims in federal court, and I have no
3  idea why --
4       MR. GOLD:  Okay.  Let's come back
5  --
6  BY MR. GOLD:
7       Q.   When did you --
8       MR. CARSON:  She never withdrew
9  anything.  She never --
10 BY MR. GOLD:
11      Q.   Ms. McNulty, when was the last time --
12 did you ever have a conversation with Tiffany Lee in
13 your lifetime?
14      A.   No, I haven't.
15      THE COURT REPORTER:  Excuse me.  I
16 didn't -- did you ever have a
17 conversation with Tiffany Lee -- what
18 was the end of it?
19      MR. GOLD:  In her life -- in your
20 lifetime.
21      THE COURT REPORTER:  And what was
22 the answer?
23      MR. GOLD:  No.
24      THE WITNESS:  No.
25 BY MR. GOLD:

Page 145

1       Q.   So the only thing you know about
2  Tiffany Lee is what Matt Bennett may have told you,
3  correct?
4       A.   Correct.
5       Q.   And based on what Matt Bennett told
6  you, you felt you couldn't talk to Daniel Pipes, you
7  couldn't talk to Marnie O'Brien, you couldn't talk to
8  Gregg Roman; is that accurate?
9       MR. CARSON:  Objection.  That's
10 not what her testimony was, but you can
11 answer.
12      THE WITNESS:  He warned me against
13 complaining about anything for that
14 reason, about making any formal
15 complaints.
16 BY MR. GOLD:
17      Q.   And is that what inhibited -- what I'm
18 -- Matt Bennett told you these things, that's what
19 caused you not to tell anybody about anything, that
20 you were working on the assumption that Matt Bennett
21 told me not to do it therefore I won't do it?
22      MR. CARSON:  Objection.
23      THE WITNESS:  Well --
24      MR. CARSON:  Object to the form.
25      You can answer.

Page 146

1       THE WITNESS:  He had told me
2  exactly how lawyers had come in and
3  talked to him and he was instructed to
4  lie about it and that everyone else
5  would do the same and it was -- that
6  there was no point and I would be the
7  one to leave in the end if I said
8  anything, so, yeah, it was very
9  daunting.
10 BY MR. GOLD:
11      Q.   Did he identify the lawyers who told
12 him to lie?
13      A.   He didn't, no.
14      Q.   Why didn't you ask him?
15      A.   What the lawyers' names were?
16      Q.   Yeah, who asked you to lie.
17      A.   I mean, this was in the -- within the
18 first three months of me working there.  I was just
19 scared out of my mind when he told me this story.
20      Q.   Why didn't you just quit?
21      A.   Because I loved the job.
22      Q.   You loved the job even though you were
23 told never talk to Daniel Pipes, never talk to Gregg
24 Roman, never talk to Marnie, because you would be
25 terminated if you talked to any about any of the

Page 147

1  problems you had at MEF, correct?
2       A.   Correct.
3       Q.   But then in November Daniel Pipes came
4  to your office as you so testified and you told him
5  everything that was bothering you, correct?
6       A.   I didn't tell him everything that
7  bothered me that first initial meeting, no.
8       Q.   When did you finally tell him
9  everything?  In the second meeting?
10      A.   I told him a lot of what was going on
11 with Gregg --
12      Q.   Did you tell him that Matt Bennett --
13 did you tell him what Matt Bennett had told you?
14      A.   About Tiffany Lee?
15      Q.   Yeah, about -- that lawyers will come
16 into the office, they'll tell you to lie, there's no
17 reason to report anything, you're going to get
18 terminated, did you tell him about that conversation?
19      A.   No.
20      Q.   Why not?
21      A.   Because we were telling Daniel what was
22 happening then, so it didn't seem to apply.
23      Q.   Okay.  So -- well, things you were
24 talking about, some of them occurred back in March of
25 2018, and this is now seven or eight months later.

Page 148

1  Did Daniel ever ask you why you waited so long to
2  make the report?
3      A.    No, he never asked.
4      Q.    Did you ever tell him why you waited so
5  long to make the report?
6      A.    I mean, we told him that -- about the
7  instructions not to talk to him --
8          (Brief interruption.)
9          THE WITNESS:  Yes, we did --
10 BY MR. GOLD:
11     Q.    I'm sorry, I couldn't hear your answer.
12 Pardon me?
13     A.    We told him about the instructions not
14 to talk to him and the way that Gregg had run the
15 office so that he was the top guy, the head -- that
16 we weren't -- couldn't go over him.
17     Q.    Okay.  So that was -- that had to do
18 with Gregg's management style, that wasn't
19 discrimination, was it?
20         MR. CARSON:  Objection.
21         THE WITNESS:  What?
22         MR. CARSON:  Calls for a legal
23 conclusion.
24 BY MR. GOLD:
25     Q.    The fact that Gregg -- you were told by

Page 149

1  Gregg not to talk to anybody above him.
2          MR. CARSON:  Objection.
3  BY MR. GOLD:
4      Q.    That is how he chose --
5          MR. CARSON:  Calls for a legal
6  conclusion.
7  BY MR. GOLD:
8      Q.    If that is true, that was his
9  prerogative to how he wanted to run the office, he
10 was the director, correct?
11         THE COURT REPORTER:  Excuse me,
12 Mr. Gold, I didn't hear --
13         MR. CARSON:  Objection.
14         THE COURT REPORTER:  I didn't hear
15 the question.
16         MR. CARSON:  Calls for legal
17 conclusion.  Assuming facts not in
18 evidence.
19         MR. GOLD:  Seth, I'm going to ask
20 you -- listen, I got no problem with you
21 objecting, but you got to put it on mute
22 when your child is acting up, please.
23 It's making it difficult to hear the
24 answers.
25         THE COURT REPORTER:  Yeah,

Page 150

1      Mr. Gold, just so you know, I don't know
2      if I got your full question before that.
3          MR. GOLD:  Yeah.  My question --
4      read back what I had said -- oh, I think
5      we're talking about, quote, Gregg's
6      management style.  Okay?
7  BY MR. GOLD:
8      Q.    So the fact that Gregg had a certain
9  management style that you obviously didn't agree
10 with, I'm asking you, that didn't constitute sex
11 discrimination in your mind, correct?
12         MR. CARSON:  Objection.  Calls for
13      a legal conclusion.  Assuming facts not
14      in evidence.
15         You can answer.
16 BY MR. GOLD:
17     Q.    You can answer the question.
18     A.    It just made there -- you feel like
19 there was nowhere to -- nobody to tell, nobody --
20     Q.    But you loved the job anyway, so what
21 are you going to talk about anyway, you said you
22 loved it there.  So did you tell Daniel Pipes that
23 you loved your job --
24     A.    I didn't love it there, but I liked the
25 --

Page 151

1      Q.    -- and you loved working --
2      A.    I did tell him that I loved my job and
3  that --
4      Q.    Okay.
5      A.    -- the mission, but I didn't like the
6  working environment, but I put up with it because I
7  liked the job, I thought it was going to be more for
8  me than it was.
9      Q.    What did you -- how was it going to be
10 more than you thought it would be?  You thought you
11 were going to become the director of development, is
12 that it?
13     A.    Even if I didn't, I thought it would be
14 a career job -- like a much longer stay there.  You
15 know, I was already building the program --
16     Q.    What job --
17     A.    -- portion of MEF bigger.
18     Q.    I'm sorry, what job did you have before
19 you came to MEF?  I believe you were working for like
20 the -- the Hotel Chelsea before you came here; is
21 that right?
22     A.    That wasn't my last employment before
23 there.  It was at Icon Hospitality.  But it was --
24     Q.    Okay.  How long were you at the Chelsea
25 Hotel?

Deposition of Patricia McNulty                              Lisa Barbounis v. Middle Eastern Forum, et. al.

Page 152

1      A.    Five years I think.
2      Q.    What happened there?
3      A.    I took another job.
4      Q.    At MEF, correct?
5      A.    No.
6      Q.    Where were you working --
7      A.    Again, Icon Hospitality -- Icon
8  Hospitality was my last job before.
9      Q.    And how long had you worked there?
10     A.    Two years I think.
11     Q.    Okay.  Were you thinking of that being
12  a lifetime job for you as well?
13     A.    No, I let them know when I got hired
14  that it was not the plan.
15     Q.    How about the job at the Chelsea, was
16  that going to be a lifetime job as well?
17     A.    I mean, I was not thinking about it as
18  much then because I was younger.
19     Q.    How old were you when you took the job
20  at the Chelsea?
21     A.    I don't remember exactly how old I was.
22     Q.    Well, how old were you when you took
23  the job at MEF?
24     A.    I was -- three years ago.  Thirty --
25     MR. CARSON:  2017.

Page 153

1      THE WITNESS:  35 I think.
2  BY MR. GOLD:
3      Q.    Okay.  So when you left the job at
4  Chelsea you were 33 years old, correct?
5      A.    I don't remember the exact dates of my
6  employment -- but I worked at Icon Hospitality before
7  MEF.
8      Q.    Okay.  And you were 33 when you took
9  that job, correct?
10     A.    Correct.
11     Q.    So now that you became --
12     A.    I think.
13     Q.    Now that you reached the ripe old age
14  of 35 you thought this was going to be a lifetime
15  engagement for you at MEF?
16     A.    It was a job that I liked --
17     MR. CARSON:  Objection.
18     THE WITNESS:  -- more than what I
19  was doing.
20     MR. GOLD:  Okay.
21     THE WITNESS:  So that's --
22  BY MR. GOLD:
23     Q.    Did you ever tell Gregg how much you
24  liked working at MEF?
25     A.    I'm sure I did.

Page 154

1      Q.    Okay.  And did Lisa Barbounis like
2  working at MEF?
3      MR. CARSON:  Objection.
4  BY MR. GOLD:
5      Q.    To the best of your knowledge.
6      A.    Parts of it.
7      Q.    What parts did she like?
8      A.    She liked the mission as well.
9      Q.    She liked being with Tommy -- liked
10  going to the UK and hanging out with Danny Tommo?
11     MR. CARSON:  Objection.  You're
12  asking her --
13  BY MR. GOLD:
14     Q.    Did she like that part?
15     MR. CARSON:  You can answer to the
16  extent you know what Lisa likes and what
17  she doesn't like.
18     MR. GOLD:  Why don't we -- I'll
19  rephrase the question.
20  BY MR. GOLD:
21     Q.    What did she tell you about her
22  relationship with Danny Tommo while she worked at
23  MEF?
24     A.    They had worked together on a project
25  and then later when she was separated they were more

Page 155

1  romantically personally involved, but --
2      Q.    What do you mean when she was -- when
3  was she ever separated from her husband?
4      A.    I don't know exactly when it was.
5      Q.    Was it while she was working at MEF?
6      A.    Yes.
7      Q.    And what exactly did she tell you?
8      A.    About what?
9      Q.    About their sexual encounters together?
10     A.    I don't remember exactly what she told
11  me.  I mean, it's -- I don't remember exactly what
12  she told me.
13     Q.    Are you aware of an incident where he
14  had, quote, rough sex with her and had a black eye
15  when she came to work one day?
16     A.    I'm aware of that incident, yes.
17     MR. CARSON:  Objection.
18  BY MR. GOLD:
19     Q.    What did she tell you about that?
20     A.    Just that it happened.
21     Q.    Well, didn't she first say she fell in
22  the shower?
23     A.    Did I think she first fell in the
24  shower?  No.
25     Q.    Did she ever tell you that she had a

Deposition of Patricia McNulty                                     Lisa Barbounis v. Middle Eastern Forum, et. al.

Page 156

1  black eye because she fell in the shower?
2      A.   No, she never told me that.
3      Q.   Did she -- what did she -- did she ever
4  tell you that she had a black eye for some other
5  reason unrelated to Danny Thomas?
6      A.   I don't remember.
7      Q.   Okay.  So how long did that
8  relationship last with Danny Thomas the best of your
9  knowledge?
10     A.   I don't know exactly how long.
11     Q.   Was it -- was she still seeing Danny
12 Thomas when you left the organization?
13     A.   I don't think so.
14     Q.   Did you ever go to the UK with her for
15 a rally of sorts?
16     A.   I did.
17     Q.   When was that?
18     A.   June of 2018.
19     Q.   Okay.  So June of 2018 you went with
20 her, and was that on MEF business or personal
21 business, personal pleasure?
22     A.   That was for MEF.
23     Q.   Okay.  And where did you stay?
24     A.   We stayed in a hotel.
25     Q.   Who paid for the plane tickets?

Page 157

1      A.   MEF paid for half of the plane tickets
2  and then the rest was left up to us.
3      Q.   Okay.  And so you say it was MEF
4  business.  What exactly was the MEF business in the
5  UK that you were participating in?
6      A.   We were putting on a rally there for
7  Tommy Robinson, and Lisa and I attended the rally and
8  we were just asked to report back on how it went and
9  what happened.
10     Q.   Do you know whether she had met with
11 Danny Thomas during that visit to the UK when you
12 were with her?
13     A.   We met him at the rally.  It was the
14 first time either of us had met him in person and
15 that was the only time we saw him.  We didn't see him
16 again after we left the rally.
17     Q.   Had she already had a relationship with
18 him at that point?
19     A.   No.
20     Q.   Okay.  So that was the first time they
21 met.
22     A.   Correct.
23     Q.   Okay.  And did Lisa then tell you that
24 she had met with him thereafter?
25     A.   Yes.

Page 158

1      Q.   Did she tell you how that -- who
2  initiated that contact, did she call him or did he
3  call her?
4      A.   They were working on another rally
5  together I believe.
6      Q.   In the UK?
7      A.   Correct.
8      Q.   Now, as I understand it during that
9  visit to the UK for that rally MEF paid for half your
10 plane tickets.
11     A.   The one that Lisa and I attended.
12     Q.   Yeah.  And who arranged for that?
13 Gregg?
14     A.   Lisa and Gregg I believe.
15     Q.   Okay.  And -- I'll come back to that.
16          MR. GOLD:  Let's go to Exhibit 4.
17          THE COURT REPORTER:  Excuse me.
18     Mr. Carson, do you mind muting, please?
19          MR. CARSON:  Yeah.  Sorry.  I
20     thought I was on mute.  Sorry about
21     that.
22 BY MR. GOLD:
23     Q.   Okay.  So I think we've exhausted the
24 conversations that Lisa had with Matt Bennett where
25 Bennett told her that Gregg was -- Gregg told Marnie

Page 159

1  to watch her.  Did you have any kind of relationship
2  with Matt Bennett?
3      A.   Just working together.
4      Q.   Did you ever register any complaints
5  about your interactions with Matt Bennett with Daniel
6  Pipes?
7      A.   I didn't, no.
8      Q.   Did you ever register any complaints
9  about the relationship you had with Matt Bennett
10 prior to leaving MEF?
11     A.   I didn't, no.
12          MR. GOLD:  Let's go to Exhibit 5.
13          Can you hold on a second?
14          (Pause in proceedings.)
15          MR. GOLD:  Sorry about that.  Can
16     you hear me?
17          THE WITNESS:  Uh-huh.
18 BY MR. GOLD:
19     Q.   Okay.  Why don't you read through this
20 --
21          MR. GOLD:  Scroll through this,
22     Matt.
23          THE WITNESS:  Okay.
24 BY MR. GOLD:
25     Q.   In this particular e-mail Lisa -- this

Page 160

1  is again a text conversation between you -- a chain
2  of text messages between you and Lisa, correct?
3      A.   Uh-huh.  Yes.
4      Q.   And she seems to be pretty happy that
5  Gregg told her that she was on top of her shit, so
6  that was I guess a compliment of sorts that Gregg
7  gave to Lisa?
8      A.   Yes, a rarity.
9      Q.   Okay.  And that would be in February of
10 2018, correct?
11     A.   Correct.
12     Q.   Do you know why he complimented her on
13 her work at that point in time?  Was there a project
14 she was working on or something she was planning?
15     A.   I don't know.
16     Q.   What was her job, by the way, Lisa's
17 job at MEF?
18     A.   She was the executive liaison and then
19 the director of communications.
20     Q.   Okay.  So in February of '18 was she
21 already director of communications, do you know?
22     A.   No, she was not.
23     Q.   Not yet.  So when you say liaison,
24 liaison -- what does that mean, what did you
25 understand her job to be?

Page 161

1      A.   She was an executive assistant to
2  Daniel and Gregg basically, to Gregg.
3      Q.   Okay.  Okay.  Was she there when you --
4  when you were hired, she had already been working
5  there, I take it, or did she come on afterward?
6      A.   We started at the same time.
7      Q.   Okay.  And you had --
8      A.   I think she started a week ahead of me.
9      Q.   Okay.  Got it.  And --
10         MR. GOLD:  Can you go to Exhibit
11 6?
12 BY MR. GOLD:
13     Q.   In that text exchange she states she's
14 totally ignoring calls from Gregg, as these calls
15 were after work hours I assume, meaning after 5:00.
16 Did Gregg ever call you after work hours for -- on
17 MEF business?
18     A.   Yes.
19     Q.   And you -- I think you testified
20 earlier that there were flex hours, so it really
21 didn't matter when Gregg would call you, whether it
22 was before 5 or after 5, correct?
23     A.   Well, we had flex hours, but it was
24 still -- we were expected to work an eight-hour day,
25 it was just if you wanted to come in at 7:30 and

Page 162

1  leave at 3:30 instead of coming in 9 to 5, you could.
2      Q.   Okay.
3      A.   It wasn't a free-for-all 24-hour day.
4      Q.   Okay.  But you -- I'm sure you've
5  worked jobs where your boss called you after you left
6  the office, correct?
7      A.   No, not really.
8      Q.   So your -- so even though this is the
9  job you wanted for life, you were resentful if
10 somebody called you after 5:00 at night?
11     A.   He would call at like 10:00 at night.
12 It felt very inappropriate, yes.
13     Q.   And when did he call you at 10:00 at
14 night?
15     A.   It happened on multiple occasions.
16     Q.   And what did he talk about?  Work?
17     A.   Yeah, sometimes it would be work,
18 sometimes it would be about where we would be working
19 the next day or that week.
20     Q.   So did you tell Gregg do not call me
21 after 5:00 anymore, I don't want anybody bothering me
22 after I leave the office?
23     A.   Yeah, I mean it was discussed within
24 the office.
25     Q.   About not getting calls after hours?

Page 163

1      A.   Yes, and even put into place where he
2  wasn't allowed to call us past 5:00 later.
3      Q.   Is that when he was -- when he was out
4  of the office from November to March?
5      A.   Correct.
6      Q.   Okay.  Well, before that did you ever
7  register a complaint with Daniel or Marnie that you
8  thought Gregg was calling you after hours and that
9  you wanted him to stop calling you after hours even
10 if he had a legitimate question about work?
11     A.   I told Matt.
12         MR. CARSON:  I'm just -- I'm going
13 to just object to the form of the
14 question.
15 BY MR. GOLD:
16     Q.   What did --
17         MR. CARSON:  Before the complaint
18 you want to know if she complained?
19 BY MR. GOLD:
20     Q.   Yeah, did you ever call Matt -- you
21 ever call Daniel Pipes and say Gregg's calling me at
22 10:00 at night to talk about work, I don't want
23 anybody calling me after I leave the office?
24         MR. CARSON:  Objection.  Asked and
25 answered.

Page 164

BY MR. GOLD:

Q.    You said you told Matt that, correct?

A.    I told Matt that I felt it was inappropriate to be calling on things that weren't time sensitive, weren't -- I wasn't a I need to know this now, it was just calling at odd hours very late asking what you're doing in your personal life, and then if it was something work related, it was something that could have been sent in an e-mail or talked about the next day.

Q.    So why didn't you just tell Gregg don't call me anymore?

A.    Because it's hard to tell the head of the office who has the power to --

Q.    Oh, please.

A.    -- to fire you at will.

Q.    But you -- you loved this job, you were going to stay there until you dropped dead.  Why couldn't you tell Gregg, hey, do me a favor, Gregg, I want to stay here, I love working here, just don't call me after 5:00, don't call me at 10:00, it disrupts my sleep, it disrupts my free time; if it can wait until tomorrow, call me tomorrow; are you telling me you were afraid to tell him that?

MR. CARSON:  I'm going to object

Page 165

to the form of that -- wait, don't answer the question.  I'm going to object to the form of the question.

BY MR. GOLD:

Q.    Go ahead.  You can answer.

MR. CARSON:  You can answer, but, you know, listen to the question.

THE WITNESS:  I'm sorry, can you repeat the question?

BY MR. GOLD:

Q.    I said you loved this job, you wanted to work there until you dropped dead, but you were afraid to tell Gregg don't call me after 5:00 because it's annoying to me and I don't like it, it's inconvenient for me, we can talk about it tomorrow.

A.    I never said I wanted to work there until I dropped dead.

Q.    Well, hypothetically, at least until you're 70, right?  You were going to work there until you were 70 years old, 80 years old?

A.    I don't know if --

MR. CARSON:  I'm going to object.

BY MR. GOLD:

Q.    65 years old?

MR. CARSON:  I'm going to object.

Page 166

I don't even know if these are questions anymore, but objection to the extent it's a question.

BY MR. GOLD:

Q.    You said you wanted to work there until you retired, correct?

A.    I said that I wanted to work there for an extended period of time, I thought it would be a substantial amount of time, yes, I don't know if it would be --

Q.    Okay.

A.    -- the last job I ever had.

Q.    Ten, twenty years?

A.    Ten years would have been --

Q.    Okay, so ten years, and yet here is Gregg, the director of the organization, calling you in the evening, which annoyed you, okay, even though you loved this job, you were, what, afraid to tell him not to call you at those hours?

A.    Yeah, because he did a lot of other --

MR. CARSON:  Objection.  Form.

BY MR. GOLD:

Q.    Go ahead, answer.

MR. CARSON:  Go ahead.  You can answer.

Page 167

THE WITNESS:  He did a lot of other things, too, along with it, it wasn't just the phone calls, but, I mean, during that time he was making me feel uncomfortable in -- making a lot of people feel uncomfortable in an array of ways and making us feel like if you said anything or did anything, just like Tiffany Lee, we would -- we would be gone.

BY MR. GOLD:

Q.    But meanwhile you knew what happened, quote, with, quote, Tiffany Lee, and you knew about him making you feel uncomfortable, and notwithstanding all of that, you wanted to work there for at least ten more years.

MR. CARSON:  Objection.  Is that even a question?

MR. GOLD:  That's a question.

BY MR. GOLD:

Q.    Is it not a fact that notwithstanding, quote, what happened to Tiffany Lee, which you heard from some third party, and notwithstanding the fact that he would call you after hours, and notwithstanding the fact that you were told not to

Deposition of Patricia McNulty                                    Lisa Barbounis v. Middle Eastern Forum, et. al.

Page 168

1  make any complaints to anybody other than Gregg, you
2  would have liked to stay there for ten more years.
3          MR. CARSON:  Objection.  Asked and
4      answered.
5  BY MR. GOLD:
6      Q.    Yes or no?
7          MR. CARSON:  Lack of foundation.
8  BY MR. GOLD:
9      Q.    Yes or no?
10         MR. CARSON:  It wasn't some third
11     party; it was a direct supervisor.
12         MR. GOLD:  It's a third -- it's
13     not -- it wasn't from Tiffany Lee.  It's
14     a third party.  Answer is yes or no.
15         MR. CARSON:  Not a third party.
16     And if we're going -- as long as we're
17     going to lay out all the facts of things
18     that happened before --
19         MR. GOLD:  Listen, Seth, I don't
20     need to have any talking -- speaking
21     objections.  You did that with Jon this
22     morning.  I don't have the patience for
23     it today.  The answer is yes or no.
24         MR. CARSON:  What's the question?
25         MR. GOLD:  The question is,

Page 169

1  notwithstanding all of her woes and
2  tales of woes and all the inhibition she
3  had about working at MEF, she wanted to
4  stay there for at least ten more years;
5  is that not a fact, ma'am?
6          MR. CARSON:  Objection.  That's
7      not her testimony.  She testified --
8          MR. GOLD:  Then say no.
9          MR. CARSON:  -- that she loved her
10     work --
11         MR. GOLD:  Let her answer the
12     question.
13         MR. CARSON:  Yeah, you can answer
14     the question.  Is it yes or no?
15         THE WITNESS:  Matt had also told
16     us that there was a different plan for
17     how MEF would be going forward.  Daniel
18     was supposed to be retiring --
19  BY MR. GOLD:
20     Q.    Ma'am, that's --
21     A.    -- and Gregg would be --
22     Q.    Not responding to --
23     A.    -- out of the office --
24     Q.    You're not responding --
25         MR. CARSON:  Are we going to let

Page 170

1  her finish?
2  BY MR. GOLD:
3      Q.    -- to my question, ma'am.  Yes or no,
4  then you can explain your answer.
5          MR. CARSON:  Well, you can answer
6      however you feel --
7          THE WITNESS:  I am answering.
8          MR. CARSON:  -- is appropriate.
9          THE WITNESS:  I am answering, but
10     I have to explain that Matt had told us
11     that Daniel -- and Daniel had told us
12     that he was planning on retiring that --
13     in 2019 and that Gregg would then be
14     taking over and he would be off
15     traveling the world and writing and he
16     wouldn't be in charge of the office
17     anymore, it wouldn't be him directly
18     supervising us, and that there was a
19     different plan going forward, and so
20     there was some sort of light at the end
21     of the tunnel where this job wouldn't
22     include Gregg being in the office and
23     Gregg being the one to tell us whether
24     what we were doing was crap or if we
25     were going to the bathroom too much or

Page 171

1  hovering over us taking phone calls, all
2  of that would be gone.
3  BY MR. GOLD:
4      Q.    I'm going to -- okay.  When you left
5  there, okay -- when did you stop loving your job?
6  When you left?
7      A.    Before I left.
8      Q.    Before you left.  Give me a precise
9  date when you woke up one day and said I hate this
10 job, I want to leave.
11     A.    I mean, I -- I knew I had to leave.
12     Q.    When?
13     A.    In the spring of 2019.
14     Q.    And you left.
15     A.    In the fall, yes.
16     Q.    Okay.  So -- and that's because, as we
17 know, you had a job already lined up, correct?
18     A.    I wasn't going to leave until I had a
19 job, but yes.
20     Q.    Well, why didn't you leave immediately
21 when you realized you didn't like it there anymore,
22 why didn't you just pick yourself up and leave?
23     A.    Because I have bills to pay.
24     Q.    Okay.  Well, we all have bills to pay.
25 That didn't change.

Page 172

A.   I don't see how what you're saying --

Q.   So when did you realize that Daniel Pipes was not going to retire and Gregg wasn't going to be flying around the world writing, you know, for MEF and not being in the office -- when did that -- when did you have that awakening that that was not going to happen?

A.   In November of 2018 when we went -- when Daniel --

MR. CARSON:  Yeah, also -- the other thing, too, is -- let's stop for a second because --

MR. GOLD:  You're interrupting the answer.

MR. CARSON:  Yeah, no, I'm -- no, because I was on mute when I started my objection, correct, I'm interrupting the answer.

MR. GOLD:  Go ahead.

MR. CARSON:  Her answer -- it's subject to the following objections. So, first of all, we're going to not ask questions like this anymore.  You're just not.  Or else I'm going to start instructing her not to answer them.  All

Page 173

right?  So stop characterizing her previous testimony with words like "when did you have this awakening."  These questions are designed -- are argumentative, they're designed to embarrass and harass, and she's not going to answer them.  So stop.

MR. GOLD:  I think you need to take a course in advocacy, Mr. Carson. This is a deposition.

MR. CARSON:  Okay.

MR. GOLD:  It's a deposition.

MR. CARSON:  Well, maybe --

MR. GOLD:  I get to ask the questions.

MR. CARSON:  -- maybe you need to practice for another 20 years, Mr. Gold, because --

MR. GOLD:  You get to make the objection.

MR. CARSON:  -- you're not going to ask her questions.  All right?

THE COURT REPORTER:  I can't hear both of you.

MR. CARSON:  You're not going to

Page 174

ask her any questions anymore.

MR. GOLD:  Are we done?

MR. CARSON:  We're going to take -- we're going to take -- yeah, we're going to take a 20-minute break.  Okay? So we'll see you guys in 20 minutes.

MR. GOLD:  Okay, good.

MR. CARSON:  Thank you.

THE VIDEO SPECIALIST:  Off the record.

MR. GOLD:  And do not talk to the witness.

(A brief recess was taken from 1:41 p.m. to 2:10 p.m.)

THE VIDEO SPECIALIST:  The time is 2:10 p.m. Eastern.  We are now back on the record.

MR. GOLD:  Is the witness back as well?  Seth?  Seth?

MR. CARSON:  Yeah, I think she's here.

Patricia, you got to speak up.

MR. CAVALIER:  She's on mute.

THE COURT REPORTER:  Yeah, it looks like it's muted.

Page 175

MR. GOLD:  Are we back?

MR. CARSON:  Patricia, are you there?

THE VIDEO SPECIALIST:  Should we go off the record real quick?

MR. GOLD:  Yeah, give her a call, yeah, sure.

THE VIDEO SPECIALIST:  Off the record.

(A brief recess was taken from 2:10 p.m. to 2:17 p.m.)

BY MR. GOLD:

Q.   I just have a couple quick follow-up questions on those phone calls from Gregg.  Can you hear me?

A.   Yes, now I can.

Q.   Do you recall -- if I'm not mistaken, you were on salary, correct?  You didn't get paid by the hour, correct?

THE VIDEO SPECIALIST:  Mr. Gold?

MR. GOLD:  Yeah.

THE VIDEO SPECIALIST:  I want to make sure we are now on the record.

MR. GOLD:  I'm sorry, go ahead.

THE WITNESS:  I'm sorry, what was

Deposition of Patricia McNulty                                  Lisa Barbounis v. Middle Eastern Forum, et. al.

Page 176

1  the question?
2  BY MR. GOLD:
3      Q.    When you were working for MEF you were
4  an exempt employee, correct?
5      A.    I was a salary employee.
6      Q.    Salary employee, and you weren't -- so
7  therefore you weren't paid by the hours, correct?
8      A.    Correct.
9      Q.    And you understand the job could
10 require you to work more than 40 hours a week,
11 correct?
12     A.    Correct.
13     Q.    Okay.  Do you recall that Gregg may
14 have called you when he was in a different time zone
15 perhaps, whether it be California, Israel, wherever,
16 were there occasions when he called you from out of
17 the country?
18     A.    It's possible.  I don't remember.
19     Q.    All right.
20         MR. GOLD:  Could you please put up
21     exhibit -- I guess we're up to Exhibit 7.
22 BY MR. GOLD:
23     Q.    There's a reference there to a Mr. --
24 is Eman a first name or a last name of this employee?
25     A.    Eman.  She's a female.

Page 177

1      Q.    Is that his first name?
2      A.    Her first name that was used there.
3      Q.    What's -- is it a she or a he?
4      A.    A she.
5      Q.    Okay.  What was her second name, her
6  maiden name or surname?
7      A.    Eman Patel was the name she used at
8  MEF.
9      Q.    Eman Patel.  That's right.  Okay.  Got
10 it.
11         So it says Eman was crying in the
12 office today and laid the blame on Daniel Pipes.
13 Lisa sends you that in an e-mail.  Do you know much
14 about that issue when it occurred?
15     A.    I read "Eman was crying in my office
16 today."
17     Q.    And that was from Lisa to you?
18     A.    Yes.
19     Q.    Okay.  Do you know -- and this is
20 because of some interaction that she had with Daniel
21 Pipes?
22     A.    I guess.  I don't remember.
23     Q.    Do you know if the -- what it was
24 about, do you have any recollection of what it was
25 about?

Page 178

1      A.    I don't remember.
2      Q.    Okay.  Do you know -- was this just an
3  isolated event here or was this something that Eman
4  couldn't get along with Daniel Pipes or couldn't get
5  along with certain people that worked at MEF?  Do you
6  have any recollection?
7      A.    Well, Eman was -- was the one that
8  Daniel had admitted to us that -- that they had tried
9  to make quit by making so uncomfortable.  So, yeah,
10 there was definitely daily things that were
11 constantly happening.
12     Q.    Daniel Pipes told you that?
13     A.    Daniel told us when we were in the
14 conference room all together, yes, that he had given
15 Gregg the authority to make her feel so uncomfortable
16 that she would leave.
17     Q.    Okay.  And do you know why he -- why --
18 what was the motivation for that, if you know?
19     A.    I know they didn't want her working
20 there anymore and she was the one that they said was
21 a walking liability because she was a female, gay,
22 and Muslim.
23     Q.    And who made that statement?
24     A.    We were told that Gregg and Daniel had
25 both, Matt had told us that --

Page 179

1      Q.    Matt -- Matt again, no -- but no
2  firsthand knowledge; you heard this from Matt.
3         MR. CARSON:  Is that a question or
4      are you just now commenting on her
5      testimony --
6  BY MR. GOLD:
7      Q.    You said you heard that from Matt,
8  correct?
9         MR. CARSON:  You heard her
10     testimony.  She just testified Matt
11     said.
12         MR. GOLD:  I want to be sure.
13 BY MR. GOLD:
14     Q.    And Matt told you that, correct?
15         MR. CARSON:  Just comment on her
16     testimony -- every time she says
17     something you're going to pretend like
18     --
19         MR. GOLD:  I'm going to be a
20     ventriloquist --
21         THE COURT REPORTER:  I can't hear
22     you.  You're talking at the same time.
23         MR. CARSON:  Yeah, I'm going to --
24         MR. GOLD:  Let's move on.
25 BY MR. GOLD:

Page 180

1    Q.   Was that comment made --
2         MR. CARSON:  I'm going to instruct
3    counsel --
4    BY MR. GOLD:
5    Q.   Was that comment made --
6         MR. CARSON:  I'm going to instruct
7    counsel -- all right.  When you're done
8    I'll put my instruction on the record.
9    BY MR. GOLD:
10   Q.   Was that comment made while Daniel
11   Pipes and Gregg were in the room?
12        MR. CARSON:  I'm going to instruct
13   counsel to discontinue commenting on the
14   testimony.  Stop saying "okay" --
15        MR. GOLD:  How about if you go to
16   a mirror and direct yourself to do the
17   same thing.
18        THE COURT REPORTER:  I can't -- I
19   didn't hear you.  I didn't hear you,
20   Mr. Gold.
21        MR. CARSON:  Stop saying the words
22   "okay" after she says something, stop --
23        MR. GOLD:  I'll do whatever I
24   please --
25        MR. CARSON:  -- stop making

Page 181

1    comments --
2         MR. GOLD:  I'll do whatever I
3    please.
4         MR. CARSON:  Discontinue all --
5         MR. GOLD:  Let's move along.  All
6    right?
7         MR. CARSON:  No, you won't.  No,
8    you won't.
9         MR. GOLD:  Are you done?
10        MR. CARSON:  If it happens again
11   -- if it happens again, I'll point it
12   out again.  If it continues to happen, I
13   guess we'll stop the deposition and
14   we'll deal with it.
15        MR. GOLD:  Do whatever you want.
16   Okay?
17        MR. CARSON:  I will.
18   BY MR. GOLD:
19   Q.   My question is -- my question is this,
20   ma'am.  I'm going to move on.  My question -- was
21   Gregg Roman in the room when Daniel Pipes told you
22   that they wanted to get rid of Eman?
23   A.   I don't think he was.
24   Q.   Okay.  And this conversation that you
25   had with Matt, was -- did -- was Gregg Roman in the

Page 182

1    room or was Daniel Pipes in the room?
2    A.   No, I don't think so.
3    Q.   And when did you have that conversation
4    with Matt?
5    A.   I don't remember exactly when it was.
6    Q.   Was it before November 18th or after
7    November 18th, 2018?
8    A.   Before.
9    Q.   So this would have been early on in
10   your employment, I take it?
11   A.   Yes.
12   Q.   Okay.  Because this e-mail is dated
13   February 28th, 2018.  Did Eman eventually leave the
14   office?
15   A.   Sorry, what was that?
16   Q.   Was Eman still employed at MEF when you
17   departed?
18   A.   No.
19   Q.   Do you know when she left?
20   A.   I don't remember exactly when it was.
21   Q.   Was it in 2018 or 2019, if you can
22   recall?
23   A.   It was in 2018.
24   Q.   Okay.  Were you friendly with her?
25   A.   Yes.

Page 183

1    Q.   And after Eman left is that when you
2    took your -- you became a -- is that whose position
3    you took over when -- after she left?
4    A.   No.
5    Q.   Okay.  What was her title when she
6    left?
7    A.   She was communications.  I don't know
8    what the exact title was.
9    Q.   Okay.  So she had the same title as --
10   what was -- and your title again?  I'm sorry, you
11   were program director?
12   A.   Yes.
13   Q.   So who -- did anyone assume her
14   responsibilities after she left?
15   A.   No, not that I know of.
16   Q.   Okay.  All right.  Were you -- what was
17   your relationship like with Eman?  I mean, did you
18   ever -- any -- have any conversations with her about
19   her -- during her tenure at MEF?
20   A.   Mostly about work, not much outside of
21   work, just general pleasantries.  We were -- we
22   weren't close, but we were friendly.
23   Q.   Didn't she train you when you were
24   first hired?
25   A.   There wasn't much training involved,

Deposition of Patricia McNulty                          Lisa Barbounis v. Middle Eastern Forum, et. al.

Page 184

1  but she probably for the first day or two told me how
2  she did things.
3      Q.    And at that point she -- so after she
4  left in -- as I understand it, her job title was
5  program director, so who became the program director
6  after --
7      A.    That was my job.
8      Q.    Okay.  So --
9      A.    Before she left.
10     Q.    Before she left.
11     A.    That was not her job when she was there
12 when I was there.
13     Q.    Okay.  So you became the program
14 director after she, quote, had some minimal training
15 with you?
16     A.    I came into MEF with that role.  She
17 had previously done it before me.  She was taking on
18 a new role.  She told --
19     Q.    What role was that?
20     A.    In communications.
21     Q.    Okay.  So she would be into -- moving
22 into -- as director or just a role in communications?
23     A.    Again, I don't remember what the exact
24 title was that she had.
25         MR. GOLD:  Okay.  Let's move on to

Page 185

1      Exhibit 18.  I'm sorry, Exhibit 8.
2  BY MR. GOLD:
3      Q.    One last point.  Did Eman ever tell you
4  why she was leaving MEF?
5      A.    She had told us, you know, for -- since
6  she got there that she was very unhappy with the work
7  environment and the constant monitoring and the way
8  she was treated there.
9      Q.    And do you remember any details about
10 how she was treated?
11     A.    I know she was -- Gregg made comments
12 about her having to take too many doctors
13 appointments and taking time away from the job for
14 those doctors appointments.  He would count how many
15 times she went to the bathroom.  She was just very --
16 felt very unhappy with how she was treated.
17     Q.    When did you have that conversation
18 with her?
19     A.    While she was still there, she
20 mentioned it a couple times, I'm not sure of the
21 exact dates.
22     Q.    Do you know if she left before November
23 2018 or thereafter?
24     A.    She left before.
25     Q.    Okay.  Do you know whether she tendered

Page 186

1  her resignation or what the reason she gave for
2  resigning?
3      A.    I don't know what reason she gave them.
4      Q.    Have you -- did you speak to her after
5  she left MEF?
6      A.    Not about work or MEF.
7      Q.    What about?
8      A.    I've talked to her about food posts she
9  has, she cooks, food.
10     Q.    Okay.
11     A.    Just --
12     Q.    Where is she working -- do you know
13 where she's working now?
14     A.    I don't, no.
15     Q.    Okay.
16         MR. GOLD:  All right.  Let's go to
17     Exhibit 8.
18 BY MR. GOLD:
19     Q.    And if you would be kind enough to just
20 read through that.  These are an exchange of text
21 messages that occurred in March of 2018 and this is
22 while Lisa was on a trip to Israel with Gregg.
23     A.    Okay.
24     Q.    And she's complaining that she can't
25 post on social media while she's there.

Page 187

1      Did you have any more conversations or
2  did you exchange any further messages with Lisa about
3  why she -- Gregg had told her she couldn't post on
4  social media while she was in Israel?
5      A.    Well, he had already told us that we
6  weren't supposed to -- Daniel wasn't supposed to know
7  that Lisa went with him, so --
8      Q.    Right.
9      A.    -- we weren't supposed to tell anybody,
10 so I assume that's why she couldn't post on social
11 media, because no one was supposed to know.
12     Q.    Couldn't be for security reasons that
13 MEF had, no posting while they were in a foreign
14 country?
15     A.    I was never told that, so I can't speak
16 to that.
17     Q.    But you never went on a trip with Gregg
18 to Israel of course, right?
19     A.    I didn't, but I went abroad.
20     Q.    You went to UK.
21     A.    Correct.
22     Q.    Was Gregg there on that trip?
23     A.    He was not.
24     Q.    Okay.  Anyway, as far as -- this trip
25 was to Israel, and you don't recall anything --

Page 188

1 anything in the handbook or policy of MEF that spoke
2 to the issue of posting things on social media and
3 the possibility that it could result in security
4 threats against employees or MEF in general?
5    A.    If it pertains to MEF, but if you're
6 just posting a picture that you're traveling
7 somewhere, that has nothing to do with MEF.
8    Q.    Well, if the terrorists knew where you
9 were at the time, that would have a lot to do with
10 MEF.
11    A.    So with that rational thinking, you
12 could never post where you are ever in life.
13    Q.    No, only -- I'm saying if you're in
14 Israel.
15    A.    Why only in Israel?
16    Q.    Well, because that's where -- there's a
17 good possibility of terrorism happening more likely
18 in Israel than in the United States.
19    A.    We have terrorist --
20       MR. CARSON:  I'm going to object
21 to form, argumentative.  Comical
22 overall.
23       Go ahead.  You can answer.
24       MR. GOLD:  I'm just asking her
25 questions, that's all.

Page 189

1       THE WITNESS:  I don't agree with
2 the reasoning there, but --
3 BY MR. GOLD:
4    Q.    Okay.  So you don't recall anything in
5 the policies of MEF that spoke to the issue of
6 posting on social media while you were out of the
7 country or in Israel.
8    A.    No.
9    Q.    Okay.  All right.  Do you know whether
10 Gregg ever posted on social media when he was in
11 Israel?
12    A.    I don't know any of Gregg's social
13 media, so no.
14    Q.    Okay.  And do you know why she -- why
15 Lisa was upset that she couldn't post on social
16 media?
17    A.    I think she just wanted to share a nice
18 place that she was traveling, that she was traveling,
19 nothing to do with work.
20    Q.    Yeah, but obviously she was there on
21 work, correct?
22    A.    She was there on work, but she also had
23 downtime to herself.
24    Q.    Okay.  But you would agree, though, if
25 a company or business had security reasons for not

Page 190

1 wanting their employees to post on social media when
2 they were out of the country, that would be a
3 legitimate concern?
4       MR. CARSON:  I'm going to object.
5 It's assuming facts not in evidence.
6 There's been no -- like, zero evidence
7 that these pretend security protocols
8 even exist, but -- so if we're going to
9 ask questions on pretend security
10 protocols, as long as everyone's aware
11 that that's what --
12       MR. GOLD:  Okay.  I'm going to
13 move on -- I'm going to move on anyway.
14 Let's go to Exhibit 9.
15 BY MR. GOLD:
16    Q.    It says:  Gregg has me working like a
17 dog.  It's so hard to work with the kids.
18       Did Lisa at times register complaints
19 with you about how hard she was working for MEF?
20    A.    She didn't regularly register
21 complaints about how -- she would mention that she
22 was doing a lot of work, like something like that,
23 nothing out of the ordinary.
24    Q.    She was overworked, is that what she
25 would tell you?

Page 191

1    A.    I don't ever remember her telling me
2 she was overworked.
3    Q.    Okay.  She writes to you:  Gregg has me
4 working like a dog.  It's so hard to work with the
5 kids.
6       And you respond:  Ugh, I can't even
7 imagine.  I was plowing through work this morning,
8 now I'm ready for a lunch break.
9       So it seems like you were working
10 pretty hard as well, correct?
11    A.    Correct.
12    Q.    And would you agree that there was a
13 heavy workload while you and Lisa were working at
14 MEF?
15    A.    I would agree that we worked hard,
16 yeah.
17    Q.    Okay.  And you don't think you were
18 singled out for heavy workload because of your
19 gender, do you?
20    A.    For workload?
21    Q.    Yeah --
22    A.    No.
23    Q.    -- do you think you were -- okay.
24       MR. GOLD:  Let's go to the next
25 exhibit.

Page 192

BY MR. GOLD:

Q.    Moving along to March 29th, 2018:
Marnie is assigning me a million things.  Didn't
Gregg leave for Florida?  She is in boss mode.

You write back:  Total.  But don't even
worry about it or look at it yet.  Bog stuff, she has
taken the reigns, and she's definitely a delegator
not a doer.

What does bog stuff mean?

A.    Board of governors.

Q.    Okay.  Got it.  Okay.  So it's another
exchange of text messages where Lisa is complaining
about the amount of work she has from Marnie?

MR. CARSON:  Objection.

You can answer.

THE WITNESS:  I think she might
have been on vacation during that time.

BY MR. GOLD:

Q.    Okay.  So Marnie assigning her work
while she's out of the office on vacation?

A.    I believe Lisa was away when we started
working on that.

Q.    What was it that you were working on,
if you can recall?

A.    The board of governors meeting.

Page 193

Q.    When does that usually take place?

A.    I think that one was in -- I don't
remember.  They're twice a year, but they're not
always the -- it depends on their travel schedules.

Q.    And where does that generally take
place at?

A.    New York, and then I think there is one
in Philadelphia too.

Q.    Did you -- would you be attending that
event or --

A.    No, I did not attend that.

Q.    Would Lisa be attending that event?

A.    No.

Q.    No.  What exactly happens at a board of
governors meeting?

A.    I've never attended one and I don't see
what they -- or hear about what exactly they talk
about.  I just know the general financials and
discussing what MEF has done throughout the year,
things like that, but I don't know the specifics.

Q.    Do you know the nature of the work that
Marnie was assigning to Lisa at the time?

A.    I'm not sure.

Q.    Okay.  It's clear to me from these text
messages that Marnie would act like she was a boss

Page 194

over Lisa, was that Lisa's impression?

A.    Yeah, that she was -- they were
characteristics, yes.

Q.    And, in fact, was Marnie Lisa's boss?

A.    No.

Q.    No.  Who was her boss, if she had a
boss at all?

A.    Gregg.

Q.    And I thought you said, though, that --
ultimately who ran the office?  Daniel Pipes?

A.    No, Gregg.

Q.    Gregg ran the office -- he was -- he
had more power than Daniel Pipes?

A.    As far as we knew in the office, yes.

Q.    And when you say as far as we knew, how
would you know that?

A.    Because Gregg was the one who was
telling us where orders were coming from, what was to
be done, when it was to be done.  Daniel had no parts
in that.  We rarely spoke to Daniel.

Q.    When you say he told us where the
orders were coming from, where were they coming from?

A.    Him.

Q.    Okay.  So he made it clear that when he
asked things to be done by him they were -- the

Page 195

orders were coming from him.

A.    Correct.

Q.    Correct?  And he was the director,
correct?

A.    Correct.

Q.    Okay.  So in terms of this board of
governors meeting, what was Marnie's role in that
meeting?

A.    As far as I remember, she was supposed
to be getting -- she had to attend the meeting to
discuss financials I believe because she did the
accounting, so she was helping to just get documents
together.

Q.    Okay.  So she not only was HR, she was
also part of the financial aspect of the -- of MEF?

A.    Correct.

Q.    Did she have a title that went along
with that?

A.    I'm not sure what it was at -- I think
-- I'm not sure what her title was at the -- that
pertained to the finance portion, what the exact
title was.

Q.    And did Marnie eventually separate from
MEF?

A.    I haven't talked to Marnie since I left

Page 196

1 there, so I'm not sure.
2    Q.   Who have you spoken with from MEF since
3 you left?  I know you talked to Matt, right?  Matt
4 Bennett?
5    A.   No, I have not talked to Matt Bennett
6 since I left.
7    Q.   Oh, you have not.  Okay.  Who have you
8 spoken with since you left?
9    A.   I've talked to Lisa, I've spoken to
10 Delaney, and I think that might be it.  I think
11 that's it since I left.
12         MR. GOLD:  Let's go to Exhibit 10.
13 BY MR. GOLD:
14    Q.   Starts off with:  Why do I hate that
15 she is giving me stuff with due dates.
16         Is -- do you know if Lisa was referring
17 to Marnie at the time?
18    A.   Yes.
19    Q.   Okay.  And you write back:  Trust me, I
20 know.  My inbox is flooded with Asana telling her --
21 telling me to do a million things and she always
22 wants to be piling on my plate.  Thankfully Matt
23 understands what I do and at least feels my pain.
24         Again, are you referring to Marnie as
25 well?

Page 197

1    A.   Yes.
2    Q.   Okay.
3         MR. GOLD:  Could you scroll down?
4 BY MR. GOLD:
5    Q.   She says:  I need to be -- I need to
6 look for a new job where I'm not an assistant.  A
7 real policy job.
8         You say:  Don't leave me.
9         She says:  I have had it with note
10 taking and agenda writing.
11         Again, is she referring to Marnie in
12 this text message?
13    A.   No.
14    Q.   Well, you write back:  Don't think
15 about it, the Marnie part is making you hate it more.
16    A.   The work.  She's talking about the work
17 here.
18    Q.   Okay.  But who is the -- she says:  I
19 have had it with note taking and agenda writing.
20    A.   That's what she was doing at the time.
21    Q.   And who gave her that work to do?
22    A.   She would take notes in our development
23 meetings, in -- in all kinds of company meetings for
24 Gregg and -- and the agenda writing was for this
25 event specifically but it was just part of her --

Page 198

1    Q.   Okay.  When you say "the Marnie part is
2 making you hate it more," is it pretty obvious at
3 that point in time Lisa was thinking of leaving MEF?
4    A.   I don't know if she was seriously
5 thinking about leaving at that point.  She really
6 liked the content portion of being in the mission,
7 but I think it was just normal complaining.
8    Q.   Well, she said that -- if you go back
9 to the top of that text message --
10         MR. GOLD:  Can you scroll up?
11         Keep going up.  Some more.  Go back
12         down.
13 BY MR. GOLD:
14    Q.   Didn't she say "I need to look for a
15 new job where I'm not an assistant"?
16    A.   I think that was on the page we were
17 at, down --
18    Q.   Yeah.
19    A.   -- at the bottom.
20    Q.   And then you begged -- you said "don't
21 leave."
22         So you're saying that she wasn't happy
23 but you don't know if she was actually going to
24 leave; is that somewhat accurate?
25    A.   She -- I know that she had always

Page 199

1 talked about with Gregg when she first got hired that
2 she wanted more of a content role and they had
3 discussed that she would start as the executive
4 liaison and then that could transition into more.  I
5 think she was just getting inpatient with getting to
6 the content part because that was her -- what she
7 really liked about the job.
8    Q.   And you would agree, though, she also
9 hated the Marnie part of the job, correct?  You said
10 that.
11    A.   When Marnie was delegating.
12    Q.   Yeah, you said "don't think about it
13 now, the Marnie part is making you hate it more,"
14 correct?
15    A.   Correct, I said that.
16    Q.   Okay.
17         MR. GOLD:  Let's go to Exhibit 11.
18 BY MR. GOLD:
19    Q.   Again she says to you in an exchange of
20 text messages "I'm going to punch Marnie and quit."
21 This is now March 30th, 2018.  Do you believe that
22 she was expressing her frustration with Marnie or
23 again was she just reacting to Marnie's behavior
24 towards her?
25    A.   I think she was just -- but, again, I'm

Page 200

just guessing what she was feeling right now. I
mean, I can tell you guesses.

Q.   Okay.  Well, she -- you have a lot of
contact with her.  I mean, next message, if you move
down, you say:  Is she e-mailing you again?

She says:  She sent me an e-mail asking
for the -- asking for minutes from last year when I
wasn't there and for this year which I didn't do.
Fucking look in the Dropbox bitch.

Are you telling me from that you could
assume she liked working with Marnie?

A.   No, I think she was frustrated at the
time.

Q.   Well, she said she wanted to quit, she
said she wanted to punch Marnie, and now she says --
refers to her as a bitch.

A.   I think she was just frustrated with
the planning of this event in general.

Q.   Okay.  You and her never had any
conversations about -- you know, she never said to
you I want to quit because of Marnie except for what
appears in these text messages.

A.   Not seriously.

Q.   Well, what makes you think she wasn't
serious?

Page 201

A.   Because she would -- it wasn't
something that she continuously talked about.

Q.   Okay.  When did she stop talking about
it?

A.   I don't know exactly.  She would be
fine in a conversation or two.

MR. GOLD:  Okay.  Go down further
in this text message.  Stop.

BY MR. GOLD:

Q.   "I'm actively looking for a new job.  I
hate this type of work anyway."

And you respond:  Don't even worry
about it, it's not needed right this second, or week,
it's needed for the 16th.

MR. GOLD:  Go ahead, scroll down.

BY MR. GOLD:

Q.   She says:  She is in MAJA boss mode.
She sent an e-mail out yesterday about letting her
know when we change schedules and that's cause Matt
didn't come in yesterday and told me but not her.

And you say:  Yeah, stay your ass on
the beach and don't mind her.

Then she writes -- you write:  I know,
she's on a power trip, don't let it get to you.
Somebody get this girl a mimosa.

Page 202

So your observation was that Marnie was
on some kind of a power trip?

A.   Yes.

Q.   What does that mean?

A.   She was leading the project and that's
not something that's normally in her role, so she was
just going a bit overboard with it.

Q.   Okay.  Do you know what the word MAJA
boss means?  Is that -- do you understand what that
--

A.   It's slang for major.

Q.   Okay.  Got it.

MR. GOLD:  Can you scroll down
some more, Matt?

BY MR. GOLD:

Q.   Okay, Exhibit 12.  This one is dated --
now we're into April 2018.  She says:  I was up so
late last night working on this power point,
accidentally deleted it.  I actually cried.  Vasili
tried to get it back it didn't happen.  I'm halfway
done.  It's 6 I'm thinking of ramping up my heart and
taking a trip to the ER to postpone.

What exactly was that about, if you can
recall?

A.   She had a school assignment that got

Page 203

deleted.

Q.   So this wasn't -- this wasn't MEF work?

A.   No, I don't think so.

Q.   Okay.  So what did you think about her
thought of running over to the ER to postpone having
to turn in the work when it had been deleted?

A.   I mean, I thought she was just
exaggerating that part because she was so upset.

Q.   Okay.  Do you know whether she went to
the ER that night?

A.   I don't know.

Q.   You write --

A.   I don't remember.

Q.   You write:  Holy shit.  Oh my God.  How
is it even possible it didn't automatically save, I
would have cried too.  Don't make your heart go
crazy.  You know if a trip to the ER would get you
out of -- get you out of jail -- jail free card you
could just go and say your heart was acting up.

So were you encouraging her to go to
the ER and misrepresent what actually occurred with
whatever paper she was working on?

A.   I wasn't seriously intending that.  I
didn't think that she was even serious when she was
talking about going to the ER.

Page 204

1  Q.   Okay.
2  A.   I was just pointing out the absurdity
3  was ironic.
4  Q.   And she writes back: My heart was
5  insane last night.  I thought I was going to die.
6  Adderall, coffee, anxiety, anger.  That's what gave
7  me the idea.
8       MR. GOLD:  Can you scroll up,
9  Matt?
10 BY MR. GOLD:
11 Q.   So your recollection this had to do
12 with a project for school, not for MEF?
13 A.   I think so.
14 Q.   And you thought she was kidding about
15 faking a certain medical condition to avoid having to
16 turn the paper in on time?
17 A.   Yes.
18 Q.   Okay.  Had she ever done that before,
19 suggested that she would engage in some deceit or
20 misrepresentation as an excuse to not get something
21 in by a certain deadline?
22     MR. CARSON:  Objection.  Assuming
23 facts not in evidence.
24 Mischaracterization of prior testimony.
25 Object to form.

Page 205

1  You can answer.
2       THE WITNESS:  No, and she wasn't
3  being serious in that moment.
4  BY MR. GOLD:
5  Q.   Well, what if she was being serious?
6       MR. CARSON:  Objection.  What do
7  you mean what if she was being serious?
8  BY MR. GOLD:
9  Q.   How do you know she wasn't being
10 serious?  How do you know she was kidding?
11     MR. CARSON:  She just testified
12 that's what she -- that's what --
13 BY MR. GOLD:
14 Q.   So your perception she was kidding and
15 she wasn't going to do that, correct?
16     MR. CARSON:  Objection.  Asked and
17 answered.
18 BY MR. GOLD:
19 Q.   Okay.  Had you ever --
20     MR. CARSON:  The other thing, too,
21 is that you guys already asked her
22 questions about --
23     MR. GOLD:  I have another
24 question.
25 BY MR. GOLD:

Page 206

1  Q.   My question is, in your interactions
2  with her while you were working at MEF had she ever
3  engaged in any acts of deception or
4  misrepresentation?
5  A.   Not that I can think of.
6  Q.   Okay.
7       MR. GOLD:  Let's go to the next
8  exhibit then, Exhibit 13.
9       THE WITNESS:  Okay.
10 BY MR. GOLD:
11 Q.   Okay.  Was there a point in time when
12 Lisa sent someone a text message and represented it
13 was actually coming from her husband, Vasili?
14 A.   I don't know.
15 Q.   Okay.  I'll come back to that.  You
16 don't know of any such situation where that occurred.
17 A.   Not that I remember.
18 Q.   We'll get to that.
19 Okay.  Exhibit 13.  She says:  I want
20 to kill Gregg.  Are you up?
21 Now we're at -- what time -- this is in
22 the early morning on May 4th, 2018?
23 A.   Okay.
24 Q.   What time did -- what time was it when
25 you got that text message?

Page 207

1  A.   Looks like almost 2 a.m. from this.
2  Q.   Okay.  And I guess you were awake.  You
3  responded:  Yeah, what's he doing.
4  And then you say:  You only had one.
5  I'm sorry.
6  What does that mean?
7  A.   I'm not sure.
8  Q.   Okay.  And then she comes back -- "I'm
9  going to kill him."
10     MR. GOLD:  Go ahead -- can you
11 scroll up?  Yeah.
12 BY MR. GOLD:
13 Q.   "What I have on my plate this week,"
14 and she gives you a rundown of what she has to do.
15 "I'm genuinely frustrated.  This is exactly what
16 we're talking about in meeting.  How would I have
17 ever" -- "how would I ever know you wanted all of
18 that by tomorrow?  It's like you push people to
19 'grow' but you give them no guidance and get mad when
20 they don't deliver or meet your expectations."
21 Is she referring to Gregg in that text
22 message?
23 A.   Yes.
24 Q.   Okay.  And --
25     MR. GOLD:  Keep scrolling down.

Page 208

BY MR. GOLD:

Q.   You say:  Are you okay?

"I'm better.  I need to do this paper and not kill Marnie."

Is this the paper we were talking about before for school or is this another paper?

A.   I'm not sure.

Q.   Okay.  And then you say:  When she comes in here in the mornings, she goes around to see who's here.  I want to kill her.  Do your paper, don't think about these mongrels.

Are you referring to Marnie in that text?

A.   And Gregg.

Q.   Well, you say "when she comes in here," so you're talking -- when you say Gregg, you mean what, the mongrel?

A.   Yes.

Q.   Who else?

A.   Who else what?

Q.   You say -- it's plural, so what other mongrels were there?

A.   Marnie and Gregg.

Q.   Just the two of them.  Okay.  So is it -- would you say that -- are these complaints

Page 209

regarding -- I think you answered these complaints are regarding the workload that Gregg gave her, not necessarily what Marnie had given her, correct?

A.   The complaint about what workload?

Q.   The workload that she's complaining about right in here where she wants to kill Gregg because she has too much work.

A.   I'm sorry, I'm not seeing that on the screen.

MR. GOLD:  Go back -- scroll back up.

THE WITNESS:  Oh, you're talking about the last one.

BY MR. GOLD:

Q.   Yeah, "here is what I" -- she says "I want to kill Gregg.  Here is what I have on my plate."

She's complaining about the workload, correct?

A.   Yes.

Q.   Okay.

A.   And also the way that Gregg gives the workload but then doesn't explain exactly what he wants from things, so it takes ten times longer and ten times over to do the workloads.

Page 210

Q.   Okay.  Well, that has to do with I guess management style versus -- that wasn't -- you wouldn't consider that to be sexual harassment, would you?

A.   Some of it was forms of harassment when he would do it.

Q.   No, I asked you, ma'am, was that motivated by reason of her gender?

MR. CARSON:  Objection.  Asked and answered.

BY MR. GOLD:

Q.   Okay.  What proof do you have that that was motivated by reason of her gender?

A.   I didn't say that this specific thing was motivated by her gender.  I just think that his -- everything that he did in conjunction with the other things that he did all compiled together, like you can't just take one thing at a time and say -- like the phone calls late at night or this one time that he assigned her all of these things, how are those -- all together along with the way he would touch us or the way he would make you go on forced dates outside of hours with him and all of those things together; it's not just singled out.

Q.   Okay.  So giving excessive work to you

Page 211

or Lisa in your mind was another form of sex discrimination.

A.   It was a form of discrimination in how he was feeling at that time, if he was feeling like your reactions to his touching were not good or good.

Q.   So you're saying he would give you more work if you resisted his touchings; is that what you're trying to say?

A.   If he was unhappy with you at that time, if he felt like he wasn't getting a good reaction from you when he would tell you to sit on the couch and have a personal conversation with him or talk about your dating life or things like that, if he didn't feel like it was super close and he was getting what he wanted, then, yes, it would come back and be extra work.

Q.   Okay.  Now we're talking in May of 2018 if you felt that way and if Lisa felt that way why did you not register a complaint with Daniel Pipes or Marnie O'Brien?

A.   I mean, I've said this answer multiple times.  Are we just going to keep saying the same thing?

Q.   That's the question, ma'am.  The question is why did you not complain to Marnie

Deposition of Patricia McNulty                                    Lisa Barbounis v. Middle Eastern Forum, et. al.

Page 212

O'Brien or Daniel Pipes if that's the way you felt in
May of 2018?

        MR. CARSON:  Objection.  Asked and
    answered.

        You can answer again.

        THE WITNESS:  There were multiple
    reasons, one being feeling like all of
    these things -- I mean, we weren't
    talking about all of them together at
    that time, you felt very much alone in
    what was happening to you, and so I
    didn't go because I didn't feel like me
    alone was meant -- it would be powerful
    enough and I thought that I would just
    be fired like they said happened to
    Tiffany Lee, which is exactly what Matt
    told me not to do in the beginning, he
    said don't make any complaints because
    they won't matter, they'll tell
    everybody to lie and they'll get you to
    leave.

BY MR. GOLD:

    Q.    Okay.  Now, when did you last have your
forced date with Gregg Roman before May of 2018?

    A.    I mean, I don't know exactly when it

Page 213

was.  They happened all the time.  He would do it
regularly.

    Q.    Where did you go with him?  To dinner?
Bowling?  See a movie?

    A.    To -- he made me go to the movies once
with him during work hours.

    Q.    What did you see?  Star Trek?

    A.    Star Wars I think.

    Q.    Star Wars?  Okay.  So you felt
compelled to go to a movie with him?

    A.    He said I had to.

    Q.    Okay.  And did you voice your
opposition to going to that movie with him?

    A.    No, it was within the first two months
of me working there and --

    Q.    Okay.  So did he make any sexual moves
towards you, any advances towards you, during the
movie?

    A.    I mean, it was just uncomfortable.  He
was sitting directly next to me.

    Q.    Well, where did you want him to sit?
Behind you?

    A.    It was an empty movie theater.  He
could have sat behind me.

    Q.    Well, then why -- why didn't you tell

Page 214

him to social distance and sit on the balcony and you
can sit on the first floor?

    A.    Because that's easier said than done
when you're talking about your direct supervisor who
is in charge of all of your work and all of the
things you do and the job that you have and your
paycheck and you just -- I had already heard these
horror stories, I didn't want to just get fired for
something as silly as just going though -- to a
movie.  I thought I would just sit through it and --

    Q.    Well -- you sat right through it,
correct?

    A.    I did.

    Q.    And did he make any sexual advances
towards you?

    A.    At the movie theater?

        MR. CARSON:  Objection.

BY MR. GOLD:

    Q.    Yeah, at the movie theater.

    A.    I mean, it was already inappropriate
enough, again, to me, I felt, sitting next to me in
an empty movie theater.

    Q.    Why wasn't that on the list of your
things you told Daniel Pipes back in November of
2018?

Page 215

    A.    There is a lot to tell.  I mean, we
made it pretty -- I thought saying all of the things
that we had told him had happened -- I mean, I
thought once I told him that Gregg had touched me at
AIPAC on the couch, you know, his hand on my thigh
pulling me onto his lap would be all that anyone
would need to hear at that point.  It didn't seem
like we had to go through the whole this is what he
does on a daily basis, but we continued to do so, but
it's hard -- there were so many things that he did,
it's hard to remember them all every single time
you're talking.

    Q.    Were you alone with Gregg at the movie
or was Marnie there with you?

    A.    Marnie was there as well.

    Q.    Okay.  So did he make any sexual
advances towards Marnie at the movie theater?

    A.    I don't know.

    Q.    Okay.  So in your mind that visit to
the movie theater was sexually motivated; is that
your testimony?

    A.    Yeah, it was forcing two females to go
to the movies with him during --

    Q.    To have -- and what would be the sexual
motivation?  Just because you're females?

Page 216

A.    And along with while he was also, you know, doing other things in the office.  It's not just like nothing else ever happened and he just made us go to the movies with him the one day.  It was in conjunction with everything else happening.

Q.    So why did you go to the movie theater with him?  I'll withdraw --

A.    I just answered that.

Q.    -- the question.  I'll withdraw the question.  It's --

So did Marnie -- well, Marnie was the head of HR, so why did she go to the movie theater with Gregg and you, do you know?

A.    I mean, as far as -- as far as I knew at that point they still had a very good friendly relationship with each other.

Q.    Okay.  So you -- so you were ambivalent to register a complaint with Marnie for that reason?

A.    For multiple reasons, for the reasons I just stated before.

Q.    Did you tell Matt -- did you tell Matt Bennett that you thought that this visit to the movie theater was sexually motivated?

A.    I told Matt a lot of the things that Gregg did that I thought were inappropriate.

Page 217

Q.    Well, I'm only asking about this one -- I'm asking about the movie visit, though.  Did you tell Matt about that?

A.    I don't remember if I told him about the movie or not.

Q.    Okay.  Okay.  Got it.  All right.  So --

A.    Gregg had instructed us not to tell anyone, so I don't know if I --

Q.    And you did everything you were told, right?  Because if Gregg would have told you to jump off the roof, you would have jumped off the roof, right?

A.    I mean, that's absurd.

MR. CARSON:  Object -- object to form.

You can answer.

I think the question is if Gregg told you to jump off the roof would you have jumped off the roof.

MR. GOLD:  Yeah, that's the question.

MR. CARSON:  So is the answer yes or no?

THE WITNESS:  No.  That's absurd.

Page 218

MR. GOLD:  Okay.  That's good to hear.

Let's go to Exhibit 13.

BY MR. GOLD:

Q.    Starts off with:  You okay?

And then she responds:  I'm better.  I need to do this paper and not kill Marnie.

I think we --

MR. GOLD:  Keep -- next -- I mean Exhibit 14.  I'm sorry.  I got the wrong -- we already had that exhibit.  14.

BY MR. GOLD:

Q.    Okay.  Here we go.  Starts off with something about the texts from Israel, and you respond:  I do have those texts.

Do you know -- this is now in May of 2018.

And then you say:  I just figured better safe than sorry.

And then she says to you:  Good.  Screen shot that shit and lee it.

What does "lee it" mean?

A.    I think it's a typo.

Q.    What's the word that the typo is?

A.    I would assume send.

Page 219

Q.    Oh -- okay.  "Good.  Screen shot that shit and send it"?

Do you know why she wanted -- do you know why she asked you for those texts from Israel?

A.    I'm not sure.

Q.    Did you send it to her that day?

A.    I don't remember.

Q.    Did you take a screen shot of those texts at any point in time?

A.    I did.

Q.    Okay.  When did you do that?

A.    After she sent them to me.

Q.    Okay.  And the reason why she wanted you to screen shot it is no longer on her phone.  Did she actually delete it herself?

A.    I'm not sure.

Q.    Do you have any personal knowledge as to whether Gregg ever hacked into Lisa's phone?

A.    I don't know.

Q.    Did Gregg ever hack into your phone?

A.    Not that I know of.

MR. GOLD:  Okay.  Scroll down, Matt.

BY MR. GOLD:

Q.    Okay.  She says then:  Keep it.  I

Page 220

1  deleted mine in case he got paranoid and went through
2  my phone.
3        I covered that with you.
4        MR. GOLD:  Keep going.  Okay.
5  Let's go to Exhibit 15.
6  BY MR. GOLD:
7     Q.   She says:  I just called Gregg in
8  Israel and told him I'm at my breaking point and I'm
9  about to quit.
10        Do you know the context in which that
11  conversation took place between you and Lisa?
12     A.   No, I don't remember exactly what it
13  was about.
14        MR. GOLD:  Keep going down here.
15  BY MR. GOLD:
16     Q.   It says:  Can you talk.  I just got off
17  the phone.
18        You said:  Yeah.
19        And then it says:  I told him tired of
20  morning inserting herself and everybody's job
21  including mine.
22        Is that in reference to Marnie again?
23     A.   I believe so.
24     Q.   Okay.  So now it's May of 2018, she's
25  still complaining about Marnie; would you agree?

Page 221

1     A.   Yes.
2     Q.   Okay.
3        MR. GOLD:  Scroll down.  Stop.
4  Let's see.  Keep going.  Keep going.
5  Stop.
6  BY MR. GOLD:
7     Q.   It says here:  I called her on the Matt
8  thing and she had an explanation for that but
9  admitted it too.  I said it's an awful work
10  environment.  She said well Gregg has had people stab
11  him in the back.  I said that's on him.  Does she
12  hear the way she -- the way he speaks to people?
13        And then you say -- she says:  He's
14  exacerbating the problem.  And he said that he
15  insults my intelligence by thinking I'm stupid to
16  know what's up.
17        And then you say:  I think -- if he
18  thinks being sneaky and manipulative is going to stop
19  people from stabbing him in the back he's got another
20  thing coming.
21        So are you now -- are we talking about
22  Gregg now in this exchange?
23     A.   Yes.
24     Q.   Okay.  So now it looks like Gregg is
25  her -- she's shifting away from Marnie now and

Page 222

1  focusing more on Gregg, is that what's occurring
2  here?
3     A.   I don't think there was ever a shift, I
4  think that there was always issues with Gregg, but in
5  this particular instance that's who she's talking
6  about, yes.
7     Q.   Okay.  And what is the subject matter
8  anyway that she's complaining about, do you know?  Do
9  you have any recollection?
10     A.   I don't know.
11        MR. GOLD:  Okay.  Keep scrolling
12  down.
13  BY MR. GOLD:
14     Q.   It says something that she's preparing
15  a paper of sorts.  You have no recollection what
16  that's about.
17     A.   No.
18     Q.   Okay.  And you understand she's
19  complaining about workload again, getting work done
20  at a certain point in time.  Nothing in that text
21  would you consider to be sexually offensive, would
22  you?
23     A.   Specific to that text, no.
24     Q.   Right.
25        MR. GOLD:  Go back to -- go back

Page 223

1  to Exhibit 14 for one second here, make
2  sure we don't skip over -- oh, we're at
3  15 now?  Okay, good.
4  BY MR. GOLD:
5     Q.   She says:  I just called Gregg in
6  Israel --
7     A.   We just did this one.
8     Q.   We did -- we're going to keep -- move
9  on to the bottom of this text message, though, I want
10  to --
11        MR. GOLD:  Stop.  Keep going.
12  Stop.
13  BY MR. GOLD:
14     Q.   Okay.  Here is what you write:  Me
15  neither, but I've put them in mail -- mailchimp
16  before so I see there is a list created there for
17  conference call subscribers, and the RSVPs go to
18  Thelma to create a link and campaign, so I used to
19  get e-mails to enter from people who wanted to listen
20  so I recognized --
21        So the work she was doing was clearly
22  MEF work, correct?
23     A.   I'm not sure where -- I mean, I know
24  I'm talking about MEF work in that text message.
25     Q.   Okay.  And you don't know if she is?

Page 224

A.    In what instance?  I'm not sure.

Q.    In Exhibit 16, you're referring to MEF work, right?

A.    Correct.

Q.    Is this again with the board of governors meeting or is this something else?

A.    I don't think that has to do with the board of governors.

Q.    Okay.  Do you know what it had to do with?

A.    Mailchimp is a platform we use for invites and articles and things like that.  I'm not sure specifically what that pertains to.

Q.    Okay.

MR. GOLD:  Keep going.  Keep going.  Stop.  Go ahead, keep scrolling down.  Scroll down.  Stop.  Keep scrolling down.  Keep going.  Keep going.  Scroll down.  Okay.  Stop.  Scroll -- stop.

BY MR. GOLD:

Q.    Okay.  Looks as now like -- this is now June of 2018, and this is Exhibit 18 I believe.  Yeah.  It says -- you say to her:  I don't know if I can bring myself to spend that for literally one day.

Page 225

She says:  I know.  What if we throw another day in there.

What exactly were you talking about, this trip to the UK?

A.    Yes.

Q.    Okay.  And when was this trip to take place?  That weekend?

A.    I believe the 9th.

Q.    Okay.  So this is -- so you're planning ahead for the week for the 9th.

MR. GOLD:  Go ahead.

BY MR. GOLD:

Q.    "I know.  It looks like Raheem is ducking out cause Gregg won't pay him.  I won't get connects if he isn't going."

MR. GOLD:  Keep going.  Go ahead.

BY MR. GOLD:

Q.    "Raheem said he'd pay for you."

So Raheem was willing to pay for both you and Lisa to go to the UK on the 9th?

A.    Just for me, for my plane ticket.

Q.    Just for you.

A.    Uh-huh.

Q.    Do you know why just for you and not Lisa?

Page 226

A.    Because Lisa was willing to pay to go for herself.

Q.    Okay.  Okay.  So --

MR. GOLD:  Stop.

BY MR. GOLD:

Q.    And Lisa says:  He's definitely paying for your ticket.

Again, is that with reference to Raheem?

A.    Yes.

Q.    Okay.

MR. GOLD:  Keep going.

BY MR. GOLD:

Q.    "He called me and talked about other stuff.  Said he would talk tomorrow."  And she says I need to book the flights.  He said he would talk to you tonight.  I know DP could give two shits.

Is this now in reference to a conversation had with Gregg?

A.    This is about Gregg, yes.

Q.    Okay.  And looks like they never thought that -- appears to me they thought Gregg would never pay for the flight.

You say:  Yeah, DP doesn't care --

A.    No, he wasn't going to let us go at

Page 227

all.

Q.    Not go at all.  Okay.  And then you say:  Yeah --

A.    It wasn't about them paying.

Q.    -- yeah, Daniel -- DP doesn't care what the fuck you do -- what -- you and I do on our own time.  Why wouldn't he just say one way or another on the phone.

And then she says:  I want to write this.

And she says:  It is that you don't want us at the march or off Monday?  It's about the day I look for flights that come home on Sunday.  It's about what we do on our own time then we should talk about that.

MR. GOLD:  Scroll down.  Stop.

BY MR. GOLD:

Q.    You say:  Why does he just want to be difficult with everything?

And then she says:  I'm quitting they're all nuts.

And you say:  Does he say anything?

She says:  No but I just got into a minor tiff with Marnie.

Do you know what she's talking about

Deposition of Patricia McNulty                                    Lisa Barbounis v. Middle Eastern Forum, et. al.

Page 228

1  there?
2      A.    No.
3      Q.    Okay.  This conversation has to do with
4  whether Gregg is going to pay for any part of the
5  trip, is that it?
6      A.    No, it was whether he was going to let
7  us go or not.
8      Q.    Oh, okay.  And you were working on the
9  assumption that he wasn't going to let you go,
10 correct?
11     A.    He was saying that he might not let us.
12     Q.    Okay.  Next one says -- Lisa says: Ya.
13 I was just asking if he doesn't approve the time off
14 on Monday am I allowed to do what I want on my own
15 time?
16         MR. GOLD:  Scroll up.
17 BY MR. GOLD:
18     Q.    "She was" -- "she was like if you want
19 to get technical about the manual you didn't request
20 time off" --
21         You're referring now to Marnie?
22     A.    Lisa's saying that, yes.
23     Q.    Yeah, because Marnie said you have to
24 follow the protocol in the manual?
25     A.    She's saying if you want to get

Page 229

1  technical about it, yes.
2      Q.    Okay.  Was Marnie involved in these
3  discussions as well as Gregg?
4      A.    I believe Lisa had went to her to see
5  if we would be able to take that Monday off.
6      Q.    Okay.  All right.  And then you write
7  back: Oh yeah, she's a hundred percent just ready to
8  fight.
9         And then she writes back: No.  Still
10 waiting for Gregg to give me a yes or no.  He could
11 ruin a picnic.
12         MR. GOLD:  Keep going.
13 BY MR. GOLD:
14     Q.    And then she says: We're going.
15         I guess at that point she heard from
16 Gregg and he gave his -- gave the green light on it,
17 I take it?
18     A.    Yeah.
19     Q.    And paid for half your tickets?
20     A.    We found that out later.
21     Q.    Okay.  And then she went and booked the
22 flight.
23         MR. GOLD:  Keep going.  And now
24 we're on Exhibit -- we're still on
25 Exhibit 18.  Stop there.

Page 230

1  BY MR. GOLD:
2      Q.    "Making major shit happen.  Who books a
3  trip on a Monday to fly to London on a weekend?"
4         And she says:  We do.
5         So I guess you two sound like you're
6  pretty ecstatic about going to London.  Was this for
7  a rally or was this for some other reason?
8      A.    There was a rally taking place that
9  weekend.  The two of us going started out as a
10 personal trip and when MEF said that they would pay
11 for half, then it became we would report back to
12 Daniel on -- on what we saw.
13     Q.    And earlier today I had asked you
14 whether -- you know, about the first trip to the UK
15 where she met -- where Lisa met Tommy -- Danny Rommo
16 -- or Danny Thomas, rather.  Is this where it took
17 place, that weekend when you left for London?
18     A.    Yes.
19     Q.    Okay.  And when you were with her at
20 the rally were you involved with -- did you meet
21 Robinson and Danny Thomas?
22     A.    Not Tommy Robinson, he was in jail at
23 the time, but --
24     Q.    He was in jail.  Okay.
25     A.    -- I met Danny.

Page 231

1      Q.    Okay.  So what was your understanding
2  of what the rally was for?
3      A.    It was for awareness of what had
4  happened to Tommy Robinson and for backing --
5      Q.    Okay.
6      A.    -- the public.
7      Q.    And was there any -- did Gregg Roman
8  ever express any apprehension about MEF getting
9  involved with Tommy Robinson at that juncture?
10     A.    Not that he talked to me about.
11     Q.    And I guess Lisa didn't talk to you
12 about that either?
13     A.    No.
14     Q.    Okay.  So let's go to -- when you heard
15 that Raheem was going to pay for your flight, was he
16 going to pay for it out of MEF money or out of his
17 own personal funds?
18     A.    Personal funds.
19     Q.    Okay.  How did you know that?
20     A.    Because that's what I was told.
21     Q.    So Raheem's going to give you -- what,
22 would be a gift to you to pay for your flight -- your
23 flight to go to the UK for the weekend?
24     A.    Yeah, he wanted me to go.
25     Q.    Why would he want you to go?

Page 232

A. Because he was going to be there.

Q. He was interested in some kind of relationship with you at the time?

A. We were just friends, but he just -- he was in England and he wanted to hang out, me to be a part of the three of us hanging out together.

Q. Okay. So he was actually in -- I'm sorry, was he actually -- was he an employee of MEF or was he hooked up with the Robinson campaign?

A. He's in the same line of business, but he wasn't participating in the rally with us, he wasn't being paid by MEF for that, he wasn't -- he was a fellow at one point, I don't remember if he was a fellow during this time or not.

Q. Okay. When did you -- did you ever meet him in person?

A. Did I ever what?

Q. Did you ever meet him in person? Raheem.

A. Yeah, I had met him before --

Q. Where?

A. -- this.

Q. I'm sorry, where -- go ahead.

A. I met him for the first time at the dinner we held in AIPAC.

Page 233

Q. Okay.

A. And then I'm not sure if we saw each other in person again before this rally, but we've definitely been at other work events together, ones that he's attended in the same line of work.

Q. So how many times had you been in his presence --

A. I don't know, only a handful.

Q. Okay. But I guess he -- Lisa told you that he was willing to pay for your trip to UK. Did she ever explain why?

A. Just that he wanted me to be there to participate in it all as well.

Q. In the rally?

A. In the trip. We were going to go to the rally and also sightsee with him and just hang out for two days.

Q. Okay. So you don't know whether he had any interest in you from a more -- like beyond business, on a social level. You don't know that.

A. Nothing ever happened with me and Raheem, so I don't --

Q. Okay.

A. -- I don't -- I can't speak to his intentions.

Page 234

Q. Well, it says here: Raheem is booking the room. I told him to save money you and I could share a room but three is better.

So were the three of you going to share a room?

A. I don't think that -- I'm not -- I don't think that's what she meant there.

Q. Did Marnie go on the trip as well?

A. No, Marnie wasn't there.

Q. Okay. It says here: I knew Marnie was going to end up coming up to New York on Thursday, I was waiting for that too.

What was happening in New York? Is that where the board of governors meeting was or was that a different meeting?

A. Different meeting. The board of governors meeting would have already happened.

MR. GOLD: Let's go to Exhibit 19. Stop.

BY MR. GOLD:

Q. She says to you: I'm going to drop kick Marnie.

And you said: That's me today. What is she doing now.

She says: I'll call you when I leave.

Page 235

What a fucking cunt.

Is this the kind of language that Lisa used at work?

A. Well, she was just speaking to me personally in this.

Q. Well, I mean have you ever heard her refer to any other women as cunts or is this -- Marnie is the only person she referred to as a cunt?

A. I don't remember.

Q. How often did she use the C word with you?

A. I don't think often.

Q. Okay. And that's how she was referring to her -- to Marnie O'Brien, correct?

A. In that text message, correct.

Q. Yeah. Okay.

MR. GOLD: Why don't we take a five-minute break right here and I'll be back. All right?

MR. CARSON: Okay.

MR. GOLD: Off record.

THE VIDEO SPECIALIST: Off the record.

(A brief recess was taken from 3:27 p.m. to 3:35 p.m.)

Page 236

1   MR. GOLD: I'm posting --
2   THE VIDEO SPECIALIST: Back on the
3   record.
4   MR. GOLD: I haven't marked this
5   as an exhibit. We'll mark this, though,
6   as Exhibit 66 when we're done the
7   deposition.
8   BY MR. GOLD:
9   Q.   This appears to be a text message -- a
10  text message with -- can't tell if it's -- looks like
11  it's Raheem. I can't tell who it's with. Oh, there
12  we go. It's with you, it's Raheem and yourself,
13  Ms. McNulty. Do you recall seeing this text message?
14  MR. MAINEN: Hey, Sid, sorry to
15  interrupt. This is something -- this is
16  between Raheem and Lisa, screen shot
17  sent to Tricia.
18  MR. GOLD: Okay. Good. Got it.
19  Thank you.
20  BY MR. GOLD:
21  Q.   I'm sorry. These are screen shots of
22  text messages between Raheem and Lisa. Have you ever
23  seen this before?
24  THE COURT REPORTER: Excuse me --
25  MR. GOLD: I think she's --

Page 237

1   THE COURT REPORTER: Yeah, she's
2   muted.
3   THE WITNESS: Sorry.
4   I don't remember.
5   BY MR. GOLD:
6   Q.   Okay. Anyway, it goes -- it goes to
7   the trip to -- it deals with the trip to the UK.
8   Were you aware that MEF had paid Raheem $5,000 in
9   connection with this UK trip in May of 2018?
10  A.   No, I wasn't.
11  Q.   Or June of 2018?
12  A.   No.
13  Q.   Okay. Do you know whether Lisa was
14  aware that MEF had paid Raheem $5,000 in connection
15  with the trip to the UK in June of 2018?
16  A.   I'm not sure. As far as I'm aware, he
17  didn't receive money for --
18  Q.   Well, when you --
19  A.   -- for the rally anyway. I don't know
20  if this is something separate.
21  Q.   So when Lisa told you that Raheem was
22  going to pay for your trip, you don't have any
23  recollection as to whether Lisa told you that Raheem
24  was using MEF money anyway to pay for your trip, you
25  don't have any recollection of that?

Page 238

1   A.   She had told me that he was using
2   personal money.
3   Q.   Okay. And that's what she was led to
4   believe?
5   A.   As far as I know.
6   Q.   Okay.
7   MR. CARSON: Objection. Object to
8   form.
9   BY MR. GOLD:
10  Q.   And at no time did you learn that that
11  offer to pay for your trip was going to be coming out
12  of the monies that MEF had paid Raheem in connection
13  with this trip --
14  MR. CARSON: Objection. There is
15  no evidence that any of this even
16  happened, so just --
17  MR. GOLD: Well, you can object --
18  you can object and --
19  MR. CARSON: Hypothetical --
20  MR. GOLD: Yeah. No, not
21  hypothetical; it's a fact, but I don't
22  know if she knew about it, I was only
23  asking if she knew about it.
24  MR. CARSON: In order for it to be
25  a fact, you got to present evidence.

Page 239

1   All you have is the premise of a
2   question --
3   THE COURT REPORTER: I'm sorry, I
4   can't -- Mr. Carson, I'm having trouble
5   hearing anything you're saying there.
6   MR. CARSON: Sorry. Well --
7   MR. GOLD: And I think you've
8   answered the question -- she's answered
9   the question already.
10  MR. CARSON: Sid, this is a
11  hypothetical. She didn't answer the
12  question yet. And if she did, it's
13  subject to the objection I'm putting on
14  the record right now. It's a
15  hypothetical, it's assuming facts not in
16  evidence, there's no foundation, there
17  is no evidence for the premise of the
18  question. So subject to all that, she
19  can answer.
20  MR. GOLD: Okay.
21  BY MR. GOLD:
22  Q.   Again, you were never aware of the fact
23  that MEF had paid Raheem $5,000 in connection with
24  this rally in the UK.
25  A.   Yeah, as far as I know he didn't

Page 240

1  receive any money --
2          MR. CARSON:  Same objection.
3          THE WITNESS:  -- for that rally.
4          MR. GOLD:  Okay.  Let's go back --
5      let's put up -- take this off the board,
6      and we can go right to Exhibit 19.
7      Stop, go back.  Go back to the
8      highlighted part.
9  BY MR. GOLD:
10     Q.    It says:  Raheem is booking the room --
11         We covered that already.
12         MR. GOLD:  Keep going.  Scroll
13     down.  Keep going.  Keep going, we
14     covered all this.  Stop there.
15  BY MR. GOLD:
16     Q.    After she -- Lisa says that Gregg just
17  called me and he spoke to DP and they're giving us
18  each 300 towards our ticket, and then Lisa says:  I
19  should tell Raheem.
20         You say:  Oh my gosh that's amazing.
21  Or my $300 goes to Vasili?  That's -- since that's
22  what Raheem had kind of agreed to in the beginning.
23         What is that about?
24     A.    Because Vasili was paying for half of
25  Lisa's ticket, so they were -- we were discussing

Page 241

1  whether she should -- when she talks to Raheem
2  whether they should talk about him -- because he was
3  paying my full ticket at this point, so whether that
4  300 would just go to reimburse him for the portion
5  that he paid or if he wanted Vasili to get it since
6  he was fine with paying my full portion and Lisa and
7  Vasili paying theirs.
8      Q.    Okay.  So Raheem paid for your full
9  ticket anyway, correct?
10     A.    I -- this is the last we talked about
11  it.  I'm not sure if that money went to Raheem or if
12  it went to Vasili or --
13     Q.    Why didn't you just tell Gregg I don't
14  need the 300 because Raheem is paying for my ticket?
15     A.    Because they wanted us to report back,
16  it was -- they would pay 300 towards our ticket and
17  the trip would be somewhat work related during the
18  rally.
19     Q.    Yeah, but if Raheem was going to pay
20  for your ticket, what's the difference?  Why should
21  MEF pay for it?
22     A.    Because I wasn't doing work previously
23  when Raheem was paying for it.
24     Q.    Well, then -- but why would that 300
25  then go to Vasili?

Page 242

1      A.    I don't know where it went in the end,
2  but that's what we were talking about, whether Raheem
3  would want it to go to him or not.
4      Q.    Why wouldn't you just let MEF keep that
5  300, though, and you go for free and then Vasili pays
6  300 -- the other -- the 300 goes to Lisa's ticket?
7      A.    Because I was working now with the $300
8  rather than not working.
9      Q.    But you never got the $300.
10     A.    No, it went towards -- because I wasn't
11  paying for my ticket.
12     Q.    Right --
13     A.    Somebody else was.
14     Q.    -- so -- but the instructions were that
15  -- that -- according to -- he spoke to Daniel Pipes
16  and he said that they're giving each of us 300, so if
17  you don't need the 300, why would you take the 300
18  and give it to Vasili?
19     A.    Because I was working now.  When you
20  work you get paid for it.
21     Q.    So -- who cares?
22     A.    People who work care.  People who have
23  bills care.
24     Q.    Then why didn't you --
25     A.    It wasn't like a money free-for-all.

Page 243

1      Q.    Then why didn't you just tell Raheem
2  you only need to pay for my ticket over and above
3  $300?
4      A.    They did have that --
5          MR. CARSON:  Can you guys hear me?
6          THE WITNESS:  Now we can.
7          MR. CARSON:  Because I'm objecting
8      --
9          THE COURT REPORTER:  Barely.
10         MR. CARSON:  This entire line of
11     questioning is based on something that
12     didn't happen, right?  So --
13         MR. GOLD:  No, it did happen.
14         MR. CARSON:  So start with --
15         MR. GOLD:  It did happen.
16         MR. CARSON:  No, it didn't.
17         MR. GOLD:  Vasili paid for her
18     ticket.  I mean Raheem paid for her
19     ticket.
20         MR. CARSON:  You have no idea
21     whether Raheem paid for the ticket with
22     MEF money or his own money.
23         MR. GOLD:  She just said that she
24     --
25         MR. CARSON:  You're making stuff

Case 2:19-cv-05030-JDW   Document 110-3   Filed 03/02/21   Page 64 of 157

Deposition of Patricia McNulty                                          Lisa Barbounis v. Middle Eastern Forum, et. al.

Page 244

1 up.
2      MR. GOLD: I'm not -- forget about
3 the MEF money. My question was --
4      MR. CARSON: You're just making
5 stuff up for fun. Let's just -- while
6 we're at it, let's just invent facts and
7 just say Gregg Roman is not a sexual --
8      MR. GOLD: It doesn't matter --
9      THE COURT REPORTER: Excuse me.
10      MR. GOLD: Forget whether Raheem
11 did it with MEF money.
12      THE COURT REPORTER: Excuse me. I
13 can't --
14      MR. GOLD: My question is --
15      THE COURT REPORTER: I can't hear
16 you guys. It's not making it onto the
17 record because I can't understand what
18 you're saying.
19      MR. GOLD: Let me just clarify my
20 point. My point is forget about whether
21 MEF gave Raheem the money. Raheem did,
22 in fact, pay for Tricia's ticket to the
23 UK, that's correct.
24      MR. CARSON: First of all, I don't
25 know if that happened either. Did

Page 245

1 Tricia say that?
2      MR. GOLD: Well, she just answered
3 that she -- no, she already answered
4 that he did.
5      THE VIDEO SPECIALIST: Excuse me,
6 gentlemen. For the sake of the court
7 reporter we have to have one person talk
8 at once because she cannot do her job
9 otherwise. Thank you.
10      MR. CARSON: If Mr. Kassam paid
11 for anything, then -- it has nothing to
12 do with the fact that MEF still paid for
13 half of each of their ticket, which is
14 $300, so --
15      MR. GOLD: You're missing the
16 point -- you're missing the point.
17      MR. CARSON: I don't think I am.
18      MR. GOLD: The $300 was supposed
19 to go towards Tricia's ticket. Okay?
20 It did not go to Tricia's ticket. In
21 fact, Lisa used that money to reimburse
22 her husband.
23      THE WITNESS: That's not -- no one
24 ever said that. That's not a fact.
25 BY MR. GOLD:

Page 246

1      Q.   Then tell me what you said. Tell me
2 what you said.
3      MR. CARSON: That's not accurate.
4 That's not accurate.
5 BY MR. GOLD:
6      Q.   Tell me what is accurate, ma'am. Tell
7 me what is accurate, ma'am.
8      MR. CARSON: By the way, the only
9 -- the only people making these
10 allegations a year and a half later
11 after they've been accused of sexual
12 harassment, sexual assault --
13      MR. GOLD: That's a beautiful,
14 beautiful speaking objection.
15 BY MR. GOLD:
16      Q.   Go ahead. Go ahead. Tell me what
17 happened --
18      MR. CARSON: What happened is what
19 my client already testified to.
20      MR. GOLD: That she got a free
21 trip from Raheem --
22      MR. CARSON: (Indiscernible) half
23 the tickets and did pay for half --
24      MR. GOLD: Let me -- I have one
25 question.

Page 247

1      THE COURT REPORTER: I can't hear
2 Mr. Carson. I can't hear Mr. Carson.
3      MR. GOLD: I have one question.
4 BY MR. GOLD:
5      Q.   Who paid for your trip to the UK?
6      A.   I'm actually going to get a chance to
7 answer now?
8      Q.   Yeah, you are.
9      MR. CARSON: You can answer that
10 question. Yeah.
11      THE WITNESS: Raheem initially
12 paid for my trip. MEF reimbursed $300,
13 which I sent to Lisa to either send to
14 Raheem or she was having a conversation
15 with Raheem on whether he wanted to
16 reimburse Vasili.
17 BY MR. GOLD:
18      Q.   Okay. That's exactly what I said.
19      MR. GOLD: Okay. So let's go now
20 to the next exhibit.
21      MR. CARSON: MEF doesn't get out
22 of paying for half of the ticket just
23 because --
24      MR. GOLD: Save it for the --
25      MR. CARSON: -- someone else --

Page 248

1      MR. GOLD:  Save it for the jury,
2  my friend.
3      MR. CARSON:  Yeah.  All right.  I
4  will.  We will save it for the jury.
5      MR. GOLD:  Next exhibit is --
6  we're up to now looks like 19.  Is that
7  -- or was that -- we're up to 20 now?
8      MR. MAINEN:  We just wrapped up
9  19.  We're on 20.
10      MR. GOLD:  Okay.  All right.
11  Let's get to Exhibit 20.
12  BY MR. GOLD:
13      Q.    And I guess these are a series of text
14  messages between yourself and Lisa.  The time period
15  now is November 3rd, 2018, and this is at or about
16  the time you met with Mr. Pipes, correct?
17      A.    Correct.
18      Q.    Okay.  And --
19      MR. GOLD:  Scroll down.
20  BY MR. GOLD:
21      Q.    Okay.  Looks like "I just went from I'm
22  going to enjoy that weekend" --
23      MR. GOLD:  Go ahead.  Let her read
24  -- don't go so fast because she has to
25  read it.

Page 249

1  BY MR. GOLD:
2      Q.    She talks about this Young Republican
3  party, and who says "you wanna go"?  Is that you?
4      A.    No, I think that's her.
5      Q.    That's her.
6          "Wanna go, if we still have jobs?"
7          And you said:  Haha, if we still have
8  jobs then yes.  I was going to wear a gown.  How much
9  is it?
10          Was there some concern that you and
11  Lisa had that you were going to lose your jobs
12  because you were going to have this meeting with
13  Daniel Pipes on the 3rd after you had registered your
14  complaints on that -- on the 30th?
15      A.    There was always reservations that at
16  any second we could lose our job because Gregg didn't
17  want us there anymore.
18      Q.    Was there -- did Daniel Pipes ever
19  threaten you with losing your job when he met with
20  you on the 30th?
21      A.    On the 30th?
22      Q.    Or November 1st -- whenever it is you
23  registered the complaints, the actual day, were you
24  ever threatened by Daniel Pipes that you would lose
25  your job because you came forward and you registered

Page 250

1  a complaint?
2      A.    No --
3      Q.    Okay.
4      A.    -- not by Daniel.
5      Q.    Okay.  So at this point we're talking
6  now -- we're talking with Daniel, and Daniel
7  wanted to know exactly what you were complaining
8  about, and did you make your complaints known to
9  Mr. Pipes at that point?
10      A.    At what point?
11      Q.    November 2018.
12      A.    Yes.
13      Q.    Okay.  And as a result thereof what
14  happened?
15      A.    Initially when we talked about it
16  before the weekend started Daniel told us that
17  nothing would happen, that Gregg would get a slap on
18  the wrist and told not to do it again and there would
19  be no changes.  And then we got an e-mail that
20  weekend or that night, whenever, that said that now
21  we needed to not come in the office the next day and
22  he wanted to think about it some more and we would
23  have a meeting with everybody together that Monday.
24      Q.    Okay.  And did that happen?
25      A.    Yes.

Page 251

1      Q.    Okay.  So these -- this e-mail exchange
2  is in anticipation of that meeting, I take it?
3      A.    I believe so.
4      Q.    Okay.  And what happened at the meeting
5  on that Monday?
6      A.    The meeting on Monday was very
7  different than the meeting the week before, in some
8  ways.  We last left it off with Daniel saying that
9  priests had committed worse crimes and had less
10  punishment and that's why he wasn't going to punish
11  Gregg, and then this Monday we came in and he said
12  that after reconsidering that he would remove Gregg
13  from the office but that nothing else would change
14  with his role, he would still remain the director and
15  still have the senior position and Daniel would take
16  more participation with the office.
17      Q.    Okay.  And then did -- do you recall
18  Mr. Pipes' office actually posing three questions to
19  you, whether you were satisfied with the resolution
20  or his proposed resolution of the matter?
21      A.    He did send an e-mail with those
22  questions, yes.
23      Q.    And did you indicate that you were
24  satisfied?
25      A.    As long as Gregg wasn't back in the

Page 252

office, I did say yes.  It was better than the week
before where nothing was happening to him at all.
Q.    So after that date did Gregg set foot
in the office ever again?
A.    After that date, yes.
Q.    And that would be sometime in March of
2019?
A.    Yes.
Q.    Okay.  And did you have any interaction
with Gregg from November through March of 2019?
A.    Yes.
Q.    Okay.  All of it being work related, I
take it?
A.    Yes.
Q.    Okay.
       MR. GOLD:  Let's go to Exhibit 21.
       Let's go -- go backwards for one second.
BY MR. GOLD:
Q.    It looks like, again:  If we still have
jobs do you think we'll be able to work from home?
It's midweek.
       "It's Tuesday I'll take off.  Fuck it.
You will still have a job.  Nothing is going to
change for you."
       Are you now talking to Lisa?

Page 253

A.    I'm the blue, yeah, and Lisa is --
Q.    Okay.  And she tells you that you'll
still have your job, nothing is going to change for
you.
       MR. GOLD:  Go ahead, keep going,
scroll -- scroll down.  Stop.  Okay.
       We're now to Exhibit 21.
BY MR. GOLD:
Q.    This has to do with the NDA that you
were asked to sign, and I know you had some
reluctance or apprehension about not signing it.  Was
the NDA ever -- the NDA that you were asked to sign
ever modified or amended?
A.    There was an amended version sent -- we
signed an NDA when we started at MEF --
Q.    Okay.
A.    -- and when the complaints were brought
against Gregg they amended the NDA and asked us to
sign a new one.
Q.    And did you sign a new one?
A.    No.
Q.    Okay.  So you weren't -- you weren't
fired for not signing it obviously, right?
A.    No.
Q.    Okay.  But it was amended?

Page 254

A.    Yes.
Q.    Okay.  Do you know whether Lisa signed
it?
A.    I'm not sure.  I don't think she did.
Q.    Did anyone sign it?
A.    I know Matt signed it.
Q.    How do you know that?
A.    Because he told me.
Q.    Okay.
       MR. GOLD:  Stop there.
BY MR. GOLD:
Q.    Yeah, it said:  Matt said just sign it.
Don't be stupid they are doing this for Gregg.  I
just talked to Marnie.  She's not signing it either.
My dad said under no circumstances should I sign
it --
       Who is that?  Is that Lisa talking?
A.    Yes.
Q.    Okay.
       MR. GOLD:  Scroll down.  Stop.
BY MR. GOLD:
Q.    "Delaney doesn't want to sign it."
       How was this NDA different than the one
you signed when you were first employed at MEF?
A.    I don't remember the exact specifics of

Page 255

what it said.  I know we've given a copy of the
document, but I don't remember the exact specifics.
Q.    Okay.  In any event, you didn't -- even
with the amendment you wouldn't sign it.
       MR. GOLD:  And keep going down.
       Scroll down.  Stop.
BY MR. GOLD:
Q.    Daniel writes back:  As long as you
have previously signed an NDA with the Forum, signing
the new by tomorrow morning is not imperative.  It is
largely intended to make everyone in the room -- make
sure that everyone in the room has signed a version
of the NDA form.  The NDA benefits you by allowing
you to have access to information necessary for you
to do your job at the Forum.  As to potentially
releasing confidential information to outside
counsel, this would be implicitly allowed in the NDA.
However, to make you feel more at ease, I've reviewed
the NDA to make this explicit.  Please note the
addition of Section 4.
       And --
       MR. GOLD:  Scroll down.  Stop.
BY MR. GOLD:
Q.    And Lisa says:  Oh gosh, that makes me
feel better.  I feel like I could cry tonight a

Page 256

1 little bit from anxiety relief.
2         Was Lisa's reluctance to sign the NDA
3 because she understood that if she signed that she
4 couldn't talk to an attorney about whatever was going
5 on with her?
6     A.    I'm not sure.
7     Q.    Okay.  Was that why you wouldn't sign
8 it?
9     A.    I didn't want to sign it because there
10 should be no reason for an -- we had already signed
11 NDAs, so for them to change it specifically to cover
12 what was happening with Gregg at that point just
13 didn't seem right to me.
14    Q.    Okay.  And you wrote -- you said:  If
15 you give me your Gmail or whatever I'll forward it to
16 you.
17        She gives you her Gmail address.
18    A.    That's me and her.
19    Q.    Okay.  So she forwards it to you; is
20 that right?
21    A.    Correct.
22    Q.    You then -- and who says "I'm relieved"
23 -- I'm sorry, is that Lisa or is that you?
24    A.    She's the gray.
25    Q.    Okay.  She's the gray?  I'm sorry.

Page 257

1         "So I'm glad I wrote the e-mail last
2 night.  I was freaking out."
3         MR. GOLD:  Keep going.  Scroll
4 down.  Okay.  We're now on Exhibit 22.
5 BY MR. GOLD:
6     Q.    So as far as you know, nobody signed
7 the NDA except for maybe Matt?
8     A.    As far as I know.
9     Q.    Okay.
10        MR. CARSON:  For the record,
11 Delaney and Caitriona signed it too.
12        THE WITNESS:  I didn't know.
13        MR. GOLD:  Okay.  So -- keep
14 going.
15 BY MR. GOLD:
16    Q.    Is that the picture from the rally, by
17 the way, in the UK?
18    A.    Yes.
19    Q.    Okay.  And that was posted by -- is
20 that -- now, is that posted by Lisa or you?
21    A.    Lisa.
22    Q.    Okay.  And then she writes:  I'm so
23 sad.  I don't know.
24        And you write:  Why?
25        And then she says:  I think it's all

Page 258

1 draining and that's what you're left with --
2     A.    I'm the blue.
3     Q.    You're the blue.  This is you saying
4 that I think it's all draining and that's what you're
5 left with, but I think it's going to only go up from
6 here.  You're gonna get a fancy title you're proud
7 of, you'll be immersed in content, sure not in the
8 way you wanted -- want yet, but this is a good
9 stepping stone to that.
10        So it appears that you're giving her
11 words of encouragement and that in a way her job
12 becomes a bit more attractive; would you agree?
13    A.    I was trying to give her a pep talk,
14 yes.
15    Q.    Yeah.  Okay.
16        MR. GOLD:  Keep going down.
17 Scroll down.  Stop.
18 BY MR. GOLD:
19    Q.    And then you posted:  Life is amazing.
20        Is that your post?
21    A.    Yes.
22    Q.    Okay.  And then you say:  FYI, Matt
23 still has not replaced that gift from Neal that he so
24 awkwardly asked me to give him.  And I've mentioned
25 it to him like 15 times by now.

Page 259

1         What exactly is that about?
2     A.    I don't remember exactly what it was.
3 I think that's when Matt had asked me for, like, CBD
4 oil that my now-fiance, boyfriend, had given me when
5 we first met to try.
6     Q.    Okay.  What exactly is CBD oil?
7     A.    It's just like a natural -- like a
8 vape.
9     Q.    You would smoke it?
10    A.    Yeah, you smoke it.
11    Q.    You can get high from that?
12    A.    You don't get high.  It's not a drug.
13    Q.    What is it?
14    A.    I wouldn't be able to say exactly what
15 it is.  I'm not --
16    Q.    Do you hyperventilate when --
17    A.    -- well-versed in it.
18    Q.    Do you hyperventilate when you smoke
19 it?
20    A.    I don't smoke it.
21    Q.    Oh, so why would your boyfriend -- why
22 would -- why would you have it?
23    A.    It was given as a gift.
24    Q.    Oh, okay.  Okay.  And then she writes
25 back:  I don't know what to say.  Unbelievable.

Page 260

You say: So weird. I wish I had never given it to him. The lack of respect to not replace it for weeks is making me mad.

So this is something you gave to Matt that you had gotten from Neal?

A. Correct.

Q. Okay. So why were you asking him to give it back to you?

A. Because it was a gift. It was sentimental to me.

Q. Okay. Okay. So when you gave it to Matt, it wasn't intended as a gift, I take it, he was going to borrow it?

A. Yeah, Matt had asked me to take it and said he would replace it.

Q. Oh, okay. So he -- you expected him to buy a new one for you.

A. Correct.

Q. What's the cost of that?

A. I have no idea.

Q. Okay.

MR. GOLD: Scroll down. Stop.

BY MR. GOLD:

Q. You say: We planned it, he came here for a day and then we drove to my --

Page 261

MR. GOLD: Can you scroll down? I can't see that word. Okay.

BY MR. GOLD:

Q. -- drove to my W his friends who had something up here this weekend.

Who would that be?

A. I don't know what this conversation that -- you're starting, like, in the middle a conversation. I don't --

Q. Okay.

MR. GOLD: Scroll up for a minute. Let's see if we can get the context of this. Stop.

BY MR. GOLD:

Q. You say: I'm in New York now.

Does that refresh your recollection?

A. Okay. So I was visiting him.

Q. Meaning Neal?

A. Correct.

Q. Okay. And Lisa then writes back: I'm losing my mind. This has been the worst month. I'm irritated that a person I'm not even to be -- supposed to be talking with hasn't texted or called me. Can you please remind me that I have a husband and a family and responsibilities.

Page 262

And you say: You have an amazing and hot husband and super adorable children. Don't sweat some short dude who shot you down not texting --

Who are you referring to? Is this Danny Thomas?

A. I don't remember.

Q. Okay. But you're trying to kind of reassure her that she has family obligations?

A. I'm reminding her that her life is good.

Q. Okay. And she was trying to cheat on her husband, I take it?

A. I don't -- she wasn't trying to cheat on her husband. I think she was -- had a friendly relationship with somebody that she's mentioning in this text.

Q. You don't know who that was?

A. I don't.

Q. Okay. And --

MR. GOLD: Scroll down.

BY MR. GOLD:

Q. You said: You have a gorgeous family.

MR. GOLD: Scroll down. Scroll down. All right. 24. Keep going.

BY MR. GOLD:

Page 263

Q. And who is that a picture of?

A. I think that's Jaz.

Q. And that's the mother of Danny Thomas's children?

A. I think so.

Q. Okay.

MR. GOLD: Go back up. I want to see what the date of that previous message was. Stop.

BY MR. GOLD:

Q. Yeah, it looks like that was on the 10th of November, so this is now on the 17th of November 2018, so does that refresh your recollection that she was talking about Danny Thomas in that previous text message?

A. It could have been. I don't remember.

Q. Do you know why she would post a picture of Jaz and her son on this -- in this message?

A. I don't remember.

MR. GOLD: Scroll down. Stop. Scroll down. Scroll down. Stop.

BY MR. GOLD:

Q. In the box there is that a text message exchange between Danny and Lisa?

Deposition of Patricia McNulty                                    Lisa Barbounis v. Middle Eastern Forum, et. al.

Page 264

1  A.    It looks like it.
2  Q.    And Danny writes --
3        MR. GOLD:  Go back up -- can you
4  scroll up for a minute?  Stop.
5  BY MR. GOLD:
6  Q.    "About to talk on Capitol Hill" --
7  A.    I can't read that if I'm supposed to
8  be.
9  Q.    Okay.  And who is sharif, do you know
10 who that is, msharif?
11 A.    I don't know.
12       MR. GOLD:  Scroll down.  Scroll
13 down.  Scroll down.  Make this larger.
14 Okay.  Scroll down.
15 BY MR. GOLD:
16 Q.    Okay.  And he said:  Lisa, all the
17 things from today have been deleted.  He knows he
18 needs to change.  I promise you it won't happen
19 again.  Don't fall out with me FFS.  I int done fuck
20 all.
21       "Right."
22       You wouldn't know who those messages
23 came from, would you?
24 A.    Who they came from?
25 Q.    Yeah, is that the exchange between

Page 265

1  Danny and her?
2  A.    Yeah, well, I can see it's Danny.
3  Q.    Okay.  And that's her with the "right"?
4  A.    I think she's the -- yeah, she's the
5  green and he's the white.
6  Q.    Okay.
7        MR. GOLD:  Scroll down.  Stop.
8  Okay.
9  BY MR. GOLD:
10 Q.    And then it looks like you say:  Are
11 you gonna have a conversation about you two.
12       She says:  I don't know.  Should I?
13       And you say:  I feel like you either
14 have to be nice or not have it or just have it, but
15 you can't be passive aggressive without talking about
16 it.
17       Is that your comment?
18 A.    Yes.
19 Q.    What did you mean by that?
20 A.    I'm not sure exactly what it's
21 referring to, but I'm just telling her to be
22 forthright with Danny about whatever she's upset
23 about.
24 Q.    Okay.
25       MR. GOLD:  Scroll down.

Page 266

1  BY MR. GOLD:
2  Q.    And who is that a picture of, by the
3  way?
4  A.    It's a Golden Girl.
5  Q.    Okay.  And then she goes:  Lots of
6  luck.  That's me.  Except I'm so miserable.  And I
7  don't look good -- look that good.
8        You say:  Crazy.
9        "You're coming in tomorrow?"
10       She says -- you say yes.
11       "I'll be in 9:30ish.  I'm taking
12 Georgie to school."
13       Is Georgie her son or daughter?
14 A.    Her son.
15 Q.    Son?  Okay.  And then you say:  I'll be
16 in regular time.
17       What is regular time, by the way?
18 A.    For me usually like 8 a.m.
19 Q.    Okay.
20       MR. GOLD:  Scroll down.
21 BY MR. GOLD:
22 Q.    She says:  Are you reading these
23 e-mails?
24       And then you say -- she says:  Because
25 DP and I --

Page 267

1        "Why that face?"
2        And she says:  Because DP and I
3  disagree.
4        And it looks like you're giving her
5  some advice on how to handle this relationship with
6  Danny?
7  A.    I don't see that.
8  Q.    Well, it says:  You're just discussing
9  though, it doesn't need to be an argument or anything
10 --
11 A.    I think that's between her and Daniel.
12 Q.    Oh, this is now -- okay.  So she
13 references Daniel -- "I'm basically advising Tommy.
14 We had this long talk after we got off the phone and
15 he called Danny and makes a quick video.  And now DP
16 disagrees."
17       You're telling her not to argue with
18 Daniel Pipes, is that it?  Or Daniel -- Danny Thomas?
19 Which one?
20 A.    I was telling her that it didn't --
21 what she was describing to me didn't sound like an
22 argument, it just sounded like a disagreement.
23 Q.    Okay.
24       MR. GOLD:  Scroll down.  Let's get
25 to the yellow part.  Okay.

Page 268

BY MR. GOLD:

Q.   So she says:  I definitely think he is wrong.  Like playing it safe.  Tommy has a larger audience now.  Going back to grooming gangs is good work and he should -- he should but the people want more from him.  If he throws this Brexit rally and a hundred thousand people show up that will make a mark.

And then you say:  Yeah, if a hundred thousand people show up it definitely would.

And she says:  I don't know what's wrong lately but I want to address it at work.  You've been really funny since DC.  You said a thousand times have you think -- that you think you work so much harder than everyone else.  In DC you did what you don't understand how the rest of my ear looked so that's not a fair comparison you've been a little bitchy with me.

What is she talking about, do you know?

A.   I think I was just upset in general at the time.  I was super overworked, I was working like 20-hour days at this point and upset about work in general.

Q.   Okay.  And it says:  I saw you rolling your eyes while I was talking today.  I know you're

Page 269

not happy with my behavior and the Danny thing but when friends are weak that's when their friends need to be there the most.  I don't know what it is -- what's the core of the problem but I know you are hurting my feelings and I don't like it.

And you then say:  Well, I'm just overworked, tired, and sick --

So it seems like she had some apprehension or misapprehension that you were not happy with her interactions with Danny.  Are you saying that's not accurate?

A.   No, I think she -- I mean, I didn't want to be hearing about every little thing about them, I think was -- she thought that it was like a bother to me.

Q.   From a morality viewpoint, do you feel it was appropriate for her to be, you know, cheating on her husband and (indiscernible)?

THE COURT REPORTER:  Mr. Gold, I didn't hear the question.  Can you --

MR. GOLD:  Yeah.

THE COURT REPORTER:  -- repeat it?

BY MR. GOLD:

Q.   Do you have a moral issue with the fact she was cheating on her husband and her children?

Page 270

A.   Well, I know she separated --

MR. CARSON:  Object --

THE WITNESS:  -- from her husband.

MR. CARSON:  Woah, woah, woah, objection.  Again, are we making up facts that aren't on the record again and premising our questions on those unsupported facts?

MR. GOLD:  I just asked a question.

MR. CARSON:  Yeah, and the question was did -- something about cheating on husband and cheating on her children now too.  She never cheated on her husband, she never cheated on her children, so as long as we understand that, then she could answer the question.

MR. GOLD:  Okay.  That's your interpretation.  Okay.

MR. CARSON:  That's fact.

MR. GOLD:  Okay.  Let's go.

BY MR. GOLD:

Q.   You said:  I just -- I'm just overworked, tired, and sick, and it's making me

Page 271

irritable.  DC made me annoyed with everyone because I was working 20 hours a day.  Everyone else was on how Caitriona so eloquently put it "vacation."  I feel like Delaney when she said "Lisa, I'm in a place where I can't celebrate every one of your successes right now."  It's hard to hear "Daniel loves everything I write" from you while I'm drowning in work and stressed by -- stressed out every second.

So it appears like you were telling her you're exhausted from the amount of work you have, correct?  And you're a little grumpy.

MR. CARSON:  These are really good questions.  Object to form.

BY MR. GOLD:

Q.   Is that true?

MR. CARSON:  Object to form.

BY MR. GOLD:

Q.   Go ahead.  Answer the question.

MR. CARSON:  You want her to tell you how it appears?  That's your question?

MR. GOLD:  Yeah, that's my question, yeah.

MR. CARSON:  How does it appear --

MR. GOLD:  You want to ask the

Page 272

question for me -- you want to ask the
question for me?
        MR. CARSON:  Yeah, I probably --
        MR. GOLD:  Go ahead, ask the
question --
        MR. CARSON:  -- could do a better
job.
        MR. GOLD:  You ask the question.
Go ahead.
        MR. CARSON:  Well, I would have to
see the exhibit.  Do you want to read
the exhibit to me, Mr. Gold?
        MR. GOLD:  Well, it's right --
it's right in front of your face.  Put
your face on the screen.
        MR. CARSON:  No, I can't.  Not
possible.
        MR. GOLD:  You don't have the
exhibit on your screen?
        MR. CARSON:  Do not.
        MR. GOLD:  Okay.
BY MR. GOLD:
    Q.    Let me just finish this last line here.
You said:  I'm grumpy and I miss you as a friend,
instead of only ever talking about Tommy and Danny

Page 273

and Avi and Cassandra --
        Who is Avi?
    A.    Someone she met --
    Q.    Another guy?
    A.    -- in London.
    Q.    Another male?
    A.    Avi is a male.  He worked with the
Tommy stuff too, I think.
    Q.    -- and all these shiny people that are
just so much more interesting.  London is better, I
get it.  They are better, I get it.  That will never
be me.
        What do you mean by that, that will
never be me?
    A.    One of these journalists who are
traveling the world.
        MR. GOLD:  Okay.  Do you want to
scroll down to the next exhibit?  Keep
going.  Stop.  Okay, keep going.  Keep
going.  Stop.  Keep going.  Stop.  Okay.
BY MR. GOLD:
    Q.    She says to you:  I don't know it was
like eight hours ago.  I told Danny to give her my
number.  I'm gonna look your problem isn't with me,
your behavior isn't professional.

Page 274

        Is she talking with you?
    A.    Not about me.  This conversation is
with me.
    Q.    Okay.  So what does she mean by saying
that -- is that her saying that your behavior isn't
professional or is that you telling her that her
behavior isn't professional?
    A.    No, she's saying this about someone
else.
    Q.    Who is she talking about?
    A.    I think Jaz from what you scrolled by
earlier.
        MR. GOLD:  Scroll up.  Stop.  Go
down.  Stop.
BY MR. GOLD:
    Q.    "Matt and DP" -- "Matt, DP, and Marc
have been in spa -- in the spa office" --
        What's the spa office?  What is that?
    A.    I think it's an auto correct from "the"
--
    Q.    Okay.
        -- "with the door closed" --
    A.    -- or DP's.
    Q.    Okay.
        -- "with the door closed for like an

Page 275

hour."
        So this is something that was sent to
you during work on a given day, December 28th, 2018?
    A.    I'm the blue.
    Q.    Okay.  So you sent it to her.
    A.    Yes.
    Q.    Okay.  And this is now at work,
correct?
    A.    I'm not sure.
    Q.    Well, 2:43 in the afternoon.
    A.    Yeah, I can't see the time.
    Q.    Yeah.  Okay.
        MR. GOLD:  So scroll down.  Stop.
BY MR. GOLD:
    Q.    She -- and this is Lisa saying:  I
should read them instead of skimming them.  Mental
note.  It's even worse with George on my lap.
        Is that Lisa's response?
    A.    To the text message before it, yes.
    Q.    Who is George?
    A.    Her son.
    Q.    Okay.  So she's home at the time, I
take it?
    A.    I think so.
    Q.    Okay.

Case 2:19-cv-05030-JDW  Document 110-3  Filed 03/02/21  Page 72 of 157

Deposition of Patricia McNulty                         Lisa Barbounis v. Middle Eastern Forum, et. al.

Page 276

1  MR. GOLD: Keep going down. Stop.
2  Keep going down. Stop.
3  BY MR. GOLD:
4  Q.  And I guess it's -- she makes a
5  comment: Could you imagine if social media stalked
6  all of Vasili's female coworkers.
7  What is she referring to there? Do you
8  know?
9  A.  I'm not sure.
10  MR. GOLD: Scroll down. Scroll
11  down. Keep going. Stop.
12  BY MR. GOLD:
13  Q.  Okay. Now she injects --
14  MR. GOLD: Scroll back up for a
15  minute. Stop. Scroll down. Stop.
16  Scroll down. Stop.
17  BY MR. GOLD:
18  Q.  Okay. Looks -- she says -- again,
19  she's in the -- you're in the blue and she's in the
20  gray, right?
21  A.  Correct.
22  Q.  Okay. She says: LOL. It's Tommy's
23  company so I'm betting he doesn't.
24  And you say: Haha so funny.
25  And then you say: I wonder what Jaz is

Page 277

1  thinking now. I can't believe she never called, what
2  a bizarro.
3  And then she says: I bet she will call
4  tomorrow morning.
5  Is that -- does that mean she was going
6  to call Lisa in the morning?
7  A.  Yes.
8  Q.  Okay. So was she having conversations
9  with Jaz at or about this time in December of 2018 to
10  the best of your knowledge?
11  A.  I think this was supposed to be the
12  first time that Jaz was calling her.
13  Q.  Okay. And Jaz, again, is the mother of
14  the children of Danny Thomas, correct?
15  A.  Correct.
16  Q.  Did she tell you why she would be
17  calling her?
18  A.  No.
19  MR. GOLD: Okay. Scroll down.
20  BY MR. GOLD:
21  Q.  At this point in time was -- did you
22  know whether Lisa was spending more time with Danny
23  Thomas?
24  A.  I don't know if she was spending more
25  time.

Page 278

1  Q.  Well, what did she tell you?
2  A.  I know they hung out a few times, they
3  saw each other, they talked.
4  Q.  In the UK or --
5  A.  I don't know exactly when, but yes.
6  Q.  Okay. Then you mention: Haha, a new
7  dress? I just saw this, did something happen?
8  And she says: Nothing happened. Trump
9  hotel for NYE in -- New Years Eve in DC with Raheem.
10  You in?
11  You said: I think I'm too poor for
12  that.
13  And she mentioned just hang out, no
14  ball or nothing.
15  MR. GOLD: Keep scrolling down.
16  Stop.
17  BY MR. GOLD:
18  Q.  You say: I need to figure out the
19  money thing. I don't think Marnie cut my check right
20  for the one millionth time.
21  Were you having problems getting
22  payroll checks or reimbursement checks from Marnie?
23  A.  They just weren't always accurate.
24  Q.  Okay.
25  MR. GOLD: Keep going. Stop.

Page 279

1  BY MR. GOLD:
2  Q.  You say: I hate him so much. I can't
3  wait till you're over him, you're passionate about
4  somebody else, because it's only when -- only then
5  you'll realize what a little twerp he is.
6  Are you talking about Danny Thomas now
7  and the relationship with -- she had with Danny
8  Thomas?
9  A.  I don't remember. I believe so.
10  Q.  Who is the little twerp? You don't
11  remember?
12  A.  Probably him.
13  Q.  Okay. Looks like you're trying to talk
14  her out of any further contact with him; would that
15  be fair to say?
16  A.  No, I don't think I was trying to talk
17  her out of any contact with him.
18  Q.  Okay. Okay.
19  MR. GOLD: Keep going. Scroll
20  down. Stop.
21  BY MR. GOLD:
22  Q.  She says --
23  MR. GOLD: Scroll up for a second.
24  BY MR. GOLD:
25  Q.  Something about an 18-month position at

Page 280

1 the Gates Foundation, the -- you say:  That would be
2 nice, are you applying.
3          At that point was Lisa looking for
4 work?
5      A.   Not that I know of, but she sent me
6 that job request, or that job opening.
7      Q.   Okay.  And she writes back:  Thinking
8 about it.  I don't have enough French.
9          You say:  Boo.  I'm definitely gonna
10 start looking, fuck this under appreciated bullshit.
11          So that was January 18th, 2019.  At
12 that point you stated you were going to start looking
13 for work.  Is that what you did?
14      A.   No, I was just venting.
15      Q.   Okay.
16          MR. GOLD:  Scroll down.  Scroll
17      down.  Stop.  Scroll down.  Stop.
18      Scroll down.
19          We're going to take a break right
20      now.  It's Exhibit 28.  Give me a
21      two-minute break.  All right?
22          Off the record.
23          THE VIDEO SPECIALIST:  Off the
24      record.
25          (A brief recess was taken from

Page 281

1 4:25 p.m. to 4:32 p.m.)
2          THE VIDEO SPECIALIST:  The time is
3      4:32 p.m.  We are now back on the
4      record.
5 BY MR. GOLD:
6      Q.   Okay.  We're on Exhibit 28 and we're
7 trying to focus on the highlighted yellow portions of
8 the text message, and course if you need to have
9 me scroll back up to get a better feel for the
10 context of any statement that may have been
11 attributed to you or Lisa, please tell me.  I'll be
12 going out of my way to kind of scroll back and forth
13 for you, but that rate we'll be here probably
14 forever, so I'm going to try to take it up a notch
15 for you.
16          So, again, you're in the gray and --
17 rather, Lisa's in the gray and you're in the blue,
18 correct?
19      A.   Correct.
20      Q.   And we're now up to Exhibit 28, and the
21 date of that -- this text is --
22          MR. GOLD:  Can you scroll --
23 BY MR. GOLD:
24      Q.   -- looks like it's -- okay.  We're now
25 on January of 2019.

Page 282

1          MR. GOLD:  So go back to the first
2      --
3 BY MR. GOLD:
4      Q.   Okay.  So Lisa says:  I'm about to say
5 expect those dick pics any day.
6          And you said:  You can't do that, he's
7 got pictures of you too.
8          Is the "he" Danny Thomas or her
9 husband?
10      A.   Danny.
11      Q.   Okay.  And why would she tell you that
12 she's about to send some dick pics to Danny Thomas?
13      A.   She was upset with him.
14      Q.   And is she sending pictures -- and
15 whose dick is she photographing to send to Danny
16 Thomas?
17      A.   His.
18      Q.   Okay.  So I guess in some kind of
19 expression of anger she's going to send him some dick
20 pics of his own dick?
21      A.   Yeah, that he had sent to her.
22      Q.   That he had sent to her.  Okay.  So --
23 and you say:  You can't do that, he's got pictures of
24 you too.
25          What pictures did he have of her?

Page 283

1      A.   I know the two of them sent intimate
2 pictures back and forth to each other when they were
3 in a relationship.
4      Q.   Okay.  Were you uncomfortable getting
5 these kind of text messages from Lisa?
6      A.   Not really.  It's not something that I
7 delve too deeply into, but --
8      Q.   Well, do they call -- is this what's
9 known as revenge porn?  Ever hear that term before?
10          MR. CARSON:  Asking someone a
11      question about a dick pic --
12          MR. GOLD:  Yeah, do you know what
13      revenge porn is.  Yeah.
14          THE WITNESS:  No.
15          MR. CARSON:  Yeah, I'm going to --
16 BY MR. GOLD:
17      Q.   Okay.  If you don't know, you don't
18 know.
19          Okay.  Then she says:  Fuck him.  I'm
20 so angry.
21          MR. GOLD:  Keep scrolling down.
22 BY MR. GOLD:
23      Q.   You say:  You have every right to be,
24 he treats you like a joke.  He's the joke.
25          And she says:  Still active, hasn't

Page 284

1 read -- hasn't read it's.
2        Meaning, what, he hasn't gotten a --
3 hasn't gotten the dick pic yet?  Is that what she
4 means?
5        A.    No, it means she hasn't -- he hadn't
6 read the text message she sent through.
7        Q.    Okay.  And you say:  What is he even
8 doing?
9        And she says:  Talking to other chicks
10 is the only thing I can think of.  He's one point of
11 Sapchat.
12        What exactly is that, Sapchat, do you
13 know?
14        A.    Snapchat.
15        Q.    Oh, is that what that -- left out the
16 N.  Okay.
17        -- since last talked to him as he's
18 never on it.  So I'm fucking done.
19        You say:  I loathe him.  He just chats
20 it up with a bunch of randos like the one he DMSs
21 kissy faces.
22        What's a rando?  Random women?
23        A.    Yes.
24        Q.    Okay.  I'm getting good at this now.
25        And you say:  He's the worst.  Be

Page 285

1 alright, Dean Lewis --
2        Who is Dean Lewis?
3        A.    A singer.
4        Q.    Okay.
5        -- have you heard it?
6        MR. GOLD:  And then scroll down.
7 BY MR. GOLD:
8        Q.    She writes down --
9        MR. GOLD:  Stop.
10 BY MR. GOLD:
11        Q.    She says -- this is Danny Thomas, I
12 guess it's an exchange she sends to you.
13        "Oh my bad."
14        And she says:  I'm the last person you
15 want to make mad hang up on me and I swear to God I'm
16 sending Jaz every fucking piece of that shit I have
17 from you.
18        So now we have Lisa threatening Danny
19 to send photographs to Jaz.  How did that make you
20 feel when you knew she was having that exchange with
21 Danny Thomas?
22        A.    Just fighting with somebody that she's
23 intimate with at the time.  I didn't think she was --
24        Q.    You don't see anything wrong with
25 somebody sending a -- her sending Jazmin pictures of

Page 286

1 I guess herself and Danny together.
2        A.    I don't think she actually did send
3 them, she was just fighting with him --
4        Q.    Well, I mean, it sounds --
5        A.    -- and saying things --
6        Q.    It says like she was -- sounds like she
7 was threatening him.  Anyway --
8        MR. CARSON:  Is that a question?
9 BY MR. GOLD:
10        Q.    Well, what -- let's assume that they
11 were fighting.  I mean, do you think that's
12 appropriate to be threatening to send his -- the
13 mother of his children sexual photos because she's
14 angry at him or fighting with him?
15        MR. CARSON:  Object to form.
16        Hypothetical question.
17        You can answer.
18 BY MR. GOLD:
19        Q.    You can answer.
20        A.    I can't speak to what exactly was going
21 on in that relationship at the time.  I don't know
22 all of the details and I don't know exactly what this
23 fight entailed.  I'm just seeing bits and pieces of
24 it.  So I really can't answer to --
25        Q.    She then writes back:  You have no --

Page 287

1 you have no right to treat me with disrespect like
2 after I've done fucking everything for you.
3        Do you know what she meant by "I've
4 done everything fucking for you"?
5        MR. CARSON:  Is this a text thread
6        between Lisa and Danny Tommo?
7        MR. GOLD:  Yeah.  Yeah.
8 BY MR. GOLD:
9        Q.    Do you know --
10        MR. GOLD:  I asked what -- do you
11        know what she's referring to.
12        MR. CARSON:  You're asking my
13        client her opinion about a communication
14        --
15        MR. GOLD:  No, I'm asking your
16        client does she have any idea what she's
17        referring to.  That's the question.  The
18        answer is yes or no.
19        THE WITNESS:  No, I don't know --
20        MR. CARSON:  Object to form.
21        THE WITNESS:  -- what "everything"
22        is.
23 BY MR. GOLD:
24        Q.    And she says -- he says:  Wow, thanks,
25 babe.

Page 288

1   And she says:  Don't fucking babe me.
2   "Your having a go at me for someone
3  taking shit."
4   And she writes back:  I'm two seconds
5  away from hitting fucking send you better fix up --
6  fix pick up --
7   MR. GOLD:  Scroll down.
8  BY MR. GOLD:
9   Q.   Anyway, is that her saying "this was
10  after I spoke to him and he hung up on me because I
11  was a dick"?
12   A.   Yeah.
13   MR. CARSON:  I'm going to object
14   based on the fact that's not her text
15   message -- you're asking her to
16   authenticate --
17   MR. GOLD:  No, she sent this --
18   this is what --
19  BY MR. GOLD:
20   Q.   Who sent -- is this a text that was
21  sent to you by Lisa?
22   A.   Yeah, the gray is Lisa talking to me.
23   Q.   Okay.  And it's highlighted here in
24  yellow.  She says:  I just hung up on him because I
25  was a dick.

Page 289

1   MR. GOLD:  Scroll down.  Stop.
2  BY MR. GOLD:
3   Q.   And you said:  I just tried to hit that
4  video but I could -- like I could see it.
5   Is there a video she sent you?
6   A.   In the text message above.
7   Q.   What was that a video of, do you know?
8   A.   I don't know.  I couldn't see it.
9   Q.   It says --
10   MR. GOLD:  Scroll up.  Scroll
11   down.
12  BY MR. GOLD:
13   Q.   -- "I'm still mad and you" --
14   MR. GOLD:  Stop.
15  BY MR. GOLD:
16   Q.   -- "where is the video of you hitting
17  someone?  And who is he talking about?"
18   "Patriot calling me a Nazi because of
19  my anti Zionist stance."
20   Is that Danny Thomas speaking?
21   A.   I'm not sure what that one is.
22   Q.   Okay.  All right.  And then you say:  I
23  just tried to hit the video.
24   And then she writes:  LOL.  He hit a
25  guy today.  Antifa.  That's his hand.  We talked

Page 290

1  about -- we talked for like two hours.  I was brutal.
2   "How did it end?"
3   "He said a lot of things that made
4  sense.  He agreed he could treat me better."
5   And you say:  Did you guys talk about
6  actually what's happening now?  Expectations?
7  Future?
8   MR. GOLD:  Scroll down.  Scroll
9   down.  Scroll down.  Stop.
10  BY MR. GOLD:
11   Q.   She then says:  Danny got arrested.  I
12  had to call his girlfriend.
13   What's that all about?
14   A.   I think he got arrested like at an
15  event or a protest or something of that sort.
16   Q.   And was he incarcerated?
17   A.   I'm not sure.
18   MR. GOLD:  Okay.  Scroll down.
19   "Out no charges."
20   Okay.  Stop.  We're now on Exhibit
21   30.  Scroll down.
22  BY MR. GOLD:
23   Q.   This is January 17th.  Is this another
24  exchange of texts between yourself and Lisa?
25   A.   That's not between myself and Lisa.

Page 291

1   Q.   Do you know who that is?
2   A.   Who Patrick is?
3   Q.   Yeah.
4   A.   Yeah, I know who he is.
5   Q.   Who is he?
6   A.   A friend of Lisa's.
7   Q.   Okay.  Do you know whether Lisa ever
8  reported to Daniel Pipes the fact that Danny had been
9  arrested and for allegedly punching somebody during a
10  rally, did she -- do you know whether she reported
11  that to Daniel Pipes?
12   A.   I don't know.
13   Q.   Okay.
14   MR. CARSON:  Does it matter?
15  BY MR. GOLD:
16   Q.   Okay.  So this is Exhibit -- I mean,
17  were you -- as I understand it, Danny Thomas was a
18  representative for the Tommy Robinson campaign; is
19  that correct?
20   A.   I know he worked with Tommy Robinson.
21  I don't know exactly what his --
22   Q.   Having met -- having met Danny Thomas
23  and having heard these stories from Lisa about Danny
24  Thomas, were you concerned that MEF had any kind of
25  relationship to the Tommy Robinson campaign?

Page 292

MR. CARSON:  Object to form.  What stories are you even talking about?

MR. GOLD:  I'm asking her whether having learned that Danny Thomas had been arrested at a rally, had been engaging in activities that was sultry at best, were you concerned that MEF had aligned itself with Danny Thomas.

MR. CARSON:  Object -- object to form, object to assuming facts not in evidence.  What --

BY MR. GOLD:

Q.    You can answer the question.

MR. CARSON:  What relationship are you even talking about.

MR. GOLD:  The fact that they were funding -- Danny Thomas was involved with the Robinson campaign.  I'm asking her having met --

MR. CARSON:  She told you that --

MR. GOLD:  -- Danny Thomas --

MR. CARSON:  I'll -- you finish and then I'll put my response on the record.

MR. GOLD:  Yeah, yeah, listen, why

Page 293

don't you let me finish the question.  All right?

BY MR. GOLD:

Q.    My question is --

MR. CARSON:  She already testified that the money was funded and -- and the rally happened at a time when they first met the guy.  Everything you're talking about happened after that.  So what relationship exactly are you talking about?  Did MEF have an ongoing relationship with this guy?  Is that something --

MR. GOLD:  What are you talking about?  That's even better yet.

MR. CARSON:  Okay.  Well --

MR. GOLD:  She has now been told that Danny -- let's get the facts.  -- Danny Thomas was arrested for having had assaulted somebody at a rally, Danny Thomas was --

MR. CARSON:  When?

MR. GOLD:  -- engaging in revenge porn with Lisa, who is an employee of MEF, and I'm asking her based on those

Page 294

two factors alone did she not think it would be in the best interest of MEF if she reported that to Daniel Pipes.

MR. CARSON:  I'm going to object.  I'm also going to tell her not to answer.

MR. GOLD:  Object to anything you want.

BY MR. GOLD:

Q.    You can answer the question.

MR. CARSON:  At this point you're just trying to harass and embarrass the client with -- you're making up facts, you're making up evidence, you're mischaracterizing, you're --

MR. GOLD:  These are -- well, let's --

MR. CARSON:  You're not going to --

THE COURT REPORTER:  I can't hear you.  I can't hear you.

BY MR. GOLD:

Q.    Ms. McNulty, did you not learn through conversations with Lisa that Danny Thomas was arrested for assault?

Page 295

MR. CARSON:  Objection.

BY MR. GOLD:

Q.    Answer the question.

A.    Yes.

Q.    Did you not learn from conversations with Lisa that Lisa was exchanging dick pics with Danny Thomas --

MR. CARSON:  Objection.

BY MR. GOLD:

Q.    -- and was threatening to send -- and was threatening to send photographs to the mother of his children?

MR. CARSON:  Objection.  You haven't shown her any dick pics.  Talking about discussion about one.

BY MR. GOLD:

Q.    You can answer the question.

MR. CARSON:  You can answer the question based on his hypothetical, the hypothetical dick pics --

BY MR. GOLD:

Q.    Answer the question.

MR. CARSON:  -- you never saw.

THE WITNESS:  Yeah, she did tell me that she had --

Deposition of Patricia McNulty                                    Lisa Barbounis v. Middle Eastern Forum, et. al.

Page 296

BY MR. GOLD:

Q.    Okay.

A.    -- dick pics.

Q.    So knowing those two facts and knowing that MEF was involved in funding this rally with the Robinson campaign, did you not feel it would be appropriate to report back to Daniel Pipes that this behavior was disconcerting to you at best?

MR. CARSON:  Objection.  Assuming facts not in evidence.  The campaign you're talking about --

BY MR. GOLD:

Q.    You can --

MR. CARSON:  The campaign you're talking about happened before what you just said, so how could she possibly tell them about something that hadn't happened yet?

MR. GOLD:  Your client just admitted -- she just admitted it happened.  What are you talking about?

MR. CARSON:  The campaign happened in June of 2018.  The dick pics you're talking about happened a year later.  So how is she supposed to --

Page 297

MR. GOLD:  We're not going -- we're not on June.  We're on January of '19 now.

THE COURT REPORTER:  I can't hear either of you.  I can't hear either of you.

MR. CARSON:  (Indiscernible) magical time machine --

MR. GOLD:  Seth, Seth, look at the text --

MR. CARSON:  -- go forward in the future --

MR. GOLD:  Seth, the text message is dated January 15th, 2019.  If you had the exhibits --

MR. CARSON:  Correct.

MR. GOLD:  -- in front of you instead of playing with your kid all day, maybe you would know what I'm talking about.

MR. CARSON:  No, actually -- you actually just made my point, so thank you, that it's -- the exhibit you're showing her was in January 2019.  The rally occurred in June 2018.

Page 298

MR. GOLD:  And I'm asking her -- and I'm asking her --

MR. CARSON:  So what was she supposed to do, time machine, go six months into the future and then go back in time to warn him about what might happen?

MR. GOLD:  We're in January of 2019 --

MR. CARSON:  She's not going to answer the question.

MR. GOLD:  My question is --

THE COURT REPORTER:  I can't hear you.

MR. GOLD:  -- why did she not in January of 2019 report this to Daniel Pipes.

THE COURT REPORTER:  Okay.  Excuse me.

MR. CARSON:  Because they weren't in the relationship in 2019.

THE COURT REPORTER:  Excuse me.

MR. CARSON:  She's not going to answer the question.

THE COURT REPORTER:  Excuse me.

Page 299

None of that was on the record because I couldn't hear either of you.

MR. GOLD:  I'm going to withdraw the line of questioning.  I don't have any time to educate Mr. Carson on the facts.

MR. CARSON:  Yeah, I'm the one educating you, actually, but go ahead.

MR. GOLD:  I don't think so.  I don't think so.

MR. CARSON:  I know so.  That's why it's called an education --

BY MR. GOLD:

Q.    In January of 2019, ma'am, what was your understanding of the relationship that Lisa had with Danny Thomas?

A.    They were intimate.

Q.    Okay.  And at that point in time you had, in fact, learned that Danny Thomas at some point in time had been arrested, correct?  For assault.  Correct?

A.    In January of 2019.

Q.    January 2019.  So my question to you, ma'am, is, in January of 2019 why did you not report that to Daniel Pipes?

Deposition of Patricia McNulty                                    Lisa Barbounis v. Middle Eastern Forum, et. al.

Page 300

A.    Because the MEF wasn't working for Danny anymore.  He was -- they worked with him in June of 2018 for a rally.  But as far as I know there was no continued work with Danny Tommo.

Q.    In 2019.

A.    Not that I know of.

Q.    That's as far as you know.

MR. CARSON:  I thought you were going to withdraw this line of questioning.  She just -- I guess she just explained to you what I tried to explain to you to try to save you the trouble of asking questions that are --

MR. GOLD:  Listen, you can do whatever you want on redirect, I don't really care, okay, what you do.  The fact of the matter is -- she answered the question as to why she didn't report it, and that's an adequate answer. Okay?  You're trying to -- you're acting as if I'm trying to lead her into a question that has no foundation when, in fact, she's just admitted the two key factors that support my question. You're the one who is belaboring a moot

Page 301

point.

MR. CARSON:  That's not at all what just happened, but --

MR. GOLD:  It's absolutely true. She admitted the two predicate facts of my question and she explained why she didn't report it.  There is nothing more to it.  There is nothing sinister about the question.  You're just so anxious to jump in and make an objection.

What's the next exhibit?  We're on exhibit --

MR. CARSON:  (Indiscernible.)

MR. GOLD:  Yeah, let the record speak for itself.

We're now on Exhibit 29.

THE WITNESS:  I think we're past this.

MR. GOLD:  Go to the highlighted portion of 29.  Stop.  Go back.  Go back.  Go back.  Okay.  Go back.  Go back to 29.  Go back.  Stop.  Stop.  We covered this one.  Go right to 30.  Go ahead, 30.  Stop.

THE WITNESS:  We just did this one

Page 302

too.

MR. GOLD:  Yeah, we went through this one too.  Go to 31.

BY MR. GOLD:

Q.    She tells you that Matt just told me not to message him anymore.

MR. GOLD:  Scroll down.  Scroll down.  Hold on.  Hold on.  Go back to --

BY MR. GOLD:

Q.    Again, are you in the gray or are you in the blue?

A.    Still in the blue.

Q.    Okay.  So you say:  I texted Matt earlier and no reply.  Is he just done and never going to talk to any of us ever again.

Okay.  Had he left the organization at that point?

A.    He hadn't.  He was fighting with Daniel and he was threatening to leave.

Q.    Okay.

"Matt just told me to" -- "not to message him anymore.  He said he's waiting for DP to give him his letter of recommendation and then he's leaving Philly and MEF as soon as possible, and to please not message him anymore."

Page 303

Okay.  And Lisa responds:  Same here.

And you say:  What the fuck.

And she says:  I honestly don't care anymore.

And you say:  It impacts me so much though.  I feel like his role changes are out of the window now, I'm not taking on his job without any training on how to do it.

Okay.  And his job was director of development, correct?

A.    Correct.

Q.    And you were concerned about taking over his job because you hadn't had any training to do that job, correct?

A.    On how he did it, yeah.

Q.    Okay.  And --

MR. GOLD:  Scroll down.  Stop.

BY MR. GOLD:

Q.    And Lisa says:  I know.  I spoke to DP and I'll call you in 20.

Was that Daniel Pipes she's referring to?

A.    Yes.

Q.    Okay.  And you said:  Okay.  Any time after 3, on a Qatar call til then.

Page 304

1  And then she writes:  He even noticed I
2  dyed my hair.
3      Do you know who the "he" is?
4      A.   I don't.
5      Q.   Daniel Pipes?  You don't?  Okay.
6  "Did he comment on how skinny minny you
7  are?"
8      "I brought it up and he said I look
9  great.  I sent a snap to sandman."
10     Who is sandman, do you know?
11     A.   Patrick.
12     Q.   Okay.
13     "Of course you do duh."
14     MR. GOLD:  And keep scrolling
15  down.  Okay.  Stop.
16  BY MR. GOLD:
17     Q.   "We just got an e-mail from him that
18  basically said no one is getting raises or bonuses.
19  So, I'm tweeting my resume tonight.  Fuck all this."
20     And the "him" is what?  Matt?
21     A.   I don't remember.
22     Q.   Okay.  So is that when you started
23  sending out resumes for a new job?
24     A.   No.
25     Q.   Okay.  So why did you send that

Page 305

1  message?
2      A.   Because I was venting.
3      Q.   Okay.  And then she writes back:  I
4  responded to Sam directly because I didn't want Gregg
5  to have the passwords.  I should have cc'd you.
6      What passwords is she talking about?
7      A.   I don't know.
8      Q.   Okay.  You say:  What are you doing.
9  Call me back.
10     MR. GOLD:  Scroll down.  Keep
11  going.  Stop.
12  BY MR. GOLD:
13     Q.   Looks like we have -- here is an
14  exchange between Lisa and Marnie Meyer.
15     MR. GOLD:  Scroll down.
16  BY MR. GOLD:
17     Q.   Is this Lisa and Marnie's exchange or
18  is this your exchange with Marnie?
19     A.   This is my exchange with Marnie I
20  think.
21     Q.   Okay.  You said:  I'm livid over the
22  honorarium stuff and that I was involved at all.
23  That wasn't my poor planning and I did all I could to
24  try to get some communication between you and Gregg.
25  It clearly won't be the case for the gala.

Page 306

1      What were you talking about there?
2      A.   There was a lot of fighting between
3  Gregg and Marnie during an event we held because they
4  refused to talk to each other directly, so they would
5  use me as the middleman to talk about financials.
6      Q.   Okay.  All right.
7      MR. GOLD:  Okay.  So let's scroll
8  down.  And now we're on Exhibit 32.
9  Stop.  Can you blow that up a little
10  bit?
11  BY MR. GOLD:
12     Q.   Is this another exchange between you
13  and Marnie?
14     A.   Yeah, that's continuing the same one.
15     Q.   Okay.  Do you want to take a chance --
16  do you want to read that?
17     A.   Okay.
18     MR. GOLD:  Scroll down -- which
19  exhibit is this?  Scroll up.  Scroll
20  down.  Scroll down.  Okay.  It's -- this
21  is Exhibit 32 for the record.  Okay.
22  BY MR. GOLD:
23     Q.   So in that e-mail you say to -- I guess
24  now you're back -- after you communicate with Marnie
25  now you're communicating with Lisa, correct?

Page 307

1      A.   Correct.
2      Q.   And you say:  I'm done with this bitch.
3      What's the -- what was the story there?
4  What's the context of that commentary?
5      A.   It was just being upset with Marnie at
6  the time having to do that in-between portion of the
7  finance between her and Gregg and her not
8  understanding why that shouldn't have been.
9      Q.   Okay.  So this is one of the many
10 altercations or differences of opinion you had with
11 Marnie while you were working at MEF?
12     A.   That was a difference of opinions, yes.
13     Q.   Okay.  And we're now in January of 2019
14 -- February of 2019, and would it be fair to say that
15 this -- the problems you had, the interpersonal
16 problems you had with Marnie, now had been going on
17 for over a year?
18     A.   I mean, Marnie and I didn't have a ton
19 of issues that came together between the two of us.
20 I didn't always trust her based on things that were
21 told to me, so I didn't talk to her very much outside
22 of whatever was work communication and --
23     Q.   It was all work related, correct?
24     A.   Correct.
25     Q.   Okay.  So did you ever try to work out

Case 2:19-cv-05030-JDW   Document 110-3   Filed 03/02/21   Page 80 of 157

Deposition of Patricia McNulty                                          Lisa Barbounis v. Middle Eastern Forum, et. al.

Page 308

1 these conflicts with her?
2     A.    Like I said, there weren't a ton of
3 conflicts.  It was -- that was like one argument that
4 we had.
5     Q.    Well, you said you were done with this
6 bitch.  That's like past tense.  So you're just done
7 with her for that day?
8     A.    Yeah.
9     Q.    Okay.
10     A.    That moment.
11     Q.    And you considered -- and you
12 considered her to be a bitch towards you, correct?
13     A.    At that moment.
14     MR. GOLD:  Let's go to Exhibit 33.
15 BY MR. GOLD:
16     Q.    Okay.  Why don't you read through that
17 exchange with Lisa.  Looks like she shared an article
18 with you from The Sun, Tommy Robinson drugs racist
19 slur rant.  Do you recall that?
20     A.    Vaguely.
21     Q.    Did you hit that link when you got it?
22     A.    Probably.
23     Q.    Okay.  So you then say:  Why would he
24 record that?
25     And you say -- that's what -- so were

Page 309

1 you concerned that -- that Lisa was associated with
2 Danny Thomas and this Tommy Robinson campaign given
3 what you just read in that article on The Sun?
4     A.    I mean, Lisa's a big girl, she could
5 handle herself.  I wasn't --
6     Q.    Okay.  So did you think about telling
7 Daniel Pipes about this -- about what you had read?
8     A.    No.  Again, as far as I know we weren't
9 working with -- and they would -- any of this stuff
10 that's out there in the internet they would know
11 before I would --
12     Q.    Okay.  But Lisa was -- Lisa had an
13 ongoing relationship with Danny Thomas throughout
14 this entire time, correct?
15     A.    That video was about Tommy Robinson.
16     Q.    I know.  And Danny Thomas was part of
17 -- part of that campaign, correct?
18     A.    I don't know if he still was.  He
19 wasn't always a part of the campaign.
20     Q.    Do you know whether MEF was putting any
21 more money into the Robinson campaign as of February
22 2019?
23     A.    We weren't holding rallies for him.
24     Q.    And do you know whether any money was
25 being invested in that campaign at that point?

Page 310

1     A.    Not that I know of.
2     Q.    Okay.
3     MR. CARSON:  Middle East Forum
4 doesn't invest money into people's
5 campaigns.
6     MR. GOLD:  What do you call it?
7 What do you call it?  Contributing money
8 to person's campaign?
9     MR. CARSON:  The Middle East Forum
10 is not allowed to make political
11 contributions.
12     MR. GOLD:  They can -- you can --
13     MR. CARSON:  You might want to
14 have a conversation --
15     MR. GOLD:  You can rehabilitate
16 your witness, you can go through
17 redirect, you can do whatever you want
18 to do.  Let me finish my deposition.
19 All right?
20     MR. CARSON:  (Indiscernible).
21     THE COURT REPORTER:  I can't hear
22 you.
23     MR. CARSON:  I'm trying to educate
24 you --
25     THE COURT REPORTER:  Mr. Carson, I

Page 311

1 can't understand what you're saying.
2     MR. CARSON:  Your client is not
3 permitted to make political
4 contributions --
5     MR. GOLD:  And I'm not saying they
6 did.  Okay?  I'm not saying they did.
7     MR. CARSON:  You asked her a
8 question about a political campaign.
9 Are we going to waste time with
10 questions like these at 5:00?
11     MR. GOLD:  You've got your -- you
12 got your objection on the record and
13 that's fine and dandy.  We're going to
14 move on.
15 BY MR. GOLD:
16     Q.    So as far as you know, MEF was not
17 involved paying any -- any legal cause in connection
18 with the Robinson campaign at that point?
19     A.    Not that I know of.
20     MR. GOLD:  Okay.  Go to exhibit --
21 next exhibit which is 34.
22 BY MR. GOLD:
23     Q.    Do you know who Twin Walton is?
24     A.    I know of him.  I don't actually know
25 him.

Page 312

Q.    Was Lisa involved in a relationship
with him?

A.    I mean, I can't recall everyone or --
that Lisa's had a relationship with.

Q.    Who is -- who is Twin Walton?

A.    I know she met him in London.  I don't
exactly know who he is.

Q.    Was he involved with the Robinson
efforts?

A.    I don't think so.  I think he's like a
security person.

Q.    Okay.  Security guard?

A.    I believe so.

Q.    Okay.  Do you know why she would share
with you the conversation that she had with Twin
Walton?

A.    I can't see the conversation.  I'm not
sure what --

MR. GOLD:  Do you want to blow
that up, Matt?

THE WITNESS:  Okay.

BY MR. GOLD:

Q.    Do you have any reason to know why she
would share that with you?

A.    I don't know, just to show that he was

Page 313

being nice.

Q.    And then you said that you don't know
much about their relationship, correct?

A.    Correct, not that I can recall.

Q.    Were they going out at all, do you
know?

A.    What does that even mean, going out?

Q.    Well, were they having sex?

A.    I don't remember.

Q.    Did she tell you they had sex?

A.    I don't remember.

MR. GOLD:  Okay.  Let's go on to
the next exhibit, 35.  Stop there at the
yellow.

BY MR. GOLD:

Q.    This is Lisa telling you that Marnie
called screaming that I moved over the calendar for
everybody.  "Oh my god.  She's crazy."

Looks like Lisa again was encountering
problems working with Marnie as of March of 2019.
Did you have any problems with Marnie as well in
March of 2019?

A.    I don't remember.

Q.    Do you know whether Lisa's complaints
about Marnie were justified or was she overreacting?

Page 314

A.    No, I think they were -- I mean, I
think it was justified to be -- it was just a blown
out of proportion scenario for everyone.

Q.    Why is that?

A.    Because it was just moving over the
calendars, there was no -- just doing work.

Q.    Okay.  So really then it wasn't
justified, it was just moving over the calendar.

MR. CARSON:  Objection.  Is that a
question?

MR. GOLD:  Let's move over to the
next exhibit, thirty -- let's go to 35,
of the yellow highlighted part.  Keep
going.  Okay.  Here it is.

BY MR. GOLD:

Q.    "The whole thing is stupid, I can't
even believe she's acting like this and says these
things."

Why don't you take a minute and read
that.  Do you want to go up to the top of the page or
can you start there?

A.    I can start here I guess.

Q.    Do you know who you're referring to in
terms of who was offered the job?

A.    I don't think I've gotten to that point

Page 315

yet.

Q.    Okay.

A.    Okay.

Q.    Okay.  What's the context of this
conversation?

A.    About the head of the office again.

Q.    In terms of who?  Who are we talking
about here?  It says:  Look if Daniel offered her the
job.

Who is "her"?

A.    Marnie.

Q.    Marnie.  Okay.  And what job did he
offer her?

A.    It said if, if Daniel offered her the
job of head of the office.

Q.    Head of the office?  We're coming down
to that point -- we talked about at the Continental,
the point person?

A.    Correct, that never happened.

Q.    Okay.  Well, I thought you said they
had taken a vote.  That took place?

A.    We took a vote.

Q.    And that never happened.

THE VIDEO SPECIALIST:  Your volume
is very low.

Case 2:19-cv-05030-JDW   Document 110-3   Filed 03/02/21   Page 82 of 157

Deposition of Patricia McNulty                                    Lisa Barbounis v. Middle Eastern Forum, et. al.

Page 316

1    MR. GOLD:  I'm sorry, can you hear
2  me?  Yeah.  I'm sorry.
3  BY MR. GOLD:
4    Q.    So this was subsequent to that meeting
5  at the Continental?
6    A.    Correct.  That wasn't at the
7  Continental, that meeting.  That meeting was in the
8  conference room at MEF.
9    Q.    Oh, in the conference room.  Okay.  And
10  when was the luncheon at the Continental?
11    A.    I don't remember.  It was in March of
12  2019.
13    Q.    Well, was it before this meeting in the
14  conference room or after?
15    A.    I think it was after.
16    MR. GOLD:  Okay.  Go to the next
17  exhibit.  We're on -- we're on 36.
18  BY MR. GOLD:
19    Q.    This is another exchange between you
20  and Lisa, and she says:  Someone has to tell Danny to
21  fix this shit because it's fucking up Tommy's
22  relationship with MEF or something like that just not
23  so extreme.
24    Do you know the context for that
25  conversation?

Page 317

1    A.    I don't.
2    Q.    Well, at that point it appears as
3  though MEF had some kind of relationship with the
4  Tommy Robinson campaign, correct?
5    A.    I don't know if they did or if this is
6  saying that this is hurting the fact that there can't
7  be a relationship.
8    Q.    Well, it says:  Someone has to tell
9  Danny to fix this shit because it's fucking up
10  Tommy's relationship with MEF.
11    Seems to me that there is an ongoing
12  relationship between Tommy Robinson and MEF, you just
13  don't know about it?
14    A.    Not that I know of, no.
15    Q.    Okay.  And she says:  I'm getting
16  depressed over it.
17    And you say:  What happened?
18    MR. GOLD:  Scroll down.  Could you
19  blow up that exchange there that looks
20  like it's a -- scroll up.
21    MR. CARSON:  For the record, MEF
22  is a 501(c)(3).  By definition --
23    MR. GOLD:  I think I know that.
24  Thank you very much for telling me that.
25  Appreciate it.

Page 318

1    MR. CARSON:  By definition they're
2  absolutely prohibited from engaging in
3  any political activity.
4    MR. GOLD:  I think we know that.
5  Scroll down.
6    MR. CARSON:  That includes funding
7  campaigns or being involved in political
8  campaigns.
9  BY MR. GOLD:
10    Q.    And then she says to you:  Did you get
11  that message from Mr. Fink?
12    And you said:  I did.  Gonna do it
13  tomorrow.
14    MR. GOLD:  Keep scrolling.  Go
15  down to 37.  Okay.  Keep going to the
16  yellow highlighted part.  Could you blow
17  up that -- okay.  Stop.
18  BY MR. GOLD:
19    Q.    This is a chat with Daniel Pipes.  Is
20  this -- were you involved in this chat or is this
21  something Lisa sent you?
22    A.    No, this is between me and Daniel.
23    Q.    You and Daniel.  Okay.  Good.
24    And who says "Matt appears to be
25  playing games again"?  Is that you?

Page 319

1    A.    Daniel.
2    Q.    Daniel.  Okay.
3    "He heard nothing, as there is no job
4  description.  I yesterday sent the announcement from
5  2016 to Marnie and Gregg.  That's all.  I fail to
6  understand why, if you are a candidate for the job,
7  you expect to be part of the selection process.  That
8  only makes sense if you were not a candidate."
9    So you then write:  I don't expect to
10  be part of the selection process but I've accepted
11  the responsibility, at least in the interim --
12    Were you saying that you were -- you
13  thought you were the acting program director?
14    A.    No, I was the acting director of
15  development at this time.
16    Q.    Development, okay.  So -- and it's true
17  you weren't -- you didn't think you would be part of
18  the selection process at the time?
19    A.    I did not, no.
20    Q.    Okay.  So what was the point you were
21  trying to make in the context of this exchange with
22  Mr. Pipes?
23    A.    I was upset that Gregg had gone to --
24  had called Matt and told him things about MEF work
25  that I didn't know and then Matt had called and told

Page 320

1  me and after signing the NDA you shouldn't be telling
2  MEF proprietary information to anyone who doesn't
3  work at MEF.
4      Q.   Okay.  And you then made this known to
5  Mr. Pipes, and is that how he responded, "Matt
6  appears to be playing games again, he heard nothing"?
7      A.   Correct.
8      Q.   Did Mr. Pipes tell you that he had
9  spoken with Mr. Bennett?
10     A.   No.
11     Q.   Okay.  Well, it seems like he did from
12 this exchange.  Was that what you -- you assumed that
13 he spoke with Mr. Bennett?
14     A.   No, he's not saying that he spoke with
15 Matt at all.  He's saying that he thinks Matt is
16 playing games with me.
17     Q.   Okay.  Okay.  And you made your
18 position known.
19         "I know you said you wanted to find a
20 director before looking for a new DOD but I was under
21 the impression that there was a probationary period
22 for Gregg" --
23         MR. GOLD:  Scroll down.
24 BY MR. GOLD:
25     Q.   -- "and therefore thought you might

Page 321

1  wait until that was set.  I would have more time to
2  prove myself.  The news caught me off guard.  It just
3  does not feel good to learn the news concerning my
4  job that could greatly impact my future was first
5  told to a person who doesn't even work for the Forum
6  while I remained in the dark."
7         Are you referring to Mr. Bennett?
8      A.   And Gregg, the conversation between the
9  two of them, yes.
10     Q.   Okay.
11         MR. GOLD:  And scroll down.  Stop.
12 It's the same thing.  Go ahead.
13         THE WITNESS:  That wasn't the same
14 thing.
15         MR. GOLD:  Right.
16 BY MR. GOLD:
17     Q.   You then say that -- "to repeat, I told
18 Matt nothing at all."
19     A.   That's Daniel.
20     Q.   "I'm not" -- pardon me?
21     A.   That's Daniel.
22     Q.   Yeah.
23         "I told Matt nothing at all.  I'm not
24 in communication with him" --
25         And you believed Daniel was telling the

Page 322

1  truth at that point, right?
2      A.   That he hadn't spoken to Matt?  Yes.
3      Q.   Correct.  Okay.  Good.
4          And he says:  I do not recall you
5  asking me or agreeing to hold off until an
6  announcement for you to prove yourself --
7          Did you ask for time to prove yourself?
8      A.   I had talked about it with people in
9  the office, yes.
10     Q.   Did you talk with Mr. Pipes about it?
11     A.   When he gave me the position we had
12 talked about it, yes.
13     Q.   Okay.  And when were you given the
14 position?
15     A.   When Matt left.
16     Q.   So that would be March of 2019,
17 correct?
18     A.   Correct.
19     Q.   Okay.  This is all in that same time
20 period, correct?
21     A.   Correct.
22     Q.   Okay.
23         -- so I fail to see how you could be
24 upset that was not in my thinking.  I am not a mind
25 reader to know what your impression you had.

Page 323

1          And you say:  I know you are not in
2  communication with Matt and that was discussed
3  between him and Gregg.
4          And that's based on what Matt told you?
5      A.   Matt knew that the job description had
6  already been -- was already in the works, so he had
7  given me information that I would have in no other
8  way known, so yes.
9      Q.   Well, how do you know that Gregg talked
10 to Matt?
11     A.   Matt told me that he learned this from
12 Gregg.
13     Q.   Okay.  So you had conversations with
14 Matt, and Matt told you he had conversations with
15 Gregg.
16     A.   Correct, Matt told me Gregg had called
17 him.
18     Q.   And when did that take place in
19 relation to this conversation you had with Mr. Pipes?
20     A.   The same day.
21     Q.   Okay.
22         "I reached out to you because I was mad
23 at you for this but to make you" -- "I was not" -- "I
24 was mad at you for this" --
25     A.   "Not because."

Deposition of Patricia McNulty                           Lisa Barbounis v. Middle Eastern Forum, et. al.

Page 324

Q.   -- "not because I was mad at you but to make you aware that it is disheartening to be updated this way and to be given the impression the decision has already been made."

MR. GOLD:  Scroll down.  Stop.

Scroll down.  Okay.

BY MR. GOLD:

Q.   He says -- then Mr. Pipes says:  As you acknowledge I had nothing to do with the communication with Matt, I don't understand why you are complaining to me.  If Gregg told him this, complain to him, no?  I am sorry if you are disheartened but I don't believe I signaled in any way that we would hold off looking for Matt's permanent replacement.  Nor am I clear why you think we should do so; I figure it's best to have this job permanently filled as soon as possible.  Do you disagree?  It is not incumbent upon you to come to me and ask for a delay so you can prove yourself, rather than assume this is the intended course of action and be then be disappointed when you learn of it again it's not -- I am not a mind reader.  I had no knowledge until now what you expected.  How could I?

MR. GOLD:  Scroll down.

BY MR. GOLD:

Page 325

Q.   And who said "I'm done"?  Is that you?

A.   Yes.

Q.   Okay.  You say:  What time I coming in?  Should I wait for you downstairs?

And she says -- this is Lisa now -- "seven minutes away in an Uber?"

A.   Yeah.

MR. GOLD:  Okay.  Let's go to Exhibit 39.

BY MR. GOLD:

Q.   So were you satisfied with Daniel's explanation?

A.   No, I was very dissatisfied for multiple reasons.

Q.   Why?  Why?

A.   Well, one, he had said that even with Gregg staying on, he wasn't leaving, he wasn't fired, there weren't repercussions in that way, he said that, you know, we would go to him now for things and there -- we wouldn't have to worry about Gregg in that manner, and the second I told him that Gregg did something wrong he's like go complain to Gregg about it, not me.  So it was exactly the opposite of what he said he was going to do.  So --

Q.   Well, Gregg was back -- Gregg was back

Page 326

in the office at this point, right?

A.   He wasn't actually working from the office, but he was given more responsibility on a probationary period, as we were told it was supposed to be, a probationary period, and that Daniel was still supposed to be the person who was ultimately in charge and that we would go to him directly and not Gregg.

Q.   Are you telling me you think that Gregg was above Daniel Pipes in the pecking order?

A.   No, I'm saying that Daniel said there would be some sort of protection through him, but the first -- as soon as I said that Gregg was already doing things that he shouldn't be doing, Gregg told me to go complain to -- Gregg -- Daniel told me to go complain to Gregg about it and not him, he didn't want to be bothered.

Q.   Okay.  So did you go to -- did you go to Gregg and complain about it?

A.   I mentioned something to Gregg about the job role being created and he told me that it hadn't gone out yet and that they were creating it and that -- pretty much that was it, and Daniel and him talked about the conversation between him and Matt and he claims it doesn't -- never happened, but,

Page 327

I mean, at this point everything that they were doing was --

Q.   Well, first of all, who was selected for the job ultimately on a permanent basis?

A.   I don't know.  There was no one selected by the time I left.

Q.   Okay.  And you were permitted to apply for it, correct?

A.   Correct.

Q.   So I'm having difficulty -- what's the problem?

A.   The job role was being created by Gregg and I wasn't even made aware of it yet that it was being created and somebody outside of the organization already knew that -- that information, which shouldn't have happened, that should have been illegal based on the NDA.  Gregg was giving out information he shouldn't have been giving.

Q.   Okay.  So that's your point, that according to you under the NDA Gregg should not have been talking to Mr. Bennett.  Okay?  But you're not talking about the underlying, you know, interviewing people for that position.  You're not suggesting they had to give you time to prove yourself before they posted the job, is that what you're trying to say?

Page 328

1   A.   When Daniel gave me that position, when
2  he told me that I was going to be taking it on, he
3  did say -- we sat in his office and he told me this
4  is your time to show me exactly what you can do and
5  show me who you are because I don't know you.
6   Q.   Okay.  And you brought that up in your
7  conversation with Daniel and he responded
8  accordingly, so is that what you weren't happy with?
9   A.   I wasn't happy with everything I just
10 mentioned.
11  Q.   Okay.  But I think you admitted that
12 you weren't even properly trained for that job
13 anyway, correct?
14  A.   I wasn't trained by the person who was
15 doing it before me --
16  Q.   Right, because he's --
17  A.   -- which is --
18  Q.   -- no longer there, right?
19  A.   Well, because he was threatening to
20 leave.  That was in January.  He didn't leave until
21 March.  So I did end up -- he did end up showing me
22 exactly the way that he did it before he left.
23  Q.   Okay.  And did you meet all the
24 qualifications to be the director?
25  A.   Yes.

Page 329

1   Q.   Okay.  And when you finally left in
2  2019 had the position been filled yet?
3   A.   No.
4   Q.   Okay.  So nobody filled that position,
5  so what's the point?
6   A.   What's the point of what?
7   Q.   What are you not happy with?  No one
8  got that job, so what are you talking about?
9   A.   Do I have to repeat all the reasons why
10 I wasn't happy at that time again?
11  Q.   Well, no, because no one -- I just
12 don't understand -- it's a nonevent if nobody got the
13 job.
14  A.   That's months later that you're talking
15 about.  This is -- I left in September.  That was in
16 --
17  Q.   I'm in March of 2019, okay, when you
18 had these conversations with Daniel, you were upset,
19 but the bottom line is even by the time you had
20 left --
21  A.   Those text messages --
22  Q.   -- no one --
23  A.   -- that you --
24  Q.   -- no one had been placed in that
25 position, correct?

Page 330

1   A.   Correct, but that doesn't change the
2  fact that proprietary information was given out and
3  that -- that doesn't change the fact that those
4  conversations didn't happen in March.
5   Q.   Okay.  And you reported that to
6  Mr. Pipes and he answered accordingly and you weren't
7  happy with his answer, correct?
8   A.   He told me to go complain to Gregg.
9   Q.   Okay.
10  A.   Who is my --
11  Q.   And you weren't happy --
12  A.   -- sexual abuser, who has been --
13  Q.   And you weren't happy with that answer
14 --
15  A.   -- sexually abusing me since the moment
16 I stepped foot into that place and then the second he
17 wasn't in the office it was just changed to
18 retaliation and horrible -- it was --
19  Q.   When were you --
20  A.   -- a complete toxic workplace --
21  Q.   When were -- after November --
22  A.   -- from start to finish.
23  Q.   After March of -- after -- after
24 November of 2018 when were you sexually abused by
25 Gregg?

Page 331

1   A.   That's when the retaliation began.
2   Q.   No, you said you've been sexually
3  abused by Gregg since the time you were hired.  I'm
4  asking you after November of 2018 --
5   A.   And I said until he left the office and
6  then the retaliation started.
7   Q.   Okay.  So you weren't sexually abused
8  after March of 2019 by Gregg, correct?
9   A.   After March, yes; up until November
10 when he left, yes, the entire time.
11  Q.   I'm talking after November -- after
12 November.
13  A.   After November --
14  Q.   Yeah.
15  A.   -- then the retaliation started.
16  Q.   And what was the retaliation?
17  A.   It was a constant telling us -- telling
18 me to do things five times over but not giving me an
19 explanation on what was wrong with things.  He would
20 send me e-mails of highlighted items asking me to do
21 all of these things that weren't even in my job
22 description or sent him these things --
23  Q.   Were you ever placed on a performance
24 improvement plan?
25  A.   No.

Page 332

Q.   Were you ever disciplined?

A.   No, but people who were completely forced to leave before were done the same way.  It wasn't a we're going to put you on a performance plan, it's we're going to make you so uncomfortable that you have to leave --

Q.   Ma'am.

A.   -- because this is the worst --

Q.   Ma'am.

A.   -- place to ever be.

Q.   Okay.  But it was the worst place to ever be but you wanted to be there for at least ten more years, correct?

A.   I started out thinking that.  I didn't end thinking that.

Q.   Okay.

A.   Clearly.

Q.   And you didn't because you left for a better paying job ultimately anyway, correct?

A.   Yes, in a city where it's more expensive to live, so --

Q.   You could have --

A.   -- money had nothing to do with it.

Q.   You could have gone to Detroit or Cleveland.  You picked New York.

Page 333

A.   Correct, I did.

Q.   Maybe you should have considered, like, you know, Jackson Hole, Wyoming.

A.   Okay.  Do you want to give me life lessons now, too?

MR. GOLD:  Let's go to Exhibit Number --

BY MR. GOLD:

Q.   So just so I can be clear, you were never disciplined, you were never warned, you were never threatened with termination, prior to the point in time when you left the organization; is that accurate?

A.   I was just made to feel horrible all of the time so that I would want to leave.

Q.   Okay.  Got it.  But the answer to the question is, no, you were never disciplined, you were never placed on a PIP, you were never demoted, you were never -- salary was never reduced, and you were never threatened with termination, correct?

A.   Those things did not happen, no.

Q.   Okay.

MR. GOLD:  Let's go to Exhibit 39.  Stop.  Go back up -- this is the first highlighted -- yeah.

Page 334

BY MR. GOLD:

Q.   "I hate" --

MR. GOLD:  Why don't you go to the top of the page.  Scroll up for a minute.  I just want to get the date of this exchange here.  Okay.

BY MR. GOLD:

Q.   So this is another exchange between you and Lisa.  It says --

MR. GOLD:  Stop.  Go back up to the top.

BY MR. GOLD:

Q.   -- "Sandman" -- who I think is, what -- is that Patrick?

A.   Yes.

Q.   -- "replied to my Snap story and said 'let me eat some' and then said sorry I know you are wifed up and I" -- "and I friended me on Snapchat.  What is happening."

And you say:  Those faces.

What was your intention with that response?

A.   I don't know.  It looks like there must have been a video or something before.

Q.   Okay.

Page 335

MR. GOLD:  Let's scroll down then to the yellow highlighted part.  Stop.  Stop.  Go back one line.  Okay.  Stop.  Let's go back up.  Go back up.

THE WITNESS:  Could we take a two-minute break, please?

MR. GOLD:  Yeah, sure.  Off the record.

THE VIDEO SPECIALIST:  We are now off the record.  The time is 5:30.

(A brief recess was taken from 5:30 p.m. to 5:34 p.m.)

THE VIDEO SPECIALIST:  We are now back on the record.

BY MR. GOLD:

Q.   This is a -- we're -- this is a text message exchange between you and Lisa dated March 19, 2019, and it appears that you were on a cruise somewhere?

A.   Okay.

Q.   Is that accurate?

A.   Yes.

Q.   Okay.  And then you get an e-mail from -- I'm sorry, a text message from Lisa "I hate to bother you on a trip but the investor said he'll be"

Deposition of Patricia McNulty                    Lisa Barbounis v. Middle Eastern Forum, et. al.

Page 336

-- "he'll take a meeting with us."

And you write back:  Holy shit, I can't curse, that's amazing.

Do you know who the investor was?

A.    I don't, no.

Q.    Was it Terry Giles?

A.    It could have been.  I don't know.

Q.    Okay.

MR. GOLD:  Do you want to scroll down?

BY MR. GOLD:

Q.    Lisa says:  Oh my God.  He's going to be in London when I'm there.

And you say:  No way.  Are you going to meet him there.

You still don't know who he is?

A.    I don't remember.

Q.    Okay.  And this is roughly about -- this is, like I said, 2019.  Okay.

She says:  I just wrote him back saying I actually will be in London on the 21st and 22nd as well, can we meet there.

And she says:  He's going to be there for Tommy.

MR. GOLD:  Scroll down.  Stop.

Page 337

Okay.

BY MR. GOLD:

Q.    "I'm freaking out.  I hope he can meet me in London," she says.

And you say:  And the toes.

What's that supposed to mean?

A.    Crossing fingers.

Q.    Oh, cross your fingers.  Okay.

"When do you leave, tomorrow night?"

She says:  Yes.  I'm sick to my stomach.

And then you say:  Haha don't be.  You're going to be amazing and knock it out of the park and walk away with a hundred thousand dollar commission and a year off.

What were you talking about when you say she would be entitled to a hundred thousand dollar commission and a year off?

A.    This was starting a new -- I don't know the exact details, but the investor would have been paying her an annual salary for a job if it came to be.

Q.    So she was soliciting a donor of sorts?  An investor?

MR. CARSON:  Objection.

Page 338

Objection.  We know for certain that the person that we're talking about was never a donor of MEF, so don't ask a question --

BY MR. GOLD:

Q.    Okay.  So Terry Giles -- does this refresh your memory now that the person she was going to meet is Terry Giles?

A.    I really don't remember, but if you're saying --

Q.    Okay.  So explain to me again how does she -- how does she walk away with a hundred thousand dollars, Lisa, and a year off?

A.    I don't remember the exact details.  I just remember that this was talking about, like, a year employment for that amount of money.

Q.    Is that a commission on an investment or is that just a salary?  What exactly -- you say it's a hundred thousand dollar commission.  What were you talking about?

A.    A salary.

Q.    Not a commission.

A.    Correct.

Q.    Why did you use the word commission?

A.    I don't remember.

Page 339

Q.    And then she says to you:  I don't want to hear her off I'm on $135,000 salary and you to come with me at --

What's that word?

-- the same -- the same grand that's what.

What did you understand that to mean?

A.    That she didn't want a year off, she wanted $135,000 salary.

Q.    In addition to the hundred thousand dollar commission?

A.    Instead of a hundred and a year off.

Q.    Okay.  And then you said:  That would be insane.

And she said:  That's what I want.

And you said:  Well work yo magic on this angel.  You can always win over these types.

What types are we talking about?

A.    People in general.  Everyone likes Lisa when they meet her.

MR. GOLD:  Okay.  Scroll down.  Stop.  Could you blow up this exchange here?  I can't read it.  Scroll down.  Scroll down.  Stop.  Okay.  That's the next exhibit.  Okay.

Page 340

BY MR. GOLD:

Q.    So you don't know who the investor was and you don't know whether it was Terry Giles, correct?

A.    No, I don't remember.

Q.    Okay.  And you don't know whether the investor was a donor to -- potential donor for MEF?

A.    I don't remember who the person was, but she wouldn't have asked for money from a donor.

Q.    Well, if it -- is Jerry -- is Mr. Giles, Terry Giles, a donor to MEF?

A.    I don't know offhand.

Q.    What if she were meeting with a donor for MEF and was cutting a side deal for her to make a hundred thousand dollars, would that be appropriate?

MR. CARSON:  Objection.

THE WITNESS:  Why are we talking about hypotheticals.

MR. CARSON:  And her opinion on the hypotheticals.

BY MR. GOLD:

Q.    You can answer the question.

MR. CARSON:  You can answer -- you can answer your -- what your opinion is based on the hypothetical thing that

Page 341

never happened that --

MR. GOLD:  Correct.  Correct.

MR. CARSON:  I guess the question is would it be appropriate?  Is that the question?

MR. GOLD:  Yeah, appropriate for her to make -- for her to solicit an investment from a MEF donor for a hundred thousand dollars.

MR. CARSON:  I would suggest it would be entirely appropriate.  The witness is welcome to answer that, what she thinks.

THE WITNESS:  My opinion would be no.

BY MR. GOLD:

Q.    Okay.  And why is that?

A.    My personal opinion would be that MEF -- if we're soliciting money as employees from MEF for donations to MEF we wouldn't do anything off to the side unless it was spoken about with Daniel.

Q.    Okay.  So you would have suggested that -- if, in fact, it was a donor, you would have reported to Daniel or would you expect that Lisa to report it to Daniel?

Page 342

MR. CARSON:  Objection.  Same objection.  Hypothetical opinion.

BY MR. GOLD:

Q.    Under those circumstances would you have reported it to Daniel?

A.    I would have expected Lisa to report it to Daniel if she's the one who is actually meeting him and --

Q.    Let's say Lisa didn't report it to Daniel.  Would you report it to Daniel?

MR. CARSON:  It's a hypothetical about a hypothetical.

MR. GOLD:  I know it's a hypothetical.  Go ahead.

THE WITNESS:  Yes, if I knew that was the case.

MR. CARSON:  I'm going to object -- I'm going to object to the form of the question.

MR. GOLD:  Okay.  Let's go to the next exhibit here.  We're on Number 40 now.

MR. CARSON:  I think we're also running out of time, but yeah.

MR. GOLD:  How much time do I

Page 343

have?

MR. CARSON:  We started about 10:10, so --

MR. GOLD:  I'm going to buzz through this.  Let's go to Number 40. Stop.

BY MR. GOLD:

Q.    At that point if you look at -- it says -- Lisa says to you:  I'm -- that's it.  I'm looking for a new job.  Resume workshop tomorrow.

Was Lisa, in fact, looking for a new job at that juncture?

A.    It's possible, yes.  I don't know.

Q.    And you said:  Oh God what happened? We're now in April of 2019.

"But also, yes, I applied to like 20 jobs on Monday night."

Is that true?

A.    Yes, I started applying jobs in the spring of 2019.

Q.    Is that the first time you started applying, in April?

A.    Yes.

Q.    Okay.  And she says:  I sent you his response back to me.  Fuck off dude.

Page 344

1  Who is she talking about?
2  A.   I'm not sure.
3  Q.   Okay.
4  MR. GOLD:  Scroll down.  Scroll
5  down.  Scroll down.  We're on Exhibit 44
6  now.  Let's go back to Exhibit 42 for a
7  second.  Go to the yellow.  Stop.  Can
8  you scroll up for one second?  Is this
9  Exhibit 42?  Okay.  Go to forty -- okay.
10 BY MR. GOLD:
11 Q.   It says:  Right why am I asking you you
12 went off so I can't -- I don't call the same one --
13 MR. GOLD:  Keep going.  Scroll
14 down.  Scroll down.  Stop.
15 BY MR. GOLD:
16 Q.   She mentions:  I'm looking at lawyers
17 now.  I don't want to double up or waste my time
18 calling somebody that you already called.  I'm
19 looking at Murphy Law Group.
20 And then you say:  Sorry I'm driving,
21 hold on.  Sidney L. Gold and Associates.
22 What was that exchange about?
23 A.   What lawyers we were going to call.
24 Q.   Okay.  And did she actually call the
25 Murphy Law Group?  Do you know?

Page 345

1  A.   I'm not sure.
2  Q.   And did you call my office?
3  A.   I did.
4  Q.   Okay.  Who did you speak with, do you
5  know?
6  A.   You.
7  Q.   Oh, me.  Okay.  And what did we talk
8  about?
9  A.   We talked about the type of case that I
10 was -- that I was looking at discussing with you --
11 Q.   Right.
12 A.   -- and then you asked me who the names
13 of the people involved were --
14 Q.   Okay.
15 A.   -- and when I said Gregg's name, you
16 said that it was a conflict of interest and you
17 couldn't because of Gregg.
18 MR. GOLD:  All right.  Scroll
19 down.  Scroll down.  Stop.  Scroll down.
20 Go to the -- we're now on Exhibit 43.
21 Go back to 42 for one minute.  Are we on
22 -- scroll up.  Scroll down.  Scroll
23 down.  Go -- keep going.  Keep going.
24 Keep going.
25 BY MR. GOLD:

Page 346

1  Q.   Who is this individual?  There's a
2  photo here of somebody?
3  A.   Of Benjamin Baird.
4  Q.   Is he an employee of -- was he an
5  employee of MEF at the time?
6  A.   Yes.
7  Q.   Who is he, do you know?
8  A.   What do you mean who is he?
9  Q.   Who was -- was he an employee of MEF?
10 A.   Yes, you just asked that and I said
11 yes.
12 Q.   Okay.  I didn't hear the yes.  I'm
13 sorry.  So why would Lisa have taken a picture of him
14 sleeping -- is that a hospital bed or is that an
15 actual bed?
16 A.   That's an actual bed.
17 Q.   Do you know whether Lisa slept with
18 him?
19 A.   Yes.
20 Q.   Is that what she told you?
21 A.   That they were intimately involved,
22 yes.
23 Q.   Do you think her dating life and sex
24 life was adversely impacting her employment at MEF?
25 A.   To be honest, it's not something I

Page 347

1  really think about her personal life outside of --
2  Q.   Did it have any impact on her
3  employment positive or negative?
4  MR. CARSON:  Objection.  Are we
5  talking about when Gregg Roman sexually
6  harassed her twice -- what are we
7  talking about here?
8  MR. GOLD:  I'm talking the fact
9  when she's sleeping with guys that work
10 at MEF, okay, like Mr. Baird.
11 MR. CARSON:  Are we talking about
12 (indiscernible) --
13 MR. GOLD:  That's what we're
14 talking about, yeah.  Listen, you have
15 your chance --
16 MR. CARSON:  (Indiscernible.)
17 MR. GOLD:  You can ask her all the
18 questions you want on redirect.
19 THE COURT REPORTER:  I can't hear
20 anything Mr. Carson is saying.
21 MR. CARSON:  I don't have any
22 questions.  I have no questions --
23 BY MR. GOLD:
24 Q.   My question is, ma'am -- you can answer
25 yes or no.

Deposition of Patricia McNulty                    Lisa Barbounis v. Middle Eastern Forum, et. al.

Page 348

1    MR. CARSON: Are we talking about
2 --
3 BY MR. GOLD:
4    Q.   Did the fact that she slept with Mr. --
5 did the fact that she slept with Mr. Baird, did that
6 have any impact on her employment at MEF?
7    MR. CARSON: Objection. I'm going
8 to instruct her not to answer that.
9    MR. GOLD: On what grounds?
10    MR. CARSON: It's designed to
11 embarrass and harass.
12    MR. GOLD: Because what?
13    MR. CARSON: No relevance.
14    MR. GOLD: Because of what?
15    MR. CARSON: Designed only -- it's
16 only -- it's designed only to embarrass
17 and harass. Rape shield. It's a great
18 --
19    MR. GOLD: How does it embarrass
20 her? She's not the one having sex with
21 Mr. Baird, so how does it -- how is it
22 harassing to her?
23    MR. CARSON: She's such a slut so
24 she -- so Gregg Roman should have
25 sexually assaulted her, right? That's a

Page 349

1 great strategy you guys are developing.
2    MR. GOLD: Well, I want to know --
3 you're telling her not to answer the
4 question because of the rape shield law,
5 is that your objection?
6    MR. CARSON: The question is
7 designed solely to embarrass and harass.
8 There is no basis --
9    MR. GOLD: In what country? What
10 law are you relying -- what's the legal
11 authority for that objection?
12    MR. CARSON: The legal authority
13 is that you can -- is that when a
14 question is designed solely to embarrass
15 and harass the witness or to embarrass
16 and harass period that they don't have
17 to answer the question, they could be
18 instructed not to answer --
19    MR. GOLD: How does it embarrass
20 her? She's already admitted that she
21 knew that Lisa slept with him, so where
22 is she -- embarrassed about what?
23    MR. CARSON: My objection is
24 noted.
25    MR. GOLD: Okay. We'll move on.

Page 350

1    Let's go to the next exhibit.
2 We're on now -- stop. Keep going.
3 Stop. Okay.
4 BY MR. GOLD:
5    Q.   By the way, you learned that Lisa was
6 sleeping with Ben Baird, did you report it to anybody
7 at MEF?
8    A.   No.
9    Q.   Did you ever observe Lisa flirting with
10 any other MEF employees or contractors?
11    MR. CARSON: Objection. Any
12 other?
13    MR. GOLD: Yeah, any other --
14    MR. CARSON: Who did she flirt
15 with?
16    MR. GOLD: -- MEF employees or
17 contractors.
18    MR. CARSON: Who did she flirt
19 with that -- she never -- you never
20 established she flirted with anyone yet.
21 Objection --
22    MR. GOLD: I thought she said she
23 slept with Ben Baird.
24    MR. CARSON: Objection. Lack of
25 foundation. Object to form.

Page 351

1    You can answer.
2 BY MR. GOLD:
3    Q.   Did she ever sleep with any other
4 employees of MEF; yes or no?
5    A.   Not that I -- not that I know of, no.
6    Q.   Okay. That's all I wanted to know.
7    MR. CARSON: Yeah, if she had I
8 guess she deserves to be sexually
9 assaulted by the director.
10    MR. GOLD: Maybe that's your --
11 maybe that's your logic coming into
12 play, Mr. Carson.
13    MR. CARSON: Seems to be the
14 defense you're trying to establish.
15 BY MR. GOLD:
16    Q.   Did Ben Baird know -- did Ben Baird
17 know that Lisa was taking pictures of him?
18    A.   I don't know.
19    Q.   Did you ask her why she sent you that
20 picture?
21    A.   No.
22    Q.   When did you first decide -- you said
23 you called my firm and Lisa was calling Michael
24 Murphy. When did you finally meet with the Derek
25 Smith Law Firm?

Deposition of Patricia McNulty        Lisa Barbounis v. Middle Eastern Forum, et. al.

Page 352

1     A.    June 2019.
2     Q.    And is that -- who selected the Derek
3 Smith Law Firm?
4     A.    Lisa had spoken with --
5       MR. CARSON: Objection. What does
6 that mean, who selected?
7       MR. GOLD: Who set up the meeting.
8       MR. CARSON: I --
9       MR. GOLD: She already answered
10 the question, so it's too bad. Okay?
11       MR. CARSON: She hasn't answered
12 the question. Objected to the question.
13       MR. GOLD: She did answer the
14 question. She said Lisa set it up.
15 Can't you hear her? Pay attention.
16       MR. CARSON: Yeah, I can hear.
17       MR. GOLD: Pay attention. It's
18 your witness. It's your client.
19       MR. CARSON: Object -- I'm going
20 to object to the question. She hasn't
21 -- she didn't answer the question. I'm
22 also going to let Tricia know when I
23 object please do not respond until after
24 my objections, but she -- the objection
25 is based on the fact that the question

Page 353

1 makes no sense. What do you even mean
2 who selected the law firm --
3       MR. GOLD: What makes sense to
4 you, Mr. Carson, is much different than
5 what makes sense to me. Okay? Let's
6 just leave it at that.
7       MR. CARSON: Yeah, well that --
8 BY MR. GOLD:
9     Q.    Whose idea was it to file the lawsuit
10 against MEF?
11       MR. CARSON: -- question makes no
12 sense.
13       Objection. Who selected the --
14 who selected the what?
15 BY MR. GOLD:
16     Q.    Whose idea was it to file a lawsuit
17 against MEF?
18       MR. CARSON: You're asking a
19 question about three different -- for
20 what case? There is three -- there is
21 --
22       MR. GOLD: This case right here,
23 this case, her case.
24       MR. CARSON: You're asking
25 Patricia McNulty in her case --

Page 354

1       MR. GOLD: Okay. I'll ask it
2 better yet.
3 BY MR. GOLD:
4     Q.    Who -- okay. Did -- let me come back
5 to this. Okay? Is that did you have any discussions
6 with Lisa about starting a lawsuit against MEF?
7       THE WITNESS: Seth, are you
8 talking? Because nothing is -- I can't
9 hear you.
10 BY MR. GOLD:
11     Q.    Yeah, no, the question is, did you have
12 any discussions with Lisa about starting a lawsuit --
13     A.    I can see Seth's microphone going,
14 though.
15     Q.    What?
16     A.    I can see Seth's microphone going. I
17 just wanted to make sure he wasn't talking before I
18 said anything.
19     Q.    Okay. The question is, did you have
20 any conversations with Lisa before you started this
21 lawsuit against MEF?
22     A.    We talked about lawyers.
23       MR. CARSON: You're allowed to
24 talk about conversations you had with
25 Lisa, not me, but with Lisa --

Page 355

1       MR. GOLD: That's why the question
2 is phrased that way to -- did she talk
3 with Lisa, not you.
4       THE WITNESS: Yes, we talked about
5 --
6 BY MR. GOLD:
7     Q.    Okay. Now, when did you --
8     A.    -- each going to a lawyer.
9     Q.    Okay. And when did that first -- that
10 conversation first take place?
11     A.    I think it was still in June of 2019.
12     Q.    Where did it take place at?
13     A.    I don't remember.
14     Q.    Was it by phone? Was there -- did you
15 have dinner? Was it a luncheon?
16     A.    There wasn't like a super long
17 conversation on it. We were all just so frustrated
18 at that point I think it was just I'm going to speak
19 to a lawyer; I'm going to speak to a lawyer too.
20 There wasn't a lengthy --
21     Q.    Were Ms. Yonchek and Ms. Brady part of
22 those conversations?
23     A.    No.
24     Q.    Okay. So conversations were between
25 you and Lisa alone.

Deposition of Patricia McNulty                                    Lisa Barbounis v. Middle Eastern Forum, et. al.

Page 356

A.    Correct.

Q.    Okay.  And you say they took place sometime in March or April of 2019?

A.    June of 2019 I think.

Q.    June of 2019.  Okay.

MR. GOLD:  Let's go to Exhibit 45. Okay.  Can you keep going down until you hit the yellow -- hit the highlighted part here.  Keep going.  Stop.

BY MR. GOLD:

Q.    She writes to you:  I fucked up at work today.  I'm not concentrating on this job at all at the moment.  I never sent the director of development announcement out.  I'm fired.  I just suck.  Since I started this job nothing has ever been right.  They got in my head and I don't live up to my potential. It makes me feel bad about myself.

And you said:  I went on LinkedIn and --

A.    It.

Q.    -- there's tons of people so it's fine.

A.    It went out on LinkedIn.

Q.    It went out on LinkedIn.  Okay.  What is the "it"?

A.    The director of development

Page 357

announcement.

Q.    Okay.  So at that point did you understand Lisa to have -- basically telling you that she was not really doing well in her job, to put it mildly?

A.    I understood that she was frustrated with herself at the -- in that moment.

Q.    Would you agree she wasn't living up to her potential at the job?

A.    I mean, this is my opinion, but I think she felt that way that day.

Q.    Okay.  Well, it says she never -- "since I started this job nothing right" -- "nothing has ever been right.  They got in my head and I don't live up to my potential."

A.    Right.

Q.    Okay.  Was that accurate?

MR. CARSON:  Objection.  Object to form.  Asking questions about someone -- another person's --

BY MR. GOLD:

Q.    You can --

MR. GOLD:  Well, that's her -- that's a self-assessment by Lisa, and I'm asking her if she thought that was

Page 358

accurate.

MR. CARSON:  You're asking her whether or not -- what is she, a psychiatrist now?

MR. GOLD:  Maybe one day she will be one.  Okay?  That's not the question. The question is here is someone stating her self-assessment of herself at the job that she's a total failure, and I'm asking you did you agree with that, yes or no.  If the answer is no, fine.

MR. CARSON:  I'm going to object. There is nowhere that says total failure --

MR. GOLD:  Well, it says it right here, since I started this job nothing has been right, I fucked up at work today, I'm not concentrating on the job, they got in my head, I don't live up to my potential, it makes me feel bad about myself.

MR. CARSON:  Since I started at this job nothing has been right.  It doesn't say nothing has been right at work.  Maybe nothing has been right

Page 359

because Gregg Roman sexually assaulted her twice --

MR. GOLD:  Maybe at the trial you can serve as an interpreter.

MR. CARSON:  -- (indiscernible) --

THE COURT REPORTER:  I can't hear you.

MR. CARSON:  -- (indiscernible) sexually assaulted her twice, sexually assaulted her coworker right in front of her, basically more or less --

MR. GOLD:  Mr. Carson, I understand you're getting tired, you're making senseless objections, wasting time.

MR. CARSON:  No, I'm not.  I'm trying to --

MR. GOLD:  It's a simple question. Did you agree with that assessment or not; yes or no.

MR. CARSON:  The objection still stands.

MR. GOLD:  Why don't you direct -- you're directing her not to answer the question?

Page 360

MR. CARSON:  No, she could answer but I'm just putting an objection.

MR. GOLD:  Then let her answer the question.

MR. CARSON:  So the objection is based on the fact that you're asking her opinion about some other person's frame of mind based on the --

MR. GOLD:  And I got the objection -- I got -- and I think she's fully capable of having her own assessment of the situation.  You may think not or otherwise, but let her answer the question.

MR. CARSON:  You can say whether or not you think -- what was the question, that she -- that that's accurate?

MR. GOLD:  Yeah, that's her self-assessment, is it accurate.

MR. CARSON:  So you can say whether or not you think that's an accurate self-assessment.  It's just a yes or no question.

THE WITNESS:  I think the part

Page 361

about nothing at that job being right since the beginning is accurate in other ways not pertaining to the work that we did.

BY MR. GOLD:

Q.    Well, of course, because Carson just gave you the answer through his long speech about all the sexual harassment that was experienced by her back in March of 2018.  Let's move on.

MR. GOLD:  Let's go to Exhibit Number 46.

THE COURT REPORTER:  Excuse me.  Hold on.

MR. CARSON:  I think we're probably -- we're probably getting near seven hours.  Can we get a time check, please?

THE COURT REPORTER:  I was just going to say I need a minute, so just hold on one second.

MR. GOLD:  Why don't you take a minute then and we'll come back.  All right?

THE VIDEO SPECIALIST:  Off the record.

Page 362

(A brief recess was taken from 6:00 p.m. to 6:04 p.m.)

THE VIDEO SPECIALIST:  Back on the record.  It's 6:04 p.m.

MR. GOLD:  Okay.  So we're up to Exhibit -- go back to 45 for one minute.  Let me see where we left off here.  45, go up.  Scroll up.  Stop.  Okay.  Scroll down.  Scroll up for one minute, one second go up there.  Stop.  Okay, scroll down.  Scroll down.  Scroll down.  Stop.  Okay.  This is now Exhibit 45 -- 46, rather.  And scroll down a little bit.

BY MR. GOLD:

Q.    And who is that a picture of?

A.    Lisa --

Q.    Is that Lisa?

A.    -- and Jaz.

Q.    Okay.  And do you know who Jaz is?

A.    Yes.

Q.    That's -- who is she?

A.    She's the mother of Danny Thomas's kids.

MR. GOLD:  Okay.  And let's go to Exhibit 47.  Let's stop.  Keep going.

Page 363

Stop.

BY MR. GOLD:

Q.    This is an exchange again between you and Lisa?

A.    Uh-huh.

Q.    It looks -- on July 15th she writes:  I miss you.  I fucked up -- I fucked that shit up with Charlie by sleeping with him.  I know it.  I'm bummed.

Do you know who Charlie was?

A.    Yes.

Q.    Who is he?

A.    A friend of hers.

Q.    Another guy she slept with?

A.    Yes.

Q.    You said:  Why do you say that?  Did you guys talk any more?

She says:  A little.  About sex.  Nothing yesterday.

MR. GOLD:  Let's scroll down.  Stop.  Scroll down.  Back up to the top of the exhibit for one second.  Stop.

BY MR. GOLD:

Q.    What is this a picture of?

A.    Lisa's butt.

Page 364

Q.   Why is she sending that to you?
A.   Because she had a bruise on it.
Q.   Why is she sending it to you, though?
     MR. CARSON:  Objection.  Asked and
answered.
BY MR. GOLD:
Q.   Because it had a bruise on it, that's
why she sent it to you?
A.   To show me the bruise.
Q.   And your answer was:  Your ass looks
great honestly.
     Correct?
A.   Correct.
     MR. GOLD:  Okay.  Scroll down.
Let's go to 48.
     MR. CARSON:  It's my understanding
that the pictures like that are supposed
to be attorneys' eyes only.  What are we
doing right now?
     MR. GOLD:  As far as I know this
is ripe for a deposition.
     MR. CARSON:  No, it's not.
     MR. GOLD:  Keep scrolling down.
     MR. CARSON:  It's not.  So we're
going to have to -- we're going to have

Page 365

to go back and mark that -- I hope your
clients --
     MR. GOLD:  I'll agree to redact
any and all pictures of Lisa, so don't
be concerned about that.
     MR. CARSON:  Yeah, and please -- I
seriously hope that we're not -- that
there is not a misunderstanding on your
part and that your clients have now
looked at images and photos that we had
--
     MR. GOLD:  No, they have not.
They have not.
     MR. CARSON:  -- designated
attorneys' eyes only.
     MR. GOLD:  All right?
     MR. CARSON:  Yeah.  I'm not sure I
believe --
     MR. GOLD:  And all those pictures
-- we're going to redact all the
pictures from this deposition before
anything is ever filed with the Court.
     Let's go down --
     THE WITNESS:  Is somebody eating
on this call?  Sorry.

Page 366

     MR. GOLD:  Go down.  Stop.
BY MR. GOLD:
Q.   Lisa says:  DP I just tried to fuck me
and I screwed them.  Dicks.  Seth is calling me right
now.
     What is that supposed to mean, if you
know?
A.   I'm not sure.
Q.   Is DP Daniel Pipes?
A.   Yes.
Q.   Okay.  And is Seth Seth Carson?
A.   Yes.
Q.   Okay.
     MR. GOLD:  Scroll down.  And this
now is -- this is now -- we're in July
of 2019.  Scroll down.  Let's go to
Exhibit 48.  Kind of move this along
now.  That was Exhibit 48.  Go back up.
Go back up to 48.  Keep going.  Okay.
BY MR. GOLD:
Q.   Do you know what the context was for
that discussion between you and Lisa?
A.   I don't remember.
Q.   Okay.
     MR. GOLD:  Let's go to 49.  Okay.

Page 367

Stop.
BY MR. GOLD:
Q.   It says here -- it says:  We'll talk
later.  Have fun with Neal.
     And then you say:  Ugh, that's just
making you sadder I know it.  I fucking hate him,
that he made you love him.
     Are you talking about Danny Thomas?
A.   Yes.
Q.   Okay.
     MR. GOLD:  Scroll down.  Okay.
Stop.
BY MR. GOLD:
Q.   There is a reference here -- Lisa says:
You are like sleeping -- you are likely sleeping but
I did see the telegram from Marc.  Is he fucking
serious.
     What's the backstory on that?
A.   I don't remember.
Q.   Is that Marc Fink she's referring to?
A.   Yes.
Q.   Okay.  You don't have any recollection
as to what that's about?
A.   I don't.
     MR. GOLD:  Okay.  Let's go to

Case 2:19-cv-05030-JDW   Document 110-3   Filed 03/02/21   Page 95 of 157

Deposition of Patricia McNulty                                    Lisa Barbounis v. Middle Eastern Forum, et. al.

Page 368

1  Exhibit 50.  Stop.  Go to the yellow
2  highlighted portion.  Stop.  Okay.
3  BY MR. GOLD:
4     Q.    It looks like Lisa's asking you to lend
5  her a hundred dollars.  Do you know what the
6  backstory is on that?
7     A.    I don't --
8        MR. CARSON:  Who cares.
9        THE WITNESS:  I don't --
10       MR. CARSON:  Objection.
11       MR. GOLD:  I'm just asking if she
12    recalls what it was -- what the hundred
13    dollars was for, why she was borrowing a
14    hundred dollars from her.
15       MR. CARSON:  Good question.
16       THE WITNESS:  I don't think -- I
17    didn't ask.
18       MR. GOLD:  Okay.  Scroll down.  So
19    let's go to the -- let's go to the --
20 BY MR. GOLD:
21    Q.    Is that the first time she asked you to
22 borrow money from you?
23    A.    I'm not sure.
24    Q.    Do you know whether -- yes or no?  Was
25 that the first time she had asked you to lend her

Page 369

1  money?
2     A.    I'm not sure.
3     Q.    Was she having any money problems as
4  far as you knew, financial issues, IRS liens?
5     A.    I don't know.
6     Q.    Do you know whether she had an -- did
7  she ever tell you that there was a IRS lien against
8  her for a couple hundred grand, her and her husband?
9     A.    No, she never told me about a lien.
10       MR. GOLD:  Okay.  Keep going.
11    Let's go to Exhibit 51.  Stop.
12 BY MR. GOLD:
13    Q.    She says:  I officially have a crush on
14 Will.
15       Do you know who that is, who Will is?
16    A.    Yes.
17    Q.    Who is that?
18    A.    I don't remember his last name offhand.
19    Q.    Well, is it Will Chamberlain?
20    A.    Yes, I think so.
21    Q.    Okay.  And who was he?
22    A.    A person who she knows.
23    Q.    Was he the editor of a publication on
24 -- Human Events, which is a conservative magazine?
25    A.    I don't know.

Page 370

1     Q.    Do you know -- do you know whether Will
2  Chamberlain has any relationship to Raheem, whether
3  they're friends or business relations?  Raheem
4  Kaseem.
5     A.    They're friends.
6     Q.    Okay.  So you know they were friends.
7  Okay.  And do you know whether Lisa ever slept with
8  Will?
9     A.    Yes.
10    Q.    Okay.  Did she tell you that?
11    A.    Yes.
12    Q.    Okay.  Did she have any -- was it a
13 long-term relationship or just relatively short
14 relationship, if you know?
15    A.    I don't remember.
16    Q.    Okay.  So you don't recall much more
17 about the relationship beyond what you already told
18 me?
19    A.    No.
20    Q.    Okay.  Do you know who Mike Yoder is?
21    A.    I don't think so.
22    Q.    Do you know whether Lisa ever had a
23 lawyer by the name of Mike Yoder?
24    A.    Not that I know of.
25    Q.    Do you know whether she ever had a

Page 371

1  relationship with a Mike Yoder, sexual relationship?
2        MR. CARSON:  She just said she
3     didn't know who the person is.
4        THE WITNESS:  Not that I know of.
5        MR. CARSON:  Objection.
6        MR. GOLD:  Okay.  Let's move on to
7     52.  Keep going.  Stop.
8  BY MR. GOLD:
9     Q.    "Today is the big day.  I have your
10 letter but it's in my computer.  I just want to say
11 good luck."
12       Is this the resignation letter that
13 Lisa drafted for you?
14    A.    She looked at my letter and --
15    Q.    Did she revise it at all?
16    A.    Slightly, yes.
17    Q.    Okay.  So you gave her the letter to
18 revise?  Who actually wrote it?
19    A.    I had given her a handwritten copy.
20    Q.    Okay.  You gave her a handwritten copy
21 and then she typed it and revised it to some extent?
22    A.    Yes.
23    Q.    Okay.  How much input did Lisa have in
24 that resignation letter?
25    A.    I don't know the exact amounts.

Case 2:19-cv-05030-JDW    Document 110-3    Filed 03/02/21    Page 96 of 157

Deposition of Patricia McNulty                                Lisa Barbounis v. Middle Eastern Forum, et. al.

Page 372

1  Q.    Was it changed -- do you still have the
2 handwritten copy?
3  A.    I do not.
4        MR. CARSON:  Objection.
5 BY MR. GOLD:
6  Q.    Does Lisa still -- do you know whether
7 Lisa still has the handwritten copy?
8  A.    I don't think she does.
9  Q.    Okay.  When did you give her the
10 handwritten copy?
11  A.    In September of 2019.  I don't know the
12 exact date.
13  Q.    At or about September the 12th?
14  A.    Just about before I think.
15  Q.    Were you in -- working in Philadelphia
16 at the time or were you working in -- were you in
17 Washington DC or was Lisa already in Washington DC?
18  A.    She was in Washington, I was in
19 Philadelphia.
20  Q.    Okay.  Had she already left MEF?
21  A.    She had.
22  Q.    Okay.  So she was working for the
23 congressman already?
24  A.    Yes.
25  Q.    Okay.  And how did she eventually --

Page 373

1 did she send you a letter via e-mail or did she mail
2 it to you or --
3  A.    Via e-mail.
4  Q.    Okay.  And you say:  Oh my goodness, I
5 fell asleep early last night, it was a -- it was
6 glorious.  Tomorrow is technically the day.  And
7 thank you so much for helping with this.  You are the
8 best.  I love you so much.
9        MR. GOLD:  Scroll down.  Scroll
10        down.  Stop.
11 BY MR. GOLD:
12  Q.    She writes back:  Tommy is free today.
13        Is that a reference to Tommy Robinson?
14  A.    Yes.
15  Q.    Okay.  Do you know whether Lisa was
16 headed to the UK for -- to meet with Tommy Robinson
17 at about the time he was let out of jail?
18  A.    I don't remember.
19  Q.    Okay.
20        MR. GOLD:  Let's go down to
21        Exhibit 53.
22 BY MR. GOLD:
23  Q.    You -- she writes to you:  Did we get
24 my pictures off the iPad.
25        Is that the work iPad we're talking

Page 374

1 about from work?
2  A.    Yes.
3  Q.    Okay.  So MEF owned the iPad, and what
4 was your answer?  "Yes, reset it."
5        What was that -- were you telling her
6 what to do, to reset the iPad to erase the pictures
7 or what were you -- what instructions were you giving
8 her?
9  A.    No, she had -- you couldn't use the
10 iPad without an iCloud account, so she had put her
11 own private iCloud account into the iPad to be able
12 to use it for the radio station, and I took her
13 iCloud account off when she was gone.
14  Q.    What radio station?
15  A.    The MEF radio station.
16  Q.    Okay.  So you said:  Yeah, reset it.
17        Did she -- do you know whether she
18 reset it after that?
19  A.    No, I took her iCloud account off the
20 iPad.
21  Q.    Oh, you took her -- okay.  You took it
22 off for her.  Okay.  So who had the -- who had
23 possession of the actual iPad?
24  A.    MEF did.  I'm not sure --
25  Q.    Okay.

Page 375

1  A.    -- who had it in the office.
2  Q.    Did you -- when you say you had it, did
3 you turn it in when you resigned?
4  A.    I didn't have it.  Somebody in the
5 office had it.
6  Q.    Okay.  So when she resigned from MEF
7 someone in the office had her iPad and then someone
8 reset it or you reset it?
9  A.    It's the office iPad and she had left
10 her iCloud account attached to it, and I took her
11 iCloud account off that day.
12  Q.    And who authorized you to do that?
13        MR. CARSON:  Objection.  She just
14        said Lisa authorized her to do it.
15        MR. GOLD:  Lisa wasn't even
16        working there anymore.
17        MR. CARSON:  It's her iCloud
18        account.
19 BY MR. GOLD:
20  Q.    Who at MEF gave you authority to even
21 do anything with that iPad?
22        MR. CARSON:  Objection.  Assuming
23        facts not in evidence.  Object to form.
24        You can answer.
25 BY MR. GOLD:

Page 376

Q.    Were you aware that Lisa and you both had -- had been given litigation hold letters at that point in time?

MR. CARSON:  Doesn't mean she has to let MEF have access to her --

MR. GOLD:  I'm not asking your interpretation of it, Seth.  I'm asking her a question.  What it means or what she does or what she thinks about it, that's not my concern right now.

BY MR. GOLD:

Q.    My question is, were you aware of a litigation hold letter or preservation letter?

A.    Nothing was deleted.

MR. CARSON:  Objection.  The witness has already answered the question.

BY MR. GOLD:

Q.    Okay.  Nothing was deleted, it was just reset.

MR. CARSON:  She didn't say she reset it.  She said she took Lisa's iCloud off --

MR. GOLD:  No, she said she reset it.  She said she reset it.

Page 377

MR. CARSON:  That's not what she said.

BY MR. GOLD:

Q.    Did you reset it?

A.    I took her iCloud account off of the iPad.

Q.    And how did you do that?

A.    I just went onto the iPad and took her iCloud off.

Q.    You said that you -- in this text exchange you said you reset it.  Is that accurate or not accurate?

A.    What I meant by that was that I took her iCloud account off.

Q.    By simply deleting it or erasing it?

A.    By taking --

MR. CARSON:  Go ahead.  You can answer it.

THE WITNESS:  By taking the account off.  It doesn't delete anything.  Everything is still in the cloud.

BY MR. GOLD:

Q.    Okay.

A.    Just wasn't attached to that iPad

Page 378

anymore.

Q.    Okay.  And at that point you were still an MEF employee, correct?

A.    Correct.

Q.    Correct?  You hadn't yet resigned at that point, correct?

A.    Correct.

MR. GOLD:  Okay.  Let's go to the next exhibit.  We're up to 54.  Keep going.  Keep it going.  Keep it going.  Keep it going.  Keep it going.  Oh, stop.  Keep it going.  Keep going.  Go back to that picture.

BY MR. GOLD:

Q.    Do you know who that is?

A.    Yes.

Q.    Who is it?

A.    Patrick.

Q.    That's Patrick Sandman?

A.    I believe so.

Q.    Okay.  Do you know why she sent you that picture?

A.    To show me what her morning looked like.

MR. GOLD:  Okay.  Keep -- next

Page 379

exhibit -- keep going.  Scroll down.  Stop.  Okay.

BY MR. GOLD:

Q.    It says:  Jaz made a new fake Twitter account DM me out of nowhere.

Do you understand what that meant?

A.    That Jaz created a fake Twitter account to direct message her.

Q.    Okay.  And do you know why she did that?

A.    Why Jaz did that?

MR. CARSON:  Are you asking her why -- how could she know that.

BY MR. GOLD:

Q.    Well, did she tell you that?

MR. CARSON:  Has she -- have you ever spoken to Jaz before in your life?

THE WITNESS:  I've never spoken to Jaz.

BY MR. GOLD:

Q.    Okay.  So when you learned of this, okay, did you ever tell any of your supervisors at MEF that Jaz had made -- set up a fake account --

A.    I wasn't working at MEF at this time.

Q.    Oh, you weren't working at that point

Page 380

1 in time.  Okay.
2        Do you know whether anyone had actually
3 spoken to Lisa, to the best of your knowledge, about
4 interacting with Jazmin Bishop before she had left
5 MEF?
6     A.   I don't know.
7     Q.   I take it Lisa never told you that she
8 had any conversations with any supervisors about her
9 interactions with Jazmin Bishop; is that accurate?
10    A.   Not that I remember.
11        MR. GOLD:  Okay.  Let's go to 57.
12 BY MR. GOLD:
13    Q.   By the way, who is Ryan Coyne?
14    A.   A friend of hers from DC.
15    Q.   Was Lisa dating Ryan Coyne at some
16 point in time?
17    A.   Yes.
18    Q.   Is she still dating him to this day?
19    A.   I don't know.
20    Q.   When is the last time you spoke with
21 Lisa about things outside of MEF?
22    A.   I don't know the exact last time.  I
23 would have to look.
24    Q.   Within the last month?
25    A.   Within the last month, yeah.

Page 381

1     Q.   Okay.  And you don't know -- you don't
2 know whether she's going out with Ryan Coyne right
3 now?
4     A.   I don't.
5        MR. GOLD:  Okay.  Let's go to
6     Exhibit 57.
7        THE VIDEO SPECIALIST:  I just want
8     to interject quickly, gentlemen.  We're
9     at 6 hours, 50 minutes on the record.
10       MR. GOLD:  We're going to be done,
11    don't worry, we're getting there, I got
12    three more exhibits to go.
13 BY MR. GOLD:
14    Q.   She says to you:  He's back on Bumble.
15 I'm done.  I set up a fake account with Allison's
16 pic.  Ryan's in Philadelphia.
17       Can you tell me what that's about, if
18 you know?
19    A.   I'm not sure who that's about.
20    Q.   Well, is she referring to Ryan Coyne
21 setting up -- being on Bumble; is that a dating site?
22    A.   Bumble is a dating site.  I'm not sure
23 if she's talking about Ryan in that.
24    Q.   Well, what about her saying I set up a
25 fake account with Allison's pic.  Who is Allison?

Page 382

1     A.   Her friend.
2     Q.   So she set up a fake account on Bumble
3 with Allison's pic?
4     A.   I guess so.
5     Q.   Claiming that -- I guess -- claiming
6 that she was Allison, I take it?
7     A.   Yeah.
8     Q.   Is that so she can monitor and see
9 whether Ryan Coyne was accessing pictures on Bumble?
10       (Voice on computer interrupts
11    proceedings.)
12 BY MR. GOLD:
13    Q.   Go ahead.  That was my -- that's my
14    computer.
15       MR. CARSON:  Ms. McNulty, do you
16    know if Ms. Barbounis got MEF's
17    authorization to set up a Bumble
18    account?
19       Are these questions even serious
20    right now?
21 BY MR. GOLD:
22    Q.   I want to know why -- I want to know --
23 did she tell you why she set up a fake account under
24 Allison's name, that's the question.
25    A.   I mean --

Page 383

1     Q.   The answer is yes or no.
2     A.   -- she was talking about somebody in
3 this, but I don't remember who the "he" is.
4     Q.   Okay.  Well, she mentions Ryan's in
5 Philly.  Is that Ryan Coyne?
6     A.   Yes, that's in reference to Ryan.
7        MR. GOLD:  Okay.  Let's go to
8     number -- we're up to fifty -- go to 56.
9     Sorry, stop.  58.  Okay.  Go down.
10    Stop.
11 BY MR. GOLD:
12    Q.   Here is an exchange -- do you want to
13 go up a little further so you can get the context of
14 it?
15       Lisa says:  I'm crushed.  I just got
16 drunk.  I got it so bad.
17       You say:  Oh shit, that's not at all
18 what I thought you were gonna say.  What a dick.  Did
19 you guys end things?
20       Are you talking about Ryan Coyne or
21 someone else?
22    A.   I'm not sure.
23       MR. GOLD:  Could you go up -- pull
24    it up a little bit?  Stop.  Little more.
25    Okay.  Go down.

Lisa Barbounis v. Middle Eastern Forum, et. al.

Page 384

BY MR. GOLD:
Q.   So you're not sure it's Ryan Coyne but you don't know who it is, correct?
A.   No.
MR. GOLD:  Okay.  Stop.  Go back up.  Okay.
BY MR. GOLD:
Q.   "Yes he can.  After I went psycho. Crying wouldn't go home.  Not good.  I'm so embarrassed.  I can't leave now because I want to talk to him."
Anything in there refresh your recollection?
A.   I'm not sure who it was about.
Q.   Well, you say:  I doubt it's as bad as you think but him fucking a bunch of girls isn't great.
Any idea now who she's talking about?
A.   I'm not sure.
Q.   Okay.
MR. GOLD:  Let's go to the next one.  Fifty -- let's go to 58.  Let's get into the -- let's go to -- stop.
BY MR. GOLD:
Q.   It says here the -- she says to you

Page 385

"Lisa" --
A.   This is between her and Ryan.
Q.   Okay.  This is Ryan Coyne.
"Lisa if you don't get into an Uber and go home I'm going to have to call someone and I don't know" -- "don't want to do that."
You said -- she says:  Call who?
And he says:  The police.  You are dangerously roaming the streets at 4 a.m. in the morning and don't know where you are.  You're totally out of control.
She says:  LOL.  And say what?  Now you are acting crazy.  I just want to be alone.
MR. GOLD:  Keep going.
BY MR. GOLD:
Q.   "This is unbelievable that a grown woman and a mother would act this way.  Be alone in an Uber" -- "be alone in a Uber home."
And then she says:  Pulling the mother card.  You don't even know my kids' names.
Do you recall Lisa telling you about this interaction she had with Ryan Coyne?
A.   Yes.
Q.   Okay.  And she sent you a copy of the screen shots of the conversation she had with Ryan

Page 386

Coyne?
A.   Yes.
Q.   Okay.  And what was your -- do you know whether Lisa had a problem with alcohol?  Was she an alcoholic?
A.   I don't think she's an alcoholic, no.
Q.   Okay.  Well, did you have any conversations with her about this interaction she had with Ryan Coyne?
A.   I mean, she sent me that screen shot.
Q.   And what was your --
A.   This conversation is what we talked about.
Q.   Okay.  And what was your perception of that conversation?
A.   My perception of her conversation with Ryan?
Q.   Yeah.
A.   That they were drunk and having an argument.
Q.   We want to know -- we know that Lisa was drunk.  Was that -- she was running around the streets at 4 a.m. in the morning in Philadelphia.  Is that where she was, in Philadelphia?
A.   I'm not sure.

Page 387

MR. GOLD:  Okay.  Let's go to the next one.  Let's go to Exhibit 59.  Go to the highlighted part.  Keep going. Keep going.  Stop.  Keep going.  Keep going.  Keep going.  Stop.
BY MR. GOLD:
Q.   Is that Ryan Coyne?
A.   I don't think so.
Q.   Who is that?
A.   I don't know who that is.
Q.   Did she ever tell you that she's been flying on a private plane recently with Ryan Coyne?
A.   Not that she's flown on it.  She's told me she's seen one.
Q.   She has not been on the plane?
A.   I don't think so.
Q.   Okay.  When did she tell you that?
(Brief interruption.)
BY MR. GOLD:
Q.   When did she tell you that?
A.   This was maybe a couple months ago.
Q.   Okay.  Whose picture is this on this exhibit?
A.   I don't know who this is.
Q.   Is this someone else she had sex with?

Page 388

1    A.    Looks like it from that conversation.
2         MR. GOLD:  Okay.  Let's go on next
3  -- let's go to Exhibit 60.  That was 60.
4  61.
5  BY MR. GOLD:
6    Q.    She says:  They're back and they're
7  trying to destroy my freaking life.  It's all
8  bullshit.  It's public now.
9         Do you know what she's talking about?
10   A.    I'm not sure.
11   Q.    This is now August 12th, 2020.  You
12 don't have any recollection?  And who is that --
13   A.    No, I'm not --
14   Q.    -- a picture of?  Who is that a picture
15 of?
16   A.    I don't know.
17        MR. GOLD:  Let's go to 61.  I'm
18 sorry, 62.  Stop.  Keep going.  Stop
19 right there.
20 BY MR. GOLD:
21   Q.    "Ok.  So I wouldn't ask unless
22 necessary.  Any chance you can spot me a hundred
23 until Tuesday" -- "Thursday."
24        Is that -- we know that's now the
25 second time she's asked to borrow money from you.

Page 389

1  Did you give her the hundred?
2    A.    Yes.
3    Q.    Okay.  Does she owe you any money?
4    A.    No.
5    Q.    She paid you back?
6    A.    Yeah.
7    Q.    Okay, good.
8         MR. GOLD:  Next.  Let's go to 63.
9  Go to the yellow highlighted part.
10 Let's move it along.  Go, go, go, go --
11 stop.
12 BY MR. GOLD:
13   Q.    Who is Sam Westeros, if you know?
14   A.    Sam -- I think that's a typo.  I think
15 she meant --
16   Q.    Yeah, it's actually -- should be
17 Westrop.
18   A.    Yeah.
19   Q.    Okay.  Who is he?
20   A.    He was an employee when we worked at
21 MEF.
22   Q.    Okay.  And she's asking for Sam's
23 number?
24   A.    Yes.
25   Q.    Okay.  And were you able to give her

Page 390

1  the number or you didn't have it?
2    A.    I didn't have it.
3         MR. GOLD:  Okay.  Scroll down.
4  BY MR. GOLD:
5    Q.    Who is that a picture of?
6    A.    Me and my fiance.
7         MR. GOLD:  Okay.  Scroll down.
8  Scroll down.  Stop.
9         MR. MAINEN:  Hey, Sid, sorry to
10 interrupt.  That's the end of the
11 exhibits.
12        MR. GOLD:  That's it?  Okay.  Then
13 go -- scroll up for one second.  Stop.
14 Okay.  Scroll up to -- one last shot at
15 63.  I just have one question and I'll
16 be done.
17        THE WITNESS:  I think we're at
18 time, so --
19        MR. GOLD:  Keep going.  Keep
20 going.  Stop.  We got it then.  Okay.
21 I'm done.  Thank you.
22 I have no further questions.
23        THE WITNESS:  Are we going off the
24 record now?
25        THE VIDEO SPECIALIST:  Mr. Carson?

Page 391

1         MR. CARSON:  Yeah, I think we're
2  done, right?
3         THE WITNESS:  We can't hear you,
4  Seth.
5         MR. CARSON:  I think we're done,
6  right?  Seven hours?
7         MR. GOLD:  Right.  I know I'm
8  done.
9         MR. CARSON:  All right.  Thank
10 you, everybody.
11        MR. GOLD:  Thank you, everybody.
12 Have a good weekend.  Be safe.
13        THE VIDEO SPECIALIST:  We are now
14 off the record.
15               - - -
16        (The proceedings concluded at 6:38 p.m.)
17
18
19
20
21
22
23
24
25

Case 2:19-cv-05030-JDW   Document 110-3   Filed 03/02/21   Page 101 of 157

Deposition of Patricia McNulty                    Lisa Barbounis v. Middle Eastern Forum, et. al.

C E R T I F I C A T E


        I HEREBY CERTIFY that the proceedings and

evidence are contained fully and accurately, to the

best of my ability, in the notes of testimony taken by

me in the proceedings of the above cause, and that the

copy is a correct transcript of the same.




                        _____
                        Carrie A. Kaufman
                        Registered Professional Reporter
                        Notary Public

**WORD INDEX**

**< $ >**
**$135,000** 339:2, *9*
**$300** 240:*21* 242:*7, 9*
243:*3* 245:*14, 18*
247:*12*
**$5,000** 237:8, *14*
239:*23*

**< 1 >**
**1** 3:*1* 16:*4* 92:*20*
94:*24*
**1:41** 174:*14*
**10** 196:*12*
**10:00** 162:*11, 13*
163:22 164:*21*
**10:10** 343:*3*
**10:12** 1:*1* 4:*3*
**10:52** 50:*18*
**10th** 263:*12*
**11** 50:*14* 199:*17*
**11:08** 50:*18, 20*
**11:53** 91:*10*
**12** 202:*16*
**12:05** 91:*10, 12*
**12th** 372:*13* 388:*11*
**13** 206:8, *19* 218:*3*
**14** 218:*10, 11* 223:*1*
**15** 220:*5* 223:*3*
258:*25*
**15th** 25:*17* 297:*14*
363:*6*
**16** 224:2
**1650** 2:*1*
**16th** 37:*13* 201:*14*
**17th** 263:*12* 290:*23*
**18** 160:2*0* 185:*1*
224:*23* 229:25
**1835** 2:*1*
**18-month** 279:*25*
**18th** 182:6, *7* 280:*11*
**19** 234:*18* 240:*6*
248:*6, 9* 297:*3*
335:*17*
**19103** 2:*1*
**1968** 124:*18*
**1st** 136:*2* 249:*22*

**< 2 >**
**2** 101:*18* 207:*1*
**2:10** 174:*14, 16*
175:*11*
**2:17** 175:*11*
**2:19-cv-05030** 1:*1*
**2:19-CV-05030-JDW**
4:*11*
**2:43** 275:*10*
**20** 9:*16* 53:*10*
173:*17* 174:*6* 248:*7,*
*9, 11* 271:*2* 303:*20*
343:*16*
**2016** 319:*5*
**2017** 37:*13* 38:*12*
75:*1* 76:*5* 92:*25*
152:*25*
**2018** 69:*23* 70:*14*
76:*7* 79:*12* 101:*25*
103:*16* 105:2*1* 108:*7*
111:*5* 115:*8* 116:*13,*
*25* 118:2*4* 119:*2, 7,*
*14* 122:*3, 8, 9* 132:*22*
133:*15* 134:*4, 10*
135:*3, 20* 136:*2, 4*
139:*18* 140:*25*
147:*25* 156:*18, 19*
160:*10* 172:*8* 182:*7,*
*13, 21, 23* 185:*23*
186:*21* 192:*2* 199:*21*
202:*17* 206:*22*
211:*17* 212:*2, 24*
214:*25* 218:*17*
220:*24* 224:*23* 237:*9,*
*11, 15* 248:*15* 250:*11*
263:*13* 275:*3* 277:*9*
296:*23* 297:*25* 300:*3*
330:*24* 331:*4* 361:*9*
**2019** 69:*23* 119:*9, 19*
127:*16, 18* 128:*17, 22*
129:*20* 130:*4* 132:*6,*
*22* 133:*15* 134:*4, 5,*
*11* 170:*13* 171:*13*
182:*21* 252:*7, 10*
280:*11* 281:*25*
297:*14, 24* 298:*9, 16,*
*21* 299:*14, 22, 23, 24*
300:*5* 307:*13, 14*
309:*22* 313:2*0, 22*
316:*12* 322:*16* 329:*2,*
**17** 331:*8* 335:*18*
336:*19* 343:*15, 20*
352:*1* 355:*11* 356:*3,*
*4, 5* 366:*16* 372:*11*
**2020** 25:*17* 60:*23*
69:*23* 388:*11*
**2021** 1:*1* 4:*3*
**20-hour** 268:*22*
**20-minute** 174:*5*
**21** 26:*10* 252:*16*
253:*7*
**215** 2:*1*
**21st** 336:*21*
**22** 37:*6* 257:*4*
**22nd** 336:2*1*
**23** 37:*10*
**24** 262:*24*
**24-hour** 162:*3*
**28** 280:2*0* 281:*6, 20*
**2800** 2:*1*
**28th** 182:*13* 275:*3*
**29** 301:*16, 20, 22*
**2950** 2:*1*
**29th** 192:*2*
**2nd** 103:*16* 135:*20*
136:*4*

**< 3 >**
**3** 103:*11* 135:*9, 12,*
*20* 303:*25*
**3:27** 235:*25*
**3:30** 162:*1*
**3:35** 235:*25*
**30** 120:*17* 290:2*1*
301:2*3, 24*
**300** 240:*18* 241:*4, 14,*
*16, 24* 242:*5, 6, 16, 17*
**30th** 199:2*1* 249:*14,*
*20, 21*
**31** 302:*3*
**32** 306:8, *21*
**33** 25:*17* 153:*4, 8*
308:*14*
**34** 311:2*1*
**35** 153:*1, 14* 313:*13*
314:*12*
**36** 316:*17*
**37** 318:*15*
**39** 325:*9* 333:*23*

**< 4 >**
**4** 134:*25* 139:*6, 8*
158:*16* 255:2*0* 385:*9*
386:*23*
**4:25** 281:*1*
**4:32** 281:*1, 3*
**40** 176:*10* 342:2*1*
343:*5*
**42** 344:6, *9* 345:2*1*
**43** 345:2*0*
**44** 344:*5*
**45** 356:*6* 362:*6, 7, 12*
**46** 361:*11* 362:*12*
**47** 362:*25*
**48** 364:*15* 366:*17, 18,*
*19*
**4848** 93:2*0* 94:*9, 11*
**49** 366:*25*
**4th** 101:*25* 206:*22*

**< 5 >**
**5** 1:*1* 3:*1* 112:2*3*
159:*12* 161:*22* 162:*1*
**5:00** 161:*15* 162:*10,*
*21* 163:*2* 164:2*1*
165:*13* 311:*10*
**5:30** 335:*10, 12*
**5:34** 335:*12*
**50** 368:*1* 381:*9*
**501(c)(3** 317:*22*
**51** 369:*11*
**515** 2:*1*
**52** 371:*7*
**53** 373:2*1*
**54** 378:*9*
**56** 383:*8*
**569-1999** 2:*1*
**57** 380:*11* 381:*6*
**58** 383:*9* 384:*22*
**59** 387:*2*
**5th** 4:*3*

**< 6 >**
**6** 161:*11* 202:2*1*
381:*9*
**6:00** 362:*2*

**391-4790** 2:*1*
**3rd** 248:*15* 249:*13*

Deposition of Patricia McNulty                    Lisa Barbounis v. Middle Eastern Forum, et. al.

**6:04** 362:2, 4
**6:38** 391:16
**60** 388:3
**61** 388:4, 17
**62** 388:18
**63** 389:8 390:15
**65** 120:15 121:24
123:22 165:24
**66** 3:1 236:6
**665-2776** 2:1

**< 7 >**
**7** 176:21
**7:30** 161:25
**70** 165:19, 20

**< 8 >**
**8** 185:1 186:17
266:18
**80** 165:20
**8th** 124:23 128:22

**< 9 >**
**9** 112:23 162:1
190:14
**9:30ish** 266:11
**91** 3:1
**9th** 225:8, 10, 20

**< A >**
**a.m** 1:1 4:3 50:18,
20 91:10 207:1
266:18 385:9 386:23
**ability** 27:5 392:1
**able** 5:6 6:11 8:21
27:5 52:4 72:2
229:5 252:20 259:14
374:11 389:25
**abroad** 187:19
**absolutely** 142:8
301:4 318:2
**absurd** 217:14, 25
**absurdity** 204:2
**abused** 330:24 331:3,
7
**abuser** 330:12
**abusing** 330:15
**accepted** 319:10
**access** 69:9 70:1

**72:2** 255:14 376:5
**accessing** 382:9
**accidentally** 202:19
**accommodate** 102:8
**accommodation**
102:16, 21, 24 103:2,
4, 7
**account** 49:9, 15
50:1 51:19 53:14
54:3 57:7 58:5, 14,
21 59:2, 9 61:20
63:2 64:22 67:3, 16,
22 68:5, 7, 8, 10 69:8,
11 374:10, 11, 13, 19
375:10, 11, 18 377:5,
14, 20 379:5, 7, 23
381:15, 25 382:2, 18,
23
**accounting** 195:12
**accounts** 71:25
**accuracy** 21:3 38:7
**accurate** 31:7 35:16,
25 37:19 43:1
127:19 145:8 198:24
246:3, 4, 6, 7 269:11
278:23 333:13
335:21 357:17 358:1
360:18, 20, 23 361:2
377:11, 12 380:9
**accurately** 8:2 392:1
**accusation** 130:22, 24
**accused** 246:11
**acknowledge** 324:9
**act** 193:25 385:17
**acting** 131:9 149:22
203:19 300:20
314:17 319:13, 14
385:13
**ACTION** 1:1 4:10
10:24 140:2 324:20
**actions** 78:17, 22
116:1 138:10, 12
**active** 283:25
**actively** 66:24
131:25 201:10
**activities** 292:6
**activity** 108:24 318:3
**acts** 206:3
**actual** 38:18 249:23

346:15, 16 374:23
**ADD** 100:1
**Adderall** 99:12, 15,
18 204:6
**addition** 255:20
339:10
**Additionally** 7:10
**address** 11:18 41:21
42:15, 21 43:14, 15,
18, 21, 22 44:3 46:11,
19 48:25 49:8, 14
51:18 53:13 54:2
55:10 57:6 63:1, 21,
24 64:3 256:17
268:12
**addresses** 38:11, 18,
24 39:8, 10, 18, 22
40:15 67:14
**adequate** 300:19
**ADHD** 100:1
**admitted** 178:8
221:9 296:20 300:23
301:5 328:11 349:20
**adorable** 262:2
**advance** 86:13 92:10
**advances** 213:17
214:14 215:17
**advantage** 23:11
**adversely** 346:24
**advice** 45:25 60:10
267:5
**advising** 267:13
**advocacy** 173:9
**advocate** 136:13
**affect** 8:23
**afraid** 164:24
165:13 166:18
**afternoon** 91:23, 25
275:10
**afterward** 161:5
**age** 107:2 153:13
**agency** 26:14, 21
**agenda** 197:10, 19, 24
**aggressive** 265:15
**ago** 14:10 43:10
54:19 60:21 62:10
64:19 67:13 84:18
90:1 100:15 152:24
273:23 387:21

**agree** 31:12, 23
37:18 81:13 116:4
137:20 138:11 150:9
189:1, 24 191:12, 15
199:8 220:25 258:12
357:8 358:10 359:19
365:3
**agreed** 32:22 136:25
240:22 290:4
**agreeing** 322:5
**agreement** 23:6 32:7,
10, 14 113:17
**ahead** 13:13 40:20
51:8 77:14 93:12
110:17 113:23
133:10 161:8 165:5
166:23, 24 172:19
175:24 188:23
201:15 207:10
224:16 225:10, 11, 16
232:23 246:16
248:23 253:5 271:18
272:4, 9 299:8
301:24 321:12
342:14 377:17
382:13
**ahold** 45:14, 15
**AIPAC** 215:5 232:25
**al** 1:1 4:8
**alcohol** 386:4
**alcoholic** 386:5, 6
**Alex** 2:1 4:12
**aligned** 292:8
**allegations** 41:3 42:3,
5 246:10
**allegedly** 291:9
**Allison** 381:25 382:6
**Allison's** 381:15, 25
382:3, 24
**allow** 94:12
**allowed** 163:2
228:14 255:17
310:10 354:23
**allowing** 255:13
**alright** 285:1
**altercations** 307:10
**amazing** 240:20
258:19 262:1 336:3
337:13
**ambivalent** 216:17

**amended** 253:*13, 14, 18, 25*
**amendment** 255:*4*
**amount** 166:*9 192:13 271:10 338:16*
**amounts** 371:*25*
**angel** 339:*17*
**anger** 204:*6* 282:*19*
**angry** 132:*16* 283:*20 286:14*
**announcement** 319:*4 322:6 356:14 357:1*
**annoyed** 166:*17 271:1*
**annoying** 165:*14*
**annual** 337:*21*
**anonymously** 125:*23*
**answer** 6:*18, 19* 7:*16, 17* 8:*2, 6, 17* 12:*10 13:10, 13* 14:*2, 14, 19 15:2, 11* 16:*11, 19, 25 17:2, 6, 12* 18:*6, 10, 23, 25* 26:*3* 29:*15, 25 30:7, 12, 16, 19* 31:*22 35:20, 24* 36:*6, 9, 14, 17* 37:*3* 38:*1, 9* 39:*2 43:5, 6* 45:*8* 46:*17 47:11, 19, 21, 25* 48:*4, 5, 8, 22* 59:*19* 60:*4, 8 61:6* 75:*15* 77:*14 81:20* 82:*15* 89:*4, 5, 20* 92:*8, 11* 95:*16 107:8 113:23 116:6 118:11 133:9 144:22 145:11, 25* 148:*11 150:15, 17* 154:*15 165:2, 5, 6* 166:*23, 25 168:14, 23* 169:*11, 13 170:4, 5* 172:*14, 18, 20, 25* 173:*7* 188:*23 192:15 205:1 211:21 212:5 217:17, 23 239:11, 19 247:7, 9 270:17 271:18 286:17, 19, 24* 287:*18 292:13 294:6, 10 295:3, 17, 18, 22 298:11, 24* 300:*19 330:7, 13 333:16*

**anybody** 10:*4, 7 24:16* 43:*9* 107:*3 118:6 128:13 141:12 143:4 145:19 149:1 162:21 163:23 168:1 187:9* 350:*6*
**anymore** 44:*9 114:13 162:21 164:12 166:2 170:17 171:21 172:23 174:1 178:20 249:17 300:2 302:6, 22, 25* 303:*4 375:16 378:1*
**anyway** 122:*16 123:14 140:25 150:20, 21* 187:*24 190:13 201:11 222:8 237:6, 19, 24* 241:*9*

**amount** 340:*22, 23, 24* 341:*12 347:24* 348:*8* 349:*3, 17, 18* 351:*1* 352:*13, 21* 358:*11* 359:*24 360:1, 3, 13* 361:*7 364:10* 374:*4* 375:*24 377:18* 383:*1*
**answered** 15:*10 41:13* 42:*23* 43:*3 44:1, 19* 45:*7, 20 46:16* 47:*1* 48:*7, 20 52:21, 23* 53:*4, 16 55:13* 73:*12* 82:*13, 18* 113:*21* 163:*25 168:4* 205:*17* 209:*1 210:10* 212:*4* 216:*8 239:8* 245:*2, 3 300:17* 330:*6* 352:*9, 11* 364:*5* 376:*16*
**answering** 12:*15 170:7, 9*
**answers** 6:*16* 7:*19 8:1* 15:*23* 35:*16 76:21* 149:*24*
**anti** 289:*19*
**antianxiety** 96:*17*
**anticipate** 6:*18*
**anticipation** 251:*2*
**Antifa** 289:*25*
**anxiety** 204:*6* 256:*1*
**anxious** 301:*9*

**amount** 286:*7* 288:*9* 328:*13 332:19*
**apologize** 52:*15 92:10* 133:*8*
**Apology** 130:*17*
**apparently** 47:*24*
**appear** 31:*13, 24 271:24*
**appearing** 4:*16* 34:*3*
**appears** 132:*7 200:22 226:22 236:9 258:10 271:9, 20 317:2 318:24 320:6 335:18*
**application** 26:*11, 18*
**applications** 26:*11*
**applied** 343:*16*
**applies** 26:*25*
**apply** 132:*3* 147:*22 327:7*
**applying** 280:*2 343:19, 22*
**appoint** 125:*19*
**appointing** 127:*25*
**appointments** 185:*13, 14*
**appreciate** 40:*13 317:25*
**appreciated** 280:*10*
**apprehension** 231:*8 253:11* 269:*9*
**appropriate** 41:*20 170:8* 269:*17* 286:*12 296:7* 340:*15* 341:*4, 6, 11*
**approve** 228:*13*
**approximately** 98:*3*
**approximation** 57:*19*
**apps** 63:*13*
**April** 202:*17* 343:*15, 22* 356:*3*
**argue** 267:*17*
**argument** 33:*1 132:12* 267:*9, 22 308:3* 386:*20*
**argumentative** 173:*5 188:21*
**arranged** 158:*12*
**array** 167:*6*

**arrested** 290:*11, 14 291:9* 292:*5* 293:*19 294:25* 299:*20*
**article** 308:*17* 309:*3*
**articles** 224:*12*
**Asana** 196:*20*
**asked** 42:*5, 11, 22 43:2, 25* 44:*18* 45:*7, 20* 46:*3, 7, 16, 18 48:19* 51:*3* 52:*20, 23 53:1, 3, 15* 55:*12 73:11* 75:*22* 77:*4 80:7* 82:*12, 19* 84:*16 89:25* 90:*1* 102:*24 103:1, 4* 113:*20 125:20, 22* 146:*16 148:3* 157:*8* 163:*24 168:3* 194:*25* 205:*16, 21* 210:*7, 9* 212:*3 219:4* 230:*13* 253:*10, 12, 18* 258:*24* 259:*3 260:14* 270:*9* 287:*10 311:7* 340:*9* 345:*12 346:10* 364:*4* 368:*21, 25* 388:*25*
**asking** 14:*23* 18:*12, 17, 18* 19:*22, 24, 25 22:22* 24:*13, 14, 15, 16* 25:*21* 29:*11 31:25* 45:*12* 73:*8 75:9, 18* 76:*3* 80:*17 82:3, 8, 23* 89:*16 95:8* 108:*9* 129:*3 150:10* 154:*12* 164:*7 188:24* 200:*6, 7 217:1, 2* 228:*13 238:23* 260:*7* 283:*10 287:12, 15* 288:*15 292:3, 18* 293:*25 298:1, 2* 300:*13 322:5* 331:*4, 20 344:11* 353:*18, 24 357:19, 25* 358:*2, 10 360:6* 368:*4, 11 376:6, 7* 379:*12 389:22*
**asleep** 373:*5*
**aspect** 195:*15*
**ass** 201:*21* 364:*10*

**assault** 137:*19* 138:*2,*
*6, 11* 246:*12* 294:*25*
299:*20*
**assaulted** 293:*20*
348:*25* 351:*9* 359:*1,*
*9, 10*
**assessment** 359:*19*
360:*11*
**assigned** 210:*20*
**assigning** 192:*3, 19*
193:*22*
**assignment** 202:*25*
**assistant** 161:*1*
197:*6* 198:*15*
**associated** 49:*9, 15*
51:*18* 309:*1*
**ASSOCIATES** 2:*1*
344:*21*
**association** 67:*15*
**assume** 96:*1* 102:*21*
161:*15* 183:*13*
187:*10* 200:*11*
218:*25* 286:*10*
324:*20*
**assumed** 320:*12*
**assuming** 35:*22* 62:*3,*
*12* 85:*2* 116:*1*
149:*17* 150:*13* 190:*5*
204:*22* 239:*15*
292:*10* 296:*9* 375:*22*
**assumption** 145:*20*
228:*9*
**attach** 71:*25*
**attached** 375:*10*
377:*25*
**attempt** 40:*10*
**attend** 193:*11* 195:*10*
**attendance** 113:*6*
125:*8*
**attended** 157:*7*
158:*11* 193:*16* 233:*5*
**attending** 193:*9, 12*
**attention** 352:*15, 17*
**attest** 121:*14*
**attorney** 19:*11* 24:*10*
256:*4*
**attorney-client** 89:*6*
**attorneys** 32:*22*
364:*18* 365:*15*

**attractive** 258:*12*
**attributed** 281:*11*
**at-will** 106:*7, 15*
**audience** 268:*4*
**August** 79:*12* 388:*11*
**authenticate** 288:*16*
**authority** 178:*15*
349:*11, 12* 375:*20*
**authorization** 382:*17*
**authorized** 375:*12, 14*
**auto** 274:*19*
**automatic** 66:*21*
**automatically** 19:*6*
203:*15*
**Avi** 273:*1, 2, 7*
**avoid** 70:*4* 204:*15*
**awake** 207:*2*
**awakening** 172:*6*
173:*3*
**aware** 10:*23* 11:*9*
22:*6, 8, 18* 23:*19, 25*
24:*9, 14, 17* 25:*1, 22*
99:*2, 6* 155:*13, 16*
190:*10* 237:*8, 14, 16*
239:*22* 324:*2* 327:*13*
376:*1, 12*
**awareness** 22:*15, 21*
24:*5* 231:*3*
**awful** 221:*9*
**awkwardly** 258:*24*

**< B >**
**babe** 287:*25* 288:*1*
**babysitter** 139:*23*
**back** 1:*10* 23:*12*
26:*7* 50:*13, 20* 51:*25*
52:*8, 15, 24* 53:*8, 9*
58:*21* 67:*5* 70:*18*
72:*3* 74:*5, 9, 15, 17*
75:*1, 24* 76:*5* 88:*9*
90:*2, 6, 22* 91:*12*
92:*24* 98:*2* 128:*1, 5,*
*16* 130:*1* 131:*2, 11,*
*18, 22* 134:*24* 135:*12,*
*19* 139:*17* 144:*4*
147:*24* 150:*4* 157:*8*
158:*15* 174:*16, 18*
175:*1* 192:*5* 196:*19*
197:*14* 198:*8, 11*
202:*20* 204:*4* 206:*15*

207:*8* 209:*10* 211:*15*
214:*24* 221:*11, 19*
222:*25* 229:*7, 9*
230:*11* 235:*19* 236:*2*
240:*4, 7* 241:*15*
251:*25* 255:*8* 259:*25*
260:*8* 261:*20* 263:*7*
264:*3* 268:*4* 276:*14*
280:*7* 281:*3, 9, 12*
282:*1* 283:*2* 286:*25*
288:*4* 296:*7* 298:*5*
301:*20, 21, 22* 302:*8*
305:*3, 9* 306:*24*
325:*25* 333:*24*
334:*10* 335:*3, 4, 14*
336:*2, 20* 343:*25*
344:*6* 345:*21* 354:*4*
361:*9, 22* 362:*3, 6*
363:*21* 365:*1* 366:*18,*
*19* 373:*12* 378:*13*
381:*14* 384:*5* 388:*6*
389:*5*
**background** 6:*23*
52:*3*
**backing** 231:*4*
**backstory** 367:*18*
368:*6*
**backwards** 252:*17*
**bad** 86:*21* 137:*9, 19*
138:*1* 285:*13* 352:*10*
356:*17* 358:*20*
383:*16* 384:*15*
**Baird** 346:*3* 347:*10*
348:*5, 21* 350:*6, 23*
351:*16*
**balcony** 214:*1*
**ball** 278:*14*
**bar** 70:*18*
**BARBOUNIS** 1:*1*
4:*7* 33:*7, 22* 54:*11,*
*17, 25* 58:*23* 59:*11,*
*14* 60:*18* 61:*5, 12, 17*
62:*24* 64:*15* 69:*13*
72:*10* 74:*17* 75:*5, 23*
76:*6* 77:*9* 78:*2* 80:*2*
81:*16* 83:*5* 85:*10*
86:*4* 88:*15* 92:*1, 24*
97:*19* 98:*4, 22* 99:*3,*
*6* 100:*9, 13* 154:*1*
382:*16*

**Barbounis's** 23:*1*
34:*4* 100:*7* 108:*24*
**Barely** 243:*9*
**based** 15:*3* 23:*24*
40:*19* 59:*17* 74:*8, 25*
77:*12, 14* 104:*21, 22,*
*23* 105:*17* 108:*14*
134:*20* 145:*5* 243:*11*
288:*14* 293:*25*
295:*19* 307:*20* 323:*4*
327:*17* 340:*25*
352:*25* 360:*6, 8*
**basic** 24:*18*
**basically** 161:*2*
267:*13* 304:*18* 357:*3*
359:*11*
**basis** 14:*21* 17:*17,*
*18, 21* 215:*9* 327:*4*
349:*8*
**bathroom** 112:*15*
170:*25* 185:*15*
**bathtub** 27:*10*
**beach** 201:*22*
**bearing** 36:*24*
**beautiful** 246:*13, 14*
**bed** 346:*14, 15, 16*
**began** 137:*13* 331:*1*
**begged** 198:*20*
**beginning** 1:*1* 74:*20*
116:*25* 117:*11*
122:*15* 123:*15* 140:*6*
212:*17* 240:*22* 361:*2*
**behalf** 2:*1*
**behavior** 86:*21*
199:*23* 269:*1* 273:*25*
274:*5, 7* 296:*8*
**belaboring** 300:*25*
**believe** 10:*15* 14:*3*
27:*24* 51:*14* 53:*6, 12*
66:*18* 83:*11* 89:*12*
103:*17* 111:*6* 118:*9*
123:*24* 132:*14*
151:*19* 158:*5, 14*
192:*21* 195:*11*
199:*21* 220:*23*
224:*23* 225:*8* 229:*4*
238:*4* 251:*3* 277:*1*
279:*9* 312:*13* 314:*17*
324:*13* 365:*18*

378:20
believed 321:25
Ben 350:6, 23 351:16
benefits 255:13
Benjamin 346:3
Bennett 73:22 74:21
  75:4 76:1, 5 77:8, 10,
  22 78:1 88:5 107:25
  109:3 145:2, 5, 18, 20
  147:12, 13 158:24, 25
  159:2, 5, 9 196:4, 5
  216:22 320:9, 13
  321:7 327:21
best 6:15 99:10
  105:20 117:5 132:7
  154:5 156:8 277:10
  292:7 294:2 296:8
  324:16 373:8 380:3
  392:1
bet 277:3
better 7:6 51:8 62:7
  115:25 132:10 139:1
  208:3 218:6, 19
  234:3 252:1 255:25
  272:6 273:10, 11
  281:9 288:5 290:4
  293:15 332:19 354:2
betting 276:23
beyond 78:15 107:2
  143:24 233:19
  370:17
big 23:21 309:4
  371:9
bigger 25:11, 12
  151:17
biggest 136:13
Bill 5:16
bills 171:23, 24
  242:23
Bishop 380:4, 9
bit 75:3 137:21
  202:7 256:1 258:12
  306:10 362:13
  383:24
bitch 200:9, 16
  307:2 308:6, 12
bitchy 268:18
bits 286:23
bizarro 277:2

black 155:14 156:1, 4
blame 177:12
blindly 86:2
blow 306:9 312:19
  317:19 318:16
  339:22
blown 314:2
blue 19:15 253:1
  258:2, 3 275:4
  276:19 281:17
  302:11, 12
board 65:17 135:14
  192:10, 25 193:14
  195:6 224:5, 8
  234:14, 16 240:5
Bog 192:6, 9
bonuses 304:18
Boo 280:9
book 94:17 226:16
booked 229:21
booking 234:1
  240:10
books 230:2
borrow 260:13
  368:22 388:25
borrowing 368:13
boss 140:17 162:5
  192:4 193:25 194:4,
  6, 7 201:17 202:9
bother 269:15 335:25
bothered 147:7
  326:17
bothering 147:5
  162:21
bottom 198:19 223:9
  329:19
bought 71:10
boundaries 139:2
Bowling 213:4
box 263:24
boy 121:9
boyfriend 259:4, 21
boys 121:13
Brady 56:20 355:21
break 8:11, 13, 18, 19
  50:5 53:3 120:23, 24,
  25 174:5 191:8
  235:18 280:19, 21
  335:6

breaking 220:8
Brexit 268:6
brief 50:17 56:8
  91:9 148:8 174:13
  175:10 235:24
  280:25 335:11 362:1
  387:18
bring 116:12, 14
  224:25
Brody's 25:16
brought 5:14 10:24
  116:16 253:17 304:8
  328:6
bruise 364:2, 7, 9
brutal 290:1
build 111:22
building 151:15
bullshit 280:10 388:8
Bumble 381:14, 21,
  22 382:2, 9, 17
bummed 363:9
bunch 284:20 384:16
bus 136:9, 11, 17
business 26:12, 18
  28:8 156:20, 21
  157:4 161:17 189:25
  232:10 233:20 370:3
butt 363:25
buy 260:17
buzz 343:4

< C >
Caitriona 56:20
  125:11 257:11 271:3
calculated 117:23
calendar 313:17
  314:8
calendars 314:6
California 176:15
call 6:2 23:2 96:21
  97:1 142:14 158:2, 3
  161:16, 21 162:11, 13,
  20 163:2, 20, 21
  164:12, 21, 23 165:13
  166:19 167:24 175:6
  223:17 234:25 277:3,
  6 283:8 290:12
  303:20, 25 305:9
  310:6, 7 344:12, 23,

24 345:2 365:25
  385:5, 7
CALLED 4:23
  10:13 129:12, 24, 25
  130:1 131:1 162:5,
  10 176:14, 16 220:7
  221:7 223:5 226:14
  240:17 261:23
  267:15 277:1 299:12
  313:17 319:24, 25
  323:16 344:18
  351:23
calling 130:21 163:8,
  9, 21, 23 164:4, 6
  166:16 277:12, 17
  289:18 344:18
  351:23 366:4
Calls 107:6 129:22
  148:22 149:5, 16
  150:12 161:14
  162:25 167:3 171:1
  175:14 210:19
campaign 223:18
  232:9 291:18, 25
  292:18 296:6, 10, 14,
  22 309:2, 17, 19, 21,
  25 310:8 311:8, 18
  317:4
campaigns 310:5
  318:7, 8
cancelling 35:11
candidate 319:6, 8
capable 360:11
Capitol 264:6
card 203:18 385:20
cards 26:12, 19 28:8
care 52:12 102:10,
  20 103:5 226:24
  227:5 242:22, 23
  300:16 303:3
career 151:14
cares 242:21 368:8
Carrie 1:1 4:15 7:4
  392:1
CARSON 2:1 5:3
  9:4 11:4 12:8, 16, 21
  13:6, 11 14:12, 24
  15:8 16:10, 16, 24
  17:11, 18, 21 18:4, 23
  19:8, 17 20:1, 6, 13,

19, 23   21:5, 10   22:12,
17, 23   23:10, 16, 20
24:3, 7, 21, 25   25:25
26:3   27:8   28:9, 14,
24   29:2, 12, 24   30:5,
11, 18, 24   31:8, 20
32:6, 15, 25   33:21
34:10, 18, 24   35:2, 6,
18   36:3, 8, 21, 22
37:25   38:8, 19, 22
39:2, 6, 17, 25   40:4, 5,
9, 19, 24   41:4, 23
42:8, 17, 22   43:2, 6,
25   44:18, 22   45:2, 5,
12, 17, 23   46:4, 9, 12,
15, 21, 25   47:4, 10, 18,
25   48:4, 19   50:4, 11
51:2, 24   52:12, 20
53:1, 7, 15, 21   54:5, 8
55:12, 18, 23   57:10
59:16   60:2, 6, 7, 14
61:2, 6   63:6, 8, 12, 18
64:11   67:21   68:2
70:9   72:15   73:11
75:8, 11, 16   76:10, 15,
19, 23   77:4, 11   81:6,
18   82:3, 12, 16, 25
83:10, 20, 24   84:2, 12,
17, 24   85:2, 15, 20
86:7   87:5, 10, 16
88:18   89:2, 10, 15, 20
90:17   91:4   94:3, 4, 8,
15   95:7, 15   101:8
106:13, 16   107:6
109:23   110:4   113:20
114:3   116:5   117:18,
25   118:3, 14   121:2,
16   142:7, 13, 18, 22,
25   143:7, 10, 16, 19,
25   144:8   145:9, 22,
24   148:20, 22   149:2,
5, 13, 16   150:12
152:25   153:17   154:3,
11, 15   155:17   158:18,
19   163:12, 17, 24
164:25   165:6, 22, 25
166:21, 24   167:17
168:3, 7, 10, 15, 24
169:6, 9, 13, 25   170:5,
8   172:10, 15, 20

173:9, 11, 13, 16, 21,
25   174:3, 8, 20   175:2
179:3, 9, 15, 23   180:2,
6, 12, 21, 25   181:4, 7,
10, 17   188:20   190:4
192:14   204:22   205:6,
11, 16, 20   210:9
212:3   214:17   217:15,
23   235:20   238:7, 14,
19, 24   239:4, 6, 10
240:2   243:5, 7, 10, 14,
16, 20, 25   244:4, 24
245:10, 17   246:3, 8,
18, 22   247:2, 9, 21, 25
248:3   257:10   270:2,
4, 11, 21   271:12, 16,
19, 24   272:3, 6, 10, 16,
20   283:10, 15   286:8,
15   287:5, 12, 20
288:13   291:14   292:1,
9, 14, 20, 22   293:5, 16,
22   294:4, 11, 18
295:1, 8, 13, 18, 23
296:9, 14, 22   297:7,
11, 16, 21   298:3, 10,
20, 23   299:5, 7, 11
300:8   301:2, 13
310:3, 9, 13, 20, 23, 25
311:2, 7   314:9
317:21   318:1, 6
337:25   340:16, 19, 23
341:3, 10   342:1, 11,
17, 23   343:2   347:4,
11, 16, 20, 21   348:1, 7,
10, 13, 15, 23   349:6,
12, 23   350:11, 14, 18,
24   351:7, 12, 13
352:5, 8, 11, 16, 19
353:4, 7, 11, 18, 24
354:23   357:18   358:2,
12, 22   359:5, 8, 12, 16,
21   360:1, 5, 15, 21
361:6, 14   364:4, 16,
22, 24   365:6, 14, 17
366:11   368:8, 10, 15
371:2, 5   372:4
375:13, 17, 22   376:4,
15, 21   377:1, 17
379:12, 16   382:15
390:25   391:1, 5, 9

case   11:1, 20, 24
16:9   18:9   19:12
23:1   29:4   32:1, 16
34:1, 4, 20   36:25
74:12   101:12   142:5
220:1   305:25   342:16
345:9   353:20, 22, 23,
25
cases   5:22   6:3   9:20
Cassandra   273:1
caught   321:2
cause   201:19   225:14
311:17   392:1
caused   145:19
CAVAILER   45:14
CAVAILER   2:1   3:1
5:1, 4, 9, 11   6:22   7:2,
7, 9   11:6, 8   12:14, 19
13:3, 8, 14   14:20
15:4, 15   16:13, 20
17:8, 15, 20, 23   18:12
19:3, 14, 22   20:2, 9,
17, 21   21:1, 7   22:5,
14, 21   23:5, 14, 17, 21
24:5, 12, 23   25:8
26:5, 6   27:11   28:11,
22, 25   29:9, 19   30:2,
9, 14, 22   31:1, 4, 16
32:2, 9, 18   33:17
34:6, 11, 22, 25   35:14
36:4   37:5   38:5, 10,
21   39:4, 14, 20   40:17,
22   41:1, 17   42:3, 13,
19, 24   43:4, 13   44:2,
20, 25   45:4, 10, 21
46:1, 7, 10, 13, 18, 23
47:2, 9, 12, 14, 22
48:1, 11, 21   49:4, 5
50:8, 13, 22   51:4, 9
52:10, 14, 22   53:5, 11,
18, 24   54:6, 9   55:15,
20, 24   56:9   57:11
59:21   60:12, 16   61:4,
11   63:7, 11, 16, 20
64:9, 12, 13   67:19, 24
68:4   70:3, 11, 12
72:17   73:2, 3, 14
75:14, 21   76:8, 12, 17,
21   77:2, 6, 23   81:8,
24   82:7, 14, 21   83:1,

12, 22   84:1, 9, 15, 19,
25   85:5, 7, 18, 22, 24
86:8   87:6, 12, 20
88:20   89:9, 13, 17, 24
90:15, 20   91:2, 5, 14
174:23
CBD   259:3, 6
cc'd   140:16   305:5
celebrate   271:5
cell   66:6, 8
certain   99:7   150:8
178:5   204:15, 21
222:20   338:1
certainly   52:10
CERTIFY   392:1
chain   160:1
Chamberlain   369:19
370:2
chance   42:25   113:16
247:6   306:15   347:15
388:22
change   171:25
201:19   251:13
252:24   253:3   256:11
264:18   330:1, 3
changed   103:22
330:17   372:1
changes   250:19
303:6
characteristics   194:3
characterize   97:18
characterizing   173:1
charge   170:16   214:5
326:7
charges   290:19
Charlie   363:8, 10
chase   113:4
chat   318:19, 20
chats   69:14, 18, 22
284:19
cheat   262:11, 13
cheated   270:14, 15
cheating   269:17, 25
270:13
check   70:6   74:5
97:22   278:19   361:16
checks   278:22
Chelsea   151:20, 24
152:15, 20   153:4

Case 2:19-cv-05030-JDW Document 110-3 Filed 03/02/21 Page 108 of 157

Deposition of Patricia McNulty                    Lisa Barbounis v. Middle Eastern Forum, et. al.

chicks 284:9
child 149:22
children 102:10, 17
 103:5 262:2 263:4
 269:25 270:14, 16
 277:14 286:13
 295:12
choice 125:23
chose 149:4
chosen 128:8
Cinnamon 57:22
circumstances 70:17
 254:15 342:4
city 332:20
CIVIL 1:1 4:10
 10:13, 18 22:9 24:1
 25:15, 23
claim 142:11 143:24
Claiming 382:5
claims 96:21 143:12,
 20, 22 144:2 326:25
clarify 75:17 110:4
 244:19
clarifying 110:18
clear 13:7, 9, 10, 12
 17:24 27:18 28:17
 30:15 36:13 41:18
 72:22 73:7 82:8
 92:16 125:3 137:8
 193:24 194:24
 324:15 333:9
cleared 13:12
clearly 27:6 33:11
 223:21 305:25
 332:17
Cleveland 332:25
client 19:5, 11, 15
 22:1 23:24 24:11
 30:21 39:25 40:9
 41:6 95:8 246:19
 287:13, 16 294:13
 296:19 311:2 352:18
clients 365:2, 9
close 104:12 121:17
 122:16, 20 123:16
 183:22 211:14
closed 126:19
 274:22, 25
cloud 377:22

cloud-based 66:13
coffee 204:6
colleague 91:16
come 7:24 48:15
 140:13 144:4 146:2
 147:15 158:15 161:5,
 25 201:20 206:15
 211:15 227:13
 250:21 324:18 339:3
 354:4 361:22
comes 66:17 207:8
 208:9, 15
Comical 188:21
coming 86:15 162:1
 194:18, 22 195:1
 206:13 221:20
 234:11 238:11 266:9
 315:16 325:3 351:11
comment 179:15
 180:1, 5, 10 265:17
 276:5 304:6
commentary 307:4
commenting 179:4
 180:13
comments 181:1
 185:11
Commission 142:4
 143:14 337:15, 18
 338:17, 19, 22, 24
 339:11
commitments 102:2
committed 251:9
common 87:7
Commonwealth 1:1
communicate 57:3
 306:24
communicating
 306:25
communication 18:13
 19:10 30:20 78:25
 79:19 287:13 305:24
 307:22 321:24 323:2
 324:10
communications 18:7,
 18, 20 19:2 22:19
 24:10 37:11 59:10,
 14 60:18 61:1, 3, 4
 64:23 65:1 69:14
 74:16 78:1 80:18

86:3 160:19, 21
 183:7 184:20, 22
company 189:25
 197:23 276:23
comparison 268:17
compelled 213:10
compiled 210:17
complain 117:7
 119:12 122:3 141:5
 211:25 324:12
 325:22 326:15, 16, 19
 330:8
complained 141:25
 163:18
complaining 118:7
 140:6 145:13 186:24
 192:12 198:7 209:5,
 18 220:25 222:8, 19
 250:7 324:11
complaint 115:19
 118:17 140:3 141:12
 142:3 143:13 163:7,
 17 209:4 211:19
 216:18 250:1
complaints 141:6
 145:15 159:4, 8
 168:1 190:18, 21
 208:25 209:1 212:18
 249:14, 23 250:8
 253:17 313:24
complete 330:20
completed 93:16
completely 332:2
compliment 160:6
complimented 160:12
comply 25:16, 24
computer 371:10
 382:10, 14
conceded 138:8
concentrating 356:12
 358:18
concern 190:3
 249:10 376:10
concerned 136:11
 291:24 292:7 303:12
 309:1 365:5
concerning 321:3
concluded 391:16
concludes 94:23
 124:23

conclusion 107:7
 148:23 149:6, 17
 150:13
condition 8:22
 204:15
conduct 42:4
conference 110:21
 178:14 223:17 316:8,
 9, 14
confidential 255:16
confirm 18:6 21:12
 39:9
confirmed 111:2
conflict 345:16
conflicts 308:1, 3
confused 80:16
Congratulations
 121:6
Congressman 28:5, 6,
 13, 18, 20 29:17 37:8,
 15 372:23
conjunction 210:16
 216:5
connection 237:9, 14
 238:12 239:23
 311:17
connects 225:15
conservative 369:24
consider 210:3
 222:21
considered 308:11, 12
 333:2
considering 98:20
constant 185:7
 331:17
constantly 178:11
constitute 150:10
contact 126:25 158:2
 200:4 279:14, 17
contained 59:2
 64:23 68:11 69:6
 392:1
containing 80:1
 81:15 82:1, 10 83:18
 84:22 85:9
contains 37:7
contempt 22:9 24:1
 25:4, 16, 23
content 198:6 199:2,

6  258:7

**contents**  60:25  71:15

**context**  139:16
220:10  261:12
281:10  307:4  315:4
316:24  319:21
366:21  383:13

**Continental**  119:22,
25  123:25  125:3
128:7  135:19  315:17
316:5, 7, 10

**continue**  14:17  29:6
31:14  46:5, 6  142:9

**continued**  215:9
300:4

**continues**  181:12

**continuing**  306:14

**continuously**  201:2

**contractors**  65:14
350:10, 17

**Contributing**  310:7

**contributions**  310:11
311:4

**control**  13:19, 20
385:11

**conversation**  41:14
77:18, 19  86:12, 17
96:7  102:4  105:11,
14, 15, 19  108:3, 6, 8
109:2, 5, 8  110:10, 13,
14, 19  111:2, 23
112:2  119:1  127:13
129:15  130:20, 25
139:17  144:12, 17
147:18  160:1  181:24
182:3  185:17  201:6
211:12  220:11
226:19  228:3  247:14
261:7, 9  265:11
274:2  310:14  312:15,
17  315:5  316:25
321:8  323:19  326:24
328:7  355:10, 17
385:25  386:12, 15, 16
388:1

**conversations**  19:20
54:14  56:4  75:5, 6,
23  76:4, 6  77:21
80:2  81:16  83:4
85:10  87:8  88:14, 24

97:15  107:14, 16
110:23  111:4, 20
116:24  129:7  130:10,
13, 19  140:22  142:5
158:24  183:18  187:1
200:20  277:8  294:24
295:5  323:13, 14
329:18  330:4  354:20,
24  355:22, 24  380:8
386:8

**convey**  19:4

**conveyed**  78:23

**cooks**  186:9

**coordinator**  115:6

**copies**  26:11, 18

**copy**  101:14  255:1
371:19, 20  372:2, 7,
10  385:24  392:1

**core**  269:4

**Correct**  9:5  10:21,
22  11:1, 16, 22  19:7
28:13  29:20  37:20
43:16, 17  46:23
51:14, 19, 20  52:18,
19  53:14, 17  54:7, 8
55:8, 9  59:24  72:4
73:5, 6  81:17  82:2
83:5, 8, 9, 15, 16
98:18  106:7, 11
107:4, 5  108:7, 20, 21
112:4  114:2, 8, 11
116:4, 17  117:4
118:13  119:22
122:18, 19  127:1
128:16  129:5  130:12
131:7, 8, 10  132:22,
23, 25  133:7, 23
135:5  137:10  139:23
140:22, 23  141:13
143:15  145:3, 4
147:1, 2, 5  149:10
150:11  152:4  153:4,
9, 10  157:22  158:7
160:2, 10, 11  161:22
162:6  163:5  164:2
166:6  171:17  172:17
175:18, 19  176:4, 7, 8,
11, 12  179:8, 14
187:21  189:21
191:10, 11  195:2, 3, 4,

5, 16  199:9, 14, 15
205:15  209:3, 19
214:12  223:22  224:4
228:10  235:14, 15
241:9  244:23  248:16,
17  256:21  260:6, 18
261:19  271:11
274:19  275:8  276:21
277:14, 15  281:18, 19
291:19  297:16
299:20, 21  303:10, 11,
14  306:25  307:1, 23,
24  308:12  309:14, 17
313:3, 4  315:19
316:6  317:4  320:7
322:3, 17, 18, 20, 21
323:16  327:8, 9
328:13  329:25  330:1,
7  331:8  332:13, 19
333:1, 20  338:23
340:4  341:2  356:1
364:12, 13  378:3, 4, 5,
6, 7  384:3  392:1

**correcting**  76:23

**correctly**  25:18

**correspondence**  74:23

**correspondences**
37:11

**cost**  260:19

**couch**  211:12  215:5

**counsel**  3:1  4:16
7:11  9:2  18:7, 16
22:7  25:21  26:17
30:21  45:19, 25  48:2
51:22  54:1  60:10
65:6  88:21  89:19
180:3, 7, 13  255:17

**counsel's**  11:18

**count**  112:14  185:14

**counting**  68:22

**country**  176:17
187:14  189:7  190:2
349:9

**couple**  6:8  14:10
26:9  50:14  51:12
61:15  62:2  88:22
100:15  175:13
185:20  369:8  387:21

**course**  97:24  106:24
173:9  187:18  281:8
304:13  324:20  361:6

**COURT**  1:1  2:1
4:9, 13, 14, 15, 19
6:25  7:5, 22  8:2, 7
21:24  25:4  27:3
35:4, 10  36:19  40:3,
7  49:2  50:25  51:6
60:5  72:24  92:14
93:19, 22  95:21
133:8  143:3, 21
144:2, 15, 21  149:11,
14, 25  158:17  173:23
174:24  179:21
180:18  236:24  237:1
239:3  243:9  244:9,
12, 15  245:6  247:1
269:19, 22  294:20
297:4  298:13, 18, 22,
25  310:21, 25  347:19
359:6  361:12, 18
365:22

**cover**  256:11

**covered**  220:3
240:11, 14  301:23

**coworker**  359:10

**coworkers**  99:15
122:21  276:6

**Coyne**  380:13, 15
381:2, 20  382:9
383:5, 20  384:2
385:3, 22  386:1, 9
387:7, 12

**COZEN**  2:1  5:11

**crap**  170:24

**crazy**  203:17  266:8
313:18  385:13

**create**  67:25  223:18

**created**  223:16
326:21  327:12, 14
379:7

**creates**  6:10

**creating**  326:22

**credibility**  34:9, 23,
24  35:1, 7

**cried**  202:19  203:16

**crimes**  251:9

**criminal**  42:4

Deposition of Patricia McNulty                                    Lisa Barbounis v. Middle Eastern Forum, et. al.

cross  337:8
Crossing  337:7
cruise  335:18
crush  369:13
crushed  383:15
cry  255:25
crying  177:11, 15
384:9
culmination  105:6
cunt  235:1, 8
cunts  235:7
current  38:16  43:15
62:21  63:24  66:3
currently  67:10
curse  336:3
cut  76:7  92:10
113:4  278:19
cutting  340:14

< D >
dad  102:13  254:15
dads  121:14
daily  178:10  215:9
dandy  311:13
dangerously  385:9
Daniel  2:1  105:25
111:12  116:13, 20
125:19  126:20
127:12, 13, 24  128:12
140:4, 7, 15, 22  141:1
145:6  146:23  147:3,
21  148:1  150:22
159:5  161:2  163:7,
21  169:17  170:11
172:2, 9  177:12, 20
178:4, 8, 12, 13, 24
180:10  181:21  182:1
187:6  194:10, 13, 19,
20  211:19  212:1
214:24  227:5  230:12
242:15  249:13, 18, 24
250:4, 6, 16  251:8, 15
255:8  267:11, 13, 18
271:6  291:8, 11
294:3  296:7  298:16
299:25  302:18
303:21  304:5  309:7
315:8, 14  318:19, 22,
23  319:1, 2  321:19,
21, 25  326:5, 10, 11,

15, 23  328:1, 7
329:18  341:21, 24, 25
342:5, 7, 10  366:9
Daniel's  127:13
325:11
Danny  69:18, 22
154:10, 22  156:5, 8,
11  157:11  230:15, 16,
21, 25  262:5  263:3,
14, 25  264:2  265:1, 2,
22  267:6, 15, 18
269:1, 10  272:25
273:23  277:14, 22
279:6, 7  282:8, 10, 12,
15  285:11, 18, 21
286:1  287:6  289:20
290:11  291:8, 17, 22,
23  292:4, 8, 17, 21
293:18, 19, 20  294:24
295:7  299:16, 19
300:2, 4  309:2, 13, 16
316:20  317:9  362:22
367:8
dark  321:6
data  90:10
date  4:2  71:5, 7
74:10  76:7  117:1
135:6, 8, 16  136:1
171:9  212:24  252:3,
5  263:8  281:21
334:5  372:12
dated  103:16  128:22
182:12  202:16
297:14  335:17
dates  141:20  153:5
185:21  196:15
210:23
dating  61:18  211:13
346:23  380:15, 18
381:21, 22
daughter  266:13
daunting  146:9
day  12:12  100:19, 21
105:9  108:13  113:3,
7, 8  115:18  155:15
161:24  162:3, 19
164:10  171:9  184:1
216:4  219:6  224:25
225:2  227:13  249:23
250:21  260:25  271:2

275:3  282:5  297:19
308:7  323:20  357:11
358:5  371:9  373:6
375:11  380:18
days  98:5, 7, 11, 12
233:17  268:22
DC  268:13, 15  271:1
278:9  372:17  380:14
dead  164:18  165:12,
17
deadline  204:21
deal  93:2  181:14
340:14
dealing  8:22
deals  237:7
Dean  285:1, 2
debate  31:17
deceit  204:19
December  92:25
119:14  275:3  277:9
deception  206:3
decide  351:22
decided  143:20  144:1
decision  125:21
324:3
deeply  283:7
defamatory  41:3
default  66:22, 23
defend  142:2
Defendants  1:1
10:24  11:9  12:13
16:8  28:4, 7
defendant's  58:3, 13
59:1, 6, 15  64:21
68:12  69:7  74:4
81:11  85:11
defense  45:19, 25
351:14
definitely  178:10
192:7  226:6  233:4
268:2, 10  280:9
definition  317:22
318:1
Delaney  56:14  73:25
125:11  196:10
254:22  257:11  271:4
delay  324:19
delegating  199:11
delegator  192:7

delete  75:5  77:8
88:5  219:15  377:20
deleted  74:24  76:2
77:16, 18  78:1  81:2
88:16, 25  202:19
203:1, 6  220:1
264:17  376:14, 19
deleting  80:25
377:15
deliberately  92:13
deliver  207:20
delve  283:7
demoted  333:18
denied  103:6
departed  182:17
depends  193:4
deposed  5:21  6:1
9:20  101:6
deposition  1:1  4:6
5:16, 23  6:9  7:14
9:7  24:18  29:4
31:11  33:13  39:24
54:4  91:24  92:6
100:7, 10  101:11
173:10, 12  181:13
236:7  310:18  364:21
365:21
depositions  6:6  9:25
10:7  23:7  32:20
depressed  317:16
DEREK  2:1  351:24
352:2
describe  18:18  70:16
describing  267:21
description  131:5
319:4  323:5  331:22
deserves  351:8
designated  126:8
365:14
designed  36:10, 15,
23  38:2  173:4, 5
348:10, 15, 16  349:7,
14
destroy  388:7
detailed  8:1
details  128:2  185:9
286:22  337:20
338:14
determination  60:9
determinations  59:18

Deposition of Patricia McNulty                                    Lisa Barbounis v. Middle Eastern Forum, et. al.

**determine** 59:2, *9*
64:22, *25* 65:2 68:*11*
69:*5* 70:6
**determined** 59:*13*, 22,
*25* 65:*4*
**Detroit** 332:24
**developing** 349:*1*
**development** 131:*4*,
*24* 151:*11* 197:22
303:*10* 319:*15*, *16*
356:*13*, 25
**dick** 282:5, *12*, *15*, *19*,
*20* 283:*11* 284:*3*
288:*11*, *25* 295:6, *14*,
*20* 296:*3*, 23 383:*18*
**Dicks** 366:*4*
**die** 204:*5*
**difference** 47:*16*
241:*20* 307:*12*
**differences** 307:*10*
**different** 28:*16*
44:*21* 47:2 85:*21*
140:6 169:*16* 170:*19*
176:*14* 234:*15*, *16*
251:*7* 254:*23* 353:*4*,
*19*
**difficult** 21:*20*
149:*23* 227:*19*
**difficulties** 6:*11*
**difficulty** 327:*10*
**dig** 85:22
**dinner** 213:*3* 232:*25*
355:*15*
**direct** 137:*19* 138:2,
*5*, *7*, *10*, *17* 168:*11*
180:*16* 214:*4* 359:*23*
379:*8*
**directing** 359:*24*
**directly** 19:*12* 77:*20*
170:*17* 213:*20* 305:*4*
306:*4* 326:*7*
**director** 122:*17*
131:*4*, *9*, *24* 149:*10*
151:*11* 160:*19*, *21*
166:*16* 183:*11* 184:*5*,
*14*, 22 195:*3* 251:*14*
303:9 319:*13*, *14*
320:*20* 328:24 351:9
356:*13*, 25
**disability** 107:*1*

**disagree** 267:*3*
324:*18*
**disagreement** 267:22
**disagrees** 267:*16*
**disappointed** 324:*21*
**disciplined** 113:*10*, 15
332:*1* 333:*10*, *17*
**disconcerting** 296:*8*
**discontinue** 180:*13*
181:*4*
**discovered** 27:*21*
**discovery** 10:*13*, *20*,
*25* 11:*21*, 23 12:*4*, 22,
*23* 14:*16* 16:22
17:*10* 18:2, 22 19:*18*
20:*3* 21:*3*, *18* 22:*3*, 7,
*10* 23:22 25:*17*, 24
26:*8* 28:*15* 31:6
35:*17* 36:*7* 38:*7*
64:*21* 68:*12* 69:7
**discrimination** 116:*4*
148:*19* 150:*11* 211:2,
*3*
**discuss** 10:*4* 56:6
195:*11*
**discussed** 162:*23*
199:*3* 323:*2*
**discussing** 193:*19*
240:*25* 267:*8* 345:*10*
**discussion** 125:*14*
295:*15* 366:22
**discussions** 229:*3*
354:5, *12*
**disheartened** 324:*13*
**disheartening** 324:2
**disrespect** 287:*1*
**disrupts** 164:22
**dissatisfied** 325:*13*
**distance** 214:*1*
**distinction** 48:*12*
62:*4* 78:*8* 82:*17*, 22
**DISTRICT** 1:*1* 4:*9*
22:*10* 24:2
**DM** 379:*5*
**DMSs** 284:*20*
**Doc** 25:*17*
**docket** 39:*19*, 22, *23*
40:*5*, *11* 41:*10*, 15
42:*1*, *11*

**doctor** 99:24
**doctors** 185:*12*, 14
**document** 12:*20*
13:*17*, 21, 22, 25
15:*17*, *23* 16:8, *15*
37:*24* 58:*13* 59:*1*
85:*11* 255:2
**documents** 9:*17*, 18
10:*10*, *19* 13:5 15:24
26:*10*, *12*, *19* 27:21
28:*3*, 5 37:*11* 58:*4*
64:*20* 67:*2* 68:*11*, 14
69:*2* 74:*4* 81:*12*, 13
195:*12*
**DOD** 320:*20*
**doer** 192:*8*
**dog** 190:*17* 191:*4*
**doing** 7:*20* 8:5
21:*23* 31:9 33:*13*
34:5, *12* 53:*10* 97:*23*
104:*19* 105:*9* 108:*11*,
*12* 116:*8* 153:*19*
164:*7* 170:*24* 190:*22*
197:*20* 207:*3* 216:2
223:*21* 234:*24*
241:22 254:*13* 284:8
305:8 314:6 326:*14*
327:*1* 328:*15* 357:*4*
364:*19*
**dollar** 337:*14*, *18*
338:*19* 339:*11*
**dollars** 338:*13*
340:*15* 341:9 368:5,
*13*, *14*
**donations** 341:*20*
**donor** 337:*23* 338:*3*
340:*7*, *9*, *11*, *13* 341:*8*,
*23*
**donors** 65:22 78:9
**door** 126:*19* 274:22,
*25*
**double** 344:*17*
**doubly** 8:*5*
**doubt** 384:*15*
**downstairs** 325:*4*
**downtime** 189:*23*
**DP** 226:*17*, 24 227:*5*
240:*17* 266:25 267:2,
*15* 274:*16* 302:22

303:*19* 366:*3*, 9
**DP's** 274:*23*
**drafted** 371:*13*
**draining** 258:*1*, 4
**drawing** 48:*13* 78:8
**dress** 278:*7*
**drink** 8:*15*
**Drive** 67:*8*, *15*, 17
68:*5*, 8
**driving** 344:*20*
**drop** 234:*21*
**Dropbox** 68:*16*, 18
69:*3*, 5, 8, *11* 200:9
**dropped** 164:*18*
165:*12*, 17
**drove** 260:25 261:*4*
**drowning** 271:7
**drug** 96:*10*, 17
259:*12*
**drugs** 95:6, *9*, 14
96:8 98:24 99:*3*, 7
308:*18*
**drunk** 383:*16*
386:*19*, 22
**ducking** 225:*14*
**dude** 262:*3* 343:25
**due** 196:*15*
**duh** 304:*13*
**DULY** 4:*23*
**dumb** 21:*25*
**dyed** 304:2
**dynamics** 127:*14*

< E >
**ear** 268:*16*
**earlier** 52:*17* 53:*12*
55:*7* 80:*17* 81:*10*
161:*20* 230:*13*
274:*12* 302:*14*
**early** 182:*9* 206:22
373:*5*
**ease** 255:*18*
**easier** 214:*3*
**EAST** 1:*1* 2:*1* 4:*8*
5:*12* 6:*2* 11:*12* 33:7,
*9*, 22 38:*15* 54:22
55:*1*, 4 56:*11*, *23*
66:9 310:*3*, 9

Deposition of Patricia McNulty                                    Lisa Barbounis v. Middle Eastern Forum, et. al.

**EASTERN** 1:*1* 4:*4,
9* 22:*10* 24:2 50:*20*
91:*12* 174:*16*
**eat** 334:*17*
**eating** 365:*24*
**ecstatic** 230:*6*
**editor** 369:*23*
**educate** 299:5 310:*23*
**educating** 299:*8*
**education** 299:*12*
**EEOC** 143:*17*
**efficient** 34:*12*
**effort** 65:*1*
**efforts** 312:*9*
**eight** 121:*3, 21*
147:*25* 273:*23*
**eighth** 121:*18*
**eight-hour** 161:*24*
**either** 63:*18* 94:*11*
101:*9* 157:*14* 231:*12*
244:*25* 247:*13*
254:*14* 265:*13* 297:5
299:*2*
**election** 128:*7*
**eloquently** 271:*3*
**e-mail** 12:*12* 20:*23*
21:*21* 33:*5, 6, 8*
38:*11, 15, 16, 18, 24*
39:*8, 9, 18, 21* 40:*15*
41:*21* 42:*15, 21*
43:*14, 15, 18, 21* 44:*3*
46:*10, 19* 48:*25* 49:*8,
14* 51:*18* 53:*13* 54:*2*
55:*10* 57:6 63:*1, 21,
24* 64:*3* 67:*14, 22*
71:*24* 72:*3* 140:*17*
159:*25* 164:*9* 177:*13*
182:*12* 200:*6* 201:*18*
250:*19* 251:*1, 21*
257:*1* 304:*17* 306:*23*
335:*23* 373:*1, 3*
**e-mailed** 21:*16*
**e-mailing** 140:*15*
200:*5*
**e-mails** 48:*10, 15, 16,
18* 71:*25* 223:*19*
266:*23* 331:*20*
**Eman** 176:*24, 25*
177:*7, 9, 11, 15* 178:*3,*

7 181:*22* 182:*13, 16*
183:*1, 17* 185:*3*
**embarrass** 33:*25*
36:*10, 15, 23* 37:*2*
38:*2* 47:*20* 173:6
294:*12* 348:*11, 16, 19*
349:*7, 14, 15, 19*
**embarrassed** 349:*22*
384:*10*
**employed** 182:*16*
254:*24*
**employee** 56:*23* 69:*1*
102:*9* 103:*3* 176:*4, 5,
6, 24* 232:*8* 293:*24*
346:*4, 5, 9* 378:*3*
389:*20*
**employees** 62:*21*
65:*11* 78:*17* 99:*4*
127:*23* 188:*4* 190:*1*
341:*19* 350:*10, 16*
351:*4*
**employer** 26:*13, 20*
107:*2*
**employment** 26:*14,
21* 28:6 37:*12* 78:*12*
106:*7, 15* 151:*22*
153:6 182:*10* 338:*16*
346:*24* 347:*3* 348:6
**empty** 213:*23* 214:*22*
**encountering** 313:*19*
**encounters** 155:*9*
**encouragement**
258:*11*
**encouraging** 203:*20*
**ended** 26:*15, 22* 36:6,
11, 13*
**endurance** 8:*12*
**engage** 31:*17* 204:*19*
**engaged** 206:*3*
**engagement** 153:*15*
**engaging** 292:6
293:*23* 318:*2*
**England** 232:*5*
**enjoy** 248:*22*
**entailed** 286:*23*
**enter** 223:*19*
**entire** 41:*7, 8, 9, 14*
243:*10* 309:*14*
331:*10*

**entirely** 341:*11*
**entirety** 69:*22*
**entitled** 337:*17*
**entry** 126:*16*
**environment** 151:6
185:*7* 221:*10*
**environmental** 140:*2*
**episode** 126:*20*
**ER** 202:*22* 203:*5, 10,
17, 21, 25*
**erase** 63:*9, 15* 374:6
**erased** 74:*21*
**erasing** 377:*15*
**Especially** 132:*20*
**ESQ** 2:*1*
**establish** 351:*14*
**established** 350:*20*
**establishment** 115:*5*
**et** 1:*1* 4:*8*
**Eve** 278:*9*
**evening** 166:*17*
**event** 178:*3* 193:*10,
12* 197:*25* 200:*18*
255:*3* 290:*15* 306:*3*
**events** 233:*4* 369:*24*
**eventually** 140:*21*
182:*13* 195:*23*
372:*25*
**Everest** 2:*1* 4:*13, 15*
**everybody** 112:*7*
142:*1* 212:*20* 250:*23*
313:*18* 391:*10, 11*
**everybody's** 220:*20*
**everyone's** 190:*10*
**evidence** 35:*22* 42:6,
12* 85:*3* 132:*15*
149:*18* 150:*14* 190:*5,
6* 204:*23* 238:*15, 25*
239:*16, 17* 292:*11*
294:*14* 296:*10*
375:*23* 392:*1*
**exacerbating** 221:*14*
**exact** 28:*15* 71:*7*
99:*19* 117:*1* 128:*2*
141:*20* 153:*5* 183:*8*
184:*23* 185:*21*
195:*21* 254:*25* 255:*2*
337:*20* 338:*14*
371:*25* 372:*12*
380:*22*

**exactly** 20:6 28:*23*
60:*19, 24* 61:*7*
100:*14* 104:*3* 105:*16,
22* 106:*4* 107:*17*
108:*1* 111:*9* 118:*22*
120:*8* 128:*18* 129:*11,
16* 134:6 137:*2*
141:*9* 142:*22* 146:*2*
152:*21* 155:*4, 7, 10,
11* 156:*10* 157:*4*
182:*5, 20* 193:*14, 17*
201:*5* 202:*23* 207:*15*
209:*23* 212:*16, 25*
220:*12* 225:*3* 247:*18*
250:*7* 259:*1, 2, 6, 14*
265:*20* 278:*5* 284:*12*
286:*20, 22* 291:*21*
293:*10* 312:*7* 325:*23*
328:*4, 22* 338:*18*
**exaggerating** 203:*8*
**Examination** 3:*1* 5:8
91:*21*
**EXAMINED** 4:*24*
**example** 16:*4*
**examples** 123:*20*
**excessive** 210:*25*
**exchange** 32:*21*
92:*23* 123:*24* 161:*13*
186:*20* 187:*2* 192:*12*
199:*19* 221:*22* 251:*1*
263:*25* 264:*25*
285:*12, 20* 290:*24*
305:*14, 17, 18, 19*
306:*12* 308:*17*
316:*19* 317:*19*
319:*21* 320:*12* 334:6,
8* 335:*17* 339:*22*
344:*22* 363:*3* 377:*11*
383:*12*
**exchanged** 92:*3*
123:*25* 125:*2*
**exchanging** 295:6
**Excuse** 27:*3* 72:*24*
144:*15* 149:*11*
158:*17* 204:*20*
236:*24* 244:*9, 12*
245:*5* 298:*18, 22, 25*
361:*12*
**executive** 160:*18*

161:*1*  199:*3*
**exempt**  176:*4*
**exhausted**  158:*23*
271:*10*
**Exhibit**  92:20  94:*24*
101:*18*  103:*10*
120:*15*  121:*24*
134:*25*  135:9, *12, 20*
139:6, *8*  158:*16*
159:*12*  161:*10*
176:*21*  185:*1*  186:*17*
190:*14*  191:*25*
196:*12*  199:*17*
202:*16*  206:8, *19*
218:*3, 10, 11*  220:*5*
223:*1*  224:2, *23*
229:*24, 25*  234:*18*
236:5, *6*  240:*6*
247:*20*  248:5, *11*
252:*16*  253:7  257:*4*
272:*11, 12, 19*  273:*18*
280:*20*  281:6, *20*
290:*20*  291:*16*
297:*23*  301:*11, 12, 16*
306:8, *19, 21*  308:*14*
311:*20, 21*  313:*13*
314:*12*  316:*17*  325:*9*
333:6, *23*  339:*25*
342:*21*  344:5, 6, *9*
345:*20*  350:*1*  356:*6*
361:*10*  362:6, *12, 25*
363:22  366:*17, 18*
368:*1*  369:*11*  373:*21*
378:9  379:*1*  381:*6*
387:2, *23*  388:*3*
**EXHIBITS**  3:*1*
297:*15*  381:*12*
390:*11*
**exist**  83:7  190:*8*
**existed**  127:*17*
**expect**  126:7  282:*5*
319:7, *9*  341:*24*
**expectations**  207:*20*
290:*6*
**expected**  7:*15*
126:*10*  161:*24*
260:*16*  324:*23*  342:*6*
**expensive**  332:*21*
**experience**  138:*25*
**experienced**  361:*8*

**explain**  17:*17*  22:*15*
36:*5*  170:*4, 10*
209:*23*  233:*11*
300:*12*  338:*11*
**explained**  300:*11*
301:*6*
**explanation**  86:*4*
221:*8*  325:*12*  331:*19*
**explicit**  255:*19*
**express**  231:*8*
**expressing**  199:*22*
**expression**  282:*19*
**extended**  166:*8*
**extent**  7:*13*  8:*16*
11:*15*  14:*1*  66:*21*
106:*12, 18*  154:*16*
166:2  371:*21*
**extra**  211:*16*
**extreme**  316:*23*
**eye**  126:*25*  155:*14*
156:*1, 4*
**eyes**  268:*25*  364:*18*
365:*15*

< F >
**face**  267:*1*  272:*14, 15*
**Facebook**  49:*12, 15,
17*  50:*1*  55:8, *11, 17,
25*  56:6, *10, 13, 16, 19,
22*  58:*12, 14, 20, 23*
**faces**  284:*21*  334:*20*
**fact**  16:*21*  24:6, *17*
32:*24*  77:*17, 25*
90:*25*  108:*19*  148:*25*
150:*8*  167:*21, 23, 25*
169:*5*  194:*4*  238:*21,
25*  239:*22*  244:*22*
245:*12, 21, 24*  269:*24*
270:*21*  288:*14*  291:*8*
292:*16*  299:*19*
300:*17, 23*  317:*6*
330:2, *3*  341:*23*
343:*11*  347:*8*  348:*4,
5*  352:*25*  360:*6*
**factors**  294:*1*  300:*24*
**facts**  33:*3*  35:*22*
85:*3*  149:*17*  150:*13*
168:*17*  190:*5*  204:*23*
239:*15*  244:6  270:*6,
8*  292:*10*  293:*18*

294:*13*  296:4, *10*
299:*6*  301:*5*  375:*23*
**fail**  319:*5*  322:*23*
**failing**  25:*16, 23*
**failure**  358:9, *14*
**fair**  6:*19*  7:*17*  11:*14*
25:*22*  37:*23*  66:*20*
71:*19*  102:7  268:*17*
279:*15*  307:*14*
**fake**  379:*4, 7, 23*
381:*15, 25*  382:2, *23*
**faking**  204:*15*
**fall**  70:*13*  105:*21*
108:7  111:*5*  115:*7*
118:*24*  171:*15*
264:*19*
**false**  142:*8*
**familiar**  6:*7*
**family**  102:*2*  261:*25*
262:*8, 22*
**fancy**  258:*6*
**far**  74:*5*  99:*17*
132:*13*  187:*24*
194:*14, 15*  195:*9*
216:*14*  237:*16*  238:*5*
239:*25*  257:6, *8*
300:*3, 7*  309:*8*
311:*16*  364:*20*  369:*4*
**fast**  92:*13*  248:*24*
**favor**  164:*19*
**February**  1:*1*  4:*2*
103:*16*  135:*3, 20*
136:2, *4*  139:*17*
160:*9, 20*  182:*13*
307:*14*  309:*21*
**federal**  143:*21*  144:*2*
**feel**  78:*18*  131:*17*
137:*5*  150:*18*  167:*5,
6, 7, 14*  170:*6*  178:*15*
211:*14*  212:*12*
255:*18, 25*  265:*13*
269:*16*  271:*4*  281:*9*
285:*20*  296:*6*  303:*6*
321:*3*  333:*14*  356:*17*
358:*20*
**feeling**  78:*13, 15*
79:*14*  96:*24*  97:*7*
137:*25*  138:*3, 14, 19,
24*  200:*1*  211:*4*
212:*7*

**feelings**  79:*21*  80:*20*
269:*5*
**feels**  83:*24*  196:*23*
**fees**  23:*9*  32:*23*
**fell**  155:*21, 23*  156:*1*
373:*5*
**fellow**  232:*13, 14*
**felt**  103:*25*  114:*5*
145:6  162:*12*  164:*3*
185:*16*  211:*10, 18*
212:*1, 10*  213:*9*
214:*21*  357:*11*
**female**  106:*20, 22, 25*
176:*25*  178:*21*  276:*6*
**females**  215:*22, 25*
**FFS**  264:*19*
**fiance**  79:*10*  114:*22,
25*  390:*6*
**fifth**  77:*7*
**fifty**  383:*8*  384:*22*
**fight**  115:*17*  116:*14*
126:*3*  229:*8*  286:*23*
**fighting**  285:*22*
286:*3, 11, 14*  302:*18*
306:*2*
**figure**  74:*11*  130:*23*
278:*18*  324:*16*
**figured**  218:*18*
**figuring**  115:*24*
**file**  21:*24*  115:*18*
353:9, *16*
**filed**  11:*20*  25:*2*
142:*3*  143:*13, 16, 17*
365:*22*
**filled**  324:*17*  329:2, *4*
**filtered**  43:*10*
**finalized**  25:*5*
**finally**  147:*8*  329:*1*
351:*24*
**finance**  195:*21*  307:*7*
**financial**  195:*15*
369:*4*
**financials**  193:*18*
195:*11*  306:*5*
**find**  20:*11*  29:9, *13,
14*  58:*9, 17*  59:*5*
68:*14*  70:*24*  108:*13*
110:*25*  142:*15*
320:*19*

**fine** 8:*15* 50:8 63:7 120:*19* 132:*13* 201:6 241:6 311:*13* 356:*21* 358:*11*

**fingers** 337:7, *8*

**finish** 6:*15*, *17* 8:*17* 92:*11* 110:*15* 170:*1* 272:23 292:22 293:*1* 310:*18* 330:22

**Fink** 2:*1* 94:*13* 318:*11* 367:20

**fire** 106:*10*, *19*, *25* 107:*3*, *11* 108:*13* 164:*16*

**fired** 40:*13* 104:*19* 106:*21*, *23* 111:*1*, *11*, *23* 112:4 113:*17*, *25* 114:*1* 117:*15*, *16*, *23*, *24* 118:7, *17* 212:*15* 214:8 253:23 325:*17* 356:*14*

**firing** 105:*12*, *14* 107:23 108:9 110:22

**firm** 142:*25* 143:7 351:*23*, *25* 352:*3* 353:*2*

**first** 15:*23* 26:9 33:4 45:*16* 95:4 103:*24* 108:2, *4*, *17* 110:*10* 113:*3*, *11*, *12* 140:*11* 141:*3* 146:*18* 147:7 155:*21*, *23* 157:*14*, *20* 172:22 176:24 177:*1*, *2* 183:*24* 184:*1* 199:*1* 213:*14* 214:2 230:*14* 232:24 244:24 254:24 259:5 277:*12* 282:*1* 293:7 321:*4* 326:*13* 327:*3* 333:24 343:*21* 351:22 355:9, *10* 368:*21*, *25*

**firsthand** 179:*2*

**fit** 32:*12*

**five** 8:*14* 44:*14* 45:*1* 46:*13*, *20* 47:*12*, *16* 50:6, *10* 91:2 98:5, *7*, *12* 152:*1* 331:*18*

**five-minute** 50:*5* 235:*18*

**fix** 288:5, *6* 316:*21* 317:*9*

**flat** 140:*14*

**flex** 98:*20* 112:22 161:*20*, *23*

**flight** 226:*23* 229:22 231:*15*, *22*, *23*

**flights** 226:*16* 227:*13*

**flirt** 350:*14*, *18*

**flirted** 350:*20*

**flirting** 350:*9*

**flooded** 196:*20*

**floor** 214:2

**Florida** 192:*4*

**flown** 387:*13*

**fly** 230:*3*

**flying** 172:*4* 387:*12*

**focus** 281:*7*

**focusing** 222:*1*

**follow** 228:*24*

**following** 172:*21*

**FOLLOWS** 4:*24*

**follow-up** 175:*13*

**food** 186:*8*, *9*

**foot** 252:*3* 330:*16*

**forced** 210:22 212:*24* 332:*3*

**forcing** 215:22

**foreign** 187:*13*

**forever** 281:*14*

**forget** 244:*2*, *10*, *20*

**form** 35:*21* 75:9 77:*11* 87:*16* 95:*15* 145:*24* 163:*13* 165:*1*, *3* 166:*21* 188:*21* 204:*25* 211:*1*, *3* 217:*16* 238:8 255:*13* 271:*13*, *16* 286:*15* 287:*20* 292:*1*, *10* 342:*18* 350:*25* 357:*19* 375:*23*

**formal** 145:*14*

**formatted** 16:*3*

**former** 62:*21*

**forms** 26:*11*, *18* 210:*5*

**forth** 281:*12* 283:*2*

**forthright** 265:*22*

**forty** 344:*9*

**FORUM** 1:*1* 2:*1* 4:8 5:*13* 6:2 10:*25* 11:*10*, *12*, *15*, *20*, *21* 12:*5* 26:*15*, *22* 33:7, *9*, *22* 38:*16* 49:*23* 54:22 55:*1*, *5* 56:*11*, *23* 66:9 68:6 80:*19* 255:9, *15* 310:3, *9* 321:*5*

**Forward** 20:*23* 169:*17* 170:*19* 249:25 256:*15* 297:*11*

**forwards** 43:*15* 256:*19*

**found** 22:9 25:*15*, *23* 70:20 107:*14* 129:*13* 139:*19* 229:*20*

**foundation** 35:*23* 168:7 239:*16* 280:*1* 300:22 350:*25*

**frame** 360:*7*

**freaking** 257:*2* 337:*3* 388:*7*

**free** 164:22 203:*18* 242:*5* 246:*20* 373:*12*

**free-for-all** 162:*3* 242:*25*

**French** 280:8

**Friday** 1:*1*

**friend** 61:*12* 117:*12* 248:*2* 272:*24* 291:6 363:*13* 380:*14* 382:*1*

**friended** 334:*18*

**friendly** 122:*22*, *23*, *25* 123:*1*, *2*, *3*, *4* 182:*24* 183:22 216:*15* 262:*14*

**friends** 62:*20* 97:*20* 123:*16* 232:*4* 261:*4* 269:*2* 370:*3*, *5*, *6*

**front** 272:*14* 297:*17* 359:*10*

**frustrated** 200:*12*, *17* 207:*15* 355:*17* 357:*6*

**frustration** 199:22

**fuck** 227:6 252:22 264:*19* 280:*10* 283:*19* 303:2 304:*19* 343:*25* 366:*3*

**fucked** 356:*11* 358:*17* 363:7

**fucking** 136:8 200:9 235:*1* 284:*18* 285:*16* 287:2, *4* 288:*1*, *5* 316:*21* 317:*9* 367:6, *16* 384:*16*

**full** 150:2 241:*3*, *6*, *8*

**fully** 360:*10* 392:*1*

**fun** 244:5 367:*4*

**funded** 293:6

**funding** 292:*17* 296:5 318:6

**funds** 231:*17*, *18*

**funny** 268:*13* 276:24

**further** 91:*15* 187:2 201:7 279:*14* 383:*13* 390:22

**Future** 290:7 297:*12* 298:5 321:*4*

**FYI** 258:22

**< G >**

**gala** 305:*25*

**games** 318:*25* 320:6, *16*

**gangs** 268:*4*

**gap** 27:*19*

**Gary** 131:*13*, *19*

**Gates** 280:*1*

**gather** 26:*17* 126:*1*

**gay** 178:*21*

**gender** 191:*19* 210:8, *13*, *15*

**general** 48:*17* 86:*21* 138:*21* 183:*21* 188:*4* 193:*18* 200:*18* 268:*20*, *23* 339:*19*

**generally** 138:*20* 193:*5*

**gentlemen** 245:6 381:*8*

**genuinely** 207:*15*

**George** 275:*17*, *20*

**Georgie** 266:*12*, *13*

**gestures** 7:22

**getting** 7:*1* 120:*10* 131:*19* 162:*25* 195:*10* 199:5 211:*10*, *15* 222:*19* 231:8

Case 2:19-cv-05030-JDW   Document 110-3   Filed 03/02/21   Page 115 of 157

Deposition of Patricia McNulty                                        Lisa Barbounis v. Middle Eastern Forum, et. al.

278:*21* 283:*4* 284:*24*
304:*18* 317:*15*
359:*13* 361:*15*
381:*11*

**gifs** 61:*8*

**gift** 231:22 258:*23*
259:*23* 260:9, *12*

**Giles** 336:*6* 338:*6, 8*
340:*3, 11*

**Girl** 121:*9, 11*
201:*25* 266:*4* 309:*4*

**girlfriend** 290:*12*

**girls** 384:*16*

**give** 7:*11* 10:9
13:*19* 28:*1* 39:*3*
41:*11* 57:*19* 64:7
70:*10* 89:*19* 91:2
99:*3, 14* 105:*4*
123:*19* 171:*8* 175:6
207:*19* 211:6 226:*17*
229:*10* 231:*21*
242:*18* 256:*15*
258:*13, 24* 260:*8*
273:*23* 280:*20*
302:*23* 327:*24* 333:*4*
372:9 389:*1, 25*

**given** 6:*5* 37:22
101:*12* 113:*5, 7, 8, 16*
178:*14* 209:*3* 255:*1*
259:*4, 23* 260:2
275:*3* 309:2 322:*13*
323:*7* 324:*3* 326:*3*
330:2 371:*19* 376:2

**gives** 207:*14* 209:22
256:*17*

**giving** 42:*24* 92:8
196:*15* 210:25
240:*17* 242:*16*
258:*10* 267:*4* 327:*17,
18* 331:*18* 374:7

**glad** 257:*1*

**glorious** 373:*6*

**Gmail** 43:*8* 68:7
256:*15, 17*

**go** 5:2 12:*24* 13:*13*
19:*18* 26:7 35:*6*
37:*4* 40:*20* 50:6
51:*8, 25* 52:*8, 15, 24*
53:9 74:*9, 15, 17*
75:*1, 24* 76:5 77:*13*

90:6 93:*12* 96:*19*
110:*17* 113:*18, 23*
117:*6* 123:*17, 22*
133:*10* 134:*24, 25*
140:*3, 12, 19* 141:*4*
148:*16* 156:*14*
158:*16* 159:*12*
161:*10* 165:*5* 166:*23,
24* 172:*19* 175:*5, 24*
180:*15* 186:*16*
188:*23* 190:*14*
191:*24* 196:*12* 198:*8,
11* 199:*17* 201:*7, 15*
203:*16, 19, 20* 206:7
207:*10* 209:*10*
210:22 212:*12* 213:*3,
5, 10* 215:*8, 22* 216:*4,
6, 12* 218:*3, 13* 220:*5*
222:25 223:*17*
224:*16* 225:*11, 16, 20*
226:*1, 25* 227:2
228:*7, 9* 231:*14, 23,
24, 25* 232:*23* 233:*15*
234:*8, 18* 236:*12*
240:*4, 6, 7* 241:*4, 25*
242:*3, 5* 245:*19, 20*
246:*16* 247:*19*
248:*23, 24* 249:*3, 6*
252:*16, 17* 253:*5*
258:*5* 263:7 264:*3*
270:22 271:*18* 272:*4,
9* 274:*13* 282:*1*
288:2 297:*11* 298:*4,
5* 299:*8* 301:*19, 20,
21, 22, 23* 302:*3, 8*
308:*14* 310:*16*
311:*20* 313:*12*
314:*12, 20* 316:*16*
318:*14* 321:*12* 325:*8,
19, 22* 326:*7, 15, 18*
330:*8* 333:*6, 23, 24*
334:*3, 10* 335:*3, 4*
342:*14, 20* 343:*5*
344:*6, 7, 9* 345:*20, 21,
23* 350:*1* 356:*6*
361:*10* 362:*6, 8, 10,
24* 364:*15* 365:*1, 23*
366:*1, 16, 18, 19, 25*
367:25 368:*1, 19*
369:*11* 373:*20*

377:*17* 378:*8, 12*
380:*11* 381:*5, 12*
382:*13* 383:*7, 8, 9, 13,
23, 25* 384:*5, 9, 21, 22,
23* 385:*5* 387:*1, 2*
388:*2, 3, 17* 389:*8, 9,
10* 390:*13*

**God** 203:*14* 285:*15*
313:*18* 336:*12*
343:*14*

**goes** 34:*8, 22, 25*
137:*6* 208:9 237:*6*
240:*21* 242:*6* 266:*5*

**going** 5:*17, 18, 19*
6:*18* 12:2, *8, 17, 19*
13:*4, 8, 15, 24* 14:*8,
13, 18, 24* 15:*1, 2*
16:*19* 17:*3, 15, 16*
18:*10, 11* 20:22
23:*12* 27:*8* 31:*13, 15,
16, 22* 32:9 33:*20, 24*
34:*14, 15* 36:*14* 37:2
38:*23* 39:*6, 11* 41:*10*
46:*4, 5* 50:9 51:*21*
52:8 53:*8, 22* 59:*16*
70:*5* 72:*3* 81:*23*
88:*5* 90:*15* 91:*17, 25*
92:2, 22 93:2, *10*
94:*4, 20, 25* 96:*14*
107:*11* 111:*21*
113:*10* 115:*12, 13, 15*
119:*21, 25* 120:*1, 6,
17* 124:*8, 11, 13, 14*
128:*13* 131:*3* 139:*5,
12* 147:*10, 17* 149:*19*
150:*21* 151:*7, 9, 11*
152:*16* 153:*14*
154:*10* 163:*12*
164:*18, 25* 165:*2, 19,
22, 25* 168:*16, 17*
169:*17, 25* 170:*19, 25*
171:*4, 18* 172:*3, 7, 22,
24* 173:*7, 21, 25*
174:*3, 4, 5* 179:*17, 19,
23* 180:*2, 6, 12*
181:*20* 188:*20* 190:*4,
8, 12, 13* 198:*11, 23*
199:*20* 202:*7* 203:*25*
204:*5* 205:*15* 207:*9*
211:*22* 213:*13* 214:9

220:*4, 14* 221:*4, 18*
223:*8, 11* 224:*15, 16,
18, 19* 225:*15, 16*
226:*12, 25* 228:*4, 6, 9*
229:*12, 14, 23* 230:*6,
9* 231:*15, 16, 21*
232:*1* 233:*15* 234:*4,
11, 21* 237:22 238:*11*
240:*12, 13* 241:*19*
247:*6* 248:22 249:*8,
11, 12* 251:*10* 252:*23*
253:*3, 5* 255:*5* 256:*4*
257:*3, 14* 258:*5, 16*
260:*13* 262:*24* 268:*4*
273:*19, 20* 276:*1, 2,
11* 277:*5* 278:*25*
279:*19* 280:*12, 19*
281:*12, 14* 282:*19*
283:*15* 286:*20*
288:*13* 294:*4, 5, 18*
297:*1* 298:*10, 23*
299:*3* 300:9 302:*15*
305:*11* 307:*16* 311:*9,
13* 313:*5, 7* 314:*14*
318:*15* 325:*24* 328:2
332:*4, 5* 336:*12, 14,
23* 337:*13* 338:7
342:*17, 18* 343:*4*
344:*13, 23* 345:*23, 24*
348:*7* 350:2 352:*19,
22* 354:*13, 16* 355:*8,
18, 19* 356:*7, 9*
358:*12* 361:*19*
362:25 364:*25*
365:*20* 366:*19*
369:*10* 371:*7* 378:*10,
11, 12* 379:*1* 381:*2,
10* 385:*5, 14* 387:*3, 4,
5* 388:*18* 390:*19, 20,
23*

**GOLD** 2:*1* 3:*1* 5:*15,
18* 91:*16, 22* 92:*19,
21* 93:*3, 7, 10, 14*
94:*20* 95:*1, 2, 11*
96:*3* 101:*10, 17, 19*
103:*10, 12* 106:*15, 17*
107:*9* 110:*2, 6*
113:22 114:*6* 116:*9*
117:*19* 118:*1, 5, 15*
120:*14, 19, 21* 121:*5,*

Deposition of Patricia McNulty                                  Lisa Barbounis v. Middle Eastern Forum, et. al.

9, 12, 18, 22, 25   122:1
124:4, 7, 10, 15, 24, 25
133:10, 13   134:24
135:1, 13, 17, 24, 25
136:19, 22, 23   137:16,
17   139:5, 12, 15
142:10, 14, 16, 19, 24
143:2, 5, 8, 13, 18, 23
144:4, 6, 10, 19, 23, 25
145:16   146:10
148:10, 24   149:3, 7,
12, 19   150:1, 3, 7, 16
153:2, 20, 22   154:4,
13, 18, 20   155:18
158:16, 22   159:12, 15,
18, 21, 24   161:10, 12
163:15, 19   164:1
165:4, 10, 23   166:4,
22   167:11, 19, 20
168:5, 8, 12, 19, 25
169:8, 11, 19   170:2
171:3   172:13, 19
173:8, 12, 14, 17, 19
174:2, 7, 11, 18   175:1,
6, 12, 20, 21, 24   176:2,
20, 22   179:6, 12, 13,
19, 24, 25   180:4, 9, 15,
20, 23   181:2, 5, 9, 15,
18   184:25   185:2
186:16, 18   188:24
189:3   190:12, 15
191:24   192:1, 18
196:12, 13   197:3, 4
198:10, 13   199:17, 18
201:7, 9, 15, 16
202:13, 15   204:8, 10
205:4, 8, 13, 18, 23, 25
206:7, 10   207:10, 12,
25   208:1   209:10, 14
210:11   212:22
214:18   217:21   218:1,
4, 9, 12   219:22, 24
220:4, 6, 14, 15   221:3,
6   222:11, 13, 25
223:4, 11, 13   224:15,
21   225:11, 12, 16, 17
226:4, 5, 12, 13
227:16, 17   228:16, 17
229:12, 13, 23   230:1
234:18, 20   235:17, 21

236:1, 4, 8, 18, 20, 25
237:5   238:9, 17, 20
239:7, 20, 21   240:4, 9,
12, 15   243:13, 15, 17,
23   244:2, 8, 10, 14, 19
245:2, 15, 18, 25
246:5, 13, 15, 20, 24
247:3, 4, 17, 19, 24
248:1, 5, 10, 12, 19, 20,
23   249:1   252:16, 18
253:5, 8   254:10, 11,
20, 21   255:5, 7, 22, 23
257:3, 5, 13, 15
258:16, 18   260:22, 23
261:1, 3, 11, 14
262:20, 21, 23, 25
263:7, 10, 21, 23
264:3, 5, 12, 15   265:7,
9, 25   266:1, 20, 21
267:24   268:1   269:19,
21, 23   270:9, 19, 22,
23   271:14, 17, 22, 25
272:4, 8, 12, 13, 18, 21,
22   273:17, 21   274:13,
15   275:13, 14   276:1,
3, 10, 12, 14, 17
277:19, 20   278:15, 17,
25   279:1, 19, 21, 23,
24   280:16   281:5, 22,
23   282:1, 3   283:12,
16, 21, 22   285:6, 7, 9,
10   286:9, 18   287:7, 8,
10, 15, 23   288:7, 8, 17,
19   289:1, 2, 10, 12, 14,
15   290:8, 10, 18, 22
291:15   292:3, 12, 16,
21, 25   293:3, 14, 17,
23   294:7, 9, 16, 22
295:2, 9, 16, 21   296:1,
12, 19   297:1, 9, 13, 17
298:1, 8, 12, 15   299:3,
9, 13   300:14   301:4,
14, 19   302:2, 4, 7, 9
303:17, 18   304:14, 16
305:10, 12, 15, 16
306:7, 11, 18, 22
308:14, 15   310:6, 12,
15   311:5, 11, 15, 20,
22   312:19, 22   313:12,
15   314:11, 15   316:1,

3, 16, 18   317:18, 23
318:4, 9, 14, 18
320:23, 24   321:11, 15,
16   324:5, 7, 24, 25
325:8, 10   333:6, 8, 23
334:1, 3, 7, 10, 12
335:1, 7, 15   336:9, 11,
25   337:2   338:5
339:21   340:1, 21
341:2, 6, 16   342:3, 13,
20, 25   343:4, 7   344:4,
10, 13, 15, 21   345:18,
25   347:8, 13, 17, 23
348:3, 9, 12, 14, 19
349:2, 9, 19, 25   350:4,
13, 16, 22   351:2, 10,
15   352:7, 9, 13, 17
353:3, 8, 15, 22   354:1,
3, 10   355:1, 6   356:6,
10   357:21, 23   358:5,
15   359:3, 12, 18, 23
360:3, 9, 19   361:5, 10,
21   362:5, 14, 24
363:2, 20, 23   364:6,
14, 20, 23   365:3, 12,
16, 19   366:1, 2, 14, 20,
25   367:2, 11, 13, 20
368:3, 11, 18, 20
369:10, 12   371:6, 8
372:5   373:9, 11, 20,
22   375:15, 19, 25
376:6, 11, 18, 24
377:3, 23   378:8, 14,
25   379:3, 14, 20
380:11, 12   381:5, 10,
13   382:12, 21   383:7,
11, 23   384:1, 5, 7, 21,
24   385:14, 15   387:1,
6, 19   388:2, 5, 17, 20
389:8, 12   390:3, 4, 7,
12, 19   391:7, 11
**Golden**   266:4
**Goldstein**   114:19, 24
**gonna**   136:25   258:6
265:11   273:24   280:9
318:12   383:18
**good**   5:1, 3, 10   7:3,
20   91:23   117:10
132:11, 18   137:5
174:7   188:17   211:5,

10   216:15   218:1, 20
219:1   223:3   236:18
258:8   262:10   266:7
268:4   271:12   284:24
318:23   321:3   322:3
368:15   371:11   384:9
389:7   391:12
**goodness**   373:4
**Google**   67:8, 15, 17
68:5, 8
**gorgeous**   262:22
**gosh**   240:20   255:24
**gotten**   260:5   284:2,
3   314:25
**governors**   192:10, 25
193:15   195:7   224:6,
8   234:14, 17
**gown**   249:8
**grand**   339:5   369:8
**gray**   256:24, 25
276:20   281:16, 17
288:22   302:10
**Great**   120:21   121:5,
22   304:9   348:17
349:1   364:11   384:17
**greatly**   321:4
**green**   229:16   265:5
**Gregg**   2:1   5:13
73:16   96:22   97:2
102:2, 8, 23, 25
104:12   105:8, 17
107:11, 21   108:5
110:25   111:10, 22
112:3   113:13   115:18,
22   116:1   117:15, 22
118:7, 18   122:4, 7, 14,
17   123:16, 18   128:16
129:14   130:21
132:21   134:3   136:6
137:6   140:9   142:2
145:8   146:23   147:11
148:14, 25   149:1
150:8   153:23   158:13,
14, 25   160:5, 6   161:2,
14, 16, 21   162:20
163:8   164:11, 19
165:13   166:16   168:1
169:21   170:13, 22, 23
172:3   175:14   176:13
178:15, 24   180:11

181:21, 25  185:11
186:22  187:3, 17, 22
189:10  190:16  191:3
192:4  194:8, 11, 12,
17  197:24  199:1
206:20  207:21
208:14, 16, 23  209:2,
6, 16, 22  212:24
215:4, 13  216:13, 25
217:8, 11, 18  219:18,
20  220:7  221:10, 22,
24  222:1, 4  223:5
225:14  226:19, 20, 22
228:4  229:3, 10, 16
231:7  240:16  241:13
244:7  249:16  250:17
251:11, 12, 25  252:3,
10  253:18  254:13
256:12  305:4, 24
306:3  307:7  319:5,
23  320:22  321:8
323:3, 9, 12, 15, 16
324:11  325:17, 20, 21,
22, 25  326:8, 9, 13, 14,
15, 16, 19, 20  327:12,
17, 20  330:8, 25
331:3, 8  345:17
347:5  348:24  359:1
**Gregg's**  148:18
150:5  163:21  189:12
345:15
**grooming**  268:4
**ground**  92:16
**grounds**  348:9
**GROUP**  2:1  344:19,
25
**grow**  207:19
**grown**  385:16
**grumpy**  271:11
272:24
**guard**  312:12  321:2
**guess**  25:6  39:4
66:18  77:5  95:4
111:11  126:2, 9, 22
127:1  128:24  133:2
160:6  176:21  177:22
181:13  207:2  210:2
229:15  230:5  231:11
233:9  248:13  276:4
282:18  285:12  286:1

300:10  306:23
314:22  341:3  351:8
382:4, 5
**guesses**  200:2
**guessing**  76:16  200:1
**guidance**  207:19
**guy**  41:10  148:15
273:4  289:25  293:8,
12  363:14
**guys**  28:14, 19  29:4
50:4  51:24, 25  52:1
67:22  83:10  89:10,
11  93:5  174:6
205:21  243:5  244:16
290:5  347:9  349:1
363:17  383:19

< H >
**habit**  137:19  138:1
**hack**  219:20
**hacked**  219:18
**haha**  138:24  249:7
276:24  278:6  337:12
**hair**  304:2
**hairdresser**  97:12
**half**  60:23  157:1
158:9  229:19  230:11
240:24  245:13
246:10, 22, 23  247:22
**halfway**  202:20
**hand**  215:5  289:25
**handbook**  188:1
**handed**  10:16  74:2
**handful**  233:8
**handle**  267:5  309:5
**handwritten**  371:19,
20  372:2, 7, 10
**hang**  232:5  233:16
278:13  285:15
**hanging**  154:10
232:6
**happen**  27:8  113:18
142:1  172:7  181:12
202:20  230:2  243:12,
13, 15  250:17, 24
264:18  278:7  298:7
330:4  333:21
**happened**  20:10
28:17  29:10  77:13
110:20  117:10  119:2,

10, 18  128:9, 10
136:8  141:15  142:23
152:2  155:20  157:9
162:15  167:12, 22
168:18  212:15  213:1
215:3  216:3  231:4
233:21  234:17
238:16  244:25
246:17, 18  250:14
251:4  278:8  293:7, 9
296:15, 18, 21, 22, 24
301:3  315:19, 23
317:17  326:25
327:16  341:1  343:14
**happening**  108:3
109:7  117:7  129:13
147:22  178:11
188:17  212:11  216:5
234:13  252:2  256:12
290:6  334:19
**happens**  141:9
181:10, 11  193:14
**happy**  21:13  160:4
198:22  269:1, 10
328:8, 9  329:7, 10
330:7, 11, 13
**harass**  36:11, 16, 23
37:1  38:3  40:12
47:20  173:6  294:12
348:11, 17  349:7, 15,
16
**harassed**  347:6
**harassing**  348:22
**harassment**  210:3, 5
246:12  361:8
**hard**  8:3, 5  36:19
98:19  164:13  190:17,
19  191:4, 10, 15
215:10, 11  271:6
**harder**  268:15
**hate**  171:9  196:14
197:15  198:2  199:13
201:11  279:2  334:2
335:24  367:6
**hated**  199:9
**Head**  7:20, 21  117:3
122:18  125:20
127:21  140:19  141:5
148:15  164:13
216:12  315:6, 15, 16

356:16  357:14
358:19
**headaches**  6:11
**headed**  373:16
**headhunter**  26:13, 20
**hear**  5:6  7:12  18:15
27:5  35:8  40:3, 7
51:4  63:11  123:1
133:9  143:3, 4
148:11  149:12, 14, 23
159:16  173:23
175:15  179:21
180:19  193:17  215:7
218:2  221:12  243:5
244:15  247:1, 2
269:20  271:6  283:9
294:20, 21  297:4, 5
298:13  299:2  310:21
316:1  339:2  346:12
347:19  352:15, 16
354:9  359:6  391:3
**heard**  109:20, 23, 25
111:10  127:12  131:1,
3  167:22  179:2, 7, 9
214:7  229:15  231:14
235:6  285:5  291:23
319:3  320:6
**hearing**  94:16  239:5
269:13
**heart**  202:21  203:16,
19  204:4
**heavy**  191:13, 18
**heck**  35:2
**he'd**  225:18
**Held**  2:1  4:12  24:1
25:3  232:25  306:3
**he'll**  335:25  336:1
**help**  117:14, 15
**helping**  195:12  373:7
**hey**  21:16, 21, 22
87:25  124:22  164:19
236:14  390:9
**high**  96:20  97:1
259:11, 12
**highlighted**  16:4
25:10  93:1, 2, 6
101:20  103:13  139:9
240:8  281:7  288:23
301:19  314:13
318:16  331:20

333:25  335:2  356:8
368:2  387:3  389:9
**Hill**  264:6
**hire**  131:3  132:1
**hired**  131:2, 11, 15,
18, 22  132:1  152:13
161:4  183:24  199:1
331:3
**history**  33:3
**hit**  289:3, 23, 24
308:21  356:8
**hitting**  288:5  289:16
**hold**  87:25  159:13
302:8  322:5  324:14
344:21  361:13, 20
376:2, 13
**holding**  309:23
**Hole**  333:3
**Holy**  203:14  336:2
**home**  102:1, 16, 19
227:13  252:20
275:22  384:9  385:5,
18
**honcho**  140:19
**honest**  346:25
**honestly**  137:4  303:3
364:11
**honorarium**  305:22
**hook**  23:9
**hooked**  232:9
**hope**  30:22  31:1
102:11  121:6  337:3
365:1, 7
**Hopefully**  13:16
**horrible**  330:18
333:14
**horror**  214:8
**hospital**  346:14
**Hospitality**  151:23
152:7, 8  153:6
**host**  52:1
**hot**  262:2
**Hotel**  151:20, 25
156:24  278:9
**hour**  9:13  175:19
275:1
**hours**  31:24  32:2
33:24  98:15, 20, 21
112:22  161:15, 16, 20,
23  162:25  163:8, 9

164:6  166:19  167:24
176:7, 10  210:23
213:6  271:2  273:23
290:1  361:16  381:9
391:6
**hovering**  171:1
**HR**  117:3, 8, 13
122:18  136:25  141:6,
9  195:14  216:12
**Human**  369:24
**hundred**  229:7
268:7, 9  337:14, 17
338:12, 19  339:10, 12
340:15  341:9  368:5,
12, 14  369:8  388:22
389:1
**hung**  278:2  288:10,
24
**hungry**  8:14
**hurting**  269:5  317:6
**husband**  155:3
206:13  245:22
261:24  262:2, 12, 14
269:18, 25  270:3, 13,
15  282:9  369:8
**hyperventilate**
259:16, 18
**hypothetical**  77:12
238:19, 21  239:11, 15
286:16  295:19, 20
340:25  342:2, 11, 12,
14
**hypothetically**  165:18
**hypotheticals**  340:18,
20

< I >
**iCloud**  66:16, 21
67:3, 6, 16, 17  374:10,
11, 13, 19  375:10, 11,
17  376:23  377:5, 9,
14
**Icon**  151:23  152:7
153:6
**idea**  74:12, 18  76:13,
20  77:8  120:3  134:9
139:1  144:3  204:7
243:20  260:20
287:16  353:9, 16

384:18
**identify**  14:2  146:11
**ignoring**  161:14
**ill**  97:2  103:6
**illegal**  327:17
**illness**  96:4
**image**  83:8
**images**  365:10
**imagine**  191:7  276:5
**immediately**  171:20
**immersed**  258:7
**impact**  321:4  347:2
348:6
**impacting**  346:24
**impacts**  303:5
**imperative**  255:10
**implicitly**  255:17
**important**  6:13  7:24,
25  8:6  31:6  35:15,
25  81:1
**impression**  102:8
194:1  320:21  322:25
324:3
**improvement**  113:16
331:24
**inappropriate**  162:12
164:4  214:20  216:25
**in-between**  307:6
**inbox**  196:20
**incarcerated**  290:16
**incident**  155:13, 16
**include**  170:22
**includes**  318:6
**including**  101:3
220:21
**inconvenient**  165:15
**incorrect**  19:9  84:24
85:3
**increase**  33:14
**incumbent**  324:18
**INDEX**  3:1
**indicate**  93:15
251:23
**Indiscernible**  246:22
269:18  297:7  301:13
310:20  347:12, 16
359:5, 8
**individual**  346:1
**inflammatory**  41:2

**influence**  95:6, 14
96:8  98:24
**information**  19:5, 6
48:24  49:3, 4  50:2
58:6, 15  59:3, 5, 10
69:6, 25  70:7  76:2
88:5  255:14, 16
320:2  323:7  327:15,
18  330:2
**inhibited**  145:17
**inhibition**  169:2
**initial**  147:7
**initially**  247:11
250:15
**initiated**  158:2
**injects**  276:13
**inpatient**  199:5
**input**  371:23
**insane**  204:5  339:14
**inserting**  220:20
**Instagram**  49:6, 9
50:24  51:3, 11, 15, 19
52:18  53:14, 20  54:3,
10, 17, 21, 24  55:3
58:23, 24  59:2, 8
60:18  61:9, 18
**instance**  222:5  224:1
**instruct**  14:18  87:21
180:2, 6, 12  348:8
**instructed**  105:8
109:11  111:15, 21
139:20  146:3  217:8
349:18
**instructing**  18:1
30:16, 18  37:3  41:20
110:25  172:25
**instruction**  45:18
180:8
**instructions**  6:6
24:24  45:19  148:7,
13  242:14  374:7
**instructs**  7:16
**insults**  221:15
**int**  264:19
**intelligence**  221:15
**intended**  255:11
260:12  324:20
**intending**  203:23
**intense**  127:18

Case 2:19-cv-05030-JDW   Document 110-3   Filed 03/02/21   Page 119 of 157

Deposition of Patricia McNulty                                    Lisa Barbounis v. Middle Eastern Forum, et. al.

**intention** 334:*21*
**intentional** 92:*9*
**intentionally** 67:*2*
**intentions** 233:*25*
**interacting** 380:*4*
**interaction** 177:*20*
252:*9* 385:*22* 386:*8*
**interactions** 159:*5*
206:*1* 269:*10* 380:*9*
**interest** 233:*19*
294:*2* 345:*16*
**interested** 232:*2*
**interesting** 273:*10*
**interference** 7:*1*
27:*4* 51:*1* 73:*1*
**interim** 319:*11*
**interject** 381:*8*
**internet** 309:*10*
**interpersonal** 307:*15*
**interpretation** 270:*20*
376:*7*
**interpreted** 33:*16*
96:*23* 117:*21*
**interpreter** 359:*4*
**interrelationship**
97:*14*
**interrupt** 92:*8*
110:*15* 236:*15*
390:*10*
**interrupting** 172:*13,*
*17*
**interruption** 56:*8*
148:*8* 387:*18*
**interrupts** 382:*10*
**interviewing** 327:*22*
**intimate** 283:*1*
285:*23* 299:*17*
**intimately** 346:*21*
**invent** 244:*6*
**invest** 310:*4*
**invested** 309:*25*
**investment** 338:*17*
341:*8*
**investor** 335:*25*
336:*4* 337:*20, 24*
340:*2, 7*
**invite** 119:*24*
**invited** 120:*2* 128:*16*
**invites** 224:*12*

**involved** 155:*1*
183:*25* 229:*2* 230:*20*
231:*9* 292:*17* 296:*5*
305:*22* 311:*17* 312:*1,*
*8* 318:*7, 20* 345:*13*
346:*21*
**iPad** 373:*24, 25*
374:*3, 6, 10, 11, 20, 23*
375:*7, 9, 21* 377:*6, 8,*
*25*
**iPhone** 66:*17* 71:*4*
90:*10*
**ironic** 204:*3*
**irritable** 271:*1*
**irritated** 261:*22*
**IRS** 369:*4, 7*
**isolated** 178:*3*
**Israel** 176:*15* 186:*22*
187:*4, 18, 25* 188:*14,*
*15, 18* 189:*7, 11*
218:*14* 219:*4* 220:*8*
223:*6*
**issue** 25:*22* 68:*1*
70:*5* 177:*14* 188:*2*
189:*5* 269:*24*
**issued** 11:*21*
**issues** 21:*19* 116:*12*
222:*4* 307:*19* 369:*4*
**items** 331:*20*

**< J >**
**Jackson** 333:*3*
**jail** 203:*18* 230:*22,*
*24* 373:*17*
**January** 101:*25*
280:*11* 281:*25*
290:*23* 297:*2, 14, 24*
298:*8, 16* 299:*14, 22,*
*23, 24* 307:*13* 328:*20*
**Jaz** 263:*2, 18* 274:*11*
276:*25* 277:*9, 12, 13*
285:*16, 19* 362:*18, 19*
379:*4, 7, 11, 17, 19, 23*
**Jazmin** 285:*25*
380:*4, 9*
**jcavalier@cozen.com**
2:*1*
**Jerry** 340:*10*
**job** 8:*3* 112:*23*
114:*7, 10* 120:*11*

129:*2, 5* 131:*5, 19, 21*
132:*3* 141:*21* 146:*21,*
*22* 150:*20, 23* 151:*2,*
*7, 14, 16, 18* 152:*3, 8,*
*12, 15, 16, 19, 23*
153:*3, 9, 16* 160:*16,*
*17, 25* 162:*9* 164:*17*
165:*11* 166:*12, 18*
170:*21* 171:*5, 10, 17,*
*19* 176:*9* 184:*4, 7, 11*
185:*13* 197:*6, 7*
198:*15* 199:*7, 9*
201:*10* 214:*6* 220:*20*
245:*8* 249:*16, 19, 25*
252:*23* 253:*3* 255:*15*
258:*11* 272:*7* 280:*6*
303:*7, 9, 13, 14*
304:*23* 314:*24* 315:*9,*
*12, 15* 319:*3, 6* 321:*4*
323:*5* 324:*16* 326:*21*
327:*4, 12, 25* 328:*12*
329:*8, 13* 331:*21*
332:*19* 337:*21*
343:*10, 12* 356:*12, 15*
357:*4, 9, 13* 358:*9, 16,*
*18, 23* 361:*1*
**jobs** 162:*5* 249:*6, 8,*
*11* 252:*20* 343:*17, 19*
**joke** 283:*24*
**Jon** 5:*11* 53:*7*
168:*21*
**JONATHAN** 2:*1*
**journalists** 273:*15*
**judge** 22:*9* 23:*2*
24:*1* 25:*16* 113:*2*
**July** 363:*6* 366:*15*
**jump** 217:*11, 19*
301:*10*
**jumped** 217:*12, 20*
**juncture** 132:*24*
231:*9* 343:*12*
**June** 156:*18, 19*
224:*23* 237:*11, 15*
296:*23* 297:*2, 25*
300:*3* 352:*1* 355:*11*
356:*4, 5*
**jury** 248:*1, 4*
**justified** 313:*25*
314:*2, 8*

**< K >**
**Kaseem** 370:*4*
**Kassam** 65:*8* 245:*10*
**Kaufman** 1:*1* 4:*15*
392:*1*
**keep** 14:*22* 89:*16*
93:*10* 94:*20, 24*
111:*15* 124:*8, 11, 14*
139:*5, 12* 198:*11*
207:*25* 211:*22* 218:*9*
219:*25* 220:*4, 14*
221:*4* 222:*11* 223:*8,*
*11* 224:*15, 16, 17, 18*
225:*16* 226:*12*
229:*12, 23* 240:*12, 13*
242:*4* 253:*5* 255:*5*
257:*3, 13* 258:*16*
262:*24* 273:*18, 19, 20*
276:*1, 2, 11* 278:*15,*
*25* 279:*19* 283:*21*
304:*14* 305:*10*
314:*13* 318:*14, 15*
344:*13* 345:*23, 24*
350:*2* 356:*7, 9*
362:*25* 364:*23*
366:*19* 369:*10* 371:*7*
378:*9, 10, 11, 12, 25*
379:*1* 385:*14* 387:*3,*
*4, 5* 388:*18* 390:*19*
**keeping** 110:*11*
**kept** 112:*7*
**Kevin** 142:*14*
**key** 300:*23*
**kick** 234:*22*
**kid** 297:*18*
**kidding** 204:*14*
205:*10, 14*
**kids** 102:*3* 190:*17*
191:*5* 362:*23* 385:*20*
**kill** 206:*20* 207:*9*
208:*4, 10* 209:*6, 16*
218:*7*
**kind** 27:*19* 71:*2*
102:*15* 104:*15* 128:*3*
159:*1* 186:*19* 202:*2*
232:*2* 235:*2* 240:*22*
262:*7* 281:*12* 282:*18*
283:*5* 291:*24* 317:*3*

366:*17*

**kinds** 197:*23*

**kinship** 123:*6*

**kissy** 284:*21*

**knew** 99:*13* 109:*16*
112:*5, 7* 116:*18, 20*
128:*2* 136:*7* 167:*12,
13* 171:*11* 188:*8*
194:*14, 15* 216:*14*
234:*10* 238:*22, 23*
285:*20* 323:*5* 327:*15*
342:*15* 349:*21* 369:*4*

**knock** 337:*13*

**know** 10:*12* 11:*15*
14:*6, 8* 15:*19* 20:*21*
22:*2* 28:*19* 49:*14*
53:*19* 55:*16* 57:*6, 9,
15* 58:*24* 63:*4, 18*
64:*19* 65:*23* 66:*25*
67:*5, 7, 11, 14* 71:*15*
74:*14, 19* 75:*12*
76:*16* 77:*1, 13, 15, 17,
24, 25* 86:*14* 87:*18*
89:*21* 95:*10, 16*
96:*10, 13, 16* 97:*12,
13* 98:*11, 16* 99:*17,
19, 20, 21, 23, 24*
102:*22* 103:*1, 3, 8, 23*
104:*6, 8* 105:*3, 6, 21*
106:*4, 6, 7* 107:*17, 19*
108:*2, 16, 17, 22, 25*
109:*4, 5, 6, 7, 18*
110:*20* 112:*9, 11, 20*
113:*4, 9* 114:*24*
115:*16, 21* 116:*2, 7,
23* 117:*1* 118:*2*
120:*2, 23* 121:*3, 10*
123:*8, 10, 24* 125:*23*
126:*11, 14, 15* 127:*3*
128:*11, 17, 25* 129:*11,
16, 24* 131:*12* 132:*10,
13* 134:*6, 22, 23*
135:*2* 136:*10* 137:*22,
23, 24, 25* 138:*3, 14,
23* 139:*3* 141:*20*
142:*21, 22* 145:*1*
150:*1* 151:*15* 152:*13*
154:*16* 155:*4* 156:*10*
157:*10* 160:*12, 15, 21*
163:*18* 164:*5* 165:*7,*

21* 166:*1, 9* 171:*17*
172:*4* 177:*13, 19, 23*
178:*2, 17, 18, 19*
182:*19* 183:*7, 15*
185:*5, 11, 22, 25*
186:*3, 12* 187:*6, 11*
189:*9, 12, 14* 193:*18,
20, 21* 194:*16* 196:*3,
16, 20* 198:*4, 23, 25*
200:*20* 201:*5, 19, 23*
202:*8* 203:*9, 11, 17*
205:*9, 10* 206:*14, 16*
207:*17* 212:*25* 215:*5,
18* 216:*2, 13* 217:*9*
218:*16* 219:*3, 4, 19,
21* 220:*10* 221:*16*
222:*8, 10* 223:*23, 25*
224:*9, 24* 225:*1, 13,
24* 226:*17* 227:*25*
230:*14* 231:*19* 233:*8,
18, 20* 237:*13, 19*
238:*5, 22* 239:*25*
242:*1* 244:*25* 250:*7*
253:*10* 254:*2, 6, 7*
255:*1* 257:*6, 8, 12, 23*
259:*25* 261:*7* 262:*17*
263:*17* 264:*9, 11, 22*
265:*12* 268:*11, 19, 25*
269:*3, 4, 17* 270:*1*
273:*22* 276:*8* 277:*22,
24* 278:*2, 5* 280:*5*
283:*1, 12, 17, 18*
284:*13* 286:*21, 22*
287:*3, 9, 11, 19* 289:*7,
8* 291:*1, 4, 7, 10, 12,
20, 21* 297:*19* 299:*11*
300:*3, 6, 7* 303:*19*
304:*3, 10* 305:*7*
309:*8, 10, 16, 18, 20,
24* 310:*1* 311:*16, 19,
23, 24* 312:*6, 7, 14, 23,
25* 313:*2, 6, 24*
314:*23* 316:*24* 317:*5,
13, 14, 23* 318:*4*
319:*25* 320:*19*
322:*25* 323:*1, 9*
325:*19* 327:*5, 22*
328:*5* 333:*3* 334:*17,
23* 336:*4, 7, 16*
337:*19* 338:*1* 340:*2,*

3, 6, 12* 342:*13*
343:*13* 344:*25* 345:*5*
346:*7, 17* 349:*2*
351:*5, 6, 16, 17, 18*
352:*22* 362:*19* 363:*8,
10* 364:*20* 366:*7, 21*
367:*6* 368:*5, 24*
369:*5, 6, 15, 25* 370:*1,
6, 7, 14, 20, 22, 24, 25*
371:*3, 4, 25* 372:*6, 11*
373:*15* 374:*17*
378:*15, 21* 379:*9, 13*
380:*2, 6, 19, 22* 381:*1,
2, 18* 382:*16, 22*
384:*3* 385:*6, 10, 20*
386:*3, 21* 387:*10, 24*
388:*9, 16, 24* 389:*13*
391:*7*

**knowing** 296:*4*

**knowledge** 117:*6*
154:*5* 156:*9* 179:*2*
219:*17* 277:*10*
324:*23* 380:*3*

**known** 79:*11* 250:*8*
283:*9* 320:*4, 18*
323:*8*

**knows** 25:*1* 87:*17*
264:*17* 369:*22*


**< L >**

**lack** 35:*23* 168:*7*
260:*2* 350:*24*

**ladies** 113:*7, 11, 18*

**laid** 177:*12*

**landline** 66:*11*

**language** 34:*19* 235:*2*

**lap** 215:*6* 275:*17*

**largely** 255:*11*

**larger** 264:*13* 268:*3*

**late** 164:*6* 202:*18*
210:*19*

**lately** 268:*12*

**LAW** 1:*1* 2:*1*
344:*19, 25* 349:*4, 10*
351:*25* 352:*3* 353:*2*

**lawsuit** 55:*4* 79:*17*
80:*19* 115:*15* 353:*9,
16* 354:*6, 12, 21*

**lawyer** 5:*11* 14:*4, 6,
9* 68:*21, 24* 142:*4*
355:*8, 19* 370:*23*

**lawyers** 146:*2, 11, 15*
147:*15* 344:*16, 23*
354:*22*

**lay** 168:*17*

**lead** 300:*21*

**leading** 202:*5*

**learn** 138:*25* 238:*10*
294:*23* 295:*5* 321:*3*
324:*21*

**learned** 292:*4*
299:*19* 323:*11* 350:*5*
379:*21*

**leave** 113:*3, 12*
114:*4* 146:*7* 162:*1,
22* 163:*23* 171:*10, 11,
18, 20, 22* 178:*16*
182:*13* 192:*4* 197:*8*
198:*21, 24* 212:*21*
234:*25* 302:*19*
328:*20* 332:*3, 6*
333:*15* 337:*9* 353:*6*
384:*10*

**leaving** 159:*10* 185:*4*
198:*3, 5* 302:*24*
325:*17*

**led** 238:*3*

**Lee** 141:*15, 17, 18*
142:*3, 6* 143:*6*
144:*12, 17* 145:*2*
147:*14* 167:*9, 13, 22*
168:*13* 212:*16*
218:*21, 22*

**left** 50:*24* 51:*10*
70:*18* 105:*11* 112:*14*
114:*1, 7, 17* 119:*17,
19* 128:*24, 25* 129:*1,
8, 12, 17, 19, 23* 130:*7,
8, 11, 14, 16* 131:*15,
24* 132:*2* 141:*22*
153:*3* 156:*12* 157:*2,
16* 162:*5* 171:*4, 6, 7,
8, 14* 182:*19* 183:*1, 3,
6, 14* 184:*4, 9, 10*
185:*22, 24* 186:*5*
195:*25* 196:*3, 6, 8, 11*
230:*17* 251:*8* 258:*1,
5* 284:*15* 302:*16*

322:*15*  327:*6*  328:*22*
329:*1, 15, 20*  331:*5,
10*  332:*18*  333:*12*
362:*7*  372:*20*  375:*9*
380:*4*
**legal**  107:*7*  148:*22*
149:*5, 16*  150:*13*
311:*17*  349:*10, 12*
**legit**  97:*1*
**legitimate**  163:*10*
190:*3*
**lend**  368:*4, 25*
**lengthy**  355:*20*
**lessons**  333:*5*
**letter**  143:*20*  302:*23*
371:*10, 12, 14, 17, 24*
373:*1*  376:*13*
**letters**  26:*12, 19*
376:*2*
**letting**  201:*18*
**level**  233:*20*
**leverage**  32:*13*
**Lewis**  285:*1, 2*
**liability**  178:*21*
**liaison**  160:*18, 23, 24*
199:*4*
**Liberty**  2:*1*
**lie**  139:*2*  141:*25*
146:*4, 12, 16*  147:*16*
212:*20*
**lied**  115:*23*
**lien**  369:*7, 9*
**liens**  369:*4*
**life**  138:*21*  144:*19*
162:*9*  164:*7*  188:*12*
211:*13*  258:*19*  262:*9*
333:*4*  346:*23, 24*
347:*1*  379:*17*  388:*7*
**lifetime**  144:*13, 20*
152:*12, 16*  153:*14*
**light**  170:*20*  229:*16*
**liked**  150:*24*  151:*7*
153:*16, 24*  154:*8, 9*
168:*2*  198:*6*  199:*7*
200:*11*
**likes**  154:*16*  339:*19*
**line**  33:*6, 21*  34:*16*
106:*5*  128:*15*  232:*10*
233:*5*  243:*10*  272:*23*

299:*4*  300:*9*  329:*19*
335:*3*
**lined**  171:*17*
**link**  223:*18*  308:*21*
**LinkedIn**  26:*23*
27:*13, 15, 22*  356:*18,
22, 23*
**LISA**  1:*1*  4:*7*  23:*1*
33:*7, 22*  34:*4*  54:*11,
17, 25*  56:*1*  58:*23*
59:*11, 14*  60:*18*  61:*5,
12, 17*  62:*23*  64:*15,
18*  65:*1*  69:*13*  72:*10*
74:*16, 24*  75:*5, 23*
76:*6*  77:*9*  78:*2*  80:*2,
10*  81:*16*  83:*4*  85:*10*
86:*3*  88:*15*  90:*21, 25*
92:*1, 3, 24*  95:*5, 8, 12*
97:*15, 19, 25*  98:*3, 17,
22, 23*  99:*2, 6, 17*
100:*7, 9, 13*  101:*25*
102:*1*  103:*16, 20, 25*
104:*6, 8, 18, 21, 23, 25*
105:*8, 14*  107:*12, 14,
23*  108:*7, 12, 17, 23*
109:*2, 6*  110:*11, 12,
22, 24*  111:*13, 22*
113:*5*  115:*8, 18, 20*
116:*15*  122:*6, 12*
125:*10, 25*  126:*11*
127:*17*  128:*7*  132:*7,
17*  134:*2, 9, 21*  135:*2,
3*  136:*4*  137:*2, 20*
139:*19*  154:*1, 16*
157:*7, 23*  158:*11, 14,
24*  159:*25*  160:*2, 7*
177:*13, 17*  186:*22*
187:*2, 7*  189:*15*
190:*18*  191:*13*
192:*12, 21*  193:*12, 22*
194:*1*  196:*9, 16*
198:*3*  206:*12*  211:*1,
18*  220:*11*  225:*20, 25*
226:*1, 6*  228:*12*
229:*4*  230:*15*  231:*11*
233:*9*  235:*2*  236:*16,
22*  237:*13, 21, 23*
240:*16, 18*  241:*6*
245:*21*  247:*13*
248:*14*  249:*11*

252:*25*  253:*1*  254:*2,
17*  255:*24*  256:*23*
257:*20, 21*  261:*20*
263:*25*  264:*16*  271:*4*
275:*15*  277:*6, 22*
280:*3*  281:*11*  282:*4*
283:*5*  285:*18*  287:*6*
288:*21, 22*  290:*24, 25*
291:*7, 23*  293:*24*
294:*24*  295:*6*  299:*15*
303:*1, 19*  305:*14, 17*
306:*25*  308:*17*  309:*1,
12*  312:*1*  313:*16, 19*
316:*20*  318:*21*  325:*5*
334:*9*  335:*17, 24*
336:*12*  338:*13*
339:*19*  341:*24*  342:*6,
9*  343:*9, 11*  346:*13,
17*  349:*21*  350:*5, 9*
351:*17, 23*  352:*4, 14*
354:*6, 12, 20, 25*
355:*3, 25*  357:*3, 24*
362:*16, 17*  363:*4*
365:*4*  366:*3, 22*
367:*14*  370:*7, 22*
371:*13, 23*  372:*6, 7,
17*  373:*15*  375:*14, 15*
376:*1*  380:*3, 7, 15, 21*
383:*15*  385:*1, 4, 21*
386:*4, 21*
**Lisa's**  160:*16*  194:*1,
4*  219:*18*  228:*22*
240:*25*  242:*6*  256:*2*
275:*18*  281:*17*  291:*6*
309:*4*  312:*4*  313:*24*
363:*25*  368:*4*  376:*22*
**list**  38:*14*  214:*23*
223:*16*
**listen**  46:*1*  149:*20*
165:*7*  168:*19*  223:*19*
292:*25*  300:*14*
347:*14*
**literally**  33:*18*  44:*20*
46:*24*  82:*18*  224:*25*
**litigation**  5:*13*  10:*14,
18*  19:*13*  376:*2, 13*
**little**  80:*16*  85:*23*
92:*12*  115:*17*  137:*20*
256:*1*  268:*18*  269:*13*
271:*11*  279:*5, 10*

306:*9*  362:*13*  363:*18*
383:*13, 24*
**live**  138:*24*  332:*21*
356:*16*  357:*15*
358:*19*
**livid**  305:*21*
**living**  357:*8*
**loathe**  284:*19*
**logic**  351:*11*
**LOL**  276:*22*  289:*24*
385:*12*
**London**  230:*3, 6, 17*
273:*5, 10*  312:*6*
336:*13, 21*  337:*4*
**long**  9:*11, 14*  14:*25*
79:*11*  112:*24*  123:*15*
132:*20*  148:*1, 5*
151:*24*  152:*9*  156:*7,
10*  168:*16*  190:*10*
251:*25*  255:*8*  267:*14*
270:*16*  355:*16*  361:*7*
**longer**  132:*24*
151:*14*  209:*24*
219:*14*  328:*18*
**long-term**  370:*13*
**look**  14:*1*  27:*25*
49:*11, 25*  50:*1*  58:*4,
14*  59:*1*  64:*22*  90:*18*
100:*15*  112:*13*
126:*16*  192:*6*  197:*6*
198:*14*  200:*9*  227:*13*
266:*7*  273:*24*  297:*9*
304:*8*  315:*8*  343:*8*
380:*23*
**looked**  9:*23*  20:*12*
26:*23*  127:*20*  268:*17*
365:*10*  371:*14*
378:*23*
**looking**  15:*18*  50:*2*
74:*8*  114:*10*  132:*1*
135:*10*  136:*13*
201:*10*  280:*3, 10, 12*
320:*20*  324:*14*  343:*9,
11*  344:*16, 19*  345:*10*
**looks**  74:*7, 9*  101:*24,
25*  126:*17*  128:*21*
174:*25*  207:*1*  221:*24*
224:*22*  225:*13*
226:*21*  236:*10*  248:*6,
21*  252:*19*  263:*11*

Deposition of Patricia McNulty                                    Lisa Barbounis v. Middle Eastern Forum, et. al.

264:1   265:10   267:4
276:18   279:13
281:24   305:13
308:17   313:19
317:19   334:23   363:6
364:10   368:4   388:1
**lose**   70:13   137:13
249:11, 16, 24
**losing**   249:19   261:21
**lost**   71:3, 6   72:3
73:10   74:10, 17
75:24   137:9
**lot**   7:1   27:4   29:14
74:21   103:23   117:20,
21   140:5   147:10
166:20   167:1, 5
188:9   190:22   200:3
215:1   216:24   290:3
306:2
**Lots**   266:5
**loud**   6:23
**love**   121:13   150:24
164:20   367:7   373:8
**loved**   146:21, 22
150:20, 22, 23   151:1,
2   164:17   165:11
166:18   169:9
**loves**   271:6
**loving**   171:5
**Lovitz**   142:15
**low**   315:25
**luck**   266:6   371:11
**lucky**   121:12
**lunch**   119:23   120:2,
4, 7, 9   191:8
**luncheon**   124:1, 2
125:3, 6, 9   126:13
316:10   355:15

**< M >**
**ma'am**   101:12, 21
169:5, 20   170:3
181:20   210:7   211:24
246:6, 7   299:14, 24
332:7, 9   347:24
**machine**   297:8   298:4
**mad**   207:19   260:3
285:15   289:13
323:22, 24   324:1

**magazine**   369:24
**magic**   339:16
**magical**   297:8
**maiden**   177:6
**mail**   223:15   373:1
**mailchimp**   223:15
224:11
**Mainen**   2:1   93:5, 8,
19, 25   94:23   120:16,
20   121:23   124:22
135:22   236:14   248:8
390:9
**MAJA**   201:17   202:8
**major**   202:11   230:2
**making**   5:6   62:3
82:17   93:21   145:14
149:23   167:4, 5, 7, 14
178:9   180:25   197:15
198:2   199:13   230:2
243:25   244:4, 16
246:9   260:3   270:5,
25   294:13, 14   359:14
367:6
**male**   273:6, 7
**management**   148:18
150:6, 9   210:2
**managing**   128:3
**manipulative**   221:18
**manner**   325:21
**manual**   228:19, 24
**Marc**   2:1   274:16
367:16, 20
**March**   119:7, 8, 9, 10,
19   124:23   127:16, 18
128:17, 22   129:21
132:6, 22   133:15
134:3, 5, 11   135:11
147:24   163:4   186:21
192:2   199:21   227:12
252:6, 10   313:20, 22
316:11   322:16
328:21   329:17   330:4,
23   331:8, 9   335:17
356:3   361:9
**mark**   236:5   268:8
365:1
**marked**   236:4
**Market**   2:1
**Marnie**   56:17   73:19
103:17, 20   104:11, 24

105:6, 7, 8, 11, 13, 15
107:20   108:6, 9, 17,
23   109:2, 6, 10
110:11, 20, 24   111:3,
11, 21, 25   115:9, 19,
20, 21   116:15   117:2,
5, 6   118:20   119:12
122:3, 17   123:15, 17
125:12   126:4, 7, 13
127:1, 14, 17   128:8
132:7, 15   134:2, 10,
21   135:4   136:5, 18
137:9, 10, 21, 23
138:8, 9, 10, 12
139:19   141:5   145:7
146:24   158:25   163:7
192:3, 13, 19   193:22,
25   194:4   195:23, 25
196:17, 24   197:11, 15
198:1   199:9, 11, 13,
20, 22   200:11, 15, 21
202:1   208:4, 12, 23
209:3   211:20, 25
215:14, 15, 17   216:11,
18   218:7   220:22, 25
221:25   227:24
228:21, 23   229:2
234:8, 9, 10, 22   235:8,
14   254:14   278:19, 22
305:14, 18, 19   306:3,
13, 24   307:5, 11, 16,
18   313:16, 20, 21, 25
315:11, 12   319:5
**Marnie's**   122:7, 13
195:7   199:23   305:17
**material**   22:24
**Matt**   73:22   74:21
75:1, 4, 7   76:1, 4
77:8, 10, 21   78:1
80:25   88:5   93:3, 11,
12   104:11, 24   105:17
107:25   108:17   109:2,
6   110:11, 21   111:1,
20   117:10, 11   118:21
119:12, 24   120:5, 10,
15   123:14, 19   124:1,
2, 5, 10   125:10, 20
126:17   127:7, 9
128:23, 25   129:1, 4, 8,
22   130:9, 10   135:21

136:6, 9, 11, 12, 16, 18
137:11, 13   141:8, 13,
14   145:2, 5, 18, 20
147:12, 13   158:24
159:2, 5, 9, 22   163:11,
20   164:2, 3   169:15
170:10   178:25   179:1,
2, 7, 10, 14   181:25
182:4   196:3, 5, 22
201:19   202:14   204:9
212:16   216:21, 24
217:3   219:23   221:7
254:6, 12   257:7
258:22   259:3   260:4,
12, 14   274:16   302:5,
13, 21   304:20   312:20
318:24   319:24, 25
320:5, 15   321:18, 23
322:2, 15   323:2, 4, 5,
10, 11, 14, 16   324:10
326:25
**matter**   4:7   20:5
100:7, 10   161:21
212:19   222:7   244:8
251:20   291:14
300:17
**mattered**   112:23
**Matthew**   2:1
**Matt's**   324:14
**McNULTY**   1:1   3:1
4:6   5:10   10:12
13:17   15:16   18:15
22:6   25:9   27:12
31:5   33:9   35:16
42:14   47:15   50:23
52:15   54:1   72:23
73:5   91:14   92:22
93:15   95:3, 13, 21
124:17   125:1   144:11
236:13   294:23
353:25   382:15
**mean**   10:12   15:25
21:10   22:2   23:10
28:17   31:9   34:3
39:16   42:11   61:7
66:17   67:25   75:16
78:21   86:20   97:21
98:7   102:5   103:22
104:3, 4, 10, 17   105:2
106:18, 19   109:17

112:5, *19*  113:*13*
115:*10, 13*  122:20
132:*11*  134:*18*  135:2
136:*12*  140:*17*
146:*17*  148:6  152:*17*
155:2, *11*  160:24
162:23  167:4  171:*11*
183:*17*  192:9  200:2,
*4*  202:4  203:7  205:7
207:6  208:*16*  211:*21*
212:8, *25*  213:*19*
214:*20*  215:*1, 3*
216:*14*  217:*14*  218:9,
*22*  223:23  235:6
243:*18*  265:*19*
269:*12*  273:*13*  274:4
277:5  286:4, *11*
291:*16*  307:*18*  309:4
312:3  313:7  314:*1*
327:*1*  337:6  339:7
346:8  352:6  353:*1*
357:*10*  366:6  376:4
382:25  386:*10*
**meaning**  127:*1*
161:*15*  261:*18*  284:2
**means**  30:*10*  62:*12*
106:8, *10*  137:24
202:9  284:4, *5*  376:8
**meant**  33:*11*  106:6
126:22  127:5  212:*13*
234:7  287:3  377:*13*
379:6  389:*15*
**media**  186:*25*  187:*4*,
*11*  188:2  189:6, *10*,
*13, 16*  190:*1*  276:5
**medical**  204:*15*
**medication**  97:7
**medications**  96:*1*
**meet**  207:20  230:*20*
232:*16, 18*  328:*23*
336:*15, 22*  337:*3*
338:8  339:*20*  351:24
373:16
**meeting**  91:*24*
105:*24*  147:7, *9*
192:25  193:*15*  195:7,
*8, 10*  207:*16*  224:6
234:*14, 15, 16, 17*
249:*12*  250:23  251:2,
*4, 6, 7*  316:*4, 7, 13*

336:*1*  340:*13*  342:7
352:7
**meetings**  197:*23*
**MEF**  11:*15*  48:24
49:4  62:*21*  65:*11, 14*,
*17, 22*  69:*1, 2, 8*  78:5,
*9, 12*  79:*14, 21*  98:2,
*24*  99:4, 8  103:*21*
108:24  114:7, *11, 17*
118:6, *16*  129:8, *13*,
*17*  131:22  141:*19*
147:*1*  151:*17, 19*
152:4, *23*  153:7, *15*,
*24*  154:2, *23*  155:5
156:20, *22*  157:*1, 3, 4*
158:9  159:*10*  160:*17*
161:*17*  169:3, *17*
172:5  176:3  177:8
178:5  182:*16*  183:*19*
184:*16*  185:4  186:5,
*6*  187:*13*  188:*1, 4, 5*,
*7, 10*  189:5  190:*19*
191:*14*  193:*19*
195:*15, 24*  196:2
198:3  203:2  204:*12*
206:2  223:22, *24*
224:2  230:*10*  231:8,
*16*  232:8, *12*  237:8,
*14, 24*  238:*12*  239:23
241:*21*  242:4  243:22
244:3, *11, 21*  245:*12*
247:*12, 21*  253:*15*
254:24  291:24  292:7
293:*11, 25*  294:2
296:5  300:*1*  302:24
307:*11*  309:20
311:*16*  316:8, *22*
317:3, *10, 12, 21*
319:24  320:2, *3*
338:3  340:7, *11, 14*
341:8, *18, 19, 20*
346:5, *9, 24*  347:*10*
348:6  350:7, *10, 16*
351:4  353:*10, 17*
354:6, *21*  372:20
374:3, *15, 24*  375:6,
*20*  376:5  378:*3*
379:23, *24*  380:5, *21*
389:*21*
**MEF's**  382:*16*

**Megan**  72:23  73:5, *9*
78:5, *19*  80:*1*  83:*15*
**members**  65:*17*
**memes**  61:8
**memory**  8:23  27:*18*,
*19*  338:7
**men**  61:*18*
**Mental**  275:*16*
**mention**  190:*21*
278:6
**mentioned**  110:*14, 19*
119:*13*  126:*11*
185:20  258:24
278:*13*  326:20
328:*10*
**mentioning**  95:25
262:*15*
**mentions**  344:*16*
383:*4*
**message**  80:*1*  83:*18*,
*20*  84:5  85:*13, 16*
96:20  101:*3, 24*
103:*15, 16*  123:23
127:6  128:*21*  130:*1*
135:8  197:*12*  198:9
200:*4*  201:8  206:*12*,
*25*  207:22  223:9, *24*
235:15  236:9, *10, 13*
263:9, *15, 19, 24*
275:*19*  281:8  284:6
288:*15*  289:6  297:*13*
302:6, *22, 25*  305:*1*
318:*11*  335:*17, 24*
379:8
**Messages**  3:*1*  62:*13*,
*18*  63:9, *14*  72:5, *8*,
*10, 12, 19*  73:8, *16, 19*,
*22, 24*  74:3, *9, 22*
77:9, *10*  81:5, *7, 12*,
*14, 25*  82:9  84:*21*
85:*1, 8*  87:*14*  90:*11*
92:3, *5, 24*  93:*17*
95:5, *9, 13*  98:*15*
123:25  124:23  125:2
126:2  132:*15*  135:*11*
136:2  141:8  160:2
186:*21*  187:2  192:*12*
193:25  199:20
200:22  236:22

**248**:*14*  264:22  283:5
329:*21*
**Messenger**  49:*17*
**met**  116:*13*  140:25
157:*10, 13, 14, 21, 24*
230:*15, 25*  232:20, *24*
248:*16*  249:*19*  259:5
273:3  291:22  292:*19*
293:8  312:6
**methods**  78:24  79:*19*
**Meyer**  56:*17*  73:*19*
305:*14*
**mic**  94:7, *8*
**Michael**  351:*23*
**microphone**  52:2, *11*
354:*13, 16*
**MIDDLE**  1:*1*  2:*1*
4:7  5:*12*  6:2  11:*12*
33:7, *9, 22*  38:*15*
54:22  55:*1, 4*  56:*11*,
*23*  66:9  261:8  310:*3*,
*9*
**middleman**  306:5
**midweek**  252:*21*
**Mike**  370:20, *23*
371:*1*
**mildly**  357:5
**million**  192:3  196:*21*
**millionth**  278:*20*
**mimosa**  201:*25*
**mind**  95:22  146:*19*
150:*11*  158:*18*
201:22  211:*1*  215:*19*
261:*21*  322:24
324:22  360:8
**mine**  116:*15*  220:*1*,
*21*
**minimal**  184:*14*
**minimum**  140:*16*
**minny**  304:6
**minor**  227:*24*
**minute**  261:*11*  264:4
276:*15*  314:*19*  334:5
345:*21*  361:*19, 22*
362:6, *9*
**minutes**  8:*13, 14*
9:*16*  50:7, *14*  53:*10*
84:*18*  88:22  90:*1*
174:6  200:7  325:6

381:*9*
**mirror** 180:*16*
**misapprehension**
269:*9*
**Mischaracterization**
204:*24*
**mischaracterizing**
294:*15*
**misconstrued** 137:*6*
**miserable** 266:*6*
**misheard** 110:*9*
**misinterpreted** 110:*9*
**misrepresent** 203:*21*
**misrepresentation**
76:*24* 204:*20* 206:*4*
**missed** 36:*12*
**missing** 245:*15, 16*
**mission** 151:*5* 154:*8*
198:*6*
**misstate** 33:*3*
**mistaken** 128:*15*
131:*6* 175:*17*
**misunderstanding**
365:*8*
**misunderstood**
109:*25* 130:*17*
**mode** 192:*4* 201:*17*
**modified** 253:*13*
**moment** 127:*15*
205:*3* 308:*10, 13*
330:*15* 356:*13* 357:*7*
**moms** 121:*13*
**Monday** 227:*12*
228:*14* 229:*5* 230:*3*
250:*23* 251:*5, 6, 11*
343:*17*
**money** 231:*16* 234:*2*
237:*17, 24* 238:*2*
240:*1* 241:*11* 242:*25*
243:*22* 244:*3, 11, 21*
245:*21* 278:*19* 293:*6*
309:*21, 24* 310:*4, 7*
332:*23* 338:*16* 340:*9*
341:*19* 368:*22* 369:*1,
3* 388:*25* 389:*3*
**mongrel** 208:*17*
**mongrels** 208:*11, 22*
**monies** 238:*12*
**monitor** 382:*8*
**monitoring** 185:*7*

**month** 60:*20* 61:*15*
98:*1* 121:*19* 140:*11*
261:*21* 380:*24, 25*
**months** 20:*10, 14, 16*
60:*21* 121:*4, 21*
146:*18* 147:*25*
213:*14* 298:*5* 329:*14*
387:*21*
**moot** 300:*25*
**moral** 269:*24*
**morality** 269:*16*
**morning** 5:*10, 17*
9:*10, 15* 12:*3* 168:*22*
191:*7* 206:*22* 220:*20*
255:*10* 277:*4, 6*
378:*23* 385:*10*
386:*23*
**mornings** 208:*9*
**mother** 121:*17* 263:*3*
277:*13* 286:*13*
295:*11* 362:*22*
385:*17, 19*
**motion** 25:*2*
**motions** 21:*24*
**motivated** 210:*8, 13,
15* 215:*20* 216:*23*
**motivation** 178:*18*
215:*25*
**mouth** 66:*20* 86:*1*
**move** 15:*19* 25:*7*
31:*15* 37:*17* 48:*3*
93:*12* 179:*24* 181:*5,
20* 184:*25* 190:*13*
200:*4* 223:*8* 311:*14*
314:*11* 349:*25* 361:*9*
366:*17* 371:*6* 389:*10*
**moved** 313:*17*
**moves** 213:*16*
**movie** 213:*4, 10, 13,
18, 23* 214:*10, 16, 19,
22* 215:*13, 17, 20*
216:*6, 12, 22* 217:*2, 5*
**movies** 213:*5* 215:*23*
216:*4*
**moving** 135:*12*
184:*21* 192:*2* 314:*5,
8*
**msharif** 264:*10*

**multiple** 162:*15*
211:*21* 212:*6* 216:*19*
325:*14*
**multitude** 34:*7*
**Murphy** 344:*19, 25*
351:*24*
**Muslim** 178:*22*
**mute** 15:*12* 27:*9*
52:*2, 4, 11* 93:*20*
94:*7, 11, 12, 14*
149:*21* 158:*20*
172:*16* 174:*23*
**muted** 94:*8, 13, 15*
174:*25* 237:*2*
**muting** 158:*18*
**Myers** 58:*1*

**< N >**
**name** 4:*12* 5:*10*
73:*5* 131:*14* 176:*24*
177:*1, 2, 5, 6, 7*
345:*15* 369:*18*
370:*23* 382:*24*
**named** 18:*8* 65:*8*
**names** 115:*2* 146:*15*
345:*12* 385:*20*
**narcotics** 95:*6* 96:*8*
**natural** 259:*7*
**nature** 193:*21*
**Nazi** 289:*18*
**NDA** 253:*9, 12, 15,
18* 254:*23* 255:*9, 13,
17, 19* 256:*2* 257:*7*
320:*1* 327:*17, 20*
**NDAs** 256:*11*
**Neal** 79:*9, 11, 13, 16,
20* 114:*19, 24, 25*
115:*1, 2* 258:*23*
260:*5* 261:*18* 367:*4*
**near** 361:*15*
**necessarily** 209:*3*
**necessary** 255:*14*
388:*22*
**need** 7:*19* 8:*11* 13:*9*
14:*2* 17:*15, 16* 21:*16,
21* 22:*14* 45:*10, 15*
94:*6* 120:*25* 164:*5*
168:*20* 173:*8, 16*
197:*5* 198:*14* 208:*3*
215:*7* 218:*7* 226:*16*

241:*14* 242:*17* 243:*2*
267:*9* 269:*2* 278:*18*
281:*8* 361:*19*
**needed** 20:*24* 87:*18*
102:*9, 15* 133:*17, 18,
19, 20* 201:*13, 14*
250:*21*
**needs** 120:*22* 264:*18*
**nefarious** 112:*18*
**negative** 347:*3*
**Neither** 51:*6* 223:*15*
**never** 29:*20* 32:*25*
33:*1, 4, 8* 42:*20* 79:*4,
6* 99:*25* 108:*19*
112:*1* 113:*24* 128:*1,
9, 10* 137:*3* 140:*15*
143:*11* 144:*8, 9*
146:*23, 24* 148:*3*
156:*2* 165:*16* 187:*15,
17* 188:*12* 193:*16*
200:*19, 20* 226:*21, 23*
239:*22* 242:*9* 260:*1*
270:*14, 15* 273:*11, 14*
277:*1* 284:*18* 295:*23*
302:*14* 315:*19, 23*
326:*25* 333:*10, 11, 17,
18, 19, 20* 338:*3*
341:*1* 350:*19* 356:*13*
357:*12* 369:*9* 379:*18*
380:*7*
**new** 43:*7* 71:*11*
131:*4* 184:*18* 193:*7*
197:*6* 198:*15* 201:*10*
234:*11, 13* 253:*19, 20*
255:*10* 260:*17*
261:*15* 278:*6, 9*
304:*23* 320:*20*
332:*25* 337:*19*
343:*10, 11* 379:*4*
**news** 111:*10* 321:*2, 3*
**nice** 189:*17* 265:*14*
280:*2* 313:*1*
**nickel** 142:*12*
**night** 162:*10, 11, 14*
163:*22* 202:*18*
203:*10* 204:*5* 210:*19*
250:*20* 257:*2* 337:*9*
343:*17* 373:*5*
**nine** 121:*19*

Deposition of Patricia McNulty                                    Lisa Barbounis v. Middle Eastern Forum, et. al.

nod  41:*12*

nods  7:*20, 21*

noise  6:*24*  52:*3*

nonevent  329:*12*

nonlegal  68:*25*

normal  140:*1*  198:*7*

normally  202:*6*

Notary  1:*1*  392:*1*

notch  281:*14*

note  5:*15*  197:*9, 19*
255:*19*  275:*17*

noted  4:*17*  24:*22, 24*
46:*16*  349:*24*

notes  108:*22*  109:*11*
139:*20*  197:*22*  392:*1*

notice  98:*23*  107:*4*

noticed  304:*1*

notwithstanding
167:*15, 21, 23, 25*
169:*1*

November  74:*21*
111:*8*  116:*13, 25*
122:*3, 8, 9*  132:*22*
133:*15*  134:*4, 10*
140:*21, 25*  147:*3*
163:*4*  172:*8*  182:*6, 7*
185:*22*  214:*24*
248:*15*  249:*22*
250:*11*  252:*10*
263:*12, 13*  330:*21, 24*
331:*4, 9, 11, 12, 13*

now-fiance  259:*4*

NUMBER  3:*1*  4:*10*
16:*4*  26:*10*  37:*6, 10*
64:*4, 6*  66:*8*  93:*20*
94:*2, 9, 11*  124:*17*
273:*24*  333:*7*  342:*21*
343:*5*  361:*11*  383:*8*
389:*23*  390:*1*

numbers  66:*3*

nuts  227:*21*

NYE  278:*9*

< O >

Obj  61:*2*

object  7:*11, 12*  12:*8*
14:*12, 13, 18*  39:*7*
59:*17*  75:*8*  94:*5*
95:*15*  145:*24*  163:*13*
164:*25*  165:*3, 22, 25*

188:*20*  190:*4*  204:*25*
217:*15*  238:*7, 17, 18*
270:*2*  271:*13, 16*
286:*15*  287:*20*
288:*13*  292:*1, 9, 10*
294:*4, 7*  342:*17, 18*
350:*25*  352:*19, 20, 23*
357:*18*  358:*12*
375:*23*

objected  15:*10*
352:*12*

objecting  52:*23*
149:*21*  243:*7*

objection  11:*19*
14:*22*  15:*6, 9, 13*
16:*10*  17:*5, 11*  18:*24*
21:*5*  22:*12*  24:*4, 21,*
*23*  29:*24*  31:*8, 18*
35:*18, 21, 23*  36:*8*
37:*25*  38:*8*  39:*15*
40:*20*  42:*17, 22*  43:*2,*
*25*  44:*18*  45:*6, 20*
46:*9, 12, 15*  47:*18*
48:*19*  52:*20*  53:*3, 15,*
*21*  55:*12*  60:*2*  72:*15*
73:*11*  75:*8*  77:*11*
81:*6, 18*  82:*12*  85:*2*
86:*7*  87:*5, 10, 16*
89:*2*  95:*7*  107:*6*
113:*20*  114:*3*  116:*5*
117:*18, 25*  118:*14*
142:*7*  145:*9, 22*
148:*20*  149:*2, 13*
150:*12*  153:*17*  154:*3,*
*11*  155:*17*  163:*24*
166:*2, 21*  167:*17*
168:*3*  169:*6*  172:*17*
173:*20*  192:*14*
204:*22*  205:*6, 16*
210:*9*  212:*3*  214:*17*
238:*7, 14*  239:*13*
240:*2*  246:*14*  270:*5*
295:*1, 8, 13*  296:*9*
301:*10*  311:*12*  314:*9*
337:*25*  338:*1*  340:*16*
342:*1, 2*  347:*4*  348:*7*
349:*5, 11, 23*  350:*11,*
*21, 24*  352:*5, 24*
353:*13*  357:*18*
359:*21*  360:*2, 5, 9*

364:*4*  368:*10*  371:*5*
372:*4*  375:*13, 22*
376:*15*

objections  52:*5*
168:*21*  172:*21*
352:*24*  359:*14*

objectively  41:*4, 5, 15*

objects  7:*14*  28:*4*

obligated  34:*13*

obligations  262:*8*

O'Brien  56:*17*  145:*7*
211:*20*  212:*1*  235:*14*

observation  202:*1*

observations  104:*22*
134:*20*

observe  350:*9*

obvious  6:*19*  198:*2*

obviously  6:*13*  36:*12*
150:*9*  189:*20*  253:*23*

occasion  100:*6*
102:*14*

occasions  162:*15*
176:*16*

occurred  62:*16*
98:*15*  119:*6*  147:*24*
177:*14*  186:*21*
203:*21*  206:*16*
297:*25*

occurring  222:*1*

O'CONNOR  2:*1*
5:*11*

October  25:*17*  37:*13*
74:*20*  111:*7*

odd  164:*6*

offensive  222:*21*

offer  238:*11*  315:*13*

offered  41:*6*  314:*24*
315:*8, 14*

offering  37:*12*

offhand  12:*3*  27:*17,*
*20*  55:*16*  57:*8*  96:*9*
340:*12*  369:*18*

office  98:*25*  105:*10*
112:*21*  113:*12*
115:*18*  125:*20*
126:*21*  127:*13, 14, 22*
128:*4, 16*  130:*23*
132:*12, 21*  133:*22, 24*
134:*3*  141:*2*  147:*4,*
*16*  148:*15*  149:*9*

162:*6, 22, 24*  163:*4,*
*23*  164:*14*  169:*23*
170:*16, 22*  172:*5*
177:*12, 15*  182:*14*
192:*20*  194:*10, 12, 14*
216:*2*  250:*21*  251:*13,*
*16, 18*  252:*1, 4*
274:*17, 18*  315:*6, 15,*
*16*  322:*9*  326:*1, 3*
328:*3*  330:*17*  331:*5*
345:*2*  375:*1, 5, 7, 9*

offices  126:*19*

officially  369:*13*

Oh  121:*5*  150:*4*
164:*15*  196:*7*  203:*14*
209:*12*  219:*1*  223:*2*
228:*8*  229:*7*  236:*11*
240:*20*  255:*24*
259:*21, 24*  260:*16*
267:*12*  284:*15*
285:*13*  313:*18*  316:*9*
336:*12*  337:*8*  343:*14*
345:*7*  373:*4*  374:*21*
378:*11*  379:*25*
383:*17*

oil  259:*4, 6*

Ok  388:*21*

Okay  5:*4, 20*  6:*1, 5,*
*21*  7:*2, 7, 18, 19*  8:*9,*
*10, 25*  9:*6, 14, 19*
10:*9, 17, 23*  11:*3, 18,*
*25*  12:*7, 25*  13:*2, 6,*
*24*  14:*5, 11*  15:*8, 22*
16:*2, 7*  20:*4*  23:*13*
26:*5*  27:*1, 7, 15, 17,*
*25*  31:*2*  38:*17*  42:*7*
43:*14*  50:*23*  51:*21*
58:*25*  62:*3, 11, 15*
64:*7, 12*  66:*19*  67:*1,*
*5, 18*  69:*10, 13*  70:*11*
71:*19, 24*  72:*2, 5*
74:*25*  78:*11*  80:*11*
81:*3*  82:*8, 25*  85:*18*
88:*21*  91:*3, 14, 19*
92:*18*  93:*8, 25*  94:*21,*
*22*  95:*3*  96:*16, 19*
99:*14*  100:*6*  101:*16,*
*23*  102:*7, 12, 19*
103:*9, 14, 15*  105:*23*
106:*10, 16, 24*  107:*24*

Deposition of Patricia McNulty                                    Lisa Barbounis v. Middle Eastern Forum, et. al.

108:5, 19   109:22
112:6   114:14   115:1
116:10, 16, 23   117:2
118:11   119:3, 19
120:6, 19, 21   121:1,
22   122:23   123:3
124:3, 6, 7, 9, 12, 19,
20, 21, 24   125:8
126:1, 7   128:14, 25
129:19   130:3, 9, 15
131:17   132:3, 14
133:6   134:1, 24
138:7   139:11, 14
143:8   144:4   147:23
148:17   150:6   151:4,
24   152:11   153:3, 8,
20   154:1   156:7, 19,
23   157:3, 20, 23
158:15, 23   159:19, 23
160:9, 20   161:3, 7, 9
162:2, 4   163:6
166:11, 15, 17   171:4,
5, 16, 24   173:11
174:5, 7   176:13
177:5, 9, 19   178:2, 17
180:14, 22   181:16, 24
182:12, 24   183:5, 9,
16   184:8, 13, 21, 25
185:25   186:10, 15, 23
187:24   189:4, 9, 14,
24   190:12   191:3, 17,
23   192:11, 19   193:24
194:24   195:6, 14
196:7, 19   197:2, 18
198:1   199:16   200:3,
19   201:3, 7   202:8, 12,
16   203:4, 9   204:1, 18
205:19   206:6, 9, 11,
15, 18, 19, 23   207:2, 8,
24   208:2, 8, 24
209:21   210:1, 12, 25
211:17   212:23   213:9,
12, 16   215:16, 19
216:17   217:6   218:1,
5, 13   219:1, 11, 13, 22,
25   220:4, 24   221:2,
24   222:7, 11, 18
223:3, 14, 25   224:9,
14, 19, 22   225:6, 9
226:3, 11, 21   227:2

228:3, 8, 12   229:2, 6,
21   230:19, 24   231:1,
5, 14, 19   232:7, 15
233:1, 9, 18, 23
234:10   235:13, 16, 20
236:18   237:6, 13
238:3, 6   239:20
240:4   241:8   245:19
247:18, 19   248:10, 18,
21   250:3, 5, 13, 24
251:1, 4, 17   252:9, 12,
15   253:2, 6, 16, 22, 25
254:2, 9, 19   255:3
256:7, 14, 19, 25
257:4, 9, 13, 19, 22
258:15, 22   259:6, 24
260:7, 11, 16, 21
261:2, 10, 17, 20
262:7, 11, 19   263:6
264:9, 14, 16   265:3, 6,
8, 24   266:5, 15, 19
267:12, 23, 25   268:24
270:19, 20, 22   272:21
273:17, 19, 20   274:4,
21, 24   275:5, 7, 12, 22,
25   276:13, 18, 22
277:8, 13, 19   278:6,
24   279:13, 18   280:7,
15   281:6, 24   282:4,
11, 18, 22   283:4, 17,
19   284:7, 16, 24
285:4   288:23   289:22
290:18, 20   291:7, 13,
16   293:16   296:2
298:18   299:18
300:16, 20   301:21
302:13, 16, 20   303:1,
9, 16, 24   304:5, 12, 15,
22, 25   305:3, 8, 21
306:6, 7, 15, 17, 20, 21
307:9, 13, 25   308:9,
16, 23   309:6, 12
310:2   311:6, 20
312:12, 14, 21   313:12
314:7, 14   315:2, 3, 4,
12, 20   316:9, 16
317:15   318:15, 17, 23
319:2, 16, 20   320:4,
11, 17   321:10   322:3,
13, 19, 22   323:13, 21

324:6   325:3, 8
326:18   327:7, 19, 21
328:6, 11, 23   329:1, 4,
17   330:5, 9   331:7
332:11, 16   333:4, 16,
22   334:6, 25   335:3,
20, 23   336:8, 18, 19
337:1, 8   338:6, 11
339:13, 21, 24, 25
340:6   341:17, 22
342:20   343:24   344:3,
9, 24   345:4, 7, 14
346:12   347:10
349:25   350:3   351:6
352:10   353:5   354:1,
4, 5, 19   355:7, 9, 24
356:2, 5, 7, 23   357:2,
12, 17   358:6   362:5, 8,
10, 12, 19, 24   364:14
366:11, 13, 19, 24, 25
367:10, 11, 22, 25
368:2, 18   369:10, 21
370:6, 7, 10, 12, 16, 20
371:6, 17, 20, 23
372:9, 20, 22, 25
373:4, 15, 19   374:3,
16, 21, 22, 25   375:6
376:19   377:24   378:2,
8, 21, 25   379:2, 9, 21,
22   380:1, 11   381:1, 5
383:4, 7, 9, 25   384:5,
6, 20   385:3, 24   386:3,
7, 14   387:1, 17, 22
388:2   389:3, 7, 19, 22,
25   390:3, 7, 12, 14, 20
**old**   43:14   44:5, 7, 8
48:14   131:4   152:19,
21, 22   153:4, 13
165:20, 24
**once**   20:16   51:22
61:15   98:1   213:5
215:4   245:8
**one-on-one**   110:23
**ones**   14:3   74:14, 15
233:4
**ongoing**   293:11
309:13   317:11
**opened**   62:1, 11
**opening**   47:8   62:4
280:6

**opinion**   75:11, 18
287:13   307:10
340:19, 24   341:14, 18
342:2   357:10   360:7
**opinions**   307:12
**opposed**   7:15
**opposite**   325:23
**opposition**   213:13
**order**   25:17   238:24
326:10
**ordered**   32:23, 25
33:4
**orders**   25:24   194:18,
22   195:1
**ordinary**   190:23
**organization**   156:12
166:16   302:16
327:15   333:12
**outright**   113:24
**outside**   6:2   123:6, 9,
11, 13   183:20   210:23
255:16   307:21
327:14   347:1   380:21
**overall**   188:22
**overboard**   202:7
**overreacting**   313:25
**overworked**   190:24
191:2   268:21   269:7
270:25
**owe**   389:3
**owned**   374:3

**< P >**
**P.C**   2:1
**p.m**   91:10, 12
174:14, 16   175:11
235:25   281:1, 3
335:12   362:2, 4
391:16
**PA**   2:1
**pad**   141:11
**PAGE**   3:1   198:16
314:20   334:4
**paid**   156:25   157:1
158:9   175:18   176:7
229:19   232:12   237:8,
14   238:12   239:23
241:5, 8   242:20
243:17, 18, 21   245:10,

*12* 247:5, *12* 389:5
**pain** 196:23
**painkiller** 96:13, 15
**paper** 141:11 203:22
204:16 208:3, 5, 6, 10
218:7 222:15
**paranoid** 137:21, 22
138:6 220:1
**Pardon** 17:20 38:21
97:5 148:12 321:20
**parents** 102:20 103:5
**park** 337:14
**part** 10:17 92:9
154:14 195:15
197:15, 25 198:1
199:6, 9, 13 203:8
228:4 232:6 240:8
267:25 309:16, 17, 19
314:13 318:16 319:7,
10, 17 335:2 355:21
356:9 360:25 365:9
387:3 389:9
**participate** 233:13
**participating** 157:5
232:11
**participation** 251:16
**particular** 80:23
81:4 125:9 159:25
222:5
**particularly** 19:10
**parties** 10:18
**parts** 103:23 154:6,
7 194:19
**party** 119:21, 25
120:1, 7, 8 167:23
168:11, 14, 15 249:3
**passionate** 279:3
**passive** 265:15
**passwords** 305:5, 6
**Patel** 177:7, 9
**patience** 168:22
**PATRICIA** 1:1 3:1
4:6 12:21, 22 17:5
26:1 31:12 33:8
45:8, 23 109:24
121:3 174:22 175:2
353:25
**patricia.mcnulty1@gm**
**ail.com** 42:15

**Patrick** 291:2
304:11 334:14
378:18, 19
**Patriot** 289:18
**Pause** 159:14
**pay** 23:9 32:24, 25
33:2, 4 41:6 171:23,
24 225:14, 18, 19
226:1, 23 228:4
230:10 231:15, 16, 22
233:10 237:22, 24
238:11 241:16, 19, 21
243:2 244:22 246:23
352:15, 17
**paycheck** 214:7
**paying** 226:6 227:4
240:24 241:3, 6, 7, 14,
23 242:11 247:22
311:17 332:19
337:21
**payroll** 278:22
**pays** 242:5
**pecking** 326:10
**pending** 8:17 19:12
118:4
**PENNSYLVANIA**
1:1 4:10 22:10
142:4
**people** 28:16 40:11,
12 57:4 62:1, 13
69:15 74:14 87:9
103:23 106:20
112:13, 19, 20 113:2
128:4 140:6 167:6
178:5 207:18 221:10,
12, 19 223:19 242:22
246:9 268:5, 7, 10
273:9 322:8 327:23
332:2 339:19 345:13
356:21
**people's** 310:4
**pep** 258:13
**percent** 229:7
**percentage** 98:14
**perception** 115:7
205:14 386:14, 16
**Percocet** 96:10
**performance** 113:16
331:23 332:4

**period** 122:3 133:14
134:10 166:8 248:14
320:21 322:20 326:4,
5 349:16
**permanent** 324:15
327:4
**permanently** 324:17
**permitted** 311:3
327:7
**person** 6:10 41:8
42:10 65:8 79:3, 22
80:20 126:8 127:23
128:3 157:14 232:16,
18 233:3 235:8
245:7 261:22 285:14
312:11 315:18 321:5
326:6 328:14 338:2,
7 340:8 369:22
371:3
**personal** 38:15, 24
39:7, 9, 18, 21 40:14
62:20 69:10 156:20,
21 164:7 211:12
219:17 230:10
231:17, 18 238:2
341:18 347:1
**personally** 155:1
235:5
**persons** 37:13
**person's** 310:8
357:20 360:7
**pertained** 195:21
**pertaining** 361:3
**pertains** 188:5
224:13
**Philadelphia** 2:1
5:12 193:8 372:15,
19 381:16 386:23, 24
**Philly** 302:24 383:5
**phone** 15:12 64:4, 6
66:3, 6, 8, 11, 22, 24
67:6 70:13, 24 71:2,
9, 16 72:1, 3 73:10
74:10, 18, 22 75:6, 25
76:2 77:22 80:15
81:1 88:6, 16 90:5
96:21 124:16 129:22
167:3 171:1 175:14
210:19 219:14, 18, 20

220:2, 17 227:8
267:14 355:14
**photo** 346:2
**photographing** 282:15
**photographs** 285:19
295:11
**photos** 71:22 90:6, 8
286:13 365:10
**phrased** 355:2
**pic** 283:11 284:3
381:16, 25 382:3
**pick** 171:22 288:6
**picked** 332:25
**picnic** 229:11
**pics** 282:5, 12, 20
295:6, 14, 20 296:3,
23
**picture** 188:6 257:16
263:1, 18 266:2
346:13 351:20
362:15 363:24
378:13, 22 387:22
388:14 390:5
**pictures** 61:17 62:1,
5, 12 86:2 90:4
282:7, 14, 23, 25
283:2 285:25 351:17
364:17 365:4, 19, 21
373:24 374:6 382:9
**piece** 285:16
**pieces** 286:23
**piling** 196:22
**PIP** 333:18
**Pipes** 2:1 105:25
111:12 116:13, 21
127:24 140:4, 22
141:1 145:6 146:23
147:3 150:22 159:6
163:21 172:3 177:12,
21 178:4, 12 180:11
181:21 182:1 194:10,
13 211:19 212:1
214:24 242:15
248:16 249:13, 18, 24
250:9 251:18 267:18
291:8, 11 294:3
296:7 298:17 299:25
303:21 304:5 309:7
318:19 319:22 320:5,
8 322:10 323:19

Deposition of Patricia McNulty

Lisa Barbounis v. Middle Eastern Forum, et. al.

324:8  326:10  330:6
366:9
**Place**  2:1  23:6
78:22  105:19  111:5,
19  114:12, 18, 20
115:3  116:24  129:22
139:17  163:1  189:18
193:1, 6  220:11
225:7  230:8, 17
271:4  315:21  323:18
330:16  332:10, 11
355:10, 12  356:2
**placed**  113:6  329:24
331:23  333:18
**Plaintiff**  1:1  2:1
18:8  25:15  28:2, 4, 7
**plaintiff's**  28:6, 8
**plan**  113:16  152:14
169:16  170:19
331:24  332:5
**plane**  156:25  157:1
158:10  225:21
387:12, 15
**planned**  260:24
**planning**  160:14
170:12  200:18  225:9
305:23
**plate**  196:22  207:13
209:17
**platform**  224:11
**platforms**  51:13
78:25
**play**  351:12
**playing**  115:24
268:3  297:18  318:25
320:6, 16
**pleasantries**  183:21
**please**  4:19  17:7
33:2  35:5, 10  36:18
37:4  38:4  50:7  52:5
55:19  76:17  92:19
93:18  101:17  103:10,
11  125:18  139:9
149:22  158:18
164:15  176:20
180:24  181:3  255:19
261:24  281:11
302:25  335:6  352:23
361:17  365:6

**pleasure**  156:21
**plenty**  20:18
**PLLC**  2:1
**plowing**  191:7
**plural**  60:21  208:21
**point**  6:7  21:17
28:9, 21, 25  39:15
63:8, 13  83:13  87:24
122:12  127:23
128:14  129:21
130:11  132:9, 12
143:11  146:6  157:18
160:13  181:11  184:3
185:3  198:3, 5
202:18  206:11  215:7
216:15  219:9  220:8
222:20  229:15
232:13  241:3  244:20
245:16  250:5, 9, 10
256:12  268:22
277:21  280:3, 12
284:10  294:11
297:22  299:18, 19
301:1  302:17  309:25
311:18  314:25
315:17, 18  317:2
319:20  322:1  326:1
327:1, 19  329:5, 6
333:11  343:8  355:18
357:2  376:3  378:2, 6
379:25  380:16
**pointing**  204:2
**points**  104:18
**police**  385:8
**policies**  189:5
**policy**  188:1  197:7
**political**  310:10
311:3, 8  318:3, 7
**poor**  278:11  305:23
**porn**  283:9, 13
293:24
**portion**  103:13
117:11  139:10
151:17  195:21  198:6
241:4, 6  301:20
307:6  368:2
**portions**  92:25  93:2
101:21  281:7
**posing**  251:18

**position**  19:14, 17
126:4  129:4  131:4, 7
132:17  133:1  141:21
183:2  251:15  279:25
320:18  322:11, 14
327:23  328:1  329:2,
4, 25
**positive**  347:3
**possession**  28:3
89:19  374:23
**possibility**  107:21, 22
110:22  188:3, 17
**possible**  74:23
176:18  203:15
272:17  302:24
324:17  343:13
**possibly**  24:20
105:12  111:22
296:16
**post**  186:25  187:3,
10  188:12  189:15
190:1  258:20  263:17
**postcards**  26:12, 19
**posted**  42:10  189:10
257:19, 20  258:19
327:25
**posting**  187:13
188:2, 6  189:6  236:1
**postpone**  202:22
203:5
**posts**  186:8
**potential**  26:13, 20
340:7  356:16  357:9,
15  358:20
**potentially**  59:3
255:15
**power**  164:14
194:13  201:24  202:2,
18
**powerful**  212:13
**practice**  87:7  173:17
**preach**  136:25
**preamble**  22:7
**precise**  171:8
**predicate**  301:5
**prefer**  40:25  41:25
**pregnant**  121:4
**premise**  239:1, 17
**premising**  270:7

**prepare**  9:6
**preparing**  222:14
**prerogative**  149:9
**prescribed**  99:7, 21,
23, 24
**prescription**  99:3
**presence**  233:7
**Present**  2:1  109:1
125:12  238:25
**preservation**  376:13
**pretend**  179:17
190:7, 9
**pretty**  7:3  78:18
92:16  121:17  127:18
137:8  160:4  191:10
198:2  215:2  230:6
326:23
**previous**  76:24, 25
101:11  173:2  263:8,
15
**previously**  184:17
241:22  255:9
**priests**  251:9
**primary**  126:3
**prior**  9:24  10:6
74:10  159:10  204:24
333:11
**private**  374:11
387:12
**privilege**  15:3, 11, 14
16:12  17:2, 13  18:25
21:6  22:13  24:3, 4
30:1, 8  35:19  59:17
60:3  89:3, 6
**privileged**  16:18
19:7, 16, 21  22:16, 20
24:6, 19  30:4, 11, 25
89:4
**probably**  7:13  93:2
98:5, 9, 13  121:16
142:24  184:1  272:3
279:12  281:13
308:22  361:15
**probation**  113:6, 15
**probationary**  320:21
326:4, 5
**problem**  134:21
149:20  221:14  269:4
273:24  327:11  386:4

Deposition of Patricia McNulty                                    Lisa Barbounis v. Middle Eastern Forum, et. al.

**problems** 147:*1*
278:*21* 307:*15, 16*
313:*20, 21* 369:*3*
**procedural** 20:*4*
**proceedings** 159:*14*
382:*11* 391:*16* 392:*1*
**process** 6:*7* 10:*18*
319:*7, 10, 18*
**produce** 28:*7* 81:*4*
84:*8, 21* 85:*4* 90:*16,
19*
**produced** 9:*24* 70:*8*
74:*3* 81:*7, 19, 22*
82:*5* 83:*10* 84:*6, 14*
88:*23* 89:*7, 10, 11*
90:*19*
**producing** 88:*25*
**production** 15:*24*
81:*11*
**Professional** 1:*1*
273:*25* 274:*6, 7*
392:*1*
**program** 151:*15*
183:*11* 184:*5, 13*
319:*13*
**prohibited** 318:*2*
**project** 115:*6* 154:*24*
160:*13* 202:*5* 204:*12*
**projects** 78:*10*
**promise** 6:*15* 264:*18*
**proof** 210:*12*
**propensity** 40:*1, 10*
**properly** 328:*12*
**proportion** 314:*3*
**proposed** 251:*20*
**proprietary** 320:*2*
330:*2*
**protected** 21:*25*
**protection** 326:*12*
**protest** 290:*15*
**protocol** 228:*24*
**protocols** 190:*7, 10*
**proud** 258:*6*
**prove** 321:*2* 322:*6, 7*
324:*19* 327:*24*
**provide** 11:*23* 41:*21,
23, 24* 51:*21* 54:*2*
55:*21*
**provided** 28:*14* 42:*12*

**providing** 28:*4*
**psychiatrist** 358:*4*
**psycho** 384:*8*
**Public** 1:*1* 39:*19, 22*
40:*5, 11* 231:*6* 388:*8*
392:*1*
**publication** 369:*23*
**puking** 46:*2*
**pull** 383:*23*
**pulling** 215:*6* 385:*19*
**punch** 199:*20* 200:*15*
**punching** 291:*9*
**punish** 251:*10*
**punishment** 251:*10*
**purposes** 11:*14* 68:*25*
**pursuant** 10:*19*
**pursue** 143:*20, 23*
144:*1*
**push** 23:*12* 207:*18*
**put** 15:*9* 38:*23*
40:*22* 41:*1, 9, 14*
52:*4* 66:*19* 86:*1*
92:*19* 101:*17* 103:*10*
113:*15* 120:*14*
135:*13, 17* 139:*7*
149:*21* 151:*6* 163:*1*
176:*20* 180:*8* 223:*15*
240:*5* 271:*3* 272:*14*
292:*23* 332:*4* 357:*4*
374:*10*
**putting** 135:*22*
157:*6* 239:*13* 309:*20*
360:*2*

**< Q >**
**Qatar** 303:*25*
**qualifications** 328:*24*
**question** 7:*11, 12, 14,
16* 8:*16, 18* 12:*11, 15*
15:*5, 13, 14, 18, 20*
16:*13, 19* 17:*1, 7, 14,
19, 22* 18:*20, 25* 21:*2*
23:*4, 16, 18, 20* 24:*4,
19* 25:*6* 28:*10, 12*
29:*11, 15, 16* 30:*2, 13,
16, 19* 31:*18, 22*
35:*15* 36:*3, 5, 18, 22*
37:*4, 6, 10* 38:*1, 4*
44:*21* 45:*9* 47:*3, 4, 8,
21* 48:*6* 50:*9* 59:*19*

62:*8* 72:*25* 73:*4, 8*
75:*13, 17* 76:*9, 13*
77:*3, 7* 81:*9* 82:*18,
19, 23* 83:*23* 84:*11,
18, 20* 86:*2* 89:*14, 18*
95:*4, 11* 113:*14*
118:*3* 136:*21* 139:*24*
149:*15* 150:*2, 3, 17*
154:*19* 163:*10, 14*
165:*2, 3, 7, 9* 166:*3*
167:*18, 19* 168:*24, 25*
169:*12, 14* 170:*3*
176:*1* 179:*3* 181:*19,
20* 205:*24* 206:*1*
211:*24, 25* 216:*9, 10*
217:*18, 22* 239:*2, 8, 9,
12, 18* 244:*3, 14*
246:*25* 247:*3, 10*
269:*20* 270:*10, 12, 18*
271:*18, 21, 23* 272:*1,
2, 5, 8* 283:*11* 286:*8,
16* 287:*17* 292:*13*
293:*1, 4* 294:*10*
295:*3, 17, 19, 22*
298:*11, 12, 24* 299:*23*
300:*18, 22, 24* 301:*6,
9* 311:*8* 314:*10*
333:*17* 338:*4* 340:*22*
341:*3, 5* 342:*19*
347:*24* 349:*4, 6, 14,
17* 352:*10, 12, 14, 20,
21, 25* 353:*11, 19*
354:*11, 19* 355:*1*
358:*6, 7* 359:*18, 25*
360:*4, 14, 17, 24*
368:*15* 376:*8, 12, 17*
382:*24* 390:*15*
**questioned** 139:*24*
**questioning** 34:*17*
243:*11* 299:*4* 300:*10*
**questions** 5:*17, 19*
6:*17* 14:*14, 17, 19*
15:*3* 22:*1* 28:*21*
29:*1* 31:*25* 32:*16*
36:*15* 37:*19* 41:*13*
51:*3, 12* 52:*9, 16, 25*
53:*2* 75:*3* 91:*15, 17,
25* 92:*4, 9, 14* 93:*1*
95:*4* 101:*21* 166:*1*
172:*23* 173:*4, 15, 22*

174:*1* 175:*14* 188:*25*
190:*9* 205:*22* 251:*18,
22* 270:*7* 271:*13*
300:*13* 311:*10*
347:*18, 22* 357:*19*
382:*19* 390:*22*
**quick** 21:*9* 26:*25*
175:*5, 13* 267:*15*
**quickly** 93:*13* 381:*8*
**quit** 146:*20* 178:*9*
199:*20* 200:*14, 21*
220:*9*
**quite** 132:*16, 18*
**quitting** 227:*20*
**quote** 33:*19* 150:*5*
155:*14* 167:*13, 22*
184:*14*
**quote/unquote** 41:*11*

**< R >**
**race** 107:*1*
**racist** 308:*18*
**radio** 374:*12, 14, 15*
**Raheem** 65:*8* 225:*13,
18, 19* 226:*9* 231:*15*
232:*19* 233:*22* 234:*1*
236:*11, 12, 16, 22*
237:*8, 14, 21, 23*
238:*12* 239:*23*
240:*10, 19, 22* 241:*1,
8, 11, 14, 19, 23* 242:*2*
243:*1, 18, 21* 244:*10,
21* 246:*21* 247:*11, 14,
15* 278:*9* 370:*2, 3*
**Raheem's** 231:*21*
**raises** 304:*18*
**rallies** 309:*23*
**rally** 156:*15* 157:*6, 7,
13, 16* 158:*4, 9* 230:*7,
8, 20* 231:*2* 232:*11*
233:*3, 14, 16* 237:*19*
239:*24* 240:*3* 241:*18*
257:*16* 268:*6* 291:*10*
292:*5* 293:*7, 20*
296:*5* 297:*25* 300:*3*
**ramping** 202:*21*
**ran** 194:*10, 12*
**rando** 284:*22*
**Random** 284:*22*
**randos** 284:*20*

Deposition of Patricia McNulty                                  Lisa Barbounis v. Middle Eastern Forum, et. al.

**Randy** 28:5, 13, 18, 20 29:17 37:8, 15
**rant** 308:19
**Rape** 348:17 349:4
**rarely** 194:20
**rarity** 160:8
**rate** 281:13
**rational** 188:11
**reached** 153:13 323:22
**reacting** 199:23
**reaction** 211:11
**reactions** 211:5
**read** 10:2 16:7, 17, 22 17:1 19:19 25:9, 14, 18, 20 29:22 30:3, 6, 17, 20 43:22 81:10, 11 92:23 96:22 100:6 101:11, 20 103:13 123:23 139:9 150:4 159:19 177:15 186:20 248:23, 25 264:7 272:11 275:16 284:1, 6 306:16 308:16 309:3, 7 314:19 339:23
**reader** 322:25 324:22
**reading** 93:16 94:17 102:5 126:9, 10 266:22
**ready** 93:17 191:8 229:7
**real** 175:5 197:7
**realize** 172:2 279:5
**realized** 171:21
**really** 6:23 8:6 27:16 52:22 96:12 121:5 123:17 161:20 162:7 198:5 199:7 268:13 271:12 283:6 286:24 300:16 314:7 338:9 347:1 357:4
**reason** 8:20 22:24 24:8 29:2 30:19, 23 31:2 33:12 37:1 60:8 75:2, 4 80:23 81:4 84:13 86:5 96:2 99:19 106:11 108:13 109:12 145:14 147:17 156:5

186:1, 3 210:8, 13 216:18 219:13 230:7 256:10 312:23
**reasonably** 43:22
**reasoning** 189:2
**reasons** 34:7 111:1 187:12 189:25 212:7 216:19 325:14 329:9
**reassure** 262:8
**recall** 5:22 12:3 14:8 27:21 53:13 54:13 55:10 63:1 64:3 96:4 97:17 102:3 105:5 130:10 135:4 139:16 175:17 176:13 182:22 187:25 189:4 192:24 202:24 236:13 251:17 308:19 312:3 313:4 322:4 370:16 385:21
**recalls** 368:12
**receive** 12:9, 22, 23 62:18 237:17 240:1
**received** 12:11 26:13, 20 37:12 86:18
**receives** 12:9
**receiving** 12:24
**recess** 50:17 91:9 174:13 175:10 235:24 280:25 335:11 362:1
**recognized** 223:20
**recollection** 72:13 99:10 105:20 125:5, 15 129:3 134:8 177:24 178:6 204:11 222:9, 15 237:23, 25 261:16 263:13 367:22 384:13 388:12
**recommendation** 302:23
**reconsidering** 251:12
**record** 4:2, 18 13:7, 9 14:17 15:7, 9, 14, 22 16:2, 21 17:6, 25 18:14, 24 20:2 23:22 25:10 32:4, 13 34:15 38:17, 20, 23, 24 39:1,

3, 8, 10, 13 40:15 41:3, 18, 22, 25 46:2 50:6, 16, 21 52:5 53:23 54:3 55:19, 22 72:22 73:4, 7 76:22 91:6, 8, 13 174:10, 17 175:5, 9, 23 180:8 235:21, 23 236:3 239:14 244:17 257:10 270:6 280:22, 24 281:4 292:24 299:1 301:14 306:21 308:24 311:12 317:21 335:8, 10, 14 361:25 362:4 381:9 390:24 391:14
**recorded** 1:1 4:5
**recording** 42:9
**recover** 70:23 143:9
**recovered** 72:6, 10, 14, 20 73:9, 16, 19, 22
**redact** 365:3, 20
**redirect** 300:15 310:17 347:18
**redo** 52:8
**reduced** 333:19
**refer** 10:20 235:7
**reference** 10:13 37:7 176:23 220:22 226:8, 18 367:14 373:13 383:6
**references** 267:13
**referred** 235:8
**referring** 11:12 95:18 109:18 138:16 196:16, 24 197:11 207:21 208:12 224:2 228:21 235:13 262:4 265:21 276:7 287:11, 17 303:21 314:23 321:7 367:20 381:20
**refers** 37:15 200:16
**refresh** 261:16 263:13 338:7 384:12
**refused** 306:4
**regarding** 92:1 209:1, 2
**register** 7:22 159:4, 8 163:7 190:18, 20 211:19 216:18

**Registered** 1:1 249:13, 23, 25 392:1
**regular** 8:3 266:16, 17
**regularly** 190:20 213:2
**rehabilitate** 310:15
**reigns** 192:7
**reimburse** 241:4 245:21 247:16
**reimbursed** 247:12
**reimbursement** 278:22
**relate** 138:19
**related** 28:3, 5 33:12 164:8 241:17 252:12 307:23
**relates** 19:12
**relating** 81:16
**relation** 323:19
**relations** 370:3
**relationship** 92:1 97:19 103:20 104:12 115:8, 25 122:7, 13 123:9, 11, 13 132:7, 9, 11, 18 134:9 137:9 138:9 154:22 156:8 157:17 159:1, 9 183:17 216:16 232:3 262:15 267:5 279:7 283:3 286:21 291:25 292:14 293:10, 12 298:21 299:15 309:13 312:1, 4 313:3 316:22 317:3, 7, 10, 12 370:2, 13, 14, 17 371:1
**relatively** 370:13
**releasing** 255:16
**relevance** 36:25 348:13
**relevant** 34:8, 10, 18 58:5
**reliable** 37:24
**relief** 256:1
**relieved** 256:22
**reluctance** 253:11 256:2
**relying** 349:10

Case 2:19-cv-05030-JDW   Document 110-3   Filed 03/02/21   Page 131 of 157

Deposition of Patricia McNulty                                   Lisa Barbounis v. Middle Eastern Forum, et. al.

**remain** 251:*14*
**remained** 321:*6*
**remember** 16:*7*
*27:17  44:12, 13*
*49:10, 19, 24  54:18,*
*20  55:14  56:3, 5, 15,*
*18, 21, 24  57:16, 18,*
*21, 24  58:2, 21  59:25*
*60:13, 17, 19, 24, 25*
*61:19, 24  62:10, 15*
*65:9, 12, 15, 19  69:16,*
*17, 20, 21  71:5, 7*
*72:7, 9, 11, 16, 18, 21*
*73:13, 15, 17, 18, 21,*
*23  74:1, 6  75:19*
*79:5, 8, 24  80:3*
*86:11, 16, 25  87:4, 23*
*88:2, 7, 10, 11, 13, 19*
*90:3, 23, 24  91:1*
*96:9  100:14  102:6*
*105:2, 16  108:1, 4*
*118:22  119:2  122:5*
*123:21  129:24, 25*
*130:2, 3, 13, 25*
*134:12, 14, 16, 17, 19*
*135:6, 7, 15  152:21*
*153:5  155:10, 11*
*156:6  176:18  177:22*
*178:1  182:5, 20*
*184:23  185:9  191:1*
*193:3  195:9  203:13*
*206:17  215:11  217:4*
*219:7  220:12  232:13*
*235:9  237:4  254:25*
*255:2  259:2  262:6*
*263:16, 20  279:9, 11*
*304:21  313:9, 11, 23*
*316:11  336:17  338:9,*
*14, 15, 25  340:5, 8*
*355:13  366:23*
*367:19  369:18*
*370:15  373:18*
*380:10  383:3*
**remembers** 16:*14*
**remind** 261:*24*
**reminder** 6:*9, 12*
**reminding** 262:*9*
**remotely** 1:*1*
**remove** 251:*12*

**repeat** 72:*25*  165:*9*
269:*22*  321:*17*  329:*9*
**repeated** 48:*14*
**repeatedly** 32:*19*
88:*22*
**repeating** 95:*22*
127:*11*
**repercussions** 325:*18*
**rephrase** 11:*6*  154:*19*
**replace** 71:*9*  260:*2,*
*15*
**replaced** 258:*23*
**replacement** 324:*15*
**replied** 334:*16*
**reply** 302:*14*
**report** 111:*12*
147:*17*  148:*2, 5*
157:*8*  230:*11*  241:*15*
296:*7*  298:*16*  299:*24*
300:*18*  301:*7*  341:*25*
342:*6, 9, 10*  350:*6*
**reported** 291:*8, 10*
294:*3*  330:*5*  341:*24*
342:*5*
**Reporter** 1:*1*  4:*14,*
*19*  6:*25*  7:*5, 22*  8:*3,*
*7*  27:*3*  35:*4, 10*
36:*19*  40:*3, 7*  49:*2*
50:*25*  51:*6*  60:*5*
72:*24*  92:*15*  93:*19,*
*22*  95:*21*  133:*8*
143:*3*  144:*15, 21*
149:*11, 14, 25*  158:*17*
173:*23*  174:*24*
179:*21*  180:*18*
236:*24*  237:*1*  239:*3*
243:*9*  244:*9, 12, 15*
245:*7*  247:*1*  269:*19,*
*22*  294:*20*  297:*4*
298:*13, 18, 22, 25*
310:*21, 25*  347:*19*
359:*6*  361:*12, 18*
392:*1*
**Reporting** 2:*1*  4:*14,*
*16*  128:*4*
**represent** 5:*12*  74:*7*
**representation** 53:*25*
55:*21, 23*  57:*10*  63:*6*
64:*10*  67:*20*  68:*3*
**representative** 291:*18*

**represented** 8:*25*
32:*19*  143:*1*  206:*12*
**representing** 143:*2, 6*
**Republican** 249:*2*
**request** 15:*23*  16:*3,*
*4*  26:*10*  27:*23*  28:*1,*
*4, 16*  36:*7*  228:*19*
280:*6*
**requests** 10:*20*  11:*1,*
*21*  12:*4, 23*  17:*10*
19:*18*  26:*8*  31:*6*
35:*17*  37:*24*  58:*4, 7,*
*13*  59:*1, 6, 15*  64:*21*
68:*12*  69:*7*  74:*4*
81:*11*  85:*11*
**require** 28:*7*  176:*10*
**required** 10:*19*
**requires** 18:*6*  22:*18*
24:*7*
**resentful** 162:*9*
**reservations** 249:*15*
**reset** 374:*4, 6, 16, 18*
375:*8*  376:*20, 22, 24,*
*25*  377:*4, 11*
**resignation** 186:*1*
371:*12, 24*
**resigned** 375:*3, 6*
378:*5*
**resigning** 186:*2*
**resisted** 211:*7*
**resolution** 251:*19, 20*
**respect** 79:*21*  260:*2*
**respond** 86:*24*  87:*14*
138:*3*  191:*6*  201:*12*
218:*15*  352:*23*
**responded** 207:*3*
305:*4*  320:*5*  328:*7*
**responding** 58:*3, 13,*
*25*  169:*22, 24*
**responds** 139:*3*
218:*6*  303:*1*
**response** 16:*5*  27:*25*
28:*2*  29:*22*  36:*6*
37:*14*  74:*4*  86:*9, 23*
130:*1*  275:*18*  292:*23*
334:*22*  343:*25*
**responses** 16:*22*
17:*9*  18:*3, 21*  20:*3*
21:*3*  26:*7*  31:*5*
34:*20*  37:*19, 23*  38:*7*

**responsibilities**
183:*14*  261:*25*
**responsibility** 319:*11*
326:*3*
**responsive** 27:*22*
50:*2*  58:*6, 10, 15, 18*
59:*3, 6, 9, 15, 23*  60:*1*
64:*23*  65:*2, 5*  68:*12,*
*14*  69:*6*  81:*13, 17, 21*
82:*2, 5, 11*  85:*1, 11,*
*14*
**responsiveness** 64:*21*
**rest** 157:*2*  268:*16*
**restored** 71:*16, 17, 20,*
*22*
**result** 32:*24*  138:*17*
188:*3*  250:*13*
**resume** 304:*19*
343:*10*
**resumes** 304:*23*
**retained** 3:*1*
**retaliation** 330:*18*
331:*1, 6, 15, 16*
**retire** 172:*3*
**retired** 166:*6*
**retiring** 169:*18*
170:*12*
**return** 6:*17*
**returned** 131:*2*
**revealed** 96:*7*  107:*24*
**revenge** 283:*9, 13*
293:*23*
**review** 9:*17, 18*  17:*9*
18:*21*  19:*19*  21:*2*
59:*10*  65:*1*
**reviewed** 18:*2*  19:*24*
21:*11, 12*  60:*17*  74:*2*
255:*18*
**reviewing** 16:*14*
58:*20*  59:*8*  64:*20*
**revise** 371:*15, 18*
**revised** 371:*21*
**Reynolds** 114:*15*
**rid** 181:*22*
**ridiculous** 20:*14, 18*
**RIESER** 2:*1*  5:*16, 19*
**Right** 12:*1*  20:*8*
21:*7*  22:*4*  23:*2, 10*
28:*10*  29:*12*  31:*9, 21*
32:*6*  33:*21*  39:*12*

50:5, 11, 13  53:25
63:19  74:20  75:13,
20, 25  80:8  85:5
89:9, 25  91:5  94:17
97:10  98:1  106:11
114:24  120:7, 24
121:4, 23  123:22
126:22  131:14
135:23, 24  136:6, 17,
18  137:14  143:18, 19
151:21  165:19  173:1,
22  176:19  177:9
180:7  181:6  183:16
186:16  187:8, 18
189:9  196:3  200:1
201:13  209:6  214:11
217:6, 11, 13  222:24
224:3  229:6  235:18,
19  239:14  240:6
242:12  243:12  248:3,
10  253:23  256:13, 20
262:24  264:21  265:3
271:6  272:13, 14
276:20  278:19
280:19, 21  283:23
287:1  289:22  293:2
301:23  306:6  310:19
321:15  322:1  326:1
328:16, 18  344:11
345:11, 18  348:25
353:22  356:15
357:13, 14, 16  358:15,
17, 23, 24, 25  359:10
361:1, 23  364:19
365:16  366:4  376:10
381:2  382:20  388:19
391:2, 6, 7, 9
**ripe**  153:13  364:21
**road**  31:14
**roaming**  385:9
**Robinson**  157:7
230:21, 22  231:4, 9
232:9  291:18, 20, 25
292:18  296:6  308:18
309:2, 15, 21  311:18
312:8  317:4, 12
373:13, 16
**role**  132:25  133:2, 7
184:16, 18, 19, 22
195:7  199:2  202:6

251:14  303:6  326:21
327:12
**rolling**  268:24
**Roman**  2:1  5:13
10:25  11:20  73:16
96:22  97:2  102:25
105:16  107:11  118:7,
18  122:4  132:21
134:3  145:8  146:24
181:21, 25  212:24
231:7  244:7  347:5
348:24  359:1
**romantically**  155:1
**Rommo**  230:15
**roof**  217:12, 19, 20
**room**  8:4  110:21
113:8, 11, 18  178:14
180:11  181:21  182:1
234:2, 3, 5  240:10
255:11, 12  316:8, 9,
14
**rough**  155:14
**roughly**  336:18
**row**  82:20
**RSVPs**  223:17
**ruin**  229:11
**rules**  92:16
**ruling**  25:5
**run**  6:8  148:14
149:9
**rundown**  207:14
**running**  126:3  203:5
342:24  386:22
**Russell**  114:15
**Ryan**  380:13, 15
381:2, 20, 23  382:9
383:5, 6, 20  384:2
385:2, 3, 22, 25  386:9,
17  387:7, 12
**Ryan's**  381:16  383:4

< S >
**sad**  257:23
**sadder**  367:6
**safe**  218:19  268:3
391:12
**sake**  6:12  245:6
**salary**  175:18  176:5,
6  333:19  337:21
338:18, 21  339:2, 9

**Sam**  305:4  389:13,
14
**Sam's**  389:22
**sanction**  32:23
**sanctions**  21:25
**sandman**  304:9, 10
334:13  378:19
**Sapchat**  284:11, 12
**sat**  5:23  213:24
214:11  328:3
**satisfied**  251:19, 24
325:11
**save**  203:15  234:2
247:24  248:1, 4
300:12
**saw**  157:15  230:12
233:2  268:24  278:3,
7  295:23
**saying**  12:18  16:21
31:21  33:1  36:20
52:13  82:22  90:7
100:3  107:13  110:8
128:8  133:14  172:1
180:14, 21  188:13
198:22  211:6, 22
215:2  228:11, 22, 25
239:5  244:18  251:8
258:3  269:11  274:4,
5, 8  275:15  286:5
288:9  311:1, 5, 6
317:6  319:12  320:14,
15  326:11  336:20
338:10  347:20
381:24
**says**  20:1  25:15
28:2  96:25  103:17
109:14  136:4, 24
137:2  138:1  177:11
179:16  180:22
190:16  197:5, 9, 18
199:19  200:6, 15
201:17  202:17
206:19  209:15
218:20  219:25  220:7,
16, 19  221:7, 13
222:14  223:5  224:24
225:1  226:6, 15
227:9, 11, 20, 23
228:12  229:14  230:4
234:1, 10, 21, 25

240:10, 16, 18  249:3
255:24  256:22
257:25  265:12
266:10, 22, 24  267:2,
8  268:2, 11, 24
273:22  276:18, 22
277:3  278:8  279:22
282:4  283:19, 25
284:9  285:11, 14
286:6  287:24  288:1,
24  289:9  290:11
303:3, 19  314:17
315:8  316:20  317:8,
15  318:10, 24  322:4
324:8  325:5  334:9
336:12, 20, 23  337:4,
10  339:1  343:8, 9, 24
344:11  357:12
358:13, 15  363:18
366:3  367:3, 14
369:13  379:4  381:14
383:15  384:25  385:7,
8, 12, 19  388:6
**scared**  146:19
**scenario**  314:3
**schedules**  193:4
201:19
**scheming**  111:11
**school**  202:25
204:12  208:6  266:12
**scope**  14:21  23:8
32:20  33:14
**scratch**  31:2
**screaming**  313:17
**screen**  80:1, 3, 6, 7,
21, 24  81:15, 19  82:1,
4, 10  83:3, 7, 11, 14,
17, 19, 21  84:4, 5, 7,
13, 22  85:9, 12, 15
86:3, 14, 18, 22  87:8,
15  88:9, 12, 16, 23
89:1, 15  90:7, 13, 22,
25  121:24  209:9
218:21  219:1, 8, 14
236:16, 21  272:15, 19
385:25  386:10
**screwed**  366:4
**scroll**  13:21  93:4, 17,
18  94:1  124:4, 7
136:19  137:16

159:*21*  197:*3*  198:*10*
201:*15*  202:*13*  204:*8*
207:*11*  209:*10*
219:*22*  221:*3*  224:*17*,
*19, 20*  227:*16*  228:*16*
240:*12*  248:*19*  253:*6*
254:*20*  255:*6, 22*
257:*3*  258:*17*  260:*22*
261:*1, 11*  262:*20, 23*
263:*21, 22*  264:*4, 12,*
*13, 14*  265:*7, 25*
266:*20*  267:*24*
273:*18*  274:*13*
275:*13*  276:*10, 14, 15,*
*16*  277:*19*  279:*19, 23*
280:*16, 17, 18*  281:*9,*
*12, 22*  285:*6*  288:*7*
289:*1, 10*  290:*8, 9, 18,*
*21*  302:*7*  303:*17*
305:*10, 15*  306:*7, 18,*
*19, 20*  317:*18, 20*
318:*5*  320:*23*  321:*11*
324:*5, 6, 24*  334:*4*
335:*1*  336:*9, 25*
339:*21, 23, 24*  344:*4,*
*5, 8, 13, 14*  345:*18, 19,*
*22*  362:*8, 9, 10, 11, 13*
363:*20, 21*  364:*14*
366:*14, 16*  367:*11*
368:*18*  373:*9*  379:*1*
390:*3, 7, 8, 13, 14*
**scrolled**  274:*11*
**scrolling**  15:*17*
207:*25*  222:*11*
224:*16, 18*  278:*15*
283:*21*  304:*14*
318:*14*  364:*23*
**se**  106:*20*
**search**  26:*18*  68:*10*
69:*5*
**searched**  27:*13, 22*
81:*12*
**second**  10:*9*  33:*4*
60:*23*  111:*23*  112:*1*
147:*9*  159:*13*  172:*12*
177:*5*  201:*13*  223:*1*
249:*16*  252:*17*  271:*8*
279:*23*  325:*21*
330:*16*  344:*7, 8*
361:*20*  362:*10*

363:*22*  388:*25*
390:*13*
**seconds**  92:*23*
120:*17*  288:*4*
**Section**  255:*20*
**security**  187:*12*
188:*3*  189:*25*  190:*7,*
*9*  312:*11, 12*
**see**  13:*17, 21*  15:*16*
16:*3, 5*  37:*7, 14*  58:*5,*
*14*  74:*5*  75:*1*  92:*4*
97:*23*  99:*14, 16*
109:*11*  112:*13*  136:*1,*
*7*  157:*15*  172:*1*
174:*6*  193:*16*  208:*9*
213:*4, 7*  221:*4*
223:*16*  229:*4*  261:*2,*
*12*  263:*8*  265:*2*
267:*7*  272:*11*  275:*11*
285:*24*  289:*4, 8*
312:*17*  322:*23*
354:*13, 16*  362:*7*
367:*16*  382:*8*
**seeing**  93:*5*  102:*13*
156:*11*  209:*8*  236:*13*
286:*23*
**seen**  12:*4*  13:*25*
83:*2*  236:*23*  387:*14*
**select**  128:*13*
**selected**  132:*16*
327:*3, 6*  352:*2, 6*
353:*2, 13, 14*
**selection**  319:*7, 10, 18*
**self-assessment**
357:*24*  358:*8*  360:*20,*
*23*
**send**  20:*7, 25*  21:*10,*
*13*  48:*16, 24*  69:*25*
80:*1, 14*  86:*2*  87:*7*
88:*8*  90:*2, 6, 21, 25*
95:*5*  218:*25*  219:*2, 6*
247:*13*  251:*21*
282:*12, 15, 19*  285:*19*
286:*2, 12*  288:*5*
295:*10, 11*  304:*25*
331:*20*  373:*1*
**sending**  17:*10*  21:*20*
86:*13*  87:*2, 14, 25*
88:*4*  282:*14*  285:*16,*

*25*  304:*23*  364:*1, 3*
**sends**  177:*13*  285:*12*
**senior**  133:*1*  251:*15*
**sense**  48:*17*  290:*4*
319:*8*  353:*1, 3, 5, 12*
**senseless**  359:*14*
**sensitive**  164:*5*
**sent**  21:*14*  33:*5, 8*
42:*8, 9*  48:*18*  62:*8,*
*13*  69:*21*  80:*3, 11, 21,*
*24*  81:*5, 15, 25*  82:*9*
83:*14, 18*  84:*4, 22*
85:*9*  86:*22*  88:*11, 23*
89:*23*  90:*5, 12*  95:*9,*
*13*  103:*16*  164:*9*
200:*6*  201:*18*  206:*12*
219:*12*  236:*17*
247:*13*  253:*14*  275:*2,*
*5*  280:*5*  282:*21, 22*
283:*1*  284:*6*  288:*17,*
*20, 21*  289:*5*  304:*9*
318:*21*  319:*4*  331:*22*
343:*24*  351:*19*
356:*13*  364:*8*  378:*21*
385:*24*  386:*10*
**sentence**  97:*4*
**sentimental**  260:*10*
**separate**  97:*6*  195:*23*
237:*20*
**separated**  154:*25*
155:*3*  270:*1*
**separately**  115:*19*
**September**  111:*7*
129:*20, 22*  130:*4, 7*
329:*15*  372:*11, 13*
**series**  248:*13*
**serious**  200:*25*
203:*24*  205:*3, 5, 7, 10*
367:*17*  382:*19*
**seriously**  198:*4*
200:*23*  203:*23*  365:*7*
**serve**  31:*5*  359:*4*
**served**  10:*25*  12:*5*
16:*8*  21:*3*  29:*23*
31:*8*  34:*21*
**serving**  18:*22*
**set**  71:*12*  252:*3*
321:*1*  352:*7, 14*
379:*23*  381:*15, 24*
382:*2, 17, 23*

**SETH**  2:*1*  5:*1*  9:*3,*
*4, 8, 11*  12:*14*  14:*7*
17:*16*  19:*3*  20:*17*
21:*21, 22*  22:*21*  23:*5*
24:*6, 12*  28:*22*  30:*14*
31:*16*  32:*2, 18*  33:*17*
34:*6*  39:*14*  43:*1*
45:*10*  46:*1*  54:*6*
55:*21*  63:*7*  64:*10*
67:*19*  70:*3*  76:*17*
82:*23*  90:*16*  91:*2*
121:*15*  143:*5*  149:*19*
168:*19*  174:*19*  297:*9,*
*13*  354:*7*  366:*4, 11*
376:*7*  391:*4*
**seth@dereksmithlaw.c
om**  2:*1*
**Seth's**  354:*13, 16*
**setting**  66:*22, 23*
381:*21*
**seven**  98:*12*  147:*25*
325:*6*  361:*16*  391:*6*
**sex**  116:*4*  150:*10*
155:*14*  211:*1*  313:*8,*
*10*  346:*23*  348:*20*
363:*18*  387:*25*
**sexual**  155:*9*  210:*3*
213:*16*  214:*14*
215:*16, 24*  244:*7*
246:*11, 12*  286:*13*
330:*12*  361:*8*  371:*1*
**sexually**  215:*20*
216:*23*  222:*21*
330:*15, 24*  331:*2, 7*
347:*5*  348:*25*  351:*8*
359:*1, 9*
**sgold@discrimlaw.net**
2:*1*
**share**  10:*10, 19*
13:*15*  61:*17*  122:*6,*
*13*  189:*17*  234:*3, 4*
312:*14, 24*
**shared**  69:*13, 17*
308:*17*
**sharif**  264:*9*
**sharing**  121:*24*
**She'll**  38:*19, 22*
41:*23, 24*  53:*23*
55:*18*

**shield** 348:*17* 349:*4*
**shift** 222:*3*
**shifting** 221:*25*
**shiny** 273:*9*
**shit** 126:*18* 160:*5*
203:*14* 218:*21* 219:*2*
230:*2* 285:*16* 288:*3*
316:*21* 317:*9* 336:*2*
363:*7* 383:*17*
**shits** 226:*17*
**short** 262:*3* 370:*13*
**short-lived** 134:*18*
**shot** 85:*15* 218:*21*
219:*1, 8, 14* 236:*16*
262:*3* 386:*10* 390:*14*
**shots** 80:*2, 4, 6, 8, 21,*
*24* 81:*15, 19* 82:*1, 4,*
*10* 83:*3, 4, 7, 11, 14,*
*17, 19, 21* 84:*4, 5, 7,*
*13, 22* 85:*10, 12* 86:*3,*
*14, 18, 22* 87:8, *15*
88:*9, 12, 16, 23* 89:*1,*
*16* 90:*7, 13, 22, 25*
236:*21* 385:*25*
**show** 12:*2, 19* 13:*4*
39:*7* 92:*2* 104:*19*
268:*7, 10* 312:*25*
328:*4, 5* 364:*9*
378:*23*
**showed** 37:*22* 47:*6*
135:*9*
**shower** 155:*22, 24*
156:*1*
**showing** 141:*7*
297:*24* 328:*21*
**shown** 40:*1, 9* 295:*14*
**shut** 32:*8*
**sick** 95:*18, 25* 96:*24*
97:*9, 11* 269:*7*
270:*25* 337:*10*
**Sid** 5:*15* 91:*16*
124:*22* 236:*14*
239:*10* 390:*9*
**side** 10:*21* 340:*14*
341:*21*
**SIDNEY** 2:*1* 121:*2*
344:*21*
**sightsee** 233:*16*
**sign** 57:*7* 63:*2* 64:*4*
253:*10, 12, 19, 20*

254:*5, 12, 15, 22*
255:*4* 256:*2, 7, 9*
**Signal** 65:*24* 66:*1*
**signaled** 324:*13*
**signed** 253:*15* 254:*2,*
*6, 24* 255:*9, 12* 256:*3,*
*10* 257:*6, 11*
**signing** 253:*11, 23*
254:*14* 255:*9* 320:*1*
**silly** 214:*9*
**similar** 43:*22* 44:*5, 7,*
*8*
**simple** 18:*21* 20:*4*
23:*17* 359:*18*
**simply** 7:*13* 24:*16*
377:*15*
**singer** 285:*3*
**single** 33:*5* 105:*2*
215:*11*
**singled** 191:*18*
210:*24*
**singular** 111:*1*
**sinister** 301:*8*
**sister** 72:*20, 23* 73:*9*
78:*4* 79:*1, 25* 80:*12,*
*18* 81:*5, 15* 82:*1, 10*
83:*14, 18* 84:*22* 85:*9,*
*14* 86:*4, 13, 18, 23*
87:*9, 14* 88:*8, 12, 24*
89:*23* 90:*1, 12*
**sister's** 73:*5*
**sit** 211:*11* 213:*21*
214:*1, 2, 10*
**site** 381:*21, 22*
**sitting** 8:*4* 12:*3*
77:*25* 213:*20* 214:*21*
**situation** 23:*12*
206:*16* 360:*12*
**situations** 92:*7*
**six** 298:*4*
**skimming** 275:*16*
**skinny** 304:*6*
**skip** 223:*2*
**sky** 19:*15*
**slang** 202:*11*
**slap** 250:*17*
**sleep** 164:*22* 351:*3*
**sleeping** 346:*14*
347:*9* 350:*6* 363:*8*
367:*15*

**slept** 346:*17* 348:*4, 5*
349:*21* 350:*23*
363:*14* 370:*7*
**Slightly** 371:*16*
**slow** 92:*13*
**slur** 308:*19*
**slut** 348:*23*
**SMITH** 2:*1* 351:*25*
352:*3*
**smoke** 259:*9, 10, 18,*
*20*
**snap** 304:*9* 334:*16*
**Snapchat** 61:*20* 62:*4,*
*9, 12, 13, 19, 23* 63:*2,*
*4, 9, 14* 65:*20* 284:*14*
334:*18*
**sneaky** 221:*18*
**social** 186:*25* 187:*4,*
*10* 188:*2* 189:*6, 10,*
*12, 15* 190:*1* 214:*1*
233:*20* 276:*5*
**socializing** 123:*4*
**solely** 349:*7, 14*
**solicit** 341:*7*
**soliciting** 337:*23*
341:*19*
**somebody** 106:*10, 25*
108:*5* 125:*19* 131:*1*
162:*10* 201:*25*
242:*13* 262:*15* 279:*4*
285:*22, 25* 291:*9*
293:*20* 327:*14*
344:*18* 346:*2* 365:*24*
375:*4* 383:*2*
**somewhat** 132:*8*
198:*24* 241:*17*
**son** 263:*18* 266:*13,*
*14, 15* 275:*21*
**soon** 302:*24* 324:*17*
326:*13*
**Sorry** 7:*7* 39:*20*
65:*21* 91:*6* 102:*17*
110:*15* 119:*9* 122:*24*
124:*1, 13* 130:*17*
133:*10* 134:*4* 148:*11*
151:*18* 158:*19, 20*
159:*15* 165:*8* 175:*24,*
*25* 182:*15* 183:*10*
185:*1* 207:*5* 209:*8*
218:*10, 19* 232:*8, 23*

236:*14, 21* 237:*3*
239:*3, 6* 256:*23, 25*
316:*1, 2* 324:*12*
334:*17* 335:*24*
344:*20* 346:*13*
365:*25* 383:*9* 388:*18*
390:*9*
**sort** 41:*12* 170:*20*
290:*15* 326:*12*
**sorts** 127:*23* 156:*15*
160:*6* 222:*15* 337:*23*
**sound** 230:*5* 267:*21*
**sounded** 267:*22*
**sounds** 7:*3* 286:*4, 6*
**spa** 274:*17, 18*
**speak** 9:*11, 14* 46:*3*
54:*10, 17, 21, 24* 55:*3,*
*25* 56:*13, 16, 19, 22*
58:*22, 23* 62:*23*
64:*14, 18* 65:*8, 10, 13,*
*16* 78:*4, 11, 19, 25*
79:*13, 16* 104:*3*
126:*4* 174:*22* 186:*4*
187:*15* 233:*24*
286:*20* 301:*15* 345:*4*
355:*18, 19*
**speaking** 26:*16*
79:*20* 130:*3* 168:*20*
235:*4* 246:*14* 289:*20*
**speaks** 221:*12*
**Specialist** 2:*1* 4:*1, 13*
50:*15, 19* 91:*7, 11*
94:*2, 10, 18* 174:*9, 15*
175:*4, 8, 20, 22*
235:*22* 236:*2* 245:*5*
280:*23* 281:*2* 315:*24*
335:*9, 13* 361:*24*
362:*3* 381:*7* 390:*25*
391:*13*
**specific** 74:*13* 80:*7*
210:*14* 222:*23*
**specifically** 7:*17*
67:*2* 197:*25* 224:*13*
256:*11*
**specifics** 193:*20*
254:*25* 255:*2*
**speech** 23:*22, 24*
361:*7*
**spend** 33:*24* 224:*25*
**spending** 277:*22, 24*

Deposition of Patricia McNulty                                    Lisa Barbounis v. Middle Eastern Forum, et. al.

**spoke** 9:*8* 25:*21*
78:*13* 79:*2* 100:*12*
130:*6* 188:*1* 189:*5*
194:*20* 240:*17*
242:*15* 288:*10*
303:*19* 320:*13, 14*
380:*20*
**spoken** 32:*3* 58:*24*
100:*23* 196:2, *8, 9*
320:*9* 322:*2* 341:*21*
352:*4* 379:*17, 18*
380:*3*
**spot** 388:*22*
**spring** 171:*13* 343:*20*
**stab** 221:*10*
**stabbing** 221:*19*
**Stacey** 105:*16*
**Stacy** 110:*21*
**stage** 105:*3*
**stalk** 40:*11*
**stalked** 276:*5*
**stance** 289:*19*
**stands** 359:*22*
**Star** 213:*7, 8, 9*
**start** 5:*5* 52:*1*
172:*24* 199:*3* 243:*14*
280:*10, 12* 314:*21, 22*
330:*22*
**started** 103:*24*
115:*11, 14, 22, 24*
161:6, *8* 172:*16*
192:*21* 230:*9* 250:*16*
253:*15* 304:*22* 331:*6,
15* 332:*14* 343:2, *19,
21* 354:*20* 356:*15*
357:*13* 358:*16, 22*
**starting** 115:*14*
261:*8* 337:*19* 354:*6,
12*
**Starts** 196:*14* 218:*5,
13*
**state** 15:*6* 38:*17, 19,
22*
**stated** 216:*20* 280:*12*
**statement** 33:*16, 18*
41:*8, 9, 19* 42:*10*
85:*3* 123:*20* 178:*23*
281:*10*
**STATES** 1:*1* 4:*8*

161:*13* 188:*18*
**static** 93:*21*
**stating** 38:*25* 358:*7*
**station** 374:*12, 14, 15*
**stay** 102:*1, 16, 19*
132:*19* 151:*14*
156:*23* 164:*18, 20*
168:*2* 169:*4* 201:*21*
**stayed** 156:*24*
**staying** 325:*17*
**stenographic** 4:*17*
**stepped** 330:*16*
**stepping** 258:*9*
**steps** 70:*22* 71:*8*
**Stillwell** 57:*23*
**stomach** 337:*11*
**stone** 258:*9*
**stop** 33:*20* 46:*1*
76:*17* 95:*1* 163:*9*
171:*5* 172:*11* 173:*1,
7* 180:*14, 21, 22, 25*
181:*13* 201:*3, 8*
221:*3, 5, 18* 223:*11,
12* 224:*16, 17, 19, 20*
226:*4* 227:*16* 229:*25*
234:*19* 240:*7, 14*
253:*6* 254:*10, 20*
255:*6, 22* 258:*17*
260:*22* 261:*13* 263:*9,
21, 22* 264:*4* 265:*7*
273:*19, 20* 274:*13, 14*
275:*13* 276:*1, 2, 11,
15, 16* 278:*16, 25*
279:*20* 280:*17* 285:*9*
289:*1, 14* 290:*9, 20*
301:*20, 22, 24* 303:*17*
304:*15* 305:*11* 306:*9*
313:*13* 318:*17*
321:*11* 324:*5* 333:*24*
334:*10* 335:*2, 3*
336:*25* 339:*22, 24*
343:*6* 344:*7, 14*
345:*19* 350:*2, 3*
356:*9* 362:*8, 10, 11,
25* 363:*1, 21, 22*
366:*1* 367:*1, 12*
368:*1, 2* 369:*11*
371:*7* 373:*10* 378:*12*
379:*2* 383:*9, 10, 24*
384:*5, 23* 387:*4, 5*

388:*18* 389:*11* 390:*8,
13, 20*
**storage** 66:*13*
**store** 69:*2* 71:*10, 13*
**stored** 90:*8*
**stories** 214:*8* 291:*23*
292:*2*
**storm** 126:*18*
**story** 146:*19* 307:*3*
334:*16*
**straight** 123:*17* 137:*6*
**strained** 132:*8*
**strange** 87:*13*
**strategy** 349:*1*
**Street** 2:*1*
**streets** 385:*9* 386:*23*
**stressed** 271:*8*
**stuff** 112:*17* 192:*6, 9*
196:*15* 226:*15*
243:*25* 244:*5* 273:*8*
305:*22* 309:*9*
**stupid** 221:*15*
254:*13* 314:*16*
**style** 148:*18* 150:*6, 9*
210:*2*
**subject** 33:*6, 21*
54:*13* 56:*3* 88:*15*
172:*21* 222:*7* 239:*13,
18*
**subscribed** 48:*15*
**subscribers** 223:*17*
**subsequent** 316:*4*
**substance** 18:*19*
60:*15*
**substantial** 61:*10*
166:*9*
**successes** 271:*5*
**suck** 356:*14*
**sue** 143:*19*
**suffered** 99:*25*
**suggest** 125:*4* 341:*10*
**suggested** 102:*1*
125:*1* 204:*19* 341:*22*
**suggesting** 327:*23*
**Suite** 2:*1*
**sultry** 292:*6*
**Sun** 308:*18* 309:*3*
**Sunday** 227:*13*
**super** 211:*14* 262:*2*

268:*21* 355:*16*
**supervise** 133:*5*
**supervised** 133:*12*
**supervising** 133:*15*
170:*18*
**supervisor** 168:*11*
214:*4*
**supervisors** 379:*22*
380:*8*
**supervisory** 132:*25*
133:2, *6*
**supply** 35:*16*
**support** 42:*6* 300:*24*
**supposed** 22:*3, 8*
23:*23* 87:*2* 169:*18*
187:*6, 9, 11* 195:*9*
245:*18* 261:*23* 264:*7*
277:*11* 296:*25* 298:*4*
326:*4, 6* 337:*6*
364:*17* 366:*6*
**sure** 5:*6* 6:6, *20*
14:*20* 25:*12* 42:*25*
51:*17* 71:*17* 73:*2*
74:*14* 78:*7, 23* 81:*22*
92:*11* 93:*23* 96:*18*
111:*9* 114:*9* 120:*16*
126:*9* 127:*8* 128:*5*
136:*20* 153:*25* 162:*4*
175:*7, 23* 179:*12*
185:*20* 193:*23*
195:*19, 20* 196:*1*
207:*7* 208:*7* 219:*5,
16* 223:*2, 23* 224:*1,
13* 233:*2* 237:*16*
241:*11* 254:*4* 255:*12*
256:*6* 258:*7* 265:*20*
275:*9* 276:*9* 289:*21*
290:*17* 312:*18* 335:*7*
344:*2* 345:*1* 354:*17*
365:*17* 366:*8* 368:*23*
369:*2* 374:*24* 381:*19,
22* 383:*22* 384:*2, 14,
19* 386:*25* 388:*10*
**surname** 177:*6*
**surrounding** 70:*17*
**surveillance** 108:*23*
110:*12* 111:*24*
**survival** 126:*20*
**Survivor** 126:*22*

**swear** 4:*20* 285:*15*
**sweat** 262:2
**SWORN** 4:*23*
**systems** 66:*14*

**< T >**
**tab** 111:22
**table** 21:8
**tabs** 111:*15* 112:7
**take** 8:8, *13*, *18* 14:*1*
23:*11* 27:9 45:*18*, *25*
50:*10* 70:22 92:*23*
96:*21* 97:*1* 102:*20*
103:5 105:*19* 109:*11*
111:*4* 120:*17*, *22*, *24*
121:*19* 138:4, *24*
139:7, *20* 161:5
173:9 174:3, 4, 5
182:*10* 185:*12* 193:*1*,
*5* 197:22 210:*18*
219:8 225:6 229:5,
*17* 235:*17* 240:5
242:*17* 251:2, *15*
252:*13*, *22* 260:*12*, *14*
262:12 275:*23*
280:*19* 281:*14*
306:*15* 314:*19*
323:*18* 335:5 336:*1*
355:*10*, *12* 361:*21*
380:7 382:6
**taken** 1:*1* 50:*17*
70:*19* 91:9 92:6
125:*15* 141:*11*
174:13 175:*10* 192:7
235:*24* 280:25
315:*21* 335:*11*
346:*13* 362:*1* 392:*1*
**takes** 209:*24*
**tales** 169:*2*
**talk** 6:*14* 10:6 26:8,
*9* 32:*1*, *17* 34:*1*
35:*11*, *12* 40:*14*
56:*10* 61:*14* 65:*20*,
*21* 78:9 80:*22* 90:*6*
92:*12* 97:9, *22* 100:*9*
110:5 136:7 137:5
138:*25* 140:7 145:6,
*7* 146:*23*, *24* 148:7,
*14* 149:1 150:*21*
162:*16* 163:22

165:*15* 174:*11*
193:*17* 211:*13*
220:*16* 226:*15*, 16
227:*15* 231:*11* 241:2
245:7 256:4 258:*13*
264:6 267:*14* 279:*13*,
*16* 290:5 302:*15*
306:4, 5 307:*21*
322:*10* 345:7 354:*24*
355:2 363:*17* 367:3
384:*11*
**talked** 14:7 18:*17*
19:*23* 86:*20* 104:*24*
108:2, *18* 109:6, 7
112:*1* 140:*18* 146:*3*,
*25* 164:*10* 186:8
195:*25* 196:3, 5, 9
199:*1* 201:2 226:*14*
231:*10* 241:*10*
250:*15* 254:*14* 278:*3*
284:*17* 289:*25* 290:*1*
315:*17* 322:8, *12*
323:9 326:*24* 345:9
354:22 355:4 386:*12*
**talking** 11:*16* 50:*23*
51:*11* 52:7 83:*3*
85:*16* 97:6, 8 105:7
106:*14* 107:*21*
110:*21* 111:7 115:*11*,
*14*, *22* 116:*18*, *20*
117:*17* 126:*18*
127:22 136:*16* 138:7,
*20* 140:*15* 147:*24*
150:5 168:*20* 179:22
197:*16* 201:*3* 203:*25*
207:*16* 208:5, *16*
209:*12* 211:*17* 212:9
214:4 215:*12* 221:*21*
222:5 223:*24* 225:*3*
227:*25* 242:2 250:5,
*6* 252:*25* 254:*17*
261:*23* 263:*14*
265:*15* 268:*19*, *25*
272:*25* 274:*1*, *10*
279:6 284:9 288:22
289:*17* 292:2, *15*
293:8, *10*, *14* 295:*15*
296:*11*, *15*, *21*, *24*
297:*20* 305:6 306:*1*
315:7 327:*21*, *22*

329:8, *14* 331:*11*
337:*16* 338:2, *15*, *20*
339:*18* 340:*17* 344:*1*
347:5, 7, 8, *11*, *14*
348:*1* 354:8, *17*
367:8 373:*25* 381:*23*
383:2, *20* 384:*18*
388:9
**talks** 241:*1* 249:2
**target** 111:*24*
**tech** 93:*23*
**technical** 228:*19*
229:*1*
**technically** 373:6
**telegram** 367:*16*
**tell** 8:*21* 17:*3* 18:*11*
19:*1*, *15* 22:*18* 24:*13*,
*14* 53:22 63:*16* 71:8
74:8 87:*18*, *24* 88:*3*,
*8* 98:*19* 101:5, *8*
104:25 105:8 107:*12*
112:*12* 113:2 118:*20*
125:*18* 127:5, *9*
129:*12* 130:*15*, *18*
131:*1* 142:*17* 145:*19*
147:6, *8*, *12*, *13*, *16*, *18*
148:*4* 150:*19*, *22*
151:2 153:*23* 154:*21*
155:7, *19*, *25* 156:*4*
157:*23* 158:*1* 162:*20*
164:*11*, *13*, *19*, *24*
165:*13* 166:*18*
170:*23* 185:*3* 187:9
190:*25* 200:2 211:*11*
212:*19* 213:*25* 215:*1*
216:*21* 217:*3*, *8*
236:*10*, *11* 240:*19*
241:*13* 243:*1* 246:*1*,
*6*, *16* 271:*19* 277:*16*
278:*1* 281:*11* 282:*11*
294:5 295:*24* 296:*17*
313:*10* 316:*20* 317:*8*
320:8 369:7 370:*10*
379:*15*, *22* 381:*17*
382:*23* 387:*11*, *17*, *20*
**telling** 18:*4* 24:*8*
39:*11* 40:*24* 104:*11*
105:*18* 107:*11* 111:*3*
117:*12* 126:*19*
132:*17* 133:*17*, *20*

137:*11* 147:*21*
164:*24* 191:*1* 194:*18*
196:2*0*, *21* 200:*10*
265:*21* 267:*17*, *20*
271:9 274:6 309:6
313:*16* 317:*24* 320:*1*
321:*25* 326:9 331:*17*
349:*3* 357:*3* 374:5
385:*21*
**tells** 141:9 253:2
302:5
**ten** 50:*10* 166:*13*, *14*,
*15* 167:*16* 168:2
169:*4* 209:*24*, *25*
332:*12*
**tendency** 92:*12*
**tendered** 185:*25*
**tense** 308:6
**tension** 127:*17*
**tensions** 134:2, *7*, *15*,
*18*
**tenure** 118:*13*, *16*
183:*19*
**term** 106:7, *8*, *13*
283:9
**terminate** 109:*12*
**terminated** 108:2*0*
146:25 147:*18*
**terminating** 108:6
**termination** 333:*11*,
*20*
**terms** 97:*14* 115:8
123:4, *5* 195:6
314:*24* 315:7
**terrorism** 188:*17*
**terrorist** 188:*19*
**terrorists** 188:8
**Terry** 336:6 338:6, *8*
340:*3*, *11*
**test** 8:*12* 27:*18*
**TESTIFIED** 4:*24*
52:*17* 53:6, *12* 55:7
81:*10* 132:8 147:*4*
161:*19* 169:7 179:*10*
205:*11* 246:*19* 293:5
**testifying** 76:*18*
83:*13*
**testimony** 41:7 53:9
76:25 92:*15* 145:*10*
169:7 173:2 179:5,

Case 2:19-cv-05030-JDW   Document 110-3   Filed 03/02/21   Page 137 of 157

Deposition of Patricia McNulty                                    Lisa Barbounis v. Middle Eastern Forum, et. al.

*10*, *16* 180:*14* 204:*24*
215:*21* 392:*1*

**Text** 3:*1* 72:*5*, *8*, *9*,
*12*, *18*, *19* 73:*8*, *15*, *18*,
*21*, *24* 74:*3*, *9*, *22*, *25*
77:*8*, *9*, *18* 79:*23*
80:*1*, *15*, *19* 81:*12*, *14*,
*25* 82:*9* 85:*8*, *12*
86:*24* 87:*14* 92:*2*, *5*,
*24* 93:*6* 95:*5*, *13*
97:*25* 98:*3*, *14*, *17*
101:*3*, *24* 103:*15*, *16*
123:*23*, *25* 125:*2*
126:*2* 127:*6* 128:*21*
132:*15* 135:*8*, *10*
136:*2* 141:*8* 160:*1*, *2*
161:*13* 186:*20*
192:*12* 193:*24*
197:*12* 198:*9* 199:*20*
200:*22* 201:*8* 206:*12*,
*25* 207:*21* 208:*13*
222:*20*, *23* 223:*9*, *24*
235:*15* 236:*9*, *10*, *13*,
*22* 248:*13* 262:*16*
263:*15*, *24* 275:*19*
281:*8*, *21* 283:*5*
284:*6* 287:*5* 288:*14*,
*20* 289:*6* 297:*10*, *13*
329:*21* 335:*16*, *24*
377:*10*

**texted** 79:*4*, *6* 98:*13*
261:*23* 302:*13*

**texting** 262:*3*

**texts** 75:*1* 218:*14*, *15*
219:*4*, *9* 290:*24*

**Thank** 7:*6* 27:*7*
45:*17*, *24* 50:*11*
94:*19* 106:*16* 121:*8*,
*25* 174:*8* 236:*19*
245:*9* 297:*22* 317:*24*
373:*7* 390:*21* 391:*9*,
*11*

**Thankfully** 196:*22*

**thanks** 287:*24*

**theater** 213:*23*
214:*16*, *19*, *22* 215:*17*,
*20* 216:*6*, *12*, *23*

**theirs** 116:*15* 241:*7*

**Thelma** 223:*18*

**thereof** 250:*13*

**thigh** 215:*5*

**thing** 7:*24* 8:*15*
20:*15* 26:*24* 75:*19*
85:*17* 99:*12* 110:*1*
111:*3* 115:*20* 135:*2*
136:*6* 142:*1* 145:*1*
172:*11* 180:*17*
205:*20* 210:*14*, *18*
211:*23* 221:*8*, *20*
269:*1*, *13* 278:*19*
284:*10* 314:*16*
321:*12*, *14* 340:*25*

**things** 6:*8* 7:*21*
10:*11* 12:*18* 17:*3*
18:*11* 20:*18* 61:*9*
71:*20* 74:*22* 78:*10*,
*20* 79:*1*, *3*, *7* 80:*25*
85:*21* 104:*19* 108:*10*
110:*23* 117:*9*, *22*
118:*10* 129:*13*
133:*21* 137:*4*, *6*, *19*
138:*2*, *5*, *17* 140:*5*
145:*18* 147:*23* 164:*4*
167:*2* 168:*17* 178:*10*
184:*2* 188:*2* 192:*3*
193:*20* 194:*25*
196:*21* 209:*24*
210:*17*, *20*, *24* 211:*13*
212:*8* 214:*6*, *24*
215:*2*, *10* 216:*2*, *24*
224:*12* 264:*17* 286:*5*
290:*3* 307:*20* 314:*18*
319:*24* 325:*19*
326:*14* 331:*18*, *19*, *21*,
*22* 333:*21* 380:*21*
383:*19*

**think** 9:*20*, *22* 13:*11*,
*13*, *20* 20:*19* 27:*12*
29:*16* 38:*6*, *13* 41:*18*
43:*8* 50:*24* 51:*2*, *10*
55:*2* 56:*12* 57:*20*
60:*3*, *7* 65:*18* 66:*15*
67:*21* 68:*15* 69:*24*
75:*4* 84:*23* 85:*8*, *13*
87:*13* 88:*17* 90:*17*
91:*23* 95:*17* 96:*14*
98:*12* 99:*5* 100:*3*
103:*22*, *24* 105:*17*
106:*19* 109:*21*

110:*25* 119:*16*
121:*15* 122:*11* 123:*7*,
*14* 125:*7*, *10*, *13*
128:*20* 131:*13* 132:*8*
134:*21* 138:*8*, *12*
139:*4* 140:*17* 143:*10*
150:*4* 152:*1*, *10*
153:*1*, *12* 155:*23*
156:*13* 158:*23* 161:*8*,
*19* 173:*8* 174:*20*
181:*23* 182:*2* 189:*17*
191:*17*, *23* 192:*16*
193:*2*, *7* 195:*19*
196:*10* 197:*14* 198:*7*,
*16* 199:*5*, *12*, *25*
200:*12*, *17*, *24* 203:*3*,
*4*, *24* 204:*13* 206:*5*
208:*11* 209:*1* 210:*15*
213:*8* 217:*18* 218:*8*,
*23* 221:*17* 222:*3*, *4*
224:*7* 234:*6*, *7*
235:*12* 236:*25* 239:*7*
245:*17* 249:*4* 250:*22*
252:*20* 254:*4* 257:*25*
258:*4*, *5* 259:*3*
262:*14* 263:*2*, *5*
265:*4* 267:*11* 268:*2*,
*14*, *20* 269:*12*, *14*
273:*8* 274:*11*, *19*
275:*24* 277:*11*
278:*11*, *19* 279:*16*
284:*10* 285:*23* 286:*2*,
*11* 290:*14* 294:*1*
299:*9*, *10* 301:*17*
305:*20* 309:*6* 312:*10*
314:*1*, *2*, *25* 316:*15*
317:*23* 318:*4* 319:*17*
324:*15* 326:*9* 328:*11*
334:*13* 342:*23*
346:*23* 347:*1* 355:*11*,
*18* 356:*4* 357:*10*
360:*10*, *12*, *16*, *22*, *25*
361:*14* 368:*16*
369:*20* 370:*21* 372:*8*,
*14* 384:*16* 386:*6*
387:*8*, *16* 389:*14*
390:*17* 391:*1*, *5*

**thinking** 152:*11*, *17*
188:*11* 198:*3*, *5*
202:*21* 221:*15* 277:*1*

280:*7* 322:*24* 332:*14*,
*15*

**thinks** 221:*18*
320:*15* 341:*13* 376:*9*

**third** 167:*23* 168:*10*,
*12*, *14*, *15*

**Thirty** 152:*24* 314:*12*

**Thomas** 69:*19*, *22*
156:*5*, *8*, *12* 157:*11*
230:*16*, *21* 262:*5*
263:*14* 267:*18*
277:*14*, *23* 279:*6*, *8*
282:*8*, *12*, *16* 285:*11*,
*21* 289:*20* 291:*17*, *22*,
*24* 292:*4*, *8*, *17*, *21*
293:*19*, *21* 294:*24*
295:*7* 299:*16*, *19*
309:*2*, *13*, *16* 367:*8*

**Thomas's** 263:*3*
362:*22*

**thought** 80:*17* 81:*1*
97:*16* 104:*12* 107:*10*
108:*10* 111:*14*
117:*11* 136:*12* 138:*9*
151:*7*, *10*, *13* 153:*14*
158:*20* 163:*8* 166:*8*
194:*9* 203:*5*, *7* 204:*5*,
*14* 212:*14* 214:*10*
215:*2*, *4* 216:*22*, *25*
226:*22* 269:*14* 300:*8*
315:*20* 319:*13*
320:*25* 350:*22*
357:*25* 383:*18*

**thoughts** 104:*7*
122:*7*, *13*

**thousand** 268:*7*, *10*,
*14* 337:*14*, *17* 338:*12*,
*19* 339:*10* 340:*15*
341:*9*

**thread** 287:*5*

**threat** 118:*9*

**threaten** 249:*19*

**threatened** 249:*24*
333:*11*, *20*

**threatening** 285:*18*
286:*7*, *12* 295:*10*, *11*
302:*19* 328:*19*

**threats** 188:*4*

**three** 5:*24* 9:*20*, *22*,
*23* 38:*13* 42:*16*, *21*

43:*11, 19*  44:*16, 23*
45:*3, 6*  46:22  47:*7,*
*16*  48:6  109:*5, 8*
142:6  146:*18*  152:24
232:6  234:*3, 4*
251:*18*  353:*19, 20*
381:*12*
**three-year-old**  27:*10*
94:*16*
**throw**  32:*12*  136:9
225:*1*
**throwing**  136:*11, 16*
**throws**  268:6
**Thursday**  234:*11*
388:*23*
**ticket**  225:2*1*  226:7
240:*18, 25*  241:*3, 9,*
*14, 16, 20*  242:6, *11*
243:2, *18, 19, 21*
244:22  245:*13, 19, 20*
247:22
**tickets**  156:*25*  157:*1*
158:*10*  229:*19*
246:*23*
**tiff**  227:*24*
**Tiffany**  141:*15, 17,*
*18*  142:*3, 6*  143:6
144:*12, 17*  145:2
147:*14*  167:9, *13, 22*
168:*13*  212:*16*
**till**  279:*3*
**time**  4:*3*  7:*11*  8:*19*
14:*1*  26:24  33:25
34:*14*  35:5, *11, 13*
44:*11*  48:*18*  49:*19,*
*23*  50:*19*  52:7  54:*16*
57:*15, 20*  61:24  62:8,
*16*  64:*17*  67:*11*
68:*20, 23, 24*  74:*17,*
*19*  75:24  76:*1*  77:7
91:*11*  96:6  100:*12*
104:*10*  105:*10, 11, 24*
106:5  107:*3, 10*
112:5  113:*1, 17*
122:2, *12*  123:*15*
126:*12*  128:*15, 23*
129:*21*  130:*11*  131:8,
*10*  133:2*5*  134:2, *10*
136:*12*  137:*11*  141:*3*
144:*11*  157:*14, 15, 20*

160:*13*  161:6  164:*5,*
*22*  166:*8, 9*  167:*4*
174:*15*  176:*14*
179:*16, 22*  185:*13*
188:9  192:*17*  193:22
196:*17*  197:*20*  198:*3*
200:*13*  204:*16*
206:*11, 21, 24*  210:*18,*
*19*  211:*4, 10*  212:*10*
213:*1*  215:*11*  219:9
222:*20*  227:*7, 14*
228:*13, 15, 20*  230:23
232:*3, 14, 24*  238:*10*
248:*14, 16*  266:*16, 17*
268:*21*  275:*11, 22*
277:*9, 12, 21, 22, 25*
278:*20*  281:2  285:2*3*
286:*21*  293:7  297:8
298:*4, 6*  299:*5, 18, 20*
303:24  307:6  309:*14*
311:9  319:*15, 18*
321:*1*  322:*7, 19*
325:*3*  327:6, *24*
328:*4*  329:*10, 19*
331:*3, 10*  333:*12, 15*
335:*10*  342:24, *25*
343:*21*  344:*17*  346:*5*
359:*15*  361:*16*
368:2*1, 25*  372:*16*
373:*17*  376:*3*  379:24
380:*1, 16, 20, 22*
388:*25*  390:*18*
**times**  5:22, *24*  8:*3*
9:*21*  42:6  78:*14, 16*
94:*6*  97:*15, 24*  98:*3*
105:9  112:*14*  129:*12,*
*25*  185:*15, 20*  190:*18*
209:*24, 25*  211:22
233:6  258:25  268:*14*
278:2  331:*18*
**tired**  220:*19*  269:7
270:2*5*  359:*13*
**title**  183:*5, 8, 9, 10*
184:*4, 24*  195:*17, 20,*
*22*  258:6
**tmcnulty82@gmail.co**
**m**  63:22
**today**  4:*14, 16*  6:*14*
7:*13, 19, 23, 25*  8:*11,*
*20, 25*  9:*21*  10:*11*

22:25  29:*14*  31:*11*
32:*17*  34:*3*  51:22
77:25  90:*13*  91:*16*
97:*18*  101:6  168:2*3*
177:*12, 16*  230:*13*
234:2*3*  264:*17*
268:25  289:25
356:*12*  358:*18*  371:9
373:*12*
**Today's**  4:2  9:6
11:*14*
**toes**  337:*5*
**told**  20:*24*  24:*15, 16*
41:*10*  51:*17*  80:*18*
84:2  90:2  99:25
100:*4, 5*  104:*21, 23,*
*25*  108:*4, 5, 14, 16*
109:*10*  110:*24*  111:*3,*
*16*  113:*17, 24*  115:*18,*
*19, 20*  117:*9, 14*
118:8, *10, 12, 25*
119:*13*  123:*14*
126:*17*  127:*7, 11*
128:*12*  130:*20*  136:*5,*
*8*  140:*5, 7, 8, 9, 14*
141:*3, 8, 14, 17, 25*
145:*2, 5, 18, 21*  146:*1,*
*11, 19, 23*  147:*4, 10,*
*13*  148:*6, 13, 25*
155:*10, 12*  156:2
158:*25*  160:*5*  163:*11*
164:*2, 3*  167:*25*
169:*15*  170:*10, 11*
178:*12, 13, 24, 25*
179:*14*  181:*21*  184:*1,*
*18*  185:*5*  187:*3, 5, 15*
194:*21*  201:*20*
212:*17*  214:24  215:*3,*
*4*  216:24  217:*4, 10,*
*11, 19*  220:8, *19*
231:*20*  233:9  234:2
237:*21, 23*  238:*1*
250:*16, 18*  254:8
273:*23*  292:*20*
293:*17*  302:5, *21*
307:2*1*  319:24, *25*
321:5, *17, 23*  323:*4,*
*11, 14, 16*  324:*11*
325:2*1*  326:*4, 14, 15,*
*21*  328:2, *3*  330:8

346:2*0*  369:9  370:*17*
380:7  387:*13*
**Tommo**  154:*10, 22*
287:6  300:*4*
**Tommy**  154:9  157:7
230:*15, 22*  231:*4, 9*
267:*13*  268:*3*  272:25
273:8  291:*18, 20, 25*
308:*18*  309:*2, 15*
317:*4, 12*  336:24
373:*12, 13, 16*
**Tommy's**  276:22
316:2*1*  317:*10*
**tomorrow**  164:2*3*
165:*15*  207:*18*
226:*15*  255:*10*  266:9
277:*4*  318:*13*  337:9
343:*10*  373:6
**ton**  307:*18*  308:2
**tonight**  226:*17*
255:*25*  304:*19*
**tons**  356:2*1*
**top**  148:*15*  160:*5*
198:9  314:*20*  334:*4,*
*11*  363:2*1*
**Total**  192:5  358:9, *13*
**totally**  161:*14*  385:*10*
**touch**  210:22
**touched**  215:*4*
**touching**  211:*5*
**touchings**  211:*7*
**toxic**  330:2*0*
**train**  183:2*3*
**trained**  328:*12, 14*
**training**  183:2*5*
184:*14*  303:8, *13*
**transcribe**  92:*15*
**transcribed**  8:2
**transcript**  7:*24*  392:*1*
**transcripts**  9:24
**transfer**  67:2
**transition**  199:*4*
**transmitting**  85:*14*
90:*12*
**trap**  27:*19*
**travel**  193:*4*
**traveling**  170:*15*
188:6  189:*18*  273:*16*
**treat**  287:*1*  290:*4*

Deposition of Patricia McNulty

Lisa Barbounis v. Middle Eastern Forum, et. al.

treated  185:8, *10*, *16*
treats  283:*24*
Trek  213:7
trial  7:*15*  359:*3*
Tricia  236:*17*  245:*1*
352:22
Tricia's  244:22
245:*19*, *20*
trick  12:*17*  13:*4*
83:*25*
tried  20:9, *13*, *15*, *16*
178:8  202:*20*  289:*3*,
*23*  300:*11*  366:*3*
trip  186:22  187:*17*,
*22*, *24*  201:24  202:2,
*22*  203:*17*  225:4, *6*
228:5  230:*3*, *10*, *14*
233:*10*, *15*  234:8
237:7, *9*, *15*, *22*, *24*
238:*11*, *13*  241:*17*
246:*21*  247:5, *12*
335:25
TRISHAEEEE@hotm
ail.com  44:*4*
trouble  239:*4*  300:*13*
true  11:*4*, *5*  41:5, *15*
117:*13*  134:*1*  136:*15*
142:*10*, *13*, *14*  143:*14*
149:8  271:*15*  301:*4*
319:*16*  343:*18*
Trump  278:8
trust  38:6  103:*18*, *23*
104:*1*, *4*, *9*, *11*  115:*17*
117:*12*  135:4  136:5
137:*10*, *13*  196:*19*
307:*20*
truth  8:*21*  322:*1*
truthful  97:*16*  116:*3*
try  6:*14*, *17*  13:*15*
21:*18*  23:*11*  26:*17*
37:*17*  40:*1*, *12*  70:22
259:5  281:*14*  300:*12*
305:24  307:25
trying  13:*1*, *3*  20:*11*
21:8  23:*14*  27:*19*
29:9, *13*  33:24  48:*3*
74:*11*  83:25  84:7, *9*,
*10*  85:*17*  92:*13*
107:*12*  112:*3*  120:*23*
126:*24*  130:*23*  211:8

258:*13*  262:7, *11*, *13*
279:*13*, *16*  281:7
294:*12*  300:*20*, *21*
310:23  319:*21*
327:25  351:*14*
359:*17*  388:7
Tuesday  252:22
388:23
tumultuous  115:*10*
tunnel  170:*21*
turn  5:*18*  29:5
31:*10*  132:9  203:6
204:*16*  375:*3*
turned  102:25
tweet  57:2
tweeted  57:*12*, *15*, *20*,
*22*, *25*
tweeting  304:*19*
twenty  166:*13*
twerp  279:5, *10*
Twice  5:24  45:*13*
82:*20*  193:*3*  347:6
359:*2*, *9*
Twin  311:*23*  312:5,
*15*
Twitter  56:25  57:*1*,
*7*, *9*  58:*4*  379:4, *7*
two  8:*13*  9:*20*  18:*13*
28:*16*  85:20  104:*15*
113:2  115:22  142:6
152:*10*  184:*1*  201:6
208:24  213:*14*
215:22  226:*17*  230:5,
*9*  233:*17*  265:*11*
283:*1*  288:4  290:*1*
294:*1*  296:4  300:*23*
301:5  307:*19*  321:9
two-minute  280:*21*
335:6
type  24:*18*  201:*11*
345:9
typed  371:*21*
types  339:*17*, *18*
typical  95:5, *12*
typo  218:*23*, *24*
389:*14*

< U >
Uber  325:6  385:*4*, *18*
Ugh  191:6  367:5

Uh-huh  16:6  32:6
44:*10*  136:*3*  159:*17*
160:*3*  225:*23*  363:5
UK  154:*10*  156:*14*
157:5, *11*  158:6, *9*
187:*20*  225:4, *20*
230:*14*  231:23
233:*10*  237:7, *9*, *15*
239:*24*  244:23  247:5
257:*17*  278:4  373:*16*
ultimately  88:*25*
194:*10*  326:6  327:4
332:*19*
Unbelievable  259:*25*
385:*16*
uncomfortable  78:*21*
119:*1*  167:5, *6*, *14*
178:*9*, *15*  213:*19*
283:*4*  332:5
underlying  327:22
understand  5:*21*  8:8
10:*17*  11:*11*, *19*
12:*18*, *25*  14:*21*
15:*24*  19:*4*  30:*10*
36:*20*  47:*15*, *23*
48:*12*  52:2  78:7
83:5  92:*14*  94:5
102:*3*  107:2  117:2
127:8  128:6  158:8
160:*25*  176:9  184:*4*
202:9  222:*18*  244:*17*
268:*16*  270:*16*
291:*17*  311:*1*  319:6
324:*10*  329:*12*  339:7
357:*3*  359:*13*  379:6
understanding
103:*19*  143:25  231:*1*
299:*15*  307:8  364:*16*
understands  196:*23*
Understood  94:*18*
110:8  127:9  256:*3*
357:6
unhappy  78:*21*
185:6, *16*  211:9
UNICOMP77@hotmai
l.com  43:*19*
UNITED  1:*1*  4:8
188:*18*
universe  33:*15*

unlimited  23:7  32:*21*
unrelated  156:5
unsuccessful  70:*25*
270:8
untrue  41:2
updated  324:2
upset  127:*14*  130:*21*
132:*19*  189:*15*  203:8
265:22  268:*20*, *22*
282:*13*  307:5  319:*23*
322:24  329:*18*
use  27:*15*, *16*  40:*1*,
*10*  44:6, *9*  47:6
48:*10*  49:6, *12*, *17*, *18*
51:*15*, *23*  52:*17*
53:*19*  55:7, *11*, *17*
56:25  57:*3*  58:22
61:22  62:23  63:*12*,
*21*  64:*1*, *8*  65:24
66:*13*, *16*, *21*, *24*  67:8,
*9*, *10*  68:5, *16*  78:*24*,
*25*  79:20  117:*13*
224:*11*  235:*10*  306:5
338:24  374:9, *12*
username  51:*23*
53:*19*, *22*  54:2  55:*16*
57:9  63:*4*
usually  193:*1*  266:*18*

< V >
vacation  192:*17*, *20*
271:*3*
Vaguely  308:*20*
vape  259:8
various  123:*23*
Vasili  202:*19*  206:*13*
240:*21*, *24*  241:5, *7*,
*12*, *25*  242:5, *18*
243:*17*  247:*16*
Vasili's  276:6
vent  137:*3*
venting  280:*14*  305:2
ventriloquist  179:*20*
verbal  7:*19*
verbally  8:7
verbatim  28:*15*
verification  20:8, *25*
21:*11*, *14*, *17*, *22*, *23*

Deposition of Patricia McNulty

Lisa Barbounis v. Middle Eastern Forum, et. al.

**verified** 20:*3*
**verify** 18:*1* 20:*5*
**Verizon** 71:*10, 13*
**version** 253:*14*
255:*12*
**versus** 4:*7* 131:*19*
210:*2*
**video** 1:*1* 2:*1* 4:*1, 5,
13* 7:*21* 50:*15, 19*
91:*7, 11* 94:*2, 10, 18*
174:*9, 15* 175:*4, 8, 20,
22* 235:*22* 236:*2*
245:*5* 267:*15* 280:*23*
281:*2* 289:*4, 5, 7, 16,
23* 309:*15* 315:*24*
334:*24* 335:*9, 13*
361:*24* 362:*3* 381:*7*
390:*25* 391:*13*
**viewpoint** 269:*16*
**violation** 22:*11*
**visit** 157:*11* 158:*9*
215:*19* 216:*22* 217:*2*
**visiting** 261:*17*
**voice** 213:*12* 382:*10*
**volition** 114:*2*
**volume** 315:*24*
**vote** 125:*15, 22*
315:*21, 22*
**voted** 125:*25*
**voting** 127:*4*
**vs** 1:*1*

**< W >**
**wait** 61:*2* 164:*23*
165:*1* 279:*3* 321:*1*
325:*4*
**waited** 148:*1, 4*
**waiting** 7:*10* 122:*2*
229:*10* 234:*12*
302:*22*
**waive** 32:*22*
**waiving** 89:*5*
**walk** 8:*13* 337:*14*
338:*12*
**walking** 126:*24*
178:*21*
**wall** 127:*12*
**Walton** 311:*23*
312:*5, 16*
**wanna** 249:*3, 6*

**want** 5:*5* 8:*14*
10:*10* 13:*25* 14:*6, 16*
15:*11, 17* 17:*23*
18:*15* 21:*24* 23:*5, 11*
26:*1, 7, 8, 9* 27:*25*
29:*5, 7* 30:*15* 31:*10,
12* 32:*7* 33:*10, 11, 12,
19, 23* 39:*12, 18, 21*
40:*16* 41:*17, 24*
50:*10* 66:*19* 67:*25*
86:*1* 92:*10* 106:*11*
107:*3* 112:*20* 124:*4*
125:*3, 4, 21* 162:*21*
163:*18, 22* 164:*20*
171:*10* 175:*22*
178:*19* 179:*12*
181:*15* 200:*21*
206:*19* 208:*10*
209:*16* 213:*21* 214:*8*
223:*9* 227:*9, 12, 18*
228:*14, 18, 25* 231:*25*
242:*3* 249:*17* 254:*22*
256:*9* 258:*8* 263:*7*
268:*5, 12* 269:*13*
271:*19, 25* 272:*1, 11*
273:*17* 285:*15* 294:*8*
300:*15* 305:*4* 306:*15,
16* 310:*13, 17* 312:*19*
314:*20* 326:*17* 333:*4,
15* 334:*5* 336:*9*
339:*1, 8, 15* 344:*17*
347:*18* 349:*2* 371:*10*
381:*7* 382:*22* 383:*12*
384:*10* 385:*6, 13*
386:*21*
**wanted** 51:*11*
104:*18* 108:*11*
116:*17* 125:*19* 131:*7*
141:*12* 149:*9* 161:*25*
162:*9* 163:*9* 165:*11,
16* 166:*5, 7* 167:*15*
169:*3* 181:*22* 189:*17*
199:*2* 200:*14, 15*
207:*17* 211:*15* 219:*3,
13* 223:*19* 231:*24*
232:*5* 233:*12* 241:*5,
15* 247:*15* 250:*7, 22*
258:*8* 320:*19* 332:*12*
339:*9* 351:*6* 354:*17*
**wanting** 190:*1*

**wants** 7:*12* 60:*11*
196:*22* 209:*6, 24*
**warn** 298:*6*
**warned** 141:*15, 24*
145:*12* 333:*10*
**warning** 107:*4* 113:*5*
**Wars** 213:*8, 9*
**Washington** 372:*17,
18*
**waste** 33:*25* 34:*14*
311:*9* 344:*17*
**wasting** 359:*14*
**watch** 105:*8* 108:*9*
139:*20* 159:*1*
**way** 6:*22* 8:*7* 16:*3,
17* 22:*2, 17, 25* 30:*6*
34:*12* 39:*5* 41:*13*
46:*5* 61:*10* 77:*25*
81:*9* 83:*2* 84:*21*
85:*6* 96:*24, 25* 97:*7*
105:*3* 114:*5* 115:*23*
124:*16* 148:*14*
160:*16* 185:*7* 209:*22*
210:*21, 22* 211:*18*
212:*1* 221:*12* 227:*7*
246:*8* 257:*17* 258:*8,
11* 266:*3, 17* 281:*12*
323:*8* 324:*3, 14*
325:*18* 328:*22* 332:*3*
336:*14* 350:*5* 355:*2*
357:*11* 380:*13*
385:*17*
**ways** 167:*7* 251:*8*
361:*3*
**weak** 269:*2*
**wear** 249:*8*
**Weber** 28:*5, 6, 13, 19,
20* 29:*17* 37:*8, 15*
**week** 62:*17* 97:*25*
98:*6, 8, 13* 100:*23, 25*
101:*3* 161:*8* 162:*19*
176:*10* 201:*13*
207:*13* 225:*10* 251:*7*
252:*1*
**weekend** 225:*7*
230:*3, 9, 17* 231:*23*
248:*22* 250:*16, 20*
261:*5* 391:*12*
**weekends** 98:*10*

**weeks** 14:*10* 61:*16*
62:*2* 100:*15* 260:*3*
**Weinstein** 79:*9*
114:*25* 115:*1, 2*
**weird** 260:*1*
**welcome** 8:*12, 18*
45:*24* 47:*10* 48:*5, 8*
341:*12*
**well** 5:*16* 13:*6, 11*
15:*8* 30:*22* 32:*7*
39:*20* 40:*17* 52:*10*
67:*24* 71:*25* 77:*24*
84:*17, 20* 85:*5, 18*
88:*18* 96:*25* 97:*3, 11*
98:*22* 102:*23* 104:*6*
106:*6, 21* 109:*12, 14*
111:*13, 17* 112:*9, 25*
114:*20* 115:*3, 13*
116:*12* 119:*24*
120:*10* 121:*7* 122:*17*
123:*14* 126:*7* 128:*19*
130:*6* 132:*4* 133:*19*
136:*15, 24* 137:*9, 24*
138:*7, 14, 23* 139:*22*
141:*4* 145:*23* 147:*23*
152:*12, 16, 22* 154:*8*
155:*21* 161:*23* 163:*6*
165:*18* 170:*5* 171:*20,
24* 173:*13* 174:*19*
178:*7* 187:*5* 188:*8,
16* 191:*10* 196:*25*
197:*14* 198:*8* 200:*3,
14, 24* 205:*5* 208:*15*
210:*1* 213:*21, 25*
214:*11* 215:*15*
216:*11* 217:*1* 221:*10*
229:*3* 233:*13* 234:*1,
8* 235:*4, 6* 237:*18*
238:*17* 239:*6* 241:*24*
245:*2* 265:*2* 267:*8*
269:*6* 270:*1* 272:*10,
13* 275:*10* 278:*1*
283:*8* 286:*4, 10*
293:*16* 294:*16* 308:*5*
313:*8, 21* 315:*20*
316:*13* 317:*2, 8*
320:*11* 323:*9* 325:*16,
25* 327:*3* 328:*19*
329:*11* 336:*22*
339:*16* 340:*10* 349:*2*

Deposition of Patricia McNulty                                    Lisa Barbounis v. Middle Eastern Forum, et. al.

353:7  357:4, 12, 23
358:15  361:6  369:19
379:15  381:20, 24
383:4  384:15  386:7
**well-versed**  259:17
**went**  14:4, 5, 15
70:18  71:10  74:5
112:14  119:11, 23
128:7  136:6, 17, 18
156:19  157:8  172:8
185:15  187:7, 17, 19,
20  195:17  203:9
220:1  229:4, 21
241:11, 12  242:1, 10
248:21  302:2  344:12
356:18, 22, 23  377:8
384:8
**we're**  7:14  8:4, 5
13:8, 11  14:13  22:24
31:15  32:1, 17  33:12
34:1, 2  36:24  38:23
39:6, 11  40:24  51:22
83:3  97:20  122:2
126:24  132:6  135:12,
18, 19  139:6  150:5
168:16  172:22  174:3,
4  176:21  190:8
202:17  206:21
207:16  211:17  223:2,
8  229:14, 24  236:6
244:6  248:6, 7, 9
250:5  253:7  257:4
280:19  281:6, 20, 24
290:20  297:1, 2
298:8  301:11, 16, 17
306:8  307:13  311:13
315:16  316:17  332:4,
5  335:16  338:2
341:19  342:21, 23
343:15  344:5  345:20
347:13  350:2  361:14,
15  362:5  364:24, 25
365:7, 20  366:15
373:25  378:9  381:8,
10, 11  383:8  390:17
391:1, 5
**Westeros**  389:13
**Westrop**  389:17

**We've**  20:9  42:5
140:18  158:23  233:3
255:1
**WhatsApp**  64:1, 5, 14,
18, 22  65:7, 10, 13, 16,
21  69:14, 18, 22
**white**  265:5
**wifed**  334:18
**WILLIAM**  2:1
**willing**  225:19  226:1
233:10
**win**  339:17
**window**  303:7
**Winfield**  57:25
**wink**  41:11
**winter**  119:2
**wire**  121:20
**wise**  45:21
**wish**  260:1
**withdraw**  50:9
216:7, 9  299:3  300:9
**withdrawing**  143:22
**withdrew**  142:5, 11
143:11  144:8
**WITNESS**  3:1  4:20
12:15  13:2  18:9
26:2  29:18  34:3
36:2, 11  38:25  41:21
42:18, 25  43:7  48:9
53:17  55:14  59:20
61:7  72:16  73:13
75:10  77:15  82:6
87:11, 17  88:19
89:22  91:19  93:9
94:1, 21  95:17, 24
98:23  110:5  114:4
116:7  120:22  121:1,
8, 11, 21  124:6, 9, 12
133:11  135:15
136:20  139:11, 14
144:24  145:12, 23
146:1  148:9, 21
153:1, 18, 21  159:17,
23  165:8  167:1
169:15  170:7, 9
174:12, 18  175:25
189:1  192:16  205:2
206:9  209:12  212:6
217:25  237:3  240:3
243:6  245:23  247:11

257:12  270:3  283:14
287:19, 21  295:24
301:17, 25  310:16
312:21  321:13  335:5
340:17  341:12, 14
342:15  349:15
352:18  354:7  355:4
360:25  365:24  368:9,
16  371:4  376:16
377:19  379:18
390:17, 23  391:3
**witness's**  13:10  34:14
**Woah**  270:4
**woes**  169:1, 2
**woke**  171:9
**Wolson**  23:2
**woman**  385:17
**women**  235:7  284:22
**won**  33:1
**wonder**  276:25
**wondering**  23:23
27:20
**word**  122:25  202:8
218:24  235:10  261:2
338:24  339:4
**words**  8:8  66:19
86:1  173:2  180:21
258:11
**work**  22:3, 8  23:23
28:13, 18, 19  29:16
38:16  78:5, 6, 9
79:24  86:21  98:15,
17, 20  102:1, 9, 24
113:1, 7  114:13, 19
115:3  123:5, 6, 9, 11,
13  133:5, 12, 16
137:4, 5  138:18
155:15  160:13
161:15, 16, 24  162:16,
17  163:10, 22  164:8
165:12, 16, 19  166:5,
7  167:15  169:10
176:10  183:20, 21
185:6  186:6  189:19,
21, 22  190:17, 22
191:4, 7  192:13, 19
193:21  197:16, 21
201:11  203:2, 6
209:7  210:25  211:7,
16  213:6  214:5

221:9  222:19  223:21,
22, 24  224:3  233:4, 5
235:3  241:17, 22
242:20, 22  252:12, 20
268:5, 12, 15, 22
271:8, 10  275:3, 7
280:4, 13  300:4
307:22, 23, 25  314:6
319:24  320:3  321:5
339:16  347:9  356:11
358:17, 25  361:3
373:25  374:1
**worked**  49:23  152:9
153:6  154:22, 24
162:5  178:5  191:15
273:7  291:20  300:2
389:20
**working**  21:18  68:6
78:10  98:2, 24, 25
99:8  103:20, 24
112:19  114:11, 14, 16
121:7  140:11  141:18
145:20  146:18  151:1,
6, 19  152:6  153:24
154:2  155:5  158:4
159:3  160:14  161:4
162:18  164:20  169:3
176:3  178:19  186:12,
13  190:16, 19  191:4,
9, 13  192:22, 23
200:11  202:18
203:22  206:2  213:15
228:8  242:7, 8, 19
268:21  271:2  300:1
307:11  309:9  313:20
326:2  372:15, 16, 22
375:16  379:24, 25
**workload**  191:13, 18,
20  209:2, 4, 5, 18, 23
222:19
**workloads**  209:25
**workplace**  117:8
140:1  330:20
**works**  13:16, 21
32:11  137:1  323:6
**workshop**  343:10
**world**  170:15  172:4
273:16
**worried**  88:4

Deposition of Patricia McNulty                                  Lisa Barbounis v. Middle Eastern Forum, et. al.

worry 192:6 201:12 325:20 381:11
worse 251:9 275:17
worst 261:21 284:25 332:8, 11
Wow 287:24
wrapped 248:8
wrist 250:18
write 108:10, 11 192:5 196:19 197:14 201:23 203:12, 14 223:14 227:9 229:6 257:24 271:7 319:9 336:2
writes 191:3 201:23 204:4 229:9 255:8 257:22 259:24 261:20 264:2 280:7 285:8 286:25 288:4 289:24 304:1 305:3 356:11 363:6 373:12, 23
writing 32:19 170:15 172:4 197:10, 19, 24
written 28:1 37:11 38:7 113:5 141:12, 13
wrong 51:14 104:19 108:11 115:2 127:3 218:10 268:3, 12 285:24 325:22 331:19
wrote 108:23 256:14 257:1 336:20 371:18
Wyoming 333:3

< Y >
Ya 228:12
Yeah 5:3 6:25 7:5 12:16 14:12 16:16 20:6 25:12 29:12 30:5 39:17, 25 45:5, 17, 24 53:3 54:5 57:14 67:21, 23 68:2 70:9 76:10 80:21 84:12 90:17 91:4 93:7, 9 110:7 120:16 121:16 122:10 128:20 131:19

132:19 134:17 135:17, 18, 22 136:22 137:15, 25 138:3, 5, 22, 23 141:23 142:18 146:8, 16 147:15 149:25 150:3 158:12, 19 162:17, 23 163:20 166:20 169:13 172:10, 15 174:4, 20, 24 175:6, 7, 21 178:9 179:23 189:20 191:16, 21 194:2 198:18 199:12 201:21 207:3, 11 209:15 214:19 215:22 217:21 220:18 224:24 226:24 227:3, 5 228:23 229:7, 18 231:24 232:20 235:16 237:1 238:20 239:25 241:19 247:8, 10 248:3 253:1 254:12 258:15 259:10 260:14 263:11 264:25 265:2, 4 268:9 269:21 270:11 271:22, 23 272:3 275:11, 12 282:21 283:12, 13, 15 287:7 288:12, 22 291:3, 4 292:25 295:24 299:7 301:14 302:2 303:15 306:14 308:8 316:2 321:22 325:7 331:14 333:25 335:7 341:6 342:24 347:14 350:13 351:7 352:16 353:7 354:11 360:19 365:6, 17 374:16 380:25 382:7 386:18 389:6, 16, 18 391:1
year 54:19 57:17 141:16 193:3, 19 200:7, 8 246:10 296:24 307:17 337:15, 18 338:13, 16 339:8, 12

years 42:16, 21 43:10, 12, 19 44:14, 17, 23 45:1, 3, 6 46:14, 20, 22 47:7, 13, 17, 23 48:6 62:10 64:19 67:13 92:4 142:6 152:1, 10, 24 153:4 165:20, 24 166:13, 14, 15 167:16 168:2 169:4 173:17 278:9 332:13
yelled 113:13
yellow 124:12, 13 126:16 267:25 281:7 288:24 313:14 314:13 318:16 335:2 344:7 356:8 368:1 389:9
Yesterday 9:10, 12 100:16, 17 126:18 201:18, 20 319:4 363:19
Yo 51:24 136:24 339:16
Yoder 370:20, 23 371:1
Yonchek 56:14 73:25 355:21
York 193:7 234:11, 13 261:15 332:25
Young 249:2
younger 152:18

< Z >
zero 190:6
Zionist 289:19
ZOA 120:11
Zofran 96:16
zone 176:14
Zoom 1:1 2:1 6:9 8:5 92:7

Deposition of Patricia McNulty                                    Lisa Barbounis v. Middle Eastern Forum, et. al.

### WORD LIST

**< $ >**
**$135,000** *(2)*
**$300** *(7)*
**$5,000** *(3)*

**< 1 >**
**1** *(4)*
**1:41** *(1)*
**10** *(1)*
**10:00** *(4)*
**10:10** *(1)*
**10:12** *(2)*
**10:52** *(1)*
**10th** *(1)*
**11** *(2)*
**11:08** *(2)*
**11:53** *(1)*
**12** *(1)*
**12:05** *(2)*
**12th** *(2)*
**13** *(3)*
**14** *(3)*
**15** *(3)*
**15th** *(3)*
**16** *(1)*
**1650** *(1)*
**16th** *(2)*
**17th** *(2)*
**18** *(4)*
**1835** *(2)*
**18-month** *(1)*
**18th** *(3)*
**19** *(6)*
**19103** *(3)*
**1968** *(1)*
**1st** *(2)*

**< 2 >**
**2** *(2)*
**2:10** *(3)*
**2:17** *(1)*
**2:19-cv-05030** *(1)*
**2:19-CV-05030-JDW** *(1)*
**2:43** *(1)*
**20** *(10)*
**2016** *(1)*

**2017** *(6)*
**2018** *(65)*
**2019** *(53)*
**2020** *(4)*
**2021** *(2)*
**20-hour** *(1)*
**20-minute** *(1)*
**21** *(3)*
**215** *(3)*
**21st** *(1)*
**22** *(2)*
**22nd** *(1)*
**23** *(1)*
**24** *(1)*
**24-hour** *(1)*
**28** *(3)*
**2800** *(1)*
**28th** *(2)*
**29** *(3)*
**2950** *(1)*
**29th** *(1)*
**2nd** *(3)*

**< 3 >**
**3** *(5)*
**3:27** *(1)*
**3:30** *(1)*
**3:35** *(1)*
**30** *(4)*
**300** *(11)*
**30th** *(4)*
**31** *(1)*
**32** *(2)*
**33** *(4)*
**34** *(1)*
**35** *(4)*
**36** *(1)*
**37** *(1)*
**39** *(2)*
**391-4790** *(1)*
**3rd** *(2)*

**< 4 >**
**4** *(7)*
**4:25** *(1)*
**4:32** *(2)*
**40** *(3)*
**42** *(3)*
**43** *(1)*

**44** *(1)*
**45** *(4)*
**46** *(2)*
**47** *(1)*
**48** *(4)*
**4848** *(3)*
**49** *(1)*
**4th** *(2)*

**< 5 >**
**5** *(7)*
**5:00** *(7)*
**5:30** *(2)*
**5:34** *(1)*
**50** *(2)*
**501(c)(3** *(1)*
**51** *(1)*
**515** *(1)*
**52** *(1)*
**53** *(1)*
**54** *(1)*
**56** *(1)*
**569-1999** *(1)*
**57** *(2)*
**58** *(2)*
**59** *(1)*
**5th** *(1)*

**< 6 >**
**6** *(3)*
**6:00** *(1)*
**6:04** *(2)*
**6:38** *(1)*
**60** *(2)*
**61** *(2)*
**62** *(1)*
**63** *(2)*
**65** *(4)*
**66** *(2)*
**665-2776** *(1)*

**< 7 >**
**7** *(1)*
**7:30** *(1)*
**70** *(2)*

**< 8 >**
**8** *(3)*
**80** *(1)*

**8th** *(2)*

**< 9 >**
**9** *(3)*
**9:30ish** *(1)*
**91** *(1)*
**9th** *(3)*

**< A >**
**a.m** *(10)*
**ability** *(2)*
**able** *(11)*
**abroad** *(1)*
**absolutely** *(3)*
**absurd** *(2)*
**absurdity** *(1)*
**abused** *(3)*
**abuser** *(1)*
**abusing** *(1)*
**accepted** *(1)*
**access** *(5)*
**accessing** *(1)*
**accidentally** *(1)*
**accommodate** *(1)*
**accommodation** *(6)*
**account** *(42)*
**accounting** *(1)*
**accounts** *(1)*
**accuracy** *(2)*
**accurate** *(25)*
**accurately** *(2)*
**accusation** *(2)*
**accused** *(1)*
**acknowledge** *(1)*
**act** *(2)*
**acting** *(8)*
**ACTION** *(5)*
**actions** *(5)*
**active** *(1)*
**actively** *(3)*
**activities** *(1)*
**activity** *(2)*
**acts** *(1)*
**actual** *(5)*
**ADD** *(1)*
**Adderall** *(4)*
**addition** *(2)*
**Additionally** *(1)*
**address** *(26)*

Deposition of Patricia McNulty · · · · · · · · · · · · · · · · · · · · Lisa Barbounis v. Middle Eastern Forum, et. al.

addresses  (9)
adequate  (1)
ADHD  (1)
admitted  (8)
adorable  (1)
advance  (2)
advances  (3)
advantage  (1)
adversely  (1)
advice  (3)
advising  (1)
advocacy  (1)
advocate  (1)
affect  (1)
afraid  (3)
afternoon  (3)
afterward  (1)
age  (2)
agency  (2)
agenda  (3)
aggressive  (1)
ago  (13)
agree  (19)
agreed  (4)
agreeing  (1)
agreement  (5)
ahead  (35)
ahold  (2)
AIPAC  (2)
al  (2)
alcohol  (1)
alcoholic  (2)
Alex  (2)
aligned  (1)
allegations  (4)
allegedly  (1)
Allison  (2)
Allison's  (4)
allow  (1)
allowed  (5)
allowing  (1)
alright  (1)
altercations  (1)
amazing  (5)
ambivalent  (1)
amended  (4)
amendment  (1)
amount  (4)
amounts  (1)

angel  (1)
anger  (2)
angry  (3)
announcement  (4)
annoyed  (2)
annoying  (1)
annual  (1)
anonymously  (1)
answer  (150)
answered  (38)
answering  (3)
answers  (7)
anti  (1)
antianxiety  (1)
anticipate  (1)
anticipation  (1)
Antifa  (1)
anxiety  (2)
anxious  (1)
anybody  (18)
anymore  (18)
anyway  (17)
apologize  (3)
Apology  (1)
apparently  (1)
appear  (3)
appearing  (2)
appears  (11)
application  (2)
applications  (1)
applied  (1)
applies  (1)
apply  (3)
applying  (3)
appoint  (1)
appointing  (1)
appointments  (2)
appreciate  (2)
appreciated  (1)
apprehension  (3)
appropriate  (9)
approve  (1)
approximately  (1)
approximation  (1)
apps  (1)
April  (4)
argue  (1)
argument  (6)
argumentative  (2)

arranged  (1)
array  (1)
arrested  (7)
article  (2)
articles  (1)
Asana  (1)
asked  (64)
asking  (66)
asleep  (1)
aspect  (1)
ass  (2)
assault  (7)
assaulted  (6)
assessment  (2)
assigned  (1)
assigning  (3)
assignment  (1)
assistant  (3)
associated  (4)
ASSOCIATES  (2)
association  (1)
assume  (9)
assumed  (1)
assuming  (13)
assumption  (2)
attach  (1)
attached  (2)
attempt  (1)
attend  (2)
attendance  (2)
attended  (4)
attending  (1)
attention  (2)
attest  (1)
attorney  (3)
attorney-client  (1)
attorneys  (3)
attractive  (1)
attributed  (1)
at-will  (2)
audience  (1)
August  (2)
authenticate  (1)
authority  (4)
authorization  (1)
authorized  (2)
auto  (1)
automatic  (1)
automatically  (2)

Avi  (3)
avoid  (2)
awake  (1)
awakening  (2)
aware  (25)
awareness  (4)
awful  (2)
awkwardly  (1)

< B >
babe  (2)
babysitter  (1)
back  (134)
background  (2)
backing  (1)
backstory  (2)
backwards  (1)
bad  (10)
Baird  (8)
balcony  (1)
ball  (1)
bar  (1)
BARBOUNIS  (41)
Barbounis's  (4)
Barely  (1)
based  (26)
basic  (1)
basically  (5)
basis  (7)
bathroom  (3)
bathtub  (1)
beach  (1)
bearing  (1)
beautiful  (2)
bed  (3)
began  (2)
begged  (1)
beginning  (10)
behalf  (3)
behavior  (7)
belaboring  (1)
believe  (33)
believed  (1)
Ben  (4)
benefits  (1)
Benjamin  (1)
Bennett  (30)
best  (15)
bet  (1)

Deposition of Patricia McNulty                    Lisa Barbounis v. Middle Eastern Forum, et. al.

better *(21)*
betting *(1)*
beyond *(5)*
big *(3)*
bigger *(3)*
biggest *(1)*
Bill *(1)*
bills *(3)*
Bishop *(2)*
bit *(8)*
bitch *(5)*
bitchy *(1)*
bits *(1)*
bizarro *(1)*
black *(3)*
blame *(1)*
blindly *(1)*
blow *(5)*
blown *(1)*
blue *(9)*
board *(11)*
Bog *(2)*
bonuses *(1)*
Boo *(1)*
book *(2)*
booked *(1)*
booking *(2)*
books *(1)*
borrow *(3)*
borrowing *(1)*
boss *(9)*
bother *(2)*
bothered *(2)*
bothering *(2)*
bottom *(3)*
bought *(1)*
boundaries *(1)*
Bowling *(1)*
box *(1)*
boy *(1)*
boyfriend *(2)*
boys *(1)*
Brady *(2)*
break *(15)*
breaking *(1)*
Brexit *(1)*
brief *(11)*
bring *(3)*
Brody's *(1)*

brought *(6)*
bruise *(3)*
brutal *(1)*
build *(1)*
building *(1)*
bullshit *(2)*
Bumble *(6)*
bummed *(1)*
bunch *(2)*
bus *(3)*
business *(12)*
butt *(1)*
buy *(1)*
buzz *(1)*

< C >
Caitriona *(4)*
calculated *(1)*
calendar *(2)*
calendars *(1)*
California *(1)*
call *(41)*
CALLED *(26)*
calling *(14)*
Calls *(13)*
campaign *(18)*
campaigns *(3)*
cancelling *(1)*
candidate *(2)*
capable *(1)*
Capitol *(1)*
card *(2)*
cards *(4)*
care *(10)*
career *(1)*
cares *(2)*
Carrie *(4)*
CARSON *(472)*
case *(27)*
cases *(3)*
Cassandra *(1)*
caught *(1)*
cause *(4)*
caused *(1)*
CAVAILER *(1)*
CAVALIER *(194)*
CBD *(2)*
cc'd *(2)*
celebrate *(1)*

cell *(2)*
certain *(7)*
certainly *(1)*
CERTIFY *(1)*
chain *(1)*
Chamberlain *(2)*
chance *(6)*
change *(9)*
changed *(3)*
changes *(2)*
characteristics *(1)*
characterize *(1)*
characterizing *(1)*
charge *(3)*
charges *(1)*
Charlie *(2)*
chase *(1)*
chat *(2)*
chats *(4)*
cheat *(1)*
cheated *(2)*
cheating *(4)*
check *(5)*
checks *(2)*
Chelsea *(5)*
chicks *(1)*
child *(1)*
children *(12)*
choice *(1)*
chose *(1)*
chosen *(1)*
Cinnamon *(1)*
circumstances *(3)*
city *(1)*
CIVIL *(8)*
claim *(2)*
Claiming *(2)*
claims *(6)*
clarify *(3)*
clarifying *(1)*
clear *(20)*
cleared *(1)*
clearly *(5)*
Cleveland *(1)*
client *(18)*
clients *(2)*
close *(7)*
closed *(3)*
cloud *(1)*

cloud-based *(1)*
coffee *(1)*
colleague *(1)*
come *(18)*
comes *(4)*
Comical *(1)*
coming *(14)*
comment *(7)*
commentary *(1)*
commenting *(2)*
comments *(2)*
Commission *(9)*
commitments *(1)*
committed *(1)*
common *(1)*
Commonwealth *(1)*
communicate *(2)*
communicating *(1)*
communication *(11)*
communications *(25)*
company *(3)*
comparison *(1)*
compelled *(1)*
compiled *(1)*
complain *(11)*
complained *(2)*
complaining *(13)*
complaint *(12)*
complaints *(15)*
complete *(1)*
completed *(1)*
completely *(1)*
compliment *(1)*
complimented *(1)*
comply *(2)*
computer *(3)*
conceded *(1)*
concentrating *(2)*
concern *(3)*
concerned *(6)*
concerning *(1)*
concluded *(1)*
concludes *(2)*
conclusion *(5)*
condition *(2)*
conduct *(1)*
conference *(6)*
confidential *(1)*
confirm *(3)*

Case 2:19-cv-05030-JDW  Document 110-3  Filed 03/02/21  Page 146 of 157

Deposition of Patricia McNulty                                    Lisa Barbounis v. Middle Eastern Forum, et. al.

confirmed *(1)*
conflict *(1)*
conflicts *(2)*
confused *(1)*
Congratulations *(1)*
Congressman *(9)*
conjunction *(2)*
connection *(5)*
connects *(1)*
conservative *(1)*
consider *(2)*
considered *(3)*
considering *(1)*
constant *(2)*
constantly *(1)*
constitute *(1)*
contact *(5)*
contained *(5)*
containing *(7)*
contains *(1)*
contempt *(5)*
content *(4)*
contents *(2)*
context *(10)*
Continental *(10)*
continue *(6)*
continued *(2)*
continues *(1)*
continuing *(1)*
continuously *(1)*
contractors *(3)*
Contributing *(1)*
contributions *(2)*
control *(3)*
conversation *(65)*
conversations *(46)*
convey *(1)*
conveyed *(1)*
cooks *(1)*
coordinator *(1)*
copies *(2)*
copy *(9)*
core *(1)*
Correct *(193)*
correcting *(1)*
correctly *(1)*
correspondence *(1)*
correspondences *(1)*
cost *(1)*

couch *(2)*
counsel *(23)*
counsel's *(1)*
count *(2)*
counting *(1)*
country *(5)*
couple *(13)*
course *(8)*
COURT *(67)*
cover *(1)*
covered *(4)*
coworker *(1)*
coworkers *(3)*
Coyne *(14)*
COZEN *(2)*
crap *(1)*
crazy *(4)*
create *(2)*
created *(5)*
creates *(1)*
creating *(1)*
credibility *(5)*
cried *(2)*
crimes *(1)*
criminal *(1)*
cross *(1)*
Crossing *(1)*
cruise *(1)*
crush *(1)*
crushed *(1)*
cry *(1)*
crying *(3)*
culmination *(1)*
cunt *(2)*
cunts *(1)*
current *(5)*
currently *(1)*
curse *(1)*
cut *(4)*
cutting *(1)*

< D >
dad *(2)*
dads *(1)*
daily *(2)*
dandy *(1)*
dangerously *(1)*
Daniel *(104)*
Daniel's *(2)*

Danny *(66)*
dark *(1)*
data *(1)*
date *(18)*
dated *(6)*
dates *(5)*
dating *(7)*
daughter *(1)*
daunting *(1)*
day *(36)*
days *(6)*
DC *(7)*
dead *(3)*
deadline *(1)*
deal *(3)*
dealing *(1)*
deals *(1)*
Dean *(2)*
debate *(1)*
deceit *(1)*
December *(4)*
deception *(1)*
decide *(1)*
decided *(2)*
decision *(2)*
deeply *(1)*
defamatory *(1)*
default *(2)*
defend *(1)*
Defendants *(7)*
defendant's *(11)*
defense *(3)*
definitely *(7)*
definition *(2)*
Delaney *(7)*
delay *(1)*
delegating *(1)*
delegator *(1)*
delete *(5)*
deleted *(15)*
deleting *(2)*
deliberately *(1)*
deliver *(1)*
delve *(1)*
demoted *(1)*
denied *(1)*
departed *(1)*
depends *(1)*
deposed *(4)*

deposition *(25)*
depositions *(5)*
depressed *(1)*
DEREK *(3)*
describe *(2)*
describing *(1)*
description *(4)*
deserves *(1)*
designated *(2)*
designed *(11)*
destroy *(1)*
detailed *(1)*
details *(5)*
determination *(1)*
determinations *(1)*
determine *(8)*
determined *(4)*
Detroit *(1)*
developing *(1)*
development *(9)*
dick *(15)*
Dicks *(1)*
die *(1)*
difference *(3)*
differences *(1)*
different *(14)*
difficult *(3)*
difficulties *(1)*
difficulty *(1)*
dig *(1)*
dinner *(3)*
direct *(11)*
directing *(1)*
directly *(7)*
director *(24)*
disability *(1)*
disagree *(2)*
disagreement *(1)*
disagrees *(1)*
disappointed *(1)*
disciplined *(5)*
disconcerting *(1)*
discontinue *(2)*
discovered *(1)*
discovery *(32)*
discrimination *(5)*
discuss *(3)*
discussed *(3)*
discussing *(4)*

discussion  *(3)*
discussions  *(3)*
disheartened  *(1)*
disheartening  *(1)*
disrespect  *(1)*
disrupts  *(2)*
dissatisfied  *(1)*
distance  *(1)*
distinction  *(5)*
DISTRICT  *(6)*
DM  *(1)*
DMSs  *(1)*
Doc  *(1)*
docket  *(9)*
doctor  *(1)*
doctors  *(2)*
document  *(14)*
documents  *(23)*
DOD  *(1)*
doer  *(1)*
dog  *(2)*
doing  *(34)*
dollar  *(4)*
dollars  *(6)*
donations  *(1)*
donor  *(9)*
donors  *(2)*
door  *(3)*
double  *(1)*
doubly  *(1)*
doubt  *(1)*
downstairs  *(1)*
downtime  *(1)*
DP  *(13)*
DP's  *(1)*
drafted  *(1)*
draining  *(2)*
drawing  *(2)*
dress  *(1)*
drink  *(1)*
Drive  *(5)*
driving  *(1)*
drop  *(1)*
Dropbox  *(7)*
dropped  *(3)*
drove  *(2)*
drowning  *(1)*
drug  *(3)*
drugs  *(9)*

drunk  *(3)*
ducking  *(1)*
dude  *(2)*
due  *(1)*
duh  *(1)*
DULY  *(1)*
dumb  *(1)*
dyed  *(1)*
dynamics  *(1)*

< E >
ear  *(1)*
earlier  *(9)*
early  *(3)*
ease  *(1)*
easier  *(1)*
EAST  *(18)*
EASTERN  *(8)*
eat  *(1)*
eating  *(1)*
ecstatic  *(1)*
editor  *(1)*
educate  *(2)*
educating  *(1)*
education  *(1)*
EEOC  *(1)*
efficient  *(1)*
effort  *(1)*
efforts  *(1)*
eight  *(4)*
eighth  *(1)*
eight-hour  *(1)*
either  *(12)*
election  *(1)*
eloquently  *(1)*
e-mail  *(59)*
e-mailed  *(1)*
e-mailing  *(2)*
e-mails  *(8)*
Eman  *(14)*
embarrass  *(16)*
embarrassed  *(2)*
employed  *(2)*
employee  *(15)*
employees  *(11)*
employer  *(3)*
employment  *(16)*
empty  *(2)*
encountering  *(1)*

encounters  *(1)*
encouragement  *(1)*
encouraging  *(1)*
ended  *(5)*
endurance  *(1)*
engage  *(2)*
engaged  *(2)*
engagement  *(1)*
engaging  *(3)*
England  *(1)*
enjoy  *(1)*
entailed  *(1)*
enter  *(1)*
entire  *(7)*
entirely  *(1)*
entirety  *(1)*
entitled  *(1)*
entry  *(1)*
environment  *(3)*
environmental  *(1)*
episode  *(1)*
ER  *(6)*
erase  *(3)*
erased  *(1)*
erasing  *(1)*
Especially  *(1)*
ESQ  *(4)*
establish  *(1)*
established  *(1)*
establishment  *(1)*
et  *(2)*
Eve  *(1)*
evening  *(1)*
event  *(8)*
events  *(2)*
eventually  *(4)*
Everest  *(3)*
everybody  *(7)*
everybody's  *(1)*
everyone's  *(1)*
evidence  *(19)*
exacerbating  *(1)*
exact  *(18)*
exactly  *(60)*
exaggerating  *(1)*
Examination  *(4)*
EXAMINED  *(1)*
example  *(1)*
examples  *(1)*

excessive  *(1)*
exchange  *(33)*
exchanged  *(3)*
exchanging  *(1)*
Excuse  *(14)*
executive  *(3)*
exempt  *(1)*
exhausted  *(2)*
Exhibit  *(97)*
EXHIBITS  *(6)*
exist  *(2)*
existed  *(1)*
expect  *(5)*
expectations  *(2)*
expected  *(6)*
expensive  *(1)*
experience  *(1)*
experienced  *(1)*
explain  *(9)*
explained  *(2)*
explanation  *(4)*
explicit  *(1)*
express  *(1)*
expressing  *(1)*
expression  *(1)*
extended  *(1)*
extent  *(10)*
extra  *(1)*
extreme  *(1)*
eye  *(4)*
eyes  *(3)*

< F >
face  *(3)*
Facebook  *(18)*
faces  *(2)*
fact  *(40)*
factors  *(2)*
facts  *(20)*
fail  *(2)*
failing  *(2)*
failure  *(2)*
fair  *(11)*
fake  *(7)*
faking  *(1)*
fall  *(8)*
false  *(1)*
familiar  *(1)*
family  *(4)*

Deposition of Patricia McNulty                                    Lisa Barbounis v. Middle Eastern Forum, et. al.

fancy *(1)*
far *(20)*
fast *(2)*
favor *(1)*
February *(13)*
federal *(2)*
feel *(26)*
feeling *(14)*
feelings *(3)*
feels *(2)*
fees *(2)*
fell *(4)*
fellow *(2)*
felt *(14)*
female *(6)*
females *(2)*
FFS *(1)*
fiance *(4)*
fifth *(1)*
fifty *(2)*
fight *(5)*
fighting *(6)*
figure *(4)*
figured *(1)*
figuring *(1)*
file *(4)*
filed *(7)*
filled *(3)*
filtered *(1)*
finalized *(1)*
finally *(3)*
finance *(2)*
financial *(2)*
financials *(3)*
find *(13)*
fine *(10)*
fingers *(2)*
finish *(11)*
Fink *(4)*
fire *(7)*
fired *(22)*
firing *(5)*
firm *(6)*
first *(48)*
firsthand *(1)*
fit *(1)*
five *(16)*
five-minute *(2)*
fix *(4)*

flat *(1)*
flex *(4)*
flight *(5)*
flights *(2)*
flirt *(2)*
flirted *(1)*
flirting *(1)*
flooded *(1)*
floor *(1)*
Florida *(1)*
flown *(1)*
fly *(1)*
flying *(2)*
focus *(1)*
focusing *(1)*
follow *(1)*
following *(1)*
FOLLOWS *(1)*
follow-up *(1)*
food *(2)*
foot *(2)*
forced *(3)*
forcing *(1)*
foreign *(1)*
forever *(1)*
forget *(3)*
form *(27)*
formal *(1)*
formatted *(1)*
former *(1)*
forms *(3)*
forth *(2)*
forthright *(1)*
forty *(1)*
FORUM *(33)*
Forward *(6)*
forwards *(2)*
found *(8)*
foundation *(6)*
frame *(1)*
freaking *(3)*
free *(5)*
free-for-all *(2)*
French *(1)*
Friday *(1)*
friend *(8)*
friended *(1)*
friendly *(12)*
friends *(10)*

front *(3)*
frustrated *(5)*
frustration *(1)*
fuck *(9)*
fucked *(4)*
fucking *(14)*
full *(4)*
fully *(2)*
fun *(2)*
funded *(1)*
funding *(3)*
funds *(2)*
funny *(2)*
further *(6)*
Future *(4)*
FYI *(1)*

< G >
gala *(1)*
games *(3)*
gangs *(1)*
gap *(1)*
Gary *(2)*
Gates *(1)*
gather *(2)*
gay *(1)*
gender *(4)*
general *(10)*
generally *(2)*
gentlemen *(2)*
genuinely *(1)*
George *(2)*
Georgie *(2)*
gestures *(1)*
getting *(19)*
gifs *(1)*
gift *(5)*
Giles *(6)*
Girl *(5)*
girlfriend *(1)*
girls *(1)*
give *(36)*
given *(22)*
gives *(3)*
giving *(12)*
glad *(1)*
glorious *(1)*
Gmail *(4)*
go *(235)*

God *(5)*
goes *(10)*
going *(296)*
GOLD *(679)*
Golden *(1)*
Goldstein *(2)*
gonna *(7)*
good *(37)*
goodness *(1)*
Google *(5)*
gorgeous *(1)*
gosh *(2)*
gotten *(4)*
governors *(8)*
gown *(1)*
grand *(2)*
gray *(7)*
Great *(8)*
greatly *(1)*
green *(2)*
Gregg *(185)*
Gregg's *(5)*
grooming *(1)*
ground *(1)*
grounds *(1)*
GROUP *(3)*
grow *(1)*
grown *(1)*
grumpy *(2)*
guard *(2)*
guess *(34)*
guesses *(1)*
guessing *(2)*
guidance *(1)*
guy *(7)*
guys *(22)*

< H >
habit *(2)*
hack *(1)*
hacked *(1)*
haha *(5)*
hair *(1)*
hairdresser *(1)*
half *(11)*
halfway *(1)*
hand *(2)*
handbook *(1)*
handed *(2)*

Deposition of Patricia McNulty                                    Lisa Barbounis v. Middle Eastern Forum, et. al.

**handful** *(1)*
**handle** *(2)*
**handwritten** *(5)*
**hang** *(4)*
**hanging** *(2)*
**happen** *(17)*
**happened** *(50)*
**happening** *(14)*
**happens** *(4)*
**happy** *(12)*
**harass** *(14)*
**harassed** *(1)*
**harassing** *(1)*
**harassment** *(4)*
**hard** *(13)*
**harder** *(1)*
**hate** *(10)*
**hated** *(1)*
**Head** *(17)*
**headaches** *(1)*
**headed** *(1)*
**headhunter** *(2)*
**hear** *(50)*
**heard** *(19)*
**hearing** *(3)*
**heart** *(4)*
**heavy** *(2)*
**heck** *(1)*
**he'd** *(1)*
**Held** *(7)*
**he'll** *(2)*
**help** *(2)*
**helping** *(2)*
**hey** *(8)*
**high** *(4)*
**highlighted** *(21)*
**Hill** *(1)*
**hire** *(2)*
**hired** *(11)*
**history** *(1)*
**hit** *(6)*
**hitting** *(2)*
**hold** *(11)*
**holding** *(1)*
**Hole** *(1)*
**Holy** *(2)*
**home** *(9)*
**honcho** *(1)*
**honest** *(1)*

**honestly** *(3)*
**honorarium** *(1)*
**hook** *(1)*
**hooked** *(1)*
**hope** *(7)*
**Hopefully** *(1)*
**horrible** *(2)*
**horror** *(1)*
**hospital** *(1)*
**Hospitality** *(4)*
**host** *(1)*
**hot** *(1)*
**Hotel** *(4)*
**hour** *(3)*
**hours** *(27)*
**hovering** *(1)*
**HR** *(9)*
**Human** *(1)*
**hundred** *(17)*
**hung** *(3)*
**hungry** *(1)*
**hurting** *(2)*
**husband** *(14)*
**hyperventilate** *(2)*
**hypothetical** *(13)*
**hypothetically** *(1)*
**hypotheticals** *(2)*

**< I >**
**iCloud** *(17)*
**Icon** *(4)*
**idea** *(16)*
**identify** *(2)*
**ignoring** *(1)*
**ill** *(2)*
**illegal** *(1)*
**illness** *(1)*
**image** *(1)*
**images** *(1)*
**imagine** *(2)*
**immediately** *(1)*
**immersed** *(1)*
**impact** *(3)*
**impacting** *(1)*
**impacts** *(1)*
**imperative** *(1)*
**implicitly** *(1)*
**important** *(8)*
**impression** *(5)*

**improvement** *(2)*
**inappropriate** *(4)*
**in-between** *(1)*
**inbox** *(1)*
**incarcerated** *(1)*
**incident** *(2)*
**include** *(1)*
**includes** *(1)*
**including** *(2)*
**inconvenient** *(1)*
**incorrect** *(3)*
**increase** *(1)*
**incumbent** *(1)*
**INDEX** *(2)*
**indicate** *(2)*
**Indiscernible** *(9)*
**individual** *(1)*
**inflammatory** *(1)*
**influence** *(4)*
**information** *(23)*
**inhibited** *(1)*
**inhibition** *(1)*
**initial** *(1)*
**initially** *(2)*
**initiated** *(1)*
**injects** *(1)*
**inpatient** *(1)*
**input** *(1)*
**insane** *(2)*
**inserting** *(1)*
**Instagram** *(23)*
**instance** *(2)*
**instruct** *(6)*
**instructed** *(8)*
**instructing** *(7)*
**instruction** *(1)*
**instructions** *(7)*
**instructs** *(1)*
**insults** *(1)*
**int** *(1)*
**intelligence** *(1)*
**intended** *(3)*
**intending** *(1)*
**intense** *(1)*
**intention** *(1)*
**intentional** *(1)*
**intentionally** *(1)*
**intentions** *(1)*
**interacting** *(1)*

**interaction** *(4)*
**interactions** *(1)*
**interest** *(3)*
**interested** *(1)*
**interesting** *(1)*
**interference** *(4)*
**interim** *(1)*
**interject** *(1)*
**internet** *(1)*
**interpersonal** *(1)*
**interpretation** *(2)*
**interpreted** *(3)*
**interpreter** *(1)*
**interrelationship** *(1)*
**interrupt** *(4)*
**interrupting** *(2)*
**interruption** *(3)*
**interrupts** *(1)*
**interviewing** *(1)*
**intimate** *(3)*
**intimately** *(1)*
**invent** *(1)*
**invest** *(1)*
**invested** *(1)*
**investment** *(2)*
**investor** *(6)*
**invite** *(1)*
**invited** *(2)*
**invites** *(1)*
**involved** *(15)*
**iPad** *(14)*
**iPhone** *(3)*
**ironic** *(1)*
**irritable** *(1)*
**irritated** *(1)*
**IRS** *(2)*
**isolated** *(1)*
**Israel** *(14)*
**issue** *(7)*
**issued** *(1)*
**issues** *(5)*
**items** *(1)*

**< J >**
**Jackson** *(1)*
**jail** *(5)*
**January** *(15)*
**Jaz** *(17)*
**Jazmin** *(3)*

Deposition of Patricia McNulty                                          Lisa Barbounis v. Middle Eastern Forum, et. al.

jcavalier@cozen.com *(1)*
Jerry *(1)*
job *(104)*
jobs *(7)*
joke *(2)*
Jon *(3)*
JONATHAN *(1)*
journalists *(1)*
judge *(5)*
July *(2)*
jump *(3)*
jumped *(2)*
juncture *(3)*
June *(13)*
jury *(2)*
justified *(3)*

< K >
Kaseem *(1)*
Kassam *(2)*
Kaufman *(3)*
keep *(89)*
keeping *(1)*
kept *(1)*
Kevin *(1)*
key *(1)*
kick *(1)*
kid *(1)*
kidding *(3)*
kids *(5)*
kill *(7)*
kind *(18)*
kinds *(1)*
kinship *(1)*
kissy *(1)*
knew *(24)*
knock *(1)*
know *(410)*
knowing *(2)*
knowledge *(8)*
known *(6)*
knows *(4)*

< L >
lack *(4)*
ladies *(3)*
laid *(1)*
landline *(1)*

language *(2)*
lap *(2)*
largely *(1)*
larger *(2)*
late *(3)*
lately *(1)*
LAW *(9)*
lawsuit *(9)*
lawyer *(11)*
lawyers *(7)*
lay *(1)*
lead *(1)*
leading *(1)*
learn *(6)*
learned *(5)*
leave *(29)*
leaving *(6)*
led *(1)*
Lee *(17)*
left *(75)*
legal *(8)*
legit *(1)*
legitimate *(2)*
lend *(2)*
lengthy *(1)*
lessons *(1)*
letter *(10)*
letters *(3)*
letting *(1)*
level *(1)*
leverage *(1)*
Lewis *(2)*
liability *(1)*
liaison *(4)*
Liberty *(1)*
lie *(7)*
lied *(1)*
lien *(2)*
liens *(1)*
life *(14)*
lifetime *(5)*
light *(2)*
liked *(11)*
likes *(2)*
line *(13)*
lined *(1)*
link *(2)*
LinkedIn *(7)*
LISA *(266)*

Lisa's *(17)*
list *(3)*
listen *(8)*
literally *(5)*
litigation *(6)*
little *(17)*
live *(5)*
livid *(1)*
living *(1)*
loathe *(1)*
logic *(1)*
LOL *(3)*
London *(9)*
long *(21)*
longer *(5)*
long-term *(1)*
look *(26)*
looked *(8)*
looking *(18)*
looks *(32)*
lose *(5)*
losing *(2)*
lost *(8)*
lot *(19)*
Lots *(1)*
loud *(1)*
love *(5)*
loved *(11)*
loves *(1)*
loving *(1)*
Lovitz *(1)*
low *(1)*
luck *(2)*
lucky *(1)*
lunch *(6)*
luncheon *(8)*

< M >
ma'am *(15)*
machine *(2)*
mad *(7)*
magazine *(1)*
magic *(1)*
magical *(1)*
maiden *(1)*
mail *(2)*
mailchimp *(2)*
Mainen *(14)*
MAJA *(2)*

major *(2)*
making *(27)*
male *(2)*
management *(4)*
managing *(1)*
manipulative *(1)*
manner *(1)*
manual *(2)*
Marc *(4)*
March *(39)*
mark *(3)*
marked *(1)*
Market *(3)*
Marnie *(142)*
Marnie's *(5)*
material *(1)*
Matt *(142)*
matter *(11)*
mattered *(1)*
Matthew *(1)*
Matt's *(1)*
McNULTY *(34)*
mean *(96)*
meaning *(4)*
means *(9)*
meant *(10)*
media *(10)*
medical *(1)*
medication *(1)*
medications *(1)*
meet *(12)*
meeting *(29)*
meetings *(2)*
MEF *(159)*
MEF's *(1)*
Megan *(7)*
members *(1)*
memes *(1)*
memory *(4)*
men *(1)*
Mental *(1)*
mention *(2)*
mentioned *(9)*
mentioning *(2)*
mentions *(2)*
message *(47)*
Messages *(60)*
Messenger *(1)*
met *(21)*

Case 2:19-cv-05030-JDW    Document 110-3    Filed 03/02/21    Page 151 of 157

Deposition of Patricia McNulty                                        Lisa Barbounis v. Middle Eastern Forum, et. al.

methods  (2)
Meyer  (3)
mic  (2)
Michael  (1)
microphone  (4)
MIDDLE  (19)
middleman  (1)
midweek  (1)
Mike  (3)
mildly  (1)
million  (2)
millionth  (1)
mimosa  (1)
mind  (11)
mine  (3)
minimal  (1)
minimum  (1)
minny  (1)
minor  (1)
minute  (10)
minutes  (13)
mirror  (1)
misapprehension  (1)
Mischaracterization
  (1)
mischaracterizing  (1)
misconstrued  (1)
miserable  (1)
misheard  (1)
misinterpreted  (1)
misrepresent  (1)
misrepresentation  (3)
missed  (1)
missing  (2)
mission  (3)
misstate  (1)
mistaken  (3)
misunderstanding  (1)
misunderstood  (2)
mode  (2)
modified  (1)
moment  (7)
moms  (1)
Monday  (9)
money  (29)
mongrel  (1)
mongrels  (2)
monies  (1)
monitor  (1)

monitoring  (1)
month  (8)
months  (12)
moot  (1)
moral  (1)
morality  (1)
morning  (15)
mornings  (1)
mother  (8)
motion  (1)
motions  (1)
motivated  (5)
motivation  (2)
mouth  (2)
move  (21)
moved  (1)
moves  (1)
movie  (17)
movies  (3)
moving  (5)
msharif  (1)
multiple  (5)
multitude  (1)
Murphy  (3)
Muslim  (1)
mute  (14)
muted  (5)
muting  (1)
Myers  (1)

< N >
name  (15)
named  (3)
names  (4)
narcotics  (2)
natural  (1)
nature  (1)
Nazi  (1)
NDA  (16)
NDAs  (1)
Neal  (14)
near  (1)
necessarily  (1)
necessary  (2)
need  (32)
needed  (12)
needs  (2)
nefarious  (1)
negative  (1)

Neither  (2)
never  (66)
new  (24)
news  (3)
nice  (4)
nickel  (1)
night  (13)
nine  (1)
nod  (1)
nods  (2)
noise  (2)
nonevent  (1)
nonlegal  (1)
normal  (2)
normally  (1)
Notary  (2)
notch  (1)
note  (5)
noted  (5)
notes  (2)
notice  (2)
noticed  (1)
notwithstanding  (5)
November  (33)
now-fiance  (1)
NUMBER  (22)
numbers  (1)
nuts  (1)
NYE  (1)

< O >
Obj  (1)
object  (46)
objected  (2)
objecting  (3)
objection  (132)
objections  (5)
objectively  (3)
objects  (2)
obligated  (1)
obligations  (1)
O'Brien  (5)
observation  (1)
observations  (2)
observe  (1)
obvious  (2)
obviously  (5)
occasion  (2)
occasions  (2)

occurred  (9)
occurring  (1)
O'CONNOR  (2)
October  (4)
odd  (1)
offensive  (1)
offer  (2)
offered  (4)
offering  (1)
offhand  (8)
office  (63)
offices  (1)
officially  (1)
Oh  (30)
oil  (2)
Ok  (1)
Okay  (668)
old  (14)
once  (7)
one-on-one  (1)
ones  (4)
ongoing  (3)
opened  (2)
opening  (3)
opinion  (11)
opinions  (1)
opposed  (1)
opposite  (1)
opposition  (1)
order  (3)
ordered  (3)
orders  (4)
ordinary  (1)
organization  (5)
outright  (1)
outside  (12)
overall  (1)
overboard  (1)
overreacting  (1)
overworked  (5)
owe  (1)
owned  (1)

< P >
P.C  (1)
p.m  (18)
PA  (3)
pad  (1)
PAGE  (4)

Deposition of Patricia McNulty                                    Lisa Barbounis v. Middle Eastern Forum, et. al.

**paid** *(22)*
**pain** *(1)*
**painkiller** *(2)*
**paper** *(9)*
**paranoid** *(4)*
**Pardon** *(5)*
**parents** *(2)*
**park** *(1)*
**part** *(30)*
**participate** *(1)*
**participating** *(2)*
**participation** *(1)*
**particular** *(5)*
**particularly** *(1)*
**parties** *(1)*
**parts** *(4)*
**party** *(11)*
**passionate** *(1)*
**passive** *(1)*
**passwords** *(2)*
**Patel** *(2)*
**patience** *(1)*
**PATRICIA** *(16)*
**patricia.mcnulty1@gm**
**ail.com** *(1)*
**Patrick** *(5)*
**Patriot** *(1)*
**Pause** *(1)*
**pay** *(30)*
**paycheck** *(1)*
**paying** *(13)*
**payroll** *(1)*
**pays** *(1)*
**pecking** *(1)*
**pending** *(3)*
**PENNSYLVANIA** *(5)*
**people** *(38)*
**people's** *(1)*
**pep** *(1)*
**percent** *(1)*
**percentage** *(1)*
**perception** *(4)*
**Percocet** *(1)*
**performance** *(3)*
**period** *(10)*
**permanent** *(2)*
**permanently** *(1)*
**permitted** *(2)*
**person** *(28)*

**personal** *(20)*
**personally** *(2)*
**persons** *(1)*
**person's** *(3)*
**pertained** *(1)*
**pertaining** *(1)*
**pertains** *(2)*
**Philadelphia** *(10)*
**Philly** *(2)*
**phone** *(45)*
**photo** *(1)*
**photographing** *(1)*
**photographs** *(2)*
**photos** *(5)*
**phrased** *(1)*
**pic** *(5)*
**pick** *(2)*
**picked** *(1)*
**picnic** *(1)*
**pics** *(8)*
**picture** *(15)*
**pictures** *(20)*
**piece** *(1)*
**pieces** *(1)*
**piling** *(1)*
**PIP** *(1)*
**Pipes** *(55)*
**Place** *(30)*
**placed** *(4)*
**Plaintiff** *(7)*
**plaintiff's** *(2)*
**plan** *(6)*
**plane** *(6)*
**planned** *(1)*
**planning** *(5)*
**plate** *(3)*
**platform** *(1)*
**platforms** *(2)*
**play** *(1)*
**playing** *(6)*
**pleasantries** *(1)*
**please** *(33)*
**pleasure** *(1)*
**plenty** *(1)*
**PLLC** *(1)*
**plowing** *(1)*
**plural** *(2)*
**point** *(77)*
**pointing** *(1)*

**points** *(1)*
**police** *(1)*
**policies** *(1)*
**policy** *(2)*
**political** *(5)*
**poor** *(2)*
**porn** *(3)*
**portion** *(11)*
**portions** *(4)*
**posing** *(1)*
**position** *(20)*
**positive** *(1)*
**possession** *(3)*
**possibility** *(5)*
**possible** *(7)*
**possibly** *(4)*
**post** *(8)*
**postcards** *(2)*
**posted** *(6)*
**posting** *(5)*
**postpone** *(2)*
**posts** *(1)*
**potential** *(7)*
**potentially** *(2)*
**power** *(5)*
**powerful** *(1)*
**practice** *(2)*
**preach** *(1)*
**preamble** *(1)*
**precise** *(1)*
**predicate** *(1)*
**prefer** *(2)*
**pregnant** *(1)*
**premise** *(2)*
**premising** *(1)*
**prepare** *(1)*
**preparing** *(1)*
**prerogative** *(1)*
**prescribed** *(4)*
**prescription** *(1)*
**presence** *(1)*
**Present** *(4)*
**preservation** *(1)*
**pretend** *(3)*
**pretty** *(13)*
**previous** *(6)*
**previously** *(3)*
**priests** *(1)*
**primary** *(1)*

**prior** *(6)*
**private** *(2)*
**privilege** *(18)*
**privileged** *(12)*
**probably** *(14)*
**probation** *(2)*
**probationary** *(3)*
**problem** *(7)*
**problems** *(7)*
**procedural** *(1)*
**proceedings** *(5)*
**process** *(5)*
**produce** *(7)*
**produced** *(17)*
**producing** *(1)*
**production** *(2)*
**Professional** *(5)*
**program** *(6)*
**prohibited** *(1)*
**project** *(5)*
**projects** *(1)*
**promise** *(2)*
**proof** *(1)*
**propensity** *(2)*
**properly** *(1)*
**proportion** *(1)*
**proposed** *(1)*
**proprietary** *(2)*
**protected** *(1)*
**protection** *(1)*
**protest** *(1)*
**protocol** *(1)*
**protocols** *(2)*
**proud** *(1)*
**prove** *(5)*
**provide** *(7)*
**provided** *(2)*
**providing** *(1)*
**psychiatrist** *(1)*
**psycho** *(1)*
**Public** *(3)*
**publication** *(1)*
**puking** *(1)*
**pull** *(1)*
**pulling** *(2)*
**punch** *(2)*
**punching** *(1)*
**punish** *(1)*
**punishment** *(1)*

Deposition of Patricia McNulty                                      Lisa Barbounis v. Middle Eastern Forum, et. al.

purposes  *(2)*
pursuant  *(1)*
pursue  *(3)*
push  *(2)*
put  *(31)*
putting  *(5)*

**< Q >**
Qatar  *(1)*
qualifications  *(1)*
question  *(200)*
questioned  *(1)*
questioning  *(4)*
questions  *(53)*
quick  *(5)*
quickly  *(2)*
quit  *(6)*
quite  *(2)*
quitting  *(1)*
quote  *(7)*
quote/unquote  *(1)*

**< R >**
race  *(1)*
racist  *(1)*
radio  *(3)*
Raheem  *(42)*
Raheem's  *(1)*
raises  *(1)*
rallies  *(1)*
rally  *(28)*
ramping  *(1)*
ran  *(2)*
rando  *(1)*
Random  *(1)*
randos  *(1)*
Randy  *(7)*
rant  *(1)*
Rape  *(2)*
rarely  *(1)*
rarity  *(1)*
rate  *(1)*
rational  *(1)*
reached  *(2)*
reacting  *(1)*
reaction  *(1)*
reactions  *(1)*
read  *(46)*
reader  *(2)*

reading  *(6)*
ready  *(3)*
real  *(2)*
realize  *(2)*
realized  *(1)*
really  *(21)*
reason  *(33)*
reasonably  *(1)*
reasoning  *(1)*
reasons  *(9)*
reassure  *(1)*
recall  *(31)*
recalls  *(1)*
receive  *(6)*
received  *(5)*
receives  *(1)*
receiving  *(1)*
recess  *(8)*
recognized  *(1)*
recollection  *(19)*
recommendation  *(1)*
reconsidering  *(1)*
record  *(82)*
recorded  *(2)*
recording  *(2)*
recover  *(2)*
recovered  *(8)*
redact  *(1)*
redirect  *(3)*
redo  *(1)*
reduced  *(1)*
refer  *(2)*
reference  *(9)*
references  *(1)*
referred  *(1)*
referring  *(22)*
refers  *(2)*
refresh  *(4)*
refused  *(1)*
regarding  *(3)*
register  *(8)*
Registered  *(5)*
regular  *(3)*
regularly  *(2)*
rehabilitate  *(1)*
reigns  *(1)*
reimburse  *(3)*
reimbursed  *(1)*
reimbursement  *(1)*

relate  *(1)*
related  *(7)*
relates  *(1)*
relating  *(1)*
relation  *(1)*
relations  *(1)*
relationship  *(52)*
relatively  *(1)*
releasing  *(1)*
relevance  *(2)*
relevant  *(4)*
reliable  *(1)*
relief  *(1)*
relieved  *(1)*
reluctance  *(2)*
relying  *(1)*
remain  *(1)*
remained  *(1)*
remember  *(154)*
remembers  *(1)*
remind  *(1)*
reminder  *(2)*
reminding  *(1)*
remotely  *(1)*
remove  *(1)*
repeat  *(5)*
repeated  *(1)*
repeatedly  *(2)*
repeating  *(2)*
repercussions  *(1)*
rephrase  *(2)*
replace  *(3)*
replaced  *(1)*
replacement  *(1)*
replied  *(1)*
reply  *(1)*
report  *(17)*
reported  *(6)*
Reporter  *(59)*
Reporting  *(4)*
represent  *(2)*
representation  *(8)*
representative  *(1)*
represented  *(4)*
representing  *(2)*
Republican  *(1)*
request  *(12)*
requests  *(23)*
require  *(2)*

required  *(1)*
requires  *(3)*
resentful  *(1)*
reservations  *(1)*
reset  *(12)*
resignation  *(3)*
resigned  *(3)*
resigning  *(1)*
resisted  *(1)*
resolution  *(2)*
respect  *(2)*
respond  *(7)*
responded  *(4)*
responding  *(5)*
responds  *(3)*
response  *(14)*
responses  *(12)*
responsibilities  *(2)*
responsibility  *(2)*
responsive  *(27)*
responsiveness  *(1)*
rest  *(2)*
restored  *(4)*
result  *(4)*
resume  *(2)*
resumes  *(1)*
retained  *(1)*
retaliation  *(5)*
retire  *(1)*
retired  *(1)*
retiring  *(2)*
return  *(1)*
returned  *(1)*
revealed  *(2)*
revenge  *(3)*
review  *(8)*
reviewed  *(7)*
reviewing  *(4)*
revise  *(2)*
revised  *(1)*
Reynolds  *(1)*
rid  *(1)*
ridiculous  *(2)*
RIESER  *(1)*
Right  *(132)*
ripe  *(2)*
road  *(1)*
roaming  *(1)*
Robinson  *(21)*

Deposition of Patricia McNulty                                      Lisa Barbounis v. Middle Eastern Forum, et. al.

role *(14)*
rolling *(1)*
Roman *(27)*
romantically *(1)*
Rommo *(1)*
roof *(4)*
room *(19)*
rough *(1)*
roughly *(1)*
row *(1)*
RSVPs *(1)*
ruin *(1)*
rules *(1)*
ruling *(1)*
run *(3)*
rundown *(1)*
running *(4)*
Russell *(1)*
Ryan *(18)*
Ryan's *(2)*

< S >
sad *(1)*
sadder *(1)*
safe *(3)*
sake *(2)*
salary *(9)*
Sam *(3)*
Sam's *(1)*
sanction *(1)*
sanctions *(1)*
sandman *(4)*
Sapchat *(2)*
sat *(4)*
satisfied *(3)*
save *(6)*
saw *(7)*
saying *(47)*
says *(127)*
scared *(1)*
scenario *(1)*
schedules *(2)*
scheming *(1)*
school *(4)*
scope *(4)*
scratch *(1)*
screaming *(1)*
screen *(56)*
screwed *(1)*

scroll *(138)*
scrolled *(1)*
scrolling *(10)*
se *(1)*
search *(3)*
searched *(3)*
second *(24)*
seconds *(3)*
Section *(1)*
security *(7)*
see *(46)*
seeing *(6)*
seen *(5)*
select *(1)*
selected *(8)*
selection *(3)*
self-assessment *(4)*
send *(34)*
sending *(14)*
sends *(2)*
senior *(2)*
sense *(7)*
senseless *(1)*
sensitive *(1)*
sent *(61)*
sentence *(1)*
sentimental *(1)*
separate *(3)*
separated *(3)*
separately *(1)*
September *(8)*
series *(1)*
serious *(8)*
seriously *(4)*
serve *(2)*
served *(7)*
serving *(1)*
set *(11)*
SETH *(53)*
seth@dereksmithlaw.c
om *(1)*
Seth's *(2)*
setting *(3)*
seven *(5)*
sex *(10)*
sexual *(13)*
sexually *(13)*
sgold@discrimlaw.net
*(1)*

share *(11)*
shared *(3)*
sharif *(1)*
sharing *(1)*
She'll *(1)*
shield *(2)*
shift *(1)*
shifting *(1)*
shiny *(1)*
shit *(13)*
shits *(1)*
short *(2)*
short-lived *(1)*
shot *(9)*
shots *(45)*
show *(13)*
showed *(3)*
shower *(3)*
showing *(3)*
shown *(3)*
shut *(1)*
sick *(8)*
Sid *(6)*
side *(3)*
SIDNEY *(4)*
sightsee *(1)*
sign *(15)*
Signal *(2)*
signaled *(1)*
signed *(10)*
signing *(5)*
silly *(1)*
similar *(4)*
simple *(4)*
simply *(3)*
singer *(1)*
single *(3)*
singled *(2)*
singular *(1)*
sinister *(1)*
sister *(30)*
sister's *(1)*
sit *(5)*
site *(2)*
sitting *(5)*
situation *(3)*
situations *(1)*
six *(1)*
skimming *(1)*

skinny *(1)*
skip *(1)*
sky *(1)*
slang *(1)*
slap *(2)*
sleep *(2)*
sleeping *(6)*
slept *(7)*
Slightly *(1)*
slow *(1)*
slur *(1)*
slut *(1)*
SMITH *(3)*
smoke *(4)*
snap *(2)*
Snapchat *(14)*
sneaky *(1)*
social *(12)*
socializing *(1)*
solely *(2)*
solicit *(1)*
soliciting *(2)*
somebody *(20)*
somewhat *(3)*
son *(5)*
soon *(3)*
Sorry *(48)*
sort *(4)*
sorts *(5)*
sound *(2)*
sounded *(1)*
sounds *(3)*
spa *(3)*
speak *(39)*
speaking *(7)*
speaks *(1)*
Specialist *(29)*
specific *(4)*
specifically *(5)*
specifics *(3)*
speech *(3)*
spend *(2)*
spending *(2)*
spoke *(16)*
spoken *(13)*
spot *(1)*
spring *(2)*
stab *(1)*
stabbing *(1)*

Lisa Barbounis v. Middle Eastern Forum, et. al.

Stacey *(1)*
Stacy *(1)*
stage *(1)*
stalk *(1)*
stalked *(1)*
stance *(1)*
stands *(1)*
Star *(3)*
start *(10)*
started *(24)*
starting *(5)*
Starts *(3)*
state *(4)*
stated *(2)*
statement *(10)*
STATES *(4)*
static *(1)*
stating *(2)*
station *(3)*
stay *(11)*
stayed *(1)*
staying *(1)*
stenographic *(1)*
stepped *(1)*
stepping *(1)*
steps *(2)*
Stillwell *(1)*
stomach *(1)*
stone *(1)*
stop *(123)*
storage *(1)*
store *(3)*
stored *(1)*
stories *(3)*
storm *(1)*
story *(3)*
straight *(2)*
strained *(1)*
strange *(1)*
strategy *(1)*
Street *(3)*
streets *(2)*
stressed *(2)*
stuff *(10)*
stupid *(3)*
style *(4)*
subject *(9)*
subscribed *(1)*
subscribers *(1)*

subsequent *(1)*
substance *(2)*
substantial *(2)*
successes *(1)*
suck *(1)*
sue *(1)*
suffered *(1)*
suggest *(2)*
suggested *(4)*
suggesting *(1)*
Suite *(3)*
sultry *(1)*
Sun *(2)*
Sunday *(1)*
super *(4)*
supervise *(1)*
supervised *(1)*
supervising *(1)*
supervisor *(2)*
supervisors *(2)*
supervisory *(3)*
supply *(1)*
support *(2)*
supposed *(21)*
sure *(71)*
surname *(1)*
surrounding *(1)*
surveillance *(3)*
survival *(1)*
Survivor *(1)*
swear *(2)*
sweat *(1)*
SWORN *(1)*
systems *(1)*

< T >
tab *(1)*
table *(1)*
tabs *(2)*
take *(65)*
taken *(17)*
takes *(1)*
tales *(1)*
talk *(68)*
talked *(40)*
talking *(103)*
talks *(2)*
target *(1)*
tech *(1)*

technical *(2)*
technically *(1)*
telegram *(1)*
tell *(103)*
telling *(38)*
tells *(3)*
ten *(10)*
tendency *(1)*
tendered *(1)*
tense *(1)*
tension *(1)*
tensions *(4)*
tenure *(3)*
term *(4)*
terminate *(1)*
terminated *(3)*
terminating *(1)*
termination *(2)*
terms *(7)*
terrorism *(1)*
terrorist *(1)*
terrorists *(1)*
Terry *(5)*
test *(2)*
TESTIFIED *(14)*
testifying *(2)*
testimony *(15)*
Text *(101)*
texted *(5)*
texting *(1)*
texts *(6)*
Thank *(18)*
Thankfully *(1)*
thanks *(1)*
theater *(9)*
theirs *(2)*
Thelma *(1)*
thereof *(1)*
thigh *(1)*
thing *(30)*
things *(72)*
think *(193)*
thinking *(12)*
thinks *(4)*
third *(5)*
Thirty *(2)*
Thomas *(38)*
Thomas's *(2)*
thought *(39)*

thoughts *(3)*
thousand *(10)*
thread *(1)*
threat *(1)*
threaten *(1)*
threatened *(3)*
threatening *(7)*
threats *(1)*
three *(30)*
three-year-old *(2)*
throw *(3)*
throwing *(2)*
throws *(1)*
Thursday *(2)*
ticket *(20)*
tickets *(5)*
tiff *(1)*
Tiffany *(15)*
till *(1)*
time *(170)*
times *(26)*
tired *(4)*
title *(10)*
tmcnulty82@gmail.co
m *(1)*
today *(35)*
Today's *(3)*
toes *(1)*
told *(144)*
Tommo *(4)*
Tommy *(22)*
Tommy's *(1)*
tomorrow *(12)*
ton *(2)*
tonight *(3)*
tons *(1)*
top *(7)*
Total *(3)*
totally *(2)*
touch *(1)*
touched *(1)*
touching *(1)*
touchings *(1)*
toxic *(1)*
train *(1)*
trained *(2)*
training *(4)*
transcribe *(1)*
transcribed *(1)*

Case 2:19-cv-05030-JDW   Document 110-3   Filed 03/02/21   Page 156 of 157

Deposition of Patricia McNulty                                    Lisa Barbounis v. Middle Eastern Forum, et. al.

transcript  (2)
transcripts  (1)
transfer  (1)
transition  (1)
transmitting  (2)
trap  (1)
travel  (1)
traveling  (5)
treat  (2)
treated  (3)
treats  (1)
Trek  (1)
trial  (2)
Tricia  (3)
Tricia's  (3)
trick  (3)
tried  (10)
trip  (30)
TRISHAEEEE@hotm
ail.com  (1)
trouble  (2)
true  (17)
Trump  (1)
trust  (15)
truth  (2)
truthful  (2)
try  (15)
trying  (39)
Tuesday  (2)
tumultuous  (1)
tunnel  (1)
turn  (7)
turned  (1)
tweet  (1)
tweeted  (5)
tweeting  (1)
twenty  (1)
twerp  (2)
Twice  (7)
Twin  (3)
Twitter  (7)
two  (29)
two-minute  (2)
type  (3)
typed  (1)
types  (2)
typical  (2)
typo  (3)

< U >
Uber  (4)
Ugh  (2)
Uh-huh  (8)
UK  (21)
ultimately  (5)
Unbelievable  (2)
uncomfortable  (10)
underlying  (1)
understand  (43)
understanding  (6)
understands  (1)
Understood  (5)
unhappy  (4)
UNICOMP77@hotmai
l.com  (1)
UNITED  (3)
universe  (1)
unlimited  (2)
unrelated  (1)
unsuccessful  (1)
unsupported  (2)
untrue  (1)
updated  (1)
upset  (13)
use  (49)
username  (7)
usually  (2)

< V >
vacation  (3)
Vaguely  (1)
vape  (1)
various  (1)
Vasili  (12)
Vasili's  (1)
vent  (1)
venting  (2)
ventriloquist  (1)
verbal  (1)
verbally  (1)
verbatim  (1)
verification  (7)
verified  (1)
verify  (2)
Verizon  (2)
version  (2)
versus  (3)
video  (40)

viewpoint  (1)
violation  (1)
visit  (5)
visiting  (1)
voice  (2)
volition  (1)
volume  (1)
vote  (4)
voted  (1)
voting  (1)
vs  (1)

< W >
wait  (6)
waited  (2)
waiting  (5)
waive  (1)
waiving  (1)
walk  (2)
walking  (2)
wall  (1)
Walton  (3)
wanna  (2)
want  (115)
wanted  (41)
wanting  (1)
wants  (5)
warn  (1)
warned  (4)
warning  (2)
Wars  (2)
Washington  (3)
waste  (4)
wasting  (1)
watch  (4)
way  (56)
ways  (3)
weak  (1)
wear  (1)
Weber  (8)
week  (16)
weekend  (10)
weekends  (1)
weeks  (5)
Weinstein  (4)
weird  (1)
welcome  (7)
well  (147)
well-versed  (1)

went  (40)
we're  (102)
Westeros  (1)
Westrop  (1)
We've  (1)
WhatsApp  (13)
white  (1)
wifed  (1)
WILLIAM  (1)
willing  (3)
win  (1)
window  (1)
Winfield  (1)
wink  (1)
winter  (1)
wire  (1)
wise  (1)
wish  (1)
withdraw  (5)
withdrawing  (1)
withdrew  (4)
WITNESS  (115)
witness's  (2)
Woah  (3)
woes  (2)
woke  (1)
Wolson  (1)
woman  (1)
women  (2)
won  (1)
wonder  (1)
wondering  (2)
word  (7)
words  (6)
work  (121)
worked  (12)
working  (65)
workload  (9)
workloads  (1)
workplace  (3)
works  (5)
workshop  (1)
world  (3)
worried  (1)
worry  (4)
worse  (2)
worst  (4)
Wow  (1)
wrapped  (1)

**wrist**  *(1)*
**write**  *(15)*
**writes**  *(20)*
**writing**  *(6)*
**written**  *(6)*
**wrong**  *(11)*
**wrote**  *(5)*
**Wyoming**  *(1)*

**< Y >**
**Ya**  *(1)*
**Yeah**  *(164)*
**year**  *(16)*
**years**  *(40)*
**yelled**  *(1)*
**yellow**  *(14)*
**Yesterday**  *(9)*
**Yo**  *(3)*
**Yoder**  *(3)*
**Yonchek**  *(3)*
**York**  *(5)*
**Young**  *(1)*
**younger**  *(1)*

**< Z >**
**zero**  *(1)*
**Zionist**  *(1)*
**ZOA**  *(1)*
**Zofran**  *(1)*
**zone**  *(1)*
**Zoom**  *(13)*