# EXHIBIT 1
# Declaration of Daniel Pipes

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| LISA BARBOUNIS | : | CIVIL ACTION |
| | : | NO. 2:19-cv-05030-JDW |
| Plaintiff, | : | NO. 2:20-cv-02946 |
| -vs- | : | |
| | : | |
| THE MIDDLE EAST FORUM, et al. | : | |
| | : | |
| | : | |
| Defendants. | : | |

**DECLARATION OF DANIEL PIPES IN SUPPORT OF**
**DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

I, Daniel Pipes, make the following declaration in accordance with 28 U.S.C. 1746, and declare under penalty of perjury that the following is true and correct based upon my personal knowledge.

1.      I am the President of The Middle East Forum ("the Forum" or "MEF"), the defendant and counterclaim plaintiff in the above-captioned action.

2.      The Forum is a research institute founded which I founded in 1994.

3.      The mission of the Forum is to promote American interests in the Middle East and to protect Western values from Middle East threats.

4.      In the Middle East, the Forum focuses on ways to defeat radical Islam, work for Palestinian acceptance of Israel, develop strategies to contain Iran, and deal with advancing anarchy.

5.      In the United States, the Forum emphasizes the danger of lawful Islamism, protects the freedoms of anti-Islamist authors and activists, and works to improve Middle Eastern studies.

6.      The work performed by the Forum, at times, generates controversy.

7.      As a result, the Forum's employees are occasionally subject to threats by terrorist organizations, including ISIS and Al Qaeda.

8.      Confidentiality is of the utmost importance to the Forum, as is responsiveness to donors, as it depends on donations to carry out its mission.

9.      Those who work for the Forum have, at times, a demanding and stressful job.

10.     Forum staff are frequently required to travel.

11.     Defendant Gregg Roman is the director of the Forum.

12.     Gregg Roman is very passionate about the Forum's mission and his work.

13.     Roman works long hours to advance the Forum's mission across the globe.

14.     Roman is a demanding supervisor.

15.     He demands the same commitment from the Forum's employees as he does from himself.

16.     At times, this has led to personality clashes with his subordinates.

17.     Matthew Bennett was the former director of development of the Forum until he voluntarily resigned his position to pursue other opportunities on March 8, 2019.

18.     Plaintiff Lisa Barbounis is a former employee of the Forum and the Plaintiff in the instant case.

19.     Patricia McNulty is a former employee of the Forum and a friend of Plaintiff.

20.     Marnie Meyer is a former employee and human resources director of the Forum who often feuded with Plaintiff.

21.     Paul Harris, also known as Tommy Robinson (legal name: Stephen Christopher Yaxley-Lennon) is a United Kingdom-based political activist for whom Plaintiff did substantial work on behalf of the Forum beginning in 2017.

22.    Daniel Thomas is an affiliate of Robinson who was in charge of putting together rallies and fundraising for his benefit.

23.    Jazmin Bishop ("Bishop") is the domestic partner and mother of Thomas' three children.

24.    Caitriona Brady is a former employee of the Forum and was subordinate to McNulty and Bennett.

25.    Vasili Barbounis is Plaintiff's husband.

26.    Plaintiff began her employment at the Forum in October 2017.

27.    Plaintiff was hired as an executive liaison for the Forum and continued in that role until January of 2019, when she was promoted to Director of Communications.

28.    From the inception of her employment until November 5, 2018, Plaintiff reported to Roman.

29.    As the president of the Forum, I had ultimate supervisory authority over Plaintiff at all times during her employment.

30.    I met with new employees, including Plaintiff, and told them that that I maintained an open-door policy and that there should be "no surprises" – in other words, that employees should report any substantive issue concerning their work or their employment to me immediately.

31.    I never heard any complaints from Plaintiff about Roman until November 1, 2018.

32.    On November 1, 2018, Marnie Meyer sent me several complaints about the behavior of Gregg Roman.

33.    The complaints included allegations relating to Plaintiff, Marnie Meyer and Patricia McNulty.

34.    I took these complaints seriously and investigated them myself.

3

35.     My investigation included interviewing Plaintiff, Meyer, McNulty and Roman.

36.     Plaintiff's complaints largely centered around her issues with Roman's management style.

37.     In a meeting held to discuss these concerns on November 5, 2018, the employees' grievances centered around Roman's management style, and as reflected in the meeting notes, no allegations of sexual harassment or misconduct were raised.

38.     Roman denied all allegations of sexual harassment and misconduct.

39.     I found Roman's denials to be credible.

40.     Nevertheless, out of an abundance of caution and respect for the Forum's subordinate employees, I implemented a new supervisory structure which removed McNulty, Meyer and Barbounis from Roman's supervision and implement restrictions on contact with Roman to business hours, with no in-person contact without approval.

41.     In follow-up with the aggrieved employees, I relayed these decisions and sought their input as to whether this new structure satisfied their concerns.

42.     They all, including Plaintiff, indicated that they were satisfied.

43.     Roman agreed to the new structure, and from November 6, 2018 through March 9, 2019, he ran projects for the Forum and met with donors, but was not involved in the day-to-day in-office operations at the Forum and had little to no contact with the Forum's in-office employees, including Plaintiff, nor visited the MEF premises, except one time, supervised by me, in order to clean out his office.

44.     Between November 5, 2018 and March 7, 2019, I heard no complaints from any employees concerning sexual harassment, misconduct or retaliation by Roman from any employee.

45.     On March 8, 2019, Plaintiff requested that I have Roman return to his previous role at the Forum with some minor restrictions still in place.

46.     Plaintiff indicated that, with Matthew Bennett leaving the Forum to pursue other opportunities, she desired Roman to resume his prior duties to give the Forum direction and leadership.

47.     On March 9, 2019, I held a staff meeting to discuss Plaintiff's request, and Plaintiff again enthusiastically encouraged Roman's return.

48.     On March 13, 2019, I sent a letter to Roman summarizing the new terms of his employment and return to the office, which included a closer collaboration with office staff, but with several restrictions in place, including no authority to hire and fire the Forum's employees, no authority to monitor or restrict communications of staff with me, and no communication with employees outside of normal business hours except at sponsored events or through the use of the company's email or Telegram systems.

49.     After March 13, 2019, Plaintiff never complained to me about any sexual harassment, sexual misconduct or retaliation by Roman.

50.     In May of 2017, the Forum began working with Tommy Robinson ("Robinson"), to support his free speech rights on controversial subjects.

51.     In Spring of 2018, Barbounis began working on the Forum's behalf to support Robinson's free speech rights.

52.     Plaintiff's first and primary point of contact for Robinson was a man named Daniel Thomas.

53.     At Plaintiff's urging, the Forum provided Thomas with a $32,000 grant to fund a rally to show support for Robinson

54.     Plaintiff was tasked with managing the Forum's relationship with Robinson.

55.     At her request, Plaintiff went to London to help with and witness the rally and to supervise the use of the Forum's funds.

56.     On August 3, 2018, Plaintiff sent a memorandum to Roman advocating for an increase in the Forum's financial support for Robinson.

57.     I had become concerned about The Forum's support for Robinson and indicated that we should limit the Forum's support to his legal issues and refrain from becoming involved in any political support for him.

58.     In the fall of 2018, I became concerned that Plaintiff's support for Robinson was causing her to neglect her responsibilities to the Forum and causing potential problems for the Forum.

59.     As a 501(c)(3) organization, The Forum cannot and does not involve itself in support for political candidates.

60.     Between December 2018 and July 2019, I had numerous exchanges with Plaintiff wherein I repeatedly warned her about her work with Robinson, informed her of the problems that it could cause for her and for the Forum, and cautioned her that her work for the Forum must be her priority.

61.     Although Plaintiff indicated at the time that she understood and agreed with my concerns, I have since discovered that she ignored my caution and warnings.

62.     Ultimately, after Plaintiff's disregard for my instructions caused her work performance to suffer greatly.

63.     Nevertheless, I never disciplined her or terminated her for performance or any other reason, and in fact gave Plaintiff two bonuses in early 2019 for a job well done in addition to her promotion to Director of Communications.

64.     In May of 2017, The Guardian wrote an article tying The Forum to Robinson's political campaign because of Plaintiff's work with Robinson.

65.     After an exchange with Plaintiff, on June 5, 2019, I wrote to her: "The Guardian article from May 17 has a long, insinuating paragraph about you along with a picture of you. The clear implication is that MEF supports Tommy Robinson's campaign. This rates as both a surprise and an unwelcome complication. The article could entirely disappear but it could also pop up in the future and make trouble for us. I do not want potential trouble hanging over us, so am displeased. You and I have already discussed the matter of your affiliating MEF too closely with Tommy Robinson and we reached an informal agreement that you would stay away from his efforts. Given this development, I am now imposing a formal limitation on you: No campaign work, even during your private time, without clearance from me."

66.     On June 17, 2019, I again wrote to Plaintiff: "I am reluctant to tell you where to go and what to do in your private time. But I am adamantly opposed to the press getting wind of your working with Tommy; we have a limited role in his work and your repeated presence there goes much beyond our preferred limits. So, go if you wish but know I will be very upset with major consequences if your presence becomes known outside Tommy Robinson's own circles. Put differently, I much prefer you not go but I leave the decision to you."

67.     On August 17, 2019, Plaintiff voluntarily resigned from her position at The Forum.

68.     Since Plaintiff filed her lawsuit, through discovery and depositions in this matter, I have learned of disturbing information of which I was unaware during Plaintiff's employment.

69.     For example, I learned that Thomas misappropriated the Forum's grant monies, that Plaintiff was aware of his misappropriation, and that Plaintiff never reported that misappropriation to anyone at the Forum, and specifically not to me.

70.     Had she done so, The Forum would have made efforts to recover the entirety of the funds provided to Thomas and would have terminated all subsequent funding of Robinson.

71.     Had I known about Plaintiff's failure to inform the Forum of Thomas' misappropriation, I would immediately have terminated her employment with the Forum for cause.

72.     I also learned that Plaintiff was dishonest with me concerning her prioritization of The Forum's work over her work for Robinson, my instructions to her to limit and ultimately stop any work with Robinson's political campaign, and her loyalty to The Forum.

73.     At one point, Plaintiff claimed that she took her children on a personal vacation to Europe, which I later discovered was a lie to cover her activity with Robinson.

74.     Had I known about her dishonesty at the time, I would have terminated her employment with The Forum for cause.

75.     I also learned that Plaintiff in harassment of Jazmin Bishop, Thomas' wife, and said to Bishop some extremely vulgar and offensive things over the course of several months.

76.     By way of example, I learned that Plaintiff told Bishop the following, among other things:

- "You're the biggest fucking loser I've ever met in my entire life. I actually can't think of anybody in the world more pathetic than you right now. Think about what you're doing on your Saturday night."

- "He dogged you to me in texts you read. He slept with me and came home to you. He posted pics of your kids with our songs. And lied to you the WHOLE time. I'm the one who told your everything and you still think I'm the liar. You are totally insane" and "I am going to galas with the Vice President today. You think I care about two welfare losers [sic]"

- "I'll protect him but don't want him. I have no relationship with you. The only reason I ever showed you anything in the first place was because I was sick of all the lies. But since you refuse to go anywhere there's not benefit in that for me. It's all

a cost benefit analysis. And there is no return on my investment from showing you anything."

- "That's why it's so funny for me you get all angry and call me all these names but deep down it's all because you know how awesome I am and it scares you. You see me as a threat to your life. And if you didn't think that I had any power over you or Danny you wouldn't be messaging me."

- "Oh, but I do. I really do, because you were so pathetic and sad, you told me all of it. You poor thing. Have another abortion, you whore [laughter]."

- "I went to an Ivy League school twice and I work for Congress, she's plenty proud. You mom's a junkie that puts fucking drugs up her snatch. What a loser."

77.    I do not tolerate that kind of behavior or conduct by employees of The Forum, even if carried out on the employee's personal time.

78.    Had I known of Plaintiff's behavior at the time and if she were still employed by The Forum, I would have terminated her employment with The Forum for cause.

79.    I would have terminated her had I known the truth.

80.    In short, had I known about (1) Plaintiff's knowledge of and failure to report Thomas' misappropriation of The Forum's grant funds for personal use; (2) her continual disregard of my instructions to limit her work for and association with Robinson; (3) her many misrepresentations to me about the purpose of her trips to the United Kingdom; and (4) her treatment of Bishop in voice mails and text messages; I would have terminated Barbounis with cause for any single one of the above.

81.    I have also learned that Plaintiff is in active association with several high-ranking members of far-right white nationalist organizations, such as the Proud Boys, and has indicated support for those people and organizations on social media.

82.    The Forum adamantly opposes white nationalism and would not have tolerated such associations were I aware of them at a time when Plaintiff was employed by The Forum.

83.     Plaintiff's failure to inform the Forum about Thomas' misappropriation has caused damage to the Forum by, among others things, (1) preventing the Forum from recouping the monies paid to Thomas, (2) continuing to support Robinson financially, (2) continuing to employ Plaintiff and pay her for her work with Robinson, and (4) causing the Forum to incur significant investigative and legal costs.

84.     Plaintiff's misrepresentations to the Forum concerning the scope and extent of her work with Robinson and her support of his election campaign has caused damage to the Forum by, among other things, (1) creating the appearance that the Forum was engaged in political activity, which is contrary to its mission, (2) subjecting the Forum to significant negative media coverage, (3) causing the Forum to continue to employ and pay Plaintiff.

85.     Plaintiff's conspiracy with Thomas (to cover up his misappropriation) and with Robinson (to continue working for him in a political capacity despite my instructions) caused damage to the Forum for the same reasons as set forth above.

86.     I swear under penalty of perjury that the foregoing is true and correct based on my personal knowledge.

Executed March 1, 2021.

_/s/ Daniel Pipes_____
DANIEL PIPES

# EXHIBIT 2
# Deposition of Lisa Barbounis

# BARBOUNIS DEPOSITION EXCERPTS

# PART 1

LISA REYNOLDS-BARBOUNIS

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF PENNSYLVANIA

- - -

LISA BARBOUNIS          :   CIVIL ACTION NO.

                        :   2:19-cv-05030-JDW

      vs.               :

                        :

THE MIDDLE EAST FORUM,  :

and GREGG ROMAN        :

(individually)         :

- - -

WEDNESDAY, NOVEMBER 4, 2020

- - -

VIDEOTAPE DEPOSITION OF LISA
REYNOLDS-BARBOUNIS, taken pursuant to
notice, was held by and between all parties
present via communication technology using
Zoom, commencing at 11:03 a.m., before
Kimberly S. Gordon, a Registered
Professional Reporter, Certified Court
Reporter and Notary Public.
                   - - -
      ELITE LITIGATION SOLUTIONS, LLC
             One Penn Center
      1617 J.F.K. Boulevard, Suite 340
      Philadelphia, Pennsylvania 19103
      www.elitelsllc.com ~ (215) 563-3703

LISA REYNOLDS-BARBOUNIS

Page 48

1          to keep this exhibit up for now?

2                    MR. CAVALIER:  Yes, for now.

3     BY MR. CAVALIER:

4       Q.    Do you have a sexual relationship

5     with Mr. Baird?

6       A.    I do not.

7       Q.    Have you ever engaged in sexual

8     activity with Mr. Baird?

9       A.    I have.

10      Q.    When?

11      A.    2019.

12      Q.    And where did that occur?

13      A.    D.C.

14      Q.    Was this over a period of time or was

15    it one discrete incident?

16                   MR. CARSON:  I'm going to

17          object.

18                   THE WITNESS:  Uhm.

19                   MR. CARSON:  I'm going to

20          object.  We're not going to go into a

21          history of her sex life today, and

22          I'm going to direct her not to answer

23          questions if you try to.  I'll allow

24          this line of questioning to finish,

LISA REYNOLDS-BARBOUNIS

Page 62

1           THE WITNESS:  No, I want to.

2           MR. CARSON:  Lisa, you don't

3      have to.

4           THE WITNESS:  I never cheated

5      on my husband or had an affair or

6      anything.  This is what happened, The

7      Middle East Forum beat me down.  They

8      beat me down so bad, so bad.  I never

9      so much just looked at another man,

10     okay, until The Middle East Forum.

11          And did you know that sexual

12     abuse survivors and sexual assault

13     victims and sexual people that have

14     been attacked by sexual predators,

15     like Gregg Roman, one in four have

16     extra things like what I do, right.

17     It's a classic trauma symptom.  So

18     don't you go and start blaming my sex

19     life on what happened to me.

20          The only reason that I had sex

21     with anybody was because The Middle

22     East Forum damaged my freakin'

23     emotional state.  So please, I don't

24     want to go there.  This is The Middle

LISA REYNOLDS-BARBOUNIS

Page 63

1        East Forum's -- The Middle East Forum
2        did it all.  They beat me down so
3        bad, so badly that I just needed, I
4        needed to feel happy, to feel good,
5        to feel proud of myself.
6                Don't you dare try to use my
7        sexual life or my sexual anything as
8        a reason.  It wouldn't have even
9        happened had it not been for The
10       Middle East Forum, none of this, my
11       marriage, my dating life, none of it.
12       It's all The Middle East Forum's
13       fault.  Those people are predators.
14               MR. CARSON:  So, Jon,
15       irrespective of what you might have
16       read in medical records, --
17               MR. CAVALIER:  Well, Seth,
18       irrespective of the records, it's
19       clearly relevant now.
20               MR. CARSON:  It's not a license
21       to ask her about every guy she's ever
22       had sex with.  It's not a license to
23       ask her about every guy she's ever
24       spoken to and then ask her if she's

LISA REYNOLDS-BARBOUNIS

Page 111

1   something.

2         You know, any -- like dismissive,

3   like I would always try to resort to like

4   dismissive humor.  Because then it was more

5   like, "Oh, Gregg, come on, you're being

6   weird", like that, because it was less

7   hostile and aggressive.  Because I was, you

8   know, afraid that he would, I don't know, do

9   something.  He's weird.

10   Q.    So I need you to explain that.

11   Because I've never met the man in person.

12   So --

13   A.    Good for you.

14   Q.    So tell me what you mean by that.

15   I'm trying to understand what you mean when

16   you say that he's scary.

17   A.    Well, I mean physically he's

18   intimidating.  I mean --

19   Q.    Why?

20   A.    Just think about it this way, he's so

21   intimidating that Delaney, a 22-year old

22   girl, when we were having a meeting, thought

23   she needed to bring pepper spray.  She

24   brought pepper spray to a business meeting

LISA REYNOLDS-BARBOUNIS

Page 112

```
 1   because she was physically afraid of Gregg
 2   Roman.
 3           Like the man is big, loud,
 4   boisterous.  He is -- and he is -- I've seen
 5   him be like real manipulative with employees,
 6   and that started like from Day 1.  And I'm
 7   not just talking -- like Eman Patel was a
 8   girl that we worked with, and he told me that
 9   she was a walking lawsuit because she was
10   gay, Muslim and a woman.  And so they were
11   giving her, purposely giving her work that
12   she couldn't do because of like constraints
13   on her identity so that would she would leave
14   on her own accord.  And I saw him do that.
15   So I was, you know, like, "This guy is
16   like -- he'll do anything.  I don't know what
17   he'll do.  He's nuts".
18       Q.    So let me unpack that a little bit
19   before we take our break.  Gregg Roman said
20   that to you about Eman?
21       A.    Yes.
22       Q.    What did you say in response?
23       A.    I said, "That's not right".  And he
24   goes, "Well, she's also not good.  She's on
```

LISA REYNOLDS-BARBOUNIS

Page 122

1    worked there did everyone become really like

2    closer and a family and like I get them all

3    to talk again.  Like they had two staffers

4    had a problem with the Legislative Director,

5    and now it's gone.  Because I encourage

6    people if you just show people kindness,

7    sometimes their bark dies down.

8        Q.    So, if Gregg was behaving in a way

9    that you didn't like and you were not telling

10   him to stop and you were killing him with

11   kindness, how would he ever know that what he

12   was doing was wrong?

13                MR. CARSON:  Objection.

14                THE WITNESS:  Hold on a second.

15           Because when I would kill him with

16           kindness and be dismissive, I'm like,

17           "Gregg, stop.  You're gross.  It's

18           inappropriate", like in a dismissive,

19           funny way.  I mean I was still

20           letting him know.

21                Just because my tone wasn't

22           like "Gregg, you're the most

23           disgusting person on the planet"

24           doesn't mean -- he's not, he's not an

LISA REYNOLDS-BARBOUNIS

```
 1          idiot.  Gregg is very smart.  He
 2          knows when he's inappropriate.  He's
 3          an adult.  He knows how to act.  He
 4          knows what's right and wrong, I hope
 5          so, unless he's a complete sociopath,
 6          which he might be.
 7                   I mean you're a human.  You
 8          know when you're doing right and
 9          wrong, don't you?
10  BY MR. CAVALIER:
11     Q.    But he wouldn't know --
12     A.    Yes, he would.  He definitely knew it
13  was unwelcome, 100 percent.
14     Q.    Well, okay, let's say --
15     A.    Friend zone a guy, right.  Like girls
16  all the time, women talk about all the
17  time, --
18     Q.    What does "friend zone" mean?
19     A.    -- "Put the guy in a friend zone.  He
20  knows he's in the friend zone".  Men are very
21  aware that they're in the friend zone, "I'm
22  never getting anywhere with this girl.  She's
23  in the friend zone".
24                   I was trying to make sure Gregg was
```

LISA REYNOLDS-BARBOUNIS

Page 124

1    super friend-zoned.  I talked to him about my

2    husband, my family, my kids.  I invited him

3    to places, well, in group events only.  I

4    never invited Gregg out one-on-one, never.

5    Would never do that in a million years.  I

6    tried to kill this dude with kindness and

7    make sure he knew he was friend-zoned.

8    Because he was.

9        Q.    And what do you mean by

10   "friend-zoned"?

11       A.    It's like the standard urban

12   dictionary if you want to look it up what

13   "friend zone" means.  "Friend zone" means

14   you're not going to have sex with that

15   person.  You're in a zone that has no sexual

16   components to it at all.

17       Q.    When you use the term "friend zone",

18   does it imply that that's a negative place

19   for a guy to be?

20       A.    I mean --

21              MR. CARSON:  Objection.

22              THE WITNESS:  I guess.  I mean

23          it depends if -- if the guy likes the

24          girl, I guess it's negative for him.

LISA REYNOLDS-BARBOUNIS

Page 125

1           If the girl -- you know, it depends
2           on like the context I guess.
3   BY MR. CAVALIER:
4     Q.    I'm just trying to understand.  I've
5   been married for 400 years.  This is new to
6   me.
7     A.    You've never heard of "friend-zoned"?
8     Q.    I've heard of it, but I want to know
9   what it means to you.
10    A.    I just told you.  It means that --
11              MR. CARSON:  Objection.
12              THE WITNESS:  -- you can have a
13          professional or a friendship
14          relationship with somebody and they
15          know clear as day that they're in a
16          friend zone, there's no sex
17          happening, no kissing, no holding
18          hands, no physical contact,
19          inappropriate, all of it.  Friend
20          zone, no sex.
21  BY MR. CAVALIER:
22    Q.    Amongst friends, is it common to
23  have, even amongst friends in the friend
24  zone, is it common to have banter about sex

LISA REYNOLDS-BARBOUNIS

Page 151

1  You know what I mean?  Like it was forever.

2          Where do I draw the line between

3  being drunk and drinking?  I don't know,

4  where like you're like, I don't know, loopy

5  feeling in your head.

6     Q.    Were there other people drinking --

7     A.    Yes.

8     Q.    -- at the bars?

9     A.    Everybody was, yes.

10    Q.    Was anybody drunk?

11    A.    I don't think anybody was drunk, not

12  one person.  I don't even think Gregg was

13  drunk.

14    Q.    So you go back to the Airbnb?

15    A.    Uh-huh.

16    Q.    And everybody is just hanging out?

17    A.    Uh-huh.  They were talking, they were

18  talking like to the Pinsker kids, talking

19  about work and what they do and, you know,

20  just like BS'g.  I forget, there might have

21  been other people there too.

22          I know the Pinsker kids were there.

23  I was so tired.  I remember being tired.  But

24  like there was the Pinsker kids were there,

LISA REYNOLDS-BARBOUNIS

Page 183

1    first got there, I think.

2        Q.    So you wake up in the morning on the

3    couch at the Airbnb the next day?

4        A.    And I said, "Can we all get out of

5    here, please", and then we all got in an Uber

6    I think and went back to our hotel.  I don't

7    really remember, but yes.

8        Q.    What happened with the rest of the

9    trip?  Anything of note?

10       A.    No.  We all went home.

11       Q.    Okay.  So you get back from AIPAC.

12   Did you ever confront Gregg about what

13   happened in D.C.?

14       A.    No.  Why would I?  He's my boss.  He

15   doesn't like what I say, I'm fired.

16       Q.    Did you ever tell him that he made

17   you feel uncomfortable?

18       A.    No.  That would only, that would only

19   like make Gregg angry and mean and vengeful.

20       Q.    Did you ever tell him that you didn't

21   like being touched by him?

22       A.    No.  Who is going to say that to

23   their boss, "Please don't touch me"?

24       Q.    Did you ever tell him that he made

LISA REYNOLDS-BARBOUNIS

Page 184

1   you feel uncomfortable in social situations?

2       A.    How could he not tell when I jerked

3   myself away from him?

4       Q.    Did you ever verbalize to him that

5   you were uncomfortable with him in social

6   situations?

7       A.    No.  Should I need to?  I mean, like

8   if somebody punches you in the face, you know

9   that's inappropriate, do I need to tell them

10  that that was wrong that they punched me in

11  the face?

12      Q.    Did you ever tell him not to touch

13  you anymore?

14      A.    No.  Should I tell people not to tell

15  me not to -- please don't punch me in my face

16  anymore?  I mean, like you know it's wrong,

17  right?

18      Q.    Did you ever tell Daniel Pipes that

19  you were uncomfortable with Gregg Roman?

20      A.    I hardly ever saw Daniel Pipes.

21  Daniel Pipes would come into the office maybe

22  once a month to pick up his mail, he'd sit in

23  his office, he may come in my office and put

24  a thing on my desk to fax.

LISA REYNOLDS-BARBOUNIS

Page 186

1          He was hiding things from Daniel

2     Pipes, including that he was paying our, half

3     of our insurance or that he spent $400,000 on

4     a website that had nothing happen.  I saw him

5     lie to Daniel Pipes about donors.  Telling

6     Daniel Pipes isn't going to do anything.

7          Q.    Did you ever go to HR at this point

8     in time?

9          A.    Marnie is HR.  And I did tell her

10    when I came back from Israel, well, I

11    attempted to tell her, but then it got

12    awkward and then I didn't say anything.  But

13    I told Matt.  I felt comfortable enough with

14    Matt.

15          Because Marnie and Gregg were like,

16    were like two little peas in a pod kind of

17    thing.  Like Marnie, when Gregg would do

18    things wrong, Marnie would like stick up for

19    him, and like I never understood that, like I

20    never got it.  And that's a lot of the reason

21    why Marnie and I didn't get along for the

22    very first part of like the whole first year.

23    I mean Marnie and I were not like -- we

24    butted heads all the time, and it was because

LISA REYNOLDS-BARBOUNIS

Page 190

1    on this like Little Project", or whatever,

2    some sneaky project he was doing, Saudi

3    thing, I don't know, right, and so -- well, I

4    do know like some of it but I don't really

5    recall all the details, but I don't know who

6    hired him or any of that stuff.  All I know

7    it was called the Little Project and it was

8    about like influencing people on how to do

9    it.

10          So he claimed that like he was

11   bringing me because you weren't supposed to

12   like do that stuff on American soil and I can

13   help him with the PowerPoint presentation and

14   whatever.  But then why would you ask Marnie

15   to go?  I didn't think about this until

16   later.  Like why would you ask Marnie to go?

17   She don't do PowerPoint presentations, right.

18   Like what do you need somebody to go with you

19   on that trip for?  I didn't think about it.

20   I said, "I want to go to Israel.  I've never

21   been there".

22          I had never travelled much at all.  I

23   didn't go on my first airplane until I was

24   25-years old and I went, you know, Vasil-, my

LISA REYNOLDS-BARBOUNIS

Page 191

1   husband took me to Paris.  But like, you

2   know, I'm not well-travelled, and I always

3   wanted to be.  So why not jump on an

4   opportunity to prove to my boss that I can be

5   flexible, I can travel, and I can get work

6   done that he needs and be involved?  Of

7   course I would want to go on that trip.

8       Q.    So the first person that he asked to

9   go on the trip was Matt Bennett, right?

10      A.    First that I know he asked was

11  Marnie.

12      Q.    Okay.

13      A.    I didn't know about him asking Matt.

14      Q.    So, when you heard that this trip was

15  happening and found out that Marnie did not

16  want to go, did you go to Gregg and tell him

17  that you wanted to go?  Did you express

18  interest?

