- - -

1           IN THE UNITED STATES DISTRICT COURT
            FOR THE EASTERN DISTRICT OF PENNSYLVANIA
2

3                           - - -

LISA BARBOUNIS,              :   CIVIL ACTION
4           Plaintiff,        :
                              :
5           vs.               :
                              :
6   MIDDLE EAST FORUM, et al., :
            Defendants.       :   NO. 2:19-cv-05030-GAM
7

8                           - - -

            Tuesday, November 17, 2020
9
                            - - -
10

11          Videotaped deposition of DANIEL PIPES,

12   taken pursuant to Notice and remotely via Zoom at

13   1650 Market Street, Philadelphia, Pennsylvania,

14   commencing at 10:08 a.m., and reported

15   stenographically by Grace M. Baldino, Professional

16   Shorthand Reporter and Notary Public in and for the

17   Commonwealth of Pennsylvania.

18                           - - -

19

20

21

22

23

24

Deposition of DANIEL PIPES                           Lisa Barbounis v. Middle Eastern Forum, et. al.

                              -  -  -

1   APPEARANCES:

2

                DEREK SMITH LAW GROUP
3               BY:  SETH D. CARSON, ESQUIRE
                1835 Market Street
4               Suite 2950
                Philadelphia, PA 19103
5               215-391-4790
                seth@dereksmithlaw.com
6               Representing the Plaintiff via Zoom

7

                COZEN O'CONNOR
8               BY:  JONATHAN R. CAVALIER, ESQUIRE
                One Liberty Place
9               1650 Market Street
                Philadelphia, PA 19103
10              215-665-2000
                jcavalier@cozen.com
11              Representing the Defendant, Middle East
                Forum, via Zoom

12

13              SIDNEY L. GOLD & ASSOCIATES, P.C.
                BY:  WILLIAM RIESER, ESQUIRE
14              1835 Market Street
                Suite 515
15              Philadelphia, PA 19103
                215-569-1999
16              brieser@discrimlaw.net
                Representing the Defendant, Gregg Roman,
17              via Zoom

18                            -  -  -

19

    ALSO PRESENT:
20
                LUKE ZABROSKE, Videographer
21              LEIGH ANN BENSON, Esquire (Cozen O'Connor)
                GREGG ROMAN, Defendant
22              MARC FINK, MEF Representative
                LISA BARBOUNIS, Plaintiff
23              SIDNEY L. GOLD, Esquire

24                            -  -  -

- - -

1                              INDEX

2                              - - -

3    Testimony of:   DANIEL PIPES

4                                                    PAGE

5    By Mr. Carson     . . . . . . . . . . . .     7

6

7                              - - -

8                            EXHIBITS

9                              - - -

10   NUMBER       DESCRIPTION                 PAGE MENTIONED

11   Pipes-1      Bylaws                      51

12   Pipes-2      Emails                      122

13   Pipes-3      Screenshot                  63

14   Pipes-4      Audio Recording             75

15   Pipes-5      Emails                      176

16   Pipes-6      Emails                      189

17   Pipes-7      Emails                      218

18   Pipes-8      Emails                      242

19   Pipes-9      Emails                      --

20   Pipes-10     Emails                      251

21   Pipes-11     Audio Recording             275

22   Pipes-12     Emails                      292

23   Pipes-13     Emails                      316

24   Pipes-14     Emails                      320

```
                                 -  -  -

  1                      EXHIBITS (cont'd)

  2                             -  -  -

  3      NUMBER       DESCRIPTION                 PAGE MENTIONED

  4      Pipes-15  Emails                              321

  5      Pipes-16  Emails                              336

  6      Pipes-17  Emails                              345

  7      Pipes-18  Emails                              347

  8      Pipes-19  Emails                              354

  9      Pipes-20  Letter                              365

 10      Pipes-21  Emails                              368

 11      Pipes-22  Emails                              371

 12      Pipes-23  Emails                              374

 13      Pipes-24  Emails                              374

 14      Pipes-25  Memorandum                          379

 15      Pipes-26  Emails                              406

 16      Pipes-27  Emails                              408

 17      Pipes-28  Emails                              417

 18      Pipes-29  Text Messages                       428

 19

 20

 21

 22

 23

 24
```

Deposition of DANIEL PIPES                                    Lisa Barbounis v. Middle Eastern Forum, et. al.

---

Page 5

- - -

1   (It is hereby stipulated and agreed by and
2   among counsel for the respective parties that
3   sealing, certification and filing are waived;
4   and that all objections, except as to the form
5   of the question, be reserved until the time of
6   trial.)
7                    - - -
8        THE VIDEOGRAPHER:  We are now on the
9   record.  Today's date is Tuesday, November
10  17th, 2020, and the time is 10:08 a.m. EST.
11  This is the recorded video deposition of Daniel
12  Pipes in the matter of Lisa Barbounis versus
13  Middle East Forum, et al. in the United States
14  District Court, Eastern District of
15  Pennsylvania, Code No. 2:19-CV-05030-GAM.  My
16  name is Luke Zabroske from Everest Court
17  Reporting.  I am the video specialist.  The
18  court reporter today is Grace Baldino, also
19  from Everest Court Reporting.  All counsel
20  appearing today will be noted on the
21  stenographic record.  Will the court reporter
22  please swear in the witness.
23       THE COURT REPORTER:  Due to the need for
24  this deposition to take place remotely because

---

Page 6

- - -

1   of the Government's order for social
2   distancing, the parties will stipulate that the
3   court reporter may swear in the witness
4   remotely via videoconference and that the
5   witness has verified that he is, in fact,
6   Daniel Pipes.  Will the attorneys please
7   indicate agreement by stating your name and
8   your agreement on the record, beginning with
9   counsel for plaintiff.
10       MR. CARSON:  I represent Lisa Barbounis.
11  My name is Seth Carson.
12       MR. CAVALIER:  Jon Cavalier at Cozen
13  O'Connor representing the Middle East Forum.
14  We agree to that condition, and also I'll note
15  for the record the witness will read and sign.
16       THE COURT REPORTER:  Okay.
17       MR. RIESER:  William Rieser on behalf of
18  Gregg Roman, and I agree to those conditions as
19  well.  Thank you.
20                    - - -
21       DANIEL PIPES, after having been first
22  remotely duly sworn, was examined and testified
23  as follows:
24                    - - -

---

Page 7

- - -

1                    EXAMINATION
2                    - - -
3   BY MR. CARSON:
4        Q.  Mr. Pipes, we're here today to take your
5   deposition in the matter of Lisa Barbounis vs. The
6   Middle East Forum, Gregg Roman, Daniel Pipes, which
7   is you, and we're here today to take your
8   deposition.  Have you ever done a deposition before?
9        A.  No.
10       Q.  I'm sorry?
11       A.  No.
12       Q.  Okay.  So I think you probably watched
13  enough of these now that you can probably give me
14  the instructions back to me, but I'm just gonna run
15  through them really quickly anyway, and if you have
16  any questions about the deposition, just speak up
17  and ask, and we'll make sure we answer them for you.
18  So the first thing is that it's a question and
19  answer session.  We're here today.  I'm gonna ask
20  questions.  You're gonna provided responses.  You
21  can provide any response that you want -- yes, no,
22  "I don't know," "I don't remember," or any other
23  responsive -- or any other responsive answer that
24  you care to provide today, but it's important that

---

Page 8

- - -

1   all your answers be verbal.  So nods and shrugs and
2   "uh-huhs" and "uh-uhs," you know, we all kind of do
3   that sometimes.  If you do, I may ask you to speak
4   up and just say yes or no.  It's just that we're
5   trying to create a clear record, okay?
6        A.  Yes.
7        Q.  Yes?
8        A.  Yes.
9        Q.  Okay.  So the second thing is if I ask you
10  a question and you answer the question, we're gonna
11  assume that you understood the question.  If there's
12  any questions today you don't understand, all
13  you have to do is ask me to rephrase or repeat it,
14  and we'll be happy to do that today, okay?
15       A.  Yes.
16       Q.  It's important that we don't speak over
17  each other today.  So, especially with Zoom, I think
18  that software only can hear one person talking at a
19  time or record one person talking at a time, so
20  please do me a favor.  Let me finish my answer.  I
21  promise I'll let you finish your -- let me finish my
22  question.  I promise I'll let your finish your
23  response, and we'll try not to drive the court
24  reporter crazy today with interruptions, okay?

Page 9

- - -

1    A.   Yes.
2    Q.   You've been sworn in, so you're under
3 oath.  It's important that all your responses be to
4 the best -- honest and truthful to the best of your
5 ability.  Do you understand that?
6    A.   I do.
7    Q.   Can you please state your full name for
8 the record?
9    A.   Daniel Pipes.
10    Q.   And, Mr. Pipes, where do you work?
11    A.   Middle East Forum.
12    Q.   And how long have you worked with the
13 Middle East Forum?
14    A.   Twenty-six years.
15    Q.   How did the Middle East Forum come into
16 existence?
17    A.   I created it with a couple of colleagues.
18    Q.   Who did you create it with?
19    A.   Albert Wood, Amy Shargel.
20    Q.   Can you say those names again, please?
21    A.   Albert Wood, Amy Shargel.
22    Q.   Amy Shardelle?  Is that S-H-A-R-D-E-L-L-E?
23    A.   G-E-L.
24    Q.   Do Albert Wood and Amy Shargel still have

Page 10

- - -

1 any -- do they still work at the Forum in any
2 capacity?
3    A.   No.
4    Q.   And when you created the organization 26
5 years ago, do you remember the date when it was
6 created, by any chance?
7    A.   January 24th.
8    Q.   What year?
9    A.   1994.
10    Q.   1994.  And when you created the
11 organization on January 24th, 1994, what was the
12 type of entity that you created?  What's it called?
13    A.   Middle East Forum.
14    Q.   So is it called The Middle East Forum?  Is
15 that the legal name?
16    A.   No.
17    Q.   It's Middle East Forum?
18    A.   Yes.
19    Q.   Okay.  And is there a business
20 classification for the type of organization that is?
21      MR. CAVALIER:  Object to form.  You can
22    answer, Daniel.
23      THE WITNESS:  501(c)(3).
24 BY MR. CARSON:

Page 11

- - -

1    Q.   The organization is a 501(c)(3); is that
2 correct?
3    A.   Yes.
4    Q.   What is a 501(c)(3)?
5    A.   Nonprofit.
6    Q.   Are there different types of nonprofit
7 organizations?
8    A.   Yes.
9    Q.   Is there a 501(c)(4)?
10    A.   Yes.
11    Q.   Is there a 501(c)(2)?
12    A.   I don't know.
13    Q.   So what's the difference between a
14 501(c)(3) and a 501(c)(4)?
15    A.   I don't know.  It's a legal matter.  You
16 can look it up.
17    Q.   Is the difference have anything to do with
18 solicitation or activities with politics?
19    A.   I'm a specialist on the Middle East, not
20 American tax law.
21    Q.   Do you know the answer?
22    A.   No.  I --
23    Q.   You don't know what -- so tell me what a
24 501(c)(3) is then.

Page 12

- - -

1    A.   A nonprofit.
2    Q.   Okay.  So what type of nonprofit is it?
3 Are you guys allowed to do political work?
4    A.   No.
5    Q.   Why not?
6    A.   Because our status as a 501(c)(3) does not
7 allow us to do political work.
8    Q.   Do you ever consider opening a 501(c)(4)?
9    A.   Yes.
10    Q.   When?
11    A.   In late 2019, early two thousand --
12 sorry -- late 2018, early 2019.
13    Q.   Why did you consider opening a 501(c)(4)?
14    A.   Because it's useful in itself and because
15 it could be a way in which Gregg Roman could be
16 helpful to our efforts with that, the complications
17 that had arisen.
18    Q.   In other words, the 501(c)(4) was some --
19 strike that.  When you were considering -- did you,
20 in fact, open a 501(c)(4)?
21    A.   No.
22    Q.   Why?
23    A.   Because he rejoined the 501(c)(3).
24    Q.   What do you mean by "he rejoined the

Deposition of DANIEL PIPES                                 Lisa Barbounis v. Middle Eastern Forum, et. al.

Page 13

- - -

501(c)(3)"?

A.   Not exactly rejoined.  He became more active and more of a participant in the 501(c)(3).

Q.   What do you mean, he became more active in the 501(c)(3)?

A.   I was approached by Lisa Barbounis, who asked him to return -- asked me to have him return. At that point, we proceeded in having him return more fully and scuttled the 501(c)(4) idea.

Q.   When did you scuttle the 501(c)(4) idea?

A.   March 2019.

Q.   In March 2018, did you say?

A.   '19.

Q.   '19.  So what happened -- so you guys don't have any interest in doing work with politics anymore?

MR. CAVALIER:  Object to form.  You can answer.

THE WITNESS:  I don't know what you're asking.

BY MR. CARSON:

Q.   Sure.  You testified earlier that the reason why you were considering opening a 501(c)(4) was to allow Gregg to do work in politics, correct?

Page 14

- - -

A.   No, I didn't say that.

Q.   Why did you consider opening a 501(c)(4)?

MR. CAVALIER:  Object to form.  You can answer.

THE WITNESS:  Because it seemed like a good idea and looking for a way for Gregg to be part of the organization without the complications that had arisen.

BY MR. CARSON:

Q.   Without what complications?  You gotta speak up, Mr. Pipes.

MR. CAVALIER:  Seth, I can hear him fine.

MR. CARSON:  I can't, and I think --

MR. CAVALIER:  Can the court reporter hear him okay?

THE COURT REPORTER:  He's a little quiet to me, too.

MR. CAVALIER:  Okay.  Daniel --

MR. CARSON:  You can't hear him fine, either, so just -- I mean, he has to speak up, period.

THE WITNESS:  What's your question?

MR. CARSON:  Can you read back my question, please?  I don't remember.

Page 15

- - -

(Whereupon the court reporter read back the pertinent testimony.)

- - -

BY MR. CARSON:

Q.   Yeah.  What complications are you talking about?

A.   The -- the wish -- the fact that several employees have problems with his management style.

Q.   So what does a 501(c)(4) have to do with his management style?

A.   It would be a separate organization.

Q.   Would it be underneath the Middle East Forum?

A.   No.

Q.   Would it have anything to do with the Middle East Forum?

A.   No.

Q.   It would be a completely separate organization that has nothing to do with the Middle East Forum?  That's your testimony?

A.   That's what the law is, I believe, that a 501(c)(4) is separate from a 501(c)(3), though many organizations have both.  As far as I know, they're

Page 16

- - -

separate.  We never did it, so I don't know the law. You can check the lawbooks.

Q.   I'm asking about your intention, though. Who was gonna be the -- who were gonna be the members of the 501(c)(4) when you were considering starting one?

A.   What do you mean by "members"?

Q.   Who were gonna be the officers?

A.   I don't know.  We never got that far.

Q.   When you start a organization like a 501(c)(3), do you have to -- does an individual have to be listed to start the organization?

A.   Check the lawbooks.  I don't know.

Q.   Well, were you listed when you started the 501(c)(3)?

MR. CAVALIER:  Object to form.

THE WITNESS:  We did not start.  We were planning --

BY MR. CARSON:

Q.   Sorry?

A.   We were planning it.  We did not start it.

Q.   All right.  So when you were planning on starting the 501(c)(4), was it your intention that the 501(c)(4) be connected to the 501(c)(3) in some

Page 17

- - -

1 capacity?
2     MR. CAVALIER: Object to form.
3     THE WITNESS: What does "connected" mean?
4     MR. CARSON: Involved with.
5     MR. CAVALIER: Same objection.
6     THE WITNESS: I don't know what "involved
7 with" means.
8 BY MR. CARSON:
9     Q. Well, do you know -- do you want me to
10 look up the definition of "involved"? What part
11 don't you understand?
12     A. I know English, but I don't know what you
13 mean in this case.
14     Q. Was there gonna be a relationship between
15 the 501(c)(3), the Middle East Forum that you are
16 working with now, and the 501(c)(4)?
17     MR. CAVALIER: Object to form. Asked and
18 answered.
19     THE WITNESS: We were gonna --
20     MR. CARSON: What're you talking about,
21 asked and answered? He said he doesn't know
22 what I mean.
23     THE WITNESS: We were gonna follow the
24 legal requirements, whatever those are, and I'm

Page 18

- - -

1 not capable of telling you what those are.
2 BY MR. CARSON:
3     Q. You answer's nonresponsive. My question
4 is, did you have an intention for the 501(c)(4) to
5 work with the 501(c)(3)?
6     MR. CAVALIER: Object to form. Asked and
7 answered. Argumentative. Dan, you can answer,
8 and, again --
9     MR. CARSON: Jon, if you keep doing it,
10 we're gonna get on the phone with Judge Wolson
11 quick. Please, you're not gonna interrupt my
12 deposition all day with nonsense objections.
13     MR. CAVALIER: The irony of that statement
14 coming from --
15     MR. CARSON: You're not -- you're just not
16 gonna do it, all right? You're not gonna do
17 it.
18     MR. CAVALIER: Call the judge.
19     MR. CARSON: So just stop.
20     MR. CAVALIER: Daniel, if you can answer
21 the question, feel free to do so.
22     THE WITNESS: We were planning it. There
23 are complicated laws about what you can and
24 can't do. We didn't go through with it. I'm

Page 19

- - -

1 not a specialist on these laws. Check your
2 lawbooks to find out what the --
3 BY MR. CARSON:
4     Q. My question is about your intention --
5     A. You're not to interrupt me, Mr. Carson.
6 You're not to interrupt me. Isn't that the rule of
7 this?
8     Q. My question is about your intention,
9 Mr. Pipes.
10     A. I thought I am answering, and when I
11 answer, you be quiet. Is that not the rule? Tell
12 me.
13     Q. I'm asking about your intentions,
14 Mr. Pipes.
15     A. Answer my question. Are you gonna
16 interrupt me, or you gonna let me speak?
17     Q. You can proceed. I don't answer your
18 questions today.
19     A. Well, then, I'm not gonna answers yours.
20     Q. That's actually not how it works.
21     A. Well, it's gonna work that way.
22     Q. If you need a break --
23     A. You're not gonna interrupt me.
24     Q. If you need to stop and talk to your

Page 20

- - -

1 lawyer --
2     A. I don't need to stop. You're not gonna
3 interrupt me.
4     MR. CAVALIER: Let him finish his answer,
5 Seth. Daniel, to the extent you can answer the
6 question, go ahead and try your best to answer
7 it again.
8     THE WITNESS: What is the question?
9 BY MR. CARSON:
10     Q. The question is, was the 501(c)(4) gonna
11 be related in any way with this 501(c)(3)?
12     A. What does "related" mean?
13     Q. Involved with, related, connected to. Was
14 there gonna be any relationship between the two
15 organizations?
16     MR. CAVALIER: Same objection. Daniel --
17 BY MR. CARSON:
18     Q. Were they gonna work together? Were they
19 gonna have the same staff? Was there any
20 relationship between the two? It's a simple
21 question. Yes or no?
22     MR. CAVALIER: Same objection. Daniel, to
23 the extent you can answer, go ahead.
24     THE WITNESS: One, it never happened, and,

Deposition of DANIEL PIPES                                    Lisa Barbounis v. Middle Eastern Forum, et. al.

Page 21

- - -

1 two, I don't know the complex laws between --
2 of relations between threes and fours off the
3 top of my head.  So I cannot answer that.
4 BY MR. CARSON:
5    Q.  Well, do you remember when you were gonna
6 open a 501(c)(4)?  Do you remember that?  Do you
7 remember what your intentions were at that time?
8    A.  Open a 501(c)(4).
9    Q.  Did you have any intentions with regard to
10 the type of organization the 501(c)(4) was gonna
11 have with the 501(c)(3)?  We're just wasting time --
12                    - - -
13       (Indistinguishable cross-talk.)
14                    - - -
15    THE WITNESS:  Are you gonna interrupt me
16 again?
17    MR. CARSON:  These aren't trick questions,
18 Mr. Pipes.  We're just wasting time by --
19    MR. CAVALIER:  Just let him try to answer
20 the question.
21    THE WITNESS:  I will not be interrupted by
22 you, Mr. Carson.
23    MR. CARSON:  Okay.
24    THE WITNESS:  I'm not interrupting you.

Page 22

- - -

1 You don't interrupt me.  Can I be clear on
2 that?  I'm not gonna proceed with this if you
3 keep interrupting me.  Do you understand?
4 BY MR. CARSON:
5    Q.  You do know you're under court order
6 today, right, Mr. Pipes, to be here?
7    A.  You do understand that you're not supposed
8 to interrupt me?
9    Q.  Are you aware that there's a court order
10 for you to be here today, Mr. Pipes?
11    A.  I am.
12    MR. CAVALIER:  I object to the --
13    THE WITNESS:  Are you aware there's a
14 court order that requires you be here, too,
15 Mr. Carson?
16 BY MR. CARSON:
17    Q.  Mr. Pipes, what do you know about the
18 court order today that has you appearing today for a
19 deposition?
20    MR. CAVALIER:  Hold on a second.  Hold on
21 a second, Daniel.  Don't answer that.  That's a
22 gross mischaracterization of the order.  It's
23 completely irrelevant.
24    MR. CARSON:  It's not irrelevant.  He now

Page 23

- - -

1 threatened to stop the deposition three times
2 in the first 20 minutes.
3    MR. CAVALIER:  Don't answer the question,
4 Daniel.  You're not under any kind of order
5 here today.
6    MR. CARSON:  Yes, he is.
7    MR. CAVALIER:  Ask your question, Seth.
8 You're under an order.  I'm under an order.
9 Daniel Pipes is not under any orders --
10    MR. CARSON:  You're an agent of Mr. Pipes.
11 That's a funny characterization of the court's
12 order, but I guess we can clear it up pretty
13 easily, but it would --
14    MR. CAVALIER:  Well, I guess we should
15 probably not talk about compliance with court
16 orders on the record.  So if you have a
17 question --
18    MR. CARSON:  Got no problem talking about
19 it.
20    MR. CAVALIER:  Ask the question, and we'll
21 go forward.
22    MR. CARSON:  Read my last question.
23                    - - -
24    (Whereupon the court reporter read back

Page 24

- - -

1 the pertinent testimony.)
2                    - - -
3    THE WITNESS:  Yes.
4 BY MR. CARSON:
5    Q.  Who was gonna be involved in the 501(c)(4)
6 besides Gregg Roman?
7    A.  [Inaudible].
8    Q.  Sorry?
9    A.  Only him.
10    Q.  How were you gonna pay Gregg Roman when he
11 started working with the 501(c)(4)?
12    MR. CAVALIER:  Object to form.  You can
13 answer.
14 BY MR. CARSON:
15    Q.  How was he gonna be compensated?
16    A.  We did not get that far.
17    Q.  You didn't talk to anyone about how
18 Mr. Roman was gonna be compensated when he began
19 working with the 501(c)(4)?
20    A.  No.
21    Q.  The answer is no?
22    A.  Yes.
23    Q.  Okay.  How far did you get?
24    A.  We talked to potential donors.

Deposition of DANIEL PIPES                                  Lisa Barbounis v. Middle Eastern Forum, et. al.

Page 25

- - -
1  Q.  What else did you do?
2  A.  We looked into the legalities.
3  Q.  How did you look into legalities?
4  A.  I don't remember.
5  Q.  What do you mean, you don't know?
6  A.  I --
7  Q.  How do you know you did it then?
8  A.  "I don't remember" is a simple English
9  phrase that I think you understand.
10  Q.  Well, are you sure you looked into the
11  legalities if you don't remember how you did it?
12  A.  I remember discussion about legalities.
13  Q.  Who was the discussion with?  Who was --
14  - - -
15  (Indistinguishable cross-talk.)
16  - - -
17  THE WITNESS:  Gregg.
18  BY MR. CARSON:
19  Q.  Who else was present when you held this
20  discussion?
21  A.  I don't remember.
22  Q.  Did you hold discussions about the
23  501(c)(4) and 501(c)(3) with anyone else besides
24  Gregg?

Page 26

- - -
1  A.  Marc Fink.
2  Q.  How about anybody else besides Gregg and
3  Marc Fink?
4  A.  I don't think so.
5  Q.  Did you hold discussions with Lisa
6  Barbounis about it?
7  A.  Who is "you"?
8  Q.  You, Mr. Pipes, are you.
9  A.  I don't believe so, no.
10  Q.  Did you hold discussions with Patricia
11  McNulty about it?
12  A.  Believe so.
13  Q.  Did you hold discussions with Marnie Meyer
14  about it?
15  A.  Don't believe so.
16  Q.  How is Gregg Roman paid?
17  MR. CAVALIER:  Object to form.  You can
18  answer.
19  BY MR. CARSON:
20  Q.  I can set it up.  Is Gregg Roman employee
21  of the Middle Eastern Forum?
22  A.  Yes.
23  Q.  How is he paid?  How does the Middle East
24  Forum compensate Gregg Roman?

Page 27

- - -
1  A.  What do you mean?
2  Q.  Is he paid a salary?  Is he paid by the
3  hour?  Is he paid by the year?
4  A.  A salary.
5  Q.  He's paid a salary?  What's his salary?
6  A.  I don't know.
7  Q.  Who knows what his salary is?
8  A.  The accountant.
9  Q.  Who's the accountant?
10  A.  [Inaudible].
11  THE COURT REPORTER:  What was the --
12  THE WITNESS:  The accountant.  I don't
13  remember the name of the accountant.  Her name
14  is Amy, but I forget her last name and the
15  company.
16  BY MR. CARSON:
17  Q.  Amy?  Is Amy an employee of the Middle
18  East Forum?
19  A.  No.  This is a different Amy from the
20  first Amy.  No, she's not employee.  She works for
21  accounting company that does our accounting.
22  Q.  Okay.  Does the Middle East Forum have a
23  bookkeeper?
24  A.  No.  I mean, yes, the company.  Not an

Page 28

- - -
1  individual.
2  Q.  What's the name of the company?
3  A.  I don't remember.
4  Q.  What do you mean, you don't -- can you
5  look it up?  We can stop, and you can look it up.
6  A.  I can look it up, yeah.
7  MR. CAVALIER:  We're not doing that, Seth.
8  MR. CARSON:  Yeah.  I need to know the
9  name of the company that does the bookkeeping.
10  MR. CAVALIER:  Then send an interrogatory
11  or ask another witness.
12  MR. CARSON:  I'm asking --
13  BY MR. CARSON:
14  Q.  What's your -- what's your position with
15  the Middle East Forum?
16  A.  President.
17  Q.  So who decided to retain this company that
18  does the accounting?
19  A.  Let me make a point now that will be --
20  that I'll be coming back to over and over again.
21  Middle East Forum has about 25 employees.  Each one
22  of them does a specialized task.  I do not do what
23  all the other 25 do.  I can't do all the things they
24  do.  I provide leadership.  I provide intellectual

Page 29

- - -

1  underpinnings.  I'm not engaged in the details of
2  employment, finances, legal, office management,
3  technology, and so forth.  So you will find on many
4  occasions, when you ask me specifics, I will not
5  know.  This does not mean I am not the CEO.  This
6  does not mean I don't make the ultimate decisions,
7  but it does mean that others make many decisions
8  along the way and just check with -- sometimes on
9  their own, and sometimes they check with me.
10     Q.  Are you the CEO?
11     A.  Are you interrupting me again?
12     Q.  Are you the CEO?
13                      - - -
14          (Indistinguishable cross-talk.)
15                      - - -
16       MR. CAVALIER:  Hold on.  Daniel, finish
17  your answer.
18  BY MR. CARSON:
19     Q.  You don't have to finish your answer.
20  Your answer is totally nonresponsive anyway.
21     A.  I can't believe it.
22                      - - -
23          (Indistinguishable cross-talk.)
24                      - - -

Page 30

                         - - -
1       THE COURT REPORTER:  Guys, we gotta do one
2  at a time, all right?
3  BY MR. CARSON:
4     Q.  Are you the CEO of the Middle East Forum?
5     A.  You gonna interrupt me?
6     Q.  Mr. Pipes, are you the CEO of the Middle
7  East Forum?
8     A.  Are you gonna interrupt me, Mr. Carson?
9                      - - -
10          (Indistinguishable cross-talk.)
11                      - - -
12       MR. CARSON:  I'm happy to give you guys
13  time if you wanna sit down and have a
14  conversation with your client about
15  depositions.
16       THE WITNESS:  I don't need any time.  I
17  want you to --
18       MR. CAVALIER:  I think he's entitled to
19  ask you not to interrupt him and let him finish
20  his answer.  I mean, that's what we've been
21  doing.  I let Lisa go on for pages of the
22  transcript.
23  BY MR. CARSON:
24     Q.  Are you the CEO of the Middle East Forum,

Page 31

                         - - -
1  Mr. Pipes?
2     A.  I'm not answering that.  I'm gonna finish
3  my statement.
4       MR. CAVALIER:  Finish what -- finish your
5  answer, Daniel, and then we can move on.
6       THE WITNESS:  I am the head of the Middle
7  East Forum.  I do not do all the jobs.  There
8  are 25 --
9  BY MR. CARSON:
10     Q.  Mr. Pipes, you said all this already.
11     A.  All right.  But you --
12     Q.  Is there something that you wanna add to
13  your answer?
14     A.  Interrupting me again?
15       MR. CAVALIER:  Seth, if you keep
16  interrupting him, we are gonna stop.
17       MR. CAVALIER:  I think we should.  I think
18  you should have a conversation with your client
19  about how depositions --
20       MR. CAVALIER:  No.  I mean we're gonna
21  stop for the whole day.
22       MR. CARSON:  That's not gonna happen, Jon,
23  so don't even try threatening, okay, because
24  it's --

Page 32

                         - - -
1                      - - -
2          (Indistinguishable cross-talk.)
3                      - - -
4       MR. CAVALIER:  -- and we'll move on.
5  BY MR. CARSON:
6     Q.  Mr. Pipes, do you have something new to
7  say to your answer, because you don't have to go and
8  repeat the whole thing again.  We have the record.
9  We can read it back if we need to.
10     A.  I am not going to be interrupted.  Is that
11  clear?  And I wanna say what I wanna say.
12     Q.  Okay.  Are you done?
13     A.  No, I'm not done.
14     Q.  Okay.  Do you wanna finish?  Go ahead.
15     A.  I wanna finish.
16     Q.  Please only provide new information that
17  you haven't --
18     A.  I will tell you what I want to tell you,
19  and you will listen.  That's the deal.
20     Q.  Are you the CEO of the Middle East Forum,
21  Mr. Pipes?
22     A.  As I was saying, I am the head of the
23  organization, which means I provide leadership and,
24  in many cases, take the ultimate decision, but I

Deposition of DANIEL PIPES                                                   Lisa Barbounis v. Middle Eastern Forum, et. al.

Page 33

- - -

1  don't take all the decisions, and I don't know all
2  that's going on.  This does not mean I am unaware.
3  It means that I am filling my job as CEO, as the
4  president.  So when you ask me about the accounting
5  and how we decided it, Gregg, who is the COO, he
6  chose the company, he told me about the various
7  companies, and he got my okay to go with a company
8  whose name I don't remember.
9      Q.  So Gregg Roman knows who this accounting
10  company is?  Is that your testimony?
11     A.  You have to ask him.
12     Q.  Well, I'm asking you.  Does Gregg Roman
13  know who they are?
14         MR. CAVALIER:  Object to form.
15         THE WITNESS:  I don't know what Gregg
16     Roman knows and doesn't know.
17  BY MR. CARSON:
18     Q.  Okay.  Do you know who they are?
19     A.  I told you I do not know --
20         MR. CAVALIER:  Object to form.
21  BY MR. CARSON:
22     Q.  Have you ever worked with them before?
23     A.  What does "work with them before" mean?
24     Q.  Have you ever worked with them before?

Page 34

- - -

1      A.  I don't know what you mean.  Be specific.
2      Q.  I'm not being specific.  I'm being
3  general.  In your entire life, have you ever worked
4  with the accounting company who does the books for
5  the Middle East Forum?
6      A.  Since they started working with us, yes.
7      Q.  So when did they start working with you?
8      A.  Early 2020.
9      Q.  What's the date?
10     A.  Early 2020.
11     Q.  Who chose them?
12     A.  Gregg looked at several companies and, in
13  the end, decided on this one, checked with me, so I
14  said okay.
15     Q.  Do you have one person there, or do you
16  have more than one person that you work with?
17     A.  I don't know.
18     Q.  Who's the contact that you've talked with
19  there?
20     A.  I don't know.
21     Q.  Is her name Amy?
22     A.  I don't talk to anyone.
23     Q.  Well, who's Amy?  When you testified about
24  Amy, who's that?

Page 35

- - -

1      A.  Amy's the person that the Forum works with
2  most closely.
3      Q.  The person at the Forum who works with
4  who?
5      A.  Most closely.
6      Q.  With what?
7      A.  Most closely.
8      Q.  Amy's the person at the Forum that you
9  work with most closely?  That's your testimony?
10         MR. CAVALIER:  Objection.  That's not what
11     he said, Seth.
12         MR. CARSON:  I -- well, it'd be nice if I
13     could hear him, Jon.
14         MR. CAVALIER:  I can hear him fine.
15         MR. CARSON:  Well, does it matter if you
16     can hear him fine if I can't?
17         MR. CAVALIER:  Turn your computer up.  I
18     don't know what to tell you.
19         MR. CARSON:  My computer's up all the way.
20     You have to speak up, Mr. Pipes.
21         THE WITNESS:  Get a better computer, Mr.
22     Carson.
23         MR. CARSON:  If we're gonna have problem
24     with the technology today, then we're gonna

Page 36

- - -

1  have to do something about it, but you have to
2  speak up.  You're whispering.
3      THE WITNESS:  I'm speaking at normal
4  voice.
5         MR. CARSON:  No, you're not.
6         MR. CAVALIER:  I'm not gonna let you do
7     that, Seth.
8         MR. CARSON:  Jon, stop telling me what
9     you're gonna do and what you're not gonna do,
10     okay?  Seriously.
11         MR. CAVALIER:  All right.  We're gonna
12     take a break.
13         MR. CARSON:  Maybe while on the break you
14     can have your client speak up when he comes
15     back because this is getting ridiculous.  It's
16     just ridiculous.  This is not how depositions
17     are supposed --
18         MR. CAVALIER:  There are lots of things
19     that are ridiculous about this case, Seth.
20     We're going off the record.
21         MR. CARSON:  That's not an excuse, Jon.
22     Get your client in order, man.
23         THE VIDEOGRAPHER:  We are now off the
24     record.

Page 37

1         - - -
2         - - -
3     (Whereupon there was a recess in the
      proceeding from 10:35 a.m. to 10:45 a.m.)
4         - - -
5     THE VIDEOGRAPHER:  The time is 10:45 a.m.
6 Eastern Time.  We are now on the record.  Thank
7 you for your patience, guys.  Apologize.
8 BY MR. CARSON:
9     Q.  Who approved how much money Gregg Roman
10 was paid for the Middle East Forum?
11    A.  I decided with the chairman of the
12 executive committee.
13    Q.  When did you make that decision?
14    A.  I do it annually.
15    Q.  So you -- when did it happen last?
16    A.  In late 2019 or early 2020.
17    Q.  And how much money did you approve this
18 year?
19    A.  I don't remember.
20    Q.  For Gregg's salary?
21    A.  I don't remember.
22    Q.  Okay.  Why don't you remember?
23    MR. CAVALIER:  Object to form.
24    THE WITNESS:  We do a lot of the things,

Page 38

1 and I do not recall them months and years
2 later, the numbers.
3 BY MR. CARSON:
4     Q.  Do you get paid through the Middle East
5 Forum?
6     A.  I do get paid.
7     Q.  How much do you get paid?
8     A.  I can't give you an exact number.
9     Q.  Well, give me a ballpark.
10    A.  240,000.
11    Q.  $240,000 a year?
12    A.  Yeah.
13    Q.  And how much money does the Middle East
14 Forum take in donations every year?
15    MR. CAVALIER:  Object to form.
16    THE WITNESS:  I can't remember.
17 BY MR. CARSON:
18    Q.  Well, give me a ballpark.
19    A.  There's a 990 form that you can go and
20 look it up.
21    Q.  What's a 990 form?
22    A.  It's an IRS form for nonprofits.
23    Q.  Does the Middle East Forum have an account
24 where they keep the donations?

Page 39

1     A.  What do you mean?
2     Q.  Where do you keep the donations after
3 they're made?
4     A.  We have a bank account.
5     Q.  Okay.  Do you guys invest the donations,
6 or you just keep them all in a bank account?  How
7 does that work?
8     A.  A mix.
9     Q.  Did you say a mix?
10    A.  A mix.
11    Q.  So how much money does the Middle East
12 Forum have invested?
13    A.  I don't know.
14    Q.  Well, when's the last time you checked?
15    A.  Month ago.
16    Q.  I'm sorry?
17    A.  Month ago.
18    Q.  You checked a month ago?
19    A.  Yeah.  I looked at the account.
20    Q.  Okay.  So a month ago, what did it say?
21    A.  I don't know.  I do not memorize numbers.
22    Q.  Well, ballpark it approximately.
23    A.  I -- I can't.
24    Q.  Why not?

Page 40

1     A.  I don't remember.  It's easy enough to
2 look up.
3     Q.  Okay.  So where would you go to look that
4 up?
5     A.  I would go to the company that has our
6 money invested.
7     Q.  What company is that?
8     A.  Raymond James.
9     Q.  Raymond James?
10    A.  Yep, and PNC, and maybe others smaller
11 amounts.
12    Q.  How long have you been working with
13 Raymond James?
14    A.  Four years.
15    Q.  And the portfolio that you keep with
16 Raymond James, does that include stocks and bonds?
17    A.  I believe so.
18    Q.  How about you?  What are you worth?
19    MR. CAVALIER:  Object to form.
20    THE WITNESS:  None of your business.
21    MR. CARSON:  No, it actually is our
22 business.  It goes to punitive damages.
23    MR. CAVALIER:  Personally?  Daniel, you
24 don't have to answer that question.

Page 41

- - -

1   MR. CARSON:  No, he does have to answer
2  it.
3      MR. CAVALIER:  He's not going to.
4      MR. CARSON:  Well, then we're gonna call
5  Judge Wolson, okay?
6      MR. CAVALIER:  Hold up.
7      MR. CARSON:  That's no problem.  We will.
8  It goes directly to punitive damages.
9      MR. CAVALIER:  Daniel Pipes' personal net
10  worth goes to punitive damages?
11      MR. CARSON:  It absolutely does.  How can
12  a jury calculate punitive damages, and how do
13  they know what's punitive unless they know what
14  he's worth?  It absolutely go -- the case law
15  is pretty clear.
16      MR. RIESER:  Seth, you can't -- you have
17  no claim for punitive damages against --
18      MR. CARSON:  Yes, we do.  He's a defendant
19  in the case, and we made a claim for punitive
20  damages.
21      MR. CAVALIER:  -- recognize that theory,
22  Seth.
23      MR. RIESER:  Seth, under the PHRA there is
24  no punitive damages, okay?

Page 42

- - -

1      MR. CARSON:  First of all, under the
2  Philadelphia Fair Practice Ordinance, there are
3  punitive damages.
4      MR. CAVALIER:  Not against --
5  - - -
6      (Indistinguishable cross-talk.)
7  - - -
8      MR. CARSON:  Yeah, there are, and under
9  the PHRA there's liquidated damages.
10      MR. RIESER:  Well, number one, there
11  isn't.
12      MR. CARSON:  Yeah, there is.
13      MR. RIESER:  It has nothing to do with his
14  net worth.
15      MR. CARSON:  No, it absolutely does.
16      MR. RIESER:  It doesn't.  Then call the
17  judge.  It's stupid.  Go ahead.
18      MR. CARSON:  It's not stupid.
19      MR. CAVALIER:  He's not gonna answer your
20  questions about his personal net worth.
21      MR. CARSON:  I mean, it's not really a
22  choice, but I'm just gonna make a list.
23      MR. CAVALIER:  Well, I'm instructing --
24      MR. CARSON:  I'll call the judge and deal

Page 43

- - -

1  with everything at once, and we'll get all
2  those questions answered before the end of the
3  deposition, so I'll just keep a list here.  I
4  mean, I'd be happy to send you the case law.
5      MR. CAVALIER:  Okay.
6      MR. CARSON:  It's well settled.
7      MR. CAVALIER:  I will look forward to it.
8      MR. CARSON:  I mean, we -- I'll send it to
9  you on the next break.  Maybe then we can
10  resolve it without getting the judge involved,
11  but if the judge gets involved, in the Third
12  Circuit, these questions are highly relevant.
13  I just had the same argument the other day in
14  one so -- but, again, I'll give you the
15  opportunity to give your client the right
16  advice.
17  BY MR. CARSON:
18      Q.   How much money did the Middle East Forum
19  receive in donations in 2019?
20      A.   I don't know.
21      Q.   Where is that listed?
22      A.   In the -- it will be listed in the 2019
23  990, which is now being worked on.
24      Q.   2019 990?

Page 44

- - -

1      A.   Yep.
2      Q.   Do you notify members of the board about
3  Middle East Forum's stock portfolio, investment
4  portfolio?
5      A.   What do you mean by "members of the
6  board"?
7      Q.   Well, the Middle East Forum has board
8  members; is that correct?
9      A.   What do you mean by "board"?
10      Q.   Board of directors.
11      A.   We don't have a board of directors.
12      Q.   What do you guys have in place of a board
13  of directors?
14      A.   I don't know.  What do you mean?
15      Q.   You tell me.  What do you think I mean?
16      A.   I don't know what you mean.  You tell me
17  what your question is.
18      Q.   My question is, does the Middle East Forum
19  have a board of directors?
20      A.   No.
21      Q.   Does the Middle East Forum have a Board of
22  Governors?
23      A.   [Inaudible].
24      Q.   We can't hear you.  You gotta speak up.

Deposition of DANIEL PIPES                    Lisa Barbounis v. Middle Eastern Forum, et. al.

Page 45

- - -

1   A.  Yes.
2   Q.  Who's on the Board of Governors?
3   A.  About 60, 70 people.
4   Q.  Are there officers on the Board of
5  Governors?
6   A.  No.
7   Q.  Does the Middle East Forum have corporate
8  officers?
9   A.  Yes.
10   Q.  Who are they?
11   A.  Steven Levy and Lawrence Hollin and
12  myself, Gregg, and one or two others.
13   Q.  Who are the other people?
14   A.  I don't remember.
15   Q.  What's Steve Levy's position?
16   A.  He's chairman.
17   Q.  What's Lawrence Hollin's position?
18   A.  I don't remember.
19   Q.  What?
20   A.  I don't remember.
21   Q.  What's Daniel Pipes' position?  Do you
22  remember your position?
23   A.  Might be president; might be something
24  else.

Page 46

- - -

1   Q.  Well, what's your understanding of what it
2  is?
3   A.  I just told you.  I don't -- might be
4  president; might be something else.
5   Q.  Well, what might else [sic] it be if it's
6  not president?
7   A.  I don't -- it's not an important title.
8  My important title is I'm president of the
9  organization, and I have --
10   Q.  Are you -- are you the CEO?
11   A.  -- interrupting me.  You're inter --
12   Q.  Are you the CEO?
13   MR. CAVALIER:  Seth, let him finish his
14  answer.
15  BY MR. CARSON:
16   Q.  Are you the CEO?
17   MR. CAVALIER:  Hold on a second.  Daniel,
18  were you finished your last answer?
19   MR. CARSON:  He was finished.
20  BY MR. CARSON:
21   Q.  Are you the CEO?
22   MR. CAVALIER:  Daniel, don't answer the
23  question.
24   - - -

Page 47

- - -

1   (Indistinguishable cross-talk.)
2   - - -
3   THE WITNESS:  Could the court reporter
4  read me back what I said?
5   - - -
6   (Whereupon the court reporter read back
7  the pertinent testimony.)
8   - - -
9   (Indistinguishable cross-talk.)
10   - - -
11   THE COURT REPORTER:  Guys, we gotta do one
12  at a time here.
13  BY MR. CARSON:
14   Q.  Are you the CEO, is the next --
15   MR. CAVALIER:  Daniel, do you wanna finish
16  your prior answer?
17   THE WITNESS:  I do.
18   MR. CAVALIER:  Then go ahead and do it.
19   THE WITNESS:  The important title is
20  president, and I have another title as -- in
21  the corporate structure but --
22  BY MR. CARSON:
23   Q.  What's that title?
24   MR. CAVALIER:  Daniel, were you finished

Page 48

- - -

1  your answer?
2  BY MR. CARSON:
3   Q.  What's that title?
4   MR. CAVALIER:  Daniel, were you finished
5  your answer?
6   THE WITNESS:  Could the court reporter
7  read back to me what I said?
8   THE COURT REPORTER:  Guys, we're not gonna
9  do this all day, just so you know, okay?
10   MR. CAVALIER:  I agree with you, and I
11  apologize on behalf of --
12   MR. CARSON:  Then why don't you just --
13  why don't you like -- please, just do what
14  everyone does before a deposition when they
15  have a client, and explain to your client the
16  way the deposition works.
17   MR. CAVALIER:  The way the deposition
18  works is you ask your question.  He --
19   MR. CARSON:  I ask questions.  He provides
20  answers.
21   MR. CAVALIER:  If you're not gonna let him
22  answer the question, there's no point for any
23  of us to be here.
24  BY MR. CARSON:

Page 49

- - -

1  Q.  Are you also the CEO?  It's a simple --
2      MR. CAVALIER:  That's not a question
3  pending.  He wants to finish his answer --
4      MR. CARSON:  It is the question --
5      MR. CAVALIER:  -- finish his answer before
6  we move on to the next question, Seth.  No
7  matter how many times you try to talk over him,
8  he's gonna finish his answers.
9      MR. CARSON:  That's good advice, Jon.
10 BY MR. CARSON:
11 Q.  Are you the CEO?
12     MR. CAVALIER:  Daniel, do you wanna finish
13 your prior answer?
14     THE WITNESS:  I do.
15 BY MR. CARSON:
16 Q.  Go ahead, Mr. Pipes.  What's so important
17 that you need to get it out?  Go ahead.  Finish.
18 A.  The important title I have is as president
19 of the Middle East Forum.  I have perhaps that and
20 perhaps some other title in the corporate structure.
21 I don't remember it.  It's not important.
22 Q.  Is it CEO?
23 A.  It is not CEO.
24 Q.  Well, what is it?

Page 50

- - -

1  A.  I don't know.  It could be president; it
2  could be something else.
3  Q.  Well, what else do you think it might be?
4  A.  I don't know.
5  Q.  Well, why do you think this other title
6  exists then?
7  A.  There's a legal need for corporate
8  structure.
9  Q.  Is there a document to look at where this
10 other title is listed?
11 A.  I'm sure there is.
12 Q.  Well, what's that document?
13 A.  I don't know.
14 Q.  Is it the Middle East Forum charter?
15 A.  I don't know.  If you want to look up our
16 paperwork, our public paperwork, be glad to make it
17 available to you.
18 Q.  That's not necessary.  You already have
19 made it available.
20 A.  I deal with the Middle East, Mr. Carson.
21 I don't deal with the legalities of the Middle East
22 Forum.  I can give you dates what happened in the
23 11th century.  I cannot give you specifics of
24 legalities of corporate governance of a 501(c)(3).

Page 51

- - -

1  Q.  Are there MEF bylaws?
2  A.  Yes.
3  Q.  Is your other title listed in the MEF
4  bylaws?
5  A.  I don't know.
6  Q.  Do you wanna look at them?
7  A.  If you want me to.
8  Q.  Sure, we can look at the MEF bylaws.  Do
9  you see this document I put on the screen?
10 A.  Yep.
11 Q.  Okay.  Are these the MEF bylaws?
12 A.  I don't know.
13 Q.  We'll take a minute and review it.
14     MR. CAVALIER:  Seth, do you really want
15 him to review the entire bylaws [inaudible] --
16     MR. CARSON:  I mean, the question I'm
17 asking is, are these the bylaws?
18     THE WITNESS:  I can only --
19         - - -
20     (Indistinguishable cross-talk.)
21         - - -
22 BY MR. CARSON:
23 Q.  You review it until you have enough
24 information to answer the question.

Page 52

- - -

1  A.  Then let me read the entire document.
2  Q.  If you're gonna read the whole thing,
3  we're gonna go off the record while you read it.
4  A.  Up to you.
5      MR. CARSON:  We're gonna go off the record
6  while we read this.  We're not wasting time to
7  read the whole document.
8      MR. CAVALIER:  I disagree.  We're not -- I
9  mean, you wanna go off the record, we'll go off
10 the record, but you're not stopping the clock
11 while the witness reviews the document you put
12 in front if him.
13     MR. CARSON:  Yes, we are stopping the
14 clock.
15         - - -
16     (Indistinguishable cross-talk.)
17         - - -
18     MR. CAVALIER:  Seth, that's not how it
19 works.
20     MR. CARSON:  Yeah, it is how it works.
21     MR. CAVALIER:  You want him to identify a
22 19-page document, he's gotta look at the
23 document.
24     MR. CARSON:  It's not 19 pages.

Deposition of DANIEL PIPES                                       Lisa Barbounis v. Middle Eastern Forum, et. al.

Page 53

- - -
- - -
(Indistinguishable cross-talk.)
- - -
BY MR. CARSON:
    Q.  Have you ever seen this document before, Mr. Pipes?
    A.  I don't know.  I have to see the whole of it before I --
    Q.  Well, let me ask you a question:  How did these documents get to your attorney?  Did you turn them over?
    A.  I did not, no.
    Q.  Who turned them over?
    A.  I don't know.
    Q.  Well, do you know that documents were turned over to your attorneys in this case?
    A.  No.
    Q.  You don't know whether you turned documents over to your attorneys in this case?
    A.  No.
    Q.  Okay.
    A.  We have a legal counsel who handles these things.
    Q.  Who handled the turning over of documents

Page 54

- - -
in this case?
    A.  You interrupted me.  Legal --
    Q.  Who turned over the document -- handing over the documents in this case?  I didn't hear you.
    A.  I'd like to finish.  My legal counsel handles matters such as documents to lawyers and to opposing counsel and so forth.  I do not deal with this.  I will note again that we have 25 people at the Forum, and we have specialized tasks, and I don't do everything, and I don't know everything that goes on.  I make key decisions.  I do not make every single decision such as whether to hand over bylaws to lawyers or not.  So I don't know how these went -- if these are, in fact, our bylaws -- how they went from us --
    Q.  Well, how would you tell if they were?
    A.  I would have to read this document, and I'd have to compare it to the documents -- the document in my possession that says --
    MR. CARSON:  Then we're gonna call the judge, Jon.  This is bullshit.  We're gonna call the judge.  We're not gonna spend an hour reading a document and staying on the clock, so I'm gonna get Judge Wolson on the phone.

Page 55

- - -
    MR. CAVALIER:  You're gonna call the judge?
    MR. CARSON:  Yes.
    MR. CAVALIER:  Because you don't want the witness to be able to read the document you're presenting --
    MR. CARSON:  No.  We're not gonna spend an hour where he reads a four-page document and tell me we're on the clock.
    MR. CAVALIER:  Not gonna take an hour.
    MR. CARSON:  That's not gonna happen, all right, and we're also not gonna pretend like we don't know that these are -- the document is labeled "MEF Bylaws," so we're not playing games today.  So either you wanna talk to your client, or I'm just gonna call the judge, and the judge will make a ruling.
    MR. CAVALIER:  If you wanna call the judge and tell him that you don't want the witness to be able to read the documents that you're putting in front of him --
    MR. CARSON:  I -- that's no problem.
    MR. CAVALIER:  Feel free.
    THE VIDEOGRAPHER:  Counsels, are we agreed

Page 56

- - -
to go off the record while --
    MR. CARSON:  No, let's stay on the record.
    THE VIDEOGRAPHER:  Sure thing, Seth.
    THE DEPUTY:  Good morning.  Judge Wolson's chambers.  This is Jeannine.
    MR. CARSON:  Yeah.  This is Seth Carson.  We're calling from a deposition in connection with the Middle East Forum verse -- I'm sorry -- Lisa Barbounis verse the Middle East Forum.  We're just having an issue with the witness just being completely nonresponsive, refusing to even verify documents as simple as the Middle East Forum bylaws.  We're dealing with the president of the Middle East Forum, and I don't know what to do, but they're -- counsel's telling me that he needs to sit and take -- to read, you know, documents that are four or five pages long and that we need to stay on the record to do it, and that's gonna count against the clock, and it's just -- we only have one opportunity to do this deposition, and it's just getting out of control.
    THE DEPUTY:  Okay.  Unfortunately, the

Deposition of DANIEL PIPES                                    Lisa Barbounis v. Middle Eastern Forum, et. al.

Page 57

- - -

1   judge is in the middle of a telephone
2   conference.  Can you hold on for just a moment?
3        MR. CARSON:  Sure.
4        THE DEPUTY:  Thanks.
5        MR. CARSON:  Your client can take as much
6   time as he wants to read documents today, but
7   we're just not gonna do it and count against
8   the clock.  Not gonna spend two hours looking
9   at doc -- because there's gonna be a lot of
10  documents that are coming up, and we're not
11  gonna do that every time.  It's ridiculous, and
12  I'm -- frankly, I'm sort of surprised that you
13  would even suggest it.
14       THE DEPUTY:  Mr. Carson?
15       MR. CARSON:  Yup.
16       THE DEPUTY:  Okay.  As I said, the judge
17  is in the middle of a Rule 16.  I don't know if
18  you wanna try calling back, I wanna say, maybe
19  like 11:45?
20       MR. CARSON:  Yeah.  I can keep asking --
21  yeah.  I can keep asking other questions, and
22  then we can call the judge back.  It's just
23  like, you know, the first document that I put
24  in front of the witness, you know, he said he

Page 58

- - -

1   needs to take his time and read the entire
2   document before he answers any questions on it.
3   There's gonna be a lot of documents in the
4   case, so I suggested that [inaudible] hours
5   while he confirms documents, that's fine.  He
6   can take all the time he wants to do that, but
7   they're trying to say that it has to count
8   against the clock, and that's -- you know what
9   I mean?  It's just -- that's just patently
10  unfair, and it's clearly a strategy designed to
11  reduce the amount of questions that I'm
12  permitted to ask today.
13       MR. CAVALIER:  For defense counsel, I'll
14  just note that I disagree with everything
15  Mr. Carson just said.
16       MR. CARSON:  Yeah, of course you do.
17       THE DEPUTY:  Okay.  I would suggest that
18  you both, you know, dial in around 11:45, and I
19  could see if the judge can speak to you all at
20  one time.
21       MR. CARSON:  Thank you.  We'll call back.
22  I'll just keep going for now.  Thank you.
23       THE DEPUTY:  No problem.  Thank you.
24       MR. CARSON:  We can go off the record if

Page 59

- - -

1   he wants to read this document, or we can keep
2   going and we can --
3        MR. CAVALIER:  It's your deposition.  To
4   the extent you want him to review documents or
5   to ask -- if you wanna ask him questions about
6   documents --
7        MR. CARSON:  I'm gonna ask him questions
8   about this document, but first -- my first
9   question, is this the Middle East Forum bylaws?
10  Your client says "I don't know," which is --
11  it's ridiculous.
12       MR. CAVALIER:  He needs to read the
13  document to identify it.
14       MR. CARSON:  Right.
15       MR. CAVALIER:  I don't know why that's
16  such a controversial statement to you.
17  BY MR. CARSON:
18   Q.  All right.  Let's just time it just for
19  fun.  You go ahead, Mr. Pipes.  Wanna read the
20  document before you confirm it?  Is this the Middle
21  East Forum bylaws, is the question.  Let us know
22  when you're ready to answer.
23   A.  I'm finished with this.
24   Q.  So is it the MEF -- is it Middle East

Page 60

- - -

1   Forum's bylaws?
2    A.  I'm finished with the first page.
3        MR. CAVALIER:  Read the whole document.
4        THE WITNESS:  No, no, no.  First page, the
5   first section that you showed me.  No, go back
6   up.  Come on.
7        MR. CAVALIER:  Still not all the way --
8   BY MR. CARSON:
9    Q.  Tell me where to go.
10   A.  To the bottom -- look at the first page --
11   Q.  You just said you read the first page.
12   A.  First page in the sense of first screen.
13   Q.  This was the first screen, so I went down
14  to the second screen.
15   A.  No, no, no.  Up.  Okay.
16   Q.  Can you read Section I for the record out
17  loud, please?  I'll highlight it for you.  Can you
18  read the section out loud for the record?
19   A.  Middle East Forum shall have two Boards of
20  Governors, one based in Philadelphia, and the other,
21  New York.  Each shall consist of no less than 15
22  persons and no more than 45 persons or such other
23  members -- or such other number of the members of
24  each board shall, from time to time, determine.

Page 61

- - -

1  Q.  So is that the Board of Governors that you
2  were just testifying to?
3      MR. CAVALIER:  So, just so we're clear for
4    the record, are you withdrawing the question
5    that the witness was answering and moving on to
6    other --
7  BY MR. CARSON:
8  Q.  I'm asking you if this is the board of
9  directors -- the Board of Governors that we just
10 talked about.
11 A.  Well, we haven't verified that this is our
12 bylaws, so if you're just asking me, in general, is
13 there a Board of Governors, yes, there is.
14 Q.  Does this document state that the Middle
15 East Forum shall have two Boards of Governors?
16 A.  I don't know what this document is.  I --
17 Q.  Well, does this document say that?  The
18 Middle East Forum will have two Boards of Governors.
19 Is that what it says?
20 A.  This document says that.  Whatever this
21 document --
22 Q.  Why does the Middle East Forum have two
23 Boards of Governors?  What does that mean?
24     MR. CAVALIER:  Object to form.  You can

Page 62

- - -

1  answer.
2      THE WITNESS:  Middle East Forum does not
3    have two Board of Governors.
4  BY MR. CARSON:
5  Q.  Well, how many Boards of Governors does
6  the Middle East Forum have?
7  A.  One.
8  Q.  So this document says one is based in
9  Philly, and the other's in New York.  Was there ever
10 a time when the Middle East Forum had two Boards of
11 Governors?
12 A.  Yes.
13 Q.  When did they go from having two to one?
14 A.  Five years ago.
15 Q.  When did Gregg Roman become a member of
16 the Board of Governors?
17 A.  He didn't.
18 Q.  Gregg Roman doesn't sit on the Board of
19 Governors?
20 A.  No.
21 Q.  Is Gregg Roman a corporate officer?
22 A.  Yes.
23 Q.  You have a website online.  Are you aware
24 of that?

Page 63

- - -

1  A.  Yes.
2  Q.  The website has a page that's listed,
3  "Middle East Forum Board of Governors".  Are you
4  aware of that?
5  A.  Yes.
6  Q.  And Gregg Roman's name is listed on that
7  page.  Do you know that?
8  A.  No.  I think that's wrong.
9  Q.  Have you ever seen this web page before?
10 A.  Let me see the whole of it.
11 Q.  Do you see here where it says "Middle East
12 Forum Board of Governors"?
13 A.  Yep.
14 Q.  Do you see here where it says Gregg
15 Roman's name underneath that?
16 A.  Yup.
17 Q.  So does that better help your memory of
18 whether Gregg Roman's a member of the Board of
19 Governors?
20 A.  Well, I haven't verified this page, but if
21 we just look at this page, it's quite clear that the
22 top five names are officers, and the next 12 or so
23 names are executive committee, and then comes the
24 Board of Governors.  And if Gregg's name is on the

Page 64

- - -

1  Board of Governors, that would be a surprise to me.
2  Q.  And I'll represent to you that this --
3  this is what your website looks like right now.  I
4  just took a screenshot of it just now.
5  A.  Well, I just explained to you that if it
6  does -- it says that Gregg is secretary of the
7  organization, and the Board of Governors are below
8  it.
9  Q.  And if we look at the Middle East Forum
10 bylaws, there is a section for officers, correct,
11 right here?
12 A.  I don't know that this is the Middle East
13 Forum bylaws.
14 Q.  We can pretend it's not for now.  Is there
15 a section in this document that says "officers"?
16 A.  Yes.
17 Q.  You are aware that your attorneys turned
18 this over to us and represented that it's the Middle
19 East Forum bylaws, correct?
20 A.  No.
21 Q.  I'll represent to you that that's exactly
22 what happened.  Do you see this little number right
23 here?  Do you see this?
24 A.  I do.

Deposition of DANIEL PIPES                                   Lisa Barbounis v. Middle Eastern Forum, et. al.

Page 65

- - -

1  Q.  Do you know what that's called?  It's
2 called a Bates stamp.  I'll represent to you that
3 your attorneys put this number on this page and
4 turned it over to us in connection with our requests
5 in this case.  Did you know that?
6  A.  No.
7  Q.  Your attorneys never talked to you about
8 discovery?
9     MR. CAVALIER:  Objection.  Daniel, you
10 don't have to --
11        - - -
12    (Indistinguishable cross-talk.)
13        - - -
14    MR. CARSON:  You can just say
15 "privileged," Jon.  It's fine.
16    MR. CAVALIER:  Yeah.
17    MR. CARSON:  Objection, privilege.
18 BY MR. CARSON:
19  Q.  Okay.  So did you ever work on producing
20 discovery in this case in any way?
21  A.  No.
22    MR. CAVALIER:  Object to form.
23 BY MR. CARSON:
24  Q.  Did you ever have to respond to -- do you

Page 66

- - -

1 know what interrogatories are?
2  A.  No.
3  Q.  Do you know what a request for production
4 of documents is?
5  A.  No.
6  Q.  So you've never responded to
7 interrogatories, then?  Is that your testimony?
8    MR. CAVALIER:  Objection.
9 BY MR. CARSON:
10  Q.  Have you ever responded to
11 interrogatories?
12  A.  No.
13  Q.  Have you ever responded to a request for
14 production of documents?
15  A.  No.
16  Q.  Well, do you see how this document here,
17 which your attorneys are representing to us is the
18 Middle East Forum bylaws, do you see it has a
19 section for "officers"?
20    MR. CAVALIER:  I'm gonna object to the
21 description of the document, but to the extent
22 you can answer the question, go ahead.
23    MR. CARSON:  You -- Jon, you do know that
24 you guys gave us written requests -- written

Page 67

- - -

1 responses to requests for production of
2 documents, right?
3    MR. CAVALIER:  Sure.
4    MR. CARSON:  So you do know that you
5 represented that this is the Middle East Forum
6 bylaws, correct?
7    MR. CAVALIER:  Listen.  I'm not -- the
8 discovery speaks for itself --
9        - - -
10    (Indistinguishable cross-talk.)
11        - - -
12    MR. CARSON:  I get it, I get it.  It's
13 fine.
14 BY MR. CARSON:
15  Q.  So you are aware that this document does
16 have a section called "Officers," correct,
17 Mr. Pipes?
18  A.  I see in front of me it says "Officers,"
19 yes.
20  Q.  And these -- chairman, vice chairman,
21 president, vice president, secretary, treasurer, are
22 those the offices that the Middle East Forum
23 maintains for its officers?
24    MR. CAVALIER:  Object to the form of the

Page 68

- - -

1 question.
2    THE WITNESS:  I'd have to check.
3 BY MR. CARSON:
4  Q.  Where would you check?
5  A.  I would check our documents.
6  Q.  Would you check with the Middle East Forum
7 bylaws?
8  A.  No.  I would check to see what our current
9 officers are.
10  Q.  Well, what document would you check that
11 would tell you that?
12  A.  I would check the internal documents of
13 the Middle East Forum.
14  Q.  Well, what are the internal documents you
15 would check?  Please identify one.
16  A.  We keep lists of who is doing what.
17  Q.  And is one of those lists have a job
18 called -- a position called secretary?
19  A.  Yeah.  I told you that.  Gregg is the
20 secretary.
21  Q.  Okay.  And Gregg is also the director of
22 the Middle East Forum, correct?
23  A.  Correct.
24  Q.  Is there any position at the Middle East

Page 69

- - -

1 Forum that's higher than director in the corporate
2 structure?
3    A.  I'm the president of the -- making -- I'm
4 the president.  Yeah.
5    Q.  So it's your testimony that you are
6 positioned higher in the corporate structure than
7 the director of the Middle East Forum?
8    A.  Yes.
9    Q.  Is there anybody else who's positioned
10 higher?
11    A.  The chairman is the highest position in
12 the corporate structure.
13    Q.  Who's the chairman?
14    A.  Steven Levy.
15    Q.  So Steven Levy is positioned above you in
16 the corporate structure; is that your testimony?
17    A.  Yes.
18    Q.  When did he become the chairman?
19    A.  I don't remember.
20    Q.  Well, how long have you worked with Steve
21 Levy for?
22    A.  I don't remember.
23    Q.  We can't hear you when you whisper,
24 Mr. Pipes.

Page 70

- - -

1    A.  I don't remember.
2    Q.  Did you start working with him this year?
3    A.  No.
4    Q.  Did you start working with him last year?
5    A.  Earlier.
6    Q.  Early last year is when you began working
7 with Mr. Levy; is that your testimony?
8    A.  I've worked with him for some years.  I
9 cannot be precise when I first --
10    Q.  Did you work with him at all times related
11 to the allegations in this case?
12    A.  Yes.
13    Q.  Did you work with him while Tiffany Lee
14 was still an employee of the Middle East Forum?
15    A.  Probably.
16    Q.  Did you work with him while Gabrielle
17 Bloom was still an employee of the Middle East
18 Forum?
19    A.  I don't know who Gabrielle Bloom is.
20    Q.  Do you know who Alana Goodman is?
21    A.  I know the name as a reporter.
22    Q.  You know the name what?
23    A.  As a reporter.
24    Q.  Do you know that she accused Gregg Roman

Page 71

- - -

1 of taking his penis out in front of her?
2         MR. CAVALIER:  I'm gonna object to the
3    form there.
4 BY MR. CARSON:
5    Q.  We can listen to the recording if you'd
6 like, Mr. Pipes.
7    A.  I don't know that.
8    Q.  We can do that on the record.
9    A.  If you like.
10    Q.  Sorry?  What's your answer?
11    A.  If you like.
12    Q.  Well, did you know that she accused Gregg
13 Roman of taking his penis out in front of her at a
14 bar in Washington D.C.?
15         MR. CAVALIER:  Object to the form.
16         THE WITNESS:  No, I don't.
17 BY MR. CARSON:
18    Q.  You didn't know that?
19    A.  No.  I know that -- no, I don't know that.
20    Q.  If you knew that, would you have
21 investigated it?
22    A.  I am not now or at any time in the next
23 few hours going to deal with hypotheticals.  If
24 you --

Page 72

- - -

1    Q.  That's --
2    A.  Let me finish.
3    Q.  That's not a choice you have today,
4 Mr. Pipes.
5    A.  Let me finish.
6         MR. CAVALIER:  Let him finish his answer.
7         MR. CARSON:  His answer was, I'm not now
8    gonna deal with hypotheticals today.
9 BY MR. CARSON:
10    Q.  That's not a choice that you have today,
11 Mr. Pipes.  You have to answer the questions
12 honestly and truthfully to the best of your ability.
13 You don't get to decide if there's an entire
14 category of questions that you're not gonna respond
15 to.
16         - - -
17         (Indistinguishable cross-talk.)
18         - - -
19         MR. CARSON:  So will not answer
20    hypotheticals.  Okay.
21 BY MR. CARSON:
22    Q.  Did you wanna tell me anything else about
23 how you will not answer hypotheticals?
24         MR. CAVALIER:  Is that a question?

Deposition of DANIEL PIPES                                   Lisa Barbounis v. Middle Eastern Forum, et. al.

Page 73

- - -

1  THE WITNESS:  Read me back what I started
2  to say.
3  BY MR. CARSON:
4  Q.  You said, I will not now or today respond
5  to hypotheticals.  Is there something else you
6  wanted to say in response to that?
7  A.  In each case, it's a matter of when,
8  where, who, and other specifics, and, therefore,
9  answering hypotheticals is a mistake, and I'm not
10 gonna engage in it.
11 Q.  Well, at 11:45 we're gonna talk to the
12 judge, and if he instructs you to answer
13 hypotheticals, will you answer them?
14 MR. CAVALIER:  Objection.
15 THE WITNESS:  If you give me specifics
16 about who, when, where, and every detail, then
17 I can perhaps make a judgment, but I can't make
18 a judgment [inaudible].
19 BY MR. CARSON:
20 Q.  Another nonresponsive answer, okay.  So if
21 you would've known that there was an allegation --
22 whether it was true or not, if you just would've
23 heard that there's an allegation that the director
24 of the Middle East Forum took his penis out in front

Page 74

- - -

1  of a Washington Examiner reporter, is that something
2  that you think you should've investigated?
3  A.  It depends on the specifics -- when,
4  where, who, what the relations were, what the
5  background is, and so forth.  I'm not gonna make a
6  determination on the abstract.
7  Q.  Under what context would it be appropriate
8  for the director of the Middle East Forum to take
9  his penis out in front of a Washington Examiner
10 reporter?
11 MR. CAVALIER:  Object to form.  We're
12 getting close to starting to hear instructions
13 from me not to answer, Seth.
14 MR. CARSON:  Yeah.  Based on what,
15 privilege?
16 MR. CAVALIER:  No.  Based on the fact that
17 these questions are ludicrous.
18 MR. CARSON:  They're not ludicrous.
19 BY MR. CARSON:
20 Q.  Mr. Pipes, tell me -- so I'll give you a
21 context.  If Gregg Roman was telling a Washington
22 Examiner reporter that he would give her stories, is
23 that something that would be within the purview of
24 the director of the Middle East Forum?

Page 75

- - -

1  MR. CAVALIER:  Object to form.
2  THE WITNESS:  If Gregg Roman said he would
3  give stories to a reporter, is that within the
4  purview?  Yes.
5  BY MR. CARSON:
6  Q.  Because one of the jobs of the director of
7  the Middle East Forum is to work with the press; is
8  that correct?
9  A.  Correct.
10 Q.  If Gregg Roman said he's gonna trade those
11 stories for sex, is that something that's within the
12 purview of the director of the Middle East Forum?
13 A.  No.
14 Q.  So if you found out that he was making
15 propositions to reporters to trade stories for sex,
16 is that something you think you should've
17 investigated?
18 A.  Depends on the exact circumstances.
19 Q.  I'm gonna play a recording that was turned
20 over to your attorneys in the course and scope of
21 discovery.
22 - - -
23 (Whereupon an audio recording was played
24 from 11:20 a.m. to 11:31 a.m.)

Page 76

- - -
- - -

1
2  BY MR. CARSON:
3  Q.  Have you ever heard that recording before,
4  Mr. Pipes?
5  A.  No.
6  Q.  Is that a recording that you would've been
7  interested in hearing?
8  MR. CAVALIER:  Objection.  Form,
9  foundation.
10 BY MR. CARSON:
11 Q.  Is that something you wished you would've
12 known that someone alleged?
13 MR. CAVALIER:  Same objections.
14 THE WITNESS:  I don't know if this is
15 legal recording.  I don't know if this is
16 legitimate recording.  I don't know if this
17 person speaking was paid to act this out.  I
18 know nothing about it.
19 BY MR. CARSON:
20 Q.  Forgetting about the truth of anything
21 said, wouldn't that be something you'd wanna be
22 aware of?
23 MR. CAVALIER:  Objection.  Form,
24 foundation, incomplete hypothetical.  You can

Page 77

- - -

answer if you can.
    THE WITNESS:  I'm the president of the
Middle East Forum.
BY MR. CARSON:
    Q.  Right.
    A.  Interrupt me.
    Q.  You're the president of Middle East Forum.
Continue.
    A.  I am not the den mother of the Middle East
Forum.  The employees at the Forum engage in all
sorts of activities that I know nothing about that I
probably wouldn't approve of.  If this is accurate,
I wouldn't approve of it.  If I learned that Lisa
Barbounis goes and picks up men at a dinner, takes
them back to her hotel room, and has sex with them
that night, probably wouldn't approve of that
either.  These are not my concerns.  I do not deal
with the personal lives of my staff.  I don't know
them in that way.  I'm not concerned with their
activities.  If they do something that I don't like
and I know about it, I'll tell them, but I am not
den mother of the Middle East Forum.
    Q.  But don't you have a legal duty to the
employees who've worked with Gregg Roman?

Page 78

- - -

    MR. CAVALIER:  Object to form, foundation.
BY MR. CARSON:
    Q.  Don't you owe -- strike that.  Don't you
have a responsibility, an ethical responsibility, to
the employees who work with Gregg Roman?
    MR. CAVALIER:  Same objection.
    THE WITNESS:  [Inaudible].
BY MR. CARSON:
    Q.  I'm sorry?
    A.  To do what?
    Q.  To protect them.
    MR. CAVALIER:  Same objection.  Form.
    THE WITNESS:  [Inaudible].
BY MR. CARSON:
    Q.  I'm sorry?
    A.  Protect whom from who?
    Q.  I'll try to make my point.  Is there
anyone else who could fire Gregg Roman other than
you?
    A.  No.
    Q.  Is there anyone else who could discipline
Gregg Roman other than you?
    A.  No.
    Q.  So is there anyone else who's in a

Page 79

- - -

position, other than you, to make sure that the
female employees who work for the Middle East Forum
aren't subjected to illegal conduct?
    MR. CAVALIER:  Object to form, foundation.
    THE WITNESS:  I have yet [inaudible].
    THE COURT REPORTER:  I'm sorry, Mr. Pipes.
I cannot hear you.
    THE WITNESS:  I have yet to be shown
illegal conduct, and that illegal conduct is
specific in time and place.
BY MR. CARSON:
    Q.  Well --
    A.  What illegal conduct have you shown me?
    Q.  Is sexual harassment illegal conduct?
    A.  I don't know that what was described in
that tape recording of unknown providence with
unknown people is illegal activity.  If it is, I
would be concerned, but I didn't know about it, and
I, at this point, have my doubts about its
authenticity.
    Q.  Why do you have your doubts about its
authenticity?
    A.  I told you before.  I don't know if this
was paid for, if this was an actress.  I don't know

Page 80

- - -

if it was done legally in a place where one or both
of the speakers have to get an agreement.  I don't
know any of these things.
    Q.  What would it take to find out, though?
You just pick up the phone and call Alana Goodman,
correct?
    A.  I don't know if this was Alana Goodman.
    Q.  Well, you heard her say that she referred
to herself as Alana in the recording.  Like she
said, Alana, tell him what you should have -- tell
him why you should have the story.  You heard her
say that, right?  So we heard her first name.
    A.  What are you asking me?
    Q.  I'm asking you that to authenticate its --
the veracity of the recording.  It's just a simple
phone call from you to Alana Goodman, right?
    MR. CAVALIER:  Object to form, foundation.
You can answer.
BY MR. CARSON:
    Q.  It's all right.  You can --
    A.  I don't know if that's the case or not.  I
don't know if she would talk to me.  I don't know if
she would authenticate it.  I don't know.
    Q.  And the reason you don't know is because

Deposition of DANIEL PIPES                                    Lisa Barbounis v. Middle Eastern Forum, et. al.

Page 81

- - -

1  you never tried?
2      MR. CAVALIER: Object, foundation. He
3  never heard the recording before today.
4  BY MR. CARSON:
5      Q. You never tried calling Alana Goodman; is
6  that correct?
7      A. [Inaudible].
8      THE COURT REPORTER: I can't hear you, Mr.
9  Pipes.
10     THE WITNESS: I have not called Alana
11 Goodman.
12 BY MR. CARSON:
13     Q. Also, you're being recorded. This is a
14 video dep, and I don't know if it's the green screen
15 effect you have going on, but it's -- we're not
16 getting a -- we're not getting a good video because
17 of it, so we gotta [inaudible]. If you wanna use
18 the green screen, I think you gotta sit more so on
19 the chair. Have you ever read the charge of
20 discrimination that Lisa Barbounis filed in this
21 case?
22     A. Yes.
23     Q. Have you ever read the complaint Lisa
24 Barbounis filed in this case?

Page 82

- - -

1      A. Yes.
2      Q. So you do know about the allegations that
3  Alana Goodman made, correct?
4      MR. CAVALIER: Object to form, foundation.
5      MR. CARSON: Well, they are listed --
6      MR. CAVALIER: That's a
7  mischaracterization of the documents you just
8  asked him about.
9      MR. CARSON: Well, the allegations are in
10 those documents, correct?
11     MR. CAVALIER: Well, they're allegations
12 by Lisa Barbounis --
13     MR. CARSON: Jon, why are you answering
14 for him?
15     MR. CAVALIER: I'm making an objection --
16     - - -
17     (Indistinguishable cross-talk.)
18     - - -
19     MR. CARSON: You're answering the
20 question.
21     THE COURT REPORTER: Guys, we gotta do one
22 at a time.
23     MR. CARSON: Don't answer questions.
24     THE WITNESS: I read the complaint that

Page 83

- - -

1  you concocted, yes.
2  BY MR. CARSON:
3      Q. What do you mean by "concocted"?
4      A. Imagined, made up.
5      Q. You think I used magic to make the
6  complaint?
7      A. No. You used your imagination.
8      Q. Excuse me? We can't hear you.
9      A. You used your imagination.
10     Q. You think that I used my imagination to
11 draft a complaint? That's your testimony?
12     A. I do.
13     Q. Why?
14     A. You put things in that are clearly false.
15     Q. Like what?
16     A. Like saying that I was the one who asked
17 Gregg to come back. It was my initiative -- my
18 initiative -- to have Gregg come back in March 2019,
19 omitting Lisa Barbounis' initiation on that. She
20 simply disappeared.
21     Q. Mr. Pipes, did --
22     MR. CAVALIER: He's not done his answer.
23 BY MR. CARSON:
24     Q. Were you done? You can keep going if you

Page 84

- - -

1  want.
2      A. I'm done.
3      Q. Yeah, I thought you were done.
4      MR. CARSON: Please don't interrupt us
5  again, Jon, all right? You can put objections
6  on the record. That's what you're allowed to
7  do in --
8      MR. CAVALIER: You keep interrupting the
9  witness. I'm gonna keep letting him finish his
10 answer.
11     MR. CARSON: He just corrected you, Jon.
12 He just said he wasn't interrupted.
13     MR. CAVALIER: One time out of 60.
14     MR. CARSON: Well, you know, if you're
15 gonna interrupt, you gotta get it right all the
16 time.
17 BY MR. CARSON:
18     Q. All right. So, Mr. Pipes, was Lisa in a
19 position to make a decision to have Gregg Roman
20 return to the Middle East Forum?
21     A. I said "initiate". You had in that
22 complaint that I initiated -- that I, on my own,
23 with no role taken by Lisa Barbounis -- I had the
24 idea, implying -- and this is a very crucial point

Deposition of DANIEL PIPES                                    Lisa Barbounis v. Middle Eastern Forum, et. al.

Page 85

- - -

1  to these lawsuits -- that I inflicted Gregg on Lisa
2  and the others when, in fact, it was her idea.  She
3  came to me.  I held a meeting with all the staff,
4  with the administrative staff, and Lisa took the
5  lead and said we want Gregg back.  I said good.
6  Good idea.  And everyone but Marnie was enthusiastic
7  about it.  Marnie didn't like it -- fair enough --
8  but it was Lisa who did it, and your concocted
9  complaint simply makes her disappear from that.  It
10 has to be my decision.  When I saw that, I realized
11 that this is a bogus case.  I realized this is a
12 case where you brought together five women to bring
13 a lawsuit against the Middle East Forum for almost
14 $31 million, and I realized that you are the one
15 behind it.  Fine, okay.  That's your work, but it's
16 a concoction.  It's a fantasy.  It's --
17     Q.  Do you have any other reasons why you
18 think it's a concoction besides that?
19     A.  Oh, there are plenty more.
20     Q.  Well, go ahead.  Tell us all the reasons
21 why you think this case is a concoction.
22     A.  Because that was the first one that
23 signaled to me that this is a falsehood.
24     Q.  Well, what's the second one?

Page 86

- - -

1     A.  That's -- I'll stick with that.
2     Q.  Well, Mr. Pipes, this is your deposition,
3  so if you think that the complaint presents facts
4  that you don't agree with, I'd like you to say all
5  the reasons why you think that the complaint is
6  concocted.
7     MR. CAVALIER:  Hold on a second.  Hold on,
8     Daniel.  Hold on.  I'm gonna object to the
9     form, and I'm gonna object to foundation.
10    Unless you revise the question, I'm gonna
11    instruct him not to answer.  You're asking him
12    to identify all the issues in a 500-paragraph
13    complaint?
14 BY MR. CARSON:
15    Q.  I'm asking you to tell me all the reasons
16 why you think the complaint is concocted.  So far,
17 you've given me one.  You said because the complaint
18 states that it was your decision to bring Ms. Bar --
19 to bring Gregg Roman back.
20    A.  Not that I -- my decision it was, yes, but
21 that I originally -- you whitewashed her out of the
22 story is the reason.  All my doing when, in fact, it
23 was her initiative.  That's all my -- all my
24 problems [inaudible] --

Page 87

- - -

1     THE COURT REPORTER:  Sir, I cannot hear
2  you.
3  BY MR. CARSON:
4     Q.  Can't hear what you're saying.
5     A.  If you want all my objections, we have to
6  pull out this document and go through it paragraph
7  by paragraph, which is something I don't think you
8  want to do.  So let me say that this was the initial
9  trigger that told me that this is a false document,
10 and it talked about something about me, not about
11 Gregg or anyone else.  It was about me, and it was
12 false, false to the core, on a critical, critical
13 [inaudible].  Therefore, I see this as a bogus
14 undertaking that you've initiated.
15    Q.  Are you finished?
16    A.  I'm finished.
17    Q.  Okay.  Please, if you can remember, and --
18 listen.  We can look at the complaint sometime
19 today.  But, right now, as you stand here today, I'm
20 asking if you can think of any other reasons why you
21 think this is a concocted complaint besides the one
22 you already testified to.
23    A.  I can.
24        MR. CAVALIER:  Object to form.  Dan, you

Page 88

- - -

1  can answer if you can.
2     THE WITNESS:  I can, yes.
3  BY MR. CARSON:
4     Q.  You can?
5     A.  I can.
6     Q.  Okay.  So, please, what's -- give us
7  another reason.
8     A.  I believe that one suffices because that's
9  what told me that this is a bogus undertaking,
10 that --
11    Q.  I'm gonna give you the opportunity -- I'm
12 sorry.  Are you finished?
13    A.  I'm finished.
14    Q.  I'm gonna give you the opportunity because
15 if you think this is a concocted complaint, I want
16 you to be able to tell -- say on the record why.  So
17 I'll give you the opportunity.  Can you think of any
18 other reasons right now, other than the reason that
19 you provided us, why this is a concocted complaint?
20    A.  Yes.
21    Q.  So what is it?
22    A.  I would rather stick with just this one,
23 and if we wanna go through the document, we can go
24 through it, and I'll give you all my complaints.

Deposition of DANIEL PIPES                                    Lisa Barbounis v. Middle Eastern Forum, et. al.

Page 89

- - -

There are many, but I do not remember them all.

Q.   You can't remember any other ones right now, right?

A.   I remember this one specifically as the most important, as the one that most directly involved me.

Q.   So let's talk about that one since it's the only one that you're able to testify about right now. Did Lisa Barbounis have the authority to bring Gregg Roman back to the Middle East Forum after he was ejected in November of 2018?

MR. CAVALIER:  I'm gonna object to the form.

BY MR. CARSON:

Q.   I can set it up. Was Gregg Roman ejected from the Middle East Forum in November of 2018? And by "ejected," I mean physically not allowed to show up at the office anymore.

MR. CAVALIER:  Same objection.

THE WITNESS:  Yes.

BY MR. CARSON:

Q.   So after -- were there other conditions of Gregg Roman's continued employment with the Middle East Forum in November 2018 other than not being

Page 90

- - -

able to visit the office anymore?

A.   Yes.

Q.   At some point in time, you lifted those restrictions, correct?

A.   Some of them.

Q.   And it's your testimony that you lifted those restrictions at the suggestion of Lisa Barbounis, correct?

MR. CAVALIER:  Object to form.

BY MR. CARSON:

Q.   Is that your testimony?

A.   Yes.

Q.   Use whatever word you want -- suggested, initiated.

A.   She initiated it.  She came to my office and said, I think we need Gregg back.

Q.   Okay.  So --

A.   [Inaudible].

THE COURT REPORTER:  Sir, I can't hear you.

THE WITNESS:  I said, oh, that's a surprise.  Let's pursue this.  Let's have a meeting of all the administrative staff tomorrow and pursue this and discuss this,

Page 91

- - -

which we did, and I had the conclusion that with everyone's assent, happiness -- with exception of Marnie Meyer -- he resumed some of his duties that were ended in November, five months earlier.

THE COURT REPORTER:  Seth, are you talking?  I'm going off the stenographic record.  I can't hear you at all.

- - -

(Discussion was held off the record.)

- - -

BY MR. CARSON:

Q.   The question that I asked that I don't think anyone heard is, isn't it true that the decision for some of those restrictions to be lifted, that was ultimately your decision, right?

A.   Yes.

Q.   And so the problem you have with the complaint is that you don't think it adequately explained that you made that decision at the suggestion of Lisa Barbounis; is that correct?

MR. CAVALIER:  Object to form.  You can answer.

THE WITNESS:  I didn't -- I didn't use the

Page 92

- - -

word -- I wouldn't use the word "adequate".  It hid, it disguised it, made disappear the critical fact that Lisa Barbounis, with the enthusiastic support of Tricia McNulty, wanted Gregg back in the office.  The narrative is entirely different if they came to me in November and I excluded him, and then I unilaterally brought him back in -- partially brought him back in March, to their dismay, as your complaint suggests.  That's one version, and the other is that they, particularly Lisa Barbounis, initiated this, and Tricia McNulty enthusiastically agreed to it.  It's a very different story.  You distorted the history of what happened, and when I saw that, I realized that this is a falsehood, that this is a tissue of lies.

BY MR. CARSON:

Q.   Based on that, you decided that none of these women were ever subjected to any inappropriate conduct?

A.   I didn't -- I didn't reach that conclusion.  I reached the conclusion that this is an untrustworthy document and that their testimony

Lisa Barbounis v. Middle Eastern Forum, et. al.

Page 93

- - -

1  and your writing it up were dishonest.
2    Q.  When Mr. Roman was brought back to the
3  Middle East Forum, did any of the women still
4  require or ask that certain conditions be -- remain
5  in place to -- for the -- period -- that certain
6  conditions remain in place?
7        MR. CAVALIER:  Object to form.
8        THE WITNESS:  I don't remember that any
9    did.  I do remember that I did keep certain
10   conditions in place.  The basic problem, as I
11   understood it, is that Gregg had become too
12   close to his staff.  I have been the head of an
13   organization now for 34 years, and I have
14   always kept my distance.  It did not seem to me
15   a good idea to become friends and to have close
16   relations with my staff, so I have kept away.
17   He did not do that.  He became friends with
18   them, and that led to all sorts of
19   complications, and all that I did in November
20   of 2018 was say, no more friendship -- not that
21   [inaudible] -- but end this.  No more
22   fraternizing.  You are not to do this.  And he
23   didn't do it.  And, indeed, the point of the
24   March meeting was that everyone said they had

Page 94

- - -

1  no complaints about him since November, no
2  complaints.  Let me make that point.  Before
3  November 1st, 2018, I never heard any
4  complaints about him, and we had five, six days
5  of intense discussion, and I said he's on
6  probation, and if I hear any complaints and if
7  I -- I will look at them very closely, and if I
8  find that he has done -- he has trespassed,
9  he's out.  I heard nothing, and after March --
10 BY MR. CARSON:
11   Q.  Can you just say the time that you're
12 talking about?  You heard nothing from when till
13 when?
14   A.  I heard nothing before November 1st.  I
15 heard nothing after November, say, 5th or 6th.  I
16 heard nothing after March -- before March 9th, after
17 March 9th.  All the complaints came in the early
18 part of November 2018.  There were otherwise no
19 complaints against him so -- also, it's worth noting
20 that, in 2018, I was hearing complaints, in
21 particular from Lisa Barbounis, about the trip to
22 Israel that happened, I think, in March or April of
23 that year, seven or eight months earlier.  I had not
24 heard about it at the time.  She did not come to me,

Page 95

- - -

1  and, indeed, the only report I heard about that was
2  from Marnie Meyer in a memo, handwritten memo, she
3  wrote to me on the 1st of November, in which she
4  said that she thought there was something weird that
5  happened in Israel and that she asked Lisa,
6  point-blank, "Did Gregg hit on you" -- quote,
7  unquote -- and Lisa -- Marnie reports, quote, "Lisa
8  said no," unquoted.  So the very first report I had,
9  I've ever heard, of anything going on denied that
10 this was, in fact, a sexual encounter of some sort
11 in Israel.  Then I dealt with it.  I dealt with it
12 quickly and thoroughly, and there were no more
13 complaints until you, Mr. Carson, turned up and came
14 up with five [inaudible] to demand $31 million from
15 the Middle East Forum.  We were doing just --
16   Q.  Wait, wait.  I don't -- can you hear that,
17 because I can't hear him.  I heard you say "until
18 you, Mr. Carson," and then he broke up.
19   A.  You found five plaintiffs and demanded
20 $31 million -- 30,800,000-some dollars -- and we
21 have these lawsuits.  But it is clear to me that
22 these are concocted accusations.  Lisa is quoted in
23 November 2018 saying to Marnie -- no -- she is --
24 Marnie quotes her in November saying, back in March

Page 96

- - -

1  or April, Lisa said no, there was no problem.  So I
2  am very skeptical about this entire thing.  Let me
3  go further and say that Marnie reported to me back
4  in November 2018, Lisa said that -- Lisa said that
5  Gregg had touched her with his foot on her backside.
6  Marnie said that Gregg -- she couldn't remember, but
7  Gregg -- her conversation with Gregg ended with her
8  saying to Gregg, "Gregg, I'm not going to sleep with
9  you".  Tricia reported to me that Gregg was too
10 close to her on a couch in a room full of people.
11 So, yeah, Lisa's is a problem, except that I had it
12 already from Marnie that she had denied that back
13 when it happened.  Marnie's was clearly not an
14 issue.  It was, "I said to him I wasn't gonna sleep
15 with him".  It's hardly a major topic.  And Tricia
16 said that he was too close to her on a crowded
17 couch.  Laterally, she said that he tried to touch
18 her bottom.  She didn't tell me that.  She changed
19 her story afterwards.  So with all this evidence
20 coming from the plaintiffs themselves, I'm very
21 skeptical of this, and I -- and then you brought in
22 two others, Delaney Yonchek and Caitriona Brady,
23 both of whom had no complaints whatsoever through
24 this entire process until you convinced them that,

Deposition of DANIEL PIPES                                    Lisa Barbounis v. Middle Eastern Forum, et. al.

Page 97

- - -

1  oh, Gregg sexually assaulted them.  That's what you
2  put in the complaint, and then they denied it in
3  their depositions.  So this is all manufactured.
4  Mr. Carson, you're good at your work.  You can turn
5  nothing into something.  You can turn no problems
6  into a giant problem that convulses the lives of
7  both the plaintiffs and the defendants.
8  Congratulations on your excellent work.
9      Q.  Are you sure that Caitriona Brady and
10  Delaney Yonchek claimed that they were sexually
11  assaulted in their complaints?
12      A.  It's in there.  Yeah.
13      Q.  I'll represent to you it's not in there.
14  They never made those claims to me, and they never
15  made those claims in their complaints or their
16  charges.
17      A.  We can check, but you have --
18      Q.  When you said -- I'm sorry.  Go ahead.
19      A.  We can check it.  Maybe I have the wording
20  wrong.
21      Q.  When you say $31,000 -- I'm sorry -- when
22  you say $31 million, I think you might be referring
23  to something called a 26(f) report.  Do you know
24  what that is?

Page 98

- - -

1      A.  I do not.
2      Q.  So I don't want you to tell me anything
3  your attorneys told you, but have you ever seen a
4  document from the plaintiff where they -- where
5  anyone -- where anyone asks for $31 million?
6      A.  I saw additions of nine, nine, nine,
7  three-something -- millions, these all are -- and
8  some other amount, and it came out to 30 million,
9  eight-hundred-some thousand -- 33,000.
10      Q.  There's a document that a plaintiff has to
11  fill out and a defendant has to fill out in a case
12  called a 26(f) report, which is a -- it's -- it's in
13  the Federal Rules of Civil Procedure under like
14  self-reporting disclosures.  Do you know anything
15  about that?
16      A.  I do not.  I was given this figure from
17  legal source, and I'm just using it.  I have the
18  numbers that add up to 31, but I don't -- I don't
19  know the details.
20      Q.  So did you know that all the plaintiffs,
21  all together, represented that they would be willing
22  to resolve these matters for a number between a
23  hundred thousand and a million?  So they admitted
24  that, all together, the cases aren't even worth a

Page 99

- - -

1  million dollars at some point?  Not admitted -- I'm
2  sorry -- strike that.  So they represented that
3  they'd be willing to settle for a number under a
4  million dollars for all of them; did you know that?
5      A.  Later, they did come down, yes, but the
6  initial figure was enormous, and given the two facts
7  that this would break all of us financially and was
8  based on a tissue of lies, I decided to [inaudible].
9          THE COURT REPORTER:  You decided what?
10          THE WITNESS:  To fight it, and that's what
11  we are doing.
12  BY MR. CARSON:
13      Q.  Well, do you know that when the offer to
14  resolve these cases, all of them, for somewhere
15  south of a million dollars, that was before any of
16  the complaints were filed in the court?
17      A.  I do not.
18      Q.  You didn't know that, okay.  So at some
19  point in time you reached out to Lisa Barbounis and
20  asked her to meet you at 30th Street Station; is
21  that correct?
22      A.  Yes.
23      Q.  And when you were there, you told Lisa
24  Barbounis that you two have the same problem.  Do

Page 100

- - -

1  you remember that?
2      A.  What are you referring to?
3      Q.  You said to Lisa that you and Lisa have
4  the same problem.  Do you remember that?
5          MR. CAVALIER:  Form.
6          THE WITNESS:  No.
7  BY MR. CARSON:
8      Q.  I was just wondering if, by that
9  "problem," you were referring to me since you just
10  testified that I'm the reason why these cases are --
11  were brought.
12      A.  Yeah.  Now that you explain, yes, I do
13  believe you are a mutual problem.  Yes.
14      Q.  Okay.  That's a new one.
15      A.  You have [inaudible] --
16          - - -
17      (Indistinguishable cross-talk.)
18          - - -
19          THE WITNESS:  You have made our lives
20  difficult.
21  BY MR. CARSON:
22      Q.  Okay.
23      A.  She told me, said, "My life is a wreck.
24  My future is in question".  She didn't name you, but

Deposition of DANIEL PIPES                                      Lisa Barbounis v. Middle Eastern Forum, et. al.

Page 101

- - -

1  the implication was very clear.  Had these --
2                        - - -
3          (Indistinguishable cross-talk.)
4                        - - -
5  BY MR. CARSON:
6      Q.  -- conversation with you about it, but
7  we're not permitted to do that.  Can we take a
8  five-minute bathroom break, just a little -- I'm
9  sorry.  Finish.  Go ahead.
10     A.  She said to me that her life is disrupted
11 and her future is in question because of these
12 lawsuits, and I ascribe these lawsuits to you.
13     Q.  Okay.  I think that -- isn't another way
14 to look at it is that it's because of the -- you
15 know, the unlawful conduct that they were subjected
16 to that caused them to bring the lawsuits?
17         MR. CAVALIER:  Is that a question?
18         MR. CARSON:  Yeah.  You don't have to
19     answer that.  Do you guys mind if we do like a
20     five-minute bathroom break?
21         MR. CAVALIER:  I'd rather do ten.
22         MR. CARSON:  That's fine, Jon.
23         MR. CAVALIER:  All right, great.  Thanks,
24     Seth.  So 12:10, back on?

Page 102

- - -

1          MR. CARSON:  Okay.  Thank you, guys.  I
2      just -- I have a little emergency I gotta go
3      take care of.
4          THE VIDEOGRAPHER:  We are now off the
5      record.
6                        - - -
7          (Whereupon there was a recess in the
8      proceeding from 11:58 a.m. to 12:15 p.m.)
9                        - - -
10         THE VIDEOGRAPHER:  The time is 12:15
11     Eastern Time, and we are now on the record.
12         THE COURT REPORTER:  Seth, you're muted,
13     by the way.
14 BY MR. CARSON:
15     Q.  Okay.  So let's try to get back to some of
16 that testimony that we just went over.  So you spoke
17 about hearing everything in or around the beginning
18 of November 2018.  Do you remember that?  And by
19 "everything," I mean the allegations that are the
20 subject matter in this case.
21     A.  Yes.
22     Q.  And can you pin down exactly what the date
23 is when you first heard the allegations of Lisa
24 Barbounis?

Page 103

- - -

1          MR. CAVALIER:  Object to form.  You can
2  answer.
3          THE WITNESS:  I believe it was
4  November 1st.  After receiving the memo from
5  Marnie, I asked everyone to be in the office,
6  and I interviewed everyone one-on-one.
7  BY MR. CARSON:
8      Q.  So do you remember when you received that
9  memo from Marnie?
10     A.  November 1st, 2018.  Morning.
11     Q.  And how did you receive that memo?
12     A.  Email.
13     Q.  And by the memo, I think you're referring
14 to -- like it was a few pages, a handwritten
15 statement by Marnie Meyer?
16     A.  That's right.
17     Q.  And, based on that email, you interviewed
18 who?
19     A.  Everyone in the office.
20     Q.  So that -- that would include --
21 interviewed -- you interviewed Marnie Meyer?
22     A.  Yes.
23     Q.  And did you interview Patricia McNulty?
24     A.  Yes.

Page 104

- - -

1      Q.  And Lisa Barbounis?
2      A.  Yes.
3      Q.  Did you interview Matthew Bennett?
4      A.  Yes.
5      Q.  And did you interview Caitriona Brady?
6      A.  Yes.
7      Q.  Delaney Yonchek?
8      A.  Yes.
9      Q.  Did you interview Thelma Prosser?
10     A.  Yes.
11     Q.  And did you -- can you think of anyone
12 else that you interviewed?
13     A.  Gregg, Stacey [phonetic].
14     Q.  Anybody else?
15     A.  Gary, maybe.  I'm not sure.  Gary Gambill.
16     Q.  Gary?
17     A.  Gambill.
18     Q.  Gambill.
19     A.  Maybe.
20     Q.  So that's ten people.  Other than those
21 ten people, is there anyone else that you can think
22 of that you interviewed?  It's okay -- if you leave
23 someone out, it's not the end of the world.
24     A.  No.

Deposition of DANIEL PIPES                                    Lisa Barbounis v. Middle Eastern Forum, et. al.

Page 105

- - -

1  Q.  The interview with -- who did you
2 interview first; do you remember?
3  A.  No.
4  Q.  Do you remember -- these interviews, did
5 they take place over the phone, in person?
6  A.  In person, one-on-one in their offices.
7  Q.  You visited each of their offices?
8  A.  I did.
9  Q.  And tell me, please, what Lisa Barbounis
10 reported.
11      MR. CAVALIER:  Object to form.  You can
12  answer.
13 BY MR. CARSON:
14  Q.  What did she say?
15  A.  She gave me a exposition of her complaints
16 about Gregg as a manager, as her supervisor.
17  Q.  And what precisely did she say about Gregg
18 as a supervisor?
19  A.  Too demanding, too inquisitive, watching
20 everybody, manipulative.
21  Q.  I didn't hear the last one.
22  A.  Manipulative.
23  Q.  Anything else?
24  A.  I can't remember exactly if it was she,

Page 106

- - -

1 but make-work that wasn't serious.  Range of issues.
2  Q.  Did she talk about any inappropriate
3 conduct in terms of, you know, sexual harassment?
4  A.  Yes.
5  Q.  What did she say about that?
6  A.  She told me about the trip to Israel, and
7 she showed me her screenshots of her text to her
8 husband, and I don't know who else, and she
9 [inaudible].
10      THE COURT REPORTER:  I didn't hear that
11  last part.
12      THE WITNESS:  She told me what happened
13  there.
14 BY MR. CARSON:
15  Q.  What did she say happened?
16  A.  She said that they had a Airbnb together
17 and that, late one evening, he had stretched out on
18 the couch and said something to the effect of, now
19 we are close, and now I can put my feet on your --
20 against your body.
21  Q.  Did she say where on her body that he
22 put -- where he put his feet?
23  A.  On her back and on her -- on her bottom
24 and back.

Page 107

- - -

1  Q.  Did she describe any other sexually
2 inappropriate conduct?
3  A.  No.
4      MR. CAVALIER:  I'm gonna object to form on
5  the last question.
6 BY MR. CARSON:
7  Q.  Did she say that Gregg Roman brushed
8 against her in the office?
9  A.  No.
10  Q.  Did she say that Gregg Roman showed her
11 inappropriate photos?
12  A.  No.
13  Q.  Did she say whether Gregg Roman forced her
14 to sit inappropriately close to him, other than the
15 couch incident?
16  A.  She did complain that he wanted her by his
17 side.  I don't know if it was inappropriate, but she
18 was being called into his office -- the witness is
19 doing something to be there -- and she thought it
20 was a waste of time.  She didn't like it.  She
21 thought he was wasting her time.
22  Q.  Regarding the other complaints regarding
23 Gregg Roman being manipulative or -- did you ever
24 hear complaints about Gregg Roman like that before?

Page 108

- - -

1  A.  Before November 1st, I heard no complaints
2 at all about Gregg from anyone.
3  Q.  How about from Tiffany Lee?
4  A.  [Inaudible].
5      THE COURT REPORTER:  I can't hear you,
6  sir.
7      THE WITNESS:  From anyone.  She complained
8  after she left.  Active employees, I never
9  heard from anyone.
10 BY MR. CARSON:
11  Q.  Why do you make a distinction between
12 reports of active employees verse current employees?
13      MR. CAVALIER:  Object to form.
14      THE WITNESS:  After Tiffany Lee was
15  terminated, she then went to Derek Smith Law
16  Group and found a lawyer who would concoct --
17  Caroline Miller's the name, I believe -- who
18  would concoct a claim against the Forum based
19  on inaccurate use of text.  We exposed them,
20  and Tiffany Lee disappeared, but she had no
21  complaints whatsoever while she was an active
22  employee.
23 BY MR. CARSON:
24  Q.  I didn't hear the last part of that.

Deposition of DANIEL PIPES                                    Lisa Barbounis v. Middle Eastern Forum, et. al.

Page 109

- - -

1  A.  She had no complaints about anybody, about
2  Gregg, while she was an active employee.
3  Q.  Did you consider that -- did you consider
4  Tiffany Lee's charge of discrimination in any way
5  when you heard about these allegations from Patricia
6  McNulty and Lisa Barbounis and Marnie Meyer?
7  A.  No.  I thought about the Derek Smith Law
8  Firm -- Law Group --
9  Q.  Why is that?
10  A.  -- to those two cases and a third case
11  also concocted complaints against us.  I don't know
12  what it is about Derek Smith Law Group, why you have
13  it in for the Middle East Forum, but anybody who's
14  unhappy about anything or has any aspirations to
15  anything turns to the Derek Smith Law Group --
16  Caroline Miller, Ken Lobitz [phonetic], Seth Carson,
17  Erica Shikunov.  Everybody wants to get at us with
18  the Derek Smith Law Firm.  You tell me why.
19  Q.  If -- well, I didn't work here when
20  Tiffany Lee filed a charge, so I don't have any
21  knowledge related to that, but I guess my question
22  is, other than Tiffany Lee and the plaintiffs in
23  this case, is there another allegation or charge
24  that was filed against the Middle East Forum?

Page 110

- - -

1  A.  Not filed, but I believe a letter was sent
2  from Smith Law Group about Lara [phonetic] and
3  Laura, who were also terminated because they were
4  poor employees.  When they started talking about the
5  case against us, we showed them what we knew about
6  them, and they dropped it.  But that's four
7  different instances of turning to lawyers who
8  presently or had been at the Derek Smith Law Group.
9  Q.  What were the -- what were the complaints
10  that Lara and Laura made?
11  A.  You're interrupting me.  I guess the Derek
12  Smith Law Group doesn't like what we do.
13  Q.  I don't think anyone here knows what you
14  guys do, but what were the complaints that Lara and
15  Laura made?
16  A.  I don't remember.  They were minor, and I
17  don't know if I ever saw them.  They're not on my
18  hard drive.  I don't know what they were.
19  Q.  Was it related to sexual harassment?
20  A.  I don't know.
21  Q.  Just the allegations.  I'm not saying --
22  I'm not giving any credence to them.
23  A.  I don't know.  Just remember they started
24  making noises, and then they wanted money from us,

Page 111

- - -

1  so [inaudible].
2  Q.  Why -- what was Lara's position?
3  A.  Lara was assistant to Gregg.
4  Q.  An assistant to who?
5  A.  Gregg.
6  Q.  And what's Lara's last name?
7  A.  I don't remember.
8  Q.  What about Laura?  Laura's last name is
9  Frank?
10  A.  Could be, yeah.
11  Q.  Laura Frank, what was her job?
12  A.  Director of development, I believe.
13  Q.  Did Lara and Laura talk to each other
14  during work using any electronic messaging apps that
15  you know of?
16  MR. CAVALIER:  Object to form.
17  THE COURT REPORTER:  I didn't get the
18  answer.
19  THE WITNESS:  That's all they did is
20  message each other on Slack, which we have.
21  Endless, endless discussions hating Gregg,
22  hating me.  Nasty, snarky, endless, endless,
23  endless.
24  BY MR. CARSON:

Page 112

- - -

1  Q.  And you still have those messages, right?
2  A.  I'm not sure.
3  Q.  Well, you just said "which we have".
4  A.  Which we -- which I read at the time.
5  Presumably, it's somewhere.
6  MR. CARSON:  I'm gonna ask that you guys
7  turn those messages over in response to our
8  discovery requests.
9  MR. CAVALIER:  If we have them in our
10  possession, custody, or control and there's a
11  responsive request, we will do so.
12  MR. CARSON:  I mean, we definitely
13  requested them in our request for production of
14  documents.  So there's Slack messages which --
15  just testifying to having.
16  THE WITNESS:  No.  I testified that I read
17  them at the time.
18  BY MR. CARSON:
19  Q.  A minute ago, you said "which we have,"
20  so --
21  A.  I'm correcting it and saying I read it at
22  the time, which is middle of 2017 --
23  Q.  Right.
24  A.  -- years ago.  I don't know if I have them

Case 2:19-cv-05030-JDW   Document 126-3   Filed 04/20/21   Page 32 of 179

Deposition of DANIEL PIPES                                    Lisa Barbounis v. Middle Eastern Forum, et. al.

Page 113

- - -

1  now.  [Inaudible] --
2        MR. CAVALIER:  If we have responsive
3  documents that are responsive and not
4  privileged to the request you issued we will
5  produce them.
6        MR. CARSON:  We'll deal with that.
7  BY MR. CARSON:
8     Q.  So what did these messages say about Gregg
9  Roman?
10    A.  Just they were nasty.
11    Q.  They were nasty?
12    A.  Nasty.
13    Q.  Why were they nasty?
14    A.  Have to ask them.
15    Q.  Why did you think they were nasty?
16    A.  I have no idea.  I didn't know them.  I
17  found their vituperation against him and myself and
18  maybe others to be surprising, but there it was.
19    Q.  How many people other than the -- other
20  than Tiffany Lee and Lara and Laura and Delaney and
21  Caitriona and Marnie and Patricia McNulty and Lisa
22  Barbounis have complained about Gregg Roman?
23    A.  Nobody.
24    Q.  No one else?

Page 114

- - -

1     A.  Not to me.  Not to my knowledge.
2     Q.  No one else complained that Gregg Roman
3  disparages other employees?
4     A.  I am president.  I am not omniscient
5  voyeur of what everyone is doing and saying.
6     Q.  Well --
7     A.  -- not to me.
8     Q.  I'm not suggesting that omniscience is
9  required.  I'm asking if you ever heard any other
10  employee of the Middle East Forum make complaints
11  about the way Gregg Roman behaved in his -- in his
12  role as director of the Middle East Forum.
13    A.  Yes.  And two years ago Matt complained as
14  well, Matt Bennett.
15    Q.  Matt Bennett made complaints, too?
16    A.  Yeah.
17    Q.  What were Matt Bennett's complaints?
18    A.  Again, Gregg was too tough.  He was
19  bossing them around.  And I might add that the only
20  bossiness I saw on Gregg's part was vis-à-vis Matt,
21  not the plaintiffs.
22    Q.  Did anyone else besides Matt Bennett --
23    A.  Don't interrupt me.  And he --
24    Q.  Okay.

Page 115

- - -

1     A.  -- heard from me on this, both in person.
2  At the time, I remember, he was sitting in my
3  office, and he said, "Matt, get over here," and I
4  said, "You can't treat him like that."  Other times,
5  there are two written documents -- I mean, there are
6  other times I said it in person, but the two
7  documents, we have emails from me to Gregg
8  lacerating him, being too tough, too bossy.  I
9  called him a drill sergeant.  You don't behave like
10  this.  You get the best out of people by working
11  with them and not bossing them [inaudible].  I was
12  the one who complained.  Matt never said a word
13  [inaudible] --
14        THE COURT REPORTER:  It's really hard to
15  hear you, Mr. Pipes.  Please speak up.
16        THE WITNESS:  -- anyone else.  I, on my
17  own, complained that he was too bossy.  I
18  complained to him.  He heard it through me.
19  BY MR. CARSON:
20    Q.  So Matt didn't complain; Gregg -- you
21  complained?
22    A.  I complained, and I complained number of
23  times, and I kept on complaining.  He's a brilliant
24  administrator.  He knows the subject, but he was too

Page 116

- - -

1  tough, too bossy.  I didn't like it, didn't think
2  it's the way one should treat one's colleagues.  So
3  that was my complaint.  My complaint.  Nobody came
4  to me.  I, on my own, from what I witnessed,
5  particularly vis-à-vis Matt, was displeased with his
6  bossiness.  So I understood when they said he's too
7  bossy.  I said, yeah, I understand.  I saw -- I
8  didn't see it with the others, but I saw it with
9  Matt.
10    Q.  You ever seen Gregg take his penis out in
11  front of a female employee?
12        MR. CAVALIER:  Object to form.
13  BY MR. CARSON:
14    Q.  Yes or no?
15    A.  No.
16    Q.  You ever seen Gregg rub his body against a
17  female employee?
18    A.  No.  I never saw any kind of harassment of
19  any sort.
20    Q.  Did Gregg ever -- strike that.  Did you
21  ever -- did you know that one of the complaints that
22  the women were making is that they weren't allowed
23  to come to you directly, that Gregg had a policy
24  whereby people weren't allowed to talk to you or

Page 117

- - -

1  report things to you?  Did you know that?
2     A.  I know it's in the complaint, to which my
3  response is, I told every new employee two things:
4  The number one rule is no surprises.  If something's
5  going wrong, come to me early, not when it's a
6  full-bloomed crisis.  Number two, my door is open,
7  both literally and figuratively.  Come to me if you
8  have any problems.  So it is very hard for me to
9  believe that they were concerned about coming to me
10  with their problems since I had specifically invited
11  them to come to me with their problems.
12     Q.  But they told you that, too, right, that
13  they -- that Gregg maintained this policy which
14  blocked them from coming to you or which was -- they
15  believed blocked them from coming to you?
16     A.  They did tell me that, yes.
17     Q.  Does the Middle East Forum maintain a
18  policy to prevent discrimination and harassment in
19  the workplace?
20     A.  Yes, and we've held workshops for
21  refreshers on those subjects.
22     Q.  When's the last time you've held one of
23  these workshops?
24     A.  I think it was in 2018.

Page 118

- - -

1     Q.  In 2018?
2     A.  Yes.
3     Q.  Was that in response to the reports that
4  are the subject matter of this case?
5     A.  No.  It was ahead of it, sometime in the
6  early part of the year.
7     Q.  The policy that Middle East Forum
8  maintains to prevent discrimination and harassment
9  in the workplace, is that a written policy?
10     A.  Yes.  It's in the personnel manual.
11     Q.  It's in the personnel manual?
12     A.  Yes.
13     Q.  Where does it say that employees should
14  complain about discrimination and harassment or
15  report discrimination and harassment?
16     A.  [Inaudible].
17        THE COURT REPORTER:  I cannot hear you,
18  Mr. Pipes.
19        THE WITNESS:  I don't have the personal
20  [inaudible] cite to you paragraph, but I know
21  that it's part of my policy, it's fairly
22  extensive in there, and I also know that I told
23  every employee as the employee started there
24  would be no surprises, and come to me if you

Page 119

- - -

1  have any problems.
2  BY MR. CARSON:
3     Q.  Are you listed in that -- in that employee
4  manual for -- as part of the reporting process?
5     A.  As the president, not by name, yes.  There
6  was also a process by which employees unhappy about
7  something would turn to the director of human
8  resources, being Marnie Meyer, and I believe, in
9  some cases, people did do that, but I don't know
10  details, but they did do that.
11     Q.  Other than Matt Bennett, Lisa Barbounis,
12  Caitriona Brady, Delaney Yonchek, Laura Frank,
13  Lara -- we'll say Lara, last name unknown, since I
14  don't know it off the top of my head -- Patricia
15  McNulty, did anyone else -- did any other employees
16  complain to you about the way Gregg Roman behaved?
17     A.  No.  I -- in November 2018, there was this
18  crisis in the office, and I then approached the
19  out-of-office staff and asked them if they had
20  problems with Gregg.  I think I approached all the
21  project directors at the time, and all said things
22  were fine.  One said few things I don't like, but
23  nothing particularly deep.  So they gave him a clean
24  bill of health, so he was an office issue, not a

Page 120

- - -

1  Forum-wide issue.  Outside the office did not
2  have --
3     Q.  They all gave him a clean bill of health?
4     A.  Yeah.  Well, except for one who had a few
5  issues, yes.
6     Q.  What was the one's complaints?
7     A.  Something on the lines of piling on too
8  much -- two different projects.  Before one ended,
9  the next one started.
10     Q.  I'm sorry.  I didn't hear you.
11     A.  Something on the lines of, before one
12  project was finished, the next one was started.
13     Q.  Other than that one complaint, was there
14  any other complaints?
15     A.  No.
16     Q.  The project directors -- strike that.
17  Just a moment, please.  I'm just finding a document.
18  Just a minute, please, while I pull this up.  Sorry.
19  Just an indulgence for a second.  Okay.  All right.
20  So do you see this document right here, which is --
21  wait.  I gotta keep a list of exhibits.  So Exhibit
22  No. 1 was -- Exhibit 1 we'll call Pipes-1, I guess,
23  and Pipes-1 was the --
24        THE VIDEOGRAPHER:  It was the Middle

Deposition of DANIEL PIPES                                          Lisa Barbounis v. Middle Eastern Forum, et. al.

Page 121

- - -
1  East --
2            - - -
3       (Indistinguishable cross-talk.)
4            - - -
5       MR. CARSON: Yeah. And so Pipes-2 will be
6  MEF Docs, and we'll say 975, 976, 977, and 978.
7  So MEF Docs --
8       THE VIDEOGRAPHER: And then, Counsel,
9  would you like to mark for exhibit the
10 screenshot of the website or the recording you
11 played?
12      MR. CARSON: Oh, yeah. So, yeah, let's
13 just -- it'll be out of order, but Pipes --
14 Pipes-3 will just be the --
15      THE VIDEOGRAPHER: The screenshots, sir?
16      MR. CARSON: Pipes-3 will be the
17 screenshot of the website.
18      THE VIDEOGRAPHER: All right. And Pipes-4
19 will be the recording concerning Gregg?
20      MR. CARSON: Pipes-4 is the recording.
21      THE VIDEOGRAPHER: Okay. And then,
22 Counsel, just going forward, would you like me
23 to maintain the order of exhibition in the
24 labeling?

Page 122

          - - -
1       MR. CARSON: Sure.
2       THE VIDEOGRAPHER: -- do it like that.
3       MR. CARSON: All right. Thank you. So
4  Pipes-2 is MEF Docs 975 to 978.
5       THE VIDEOGRAPHER: Gotcha.
6  BY MR. CARSON:
7    Q.  So, Mr. Pipes, this is an email that, it
8  looks like, was sent by you to Gregg Roman on
9  November 8, 2018 at 9:02 a.m. Do you see that right
10 here?
11   A.  Mm-hmm.
12   Q.  Okay.
13   A.  Yes.
14   Q.  So just take a minute and you can read it,
15 and I'll ask you questions about it when you're
16 done.
17   A.  Okay. Okay. Okay.
18   Q.  Sorry. You guys are on my screen. I was
19 gonna check my email.
20   A.  Okay.
21   Q.  So...
22   A.  Okay. Okay. Okay. Read it.
23   Q.  Does that give you a better recollection
24 of what the --

Page 123

          - - -
1    A.  It does, yeah.
2    Q.  -- project director said about Gregg?
3    A.  Yep.
4    Q.  They did not give him a clean bill of
5  health, correct?
6    A.  Well, I mean, they all had something to
7  say, but I asked the project directors about their
8  willingness to work with you. Five out of the six
9  were happy to do so. So that's what I mean by clean
10 bill of health. Were they happy about everything?
11 No, but they were happy to work with him, and that's
12 a clean bill of health. One had his doubts.
13   Q.  One had his doubts?
14   A.  Wasn't so happy about working with him,
15 but --
16   Q.  Who was the one who didn't wanna work with
17 him?
18   A.  I don't remember.
19   Q.  Well, who are the project directors? What
20 are their names?
21      MR. CAVALIER: Object to form.
22      THE WITNESS: Back then, I'm not sure. I
23 have to check.
24 BY MR. CARSON:

Page 124

          - - -
1    Q.  That's what we're talking about here.
2  These are the project directors, correct?
3    A.  Right, but this is over two years ago, and
4  I have to go check who was doing what when. And --
5    Q.  Go ahead. You wanna add something?
6    A.  No.
7    Q.  So, just pointing out a couple things, you
8  say here that four of them made critical comments,
9  right?
10   A.  Yep.
11   Q.  And you sent this email to Gregg to make
12 him aware of these comments; is that right?
13   A.  And to select in-office staff, yes.
14   Q.  So why didn't you -- it says, "I listed
15 the harsh criticisms of you from in-office staff but
16 have not collected these in a systematic way." Why
17 didn't you collect them in a systematic way?
18   A.  Finish the sentence.
19   Q.  I see what it says. Says, "Because you
20 will not be working with them going forward," but
21 why does that matter?
22   A.  He knew what they had to say. I didn't
23 have to memorialize it because they weren't gonna be
24 working together.

Deposition of DANIEL PIPES                                    Lisa Barbounis v. Middle Eastern Forum, et. al.

Page 125

- - -

1    Q.  So nowhere are your conversations with
2 the -- you know, ten people that we listed earlier
3 that you spoke to in the beginning of November 2018,
4 nowhere are those conversations memorialized the way
5 these conversations are, right?
6      MR. CAVALIER:  Object to form, foundation.
7 You can answer.
8      THE WITNESS:  I took notes, but because
9 everything was solved to apparently everyone's
10 satisfaction, I did not -- I'm not sure if I
11 still have those notes.  It didn't seem
12 important.  We had --
13 BY MR. CARSON:
14    Q.  What did you do --
15    A.  We dealt with the issue, and maybe I have
16 them somewhere; maybe I don't.  I don't know.
17    Q.  I asked on the record that the notes from
18 those meetings -- search your records, and if you
19 have them, that you turn those over in response to
20 our first set of -- first request for production of
21 documents.  Meetings.  How did you keep those notes,
22 you handwrote them during the meetings?
23    A.  Handwrote them during the meetings, yeah.
24    Q.  Again, please check your records and turn

Page 126

- - -

1 them over if you can find them.  So one person said
2 that he -- "I have often had to listen -- both on
3 the phone and in person -- as Gregg expressed
4 unpleasant views toward other members of staff.  He
5 often denounces or spoken ill of other project
6 directors or office staff before pointedly asking me
7 what I thought of them.  I could only speak in their
8 defense or offer a noncommittal response.  This does
9 not seem to have been ordinary office politics, but
10 something more calculated and toxic.  First XX, and
11 then XX" -- what's the XX there and the XX?  Why
12 does it say XX?
13    A.  Names of individuals.
14    Q.  You didn't want Gregg to know who was
15 making the statements; is that right?
16    A.  No.  The whole thing is anonymous.
17    Q.  Well, whose names were there before you
18 X'd them out?
19    A.  I have no idea.
20    Q.  Well, how do we figure that out?
21    A.  I don't know.
22    Q.  Well, do you have any notes anywhere that
23 we could look to?
24    A.  I don't know.

Page 127

- - -

1    Q.  Well, don't you think it's important to
2 document it, like to keep a record of who's saying
3 what?  I understand why you might not have wanted
4 Gregg to read it, but why wouldn't you keep records
5 like that?
6    A.  Because go to the top, and you'll see that
7 I gave them assurance of confidentiality.
8    Q.  Sorry?
9    A.  This information was sent to me on
10 assurances of confidentiality.
11    Q.  You thought -- you would -- what about
12 with yourself?  Wouldn't you want those records for
13 yourself?
14    A.  I offered confidentiality.  I maintain
15 that confidentiality in this note, which went not
16 only to Gregg, but also to select in-office staff.
17 So it went to several people, and I thought it best
18 not to provide specific names, and there is no name
19 in here other than Gregg's.
20    Q.  So this person is saying something more
21 calculated and toxic --
22    A.  Yes.
23    Q.  -- first blank -- sorry.  Did you --
24    A.  Well, this is the accusation that he was

Page 128

- - -

1 manipulative, yes.  This is what I heard from
2 in-office and heard it from outside of the office,
3 too, yes.
4    Q.  Well, he names two people that are the
5 most frequent targets of Gregg, right?
6    A.  He or she does, yes.
7    Q.  So don't you think it's important what
8 those names are if they're relevant to this case?
9      MR. CAVALIER:  Object to form, foundation.
10      THE WITNESS:  I assured them of
11 confidentiality.
12 BY MR. CARSON:
13    Q.  But your word that you'll keep it
14 confidential isn't a reason not to disclose that in
15 this case.  You understand that, right?
16    A.  I don't know.  This is two years ago.  I
17 have no idea who these people are.
18    Q.  You just forget?
19    A.  Yes.  I mean, I move on.  I deal with the
20 Middle East.  I don't spend my time thinking about
21 office -- the office.
22    Q.  You don't --
23    A.  I dealt with it -- let me finish -- I
24 dealt with it.  I dealt with it satisfactorily.

Page 129

- - -

1 Everyone in the office literally signed on who was
2 concerned. All three of the complainants signed on,
3 like written documents saying they're fine with it.
4 They weren't happy about every aspect, but they were
5 fine with it. Gregg was fine with it. We moved on.
6 I did not think about these things after that. I
7 have not thought about them for two years. We
8 solved the problem. I --
9    Q. Did any of them complain after they gave
10 you that agreement?
11    A. I told you not a single complaint before
12 November 1st or after November 6th, 7th, or so. Not
13 a single one.
14    Q. You're sure of that?
15    A. Well, I don't remember any. I can't tell
16 you for sure. I might've forgotten something, but I
17 don't remember any complaints, certainly nothing of
18 a sexual nature, nothing that would cause me to fire
19 Gregg, which I said I would do if there was anything
20 of a sexual nature.
21    Q. What about retaliation? Would you fire
22 Gregg if he retaliated against the employees who
23 reported him?
24      MR. CAVALIER: Object to form.

Page 130

- - -

1      THE WITNESS: He had no opportunity to
2   retaliate.
3 BY MR. CARSON:
4    Q. We can't -- did you hear that, because I
5 didn't.
6    A. There was no opportunity for him to
7 retaliate. He was out of their lives. Between
8 November and March, he had almost no contact with
9 them. Only after March did he do so.
10    Q. Well, he was still the director of the
11 Middle East Forum that whole time, right?
12    A. He had the same title but very different
13 job responsibilities. I'm sure you have the email I
14 sent to him describing his new responsibilities, and
15 you'll see that he had no -- essentially,
16 effectively, no contact, just some emails once in a
17 while. I took him out of their lives, and they were
18 content.
19    Q. They were content unless they were
20 complaining about it the whole time to you, right?
21      MR. CAVALIER: Objection.
22      THE WITNESS: I specifically said at the
23   meeting and in other context if you have any
24   problems with Gregg, let me know. I told them

Page 131

- - -

1 he has no second chance.
2 BY MR. CARSON:
3    Q. But they did let you know, and you didn't
4 do anything about it, right?
5      MR. CAVALIER: Object to form, foundation.
6      THE WITNESS: They did not let me know.
7   They let me know in early November about things
8   that had happened months and months earlier.
9   Prior to November there were no complaints
10   about anything of a sexual nature or anything
11   else, for that matter, that I can recall. I
12   mean, not everybody finds him wonderful in
13   every way, but I do not recall any serious
14   complaints about Gregg before or after that
15   week in the middle of -- at the beginning of
16   November 2018.
17 BY MR. CARSON:
18    Q. No complaints about retaliation?
19    A. No complaints about retaliation.
20    Q. No complaints, period, actually?
21    A. No complaints, period, yes. That's
22 correct. If there were some and I forgot, then
23 remind me, but I remember nothing. I remember a
24 clean bill, and I remember Tricia, in particular,

Page 132

- - -

1 saying at the March meeting he's been great. I have
2 no complaints. She said it explicitly. I have no
3 complaints.
4    Q. Tricia definitely didn't make any
5 complaints to you?
6    A. Definitely.
7    Q. In fact, she said the opposite. She said
8 everything's great?
9    A. She said I have no problems with Gregg
10 since November, the last five months.
11    Q. And if she was complaining to you, you
12 would've fired Gregg?
13    A. If I had a complaint, particularly of a
14 sexual -- not any complaint would get him fired --
15 but a complaint of a sexual nature, then, yes, I
16 would've fired him immediately.
17    Q. Well, what happened with Alana Goodman,
18 that's of a sexual nature, right?
19      MR. CAVALIER: Object to form, foundation.
20      THE WITNESS: If it happened. I don't
21   know when it happened. I was not aware of it.
22   There was not a complaint, so it was not part
23   of my decision making.
24 BY MR. CARSON:

Page 133

- - -

1  Q.  Well, now you're aware of it today.  Are
2 you gonna fire Gregg?
3  A.  I am not gonna engage in hypotheticals.
4  Q.  Well, are you gonna call Alana Goodman
5 after this and talk to her about the recording you
6 heard today?
7  A.  I am not going to take your bait.
8  Q.  Are you gonna investigate it?
9  A.  I am not going to take your bait.
10  Q.  It's not bait.  It's a question, and you
11 have to answer it.  Are you gonna investigate the
12 recording you just heard today?
13  MR. CAVALIER:  Object to form, foundation.
14  THE WITNESS:  I am not the Middle East
15  Forum den mother.  I am not looking into
16  people's private lives, and if I did, I would
17  have no time for the Middle East, which is what
18  I work on.
19 BY MR. CARSON:
20  Q.  You would have what?
21  A.  No time for the Middle East, which is what
22 I work on.
23  Q.  You don't have time to investigate this
24 stuff because you're not their den mother; is that

Page 134

- - -

1 right?
2  MR. CAVALIER:  Object to form.  Object to
3  characterization.
4  MR. CARSON:  I'm repeating your client's
5  testimony, Jon.  I understand why you wanna
6  object, though.  Trust me.
7  THE WITNESS:  I am a Middle East
8  specialist.  I am the head of an organization.
9  I deal with the organization.  As you can see,
10  in early November I had a problem, I dealt with
11  it expeditiously, I investigated it, and I
12  mediated it, and everyone was content with it,
13  and I moved on, and they moved on.  At least,
14  it appeared.  I called them.  To their faces, I
15  said you are my heroes and my angels.  We're
16  gonna work together.  We're gonna fix this.
17  And they said yes, and then you pop up and
18  cause a problem.
19 BY MR. CARSON:
20  Q.  What was the last thing you said?
21  A.  And then you pop up five months later, and
22 everything falls apart.
23  Q.  All right.  So you understood that these
24 women looked up to you, right, personally?

Page 135

- - -

1  A.  No idea.  You have to ask them.
2  Q.  Well, they told you that, didn't they?
3  A.  I have no memory of that.
4  Q.  Can you understand why it might've been
5 hard for some of them to come to you?
6  A.  Not at all.
7  Q.  You don't understand that?
8  A.  No.  I said come to me if you have any
9 problems.  Don't hit me with surprises.  Let me know
10 when there's a problem brewing.  If something had
11 happened in Israel in early 2018, it was incumbent
12 upon Lisa to come to me and tell me about it, and
13 she didn't do so.
14  Q.  Would you characterize yourself as having
15 a welcoming personality?
16  A.  I am not going to take your bait,
17 Mr. Carson.
18  Q.  I'm just -- I mean, the allegations in
19 this case are very personal to these women, right?
20  A.  Yes, and they came to me November.  They
21 could've come to me in -- in a timely manner.  They
22 didn't, in particular the AIPAC and the Israel
23 events.  I don't remember when the Marnie
24 conversation was, how much earlier, but these were

Page 136

- - -

1 in the spring, and they came to me in the fall, some
2 six, seven, eight months later.  That was wrong on
3 their part.  And, as indicated earlier, the initial
4 information I had was Marnie's report, and Lisa
5 said, no, Gregg had not hit on her.  So what am I to
6 think?  Eight months, and the first report is that
7 she said no.
8  Q.  Well, you did --
9  A.  -- seriously.  I took it seriously, and I
10 took radical steps.  I investigated, mediated, got
11 everyone into agreement, and removed Gregg from his
12 office role, retained his external role with the
13 projects, with fundraising, with dealing with the
14 media and the like.  So I dealt with it fully and
15 satisfactorily to everyone's -- to everyone's
16 satisfaction.  So why, in June 2019, we get hit with
17 five EEOC and then lawsuits is a little strange
18 since everyone said it was fine, and the two who
19 were not part of this didn't say a word, not a word.
20  Q.  Well, Caitriona Brady did, right?
21  A.  No, not a word.
22  Q.  You don't think she was upset if Gregg --
23 you don't think she was upset if Gregg Roman was
24 telling people that Marnie got her job by giving --

Deposition of DANIEL PIPES                                                   Lisa Barbounis v. Middle Eastern Forum, et. al.

Page 137

- - -

1  by trading sexual favors with her father?
2      MR. CAVALIER:  Object to form, foundation.
3      THE WITNESS:  In the first place, I'm not
4  gonna attempt to ascertain how she felt.  It's
5  not my business.  But, secondly, there was this
6  rumor that Marnie ascribed to Gregg.  Marnie
7  has been proven to be a liar since then.  I
8  have no reason to believe what Marnie has said
9  to them about that.  Let me put it
10 differently --
11     MR. CARSON:  Can you hear, because I'm
12 having a really hard time.
13     THE COURT REPORTER:  It's very tough.
14     THE WITNESS:  Okay.  First, I have no way
15 of explaining to you what Brady's mental state
16 was.  I have no idea, and I'm not gonna answer
17 that.  Secondly, that rumor, we have never
18 found out where it came from.  Marnie ascribed
19 it to Gregg.  I have no reason to believe that
20 that is the case.  I don't know where it came
21 from, but I have no reason to believe that
22 Gregg was the source of it.  So --
23 BY MR. CARSON:
24     Q.  Why, because -- go ahead.  You can finish.

Page 138

- - -

1      A.  Finished.
2      Q.  Why, because Gregg denied it?  That's why
3  you don't think it came from him?
4      A.  Because there's a tissue of lies about
5  this.
6      Q.  Where'd that --
7      A.  Tissue of lies.
8      Q.  Where'd that tissue of lies begin?
9      A.  Where'd it begin?  I don't know where it
10 began.  There's just so many of them.
11     Q.  Well, when is the first time you heard
12 about this rumor?  And by "rumor," I think we're
13 both talking about the same thing.  There was a
14 rumor that Gregg Roman said that Caitriona Brady's
15 father had traded sexual favors with Marnie.
16     A.  No.  The rumor was that Marnie's -- that
17 Marnie had sexual relations with Brady's father in
18 order to get a job.
19     Q.  Okay.
20     A.  Wasn't Gregg's rumor.  It was a rumor.
21     Q.  Let's just characterize it as a rumor for
22 now.  So you did hear that Gregg started the rumor,
23 correct?
24     A.  Marnie told me that.  Yes.

Page 139

- - -

1      Q.  And Gregg denied it?
2      A.  Gregg denied it.
3      Q.  Was there any other reason besides Gregg's
4  denial that you didn't believe it came from Gregg?
5      A.  I don't know where it came from.  It may
6  have come from Gregg; it may have come from Marnie;
7  it may have come from Brady; it may have come from
8  Lisa.  I have no idea.
9      Q.  You think Marnie started the rumor about
10 herself?
11     A.  [Inaudible].
12     THE COURT REPORTER:  What was that, sir?
13     THE WITNESS:  They were playing so many
14 games.  I don't know what they were --
15 BY MR. CARSON:
16     Q.  Who was playing games?
17     A.  All of these people.
18     Q.  Who are you talking about when you say
19 that?
20     A.  Marnie, Lisa, Tricia, Matt.  Playing
21 games.  The very first --
22     Q.  Marnie, Tricia, Lisa, Matt.  Who else?
23     A.  Those four.  The very first memo, the
24 handwritten memo, was all about the games.  Matt's

Page 140

- - -

1  doing this to push Lisa to take a job she can't
2  handle so that Tricia can take over her job.  I
3  mean, I had no idea this was taking place, and then
4  after -- after that, it kept on going.  Matt wanted
5  the directorship.  Marnie wanted the directorship.
6  Lisa wanted directorship.  Everybody was after
7  Gregg's position, playing games.  I don't know
8  what -- I don't know what the specific tactics were,
9  but I know that they were playing games.
10     Q.  Earlier you said you didn't know what
11 Brady's mental state was, right?
12     A.  Yes.
13     Q.  That's Caitriona Brady?
14     A.  Correct.
15     Q.  Why are you questioning her mental state?
16     MR. CAVALIER:  Object to form.  Object to
17 the characterization.
18 BY MR. CARSON:
19     Q.  Why are you questioning her mental state?
20     A.  You asked me if she did not feel this or
21 that, and I said I have no idea what she felt.  I
22 did not talk to her about it, and I'm not gonna
23 guess at what she was feeling.
24     Q.  You didn't talk to her about it?

Page 141

- - -

1    A.  I talked to her not at all about this.
2    Q.  Don't you think that you owed it to her to
3  talk to her about it?
4        MR. CAVALIER:  Object to form, foundation.
5        THE WITNESS:  If she had wanted to talk to
6    me, she could've come to me.  [Inaudible] that
7    I was looking to see if he had done anything
8    wrong after November and that I was eager to
9    learn of any -- anything wrong he did,
10   particularly in the sexual area.  Nobody came
11   to me.
12 BY MR. CARSON:
13   Q.  How long did your investigation take?
14   A.  Investigation of what?
15   Q.  You testified earlier that, as part of the
16 investigation, you interviewed everyone in the
17 office.  How long did that investigation take?
18   A.  It dominated a week of mine from the 1st
19 of November till the 7th or 8th or so.  This letter
20 that you have up here is dated, I think, the 8th, so
21 that's a full week from the 1st.  Something on the
22 order of [inaudible].
23   Q.  Sorry.  I didn't hear the last thing you
24 said.

Page 142

- - -

1    A.  Something on the order of a week.  Nothing
2  else.  Talked to Marc incessantly, talked to others
3  at great length, asked lots of questions, discussed
4  with Marc what steps to take.  Marc was my legal
5  and -- my legal confidant who worked with me on
6  fixing this.
7    Q.  Who was your legal confidant?  Oh, Marc
8  Fink, your house counsel, correct?
9    A.  Yes.
10   Q.  Yeah.  You don't have to tell me what he
11 said.  Let me think.  So when you say that it took a
12 week, was that to do all the interviews or what --
13 why did it take a week?  What did you do throughout
14 that week?
15   A.  Interviewed, I discussed with Marc, I came
16 up with different ideas.  Essentially, it was a week
17 intensely talking to Marc, gathering information,
18 and figuring out solutions.
19   Q.  Did you look at any phone records during
20 the course of the investigation?
21   A.  I did not.  I talked to people.
22   Q.  Did you read emails or Slacks or Telegrams
23 or WhatsApps or anything like that?
24   A.  Nothing.  I only talked to people.

Page 143

- - -

1    Q.  Okay.  So --
2    A.  Or, I should say, in the case of the staff
3  who are not in the office, I wrote to them.
4    Q.  Fair enough.
5    A.  Personal communication between me and
6  them, one-to-one, which I then shared with Marc, and
7  we worked out resolutions and solutions.
8    Q.  As far as the -- as far as the -- the
9  rumor about Caitriona Brady's father and Marnie
10 Meyer, that wasn't done that week, correct?  That
11 was done at a later date?
12   A.  That was well into 2019.  Yes.
13   Q.  And did you investigate that in any way?
14   A.  I tried, but I hit a brick wall.
15 Everything was contradictory.  At a certain point, I
16 just couldn't figure out who was saying what to
17 whom.
18   Q.  Wasn't it true that everyone was telling
19 you Gregg Roman said it except Gregg Roman?
20   A.  No.
21   Q.  What did Lisa tell you about it?  Did you
22 interview Lisa?
23   A.  I did, and I can't tell you specifically
24 who said what, but I remember that some thought it

Page 144

- - -

1  was Marnie who had come up with it; some thought
2  Lisa who had come up with it; and some thought Gregg
3  had come up with it.
4    Q.  Who thought Lisa came up with it?
5    A.  I can't remember the specifics.
6    Q.  Just Gregg Roman, right?
7        MR. CAVALIER:  Object to form.
8        THE WITNESS:  I -- I don't know.
9  BY MR. CARSON:
10   Q.  Did you send Lisa any emails about it
11 letting her know that we interview -- you conducted
12 this investigation?
13   A.  [Inaudible].
14       THE COURT REPORTER:  I can't rem -- I
15   can't hear you, sir.
16       THE WITNESS:  I don't think so.  Don't
17   remember if she should, but I don't think so.
18       MR. CARSON:  I really need to take a
19   bathroom break.  I'm sorry.  I can't -- just go
20   off the record for a minute, guys.  I'm sorry
21   about that.
22       THE VIDEOGRAPHER:  All right.  The time
23   is --
24       MR. CARSON:  I'll do as long as you want

Page 145

- - -

1  Jon, but I only need like three minutes.  I
2  just gotta run to the bathroom.
3         MR. CAVALIER:  If we're gonna break --
4  like I always say, if we're gonna break, I'd
5  rather break for at least ten just so it can
6  actually be a break.
7         MR. CARSON:  Yeah, that's fine.  All
8  right.  So we'll come back in like 1:21 or
9  something like that.
10        MR. CAVALIER:  That works.
11        THE VIDEOGRAPHER:  The time is 1:11, and
12 we are off the record.
13        - - -
14        (Whereupon there was a recess in the
15 proceeding from 1:11 p.m. to 1:24 p.m.)
16        - - -
17        THE VIDEOGRAPHER:  It is 1:24 a.m. --
18 excuse me -- p.m. Eastern Time, and we are now
19 on the record.
20 BY MR. CARSON:
21    Q.  Mr. Pipes, did Gregg Roman ever tell you
22 that he could destroy you?
23    A.  No.
24    Q.  Did he ever tell anyone else that?

Page 146

- - -

1         MR. CAVALIER:  Object to form.
2         THE WITNESS:  Ask him.
3         THE COURT REPORTER:  Sorry, Seth.  What
4  was the question?
5         MR. CARSON:  Did he ever tell anybody else
6  that?
7         MR. CAVALIER:  Object to form.
8         THE WITNESS:  Ask him.
9  BY MR. CARSON:
10    Q.  And you said "ask him".  Did anyone ever
11 tell you that he said that?
12    A.  No, not that I remember.
13    Q.  Do you know why Gregg Roman would think he
14 can destroy you?
15        MR. CAVALIER:  Object to form, foundation.
16 If you can answer it, go for it.
17        THE WITNESS:  No.
18 BY MR. CARSON:
19    Q.  Are you worried about him being able to
20 destroy you?
21        MR. CAVALIER:  Same objection.
22        THE WITNESS:  No.
23 BY MR. CARSON:
24    Q.  Is that why, no matter what he does, you

Page 147

- - -

1  don't fire him?
2         MR. CAVALIER:  Object to form.
3         THE WITNESS:  No.
4  BY MR. CARSON:
5     Q.  I mean, a lot of women have complained
6  about Gregg Roman's misconduct now, right?
7     A.  Thanks to the Derek Smith Law Group, yes.
8     Q.  Well, are we responsible for Samantha
9  Mandeles complaining about him?
10    A.  Don't know about that.
11    Q.  I'm sorry?
12    A.  I don't know about that.
13    Q.  Are we responsible for Lea Merville
14 [phonetic] complaining about him?
15        MR. CAVALIER:  Object to form.
16        THE WITNESS:  Don't know about that.
17 BY MR. CARSON:
18    Q.  You don't what?
19    A.  I don't know about that.
20    Q.  Did you ever talk to Lea Merville?
21    A.  No.
22    Q.  You never called her in your entire life?
23    A.  I think I met her when she began as an
24 intern.

Page 148

- - -

1     Q.  Well, when you interviewed her during your
2  investigation into the reports of sexual misconduct,
3  what did she say?
4     A.  I did not --
5         MR. CAVALIER:  Object to form, foundation.
6  BY MR. CARSON:
7     Q.  Why didn't you interview her?
8     A.  She did not complain.  She was not an
9  employee, and she did not complain.
10    Q.  Didn't your director of human resources
11 include her in a written complaint that was
12 submitted to you in November?
13    A.  What Seth [sic] does with his personal
14 life is not my concern.  My concern was that there
15 was a large-scale complaint from many staff in the
16 office about Gregg.
17    Q.  Did you just say when Seth does?
18    A.  I did not.
19    Q.  Did he say when Seth does?
20    A.  I did not.  I said large-scale.
21    Q.  Okay.
22    A.  Large-scale complaint.
23    Q.  I think you meant if Gregg does.  I just
24 wasn't [inaudible].  So, for the record, if you said

Page 149

- - -

1  Seth, I think you meant Gregg.  What Gregg does --
2      A.  I was not talking about you.  I was
3  talking about Gregg.
4      Q.  So don't you find it disturbing, though,
5  the allegation that was made in connection with Lea
6  Merville?
7          MR. CAVALIER:  Object to form.
8          THE WITNESS:  What allegation?
9  BY MR. CARSON:
10     Q.  Well, there was an allegation that he
11  subjected Lea Merville to quid pro quo sexual
12  harassment, right?
13         THE COURT REPORTER:  What was that, Seth?
14         MR. CARSON:  Quid pro -- he subjected Lea
15      Merville to quid pro quo sexual harassment.
16         MR. CAVALIER:  Object to form and
17      foundation.
18         THE WITNESS:  That there are rumors going
19      around are not my concern.  If Lea Merville
20      came to me and said there was a problem, I
21      would've dealt with that.  I'm not gonna deal
22      with rumors.
23  BY MR. CARSON:
24     Q.  When the director of human resources comes

Page 150

- - -

1  to you, it rises above being just a rumor at that
2  point, correct?
3          MR. CAVALIER:  Object to form.
4          THE WITNESS:  That is a hypothetical.
5  BY MR. CARSON:
6      Q.  Well, it's not a hypothetical.  Marnie
7  Meyer, in fact, came to you and included allegations
8  about Lea Merville in a written report to you
9  submitted to you in November 2018, correct?
10     A.  Yes.
11     Q.  And the allegations concerning Lea
12  Merville was that Gregg Roman lured her to a hotel
13  room because she needed a document signed?
14     A.  If Lea Merville had come to me and
15  complained, I would've dealt with it.  There was a
16  rumor that Marnie Meyer retold to me.  I did not pay
17  attention.  I paid attention to my staff who had a
18  large complaint about Gregg.  They were very unhappy
19  with him for a whole range of reasons.  I put
20  everything else aside, and I devoted a week to
21  dealing with this to their satisfaction.
22     Q.  The allegation that Lea -- that concerned
23  Lea Merville is eerily similar to the allegation
24  that we listened to today on the recording, isn't

Page 151

- - -

1  it?
2          MR. CAVALIER:  Object to form and
3      foundation.
4          THE WITNESS:  I don't know.
5  BY MR. CARSON:
6      Q.  I mean, there was a recording we heard
7  today where a Washington Examiner reporter said that
8  Gregg Roman tried to lure her to his hotel room to
9  trade sex for stories, right?  That's what we heard
10  today?
11         MR. CAVALIER:  Object to the
12      categorization, the lack of foundation, the
13      description of the recording, and essentially
14      everything else you just said, but to the
15      extent you can answer --
16         MR. CARSON:  Yeah, of course.  I know.
17      Just object to the whole question because why
18      answer when this has nothing to do --
19      everything to do with the case.
20  BY MR. CARSON:
21     Q.  Okay.  So she said that he told her, I
22  have a killer story.  She said -- she said, Alana,
23  tell him why you should have the story.  You and me
24  should be in an arrangement.  He then whipped out

Page 152

- - -

1  his penis.  She was embarrassed for him.  He then
2  screamed across the -- across the -- you know, from
3  outside what room number he's in and said, you have
4  30 minutes to be here.  I mean, it's the exact same
5  thing that Lea Merville was -- what was reported in
6  connection with Lea Merville, right?
7          MR. CAVALIER:  Object to form, foundation,
8      lack of authenticity.
9              - - -
10         (Indistinguishable cross-talk.)
11              - - -
12         THE WITNESS:  I believe we're dealing with
13      a legal process, and a legal process is not
14      about hearsay; it's about individuals speaking
15      on the record for themselves.  Neither Alana
16      Goodman nor Lea Merville has ever contacted me
17      for anything related to Gregg, and, therefore,
18      they were not my concern.  My concern were the
19      employees of the Middle East Forum who
20      complained to me in person about specifics, and
21      I put everything else aside in my life and
22      spent a week to deal with those issues.  I
23      investigated them and I mitigated them to their
24      entire satisfaction.  They signed documents

Deposition of DANIEL PIPES                                                    Lisa Barbounis v. Middle Eastern Forum, et. al.

Page 153

- - -

1  indicating they were happy with the resolution.
2  Gregg signed a document saying he was happy
3  with the resolution.  He was content with
4  the -- "happy" is too strong a word.  Everyone
5  was content with the resolution.  May not be
6  ideal, but it was content -- they were
7  contented with it.  I did not need to go into
8  other matters, and I will not be baited into
9  getting into those matters here.  I dealt with
10  the issues in front of me effectively, to
11  everyone's contentment.
12 BY MR. CARSON:
13  Q.  The matters we're talking about are the
14 subject of this case, though, aren't they?
15      MR. CAVALIER:  Object to form.
16      THE WITNESS:  As I understand, there are
17      three plaintiffs at this point.  None of them
18      are named Lea Merville or Alana Goodman.
19 BY MR. CARSON:
20  Q.  But they told you when they made their
21 complaints in November of 2018 that Lea Merville
22 had -- had said these things, correct?
23      MR. CAVALIER:  Object to form.
24      THE WITNESS:  Marnie repeated a rumor

Page 154

- - -

1  about this.  Yes.
2  BY MR. CARSON:
3  Q.  And Daniel -- strike that.  And Lisa
4  Barbounis, my client, said that, as part of the
5  sexual harassment that she was subjected to, Gregg
6  Roman described in detail him having sex with Lea
7  Merville.  That's why it's relevant to this case.
8  Do you understand?
9      MR. CAVALIER:  Object to form, if that's a
10      question.
11 BY MR. CARSON:
12  Q.  Do you understand that that's the
13 relevancy of this case?  When your supervisor
14 decides he's gonna tell the person that he's in
15 charge of intimate details about his sexual life,
16 that's sexual harassment, right?
17      MR. CAVALIER:  Object to form.  Object to
18      calling for a legal conclusion as well.
19      MR. CARSON:  You don't need to say
20      [inaudible].
21 BY MR. CARSON:
22  Q.  It's sexual harassment.  It's unwelcome
23 sexual comments, right?
24  A.  From what I understand, Lisa and Gregg had

Page 155

- - -

1  a close personal relationship in which they told
2  each other all sorts of things about their lives,
3  including their bodily issues, sexual issues, their
4  relationships with all sorts of people and the like.
5  That is their business, not mine.
6  Q.  Are they on equal footing?
7  A.  They were supervisor and supervisee.  They
8 became friends, and that was a mistake.  That's at
9 the heart of this, that Gregg should not have done
10 that.  He made a mistake.
11  Q.  It's more than just supervisor and
12 supervisee, though, right, because Gregg Roman's
13 also a corporate officer of the entity, the Middle
14 East Forum, correct?
15  A.  What is your question?
16  Q.  Do you know what proxy liability is?
17  A.  No, I don't.
18      MR. CAVALIER:  Object to form.
19 BY MR. CARSON:
20  Q.  Well, Gregg Roman is a corporate officer
21 of the Middle East Forum, so the conduct and
22 comments that he made, those conduct and comments
23 are from the Middle East Forum.
24      MR. CAVALIER:  Is that a --

Page 156

- - -

1  BY MR. CARSON:
2  Q.  That's the relationship [inaudible],
3 correct?
4  A.  I have no idea.
5      MR. CAVALIER:  Object to the --
6      THE WITNESS:  No, I don't.  I know the
7      Middle East.
8  BY MR. CARSON:
9  Q.  Do you equate your job as having a
10 responsibility to the women who work with Gregg
11 Roman?
12      MR. CAVALIER:  Object to form.
13 BY MR. CARSON:
14  Q.  Strike that.  Let me ask a better
15 question:  Do you have a responsibility to the women
16 who work at the Middle East Forum?
17  A.  No.  I have a responsibility to the
18 employees of the Middle East Forum, whatever their
19 gender might be.
20  Q.  But if a lot of women are complaining
21 about sexual misconduct in their employment, don't
22 you have a responsibility to -- to those women?
23  A.  I had three complaints on November 1st
24 about Gregg in a sexual context.  I investigated

Page 157

- - -

them, and I mitigated them to their satisfaction.

MR. CARSON: Sorry. Can you read -- I'm
sorry -- I just got distracted. Can you read
back his answer?

(Whereupon the court reporter read back
the pertinent testimony.)

- - -

THE WITNESS: I investigated them, and I
mitigated them to their satisfaction.

BY MR. CARSON:

Q. You don't see yourself as having some
particularized responsibility to make sure the women
at the Middle East Forum who complained about sexual
harassment are protected?

MR. CAVALIER: Object to form. Asked and
answered.

THE WITNESS: Yes, and, accordingly, I
removed Gregg from the office and from any
direct contact with them in a physical presence
in their life, and I protected them entirely.
They were content with that protection until
you came along five months later and decided it
wasn't good enough.

Page 158

- - -

BY MR. CARSON:

Q. I know. It's my fault. I get it. It's
not your fault in any way, correct?

A. They signed documents saying they were
content with it. Nobody complained after that
point, after they signed the documents.

Q. So you don't feel responsible for anything
at all?

MR. CAVALIER: Object to form.

- - -

(Indistinguishable cross-talk.)

- - -

THE WITNESS: I investigated and I
mitigated the problem to everyone's
satisfaction. All four individuals directly
involved were content with my resolution of it.
I thought everything was fine. They indicated
everything was fine. I refer you to the
photographs of May 19th, 2019 at our gala in
New York -- big smiles in a chorus line with
Gregg and others. Everything was fine, and
then all of a sudden we got big problems. Why?
Well, Derek Smith Law Group entered the scene.

BY MR. CARSON:

Page 159

- - -

Q. Is the Middle East Forum a victim in this
case?

A. Of course it is. Of course it is. $31
million for what, for made up stuff? Tricia McNulty
tells me that he sat too close to her, and then the
complaint comes in. Oh, he tried to touch her
bottom. Oh, really? Somehow it magically changed
between November and June. Wonder how that
happened. Sex trafficking? Oh, where did that come
from? Sexual assault? Where did all these things
come from? Who came up with sex trafficking?
Mr. Carson, who came up with sex trafficking?

Q. The United States Congress, Mr. Pipes.

A. United States Congress did not apply to
Gregg Roman; Seth Carson did.

Q. Have you ever read the statute because --

A. I've read what you have produced and what
words you put into their mouths.

Q. Have you ever read the sex trafficking
statute --

- - -

(Indistinguishable cross-talk.)

- - -

THE WITNESS: I do not need to know about

Page 160

- - -

the details of sex trafficking laws. I need to
know that that's what you claimed.

BY MR. CARSON:

Q. So you don't know whether it applies to
this situation or not, do you?

A. I know perfectly well that you make things
up as you need to claim your $31 million, of which
you get, what, 40 percent? How much does that come
to, Mr. Carson? That seems to come to about $14
million for you. That's a nice payday.

Q. That's what you think --

A. Good luck with that, Mr. Carson. I'll let
you know that we're not gonna be paying you. We're
gonna fight you tooth and nail, as you can see.

Q. Right. And then --

A. Good luck with your $14 million.

Q. If there's a judgment, you'll end up
paying it, correct?

A. And so far, let me point out, Mr. Carson,
you have paid us, not we have paid you. Due to your
mistakes, you have paid us, and, indeed, just a few
minutes ago, you got another problem with Judge
Wolson, didn't you?

Q. How much money have you received from our

Deposition of DANIEL PIPES                                    Lisa Barbounis v. Middle Eastern Forum, et. al.

Page 161

- - -

1  firm?
2      A.   Something on the order of $5,000.
3      Q.   And that was profit for you guys?
4      A.   No.
5          MR. CAVALIER:  Object to form.
6          THE WITNESS:  It was the money that we had
7  to pay our lawyers because of your -- your
8  actions.
9  BY MR. CARSON:
10     Q.   So how much money have you made from our
11  firm?
12         MR. CAVALIER:  Object to form.
13         THE WITNESS:  -- $5,000.
14  BY MR. CARSON:
15     Q.   You've made $5,000?
16     A.   We didn't make it.  We paid it to our
17  lawyers because they had to spend time dealing with
18  the things you raised wrongly.
19     Q.   When did you pay it to your lawyer?
20         MR. CAVALIER:  Object to form.  Hold up,
21  hold up.  Do not answer any questions about
22  bills or payments or --
23         MR. CARSON:  He raised the issue, Jon, not
24  me.

Page 162

- - -

1          MR. CAVALIER:  The instruction stands.
2          THE WITNESS:  So far, you have paid us.
3  We have not paid you.  I remind you of that.
4  And you have more problems on your docket,
5  don't you?  Daily reports to the judge.
6  Remember those, Mr. Carson.
7  BY MR. CARSON:
8      Q.   I'm gonna direct you back to the question
9  that we were discussing a moment ago in connection
10  with the sex trafficking statute.  Have you ever
11  reviewed that statute before?
12     A.   I deal with the Middle East, Mr. Carson.
13  I don't read sex trafficking statutes, but I know
14  what the term means, and I know that Gregg did not
15  engage in sex trafficking.
16     Q.   Well, if you lure someone across national
17  borders in order to try to engage them in sexual
18  intercourse, isn't that what the statute states?
19     A.   Only a perverted mind like your own would
20  come up with an interpretation like that.  He went
21  there to work.  He asked Matt Bennett first, he
22  asked Marnie Meyer second, and he asked Lisa
23  Barbounis third.
24     Q.   Why didn't Marnie Meyer wanna go?

Page 163

- - -

1      A.   I don't know why.  Something to do with
2  her busyness or something, but --
3      Q.   Isn't it -- go ahead.  You wanna finish?
4      A.   But he invited Lisa to go to Israel to do
5  work with him.  That was not sex trafficking.
6      Q.   Isn't it -- did you know that she went?
7      A.   I know that she went now.  At the time, I
8  did not.
9      Q.   He hid it from you, correct?
10     A.   He hid it from me.  And, by the way, so
11  did Lisa hide it from me.  The two of them were
12  complicit in hiding it from me.
13     Q.   Well, Lisa was following instructions,
14  though, right?
15     A.   Lisa hid it from me.  Gregg hid it from
16  me, and I --
17     Q.   Lisa was following the instructions of her
18  supervisor?
19     A.   Lisa hid it.  She was upset by -- if she
20  had a problem with it, she could've come to me.  As
21  you have pointed out repeatedly, I was the ultimate
22  authority.  And when she did come to me on November
23  1st, I took action.  So why didn't she come to me
24  back in March or April when she had a problem?

Page 164

- - -

1      Q.   Wasn't she just following the instructions
2  of her supervisor?
3      A.   She hid it from me.  She was complicit in
4  hiding it from me, and when she decided no longer
5  could it be complicit, it was eight months -- seven,
6  eight months later.  How come she didn't do it at
7  the time, Mr. Carson?  Maybe because nothing
8  happened at the time, and she was only looking for a
9  vehicle with which to come to me en masse, all three
10  of them, and find a reason to get my attention.
11  They felt safety in numbers, safety in arguing for
12  sexual harassment.  I don't know why.  There was no
13  indication that I would not take it seriously
14  individually back in the spring, but that's what
15  they chose to do.  So she was complicit.  They both
16  did something wrong, and I've admonished Gregg.
17     Q.   What did Gregg do wrong?
18     A.   He hid it from me.
19     Q.   Isn't the reason that he didn't want
20  Marnie -- isn't the reason Marnie didn't wanna go is
21  because Gregg told her that she would have to share
22  a room with him?
23         MR. CAVALIER:  Object to form.
24         THE WITNESS:  Ask her.  Don't ask me her

Deposition of DANIEL PIPES                                    Lisa Barbounis v. Middle Eastern Forum, et. al.

Page 165

- - -

1  reasoning.
2  BY MR. CARSON:
3     Q.  Sorry?
4     A.  Ask her, not me.
5     Q.  Well, isn't that her plea?
6     A.  I don't know.
7     Q.  You don't know what her claims are in her
8  case?
9          MR. CAVALIER:  Object to form.
10         THE WITNESS:  -- talking about Lisa
11  Barbounis now.
12  BY MR. CARSON:
13    Q.  But you testified that he didn't try to
14  lure her there for sex.
15    A.  That's correct.  He took her there to do
16  work, and apparently she did do work.
17    Q.  But the work could only be done if they
18  shared a hotel room together or an Airbnb together?
19         MR. CAVALIER:  Object to form, foundation.
20         THE WITNESS:  I know nothing about their
21  arrangements and why they had the arrangements
22  they did.  Ask --
23  BY MR. CARSON:
24    Q.  Well, isn't it evidence of the reason why

Page 166

- - -

1  he wanted to bring her, that Marnie Meyer wouldn't
2  go unless -- that he wouldn't let Marnie Meyer go
3  unless she shared a room with him?
4          MR. CAVALIER:  Object to form.
5  BY MR. CARSON:
6     Q.  Doesn't that indicate something to you,
7  Mr. Pipes?
8     A.  Ask Marnie Meyer.
9     Q.  The question's not directed to Marnie
10  Meyer.  It's directed to you.  What do you think it
11  indicates -- I'll strike that.  I'll ask another
12  question.  What do you think it indicates that he
13  would only allow her to come if she shared a room
14  with him?
15         MR. CAVALIER:  Are you asking a
16  hypothetical?
17         MR. CARSON:  No.
18         MR. CAVALIER:  Then I'm objecting on lack
19  of foundation, and I'm instructing him not to
20  answer it.
21         MR. CARSON:  You can't instruct him not to
22  answer.
23         MR. CAVALIER:  I just did.
24         MR. CARSON:  Well, you have to answer or

Page 167

- - -

1  we're definitely gonna call the judge if you
2  make that instruction.
3          THE WITNESS:  I think I --
4          MR. CARSON:  Not a choice.  You can't
5  instruct someone not to answer based on lack of
6  foundation.
7          - - -
8          (Indistinguishable cross-talk.)
9          - - -
10         MR. CAVALIER:  You're mischaracterizing --
11  you're mischaracterizing the allegations --
12         MR. CARSON:  Here is where you try to help
13  him testify.  Go ahead, Jon.  Tell him what to
14  say.
15         MR. CAVALIER:  You're asking me to explain
16  my objection.  I have to do that.
17         MR. CARSON:  -- to say.  Take a minute.
18  I'll allow you to tell him what to say.  Go
19  ahead.
20         MR. CAVALIER:  I stand on the instruction.
21         THE WITNESS:  I can answer.  Jon, I would
22  like to --
23         MR. CARSON:  What does it indicate to --
24         - - -

Page 168

- - -

1  (Indistinguishable cross-talk.)
2          - - -
3          THE COURT REPORTER:  Guys, come on.
4  BY MR. CARSON:
5     Q.  The question that I asked was, what does
6  it indicate to you that he didn't want Marnie to go
7  unless she shared a room with him?
8     A.  It indicates to me that Marnie was
9  building a case against Gregg to show that he had
10  behaved badly.  And so, at a later date, she decided
11  to give this as an explanation.  Whether or not that
12  was the explanation at the time, I do not know
13  because she did not tell me.  If she were upset
14  about being invited to Israel with Gregg to share an
15  Airbnb -- if that was, in fact, the case -- she
16  should've told me in February, March, April,
17  whenever it was when she got that offer.  She did
18  not.  She came to me in November, and she did not
19  mention that to me.  That came up later when you,
20  Mr. Carson, entered the case, and you decided to
21  find all sorts of reasons to impugn Gregg Roman, so
22  I --
23    Q.  Sure about that?
24    A.  Hm?

Page 169

- - -

1  Q.  You sure?
2  A.  I'm not sure of the dates, but I know that
3  she didn't tell me that in November.  That came --
4  Q.  It wasn't in the letter?
5  A.  In the letter, I don't think so, no.
6  Q.  Well, we'll have plenty of time to look at
7  the letter today but --
8  A.  In any case, she did not come to me at the
9  time in February, March, April, whenever it took
10 place and tell me, Gregg made an inappropriate offer
11 to me to go to Israel and to stay in a hotel room
12 with him -- in an Airbnb with him.  She did not do
13 that.  She was complicit as well in hiding this from
14 me.  I did not know about it until she wrote me that
15 memo in early November.  Of that I am positive.  I
16 knew nothing of this trip.  I knew the trip -- I
17 knew Gregg went.  I knew nothing about Lisa going
18 there.  I knew nothing about Marnie being invited.
19 I knew nothing about the Airbnb.  I knew nothing
20 about the alleged assault.  Call it what you will.
21 Knew nothing about November.  So all of them were
22 complicit in hiding this from me, and then later --
23 months, months later, eight months later -- they
24 decide, oh, Gregg did all these things, and Marnie

Page 170

- - -

1  even tells me that she asked Lisa, did Gregg hit on
2  you in Israel, and Lisa -- quote, "Lisa said no,"
3  unquote.  So what am I supposed to take seriously?
4  Q.  Did you ever read that email?
5  A.  What do you mean?
6  MR. CAVALIER:  Object to form.  What
7  email?
8  BY MR. CARSON:
9  Q.  I don't know.  Are you testifying you got
10 on email?
11 A.  No one said that.
12 Q.  When did Marnie ask Lisa if something
13 happened in Israel and she said --
14 A.  -- the handwritten note -- one wants to
15 call it -- email, note -- of November 1st, 2018.
16 Q.  So on November 1st Marnie said that she
17 asked Lisa if something happened in Israel and that
18 Lisa said no?
19 A.  Exactly.  "Lisa said no."  Three words.
20 Exact.
21 Q.  Did you learn anything else on
22 November 1st?
23 A.  Yes.  Lots of things.
24 Q.  Did you learn that Lisa had accused

Page 171

- - -

1  Mr. Roman of putting his foot up her butt?
2  A.  Yes, yes, of course.
3  Q.  Can you understand why it might be hard
4  for women to report sexual misconduct?
5  MR. CAVALIER:  Object to form.
6  THE WITNESS:  I have a question why it's
7  hard to report it in March, and it's possible
8  to report it in November.  They did report it,
9  and I acted expeditiously and satisfactorily.
10 So they had no complaints about my actions, so
11 I don't understand why -- okay, it's difficult
12 to bring up these personal issues, sexual
13 issues, of course.  But if it's possible to
14 bring it up in November, why couldn't they have
15 brought it up in the spring?  Why couldn't
16 Marnie and Lisa have come to me together and
17 said, oh, we have a problem with Gregg because
18 he invited us to an Airbnb, and he wanted to
19 keep it secret from you.  Why didn't they do
20 that?  What kind of credibility do they have
21 when they -- don't interrupt me -- when they
22 don't deal with it expeditiously, but wait
23 eight months and wait to recruit another
24 person, and then five months after that --

Page 172

- - -

1  no -- eight months after that, recruit two
2  more, and they go to you, or you go to them.
3  Who knows?  But now safety in numbers sort of
4  thing.  Well, no, no.  They should've reported
5  this back in the spring when it took place and
6  told me, and if it was so difficult, how come
7  they could do it in November?  What's the
8  difference between the spring and the fall?
9  So --
10 BY MR. CARSON:
11 Q.  Why don't you answer your own question?
12 Can you think of anything?
13 A.  I am not going to try and interpret their
14 minds.  All I know is that they waited a long time,
15 and they concocted stories for my benefit, and I
16 took them at face value, and I took expeditious
17 steps to clear up that problem from their lives,
18 which I did, and they signed documents saying they
19 were content with my [inaudible].  So they have no
20 grounds to stand on, you have no grounds to stand
21 on, and you should just close this whole damn thing
22 down.
23 Q.  Can you think of any reasons why they
24 reported it in November 2018?

Deposition of DANIEL PIPES                                    Lisa Barbounis v. Middle Eastern Forum, et. al.

Page 173

- - -
1    A.  You ask them, not me, why they did it.
2    Q.  Well, you keep saying that they concocted.
3  What do you mean by "concocted"?  You mean made the
4  whole thing up?
5    A.  They made things up, yes.  Lisa told
6  Marnie that she had not been hit on by Gregg.  I
7  learned that November 1st in the morning.  That
8  afternoon, I went in and Lisa told me she had been
9  hit on by Gregg.  Excuse me.
10         - - -
11       (Indistinguishable cross-talk.)
12         - - -
13       THE WITNESS:  -- she would've come to me
14       at the time and told me.  She would not have
15       waited eight months.  I do not believe it, no.
16       I acted as though -- I acted on face value.  I
17       took it very seriously, and I took him out of
18       their lives.
19  BY MR. CARSON:
20    Q.  Did you read any text messages that Lisa
21  sent while she was in Israel?
22    A.  She showed me her text messages, and none
23  of them indicated that he had assaulted her.  She
24  said she was uncomfortable, et cetera, et cetera,

Page 174

- - -
1  or, at least, that's what the text messages that she
2  showed me said.  Were they actually sent at the time
3  from Israel?  I don't know.  I did not look at the
4  metadata.  She just showed me text messages
5  allegedly from her to her husband.  I took them at
6  face value.  I did not do an inquiry.  I did not ask
7  for the metadata or anything like that.  I just took
8  everything at face value.  Though, now, two years
9  later, I'm gonna say, show me the metadata.  Show me
10  [inaudible].  Show me that this actually happened.
11  But, in fact, if you look even at what she showed,
12  she didn't ever allude to any kind of assault.  She
13  was weirded out.  She was uncomfortable.  He was
14  talking about this and that, but nothing -- the
15  striking thing about her text messages, they don't
16  actually refer to his touching her.  They don't
17  refer to it.  So, yeah, clearly, if those text
18  messages are valid, she was uneasy in the
19  circumstance but --
20    Q.  Did she say she was scared?
21    A.  I don't remember the exact words, but,
22  yeah, she was uneasy.
23    Q.  Did she say she wanted to sleep with a
24  knife under her pillow?

Page 175

- - -
1    A.  Something along those lines, yes.
2    Q.  She say that she'll stab him?
3    A.  She has said that she will stab him, yes.
4  She has often said that she wants to kill him and
5  stab him.  She loathed him.
6    Q.  She often told you that she wants to kill
7  him?
8    A.  Yeah.  She said --
9    Q.  How often did she say that?
10    A.  No, no.  She didn't tell me.  She wrote
11  that in her emails, in her texts and so forth.
12  Yeah.  That's her --
13       MR. CARSON:  Can you hear?  I'm having a
14       tough time --
15       THE COURT REPORTER:  It's tough.
16       MR. CARSON:  Are you getting it all?
17       THE WITNESS:  I'm speaking very loud.  I'm
18       sorry.
19       THE COURT REPORTER:  Yeah, it's very quiet
20       on my end, so please speak up.
21  BY MR. CARSON:
22    Q.  You just have a naturally quiet voice,
23  Mr. Pipes.  We're not trying to be --
24    A.  Okay.

Page 176

- - -
1    Q.  All right.  Let's -- let's take a minute
2  and go through some stuff.  Okay.  Do you see this
3  document here I just put in front of you?
4    A.  Yep.
5    Q.  Do you remember writing this on 11/2/18?
6    A.  No.
7    Q.  Wanna take a minute and read through it
8  real quick?
9    A.  Okay.  Okay.
10    Q.  Do you remember writing it now?
11    A.  No, I don't remember writing it, but I
12  recognize it, yeah.
13    Q.  So all three women on 11/1/2018 made
14  allegations of unwanted sexual advances, correct?
15    A.  Correct.
16    Q.  What you said in the letter?
17    A.  Yep, reporting.
18    Q.  So on November 1st, 2018 Lisa was one of
19  the women who made allegations of unwanted --
20    A.  Yes, of course.
21    Q.  -- advances, right?
22    A.  Yes.
23    Q.  Because you also said that she said no on
24  11/1/18, so I'm just trying to understand.

Deposition of DANIEL PIPES                                    Lisa Barbounis v. Middle Eastern Forum, et. al.

Page 177

- - -
1    MR. CAVALIER: Objection.
2 Mischaracterization.
3    THE WITNESS: I did not say that. I said
4 that the handwritten email from Marnie to me
5 that I read early in the morning on
6 November 1st quoted Lisa -- paraphrased Lisa as
7 saying no in answer to the question, did Gregg
8 make advances on you. But, as you can see, I
9 took their testimonies, I confronted Gregg with
10 it, and I dealt with it. You have it all right
11 here in black and white.
12 BY MR. CARSON:
13    Q.  Well --
14    A.  -- have in black and white is that they
15 said they were satisfied with this solution.
16    Q.  So I haven't seen --
17    A.  -- they came back and said, oh, no, we're
18 not satisfied. We want $31 million.
19    Q.  I haven't seen the email you keep
20 referring to, so I'll ask that you please produce
21 the November 1st, 2018 email from Marnie Meyer where
22 Marnie Meyer writes that Lisa denied being
23 sexually -- being subjected to sexual harassment.
24    A.  I can send it to you right now. I don't

Page 178

- - -
1 know what the protocol is, but I can send it.
2    Q.  Well, when we get a break -- I mean, you
3 guys -- can you hear him? I didn't hear what he
4 just said.
5    A.  I said I can send it to you. I don't know
6 what the protocols are, but I have it, and I can
7 send it to you.
8    Q.  Well, maybe on a break you can --
9    MR. CAVALIER: Seth, you have the Marnie
10 Meyer note.
11    MR. CARSON: Is that what he's referring
12 to, the handwritten --
13    MR. CAVALIER: Yes. I believe the
14 handwritten note was put -- was attached to an
15 email that was sent to Daniel. I think that's
16 the discrepancy here.
17    MR. CARSON: If that's what he's referring
18 to, I have it.
19    THE WITNESS: Handwritten note attached to
20 photograph and sent to you by email.
21 BY MR. CARSON:
22    Q.  Okay. So it says here -- it says,
23 accordingly, you investigated this matter yesterday
24 immediately upon learning of it. Do you see that?

Page 179

- - -
1    A.  Yeah.
2    Q.  So you investigated it in one day?
3    A.  Yes.
4    Q.  And here is what I found. These women who
5 work for you made unwelcome -- strike that -- say
6 that you made unwanted sexual advances -- I can read
7 this to myself. Hang on a second. So my next
8 question is, Gregg Roman said that he acknowledges
9 his conduct was not acceptable, right?
10    A.  Yes.
11    Q.  What about his conduct wasn't acceptable?
12    A.  Ask them.
13    Q.  Well, he said it to you during your
14 investigation, so I'm asking you.
15    A.  Ask him. Ask them. I mean, I'm reporter
16 here. I'm not mind reader.
17    Q.  Well --
18    A.  Investigator.
19    Q.  If he said that his conduct was not
20 acceptable, then why are you trying to say that
21 everything's made up in this case?
22    MR. CAVALIER: Object to form. Object to
23 the mischaracterization.
24 BY MR. CARSON:

Page 180

- - -
1    Q.  You can answer.
2    A.  He acknowledged, broadly speaking, that he
3 made a mistake in having close friendships with his
4 staff, with the people reporting to him.
5    Q.  His friendships weren't acceptable? I'm
6 sorry. Go ahead.
7    A.  He acknowledged that that was a mistake.
8 He now understands -- he understands for two years
9 now that it's a mistake to have close personal
10 relations with people who you are supervising at
11 work. This is a bad idea. I didn't know about it.
12 I didn't know he was so close to them. I knew he
13 went to lunch with them, but I didn't know he had
14 drinks, and I didn't know he went off to Israel. I
15 didn't know about all these things. When I learned
16 about it, I came down on him and said this is wrong.
17 You made a mistake. And he said, yeah, I made a
18 mistake.
19    Q.  Well, he said that his conduct was not
20 acceptable, was what he said, right?
21    A.  Yeah. I've just explained to you that
22 having close relations with people you supervise is
23 not acceptable.
24    Q.  Why isn't it acceptable, because of the

Deposition of DANIEL PIPES                                    Lisa Barbounis v. Middle Eastern Forum, et. al.

Page 181

- - -

1  power dynamic?
2        MR. CAVALIER:  Object to form.
3        THE WITNESS:  It's --
4  BY MR. CARSON:
5        Q.  Is that why?
6        A.  It's wrong for supervisors to be close to
7  their -- the people they supervise.
8        Q.  And why?
9        A.  -- maintain -- because it complicates
10  things in all sorts of ways, as we can see right
11  here.  Not a good idea.  Do what you want on your
12  time.  Stay away from close relations with people
13  you supervise.
14        Q.  Were you Lisa Barbounis' supervisor at
15  this time?
16        A.  I was not.
17        Q.  So if Gregg Roman, her supervisor, directs
18  her to do something, and then she doesn't tell you
19  about it, why would you think that she's complicit?
20        A.  Why are we going over this again?
21        MR. CAVALIER:  Yeah.  Object to --
22        THE WITNESS:  -- came to me in November.
23  Why didn't she come to me in, let's say, March
24  when the -- I don't remember when it was --

Page 182

- - -

1        let's say March was when the Israel trip was.
2  Why did she not come to me?  Why did she hide
3  the whole trip from me?  Why did Marnie not
4  tell me about what she was offered to do in
5  Israel?  Why did they wait eight months?
6  BY MR. CARSON:
7        Q.  Is it possible she was --
8        A.  Obviously, they were not scared because
9  they came to me, but they waited eight months.
10  Isn't that a little suspicious, Mr. Carson?
11        Q.  No, not at all.  Not even a little bit.
12        A.  I see.  So waiting eight months to come
13  with allegations is perfectly normal and enhances
14  their credibility, does it?
15        Q.  Yes.
16        A.  Okay.
17        Q.  The reason why is because if they were
18  scared of losing their jobs, maybe they felt some
19  sort of safety in numbers by telling you the
20  complaints all at the same time.  Did you ever
21  consider that?
22        A.  They had numbers.  As I pointed out to you
23  previously, Marnie and Lisa knew of each other's
24  offers to go to Israel.  They could've come to me.

Page 183

- - -

1  I don't know if AIPAC was before that or after that,
2  but I'm sure they could've found some other reason
3  to -- some other person to come up with a reason.
4  They had numbers.  They had two of them, and there
5  was no indication whatsoever that either of them
6  would be fired.  That was just a fear they had.  No
7  indication.  And, for that matter, no indication
8  anytime after that.  I didn't fire anybody.  I had
9  no hint of firing anybody.  I had no intention to
10  fire anyone.  I called them my angels and my heroes,
11  and I wanted it to work.
12        Q.  Gregg acknowledged that his conduct put
13  these women in a difficult position, correct?
14        A.  Yes.
15        Q.  So maybe that's the position they put him
16  in is whether or not to -- well, you tell me.  What
17  was the difficult position?
18        A.  I just explained it to you.
19        Q.  Right, agreed.  Okay.  "You put this in
20  the context of calling yourself a 'social junkie'
21  who seeks constant social interaction."  Did he
22  explain what he meant by that?
23        A.  I think it's self-evident, isn't it?
24        Q.  I do, actually.  So are you aware -- have

Page 184

- - -

1  you ever done any research into people who have --
2  who commit serial sexual misconduct?
3        A.  I have not.  Mr. Carson, I've told you
4  repeatedly I specialize in the Middle East, not
5  these matters.  This is your area, not mine.
6        Q.  Well, since you have someone like Gregg
7  Roman working for you, do you think maybe you
8  should've done some research like that?
9        MR. CAVALIER:  Hey, Seth.  Come on, man.
10  I mean, really?
11        MR. CARSON:  No.  It's a serious question.
12        THE WITNESS:  I was approached by three
13  employees with complaints -- far-reaching
14  complaints about all sorts of topics.  I
15  investigated and mitigated.  I did not do
16  research into their personalities.  I did not
17  do psychological research.  I did not do legal
18  research.  I did research into what is going
19  on, and I mitigated it to their satisfaction.
20  I don't see why you are suggesting that I
21  should also have gone into all sorts of arcane
22  research about psychology.  No.  I dealt with
23  the problem in front of me.  I'm a Middle East
24  specialist.  I'm the head of an organization:

Page 185

- - -

1  I deal with problems when they arise.  I did
2  that here.  I spent a week on it.  I mitigated
3  it to everyone's contentment.  What more do you
4  want?
5  BY MR. CARSON:
6     Q.  I wasn't suggesting that you seek out
7  arcane psychological research, but maybe current
8  psychological research, maybe talk to an expert.
9  Did you ever consider doing that?
10       MR. CAVALIER:  Object to form.
11       THE WITNESS:  I did not need to talk to an
12  expert.  I needed to talk to the individuals
13  who come to me and complain and listen to them
14  carefully and figure out a solution.
15  BY MR. CARSON:
16     Q.  Well, based on some of the complaints that
17  we heard today, it does appear Mr. Roman has an MO,
18  doesn't it?
19       MR. CAVALIER:  Object to form.
20       THE WITNESS:  I know nothing about
21  Mr. Roman's private life.
22  BY MR. CARSON:
23     Q.  Isn't it your job to know something about
24  it?

Page 186

- - -

1       MR. CAVALIER:  Object --
2       THE WITNESS:  It is not my job to know
3  about Mr. Roman's or any other employee's
4  private life.  I am only concerned if what they
5  do affects the Middle East Forum.  So we had
6  another instance of that, I might remind you,
7  where Lisa Barbounis was going off to Britain,
8  and she was engaged in activities which are
9  harmful to the Middle East Forum.  She can go
10  where she wants and do what she wants, but she
11  can't engage in activities which are harmful to
12  us, and so I protested them repeatedly.  So
13  whenever -- whether it be Gregg or Lisa or
14  anyone else engages in activity which I deem
15  harmful, particularly in conjunction with Marc
16  on a legal basis, harmful to what we -- our
17  work, I will bring it up.  But if it's not
18  harmful, Lisa can do what she wants.  If it's
19  not harmful, Gregg can do what he wants.  I am
20  not their den mother.  I'm the head of an
21  organization.  I'm concerned about the efficacy
22  and credibility of the organization.  I have to
23  raise funds for the organization.  I'm
24  responsible for the employees of the

Page 187

- - -

1  organization.  That's what I do, and I deal
2  with the problem, and I move on, and I think
3  this is a perfect example of dealing with a
4  problem and moving on.
5  BY MR. CARSON:
6     Q.  Well, I do, too, Mr. Pipes.
7     A.  Thank you.
8     Q.  The moving on part is the problem, though,
9  right?  You moved on before the issues were actually
10  dealt with, correct?
11     A.  No.  I dealt with all the issues.  All
12  four of the principals in this issue were content
13  with the resolution I came up with.  And, if you
14  don't know it, I have signed documents by all four
15  of them to that effect.  Yes, they didn't like one
16  or another aspect of it, but they signed it and
17  moved on.  There were no complaints, not a single
18  complaint.  If there had been, I would've acted on
19  it.
20     Q.  Other than November 2018?
21     A.  After the beginning of November.  It was
22  all consolidated in this one week.  Nothing before,
23  and nothing after.
24     Q.  You definitely made that clear today.  So

Page 188

- - -

1  you never had another credible unwanted allegation
2  of sexual advances by Mr. Roman to a female staffer?
3  See this sentence here?  I can ask a better
4  question.  You write here that you acknowledge
5  that -- you're telling Gregg that he acknowledges
6  that, in the future, if there's another credible
7  unwanted sexual advance --
8     A.  It doesn't say --
9           - - -
10       (Indistinguishable cross-talk.)
11           - - -
12       THE WITNESS:  A credible.  Not another
13  credible.  A credible.
14  BY MR. CARSON:
15     Q.  I'm sorry.  Say that again, Mr. Pipes.
16     A.  You misread that.  You said another
17  credible unwanted sexual advance, implying that I
18  accepted the accusations against him were credible.
19  I didn't write that.  I wrote, if there is a future
20  case of a credible unwanted sexual advance, then I
21  will fire you, but I didn't imply that -- I took
22  seriously that I believed them.  I took them
23  seriously, but it's a fine line.  I took it
24  seriously and acted upon these complaints, but I did

Deposition of DANIEL PIPES                                    Lisa Barbounis v. Middle Eastern Forum, et. al.

Page 189

- - -

1  not actually believe them.
2      Q.   You never believed them, correct?
3      A.   No.  Well, I mean, what is there to
4  believe about a sexual advance when a woman says to
5  a man, I'm not gonna sleep with you?  That is not
6  exactly...
7      Q.   Mr. Pipes, what about that she felt the
8  need to point that out, though?
9      A.   Well, that's not our case here, is it?
10     Q.   So Mr. Pipes agreed to the -- strike that.
11  So Mr. Roman agreed to the new structure governing
12  the employee, the employment relationship between
13  Mr. Roman and the female staffers, right?
14     A.   Yes.  You have, I'm sure, the agreement
15  between -- signed agreement between Gregg and me.
16     Q.   It looks like this is an email from
17  Ms. McNulty, and it's addressed to you, and Marc
18  Fink is cc'd on it, and I think she's actually
19  responding to an email that you wrote her.  So you
20  see on Sunday, November 4th at -- strike that.  On
21  Sunday, November 4th, 2018 at 11:34 p.m., you sent
22  an email with the subject line, "Allegations and
23  consequences," correct?
24     A.   Correct, except it's a.m., not p.m.

Page 190

- - -

1      Q.   Thank you -- a.m. -- and you sent -- you
2  copied and pasted and sent this exact email to
3  Ms. McNulty, Ms. Meyer, and Ms. Barbounis, correct?
4      A.   Correct.
5      Q.   And you -- I mean, I can show them to you,
6  but I'll represent to you you sent all three of them
7  at 11:34 a.m. on November 4th.  Do you remember
8  that?
9      A.   Yep.  I don't know if I remember, but,
10  yeah, I see it.
11     Q.   And I think that later the same day --
12  that evening, Ms. McNulty replied.
13     A.   Mm-hmm.  Well, thank you for pointing this
14  out because it shows that she, too, is complicit --
15            - - -
16       (Indistinguishable cross-talk.)
17            - - -
18       THE WITNESS:  She also was aware of it, so
19  all three were complicit.
20  BY MR. CARSON:
21     Q.   Wait.  What are we talking about now?
22  What are they complicit in?
23     A.   Hiding the trip to Israel and not saying
24  anything -- one, hiding it, and, two, not telling me

Page 191

- - -

1  about it.
2      Q.   You might be a faster reader than me.  Are
3  you --
4      A.   "On November 1st, I confirmed with you
5  that I was aware of certain indiscretions between"
6  -- da, da, da, da -- "during a trip to Israel in
7  May."
8      Q.   Take a minute and just read it to
9  yourself, and tell me when you're ready.
10     A.   Okay.
11       MR. CAVALIER:  Seth, if you got a natural
12  break point coming up, it's almost --
13       MR. CARSON:  Wanna do it now?  You wanna
14  just do it now?
15       MR. CAVALIER:  -- 2:15.  We can if you
16  want to.  I'm just thinking maybe we break for
17  a half hour for lunch.
18       MR. CARSON:  Yeah.  We can just do it now,
19  whatever.  We'll do this document when we get
20  back.
21       MR. CAVALIER:  That works for me.  You
22  okay with that, Daniel?
23       THE WITNESS:  Yeah.
24       THE VIDEOGRAPHER:  All right.  So it is

Page 192

- - -

1  2:10 p.m., and we are off the record.
2            - - -
3       (Whereupon there was a recess in the
4  proceeding from 2:10 p.m. to 2:49 p.m.)
5            - - -
6       THE VIDEOGRAPHER:  The time is 2:49 p.m.
7  Eastern Time, and we are on the record.
8  BY MR. CARSON:
9      Q.   All right.  Let's do it.  Do it to it.
10  All right.  So we left off, we were looking at this
11  document, which looks like an email -- like we said
12  before, it's an email.  You sent this email to
13  Tricia in the morning, and then she replied.  Just
14  tell me whenever you're ready.
15     A.   Ready.  I am ready.
16     Q.   So today you testified that the only thing
17  that was reported to you by Patricia McNulty was
18  that Gregg sat too close to her on the couch.  Do
19  you remember that?
20     A.   Yep.
21     Q.   So this email seems to describe a much
22  more significant incident.  Don't you agree?
23     A.   Well, this is the next day.
24     Q.   Sorry?

Page 193

- - -

1  A.  This is the next day.  This is not what
2 she told me in her office.  "Gregg put his arm
3 around Lisa and myself and pulled me into him."
4 Yeah, that is different from her initial testimony.
5  Q.  Initial what?
6  A.  It's different from her initial statement
7 to me.
8  Q.  Did you read this?
9  A.  I read it, yeah.  It's not what she told
10 me on the first -- first time we spoke.
11  Q.  I mean, what she describes is that he
12 abruptly asked the three men to leave.  "At that
13 point, as the men were trying to wrap up the
14 conversation with Matt, Gregg put his arm around
15 Lisa and myself and pulled me into him so that I was
16 almost in his lap and began whispering in my ear
17 that no other men should be in the room."
18  A.  Yep.  I see it.  That's not what she told
19 me the day before.
20  Q.  Yeah, and her complaint alleges that he
21 put his hand underneath her to make that move.
22  A.  Right, so she added the first round here
23 and the second round about the hand under her.
24  Q.  Oh, so these are -- she's lying, right?

Page 194

- - -

1  A.  She's inconsistent.  I don't know what the
2 truth is.  I wasn't there, but it's inconsistent.
3  Q.  Do you know --
4  A.  Also point out to you that -- No. 1 below,
5 because I witnessed his -- da, da, da, da, da --
6 nature, I worry more -- I -- well, she worries more
7 about his vindictive, manipulative, and volatile
8 nature more than sexual advances.  So the sexual
9 advances were always secondary matter.  It was the
10 management of his team that she was unhappy about
11 and everyone was unhappy about and I was unhappy
12 about.  Yeah.
13  Q.  Do you know where a woman's vagina is?
14  MR. CAVALIER:  Hold on.  Really?
15  MR. CARSON:  Yes.  Do you know where a --
16  MR. CAVALIER:  Don't answer that, Daniel.
17  - - -
18  (Indistinguishable cross-talk.)
19  - - -
20  MR. CARSON:  You're not cutting anything
21 off, so stop threatening, and, second, he has
22 to answer the question.
23  MR. CAVALIER:  No, he doesn't.  Don't
24 answer the question.

Page 195

- - -

1  MR. CARSON:  We're gonna wait for an
2 answer.
3  MR. CAVALIER:  Then we're gonna be waiting
4 a long time.
5  MR. CARSON:  Fine.  Go off the record
6 while we wait.
7  MR. CAVALIER:  I disagree.  Ask your next
8 question or call the judge.  You wanna call
9 Judge Wolson and tell him you want Daniel
10 Pipes, the president of the Middle East Forum,
11 to answer the question about where a woman's
12 vagina is?
13  MR. CARSON:  Yeah, because it's
14 relevant --
15  - - -
16  (Indistinguishable cross-talk.)
17  - - -
18  MR. CARSON:  Jon, sorry, but it's relevant
19 to the case.  The director of the Middle East
20 Forum put his hand underneath my client's butt
21 right next to her vagina, so it's relevant.
22  MR. CAVALIER:  You can ask the next
23 question, or you can call the judge.
24 BY MR. CARSON:

Page 196

- - -

1  Q.  You do understand that a woman's vagina is
2 underneath her, right?  Underneath her, right next
3 to her butt?
4  MR. CAVALIER:  Same objection, same
5 instruction.
6  MR. CARSON:  We're gonna call the judge if
7 I can't ask questions about this.
8  MR. CAVALIER:  Call the judge, please.
9 Call Judge Wolson and tell him that you're
10 asking these questions.  I --
11  MR. CARSON:  They're good questions, Jon.
12  MR. CAVALIER:  Then call the judge.
13  MR. CARSON:  He's gonna be instructed to
14 answer.
15  MR. CAVALIER:  Call the judge.
16 BY MR. CARSON:
17  Q.  You do know that, right, Mr. Pipes?
18  MR. CAVALIER:  Ask legitimate questions of
19 this witness --
20 BY MR. CARSON:
21  Q.  You do know that, right?  So you
22 understand why it might be a sensitive subject for
23 her to describe what Mr. Roman did to her, right?
24 You understand that?

Deposition of DANIEL PIPES                                    Lisa Barbounis v. Middle Eastern Forum, et. al.

Page 197

- - -

1   MR. CAVALIER:  You can answer that
2  question, Daniel.
3   THE WITNESS:  Ask it again.
4   MR. CARSON:  You can read back my
5  question.

- - -

7   (Whereupon the court reporter read back
8  the pertinent testimony.)

- - -

10   THE WITNESS:  Yes.  It's a sensitive
11  subject, and it was sensitive in April, and it
12  was sensitive in November, and there's no
13  reason in my mind that she should bring it up
14  only, what, seven months later.
15  BY MR. CARSON:
16   Q.  Brought it up because she was asking you
17  for help, right?
18   A.  Yeah.
19   Q.  And you didn't help her, did you?
20   A.  Of course I did.  I --
21   Q.  What did you do, Mr. Pipes?
22   A.  Removed Gregg from her life.
23   Q.  Forever?
24   A.  Until she was happy to have him back.

Page 198

- - -

1   Q.  She was happy to have him back throughout
2  the entire time after he came back?
3   A.  And when the issue came up in March 9th,
4  she said, I have no problems with Gregg.
5   Q.  Did she ever complain?
6   A.  No.
7   Q.  Never?
8   A.  Not after this, and not before this.  This
9  was the one time.
10   Q.  Okay.
11   A.  And I will point out that her note says
12  that she's more worried about his personality,
13  manipulative and so forth, than about sexual
14  advances.  This was not the issue.  It was put
15  aside.
16   Q.  But you were wrong when you said that she
17  only said that Gregg Roman was close to her on the
18  couch, right?  That was wrong?
19   A.  I'm not wrong.  I'm reporting to you what
20  I was told by her on November 1st.  The first
21  escalation was November 2nd, and the second came in
22  your imaginary complaints.
23   Q.  You asked her for a more detailed report,
24  correct?

Page 199

- - -

1   A.  I don't know.  Show me.
2   Q.  You asked her for a written statement, no?
3   A.  Show me.  Show me --
4   Q.  Sure, I'd be happy to show you.  I mean,
5  do you remember asking her for a written statement?
6   A.  I do not remember notes I sent two years
7  ago.  You have to show them to me.  I see no request
8  for more information.  I see three questions.  None
9  of them inquire about -- ask for more information.
10  She offered it.
11   Q.  You never asked her to provide more
12  information?
13   A.  Not in this letter.
14   Q.  Did you ever ask her in any other letters?
15   A.  I went around the day before and I
16  inquired, what's going on?  Tell me everything, and
17  she told me that he was too close to her on the
18  couch.  That was it.  I remember that distinctly.
19  This increased the complaint, and your imaginary
20  complaint increased it further, that he put his hand
21  under her, I think.  That wasn't here, and it
22  certainly wasn't the first day.  So she elaborated
23  on it.  What the truth is, I don't know.  I just
24  know that having three different versions of the

Page 200

- - -

1  same thing makes me skeptical.
2   Q.  You don't know what the truth is, right?
3   A.  Of course I don't, but I see three
4  different versions of it.  I can read two, and the
5  third one I remember.
6   Q.  Why don't you try reading this sentence
7  here, Mr. Pipes?
8   A.  I didn't ask for more, just what you told
9  me already, and she elaborated on what she told me
10  the day before.
11   Q.  Did you ask her about the elaboration?
12   A.  No, I did not.  I did not go into --
13   Q.  Did you ask her any other questions after
14  that?
15   A.  You're interrupting me.
16   MR. CAVALIER:  Gonna let him answer?
17   THE WITNESS:  I did not go into any --
18   MR. CARSON:  He answered.  He said, no, I
19  did not.
20  BY MR. CARSON:
21   Q.  Did you ask him about any other questions
22  after that?
23   A.  I took at face value the complaints
24  against Gregg, I noted them, and I acted upon them.

Deposition of DANIEL PIPES                                    Lisa Barbounis v. Middle Eastern Forum, et. al.

Page 201

1   Q.  You still take them at face value?
2   A.  I took them at face value then.  I have
3   learned a lot since then.  I didn't know that
4   there'd be a third round where she would claim that
5   he put his hand under her at this time.
6   Q.  Well, how do you think he pulled her onto
7   her?
8   A.  You're interrupting me again.
9   Q.  How do you think he pulled her onto her?
10  A.  Could I finish --
11  Q.  Answer both questions at the same time.
12  A.  No.  I'll finish one, and then you will
13  proceed.
14  Q.  Do it in the order you wanna do it,
15  Mr. Pipes.
16  A.  I've lost my train of thought.  Could I
17  ask the court reporter from where I was?
18          - - -
19      (Whereupon the court reporter read back
20      the pertinent testimony.)
21          - - -
22      THE WITNESS:  I have learned a great deal
23  about these complaints in the two years since.
24  I've been made aware of all sorts of

Page 202

1   interactions.  I can't give you chapter and
2   verse, but I've become aware of a far more
3   elaborate ruse than I was aware of at the time.
4   I just took it at face value at the time.  Now,
5   no, I do not.  Now I'm highly skeptical.
6   BY MR. CARSON:
7   Q.  You've learned that Gregg Roman is a
8   sexual predator, correct?
9       MR. CAVALIER:  Object to form.
10      THE WITNESS:  I've learned that the
11  accusations against him are false.
12  BY MR. CARSON:
13  Q.  I thought you just said you don't know if
14  they're false.
15  A.  I didn't know then.  I just took it at
16  face value in early November 2018.
17  Q.  So now you know they're false?
18  A.  Move ahead to November 2020, and I have
19  had a lot more information.  I have looked at it far
20  more in detail, and I came to the conclusion these
21  are false and --
22  Q.  So you know what happened?
23  A.  Let me finish --
24      MR. CAVALIER:  Let him finish his answer.

Page 203

1       THE WITNESS:  And that they were ginned
2   up --
3   BY MR. CARSON:
4   Q.  I asked you a yes or no question,
5   Mr. Pipes.
6   A.  I am allowed to answer as I wish, I
7   believe; am I not?
8   Q.  Actually, not true, but go ahead.  You can
9   finish your response.  It was a yes or no question.
10  A.  What is your question?
11  Q.  I said, today, you know that they're
12  false?
13  A.  Yes.
14  Q.  So you do know what happened then?
15  A.  I know it didn't happen.
16  Q.  What didn't happen?
17  A.  What these inconsistent, variable
18  accusations claim happened.
19  Q.  So Gregg Roman never pulled Tricia onto
20  his lap?
21  A.  I don't know.
22  Q.  That never happened?
23  A.  I know that she gave three different
24  accounts of it, and I find that implausible.

Page 204

1   Q.  None of the counts contradict each other,
2   Mr. Pipes, do they?
3   A.  They do.
4   Q.  How?  Tell me the contradictions.
5   A.  The first time was that he was just too
6   close to her, which I found odd.  That's why I
7   remember it so clearly.  Too close to her?
8   That's -- in a room full of people on, apparently,
9   couch full of people?  Okay.  You say so.  I
10  didn't -- I didn't argue with her.  I just took it,
11  and I removed him from her life, or at least almost
12  entirely from her life, so she had only a few
13  electronic communications with [inaudible].
14  Q.  Mr. Pipes, how is that a contradiction?
15  If he pulled her onto his lap, wouldn't that be too
16  close?
17  A.  No.  That would be different.
18  Q.  It's not too close if he pulls her onto
19  his lap?  That's okay?
20  A.  No.  I didn't say it's okay.  I said it's
21  a different complaint.  She --
22  Q.  But it's not a contradiction, is it?
23  A.  She mentioned nothing about pulling him to
24  her on her lap, and she mentioned nothing about

Deposition of DANIEL PIPES                                          Lisa Barbounis v. Middle Eastern Forum, et. al.

Page 205

- - -
1  putting his hand under her in the initial statement
2  she made to me.
3      Q.  And if he wrapped his hand around her and
4  pulled her onto his lap by using her backside,
5  that's not a contradiction either, right?  There's
6  never been a contradiction in Ms. McNulty's
7  statements, has there?
8      A.  An inconsistency.
9          - - -
10         (Indistinguishable cross-talk.)
11         - - -
12         THE COURT REPORTER:  One at a time, guys.
13         THE WITNESS:  It is a very substantial
14         inconsistency that puts her statements into
15         doubt in my mind.
16 BY MR. CARSON:
17     Q.  There's never been a single
18 inconsistency --
19         MR. CAVALIER:  Objection.  Asked and
20         answered.  Daniel, you've answered this
21         already.  Seth, move on.
22 BY MR. CARSON:
23     Q.  Right?
24     A.  Right what?

Page 206

- - -
1      Q.  There's never been a single inconsistency,
2  has there?
3      A.  I've just pointed out two inconsist --
4  three inconsistencies.
5      Q.  How?  What are they?
6          MR. CAVALIER:  Objection.  Asked and
7          answered.
8          THE WITNESS:  First one was that he was
9          just too close; second one was that he pulled
10         her onto his lap; third one was he put his hand
11         under her as well as the first two.
12 BY MR. CARSON:
13     Q.  So according to you, because of those, it
14 never happened, right?
15     A.  I didn't say that.  I said her testimony
16 is not credible with me because she has changed her
17 testimony over time.
18     Q.  You don't like -- strike that.  You
19 weren't there, were you?
20     A.  No, I wasn't.
21     Q.  So you don't know whether this happened,
22 do you?
23     A.  I have no idea what happened.
24     Q.  Did Lisa corroborate it?

Page 207

- - -
1      A.  Lisa was on the other side and couldn't
2  see.  She has made that clear.
3      Q.  Has she made that clear?  Were you at her
4  deposition the other day?
5      A.  I was.
6      Q.  So you heard her testimony that she was
7  looking right at him, correct?
8      A.  I believe --
9          MR. CAVALIER:  Object to the
10         categorization and description.
11         MR. CARSON:  I'm describing my client's
12         testimony at her deposition.
13         - - -
14         (Indistinguishable cross-talk.)
15         - - -
16         THE WITNESS:  -- where Gregg's hand was.
17 BY MR. CARSON:
18     Q.  So you've heard Lisa swear under oath that
19 she watched him pull Patricia onto his lap, correct?
20         MR. CAVALIER:  Object to form.
21         THE COURT REPORTER:  What was the answer?
22         THE WITNESS:  Yes.
23 BY MR. CARSON:
24     Q.  You heard him, right?  You heard her

Page 208

- - -
1  testify to that, correct?
2      A.  Yup.
3      Q.  She also corroborated to you at the time,
4  right, back in November?
5      A.  Who?
6      Q.  Lisa.
7      A.  I don't remember.  Show me.
8      Q.  Well, wouldn't she have been a witness
9  that you could've talked to about this incident?
10     A.  I spoke to Tricia about Tricia, Lisa about
11 Lisa, and Marnie about Marnie.
12     Q.  So you didn't care about talking about --
13 getting witness statements?
14         MR. CAVALIER:  Object to form.
15         THE WITNESS:  I asked --
16 BY MR. CARSON:
17     Q.  Did you care about getting witness
18 statements?
19         MR. CAVALIER:  Seth, listen.  You're not
20         on television.  You're not in front of a jury.
21         If you wanna ask questions, let him answer the
22         questions.
23 BY MR. CARSON:
24     Q.  Did you care about getting witness

Page 209

- - -

1  statements?
2      A.  I got witness statements.
3      Q.  I thought you just said you talked to --
4                  - - -
5      (Indistinguishable cross-talk.)
6                  - - -
7      THE COURT REPORTER:  Guys, just so you
8  know, every time there's an interruption, it's
9  gonna be a very unclear record.
10     MR. CAVALIER:  I mean, this whole
11 thing's --
12     THE WITNESS:  I cared about witness
13 statements, and I collected witness statements.
14 I did not ask each about the other.  I asked
15 each about herself and herself alone, and it
16 wasn't just the sexual topic; it was the whole
17 range of displeasure with Gregg's behavior as a
18 manager, and I took this all in, I took notes
19 on it, which I may or may not have, and I --
20 BY MR. CARSON:
21     Q.  You gotta speak up.
22     A.  I investigated it, and I mitigated it, and
23 everybody was satisfied with it.  So why are we
24 talking about it now?

Page 210

- - -

1      Q.  So you didn't try to corroborate any of
2  the allegations that any of these women made?  Is
3  that your testimony?
4      A.  I took their allegations at face value and
5  acted upon them.
6      Q.  So trying to get to the bottom of it and
7  find out if these things really happened wasn't
8  really a concern of yours, was it?
9      MR. CAVALIER:  Object to form.
10     THE WITNESS:  I took their allegations at
11 face value and did --
12 BY MR. CARSON:
13     Q.  Don't you wanna know if Gregg did it?
14     MR. CAVALIER:  Seth, how many times you
15 gonna interrupt the guy?
16     MR. CARSON:  He answered my question.
17 BY MR. CARSON:
18     Q.  Don't you wanna know if Gregg did it?
19     A.  I took at face value that he did it.  I
20 listened to them, and I acted upon it.  I did not
21 engage in a forensic investigation into it beyond
22 that.  I did not, for example, look at Lisa's text
23 messages in context.  I just looked at them on her
24 phone, and she showed me.  Now, she could've made

Page 211

- - -

1  them up.
2      Q.  So you --
3      A.  Let me finish.  I didn't inquire.  I took
4  it at face value that these were text messages that
5  she sent at that time, in that place, made no
6  inquiry.  I took all three of their statements at
7  face value and took drastic, radical action to
8  mediate their problems, and they were content with
9  it.  And I ask again, why are we here discussing
10 this when everybody was happy with it, and nobody
11 had a complaint after that?  What grounds are there
12 to be discontent?  They said -- and look at this
13 very note that you point out to me from Tricia that
14 says that the least of my -- more or less, my main
15 problem is not sexual harassment and sexual things.
16 It's other things.  Gregg's being a bad --
17                  - - -
18     (Indistinguishable cross-talk.)
19                  - - -
20     THE WITNESS:  That was the gist of it.
21 Yes, there was a sexual component.  It was
22 minor.  It was put aside.  Look at Stacey
23 Roman's notes on the meeting on the 5th of
24 November.  It was all about this and that and

Page 212

- - -

1  the other.  Not a word about sexual --
2  BY MR. CARSON:
3      Q.  I asked you a yes or no question.
4      A.  All right, and I can answer as I wish.
5      Q.  So -- but you can't just talk for five to
6  ten minutes without --
7      A.  I believe I can, and I will do so if I
8  want to.
9      Q.  Actually, you're not going to.  So -- so
10 Mr. Pipes, your -- the way you reacted to these
11 allegations, you reacted as if all of them were
12 true?  Is that your testimony, yes or no?
13     A.  I reacted to them, yes.
14     Q.  So if Gregg Roman stuck his foot up Lisa's
15 ass, and if Gregg Roman had sex with an 18-year-old
16 intern and lured her to his room to get something
17 signed in the course and scope of his position as
18 director, and if Gregg Roman put his hand under
19 Patricia's butt and dragged her onto his lap and
20 started whispering inappropriate things in her ear,
21 your response was to let him maintain his
22 directorship?
23     MR. CAVALIER:  Object to form across the
24 board.

Page 213

- - -

1   MR. CARSON:  Your objection's noted.
2   BY MR. CARSON:
3     Q.  You can answer.
4     A.  Lea Merville is not at issue here.
5     Q.  Yeah, I know.  She wasn't an issue for you
6   ever, right?
7     A.  No.  She never came to me.
8     Q.  You never did anything about Lea -- the
9   issues that dealt with -- that pertained to Lea
10  Merville, correct?
11    A.  I never did.  She never came to me.
12    Q.  It never did --
13    A.  -- true and what's not true.  I don't know
14  what her views are.  I don't know if she -- anything
15  happened.  I don't know if she want it to happen.  I
16  know nothing.
17    Q.  Could you have called her?
18    A.  Not my business.  I had three employees
19  who were unhappy and put matters aforth [sic] --
20  without the sex part -- four employees who were
21  unhappy, and I had to deal with it.
22    Q.  Did you just say it's not your business?
23    A.  What relations Gregg has with others who
24  don't protest to me, no, it's not my business.

Page 214

- - -

1     Q.  So it only becomes your business if
2   someone complains to you directly?  Is that your
3   testimony?
4     MR. CAVALIER:  Object to form.
5     THE WITNESS:  There could be other
6   conditions, but what we're talking about now is
7   three employees who came to me with specific
8   allegations, and I dealt with them.
9       - - -
10    (Indistinguishable cross-talk.)
11      - - -
12    THE WITNESS:  I have now, since then,
13  engaged in lawsuits that seem to pretend that I
14  didn't deal with them.
15  BY MR. CARSON:
16    Q.  So if Gregg Roman entices a 18-year-old
17  intern to a hotel room and says, you'll come to my
18  hotel room if -- and I'll sign your document, that's
19  not your business?
20    MR. CAVALIER:  Object to form.  Object to
21  lack of foundation --
22  BY MR. CARSON:
23    Q.  That's not your business?
24    MR. CAVALIER:  -- incomplete

Page 215

- - -

1   hypothetical --
2   BY MR. CARSON:
3     Q.  That's not your business?
4     MR. CAVALIER:  You can answer if you can.
5     THE WITNESS:  If Lisa Barbounis goes to a
6   member of the MEF staff and lures her to his --
7   to her room for sex, it's also not my business.
8   Yeah, these are not my business.
9   BY MR. CARSON:
10    Q.  So you're comparing consensual sex -- Lisa
11  Barbounis' decision to have consensual sex with
12  someone to quid pro quo sexual harassment?  That's
13  your --
14    MR. CAVALIER:  Object to form, and object
15  to the mischaracterization of --
16  BY MR. CARSON:
17    Q.  Are you comparing those two things?
18    A.  No.
19    Q.  Then why do you keep saying that,
20  Mr. Pipes?  What does Lisa Barbounis' decision to
21  have sex with someone have to do with anything in
22  this case?
23    A.  These are both actions -- sexual actions
24  that people doing on their own private time, and no

Page 216

- - -

1   one has come to me to complain about it, and,
2   therefore, it's not my business.  I am --
3     Q.  So you're only responsible --
4     A.  Let me finish.
5     Q.  You just --
6     A.  Let me finish.
7     Q.  Go ahead, Mr. Pipes.  Finish your answer.
8     A.  I am president of the Middle East Forum.
9   I am not their chaperones.
10    Q.  You're not their den mother, right?
11    A.  I'm not their den mother.  Thank you.  I
12  am not concerned unless someone comes to me -- I
13  have a big job.  I have to raise money.  I have to
14  engage in scholarship.  I have to oversee the
15  institution, and I do not go inquire of people, how
16  are you feeling today?  Any problems?  No.  They
17  come to me.  I made it clear from the beginning.  No
18  surprises, open door, come to me.  Any problems,
19  come to me, and they came to me and --
20    Q.  If they don't come to you, it's not your
21  business?
22    A.  Right.  What am I -- I don't delve into
23  their private lives.
24    Q.  It's not your problem?

Deposition of DANIEL PIPES                                    Lisa Barbounis v. Middle Eastern Forum, et. al.

Page 217

- - -

1  A.  It's not --
2  Q.  Right?
3  A.  -- something I know about.
4  Q.  You're too important of a person?
5      MR. CAVALIER:  Object.
6      THE WITNESS:  I have a job.  My job is to
7  pay close attention to my employees if they
8  have a problem.
9  BY MR. CARSON:
10  Q.  Whose job it is [sic] to make sure that
11  Gregg Roman doesn't violate the rights of women who
12  work for the Middle East Forum?  Isn't that your
13  job, too, Mr. Pipes?
14  A.  My job is to be concerned with the welfare
15  of my employees, whatever gender they may be and
16  whatever their issues may be, and I take concern.  I
17  think you have Exhibit A in front of you.  When I
18  was presented with a problem, I dealt with it
19  expeditiously and successfully.  The issue was
20  closed until certain people wandered in and raised
21  it and asked for $31 million.
22  Q.  You would characterize the way you handled
23  this as successful?
24  A.  I certainly would.

Page 218

- - -

1  Q.  Sitting here today?
2  A.  Yes, very successful.  I have --
3  Q.  I applaud your honesty.
4  A.  -- four written -- signed documents
5  saying, go ahead, I'm content.  You have them right
6  here in front of you.  They all signed --
7  Q.  Mr. Pipes, I'm gonna direct your attention
8  to another exhibit.  It's marked 0005 to 6.  Let's
9  just take it up to 7.  All right.  And, again, see
10  this email?  It's the exact same email you sent to
11  Patricia McNulty?
12  A.  Yup.
13  Q.  You didn't draft a separate email for her.
14  You sent the same -- you didn't draft a separate
15  email for Lisa.  You sent her the same email you
16  sent Ms. McNulty, correct?
17  A.  Correct.
18  Q.  And you sent it the exact same time,
19  correct?
20  A.  Yep.
21  Q.  You didn't think these situations
22  warranted a personal response?
23      MR. CAVALIER:  Object to form.
24  BY MR. CARSON:

Page 219

- - -

1  Q.  Did you think these situations warranted a
2  personal response?
3  A.  Yes.
4  Q.  So why did you send them the exact same
5  email?  You sent Marnie the same email, too.  Why?
6  A.  Because I wanted to have a single
7  arrangement with everyone, and everyone was content
8  with it.  There were no special circumstances for
9  one or the other person.
10  Q.  Shouldn't there have been special
11  circumstances since each one of them was alleging
12  special conduct -- different conduct?
13  A.  No.
14  Q.  No, okay.  So Ms. Barbounis tells you that
15  she's not at all happy with Mr. Roman's response to
16  the allegations, correct?
17  A.  I have to read it.  I note his
18  inappropriate behavior is the least of my concerns.
19  More troubling is the deceit and abusive behavior I
20  witness and experience on a weekly basis, which
21  increased after the Israel incident.  And this is,
22  rather, what Tricia said -- least of her concerns,
23  that this was a minor matter -- and then they go on
24  about all the bad things that Gregg did as a

Page 220

- - -

1  manager.  Right, understood.  That's what I heard
2  loud and clear.
3  Q.  So, Mr. Pipes, you decided to interpret
4  that sentence as minimizing the sexual misconduct
5  and not outlining the seriousness of the deceit and
6  the abusive behavior?
7      MR. CAVALIER:  Object to form.
8  BY MR. CARSON:
9  Q.  Why?  Why did you decide to interpret it
10  that way?
11  A.  I'm reading her words.  His, quote,
12  "inappropriate behavior," unquote, is the least of
13  my concern.
14  Q.  Compared to the deceit and the abusive
15  behavior, she said.
16  A.  Least of my concern.  Least of my concern.
17  That was not her major issue.  Tricia said roughly
18  the same thing.  Marnie, I believe, said roughly the
19  same thing.  All our discussions --
20  Q.  Mr. Pipes --
21  A.  Let me finish.
22  Q.  Right.  You're gonna answer the
23  question --
24  A.  Let me finish.

Deposition of DANIEL PIPES                                    Lisa Barbounis v. Middle Eastern Forum, et. al.

Page 221

- - -
- - -
(Indistinguishable cross-talk.)
- - -
THE COURT REPORTER:  Okay.  Guys, this is my last time, okay?  From here on out, it's gonna be whatever comes out, comes out.
MR. CAVALIER:  I'm amazed you've managed to go this long, Grace.
THE COURT REPORTER:  Me, too.
- - -
(Indistinguishable cross-talk.)
- - -
THE WITNESS:  -- I get to talk and then you wait till --
MR. CARSON:  You have to answer the questions I ask.
THE WITNESS:  No, I don't.
MR. CAVALIER:  He is answering the questions.
MR. CARSON:  You actually do, Mr. Pipes.  I ask the questions.  You answer the questions I ask.
MR. CAVALIER:  He's allowed to give his complete answer, Seth.  You know that.

Page 222

- - -
MR. CARSON:  Can't answer whatever question that you wish I asked.
MR. CAVALIER:  He's allowed to expound on his answer.  You don't have the right to demand a yes or no from him.  If he feels the complete answer needs to explain, then he can explain it.  He took an oath to tell the whole truth.
BY MR. CARSON:
Q.  So my next question is this.
A.  I am not gonna deal with your next question.  I'm gonna deal with what I was saying.
Q.  Do you know what you were saying?
A.  Yes, I know what I was saying.
Q.  Go ahead.  Finish.
A.  Lisa said here in words I'll, again, quote, his inappropriate behavior is the least of my concern.  Tricia said something similar.  Marnie said something similar.  The emphasis of all three was -- and Matt as well -- was on his being a bad manager.  Deceit, abuse, manipulation, and so forth.  Yes, they had a lot of complaints about him.
Q.  Why do you --
A.  Let me finish.
Q.  Mr. Pipes, do you know what question

Page 223

- - -
you're answering right now?  You don't even know what you're answering.
MR. CAVALIER:  Seth, this is gonna take a long time, and you're gonna have a really jumbled record if you don't let him answer the question --
MR. CARSON:  I strike my last question.  I'm moving on.
MR. CAVALIER:  If you want different answers, ask different questions.  Otherwise, let him --
MR. CARSON:  -- yes or no question.  Every time I ask a question, your client decides he's gonna go off on a speech about god knows what.  So we're gonna get a clear record, and we're gonna focus on the questions that I'm asking.
MR. CAVALIER:  Clear record went out the window long ago.
BY MR. CARSON:
Q.  So, anyway, Mr. Pipes, why do you not highlight the deceit and the abusive behavior?  Why are you attributing that to his management style?  It doesn't say anything about that in this email, does it?

Page 224

- - -
A.  I'm gonna resume where I was interrupted.
Q.  Mr. Pipes, forget about the last question.  I'll withdraw it.  More troubling is the deceit and the abusive behavior, it says.
A.  I'm gonna resume my prior answer.
Q.  You don't have to.  It's not --
A.  I'm going to.
Q.  I withdrew the question.  There's no question pending.
A.  I wanna finish what I was saying.
Q.  You just wanna go off on a speech?
MR. CARSON:  We're gonna go off the record, then, if he's gonna just go off on a speech.  There's no question, Jon.
MR. CAVALIER:  Daniel, let him ask the next question.  If he's withdrawing the prior question, there's no point in finishing your answer.  He can withdraw the question if he wants to.
BY MR. CARSON:
Q.  "More troubling is the deceit and the abusive behavior."  What does that have to do with management style?
A.  That was her complaint about his

Deposition of DANIEL PIPES                                      Lisa Barbounis v. Middle Eastern Forum, et. al.

Page 225

- - -

1 management.
2   Q.  Where does it say that?
3   A.  That's what it's about.
4   Q.  Why?  Where does it say it?
5   A.  She was working with him, and she found
6 his management to be deceitful, abusive, and much
7 else.  She had a long list of complaints, and others
8 have other complaints, and this is what you will --
9 if you look at my letter to Gregg, I dealt with it.
10 I dealt with all the problems in his being the
11 supervisor of all these personnel.  He did a bad
12 job.
13   Q.  Does she say that she's talking about his
14 management style?
15   A.  Let me finish.  He has many virtues, he
16 has many skills, but he was a bad manager, and I
17 didn't argue with them.  I accepted that he was --
18   Q.  Okay.  Thank you, Mr. Pipes.
19   A.  Let me finish.
20   Q.  Mr. Pipes, you're not just gonna go off on
21 a speech.  I didn't ask anything about his
22 management style.  My question was, where does it
23 say in here that she's talking about his management
24 style?  You're not gonna go off on a speech every

Page 226

- - -

1 time I ask a question, all right?  You have to
2 answer the questions I ask.
3   A.  -- the rules of a deposition and what I'm
4 allowed --
5       MR. CARSON:  Jon, can you please explain
6   to your client that he has to answer --
7       MR. CAVALIER:  Seth, if you ask him
8   open-ended --
9       MR. CARSON:  It wasn't an open-ended
10   question.  Jon, I said, where does it say in
11   this email that he's talking about management
12   style?
13       MR. CAVALIER:  He's trying to --
14       MR. CARSON:  It's a yes or no question.
15   He points out the answer as pointing out
16   something in the email that he's referencing.
17       THE WITNESS:  "Where" is not a yes or no
18   question.
19       MR. CAVALIER:  He's trying to explain to
20   you where he learned the information.
21 BY MR. CARSON:
22   Q.  Does it say in this email that she's
23 talking about his management style, yes or no?
24   A.  Yes.

Page 227

- - -

1   Q.  Where?
2   A.  "More troubling is the deceit and abusive
3 behavior I witnessed and experienced on a weekly
4 basis, which increased after the Israel incident."
5   Q.  Why do you think that's about his
6 management style?
7   A.  Because he was her manager.
8   Q.  Couldn't she have been talking about
9 sexual misconduct when she said that?
10   A.  No.  She just said that sexual misconduct,
11 which she referred to as "inappropriate behavior,"
12 was the least of her concerns.  No.  She was
13 concerned with him as a manager, as was Tricia, as
14 was Marnie, as was Matt, and as was I.
15   Q.  That's how you interpreted this letter?
16   A.  That's how I interpreted this letter.
17   Q.  Did you ever ask Lisa what she meant by
18 it?
19   A.  We had long discussion.  This is a summary
20 of our long discussion.
21   Q.  Did you have a discussion after she
22 sent --
23   A.  Don't interrupt me.  And our long
24 discussion was about her many grievances with Gregg

Page 228

- - -

1 as a manager.
2   Q.  When was that discussion?
3   A.  November 1st.
4   Q.  So this email was sent on November 4th, so
5 did you ever have a discussion with her about this
6 email?
7   A.  I don't think so.  I don't remember.
8   Q.  You never followed up with her to talk to
9 her about the deceit and the abuse?
10       MR. CAVALIER:  Object to form.
11       THE WITNESS:  I dealt with this by
12   removing him from her -- being her manager.  I
13   did what she wanted.  I took Gregg out of her,
14   Tricia's, and Marnie's lives, and, to some
15   extent, Matt's as well.
16   Q.  Did you deal with the comment that if Lisa
17 crosses Gregg, he's gonna slit her throat?
18   A.  She told me about this, and she also told
19 me that she threatened to slit him, slit his throat
20 if he didn't behave.  So, yeah, this is the way she
21 talks.
22   Q.  But she's not the one who said that.
23 Gregg said that, according to her, right?
24   A.  Gregg talks that way, too.

Page 229

- - -

1  Q. That's how Gregg talks, right? He
2 threatens to slit people's throats?
3  A. I am not --
4  MR. CAVALIER: Object to form.
5  THE WITNESS: -- other than this one or
6  this. I don't know about this, but the point
7  is that this is a summary of what our
8  discussions have been, and we moved on.
9 BY MR. CARSON:
10  Q. She --
11  A. -- put down on the record her -- her
12 complaints, her problems, and she agreed at the end
13 of it to the arrangement I had suggested, and we all
14 moved on, and there was no more discussion of this.
15 Zero. We --
16  Q. Do you agree with Gregg --
17  A. Let me finish. We addressed it intensely
18 for a week, and then we moved on and never discussed
19 it again, except with the minor exception of
20 March 9th when we alluded to it, and everybody said,
21 no problem. Otherwise, it never came up until your
22 concocted lawsuits.
23  Q. Yeah. You said that about 30 times today.
24 On November 5th, 2018, you had a meeting, correct?

Page 230

- - -

1  A. On which date?
2  Q. On November 5th, 2018, you had a meeting?
3  A. Yes.
4  Q. Right, and then after that you moved on;
5 is that right?
6  A. Yeah. Within a few days.
7  Q. Can't hear you.
8  A. Within a few days, yes. I mean, I asked
9 the project directors as well.
10  Q. Take a minute and read the rest of the
11 paragraph.
12  A. Which one?
13  Q. This one, and you can read the one below,
14 too. Let me know when you want me to move down.
15 Well, I can ask, do you agree with Gregg that MEF is
16 better without you?
17  MR. CAVALIER: Object to form.
18 BY MR. CARSON:
19  Q. Says here that Gregg claims MEF is better
20 without you. Do you agree with that, Mr. Pipes?
21  A. No, I don't.
22  Q. Do you ever talk to Gregg about that?
23  A. I raised with him, in general, the nasty
24 things that I was told that he said about me, of

Page 231

- - -

1 which this is only one.
2  Q. Do you believe those things?
3  MR. CAVALIER: Object to form.
4  THE WITNESS: He did acknowledge that he
5  said nasty things about me, yeah. And,
6  therefore, I'll add I put him on probation and
7  said, any serious mistakes you make, you're
8  gone. And I also, I might add, looked for
9  someone to replace him right there in November.
10 BY MR. CARSON:
11  Q. And while he was on probation, he never
12 once -- you never once got any complaints about him,
13 right?
14  A. Correct. I remember --
15  Q. Sure.
16  A. So, yes, he made lots of mistakes before
17 November 1st.
18  Q. You're not in focus.
19  A. Lots of mistakes. And, at the same time,
20 he's very skilled, so I said, stop making the
21 mistakes. I'll limit -- I'll reduce your
22 remuneration. I'll take away all these perks and
23 benefits you have. Show me what you can do, that
24 you are -- continue to be skilled and behave

Page 232

- - -

1 yourself and not do this again, and he did.
2  Q. Did you ever take away any perks or
3 benefits from Gregg Roman?
4  A. Yes, lots. You have a letter.
5  Q. Which ones did you take away?
6  A. You have the letter. You showed me the
7 letter --
8  Q. He didn't lose any money, right? You
9 didn't take away his salary?
10  A. He did. He lost something in the order of
11 $27,000.
12  Q. How much?
13  A. $27,000.
14  Q. How did he lose $27,000?
15  A. The medical insurance I took away.
16  Q. You took it away from everyone because you
17 said it's not your policy to do that, right?
18  A. No. I didn't take away from -- it all
19 from anyone, and I only took it all away from him.
20  Q. Gregg Roman bought that policy for the
21 office without your permission, correct?
22  A. Correct.
23  Q. Right?
24  A. Right.

Deposition of DANIEL PIPES                                          Lisa Barbounis v. Middle Eastern Forum, et. al.

Page 233

\- - -

Q.   You didn't want him to do that.  He went rogue and did it on his own, right?

A.   Right, so I punished him by taking the --

Q.   Right.  Had nothing to do with the sexual harassment, right?

A.   No.  The sexual harassment meant that he was excluded from the office.  Other problems -- spending money --

Q.   You keep going out of focus, Mr. Pipes, something about your green screen effect.  We need a clear record of the video for the courtroom, so you gotta like move your chair up or something like that.  Yeah, there you go.

\- - -

(Indistinguishable cross-talk.)

\- - -

BY MR. CARSON:

Q.   Did you talk to Thelma Prosser about what she meant when she said that Gregg was borderline unbearable?

MR. CAVALIER:  Object to form.

THE WITNESS:  I went around and talked to everyone about everything that was on their minds November 1st.  Whether I went back to

Page 234

\- - -

them again, I don't think so.  Whether she mentioned that on November 1st, I can't remember, but I got a complete download of all these many, many complaints about Gregg, which were generally quite consistent that he was doing lots of things wrong as director of the Middle East Forum, and I excluded him from the office for the sake of getting him out of the women's hair so there wouldn't be any allegations and so forth, protect him as well as them.  And, on the other hand, I took away all sorts of perks and powers because of his mistakes as director.  So I addressed both issues simultaneously and, as you know, got the --

BY MR. CARSON:

Q.   Gotta speak up.

A.   As you know, I got the agreement of the principals involved.

Q.   What would it take to fire Gregg Roman?

MR. CAVALIER:  Object to form.  Object to the incomplete hypothetical.

THE WITNESS:  Hypothetical.

BY MR. CARSON:

Page 235

\- - -

Q.   Well, could Gregg Roman do anything that could lead to his termination?  Is there anything -- is there way you would ever consider firing him?

MR. CAVALIER:  Same objection.

THE WITNESS:  I -- you saw the letter to him, and I said, if there's anything along these lines, you will be fired immediately.

BY MR. CARSON:

Q.   Well, today we know there is something along those lines, correct?

MR. CAVALIER:  Object to form.

THE WITNESS:  Post November.  If there's anything post November 5th, 6th, he would be fired.  He did not --

\- - -

(Indistinguishable cross-talk.)

\- - -

THE WITNESS:  Nobody complained, and therefore he --

BY MR. CARSON:

Q.   You gotta speak up.

A.   Nobody complained after November 5th or so and --

Q.   Alana Goodman.

Page 236

\- - -

A.   Alana Goodman did not complain to me.

Q.   So you can pick up the phone and call her and find out if Gregg is using his position as the director of the Middle East Forum to try to force reporters to have sex with him, right?

MR. CAVALIER:  Object to -- oh, he's gonna call everybody in the world just to ask about --

\- - -

(Indistinguishable cross-talk.)

\- - -

MR. CARSON:  -- complain that Gregg Roman is trying -- yelling at them across a bar to go to his hotel room in 30 minutes or he's gonna give the story to somebody else.

BY MR. CARSON:

Q.   How about just call those people, Mr. Pipes?  Did you ever consider that?

MR. CAVALIER:  Object to form.  Object to foundation.  Object to the hypothetical.

BY MR. CARSON:

Q.   You know about it now.  You just listened to the recording.  Have you ever considered it?  What do you consider --

Deposition of DANIEL PIPES                                     Lisa Barbounis v. Middle Eastern Forum, et. al.

Page 237

- - -

1  A.  I heard a recording.  I don't know its
2  providence.  I don't know if it's a paid actress.  I
3  don't know anything about it.
4  Q.  Do you know who Alana Goodman is?
5  A.  I told you I --
6  Q.  Is she an actress?
7  MR. CAVALIER:  Object to the form.
8  THE WITNESS:  I don't know if she's an
9  actress or not, but I don't know who was
10  speaking there.  I know nothing about this.  If
11  Alana Goodman wants to complain about something
12  that happened some years ago, let her come to
13  me.  I am not in the business of investigating
14  my employee's personal life.
15  BY MR. CARSON:
16  Q.  Yeah.  You're not in the business of
17  making your workplace safe for the female employees,
18  correct?
19  MR. CAVALIER:  Object to form.  Object to
20  argumentative.  You don't have to answer that,
21  Daniel.
22  MR. CARSON:  Yeah, he does.
23  BY MR. CARSON:
24  Q.  Are you in the business of making your

Page 238

- - -

1  workplace safe for the female employees who work
2  there?
3  MR. CAVALIER:  Again, same objection.  You
4  can answer it if you want to, Daniel, but you
5  don't have to.  It's argumentative.
6  BY MR. CARSON:
7  Q.  No.  You do have to.
8  A.  I'm in the business of making the
9  workplace safe for all the employees, and, indeed,
10  we have gone to great lengths to make the workplace
11  safe.  As you've heard, we have all sorts of
12  safeguards in place to protect everyone from
13  dangers.  Yes, it's a very high priority for me, and
14  we have done so.  And, indeed, in this case --
15  Q.  You gotta speak up.
16  A.  Where there was an allegation -- where
17  there were allegations against Gregg, I dealt with
18  them immediately and radically until the
19  satisfaction of those who complained.
20  Q.  You think a female employee would feel
21  comfortable reporting sexual harassment today after
22  the way you've handled the last ten reports?
23  MR. CAVALIER:  Object to the incomplete
24  hypothetical.  You can answer.

Page 239

- - -

1  THE WITNESS:  Yes.
2  BY MR. CARSON:
3  Q.  You really think that?
4  A.  I handled these objections -- I handled
5  these complaints expeditiously and satisfactorily.
6  I can't imagine why anyone would not be -- would not
7  come away from this pleased with what I did since
8  the principals were pleased with what I did.
9  Q.  Do you think they're still pleased today?
10  A.  Well, you got your hands on them, and you
11  got them to ask for $31 million.  Of course not.
12  - - -
13  (Indistinguishable cross-talk.)
14  - - -
15  THE WITNESS:  They were content.  They
16  wrote -- they signed agreements that this was
17  fine.
18  BY MR. CARSON:
19  Q.  You think I called them to sign them up
20  for their cases?  That's how you think it works?
21  A.  I don't know what happened.  $31 million
22  will certainly influence a lot of people's memories,
23  including yours.  How much are you getting, 14
24  million out of it, 13 million?  Good amount, Mr. --

Page 240

- - -

1  Q.  Mr. Pipes, if you wanna pay me 14 million,
2  that's fine, but I can assure you I will never get
3  $14 million out of this case or anything --
4  A.  We can agree on that, Mr. Carson.  You're
5  not gonna get --
6  Q.  I think we can.  Off the record I can tell
7  you what I really think about that, but, anyway,
8  let's keep going.  So one of the things that Lisa
9  writes in this email to you is that she would be
10  willing to participate in any investigation of Gregg
11  Roman, correct?
12  A.  Where?
13  Q.  Just take a minute and read.  Do you see
14  what I highlighted there?
15  MR. CAVALIER:  Seth, I'd ask, if you're
16  gonna ask about a sentence referencing
17  aforementioned instances, that you position the
18  document so that we can see the aforementioned
19  instances.
20  MR. CARSON:  We just read the rest of the
21  document.  I just got done scrolling down.
22  It's the same email we're talking about the
23  last hour.
24  MR. CAVALIER:  If you're gonna ask him

Page 241

- - -

1  questions about it, he should be able to see
2  it, right?
3  BY MR. CARSON:
4      Q.  -- need me to scroll back up, let me know,
5  but I'm also talking about this.  It says, "I am
6  satisfied with the speed of the inquiry yet
7  disappointed in the discovery aspect of the
8  incident.  I will, as requested, submit a separate
9  detailed description of the events that occurred on
10 March 14 in addition to all corroborating evidence."
11 So she does tell you that she's willing to continue
12 to help you corroborate the allegations made, right?
13 It's what she said.  It's what the document says.
14     A.  Yeah.
15     Q.  But there was no investigation done after
16 this letter was sent, correct?
17         MR. CAVALIER:  Object to form.
18 BY MR. CARSON:
19     Q.  Did you investigate anything after this
20 letter?  Remember, it's dated November 4th.
21     A.  The issue was closed.
22     Q.  The issue was closed.  That's right.
23 Okay.  We can move on to the next exhibit.  Where
24 are we?  All right.  So, just to round it out, I

Page 242

- - -

1  won't spend a lot of time on it because I'm sure
2  you'll get questions on it from another lawyer at
3  some point.  So exhibit number -- I don't know what
4  number we're on.
5         THE VIDEOGRAPHER:  Sorry, counsel.  We
6  are -- I'm at Pipes-8.  So we just finished
7  Pipes-7, which were pages five through seven of
8  the large Bates-marked document.
9         MR. CARSON:  All right.  So 11 -- the next
10 one will be 11 -- 11 through 15, I guess.
11        THE VIDEOGRAPHER:  All right.  Thank you.
12 And we'll mark it as Pipes-8 for exhibition.
13 BY MR. CARSON:
14     Q.  All right.  So this is an email.  This is
15 the same email that we already looked at for the
16 other two women.  He sent it at 11:34 where you talk
17 about the investigation you did yesterday.  Do you
18 recall that?
19     A.  I don't recall it, but I see it.
20     Q.  I'm sorry?
21     A.  I don't recall it, but I see it.
22     Q.  Wait.  What don't -- you don't recall --
23 remember we talked -- you sent this one to Lisa and
24 Tricia, too?

Page 243

- - -

1      A.  I agree.  I see it, yes.
2      Q.  Okay.  And you sent them all at 11:34.
3  This one says 11:34, too, and that's a.m., correct?
4      A.  It's a.m., yup.
5      Q.  Okay.  And then Marnie responds, right,
6  and she's worried about Gregg having access to
7  emails and passwords.  Do you see that?
8      A.  Yep.
9      Q.  And then, down here -- this is part of the
10 same exhibit -- it's a memorandum.  Now, I think
11 that this is a memorandum that you sent to the
12 entire office.  This looks like one of those things
13 where you have like a group email.  Is that what
14 this is?
15     A.  Yep.
16     Q.  Can you speak up, please, Mr. Pipes?
17     A.  Yes, okay.
18     Q.  And this email is -- looks like it was
19 sent on November 4th and -- "I am again addressing
20 this memo to everyone who works at MEF," and,
21 basically, you're announcing the staff meeting that
22 occurred on November 5th, 2018, right?
23     A.  Yes.
24     Q.  And Gregg Roman was initially invited to

Page 244

- - -

1  that meeting, correct?
2      A.  Correct.
3      Q.  And then you disinvited him when you
4  realized it would make the women uncomfortable?
5         MR. CAVALIER:  Object to form.
6         THE COURT REPORTER:  I can't hear you, Mr.
7  Pipes.
8         THE WITNESS:  Legal privilege.
9         THE COURT REPORTER:  What was that?
10        THE WITNESS:  Legal privilege.
11        MR. CAVALIER:  You're saying the reason
12    that you disinvited Gregg Roman has to do with
13    legal, so we're gonna object to that and not
14    answer the question under --
15 BY MR. CARSON:
16     Q.  No.  I think what you're trying to say is
17 Marc told you, but I'm not asking what Marc told
18 you.  I'm asking, why did you decide not to -- if
19 the only answer is that you're following the advice
20 of counsel, I guess you don't have to answer, but
21 I'll ask this for the record:  Why did you tell
22 Gregg not to come to the meeting?
23        MR. CAVALIER:  We're gonna assert to
24    privilege to that, Seth.

Deposition of DANIEL PIPES                                    Lisa Barbounis v. Middle Eastern Forum, et. al.

Page 245

- - -

1    MR. CARSON:  Well, he has to decide
2  whether that's true.
3    THE WITNESS:  Yeah, legal privilege.
4  BY MR. CARSON:
5    Q.  Did you think it was appropriate to invite
6  him in the first place?
7    A.  Legal privilege.
8    Q.  That's not legally privileged.  I'm not
9  asking about any communication between you and
10  counsel.
11    A.  Yeah, it was.
12    Q.  Well, it was appropriate?
13    A.  This was -- these decisions to invite him
14  and then not to invite him --
15    Q.  We can't hear you, Mr. Pipes.
16    A.  The decisions to invite him and then not
17  to invite him were based on conversations with Marc
18  Fink.
19    Q.  I'm asking in your opinion.  You're the
20  director of the Middle East Forum.  It's your job to
21  enforce MEF policy, especially their
22  anti-discrimination policy.  So I'm asking, based on
23  that, do you think it's appropriate to make the
24  women who are accusing someone of sexual harassment

Page 246

- - -

1  face the harasser directly?
2    MR. CAVALIER:  Object to form.
3    THE WITNESS:  He wasn't there, so it's a
4  hypothetical question.
5  BY MR. CARSON:
6    Q.  I think your actions speak for themselves,
7  so I'll move on.
8    A.  Well, let me think.
9    Q.  You can answer.
10    A.  All right.  I guess I'll tell you.
11    MR. CARSON:  Jon, you wanna jump in?
12    MR. CAVALIER:  If you want to answer --
13  there's no question pending, Daniel, but --
14    THE WITNESS:  Well, I didn't answer
15  before.
16    MR. CARSON:  I just wanna be fair to you.
17    THE WITNESS:  And I did command privilege,
18  but --
19    MR. CAVALIER:  Just -- just so -- you
20  can't talk about anything substantive that you
21  talked about with Marc.
22    MR. CARSON:  Yeah.  I can move on --
23    MR. CAVALIER:  -- want to.  You still can.
24    MR. CARSON:  This is not a big deal.  We

Page 247

- - -

1  can move on.
2    MR. CAVALIER:  Okay.
3    THE WITNESS:  Give me a moment.  Give me a
4  moment.
5  BY MR. CARSON:
6    Q.  Go ahead.
7    A.  I initially invited him -- go back to that
8  memo.  The key section here was, "I am sending you a
9  new NDA," and I included Gregg because I wanted him
10  to sign the NDA.  I actually never had any intention
11  of his appearing, but I did want to get his NDA,
12  and, therefore, I made it seem to him that he was
13  coming so it made it more likely he would sign it,
14  but I had no intention of his being there.
15    Q.  Wasn't it already signed?
16    A.  No.  There wasn't clear that -- no, didn't
17  happen.
18    Q.  Didn't you send an email to everyone
19  saying he's no longer coming anymore?
20    A.  Yes, subsequently, when he did sign it.
21    Q.  Mr. Pipes, I'm gonna move on.  The -- the
22  next exhibit I'll show you is -- so, I guess, since
23  you brought up the NDA, I'll just -- why did you
24  want everyone to sign an NDA before the

Page 248

- - -

1  November 5th, 2018 meeting?
2    MR. CAVALIER:  To the extent you can
3    answer that question without talking about
4    legal advice, you can answer it.  If you need
5    to rely on legal advice to answer the question,
6    we're gonna assert to privilege.
7    THE WITNESS:  I believe we had NDAs from
8    everyone but -- but Gregg, so --
9  BY MR. CARSON:
10    Q.  Where did you --
11    A.  I sent it to everyone to de-emphasize the
12  fact that, actually, the only person we really cared
13  about was Gregg.
14    Q.  But, like, I guess my question is, I would
15  be concerned about the chilling effect that an NDA
16  might have on future reports.  Did you consider that
17  at all?
18    A.  No.
19    Q.  There were some new stipulations in that
20  NDA, right?
21    A.  Yes.
22    Q.  Do you know what they were off the top of
23  your head?
24    A.  No.

Deposition of DANIEL PIPES                                Lisa Barbounis v. Middle Eastern Forum, et. al.

Page 249

- - -

1  Q.  Do you know what you guys were talking
2  about in this here?  I think it's trying to figure
3  out -- I'll bring your attention to this.
4  A.  Self-explanatory, no?
5  Q.  Well, it says, "Marnie, Marc, and I have
6  been working on this."  Do you know what "this" is
7  when you guys -- what "this" is there?
8  A.  Well, it says the letter to GR, new terms
9  of employment.
10  Q.  So that was like trying to figure out what
11  his terms of employment would be post November 5th,
12  2018?
13  A.  And I discussed it with various people,
14  including --
15  Q.  No.  It wasn't a real question that time.
16  I just didn't know.  Thank you, though.
17  A.  Marnie was part of the discussion.
18  Q.  All right.  So I'll wait to do that.  Did
19  you ever take Gregg Roman's key away from him?
20  A.  Personally, no, but someone did.
21  Q.  How does that work?  Like is there
22  actually -- like I don't have a key to my office.  I
23  have like a card that gets me in everywhere.  Do you
24  have cards, or do you have like a physical key that

Page 250

- - -

1  you took from him?
2  A.  Card.  Card was taken from him.
3  Q.  So was Gregg Roman's privileges to come to
4  the office like physically taken away, as in, if he
5  wanted to come, he wouldn't have been able to
6  because he didn't have a key or card anymore; is
7  that right?
8  A.  Yes.
9  Q.  Yeah?
10  A.  Yes.
11  Q.  When did that happen?
12  A.  Immediately.
13  Q.  Do you know who did that?
14      THE COURT REPORTER:  I didn't catch what
15  Mr. --
16  BY MR. CARSON:
17  Q.  Daniel, I think the court reporter is
18  having a tough time hearing you.
19  A.  Marnie, I believe, is head of human
20  resources.
21  Q.  So Marnie would've done that, the
22  actual -- physically making sure he doesn't have
23  access anymore?
24  A.  I believe so.

Page 251

- - -

1  Q.  Do you know for a fact that Gregg ever
2  lost his key and his card?  Strike that.  Do you
3  know for a fact that Gregg Roman's key and card were
4  actually physically taken away from him?
5  A.  Yes.
6  Q.  How do you know that?
7  A.  He -- I was told that -- I asked for it to
8  be handed in, and it was handed in.
9  Q.  Marnie Meyer told you that?
10  A.  I can't be specific.  It's two years ago.
11  I know, to my satisfaction, his key was removed, and
12  when he did come to the office to take away his
13  personal effects, I was there, went downstairs and
14  let him in, and watched as he packed up and took his
15  stuff out.
16  Q.  All right.  So I guess I will show it to
17  you.  So the next document is 17.  It's right here.
18  We're on it now.  So 17 and, I guess, 18 will be a
19  document, and this document is dated March 11th, and
20  it's from Tricia McNulty.  So you testified earlier
21  that Ms. McNulty was happy to have Gregg come back;
22  is that correct?
23  A.  Correct.
24  Q.  Did Ms. McNulty or Ms. Barbounis or anyone

Page 252

- - -

1  want conditions on that, on him coming back?
2  A.  Yeah.  They reiterated the conditions that
3  we had agreed on.
4  Q.  Okay.  And so then, I guess, based on
5  that, I think this is what we're talking about.  Can
6  you just review this -- this email?  Just let me
7  know when you're done.
8  A.  Okay.
9  Q.  All right.  So this is an email that
10  Ms. McNulty sent you on March 11, 2019; is that
11  correct?
12  A.  That's what it says.
13  Q.  And do you remember receiving this email?
14  A.  I do not.
15  Q.  But you did receive it?
16  A.  I assume it's valid, yeah.
17  Q.  Okay.  And I'll represent to you it was
18  produced by your lawyers and was marked by your
19  attorneys D0000017.  And it says, "My understanding
20  of the meeting outcome is that Gregg will serve as
21  the Forum's director once again with certain
22  parameters in place.  At a minimum, the first six
23  months will essentially be a probationary period
24  with Daniel looking over Gregg's shoulder to be sure

Deposition of DANIEL PIPES                         Lisa Barbounis v. Middle Eastern Forum, et. al.

Page 253

- - -

1  no improprieties are being made."  So Ms. McNulty
2  said -- she allowed for him to return as long as
3  certain parameters remained in place, correct?
4      A.   Yep.
5          MR. CAVALIER:  Object to form.
6  BY MR. CARSON:
7      Q.   She -- she acquiesced to his return as
8  long as certain parameters were in place, correct?
9      A.   No.
10     Q.   What do you mean, no?
11     A.   The verb "acquiesce".
12     Q.   What's the word you would use?
13     A.   Look at No. 2:  "I think there should be
14 no problem with Gregg being in the office."  That
15 was not an acquiescence.  That was an agreement.
16     Q.   Okay.  She agreed that he could return as
17 long as certain parameters remained in place, right?
18     A.   Right.
19     Q.   Okay.  We'll use the word "agreement".
20 And one of those parameters was that it be a
21 probationary period, right?
22     A.   Right.
23     Q.   And --
24     A.   All this confirms the discussion we had on

Page 254

- - -

1  the 9th of March.  This is not breaking ground; this
2  is confirming the points we --
3      Q.   Can you speak up just a little?
4      A.   -- the points that Gregg had agreed upon
5  as well as the meeting.  He was there at that
6  meeting on March 9th.  We all agreed.
7      Q.   Where was the meeting on March 9th?
8      A.   At the office.
9      Q.   It was in your office?
10     A.   The Middle East Forum office, yes.
11     Q.   In the what?
12     A.   Middle East Forum office, yes.
13     Q.   Middle East Forum office, okay.  And --
14 and who was at that meeting?  Was it you, Gregg,
15 Lisa, Patricia, Marc?
16     A.   Marnie, Thelma.  I forget whether it was
17 Delaney or Caitriona.  One of them was there, and
18 one wasn't.
19     Q.   Okay.
20     A.   Matt was there.  Essentially, everyone
21 except either Caitriona or Delaney was not there,
22 and Marc was on the telephone.
23     Q.   Okay.  So it says, "Gregg knows that those
24 in the office are allowed to talk to Daniel directly

Page 255

- - -

1  at any time should they wish to raise concerns and
2  that, unlike before, there can be no directive to
3  discuss anything with Daniel," right?
4      A.   Yup, that's what it says.
5      Q.   Sorry.  Can you say that louder?
6      A.   That's what it says.
7      Q.   So, again, it references that, before,
8  Gregg Roman maintained a policy where people weren't
9  allowed to come to you, right?
10         MR. CAVALIER:  Object to form.  Object to
11     the categorization.
12 BY MR. CARSON:
13     Q.   Well, that's what she's talking about,
14 correct?
15     A.   That is what she's saying, yes.
16     Q.   Did you disagree that he did that?  Did he
17 ever disagree he did that?
18         MR. CAVALIER:  Object to form.
19         THE WITNESS:  All I know is they did come
20     to me, and I acted promptly and effectively, so
21     this whole thing doesn't make much sense to me.
22 BY MR. CARSON:
23     Q.   Did you --
24     A.   They did come, and they got the relief

Page 256

- - -

1  they sought.
2      Q.   Did you know that Gregg Roman dissuaded
3  employees from going to you before November 1st,
4  2018?
5          MR. CAVALIER:  Object to form.  Lack of
6      foundation.
7  BY MR. CARSON:
8      Q.   Did you know that he did that?
9      A.   Well, I didn't know that there were
10 allegations that he did that.  Whether he did it or
11 not, I don't know, but there were definitely
12 allegations that he told staff to bring their
13 complaints to him and not to me.
14     Q.   Well, did you ever talk to him about it?
15     A.   I don't remember.  What I did make clear
16 is that, henceforth, he is welcome to tell me --
17 said it again, and, indeed, Tricia's note reflects
18 that -- that, in the future, we are free to come to
19 you.
20     Q.   Did you make it clear to Gregg Roman that
21 he wasn't permitted to do that anymore?
22     A.   Definitely.  Well, I mean, I don't know if
23 he ever did, but definitely he couldn't do that in
24 the future.  It was a whole different regime

Case 2:19-cv-05030-JDW   Document 126-3   Filed 04/20/21   Page 68 of 179

Deposition of DANIEL PIPES                                    Lisa Barbounis v. Middle Eastern Forum, et. al.

Page 257

- - -
1 starting in November.  Everything changed concerning
2 Gregg.  He was no longer in the office, no longer
3 managing the office --
4      Q.  It was just a yes or no question,
5 Mr. Pipes.  I asked, did you make it clear to Gregg
6 Roman that he could not tell employees that they
7 weren't allowed to come to you?
8           MR. CAVALIER:  Object to form.
9           THE WITNESS:  I will answer as I see fit.
10 BY MR. CARSON:
11      Q.  It's just -- did you ever talk to him
12 about it?  It's a simple question.
13      A.  I will answer as I see fit, and I did.
14      Q.  Can you please say yes or no as part of
15 your answer?
16           MR. CAVALIER:  He already did.
17           THE WITNESS:  -- answer as I see fit.
18 BY MR. CARSON:
19      Q.  Well, I didn't hear you.  Was your answer
20 yes or no to that?
21      A.  You're not gonna tell me how to answer.
22      Q.  I didn't hear --
23                - - -
24      (Indistinguishable cross-talk.)

Page 258

- - -
- - -
2 BY MR. CARSON:
3      Q.  Did you say yes or no to that question?
4      A.  I didn't answer that question.  I already
5 answered --
6      Q.  Okay.  So can we try to answer that
7 question, then?  Did you ever talk to Gregg Roman
8 about that?  Did you ever tell him, hey, I don't
9 know whether you did this in the past, but, going
10 forward, you can't do that anymore?  Did you ever
11 say that?
12           MR. CAVALIER:  Object to form, but you can
13      answer that question, Daniel.
14           THE WITNESS:  That's too specific.  I do
15      not know what -- I do not remember what exactly
16      I said.  I do know that I told him that this
17      was -- your management of the office personnel
18      was terrible.  You're not gonna happen --
19      you're not gonna be managing it henceforth.
20      There's wholesale changes.  Among those, any
21      possibility of his telling anyone not to talk
22      to me, but that was a minor detail of a much
23      larger picture.  Whether I brought up that
24      minor detail specifically or not, I don't know.

Page 259

- - -
1 BY MR. CARSON:
2      Q.  You think that's a minor detail?
3      A.  That was a minor detail in the whole
4 panoply of complaints.  That was one of many
5 complaints against Gregg.
6      Q.  Well, couldn't that explain why no one
7 came to you for eight months?  You keep talking
8 about how -- I don't know why they didn't come to me
9 for eight months.  I can't believe they didn't come
10 to me for eight months.  So, in that context, it's
11 not very minor if there was a policy that they
12 weren't allowed to go to you, right?
13      A.  No.
14           MR. CAVALIER:  Object to form.
15           THE WITNESS:  Makes no sense.  First of
16      all, they knew from me that my door was open, I
17      wanted no surprises, and, secondly, they did
18      come to me, and they got satisfaction.
19 BY MR. CARSON:
20      Q.  Okay.  They got satisfaction until I
21 called them and started a conspiracy against your
22 business, right?
23      A.  Thank you for acknowledging that.
24      Q.  That's what you think happened, right?

Page 260

- - -
1      A.  Yeah.
2      Q.  That's what you believe, right?
3      A.  Yeah.  $17 million divided four, five ways
4 is a lot of money.
5      Q.  Did you ever threaten Lisa Barbounis with
6 a RICO case?
7           MR. CAVALIER:  Object to form.
8           THE WITNESS:  I'm glad you raised that.
9                - - -
10      (Indistinguishable cross-talk.)
11                - - -
12           THE WITNESS:  -- explain what happened,
13      and you're just gonna have to listen to me.
14 BY MR. CARSON:
15      Q.  I will --
16      A.  I did not --
17      Q.  I will allow you to explain, but can you
18 please say yes or no as part of your answer?  Did
19 you ever --
20      A.  No, I did not.  Let me explain.
21      Q.  Okay.  Go ahead.
22      A.  We met twice on October 12th and October
23 14th, a month ago.
24      Q.  Speak up a little, please.

Deposition of DANIEL PIPES                                              Lisa Barbounis v. Middle Eastern Forum, et. al.

Page 261

- - -

A.   And that first time I referenced the RICO case.  She expressed complete ignorance of it.  So the second time, on October 14th, I brought with me a printout of the letter that you received, Mr. Carson, and presumably had passed on to your client, dated September 29th, informing you of the RICO case.  I did not threaten her with it.  I informed her, since you apparently did not, that there's a RICO case that had been initiated against her.  So, no, there was no threat.  It was information, strange information that I should have to provide to her since the letter went to you and, presumably, you received it, and you didn't pass it on to her.  So, no, there was no threat whatsoever.  All I said was, this is underway.  I hope we can reconcile our differences so that this can -- this and everything else can be stopped.  She knew about the employment claim; she knew about the counterclaim; she knew about the trade secrets claim.  She did not know about the RICO claim.  Therefore, I thought it would be useful for her to know about that.  That she portrayed it to you as a threat shows, once again, her -- how shall I put it -- lack of veracity.  There was no threat.  It

Page 262

- - -

was informational.  Here, Lisa, is the letter that was sent about two weeks ago to your counsel, which, for some reason, he didn't make available to you, and then she portrayed that as a threat.  No.  No threat.  But I said, if we don't quit, we will have to go forward with it, and I don't wanna.  I'd rather bury this whole thing.  We can do this now, you and I.  She said no.  She can -- subsequently, she wrote me and said, no, she's gonna continue with it.  So we are continuing with it as well.

Q.   Did you use the word "scuttle"?  Did you say you'd scuttle the RICO case?

A.   I do not remember what verbs I used.  I can tell you that I suggested that if we reached an agreement between her and the Middle East Forum, all these cases would be closed, including three that I mentioned and the fourth -- the three that she knew about and the fourth that she did not know about.

Q.   So you asked Ms. McNulty and Ms. Barbounis to send you an email saying that it was okay if Gregg came back to the Forum, right?

MR. CAVALIER:  Object to form.

BY MR. CARSON:

Q.   You requested that email, right?

Page 263

- - -

MR. CAVALIER:  Object to form.

THE WITNESS:  No, I did not.

BY MR. CARSON:

Q.   Did you request the email?  Did you ask them to confirm with you that Gregg could come back?

A.   No.

Q.   You never said to them, hey, I need you guys to send me an email if he's gonna come back?  You gotta send me an email saying that.

A.   No.

Q.   So your testimony is that they unilaterally both decided to send you an email confirming that it was okay if he came back on their own?

A.   No.

MR. CAVALIER:  Object to form.

BY MR. CAVALIER:

Q.   Well, which one is it?

MR. CAVALIER:  Object to form.

THE WITNESS:  Mr. Carson, if you look in front of you, it says, from Marc Fink.  It's not from me.

BY MR. CARSON:

Q.   I wasn't referencing anything right now.

Page 264

- - -

I was just asking you a question.

A.   You, you, you, you.  No, it wasn't me.

Q.   I was talking about this one, actually, the email that she sent on March 11th.  That was after a meeting you held on March 9th, right?

A.   I believe it's addressed to Marc Fink, not to me.

Q.   Right, okay, and you're cc'd on it, right?

A.   I was cc'd.

Q.   And she's saying -- she's confirming a meeting, right?

A.   Mm-hmm.

Q.   So isn't it true that she was asked to send this email and that Lisa was asked to send a similar email?

A.   Yes.

Q.   Okay.  Thank you.  All right.  So the next exhibit will be -- do you think Ms. Barbounis has stolen anything from you?

A.   Yes.

Q.   What?

A.   Trade secrets.

Q.   What are the trade secrets you think she stole?

   

Page 265

- - -

1  A.  A donor list, Middle East Forum internal
2 discussions, Forum projects.  I don't know what
3 else.
4  Q.  Please just talk a little louder.  So when
5 you say "a donor list," what do you mean by that,
6 you know?  Like what -- like you think she still has
7 a list of donors' names?  Is that what you're
8 saying?
9  MR. CAVALIER:  Seth -- one second, Daniel,
10 before you answer -- you're going off into
11 another case.
12  MR. CARSON:  No, I'm not.  You guys have a
13 counterclaim in this case that's based on this
14 stuff.
15  MR. CAVALIER:  To the extent you stay
16 within this case, we'll let you go.  I just
17 wanted to let you know that I don't wanna get
18 into a full-blown discussion of --
19  MR. CARSON:  Yeah, I don't either.  I have
20 two more hours -- two and a half more hours,
21 whatever it is, so I'm trying to --
22  MR. CAVALIER:  All right.  So long as
23 we're on the same page, I'll certainly grant
24 you a little leeway.

Page 266

- - -

1 BY MR. CARSON:
2  Q.  So -- [unintelligible] -- you think she
3 has a list of the names and donors' names and phone
4 numbers?  What're we talking about?
5  A.  Yes.
6  Q.  Has any of these donors ever told you that
7 she contacted them?
8  A.  No.
9  Q.  So if she had a list of donors that just
10 happen to be on a hard drive somewhere and she never
11 contacted them, do you have a problem with that?
12  A.  Yes.
13  MR. CAVALIER:  Object to form.
14 BY MR. CARSON:
15  Q.  Do you think that she did something wrong
16 if she -- she did work with the donor list when she
17 worked with the Middle East Forum, right?
18  A.  Yes.
19  Q.  That was a yes, right?
20  A.  Yes.
21  Q.  You think she ever stole anything else
22 besides donor list?
23  A.  Well, let's not leave that subject yet.
24 We know that she sent it to at least one other --

Page 267

- - -

1 she sent information from our donor list to at least
2 one other nonprofit looking to raise funds.
3  Q.  Who?
4  A.  Amy Mekelburg.  And we know that she used
5 our information to try and help the Rebel to raise
6 money from --
7  Q.  What's a Rebel?
8  A.  It's a media organization in Canada.
9  - - -
10  (Indistinguishable cross-talk.)
11  - - -
12 BY MR. CARSON:
13  Q.  Are you talking about Tommy Robinson?
14  A.  No, no.
15  Q.  Okay.
16  A.  We have reason to believe -- we have
17 specifics that she used information of ours to help,
18 and perhaps herself, gain income by helping other
19 nonprofits.  So, no, the fact that I have not heard
20 from donors saying, oh, Lisa contacted me, no, that
21 wasn't the issue.  The issue was that she was giving
22 it to others, and others would use it, and our
23 donors know that Amy Mekelburg got their names from
24 us.

Page 268

- - -

1  Q.  Well, do you know if Amy Mekelburg ever
2 tried to contact a donor?
3  A.  I don't.  I know that Lisa gave our
4 information to Amy Mekelburg, and that is stealing.
5  Q.  What information do you think she gave?
6  A.  Our donor list.
7  Q.  You think she sent a donor list to Amy
8 Mekelburg?
9  A.  I do.
10  Q.  Do you think she stole anything else?
11  A.  She stole media contacts.
12  Q.  What media contacts?
13  A.  That was her job, to deal with the media.
14  Q.  What media contacts did she steal?
15  A.  She stole the list of media contacts.
16  Q.  That's your information?  Other people's
17 contact information belongs to you?
18  A.  Of course.  When it's put together into a
19 list, it becomes privileged trade secret
20 information.
21  Q.  A list of public information about
22 contacts in the media is trade secrets?
23  MR. CAVALIER:  Object to the
24 characterization of the document.  Object to

Deposition of DANIEL PIPES                                    Lisa Barbounis v. Middle Eastern Forum, et. al.

Page 269

- - -

1    form.
2         THE WITNESS:  Same goes with the donors.
3    The donors are generally not secret, but
4    knowing who to go to and what their views are
5    and what their positions are.  Likewise, with
6    the media, to know who to go to at a
7    publication or television station is, yeah,
8    important information [inaudible] and she took
9    that from us.
10   BY MR. CARSON:
11        Q.   You think that you own information about
12   how to contact TV stations and newspapers?  That's
13   your --
14        MR. CAVALIER:  Object to the
15   categorization of the testimony.  And, Seth, by
16   the way, I gave you a little leeway, but I just
17   wanna remind you the trade secret issues are in
18   a separate --
19             - - -
20        (Indistinguishable cross-talk.)
21             - - -
22        MR. CAVALIER:  There are no counterclaims
23   about any theft in this case.  [Inaudible]
24   trade secrets.

Page 270

- - -

1         MR. CARSON:  I'm following his answer
2    [inaudible].
3    BY MR. CARSON:
4         Q.   But, I mean, look.  Did she steal anything
5    else besides the names and phone numbers of public
6    information in the media?
7         MR. CAVALIER:  Object to form.
8    BY MR. CARSON:
9         Q.   Mr. Pipes, I'm trying to --
10        A.   -- to discuss this today.  I thought we
11   were talking about the employment case.
12        Q.   We are, but you made a counterclaim in
13   this case, so it's the same case.  So --
14        MR. CAVALIER:  Hold on.  Seth, hold on.
15   There's no counterclaim for theft of trade
16   secrets or theft of anything.
17        MR. CARSON:  Yeah, there is, actually.
18   Read your counterclaim.
19        MR. CAVALIER:  I'm looking at it right
20   now.
21        MR. CARSON:  Look at it a little closer.
22        MR. CAVALIER:  Seth --
23             - - -
24        (Indistinguishable cross-talk.)

Page 271

- - -

- - -

1    BY MR. CARSON:
2         Q.   What's your counterclaim, Mr. Pipes?  Why
3    did you counterclaim in this case?
4         MR. CAVALIER:  Seth, he -- if you can
5    answer that off the top of your head, Daniel.
6         THE WITNESS:  I can.  I'm --
7         MR. CAVALIER:  Go for it.
8         THE WITNESS:  I'm here to discuss my being
9    the head of the Forum, my being Gregg's
10   supervisor.  I am not prepared to talk about
11   the counterclaim.
12   BY MR. CARSON:
13        Q.   It doesn't matter whether you're prepared.
14   That's not my problem, Mr. Pipes.  We're gonna talk
15   about this because it's your counterclaim, and
16   unless you're gonna agree that we can do another
17   deposition, talk about the counterclaim --
18        MR. CAVALIER:  To be clear, we are -- you
19   can ask whatever you want about the
20   counterclaims, but they are -- the trade
21   secrets theft allegations are not part of these
22   counterclaims.  It's a totally separate case.
23        MR. CARSON:  Read your counterclaim a

Page 272

- - -

1    little more closely, but, Jon, is the $7,500
2    part of the counterclaim?
3         MR. CAVALIER:  Nobody has alleged that
4    Lisa Barbounis stole $7,000 from the Middle
5    East Forum.
6         MR. CARSON:  Well, tell me what your
7    counterclaim is based on --
8         MR. CAVALIER:  My counterclaim is based on
9    breach of duty of loyalty for her failure to
10   disclose that she knew about the theft or
11   reported to the Middle East Forum, it's civil
12   conspiracy based on her interactions with
13   Daniel Thomas around that misappropriation, and
14   it's fraudulent misrepresentation relating to
15   what she told MEF she was doing while she was
16   getting paid by them while she was off doing
17   other things.  There's no trade secret
18   allegations in these counterclaims.  I'm
19   looking at it right here.
20   BY MR. CARSON:
21        Q.   Does that help you, Mr. Pipes?  I allowed
22   Mr. Cavalier to do that because I thought it might
23   help focus the issues.
24        A.   Okay, yep.  It helps remind me, yeah.

Deposition of DANIEL PIPES                                    Lisa Barbounis v. Middle Eastern Forum, et. al.

Page 273

- - -

1  Q.  So you think that Ms. Barbounis broke the
2  law because she didn't tell you about $7,500?  Is
3  that what you think?
4      MR. CAVALIER:  I'll object to the form.
5      THE WITNESS:  I don't know if it's
6  breaking the law or not.
7  BY MR. CARSON:
8      Q.  Well, you sued her and accused her of
9  breaking the law, right?
10     MR. CAVALIER:  Again, object to the form.
11     I think you're confusing the difference between
12     criminal law and a civil violation.
13  BY MR. CARSON:
14     Q.  Do you know the difference between
15  criminal law and a civil violation?
16     A.  I do.
17     Q.  So -- sorry.  What was your answer?
18     A.  I do, yes.
19     Q.  You understand that when I say "break the
20  law," I'm -- I've said it many times today.  Gregg
21  Roman broke the law when he violated Title VII in
22  the [unintelligible] Philadelphia Fair Practice
23  Ordinance.  You're accusing Ms. Barbounis of
24  breaking the law by violating the duty of loyalty.

Page 274

- - -

1  Do you understand that?
2      A.  Okay.
3      Q.  So why do you think Ms. Barbounis
4  violated -- what's her duty of loyalty?  What
5  information do you have about that?
6      A.  She knew about the theft of the $7,000 and
7  didn't report it.
8      Q.  Why do you think she knew about it?
9      A.  Because we have texts between her and
10  others that indicate that.
11     Q.  Do you know if $7,000 was ever really
12  stolen from you?
13     A.  We have her text to tell us that as well
14  as other people's information.
15     Q.  Have you ever confirmed whether that money
16  was ever really stolen from you?
17     A.  It was stolen in the sense that it was
18  meant for one purpose and used for another.
19         - - -
20     (Indistinguishable cross-talk.)
21         - - -
22  BY MR. CARSON:
23     Q.  What purpose was it used -- who stole the
24  money?

Page 275

- - -

1      A.  Danny Thomas.
2      Q.  Do you know whether Danny Thomas actually
3  took the money?
4      A.  Yes.  We were told.  He admitted it.
5      Q.  He admitted it?  Is that your testimony?
6      A.  I believe so.
7      Q.  Did he also say whether Gregg Roman
8  offered to pay him money for admitting it?
9      A.  He did not say that.
10     MR. CAVALIER:  Object to form.
11  BY MR. CARSON:
12     Q.  Did you ever listen to a recording where
13  he said that?
14     A.  I listened to a recording, and he did not
15  say that.
16     Q.  Oh, he didn't?
17     A.  He didn't.
18     Q.  Do you wanna listen to it right now?
19     A.  Sure.
20         - - -
21     (Whereupon audio recording was played.)
22         - - -
23  BY MR. CARSON:
24     Q.  You heard him just say, "So Gregg

Page 276

- - -

1  contacted me," correct?
2      MR. CAVALIER:  I'm gonna object to the
3      fact that that sounds incomprehensible to me,
4      but to the extent --
5  BY MR. CARSON:
6      Q.  You heard him just say, "So Gregg
7  contacted me," correct?
8      A.  I heard those words spoken.  I don't know
9  who spoke them.
10     Q.  Okay.
11         - - -
12     (Whereupon audio recording was played.)
13         - - -
14  BY MR. CARSON:
15     Q.  "He gave me a little wink and said, 'When
16  this is all over'" -- "He said, 'Help us do
17  this'" -- so did you ever hear that recording
18  before?
19     MR. CAVALIER:  Again, I'm just gonna
20     object to the fact that I find it
21     incomprehensible but --
22  BY MR. CARSON:
23     Q.  Did you ever hear that recording before?
24     A.  I did not.

Page 277

- - -

1  Q.  You never listened to that recording
2 before?  Do you think it's troubling that he's
3 saying, "I'm gonna fuckin' testify against that
4 cunt"?  Like do you think that's credible?
5  A.  I have no idea who's speaking, and I don't
6 know what the subject is.
7  Q.  I mean, you testify all day about
8 credibility, Mr. Pipes.
9  A.  I didn't even understand half of it, so
10 provide a transcript, and let's go over it.
11  Q.  We'd be happy --
12  - - -
13  (Indistinguishable cross-talk.)
14  - - -
15  THE WITNESS:  -- who spoke this and so
16 forth.  I have no idea what this is.
17 BY MR. CARSON:
18  Q.  Have you ever had a conversation with him?
19  A.  With who?
20  MR. CAVALIER:  Object to form.
21 BY MR. CARSON:
22  Q.  Danny Thomas.
23  A.  No.
24  Q.  Have you ever asked him to return the

Page 278

- - -

1 money?
2  MR. CAVALIER:  Object to form.
3  THE WITNESS:  No.
4 BY MR. CARSON:
5  Q.  Why -- if you think he stole money from
6 you, why haven't you asked him to return it?
7  A.  I have not dealt with the specifics of
8 this.  Gregg has.  You have to ask him.
9  Q.  Nobody's asked him to return the money,
10 though, right?
11  MR. CAVALIER:  Object to form.
12  THE WITNESS:  All I can tell you is that I
13 did not authorize any payment of money to Danny
14 Thomas, and I would not.  It's --
15  MR. CARSON:  You have to speak up.  Can
16 you hear him, because I can't hear him at all.
17  THE COURT REPORTER:  It's very quiet.
18  MR. CARSON:  I mean, you just --
19 Mr. Pipes, we're doing this on a video
20 recording, so you just gotta make it so we can
21 hear you, man.  Can you read the last question?
22  - - -
23  (Whereupon the court reporter read back
24 the pertinent testimony.)

Page 279

- - -

1  - - -
2 BY MR. CARSON:
3  Q.  That's the question.  Are you aware of
4 anyone asking for money to be returned?
5  A.  No.
6  Q.  Mr. Pipes, if Danny Thomas never really
7 stole money, then is there anything that Lisa did
8 wrong?
9  MR. CAVALIER:  Object to the hypothetical,
10 lack of foundation.
11 BY MR. CARSON:
12  Q.  I mean, it's the basis for your
13 counterclaim that money was stolen from you,
14 right?
15  A.  There are -- I don't know.
16  Q.  Well, have you ever seen any evidence that
17 money was stolen from you?
18  A.  What do you mean by "evidence"?
19  Q.  Have you ever seen any evidence that Danny
20 Thomas actually took money that was donated for a
21 Tommy Robinson campaign and that he spent on
22 something else?  Has anyone ever provided evidence
23 of that?
24  MR. CAVALIER:  Object to form.

Page 280

- - -

1 BY MR. CARSON:
2  Q.  What was that evidence?
3  A.  The many texts going back and forth
4 between him and Lisa, maybe others, about this
5 misappropriated money.
6  Q.  Are you talking about the texts where he
7 says, I never stole money?
8  MR. CAVALIER:  Object to form.
9  THE WITNESS:  No.  I'm talking about where
10 they discussed the money that he had taken that
11 was meant for other purposes.
12 BY MR. CARSON:
13  Q.  You saw text messages where Danny Thomas
14 and Lisa Barbounis discussed money that Danny Thomas
15 stole?
16  A.  Yes.
17  Q.  Really?
18  A.  I believe so.
19  Q.  What did they say?
20  A.  I don't memorize these things.  I'm sure
21 we can produce it for you quickly enough.
22  Q.  I would love to see those text messages.
23 You saw text messages where Danny Thomas and Lisa
24 are talking about seven -- how much was it that was

Page 281

- - -

1 supposedly stolen?
2   A.  $7,000.
3   Q.  You saw text messages where they're
4 talking about $7,000, and they both are agreeing
5 that he took the money?
6   A.  I believe so.  Be happy to find you the --
7   Q.  Yeah, no.  Please, I would ask, if you
8 have those text messages, I'd ask you to please
9 produce them.
10   A.  Okay.
11   Q.  Because I've never seen a text message
12 like that.
13   A.  Okay.
14   Q.  I'll move on.  Is that the only basis of
15 your counterclaim is this $7,000?
16       MR. CAVALIER:  Object to the form and the
17   characterization of the counterclaim.
18       MR. CARSON:  I'm asking what the basis of
19   it is.
20       MR. CAVALIER:  You're asking him what the
21   basis of the counterclaim is.  That involves
22   all kinds of legal conclusions and analysis.
23   If you wanna --
24       - - -

Page 282

- - -

1       (Indistinguishable cross-talk.)
2       - - -
3 BY MR. CARSON:
4   Q.  Is there any other reason why you decided
5 to make a counterclaim against Lisa Barbounis other
6 than the $7,000 that --
7       MR. CAVALIER:  Object to form.  Are you
8   talking about just the breach of fiduciary
9   claim, or you talking about the other
10   counterclaim?
11 BY MR. CARSON:
12   Q.  All of them.  Is there any other claims?
13 Are any of them based on anything other than the
14 $7,000?
15   A.  It's a long document that I have not
16 memorized, so if you want me to go back and review
17 it, I --
18       - - -
19       (Indistinguishable cross-talk.)
20       - - -
21 BY MR. CARSON:
22   Q.  Testify to the best of your knowledge
23 right now.  To your knowledge, is there any other
24 basis for any of the counterclaims other than the

Page 283

- - -

1 $7,000?
2       MR. CAVALIER:  Gonna object as asked and
3   answered.
4       THE WITNESS:  Provide me the documents,
5   and I will then tell you -- give you an answer,
6   but I can't --
7 BY MR. CARSON:
8   Q.  What document should I provide you that
9 will help you answer that question?
10   A.  Counterclaim.  Provide me with the
11 counterclaim.
12   Q.  It's your counterclaim.
13   A.  Right, but I --
14   Q.  You want me to show you your counterclaim
15 so you can answer a question about your
16 counterclaim?
17   A.  I did not memorize it.  It's a long,
18 complicated document with many legal aspects which I
19 cannot recite to you.
20   Q.  So, sitting here right now, you don't know
21 of any other basis for the counterclaim other than
22 the 7,000 --
23       MR. CAVALIER:  Object to form.  Object to
24   the miscategorization of testimony.  He's

Page 284

- - -

1   answered the question to the best of his
2   ability, Seth.
3       MR. CARSON:  Actually, he hasn't.
4 BY MR. CARSON:
5   Q.  But just clear it up.  Sitting here right
6 now, without looking at the counterclaim, without
7 reading it, do you know of any other basis for the
8 counterclaim other than the $7,000?
9   A.  Sitting here --
10       MR. CAVALIER:  Object to form.
11       THE WITNESS:  I'm not gonna be trapped by
12   you.
13 BY MR. CARSON:
14   Q.  It's not a trap.
15   A.  Let me finish --
16   Q.  Your lawyer entered his objection.  Just
17 answer the question, yes or no.  It's simple.  We
18 can move on.
19   A.  Sitting here right now, I am not gonna be
20 trapped by you into giving an incomplete version of
21 the counterclaim.  It's in black and white.  I can
22 read it, I can bone up on it, I can recite it to
23 you, but I can't do it for you right now.  I'm
24 focused on the timeline of what happened, and that's

Deposition of DANIEL PIPES                                    Lisa Barbounis v. Middle Eastern Forum, et. al.

Page 285

- - -

1 what I can speak about with confidence.  The
2 counterclaim I'm not prepared to talk about.
3     Q.  Lisa Barbounis had your permission to work
4 with Tommy Robinson, correct, on her own time?
5        MR. CAVALIER:  Object to form.
6        THE WITNESS:  When?
7        MR. CAVALIER:  -- date range on that?
8 BY MR. CARSON:
9     Q.  Anytime.  She had your permission at
10 sometime in your life to work with Tommy Robinson?
11     A.  Until she abused it, yes.
12     Q.  You said to her, you can do what you want
13 on your own time, right?
14     A.  Until she abused that, and then I took it
15 away.
16     Q.  You actually said to her, I'm hesitant to
17 tell you what to do on your own time.  You can do
18 what you like, right?
19     A.  Until she abused that, and I took it away.
20     Q.  Is there any basis -- is there any policy
21 in the Middle East Forum maintained that an employee
22 of the Middle East Forum isn't allowed to have a
23 second job?
24     A.  No, but there is a policy that we cannot

Page 286

- - -

1 be involved in politics, and when British media
2 portray a Middle East Forum employee as working on
3 the Tommy Robinson campaign, red lights go off all
4 over the place, and I had to stop that.
5     Q.  So -- but she's allowed to work on
6 politics as long as it's not related to her job at
7 the Middle East Forum, right?
8     A.  That was the initial point.  Later, I said
9 you gotta stop it entirely because you've crossed
10 the line.
11     Q.  And after you said that she has to --
12 well, when did you say she has to stop it entirely?
13     A.  You have the dates.  Sometime --
14     Q.  You know when?
15     A.  I don't remember the exact date, but in
16 the spring of 2019.
17     Q.  Do you know if she ever was paid by Tommy
18 Robinson?
19     A.  I do not.
20     Q.  Sorry?  I didn't hear you.
21     A.  No, I don't know.
22     Q.  She just did some volunteer work for the
23 guy, right?
24        MR. CAVALIER:  Object to form.

Page 287

- - -

1        THE WITNESS:  She appeared in photographs
2 and in other media in Britain being part of the
3 Tommy Robinson campaign.  They didn't care
4 whether she was paid or not, and I don't care
5 if she was paid or not.  I care --
6 BY MR. CARSON:
7     Q.  I can't hear you.
8     A.  It didn't matter that she was paid or not.
9 It mattered that she was portrayed in British
10 media -- prominent British media -- as part of the
11 Tommy Robinson campaign.
12     Q.  But at the time that those pictures were
13 taken, she did have your permission to be there,
14 right?
15     A.  She had my permission to be there.  She
16 did not have my permission to be engaged in the
17 campaign and to be publicly associated with the
18 campaign as a Middle East Forum employee.
19     Q.  Right, but she did have your permission to
20 do that on her own time at that time?
21        MR. CAVALIER:  Object to form.
22        THE WITNESS:  I don't know which time
23 you're speaking about --
24                     - - -

Page 288

- - -

1        (Indistinguishable cross-talk.)
2                     - - -
3        THE WITNESS:  -- I don't remember
4 [inaudible] was before or after, but,
5 initially, she had it, and then I took it away.
6 BY MR. CARSON:
7     Q.  But the problem you had with her is that
8 her picture was taken, and you were worried about
9 the exposure it might have or the blowback it might
10 have on the Middle East Forum, correct?
11     A.  No.
12     Q.  Okay.  Then what were you worried about?
13     A.  Legal consequences.
14     Q.  The blowback, the -- aren't we saying the
15 same thing, Mr. Pipes?
16     A.  I don't know what "blowback" means.  I
17 know that this is legally unacceptable for us to --
18     Q.  Blowback, consequences, repercussions.
19 All means the same thing.  So would you like me to
20 use the word "consequences"?  Were you worried about
21 the consequences that her picture in the paper might
22 have?  I think it was The Guardian, correct?
23     A.  I believe so.
24     Q.  So you were worried about the consequences

Deposition of DANIEL PIPES                                    Lisa Barbounis v. Middle Eastern Forum, et. al.

Page 289

- - -

1  that picture might have on the Middle East Forum; is
2  that right?
3      A.   Correct.
4      Q.   But at the time that picture was taken,
5  she did have your permission to work with him on her
6  own time, right?
7      A.   I'm not sure.
8      Q.   Did you fire her after that?
9      A.   I never fired her.
10     Q.   Sorry?
11     A.   I never fired her.
12     Q.   Right.  You knew that the picture was
13 taken, you talked to her about it, and she continued
14 her employment thereafter, correct?
15     A.   She continued her employment, and then she
16 continued her working with Tommy Robinson against my
17 wishes.
18     Q.   But are you --
19     A.   -- so far as to lie to me -- let me
20 finish.  She went so far as to lie to me that she
21 took her children to Britain when she didn't, and
22 then she lied further and pretended that I'd agreed
23 with her and connived with her to say that she'd
24 taken her children to Britain when she --

Page 290

- - -

1      Q.   We can't hear you.
2      A.   -- when I had --
3          MR. CARSON:  Can you hear him?
4          THE COURT REPORTER:  Little bit.
5  BY MR. CARSON:
6      Q.   Mr. Pipes, it's really hard to hear you
7  today.  Like you have to just speak up and talk
8  loud.  I don't know what else to tell you.  It's
9  literally almost impossible to hear what you're
10 saying.  You were talking about a picture that was
11 taken, and then you were talking about Ms. Barbounis
12 telling you that she was there with her kids, right?
13     A.   Right.
14     Q.   Yes?
15     A.   Yes.
16     Q.   Okay.  So wasn't she telling you that to
17 give the Middle East Forum cover to help the Middle
18 East Forum?
19         MR. CAVALIER:  Object to form.
20         THE WITNESS:  No.
21 BY MR. CARSON:
22     Q.   Because you were worried about her being
23 there and associated with the Middle East Forum, she
24 was saying, hey, I was just there with my kids?

Page 291

- - -
- - -

2      (Indistinguishable cross-talk.)
3                    - - -
4          THE WITNESS:  No.  She lied to me.  The
5  first time she -- let me finish.  The first lie
6  was to tell me that she went to Britain with
7  her children, and her second lie was to tell,
8  subsequently, that I agreed to that lie, that I
9  was in on that lie with her.
10 BY MR. CARSON:
11     Q.   Well, maybe she thought you knew that she
12 wasn't there with her kids, right?
13     A.   Didn't know that.  She knew that she lied
14 to me about taking her children, and then she
15 pretended that I had agreed to that lie, that I
16 connived in that lie with her, that I was party to
17 that lie, so a double lie.  First, the children, and
18 then my agreements.  Lies, lies, lies.  Your clients
19 tell lies, Mr. Carson.
20     Q.   Mr. Pipes, have you counted the number of
21 inconsistencies in your testimony today?
22         MR. CAVALIER:  Object to form.  Daniel,
23     you don't have to answer that.
24 BY MR. CARSON:

Page 292

- - -

1      Q.   You don't have to answer that, but I'd be
2  careful telling other people that they're lying.  So
3  let's just keep going.  Speaking of lies -- all
4  right.  So let's look at a document that's dated --
5  it's gonna be 21 and 22 and 23, all right?  And I
6  forgot we're on a screen share, so that's all the
7  discovery.  All right.  So 22, 23.  All right,
8  ready?  Here is Document No. 22.  Do you see when
9  this email was sent?  It was -- here's a date right
10 here.
11     A.   Yep.
12     Q.   That's after November 5th, 2018, right?
13     A.   Right.
14     Q.   It's afterwards, right?  And it's from
15 Tricia to you, correct?
16     A.   Yup.
17     Q.   You wanna take a minute and read this?
18     A.   Okay.  Okay.
19     Q.   So these are complaints about Gregg Roman
20 made after November 5th, 2018, correct?
21     A.   Correct.
22     Q.   Didn't you testify there were none?
23     A.   Correct.
24     Q.   Didn't you specifically testify there were

Deposition of DANIEL PIPES                                           Lisa Barbounis v. Middle Eastern Forum, et. al.

Page 293

- - -

1  absolutely none from Tricia McNulty?
2      A.  Right.
3      Q.  Okay.  Well, let's start counting, then,
4  since we're gonna talk about this next.  So number
5  one would be the April 23rd, 2019 email from
6  McNulty, okay?  And this email actually has a lot of
7  complaints in it; it's not just one complaint,
8  right?
9      A.  Yep.
10     Q.  It talks about a complaint that Marnie
11 made.  It talks about a complaint that Caitriona
12 Brady made, right?
13     A.  Right.
14     Q.  So what did you do about this?  Did you
15 investigate this?
16     A.  Yes.
17     Q.  Did you fire Gregg Roman?
18     A.  No.
19     Q.  Why not?
20     A.  Why should I?
21     Q.  I don't know.  Maybe because retaliation
22 is against the law, correct?
23         MR. CAVALIER:  Object to form.  You don't
24     have to answer that if you don't want to.

Page 294

- - -

1  BY MR. CARSON:
2      Q.  Retaliation is against the law, right?  Do
3  you know it's against the law?
4      A.  I don't see retaliation.
5      Q.  Well, if Gregg Roman is responding to all
6  the reports of discrimination and harassment by
7  subjecting the women who made the reports to further
8  harassment, that would be retaliation, correct?
9         MR. CAVALIER:  Object to the hypothetical.
10     Object to --
11 BY MR. CARSON:
12     Q.  That your understanding of what
13 retaliation is?
14     A.  Hypothetical.
15         MR. CAVALIER:  Same objections.
16 BY MR. CARSON:
17     Q.  Well, tell me your understanding of
18 retaliation.
19     A.  I'm not a legal specialist.
20     Q.  Okay.  But do you understand that
21 retaliation is against the law?
22     A.  Yes.
23     Q.  And does MEF have a policy prohibiting
24 retaliation?

Page 295

- - -

1      A.  I don't know.
2      Q.  Don't you find it a little disturbing that
3  when Gregg Roman doesn't know who the person is
4  who's alleging the harassment, he guesses and gets
5  it wrong?
6         MR. CAVALIER:  Object to form.  Object to
7     the mis --
8  BY MR. CARSON:
9      Q.  How many women does someone have to harass
10 where, when someone accuses them of harassment, they
11 can't even guess the right person?
12         MR. CAVALIER:  Object to form.  Object as
13     argumentative.  Daniel, I don't even know if
14     that's an actual question, but, to the extent
15     it is, you don't have to answer it --
16 BY MR. CARSON:
17     Q.  It's at least two, right?  Can't be one,
18 correct?
19         MR. CAVALIER:  Object because I don't
20     understand what the question is.
21 BY MR. CARSON:
22     Q.  Right.  In order to not know who the
23 person is making the allegation of harassment, you'd
24 have to harass multiple people; is that right?

Page 296

- - -

1         MR. CAVALIER:  Object to the hypothetical.
2     Object to form.
3         MR. CARSON:  You can answer.
4         MR. CAVALIER:  Object as argumentative.
5  BY MR. CARSON:
6      Q.  Go ahead.  You can answer.
7      A.  I don't know the law.
8         THE COURT REPORTER:  What was that, sir?
9         THE WITNESS:  I don't know the law in
10     detail.
11 BY MR. CARSON:
12     Q.  Mr. Pipes, who's Gabrielle Bloom?
13     A.  I don't know.
14     Q.  Well, did you check to see whether money
15 was paid to her?
16     A.  I investigated this at the time.
17     Q.  Did you find that money was paid to her
18 from the Middle East Forum?
19     A.  I don't remember.
20     Q.  You don't know whether money was paid to
21 her?
22         MR. CAVALIER:  Object to form.
23 BY MR. CARSON:
24     Q.  Was it hush money?

Deposition of DANIEL PIPES                          Lisa Barbounis v. Middle Eastern Forum, et. al.

Page 297

- - -

1   A.  I did not authorize any money going to
2  Gabrielle Bloom.
3   Q.  How much money got paid to her?
4     MR. CAVALIER:  Object to form.  That's not
5  what he said.
6  BY MR. CARSON:
7   Q.  How much money did MEF issue to Ms. Bloom
8  that wasn't on a W-2?
9     MR. CAVALIER:  Object to form.
10    THE WITNESS:  I know of no such money.
11  BY MR. CARSON:
12   Q.  Sorry?
13   A.  I know of no such money.
14   Q.  Well, you did say that you investigated
15  whether money went to her, correct?
16   A.  I don't remember any money going to her.
17   Q.  My question was, did you investigate
18  whether the Middle East Forum issued money to
19  Gabrielle Bloom?
20   A.  I looked into it and did not find any
21  money.
22   Q.  Did you ever try to call Gabrielle Bloom
23  to talk to her?
24   A.  She did not contact me to complain, so,

Page 298

- - -

1  no.
2   Q.  That's part of your policy where you won't
3  investigate anything unless [inaudible] comes to you
4  first, correct?
5     MR. CAVALIER:  Object to form.
6     THE WITNESS:  My concern here, as in other
7     cases, was the welfare of the employees who
8     worked with me -- in this case, Marnie, Matt
9     Bennett, and Tricia McNulty -- and that's who I
10    focused on.
11  BY MR. CARSON:
12   Q.  Aren't you concerned when there is --
13  let's just count it now, right?  There's Patricia
14  McNulty, right; there's Lisa Barbounis; there's Lea
15  Merville; there's Delaney Yonchek; there's Caitriona
16  Brady; there's Marnie Meyer; there's Tiffany Lee;
17  there's Laura Frank; there's Lara -- we don't know
18  her last name -- and now there's Gabrielle Bloom;
19  one, two, three, four, five, six, seven, eight,
20  nine -- ten women who might have been harassed by
21  Gregg Roman by this point.  Whether true or not,
22  that's ten women who may have been harassed by him,
23  correct?
24    MR. CAVALIER:  Object to form.  Hold on,

Page 299

- - -

1    Daniel.  Object to form.  Object, lack of
2    foundation.  Object, argumentative.
3  BY MR. CARSON:
4   Q.  I didn't try to create a foundation.
5  Whether true or not, that's ten women's names who
6  could possibly be linked to harassment by Gregg
7  Roman, right?
8     MR. CAVALIER:  Question you're asking him
9  is, did you just name ten people?
10  BY MR. CARSON:
11   Q.  Yes.  Did I just name ten women?
12   A.  Yes, and I congratulate you on finding all
13  these different women to --
14   Q.  Right, and [unintelligible] --
15      - - -
16     (Indistinguishable cross-talk.)
17      - - -
18    THE WITNESS:  Let me finish.
19  BY MR. CARSON:
20   Q.  I said, did I name ten women?  That was
21  the question.  You said yes.
22   A.  But I get to answer the way I want to
23  answer.
24   Q.  No, actually, you don't.

Page 300

- - -

1   A.  You can't stop me.
2   Q.  I asked you if that was ten.  Do you wanna
3  expand on your answer of whether ten equals ten?  Go
4  ahead.  Tell me what you have to say about the
5  number ten.
6   A.  [Inaudible].  Very kind of you to allow me
7  to speak.
8   Q.  Go ahead, go ahead.
9   A.  Yes, and I congratulate you on [inaudible]
10  bring up against the Forum and Gregg.  It was --
11   Q.  We can't hear you.
12    THE COURT REPORTER:  Yeah.  Can you start
13    your answer again, please, Mr. Pipes?
14  BY MR. CARSON:
15   Q.  We can't hear you at all.
16   A.  I said fine work, Mr. Carson, on finding
17  ten women to name as you just did.
18   Q.  That's your answer?
19   A.  That's my answer.
20   Q.  You're welcome.  Thank you for saying fine
21  work.  But the point, Mr. Pipes, is that this is ten
22  names that you are now in possession of.  By
23  April 23rd, 2019, you had all ten of these women's
24  names in front of you, right?

Deposition of DANIEL PIPES                                    Lisa Barbounis v. Middle Eastern Forum, et. al.

Page 301

- - -
1    A.  I'm not sure.
2    Q.  Sorry?
3    A.  I'm not sure.  I haven't counted them.
4    Q.  Well, you definitely had Gabrielle Bloom's
5  name in front of you, right?
6    A.  Right.
7    Q.  Yeah?
8    A.  Yeah.
9    Q.  You had Caitriona Brady's name in front of
10  you.  That name's in this email, correct?
11    A.  Right.
12    Q.  You had --
13    A.  Well, no, no, no.  There was no allegation
14  against -- by Caitriona against Gregg, no.
15    Q.  You don't think she's upset that Gregg
16  Roman is telling people that her dad and her boss
17  had sex?
18    A.  She was upset but --
19    MR. CAVALIER:  I think you mis -- I think
20  you mischaracterized the rumor.
21    MR. CARSON:  Yeah, no.  It's worse than
22  what I said.  It's that Marnie Meyer got her
23  job because her dad had sex with her.
24    MR. CAVALIER:  I think you still got the

Page 302

- - -
1  parties a little mixed up, but, Daniel, if you
2  can answer the question, go ahead.
3    - - -
4    (Indistinguishable cross-talk.)
5    - - -
6  BY MR. CARSON:
7    Q.  Caitriona Brady's dad and Marnie Meyer
8  having sex is the rumor.
9    A.  Caitriona did not allege, until you got
10  your hands on her, that Gregg did anything against
11  her --
12    Q.  -- sent this email.  I didn't talk to them
13  in April 2019.
14    A.  Show me in the email where Caitriona says
15  that Gregg did something sexually inappropriate with
16  Caitriona.
17    Q.  That's not what I said.
18    A.  What did you say?
19    Q.  I said that Caitriona Brady is upset that
20  Gregg is talking about her father and Marnie Meyer
21  having sex.
22    A.  Agreed on that, but what is the list of --
23  how do you --
24    Q.  Well, Caitriona's one of them, right?

Page 303

- - -
1    A.  No, she's not.
2    Q.  That's not inappropriate conduct to spread
3  a rumor about someone's father having sex?  Nothing
4  wrong with that?
5    A.  I thought your list was --
6    MR. CAVALIER:  Object to form.
7    THE WITNESS:  -- women who allege that
8  Gregg had misbehaved with.
9  BY MR. CARSON:
10    Q.  Oh.  Well, if you want that list, that's
11  fine.  We can take two names off, so now we have
12  eight women who said that.  So you wanna do that?
13  I'm fine with doing that.  Let's take off Delaney
14  Yonchek, and let's take off Caitriona Brady.  So now
15  there's eight women by April of 2019 who allege
16  sexual misconduct, right, and you're aware of all of
17  them by April 2019, right?
18    MR. CAVALIER:  Object to form.  Object to
19  lack of foundation.
20    THE WITNESS:  I'm aware of what exactly?
21  BY MR. CARSON:
22    Q.  That there's eight women who potentially
23  were harassed by Gregg Roman by April of 2019,
24  sexually --

Page 304

- - -
1    A.  Where does it say that Gabrielle Bloom was
2  sexually harassed?
3    Q.  "I received a phone call from Matt Bennett
4  last night.  He started the conversation with
5  pleasantries, but then began to discuss current MEF
6  internal operations.  He is apparently speaking to
7  Gregg every two days, knew that Gary was back, and
8  also that Marnie had made another allegation against
9  Gregg, which Gregg was very upset about because he
10  didn't know what the allegation was.  They were
11  apparently concerned that Marnie might have gone out
12  to find an old intern by the name of Gabrielle
13  Bloom.  The story there, as I was told, was that
14  Gabrielle Bloom would be able to testify about a
15  personal relationship with Gregg Roman."  Right?
16    A.  Do I hear anything here about sexual
17  misbehavior?
18    Q.  That's not the point, Mr. Pipes.  The
19  point is you were in possession of another name that
20  you could've investigated.
21    MR. CAVALIER:  Object to form.
22    THE WITNESS:  -- investigating that Gregg
23  may or may not have had sexual relationship
24  with Gabrielle Bloom.  Any --

Deposition of DANIEL PIPES                              Lisa Barbounis v. Middle Eastern Forum, et. al.

Page 305

- - -
- - -
(Indistinguishable cross-talk.)
- - -
THE WITNESS:  -- that Lisa Barbounis had a
sexual relationship with a member of the MEF
staff.  I don't do this.
- - -
(Indistinguishable cross-talk.)
- - -
THE WITNESS:  -- Gabrielle -- there's no
allegation of sexual misbehavior here.
Gabrielle Bloom did not come to me.  Why is
this my concern?  It's not my concern.  Marnie
is going off and doing research to find who
Gregg may or may not have had sex with.  Really
not my issue.
BY MR. CARSON:
Q.   But you did testify earlier there's a
difference between friends and a
supervisor/supervisee relationship, correct?
A.   Correct.
Q.   And Gregg is the supervisor of Gabrielle
Bloom, correct?
A.   I'm not sure --

Page 306

- - -
MR. CAVALIER:  Object to form.
THE WITNESS:  I don't think so.
BY MR. CARSON:
Q.   Well, Gregg was the director of the Middle
East Forum, and Gabrielle Bloom was an intern,
correct?
A.   That's what it says here.  I don't know
what Gabrielle Bloom is.
Q.   And you don't know because you never
looked into it, right?
A.   Right.
Q.   Didn't you say in an email back in
November if there's another credible allegation of
sexual harassment by him that he'd be fired?  So
when you hear another name, don't you go out and try
to look into it?
A.   There's no allegation of sexual
misbehavior here.
Q.   That's your testimony.  It's fine.
A.   But will you show me where this allegation
of sexual misbehavior here, because I don't see it.
Q.   If you're comfortable with that testimony,
then we can move on.
A.   I am comfortable with that testimony.

Page 307

- - -
Q.   And he was wrong, actually.  Gregg thought
that, when the allegation came up, it was Gabrielle
Bloom, but it wasn't, right?  It was Caitriona Brady
and her father and Marnie Meyer, correct?
A.   No idea what you're talking about.
Q.   What?
A.   I don't know what you're talking about.
Q.   Well, what allegation was brought up to
you at this time?  What were they talking about,
Mr. Pipes?  Says it right here.
A.   There was a rumor about Marnie and
Caitriona's father.  I tried to investigate it.  I
bumped up quickly against a brick wall of
contradictory allegations, and I remember concluding
that I just can't.  I can't.  It's not a murder.  I
don't have to devote weeks of my life to this.  I
just couldn't figure out what went on, and I
announced to everyone that I just -- I'm --
Q.   You weren't doing anything?
A.   No.  I did.
MR. CAVALIER:  Object to form.
THE WITNESS:  I went as far as I could,
and I couldn't go further and figure out what
was at the bottom of this, who had initiated

Page 308

- - -
this rumor, whether it was true or not, who
initiated.  I couldn't find out anything, and
eventually I just told everyone I am not doing
this.
BY MR. CARSON:
Q.   So Patricia's also reporting to you that
Gregg Roman is slandering her, right, and the
other -- and Lisa?
A.   Yeah, and I looked into that as well, and
this was Matt telling her what Gregg's comments
were.  So it, again, was the complex matter.  Matt
and Gregg have a long and difficult -- not
difficult, but --
Q.   We can't hear you.
A.   Matt and Gregg have a long relationship
going back many years, I think to college.  They
have their ups and downs.  Matt was very angry at
Gregg.  Matt wanted Gregg's job.  Matt was full of
high emotions, as you heard when he testified, when
he deposed the other day -- lost a child, all sorts
of things going on -- and he had a particular
friendship with Tricia, and I looked into this, and
I couldn't tell what the truth was.  And, again,
this is not a murder.

Deposition of DANIEL PIPES                                     Lisa Barbounis v. Middle Eastern Forum, et. al.

Page 309

- - -

Q.  Not that serious.

A.  It wasn't a murder.  I could only go so
far to try and figure out who said what.  I quizzed
Tricia.  I quizzed Matt.  I quizzed Gregg.  I tried
to find out who said what to who and when, and I
ended up with no resolution.  At a certain point, I
gave up, as with the other thing, because I was
getting such contrary stories.  I never imagined a
place of work would be such a hotbed of personal --
intense personal relations of vulgarity, of
backstabbing, and so forth.  I was unaware that this
was taking place, and when I became aware, as with
this note, I did my best to investigate, and I just
couldn't track these things down -- who's saying
what?  Where does the rumor come from?  Who actually
said what?  Is this-and-that making it up?  Did
Gregg actually say this?  Did Tricia exaggerate it?
I couldn't figure it out in the end.

Q.  Do you think Tricia was exaggerating?

A.  I don't know.

Q.  Does she sound like she is in this letter?

A.  I don't know what the actual story was.

Q.  Well, the only -- everyone is saying the
same thing but Gregg, though, right?  It's basically

Page 310

- - -

everyone accusing Gregg of doing something, Gregg
denies it, and you accept Gregg's word every time.
That's the pattern, right?

MR. CAVALIER:  Object to form.
Argumentative.

BY MR. CARSON:

Q.  It's not argumentative.  Is that the
pattern?

A.  No, it's not the pattern.  I did not
accept Gregg's word.  I --

Q.  When haven't you accepted his word?  Give
me an example of when you haven't.

A.  Let me finish.

THE COURT REPORTER:  Guys, I'm not getting
much, just so you know.

THE WITNESS:  I did not accept Gregg's
word.  I found contradictory.  I did not
endorse Gregg at expense of the others.  I did
not endorse the others at Gregg's expense.  I
came away unable to discern the truth, and, as
it wasn't a matter of enormous import, but
rather backstabbing going on --

BY MR. CARSON:

Q.  It was minor.

Page 311

- - -

A.  Let me finish.  Don't characterize --
don't put words in my mouth.

Q.  Is that what you're saying?  Was it --

A.  Let me finish.  Why do you continuously
interrupt me?

Q.  Mr. Pipes, I asked you another yes or no
question.  You go on and on and on, and you're not
answering the question that we're asking, but go
ahead.  Take your time.  Tell us why -- why you --
why you accept Gregg's word every time he denies it.

MR. CAVALIER:  Object to form.

THE WITNESS:  You are mischaracterizing
what I just said.  I did not --

BY MR. CARSON:

Q.  It was just a question.

A.  Well, it's a "when did you stop beating
your wife" question.  No, I can't answer that
question.  I'm not gonna answer that question.  The
question is, why do you always accept Gregg's word?
No, I don't accept Gregg's word.  I --

Q.  Just give me an example [inaudible] --

A.  I am giving you an example.  I made two
inquiries into the two issues here, one about
Gabrielle Bloom, and one about the rumor.  In both

Page 312

- - -

cases, I came up against contradictory
information -- what Marnie was saying, what Lisa was
saying, what Gregg was saying in the first case,
what Gregg was saying, what Matt was saying, what
Tricia was saying in the second case -- were all
different.  As this was not an issue that was
potentially a fireable issue, as this was not --
this was staff gunning for -- gunning for Gregg's
job, disliking each other, allying with each other,
at a certain point, I threw up my hands in disgust
with this office environment and tried to tell them
to just deal with their work and stop this intense
interpersonal relations between the staff and stop
this already.

Q.  So it's your testimony that you spoke to
Matt, Lisa, Tricia, and Gregg in connection with
this incident?

A.  Which incident?

Q.  The one that you just said, what Matt was
saying, what Lisa was saying, what Gregg was saying,
what -- you know, what Tricia saying.  So did you --
you spoke to them all again after this email?

A.  I can't tell you exactly who I spoke to in
every single case, but I went around and tried to

Deposition of DANIEL PIPES                                    Lisa Barbounis v. Middle Eastern Forum, et. al.

Page 313

- - -

1  collect information from the pertinent staff about
2  what was going on, and I could not figure it out.
3  This was not the case as of November of a lot of
4  people coming and saying roughly the same thing and
5  my taking action on it.  This was a mess of
6  contradictions between virtually every person that
7  came to me.  Disagreement on almost every topic.
8      Q.  Tricia closes by saying, "I know that
9  everyone is concerned that Gregg is back to his old
10  ways, but I truly wanted to believe that he had
11  learned a lesson.  The things I was told last night
12  make me believe otherwise," right?  I read that
13  correctly?
14      A.  You did.
15      Q.  So did you do another investigation to
16  determine whether Gregg was back to his old ways?
17      A.  What are his old ways?  His old ways --
18      Q.  I think she's referencing the things that
19  got him thrown out of the office, no?
20      A.  This -- frankly, I think Matt, who left --
21  Matt -- we haven't talked about Matt.  Matt's a good
22  man, but he had a difficult time, as explained the
23  other day in his deposition, and he wanted to be
24  director, and he was angry at Gregg way back in

Page 314

- - -

1  November.  He was -- he wanted to be director.  He
2  was annoyed with me for not making him director.  I
3  told him on many occasions that he had a year in
4  which to prove himself, from November to November,
5  '18 to '19.  Let him show me what he can do, and I
6  will consider it.  By March, he had decided he
7  didn't wanna do that anymore.  He was fed up.  He
8  was displeased.  He started all sorts of rumors.
9  [Inaudible].  The day he left, he gave me a call and
10  told me that Marnie wants to be director instead of
11  Gregg.  Is it true?  Is it not true?  I don't know.
12  Did I do an investigation to it?  No.  These
13  statements, rumors, allegations were zooming all
14  around the place, and I was, on the one hand, very
15  fed up with them; on the other, I could not spend my
16  entire time looking into whether Marnie really does
17  wanna become director or not.  I just --
18      Q.  We haven't seen any allegations against
19  Matt, only Gregg Roman.
20      MR. CAVALIER:  Object to form.
21  BY MR. CARSON:
22      Q.  Right?  Why do you think Matt Bennett's
23  the problem, not Gregg Roman?
24      A.  I think I just explained to you why I

Page 315

- - -

1  think Matt had various issues and had affections for
2  some and anger at others and was -- mind you, back
3  then, he was purveying all sorts of information,
4  some of it true, some of it not true.
5      Q.  So you're [inaudible] that Matt lied?
6      A.  Let me finish.
7      Q.  Is that your conclusion, that Matt lied?
8      A.  No, I'm not concluded.  I'm talking.  Man,
9  you're so impolite.  I concluded --
10      Q.  This isn't a conversation, Mr. Pipes.
11  It's a question and answer session --
12      MR. CAVALIER:  I'll tell you what, I'm
13  gonna ask for a break while there's no question
14  pending because I need one.
15      MR. CARSON:  There is no question pending,
16  and you're client's just waxing poetic.
17      MR. CAVALIER:  Well, that's even better.
18  If there's no question pending, we can take a
19  break.
20      MR. CARSON:  Perfectly fine.
21      THE VIDEOGRAPHER:  All right.  So both
22  counsels agree to a break and --
23      MR. CARSON:  -- Jon, maybe you could just
24  have a conversation with your client about

Page 316

- - -

1  quickly getting through this.
2      - - -
3      (Indistinguishable cross-talk.)
4      - - -
5      THE COURT REPORTER:  Luke, what time is
6  it?
7      THE VIDEOGRAPHER:  The time is 4:49, and
8  we are off the record.
9      - - -
10      (Whereupon there was a recess in the
11  proceeding from 4:49 p.m. to 5:08 p.m.)
12      - - -
13      THE VIDEOGRAPHER:  The time is 5:08 p.m.
14  Eastern Time, and we are now back on the
15  record.
16  BY MR. CARSON:
17      Q.  Mr. Pipes, do you see this email to Lisa
18  Barbounis from you sent on June 5th, 2019?
19      A.  Yep.
20      Q.  You did tell Lisa in this email that she
21  could work on her own time on the Tommy Robinson
22  stuff, correct?
23      A.  Yup.
24      Q.  Yes?

Deposition of DANIEL PIPES                                          Lisa Barbounis v. Middle Eastern Forum, et. al.

Page 317

\- - -

1   A.  I did say it, yeah.
2   Q.  You did say it, yes?  We can't hear you.
3  Is that what you said?
4   A.  Yes.
5   Q.  Do you know that Lisa Barbounis is a
6  elected Republican official in Philadelphia?
7   A.  I learned this in this email.  Yes.
8   Q.  So she is allowed to do political work on
9  her own time, correct?
10   MR. CAVALIER:  Object to form.
11  BY MR. CARSON:
12   Q.  By nature of her being a public-elected
13  official, that's political, right?
14   A.  No.
15   Q.  No?  Being an elected official is not
16  political?
17   A.  Serving as elected official is not
18  political.  It depends -- I mean, not necessarily.
19  Depends what the office is.  I don't know what the
20  office --
21   Q.  We can't hear you.
22   A.  I don't know what her office is.  I don't
23  know if it's political or not.
24   Q.  After you found out that she was an

Page 318

\- - -

1  elected public official as a Republican, did you
2  tell her she had to stop doing that at any time?
3   A.  [Inaudible].
4   Q.  I'm sorry.  We can't hear you.
5   A.  Go up, and you have my reply to her.
6   Q.  Well, I'm just asking, did you ever tell
7  her that she had to stop?
8   A.  Go up, and you'll see my reply.
9   Q.  I'm not referencing a document.  I'm
10  asking you a question right now.
11   A.  I'm referencing a document.
12   Q.  What?
13   A.  I'm referencing a document.
14   Q.  Well, that's not how it works.
15   A.  Well, you just --
16   Q.  Did you ever tell Lisa that she had to
17  stop being an elected public official as a
18  Republican?  That's my question.  Yes or no?  It's
19  just a yes or no question.
20   A.  No.
21   Q.  And, actually, just to reiterate, on
22  June 24th, which is document D000024, you told her,
23  "I leave it in your good sense not to get entangled
24  in anything related to MEF issues," right?  See

Page 319

\- - -

1  that?
2   MR. CAVALIER:  Object to form.
3   THE WITNESS:  No, I don't see that.  I see
4  where she lied about taking her children to
5  Britain.
6  BY MR. CARSON:
7   Q.  You don't see it?
8   A.  No, I don't.  Now I see both.  I see --
9   Q.  "I leave it to your good sense not to get
10  entangled in anything MEF issues" [as read].  Do you
11  see that?
12   MR. CAVALIER:  I'm gonna let the record
13  reflect that you scrolled the document up so he
14  could see the part you were referring to.
15   THE WITNESS:  Now that you scroll the
16  document up, I can see it, and I can also see
17  the lie that Lisa told me about taking her
18  children with her to the UK.
19  BY MR. CARSON:
20   Q.  Right.  I think we've already testified
21  about that today.
22   A.  Thank you for pointing it out.
23   Q.  So on June 5th, 2019 there's an email from
24  Marnie Meyer, right?

Page 320

\- - -

1   A.  Yep.
2   Q.  And she tells you that she's disappointed
3  that conditions that were implemented after the
4  November 5th meeting with Gregg Roman weren't being
5  adhered to, correct?
6   A.  Wrong.
7   Q.  Was she disappointed?
8   A.  There's no reference here to November --
9   Q.  Wasn't one of the conditions that he
10  wouldn't deal with the finances?
11   A.  He -- his -- in November '18, yes; in
12  March '19, no.
13   Q.  So isn't she upset?  "Daniel, I am upset
14  by your response due to the fact that you assured me
15  that Gregg's continued employment with MEF would not
16  involve finances" [as read].  Right?  She's
17  complaining that the conditions for Gregg Roman's
18  continued employment aren't being adhered to.
19  That's what she's complaining about; isn't that
20  right?
21   A.  That is correct, but it is not what I told
22  her, as I explained above.  Removed him from
23  day-to-day finances; I did not remove him from the
24  audit.  I couldn't.  There's no one else who can do

Deposition of DANIEL PIPES                                    Lisa Barbounis v. Middle Eastern Forum, et. al.

Page 321

- - -

1  it, and I told her that at all times, that Gregg has
2  to do the audit.
3      Q.  Document No. 26 is the next document.
4  Document 26 is another email.  This one is dated --
5  so now we have this number, too -- June 10th, 2019.
6  This is an email from Patricia McNulty to you,
7  correct?
8      A.  Yes.
9      Q.  Wanna take a minute and look at it?
10     A.  Okay.
11     Q.  This is another complaint made after
12 November 5th, 2018 about Gregg Roman, correct?
13     A.  Wrong.
14     Q.  It's not?
15     A.  No.
16     Q.  Okay.  So when she says, "We agreed I do
17 not report to Gregg but directly to you, as his
18 continued abusive and deceitful behavior is more
19 than I should have to endure."  So she's not
20 complaining about Gregg Roman there?
21     A.  No.  She's just giving her usual dislike
22 of Gregg at this point.  It's not a complaint.  Show
23 me a --
24     Q.  Abuse and deceit, that's just normal --

Page 322

- - -
- - -

2      (Indistinguishable cross-talk.)

3                    - - -
4  BY MR. CARSON:
5      Q.  Sorry?
6      A.  Show me a complaint.
7      Q.  She's saying that he's -- "his continued
8  abusive and deceitful behavior".
9      A.  Right.  That's --
10     Q.  Aren't you concerned that he's being
11 abusive and deceitful and that it's happening after
12 they reported him for sexual harassment?
13     MR. CAVALIER:  Object to form.
14     THE WITNESS:  There is no allegation of
15 sexual harassment here.
16 BY MR. CARSON:
17     Q.  Do you know what retaliation is?
18     A.  I do.
19     Q.  It's an allegation of retaliation, right?
20     MR. CAVALIER:  Object to form.
21 BY MR. CARSON:
22     Q.  Does she have to use a magic word to
23 complain about retaliation?
24     MR. CAVALIER:  Object to form.

Page 323

- - -

1      THE WITNESS:  She's simply repeating what
2  she'd said a couple of days -- weeks before.
3  BY MR. CARSON:
4      Q.  Yeah, exactly.  She made another complaint
5  weeks before, right?
6      A.  Let's go back to that earlier complaint
7  now that you --
8      Q.  We're gonna stay on --
9      A.  No.  I'm gonna bring up the other thing.
10     Q.  Nope, you're not.
11     A.  Yes, I am.
12     MR. CARSON:  All right.  Then we're gonna
13 go off the record, all right?  We're off the
14 record.
15     THE VIDEOGRAPHER:  Counsel, do we have an
16 agreement about whether or not we are off the
17 record?
18     MR. CAVALIER:  No.  I have no idea why
19 we're going off the record.
20     MR. CARSON:  Because your client decided
21 that he's gonna stop and look through his own
22 documents.  We're not doing that on my time.
23     MR. CAVALIER:  I don't remember him saying
24 he wanted to look through other documents.

Page 324

- - -

1      MR. CARSON:  What'd he just say?
2      MR. CAVALIER:  That he wanted to relate
3  his answer back to the prior complaint --
4      MR. CARSON:  We're not looking at this
5  document right now.  We're not looking at
6  previous documents.
7      MR. CAVALIER:  I'm not talking about a
8  previous document.  He just said -- you asked
9  him a question about this, what you --
10                   - - -
11     (Indistinguishable cross-talk.)
12                   - - -
13 BY MR. CARSON:
14     Q.  You ready to continue, Mr. Pipes?
15     A.  When you let me speak.
16     Q.  There's no question pending.  There's
17 nothing for you to say.
18     A.  I haven't finished my answer.
19     Q.  There's no question pending.
20     A.  I didn't finish my answer.
21     Q.  There's no question pending, Mr. Pipes.
22 Okay.  So we're gonna continue when you're ready.
23 If you're not ready, we're gonna go off the record.
24 Which one do you wanna do?

Deposition of DANIEL PIPES

Lisa Barbounis v. Middle Eastern Forum, et. al.

Page 325

---

1  A.  I wanna finish my answer.
2  Q.  There's no question, Mr. Pipes.  What are
3  you gonna --
4  - - -
5  (Indistinguishable cross-talk.)
6  - - -
7  MR. CARSON:  Look, we're gonna go off the
8  record because I'm gonna get up and walk away
9  and --
10  MR. CAVALIER:  Are you withdrawing your
11  last question?
12  MR. CARSON:  There's no question pending.
13  He wasn't answering a question.
14  MR. CAVALIER:  Yes, he was.
15  MR. CARSON:  All right.  What's the
16  question pending?
17  MR. CAVALIER:  You're gonna have to ask
18  the court reporter since --
19  MR. CARSON:  Go ahead.  What's the
20  question?
21  - - -
22  (Discussion was held off the stenographic
23  record.)
24  - - -

Page 326

---

1  THE COURT REPORTER:  There's no question.
2  MR. CARSON:  There's no question pending,
3  so what are we doing, Jon?
4  MR. CAVALIER:  You asked a question
5  before --
6  MR. CARSON:  The court reporter just said
7  there's no question pending.
8  MR. CAVALIER:  If you're acknowledging for
9  the record that there's no pending question or
10  you withdraw the question, we can --
11  MR. CARSON:  I'm not withdrawing the
12  question because there's no question pending,
13  which now I've said it and the court reporter
14  said it.  So are we ready?
15  MR. CAVALIER:  So ask the question.
16  BY MR. CARSON:
17  Q.  Are we ready to continue, Mr. Pipes?
18  A.  If you let me finish my answer.
19  Q.  There's no question pending, Mr. Pipes.
20  There's nothing to be finished.  Mr. Pipes, is there
21  a magic word that people have to say in order to
22  report retaliation?
23  MR. CAVALIER:  Object to form.  Object to
24  calling for a legal conclusion.  You can answer

Page 327

---

1  it if you can, Daniel.
2  THE WITNESS:  I don't do legal things.
3  I'm a Middle East specialist.
4  BY MR. CARSON:
5  Q.  Do you -- what does someone have to say in
6  order for it to be retaliation, in order for them to
7  report retaliation?  What do they have to say to
8  you?
9  MR. CAVALIER:  Same objection.
10  THE WITNESS:  Hypothetical.
11  BY MR. CARSON:
12  Q.  Mr. Pipes, you have to answer the
13  question.  What do they have to say to you?
14  A.  Hypothetical.  I do not know what they
15  have to say to me.
16  Q.  Are you in charge of --
17  - - -
18  (Indistinguishable cross-talk.)
19  - - -
20  THE WITNESS:  Let me speak.
21  BY MR. CARSON:
22  Q.  Mr. Pipes, you just said you're not
23  answering hypothetical.  Are you in charge of
24  enforcing MEF policy to prohibit discrimination and

Page 328

---

1  harassment in the workplace?  Is that part of your
2  job responsibility?
3  A.  When?
4  Q.  Anytime between 2017 and the present.  Has
5  that been your job responsibility?
6  A.  When we had someone in charge of human
7  resources, no.  As the ultimate decision maker, but,
8  no --
9  Q.  Okay.  You are the president of the Middle
10  East Forum, correct?
11  A.  Yes.
12  Q.  So you are, quote, unquote, the ultimate
13  decision maker?
14  A.  Yeah, but I don't --
15  Q.  So you're aware of whether the Middle East
16  Forum maintains a [unintelligible] --
17  THE COURT REPORTER:  Sorry.  Say that
18  slower.
19  BY MR. CARSON:
20  Q.  Are you aware of whether the Middle East
21  Forum maintains a policy to prohibit retaliation?
22  A.  I am not.
23  Q.  You're not aware whether they have one?
24  A.  No.

Page 329

- - -

Q. Okay. That's fine. So, here, you're not
concerned -- when Ms. McNulty says that there's
continued abusive and deceitful behavior regarding
Gregg Roman, you're not concerned that she might be
reporting retaliation, correct, or are you?

MR. CAVALIER: Object to form.

THE WITNESS: When did I stop beating my
wife? I'm not gonna answer those questions.
I'm gonna give you my answer.

BY MR. CARSON:

Q. No, you're not.

A. I'm going to give you my answer --

Q. If I ask a yes or no question, you don't
get to just say whatever you want. That's not the
way this works.

MR. CAVALIER: Seth, when you load the
question, it causes problems for the witness.

BY MR. CARSON:

Q. I'm asking you, are you concerned, when
she reports continued abusive and deceitful
behavior, that it implicates retaliation, yes or no?
Are you concerned?

MR. CAVALIER: Same objection.

THE WITNESS: I'm not gonna answer a

Page 330

- - -

loaded question. I'll answer the question the
way I wanna answer it.

BY MR. CARSON:

Q. You don't get to choose what questions you
answer.

A. I am. Either you wanna hear my answer, or
you don't get an answer. Do it your way.

MR. CARSON: All right. If your client's
not gonna answer questions, we're gonna stop
and file a motion, Jon, okay, because this is
ridiculous.

MR. CAVALIER: Seth, he's trying to answer
your question --

MR. CARSON: No, he's not. He's trying --

MR. CAVALIER: -- questions that involve
legal definitions. You're loading the
questions by assuming that some kind of a
report occurred. You're loading the questions
by --

MR. CARSON: Jon, I'm referencing an email
that was sent from my client to him. The email
says that there's continued abusive and
deceitful behavior. My question is simple:
Are you concerned that it might implicate

Page 331

- - -

retaliation? It's not a difficult question.

MR. CAVALIER: That's not a question that
you asked before.

MR. CARSON: It's a yes or no question.
It's simple.

MR. CAVALIER: That's a different
question --

- - -

(Indistinguishable cross-talk.)

- - -

BY MR. CARSON:

Q. Yes or no, Mr. Pipes, were you concerned?

MR. CAVALIER: You can answer that
question, Daniel.

THE WITNESS: No.

BY MR. CARSON:

Q. How about when she said, "It's more than I
should have to endure"? Were you concerned about
that?

A. No, and I'll tell you why I was wasn't.

Q. You don't have to. It was a yes or no
question.

A. I'm going to.

Q. I didn't ask you why.

Page 332

- - -

A. I'm going to tell you why.

Q. No, Mr. Pipes. There's no question
pending.

A. Well, that's the next thing I'm gonna do
is --

- - -

(Indistinguishable cross-talk.)

- - -

BY MR. CARSON:

Q. Mr. Pipes, there's no question pending,
and we're gonna stop the deposition, and we're gonna
get -- I'm just gonna file a motion tomorrow and let
him know that the witness was completely
nonresponsive, refused to cooperate in a deposition,
and I'm gonna ask to do another seven hours.

MR. CAVALIER: Hey, Daniel, if he doesn't
wanna hear you say why, he doesn't need to hear
you say why. I mean, it's his loss, not yours.

BY MR. CARSON:

Q. So the next sentence in the email says,
"The outline of this job description is also
concerning due to Gregg's history of discrimination
and harassment of female employees in the workplace.
Can you even consider a female employee for this

Deposition of DANIEL PIPES                                     Lisa Barbounis v. Middle Eastern Forum, et. al.

Page 333

- - -

1  position knowing she will have to work closely with
2  Gregg Roman and report directly to him?"
3      A.  Tricia McNulty had proven herself to be a
4  liar.  Why would I pay attention to all the things
5  she was saying?
6      Q.  When did she prove herself to be a liar,
7  Mr. Pipes?
8      A.  By saying different things about what
9  Gregg did, by changing her story.  How can I believe
10 her?
11     Q.  Well, let me ask you a question.  When did
12 you find out that she changed her story?
13     A.  On November 2nd.  November 1st, she told
14 me one thing; November 2nd, she wrote me another
15 thing; and then, subsequently -- I don't remember
16 which date -- she came up with a third story.
17     Q.  You sure you wanna go with that testimony
18 right now?
19     A.  I'm very sure.
20         MR. CAVALIER:  Object to form.
21 BY MR. CARSON:
22     Q.  Okay, good.  Didn't you testify today that
23 you just found out that she said the second thing on
24 November 2nd?

Page 334

- - -

1          MR. CAVALIER:  Object to form.
2          THE WITNESS:  No.
3  BY MR. CARSON:
4      Q.  No, you didn't?  Okay.  "Due to parameters
5  that are supposed to be in place concerning myself
6  and Gregg, I am wondering how it would be possible
7  for me to even be considered for this position."
8  Did you consider her for the position knowing that
9  she'd have to work with Gregg, yes or no?
10         MR. CAVALIER:  Object to form.
11         THE WITNESS:  It's a loaded question.
12 BY MR. CARSON:
13     Q.  Did you consider her for the position?
14     A.  She would have been considered had she
15 applied, but this was simply the announcement of a
16 job, so how could I consider her before she applied?
17     Q.  She never told you she was interested in
18 the position?
19         MR. CAVALIER:  Object to form.
20         THE WITNESS:  She announces here that
21 she's interested in the position but doesn't
22 wanna work for Gregg, so she'd have to tell me
23 who the director of development is going to
24 report to.  I didn't tell her she had to apply

Page 335

- - -

1  for the director of development.  I didn't tell
2  her she should or should not.  She decided she
3  wanted to apply, but she didn't like the terms
4  of it.  Fine.  It's --
5
6          (Indistinguishable cross-talk.)
7  - - -
8          THE WITNESS:  -- with Marnie and the
9  others, I have to take everybody's wish and
10 make that my command.
11 BY MR. CARSON:
12     Q.  Okay, Mr. Pipes.  Thank you.
13     A.  Let me finish.
14     Q.  No, no.  You don't have to finish.
15 There's no question pending.
16         MR. CAVALIER:  No.  This time, you asked a
17 question.
18         MR. CARSON:  No, I did not.  We're not --
19 Jon, he's not just gonna go on and wax poetic
20 during the next hour and a half.  That's not --
21         MR. CAVALIER:  -- you asked him about
22 whether he considered her for the job and --
23 BY MR. CARSON:
24     Q.  Did you consider her for the job, yes or

Page 336

- - -

1  no?  It's a yes or no question.
2      A.  Not a yes or no question.
3      Q.  "Giving you" -- so what did you mean here
4  on June 9th, 2019?  You wrote -- and this is
5  Document No. 26 -- "Giving you an advance look,
6  though small changes might still be made to it."
7  What's that mean?
8      A.  That means I gave her the courtesy, since
9  she was interested in the job, of seeing what the
10 description would be, but I wasn't taking orders
11 from Tricia on how to define the job.  The job was
12 an administrative job.  I am not the administrator,
13 and I thought that that job -- the person in that
14 job should report to Gregg, and that's what would
15 have been had we gone through with that job, which
16 we didn't because, shortly after this, she then did
17 the EEOC letter, and then we just -- I just stopped
18 it completely.
19     Q.  Thank you, Mr. Pipes.  The next email is
20 on June 11th, 2019, and the document number is
21 000027, and in this email, she says, "Daniel, there
22 have been no new instances of sexual harassment
23 since November when Gregg was removed from the
24 office, but I was referring to the ongoing

Deposition of DANIEL PIPES                                    Lisa Barbounis v. Middle Eastern Forum, et. al.

Page 337

- - -

1  psychological harassment we discussed following his
2  phone call with Matt." So, here, she's reporting
3  ongoing psychological harassment, correct?
4      A.  Correct.
5      Q.  So that's three emails she sent to you
6  reporting Gregg's misconduct since November 5th,
7  2019, right?
8      A.  No, wrong.
9      Q.  Not three emails?
10     A.  She's reporting what she heard from Matt.
11  She didn't hear it from Gregg. She heard Matt's
12  version of what Gregg said. What Gregg said he said
13  and what Matt said he said were different, so I
14  don't know what the truth was.
15     Q.  So you disregarded her email, correct?
16         MR. CAVALIER: Object to form.
17         THE WITNESS: -- regard it. I can't take
18     every single statement of someone and rearrange
19     the office at their convenience. We had an
20     agreement -- one in November, and a second
21     agreement in March -- and they were all gunning
22     for each other's jobs. They were hating and
23     loving and engaged with each other in all sorts
24     of complex ways, and here she goes on about

Page 338

- - -

1      what Matt said on a telephone call after Matt
2      had left the office. Why is Matt reporting to
3      her what Gregg allegedly said after he left the
4      office?
5  BY MR. CARSON:
6      Q.  Her email continues, "He has continued to
7  spew slander regarding my work and my reputation.
8  He has a history of speaking badly about employees
9  to other employees and, as was the case in April, to
10  former employees. It is very hard to work with
11  someone knowing he is trying to damage my reputation
12  and find a way to push me out of a job." So
13  considering these -- the June 11th, 2019 email from
14  Patricia McNulty to you, did you consider that a
15  report of retaliation?
16     A.  Course not. I consider it a report of
17  what Matt is telling her.
18     Q.  But she doesn't say this is what Matt --
19  she's just saying to you --
20     A.  Yes, she does. "Following his phone calls
21  with Matt." She got it from Matt.
22              - - -
23         (Indistinguishable cross-talk.)
24              - - -

Page 339

- - -

1  BY MR. CARSON:
2      Q.  She said that it happened following the
3  phone calls with Matt.
4      A.  She had no direct contact with Gregg. She
5  had contact with Matt, who she had a great affection
6  for, and Matt had a relationship with Gregg which
7  was complex, and the three of them went from Gregg
8  to Matt -- maybe Gregg to Matt, and Matt,
9  definitely, to Tricia. I --
10     Q.  The email continues, "Gregg continues to
11  be the director, a position of power and authority,
12  which will always be detrimental to my ability to be
13  successful here. Even though I report to you, I am
14  still receiving directives and deadlines to be met
15  by Gregg. For all intents and purposes, I am still
16  held accountable to him." Right? That's what she
17  said to you?
18     A.  That's what she said, and that's what she
19  agreed to back in March.
20     Q.  "You have stated that you highly dislike
21  the administrative part of running a think tank,
22  which you were forced into taking over when Gregg
23  was removed from the office in November. That being
24  said, my reporting to you as director of development

Page 340

- - -

1  would already put me at a disadvantage in my
2  application pool since it would not alleviate your
3  oversight of administrative tasks. Additionally, if
4  Gregg is part of the hiring process for the director
5  of development, I am even further disadvantaged,
6  despite my experience and accomplishments, knowing
7  full well he has already stated that he considers
8  Marnie, Lisa, and me 'usurpers'." That didn't come
9  from Matt, did it?
10     A.  You tell me. I don't know where it came
11  from.
12     Q.  Did you investigate it?
13     A.  You want me to full-time investigate every
14  single email I get?
15     Q.  No. Every single report of --
16     A.  We went through all of this in November.
17  I devoted a week to it. I moved on.
18     Q.  Right. You moved on, but they didn't,
19  correct?
20     A.  Oh, no. They were building their case.
21  We have perfect example of Tricia here building her
22  case to take to Derek Smith Law Group and sue us for
23  $31 million. Good job, Tricia. Good job,
24  Mr. Carson. Well done.

Deposition of DANIEL PIPES                                          Lisa Barbounis v. Middle Eastern Forum, et. al.

Page 341

- - -

Q.  This is what you intend to tell a jury?
This is how you're gonna testify?

A.  They agreed.  They agreed to what we set
up in November, they agreed to the changes in March,
and then, all of a sudden, in late May, early June
or so, suddenly comes barrage of calumny against
Gregg out of nowhere.  Did he do anything?  Did he
do anything?  All we know is that Matt said some
things, quoted Gregg to Tricia.  We know of no
complaints that he actually did anything.  We have
generalizations about what a miserable person he is,
how she doesn't like him.  Okay.  So what am I
supposed to do, change the whole organization all
over again because Tricia is saying these things?

Q.  No, of course not, right?  You didn't even
think about doing that, correct?  Right?  That's a
question.

- - -

(Indistinguishable cross-talk.)

- - -

BY MR. CARSON:

Q.  Right?  Hello?  There's a question
pending, Mr. Pipes.

A.  I've answered you.

Page 342

- - -

Q.  No.  My last question is, did you even
consider doing that, making changes to the
organization to protect the female employees who
worked for you?

MR. CAVALIER:  Object to form.

THE WITNESS:  I made extensive changes to
the organization in November --

BY MR. CARSON:

Q.  In November.

A.  -- approval.  I made further changes in
March with their initiation and approval.  I could
not make, in every month, a whole new range of
changes because someone doesn't like someone.
Here's something from someone else that someone
said.  This was a viper's nest, and if I thought so
then, I think so more and more as I've read the
exchanges of emails between these people and the
things about they were saying -- things they were
saying about each other, things they were saying to
each other, the things they were saying about
others, incredible.  So I hope you don't raise this,
Mr. Carson, because it's just gonna raise a viper's
nest of contention, ugliness, vulgarity, sexual
accession.  It's nasty stuff, and I was not part of

Page 343

- - -

it.  I'm trying to do my work, and these people are
engaged in this backstabbing, including Matt, I'm
sorry to say.  Matt was part of it.  Matt was part
of this backstabbing, and I don't know why he did
it.  He left the organization.  I don't know why he
was doing it.  I don't know [inaudible] Marnie
wanted to be the head of it.  I don't know why he
was trying to get Tricia upset about Gregg.  I don't
know why.  I don't know.  Oh, and let me note that
you asked about the rumor, the Brady rumor.

Q.  Yeah.  There's no question pending about
the Brady rumor.

A.  I now remember that the Brady -- I asked
Lisa, is this new?  Is this since November?  She
said no.  Predated November.  So --

Q.  Mr. Pipes, did you hire a deputy director?

A.  [Inaudible] --

Q.  No, I'm not.  You're not gonna finish, Mr.
Pipes.  You're done, okay?  Were you gonna hire a
deputy director?

- - -

(Indistinguishable cross-talk.)

- - -

THE WITNESS:  -- to me in April.

Page 344

- - -

Actually, it took place before November, and it
was a quiver in their satchel, which they
brought out --

MR. CARSON:  Jon, you gotta get your
client under control.  I don't even know what
he's talking about right now.

MR. CAVALIER:  So you do not want the
witness to correct prior testimony?

MR. CARSON:  I have no idea.  He's just
been going on for the last five minutes.  I
don't think anyone here knows what he's talking
about, so, please, get your client under
control.  He's not answering a question right
now.  He's just going on and on and on, and,
seriously, I'm gonna file a motion about it
because it's ridiculous.  It's just ridiculous.
It's not okay.  You can't intentionally try to
sabotage a deposition by answering yes or no
questions by taking five minutes and going on
and on and on just blabbering about nothing.
He's not responsive to anything right now.

MR. CAVALIER:  It should go without saying
that we disagree with the way you describe
that.  If you wanna file a motion --

Deposition of DANIEL PIPES                                    Lisa Barbounis v. Middle Eastern Forum, et. al.

Page 345

- - -

1    MR. CARSON:  You don't have a choice, but
2  that's what's happening, and I think the record
3  will speak for itself, okay?
4    MR. CAVALIER:  To the extent the record
5  can speak at all, to the extent you've
6  interrupted the witness 500 times, and the
7  court reporter has been put through hell during
8  these six hours --
9    MR. CARSON:  We're gonna move on.
10    MR. CAVALIER:  -- we'll see what it looks
11  like but --
12    MR. CARSON:  We're gonna move on now.
13  BY MR. CARSON:
14    Q.  Mr. Pipes, you told -- you talked about
15  hiring a deputy director.  Did you ever do that, yes
16  or no?
17    A.  No.
18    Q.  See this email from Lisa on July 18, 2019,
19  Mr. Pipes?
20    A.  Yeah.
21    Q.  She talking about attending, I think, a
22  conference in Washington D.C.; is that right?
23    A.  I don't know.
24    Q.  What?

Page 346

- - -

1    A.  I don't know.
2    Q.  Marc writes, "Dear Lisa, as you well know,
3  [unintelligible] no surprises when it comes to
4  activities that could embarrass the organizations,
5  especially political activities.  As you know,
6  Daniel Pipes previously confronted you about your
7  surprise travels, first on April 17th about your
8  meeting in D.C. with Jack Posepiak [phonetic], then
9  on May 28th about your travels to the UK."  Do you
10  remember?
11    A.  I read it, yeah.
12    Q.  So she responds and says, Please see the
13  attached screenshot.  I asked Dr. Pipes for
14  permission, and he granted it.  So she did talk to
15  you about going to that conference in D.C., right,
16  and you said okay?
17    MR. CAVALIER:  Object to form.
18    THE WITNESS:  This is a letter from Marc
19  to Lisa, and from Lisa to Marc.  I'm not quite
20  sure what we're supposed to...
21  BY MR. CARSON:
22    Q.  I'm asking you if you -- she says that you
23  gave her permission to go.  She asks, and you
24  granted permission; is that true?

Page 347

- - -

1    A.  Apparently.
2    Q.  So here's another email from Ms. McNulty
3  dated May 10th, right?  May 10th, 2019, all right?
4  This one, she says, "Daniel, I feel very
5  uncomfortable in the situation I find myself now in.
6  When Gregg was removed from the office the first
7  time, I continued to work with him regularly.  His
8  role keeps him involved in events and fundraising,
9  essentially working hand-in-hand with me."  So she's
10  telling you that, even after Gregg was ejected from
11  the office, she still had to work with him, correct?
12    A.  No.
13    Q.  Not what she's saying there?
14    A.  No.
15    Q.  Says, "When Gregg was removed from the
16  office the first time".  Is she referring to the
17  November 5th, 2018 situation when he was removed
18  from the office there?
19    A.  Yes.
20    Q.  Okay.  She said, "I continue to work with
21  him regularly," right?
22    A.  Yes.
23    Q.  So then why'd you say no a minute ago?
24    MR. CAVALIER:  Objection.

Page 348

- - -

1    THE WITNESS:  Because there's
2  communication that the next sentence is about
3  the pre-March era.
4  BY MR. CARSON:
5    Q.  All right.  So we'll read that, then.
6  "Everyone else here [sic] received a reprieve from
7  him, but I did not."  She's referring to between
8  November 5th, 2018 and March 2018.  She's saying,
9  even during that time period, I didn't get a
10  reprieve, right?
11    MR. CAVALIER:  Object to form.
12  BY MR. CARSON:
13    Q.  Is that how you understand it?
14    A.  Understand what?
15    Q.  What she wrote to you.  I'll continue.
16  "Everyone else received a reprieve from him, but I
17  did not.  With him returning to that role, I will
18  again continue to be working with him just as much
19  as ever.  I had very much wanted to believe that he
20  had learned a lesson and could be brought back
21  because I knew it would make your life better, but I
22  was wrong," right?  "Now I find myself again on the
23  very bad side of Gregg, who remains in power.
24  Despite splitting that power into two parts, it is

Deposition of DANIEL PIPES                                    Lisa Barbounis v. Middle Eastern Forum, et. al.

Page 349

- - -

1  still -- it is still a position of power that could
2  directly affect my career and future.  There will
3  never be a day when Gregg doesn't think it would be
4  in his best interest to not have me at MEF.  Between
5  the sexual harassment, the verbal abuse, and the
6  slander of my character and reputation that has all
7  been made known, he will force me out of the Forum
8  the second he has an opportunity.  I witnessed him
9  drive Eman, Grayson, and Gary out of employment at
10 the Forum because he didn't want to be working with
11 them.  He will back me into a corner until I have no
12 choice to leave, like each of them" [as read].  She
13 is complaining to you after November 5th, 2018,
14 correct?
15    A.  She got in touch with a shoddy lawyer who
16 told her to start documenting how terrible
17 everything was, and she did that, and a few days
18 later, she filed an EEOC complaint.  Yes.
19    Q.  What lawyer did she get in touch with by
20 May 10th, 2019?
21    A.  Perhaps yourself, perhaps another one.
22    Q.  I'll represent to you she didn't get a
23 lawyer by May 10th, 2019.
24    A.  She was on her way to getting a lawyer.

Page 350

- - -

1  She was the one who went first to a lawyer, and you
2  are the lawyer, I believe, and she was setting up
3  her argument.  Note that these all came late in the
4  day just before the EEOC complaint.  Gregg never
5  tried to get rid of her.  This is --
6     Q.  So this is part of the conspiracy, right,
7  the huge conspiracy that you've concocted?
8     A.  The conspiracy you've concocted, yes.
9     Q.  "I honestly do not know what I am supposed
10 to do in this position.  Like I said to you before,
11 I feel like I am in a lose-lose situation.  I do
12 believe that speaking to a lawyer is in my best
13 interest."  She hadn't gone to a lawyer, right?
14 She's thinking about it right now.
15    A.  [Inaudible].
16    Q.  What?
17    A.  Preparing the way to go to a lawyer.
18    Q.  Preparing the way to go to a lawyer, okay.
19 But the point is she did complain about Gregg again,
20 correct?
21    A.  Well, it's the same point she's making in
22 slightly different words over and over again, but
23 not -- at no point after November was there any
24 specific allegation that Gregg did something that

Page 351

- - -

1  would cause him to be fired, that he did something
2  that was terrible.  There are vague things about
3  Gregg --
4     Q.  My question was, she did complain again,
5  correct?
6     A.  I'm answering it --
7     Q.  No, you're not.  My question was, did she
8  complain again?  That's the question, Mr. Pipes.
9  It's yes or no or "I don't know".  You're allowed to
10 say "I don't know," too.  Did she complain again?
11 Is this another complaint?
12    A.  I am not gonna answer your loaded
13 question.
14    Q.  You have to answer the question.
15             - - -
16       (Indistinguishable cross-talk.)
17             - - -
18 BY MR. CARSON:
19    Q.  -- say whatever you want to my questions.
20 It's a yes or no question.  Did she complain again?
21 Is this a complaint?
22       MR. CAVALIER:  He's trying to give you the
23 context --
24       MR. CARSON:  No.  I'm not asking for

Page 352

- - -

1  context.  I'm asking a yes or no question.
2  BY MR. CARSON:
3     Q.  Did she complain again?
4     A.  No.
5     Q.  She didn't -- this is not a complaint,
6  right?
7     A.  No.
8     Q.  Okay.  So we've now looked at a complaint
9  on April 23rd, 2019, one on June 10th, 2019, one on
10 June 11th, 2019, and one on May 10th, 2019.  They're
11 all from Patricia McNulty.  Do you remember that
12 today?
13    A.  No.  I --
14    Q.  You don't remember?
15    A.  I said no, I do not remember.  I do not
16 see complaints.  I see moaning about Gregg.  I do
17 not see any complaints, anything for me to act on.
18    Q.  That's what Patricia McNulty's doing,
19 she's moaning about Gregg?
20    A.  That's what she's doing.
21    Q.  Okay.  Thank you.
22    A.  Not providing me with any specifics that I
23 can act on.
24    Q.  I understood your answer.  Mr. Pipes --

Case 2:19-cv-05030-JDW   Document 126-3   Filed 04/20/21   Page 92 of 179

Deposition of DANIEL PIPES                          Lisa Barbounis v. Middle Eastern Forum, et. al.

Page 353

- - -
- - -
(Indistinguishable cross-talk.)
- - -
MR. CARSON:  There's no question on the table.
MR. CAVALIER:  He's finishing his answer.
MR. CARSON:  No, there's no question.  All right.  So right now we are going to look at -- and, by the way, that was -- the last complaint we looked at was on -- was D000037.
MR. CAVALIER:  I'm objecting to the --
- - -
(Indistinguishable cross-talk.)
- - -
THE COURT REPORTER:  Nothing is getting written down when you're talking at the same time.
MR. CARSON:  That's okay.  I'm just letting the court reporter -- I'm sorry -- the videographer know what exhibits we're at.
BY MR. CARSON:
Q.  So the next thing we're gonna look at is -- so this is a email where -- do you remember this email where Marnie Meyer complains?

Page 354

- - -
A.  No.
MR. CAVALIER:  Object to form.
BY MR. CARSON:
Q.  She's saying Gregg -- you see right here, "Gregg has made it clear he has hostilities toward me and he now -- and is now known to have started rumors about me, damaging my reputation, for which he has not even been held accountable in any manner, including a simple apology" [as read].  Right?  She's complaining there, correct?
A.  No.
Q.  Okay.  So now that's -- you said there wasn't one complaint against Gregg Roman after November 5th, 2019, and I would represent to you that we've now looked at at least seven, but you're saying none of them are complaints, correct?
A.  This was a complaint about something that happened before November 2018.
Q.  That you found out about after --
A.  I asked Lisa when she told me about this Brady rumor, was this pre or post November '18, and she said pre.  So this is from before.  It is not a new complaint.  It is raising the same old complaints in a new way, or at a new time, as the

Page 355

old -- it's the old issues.
Q.  But you didn't investigate this rumor in 2018 because you didn't know about it, right?
A.  -- know about it, but when I asked Lisa --
Q.  I'm sorry.  Did you say you did not know about it?
A.  I did not know about it until spring -- I'm not sure when -- of 2019, and when I heard about it, the most important thing to me was when did this take -- when did she hear about this?
Q.  Yeah.
A.  When she heard about -- let me finish.  She said she heard about it before November '18, and that made me less anxious about it because whoever had initiated it, it took place in the previous era, and we are now out of that.  So I don't know --
Q.  Yeah.  That's because you gave Gregg immunity for everything that happened before November 2018, right?
A.  I what?
Q.  You gave him immunity.  You gave him a reprieve.  If it happened before that, you weren't interested.
MR. CAVALIER:  Object to form.  Object as

Page 356

- - -
argumentative.
THE WITNESS:  No, I did not give immunity.  I severely curtailed his hour, his remuneration, and other aspects of his job.
BY MR. CARSON:
Q.  You've already testified about that.
- - -
(Indistinguishable cross-talk.)
- - -
THE WITNESS:  -- can't just interrupt me.
BY MR. CARSON:
Q.  It was another yes or no question.  That's it, yes or no.  Mr. Pipes, what about this?  Here, there's another -- there's another sentence here.  Besides the rumor about Marnie Meyer, she says, "Gregg has made it clear he has hostilities toward me".  That's present tense, correct?
A.  I will answer my way, or I don't answer.
Q.  I mean, I'm asking you if she's talking in the present tense.
A.  I will answer as I wish to answer, and you'll let me answer.
Q.  It's a simple yes or no question -- is she talking in present tense -- or maybe you don't know.

Deposition of DANIEL PIPES                                    Lisa Barbounis v. Middle Eastern Forum, et. al.

Page 357

1  Yes, no, I don't know?
2      A.  You gonna let me answer?
3      Q.  I'm asking you a question, if you can
4  answer my question.  Is she talking in the present
5  tense right here?
6      A.  Are you gonna censor me or gonna let me
7  speak?
8      Q.  I'm not censoring you.  I'm asking you a
9  question.  You can answer my question.  Is she
10  talking in the present tense?  This is a present
11  complaint, correct, or did you not see it that way?
12  It's just a yes or no question.
13      A.  I would like to answer my way.
14      Q.  Is your way include saying yes or no?
15      MR. CAVALIER:  Seth, just let him answer
16  the question.
17      MR. CARSON:  No, I'm not, because he
18  answers every single question by not answering
19  the question and just talking and talking and
20  talking.
21      MR. CAVALIER:  We deposed your client a
22  week ago, and she went on for pages.
23                    - - -
24      (Indistinguishable cross-talk.)

Page 358

1                    - - -
2      MR. CARSON:  Are you guys gonna give me
3  eight and a half hours today?  I'll let him
4  answer whatever he needs to, however long he
5  needs to.
6      MR. CAVALIER:  You didn't give us eight --
7      MR. CARSON:  Yeah, I did.  I gave you
8  eight and a half hours.
9      MR. CAVALIER:  Secondly, if you wanna ask
10  questions that require context, he's allowed to
11  give it.
12                    - - -
13      (Indistinguishable cross-talk.)
14                    - - -
15      MR. CAVALIER:  -- far further along if you
16  would stop interrupting him and just let him --
17      MR. CARSON:  No, we wouldn't.  My
18  question, Jon, is if this is a present tense
19  sentence.  That's the question.  Is it in the
20  present tense?  That's all I'm asking.
21  BY MR. CARSON:
22      Q.  Do you know, Mr. Pipes, whether this is in
23  present tense?
24      A.  You gonna censor me or let me speak?

Page 359

1                    - - -
2      MR. CARSON:  We're gonna go off the record
3  because, I mean, he's just not answering right
4  now.  So I'm gonna stop sharing --
5      MR. CAVALIER:  Ask the question, Seth.
6      MR. CARSON:  Is it a present tense
7  sentence?
8      MR. CAVALIER:  Answer the question in the
9  way you think it needs to be answered.
10      MR. CARSON:  I mean, at this point it
11  doesn't matter what happens.  We're just gonna
12  have to deal with it with the court because you
13  guys are what's wasting a lot of time today
14  with nothing, and it's really -- you know, it's
15  obviously a strategy.  It's not a good
16  strategy, but, you know, I'm objecting to the
17  nonresponsiveness throughout the entire day.
18  BY MR. CARSON:
19      Q.  Mr. Pipes, are you gonna continue the
20  deposition, yes or no?
21      A.  Yes, if you let me speak.
22      Q.  Well, you can speak all you want, but your
23  responses and what you say have to be in answer to
24  my question.  You can't just say whatever you want
    to anything I say.

Page 360

1                    - - -
2      MR. CAVALIER:  He's not.  He's trying to
3  answer your question.
4  BY MR. CARSON:
5      Q.  Okay.  So my question here with regard to
6  this email -- I'm not -- this is the last time I'm
7  gonna try this.  My question here with regard to
8  this email is, do you see here right here where it
9  says, "Gregg Roman has made it clear that he has
10  hostilities toward me"?
11      A.  You gonna box me in to one-syllable answer
12  or --
13      Q.  Do you see that?
14      A.  No, I don't see it.
15      Q.  You don't see it?  I just highlighted it.
16      MR. CAVALIER:  The document's not up.
17  BY MR. CARSON:
18      Q.  Do you see it now?  "Gregg Roman has made
19  it clear that he has hostilities toward me."
20      A.  I see it.
21      Q.  Okay.  Isn't she talking in the present
22  tense there?
23      A.  You gonna let me answer?
24      Q.  It's just a yes or no.
      MR. CAVALIER:  I'm gonna object to the

Deposition of DANIEL PIPES                                    Lisa Barbounis v. Middle Eastern Forum, et. al.

Page 361

- - -

1 form. The document speaks for itself, and it's
2 literally not in the present tense, and you
3 keep asking --
4        MR. CARSON: "Gregg has made it clear" --
5 then he can say no, can't he?
6        THE WITNESS: No, it's not in the present
7 tense.
8 BY MR. CARSON:
9    Q. Okay. So you think when she was saying
10 this she was talking about the Caitriona Brady
11 situation?
12    A. "Has made" is past tense. "Has" is
13 present tense.
14    Q. Okay. Thank you for answering.
15    A. Therefore, it is not a single-word answer.
16    Q. All right. Your answer was no. Do you
17 think that when she said -- do you think when she
18 said this she was referring to the Caitriona Brady
19 rumor, or you think she was talking about continued
20 hostilities?
21    A. It goes on to mention the rumor, but, of
22 course, we now know that the rumor actually dated
23 from a half year earlier.
24    Q. But doesn't she say, "Gregg Roman made it

Page 362

- - -

1 clear that he has hostilities and is now known to
2 have started rumors against me" [as read]? Isn't
3 that two things?
4    A. Well, they're obviously connected because
5 she mentions one right after the other, and so she's
6 referring to something --
7    Q. Mr. Pipes, you answered the question.
8    A. -- six months earlier, pre November '18.
9    Q. Okay. So the next thing we're gonna look
10 at is -- who said this right here? The bane of
11 my -- "This tension is the bane of my life," right?
12 You forwarded Marnie's email complaining about Gregg
13 to Gregg, and then said, "This tension is the bane
14 of my life," right?
15    A. Right.
16    Q. Your key statement below is, "I'm no
17 longer comfortable with Gregg reviewing or having
18 access to my work product or your resulting refusal
19 to work with him" [as read]. That was in connection
20 to the finances, right?
21        MR. CAVALIER: Object to form.
22 BY MR. CARSON:
23    Q. Was that -- what was that in connection
24 to, Mr. Pipes?

Page 363

- - -

1    A. You tell me.
2    Q. Well, I'm asking. You're the one who said
3 it. Marnie -- this is your email, right, Daniel
4 Pipes to Marnie Meyer?
5    A. That's my email from a year and a half
6 ago. I don't recall. You have the list of -- you
7 have the documents. I don't.
8    Q. I can't -- we can't hear you, Mr. Pipes.
9 Can you speak up? Here, you say, "I understand your
10 feelings and sympathize with them and respect your
11 reluctance. Gregg has made many -- made errors and
12 many of -- Gregg has made errors, and many of us,
13 including myself, have issues with what he has done.
14 Accordingly, he has a diminished standing at MEF,
15 including severely limited access to the office.
16 You are not asked to be alone with him, you do not
17 report to him, and he has no say over your
18 employment duties or status" [as read]. Sent that
19 on June 5th, 2019, right? Can you hear me?
20    A. Yep.
21    Q. You sent that on June 5th, 2019, correct?
22    A. Correct.
23    Q. Okay. You also write, "Gregg Roman has
24 had -- has had many errors" [as read], correct?

Page 364

- - -

1    A. Correct.
2    Q. What are the errors you're referring to
3 there?
4    A. Pre November '18.
5    Q. But you also say, you have to work with
6 Gregg Roman, correct?
7    A. Correct.
8    Q. So you're forcing her to work with him
9 after November 5th, 2019 -- 2018, correct?
10        MR. CAVALIER: Object to form.
11 BY MR. CARSON:
12    Q. You're forcing her to work with him,
13 correct?
14        MR. CAVALIER: Same objection.
15 BY MR. CARSON:
16    Q. I mean, "You have to work with Gregg
17 Roman." That's what you said?
18    A. I'm not forcing her. She is free to --
19    Q. Can't hear you.
20    A. No, I'm not forcing her.
21    Q. I mean, if she wants to continue her
22 employment, she has to, right?
23    A. Correct.
24    Q. What?

Deposition of DANIEL PIPES                                      Lisa Barbounis v. Middle Eastern Forum, et. al.

Page 365

- - -

1   A. Yes.
2   Q. Okay.
3      THE VIDEOGRAPHER: Counsels, we are in the
4   last 60 minutes until seven hours, for your
5   information.
6      MR. CARSON: So the next thing we're gonna
7   look at is November -- is Documents 50, 51, 52.
8      THE VIDEOGRAPHER: Thank you.
9      MR. CARSON: Got it?
10     - - -
11     (Indistinguishable cross-talk.)
12     - - -
13     MR. CARSON: What?
14     THE VIDEOGRAPHER: Yes, Counselor.
15  BY MR. CARSON:
16  Q. November 6, 2018. You see this? Is this
17  the agreement between you and Gregg Roman for him to
18  continue working with the Middle East Forum after
19  November 5th, 2018 meeting?
20  A. Looks like it, yeah.
21  Q. So he keeps his -- keeps his title as
22  director, correct?
23  A. Looks like it.
24  Q. Yeah?

Page 366

- - -

1   A. Yep.
2   Q. He continues to make the same amount of
3   money, no -- all his benefits are the same, correct?
4   A. No. No, I said.
5   Q. "Your salary and benefits remain
6   unchanged." Isn't that part of the agreement?
7   A. No.
8   Q. Well, it says so right here, though,
9   right?
10  A. Yeah, but that isn't what happened.
11  Q. Well, what happened that's different than
12  that?
13  A. I learned that he had, I think, $27,000 in
14  health insurance, and I took that away.
15  Q. But that has nothing to do with this,
16  though, right?
17  A. When I found out about that, I took it
18  away. That was --
19  Q. It has nothing to do with the conditions
20  that you imposed upon Gregg because of all the women
21  coming forward and reporting sexual harassment,
22  discrimination, and harassment, correct?
23     MR. CAVALIER: Object to form. Object to
24  lack of foundation.

Page 367

- - -

1   BY MR. CARSON:
2   Q. [Unintelligible]. You already testified
3   to that, right?
4      MR. CAVALIER: Object to argumentative
5   nature of the question. To the extent you can
6   answer, you can answer.
7   BY MR. CARSON:
8   Q. Why are you trying to compare the -- why
9   are you trying to relate Gregg Roman going rogue and
10  signing up with a $200,000 health insurance policy
11  for the office, and what you did in response to
12  that, to this document?
13     MR. CAVALIER: Object to form.
14     THE WITNESS: The complaints in November
15  fell into two categories, the sexual complaints
16  and the management complaints. The sexual
17  harassment complaints I dealt with by excluding
18  him from the office and limiting his contact
19  with the female employees. The administrative
20  and management complaints I dealt with by
21  taking him out of administration. They're two
22  separate problems which I dealt with in two
23  separate ways, and the -- I initially kept the
24  remuneration the same, and benefits, and then

Page 368

- - -

1   when I learned shortly afterwards that he had
2   $27,000 or so in health insurance, we were
3   paying -- the Forum was paying $27,000 a year
4   in health insurance. I took that away, so, in
5   fact, he did have a significant loss of income.
6   BY MR. CARSON:
7   Q. But he didn't have a significant loss
8   because of the women's complaints, right? The loss
9   of the health insurance was connected to his own
10  misconduct, correct?
11  A. No, it was not misconduct. It was bad
12  management.
13  Q. His own bad management, right?
14  A. Yes.
15  Q. Okay. So the next thing we're gonna look
16  at is an email from Lisa Barbounis to you. "Gregg
17  Roman will be restated -- will be reinstated as
18  director of MEF" -- and this is Document 54. "He
19  will maintain responsibility for projects,
20  developments, and communications, anything
21  content/production related. He will have no
22  oversight over finance operations. His position as
23  director will remain probationary" [as read] -- so,
24  here, Lisa is saying that his position is

Deposition of DANIEL PIPES                                    Lisa Barbounis v. Middle Eastern Forum, et. al.

Page 369

- - -

1  probationary, too, right?
2      A.  Yes.  That was public.  His -- he was on
3  probation.
4      Q.  And while he's on this probationary
5  status, there have been -- there were multiple
6  emails to you complaining about his conduct and --
7  is that correct?
8          MR. CAVALIER:  Object to form.
9          THE WITNESS:  No.
10 BY MR. CARSON:
11     Q.  While he was on probationary status, he
12 received multiple emails complaining about Gregg
13 Roman's misconduct, correct, or not correct?
14         MR. CAVALIER:  Object to form.
15         THE WITNESS:  Not correct.
16 BY MR. CARSON:
17     Q.  Sorry?
18     A.  Not correct.
19     Q.  It was just moaning, those emails, right?
20         MR. CAVALIER:  Object to form.
21         THE WITNESS:  -- same old thing and
22 preparing --
23 BY MR. CARSON:
24     Q.  Wait, wait.  Did you say "same old

Page 370

- - -

1  moaning"?  Is that how you started the response?
2      A.  You gave several examples of Tricia
3  repeating herself, giving no specifics other than
4  what Matt allegedly said to her.  And, otherwise,
5  it's gearing up for lawsuits.
6      Q.  They were just moaning and conspiring,
7  right?
8      A.  Well, there are no specifics.  In
9  November, I had specific after specific about money,
10 about misuse of authority and the like.  Here, it
11 was moaning.  It was saying, Gregg doesn't like me.
12 Gregg doesn't want me here.  Gregg this, Gregg that,
13 but there's nothing specific, nothing for me to --
14     Q.  Did you schedule any meetings to ask them
15 for specifics?
16     A.  My door was open.  My emails were open.
17 My texts were open.  If you've got any problems with
18 Gregg, tell me.  And they did.  You have been going
19 through them.  They did, but I look at them and say,
20 I don't see specifics here.  And when I did see one
21 specific about the Gregg, Matt, Tricia thing, and
22 when I saw another one with the rumor thing, I
23 looked into them, and, in the rumor, I concluded it
24 took place a half year earlier and, therefore, not

Page 371

- - -

1  really germane.  In the case of the Gregg, Matt,
2  Tricia, I threw up my hands, and I couldn't get to
3  the bottom of it and figured, you know, we're just
4  gonna live with this.
5      Q.  Marnie was against Gregg Roman returning
6  from the beginning, correct?
7      A.  Correct.
8      Q.  All right.  So we're gonna look at a
9  document that's marked 60 -- 00060, and that
10 document says -- so here you're talking to Lisa
11 Barbounis, and this is on June 5th, 2019, and you're
12 talking to her about the article in The Guardian,
13 and you were concerned about the possible
14 consequences that -- because of, you know, while she
15 was on her own time, it might be misconstrued as
16 political activity from the Middle East Forum.  So
17 you say that although the trip was for fun -- strike
18 that.  You say -- excuse me.  You say, "The article
19 could entirely disappear, but it could pop up in the
20 future," right?
21     A.  Yep.
22     Q.  Which one happened?
23         MR. CAVALIER:  Object to form.
24 BY MR. CARSON:

Page 372

- - -

1      Q.  Did it entirely disappear, or did it pop
2  up in the future?
3      A.  No, it didn't, either.  Where do you see
4  that, the "pop up in the future"?  I'm not seeing
5  that.
6      Q.  Is it down on this one?
7  [Unintelligible] -- "This rates as both a surprise
8  and an unwelcome complication.  The article could
9  entirely disappear, but it could also pop up in the
10 future and make trouble for us."  Did it ever pop up
11 and make trouble for you?
12     A.  No.
13     Q.  It entirely disappeared, right?
14     A.  No.
15         MR. CAVALIER:  Object to form.
16 BY MR. CARSON:
17     Q.  Sorry?
18     A.  No.
19     Q.  Well, what happened?
20     A.  It's there on the record and available to
21 those who wish to make trouble for us.
22     Q.  But it's been a year and a half, and none
23 of that trouble's happened, right?
24     A.  No.  There was trouble.  We had trouble in

Deposition of DANIEL PIPES                                      Lisa Barbounis v. Middle Eastern Forum, et. al.

Page 373

- - -

1  Britain.
2      Q.  What was the trouble related to the
3  article?
4      A.  Yeah.  A number of articles about Lisa,
5  about the Middle East Forum, Tommy Robinson.  Yeah,
6  there were some.  It didn't have legal
7  repercussions, which I most feared.
8      Q.  Did it have any repercussions?
9      A.  Yeah, it did.  I just told you.
10     Q.  What were the repercussions?
11     A.  It was mentioned time and again that the
12  Forum was connected to the Tommy Robinson campaign.
13     Q.  Okay.  I'd like you to please -- I'll make
14  a request on the record to produce any articles that
15  you say were repercussions of the article referenced
16  in Document 60, okay?
17     A.  Okay.
18         MR. CAVALIER:  I'll just note for the
19     record that, to the extent you have a request
20     out there that those documents would be
21     responsive to, we will do so.
22         MR. CARSON:  Well, I think we do, and
23     they're in their second request for production
24     of documents in response to your counterclaim.

Page 374

- - -

1  BY MR. CARSON:
2      Q.  Sixty-two.  So here in -- on June 17th,
3  2017, you're talking about Lisa Barbounis' work on
4  her own time, and you give her permission again.
5  You say, "Go if you wish, but know that I will be
6  very upset with -- upset with major consequences if
7  your presence becomes known outside of Tommy
8  Robinson's own circles" [as read], right?
9      A.  Yeah.
10     Q.  So you said you can keep doing it, just
11  make sure there's no consequences for us, the Middle
12  East Forum, right?
13     A.  Yeah.
14         MR. CAVALIER:  Object to form.
15         THE WITNESS:  One week before the EEOC
16     complaints, I might note.
17  BY MR. CARSON:
18     Q.  I know that's on your mind, Mr. Pipes, but
19  that wasn't a question.  All right.  So we're gonna
20  look at Document 65 now.  Document 65 is an email
21  from you to Ms. McNulty on May 10th.  You tell her,
22  "Thank you for your thoughts.  Most importantly, I'd
23  like to point out that, since November, you and
24  everyone else in the office reports to me.  Gregg is

Page 375

- - -

1  a colleague with whom you work, in your words,
2  hand-in-hand."  So you're acknowledging that she and
3  Gregg have to work hand-in-hand, correct?
4      A.  Yes.
5      Q.  "He is not authorized to give you
6  instructions, and he does not judge your work.  In
7  March, with your agreement, he took a more
8  administrative -- he took -- he took on more
9  administrative tasks, but this situation remains
10  unchanged.  Further, I plan the deputy director
11  position that I sketched out for Marnie and you on
12  Tuesday, that person will also report to me.  In
13  short, now and in the future, Gregg has no authority
14  over you and cannot force you out of the Forum.  I
15  ask you to be wary of what Matt reported to you
16  about Gregg's statements about you.  I have reason
17  to think that Matt wants to make trouble for us" [as
18  read].  And that's -- you're basing that on Gregg
19  telling you that Matt made that stuff up; is that
20  right?
21     A.  In part, and in part on Matt's record of
22  saying all sorts of things.  I gave you one example
23  of reporting to me that Marnie wants to become
24  director, and he had a history with me of saying

Page 376

- - -

1  things that made me leery of what he was saying.
2      Q.  So I think -- I think that's everything on
3  this one.  There might -- let's see.  Ms. Barbounis'
4  employment from the Middle East Forum, she was
5  permitted to submit expense reports, right?
6      A.  I don't know.
7      Q.  Why don't you know that?
8      A.  I didn't deal with expense reports.
9      Q.  Well, is it your understanding that
10  employees were permitted to get reimbursed if they
11  spent their own money on work-related expenses?
12     A.  If they were pre-authorized, yes.  If they
13  just decided -- [inaudible] --
14         THE COURT REPORTER:  I can't hear that,
15     Mr. Pipes.
16         THE WITNESS:  If they pre-authorized, yes;
17     if they on their own decided to submit
18     expenses, no.
19  BY MR. CARSON:
20     Q.  Well, if they submit expenses before they
21  get paid, they have to be authorized, correct?
22     A.  They would only be reimbursed if they had
23  been authorized.  They got authorization.
24     Q.  And who makes that determination?

Deposition of DANIEL PIPES                                    Lisa Barbounis v. Middle Eastern Forum, et. al.

Page 377

- - -

1  A. Gregg or me.
2  Q. Well, in 2018 and 2019, Marnie Meyer made
3  that determination, correct?
4  A. No. We are speaking pre November. Post
5  November, no, Marnie did not make that. I did.
6  Q. It's your testimony that in order for an
7  expense to be authorized, you had to authorize it?
8  A. The personnel manual says the director or
9  the president, and I took Gregg out of that, so it
10  just left the president. Did not say the
11  accountant.
12  Q. So were you authorizing all the expenses
13  submitted to the Middle East Forum for
14  reimbursement?
15  A. If there were, yes.
16  Q. Okay. So how would that work? Marnie
17  would tell you, hey, someone submitted an expense,
18  can I pay it out, and then you'd say yes?
19  A. Different ways.
20  Q. Generally, though, would the -- is the
21  procedure that an employee would submit their
22  receipts to Marnie Meyer, Marnie Meyer would then
23  confirm with you whether she was permitted to
24  reimburse the money, and then, if you said yes, she

Page 378

- - -

1  would reimburse it?
2  A. I don't remember the usual way.
3  Q. Well, what's the procedure for that?
4  A. The key point is that I would give the
5  authorization or not. I don't remember the --
6  Q. But if Marnie Meyer reimbursed money, it
7  means that you authorized it, correct?
8  MR. CAVALIER: Object to form.
9  THE WITNESS: She could've reimbursed
10  money without checking with me.
11  BY MR. CARSON:
12  Q. Do you know whether she did that?
13  A. I do not.
14  Q. Have you ever thought that she might've
15  done that?
16  A. I don't deal with the books.
17  Q. Well, do you have any reason to believe
18  she did that?
19  A. I don't know if she did or not.
20  Q. So you don't have any reason to believe --
21  it's not your question. Do you have any reason to
22  believe that Marnie was authorizing expenses when
23  she wasn't supposed to?
24  A. I don't know. I'm not saying she didn't.

Page 379

- - -

1  I'm not saying she did. I'm saying I don't know.
2  My job is to bring the money in. I did not oversee
3  the spending of the money.
4  Q. But you just testified it was your job to
5  authorize whether an employee could be reimbursed
6  for their expenses.
7  A. Simple fact, but I did not get into the
8  amounts, and I did not get into the payments and the
9  like. I did not sign checks. I did not [inaudible]
10  the checks. I did not look at the amounts that were
11  being submitted. I simply said, yes, this is okay
12  to reimburse.
13  Q. And how would she do that, by email?
14  A. I don't know. Various different ways.
15  Q. Have you ever accused Marnie of paying an
16  employee an expense that was unauthorized? Strike
17  that. Have you ever accused Marnie of reimbursing
18  an employee for -- for money spent that she wasn't
19  supposed to?
20  A. I don't recall that, no. Could've, but I
21  don't recall it.
22  Q. So this is Document 968, and this
23  document, it says, to administrative staff, Marnie,
24  from Daniel Pipes. It's not dated, but it says,

Page 380

- - -

1  "November 1st, 2018 was when I received a number of
2  complaints about Gregg. I took the complaints at --
3  I took the complainants -- I took the complainants
4  at their word and immediately took steps to limit
5  Gregg's role at MEF. In particular, I took away his
6  office key" [as read]. When you said that, you mean
7  that you think Marnie took his office key, correct?
8  A. Yeah. Not me personally.
9  Q. Okay. "On March 9th, 2019, responding to
10  a demand from many of you, I reinstated him
11  particularly" [sic] -- I'm sorry. I'm sorry.
12  Strike that. "I reinstated him partially but
13  maintained his limited access to the office. Now, I
14  am happy to report we have completed a
15  comprehensive" -- sorry. I lost my place. "Now, we
16  have completed a comprehensive investigation into
17  Gregg's conduct and have determined that all
18  accusations against Gregg are a hundred percent
19  false. Thus, there is now no reason to maintain the
20  previous restrictions" [as read]. Do you see that?
21  A. Yep.
22  Q. Is that true?
23  A. I don't know if I ever sent this. I don't
24  know when I -- if I did --

Page 381

- - -

1   MR. CAVALIER:  Yeah.  Seth, I --
2   BY MR. CARSON:
3   Q.  I mean, is this accurate?
4   A.  It could be a draft.  It could be --
5   MR. CAVALIER:  Yeah.  This may be a draft
6   that has privilege issues attached to it.
7   MR. CARSON:  You guys produced it,
8   Document 968.
9   MR. CAVALIER:  Mark confidential -- yeah,
10  you're gonna have to let him read it.
11  MR. CARSON:  They're all marked
12  confidential, every document you gave me.
13  MR. CAVALIER:  My only point is you're
14  gonna have to let us read it here if you want
15  us to answer questions about it because I'm not
16  sure what it is.
17  MR. CARSON:  I just read it to you.
18  MR. CAVALIER:  You read us the top part.
19  I wanna see the whole document.
20  MR. CARSON:  Well, this is the whole
21  document.
22  MR. CAVALIER:  I can only see down to
23  "Original".  There's obviously more text.
24  MR. CARSON:  Well, I'll get to that in

Page 382

- - -

1   just a second.
2   MR. CAVALIER:  It's the same document.
3   BY MR. CARSON:
4   Q.  I'm asking you about this sentence.  Is
5   this true?  Did you perform an investigation --
6   - - -
7   (Indistinguishable cross-talk.)
8   - - -
9   MR. CAVALIER:  Seth, he's not gonna answer
10  questions on a --
11  MR. CARSON:  I'm not asking about the
12  document then [unintelligible].
13  BY MR. CARSON:
14  Q.  Did you complete a comprehensive
15  investigation to Gregg's conduct and determine that
16  all accusations against Gregg are a hundred percent
17  false?  Did you do that?
18  A.  I --
19  MR. CAVALIER:  You're asking at any time,
20  at any point in the universe?
21  MR. CARSON:  Sure.
22  THE WITNESS:  At some point, yes.  When
23  this was written, I don't know.  I don't know
24  if it was sent --

Page 383

- - -

1   BY MR. CARSON:
2   Q.  Well, when --
3   A.  As of today, I can tell you, yes, I
4   have -- we have completed -- I can endorse that as
5   of today.  I cannot do it as some arbitrary date in
6   the past, but today, yes.
7   Q.  Well, when?  When did that happen?  When
8   did that investigation happen?
9   A.  I can tell you today that I endorsed it.
10  I cannot give you a date.
11  Q.  I'm asking you when the -- you said that
12  your conclusion that everything [unintelligible] is
13  based on a comprehensive investigation.
14  MR. CAVALIER:  So unless and until you let
15  us --
16  - - -
17  (Indistinguishable cross-talk.)
18  - - -
19  MR. CAVALIER:  -- but if you're gonna
20  refer to the document and base your questions
21  on it, you need to let us see the document.
22  MR. CARSON:  I'll get to -- I'll
23  [unintelligible].
24  BY MR. CARSON:

Page 384

- - -

1   Q.  When did you complete -- when did you do
2   this investigation?
3   A.  Over the past two years.
4   Q.  Over the past two years you did an
5   investigation?
6   A.  Since November 1st, so --
7   Q.  So you've been investigating this matter
8   since November 1st, 2018?
9   A.  Yeah, thanks to you.
10  Q.  Okay.  What did you do to investigate the
11  reports of discrimination and harassment in the
12  workplace after January 1st, 2019?
13  MR. CAVALIER:  Object to form.
14  BY MR. CARSON:
15  Q.  What did you do to investigate it?  What
16  are the steps you took?
17  MR. CAVALIER:  This is asked and answered.
18  MR. CARSON:  No, it's not.  Yeah, you're
19  right.  It is, and he said he did nothing.
20  MR. CAVALIER:  I disagree with your --
21  - - -
22  (Indistinguishable cross-talk.)
23  - - -
24  THE WITNESS:  I received no complaints.  I

Deposition of DANIEL PIPES                                  Lisa Barbounis v. Middle Eastern Forum, et. al.

Page 385

- - -

1 received moans about how Gregg is a lousy
2 person, but I received nothing that I was to
3 investigate.  I mean, when Tricia says, he
4 doesn't want me here, what am I supposed to
5 investigate?
6 BY MR. CARSON:
7   Q.  So you have not investigated this matter
8 since November 2018, correct?
9   A.  No, not correct.  Investigating it
10 unendingly until November 17th, 2020.  Thank you.
11   Q.  Okay.  So what -- what did you do?  Who
12 did you -- I'll get more specific.  Did you take any
13 witness statements?
14   A.  We have been taking witness statements.
15 We've been reading emails and texts and so forth
16 unendingly --
17   Q.  Who did you get witness statements from?
18   A.  Would you let me finish?
19   Q.  No.  Let's just -- let's just take it step
20 by step.  Who did you --
21      MR. RIESER:  Seth, you can't interrupt
22   him.  You really can't.
23      MR. CARSON:  No, I can, and, Mr. Rieser,
24   you have no standing to put anything on the

Page 386

- - -

1 record today.
2      - - -
3      (Indistinguishable cross-talk.)
4      - - -
5      MR. CAVALIER:  What're you talking about?
6   He's representing Gregg Roman, a defendant in
7   the case.
8      MR. CARSON:  Gregg Roman's not on --
9   [unintelligible] not testifying.
10      MR. RIESER:  It's -- I --
11      MR. CAVALIER:  So what?  He's allowed to
12   represent his client.
13 BY MR. CARSON:
14   Q.  Anyway, it was a yes or no question.  Did
15 you take any witness statements?
16      MR. RIESER:  Seth, you're out of control.
17   Your behavior's outrageous.
18      MR. CARSON:  Right.
19      - - -
20      (Indistinguishable cross-talk.)
21      - - -
22      MR. CARSON:  Your objection is totally
23 inappropriate.
24 BY MR. CARSON:

Page 387

- - -

1   Q.  Mr. Pipes, did you take any witness
2 statements?
3      MR. RIESER:  Is it your position you have
4   the right to interject and interfere with the
5   client -- with the deponent's --
6      MR. CARSON:  Mr. Rieser, we're gonna go
7   off the record if you're gonna say anything
8   else today.
9      MR. RIESER:  I don't agree to go off the
10   record.
11      MR. CARSON:  Well, you don't get to agree
12   or not agree.  You're not -- you're here to
13   watch.  That's it.
14      MR. RIESER:  I am representing a defendant
15   in the case.
16      MR. CARSON:  Right, exactly, a defendant
17   who's not testifying today, but we're not --
18   look.  The question is standing.
19 BY MR. CARSON:
20   Q.  Mr. Pipes, did you take any witness
21 statements?  It's just a yes or no question.
22   A.  Yes.
23   Q.  Who?  Who'd you take them from?
24   A.  I don't remember.  There's so many people

Page 388

- - -

1 we've talked to.
2   Q.  Well, name one person that you took it
3 from.
4   A.  I am not --
5   Q.  Tell me one.
6   A.  -- go down this path with you, Mr. Carson.
7 We have done enormous amount of research.
8   Q.  Did you hire an investigator?
9   A.  We did all sorts of things.
10   Q.  Yes or no, did you hire an investigator?
11   A.  We did not hire an investigator.
12   Q.  You're saying you did all sorts of things,
13 but you can't give me one example of something you
14 did, so that's why I'm just trying to drill down on
15 you what your testimony is.
16   A.  You've got --
17   Q.  So if you've taken a witness statement,
18 tell me a name of somebody.  If you've hired
19 investigator, you know, if you've looked at
20 records -- like tell me what you've done to
21 investigate it.
22   A.  I was trying to [inaudible] and you
23 interrupted me.
24   Q.  Well, let's go step by step.  So, witness

Deposition of DANIEL PIPES                                    Lisa Barbounis v. Middle Eastern Forum, et. al.

Page 389

- - -

1  statements, can you name anyone you've taken a
2  witness statement from?
3      A.  We have taken witness statements, yes.
4      Q.  From who?
5      A.  I don't wanna tell you.
6      Q.  You have to tell me.
7      A.  I don't know why I have to tell you.
8      Q.  Because it's your deposition.  You have to
9  tell me.
10     A.  Well, okay.  Danny Thomas.
11     Q.  You took a witness statement from Danny
12 Thomas?
13     A.  Yeah.
14     Q.  Anybody else?
15     A.  Not that I remember.
16     Q.  Okay.  So did you review any records that
17 made you determine that everything is a hundred
18 percent false regarding Gregg Roman?
19     A.  Yes.
20     Q.  What records did you review?
21     A.  Electronic records of all sorts, emails,
22 texts.
23     Q.  Well, can you think of any specific email
24 that you read that indicates that everything that

Page 390

- - -

1  Gregg Roman that was --
2          - - -
3      (Indistinguishable cross-talk.)
4          - - -
5  BY MR. CARSON:
6      Q.  Let me finish my question.  Can you think
7  of any document that you read or reviewed at any
8  time that indicates that everything, all allegations
9  against Gregg Roman, are a hundred percent false?
10     A.  It is the sum of evidence.  We can look at
11 three incidents in particular.  Since we're
12 discussing Ms. Barbounis, we can go over the Israel
13 one.
14     Q.  We can go over what?
15     A.  We can go over the Israel one since
16 Ms. Barbounis is the topic today.  She -- we have
17 texts from her saying there was no -- nothing
18 happened in Israel.  Right contemporaneous, we have
19 statements by people who met her at that time who
20 said she was not troubled.
21     Q.  Who?  Who said that?  Who said she wasn't
22 troubled?
23     A.  We have -- don't interrupt.
24     Q.  Mr. Pipes --

Page 391

- - -

1      MR. CAVALIER:  You asked him a question.
2  This time, he's gonna finish his answer.
3      MR. CARSON:  No.
4  BY MR. CARSON:
5      Q.  Who said that she wasn't troubled?
6      MR. CAVALIER:  Daniel --
7          - - -
8      (Indistinguishable cross-talk.)
9          - - -
10     MR. CAVALIER:  He is directly responding
11 to your question.
12         - - -
13     (Indistinguishable cross-talk.)
14         - - -
15     THE WITNESS:  We have --
16 BY MR. CARSON:
17     Q.  Mr. Pipes, who said she wasn't troubled?
18 I'm asking about what you just said.
19     A.  You're not interrupting me.
20     MR. CAVALIER:  You can ask him when he's
21 finished his answer.
22     MR. CARSON:  He is finished his answer.
23     MR. CAVALIER:  No, he's not.  Clearly,
24 he's not.

Page 392

- - -

1  BY MR. CARSON:
2      Q.  Who testified that -- who told you that
3  she was --
4          - - -
5      (Indistinguishable cross-talk.)
6          - - -
7      MR. CAVALIER:  Either withdraw your
8  question --
9      THE WITNESS:  I'm not dealing with this.
10     MR. CAVALIER:  -- or let him answer it.
11     MR. CARSON:  We have to go off the record.
12 The witness is making a phone call.
13     MR. CAVALIER:  I don't agree to go off --
14         - - -
15     (Indistinguishable cross-talk.)
16         - - -
17     THE WITNESS:  -- because you're not
18 letting me say what I wanna say.
19 BY MR. CARSON:
20     Q.  Who you gonna call?
21     A.  I'm not calling anyone.  I was gonna read
22 the news, and I'm not gonna do --
23         - - -
24     (Indistinguishable cross-talk.)

Page 393

- - -
- - -

1  MR. CAVALIER: Seth, you asked him the
2  question, what did he look at to determine that
3  the allegations were false. He was in the
4  middle of an answer, and you cut him off.
5  MR. CARSON: He said that he talked to
6  witnesses who said that Lisa wasn't troubled,
7  and my simple question is, who were they?
8  MR. CAVALIER: No. You asked him what he
9  did. He was telling you what he did, and then
10 you decided to interject and interrupt with a
11 new question. You've gotta let him finish his
12 answer.
13 MR. CARSON: -- because I wanna know who
14 he spoke to, who these witnesses --
15 MR. CAVALIER: Well, you can ask him who
16 he spoke to after he's done his answer, but
17 you're not gonna cut him off in the middle and
18 make his answer look incomplete when he's
19 answered --
20      - - -
21 (Indistinguishable cross-talk.)
22      - - -
23 MR. CARSON: I am, actually, because --

Page 394

- - -
- - -

1  (Indistinguishable cross-talk.)
2      - - -
3  MR. CARSON: Okay. All right. So, what,
4  you guys are walking out?
5  MR. CAVALIER: No. We're sitting here,
6  and we're telling you we're ready to finish our
7  answer whenever you're ready to allow us to do
8  so.
9  MR. CARSON: I'll withdraw the question.
10 BY MR. CARSON:
11 Q. Mr. Pipes, who did you -- who told you
12 that Ms. Barbounis was not troubled?
13 MR. CAVALIER: That's not gonna work this
14 time.
15 MR. CARSON: There's no question pending
16 now. Who told you that Ms. Barbounis --
17 MR. CAVALIER: -- was an answer pending
18 that he was halfway through.
19 MR. CARSON: I withdrew the question.
20 It's not a question anymore.
21 MR. CAVALIER: It doesn't matter.
22      - - -
23 (Indistinguishable cross-talk.)

Page 395

- - -

1  BY MR. CARSON:
2  Q. Who told you that Ms. Barbounis wasn't
3  troubled?
4  MR. CAVALIER: Seth, I mean, I can't be
5  any more clear with you.
6  MR. CARSON: Yeah. I'm not gonna be any
7  more clear, either. I mean, we're just gonna
8  end up doing this all again tomorrow, I think,
9  right, or another day, and it's crazy because
10 it could easily get done today.
11 MR. CAVALIER: Seth, just because --
12      - - -
13 (Indistinguishable cross-talk.)
14      - - -
15 MR. CAVALIER: Just because you don't like
16 the answer to a question doesn't --
17 MR. CARSON: I have no problem with the
18 answer, but we're not -- he's just sitting
19 there generally -- I looked at a lot of
20 documents. I talked to witnesses who said
21 this. If he's gonna say that he spoke to
22 witnesses, just name them.
23 MR. CAVALIER: The question is, what did

Page 396

- - -

1  you do --
2  MR. CARSON: That wasn't actually the
3  question.
4  MR. CAVALIER: -- to determine the
5  allegations were false?
6  MR. CARSON: No, that wasn't the question.
7  That's not the pending question. The question
8  was, did you look at any documents?
9  MR. CAVALIER: That was not the question.
10 MR. CARSON: That was the last question I
11 asked. Do you wanna check? What happens when
12 I'm right? Are you gonna let me continue my
13 deposition?
14 MR. CAVALIER: You can do whatever you
15 want, but he's entitled to finish his answer,
16 Seth. I don't know how many different ways I
17 can say it.
18 MR. CARSON: Well, answering the question
19 that I ask. You're right.
20 BY MR. CARSON:
21 Q. So what documents did you look at?
22 MR. CAVALIER: You can finish your answer,
23 Daniel, until Seth cuts you off again and --
24      - - -

Deposition of DANIEL PIPES                          Lisa Barbounis v. Middle Eastern Forum, et. al.

Page 397

- - -
1   (Indistinguishable cross-talk.)
2   - - -
3   MR. CAVALIER:  -- waste another five
4   minutes.
5   MR. CARSON:  I mean, you guys are just
6   making it so we're gonna have to come back and
7   do this all over again, and it sucks, but, you
8   know, whatever.
9   THE WITNESS:  We did research, not all by
10  me personally, into electronic communications,
11  talking to people who met her.
12  BY MR. CARSON:
13  Q.   Who?
14  A.   And also we reviewed the social media.
15  Q.   Okay.  What accounts?
16  A.   And we looked -- we talked to people who
17  knew her --
18  Q.   You said that already.
19  A.   No.  So we did a lot of research into what
20  happened in -- and her response in --
21  Q.   I didn't ask you what her response was.  I
22  said, what documents did you look at?
23  A.   Emails, texts, social media.  Profusely.
24  Q.   Okay.  Who did you talk to that said that

Page 398

- - -
1   she was not affected by anything?
2   A.   People that she met the next day in
3   Israel.
4   Q.   Who?  Who are they?
5   A.   I can't provide you with the names.
6   Q.   Why?
7   A.   I don't know them.  I don't remember.
8   Q.   You don't know -- you don't know their
9   names, right?
10  A.   I've seen the names.  I -- I am not --
11  Q.   Are you producing them as witnesses in
12  this case?
13  MR. CAVALIER:  Objection.
14  BY MR. CARSON:
15  Q.   Have you taken a declaration or a
16  statement for any of these people?
17  A.   Yes, we've taken statements.
18  Q.   You have?
19  MR. CARSON:  All right.  So, Jon, please,
20  can you turn over these statements that he's
21  testifying about?
22  MR. CAVALIER:  As I've told you before --
23  BY MR. CARSON:
24  Q.   You're testifying today under oath that

Page 399

- - -
1   you've seen these statements, correct?
2   MR. CAVALIER:  To the extent that you have
3   document requests out that are responsive,
4   which, by the way --
5   - - -
6   (Indistinguishable cross-talk.)
7   - - -
8   MR. CARSON:  I'm requesting specific
9   documents that I didn't know existed that are
10  absolutely responsive to our request that
11  weren't produced.
12  - - -
13  (Indistinguishable cross-talk.)
14  - - -
15  THE COURT REPORTER:  Stop!  Seriously --
16  MR. CAVALIER:  Responses to your requests
17  are not due yet.
18  MR. CARSON:  Yeah.  My first ones are due
19  six months ago.  Mr. Pipes --
20  MR. CAVALIER:  -- responsive to your first
21  ones.
22  BY MR. CARSON:
23  Q.   Mr. Pipes, are you a hundred percent sure
24  that you've read statements from people that saw

Page 400

- - -
1   Ms. Barbounis the next day that -- where she said
2   she was just fine?
3   A.   First of all, these are brand new, so you
4   couldn't have had them six months ago.
5   Q.   My question was, are you a hundred percent
6   sure that you've read statements from people who saw
7   Ms. Barbounis the next day who said that she was
8   just fine?  Are you sure that you've read those
9   statements?  It's a yes or no question.
10  A.   Secondly, I'm not sure --
11  Q.   Mr. Pipes -- Mr. Pipes, I asked you a
12  simple yes or no question.  Are you sure that you've
13  read these statements that you're testifying about?
14  A.   Secondly, I'm not sure if I read them or
15  they were read to me.
16  Q.   Okay.  If they were read to you, do you
17  know who read them to you?
18  A.   Thirdly, I'm not sure whether they met her
19  exactly the next day or the day after that, so I'm
20  vague on this.  This is not something I know in
21  detail.
22  Q.   Are you sure that you've heard or read
23  these statements?
24  A.   I'm sure that there are statements about

Deposition of DANIEL PIPES                                    Lisa Barbounis v. Middle Eastern Forum, et. al.

Page 401

- - -

the state of how Lisa appeared and acted in the
aftermath of that evening.

Q.   And they're from people who were in
Israel?

A.   People who were in Israel.

Q.   Okay.

MR. CARSON:   Okay.  Like I said, Jon, you
guys gotta turn them over if you have them.

MR. CAVALIER:   You're not getting a
dispute from me.  I agree with you.  They will
be turned over in due course in accordance
with --

MR. CARSON:   I mean, due course would've
been like seven months ago, I think.

- - -

(Indistinguishable cross-talk.)

- - -

MR. CAVALIER:   -- seven months ago that
didn't exist two weeks ago, but we'll leave
that to the discovery practice and the federal
rules, as I said.

BY MR. CARSON:

Q.   968, memo from Mr. Pipes.  So, next, we're
gonna look at -- we'll get back to this memo.  So

Page 402

- - -

here's the memo that you wrote where you said you
did a investigation and you found a hundred percent
sure, and then here's another one where it says the
exact same thing, right, only here it says --

MR. CAVALIER:   We're now back on a
document that you will not let us read in full.

MR. CARSON:   This is the whole document.

MR. CAVALIER:   So let us read it.

MR. CARSON:   You can read it.

MR. CAVALIER:   Yeah.  So I don't -- now
that I recognize this, I don't know why it was
produced.  If it was, it was inadvertent, and
we're objecting to it on the grounds of
attorney-client privilege.

MR. CARSON:   It's not attorney-client
privilege.  It's a document that's addressed to
Marnie Meyer.

MR. CAVALIER:   It was never sent.  I don't
know why this was produced.  I didn't produce
it, but we're not answering questions about it,
and we're gonna demand that it be returned to
us.

MR. CARSON:   Yeah.  You're gonna get an
argument on that one.

Page 403

- - -

BY MR. CARSON:

Q.   So here you said that he's --

MR. CAVALIER:   No.  I told you we're not
answering questions about --

MR. CARSON:   Well, I'm gonna put the
question on the record, and you can object to
it, but we're gonna get an answer to it one
day.

MR. CAVALIER:   Well, for someone who's
complaining about lack of time --

BY MR. CARSON:

Q.   "Now, the year is up, and I am pleased to
inform you that he has learned his lesson.  I found
no -- I have found no fault in his work, and no one
on the staff has complained about his actions.
Therefore, I am asking him to begin" [as read] -- so
you see the problem here, right, Mr. Pipes?

MR. CAVALIER:   Daniel, do not --

- - -

(Indistinguishable cross-talk.)

- - -

MR. CAVALIER:   -- not to answer any
questions about this document --

- - -

Page 404

- - -

(Indistinguishable cross-talk.)

- - -

MR. CARSON:   Objection, privilege is the
way it works.

BY MR. CARSON:

Q.   You went from finding that he learned his
lesson to doing a hun -- a comprehensive
investigation and determining a hundred percent the
allegations are false.  Why -- do you see the
inherent contradiction in those two statements?

MR. CAVALIER:   Objection.  Attorney-client
privilege.  Daniel, I am instructing you not to
answer any questions about this document.

BY MR. CARSON:

Q.   Well, we're gonna get to the bottom of it,
Mr. Pipes, because it's a pretty -- pretty big
difference between your two statements there.

- - -

(Indistinguishable cross-talk.)

- - -

MR. CAVALIER:   Object to the editorial.
Object to the argumentative nature of your
statement.  Object to the mischaracterization.

MR. CARSON:   Are you objecting to a

Page 405

- - -

1  question right now, or you just objecting --
2       MR. CAVALIER:  I'm objecting to the fact
3  that you're editorializing and not asking a
4  question.
5       THE WITNESS:  I have no problem answering
6  to the alleged discrepancy.  Jon --
7  BY MR. CARSON:
8       Q.  So June 10th, 2019 --
9       THE WITNESS:  Jon, I have no problem
10  answering to the alleged discrepancy.
11       MR. CAVALIER:  Daniel, you're not
12  answering any questions about a privileged
13  document.  I know that you can answer the
14  questions, and I know the answers are simple,
15  but for the sake of the argument and the
16  preservation of the privilege, I cannot allow
17  you to answer any questions about it.
18       MR. CARSON:  He can waive his privilege.
19  It's his privilege.  He can waive --
20       MR. CAVALIER:  I'm instructing him not to
21  answer the questions about the document.
22  BY MR. CARSON:
23       Q.  Are you taking your attorney's advice, Mr.
24  Pipes?

Page 406

- - -

1       A.  I am.
2       Q.  Sorry, what?
3       A.  I am, yes.  There we go.  Rumor was
4  started prior to November 1st.
5       Q.  Right.  Because of that, you didn't do
6  anything about it, right?  He got a reprieve for
7  everything that happened pre November 1st.  So do
8  you see this right here?
9       A.  Yup.
10       Q.  "Marnie, I have just been given news of
11  what appears to be an instance of Gregg's
12  misbehavior that has nothing to do with you.  I'd
13  like to confront him with what -- with that and also
14  with what you told me last week.  So far, I just
15  told him that you disclosed troubling information to
16  me, but he has no idea what that might be.  Indeed,
17  he is speculating that it concerns something
18  entirely unrelated to what you told me" [as read].
19  Right?  You were talking about how he thought it was
20  Gabrielle Bloom, right?
21       MR. CAVALIER:  Object to form.
22       THE WITNESS:  Huh?  No.
23  BY MR. CARSON:
24       Q.  That's what you're referring to there.

Page 407

- - -

1  They told you that Gregg was speculating that the
2  new allegation for Marnie had to do with Gabrielle
3  Bloom, and it had to do with Marnie and Caitriona's
4  father, right?
5       A.  It had to do with the rumor, but I don't
6  know what the reference is to what he might've
7  thought.  I don't remember that.
8       Q.  But you told Marnie that he's speculating
9  that it's about a completely unrelated matter.
10       A.  Yeah, I told him that, but I --
11       Q.  Yeah.
12       A.  Nowhere does it mention Gabrielle Bloom.
13       Q.  But that's what you are referencing,
14  right?  That's the unrelated matter that he's
15  speculating about.
16       A.  I -- I don't agree to that.
17       Q.  You're getting the information from
18  Ms. McNulty, correct?
19       A.  I don't -- no, not correct.  I --
20       Q.  Ms. McNulty sent you an email the same day
21  where she told you about Gregg Roman and Matt's
22  conversation.  So here you're giving Marnie
23  information about the conversation, but then you're
24  denying that it happened on the other side, right?

Page 408

- - -

1       A.  I have no reason to think this has
2  anything to do with Gabrielle Bloom.
3       Q.  So what did you mean, then?  What was the
4  unrelated matter that he was speculating and
5  concerns [sic]?
6       A.  I don't remember what his speculation was.
7  It was wrong, whatever it was.
8       Q.  We can't hear you.
9       A.  It was wrong, whatever it was.
10       Q.  It wasn't Gabrielle Bloom.  It was
11  Caitriona Brady, Caitriona Brady's father, and
12  Marnie Meyer, right?
13       A.  I believe that the topic of this is the
14  rumor, yes.
15       Q.  Is this when Matt Bennett -- Matt
16  Bennett's employment ended?  Marnie Meyer,
17  3/11/2019?
18       A.  No.  He ended on the 8th.
19       Q.  So she's telling him, "You're welcome for
20  the laptop," right?  She's telling him he can keep
21  the laptop, right?
22       A.  Yeah.
23       Q.  And the laptop you're referring to was the
24  Apple laptops that everyone was -- that MEF bought

Deposition of DANIEL PIPES                                    Lisa Barbounis v. Middle Eastern Forum, et. al.

Page 409

- - -

1  the employees, correct?
2      A.  No.
3      Q.  That's not the laptop?
4      A.  No.
5      Q.  What's the laptop that he's allowed to
6  keep?
7      A.  The laptop he purchased.
8      Q.  He purchased it with MEF money, right?
9      A.  Yes.
10     Q.  Right, and it was the Apple laptop, right?
11     A.  I don't know what make it was.  He had --
12     Q.  Can't hear you.
13     A.  I don't know what make it was.  He had a
14  choice to buy whatever laptop [inaudible] --
15     Q.  Did Matt help facilitate everyone using
16  Macs in 2019?
17     A.  I don't know if everybody used Apples.
18  Some did.  I don't know if --
19     Q.  And Matt was permitted to keep his laptop,
20  right?
21     A.  He was permitted to keep it on condition
22  that he paid the remainder of what he had -- what he
23  had -- the time he wasn't there.
24     Q.  He paid for it?  Are you sure about that?

Page 410

- - -

1      A.  Yes.  That's what she's...
2      Q.  She's saying, "You're welcome for the
3  laptop".  Why is she saying "you're welcome" if he
4  paid for it?
5      A.  Because he got some credit for the time he
6  was there when he used the laptop.  The deal --
7      Q.  They all got credit.  It's called
8  depreciation, right?
9          MR. RIESER:  Seth, please don't interrupt
10     him.
11         THE WITNESS:  If you're there, I think,
12     for three years, the laptop is yours, and if
13     you leave earlier, then you have to pay -- we
14     paid --
15  BY MR. CARSON:
16     Q.  Correct.
17     A.  -- $1500 -- don't interrupt.
18     Q.  That's according to the
19  bring-your-own-device agreement, right?
20     A.  We paid $1500, if I remember correctly,
21  and --
22     Q.  Right, but he didn't pay anything --
23     A.  Let me finish.  If you're there for one
24  year, you would pay a thousand; if you're there for

Page 411

- - -

1  two years, 500; and if you're there for three years,
2  it's yours.
3      Q.  But he didn't have to pay anything, right?
4  He got to keep it?
5      A.  No.  He had to pay.
6      Q.  Well, where'd that money come from?  Did
7  he give you a check?
8          MR. CAVALIER:  Object to form.
9  BY MR. CARSON:
10     Q.  How'd he pay for it?
11     A.  Don't know how he paid for it.  I have --
12         - - -
13         (Indistinguishable cross-talk.)
14         - - -
15         THE WITNESS:  We have an accountant for
16     that.  I didn't deal with --
17  BY MR. CARSON:
18     Q.  Well, Marnie Meyer was the accountant,
19  correct?  Right?  Marnie Meyer?
20     A.  Yes.
21     Q.  So if she says that he got it for free, do
22  you have a reason to disagree with that?
23     A.  Of course.  It's not -- that's not what
24  she's saying.

Page 412

- - -

1      Q.  It actually is what she's saying,
2  Mr. Pipes but, Mr. Pipes, do you have any -- what
3  reason do you have to believe that he paid for it?
4      A.  -- "happy to work that out for you."
5  Namely, working out what he owed and how that would
6  be paid to the Forum.
7      Q.  "You're welcome for the laptop.  I was
8  happy to work that out for you.  The deal also
9  included setting up the docking stations for
10  everyone.  Although, those did not arrive in time
11  for you to do that."  What she's saying is she
12  worked it out so he didn't have to pay for it.  He
13  just got to keep it.  That's what she's telling him,
14  correct?
15     A.  No.
16     Q.  Why don't -- what evidence do you have to
17  suggest that he actually gave money for the laptop?
18     A.  Actually, what I think happened is he did
19  extra work after he left that paid for some of the
20  laptop.
21     Q.  So he didn't pay for it.
22     A.  No.  He did --
23     Q.  Right?  He got to keep it?
24     A.  No.  He paid for it.  Whether he paid for

- - -

1  it in cash or paid for it in extra work, I'm not
2  exactly sure of, but he did not -- he was not handed
3  a laptop on leaving.  No, no.  He had to pay.
4      Q.  Did Marnie Meyer come to you and get
5  permission from you to allow Matt to keep the
6  laptop?
7      A.  I don't remember.  You have to --
8      Q.  Are there -- yes or no, did she, or "I
9  don't know"?
10     A.  I don't know.
11     Q.  Okay.  Is there gonna be communications
12 between you and Marnie Meyer where you discuss it?
13     MR. CAVALIER:  Object to form.
14 BY MR. CARSON:
15     Q.  Yes, no, "I don't know"?
16     A.  What's the question?
17     Q.  Did you and Marnie Meyer discuss it
18 through WhatsApp or Telegram or texting?
19     A.  I don't remember.
20     Q.  You don't remember if you discussed
21 whether he was allowed to keep the laptop?
22     A.  I remember having discussion with her.
23 Whether it was this medium or that medium, I have no
24 idea.  [Inaudible] person.  I have no idea.

- - -

1      Q.  So she did come to you and say, hey, can
2  he keep the laptop, and you approved it, right?
3      A.  I -- I remember something about Matt and
4  his laptop and his doing [inaudible] --
5      THE COURT REPORTER:  Hold on.  There's
6      like a bunch of shuffling going on.
7  BY MR. CARSON:
8      Q.  Go ahead, Mr. Pipes.  What's your answer?
9      A.  I remember there was some discussion of
10 Matt's laptop, and we made some kind of arrangement
11 to decrease what he owed the Forum [inaudible] --
12     Q.  Can't hear you because of the shuffling.
13     A.  -- and that, I think, is the reference to
14 the docks that hadn't arrived yet, that he was gonna
15 be working on that.  But, no, he was not gifted a
16 1500-dollar contribution towards a laptop.  In so
17 far as he didn't pay that back, he earned it some
18 other way by doing extra work after he left the
19 Forum because he was the tech guy, and he knew what
20 was going on in a way that no one else did, and we
21 needed him for that help.
22     Q.  Here's an email dated April 23rd, 2019,
23 right?
24     A.  Yeah.

- - -

1      Q.  Did you receive this email?
2      A.  No.
3      Q.  Okay.
4      MR. RIESER:  Luke, can you let us know how
5  much time's left?
6      THE VIDEOGRAPHER:  We will reach the
7  seventh hour at 6:53.
8      MR. RIESER:  Thank you very much.
9      THE VIDEOGRAPHER:  -- now 6:40, so we
10 have --
11     MR. CARSON:  Yeah.  We're gonna go past
12 7:00, maybe.
13     MR. RIESER:  No, we're not.  No, we're
14 not.
15     MR. CARSON:  Bill, you can say whatever
16 you want.  You don't have a client here today.
17     MR. CAVALIER:  Well, then, I'll say it for
18 him.  We're not going past 7:00.
19     MR. CARSON:  I'm letting you know, if we
20 don't, we're gonna file a motion to do another
21 deposition.
22     MR. CAVALIER:  You are welcome to file
23 that motion.
24     MR. CARSON:  Yeah.  Well, we can because

- - -

1  there's a counterclaim, so we actually get
2  another seven hours on the counterclaim, but we
3  also get it because of the total misconduct
4  that we had today.
5      MR. RIESER:  The only misconduct is from
6  you, Seth.
7      MR. CARSON:  Bill, I don't know what you
8  think you're doing talking on the record.
9  You're here to observe, and that's it.
10     MR. CAVALIER:  You realize he's allowed to
11 ask questions of this witness if he wants --
12     MR. CARSON:  No.  He can ask questions.
13 He can't object on his behalf.  He doesn't
14 represent him.
15     MR. RIESER:  I'm within my rights, Seth.
16     MR. CARSON:  No, you're not.  You don't
17 represent the witness.  You can't enter
18 objections on behalf of someone you don't
19 represent.
20     MR. RIESER:  I'm --
21     MR. CARSON:  I don't know why you would
22 think you can.
23     MR. RIESER:  Okay.  You wanna keep barking
24 at me, that's fine.

Deposition of DANIEL PIPES                                    Lisa Barbounis v. Middle Eastern Forum, et. al.

Page 417

- - -

BY MR. CARSON:
Q.   Okay.  So, here, Marnie Meyer is sending an email to you, right, Mr. Pipes?
A.   Yep.
Q.   "Thanks for allowing me to weigh in on this.  The final note I have is regarding the foundations.  Matt mentioned a website we used to belong to that would allow us to do research -- to research other foundations.  I was interested in playing with that idea and seeing if we could stir up additional funds.  I was figuring I would work with Marc.  I know he's got a lot on his plate and deadlines sometimes always get -- get away from him.  I would look to organize things a bit and then try to reuse what he's already created to apply other foundations.  Just a thought, but something should definitely -- but someone should definitely help him with the timeliness, et cetera" [as read].  Do you remember receiving this email?
A.   No.
Q.   You don't?
A.   Why would I remember some random email from two years ago?
Q.   I don't know.  Do you remember it, yes or

Page 418

- - -

no?
A.   No.
Q.   How about -- do you remember responding?
A.   No.
Q.   Meetings with Matt?
A.   No.
Q.   "Tricia: I know that she wants the chance to move up.  I also know that, in preparation for her yearly review, she had prepared a spreadsheet to show how she had advanced and the events gig far and beyond what Eman had ever done with it" [as read].  Did you ever interview Eman about Gregg Roman?
A.   No.
Q.   Why not?
A.   Why should I?
Q.   Well, people brought it to your attention that Eman had complained about him, right?
A.   I never heard any.
Q.   You never saw any emails where people brought it to your attention that Eman complained about him?
A.   No.  Anyway, the key point is not whether I solved rumors; it's whether Eman herself comes to me and tells me she's got a problem.

Page 419

- - -

Q.   I know that's what you think.
A.   Which she did not do.  I am not gonna spend my entire time tracing down every random rumor.
Q.   Yeah.  "She was disappointed that she never got the chance to show her stuff.  She's disappointed that she did not receive a salary increase," and then I think you say, "She will get one now," correct?
A.   Correct.
Q.   So you are copying something that Marnie's telling you, and then you are responding to it, correct?
A.   Yep.  She got a raise.
Q.   Okay.  "You mentioned finding her 'standoffish,' and I think that she can" -- this is Marnie to you -- "and I think that she can be as well, but she's an introverted person so much so that she brought that up at her interview.  She actually has a great personality, but if you are not around her much, you may not get a chance to see that.  My point is that I feel that in time you'll get to know her better and see her as less standoffish and that I think she's earned a shot"

Page 420

- - -

[as read].  You responded, "She has to show some personality around me to see her beyond the confines of her events at work.  For example, since the Matt resignation, I have heard from Lisa and yourself about the current situation, but not from Tricia" [as read].  In fact, Tricia sent you several emails, right, about it?
A.   At this time I don't know.
Q.   Well, we've looked at a bunch of them today, correct?
A.   They were in April and June, if I remember.
Q.   April, May, and June.  Every month.
A.   This is February.  I don't remember anything from February.
Q.   Okay.  So she never sent you anything before April, May, June?
A.   Anyway, there was not -- I was not asking her to moan about Gregg some more.  I was asking her to show some interest and energy about the Forum as a whole, which she didn't do.
Q.   We can skip down.  "Lisa and projects: Frankly, I don't think she knows enough yet.  Perhaps with time.  So I will suggest to her that

Deposition of DANIEL PIPES                                  Lisa Barbounis v. Middle Eastern Forum, et. al.

Page 421

1  she take part in the project conference calls, be
2  cc'd on correspondence, and so forth.  But, for now,
3  it's best to stick with Gregg.  As you may recall,
4  with only one exception, all five other directors,
5  when asked in November, said they are fine working
6  with him, and the sixth had mild problems" [as
7  read].  So your response was --
8      A.  No.  That was me writing.
9      Q.  What'd you say?  This is you writing now?
10     A.  It's me, yeah.  I think --
11     Q.  And then who's this?
12     A.  Judging by the purple, that's Marnie.
13     Q.  Okay.  So is it correct that Marnie is the
14  purple, and you're the black in these --
15              - - -
16         (Indistinguishable cross-talk.)
17              - - -
18  BY MR. CARSON:
19     Q.  Sorry?
20     A.  It's the logic of this, yes.  I don't
21  remember it, but looking at it now, yeah.
22     Q.  So Marnie says, "My thoughts are not so
23  much as who likes him or who doesn't, but that it
24  would be natural for his work with the c4 to take

Page 422

1  precedence over his work with the c3."  And you
2  said, "See above on this."  "I do see him in what
3  you see -- I do see in him what you see, that he's
4  creative and has a lot of great ideas, but I believe
5  the focus that he does gives to the projects and the
6  c3 will mostly be centered around him" [as read].
7  Who's "him" there?  Is that Gregg Roman?
8      A.  Presumably.
9      Q.  And up here, you wrote, "I expect it will
10 be largely or wholly the c4, but the c4 is a
11 derivative of the c3.  Without the c3, it is
12 nothing.  So Gregg understands he needs to help out.
13 Also, this justifies his high salary."  So what do
14 you mean when you said that the c4 is a derivative
15 of the c3?
16     A.  Without the c3, it is nothing.
17     Q.  The c4 wouldn't exist without the c3.
18     A.  Right.
19     Q.  They're related, correct?
20     A.  No.
21         MR. CAVALIER:  Object to form.
22 BY MR. CARSON:
23     Q.  Well, what does that mean?  If one is --
24 if one can't exist without the other, doesn't that

Page 423

1  mean that they're related by definition?
2      A.  No.
3          MR. CAVALIER:  Object to form.
4  BY MR. CARSON:
5      Q.  I'm asking you, what does it mean?
6      A.  It means that the c4 requires a c3, but
7  it's a separate organization legally and
8  organizationally.  Gregg was gonna be there without
9  any staff whatsoever.  All the staff was gonna
10 remain at the c3.  He would be at the c4, but he
11 would be asked to help with fundraising for the --
12 and other activities for the c3 on a friendly basis.
13     Q.  What does it mean that c4 is a derivative
14 of c3?
15     A.  I just wrote it.  Without the c3, it is
16 nothing.  You have to have the c3 to justify the c4.
17     Q.  Is that a legal thing?  You're not allowed
18 to have a c4 without a c3?
19     A.  Effectively, you can't have a c4 without a
20 c3.  People who like the c3, who like what we're
21 doing, who have money that they are giving to
22 political candidates will -- who know who we are,
23 who know what we stand for will give to the c4
24 because they're confident of who we are and what we

Page 424

1  stand for.  If they didn't know who we were and what
2  we stood for, they would never give money to the c4.
3      Q.  Mr. Pipes, I don't know the answers to
4  these questions.  I'm asking, like, if I wanted to
5  go open a c4, can I do that, or do I have to open a
6  c3 first?
7      A.  You can do it, but you won't have any
8  takers because nobody knows who you are politically
9  and what you stand for and who you're gonna give
10 money to, who you're gonna support, whereas --
11     Q.  So --
12     A.  -- Forum has a profile, is known, and
13 therefore, if you like what the Middle East Forum is
14 doing, then the c4 is a way for you to entrust your
15 money because you don't follow -- you, the donor,
16 don't follow politics that closely, and you entrust
17 it to someone at a c4 who does follow it closely and
18 can figure out which races are important and which
19 ones are not and the like.
20     Q.  So the c3 -- I'm sorry -- the c4 that
21 Mr. -- that you guys were considering starting was
22 going to be connected to the Middle East Forum c3?
23     A.  No, not gonna be connected.
24     Q.  "Without the c3, it is nothing."  I guess

Deposition of DANIEL PIPES                                   Lisa Barbounis v. Middle Eastern Forum, et. al.

Page 425

- - -

1  I just don't understand what you mean.
2       A.   I just explained.
3       Q.   What's the -- go ahead.
4       A.   If you have -- in other words, if the --
5  if we go to potential donors and say, hi, you like
6  the c3.  You give money to the c3.  Now, do you have
7  another pot of money, not tax-deductible, that you
8  give to candidates?  Give some of it to us, and
9  we'll direct it towards the campaigns -- not
10 candidates, but campaigns -- that you will like
11 because you like what we do, and we can do it
12 because we're specialized.  We know the ins and outs
13 of these campaigns in a way you don't.  So rather
14 than you bumble around, giving away money you're not
15 quite sure where to give it, give it to us, and we
16 know what to do with it.
17      Q.   So who does the money go to, the c4 or the
18 c3?
19      A.   Some money goes -- tax-deductible money
20 goes to the c3, and non-tax-deductible money goes to
21 the c4.
22      Q.   But the rule is that donations to a c4 are
23 taxable, and donations to a c3 are not?
24      A.   Correct, as far as I understand it.

Page 426

- - -

1       Q.   Okay.  So the c4 that you guys were
2  considering opening was gonna be a derivative of the
3  Middle East Forum, though, correct?  That's what you
4  meant by that?
5       A.   I believe it's 6:50, and I'm done.
6       Q.   My question's pending.  The c4 that you
7  guys were considering starting was going to be a
8  derivative of the Middle East Forum; is that --
9            MR. CAVALIER:  I'm gonna object to form.
10 "A derivative" is not what the document said.
11           MR. CARSON:  What'd it say?
12           THE WITNESS:  It's 6:50 p.m., and I
13 believe I'm done.
14                - - -
15           (Indistinguishable cross-talk.)
16                - - -
17           THE WITNESS:  What'd you say, Jon?
18           MR. CAVALIER:  6:53.
19           THE WITNESS:  Oh, okay.
20           MR. CARSON:  I mean, if you guys really
21 are gonna bounce out at exactly seven hours, I
22 mean, I'm telling you right now, I'm gonna --
23 it's gonna be an issue with me because I gave
24 you guys eight and a half hours with Lisa.

Page 427

- - -

1            MR. CAVALIER:  Well, I don't think that's
2  correct, but, I mean --
3            MR. CARSON:  It is correct.
4            MR. CAVALIER:  To the extent we're going a
5  minute beyond 6:53 -- which I'm not saying
6  we're gonna do -- we're gonna need a
7  representation from you that the remaining time
8  that you have is extraordinarily short.  If you
9  wanna go for another five minutes in lieu of
10 filing your motion, maybe we can make an
11 agreement, but if you're just going on
12 willy-nilly until you feel like stopping, we're
13 not doing that.
14 BY MR. CARSON:
15      Q.   Why did you say it didn't say it was the
16 derivative, because it said the c4 is a derivative
17 of the c3, right?
18      A.   I've explained it twice.  Yes.
19      Q.   So the c3 that you're referencing there is
20 the Middle East Forum, correct?
21      A.   Yes.
22      Q.   So can you read this real quick, please?
23 This will be my last question.
24      A.   Make it larger.  Who is this to who?

Page 428

- - -

1       Q.   So I'll represent to you these are
2  messages that you produced that are text messages
3  between you and Marnie Meyer.  Can you hear where
4  she says that Gregg told Matt that he could destroy
5  Daniel Pipes?  Did you ever talk to Gregg about
6  that?
7       A.   No, I didn't.  I told you I don't -- I
8  didn't take Matt's rumor mongering seriously.  He
9  was engaged in so much of this.  It reminded me of
10 another instance, and this is --
11      Q.   Okay.  Here she says Gregg -- she says she
12 just found out that Delaney was afraid to use the
13 ladies' room because he would use the TV in his
14 office to count how many times a day Eman went to
15 the ladies' room.  So that's why I asked if you ever
16 spoke to Eman.
17      A.   No, I didn't speak to Eman about this.  If
18 she had a problem with it, she could've come to me.
19 This is rumor mongering.
20      Q.   So --
21      A.   Marnie says to -- Marnie says to Eman says
22 to me.  I mean, what -- hello, if somebody has a
23 problem, come to me.  And, as you saw, I dealt with
24 it expeditiously and rapidly.  I cannot deal with

Deposition of DANIEL PIPES                                   Lisa Barbounis v. Middle Eastern Forum, et. al.

Page 429

- - -

1  rumors.
2      Q.  The last question is, is the money that
3  you're talking about here the health insurance?
4      A.  I don't know what this is referencing.
5      Q.  Sorry?
6      A.  I don't know what this is in reference to.
7  Complicated.
8      Q.  Yeah.  I don't know either.  That's why
9  I'm asking.
10     A.  I don't know what the 207,000 -- I don't
11 know.
12     Q.  The gross is -- well, I guess we can ask
13 Marnie.  All right, whatever.  It's 6:54.  I'm done.
14 That was easy, right, Mr. Pipes?
15     A.  Oh, yeah.
16         THE COURT REPORTER:  All right.  We off
17 the record?
18         MR. CAVALIER:  No questions from me.
19         THE VIDEOGRAPHER:  The time is 6:55 p.m.
20 Eastern Time.  We are now off the record.
21 Thank you, Counsels.
22             - - -
23     (Witness excused.)
24             - - -

Page 430

- - -

1      (Deposition concluded at 6:55 p.m.)
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Case 2:19-cv-05030-JDW   Document 126-3   Filed 04/20/21   Page 112 of 179

Deposition of DANIEL PIPES                          Lisa Barbounis v. Middle Eastern Forum, et. al.

- - -

1            C E R T I F I C A T E

2                    - - -

3

4        I do hereby certify that I am a Notary
Public in good standing, that the aforesaid
5   testimony was taken before me, pursuant to notice,
at the time and place indicated; that said deponent
6   was by me duly sworn to tell the truth, the whole
truth, and nothing but the truth; that the testimony
7   of said deponent was correctly recorded in machine
shorthand by me and thereafter transcribed under my
8   supervision with computer-aided transcription; that
the deposition is a true and correct record of the
9   testimony given by the witness; and that I am
neither of counsel nor kin to any party in said
10  action, nor interested in the outcome thereof.

11        WITNESS my hand and official seal this
23rd day of November, 2020.

12

13

14

15            <%signature%>
   _____
16            Notary Public

17

18

19

20

21

22

23

24

- - -

1              INSTRUCTIONS TO WITNESS

2                        - - -

3

4          Please read your deposition over carefully

5    and make any necessary corrections.  You should

6    state the reason in the appropriate space on the

7    errata sheet for any corrections that are made.

8              After doing so, please sign the errata

9    sheet and date it.

10             You are signing same subject to the

11   changes you have noted on the errata sheet, which

12   will be attached to your deposition.

13             It is imperative that you return the

14   original errata sheet to the deposing attorney

15   within thirty (30) days of receipt of the deposition

16   transcript by you.  If you fail to do so, the

17   deposition transcript may be deemed to be accurate

18   and may be used in court.

19

20

21

22

23

24

```
                              -  -  -

                        E R R A T A

                              -  -  -

   PAGE            LINE                           CHANGE

   _ _ _        _ _ _      _ _ _ _ _ _ _ _ _ _ _ _ _

   Reason for

   Change:      _ _ _      _ _ _ _ _ _ _ _ _ _ _ _ _

   _ _ _        _ _ _      _ _ _ _ _ _ _ _ _ _ _ _ _

   Reason for

   Change:      _ _ _      _ _ _ _ _ _ _ _ _ _ _ _ _

   _ _ _        _ _ _      _ _ _ _ _ _ _ _ _ _ _ _ _

   Reason for

   Change:      _ _ _      _ _ _ _ _ _ _ _ _ _ _ _ _

   _ _ _        _ _ _      _ _ _ _ _ _ _ _ _ _ _ _ _

   Reason for

   Change:      _ _ _      _ _ _ _ _ _ _ _ _ _ _ _ _

   _ _ _        _ _ _      _ _ _ _ _ _ _ _ _ _ _ _ _

   Reason for

   Change:      _ _ _      _ _ _ _ _ _ _ _ _ _ _ _ _

   _ _ _        _ _ _      _ _ _ _ _ _ _ _ _ _ _ _ _

   Reason for

   Change:       _ _ _     _ _ _ _ _ _ _ _ _ _ _ _ _

   _ _ _        _ _ _      _ _ _ _ _ _ _ _ _ _ _ _ _

   Reason for

   Change        _ _ _     _ _ _ _ _ _ _ _ _ _ _ _ _
```

- - -

1             ACKNOWLEDGMENT OF DEPONENT

2                         - - -

3            I, _____, do hereby certify that

4     I have read the foregoing pages 1 to ___ and that

5     the same is a correct transcription of the answers

6     given by me to the questions therein propounded,

7     except for the corrections or changes in form or

8     substance, if any, noted on the attached Errata

9     Sheet.

10    _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _

11    DATE                                  SIGNATURE

12

13            Subscribed and sworn to before

14    me this _ _ _ _ _ _ day of _ _ _ _ _ _ _ _ _ , 20___.

15

16            My commission expires:

17            _ _ _ _ _ _ _ _ _ _ _

18

19

20            _ _ _ _ _ _ _ _ _ _ _

21            Notary Public

22

23

24

Deposition of DANIEL PIPES                              Lisa Barbounis v. Middle Eastern Forum, et. al.

## WORD INDEX

< $ >
**$14**  160:9, 16  240:3
**$1500**  410:17, 20
**$17**  260:3
**$200,000**  367:10
**$240,000**  38:11
**$27,000**  232:11, 13, 14
366:13  368:2, 3
**$31**  85:14  95:14, 20
97:22  98:5  159:3
160:7  177:18  217:21
239:11, 21  340:23
**$31,000**  97:21
**$5,000**  161:2, 13, 15
**$7,000**  272:4  274:6,
11  281:2, 4, 15  282:6,
14  283:1  284:8
**$7,500**  272:1  273:2

< 0 >
**000027**  336:21
**0005**  218:8
**00060**  371:9

< 1 >
**1**  120:22, 22  176:13,
24  194:4  434:4
**1:11**  145:11, 15
**1:21**  145:8
**1:24**  145:15, 17
**10:08**  1:14  5:10
**10:35**  37:3
**10:45**  37:3, 5
**10th**  321:5  347:3, 3
349:20, 23  352:9, 10
374:21  405:8
**11**  176:5, 13, 24
242:9, 10, 10  252:10
408:17
**11:20**  75:24
**11:31**  75:24
**11:34**  189:21  190:7
242:16  243:2, 3
**11:45**  57:19  58:18
73:11
**11:58**  102:8

**11th**  50:23  251:19
264:4  336:20  338:13
352:10
**12**  63:22
**12:10**  101:24
**12:15**  102:8, 10
**122**  3:12
**12th**  260:22
**13**  239:24
**14**  239:23  240:1
241:10
**14th**  260:23  261:3
**15**  60:21  242:10
**1500-dollar**  414:16
**16**  57:17
**1650**  1:13  2:9
**17**  1:6  251:17, 18
**176**  3:15
**17th**  5:10  346:7
374:2  385:10
**18**  176:5, 24  251:18
314:5  320:11  345:18
354:21  355:13  362:8
364:4
**1835**  2:3, 14
**189**  3:16
**18-year-old**  212:15
214:16
**19**  13:13, 14  52:24
314:5  320:12
**19103**  2:4, 9, 15
**1994**  10:9, 10, 11
**19-page**  52:22
**19th**  158:19
**1st**  94:3, 14  95:3
103:4, 10  108:1
129:12  141:18, 21
156:23  163:23
170:15, 16, 22  173:7
176:18  177:6, 21
191:4  198:20  228:3
231:17  233:24  234:2
256:3  333:13  380:1
384:6, 8, 12  406:4, 7

< 2 >
**2**  11:11  176:5
253:13
**2:10**  192:1, 4
**2:15**  191:15

**2:19-cv-05030-GAM**
1:6  5:15
**2:49**  192:4, 6
**20**  23:2  434:14
**2017**  112:22  328:4
374:3
**2018**  12:12  13:12
89:11, 16, 24  93:20
94:3, 18, 20  95:23
96:4  102:18  103:10
117:24  118:1  119:17
122:9  125:3  131:16
135:11  150:9  153:21
170:15  172:24
176:13, 18  177:21
187:20  189:21
202:16  229:24  230:2
243:22  248:1  249:12
256:4  292:12, 20
321:12  347:17  348:8,
8  349:13  354:18
355:3, 19  364:9
365:16, 19  377:2
380:1  384:8  385:8
**2019**  12:11, 12  13:11
37:16  43:19, 22, 24
83:18  136:16  143:12
158:19  252:10
286:16  293:5  300:23
302:13  303:15, 17, 23
316:18  319:23  321:5
336:4, 20  337:7
338:13  345:18  347:3
349:20, 23  352:9, 9,
10, 10  354:14  355:8
363:19, 21  364:9
371:11  377:2  380:9
384:12  405:8  408:17
409:16  414:22
**2020**  1:6  5:10  34:8,
10  37:16  202:18
385:10  431:11
**207,000**  429:10
**21**  292:5
**215-391-4790**  2:5
**215-569-1999**  2:15
**215-665-2000**  2:10
**218**  3:17
**22**  292:5, 7, 8
**23**  292:5, 7

**23rd**  293:5  300:23
352:9  414:22  431:11
**240,000**  38:10
**242**  3:18
**24th**  10:7, 11  318:22
**25**  28:21, 23  31:8
54:8
**251**  3:20
**26**  10:4  97:23  98:12
321:3, 4  336:5
**275**  3:21
**28th**  346:9
**292**  3:22
**2950**  2:4
**29th**  261:6
**2nd**  198:21  333:13,
14, 24

< 3 >
**3**  10:23  11:1, 4, 14,
24  12:6, 23  13:1, 3, 5
15:23  16:11, 15, 24
17:15  18:5  20:11
21:11  25:23  50:24
408:17
**30**  98:8  152:4
229:23  236:14
432:15
**30,800,000-some**  95:20
**30th**  99:20
**31**  98:18
**316**  3:23
**320**  3:24
**321**  4:4
**33,000**  98:9
**336**  4:5
**34**  93:13
**345**  4:6
**347**  4:7
**354**  4:8
**365**  4:9
**368**  4:10
**371**  4:11
**374**  4:12, 13
**379**  4:14

< 4 >
**4**  11:9, 14  12:8, 13,
18, 20  13:9, 10, 23
14:2  15:10, 23  16:5,

Deposition of DANIEL PIPES

Lisa Barbounis v. Middle Eastern Forum, et. al.

23, 24  17:16  18:4
20:10  21:6, 8, 10
24:5, 11, 19  25:23
**4:49**  316:7, 11
**40**  160:8
**406**  4:15
**408**  4:16
**417**  4:17
**428**  4:18
**45**  60:22
**4th**  189:20, 21  190:7
228:4  241:20  243:19

**< 5 >**
**5:08**  316:11, 13
**50**  365:7
**500**  345:6  411:1
**500-paragraph**  86:12
**501**  10:23  11:1, 4, 9,
11, 14, 14, 24  12:6, 8,
13, 18, 20, 23  13:1, 3,
5, 9, 10, 23  14:2
15:10, 23, 23  16:5, 11,
15, 23, 24, 24  17:15,
16  18:4, 5  20:10, 11
21:6, 8, 10, 11  24:5,
11, 19  25:23, 23  50:24
**51**  3:11  365:7
**515**  2:14
**52**  365:7
**54**  368:18
**5th**  94:15  211:23
229:24  230:2  235:13,
22  243:22  248:1
249:11  292:12, 20
316:18  319:23  320:4
321:12  337:6  347:17
348:8  349:13  354:14
363:19, 21  364:9
365:19  371:11

**< 6 >**
**6**  218:8  365:16
**6:40**  415:9
**6:50**  426:5, 12
**6:53**  415:7  426:18
427:5
**6:54**  429:13
**6:55**  429:19  430:1

**60**  45:3  84:13  365:4
371:9  373:16
**63**  3:13
**65**  374:20, 20
**6th**  94:15  129:12
235:13

**< 7 >**
**7**  3:5  218:9
**7,000**  283:22
**7:00**  415:12, 18
**70**  45:3
**75**  3:14
**7th**  129:12  141:19

**< 8 >**
**8**  122:9
**8th**  141:19, 20  408:18

**< 9 >**
**9:02**  122:9
**968**  379:22  381:8
401:23
**975**  121:6  122:4
**976**  121:6
**977**  121:6
**978**  121:6  122:4
**990**  38:19, 21  43:23,
24
**9th**  94:16, 17  198:3
229:20  254:1, 6, 7
264:5  336:4  380:9

**< A >**
**a.m**  1:14  5:10  37:3,
3, 5  75:24, 24  102:8
122:9  145:17  189:24
190:1, 7  243:3, 4
**ability**  9:5  72:12
284:2  339:12
**able**  55:5, 20  88:16
89:8  90:1  146:19
241:1  250:5  304:14
**abruptly**  193:12
**absolutely**  41:11, 14
42:15  293:1  399:10
**abstract**  74:6
**abuse**  222:20  228:9
321:24  349:5
**abused**  285:11, 14, 19

**abusive**  219:19  220:6,
14  223:21  224:4, 22
225:6  227:2  321:18
322:8, 11  329:3, 20
330:22
**accept**  310:2, 10, 16
311:10, 19, 20
**acceptable**  179:9, 11,
20  180:5, 20, 23, 24
**accepted**  188:18
225:17  310:11
**access**  243:6  250:23
362:18  363:15
380:13
**accession**  342:24
**accomplishments**
340:6
**account**  38:23  39:4,
6, 19
**accountable**  339:16
354:8
**accountant**  27:8, 9, 12,
13  377:11  411:15, 18
**accounting**  27:21, 21
28:18  33:4, 9  34:4
**accounts**  203:24
397:15
**accurate**  77:12  381:3
432:17
**accusation**  127:24
**accusations**  95:22
188:18  202:11
203:18  380:18
382:16
**accused**  70:24  71:12
170:24  273:8  379:15,
17
**accuses**  295:10
**accusing**  245:24
273:23  310:1
**acknowledge**  188:4
231:4
**acknowledged**  180:2,
7  183:12
**acknowledges**  179:8
188:5
**acknowledging**
259:23  326:8  375:2
**ACKNOWLEDGMEN**

**T**  434:1
**acquiesce**  253:11
**acquiesced**  253:7
**acquiescence**  253:15
**act**  76:17  352:17, 23
**acted**  171:9  173:16,
16  187:18  188:24
200:24  210:5, 20
255:20  401:1
**ACTION**  1:1  163:23
211:7  313:5  431:9
**actions**  161:8  171:10
215:23, 23  246:6
403:15
**active**  13:3, 4  108:8,
12, 21  109:2
**activities**  11:18  77:11,
20  186:8, 11  346:4, 5
423:12
**activity**  79:17  186:14
371:16
**actress**  79:24  237:2,
6, 9
**actual**  250:22  295:14
309:22
**add**  31:12  98:18
114:19  124:5  231:6,
8
**added**  193:22
**addition**  241:10
**additional**  417:11
**Additionally**  340:3
**additions**  98:6
**addressed**  189:17
229:17  234:13  264:6
402:16
**addressing**  243:19
**adequate**  92:1
**adequately**  91:19
**adhered**  320:5, 18
**administration**  367:21
**administrative**  85:4
90:23  336:12  339:21
340:3  367:19  375:8,
9  379:23
**administrator**  115:24
336:12
**admitted**  98:23  99:1
275:4, 5

Deposition of DANIEL PIPES                                      Lisa Barbounis v. Middle Eastern Forum, et. al.

admitting 275:8
admonished 164:16
advance 188:7, 17, 20
 189:4 336:5
advanced 418:10
advances 176:14, 21
 177:8 179:6 188:2
 194:8, 9 198:14
advice 43:16 49:9
 244:19 248:4, 5
 405:23
affect 349:2
affection 339:5
affections 315:1
aforementioned
 240:17, 18
aforesaid 431:4
aforth 213:19
afraid 428:12
aftermath 401:2
afternoon 173:8
agent 23:10
ago 10:5 39:15, 17,
 18, 20 62:14 112:19,
 24 114:13 124:3
 128:16 160:22 162:9
 199:7 223:18 237:12
 251:10 260:23 262:2
 347:23 357:22 363:6
 399:19 400:4 401:14,
 18, 19 417:23
agree 6:14, 18 48:10
 86:4 192:22 229:16
 230:15, 20 240:4
 243:1 271:17 315:22
 387:9, 11, 12 392:13
 401:10 407:16
agreed 5:1 55:24
 92:13 183:19 189:10,
 11 229:12 252:3
 253:16 254:4, 6
 289:22 291:8, 15
 302:22 321:16
 339:19 341:3, 3, 4
agreeing 281:4
agreement 6:7, 8
 80:2 129:10 136:11
 189:14, 15 234:18
 253:15, 19 262:15
 323:16 337:20, 21

365:17 366:6 375:7
 410:19 427:11
agreements 239:16
 291:18
ahead 20:6, 23 32:14
 42:17 47:18 49:16,
 17 59:19 66:22
 85:20 97:18 101:9
 118:5 124:5 137:24
 163:3 167:13, 19
 180:6 202:18 203:8
 216:7 218:5 222:14
 247:6 260:21 296:6
 300:4, 8, 8 302:2
 311:9 325:19 414:8
 425:3
AIPAC 135:22 183:1
Airbnb 106:16
 165:18 168:15
 169:12, 19 171:18
al 1:6 5:13
Alana 70:20 80:5, 7,
 9, 10, 16 81:5, 10
 82:3 132:17 133:4
 151:22 152:15
 153:18 235:24 236:1
 237:4, 11
Albert 9:19, 21, 24
allegation 73:21, 23
 109:23 149:5, 8, 10
 150:22, 23 188:1
 238:16 295:23
 301:13 304:8, 10
 305:11 306:13, 17, 20
 307:2, 8 322:14, 19
 350:24 407:2
allegations 70:11
 82:2, 9, 11 102:19, 23
 109:5 110:21 135:18
 150:7, 11 167:11
 176:14, 19 182:13
 189:22 210:2, 4, 10
 212:11 214:8 219:16
 234:10 238:17
 241:12 256:10, 12
 271:22 272:18
 307:14 314:13, 18
 390:8 393:4 396:5
 404:9
allege 302:9 303:7, 15

alleged 76:12 169:20
 272:3 405:6, 10
allegedly 174:5
 338:3 370:4
alleges 193:20
alleging 219:11 295:4
alleviate 340:2
allow 12:7 13:24
 166:13 167:18
 260:17 300:6 394:8
 405:16 413:5 417:8
allowed 12:3 84:6
 89:17 116:22, 24
 203:6 221:23 222:3
 226:4 253:2 254:24
 255:9 257:7 259:12
 272:21 285:22 286:5
 317:8 351:9 358:10
 386:11 409:5 413:21
 416:10 423:17
allowing 417:5
allude 174:12
alluded 229:20
allying 312:9
amazed 221:7
American 11:20
amount 58:11 98:8
 239:24 366:2 388:7
amounts 40:11 379:8,
 10
Amy 9:19, 21, 22, 24
 27:14, 17, 17, 19, 20
 34:21, 23, 24 267:4,
 23 268:1, 4, 7
Amy's 35:1, 8
analysis 281:22
angels 134:15 183:10
anger 315:2
angry 308:17 313:24
ANN 2:21
announced 307:18
announcement 334:15
announces 334:20
announcing 243:21
annoyed 314:2
annually 37:14
anonymous 126:16
answer 7:17, 19, 23
 8:10, 20 10:22 11:21
 13:18 14:4 18:7, 20

19:11, 15, 17 20:4, 5,
 6, 23 21:3, 19 22:21
 23:3 24:13, 21 26:18
 29:17, 19, 20 30:20
 31:5, 13 32:7 40:24
 41:1 42:19 46:14, 18,
 22 47:16 48:1, 5, 22
 49:3, 5, 13 51:24
 59:22 62:1 66:22
 71:10 72:6, 7, 11, 19,
 23 73:12, 13, 20
 74:13 77:1 80:18
 82:23 83:22 84:10
 86:11 88:1 91:23
 101:19 103:2 105:12
 111:18 125:7 133:11
 137:16 146:16
 151:15, 18 157:4
 161:21 166:20, 22, 24
 167:5, 21 172:11
 177:7 180:1 194:16,
 22, 24 195:2, 11
 196:14 197:1 200:16
 201:11 202:24 203:6
 207:21 208:21 212:4
 213:3 215:4 216:7
 220:22 221:15, 21, 24
 222:1, 4, 6 223:5
 224:5, 18 226:2, 6, 15
 237:20 238:4, 24
 244:14, 19, 20 246:9,
 12, 14 248:3, 4, 5
 257:9, 13, 15, 17, 19,
 21 258:4, 6, 13
 260:18 265:10 270:1
 271:6 273:17 283:5,
 9, 15 284:17 291:23
 292:1 293:24 295:15
 296:3, 6 299:22, 23
 300:3, 13, 18, 19
 302:2 311:17, 18
 315:11 324:3, 18, 20
 325:1 326:18, 24
 327:12 329:8, 9, 12,
 24 330:1, 2, 5, 6, 7, 9,
 12 331:13 351:12, 14
 352:24 353:6 356:18,
 18, 21, 21, 22 357:2, 4,
 9, 13, 15 358:4 359:7,
 22 360:2, 10, 22

Deposition of DANIEL PIPES

Lisa Barbounis v. Middle Eastern Forum, et. al.

361:*15, 16*  367:*6, 6*
381:*15*  382:*9*  391:*2,*
*21, 22*  392:*10*  393:*5,*
*13, 17, 19*  394:*8, 18*
395:*17, 19*  396:*15, 22*
403:*7, 22*  404:*13*
405:*13, 17, 21*  414:*8*
**answered**  17:*18, 21*
18:*7*  43:*2*  157:*17*
200:*18*  205:*20, 20*
206:*7*  210:*16*  258:*5*
283:*3*  284:*1*  341:*24*
359:*8*  362:*7*  384:*17*
393:*20*
**answering**  19:*10*
31:*2*  61:*5*  73:*9*
82:*13, 19*  221:*18*
223:*1, 2*  311:*8*
325:*13*  327:*23*
344:*13, 18*  351:*6*
357:*18*  359:*2*  361:*14*
396:*18*  402:*20*  403:*4*
405:*5, 10, 12*
**answers**  8:*1*  19:*19*
48:*20*  49:*8*  58:*2*
223:*10*  357:*18*
405:*14*  424:*3*  434:*5*
**answer's**  18:*3*
**anti-discrimination**
245:*22*
**anxious**  355:*14*
**anybody**  26:*2*  69:*9*
104:*14*  109:*1, 13*
146:*5*  183:*8, 9*
389:*14*
**anymore**  13:*16*  89:*18*
90:*1*  247:*19*  250:*6,*
*23*  256:*21*  258:*10*
314:*7*  394:*21*
**anytime**  183:*8*  285:*9*
328:*4*
**anyway**  7:*15*  29:*20*
223:*20*  240:*7*  386:*14*
418:*22*  420:*18*
**apart**  134:*22*
**Apologize**  37:*7*  48:*11*
**apology**  354:*9*
**apparently**  125:*9*
165:*16*  204:*8*  261:*8*

304:*6, 11*  347:*1*
**appear**  185:*17*
**APPEARANCES**  2:*1*
**appeared**  134:*14*
287:*1*  401:*1*
**appearing**  5:*20*
22:*18*  247:*11*
**appears**  406:*11*
**applaud**  218:*3*
**Apple**  408:*24*  409:*10*
**Apples**  409:*17*
**application**  340:*2*
**applied**  334:*15, 16*
**applies**  160:*4*
**apply**  159:*14*  334:*24*
335:*3*  417:*15*
**approached**  13:*6*
119:*18, 20*  184:*12*
**appropriate**  74:*7*
245:*5, 12, 23*  432:*6*
**approval**  342:*10, 11*
**approve**  37:*17*  77:*12,*
*13, 16*
**approved**  37:*9*  414:*2*
**approximately**  39:*22*
**apps**  111:*14*
**April**  94:*22*  96:*1*
163:*24*  168:*16*  169:*9*
197:*11*  293:*5*  300:*23*
302:*13*  303:*15, 17, 23*
338:*9*  343:*24*  346:*7*
352:*9*  414:*22*  420:*11,*
*13, 17*
**arbitrary**  383:*5*
**arcane**  184:*21*  185:*7*
**area**  141:*10*  184:*5*
**argue**  204:*10*  225:*17*
**arguing**  164:*11*
**argument**  43:*13*
350:*3*  402:*24*  405:*15*
**Argumentative**  18:*7*
237:*20*  238:*5*  295:*13*
296:*4*  299:*2*  310:*5, 7*
356:*1*  367:*4*  404:*22*
**arisen**  12:*17*  14:*8*
**arm**  193:*2, 14*
**arrangement**  151:*24*
219:*7*  229:*13*  414:*10*
**arrangements**  165:*21,*

*21*
**arrive**  412:*10*
**arrived**  414:*14*
**article**  371:*12, 18*
372:*8*  373:*3, 15*
**articles**  373:*4, 14*
**ascertain**  137:*4*
**ascribe**  101:*12*
**ascribed**  137:*6, 18*
**aside**  150:*20*  152:*21*
198:*15*  211:*22*
**asked**  13:*7, 7*  17:*17,*
*21*  18:*6*  82:*8*  83:*16*
91:*13*  95:*5*  99:*20*
103:*5*  119:*19*  123:*7*
125:*17*  140:*20*  142:*3*
157:*16*  162:*21, 22, 22*
168:*5*  170:*1, 17*
193:*12*  198:*23*  199:*2,*
*11*  203:*4*  205:*19*
206:*6*  208:*15*  209:*14*
212:*3*  217:*21*  222:*2*
230:*8*  251:*7*  257:*5*
262:*19*  264:*13, 14*
277:*24*  278:*6, 9*
283:*2*  300:*2*  311:*6*
324:*8*  326:*4*  331:*3*
335:*16, 21*  343:*10, 13*
346:*13*  354:*20*  355:*4*
363:*16*  384:*17*  391:*1*
393:*2, 9*  396:*11*
400:*11*  421:*5*  423:*11*
428:*15*
**asking**  13:*20*  16:*3*
19:*13*  28:*12*  33:*12*
51:*17*  57:*20, 21*  61:*8,*
*12*  80:*13, 14*  86:*11,*
*15*  87:*20*  114:*9*
126:*6*  166:*15*  167:*15*
179:*14*  196:*10*
197:*16*  199:*5*  223:*16*
244:*17, 18*  245:*9, 19,*
*22*  264:*1*  279:*4*
281:*18, 20*  299:*8*
311:*8*  318:*6, 10*
329:*19*  346:*22*
351:*24*  352:*1*  356:*19*
357:*3, 8*  358:*20*
361:*3*  363:*2*  382:*4,*
*11, 19*  383:*11*  391:*18*

403:*16*  405:*3*  420:*18,*
*19*  423:*5*  424:*4*
429:*9*
**asks**  98:*5*  346:*23*
**aspect**  129:*4*  187:*16*
241:*7*
**aspects**  283:*18*  356:*4*
**aspirations**  109:*14*
**ass**  212:*15*
**assault**  159:*10*
169:*20*  174:*12*
**assaulted**  97:*1, 11*
173:*23*
**assent**  91:*2*
**assert**  244:*23*  248:*6*
**assistant**  111:*3, 4*
**associated**  287:*17*
290:*23*
**ASSOCIATES**  2:*13*
**assume**  8:*11*  252:*16*
**assuming**  330:*17*
**assurance**  127:*7*
**assurances**  127:*10*
**assure**  240:*2*
**assured**  128:*10*
320:*14*
**attached**  178:*14, 19*
346:*13*  381:*6*  432:*12*
434:*8*
**attempt**  137:*4*
**attending**  345:*21*
**attention**  150:*17, 17*
164:*10*  217:*7*  218:*7*
249:*3*  333:*4*  418:*16,*
*20*
**attorney**  53:*10*
432:*14*
**attorney-client**  402:*14,*
*15*  404:*11*
**attorneys**  6:*6*  53:*16,*
*19*  64:*17*  65:*3, 7*
66:*17*  75:*20*  98:*3*
252:*19*
**attorney's**  405:*23*
**attributing**  223:*22*
**Audio**  3:*14, 21*  75:*23*
275:*21*  276:*12*
**audit**  320:*24*  321:*2*
**authenticate**  80:*14, 23*

Deposition of DANIEL PIPES                                      Lisa Barbounis v. Middle Eastern Forum, et. al.

authenticity 79:20, 22
152:8
authority 89:9
163:22 339:11
370:10 375:13
authorization 376:23
378:5
authorize 278:13
297:1 377:7 379:5
authorized 375:5
376:21, 23 377:7
378:7
authorizing 377:12
378:22
available 50:17, 19
262:3 372:20
aware 22:9, 13 62:23
63:4 64:17 67:15
76:22 124:12 132:21
133:1 183:24 190:18
191:5 201:24 202:2,
3 279:3 303:16, 20
309:12 328:15, 20, 23

< B >
back 7:14 14:23
15:2 23:24 28:20
32:9 36:15 47:4, 6
48:7 57:18, 22 58:21
60:5 73:1 77:15
83:17, 18 85:5 86:19
89:10 90:16 92:5, 8,
9 93:2 95:24 96:3,
12 101:24 102:15
106:23, 24 123:22
145:8 157:4, 6 162:8
163:24 164:14 172:5
177:17 191:20 197:4,
7, 24 198:1, 2 201:19
208:4 233:24 241:4
247:7 251:21 252:1
262:21 263:5, 8, 13
278:23 280:3 282:16
304:7 306:12 308:16
313:9, 16, 24 315:2
316:14 323:6 324:3
339:19 348:20
349:11 397:6 401:24
402:5 414:17

background 74:5
backside 96:5 205:4
backstabbing 309:11
310:22 343:2, 4
bad 180:11 211:16
219:24 222:19
225:11, 16 348:23
368:11, 13
badly 168:10 338:8
bait 133:7, 9, 10
135:16
baited 153:8
Baldino 1:15 5:18
ballpark 38:9, 18
39:22
bane 362:10, 11, 13
bank 39:4, 6
bar 71:14 86:18
236:13
BARBOUNIS 1:1
2:22 5:12 6:10 7:5
13:6 26:6 56:9
77:14 81:20, 24
82:12 83:19 84:23
89:9 90:8 91:21
92:3, 12 94:21 99:19,
24 102:24 104:1
105:9 109:6 113:22
119:11 154:4 162:23
165:11 181:14 186:7
190:3 215:5, 11, 20
219:14 251:24 260:5
262:19 264:18 272:4
273:1, 23 274:3
280:14 282:5 285:3
290:11 298:14 305:4
316:18 317:5 368:16
371:11 374:3 376:3
390:12, 16 394:13, 17
395:3 400:1, 7
barking 416:23
barrage 341:6
base 383:20
based 60:20 62:8
74:14, 16 92:19 99:8
103:17 108:18 167:5
185:16 245:17, 22
252:4 265:13 272:7,
8, 12 282:13 383:13
basic 93:10

basically 243:21
309:24
basing 375:18
basis 186:16 219:20
227:4 279:12 281:14,
18, 21 282:24 283:21
284:7 285:20 423:12
Bates 65:2
Bates-marked 242:8
bathroom 101:8, 20
144:19 145:2
beating 311:16 329:7
began 24:18 70:6
138:10 147:23
193:16 304:5
beginning 6:8 102:17
125:3 131:15 187:21
216:17 371:6
behalf 6:17 48:11
416:13, 18
behave 115:9 228:20
231:24
behaved 114:11
119:16 168:10
behavior 209:17
219:18, 19 220:6, 15
222:16 223:21 224:4,
22 227:3 321:18
322:8 329:3, 21
330:23
behavior, 220:12
227:11
behavior's 386:17
believe 15:22 26:9,
12, 15 29:21 40:17
88:8 100:13 103:3
108:17 110:1 111:12
117:9 119:8 137:8,
19, 21 139:4 152:12
173:15 178:13 189:1,
4 203:7 207:8 212:7
220:18 231:2 248:7
250:19, 24 259:9
260:2 264:6 267:16
275:6 280:18 281:6
288:23 313:10, 12
333:9 348:19 350:2,
12 378:17, 20, 22
408:13 412:3 422:4
426:5, 13

believed 117:15
188:22 189:2
belong 417:8
belongs 268:17
benefit 172:15
benefits 231:23
232:3 366:3, 5
367:24
Bennett 104:3
114:14, 15, 22 119:11
162:21 298:9 304:3
408:15
Bennett's 114:17
314:22 408:16
BENSON 2:21
best 9:4, 4 20:6
72:12 115:10 127:17
282:22 284:1 309:13
349:4 350:12 421:3
better 35:21 63:17
122:23 156:14 188:3
230:16, 19 315:17
348:21 419:23
beyond 210:21
418:11 420:2 427:5
big 158:20, 22
216:13 246:24
404:16
bill 119:24 120:3
123:4, 10, 12 131:24
415:15 416:7
bills 161:22
bit 182:11 290:4
417:14
blabbering 344:20
black 177:11, 14
284:21 421:14
blank 127:23
blocked 117:14, 15
Bloom 70:17, 19
296:12 297:2, 7, 19,
22 298:18 304:1, 13,
14, 24 305:12, 23
306:5, 8 307:3
311:24 406:20 407:3,
12 408:2, 10
Bloom's 301:4
blowback 288:9, 14,
16, 18

Deposition of DANIEL PIPES                                          Lisa Barbounis v. Middle Eastern Forum, et. al.

**board** 44:*2, 6, 7, 9, 10, 11, 12, 19, 21* 45:*2, 4* 60:*24* 61:*1, 8, 9, 13* 62:*3, 16, 18* 63:*3, 12, 18, 24* 64:*1, 7* 212:*24*
**Boards** 60:*19* 61:*15, 18, 23* 62:*5, 10*
**bodily** 155:*3*
**body** 106:*20, 21* 116:*16*
**bogus** 85:*11* 87:*13* 88:*9*
**bonds** 40:*16*
**bone** 284:*22*
**bookkeeper** 27:*23*
**bookkeeping** 28:*9*
**books** 34:*4* 378:*16*
**borderline** 233:*19*
**borders** 162:*17*
**boss** 301:*16*
**bossiness** 114:*20* 116:*6*
**bossing** 114:*19* 115:*11*
**bossy** 115:*8, 17* 116:*1, 7*
**bottom** 60:*10* 96:*18* 106:*23* 159:*7* 210:*6* 307:*24* 371:*3* 404:*15*
**bought** 232:*20* 408:*24*
**bounce** 426:*21*
**box** 360:*10*
**Brady** 96:*22* 97:*9* 104:*5* 119:*12* 136:*20* 139:*7* 140:*13* 293:*12* 298:*16* 302:*19* 303:*14* 307:*3* 343:*10, 12, 13* 354:*21* 361:*10, 18* 408:*11*
**Brady's** 137:*15* 138:*14, 17* 140:*11* 143:*9* 301:*9* 302:*7* 408:*11*
**brand** 400:*3*
**breach** 272:*9* 282:*8*
**break** 19:*22* 36:*12, 13* 43:*9* 99:*7* 101:*8, 20* 144:*19* 145:*3, 4, 5, 6* 178:*2, 8* 191:*12, 16* 273:*19* 315:*13, 19, 22*

**breaking** 254:*1* 273:*6, 9, 24*
**brewing** 135:*10*
**brick** 143:*14* 307:*13*
**brieser@discrimlaw.net** 2:*16*
**brilliant** 115:*23*
**bring** 85:*12* 86:*18, 19* 89:*9* 101:*16* 166:*1* 171:*12, 14* 186:*17* 197:*13* 249:*3* 256:*12* 300:*10* 323:*9* 379:*2*
**bring-your-own-device** 410:*19*
**Britain** 186:*7* 287:*2* 289:*21, 24* 291:*6* 319:*5* 373:*1*
**British** 286:*1* 287:*9, 10*
**broadly** 180:*2*
**broke** 95:*18* 273:*1, 21*
**brought** 85:*12* 92:*8, 9* 93:*2* 96:*21* 100:*11* 171:*15* 197:*16* 247:*23* 258:*23* 261:*3* 307:*8* 344:*3* 348:*20* 418:*16, 20* 419:*19*
**brushed** 107:*7*
**building** 168:*9* 340:*20, 21*
**bullshit** 54:*21*
**bumble** 425:*14*
**bumped** 307:*13*
**bunch** 414:*6* 420:*9*
**bury** 262:*7*
**business** 10:*19* 40:*20, 22* 137:*5* 155:*5* 213:*18, 22, 24* 214:*1, 19, 23* 215:*3, 7, 8* 216:*2, 21* 237:*13, 16, 24* 238:*8* 259:*22*
**busyness** 163:*2*
**butt** 171:*1* 195:*20* 196:*3* 212:*19*
**buy** 409:*14*
**Bylaws** 3:*11* 51:*1, 4, 8, 11, 15, 17* 54:*13, 14* 56:*13* 59:*9, 21* 60:*1*

61:*12* 64:*10, 13, 19* 66:*18* 67:*6* 68:*7*
**Bylaws,** 55:*14*

**< C >**
**c3** 422:*1, 6, 11, 11, 15, 16, 17* 423:*6, 10, 12, 14, 15, 16, 18, 20, 20* 424:*6, 20, 22, 24* 425:*6, 6, 18, 20, 23* 427:*17, 19*
**c4** 421:*24* 422:*10, 10, 14, 17* 423:*6, 10, 13, 16, 18, 19, 23* 424:*2, 5, 14, 17, 20* 425:*17, 21, 22* 426:*1, 6* 427:*16*
**Caitriona** 96:*22* 97:*9* 104:*5* 113:*21* 119:*12* 136:*20* 138:*14* 140:*13* 143:*9* 254:*17, 21* 293:*11* 298:*15* 301:*9, 14* 302:*7, 9, 14, 16, 19* 303:*14* 307:*3* 361:*10, 18* 408:*11, 11*
**Caitriona's** 302:*24* 307:*12* 407:*3*
**calculate** 41:*12*
**calculated** 126:*10* 127:*21*
**Call** 18:*18* 41:*4* 42:*16, 24* 54:*20, 22* 55:*1, 16, 18* 57:*22* 58:*21* 80:*5, 16* 120:*22* 133:*4* 167:*1* 169:*20* 170:*15* 195:*8, 8, 23* 196:*6, 8, 9, 12, 15* 236:*2, 7, 17* 297:*22* 304:*3* 314:*9* 337:*2* 338:*1* 392:*12, 20*
**called** 10:*12, 14* 65:*1, 2* 67:*16* 68:*18, 18* 81:*10* 97:*23* 98:*12* 107:*18* 115:*9* 134:*14* 147:*22* 183:*10* 213:*17* 239:*19* 259:*21* 410:*7*
**calling** 56:*7* 57:*18* 81:*5* 154:*18* 183:*20* 326:*24* 392:*21*

**calls** 338:*20* 339:*3* 421:*1*
**calumny** 341:*6*
**campaign** 279:*21* 286:*3* 287:*3, 11, 17, 18* 373:*12*
**campaigns** 425:*9, 10, 13*
**Canada** 267:*8*
**candidates** 423:*22* 425:*8, 10*
**capable** 18:*1*
**capacity** 10:*2* 17:*1*
**card** 249:*23* 250:*2, 2, 6* 251:*2, 3*
**cards** 249:*24*
**care** 7:*24* 102:*3* 208:*12, 17, 24* 287:*3, 4, 5*
**cared** 209:*12* 248:*12*
**career** 349:*2*
**careful** 292:*2*
**carefully** 185:*14* 432:*4*
**Caroline** 108:*17* 109:*16*
**CARSON** 2:*3* 3:*5* 6:*10, 11* 7:*3* 10:*24* 13:*21* 14:*9, 13, 19, 23* 15:*5* 16:*19* 17:*4, 8, 20* 18:*2, 9, 15, 19* 19:*3, 5* 20:*9, 17* 21:*4, 17, 22, 23* 22:*4, 15, 16, 24* 23:*6, 10, 18, 22* 24:*4, 14* 25:*18* 26:*19* 27:*16* 28:*8, 12, 13* 29:*18* 30:*3, 8, 12, 23* 31:*9, 17, 22* 32:*5* 33:*17, 21* 35:*12, 15, 19, 22, 23* 36:*5, 8, 13, 21* 37:*8* 38:*3, 17* 40:*21* 41:*1, 4, 7, 11, 18* 42:*1, 8, 12, 15, 18, 21, 24* 43:*6, 8, 17* 46:*15, 19, 20* 47:*13, 22* 48:*2, 12, 19, 24* 49:*4, 9, 10, 15* 50:*20* 51:*16, 22* 52:*5, 13, 20, 24* 53:*4* 54:*20* 55:*3, 7, 11, 22* 56:*2, 6, 6*

Deposition of DANIEL PIPES                                    Lisa Barbounis v. Middle Eastern Forum, et. al.

57:3, 5, 14, 15, 20
58:15, 16, 21, 24  59:7,
14, 17  60:8  61:7
62:4  65:14, 17, 18, 23
66:9, 23  67:4, 12, 14
68:3  71:4, 17  72:7, 9,
19, 21  73:3, 19  74:14,
18, 19  75:5  76:2, 10,
19  77:4  78:2, 8, 14
79:11  80:19  81:4, 12
82:5, 9, 13, 19, 23
83:2, 23  84:4, 11, 14,
17  86:14  87:3  88:3
89:14, 21  90:10
91:12  92:18  94:10
95:13  97:4  99:12
100:7, 21  101:5, 18,
22  102:1, 14  103:7
105:13  106:14  107:6
108:10, 23  109:16
111:24  112:6, 12, 18
113:6, 7  115:19
116:13  119:2  121:5,
12, 16, 20  122:1, 3, 6
123:24  125:13
128:12  130:3  131:2,
17  132:24  133:19
134:4, 19  135:17
137:11, 23  139:15
140:18  141:12  144:9,
18, 24  145:7, 20
146:5, 9, 18, 23  147:4,
17  148:6  149:9, 14,
23  150:5  151:5, 16,
20  153:12, 19  154:2,
11, 19, 21  155:19
156:1, 8, 13  157:2, 11
158:1, 24  159:12, 15
160:3, 9, 12, 19  161:9,
14, 23  162:6, 7, 12
164:7  165:2, 12, 23
166:5, 17, 21, 24
167:4, 12, 17, 23
168:4, 20  170:8
172:10  173:19
175:13, 16, 21  177:12
178:11, 17, 21  179:24
181:4  182:6, 10
184:3, 11  185:5, 15,
22  187:5  188:14

190:20  191:13, 18
192:8  194:15, 20
195:1, 5, 13, 18, 24
196:6, 11, 13, 16, 20
197:4, 15  200:18, 20
202:6, 12  203:3
205:16, 22  206:12
207:11, 17, 23  208:16,
23  209:20  210:12, 16,
17  212:2  213:1, 2
214:15, 22  215:2, 9,
16  217:9  218:24
220:8  221:15, 20
222:1, 8  223:7, 12, 19
224:12, 20  226:5, 9,
14, 21  229:9  230:18
231:10  233:17
234:16, 24  235:8, 20
236:12, 16, 21  237:15,
22, 23  238:6  239:2,
18  240:4, 20  241:3,
18  242:9, 13  244:15
245:1, 4  246:5, 11, 16,
22, 24  247:5  248:9
250:16  253:6  255:12,
22  256:7  257:10, 18
258:2  259:1, 19
260:14  261:5  262:23
263:3, 20, 23  265:12,
19  266:1, 14  267:12
269:10  270:1, 3, 8, 17,
21  271:2, 13, 24
272:6, 20  273:7, 13
274:22  275:11, 23
276:5, 14, 22  277:17,
21  278:4, 15, 18
279:2, 11  280:1, 12
281:18  282:3, 11, 21
283:7  284:3, 4, 13
285:8  287:6  288:6
290:3, 5, 21  291:10,
19, 24  294:1, 11, 16
295:8, 16, 21  296:3, 5,
11, 23  297:6, 11
298:11  299:3, 10, 19
300:14, 16  301:21
302:6  303:9, 21
305:17  306:3  308:5
310:6, 23  311:14
314:21  315:15, 20, 23

316:16  317:11  319:6,
19  322:4, 16, 21
323:3, 12, 20  324:1, 4,
13  325:7, 12, 15, 19
326:2, 6, 11, 16  327:4,
11, 21  328:19  329:10,
18  330:3, 8, 14, 20
331:4, 11, 16  332:9,
19  333:21  334:3, 12
335:11, 18, 23  338:5
339:1  340:24  341:21
342:8, 22  344:4, 9
345:1, 9, 12, 13
346:21  348:4, 12
351:18, 24  352:2
353:4, 7, 18, 21  354:3
356:5, 11  357:17
358:2, 7, 17, 21  359:1,
5, 9, 17  360:3, 16
361:4, 8  362:22
364:11, 15  365:6, 9,
13, 15  367:1, 7  368:6
369:10, 16, 23  371:24
372:16  373:22  374:1,
17  376:19  378:11
381:2, 7, 11, 17, 20, 24
382:3, 11, 13, 21
383:1, 22, 24  384:14,
18  385:6, 23  386:8,
13, 18, 22, 24  387:6,
11, 16, 19  388:6
390:5  391:3, 4, 16, 22
392:1, 11, 19  393:6,
14, 24  394:4, 10, 11,
16, 20  395:2, 7, 18
396:2, 6, 10, 18, 20
397:5, 12  398:14, 19,
23  399:8, 18, 22
401:7, 13, 22  402:7, 9,
15, 23  403:1, 5, 11
404:3, 5, 14, 24  405:7,
18, 22  406:23  410:15
411:9, 17  413:14
414:7  415:11, 15, 19,
24  416:7, 12, 16, 21
417:1  421:18  422:22
423:4  426:11, 20
427:3, 14
**Carson,**  95:18

**case**  17:13  36:19
41:14, 19  43:4  53:16,
19  54:1, 4  58:4  65:5,
20  70:11  73:7  80:21
81:21, 24  85:11, 12,
21  98:11  102:20
109:10, 23  110:5
118:4  128:8, 15
135:19  137:20  143:2
151:19  153:14  154:7,
13  159:2  165:8
168:9, 15, 20  169:8
179:21  188:20  189:9
195:19  215:22
238:14  240:3  260:6
261:2, 7, 9  262:12
265:11, 13, 16  269:23
270:11, 13, 13  271:4,
23  298:8  312:3, 5, 24
313:3  338:9  340:20,
22  371:1  386:7
387:15  398:12
**cases**  32:24  98:24
99:14  100:10  109:10
119:9  239:20  262:16
298:7  312:1
**cash**  413:1
**catch**  250:14
**categories**  367:15
**categorization**  151:12
207:10  255:11
269:15
**category**  72:14
**cause**  129:18  134:18
351:1
**caused**  101:16
**causes**  329:17
**CAVALIER**  2:8
6:12, 12  10:21  13:17
14:3, 12, 14, 18  16:16
17:2, 5, 17  18:6, 13,
18, 20  20:4, 16, 22
21:19  22:12, 20  23:3,
7, 14, 20  24:12  26:17
28:7, 10  29:16  30:18
31:4, 15, 20  32:4
33:14, 20  35:10, 14,
17  36:6, 11, 18  37:23
38:15  40:19, 23  41:3,
6, 9, 21  42:4, 19, 23

Deposition of DANIEL PIPES                                    Lisa Barbounis v. Middle Eastern Forum, et. al.

43:5, 7   46:13, 17, 22
47:15, 18, 24   48:4, 10,
17, 21   49:2, 5, 12
51:14   52:8, 18, 21
55:1, 4, 10, 18, 23
58:13   59:3, 12, 15
60:3, 7   61:3, 24   65:9,
16, 22   66:8, 20   67:3,
7, 24   71:2, 15   72:6,
24   73:14   74:11, 16
75:1   76:8, 13, 23
78:1, 6, 12   79:4
80:17   81:2   82:4, 6,
11, 15   83:22   84:8, 13
86:7   87:24   89:12, 19
90:9   91:22   93:7
100:5   101:17, 21, 23
103:1   105:11   107:4
108:13   111:16   112:9
113:2   116:12   123:21
125:6   128:9   129:24
130:21   131:5   132:19
133:13   134:2   137:2
140:16   141:4   144:7
145:3, 10   146:1, 7, 15,
21   147:2, 15   148:5
149:7, 16   150:3
151:2, 11   152:7
153:15, 23   154:9, 17
155:18, 24   156:5, 12
157:16   158:9   161:5,
12, 20   162:1   164:23
165:9, 19   166:4, 15,
18, 23   167:10, 15, 20
170:6   171:5   177:1
178:9, 13   179:22
181:2, 21   184:9
185:10, 19   186:1
191:11, 15, 21   194:14,
16, 23   195:3, 7, 22
196:4, 8, 12, 15, 18
197:1   200:16   202:9,
24   205:19   206:6
207:9, 20   208:14, 19
209:10   210:9, 14
212:23   214:4, 20, 24
215:4, 14   217:5
218:23   220:7   221:7,
18, 23   222:3   223:3, 9,
17   224:15   226:7, 13,

19   228:10   229:4
230:17   231:3   233:21
234:21   235:4, 11
236:6, 19   237:7, 19
238:3, 23   240:15, 24
241:17   244:5, 11, 23
246:2, 12, 19, 23
247:2   248:2   253:5
255:10, 18   256:5
257:8, 16   258:12
259:14   260:7   262:22
263:1, 16, 17, 19
265:9, 15, 22   266:13
268:23   269:14, 22
270:7, 14, 19, 22
271:5, 8, 19   272:3, 8,
22   273:4, 10   275:10
276:2, 19   277:20
278:2, 11   279:9, 24
280:8   281:16, 20
282:7   283:2, 23
284:10   285:5, 7
286:24   287:21
290:19   291:22
293:23   294:9, 15
295:6, 12, 19   296:1, 4,
22   297:4, 9   298:5, 24
299:8   301:19, 24
303:6, 18   304:21
306:1   307:21   310:4
311:11   314:20
315:12, 17   317:10
319:2, 12   322:13, 20,
24   323:18, 23   324:2,
7   325:10, 14, 17
326:4, 8, 15, 23   327:9
329:6, 16, 23   330:12,
15   331:2, 6, 13
332:16   333:20   334:1,
10, 19   335:16, 21
337:16   342:5   344:7,
22   345:4, 10   346:17
347:24   348:11
351:22   353:6, 11
354:2   355:24   357:15,
21   358:6, 9, 15   359:4,
7   360:1, 15, 24
362:21   364:10, 14
366:23   367:4, 13
369:8, 14, 20   371:23

372:15   373:18
374:14   378:8   381:1,
5, 9, 13, 18, 22   382:2,
9, 19   383:14, 19
384:13, 17, 20   386:5,
11   391:1, 6, 10, 20, 23
392:7, 10, 13   393:2, 9,
16   394:6, 14, 18, 22
395:5, 12, 16, 24
396:4, 9, 14, 22   397:3
398:13, 22   399:2, 16,
20   401:9, 18   402:5, 8,
10, 18   403:3, 9, 18, 22
404:11, 21   405:2, 11,
20   406:21   411:8
413:13   415:17, 22
416:10   422:21   423:3
426:9, 18   427:1, 4
429:18
**cc'd**   189:18   264:8, 9
421:2
**censor**   357:6   358:24
**censoring**   357:8
**centered**   422:6
**century**   50:23
**CEO**   29:5, 10, 12
30:4, 6, 24   32:20
33:3   46:10, 12, 16, 21
47:14   49:1, 11, 22, 23
**certain**   93:4, 5, 9
143:15   191:5   217:20
252:21   253:3, 8, 17
309:6   312:10
**certainly**   129:17
199:22   217:24
239:22   265:23
**certification**   5:3
**certify**   431:2   434:3
**cetera**   173:24, 24
417:18
**chair**   81:19   233:12
**chairman**   37:11
45:16   67:20, 20
69:11, 13, 18
**chambers**   56:5
**chance**   10:6   131:1
418:7   419:6, 21
**change**   341:13   433:3,
6, 9, 12, 15, 18, 21, 24

**changed**   96:18   159:7
206:16   257:1   333:12
**changes**   258:20
336:6   341:4   342:2, 6,
10, 13   432:11   434:7
**changing**   333:9
**chaperones**   216:9
**chapter**   202:1
**character**   349:6
**characterization**
23:11   134:3   140:17
268:24   281:17
**characterize**   135:14
138:21   217:22   311:1
**charge**   81:19   109:4,
20, 23   154:15   327:16,
23   328:6
**charges**   97:16
**charter**   50:14
**check**   16:2, 13   19:1
29:8, 9   68:2, 4, 5, 6, 8,
10, 12, 15   97:17, 19
122:19   123:23   124:4
125:24   296:14
396:11   411:7
**checked**   34:13   39:14,
18
**checking**   378:10
**checks**   379:9, 10
**child**   308:20
**children**   289:21, 24
291:7, 14, 17   319:4, 18
**chilling**   248:15
**choice**   42:22   72:3, 10
167:4   345:1   349:12
409:14
**choose**   330:4
**chorus**   158:20
**chose**   33:6   34:11
164:15
**circles**   374:8
**Circuit**   43:12
**circumstance**   174:19
**circumstances**   75:18
219:8, 11
**cite**   118:20
**CIVIL**   1:1   98:13
272:11   273:12, 15
**claim**   41:17, 19
108:18   160:7   201:4

Deposition of DANIEL PIPES                                    Lisa Barbounis v. Middle Eastern Forum, et. al.

203:*18*  261:*18, 20, 20*
282:*9*
**claimed**  97:*10*  160:*2*
**claims**  97:*14, 15*
165:*7*  230:*19*  282:*12*
**classification**  10:*20*
**clean**  119:*23*  120:*3*
123:*4, 9, 12*  131:*24*
**clear**  8:*5*  22:*1*  23:*12*
32:*11*  41:*15*  61:*3*
63:*21*  95:*21*  101:*1*
172:*17*  187:*24*  207:*2,
3*  216:*17*  220:*2*
223:*15, 17*  233:*11*
247:*16*  256:*15, 20*
257:*5*  271:*19*  284:*5*
354:*5*  356:*16*  360:*8,
18*  361:*4*  362:*1*
395:*6, 8*
**clearly**  58:*10*  83:*14*
96:*13*  174:*17*  204:*7*
391:*23*
**client**  30:*14*  31:*18*
36:*14, 22*  43:*15*
48:*15, 15*  55:*16*  57:*5*
59:*10*  154:*4*  223:*13*
226:*6*  261:*6*  315:*24*
323:*20*  330:*21*  344:*5,
12*  357:*21*  386:*12*
387:*5*  415:*16*
**clients**  291:*18*
**client's**  134:*4*  195:*20*
207:*11*  315:*16*  330:*8*
**clock**  52:*10, 14*  54:*23*
55:*9*  56:*20*  57:*8*
58:*8*
**close**  74:*12*  93:*12, 15*
96:*10, 16*  106:*19*
107:*14*  155:*1*  159:*5*
172:*21*  180:*3, 9, 12,
22*  181:*6, 12*  192:*18*
198:*17*  199:*17*  204:*6,
7, 16, 18*  206:*9*  217:*7*
**closed**  217:*20*  241:*21,
22*  262:*16*
**closely**  35:*2, 5, 7, 9*
94:*7*  272:*1*  333:*1*
424:*16, 17*
**closer**  270:*21*

**closes**  313:*8*
**Code**  5:*15*
**colleague**  375:*1*
**colleagues**  9:*17*  116:*2*
**collect**  124:*17*  313:*1*
**collected**  124:*16*
209:*13*
**college**  308:*16*
**come**  9:*15*  60:*6*
83:*17, 18*  94:*24*  99:*5*
116:*23*  117:*5, 7, 11*
118:*24*  135:*5, 8, 12,
21*  139:*6, 6, 7, 7*
141:*6*  144:*1, 2, 3*
145:*8*  150:*14*  159:*9,
11*  160:*8, 9*  162:*20*
163:*20, 22, 23*  164:*6,
9*  166:*13*  168:*3*
169:*8*  171:*16*  172:*6*
173:*13*  181:*23*  182:*2,
12, 24*  183:*3*  184:*9*
185:*13*  214:*17*  216:*1,
17, 18, 19, 20*  237:*12*
239:*7*  244:*22*  250:*3,
5*  251:*12, 21*  255:*9,
19, 24*  256:*18*  257:*7*
259:*8, 9, 18*  263:*5, 8*
305:*12*  309:*15*  340:*8*
397:*6*  411:*6*  413:*4*
414:*1*  428:*18, 23*
**comes**  36:*14*  63:*23*
149:*24*  159:*6*  216:*12*
221:*6, 6*  298:*3*  341:*6*
346:*3*  418:*23*
**comfortable**  238:*21*
306:*22, 24*  362:*17*
**coming**  18:*14*  28:*20*
57:*10*  96:*20*  117:*9,
14, 15*  191:*12*  247:*13,
19*  252:*1*  313:*4*
366:*21*
**command**  246:*17*
335:*10*
**commencing**  1:*14*
**comment**  228:*16*
**comments**  124:*8, 12*
154:*23*  155:*22, 22*
308:*10*
**commission**  434:*16*
**commit**  184:*2*

**committee**  37:*12*
63:*23*
**Commonwealth**  1:*17*
**communication**  143:*5*
245:*9*  348:*2*
**communications**
204:*13*  368:*20*
397:*10*  413:*11*
**companies**  33:*7*  34:*12*
**company**  27:*15, 21,
24*  28:*2, 9, 17*  33:*6, 7,
10*  34:*4*  40:*5, 7*
**compare**  54:*18*  367:*8*
**Compared**  220:*14*
**comparing**  215:*10, 17*
**compensate**  26:*24*
**compensated**  24:*15, 18*
**complain**  107:*16*
115:*20*  118:*14*
119:*16*  129:*9*  148:*8,
9*  185:*13*  198:*5*
216:*1*  236:*1, 12*
237:*11*  297:*24*
322:*23*  350:*19*  351:*4,
8, 10, 20*  352:*3*
**complainants**  129:*2*
380:*3, 3*
**complained**  108:*7*
113:*22*  114:*2, 13*
115:*12, 17, 18, 21, 22,
22*  147:*5*  150:*15*
152:*20*  157:*14*  158:*5*
235:*18, 22*  238:*19*
403:*15*  418:*17, 20*
**complaining**  115:*23*
130:*20*  132:*11*  147:*9,
14*  156:*20*  320:*17, 19*
321:*20*  349:*13*
354:*10*  362:*12*  369:*6,
12*  403:*10*
**complains**  214:*2*
353:*24*
**complaint**  81:*23*
82:*24*  83:*6, 11*  84:*22*
85:*9*  86:*3, 5, 13, 16,
17*  87:*18, 21*  88:*15,
19*  91:*19*  92:*10*  97:*2*
116:*3, 3*  117:*2*
120:*13*  129:*11*
132:*13, 14, 15, 22*

148:*11, 15, 22*  150:*18*
159:*6*  187:*18*  193:*20*
199:*19, 20*  204:*21*
211:*11*  224:*24*  293:*7,
10, 11*  321:*11, 22*
322:*6*  323:*4, 6*  324:*3*
349:*18*  350:*4*  351:*11,
21*  352:*5, 8*  353:*9*
354:*13, 17, 23*  357:*11*
**complaints**  88:*24*
94:*1, 2, 4, 6, 17, 19, 20*
95:*13*  96:*23*  97:*11,
15*  99:*16*  105:*15*
107:*22, 24*  108:*1, 21*
109:*1, 11*  110:*9, 14*
114:*10, 15, 17*  116:*21*
120:*6, 14*  129:*17*
131:*9, 14, 18, 19, 20,
21*  132:*2, 3, 5*  153:*21*
156:*23*  171:*10*
182:*20*  184:*13, 14*
185:*16*  187:*17*
188:*24*  198:*22*
200:*23*  201:*23*
222:*21*  225:*7, 8*
229:*12*  231:*12*  234:*4*
239:*5*  256:*13*  259:*4,
5*  292:*19*  293:*7*
341:*10*  352:*16, 17*
354:*16, 24*  367:*14, 15,
16, 17, 20*  368:*8*
374:*16*  380:*2, 2*
384:*24*
**complete**  221:*24*
222:*5*  234:*3*  261:*2*
382:*14*  384:*1*
**completed**  380:*14, 16*
383:*4*
**completely**  15:*19*
22:*23*  56:*11*  332:*13*
336:*18*  407:*9*
**complex**  21:*1*  308:*11*
337:*24*  339:*7*
**compliance**  23:*15*
**complicated**  18:*23*
283:*18*  429:*7*
**complicates**  181:*9*
**complication**  372:*8*
**complications**  12:*16*
14:*8, 10*  15:*6*  93:*19*

Deposition of DANIEL PIPES                                      Lisa Barbounis v. Middle Eastern Forum, et. al.

complicit  163:*12*
164:*3, 5, 15*  169:*13,*
*22*  181:*19*  190:*14, 19,*
*22*
component  211:*21*
comprehensive
380:*15, 16*  382:*14*
383:*13*  404:*7*
computer  35:*17, 21*
computer-aided  431:*7*
computer's  35:*19*
concern  148:*14, 14*
149:*19*  152:*18, 18*
210:*8*  217:*16*  220:*13,*
*16, 6*  222:*17*  298:*6*
305:*13, 13*
concerned  77:*19*
79:*18*  117:*9*  129:*2*
150:*22*  186:*4, 21*
216:*12*  217:*14*
227:*13*  248:*15*
298:*12*  304:*11*  313:*9*
322:*10*  329:*2, 4, 19,*
*22*  330:*24*  331:*12, 18*
371:*13*
concerning  121:*19*
150:*11*  257:*1*  332:*22*
334:*5*
concerns  77:*17*
219:*18, 22*  227:*12*
255:*1*  406:*17*  408:*5*
concluded  315:*8, 9*
370:*23*  430:*1*
concluding  307:*14*
conclusion  91:*1*
92:*23, 23*  154:*18*
202:*20*  315:*7*  326:*24*
383:*12*
conclusions  281:*22*
concoct  108:*16, 18*
concocted  83:*1, 3*
85:*8*  86:*6, 16*  87:*21*
88:*15, 19*  95:*22*
109:*11*  172:*15*  173:*2,*
*3*  229:*22*  350:*7, 8*
concoction  85:*16, 18,*
*21*
condition  6:*14*  409:*21*
conditions  6:*18*
89:*22*  93:*4, 6, 10*

214:*6*  252:*1, 2*  320:*3,*
*9, 17*  366:*19*
conduct  79:*3, 9, 9, 13,*
*14*  92:*21*  101:*15*
106:*3*  107:*2*  155:*21,*
*22*  179:*9, 11, 19*
180:*19*  183:*12*
219:*12, 12*  303:*2*
369:*6*  380:*17*  382:*15*
conducted  144:*11*
conference  57:*2*
345:*22*  346:*15*  421:*1*
confidant  142:*5, 7*
confidence  285:*1*
confident  423:*24*
confidential  128:*14*
381:*9, 12*
confidentiality  127:*7,*
*10, 14, 15*  128:*11*
confines  420:*2*
confirm  59:*20*  263:*5*
377:*23*
confirmed  191:*4*
274:*15*
confirming  254:*2*
263:*13*  264:*10*
confirms  58:*5*  253:*24*
confront  406:*13*
confronted  177:*9*
346:*6*
confusing  273:*11*
congratulate  299:*12*
300:*9*
Congratulations  97:*8*
Congress  159:*13, 14*
conjunction  186:*15*
connected  16:*24*  17:*3*
20:*13*  362:*4*  368:*9*
373:*12*  424:*22, 23*
connection  56:*7*  65:*4*
149:*5*  152:*6*  162:*9*
312:*16*  362:*19, 23*
connived  289:*23*
291:*16*
consensual  215:*10, 11*
consequences  288:*13,*
*18, 20, 21, 24*  371:*14*
374:*6, 11*
consequences,  189:*23*

consider  12:*8, 13*
14:*2*  109:*3, 3*  182:*21*
185:*9*  235:*3*  236:*18,*
*24*  248:*16*  314:*6*
332:*24*  334:*8, 13, 16*
335:*24*  338:*14, 16*
342:*2*
considered  236:*23*
334:*7, 14*  335:*22*
considering  12:*19*
13:*23*  16:*5*  338:*13*
424:*21*  426:*2, 7*
considers  340:*7*
consist  60:*21*
consistent  234:*5*
consolidated  187:*22*
conspiracy  259:*21*
272:*12*  350:*6, 7, 8*
conspiring  370:*6*
constant  183:*21*
contact  34:*18*  130:*8,*
*16*  157:*20*  268:*2, 17*
269:*12*  297:*24*  339:*4,*
*5*  367:*18*
contacted  152:*16*
266:*7, 11*  267:*20*
276:*1, 7*
contacts  268:*11, 12,*
*14, 15, 22*
cont'd  4:*1*
contemporaneous
390:*18*
content  130:*18, 19*
134:*12*  153:*3, 5, 6*
157:*22*  158:*5, 16*
172:*19*  187:*12*  211:*8*
218:*5*  219:*7*  239:*15*
368:*21*
contented  153:*7*
contention  342:*23*
contentment  153:*11*
185:*3*
context  74:*7, 21*
130:*23*  156:*24*
183:*20*  210:*23*
259:*10*  351:*23*  352:*1*
358:*10*
Continue  77:*8*
231:*24*  241:*11*  262:*9*
324:*14, 22*  326:*17*

347:*20*  348:*15, 18*
359:*18*  364:*21*
365:*18*  396:*12*
continued  89:*23*
289:*13, 15, 16*  320:*15,*
*18*  321:*18*  322:*7*
329:*3, 20*  330:*22*
338:*6*  347:*7*  361:*19*
continues  338:*6*
339:*10, 10*  366:*2*
continuing  262:*10*
continuously  311:*4*
contradict  204:*1*
contradiction  204:*14,*
*22*  205:*5, 6*  404:*10*
contradictions  204:*4*
313:*6*
contradictory  143:*15*
307:*14*  310:*17*  312:*1*
contrary  309:*8*
contribution  414:*16*
control  56:*23*  112:*10*
344:*5, 13*  386:*16*
controversial  59:*16*
convenience  337:*19*
conversation  30:*14*
31:*18*  96:*7*  101:*6*
135:*24*  193:*14*
277:*18*  304:*4*  315:*10,*
*24*  407:*22, 23*
conversations  125:*1,*
*4, 5*  245:*17*
convinced  96:*24*
convulses  97:*6*
COO  33:*5*
cooperate  332:*14*
copied  190:*2*
copying  419:*11*
core  87:*12*
corner  349:*11*
corporate  45:*7*  47:*21*
49:*20*  50:*7, 24*  62:*21*
69:*1, 6, 12, 16*  155:*13,*
*20*
correct  11:*2*  13:*24*
44:*8*  64:*10, 19*  67:*6,*
*16*  68:*22, 23*  75:*8, 9*
80:*6*  81:*6*  82:*3, 10*
90:*4, 8*  91:*21*  99:*21*
123:*5*  124:*2*  131:*22*

138:*23*  140:*14*  142:*8*
143:*10*  150:*2, 9*
153:*22*  155:*14*  156:*3*
158:*3*  160:*18*  163:*9*
165:*15*  176:*14, 15*
183:*13*  187:*10*  189:*2,*
*23, 24*  190:*3, 4*
198:*24*  202:*8*  207:*7,*
*19*  208:*1*  213:*10*
218:*16, 17, 19*  219:*16*
229:*24*  231:*14*
232:*21, 22*  235:*10*
237:*18*  240:*11*
241:*16*  243:*3*  244:*1,*
*2*  251:*22, 23*  252:*11*
253:*3, 8*  255:*14*
276:*1, 7*  285:*4*
288:*10, 22*  289:*3, 14*
292:*15, 20, 21, 23*
293:*22*  294:*8*  295:*18*
297:*15*  298:*4, 23*
301:*10*  305:*20, 21, 23*
306:*6*  307:*4*  316:*22*
317:*9*  320:*5, 21*
321:*7, 12*  328:*10*
329:*5*  337:*3, 4, 15*
340:*19*  341:*16*  344:*8*
347:*11*  349:*14*
350:*20*  351:*5*  354:*10,*
*16*  356:*17*  357:*11*
363:*21, 22, 24*  364:*1,*
*6, 7, 9, 13, 23*  365:*22*
366:*3, 22*  368:*10*
369:*7, 13, 13, 15, 18*
371:*6, 7*  375:*3*
376:*21*  377:*3*  378:*7*
380:*7*  385:*8, 9*  399:*1*
407:*18, 19*  409:*1*
410:*16*  411:*19*
412:*14*  419:*9, 10, 13*
420:*10*  421:*13*
422:*19*  425:*24*  426:*3*
427:*2, 3, 20*  431:*8*
434:*5*
**corrected**  84:*11*
**correcting**  112:*21*
**corrections**  432:*5, 7*
434:*7*
**correctly**  313:*13*

410:*20*  431:*6*
**correspondence**  421:*2*
**corroborate**  206:*24*
210:*1*  241:*12*
**corroborated**  208:*3*
**corroborating**  241:*10*
**couch**  96:*10, 17*
106:*18*  107:*15*
192:*18*  198:*18*
199:*18*  204:*9*
**could've**  135:*21*
141:*6*  163:*20*  182:*24*
183:*2*  208:*9*  210:*24*
304:*20*  378:*9*  379:*20*
428:*18*
**counsel**  5:*2, 19*  6:*9*
53:*22*  54:*5, 7*  58:*13*
121:*8, 22*  142:*8*
242:*5*  244:*20*  245:*10*
262:*2*  323:*15*  431:*9*
**Counselor**  365:*14*
**Counsels**  55:*24*
315:*22*  365:*3*  429:*21*
**counsel's**  56:*16*
**count**  56:*20*  57:*7*
58:*7*  298:*13*  428:*14*
**counted**  291:*20*  301:*3*
**counterclaim**  261:*19*
265:*13*  270:*12, 15, 18*
271:*3, 4, 12, 16, 18, 24*
272:*2, 7, 8*  279:*13*
281:*15, 17, 21*  282:*5,*
*10*  283:*10, 11, 12, 14,*
*16, 21*  284:*6, 8, 21*
285:*2*  373:*24*  416:*1,*
*2*
**counterclaims**  269:*22*
271:*21, 23*  272:*18*
282:*24*
**counting**  293:*3*
**counts**  204:*1*
**couple**  9:*17*  124:*7*
323:*2*
**course**  58:*16*  75:*20*
142:*20*  151:*16*  159:*3,*
*3*  171:*2, 13*  176:*20*
197:*20*  200:*3*  212:*17*
239:*11*  268:*18*
338:*16*  341:*15*

361:*22*  401:*11, 13*
411:*23*
**COURT**  1:*1*  5:*14, 16,*
*18, 19, 21, 23*  6:*3, 16*
8:*23*  14:*14, 16*  15:*2*
22:*5, 9, 14, 18*  23:*15,*
*24*  27:*11*  30:*1*  47:*3,*
*6, 11*  48:*6, 8*  79:*6*
81:*8*  82:*21*  87:*1*
90:*19*  91:*6*  99:*9, 16*
102:*12*  106:*10*  108:*5*
111:*17*  115:*14*
118:*17*  137:*13*
139:*12*  144:*14*  146:*3*
149:*13*  157:*6*  168:*3*
175:*15, 19*  197:*7*
201:*17, 19*  205:*12*
207:*21*  209:*7*  221:*4,*
*9*  244:*6, 9*  250:*14, 17*
278:*17, 23*  290:*4*
296:*8*  300:*12*  310:*14*
316:*5*  325:*18*  326:*1,*
*6, 13*  328:*17*  345:*7*
353:*15, 19*  359:*11*
376:*14*  399:*15*  414:*5*
429:*16*  432:*18*
**courtesy**  336:*8*
**courtroom**  233:*11*
**court's**  23:*11*
**cover**  290:*17*
**COZEN**  2:*6, 21*  6:*12*
**crazy**  8:*24*  395:*10*
**create**  8:*5*  9:*18*
299:*4*
**created**  9:*17*  10:*4, 6,*
*10, 12*  417:*15*
**creative**  422:*4*
**credence**  110:*22*
**credibility**  171:*20*
182:*14*  186:*22*  277:*8*
**credible**  188:*1, 6, 12,*
*13, 13, 17, 18, 20*
206:*16*  277:*4*  306:*13*
**credit**  410:*5, 7*
**criminal**  273:*12, 15*
**crisis**  117:*6*  119:*18*
**critical**  87:*12, 12*
92:*3*  124:*8*
**criticisms**  124:*15*

**crossed**  286:*9*
**crosses**  228:*17*
**cross-talk**  21:*13*
25:*15*  29:*14, 23*
30:*10*  32:*2*  42:*6*
47:*1, 9*  51:*20*  52:*16*
53:*2*  65:*12*  67:*10*
72:*17*  82:*17*  100:*17*
101:*3*  121:*3*  152:*10*
158:*11*  159:*22*  167:*8*
168:*1*  173:*11*  188:*10*
190:*16*  194:*18*
195:*16*  205:*10*
207:*14*  209:*5*  211:*18*
214:*10*  221:*2, 11*
233:*15*  235:*16*
236:*10*  239:*13*
257:*24*  260:*10*
267:*10*  269:*20*
270:*24*  274:*20*
277:*13*  282:*1, 19*
288:*1*  291:*2*  299:*16*
302:*4*  305:*2, 8*  316:*3*
322:*2*  324:*11*  325:*5*
327:*18*  331:*9*  332:*7*
335:*6*  338:*23*  341:*19*
343:*22*  351:*16*  353:*2,*
*13*  356:*8*  357:*24*
358:*13*  365:*11*  382:*7*
383:*17*  384:*22*  386:*3,*
*20*  390:*3*  391:*8, 13*
392:*5, 15, 24*  393:*22*
394:*2, 24*  395:*14*
397:*1*  399:*6, 13*
401:*16*  403:*20*  404:*1,*
*19*  411:*13*  421:*16*
426:*15*
**crowded**  96:*16*
**crucial**  84:*24*
**cunt**  277:*4*
**current**  68:*8*  108:*12*
185:*7*  304:*5*  420:*5*
**curtailed**  356:*3*
**custody**  112:*10*
**cut**  393:*5, 18*
**cuts**  396:*23*
**cutting**  194:*20*

**< D >**

**D.C** 345:22 346:8, 15
**D.C.** 71:14
**D000017** 252:19
**D000024** 318:22
**D000037** 353:10
**da** 191:6, 6, 6, 6
194:5, 5, 5, 5, 5
**dad** 301:16, 23 302:7
**Daily** 162:5
**damage** 338:11
**damages** 40:22 41:8,
10, 12, 17, 20, 24 42:3,
9
**damaging** 354:7
**damn** 172:21
**Dan** 18:7 87:24
**dangers** 238:13
**DANIEL** 1:11 3:3
5:11 6:6, 21 7:6 9:9
10:22 14:18 18:20
20:5, 16, 22 22:21
23:4, 9 29:16 31:5
40:23 41:9 45:21
46:17, 22 47:15, 24
48:4 49:12 65:9
86:8 154:3 178:15
191:22 194:16 195:9
197:2 205:20 224:15
237:21 238:4 246:13
250:17 252:24
254:24 258:13 265:9
271:6 272:13 291:22
295:13 299:1 302:1
320:13 327:1 331:14
332:16 336:21 346:6
347:4 363:3 379:24
391:6 396:23 403:18
404:12 405:11 428:5
**Daniel,** 255:3
**Danny** 275:1, 2
277:22 278:13 279:6,
19 280:13, 14, 23
389:10, 11
**date** 5:9 10:5 34:9
102:22 143:11
168:10 230:1 285:7
286:15 292:9 333:16
383:5, 10 432:9
434:11

**dated** 141:20 241:20
251:19 261:6 292:4
321:4 347:3 361:22
379:24 414:22
**dates** 50:22 169:2
286:13
**day** 18:12 31:21
43:13 48:9 179:2
190:11 192:23 193:1,
19 199:15, 22 200:10
207:4 277:7 308:20
313:23 314:9 349:3
350:4 359:16 395:10
398:2 400:1, 7, 19, 19
403:8 407:20 428:14
431:11 434:14
**days** 94:4 230:6, 8
304:7 323:2 349:17
432:15
**day-to-day** 320:23
**deadlines** 339:14
417:13
**deal** 32:19 42:24
50:20, 21 54:7 71:23
72:8 77:17 113:6
128:19 134:9 149:21
152:22 162:12
171:22 185:1 187:1
201:22 213:21
214:14 222:10, 11
228:16 246:24
268:13 312:12
320:10 359:11 376:8
378:16 410:6 411:16
412:8 428:24
**dealing** 56:13 136:13
150:21 152:12
161:17 187:3 392:9
**dealt** 95:11, 11
125:15 128:23, 24, 24
134:10 136:14
149:21 150:15 153:9
177:10 184:22
187:10, 11 213:9
214:8 217:18 225:9,
10 228:11 238:17
278:7 367:17, 20, 22
428:23
**Dear** 346:2

**deceit** 219:19 220:5,
14 222:20 223:21
224:3, 21 227:2
228:9 321:24
**deceitful** 225:6
321:18 322:8, 11
329:3, 20 330:23
**decide** 72:13 169:24
220:9 244:18 245:1
**decided** 28:17 33:5
34:13 37:11 92:19
99:8, 9 157:23 164:4
168:10, 20 220:3
263:12 282:4 314:6
323:20 335:2 376:13,
17 393:11
**decides** 154:14
223:13
**decision** 32:24 37:13
54:12 84:19 85:10
86:18, 20 91:15, 16,
20 132:23 215:11, 20
328:7, 13
**decisions** 29:6, 7
33:1 54:11 245:13,
16
**declaration** 398:15
**decrease** 414:11
**deem** 186:14
**deemed** 432:17
**de-emphasize** 248:11
**deep** 119:23
**Defendant** 2:11, 16,
21 41:18 98:11
386:6 387:14, 16
**Defendants** 1:6 97:7
**defense** 58:13 126:8
**define** 336:11
**definitely** 112:12
132:4, 6 167:1
187:24 256:11, 22, 23
301:4 339:9 417:17,
17
**definition** 17:10
423:1
**definitions** 330:16
**Delaney** 96:22 97:10
104:7 113:20 119:12
254:17, 21 298:15

**303:13 428:12
**delve** 216:22
**demand** 95:14 222:4
380:10 402:21
**demanded** 95:19
**demanding** 105:19
**den** 77:9, 22 133:15,
24 186:20 216:10, 11
**denial** 139:4
**denied** 95:9 96:12
97:2 138:2 139:1, 2
177:22
**denies** 310:2 311:10
**denounces** 126:5
**denying** 407:24
**dep** 81:14
**depends** 74:3 75:18
317:18, 19
**deponent** 431:5, 6
434:1
**deponent's** 387:5
**deposed** 308:20
357:21
**deposing** 432:14
**deposition** 1:11 5:11,
24 7:5, 8, 8, 16 18:12
22:19 23:1 43:3
48:14, 16, 17 56:7, 22
59:3 86:2 207:4, 12
226:3 271:18 313:23
332:11, 14 344:18
359:19 389:8 396:13
415:21 430:1 431:8
432:4, 12, 15, 17
**depositions** 30:15
31:19 36:16 97:3
**depreciation** 410:8
**DEPUTY** 56:4, 24
57:4, 14, 16 58:17, 23
343:16, 20 345:15
375:10
**DEREK** 2:1 108:15
109:7, 12, 15, 18
110:8, 11 147:7
158:23 340:22
**derivative** 422:11, 14
423:13 426:2, 8, 10
427:16, 16

Case 2:19-cv-05030-JDW   Document 126-3   Filed 04/20/21   Page 128 of 179

Deposition of DANIEL PIPES                                    Lisa Barbounis v. Middle Eastern Forum, et. al.

describe 107:*1*
192:*21* 196:*23*
344:*23*
described 79:*15*
154:*6*
describes 193:*11*
describing 130:*14*
207:*11*
DESCRIPTION 3:*10*
4:*3* 66:*21* 151:*13*
207:*10* 241:*9* 332:*21*
336:*10*
designed 58:*10*
despite 340:*6* 348:*24*
destroy 145:*22*
146:*14, 20* 428:*4*
detail 73:*16* 154:*6*
202:*20* 258:*22, 24*
259:*2, 3* 296:*10*
400:*21*
detailed 198:*23* 241:*9*
details 29:*1* 98:*19*
119:*10* 154:*15* 160:*1*
determination 74:*6*
376:*24* 377:*3*
determine 60:*24*
313:*16* 382:*15*
389:*17* 393:*3* 396:*4*
determined 380:*17*
determining 404:*8*
detrimental 339:*12*
development 111:*12*
334:*23* 335:*1* 339:*24*
340:*5*
developments 368:*20*
devote 307:*16*
devoted 150:*20*
340:*17*
dial 58:*18*
difference 11:*13, 17*
172:*8* 273:*11, 14*
305:*19* 404:*17*
differences 261:*16*
different 11:*6* 27:*19*
92:*6, 14* 110:*7* 120:*8*
130:*12* 142:*16* 193:*4,
6* 199:*24* 200:*4*
203:*23* 204:*17, 21*
219:*12* 223:*9, 10*
256:*24* 299:*13* 312:*6*

331:*6* 333:*8* 337:*13*
350:*22* 366:*11*
377:*19* 379:*14*
396:*16*
differently 137:*10*
difficult 100:*20*
171:*11* 172:*6* 183:*13,
17* 308:*12, 13* 313:*22*
331:*1*
diminished 363:*14*
dinner 77:*14*
direct 157:*20* 162:*8*
218:*7* 339:*4* 425:*9*
directed 166:*9, 10*
directive 255:*2*
directives 339:*14*
directly 41:*8* 89:*5*
116:*23* 158:*15* 214:*2*
246:*1* 254:*24* 321:*17*
333:*2* 349:*2* 391:*10*
director 68:*21* 69:*1,
7* 73:*23* 74:*8, 24*
75:*6, 12* 111:*12*
114:*12* 119:*7* 123:*2*
130:*10* 148:*10*
149:*24* 195:*19*
212:*18* 234:*6, 13*
236:*4* 245:*20* 252:*21*
306:*4* 313:*24* 314:*1,
2, 10, 17* 334:*23*
335:*1* 339:*11, 24*
340:*4* 343:*16, 20*
345:*15* 365:*22*
368:*18, 23* 375:*10, 24*
377:*8*
directors 44:*10, 11,
13, 19* 61:*9* 119:*21*
120:*16* 123:*7, 19*
124:*2* 126:*6* 230:*9*
421:*4*
directorship 140:*5, 5,
6* 212:*22*
directs 181:*17*
disadvantage 340:*1*
disadvantaged 340:*5*
disagree 52:*8* 58:*14*
195:*7* 255:*16, 17*
344:*23* 384:*20*
411:*22*
Disagreement 313:*7*

disappear 85:*9* 92:*2*
371:*19* 372:*1, 9*
disappeared 83:*20*
108:*20* 372:*13*
disappointed 241:*7*
320:*2, 7* 419:*5, 7*
discern 310:*20*
discipline 78:*21*
disclose 128:*14*
272:*10*
disclosed 406:*15*
disclosures 98:*14*
discontent 211:*12*
discovery 65:*8, 20*
67:*8* 75:*21* 112:*8*
241:*7* 292:*7* 401:*20*
discrepancy 178:*16*
405:*6, 10*
discrimination 81:*20*
109:*4* 117:*18* 118:*8,
14, 15* 294:*6* 327:*24*
332:*22* 366:*22*
384:*11*
discuss 90:*24* 255:*3*
270:*10* 271:*9* 304:*5*
413:*12, 17*
discussed 142:*3, 15*
229:*18* 249:*13*
280:*10, 14* 337:*1*
413:*20*
discussing 162:*9*
211:*9* 390:*12*
discussion 25:*12, 13,
20* 91:*10* 94:*5*
227:*19, 20, 21, 24*
228:*2, 5* 229:*14*
249:*17* 253:*24*
265:*18* 325:*22*
413:*22* 414:*9*
discussions 25:*22*
26:*5, 10, 13* 111:*21*
220:*19* 229:*8* 265:*2*
disguised 92:*2*
disgust 312:*10*
dishonest 93:*1*
disinvited 244:*3, 12*
dislike 321:*21* 339:*20*
disliking 312:*9*
dismay 92:*9*
disparages 114:*3*

displeased 116:*5*
314:*8*
displeasure 209:*17*
dispute 401:*10*
disregarded 337:*15*
disrupted 101:*10*
dissuaded 256:*2*
distance 93:*14*
distancing 6:*2*
distinction 108:*11*
distinctly 199:*18*
distorted 92:*14*
distracted 157:*3*
DISTRICT 1:*1, 1*
5:*14, 14*
disturbing 149:*4*
295:*2*
divided 260:*3*
doc 57:*9*
docket 162:*4*
docking 412:*9*
docks 414:*14*
Docs 121:*6, 7* 122:*4*
document 50:*9, 12*
51:*9* 52:*1, 7, 11, 22,
23* 53:*5* 54:*3, 17, 19,
23* 55:*5, 8, 13* 57:*23*
58:*2* 59:*1, 8, 13, 20*
60:*3* 61:*14, 16, 17, 20,
21* 62:*8* 64:*15* 66:*16,
21* 67:*15* 68:*10* 87:*5,
9* 88:*23* 92:*24* 98:*4,
10* 120:*17, 20* 127:*2*
150:*13* 153:*2* 176:*3*
191:*19* 192:*11*
214:*18* 240:*18, 21*
241:*13* 242:*8* 251:*17,
19, 19* 268:*24* 282:*15*
283:*8, 18* 292:*4, 8*
318:*9, 11, 13, 22*
319:*13, 16* 321:*3, 3, 4*
324:*5, 8* 336:*5, 20*
361:*1* 367:*12* 368:*18*
371:*9, 10* 373:*16*
374:*20, 20* 379:*22, 23*
381:*8, 12, 19, 21*
382:*2, 12* 383:*20, 21*
390:*7* 399:*3* 402:*6, 7,
16* 403:*23* 404:*13*

Deposition of DANIEL PIPES                                    Lisa Barbounis v. Middle Eastern Forum, et. al.

405:*13, 21*  426:*10*
**documenting**  349:*16*
**documents**  53:*10, 15,*
*19, 24*  54:*4, 6, 18*
55:*20*  56:*12, 17*  57:*6,*
*10*  58:*3, 5*  59:*4, 6*
66:*4, 14*  67:*2*  68:*5,*
*12, 14*  82:*7, 10*
112:*14*  113:*3*  115:*5,*
*7*  125:*21*  129:*3*
152:*24*  158:*4, 6*
172:*18*  187:*14*  218:*4*
283:*4*  323:*22, 24*
324:*6*  363:*7*  365:*7*
373:*20, 24*  395:*21*
396:*8, 21*  397:*22*
399:*9*
**document's**  360:*15*
**doing**  13:*15*  18:*9*
28:*7*  30:*21*  68:*16*
86:*22*  95:*15*  99:*11*
107:*19*  114:*5*  124:*4*
140:*1*  185:*9*  215:*24*
234:*6*  272:*15, 16*
278:*19*  303:*13*
305:*14*  307:*19*  308:*3*
310:*1*  318:*2*  323:*22*
326:*3*  341:*16*  342:*2*
343:*6*  352:*18, 20*
374:*10*  395:*9*  404:*7*
414:*4, 18*  416:*8*
423:*21*  424:*14*
427:*13*  432:*8*
**dollars**  95:*20*  99:*1, 4,*
*15*
**dominated**  141:*18*
**donated**  279:*20*
**donations**  38:*14, 24*
39:*2, 5*  43:*19*  425:*22,*
*23*
**donor**  265:*1, 5*
266:*16, 22*  267:*1*
268:*2, 6, 7*  424:*15*
**donors**  24:*24*  265:*7*
266:*3, 6, 9*  267:*20, 23*
269:*2, 3*  425:*5*
**door**  117:*6*  216:*18*
259:*16*  370:*16*
**double**  291:*17*
**doubt**  205:*15*

**doubts**  79:*19, 21*
123:*12, 13*
**download**  234:*3*
**downs**  308:*17*
**downstairs**  251:*13*
**Dr**  346:*13*
**draft**  83:*11*  218:*13,*
*14*  381:*4, 5*
**dragged**  212:*19*
**drastic**  211:*7*
**drill**  115:*9*  388:*14*
**drinks**  180:*14*
**drive**  8:*23*  110:*18*
266:*10*  349:*9*
**dropped**  110:*6*
**Due**  5:*23*  160:*20*
320:*14*  332:*22*  334:*4*
399:*17, 18*  401:*11, 13*
**duly**  6:*22*  431:*5*
**duties**  91:*4*  363:*18*
**duty**  77:*23*  272:*9*
273:*24*  274:*4*  282:*8*
**dynamic**  181:*1*

**< E >**
**eager**  141:*8*
**ear**  193:*16*  212:*20*
**earlier**  13:*22*  70:*5*
91:*5*  94:*23*  125:*2*
131:*8*  135:*24*  136:*3*
140:*10*  141:*15*
251:*20*  305:*18*  323:*6*
361:*23*  362:*8*  370:*24*
410:*13*
**early**  12:*11, 12*  34:*8,*
*10*  37:*16*  70:*6*  94:*17*
117:*5*  118:*6*  131:*7*
134:*10*  135:*11*
169:*15*  177:*5*  202:*16*
341:*5*
**earned**  414:*17*  419:*24*
**easily**  23:*13*  395:*11*
**EAST**  1:*6*  2:*11*  5:*13*
6:*13*  7:*6*  9:*11, 13, 15*
10:*13, 14, 17*  11:*19*
15:*13, 17, 21*  17:*15*
26:*21, 23*  27:*18, 22*
28:*15, 21*  30:*4, 7, 24*
31:*7*  32:*20*  34:*5*
37:*10*  38:*4, 13, 23*

39:*11*  43:*18*  44:*3, 7,*
*18, 21*  45:*7*  49:*19*
50:*14, 20, 21*  56:*8, 9,*
*13, 14*  59:*9, 21, 24*
60:*19*  61:*15, 18, 22*
62:*2, 6, 10*  63:*3, 11*
64:*9, 12, 19*  66:*18*
67:*5, 22*  68:*6, 13, 22,*
*24*  69:*7*  70:*14, 17*
73:*24*  74:*8, 24*  75:*7,*
*12*  77:*3, 7, 9, 22*  79:*2*
84:*20*  85:*13*  89:*10,*
*16, 24*  93:*3*  95:*15*
109:*13, 24*  114:*10, 12*
117:*17*  118:*7*  121:*1*
128:*20*  130:*11*
133:*14, 17, 21*  134:*7*
152:*19*  155:*14, 21, 23*
156:*7, 16, 18*  157:*14*
159:*1*  162:*12*  184:*4,*
*23*  186:*5, 9*  195:*10,*
*19*  216:*8*  217:*12*
234:*7*  236:*4*  245:*20*
254:*10, 12, 13*  262:*15*
265:*1*  266:*17*  272:*5,*
*11*  285:*21, 22*  286:*2,*
*7*  287:*18*  288:*10*
289:*1*  290:*17, 18, 23*
296:*18*  297:*18*  306:*5*
327:*3*  328:*10, 15, 20*
365:*18*  371:*16*  373:*5*
374:*12*  376:*4*  377:*13*
424:*13, 22*  426:*3, 8*
427:*20*
**EASTERN**  1:*1*  5:*14*
37:*6*  102:*11*  145:*18*
192:*7*  316:*14*  429:*20*
**easy**  40:*1*  429:*14*
**editorial**  404:*21*
**editorializing**  405:*3*
**EEOC**  136:*17*
336:*17*  349:*18*  350:*4*
374:*15*
**eerily**  150:*23*
**effect**  81:*15*  106:*18*
187:*15*  233:*10*
248:*15*
**effectively**  130:*16*
153:*10*  255:*20*

423:*19*
**effects**  251:*13*
**efficacy**  186:*21*
**efforts**  12:*16*
**eight**  94:*23*  136:*2, 6*
164:*5, 6*  169:*23*
171:*23*  172:*1*  173:*15*
182:*5, 9, 12*  259:*7, 9,*
*10*  298:*19*  303:*12, 15,*
*22*  358:*3, 6, 8*  426:*24*
**eight-hundred-some**
98:*9*
**either**  14:*20*  55:*15*
77:*17*  183:*5*  205:*5*
254:*21*  265:*19*  330:*6*
372:*3*  392:*7*  395:*8*
429:*8*
**ejected**  89:*11, 15*
347:*10*
**ejected,**  89:*17*
**elaborate**  202:*3*
**elaborated**  199:*22*
200:*9*
**elaboration**  200:*11*
**elected**  317:*6, 15, 17*
318:*1, 17*
**electronic**  111:*14*
204:*13*  389:*21*
397:*10*
**Email**  103:*12, 17*
122:*7, 19*  124:*11*
130:*13*  170:*4, 7, 10,*
*15*  177:*4, 19, 21*
178:*15, 20*  189:*16, 19,*
*22*  190:*2*  192:*11, 12,*
*12, 21*  218:*10, 10, 13,*
*15, 15*  219:*5, 5*
223:*23*  226:*11, 16, 22*
228:*4, 6*  240:*9, 22*
242:*14, 15*  243:*13, 18*
247:*18*  252:*6, 9, 13*
262:*20, 24*  263:*4, 8, 9,*
*12*  264:*4, 14, 15*
292:*9*  293:*5, 6*
301:*10*  302:*12, 14*
306:*12*  312:*22*
316:*17, 20*  317:*7*
319:*23*  321:*4, 6*
330:*20, 21*  332:*20*
336:*19, 21*  337:*15*

Deposition of DANIEL PIPES

Lisa Barbounis v. Middle Eastern Forum, et. al.

338:*6, 13*  339:*10*
340:*14*  345:*18*  347:*2*
353:*23, 24*  360:*5, 7*
362:*12*  363:*3, 5*
368:*16*  374:*20*
379:*13*  389:*23*
407:*20*  414:*22*  415:*1*
417:*3, 19, 22*
**Emails**  3:*12, 15, 16,*
*17, 18, 19, 20, 22, 23,*
*24*  4:*4, 5, 6, 7, 8, 10,*
*11, 12, 13, 15, 16, 17*
115:*7*  130:*16*  142:*22*
144:*10*  175:*11*  243:*7*
337:*5, 9*  342:*17*
369:*6, 12, 19*  370:*16*
385:*15*  389:*21*
397:*23*  418:*19*  420:*6*
**Eman**  349:*9*  418:*11,*
*12, 17, 20, 23*  428:*14,*
*16, 17, 21*
**embarrass**  346:*4*
**embarrassed**  152:*1*
**emergency**  102:*2*
**emotions**  308:*19*
**emphasis**  222:*18*
**employee**  26:*20*
27:*17, 20*  70:*14, 17*
108:*22*  109:*2*  114:*10*
116:*11, 17*  117:*3*
118:*23, 23*  119:*3*
148:*9*  189:*12*  238:*20*
285:*21*  286:*2*  287:*18*
332:*24*  377:*21*  379:*5,*
*16, 18*
**employees**  15:*9*
28:*21*  77:*10, 24*  78:*5*
79:*2*  108:*8, 12, 12*
110:*4*  114:*3*  118:*13*
119:*6, 15*  129:*22*
152:*19*  156:*18*
184:*13*  186:*24*
213:*18, 20*  214:*7*
217:*7, 15*  237:*17*
238:*1, 9*  256:*3*  257:*6*
298:*7*  332:*23*  338:*8,*
*9, 10*  342:*3*  367:*19*
376:*10*  409:*1*
**employee's**  186:*3*
237:*14*

**employment**  29:*2*
89:*23*  156:*21*  189:*12*
249:*9, 11*  261:*18*
270:*11*  289:*14, 15*
320:*15, 18*  349:*9*
363:*18*  364:*22*  376:*4*
408:*16*
**en**  164:*9*
**encounter**  95:*10*
**ended**  91:*4*  96:*7*
120:*8*  309:*6*  408:*16,*
*18*
**Endless**  111:*21, 21, 22,*
*22, 23*
**endorse**  310:*18, 19*
383:*4*
**endorsed**  383:*9*
**endure**  321:*19*  331:*18*
**energy**  420:*20*
**enforce**  245:*21*
**enforcing**  327:*24*
**engage**  73:*10*  77:*10*
133:*3*  162:*15, 17*
186:*11*  210:*21*
216:*14*
**engaged**  29:*1*  186:*8*
214:*13*  287:*16*
337:*23*  343:*2*  428:*9*
**engages**  186:*14*
**English**  17:*12*  25:*8*
**enhances**  182:*13*
**enormous**  99:*6*
310:*21*  388:*7*
**entangled**  318:*23*
319:*10*
**enter**  416:*17*
**entered**  158:*23*
168:*20*  284:*16*
**enthusiastic**  85:*6*
92:*4*
**enthusiastically**  92:*13*
**entices**  214:*16*
**entire**  34:*3*  51:*15*
52:*1*  58:*1*  72:*13*
96:*2, 24*  147:*22*
152:*24*  198:*2*  243:*12*
314:*16*  359:*16*  419:*3*
**entirely**  92:*6*  157:*21*
204:*12*  286:*9, 12*

371:*19*  372:*1, 9, 13*
406:*18*
**entitled**  30:*18*  396:*15*
**entity**  10:*12*  155:*13*
**entrust**  424:*14, 16*
**environment**  312:*11*
**equal**  155:*6*
**equals**  300:*3*
**equate**  156:*9*
**era**  348:*3*  355:*15*
**Erica**  109:*17*
**errata**  432:*7, 8, 11, 14*
434:*8*
**errors**  363:*11, 12, 24*
364:*2*
**escalation**  198:*21*
**especially**  8:*17*
245:*21*  346:*5*
**ESQUIRE**  2:*3, 8, 13,*
*21, 23*
**essentially**  130:*15*
142:*16*  151:*13*
252:*23*  254:*20*  347:*9*
**EST**  5:*10*
**et**  1:*6*  5:*13*  173:*24,*
*24*  417:*18*
**ethical**  78:*4*
**evening**  106:*17*
190:*12*  401:*2*
**events**  135:*23*  241:*9*
347:*8*  418:*10*  420:*3*
**eventually**  308:*3*
**Everest**  5:*16, 19*
**everybody**  105:*20*
109:*17*  131:*12*  140:*6*
209:*23*  211:*10*
229:*20*  236:*7*  409:*17*
**everybody's**  335:*9*
**everyone's**  91:*2*
125:*9*  136:*15, 15*
153:*11*  158:*14*  185:*3*
**everything,**  102:*19*
**everything's**  132:*8*
179:*21*
**evidence**  96:*19*
165:*24*  241:*10*
279:*16, 18, 19, 22*
280:*2*  390:*10*  412:*16*
**exact**  38:*8*  75:*18*
152:*4*  170:*20*  174:*21*

190:*2*  218:*10, 18*
219:*4*  286:*15*  402:*4*
**exactly**  13:*2*  64:*21*
102:*22*  105:*24*
170:*19*  189:*6*  258:*15*
303:*20*  312:*23*  323:*4*
387:*16*  400:*19*  413:*2*
426:*21*
**exaggerate**  309:*17*
**exaggerating**  309:*19*
**EXAMINATION**  7:*1*
**examined**  6:*22*
**Examiner**  74:*1, 9, 22*
151:*7*
**example**  187:*3*
210:*22*  310:*12*
311:*21, 22*  340:*21*
375:*22*  388:*13*  420:*3*
**examples**  370:*2*
**excellent**  97:*8*
**exception**  91:*3*
229:*19*  421:*4*
**exchanges**  342:*17*
**excluded**  92:*7*  233:*7*
234:*7*
**excluding**  367:*17*
**excuse**  36:*21*  83:*8*
145:*18*  173:*9*  371:*18*
**excused**  429:*23*
**executive**  37:*12*  63:*23*
**Exhibit**  120:*21, 22*
121:*9*  217:*17*  218:*8*
241:*23*  242:*3*  243:*10*
247:*22*  264:*18*
**exhibition**  121:*23*
242:*12*
**EXHIBITS**  3:*8*  4:*1*
120:*21*  353:*20*
**exist**  401:*19*  422:*17,*
*24*
**existed**  399:*9*
**existence**  9:*16*
**exists**  50:*6*
**expand**  300:*3*
**expect**  422:*9*
**expeditious**  172:*16*
**expeditiously**  134:*11*
171:*9, 22*  217:*19*
239:*5*  428:*24*

Deposition of DANIEL PIPES                                                    Lisa Barbounis v. Middle Eastern Forum, et. al.

expense 310:*18*, *19* 376:5, *8* 377:7, *17* 379:16

expenses 376:*11*, *18*, *20* 377:*12* 378:*22* 379:6

experience 219:*20* 340:6

experienced 227:*3*

expert 185:8, *12*

expires 434:*16*

explain 48:*15* 100:*12* 167:*15* 183:*22* 222:6, *6* 226:5, *19* 259:6 260:*12*, *17*, *20*

explained 64:5 91:*20* 180:*21* 183:*18* 313:*22* 314:*24* 320:*22* 425:*2* 427:*18*

explaining 137:*15*

explanation 168:*11*, *12*

explicitly 132:*2*

exposed 108:*19*

exposition 105:*15*

exposure 288:*9*

expound 222:*3*

expressed 126:*3* 261:*2*

extensive 118:*22* 342:6

extent 20:5, *23* 59:*4* 66:*21* 151:*15* 228:*15* 248:*2* 265:*15* 276:*4* 295:*14* 345:4, *5* 367:5 373:*19* 399:*2* 427:*4*

external 136:*12*

extra 412:*19* 413:*1* 414:*18*

extraordinarily 427:*8*

< F >

face 172:*16* 173:*16* 174:6, *8* 200:*23* 201:*1*, *2* 202:4, *16* 210:4, *11*, *19* 211:4, *7* 246:*1*

faces 134:*14*

facilitate 409:*15*

fact 6:5 12:*20* 15:*8* 54:*14* 74:*16* 85:*2* 86:*22* 92:*3* 95:*10* 132:7 150:7 168:*15* 174:*11* 248:*12* 251:*1*, *3* 267:*19* 276:3, *20* 320:*14* 368:5 379:*7* 405:*2* 420:*6*

facts 86:*3* 99:*6*

fail 432:*16*

failure 272:*9*

Fair 42:*2* 85:*7* 143:*4* 246:*16* 273:*22*

fairly 118:*21*

fall 136:*1* 172:*8*

falls 134:*22*

false 83:*14* 87:*9*, *12*, *12* 202:*11*, *14*, *17*, *21* 203:*12* 380:*19* 382:*17* 389:*18* 390:*9* 393:*4* 396:5 404:*9*

falsehood 85:*23* 92:*16*

fantasy 85:*16*

far 15:*24* 16:*9* 24:*16*, *23* 86:*16* 143:8, *8* 160:*19* 162:*2* 202:2, *19* 289:*19*, *20* 307:*22* 309:*3* 358:*15* 406:*14* 414:*17* 418:*10* 425:*24*

far-reaching 184:*13*

faster 191:*2*

father 137:*1* 138:*15*, *17* 143:*9* 302:*20* 303:*3* 307:4, *12* 407:*4* 408:*11*

fault 158:*2*, *3* 403:*14*

favor 8:*20*

favors 137:*1* 138:*15*

fear 183:*6*

feared 373:*7*

February 168:*16* 169:*9* 420:*14*, *15*

fed 314:7, *15*

Federal 98:*13* 401:*20*

feel 18:*21* 55:*23* 140:*20* 158:7 238:*20*

347:*4* 350:*11* 419:*22* 427:*12*

feeling 140:*23* 216:*16*

feelings 363:*10*

feels 222:5

feet 106:*19*, *22*

fell 367:*15*

felt 137:*4* 140:*21* 164:*11* 182:*18* 189:7

female 79:*2* 116:*11*, *17* 188:*2* 189:*13* 237:*17* 238:*1*, *20* 332:*23*, *24* 342:*3* 367:*19*

fiduciary 282:*8*

fight 99:*10* 160:*14*

figuratively 117:*7*

figure 98:*16* 99:*6* 126:*20* 143:*16* 185:*14* 249:*2*, *10* 307:*17*, *23* 309:*3*, *18* 313:*2* 424:*18*

figured 371:*3*

figuring 142:*18* 417:*11*

file 330:*10* 332:*12* 344:*15*, *24* 415:*20*, *22*

filed 81:*20*, *24* 99:*16* 109:*20*, *24* 110:*1* 349:*18*

filing 5:*3* 427:*10*

fill 98:*11*, *11*

filling 33:*3*

final 417:*6*

finance 368:*22*

finances 29:*2* 320:*10*, *16*, *23* 362:*20*

financially 99:*7*

find 19:*2* 29:*3* 80:*4* 94:*8* 126:*1* 149:*4* 164:*10* 168:*21* 203:*24* 210:7 236:*3* 276:*20* 281:6 295:*2* 296:*17* 297:*20* 304:*12* 305:*14* 308:*2* 309:5 333:*12* 338:*12* 347:5 348:*22*

finding 120:*17* 299:*12* 300:*16* 404:6

419:*15*

finds 131:*12*

fine 14:*12*, *19* 35:*14*, *16* 58:5 65:*15* 67:*13* 85:*15* 101:*22* 119:*22* 129:3, 5, 5 136:*18* 145:7 158:*17*, *18*, *21* 188:*23* 195:5 239:*17* 240:*2* 300:*16*, *20* 303:*11*, *13* 306:*19* 315:*20* 329:*1* 335:*4* 400:*2*, *8* 416:*24* 421:5

finish 8:*20*, *21*, *21*, *22* 20:*4* 29:*16*, *19* 30:*19* 31:2, *4*, *4* 32:*14*, *15* 46:*13* 47:*15* 49:*3*, *5*, *8*, *12*, *17* 54:5 72:*2*, *5*, *6* 84:*9* 101:*9* 124:*18* 128:*23* 137:*24* 163:*3* 201:*10*, *12* 202:*23*, *24* 203:*9* 211:*3* 216:*4*, *6*, *7* 220:*21*, *24* 222:*14*, *23* 224:*10* 225:*15*, *19* 229:*17* 284:*15* 289:*20* 291:5 299:*18* 310:*13* 311:*1*, *4* 315:6 324:*20* 325:*1* 326:*18* 335:*13*, *14* 343:*18* 355:*12* 385:*18* 390:6 391:*2* 393:*12* 394:7 396:*15*, *22* 410:*23*

finished 46:*18*, *19* 47:*24* 48:*4* 59:*23* 60:*2* 87:*15*, *16* 88:*12*, *13* 120:*12* 138:*1* 242:6 324:*18* 326:*20* 391:*21*, *22*

finishing 224:*17* 353:6

FINK 2:*22* 26:*1*, *3* 142:8 189:*18* 245:*18* 263:*21* 264:6

fire 78:*18* 129:*18*, *21* 133:*2* 147:*1* 183:8, *10* 188:*21* 234:*20* 289:8 293:*17*

fireable 312:7

Deposition of DANIEL PIPES                                    Lisa Barbounis v. Middle Eastern Forum, et. al.

**fired** 132:*12, 14, 16*
183:*6* 235:*7, 14*
289:*9, 11* 306:*14*
351:*1*
**firing** 183:*9* 235:*3*
**Firm** 109:*8, 18* 161:*1,
11*
**first** 6:*21* 7:*18* 23:*2*
27:*20* 42:*1* 57:*23*
59:*8, 8* 60:*2, 4, 5, 10,
11, 12, 12, 13* 70:*9*
80:*12* 85:*22* 95:*8*
102:*23* 105:*2* 125:*20,
20* 126:*10* 127:*23*
136:*6* 137:*3, 14*
138:*11* 139:*21, 23*
162:*21* 193:*10, 10, 22*
198:*20* 199:*22* 204:*5*
206:*8, 11* 245:*6*
252:*22* 259:*15* 261:*1*
291:*5, 5, 17* 298:*4*
312:*3* 346:*7* 347:*6,
16* 350:*1* 399:*18, 20*
400:*3* 424:*6*
**fit** 257:*9, 13, 17*
**five** 56:*18* 62:*14*
63:*22* 85:*12* 91:*4*
94:*4* 95:*14, 19* 123:*8*
132:*10* 134:*21*
136:*17* 157:*23*
171:*24* 212:*5* 242:*7*
260:*3* 298:*19* 344:*10,
19* 397:*3* 421:*4*
427:*9*
**five-minute** 101:*8, 20*
**fix** 134:*16*
**fixing** 142:*6*
**focus** 223:*16* 231:*18*
233:*9* 272:*23* 422:*5*
**focused** 284:*24*
298:*10*
**follow** 17:*23* 424:*15,
16, 17*
**followed** 228:*8*
**following** 163:*13, 17*
164:*1* 244:*19* 270:*1*
337:*1* 338:*20* 339:*2*
**follows** 6:*23*
**foot** 96:*5* 171:*1*

212:*14*
**footing** 155:*6*
**force** 236:*4* 349:*7*
375:*14*
**forced** 107:*13* 339:*22*
**forcing** 364:*8, 12, 18,
20*
**foregoing** 434:*4*
**forensic** 210:*21*
**Forever** 197:*23*
**forget** 27:*14* 128:*18*
224:*2* 254:*16*
**Forgetting** 76:*20*
**forgot** 131:*22* 292:*6*
**forgotten** 129:*16*
**form** 5:*4* 10:*21*
13:*17* 14:*3* 16:*16*
17:*2, 17* 18:*6* 24:*12*
26:*17* 33:*14, 20*
37:*23* 38:*15, 19, 21,
22* 40:*19* 61:*24*
65:*22* 67:*24* 71:*3, 15*
74:*11* 75:*1* 76:*8, 23*
78:*1, 12* 79:*4* 80:*17*
82:*4* 86:*9* 87:*24*
89:*13* 90:*9* 91:*22*
93:*7* 100:*5* 103:*1*
105:*11* 107:*4* 108:*13*
111:*16* 116:*12*
123:*21* 125:*6* 128:*9*
129:*24* 131:*5* 132:*19*
133:*13* 134:*2* 137:*2*
140:*16* 141:*4* 144:*7*
146:*1, 7, 15* 147:*2, 15*
148:*5* 149:*7, 16*
150:*3* 151:*2* 152:*7*
153:*15, 23* 154:*9, 17*
155:*18* 156:*12*
157:*16* 158:*9* 161:*5,
12, 20* 164:*23* 165:*9,
19* 166:*4* 170:*6*
171:*5* 179:*22* 181:*2*
185:*10, 19* 202:*9*
207:*20* 208:*14* 210:*9*
212:*23* 214:*4, 20*
215:*14* 218:*23* 220:*7*
228:*10* 229:*4* 230:*17*
231:*3* 233:*21* 234:*21*
235:*11* 236:*19* 237:*7,
19* 241:*17* 244:*5*

246:*2* 253:*5* 255:*10,
18* 256:*5* 257:*8*
258:*12* 259:*14* 260:*7*
262:*22* 263:*1, 16, 19*
266:*13* 269:*1* 270:*7*
273:*4, 10* 275:*10*
277:*20* 278:*2, 11*
279:*24* 280:*8* 281:*16*
282:*7* 283:*23* 284:*10*
285:*5* 286:*24* 287:*21*
290:*19* 291:*22*
293:*23* 295:*6, 12*
296:*2, 22* 297:*4, 9*
298:*5, 24* 299:*1*
303:*6, 18* 304:*21*
306:*1* 307:*21* 310:*4*
311:*11* 314:*20*
317:*10* 319:*2* 322:*13,
20, 24* 326:*23* 329:*6*
333:*20* 334:*1, 10, 19*
337:*16* 342:*5* 346:*17*
348:*11* 354:*2* 355:*24*
361:*1* 362:*21* 364:*10*
366:*23* 367:*13* 369:*8,
14, 20* 371:*23* 372:*15*
374:*14* 378:*8* 384:*13*
406:*21* 411:*8* 413:*13*
422:*21* 423:*3* 426:*9*
434:*7*
**former** 338:*10*
**forth** 29:*3* 54:*7* 74:*5*
175:*11* 198:*13*
222:*20* 234:*10*
277:*16* 280:*3* 309:*11*
385:*15* 421:*2*
**FORUM** 1:*6* 2:*11*
5:*13* 6:*13* 7:*6* 9:*11,
13, 15* 10:*1, 13, 14, 17*
15:*14, 17, 21* 17:*15*
26:*21, 24* 27:*18, 22*
28:*15, 21* 30:*4, 7, 24*
31:*7* 32:*20* 34:*5*
35:*1, 3, 8* 37:*10* 38:*5,
14, 23* 39:*12* 43:*18*
44:*7, 18, 21* 45:*7*
49:*19* 50:*14, 22* 54:*9*
56:*8, 10, 13, 14* 59:*9,
21* 60:*19* 61:*15, 18,
22* 62:*2, 6, 10* 63:*3,
12* 64:*9, 13, 19* 66:*18*

67:*5, 22* 68:*6, 13, 22*
69:*1, 7* 70:*14, 18*
73:*24* 74:*8, 24* 75:*7,
12* 77:*3, 7, 10, 10, 22*
79:*2* 84:*20* 85:*13*
89:*10, 16, 24* 93:*3*
95:*15* 108:*18* 109:*13,
24* 114:*10, 12* 117:*17*
118:*7* 130:*11* 133:*15*
152:*19* 155:*14, 21, 23*
156:*16, 18* 157:*14*
159:*1* 186:*5, 9*
195:*10, 20* 216:*8*
217:*12* 234:*7* 236:*4*
245:*20* 254:*10, 12, 13*
262:*15, 21* 265:*1, 2*
266:*17* 271:*10* 272:*5,
11* 285:*21, 22* 286:*2,
7* 287:*18* 288:*10*
289:*1* 290:*17, 18, 23*
296:*18* 297:*18*
300:*10* 306:*5* 328:*10,
16, 21* 349:*7, 10*
365:*18* 368:*3* 371:*16*
373:*5, 12* 374:*12*
375:*14* 376:*4* 377:*13*
412:*6* 414:*11, 19*
420:*20* 424:*12, 13, 22*
426:*3, 8* 427:*20*
**Forum's** 44:*3* 60:*1*
252:*21*
**Forum-wide** 120:*1*
**forward** 23:*21* 43:*7*
121:*22* 258:*10* 262:*6*
366:*21*
**forward,** 124:*20*
**forwarded** 362:*12*
**found** 75:*14* 95:*19*
108:*16* 113:*17*
137:*18* 179:*4* 183:*2*
204:*6* 225:*5* 310:*17*
317:*24* 333:*23*
354:*19* 366:*17* 402:*2*
403:*13, 14* 428:*12*
**foundation** 76:*9, 24*
78:*1* 79:*4* 80:*17*
81:*2* 82:*4* 86:*9*
125:*6* 128:*9* 131:*5*
132:*19* 133:*13* 137:*2*
141:*4* 146:*15* 148:*5*

Deposition of DANIEL PIPES                                                                 Lisa Barbounis v. Middle Eastern Forum, et. al.

149:*17*  151:*3, 12*
152:7  165:*19*  166:*19*
167:*6*  214:*21*  236:*20*
256:*6*  279:*10*  299:*2,
4*  303:*19*  366:*24*
**foundations**  417:*7, 9,
16*
**Four**  40:*14*  56:*18*
110:*6*  124:*8*  139:*23*
158:*15*  187:*12, 14*
213:*20*  218:*4*  260:*3*
298:*19*
**four-page**  55:*8*
**fours**  21:*2*
**fourth**  262:*17, 18*
**Frank**  111:*9, 11*
119:*12*  298:*17*
**frankly**  57:*12*  313:*20*
420:*23*
**fraternizing**  93:*22*
**fraudulent**  272:*14*
**free**  18:*21*  55:*23*
256:*18*  364:*18*
411:*21*
**frequent**  128:*5*
**friendly**  423:*12*
**friends**  93:*15, 17*
155:*8*  305:*19*
**friendship**  93:*20*
308:*22*
**friendships**  180:*3, 5*
**front**  52:*12*  55:*21*
57:*24*  67:*18*  71:*1, 13*
73:*24*  74:*9*  116:*11*
153:*10*  176:*3*  184:*23*
208:*20*  217:*17*  218:*6*
263:*21*  300:*24*  301:*5,
9*
**fuckin**  277:*3*
**full**  9:*7*  96:*10*
141:*21*  204:*8, 9*
308:*18*  340:*7*  402:*6*
**full-bloomed**  117:*6*
**full-blown**  265:*18*
**full-time**  340:*13*
**fully**  13:*9*  136:*14*
**fun**  59:*19*  371:*17*
**fundraising**  136:*13*
347:*8*  423:*11*

**funds**  186:*23*  267:*2*
417:*11*
**funny**  23:*11*
**further**  96:*3*  199:*20*
289:*22*  294:*7*  307:*23*
340:*5*  342:*10*  358:*15*
375:*10*
**future**  100:*24*  101:*11*
188:*6, 19*  248:*16*
256:*18, 24*  349:*2*
372:*2, 4, 10*  375:*13*
**future,**  371:*20*

**< G >**
**Gabrielle**  70:*16, 19*
296:*12*  297:*2, 19, 22*
298:*18*  301:*4*  304:*1,
12, 14, 24*  305:*10, 12,
22*  306:*5, 8*  307:*2*
311:*24*  406:*20*  407:*2,
12*  408:*2, 10*
**gain**  267:*18*
**gala**  158:*19*
**Gambill**  104:*15, 17, 18*
**games**  55:*15*  139:*14,
16, 21, 24*  140:*7, 9*
**Gary**  104:*15, 15, 16*
304:*7*  349:*9*
**gathering**  142:*17*
**gearing**  370:*5*
**G-E-L**  9:*23*
**gender**  156:*19*  217:*15*
**general**  34:*3*  61:*12*
230:*23*
**generalizations**  341:*11*
**generally**  234:*5*
269:*3*  377:*20*  395:*20*
**germane**  371:*1*
**getting**  36:*15*  43:*10*
56:*22*  74:*12*  81:*16,
16*  153:*9*  175:*16*
208:*13, 17, 24*  234:*8*
239:*23*  272:*16*  309:*8*
310:*14*  316:*1*  349:*24*
353:*15*  401:*9*  407:*17*
**giant**  97:*6*
**gifted**  414:*15*
**gig**  418:*10*
**ginned**  203:*1*
**gist**  211:*20*

**give**  7:*13*  30:*12*  38:*8,
9, 18*  43:*14, 15*  50:*22,
23*  73:*15*  74:*20, 22*
75:*3*  88:*6, 11, 14, 17,
24*  122:*23*  123:*4*
168:*11*  202:*1*  221:*23*
236:*15*  247:*3, 3*
283:*5*  290:*17*  310:*11*
311:*21*  329:*9, 12*
351:*22*  356:*2*  358:*2,
6, 11*  374:*4*  375:*5*
378:*4*  383:*10*  388:*13*
411:*7*  423:*23*  424:*2,
9*  425:*6, 8, 8, 15, 15*
**given**  86:*17*  98:*16*
99:*6*  406:*10*  431:*8*
434:*6*
**gives**  422:*5*
**giving**  110:*22*  136:*24*
267:*21*  284:*20*
311:*22*  321:*21*  336:*3,
5*  370:*3*  407:*22*
423:*21*  425:*14*
**glad**  50:*16*  260:*8*
**go**  18:*24*  20:*6, 23*
23:*21*  30:*21*  32:*7, 14*
33:*7*  38:*19*  40:*3, 5*
41:*14*  42:*17*  47:*18*
49:*16, 17*  52:*3, 5, 9, 9*
56:*1*  58:*24*  59:*19*
60:*5, 9*  62:*13*  66:*22*
85:*20*  87:*6*  88:*23, 23*
96:*3*  97:*18*  101:*9*
102:*2*  124:*4, 5*  127:*6*
137:*24*  144:*19*
146:*16*  153:*7*  162:*24*
163:*3, 4*  164:*20*
166:*2, 2*  167:*13, 18*
168:*6*  169:*11*  172:*2,
2*  176:*2*  180:*6*
182:*24*  186:*9*  195:*5*
200:*12, 17*  203:*8*
216:*7, 15*  218:*5*
219:*23*  221:*8*  222:*14*
223:*14*  224:*11, 12, 13*
225:*20, 24*  233:*13*
236:*13*  247:*6, 7*
259:*12*  260:*21*  262:*6*
265:*16*  269:*4, 6*
271:*8*  277:*10*  282:*16*

286:*3*  296:*6*  300:*3, 8,
8*  302:*2*  306:*15*
307:*23*  309:*2*  311:*7,
8*  318:*5, 8*  323:*6, 13*
324:*23*  325:*7, 19*
333:*17*  335:*19*
344:*22*  346:*23*
350:*17, 18*  359:*1*
374:*5*  387:*6, 9*  388:*6,
24*  390:*12, 14, 15*
392:*11, 13*  406:*3*
414:*8*  415:*11*  424:*5*
425:*3, 5, 17*  427:*9*
**god**  223:*14*
**goes**  40:*22*  41:*8, 10*
54:*11*  77:*14*  215:*5*
269:*2*  337:*24*  361:*21*
425:*19, 20, 20*
**going**  32:*10*  33:*2*
36:*20*  41:*3*  58:*22*
59:*2*  71:*23*  81:*15*
83:*24*  91:*7*  95:*9*
96:*8*  117:*5*  121:*22*
124:*20*  133:*7, 9*
135:*16*  140:*4*  149:*18*
169:*17*  172:*13*
181:*20*  184:*18*  186:*7*
199:*16*  212:*9*  224:*7*
233:*9*  240:*8*  256:*3*
258:*9*  265:*10*  280:*3*
292:*3*  297:*1, 16*
305:*14*  308:*16, 21*
310:*22*  313:*2*  323:*19*
329:*12*  331:*23*  332:*1*
334:*23*  344:*10, 14, 19*
346:*15*  353:*8*  367:*9*
370:*18*  414:*6, 20*
415:*18*  424:*22*  426:*7*
427:*4, 11*
**GOLD**  2:*13, 23*
**gonna**  7:*14, 19, 20*
8:*10*  16:*4, 4, 8*  17:*14,
19, 23*  18:*10, 11, 16,
16*  19:*15, 16, 19, 21,
23*  20:*2, 10, 14, 18, 19*
21:*5, 10, 15*  22:*2*
24:*5, 10, 15, 18*  30:*5,
8*  31:*2, 16, 20, 22*
35:*23, 24*  36:*6, 9, 9,
11*  41:*4*  42:*19, 22*

Deposition of DANIEL PIPES                                           Lisa Barbounis v. Middle Eastern Forum, et. al.

48:*8, 21*  49:*8*  52:*2, 3,*
*5*  54:*20, 21, 22, 24*
55:*1, 7, 10, 11, 12, 16*
56:*19*  57:*7, 8, 9, 11*
58:*3*  59:*7*  66:*20*
71:*2*  72:*8, 14*  73:*10,*
*11*  74:*5*  75:*10, 19*
84:*9, 15*  86:*8, 9, 10*
88:*11, 14*  89:*12*
96:*14*  107:*4*  112:*6*
122:*19*  124:*23*  133:*2,*
*3, 4, 8, 11*  134:*16, 16*
137:*4, 16*  140:*22*
145:*3, 4*  149:*21*
154:*14*  160:*13, 14*
162:*8*  167:*1*  174:*9*
189:*5*  195:*1, 3*  196:*6,*
*13*  200:*16*  209:*9*
210:*15*  218:*7*  220:*22*
221:*6*  222:*10, 11*
223:*3, 4, 14, 15, 16*
224:*1, 5, 12, 13*
225:*20, 24*  228:*17*
236:*6, 14*  240:*5, 16,*
*24*  244:*13, 23*  247:*21*
248:*6*  257:*21*  258:*18,*
*19*  260:*13*  262:*9*
263:*8*  271:*15, 17*
276:*2, 19*  277:*3*
283:*2*  284:*11, 19*
292:*5*  293:*4*  311:*18*
315:*13*  319:*12*  323:*8,*
*9, 12, 21*  324:*22, 23*
325:*3, 7, 8, 17*  329:*8,*
*9, 24*  330:*9, 9*  332:*4,*
*11, 11, 12, 15*  335:*19*
341:*2*  342:*22*  343:*18,*
*19*  344:*15*  345:*9, 12*
351:*12*  353:*22*  357:*2,*
*6, 6*  358:*2, 24*  359:*1,*
*3, 10, 18*  360:*6, 10, 22,*
*24*  362:*9*  365:*6*
368:*15*  371:*4, 8*
374:*19*  381:*10, 14*
382:*9*  383:*19*  387:*6,*
*7*  391:*2*  392:*20, 21,*
*22*  393:*18*  394:*14*
395:*7, 8, 22*  396:*12*
397:*6*  401:*24*  402:*21,*
*23*  403:*5, 7*  404:*15*

413:*11*  414:*14*
415:*11, 20*  419:*2*
423:*8, 9*  424:*9, 10, 23*
426:*2, 9, 21, 22, 23*
427:*6, 6*
**good**  14:*6*  49:*9*  56:*4*
81:*16*  85:*5, 6*  93:*15*
97:*4*  157:*24*  160:*12,*
*16*  181:*11*  196:*11*
239:*24*  313:*21*
318:*23*  319:*9*  333:*22*
340:*23, 23*  359:*14*
431:*4*
**Goodman**  70:*20*  80:*5,*
*7, 16*  81:*5, 11*  82:*3*
132:*17*  133:*4*  152:*16*
153:*18*  235:*24*  236:*1*
237:*4, 11*
**Gotcha**  122:*5*
**gotta**  14:*10*  30:*1*
44:*24*  47:*11*  52:*22*
81:*17, 18*  82:*21*
84:*15*  102:*2*  120:*21*
145:*2*  209:*21*  233:*12*
234:*17*  235:*21*
238:*15*  263:*9*  278:*20*
286:*9*  344:*4*  393:*12*
401:*8*
**governance**  50:*24*
**governing**  189:*11*
**Government's**  6:*1*
**Governors**  44:*22*
*45:2, 5*  60:*20*  61:*1, 9,*
*13, 15, 18, 23*  62:*3, 5,*
*11, 16, 19*  63:*3, 12, 19,*
*24*  64:*1, 7*
**GR**  249:*8*
**Grace**  1:*15*  5:*18*
221:*8*
**grant**  265:*23*
**granted**  346:*14, 24*
**Grayson**  349:*9*
**great**  101:*23*  132:*1, 8*
142:*3*  201:*22*  238:*10*
339:*5*  419:*20*  422:*4*
**green**  81:*14, 18*
233:*10*
**Gregg**  2:*16, 21*  6:*18*
7:*6*  12:*15*  13:*24*
14:*6*  24:*6, 10*  25:*17,*

*24*  26:*2, 16, 20, 24*
33:*5, 9, 12, 15*  34:*12*
37:*9*  45:*12*  62:*15, 18,*
*21*  63:*6, 14, 18*  64:*6*
68:*19, 21*  70:*24*
71:*12*  74:*21*  75:*2, 10*
77:*24*  78:*5, 18, 22*
83:*17, 18*  84:*19*  85:*1,*
*5*  86:*19*  87:*11*  89:*10,*
*15, 23*  90:*16*  92:*5*
93:*11*  95:*6*  96:*5, 6, 7,*
*7, 8, 8, 9*  97:*1*  104:*13*
105:*16, 17*  107:*7, 10,*
*13, 23, 24*  108:*2*
109:*2*  111:*3, 5, 21*
113:*8, 22*  114:*2, 11,*
*18*  115:*7, 20*  116:*10,*
*16, 20, 23*  117:*13*
119:*16, 20*  121:*19*
122:*8*  123:*2*  124:*11*
126:*3, 14*  127:*4, 16*
128:*5*  129:*5, 19, 22*
130:*24*  131:*14*  132:*9,*
*12*  133:*2*  136:*5, 11,*
*22, 23*  137:*6, 19, 22*
138:*2, 14, 22*  139:*1, 2,*
*4, 6*  143:*19, 19*  144:*2,*
*6*  145:*21*  146:*13*
147:*6*  148:*16, 23*
149:*1, 1, 3*  150:*12, 18*
151:*8*  152:*17*  153:*2*
154:*5, 24*  155:*9, 12,*
*20*  156:*10, 24*  157:*19*
158:*21*  159:*15*
162:*14*  163:*15*
164:*16, 17, 21*  168:*9,*
*14, 21*  169:*10, 17, 24*
170:*1*  171:*17*  173:*6,*
*9*  177:*7, 9*  179:*8*
181:*17*  183:*12*  184:*6*
186:*13, 19*  188:*5*
189:*15*  192:*18*  193:*2,*
*14*  197:*22*  198:*4, 17*
200:*24*  202:*7*  203:*19*
210:*13, 18*  212:*14, 15,*
*18*  213:*23*  214:*16*
217:*11*  219:*24*  225:*9*
227:*24*  228:*13, 17, 23,*
*24*  229:*1, 16*  230:*15,*
*19, 22*  232:*3, 20*

233:*19*  234:*4, 20*
235:*1*  236:*3, 12*
238:*17*  240:*10*  243:*6,*
*24*  244:*12, 22*  247:*9*
248:*8, 13*  249:*19*
250:*3*  251:*1, 3, 21*
252:*20*  253:*14*  254:*4,*
*14, 23*  255:*8*  256:*2,*
*20*  257:*2, 5*  258:*7*
259:*5*  262:*21*  263:*5*
273:*20*  275:*7, 24*
276:*6*  278:*8*  292:*19*
293:*17*  294:*5*  295:*3*
298:*21*  299:*6*  300:*10*
301:*14, 15*  302:*10, 15,*
*20*  303:*8, 23*  304:*7, 9,*
*9, 15, 22*  305:*15, 22*
306:*4*  307:*1*  308:*7,*
*12, 15, 18*  309:*4, 17,*
*24*  310:*1, 1, 18*  312:*3,*
*4, 16, 20*  313:*9, 16, 24*
314:*11, 19, 23*  320:*4,*
*17*  321:*1, 12, 17, 20,*
*22*  329:*4*  333:*2, 9*
334:*6, 9, 22*  336:*14,*
*23*  337:*11, 12, 12*
338:*3*  339:*4, 6, 7, 8,*
*10, 15, 22*  340:*4*
341:*7, 9*  343:*8*  347:*6,*
*10, 15*  348:*23*  349:*3*
350:*4, 19, 24*  351:*3*
352:*16, 19*  354:*4, 5,*
*13*  355:*17*  356:*16*
360:*8, 17*  361:*4, 24*
362:*12, 13, 17*  363:*11,*
*12, 23*  364:*6, 16*
365:*17*  366:*20*  367:*9*
368:*16*  369:*12*
370:*11, 12, 12, 12, 18,*
*21*  371:*1, 5*  374:*24*
375:*3, 13, 18*  377:*1, 9*
380:*2, 18*  382:*16*
385:*1*  386:*6, 8*
389:*18*  390:*1, 9*
407:*1, 21*  418:*12*
420:*19*  421:*3*  422:*7,*
*12*  423:*8*  428:*4, 5, 11*
**Gregg's**  37:*20*  63:*24*
114:*20*  127:*19*
138:*20*  139:*3*  140:*7*

Deposition of DANIEL PIPES                          Lisa Barbounis v. Middle Eastern Forum, et. al.

207:16  209:17
211:16  252:24
271:10  308:10, 18
310:2, 10, 16, 19
311:10, 19, 20  312:8
320:15  332:22  337:6
375:16  380:5, 17
382:15  406:11
**grievances**  227:24
**gross**  22:22  429:12
**ground**  254:1
**grounds**  172:20, 20
211:11  402:13
**GROUP**  2:1  108:16
109:8, 12, 15  110:2, 8,
12  147:7  158:23
243:13  340:22
**Guardian**  288:22
371:12
**guess**  23:12, 14
109:21  110:11
120:22  140:23
242:10  244:20
246:10  247:22
248:14  251:16, 18
252:4  295:11  424:24
429:12
**guesses**  295:4
**gunning**  312:8, 8
337:21
**guy**  210:15  286:23
414:19
**guys**  12:3  13:14
30:1, 12  37:7  39:5
44:12  47:11  48:8
66:24  82:21  101:19
102:1  110:14  112:6
122:18  144:20  161:3
168:3  178:3  205:12
209:7  221:4  249:1, 7
263:8  265:12  310:14
358:2  359:12  381:7
394:5  397:5  401:8
424:21  426:1, 7, 20, 24

< H >
**hair**  234:9
**half**  191:17  265:20
277:9  335:20  358:3,
8  361:23  363:5

370:24  372:22
426:24
**halfway**  394:19
**hand**  54:12  193:21,
23  195:20  199:20
201:5  205:1, 3
206:10  207:16
212:18  234:11
314:14  431:11
**handed**  251:8, 8
413:2
**handing**  54:3
**hand-in-hand**  347:9
375:2, 3
**handle**  140:2
**handled**  53:24
217:22  238:22  239:4,
4
**handles**  53:22  54:6
**hands**  239:10  302:10
312:10  371:2
**handwritten**  95:2
103:14  139:24
170:14  177:4  178:12,
14, 19
**handwrote**  125:22, 23
**Hang**  179:7
**happen**  31:22  37:15
55:11  203:15, 16
213:15  247:17
250:11  258:18
266:10  383:7, 8
**happened**  13:14
20:24  50:22  64:22
92:15  94:22  95:5
96:13  106:12, 15
131:8  132:17, 20, 21
135:11  159:9  164:8
170:13, 17  174:10
202:22  203:14, 18, 22
206:14, 21, 23  210:7
213:15  237:12
239:21  259:24
260:12  284:24  339:2
354:18  355:18, 22
366:10, 11  371:22
372:19, 23  390:18
397:20  406:7  407:24
412:18

**happening**  322:11
345:2
**happens**  359:10
396:11
**happiness**  91:2
**happy**  8:14  30:12
43:4  123:9, 10, 11, 14
129:4  153:1, 2, 4
197:24  198:1  199:4
211:10  219:15
251:21  277:11  281:6
380:14  412:4, 8
**harass**  295:9, 24
**harassed**  298:20, 22
303:23  304:2
**harasser**  246:1
**harassment**  79:14
106:3  110:19  116:18
117:18  118:8, 14, 15
149:12, 15  154:5, 16,
22  157:15  164:12
177:23  211:15
215:12  233:5, 6
238:21  245:24  294:6,
8  295:4, 10, 23  299:6
306:14  322:12, 15
328:1  332:23  336:22
337:1, 3  349:5
366:21, 22  367:17
384:11
**hard**  110:18  115:14
117:8  135:5  137:12
171:3, 7  266:10
290:6  338:10
**harmful**  186:9, 11, 15,
16, 18, 19
**harsh**  124:15
**hating**  111:21, 22
337:22
**have,**  112:19
**head**  21:3  31:6
32:22  93:12  119:14
134:8  184:24  186:20
248:23  250:19  271:6,
10  343:7
**health**  119:24  120:3
123:5, 10, 12  366:14
367:10  368:2, 4, 9
429:3

**hear**  8:18  14:12, 14,
19  35:13, 14, 16
44:24  54:4  69:23
74:12  79:7  81:8
83:8  87:1, 4  90:19
91:8  94:6  95:16, 17
105:21  106:10
107:24  108:5, 24
115:15  118:17
120:10  130:4  137:11
138:22  141:23
144:15  175:13  178:3,
3  230:7  244:6
245:15  257:19, 22
276:17, 23  278:16, 16,
21  286:20  287:7
290:1, 3, 6, 9  300:11,
15  304:16  306:15
308:14  317:2, 21
318:4  330:6  332:17,
17  337:11  355:10
363:8, 19  364:19
376:14  408:8  409:12
414:12  428:3
**heard**  73:23  76:3
80:8, 11, 12  81:3
91:14  94:3, 9, 12, 14,
15, 16, 24  95:1, 9, 17
102:23  108:1, 9
109:5  114:9  115:1,
18  128:1, 2  133:6, 12
138:11  151:6, 9
185:17  207:6, 18, 24,
24  220:1  237:1
238:11  267:19
275:24  276:6, 8
308:19  337:10, 11
355:8, 12, 13  400:22
418:18  420:4
**hearing**  76:7  94:20
102:17  250:18
**hearsay**  152:14
**heart**  155:9
**he'd**  306:14
**held**  25:19  85:3
91:10  117:20, 22
264:5  325:22  339:16
354:8
**hell**  345:7
**Hello**  341:22  428:22

Deposition of DANIEL PIPES                                    Lisa Barbounis v. Middle Eastern Forum, et. al.

help  63:*17*  167:*12*
197:*17, 19*  241:*12*
267:*5, 17*  272:*21, 23*
276:*16*  283:*9*  290:*17*
409:*15*  414:*21*
417:*17*  422:*12*
423:*11*
helpful  12:*16*
helping  267:*18*
helps  272:*24*
henceforth  256:*16*
258:*19*
here,  115:*3*
heroes  134:*15*  183:*10*
hesitant  285:*16*
Hey  184:*9*  258:*8*
263:*7*  290:*24*  332:*16*
377:*17*  414:*1*
hi  425:*5*
hid  92:*2*  163:*9, 10,*
*15, 15, 19*  164:*3, 18*
hide  163:*11*  182:*2*
hiding  163:*12*  164:*4*
169:*13, 22*  190:*23, 24*
high  238:*13*  308:*19*
422:*13*
higher  69:*1, 6, 10*
highest  69:*11*
highlight  60:*17*
223:*21*
highlighted  240:*14*
360:*14*
highly  43:*12*  202:*5*
339:*20*
hint  183:*9*
hire  343:*16, 19*  388:*8,*
*10, 11*
hired  388:*18*
hiring  340:*4*  345:*15*
history  92:*14*  332:*22*
338:*8*  375:*24*
hit  95:*6*  135:*9*  136:*5,*
*16*  143:*14*  170:*1*
173:*6, 9*
Hm  168:*24*
Hold  22:*20, 20*  25:*22*
26:*5, 10, 13*  29:*16*
41:*6*  46:*17*  57:*2*
86:*7, 7, 8*  161:*20, 21*

194:*14*  270:*14, 14*
298:*24*  414:*5*
Hollin  45:*11*
Hollin's  45:*17*
honest  9:*4*
honestly  72:*12*  350:*9*
honesty  218:*3*
hope  261:*15*  342:*21*
hostilities  354:*5*
356:*16*  360:*9, 18*
361:*20*  362:*1*
hotbed  309:*9*
hotel  77:*15*  150:*12*
151:*8*  165:*18*  169:*11*
214:*17, 18*  236:*14*
hour  27:*3*  54:*22*
55:*8, 10*  191:*17*
240:*23*  335:*20*  356:*3*
415:*7*
hours  57:*8*  58:*4*
71:*23*  265:*20, 20*
332:*15*  345:*8*  358:*3,*
*8*  365:*4*  416:*2*
426:*21, 24*
house  142:*8*
How'd  411:*10*
huge  350:*7*
Huh  406:*22*
human  119:*7*  148:*10*
149:*24*  250:*19*  328:*6*
hun  404:*7*
hundred  98:*23*
380:*18*  382:*16*
389:*17*  390:*9*  399:*23*
400:*5*  402:*2*  404:*8*
husband  106:*8*  174:*5*
hush  296:*24*
hypothetical  76:*24*
150:*4, 6*  166:*16*
215:*1*  234:*22, 23*
236:*20*  238:*24*  246:*4*
279:*9*  294:*9, 14*
296:*1*  327:*10, 14, 23*
hypotheticals  71:*23*
72:*8, 20, 23*  73:*5, 9,*
*13*  133:*3*

< I >
idea  13:*9, 10*  14:*6*
84:*24*  85:*2, 6*  93:*15*

113:*16*  126:*19*
128:*17*  135:*1*  137:*16*
139:*8*  140:*3, 21*
156:*4*  180:*11*  181:*11*
206:*23*  277:*5, 16*
307:*5*  323:*18*  344:*9*
406:*16*  413:*24, 24*
417:*10*
ideal  153:*6*
ideas  142:*16*  422:*4*
identify  52:*21*  59:*13*
68:*15*  86:*12*
ignorance  261:*2*
ill  126:*5*
illegal  79:*3, 9, 9, 13,*
*14, 17*
imaginary  198:*22*
199:*19*
imagination  83:*7, 9,*
*10*
imagine  239:*6*
Imagined  83:*4*  309:*8*
immediately  132:*16*
178:*24*  235:*7*  238:*18*
250:*12*  380:*4*
immunity  355:*18, 21*
356:*2*
imperative  432:*13*
implausible  203:*24*
implemented  320:*3*
implicate  330:*24*
implicates  329:*21*
implication  101:*1*
imply  188:*21*
implying  84:*24*
188:*17*
impolite  315:*9*
import  310:*21*
important  7:*24*  8:*16*
9:*3*  46:*7, 8*  47:*19*
49:*16, 18, 21*  89:*5*
125:*12*  127:*1*  128:*7*
217:*4*  269:*8*  355:*9*
424:*18*
importantly  374:*22*
imposed  366:*20*
impossible  290:*9*
improprieties  253:*1*
impugn  168:*21*

inaccurate  108:*19*
inadvertent  402:*12*
inappropriate  92:*20*
106:*2*  107:*2, 11, 17*
169:*10*  212:*20*
219:*18*  220:*12*
222:*16*  227:*11*
302:*15*  303:*2*  386:*23*
inappropriately
107:*14*
Inaudible  24:*7*  27:*10*
44:*23*  51:*15*  58:*4*
73:*18*  78:*7, 13*  79:*5*
81:*7, 17*  86:*24*  87:*13*
90:*18*  93:*21*  95:*14*
99:*8*  100:*15*  106:*9*
108:*4*  111:*1*  113:*1*
115:*11, 13*  118:*16, 20*
139:*11*  141:*6, 22*
144:*13*  148:*24*
154:*20*  156:*2*  172:*19*
174:*10*  204:*13*  269:*8,*
*23*  270:*2*  288:*4*
298:*3*  300:*6, 9*
311:*21*  314:*9*  315:*5*
318:*3*  343:*6, 17*
350:*15*  376:*13*  379:*9*
388:*22*  409:*14*
413:*24*  414:*4, 11*
incessantly  142:*2*
incident  107:*15*
192:*22*  208:*9*  219:*21*
227:*4*  241:*8*  312:*17,*
*18*
incidents  390:*11*
include  40:*16*  103:*20*
148:*11*  357:*14*
included  150:*7*  247:*9*
412:*9*
including  155:*3*
239:*23*  249:*14*
262:*16*  343:*2*  354:*9*
363:*13, 15*
income  267:*18*  368:*5*
incomplete  76:*24*
214:*24*  234:*22*
238:*23*  284:*20*
393:*19*
incomprehensible

Deposition of DANIEL PIPES                                      Lisa Barbounis v. Middle Eastern Forum, et. al.

276:3, 21
**inconsist** 206:3
**inconsistencies** 206:4
291:21
**inconsistency** 205:8,
14, 18 206:1
**inconsistent** 194:1, 2
203:17
**increase,** 419:8
**increased** 199:19, 20
219:21 227:4
**incredible** 342:21
**incumbent** 135:11
**INDEX** 3:1
**indicate** 6:7 166:6
167:23 168:6 274:10
**indicated** 136:3
158:17 173:23 431:5
**indicates** 166:11, 12
168:8 389:24 390:8
**indicating** 153:1
**indication** 164:13
183:5, 7, 7
**indiscretions** 191:5
**Indistinguishable**
21:13 25:15 29:14,
23 30:10 32:2 42:6
47:1, 9 51:20 52:16
53:2 65:12 67:10
72:17 82:17 100:17
101:3 121:3 152:10
158:11 159:22 167:8
168:1 173:11 188:10
190:16 194:18
195:16 205:10
207:14 209:5 211:18
214:10 221:2, 11
233:15 235:16
236:10 239:13
257:24 260:10
267:10 269:20
270:24 274:20
277:13 282:1, 19
288:1 291:2 299:16
302:4 305:2, 8 316:3
322:2 324:11 325:5
327:18 331:9 332:7
335:6 338:23 341:19
343:22 351:16 353:2,
13 356:8 357:24

358:13 365:11 382:7
383:17 384:22 386:3,
20 390:3 391:8, 13
392:5, 15, 24 393:22
394:2, 24 395:14
397:1 399:6, 13
401:16 403:20 404:1,
19 411:13 421:16
426:15
**individual** 16:11 28:1
**individually** 164:14
**individuals** 126:13
152:14 158:15
185:12
**indulgence** 120:19
**inflicted** 85:1
**influence** 239:22
**inform** 403:13
**information** 32:16
51:24 127:9 136:4
142:17 199:8, 9, 12
202:19 226:20
261:11, 11 267:1, 5,
17 268:4, 5, 16, 17, 20,
21 269:8, 11 270:6
274:5, 14 312:2
313:1 315:3 365:5
406:15 407:17, 23
**informational** 262:1
**informed** 261:8
**informing** 261:6
**inherent** 404:10
**initial** 87:8 99:6
136:3 193:4, 5, 6
205:1 286:8
**initially** 243:24
247:7 288:5 367:23
**initiate** 84:21
**initiated** 84:22 87:14
90:14, 15 92:12
261:9 307:24 308:2
355:15
**initiation** 83:19
342:11
**initiative** 83:17, 18
86:23
**in-office** 124:13, 15
127:16 128:2
**inquire** 199:9 211:3

216:15
**inquired** 199:16
**inquiries** 311:23
**inquiry** 174:6 211:6
241:6
**inquisitive** 105:19
**ins** 425:12
**instance** 186:6
406:11 428:10
**instances** 110:7
240:17, 19 336:22
**institution** 216:15
**instruct** 86:11
166:21 167:5
**instructed** 196:13
**instructing** 42:23
166:19 404:12
405:20
**instruction** 162:1
167:2, 20 196:5
**instructions** 7:14
74:12 163:13, 17
164:1 375:6 432:1
**instructs** 73:12
**insurance** 232:15
366:14 367:10 368:2,
4, 9 429:3
**intellectual** 28:24
**intend** 341:1
**intense** 94:5 309:10
312:12
**intensely** 142:17
229:17
**intention** 16:3, 23
18:4 19:4, 8 183:9
247:10, 14
**intentionally** 344:17
**intentions** 19:13 21:7,
9
**intents** 339:15
**inter** 46:11
**interaction** 183:21
**interactions** 202:1
272:12
**intercourse** 162:18
**interest** 13:15 349:4
350:13 420:20
**interested** 76:7
334:17, 21 336:9

355:23 417:9 431:9
**interfere** 387:4
**interject** 387:4
393:11
**intern** 147:24 212:16
214:17 304:12 306:5
**internal** 68:12, 14
265:1 304:6
**interpersonal** 312:13
**interpret** 172:13
220:3, 9
**interpretation** 162:20
**interpreted** 227:15, 16
**interrogatories** 66:1,
7, 11
**interrogatory** 28:10
**interrupt** 18:11 19:5,
6, 16, 23 20:3 21:15
22:1, 8 30:5, 8, 19
77:6 84:4, 15 114:23
171:21 210:15
227:23 311:5 356:10
385:21 390:23
393:11 410:9, 17
**interrupted** 21:21
32:10 54:2 84:12
224:1 345:6 388:23
**interrupting** 21:24
22:3 29:11 31:14, 16
46:11 84:8 110:11
200:15 201:8 358:16
391:19
**interruption** 209:8
**interruptions** 8:24
**interview** 103:23
104:3, 5, 9 105:1, 2
143:22 144:11 148:7
418:12 419:19
**interviewed** 103:6, 17,
21, 21 104:12, 22
141:16 142:15 148:1
**interviews** 105:4
142:12
**intimate** 154:15
**introverted** 419:18
**invest** 39:5
**invested** 39:12 40:6
**investigate** 133:8, 11,
23 143:13 241:19
293:15 297:17 298:3

Case 2:19-cv-05030-JDW   Document 126-3   Filed 04/20/21   Page 138 of 179

Deposition of DANIEL PIPES                           Lisa Barbounis v. Middle Eastern Forum, et. al.

307:*12*  309:*13*
340:*12, 13*  355:*2*
384:*10, 15*  385:*3, 5*
388:*21*
**investigated**  71:*21*
74:*2*  75:*17*  134:*11*
136:*10*  152:*23*
156:*24*  157:*9*  158:*13*
178:*23*  179:*2*  184:*15*
209:*22*  296:*16*
297:*14*  304:*20*  385:*7*
**investigating**  237:*13*
304:*22*  384:*7*  385:*9*
**investigation**  141:*13,
14, 16, 17*  142:*20*
144:*12*  148:*2*  179:*14*
210:*21*  240:*10*
241:*15*  242:*17*
313:*15*  314:*12*
380:*16*  382:*5, 15*
383:*8, 13*  384:*2, 5*
402:*2*  404:*8*
**Investigator**  179:*18*
388:*8, 10, 11, 19*
**investment**  44:*3*
**invite**  245:*5, 13, 14,
16, 17*
**invited**  117:*10*  163:*4*
168:*14*  169:*18*
171:*18*  243:*24*  247:*7*
**involve**  320:*16*
330:*15*
**Involved**  17:*4, 6, 10*
20:*13*  24:*5*  43:*10, 11*
89:*6*  158:*16*  234:*19*
286:*1*  347:*8*
**involves**  281:*21*
**irony**  18:*13*
**irrelevant**  22:*23, 24*
**IRS**  38:*22*
**Israel**  94:*22*  95:*5, 11*
106:*6*  135:*11, 22*
163:*4*  168:*14*  169:*11*
170:*2, 13, 17*  173:*21*
174:*3*  180:*14*  182:*1,
5, 24*  190:*23*  191:*6*
219:*21*  227:*4*  390:*12,
15, 18*  398:*3*  401:*4, 5*
**issue**  56:*10*  96:*14*
119:*24*  120:*1*  125:*15*

161:*23*  187:*12*  198:*3,
14*  213:*4, 5*  217:*19*
220:*17*  241:*21, 22*
267:*21, 21*  297:*7*
305:*16*  312:*6, 7*
426:*23*
**issued**  113:*4*  297:*18*
**issues**  86:*12*  106:*1*
120:*5*  152:*22*  153:*10*
155:*3, 3*  171:*12, 13*
187:*9, 11*  213:*9*
217:*16*  234:*14*
269:*17*  272:*23*
311:*23*  315:*1*  319:*10*
355:*1*  363:*13*  381:*6*
**issues,**  318:*24*
**it'd**  35:*12*
**it'll**  121:*13*
**its**  67:*23*  79:*19, 21*
80:*14*  237:*1*

**< J >**
**Jack**  346:*8*
**James**  40:*8, 9, 13, 16*
**January**  10:*7, 11*
384:*12*
**jcavalier@cozen.com**
2:*10*
**Jeannine**  56:*5*
**job**  33:*3*  68:*17*
111:*11*  130:*13*
136:*24*  138:*18*  140:*1,
2*  156:*9*  185:*23*
186:*2*  216:*13*  217:*6,
6, 10, 13, 14*  225:*12*
245:*20*  268:*13*
285:*23*  286:*6*  301:*23*
308:*18*  312:*9*  328:*2,
5*  332:*21*  334:*16*
335:*22, 24*  336:*9, 11,
11, 12, 13, 14, 15*
338:*12*  340:*23, 23*
356:*4*  379:*2, 4*
**jobs**  31:*7*  75:*6*
182:*18*  337:*22*
**Jon**  6:*12*  18:*9*  31:*22*
35:*13*  36:*8, 21*  49:*9*
54:*21*  65:*15*  66:*23*
82:*13*  84:*5, 11*
101:*22*  134:*5*  145:*1*

161:*23*  167:*13, 21*
195:*18*  196:*11*
224:*14*  226:*5, 10*
246:*11*  272:*1*  315:*23*
326:*3*  330:*10, 20*
335:*19*  344:*4*  358:*18*
398:*19*  401:*7*  405:*6,
9*  426:*17*
**JONATHAN**  2:*8*
**Judge**  18:*10, 18*  41:*5*
42:*17, 24*  43:*10, 11*
54:*21, 22, 24*  55:*2, 16,
17, 18*  56:*4*  57:*1, 16,
22*  58:*19*  73:*12*
160:*22*  162:*5*  167:*1*
195:*8, 9, 23*  196:*6, 8,
9, 12, 15*  375:*6*
**Judging**  421:*12*
**judgment**  73:*17, 18*
160:*17*
**July**  345:*18*
**jumbled**  223:*5*
**jump**  246:*11*
**June**  136:*16*  159:*8*
316:*18*  318:*22*
319:*23*  321:*5*  336:*4,
20*  338:*13*  341:*5*
352:*9, 10*  363:*19, 21*
371:*11*  374:*2*  405:*8*
420:*11, 13, 17*
**junkie**  183:*20*
**jury**  41:*12*  208:*20*
341:*1*
**justifies**  422:*13*
**justify**  423:*16*

**< K >**
**keep**  18:*9*  22:*3*
31:*15*  38:*24*  39:*2, 6*
40:*15*  43:*3*  57:*20, 21*
58:*22*  59:*1*  68:*16*
83:*24*  84:*8, 9*  93:*9*
120:*21*  125:*21*  127:*2,
4*  128:*13*  171:*19*
173:*2*  177:*19*  215:*19*
233:*9*  240:*8*  259:*7*
292:*3*  361:*3*  374:*10*
408:*20*  409:*6, 19, 21*
411:*4*  412:*13, 23*

413:*5, 21*  414:*2*
416:*23*
**keeps**  347:*8*  365:*21,
21*
**Ken**  109:*16*
**kept**  93:*14, 16*
115:*23*  140:*4*  367:*23*
**key**  54:*11*  247:*8*
249:*19, 22, 24*  250:*6*
251:*2, 3, 11*  362:*16*
378:*4*  380:*6, 7*
418:*22*
**kids**  290:*12, 24*
291:*12*
**kill**  175:*4, 6*
**killer**  151:*22*
**kin**  431:*9*
**kind**  8:*2*  23:*4*
116:*18*  171:*20*
174:*12*  300:*6*  330:*17*
414:*10*
**kinds**  281:*22*
**knew**  71:*20*  110:*5*
124:*22*  169:*16, 16, 17,
17, 18, 19, 19, 21*
180:*12*  182:*23*
259:*16*  261:*17, 18, 19*
262:*17*  272:*10*  274:*6,
8*  289:*12*  291:*11, 13*
304:*7*  348:*21*  397:*17*
414:*19*
**knife**  174:*24*
**know**  8:*2*  11:*12, 15,
21, 23*  13:*19*  15:*24*
16:*1, 9, 13*  17:*6, 9, 12,
12, 21*  21:*1*  22:*5, 17*
25:*5, 7*  27:*6*  28:*8*
29:*5*  33:*1, 13, 15, 16,
18, 19*  34:*1, 17, 20*
35:*18*  39:*13, 21*
41:*13, 13*  43:*20*
44:*14, 16*  48:*9*  50:*1,
4, 13, 15*  51:*5, 12*
53:*7, 14, 15, 18*  54:*10,
13*  55:*13*  56:*15, 17*
57:*17, 23, 24*  58:*8, 18*
59:*15, 21*  61:*16*  63:*7*
64:*12*  65:*1, 5*  66:*1, 3,
23*  67:*4*  70:*19, 20, 21,
22, 24*  71:*7, 12, 18, 19,*

Deposition of DANIEL PIPES

Lisa Barbounis v. Middle Eastern Forum, et. al.

19  76:14, 15, 16, 18
77:11, 18, 21  79:15,
18, 23, 24  80:3, 7, 21,
22, 22, 23, 24  81:14
82:2  84:14  97:23
98:14, 19, 20  99:4, 13,
18  101:15  106:3, 8
107:17  109:11
110:17, 18, 20, 23
111:15  112:24
113:16  116:21  117:1,
2  118:20, 22  119:9,
14  125:2, 16  126:14,
21, 24  128:16  130:24
131:3, 6, 7  132:21
135:9  137:20  138:9
139:5, 14  140:7, 8, 9,
10  144:8, 11  146:13
147:10, 12, 16, 19
151:4, 16  152:2
155:16  156:6  158:2
159:24  160:2, 4, 6, 13
162:13, 14  163:1, 6, 7
164:12  165:6, 7, 20
168:12  169:2, 14
170:9  172:14  174:3
178:1, 5  180:11, 12,
13, 14, 15  183:1
185:20, 23  186:2
187:14  190:9  194:1,
3, 13, 15  196:17, 21
199:1, 23, 24  200:2
201:3  202:13, 15, 17,
22  203:11, 14, 15, 21,
23  206:21  209:8
210:13, 18  213:5, 13,
14, 15, 16  217:3
221:24  222:12, 13, 24
223:1  229:6  230:14
234:14, 18  235:9
236:22  237:1, 2, 3, 4,
8, 9, 10  239:21  241:4
242:3  248:22  249:1,
6, 16  250:13  251:1, 3,
6, 11  252:7  255:19
256:2, 8, 9, 11, 22
258:9, 15, 16, 24
259:8  261:20, 22
262:18  265:2, 6, 17
266:24  267:4, 23

268:1, 3  269:6  273:5,
14  274:11  275:2
276:8  277:6  279:15
283:20  284:7  286:14,
17, 21  287:22  288:16,
17  290:8  291:13
293:21  294:3  295:1,
3, 13, 22  296:7, 9, 13,
20  297:10, 13  298:17
304:10  306:7, 9
307:7  309:20, 22
310:15  312:21  313:8
314:11  317:5, 19, 22,
23  322:17  327:14
332:13  337:14
340:10  341:8, 9
343:4, 5, 6, 7, 9, 9
344:5  345:23  346:1,
2, 5  350:9  351:9
353:20  355:3, 4, 5, 7,
16  356:24  357:1
358:22  359:13, 15
361:22  371:3, 14
374:5, 18  376:6, 7
378:12, 19, 24  379:1,
14  380:23, 24  382:23,
23  388:19  389:7
393:14  396:16  397:8
398:7, 8, 8  399:9
400:17, 20  402:11, 19
405:13, 14  407:6
409:11, 13, 17, 18
411:11  413:9, 10, 15
415:4, 19  416:7, 21
417:12, 24  418:7, 8
419:1, 23  420:8
423:22, 23  424:1, 3
425:12, 16  429:4, 6, 8,
10, 11
know,  7:22  59:10
351:10
knowing  269:4  333:1
334:8  338:11  340:6
knowledge  109:21
114:1  282:22, 23
known  73:21  76:12
349:7  354:6  362:1
374:7  424:12
knows  27:1  33:9, 16
110:13  115:24  172:3

223:14  254:23
344:11  420:23  424:8

< L >
labeled  55:14
labeling  121:24
lacerating  115:8
lack  151:12  152:8
166:18  167:5  214:21
256:5  261:24  279:10
299:1  303:19  366:24
403:10
ladies  428:13, 15
lap  193:16  203:20
204:15, 19, 24  205:4
206:10  207:19
212:19
laptop  408:21, 23
409:3, 5, 7, 10, 14, 19
410:3, 6, 12  412:7, 17,
20  413:3, 6, 21  414:2,
4, 10, 16
laptop,  408:20
laptops  408:24
Lara  110:2, 10, 14
111:3, 13  113:20
119:13, 13  298:17
Lara's  111:2, 6
large  150:18  242:8
largely  422:10
larger  258:23  427:24
large-scale  148:15, 20,
22
late  12:11, 12  37:16
106:17  341:5  350:3
Laterally  96:17
Laura  110:3, 10, 15
111:8, 11, 13  113:20
119:12  298:17
Laura's  111:8
LAW  2:1  11:20
15:22  16:1  41:14
43:4  108:15  109:7, 8,
12, 15, 18  110:2, 8, 12
147:7  158:23  273:2,
6, 9, 12, 15, 21, 24
293:22  294:2, 3, 21
296:7, 9  340:22
law,  273:20

lawbooks  16:2, 13
19:2
Lawrence  45:11, 17
laws  18:23  19:1
21:1  160:1
lawsuit  85:13
lawsuits  85:1  95:21
101:12, 12, 16  136:17
214:13  229:22  370:5
lawyer  20:1  108:16
161:19  242:2  284:16
349:15, 19, 23, 24
350:1, 2, 12, 13, 17, 18
lawyers  54:6, 13
110:7  161:7, 17
252:18
Lea  147:13, 20  149:5,
11, 14, 19  150:8, 11,
14, 22, 23  152:5, 6, 16
153:18, 21  154:6
213:4, 8, 9  298:14
lead  85:5  235:2
leadership  28:24
32:23
learn  141:9  170:21,
24
learned  77:13  173:7
180:15  201:3, 22
202:7, 10  226:20
313:11  317:7  348:20
366:13  368:1  403:13
404:6
learning  178:24
leave  104:22  193:12
266:23  318:23  319:9
349:12  401:19
410:13
leaving  413:3
led  93:18
Lee  70:13  108:3, 14,
20  109:20, 22  113:20
298:16
leery  376:1
Lee's  109:4
leeway  265:24  269:16
left  108:8  192:10
313:20  314:9  338:2,
3  343:5  377:10
412:19  414:18  415:5

Deposition of DANIEL PIPES                                    Lisa Barbounis v. Middle Eastern Forum, et. al.

**legal** 10:*15* 11:*15* 17:*24* 29:*2* 50:*7* 53:*22* 54:*2, 5* 76:*15* 77:*23* 98:*17* 142:*4, 5, 7* 152:*13, 13* 154:*18* 184:*17* 186:*16* 244:*8, 10, 13* 245:*3, 7* 248:*4, 5* 281:*22* 283:*18* 288:*13* 294:*19* 326:*24* 327:*2* 330:*16* 373:*6* 423:*17*
**legalities** 25:*2, 3, 11, 12* 50:*21, 24*
**legally** 80:*1* 245:*8* 288:*17* 423:*7*
**legitimate** 76:*16* 196:*18*
**LEIGH** 2:*21*
**length** 142:*3*
**lengths** 238:*10*
**lesson** 313:*11* 348:*20* 403:*13* 404:*7*
**Letter** 4:*9* 110:*1* 141:*19* 169:*4, 5, 7* 176:*16* 199:*13* 225:*9* 227:*15, 16* 232:*4, 6, 7* 235:*5* 241:*16, 20* 249:*8* 261:*4, 12* 262:*1* 309:*21* 336:*17* 346:*18*
**letters** 199:*14*
**letting** 84:*9* 144:*11* 353:*19* 392:*18* 415:*19*
**Levy** 45:*11* 69:*14, 15, 21* 70:*7*
**Levy's** 45:*15*
**liability** 155:*16*
**liar** 137:*7* 333:*4, 6*
**Liberty** 2:*8*
**lie** 289:*19, 20* 291:*5, 7, 8, 9, 15, 16, 17, 17* 319:*17*
**lied** 289:*22* 291:*4, 13* 315:*5, 7* 319:*4*
**lies** 92:*17* 99:*8* 138:*4, 7, 8* 291:*18, 18, 18, 19* 292:*3*
**lieu** 427:*9*

**life** 34:*3* 100:*23* 101:*10* 147:*22* 148:*14* 152:*21* 154:*15* 157:*21* 185:*21* 186:*4* 197:*22* 204:*11, 12* 237:*14* 285:*10* 307:*16* 348:*21*
**life,** 362:*11, 14*
**lifted** 90:*3, 6* 91:*16*
**lights** 286:*3*
**likes** 421:*23*
**Likewise** 269:*5*
**limit** 231:*21* 380:*4*
**limited** 363:*15* 380:*13*
**limiting** 367:*18*
**line** 158:*20* 188:*23* 189:*22* 286:*10* 433:*3*
**lines** 120:*7, 11* 175:*1* 235:*7, 10*
**linked** 299:*6*
**liquidated** 42:*9*
**LISA** 1:*1* 2:*22* 5:*12* 6:*10* 7:*5* 13:*6* 26:*5* 30:*21* 56:*9* 77:*13* 81:*20, 23* 82:*12* 83:*19* 84:*18, 23* 85:*1, 4, 8* 89:*9* 90:*7* 91:*21* 92:*3, 11* 94:*21* 95:*5, 7, 7, 22* 96:*1, 4, 4* 99:*19, 23* 100:*3, 3* 102:*23* 104:*1* 105:*9* 109:*6* 113:*21* 119:*11* 135:*12* 136:*4* 139:*8, 20, 22* 140:*1, 6* 143:*21, 22* 144:*2, 4, 10* 154:*3, 24* 162:*22* 163:*4, 11, 13, 15, 17, 19* 165:*10* 169:*17* 170:*1, 2, 2, 12, 17, 18, 19, 24* 171:*16* 173:*5, 8, 20* 176:*18* 177:*6, 6, 22* 181:*14* 182:*23* 186:*7, 13, 18* 193:*3, 15* 206:*24* 207:*1, 18* 208:*6, 10, 11* 215:*5, 10, 20* 218:*15* 222:*15* 227:*17* 228:*16* 240:*8* 242:*23* 254:*15* 260:*5* 262:*1* 264:*14* 267:*20*

268:*3* 272:*4* 279:*7* 280:*4, 14, 23* 282:*5* 285:*3* 298:*14* 305:*4* 308:*8* 312:*2, 16, 20* 316:*17, 20* 317:*5* 318:*16* 319:*17* 340:*8* 343:*14* 345:*18* 346:*2, 19, 19* 354:*20* 355:*4* 368:*16, 24* 371:*10* 373:*4* 374:*3* 393:*7* 401:*1* 420:*4, 22* 426:*24*
**Lisa's** 96:*11* 210:*22* 212:*14*
**list** 42:*22* 43:*3* 120:*21* 225:*7* 265:*1, 7* 266:*3, 9, 16, 22* 267:*1* 268:*6, 7, 15, 19, 21* 302:*22* 303:*5, 10* 363:*6*
**list,** 265:*5*
**listed** 16:*12, 14* 43:*21, 22* 50:*10* 51:*3* 63:*2, 6* 82:*5* 119:*3* 124:*14* 125:*2*
**listen** 32:*19* 67:*7* 71:*5* 87:*18* 126:*2* 185:*13* 208:*19* 260:*13* 275:*12, 18*
**listened** 150:*24* 210:*20* 236:*22* 275:*14* 277:*1*
**lists** 68:*16, 17*
**literally** 117:*7* 129:*1* 290:*9* 361:*2*
**little** 14:*16* 64:*22* 101:*8* 102:*2* 136:*17* 182:*10, 11* 254:*3* 260:*24* 265:*4, 24* 269:*16* 270:*21* 272:*1* 276:*15* 290:*4* 295:*2* 302:*1*
**live** 371:*4*
**lives** 77:*18* 97:*6* 100:*19* 130:*7, 17* 133:*16* 155:*2* 172:*17* 173:*18* 216:*23* 228:*14*
**load** 329:*16*

**loaded** 330:*1* 334:*11* 351:*12*
**loading** 330:*16, 18*
**loathed** 175:*5*
**Lobitz** 109:*16*
**logic** 421:*20*
**long** 9:*12* 40:*12* 56:*18* 69:*20* 141:*13, 17* 144:*24* 172:*14* 195:*4* 221:*8* 223:*4, 18* 225:*7* 227:*19, 20, 23* 253:*2, 8, 17* 265:*22* 282:*15* 283:*17* 286:*6* 308:*12, 15* 358:*4*
**longer** 164:*4* 247:*19* 257:*2, 2* 362:*17*
**look** 11:*16* 17:*10* 25:*3* 28:*5, 5, 6* 38:*20* 40:*2, 3* 43:*7* 50:*9, 15* 51:*6, 8* 52:*22* 60:*10* 63:*21* 64:*9* 87:*18* 94:*7* 101:*14* 126:*23* 142:*19* 169:*6* 174:*3, 11* 210:*22* 211:*12, 22* 225:*9* 253:*13* 263:*20* 270:*4, 21* 292:*4* 306:*16* 321:*9* 323:*21, 24* 325:*7* 336:*5* 353:*8, 22* 362:*9* 365:*7* 368:*15* 370:*19* 371:*8* 374:*20* 379:*10* 387:*18* 390:*10* 393:*3, 19* 396:*8, 21* 397:*22* 401:*24* 417:*14*
**looked** 25:*2, 10* 34:*12* 39:*19* 134:*24* 202:*19* 210:*23* 231:*8* 242:*15* 297:*20* 306:*10* 308:*9, 22* 352:*8* 353:*10* 354:*15* 370:*23* 388:*19* 395:*20* 397:*16* 420:*9*
**looking** 14:*6* 57:*8* 133:*15* 141:*7* 164:*8* 192:*10* 207:*7* 252:*24* 267:*2* 270:*19* 272:*19* 284:*6* 314:*16* 324:*4, 5* 421:*21*

Deposition of DANIEL PIPES                                      Lisa Barbounis v. Middle Eastern Forum, et. al.

looks 64:3 122:8
189:16 192:11
243:12, 18 345:10
365:20, 23
lose 232:8, 14
lose-lose 350:11
losing 182:18
loss 332:18 368:5, 7,
8
lost 201:16 232:10
251:2 308:20 380:15
lot 37:24 57:9 58:3
147:5 156:20 201:3
202:19 222:21
239:22 242:1 260:4
293:6 313:3 359:12
395:20 397:19
417:12 422:4
lots 36:18 142:3
170:23 231:16, 19
232:4 234:6
loud 60:17, 18
175:17 220:2 290:8
louder 255:5 265:4
lousy 385:1
love 280:22
loving 337:23
loyalty 272:9 273:24
274:4
luck 160:12, 16
ludicrous 74:17, 18
LUKE 2:18 5:16
316:5 415:4
lunch 180:13 191:17
lure 151:8 162:16
165:14
lured 150:12 212:16
lures 215:6
lying 193:24 292:2

< M >
machine 431:6
Macs 409:16
magic 83:5 322:22
326:21
magically 159:7
main 211:14
maintain 117:17
121:23 127:14 181:9

212:21 368:19
380:19
maintained 117:13
255:8 285:21 380:13
maintains 67:23
118:8 328:16, 21
major 96:15 220:17
374:6
maker 328:7, 13
make-work 106:1
making 69:3 75:14
82:15 110:24 116:22
126:15 132:23
231:20 237:17, 24
238:8 250:22 295:23
309:16 314:2 342:2
350:21 392:12 397:6
man 36:22 184:9
189:5 278:21 313:22
315:8
managed 221:7
management 15:9, 11
29:2 194:10 223:22
224:23 225:1, 6, 14,
22, 23 226:11, 23
227:6 258:17 367:16,
20 368:12, 13
manager 105:16
209:18 220:1 222:20
225:16 227:7, 13
228:1, 12
managing 257:3
258:19
Mandeles 147:9
manipulation 222:20
manipulative 105:20,
22 107:23 128:1
194:7 198:13
manner 135:21 354:8
manual 118:10, 11
119:4 377:8
manufactured 97:3
MARC 2:22 26:1, 3
142:2, 4, 4, 7, 15, 17
143:6 186:15 189:17
244:17, 17 245:17
246:21 249:5 254:15,
22 263:21 264:6
346:2, 18, 19 417:12

March 13:11, 12
83:18 92:9 93:24
94:9, 16, 16, 17, 22
95:24 130:8, 9 132:1
163:24 168:16 169:9
171:7 181:23 182:1
198:3 229:20 241:10
251:19 252:10 254:1,
6, 7 264:4, 5 314:6
320:12 337:21
339:19 341:4 342:11
348:8 375:7 380:9
mark 121:9 242:12
381:9
marked 218:8
252:18 371:9 381:11
Market 1:13 2:3, 9,
14
Marnie 26:13 85:6, 7
91:3 95:2, 7, 23, 24
96:3, 6, 12 103:5, 9,
15, 21 109:6 113:21
119:8 135:23 136:24
137:6, 6, 8, 18 138:15,
17, 24 139:6, 9, 20, 22
140:5 143:9 144:1
150:6, 16 153:24
162:22, 24 164:20, 20
166:1, 2, 8, 9 168:6, 8
169:18, 24 170:12, 16
171:16 173:6 177:4,
21, 22 178:9 182:3,
23 208:11, 11 219:5
220:18 222:17
227:14 243:5 249:5,
17 250:19, 21 251:9
254:16 293:10 298:8,
16 301:22 302:7, 20
304:8, 11 305:13
307:4, 11 312:2
314:10, 16 319:24
335:8 340:8 343:6
353:24 356:15 363:3,
4 371:5 375:11, 23
377:2, 5, 16, 22, 22
378:6, 22 379:15, 17,
23 380:7 402:17
406:10 407:2, 3, 8, 22
408:12, 16 411:18, 19
413:4, 12, 17 417:2

419:17 421:12, 13, 22
428:3, 21, 21 429:13
Marnie's 96:13
136:4 138:16 228:14
362:12 419:11
masse 164:9
Matt 114:13, 14, 15,
17, 20, 22 115:3, 12,
20 116:5, 9 119:11
139:20, 22 140:4
162:21 193:14
222:19 227:14
254:20 298:8 304:3
308:10, 11, 15, 17, 18,
18 309:4 312:4, 16,
19 313:20, 21, 21
314:19, 22 315:1, 5, 7
337:2, 10, 13 338:1, 1,
2, 17, 18, 21, 21 339:3,
5, 6, 8, 8, 8 340:9
341:8 343:2, 3, 3
370:4, 21 371:1
375:15, 17, 19 408:15,
15 409:15, 19 413:5
414:3 417:7 418:5
420:3 428:4
matter 5:12 7:5
11:15 35:15 49:7
73:7 102:20 118:4
124:21 131:11
146:24 178:23 183:7
194:9 219:23 271:14
287:8 308:11 310:21
359:10 384:7 385:7
394:22 407:9, 14
408:4
mattered 287:9
matters 54:6 98:22
153:8, 9, 13 184:5
213:19
Matthew 104:3
Matt's 139:24 228:15
313:21 337:11
375:21 407:21
414:10 428:8
McNulty 26:11 92:4,
12 103:23 109:6
113:21 119:15 159:4
189:17 190:3, 12
192:17 218:11, 16

Deposition of DANIEL PIPES                                            Lisa Barbounis v. Middle Eastern Forum, et. al.

251:*20, 21, 24*  252:*10*
253:*1*  262:*19*  293:*1*,
*6*  298:*9, 14*  321:*6*
329:*2*  333:*3*  338:*14*
347:*2*  352:*11*  374:*21*
407:*18, 20*
**McNulty's**  205:*6*
352:*18*
**me,**  276:*1, 7*
**mean**  12:*24*  13:*4*
14:*20*  16:*7*  17:*3, 13,*
*22*  20:*12*  25:*5*  27:*1,*
*24*  28:*4*  29:*5, 6, 7*
30:*20*  31:*20*  33:*2, 23*
34:*1*  39:*1*  42:*21*
43:*4, 8*  44:*5, 9, 14, 15,*
*16*  51:*16*  52:*9*  58:*9*
61:*23*  83:*3*  89:*17*
102:*19*  112:*12*  115:*5*
123:*6, 9*  128:*19*
131:*12*  135:*18*  140:*3*
147:*5*  151:*6*  152:*4*
170:*5*  173:*3, 3*  178:*2*
179:*15*  184:*10*  189:*3*
190:*5*  193:*11*  199:*4*
209:*10*  230:*8*  253:*10*
256:*22*  265:*5*  270:*4*
277:*7*  278:*18*  279:*12,*
*18*  317:*18*  332:*18*
336:*3, 7*  356:*19*
359:*2, 9*  364:*16, 21*
380:*6*  381:*3*  385:*3*
395:*5, 8*  397:*5*
401:*13*  408:*3*  422:*14,*
*23*  423:*1, 5, 13*  425:*1*
426:*20, 22*  427:*2*
428:*22*
**means**  17:*7*  32:*23*
33:*3*  162:*14*  288:*16,*
*19*  336:*8*  378:*7*
423:*6*
**meant**  148:*23*  149:*1*
183:*22*  227:*17*  233:*6,*
*19*  274:*18*  280:*11*
426:*4*
**media**  136:*14*  267:*8*
268:*11, 12, 13, 14, 15,*
*22*  269:*6*  270:*6*
286:*1*  287:*2, 10, 10*

397:*14, 23*
**mediate**  211:*8*
**mediated**  134:*12*
136:*10*
**medical**  232:*15*
**medium**  413:*23, 23*
**meet**  99:*20*
**meeting**  85:*3*  90:*23*
93:*24*  130:*23*  132:*1*
211:*23*  229:*24*  230:*2*
243:*21*  244:*1, 22*
248:*1*  252:*20*  254:*5,*
*6, 7, 14*  264:*5, 11*
320:*4*  346:*8*  365:*19*
**meetings**  125:*18, 21,*
*22, 23*  370:*14*  418:*5*
**MEF**  2:*22*  51:*1, 3, 8,*
*11*  55:*14*  59:*24*
121:*6, 7*  122:*4*  215:*6*
230:*15, 19*  245:*21*
272:*15*  294:*23*  297:*7*
304:*5*  305:*5*  318:*24*
319:*10*  320:*15*
327:*24*  349:*4*  363:*14*
368:*18*  380:*5*  408:*24*
409:*8*
**MEF,**  243:*20*
**Mekelburg**  267:*4, 23*
268:*1, 4, 8*
**member**  62:*15*  63:*18*
215:*6*  305:*5*
**members**  16:*5, 7*
44:*2, 5, 8*  60:*23, 23*
126:*4*
**memo**  95:*2, 2*  103:*4,*
*9, 11, 13*  139:*23, 24*
169:*15*  243:*20*  247:*8*
401:*23, 24*  402:*1*
**Memorandum**  4:*14*
243:*10, 11*
**memorialize**  124:*23*
**memorialized**  125:*4*
**memories**  239:*22*
**memorize**  39:*21*
280:*20*  283:*17*
**memorized**  282:*16*
**memory**  63:*17*  135:*3*
**men**  77:*14*  193:*12,*
*13, 17*

**mental**  137:*15*
140:*11, 15, 19*
**mention**  168:*19*
361:*21*  407:*12*
**MENTIONED**  3:*10*
4:*3*  204:*23, 24*  234:*2*
262:*17*  373:*11*  417:*7*
419:*15*
**mentions**  362:*5*
**Merville**  147:*13, 20*
149:*6, 11, 15, 19*
150:*8, 12, 14, 23*
152:*5, 6, 16*  153:*18,*
*21*  154:*7*  213:*4, 10*
298:*15*
**mess**  313:*5*
**message**  111:*20*
281:*11*
**Messages**  4:*18*  112:*1,*
*7, 14*  113:*8*  173:*20,*
*22*  174:*1, 4, 15, 18*
210:*23*  211:*4*  280:*13,*
*22, 23*  281:*3, 8*  428:*2,*
*2*
**messaging**  111:*14*
**met**  147:*23*  260:*22*
339:*14*  390:*19*
397:*11*  398:*2*  400:*18*
**metadata**  174:*4, 7, 9*
**Meyer**  26:*13*  91:*3*
95:*2*  103:*15, 21*
109:*6*  119:*8*  143:*10*
150:*7, 16*  162:*22, 24*
166:*1, 2, 8, 10*  177:*21,*
*22*  178:*10*  190:*3*
251:*9*  298:*16*  301:*22*
302:*7, 20*  307:*4*
319:*24*  353:*24*
356:*15*  363:*4*  377:*2,*
*22, 22*  378:*6*  402:*17*
408:*12, 16*  411:*18, 19*
413:*4, 12, 17*  417:*2*
428:*3*
**MIDDLE**  1:*6*  2:*11*
5:*13*  6:*13*  7:*6*  9:*11,*
*13, 15*  10:*13, 14, 17*
11:*19*  15:*13, 17, 20*
17:*15*  26:*21, 23*
27:*17, 22*  28:*15, 21*
30:*4, 6, 24*  31:*6*

32:*20*  34:*5*  37:*10*
38:*4, 13, 23*  39:*11*
43:*18*  44:*3, 7, 18, 21*
45:*7*  49:*19*  50:*14, 20,*
*21*  56:*8, 9, 13, 14*
57:*1, 17*  59:*9, 20, 24*
60:*19*  61:*14, 18, 22*
62:*2, 6, 10*  63:*3, 11*
64:*9, 12, 18*  66:*18*
67:*5, 22*  68:*6, 13, 22,*
*24*  69:*7*  70:*14, 17*
73:*24*  74:*8, 24*  75:*7,*
*12*  77:*3, 7, 9, 22*  79:*2*
84:*20*  85:*13*  89:*10,*
*16, 23*  93:*3*  95:*15*
109:*13, 24*  112:*22*
114:*10, 12*  117:*17*
118:*7*  120:*24*  128:*20*
130:*11*  131:*15*
133:*14, 17, 21*  134:*7*
152:*19*  155:*13, 21, 23*
156:*7, 16, 18*  157:*14*
159:*1*  162:*12*  184:*4,*
*23*  186:*5, 9*  195:*10,*
*19*  216:*8*  217:*12*
234:*7*  236:*4*  245:*20*
254:*10, 12, 13*  262:*15*
265:*1*  266:*17*  272:*4,*
*11*  285:*21, 22*  286:*2,*
*7*  287:*18*  288:*10*
289:*1*  290:*17, 17, 23*
296:*18*  297:*18*  306:*4*
327:*3*  328:*9, 15, 20*
365:*18*  371:*16*  373:*5*
374:*11*  376:*4*  377:*13*
393:*5, 18*  424:*13, 22*
426:*3, 8*  427:*20*
**might've**  129:*16*
135:*4*  378:*14*  407:*6*
**mild**  421:*6*
**Miller**  109:*16*
**Miller's**  108:*17*
**million**  85:*14*  95:*14,*
*20*  97:*22*  98:*5, 8, 23*
99:*1, 4, 15*  159:*4*
160:*7, 10, 16*  177:*18*
217:*21*  239:*11, 21, 24,*
*24*  240:*1, 3*  260:*3*
340:*23*
**millions**  98:*7*

Deposition of DANIEL PIPES                                                  Lisa Barbounis v. Middle Eastern Forum, et. al.

mind 101:*19* 162:*19*
179:*16* 197:*13*
205:*15* 315:*2* 374:*18*
minds 172:*14* 233:*24*
mine 141:*18* 155:*5*
184:*5*
minimizing 220:*4*
minimum 252:*22*
minor 110:*16* 211:*22*
219:*23* 229:*19*
258:*22, 24* 259:*2, 3,*
*11* 310:*24*
minute 51:*13* 112:*19*
120:*18* 122:*14*
144:*20* 167:*17* 176:*1,*
*7* 191:*8* 230:*10*
240:*13* 292:*17* 321:*9*
347:*23* 427:*5*
minutes 23:*2* 145:*1*
152:*4* 160:*22* 212:*6*
236:*14* 344:*10, 19*
365:*4* 397:*4* 427:*9*
mis 295:*7* 301:*19*
misappropriated
280:*5*
misappropriation
272:*13*
misbehaved 303:*8*
misbehavior 304:*17*
305:*11* 306:*18, 21*
406:*12*
miscategorization
283:*24*
mischaracterization
22:*22* 82:*7* 177:*2*
179:*23* 215:*15*
404:*23*
mischaracterized
301:*20*
mischaracterizing
167:*10, 11* 311:*12*
misconduct 147:*6*
148:*2* 156:*21* 171:*4*
184:*2* 220:*4* 227:*9,*
*10* 303:*16* 337:*6*
368:*10, 11* 369:*13*
416:*3, 5*
misconstrued 371:*15*
miserable 341:*11*
misread 188:*16*

misrepresentation
272:*14*
mistake 73:*9* 155:*8,*
*10* 180:*3, 7, 9, 17, 18*
mistakes 160:*21*
231:*7, 16, 19, 21*
234:*13*
misuse 370:*10*
mitigated 152:*23*
157:*1, 10* 158:*14*
184:*15, 19* 185:*2*
209:*22*
mix 39:*8, 9, 10*
mixed 302:*1*
Mm-hmm 122:*11*
190:*13* 264:*12*
MO 185:*17*
moan 420:*19*
moaning 352:*16, 19*
369:*19* 370:*1, 6, 11*
moans 385:*1*
moment 57:*2* 120:*17*
162:*9* 247:*3, 4*
money 37:*9, 17*
38:*13* 39:*11* 40:*6*
43:*18* 110:*24* 160:*24*
161:*6, 10* 216:*13*
232:*8* 233:*8* 260:*4*
267:*6* 274:*15, 24*
275:*3, 8* 278:*1, 5, 9,*
*13* 279:*4, 7, 13, 17, 20*
280:*5, 7, 10, 14* 281:*5*
296:*14, 17, 20, 24*
297:*1, 3, 7, 10, 13, 15,*
*16, 18, 21* 366:*3*
370:*9* 376:*11* 377:*24*
378:*6, 10* 379:*2, 3, 18*
409:*8* 411:*6* 412:*17*
423:*21* 424:*2, 10, 15*
425:*6, 7, 14, 17, 19, 19,*
*20* 429:*2*
mongering 428:*8, 19*
Month 39:*15, 17, 18,*
*20* 260:*23* 342:*12*
420:*13*
months 38:*1* 91:*5*
94:*23* 131:*8, 8*
132:*10* 134:*21* 136:*2,*
*6* 157:*23* 164:*5, 6*
169:*23, 23, 23* 171:*23,*

*24* 172:*1* 173:*15*
182:*5, 9, 12* 197:*14*
252:*23* 259:*7, 9, 10*
362:*8* 399:*19* 400:*4*
401:*14, 18*
morning 56:*4* 103:*10*
173:*7* 177:*5* 192:*13*
mother 77:*9, 22*
133:*15, 24* 186:*20*
216:*10, 11*
motion 330:*10*
332:*12* 344:*15, 24*
415:*20, 23* 427:*10*
mouth 311:*2*
mouths 159:*18*
move 31:*5* 32:*4*
49:*6* 128:*19* 187:*2*
193:*21* 202:*18*
205:*21* 230:*14*
233:*12* 241:*23* 246:*7,*
*22* 247:*1, 21* 281:*14*
284:*18* 306:*23* 345:*9,*
*12* 418:*8*
moved 129:*5* 134:*13,*
*13* 187:*9, 17* 229:*8,*
*14, 18* 230:*4* 340:*17,*
*18*
moving 61:*5* 187:*4, 8*
223:*8*
multiple 295:*24*
369:*5, 12*
murder 307:*15*
308:*24* 309:*2*
muted 102:*12*
mutual 100:*13*

< N >
nail 160:*14*
name 5:*16* 6:*7, 11*
9:*7* 10:*15* 27:*13, 13,*
*14* 28:*2, 9* 33:*8*
34:*21* 63:*6, 15, 24*
70:*21, 22* 80:*12*
100:*24* 108:*17* 111:*6,*
*8* 119:*5, 13* 127:*18*
298:*18* 299:*9, 11, 20*
300:*17* 301:*5, 9*
304:*12, 19* 306:*15*
388:*2, 18* 389:*1*

395:*23*
named 153:*18*
names 9:*20* 63:*22, 23*
123:*20* 126:*13, 17*
127:*18* 128:*4, 8*
265:*7* 266:*3, 3*
267:*23* 270:*5* 299:*5*
300:*22, 24* 303:*11*
398:*5, 9, 10*
name's 301:*10*
narrative 92:*5*
Nasty 111:*22* 113:*10,*
*11, 12, 13, 15* 230:*23*
231:*5* 342:*24*
national 162:*16*
natural 191:*11*
421:*24*
naturally 175:*22*
nature 129:*18, 20*
131:*10* 132:*15, 18*
194:*6, 8* 317:*12*
367:*5* 404:*22*
NDA 247:*10, 11, 23,*
*24* 248:*15, 20*
NDA, 247:*9*
NDAs 248:*7*
necessarily 317:*18*
necessary 50:*18*
432:*5*
need 5:*23* 19:*22, 24*
20:*2* 28:*8* 30:*16*
32:*9* 49:*17* 50:*7*
56:*18* 90:*16* 144:*18*
145:*1* 153:*7* 154:*19*
159:*24* 160:*1, 7*
185:*11* 189:*8* 233:*10*
241:*4* 248:*4* 263:*7*
315:*14* 332:*17*
383:*21* 427:*6*
needed 150:*13*
185:*12* 414:*21*
needs 56:*16* 58:*1*
59:*12* 222:*6* 358:*4, 5*
359:*8* 422:*12*
Neither 152:*15* 431:*9*
nest 342:*15, 23*
net 41:*9* 42:*14, 20*
never 16:*1, 9* 20:*24*
65:*7* 66:*6* 81:*1, 3, 5*
94:*3* 97:*14, 14* 108:*8*

Deposition of DANIEL PIPES                                   Lisa Barbounis v. Middle Eastern Forum, et. al.

115:*12*  116:*18*
137:*17*  147:*22*  188:*1*
189:*2*  198:*7*  199:*11*
203:*19, 22*  205:*6, 17*
206:*1, 14*  213:*7, 8, 11,*
*11, 12*  228:*8*  229:*18,*
*21*  231:*11, 12*  240:*2*
247:*10*  263:*7*  266:*10*
277:*1*  279:*6*  280:*7*
281:*11*  289:*9, 11*
306:*9*  309:*8*  334:*17*
349:*3*  350:*4*  402:*18*
418:*18, 19*  419:*6*
420:*16*  424:*2*
**new**  32:*6, 16*  60:*21*
62:*9*  100:*14*  117:*3*
130:*14*  158:*20*
189:*11*  247:*9*  248:*19*
249:*8*  336:*22*  342:*12*
343:*14*  354:*23, 24, 24*
393:*12*  400:*3*  407:*2*
**news**  392:*22*  406:*10*
**newspapers**  269:*12*
**nice**  35:*12*  160:*10*
**night**  77:*16*  304:*4*
313:*11*
**nine**  98:*6, 6, 6*  298:*20*
**no,**  95:*8*  170:*2*
**Nobody's**  278:*9*
**nods**  8:*1*
**noises**  110:*24*
**noncommittal**  126:*8*
**Nonprofit**  11:*5, 6*
12:*1, 2*  267:*2*
**nonprofits**  38:*22*
267:*19*
**nonresponsive**  18:*3*
29:*20*  56:*11*  73:*20*
332:*14*
**nonresponsiveness**
359:*16*
**nonsense**  18:*12*
**non-tax-deductible**
425:*20*
**Nope**  323:*10*
**normal**  36:*3*  182:*13*
321:*24*
**Notary**  1:*16*  431:*2,*
*15*  434:*21*

**note**  6:*14*  54:*8*
58:*14*  127:*15*  170:*14,*
*15*  178:*10, 14, 19*
198:*11*  211:*13*
219:*17*  256:*17*
309:*13*  343:*9*  350:*3*
373:*18*  374:*16*  417:*6*
**noted**  5:*20*  200:*24*
213:*1*  432:*11*  434:*8*
**notes**  125:*8, 11, 17, 21*
126:*22*  199:*6*  209:*18*
211:*23*
**Notice**  1:*12*  431:*4*
**notify**  44:*2*
**noting**  94:*19*
**November**  1:*6*  5:*9*
89:*11, 16, 24*  91:*4*
92:*7*  93:*19*  94:*1, 3,*
*14, 15, 18*  95:*3, 23, 24*
96:*4*  102:*18*  103:*4,*
*10*  108:*1*  119:*17*
122:*9*  125:*3*  129:*12,*
*12*  130:*8*  131:*7, 9, 16*
132:*10*  134:*10*
135:*20*  141:*8, 19*
148:*12*  150:*9*  153:*21*
156:*23*  159:*8*  163:*22*
168:*18*  169:*3, 15, 21*
170:*15, 16, 22*  171:*8,*
*14*  172:*7, 24*  173:*7*
176:*18*  177:*6, 21*
181:*22*  187:*20, 21*
189:*20, 21*  190:*7*
191:*4*  197:*12*  198:*20,*
*21*  202:*16, 18*  208:*4*
211:*24*  228:*3, 4*
229:*24*  230:*2*  231:*9,*
*17*  233:*24*  234:*2*
235:*12, 13, 22*  241:*20*
243:*19, 22*  248:*1*
249:*11*  256:*3*  257:*1*
292:*12, 20*  306:*13*
313:*3*  314:*1, 4, 4*
320:*4, 8, 11*  321:*12*
333:*13, 13, 14, 24*
336:*23*  337:*6, 20*
339:*23*  340:*16*  341:*4*
342:*7, 9*  343:*14, 15*
344:*1*  347:*17*  348:*8*
349:*13*  350:*23*

354:*14, 18, 21*  355:*13,*
*19*  362:*8*  364:*4, 9*
365:*7, 16, 19*  367:*14*
370:*9*  374:*23*  377:*4,*
*5*  380:*1*  384:*6, 8*
385:*8, 10*  406:*4, 7*
421:*5*  431:*11*
**now,**  419:*9*
**NUMBER**  3:*10*  4:*3*
38:*8*  42:*10*  60:*23*
64:*22*  65:*3*  98:*22*
99:*3*  115:*22*  117:*4, 6*
152:*3*  242:*3, 4*
291:*20*  293:*4*  300:*5*
321:*5*  336:*20*  373:*4*
380:*1*
**numbers**  38:*2*  39:*21*
98:*18*  164:*11*  172:*3*
182:*19, 22*  183:*4*
266:*4*  270:*5*

**< O >**
**oath**  9:*3*  207:*18*
222:*7*  398:*24*
**Object**  10:*21*  13:*17*
14:*3*  16:*16*  17:*2, 17*
18:*6*  22:*12*  24:*12*
26:*17*  33:*14, 20*
37:*23*  38:*15*  40:*19*
61:*24*  65:*22*  66:*20*
67:*24*  71:*2, 15*  74:*11*
75:*1*  78:*1*  79:*4*
80:*17*  81:*2*  82:*4*
86:*8, 9*  87:*24*  89:*12*
90:*9*  91:*22*  93:*7*
103:*1*  105:*11*  107:*4*
108:*13*  111:*16*
116:*12*  123:*21*  125:*6*
128:*9*  129:*24*  131:*5*
132:*19*  133:*13*  134:*2,*
*2, 6*  137:*2*  140:*16, 16*
141:*4*  144:*7*  146:*1, 7,*
*15*  147:*2, 15*  148:*5*
149:*7, 16*  150:*3*
151:*2, 11, 17*  152:*7*
153:*15, 23*  154:*9, 17,*
*17*  155:*18*  156:*5, 12*
157:*16*  158:*9*  161:*5,*
*12, 20*  164:*23*  165:*9,*
*19*  166:*4*  170:*6*

171:*5*  179:*22, 22*
181:*2, 21*  185:*10, 19*
186:*1*  202:*9*  207:*9,*
*20*  208:*14*  210:*9*
212:*23*  214:*4, 20, 20*
215:*14, 14*  217:*5*
218:*23*  220:*7*  228:*10*
229:*4*  230:*17*  231:*3*
233:*21*  234:*21, 21*
235:*11*  236:*6, 19, 19,*
*20*  237:*7, 19, 19*
238:*23*  241:*17*  244:*5,*
*13*  246:*2*  253:*5*
255:*10, 10, 18*  256:*5*
257:*8*  258:*12*  259:*14*
260:*7*  262:*22*  263:*1,*
*16, 19*  266:*13*  268:*23,*
*24*  269:*14*  270:*7*
273:*4, 10*  275:*10*
276:*2, 20*  277:*20*
278:*2, 11*  279:*9, 24*
280:*8*  281:*16*  282:*7*
283:*2, 23, 23*  284:*10*
285:*5*  286:*24*  287:*21*
290:*19*  291:*22*
293:*23*  294:*9, 10*
295:*6, 6, 12, 12, 19*
296:*1, 2, 4, 22*  297:*4,*
*9*  298:*5, 24*  299:*1, 1,*
*2*  303:*6, 18, 18*
304:*21*  306:*1*  307:*21*
310:*4*  311:*11*  314:*20*
317:*10*  319:*2*  322:*13,*
*20, 24*  326:*23, 23*
329:*6*  333:*20*  334:*1,*
*10, 19*  337:*16*  342:*5*
346:*17*  348:*11*  354:*2*
355:*24, 24*  360:*24*
362:*21*  364:*10*
366:*23, 23*  367:*4, 13*
369:*8, 14, 20*  371:*23*
372:*15*  374:*14*  378:*8*
384:*13*  403:*6*  404:*21,*
*22, 23*  406:*21*  411:*8*
413:*13*  416:*13*
422:*21*  423:*3*  426:*9*
**objecting**  166:*18*
353:*11*  359:*15*
402:*13*  404:*24*  405:*1,*
*2*

objection   17:*5*  20:*16,*
*22*  35:*10*  65:*9, 17*
66:*8*  73:*14*  76:*8, 23*
78:*6, 12*  82:*15*  89:*19*
130:*21*  146:*21*
167:*16*  177:*1*  196:*4*
205:*19*  206:*6*  235:*4*
238:*3*  284:*16*  327:*9*
329:*23*  347:*24*
364:*14*  386:*22*
398:*13*  404:*3, 11*
objections   5:*4*  18:*12*
76:*13*  84:*5*  87:*5*
239:*4*  294:*15*  416:*18*
objection's   213:*1*
observe   416:*9*
Obviously   182:*8*
359:*14*  362:*4*  381:*23*
occasions   29:*4*  314:*3*
occurred   241:*9*
243:*22*  330:*18*
O'CONNOR   2:*6, 21*
6:*13*
October   260:*22, 22*
261:*3*
odd   204:*6*
offer   99:*13*  126:*8*
168:*17*  169:*10*
offered   127:*14*  182:*4*
199:*10*  275:*8*
offers   182:*24*
office   29:*2*  89:*18*
90:*1, 15*  92:*5*  103:*5,*
*19*  107:*8, 18*  115:*3*
119:*18, 24*  120:*1*
126:*6, 9*  128:*2, 21, 21*
129:*1*  136:*12*  141:*17*
143:*3*  148:*16*  157:*19*
193:*2*  232:*21*  233:*7*
234:*8*  243:*12*  249:*22*
250:*4*  251:*12*  253:*14*
254:*8, 9, 10, 12, 13, 24*
257:*2, 3*  258:*17*
312:*11*  313:*19*
317:*19, 20, 22*  336:*24*
337:*19*  338:*2, 4*
339:*23*  347:*6, 11, 16,*
*18*  363:*15*  367:*11, 18*
374:*24*  380:*6, 7, 13*
428:*14*

officer   62:*21*  155:*13,*
*20*
officers   16:*8*  45:*4, 8*
63:*22*  64:*10, 15*
66:*19*  67:*23*  68:*9*
Officers,   67:*16, 18*
offices   67:*22*  105:*6, 7*
official   317:*6, 13, 15,*
*17*  318:*1, 17*  431:*11*
Oh   85:*19*  90:*21*
97:*1*  121:*12*  142:*7*
159:*6, 7, 9*  169:*24*
171:*17*  177:*17*
193:*24*  236:*6*  267:*20*
275:*16*  303:*10*
340:*20*  343:*9*  426:*19*
429:*15*
Okay   6:*16*  7:*12*  8:*5,*
*9, 14, 24*  10:*19*  12:*2*
14:*15, 18*  21:*23*
24:*23*  27:*22*  31:*23*
32:*12, 14*  33:*7, 18*
34:*14*  36:*10*  37:*22*
39:*5, 20*  40:*3*  41:*5,*
*24*  43:*5*  48:*9*  51:*11*
53:*21*  56:*24*  57:*16*
58:*17*  60:*15*  65:*19*
68:*21*  72:*20*  73:*20*
85:*15*  87:*17*  88:*6*
90:*17*  99:*18*  100:*14,*
*22*  101:*13*  102:*1, 15*
104:*22*  114:*24*
120:*19*  121:*21*
122:*12, 17, 17, 17, 20,*
*22, 22, 22*  137:*14*
138:*19*  143:*1*  148:*21*
151:*21*  171:*11*
175:*24*  176:*2, 9, 9*
178:*22*  182:*16*
183:*19*  191:*10, 22*
198:*10*  204:*9, 19, 20*
219:*14*  221:*4, 5*
225:*18*  241:*23*  243:*2,*
*5*  247:*2*  252:*4, 8, 17*
253:*16, 19*  254:*13, 19,*
*23*  258:*6*  259:*20*
260:*21*  262:*20*
263:*13*  264:*8, 17*
267:*15*  272:*24*  274:*2*
276:*10*  281:*10, 13*

288:*12*  290:*16*
292:*18, 18*  293:*3, 6*
294:*20*  321:*10, 16*
324:*22*  328:*9*  329:*1*
330:*10*  333:*22*  334:*4*
335:*12*  341:*12*
343:*19*  344:*17*  345:*3*
346:*16*  347:*20*
350:*18*  352:*8, 21*
353:*18*  354:*12*  360:*4,*
*20*  361:*9, 14*  362:*9*
363:*23*  365:*2*  368:*15*
373:*13, 16, 17*  377:*16*
379:*11*  380:*9*  384:*10*
385:*11*  389:*10, 16*
394:*4*  397:*15, 24*
400:*16*  401:*6, 7*
413:*11*  415:*3*  416:*23*
417:*2*  419:*15*  420:*16*
421:*13*  426:*1, 19*
428:*11*
old   304:*12*  313:*9, 16,*
*17, 17*  354:*23*  355:*1,*
*1*  369:*21, 24*
omitting   83:*19*
omniscience   114:*8*
omniscient   114:*4*
once   43:*1*  130:*16*
231:*12, 12*  252:*21*
261:*23*
one-on-one   103:*6*
105:*6*
ones   89:*2*  232:*5*
399:*18, 21*  424:*19*
one's   116:*2*  120:*6*
one-syllable   360:*10*
one-to-one   143:*6*
ongoing   336:*24*  337:*3*
online   62:*23*
open   12:*20*  21:*6, 8*
117:*6*  216:*18*  259:*16*
370:*16, 16, 17*  424:*5, 5*
open-ended   226:*8, 9*
opening   12:*8, 13*
13:*23*  14:*2*  426:*2*
operations   304:*6*
368:*22*
opinion   245:*19*

opportunity   43:*15*
56:*21*  88:*11, 14, 17*
130:*1, 6*  349:*8*
opposing   54:*7*
opposite   132:*7*
order   6:*1*  22:*5, 9, 14,*
*18, 22*  23:*4, 8, 8, 12*
36:*22*  121:*13, 23*
138:*18*  141:*22*  142:*1*
161:*2*  162:*17*  201:*14*
232:*10*  295:*22*
326:*21*  327:*6, 6*
377:*6*
orders   23:*9, 16*
336:*10*
Ordinance   42:*2*
273:*23*
ordinary   126:*9*
organization   10:*4, 11,*
*20*  11:*1*  14:*7*  15:*12,*
*20*  16:*10, 12*  21:*10*
32:*23*  46:*9*  64:*7*
93:*13*  134:*8, 9*
184:*24*  186:*21, 22, 23*
187:*1*  267:*8*  341:*13*
342:*3, 7*  343:*5*  423:*7*
organizationally   423:*8*
organizations   11:*7*
15:*24*  20:*15*  346:*4*
organize   417:*14*
Original   381:*23*
432:*14*
originally   86:*21*
other's   62:*9*  182:*23*
337:*22*
otherwise,   313:*12*
outcome   252:*20*
431:*9*
outline   332:*21*
outlining   220:*5*
out-of-office   119:*19*
outrageous   386:*17*
outs   425:*12*
Outside   120:*1*  128:*2*
152:*3*  374:*7*
over'   276:*16*
oversee   216:*14*  379:*2*
oversight   340:*3*
368:*22*
owe   78:*3*

owed  141:2  412:5
414:11

< P >
P.C  2:13
p.m  102:8  145:15, 15,
18  189:21, 24  192:1,
4, 4, 6  316:11, 11, 13
426:12  429:19  430:1
PA  2:4, 9, 15
packed  251:14
PAGE  3:4, 10  4:3
60:2, 4, 10, 11, 12
63:2, 7, 9, 20, 21  65:3
265:23  433:3
pages  30:21  52:24
56:18  103:14  242:7
357:22  434:4
paid  26:16, 23  27:2,
2, 3, 5  37:10  38:4, 6,
7  76:17  79:24
150:17  160:20, 20, 21
161:16  162:2, 3
237:2  272:16  286:17
287:4, 5, 8  296:15, 17,
20  297:3  376:21
409:22, 24  410:4, 14,
20  411:11  412:3, 6,
19, 24, 24  413:1
panoply  259:4
paper  288:21
paperwork  50:16, 16
paragraph  87:6, 7
118:20  230:11
parameters  252:22
253:3, 8, 17, 20  334:4
paraphrased  177:6
part  14:7  17:10
94:18  106:11  108:24
114:20  118:6, 21
119:4  132:22  136:3,
19  141:15  154:4
187:8  213:20  243:9
249:17  257:14
260:18  271:22  272:2
287:2, 10  298:2
319:14  328:1  339:21
340:4  342:24  343:3,
3  350:6  366:6

375:21, 21  381:18
421:1
partially  92:8  380:12
participant  13:3
participate  240:10
particular  94:21
131:24  135:22
308:21  380:5  390:11
particularized  157:13
particularly  92:11
116:5  119:23  132:13
141:10  186:15
380:11
parties  5:2  6:2  302:1
parts  348:24
party  291:16  431:9
pass  261:13
passed  261:5
passwords  243:7
pasted  190:2
patently  58:9
path  388:6
patience  37:7
Patricia  26:10
103:23  109:5  113:21
119:14  192:17
207:19  218:11
254:15  298:13  321:6
338:14  352:11, 18
Patricia's  212:19
308:6
pattern  310:3, 8, 9
pay  24:10  150:16
161:7, 19  217:7
240:1  275:8  333:4
377:18  410:13, 22, 24
411:3, 5, 10  412:12,
21  413:3  414:17
payday  160:10
paying  160:13, 18
368:3, 3  379:15
payment  278:13
payments  161:22
379:8
pending  49:3  224:9
246:13  315:14, 15, 18
324:16, 19, 21  325:12,
16  326:2, 7, 9, 12, 19
332:3, 10  335:15
341:23  343:11

394:16, 18  396:7
426:6
penis  71:1, 13  73:24
74:9  116:10  152:1
PENNSYLVANIA
1:1, 13, 17  5:15
people  45:3, 13  54:8
79:17  96:10  104:20,
21  113:19  115:10
116:24  119:9  125:2
127:17  128:4, 17
136:24  139:17
142:21, 24  155:4
180:4, 10, 22  181:7,
12  184:1  204:8, 9
215:24  216:15
217:20  236:17
249:13  255:8  292:2
295:24  299:9  301:16
313:4  326:21  342:17
343:1  387:24  390:19
397:11, 16  398:2, 16
399:24  400:6  401:3,
5  418:16, 19  423:20
people's  133:16
229:2  239:22  268:16
274:14
percent  160:8  380:18
382:16  389:18  390:9
399:23  400:5  402:2
404:8
perfect  187:3  340:21
perfectly  160:6
182:13  315:20
perform  382:5
period  14:21  93:5
131:20, 21  252:23
253:21  348:9
perks  231:22  232:2
234:12
permission  232:21
285:3, 9  287:13, 15,
16, 19  289:5  346:14,
23, 24  374:4  413:5
permitted  58:12
101:7  256:21  376:5,
10  377:23  409:19, 21
person  8:18, 19
34:15, 16  35:1, 3, 8
76:17  105:5, 6  115:1,

6  126:1, 3  127:20
152:20  154:14
171:24  183:3  217:4
219:9  248:12  295:3,
11, 23  313:6  336:13
341:11  375:12  385:2
388:2  413:24  419:18
personal  41:9  42:20
77:18  118:19  135:19
143:5  148:13  155:1
171:12  180:9  218:22
219:2  237:14  251:13
304:15  309:9, 10
personalities  184:16
personality  135:15
198:12  419:20  420:2
Personally  40:23
134:24  249:20  380:8
397:10
personnel  118:10, 11
225:11  258:17  377:8
persons  60:22, 22
pertained  213:9
pertinent  15:3  24:1
47:7  157:7  197:8
201:20  278:24  313:1
perverted  162:19
Philadelphia  1:13
2:4, 9, 15  42:2  60:20
273:22  317:6
Philly  62:9
phone  18:10  54:24
80:5, 16  105:5  126:3
142:19  210:24  236:2
266:3  270:5  304:3
337:2  338:20  339:3
392:12
phonetic  104:13
109:16  110:2  147:14
346:8
photograph  178:20
photographs  158:19
287:1
photos  107:11
PHRA  41:23  42:9
phrase  25:9
physical  157:20
249:24
physically  89:17

Deposition of DANIEL PIPES                                    Lisa Barbounis v. Middle Eastern Forum, et. al.

250:*4, 22*  251:*4*
pick  80:*5*  236:*2*
picks  77:*14*
picture  258:*23*  288:*8,*
*21*  289:*1, 4, 12*  290:*10*
pictures  287:*12*
piling  120:*7*
pillow  174:*24*
pin  102:*22*
PIPES  1:*11*  3:*3*
*5:12*  6:*6, 21*  7:*4, 6*
*9:9, 10*  14:*11*  19:*9,*
*14*  21:*18*  22:*6, 10, 17*
*23:9, 10*  26:*8*  30:*6*
*31:1, 10*  32:*6, 21*
*35:20*  41:*9*  45:*21*
*49:16*  53:*6*  59:*19*
*67:17*  69:*24*  71:*6*
*72:4, 11*  74:*20*  76:*4*
*79:6*  81:*9*  83:*21*
*84:18*  86:*2*  115:*15*
*118:18*  121:*13*  122:*7*
*145:21*  159:*13*  166:*7*
*175:23*  187:*6*  188:*15*
*189:7, 10*  195:*10*
*196:17*  197:*21*  200:*7*
*201:15*  203:*5*  204:*2,*
*14*  212:*10*  215:*20*
*216:7*  217:*13*  218:*7*
*220:3, 20*  221:*20*
*222:24*  223:*20*  224:*2*
*225:18, 20*  230:*20*
*233:9*  236:*18*  240:*1*
*243:16*  244:*7*  245:*15*
*247:21*  257:*5*  270:*9*
*271:3, 15*  272:*21*
*277:8*  278:*19*  279:*6*
*288:15*  290:*6*  291:*20*
*296:12*  300:*13, 21*
*304:18*  307:*10*  311:*6*
*315:10*  316:*17*
*324:14, 21*  325:*2*
*326:17, 19, 20*  327:*12,*
*22*  331:*12*  332:*2, 10*
*333:7*  335:*12*  336:*19*
*341:23*  343:*16, 19*
*345:14, 19*  346:*6, 13*
*351:8*  352:*24*  356:*13*
*358:22*  359:*18*  362:*7,*
*24*  363:*4, 8*  374:*18*

376:*15*  379:*24*  387:*1,*
*20*  390:*24*  391:*17*
*394:12*  399:*19, 23*
*400:11, 11*  401:*23*
*403:17*  404:*16*
*405:24*  412:*2, 2*
*414:8*  417:*3*  424:*3*
*428:5*  429:*14*
Pipes-1  3:*11*  120:*22,*
*23*
Pipes-10  3:*20*
Pipes-11  3:*21*
Pipes-12  3:*22*
Pipes-13  3:*23*
Pipes-14  3:*24*
Pipes-15  4:*4*
Pipes-16  4:*5*
Pipes-17  4:*6*
Pipes-18  4:*7*
Pipes-19  4:*8*
Pipes-2  3:*12*  121:*5*
*122:4*
Pipes-20  4:*9*
Pipes-21  4:*10*
Pipes-22  4:*11*
Pipes-23  4:*12*
Pipes-24  4:*13*
Pipes-25  4:*14*
Pipes-26  4:*15*
Pipes-27  4:*16*
Pipes-28  4:*17*
Pipes-29  4:*18*
Pipes-3  3:*13*  121:*14,*
*16*
Pipes-4  3:*14*  121:*18,*
*20*
Pipes-5  3:*15*
Pipes-6  3:*16*
Pipes-7  3:*17*  242:*7*
Pipes-8  3:*18*  242:*6,*
*12*
Pipes-9  3:*19*
Place  2:*8*  5:*24*
*44:12*  79:*10*  80:*1*
*93:5, 6, 10*  105:*5*
*137:3*  140:*3*  169:*10*
*172:5*  211:*5*  238:*12*
*245:6*  252:*22*  253:*3,*
*8, 17*  286:*4*  309:*9, 12*
*314:14*  334:*5*  344:*1*

355:*15*  370:*24*
380:*15*  431:*5*
Plaintiff  1:*4*  2:*6, 22*
*6:9*  98:*4, 10*
plaintiffs  95:*19*
*96:20*  97:*7*  98:*20*
*109:22*  114:*21*
*153:17*
plan  375:*10*
planning  16:*18, 21, 22*
*18:22*
plate  417:*12*
play  75:*19*
played  75:*23*  121:*11*
*275:21*  276:*12*
playing  55:*14*  139:*13,*
*16, 20*  140:*7, 9*  417:*10*
plea  165:*5*
pleasantries  304:*5*
please  5:*22*  6:*6*  8:*20*
*9:7, 20*  14:*24*  18:*11*
*32:16*  48:*13*  60:*17*
*68:15*  84:*4*  87:*17*
*88:6*  105:*9*  115:*15*
*120:17, 18*  125:*24*
*175:20*  177:*20*  196:*8*
*226:5*  243:*16*  257:*14*
*260:18, 24*  265:*4*
*281:7, 8*  300:*13*
*344:12*  346:*12*
*373:13*  398:*19*  410:*9*
*427:22*  432:*4, 8*
pleased  239:*7, 8, 9*
*403:12*
plenty  85:*19*  169:*6*
PNC  40:*10*
poetic  315:*16*  335:*19*
point  13:*8*  28:*19*
*48:22*  78:*17*  79:*19*
*84:24*  90:*3*  93:*23*
*94:2*  99:*1, 19*  143:*15*
*150:2*  153:*17*  158:*6*
*160:19*  189:*8*  191:*12*
*193:13*  194:*4*  198:*11*
*211:13*  224:*17*  229:*6*
*242:3*  286:*8*  298:*21*
*300:21*  304:*18, 19*
*309:6*  312:*10*  321:*22*
*350:19, 21, 23*  359:*9*
*374:23*  378:*4*  381:*13*

382:*20, 22*  418:*22*
*419:22*
point-blank  95:*6*
pointed  163:*21*
*182:22*  206:*3*
pointedly  126:*6*
pointing  124:*7*
*190:13*  226:*15*
*319:22*
points  226:*15*  254:*2,*
*4*
policy  116:*23*  117:*13,*
*18*  118:*7, 9, 21*
*232:17, 20*  245:*21, 22*
*255:8*  259:*11*  285:*20,*
*24*  294:*23*  298:*2*
*327:24*  328:*21*
*367:10*
political  12:*3, 7*
*317:8, 13, 16, 18, 23*
*346:5*  371:*16*  423:*22*
politically  424:*8*
politics  11:*18*  13:*15,*
*24*  126:*9*  286:*1, 6*
*424:16*
pool  340:*2*
poor  110:*4*
pop  134:*17, 21*
*371:19*  372:*1, 4, 9, 10*
portfolio  40:*15*  44:*3,*
*4*
portray  286:*2*
portrayed  261:*22*
*262:4*  287:*9*
Posepiak  346:*8*
position  28:*14*  45:*15,*
*17, 21, 22*  68:*18, 24*
*69:11*  79:*1*  84:*19*
*111:2*  140:*7*  183:*13,*
*15, 17*  212:*17*  236:*3*
*240:17*  333:*1*  334:*7,*
*8, 13, 18, 21*  339:*11*
*349:1*  350:*10*  368:*22,*
*24*  375:*11*  387:*3*
positioned  69:*6, 9, 15*
positions  269:*5*
positive  169:*15*
possession  54:*19*
*112:10*  300:*22*

304:*19*
**possibility** 258:*21*
**possible** 171:*7, 13*
182:*7* 334:*6* 371:*13*
**possibly** 299:*6*
**Post** 235:*12, 13*
249:*11* 354:*21* 377:*4*
**pot** 425:*7*
**potential** 24:*24* 425:*5*
**potentially** 303:*22*
312:*7*
**power** 181:*1* 339:*11*
348:*23, 24* 349:*1*
**powers** 234:*12*
**Practice** 42:*2* 273:*22*
401:*20*
**pre** 354:*21, 22* 362:*8*
364:*4* 377:*4* 406:*7*
**pre-authorized**
376:*12, 16*
**precedence** 422:*1*
**precise** 70:*9*
**precisely** 105:*17*
**Predated** 343:*15*
**predator** 202:*8*
**pre-March** 348:*3*
**preparation** 418:*8*
**prepared** 271:*11, 14*
285:*2* 418:*9*
**Preparing** 350:*17, 18*
369:*22*
**presence** 157:*20*
374:*7*
**PRESENT** 2:*18*
25:*19* 328:*4* 356:*17,
20, 24* 357:*4, 10, 10*
358:*18, 20, 23* 359:*5*
360:*20* 361:*2, 6, 13*
**presented** 217:*18*
**presenting** 55:*6*
**presently** 110:*8*
**presents** 86:*3*
**preservation** 405:*16*
**President** 28:*16* 33:*4*
45:*23* 46:*4, 6, 8*
47:*20* 49:*18* 50:*1*
56:*14* 67:*21, 21* 69:*3,
4* 77:*2, 7* 114:*4*
119:*5* 195:*10* 216:*8*

328:*9* 377:*9, 10*
**press** 75:*7*
**Presumably** 112:*5*
261:*5, 13* 422:*8*
**pretend** 55:*12* 64:*14*
214:*13*
**pretended** 289:*22*
291:*15*
**pretty** 23:*12* 41:*15*
404:*16, 16*
**prevent** 117:*18* 118:*8*
**previous** 324:*6, 8*
355:*15* 380:*20*
**previously** 182:*23*
346:*6*
**principals** 187:*12*
234:*19* 239:*8*
**printout** 261:*4*
**prior** 47:*16* 49:*13*
131:*9* 224:*5, 16*
324:*3* 344:*8* 406:*4*
**priority** 238:*13*
**private** 133:*16*
185:*21* 186:*4* 215:*24*
216:*23*
**privilege** 65:*17* 74:*15*
244:*8, 10, 24* 245:*3, 7*
246:*17* 248:*6* 381:*6*
402:*14, 16* 404:*3, 12*
405:*16, 18, 19*
**privileged** 113:*4*
245:*8* 268:*19* 405:*12*
**privileged,** 65:*15*
**privileges** 250:*3*
**pro** 149:*11, 14, 15*
215:*12*
**probably** 7:*12, 13*
23:*15* 70:*15* 77:*12,
16*
**probation** 94:*6* 231:*6,
11* 369:*3*
**probationary** 252:*23*
253:*21* 368:*23* 369:*1,
4, 11*
**problem** 23:*18* 35:*23*
41:*7* 55:*22* 58:*23*
91:*18* 93:*10* 96:*1, 11*
97:*6* 99:*24* 100:*4, 13*
129:*8* 134:*10, 18*
135:*10* 149:*20*

158:*14* 160:*22*
163:*20, 24* 171:*17*
172:*17* 184:*23* 187:*2,
4, 8* 211:*15* 216:*24*
217:*8, 18* 229:*21*
253:*14* 266:*11*
271:*15* 288:*7* 314:*23*
395:*18* 403:*17* 405:*5,
9* 418:*24* 428:*18, 23*
**problem,** 100:*9*
**problems** 15:*9* 86:*24*
97:*5* 117:*8, 10, 11*
119:*1, 20* 130:*24*
132:*9* 135:*9* 158:*22*
162:*4* 185:*1* 198:*4*
211:*8* 216:*16, 18*
225:*10* 229:*12* 233:*7*
329:*17* 367:*22*
370:*17* 421:*6*
**Procedure** 98:*13*
377:*21* 378:*3*
**proceed** 19:*17* 22:*2*
201:*13*
**proceeded** 13:*8*
**proceeding** 37:*3*
102:*8* 145:*15* 192:*4*
316:*11*
**process** 96:*24* 119:*4,
6* 152:*13, 13* 340:*4*
**produce** 113:*5*
177:*20* 280:*21* 281:*9*
373:*14* 402:*19*
**produced** 159:*17*
252:*18* 381:*7* 399:*11*
402:*12, 19* 428:*2*
**producing** 65:*19*
398:*11*
**product** 362:*18*
**production** 66:*3, 14*
67:*1* 112:*13* 125:*20*
368:*21* 373:*23*
**Professional** 1:*15*
**profile** 424:*12*
**profit** 161:*3*
**Profusely** 397:*23*
**prohibit** 327:*24*
328:*21*
**prohibiting** 294:*23*
**project** 119:*21*
120:*12, 16* 123:*2, 7,

*19* 124:*2* 126:*5*
230:*9* 421:*1*
**projects** 120:*8*
136:*13* 265:*2* 368:*19*
420:*22* 422:*5*
**prominent** 287:*10*
**promise** 8:*21, 22*
**promptly** 255:*20*
**propositions** 75:*15*
**propounded** 434:*6*
**Prosser** 104:*9* 233:*18*
**protect** 78:*11, 16*
234:*10* 238:*12* 342:*3*
**protected** 157:*15, 21*
**protection** 157:*22*
**protest** 213:*24*
**protested** 186:*12*
**protocol** 178:*1*
**protocols** 178:*6*
**prove** 314:*4* 333:*6*
**proven** 137:*7* 333:*3*
**provide** 7:*21, 24*
28:*24, 24* 32:*16, 23*
127:*18* 199:*11*
261:*12* 277:*10* 283:*4,
8, 10* 398:*5*
**provided** 7:*20* 88:*19*
279:*22*
**providence** 79:*16*
237:*2*
**provides** 48:*19*
**providing** 352:*22*
**proxy** 155:*16*
**psychological** 184:*17*
185:*7, 8* 337:*1, 3*
**psychology** 184:*22*
**Public** 1:*16* 50:*16*
268:*21* 270:*5* 318:*1,
17* 369:*2* 431:*4, 15*
434:*21*
**publication** 269:*7*
**public-elected** 317:*12*
**publicly** 287:*17*
**pull** 87:*6* 120:*18*
207:*19*
**pulled** 193:*3, 15*
201:*6, 9* 203:*19*
204:*15* 205:*4* 206:*9*
**pulling** 204:*23*

Deposition of DANIEL PIPES

Lisa Barbounis v. Middle Eastern Forum, et. al.

**pulls** 204:*18*
**punished** 233:*3*
**punitive** 40:*22* 41:*8,
10, 12, 13, 17, 19, 24*
42:*3*
**purchased** 409:*7, 8*
**purple** 421:*12, 14*
**purpose** 274:*18, 23*
**purposes** 280:*11*
339:*15*
**pursuant** 1:*12* 431:*4*
**pursue** 90:*22, 24*
**purveying** 315:*3*
**purview** 74:*23* 75:*4,
12*
**push** 140:*1* 338:*12*
**put** 51:*9* 52:*11*
57:*23* 65:*3* 83:*14*
84:*5* 97:*2* 106:*19, 22,
22* 137:*9* 150:*19*
152:*21* 159:*18* 176:*3*
178:*14* 183:*12, 15, 19*
193:*2, 14, 21* 195:*20*
198:*14* 199:*20* 201:*5*
206:*10* 211:*22*
212:*18* 213:*19*
229:*11* 231:*6* 261:*23*
268:*18* 311:*2* 340:*1*
345:*7* 385:*24* 403:*5*
**puts** 205:*14*
**putting** 55:*21* 171:*1*
205:*1*

< Q >
**question** 5:*5* 7:*18*
8:*10, 10, 11, 22* 14:*22,
24* 18:*3, 21* 19:*4, 8,
15* 20:*6, 8, 10, 21*
21:*20* 23:*3, 7, 17, 20,
22* 40:*24* 44:*17, 18*
46:*23* 48:*18, 22* 49:*2,
4, 6* 51:*16, 24* 53:*9*
59:*9, 21* 61:*4* 66:*22*
68:*1* 72:*24* 82:*20*
86:*10* 91:*13* 100:*24*
101:*11, 17* 107:*5*
109:*21* 133:*10* 146:*4*
151:*17* 154:*10*
155:*15* 156:*15* 162:*8*
166:*12* 168:*5* 171:*6*

172:*11* 177:*7* 179:*8*
184:*11* 188:*4* 194:*22,
24* 195:*8, 11, 23*
197:*2, 5* 203:*4, 9, 10*
210:*16* 212:*3* 220:*23*
222:*2, 9, 11, 24* 223:*6,
7, 12, 13* 224:*2, 8, 9,
14, 16, 17, 18* 225:*22*
226:*1, 10, 14, 18*
244:*14* 246:*4, 13*
248:*3, 5, 14* 249:*15*
257:*4, 12* 258:*3, 4, 7,
13* 264:*1* 278:*21*
279:*3* 283:*9, 15*
284:*1, 17* 295:*14, 20*
297:*17* 299:*8, 21*
302:*2* 311:*7, 8, 15, 17,
18, 18, 19* 315:*11, 13,
15, 18* 318:*10, 18, 19*
324:*9, 16, 19, 21*
325:*2, 11, 12, 13, 16,
20* 326:*1, 2, 4, 7, 9, 10,
12, 12, 15, 19* 327:*13*
329:*13, 17* 330:*1, 1,
13, 23* 331:*1, 2, 4, 7,
14, 22* 332:*2, 10*
333:*11* 334:*11*
335:*15, 17* 336:*1, 2*
341:*17, 22* 342:*1*
343:*11* 344:*13* 351:*4,
7, 8, 13, 14, 20* 352:*1*
353:*4, 7* 356:*12, 23*
357:*3, 4, 9, 9, 12, 16,
18, 19* 358:*18, 19*
359:*4, 7, 23* 360:*2, 4,
6* 362:*7* 367:*5*
374:*19* 378:*21*
386:*14* 387:*18, 21*
390:*6* 391:*1, 11*
392:*8* 393:*3, 8, 12*
394:*10, 16, 20, 21*
395:*17, 24* 396:*3, 6, 7,
7, 9, 10, 18* 400:*5, 9,
12* 403:*6* 405:*1, 4*
413:*16* 427:*23* 429:*2*
**questioning** 140:*15, 19*
**questions** 7:*16, 20*
8:*12* 19:*18* 21:*17*
42:*20* 43:*2, 12* 48:*19*
57:*21* 58:*2, 11* 59:*5,

7* 72:*11, 14* 74:*17*
82:*23* 122:*15* 142:*3*
161:*21* 196:*7, 10, 11,
18* 199:*8* 200:*13, 21*
201:*11* 208:*21, 22*
221:*16, 19, 21, 21*
223:*10, 16* 226:*2*
241:*1* 242:*2* 329:*8*
330:*4, 9, 15, 17, 18*
344:*19* 351:*19*
358:*10* 381:*15*
382:*10* 383:*20*
402:*20* 403:*4, 23*
404:*13* 405:*12, 14, 17,
21* 416:*11, 12* 424:*4*
429:*18* 434:*6*
**question's** 166:*9*
426:*6*
**quick** 18:*11* 176:*8*
427:*22*
**quickly** 7:*15* 95:*12*
280:*21* 307:*13* 316:*1*
**quid** 149:*11, 14, 15*
215:*12*
**quiet** 14:*16* 19:*11*
175:*19, 22* 278:*17*
**quit** 262:*5*
**quite** 63:*21* 234:*5*
346:*19* 425:*15*
**quiver** 344:*2*
**quizzed** 309:*3, 4, 4*
**quo** 149:*11, 15*
215:*12*
**quote** 95:*6, 7* 170:*2*
220:*11* 222:*16*
328:*12*
**quoted** 95:*22* 177:*6*
341:*9*
**quotes** 95:*24*

< R >
**races** 424:*18*
**radical** 136:*10* 211:*7*
**radically** 238:*18*
**raise** 186:*23* 216:*13*
255:*1* 267:*2, 5*
342:*21, 22* 419:*14*
**raised** 161:*18, 23*
217:*20* 230:*23* 260:*8*

**raising** 354:*23*
**random** 417:*22* 419:*3*
**Range** 106:*1* 150:*19*
209:*17* 285:*7* 342:*12*
**rapidly** 428:*24*
**rates** 372:*7*
**Raymond** 40:*8, 9, 13,
16*
**reach** 92:*22* 415:*6*
**reached** 92:*23* 99:*19*
262:*14*
**reacted** 212:*10, 11, 13*
**read** 6:*15* 14:*23*
15:*2* 23:*22, 24* 32:*9*
47:*4, 6* 48:*7* 52:*1, 2,
3, 6, 7* 54:*17* 55:*5, 20*
56:*17* 57:*6* 58:*1*
59:*1, 12, 19* 60:*3, 11,
16, 18* 73:*1* 81:*19, 23*
82:*24* 112:*4, 16, 21*
122:*14, 22* 127:*4*
142:*22* 157:*2, 3, 6*
159:*16, 17, 19* 162:*13*
170:*4* 173:*20* 176:*7*
177:*5* 179:*6* 191:*8*
193:*8, 9* 197:*4, 7*
200:*4* 201:*19* 219:*17*
230:*10, 13* 240:*13, 20*
270:*18* 271:*24*
278:*21, 23* 284:*22*
292:*17* 313:*12*
319:*10* 320:*16*
342:*16* 346:*11* 348:*5*
349:*12* 354:*9* 362:*2,
19* 363:*18, 24* 368:*23*
374:*8* 375:*18* 380:*6,
20* 381:*10, 14, 17, 18*
389:*24* 390:*7* 392:*21*
399:*24* 400:*6, 8, 13,
14, 15, 16, 17, 22*
402:*6, 8, 9* 403:*16*
406:*18* 417:*18*
418:*11* 420:*1, 6*
421:*7* 422:*6* 427:*22*
432:*4* 434:*4*
**reader** 179:*16* 191:*2*
**reading** 54:*23* 200:*6*
220:*11* 284:*7* 385:*15*
**reads** 55:*8*

**ready** 59:*22* 191:*9*
192:*14, 15, 15* 292:*8*
324:*14, 22, 23* 326:*14,*
*17* 394:*7, 8*
**real** 176:*8* 249:*15*
427:*22*
**realize** 416:*10*
**realized** 85:*10, 11, 14*
92:*15* 244:*4*
**really** 7:*15* 42:*21*
51:*14* 115:*14* 137:*12*
144:*18* 159:*7* 184:*10*
194:*14* 210:*7, 8*
223:*4* 239:*3* 240:*7*
248:*12* 274:*11, 16*
279:*6* 280:*17* 290:*6*
305:*15* 314:*16*
359:*13* 371:*1* 385:*22*
426:*20*
**rearrange** 337:*18*
**reason** 13:*23* 80:*24*
86:*22* 88:*7, 18*
100:*10* 128:*14* 137:*8,*
*19, 21* 139:*3* 164:*10,*
*19, 20* 165:*24* 182:*17*
183:*2, 3* 197:*13*
244:*11* 262:*3* 267:*16*
282:*4* 375:*16* 378:*17,*
*20, 21* 380:*19* 408:*1*
411:*22* 412:*3* 432:*6*
433:*5, 8, 11, 14, 17, 20,*
*23*
**reasoning** 165:*1*
**reasons** 85:*17, 20*
86:*5, 15* 87:*20* 88:*18*
150:*19* 168:*21*
172:*23*
**Rebel** 267:*5, 7*
**recall** 38:*1* 131:*11,*
*13* 242:*18, 19, 21, 22*
363:*6* 379:*20, 21*
421:*3*
**receipt** 432:*15*
**receipts** 377:*22*
**receive** 43:*19* 103:*11*
252:*15* 415:*1* 419:*7*
**received** 103:*8*
160:*24* 261:*4, 13*
304:*3* 348:*6, 16*

369:*12* 380:*1* 384:*24*
385:*1, 2*
**receiving** 103:*4*
252:*13* 339:*14*
417:*19*
**recess** 37:*2* 102:*7*
145:*14* 192:*3* 316:*10*
**recite** 283:*19* 284:*22*
**recognize** 41:*21*
176:*12* 402:*11*
**recollection** 122:*23*
**reconcile** 261:*16*
**record** 5:*9, 21* 6:*8,*
*15* 8:*5, 19* 9:*8* 23:*16*
32:*8* 36:*20, 24* 37:*6*
52:*3, 5, 9, 10* 56:*1, 2,*
*19* 58:*24* 60:*16, 18*
61:*4* 71:*8* 84:*6*
88:*16* 91:*8, 10* 102:*5,*
*11* 125:*17* 127:*2*
144:*20* 145:*12, 19*
148:*24* 152:*15* 192:*1,*
*7* 195:*5* 209:*9* 223:*5,*
*15, 17* 224:*13* 229:*11*
233:*11* 240:*6* 244:*21*
316:*8, 15* 319:*12*
323:*13, 14, 17, 19*
324:*23* 325:*8, 23*
326:*9* 345:*2, 4* 359:*1*
372:*20* 373:*14, 19*
375:*21* 386:*1* 387:*7,*
*10* 392:*11* 403:*6*
416:*8* 429:*17, 20*
431:*8*
**recorded** 5:*11* 81:*13*
431:*6*
**Recording** 3:*14, 21*
71:*5* 75:*19, 23* 76:*3,*
*6, 15, 16* 79:*16* 80:*9,*
*15* 81:*3* 121:*10, 19,*
*20* 133:*5, 12* 150:*24*
151:*6, 13* 236:*23*
237:*1* 275:*12, 14, 21*
276:*12, 17, 23* 277:*1*
278:*20*
**records** 125:*18, 24*
127:*4, 12* 142:*19*
388:*20* 389:*16, 20, 21*
**recruit** 171:*23* 172:*1*

**red** 286:*3*
**reduce** 58:*11* 231:*21*
**refer** 158:*18* 174:*16,*
*17* 383:*20*
**reference** 320:*8*
407:*6* 414:*13* 429:*6*
**referenced** 261:*1*
373:*15*
**references** 255:*7*
**referencing** 226:*16*
240:*16* 263:*24*
313:*18* 318:*9, 11, 13*
330:*20* 407:*13*
427:*19* 429:*4*
**referred** 80:*8* 227:*11*
**referring** 97:*22*
100:*2, 9* 103:*13*
177:*20* 178:*11, 17*
319:*14* 336:*24*
347:*16* 348:*7* 361:*18*
362:*6* 364:*2* 406:*24*
408:*23*
**reflect** 319:*13*
**reflects** 256:*17*
**refreshers** 117:*21*
**refusal** 362:*18*
**refused** 332:*14*
**refusing** 56:*12*
**regard** 21:*9* 337:*17*
360:*4, 6*
**Regarding** 107:*22, 22*
329:*2* 338:*7* 389:*18*
417:*6*
**regime** 256:*24*
**regularly** 347:*7*
**regularly,** 347:*21*
**reimburse** 377:*24*
378:*1* 379:*12*
**reimbursed** 376:*10,*
*22* 378:*6, 9* 379:*5*
**reimbursement** 377:*14*
**reimbursing** 379:*17*
**reinstated** 368:*17*
380:*10, 12*
**reiterate** 318:*21*
**reiterated** 252:*2*
**rejoined** 12:*23, 24*
13:*2*
**relate** 324:*2* 367:*9*

**related** 20:*11, 12, 13*
70:*10* 109:*21* 110:*19*
152:*17* 286:*6* 318:*24*
368:*21* 373:*2* 422:*19*
423:*1*
**relating** 272:*14*
**relations** 21:*2* 74:*4*
93:*16* 138:*17* 180:*10,*
*22* 181:*12* 213:*23*
309:*10* 312:*13*
**relationship** 17:*14*
20:*14, 20* 155:*1*
156:*2* 189:*12* 304:*15,*
*23* 305:*5, 20* 308:*15*
339:*6*
**relationships** 155:*4*
**relevancy** 154:*13*
**relevant** 43:*12* 128:*8*
154:*7* 195:*14, 18, 21*
**relief** 255:*24*
**reluctance** 363:*11*
**rely** 248:*5*
**rem** 144:*14*
**remain** 93:*4, 6* 366:*5*
368:*23* 423:*10*
**remainder** 409:*22*
**remained** 253:*3, 17*
**remaining** 427:*7*
**remains** 348:*23* 375:*9*
**remember** 10:*5*
14:*24* 21:*5, 6, 7* 25:*4,*
*8, 11, 12, 21* 27:*13*
28:*3* 33:*8* 37:*19, 21,*
*22* 38:*16* 40:*1* 45:*14,*
*18, 20, 22* 49:*21*
69:*19, 22* 70:*1* 87:*17*
89:*1, 2, 4* 93:*8, 9*
96:*6* 100:*1, 4* 102:*18*
103:*8* 105:*2, 4, 24*
110:*16, 23* 111:*7*
115:*2* 123:*18* 129:*15,*
*17* 131:*23, 23, 24*
135:*23* 143:*24* 144:*5,*
*17* 146:*12* 162:*6*
174:*21* 176:*5, 10, 11*
181:*24* 190:*7, 9*
192:*19* 199:*5, 6, 18*
200:*5* 204:*7* 208:*7*
228:*7* 231:*14* 234:*3*
241:*20* 242:*23*

Deposition of DANIEL PIPES                                    Lisa Barbounis v. Middle Eastern Forum, et. al.

252:13  256:15
258:15  262:13
286:15  288:3  296:19
297:16  307:14
323:23  333:15
343:13  346:10
352:11, 14, 15  353:23
378:2, 5  387:24
389:15  398:7  407:7
408:6  410:20  413:7,
19, 20, 22  414:3, 9
417:19, 22, 24  418:3
420:12, 14  421:21
**remember,**  7:22
**remind**  131:23  162:3
186:6  269:17  272:24
**reminded**  428:9
**remotely**  1:12  5:24
6:4, 22
**remove**  320:23
**removed**  136:11
157:19  197:22
204:11  251:11
320:22  336:23
339:23  347:6, 15, 17
**removing**  228:12
**remuneration**  231:22
356:4  367:24
**repeat**  8:13  32:8
**repeated**  153:24
**repeatedly**  163:21
184:4  186:12
**repeating**  134:4
323:1  370:3
**repercussions**  288:18
373:7, 8, 10, 15
**rephrase**  8:13
**replace**  231:9
**replied**  190:12  192:13
**reply**  318:5, 8
**report**  95:1, 8  97:23
98:12  117:1  118:15
136:4, 6  150:8  171:4,
7, 8, 8  198:23  274:7
321:17  326:22  327:7
330:18  333:2  334:24
336:14  338:15, 16
339:13  340:15
363:17  375:12
380:14

**reported**  1:14  96:3, 9
105:10  129:23  152:5
172:4, 24  192:17
272:11  322:12
375:15
**Reporter**  1:16  5:18,
21, 23  6:3, 16  8:24
14:14, 16  15:2  23:24
27:11  30:1  47:3, 6,
11  48:6, 8  70:21, 23
74:1, 10, 22  75:3
79:6  81:8  82:21
87:1  90:19  91:6
99:9  102:12  106:10
108:5  111:17  115:14
118:17  137:13
139:12  144:14  146:3
149:13  151:7  157:6
168:3  175:15, 19
179:15  197:7  201:17,
19  205:12  207:21
209:7  221:4, 9  244:6,
9  250:14, 17  278:17,
23  290:4  296:8
300:12  310:14  316:5
325:18  326:1, 6, 13
328:17  345:7  353:15,
19  376:14  399:15
414:5  429:16
**reporters**  75:15  236:5
**Reporting**  5:17, 19
119:4  176:17  180:4
198:19  238:21  308:6
329:5  337:2, 6, 10
338:2  339:24  366:21
375:23
**reports**  95:7  108:12
118:3  148:2  162:5
238:22  248:16  294:6,
7  329:20  374:24
376:5, 8  384:11
**represent**  6:10  64:2,
21  65:2  97:13  190:6
252:17  349:22
354:14  386:12
416:14, 17, 19  428:1
**representation**  427:7
**Representative**  2:22
**represented**  64:18
67:5  98:21  99:2

**Representing**  2:6, 11,
16  6:13  66:17  386:6
387:14
**reprieve**  348:6, 10, 16
355:22  406:6
**Republican**  317:6
318:1, 18
**reputation**  338:7, 11
349:6  354:7
**request**  66:3, 13
112:11, 13  113:4
125:20  199:7  263:4
373:14, 19, 23  399:10
**requested**  112:13
241:8  262:24
**requesting**  399:8
**requests**  65:4  66:24
67:1  112:8  399:3, 16
**require**  93:4  358:10
**required**  114:9
**requirements**  17:24
**requires**  22:14  423:6
**research**  184:1, 8, 16,
17, 18, 18, 22  185:7, 8
305:14  388:7  397:9,
19  417:8, 9
**reserved**  5:5
**resignation**  420:4
**resolution**  153:1, 3, 5
158:16  187:13  309:6
**resolutions**  143:7
**resolve**  43:10  98:22
99:14
**resources**  119:8
148:10  149:24
250:20  328:7
**respect**  363:10
**respective**  5:2
**respond**  65:24  72:14
73:4
**responded**  66:6, 10,
13  420:1
**responding**  189:19
294:5  380:9  391:10
418:3  419:12
**responds**  243:5
346:12
**response**  7:21  8:23
73:6  112:7  117:3
118:3  125:19  126:8

203:9  212:21  218:22
219:2, 15  320:14
367:11  370:1  373:24
397:20, 21  421:7
**responses**  7:20  9:3
67:1  359:22  399:16
**responsibilities**
130:13, 14
**responsibility**  78:4, 4
156:10, 15, 17, 22
157:13  328:2, 5
368:19
**responsible**  147:8, 13
158:7  186:24  216:3
**responsive**  7:23, 23
112:11  113:2, 3
344:21  373:21  399:3,
10, 20
**rest**  230:10  240:20
**restated**  368:17
**restrictions**  90:4, 7
91:15  380:20
**resulting**  362:10
**resume**  224:1, 5
**resumed**  91:3
**retain**  28:17
**retained**  136:12
**retaliate**  130:2, 7
**retaliated**  129:22
**retaliation**  129:21
131:18, 19  293:21
294:2, 4, 8, 13, 18, 21,
24  322:17, 19, 23
326:22  327:6, 7
328:21  329:5, 21
331:1  338:15
**retold**  150:16
**return**  13:7, 7, 8
84:20  253:2, 7, 16
277:24  278:6, 9
432:13
**returned**  279:4
402:21
**returning**  348:17
371:5
**reuse**  417:15
**review**  51:13, 15, 23
59:4  252:6  282:16
389:16, 20  418:9

Deposition of DANIEL PIPES                                    Lisa Barbounis v. Middle Eastern Forum, et. al.

reviewed 162:*11* 390:*7* 397:*14*
reviewing 362:*17*
reviews 52:*11*
revise 86:*10*
RICO 260:*6* 261:*1, 7, 9, 20* 262:*12*
rid 350:*5*
ridiculous 36:*15, 16, 19* 57:*11* 59:*11* 330:*11* 344:*16, 16*
RIESER 2:*13* 6:*17, 17* 41:*16, 23* 42:*10, 13, 16* 385:*21, 23* 386:*10, 16* 387:*3, 6, 9, 14* 410:*9* 415:*4, 8, 13* 416:*5, 15, 20, 23*
right 16:*22* 18:*16* 22:*6* 30:*2* 31:*11* 36:*11* 43:*15* 55:*12* 59:*14, 18* 64:*3, 11, 22* 67:*2* 77:*5* 80:*12, 16, 20* 84:*5, 15, 18* 87:*19* 88:*18* 89:*2, 3, 8* 91:*16* 101:*23* 103:*16* 112:*1, 23* 117:*12* 120:*19, 20* 121:*18* 122:*3, 9* 124:*3, 9, 12* 125:*5* 126:*15* 128:*5, 15* 130:*11, 20* 131:*4* 132:*18* 134:*1, 23, 24* 135:*19* 136:*20* 140:*11* 144:*6, 22* 145:*8* 147:*6* 149:*12* 151:*9* 152:*6* 154:*16, 23* 155:*12* 160:*15* 163:*14* 176:*1, 21* 177:*10, 24* 179:*9* 180:*20* 181:*10* 183:*19* 187:*9* 189:*13* 191:*24* 192:*9, 10* 193:*22, 24* 195:*21* 196:*2, 2, 17, 21, 23* 197:*17* 198:*18* 200:*2* 205:*5, 23, 24* 206:*14* 207:*7, 24* 208:*4* 212:*4* 213:*6* 216:*10, 22* 217:*2* 218:*5, 9* 220:*1, 22* 222:*4* 223:*1* 226:*1* 228:*23*

229:*1* 230:*4, 5* 231:*9, 13* 232:*8, 17, 23, 24* 233:*2, 3, 4, 5* 236:*5* 241:*2, 12, 22, 24* 242:*9, 11, 14* 243:*5, 22* 246:*10* 248:*20* 249:*18* 250:*7* 251:*16, 17* 252:*9* 253:*17, 18, 21, 22* 255:*3, 9* 259:*12, 22, 24* 260:*2* 262:*21, 24* 263:*24* 264:*5, 8, 8, 11, 17* 265:*22* 266:*17, 19* 270:*19* 272:*19* 273:*9* 275:*18* 278:*10* 279:*14* 282:*23* 283:*13, 20* 284:*5, 19, 23* 285:*13, 18* 286:*7, 23* 287:*14, 19* 289:*2, 6, 12* 290:*12, 13* 291:*12* 292:*4, 5, 7, 7, 9, 12, 13, 14* 293:*2, 8, 12, 13* 294:*2* 295:*11, 17, 22, 24* 298:*13, 14* 299:*7, 14* 300:*24* 301:*5, 6, 11* 302:*24* 303:*16, 17* 304:*15* 306:*10, 11* 307:*3, 10* 308:*7* 309:*24* 310:*3* 313:*12* 314:*22* 315:*21* 317:*13* 318:*10, 24* 319:*20, 24* 320:*16, 20* 322:*9, 19* 323:*5, 12, 13* 324:*5* 325:*15* 330:*8* 333:*18* 337:*7* 339:*16* 340:*18* 341:*15, 16, 22* 344:*6, 13, 21* 345:*22* 346:*15* 347:*3, 3, 21* 348:*5, 10, 22* 350:*6, 13, 14* 352:*6* 353:*8, 8* 354:*4, 9* 355:*3, 19* 357:*5* 359:*2* 360:*7* 361:*16* 362:*5, 10, 11, 14, 15, 20* 363:*3, 19* 364:*22* 366:*8, 9, 16* 367:*3* 368:*8, 13* 369:*1, 19* 370:*7* 371:*8, 20* 372:*13, 23* 374:*8, 12, 19* 375:*20* 376:*5*

384:*19* 386:*18* 387:*4, 16* 390:*18* 394:*4* 395:*10* 396:*12, 19* 398:*9, 19* 402:*4* 403:*17* 405:*1* 406:*5, 6, 8, 19, 20* 407:*4, 14, 24* 408:*12, 20, 21* 409:*8, 10, 10, 20* 410:*8, 19, 22* 411:*3, 19* 412:*23* 414:*2, 23* 417:*3* 418:*17* 420:*7* 422:*18* 426:*22* 427:*17* 429:*13, 14, 16*
rights 217:*11* 416:*15*
rises 150:*1*
Robinson 267:*13* 279:*21* 285:*4, 10* 286:*3, 18* 287:*3, 11* 289:*16* 316:*21* 373:*5, 12*
Robinson's 374:*8*
rogue 233:*2* 367:*9*
role 84:*23* 114:*12* 136:*12, 12* 347:*8* 348:*17* 380:*5*
Roman 2:*16, 21* 6:*18* 7:*6* 12:*15* 24:*6, 10, 18* 26:*16, 20, 24* 33:*9, 12, 16* 37:*9* 62:*15, 18, 21* 70:*24* 71:*13* 74:*21* 75:*2, 10* 77:*24* 78:*5, 18, 22* 84:*19* 86:*19* 89:*10, 15* 93:*2* 107:*7, 10, 13, 23, 24* 113:*9, 22* 114:*2, 11* 119:*16* 122:*8* 136:*23* 138:*14* 143:*19, 19* 144:*6* 145:*21* 146:*13* 150:*12* 151:*8* 154:*6* 155:*20* 156:*11* 159:*15* 168:*21* 171:*1* 179:*8* 181:*17* 184:*7* 185:*17* 188:*2* 189:*11, 13* 196:*23* 198:*17* 202:*7* 203:*19* 212:*14, 15, 18* 214:*16* 217:*11* 232:*3, 20* 234:*20* 235:*1* 236:*12* 240:*11* 243:*24* 244:*12* 255:*8* 256:*2, 20* 257:*6*

258:*7* 273:*21* 275:*7* 292:*19* 293:*17* 294:*5* 295:*3* 298:*21* 299:*7* 301:*16* 303:*23* 304:*15* 308:*7* 314:*19, 23* 320:*4* 321:*12, 20* 329:*4* 333:*2* 354:*13* 360:*8, 17* 361:*24* 363:*23* 364:*6, 17* 365:*17* 367:*9* 368:*17* 371:*5* 386:*6* 389:*18* 390:*1, 9* 407:*21* 418:*12* 422:*7*
Roman's 63:*6, 15, 18* 89:*23* 147:*6* 155:*12* 185:*21* 186:*3* 211:*23* 219:*15* 249:*19* 250:*3* 251:*3* 320:*17* 369:*13* 386:*8*
room 77:*15* 96:*10* 150:*13* 151:*8* 152:*3* 164:*22* 165:*18* 166:*3, 13* 168:*7* 169:*11* 193:*17* 204:*8* 212:*16* 214:*17, 18* 215:*7* 236:*14* 428:*13, 15*
roughly 220:*17, 18* 313:*4*
round 193:*22, 23* 201:*4* 241:*24*
rub 116:*16*
rule 19:*6, 11* 57:*17* 117:*4* 425:*22*
Rules 98:*13* 226:*3* 401:*21*
ruling 55:*17*
rumor 137:*6, 17* 138:*12, 14, 16, 20, 20, 21, 22* 139:*9* 143:*9* 150:*1, 16* 153:*24* 301:*20* 302:*8* 303:*3* 307:*11* 308:*1* 309:*15* 311:*24* 343:*10, 10, 12* 354:*21* 355:*2* 356:*15* 361:*19, 21, 22* 370:*22, 23* 406:*3* 407:*5* 408:*14* 419:*4* 428:*8, 19*
rumor, 138:*12*

Deposition of DANIEL PIPES                                    Lisa Barbounis v. Middle Eastern Forum, et. al.

rumors 149:*18*, *22*
314:*8*, *13* 354:*7*
362:*2* 418:*23* 429:*1*
run 7:*14* 145:*2*
running 339:*21*
ruse 202:*3*

< S >
sabotage 344:*18*
safe 237:*17* 238:*1*, *9*,
*11*
safeguards 238:*12*
safety 164:*11*, *11*
172:*3* 182:*19*
sake 234:*8* 405:*15*
salary 27:*2*, *4*, *5*, *5*, *7*
37:*20* 232:*9* 366:*5*
419:*7* 422:*13*
Samantha 147:*8*
sat 159:*5* 192:*18*
satchel 344:*2*
satisfaction 125:*10*
136:*16* 150:*21*
152:*24* 157:*1*, *10*
158:*15* 184:*19*
238:*19* 251:*11*
259:*18*, *20*
satisfactorily 128:*24*
136:*15* 171:*9* 239:*5*
satisfied 177:*15*, *18*
209:*23* 241:*6*
saw 85:*10* 92:*15*
98:*6* 110:*17* 114:*20*
116:*7*, *8*, *18* 235:*5*
280:*13*, *23* 281:*3*
370:*22* 399:*24* 400:*6*
418:*19* 428:*23*
saying 32:*22* 83:*16*
87:*4* 95:*23*, *24* 96:*8*
110:*21* 112:*21* 114:*5*
127:*2*, *20* 129:*3*
132:*1* 143:*16* 153:*2*
158:*4* 172:*18* 173:*2*
177:*7* 190:*23* 215:*19*
218:*5* 222:*11*, *12*, *13*
224:*10* 244:*11*
247:*19* 255:*15*
262:*20* 263:*9* 264:*10*
265:*8* 267:*20* 277:*3*
288:*14* 290:*10*, *24*

300:*20* 309:*14*, *23*
311:*3* 312:*2*, *3*, *3*, *4*, *4*,
*5*, *20*, *20*, *20*, *21* 313:*4*,
*8* 322:*7* 323:*23*
333:*5*, *8* 338:*19*
341:*14* 342:*18*, *19*, *19*,
*20* 344:*22* 347:*13*
348:*8* 354:*4*, *16*
357:*14* 361:*9* 368:*24*
370:*11* 375:*22*, *24*
376:*1* 378:*24* 379:*1*,
*1* 388:*12* 390:*17*
410:*2*, *3* 411:*24*
412:*1*, *11* 427:*5*
says 54:*19* 59:*10*
61:*19*, *20* 62:*8* 63:*11*,
*14* 64:*6*, *15* 67:*18*
124:*14*, *19*, *19* 178:*22*,
*22* 189:*4* 198:*11*
211:*14* 214:*17* 224:*4*
230:*19* 241:*5*, *13*
243:*3* 249:*5*, *8*
252:*12*, *19* 254:*23*
255:*4*, *6* 263:*21*
280:*7* 302:*14* 306:*7*
307:*10* 321:*16* 329:*2*
330:*22* 332:*20*
336:*21* 346:*12*, *22*
347:*4*, *15* 356:*15*
360:*8* 366:*8* 371:*10*
377:*8* 379:*23*, *24*
385:*3* 402:*3*, *4*
411:*21* 421:*22* 428:*4*,
*11*, *11*, *21*, *21*, *21*
scared 174:*20* 182:*8*,
*18*
scene 158:*23*
schedule 370:*14*
scholarship 216:*14*
scope 75:*20* 212:*17*
screamed 152:*2*
screen 51:*9* 60:*12*, *13*,
*14* 81:*14*, *18* 122:*18*
233:*10* 292:*6*
Screenshot 3:*13* 64:*4*
121:*10*, *17* 346:*13*
screenshots 106:*7*
121:*15*
scroll 241:*4* 319:*15*

scrolled 319:*13*
scrolling 240:*21*
scuttle 13:*10* 262:*11*,
*12*
scuttled 13:*9*
seal 431:*11*
sealing 5:*3*
search 125:*18*
second 8:*9* 22:*20*, *21*
46:*17* 60:*14* 85:*24*
86:*7* 120:*19* 131:*1*
162:*22* 179:*7* 193:*23*
194:*21* 198:*21* 206:*9*
261:*3* 265:*9* 285:*23*
291:*7* 312:*5* 333:*23*
337:*20* 349:*8* 373:*23*
382:*1*
secondary 194:*9*
secondly 137:*5*, *17*
259:*17* 358:*9* 400:*10*,
*14*
secret 171:*19* 268:*19*
269:*3*, *17* 272:*17*
secretary 64:*6* 67:*21*
68:*18*, *20*
secrets 261:*19*
264:*22*, *23* 268:*22*
269:*24* 270:*16*
271:*22*
section 60:*5*, *16*, *18*
64:*10*, *15* 66:*19*
67:*16* 247:*8*
see 51:*9* 53:*7* 58:*19*
63:*10*, *11*, *14* 64:*22*,
*23* 66:*16*, *18* 67:*18*
68:*8* 87:*13* 116:*8*
120:*20* 122:*9* 124:*19*
127:*6* 130:*15* 134:*9*
141:*7* 157:*12* 160:*14*
176:*2* 177:*8* 178:*24*
181:*10* 182:*12*
184:*20* 188:*3* 189:*20*
190:*10* 193:*18* 199:*7*,
*8* 200:*3* 207:*2* 218:*9*
240:*13*, *18* 241:*1*
242:*19*, *21* 243:*1*, *7*
257:*9*, *13*, *17* 280:*22*
292:*8* 294:*4* 296:*14*
306:*21* 316:*17* 318:*8*,
*24* 319:*3*, *3*, *7*, *8*, *8*, *11*,

*14*, *16*, *16* 345:*10*, *18*
346:*12* 352:*16*, *16*, *17*
354:*4* 357:*11* 360:*7*,
*12*, *13*, *14*, *17*, *19*
365:*16* 370:*20*, *20*
372:*3* 376:*3* 380:*20*
381:*19*, *22* 383:*21*
403:*17* 404:*9* 406:*8*
419:*21*, *23* 420:*2*
422:*2*, *2*, *3*, *3*, *3*
seeing 336:*9* 372:*4*
417:*10*
seek 185:*6*
seeks 183:*21*
seen 53:*5* 63:*9* 98:*3*
116:*10*, *16* 177:*16*, *19*
279:*16*, *19* 281:*11*
314:*18* 398:*10* 399:*1*
select 124:*13* 127:*16*
self-evident 183:*23*
Self-explanatory 249:*4*
self-reporting 98:*14*
send 28:*10* 43:*4*, *8*
144:*10* 177:*24* 178:*1*,
*5*, *7* 219:*4* 247:*18*
262:*20* 263:*8*, *9*, *12*
264:*14*, *14*
sending 247:*8* 417:*2*
sense 60:*12* 255:*21*
259:*15* 274:*17*
318:*23* 319:*9*
sensitive 196:*22*
197:*10*, *11*, *12*
sent 110:*1* 122:*8*
124:*11* 127:*9* 130:*14*
173:*21* 174:*2* 178:*15*,
*20* 189:*21* 190:*1*, *2*, *6*
192:*12* 199:*6* 211:*5*
218:*10*, *14*, *15*, *16*, *18*
219:*5* 227:*22* 228:*4*
241:*16* 242:*16*, *23*
243:*2*, *11*, *19* 248:*11*
252:*10* 262:*2* 264:*4*
266:*24* 267:*1* 268:*7*
292:*9* 302:*12* 316:*18*
330:*21* 337:*5* 363:*18*,
*21* 380:*23* 382:*24*
402:*18* 407:*20* 420:*6*,
*16*

Deposition of DANIEL PIPES

Lisa Barbounis v. Middle Eastern Forum, et. al.

sentence   124:*18*
188:*3*  200:*6*  220:*4*
240:*16*  332:*20*  348:*2*
356:*14*  358:*19*  359:*6*
382:*4*
separate   15:*12, 19, 23*
16:*1*  218:*13, 14*
241:*8*  269:*18*  271:*23*
367:*22, 23*  423:*7*
September   261:*6*
sergeant   115:*9*
serial   184:*2*
serious   106:*1*  131:*13*
184:*11*  231:*7*  309:*1*
Seriously   36:*10*
136:*9, 9*  164:*13*
170:*3*  173:*17*  188:*22,
23, 24*  344:*15*  399:*15*
428:*8*
seriousness   220:*5*
serve   252:*20*
Serving   317:*17*
session   7:*19*  315:*11*
set   26:*20*  89:*15*
125:*20*  341:*3*
SETH   2:*3*  6:*11*
14:*12*  20:*5*  23:*7*
28:*7*  31:*15*  35:*11*
36:*7, 19*  41:*16, 22, 23*
46:*13*  49:*6*  51:*14*
52:*18*  56:*3, 6*  74:*13*
91:*6*  101:*24*  102:*12*
109:*16*  146:*3*  148:*13,
17, 19*  149:*1, 13*
159:*15*  178:*9*  184:*9*
191:*11*  205:*21*
208:*19*  210:*14*
221:*24*  223:*3*  226:*7*
240:*15*  244:*24*  265:*9*
269:*15*  270:*14, 22*
271:*5*  284:*2*  329:*16*
330:*12*  357:*15*  359:*4*
381:*1*  382:*9*  385:*21*
386:*16*  393:*2*  395:*5,
12*  396:*16, 23*  410:*9*
416:*6, 15*
seth@dereksmithlaw.c
om   2:*5*
setting   350:*2*  412:*9*

settle   99:*3*
settled   43:*6*
seven   94:*23*  136:*2*
164:*5*  197:*14*  242:*7*
280:*24*  298:*19*
332:*15*  354:*15*  365:*4*
401:*14, 18*  416:*2*
426:*21*
seventh   415:*7*
severely   356:*3*  363:*15*
sex   75:*11, 15*  77:*15*
151:*9*  154:*6*  159:*9,
11, 12, 19*  160:*1*
162:*10, 13, 15*  163:*5*
165:*14*  212:*15*
213:*20*  215:*7, 10, 11,
21*  236:*5*  301:*17, 23*
302:*8, 21*  303:*3*
305:*15*
sexual   79:*14*  95:*10*
106:*3*  110:*19*  129:*18,
20*  131:*10*  132:*14, 15,
18*  137:*1*  138:*15, 17*
141:*10*  148:*2*  149:*11,
15*  154:*5, 15, 16, 22,
23*  155:*3*  156:*21, 24*
157:*14*  159:*10*
162:*17*  164:*12*  171:*4,
12*  176:*14*  177:*23*
179:*6*  184:*2*  188:*2, 7,
17, 20*  189:*4*  194:*8, 8*
198:*13*  202:*8*  209:*16*
211:*15, 15, 21*  212:*1*
215:*12, 23*  220:*4*
227:*9, 10*  233:*4, 6*
238:*21*  245:*24*
303:*16*  304:*16, 23*
305:*5, 11*  306:*14, 17,
21*  322:*12, 15*  336:*22*
342:*23*  349:*5*  366:*21*
367:*15, 16*
sexually   97:*1, 10*
107:*1*  177:*23*  302:*15*
303:*24*  304:*2*
Shardelle   9:*22*
S-H-A-R-D-E-L-L-E
9:*22*
share   164:*21*  168:*14*
292:*6*

shared   143:*6*  165:*18*
166:*3, 13*  168:*7*
Shargel   9:*19, 21, 24*
sharing   359:*3*
she'd   289:*23*  323:*2*
334:*9, 22*
sheet   432:*7, 9, 11, 14*
434:*9*
she'll   175:*2*
Shikunov   109:*17*
shoddy   349:*15*
short   375:*13*  427:*8*
Shorthand   1:*16*
431:*7*
shortly   336:*16*  368:*1*
shot   419:*24*
shoulder   252:*24*
should've   74:*2*  75:*16*
168:*16*  172:*4*  184:*8*
show   89:*17*  168:*9*
174:*9, 9, 10*  190:*5*
199:*1, 3, 3, 4, 7*  208:*7*
231:*23*  247:*22*
251:*16*  283:*14*
302:*14*  306:*20*  314:*5*
321:*22*  322:*6*  418:*10*
419:*6*  420:*1, 20*
showed   60:*5*  106:*7*
107:*10*  110:*5*  173:*22*
174:*2, 4, 11*  210:*24*
232:*6*
shown   79:*8, 13*
shows   190:*14*  261:*23*
shrugs   8:*1*
shuffling   414:*6, 12*
sic   46:*5*  148:*13*
213:*19*  217:*10*  348:*6*
380:*11*  408:*5*
side   107:*17*  207:*1*
348:*23*  407:*24*
SIDNEY   2:*13, 23*
sign   6:*15*  214:*18*
239:*19*  247:*10, 13, 20,
24*  379:*9*  432:*8*
signaled   85:*23*
signature   431:*11*
434:*11*
signed   129:*1, 2*
150:*13*  152:*24*  153:*2*
158:*4, 6*  172:*18*

187:*14, 16*  189:*15*
212:*17*  218:*4, 6*
239:*16*  247:*15*
significant   192:*22*
368:*5, 7*
signing   367:*10*
432:*10*
similar   150:*23*
222:*17, 18*  264:*15*
simple   20:*20*  25:*8*
49:*1*  56:*12*  80:*15*
257:*12*  284:*17*
330:*23*  331:*5*  354:*9*
356:*23*  379:*7*  393:*8*
400:*12*  405:*14*
simply   83:*20*  85:*9*
323:*1*  334:*15*  379:*11*
simultaneously   234:*14*
single   54:*12*  129:*11,
13*  187:*17*  205:*17*
206:*1*  219:*6*  312:*24*
337:*18*  340:*14, 15*
357:*18*
single-word   361:*15*
Sir   87:*1*  90:*19*
108:*6*  121:*15*  139:*12*
144:*15*  296:*8*
sit   30:*13*  56:*16*
62:*18*  81:*18*  107:*14*
sitting   115:*2*  218:*1*
283:*20*  284:*5, 9, 19*
394:*6*  395:*19*
situation   160:*5*  347:*5,
17*  350:*11*  361:*11*
375:*9*  420:*5*
situations   218:*21*
219:*1*
six   94:*4*  123:*8*  136:*2*
252:*22*  298:*19*  345:*8*
362:*8*  399:*19*  400:*4*
sixth   421:*6*
Sixty-two   374:*2*
skeptical   96:*2, 21*
200:*1*  202:*5*
sketched   375:*11*
skilled   231:*20, 24*
skills   225:*16*
skip   420:*22*
Slack   111:*20*  112:*14*

Deposition of DANIEL PIPES                                    Lisa Barbounis v. Middle Eastern Forum, et. al.

Slacks  142:*22*
slander  338:*7*  349:*6*
slandering  308:*7*
sleep  96:*8, 14*  174:*23*
  189:*5*
slightly  350:*22*
slit  228:*17, 19, 19*
  229:*2*
slower  328:*18*
small  336:*6*
smaller  40:*10*
smiles  158:*20*
SMITH  2:*1*  108:*15*
  109:*7, 12, 15, 18*
  110:*2, 8, 12*  147:*7*
  158:*23*  340:*22*
snarky  111:*22*
social  6:*1*  183:*20, 21*
  397:*14, 23*
software  8:*18*
solicitation  11:*18*
solution  177:*15*
  185:*14*
solutions  142:*18*
  143:*7*
solved  125:*9*  129:*8*
  418:*23*
somebody  236:*15*
  388:*18*  428:*22*
someone's  303:*3*
something's  117:*4*
sorry  7:*10*  12:*12*
  16:*20*  24:*8*  39:*16*
  56:*9*  71:*10*  78:*9, 15*
  79:*6*  88:*12*  97:*18, 21*
  99:*2*  101:*9*  120:*10,
  18*  122:*18*  127:*8, 23*
  141:*23*  144:*19, 20*
  146:*3*  147:*11*  157:*2,
  3*  165:*3*  175:*18*
  180:*6*  188:*15*  192:*24*
  195:*18*  242:*5, 20*
  255:*5*  273:*17*  286:*20*
  289:*10*  297:*12*  301:*2*
  318:*4*  322:*5*  328:*17*
  343:*3*  353:*19*  355:*5*
  369:*17*  372:*17*
  380:*11, 11, 15*  406:*2*
  421:*19*  424:*20*  429:*5*

sort  57:*12*  95:*10*
  116:*19*  172:*3*  182:*19*
sorts  77:*11*  93:*18*
  155:*2, 4*  168:*21*
  181:*10*  184:*14, 21*
  201:*24*  234:*12*
  238:*11*  308:*20*  314:*8*
  315:*3*  337:*23*  375:*22*
  388:*9, 12*  389:*21*
sought  256:*1*
sound  309:*21*
sounds  276:*3*
source  98:*17*  137:*22*
south  99:*15*
space  432:*6*
speak  7:*16*  8:*3, 16*
  14:*11, 20*  19:*16*
  35:*20*  36:*2, 14*  44:*24*
  58:*19*  115:*15*  126:*7*
  175:*20*  209:*21*
  234:*17*  235:*21*
  238:*15*  243:*16*  246:*6*
  254:*3*  260:*24*  278:*15*
  285:*1*  290:*7*  300:*7*
  324:*15*  327:*20*  345:*3,
  5*  357:*7*  358:*24*
  359:*20, 21*  363:*9*
  428:*17*
speakers  80:*2*
speaking  36:*3*  76:*17*
  152:*14*  175:*17*  180:*2*
  237:*10*  277:*5*  287:*23*
  292:*3*  304:*6*  338:*8*
  350:*12*  377:*4*
speaks  67:*8*  361:*1*
special  219:*8, 10, 12*
specialist  5:*17*  11:*19*
  19:*1*  134:*8*  184:*24*
  294:*19*  327:*3*
specialize  184:*4*
specialized  28:*22*
  54:*9*  425:*12*
specific  34:*1, 2*  79:*10*
  127:*18*  140:*8*  214:*7*
  251:*10*  258:*14*
  350:*24*  370:*9, 9, 13,
  21*  385:*12*  389:*23*
  399:*8*
specifically  89:*4*
  117:*10*  130:*22*

143:*23*  258:*24*
  292:*24*
specifics  29:*4*  50:*23*
  73:*8, 15*  74:*3*  144:*5*
  152:*20*  267:*17*  278:*7*
  352:*22*  370:*3, 8, 15, 20*
speculating  406:*17*
  407:*1, 8, 15*  408:*4*
speculation  408:*6*
speech  223:*14*
  224:*11, 14*  225:*21, 24*
speed  241:*6*
spend  54:*22*  55:*7*
  57:*8*  128:*20*  161:*17*
  242:*1*  314:*15*  419:*3*
spending  233:*8*  379:*3*
spent  152:*22*  185:*2*
  279:*21*  376:*11*
  379:*18*
spew  338:*7*
splitting  348:*24*
spoke  102:*16*  125:*3*
  193:*10*  208:*10*  276:*9*
  277:*15*  312:*15, 22, 23*
  393:*15, 17*  395:*22*
  428:*16*
spoken  126:*5*  276:*8*
spread  303:*2*
spreadsheet  418:*9*
spring  136:*1*  164:*14*
  171:*15*  172:*5, 8*
  286:*16*  355:*7*
stab  175:*2, 3, 5*
Stacey  104:*13*  211:*22*
staff  20:*19*  77:*18*
  85:*3, 4*  90:*23*  93:*12,
  16*  119:*19*  124:*13, 15*
  126:*4, 6*  127:*16*
  143:*2*  148:*15*  150:*17*
  180:*4*  215:*6*  243:*21*
  256:*12*  305:*6*  312:*8,
  13*  313:*1*  379:*23*
  403:*15*  423:*9, 9*
staffer  188:*2*
staffers  189:*13*
stamp  65:*2*
stand  87:*19*  167:*20*
  172:*20, 20*  423:*23*
  424:*1, 9*

standing  363:*14*
  385:*24*  387:*18*  431:*4*
standoffish  419:*24*
standoffish,  419:*16*
stands  162:*1*
start  16:*10, 12, 17, 21*
  34:*7*  70:*2, 4*  293:*3*
  300:*12*  349:*16*
started  16:*14*  24:*11*
  34:*6*  73:*1*  110:*4, 23*
  118:*23*  120:*9, 12*
  138:*22*  139:*9*  212:*20*
  259:*21*  304:*4*  314:*8*
  354:*6*  362:*2*  370:*1*
  406:*4*
starting  16:*6, 23*
  74:*12*  257:*1*  424:*21*
  426:*7*
state  9:*7*  61:*14*
  137:*15*  140:*11, 15, 19*
  401:*1*  432:*6*
stated  339:*20*  340:*7*
statement  18:*13*  31:*3*
  59:*16*  103:*15*  193:*6*
  199:*2, 5*  205:*1*
  337:*18*  362:*16*
  388:*17*  389:*2, 11*
  398:*16*  404:*23*
statements  126:*15*
  205:*7, 14*  208:*13, 18*
  209:*1, 2, 13, 13*  211:*6*
  314:*13*  375:*16*
  385:*13, 14, 17*  386:*15*
  387:*2, 21*  389:*1, 3*
  390:*19*  398:*17, 20*
  399:*1, 24*  400:*6, 9, 13,
  23, 24*  404:*10, 17*
STATES  1:*1*  5:*13*
  86:*18*  159:*13, 14*
  162:*18*
stating  6:*7*
Station  99:*20*  269:*7*
stations  269:*12*  412:*9*
status  12:*6*  363:*18*
  369:*5, 11*
statute  159:*16, 20*
  162:*10, 11, 18*
statutes  162:*13*
stay  56:*2, 19*  169:*11*

181:*12*  265:*15*  323:*8*
**staying**  54:*23*
**steal**  268:*14*  270:*4*
**stealing**  268:*4*
**stenographic**  5:*21*
91:*7*  325:*22*
**stenographically**  1:*15*
**step**  385:*19*, *20*
388:*24*, *24*
**steps**  136:*10*  142:*4*
172:*17*  380:*4*  384:*16*
**Steve**  45:*15*  69:*20*
**Steven**  45:*11*  69:*14*,
*15*
**stick**  86:*1*  88:*22*
421:*3*
**stipulate**  6:*2*
**stipulated**  5:*1*
**stipulations**  248:*19*
**stir**  417:*10*
**stock**  44:*3*
**stocks**  40:*16*
**stole**  264:*24*  266:*21*
268:*10*, *11*, *15*  272:*4*
274:*23*  278:*5*  279:*7*
280:*7*, *15*
**stolen**  264:*19*  274:*12*,
*16*, *17*  279:*13*, *17*
281:*1*
**stood**  424:*2*
**stop**  18:*19*  19:*24*
20:*2*  23:*1*  28:*5*
31:*16*, *21*  36:*8*
194:*21*  231:*20*  286:*4*,
*9*, *12*  300:*1*  311:*16*
312:*12*, *13*  318:*2*, *7*,
*17*  323:*21*  329:*7*
330:*9*  332:*11*  358:*16*
359:*3*  399:*15*
**stopped**  261:*17*
336:*17*
**stopping**  52:*10*, *13*
427:*12*
**stories**  74:*22*  75:*3*, *11*,
*15*  151:*9*  172:*15*
309:*8*
**story**  80:*11*  86:*22*
92:*14*  96:*19*  151:*22*,
*23*  236:*15*  304:*13*
309:*22*  333:*9*, *12*, *16*

**strange**  136:*17*
261:*11*
**strategy**  58:*10*
359:*14*, *15*
**Street**  1:*13*  2:*3*, *9*, *14*
99:*20*
**stretched**  106:*17*
**strike**  12:*19*  78:*3*
99:*2*  116:*20*  120:*16*
154:*3*  156:*14*  166:*11*
179:*5*  189:*10*, *20*
206:*18*  223:*7*  251:*2*
371:*17*  379:*16*
380:*12*
**striking**  174:*15*
**strong**  153:*4*
**structure**  47:*21*
49:*20*  50:*8*  69:*2*, *6*,
*12*, *16*  189:*11*
**stuck**  212:*14*
**stuff**  133:*24*  159:*4*
176:*2*  251:*15*  265:*14*
316:*22*  342:*24*
375:*19*  419:*6*
**stupid**  42:*17*, *18*
**style**  15:*9*, *11*  223:*22*
224:*23*  225:*14*, *22*, *24*
226:*12*, *23*  227:*6*
**subject**  102:*20*
115:*24*  118:*4*  153:*14*
189:*22*  196:*22*
197:*11*  266:*23*  277:*6*
432:*10*
**subjected**  79:*3*  92:*20*
101:*15*  149:*11*, *14*
154:*5*  177:*23*
**subjecting**  294:*7*
**subjects**  117:*21*
**submit**  241:*8*  376:*5*,
*17*, *20*  377:*21*
**submitted**  148:*12*
150:*9*  377:*13*, *17*
379:*11*
**Subscribed**  434:*13*
**subsequently**  247:*20*
262:*8*  291:*8*  333:*15*
**substance**  434:*8*
**substantial**  205:*13*
**substantive**  246:*20*

**successful**  217:*23*
218:*2*  339:*13*
**successfully**  217:*19*
**sucks**  397:*7*
**sudden**  158:*22*  341:*5*
**suddenly**  341:*6*
**sue**  340:*22*
**sued**  273:*8*
**suffices**  88:*8*
**suggest**  57:*13*  58:*17*
412:*17*  420:*24*
**suggested**  58:*4*  90:*13*
229:*13*  262:*14*
**suggesting**  114:*8*
184:*20*  185:*6*
**suggestion**  90:*7*  91:*21*
**suggests**  92:*10*
**Suite**  2:*4*, *14*
**sum**  390:*10*
**summary**  227:*19*
229:*7*
**Sunday**  189:*20*, *21*
**supervise**  180:*22*
181:*7*, *13*
**supervisee**  155:*7*, *12*
305:*20*
**supervising**  180:*10*
**supervision**  431:*7*
**supervisor**  105:*16*, *18*
154:*13*  155:*7*, *11*
163:*18*  164:*2*  181:*14*,
*17*  225:*11*  271:*11*
305:*20*, *22*
**supervisors**  181:*6*
**support**  92:*4*  424:*10*
**supposed**  22:*7*  36:*17*
170:*3*  334:*5*  341:*13*
346:*20*  350:*9*  378:*23*
379:*19*  385:*4*
**supposedly**  281:*1*
**sure**  7:*17*  13:*22*
25:*10*  50:*11*  51:*8*
56:*3*  57:*3*  67:*3*  79:*1*
97:*9*  104:*15*  112:*2*
122:*1*  123:*22*  125:*10*
129:*14*, *16*  130:*13*
157:*13*  168:*23*  169:*1*,
*2*  183:*2*  189:*14*
199:*4*  217:*10*  231:*15*
242:*1*  250:*22*  252:*24*

275:*19*  280:*20*  289:*7*
301:*1*, *3*  305:*24*
333:*17*, *19*  346:*20*
355:*8*  374:*11*  381:*16*
382:*21*  399:*23*  400:*6*,
*8*, *10*, *12*, *14*, *18*, *22*, *24*
402:*3*  409:*24*  413:*2*
425:*15*
**surprise**  64:*1*  90:*22*
346:*7*  372:*7*
**surprised**  57:*12*
**surprises**  117:*4*
118:*24*  135:*9*  216:*18*
259:*17*  346:*3*
**surprising**  113:*18*
**suspicious**  182:*10*
**swear**  5:*22*  6:*3*
207:*18*
**sworn**  6:*22*  9:*2*
431:*5*  434:*13*
**sympathize**  363:*10*
**systematic**  124:*16*, *17*

**< T >**
**table**  353:*5*
**tactics**  140:*8*
**take**  5:*24*  7:*4*, *7*
32:*24*  33:*1*  36:*12*
38:*14*  51:*13*  55:*10*
56:*17*  57:*5*  58:*1*, *6*
74:*8*  80:*4*  101:*7*
102:*3*  105:*5*  116:*10*
122:*14*  133:*7*, *9*
135:*16*  140:*1*, *2*
141:*13*, *17*  142:*4*, *13*
144:*18*  164:*13*
167:*17*  170:*3*  176:*1*,
*7*  191:*8*  201:*1*
217:*16*  218:*9*  223:*3*
230:*10*  231:*22*  232:*2*,
*5*, *9*, *18*  234:*20*
240:*13*  249:*19*
251:*12*  292:*17*
303:*11*, *13*, *14*  311:*9*
315:*18*  321:*9*  335:*9*
337:*17*  340:*22*
355:*10*  385:*12*, *19*
386:*15*  387:*1*, *20*, *23*
421:*1*, *24*  428:*8*

Deposition of DANIEL PIPES                                      Lisa Barbounis v. Middle Eastern Forum, et. al.

taken 1:*12* 84:*23*
250:*2, 4* 251:*4*
280:*10* 287:*13* 288:*8*
289:*4, 13, 24* 290:*11*
388:*17* 389:*1, 3*
398:*15, 17* 431:*4*
takers 424:*8*
takes 77:*14*
talk 19:*24* 23:*15*
24:*17* 34:*22* 49:*7*
55:*15* 73:*11* 80:*22*
89:*7* 106:*2* 111:*13*
116:*24* 133:*5* 140:*22,
24* 141:*3, 5* 147:*20*
185:*8, 11, 12* 212:*5*
221:*13* 228:*8* 230:*22*
233:*18* 242:*16*
246:*20* 254:*24*
256:*14* 257:*11* 258:*7,
21* 265:*4* 271:*11, 15,
18* 285:*2* 290:*7*
293:*4* 297:*23* 302:*12*
346:*14* 397:*24* 428:*5*
talked 24:*24* 34:*18*
61:*10* 65:*7* 87:*10*
141:*1* 142:*2, 2, 21, 24*
208:*9* 209:*3* 233:*22*
242:*23* 246:*21*
289:*13* 313:*21*
345:*14* 388:*1* 393:*6*
395:*21* 397:*16*
talking 8:*18, 19* 15:*6*
17:*20* 23:*18* 91:*7*
94:*12* 110:*4* 124:*1*
138:*13* 139:*18*
142:*17* 149:*2, 3*
153:*13* 165:*10*
174:*14* 190:*21*
208:*12* 209:*24* 214:*6*
225:*13, 23* 226:*11, 23*
227:*8* 240:*22* 241:*5*
248:*3* 249:*1* 252:*5*
255:*13* 259:*7* 264:*3*
266:*4* 267:*13* 270:*11*
280:*6, 9, 24* 281:*4*
282:*8, 9* 290:*10, 11*
302:*20* 307:*5, 7, 9*
315:*8* 324:*7* 344:*6,
11* 345:*21* 353:*16*
356:*19, 24* 357:*4, 10,*

19, 19, 20* 360:*20*
361:*10, 19* 371:*10, 12*
374:*3* 386:*5* 397:*11*
406:*19* 416:*8* 429:*3*
talks 228:*21, 24*
229:*1* 293:*10, 11*
tank 339:*21*
tape 79:*16*
targets 128:*5*
task 28:*22*
tasks 54:*9* 340:*3*
375:*9*
tax 11:*20*
taxable 425:*23*
tax-deductible 425:*7,
19*
team 194:*10*
tech 414:*19*
technology 29:*3*
35:*24*
Telegram 413:*18*
Telegrams 142:*22*
telephone 57:*1*
254:*22* 338:*1*
television 208:*20*
269:*7*
tell 11:*23* 19:*11*
32:*18, 18* 35:*18*
44:*15, 16* 54:*16* 55:*9,
19* 60:*9* 68:*11* 72:*22*
74:*20* 77:*21* 80:*10,
10* 85:*20* 86:*15*
88:*16* 96:*18* 98:*2*
105:*9* 109:*18* 117:*16*
129:*15* 135:*12*
142:*10* 143:*21, 23*
145:*21, 24* 146:*5, 11*
151:*23* 154:*14*
167:*13, 18* 168:*13*
169:*3, 10* 175:*10*
181:*18* 182:*4* 183:*16*
191:*9* 192:*14* 195:*9*
196:*9* 199:*16* 204:*4*
222:*7* 240:*6* 241:*11*
244:*21* 246:*10*
256:*16* 257:*6, 21*
258:*8* 262:*14* 272:*6*
273:*2* 274:*13* 278:*12*
283:*5* 285:*17* 290:*8*
291:*6, 7, 19* 294:*17*

300:*4* 308:*23* 311:*9*
312:*11, 23* 315:*12*
316:*20* 318:*2, 6, 16*
331:*20* 332:*1* 334:*22,
24* 335:*1* 340:*10*
341:*1* 363:*1* 370:*18*
374:*21* 377:*17* 383:*3,
9* 388:*5, 18, 20* 389:*5,
6, 7, 9* 431:*5*
telling 18:*1* 36:*8*
56:*16* 74:*21* 136:*24*
143:*18* 182:*19* 188:*5*
190:*24* 258:*21*
290:*12, 16* 292:*2*
301:*16* 308:*10*
338:*17* 347:*10*
375:*19* 393:*10* 394:*7*
408:*19, 20* 412:*13*
419:*12* 426:*22*
tells 159:*5* 170:*1*
219:*14* 320:*2* 418:*24*
ten 101:*21* 104:*20,
21* 125:*2* 145:*5*
212:*6* 238:*22* 298:*20,
22* 299:*5, 9, 11, 20*
300:*2, 3, 3, 5, 17, 21, 23*
tense 356:*17, 20, 24*
357:*5, 10* 358:*18, 20,
23* 359:*5* 360:*21*
361:*2, 7, 12, 13*
tension 362:*11, 13*
term 162:*14*
terminated 108:*15*
110:*3*
termination 235:*2*
terms 106:*3* 249:*8,
11* 335:*3*
terrible 258:*18*
349:*16* 351:*2*
testified 6:*22* 13:*22*
34:*23* 87:*22* 100:*10*
112:*16* 141:*15*
165:*13* 192:*16*
251:*20* 308:*19*
319:*20* 356:*6* 367:*2*
379:*4* 392:*2*
testify 89:*8* 167:*13*
208:*1* 277:*3, 7*
282:*22* 292:*22, 24*

304:*14* 305:*18*
333:*22* 341:*2*
testifying 61:*2*
112:*15* 170:*9* 386:*9*
387:*17* 398:*21, 24*
400:*13*
testimonies 177:*9*
Testimony 3:*3* 15:*3,
21* 24:*1* 33:*10* 35:*9*
47:*7* 66:*7* 69:*5, 16*
70:*7* 83:*11* 90:*6, 11*
92:*24* 102:*16* 134:*5*
157:*7* 193:*4* 197:*8*
201:*20* 206:*15, 17*
207:*6, 12* 210:*3*
212:*12* 214:*3* 263:*11*
269:*15* 275:*5* 278:*24*
283:*24* 291:*21*
306:*19, 22, 24* 312:*15*
333:*17* 344:*8* 377:*6*
388:*15* 431:*4, 6, 8*
Text 4:*18* 106:*7*
108:*19* 173:*20, 22*
174:*1, 4, 15, 17*
210:*22* 211:*4* 274:*13*
280:*13, 22, 23* 281:*3,
8, 11* 381:*23* 428:*2*
texting 413:*18*
texts 175:*11* 274:*9*
280:*3, 6* 370:*17*
385:*15* 389:*22*
390:*17* 397:*23*
Thank 6:*19* 37:*6*
58:*21, 22, 23* 102:*1*
122:*3* 187:*7* 190:*1,
13* 216:*11* 225:*18*
242:*11* 249:*16*
259:*23* 264:*17*
300:*20* 319:*22*
335:*12* 336:*19*
352:*21* 361:*14* 365:*8*
374:*22* 385:*10* 415:*8*
429:*21*
Thanks 57:*4* 101:*23*
147:*7* 384:*9* 417:*5*
theft 269:*23* 270:*15,
16* 271:*22* 272:*10*
274:*6*
Thelma 104:*9*

Deposition of DANIEL PIPES

Lisa Barbounis v. Middle Eastern Forum, et. al.

233:*18*   254:*16*

**theory** 41:*21*

**thereof** 431:*9*

**thing** 7:*18*   8:*9*   32:*8*
52:*2*   56:*3*   96:*2*
126:*16*   134:*20*
138:*13*   141:*23*   152:*5*
172:*4, 21*   173:*4*
174:*15*   192:*16*   200:*1*
220:*18, 19*   255:*21*
262:*7*   288:*15, 19*
309:*7, 24*   313:*4*
323:*9*   332:*4*   333:*14,
15, 23*   353:*22*   355:*9*
362:*9*   365:*6*   368:*15*
369:*21*   370:*21, 22*
402:*4*   423:*17*

**things** 28:*23*   36:*18*
37:*24*   53:*23*   80:*3*
83:*14*   117:*1, 3*
119:*21, 22*   124:*7*
129:*6*   131:*7*   153:*22*
155:*2*   159:*10*   160:*6*
161:*18*   169:*24*
170:*23*   173:*5*   180:*15*
181:*10*   210:*7*   211:*15,
16*   212:*20*   215:*17*
219:*24*   230:*24*   231:*2,
5*   234:*6*   240:*8*
243:*12*   272:*17*
280:*20*   308:*21*
309:*14*   313:*11, 18*
327:*2*   333:*4, 8*   341:*9,
14*   342:*18, 18, 19, 20*
351:*2*   362:*3*   375:*22*
376:*1*   388:*9, 12*
417:*14*

**thing's** 209:*11*

**think** 7:*12*   8:*17*
14:*13*   25:*9*   26:*4*
30:*18*   31:*17, 17*
44:*15*   50:*3, 5*   63:*8*
74:*2*   75:*16*   81:*18*
83:*5, 10*   85:*18, 21*
86:*3, 5, 16*   87:*7, 20,
21*   88:*15, 17*   90:*16*
91:*14, 19*   94:*22*
97:*22*   101:*13*   103:*13*
104:*11, 21*   110:*13*
113:*15*   116:*1*   117:*24*

119:*20*   127:*1*   128:*7*
129:*6*   136:*6, 22, 23*
138:*3, 12*   139:*9*
141:*2, 20*   142:*11*
144:*16, 17*   146:*13*
147:*23*   148:*23*   149:*1*
160:*11*   166:*10, 12*
167:*3*   169:*5*   172:*12,
23*   178:*15*   181:*19*
183:*23*   184:*7*   187:*2*
189:*18*   190:*11*
199:*21*   201:*6, 9*
217:*17*   218:*21*   219:*1*
227:*5*   228:*7*   234:*1*
238:*20*   239:*3, 9, 19,
20*   240:*6, 7*   243:*10*
244:*16*   245:*5, 23*
246:*6, 8*   249:*2*
250:*17*   252:*5*   253:*13*
259:*2, 24*   264:*18, 23*
265:*6*   266:*2, 15, 21*
268:*5, 7, 10*   269:*11*
273:*1, 3, 11*   274:*3, 8*
277:*2, 4*   278:*5*
288:*22*   301:*15, 19, 19,
24*   306:*2*   308:*16*
309:*19*   313:*18, 20*
314:*22, 24*   315:*1*
319:*20*   339:*21*
341:*16*   342:*16*
344:*11*   345:*2, 21*
349:*3*   359:*8*   361:*9,
17, 17, 19*   366:*13*
373:*22*   375:*17*   376:*2,
2*   380:*7*   389:*23*
390:*6*   395:*9*   401:*14*
408:*1*   410:*11*   412:*18*
414:*13*   416:*8, 22*
419:*1, 8, 16, 17, 24*
420:*23*   421:*10*   427:*1*

**thinking** 128:*20*
191:*16*   350:*14*

**Third** 43:*11*   109:*10*
162:*23*   200:*5*   201:*4*
206:*10*   333:*16*

**Thirdly** 400:*18*

**thirty** 432:*15*

**this'** 276:*17*

**this-and-that** 309:*16*

**Thomas** 272:*13*
275:*1, 2*   277:*22*
278:*14*   279:*6, 20*
280:*13, 14, 23*   389:*10,
12*

**thoroughly** 95:*12*

**thought** 19:*10*   84:*3*
95:*4*   107:*19, 21*
109:*7*   126:*7*   127:*11,
17*   129:*7*   143:*24*
144:*1, 2, 4*   158:*17*
201:*16*   202:*13*   209:*3*
261:*21*   270:*10*
272:*22*   291:*11*   303:*5*
307:*1*   336:*13*   342:*15*
378:*14*   406:*19*   407:*7*
417:*16*

**thoughts** 374:*22*
421:*22*

**thousand** 12:*11*   98:*9,
23*   410:*24*

**threat** 261:*10, 14, 23,
24*   262:*4, 5*

**threaten** 260:*5*   261:*7*

**threatened** 23:*1*
228:*19*

**threatening** 31:*23*
194:*21*

**threatens** 229:*2*

**three** 23:*1*   129:*2*
145:*1*   153:*17*   156:*23*
164:*9*   170:*19*   176:*13*
184:*12*   190:*6, 19*
193:*12*   199:*8, 24*
200:*3*   203:*23*   206:*4*
211:*6*   213:*18*   214:*7*
222:*18*   262:*16, 17*
298:*19*   337:*5, 9*
339:*7*   390:*11*   410:*12*
411:*1*

**threes** 21:*2*

**three-something** 98:*7*

**threw** 312:*10*   371:*2*

**throat** 228:*17, 19*

**throats** 229:*2*

**thrown** 313:*19*

**Tiffany** 70:*13*   108:*3,
14, 20*   109:*4, 20, 22*
113:*20*   298:*16*

**till** 94:*12*   141:*19*
221:*14*

**time** 5:*5, 10*   8:*19, 19*
21:*7, 11, 18*   30:*2, 13,
16*   37:*5, 6*   39:*14*
47:*12*   52:*6*   57:*6, 11*
58:*1, 6, 20*   59:*18*
60:*24, 24*   62:*10*
71:*22*   79:*10*   82:*22*
84:*13, 16*   90:*3*   94:*11,
24*   99:*19*   102:*10, 11*
107:*20, 21*   112:*4, 17,
22*   115:*2*   117:*22*
119:*21*   128:*20*
130:*11, 20*   133:*17, 21,
23*   137:*12*   138:*11*
144:*22*   145:*11, 18*
161:*17*   163:*7*   164:*7,
8*   168:*12*   169:*6, 9*
172:*14*   173:*14*   174:*2*
175:*14*   181:*12, 15*
182:*20*   192:*6, 7*
193:*10*   195:*4*   198:*2,
9*   201:*5, 11*   202:*3, 4*
204:*5*   205:*12*   206:*17*
208:*3*   209:*8*   211:*5*
215:*24*   218:*18*   221:*5*
223:*4, 13*   226:*1*
231:*19*   242:*1*   249:*15*
250:*18*   255:*1*   261:*1,
3*   285:*4, 13, 17*
287:*12, 20, 20, 22*
289:*4, 6*   291:*5*
296:*16*   307:*9*   310:*2*
311:*9, 10*   313:*22*
314:*16*   316:*5, 7, 13,
14, 21*   317:*9*   318:*2*
323:*22*   335:*16*   347:*7,
16*   348:*9*   353:*17*
354:*24*   359:*12*   360:*5*
371:*15*   373:*11*   374:*4*
382:*19*   390:*8, 19*
391:*2*   394:*15*   403:*10*
409:*23*   410:*5*   412:*10*
419:*3, 22*   420:*8, 24*
427:*7*   429:*19, 20*
431:*5*

**timeline** 284:*24*

**timeliness** 417:*18*

**timely** 135:*21*

Deposition of DANIEL PIPES                                    Lisa Barbounis v. Middle Eastern Forum, et. al.

**times** 23:*1* 49:*7*
70:*10* 115:*4, 6, 23*
210:*14* 229:*23*
273:*20* 321:*1* 345:*6*
428:*14*
**time's** 415:*5*
**tissue** 92:*16* 99:*8*
138:*4, 7, 8*
**title** 46:*7, 8* 47:*19, 20,
23* 48:*3* 49:*18, 20*
50:*5, 10* 51:*3* 130:*12*
273:*21* 365:*21*
**today** 5:*18, 20* 7:*4, 7,
19, 24* 8:*12, 14, 17, 24*
19:*18* 22:*6, 10, 18, 18*
23:*5* 35:*24* 55:*15*
57:*6* 58:*12* 72:*3, 8,
10* 73:*4* 81:*3* 87:*19,
19* 133:*1, 6, 12*
150:*24* 151:*7, 10*
169:*7* 185:*17* 187:*24*
192:*16* 203:*11*
216:*16* 218:*1* 229:*23*
235:*9* 238:*21* 239:*9*
270:*10* 273:*20* 290:*7*
291:*21* 319:*21*
333:*22* 352:*12* 358:*3*
359:*12* 383:*3, 5, 6, 9*
386:*1* 387:*8, 17*
390:*16* 395:*11*
398:*24* 415:*16* 416:*4*
420:*10*
**Today's** 5:*9*
**told** 33:*6, 19* 46:*3*
68:*19* 79:*23* 87:*9*
88:*9* 98:*3* 99:*23*
100:*23* 106:*6, 12*
117:*3, 12* 118:*22*
129:*11* 130:*24* 135:*2*
138:*24* 151:*21*
153:*20* 155:*1* 164:*21*
168:*16* 172:*6* 173:*5,
8, 14* 175:*6* 184:*3*
193:*2, 9, 18* 198:*20*
199:*17* 200:*8, 9*
228:*18, 18* 230:*24*
237:*5* 244:*17, 17*
251:*7, 9* 256:*12*
258:*16* 266:*6* 272:*15*
275:*4* 304:*13* 308:*3*

313:*11* 314:*3, 10*
318:*22* 319:*17*
320:*21* 321:*1* 333:*13*
334:*17* 345:*14*
349:*16* 354:*20* 373:*9*
392:*2* 394:*12, 17*
395:*3* 398:*22* 403:*3*
406:*14, 15, 18* 407:*1,
8, 10, 21* 428:*4, 7*
**Tommy** 267:*13*
279:*21* 285:*4, 10*
286:*3, 17* 287:*3, 11*
289:*16* 316:*21* 373:*5,
12* 374:*7*
**tomorrow** 90:*24*
332:*12* 395:*9*
**tooth** 160:*14*
**top** 21:*3* 63:*22*
119:*14* 127:*6* 248:*22*
271:*6* 381:*18*
**topic** 96:*15* 209:*16*
313:*7* 390:*16* 408:*13*
**topics** 184:*14*
**total** 416:*3*
**totally** 29:*20* 271:*23*
386:*22*
**touch** 96:*17* 159:*6*
349:*15, 19*
**touched** 96:*5*
**touching** 174:*16*
**tough** 114:*18* 115:*8*
116:*1* 137:*13* 175:*14,
15* 250:*18*
**toxic** 126:*10* 127:*21*
**tracing** 419:*3*
**track** 309:*14*
**trade** 75:*10, 15* 151:*9*
261:*19* 264:*22, 23*
268:*19, 22* 269:*17, 24*
270:*15* 271:*21*
272:*17*
**traded** 138:*15*
**trading** 137:*1*
**trafficking** 159:*9, 11,
12, 19* 160:*1* 162:*10,
13, 15* 163:*5*
**train** 201:*16*
**transcribed** 431:*7*
**transcript** 30:*22*
277:*10* 432:*16, 17*

**transcription** 431:*7*
434:*5*
**trap** 284:*14*
**trapped** 284:*11, 20*
**travels** 346:*7, 9*
**treasurer** 67:*21*
**treat** 115:*4* 116:*2*
**trespassed** 94:*8*
**trial** 5:*6*
**Tricia** 92:*4, 12* 96:*9,
15* 131:*24* 132:*4*
139:*20, 22* 140:*2*
159:*4* 192:*13* 203:*19*
208:*10, 10* 211:*13*
219:*22* 220:*17*
222:*17* 227:*13*
242:*24* 251:*20*
292:*15* 293:*1* 298:*9*
308:*22* 309:*4, 17, 19*
312:*5, 16, 21* 313:*8*
333:*3* 336:*11* 339:*9*
340:*21, 23* 341:*9, 14*
343:*8* 370:*2, 21*
371:*2* 385:*3* 418:*7*
420:*5, 6*
**Tricia's** 228:*14*
256:*17*
**trick** 21:*17*
**tried** 81:*1, 5* 96:*17*
143:*14* 151:*8* 159:*6*
268:*2* 307:*12* 309:*4*
312:*11, 24* 350:*5*
**trigger** 87:*9*
**trip** 94:*21* 106:*6*
169:*16, 16* 182:*1, 3*
190:*23* 191:*6* 371:*17*
**trouble** 372:*10, 11, 21,
24, 24* 373:*2* 375:*17*
**troubled** 390:*20, 22*
391:*5, 17* 393:*7*
394:*13* 395:*4*
**trouble's** 372:*23*
**troubling** 219:*19*
224:*3, 21* 227:*2*
277:*2* 406:*15*
**true** 73:*22* 91:*14*
143:*18* 203:*8* 212:*12*
213:*13, 13* 245:*2*
264:*13* 298:*21* 299:*5*
308:*1* 314:*11, 11*

315:*4, 4* 346:*24*
380:*22* 382:*5* 431:*8*
**truly** 313:*10*
**Trust** 134:*6*
**truth** 76:*20* 194:*2*
199:*23* 200:*2* 222:*7*
308:*23* 310:*20*
337:*14* 431:*5, 6, 6*
**truthful** 9:*4*
**truthfully** 72:*12*
**try** 8:*23* 20:*6* 21:*19*
31:*23* 49:*7* 57:*18*
78:*17* 102:*15* 162:*17*
165:*13* 167:*12*
172:*13* 200:*6* 210:*1*
236:*4* 258:*6* 267:*5*
297:*22* 299:*4* 306:*15*
309:*3* 344:*17* 360:*6*
417:*14*
**trying** 8:*5* 58:*7*
175:*23* 176:*24*
179:*20* 193:*13* 210:*6*
226:*13, 19* 236:*13*
244:*16* 249:*2, 10*
265:*21* 270:*9* 330:*12,
14* 338:*11* 343:*1, 8*
351:*22* 360:*1* 367:*8,
9* 388:*14, 22*
**Tuesday** 1:*6* 5:*9*
375:*12*
**Turn** 35:*17* 53:*10*
97:*4, 5* 112:*7* 119:*7*
125:*19, 24* 398:*20*
401:*8*
**turned** 53:*13, 16, 18*
54:*3* 64:*17* 65:*4*
75:*19* 95:*13* 401:*11*
**turning** 53:*24* 110:*7*
**turns** 109:*15*
**TV** 269:*12* 428:*13*
**Twenty-six** 9:*14*
**twice** 260:*22* 427:*18*
**two** 12:*11* 20:*14, 20*
21:*1* 45:*12* 57:*8*
60:*19* 61:*15, 18, 22*
62:*3, 10, 13* 96:*22*
99:*6, 24* 109:*10*
114:*13* 115:*5, 6*
117:*3, 6* 120:*8* 124:*3*
128:*4, 16* 129:*7*

Deposition of DANIEL PIPES                                    Lisa Barbounis v. Middle Eastern Forum, et. al.

136:*18*  163:*11*  172:*1*
174:*8*  180:*8*  183:*4*
190:*24*  199:*6*  200:*4*
201:*23*  206:*3*, *11*
215:*17*  242:*16*
251:*10*  262:*2*  265:*20*,
*20*  295:*17*  298:*19*
303:*11*  304:*7*  311:*22*,
*23*  348:*24*  362:*3*
367:*15*, *21*, *22*  384:*3*,
*4*  401:*19*  404:*10*, *17*
411:*1*  417:*23*
**type**  10:*12*, *20*  12:*2*
21:*10*
**types**  11:*6*

**< U >**
**ugliness**  342:*23*
**uh-huhs**  8:*2*
**uh-uhs,**  8:*2*
**UK**  319:*18*  346:*9*
**ultimate**  29:*6*  32:*24*
163:*21*  328:*7*, *12*
**ultimately**  91:*16*
**unable**  310:*20*
**unacceptable**  288:*17*
**unauthorized**  379:*16*
**unaware**  33:*2*  309:*11*
**unbearable**  233:*20*
**unchanged**  366:*6*
375:*10*
**unclear**  209:*9*
**uncomfortable**  173:*24*
174:*13*  244:*4*  347:*5*
**underneath**  15:*13*
63:*15*  193:*21*  195:*20*
196:*2*, *2*
**underpinnings**  29:*1*
**understand**  8:*12*  9:*5*
17:*11*  22:*3*, *7*  25:*9*
116:*7*  127:*3*  128:*15*
134:*5*  135:*4*, *7*
153:*16*  154:*8*, *12*, *24*
171:*3*, *11*  176:*24*
196:*1*, *22*, *24*  273:*19*
274:*1*  277:*9*  294:*20*
295:*20*  348:*13*, *14*
363:*9*  425:*1*, *24*

**understanding**  46:*1*
252:*19*  294:*12*, *17*
376:*9*
**understands**  180:*8*, *8*
422:*12*
**understood**  8:*11*
93:*11*  116:*6*  134:*23*
220:*1*  352:*24*
**undertaking**  87:*14*
88:*9*
**underway**  261:*15*
**uneasy**  174:*18*, *22*
**unendingly**  385:*10*, *16*
**unfair**  58:*10*
**Unfortunately**  56:*24*
**unhappy**  109:*14*
119:*6*  150:*18*  194:*10*,
*11*, *11*  213:*19*, *21*
**unilaterally**  92:*8*
263:*12*
**unintelligible**  266:*2*
273:*22*  299:*14*
328:*16*  346:*3*  367:*2*
372:*7*  382:*12*  383:*12*,
*23*  386:*9*
**UNITED**  1:*1*  5:*13*
159:*13*, *14*
**universe**  382:*20*
**unknown**  79:*16*, *17*
119:*13*
**unlawful**  101:*15*
**unpleasant**  126:*4*
**unquote**  95:*7*  170:*3*
220:*12*  328:*12*
**unquoted**  95:*8*
**unrelated**  406:*18*
407:*9*, *14*  408:*4*
**untrustworthy**  92:*24*
**unwanted**  176:*14*, *19*
179:*6*  188:*1*, *7*, *17*, *20*
**unwelcome**  154:*22*
179:*5*  372:*8*
**ups**  308:*17*
**upset**  136:*22*, *23*
163:*19*  168:*13*
301:*15*, *18*  302:*19*
304:*9*  320:*13*, *13*
343:*8*  374:*6*, *6*
**use**  81:*17*  90:*13*
91:*24*  92:*1*  108:*19*

253:*12*, *19*  262:*11*
267:*22*  288:*20*
322:*22*  428:*12*, *13*
**useful**  12:*14*  261:*21*
**usual**  321:*21*  378:*2*
**usurpers'**  340:*8*

**< V >**
**vagina**  194:*13*
195:*12*, *21*  196:*1*
**vague**  351:*2*  400:*20*
**valid**  174:*18*  252:*16*
**value**  172:*16*  173:*16*
174:*6*, *8*  200:*23*
201:*1*, *2*  202:*4*, *16*
210:*4*, *11*, *19*  211:*4*, *7*
**variable**  203:*17*
**various**  33:*6*  249:*13*
315:*1*  379:*14*
**vehicle**  164:*9*
**veracity**  80:*15*  261:*24*
**verb**  253:*11*
**verbal**  8:*1*  349:*5*
**verbs**  262:*13*
**verified**  6:*5*  61:*11*
63:*20*
**verify**  56:*12*
**verse**  56:*8*, *9*  108:*12*
202:*2*
**version**  92:*10*  284:*20*
337:*12*
**versions**  199:*24*  200:*4*
**versus**  5:*12*
**vice**  67:*20*, *21*
**victim**  159:*1*
**video**  5:*11*, *17*  81:*14*,
*16*  233:*11*  278:*19*
**videoconference**  6:*4*
**Videographer**  2:*18*
5:*8*  36:*23*  37:*5*
55:*24*  56:*3*  102:*4*, *10*
120:*24*  121:*8*, *15*, *18*,
*21*  122:*2*, *5*  144:*22*
145:*11*, *17*  191:*24*
192:*6*  242:*5*, *11*
315:*21*  316:*7*, *13*
323:*15*  353:*20*  365:*3*,
*8*, *14*  415:*6*, *9*  429:*19*
**Videotaped**  1:*11*

**views**  126:*4*  213:*14*
269:*4*
**VII**  273:*21*
**vindictive**  194:*7*
**violate**  217:*11*
**violated**  273:*21*  274:*4*
**violating**  273:*24*
**violation**  273:*12*, *15*
**viper's**  342:*15*, *22*
**virtually**  313:*6*
**virtues**  225:*15*
**vis-à-vis**  114:*20*  116:*5*
**visit**  90:*1*
**visited**  105:*7*
**vituperation**  113:*17*
**voice**  36:*4*  175:*22*
**volatile**  194:*7*
**volunteer**  286:*22*
**voyeur**  114:*5*
**vs**  1:*5*  7:*5*
**vulgarity**  309:*10*
342:*23*

**< W >**
**W-2**  297:*8*
**Wait**  95:*16*, *16*
120:*21*  171:*22*, *23*
182:*5*  190:*21*  195:*1*,
*6*  221:*14*  242:*22*
249:*18*  369:*24*, *24*
**waited**  172:*14*
173:*15*  182:*9*
**waiting**  182:*12*  195:*3*
**waive**  405:*18*, *19*
**waived**  5:*3*
**walk**  325:*8*
**walking**  394:*5*
**wall**  143:*14*  307:*13*
**wandered**  217:*20*
**wanna**  30:*13*  31:*12*
32:*11*, *11*, *14*, *15*
47:*15*  49:*12*  51:*6*
52:*9*  55:*15*, *18*  57:*18*,
*18*  59:*5*, *19*  72:*22*
76:*21*  81:*17*  88:*23*
123:*16*  124:*5*  134:*5*
162:*24*  163:*3*  164:*20*
176:*7*  191:*13*, *13*
195:*8*  201:*14*  208:*21*
210:*13*, *18*  224:*10*, *11*

Case 2:19-cv-05030-JDW   Document 126-3   Filed 04/20/21   Page 161 of 179

Deposition of DANIEL PIPES                    Lisa Barbounis v. Middle Eastern Forum, et. al.

240:*1*  246:*11, 16*
262:*6*  265:*17*  269:*17*
275:*18*  281:*23*
292:*17*  300:*2*  303:*12*
314:*7, 17*  321:*9*
324:*24*  325:*1*  330:*2,
6*  332:*17*  333:*17*
334:*22*  344:*24*  358:*9*
381:*19*  389:*5*  392:*18*
393:*14*  396:*11*
416:*23*  427:*9*
**want** 7:*21*  17:*9*
30:*17*  32:*18*  50:*15*
51:*7, 14*  52:*21*  55:*4,
19*  59:*4*  84:*1*  85:*5*
87:*5, 8*  88:*15*  90:*13*
98:*2*  126:*14*  127:*12*
144:*24*  164:*19*  168:*6*
177:*18*  181:*11*  185:*4*
191:*16*  195:*9*  212:*8*
213:*15*  223:*9*  230:*14*
233:*1*  238:*4*  246:*12,
23*  247:*11, 24*  252:*1*
271:*20*  282:*16*
283:*14*  285:*12*
293:*24*  299:*22*
303:*10*  329:*14*
340:*13*  344:*7*  349:*10*
351:*19*  359:*21, 23*
370:*12*  381:*14*  385:*4*
396:*15*  415:*16*
**wanted** 73:*6*  92:*4*
107:*16*  110:*24*  127:*3*
140:*4, 5, 6*  141:*5*
166:*1*  171:*18*  174:*23*
183:*11*  219:*6*  228:*13*
247:*9*  250:*5*  259:*17*
265:*17*  308:*18*
313:*10, 23*  314:*1*
323:*24*  324:*2*  335:*3*
343:*7*  348:*19*  424:*4*
**wants** 49:*3*  57:*6*
58:*6*  59:*1*  109:*17*
170:*14*  175:*4, 6*
186:*10, 10, 18, 19*
224:*19*  237:*11*
314:*10*  364:*21*
375:*17, 23*  416:*11*
418:*7*

**warranted** 218:*22*
219:*1*
**wary** 375:*15*
**Washington** 71:*14*
74:*1, 9, 21*  151:*7*
345:*22*
**waste** 107:*20*  397:*3*
**wasting** 21:*11, 18*
52:*6*  107:*21*  359:*12*
**watch** 387:*13*
**watched** 7:*12*  207:*19*
251:*14*
**watching** 105:*19*
**wax** 335:*19*
**waxing** 315:*16*
**way** 12:*15*  14:*6*
19:*21*  20:*11*  29:*8*
35:*19*  48:*16, 17*  60:*7*
65:*20*  77:*19*  101:*13*
102:*13*  109:*4*  114:*11*
116:*2*  119:*16*  124:*16,
17*  125:*4*  131:*13*
137:*14*  143:*13*  158:*3*
163:*10*  212:*10*
217:*22*  220:*10*
228:*20, 24*  235:*3*
238:*22*  269:*16*
299:*22*  313:*24*
329:*15*  330:*2, 7*
338:*12*  344:*23*
349:*24*  350:*17, 18*
353:*9*  354:*24*  356:*18*
357:*11, 13, 14*  359:*8*
378:*2*  399:*4*  404:*4*
414:*18, 20*  424:*14*
425:*13*
**ways** 181:*10*  260:*3*
313:*10, 16, 17, 17*
337:*24*  367:*23*
377:*19*  379:*14*
396:*16*
**web** 63:*9*
**website** 62:*23*  63:*2*
64:*3*  121:*10, 17*
417:*7*
**week** 131:*15*  141:*18,
21*  142:*1, 12, 13, 14,
16*  143:*10*  150:*20*
152:*22*  185:*2*  187:*22*
229:*18*  340:*17*

357:*22*  374:*15*
406:*14*
**weekly** 219:*20*  227:*3*
**weeks** 262:*2*  307:*16*
323:*2, 5*  401:*19*
**weigh** 417:*5*
**weird** 95:*4*
**weirded** 174:*13*
**welcome** 256:*16*
300:*20*  408:*19*  410:*2,
3*  412:*7*  415:*22*
**welcoming** 135:*15*
**welfare** 217:*14*  298:*7*
**well** 6:*19*  16:*14*  17:*9*
19:*19, 21*  21:*5*  23:*14*
25:*10*  33:*12*  34:*23*
35:*12, 15*  38:*9, 18*
39:*14, 22*  41:*4*  42:*10,
23*  43:*6*  44:*7*  46:*1, 5*
49:*24*  50:*3, 5, 12*
53:*9, 15*  54:*16*  61:*11,
17*  62:*5*  63:*20*  64:*5*
66:*16*  68:*10, 14*
69:*20*  71:*12*  73:*11*
79:*12*  80:*8*  82:*5, 9,
11*  84:*14*  85:*20, 24*
86:*2*  99:*13*  109:*19*
112:*3*  114:*6, 14*
120:*4*  123:*6, 19*
126:*17, 20, 22*  127:*1,
24*  128:*4*  129:*15*
130:*10*  132:*17*  133:*1,
4*  135:*2*  136:*8, 20*
138:*11*  143:*12*  147:*8*
148:*1*  149:*10*  150:*6*
154:*18*  155:*20*
158:*23*  160:*6*  162:*16*
163:*13*  165:*5, 24*
166:*24*  169:*6, 13*
172:*4*  173:*2*  177:*13*
178:*2, 8*  179:*13, 17*
180:*19*  183:*16*  184:*6*
185:*16*  187:*6*  189:*3,
9*  190:*13*  192:*23*
194:*6*  201:*6*  206:*11*
208:*8*  222:*19*  228:*15*
230:*9, 15*  234:*10*
235:*1, 9*  239:*10*
245:*1, 12*  246:*8, 14*
249:*5, 8*  254:*5*

255:*13*  256:*9, 14, 22*
257:*19*  259:*6*  262:*10*
263:*18*  266:*23*  268:*1*
272:*6*  273:*8*  274:*13*
279:*16*  286:*12*
291:*11*  293:*3*  294:*5,
17*  296:*14*  297:*14*
301:*4, 13*  302:*24*
303:*10*  306:*4*  307:*8*
308:*9*  309:*23*  311:*16*
315:*17*  318:*6, 14, 15*
332:*4*  333:*11*  340:*7,
24*  346:*2*  350:*21*
359:*21*  362:*4*  363:*2*
366:*8, 11*  370:*8*
372:*19*  373:*22*  376:*9,
20*  377:*2*  378:*3, 17*
381:*20, 24*  383:*2, 7*
387:*11*  388:*2, 24*
389:*10, 23*  393:*16*
396:*18*  403:*5, 9*
404:*15*  411:*6, 18*
415:*17, 24*  418:*16*
419:*18*  420:*9*  422:*23*
427:*1*  429:*12*
**went** 54:*14, 15*  60:*13*
102:*16*  108:*15*
127:*15, 17*  162:*20*
163:*6, 7*  169:*17*
173:*8*  180:*13, 14*
199:*15*  223:*17*  233:*1,
22, 24*  251:*13*  261:*12*
289:*20*  291:*6*  297:*15*
307:*17, 22*  312:*24*
339:*7*  340:*16*  350:*1*
357:*22*  404:*6*  428:*14*
**we're** 7:*4, 7, 19*  8:*4,
10*  18:*10*  21:*11, 18*
28:*7*  31:*20*  35:*23, 24*
36:*11, 20*  41:*4*  48:*8*
52:*3, 5, 6, 8*  54:*20, 21,
22*  55:*7, 9, 12, 14*
56:*7, 10, 13*  57:*7, 10*
61:*3*  73:*11*  74:*11*
81:*15, 16*  101:*7*
124:*1*  134:*15, 16*
138:*12*  145:*3, 4*
152:*12*  153:*13*
160:*13, 13*  167:*1*
175:*23*  177:*17*  195:*1,

Deposition of DANIEL PIPES                                    Lisa Barbounis v. Middle Eastern Forum, et. al.

*3* 196:*6* 214:*6*
223:*15, 15* 224:*12*
240:*22* 242:*4* 244:*13,*
*23* 248:*6* 251:*18*
252:*5* 265:*23* 271:*15*
278:*19* 292:*6* 293:*4*
311:*8* 323:*8, 12, 13,*
*19, 22* 324:*4, 5, 22, 23*
325:*7* 330:*9* 332:*11,*
*11* 335:*18* 345:*9, 12*
346:*20* 353:*20, 22*
359:*1, 10* 362:*9*
365:*6* 368:*15* 371:*3,*
*8* 374:*19* 387:*6, 17*
390:*11* 394:*6, 7, 7*
395:*8, 19* 397:*6*
401:*23* 402:*5, 13, 20,*
*21* 403:*3, 7* 404:*15*
415:*11, 13, 13, 18, 20*
423:*20* 425:*12* 427:*4,*
*6, 6, 12*
**we've** 30:*20* 117:*20*
319:*20* 352:*8* 354:*15*
385:*15* 388:*1* 398:*17*
420:*9*
**What'd** 324:*1* 421:*9*
426:*11, 17*
**What're** 17:*20* 266:*4*
386:*5*
**WhatsApp** 413:*18*
**WhatsApps** 142:*23*
**whatsoever** 96:*23*
108:*21* 183:*5* 261:*14*
423:*9*
**when's** 39:*14* 117:*22*
**Where'd** 138:*6, 8, 9*
411:*6*
**whipped** 151:*24*
**whisper** 69:*23*
**whispering** 36:*2*
193:*16* 212:*20*
**white** 177:*11, 14*
284:*21*
**whitewashed** 86:*21*
**wholesale** 258:*20*
**wholly** 422:*10*
**who've** 77:*24*
**why'd** 347:*23*
**wife** 311:*17* 329:*8*
**WILLIAM** 2:*13* 6:*17*

**willing** 98:*21* 99:*3*
240:*10* 241:*11*
**willingness** 123:*8*
**willy-nilly** 427:*12*
**window** 223:*18*
**wink** 276:*15*
**wish** 15:*8* 203:*6*
212:*4* 222:*2* 255:*1*
335:*9* 356:*21* 372:*21*
374:*5*
**wished** 76:*11*
**wishes** 289:*17*
**withdraw** 224:*3, 18*
326:*10* 392:*7* 394:*10*
**withdrawing** 61:*4*
224:*16* 325:*10*
326:*11*
**withdrew** 224:*8*
394:*20*
**witness** 5:*22* 6:*3, 5,*
*15* 10:*23* 13:*19* 14:*5,*
*22* 16:*17* 17:*3, 6, 19,*
*23* 18:*22* 20:*8, 24*
21:*15, 21, 24* 22:*13*
24:*3* 25:*17* 27:*12*
28:*11* 30:*16* 31:*6*
33:*15* 35:*21* 36:*3*
37:*24* 38:*16* 40:*20*
47:*3, 17, 19* 48:*6*
49:*14* 51:*18* 52:*11*
55:*5, 19* 56:*11* 57:*24*
60:*4* 61:*5* 62:*2* 68:*2*
71:*16* 73:*1, 15* 75:*2*
76:*14* 77:*2* 78:*7, 13*
79:*5, 8* 81:*10* 82:*24*
84:*9* 88:*2* 89:*20*
90:*21* 91:*24* 93:*8*
99:*10* 100:*6, 19*
103:*3* 106:*12* 107:*18*
108:*7, 14* 111:*19*
112:*16* 115:*16*
118:*19* 123:*22* 125:*8*
128:*10* 130:*1, 22*
131:*6* 132:*20* 133:*14*
134:*7* 137:*3, 14*
139:*13* 141:*5* 144:*8,*
*16* 146:*2, 8, 17, 22*
147:*3, 16* 149:*8, 18*
150:*4* 151:*4* 152:*12*
153:*16, 24* 156:*6*

157:*9, 18* 158:*13*
159:*24* 161:*6, 13*
162:*2* 164:*24* 165:*10,*
*20* 167:*3, 21* 171:*6*
173:*13* 175:*17* 177:*3*
178:*19* 181:*3, 22*
184:*12* 185:*11, 20*
186:*2* 188:*12* 190:*18*
191:*23* 196:*19* 197:*3,*
*10* 200:*17* 201:*22*
202:*10* 203:*1* 205:*13*
206:*8* 207:*16, 22*
208:*8, 13, 15, 17, 24*
209:*2, 12, 12, 13*
210:*10* 211:*20* 214:*5,*
*12* 215:*5* 217:*6*
219:*20* 221:*13, 17*
226:*17* 228:*11* 229:*5*
231:*4* 233:*22* 234:*23*
235:*5, 12, 18* 237:*8*
239:*1, 15* 244:*8, 10*
245:*3* 246:*3, 14, 17*
247:*3* 248:*7* 255:*19*
257:*9, 17* 258:*14*
259:*15* 260:*8, 12*
263:*2, 20* 269:*2*
271:*7, 9* 273:*5*
277:*15* 278:*3, 12*
280:*9* 283:*4* 284:*11*
285:*6* 287:*1, 22*
288:*3* 290:*20* 291:*4*
296:*9* 297:*10* 298:*6*
299:*18* 303:*7, 20*
304:*22* 305:*4, 10*
306:*2* 307:*22* 310:*16*
311:*12* 319:*3, 15*
322:*14* 323:*1* 327:*2,*
*10, 20* 329:*7, 17, 24*
331:*15* 332:*13* 334:*2,*
*11, 20* 335:*8* 337:*17*
342:*6* 343:*24* 344:*8*
345:*6* 346:*18* 348:*1*
356:*2, 10* 361:*6*
367:*14* 369:*9, 15, 21*
374:*15* 376:*16* 378:*9*
382:*22* 384:*24*
385:*13, 14, 17* 386:*15*
387:*1, 20* 388:*17, 24*
389:*2, 3, 11* 391:*15*
392:*9, 12, 17* 397:*9*

405:*5, 9* 406:*22*
410:*11* 411:*15*
416:*11, 17* 426:*12, 17,*
*19* 429:*23* 431:*8, 11*
432:*1*
**witnessed** 116:*4*
194:*5* 227:*3* 349:*8*
**witnesses** 393:*7, 15*
395:*21, 23* 398:*11*
**Wolson** 18:*10* 41:*5*
54:*24* 160:*23* 195:*9*
196:*9*
**Wolson's** 56:*4*
**woman** 189:*4*
**woman's** 194:*13*
195:*11* 196:*1*
**women** 85:*12* 92:*20*
93:*3* 116:*22* 134:*24*
135:*19* 147:*5* 156:*10,*
*15, 20, 22* 157:*13*
171:*4* 176:*13, 19*
179:*4* 183:*13* 210:*2*
217:*11* 242:*16* 244:*4*
245:*24* 294:*7* 295:*9*
298:*20, 22* 299:*11, 13,*
*20* 300:*17* 303:*7, 12,*
*15, 22* 366:*20*
**women's** 234:*9* 299:*5*
300:*23* 368:*8*
**Wonder** 159:*8*
**wonderful** 131:*12*
**wondering** 100:*8*
334:*6*
**Wood** 9:*19, 21, 24*
**word** 90:*13* 92:*1, 1*
115:*12* 128:*13*
136:*19, 19, 21* 153:*4*
212:*1* 253:*12, 19*
262:*11* 288:*20* 310:*2,*
*10, 11, 17* 311:*10, 19,*
*20* 322:*22* 326:*21*
380:*4*
**wording** 97:*19*
**words** 12:*18* 159:*18*
170:*19* 174:*21*
220:*11* 222:*15* 276:*8*
311:*2* 350:*22* 375:*1*
425:*4*
**work** 9:*10* 10:*1* 12:*3,*
*7* 13:*15, 24* 18:*5*

Deposition of DANIEL PIPES                                    Lisa Barbounis v. Middle Eastern Forum, et. al.

19:21  20:18  33:23
34:16  35:9  39:7
65:19  70:10, 13, 16
75:7  78:5  79:2
85:15  97:4, 8  109:19
111:14  123:8, 11, 16
133:18, 22  134:16
156:10, 16  162:21
163:5  165:16, 16, 17
179:5  180:11  183:11
186:17  217:12  238:1
249:21  266:16  285:3,
10  286:5, 22  289:5
300:16, 21  309:9
312:12  316:21  317:8
333:1  334:9, 22
338:7, 10  343:1
347:7, 11, 20  362:18,
19  364:5, 8, 12, 16
374:3  375:1, 3, 6
377:16  394:14
403:14  412:4, 8, 19
413:1  414:18  417:11
420:3  421:24  422:1
**worked**  9:12  33:22,
24  34:3  43:23  69:20
70:8  77:24  142:5
143:7  266:17  298:8
342:4  412:12
**working**  17:16  24:11,
19  34:6, 7  40:12
70:2, 4, 6  115:10
123:14  124:20, 24
184:7  225:5  249:6
286:2  289:16  347:9
348:18  349:10
365:18  412:5  414:15
421:5
**workplace**  117:19
118:9  237:17  238:1,
9, 10  328:1  332:23
384:12
**work-related**  376:11
**works**  19:20  27:20
35:1, 3  48:16, 18
52:19, 20  145:10
191:21  239:20
243:20  318:14
329:15  404:4

**workshops**  117:20, 23
**world**  104:23  236:7
**worried**  146:19
198:12  243:6  288:8,
12, 20, 24  290:22
**worries**  194:6
**worry**  194:6
**worse**  301:21
**worth**  40:18  41:10,
14  42:14, 20  94:19
98:24
**would've**  73:21, 22
76:6, 11  132:12, 16
149:21  150:15
173:13  187:18
250:21  401:13
**wrap**  193:13
**wrapped**  205:3
**wreck**  100:23
**write**  188:4, 19
363:23
**writes**  177:22  240:9
346:2
**writing**  93:1  176:5,
10, 11  421:8, 9
**written**  66:24, 24
115:5  118:9  129:3
148:11  150:8  199:2,
5  218:4  353:16
382:23
**wrong**  63:8  97:20
117:5  136:2  141:8, 9
164:16, 17  180:16
181:6  198:16, 18, 19
234:6  266:15  279:8
295:5  303:4  307:1
320:6  321:13  337:8
408:7, 9
**wrong,**  348:22
**wrongly**  161:18
**wrote**  95:3  143:3
169:14  175:10
188:19  189:19
239:16  262:9  333:14
336:4  348:15  402:1
422:9  423:15

**< X >**
**X'd**  126:18

**XX**  126:10, 11, 11, 11,
12

**< Y >**
**Yeah**  15:6  28:6, 8
38:12  39:19  42:8, 12
52:20  56:6  57:20, 21
58:16  65:16  68:19
69:4  74:14  84:3
96:11  97:12  100:12
101:18  111:10
114:16  116:7  120:4
121:5, 12, 12  123:1
125:23  142:10  145:7
151:16  174:17, 22
175:8, 12, 19  176:12
179:1  180:17, 21
181:21  190:10
191:18, 23  193:4, 9,
20  194:12  195:13
197:18  213:5  215:8
228:20  229:23  230:6
231:5  233:13  237:16,
22  241:14  245:3, 11
246:22  250:9  252:2,
16  260:1, 3  265:19
269:7  270:17  272:24
281:7  300:12  301:7,
8, 21  308:9  317:1
323:4  328:14  343:11
345:20  346:11
355:11, 17  358:7
365:20, 24  366:10
373:4, 5, 9  374:9, 13
380:8  381:1, 5, 9
384:9, 18  389:13
395:7  399:18  402:10,
23  407:10, 11  408:22
414:24  415:11, 24
419:5  421:10, 21
429:8, 15
**year**  10:8  27:3
37:18  38:11, 14  70:2,
4, 6  94:23  118:6
314:3  361:23  363:5
368:3  370:24  372:22
403:12  410:24
**yearly**  418:9
**years**  9:14  10:5
38:1  40:14  62:14

70:8  93:13  112:24
114:13  124:3  128:16
129:7  174:8  180:8
199:6  201:23  237:12
251:10  308:16  384:3,
4  410:12  411:1, 1
417:23
**yelling**  236:13
**Yep**  40:10  44:1
51:10  63:13  123:3
124:10  176:4, 17
190:9  192:20  193:18
218:20  243:8, 15
253:4  272:24  292:11
293:9  316:19  320:1
363:20  366:1  371:21
380:21  417:4  419:14
**yesterday**  178:23
242:17
**Yonchek**  96:22
97:10  104:7  119:12
298:15  303:14
**York**  60:21  62:9
158:20
**Yup**  57:15  63:16
208:2  218:12  243:4
255:4  292:16  316:23
406:9

**< Z >**
**ZABROSKE**  2:18
5:16
**Zero**  229:15
**Zoom**  1:12  2:6, 11,
17  8:17
**zooming**  314:13

Case 2:19-cv-05030-JDW   Document 126-3   Filed 04/20/21   Page 164 of 179

Deposition of DANIEL PIPES                                Lisa Barbounis v. Middle Eastern Forum, et. al.

## WORD LIST

**< $ >**
$14  (3)
$1500  (2)
$17  (1)
$200,000  (1)
$240,000  (1)
$27,000  (6)
$31  (12)
$31,000  (1)
$5,000  (3)
$7,000  (10)
$7,500  (2)

**< 0 >**
000027  (1)
0005  (1)
00060  (1)

**< 1 >**
1  (6)
1:11  (2)
1:21  (1)
1:24  (2)
10:08  (2)
10:35  (1)
10:45  (2)
10th  (9)
11  (8)
11:20  (1)
11:31  (1)
11:34  (5)
11:45  (3)
11:58  (1)
11th  (6)
12  (1)
12:10  (1)
12:15  (2)
122  (1)
12th  (1)
13  (1)
14  (3)
14th  (2)
15  (2)
1500-dollar  (1)
16  (1)
1650  (2)
17  (3)

176  (1)
17th  (4)
18  (10)
1835  (2)
189  (1)
18-year-old  (2)
19  (5)
19103  (3)
1994  (3)
19-page  (1)
19th  (1)
1st  (32)

**< 2 >**
2  (3)
2:10  (2)
2:15  (1)
2:19-cv-05030-GAM  (2)
2:49  (2)
20  (2)
2017  (3)
2018  (53)
2019  (47)
2020  (8)
207,000  (1)
21  (1)
215-391-4790  (1)
215-569-1999  (1)
215-665-2000  (1)
218  (1)
22  (3)
23  (2)
23rd  (5)
240,000  (1)
242  (1)
24th  (3)
25  (4)
251  (1)
26  (6)
275  (1)
28th  (1)
292  (1)
2950  (1)
29th  (1)
2nd  (4)

**< 3 >**
3  (21)

30  (5)
30,800,000-some  (1)
30th  (1)
31  (1)
316  (1)
320  (1)
321  (1)
33,000  (1)
336  (1)
34  (1)
345  (1)
347  (1)
354  (1)
365  (1)
368  (1)
371  (1)
374  (2)
379  (1)

**< 4 >**
4  (25)
4:49  (2)
40  (1)
406  (1)
408  (1)
417  (1)
428  (1)
45  (1)
4th  (6)

**< 5 >**
5:08  (2)
50  (1)
500  (2)
500-paragraph  (1)
501  (46)
51  (2)
515  (1)
52  (1)
54  (1)
5th  (25)

**< 6 >**
6  (2)
6:40  (1)
6:50  (2)
6:53  (3)
6:54  (1)
6:55  (2)

60  (5)
63  (1)
65  (2)
6th  (3)

**< 7 >**
7  (2)
7,000  (1)
7:00  (2)
70  (1)
75  (1)
7th  (2)

**< 8 >**
8  (1)
8th  (3)

**< 9 >**
9:02  (1)
968  (3)
975  (2)
976  (1)
977  (1)
978  (2)
990  (4)
9th  (10)

**< A >**
a.m  (15)
ability  (4)
able  (9)
abruptly  (1)
absolutely  (5)
abstract  (1)
abuse  (4)
abused  (3)
abusive  (14)
accept  (6)
acceptable  (7)
accepted  (3)
access  (5)
accession  (1)
accomplishments  (1)
account  (4)
accountable  (2)
accountant  (7)
accounting  (6)
accounts  (2)
accurate  (3)

accusation  (1)
accusations  (6)
accused  (6)
accuses  (1)
accusing  (3)
acknowledge  (2)
acknowledged  (3)
acknowledges  (2)
acknowledging  (3)
ACKNOWLEDGMENT  (1)
acquiesce  (1)
acquiesced  (1)
acquiescence  (1)
act  (3)
acted  (10)
ACTION  (5)
actions  (6)
active  (6)
activities  (8)
activity  (3)
actress  (4)
actual  (3)
add  (6)
added  (1)
addition  (1)
additional  (1)
Additionally  (1)
additions  (1)
addressed  (5)
addressing  (1)
adequate  (1)
adequately  (1)
adhered  (2)
administration  (1)
administrative  (9)
administrator  (2)
admitted  (4)
admitting  (1)
admonished  (1)
advance  (5)
advanced  (1)
advances  (8)
advice  (6)
affect  (1)
affection  (1)
affections  (1)
aforementioned  (2)
aforesaid  (1)

aforth  (1)
afraid  (1)
aftermath  (1)
afternoon  (1)
agent  (1)
ago  (28)
agree  (18)
agreed  (20)
agreeing  (1)
agreement  (19)
agreements  (2)
ahead  (35)
AIPAC  (2)
Airbnb  (6)
al  (2)
Alana  (18)
Albert  (3)
allegation  (24)
allegations  (36)
allege  (3)
alleged  (5)
allegedly  (3)
alleges  (1)
alleging  (2)
alleviate  (1)
allow  (10)
allowed  (25)
allowing  (1)
allude  (1)
alluded  (1)
allying  (1)
amazed  (1)
American  (1)
amount  (5)
amounts  (3)
Amy  (17)
Amy's  (2)
analysis  (1)
angels  (2)
anger  (1)
angry  (2)
ANN  (1)
announced  (1)
announcement  (1)
announces  (1)
announcing  (1)
annoyed  (1)
annually  (1)
anonymous  (1)

answer  (229)
answered  (18)
answering  (24)
answers  (10)
answer's  (1)
anti-discrimination  (1)
anxious  (1)
anybody  (9)
anymore  (10)
anytime  (3)
anyway  (7)
apart  (1)
Apologize  (2)
apology  (1)
apparently  (7)
appear  (1)
APPEARANCES  (1)
appeared  (3)
appearing  (3)
appears  (1)
applaud  (1)
Apple  (2)
Apples  (1)
application  (1)
applied  (2)
applies  (1)
apply  (4)
approached  (4)
appropriate  (5)
approval  (2)
approve  (4)
approved  (2)
approximately  (1)
apps  (1)
April  (20)
arbitrary  (1)
arcane  (2)
area  (2)
argue  (2)
arguing  (1)
argument  (4)
Argumentative  (11)
arisen  (2)
arm  (2)
arrangement  (4)
arrangements  (2)
arrive  (1)
arrived  (1)

article  (5)
articles  (2)
ascertain  (1)
ascribe  (1)
ascribed  (2)
aside  (4)
asked  (67)
asking  (59)
asks  (2)
aspect  (3)
aspects  (2)
aspirations  (1)
ass  (1)
assault  (3)
assaulted  (3)
assent  (1)
assert  (2)
assistant  (1)
associated  (2)
ASSOCIATES  (1)
assume  (2)
assuming  (2)
assurance  (1)
assurances  (1)
assure  (1)
assured  (2)
attached  (6)
attempt  (1)
attending  (1)
attention  (9)
attorney  (2)
attorney-client  (3)
attorneys  (10)
attorney's  (1)
attributing  (1)
Audio  (5)
audit  (2)
authenticate  (2)
authenticity  (3)
authority  (5)
authorization  (2)
authorize  (4)
authorized  (5)
authorizing  (2)
available  (4)
aware  (23)

< B >
back  (79)

Deposition of DANIEL PIPES

Lisa Barbounis v. Middle Eastern Forum, et. al.

background *(1)*
backside *(2)*
backstabbing *(4)*
bad *(9)*
badly *(2)*
bait *(4)*
baited *(1)*
Baldino *(2)*
ballpark *(3)*
bane *(3)*
bank *(2)*
bar *(3)*
BARBOUNIS *(65)*
barking *(1)*
barrage *(1)*
base *(1)*
based *(19)*
basic *(1)*
basically *(2)*
basing *(1)*
basis *(12)*
Bates *(1)*
Bates-marked *(1)*
bathroom *(4)*
beating *(2)*
began *(6)*
beginning *(7)*
behalf *(4)*
behave *(3)*
behaved *(3)*
behavior *(15)*
behavior, *(2)*
behavior's *(1)*
believe *(53)*
believed *(3)*
belong *(1)*
belongs *(1)*
benefit *(1)*
benefits *(5)*
Bennett *(9)*
Bennett's *(3)*
BENSON *(1)*
best *(12)*
better *(10)*
beyond *(4)*
big *(5)*
bill *(8)*
bills *(1)*
bit *(3)*

blabbering *(1)*
black *(4)*
blank *(1)*
blocked *(2)*
Bloom *(23)*
Bloom's *(1)*
blowback *(4)*
board *(26)*
Boards *(6)*
bodily *(1)*
body *(3)*
bogus *(3)*
bonds *(1)*
bone *(1)*
bookkeeper *(1)*
bookkeeping *(1)*
books *(2)*
borderline *(1)*
borders *(1)*
boss *(1)*
bossiness *(2)*
bossing *(2)*
bossy *(4)*
bottom *(8)*
bought *(2)*
bounce *(1)*
box *(1)*
Brady *(19)*
Brady's *(8)*
brand *(1)*
breach *(2)*
break *(20)*
breaking *(4)*
brewing *(1)*
brick *(2)*
brieser@discrimlaw.net *(1)*
brilliant *(1)*
bring *(15)*
bring-your-own-device *(1)*
Britain *(7)*
British *(3)*
broadly *(1)*
broke *(3)*
brought *(17)*
brushed *(1)*
building *(3)*
bullshit *(1)*

bumble *(1)*
bumped *(1)*
bunch *(2)*
bury *(1)*
business *(21)*
busyness *(1)*
butt *(4)*
buy *(1)*
Bylaws *(20)*
Bylaws, *(1)*

< C >
c3 *(27)*
c4 *(23)*
Caitriona *(26)*
Caitriona's *(3)*
calculate *(1)*
calculated *(2)*
Call *(36)*
called *(19)*
calling *(7)*
calls *(3)*
calumny *(1)*
campaign *(7)*
campaigns *(3)*
Canada *(1)*
candidates *(3)*
capable *(1)*
capacity *(2)*
card *(6)*
cards *(1)*
care *(8)*
cared *(2)*
career *(1)*
careful *(1)*
carefully *(2)*
Caroline *(2)*
CARSON *(697)*
Carson, *(1)*
case *(74)*
cases *(10)*
cash *(1)*
catch *(1)*
categories *(1)*
categorization *(4)*
category *(1)*
cause *(3)*
caused *(1)*
causes *(1)*

CAVALIER *(500)*
cc'd *(4)*
censor *(2)*
censoring *(1)*
centered *(1)*
century *(1)*
CEO *(17)*
certain *(12)*
certainly *(5)*
certification *(1)*
certify *(2)*
cetera *(3)*
chair *(2)*
chairman *(7)*
chambers *(1)*
chance *(5)*
change *(9)*
changed *(9)*
changes *(9)*
changing *(1)*
chaperones *(1)*
chapter *(1)*
character *(1)*
characterization *(5)*
characterize *(4)*
charge *(8)*
charges *(1)*
charter *(1)*
check *(22)*
checked *(3)*
checking *(1)*
checks *(2)*
child *(1)*
children *(7)*
chilling *(1)*
choice *(7)*
choose *(1)*
chorus *(1)*
chose *(3)*
circles *(1)*
Circuit *(1)*
circumstance *(1)*
circumstances *(3)*
cite *(1)*
CIVIL *(5)*
claim *(10)*
claimed *(2)*
claims *(5)*
classification *(1)*

Deposition of DANIEL PIPES                                    Lisa Barbounis v. Middle Eastern Forum, et. al.

| | | | |
|---|---|---|---|
| clean  (6) | complex  (4) | consequences  (8) | correcting  (1) |
| clear  (32) | compliance  (1) | consequences,  (1) | corrections  (3) |
| clearly  (6) | complicated  (3) | consider  (20) | correctly  (3) |
| client  (23) | complicates  (1) | considered  (4) | correspondence  (1) |
| clients  (1) | complication  (1) | considering  (7) | corroborate  (3) |
| client's  (5) | complications  (5) | considers  (1) | corroborated  (1) |
| clock  (7) | complicit  (10) | consist  (1) | corroborating  (1) |
| close  (25) | component  (1) | consistent  (1) | couch  (8) |
| closed  (4) | comprehensive  (5) | consolidated  (1) | could've  (11) |
| closely  (9) | computer  (2) | conspiracy  (5) | counsel  (16) |
| closer  (1) | computer-aided  (1) | conspiring  (1) | Counselor  (1) |
| closes  (1) | computer's  (1) | constant  (1) | Counsels  (4) |
| Code  (1) | concern  (14) | contact  (11) | counsel's  (1) |
| colleague  (1) | concerned  (23) | contacted  (6) | count  (5) |
| colleagues  (2) | concerning  (5) | contacts  (5) | counted  (2) |
| collect  (2) | concerns  (7) | cont'd  (1) | counterclaim  (33) |
| collected  (2) | concluded  (4) | contemporaneous  (1) | counterclaims  (5) |
| college  (1) | concluding  (1) | content  (16) | counting  (1) |
| come  (80) | conclusion  (8) | contented  (1) | counts  (1) |
| comes  (11) | conclusions  (1) | contention  (1) | couple  (3) |
| comfortable  (4) | concoct  (2) | contentment  (2) | course  (20) |
| coming  (13) | concocted  (16) | context  (10) | COURT  (82) |
| command  (2) | concoction  (3) | Continue  (14) | courtesy  (2) |
| commencing  (1) | condition  (2) | continued  (14) | courtroom  (1) |
| comment  (1) | conditions  (12) | continues  (4) | court's  (1) |
| comments  (6) | conduct  (22) | continuing  (1) | cover  (1) |
| commission  (1) | conducted  (1) | continuously  (1) | COZEN  (3) |
| commit  (1) | conference  (4) | contradict  (1) | crazy  (2) |
| committee  (2) | confidant  (2) | contradiction  (5) | create  (3) |
| Commonwealth  (1) | confidence  (1) | contradictions  (2) | created  (6) |
| communication  (3) | confident  (1) | contradictory  (4) | creative  (1) |
| communications  (4) | confidential  (3) | contrary  (1) | credence  (1) |
| companies  (2) | confidentiality  (5) | contribution  (1) | credibility  (4) |
| company  (12) | confines  (1) | control  (5) | credible  (11) |
| compare  (2) | confirm  (3) | controversial  (1) | credit  (2) |
| Compared  (1) | confirmed  (2) | convenience  (1) | criminal  (2) |
| comparing  (2) | confirming  (3) | conversation  (12) | crisis  (2) |
| compensate  (1) | confirms  (2) | conversations  (4) | critical  (4) |
| compensated  (2) | confront  (1) | convinced  (1) | criticisms  (1) |
| complain  (21) | confronted  (2) | convulses  (1) | crossed  (1) |
| complainants  (3) | confusing  (1) | COO  (1) | crosses  (1) |
| complained  (21) | congratulate  (2) | cooperate  (1) | cross-talk  (98) |
| complaining  (15) | Congratulations  (1) | copied  (1) | crowded  (1) |
| complains  (2) | Congress  (2) | copying  (1) | crucial  (1) |
| complaint  (59) | conjunction  (1) | core  (1) | cunt  (1) |
| complaints  (77) | connected  (8) | corner  (1) | current  (5) |
| complete  (6) | connection  (8) | corporate  (12) | curtailed  (1) |
| completed  (3) | connived  (2) | correct  (163) | custody  (1) |
| completely  (6) | consensual  (2) | corrected  (1) | cut  (2) |

Deposition of DANIEL PIPES                                    Lisa Barbounis v. Middle Eastern Forum, et. al.

cuts  *(1)*
cutting  *(1)*

< D >
D.C  *(3)*
D.C.  *(1)*
D000017  *(1)*
D000024  *(1)*
D000037  *(1)*
da  *(9)*
dad  *(3)*
Daily  *(1)*
damage  *(1)*
damages  *(9)*
damaging  *(1)*
damn  *(1)*
Dan  *(2)*
dangers  *(1)*
DANIEL  *(66)*
Daniel,  *(1)*
Danny  *(11)*
date  *(15)*
dated  *(10)*
dates  *(3)*
day  *(31)*
days  *(7)*
day-to-day  *(1)*
deadlines  *(2)*
deal  *(34)*
dealing  *(7)*
dealt  *(27)*
Dear  *(1)*
deceit  *(10)*
deceitful  *(7)*
decide  *(5)*
decided  *(20)*
decides  *(2)*
decision  *(15)*
decisions  *(6)*
declaration  *(1)*
decrease  *(1)*
deem  *(1)*
deemed  *(1)*
de-emphasize  *(1)*
deep  *(1)*
Defendant  *(8)*
Defendants  *(2)*
defense  *(2)*
define  *(1)*

definitely  *(12)*
definition  *(2)*
definitions  *(1)*
Delaney  *(10)*
delve  *(1)*
demand  *(4)*
demanded  *(1)*
demanding  *(1)*
den  *(7)*
denial  *(1)*
denied  *(7)*
denies  *(2)*
denounces  *(1)*
denying  *(1)*
dep  *(1)*
depends  *(4)*
deponent  *(3)*
deponent's  *(1)*
deposed  *(2)*
deposing  *(1)*
deposition  *(36)*
depositions  *(4)*
depreciation  *(1)*
DEPUTY  *(11)*
DEREK  *(11)*
derivative  *(8)*
describe  *(4)*
described  *(2)*
describes  *(1)*
describing  *(2)*
DESCRIPTION  *(8)*
designed  *(1)*
despite  *(2)*
destroy  *(4)*
detail  *(9)*
detailed  *(2)*
details  *(5)*
determination  *(3)*
determine  *(6)*
determined  *(1)*
determining  *(1)*
detrimental  *(1)*
development  *(5)*
developments  *(1)*
devote  *(1)*
devoted  *(2)*
dial  *(1)*
difference  *(7)*
differences  *(1)*

different  *(29)*
differently  *(1)*
difficult  *(9)*
diminished  *(1)*
dinner  *(1)*
direct  *(5)*
directed  *(2)*
directive  *(1)*
directives  *(1)*
directly  *(11)*
director  *(42)*
directors  *(13)*
directorship  *(4)*
directs  *(1)*
disadvantage  *(1)*
disadvantaged  *(1)*
disagree  *(8)*
Disagreement  *(1)*
disappear  *(5)*
disappeared  *(3)*
disappointed  *(5)*
discern  *(1)*
discipline  *(1)*
disclose  *(2)*
disclosed  *(1)*
disclosures  *(1)*
discontent  *(1)*
discovery  *(8)*
discrepancy  *(3)*
discrimination  *(11)*
discuss  *(7)*
discussed  *(8)*
discussing  *(3)*
discussion  *(18)*
discussions  *(8)*
disguised  *(1)*
disgust  *(1)*
dishonest  *(1)*
disinvited  *(2)*
dislike  *(2)*
disliking  *(1)*
dismay  *(1)*
disparages  *(1)*
displeased  *(2)*
displeasure  *(1)*
dispute  *(1)*
disregarded  *(1)*
disrupted  *(1)*
dissuaded  *(1)*

distance  *(1)*
distancing  *(1)*
distinction  *(1)*
distinctly  *(1)*
distorted  *(1)*
distracted  *(1)*
DISTRICT  *(4)*
disturbing  *(2)*
divided  *(1)*
doc  *(1)*
docket  *(1)*
docking  *(1)*
docks  *(1)*
Docs  *(3)*
document  *(103)*
documenting  *(1)*
documents  *(49)*
document's  *(1)*
doing  *(41)*
dollars  *(4)*
dominated  *(1)*
donated  *(1)*
donations  *(7)*
donor  *(9)*
donors  *(10)*
door  *(4)*
double  *(1)*
doubt  *(1)*
doubts  *(4)*
download  *(1)*
downs  *(1)*
downstairs  *(1)*
Dr  *(1)*
draft  *(5)*
dragged  *(1)*
drastic  *(1)*
drill  *(2)*
drinks  *(1)*
drive  *(4)*
dropped  *(1)*
Due  *(9)*
duly  *(2)*
duties  *(2)*
duty  *(5)*
dynamic  *(1)*

< E >
eager  *(1)*
ear  *(2)*

Deposition of DANIEL PIPES                                   Lisa Barbounis v. Middle Eastern Forum, et. al.

earlier  *(17)*
early  *(16)*
earned  *(2)*
easily  *(2)*
EAST  *(159)*
EASTERN  *(8)*
easy  *(2)*
editorial  *(1)*
editorializing  *(1)*
EEOC  *(5)*
eerily  *(1)*
effect  *(5)*
effectively  *(4)*
effects  *(1)*
efficacy  *(1)*
efforts  *(1)*
eight  *(23)*
eight-hundred-some
  *(1)*
either  *(12)*
ejected  *(3)*
ejected,  *(1)*
elaborate  *(1)*
elaborated  *(2)*
elaboration  *(1)*
elected  *(5)*
electronic  *(4)*
Email  *(98)*
Emails  *(40)*
Eman  *(10)*
embarrass  *(1)*
embarrassed  *(1)*
emergency  *(1)*
emotions  *(1)*
emphasis  *(1)*
employee  *(25)*
employees  *(38)*
employee's  *(2)*
employment  *(17)*
en  *(1)*
encounter  *(1)*
ended  *(6)*
Endless  *(5)*
endorse  *(3)*
endorsed  *(1)*
endure  *(2)*
energy  *(1)*
enforce  *(1)*
enforcing  *(1)*

engage  *(8)*
engaged  *(7)*
engages  *(1)*
English  *(2)*
enhances  *(1)*
enormous  *(3)*
entangled  *(2)*
enter  *(1)*
entered  *(3)*
enthusiastic  *(2)*
enthusiastically  *(1)*
entices  *(1)*
entire  *(14)*
entirely  *(10)*
entitled  *(2)*
entity  *(2)*
entrust  *(2)*
environment  *(1)*
equal  *(1)*
equals  *(1)*
equate  *(1)*
era  *(2)*
Erica  *(1)*
errata  *(5)*
errors  *(4)*
escalation  *(1)*
especially  *(3)*
ESQUIRE  *(5)*
essentially  *(6)*
EST  *(5)*
et  *(5)*
ethical  *(1)*
evening  *(3)*
events  *(5)*
eventually  *(1)*
Everest  *(2)*
everybody  *(9)*
everybody's  *(1)*
everyone's  *(7)*
everything,  *(1)*
everything's  *(2)*
evidence  *(10)*
exact  *(11)*
exactly  *(14)*
exaggerate  *(1)*
exaggerating  *(1)*
EXAMINATION  *(1)*
examined  *(1)*
Examiner  *(4)*

example  *(9)*
examples  *(1)*
excellent  *(1)*
exception  *(3)*
exchanges  *(1)*
excluded  *(3)*
excluding  *(1)*
excuse  *(5)*
excused  *(1)*
executive  *(2)*
Exhibit  *(10)*
exhibition  *(2)*
EXHIBITS  *(4)*
exist  *(3)*
existed  *(1)*
existence  *(1)*
exists  *(1)*
expand  *(1)*
expect  *(1)*
expeditious  *(1)*
expeditiously  *(6)*
expense  *(7)*
expenses  *(6)*
experience  *(2)*
experienced  *(1)*
expert  *(2)*
expires  *(1)*
explain  *(12)*
explained  *(9)*
explaining  *(1)*
explanation  *(2)*
explicitly  *(1)*
exposed  *(1)*
exposition  *(1)*
exposure  *(1)*
expound  *(1)*
expressed  *(2)*
extensive  *(2)*
extent  *(16)*
external  *(1)*
extra  *(3)*
extraordinarily  *(1)*

< F >
face  *(15)*
faces  *(1)*
facilitate  *(1)*
fact  *(24)*
facts  *(2)*

fail  *(1)*
failure  *(1)*
Fair  *(5)*
fairly  *(1)*
fall  *(2)*
falls  *(1)*
false  *(16)*
falsehood  *(2)*
fantasy  *(1)*
far  *(20)*
far-reaching  *(1)*
faster  *(1)*
father  *(10)*
fault  *(3)*
favor  *(1)*
favors  *(2)*
fear  *(1)*
feared  *(1)*
February  *(4)*
fed  *(2)*
Federal  *(2)*
feel  *(9)*
feeling  *(2)*
feelings  *(1)*
feels  *(1)*
feet  *(2)*
fell  *(1)*
felt  *(5)*
female  *(12)*
fiduciary  *(1)*
fight  *(2)*
figuratively  *(1)*
figure  *(13)*
figured  *(1)*
figuring  *(2)*
file  *(6)*
filed  *(7)*
filing  *(2)*
fill  *(2)*
filling  *(1)*
final  *(1)*
finance  *(1)*
finances  *(5)*
financially  *(1)*
find  *(24)*
finding  *(5)*
finds  *(1)*
fine  *(34)*
finish  *(70)*

Deposition of DANIEL PIPES                                    Lisa Barbounis v. Middle Eastern Forum, et. al.

| | | | |
|---|---|---|---|
| finished (17) | frankly (3) | glad (2) | handwrote (2) |
| finishing (2) | fraternizing (1) | go (130) | Hang (1) |
| FINK (8) | fraudulent (1) | god (1) | happen (12) |
| fire (11) | free (5) | goes (12) | happened (48) |
| fireable (1) | frequent (1) | going (61) | happening (2) |
| fired (10) | friendly (1) | GOLD (2) | happens (2) |
| firing (2) | friends (4) | gonna (253) | happiness (1) |
| Firm (4) | friendship (2) | good (22) | happy (22) |
| first (58) | friendships (2) | Goodman (15) | harass (2) |
| fit (3) | front (19) | Gotcha (1) | harassed (4) |
| five (23) | fuckin (1) | gotta (23) | harasser (1) |
| five-minute (2) | full (8) | governance (1) | harassment (41) |
| fix (1) | full-bloomed (1) | governing (1) | hard (10) |
| fixing (1) | full-blown (1) | Government's (1) | harmful (6) |
| focus (5) | full-time (1) | Governors (21) | harsh (1) |
| focused (2) | fully (2) | GR (1) | hating (3) |
| follow (4) | fun (2) | Grace (3) | have, (1) |
| followed (1) | fundraising (3) | grant (1) | head (13) |
| following (8) | funds (3) | granted (2) | health (11) |
| follows (1) | funny (1) | Grayson (1) | hear (74) |
| foot (3) | further (9) | great (9) | heard (52) |
| footing (1) | future (12) | green (3) | hearing (4) |
| force (3) | future, (1) | Gregg (382) | hearsay (7) |
| forced (2) | | Gregg's (30) | heart (1) |
| forcing (4) | < G > | grievances (1) | he'd (1) |
| foregoing (1) | Gabrielle (24) | gross (2) | held (9) |
| forensic (1) | gain (1) | ground (1) | hell (1) |
| Forever (1) | gala (1) | grounds (4) | Hello (2) |
| forget (4) | Gambill (3) | GROUP (12) | help (17) |
| Forgetting (1) | games (7) | Guardian (2) | helpful (1) |
| forgot (2) | Gary (17) | guess (17) | helping (1) |
| forgotten (1) | gathering (1) | guesses (1) | helps (1) |
| form (199) | gearing (1) | gunning (3) | henceforth (2) |
| former (1) | G-E-L (1) | guy (3) | here, (1) |
| forth (12) | gender (2) | guys (39) | heroes (2) |
| FORUM (166) | general (3) | | hesitant (1) |
| Forum's (3) | generalizations (1) | < H > | Hey (7) |
| Forum-wide (1) | generally (4) | hair (1) | hi (1) |
| forward (6) | germane (1) | half (11) | hid (8) |
| forward, (1) | getting (21) | halfway (1) | hide (2) |
| forwarded (1) | giant (1) | hand (14) | hiding (6) |
| found (18) | gifted (1) | handed (3) | high (3) |
| foundation (32) | gig (1) | handing (1) | higher (3) |
| foundations (3) | ginned (1) | hand-in-hand (3) | highest (1) |
| Four (12) | gist (1) | handle (1) | highlight (2) |
| four-page (1) | give (51) | handled (5) | highlighted (2) |
| fours (1) | given (6) | handles (2) | highly (3) |
| fourth (2) | gives (1) | hands (4) | hint (1) |
| Frank (4) | giving (12) | handwritten (8) | hire (5) |

hired  *(1)*
hiring  *(2)*
history  *(4)*
hit  *(8)*
Hm  *(1)*
Hold  *(20)*
Hollin  *(1)*
Hollin's  *(1)*
honest  *(1)*
honestly  *(2)*
honesty  *(1)*
hope  *(2)*
hostilities  *(6)*
hotbed  *(1)*
hotel  *(8)*
hour  *(9)*
hours  *(13)*
house  *(1)*
How'd  *(1)*
huge  *(1)*
Huh  *(1)*
human  *(5)*
hun  *(1)*
hundred  *(9)*
husband  *(2)*
hush  *(1)*
hypothetical  *(17)*
hypotheticals  *(8)*

< I >
idea  *(28)*
ideal  *(1)*
ideas  *(2)*
identify  *(4)*
ignorance  *(1)*
ill  *(1)*
illegal  *(6)*
imaginary  *(2)*
imagination  *(3)*
imagine  *(1)*
Imagined  *(2)*
immediately  *(6)*
immunity  *(3)*
imperative  *(1)*
implausible  *(1)*
implemented  *(1)*
implicate  *(1)*
implicates  *(1)*
implication  *(1)*

imply  *(1)*
implying  *(2)*
impolite  *(1)*
import  *(1)*
important  *(17)*
importantly  *(1)*
imposed  *(1)*
impossible  *(1)*
improprieties  *(1)*
impugn  *(1)*
inaccurate  *(1)*
inadvertent  *(1)*
inappropriate  *(14)*
inappropriately  *(1)*
Inaudible  *(57)*
incessantly  *(1)*
incident  *(8)*
incidents  *(1)*
include  *(4)*
included  *(3)*
including  *(8)*
income  *(2)*
incomplete  *(6)*
incomprehensible  *(2)*
inconsist  *(1)*
inconsistencies  *(2)*
inconsistency  *(4)*
inconsistent  *(3)*
increase,  *(1)*
increased  *(4)*
incredible  *(1)*
incumbent  *(1)*
INDEX  *(1)*
indicate  *(5)*
indicated  *(4)*
indicates  *(5)*
indicating  *(1)*
indication  *(4)*
indiscretions  *(1)*
Indistinguishable  *(98)*
individual  *(2)*
individually  *(1)*
individuals  *(4)*
indulgence  *(1)*
inflicted  *(1)*
influence  *(1)*
inform  *(1)*
information  *(33)*
informational  *(1)*

informed  *(1)*
informing  *(1)*
inherent  *(1)*
initial  *(8)*
initially  *(4)*
initiate  *(1)*
initiated  *(9)*
initiation  *(2)*
initiative  *(3)*
in-office  *(4)*
inquire  *(3)*
inquired  *(1)*
inquiries  *(1)*
inquiry  *(3)*
inquisitive  *(1)*
ins  *(1)*
instance  *(3)*
instances  *(4)*
institution  *(1)*
instruct  *(3)*
instructed  *(1)*
instructing  *(1)*
instruction  *(4)*
instructions  *(7)*
instructs  *(1)*
insurance  *(7)*
intellectual  *(1)*
intend  *(1)*
intense  *(3)*
intensely  *(2)*
intention  *(8)*
intentionally  *(1)*
intentions  *(3)*
intents  *(1)*
inter  *(1)*
interaction  *(1)*
interactions  *(2)*
intercourse  *(1)*
interest  *(4)*
interested  *(7)*
interfere  *(1)*
interject  *(2)*
intern  *(5)*
internal  *(4)*
interpersonal  *(1)*
interpret  *(3)*
interpretation  *(1)*
interpreted  *(2)*
interrogatories  *(3)*

interrogatory  *(1)*
interrupt  *(26)*
interrupted  *(7)*
interrupting  *(12)*
interruption  *(1)*
interruptions  *(1)*
interview  *(11)*
interviewed  *(9)*
interviews  *(2)*
intimate  *(1)*
introverted  *(1)*
invest  *(1)*
invested  *(2)*
investigate  *(18)*
investigated  *(17)*
investigating  *(4)*
investigation  *(23)*
Investigator  *(5)*
investment  *(1)*
invite  *(5)*
invited  *(7)*
involve  *(2)*
Involved  *(12)*
involves  *(1)*
irony  *(1)*
irrelevant  *(2)*
IRS  *(1)*
Israel  *(28)*
issue  *(22)*
issued  *(2)*
issues  *(22)*
issues,  *(1)*
it'd  *(1)*
it'll  *(1)*
its  *(5)*

< J >
Jack  *(1)*
James  *(4)*
January  *(3)*
jcavalier@cozen.com  *(1)*
Jeannine  *(1)*
job  *(44)*
jobs  *(4)*
Jon  *(38)*
JONATHAN  *(1)*
Judge  *(32)*
Judging  *(1)*

Deposition of DANIEL PIPES                                    Lisa Barbounis v. Middle Eastern Forum, et. al.

judgment  (3)
July  (1)
jumbled  (1)
jump  (1)
June  (20)
junkie  (1)
jury  (3)
justifies  (1)
justify  (1)

< K >
keep  (43)
keeps  (3)
Ken  (1)
kept  (5)
key  (14)
kids  (3)
kill  (2)
killer  (1)
kin  (1)
kind  (8)
kinds  (1)
knew  (28)
knife  (1)
know  (416)
know,  (3)
knowing  (5)
knowledge  (4)
known  (7)
knows  (11)

< L >
labeled  (1)
labeling  (1)
lacerating  (1)
lack  (12)
ladies  (2)
lap  (9)
laptop  (21)
laptop,  (1)
laptops  (1)
Lara  (9)
Lara's  (2)
large  (2)
largely  (1)
larger  (2)
large-scale  (3)
late  (6)
Laterally  (1)

Laura  (9)
Laura's  (1)
LAW  (31)
law,  (1)
lawbooks  (3)
Lawrence  (2)
laws  (4)
lawsuit  (1)
lawsuits  (9)
lawyer  (15)
lawyers  (6)
Lea  (21)
lead  (2)
leadership  (2)
learn  (3)
learned  (15)
learning  (1)
leave  (8)
leaving  (1)
led  (1)
Lee  (8)
leery  (1)
Lee's  (1)
leeway  (2)
left  (11)
legal  (35)
legalities  (6)
legally  (4)
legitimate  (2)
LEIGH  (1)
length  (1)
lengths  (1)
lesson  (4)
Letter  (24)
letters  (1)
letting  (5)
Levy  (5)
Levy's  (1)
liability  (1)
liar  (3)
Liberty  (1)
lie  (11)
lied  (6)
lies  (10)
lieu  (1)
life  (17)
life,  (2)
lifted  (3)
lights  (1)

likes  (1)
Likewise  (1)
limit  (2)
limited  (2)
limiting  (1)
line  (5)
lines  (5)
linked  (1)
liquidated  (1)
LISA  (145)
Lisa's  (3)
list  (20)
list,  (1)
listed  (12)
listen  (10)
listened  (5)
lists  (2)
literally  (4)
little  (18)
live  (1)
lives  (11)
load  (1)
loaded  (3)
loading  (2)
loathed  (1)
Lobitz  (1)
logic  (1)
long  (26)
longer  (5)
look  (59)
looked  (21)
looking  (16)
looks  (9)
lose  (2)
lose-lose  (1)
losing  (1)
loss  (4)
lost  (5)
lot  (18)
lots  (1)
loud  (5)
louder  (2)
lousy  (1)
love  (1)
loving  (1)
loyalty  (3)
luck  (2)
ludicrous  (2)
LUKE  (4)

lunch  (2)
lure  (3)
lured  (2)
lures  (1)
lying  (2)

< M >
machine  (1)
Macs  (1)
magic  (1)
magically  (1)
main  (1)
maintain  (7)
maintained  (4)
maintains  (4)
major  (3)
maker  (2)
make-work  (1)
making  (19)
man  (6)
managed  (1)
management  (19)
manager  (9)
managing  (2)
Mandeles  (1)
manipulation  (1)
manipulative  (6)
manner  (2)
manual  (4)
manufactured  (1)
MARC  (25)
March  (39)
mark  (3)
marked  (4)
Market  (4)
Marnie  (130)
Marnie's  (6)
masse  (1)
Matt  (77)
matter  (26)
mattered  (1)
matters  (7)
Matthew  (1)
Matt's  (8)
McNulty  (33)
McNulty's  (2)
me,  (2)
mean  (94)
means  (9)

Deposition of DANIEL PIPES                                          Lisa Barbounis v. Middle Eastern Forum, et. al.

meant *(9)*
media *(16)*
mediate *(1)*
mediated *(2)*
medical *(1)*
medium *(2)*
meet *(1)*
meeting *(22)*
meetings *(6)*
MEF *(29)*
MEF, *(1)*
Mekelburg *(5)*
member *(4)*
members *(8)*
memo *(14)*
Memorandum *(3)*
memorialize *(1)*
memorialized *(1)*
memories *(1)*
memorize *(3)*
memorized *(1)*
memory *(2)*
men *(4)*
mental *(4)*
mention *(3)*
MENTIONED *(9)*
mentions *(1)*
Merville *(19)*
mess *(1)*
message *(2)*
Messages *(20)*
messaging *(1)*
met *(7)*
metadata *(3)*
Meyer *(44)*
MIDDLE *(165)*
might've *(4)*
mild *(1)*
Miller *(1)*
Miller's *(1)*
million *(24)*
millions *(1)*
mind *(7)*
minds *(2)*
mine *(3)*
minimizing *(1)*
minimum *(1)*
minor *(10)*
minute *(15)*

minutes *(11)*
mis *(2)*
misappropriated *(1)*
misappropriation *(1)*
misbehaved *(1)*
misbehavior *(5)*
miscategorization *(1)*
mischaracterization *(6)*
mischaracterized *(1)*
mischaracterizing *(3)*
misconduct *(15)*
misconstrued *(1)*
miserable *(1)*
misread *(1)*
misrepresentation *(1)*
mistake *(8)*
mistakes *(6)*
misuse *(1)*
mitigated *(8)*
mix *(3)*
mixed *(1)*
Mm-hmm *(3)*
MO *(1)*
moan *(1)*
moaning *(6)*
moans *(1)*
moment *(5)*
money *(70)*
mongering *(2)*
Month *(7)*
months *(32)*
morning *(5)*
mother *(7)*
motion *(7)*
mouth *(3)*
mouths *(1)*
move *(21)*
moved *(11)*
moving *(4)*
multiple *(3)*
murder *(3)*
muted *(1)*
mutual *(1)*

**< N >**
nail *(1)*
name *(39)*
named *(1)*

names *(21)*
name's *(1)*
narrative *(1)*
Nasty *(9)*
national *(1)*
natural *(2)*
naturally *(1)*
nature *(10)*
NDA *(6)*
NDA, *(1)*
NDAs *(1)*
necessarily *(1)*
necessary *(2)*
need *(28)*
needed *(3)*
needs *(8)*
Neither *(2)*
nest *(2)*
net *(3)*
never *(57)*
new *(21)*
news *(2)*
newspapers *(1)*
nice *(2)*
night *(3)*
nine *(4)*
no, *(2)*
Nobody's *(1)*
nods *(1)*
noises *(1)*
noncommittal *(1)*
Nonprofit *(5)*
nonprofits *(2)*
nonresponsive *(5)*
nonresponsiveness *(1)*
nonsense *(1)*
non-tax-deductible *(1)*
Nope *(1)*
normal *(3)*
Notary *(4)*
note *(19)*
noted *(5)*
notes *(8)*
Notice *(2)*
notify *(1)*
noting *(1)*
November *(143)*
now, *(1)*
NUMBER *(22)*

numbers *(10)*

**< O >**
oath *(4)*
Object *(242)*
objecting *(7)*
objection *(32)*
objections *(8)*
objection's *(1)*
observe *(1)*
Obviously *(4)*
occasions *(2)*
occurred *(3)*
O'CONNOR *(3)*
October *(3)*
odd *(1)*
offer *(4)*
offered *(4)*
offers *(1)*
office *(64)*
officer *(3)*
officers *(9)*
Officers, *(2)*
offices *(3)*
official *(7)*
Oh *(20)*
Okay *(169)*
old *(10)*
omitting *(1)*
omniscience *(1)*
omniscient *(1)*
once *(6)*
one-on-one *(2)*
ones *(2)*
one's *(2)*
one-syllable *(1)*
one-to-one *(1)*
ongoing *(2)*
online *(1)*
open *(11)*
open-ended *(2)*
opening *(5)*
operations *(2)*
opinion *(1)*
opportunity *(8)*
opposing *(1)*
opposite *(1)*
order *(25)*
orders *(3)*

Deposition of DANIEL PIPES                                    Lisa Barbounis v. Middle Eastern Forum, et. al.

Ordinance  (2)
ordinary  (1)
organization  (27)
organizationally  (1)
organizations  (4)
organize  (1)
Original  (2)
originally  (1)
other's  (3)
otherwise,  (1)
outcome  (2)
outline  (1)
outlining  (1)
out-of-office  (1)
outrageous  (1)
outs  (1)
Outside  (4)
over'  (1)
oversee  (2)
oversight  (2)
owe  (1)
owed  (3)

< P >
P.C  (1)
p.m  (16)
PA  (3)
packed  (1)
PAGE  (16)
pages  (7)
paid  (42)
panoply  (1)
paper  (1)
paperwork  (2)
paragraph  (4)
parameters  (6)
paraphrased  (1)
part  (38)
partially  (2)
participant  (1)
participate  (1)
particular  (6)
particularized  (1)
particularly  (7)
parties  (3)
parts  (1)
party  (2)
pass  (1)
passed  (1)

passwords  (1)
pasted  (1)
patently  (1)
path  (1)
patience  (1)
Patricia  (14)
Patricia's  (2)
pattern  (3)
pay  (19)
payday  (1)
paying  (5)
payment  (1)
payments  (2)
pending  (25)
penis  (6)
PENNSYLVANIA  (4)
people  (55)
people's  (5)
percent  (9)
perfect  (2)
perfectly  (3)
perform  (1)
period  (7)
perks  (3)
permission  (13)
permitted  (8)
person  (33)
personal  (17)
personalities  (1)
personality  (4)
Personally  (5)
personnel  (5)
persons  (2)
pertained  (1)
pertinent  (8)
perverted  (1)
Philadelphia  (8)
Philly  (1)
phone  (16)
phonetic  (5)
photograph  (1)
photographs  (2)
photos  (1)
PHRA  (2)
phrase  (2)
physical  (2)
physically  (4)
pick  (2)
picks  (1)

picture  (7)
pictures  (1)
piling  (1)
pillow  (1)
pin  (1)
PIPES  (155)
Pipes-1  (3)
Pipes-10  (1)
Pipes-11  (1)
Pipes-12  (1)
Pipes-13  (1)
Pipes-14  (1)
Pipes-15  (1)
Pipes-16  (1)
Pipes-17  (1)
Pipes-18  (1)
Pipes-19  (1)
Pipes-2  (3)
Pipes-20  (1)
Pipes-21  (1)
Pipes-22  (1)
Pipes-23  (1)
Pipes-24  (1)
Pipes-25  (1)
Pipes-26  (1)
Pipes-27  (1)
Pipes-28  (1)
Pipes-29  (1)
Pipes-3  (3)
Pipes-4  (3)
Pipes-5  (1)
Pipes-6  (1)
Pipes-7  (2)
Pipes-8  (3)
Pipes-9  (1)
Place  (30)
Plaintiff  (6)
plaintiffs  (7)
plan  (1)
planning  (4)
plate  (1)
play  (1)
played  (4)
playing  (7)
plea  (1)
pleasantries  (1)
please  (39)
pleased  (4)
plenty  (2)

PNC  (1)
poetic  (2)
point  (44)
point-blank  (1)
pointed  (3)
pointedly  (1)
pointing  (4)
points  (3)
policy  (19)
political  (10)
politically  (1)
politics  (7)
pool  (1)
poor  (1)
pop  (7)
portfolio  (3)
portray  (1)
portrayed  (3)
Posepiak  (1)
position  (31)
positioned  (3)
positions  (1)
positive  (1)
possession  (4)
possibility  (1)
possible  (5)
possibly  (1)
Post  (5)
pot  (1)
potential  (2)
potentially  (2)
power  (5)
powers  (1)
Practice  (3)
pre  (6)
pre-authorized  (2)
precedence  (1)
precise  (1)
precisely  (1)
Predated  (1)
predator  (1)
pre-March  (1)
preparation  (1)
prepared  (4)
Preparing  (3)
presence  (2)
PRESENT  (17)
presented  (1)
presenting  (1)

presently  (1)
presents  (1)
preservation  (1)
President  (23)
press  (1)
Presumably  (4)
pretend  (3)
pretended  (2)
pretty  (4)
prevent  (2)
previous  (4)
previously  (2)
principals  (3)
printout  (1)
prior  (8)
priority  (1)
private  (5)
privilege  (17)
privileged  (4)
privileged,  (1)
privileges  (1)
pro  (4)
probably  (6)
probation  (4)
probationary  (6)
problem  (45)
problem,  (1)
problems  (25)
Procedure  (3)
proceed  (3)
proceeded  (1)
proceeding  (5)
process  (6)
produce  (6)
produced  (7)
producing  (2)
product  (1)
production  (7)
Professional  (1)
profile  (1)
profit  (1)
Profusely  (1)
prohibit  (2)
prohibiting  (1)
project  (10)
projects  (6)
prominent  (1)
promise  (2)
promptly  (1)

propositions  (1)
propounded  (1)
Prosser  (2)
protect  (5)
protected  (2)
protection  (1)
protest  (1)
protested  (1)
protocol  (1)
protocols  (1)
prove  (2)
proven  (2)
provide  (14)
provided  (3)
providence  (2)
provides  (1)
providing  (1)
proxy  (1)
psychological  (5)
psychology  (1)
Public  (10)
publication  (1)
public-elected  (1)
publicly  (1)
pull  (3)
pulled  (8)
pulling  (1)
pulls  (1)
punished  (1)
punitive  (9)
purchased  (2)
purple  (2)
purpose  (2)
purposes  (2)
pursuant  (2)
pursue  (1)
purveying  (1)
purview  (3)
push  (2)
put  (39)
puts  (1)
putting  (3)

< Q >
question  (246)
questioning  (2)
questions  (65)
question's  (2)
quick  (3)

quickly  (5)
quid  (4)
quiet  (5)
quit  (1)
quite  (4)
quiver  (1)
quizzed  (3)
quo  (3)
quote  (6)
quoted  (3)
quotes  (1)

< R >
races  (1)
radical  (2)
radically  (1)
raise  (8)
raised  (5)
raising  (1)
random  (2)
Range  (5)
rapidly  (1)
rates  (1)
Raymond  (4)
reach  (2)
reached  (3)
reacted  (3)
read  (115)
reader  (2)
reading  (5)
reads  (1)
ready  (13)
real  (3)
realize  (1)
realized  (5)
really  (26)
rearrange  (1)
reason  (39)
reasoning  (1)
reasons  (9)
Rebel  (2)
recall  (11)
receipt  (1)
receipts  (1)
receive  (5)
received  (12)
receiving  (4)
recess  (5)
recite  (2)

recognize  (3)
recollection  (1)
reconcile  (1)
record  (76)
recorded  (1)
Recording  (31)
records  (9)
recruit  (2)
red  (1)
reduce  (2)
refer  (4)
reference  (4)
referenced  (2)
references  (2)
referencing  (11)
referred  (2)
referring  (16)
reflect  (1)
reflects  (1)
refreshers  (1)
refusal  (1)
refused  (1)
refusing  (1)
regard  (4)
Regarding  (6)
regime  (1)
regularly  (2)
regularly,  (1)
reimburse  (3)
reimbursed  (5)
reimbursement  (1)
reimbursing  (1)
reinstated  (3)
reiterate  (1)
reiterated  (1)
rejoined  (3)
relate  (2)
related  (13)
relating  (1)
relations  (10)
relationship  (12)
relationships  (1)
relevancy  (1)
relevant  (6)
relief  (1)
reluctance  (1)
rely  (1)
rem  (1)
remain  (5)

Deposition of DANIEL PIPES                                    Lisa Barbounis v. Middle Eastern Forum, et. al.

| | | | |
|---|---|---|---|
| remainder  (1) | resolve  (3) | roughly  (3) | secret  (5) |
| remained  (2) | resources  (5) | round  (4) | secretary  (4) |
| remaining  (1) | respect  (1) | rub  (1) | secrets  (7) |
| remains  (2) | respective  (1) | rule  (5) | section  (8) |
| remember  (113) | respond  (3) | Rules  (3) | see  (99) |
| remember,  (1) | responded  (4) | ruling  (1) | seeing  (3) |
| remind  (5) | responding  (6) | rumor  (38) | seek  (1) |
| reminded  (1) | responds  (2) | rumor,  (1) | seeks  (1) |
| remotely  (4) | response  (20) | rumors  (8) | seen  (13) |
| remove  (1) | responses  (5) | run  (2) | select  (2) |
| removed  (11) | responsibilities (2) | running  (3) | self-evident  (1) |
| removing  (1) | responsibility  (10) | ruse  (1) | Self-explanatory  (1) |
| remuneration  (3) | responsible  (5) | | self-reporting  (1) |
| repeat  (2) | responsive  (10) | < S > | send  (16) |
| repeated  (1) | rest  (2) | sabotage  (1) | sending  (2) |
| repeatedly  (3) | restated  (1) | safe  (4) | sense  (6) |
| repeating  (3) | restrictions  (4) | safeguards  (1) | sensitive  (4) |
| repercussions  (5) | resulting  (1) | safety  (4) | sent  (50) |
| rephrase  (1) | resume  (3) | sake  (2) | sentence  (11) |
| replace  (1) | resumed  (1) | salary  (10) | separate  (12) |
| replied  (2) | retain  (1) | Samantha  (1) | September  (1) |
| reply  (2) | retained  (1) | sat  (2) | sergeant  (1) |
| report  (29) | retaliate  (2) | satchel  (1) | serial  (1) |
| reported  (12) | retaliated  (1) | satisfaction  (12) | serious  (5) |
| Reporter  (79) | retaliation  (22) | satisfactorily  (4) | Seriously  (12) |
| reporters  (2) | retold  (1) | satisfied  (4) | seriousness  (1) |
| Reporting  (16) | return  (11) | saw  (17) | serve  (1) |
| reports  (14) | returned  (2) | saying  (87) | Serving  (1) |
| represent  (14) | returning  (2) | says  (63) | session  (2) |
| representation  (1) | reuse  (1) | scared  (3) | set  (4) |
| Representative  (1) | review  (9) | scene  (1) | SETH  (64) |
| represented  (4) | reviewed  (3) | schedule  (1) | seth@dereksmithlaw.c |
| Representing  (7) | reviewing  (1) | scholarship  (1) | om  (1) |
| reprieve  (5) | reviews  (1) | scope  (2) | setting  (2) |
| Republican  (3) | revise  (1) | screamed  (1) | settle  (1) |
| reputation  (4) | RICO  (6) | screen  (9) | settled  (1) |
| request  (12) | rid  (1) | Screenshot  (5) | seven  (14) |
| requested  (3) | ridiculous  (8) | screenshots  (2) | seventh  (1) |
| requesting  (1) | RIESER  (24) | scroll  (2) | severely  (2) |
| requests  (6) | right  (344) | scrolled  (1) | sex  (28) |
| require  (2) | rights  (2) | scrolling  (1) | sexual  (74) |
| required  (1) | rises  (1) | scuttle  (3) | sexually  (7) |
| requirements  (1) | Robinson  (12) | scuttled  (1) | Shardelle  (1) |
| requires  (2) | Robinson's  (1) | seal  (1) | S-H-A-R-D-E-L-L-E |
| research  (15) | rogue  (2) | sealing  (1) | (1) |
| reserved  (1) | role  (7) | search  (1) | share  (3) |
| resignation  (1) | Roman  (124) | second  (25) | shared  (5) |
| resolution  (6) | Roman's  (16) | secondary  (1) | Shargel  (3) |
| resolutions  (1) | room  (20) | secondly  (6) | sharing  (1) |

| | | | |
|---|---|---|---|
| she'd  *(4)* | sleep  *(4)* | spread  *(1)* | stopped  *(2)* |
| sheet  *(5)* | slightly  *(1)* | spreadsheet  *(1)* | stopping  *(3)* |
| she'll  *(1)* | slit  *(4)* | spring  *(7)* | stories  *(7)* |
| Shikunov  *(1)* | slower  *(1)* | stab  *(3)* | story  *(12)* |
| shoddy  *(1)* | small  *(1)* | Stacey  *(2)* | strange  *(2)* |
| short  *(2)* | smaller  *(1)* | staff  *(28)* | strategy  *(3)* |
| Shorthand  *(2)* | smiles  *(1)* | staffer  *(1)* | Street  *(5)* |
| shortly  *(2)* | SMITH  *(12)* | staffers  *(1)* | stretched  *(1)* |
| shot  *(1)* | snarky  *(1)* | stamp  *(1)* | strike  *(17)* |
| shoulder  *(1)* | social  *(5)* | stand  *(7)* | striking  *(1)* |
| should've  *(5)* | software  *(1)* | standing  *(4)* | strong  *(1)* |
| show  *(25)* | solicitation  *(1)* | standoffish  *(1)* | structure  *(8)* |
| showed  *(10)* | solution  *(2)* | standoffish,  *(1)* | stuck  *(1)* |
| shown  *(2)* | solutions  *(2)* | stands  *(1)* | stuff  *(9)* |
| shows  *(2)* | solved  *(3)* | start  *(10)* | stupid  *(2)* |
| shrugs  *(1)* | somebody  *(3)* | started  *(19)* | style  *(10)* |
| shuffling  *(2)* | someone's  *(1)* | starting  *(6)* | subject  *(10)* |
| sic  *(7)* | something's  *(1)* | state  *(8)* | subjected  *(7)* |
| side  *(4)* | sorry  *(56)* | stated  *(2)* | subjecting  *(1)* |
| SIDNEY  *(2)* | sort  *(5)* | statement  *(15)* | subjects  *(1)* |
| sign  *(9)* | sorts  *(19)* | statements  *(32)* | submit  *(5)* |
| signaled  *(1)* | sought  *(1)* | STATES  *(6)* | submitted  *(5)* |
| signature  *(2)* | sound  *(1)* | stating  *(1)* | Subscribed  *(1)* |
| signed  *(16)* | sounds  *(1)* | Station  *(2)* | subsequently  *(4)* |
| significant  *(3)* | source  *(2)* | stations  *(2)* | substance  *(1)* |
| signing  *(2)* | south  *(1)* | status  *(4)* | substantial  *(1)* |
| similar  *(4)* | space  *(1)* | statute  *(5)* | substantive  *(1)* |
| simple  *(15)* | speak  *(36)* | statutes  *(1)* | successful  *(3)* |
| simply  *(5)* | speakers  *(1)* | stay  *(6)* | successfully  *(1)* |
| simultaneously  *(1)* | speaking  *(13)* | staying  *(1)* | sucks  *(1)* |
| single  *(12)* | speaks  *(2)* | steal  *(2)* | sudden  *(2)* |
| single-word  *(1)* | special  *(3)* | stealing  *(1)* | suddenly  *(1)* |
| Sir  *(7)* | specialist  *(7)* | stenographic  *(3)* | sue  *(1)* |
| sit  *(5)* | specialize  *(1)* | stenographically  *(1)* | sued  *(1)* |
| sitting  *(8)* | specialized  *(3)* | step  *(4)* | suffices  *(1)* |
| situation  *(7)* | specific  *(16)* | steps  *(5)* | suggest  *(4)* |
| situations  *(2)* | specifically  *(6)* | Steve  *(2)* | suggested  *(4)* |
| six  *(9)* | specifics  *(14)* | Steven  *(3)* | suggesting  *(3)* |
| sixth  *(1)* | speculating  *(5)* | stick  *(3)* | suggestion  *(2)* |
| Sixty-two  *(1)* | speculation  *(1)* | stipulate  *(1)* | suggests  *(1)* |
| skeptical  *(4)* | speech  *(5)* | stipulated  *(1)* | Suite  *(2)* |
| sketched  *(1)* | speed  *(1)* | stipulations  *(1)* | sum  *(1)* |
| skilled  *(2)* | spend  *(8)* | stir  *(1)* | summary  *(2)* |
| skills  *(1)* | spending  *(2)* | stock  *(1)* | Sunday  *(2)* |
| skip  *(1)* | spent  *(5)* | stocks  *(1)* | supervise  *(3)* |
| Slack  *(2)* | spew  *(1)* | stole  *(11)* | supervisee  *(3)* |
| Slacks  *(1)* | splitting  *(1)* | stolen  *(7)* | supervising  *(1)* |
| slander  *(2)* | spoke  *(13)* | stood  *(1)* | supervision  *(1)* |
| slandering  *(1)* | spoken  *(2)* | stop  *(27)* | supervisor  *(13)* |

Deposition of DANIEL PIPES                                    Lisa Barbounis v. Middle Eastern Forum, et. al.

supervisors  (1)
support  (2)
supposed  (10)
supposedly  (1)
sure  (56)
surprise  (4)
surprised  (1)
surprises  (6)
surprising  (1)
suspicious  (1)
swear  (3)
sworn  (4)
sympathize  (1)
systematic  (2)

< T >
table  (1)
tactics  (1)
take  (70)
taken  (18)
takers  (1)
takes  (1)
talk  (45)
talked  (22)
talking  (73)
talks  (5)
tank  (1)
tape  (1)
targets  (1)
task  (1)
tasks  (3)
tax  (1)
taxable  (1)
tax-deductible  (2)
team  (1)
tech  (1)
technology  (2)
Telegram  (1)
Telegrams  (1)
telephone  (3)
television  (2)
tell  (103)
telling  (25)
tells  (5)
ten  (20)
tense  (14)
tension  (2)
term  (1)
terminated  (2)

termination  (1)
terms  (4)
terrible  (3)
testified  (16)
testify  (12)
testifying  (8)
testimonies  (1)
Testimony  (45)
Text  (20)
texting  (1)
texts  (9)
Thank  (27)
Thanks  (5)
theft  (6)
Thelma  (3)
theory  (1)
thereof  (1)
thing  (41)
things  (57)
thing's  (1)
think  (169)
thinking  (3)
Third  (7)
Thirdly  (1)
thirty  (1)
this'  (1)
this-and-that  (1)
Thomas  (12)
thoroughly  (1)
thought  (30)
thoughts  (2)
thousand  (4)
threat  (6)
threaten  (2)
threatened  (2)
threatening  (2)
threatens  (1)
three  (30)
threes  (1)
three-something  (1)
threw  (2)
throat  (2)
throats  (1)
thrown  (1)
Tiffany  (9)
till  (3)
time  (150)
timeline  (1)
timeliness  (1)

timely  (1)
times  (12)
time's  (1)
tissue  (5)
title  (14)
today  (66)
Today's  (1)
told  (80)
Tommy  (13)
tomorrow  (3)
tooth  (1)
top  (7)
topic  (5)
topics  (1)
total  (1)
totally  (3)
touch  (4)
touched  (2)
touching  (1)
tough  (7)
toxic  (2)
tracing  (1)
track  (1)
trade  (13)
traded  (1)
trading  (1)
trafficking  (9)
train  (1)
transcribed  (1)
transcript  (4)
transcription  (2)
trap  (1)
trapped  (2)
travels  (2)
treasurer  (1)
treat  (2)
trespassed  (1)
trial  (1)
Tricia  (47)
Tricia's  (2)
trick  (1)
tried  (12)
trigger  (1)
trip  (9)
trouble  (7)
troubled  (7)
trouble's  (1)
troubling  (6)
true  (20)

truly  (1)
Trust  (1)
truth  (11)
truthful  (1)
truthfully  (1)
try  (24)
trying  (26)
Tuesday  (3)
Turn  (10)
turned  (9)
turning  (2)
turns  (1)
TV  (2)
Twenty-six  (1)
twice  (2)
two  (63)
type  (4)
types  (1)

< U >
ugliness  (1)
uh-huhs  (1)
uh-uhs,  (1)
UK  (2)
ultimate  (5)
ultimately  (1)
unable  (2)
unacceptable  (1)
unauthorized  (1)
unaware  (2)
unbearable  (1)
unchanged  (2)
unclear  (1)
uncomfortable  (4)
underneath  (6)
underpinnings  (1)
understand  (32)
understanding  (5)
understands  (3)
understood  (6)
undertaking  (2)
underway  (1)
uneasy  (2)
unendingly  (2)
unfair  (1)
Unfortunately  (1)
unhappy  (8)
unilaterally  (2)
unintelligible  (11)

Deposition of DANIEL PIPES                                           Lisa Barbounis v. Middle Eastern Forum, et. al.

| | | | |
|---|---|---|---|
| **UNITED** *(4)* | **viper's** *(2)* | **welcome** *(7)* | **word** *(24)* |
| **universe** *(1)* | **virtually** *(1)* | **welcoming** *(1)* | **wording** *(1)* |
| **unknown** *(3)* | **virtues** *(1)* | **welfare** *(2)* | **words** *(11)* |
| **unlawful** *(1)* | **vis-à-vis** *(2)* | **well** *(201)* | **work** *(88)* |
| **unpleasant** *(1)* | **visit** *(1)* | **went** *(33)* | **worked** *(14)* |
| **unquote** *(4)* | **visited** *(1)* | **we're** *(126)* | **working** *(25)* |
| **unquoted** *(1)* | **vituperation** *(1)* | **we've** *(9)* | **workplace** *(9)* |
| **unrelated** *(4)* | **voice** *(2)* | **What'd** *(4)* | **work-related** *(1)* |
| **untrustworthy** *(1)* | **volatile** *(1)* | **What're** *(3)* | **works** *(15)* |
| **unwanted** *(7)* | **volunteer** *(1)* | **WhatsApp** *(3)* | **workshops** *(2)* |
| **unwelcome** *(3)* | **voyeur** *(1)* | **WhatsApps** *(1)* | **world** *(2)* |
| **ups** *(1)* | **vs** *(2)* | **whatsoever** *(5)* | **worried** *(8)* |
| **upset** *(13)* | **vulgarity** *(2)* | **when's** *(2)* | **worries** *(1)* |
| **use** *(13)* | | **Where'd** *(4)* | **worry** *(1)* |
| **useful** *(2)* | **< W >** | **whipped** *(1)* | **worse** *(1)* |
| **usual** *(2)* | **W-2** *(1)* | **whisper** *(1)* | **worth** *(7)* |
| **usurpers'** *(1)* | **Wait** *(14)* | **whispering** *(3)* | **would've** *(12)* |
| | **waited** *(3)* | **white** *(3)* | **wrap** *(1)* |
| **< V >** | **waiting** *(2)* | **whitewashed** *(1)* | **wrapped** *(1)* |
| **vagina** *(4)* | **waive** *(2)* | **wholesale** *(1)* | **wreck** *(1)* |
| **vague** *(2)* | **waived** *(1)* | **wholly** *(1)* | **write** *(3)* |
| **valid** *(2)* | **walk** *(1)* | **who've** *(1)* | **writes** *(3)* |
| **value** *(14)* | **walking** *(1)* | **why'd** *(1)* | **writing** *(6)* |
| **variable** *(1)* | **wall** *(2)* | **wife** *(2)* | **written** *(12)* |
| **various** *(4)* | **wandered** *(1)* | **WILLIAM** *(2)* | **wrong** *(24)* |
| **vehicle** *(1)* | **wanna** *(66)* | **willing** *(4)* | **wrong,** *(1)* |
| **veracity** *(2)* | **want** *(58)* | **willingness** *(1)* | **wrongly** *(1)* |
| **verb** *(1)* | **wanted** *(29)* | **willy-nilly** *(1)* | **wrote** *(14)* |
| **verbal** *(2)* | **wants** *(20)* | **window** *(1)* | |
| **verbs** *(1)* | **warranted** *(2)* | **wink** *(1)* | **< X >** |
| **verified** *(3)* | **wary** *(1)* | **wish** *(9)* | **X'd** *(1)* |
| **verify** *(1)* | **Washington** *(6)* | **wished** *(1)* | **XX** *(5)* |
| **verse** *(4)* | **waste** *(2)* | **wishes** *(1)* | |
| **version** *(3)* | **wasting** *(5)* | **withdraw** *(5)* | **< Y >** |
| **versions** *(2)* | **watch** *(1)* | **withdrawing** *(4)* | **Yeah** *(119)* |
| **versus** *(1)* | **watched** *(3)* | **withdrew** *(2)* | **year** *(18)* |
| **vice** *(2)* | **watching** *(1)* | **witness** *(284)* | **yearly** *(1)* |
| **victim** *(1)* | **wax** *(1)* | **witnessed** *(4)* | **years** *(25)* |
| **video** *(6)* | **waxing** *(1)* | **witnesses** *(5)* | **yelling** *(1)* |
| **videoconference** *(1)* | **way** *(57)* | **Wolson** *(6)* | **Yep** *(26)* |
| **Videographer** *(33)* | **ways** *(11)* | **Wolson's** *(1)* | **yesterday** *(2)* |
| **Videotaped** *(1)* | **web** *(1)* | **woman** *(1)* | **Yonchek** *(6)* |
| **views** *(3)* | **website** *(6)* | **woman's** *(3)* | **York** *(3)* |
| **VII** *(1)* | **week** *(18)* | **women** *(35)* | **Yup** *(9)* |
| **vindictive** *(1)* | **weekly** *(2)* | **women's** *(4)* | |
| **violate** *(1)* | **weeks** *(5)* | **Wonder** *(1)* | **< Z >** |
| **violated** *(2)* | **weigh** *(1)* | **wonderful** *(1)* | **ZABROSKE** *(2)* |
| **violating** *(1)* | **weird** *(1)* | **wondering** *(2)* | **Zero** *(1)* |
| **violation** *(2)* | **weirded** *(1)* | **Wood** *(3)* | **Zoom** *(5)* |
| | | | **zooming** *(1)* |