# EXHIBIT H

# EXHIBIT H

1            IN THE UNITED STATES DISTRICT COURT

2              EASTERN DISTRICT OF PENNSYLVANIA

3

4

    MARNIE O'BRIEN,            )
5                              )
         Plaintiff,            )
6                              )Civil Action No.
    v.                         )19-06078 JMG
7                              )
    MIDDLE EAST FORUM,         )
8    DANIEL PIPES              )
    (individually), and GREGG )
9    ROMAN (individually),     )
                               )
10        Defendants.          )
    --------------------------
11   GREGG ROMAN,              )
                               )
12        Counterclaim and    )
          Third-Party         )
13        Plaintiff,          )
                              )
14   v.                       )
                              )
15   MARNIE O'BRIEN,          )
                              )
16        Counterclaim        )
          Defendant.          )
17

18

          DEPOSITION OF MARNIE O'BRIEN

19

           TAKEN ON JANUARY 14, 2021

20

21

                 WILCOX & FETZER
22        Registered Professional Reporters
                 1330 King Street
23          Wilmington, Delaware 19801
                 (302) 655-0477
24               www.wilfet.com

1          Deposition of MARNIE O'BRIEN via

2     remote videoconferencing of all

3     participants taken pursuant to notice

4     beginning at 9:09 a.m., on Thursday,

5     January 14, 2021, before Kurt A.

6     Fetzer, Registered Diplomate Reporter

7     and Notary Public.

8    APPEARANCES:

9          ERICA A. SHIKUNOV, ESQ.
           DEREK SMITH LAW GROUP, PLLC
10           1835 Market Street - Suite 2950
             Philadelphia, Pennsylvania 19103
11           For the Plaintiff/Counterclaim
             Defendant Marnie O'Brien
12
           MARGARET M. DiBIANCA, ESQ.
13         CLARK HILL PLC
             824 North Market Street
14           Suite 710
             Wilmington, Delaware  19801
15                - and -
           JAKOB F. WILLIAMS, ESQ.
16         CLARK HILL PLC
             Two Commerce Square
17           2001 Market Street - Suite 2620
             Philadelphia, Pennsylvania 19103
18           For the Defendants and
             Counterclaim Third-Party Plaintiff
19
     ALSO PRESENT:
20         MARC FINK, ESQ.
           MATTHEW MAINEN, ESQ.
21         IN-HOUSE COUNSEL - MIDDLE EAST FORUM

22         DANIEL PIPES
           GREGG ROMAN
23         JON CAVALIER
           JASON BROCKMAN, PARALEGAL
24         CHRIS WEISS CALHOUN, VIDEOGRAPHER



```
1                  -  -  -  -  -

2                  THE COURT REPORTER:  Will

3       counsel stipulate to the admissibility

4       of my oath via remote video-

5       conferencing?

6                  MS. DIBIANCA:  Yes.

7                  MS. SHIKUNOV:  Yes.

8                  THE VIDEOGRAPHER:  We are on

9       the record.  My name is is Chris Weiss

10      Calhoun, Certified Legal Videographer

11      retained by Lexitas.

12                 This is a video deposition

13      in the United States District Court

14      Eastern District of Pennsylvania.

15      Today's date is January 14th of 2021.

16      The time on the monitor is 9:09 a.m.

17      Eastern Time.

18                 The deposition is being held

19      virtually in the matter of Marnie

20      O'Brien versus Middle East Forum,

21      Daniel Pipes and Gregg Roman.  The

22      deponent is Marnie O'Brien.

23                 Will the attorneys please

24      state their appearance for the record?
```



1         MS. SHIKUNOV:  Erica

2    Shikunov for plaintiff.

3         MS. DIBIANCA:  And Molly

4    DiBianca behalf of the defendant.

5         THE VIDEOGRAPHER: And the

6    court reporter today is Kurt Fetzer and

7    will now administer the oath.

8

9              -  -  -  -  -

10

11         MARNIE O'BRIEN,

12     the deponent herein, having first

13     been duly sworn on oath, was

14     examined and testified as follows:

15            EXAMINATION

16   BY MS. DIBIANCA:

17    Q.  Good morning, Ms. O'Brien.  I'm

18   quite certain your counsel has done a

19   great job in getting you ready so I'm

20   not going to go into a whole bunch of

21   instructions other than to just

22   reiterate the need for us not to speak

23   on top of each other.

24         If I cut you off, it is not



1    my intention so if I do that I will

2    stop talking and you can continue.  And

3    I'll just ask that you do the same for

4    me.

5                The other instruction that

6    I'll just note is just a matter of

7    civility.  There are times inevitably

8    where the witness will nod or give a

9    non-verbal answer like a shake of the

10   head instead of a yes or a no. I'm

11   going to need you to say a yes or a no

12   if that's what you mean on the record

13   using words.  So I may say did you mean

14   yes or no or did you mean yes?

15                And when I do that, I'm not

16   trying to be rude.  I'm not trying to

17   suggest an answer to you.  I just want

18   to make sure that we have a record that

19   has words.

20                So those are the only two

21   instructions.  If there's any questions

22   at any time, let me know.  If you need

23   to revise an answer, let me know.

24                We're going to take plenty



1    of breaks.  I try not to go for longer

2    than an hour without a break, but you

3    or your counsel can request one at any

4    time.  It's not a problem.  All right.

5              Have you had your deposition

6    taken before?

7      A.   No.

8      Q.   Are you currently employed?

9      A.   No.

10     Q.   When was the last time you held

11   a job?

12     A.   At the Middle East Forum.

13     Q.   What income have you had since

14   you left the Forum?

15     A.   I have a consulting business

16   that I always have done on the side.

17   It's small.  It's not a substantial

18   amount of income.

19             I was supposed to have a new

20   job when quarantine hit.  It didn't

21   happen.  I was let go before I even

22   started, so I collected unemployment.

23             And then I had gotten my

24   real estate license.  So I had sold a



1    couple of houses, dabbled in that a

2    little.

3       Q.   I'm sorry.  That something a

4    little?

5       A.   I dabbled with the real estate a

6    little.

7       Q.   Okay.  Since you left the Middle

8    East Forum, how much have you earned as

9    a result of the consulting business?

10      A.   I don't know.  I would have to

11   look.  I think, I think I sent that

12   over at some point.

13      Q.   And the name of that business is

14   GC4, correct?

15      A.   GC4 Consulting.

16      Q.   And what type of work do you do

17   for that business?

18      A.   Bookkeeping.

19      Q.   When did you start that

20   business?

21      A.   2012.

22      Q.   And are you the only person

23   involved in the business?

24      A.   Yes.



1       Q.   What does the name stand for,

2    GC4?

3       A.   It's Group Consulting.

4       Q.   What's the 4 stand for?

5       A.   When I was originally doing it

6    there were four platforms.  I had four

7    other -- actually, I had five.  When I

8    started there were four.

9            I had four other women who

10   weren't happy in their jobs and, you

11   know, wanted to try to do something.

12   So each one of us had a platform.  One

13   was operations.  Mine was bookkeeping.

14   One was marketing and I think the other

15   was events.

16            And then one of the

17   marketing girls had -- her father-in-

18   law had been really good at advertising

19   so we brought him in.  He was in for a

20   little while.

21      Q.   And are those people involved

22   now?

23      A.   No.  They -- you know, it was

24   more or less what I had offered to them



1    was, you know, if they brought in that

2    business like I would get a percentage

3    of it for doing the back end of the

4    bookkeeping.  And because it was my

5    business that was promoting it, I would

6    get like a certain chunk of it.

7                So they would have to sell

8    it basically and if they sold something

9    that they needed help with, they could

10   pull the other players in to help with

11   that.  So everybody would basically be

12   trying to build their own business

13   under one umbrella and hopefully

14   providing work for one another.

15     Q.   Okay.  So you mentioned -- and

16   I'll circle back to what you testified

17   to about the other job that you had

18   lined up.

19                So you had a job lined up

20   when you resigned from MEF, correct?

21     A.   Yes.

22     Q.   And where was that job?

23     A.   It was called 1 Creation

24   Construction.



1        Q.    As in the number o-n-e 1?

2        A.    I think they used both.

3        Q.    But not like w-o-n?

4        A.    No.

5        Q.    Okay.  One.  Okay.

6              Tell me where they're

7    located?

8        A.    They are in I think Cherry Hill,

9    like that area.

10       Q.    Okay.  What were you going to do

11   for them?

12       A.    Bookkeeping, help them organize

13   their office and they kind of wanted me

14   to like manage their office and their

15   back end for them so that they could

16   get the, you know, the business in and

17   do the construction.

18             They did --

19       Q.    Okay.

20       A.    -- custom homes.

21       Q.    Sorry.  It's inevitable we'll

22   trip over each other a little bit.

23   It's inevitable via Zoom and I

24   apologize.



```
1                    Would that have been a
2        full-time position?
3           A.   Yes.
4           Q.   And what would have been your
5        wages?  Would it have been salary?
6           A.   Yeah.  They were going to pay me
7        salary 50,000 a year, but they were
8        putting me in a position so that I
9        could upsell their customers.  Like if
10       they added on different things as a
11       result of them talking with me, I'd be
12       able to make money there.
13                    And then they also wanted me
14       to -- they have a lot of people that
15       come to them that want a custom home
16       but they don't have a place to build it
17       so they wanted to help me find them
18       houses that they could customize or
19       knock down and redo so then I would
20       make money selling the houses.
21          Q.   Okay.  And you would be
22       utilizing your real estate license to
23       do that, correct?
24          A.   Yes.
```



1      Q.   What about benefits, did it come

2    with healthcare?

3      A.   No.  I would have had to do my

4    own.

5      Q.   What would have been, what did

6    you expect your earning potential would

7    be there as far as the salary plus the

8    upselling part?

9      A.   They were, they were pretty

10   excited about building their business

11   and they wanted to build it up pretty

12   big.  So worst-case scenario I figured

13   if it didn't come out to where I was

14   making -- you know, I wanted to make

15   over a hundred.  130 is my goal.

16            So even if I didn't see that

17   working out, at least I would be out of

18   MEF and I would be able to, you know,

19   then I would try to look for something

20   else.

21      Q.   When did you apply to that

22   employer?

23      A.   I don't remember exactly.  I

24   guess it was -- I don't know.  I know



```
 1      that I gave my notice I think February
 2      29th, so it was prior to that in 2020.
 3      So it was either -- and I think it took
 4      a little while too.  Like I met them
 5      once.  We talked a couple of times and
 6      then they were thinking about trying to
 7      see if they could afford me or whatever
 8      and then they made an offer.
 9         Q.   Okay.  So if I understand it
10      correctly -- and please do correct me
11      if I'm wrong -- your expectation for
12      that job was that you would get a
13      minimum income of the $50,000 per year
14      with salary and that you had potential
15      to earn upwards of a hundred, in the
16      neighborhood of 130,000.  Is that
17      right?
18         A.   I mean I don't know if the
19      potential for that was there.  I didn't
20      know, but I was going to take the
21      chance.
22                 And I also had my consulting
23      business on the side so...
24         Q.   Has your consulting business
```



1    taken a hit because of the pandemic?

2        A.   No.  I've done okay and I've

3    actually been concentrating on building

4    that up because I don't really want to

5    work for anybody.

6        Q.   Okay.  Have you taken any steps

7    to build that business up such as

8    advertising or networking, for example?

9        A.   Networking.

10       Q.   Networking.  And are you

11   continuing to try to build that

12   business up?

13       A.   Yes.

14       Q.   And what was your expected start

15   date for the new position?

16            Was it 1 Construction?  Was

17   that the name of it?

18       A.   I think it was March 16th.

19       Q.   2020?

20       A.   Mm-hmm.

21       Q.   I need you to say yes.

22       A.   Yes.  Yes, 2020.

23       Q.   Okay.  That was our first little

24   practice there.



```
1              So it was March what again?
2       I'm sorry.
3       A.    16th.
4       Q.    Okay.
5       A.    I believe.  I think it was the
6       Monday of that, so it might have been
7       15th, 16th, 17th, but it was the
8       Monday.  I believe it was the exact day
9       that quarantine started.
10      Q.    March 16th -- I'm looking at my
11      calendar -- is a Monday so that would
12      correspond with that.  Okay.
13              And when did you -- did they
14      delay your start date when the
15      quarantine hit?  Initially did they
16      delay it?
17      A.    They delayed it inevitably.
18      Q.    Okay.
19      A.    Like they delayed it -- I'm
20      sorry.  Not inevitably.  That's the
21      wrong word.
22              But they delayed --
23      Q.    Go ahead.  Tell me what they
24      said when they called.  That would
```



1    probably be easier than me suggesting a

2    word for you.

3        A.   They said that they were shut

4    down because they were custom homes.

5    Even though they were I guess a

6    business that could still operate, they

7    were kind of handcuffed because they

8    couldn't get CO's.  They couldn't get

9    approvals.  They were having trouble

10   getting supplies.

11            So they were just completely

12   jammed up and they weren't in a

13   position to have somebody new come in.

14       Q.   Okay.  Did they tell you whether

15   they hoped -- was there is sort of a

16   tentative check-in date, like we will

17   see, hopefully we will be able to get

18   started again or was it just -- how was

19   it left?

20       A.   They said -- well, I mean it was

21   quarantine.  Nobody really knew what

22   was going to happen.  I think all of us

23   were expecting that the world was going

24   to end and everyone was going to die at



```
 1        that point.
 2                   So they left it that we'll
 3        see and then we touched base, you know,
 4        every so often.  And then I just
 5        started trying to focus on my
 6        consulting.
 7          Q.   And this is likely stating the
 8        obvious.  But am I correct to say that
 9        it never did come to fruition, they
10        never --
11          A.   Correct.
12          Q.   I'm correct?
13          A.   Yes.
14          Q.   Okay.  Is that door still open
15        with them, in other words, if things
16        were to change in the pandemic in let's
17        say six months?
18          A.    I think so.
19          Q.   Okay.  So nothing you did caused
20        you to not proceed with that job,
21        correct?
22          A.   No.
23                   MS. SHIKUNOV:  Molly, can
24        reask that because you had a double
```



```
 1     negative in it and I think --
 2               MS. DIBIANCA:  Sure.  Sure.
 3     Absolutely.
 4               MS. SHIKUNOV:  Thank you.
 5     BY MS. DIBIANCA:
 6      Q.   So you did not cause -- I'll say
 7     it actually in a better way.
 8               The pandemic was the reason
 9     you're not working for that company,
10     correct?
11      A.   Yes.
12      Q.   Now, at this time do you have
13     any plans to look for another job or
14     are you just sticking, planning to
15     stick with the consulting business?
16      A.   I'm planning to stick with the
17     consulting business.  If there was an
18     opportunity that presented itself and I
19     was comfortable with the person that
20     wanted to hire me, then I would think
21     about it.  But right now my plan is
22     just to try to be growing the client
23     list for my consulting business and to
24     try to do some real estate on the side.
```



1    Q.   Okay.  Other than with 1
2    Construction, did you have any other
3    employment opportunities other than
4    your consulting business since leaving
5    MEF?
6    A.   I had gotten a new client who
7    talks about hiring me in, but he is
8    either going to go out of business
9    or -- it's not, it's not a solid
10   business.  There's a really good chance
11   he's going to go out of business.
12            So I said that I wanted to
13   continue consulting and then we could
14   talk about employment if he got to a
15   position where I would have a job
16   security.
17   Q.   Is his question with regard to
18   going out of business or not, is that
19   also pandemic related?
20   A.   I don't know what that is.  He
21   was in bad shape before the pandemic so
22   I don't really know what the problem
23   was.
24   Q.   All right.  Let's talk about



1     your real estate license.

2               When did you obtain your

3     real estate license?

4        A.   I can't -- I don't know exactly.

5     I know that I was supposed to go -- I

6     had told Gregg that I had wanted to do

7     that and the only way that I could do

8     it is I had to take a class.  And I

9     could do it nights for like a month and

10    a half or something like that or I

11    could take two weeks and do a two-week

12    stint.

13              So it was too much for me.

14    I have two kids.  I couldn't work all

15    day and then go to school all night

16    like that.

17              So I had asked him if I

18    could not be in the office and I just

19    worked in the morning before I went and

20    took care of my responsibilities for

21    work.  That's what I planned to do and

22    then just do the class for the two

23    weeks.

24              And he had given me



1       permission to do that.  And I was

2       supposed to start right when everything

3       happened.  So Daniel was -- it was

4       actually the day, it was November 1st I

5       think that I was supposed to start that

6       class.  And Daniel Pipes called a

7       mandatory meeting so I ended up pushing

8       the class back and I can't remember

9       exactly when I did it.  I think I'm

10      going to say like maybe February or

11      March of 2019.  I'm not exactly sure.

12           Q.   Okay.

13           A.   And I had asked Daniel Pipes if

14      he would be okay with me doing that and

15      I had explained to him that Gregg had

16      approved it and that I wasn't able to

17      do it because of everything that

18      happened and he okayed it.

19           Q.   What state do you hold your

20      license in?

21           A.   Jersey.

22           Q.   And who are you affiliated with

23      as far as being a broker?  What

24      organization or organizations?



```
 1        A.    Berkshire Hathaway.

 2        Q.    Okay.  Have you been affiliated

 3   with any other firm?

 4        A.    No.  I am under -- in Berkshire

 5   Hathaway I am under the Randy Knowles

 6   team.

 7        Q.    Randy Miller?  Is that what you

 8   said?

 9        A.    Randy Knowles.

10        Q.    Knowles, K-n-o-w-l-e-s?

11        A.    Yes.

12        Q.    How much of your time now is

13   devoted to real estate?

14        A.    Very little.  I got a few deals

15   just from people I know that asked me

16   to help them and I'm still learning it.

17   So I'm trying to do classes for that

18   like to learn more, but the Randy

19   Knowles team has an admin who when I

20   would get a deal she would basically

21   walk me through it.

22        Q.    Do you know about how many deals

23   you've had since you've --

24        A.    Three.
```



1        Q.   Three total?

2        A.   Mm-hmm.

3        Q.   Is that a yes?

4        A.   Yes.  Sorry.

5        Q.   That's okay.

6             Tell me why you thought

7    about getting your real estate license

8    in the first place.  What prompted

9    that?

10       A.   I always was interested in it

11   and I was doing the books for Lisa

12   Knowles because they have rental

13   properties.  And so I was just always

14   interested in house flipping and rental

15   properties so I wanted to kind of

16   dabble in that.

17       Q.   Was it ever your intention to do

18   that as a full-time job?

19       A.   I mean if I got great at it

20   maybe, but I wanted to try it.

21       Q.   You said that Mr. Roman and

22   Mr. Pipes or Dr. Pipes separately both

23   gave you approval to take that course

24   even though it required time away from



1      work, correct?

2          A.    Yes.

3          Q.    And did Mr. Roman at some point

4      during your employment also permit you

5      at your request to meet with clients

6      for your consulting business through

7      the workweek?

8          A.    When I originally was hired he

9      told me that I would have flexibility

10     in my schedule, that I wouldn't have to

11     be pinned to my desk 9:00 to 5:00, that

12     Daniel's way of running an office is

13     that you're an adult.  If your work is

14     done, then you can do what you want.

15     You can manage your time yourself.

16               He didn't care if you worked

17     in the middle of the night as long as

18     you were available if he needed you and

19     if your responsibilities were handled.

20               After I started it became

21     very clear to me that I felt like it

22     was a bait and switch because if I

23     wasn't at my desk at 9:00 o'clock, he

24     was on my phone where are you, where



1    are you, where are you, where are you?

2              So it really did fall off

3    and I didn't grow my business at all

4    while I worked there.  I was just at

5    MEF and, you know, he was talking about

6    growing that to a 20-million-a-year

7    organization.  So I was -- you know, I

8    enjoy startups and I was all in for

9    that.

10   Q.   So during your employment with

11   MEF did you ask Mr. Roman for

12   permission to meet with your consulting

13   clients during the workweek?

14   A.   I don't know that I did meet

15   with them during the workweek.  There

16   may have been times, but I don't know

17   that I felt like I had -- if I didn't

18   or I did, I don't know that I needed

19   to.  I was told that I could manage my

20   time myself.

21   Q.   Okay.  Again, just to be clear,

22   I'm not asking whether you did meet

23   with the clients.

24              I'm asking if you asked for



1    permission to be able to have the

2    flexibility to do that?

3        A.   Yes.  I told him when I started

4    that I had a consulting business and I

5    would need flexibility.  It was after I

6    started that the flexibility was pulled

7    from me.

8        Q.   Were you able to meet with

9    clients during the workweek?

10       A.   No.  Very rarely.  If I did,

11   maybe, you know, rarely.  I can't

12   remember at the time.  I may have had

13   one that I would go to but...

14       Q.   Did you maintain your consulting

15   business throughout your employment

16   with MEF?

17       A.   Yes.

18       Q.   And how did you do that without

19   meeting with your clients?

20       A.   I would wake up at 5:00 o'clock

21   in the morning every morning.  I would

22   meet with them at night.  But, again, I

23   was supposed to have flexibility with

24   my job so I would try to be flexible



```
1    and maybe ask for a late start.

2              A lot of times instead of,

3    you know, I would start later, start

4    later, stay later or maybe start

5    earlier and leave early so that I could

6    get to the other client.

7    Q.   During your employment with MEF

8    you had planned to go into business

9    with Mr. Roman at some point.  Is that

10   correct?

11   A.   He would take me to lunch and

12   say that he was going to start his own

13   business.  And it was like I never

14   really understood what his business was

15   going to be because he never really was

16   clear about it.  It was like secret spy

17   stuff and he was going to -- you know,

18   and I was like okay, you know, I am

19   okay with that, like let's do it.

20             And then he would have

21   another meeting about it and say

22   basically the same thing and not do

23   anything about it and then nothing

24   would happen.
```



1        Q.   What kind of an organization was

2    it, was it for tax purposes?  Was it a

3    501?

4        A.   What organization?

5        Q.   The one that he started, that he

6    had talked to you about starting.

7        A.   I have no idea.  He wasn't very

8    clear about what it was.  He told me --

9        Q.   Who -- go ahead.

10       A.   He asked me if I would be

11   willing to take envelopes and deliver

12   them to people.

13            I said is it illegal?  And

14   he said no.

15            I said well, then, why

16   wouldn't I?

17       Q.   Was there any conversation about

18   how you would be compensated for that?

19       A.   I don't remember.  I mean he was

20   talking about an entrepreneurial

21   startup.  I didn't put much stock into

22   it because he never gave any substance

23   to what they was doing.  It was almost

24   like when I grow up I'm going to have



```
1    my own business.  Do you want to be
2    landscapers?  Do you know what I mean?
3            It just was not -- I didn't
4    put much effort or thought into it.  I
5    didn't put any effort into it.  I
6    didn't put much thought into it because
7    he didn't do anything.
8        Q.  Did you discuss it with Matt
9    Bennett as well?
10       A.  Yeah.  He was always there.  He
11   was going to be in the business too.
12       Q.  You interviewed with the Kimmel
13   Center at some point, correct?
14       A.  I did.
15       Q.  And that was while you were
16   employed with MEF.  Is that correct?
17       A.  Yes.
18       Q.  What was the position for which
19   you were interviewing?
20       A.  It was an accounting position or
21   controller.  I don't remember exactly.
22       Q.  Who interviewed you?
23       A.  I think there were two different
24   people, the HR person and then I don't
```



```
 1    remember.
 2        Q.   But your recollection is that
 3    there were two people in the room?
 4        A.   Yes.
 5        Q.   A man or a woman?
 6        A.   One was a woman and one was a
 7    man.
 8        Q.   And the HR person was male or
 9    female?
10        A.   Female.
11        Q.   And you got that interview
12    through a recruiter, correct?
13        A.   Yes.
14        Q.   What was the name of the
15    recruiter?
16        A.   PeopleShare, I think.
17        Q.   And of the individual recruiter?
18        A.   I'd have to look.  I don't
19    remember her name off the top of my
20    head.
21        Q.   It was a woman though?
22        A.   Yes.
23        Q.   And how did you come to find the
24    recruiter?
```



```
 1        A.    They found me.  And they were in
 2     the building that MEF's offices were.
 3     So I was -- I thought it was so
 4     strange.  And I had a severe sense of
 5     paranoia at that point and I just
 6     didn't know how they would have picked
 7     my name out of a hat.  And it was very
 8     nerve-racking because we had the NDA
 9     and we had to protect Savannah.
10              So even though we worked for
11     MEF, we had to pretend in the building
12     that we worked for Savannah.  And it
13     was made very clear to us if you blew
14     your cover for Savannah that you would
15     be sued and take your first born child.
16              So it was very nerve-racking
17     to me that out of a hat with all these
18     resumes this place pulled my resume and
19     they were right in the building so then
20     I was scared somebody would see me and
21     ask me if I was in there because on my
22     resume --
23        Q.    You're breaking up a little bit
24     for me.  Could you maybe lean a little
```



1    closer perhaps?  I'm not sure what's

2    happening, but suddenly you're awfully

3    I quiet.

4                MS. SHIKUNOV:  There's two

5    other --

6                MS. DIBIANCA:  Can I have

7    the two people who are not on mute go

8    ahead and mute their lines, please?

9    And I understand if you're on mute on

10   your phone that's great, but if you can

11   mute on Zoom at the bottom of the Zoom

12   screen that would be helpful because

13   it's interfering with the video event.

14               Or, Chris, if you are able

15   to do it from your end, that would be

16   fine with me too.

17               One more, a 248 number.

18               Thank you.

19   BY MS. DIBIANCA:

20     Q.   Okay.  Ms. O'Brien, sorry about

21   that.

22               Would you mind restating

23   your answer?  And I apologize.  I don't

24   know where you left off because I lost



```
 1     the audio there.
 2         A.   Can you tell me --
 3         Q.   I can try.  Oh, you were talking
 4     about the recruiter and you said you
 5     were paranoid about why they got your
 6     resume.
 7         A.   Right.  You asked me how I got
 8     the recruiter.  They found me.  They
 9     were in the building that MEF's offices
10     were, which was concerning to me
11     because I signed an NDA that I was
12     supposed to protect the identity of
13     MEF.  No one was supposed to know where
14     our geographic footprint was.
15              So within the building and
16     anyone that knew us in the building, we
17     had to present ourselves as if we
18     worked for Savannah Mercantile.  And,
19     you know, I had on my resume that I
20     worked for the Middle East Forum and I
21     had to go two floors down and go in and
22     out of the elevators every day with all
23     these people that worked at PeopleShare
24     who saw my resume and knew I worked at
```



```
 1        the Middle East Forum.

 2                So then I was nervous that I

 3        was going to have to explain why I was

 4        in the building and I was nervous that

 5        I was going to, you know, out MEF and

 6        blow the cover and then be sued for a

 7        gazillion dollars.

 8          Q.   So is it fair to say that the

 9        answer to the question is that the

10        recruiter found you?

11          A.   Yes.

12          Q.   Okay.  Did you pay the

13        recruiter?

14          A.   No.

15          Q.   What other interviews besides

16        from the Kimmel Center did the

17        recruiter line up for you?

18          A.   They wouldn't touch me with a

19        ten-foot pole after that because they

20        got a call from the Kimmel Center and

21        they said that someone had called and

22        told them that I was a drug addict and

23        suing my boss for sexual harassment and

24        that they shouldn't hire me.
```



```
 1              So they called to tell me
 2       that that happened and then they washed
 3       their hands of me.
 4          Q.   Okay.  So there was several
 5       pronouns in there so I just want to
 6       make sure the record is clear.
 7              So am I correct to say that
 8       the Kimmel Center called PeopleShare,
 9       your recruiter, and said that the
10       Kimmel Center had received a phone call
11       that was speaking negatively of you --
12       and we'll go into detail about that --
13       and they conveyed, Kimmel Center
14       conveyed that phone call to the
15       recruiter, the recruiter called you and
16       said we're not going to have anything
17       to do with you now, something to that
18       effect?
19          A.   No, they didn't say that.  But I
20       never got another call from them.
21          Q.   Okay.  Okay.  Did you sign a
22       contract with the recruiter agency?
23          A.   I don't recall.  I wasn't paying
24       them.  They were being paid by the
```



1        Kimmel Center so they were just trying
2        to send people there.
3            Q.   Now, are you aware that the
4        Kimmel Center has stated that -- let me
5        ask you this:  Did you talk badly about
6        the Forum during your interview with
7        the Kimmel Center?
8            A.   I don't think I talked badly
9        about any specifics.  I said that I
10       wasn't -- I said that what I was
11       looking for was a positive work
12       environment because I had experienced
13       an unpleasant work experience.  I
14       remember that, but I don't -- I think
15       when I was asking them questions I was
16       really trying to get a sense of what
17       their culture was like because it was
18       important to me not to get stuck in
19       that same culture.
20                 To say that I bad-mouthed
21       them, I'm pretty sure that I would not
22       have done that specifically because I
23       was nervous about that NDA.
24           Q.   Are you aware that the Kimmel



```
 1       Center says that they decided to not
 2       hire you during the interview because
 3       you spoke so badly of your then current
 4       employer?
 5          A.   I guess I knew that at some
 6       point, but I would -- I mean when you
 7       say I spoke so badly of my employer, I
 8       can't recall specifically saying
 9       anything bad about any specific person.
10               I remember being very
11       unhappy in the culture that I
12       experienced and I remember wanting to
13       make sure that if I took a position I
14       wouldn't be in a culture like that
15       again.
16          Q.   Okay.  So I'm not asking, I'm
17       not asking you to change your mind
18       about your recollection of the
19       interview.
20               I'm just asking if you're
21       aware that the Kimmel Center has taken
22       the position that the phone call they
23       received after your interview did not
24       influence their decision; they made
```



1      their decision to not hire you or not

2      proceed with your potential employment

3      during your interview as a result of

4      your interview?

5             Are you aware of that?

6         A.   The recruiter told me that that

7      night, so yes.

8         Q.   The recruiter told you what that

9      night?  What night?

10        A.   That they said that it wasn't,

11     it wasn't the phone call that they

12     didn't like.  It was they weren't happy

13     with the way I -- you know, they didn't

14     want me.

15        Q.   And the recruiter told you the

16     night that the recruiter called you to

17     convey that there had been the phone

18     call?

19        A.   Yes.

20        Q.   Okay.  I just want to make sure

21     I've got it correct.

22             So you had the interview and

23     at some point after the interview the

24     recruiter called you and said that the



```
 1      Kimmel Center, Ms. O'Brien, the Kimmel

 2      Center has decided not to proceed; they

 3      received -- they decided not to proceed

 4      because of the way the interview went,

 5      but I think you should know that they

 6      also received a phone call saying that

 7      you were a drug addict and were suing

 8      your former or your employer?

 9              Is that about right?

10        A.   More or less.

11        Q.   Okah.  All right.  Other than

12      you, the recruiter and the Kimmel

13      Center, who else knew that you were

14      going to interview at the Kimmel Center

15      in advance of the interview, not after

16      the fact?

17        A.   I had some friends, probably my

18      family.  Delaney and Caitriona were the

19      only ones in the office -- I think

20      Caitriona was in the office still at

21      that point, so they knew.

22              It was in my computer.  It

23      was in my calendar as well.

24        Q.   You put it in your calendar that
```



```
 1     you were interviewing for another job?

 2       A.   My personal calendar.

 3       Q.   Okay.  Okay.  Did you tell

 4     Mr. Roman?

 5       A.   Did I tell Mr. Roman?

 6       Q.   Yes.

 7       A.   No.

 8       Q.   Did you tell Dr. Pipes?

 9       A.   No.

10       Q.   Did you tell Matthew Bennett?

11       A.   No.

12       Q.   Did you tell Mr. Ebert?

13       A.   Yes, he knew.

14       Q.   And Mr. Ebert is your domestic

15     partner, correct?

16       A.   Correct.

17       Q.   You and he are not married,

18     correct?

19       A.   No.

20       Q.   And you live together currently,

21     correct?

22       A.   Correct.

23       Q.   And how long have you lived

24     together?
```



1       A.   I moved in February, I think

2   February 15th of 2020, almost a year.

3       Q.   And you said you moved in, you

4   moved into his home.  Is that correct?

5       A.   Yes.

6       Q.   You said yes, right?

7       A.   Yes.

8       Q.   Okay.  And where did you live

9   prior to moving in with Mr. Ebert?

10      A.   I have a townhouse.  I lived

11  there.

12      Q.   Do you still own the townhouse?

13      A.   Yes.

14      Q.   And is it rented out at this

15  point?

16      A.   Currently, yes.

17      Q.   Currently.  Okay.

18           Do you have any other

19  residences other than Mr. Ebert's home?

20      A.   No.

21      Q.   When is the rental agreement,

22  when does the rental agreement expire

23  on your townhouse?

24      A.   March 31st.



```
 1        Q.   Of 2021?

 2        A.   Yes.

 3        Q.   And do you know if the renter is

 4   intending to renew the lease?

 5        A.   I have told them that I'm not,

 6   I'm not renewing the lease.

 7        Q.   Okay.  Are you returning, are

 8   you planning to return to the

 9   townhouse?

10        A.   I'm not.  My son and his

11   girlfriend will be renting it, along

12   with Mr. Ebert's daughter.

13        Q.   Okay.  Do you have any plans to

14   move out of Mr. Bennett's home at this

15   point?

16        A.   No.

17             MS. SHIKUNOV:  Molly, I'm

18   sorry.  Molly, you said Mr. Bennett and

19   I know --

20        Q.   I'm so sorry.  Thank you.  I

21   meant Mr. Ebert.  Let me try that

22   again.

23             Do you have any plans to

24   move out of Mr. Ebert's home at this
```



1    point?

2       A.   No.

3            MS. DIBIANCA: Thank you,

4    Erica.

5       Q.   About how long was that

6    interview at the Kimmel Center?

7       A.   Oh, I don't know.

8       Q.   Let me ask this:  At the end of

9    the interview with Kimmel Center, how

10   did you think it had gone?

11      A.   Not well.

12      Q.   Okay.  You didn't have a good

13   feeling about it?

14      A.   I didn't -- I wasn't interested

15   in the position.

16      Q.   What do you mean?

17      A.   I didn't, I didn't have a good

18   feeling about it, I didn't have a good

19   feeling about taking the job there if I

20   was offered it.  I would have taken it

21   but...

22      Q.   Explain that to me.

23      A.   Explain what?

24      Q.   You said you didn't think it



1    would be a good fit for you but you

2    would have taken it anyway.  Is that

3    correct?

4        A.   Yes.  It just didn't seem like

5    an environment -- it seemed like -- I

6    don't know.  It didn't seem like it had

7    a good culture there either.  Not -- it

8    just seemed stiff and I wasn't really

9    like oh, excited about it, but I would

10   have taken it to get out of MEF.