19      A.    Yes.  Well, he said, "Do you want to

20  go"?  I said, "Hell, yes, I want to go.  I

21  want to go.  Let me go".

22      Q.    Okay.  After what happened at AIPAC,

23  you weren't concerned about what you just

24  described to me as all of his creepy

LISA REYNOLDS-BARBOUNIS

Page 192

1   behavior?

2      A.    It's creepy behavior.  But like I

3   said, I'm strong, I can handle that stuff,

4   and normally, I could.  I didn't think that

5   he would be as crazy as he was in Israel.  I

6   never thought that.  Because I've never

7   experienced anything like this.

8          I've never had bosses talk to me like

9   this.  I've never had co-workers treat me

10  like this.  I've never had any of that in my

11  whole life, and I worked in Congress where

12  apparently that's supposed to be rampant.  I

13  mean I was an intern down there mingling with

14  all people.  Nobody ever, ever, ever was like

15  this with me in a work environment, ever.

16     Q.    I understand.  But at the same time,

17  I mean you just --

18     A.    I just told you I'm strong, didn't I?

19  Didn't I just tell you that I would do it and

20  I wanted to go to Israel?  Didn't I just tell

21  you that the reasons that I thought I could

22  handle myself because I didn't expect Gregg

23  to be like that?  So he looks at me --

24     Q.    You did.

LISA REYNOLDS-BARBOUNIS

Page 193

1    A.    So he looks at me creepy here and

2    there, right.  Like okay, well, then let me,

3    let me, you know, tell him it's not cool and

4    get work done.  Maybe if he sees me as an

5    equal, he'll start treating me with some

6    respect.  Maybe if I show him what a good job

7    I do here in Israel and how professional I

8    can be in front of members of the Knesset,

9    then he'll have some respect for me.

10          You don't see how anybody would think

11   that?

12   Q.    Is it fair to say then that what

13   happened at AIPAC didn't bother you that

14   much?

15   A.    Oh, it bothered me.

16               MR. CARSON:  Objection.

17               THE WITNESS:  Wait a minute.

18          It bothered me, okay, that much at

19          the time, right.  But, you know, I

20          chalk it up to, okay, maybe he's

21          drinking, he was smoking pot, maybe

22          he's high, right.

23               Like it bothered me, very much

24          it bothered me, very much it bothered

LISA REYNOLDS-BARBOUNIS

Page 194

1            me.  But did I think that it would be

2            an ongoing thing?  No.  Because who

3            does that?  Who acts like that?

4    BY MR. CAVALIER:

5      Q.    So --

6      A.    And it was an ongoing thing.

7      Q.    So, even though you had this

8    interaction with him with other people around

9    that you consider sexual in nature and it

10   bothered you, --

11     A.    I've never had anybody be like that,

12   so I don't -- so I did not --

13            MR. CARSON:  Lisa, let him

14        finish the question.

15            THE WITNESS:  And I was

16        being -- excuse me.  You asked me a

17        question.  I'm finishing.

18   BY MR. CAVALIER:

19     Q.    It's not me interrupting you.

20            MR. CARSON:  No, there's no

21        question that's asked.  So you know

22        what he's asking you?

23            THE WITNESS:  I'm sorry.  Say

24        that again.  Say it all over again.

LISA REYNOLDS-BARBOUNIS

```
1         Go.
2    BY MR. CAVALIER:
3       Q.    My question is:  You just described
4    to me a physical interaction with Gregg at
5    AIPAC that you considered sexual and very
6    uncomfortable?
7       A.    Correct.
8       Q.    That occurred with multiple other
9    people around?
10      A.    Correct.
11      Q.    And it's part of your Complaint in
12   this case?
13      A.    Correct.
14      Q.    But then a month later, you
15   enthusiastically join him one-on-one on a
16   trip to a foreign country where you'd be
17   staying in the same building at least?
18      A.    Correct.
19      Q.    And what I'm trying to understand is
20   how you square those two things.
21      A.    Because, A, I didn't think that there
22   would be any drinking involved in the trip.
23   B, I trusted Gregg that he wouldn't be -- you
24   know, like I didn't think, I don't, I didn't
```

LISA REYNOLDS-BARBOUNIS

Page 196

1   think that this would happen again.  I

2   thought this was like a one-time weird Gregg

3   moment.  It wasn't.  It turned out it wasn't.

4   I was being naive.

5       Q.    But you also told me that Gregg was

6   constantly weird?

7       A.    He was constantly weird.  But men are

8   constantly weird with me all the time, just

9   never my bosses.  Do you know how many guys

10  hit on me a week?  No offense, like I'm

11  not -- I'm not saying like I'm this most

12  beautiful girl in the world, but like men are

13  constantly looking at me like that.  I can --

14  like I said, I went to the gas station the

15  other day, the 7-11 the other day.  The guy

16  was like, "Nice dress".  I mean people are

17  always leering at me.  Yes, it happens.

18  Should it happen in your work environment,

19  should it make you uncomfortable, should it

20  affect your work product, should it affect

21  your home life and your mental instability,

22  no.

23          Most men look at me.  So I figured

24  that he was one of those most men and I would

LISA REYNOLDS-BARBOUNIS

Page 197

1   just deal with it.  I didn't think that he

2   would solicit me for blow jobs, put his foot

3   up my ass, and like say things that aren't

4   inappropriate and make me actually nervous

5   and scared.  And no, I didn't think that he

6   would be out drinking.  It's not like it was

7   a work thing.  I didn't -- we weren't

8   supposed to be entertaining anybody.  I

9   didn't think he'd be drinking.

10          And the first night I chalked it up

11  to, okay, A, Gregg is creepy all the time; B,

12  this is an isolated incident because he was

13  drinking or high or whatever his excuse was.

14  And like I said, I didn't think he was drunk,

15  but he was definitely drinking and he was

16  definitely freakin' smoking pot.

17     Q.    But I don't understand --

18     A.    I didn't think that any of that would

19  happen now.

20     Q.    So you just said he's creepy all the

21  time but this was an isolated incident?

22     A.    The physical element of it was an

23  isolated incident.

24     Q.    Okay.

LISA REYNOLDS-BARBOUNIS

Page 198

```
 1      A.    That's what I thought.

 2      Q.    Okay.

 3      A.    I thought that that was a one-time

 4    thing that he wouldn't do it again, that it

 5    was an isolated incident.  That's what I

 6    thought.  I believed that.

 7           Because I don't believe that most

 8    people are creepozoids like Gregg Roman.

 9    Because that's not -- like that would be

10    thinking that everybody is like a terrible

11    person, and I don't believe that about the

12    human race.

13      Q.    So --

14      A.    I didn't actually even believe that

15    Gregg was.  I thought that he was, you know,

16    weird, sad, ugly and maybe needed attention

17    because he didn't get it when he was younger,

18    I don't know.  Like I didn't think he was a

19    bad, horrible human.

20           I thought that he was like okay, he

21    found me attractive, and when he was drinking

22    at an event and smoking pot, that he was, you

23    know, doing whatever he was doing that night

24    and that I did not expect for that to happen
```

LISA REYNOLDS-BARBOUNIS

Page 200

1   answered your question.  Are you trying not

2   to be difficult right now or are you

3   purposely trying to be difficult?

4       Q.    I'm just trying to ask a question.

5       A.    Because the last time I couldn't

6   remember.

7               MR. CARSON:  Just let him ask,

8           and then you can answer.

9   BY MR. CAVALIER:

10      Q.    Up until that point, was it in fact a

11  one-time incident?

12      A.    The physical touching up until that

13  point, yes.

14      Q.    So you arrive in Israel.

15      A.    And by the way, my mom, because I

16  told her what happened at AIPAC, told me not

17  to go to Israel with him.

18      Q.    Why?

19      A.    Because she saw the signs too.  I was

20  the one that was naive.

21      Q.    What did your mom say to you about

22  Israel?

23      A.    She said, "Don't go.  I don't think

24  it's a good idea".  She didn't trust him.

LISA REYNOLDS-BARBOUNIS

Page 201

1    Mother's intuition, I guess.  Does that count

2    as a thing, that kind of intuition?

3        Q.    But you ignored your mother's advice?

4        A.    I did ignore my mother's advice.

5    I've done that a lot in my life, to my

6    chagrin.

7        Q.    So you arrive in Israel.  What

8    happens when you land?

9        A.    Nothing.  It's fine.  Everything is

10   getting ready, like whatever.  We get there

11   and he's like, "Oh, this place only has one

12   bathroom.  I know I promised you your own

13   bathroom.  I didn't know.  That's like what

14   the advertisement said".  I was like

15   "whatever" at that point.

16       Q.    Did it bother you?

17       A.    We were right in the kitchen.

18       Q.    Did it only have one bathroom?

19       A.    It only had one bathroom, and he

20   promised me two.

21       Q.    Did that bother you?

22       A.    Yes.  I don't want to share a

23   bathroom with him.  I don't want to share a

24   bathroom with any man to tell you the truth.

LISA REYNOLDS-BARBOUNIS

Page 202

1    Like what if I have to use the facilities --

2       Q.    So --

3       A.    -- in the middle of the hallway?

4       Q.    -- did it make you sexually

5    uncomfortable or was it annoying?

6       A.    Well, I had to shower right outside

7    his room, and I don't like to particularly

8    put my clothes on wet steamy.  I like to take

9    my towel and like get in my room and then get

10   dressed, but -- so now I had to like adjust

11   myself because I didn't want to walk around

12   in the ho-, in the room in a towel, yes.  It

13   was --

14      Q.    It was annoying?

15      A.    -- uncomfortable.  Of course it was.

16      Q.    That's what I'm trying to ask.  Did

17   you make that known that you had a problem

18   with the arrangement?

19      A.    No.  I figured I'd deal with it.  I'd

20   just get dressed in the steamy shower.

21      Q.    So, when he said to you, "I'm sorry

22   this place was supposed to have two

23   bathrooms, it only has one, I know I promised

24   you your own bathroom", --

LISA REYNOLDS-BARBOUNIS

Page 203

1            MR. CARSON:  Object to form.
2        Assuming facts not in evidence.  Go
3        ahead.
4    BY MR. CAVALIER:
5      Q.    Could you repeat --
6      A.    In a way --
7      Q.    Could you repeat to us what Gregg
8    Roman said about the bathroom situation?
9      A.    He just said -- well, originally,
10   when he said, he's like, "I got us an Airbnb
11   because it's cheaper".  He's like, "You'll
12   have your own room and your own bathroom".
13   And I was like, "Sold.  I'm in.  Fine".
14     Q.    Okay.  So you get there, there's one
15   bathroom.  What did Gregg say?
16     A.    He immediately addressed it, which
17   made me feel like -- like we just walked in
18   like the door and there was like this French
19   guy, he was pretty nice, and the French guy
20   leaves -- maybe he wasn't French, but he was
21   speaking French.  Whatever.  Maybe he was
22   French, I don't know.  Anyway, he leaves, and
23   then that's like the first thing Gregg said.
24   It wasn't like he even like toured around the

LISA REYNOLDS-BARBOUNIS

Page 204

1   place.  It's like he knew.  It's like ugh.

2        Anyway, so that was uncomfortable,

3   but that -- and -- but that was fine.  We

4   were there for a while.

5   Q.    What did --

6   A.    And it wasn't until --

7   Q.    What did he say to you about the

8   bathroom?

9   A.    He just said, "I'm sorry that there's

10  one bathroom.  I know I promised you that

11  you'd have your own".  And I was like

12  "whatever".  What am I going to say at that

13  point?  We're there.

14  Q.    Okay.  Okay.  So then what happened?

15  A.    We went about our business.  We went

16  to the IDF.  We went to the Knesset.  I

17  worked on like the Little PowerPoint

18  presentation.

19        He did tell me not to like put it up

20  on Facebook or put it anywhere because he

21  didn't want Daniel Pipes or his wife to know

22  that I was there.  I thought that was weird.

23  And, accidentally, I slipped and said it to

24  EJ, and I was like, "Uh, EJ, we're having the

LISA REYNOLDS-BARBOUNIS

Page 205

1    project directors' call.  Don't let anybody

2    know that you know that I'm in Israel because

3    Gregg doesn't want none of that".  And he's

4    like, "Why does he want to know that"?  And I

5    was like, "I don't know".  So I thought that

6    was weird.

7        Q.    When did he tell you that?

8        A.    He didn't want Daniel Pipes to know.

9    He didn't want his wife to know.

10            And then like he would have, he would

11   like FaceTime his wife and his kids and like

12   make me go in his room, like not in his room,

13   my room.  My husband, I would FaceTime my

14   husband out in the open, whatever.  Like

15   everybody knows what I'm doing.  That was

16   weird.

17       Q.    When did --

18       A.    When I was on the project directors'

19   calls, he wanted me to pretend like I was

20   still in the United States.

21       Q.    When did he tell you that you

22   couldn't post anything on social media?

23       A.    Before we left.

24       Q.    Okay.  So then you felt that was

LISA REYNOLDS-BARBOUNIS

Page 206

1   weird?

2       A.    Yes.  I mean like why can't anybody

3   know that I'm here?  What's the problem?

4       Q.    Did you think he was trying to pull

5   something with you?

6       A.    I didn't know what it was.  I just

7   thought it was weird.  Like I don't sit there

8   and like analyze every second of everybody's

9   being, by the way.  Like it's not like I'm

10  sitting there thinking, "Ooh, what does that

11  mean?  What's" -- do you know how like I

12  would be?  My head would be cluttered.

13           I got too much stuff to do.  I got

14  kids and a husband and work and bills.  I

15  mean I got a life here.  I can't analyze

16  every five seconds of a statement that Gregg

17  Roman makes.

18      Q.    Right.  But I think it's fair to ask.

19  I mean you said that he creeped you out

20  before.

21      A.    He does.

22      Q.    He creeped you out at AIPAC.  Now

23  he's telling you you can't post on social

24  media.  You find it weird.

LISA REYNOLDS-BARBOUNIS

Page 207

1    A.    I did find it weird.

2    Q.    Yet you're still getting on a plane

3  with him by yourself to go to Israel.

4    A.    True.

5            MR. CARSON:  Objection.  You

6         can answer.

7            THE WITNESS:  Clearly, in

8         hindsight, -- hindsight is 20/20,

9         isn't that what they say -- poor

10         judgment on my part.

11  BY MR. CAVALIER:

12    Q.    And at the same time, you never told

13  him, "You're being creepy.  Stop"?

14            MR. CARSON:  Objection.

15            THE WITNESS:  He knew he was

16         being creepy.  Please stop

17         insinuating like that man did not

18         know.  Please, you're insulting your

19         own and my intelligence by

20         insinuating that Gregg didn't

21         understand what, how his behavior was

22         making people feel.  I mean he would

23         have to be a total moron to not know

24         how he was making people feel.

LISA REYNOLDS-BARBOUNIS

Page 208

1   BY MR. CAVALIER:

2      Q.     That's not my question.   My question

3   is:  Did you ever tell him, "You are making

4   me uncomfortable?

5      A.     We went over this.   How many times

6   did we go over this?  Do you want me to

7   answer for the 5th millionth time?   No.

8                    MR. CARSON:   Asked and

9          answered.

10                   THE WITNESS:   Didn't I answer

11         that like seven times?   No.   No.

12  BY MR. CAVALIER:

13     Q.     Did you tell him --

14     A.     No.   No.

15     Q.     Did you tell him that it made you

16  uncomfortable that he was instructing you

17  that you couldn't post anything on social

18  media?

19     A.     Yes.   I said, "That's weird".   I did

20  say that.

21     Q.     You told him you thought that was

22  weird?

23     A.     Yes, I did, as a matter of fact.

24  That I did.

LISA REYNOLDS-BARBOUNIS

Page 209

1    Q.    And what did he say?

2    A.    I don't remember.

3    Q.    Did he say it was for security

4    reasons?

5    A.    It's not for security reasons, and

6    no, he did not say that.

7    Q.    So you said, "This is weird" --

8    A.    I think he was, didn't want his wife

9    to know because she would object to it.

10   That's what I think.  I think he probably has

11   a history of cheating and his wife wouldn't

12   like him in a room with a woman.  That's

13   what, that's what I think.

14   Q.    Did you tell him that?

15   A.    No.

16   Q.    You just said, "That's weird"?

17   A.    Yes.  That's how I talk.

18   Q.    You said, "That's weird", and he said

19   nothing and walked away?

20   A.    I don't remember what he said.  Do

21   you not understand that this was two years

22   ago?  I don't remember everything like a -- I

23   don't -- and I don't have super memory.

24             MR. CARSON:  Obje- -- yes.

LISA REYNOLDS-BARBOUNIS

Page 210

1    BY MR. CAVALIER:

2       Q.    Well, at the same time, I mean these

3    seem like pretty significant events in your

4    life, no?

5                     MR. CARSON:  Objection.

6                     THE WITNESS:  Yes, that's why I

7             remember crystally clear like the

8             actual events that happened, but like

9             the minutia surrounding it is not

10            like that.  I mean that's classic.

11                     I remember if I have a really,

12            if I have an argument with my

13            husband, I can almost remember

14            everything he says verbatim.  Do I

15            remember the conversation I had with

16            him yesterday during the day, no, I

17            don't remember any of that.

18                     Like it's minutia compared to

19            the actual stressful key event.

20                     Can we take a break for a

21            minute?

22                     MR. CAVALIER:  Of course.

23                     MR. CARSON:  Yes.

24                     MR. CAVALIER:  How long you

LISA REYNOLDS-BARBOUNIS

Page 211

1      want?

2              THE WITNESS:  Five minutes, not

3          even.

4              MR. CAVALIER:  Five minutes

5          doesn't work.  It never works.  Let's

6          make it ten so that we all get back

7          at 2:43.

8              THE WITNESS:  Fine.

9              MR. CARSON:  Yes, I'm going to

10         walk downstairs and grab a coffee.

11             THE VIDEOGRAPHER:  2:33.

12                 -  -  -

13         (A recess occurred.)

14                 -  -  -

15             THE VIDEOGRAPHER:  2:47 p.m.,

16         we're back on the record.

17     BY MR. CAVALIER:

18       Q.   Okay.  So, despite all of the prior

19     history that you guys had, you still wanted

20     to go on the Israel trip, yes?

21       A.   Yes.

22       Q.   So you get there.  There's an issue

23     with the bathroom.  What happens then?

24             MR. CARSON:  Yes, I'm back.

LISA REYNOLDS-BARBOUNIS

Page 212

1             Not in front of my camera yet, but

2             I'll be there in a second.  You can

3             start though.

4                   THE WITNESS:  What happened?

5             We already went over this.  I -- what

6             are you specifically referring to?

7    BY MR. CAVALIER:

8      Q.    Did you start working?

9      A.    Yes.  I think we went first to, we

10   had an IDF meeting at the --

11                  MR. CARSON:  Wait.  Can you

12            guys --

13                  THE WITNESS:  Wait, what?

14                  MR. CAVALIER:  I can hear you,

15            Seth.

16                  MR. CARSON:  All right.  It

17            sounded like you got started before I

18            got back.

19                  THE WITNESS:  Oh.  Are you

20            back?  I thought you said --

21                  MR. CAVALIER:  We are starting.

22            I thought you were back.

23                  MR. CARSON:  Yes, no, I just

24            got on, but go ahead.  It's okay.

LISA REYNOLDS-BARBOUNIS

Page 213

```
 1   BY MR. CAVALIER:
 2      Q.    You had a meeting with the IDF?
 3      A.    He did, yes.  And I stayed and
 4   answered e-mails in like a, there was like
 5   this coffee place I ate at, and then he met
 6   me there.  I'm trying to think of what --
 7   like I don't know what you want to know here.
 8      Q.    Okay.  So was the first day of work a
 9   normal workday?
10      A.    Yes.  I think it was until like the
11   second -- we were there for a while.  I think
12   we were there for like seven days or
13   something.  I forget how long we were there.
14      Q.    Okay.
15      A.    It just felt like forever.  I
16   couldn't wait to get home.
17            It was -- Gregg -- I didn't smoke at
18   the time.  Gregg usually chews nicotine gum.
19   He was -- but he smoked there.  And there was
20   this outside balcony and it was kind of cold
21   there or whatever, so he was out there
22   smoking and he was like, "Come out here and
23   talk to me".  So I did.  Like I sat.  This is
24   at nighttime.  Well, I don't know which day
```

LISA REYNOLDS-BARBOUNIS

Page 214

1   it was, but it was one of the days.  And he

2   sat -- I sat like -- I don't know, like he

3   was one side of this like long couch thing

4   outside.

5       Q.   Okay.  I don't, I'm sorry, I don't

6   mean to interrupt you.  I'm going to ask you

7   to pick right back up.  But we're assuming

8   this is like the second night you're in

9   Israel?

10      A.   Like maybe the second or third.  It

11  was like --

12      Q.   First, early in the trip?

13      A.   Earlier in the trip, right, yes.

14      Q.   Okay.  Up until that point, did

15  anything happen about which you would

16  complain?

17      A.   Physically, no.

18      Q.   In any way?  Verbally?

19      A.   I mean the two incidents that

20  happened there like cloud my memory.  Do you

21  know what I'm saying?  Like it was just like

22  I just -- I hardly remember any of the trip.

23  I remember those things.

24      Q.   That's fair.

LISA REYNOLDS-BARBOUNIS

Page 215

1     A.    Like I remember -- there's certain

2  things I remember.  Like I remember being at

3  the Knesset.  I remember eating lunch there.

4  I remember going to a different lunch with

5  the interior Sud guy.  I remember going, like

6  going out by myself.  I remember going to --

7  like not, Gregg not letting me go see the old

8  city, whatever.  Like there's certain --

9  there's like -- I remember like chunks of it.

10  Like you know what I mean?  I don't know how

11  to explain it.

12          But that, you know, I don't remember

13  exactly what day it was, but I remember that

14  it happened.  You know what I mean?  I don't

15  even remember -- I remember we ate.  I'm

16  trying to, if I could try to think right, we

17  had dinner one night that we got there, and

18  it was fine.  Yes, I don't remember --

19     Q.    Okay.

20     A.    -- anything like that like sticks out

21  other than these like two crazy things.

22     Q.    Okay.  So tell me about the two crazy

23  things.

24     A.    So the one, like I said, he was out

LISA REYNOLDS-BARBOUNIS

Page 216

1   smoking a cigarette and asked me to come

2   outside.  So I did.

3      Q.    Early in the trip?

4      A.    What?

5      Q.    Early in the trip still, right?

6      A.    Yes.  This is the early in the trip

7   one.

8      Q.    Okay.

9      A.    And he was like -- I sat like further

10  down.  It was like a long couch, and he was

11  like on one side and I was on the other.  So

12  he's like big though.  Like Gregg is tall.

13  So he was like getting comfortable, he had

14  the blanket, he's smoking a cigarette and he

15  like, like moves his body like this, like,

16  you know, to the whatever side to me, puts

17  his feet there, and I was sitting like kind

18  of like, like with my legs up kind of

19  comfortable, you know.  And he slides his

20  like foot like under my butt and he was like,

21  "Oh, I guess we reached a new spot in our

22  relationship.  My foot is on your ass".  I

23  was like, "Gregg".  And then I moved, like I

24  went and moved away or whatever, and then we

LISA REYNOLDS-BARBOUNIS

Page 217

1    just continued our conversation.  He's like,

2    you know, "You really need to be like my

3    right hand.  It's going to be like me and

4    you.  Like you're my, you know, you're my

5    second in command.  We're going to make you

6    all this.  Like, you know, you're going to,

7    you're going to be leading this.  We'll make

8    you like some type of Chief of Staffer.  You

9    can eventually like run the project

10   directors, you can run the calls, all that

11   stuff".

12          So that incident I was like "ugh,

13   what is this dude doing", like I thought

14   like -- whatever.  And like I said, it was

15   uncomfortable and I didn't like it, but here

16   I am in Israel.  What am I going to do, like

17   find a flight home and go to a foreign, like

18   navigate a foreign country where I don't

19   speak the language and whatever?  Like there

20   were air raid sirens.  I was like nervous

21   there in general.  Like we weren't -- he said

22   the area we stayed in were nice, was nice,

23   but let me tell you, like it was like one

24   building was nice and the next one had

LISA REYNOLDS-BARBOUNIS

Page 218

1   graffiti on the wall.  Like you know what I
2   mean?  I didn't feel safe there at all.  And
3   Gregg made it feel like it wasn't safe,
4   "Because I got this because there's extra
5   security.  You can see like the camera
6   outside, and like, you know, you need" -- he
7   always kind of like made me fearful in
8   general for my life.
9           Like the reason I said "hey, can I go
10  to the old city", right, like when we went to
11  the Knesset and he was like, "Oh, there's not
12  going to be any time", blah, blah, blah.
13  "Well, I'll just go by myself, and I'll meet
14  you back there".  You know what I mean?  Like
15  let me just go look.  And he was like, "No".
16  He was like, "You're a pretty girl and like
17  something bad will happen to you, and like
18  I'll be responsible for you like getting
19  attacked".  Like he always made me feel like
20  if I left his side or wasn't in that room
21  that something like terrible was going to
22  happen to me.  He just, he was like always
23  like inciting fear.
24          And so when he put his foot under my

LISA REYNOLDS-BARBOUNIS

Page 219

1    leg, under my butt and stuff, I'm like, "What
2    am I going to do here?  How am I going to get
3    out of this situation?  So I'm just going to
4    avoid him".  So that's what I did for the
5    most part.  I tried to avoid him as much as
6    possible.
7        Q.    Let me back you up a second.  You
8    said that he always made you feel unsafe.  I
9    mean it wasn't the safest --
10       A.    While I was there.  When I got to
11   Israel, he made me feel unsafe.
12       Q.    But you also told me that it wasn't
13   that nice a neighborhood, right?
14       A.    Yes.  He made me feel --
15                 MR. CARSON:  Objection.
16                 THE WITNESS:  He made me feel
17           unsafe like -- it wasn't that nice of
18           a neighborhood, and he made me feel
19           unsafe in that like he reinforced
20           that like -- he said it was a nice
21           neighborhood, but like you don't know
22           who is out to get us and you don't
23           know who is like whatever.
24                 Like he made me feel like if I

LISA REYNOLDS-BARBOUNIS

Page 220

```
 1        wasn't like, I don't know, like
 2        attached at the hip to him that like
 3        I -- you know, there was a time where
 4        like I went out, finally after the --
 5        it was the night after the real big
 6        incident with him, the blow jobs and
 7        all that that like he was like, "I'm
 8        having somebody over to the house for
 9        meetings.  You can go like walk
10        around".  I was like, "All right.
11        Well, I'm going to go to like that
12        little market that was down there
13        that looked cool or whatever", and
14        that's what I did.  And I went to the
15        beach and like put my feet in the
16        water.  And I was like, you know,
17        thinking and reflecting.  And I tried
18        to stay there as long as possible.
19        And he's like, "Are you coming back?
20        Are you coming back"?
21             Like just he -- it was like
22        such a bad experience.  It was just
23        like, you know, like he tried to
24        make, Gregg always tried to make,
```

LISA REYNOLDS-BARBOUNIS

Page 221

```
 1          like always made you, and this is not
 2          just Israel trip, always made you
 3          feel like you needed him, like you
 4          needed him, he's in control, he's the
 5          boss, he's everything, you need him.
 6          You know what I mean?  And like --
 7          and Israel it was heightened and it
 8          was -- and he made me nervous.  And
 9          I'm not like a scared person.  I mean
10          I've lived in rough neighborhoods in
11          Philly.  Like that's not -- I'm not
12          that kind of person.  Like I'm not
13          afraid, usually.  And he just made me
14          like uncomfortable.
15                  And so when he touched me like
16          with his foot, like I'm thinking
17          like, "What do I do here?  Do I go to
18          the police?  Do I freakin' leave?  Do
19          I go get my own place?  Like what do
20          I do"?  And I was like, "I'll just
21          avoid him".  I talked to my husband
22          and he was like, "Just avoid him.
23          Just avoid -- just like, you know,
24          but it doesn't have to be work, just
```

LISA REYNOLDS-BARBOUNIS

Page 222

```
 1            go sit in your room".
 2                 And so I tried to be in my room
 3            as much as possible.  I even would
 4            say like, I even would like make
 5            stuff up like, "Oh, my husband is" --
 6            it was like weird hours.  "Oh, my
 7            husband is calling me.  I'm going to
 8            go in my room".  You know what I
 9            mean?  Like just I like had to avoid
10            him.
11                 Now, I FaceTimed and like did
12            stuff in front of him, but like that
13            was also like a signal like I'm with
14            my family and doing -- you know, I
15            just, ugh, it was the whole thing was
16            awful.
17    BY MR. CAVALIER:
18       Q.   Given the fact that the neighborhood
19    wasn't that nice and there are air raid
20    sirens going off and you're meeting with
21    certain high-level groups, isn't it possible
22    that his concern for your safety was just
23    legitimate concern for your safety?
24                 MR. CARSON:  Objection.
```

LISA REYNOLDS-BARBOUNIS

Page 223

1              THE WITNESS:  I mean it's
2         possible, but that's not, that's not
3         how he made me feel.
4   BY MR. CAVALIER:
5     Q.    Okay.  But you don't have any reason
6   other than your own feeling to believe that
7   that wasn't his motivation, do you?
8     A.    No.
9              MR. CARSON:  Objection.
10  BY MR. CAVALIER:
11    Q.    All right.  So did you say anything
12  to him when he put his foot underneath you?
13    A.    I said, "Gregg, stop".
14    Q.    Did he stop?
15    A.    Yes.
16    Q.    Okay.  Did you tell anybody else that
17  you encountered on the trip about what had
18  happened?
19    A.    No.  They were his people.  I -- they
20  barely even spoke English, half of them.
21    Q.    You told me that you told your
22  husband what happened?
23    A.    But you said anybody that was on the
24  trip I thought you said.