11       Q.   At the time that you left the

12   interview, at the conclusion of the

13   interview did you think that you were

14   going to get a second call or get a

15   call back from them?

16       A.   I didn't know.

17       Q.   I know you didn't know but how

18   did you feel about it?

19       A.   I felt like you always feel when

20   you leave a job interview.  You're

21   waiting to hear how it went.

22       Q.   Okay.  So tell me, let's talk

23   now about what the recruiter told you

24   when he -- I'm sorry.  Did you say the

1    recruiter was a male?

2        A.   So the original recruiter was a

3    female.  The person that called me to

4    tell me about the phone call was a

5    male.

6        Q.   Had you spoken to that person

7    before?

8        A.   I don't think so.  And he was

9    never there when I was there.  He was a

10   boss and I guess he just wasn't there

11   when I was there or if he was he was

12   with someone else and I didn't speak

13   with him.

14       Q.   Okay.  So tell me what -- you

15   you don't happen to remember his name,

16   do you?

17       A.   No.

18       Q.   Tell me what your recollection

19   of that phone call was.  And by "that

20   phone call" I mean what the boss at the

21   recruiting agency said to you when he

22   called you about your Kimmel Center

23   interview.

24       A.   He said that the Kimmel Center



```
1     decided not to move forward with me;
2     that there was a phone call that came
3     in shortly after I left saying horrible
4     things about me and that they wanted
5     him to tell me because he felt like
6     they wanted -- he wanted me to know
7     that somebody in my inner circle had it
8     out for me but that wasn't the reason
9     that they were not going to move
10    forward with me.
11        Q.   Okay.  You said they said the
12    person had said horrible things about
13    you.
14              Do you recall what the
15    horrible things were?
16        A.   Yes.  I said them earlier.  I
17    said that they said I was a drug addict
18    and suing my boss for sexual
19    harassment.
20        Q.   Suing your boss for sexual
21    harassment, that was correct, wasn't
22    it?
23        A.   Yes.
24        Q.   Right.  So would you say that's
```



```
1    a horrible thing?  It's true.
2         A.   Well, it doesn't make me look
3    good to an employer.
4         Q.   Okay.  But it was true?
5         A.   Yes, that was true.  That one
6    was true.
7         Q.   And to say that you are a drug
8    addict is untrue, correct?
9         A.   It is untrue.
10        Q.   And I apologize.  That was also
11   I threw a lot of negatives in there.
12              But you do use drugs,
13   correct?
14        A.   I use prescribed Adderall.
15        Q.   And your boyfriend testified
16   that you are a daily marijuana user.
17   Is that true or not true?
18              MS. SHIKUNOV:  Molly, did
19   you say she was dealing marijuana?
20              MS. DIBIANCA:  No.  I said
21   your boyfriend testified -- I didn't.
22   Your boyfriend testified that you are a
23   daily -- maybe that's what you heard --
24   a daily marijuana user.
```



1    BY MS. DIBIANCA:

2        Q.   Is that true or untrue?

3        A.   I don't consider marijuana a

4    drug.  It's decriminalized and mostly

5    legal or it's almost legal in Jersey.

6    It's supposed to be legal so I don't

7    see that as a drug, but I do use

8    marijuana.

9        Q.   Okay.  Do you have a medical

10   marijuana card?

11       A.   I do not.

12       Q.   Have you ever had one?

13       A.   No.

14       Q.   Where do you get your marijuana

15   from?

16       A.   I don't know.  Matt gets it.

17       Q.   You get it from your boyfriend?

18       A.   Yes.

19       Q.   Does he have a medical marijuana

20   card?

21       A.   He does.

22       Q.   So you're using his lawfully

23   prescribed marijuana?

24       A.   I believe.  I don't know where



```
 1      it comes from so...
 2          Q.   Other than to say from
 3      Mr. Ebert?
 4          A.   Yes.
 5          Q.   Okay.  Got it.
 6                   You said that you were
 7      prescribed Adderall.  For how long have
 8      you been prescribed Adderall?
 9          A.   I don't remember the exact day
10      or date or even time.  It was probably
11      in 2015.
12          Q.   And what was the condition for
13      which you were being prescribed the
14      drug?
15          A.   ADHD.
16          Q.   When were you first diagnosed
17      with ADHD?
18          A.   At that time, like in 2015.
19          Q.   Do you take any other
20      medications for that condition?
21          A.   No.
22          Q.   And what's the dosing that you
23      take on Adderall?
24          A.   I take 10 milligrams.
```



1        Q.   Once a day?

2        A.   Yes.

3        Q.   And is that in the same since

4    2015?

5        A.   I'm sorry?  What?

6        Q.   I'm sorry.  Has that been the

7    same since 2015?

8        A.   Originally she prescribed me 10

9    milligrams and she said see how you

10   feel with it.  And then she bumped me

11   up to 20 milligrams so I did that for a

12   while.  And she bumped me up to 30

13   milligrams and I didn't feel

14   comfortable with it.  I didn't like it.

15   I don't really like to take medication.

16           So I backed it down and I

17   only do 10.

18       Q.   Okay.  Okay.

19       A.   If I'm like doing like a longer

20   day --

21       Q.   I didn't hear you.  I'm so

22   sorry.

23       A.   If I have a long day and I'm

24   working for a long period and I start



1    to feel my concentration slip, I'll

2    bump to 20, but that's rare.

3        Q.   Okay.  Have you ever shared your

4    Adderall with another person?

5        A.   Lisa and I had the same

6    prescription and if she was waiting for

7    a prescription or whatever, I would,

8    you know, give her a few of mine and

9    then she would give them back to me

10   when she got her prescription filled.

11            I didn't give her any more

12   than she was prescribed for and I

13   didn't do it often.

14       Q.   Okay.  Have you ever snorted

15   Adderall?

16       A.   No.  I heard it's a thing

17   though.

18       Q.   Other than Adderall, are you

19   currently taking any other medication?

20       A.   Yes.

21       Q.   And what are they?

22            THE WITNESS:  Is she allowed

23   to ask me about my medication?

24            MS. SHIKUNOV:  Yes.  Go



1    ahead.

2        A.   I don't really know the name of

3    it.  I starts with a V.

4        Q.   What condition is it for?

5        A.   It's for an STD.

6        Q.   Okay.  Anything else?

7        A.   No.

8        Q.   And how about since you left

9    MEF, other than the medication that

10   started with a V and the Adderall,

11   anything else that you've taken since

12   leaving MEF?

13       A.   Not that I recall.

14       Q.   And I don't mean to say like an

15   antibiotic or something like that where

16   it's a short course but for a

17   condition.

18       A.   No.

19            MS. DIBIANCA: Do you know

20   what?  We've gone for about fifty

21   minutes.

22            So, Erica, is this a good

23   time to take a couple of minutes?

24            MS. SHIKUNOV:  Yes.  That's



```
1     fine.  And then, Molly, I just want to
2     ask you -- let's go off the record
3     first.
4              THE VIDEOGRAPHER:  Going off
5     the record at 9:57.
6              (A brief recess was taken.)
7              THE VIDEOGRAPHER:  We're
8     rolling and back on the record at 10:10
9     Eastern Time.
10    BY MS. DIBIANCA:
11      Q.   All right.  So, Ms. O'Brien,
12    we're back from break so I'm just going
13    to continue with the questioning that
14    we left off, which was the Kimmel
15    Center.
16              Who made the anonymous call
17    to the Kimmel Center, Ms. O'Brien?
18      A.   My boyfriend did, Matt Ebert.
19      Q.   When did you learn that
20    Mr. Ebert made that call?
21      A.   I learned that -- so he took
22    ownership of that call when he filed
23    paperwork because he was served
24    something.  He never admitted it until
```



```
 1     that point despite the fact that it was

 2     pulled from his phone records.

 3        Q.   Okay.  So I'm going to break

 4     that down a little.

 5             So is it correct to say that

 6     the first time Mr. Ebert admitted to

 7     you that he had made the phone call to

 8     the Kimmel Center was when he put it

 9     into a pleading which he filed with the

10     court in this case?

11        A.   Yes.

12        Q.   Prior to that, had you asked him

13     if he had been the anonymous caller to

14     the Kimmel Center?

15        A.   Yes.

16        Q.   And --

17        A.   Go ahead.  He denied it.

18        Q.   When did you first ask him if he

19     had made that call?

20        A.   I don't, I don't recall.

21     Erica --

22             MS. SHIKUNOV:  Don't tell

23     her anything that I said.  If you're

24     going to say that I showed you phone
```



1    records that's fine, but other than

2    that don't talk about our

3    conversations.

4       Q.   Let me restate it in a way that

5    doesn't tend to invoke the counsel

6    part.

7             Prior to -- is it fair to

8    say that you did not suspect Mr. Ebert

9    made the phone call at the time it was

10   made?

11      A.   Yes.

12      Q.   At the time you filed -- let me

13   ask you this:  You filed a charge of

14   discrimination with the EEOC.  You

15   filed two of them, correct?

16      A.   Yes.

17      Q.   And the first one was alleging

18   sexual harassment, correct?

19      A.   Mm-hmm.  Yes.

20      Q.   And the second one alleged

21   retaliation, correct?

22      A.   Correct.

23      Q.   And the retaliation charge, when

24   you filed that charge did you suspect



1    it was your boyfriend at that time?

2        A.   I wouldn't have filed that if I

3    thought so, so no, I did not.

4        Q.   Did you attend Mr. Ebert's

5    deposition in this case?  We had it

6    earlier this week.

7        A.   No.

8        Q.   You didn't dial in for that at

9    all?

10       A.   No.

11       Q.   Do you know, what is your

12   understanding of the reason that

13   Mr. Ebert made that phone call?

14       A.   When I learned that he did it

15   and I -- actually, when I learned that

16   the phone number was in his phone

17   records and when I had confronted him

18   about that, he had a very genuine

19   reaction of shock and said that he

20   thought he was better at that point and

21   he didn't remember calling them and he

22   didn't know why he would have called

23   them.

24              So -- I'm sorry.  Can you



```
1      repeat the question again?
2         Q.   Sure.  No problem.
3              What is your understanding
4      of the reason he did call them?
5         A.   Oh, yeah.  So why now do I think
6      he called?
7         Q.   Sure.  Sure.
8         A.   Now I think he's a very insecure
9      person and I think he didn't want me to
10     have that job and I think he suffers
11     from impulse problems and he took it
12     upon himself to make sure I didn't get
13     it.  That's what I think.
14        Q.   So I'll represent to you that he
15     testified that he made the call at
16     least in part to get back at you for
17     giving him an STD.
18        A.   And then there's that.
19        Q.   Would that be consistent with
20     the information that you know?
21        A.   I felt that that was a different
22     problem, but I thought that -- I don't
23     know.  I guess, I guess, I guess that
24     makes sense, but I just kind of thought
```



```
 1      that there was a gap in between the

 2      phone calls.

 3                 I didn't think at that point

 4      that he would still be -- I felt like,

 5      I guess I felt our relationship was at

 6      a different point because I didn't know

 7      any of this happened, but looking back

 8      I thought our relationship was at a

 9      different point that he wouldn't have

10      done something spiteful like that to me

11      and that it was more about controlling

12      where I worked.  But it makes -- you

13      know, if that's what he said, then I

14      guess that's why he did it.

15          Q.   When you say gap between the

16      phone calls, what's the other phone

17      call you're talking about?

18          A.   The one that he made to

19      Mr. Roman.

20          Q.   And when did you first learn

21      about that?

22                 Just to be clear, I'm not

23      asking you if you learned it from

24      counsel.  Don't tell me that you
```



1    learned it from counsel.  Just when?

2        A.   I don't know the exact date, so

3    I don't know.  I'm not sure of the date

4    that I found out that he had called

5    him.

6               Again, I found out that it

7    was from -- I was just told that his

8    phone records showed that he made a

9    call to Gregg Roman.

10       Q.   Do you recall when you -- by

11   "when" I don't mean an exact date but

12   the best approximation you can give.

13              When did you tell Mr. Ebert

14   that you had an STD?

15       A.   I think I found out in like late

16   June or early July and the day I found

17   out I went and told him.

18       Q.   When you learned that Mr. Ebert

19   had sabotaged, well, that's too -- let

20   me strike that.

21              When you found out that

22   Mr. Ebert had made the phone call to

23   the Kimmel Center, did you consider

24   moving out of his home?



1        A.    When he sabotaged my job

2    opportunity?  Yes.

3        Q.    Okay.  Did you move out of his

4    home at that time?

5        A.    I was not able to move out of

6    his home at that time.

7        Q.    And why is that?

8        A.    Because quarantined had happened

9    and I had nowhere to go.  I had rented

10   out my house so I couldn't go back

11   there.  I couldn't go to my mom because

12   we were quarantining and I thought she

13   would die if I went near her.  So I had

14   to stay there.

15       Q.    Did you continue to share a

16   bedroom?

17       A.    No.  We were keeping space.  He

18   was definitely keeping space from me.

19       Q.    I'll represent to you that he

20   testified that he slept on the couch

21   maybe one or two nights but that was

22   about it.  Is that correct?

23       A.    Maybe.  I don't know.

24       Q.    So what did you mean when you



1        said he was definitely keeping space

2        from you?

3            A.    There was -- we weren't talking.

4        We weren't hanging out.  If he came --

5        we kept different, you know, did our

6        own things during the day.  So if he

7        came to bed I might have already been

8        asleep.  It wasn't like we were, you

9        know, snuggled up.

10           Q.    And at this point -- go ahead.

11       Sorry.

12           A.    I think the kids had no idea

13       what was going on and it was more about

14       not upsetting or alarming the kids.

15           Q.    And do you both have children

16       that reside in that home?

17           A.    Yes.

18           Q.    But you and Mr. Ebert have

19       worked it out since then, correct?

20           A.    We continue to work it out.

21           Q.    But you're not keeping space

22       from one another at this point,

23       correct?

24           A.    We're working on our



```
 1      relationship.
 2          Q.   And how long have you two been
 3      together?
 4          A.   Almost two years.
 5          Q.   So this is October -- I'm sorry.
 6      I looked at my clock and it says 10.
 7      It's actually January.  It's January
 8      2021, so almost two years.
 9               Do you remember about what
10      month it was when you first became I'll
11      say -- I know you knew each other in
12      high school so I don't want to say when
13      you met.
14               But when you became a couple
15      about two years ago do you remember
16      about what month?
17          A.   We started dating, our first
18      date was May 5th of 2020 and we dated
19      for a few months.  I wouldn't say we
20      were a couple until later, but I was
21      seeing him exclusively at the time but,
22      you know, I wasn't so quick to jump in
23      all in.
24          Q.   Can you hold on for just a
```



```
 1    minute?  I apologize.

 2              THE VIDEOGRAPHER:  Do you

 3    want to go off?

 4              MS. DIBIANCA:  There's no

 5    need to go off.  It was the FedEx had

 6    come in.  Sorry.

 7    BY MS. DIBIANCA:

 8      Q.   So you said May 5th.  What was

 9    the year?

10      A.   It was 2019.

11      Q.   Thanks.

12              Your first charge of

13    discrimination, let's go ahead and I'm

14    going to pull that document up now so

15    that it's available on the screen to

16    me, but I think Erica is going to give

17    you a copy of it as well so you have a

18    paper copy.

19              Give me just a minute to

20    navigate to that.

21              MS. SHIKUNOV:  The July 24,

22    2019 EEOC you're asking about?

23              MS. DIBIANCA:  Yes.

24
```



1    BY MS. DIBIANCA:

2        Q.   Ms. O'Brien, because we've been

3    able to get, your counsel has been kind

4    enough to give you a paper copy of that

5    I'm not going to share my screen.

6              MS. DIBIANCA:  Unless,

7    Erica, you prefer me to do so so you

8    can see it.

9              MS. SHIKUNOV:  I have it.

10             MS. DIBIANCA:  Okay.

11   Perfect.  So if you want me to put it

12   on the screen at any time just let me

13   know but since we all have a copy I'm

14   going to skip that challenging

15   technology stuff.

16             All right.  So the document

17   that we're referring to right now and

18   that we're going to mark as Exhibit 1

19   for the court reporter's purpose is

20   dated July 24th, 2019.

21             (O'Brien Deposition Exhibit

22   No. 1 was marked for identification.)

23   BY MS. DIBIANCA:

24       Q.   And this is your charge of



1    discrimination filed with it says

2    Pennsylvania Human Relations Commission

3    on the top, but I understand it was

4    duly filed with the EEOC as well.

5              And is that the document

6    that you have got in front of you?

7         A.   Yes.

8         Q.   And is this to the best of your

9    knowledge a true and correct copy of

10   the document you filed with the EEOC?

11        A.   I believe so.

12        Q.   Were you represented by counsel

13   at the time you filed this?

14        A.   Yes.

15        Q.   It says on the first paragraph

16   in the section titled The Particulars,

17   it says, in part, that your job duties

18   included handling human resource

19   issues.

20              Did you handle human

21   resource issues for the Forum?

22        A.   Yes.

23        Q.   And then the next paragraph says

24   that throughout your employment with



1     the Forum -- and I'm paraphrasing --

2     you had been subjected to crude

3     comments from Gregg Roman, director.

4        A.   Yes.

5        Q.   He would make comments to you

6     such as, quote, I like older women,

7     quote, or, quote, non-Jewish women were

8     made for sex, quote.  These comments

9     made you feel extremely uncomfortable.

10              When did Mr. Roman say that

11    he liked older women?

12       A.   That was pretty early on in my

13    employment.

14       Q.   Who else was present when he

15    said that?

16       A.   I don't recall.  Matt Bennett

17    may have been present, but I'm not

18    sure.

19       Q.   Was that statement said in the

20    office?

21       A.   Yes.

22       Q.   And what did you say in

23    response, if anything?

24       A.   I don't recall.  I probably just



1    said oh or tried to move the

2    conversation elsewhere would probably

3    be how I would handle something like

4    that, but I don't recall specifically.

5        Q.   Okay.  And then the second

6    comment is non-Jewish women were made

7    for sex.  Do you recall when Mr. Roman

8    allegedly said that?

9        A.   Yes.  That was when he had

10   asked, he suggested that we start going

11   out on quarterly like management

12   meetings and have a more relaxed

13   atmosphere, go get a couple of drinks

14   and talk about shop.

15            And he didn't talk very much

16   shop.  It became very personal where he

17   was telling me about his marital

18   problems and how he was unhappy and I

19   suggested that he get a divorce or

20   think about leaving.

21            MS. DIBIANCA: We lost your

22   audio.  I can't hear you, Erica.

23   Sorry.

24            (A discussion was held off



1      the record.)

2      BY MS. DIBIANCA:

3        Q.   All right.  Let's go back.  We

4      did have some audio issues.  So just to

5      make sure we've got the testimony,

6      let's go ahead and do it again.  Okay,

7      Ms. O'Brien?

8              Actually, we'll just start

9      in the beginning of that and we'll just

10     break it down.

11             What was the year or month

12     that Mr. Roman allegedly said that

13     non-Jewish women were made for sex?

14       A.   I'm not sure.  It was probably

15     earlier in 2019.

16       Q.   Are you Jewish?

17       A.   No.

18       Q.   And where did he say this?

19     Where was he when he said that

20     allegedly?

21       A.   I believe it was Misconduct,

22     which was where he had taken me for a

23     quarterly management meeting that he

24     said he wanted to have with me where we



```
1     would just go relax and talk shop and
2     strategize about, you know, the future.
3         Q.   When you say Misconduct, is that
4     a place?
5         A.   Yes.
6         Q.   Okay.  Sorry.  I'm a Delawarean.
7              Okay.  So you were outside.
8     You were not in the office at that
9     time.  Is that correct?
10        A.   Correct.
11        Q.   Was there anyone present with
12    you other than you and Mr. Roman?
13        A.   No.
14        Q.   And when you say quarterly
15    management meetings, how many times did
16    a quarterly management meeting outside
17    of the office between you and Mr. Roman
18    occur?
19        A.   One time.
20        Q.   And how long did that meeting
21    last?
22        A.   I couldn't say.
23        Q.   And when he said that non-Jewish
24    women were made for sex, what did you
```



1    say, if anything?

2        A.   I don't, I don't remember.

3    Again, I probably just was

4    uncomfortable because he was talking

5    about his marriage and stuff like that.

6    I wasn't comfortable.

7        Q.   So you said early 2019 but

8    Mr. Roman wasn't in the office in early

9    2019, was he?

10       A.   Oh, 2018 maybe.  Yeah.  I'm not

11   sure.  That's why I said I'm not sure.

12       Q.   Well, you didn't interact with

13   him in early 2019, did you?

14       A.   No.

15       Q.   So it would would have to have

16   been -- can you think about when it

17   was?  Was it early 2018?

18       A.   I would have to look, I guess.

19   I don't recall.

20       Q.   Where would you look?

21       A.   I actually don't know where I

22   would look.  Maybe my Google calendar.

23   I don't know.  I don't, I don't recall.

24       Q.   And I apologize because I'm



```
 1    going to ask a question that we've

 2    already discussed but just so we have a

 3    clear record.

 4              At this time you do not

 5    recall the month or time period when

 6    Mr. Roman allegedly made the comment

 7    that non-Jewish women were made for

 8    sex, correct?

 9      A.   It was at that meeting.

10      Q.   Okay.

11      A.   I know that.

12      Q.   But you don't know the date of

13    that meeting, right?

14      A.   Mm-mm.

15      Q.   All right.  And you need to say

16    yes or no.

17      A.   Oh, I'm sorry.  No.

18      Q.   Okay.  And you believe it was in

19    2018?

20      A.   Yes.

21      Q.   But you don't know -- do you

22    know the season?  Was it warm outside?

23    Was it cold outside?

24      A.   He had when he took me to the
```



1    meeting the first stop that -- we were

2    walking outside.  He walked me to the

3    parking garage where his car was

4    because he said he needed to get

5    something.  And what he needed to get

6    was some little thing that he had

7    bought that was like a marijuana

8    diffuser and he was like do you want to

9    get high?

10              So I was like okay, just,

11   you know, took one or two hits.  When

12   I'm working I don't want to be,

13   especially one on one in a parking

14   garage with a man I wouldn't want to

15   let my defenses be too far down.

16      Q.   So does that help you remember

17   what time of year it was?

18      A.   So it was warm was my point

19   because of the walking.

20      Q.   Okay.  All right.  To the best

21   of your knowledge, has Mr. Roman had

22   sex with non-Jewish women?

23      A.   I'm not sure.  He told me that

24   he had sex in the office at work.  He



```
1     told me that he had sex with Leah
2     Merville.  I'm not sure what she is.
3        Q.   Let's go to the next paragraph
4     of the charge.  It says "In or around
5     September 2018 Ms. O'Brien and
6     Mr. Roman went to dinner to discuss the
7     office, staff and operations."
8              Do you recall where you went
9     to dinner?
10       A.   That was Misconduct so it was
11    then.
12       Q.   So is that -- so I'm getting the
13    facts right, it would have been
14    September 2018 was the meeting at
15    Misconduct where he also said that
16    non-Jewish women were made for sex?
17       A.   Yes.  I guess that's when I
18    thought it was.  At the time I said
19    that I must have thought that was when
20    it was.  That was that same time.
21       Q.   And is that also -- okay.
22              So it says you went to
23    dinner at Misconduct.  Did you sit at
24    the bar or did you sit at a table?  I
```



1      don't even know if there are tables.

2         A.    Table.

3         Q.    Table.  Okay.  About how long

4      did the dinner last?

5         A.    I don't think it lasted that

6      long.  I don't recall.  It was...

7         Q.    So "During that same dinner at

8      Misconduct in or around September 2018

9      Mr. Roman discussed various

10     inappropriate topics that were

11     unrelated to work, specifically, sex,

12     relationships, and current problems he

13     was having with his wife."

14        A.    Yes.

15        Q.    So let's take that one at a

16     time.

17                    What did he discuss with

18     regard to sex?

19        A.    That was when he made the

20     comment about sex being for Jewish

21     women and he was telling me that he

22     needed a release.

23        Q.    Why didn't you put that in the

24     charge?



1          A.    Why didn't I put what in the

2    charge?

3          Q.    That he made that comment about

4    a release.

5          A.    I guess that's the sex

6    reference.

7          Q.    Anything else referencing sex?

8          A.    I'm sure, but I would have to --

9    I can't think of it right now.

10         Q.    This is your chance so that's

11   why we're here.

12         A.    Right.  He told me he was having

13   problems with his wife.  He was asking

14   me about my relationships, about how I

15   was like getting out of my marriage and

16   was I seeing anyone and talking about

17   how he needed a release.

18         Q.    Okay.

19         A.    He also kept telling me that he

20   forgot to sign papers because he wanted

21   to switch banks and there was paperwork

22   that had to be signed.  I had sent it

23   to him and asked him to sign it

24   electronically, but he kept saying



1      several times throughout the night that

2      oh, we need, we can stop back to the

3      office, I forgot to sign those papers

4      for you, but we can stop back to the

5      office, we can sign those papers for

6      you.

7                   And between those comments

8      and between the release comments and

9      the topic of the conversation, I became

10     so uncomfortable that I stopped and I

11     said you know I'm not going to fuck

12     you, right?

13        Q.   Okay.  And that was in the

14     restaurant?

15        A.   That was when we were walking.

16        Q.   Walking back from the

17     restaurant?

18        A.   I think we might have been

19     walking -- I'm not sure where we were

20     walking.  I think it was when we were

21     walking.  I think we might have

22     switched locations, but I can't

23     remember exactly.

24        Q.   What do you mean "switched



1    locations"?

2       A.   I don't know.  I think we might

3    have had a drink somewhere and then

4    went to Misconduct.  I can't remember

5    if we were in one location the entire

6    time.

7       Q.   So is it your testimony that you

8    left the office with Mr. Roman, stopped

9    at the parking garage, had a couple of

10   hits of weed and then went where?

11      A.   To eat.  I believe we went

12   somewhere initially and maybe he didn't

13   like it and then we switched and then

14   went to Misconduct.  I believe that's

15   where we went and ate.

16              And then walking he may have

17   mentioned, I think he kept mentioning

18   the papers and I made that comment.

19      Q.   When you made the comment about

20   you're not going to fuck him?

21      A.   Yes.

22      Q.   Are you sure this wasn't 2017?

23      A.   It may have been.  I told you

24   I'm not sure of the date.



1       Q.   He's asked you if you were

2    getting out of -- you discussed you

3    were getting a divorce.  Is that right?

4       A.   Yes.  I was not -- I think my

5    divorce wasn't final at that point but

6    I had, you know, I was separated and

7    living in my own place.

8       Q.   Does that help you remember the

9    year?

10       A.   It really doesn't.

11       Q.   When did you separate from your

12    husband?

13       A.   In 2014.

14       Q.   And when was your divorce

15    finalized?

16       A.   I don't -- I stayed married for

17    a while because I stayed on his

18    benefits.  Maybe -- I don't know.

19    Maybe 2017.

20       Q.   So if your divorce was finalized

21    in 2017, does that help you recall

22    whether it was 2017 that you had this

23    dinner with Mr. Roman at Misconduct?

24       A.   No.  Because he was just prying



1       about my personal life.  It wasn't like

2       he was asking me about like the

3       specifics of my divorce.  It was more

4       about like my marriage and what was it

5       like and what did you do and stuff like

6       that.

7                So it doesn't help me

8       remember.  I know that I went to dinner

9       with him one on one and that was my

10      evening, was uncomfortable.

11         Q.   And did you tell him at that

12      dinner about your son having a drug

13      problem?

14         A.   A drug problem?  My son doesn't

15      have a drug problem so I wouldn't have

16      told him that.

17         Q.   Did you tell him anything about

18      your son at that dinner?

19         A.   My son has struggled with issues

20      and I think I had to take time off

21      because of that and so he may have

22      asked me about that, so I may have told

23      him some of those issues.

24         Q.   Do you mean take off work at MEF



1    or prior to working at MEF?

2       A.   At MEF.

3       Q.   Okay.  Then did you walk back to

4    the office after that dinner?

5       A.   I didn't go back to the office

6    with him.  I went home.

7       Q.   Where was your car parked?

8       A.   I don't remember.  I generally

9    took PATCO in, so I may have taken the

10   train.  If I drove in, I don't know.  I

11   would have probably parked at Liberty

12   One.

13      Q.   So after the dinner the two of

14   you left separately, correct?

15      A.   I didn't -- yeah.  I didn't go

16   back to the office with him.  I didn't

17   go anywhere.  I went home.

18      Q.   You didn't go to the parking

19   garage with him?

20      A.   After?

21      Q.   Yes.

22      A.   I don't think so.

23      Q.   Okay.  I'm just asking just so

24   my questions are clear.



1          And you say in your charge

2     that he continued to make advances

3     throughout the dinner.  What were the

4     advances?  Was there something?  Did he

5     proposition you?

6        A.   He talked about -- no, I don't

7     remember saying there was a

8     proposition.  I recall saying that he

9     kept leading the conversation to

10    marital problems, asking me about what

11    it's like dating, what the dating scene

12    is like and him saying how he needed a

13    release.

14          I said that the topic of

15    conversation made me feel so

16    uncomfortable that I said to him you

17    know I'm not going to fuck you, right?

18          And he said why would you

19    say that?

20          I said because I felt like I

21    needed to.

22       Q.   And what did he say?

23       A.   He changed the topic.

24       Q.   Did he change the topic back to



1        work?

2            A.   I don't recall.  There wasn't

3        much work talk.

4            Q.   After he changed the topic did

5        you feel -- was there anything else

6        that he said after that that evening

7        that made you feel uncomfortable?

8            A.   I don't recall.  I believe the

9        release comment came after that.

10           Q.   Was that the only time you went

11       to dinner with Mr. Roman?

12           A.   I believe so.

13           Q.   Let's go to the next page of the

14       charge.  It says "A few weeks later

15       Mr. Roman invited Ms. O'Brien on a

16       business trip to Israel with him."

17                    So tell me what you mean by

18       that, he invited you on a business

19       trip.  How did he invite you on a

20       business trip?

21           A.   He said that, you know, they

22       were working on some secret project and

23       it was top secret and high security and

24       high security like -- I don't know why



```
 1        but whatever.

 2                    He said that he needed help

 3        because he needed someone to take notes

 4        for him or something, and he asked me

 5        if I would want to go.  It would be

 6        about a week.

 7                    And I did want to go.  And

 8        he said I got an Airbnb, it's two

 9        bedrooms and you'll have your own room.

10                    And I said I'm not

11        comfortable with that at all and I

12        would want to go, but I want a hotel

13        room.

14        Q.   Okay.  What did he say?

15        A.   He said he would ask someone

16        else.

17        Q.   So that trip -- did he ask

18        someone else?

19        A.   He asked Lisa Barbounis.

20        Q.   So the trip that Lisa Barbounis

21        took to Israel I'll represent to you

22        was in March of 2018.

23                    Does that sound correct to

24        you?
```



1      A.    Okay.  Yeah.

2      Q.    So your dinner at Misconduct was

3   prior to March 2018.  Is that correct?

4      A.    I believe.  I'm not entirely

5   sure, but I believe that it was.

6      Q.    In other words, the dinner at

7   Misconduct was before he talked to you

8   about Israel?

9      A.    I am not sure which came first.

10     Q.    Well, you put in your charge a

11  few weeks later.  That's the first --

12     A.    Okay.  Then I guess that's what

13  it was.  I'm not sure now.  If I said

14  that then, then that's when I thought

15  it happened.

16     Q.    Okay.  Now, had you stayed at an

17  Airbnb with anyone from the Forum

18  during your employment?

19     A.    I had been invited to go help at

20  AIPAC.  They were going to AIPAC and

21  they were having dinner and they needed

22  help with that.  So I went with -- I

23  don't know how I got there -- I guess

24  with Lisa Barbounis and Trish McNulty



1       and we had a hotel room that we were

2       supposed to stay in, one room.  We

3       shared, the three of us, one hotel

4       room.

5                   And Matt and Gregg were also

6       there and they had I think a three

7       bedroom, it was a three bedroom Airbnb.

8                   And so we had gone out

9       afterwards to I guess different

10      functions.  The different organizations

11      hold functions trying to network.  And

12      Gregg invited some people back to the

13      Airbnb for like an after party after

14      that, so we all went back there.

15         Q.   And did you stay there that

16      night?

17         A.   I did.  We had been drinking and

18      actually when we first got there he

19      said here, come here, I want to show,

20      here come back here, come back here and

21      I followed him.  I didn't know the

22      layout.

23                   So I was just following him

24      and he took me right into his bedroom



1    and shut the door.  And I was

2    uncomfortable and he's like here, you

3    know, he had pot.  So I was like ahhh,

4    I don't want to be back here;

5    everybody's going like be wondering

6    what we're doing.  And I went out on

7    the terrace because I was

8    uncomfortable.

9              After that everyone was

10   hanging out and I remember it was

11   getting later and there were grantees

12   there.  There were a couple of fellows

13   there.  And at one point he was sitting

14   on the couch in between Lisa and Tricia

15   and he put his arms around them and

16   they both -- Lisa just looked like

17   uncomfortable, like all right, go away.

18   And Tricia was more visibly

19   uncomfortable and then he pulled her up

20   onto his lap.  And she was, she was

21   visibly shaken by that.  I remember the

22   look on her face.

23      Q.   You were intoxicated at that

24   time, correct?



1        A.    Excuse me?

2        Q.    You were intoxicated at the

3    time, correct?

4        A.    We had definitely all been

5    drinking.

6        Q.    Answer my question.  That wasn't

7    my question.

8              My question was:  Were you

9    intoxicated at the time?

10       A.    Was I?  Well, what's drunk?  I

11    didn't take -- I mean I had been

12    drinking so I was buzzed at the very

13    least.

14       Q.    Okay.  So in let's say early

15    March 2018 you were intoxicated after

16    AIPAC and stayed in Mr. Roman's Airbnb,

17    correct?

18       A.    So Lisa had fallen asleep on the

19    couch and we were wanting to leave and

20    they were like no, no, no, stay here,

21    stay here, just stay here, there's an

22    extra bedroom.

23              And so Tricia and I flipped

24    a coin for the bedroom and she won so



1    she went into the bedroom.  And I was

2    like I didn't really -- I really wanted

3    to go back to the hotel room.

4              And I was like screw her.

5    There's a big bed in here.  I'm not

6    going to sleep on the couch.  I'm going

7    to go sleep in there with her.  There's

8    plenty of room.

9              And as I was walking away --

10   I was by myself at that point.  She was

11   asleep and everybody was gone.  And as

12   I was walking away, I looked and Lisa

13   was like swearing a skirt and she was

14   asleep on the couch and I was like do

15   you know what?  I didn't feel

16   comfortable leaving her alone on the

17   couch.

18             And I thought Tricia has a

19   lock on her door, so I'll just sleep on

20   the couch and we'll just leave early in

21   the morning.  So that's what we did.