LISA REYNOLDS-BARBOUNIS

Page 224

1   Q.    Yes, I did.  I'm asking you --

2   A.    My husband wasn't on the trip.

3   Q.    Right.  But you did tell your husband

4   what happened?

5   A.    I did.  I told my husband; my mom;

6   Katherine Urkel, who is the lady that like,

7   well, my work wife.  I told a bunch of

8   people.

9   Q.    Did you ask any of them to try to

10  arrange for you to get home?

11  A.    No.  I mean my husband just said,

12  "Just avoid him", so that's what I did.

13  Q.    Okay.  And so --

14  A.    And my mom goes, "I told you that was

15  going to happen".

16  Q.    Right.

17  A.    "Yes, mom, I'm an idiot".

18  Q.    Right.  But you thought avoiding him

19  was --

20  A.    Sufficient.

21  Q.    -- a practical, a sufficient

22  resolution to the issue?

23  A.    At the time, yes.  In hindsight, I

24  was naive.

LISA REYNOLDS-BARBOUNIS

Page 225

1    Q.    Okay.  So you're avoiding him, and

2    otherwise, work goes on as normal on the

3    trip?

4    A.    Yes, until he went out that night.

5    Q.    What night?

6    A.    The night before we left.

7    Q.    Okay.  So we're now a couple days

8    after the foot incident --

9    A.    Uh-huh.

10    Q.    -- on the eve of you going back, of

11    everybody going back home, both of you going

12    back home?

13    A.    He had a meeting the next day, and

14    then I think we were flying out -- it was

15    like the night or two before we left.

16    Because the next day he had those meetings

17    that I wasn't a part of and then I walked

18    around, and I think that was my last day

19    there.  And I don't remember if we flew out

20    in the night or first thing in the morning.

21    I can't remember when we flew out.

22    Q.    Okay.  In between the foot incident

23    and the second incident, did anything of a

24    sexually offensive nature occur?

LISA REYNOLDS-BARBOUNIS

Page 226

 1    A.    No.

 2    Q.    Tell me about the second incident.

 3    A.    So Gregg goes out and he says he's

 4  got a meeting, and I'm wondering why I can't

 5  go because I had been going to most of them.

 6  And he goes out to a meeting and he comes

 7  back and he's clearly drunk, and I was

 8  working on this PowerPoint presentation.

 9  He's clearly drunk, and I'm sitting on the

10  couch.  And there's two couches.  I was on

11  the left-hand side one.

12        And he's like stomping around and

13  talking to me about how he -- he comes in and

14  he was like, "Ugh".  He's like, "Did you know

15  that I had sex with Lea Merville"?  And I was

16  like, "Excuse me.  What?  Lea"?  And I -- and

17  I heard whispers of that from like Matt, but

18  I didn't really believe him because I didn't

19  think Lea Merville would ever sleep with

20  Gregg Roman.  And so he said -- but I didn't

21  hear any details from Matt.  Like I just

22  heard that it happened.

23        And so then I was like, I don't know,

24  like, "Whatever.  Like I don't want to hear

LISA REYNOLDS-BARBOUNIS

Page 227

```
 1   about you sleeping with Lea Merville".  He
 2   was like, "Well", --
 3       Q.    Did you say that to him?
 4       A.    What?
 5       Q.    Did you say that to him?
 6       A.    No.  I was just like, "I didn't know
 7   that".
 8       Q.    Okay.
 9       A.    No.  Like I said, I was trying to
10   like avoid him.  Like I didn't want to get
11   into a conversation with him, so I'm not
12   going to like talk to him.  Do you know what
13   I mean?  That wasn't my intention to like
14   engage more in conversation.  I was like,
15   "No, I didn't know that".
16           But, anyway, he told me that Lea, he
17   was like, "Did you know she was a dancer?
18   She's got a rocking body.  I fucked her".
19   And I was like -- and then I said, I asked
20   him, "When", right, because like I -- she was
21   our intern there.  And he was like, "When we
22   were in Israel, we met up at an event and she
23   needed her paperwork signed like to certify
24   her internship at MEF".  She was no longer an
```

LISA REYNOLDS-BARBOUNIS

Page 228

1    intern but she needed this paper for her

2    class credit or whatever.  And he told me

3    that, he said that the paperwork was up in

4    his room and she went up there and one thing

5    led to another and she gave him a blow job,

6    she was on top, I got the whole thing, about

7    her dancer body, and just gross and

8    inappropriate, you know.

9         And he was like -- and then he

10   started like trying to justify like why he

11   was cheating on his wife and that it's hard

12   having three kids and being a director and

13   that it's a lot of pressure and all that kind

14   of stuff.  And that's when he was like, you

15   know, "Sometimes I just need a release.

16   Sometimes I just need a release.  Like why

17   can't I just have a good blow job.  I tried

18   to meet up with Lea and she said no".  And I

19   was like (witness made a sound).

20        So, anyway, he was drunk and he was

21   running around, and I wasn't engaging in that

22   at all, right.

23   Q.   Did you say --

24   A.    That was the extent of my engagement

LISA REYNOLDS-BARBOUNIS

Page 229

1    in him.  So I guess --

2       Q.    You said nothing to him in response

3    to what he was saying?

4       A.    I mean I was just like, "I didn't

5    know that.  I can't believe that you slept

6    with Lea.  She's young".  You know what I

7    mean?

8       Q.    Okay.

9       A.    It was just weird to me.  So he

10   leaves I guess because I'm not engaging in

11   the conversation or whatever.  He's like,

12   "I've got another event.  I'm going out",

13   blah, blah, blah, blah, blah.

14           Then he comes back the second time

15   and says that he tried to meet up with his

16   ex-girlfriend and she denied him too.  And he

17   was like, "I don't know what it takes to just

18   get laid around here.  Like I want a blow

19   job.  I just need a release".  "Lis", -- what

20   was he, what did he say?  He said, "Lis", he

21   was like, "can't you just give me a release"?

22   And I was like, "Gregg, no.  Stop it.  You're

23   being creepy", right.

24           And then I was texting my husband, I

LISA REYNOLDS-BARBOUNIS

Page 230

```
 1   was like, "Gregg is being creepy.  FaceTime
 2   me, whatever", and he -- my husband was like
 3   laughing like thinking it was funny.  Like I
 4   don't think that he understood at the time
 5   the severity of like how uncomfortable I was.
 6         So then I started texting Tricia, and
 7   I like went in my room and I started texting
 8   Tricia and I was like, "Dude, Gregg is being
 9   disgusting".  And she was like, "What, like
10   AIPAC couch".  And I was like, "No".  Because
11   he was worse than that.  Like he was, you
12   know, like asking me and talking about sexual
13   conquests.  He used the word "conquests", and
14   I remember that.  I remember him just being
15   so crazy.
16         So I got a knife.  I said to her,
17   "I'm going to get a knife and put it under my
18   bed".  Because, A, my door didn't lock it.
19   So the way my room was set up it was a big,
20   glass like wall maybe that had curtains, and
21   my door barely even shut all the way.  It
22   like didn't lock.  And so I was like, "I'm
23   going to put a knife under my bed and sleep
24   with it".  Because he's big.  Like I think
```

LISA REYNOLDS-BARBOUNIS

Page 231

1    I'm strong and I'm tough, but I can't fight

2    6'5", 300-pound Gregg, like I can't do it.

3    So I slept with a knife under my bed, and I

4    said that to her.  And I came home and I told

5    her, I told my mom, I detailed it in text to

6    Katherine Urkel.  Like I told people.  It was

7    awful.  It was awful.

8         And then when he said I didn't have

9    to go to the meeting the next day, I was so

10   relieved, I just wanted to get out of there.

11   I was gone as long as possible.  I stayed

12   away as long as possible, and I just could

13   not wait to get home.

14   Q.    Did you tell Gregg that he made you

15   so uncomfortable that you slept with a knife

16   in your bed?

17   A.    No.  Why would I tell him that?  I'm

18   afraid of him.

19   Q.    I mean --

20   A.    Especially at that point, he was

21   drunk, out of control.  He was saying crazy

22   things.

23   Q.    The next day --

24   A.    I didn't know how he was going to be

LISA REYNOLDS-BARBOUNIS

Page 232

1    that day --

2        Q.    The next day on the plane ride home?

3        A.    So I can just go missing there and

4    nobody would know, right, like because I'm in

5    this scary land and in this scary --

6        Q.    Okay.

7        A.    -- neighborhood and it's a scary

8    time, and I'm a pretty, tall, white girl

9    according to him.

10       Q.    At the airport --

11       A.    What?

12       Q.    At the airport or on the flight home

13   or when you got back to Philadelphia, did you

14   ever tell him like, "Hey, you made me so

15   uncomfortable in Israel I slept with a knife

16   in my bed"?

17       A.    Do you think I wanted --

18              MR. CARSON:  Objection.

19              THE WITNESS:  -- to lose my

20        job?

21   BY MR. CAVALIER:

22       Q.    It's your belief that you would have

23   been fired for telling your boss he was

24   making you uncomfortable?

LISA REYNOLDS-BARBOUNIS

Page 234

1    to like a third party.  So -- and I was like,

2    "Really?  After the way he acted in Israel,

3    that's how -- that's -- like he's going to

4    complain about this the way he treated me".

5    And she goes, "What are you talking about"?

6    And I was like, "Nothing, never mind".

7    Because I -- and she tried to pull it out of

8    me.  She was like, "What happened in Israel"?

9    And I was like, "I'm not getting into this".

10          And I told Matt, and I told Tricia.

11   And Matt was like, "Well, we should do

12   something.  We should go to Daniel.  We

13   should do something".  And I was like, "I

14   don't want to get involved.  Like I don't

15   want to lose my job.  I'm like not interested

16   in this.  It would be bad for my reputation

17   as like a conservative pers-, like Me Too

18   person".  And we had lengthy, lengthy

19   conversations.  I would sit in Matt's, on

20   Matt's floor in his office and complain to

21   him and tell him everything.

22   Q.    Okay.

23   A.    Matt knew everything.

24   Q.    So --

LISA REYNOLDS-BARBOUNIS

Page 268

1    think I might have e-mailed it to Danny or

2    something like that, but I never even read

3    it.

4       Q.    Okay.  Do you know if it detailed

5    what the monies were to be used for by

6    Thomas?

7       A.    I don't know if the grant agreement

8    said that.  However, when we were in

9    communication with Danny, I had asked him via

10   e-mail like, you know, "Give me a breakdown

11   of what everything will cost and get me, you

12   know, like the information", and he gave me

13   all of that, it had a number on it, it went

14   to Gregg, Gregg approved it, end of story.

15      Q.    Do you know how much money went from

16   MEF to Thomas?

17      A.    I feel like it was 30,000.  It might

18   have been, it might have been 20.  I don't

19   remember exactly.

20      Q.    Does 32,000 sound right?

21      A.    It sounds about right.  I think

22   because when -- I think that why I'm thinking

23   20 is because pounds versus dollars.

24      Q.    When was the first time you went to

LISA REYNOLDS-BARBOUNIS

Page 269

1    London in connection with Tommy Robinson?

2       A.    I went for that demonstration I think

3    it was June, the demonstration that was on

4    June 9th I believe.  I'm not exact, --

5                    MR. CARSON:  Object.

6                    THE WITNESS:  -- but June.

7                    MR. CARSON:  I just wanted to

8            put an objection on the record with

9            the characterization of "in

10            connection with Tommy Robinson", but

11            go ahead.

12                    THE WITNESS:  Okay.

13    BY MR. CAVALIER:

14       Q.    And your answer to that question was

15    June of 2018?

16       A.    I believe so, yes.

17       Q.    Okay.  Did you meet Danny Thomas

18    during that trip?

19       A.    Briefly.  I met him for all of

20    30 seconds.

21       Q.    What did you talk about?

22       A.    Nothing.  I said hi, he thanked me, I

23    thanked him for, you know, pulling it off,

24    and that was it.

LISA REYNOLDS-BARBOUNIS

Page 286

1    mingling for the most part.

2       Q.    Okay.  So the dinner ends cordially.

3    Do you see Thomas later?

4       A.    We all share a taxicab home.  We

5    tried to get an Uber, there weren't any, and

6    then they finally had to call a cab.  We had

7    to call a cab.

8            Then there was no -- like the guy

9    wouldn't take our credit card.  Then I had to

10   like run around in like subway stations and

11   like try to find an ATM to get cash out to

12   pay the guy, but that just left me and my

13   mom.  We dropped Danny and Avi off at their

14   places, Cassandra too, and then me and my mom

15   went back to our hotel.

16      Q.    Did you go back out later?

17      A.    No.

18      Q.    You didn't see Thomas later that

19   night?

20      A.    Nope.

21      Q.    Did you have drinks with Thomas and

22   others after the dinner?

23      A.    Not after the dinner, no.

24      Q.    At any point during the day?

LISA REYNOLDS-BARBOUNIS

Page 287

1    A.    Not that day.

2    Q.    At any point the next day?

3    A.    Yes.  The next day was the

4    demonstration and Tommy got a good verdict

5    and we all went out to celebrate afterwards,

6    and my mom went back to her hotel room and it

7    was like all of us celebrating.  We went to a

8    pub, Red Lion I want to say it is or

9    something like that, right near Whitehall.

10   It was right around the corner from my hotel

11   room with my mom, my hotel with my mom.

12   Q.    Okay.  And was your mother present at

13   that point in time?

14   A.    She was not.  She showed up.  She

15   like -- she was a little tired because it was

16   cold that day, so she went back to the hotel.

17   And then we were still out, and then she came

18   and met us out and came back out and then she

19   went home.  And then there was like a fight

20   about to break out or something like that,

21   and me, Danny and Tommy like went a different

22   direction.  Because there was something

23   happening crazy.  I forget what it was.

24   Somebody started -- I think actually it was

LISA REYNOLDS-BARBOUNIS

Page 347

1    A.    Probably said it jokingly in anger

2    maybe.  I don't know.  I don't remember

3    saying that, but I -- maybe.

4    Q.    Is that the kind of thing you would

5    typically --

6    A.    Get under her skin.

7    Q.    Is that the kind of thing you would

8    typically say as a joke?

9    A.    I would never actually sleep with

10   Danny Tommo again.  Like that would be gross.

11   I don't know, I also said the things I said

12   about abortion.

13   Q.    What makes it gross now?

14   A.    What makes it gross now?  He punched

15   me in my face and chipped my tooth.

16   Q.    Okay.

17   A.    That's what makes it gross now.

18   Q.    So let's talk a little bit about that

19   briefly.  Where did that occur?

20   A.    Brussels.

21   Q.    Why did you go to Brussels?

22   A.    I went to Brussels because Janice

23   Atkinson asked me to speak at a, to the

24   European Parliament, and I was planning to

LISA REYNOLDS-BARBOUNIS

Page 348

```
 1   until she told me that Alex Jones was going
 2   to speak and then I pulled out.  And then she
 3   told me Alex Jones wasn't going to go and
 4   then I still had reservations about it, but I
 5   still went to watch the event.
 6          They were paying for my hotel room,
 7   not The Middle East Forum, Janice Atkinson
 8   did, and I paid for my own flights and my own
 9   everything out there.  So it was a personal
10   trip.
11     Q.    Okay.  And so Tommy Robinson joined
12   you in Brussels?
13     A.    No.  He was originally invited to
14   speak and then he was dis-invited to speak
15   because they thought that they wouldn't let
16   him in the Parliament or something like that,
17   but he was flatboard (ph) --
18     Q.    So Tommy Robinson wasn't really a
19   part of that trip then?
20     A.    No.
21     Q.    But Danny Thomas was?
22     A.    I asked him to come join me.
23     Q.    Okay.  And did he do so?
24     A.    Uh-huh.
```

LISA REYNOLDS-BARBOUNIS

Page 349

1    Q.    Why did you ask him to join you?

2    A.    Because I was seeing him then.

3    Q.    Okay.  Did you pay for him to make

4    the trip?

5    A.    I don't remember.  I might have paid

6    for his train or something like that.  I

7    don't know.  Maybe.

8    Q.    Did you meet a woman named Amy

9    Mekelburg while you were in Brussels?

10   A.    I did.

11   Q.    Who is that?

12   A.    She's a friend of mine.

13   Q.    What does she do for a living?

14   A.    She helps people with wrongful

15   convictions, and she has a website called

16   RAIR that highlights, that highlights the

17   intersectionality of Communism and Islamism.

18   Q.    Have you ever done any work for her

19   organization?

20   A.    I proofread her stuff and, you know,

21   like things you do for a friend.

22   Q.    Have you ever tried to raise money

23   for her organization?

24   A.    She at one time -- so she is friends,

LISA REYNOLDS-BARBOUNIS

Page 350

1    she was already friends with David Horowitz

2    and Adam Milstein.  They're friends that

3    she's had for like quite a long time.  They

4    follow her on Twitter and they have, and

5    they've had regular communications.

6            But they always asked her to submit

7    like actual, you know, proposals, and she

8    didn't know how to write them up.  So I was

9    trying to help her, you know, to do that.

10   Q.    Did you ever try to solicit money

11   from MEF for her organization?

12   A.    She asked me to submit a proposal to

13   Daniel Pipes, I helped her with it, and he

14   lambasted it.  He said it was juvenile I

15   believe were his words.  Sophomoric.

16   Q.    Do you ever --

17   A.    It might have been "sophomoric".  I

18   can't remember.

19   Q.    Did you ever provide Amy Mekelburg or

20   her organization with an MEF donor list?

21   A.    No.

22   Q.    Did you send her an MEF document,

23   confidential document marked, a fund-raising

24   document marked Confidential?

LISA REYNOLDS-BARBOUNIS

Page 351

1    A.    Apparently I did.

2    Q.    I'm asking you.

3    A.    No.

4              MR. CARSON:  Objection.

5              THE WITNESS:  At the time that

6         I sent it, A, I didn't know it was a

7         confidential document.  I wasn't

8         paying attention.  I was just trying

9         to like -- I just pulled one and

10        said, "Look, this is how you write a

11        proposal".

12   BY MR. CAVALIER:

13   Q.    Okay.  So you --

14   A.    At the time, I wasn't aware it was

15   confidential.

16             MR. CARSON:  This is not the

17        trade secret case.  The scope of your

18        examination, if it's going to go to

19        the trade secret case, I did not

20        prepare my client, and she did not

21        prepare today for testimony on that

22        case.  So, you know, --

23             MR. CAVALIER:  Well, two

24        things.

LISA REYNOLDS-BARBOUNIS

Page 352

1            MR. CARSON:  I don't think it's

2        proper to question her knowing that

3        there's another case to try to go

4        after her in connection with that

5        case when we're here today to talk

6        about another case.

7            MR. CAVALIER:  So, if that's

8        the extent of your objection, I'll

9        respond by saying she acknowledged at

10        the beginning of this deposition that

11        she didn't prepare at all, so I don't

12        think that's very valid, and

13        secondly, I mean anything that may

14        even lead me to evidence is

15        permissible in this deposition.  But,

16        nevertheless, I won't belabor the

17        point.

18    BY MR. CAVALIER:

19    Q.    My point is, my question is this:  Do

20    you recall sending Amy Mekelburg a document

21    called Foundations List?

22    A.    I made that.  That wasn't an MEF

23    document.  I made that from the websites.

24    Q.    When did you make it?

LISA REYNOLDS-BARBOUNIS

Page 353

1   A.   I don't remember.  I was trying to

2   help her with the thing, and it's -- all the

3   information that I gave her was public access

4   information.  I gave her -- I even put like

5   website links so she could check out the

6   foundations on it.  It wasn't an MEF

7   document.

8   Q.   Is the amount of money that was on

9   that document from MEF donors public

10  information?

11  A.   Yes.  Everything that is over I think

12  500, $5,000, whatever, it has to be listed on

13  your 990.

14  Q.   So were there donations on that

15  document that were in excess of $5,000?

16  A.   They were only in the excess of

17  $5,000.  All public information.

18  Q.   Did the document include reference to

19  e-mails that were in the public domain?

20  A.   I believe so.

21  Q.   Did it include reference to e-mails

22  that were not in the public domain?

23  A.   I don't think so.

24  Q.   Where did you get the information

LISA REYNOLDS-BARBOUNIS

1   that went into the document?

2      A.     On the websites.

3      Q.     What websites?

4      A.     The foundations' websites.

5      Q.     What foundations?

6      A.     I don't remember what they were off

7   the top of my head.

8      Q.     The foundations that provided the

9   money or the MEF website?

10     A.     What?

11     Q.     I'm trying to figure out --

12     A.     The foundations that had the money.

13     Q.     Okay.  Did you include any

14  information on that document that were not

15  from those websites?

16     A.     I don't believe so.

17     Q.     During the trip to Brussels in 2018,

18  did you tell Danny Thomas that or did Danny

19  Thomas tell you that he was ending your

20  relationship?

21     A.     No.

22     Q.     He didn't tell you that he was ending

23  the sexual relationship that you guys were

24  carrying on?

LISA REYNOLDS-BARBOUNIS

Page 355

```
 1              MR. CARSON:  Objection.
 2              THE WITNESS:  No.  Actually,
 3         not even a little bit, no.
 4    BY MR. CAVALIER:
 5      Q.    Okay.
 6      A.    As a matter of fact, Danny --
 7              MR. CARSON:  Again, --
 8              THE WITNESS:  Hold on.
 9              MR. CARSON:  -- referencing a
10         document that was paid for or that
11         someone offered to pay for, Jon.
12              THE WITNESS:  But additionally,
13         just so that you know, when I was in
14         England in, for the Tommy Robinson
15         MEP campaign, Danny tried to sleep
16         with me then too and he tried to date
17         me then too, and I told him "no".
18              So no, Danny Thomas did not --
19         as a matter of fact, there were text
20         messages from Danny where I tried to
21         end it, and he goes, "I ain't going
22         nowhere".  He wasn't, he wasn't ever
23         trying to leave me.
24    BY MR. CAVALIER:
```

LISA REYNOLDS-BARBOUNIS

Page 356

1    Q.    So you told me he gave you a black
2    eye and chipped your tooth.  How did that
3    happen?
4    A.    We were having sex.  He was drunk.
5    We were having sex.  I tried to push him off
6    me.  He was smacking me.  He didn't -- I
7    don't think he punched me.  It was like his
8    hand, he was smacking me.  I tried to push
9    him off.  I said, "Danny, it hurts.  It's too
10   hard".
11         I had a cornea problem.  I had an
12   x-ray.  I crawled to the ER by myself.  He
13   got drunk and passed out.  He didn't even --
14   I was in there for like nine hours.  He
15   didn't even come until the next day until I
16   woke him up and begged him to come get me
17   because I couldn't see.
18         And then he took care, like
19   technically took care of me like for the next
20   couple days because I couldn't see.  Like he
21   helped me wash my hair and like did those
22   type of things because he blacked my eye and
23   chipped my tooth.
24   Q.    How did you feel about that?

LISA REYNOLDS-BARBOUNIS

Page 357

1          MR. CARSON:  Objection.

2          THE WITNESS:  I think that I

3     rationalized it in my head as like he

4     was drunk and he didn't really

5     understand how hard he was hitting

6     me.

7          And then it wasn't really I

8     guess until later when Jazmine sent

9     me all the pictures of how beat up

10    she had been by him that I realized

11    that like this is a common occurrence

12    for him, and that really made me sick

13    to my stomach.

14 BY MR. CAVALIER:

15  Q.   So you took yourself to the hospital?

16  A.   I did.  Well, I felt the way down the

17 hallway and went down to the hotel lobby and

18 I said, "I need an ambulance", and they put

19 me in an ambulance.

20  Q.   They called an ambulance for you?

21  A.   They did.

22  Q.   Did you ever report that to anybody

23 in authority?

24  A.   No.  No.  It's a very embarrassing

LISA REYNOLDS-BARBOUNIS

Page 358

1    thing.  I didn't even tell my mom about it

2    until the other day.

3        Q.    Did you consider it an assault?

4        A.    I, like I said, at the time, I

5    considered it to be accidental.  He was

6    drinking and didn't realize his strength is

7    what I took it to be at the time, and maybe

8    that's why I wasn't as angry about it as I

9    should have been at the time.

10       Q.    Do you ever remember telling Tricia

11   McNulty that in a weird way you may be happy

12   that he punched you because he then took care

13   of you afterwards?

14       A.    He did take care of me after.

15                   MR. CARSON:  Objection.

16                   THE WITNESS:  I might have said

17           that.  Because I was in a really bad

18           mental spot.

19                   I mean think about that

20           statement that you're just making.

21           Think about that.

22   BY MR. CAVALIER:

23       Q.    I can understand that.

24       A.    I was certainly not myself.

LISA REYNOLDS-BARBOUNIS

Page 359

1          MR. CARSON:  No question.
2    BY MR. CAVALIER:
3      Q.    Was the rough sex aspect of your
4    relationship typical?
5      A.    No.
6              MR. CARSON:  Objection.
7          Objection.  I'm instructing her not
8          to answer.
9    BY MR. CAVALIER:
10     Q.    Where did you stay when you got out
11   of the hospital?
12     A.    My hotel room.
13     Q.    And is that where Thomas was taking
14   care of you?
15     A.    Yes.  And then I got -- and it was
16   only like a day or two after, I think it was
17   a day after, maybe a day and-a-half, and then
18   I went on a train to Amsterdam with my friend
19   who met me there.
20     Q.    Okay.  And how long were you in
21   Amsterdam for?
22     A.    A couple days.
23     Q.    It's obviously a popular thing to do
24   in Amsterdam, so I'll ask the question.  Did

LISA REYNOLDS-BARBOUNIS

Page 360

1    you smoke pot while you were in Amsterdam?

2              MR. CARSON:  Objection.  You

3         don't have to answer.

4              THE WITNESS:  I don't have to

5         answer that?

6              MR. CARSON:  You can I guess.

7         I think it's a question designed to

8         harass, embarrass and intimidate, but

9         whatever.  It doesn't matter.

10             THE WITNESS:  I mean I have no

11        problem answering that because I told

12        the guy -- I'll tell you the truth.

13        I'll tell you that now.  I tell the

14        truth all the time.  Pot makes me

15        paranoid.  It's something that I

16        don't like, it's something that I

17        don't like to do, right, and so --

18        and they always say that in Amsterdam

19        they have pot that has a strain that

20        won't make you paranoid, right.

21             So I tried it in Amsterdam and

22        it still made me freakin' paranoid.

23        It was awful.  It was the worst thing

24        ever.  And I was like, "They lied.

LISA REYNOLDS-BARBOUNIS

Page 361

1         They don't even have a strand of pot

2         that makes you not paranoid like they

3         said they would, and Amsterdam is

4         supposed to have everything".

5              So I did.  I tried.  I took two

6         hits off the thing.  I thought I was

7         going to lose my mind.  I was so

8         paranoid that everybody was there

9         laughing at me.  I thought -- I

10        dropped a French fry and I thought

11        the whole place was staring at me.

12        It was like the most awful,

13        uncomfortable feeling in the entire

14        world.  That's it.

15   BY MR. CAVALIER:

16     Q.    Did Danny Thomas accompany you to

17   Amsterdam?

18     A.    No.  No.

19     Q.    Who were you with?

20     A.    What?

21     Q.    Who were you with again?

22     A.    Allison.

23     Q.    Who is Allison?

24     A.    Teddy.  Her name is Ingrid Allison

# BARBOUNIS DEPOSITION EXCERPTS

# PART 2

Case 2:19-cv-05030-JDW   Document 111-1   Filed 03/02/21   Page 91 of 225

Deposition of Lisa Barbounis                    Lisa Barbounis v. Middle Eastern Forum, et. al.

```
 1      IN THE UNITED STATES DISTRICT FOR THE EASTERN
                   DISTRICT OF PENNSYLVANIA
 2

 3

 4

 5   LISA BARBOUNIS,
                                )
 6                   Plaintiff  ) 2:19-cv-05030-JDW
                                )
 7               vs.            )
                                )
 8   MEF, et al,               )
                                )
 9                   Defendant  )

10

11                            --oOo--

12

13   DEPONENT:      LISA BARBOUNIS

14   TAKEN BY:      Defendant

15   DATE/TIME:     Tuesday, February 9, 2021

16
     PLACE:         Zoom Videoconference
17
     REPORTER:      Joyce A. Wise, RMR
18                  Notary Public

19

20   APPEARANCES:

21   DEREK SMITH LAW GROUP, PLLC
     BY: Seth D. Carson, Esquire
22   1835 Market Street
     Suite 2950
23   Philadelphia, PA 19103
     215.391.4790
24   seth@DerekSmithLaw.com
```

Case 2:19-cv-05030-JDW   Document 111-1   Filed 03/02/21   Page 92 of 225

Deposition of Lisa Barbounis                    Lisa Barbounis v. Middle Eastern Forum, et. al.