22   Q.   Was there any incident after you

23   went to sleep?

24   A.   I don't think so.  We woke up



1    early in the morning and went back to

2    our hotel room.

3              MS. SHIKUNOV:  Molly, when

4    you're done this line of questioning

5    can we take a cbreak?

6              MS. DIBIANCA:  Yes.

7    Definitely.  I mean we can do it now if

8    you want.

9              MS. SHIKUNOV:  I don't want

10    to interrupt your line of questioning.

11    If you want to finish this topic and

12    then we can go.

13   BY MS. DIBIANCA:

14      Q.   So in the first paragraph of the

15    second page of your charge the last

16    sentence says that, quote, "Because of

17    his inappropriate advances Ms. O'Brien

18    missed out on the opportunity to

19    further her career and participate on

20    the business trip."

21              I guess I don't follow that

22    so help me unwind that if you can.

23      A.   Where is it?

24      Q.   This is the second page of your



1      charge on the first paragraph, last

2      sentence.  It begins "Because of his

3      inappropriate advances."

4          A.   Oh.  Well, I felt like the

5      Israel trip was an opportunity to, you

6      know, I guess become more, you know,

7      involved in the business, what was

8      going on.  And I didn't -- I wasn't

9      able, I wasn't comfortable taking the

10     opportunity because I was uncomfortable

11     at the thought of being alone with him

12     for a week.

13             So that's what that means.

14         Q.   Now, sitting here today do you

15     think that you lost out on a business

16     opportunity or a career opportunity by

17     not going on that trip?

18         A.   I don't think there was a career

19     opportunity.  I think it was an

20     opportunity for Mr. Roman to try to get

21     in someone's pants.

22         Q.   The next paragraph describes

23     Lisa Barbounis as an administrative

24     assistant.



1           Is that your understanding

2    of what her title was at the Forum?

3       A.   Her title changed several times.

4    She was hired in to be an executive

5    assistant.  I'm not sure.  She didn't

6    want that title.  She was very worried

7    about the title.

8           So I'm not sure what her

9    title was when she started, but the

10   role that we were hiring for was for an

11   administrative assistant and that's

12   where she started.

13      Q.   Then it says "When Ms. Barbounis

14   returned from Israel she made a comment

15   to you about, quote, the shit Mr. Roman

16   pulled in Israel."

17          Were those her exact words?

18   They're in quotation marks here.

19      A.   Yeah.

20      Q.   And you followed up and she did

21   not -- did you respond to that

22   sentence?

23      A.   When they first got back they

24   were very weird with each other, so I



1       kind of thought something might have

2       happened and then she made that

3       comment.

4                   And I said was he

5       inappropriate while you were there?

6       And she was like oh, nevermind, it's

7       nothing.  And she like made a bee line

8       for the door and got out of the office.

9       Q.   It says that she did not address

10      the trip again.  Is that correct?

11      A.   I don't, I don't know what you

12      mean.

13      Q.   I'm looking at your charge.

14      A.   She never, she never said any

15      more comments like that around me

16      anyway.

17      Q.   And then subsequently Mr. Roman

18      told you that Ms. Barbounis had hit on

19      him during the Israel trip?

20      A.   That was actually before, I

21      think.  He was in my office for

22      something and he was like she hit on me

23      in Israel.

24                  And I was like she did?  Are



1    you sure about that?

2              And he was like oh, I don't

3    know, maybe.

4              It was, it was weird.

5       Q.   When you say it was before that,

6    you mean it was before Lisa's comment

7    to you?

8       A.   I think it was.

9       Q.   Okay.  And then it says "Soon

10   after her trip to Israel," which I'm

11   assuming means Ms. Barbounis's trip to

12   Israel, "in March of 2018 Mr. Roman

13   asked you to document everything

14   Ms. Barbounis did wrong while working

15   for the Forum, including when she was

16   late or when she spoke too loudly.

17   Ms. O'Brien was directed by Mr. Roman

18   to look for reasons to discipline

19   Ms. Barbounis."

20             Is that a true and accurate

21   statement?

22      A.   It is.

23      Q.   Tell me the context of that.

24      A.   So --



1         Q.    When did it happen?

2         A.    I'm sorry.  What?

3         Q.    Let's start with when it

4    happened.  When did he say that?

5         A.    I'm not good with like actual

6    like at this point remembering the

7    exact moment that these things

8    happened.  He -- when she was hired,

9    she had zero skills for being an admin

10   assistant.

11              What was the question again?

12   Oh, when he -- okay.

13              So he wanted to fire her.

14   So he told me that we needed to start

15   gearing up to get her out because she

16   wasn't doing her job, which she wasn't

17   good at it, I guess.  But he asked me

18   to basically start documenting when she

19   was late.

20              She's a very big personality

21   and she can be disruptive in the

22   office.  He was asking me to document

23   that and just start gathering, you

24   know, a reason to fire her.



1            MS. DIBIANCA:  Okay.  Let's

2     go ahead and pause there -- Erica, I

3     forgot we were going to take a break --

4     before I carry on.  Sorry.

5            We can go off.

6            THE VIDEOGRAPHER:  Going off

7     the record at 10:56.

8            (A brief recess was taken)

9            THE VIDEOGRAPHER:  We are

10    now rolling and recording and we're on

11    the record at 11:08 Eastern Time.

12    BY MS. DIBIANCA:

13      Q.   So we're going to stick with the

14    same line or the chain of events here.

15            You said, your testimony was

16    that Ms. Barbounis did not have the

17    qualifications that she needed for the

18    position for which she was hired at

19    MEF.  Is that correct?

20      A.   Yes.

21      Q.   And at the time she was hired

22    did you disagree with her being hired?

23      A.   I did.

24      Q.   Because of her lack of



```
1    qualifications?
2        A.   I thought she was smart and
3    seemed like a hard worker and, you
4    know, but there was another woman who
5    had previously interviewed who was an
6    older woman, like a bit matronly, and
7    she was a lifelong executive assistant.
8    Her resume was perfect for what we were
9    hiring for.  She knew MEF.  She was a
10   fan of Daniel Pipes and she wanted the
11   job.
12              So I wanted her and he
13   insisted on hiring Lisa for the job.
14   And I said to her in the interview you
15   know you're not going to like this job,
16   right?  Because this isn't the job that
17   you want.
18              And she said oh, I'll learn
19   it, I'll be good at it.  And, you know,
20   so she got the job.
21       Q.   And when she was hired and
22   started to work for the Forum, in your
23   opinion did she do a good job at first?
24       A.   I wouldn't have any knowledge of
```



1    how well she did her job firsthand.  I

2    only know what Gregg told me.  And I

3    would ask him often like -- because I

4    felt like it was doomed because she was

5    hired for a job she didn't have the

6    skill set for.

7              So I asked him often, you

8    know, is she doing a good job?  How's

9    it going?

10             And he would say oh, she's

11   doing good, she's getting it, she's

12   doing great.  So he was always

13   defending her.

14             So I said if she's not doing

15   a good job you need to let her know so

16   she can fix it because you can't --

17   when you decide that she's not doing a

18   good job and you're going to try to rip

19   the rug out from under her it's going

20   to be a problem, so if she's not doing

21   a good job you need to tell me.

22   Q.   And did he tell you that she

23   wasn't doing a good job at some point?

24   A.   He always said that she was



1    doing well.  He would complain about

2    her and then he would say she was doing

3    well and it's good, everything's fine.

4            It wasn't until after they

5    got back from Israel that he said that

6    she wasn't doing a good job and that he

7    needed her to go.

8    Q.   And did you agree with him at

9    the time that he said that, that Lisa

10   was not doing a good job at that time?

11   A.   I still don't know.  I know that

12   she wasn't happy in the position.  I

13   know that she was always struggling and

14   feeling like she wasn't doing well.

15           And then I would ask him

16   about it and he'd say say no, she's

17   fine, it's good, it's good, it's good.

18           So I wouldn't have any

19   firsthand knowledge of the job that she

20   did because our jobs didn't interact.

21   They didn't really cross too much so I

22   really don't know how she did.

23   Q.   So at the time that Mr. Roman

24   told you when they returned from



1     Israel -- let me just go over that a
2     bit because it's a little unclear to
3     me.
4              When they returned from
5     Israel in March of 2018 Mr. Roman told
6     you that Ms. Barbounis -- what did he
7     tell you about Ms. Barbounis?
8       A.   He said she hit on me, like
9     that.  And that was really it.  Because
10    I went she did?  Are you sure about
11    that?
12             And then he's like oh, I
13    don't know, maybe and then that was it.
14      Q.   What about this piece about
15    telling you to document the things that
16    Ms. Barbounis did wrong?
17      A.   After he decided -- I didn't
18    realize it at the time but it was after
19    the Israel trip.  I didn't really put
20    two and two together.  He asked me to
21    start documenting all of her, you know,
22    things that she did wrong, she was loud
23    in the office, when she showed up late,
24    anything that she did, you know, that



1    was wrong or not okay.

2        Q.   Prior to March of 2018 you had

3    already told Ms. Barbounis that she had

4    tardiness issues, correct?

5        A.   Yeah.

6        Q.   Yeah.  So what he was telling

7    you was not news to you, correct?

8        A.   No.  But he wanted it documented

9    at this point.

10       Q.   Well, wasn't that your job as HR

11   to document when people are doing

12   things that are not in line with their

13   performance obligations?

14       A.   We didn't have a time clock and

15   I wasn't her boss.  And we also --

16   again we're told that we didn't have to

17   be 9:00 to 5:00, that we could flex and

18   do different, you know, schedules if we

19   needed to so --

20       Q.   You talked to her about being

21   late prior to the Israel trip, correct?

22   That's what your testimony was.

23       A.   Yes.  I believe I did.

24       Q.   Okay.  So there was obviously



1    some mechanism by which you determined

2    that she was late.

3        A.   He was the mechanism.

4        Q.   No.  My question was and your

5    testimony was that prior to the Israel

6    trip you yourself had said to

7    Ms. Barbounis you're late, right?

8        A.   She did show up late a lot.

9    But, again, I wasn't her boss so it

10   wouldn't -- I wouldn't have had a

11   discussion with her about her lateness

12   unless Gregg asked me to.

13       Q.   So the testimony you gave just a

14   few minutes ago when you said that

15   prior to Israel in March of 2018 you

16   had, in fact, talked with Ms. Barbounis

17   with regard to her tardiness, is that

18   correct or is that incorrect testimony?

19            Do you want to change that

20   testimony or are you sticking with

21   that?

22       A.   I think, I think it probably was

23   addressed at some point.

24       Q.   Okay.  And you said that she



1    was, he felt that she was not doing a

2    good job.  That's what he told you,

3    correct?

4        A.   Yes, when he, when he asked me

5    to start documenting it.

6        Q.   Did you think there was anything

7    wrong with him asking you to document

8    when an employee is not doing a good

9    job?

10       A.   He didn't ask me to document her

11   not doing a good job.  He asked me to

12   document her latenesses, her loudnesses

13   because I didn't have really the

14   ability to gauge her work performance.

15            No, there's nothing wrong

16   with that because when somebody is not

17   doing a good job and you don't want

18   them to be part of your team anymore

19   you have to document reasons for that.

20       Q.   And she was loud from time to

21   time, correct?

22       A.   Yes.

23       Q.   And it was loud in a way that

24   was disruptive, correct?



```
1        A.   Yes.
2        Q.   And she was tardy from time to
3    time, correct?
4        A.   Yes, I believe.
5        Q.   Did you document it?
6        A.   I did.  I started keeping a
7    list, yeah.
8        Q.   Did you ever speak to
9    Ms. Barbounis after Mr. Roman made the
10   request that you document it about --
11   let me say that in a better way.
12            After Mr. Roman asked you in
13   March of 2018 to document
14   Ms. Barbounis's various employment
15   failings, loudness, tardiness,
16   et cetera, you did so, correct?
17       A.   Document it?
18       Q.   Yes.
19       A.   I started keeping a list.
20       Q.   And did you address those issues
21   with Ms. Barbounis directly at any
22   time?
23       A.   She would disrupt me a lot, so
24   yes.  If she was loud, I would call her
```



```
1       out on it.
2          Q.   And you went into her office and
3       told her that she was late, correct?
4          A.   I may have.
5          Q.   Then the next paragraph of your
6       charge you say "Additionally, when he
7       returned from Israel" -- when you said
8       that did you mean in March of 2018?
9          A.   That was a prior trip to Israel.
10         Q.   So when was that?
11         A.   That trip when he came back and
12      told me he slept with Leah?
13         Q.   Yes.
14         A.   I'm not sure.  It was prior to
15      the trip with Lisa though.
16         Q.   Okay.
17         A.   And I only know that because she
18      had told me that while he was screaming
19      about needing a blow job that he called
20      Leah and she wasn't taking his calls.
21         Q.   Who is "she"?
22         A.   Leah wasn't taking his calls.
23      So he had already slept with her prior
24      to that trip was my point.
```



1      Q.   You got to unpack that a bit.

2    You said that she told you.  Who told

3    you what?

4      A.   Lisa when she told me about what

5    happened in Israel said that when she

6    was declining his advances he was

7    calling Leah and she wasn't taking his

8    calls.  That's how I know of him

9    sleeping with Leah happened prior to

10   that trip.  It had already happened.

11     Q.   And I thought you said that Lisa

12   didn't talk to you more about that

13   trip.  So are you changing that

14   testimony now?

15              MS. SHIKUNOV:  I'm going to

16   object to the form of the question

17   because it's mischaracterizing what she

18   said previously.

19     Q.   Would you like me to rephrase

20   it?

21              MS. SHIKUNOV:  She can

22   answer it or you can rephrase it,

23   whatever you prefer.

24     A.   So when you asked --



```
 1                 MS. SHIKUNOV:  Hold on.  Let
 2        her ask her question.
 3           Q.   I'm asking you if you would like
 4        me to rephrase it?
 5                 MS. SHIKUNOV:  You can
 6        rephrase it or she can answer it.  I
 7        put my form objection on the record so
 8        whatever you want to do.
 9                 MS. DIBIANCA:  I meant the
10        witness.
11           A.   Oh, me?  So when you asked me if
12        she talked to me about it again, I
13        thought you meant like that day in the
14        office brought it up again.  We did
15        talk about it again and it was when she
16        told me about what happened and that
17        ended up with me filing a complaint
18        with Daniel Pipes and Marc Fink.
19           Q.   So Lisa Barbounis just -- we got
20        a lot of pronouns on the record.
21                 So when Lisa Barbounis got
22        back from Israel she made a comment to
23        you about, quote, the shit he pulled in
24        Israel, quote.
```



1           After that she did not

2    address the trip again until October 30

3    or 31st, 2018.  Is that correct?

4        A.   That's correct.

5        Q.   Okay.  Got it.

6              So in this next paragraph

7    where you say "Additionally when he

8    returned from Israel," that is not

9    correct then?  Tell me what I'm

10   supposed to understand from that

11   sentence.

12       A.   So additionally when he returned

13   from Israel from a prior trip Mr. Roman

14   had told me how he had slept with Leah

15   Merville.

16       Q.   And when did he say exactly?

17       A.   He said that she was there

18   interning for IVP and he was there  and

19   they went out for drinks.  And he said

20   that they got a little fired up and he

21   forgot her paperwork back in his hotel

22   room to sign her internship papers,

23   which that's the only intern that he's

24   ever signed their internship papers.



1     Matt Bennett usually handled that.

2              So he had her papers up in

3     his hotel room and she went up there

4     and they -- one thing led to another

5     and they slept together.

6     Q.   When did he tell you that?

7     A.   It was prior to that Israel trip

8     and prior to the invitation to go to

9     Israel.

10             I thought I was the only one

11    that knew and then I found out later

12    that he had told other people as well.

13    Q.   So is it correct to say that he

14    told you, your testimony is that

15    Mr. Roman told you that he slept with

16    Ms. Merville and that he made that

17    comment, he made that statement prior

18    to your dinner at Misconduct in

19    September 2018?

20    A.   I'm not sure if it was prior to

21    that or not.

22    Q.   You said it was prior to when he

23    asked you to go to Israel, right?

24    A.   Yes.  I'm not sure where that,



1    when that happened.  I'm not sure of

2    the time frame of when he slept with

3    Leah or when he told me.

4        Q.  So just so we're clear and we're

5    talking about the same question, I'm

6    only talking about when he told you

7    that.  Okay?

8        A.  I'm unclear.  I don't know.

9        Q.  But you do know it was prior to

10   his trip to Israel in March 2018 with

11   Ms. Barbounis, correct?

12       A.  Yeah.  I'm pretty sure it was.

13       Q.  And are you pretty sure that it

14   was before he asked you to go to

15   Israel?

16       A.  Well, probably, yeah.

17       Q.  So as HR what did you do about

18   it when he told you that?  You kept it

19   to yourself?

20       A.  I did keep it to myself, but she

21   wasn't -- he said that she wasn't

22   working for us.  He said that --

23   actually I didn't know at that time

24   that she was interning for IVP Israel.



1    I thought it was, you know, she was

2    just coincidentally there.

3             That's kind of how he framed

4    it to me, but I told him that that's

5    stupid and you shouldn't be doing that.

6    Q.   So at the time of the alleged

7    incident when he, Mr. Roman, and

8    Ms. Merville had sex in Israel, was

9    Ms. Merville an intern for IVP at that

10   time?

11   A.   I believe that's what I found

12   out later.  I thought, I thought at the

13   time that he told me that she was

14   interning for somewhere else and that

15   maybe he helped her get the internship.

16            I'm really not that clear on

17   that.

18   Q.   She wasn't interning for the

19   Forum, correct?

20   A.   She wasn't?

21   Q.   Was she I guess?

22   A.   I'm unclear.  He told me that

23   she was not and then I heard later that

24   she was.  And if he was signing her



1    internship papers, I would have to

2    guess that she was.

3        Q.   But as the HR person you did not

4    know whether she was interning for the

5    Forum?

6        A.   No.  They didn't always update

7    me to that.  There would just be

8    somebody -- Matt really, Matt managed

9    the interns.

10       Q.   Was Ms. Merville working in the

11   office at that time, the MEF office in

12   Philadelphia?

13       A.   She was in Israel.

14       Q.   Did she ever work in the MEF

15   office in Philadelphia?

16       A.   Yes.

17       Q.   When?

18       A.   I'm going to guess --

19            MS. SHIKUNOV:  Don't guess.

20            THE WITNESS:  Okay.

21       Q.   Well, yeah, I want you to guess.

22   You can just say it's a guess, but I

23   still want you to try to figure it out.

24            MS. SHIKUNOV:  If you can



1        approximate, you can.  Just make sure

2        it's clear for the record that it is an

3        approximation.

4           A.   I'm going to say in 2017, I

5        believe.

6           Q.   So at the time that he told you

7        that he had sex with Ms. Merville, did

8        he tell you right after he returned

9        from the trip that they allegedly had

10       sex?

11          A.   He went -- he flew and traveled

12       often so I'm not sure if it was right

13       when he got back from that trip or not.

14          Q.   Well, your charge says when he

15       returned from Israel.

16          A.   Well, I mean I don't know if it

17       was the day he returned.  It was after

18       he returned and after it happened.

19          Q.   It wasn't long afterwards, in

20       other words?

21          A.   I don't think so.  It doesn't

22       seem like he would want to keep that

23       quiet since he was telling everyone.

24          Q.   Well, you didn't know that he



Marnie O'Brien - January 14, 2021                    113

```
 1     was, quote, telling everyone.  Those

 2     are your words after the fact, correct?

 3       A.   Yes.

 4             MS. SHIKUNOV:  Sorry, Molly.

 5     Can we take two seconds?

 6             MS. DIBIANCA:  Yes.

 7             MS. SHIKUNOV:  Can we take

 8     two seconds?

 9             MS. DIBIANCA:  We're going

10     off the record.

11             THE VIDEOGRAPHER:  Going off

12     the record at 11:28.

13             (A brief recess was taken.)

14             THE VIDEOGRAPHER:  We are

15     going back on the record at 11:29.

16     BY MS. DIBIANCA:

17       Q.   At the time that Mr. Roman

18     allegedly had sex with Ms. Merville in

19     Israel, was Ms. Merville an MEF intern?

20       A.   Not MEF.  I believe she was an

21     IVP intern.

22       Q.   Was she an intern with MEF after

23     you learned, allegedly learned from

24     Mr. Roman that he had sex with
```



```
1      Ms. Merville in Israel?

2       A.   No.

3       Q.   Did you do Ms. Barbounis's

4      performance review?

5       A.   I wouldn't think so.  I usually

6      sat in on them and Gregg did them.

7       Q.   Do you remember if he did a

8      midyear review for Ms. Barbounis?

9       A.   I think we did, yeah.

10      Q.   When you say "we," who do you

11     mean?

12      A.   Gregg and I.

13      Q.   It says that "On October" -- I'm

14     looking at your charge again --

15     "October 30th, 2018 Ms. O'Brien and

16     Ms. Barbounis got into an argument due

17     to Ms. O'Brien continuing to document

18     Ms. Barbounis's minor mishaps."

19           Is it true to say that

20     before October 30th, 2018 you and

21     Ms. Barbounis had gotten into arguments

22     before that?

23      A.   Yes.

24      Q.   Was this a particularly bigger
```



```
 1        argument than what you normally had?
 2          A.   Yes.
 3          Q.   And are you aware now -- and I'm
 4        not asking if you were aware at the
 5        time.  But now sitting here today are
 6        you aware of some of the messages that
 7        Ms. Barbounis sent about you during her
 8        employment at the Forum, various
 9        derogatory messages with words that I'm
10        not inclined to use on the record but I
11        will if you need me to?
12          A.   I need you to.
13          Q.   Okay.  So there's one where she
14        called you a fucking cunt.
15          A.   Ohhh, no.
16          Q.   One where she called you a
17        fucking bitch.
18          A.   I think she might have called me
19        that to my face a couple of times.
20          Q.   Okay.  So is it fair to say that
21        prior to October 30th, 2018 you and
22        Ms. Barbounis did not have a friendly
23        relationship?
24          A.   I liked her.  I didn't not like
```



1     her.  She was difficult to work with

2     and we would have differences.

3              So I would say, you know, it

4     would fluctuate.  We would get along

5     well and then when we didn't, we

6     didn't.

7        Q.   Why didn't you when you didn't?

8        A.   Gregg would tell me, like when

9     he was leaving on a trip or something

10    he had told me that him and Daniel saw

11    me as management and he wanted me to

12    act as a supervisory person when he

13    wasn't in the office.

14             So when I would try to do

15    that it would piss her off and she

16    would say you're not my boss.  And I

17    was like I'm doing my job; that's what

18    I was told to do.

19             And she would just

20    repeatedly tell me you're not my boss,

21    you're not my boss.

22             So on one hand he's telling

23    me to act as a supervisor, you know,

24    make sure she's toeing the line and



```
1      doing her job.  And not just her.  It
2      happened with other people as well.
3              And then I found out after
4      the fact when they would complain to
5      him that I told them to do something
6      that he would say don't listen to her,
7      she's not your boss.  Like so he would
8      then was basically pitting me against
9      everyone.
10     Q.   When did you find that out?
11     A.   After the fact.  After, you
12     know, he was out of the office.
13     Q.   So after November 1st, 2018?
14     A.   Yes.
15     Q.   And who did you find that out
16     from?
17     A.   I think it was Lisa and maybe
18     Tricia.
19     Q.   So the October 30th, 2018
20     argument with Ms. Barbounis, describe
21     to me how that happened.
22     A.   I was documenting, so I guess I
23     was on her a little bit.  And she was
24     very stressed out I guess because she,
```



1    she was always worried about her job at

2    that point.

3              So I think she was being

4    loud outside of the office and I told

5    her to be quiet.  And she just lost it

6    and she kind of squared up, walked into

7    my office telling me I was a bitch and

8    I needed to mind my own business and

9    who do you think you are?

10             And I was like I stood up

11   out of my desk and I squared right back

12   up and I walked her -- we argued.  I

13   can't remember what was said at that

14   point.  And I backed her right into her

15   office and shut the door and I walked

16   out.

17             She came back out.  I

18   remember feeling like Matt Bennett had

19   fueled the fire on that as well and I

20   think he told them that I told Gregg

21   something.

22             So he was in the bathroom

23   when that happened and I finished

24   yelling at her and he came in and I



1     told him that he was an asshole and I

2     left for the day.

3        Q.   Okay.  You said Matt Bennett

4     told them.

5               Are you talking about your

6     coworkers?

7        A.   Tricia and Lisa.

8        Q.   I ask just because the pronouns

9     make it hard to follow later so I just

10    try to get names associated with them

11    if we can.

12              So the October 30th incident

13    was in your opinion fueled by

14    Mr. Bennett.  Is that correct?

15       A.   Yeah.  He threw fire on it for

16    sure.

17       Q.   Then it says -- you said you

18    left for the day.  In other words, you

19    walked out, right?

20       A.   I was pissed.  I left, yeah.

21       Q.   Do you have knowledge of whether

22    Ms. Barbounis uses drugs?

23       A.   I mean she takes Adderall.

24       Q.   I mean illegal drugs.



1       A.   I don't.

2       Q.   Including marijuana?

3       A.   I don't think she smoked

4   marijuana.

5       Q.   The next day, October 31, 2018,

6   you arranged to meet with Ms. Barbounis

7   to address the argument that happened

8   the previous day.  Is that correct?  It

9   was your idea to meet to address the

10  argument?

11      A.   Yeah.  So I had yelled at Matt

12  and I had yelled at Lisa.  And Gregg

13  called me and was like, you know, what

14  happened or whatever?

15           And he told me to write it

16  up and --

17      Q.   Excuse me.  When you say "he,"

18  do you mean Bennett or Roman?

19      A.   Gregg told me to write up the

20  situation, what happened before the end

21  of the night or whatever, and get it to

22  him.

23           He also told me that I

24  needed to call Matt and smooth it over



```
1     with him because we all had to work

2     together and everything.

3               So they were going to be

4     at -- they were doing a radio show at

5     the time, so they were going to be at

6     the radio show in the morning.  He

7     wouldn't be --

8      Q.   Who is "they"?

9      A.   "They" are Gregg and Matt.

10     Q.   Okay.

11     A.   So it would have been me in the

12    office, me, Lisa, Tricia, Delaney,

13    Caitriona and Thelma.  I'm not sure if

14    Thelma was in on either of those days,

15    but that's who would have been in the

16    office.

17              And so he had told me to

18    call Matt and smooth it over or maybe

19    he told Matt to tell me.  I think he

20    told Matt to call me and smooth it

21    over.

22              So during the course of that

23    conversation, you know, we were talking

24    about it and I think he alluded to me
```



1          that something had happened between

2          Gregg and Lisa in Israel and that she

3          didn't report it.  So whatever.  I

4          guess we smoothed it over somewhat.

5                      And then Gregg had asked me

6          about it.  I think he called me the

7          next morning or something.  And I had

8          said yeah, that we smoothed it over and

9          that I was a little bit uncomfortable

10         going back to the office after that and

11         just with everybody I thought it would

12         be uncomfortable for everyone.

13                      So I said I'm going to have

14         coffee with her and just try to get to

15         a place where we're going to be civil

16         to each other.  I don't want it to be

17         weird when we go into the office or,

18         you know, for the day.

19                      So I went and I think we met

20         at the Starbucks right down the street

21         and we grabbed a cup of coffee.  And we

22         were so I guess hostile or I guess

23         angry that we didn't even speak the

24         entire time we were waiting in line for



1     coffee.  We didn't really talk to each

2     other at all.  We got the coffees and

3     we walked down the street and sat on a

4     bench.  And I was like you know, look,

5     I was doing my job or whatever we were

6     talking about.

7                     And she became completely

8     unhinged, which wasn't like her because

9     she's really more of the angry,

10    aggressive alpha person.  And she was

11    like unhinged and crying and saying how

12    she was worried about her job, they're

13    always coming at her that she didn't do

14    this and she didn't do that and she

15    felt like I was persecuting her and

16    harassing her.  And I don't know.  I

17    think I might have said Matt said this.

18                    And then she told me the

19    story of what had happened in Israel,

20    that they were on the couch or whatever

21    and I think he stuck his foot under her

22    butt and then it just escalated to

23    where he was angry and yelling about

24    wanting a blow job and calling Leah.



```
 1                     And she had said that she
 2         was so scared that she went into the
 3         bedroom and locked -- she took a knife
 4         from the kitchen and went into --
 5         because he's a bigger guy and I guess
 6         he was angry and screaming and he
 7         usually tries to make you fearful of
 8         him anyway.
 9                     So she took a knife and she
10         said she went into the bedroom, put the
11         knife under her pillow and that she was
12         texting her husband and Tricia and
13         telling them what was happening and
14         that she was scared.
15                     And she said to me that she
16         didn't want to say anything.  She said
17         I don't want to tell anybody.
18                     And I was like look -- and
19         at that point there was a big shift in
20         our relationship because now I am like
21         the HR person and I know it's my job
22         that I can't not say anything because
23         then I'm not doing my job and that
24         could hurt the Forum.
```



1              So I told her just take a

2     breath.  I was like let's go to work.

3     I was like you do your thing.  I'm

4     going to do my thing and just take the

5     day and think or whatever.

6              And I think we had talked on

7     the phone that night and I said Daniel

8     Pipes needs to know that this is

9     happening because it's not the first

10    time that he's been accused of it.  He

11    needs to know that it's happening and

12    I'm going to report it to him.

13       Q.   Your testimony is that the two

14    of you didn't agree to report it to

15    Dr. Pipes until that evening of October

16    31st?

17       A.   It wasn't really an agreement.

18    She had told me she didn't want to

19    report it and then that evening I let

20    her know that I was going to report it.

21              MS. SHIKUNOV:  Hold on.  Can

22    we go off for a minute, please?

23              MS. DIBIANCA:  Yes.

24              THE VIDEOGRAPHER:  Going off



```
1     the record at 11:43.

2                 (A brief recess was taken.)

3                 THE VIDEOGRAPHER:  We are

4     back on the record at 11:50 Eastern

5     Time.

6                 MS. DIBIANCA:  We're back

7     after that brief break.  Sorry about

8     that.

9                 All right.  So I'm trying to

10    think.

11                Actually, Kurt, could you

12    just remind us where we left off, just

13    a couple of sentences or two?

14                THE COURT REPORTER:

15    Certainly.

16                (The reporter read back the

17    last question and answer).

18                MS. DIBIANCA:  Terrific.

19    Thanks so much.

20    BY MS. DIBIANCA:

21       Q.  So on the bench outside of

22    Starbucks when you and Ms. Barbounis

23    had this conversation and she became,

24    in your words, unhinged, did you tell
```



1     her at that time that as HR you had an

2     obligation to report anything that was

3     or could be inappropriate?

4         A.   I believe so.  I don't remember.

5     But she was just so upset and scared

6     that I just wanted her to calm down and

7     I honestly was shocked.  I mean I'm not

8     a certified HR person and they knew

9     that.  So this was something that I had

10    never dealt with and I wanted to make

11    sure that I handled it the way I was

12    supposed to, but I just wanted her to

13    calm down too.  And I think I just

14    needed a minute to take it all in and

15    figure out what I was supposed to do.

16        Q.   And when did you decide what you

17    were supposed to do?

18        A.   And what?

19        Q.   When did you decide what you

20    were supposed to do?

21        A.   I went home and I just -- it was

22    Halloween so like my kids were out and

23    everything.  I think it was Halloween.

24    It was right around there.  And I --



1    oh, yeah.  Okay.  So that was

2    Halloween.

3                And I was busy that night or

4    whatever, so I just was like putting it

5    aside and then, you know, I was

6    thinking on it and thinking about

7    everything.  And I said that, you know,

8    it needs to be reported so that's what

9    I did.

10     Q.   Didn't you tell Ms. O'Brien --

11    I'm so sorry.

12                Didn't you tell

13    Ms. Barbounis after you left the park

14    bench that the other people in the

15    office were going to ask you what you

16    talked about and you needed to come up

17    with an agreed-upon story?

18     A.   I didn't -- I think everyone in

19    the office knew that this happened.  I

20    did not want Gregg to get wind of what

21    was happening.  His sister worked in

22    the office as well and he would send

23    her around to see who was at their

24    desks and just I always felt like she



1    was kind of creeping on everybody to

2    give him information.

3              There was a situation with

4    two women who were unhappy with him and

5    they never reported anything to me.

6    They took it upon themselves to meet

7    and they were like, it was like they

8    were conspiring against Gregg.  And

9    that's what he said that they were

10   doing.

11             And then they were like, it

12   did come out that they were taking

13   stuff.  I didn't want her and I to come

14   off like we were conspiring.  I didn't

15   want there to be gossip.  I didn't know

16   that everybody had already known this

17   and the only one that pretty much

18   didn't know it was me.

19             So I just wanted to keep

20   separate while I figured out what to do

21   because I was scared.

22        Q.   And the two women were named

23   Lara and Laura, correct?

24        A.   Yes.



1        Q.   So do you recall sending a

2    message to Ms. Barbounis shortly after

3    your meeting on the park bench telling

4    her they're going to ask what we talked

5    about?

6        A.   I don't, but I think I probably

7    did.  I was very nervous.  I didn't

8    want, again I didn't want to seem like

9    Lara and Laura, like all of a sudden

10   like we were making stuff up about

11   Gregg.  Like it was a real, real

12   problem.

13            And I was nervous and didn't

14   want -- it's a small office and you say

15   oh, don't tell anyone and then everyone

16   in the office knows.

17       Q.   Did you tell her that -- didn't

18   you tell Ms. Barbounis right after your

19   meeting on the park bench that the two

20   of you should if asked should say that

21   you discussed your similar

22   personalities and how you needed to

23   respect each other's space?

24       A.   And we did actually.

Marnie O'Brien - January 14, 2021                    131

```
 1        Q.   No, that's not my question.
 2             My question is limited to
 3     did you tell her that?
 4        A.   Yes.  Maybe.  I don't have the
 5     text in front of me so I can't see it.
 6        Q.   Well, do you recall telling,
 7     coming up with a story of what you
 8     thought Ms. Barbounis and you should
 9     tell others at the office about what
10     you discussed?
11        A.   I remember encouraging her to
12     keep this -- my intention was to keep
13     it quiet until we could figure out how
14     we were handling it.  Again, because
15     she said she didn't want -- she was
16     saying at that point that she did not
17     want to report it.
18             And I felt like it needed to
19     be reported, but at the same time I
20     didn't want to report it because it
21     was -- I was afraid.  So --
22        Q.   It was your job to report it
23     though, correct?  You are HR?
24        A.   I did.
```



WILCOX & FETZER
(302) 655-0477 | WWW.WILFET.COM

1        Q.   Okay.  Also that day you told

2   Ms. Barbounis that the two of you

3   needed to steer clear of each other

4   around everyone else, correct?