1    superiors?

2         A.     I didn't consider them my equals.

3         Q.     Did you consider them your

4    superiors?

5         A.     Yes.

6         Q.     Okay.  Was Marnie Meyer considered

7    a project director?

8         A.     Oh, no.  She was Human Resources

9    and Chief Financial Officer.

10        Q.     Okay.  And was she Director of

11   Human Resources?

12        A.     Correct, yes.

13        Q.     So even though Human Resources

14   isn't a project, so to speak, she was still, at

15   least in your view, co-equal to the other project

16   directors in the hierarchy?

17        A.     Correct.  And she was above me.

18   That's very much accurate, yeah.

19        Q.     Okay.  Okay.  Did you ever have

20   anyone reporting to you during your time at the

21   Middle East Forum?

22        A.     Not until later.  And reporting is

23   like -- yeah.  So Delany Yoncheck, Marnie and I

24   had, like, split her for some time.  Like, you

Case 2:19-cv-05030-JDW   Document 111-1   Filed 03/02/21   Page 93 of 225

Deposition of Lisa Barbounis                    Lisa Barbounis v. Middle Eastern Forum, et. al.

1   know, Marnie would get her for some financial

2   things.  And I would -- she would do some

3   communicationy things and website, like, tasks

4   for us.

5                  And so, yeah, she reported to me

6   so that, like, she didn't have to interact with

7   Greg.  But I wasn't technically her boss.  Was

8   just who was, like, somebody who was giving her

9   guidance and using her, you know, -- using her

10  work product to further whatever we were doing.

11  Whatever directive, like, Greg needed.

12                 Greg would be, like, tell Delaney

13  to do this and so I would tell Delaney to do

14  that.  I'm like the middleman.

15         Q.     Okay.  So help me understand a

16  little bit more about that relationship.

17                 You said you weren't like her

18  boss.

19                 I mean, were you her superior

20  within the organization?

21         A.     I guess I was -- yeah, like, if

22  you look at things like seniority, I guess I'm

23  higher than her.

24         Q.     And you could give her tasks to

Case 2:19-cv-05030-JDW   Document 111-1   Filed 03/02/21   Page 94 of 225

Deposition of Lisa Barbounis                    Lisa Barbounis v. Middle Eastern Forum, et. al.

1          A.      No, it was more than that.
2    Like -- it was more than that.
3                  He was able to give directives and
4    if those directives were not followed through or
5    people complained about those directives or
6    anything like that, it would not be Greg that was
7    in trouble for us.  It would always be us getting
8    in trouble, because Greg gave us directives, even
9    though he wasn't supposed to be supervising us.
10         Q.      Was he giving them to you
11   directly?
12         A.      Yes.
13         Q.      How?
14         A.      On the project directors' calls,
15   over e-mail.
16         Q.      Did you consider yourself to be
17   reporting to Greg during this time?
18         A.      I mean, for all intents and
19   purposes, Daniel -- like, there was plenty of
20   times where I started reporting to Daniel Pipes
21   for sure.
22                 But I was still actually actively
23   reporting to Greg Roman as well.  I mean, he
24   would say, Lisa, what's going on with the radio

Case 2:19-cv-05030-JDW   Document 111-1   Filed 03/02/21   Page 95 of 225

Deposition of Lisa Barbounis                    Lisa Barbounis v. Middle Eastern Forum, et. al.

1    show and blah, blah, blah.  And like give me

2    directives.

3                    Or, Lisa, I need to you do this.

4    Or, Lisa, how come the IW articles aren't going

5    out.  Whatever.

6                    And it turns out, he was trying to

7    trap me in that.  And he gave a directive three

8    months before that they weren't to go out.

9                    So, yes, he was still very much

10   actively involved and actively supervising.

11        Q.      Did you have a problem with that?

12        A.      Yes.

13        Q.      Why?

14        A.      Because -- because Greg would, you

15   know, continue his -- the same harassing, awful

16   behavior.

17                    Like I just gave you an example.

18   He was completely retaliatory and disgusting.

19   And even then, like, I had to go to a radio show

20   with him, right?

21                    And he called us all usurpers.  Or

22   used the usurper thing, gave like this eye.  And

23   then he would still look me and be gross with me

24   whenever I did see him.  He's gross.  He's a

Case 2:19-cv-05030-JDW   Document 111-1   Filed 03/02/21   Page 96 of 225

Deposition of Lisa Barbounis                         Lisa Barbounis v. Middle Eastern Forum, et. al.

1    terrible human.

2              And he continued to harass -- he

3    tried to get me fired on things.  He would say,

4    Daniel Pipes, this isn't happening, blah, blah,

5    blah.

6              And then like on a -- we would

7    discuss one.

8              Here's the example.  We would

9    discuss something on the project directors' call,

10   one of them was why the IW articles or

11   newsletters or something weren't going out.  I

12   don't remember what the specific thing was.  But

13   it was with IW.

14             And so I said -- and so Greg's,

15   like, yeah, it's fine, blah, blah, blah, blah.

16   We'll make whatever decision.

17             And then Daniel Pipes was not on

18   that phone call.  And I had been on the phone

19   with Sam right afterwards, who runs IW.

20             And so then I get an e-mail from

21   Daniel Pipes saying, how come the IW articles

22   haven't gone out, blah, blah, blah, since you

23   started, like, being in charge of putting them

24   out.

1          And I said, it was -- and so I

2   said, nobody did it before me.  Four people have

3   done this before me, never did, blah, blah, blah.

4          So I went to the person who got

5   rehired, that who was in the office who did that.

6   And he pulled up the e-mail and said, no, three

7   months ago they said we're not doing this

8   anymore.

9          So Greg -- and he was, like, --

10  and Daniel and Greg were both on the e-mail

11  thread.

12          And so when Daniel pressured me on

13  it, I said, it's on the e-mail thread that we

14  weren't doing this.  The whole thing was Greg is

15  doing this retaliation.

16          He knew that Daniel wouldn't

17  remember.  And so he's like, Lisa's not doing her

18  job, to get me fired -- even though that there

19  was a directive not to -- there was a directive

20  not to do what he was accusing me of doing.

21          And Daniel Pipes wouldn't have

22  known about that.  He said Greg came to him and

23  said, it's come to -- Greg brought to my

24  attention that you're not putting out the IW

1    articles.

2              And I was, like, there was a

3    directive from three months ago for us not to.

4    And then Daniel Pipes left it alone and never

5    contacted me about it again, because he knew that

6    that was true.

7              So, yes, Greg Roman was still

8    making decisions.  Still trying to get me fired.

9    Still leering at me when he did see me.  He was

10   still always inappropriate.

11        Q.    You told me earlier that in your

12   view, Greg Roman was the one really in charge in

13   the Forum, correct?

14        A.    Correct.  There's a perfect

15   example of that.

16        Q.    If he wanted you fired, couldn't

17   he have just fired you?

18             MR. CARSON:  Object to form.

19             THE DEPONENT:  I don't know what

20        Greg Roman's motives were for not firing

21        me but there has to be cause and I was a

22        very good employee.

23   BY MR. CAVALIER:

24        Q.    What do you mean there has to be

1    cause?

2                    MR. CARSON:  I'm just gonna

3          object.  It calls for a legal conclusion,

4          speculation.  It's hypothetical.

5          Objection.  You can answer.

6                    THE DEPONENT:  What would he fire

7          me for if I'm good at my job?  There's

8          never been a performance issue.  What

9          would be the grounds for firing me?

10   BY MR. CAVALIER:

11         Q.      In Pennsylvania, you don't need

12   grounds for firing somebody.  You can fire

13   somebody if you don't like the color of the tie

14   they're wearing.

15                   MR. CARSON:  Objection.

16                   THE DEPONENT:  Again --

17                   MR. CARSON:  Wait.  Wait.  Wait.

18                   THE DEPONENT:  Go ahead, Seth.

19         Sorry.

20                   MR. CARSON:  I'm gonna object

21         based on form.

22                   It calls for a legal conclusion

23         to what is and what is not an employee at

24         will and the exceptions to that.

Case 2:19-cv-05030-JDW   Document 111-1   Filed 03/02/21   Page 100 of 225

Deposition of Lisa Barbounis                    Lisa Barbounis v. Middle Eastern Forum, et. al.

1           To the extent you know the answer,

2       you can answer the question.

3           THE DEPONENT:  Listen, I am not --

4       I'm not gonna hear, like, take -- presume

5       Greg -- Greg Roman's, you know, reasons

6       for not firing me or firing me.

7           I do know that he engaged in

8       retaliatory behavior to me non-stop and I

9       know this because I experienced it.

10  BY MR. CAVALIER:

11      Q.     Is every instance of disagreement

12  that you've had with Greg Roman post November 1,

13  2018, an instance of retaliation?

14          MR. CARSON:  I'm gonna object to

15      the extent that that question is

16      argumentative and it's also misstating

17      prior testimony.

18          Do you really want her to answer

19      that question?  Do you want to rephrase

20      it?

21          MR. CAVALIER:  I'd like -- if you

22      could answer, I'd like to hear your

23      answer.

24          MR. CARSON:  I think the question

1          is, is every time you disagreed with Greg

2          Roman an example of harassment or

3          retaliation?

4                    THE DEPONENT:  Of course not.  But

5          this isn't the case of disagreements.

6                    He can say, hey, I don't think

7          that this should be worded that way and

8          that's fine.  That's not what he was

9          doing.

10                   He was engaged in a campaign of

11         putting me -- like I said, in this

12         particular example, with the project

13         directors' call, on the call everything

14         was fine.  We had the conversation.

15                   Then he went to Daniel, said

16         something different.  Didn't give him all

17         the information and with the intention of

18         making me look bad.

19                   And then when I had the evidence

20         to back it up, Daniel Pipes let it go.

21                   That is an instance of

22         retaliation.

23  BY MR. CAVALIER:

24         Q.    Well, you said Daniel Pipes let it

1  go.  I mean, he agreed with you that you didn't

2  do anything wrong, correct?

3               MR. CARSON:  I'm gonna object.

4        Argumentative.

5               THE DEPONENT:  Actually, I don't

6        know what he agreed to or didn't agree

7        to, because after I wrote that, he never

8        responded to me at all.

9  BY MR. CAVALIER:

10       Q.    But the issue went away, right?

11 You weren't disciplined or anything?

12              MR. CARSON:  Objection.  You can

13       answer.

14              THE DEPONENT:  What are you gonna

15       discipline me for if there's proof that I

16       didn't do anything wrong?

17 BY MR. CAVALIER:

18       Q.    Well, so I agree with you.

19              But it sounds like you had a

20 disagreement with Greg Roman.  You brought the

21 evidence to his boss and the issue went away.

22              MR. CARSON:  Object to form.

23       Argumentative.  Assuming facts not in

24       evidence.  Misstating prior testimony.

Case 2:19-cv-05030-JDW   Document 111-1   Filed 03/02/21   Page 103 of 225

Deposition of Lisa Barbounis                    Lisa Barbounis v. Middle Eastern Forum, et. al.

1              You can answer.

2              THE DEPONENT:  That's what I was

3        just saying.  You mischaracterized what I

4        said.  It was not a disagreement.

5              It was, was this being done, how

6        comes it wasn't being done.  Sam said,

7        we're not going to do this.  We decided

8        we're not gonna do this.

9              Then he went and said something

10       completely different to Daniel Pipes.

11       There was not a disagreement.  We didn't

12       disagree about anything.  If he wanted me

13       to put the articles out, I would have put

14       the articles out.  That's not what

15       happened.

16             You mischaracterized that whole

17       story.

18 BY MR. CAVALIER:

19       Q.    Well, I understand all of that.

20             But your testimony was that you

21 thought Greg was doing that to try to get you

22 fired.

23             Correct?

24             MR. CARSON:  Go ahead.  You can

1              answer that question.
2                        THE DEPONENT:  Yes.
3                        MR. CARSON:  Was Greg doing that
4              to get you fired?
5      BY MR. CAVALIER:
6              Q.     Okay.  But you weren't fired?
7              A.     (No audible response.)
8                        MR. CARSON:  We can't hear you,
9              Lisa.  Say that again.
10                       THE DEPONENT:  Yes.
11     BY MR. CAVALIER:
12             Q.     You weren't fired for this,
13     correct?
14                       MR. CARSON:  Or were you fired?
15                       THE DEPONENT:  I was not fired.
16             Actually, kind of.
17                       I, mean they gave me -- the
18             conditions were so terrible and so long,
19             I, like, had to quit.  I didn't want to
20             quit.
21                       I loved the mission.  I'm a
22             mission-oriented person.  It was in
23             Philly.  It was near my kids.
24                       I didn't want to have to go find a

1          new job.  Do you know how hard it is for

2          conservative people to find a

3          conservative job in Philadelphia?  Like

4          almost impossible.  I didn't want to

5          quit, I had to, because they were so

6          freaking awful.

7     BY MR. CAVALIER:

8          Q.     We're talking about the issue

9     about the radio show here.

10         A.     This was ongoing.  This happened

11    all the time.  And it wasn't about the radio

12    show.  You just mischaracterized it again.  It

13    was about the IW articles.

14         Q.     Okay.  So let's talk about the IW

15    articles.  You brought it to Daniel Pipes's

16    attention.

17              You thought Greg was doing it,

18    because he was trying to get you fired, correct?

19         A.     Correct.

20         Q.     But you were not fired for that,

21    correct?

22              MR. CARSON:  Objection.  Asked and

23         answered.  Go ahead.

24              THE DEPONENT:  Correct.

```
 1   BY MR. CAVALIER:

 2        Q.     So the issue was then resolved

 3   favorably from your perspective, correct?

 4              MR. CARSON:  Objection.

 5              THE DEPONENT:  You're

 6        mischaracterizing what I'm saying.

 7        Trying to get someone fired and it not

 8        happening is still harassment.

 9   BY MR. CAVALIER:

10        Q.     I'm not talking about harassment.

11        A.     Well, what are you talking about?

12        Q.     I'm just asking you whether the

13   issue was resolved favorably to you.

14        A.     It wasn't resolved because nobody

15   addressed it.  Daniel Pipes didn't say, oh, I'm

16   sorry, Lisa, that, like, -- you know, I got poor

17   information.  He just ignored me like I was

18   nothing.  That's how he treated everyone.

19              MR. CARSON:  I also didn't say

20        objection.  Argumentative.

21              THE DEPONENT:  Sorry, Seth.

22   BY MR. CAVALIER:

23        Q.     How do you know he just ignored

24   you?  How do you know what he did?
```

1   other George is, like, real young.

2          Q.     Just to back up real quickly.

3                 Do you -- so you're Director of

4   Communications for Congressman Randy Weber right

5   now, correct?

6          A.     Yeah.

7          Q.     Do you also manage his campaign

8   social media fundraising?

9          A.     Not his fundraising.  But his

10  campaign social media and some of the messaging.

11  Not all of it.

12         Q.     Okay.  Are you paid separately for

13  that?

14         A.     I am.

15         Q.     Okay.  And so that's not part of

16  your core job as Director of Communications?

17         A.     I mean, it's part of my job.

18         Q.     Okay.

19         A.     Because of the way I have to do

20  campaign work on my own time, and you can hire a

21  certain amount of people to work on the campaign,

22  like, that are actual staff members, as long as

23  they do their work on their own time.  And I get

24  a nominal portion -- like a get a nominal amount

# EXHIBIT 3
# Deposition of
# Gregg Roman

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF PENNSYLVANIA


| | | |
|---|---|---|
| LISA BARBOUNIS, | ) | CIVIL ACTION - LAW |
| | ) | |
| Plaintiff | ) | |
| | ) | |
| -vs- | ) | NO. 2:19-cv-05030 |
| | ) | |
| THE MIDDLE EAST FORUM, et | ) | |
| al., | ) | |
| | ) | |
| Defendants | ) | |
| _____ | X | |


* * *


The recorded video deposition of GREGG ROMAN,

taken remotely via Zoom, on Friday, November 20,

2020, beginning at 11:28 a.m., before Carrie A.

Kaufman, Registered Professional Reporter and Notary

Public in and for the Commonwealth of Pennsylvania.

```
 1   like -- you know, it's unconventional, okay, but it's
 2   still -- I would categorize it as educational.  So I
 3   was a member of the civil guard's education program
 4   from June of -- July of 2006 until about September of
 5   2006, and then there in parallel I resumed my
 6   university studies at a place called the
 7   Interdisciplinary Center, IDC, Herzliya,
 8   H-e-r-z-l-i-y-a, I did that for a year, and then I
 9   actually got drafted -- I didn't volunteer, I got
10   drafted, into the Israeli Army, so my university
11   studies stopped there, and then I was first in a
12   basic training in a place called Nitzan, N-i-t-z-a-n,
13   which is in the south of the country, and then I went
14   to the school for government and -- this is all as
15   part of the Israeli Defense Forces, a place called
16   Rishon Lezion, R-i-s-h-o-n L-e-z-i-o-n, and that was
17   in December and January, December of 2008 and January
18   of 2009, and then Operation Cast Lead broke out, so
19   again a war interrupted with my studies, and I was on
20   the frontlines in a place called Sderot, S-d-e-r-o-t,
21   then the war ended, then I went back to the college
22   for government, part of the IDF, in February of 2009,
23   I graduated from that, and then I went to the school
24   for advanced Israeli and Judaic studies, which was
25   part of the Israel Defense Forces' education corps,
```

1    and that took place in July of 2010 I think, and then

2    I got out of the army and went to the Ministry of

3    Defense Reserves in October of 2010, I want to say,

4    and then I went back to the IDC Herzliya, which was

5    the college that I was at prior to my army

6    enlistment, and I stopped studying -- I was doing

7    political communications and national security

8    studies there until May of 2012 and -- my daughter

9    was born then, and then I stopped studying then to

10   take a job in Pittsburgh where I then continued my

11   studies at the Katz Graduate School of Business at

12   the University of Pittsburgh where I was a joint sort

13   of like lecturer and I audited classes.  I have done

14   some continue education since there, but, Mr. Carson,

15   I never actually obtained my bachelor's degree, so I

16   have about seven years of college under my belt but

17   I'm missing those few credits to finish it.  And so

18   that's education but doesn't include the professional

19   development.  I just want to try to provide as clear

20   a -- complete an answer as possible.

21        Q.    No, that was a thorough answer for

22   sure.  It sounds like you have a degree in the

23   college of life to me, but -- sometimes worth more

24   than a bachelor's degree, but let me jump forward

25   ahead and --

1    -- can you say where you were when you had that

2    conversation?

3         A.    No, it's of a general nature.

4         Q.    Well, do you know -- were you in the

5    Middle East Forum office?  Was it over the phone?  Do

6    you know that?

7         A.    No, I have not been in the Middle East

8    Forum office at least between November -- was it even

9    beforehand because I was in Los Angeles when many of

10   these things were taking place, I wasn't even in

11   Philadelphia until that weekend.

12        Q.    So it was probably over the phone; is

13   that fair to say?

14        A.    Yeah.  I have not been in the Middle

15   East Forum office.  I was not in the Middle East

16   Forum office during this entire time, maybe one time

17   to film a video and I was at Lisa Barbounis's

18   initiation.

19        Q.    When you say this entire time, what do

20   you mean?  From when to when?

21        A.    Between the time that these allegations

22   were made until now.  I mean, I think I've been there

23   probably twice.

24        Q.    Okay.  So it's fair to say that the at

25   least one conversation you had with Mr. Pipes was

```
 1   over the telephone.
 2         A.     Yeah, probably, and there was actually
 3   probably ten weeks between this taking place and
 4   January of 2019 where I didn't even see him.  I was
 5   completely removed from the office.
 6         Q.     So we're just talking about
 7   conversations with Daniel Pipes in connection with
 8   Patricia McNulty's allegations of sexual harassment.
 9         A.     Right.  But, again, Mr. Carson, there
10   has to be specificity regarding these allegations
11   because there are five different versions from my
12   account --
13         Q.     But there weren't five versions --
14         A.     -- of what these accusations --
15         Q.     Were there five versions in 2018?
16         A.     There was multiple versions, yes.
17         Q.     All right.  What are the versions you
18   remember there being in 2018?
19         A.     Well, I don't remember the specific
20   versions.  I remember --
21         Q.     Well, how do you know --
22         A.     -- that there was an e-mail that I
23   received which said that Lisa Barbounis, Tricia
24   McNulty, and Marnie -- this is the words here, says
25   they say --
```

```
 1          Q.    Did you --
 2          A.      -- want to -- hold on.  Hold on.  Hold
 3   on.  Mr. Pipes, look, I've got a job, I've got three
 4   kids that I have to worry about, I have to pay my
 5   rent, I got to do things -- whatever you're saying,
 6   there will be a time to address the veracity and the
 7   truthfulness and the honesty of what these people are
 8   saying about me, but right now I'm going to work with
 9   you to try to make this problem mitigate itself and
10   I'll do whatever you need me to do, and I even
11   offered my resignation, Mr. Carson, if that's what
12   you need me to do, and the conclusion at the end of
13   the day when all this was over is that I was to go
14   and start my own organization until Lisa Barbounis
15   went back on her word, reneged on her complaints, and
16   said I should come back to work with her as if though
17   nothing ever happened.  That's what happened,
18   Mr. Carson.
19          Q.    Do you -- do you understand why women
20   might come -- not come forward and report sexual
21   harassment the day it happens?
22          A.    Mr. Carson, I'm not those women, so I
23   can't comment on something that someone else might
24   think.
25          Q.    Well, can you think of any reasons why
```

 1    it might be hard to do that?

 2            A.      Do what?

 3            Q.      For a woman to report information that

 4    has a personal sexual context to it.

 5            A.      Mr. Carson, I can and I can relate to

 6    that on a personal level.

 7            Q.      Going back to the AIPAC conference, can

 8    you please explain what that is, briefly?

 9            A.      What's what?

10            Q.      What is the AIPAC conference?  Is that

11    an annual conference held in Washington D.C.?

12            A.      Well, there's a few AIPAC conferences

13    that take place.

14            Q.      Well, in 2018 --

15            A.      Some take place --

16            Q.      In 2018 the Middle East Forum attended

17    an AIPAC conference sometime around March; is that

18    correct?

19            A.      There was the American Israel Public

20    Affairs policy conference that took place between

21    March 3rd and March 6th or March 2nd and March 5th,

22    if that's what you're referring to, yes.

23            Q.      Yeah, I'm going to try to get us

24    through this quickly.  So the AIPAC conference in

25    March of 2018, did you attend that along with Matt

1   Bennett and Patricia McNulty and Lisa Barbounis and

2   Marnie Meyer?

3          A.    Yes, and there was other people who

4   attended with us as well.

5          Q.    Understood.  And you -- it's my

6   understanding that you and Matt Bennett booked the

7   Airbnb; is that right?

8          A.    I actually think it was Lisa that

9   booked the Airbnb.

10          Q.    For you and Matt Bennett, correct?

11          A.    Yes, and she also booked her own hotel

12   room for her and Tricia and for Marnie after Tricia

13   asked if Lisa and Marnie could go.

14          Q.    Okay.  And I believe that you went to

15   the AIPAC conference over the -- over a weekend in

16   March; is that right?

17          A.    Well, you would have to tell me when it

18   is, but usually it's Saturday -- or Friday to Tuesday

19   depending on the year.

20          Q.    And that first Friday during that AIPAC

21   conference did the -- during that first AIPAC

22   conference in March of 2018 did the Middle East Forum

23   hold an event?

24          A.    No.

25          Q.    A dinner?

```
 1   you order some pizza into the room or did you go get
 2   pizza on the way back there?  How did that happen?
 3           A.      Raheem Kassam ordered pizza.
 4           Q.      Okay.  And were you sitting on the
 5   couch next to Lisa Barbounis and Patricia McNulty?
 6           A.      When?
 7           Q.      When you got back to the Airbnb.
 8           A.      No, I don't think so.
 9           Q.      At no time did you sit on the couch
10   with them.
11           A.      I may have, but the exact time you're
12   asking me if I did, I had conversations with the
13   students, I played the game of Battleship with them
14   -- we actually got this box of Battleship from one of
15   the bars which was one of these board game bars,
16   brought it back to the condo, whatever it was, and I
17   remember that some people were taking pictures
18   because the view was over Logan -- not Logan --
19   anyways, one of the circles on Massachusetts Avenue,
20   and then we were playing a game of Battleship, you
21   know, the board game Battleship, at the dining room
22   table, and the entire room was this, like, purple
23   couch that extended like this, like an oval.  The TV
24   was to the left.  There was a table for chess that
25   came around.  There was a dining room table which
```

Deposition of GREGG ROMAN                      Lisa Barbounis v. Middle Eastern Forum, et. al.

```
 1              off the record.
 2                      THE WITNESS:  Sorry about that.
 3          Is that better?
 4                      MR. CARSON:  Back on the record.
 5                      THE VIDEO SPECIALIST:  We're back
 6          on the record.  It's 5:18 p.m.
 7   BY MR. CARSON:
 8          Q.     Mr. Roman, did you take Lisa Barbounis
 9   to Israel?
10          A.     Yes.
11          Q.     Did you tell Daniel Pipes that you were
12   going to take her to Israel?
13          A.     When?
14          Q.     When you took her to Israel.
15          A.     I told Matt Bennett, I told Marnie
16   Meyer, I told Tricia McNulty, I told EJ Kimball, I
17   told --
18          Q.     My question was --
19          A.     -- most of the MEF staff, and I said to
20   Mr. Pipes that there was a staff trip to Israel, but
21   I never told him which staff went.  So in terms of
22   the general answer, yes, I said that she was going to
23   Israel, but I never used her specific name.
24          Q.     Why didn't you want Daniel Pipes to
25   know that you were taking her?
```

```
 1  staff, by the way, the story, too, about why we were
 2  taking these precautions.  I was almost put into an
 3  Egyptian jail.  If you're familiar with Cairo's
 4  Scorpion prison, Mr. Carson, it's where ISIS, Al
 5  Qaeda, Hezbollah, Muslim Brotherhood, all the bad
 6  guys are in.  I was in a car about to be taken to the
 7  prison until an embassy official from this country we
 8  were dealing with said it's okay, he's fine, and then
 9  I went on my way to stay at the Four Seasons in Cairo
10  next to the Giza Zoo, G-i-z-a Zoo.  There's a few
11  Four Seasons there.  Across from the Nile River.  The
12  next day I got into a car with Mr. Dashti and we
13  drove about two and a half hours out to a military
14  base, an Egyptian military base, between Alexandria
15  and Cairo --
16        Q.    When is this?
17        A.    -- where -- this is in January of 2018.
18        Q.    Right.  So we're about four months away
19  from where we're talking about.
20        A.    You're six weeks away from what we're
21  talking about.
22              So we went there and -- like I said, it
23  was around the time of the Superbowl, the Patriots
24  were playing the Eagles.  We watched that game in
25  Israel, went to Italy, went to Egypt, and we came
```

```
 1   back.  There I have never been more afraid for my
 2   life besides the time that I was in the army because
 3   of the work that MEF was doing.  I recorded a video
 4   with Matt Bennett which would be released in the
 5   event of my demise.  And the reason I say all of this
 6   is because a man named Michael Levin who I was
 7   friends with died after being murdered by Hezbollah.
 8   A man named Steven Sotloff who was the second hostage
 9   killed by ISIS in September 2nd -- there is -- yeah,
10   September 2nd, 2014 -- I saw him beheaded,
11   Mr. Carson.  I went into a downward spiral for the
12   better part of a year between 2014 and 2015 because
13   this is the subject of the kind of work that we do.
14   If we don't take security precautions like the ones
15   I'm laying out to you right now, people can die.  I
16   am not exaggerating this.  If you would like to speak
17   with anyone who is on our board or if you would like
18   to speak with other staff who are involved in this --
19   I've got a guy right now who has been rotting in a
20   Turkish prison for the past three years because he
21   didn't take proper security measures.  So if you're
22   asking me -- if you're asking me why there was an
23   instruction to compartmentalize information from a
24   relatively new employee who only been working with us
25   for five to six months -- by the way, that employee
```

```
 1    was the third person who was asked to go on this
 2    trip.  First it was Bennett, a man who speaks Hebrew,
 3    then it was Meyer, someone who is 20 years my senior
 4    and has extensive experience who wanted to violate
 5    the security protocols that we had put in place so no
 6    one would be hurt, and lastly --
 7              Q.     How did she want --
 8              A.     Excuse me?
 9              Q.     How did she want to violate the
10    security protocols?
11              A.     If you stay in a hotel, when you are
12    doing the kind of work that we were doing -- think
13    about it for a second.  You have staff that are
14    there.  You have someone cleaning your room.  You
15    have two people who are different.  You have
16    individuals that come and go.  You have no ability to
17    have physical security over your own space.  Now, if
18    you want to speak about the exact place where we
19    were, I actually got pictures of that apartment that
20    I would be very happy to make available to you.
21    Again, the architecture, the design, whatever else.
22    And also there is a list of 15 people that we met
23    with between March -- I'll give you the exact date,
24    March 11th and March 15th, March 11th and March 16th,
25    including representatives of Israel's intelligence
```

```
 1   agencies, one of the commanders from Israel's police
 2   department, members of parliament, individuals who
 3   disagree with MEF, and we actually have affidavits
 4   that I know you asked about in Mr. Pipes' deposition,
 5   but also that -- can I talk to counsel for a second
 6   just to direct them to do something?
 7               Mr. Cavalier, Mr. Gold, if you have
 8   those affidavits, please give them to Mr. Carson so
 9   he has more context for this.
10               They will attest to not just the manner
11   of why we had to keep this secret, but they will also
12   attest to the veracity of what I'm telling you right
13   now in terms of the subject of this.  In fact, it was
14   Lisa Barbounis who worked on the presentation that
15   eventually was given to a senior minister in the
16   government of who I'm talking to, and that senior
17   minister accepted the work that we were doing.  So
18   any mischaracterization of why information security
19   protocols and compartmentalizing personnel --
20   personnel and personal security at that time never
21   told you the whole story, and if they did you would
22   know all this of what I'm saying to you right now.
23        Q.    So you did tell Marnie Meyer then that
24   she couldn't go if she wanted to get her hotel room.
25        A.    Hundred percent.
```

```
 1   and if you go to the right, there is a kitchen --
 2   again, it's like this combined kitchen/living room
 3   area like we were talking about beforehand.  There
 4   was a bomb shelter, a restroom, and another bedroom.
 5   So on the complete opposite ends of where people
 6   were.
 7           Q.     Is this a bedroom right here?
 8           A.     Yeah, back there, that's where she
 9   chose to stay.
10           Q.     When you say she chose to stay there,
11   how many rooms were in -- how many bedrooms were
12   there?
13           A.     Three.
14           Q.     And was there -- where was the other
15   two bedrooms?
16           A.     So if you click there --
17           Q.     Oh, you know why?  It's a screen shot.
18   That's why I can't -- it's not the website.
19           A.     Actually, if you zoom in on those
20   screen shots --
21           Q.     They're going to be --
22           A.     That's -- you can't really see --
23           Q.     But, Mr. Roman, was it one of these two
24   couches that you were on when she alleges that you
25   put your foot up her butt?
```

1      A.      Mr. Carson, that never happened, so I

2   can't answer a question that's based on a factual

3   predicate that never happened.