5        A.   She kept like talking to me,

6   like she was, she was -- I didn't want

7   to seem like we were buddy buddy at

8   that point.  I felt like I needed space

9   from her because of this as well.

10       Q.   I don't follow that at all.

11  Could you explain that?

12       A.   Well, I'm HR and she reported it

13  to me.  I didn't want it to seem like

14  all of a sudden I was like buddy buddy

15  with her and there was a conspiracy, is

16  what I was afraid of, oddly enough,

17  because that's what happened with Lara

18  and Laura and I did not want to repeat

19  that.

20            I wanted to figure out how I

21  wanted to handle it and I wanted to do

22  it and I didn't want office gossip.  I

23  didn't want Stacey reporting back to

24  them they're talking, they're talking,



1    dah-dah-dah.

2              I just was trying to --

3      Q.   Hide it?

4      A.   No, not hide it.  That's not

5    what I said.

6      Q.   You said to her that --

7      A.   What I said was I didn't want

8    everybody in the office to know and I

9    didn't want everybody in the office to

10   wonder why all of a sudden we had a big

11   secret.

12             I was trying to maintain

13   professionalism.

14     Q.   You said, quote, they need to

15   think we are at odds though; they are

16   trying to pit us against each other,

17   probably to get rid of us both.

18     A.   Yes.

19     Q.   Does that sounds like a

20   conspiracy?

21     A.   It sounds like I was nervous

22   about my job because I had knowledge

23   now that now I know why he would want

24   to get rid of me.

```
1        Q.   And that you were attempting to

2    have Ms. Barbounis go along with you to

3    hide your knowledge from the Forum,

4    correct?

5               MS. SHIKUNOV:  I'm going to

6    object to form.

7               This is a, first of all,

8    mischaracterization of text messages

9    that you're not presenting to the

10   witness.  You're asking --

11              MS. DIBIANCA:  I'll present

12   them.  Let me just put them up.

13              MS. SHIKUNOV:  Let me finish

14   my objection.  If you want to put them

15   up, you can put them up.

16              But also it's mis-

17   characterizing what she just said to

18   the point that you said you were hiding

19   it and she specifically said no and now

20   you're saying that she said that again.

21              That's my objection on the

22   record.

23              THE COURT REPORTER:  I'm

24   sorry.  I couldn't pick up all the
```



```
1     words you said.
2               MS. SHIKUNOV:  I was
3     clarifying I was done speaking for
4     Molly's sake so that we didn't speak
5     over one another because it's clunky.
6               MS. DIBIANCA:  What was the
7     last word, Erica?
8               MS. SHIKUNOV:  I said
9     clunky, awkward.
10              (A discussion was held off
11    the record)
12              MS. DIBIANCA:  Let's just go
13    back and we'll clarify so that your
14    counsel's objection -- let me try to
15    make that right.
16    BY MS. DIBIANCA:
17      Q.  So after the park bench, I'm
18    still talking October 31st, 2018,
19    following your conversation with
20    Ms. Barbounis that day, did you want
21    Ms. Barbounis to hide what you two had
22    discussed from the others at MEF?
23      A.  Keep it private?
24      Q.  Sure.
```



Marnie O'Brien - January 14, 2021                    136

```
 1        A.   Yes.
 2        Q.   And you wanted her to steer
 3   clear of you in the office, correct?
 4        A.   I did.
 5        Q.   And was that because you did not
 6   want people to suspect that the two of
 7   you had knowledge of something that the
 8   others did not have knowledge of?
 9        A.   Well, they all did have
10   knowledge of it actually.
11        Q.   At the time you did not know
12   that, correct?
13        A.   Yes.
14        Q.   Okay.  So I'm talking about at
15   that time on October 31st, 2018 you
16   wanted her to steer clear of you in the
17   office because you did not want her by
18   being around you to raise suspicions
19   with the others at MEF.  Is that
20   correct?
21        A.   I didn't want the entire office
22   to know that there was a potential,
23   more specifically Gregg's sister, to
24   know that there was the potential of
```



1     this claim being filed before I filed

2     it.

3         Q.   Okay.  And did you think that

4     they were trying to pit you and

5     Ms. Barbounis against one another?

6         A.   Who's "they"?

7         Q.   Did you think anyone at MEF was

8     trying to pit the two of you against

9     each other?

10        A.   Yes.

11        Q.   Who?

12        A.   Gregg Roman.

13        Q.   And who else?

14        A.   Possibly Matt Bennett, but

15    that's it.

16        Q.   Did you think they were trying

17    to get rid of you both, meaning you and

18    Ms. Barbounis?

19        A.   I after the quarterly meeting

20    where I had --

21        Q.   I have to interrupt.  I'm still

22    talking about just October 31st on

23    2018.  On that date did you think that

24    they were probably trying to get rid of



1     both you and Ms. Barbounis?

2        A.   I was going to explain that I

3     was fearful for that myself and now I

4     realized why they were trying to get

5     rid of her because after the quarterly

6     meeting and I guess me not agreeing to

7     go to Israel with him he became less of

8     like -- I was not his right hand

9     anymore.  It was all of a sudden it

10    shifted and Matt Bennett was like Matt

11    and him were having conversations and

12    it was like there was stuff going on

13    that I didn't know.  Like I was out of

14    the loop.  I noticed that all of a

15    sudden I was out of the loop.

16              And then I realized -- first

17    off, I thought all of what he was doing

18    was because he had a crush on me.  I

19    didn't realize that he was doing it to

20    everybody in the office.

21              So yes, I was fearful at

22    that point realizing he's gearing up to

23    get rid of her and I'm probably next,

24    so I was nervous.



Marnie O'Brien - January 14, 2021                    139

1       Q.   Do you remember the Pittsburgh

2    synagogue shooting?

3       A.   Yeah.

4       Q.   Do you remember that that was

5    just a few days before your meeting

6    with Ms. Barbounis?

7       A.   I don't remember the date of

8    that happening, but I do remember it.

9       Q.   Do you remember how Mr. Roman

10   reacted to that event?

11      A.   I do.  He was yelling that

12   nobody cared how he felt about it and

13   he was emotionally distraught.  And

14   then he wrote an article and prior to

15   that every time he wrote an article he

16   would write, he would sign it, you

17   know, Gregg Roman, director of MEF and

18   that article was signed Gregg Roman,

19   former director of blah, blah, blah

20   Pittsburgh.

21      Q.   You're saying it with a very

22   cavalier tone in your voice.

23           Are you making light of the

24   tragedy that occurred in Pittsburgh?



1       A.   Of the tragedy?  No, I'm not

2    making light of a tragedy.

3             What I'm saying is his

4    response was that he was trying to get

5    attention for himself from it.

6       Q.   Oh, so you're disputing his

7    grieving of that?

8             MS. SHIKUNOV:  I'm going to

9    object to that as argumentative.

10            But you can answer.

11            MS. DIBIANCA:  That's fine.

12      A.   I don't remember him grieving.

13      Q.   And you knew at the time,

14   October 31st, 2018, that just a few

15   days before Ms. Barbounis had engaged

16   in an extramarital affair, correct?

17      A.   I don't -- I knew that she

18   engaged in extramarital affairs.  I

19   think she had told her husband that she

20   didn't want to be married anymore.  So

21   my understanding of that was more that

22   they were taking a break from their

23   marriage as opposed to that being an

24   extramarital affair, but I don't



1    remember who it was with or anything.

2        Q.    If I said it was with Danny

3    Tommo, would that help you recall?

4        A.    Okay.

5        Q.    Yes?

6        A.    Yeah.

7        A.    I do know that she had a

8    relationship with him.

9        Q.    You testified earlier that Matt

10   Bennett, quote, alluded, quote, to

11   something happening in Israel.

12              What do you mean he alluded

13   to it?

14       A.    That Gregg was inappropriate.

15       Q.    And when did he make such an

16   allusion?

17       A.    When I spoke to him the night

18   before I had coffee with her.  That was

19   the first time I had ever heard of it

20   since I kind of got that inkling

21   before.

22       Q.    And the inkling you got was

23   because of what?

24       A.    When they got back from the trip



1    they were awkward around each other and

2    he had made that comment and she had

3    made the comment about the shit he

4    pulled in Israel.

5        Q.   The shitty what in Israel?

6        A.   The shit he pulled in Israel.

7        Q.   Okay.  Sorry.  I thought you

8    used a noun.

9             And as HR director you

10   didn't follow up with Mr. Bennett about

11   that, what you felt he was alluding to?

12       A.   No.  Because I talked with her

13   about it the next day.

14       Q.   But I'm talking about during

15   your call with Mr. Bennett on the

16   evening of October 30th you just let it

17   go?

18       A.   I mean he said don't say

19   anything, don't say anything, don't say

20   anything.

21             I didn't let it go.  I met

22   with her the next morning and discussed

23   it.

24       Q.   Well, when you say alluded to,



1     what do you mean by alluded?

2         A.   He said that he was hit on her

3     in Israel or something happened in

4     Israel.  I think that's what he said.

5     Something happened in Israel between

6     the two of them is what he said,

7     something along those lines.

8         Q.   And you didn't follow up with

9     him during that call to say what do you

10    mean, Matt?

11        A.   Yeah.

12             MS. SHIKUNOV:  I object to

13    form.  That's asked and answered.

14        A.   I did.

15             MS. SHIKUNOV:  She just said

16    three times now that she met with Lisa

17    Barbounis and discussed it with her the

18    next morning.

19        Q.   My question was:  You didn't

20    follow up with Mr. Bennett during the

21    call with Mr. Bennett?

22        A.   I did.  I'm sure I was asking

23    him questions and he just was saying I

24    don't know, I don't know, like ask Lisa



1      or whatever.

2         Q.   But you don't have a specific

3      recollection of that or you do?

4         A.   I do.  I mean I wouldn't have

5      him tell me something like that and

6      then not even ask one question about

7      it.

8         Q.   Okay.  Let's return to your

9      charge, please.  We'll go to the third

10     page of it.  This is Exhibit 1.

11              "As a result of

12     Ms. O'Brien's letter," I don't know

13     that we talked about that so let's go

14     back to page 2.  The last sentence on

15     page 2 says "She notified Dr. Pipes."

16     I'm sorry.  Let me go backwards.  I

17     apologize.

18              "Upon hearing this

19     information on November 1st, 2018,

20     Ms. O'Brien wrote a letter to Daniel

21     Pipes, respondent's president, to

22     address how Mr. Roman came onto her

23     when they went to dinner, how Mr. Roman

24     tried sleeping with Ms. Barbounis and



1      how Mr. Roman slept with Ms. Merville,

2      a young, female intern, when she went

3      to Israel."

4              So let's take that piece by

5      piece.  Is it correct to say that on

6      November 1st, 2018 you wrote a letter

7      to Dr. Pipes?

8      A.   Yes.

9      Q.   You gave it to him on November

10     1st or you wrote it on November 1st?

11     A.   I wrote it that morning.  Let me

12     look.  Let me think.

13             Yeah.  Because I slept on it

14     and I went in the office and I wrote

15     it.  I wanted to report it, but Gregg

16     had access to my computer.  There were

17     many times where my mouse would just

18     jump across or there were times where I

19     felt like he was on while I was on.

20             There were other times where

21     I know that he went into my computer

22     when I wasn't there and had been

23     through my social media that I left

24     opened on there so --



```
1           Q.   How do you know that?

2           A.   Well, one day he asked me to get

3      office chairs because we had really bad

4      office chairs.  So he sent me this ad

5      and said there were all these like --

6      he saw it on Facebook, he got it on his

7      Facebook.  All these office chairs that

8      were needed came up on his Facebook

9      Marketplace.

10               Facebook Marketplace puts

11     stuff in your area and the ad that he

12     had was like near me.  Like he

13     shouldn't have been getting ads from my

14     area.

15               He made it known that he was

16     able to get information, that he was

17     able to hack into people's computers

18     and phones.  There was a widespread

19     sense of paranoia about social or your

20     personal information and the fact that

21     he bragged about being able to get to

22     it if he wanted to.

23               He also would go through I

24     think my -- he had the ability and the
```



1       right to go through my work e-mail.
2       And he would do that and he would give
3       me a hard time more than once if I was
4       having any kind of correspondence with
5       Daniel without his knowing about it.
6       He did not want me corresponding with
7       Daniel at all unless he knew about it.
8       And he was always going, you know, into
9       my -- I felt like he was always going
10      into my e-mail and stuff.
11              So I was afraid to put it on
12      my computer because I didn't want him
13      to see it.  I didn't want him to know.
14      I was like really scared.  Again, I'm
15      HR, but this is like way above what I
16      had ever dealt with so I was really
17      trying to be mindful to handle it
18      properly.
19              So I ended up writing the
20      note, writing everything down, and I
21      was trying to give him a really clear
22      picture of all the shenanigans that
23      were going on there because he was so
24      far removed from it he just didn't seem



1      to care about it.

2              So I wrote it down by hand

3      and then I took pictures of it and I

4      sent it to him and Marc I think through

5      telegram, but then they weren't able to

6      read it.  So then my next thing was I

7      did it in my phone, I took the pictures

8      and I sent them from my personal gmail

9      to Marc's and Daniel's personal gmail.

10     Q.   You don't have any actual

11     knowledge of Mr. Roman accessing your

12     computer without your knowledge,

13     correct?

14     A.    No.  He -- no.

15     Q.   Those are your suspicions,

16     correct?

17     A.    Yes.

18     Q.   When you say you sent it, you

19     sent the pictures of the handwritten

20     complaint to him, you mean Dr. Pipes,

21     correct?

22     A.   Dr. Pipes and Marc Fink.

23     Q.   Okay.  You said the word "he" so

24     I just want to make sure we get a clear



```
1     record.
2              Have you reviewed that
3     handwritten complaint in preparation
4     for today?
5       A.   No.
6       Q.   What did you review in
7     preparation for today?
8       A.   I don't know.  Just trying to
9     remember --
10             MS. SHIKUNOV:  She's asking
11    you specifically documents you
12    reviewed.  Don't tell her about
13    conversations that we had.
14      A.   Oh, documents?  I guess we
15    looked at the charges.  I don't know
16    that we looked at any specific
17    documents.
18      Q.   All right.  So you handwrote
19    your complaint.  Did you put everything
20    in that handwritten complaint that you
21    were aware of?
22             Was it a complete recitation
23    of the issues?
24      A.   No.
```



Marnie O'Brien - January 14, 2021                    150

```
1         Q.   Why not?
2         A.   What I put took six pages.  I
3    didn't, I didn't put down every
4    occurrence of every little thing that
5    happened.  I tried to give him a good
6    overview of what was happening.
7         Q.   "Him" meaning Dr. Pipes?
8         A.   Dr. Pipes, yes.
9         Q.   And you gave it to Dr. Pipes and
10   Mr. Fink on November 1st, 2018.  And
11   then what was the next -- let me ask
12   you this:  Did Lisa review the document
13   before you sent it to them?
14        A.   I did let her read it.  She was
15   terrified and I think Gregg was
16   painting a picture of her.  He actually
17   said to me one day what do you think of
18   her?  Stacey think she's crazy.  Do you
19   think she's crazy?
20             So that was kind of the
21   narrative I think that he was trying to
22   run or create.  And I think she was
23   afraid that -- you know, she didn't
24   really trust me.  She didn't trust me
```



```
1     100 percent.  She was afraid I think
2     maybe that I would, you know, turn the
3     tables and present it a different way
4     and that she was going to get fired.
5     She didn't trust me at all.
6                So I did let her read it.  I
7     didn't change a thing on it.  I didn't
8     add anything to it.  It went as I wrote
9     it.
10    Q.   Do you know that Ms. Barbounis
11    recorded a telephone call without your
12    knowledge?
13    A.   I do know that now, yeah.
14    Q.   Do you think Ms. Barbounis is
15    crazy?
16    A.   No.
17    Q.   Do you think she's stable?
18    A.   I'm not -- she seems fine.  She
19    seems high-strung.
20    Q.   Is it fair to say that you
21    coached Ms. Barbounis with regard to
22    what she should or should not say to
23    Dr. Pipes after --
24    A.   There's no --
```



1          Q.   I've got to finish my question.

2     All right?

3                    Is it fair to say that you

4     coached Ms. Barbounis on what she

5     should or should not say to Dr. Pipes

6     after the complaint was submitted on

7     November 1st, 2018?

8          A.   I don't know.  I may have made

9     recommendations to her because she

10    flies off the handle, but I doubt she

11    listened to them.

12         Q.   Okay.  What happened after you

13    submitted the complaint to Dr. Pipes?

14         A.   I think he came in later that

15    day and he went around and interviewed

16    everybody separately and asked them,

17    you know, what happened, their

18    experiences I guess with Gregg, if they

19    knew anything, if they experienced

20    anything and then he left.

21                    Originally I think he said

22    that he was going to tell them not to

23    do that anymore and then he must have

24    like researched or maybe he talked to



1    somebody and he started to take it more

2    seriously at that point.

3       Q.   So is it correct to say that

4    Dr. Pipes interviewed each of the

5    employees in the Forum, that worked in

6    the office after he received the

7    complaint?

8       A.   Yes.

9       Q.   Did that include you?

10      A.   I believe, but I mean we had

11   spoken.  I don't know if he maybe

12   called -- yeah, it did.

13      Q.   Did you tell him that there were

14   other things of concern to you outside

15   of the five pages or six pages that you

16   submitted?

17      A.   I don't recall.  I think we were

18   probably focusing on what was written

19   there at that point.

20      Q.   At that time did you tell Matt

21   Ebert what was going on?

22      A.   No.

23      Q.   When did you first tell

24   Mr. Ebert about the situation at work?



1        A.    I don't know exactly.   I mean I

2     think at one point I was talking with a

3     friend on the phone and he maybe asked

4     me a question and then I, you know, may

5     have answered it.   And he overheard I

6     guess some of what I was saying and

7     maybe kind of got the gist that there

8     was something going on and I just said

9     I have an issue at work or whatever.

10              But I was -- you know, I had

11    just been dating him, I guess.   Do you

12    know what I mean?   So I didn't say too

13    much to him early on and I certainly

14    didn't confide in him for help with it

15    or anything.

16       Q.    You had been dating him for six

17    months at that point, right?

18       A.    Yeah.

19       Q.    According to the complaint.   So

20    did a time come that you eventually did

21    tell Mr. Ebert about the issues you

22    were having at work?

23       A.    Wait.   I didn't start dating him

24    until 2019.



1        Q.   Okay.

2        A.   I wasn't dating him at the time

3     that this was all happening.

4        Q.   Okay.  And so Daniel Pipes spoke

5     with the individuals in the office and

6     then what happened?

7        A.   I said that he said that he was

8     going to tell Gregg not to do that

9     anymore.  And then he must have had,

10    you know, conferred with somebody and

11    decided to take it more seriously and

12    then he called a meeting.

13       Q.   What was he going to tell Gregg

14    not to do anymore?

15       A.   I guess be sexually harassing

16    people.

17       Q.   You're going to have to explain

18    that to me.

19       A.   That is what he said.  I think

20    he actually said it to Lisa.  So I gave

21    him the complaint written with all of

22    that stuff in it and he went around and

23    interviewed everybody and he said he

24    was going to tell Gregg to act right.



1      I don't know.  He said he was going to

2      have a talk with him.

3          Q.   And he told Lisa that, correct?

4          A.   I believe, yeah.

5          Q.   And then you said he called a

6      meeting.

7          A.   Yes.

8          Q.   So Dr. Pipes called a meeting.

9      When was the meeting held, who was

10     there and what happened?

11         A.   The meeting was on --

12         Q.   I'm sorry to interrupt.  But

13     what document are you looking at right

14     now?

15         A.   The charges.

16         Q.   Okay.

17         A.   Because I wanted to be sure of

18     the dates because I don't know them off

19     the top of my head.

20         Q.   That's fine.  Feel free to refer

21     to it at any time.

22         A.   November 5th he called a staff

23     meeting and it was just the office

24     people and Marc.  So Marc was invited,



1      Matt, me, Lisa, Tricia, Caitriona,

2      Delaney, Stacey, Gregg's sister, and

3      Thelma.

4         Q.   And Stacey Roman was an employee

5      of the Forum at that time, correct?

6         A.   Yes.

7         Q.   So Mr. Roman did not attend,

8      correct?

9         A.   No.  He was supposed to and then

10     Daniel told him he didn't want him

11     there.

12        Q.   What do you mean he was supposed

13     to?

14        A.   Originally I was told that he

15     was inviting Gregg to attend and then I

16     was told later that he didn't want him

17     to attend.

18        Q.   Dr. Pipes told you that or that

19     was in an e-mail?

20        A.   I don't know.  Maybe it was in

21     an e-mail, but I learned that he

22     wouldn't be attending.

23        Q.   As an HR professional do you

24     think it was appropriate for Mr. Roman



```
1    to not be present at that meeting?
2      A.   At that point -- so, again, I
3    said that I wasn't certified in HR and
4    this was all above my head.  And at
5    that point Marc was the one, you know,
6    he has had experience in this.  And so
7    I was no longer -- he was the one
8    handling it at that point.
9      Q.   Okay.  But my question is at the
10   time was it your opinion that Mr. Roman
11   should have attended?
12     A.   I thought it was weird that he
13   wasn't but, again, Marc and Daniel took
14   it out of my hands.  I wasn't consulted
15   about who should attend or what I
16   thought.  I was told to be there.
17     Q.   Were you upset that you weren't
18   consulted?
19     A.   I just thought that because I
20   had shared my experiences that they
21   probably were taking me away from it,
22   but no, I wasn't upset.  I wanted Marc
23   to be involved.  That's why I cc'd him.
24     Q.   And you wanted him to be
```



```
1      involved because you thought it would

2      be handled with seriousness, correct?

3        A.   Correct.

4        Q.   You say you're not certified in

5      HR.  Does that mean that you're not

6      competent in HR?

7        A.   I'm not competent?  No.  It

8      means that I don't have certifications.

9      I have experience, but I don't have a

10     certification in it.

11       Q.   But you're qualified as an HR

12     person, in other words?

13       A.   They seemed to think so.  They

14     hired me.

15       Q.   You represented to them that you

16     were, didn't you?

17       A.   I think I did a lot there to

18     create the foundation of an HR

19     department that they did not have prior

20     to that so --

21       Q.   Didn't your cover letter

22     specifically say that you had

23     significant HR experience?

24       A.   I did.  And I do.
```



1      Q.   At the time you were hired you

2   represented to the Forum that you were

3   a qualified HR professional, correct?

4      A.   When we had our discussions they

5   knew that I did not have

6   certifications.  I --

7      Q.   Certification is not what I'm

8   asking.

9           I'm asking whether you were

10   qualified, whether you had enough

11   experience and background as an HR

12   professional to perform the duties of

13   an HR professional.

14           Did you or did you not tell

15   them that?

16           MS. SHIKUNOV:  I would just

17   ask that the witness be permitted to

18   complete her answer in full before the

19   next question comes.

20           But with that, Marnie, you

21   can answer the question.

22      A.   I told them that I had

23   experience in HR, that I helped create

24   an HR department foundation where I had



1       worked before, that I did onboarding

2       and offboarding.  I did do sexual

3       harassment trainings and I did like

4       performance reports and initiated and

5       implemented those practices.

6                   And they said that that is

7       what they wanted as well.

8           Q.  Did you ever tell MEF that you

9       were not qualified to handle HR duties?

10          A.   I believe I may have said that

11      this was out of my wheelhouse and then

12      I presented it to them.

13          Q.  Were you competent to handle HR

14      duties?

15          A.   I felt like I handled it exactly

16      like I was supposed to.

17                  MS. SHIKUNOV:  Molly, it

18      doesn't have to be right this minute

19      but at some point can we take like a

20      longer break for lunch?

21                  MS. DIBIANCA:  Yes.  We

22      definitely can.  Let me get through the

23      meeting, the meeting we're about to

24      talk about, and then we can break, if



```
 1      that works.
 2                 MS. SHIKUNOV:  Okay.
 3      BY MS. DIBIANCA:
 4        Q.   So, Ms. O'Brien, at the meeting
 5      you've described this would have been
 6      November -- I'm sorry.  Was it the 1st
 7      or the 5th?
 8        A.   I think it was the 5th.
 9        Q.   Okay.  You already identified
10      who was present for the meeting.  Who
11      led the meeting, who spoke?
12        A.   Daniel.
13        Q.   And what did he say?
14        A.   Gosh, I don't remember any exact
15      words or anything like that, but he
16      felt that I guess upon speaking with
17      everyone and what was presented to him
18      that he felt that Gregg behaved poorly
19      and that he was going to remove him
20      from the office and that he would, you
21      know, not -- I can't remember if it was
22      then that he laid down like what he was
23      going to do or if it was in an e-mail.
24                 And I kind of think he may
```



1      have just like wanted to know

2      everybody's story.  We were all talking

3      about it, I guess, what happened, and

4      everybody really didn't say too much.

5      Matt Bennett, who had been very verbal

6      prior to that about an anti-Gregg and

7      not feeling that he was a good

8      executive director, he was very verbal

9      about that.  He was very verbal about

10     the way that he felt he treated people

11     poorly and the stories that he had told

12     that he said he knew he didn't say

13     anything in front of Stacey.  And I

14     think everybody was kind of hesitant to

15     say anything in front of Stacey because

16     it was her brother.

17               So he just had the meeting

18     and everybody kind of told their

19     stories.  And then I think he followed

20     up with an e-mail.  I don't think he

21     decided then how he was handling it,

22     but he just took that and went.

23               And then he came back later

24     with an e-mail to everyone telling them



1    what he was going to do.

2        Q.  Did everyone who wanted the

3    opportunity to speak, was everyone

4    given an opportunity to speak who

5    wanted to speak at that meeting?

6        A.  They were.  Again, I think that

7    everybody probably didn't say as much

8    as they would have if Stacey wasn't

9    there.

10       Q.  And why do you think that?  Did

11   anyone say that or imply that?

12       A.  Yes.  Everyone was uncomfortable

13   to talk about, to say too much about

14   what he did.  You know, he's married.

15   He has kids.  That's her brother and

16   sister-in-law.  I think everybody was

17   uncomfortable with that.

18       Q.  You say everybody was

19   uncomfortable you think.  Did anyone

20   tell you --

21       A.  I was and I know that other

22   people had mentioned that they didn't

23   say everything that they might have

24   said if she wasn't there.  And I know



1      everybody mentioned that they were kind

2      of confused by how quiet Matt was.

3          Q.   And you say "everybody."  Do you

4      mean that literally, that every person

5      other than Daniel Pipes and Marc Fink

6      told you after the meeting that they

7      were not comfortable?

8          A.   Probably not Thelma.

9          Q.   Mr. Bennett?

10         A.   Oh, no.  Actually, Lisa told him

11     he was a pussy and he didn't say

12     anything, you know, he didn't talk and

13     say what he should have said.  And she

14     said that in front of everybody.

15         Q.   How does that get us to him

16     saying that he didn't say anything, say

17     more because of Stacey?

18         A.   I didn't say that he said that.

19     I said that we felt that we didn't say

20     anything and everybody commented how

21     Matt didn't say anything.

22         Q.   Okay.  So when you say

23     "everybody," give me the names of the

24     people who told you that they did not



1    feel comfortable speaking out during

2    the meeting because of the presence of

3    Stacey Roman.

4              Identify those people for

5    me, please.

6        A.   I know, I believe it was like

7    discussed by a group of us after the

8    meeting and it was like in the office

9    afterwards.  I think Stacey left

10   directly after and everybody was kind

11   of like oh, it was weird with Stacey

12   being there; I didn't want to say

13   anything to upset her.

14             MS. SHIKUNOV:  Give her

15   names.  She's asking you for names.

16       A.   Caitriona, Delaney, Tricia,

17   Lisa, probably not Thelma because

18   Thelma just, she doesn't like drama and

19   she stays out of it and she doesn't

20   want to be a part of it it seemed.  But

21   no, Matt didn't say that.  Everybody --

22   Lisa told him he was a pussy because he

23   didn't, you know, say everything that

24   he said he was going to say.



1       Q.   What do you mean everything he

2    said he was going to say?

3       A.   Well, he was talking to Daniel a

4    lot.  As soon as, as soon as this

5    happened, I think Daniel had called

6    Matt and I into his office or whatever

7    and Matt was on the edge of his seat.

8    He was gunning for Gregg's job from the

9    get, from that minute, on the edge of

10   the seat, Daniel, whatever you need,

11   whatever you need, Daniel, whatever you

12   need I'll help you, I got it, I got

13   this, Daniel, don't worry about it, I

14   got this, dah-dah-dah.

15      Q.   Slow down.

16      A.   What?

17      Q.   Slow down because the court

18   reporter can't get it when you go that

19   fast.

20           THE COURT REPORTER:  Agreed.

21      Q.   So the meeting where you got a

22   whole lot of things getting jumbled

23   together now in my mind, so you said

24   that -- did any of the women tell you



```
1      directly hey, Marnie, I was not
2      comfortable sharing but I had more to
3      share?
4         A.   They said they were
5      uncomfortable talking about anything in
6      front of Stacey.
7         Q.   Okay.  And did you say to them
8      well, look, I gave Dr. Pipes the prior
9      complaint, so go ahead and tell me what
10     the complaint is and I'll convey it to
11     Dr. Pipes?
12        A.   No.  Because at that point I
13     felt like I had been removed from the
14     HR component because Marc Fink was
15     handling it.  Marc was reaching out to
16     everybody.  Marc was sending an e-mail
17     that said what are your needs?  Like do
18     you have -- like he was reaching out to
19     people and Daniel was reaching out to
20     people.
21              So no, I mean I didn't.  I
22     don't think I did.
23        Q.   Did you think that any employee
24     had an issue that had not been
```



```
 1    addressed in the meeting on November
 2    5th?
 3         A.   Do I think that every employee
 4    brought up every single thing that
 5    Gregg ever said or did to them during
 6    that meeting?  No.  It wasn't long
 7    enough.
 8         Q.   Every material thing?
 9         A.   I wouldn't know.  They can only
10    tell that.
11         Q.   You're saying that they told
12    you that they --
13         A.   They told me that they did not
14    feel comfortable speaking freely in
15    front of Stacey.  That's what they told
16    me.
17         Q.   Okay.  And by "they" you mean
18    the people you've already identified by
19    name, correct?
20         A.   Yes.
21         Q.   And then you talked about a
22    meeting with Matt Bennett and
23    Dr. Pipes.  When did that occur and
24    yourself?
```



```
1          A.   I'm not sure.  It might have
2     been the day that he came in to talk to
3     everybody.  It might have been after
4     that.  It was, you know, in the days
5     following everything.
6          Q.   And what was the purpose of that
7     meeting?
8          A.   Well, Daniel was very removed
9     from anything office related.  So now
10    with all of these allegations he was
11    probably trying to figure out what to
12    do because the daily operations were
13    going to be affected.
14              So I can't tell you exactly
15    why we were meeting with him but, you
16    know, he was trying to figure out what
17    to do and he and I were helping him.
18         Q.   "He" meaning Daniel Pipes was
19    trying to figure out what to do and you
20    and Matt Bennett were helping him?
21         A.   Yes.
22         Q.   Okay.
23         A.   He asked for mine and Matt
24    Bennett's help, I guess, or maybe he
```



1    didn't specifically say I need you to

2    help me but was asking us questions and

3    trying to I guess figure out what

4    needed to be done.

5        Q.   At that meeting where it was

6    you, Dr. Pipes and Mr. Bennett, did you

7    tell Dr. Pipes that you felt that

8    employees had refrained from sharing

9    everything with him because of the

10   presence of Stacey Roman at the

11   November 5th meeting?

12       A.   I may have.  I'm pretty sure I

13   mentioned more than once how

14   uncomfortable I was with Stacey and

15   that I'm pretty sure Matt said it too,

16   that you just didn't want to say

17   anything to upset her.

18       Q.   Didn't everyone at the meeting

19   share something?  The November 5th

20   meeting I'm referring to.

21       A.   I'm not sure.

22       Q.   Following the meeting on

23   November 5th is it correct that

24   Dr. Pipes announced that Mr. Roman



1    would no longer be returning to the

2    office?

3       A.   Yes.

4              NS, DIBIANCA: Erica, I'm

5    going to do a few more but not many, so

6    you don't think I forgot again.

7              MS. SHIKUNOV:  All right.  I

8    get hangry.

9              MS. DIBIANCA:  Me too.

10   BY MS. DIBIANCA:

11      Q.   Now, Dr. Pipes also informed

12   Mr. Roman that Mr. Roman would no

13   longer be running the administration of

14   the Forum, correct?

15      A.   That's my understanding.

16      Q.   And Dr. Pipes, effective

17   November 5, 2018 Dr. Pipes also imposed

18   certain restrictions on Mr. Roman's

19   activities, didn't he?

20      A.   What do you mean "activities"?

21      Q.   For example, Mr. Roman was to

22   have no involvement in the approval of

23   expenses or initiatives?

24      A.   Yes.



1       Q.   Mr. Roman was to have no

2    involvement in the hiring or firing of

3    employees, including project directors,

4    correct?

5       A.   I believe.  He was not supposed

6    to have any supervisory role over staff

7    members.

8       Q.   No authority over administrative

9    staff, correct?

10      A.   Or any staff, hiring, anything.

11      Q.   Okay.  Mr. Roman was also

12   instructed to not offer or approve

13   contracts on behalf of the Forum,

14   correct?

15      A.   I believe so, yeah.

16      Q.   And he was instructed to not

17   have involvement in the Forum's

18   accounting, finances, office affairs

19   and personnel issues and property

20   management, correct?

21      A.   I believe so.  As far as the

22   accounting went, I didn't want him to

23   have access to my work product.  So I

24   think, you know, it might have been



1    that for the accounting issues.

2              But we shared passwords and

3    there was a lot of money, investments

4    and whatchamacallit, you know, just in

5    the bank accounts that I didn't want

6    anything to happen to because I was

7    afraid he would do something to make it

8    look like I stole or that I, you know,

9    did something wrong.

10             So I didn't want him having

11   access to my work product.

12     Q.   And he was instructed by

13   Dr. Pipes, that authority was removed

14   from him after November 5th, correct?

15     A.   Yes.

16     Q.   And he was also instructed that

17   he had no authority over the Forum's

18   education fund monies anymore, correct?

19     A.   Yes.  Well, he didn't really

20   have any -- Daniel had given him a

21   certain amount to allocate to

22   organizations and I think he revoked

23   that.

24     Q.   And Dr. Pipes also told



1          Mr. Roman that Mr. Roman was to no

2          longer have access, physical access to

3          the Philadelphia office, correct?

4          A.   I think he had to make -- he had

5          to request access to make sure that

6          basically there are no female staff

7          members there or if they were they were

8          comfortable with him being there.