4      Q.      Well, did the two of you sit on one of

5   those two couches one night?

6      A.      Could you be more specific?

7      Q.      Yeah, did you come home drunk after

8   going out and come back and start talking about

9   inappropriate sexual things in front of Ms.

10  Barbounis?

11     A.      No, Mr. Carson, that never happened.

12     Q.      You didn't try to have sex with Leah

13  Merville while you were there?

14     A.      No, Mr. Carson, and just in terms of

15  general questions of a nature which may regard any

16  intimacy or alleged intimacy, I'm going to invoke my

17  privacy privilege under Israel's basic law for human

18  dignity and liberty as amended in 1989.

19     Q.      That's not a privilege you can invoke

20  in this case.

21     A.      Actually it is and I'm going to invoke

22  that since the -- well, actually, if counsel has an

23  answer to further give reason for that?

24     Q.      I mean, look, you can do whatever you

25  want, we'll just make a record of it and then we'll

```
 1    deal with it --

 2          A.     Sure.

 3          Q.     So Ms. Barbounis alleges that you sat

 4    down on the couch next to her and put your foot under

 5    her butt and put it up there and then said now that

 6    my foot is up your butt or in your butt or next to

 7    your butt then I guess we can take our relationship

 8    to the next level or something of that nature.  Did

 9    that happen?

10          A.     No.

11          Q.     Did you -- did you describe having

12    sexual intercourse with Leah Merville to my client?

13          A.     No.

14          Q.     Did you say to my client how nice her

15    body was when you were having sex with her?

16          A.     No.

17          Q.     Did you try to have sex with anyone

18    else while you were in Israel besides Leah Merville?

19          A.     Mr. Carson, again, that question is

20    based on a factual predicate of an event that never

21    happened, and, beyond that, I am not going to answer

22    any questions that you ask that are related to a

23    privacy privilege that I have as an Israeli citizen

24    under Israel's basic law of human dignity and privacy

25    1989.
```

1      Q.      Mr. Roman, are you attempting to invoke

2   a protection under Israeli law right now?

3      A.      I am.

4      Q.      Okay.  All right.  So my client alleges

5   that you came back to the room and began to describe

6   in detail different sexual encounters with different

7   women.  Did that happen?

8      A.      No.

9      Q.      My client alleges that you asked her

10  for a blowjob when you got back to the room.  Did

11  that happen?

12     A.      No, Mr. Carson, I find this offensive.

13     Q.      It's important to -- for you to put

14  your position on the record because these are

15  certainly issues of material fact that are in

16  dispute.  So it's important that you dispute them.  I

17  think your counsel would probably agree with that.

18          My client alleges that during this trip

19  you asked her to engage in different sexual acts with

20  her, primarily -- maybe even exclusively, oral sex.

21  Did that ever happen?

22     A.      No.

23     Q.      And after this trip my client alleges

24  that you started treating her differently because she

25  said no.  Do you agree with that?

```
 1   yes.  Actually yes.  In April of 2018 the Middle East
 2   Forum held a sexual harassment seminar that was led
 3   by -- I specifically remember this.  It was led by
 4   Marnie Meyer.  She had brought in a New Jersey state
 5   approved sexual harassment guide or whatever.  I
 6   specifically remember Lisa Barbounis was there in the
 7   conference room.  Tricia McNulty was there in the
 8   conference room.  Brady, I don't know if she was
 9   working for us yet.  Yonchek I think may have been
10   working for us.  And Marnie Meyer held the sexual
11   harassment seminar.  All the staff invited from all
12   over the country was either participating in the
13   office in Philadelphia or via Skype for business, and
14   there was an element there where I said members of
15   MEF staff -- I'm paraphrasing this now to the best of
16   my recollection -- if there are any incidents of
17   sexual harassment that you are aware of or if you
18   ever become aware of them, this is the following
19   procedure of what you have to do, and this is also
20   codified in our personnel manual.
21         Q.    Mr. Roman, you do understand that the
22   question I asked you is when did you get back and
23   then I said did you get back in April.
24         A.    Well, I'm saying what happened is when
25   I got back.
```

# EXHIBIT 4
# Deposition of Delaney Yonchek

```
1   ----------------------------
2   LISA BARBOUNIS,           :   UNITED STATES DISTRICT COURT
            Plaintiff         :   EASTERN DISTRICT OF
3        v.                   :   PENNSYLVANIA
    MEF, et al.,              :
4           Defendant         :   NO. 2:19-cv-05030-JDW
    ----------------------------
5
6
7
8
9           VIDEOTAPE DEPOSITION OF DELANEY YONCHEK,
10  taken VIA ZOOM CONFERENCE on Tuesday, February 2,
11  2021, commencing at 10:12 a.m. before Coleen Trifun,
12  Court Reporter and Notary Public.
13
14
15
16
17
18
19
20
21
22
23
24
```

```
 1   Q.          Okay.   Thank you.

 2                     MS. BENSON:   I think it's a good time

 3   for a break.

 4                     VIDEOGRAPHER:   Okay.

 5                     The time is 11:14 a.m. and we're off

 6   the record.

 7                                - - -

 8        (Whereupon, a brief recess was held off

 9   the record.)

10                                - - -

11                     VIDEOGRAPHER:   The time is 11:40 a.m.

12   and we're back on the record.

13   BY MS. BENSON:

14   Q.          All right.   Thanks.

15          So, Delaney, I think where we left off was

16   we had just gone over the text messages regarding

17   Lisa and your colleague -- excuse me, former

18   colleague Benjamin.

19          What was your reaction when you received

20   that text message from Lisa Barbounis?

21                     MR. CARSON:   Objection; asked and

22   answered.

23                     THE WITNESS:   Regarding, as I stated

24   before, I didn't want the message and I just didn't
```

```
 1    care to know.  I didn't want to know.

 2    BY MS. BENSON:

 3    Q.        Why didn't you want to?

 4                  MR. CARSON:  Objection; asked and

 5    answered.

 6                  THE WITNESS:  Because I had nothing

 7    to do with it and I didn't want to know that

 8    information.

 9    BY MS. BENSON:

10    Q.        Did it make your feel uncomfortable?

11    A.        Yes.

12    Q.        Yes?

13              How so?

14    A.        I don't want to know the, you know,

15    interworkings of personal life.  I don't know how

16    much more to explain it.

17    Q.        Did you report to anyone that it made you

18    uncomfortable?

19    A.        No, I didn't.

20    Q.        Why not?

21    A.        I didn't -- I didn't feel like I

22    necessarily needed to.  I don't know, I just didn't.

23    Q.        Did you consider it?

24    A.        I didn't.
```

1   Q.        Did you share the -- the image with anyone

2   other than Caitriona?

3   A.        No.

4   Q.        Did you tell anyone other than Caitriona?

5   A.        No.

6               MR. CARSON:  Objection; form.

7   BY MS. BENSON:

8   Q.        Did you tell anyone other than Caitriona

9   that Lisa told you she was sleeping with Benjamin?

10  A.        No.

11  Q.        You testified earlier before our break

12  about Lisa's -- I think -- or I don't remember the

13  word we used, we'll say sleeping with somebody by

14  the name of Twin.  Do you recall that?

15  A.        I do.

16  Q.        Are you aware of any other individuals

17  that Lisa was sleeping with during her employment at

18  MEF?

19              MR. CARSON:  Objection form; asked

20  and answered.

21              MS. BENSON:  No, I -- sorry, to

22  clarify, I previously asked about MEF employees or

23  independent contractors.

24              MR. CARSON:  Same objection.

```
 1                    THE WITNESS:  Not that -- not that I

 2    can remember at all.  I don't remember knowing that.

 3    BY MS. BENSON:

 4    Q.        Do you know -- are you familiar with the

 5    name either Danny Tomo or Danny Thomas?

 6    A.        Yes.

 7    Q.        And what do you know about --

 8                    MR. CARSON:  Object to form.

 9                    You want her to tell you everything

10    she knows about him?

11                    MS. BENSON:  I do.

12                    MR. CARSON:  Okay.

13                    You can say everything you know at

14    about Daniel Thomas.

15                    MS. BENSON:  Thank you.

16                    THE WITNESS:  I know that he was part

17    of the England group that -- that MEF worked over

18    there with.

19    BY MS. BENSON:

20    Q.        Are you aware of Lisa having a sexual

21    relationship with him?

22    A.        I believe I overheard it from someone.

23    Like I think I overheard it in the office when --

24    but I wasn't told directly.
```

# EXHIBIT 5
# Email Chain Between Gregg Roman and Lisa Barbounis

**Subject:**     Re: EA Interview: Lisa Reynolds

**Date:**        Friday, September 15, 2017 at 10:49:14 AM Eastern Daylight Time

**From:**        Lisa Reynolds

**To:**          Matthew Bennett

**CC:**          Marnie Meyer, Gregg Roman

**Attachments:** DOMeeting_LDVA (2).docx, Final draft of Yemen.docx, GLS Parent letter 09142017.pdf, Lisa
                 Reynolds – EA – Writing Sample.docx, MBDS Personal Satement.docx

Dear Mr. Bennett,

Attached is the writing assignment you have requested.  I have also attached a few other writing samples so
that you may have a clearer picture of my writing style in different contexts.

I look forward to meeting you today.

Sincerely,

Lisa Reynolds Barbounis

On Tue, Sep 12, 2017 at 1:13 PM, Matthew Bennett <Bennett@meforum.org> wrote:

> Dear Lisa,
>
> I'm sorry for the confusion. Please complete the assignment as follows:
>
> Select 5 of the 6 questions below and type your answers into a Word document:
>
>   1. Draft an email to a member of the board to request a meeting with the President.
>   2. Explain how you would plan, manage, and execute a speaking engagement for the Director.
>   3. What is one of your major strengths and one of your major weaknesses? How do they shape your
>      work ethic?
>   4. Describe a past assignment that was too difficult for you. How did you overcome the challenge?
>   5. If you were your own supervisor, how would you manage yourself?
>   6. Describe your ideal working environment and office culture.
>
> Save the doc as a PDF called "Lisa Reynolds – EA – Writing Sample" and email it to me.
>
> In the body of the email, write a few sentences on "why you'd like to work at MEF".
>
> If you have any other questions please let us know.
>
> Thanks,

**Matthew Bennett**

Director of Development

Middle East Forum

Tel: (215) 546-5406

Fax: (215) 546-5409

www.MEForum.org


**From:** Lisa Reynolds [mailto:lisa.e.reynolds@gmail.com]
**Sent:** Tuesday, September 12, 2017 11:03 AM
**To:** Gregg Roman <Roman@meforum.org>
**Cc:** Matthew Bennett <Bennett@meforum.org>; Marnie Meyer <meyer@meforum.org>
**Subject:** Re: EA Interview: Lisa Reynolds


Dear Mr. Roman and Mr. Bennett,


Thank you for taking the time to speak with me yesterday.  I am looking forward to learning more about Middle East Forum and the Executive Assistant position.  I do have an additional question.  I received a LinkedIn message regarding the position that included an assignment asking me  to answer 6 questions. However, there were only two questions listed.  Would you like me to complete this assignment and submit it Wednesday or bring it to Friday's interview?


Please let me know if there is any additional material that I can provide.  I look forward to meeting everyone on Friday.


Sincerely,


Lisa Reynolds Barbounis


On Mon, Sep 11, 2017 at 5:19 PM, Gregg Roman <Roman@meforum.org> wrote:

Dear Lisa,


This is to confirm your interview with MEF on Friday, September 15th at 3pm.

I will meet you in the lobby of <u>1650 Market Street</u> and escort you up to our offices.

Please call me on my cell when you arrive. The number is <u>609-300-9342</u>.

If you have any questions just let me know.

We look forward to meeting you.

Thank you,

Matt

--
Lisa Reynolds

--
Lisa Reynolds

# EXHIBIT 6
# Reply to Offer by
# Lisa Barbounis

# Offer Acceptance

**Sent**   Mon Sep 25, 2017 at 8:00PM UTC-04:00 / Mon Sep 25, 2017 at 8:00PM
EDT

**From**   Lisa Reynolds <lisa.e.reynolds@gmail.com>

**To**     Gregg Roman <Roman@meforum.org>

**CC**     Marnie Meyer

**BCC**

---

Dear Gregg,

I am thrilled that you have decided to extend me an offer for the Executive Liaison position   I am more than pleased to accept the position.  I truly believe I will make a positive contribution to your team.

I look forward to starting my new position October 16, 2017.  If there is any additional paperwork or information you need prior to my start date, please let me know.

Thank you again.

Sincerely,

Lisa Reynolds Barbounis

# EXHIBIT 7
# MEF Handbook

# Personnel Manual

Effective May 2015

# Middle East Forum

1500 Walnut Street, Suite 1050
Philadelphia, Pennsylvania 19102

(215) 546-5406

2

## WELCOME TO THE MIDDLE EAST FORUM

The Middle East Forum ("MEF" or "Forum") is an independent, nonprofit organization that (1) promotes American interests in the Middle East; (2) protects Western values from Middle Eastern threats; (3) protects the right in the West to freely discuss Middle East policy, Islam, and related issues; and (4) encourages excellence in the study of the Middle East, Islam, and related issues. The MEF's work includes research, publications, educational programs, media outreach, activism, and networking. As a catalyst for the exchange of ideas, it seeks to influence the intellectual climate in which American foreign policy is made.

## RECEIPT OF THE MANUAL

This policy handbook summarizes the MEF's personnel practices and the benefits to which you may be entitled as our employee. Your signature on the acknowledgment page of this handbook indicates your agreement to abide by these policies as someone who MEF compensates on a scheduled basis. Your signature on the acknowledgment page of this handbook also indicates your understanding that no part of this handbook shall be construed as being an employment contract, either implied or expressed, between you and the MEF.

The MEF reserves the right to modify the statements, policies and benefits included in the handbook at any time, with or without notice.

## AT WILL EMPLOYMENT

Unless an employee has a written contract signed by the MEF president specifying an employment term, employment is "at will." **This means that both the employee and the MEF have the right to terminate the employment relationship at any time, with or without notice, for any or no reason, with or without cause.**

## SALARIES AND WAGES

### Work Week and Reporting

The work week is Monday through Friday, 9:00 a.m. to 5:00 p.m. From time to time employees may be asked to work additional hours above the regular work schedule for events, programs, and other business operations.

Part-time employees must record their work hours on weekly time sheets.

3

## Pay Schedule

Paychecks are normally delivered on the 15th and the last day of every month, although these dates are subject to change.

## Deductions

Deductions from each employee's paycheck include the mandatory and voluntary deductions described below:

Mandatory deductions include federal, state, and local withholding taxes, the employee's portion of Social Security contributions, as well as any garnishments or any other deductions required by law.

Voluntary deductions are made only with the authorization of the employee. Voluntary deductions include sums designated for participation in pension plans.

An itemized statement of all deductions from the employee's wages accompanies each paycheck. Be certain to review your paycheck stub carefully each payday.

## WORK PRODUCT

MEF reserves all intellectual and proprietary rights to any work product, in part or whole, that is developed by an employee in the course of performance by the employee at MEF. Work that falls under this policy includes work that is initiated on a MEF directive or work for which MEF has raised funds to finance some or all of the work product. Work products that fall under this policy include but are not limited to books, articles, educational materials or media projects. MEF retains the right to claim an employee's work product as its sole property during any phase of production.  It is the responsibility of the employee at the beginning phase of production to seek MEF's opinion as to whether a work product falls under this category.

The employee retains all intellectual property rights to any work product that the employee produces during the term of employment but wholly independent of and outside of employment by MEF.

## TIME AWAY FROM WORK

## Holidays

The Forum closes on New Year's Day, Memorial Day, Independence Day, Labor Day, Thanksgiving Day, and Christmas Day. If one of these holidays falls on a Saturday, the Forum will be closed on the preceding Friday; if it falls on a Sunday, then the following Monday.

For full-time employees holidays are paid working days.

4

## Vacation

*Administrative Staff.* The vacation year coincides with the calendar year. Vacation plans should be submitted to the employee's supervisor for approval as far in advance as possible. Every effort will be made to schedule vacations at the times most desired by the employees, but the MEF reserves the right to schedule the vacations of employees at such times as will not interfere with the orderly and efficient operation of the MEF and its rendition of services. Once the planned vacation is approved, the employee should notify the director and other colleagues who need to know.

Unless otherwise arranged, a full-time employee earns 12 vacation days per year for the first three years. After continuous employment for three years, a full-time employee earns 17 vacation days per year. After continuous employment for eight years, a full-time employee earns 22 vacation days per year.

Vacation credits begin immediately when an employee joins the MEF. During the first calendar year of employment, the employee earns vacation time at the rate of one day per month worked. If the employee starts work prior to the 15th of the month, the employee is entitled to a day of vacation for that month. If the employee starts work on the 15th of the month or later the employee will not be entitled to vacation time for that month. With the supervisor's permission, the employee may take vacation time not yet earned during the calendar year. If the employee has unused vacation time at the time of leaving the Forum, the employee is entitled to receive payment for the unused vacation time.

Part-time employees, interns, consultants, and temporary staff ordinarily do not accrue vacation credits.

Vacation salary equals the salary rate in effect when the vacation period begins. Up to five vacation days per year may be carried forward into the next year.

*Professional Staff.* Professional staff members do not have vacation time as such. They are responsible for their work being done well and in a timely fashion. They control their time, when they work and when they do not.

With this freedom comes responsibility: wherever they are and whatever they are doing, professional staff members are expected to stay in regular contact with the office and to fulfill their duties.

## Jury Duty

Full-time employees receive full pay for performing jury duty up to a maximum of 10 days. Please provide to the director a statement from the court clerk giving the number of days on duty and the rate paid each day. Any compensation received by the court for service as a juror will be deducted from the compensation remitted by the MEF during the same period. An employee required to be available for jury duty but not required to be in court is expected to report to work.

## Military Leave

The MEF provides military leaves to its employees to the full extent required under

applicable law. If an employee is a member of the National Guard or Reserves, and is directed to participate in periodic field training, he or she will receive unpaid military leave for a maximum period of 15 calendar days annually. Such leaves shall not affect normal vacation or benefits in any way.

Employees who are to serve in active duty will be granted unpaid leave of absence and will be reinstated upon return to the extent required by applicable statutes.

## Sick Leave

Eligibility for sick leave begins when an employee joins the MEF. During the first calendar year of employment, sick leave is earned one day per month up to a total of 10 sick days for that year. If the employee starts work prior to the 15th of the month, the employee is entitled to a sick day for that month. If the employee starts work on the 15th of the month or later the employee will not be entitled to a sick day for that month. After that, sick leave accrues at the rate of 10 days per year of service and may be used only for ill health (and not as vacation by another name).

Sick leave also extends to caring for immediate family members. For the purposes of this policy, immediate family members are parents, siblings, children or parents, siblings and children of an employee's spouse.

Unused sick leave is not carried forward into the next year. There is no pay for unused sick leave credits.

Employees missing work due to illness must contact their supervisor as soon as possible *before* they are scheduled to begin work, and must provide a contact number. Employees who are absent for more than one day must contact their supervisor each day that they are absent. The MEF may require that employees provide a doctor's note to substantiate illness.

If an employee is sick and out of the office for a period of time that exceeds the designated sick days, the employee may discuss with the director the possibility of making up this time in the evenings or on weekends or of using earned vacation time as sick days.

## Childbirth-related Leave

Employees shall give MEF adequate notice of an expected childbirth-related absence. Employees must first exhaust all accrued vacation and paid sick leave. MEF will then provide unpaid leave for the balance of a contiguous period of up to 12 weeks. Employees will not accrue benefits during this unpaid leave and will not be eligible for it unless they have been employed at MEF for the preceding 12 months.

## Leaves of Absence

***Professional.*** Leaves of absence for work (research, writing, teaching) at other institutions may be requested by employees in good standing. Approval of such leaves is at the president's sole discretion in light of various factors including, without limitation, staffing needs and the reason for the leave. Employees will not accrue benefits during professional leaves of absence.

***Personal.*** The MEF occasionally grants its employees leaves of absence for personal reasons.

6

Approval of such leaves is at the president's sole discretion in light of various factors including without limitation staffing needs and the reason for the leave. Employees will not accrue benefits during personal leaves of absence.

## Bereavement/Death in the Family Policy

Following a death in his or her immediate family, each employee will be entitled to be absent without loss of pay for a period extending up to but not more than 24 consecutive working hours (up to three days), depending on the person's normal work day.

For other close relatives, the employee shall be entitled to be absent the day of the funeral without loss of pay.

## Personal Business

Full-time employees may request of the director or their supervisor time off during working hours to conduct personal business that cannot ordinarily be conducted outside working hours. If permitted to take such time off, employees must make up the missed time in accordance with the direction of his or her direct supervisor or the director. Such requests must be made as far in advance as possible.

## Breaks

Administrative employees are entitled to a paid 15-minute break every four hours, or may take a paid 30 minute lunch break. Apart from these breaks, employees' time at the office should be spent on work-related tasks.

**EMPLOYEE BENEFITS**

## Health Insurance

The MEF does not participate in a group medical plan. As a result of Obamacare, the Commonwealth of Pennsylvania offers its residents the option to purchase health insurance through a marketplace healthcare exchange. The Marketplace provides the services described in the Department of Labor fact sheet (which appears at the bottom of this document). The Marketplace can be accessed at https://www.healthcare.gov/. Any plan an employee selects will be the employee's sole responsibility and payments cannot be processed through payroll as a pre-tax deduction. However, an employee may be eligible for a premium tax credit under section 36B of the Internal Revenue Code if the employee purchases a qualified health plan through the Marketplace.

## Worker's Compensation

Employees who become injured due to an on-the-job accident or illness may be entitled to benefits under Workers' Compensation Insurance.

Workers' Compensation requests must be made by using the appropriate Workers' Compensation Leave form as soon as the employee becomes aware of his or her disabling condition. The form must contain a statement from a physician describing the nature of the condition and projected leave. The MEF may also require that employees provide further medical evidence satisfactory to the MEF.

Failure to promptly report workplace injuries may jeopardize receipt of worker's compensation benefits.

When an employee wishes to return from Workers' Compensation leave, that employee must report his or her availability for work to his or her supervisor no less than one (1) week prior to the date on which he or she wish to return. The MEF may require that returning employees provide a physician's statement specifying that he or she is fit to return to work.

If an employee fails to report to work at the end of the approved Workers' Compensation leave or is working for another entity during the Workers' Compensation leave, employment with the MEF will be considered voluntarily terminated.

## Pension

1) TIAA-CREF

The Forum pension plan currently is underwritten by the Teachers Insurance and Annuity Association-College Retirement Equities Fund (TIAA-CREF). Each TIAA retirement annuity contract and CREF certificate issued in accordance with this plan is for the sole purpose of providing a retirement and/or death benefit and is the property of the individual participant.

All employees are eligible to begin participation in the pension plan when their employment begins at the MEF.

2) Supplemental Retirement Annuity

In addition to the pension plan, employees may contribute to a Supplemental Retirement Annuity. Additional information is available through the director.

## OFFICE POLICIES

## Telephones

Personal calls, incoming or outgoing, should be kept to a reasonable number and reasonable length of time.

Long distance calls on the MEF network of a personal nature should be noted as such on a record sheet; reimbursement for such calls will then be requested.

When possible, long distance calls involving MEF business should be made using Skype, Google, or other discounted carriers.

## Postage

To keep down postage costs, please inform the Receptionist whenever outgoing mail need not go at first-class or air-mail rates.

8

The postage meter is for MEF mail only. Should employees not have stamps and wish to use the meter, they may do so if they indicate to the Receptionist that the mail is personal and then reimburse the MEF for the cost of postage.

## Dress Code

Employees are expected to dress in business clothes and to maintain a neat, well-groomed, and professional appearance in connection with their work for MEF.

## Purchases

*Office supplies*. Requests should be submitted for approval to the office manager.
*Books and other materials.* Requests should be submitted for approval to the director.

## Reimbursement for Travel

The following concerns travel in fulfillment of work on behalf of the Forum, but not travel to the MEF office. These guidelines apply to both employees and independent contractors.

(1) *Research travel*: The president and each project head has at his disposal a maximum of $2,500 a year for research purposes. Project heads may submit to the director requests for additional funds, which will be considered on a case-by-case basis.

(2) *Institutional travel*: MEF reimburses staff for travel expenses incurred on its behalf. A written description of the purpose and an estimate of costs provided to the director, whose permission must be given in advance. In keeping with MEF's frugal approach to spending, funds should be used in an economical and careful fashion.

After a trip, the traveler should within a week submit (1) a written, substantive report (i.e., meetings attended, individuals interviewed) to the president and (2) an expense account, with receipts, to the director.

## Personal Use of MEF Property

The MEF's equipment and services are the MEF's assets and are to be used for MEF business-related purposes and for reasonable legal personal purposes. Employees may not use the MEF's equipment or services, including but not limited to photocopy machines, fax machines, telephones and mail service, for illegal purposes.

Further, database information, addresses, and e-mail lists are MEF property and only to be used for MEF purposes and not for personal purposes.

## Confidential Information

All information and technology of MEF, the unauthorized disclosure of which would be detrimental to the interests of MEF ("MEF Confidential Information"), is solely the property of MEF. Employees must maintain all MEF Confidential Information in strict confidence and protect against its disclosure or dissemination. MEF Confidential Information is considered to include confidential information obtained from third parties. The foregoing obligations of

confidentiality and non-disclosure continue to apply after termination of employment with MEF.

Employees must not remove any MEF Confidential Information from MEF's premises or make copies of such materials except for use in MEF business.

Employees must return to MEF all MEF Confidential Information, and copies of the foregoing, at any time upon the request of MEF and, in any event and without such request, prior to or upon the termination of employment by MEF. Employees agree not to retain any copies of any MEF Confidential Information, in any form, after termination of employment for any reason.

If the employee is unsure as to whether any particular information is MEF Confidential Information, the employee shall treat it as such unless and until the employee has been advised otherwise by an authorized representative of MEF.