9                    So I don't know.  He was

10         told to work remotely and I don't know

11         that he was never allowed back, but it

12         was more that he had to make sure that

13         I guess we were comfortable with him

14         being there.

15         Q.   And Dr. Pipes also instructed

16         Mr. Roman to not have contact with the

17         Forum's female employees outside of

18         business hours other than via Forum

19         e-mail, correct?

20         A.   Yes.

21         Q.   And Dr. Pipes also instructed

22         Mr. Roman that Mr. Roman was to, any

23         e-mails he sent must be business

24         related, correct?



```
1        A.   I'm sorry.  What?
2        Q.   Dr. Pipes also instructed
3   Mr. Roman that any e-mails Mr. Roman
4   sent to any employees at the Forum must
5   be business related, correct?
6        A.   I believe, yeah.
7        Q.   After November 5th, 2018 through
8   the end of your employment did you
9   personally observe Mr. Roman in the MEF
10  office?
11       A.   He did come back and it wasn't
12  like right away.  He I'm going to
13  say -- I know one time he came back to
14  pack up his office.  I didn't feel he
15  should be allowed to do that.  I felt
16  like we should just pack it up and send
17  it to him, but Daniel arranged for him
18  to come in and pack his things.
19       Q.   Were you there for that?
20       A.   No.
21       Q.   So my question was:  From
22  November 5th, 2018 through the end of
23  your employment at MEF, did you
24  personally observe Mr. Roman in the MEF
```



1    office?

2        A.   There was a point when it first

3    happened that he was not allowed in the

4    office and then he was given back I

5    guess some of his authority or tasks or

6    responsibilities.  So he then would

7    come into the office, but Daniel would

8    make sure that he gave -- the agreement

9    I think -- there was a new agreement.

10   There was an original agreement and

11   then there was a secondary agreement.

12   And I think after the secondary

13   agreement it was that he would come to

14   the office but he had to -- you know,

15   we had to be given notice to know that

16   he was coming or something like that.

17            So I did see him one time, I

18   think one time in the office.

19       Q.   To the best of your knowledge,

20   to the best of your recollection from

21   November 5, 2018 until the end of your

22   employment at MEF you personally

23   observed Mr. Roman in the office on one

24   occasion to the best of your



```
1    recollection.  Is that correct?
2        A.    Possibly two, but yes.
3        Q.    And at the time of the one or
4    possibly two instances were you
5    notified in advance that he would be in
6    there?
7        A.    I think so, yeah.  I mean I
8    think there was one time where I
9    thought he was going to be there and I
10   was like upset because I didn't know,
11   but then he ended up not coming or it
12   was misinformation or something.
13              But yeah, I think I knew he
14   was going to be there or whatever.
15       Q.    And so the one time that -- I'm
16   understanding your testimony now, just
17   so I'm clear, I'm understanding what
18   you're saying is that you do have a
19   specific recollection of him returning
20   to the workplace on one instance and on
21   that one instance you were notified in
22   advance.
23              Am I understanding your
24   testimony correctly?
```



```
1         A.    Yes.

2         Q.    Yes?

3         A.    Yes.

4         Q.    And during the one instance that

5    he did return to the office when you

6    were there and you had received

7    advanced notice, was there any issue

8    with Mr. Roman's behavior during that

9    visit?

10        A.    I didn't, I didn't like hang out

11   or sit in a meeting.  I stayed mostly

12   in my office.  I think he was -- I

13   think they were rehiring Gary Gamble

14   and they were having a meeting with

15   Gary and he walked around and was

16   introducing Gary to people and he just

17   walked right by my office and didn't

18   introduce me.

19        Q.    So -- sorry.

20        A.    So no, I wouldn't have been able

21   to notice any behavior because I wasn't

22   around him.

23        Q.    So there was no -- you didn't

24   interact with him during that visit, is
```



1    that right, other than him -- I guess

2    did you interact with him at all during

3    that visit?

4      A.   I don't think so.  I don't

5    recall.

6      Q.   Okay.

7            MS. DIBIANCA:  All right.  I

8    drug it out long enough so let's go

9    ahead and take lunch.

10           We can go off the record.

11           THE VIDEOGRAPHER:  Going off

12   the record at 12:47.

13           (Recessed for lunch at 12:47

14   p.m.)

15            -  -  -  -  -

16           AFTERNOON SESSION

17              1:23 p.m.

18           THE VIDEOGRAPHER:  We are

19   back on the record at 1:23 p.m. Eastern

20   time.

21   BY MS. DIBIANCA:

22     Q.   Ms. O'Brien, after November 5,

23   2018 through the end of your employment

24   with the Middle East Forum, did you



1    ever have contact with Mr. Roman

2    outside of business hours?

3        A.   I don't believe so.

4                  There was one time when

5    there was an issue with Gary Gamble and

6    I think he texted, he might have texted

7    me.  I don't know.  But I think that

8    might have been one time.

9        Q.   Was it a problem?

10       A.   With his health insurance.

11       Q.   Was there any issue, did

12   anything inappropriate occur?

13       A.   I don't think so.  I think he

14   didn't have his card and I remember I

15   had sent it to him and Gregg was

16   looking for the card or something and

17   he asked me if he had it or whatever.

18                 And I resent, I sent it to

19   him.

20       Q.   So with regard to that

21   situation, there was nothing that

22   bothered you about Mr. Roman's conduct,

23   correct, as it relates to that

24   communication?



1          A.   I don't think so.  There was an

2      issue that had to be handled and it

3      seemed like it was important and it was

4      for an employee, so I don't remember

5      complaining about it.

6          Q.   Okay.  After November 5th, 2018

7      did Mr. Roman, and other than the

8      incident that you just discussed with

9      Mr. Gamble, did Mr. Roman ever text

10     you?

11         A.   I don't recall.

12         Q.   If he had, would you have

13     reported it to Dr. Pipes?

14         A.   I probably would have, yeah.

15         Q.   Because it would have --

16         A.   I don't recall if he texted me

17     or not.  I was instructed to work with

18     him.  So if I felt like it was a work

19     matter -- I don't recall.  If there is

20     an instance, show me and I'll tell you

21     if it bothered me or not.

22              But, you know, I do recall

23     that one thing and if he did contact me

24     it wasn't very often.



1        Q.   There was never a situation

2    after November 5th, 2018 where

3    Mr. Roman conducted himself

4    inappropriately with you.  Is that

5    correct?

6        A.   I don't believe so.

7        Q.   Okay.  I know that Mr. Roman was

8    involved in the Forum's audit at some

9    point, correct?

10       A.   Yes, he was.

11       Q.   Other than that audit, did

12   Mr. Roman after November 5, 2018 ever

13   again have involvement in the Forum's

14   accounting that you're aware of?

15       A.   I don't know.  I don't know.

16   While I was there I don't think so.

17       Q.   If he had, you would have

18   reported it to Dr. Pipes, correct?

19       A.   It was hard to report stuff to

20   him because there were a lot of things

21   that he said he wasn't going to have

22   access to or be doing.  It was said

23   that he wasn't going to be part of

24   hiring people, but then when they were



1    trying to hire somebody he was like the

2    one calling the shots and wanting,

3    telling Thelma to send him all the

4    e-mails, resumes so he could read them.

5             So his involvement was more

6    than it should have been, but it was

7    very small, it was little.  He'd come

8    back an inch at a time.  So the biggest

9    problem I had was when he was given

10   access to my work product.

11      Q.   Which is the audit, correct?

12      A.   Correct.

13      Q.   Did you answer?

14             MS. SHIKUNOV:  She said

15   correct.

16             MS. DIBIANCA:  Okay.  I

17   didn't hear her.

18   BY MS. DIBIANCA:

19      Q.   So just for the record, could

20   you say your answer, Ms. O'Brien, again

21   for me, please?

22      A.   I said that he --

23             MS. SHIKUNOV:  You just said

24   correct.



 1          A.   Correct.   Correct.

 2          Q.   So I'll just do it one more

 3     time.

 4               I believe your testimony was

 5     that your biggest problem was that he

 6     had access, "he" meaning Mr. Roman had

 7     access to your work product.  Is that

 8     correct?

 9          A.   Well, I complained other times

10     where he was becoming involved where I

11     thought that he wasn't going to be.

12     When he told -- when Dr. Pipes sent me

13     an e-mail telling me to basically shut

14     up and give Gregg the reports and that

15     Gregg would be taking care of the

16     audit, that was when I went to Erica

17     and --

18               MS. SHIKUNOV:  Don't talk

19     about what you talked to me about.

20          A.   That is when I decided I needed

21     help from Erica.

22          Q.   Okay.  After November 5, 2018

23     did you ever hear Mr. Roman make any

24     sexual comment?



```
 1        A.   I wasn't in his presence.
 2        Q.   I need you to give a yes or no
 3   to the question.
 4             So the question is:  After
 5   November 5th, 2018 did you ever observe
 6   Mr. Roman make a sexual comment?
 7        A.   No.
 8        Q.   After November 5, 2018 did any
 9   employee report to you in your capacity
10   as an HR manager that Mr. Roman had
11   made a sexual comment to that employee?
12        A.   I don't recall.
13        Q.   After November 5th, 2018 did
14   Mr. Roman ever make a sexual advance
15   towards you?
16        A.   No.
17        Q.   After November 5, 2018 that you
18   are aware of in your HR, in your
19   capacity as an HR manager, did
20   Mr. Roman make any advance, any sexual
21   advance toward any other employee, any
22   employee at MEF?
23        A.   Not that I know of.
24        Q.   After November 5th, 2018 did
```



```
 1        Mr. Roman contact you at times that
 2        were inappropriate in your opinion?
 3          A.    No.
 4          Q.    After November 5th, 2018 did
 5        Mr. Roman speak to you in a manner that
 6        you thought was inappropriate?
 7          A.    No.
 8          Q.    So is it correct to say that
 9        after November 5th, 2018 any concerns,
10        any and all concerns you had about --
11        I'll start over.
12                     After November 5th, 2018 is
13        it correct to say that any concerns you
14        had about Mr. Roman with regard to any
15        kind of sexual harassment did not
16        continue after November 5th, 2018?  Is
17        that correct?
18          A.    He never made a pass at me after
19        that.  There was a rumor that he
20        apparently started about me.
21          Q.    Okay.  Let's talk about that.
22          A.    I found out about it after
23        November 5th, 2018.  I'm not sure when
24        he started it.
```



1          Q.   Okay.  So we can jump to that

2     topic next.  That's fine.

3               In the interest of time, I'm

4     going to try to give you some yes or

5     no's here just because I'm worried of

6     not being able to get through my whole

7     outline.

8               So sometime after November

9     5th, 2018 is it correct to say that you

10    heard from a coworker about a rumor

11    that the coworker believed to have been

12    started about you?

13         A.   I'm sorry?  Can you say that

14    again.

15         Q.   Sure.  I'll say it in a better

16    way.

17              Did you hear at some point

18    that Mr. Roman had started a rumor

19    about you that was untrue?

20         A.   Yes.

21         Q.   And did you hear that after

22    November 5th, 2018?

23         A.   I heard it after that, but I

24    don't know when he started it.



1        Q.   Okay.   And the rumor, am I
2    correct to say that the rumor was that
3    you had slept with a Mr. Brady?
4        A.   My former employee.   He said
5    that I slept with him to get my
6    position at my job.
7        Q.   Your former employee or your
8    former employer?
9        A.   My former employer.
10       Q.   So the rumor was that you had
11   slept with your former employer in
12   order to get your job.   Is that
13   correct?
14       A.   Correct.
15       Q.   And who told you about the
16   rumor?
17       A.   Lisa told me that Gregg had told
18   her that and Tricia was there and
19   Tricia said that she had heard it from
20   Matt.
21       Q.   Okay.   When you say Tricia was
22   there, you mean Tricia was present when
23   Lisa told you that Lisa had heard Gregg
24   make that statement?   Is that correct?

1       A.   Yes.

2       Q.   And are you aware that

3   Ms. Barbounis has testified that the

4   rumor, she heard Gregg say that rumor

5   before November 2018?

6       A.   No, I didn't hear that.

7       Q.   Are you aware that there's an

8   e-mail from Ms. Barbounis to Dr. Pipes

9   in which he states that she heard the

10  rumor from Mr. Roman prior to November

11  5th, 2018?

12      A.   Yes.  I'm not aware.

13           Did you ask me if I was

14  aware of it?

15      Q.   I did.

16      A.   Okay.  No, I didn't know.

17      Q.   Do you have any reason to

18  believe that Mr. Roman initiated or

19  repeated that rumor after November 5th,

20  2018?

21      A.   I didn't know anything about it

22  until after and when I raised it I was

23  told that it wasn't going to be

24  addressed.



1      Q.   And why not?

2      A.   Because he had been good since

3    then.

4      Q.   Because it had occurred prior to

5    the time that his job duties had been

6    changed, correct?

7      A.   It was still something that he

8    did.  Yes.

9      Q.   Okay.  So I don't know that I

10   got a straight answer to my question so

11   let me just ask it again in case I

12   didn't.

13          So do you have any reason to

14   believe that Mr. Roman stated, repeated

15   or initiated the rumor at any time

16   after November 5th, 2018?

17     A.   I do not.

18     Q.   Other than Mr. Roman's

19   involvement in the audit, which I

20   promise to you that we are going to

21   talk about, other than that was there

22   anything that Mr. Roman did to which

23   you took offense after November 5th,

24   2018?



1       A.   I don't believe so.

2       Q.   All right.  Let's see.

3            Did you change any of your

4    Forum passwords to something along the

5    lines of fuck you Gregg?

6       A.   Yes.

7       Q.   When did you do that?

8       A.   Right after everything happened.

9       Q.   Right after what everything

10   happened?

11      A.   After I had to report him, after

12   all of this.

13      Q.   So sometime after October 31st,

14   2018?

15      A.   Yes.

16      Q.   And did you tell other people in

17   the workplace that you had done that?

18      A.   I don't think so, but some of

19   them needed my passwords, like Thelma

20   did.

21      Q.   Right.  So Thelma knew that you

22   had changed your password to that,

23   correct?

24      A.   Yes.  She was using it.



1      Q.   Was that the mature way to

2    handle that?

3      A.   I was angry and it was a

4    password so that's --

5      Q.   Was it the mature way to handle

6    it?

7            MS. SHIKUNOV:  I'm going to

8    object to that as argumentative.

9            But you can answer.

10     A.   Probably not.

11     Q.   Okay.

12     A.   I was very angry.

13     Q.   If you had to do it again would

14   you do that?

15     A.   (Pause)

16     Q.   You're laughing.  So is it

17   funny?

18     A.   I was angry.  I mean you're

19   telling me.  I was angry.  I was

20   emotional.  I had just -- you know, my

21   job path just completely changed

22   because of his behavior, because of his

23   manipulation and his bullshit so I was

24   angry.



1          So was it mature?  No.

2          Would I do it again?  I mean

3     right now while I'm calm and I'm not as

4     angry, no, not as angry or it's just

5     time has passed, no, I wouldn't do it

6     again.

7     Q.   You said your job path had

8     changed.  How had your job path

9     changed?

10    A.   He was telling me that he was

11    going to build -- I thought he was

12    sincere and wanted to build that

13    organization into a $20 million a year

14    organization and we were going to, you

15    know, grow it and he wanted me to

16    retire from there and I was going to

17    have job security.

18          And then because of it was

19    all bullshit my job security had

20    changed and I felt scared about my job

21    every day going to work.

22    Q.   After November 5th, 2018 you

23    felt scared?

24    A.   It probably started earlier than



1      that when I started to figure out and

2      get an inkling of what was going on,

3      but yes, after that I still felt that

4      way.

5          Q.   Even though you didn't have to

6      interact with him anymore?

7          A.   Correct.

8          Q.   If you didn't have to interact

9      with him anymore, why would you feel

10     scared that you were going to lose your

11     job?

12         A.   Because it was apparent that

13     Daniel really didn't care about any

14     other employee.  He valued Gregg more

15     than he valued everyone else.  And

16     after, you know, those things were set

17     in place, like I said, there were

18     little inches where he was creeping

19     back and taking back some of his

20     authority, some of his duties.  So I

21     felt like it was just a matter of time

22     before Gregg got himself back into a

23     position where he could kick me out the

24     door.



```
 1                    I also, you know, when it
 2          first happened I was told to, you know,
 3          everyone was told to work from home and
 4          then we went back and we were back in
 5          the office.
 6                    And then as people started
 7          getting other jobs and leaving, I was
 8          the last one there.  And I was told to
 9          work from home; administrative staff
10          wasn't needing to be in the office
11          anymore.  So I could work from home
12          permanently because they were figuring
13          out what to do with the office or
14          whatever.
15                    And then they hired a new
16          director of development that I had zero
17          part in the process and formerly I was
18          a part of that process.
19                    And I went one day and he
20          was, you know, probably not knowing
21          everything that happened, a little bit
22          in the dark and he was showing up.  He
23          seemed like a nice guy.  He seemed like
24          he was trying to work hard and he was
```



1      asking me for help.

2                So I was trying to help him

3      with like, you know, different things

4      that he needed.  And he basically told

5      me that he was working out of the

6      office every single day where I was

7      told to stay home.

8        Q.   Who was that?

9        A.   Who?

10       Q.   Yes. What was the person's name?

11       A.   I don't remember his name.  He

12     was hired as the director of

13     development.

14       Q.   And do you remember

15     approximately when he was hired as

16     director of development?

17       A.   No.

18       Q.   Was it at the end of your

19     employment?

20       A.   It was closer towards the end of

21     my employment.  I was the only one left

22     at that point.

23       Q.   And who was the previous

24     director of development?



1          A.   It was Matt Bennett.  And then

2     after that Tricia became the acting, I

3     think the acting director of

4     development or something like that.

5          Q.   You and Mr. Bennett started on

6     the same day?

7          A.   A couple of days apart.

8          Q.   So you didn't have any role

9     whatsoever in hiring Matt Bennett.

10    Isn't that correct?

11         A.   Yeah.

12         Q.   Yes.  So you testified that you

13    had previously been involved in the

14    hiring and selection of director of

15    development but, in fact, that is not

16    true at all, correct?

17         A.   Hiring and selection of staff

18    members.

19         Q.   No.  You said director of

20    development, so I'm specifically asking

21    about that.

22         A.   The hiring process is what I

23    meant.

24         Q.   Okay.  Were there other people



1        who were hired that you thought you

2        should have participated in the

3        selection and hiring process but you

4        were not able to do so?

5             A.   After?  That was like the first

6        person I think that was hired really

7        that I know of.

8             Q.   So what do you mean when you say

9        you were not permitted to hire, be

10       involved in the hiring process?  No one

11       was hired.

12            A.   He was and I wasn't a part of

13       the process.

14            Q.   But you had never been part of

15       the process for director of development

16       selection, correct?

17            A.   I didn't say selecting the

18       director of development.  What I said

19       was I wasn't a part of the hiring

20       process.  I usually, no matter who they

21       were, I was given the offer letter that

22       Marc would write and then I would have

23       to put them into Zenefits and get them

24       their benefits and all that stuff.  I



1      was part of that process.

2              I wasn't a part of that

3      process.

4        Q.   You did that, you put the new

5      director of development input, new hire

6      information?

7        A.   Exactly.  But what I'm saying is

8      that my normal level of involvement

9      wasn't where it was prior to this

10     incident.

11       Q.   And the entirety of that

12     sentence is based on this individual

13     director of development position,

14     correct?

15       A.   Yeah.

16       Q.   All right.  Let's turn to the

17     audit since we've sort of talked about

18     that a little bit but not in detail.

19              The audit was in I'll call

20     it June 2019.  Does that sound right to

21     you?

22       A.   It started earlier than that.

23     It's a longer process.  They collect

24     information.  They ask for information.



Marnie O'Brien - January 14, 2021                    201

```
1                    So the process started way

2         earlier than that, but yeah, that's

3         about when it was starting to get to

4         the end of it, I guess.

5            Q.   In June of 2019 you told

6         Dr. Pipes that you did not want

7         Mr. Roman to be involved in the audit,

8         correct?

9            A.   I didn't want him a part of my

10        work product is all I didn't want.  And

11        there were financial statements and

12        that stuff that I didn't, I didn't

13        trust him.

14           Q.   When you say your work product,

15        so lawyers have a very specific

16        definition of work product.  It's sort

17        of a term of art for lawyers.

18                    So tell me what you mean

19        when you say work product just so I

20        know that we're understanding, we're

21        operating with the same definition.

22                    What do you mean when you

23        say you didn't want --

24           A.   What I worked on.  What I worked
```



1    on, the financials.  I just didn't want

2    him to have any excuse to retaliate

3    against me.  I was trying to limit my

4    exposure to him.

5       Q.   So when you say you didn't want

6    him to have access to anything you

7    worked on --

8       A.   Yes.

9       Q.   -- does that mean that you did

10   not want him to be able to review

11   financial statements for the

12   organization?

13      A.   I don't know why they would want

14   him to.  He blew hundreds of thousands

15   of dollars.  He --

16      Q.   I'm going to try to get you to

17   answer that question, Ms. O'Brien.

18      A.   I'm sorry?  What?

19      Q.   I'm going to get you to try to

20   answer that question because I've got a

21   limited number of hours so --

22              MS. SHIKUNOV:  She can

23   answer to the best of her ability and I

24   think we can agree that none of your



1    witnesses were particularly responsive

2    and I let them finish their answer so I

3    just ask that Ms. O'Brien be given the

4    same courtesy.

5              MS. DIBIANCA: As long as you

6    don't cut me off at the end of the day

7    I'm happy to let her talk away.

8              MS. SHIKUNOV:  I mean that's

9    not how this works.  If you're asking

10   questions, she's going to answer them.

11   Because you're not getting the answer

12   you want doesn't mean that she's not

13   giving you a complete answer to your

14   question.

15             MS. DIBIANCA:  Well, it's a

16   yes or no question.  So I don't need a

17   narrative.  I just need a yes or no.

18             MS. SHIKUNOV:  I mean my

19   objection stands.  It's the same thing.

20   You are not entitled to the answer you

21   want.  You're entitled to the answer

22   you get.

23             MS. DIBIANCA:  Okay.

24



1    BY MS. DIBIANCA:

2         Q.   In early June of 2019 you

3    complained to Dr. Pipes that you did

4    not want Mr. Roman involved in the

5    Forum's annual financial audit.  Is

6    that correct?

7         A.   Yeah, I would say it is.

8         Q.   And Dr. Pipes responded that he

9    did not have the requisite knowledge to

10   be able to assist you with the audit so

11   that Mr. Roman would have to be

12   involved in some capacity.  Is that

13   correct?

14        A.   Yes, that's what he said.

15        Q.   Did he tell you to shut up?

16        A.   Those weren't his words.  That

17   was my paraphrasing of his words.

18        Q.   That was your interpretation of

19   his response?

20        A.   It was terse, yes.  That was my,

21   that was how I interpreted it just

22   then, yes.

23        Q.   All right.  So Dr. Pipes said

24   no, Mr. Roman is going to have to be



1    involved; he's the only one that has

2    the knowledge.

3              What was the extent of

4    Mr. Roman's involvement with the audit?

5       A.   He --

6       Q.   Or I should say in the audit?

7    Sorry.

8       A.   He took it over so I didn't have

9    any really other interactions with him

10   at all.  And normally as the bookkeeper

11   I did the audit.  In every other

12   organization as well I would handle the

13   audit and then at the end of it maybe

14   they do their report and their results.

15      Q.   So what period of time was

16   Mr. Roman involved in the audit?

17      A.   I don't think it was completed

18   when I was there, to my knowledge.  I

19   never really had another involvement in

20   it after that, so I wouldn't know what

21   he did or didn't do.

22      Q.   Did Mr. Roman do anything

23   inappropriate with regard to the audit?

24      A.   I don't know.



1      Q.   And you don't know, am I

2    understanding correctly you don't know

3    because he took it over?  You said they

4    took it over.

5      A.   Right.

6      Q.   And who is "they"?  He and the

7    auditors?

8      A.    No.  The auditors do the audit.

9    He became the point person, I guess.  I

10   don't recall really having much

11   involvement in it after that.

12     Q.   At some point, you would agree

13   with me that at some point in the

14   spring of 2019 Ms. Barbounis and others

15   requested that Mr. Roman return to some

16   of his duties that had been stripped

17   from him as a result of your complaint

18   on October 31st, correct?

19     A.   They did, yes.

20     Q.   Yes?

21     A.   Yes.

22     Q.   Sorry?

23     A.   Yes.

24            MS. SHIKUNOV:  She said yes.



1      Q.   Okay.  Did other employees other

2    than Ms. Barbounis agree with her

3    request?

4      A.   Tricia I think wanted him to be

5    somewhat involved, but I think she was

6    a little more hesitant than Lisa was,

7    but I don't think anybody else other

8    than that wanted him back.

9      Q.   Let's talk about your

10   socialization with coworkers.

11           Did you go out with

12   coworkers in a social context during

13   your employment with MEF?

14     A.   Every once in a while.  It was,

15   it was -- when I first started Gregg

16   and Tiffany would kind of initiate

17   everybody going out because it's nice

18   to go out with your coworkers.  It's

19   good to blow off steam or whatever.

20           So yeah, it was throughout

21   my entire employment there occasionally

22   there would be times where some or all

23   or whatever went out.

24     Q.   When you would go out in a



```
1      social setting was Mr. Roman present?
2         A.   Occasionally.
3         Q.   Do you know, could you estimate
4      how many times that happened?
5         A.   No.  We really -- I mean as
6      whole group we didn't really do it that
7      often.  I don't know.  I couldn't say
8      how many times he was there or not.
9         Q.   Did you go out with Mr. Bennett
10     and Mr. Roman, did the three of you go
11     out together?
12        A.   We would go to lunches often.  I
13     don't recall really going out after-
14     hours.  Like maybe once.
15        Q.   Was that for drinks?
16        A.   Probably.
17        Q.   Is it correct to say that those
18     instances did not occur after November
19     5th, 2018?
20        A.   Yeah.
21        Q.   Did the three of you see a movie
22     together?
23        A.   Matt?
24        Q.   You, Matt and Gregg.
```



1      A.   I don't recall seeing a movie

2   with them.

3      Q.   Star Wars, would that help

4   refresh your recollection?

5      A.   No.  Gregg actually in the

6   middle of the workday invited me to go

7   see -- he said he didn't want to work.

8   He was stressed out.  He had something.

9   He wanted to see Star Wars.  He said

10  let's go see Star Wars.

11             I said no, I have work to do

12  and I'm not comfortable going to the

13  movies alone with you.

14             And he was like well, you

15  know, he wanted to go.  And he was like

16  all right, let's get Tricia, Tricia can

17  go.  And she really didn't want to go

18  either because she wanted to finish her

19  work.  She was really overwhelmed and

20  he insisted.  So we went and saw the

21  movie with him.

22     Q.   Who?

23     A.   With Gregg.

24     Q.   You said "we."



```
1         A.    Tricia and I, not Matt Bennett.

2         Q.    Matt Bennett was not there?

3         A.    No.

4         Q.    And when was that?  Was that

5    before November 5th?

6         A.    Yes.

7         Q.    Did you take a trip to the

8    Jersey Shore with some of your female

9    colleagues in July 2019?

10        A.    Yes.

11        Q.    Who was present?

12        A.    That was Lisa, Tricia, Caitriona

13   and I.

14        Q.    Did you have a girls night out

15   on Saturday, September 28th that you

16   recall?

17        A.    Saturday --

18              MS. SHIKUNOV:  Of what year?

19              MS. DIBIANCA: I'm sorry.

20   Thank you, Erica.

21  BY MS. DIBIANCA:

22        Q.    That would have been of 2018.

23        A.    Did we go out on a Saturday?  I

24   don't know.  I don't recall that.  If I
```



1    went out with them it was normally

2    after work.

3        Q.   Did you go out with them

4    normally on the weekends?

5        A.   No.   That's what I'm saying.   If

6    I went out with them it was normally

7    after work.   We did the beach trip was

8    more because Matt had had a comp room

9    and I think Tricia was getting, had

10   just gotten a job offer.   And so we

11   were excited for her and we all felt

12   like we had been through a horrible

13   experience and we wanted to celebrate.

14              So we went to just more like

15   a going away party for Tricia.

16       Q.   Was --

17       A.   That's what it was for.

18       Q.   I didn't mean to cut you off.

19   Were you finished?

20       A.   Yes.

21       Q.   You said Matt got a comp room.

22   Did you mean Matt Ebert?

23       A.   Matt Ebert, yes.

24       Q.   Just so the record is clear.



1              Did you hear any of your
2       coworkers make sexual comments in the
3       workplace?
4          A.   Like what?  Like what kind?
5          Q.   Like did Lisa Barbounis talk
6       about her sex life?
7          A.   Yes.
8          Q.   And you said earlier that you
9       are aware that Ms. Barbounis had had
10      multiple extramarital affairs while
11      employed at MEF, correct?
12         A.   Correct.
13         Q.   And you were aware that one of
14      those was with Danny Tommo, correct?
15         A.   Correct.
16         Q.   And another one was with Tommy
17      Robertson, correct?
18         A.   Oh, I didn't know that.
19         Q.   And that one of them was with a
20      man named Twin?
21         A.   I knew, yeah.
22         Q.   And a Mr. Baird?
23         A.   Yes.
24         Q.   And those were all individuals



1      that had some connection to the Forum,

2      correct?

3         A.   Yeah.

4         Q.   And in your capacity as HR, did

5      you ever report to Dr. Pipes that

6      Ms. Barbounis was having sexual

7      relationships with individuals who were

8      connected to the Forum?

9         A.   Dr. Pipes was marrying a

10     grantee.  He was leaving his wife.  He

11     left his wife who --

12        Q.   It's a yes or no.

13        A.   -- was a former intern of the

14     Forum for a grantee.  So I didn't

15     really see the point in letting him

16     know that.

17        Q.   So you took it upon yourself to

18     make the decision to not report it to

19     Dr. Pipes, correct?

20        A.   I didn't think it was something

21     that was reportable.

22        Q.   I'm going to repeat it again.

23            Did you report it to

24     Dr. Pipes?



```
1              MS. SHIKUNOV:  She said she
2      didn't think it was something that was
3      reportable.  Again, you're not entitled
4      to the answer you want.  You're
5      entitled to the answer that you get.
6        Q.   Did you ever report it to
7      Dr. Pipes?
8        A.   No.
9        Q.   Returning to my question about
10     Lisa Barbounis, do you recall that Lisa
11     Barbounis discussed her sex life in the
12     workplace?
13       A.   Yeah.
14       Q.   Did you ever report that to
15     Dr. Pipes?
16       A.   No.
17       Q.   And you were the HR professional
18     at that time, correct?
19       A.   Actually, I would have to say I
20     would think I wasn't the HR
21     professional at that point because
22     prior to the day that everything was
23     reported I really -- Lisa Barbounis had
24     a very different lifestyle that she
```



1    lived.  She was married.  I didn't know

2    that her and -- I'm not exactly sure

3    when they started having marital

4    problems and that they decided to see

5    other people.

6              So she was very different

7    prior to that.  She was married.  She

8    was going to school.  She was working

9    hard at the Forum and a mom.  And then

10   afterwards was when all of this

11   started.  So I actually felt like my HR

12   duties had been more or less given to

13   Marc at that point.

14             So after November 5th I

15   would say that I wasn't really feeling

16   like I was the HR professional.

17     Q.   Okay.  So Ms. Barbounis made

18   those comments long before November

19   5th, right?

20     A.   I don't really, I don't really

21   recall her telling me sex stories.  I

22   thought that she was married and

23   happily married up until -- and I'm not

24   sure what that exact date was.



```
 1                But I know her behavior
 2      after was so different that I suggested
 3      that maybe she go see a psychiatrist
 4      because her behavior seemed to me like
 5      when they say a girl is sexually abused
 6      she becomes promiscuous.  It was like
 7      this happened and now all of a sudden
 8      she was off to the races.
 9                So I don't really recall her
10      talking about that stuff prior.
11         Q.   When you said this happened to
12      her, you mean she had this break with
13      her husband?
14         A.   Yes.
15         Q.   Okay.
16         A.   No.  No.  The behavior seemed to
17      escalate after we filed the charge
18      against Gregg.
19         Q.   Well, we already discussed that
20      she had had an extramarital affair with
21      Danny Tommo just days before your
22      meeting with her on the park bench,
23      right?
24         A.   Okay.  So I didn't maybe know
```



1    about that at that point.  So I guess

2    maybe she wasn't talking to me at that

3    point about that type of thing.

4       Q.   So is it your testimony that

5    Lisa Barbounis was promiscuous?

6       A.   Sure.

7       Q.   And is it your testimony that

8    she was promiscuous, based on what you

9    know now she was promiscuous throughout

10   her employment at MEF?

11      A.   No.  That's exactly the opposite

12   of what I said.  I said based on my

13   knowledge now it seemed like she was

14   promiscuous after everything else, not

15   the entire time she worked there.  Most

16   of the time she seemed like she was

17   happily married.

18      Q.   But she had the relationship

19   with Mr. Tommo prior to November or

20   prior to October 30th, correct?

21      A.   Right.  I don't know how much

22   knowledge I had of that prior to that

23   point.

24      Q.   But sitting here today?



1        A.    I guess.

2        Q.    Okay.  In March of 2018 did you

3    suggest that you, Ms. Barbounis,

4    Ms. McNulty and Ms. Patel take a group

5    pole dancing class?

6        A.    It was an exercise class, yeah.

7        Q.    Did you take that class?

8        A.    No.

9        Q.    In your opinion is it

10   appropriate for the HR manager to

11   socialize with employees outside of

12   work?

13       A.    I was never asked not to.  I was

14   included in every after-work function.

15   It wasn't very often so I mean...

16       Q.    In your opinion, is it

17   appropriate for the HR manager to

18   socialize with employees outside of

19   work?

20       A.    I don't think it's

21   inappropriate.

22       Q.    You do not think it is

23   inappropriate.

24               You do think it is



1     appropriate?

2        A.   I think it's fine.  It wouldn't

3     stop me from doing my job.

4        Q.   Having personal friendships with

5     employees in the workplace does not

6     interfere with an HR professional's

7     ability to do his or her job?  Is that

8     your testimony?

9             MS. SHIKUNOV:  I'm going to

10    object to the form of the question

11    because it mischaracterizes what she

12    just said.

13            But, Marnie, you can answer

14    the question.

15       A.   I don't -- can you ask the

16    question again?

17       Q.   By socializing with employees

18    outside of workplace, does that

19    interfere with your ability as an HR

20    professional to do your job?

21       A.   No.

22       Q.   You arranged a sexual harassment

23    training at the Forum in April 2018,

24    correct?



1          A.    At Gregg's request, yes.

2          Q.    Great.  And you conducted that

3     training, correct?

4          A.    I did.

5          Q.    And was that conducted in an

6     all-staff meeting?