**Moonlighting**

Any employee desiring to engage in any outside employment or consulting may do so provided it does not conflict with Forum goals or get in the way of fulfilling Forum duties.

**Taglines**

Taglines (the short, identifying biographies in newspapers, magazines, television shows, etc.) are of great importance to the MEF: getting our name out is a critical way of showing sponsors what we've achieved; also, it gets our name into circulation, thereby increasing our opportunities and our support. It is critical that staff mention the Middle East Forum or subsidiary activities (*Middle East Quarterly*, Campus Watch, Islamist Watch, Legal Project, Washington Project) in their i.d.

Employees must show materials that mention the Middle East Forum to the president or someone he designates. The MEF assumes its employees are alert to the activities and interests of the organization, and that they consider these in their public utterances.

**No Solicitation Policy**

Solicitation for any reason during working time is prohibited. Non-employees may not solicit on the MEF's property at any time for any reason. Employees are prohibited from distributing literature or other materials during working time and in working areas. Work time does not include those periods during the workday when employees legitimately are not engaged in performing their work tasks, such as break times, meal times or other specified breaks from work duties.

**Contact with the general public**

Everyone at the Forum has contact with the public. It is important that each member of the staff recall that he is not just an individual but also a representative for the organization when dealing with the public. Please treat everyone as if he were a potential major donor, for one never knows. In case you have questions about an individual, please check with the director.

**Contact with journalists**

From time to time, the Middle East Forum is in the news. (For an example, see http://www.lobelog.com/dennis-ross-sits-on-board-for-daniel-pipess-journal/.) If a journalist approaches you for information on the inner workings of the Forum or for a Forum position on an issue, please check with the president or director before giving a response. That means:

- Forward an e-mail question to the president or director; or
- If a reporter catches you on the phone or in person, say you are not authorized to discuss the topic. If the reporter presses further, take down his name and contact information, explaining you will pass it along to another staff member – but do not name the staff member.

## Computers and Technology

The following provisions apply to Users of MEF's Computer Resources.

### *Definitions*

Terms referred to below require definition:

The term *Computer Resources* refers to MEF's entire computer network. Specifically, Computer Resources include, but are not limited to, host computers, file servers, application servers, communication servers, mail servers, fax servers, Web servers, workstations, stand-alone computers, laptops, software, data files, and all internal and external computer and communications networks (for example, Internet, commercial online services, value-added networks, and e-mail systems) that may be accessed directly or indirectly from our computer network.

The term *Users* refers to all employees, independent contractors, consultants, temporary workers, and other persons or entities that use MEF's Computer Resources.

### *Prohibited activities*

**<u>Waste of Computer Resources</u>.** Users may not deliberately perform acts that waste Computer Resources or monopolize resources to the exclusion of others. These acts include, but are not limited to, sending mass mailings unrelated to MEF business, chain letters, spending time on the Internet unrelated to MEF business, playing games, engaging in online chat groups unrelated to MEF business, or otherwise wasting resources.

**<u>Misuse of Software</u>.** Without prior written authorization from the president, Users may not do any of the following: (1) copy software for use on their home computers; (2) provide copies of software to any independent contractors or to any third person; (3) install software on any MEF workstations or servers; (4) download any software from the Internet or other online service to any of the MEF workstations or servers; (5) modify, revise, transform, recast, or adapt any software; or (6) reverse-engineer, disassemble, or decompile any software. Users who become aware of any misuse of software or violation of copyright law should immediately report the incident to the president.

11

*Login IDs and Passwords*

*__Responsibility for Login IDs and Passwords__*. Users are responsible for safeguarding their login IDs and passwords for access to the computer system. Users are responsible for all transactions made using their login IDs and passwords. No User may access the computer system with another User's login ID or password without permission from the director or president.

*__Passwords Do Not Imply Privacy__*. Use of passwords to gain access to the computer system or to encode particular files or messages does not imply that Users have an expectation of privacy in the material they create or receive on the computer system. MEF has global passwords that permit access to all material stored on its computer system regardless of whether that material has been encoded with a particular User's password.

*__Accessing Other Computers and Networks__*. A User's ability to connect to other computer systems through the network or by a modem does not imply a right to connect to those systems or to make use of those systems unless specifically authorized by the operators of those systems.

**Viruses**

*__Virus Detection__*. Viruses can cause substantial damage to computer systems. Each User is responsible for taking precautions not to introduce viruses into the MEF network. To that end, all material received on external hard drives (including flash drives) and all material downloaded from the Internet or from computers or networks that do not belong to MEF MUST be scanned for viruses and other destructive program before being placed onto the computer system. Users should understand that their home computers and laptops might contain viruses. All disks transferred from these computers to the MEF network MUST be scanned for viruses. Please check with the director  if you want to add material to the MEF network.

*__Accessing the Internet__*. To ensure security and avoid the spread of viruses, Users accessing the Internet through a computer attached to the MEF network must do so through an approved Internet firewall. Accessing the Internet directly, by modem, is strictly prohibited unless the computer being used is not connected to the MEF network or specific prior written authorization has been made by the director or president.

*__Blocking of Inappropriate Content.__*
MEF may use software to identify inappropriate or sexually explicit Internet sites. Such sites may be blocked from access by MEF networks. In the event an employee nonetheless encounters inappropriate or sexually explicit material while browsing on the Internet, he or she must immediately disconnect from the site, regardless of whether the site was subject to MEF blocking software.

*__Games and Entertainment Software__*.
Employees may not use MEF's Internet connection to download games or other entertainment software, or to play games over the Internet.

12

### *Use of Encryption Software.*

Employees may not install or use encryption software on any of the MEF's computers without first obtaining written permission from the director or president.

### *Export Restrictions.*

The federal government has imposed restrictions on export of programs or files containing encryption technology (such as e-mail programs that permit encryption of messages and electronic commerce software that encodes transactions). Software containing encryption technology is not to be placed on the Internet or transmitted in any way outside the United States without prior written authorization from the director or president.

### *Violations.*

Failure to comply with this policy may result in appropriate disciplinary action, up to and including termination of employment.

## Electronic Mail, Voice Mail, and Internet Policy

This policy is intended to provide guidelines regarding the use and administration of electronic mail ("e-mail"), voice mail, and Internet access at the Middle East Forum.

### *E-mail and Voice Mail Communications are MEF Property*

E-mail and voice mail systems are available to assist employees in performing their work. Like the other software, hardware, and tools made available to and used by employees, the e-mail and voice mail systems and the information, work, and data contained therein are the property of MEF.

Electronic and voice mail communications are not private. They are business records that may be subject to subpoena or other legal investigation and may be introduced as evidence in a legal proceeding. MEF requires all employees to use passwords to gain access to e-mail and voice mail. The use of a password is for the protection of MEF, not the employee. Messages are not considered confidential even though a private password is used.

### *Use of the Internet, E-mail and/or Voice Mail Systems*

MEF's e-mail and voice mail systems and access to the Internet are provided to employees for MEF business. Employees may use these systems occasionally for personal business, but excessive personal use is strictly prohibited. Visiting gaming or adult sites for personal use or any other purpose not in furtherance of MEF's business is prohibited. Moreover, these systems may not be used for transmitting junk mail or chain letters.

The Internet, e-mail, and voice mail systems shall not be used to send or retrieve inappropriate materials, including suggestive or discriminatory references, materials disparaging individuals on the basis of their race, color, creed, religion, age, gender, national origin, citizenship, veteran status, marital status, mental or physical handicap or disability, sexual orientation, gender

identity or other protected characteristics, or which are not consistent with or violate any other policy of MEF, including MEF policies regarding Equal Employment Opportunity and Sexual and Other Unlawful Harassment. Any use of these systems that is threatening, abusive, obscene, harassing, defamatory, or otherwise unprofessional and/or illegal is strictly prohibited.

The e-mail system may not be used to create, retrieve, and/or send any unauthorized copies of software or to otherwise violate applicable copyright laws. Employees are responsible for ensuring that their use of e-mail, voice mail, and the Internet complies with federal, state, local, and international law. Finally, downloading programs, data, or other material except as approved by the director or the president is prohibited because of the prevalence of viruses, potential incompatibility with MEF's hardware and software systems, and copyright issues.

Employees who misuse MEF's Internet, e-mail and/or voice mail systems or knowingly allow others to do so are subject to disciplinary action, up to and including termination of employment. Employees should report violations of this policy to the president.

### *Altering Attribution Information*

Employee must not alter the "From:" line or other attribution-of-origin information in e-mails, messages or postings in an attempt to deceive. Anonymous or pseudonymous electronic communications are forbidden. Employees must identify themselves honestly and accurately when participating in chat groups, making postings to newsgroups, sending e-mail, or otherwise communicating online.

### *Monitoring Internet, E-mail and Voice Mail Systems*

MEF reserves the right to access, monitor, and disclose the contents of e-mail and/or voice mail communications sent or received over its systems. MEF also reserves the right to monitor employees' use of its systems to access the Internet and to access, monitor, and disclose the contents of any material retrieved from or disseminated over the Internet through use of MEF's systems.

### *Protection of Confidential/Proprietary Information*

Employees must exercise special care to protect the proprietary and/or confidential information of MEF. Unauthorized transmission and/or disclosure of any confidential or proprietary information is strictly prohibited.

Use of MEF equipment for e-mail and/or voice mail communications constitutes an employee's agreement to abide by the terms of this policy and consent to MEF's access, monitoring, and disclosure described herein. As with all of its policies, MEF reserves the right to change or revoke this policy at any time, in its discretion, with or without notice.

### PERFORMANCE AND DISCIPLINE

14

## Resignation

Employees who voluntarily resign from their positions at the MEF are requested to give at least two (2) weeks notice in writing of their intent to resign. Depending on the circumstances, an employee may not be asked to continue work during the notice period and may instead be required to tender their resignation effective immediately.

## Return of MEF Property upon Termination of Employment

At the time of termination of employment, an employee must return all property and materials belonging to the MEF that were utilized in the employee's work, including all copies of institutional products in electronic, written and other forms. The employee must confirm this return of property and materials in writing.

NON-DISCRIMINATION AND ANTI-HARASSMENT

## Equal Employment Opportunity

The MEF adheres to a policy of complete nondiscrimination with regard to employees and applicants for employment. Our policy is to provide equal employment opportunity for all our employees and applicants in compliance with applicable local, state and federal laws. Employment decisions will be made by the MEF without regard to non-work related factors, such as race, color, religion, sex, national origin, age, disability, citizenship, marital status, sexual orientation, veteran status or other protected status under applicable law.

## Anti Harassment

The MEF is committed to providing a work environment that is free of harassment of any kind. The MEF does not tolerate actions, words, jokes, or comments based on an individual's gender, pregnancy, race, color, national origin, ethnic background, age, religion, creed, disability, sexual orientation, veteran's status or any other legally-protected characteristic.

Harassment includes, without limitation, verbal harassment (epithets, derogatory statements, slurs), physical harassment (assault, physical interference with normal work or involvement), visual harassment (posters, cartoons, drawings), and innuendo.

***Sexual Harassment.*** Sexual harassment is a violation of state and federal law. It includes unwelcome sexual advances, requests for sexual favors, sexually motivated physical contact and other verbal or physical conduct, or visual forms of harassment of a sexual nature when:

The harasser states or implies that giving in to or rejecting such conduct will affect an individual's employment; or

such conduct unreasonably interferes with an individual's work performance or creates an intimidating, hostile or offensive work environment.

15

It is not possible to identify all of the conduct which could be sexual harassment. However, some common examples of conduct that might be sexual harassment include, but are not limited, to the following:

> threatening to, or actually making, job decisions, such as discharge, demotion or reassignment, if sexual favors are not granted;

> demanding sexual favors in exchange for favorable or preferential treatment;

> using stereotypes;

> unwelcome and/or repeated flirtations;

> propositions or advances;

> unwelcome physical contact;

> whistling in a manner directed toward the appearance of another;

> leering;

> improper gestures;

> tricks or horseplay;

> gender-related remarks which are offensive, insulting, derogatory or degrading;

> comments about appearance;

> sexual jokes or use of sexually explicit or offensive language, either in person, in writing or through e-mail;

> gender or sex-based pranks;

> the display in the workplace of sexually suggestive objects or pictures, including material from the Internet.

***Other Harassment.*** Harassment is not limited to sexual harassment. Statements or actions that ridicule or are critical of an individual because of his or her race, color, gender, age, religion, national origin, sexual orientation, disability, ancestry, veteran status or any other characteristic protected by law are offensive. Offensive conduct can create an intimidating, hostile work environment and may unreasonably interfere with the individual's work performance. Accordingly, offensive conduct is prohibited.

Again, this policy does not include a complete list of what conduct constitutes unlawful harassment. Some common examples of such harassment are:

> using epithets or slurs;

> mocking, ridiculing or mimicking another's culture, accent, appearance or customs;

> threatening, intimidating or engaging in hostile or offensive acts that focus on an individual's race, color, gender, age, religion, national origin, ancestry, sexual orientation, disability, veteran status or any other characteristic protected by law;

16

offensive jokes or pranks;

posting offensive material on walls, bulletin boards, or elsewhere on MEF's premises;

circulating offensive material in the workplace, by e-mail or otherwise.

***Reporting and Investigation***. If you believe that you are the victim of impermissible harassment, or become aware of another employee being subjected to impermissible harassment, you must promptly report the facts of the incident to your supervisor or to the president or director. The MEF will promptly, appropriately and with as much confidentiality as possible investigate any reports of offensive conduct.

***Resolving the Matter.*** After the investigation, appropriate action will be taken. Any employee who is found to have engaged in harassment of another employee will be subject to disciplinary action up to and including discharge. If deemed appropriate, an accused harasser may be suspended without pay pending investigation. In all cases, we will advise the complaining employee and the accused of the outcome of the investigation.

***Non-Retaliation.*** You will not be retaliated against for reporting incidents that you believe to be violations of this policy. You also will not be retaliated against for participating in the investigation of a harassment complaint. Retaliation is a serious violation of this policy, and you should report any incidents of retaliation immediately. We will investigate and resolve reports of retaliation in the same manner as reports of harassment.

I acknowledge that I have received a copy of the Middle East Forum Employee Handbook.

Employee

Lisa Reynolds-Barbounis
Dated: 09/25/2017

# EXHIBIT 8
# Excerpts from MEF Personnel Manual

# Personnel Manual

Effective May 2019

# Middle East Forum

1650 Market Street, Suite 3600
Philadelphia, Pennsylvania 19103

(215) 546-5406

17

**NON-DISCRIMINATION AND ANTI-HARASSMENT**

Equal Employment Opportunity

The MEF adheres to a policy of complete nondiscrimination with regard to employees and applicants for employment. Our policy is to provide equal employment opportunity for all our employees and applicants in compliance with applicable local, state and federal laws. Employment decisions will be made by the MEF without regard to non-work-related factors, such as race, color, religion, sex, national origin, age, disability, citizenship, marital status, sexual orientation, veteran status or other protected status under applicable law.

Anti-Harassment

The MEF is committed to providing a work environment that is free of harassment of any kind. . All forms of harassment are a violation of state and federal law. Some common examples of conduct that are considered to be harassment include, but are not limited, to the following:

> ➢ Threatening to, or actually making, job decisions, such as discharge, demotion or reassignment, if sexual favors are not granted;

> ➢ Demanding sexual favors in exchange for favorable or preferential treatment;

> ➢ Unwelcome and/or repeated flirtations; propositions, advances, or physical contact

> ➢ Whistling, leering; or improper gestures in a manner directed toward the appearance of another

> ➢ ; Gender-related remarks which are offensive, insulting, derogatory or degrading;

> ➢ Sexual jokes or use of sexually explicit or offensive language, either in person, in writing or through e-mail;

> ➢ Gender or sex-based tricks or horseplayor pranks;

> ➢ The display in the workplace of sexually suggestive objects or pictures, including material from the Internet.

> ➢ Using epithets or slurs;

> ➢ Mocking, ridiculing or mimicking another's culture, accent, appearance or customs;

> ➢ Threatening, intimidating or engaging in hostile or offensive acts that focus on an individual's race, color, gender, age, religion, national origin, ancestry, sexual orientation, disability, veteran status or any other characteristic protected by law;

18

> ➢ Offensive jokes or pranks;
> ➢ Posting offensive material on walls, bulletin boards, or elsewhere on MEF's premises;
> ➢ Circulating offensive material in the workplace, by e-mail or otherwise.
> ➢ Any inference by a supervisor that implies that an individual's employment will be affected if they are not accepting of advances or mistreatment Any conduct that unreasonably interferes with an individual's work performance or creates an intimidating, hostile or offensive work environment.

<u>Reporting and Investigation</u>.

If you believe that you are the victim of impermissible harassment or become aware of another employee being subjected to impermissible harassment, you must promptly report the facts of the incident to your supervisor or to the president or director. The MEF will promptly, appropriately and with as much confidentiality as possible investigate any reports of offensive conduct.

<u>Resolving the Matter.</u>

After the investigation, appropriate action will be taken. Any employee who is found to have engaged in harassment of another employee will be subject to disciplinary action up to and including discharge. If deemed appropriate, an accused harasser may be suspended without pay pending investigation. In all cases, we will advise the complaining employee and the accused of the outcome of the investigation.

<u>Non-Retaliation.</u>

You will not be retaliated against for reporting incidents that you believe to be violations of this policy. You also will not be retaliated against for participating in the investigation of a harassment complaint. Retaliation is a serious violation of this policy, and you should report any incidents of retaliation immediately. We will investigate and resolve reports of retaliation in the same manner as reports of harassment.

**PERFORMANCE AND DISCIPLINE**

<u>Performance Assessments</u>

At the end of each fiscal year employee's performance is reviewed by an individual's supervisor or the Director.  Bonuses and increases are distributed at this time if funds allow.

# EXHIBIT 9 Plaintiff's Responses to Third Set of Requests for Admissions

# UNITED STATES DISTRICT COURT
# FOR THE EASTERN DIRSTRICT OF PENNSYLVANIA

|  |  |  |
|---|---|---|
| | : | |
| LISA BARBOUNIS | : | CIVIL ACTION |
| x          Plaintiff, | : | NO. 2:19-cv-05030-JDW |
| -vs- | : | |
| | : | |
| THE MIDDLE EAST FORUM, et al. | : | |
| | : | |
| Defendants. | : | |

## PLAINTIFF LISA BARBOUNIS'S RESPONSES
## TO DEFENDANTS' THIRD REQUESTS FOR ADMISSIONS

1.     REQUEST FOR ADMISSION NO. 1: Admit that you made anti-Semitic comments about Gregg Roman while you were employed with The Forum.

RESPONSE:

Denied.  Plaintiff, Lisa Barbounis's career with The Middle East Forum was predicated upon her passion for her pro-Israel philosophy.  Prior to Plaintiff, Lisa Barbounis's reports of discrimination and harassment in the workplace, The Middle East Forum posted a public video that Plaintiff, Lisa Barbounis made.  The video was premised upon Plaintiff's Lisa Barbounis's concern for growing antisemitism in the United States and abroad.

2.     REQUEST FOR ADMISSION NO. 2: Admit that you received a promotion, bonus, and pay raise after you were appointed Director of Communications of the Middle East Forum in December 2018.

RESPONSE:

Denied as stated.  Defendants Request for Admission is a non-sequitur and based upon a false premise.  First, Defendant, The Middle East Forum and specifically Daniel Pipes never provided Plaintiff with an actual promotion to Director of The Middle East Forum.  To the contrary, Plaintiff, Lisa Barbounis was never received a meaningful promotion.  Plaintiff requested a promotion to Director of Communications because Plaintiff's job responsibilities had increased significantly and Plaintiff was doing more work with public relations for The Middle East Forum.  Plaintiff explained that people she had to do business with on behalf of The Forum would take Plaintiff more seriously if Plaintiff had the title, Director of Communications. Accordingly, Plaintiff requested the promotion.  Daniel Pipes responded that Plaintiff could hold herself out to the public as Director of Communications, however, Daniel Pipes was very clear that Plaintiff's title and promotion was in name only.  Plaintiff did not receive a pay raise to go

with the promotion.  Plaintiff did not receive a bonus.  Plaintiff and the entire staff at The Middle East Forum had all taken on added work and responsibilities in  and around the Spring 2019. Everyone was doing more work because The Middle East Forum had lost personnel.  Defendant Greg Roman posed a significant risk to the safety of the female employees who worked at The Middle East Forum and was therefore not allowed to come into the office.  This decision was made after several employees including Plaintiff reported that Defendant Greg Roman had committed sexual assaults and/or had maintained inappropriate quid pro quo sexual relationships with female staff.  Matthew Bennett had left the Forum.  So had other employees including Greg Roman's sister.  Accordingly, Daniel Pipes extended a temporary salary increase to compensate the employees for added work.  The temporary pay-raise was compensation for added work and not a bonus.  The only other increase in pay that Plaintiff received was the standard cost of living increase which all employees who worked at The Middle East Forum received.  Even the cost of living increase was executed based on Defendants discriminatory policies to which female employees were subjected.  Female staff were subjected to discriminatory treatment by Daniel Pipes and Greg Roman.  Defendant and the other female employees received a 2.8% cost of living increase.  Matthew Bennett received a 6% cost of living increase.  This is one of many examples where male staff were afforded benefits and pay denied to female staff.


3.      REQUEST FOR ADMISSION NO. 3: Admit that you shared and/or provided information about your Complaint to a reporter from the Washington Examiner.

RESPONSE:

Denied.  Plaintiff has not shared information about her Complaint which was filed in October 2019 with any reporters.

4.      REQUEST FOR ADMISSION NO. 4: Admit that you shared and/or provided information about your Complaint to a reporter from the Washington Free Beacon.

RESPONSE:

Denied.


5.      REQUEST FOR ADMISSION NO. 5: Admit that you shared and/or provided information about at least one of your accusations with a reporter from the Washington Free Beacon.

RESPONSE:

Denied.

6.     REQUEST FOR ADMISSION NO. 6: Admit that you recorded fellow employees at The Forum without their knowledge and/or permission.

RESPONSE:

Plaintiff objects to this Request as Defendant is improperly using Request for Admissions as a discovery device.  Rule 36 is not a discovery procedure Defendants are attempting to use Request for Admissions under Rule 36 to circumvent the limitations of discovery and specifically interrogatories.   Defendants have deployed one-hundred-fourteen (114) Request for Admissions to Plaintiff, Lisa Barbounis and are attempting to ascertain information that is entirely unknown to Defendants in an attempt to explore issues.  Moreover, Defendants are using Rule 36 in an attempt to harassment, embarrass, and further retaliate against Plaintiff, Lisa Barbounis.  It is clear that Defendants' counsel did not draft the Second and Third Set of Requests for Admissions.  By way of further answer, Defendants Requests seeks only to embarrass, harass, and intimidate.  Moreover, Defendants' Request is not confined to the scope of Rule 26(b)(1).

By way of further answer, Denied.  Plaintiff did not record employees without their knowledge and permission.  There was one incident where Plaintiff, Lisa Barbounis recorded a conversation with coworker, Marnie Meyer.  Marnie Meyer was ultimately informed about the recording.


7.     REQUEST FOR ADMISSION NO. 7: Admit that you played a recording for Thelma Prosser containing accusations against Gregg Roman from your iPhone.

RESPONSE:

Admitted.  There is a recording where a reporter for the Washington Examiner details a horrific account when Defendant Greg Roman exposed himself to her and threatened her in order to compel her to engage in sexual relations with Defendant Greg Roman.  Plaintiff, Lisa Barbounis informed an employee, Thelma Prosser, about the incident and played the recording for Thelma Prosser.

8.     REQUEST FOR ADMISSION NO. 8: Admit that you played a recording for Gary Gambill containing accusations against Gregg Roman from your iPhone.

Admitted.  There is a recording where a reporter for the Washington Examiner details a horrific account when Defendant Greg Roman exposed himself to her and threatened her in order to compel her to engage in sexual relations with Defendant Greg Roman.  Plaintiff, Lisa Barbounis informed an employee, Gary Gambill, about the incident and played the recording for Gary Gambill.

9.      REQUEST FOR ADMISSION NO. 9: Admit that you coerced Alana Goodman into being recorded and sharing her accusations with you about Gregg Roman.

RESPONSE:

Denied.

10.     REQUEST FOR ADMISSION NO. 10: Admit that you attended a Halloween party with Alana Goodman in October of 2019.

RESPONSE:

Admitted.


11.     REQUEST FOR ADMISSION NO. 11: Admit that you attended a  New Year's Eve party at the Trump Hotel in Washington D.C. with Alana Goodman.

RESPONSE:

It is admitted that Plaintiff attended a party on Halloween.  It is admitted that Alana Goodman was also part of the group of people with whom Plaintiff attended the party.


12.     REQUEST FOR ADMISSION NO. 12: Admit that Gregg Roman introduced you to Alana Goodman.

RESPONSE:

Denied.  Greg Roman did not introduce Plaintiff to Alana Goodman.


13.     REQUEST FOR ADMISSION NO. 13: Admit that you sent videos via text message of your son George Barbounis, to Gregg Roman.

RESPONSE:

It is admitted that Plaintiff, Lisa Barbounis sent a video of her son to her supervisor, Defendant, Greg Roman.  Defendant, Greg Roman constantly harassed Plaintiff after hours and attempted to engage Plaintiff to interact with Defendant, Greg Roman at inappropriate times when Plaintiff was spending time with her family.  Plaintiff, Lisa Barbounis sent a video of her son to Defendant, Greg Roman so that Defendant, Greg Roman understood that Plaintiff could not interact with Defendant, Greg Roman after hours.  This was yet another attempt to communicate to Defendant, Greg Roman that Plaintiff did not wish to be contacted at inappropriate times.

14.    REQUEST FOR ADMISSION NO. 14: Admit that you shared information about your kidney problems, both verbally and in text messages, to Gregg Roman, in September 2018.

RESPONSE:

Plaintiff, Lisa Barbounis admits that she communicated her health issues to her direct supervisor in 2018 to make her supervisor aware that she was having health issues that might impact Plaintiff's ability to perform her job responsibilities.  Plaintiff had ongoing kidney problems that required surgery in 2019.


15.    REQUEST FOR ADMISSION NO. 15: Admit that Gregg Roman expressed an interest in promoting you to Deputy Chief of Staff of the Middle East Forum, in October 2018.

RESPONSE:
It is admitted that Defendant, Greg Roman informed Plaintiff, Lisa Barbounis that she might be considered for Deputy Chief of Staff.  Defendant, Greg Roman made statements like this occasionally but never seriously considered Plaintiff for the position.


16.    REQUEST FOR ADMISSION NO. 16: Admit that you filed a formal written complaint about Marnie O'Brien to Gregg Roman, a week before you complained about Gregg Roman to Daniel Pipes.

RESPONSE:

It is admitted that Defendant, Greg Roman instructed Plaintiff, Lisa Barbounis to provide a written report complaining about Marnie Meyer sometime around this time period.  Defendant, Greg Roman pitted Marnie Meyer and Lisa Barbounis against one-another as part of Defendant, Greg Roman's attempt to avoid employees opposition to and reports of discrimination and harassment in the workplace.


17.    REQUEST FOR ADMISSION NO. 17: Admit that you have snorted Adderall in the past two years.

RESPONSE:

Plaintiff objects to this Request as Defendant is improperly using Request for Admissions as a discovery device.  Rule 36 is not a discovery procedure Defendants are attempting to use Request for Admissions under Rule 36 to circumvent the limitations of discovery and specifically interrogatories.   Defendants have deployed one-hundred-fourteen (114) Request for Admissions to Plaintiff, Lisa Barbounis and are attempting to ascertain information that is entirely unknown to Defendants in an attempt to explore issues.  Moreover, Defendants are using Rule 36 in an attempt to harassment, embarrass, and further retaliate against Plaintiff, Lisa

Barbounis.  It is clear that Defendants' counsel did not draft the Second and Third Set of Requests for Admissions.  By way of further answer, Defendants Requests seeks only to embarrass, harass, and intimidate.  Moreover, Defendants' Request is not confined to the scope of Rule 26(b)(1).


18.     REQUEST FOR ADMISSION NO. 18: Admit that you have snorted Ritalin in the past two years.

RESPONSE:

Plaintiff objects to this Request as Defendant is improperly using Request for Admissions as a discovery device.  Rule 36 is not a discovery procedure Defendants are attempting to use Request for Admissions under Rule 36 to circumvent the limitations of discovery and specifically interrogatories.   Defendants have deployed one-hundred-fourteen (114) Request for Admissions to Plaintiff, Lisa Barbounis and are attempting to ascertain information that is entirely unknown to Defendants in an attempt to explore issues.  Moreover, Defendants are using Rule 36 in an attempt to harassment, embarrass, and further retaliate against Plaintiff, Lisa Barbounis.  It is clear that Defendants' counsel did not draft the Second and Third Set of Requests for Admissions.  By way of further answer, Defendants Requests seeks only to embarrass, harass, and intimidate.  Moreover, Defendants' Request is not confined to the scope of Rule 26(b)(1).