7          A.    I believe it was.  And then

8     there were some people that didn't make

9     it so they maybe had to do it

10    afterwards.

11         Q.    Did Mr. Roman attend the

12    training?

13         A.    I would assume he did, yeah.

14         Q.    Do you have a specific

15    recollection?

16         A.    I don't recall.  I think

17    everybody signed a paper so there's

18    probably a paper somewhere with his

19    signature if he did.

20         Q.    If I said that he was present at

21    the beginning and made the introduction

22    and then left so that you could conduct

23    the training without him present, does

24    that help refresh your recollection?

1        A.   It really doesn't.  I mean if

2    that's -- it could be that's what

3    happened.  I don't remember.

4        Q.   Do you recall whether Mr. Roman

5    gave the employees one of the board

6    member's phone numbers so that they

7    could reach out to the board member

8    directly in the event that there was an

9    issue?

10       A.   Wait.  What?

11       Q.   Do you recall whether Mr. Roman

12   gave the employees the phone number for

13   Steven Levy specifically?

14       A.   No.  No.

15       Q.   You don't have that

16   recollection?

17       A.   I don't recall that, no.

18       Q.   And then in planning for your

19   sexual harassment training did you

20   suggest that Forum employees get an

21   Airbnb?

22       A.   He had talked about doing, he

23   had talked about doing off-site,

24   off-site like I guess team building



1    things.

2              So do I recall suggesting

3    that?  No.  Airbnb seemed to be his

4    thing, so I don't recall suggesting

5    that.  But, you know, if that's the

6    route that he was going and saying that

7    he wanted to do off-site trainings or

8    team building things, then -- I think

9    there was another thing that was being

10   discussed to do that would have been

11   something similar.

12             So maybe I was trying to go

13   along with that but...

14      Q.   Let me move Exhibit 2.  It's

15   going to be Bates stamped D, as in

16   defendant, D6695.

17             MS. DIBIANCA:  And I'm going

18   to ask Jakob to make a note of that for

19   Kurt, please.

20             (O'Brien Deposition Exhibit

21   No. 2 was marked for identification.)

22   BY MS. DIBIANCA:

23      Q.   So it should be on the screen,

24   Ms. O'Brien.



1              Do you see a document on the

2      screen?

3          A.   Yeah.

4          Q.   Let me just scroll down just so

5      we have a nice clean record.  Since you

6      don't have the document in front of you

7      I just want you to see --

8          A.   Oh, okay.

9          Q.   Let me just scroll down so I can

10     show you at the bottom here is that

11     Bates stamp D6695.

12         A.   So I guess we had staff members

13     that weren't just office members coming

14     in and we needed a spot for them.  So I

15     guess he would do the Airbnb, so I

16     guess that's why I said that.

17         Q.   So you suggested that you get an

18     Airbnb for them, correct?

19         A.   I should say I was asking if we

20     should.  So I don't know that I

21     initially suggested it, but I was

22     asking, it looks like I was confirming

23     whether or not we were doing that.

24         Q.   You were confirming it.  It



1    actually says "Should we get them an

2    Airbnb?"

3              It doesn't sound like you're

4    confirming.

5       A.   Well, he said that he was

6    talking about it.  Then I would have

7    said should we do that?  So I don't

8    know that I suggested it.  But it looks

9    like I was definitely trying to get the

10   plans in order.

11      Q.   Okay.  Do you remember telling a

12   coworker that Ms. Barbounis was a

13   cancer in the workplace?

14      A.   Probably, yeah.

15      Q.   Do you recall when you said

16   that?

17      A.   No.

18      Q.   Have you heard the phone call

19   that Ms. Barbounis recorded of you two?

20      A.   Yes.

21      Q.   And what is your opinion of that

22   phone call?

23      A.   I think you need to -- I think

24   it was illegal.  I think -- I didn't



1     know it was happening and I think it

2     was wrong that she went around playing

3     it for people.  That's my opinion.

4         Q.   And you're aware that she did

5     play it for others in the workplace,

6     right?

7         A.   I was told that, yeah.

8         Q.   What is your knowledge of

9     Ms. Barbounis's proposal to Mr. Terry

10    Giles?

11              And for the record that's

12    G-i-l-e-s.

13        A.   I'm not sure I know who he is.

14        Q.   Knowing everything that you know

15    today, is it your opinion that

16    Ms. Barbounis is an honest person?

17        A.   I didn't ask -- I mean I think

18    if you ask her a question she tells the

19    truth.

20              Was she forthcoming by

21    telling me that she recorded me and

22    then played it for everyone?  No.  But

23    I never asked her either.  So I guess I

24    always felt that she was truthful.



1        Q.   Except for the extramarital

2    affairs?

3        A.   I was under the impression that

4    her and Vasilli were on a break.  She

5    had told him that she didn't want to be

6    married anymore.

7        Q.   And the people that she was

8    sleeping with, they were married,

9    weren't they?

10       A.   I don't know about that.

11       Q.   If you knew that they were,

12   would that change your opinion of

13   Mrs. Barbounis's veracity or

14   truthfulness?

15       A.   I mean her -- is it truthful?  I

16   mean truth to me is if you ask somebody

17   a question and they tell you a lie.  I

18   think, if I remember correctly I think

19   she had some kind of exchange with one

20   of their girlfriends or whatever and

21   she was pretty open with the girl about

22   what was going on.

23              Truthful?  I think she is.

24              Do I think she makes a lot



1    of good choices?  No.

2        Q.   Do you trust her?

3        A.   Not after she played and taped

4    me probably I wouldn't trust her right

5    now, no.

6        Q.   And she filed a complaint at the

7    Forum about you, correct?

8        A.   Yeah.  She told me that Matt

9    Bennett instructed her that it had to

10   be done before she left that day that

11   we argued and demanded that she submit

12   that.

13            MS. SHIKUNOV:  Can you give

14   me just two seconds and go off the

15   record?  Somebody is yelling in the

16   hallway.  I don't know who it is, but I

17   just need a minute.

18            THE VIDEOGRAPHER:  Should we

19   go off the record?

20            MS. DIBIANCA:  Just wait a

21   minute.

22            (A discussion was held off

23   the record.)

24



1    BY MS. DIBIANCA:

2        Q.   After November 5th, 2018 -- I'm

3    sorry.  Strike that.  You already

4    answered this question.  I apologize.

5              Do you recall a meeting in

6    the MEF office in January of 2018 where

7    it was an all-staff meeting with

8    Mr. Bennett, he brought his young

9    daughter and said that all

10   communications with Mr. Roman from that

11   point forward were to go through

12   Mr. Bennett?

13             Do you have a recollection

14   of that meeting?

15     A.   Yes.

16             MS. SHIKUNOV:  Before you

17   answer that.

18             Molly, you said 2018.

19             MS. DIBIANCA:  I'm sorry.  I

20   should have said 2019.  I thought I

21   did.  I apologize.

22   BY MS. DIBIANCA:

23     Q.   So in January of 2019 there was

24   a meeting with Mr. Bennett.  Can you



1     tell me about that meeting?

2        A.   He was the -- I'm not sure if he

3     was like the acting director at that

4     point or not, but there was a point

5     where Daniel had given him, you know,

6     the opportunity to be the acting

7     director.  And he called that meeting

8     and told everyone exactly -- I don't

9     remember anything else from that

10    meeting, but I do remember him saying

11    that he didn't want anyone talking to

12    Gregg.  If there was anything to be

13    discussed with Gregg, it went through

14    him.

15       Q.   Do you have an understanding of

16    why he gave that directive?

17       A.   No.  I don't recall.

18       Q.   Did you comply with that

19    directive?

20       A.   I think Daniel Pipes nullified

21    that directive very shortly after it

22    was given.

23       Q.   Okay.  At some point in time you

24    took your boyfriend Mr. Ebert into the



1          MEF office, correct?

2            A.    I did.

3            Q.    And when was that?

4            A.    It was I went out after work one

5       night.  I had expressed to him concerns

6       that Gregg had a camera in my office.

7       I felt that he might have a camera in

8       everyone's office because we went to --

9       well, first of all, there were cameras

10      everywhere.

11                  And he had a camera in his

12      office pointed directly at his desk so

13      that if you went in to the room it

14      would set off some kind of motion

15      sensor and the video would start

16      recording and then he would call and be

17      like why are you in my office?

18                  And then I just felt

19      completely paranoid and creeped out and

20      felt that there was a camera in my

21      office.

22                  We all used to get changed

23      for work or for the gym.  There was a

24      gym there.  A lot of us would get



1    changed from our offices sometimes.  So

2    I just felt very strongly that he had

3    set something up that was

4    inappropriate.

5              And Matt had had experience

6    with that stuff and I said do you think

7    you could, you know, do you think you

8    could check for it?

9              So we had went out, I think

10   we had like one drink and then we went

11   back and he went up into Gregg's office

12   and looked up over and he said he did

13   see something.  I actually have

14   pictures of it.  He did see something

15   that was hanging that looked like it

16   didn't belong there, but he couldn't

17   see anything.

18              And then he looked up above

19   my office to see if he could see

20   anything that looked like a camera and

21   he said no, that he couldn't see

22   anything.

23   Q.   When was that?

24   A.   I don't recall.



1        Q.   Was it before November 5th, 2018

2    or after?

3        A.   Well, it had to be after because

4    I didn't start dating him until May.

5        Q.   And you knew that Mr. Roman did

6    have a camera in his office, correct?

7        A.   I did.

8        Q.   But you still had Mr. Ebert look

9    in Mr. Roman's office.  Why is that?

10       A.   He looked above his desk up in

11   the ceiling to see if there was any

12   wires running.

13       Q.   Did you tell anyone at the Forum

14   that you had brought in your boyfriend

15   to look around?

16       A.   No.  But I did follow the

17   protocols and I did have him sign an

18   NDA.

19       Q.   Why didn't you tell anyone that

20   you were concerned that there could

21   be --

22       A.   I was --

23       Q.   -- surveillance?

24            MS. SHIKUNOV:  Let her



1        finish her question.

2           A.   I'm sorry.  Say that again.

3           Q.   That's okay.

4                Why didn't you tell anyone

5        at the Forum that you were concerned

6        about potentially being, there being

7        potentially surveillance in the office?

8           A.   I don't know that I didn't.  And

9        I think, I'm pretty sure that I had

10       mentioned to Daniel that at one point

11       after the Israel trip and Gregg had his

12       top secret mission stuff he bought

13       Alexas.  I know that I told Daniel

14       this.  He bought Alexas, one for my

15       office and one for Lisa's office.  That

16       was so that he could communicate with

17       us secretly like off the grid about his

18       secret stuff.

19                And I had heard prior to

20       that that those could be hacked and

21       that you could listen in to people and

22       like turn cameras on and all that kind

23       of stuff.  And when he gave it to me I

24       said I'm not using that.



```
 1                 And he said yeah, you are
 2      and he said -- I said no, I think you
 3      hacked it and I think you're going to
 4      eavesdrop in my office and I'm not
 5      using it.  And we were laughing about
 6      it, but I was pretty blunt about the
 7      fact that I thought the whole intention
 8      of him putting that into my office was
 9      so that he could listen to me.
10                 And one time Lisa told --
11      Lisa was fine with it.  She didn't
12      care.  She was using it right away.
13      And she did tell me that one time she
14      was talking and it wasn't on and she
15      said his name and something happened,
16      it flickered the lights or something
17      like that.  And I was like I told you,
18      he hacked it.
19                 So I always had a paranoia
20      that -- and he fostered that -- that he
21      was hacking into your phone, your
22      computer.  He knew everything.  He
23      could watch everything.
24                 And I believe that I may
```



1    have said that to them.  I definitely

2    talked about the Alexa.

3        Q.   You talked about it to who?

4        A.   Daniel.

5        Q.   And what did you tell him?

6        A.   Exactly what I just told you.

7        Q.   Did you tell Dr. Pipes that you

8    did not want to use the Alexa?

9        A.   He never knew about the Alexa

10   until after the fact.  We probably

11   discussed the Alexa when Gregg was

12   cleaning up his office and wanted his

13   stuff from his office because I had put

14   my Alexa in there.

15            So Daniel didn't pay much

16   attention to anything that was going on

17   in the office so he wouldn't have

18   known.

19       Q.   Did you use the Alexa?

20       A.   He told me I had to.  I think I

21   had it on my desk for like a day and I

22   didn't actually like plug it in.  I

23   just wanted it to be off.

24            And then I might have, I



```
1    might have dabbled with it and I think
2    I kind of decided like I would just
3    keep it off and unplugged unless I
4    wanted to like listen to something or
5    whatever.
6              But it didn't even last
7    long.  I took it out.  I wasn't
8    comfortable with it.
9       Q.   It did not have a camera,
10   correct?
11      A.   I don't know what it had.
12      Q.   Are you aware that it did have a
13   camera?
14      A.   No, I'm not aware that it did.
15      Q.   It didn't have a display,
16   correct?
17      A.   Right.  No, it didn't.
18      Q.   So you let your -- well, let's
19   just back up.
20              Mr. Ebert is a convicted
21   criminal, correct?
22      A.   I don't believe so.
23      Q.   You're not aware that your
24   boyfriend has a criminal history?
```



1          A.   I know that he lost his job, but

2     I don't think he was convicted.   I

3     think it was expunged from his record.

4          Q.   Okay.  So he was convicted and

5     then it was later expunged.  Is that

6     correct?

7          A.   I don't know how that works.   I

8     know that he lost his job for gambling.

9     And I also know that he was good at his

10    job because we ran into a bunch of his

11    old coworkers and they were absolutely

12    thrilled to see him and couldn't say

13    enough about what a good cop he was.

14         Q.   Are you aware that he was

15    terminated from his position with the

16    police department as a result of being

17    charged and convicted with illegal

18    bookmaking?

19         A.   Yes.

20         Q.   So you let Mr. Ebert into the

21    MEF office and specifically into

22    Mr. Roman's office to look around

23    without prior permission from anyone at

24    the Forum, correct?



1      A.   Yes. His office was empty.  None

2   of his stuff was in there though.

3      Q.   When was this?

4      A.   I don't know.  The NDA is

5   probably dated.

6      Q.   Where is the NDA?

7      A.   Probably in their records.

8      Q.   Whose records?

9           MS. SHIKUNOV:  Molly, that

10  NDA is among the approximately 500 that

11  were produced

12          MS. DIBIANCA:  No, I don't

13  believe it was.

14  BY MS. DIBIANCA:

15     Q.   What NDA did you have him sign?

16     A.   The NDA that anybody who visited

17  the office signed.

18     Q.   And was that with the security

19  desk?

20     A.   What?  No.  It was we took -- we

21  managed that.  We just had people sign

22  when they visited.

23     Q.   Mr. Ebert testified that he

24  signed something at the security desk.



1    So is his recollection correct?

2       A.   I don't know.  I don't think so.

3    I think he signed it at the desk in the

4    office.  I don't think he had to sign

5    in to get there.  He might have had to

6    sign in to get past security.

7       Q.   Had you already retained counsel

8    by the time, at the time that you gave

9    Mr. Ebert access to the MEF office?

10      A.   Yes.

11      Q.   Had you filed your charge at

12   that time?

13      A.   I believe so.  It was filed

14   before I met him, I believe.

15      Q.   It was filed July 24th.

16      A.   I think I had gone to Erica's

17   office to request that it was filed.  I

18   know that when --

19           MS. SHIKUNOV:  Don't talk

20   about conversations at my office.  If

21   you don't remember if your charge was

22   filed at that point just say you don't

23   remember.

24      A.   I don't remember.



1          Q.   No.  I don't think you're

2     answering the question.

3               You had a charge, you had

4     signed the document that is the charge

5     of discrimination marked as Exhibit 1

6     on July 24, 2019, correct?

7          A.   Yeah.

8          Q.   And did you allow Mr. Ebert

9     access to the MEF office before or

10    after July 24th, 2019?

11         A.   I don't know.  I'm not sure what

12    the date was.  Again, the date would be

13    on the NDA.

14         Q.   And was Mr. Roman's office empty

15    at that time?

16         A.   I think it was, but I'm not

17    sure.

18               But I also want to clarify

19    that I didn't allow him entry.  I

20    escorted him into the office.  He

21    jumped up on the desk, he looked around

22    and he did that in a couple of offices

23    and he checked mine and then we left.

24               I didn't like -- he wasn't



```
1     like running around in there.
2        Q.   But which part of the statement
3     that you allowed him into the office,
4     which part of that do you disagree
5     with?
6        A.   The word "allowed," like you
7     said I allowed him access, like I gave
8     him full rein to do whatever he wished
9     in there.  I escorted him in, I walked
10    him to the specific spots that I wanted
11    him to look at and then we left.
12       Q.   He did that with your
13    permission, correct?
14       A.   Yes.
15       Q.   Okay.  And at no time did you
16    ever tell Dr. Pipes that you had
17    invited Mr. Ebert into the office,
18    correct?
19       A.   I don't think so.
20       Q.   Did you ever tell Mr. Marc Fink
21    that you had brought Mr. Ebert into the
22    office?
23       A.   I don't think so.
24       Q.   Did you tell any of your
```



1      coworkers that you had done that?

2         A.   I think I may have.

3         Q.   Like who?

4         A.   Probably the people that also

5      were very paranoid, Lisa, Tricia,

6      Delaney and Caitriona.  And I don't

7      even know if I would have told Delaney

8      and Caitriona but...

9         Q.   We talked about the AIPAC

10     conference earlier.  The AIPAC

11     conference was in March of 2018.

12              Did you report to Dr. Pipes

13     after that conference that you thought

14     there was something that had happened

15     that made you uncomfortable or was

16     inappropriate in any way?

17        A.   No.

18        Q.   And why not?

19        A.   I don't know.  I probably should

20     have.  I don't know that he would have

21     cared but...

22        Q.   Well, you certainly don't know

23     if you didn't tell him, right?

24              MS. SHIKUNOV:  Is there a



1     question?

2                    MS. DIBIANCA:  Yes.  She

3     heard the question.

4     A.    No.  Correct.

5     Q.    Let's talk about your

6     boyfriend's call to Mr. Roman.

7                    You are aware now that

8     Mr. Ebert made an anonymous phone call

9     to Mr. Roman, correct?

10    A.    Correct.

11    Q.    Are you aware how many times

12    Mr. Ebert called Mr. Roman?

13    A.    No.

14    Q.    Have you seen the phone records?

15    A.    I think I did.  I probably knew

16    at some point how many times but I

17    don't recall.

18    Q.    If I told you that there were

19    eleven phone calls, would that sound

20    correct to you?

21    A.    I think, yeah.

22    Q.    And the phone call that was

23    recorded from Mr. Ebert to Mr. Roman,

24    that was in late September 2019.  Would



1     you agree with that?

2        A.   I'm sorry.  Say it again.

3        Q.   Sure.

4             The phone call from

5     Mr. Ebert to Mr. Roman was in late

6     September 2019, correct?

7        A.   If that's what you're saying.

8     I'm not sure of the exact date.

9        Q.   Okay.  I'll make that

10    representation to you that it was -- I

11    apologize.  I don't know if it was the

12    25th or the 29th, but it was around

13    that time in September of 2019 just so

14    we have a decent chronology.

15       A.   Okay.

16       Q.   So before September 25th we'll

17    call it, September 25th, 2019, prior to

18    that what had you told Mr. Ebert about

19    your work, about MEF?

20       A.   Not much.  I did -- he knew I

21    guess that there was a lawsuit.  I

22    never discussed it with him

23    specifically, the details of it.  I

24    might have glossed over some stuff, but

1      we weren't dating for that long at that

2      point.  I guess at that point I just

3      didn't confide that stuff in him.

4         Q.   Okay.  Have you heard the tape

5      of that phone call?

6         A.   I heard a piece of it.

7         Q.   I am going to play the tape here

8      in a moment, but actually if you could

9      just hold for me for one minute I'm

10     going to adjust the blinds in my office

11     because I'm currently being blinded.

12     Hold on.

13             Okay.  Thanks so much.

14             Had you told Mr. Ebert prior

15     to his phone call to Mr. Roman in

16     September 2019 that Mr. Roman had been

17     excluded from the office at the

18     direction of Dr. Pipes?

19        A.   I don't know that I told him

20     directly, but I have friends that I

21     talk to and, you know, work calls and

22     stuff so I don't know what he may have

23     overheard.

24        Q.   What are the names of the



1        friends that you talked to about it?

2        A.   I'll be honest, I was really

3        nervous for the longest time to say

4        very much to anybody because I was so

5        afraid of the NDA and getting in

6        trouble for talking about MEF business.

7        So I really was very quiet about what I

8        said about it because I was afraid of

9        that on top of everything else that I

10       was afraid of.

11             But I do have certain

12       friends, Tracy McKinley, Monica Vona

13       that I talked to about it, Bill

14       Schlosky, my girlfriend Peggy Reese

15       probably would be who I really

16       consulted and cried to.

17       Q.   You supported the decision to

18       terminate Tiffany Lee, correct?

19       A.   I guess I did.

20       Q.   What is Ms. Reese's phone

21       number, please?

22       A.   Phone number?

23       Q.   Phone number.

24             MS. SHIKUNOV:  Molly, I



1       don't have a problem giving that to

2       you, but can we do that off the record?

3          A.   Did you hear Erica?

4          Q.   I did.

5          A.   She asked if we could give that

6       to you off the record.

7                  MS. DIBIANCA: Erica, can you

8       e-mail it to me?

9                  MS. SHIKUNOV:  Yes.

10                 MS. DIBIANCA:  Yes, that

11      would be fine.

12                 THE VIDEOGRAPHER:  Do you

13      want me to go off the record?

14                 MS. DIBIANCA:  Nope.  That's

15      okay.  We're going to carry on.  Thank

16      you for asking.

17      BY MS. DIBIANCA:

18         Q.   Did you tell Mr. Ebert -- so

19      your testimony is that you didn't tell

20      Mr. Ebert about the happenings in the

21      workplace prior to September 25, 2019?

22         A.   I don't know how much I told him

23      to be honest or if I told him anything.

24      Like I just kept that -- I didn't, like



```
1    I said, I didn't talk about it that
2    much.  I was afraid to talk about it.
3    I didn't know who it was okay to talk
4    about it with.
5               I don't know what I may have
6    said or not said.  I'm sure there were
7    some inklings of there being like a
8    lawsuit, but I didn't really go into it
9    with him.
10   Q.   At some point Mr. Roman was
11   considering promoting Ms. Barbounis,
12   correct?
13   A.   What do you mean "promoting"?  I
14   think he was going to move her or at
15   least give her some content work.
16               Is that what you mean?
17   Q.   Okay.  And did you support that
18   idea?
19   A.   I believe I did.
20   Q.   What about was she going to be
21   made deputy chief of staff at some
22   point?
23   A.   Wait.  Gregg was promoting her
24   to that?
```



1      Q.   Did Gregg discuss that with you?

2      A.   I think that was a title that

3   she got or something like that.  I

4   remember thinking that it was a weird

5   title.  I remember thinking that she

6   should be in the context of that's what

7   she wanted to do at the beginning

8   anyway.

9           I don't remember about the

10   title or what the job was.  I think she

11   wanted a title that was in line with

12   like the government jobs that she had

13   before.

14      Q.   I'm going to represent to you

15   this was around the time that Daniel

16   was considering promoting Mr. Roman to

17   CEO.

18           Does that help you refresh

19   your recollection?

20      A.   Not really.  There was a lot of

21   title talk all the time.  Everybody was

22   talking about their titles.  He was

23   telling me that I was going to be the

24   CFO.



```
1              So I mean if that was her

2       title, then I guess yeah.  Actually, I

3       think he was going to make me the COO

4       and then it changed and then Daniel was

5       going to be the CEO, Gregg was going to

6       be the CFO -- or COO and I was going to

7       be the CFO.

8          Q.   Okay.

9          A.   I don't remember what Lisa was

10      going to be.

11         Q.   Okay.  When Ms. Barbounis

12      requested that Mr. Roman be allowed to

13      return to some of his administrative

14      duties that had been stripped from him

15      in November of 2018, were you surprised

16      by that request or did she tell you

17      that that was her intent prior to

18      making it?

19         A.   I don't think she told me that

20      prior.  I was shocked.  And I could see

21      that Daniel needed for the good of the

22      organization for Gregg to be involved

23      and at least keep his position, his

24      title.  He was the face of the
```



1    organization almost as much as Daniel

2    was at that point.

3              So it definitely would have

4    hurt to not have his face on there, but

5    I don't think leopards change their

6    spots and I didn't want him in the

7    office.  And yes, I was surprised that

8    she would want more involvement with

9    him.

10   Q.   On July 24th, 2019 at around

11   1:00 p.m. you deleted more than a

12   thousand documents from Dropbox.  Why

13   is that?

14   A.   I deleted?  Did we move them

15   into Google Drive?  Because there was a

16   point where we were changing platforms

17   and we were moving out of Dropbox and

18   then everything was getting mirrored

19   into Google Drive, I think, and we were

20   supposed to be using that.

21             And then I don't know what I

22   would have deleted.  If I did, I might

23   have done it unintentionally.

24   Q.   So that was the same day you



1        filed your charge of discrimination.

2                  Does that help you refresh

3        your recollection?

4        A.   It really doesn't.  It's not --

5        it doesn't seem like something that I

6        would do.

7        Q.   And why doesn't it?

8        A.   Because I don't know why I would

9        get rid of a thousand -- what were

10       they?

11       Q.   Why wouldn't you have deleted a

12       thousand documents?  What makes you say

13       that, it doesn't sound like something

14       that you would do?

15       A.   Because I wouldn't destroy that.

16       I don't know what I would have been

17       getting rid of.

18       Q.   And at that point you already

19       had a litigation hold letter, correct,

20       instructing you to preserve documents

21       and evidence, correct?

22       A.   Yes.

23       Q.   Okay.  So you would agree with

24       me if, in fact, you did delete more



1    than a thousand documents from Dropbox

2    on July 24th, 2019 at 12:53 p.m. that

3    would have been in violation of that

4    litigation hold letter, correct?

5        A.   Yeah.  It's another reason I

6    wouldn't have done it.  But it should

7    also be there because everything was

8    mirrored into Google Drive so then it

9    should be in the Google Drive if it's

10   not in the Dropbox.

11       Q.   You also blind copied your

12   personal gmail account on multiple MEF

13   e-mails, correct?

14       A.   Yes, I did.

15       Q.   Why did you do that?

16       A.   It was when I was feeling

17   persecuted and felt like I was being

18   harassed and I felt like Daniel was

19   going back on his word, so I was

20   sending myself proof of that.

21       Q.   So let's break that down a

22   little.

23            When did you start blind

24   copying your personal e-mail?



1        A.   I don't know.

2        Q.   Did you do that -- once you

3    started doing it, did you keep doing it

4    throughout the rest of your employment?

5        A.   I don't, I don't know.  I mean

6    if you want to show me what I blind

7    copied, I'll tell you what my thought

8    process was.  I don't know.

9             I know that I was scared all

10   the time and that I was nervous and

11   that I felt like I needed to protect

12   myself.

13       Q.   And at that point there was no

14   harassment, correct?

15            MS. SHIKUNOV:  At what point

16   are we talking about?

17            MS. DIBIANCA:  Whenever she

18   started blind copying herself.  She

19   testified that she felt she was being

20   harassed, but I'm confused why that is.

21       A.   Well, prior to the complaint

22   being filed to Daniel and Gregg being

23   pushed out of the office, I was just

24   given like -- it was just if they asked

```
1    me for something I would do it.  Now

2    all of a sudden every time I was asked

3    for something it was by close of

4    business, by close of business and I

5    had to -- it basically felt like they

6    were trying to document anything that I

7    was doing that they thought was wrong,

8    anything that they could get on me.  I

9    felt like I was being documented.

10       Q.   But you weren't even interacting

11   at that point with Mr. Roman, correct?

12            MS. SHIKUNOV:  Again, I'm

13   going to ask you at what point?

14   Because you're giving her random times

15   and space.  You're not limiting your

16   questions at all.  You're just saying

17   at that point, at that point.

18            I don't even know when we're

19   talking about.

20       Q.   Ms. O'Brien, when did you start

21   blind copying yourself, your personal

22   e-mail account?

23       A.   I don't recall.

24       Q.   So if you don't recall when you
```



1    started to do it, do you recall why you

2    started to do it?

3       A.    Because I felt like I needed to

4    document stuff, Daniel going against

5    what he had originally said he was

6    going to do and different things that I

7    felt were representative of harassment

8    and stuff that I felt protected me.

9              That's what I was doing.

10      Q.    What did Daniel do to go against

11   what he was going to do?  What do you

12   mean by that?

13      A.    When he told me that I had to

14   send Gregg the work.  He was paying

15   Marc Fink $2,000 a month to pick up

16   extra responsibilities in regard to the

17   office.  I was supposed to be reporting

18   to Marc, so all of a sudden Gregg was

19   the one that was handling the audit.  I

20   was told that he was not going to be

21   taking part in the finances and he was.

22      Q.    He was only insofar as the

23   audit, correct?

24              I'm sorry.  I didn't mean to



1    cut you off.  Go ahead.

2        A.    It's fine.  What?

3        Q.    Mr. Roman was involved in the

4    finances only as far as the audit,

5    correct?

6        A.    I think.

7        Q.    And once he got involved in the

8    audit you were no longer involved in

9    the audit, correct?

10       A.    Correct.  I felt Marc Fink

11   should have been doing that because he

12   was getting paid extra money to be the

13   point person at the office.

14       Q.    Right.  But Mr. Fink is in-house

15   counsel.  So you're saying that you

16   thought Mr. Fink's job should have been

17   to run the organization's audit?

18       A.    When everything happened and

19   Gregg was removed from his

20   responsibilities, I was not to be under

21   Gregg, my work was not to be under

22   Gregg.  Marc was the one that was

23   supposed to be handling -- he was my

24   report to, him and Daniel and, as such,



1      you know, Daniel had asked me to be, he

2      actually asked me to be a point person

3      at the office.

4                  And this was after he asked

5      Tricia to be the point person for the

6      development and he offered Tricia an

7      extra thousand dollars to pick up those

8      extra responsibilities.  He didn't

9      offer me any money.  And I said well,

10     you're giving Tricia extra money.  Why

11     wouldn't I get extra money?

12                 And then I said okay, well,

13     then, I guess I'm not doing it.

14                 After that he said he would

15     think about it.  And then the next time

16     I heard of it he had put out to the

17     office staff and said we're going to

18     have a vote to see who's the point

19     person for the office.

20                 So the vote happened.  And I

21     said okay, I'm going to put myself up

22     because I've already told him that I

23     want to get paid for it.  So if they

24     vote for me, then he would have to pay



```
 1    me for it because he knows I'm not
 2    doing it otherwise.
 3               So they had the vote.  They
 4    picked Lisa for it, which was
 5    completely weird because she didn't
 6    want any administrative
 7    responsibilities so I didn't even
 8    understand why she put herself up for
 9    it.  And I would have thought that if
10    they were going to vote for somebody to
11    be the point person on the
12    administrative stuff they would have
13    picked me since most of it fell under
14    my umbrella anyway.
15               I flipped out.  I thought it
16    was bullshit.  I said it was bullshit
17    to Daniel.  And he said to me that he
18    suspected Lisa must have been
19    campaigning behind the scenes.  And
20    then he didn't give her the job.  He
21    gave Marc Fink the job and he paid him
22    $2,000 extra a month to do it.
23               So I feel like if somebody
24    was going to pick up the audit it
```



1    should have been him.

2        Q.   Who's "him"?

3        A.   Marc Fink.

4        Q.   Okay.  By blind copying your

5    personal e-mail -- what is your

6    personal e-mail address, by the way?

7        A.   Marniem03@gamail.com.

8        Q.   By blind copying that e-mail

9    address you were in violation of the

10   Forum's policies, correct?

11       A.   I didn't know that.

12       Q.   You revised the handbook,

13   correct?

14       A.   I was requested to do that.

15       Q.   Ma'am, you signed an NDA or

16   multiple NDA's, correct?

17       A.   Mm-hmm.

18       Q.   Yes?

19       A.   Yes.  Sorry.

20       Q.   That's quite all right.

21            And do you understand that

22   part of a non-disclosure agreement, the

23   purpose of a non-disclosure agreement

24   is so that Forum information does not



1     go outside the Forum?

2        A.   Okay.  Well, then I guess I was

3     in violation of it.

4        Q.   Have you produced the e-mails

5     that you blind copied to your personal

6     gmail account?

7              Have you produced those to

8     counsel in this case?

9        A.   Yes.

10       Q.   And how did you go about

11    collecting those?

12       A.   I don't know what you mean.  You

13    just said that I e-mailed them to

14    myself.

15       Q.   No.  That's okay.  I meant with

16    regard to this litigation.

17              Once the litigation started

18    at some point did you go into your

19    gmail account and collect the e-mails

20    that you had sent to it, blind copied

21    to it and turn them over to counsel?

22       A.   Yes.

23       Q.   And approximately how many were

24    there?



```
1       A.   I don't recall.
2       Q.   Do you recall if it was more
3   than five?
4       A.   Yeah.
5       Q.   Do you recall if it was more
6   than fifty?
7       A.   I don't think so.
8       Q.   Okay.  Was the rumor true about
9   you having slept with your previous
10  employer?
11      A.   No.
12      Q.   Okay.  Did you communicate with
13  Ms. Barbounis via WhatsApp?
14      A.   I don't think so.  I never
15  really used WhatsApp.
16           NS, DIBIANCA: Let's take,
17  Erica, is it okay if we take five
18  minutes?
19           MS. SHIKUNOV:  Yes.
20           MS. DIBIANCA:  So we'll go
21  off.
22           THE VIDEOGRAPHER:  Going off
23  the record the record at 2:50.
24           (A brief recess was taken.)
```



```
1              THE VIDEOGRAPHER:  We are on

2       the record at 3:01.

3       BY MS. DIBIANCA:

4          Q.   Ms. O'Brien, have you sought any

5       kind of therapy for what you claim to

6       be the harassment?

7          A.   No.

8          Q.   Are you medicated as a result of

9       what you claim to have been harassment?

10         A.   I didn't -- no.  No.

11         Q.   Has this lawsuit been stressful

12      for you?

13         A.   Yes.

14         Q.   Very?

15         A.   Yes.

16         Q.   Has the pandemic been stressful

17      for you?

18         A.   Sure.  Yeah.  It's been

19      stressful for everyone, yeah.

20         Q.   And losing your employment with

21      1 Construction, that was stressful for

22      you as well, correct?

23         A.   Yes.

24         Q.   Finding out that your domestic
```



1    partner/boyfriend Mr. Ebert

2    intentionally sabotaged your job

3    opportunity with the Kimmel Center,

4    that was stressful for you as well,

5    correct?