19.     REQUEST FOR ADMISSION NO. 19: Admit that you are currently separated from your husband, Vasili Barbounis.

RESPONSE:

Plaintiff objects to this Request as Defendant is improperly using Request for Admissions as a discovery device.  Rule 36 is not a discovery procedure Defendants are attempting to use Request for Admissions under Rule 36 to circumvent the limitations of discovery and specifically interrogatories.   Defendants have deployed one-hundred-fourteen (114) Request for Admissions to Plaintiff, Lisa Barbounis and are attempting to ascertain information that is entirely unknown to Defendants in an attempt to explore issues.  Moreover, Defendants are using Rule 36 in an attempt to harassment, embarrass, and further retaliate against Plaintiff, Lisa Barbounis.  It is clear that Defendants' counsel did not draft the Second and Third Set of Requests for Admissions.  By way of further answer, Defendants Requests seeks only to embarrass, harass, and intimidate.  Moreover, Defendants' Request is not confined to the scope of Rule 26(b)(1).

20.     REQUEST FOR ADMISSION NO. 20: Admit that Daniel Thomas' father requested you facilitate money transfers to his son Daniel Thomas.

RESPONSE:

It is admitted that Plaintiff, Lisa Barbounis informed Daniel Thomas's father that The Middle East Forum could and would not facilitate any money transfers to his son Daniel Thomas.


21.     REQUEST FOR ADMISSION NO. 21: Admit that Daniel Thomas is a convicted criminal, having previously been jailed for the attempted armed kidnapping of Graham Page in 2016.

RESPONSE:

Plaintiff is not in a position to admit or deny Request Number 21.  Plaintiff lacks personal knowledge to admit or deny this Request.   The details of Daniel Thomas's legal issues are equally accessible to Defendants as Plaintiff.  Accordingly, Plaintiff cannot admit or deny this Request.


22.     RESPONSE FOR ADMISSION NO. 22: Admit that you have snorted cocaine in the United Kingdom, during the time you worked for The Forum.

RESPONSE:

Objection.  Defendant's Request is intended to embarrass, harass, and intimidate Plaintiff, Lisa Barbounis.  Moreover this request is not relevant, material, or discoverable.  This request is also denied.


23.     REQUEST FOR ADMISSION NO. 23:  Admit that you were introduced to your current roommate, Sidney Watson, by fellow TR.News worker Avi Yemeni.

RESPONSE:

Plaintiff objects to this Request as Defendant is improperly using Request for Admissions as a discovery device.  Rule 36 is not a discovery procedure Defendants are attempting to use Request for Admissions under Rule 36 to circumvent the limitations of discovery and specifically interrogatories.   Defendants have deployed one-hundred-fourteen (114) Request for Admissions to Plaintiff, Lisa Barbounis and are attempting to ascertain information that is entirely unknown to Defendants in an attempt to explore issues.  Moreover, Defendants are using Rule 36 in an attempt to harassment, embarrass, and further retaliate against Plaintiff, Lisa

Barbounis.  It is clear that Defendants' counsel did not draft the Second and Third Set of Requests for Admissions.  By way of further answer, Defendants Requests seeks only to embarrass, harass, and intimidate.  Moreover, Defendants' Request is not confined to the scope of Rule 26(b)(1).

24.     REQUEST FOR ADMISSION NO. 24: Admit that Avi Yemeni and Sidney Watson were investigated by the FBI for allegedly making threat s against Comedy Central staff.

RESPONSE:

Plaintiff is not in a position to admit or deny Request Number 24.  Plaintiff lacks personal knowledge to admit or deny this Request.   The details of other individual's legal issues are equally accessible to Defendants as Plaintiff.  Accordingly, Plaintiff cannot admit or deny this Request.

25.     REQUEST FOR ADMISSION NO. 25: Admit that Avi Yemeni was deported from the United States.

RESPONSE:

Plaintiff is not in a position to admit or deny Request Number 25.  Plaintiff lacks personal knowledge to admit or deny this Request.   The details of other individual's legal issues are equally accessible to Defendants as Plaintiff.  Accordingly, Plaintiff cannot admit or deny this Request.

26.     REQUEST FOR ADMISSION NO. ?6: Admit that you tried to prevent Avi Yemeni's deportation from the United States.

RESPONSE:

Plaintiff objects to this request as unrelated to the instant action.  This request is immaterial and not relevant.  By way of further answer, Plaintiff, Lisa Barbounis did provide some assistance to Avi Yemeni related to this issue.

27.    REQUEST FOR ADMISSION NO. 27: Admit that you served as Director of Communications for TR.News, and online news portal ran by Tommy Robinson.

RESPONSE:

Plaintiff objects to this request as unrelated to the instant action.  This request is immaterial and not relevant and not calculated to lead to the discovery of admissible evidence nor is this Request proportional to the needs of the instant litigation.  By way of further answer, Plaintiff requested and received approval from Daniel Pipes and Defendant, Greg Roman to work with Tommy Robinson on her own time.  Plaintiff first worked with Tommy Robinson at the direction and under the supervision of Defendant, Greg Roman.  Plaintiff then worked with Tommy Robinson on Plaintiff's personal time.  Plaintiff's request and Defendant's approval of Plaintiff's request to work with Tommy Robinson is well documented.  Defendants never admonished Plaintiff and expressed no issue with Plaintiff working with Tommy Robinson under after Plaintiff reported Defendant, Greg Roman's severe and pervasive discrimination and harassment in the workplace in November 2018.

28.    REQUEST FOR ADMISSION NO. 28: Admit that you used the Forum's Meltwater public relations system to send out press releases on behalf of Tommy Robinson.

RESPONSE:

Denied.  Plaintiff did not use the Forum's Meltwater account to send out a press release on behalf of Tommy Robinson.  Any and all press releases that were sent out using the Forum's Meltwater account, that related to Tommy Robinson, were sent on behalf of The Middle East Forum.  Plaintiff was required to work with Tommy Robinson as part of her job responsibilities. Working with The Middle East Forum at the direction and supervision of Defendant, Greg Roman is the way in which Plaintiff, Lisa Barbounis learned about and met Tommy Robinson. The Middle East Forum issued press releases regarding Tommy Robinson.

29.    REQUEST FOR ADMISSION NO. 29: Admit that you used the Forum's e-mail address provided to you to solicit a meeting with a New York Times reporter, to discuss Tommy Robinson's issues with the British Broadcasting Corporation.

RESPONSE:

Denied as stated.  Defendant, The Middle East Forum and Defendant, Greg Roman instructed Plaintiff, Lisa Barbounis to set up a meeting to discuss Tommy Robinson's issues with the British Broadcasting Corporation.  This was done at the direction and supervision of Defendant, Greg Roman.

30.     REQUEST FOR ADMISSION NO. 30: Admit that you wiped your MEF issued computer before Mamie O'Brien suggested to you to look on Google to learn how to delete your personal information from your computer.

RESPONSE:


Plaintiff objects to this Request as Defendant is improperly using Request for Admissions as a discovery device.  Rule 36 is not a discovery procedure Defendants are attempting to use Request for Admissions under Rule 36 to circumvent the limitations of discovery and specifically interrogatories.   Defendants have deployed one-hundred-fourteen (114) Request for Admissions to Plaintiff, Lisa Barbounis and are attempting to ascertain information that is entirely unknown to Defendants in an attempt to explore issues.  Moreover, Defendants are using Rule 36 in an attempt to harassment, embarrass, and further retaliate against Plaintiff, Lisa Barbounis.  It is clear that Defendants' counsel did not draft the Second and Third Set of Requests for Admissions.  By way of further answer, Defendants' Request is denied.



31.     REQUEST FOR ADMISSION NO. 31: Admit that you instructed Delaney Yonchek how to erase her MEF issued computer.

RESPONSE:

Plaintiff objects to this Request as Defendant is improperly using Request for Admissions as a discovery device.  Rule 36 is not a discovery procedure Defendants are attempting to use Request for Admissions under Rule 36 to circumvent the limitations of discovery and specifically interrogatories.   Defendants have deployed one-hundred-fourteen (114) Request for Admissions to Plaintiff, Lisa Barbounis and are attempting to ascertain information that is entirely unknown to Defendants in an attempt to explore issues.  Moreover, Defendants are using Rule 36 in an attempt to harassment, embarrass, and further retaliate against Plaintiff, Lisa Barbounis.  It is clear that Defendants' counsel did not draft the Second and Third Set of Requests for Admissions.  By way of further answer, Defendants' Request is denied.



32.     REQUEST FOR ADMISSION NO. 32: Admit that you instructed  Patricia McNulty how to erase her MEF issued computer.

RESPONSE:


Plaintiff objects to this Request as Defendant is improperly using Request for Admissions as a discovery device.  Rule 36 is not a discovery procedure Defendants are attempting to use Request for Admissions under Rule 36 to circumvent the limitations of discovery and

specifically interrogatories.   Defendants have deployed one-hundred-fourteen (114) Request for Admissions to Plaintiff, Lisa Barbounis and are attempting to ascertain information that is entirely unknown to Defendants in an attempt to explore issues.  Moreover, Defendants are using Rule 36 in an attempt to harassment, embarrass, and further retaliate against Plaintiff, Lisa Barbounis.  It is clear that Defendants' counsel did not draft the Second and Third Set of Requests for Admissions.  By way of further answer, Defendants' Request is denied.

33.     REQUEST FOR ADMISSION NO. 33: Admit that you contacted Lea Merville to discuss allegations against Gregg Roman.

RESPONSE:

Plaintiff objects to this Request as Defendant is improperly using Request for Admissions as a discovery device.  Rule 36 is not a discovery procedure Defendants are attempting to use Request for Admissions under Rule 36 to circumvent the limitations of discovery and specifically interrogatories.   Defendants have deployed one-hundred-fourteen (114) Request for Admissions to Plaintiff, Lisa Barbounis and are attempting to ascertain information that is entirely unknown to Defendants in an attempt to explore issues.  Moreover, Defendants are using Rule 36 in an attempt to harassment, embarrass, and further retaliate against Plaintiff, Lisa Barbounis.  It is clear that Defendants' counsel did not draft the Second and Third Set of Requests for Admissions.  By way of further answer, Plaintiff, Lisa Barbounis contacted Lea Merville who informed Plaintiff that she never wanted to speak to Defendant, Greg Roman again, and that Defendant, Greg Roman did have an inappropriate sexual relationship with Lea Merville while Lea Merville was intern for The Middle East Forum.  Defendant, Greg Roman propositioned Lea Merville with a quid pro quo sexual advances.  Defendant, Greg Roman preyed upon Lea Merville while Lea Merville was an intern for The Middle East Forum.

34.     REQUEST FOR ADMISSION NO. 34: Admit  that you contacted Karys Melnitzer to see if she had information or allegations about Gregg Roman.

RESPONSE:

Plaintiff objects to this Request as Defendant is improperly using Request for Admissions as a discovery device.  Rule 36 is not a discovery procedure Defendants are attempting to use Request for Admissions under Rule 36 to circumvent the limitations of discovery and specifically interrogatories.   Defendants have deployed one-hundred-fourteen (114) Request for Admissions to Plaintiff, Lisa Barbounis and are attempting to ascertain information that is entirely unknown to Defendants in an attempt to explore issues.  Moreover, Defendants are using Rule 36 in an attempt to harassment, embarrass, and further retaliate against Plaintiff, Lisa Barbounis.  It is clear that Defendants' counsel did not draft the Second and Third Set of Requests for Admissions.  By way of further answer, Defendants' Request is denied.

35.     REQUEST FOR ADMISSION NO. 35: Admit that you hosted Eran Vasker at your AirBNB that you shared with Gregg Roman in Tel Aviv in March of 2018.

Plaintiff objects to this Request as Defendant is improperly using Request for Admissions as a discovery device.  Rule 36 is not a discovery procedure Defendants are attempting to use Request for Admissions under Rule 36 to circumvent the limitations of discovery and specifically interrogatories.  Defendants have deployed one-hundred-fourteen (114) Request for Admissions to Plaintiff, Lisa Barbounis and are attempting to ascertain information that is entirely unknown to Defendants in an attempt to explore issues.  Moreover, Defendants are using Rule 36 in an attempt to harassment, embarrass, and further retaliate against Plaintiff, Lisa Barbounis.  It is clear that Defendants' counsel did not draft the Second and Third Set of Requests for Admissions.  By way of further answer, Defendants' Request is denied.

36.     REQUEST FOR ADMISSION NO. 36: Admit that you hosted Gilad Ach at your AirBNB that you shared with Gregg Roman in Tel Aviv in March of 2018.

RESPONSE:

Plaintiff objects to this Request as Defendant is improperly using Request for Admissions as a discovery device.  Rule 36 is not a discovery procedure Defendants are attempting to use Request for Admissions under Rule 36 to circumvent the limitations of discovery and specifically interrogatories.  Defendants have deployed one-hundred-fourteen (114) Request for Admissions to Plaintiff, Lisa Barbounis and are attempting to ascertain information that is entirely unknown to Defendants in an attempt to explore issues.  Moreover, Defendants are using Rule 36 in an attempt to harassment, embarrass, and further retaliate against Plaintiff, Lisa Barbounis.  It is clear that Defendants' counsel did not draft the Second and Third Set of Requests for Admissions.  By way of further answer, Defendants' Request is denied.

37.     REQUEST FOR ADMISSION NO. 37: Admit that you confided to Gregg Roman the fact that you and your husband had engaged in a violent physical altercation against  one another.

RESPONSE:

Plaintiff objects to this Request as Defendant is improperly using Request for Admissions as a discovery device.  Rule 36 is not a discovery procedure Defendants are attempting to use Request for Admissions under Rule 36 to circumvent the limitations of discovery and specifically interrogatories.  Defendants have deployed one-hundred-fourteen (114) Request for Admissions to Plaintiff, Lisa Barbounis and are attempting to ascertain information that is entirely unknown to Defendants in an attempt to explore issues.  Moreover, Defendants are using

Rule 36 in an attempt to harassment, embarrass, and further retaliate against Plaintiff, Lisa Barbounis.  It is clear that Defendants' counsel did not draft the Second and Third Set of Requests for Admissions.  By way of further answer, Defendants' Request is denied.

38.     REQUEST FOR ADMISSION NO. 38: Admit that you confided to Matthew Bennett that you and your husband had engaged in a violent physical altercation against one another.

RESPONSE:

Plaintiff objects to this Request as Defendant is improperly using Request for Admissions as a discovery device.  Rule 36 is not a discovery procedure Defendants are attempting to use Request for Admissions under Rule 36 to circumvent the limitations of discovery and specifically interrogatories.   Defendants have deployed one-hundred-fourteen (114) Request for Admissions to Plaintiff, Lisa Barbounis and are attempting to ascertain information that is entirely unknown to Defendants in an attempt to explore issues.  Moreover, Defendants are using Rule 36 in an attempt to harassment, embarrass, and further retaliate against Plaintiff, Lisa Barbounis.  It is clear that Defendants' counsel did not draft the Second and Third Set of Requests for Admissions.  By way of further answer, Defendants' Request is denied.

39.     REQUEST FOR ADMISSION NO. 39: Admit that you confided to Patricia McNulty that you and your husband had engaged in a violent physical altercation against one another.

RESPONSE:

Plaintiff objects to this Request as Defendant is improperly using Request for Admissions as a discovery device.  Rule 36 is not a discovery procedure Defendants are attempting to use Request for Admissions under Rule 36 to circumvent the limitations of discovery and specifically interrogatories.   Defendants have deployed one-hundred-fourteen (114) Request for Admissions to Plaintiff, Lisa Barbounis and are attempting to ascertain information that is entirely unknown to Defendants in an attempt to explore issues.  Moreover, Defendants are using Rule 36 in an attempt to harassment, embarrass, and further retaliate against Plaintiff, Lisa Barbounis.  It is clear that Defendants' counsel did not draft the Second and Third Set of Requests for Admissions.  By way of further answer, Defendants' Request is denied.

40.    REQUEST FOR ADMISSION NO. 40: Admit that you have been arrested by the police.

RESPONSE:

Plaintiff objects to this Request as Defendant is improperly using Request for Admissions as a discovery device.  Rule 36 is not a discovery procedure Defendants are attempting to use Request for Admissions under Rule 36 to circumvent the limitations of discovery and specifically interrogatories.  Defendants have deployed one-hundred-fourteen (114) Request for Admissions to Plaintiff, Lisa Barbounis and are attempting to ascertain information that is entirely unknown to Defendants in an attempt to explore issues.  Moreover, Defendants are using Rule 36 in an attempt to harassment, embarrass, and further retaliate against Plaintiff, Lisa Barbounis.  It is clear that Defendants' counsel did not draft the Second and Third Set of Requests for Admissions.  By way of further answer, Plaintiff has never been accused or charged of a crime that is subject to discovery under Rule 26.

41.    REQUEST FOR ADMISSION NO. 41: Admit that you have engaged in sexual intercourse with at least one unmarried man in the last five (5) years.

RESPONSE:

Plaintiff objects to this Request as Defendant is improperly using Request for Admissions as a discovery device.  Rule 36 is not a discovery procedure Defendants are attempting to use Request for Admissions under Rule 36 to circumvent the limitations of discovery and specifically interrogatories.  Defendants have deployed one-hundred-fourteen (114) Request for Admissions to Plaintiff, Lisa Barbounis and are attempting to ascertain information that is entirely unknown to Defendants in an attempt to explore issues.  Moreover, Defendants are using Rule 36 in an attempt to harassment, embarrass, and further retaliate against Plaintiff, Lisa Barbounis.  It is clear that Defendants' counsel did not draft the Second and Third Set of Requests for Admissions.  By way of further answer, Defendants Requests seeks only to embarrass, harass, and intimidate.

42.     REQUEST FOR ADMISSION NO. 42: Admit that you have engaged in sexual intercourse with a bartender who works, or used to work at the Oyster House restaurant and bar at least once in the last five (5) years.

RESPONSE:

Plaintiff objects to this Request as Defendant is improperly using Request for Admissions as a discovery device.  Rule 36 is not a discovery procedure Defendants are attempting to use Request for Admissions under Rule 36 to circumvent the limitations of discovery and specifically interrogatories.  Defendants have deployed one-hundred-fourteen (114) Request for Admissions to Plaintiff, Lisa Barbounis and are attempting to ascertain information that is entirely unknown to Defendants in an attempt to explore issues.  Moreover, Defendants are using Rule 36 in an attempt to harassment, embarrass, and further retaliate against Plaintiff, Lisa Barbounis.  It is clear that Defendants' counsel did not draft the Second and Third Set of Requests for Admissions.  By way of further answer, Defendants Requests seeks only to embarrass, harass, and intimidate.

43.     REQUEST FOR ADMISSION NO. 43: Admit that on March 8, 2019, you specifically asked Gregg Roman, to return as Director of The Forum and work directly with you.

RESPONSE:

Denied as stated.  Plaintiff agreed to allow Defendant, Greg Roman to return as Director of The Middle East Forum based on assurances by Daniel Pipes that Greg Roman that strict safeguards would be put in place to protect the female staff.  Plaintiff, Lisa Barbounis's decision was made for the benefit of Daniel Pipes and The Middle East Forum.

44.     REQUEST FOR ADMISSION NO. 44: Admit that on March 8, 2019, you approached Daniel Pipes about Gregg Roman's return as Director of The Forum.

RESPONSE:

Denied as stated.  Plaintiff agreed to allow Defendant, Greg Roman to return as Director of The Middle East Forum based on assurances by Daniel Pipes that Greg Roman that strict safeguards would be put in place to protect the female staff.  Plaintiff, Lisa Barbounis's decision was made for the benefit of Daniel Pipes and The Middle East Forum. Plaintiff approached Daniel Pipes to discuss the way in which Defendant Greg Roman could help The Middle East Forum without putting the female staff at risk.

45.    REQUEST FOR ADMISSION NO. 45: Admit that on March 8, 2019, you averred that The Forum needed Gregg Roman back in order to provide it with direction and leadership.

RESPONSE:

It is admitted that Plaintiff, Lisa Barbounis conceded that The Middle East Forum was floundering in the months after Defendant, Greg Roman was ejected from the offices because of the safety risk he posed to the female staff.  It is admitted that Plaintiff, Lisa Barbounis admitted that having Defendant, Greg Roman return would help The Middle East Forum get back on track.  It is admitted that Plaintiff prioritized The Middle East Forum as an organization over her personal fears and issues related to working with Defendant, Greg Roman. Moreover, Plaintiff, Lisa Barbounis put her trust in Daniel Pipes and Mark Fink to enforce the safeguards put in place for the protection of the female staff.

46.    REQUEST FOR ADMISSION NO. 46: Admit that on March 9, 2019, there was a in-person staff meeting held at The Forum ' s office.

RESPONSE:

Admitted.

47.    REQUEST FOR ADMISSION NO. 47: Admit that you attended the in-person  staff meeting held at The Forum on March 9, 2019.

RESPONSE:

Admitted.

48.    REQUEST FOR ADMISSION NO. 48: Admit that during the in-person meeting you agreed to have Gregg Roman return as Director of The Forum.

RESPONSE:

See Plaintiff's responses to Request for Admission Numbers 44 and 45, above.

49.     REQUEST FOR ADMISSION NO. 49: Admit that on March 11, 2019, you sent an email to Marc Fink agreeing to have Gregg Roman return as Director of The Forum.

RESPONSE:

See Plaintiff's responses to Request for Admission Numbers 44 and 45, above.  Moreover, the email speaks for itself.  Defendants required Plaintiff and Plaintiff's female coworkers to send the email referenced here.

50.     REQUEST FOR ADMISSION NO. 50: Admit that you were charged with assault in New Jersey within the past eleven (11) years.

RESPONSE:

Plaintiff objects to this Request as Defendant is improperly using Request for Admissions as a discovery device.  Rule 36 is not a discovery procedure Defendants are attempting to use Request for Admissions under Rule 36 to circumvent the limitations of discovery and specifically interrogatories.   Defendants have deployed one-hundred-fourteen (114) Request for Admissions to Plaintiff, Lisa Barbounis and are attempting to ascertain information that is entirely unknown to Defendants in an attempt to explore issues.  Moreover, Defendants are using Rule 36 in an attempt to harassment, embarrass, and further retaliate against Plaintiff, Lisa Barbounis.  It is clear that Defendants' counsel did not draft the Second and Third Set of Requests for Admissions.  By way of further answer, Defendants Requests seeks only to embarrass, harass, and intimidate.  Moreover, Defendants' Request is not confined to the scope of Rule 26(b)(1).

51.     REQUEST FOR ADMISSION NO. 51: Admit that you were charged with assault for attempting to hit Joseph Fortuna with a frying pan in New Jersey.

RESPONSE:

Plaintiff objects to this Request as Defendant is improperly using Request for Admissions as a discovery device.  Rule 36 is not a discovery procedure Defendants are attempting to use Request for Admissions under Rule 36 to circumvent the limitations of discovery and specifically interrogatories.  Defendants have deployed one-hundred-fourteen (114) Request for Admissions to Plaintiff, Lisa Barbounis and are attempting to ascertain information that is entirely unknown to Defendants in an attempt to explore issues.  Moreover, Defendants are using Rule 36 in an attempt to harassment, embarrass, and further retaliate against Plaintiff, Lisa Barbounis.  It is clear that Defendants' counsel did not draft the Second and Third Set of Requests for Admissions.  By way of further answer, Defendants Requests seeks only to embarrass, harass, and intimidate.  Moreover, Defendants' Request is not confined to the scope o Rule 26(b)(1).

52.        REQUEST FOR ADMISSION NO. 52: Admit that you were required to attend anger management classes within the past eleven (11) years.

RESPONSE:

Plaintiff objects to this Request as Defendant is improperly using Request for Admissions as a discovery device.  Rule 36 is not a discovery procedure Defendants are attempting to use Request for Admissions under Rule 36 to circumvent the limitations of discovery and specifically interrogatories.  Defendants have deployed one-hundred-fourteen (114) Request for Admissions to Plaintiff, Lisa Barbounis and are attempting to ascertain information that is entirely unknown to Defendants in an attempt to explore issues.  Moreover, Defendants are using Rule 36 in an attempt to harassment, embarrass, and further retaliate against Plaintiff, Lisa Barbounis.  It is clear that Defendants' counsel did not draft the Second and Third Set of Requests for Admissions.  By way of further answer, Defendants Requests seeks only to embarrass, harass, and intimidate.  Moreover, Defendants' Request is not confined to the scope of Rule 26(b)(1).  Moreover, Defendants' Request is denied.

53.    REQUEST FOR ADMISSION NO. 53: Admit that you have been audited by the Internal Revenue Service within the past ten ( 10) years.

Plaintiff objects to this Request as Defendant is improperly using Request for Admissions as a discovery device.  Rule 36 is not a discovery procedure Defendants are attempting to use Request for Admissions under Rule 36 to circumvent the limitations of discovery and specifically interrogatories.  Defendants have deployed one-hundred-fourteen (114) Request for Admissions to Plaintiff, Lisa Barbounis and are attempting to ascertain information that is entirely unknown to Defendants in an attempt to explore issues.  Moreover, Defendants are using Rule 36 in an attempt to harassment, embarrass, and further retaliate against Plaintiff, Lisa Barbounis.  It is clear that Defendants' counsel did not draft the Second and Third Set of Requests for Admissions.  By way of further answer, Defendants Requests seeks only to

embarrass, harass, and intimidate.  Moreover, Defendants' Request is not confined to the scope of Rule 26(b)(1).

54.   REQUEST FOR ADMISSION NO. 54: Admit that you have outstanding tax liens and are currently on a payment plan with the Internal Revenue Service.

RESPONSE:

Plaintiff objects to this Request as Defendant is improperly using Request for Admissions as a discovery device.  Rule 36 is not a discovery procedure Defendants are attempting to use Request for Admissions under Rule 36 to circumvent the limitations of discovery and specifically interrogatories.  Defendants have deployed one-hundred-fourteen (114) Request for Admissions to Plaintiff, Lisa Barbounis and are attempting to ascertain information that is entirely unknown to Defendants in an attempt to explore issues.  Moreover, Defendants are using Rule 36 in an attempt to harassment, embarrass, and further retaliate against Plaintiff, Lisa Barbounis.  It is clear that Defendants' counsel did not draft the Second and Third Set of Requests for Admissions.  By way of further answer, Defendants Requests seeks only to embarrass, harass, and intimidate.  Moreover, Defendants' Request is not confined to the scope of Rule 26(b)(1).

55.   REQUEST FOR ADMISSION NO. 55: Admit that you have outstanding student loan debt.

RESPONSE:

Plaintiff objects to this Request as Defendant is improperly using Request for Admissions as a discovery device.  Rule 36 is not a discovery procedure Defendants are attempting to use Request for Admissions under Rule 36 to circumvent the limitations of discovery and specifically interrogatories.  Defendants have deployed one-hundred-fourteen (114) Request for Admissions to Plaintiff, Lisa Barbounis and are attempting to ascertain information that is entirely unknown to Defendants in an attempt to explore issues.  Moreover, Defendants are using Rule 36 in an attempt to harassment, embarrass, and further retaliate against Plaintiff, Lisa Barbounis.  It is clear that Defendants' counsel did not draft the Second and Third Set of Requests for Admissions.  By way of further answer, Defendants Requests seeks only to embarrass, harass, and intimidate.  Moreover, Defendants' Request is not confined to the scope of Rule 26(b)(1).

56.     REQUEST FOR ADMISSION NO. 56: Admit that you received foreclosure notices on your home within the past five (5) years.

RESPONSE:

Plaintiff objects to this Request as Defendant is improperly using Request for Admissions as a discovery device.  Rule 36 is not a discovery procedure Defendants are attempting to use Request for Admissions under Rule 36 to circumvent the limitations of discovery and specifically interrogatories.  Defendants have deployed one-hundred-fourteen (114) Request for Admissions to Plaintiff, Lisa Barbounis and are attempting to ascertain information that is entirely unknown to Defendants in an attempt to explore issues.  Moreover, Defendants are using Rule 36 in an attempt to harassment, embarrass, and further retaliate against Plaintiff, Lisa Barbounis.  It is clear that Defendants' counsel did not draft the Second and Third Set of Requests for Admissions.  By way of further answer, Defendants Requests seeks only to embarrass, harass, and intimidate.  Moreover, Defendants' Request is not confined to the scope of Rule 26(b)(1).

57.     REQUEST FOR ADMISSION NO. 57: Admit that you were separated from your husband, Vasili Barbounis, within the past two (2) years.

RESPONSE:

Plaintiff objects to this Request as Defendant is improperly using Request for Admissions as a discovery device.  Rule 36 is not a discovery procedure Defendants are attempting to use Request for Admissions under Rule 36 to circumvent the limitations of discovery and specifically interrogatories.  Defendants have deployed one-hundred-fourteen (114) Request for Admissions to Plaintiff, Lisa Barbounis and are attempting to ascertain information that is entirely unknown to Defendants in an attempt to explore issues.  Moreover, Defendants are using Rule 36 in an attempt to harassment, embarrass, and further retaliate against Plaintiff, Lisa Barbounis.  It is clear that Defendants' counsel did not draft the Second and Third Set of Requests for Admissions.  By way of further answer, Defendants Requests seeks only to embarrass, harass, and intimidate.  Moreover, Defendants' Request is not confined to the scope o Rule 26(b)(1).