6        A.   Stressful and heartbreaking.

7        Q.   And the fact that Mr. Ebert

8    called Mr. Roman behind your back, that

9    also was stressful for you?

10       A.   Correct.

11       Q.   How do you deal with these

12   stressors?

13       A.   What do you mean?  Are you

14   asking about my marijuana use?  Because

15   that's how I deal with it.

16       Q.   Okay.  You are aware that you

17   have made an initial demand for $3

18   million in emotional distress, pain and

19   suffering and physical injury, correct?

20           MS. SHIKUNOV:  I am going to

21   object to that insofar as it asks for

22   communications with counsel, that the

23   demand has been withdrawn and that that

24   was not the initial demand that was



1    conveyed to Mr. Walton last winter.

2                That was a demand that was

3    put forth in disclosures.

4                MS. DIBIANCA:  And that's

5    actually what I'm referring.  So let me

6    pull that up so we're all on the same

7    page.  Okay?  Hold on.

8                So I believe this will be

9    Exhibit 3 and I'll let Jakob correct us

10   if I'm wrong.

11               MR. WILLIAMS:  That's

12   correct.

13               MS. DIBIANCA:  Great.  Thank

14   you.

15               (O'Brien Deposition Exhibit

16   No. 3 was marked for identification.)

17   BY MS. DIBIANCA:

18      Q.   Ms. O'Brien, can you see the

19   exhibit that's on my screen?

20      A.   No.

21      Q.   No?

22      A.   Mm-mm.

23      Q.   Sorry.

24      A.   No.



```
 1        Q.   That's why I asked.  How about
 2    now?
 3        A.   Yes.
 4        Q.   Okay.  So Erica and Marnie, you
 5    must have dueling mikes because we have
 6    an echoe again.
 7        A.   Oh, I think I -- there we go.
 8             MS. SHIKUNOV:  You just said
 9    something we didn't hear.
10             MS. DIBIANCA:  I think
11    because, Erica, you need to turn your
12    mike off.
13        A.   I think we're good now.
14        Q.   Yep.
15             So can you see the document,
16    Ms. O'Brien, that's on my screen that
17    says Rule 26(a)(1) Initial Disclosures
18    Of Plaintiff?
19        A.   Yes.
20        Q.   Have you seen this document
21    before?
22        A.   Yes.
23        Q.   I'm going to scroll down into
24    section III where it says Computation
```



1    of Damages.  And it states "At this

2    juncture, Plaintiff is claiming the

3    following damages:"

4              And I will just tell you

5    that this is dated December 31, 2020.

6    So as of December 31, 2020, is it

7    correct to say that you are seeking

8    emotional distress and physical injury

9    in the amount of $3 million?

10             MS. SHIKUNOV:  I'm going to

11   instruct her not to answer that because

12   that goes to attorney-client privilege.

13   Molly, you can't ask her how she

14   computed her damages.

15             MS. DIBIANCA:  Actually,

16   there is a wealth of case law on that,

17   Erica, that I absolutely can ask her

18   how she calculated the damages, but I'm

19   not asking her to calculate them.

20             All I'm asking her is to

21   confirm that as of December 31, 2020

22   she was demanding $3 million for

23   emotion distress and physical injury.

24             Is that correct?



```
 1        A.    Yes.
 2        Q.    And what's the basis for you to
 3    say that you have a physical injury?
 4              What is the physical injury
 5    that you sustained, Ms. O'Brien, as a
 6    result of defendants?
 7        A.    I think I thought -- I don't
 8    have a physical injury.  Isn't that
 9    just like both of them together?  I
10    don't know.
11        Q.    Do you have $3 million in
12    emotional distress damages?
13        A.    I probably have more than that.
14        Q.    It says "Lost Wages.  The annual
15    salary at the time of Plaintiff's date
16    of termination times 10 years, plus
17    bonuses, commissions, health insurance,
18    pension, profit sharing and all other
19    expected raises and benefits."
20              You did not have health
21    insurance with the Forum, correct?
22        A.    I did originally.  It was taken
23    from me.
24        Q.    When was it taken from you?
```



1          A.   When Daniel learned that I had

2     it.

3          Q.   You said, you testified earlier

4     that you stayed married to your husband

5     so you could stay on his benefits,

6     correct?

7          A.   Right.  And when I went off I

8     went onto the Forum's plan.

9          Q.   And how long did you have it

10    through the Forum?

11         A.   I don't know.  A couple of

12    years, I guess.

13         Q.   So two of the three years that

14    you were employed there?

15         A.   That sounds about right.

16         Q.   And at the time of your

17    separation, at the time you resigned

18    you did not have health insurance,

19    correct?

20         A.   The time I resigned from the

21    Forum?

22         Q.   Yes.

23         A.   Well, generally when someone

24    leaves you offer them a COBRA.  In



1      PA -- the federal if you're over fifty

2      employees it's mandatory that you offer

3      I think 18-month COBRA.

4               PA has it's called a mini-

5      COBRA and you're supposed to offer it

6      for nine months.

7               I was never offered it and I

8      was never told I was removed from the

9      benefits.  I found out -- I forget how

10     I found out, but I needed to scramble

11     to get insurance right in the middle of

12     the epidemic.

13     Q.   So your testimony is confusing

14     me because I thought you said that

15     Daniel Pipes had you removed from the

16     benefit plan when he found out that you

17     were enrolled in it.

18     A.   No.  I had to pay for it.  I was

19     being -- it was being paid for.  Gregg

20     knew that I had wanted a higher salary

21     when I started there and he I think was

22     afraid I was going to jump, which is

23     actually what I was going to do, and I

24     needed, you know, I wanted to have my



1      benefits paid for.

2                  Well, actually he said how

3      about if I pay for your benefits?

4                  And I said are you allowed

5      to do that?

6                  And he said I am doing that.

7                  And then he decided that he

8      would get his benefits fully paid, I

9      would get my benefits fully paid and

10     Daniel, I think his ex-wife and his

11     daughter were on the plan so theirs was

12     fully paid as well.

13        Q.   At the time you gave your notice

14     of resignation to the Forum, were you

15     enrolled in the Forum's healthcare

16     plan?

17        A.   Yes.  And I was paying for it by

18     myself at that point, well, whatever

19     the split was.

20        Q.   At the time you separated from

21     the Forum did you have a pension plan

22     with the Forum?

23        A.   No.

24        Q.   At the time that you were



1    separated from the Forum did you have a

2    profit sharing plan with the Forum?

3       A.   No.

4       Q.   At any time during your

5    employment did you have a pension or

6    profit sharing plan with the Forum?

7       A.   No.

8       Q.   Okay.  Did you ever earn

9    commissions from the Forum?

10      A.   No.

11      Q.   Did you ever have any

12   expectation to earn a commission at the

13   Forum?

14      A.   No.

15      Q.   So let's talk about the

16   emotional distress $3 million number.

17              What is the basis for that

18   claim?

19      A.   I was sexually harassed.  I was

20   intimidated.  I was bullied.  I was

21   after the fact continued to be

22   harassed.

23      Q.   At what point?

24      A.   After I reported it.



1       Q.   I'm sorry.  You're saying now

2    that you were continued to be harassed?

3       A.   No.  After I reported the issue

4    to Daniel for my entire, for my entire

5    work life there I think I was bullied

6    to some degree and sexually, and

7    definitely sexually harassed.

8              And after the complaint was

9    filed I felt like I was being

10   retaliated against.

11      Q.   So, Ms. O'Brien, you've

12   testified today several times that you

13   basically had no contact with Mr. Roman

14   after your November 5th complaint.  So

15   how is it that you were sexually

16   harassed for the entirety of your

17   employment?

18      A.   Well --

19      Q.   Who sexually harassed you after

20   November 5th, 2018?

21      A.   Well, I felt harassed.

22              MS. SHIKUNOV:  I'm going to

23   object because you just asked her two

24   questions at the same time without



1    allowing her to answer.

2              So what is your question?

3    Q.   Who harassed you after November

4    5th, 2018?  Who sexually harassed you?

5    A.   I felt harassed by the rumor

6    about Kevin Brady, me sleeping with

7    Kevin Brady.  He may have started it

8    before, but it was now being talked

9    about around by everyone again.

10             I also know that someone was

11   shouting about my sex life and I suck

12   big black cock.  Those are issues to

13   me.

14   Q.   You're aware that Ms. Barbounis

15   said that, correct?

16   A.   Yes.

17   Q.   And you're aware that that was

18   long before November 5, 2018, correct?

19   A.   I didn't hear about it until

20   after.

21   Q.   Okay.  So after November 5, 2018

22   did Mr. Roman sexually harass you?

23   A.   No.

24   Q.   Did Daniel Pipes at any time



```
 1      sexually harass you?

 2        A.    No.

 3        Q.    Did Ms. Barbounis tell you that

 4      when she went to Israel with Mr. Roman

 5      Mr. Roman attempted to force himself on

 6      her?

 7        A.    Not -- I guess she said that he

 8      was trying to get her to have sex with

 9      him and he was very aggressive and she

10      was scared.

11        Q.    So my question is:  At any time

12      did Ms. Barbounis tell you that

13      Mr. Roman had tried to force himself on

14      her?

15        A.    She felt like he was forcing it.

16      He was screaming and yelling and she

17      had to go in and lock the door so she

18      felt like she was -- he was trying

19      force her.

20        Q.    Okay.  Ms. Barbounis testified

21      that they were sitting on a couch when

22      this incident occurred.  She didn't

23      testify anything about him yelling or

24      screaming.
```



1              So are you sure about your

2      recollection of what she told you?

3        A.   Yes.  She told me that when she

4      declined and she wasn't going to have

5      sex with him he became irate and he was

6      yelling and screaming, yelling and

7      screaming and she was scared.

8        Q.   Okay.  And she did not tell you

9      that he tried to force himself on her?

10     I'm asking about those words

11     specifically.

12              Did she say --

13       A.   So --

14       Q.   I'm going to finish my question.

15              Did she say to you Gregg

16     tried to force himself on me?

17       A.   I don't recall her exact words,

18     but I know that she felt forced, like

19     he was trying to force it.  He was

20     yelling and pressuring her and she was

21     scared and had a knife under her

22     pillow.

23       Q.   When you say force himself on

24     her, to me that sounds like an



1    attempted sexual assault.  Would you

2    agree with me?

3        A.   Yeah.  Yeah.  That's what I was

4    trying to say.  So maybe he was being

5    forceful.

6        Q.   So to the best of your

7    recollection, Ms. Barbounis did not

8    tell you that when she went to Israel

9    with Mr. Roman Mr. Roman attempted to

10   force himself on her?

11            MS. SHIKUNOV:  Objection.

12   Asked and answered.  She said, she's

13   answered this question now seven times.

14            MS. DIBIANCA: Yeah.  But it

15   hasn't been -- I'm going to let her

16   answer it again.  If you want to count

17   to eight, I'm happy to let you do that.

18       A.   I don't remember her exact

19   words.  So forced may not have been

20   used properly, but I don't, I don't

21   recall her exact words.

22       Q.   Okay.  Would you agree with me

23   that it's a pretty serious allegation

24   to say that a man forced himself or



1       attempted to force himself on a woman?

2          A.   Yes.

3          Q.   Yes.   Okay.   If your son was

4       accused of attempting to force himself

5       on a woman, would you be seriously

6       offended by that?

7          A.   Yes.

8          Q.   Yes.   Okay.

9               At the meeting on November

10      1st, 2018 were employees pressured to

11      sign a non-disclosure agreement?

12         A.   Well, the meeting was deemed

13      mandatory and it was mandatory that

14      everyone sign the NDA prior to the

15      meeting.

16         Q.   So the answer is no then?

17              MS. SHIKUNOV:   She didn't

18      answer no.   You're putting words in her

19      mouth.

20              If you want to ask a

21      question, her answer stands.

22         Q.   All employees at the meeting --

23      tell me if you agree or disagree with

24      this:   At the November 1st, 2018



1      meeting all employees were pressured to

2      sign a non-disclosure agreement?

3          A.   I agree with that.

4          Q.   And how were they pressured to

5      sign a non-disclosure agreement at the

6      meeting?

7          A.   Because he gave it, I think he

8      sent it prior to the meeting, but they

9      were pressured to sign it before

10     participating in the meeting and the

11     meeting was mandatory.

12         Q.   So was the NDA discussed at the

13     meeting?

14         A.   I don't recall.  It was

15     discussed, there was discussion about

16     it before because it wasn't the same

17     NDA that we had signed and there were

18     additional items in there.  And one of

19     them was that if somebody at the Forum

20     behaved inappropriately we weren't

21     allowed to tell anybody.

22         Q.   At the meeting were employees

23     pressured to sign a non-disclosure

24     agreement?



```
 1        A.   Yes.  They had to sign it to
 2   participate in the meeting and the
 3   meeting was mandatory, so they were
 4   pressured.
 5        Q.   At the meeting --
 6             MS. SHIKUNOV:  I'm going to
 7   object to asked and answered at this
 8   point.
 9             And I'm going to instruct
10   you not to answer this question any
11   further.
12             You've now asked it upwards
13   of ten times.
14             MS. DIBIANCA:  Erica, you
15   understand why I'm asking though,
16   correct?
17             MS. SHIKUNOV:  No, I don't.
18   Because she's answered you several
19   times.  I feel like I'm listening to a
20   broken record.
21             MS. DIBIANCA:  They're not
22   even close because what she's saying is
23   completely different than what I'm
24   asking.  She is saying repeatedly -- if
```



1    you want to call it ten times, go for

2    it, let's call it ten times.

3              She has said that they were

4    pressured to sign it at the meeting but

5    that they could not attend it without

6    signing it.  So they either signed it

7    before they showed up or they discussed

8    it afterwards.  But if they couldn't

9    come to the meeting unless they had an

10   non-disclosure agreement, then how

11   could they have been pressured to sign

12   it at that meeting?

13        A.   I said that they were pressured

14   into signing it.  I said that he sent

15   it prior and they weren't allowed in

16   unless it was signed.

17        Q.   Right.  Exactly.  And so I'll

18   say my question for, according to

19   Ms. Shikunov, my 11th time.

20              At the meeting, if you

21   prefer I can say during the meeting,

22   was anyone pressured to sign a non-

23   disclosure agreement?

24        A.   No.



```
1        Q.   Okay.  After your report to

2   Dr. Pipes on November 1st, 2018, would

3   you agree with me that Mr. Roman was

4   disciplined?

5        A.   I mean he kept his job.  He got

6   to work from home.

7        Q.   Please answer the question.

8        A.   He had less responsibility.  It

9   didn't seem like severe discipline.

10       Q.   After your report to Dr. Pipes

11  on November 1st, 2018 was Mr. Roman

12  disciplined?

13       A.   Yes.

14       Q.   In March of 2019 was Mr. Roman

15  considered for a promotion?

16       A.   I don't know what you mean a

17  promotion.

18       Q.   To the best of your knowledge,

19  in March of 2019 was Mr. Roman

20  considered for a promotion?

21       A.   Where was he going to get

22  promoted to?  He was a director and the

23  only person ahead of him was Daniel.

24       Q.   In March of 2019 was there
```



1    discussion about Mr. Roman becoming

2    your supervisor again?

3                What are you referring to

4    right now, Ms. O'Brien, what document?

5       A.   The charges thing.

6       Q.   Okay.

7       A.   What are you --

8       Q.   Let me ask it this way:  At any

9    time after November 1st, 2018 --

10      A.   Okay.  All right.  I don't know

11   that it was a promotion.  Essentially I

12   guess, I guess he was, I would say the

13   wording is more that he was being

14   invited to have some of his

15   responsibilities back.

16      Q.   At any time after November 1st,

17   2018 did Mr. Roman ever again become

18   your supervisor?

19      A.   No.

20      Q.   You would agree with me that you

21   have no knowledge or -- I'm sorry.

22   Strike that.

23                Do you contend that

24   Mr. Roman spread any other rumors other



1    than the one about you and Mr. Brady?

2        A.   I think that's the only one that

3    I know of.

4        Q.   Did Dr. Pipes ever tell you that

5    Mr. Roman was going to become your

6    supervisor again?

7        A.   No.

8        Q.   I believe in your complaint you

9    have some allegations regarding equal

10   pay so I would like to address those,

11   please.

12            Do you allege that you were

13   paid less than male counterparts?

14       A.   Yes.

15       Q.   And who is the male counterpart

16   or counterparts that you're referring

17   to when you say that you were paid less

18   than?

19       A.   My job was a little bit

20   different than most people's, but I

21   mean if I was like the director of

22   finance, all the other directors -- and

23   I think that was my title at one

24   point -- all the other directors made



1     much more than I did, at least like

2     10,000.

3          Q.    How much?

4          A.    Like 10,000.

5          Q.    You're not aware of any other

6     director of finance who was paid more

7     or less than you, correct?

8          A.    Correct.

9          Q.    And your predecessor in that

10    position, was that a female or a male?

11         A.    It was a female.

12         Q.    And did you make more than she

13    made or less than she made?

14         A.    I believe I made more.  But I

15    also picked up the HR and then I also

16    picked up the grant management and was

17    responsible for tracking the grants and

18    creating the grant contracts and stuff

19    like that.

20              So I had more responsibility

21    than she did so that the position that

22    I held was different than hers.

23         Q.    You do not have any background

24    or expertise in Middle East policy,



```
 1      correct?

 2        A.    Correct.

 3        Q.    You don't have any background or

 4      expertise in foreign policy at all,

 5      correct?

 6        A.    Correct.

 7        Q.    You do not speak a second

 8      language, correct?

 9        A.    Correct.

10        Q.    You do not have any background

11      or experience with database migration,

12      correct?

13        A.    Correct.

14        Q.    You filed a second charge of

15      discrimination against the Forum,

16      correct?

17        A.    Correct.

18        Q.    And in that charge you alleged

19      that Mr. Roman called the Kimmel

20      Center, correct?

21        A.    Correct.

22        Q.    And what document are you

23      referring to now?

24                  MS. SHIKUNOV:  I gave her
```



1    the second charge, Molly, and I'm

2    holding it now.

3        Q.   We're not going to go into that

4    so you can put it down.  You certainly

5    can hold it, but I'm not going to ask

6    you about the charge.  I'm going to

7    open the complaint for you.

8            MS. DIBIANCA:  Erica, do you

9    want to give her the retaliation

10   complaint?

11           MS. SHIKUNOV:  I think I

12   only pulled the active complaint, but

13   I'm going to double-check what we have

14   here.  Just a second.

15           Molly, I'm sorry.  I only

16   pulled the active complaint.  You're

17   going to have to put it on the screen

18   I'm sorry.

19           MS. DIBIANCA:  That's okay..

20   BY MS. DIBIANCA:

21       Q.   Can you see my screen, Ms.

22    O'Brien, paragraph 27?

23       A.   Yes.

24           NS, DIBIANCA:  Kurt, we're



1      not going to need to mark this.  This

2      is a pleading with the court so I'm not

3      going to mark this as an exhibit.

4      BY MS. DIBIANCA:

5         Q.   This is it says at the top the

6      case number.  Paragraph 27 says "Upon

7      information and belief, Defendant has

8      deliberately interfered with

9      Plaintiff's ability to find employment

10     elsewhere."

11              You signed this complaint,

12     correct?

13        A.   Yes.

14        Q.   And where is it that you

15     believed that defendant had

16     deliberately interfered with your

17     ability to find employment?

18        A.   I believed that he had made the

19     call to the Kimmel Center.

20        Q.   Was there anywhere else that you

21     believed that defendant had interfered

22     with your ability to find employment

23     elsewhere?

24        A.   No.



1      Q.   So there were no other

2    prospective employees that you believed

3    Mr. Roman spoke with?

4      A.   No.

5      Q.   Were you subject to any sexual

6    comments or remarks after November 5,

7    2018?

8      A.   No.

9      Q.   Were you subject to any unwanted

10   sexual advances by Mr. Roman or anyone

11   else at the Forum after November 5th,

12   2018?

13     A.   No.

14     Q.   Other than the Israel trip that

15   we discussed at the very beginning of

16   your deposition that Ms. Barbounis

17   ended up taking, were you offered or

18   invited to take any other business

19   trips that you declined to take?

20     A.   I don't believe so.

21     Q.   Were you denied any -- were

22   there opportunities to go on a business

23   trip that you thought you should have

24   been given and that you weren't, other



```
 1      than that one?

 2          A.   I don't think so.

 3          Q.   Mr. Roman's -- I'm sorry.

 4      Strike that.

 5               Mr. Roman was never allowed

 6      to return to the workplace -- let me

 7      state it a different way.  I apologize.

 8               After November 5th, 2018

 9      Mr. Roman continued to work remotely at

10      least through the end of your

11      employment, correct?

12          A.   Yes.

13          Q.   Okay.  And are you aware --

14          A.   Actually, actually I don't know.

15      I can't say yes or no to that as I'm

16      thinking about it because I was told to

17      work from home.

18               After I think Lisa got

19      employment, then Tricia, then Caitriona

20      and then Delaney, I was the last one

21      left and I was told that the

22      administrative staff wouldn't need to

23      work in the office anymore, that I

24      could work from home.  So I wasn't in
```



```
 1     the office.
 2               I did find out later that
 3     the new director of development was
 4     working out of the office every day,
 5     but I was told to work from home.  So I
 6     wouldn't know if Gregg was there or
 7     not.  I don't know if he was there
 8     after that.
 9        Q.   So you don't have any personal
10     knowledge that Mr. Roman ever returned
11     to the workplace, correct?
12        A.   Correct.
13        Q.   Okay.  So as far as you know he
14     could be still working remotely today,
15     correct?
16        A.   Correct.
17        Q.   Did you ever talk to Matt Ebert
18     about Ms. Barbounis's sexual conduct?
19        A.    I don't remember specifically
20     having a conversation with him about
21     it.  He might have overheard, you know,
22     me talking about it to her possibly.
23     Maybe I might have made an off-color
24     comment about her or something, but I
```



1    don't remember having a specific

2    conversation with him about that.

3        Q.   Were you aware that after your

4    November complaint that Tricia McNulty

5    often complained about your work

6    product?

7        A.   No.

8        Q.   Are you aware that she

9    complained that you didn't know how to

10   run payroll?

11       A.   No.

12       Q.   Are you aware that Lisa

13   Barbounis did not appreciate that you

14   were trying to boss her around still?

15       A.   I don't -- that doesn't surprise

16   me.  I don't know that I was bossing

17   her around but...

18       Q.   If the Forum migrated or at

19   least partially migrated to the Google

20   G Suite in March of 2019, would you

21   agree with me that that was before you

22   deleted the materials from Dropbox in

23   October 2019?

24       A.   Yeah.  So we were in Google



1     Drive at that point.

2         Q.   Not everyone, correct?

3         A.   He was -- I think Daniel had

4     said that everyone could choose what

5     they wanted.

6         Q.   Okay.  I am not asking about

7     anything you discussed with counsel so

8     please keep that instruction in mind

9     when you answer this next question.

10             Why did you not want to have

11    the same lawyer as Lisa Barbounis?

12        A.   I never said I didn't want to

13    have the same lawyer as Ms. Barbounis.

14    I made the decision to file on my own

15    because I felt persecuted and I made

16    the decision to file.  I chose my

17    lawyer.

18        Q.   Did Ms. Barbounis, did she tell

19    you that she did not want to have the

20    same lawyer as you?

21        A.   I don't remember discussing

22    that.  I don't remember talking about

23    lawyers.  I made my decision.  I didn't

24    even know that I was going to do it



1       until that day.  I knew that I was

2       speaking to Erica because I wanted to

3       make sure that I was protecting myself.

4       And the friends that I had talked to

5       instructed me that I should be

6       protecting myself.  So I had a

7       conversation with her and that's why I

8       went with my lawyer.

9               I actually do remember at

10      some point Lisa saying well, why don't

11      you come with my lawyer?

12              And I was like because I

13      have my lawyer; I don't want to be with

14      you.

15      Q.   Did you transfer money from the

16      Forum's bank account after you left the

17      Forum in the amount of $500?

18      A.   No.  I didn't touch any of the

19      Forum's bank accounts after I left.  I

20      did actually have an automatic check

21      set up for myself because I was -- they

22      had asked me to do the books for

23      Savannah and they were paying me $500 a

24      month to do it under my LLC.



1            So like it was a recurring

2    bill and it would take a while to get

3    there because it was processed through

4    the bank.  So I set it up as recurring,

5    so I actually still get checks from the

6    Forum.

7            The last check that I got I

8    remember going back and looking to see

9    if I should have been paid for that, if

10   that was one if I should have cashed it

11   or not.  And I determined that that

12   $500 was for services rendered for

13   February.  So I think I did cash one,

14   but the rest of them that I get,

15   continue to get I shred them.

16     Q.   When was the last time you got a

17   check from the Forum?

18     A.   I actually got three of them not

19   too long ago.  They must have been hung

20   up in my mail forwarding and I got

21   three of them not too long ago and I

22   shredded them all.

23     Q.   Did you notify the Forum that

24   you had gotten checks from them?



```
 1        A.    No.

 2        Q.    So did you get a $500 check from

 3   Savannah then after you left the Forum?

 4        A.    That's what I got, yeah.

 5        Q.    And that one you cashed?

 6        A.    Yes.

 7        Q.    And you determined that that was

 8   provided to you for services rendered?

 9        A.    It was for the prior month and I

10   had worked the entire month so I cashed

11   it.

12        Q.    Okay.  Did you ever threaten

13   Daniel Pipes that you were going to

14   quit the Forum?

15        A.    I said if he made -- I think, if

16   I remember correctly, I said that if he

17   made Matt Bennett the director I would

18   quit.

19        Q.    If he made Matt Bennett the

20   director?

21        A.    He made him the deputy director

22   or made him like the director

23   intermittent or whatever.  And so I

24   don't know what -- he was like going
```



1    give him a chance to prove he could be

2    the director.

3        Q.   And did you tell Dr. Pipes that

4    you would have no trouble finding

5    another job if you were to quit?

6        A.   I don't remember.  I'm sure I

7    thought that.

8        Q.   At your meeting at Misconduct,

9    the one we discussed much earlier

10   today, at that time you were human

11   resources, correct?

12       A.   Yes.

13       Q.   Did you ever discuss with Daniel

14   Pipes that dinner or meeting?

15       A.   No.  I felt that, I felt that he

16   had a crush on me and I felt like I

17   could just keep him at arm's length.  I

18   didn't realize that he was a predator.

19       Q.   You're referring to who?

20       A.   Gregg Roman.

21       Q.   And you say he is a predator.

22   Did you -- I'll use your word,

23   predatory behavior.  You did not

24   experience any such behavior after



```
 1      November 5th, 2018, correct?

 2        A.   Yes.

 3        Q.   And you've identified today all

 4      the instances that you felt were

 5      predatory behavior prior to November

 6      5th, 2018, correct?

 7        A.   No.

 8        Q.   No?  Anything -- well, you

 9      summarized them in your charge,

10      correct?

11        A.   Some of them.

12        Q.   Okay.  Are you aware that

13      anything that's not in your charge is

14      not something that can be the basis for

15      your claim now?

16        A.   Yes.

17        Q.   Okay.

18              MS. DIBIANCA:  All right.

19      I'm going to take about ten minutes.

20      Let's take fifteen minutes because I

21      think I can wrap up after if I get

22      fifteen minutes to just review my

23      outline.

24              Okay, Erica?
```



1          MS. SHIKUNOV: Yes.  Sorry.

2     I can't figure out when I'm on mute or

3     video, so yes.

4               THE VIDEOGRAPHER:  Going off

5     the record at 3:42.

6               (A brief recess was taken.)

7               THE VIDEOGRAPHER:  We are

8     recording and on the record at 4:00

9     o'clock.

10    BY MS. DIBIANCA:

11      Q.   Ms. O'Brien, you're aware that

12    Ms. Barbounis alleges that she

13    destroyed or she deleted electronic

14    files at your instruction, correct?

15      A.   Yes, I'm aware of that.

16      Q.   And you disagree with that

17    claim, correct?

18      A.   I don't recall instructing her

19    to do that.  I was very worried about

20    any personal information being left on

21    the laptop because I was afraid that

22    Gregg would get access to it.

23               I remember encouraging her

24    to buy it, but I don't remember, you



1    know, instructing her to do that.

2       Q.   Instructing her to wipe the

3    device?

4       A.   Correct.

5            MS. DIBIANCA:  Erica, I have

6    one, two, three, about six separate

7    text messages.  My proposal would be

8    this.  I would like to admit them as a

9    single exhibit just to save the hassle

10   of marking them.  But how about we go

11   through them first and then you can let

12   me know if you think that's appropriate

13   or not?  Okay?

14           MS. SHIKUNOV:  That's fine

15   with me.

16           MS. DIBIANCA:  Okay.

17   BY MS. DIBIANCA:

18      Q.   All right.  Ms. O'Brien, I'm

19   going to attempt to share my screen

20   here.  Let's see if I can do it this

21   time.

22           You should see a document.

23   This is a text message.  It's a

24   printout, an electronic printout.  I'm



1    not sure what's the best way to say it

2    is.  But, in other words, it's not on a

3    phone but it came from a phone.

4              The date on the top is 2018,

5    October 31.  Do you see that?

6       A.    Mm-hmm.

7              MS. SHIKUNOV:  You have to

8    say yes.

9       A.    Yes.  Sorry.

10      Q.    That's all right.  It's late in

11   the day.  It gets a little harder.

12             And this is from you to

13   Ms. Barbounis.  Is that correct?

14      A.    Yes.

15      Q.    And it's 11:49 a.m. when it was

16   sent, correct?

17      A.    I'm sorry.  What did you say?

18      Q.    It was sent at 11:49 a.m.?

19      A.    Yes.

20      Q.    Okay.  It states "They are going

21   to ask what we talked about."

22             Who were you referring to

23   when you said "they"?

24      A.    The other staff members.  This



1    was, this was I believe after we had

2    had coffee and we were going back to

3    the office.  And I was -- I think I had

4    said earlier that I was nervous because

5    of what I had just kind of found out

6    and I was trying to figure out how to

7    handle it.  I was afraid that they were

8    going to think that we were like Lara

9    and Laura and conspiring when really we

10   weren't conspiring.

11           She told me something that

12   happened and I was trying to figure out

13   how to handle it.  And I wanted her to

14   give me space and I said that the other

15   ones, because they knew we were going

16   to get coffee, were going to ask what

17   we talked about.

18           So I had wanted her to just

19   say we were talking about that we

20   are -- I don't know how to say it --

21   our personalities, we do have similar

22   personalities.  We're very different,

23   but we just -- I think our similarities

24   make it hard, were making it hard for



1     us to get along and we did talk about

2     that.

3               So I think I just was

4     thinking rather than tell anybody all

5     the stuff that was going on it was

6     better that the office not be talking

7     about it, that it not be gossip and

8     that it just be kept between us until

9     we figured out what to do with it.

10              And they actually I think

11    were probably -- now that I'm thinking

12    about it, including in that would

13    probably have been Matt and Gregg

14    because they also knew that we were

15    going to coffee.  So I just wanted to

16    not have anybody's input on it, but

17    also I didn't trust Matt or Gregg and

18    was afraid that it would be handled

19    inappropriately if I wasn't able to

20    report it.

21      Q.   Were your other coworkers at

22    that time aware of Laura and Lara?

23      A.   Yeah.  Some of them were because

24    it was talked about, so I think mostly



Marnie O'Brien - January 14, 2021                    304

```
 1    everybody was.

 2        Q.   And mostly, you think mostly all

 3    of your coworkers were aware that Laura

 4    and Lara were conspiring against the

 5    Forum?

 6        A.   Stacey was because I think

 7    Stacey worked with them, as well as

 8    Thelma, so they definitely did.  And

 9    other people knew what had happened.

10             And, again, I don't know

11    that they were conspiring against the

12    Forum.  I think at this point, and

13    hindsight being 20/20, I think they

14    probably had a gripe and I probably

15    think that, because Gregg was always

16    promoting to everybody like that we

17    were like friends, that they weren't

18    comfortable coming to me and they were

19    just handling it inappropriately.

20        Q.   And this, so we have a nice

21    clean transcript, is D9917.

22             The next one I would like

23    you to look at is marked or has been

24    stamped D9928.  This is the same day,
```



1     less than an hour later you text Lisa

2     Barbounis and say "We both need to be

3     model employees right now."

4        A.   Right when we got back from

5     coffee, like I said, I was already on

6     edge and Gregg, like I said earlier,

7     they were at a taping of the radio show

8     that they did, Matt and Gregg were.

9              And the minute, I felt like

10    the minute we got back from coffee

11    Gregg called her and I could hear her

12    talking and saying like, you know,

13    answering whatever questions he was

14    asking.  And then he called me and I

15    was really stressed out and I didn't

16    want to talk to him because I just was

17    overwhelmed I guess with everything

18    that was going on, but he did call my

19    office right after he spoke with her

20    and he was asking me, you know, what

21    happened?

22              And I said we were talking

23    about that stuff.  And then right at

24    the end of the conversation -- well, I



1    have to back up for a second because

2    the day that Lisa and I talked, right

3    before we left she said to me wait a

4    minute.  Before we leave I've got to

5    tell you something.  I wrote you up.

6    Matt told me that I had to write it up.

7    He told me I had to before close of

8    business.  They were demanding that I

9    write up the issue.  She said I really

10   didn't want to do it because I didn't

11   want to like report you but they told

12   me I had to.

13           She said that Matt told her

14   that.  And Gregg had asked me to do the

15   same, but I refused because I told him

16   I didn't think he would like what I was

17   going to write.

18           So she had told me that when

19   we went back.

20           So now going back to where I

21   was, he has me on the phone and he

22   said, you know, was asking me how

23   everything was.  And then he goes all

24   right; listen, I want you to act calm.



1     I don't want you to lose your mind or

2     anything, but I got to tell you.  Lisa

3     filed a complaint against you, but

4     don't worry.  It's okay.  I can make it

5     go away.  Marc Fink is going to come in

6     on Friday and he is going to interview

7     everybody in the office to see about

8     your behavior.  So, you know, don't

9     worry.  It's going to be okay.  I can

10    make it go away.

11              And I was immediately

12    concerned that I was now going to be

13    targeted to be fired and that is why I

14    said that I would imagine.

15    Q.   When you say he said that Marc

16    Fink would come in, was that Matt

17    Bennett?

18    A.   No.  Gregg Roman.  That's who I

19    was speaking with on the phone.  Gregg

20    told me that Marc Fink was, that he was

21    going to have Marc Fink come in and

22    interview all the employees about my

23    behavior.

24              And then at the point at



WILCOX & FETZER
(302) 655-0477  |  WWW.WILFET.COM

A-752

1    which we had the meeting and Marc was

2    in the office a few times and I had

3    asked him about that and Marc said I

4    had no idea, no one ever asked me to

5    come in and interview anything about

6    that.