58.     REQUEST FOR ADMISSION NO. 58: Admit that you used funds from The Forum to attend a conference in Brussels where you invited and paid for Daniel Thomas to attend.

RESPONSE:

Plaintiff objects to this Request as Defendant is improperly using Request for Admissions as a discovery device.  Rule 36 is not a discovery procedure Defendants are attempting to use Request for Admissions under Rule 36 to circumvent the limitations of discovery and specifically interrogatories.   Defendants have deployed one-hundred-fourteen (114) Request for Admissions to Plaintiff, Lisa Barbounis and are attempting to ascertain information that is entirely unknown to Defendants in an attempt to explore issues.  Moreover, Defendants are using Rule 36 in an attempt to harassment, embarrass, and further retaliate against Plaintiff, Lisa Barbounis.  It is clear that Defendants' counsel did not draft the Second and Third Set of Requests for Admissions.  By way of further answer, Defendants Requests seeks only to embarrass, harass, and intimidate.  Moreover, Defendants' Request is not confined to the scope o Rule 26(b)(1).   Moreover, Defendants' Request is denied.

59.     REQUEST FOR ADMISSION NO. 59: Admit that you advocated for a $32,000 payment to Daniel Thomas to stage a rally in front of the House of Commons for a free speech case in June 2018.

RESPONSE:

Denied as stated.  Plaintiff, Lisa Barbounis was assigned to the project referenced in Request for Admission 59 by Defendant, Greg Roman.  Defendant, Greg Roman oversaw, supervised, and was involved in all decisions related to this assignment.  Plaintiff, Lisa Barbounis worked on the assignment at the direction and under the supervision of Defendant, Greg Roman. All recommendations made by Plaintiff, Lisa Barbounis were made in the interest of the objectives that Defendant, Greg Roman and The Middle East Forum provided to Plaintiff, Lisa Barbounis.

60.     REQUEST FOR ADMISSION NO. 60: Admit that The Forum was lied to about  the amount of expenses to stage the rally mentioned in Request No. 59.

RESPONSE:

Plaintiff does not possess the personal knowledge required to admit or deny Request for Admissions Number 60.

61.     REQUEST FOR ADMISSION NO. 61: Admit that you purchased clothing, flights, hotels, and other items for Daniel Thomas while you were an employee with The Forum.

RESPONSE:

Plaintiff objects to this Request as Defendant is improperly using Request for Admissions as a discovery device. Rule 36 is not a discovery procedure Defendants are attempting to use Request for Admissions under Rule 36 to circumvent the limitations of discovery and specifically interrogatories. Defendants have deployed one-hundred-fourteen (114) Request for Admissions to Plaintiff, Lisa Barbounis and are attempting to ascertain information that is entirely unknown to Defendants in an attempt to explore issues. Moreover, Defendants are using Rule 36 in an attempt to harassment, embarrass, and further retaliate against Plaintiff, Lisa Barbounis. It is clear that Defendants' counsel did not draft the Second and Third Set of Requests for Admissions. By way of further answer, Defendants Requests seeks only to embarrass, harass, and intimidate. Moreover, Defendants' Request is not confined to the scope o Rule 26(b)(1).

62.     REQUEST FOR ADMISSION NO. 62: Admit that you requested reimbursement for the clothing, flights, hotels, and other items that were purchased for Daniel Thomas.

RESPONSE:

Plaintiff objects to this Request as Defendant is improperly using Request for Admissions as a discovery device. Rule 36 is not a discovery procedure Defendants are attempting to use Request for Admissions under Rule 36 to circumvent the limitations of discovery and specifically interrogatories. Defendants have deployed one-hundred-fourteen (114) Request for Admissions to Plaintiff, Lisa Barbounis and are attempting to ascertain information that is entirely unknown to Defendants in an attempt to explore issues. Moreover, Defendants are using Rule 36 in an attempt to harassment, embarrass, and further retaliate against Plaintiff, Lisa Barbounis. It is clear that Defendants' counsel did not draft the Second and Third Set of Requests for Admissions. By way of further answer, Defendants Requests seeks only to embarrass, harass, and intimidate. Moreover, Defendants' Request is not confined to the scope o Rule 26(b)(1). Moreover, Request for Admission Number 62 is denied.

**DEREK SMITH LAW GROUP, PLLC**

By:_____/s/ Seth D. Carson_____
          SETH D. CARSON
          Derek Smith Law Group, PLLC
          1835 Market St, Ste 2950
          Philadelphia, PA 19103
          P: 215-391-4790
          E: seth@dereksmithlaw.com
          *Attorneys for Plaintiff*
          *Lisa Barbounis*

DATED: April 7, 2020

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this date that I caused a true and correct copy of Plaintiff's Responses to Defendants' Requests for Admissions to be served via email to:

> David J. Walton (PA # 86019)
> Leigh Ann Benson (PA #319406)
> Cozen O'Connor
> 1650 Market Street, Suite 2800
> Philadelphia, PA 19103
> P: 215-665-2000
> F: 215-665-2013
> dwalton@cozen.com
> lbenson@cozen.com

**DEREK SMITH LAW GROUP, PLLC**

BY:   /s/  Seth D. Carson
      SETH D. CARSON

DATED: April 7, 2020

# EXHIBIT 10 Text Message from Barbounis to Roman

 

+1 (215) 910-2154 >

Sep 17, 2018, 7:40 AM

Olivia just threw up in the car. Vasili has a walk through at 9.  I'll be in when he gets back around 11:30-12

Sep 17, 2018, 8:38 PM

FYI. I'm having bad kidney pain.  I went to the ER after class but left because the wait was 4.5 hours.  If it doesn't get better I'm gonna plan to go to urgent care in the am.  If it does get better I'll just schedule an appoint with my dr.  There are 2 scenarios 1 it's a Stone (will pass and shouldn't hurt for two long and doesn't really require medical attention) 2 it's an infection  that requires antibiotics.  I have a history of both.  I'm hoping it's 1 and I'll be better in the  am.  Either way it could explain the way I felt today.  I'll keep you posted.

Sep 18, 2018, 8:10 AM

I'm going to urgent care and Thelma is out for plumbing issues.

# EXHIBIT 11
# Text Messages Between Plaintiff and Matthew Bennett

From: +16093009342 Matt  Bennett

Now you see one of reasons I've disliked Eman since day like 8

**Status:** Read
**Read:** 1/31/2018 7:37:28 PM(UTC-5)

1/31/2018 7:37:22 PM(UTC-5)

From: +12159102154 Me (owner)

She a loser

**Status:** Sent
**Delivered:** 1/31/2018 7:37:33 PM(UTC-5)

1/31/2018 7:37:33 PM(UTC-5)

From: +16093009342 Matt  Bennett

When I saw it I was about to message Tricia to ignore her

**Status:** Read
**Read:** 1/31/2018 7:37:45 PM(UTC-5)

1/31/2018 7:37:43 PM(UTC-5)

From: +16093009342 Matt  Bennett

Meanwhile Eman is the biggest clock watcher

**Status:** Read
**Read:** 1/31/2018 7:38:04 PM(UTC-5)

1/31/2018 7:38:04 PM(UTC-5)

From: +12159102154 Me (owner)

If you feel that way message us on slack not the whole office

**Status:** Sent
**Delivered:** 1/31/2018 7:38:05 PM(UTC-5)

1/31/2018 7:38:04 PM(UTC-5)

From: +12159102154 Me (owner)

Everyone was gone and it was past 4:30

**Status:** Sent
**Delivered:** 1/31/2018 7:38:30 PM(UTC-5)

1/31/2018 7:38:29 PM(UTC-5)

From: +16093009342 Matt  Bennett

DP wants her gone, so says  gregg

**Status:** Read
**Read:** 1/31/2018 7:38:33 PM(UTC-5)

1/31/2018 7:38:33 PM(UTC-5)

From: +12159102154 Me (owner)

Doubt it. She is a walking lawsuit

**Status:** Sent
**Delivered:** 1/31/2018 7:38:48 PM(UTC-5)

1/31/2018 7:38:48 PM(UTC-5)

# EXHIBIT 12
# Text Messages from Plaintiff to J. Reynolds

From: +12159102154 Me (owner)
Attachments:



Size: 982777
File name: IMG_8459.HEIC
IMG_8459.HEIC



Size: 1503935
File name: IMG_8458.HEIC
IMG_8458.HEIC

**Status:** Sent
**Delivered:** 3/11/2018 12:10:11 PM(UTC-4)
**Read:** 6/1/2018 2:03:28 PM(UTC-4)

3/11/2018 12:09:58 PM(UTC-4)

From: +12159102154 Me (owner)
Yes. But it's all like that.
**Status:** Sent
**Delivered:** 3/11/2018 12:10:26 PM(UTC-4)
**Read:** 6/1/2018 2:03:28 PM(UTC-4)

3/11/2018 12:10:25 PM(UTC-4)

From: +12159102154 Me (owner)
My place is awesome and the French host is so hot
**Status:** Sent
**Delivered:** 3/11/2018 12:10:40 PM(UTC-4)
**Read:** 6/1/2018 2:03:28 PM(UTC-4)

3/11/2018 12:10:39 PM(UTC-4)

From: +18562871436 Jane Reynolds
Haha good
**Status:** Read
**Read:** 3/11/2018 12:11:05 PM(UTC-4)

3/11/2018 12:11:00 PM(UTC-4)

From: +12159102154 Me (owner)
Attachments:



Size: 990998
File name: IMG_8461.HEIC
IMG_8461.HEIC



Size: 965611
File name: IMG_8460.HEIC
IMG_8460.HEIC

**Status:** Sent
**Delivered:** 3/11/2018 12:11:16 PM(UTC-4)
**Read:** 6/1/2018 2:03:28 PM(UTC-4)

3/11/2018 12:11:10 PM(UTC-4)

# EXHIBIT 13
# Photos taken by
# Plaintiff in Israel























# EXHIBIT 14 Intentionally Left Blank (same as Exhibit 12)

# EXHIBIT 15 Affidavits of Ashley Perry, Gilad Ach, and Matan Peleg.

**A Deposition by Ashley Perri, ID 209721059**

This deposition was filmed and taken on 25.10.20 in Mr. Ashley Perri's house in Efrat.

Attorney Tzur Pollack took this deposition.

TP: Good Afternoon. At this moment, we will be making a deposition regarding Mr. Greg Roman and Ms. Lisa Barnos.


Q: Please tell me about how you met Mr. Roman and Ms. Barnos.

A: We'll start with Greg; I've known Greg since 2007. We worked together on a project in the Old City in Jerusalem that included explaining the conflict to English speakers. The project was through Aish Hatorah. We've worked together a couple of times since then, once when I was a consultant to the Foreign Minister we worked together on a few projects. I started working with the Middle East Forum four years ago, I think. I was the first director of "Project Victory" for a year and a half. At the time, I was also their lobby representative in the Knesset. Today I am a consultant to the Middle East Forum in Israel, and I know Greg personally. We're friends, and I like him.

I met Lisa Barnos for the first time while leading a delegation of MK's to Washington. I think it was in the winter of 2018. We had a couple of meetings in Congress, and after that I went to the office in Philadelphia and there I met Lisa (I had met her also at joint events in the office). On Friday we went shopping together and she advised me and came with me to do the shopping. I don't think we have met since. Yes, we spoke a couple of times on the phone when she worked as a media consultant because that is my background. We talked about the MEF's strategy and about conveying the information to the media.

Q: Where did your last meeting with them take place?

A: On a Friday in the winter of 2018, they were together in the office when I met with them. I was being introduced to the workers at the office with whom I mostly work by phone.

Q: What was the purpose of the meeting?

A: Getting to know the office staff better

Q: How did Lisa behave during the meeting? Was there anything strange in her behavior?

A: No, Normal behavior and also Greg.

Q: Was there anything special about the meeting's location?

A: No.

Q: Did you have any one on one conversations with Ms. Barnos?

A: Yes, on the way to shopping. We talked about her work in the US that was similar to the work I did in Israel in the past. We talked a bit about our families, a personal and professional conversation.

Q: Did you hear from her about any improper behavior she experienced? Ant complaints about harassment in the workplace?

A: No.

S. Ron

צור פולק, עו"ד
מ.ר. 81779

Q: Did she say anything strange during the conversation, something that one could interpret as an attempt to signal distress?

A: Not that I recall.

Q: What is your connection to the Middle East Forum?

A: Today I am the MEF's consultant in Israel and in 2018 I was the director of "Project Victory".

Q: Have you heard of complaints regarding Greg?

A: I heard a bit about the complaint. In all the years that I have known Greg I never saw any strange behavior on his part. I never saw anything that could be interpreted as strange or harassing n his behavior.

Q: Is there anything you would like to add?

A: I think that's it.


I have read this disposition, this is my name, this is my signature and the content is true___ AUV

Validation of signature

The undersigned, Tzur Pollack, confirm that on the 25/10/20, Ashley Perri came before me, and I recognized him according to his ID number 209721059. After warning him that he must speak only the truth and liable to face penalties if he does not do so, he confirmed this disposition and signed it.

צור פלק, עו"ד
מ.ר. 81779


Translation authorized by

Mrs Shulamit Ron  BA MA  (Native English speaker and former instructor of English at Bar Ilan University (30 years) and Sharei Mishpat Law School (12 years)

ID 012150884          S. Ron

צור פלק, עו"ד
מ.ר. 81779

## A Desposition by Gilad Ach on 15.9.20, ID 039253026

This deposition was filmed and taken on 15.9.20 in Mr. Gilad Ach's office.

Attorney Tzur Pollack took this deposition.

TP: Good Afternoon. At this moment, we will be making a deposition regarding Mr. Greg Roman and Ms. Lisa Barnos.


Q: Please tell me about how you met Mr. Roman and Ms. Barnos.

A: I've known Greg Roman since around 2016. I met him and Daniel Pipes in Jerusalem, we met a couple times in Israel and a couple times in the US. In General, the Middle East Forum and my organization "Ad Kan" cooperate on international projects that involve radical Islam and activities delegitimizing Jews and the state of Israel.

I met Ms. Barnos at a meeting discussing our activities and our plans, held in a Tel Aviv apartment at the start of 2018. Lisa was there for part of the meeting.

Later in Philadelphia, I don't remember an exact date, I met Lisa for a second time.

Q: Where did the meeting take place?

A: In Tel Aviv, in an Airbnb apartment that they rented for their stay in Israel, I don't remember the exact address.

Q: What was the purpose of the meeting?

A: The Middle East Forum helps us as an organization. During the meeting, I gave them updates about our activities and our plans. Greg is the CEO of the MEF. I'm the CEO of Ad Kan.

Q: How did Lisa behave during the meeting? Was there anything strange in her behavior?

A: She was completely normal. There was nothing strange about the meeting with her. She told me about her position in the MEF. If I'm not mistaken, she said she was from the research team there. I asked her how Israel is, and she said it's a lovely country.

Q: Did the meeting's location seem weird to you? Why did you choose to hold the meeting there?

A: No, there were some classified things that we were discussing. We preferred not to sit at a coffee shop.

Q: Did you have any conversations with Ms. Barnos?

A: Not really, maybe a minute or two. Just polite conversation.

Q: Did you hear from her about any improper behavior she experienced? Any complaints about harassment?

A: No, absolutely not. Lisa didn't look shaken in any way; she seemed just fine. Everything looked normal.

Q: Did she say anything strange during the conversation, something that one could interpret as an attempt to signal distress?

A: No, by the way, after checking, my visit to Philadelphia was in March 2018. I met Lisa in her office.

Q: What is your connection to the Middle East Forum?

A: As I said, the "Ad Kan" organization, which I run, works together with the Middle East Forum since 2016, and we receive annual financial aid for part of our activity and our joint programs.

Q: Have you heard of complaints regarding Greg?

A: I heard that Lisa complained that she experienced sexual assault while she was in the country. I didn't see that she was in distress. I didn't see anything that she might have been trying to signal, help, or anything of the sort. There was nothing in that direction.

Q: Is there anything you would like to add?

A: No, I saw the apartment they were in which they were staying. I saw their relationship, and it looked very cordial. Greg explained that the reason they chose the Airbnb apartment and not a hotel is that he deals with issues regarding foreign countries and that he's not interested in having his conversations overheard.

I have read this disposition, this is my name, and the content is true

Validation of signature

The undersigned, Tzur Pollack, confirm that on the 15/9/20, Gilad Ach came before me, and I recognized him according to his ID number 039253026. After warning him that he must speak only the truth and liable to face penalties if he does not do so, he confirmed this disposition and signed it.

Translation authorized by

Mrs S Ron BA MA

Native English speaker and former instructor of English at Bar Ilan University (30 years) and Shaarei Mishpat (12 years)

ID - 012 150884

S Ron

צור פלק, עו"ד
מ.ר 81770

Declaration by Matan Peleg 8/9/20 I.D. 035821123

Declaration was conducted and filmed on 8/9/20 in Mr. Matan Peleg's office.

Editor of the Declaration – Advocate Tzur Pollack

T.P. – Good morning. Right now, we are going to edit a declaration regarding Mr. Greg Roman and Ms. Lisa Barnus.

Q – Did you meet with Greg Roman and Lisa Barnus?

A – Yes.

Q – When did you meet?

A – In 2008, I think, I don't remember an exact date, and not all of my meetings are written down in my planner.

Q – Where did the meeting take place?

A – A restaurant in Tel-Aviv, I don't remember the name of the restaurant.

Q – What was the goal of the meeting?

A – Updates mostly, "Im Tirtzu," the organization I am the head of, is supported by the Middle East Forum, and in addition to the regular updating emails, when Greg comes to visit Israel, we meet to update each other and talk about important matters.

Q – How did Lisa act in the meeting? Was there anything weird in the way she was acting?

A – I admit I didn't pay much attention to Lisa, my main focus was Greg, but I can't say she was dominant in the meeting. Most of the professional conversation was between Greg and me, but there was no tension that I felt I needed to pay attention to, I don't remember anything out of the ordinary from the meeting, she presented herself to me as someone who works in The Forum, looks like a nice person, but I don't remember any unusual behavior from the meeting.

Greg is a very assertive person, he conducted the conversation authoritatively, there was good dynamics in the conversation, there wasn't anything special between Lisa and me, except for when Greg went to the bathroom/to pay the bill when Lisa and I talked insignificant small talk.

Q – Did the location of the meeting seem weird to you? Why did you guys choose to meet there specifically?

A – Doesn't seem weird to me, usually we have a meeting either in the office or in a restaurant, it's always good to sit in public locations that allow for personal conversation as well. We ate, we talked, and we finished the meeting in the restaurant.

Q – Did you speak to Ms. Branus alone, just you two other than the "small talk"?

A – No. I'm naturally a more curious and sensitive person. If I had a feeling that someone was trying to talk to me/ to "send me a message," I would speak to the person.

Q – Did you hear any complaints from her about inappropriate behavior towards her? A complaint about harassment of any kind?

A – No, I didn't hear anything like that from her. Months after the meeting, I heard rumors that there were a few complaints within the Forum, but I didn't look into the rumors, and, at the time of the meeting, I didn't know about it.

Greg is authoritative, which, in my eyes, is an essential quality for a CEO, I can understand people who are thrown off by it, and he'll always be more "senior" than you. He's not a "small talk" kind of guy, and the types of conversation he has with other people that I know and with me are very professional and sterile relationships.

Q – What is your connection to The Middle East Forum?

A – The organization "Im Tirtzu" started their relationship with the Middle East Forum before my time and before Greg's time at the organization. The Middle East Forum is an organization that I appreciate, and they financially support us. However, the support from the Middle East Forum is much less than it was in the past, and I am not dependent on The Forum and, therefore, I have no reason to distort the reality to protect someone from there.

Q – Do you know where Greg and Lisa stayed in their visit here in Israel (hotel/apartment)?

A – I assume in Tel-Aviv, I don't know where, I didn't ask, probably in an "air BnB" apartment or in a hotel.

Q – Is there anything else you can add?

A – No. Look, I'm going back to the point of Greg's personality- we're talking about a person who brings a level of professionalism to the table that might throw people off him; he's also physically a big guy, he has a powerful energy, which usually helps focus the meeting, he doesn't flirt and look for "small talk", instead gets straight to the point. That's also the reason, I think, that in Greg's time there, The Forum rose to where it's gotten now.

In a social dynamic, when there's one woman in a room of men, someone will often say a joke about the woman. Greg is not that kind of person. Greg is equally hard on everyone. That's what I can say about him.

I read the full declaration. This is my name, and the contents of the declaration are true

Authentication of signature

I, the undersigned, Tzur Pollack, confirm that on the 8/9/20, Mr. Matan Poleg presented himself to me, I recognized him by his ID 035821123, and after I warned him to speak the truth otherwise there will be consequences of the law, he approved this declaration and signed it in front of me.

Translation authorized by:

Mrs S. Ron BA, MA

Native English speaker and former instructor of English at Bar Ilan University (30 years) and Shaarei Mishpat (12 years)

ID- 012150884    S. Ron

צור פלק עו"ד
מ.ר. 81779

# EXHIBIT 16
# Text Messages from Plaintiff to M. Bennett

From: +12159102154 Me (owner)
I don't either but I just told her Gregg is a good person but not a Good boss
Status: Sent
Delivered: 3/20/2018 10:45:55 AM(UTC-4)

3/20/2018 10:45:54 AM(UTC-4)

From: +16093009342 Matt Bennett
The first thing she'll do if she thinks you're whispering to me is tell Gregg that you ran to me after whatever happened
Status: Read
Read: 3/20/2018 10:45:58 AM(UTC-4)

3/20/2018 10:45:58 AM(UTC-4)

From: +16093009342 Matt Bennett
So....
Status: Read
Read: 3/20/2018 10:59:58 AM(UTC-4)

3/20/2018 10:59:50 AM(UTC-4)

From: +16093009342 Matt Bennett
I didn't catch the whole convo
Status: Read
Read: 3/20/2018 11:25:45 AM(UTC-4)

3/20/2018 11:25:32 AM(UTC-4)

From: +16093009342 Matt Bennett
What's going on now
Status: Read
Read: 3/20/2018 11:25:53 AM(UTC-4)

3/20/2018 11:25:53 AM(UTC-4)

From: +12159102154 Me (owner)
We are all good.  Great actually  My point was it's better when you talk to the person directly
Status: Sent
Delivered: 3/20/2018 11:26:21 AM(UTC-4)

3/20/2018 11:26:22 AM(UTC-4)

# EXHIBIT 17 Message from Plaintiff to P. McNulty

# 2018-03-29 14:41:58 UTC: +12159102154@iMessage -> [3 recipients]

---

**From:**   Home <+12159102154@imessage>
**To:**   Home <"+1 215-910-2154">, Tricia McNulty <"+1 609-742-1968">, Home <lisarey@sas.upenn.edu>
**Date:**   Thu, 29 Mar 2018 10:41:58 -0400

---

I need to look for a new job where I'm not an assistant

# EXHIBIT 18 MEF Sexual Harrassment Seminar

Middle East Forum
All Staff Meeting
Tuesday April 17, 2018
9:00 p.m. EDT

| 9:00 AM-9:15 AM- | Opening Remarks<br>-Gregg Roman |
|---|---|
| | |
| 9:15 AM-10:00AM | Harassment Training<br>-Marnie Meyer |
| | |
| 10:00 AM-10:15AM | Personnel Manual Updates/ Life Insurance Beneficiary Forms<br>-Marnie Meyer |
| 10:15AM AM-5:00PM | Roundtable discussions |
| 10:15-11:00AM | IVP-5-minute overview of 2018 objectives<br>-EJ Kimball<br>Brainstorming session<br>-All |
| 11:00-11:45PM | Washington Project-5-minute overview of 2018 objectives<br>-Cliff Smith<br>Brainstorming session<br>-All |
| 11:45-1PM | Lunch |
| 1:00-1:45PM | Legal Project-5-minute overview of 2018 objectives<br>-Marc Fink<br>Brainstorming session<br>-All |
| 1:45-2:30 | MEQ-5-minute overview of 2018 objectives<br>-Judy Goodrobb<br>Brainstorming session<br>-All |
| 2:30-3:15 | Campus Watch-5-minute overview of 2018 objectives<br>-Winfield Myers<br>Brainstorming session<br>-All |
| 3:15 -4:00 | Islamist Watch-5-minute overview of 2018 objectives<br>-Sam Westrop<br>Brainstorming session<br>-All |
| 4:00-4:45PM | Fundraising-5-minute overview of 2018 objectives<br>-Sam Westrop<br>Brainstorming session<br>-All |
| 4:45-5:00PM | Closing Remarks<br>-Gregg Roman |

# EXHIBIT 19 Message from Plaintiff to Roman

Nooooooooo

03/20/2018 11:10:51

I deserve a break every once in a whi le too 😬

03/20/2018 11:11:08

I heard you were upset about the em ail not going out. I was too.

03/20/2018 11:11:17

What email?

03/20/2018 11:11:22

You should feel comfortable telling m e when you are upset

03/20/2018 11:11:31

The one about the executive committ ee

03/20/2018 11:11:40

To the PDs.

03/20/2018 11:12:32

You said send it out to those in the m
eeting and i didn't think the next step
through to the action items of the PD
s. My bad.

03/20/2018 11:12:44

And you have other things your doing
that I need you to focus on

03/20/2018 11:13:14

There will be a time to speak about th
at mistake, but now is not it.

03/20/2018 11:13:20

Ok. I'm focused but I want you to kno
w you should feel comfortable telling
me when I piss you off

03/20/2018 11:13:53

But there's a time and place

03/20/2018 11:14:11

And when your working on somethin
g worth millions of $$$

03/20/2018 11:14:16

That's not the time or place

03/20/2018 11:14:46

Ok. I'm just saying it because I'm sur
e there will be another time that I do


Hold on. Baby back up

03/21/2018 00:15:37

I can't align the agenda to the docs. 1
. Marnie has page numbers on the do
cs and I can't change them 2. Some
of the pages on her docs are blank a
nd I can't eliminate them

03/21/2018 00:16:37

For example. Schedule 1 projected r
evenue has 6 pages but 5 of them ar
e blank

03/21/2018 00:18:21

Schedule one should be labeled pag
e 4

03/21/2018 00:19:08

I'm still going to label and send back t
o you

03/21/2018 01:24:24

Can you read what I sent

03/21/2018 01:26:31

Wake up!!!

Working our asses off

03/21/2018 18:49:37



03-21-2018 18_4

9_37.mp4

03/21/2018 18:49:37

This is my life right now

03/21/2018 19:02:07

Tell me about it

03/21/2018 19:44:42

Feeling pretty good about tomorrow
with website and excomm

03/21/2018 19:44:51

We've had one hell of a week

03/21/2018 19:45:30

I know. But is all worth it. I'm excited
about the website

# EXHIBIT 20
# Text Messages between Plaintiff and P. McNulty

From: +12159102154 Me (owner)
I just called Gregg in Israel and told him I'm at a breaking point and I'm about to quit
**Status:** Sent
**Delivered:** 5/12/2018 7:57:55 AM(UTC-4)
5/12/2018 7:57:50 AM(UTC-4)

From: +16097421968 Tricia McNulty
Oh shit. What did he say???
**Status:** Read
**Read:** 5/12/2018 10:17:42 AM(UTC-4)
5/12/2018 9:49:11 AM(UTC-4)

From: +12159102154 Me (owner)
Can you talk. I just got off the phone
**Status:** Sent
**Delivered:** 5/12/2018 10:17:52 AM(UTC-4)
5/12/2018 10:17:52 AM(UTC-4)

From: +16097421968 Tricia McNulty
Yeah
**Status:** Read
**Read:** 5/12/2018 10:18:00 AM(UTC-4)
5/12/2018 10:17:59 AM(UTC-4)

From: +12159102154 Me (owner)
I told him tired of morning inserting herself and everybody's job including mine
**Status:** Sent
**Delivered:** 5/12/2018 10:18:03 AM(UTC-4)
5/12/2018 10:18:03 AM(UTC-4)

From: +16097421968 Tricia McNulty
I bought the wrong one
**Attachments:**



Size: 145410
File name: 54784176856__58098C52-062E-4BDB-8290-B31B874E25DF.jpeg
54784176856__58098C52-062E-4BDB-8290-B31B874E25DF.jpeg

**Status:** Read
**Read:** 5/12/2018 2:17:13 PM(UTC-4)
5/12/2018 2:16:50 PM(UTC-4)

From: +12159102154 Me (owner)
Lol
**Status:** Sent
**Delivered:** 5/12/2018 2:17:24 PM(UTC-4)
5/12/2018 2:17:24 PM(UTC-4)