7        Q.   Okay.  The next text message is

8    stamped as D9938.  And this is, let's

9    see how far, less than ten minutes

10   later after the one we just reviewed.

11             You say to Mr. Barbounis "We

12   need to steer clear of each other

13   around everyone else.  I believe you.

14   They need to think we are at odds

15   though.  They are trying to pit us

16   against each other, probably to get rid

17   of us both."

18             Did I read that correctly?

19       A.   Yes.

20       Q.   And you were at this point

21   hiding information from Daniel Pipes

22   and Gregg Roman, correct?

23       A.   I was deciding how to handle the

24   information that was given to me.  I



1     wasn't hiding it.  I was trying to

2     handle the situation and figure out the

3     best way to handle the situation

4     because, again, she was telling me that

5     she didn't want to report it.

6         Q.   Okay.  Well, you two were not at

7     odds, correct, you and Ms. Barbounis?

8         A.   We were generally at odds all

9     the time.  And I said I believe you

10    there because, well, she kept trying to

11    talk to me in the office and I needed

12    her to stay away from me.  I just

13    didn't want that because then she would

14    remember this or remember that or want

15    to say this.

16              And I just said we need

17    steer clear of everyone else or around

18    everyone.  I did believe her.  She

19    didn't trust me at that point that I

20    was going to do the right thing, that I

21    was going to do my job.

22              And I just wanted everyone

23    to think the situation hadn't changed

24    until I figured out how to handle it.



1      And they were trying to pit us against

2      each other because they told us both to

3      write each other up.

4                   And I felt that they're

5      trying to get rid of us.

6         Q.   You and Ms. Barbounis had had

7      a pretty heated argument in the

8      workplace, correct?

9         A.   Yes.

10        Q.   Yes.  And so did you find it

11     unusual that following a heated

12     altercation in the workplace that the

13     involved employees would be asked to

14     write up a report about it?

15                  As HR, did you think that

16     was unusual?

17        A.   I felt that Gregg asked for

18     things to be written up when it suited

19     him.

20        Q.   Well, didn't Mr. Bennett ask

21     you?  I thought that was your

22     testimony.

23        A.   No.  Gregg instructed me to do

24     it and Matt instructed Lisa and he



```
 1      instructed her because Gregg told him
 2      to.  She said that Gregg told him to
 3      tell her.
 4          Q.   That's thirdhand knowledge to
 5      you, correct?
 6          A.   Lisa said Matt told me Gregg
 7      wanted me to write you up; it had to be
 8      done by close of business.
 9               So I don't know what kind of
10      knowledge that is.
11          Q.   You heard from Lisa who heard
12      from Matt who heard from Gregg, right?
13          A.   Yes.
14          Q.   Okay.  So you were not at odds
15      with Lisa Barbounis at the time you
16      sent this text message, correct?
17          A.   I was, well, at odds thinking
18      that we were still fighting and I just
19      wanted them to think that we were still
20      fighting.
21          Q.   Were you still fighting with
22      Ms. Barbounis at the time you sent this
23      text message?
24          A.   No.  She had handed me a big
```



1    problem and I believed her.

2       Q.   So when you said they need to

3    think we are at odds, you were not at

4    odds, correct?

5       A.   No.  I don't know what we were.

6    We weren't like in cahoots.  We were

7    handling a situation.  So I wouldn't

8    say we were at odds, no.  But we were

9    both in the middle of a problem.

10      Q.   But you instructed your coworker

11   to pretend that you were at odds to

12   hide it from your supervisors, correct?

13      A.   I told her to steer clear of me

14   and to leave me alone so that we could

15   figure out what it was.  And I wanted

16   them to think that we were still at

17   odds because I was afraid that if they

18   thought that we were speaking and

19   sharing information that they would try

20   to fire us.

21      Q.   So you wanted her to give a

22   false impression.  Is that correct?

23      A.   At that moment, yes.

24      Q.   Let's go to the next one.  This



1    one has been stamped D9941.

2              The same day, this is two

3    minutes, actually less than two minutes

4    later and you say "We need to play our

5    cards together so we can get out and

6    not be broke or scumbags."

7              Do you want to explain that

8    one?

9       A.   Yes.  They were trying to fire

10   us and we both felt like we were trying

11   to be fired.

12             Scumbags are people that do

13   the shit that Gregg Roman does and I

14   didn't want to do anything underhanded.

15   I wanted to do my job and I wanted to

16   keep it.

17      Q.   You said you thought you were

18   being fired at that time?

19      A.   I felt like he was gearing up to

20   line me up to get rid of me because,

21   remember, I had said after, after the

22   quarterly meeting and I told him I

23   wouldn't fuck him and after I said I

24   wouldn't go to Israel, remember I said



1    that I had been his right-hand man and

2    then all of a sudden Matt was his

3    right-hand man, I felt like I was being

4    teed up to be the next one out the

5    door.

6        Q.   So did you see Ms. Barbounis's

7    complaint as a way to retain your job?

8        A.   I felt like Gregg Roman was

9    trying to get rid of people that

10   wouldn't fuck him.  And I felt like if

11   we played our cards right and took it

12   to Daniel and took it to Marc that we

13   would not get fired and Gregg would.

14              That's what I thought.

15       Q.   Okay.  Didn't you ask Mr. Roman

16   on the same day about the real estate

17   course, taking time off for the real

18   estate course?

19       A.   Oh, yeah.  Do you know what?  I

20   did because I wanted to make sure -- I

21   was planning at that point to go to it.

22   It was supposed to start on November

23   5th and I knew that I was going to

24   report it, so I wanted to make sure



1     that Daniel knew that Gregg had already

2     approved it and I wanted it in writing.

3        Q.   No.   My question was you asked

4     Gregg?

5        A.   I wanted Gregg to confirm that

6     he had told me I could take the class.

7     I wanted it in writing because it was

8     another reason I was going to be out

9     for two weeks after all this.   I wanted

10    Daniel to know that Gregg had

11    previously approved it.   That is why I

12    reached out to him.

13              I wanted it in writing so

14    that he couldn't say that I wasn't at

15    work for two weeks.

16       Q.   So you were so scared that you

17    were going to lose your job that you

18    wanted to, you instructed your coworker

19    to give your bosses a false impression,

20    but on the same day you asked your boss

21    for confirmation that you were going to

22    be allowed two weeks off, correct?

23       A.   I was confirming with him that I

24    could take those -- that he had given



1    me the permission for those two weeks

2    because I was afraid for my job and I

3    didn't want to give Gregg any

4    ammunition that he could say to Daniel

5    oh, she didn't show up; she was yelling

6    at employees.

7         Q.   Were you yelling at employees?

8         A.   You know that I was.  Lisa and I

9    had a fight.

10        Q.   You said "employees."  So were

11   there others?

12        A.   No.

13             Yeah.  I yelled at Matt.

14        Q.   The next one is D9949.  It looks

15   like this one was sent about 30 minutes

16   later.  You say "We just need to be

17   smart and no one else can know that we

18   have each other's backs."

19             So would you agree with me

20   that in this text message you were

21   instructing Ms. Barbounis that you

22   should hide information from your

23   superiors?

24        A.   I didn't want -- I was trying to



```
 1      be smart about it because Gregg's
 2      incredibly smart and Gregg was already
 3      geared up to get Lisa fired and I felt
 4      like he was positioning me to be the
 5      next one out the door.  And I was
 6      trying to protect -- as you can tell,
 7      all of these happened the day that I
 8      found out about that, the day that she
 9      told me what he did to her.
10          Q.   That's my point exactly.
11          A.   It was fear and panic and it was
12      trying to keep our heads above water
13      until I could figure out how to handle
14      it because, again, she kept saying she
15      didn't want to tell him.
16               But after thinking about it,
17      I realized there's really no question
18      for me.  It's my job.  I have to tell
19      him.
20          Q.   After you told Dr. Pipes, made
21      the report to Dr. Pipes, at that point
22      did you tell him that you and Lisa,
23      that you have Lisa's back?
24          A.   Well, having her back is -- I
```

1    don't even know that I told him that or

2    not, but I believed her, I believed

3    her.  I believed her story so that's

4    having her back.

5       Q.   The next one is D9985.  And let

6    me see, the same day.  It looks like

7    ten hours later, if I'm doing the math,

8    but I'm not sure that I am.

9             You say "Honestly, I figured

10   you would.  I think you should consult

11   your people and see how they guide you.

12   I think together we could have an

13   impact with DP.  I'd like to look out

14   for MEF but I'm in your corner in the

15   meantime.  I will be looking to cover

16   my ass.  Apparently I'm going to need a

17   new job.  Ugh.  So disappointing.  I

18   really think DP and Marc would hear us

19   if we went together and spoke from the

20   heart."

21             So I would like to focus on

22   the sentence that says "I'd like to

23   look out for MEF but."

24             So at that point you were



```
1      not looking out for MEF, correct?
2        A.   I was concerned that MEF was
3      going to just be worrying about Gregg
4      and looking out for Gregg.  I was
5      taking a stand that I believed Lisa and
6      I was trying to cover my ass with them
7      not to lose my job, although I figured
8      I was going to.  As you can see, I was
9      nervous about it.
10              I was hoping that if we took
11     our stories to him and told him
12     everything, like not just her story,
13     what had happened to me, I felt like
14     they would have to see that, coupled
15     with the fact that Tiffany Lee had
16     already alleged that he was sexually
17     harassing her.  Lara and Laura were
18     alleging that he was harassing them.
19              I said if, I thought that if
20     the two of us stood together strong,
21     told our stories, because again she
22     didn't want to tell her story, I
23     thought that they would hear us and
24     that we could make it through it and
```

```
 1      potentially keep our jobs.

 2              I was wrong.

 3        Q.   You did keep your job, didn't

 4      you?

 5        A.   -ish.

 6        Q.   You did continue to work there,

 7      right?

 8        A.   I did.  From home.

 9        Q.   From home.  At the end of your

10      employment, correct?

11        A.   Yes.

12        Q.   And you resigned, correct?

13        A.   Yes.

14        Q.   After you had obtained another

15      job, correct?

16        A.   Yes.

17        Q.   Where you believed you would be

18      making approximately $30,000 up to

19      $80,000 more per year, correct?

20        A.   Not to start.  I was taking a

21      pay cut.

22        Q.   You said that you expected to

23      earn a hundred -- you wanted to earn a

24      hundred but that you thought you could
```



1    go up to 150 I think it was?

2        A.   It was goal that I would be

3    reaching for.  They were hiring me at

4    fifty.  There was an opportunity for

5    other stuff and I said that my goal

6    would have been 130.

7        Q.   130.  But you took the job

8    because you knew that there were these

9    other earning opportunities that would

10   get you to a hundred, correct?

11       A.   That could potentially get me

12   there.

13       Q.   Well, you believed it would,

14   right?

15       A.   I believed I would rather take a

16   try at that than stay where I was.

17       Q.   Did you believe that you were

18   going to earn, you could use the

19   earning potential of the new job and

20   that you would earn at least a hundred

21   thousand?

22            That was your testimony

23   earlier so I'm asking you if that's no

24   longer true.



1              MS. SHIKUNOV:  Objection to

2      the characterization of her testimony

3      because it's a mischaracterization.  It

4      speaks for itself.

5              And I think we're at the end

6      of a deposition getting bogged down in

7      semantics, but that's a mis-

8      characterization of your testimony.

9      A.   What's the question again?

10     Q.   You accepted the position, the

11     new position because you believed you

12     were going to earn at least $100,000,

13     correct?

14     A.   No.  I accepted the position

15     because I could leave.  The salary that

16     I was offered was $50,000 and there was

17     a potential to earn more and I had set

18     a goal of about 130.

19              They had never really done

20     this with anybody before so it wasn't

21     like there was other people that had

22     already done that.

23     Q.   What cuts in your budget did you

24     make to accommodate for the difference



1       in salary between the seventy-one that

2       you were earning at MEF and the fifty

3       that you were going to earn at the new

4       place?

5           A.   I had moved in with Matt and I

6       was renting my townhouse and --

7           Q.   You had done that before you got

8       that job offer, correct?

9           A.   Yeah.  But that's why I felt

10      like I could take it.  My expenses were

11      less.  I was gaining -- you know, my

12      household expenses, we were sharing

13      those.

14               And I was having a little

15      bit of income from my townhouse to

16      cover those expenses.

17          Q.   Let's go to the next one, D9204.

18      This is November 2nd, so this is after

19      you made the complaint to Dr. Pipes

20      after Dr. Pipes spoke with you about

21      your complaint but before the November

22      5th meeting.

23               And you say to Ms.

24      Barbounis "I don't think we should



1    write grants.  I think you should run

2    for an office or something and I should

3    be your campaign manager.  Fuck it.  Go

4    big or go home.  Let's rule the world."

5        A.   We felt, I felt really good --

6    I'm sorry.  Go ahead.  Ask your

7    question.

8        Q.   I was going to ask you to tell

9    me what this means.

10       A.   I can't remember what -- oh, so

11   this was after I had given Daniel the

12   complaint.  So I guess -- I'm trying to

13   remember like what this scenario was.

14           I guess -- I'm trying to

15   think what DP -- I think DP must have

16   shut down Gregg a little bit.  So I

17   felt good about that.  And we had been

18   talking about doing like something --

19   we liked working together.  As much as

20   we hated each other at times, I felt

21   like she was a hard worker and she

22   wanted to write grants or something

23   like that for -- I don't know -- like a

24   non-profit or whatever.



1          And I said -- we didn't want

2     to work there anymore and we were

3     trying to think of what we could do.

4     And I guess I thought she was, I said

5     she was -- she certainly shouldn't run

6     for office that's for sure, knowing

7     what I know now.

8               But let's rule the world.

9     We felt good, I felt good because I

10    felt like I stood up to a bully.

11       Q.   What did you mean by "Go big or

12    go home"?

13       A.   I don't know.  I guess like her

14    being for an office or something

15    because she likes politics.  Go big or

16    go home, like that's what you like,

17    let's do that.

18               And I also had two beers so

19    I don't really know.

20       Q.   This is marked or stamped

21    D10090.  It's the same day, Friday,

22    November 2nd, 2018.  This is Lisa to

23    you:  "Anyone talk to Delaney or

24    Caitriona?"



Marnie O'Brien - January 14, 2021                    326

```
1                When did you involve Delaney
2      and Caitriona in your efforts?
3         A.   Well --
4                MS. SHIKUNOV:  I'm going to
5      object to the form of that question.
6      And I'm going to instruct her not to
7      answer because there were no efforts.
8                If you want to ask her when
9      they were made aware of her reporting
10     the sexual assessment, I'll allow her
11     to answer that question.
12               MS. DIBIANCA:  Counsel, I
13     appreciate you suggesting the question
14     that I should ask, but my question is
15     pending and I'm not taking it back.
16               So you can go ahead and have
17     your witness answer.
18               MS. SHIKUNOV:  I just told
19     you I instructed her not to answer
20     because that is a completely
21     argumentative question.  So you can
22     rephrase it or she's not going to
23     answer.
24
```



```
1    BY MS. DIBIANCA:
2        Q.   Ms. O'Brien, when did you
3    involve Delaney and Caitriona in the
4    sexual harassment allegations?
5        A.   I never involved them in the
6    sexual harassment allegations.
7             Looking at the dates,
8    Friday -- so Thursday was when Daniel
9    came in and was interviewing all the
10   people, I think.  And the next day I
11   think there was a day where Gregg was
12   going into the office or they were
13   going to be in the office and they just
14   really didn't know what was going on
15   and I guess she was asking if anyone
16   told them.
17       Q.   And had anyone told them?
18       A.   I don't remember.  What was the
19   next text message?
20       Q.   I'm asking you to the best of
21   your knowledge.
22       A.   I know I didn't.  I don't know.
23   I think, I think that they knew what
24   had happened in Israel.  Like I said, I
```



1    think everybody knew, but I don't know.

2              I guess they knew I had

3    reported it because Daniel was talking

4    or I guess they knew something was up

5    because Daniel was going around.  So I

6    guess she was trying to find out what

7    they knew or if they knew because that

8    was their first job, that was their

9    first big girl job, and Delaney spent

10   every day being terrified.

11      Q.   Are you finished with your

12   answer?

13      A.   Yep.

14      Q.   This is D10092 and it's Friday,

15   November 2, 2018.  You text Lisa and

16   Tricia McNulty and ask them to call you

17   in a three-way phone call.

18              Do you recall that?

19      A.   I don't recall it, but it looks

20   like I did.

21      Q.   And do you recall if you had the

22   three-way call?

23      A.   I'm sure that we did.  And,

24   again, I'm looking at this time frame



```
1      because after Daniel kind of

2      interviewed everybody he just went away

3      and there was nothing.  I didn't know

4      what was going on.  I didn't know

5      anything.  I didn't know if I was

6      getting fired.  I didn't know if Lisa

7      was getting fired.  I didn't know what

8      Gregg had said.  It was just in limbo.

9            It was actually probably the

10     worst weekend of my life because I just

11     didn't know what was going on.

12           And I also -- I'm not sure

13     when I found out.  But I didn't know --

14     again, like we never discussed AIPAC

15     amongst, amongst the three of us.  Like

16     they never really discussed that AIPAC

17     moment with me.  And apparently Tricia

18     had other instances.  I found out that

19     she had lodged a complaint with him at

20     that point.

21       Q.   At what point?

22       A.   Somewhere, somewhere in there.

23     So I guess I was just trying to

24     figure -- we were all trying to figure
```



1    out what was going on.  We didn't know.

2       Q.   So in your HR capacity you had

3    an off-duty call with your two

4    coworkers to discuss the complaint that

5    you had brought to the Forum, correct?

6       A.   I think I had said earlier that

7    I felt like I was immediately relieved

8    of my HR duties when I reported that.

9       Q.   Did you tell anyone at the Forum

10   that you thought you had been relieved

11   of your HR duties once you reported the

12   complaint?

13      A.   Well, since they never discussed

14   it with me again until, you know, later

15   on with the group, no, I didn't have an

16   official conversation about it.  But

17   Marc Fink had definitely stepped in and

18   was taking the lead on it.

19      Q.   And Marc Fink for the record is

20   the Forum's in-house counsel, correct?

21      A.   Yes. And he was really the top

22   of the line for HR because he is a

23   lawyer and he has experience and all of

24   that.  In the Forum like he was a part



Marnie O'Brien - January 14, 2021                    331

```
 1      of HR and when things were above me

 2      they went to him.

 3              MS. DIBIANCA: Erica, do you

 4      have a preference on how we move these?

 5              MS. SHIKUNOV:  Nope.

 6              MS. DIBIANCA:  Nope.  Okay.

 7      So what I'm going to do is I will move

 8      these as one exhibit but, Kurt, I can't

 9      recall what number we're on.

10              Is it 4?

11              MR. WILLIAMS:  4 is correct.

12              MS. DIBIANCA:  Jakob, you

13      said 4?

14              MR. WILLIAMS:  Yes, 4 is

15      correct.

16              MS. DIBIANCA:  We can't hear

17      you, pal.

18              MR. WILLIAMS:  Yes, 4 is

19      correct.

20              MS. DIBIANCA:  Okay.

21      Thanks.

22              (O'Brien Deposition Exhibit

23      No. 4 was marked for identification.)

24              MS. SHIKUNOV:  Molly, do you
```



1    know how much longer you have?  Because

2    I just want to refill my water bottle

3    unless you are wrapping up.

4               MS. DIBIANCA:  I'm going to

5    do the Ebert phone call now so --

6               MS. SHIKUNOV:  Do you mind

7    if I take two just to run to the

8    kitchen?

9               MS. DIBIANCA:  Absolutely.

10   Go ahead.  No problem at all.

11              THE VIDEOGRAPHER:  Going off

12   the record at 4:35.

13              (A brief recess was taken.)

14              THE VIDEOGRAPHER:  We are on

15   the record at 4:39 Eastern Time.

16   BY MS. DIBIANCA:

17     Q.   So, Ms. O'Brien, I'm going to

18   now play the audio recording of the

19   phone call that we discussed earlier

20   from your boyfriend, Mr. Ebert, to

21   Mr. Roman in September 2019.

22              The court reporter is not

23   going to transcribe the actual phone

24   call.  In the transcript it will just



1    say audio recording was played.

2              So it's reasonably brief,

3    but I think it's like nine minutes or

4    something.  So I'll just ask that you

5    be patient and listen to the whole

6    thing and then I'll ask you some

7    questions about it at the end.

8      A.   Okay.

9      Q.   Actually, I have to do some

10   magic thing, don't I, Chris, to get

11   people to hear that, right?

12             THE VIDEOGRAPHER:  You

13   should be able -- as long as it's

14   opened first, go to screen share, it

15   should play properly.

16             MS. DIBIANCA:  Oh, yes,

17   share computer sound.  There you go.  I

18   didn't know if there was some other

19   thing I had to do.

20             Erica or Ms. O'Brien, if

21   somebody can just nod in just a moment

22   to indicate that you can hear the

23   recording so I know that it's actually

24   working on your end for you to hear.



```
1              (The audio recording was
2      played at this time)
3        A.   (The witness nodded.)
4        Q.   Okay.  Thank you.
5              So that ends the call there.
6      Who was the woman he was talking about
7      in D.C. with the long sexual history?
8        A.   I would have to assume that's
9      Lisa.
10       Q.   And he said that she was out on
11     the prowl -- I'm using his words -- on
12     Fridays and Saturdays.
13             How was he aware of that?
14       A.   I don't know that she was out on
15     the prowl on Fridays and Saturdays.
16     You would have to ask him how he knows
17     that.
18       Q.   He said that she was the one
19     that got the ball rolling and everybody
20     jumped in.
21             Would you agree with that
22     description?
23       A.   No.
24       Q.   Why not?
```



1         A.   Because there was no ball

2    rolling.  There was an inappropriate

3    behavior that was followed up with an

4    intention to fire someone.  So it

5    wasn't a ball to be rolled.  It was

6    calling out a bully and a predator.  It

7    wasn't a ball rolling.

8         Q.   Who was the person he was

9    talking about who was leaving in the

10   next month?

11        A.   I don't remember.  I don't know.

12   They were all getting jobs and job

13   offers, more so than I was.  I didn't

14   get anything really except for that

15   one.

16        Q.   And he knew that Mr. Roman was

17   on Mr. Ebert described it as work

18   leave.

19             How did Mr. Ebert know that

20   Mr. Roman was not in the workplace at

21   that time?

22        A.   Again, I'm sure I must have

23   mentioned some of it to him, so I guess

24   he picked that up that he wasn't



1    allowed in the office.

2        Q.   "He," meaning Mr. Ebert, picked

3    up that he, Mr. Roman, was not allowed

4    in the office?

5        A.   Yes.

6             And I wasn't at a high-end

7    dinner so I don't know anything about

8    that.

9        Q.   Where were you with Mr. Ebert

10   and some of your coworkers?

11       A.   I think one night we had gone

12   out for drinks and I called him and he

13   met up.  By the time he got there

14   everyone had left and Lisa was the only

15   one there and she left pretty much

16   immediately after he got there

17   because -- I don't know why but she

18   didn't stick around.

19       Q.   How did he know, how did he,

20   meaning Mr. Ebert, know that there were

21   four women involved in the suit?

22       A.   I told you I don't know what I

23   told him or I didn't.  I was dating

24   him.  I didn't confide in him.  I



1       didn't -- you know, I did ask him to

2       come in and look at the ceiling.  I

3       think that's the night that I did it.

4       I had told him that there were issues

5       and I asked him to come in and look at

6       the ceiling or whatever.

7                 So obviously I had given him

8       some information, but I certainly

9       wasn't confiding in him all of it.  I

10      actually didn't like talking about it

11      because it was upsetting and I was

12      trying to not talk about it.

13          Q.   Did you smoke marijuana with

14      your coworkers?

15          A.   They don't really smoke.  I

16      don't know why he said that because I

17      don't think I was even smoking that

18      night.  I actually -- I don't remember.

19          Q.   Do you remember if you ever

20      smoked marijuana with your coworkers?

21          A.   I smoked with Tricia at the gala

22      because somebody had had something

23      there and Gregg obviously and Matt.

24                But the others, like Lisa



1    and Delaney and Caitriona, didn't

2    really do that.  Tricia really didn't

3    do it either, but she actually started

4    to after because she was so stressed

5    out.

6       Q.   When did she start smoking

7    marijuana?

8       A.   I don't -- I mean I know she was

9    talking about trying to use it to go to

10   sleep or something like that and it was

11   after all, after November 5th when

12   everybody was really stressed.

13      Q.   How did Mr. Ebert know that

14   Dr. Pipes was only in about once a

15   week?

16      A.   Well, I'm sure I told him that

17   because he, you know, knew that I

18   could -- you know, it wasn't like the

19   wild west.  Daniel said we could come

20   and go as we needed to and work from

21   home.

22            And I think -- you know, I

23   know I did it more after Gregg left

24   because Gregg would demand us to be in

1      the office, but I would work from home.

2      So I guess he was painting it like, you

3      know, everything was, we were all

4      running the streets, but we were all

5      actually still working.

6          Q.   And how did Mr. Ebert know that

7      Lisa had recorded you?

8          A.   That wasn't me.  That was a

9      different recording.  And that wasn't

10     made up.  I don't think -- if I didn't

11     know it, he couldn't have known it.

12     And I didn't find it out until much

13     later.  So he definitely wasn't talking

14     about that.

15              But I do know that when Lisa

16     was in D.C. she was out to dinner with

17     a bunch of girlfriends.  And I was

18     afraid to tell people that I had this

19     suit because, again, the NDA scared me.

20     I was afraid to say very much about it

21     to anybody.  Lisa would tell anybody

22     that walked down the street.

23              And she was telling all

24     these girls at dinner and one of the



1      girls had said to her that she had

2      experienced sexual harassment as well

3      and coincidentally it was someone that

4      you work with.  And I don't know -- I'm

5      not even sure if Lisa had told her the

6      whole story, but I guess she had

7      alluded to it.  And then this girl

8      started telling a story about Gregg and

9      Lisa got a recording, she recorded her

10     speaking without her knowledge as well

11     the whole conversation with that girl.

12              So I believe that's what he

13     was referring to.  I don't think she

14     made it up.  Actually, I believe that

15     girl too because all the shit that he

16     was saying is bullshit anyway.  He had

17     a couple facts and then he sprinkled in

18     what he wanted to paint.

19     Q.   You're talking about Mr. Ebert

20     right now?

21     A.   Yes.

22     Q.   The recording that you're

23     talking about with Lisa, that Lisa made

24     of another person, not you, have you



1        heard that recording?

2          A.   I did, yeah.  And she told the

3        story of how Gregg was trying to get

4        her to leave the party and go to his

5        hotel room and he was going to give her

6        a story but he would only give it to

7        her if she came to the hotel room and

8        then he was peeing on the side of the

9        building -- I don't know -- on the way

10       out the door.

11                    That's what I remember of

12       that when I heard it.

13         Q.   Did you tell Mr. Ebert about the

14       recording?

15         A.   I must have said something like

16       she had a recording of somebody else,

17       yes.  Either that or he overheard it on

18       the phone because, again, I didn't go

19       into detailed conversations with him

20       about it because, number one, I don't

21       like talking about it.  I had to talk

22       about it enough at work and just

23       dealing with it.  I liked to be away

24       from it.



1              And the people that I

2    confided in or consulted or tried to,

3    like their shoulders that I cried on,

4    if he had overheard me talking to one

5    of them because a lot of them would

6    call and check on me so, you know, he

7    might have picked that up there.  I

8    don't really know how he knows.

9       Q.   So some of what he said was true

10   and some was not true.  Is that right?

11      A.   Yeah.  Most of it seems like

12   what he said wasn't true and what he

13   did say was kind of just like very

14   basic.

15      Q.   Okay.

16      A.   Like the girl in D.C. and a girl

17   that got recorded, like he didn't even

18   get that right.

19      Q.   Okay.  When you hear the tape

20   now is it pretty clear that that is his

21   voice?  Is it clear to you?

22      A.   That's him.  That's him.

23      Q.   Okay.

24              MS.  DIBIANCA: All right.



1      Let's go off the record, please, if

2      that's okay, Erica.

3                  THE VIDEOGRAPHER:  Going off

4      the record at 5:00 o'clock.

5                  (A brief recess was taken.)

6                  THE VIDEOGRAPHER:  We're

7      recording and back on the record at

8      5:04 Eastern time.

9                  MS. DIBIANCA:  We're back

10     on, Chris, when you're ready.

11                 THE VIDEOGRAPHER:  Yes.  Can

12     you hear me?  We're back on the record

13     at 5:04.

14                 (A discussion was held off

15     the record)

16     BY MS. DIBIANCA:

17       Q.   So, Ms. O'Brien, I would like

18     to play the recording now that

19     Ms. Barbounis made without your

20     knowledge.  And I may stop it at some

21     point to ask questions because it's a

22     bit long so just bear with me there.

23                 (The audio recording was

24     played at this time.)



1    BY MS. DIBIANCA:

2        Q.   I'm going to stop the tape there

3    and just ask you to identify who was

4    who.  So who was speaking last just

5    there where somebody said "I'm not

6    happy"?

7              Was that you?

8        A.   Yes, that was me.

9        Q.   Okay.  I'm going to continue it

10   now.

11             (The audio recording was

12   played at this time)

13   BY MS. DIBIANCA:

14       Q.   Let me ask a question.  I'll put

15   the tape on pause and I'll ask a

16   question.

17             At this point in the

18   conversation, Ms. O'Brien, did you

19   think that Ms. Barbounis and some of

20   the other women that you worked with

21   were ganging up on you?

22       A.    No, I didn't think they were

23   ganging up on me.  I think that, you

24   know, with Gregg out of the office we



1    were all still afraid that we were

2    going to get fired and I wanted to keep

3    my job and I wanted everybody to keep

4    their job.

5                  So I felt like they should

6    have picked me for that and I knew

7    background information.  I think I

8    actually mentioned it earlier.  He

9    had -- you know, I sat with him while

10   he was trying to distribute duties and

11   cover everything and he gave Tricia

12   extra money.  And then he asked me to

13   take on extra responsibilities and

14   offered me no money.  And I said, you

15   know, I wanted money, extra.

16                  He had just taken away my --

17   I had just taken a $6,000 hit for not

18   having my benefits paid and now he

19   wanted to give me extra responsibility

20   and not pay me for it.

21                  So I didn't feel like they

22   were ganging up on me.  He told me when

23   he told me that Lisa won he told me it

24   seems that she was campaigning behind



1     the scenes.

2              So I was just irritated

3     because I was -- you know, she was very

4     worried about her job.  So I was trying

5     to help her get responsibilities and

6     show her value.  And then when there

7     was a moment for her to say yeah,

8     Marnie can handle that, I thought they

9     would just pick me.  And then Daniel

10    already knew that if I was going to do

11    it he was going to pay me for it or

12    that I wanted money for it.

13             So I felt like her trying to

14    take an opportunity that should have

15    been mine was screwing me out of money

16    and out of showing my worth and my

17    value because, you know, we all wanted

18    to do that at that point.

19        Q.   At the time of the call did you

20    think that Lisa was conspiring against

21    you with the other women?

22        A.   No.  I thought she was

23    campaigning for the position.

24        Q.   Okay.  And they all voted --



1      nobody voted for you except for

2      yourself, correct?

3        A.   Yeah.

4        Q.   You did?

5        A.   I did.

6             (The audio recording was

7      played back at this time.)

8    BY MS. DIBIANCA:

9        Q.   Okay.  Ms. O'Brien, the tape

10     that you just heard, after hearing that

11     tape what is your current opinion of

12     Ms. Barbounis?

13       A.   I'm not happy that she taped me

14     without me knowing it.  I'm not happy

15     that she played it.  I don't know.  I

16     mean are you -- I don't know what

17     you're asking really.  Because I mean

18     are you asking about then or now?  I

19     don't know.

20       Q.   Now.

21       A.   I think it was pretty screwed up

22     that she taped me without me knowing

23     it, but she taped that other lady too

24     so it shouldn't be surprising.

```
 1                MS. DIBIANCA:  Okay.  I
 2      don't have any further questions.
 3                If Erica wants to do any
 4      cross, I'm sorry, rebuttal, you know
 5      what I mean, you're happy to do it.
 6                Did you say something?
 7                MS. SHIKUNOV:  I'm sorry.  I
 8      need to project and my throat is
 9      killing me.
10                We're good, caput.
11                MS. DIBIANCA:  We can go off
12      the record.
13                THE VIDEOGRAPHER:  Going off
14      the record at 5:32.
15                THE COURT REPORTER: Counsel,
16      just to confirm, as requested I will
17      deliver an expedited transcript to
18      Molly and, Erica, you would like to
19      order your transcript just regular
20      turnaround?
21                MS. SHIKUNOV:  Yes.
22                MS. DIBIANCA:  Yes.
23                (Deposition concluded at
24      5:32 p.m.)
```



```
1                 - - - - -

2                   I N D E X

3
   DEPONENT:  MARNIE O'BRIEN          PAGE
4
      Examination by Ms. DiBianca   4
5
                   E X H I B I T S
6

7  O'BRIEN DEPOSITION EXHIBITS      MARKED

8  Exhibit 1   Charge of

9              Discrimination        64

10 Exhibit 2   Document Bates stamped

11             D0006695              222

12 Exhibit 3   Rule 26(a)(1) Initial

13             Disclosures of

14             Plaintiff             265

15 Exhibit 4   Printouts of text

16             Messages              331

17

18                - - - - -

19

20

21

22

23

24
```



1

2       DIRECTIONS NOT TO ANSWER       PAGE  LINE

3
                                      267    10
4                                     280     9
                                      326     4
5
        REQUESTS MADE FOR DOCUMENTS    PAGE  LINE
6
                     NONE
7

8       READING AND SIGNING INSTRUCTIONS PAGE 351
        ERRATA SHEET                     PAGE 352
9       CERTIFICATE OF REPORTER          PAGE 353

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24



1    State of Delaware  )

2                       )
     New Castle County  )
3

4              CERTIFICATE OF REPORTER
5

6        I, Kurt A. Fetzer, Registered
     Diplomate Reporter and Notary Public,
7    do hereby certify that there came
     before me on Thursday, January 14,
8    2021, the deponent herein, MARNIE
     O'BRIEN, who was duly sworn by me and
9    thereafter examined by counsel for the
     respective parties; that the questions
10   asked of said deponent and the answers
     given were taken down by me in
11   Stenotype notes and thereafter
     transcribed by use of computer-aided
12   transcription and computer printer
     under my direction.
13
         I further certify that the foregoing
14   is a true and correct transcript of the
     testimony given at said examination of
15   said witness.

16       I further certify that I am not
     counsel, attorney, or relative of
17   either party, or otherwise interested
     in the event of this suit.
18

19

20
         Kurt A. Fetzer, RDR, CRR
21

22

23

24

