# EXHIBIT V

# EXHIBIT H

```
 1          IN THE UNITED STATES DISTRICT COURT

 2            EASTERN DISTRICT OF PENNSYLVANIA

 3


 4
     MARNIE O'BRIEN,          )
 5                            )
          Plaintiff,          )
 6                            )Civil Action No.
     v.                       )19-06078 JMG
 7                            )
     MIDDLE EAST FORUM,       )
 8   DANIEL PIPES             )
     (individually), and GREGG )
 9   ROMAN (individually),    )
                              )
10        Defendants.         )
     --------------------------
11   GREGG ROMAN,             )
                              )
12        Counterclaim and   )
          Third-Party        )
13        Plaintiff,          )
                              )
14   v.                       )
                              )
15   MARNIE O'BRIEN,          )
                              )
16        Counterclaim        )
          Defendant.          )
17

18
            DEPOSITION OF MARNIE O'BRIEN
19
             TAKEN ON JANUARY 14, 2021
20

21
                  WILCOX & FETZER
22        Registered Professional Reporters
                 1330 King Street
23          Wilmington, Delaware 19801
                  (302) 655-0477
24                 www.wilfet.com
```

```
1            Deposition of MARNIE O'BRIEN via

2       remote videoconferencing of all

3       participants taken pursuant to notice

4       beginning at 9:09 a.m., on Thursday,

5       January 14, 2021, before Kurt A.

6       Fetzer, Registered Diplomate Reporter

7       and Notary Public.

8     APPEARANCES:

9           ERICA A. SHIKUNOV, ESQ.
            DEREK SMITH LAW GROUP, PLLC
10            1835 Market Street - Suite 2950
              Philadelphia, Pennsylvania 19103
11            For the Plaintiff/Counterclaim
              Defendant Marnie O'Brien
12
            MARGARET M. DiBIANCA, ESQ.
13          CLARK HILL PLC
              824 North Market Street
14            Suite 710
              Wilmington, Delaware  19801
15                - and -
            JAKOB F. WILLIAMS, ESQ.
16          CLARK HILL PLC
              Two Commerce Square
17            2001 Market Street - Suite 2620
              Philadelphia, Pennsylvania 19103
18            For the Defendants and
              Counterclaim Third-Party Plaintiff
19
      ALSO PRESENT:
20          MARC FINK, ESQ.
            MATTHEW MAINEN, ESQ.
21          IN-HOUSE COUNSEL - MIDDLE EAST FORUM

22          DANIEL PIPES
            GREGG ROMAN
23          JON CAVALIER
            JASON BROCKMAN, PARALEGAL
24          CHRIS WEISS CALHOUN, VIDEOGRAPHER
```



```
1                - - - - -

2                THE COURT REPORTER:  Will

3     counsel stipulate to the admissibility

4     of my oath via remote video-

5     conferencing?

6                MS. DIBIANCA:  Yes.

7                MS. SHIKUNOV:  Yes.

8                THE VIDEOGRAPHER:  We are on

9     the record.  My name is is Chris Weiss

10    Calhoun, Certified Legal Videographer

11    retained by Lexitas.

12                This is a video deposition

13    in the United States District Court

14    Eastern District of Pennsylvania.

15    Today's date is January 14th of 2021.

16    The time on the monitor is 9:09 a.m.

17    Eastern Time.

18                The deposition is being held

19    virtually in the matter of Marnie

20    O'Brien versus Middle East Forum,

21    Daniel Pipes and Gregg Roman.  The

22    deponent is Marnie O'Brien.

23                Will the attorneys please

24    state their appearance for the record?
```



1              MS. SHIKUNOV:  Erica

2      Shikunov for plaintiff.

3              MS. DIBIANCA:  And Molly

4      DiBianca behalf of the defendant.

5              THE VIDEOGRAPHER: And the

6      court reporter today is Kurt Fetzer and

7      will now administer the oath.

8

9              -  -  -  -  -

10

11              MARNIE O'BRIEN,

12       the deponent herein, having first

13        been duly sworn on oath, was

14        examined and testified as follows:

15              EXAMINATION

16      BY MS. DIBIANCA:

17       Q.   Good morning, Ms. O'Brien.  I'm

18      quite certain your counsel has done a

19      great job in getting you ready so I'm

20      not going to go into a whole bunch of

21      instructions other than to just

22      reiterate the need for us not to speak

23      on top of each other.

24              If I cut you off, it is not



```
 1    my intention so if I do that I will

 2    stop talking and you can continue.  And

 3    I'll just ask that you do the same for

 4    me.

 5              The other instruction that

 6    I'll just note is just a matter of

 7    civility.  There are times inevitably

 8    where the witness will nod or give a

 9    non-verbal answer like a shake of the

10    head instead of a yes or a no. I'm

11    going to need you to say a yes or a no

12    if that's what you mean on the record

13    using words.  So I may say did you mean

14    yes or no or did you mean yes?

15              And when I do that, I'm not

16    trying to be rude.  I'm not trying to

17    suggest an answer to you.  I just want

18    to make sure that we have a record that

19    has words.

20              So those are the only two

21    instructions.  If there's any questions

22    at any time, let me know.  If you need

23    to revise an answer, let me know.

24              We're going to take plenty
```



1    of breaks.  I try not to go for longer

2    than an hour without a break, but you

3    or your counsel can request one at any

4    time.  It's not a problem.  All right.

5              Have you had your deposition

6    taken before?

7       A.   No.

8       Q.   Are you currently employed?

9       A.   No.

10      Q.   When was the last time you held

11   a job?

12      A.   At the Middle East Forum.

13      Q.   What income have you had since

14   you left the Forum?

15      A.   I have a consulting business

16   that I always have done on the side.

17   It's small.  It's not a substantial

18   amount of income.

19             I was supposed to have a new

20   job when quarantine hit.  It didn't

21   happen.  I was let go before I even

22   started, so I collected unemployment.

23             And then I had gotten my

24   real estate license.  So I had sold a



```
 1     couple of houses, dabbled in that a
 2     little.
 3         Q.   I'm sorry.  That something a
 4     little?
 5         A.   I dabbled with the real estate a
 6     little.
 7         Q.   Okay.  Since you left the Middle
 8     East Forum, how much have you earned as
 9     a result of the consulting business?
10         A.   I don't know.  I would have to
11     look.  I think, I think I sent that
12     over at some point.
13         Q.   And the name of that business is
14     GC4, correct?
15         A.   GC4 Consulting.
16         Q.   And what type of work do you do
17     for that business?
18         A.   Bookkeeping.
19         Q.   When did you start that
20     business?
21         A.   2012.
22         Q.   And are you the only person
23     involved in the business?
24         A.   Yes.
```



```
 1          Q.   What does the name stand for,
 2     GC4?
 3          A.   It's Group Consulting.
 4          Q.   What's the 4 stand for?
 5          A.   When I was originally doing it
 6     there were four platforms.  I had four
 7     other -- actually, I had five.  When I
 8     started there were four.
 9               I had four other women who
10     weren't happy in their jobs and, you
11     know, wanted to try to do something.
12     So each one of us had a platform.  One
13     was operations.  Mine was bookkeeping.
14     One was marketing and I think the other
15     was events.
16               And then one of the
17     marketing girls had -- her father-in-
18     law had been really good at advertising
19     so we brought him in.  He was in for a
20     little while.
21          Q.   And are those people involved
22     now?
23          A.   No.  They -- you know, it was
24     more or less what I had offered to them
```



1      was, you know, if they brought in that

2      business like I would get a percentage

3      of it for doing the back end of the

4      bookkeeping.  And because it was my

5      business that was promoting it, I would

6      get like a certain chunk of it.

7                 So they would have to sell

8      it basically and if they sold something

9      that they needed help with, they could

10     pull the other players in to help with

11     that.  So everybody would basically be

12     trying to build their own business

13     under one umbrella and hopefully

14     providing work for one another.

15        Q.   Okay.  So you mentioned -- and

16     I'll circle back to what you testified

17     to about the other job that you had

18     lined up.

19                 So you had a job lined up

20     when you resigned from MEF, correct?

21        A.   Yes.

22        Q.   And where was that job?

23        A.   It was called 1 Creation

24     Construction.



```
1        Q.   As in the number o-n-e 1?

2        A.   I think they used both.

3        Q.   But not like w-o-n?

4        A.   No.

5        Q.   Okay.  One.  Okay.

6             Tell me where they're

7    located?

8        A.   They are in I think Cherry Hill,

9    like that area.

10       Q.   Okay.  What were you going to do

11   for them?

12       A.   Bookkeeping, help them organize

13   their office and they kind of wanted me

14   to like manage their office and their

15   back end for them so that they could

16   get the, you know, the business in and

17   do the construction.

18            They did --

19       Q.   Okay.

20       A.   -- custom homes.

21       Q.   Sorry.  It's inevitable we'll

22   trip over each other a little bit.

23   It's inevitable via Zoom and I

24   apologize.
```



```
 1              Would that have been a
 2     full-time position?
 3        A.   Yes.
 4        Q.   And what would have been your
 5     wages?  Would it have been salary?
 6        A.   Yeah.  They were going to pay me
 7     salary 50,000 a year, but they were
 8     putting me in a position so that I
 9     could upsell their customers.  Like if
10     they added on different things as a
11     result of them talking with me, I'd be
12     able to make money there.
13              And then they also wanted me
14     to -- they have a lot of people that
15     come to them that want a custom home
16     but they don't have a place to build it
17     so they wanted to help me find them
18     houses that they could customize or
19     knock down and redo so then I would
20     make money selling the houses.
21        Q.   Okay.  And you would be
22     utilizing your real estate license to
23     do that, correct?
24        A.   Yes.
```



```
1         Q.   What about benefits, did it come
2    with healthcare?
3         A.   No.   I would have had to do my
4    own.
5         Q.   What would have been, what did
6    you expect your earning potential would
7    be there as far as the salary plus the
8    upselling part?
9         A.   They were, they were pretty
10   excited about building their business
11   and they wanted to build it up pretty
12   big.  So worst-case scenario I figured
13   if it didn't come out to where I was
14   making -- you know, I wanted to make
15   over a hundred.  130 is my goal.
16              So even if I didn't see that
17   working out, at least I would be out of
18   MEF and I would be able to, you know,
19   then I would try to look for something
20   else.
21        Q.   When did you apply to that
22   employer?
23        A.   I don't remember exactly.  I
24   guess it was -- I don't know.  I know
```



```
1      that I gave my notice I think February
2      29th, so it was prior to that in 2020.
3      So it was either -- and I think it took
4      a little while too.  Like I met them
5      once.  We talked a couple of times and
6      then they were thinking about trying to
7      see if they could afford me or whatever
8      and then they made an offer.
9         Q.   Okay.  So if I understand it
10     correctly -- and please do correct me
11     if I'm wrong -- your expectation for
12     that job was that you would get a
13     minimum income of the $50,000 per year
14     with salary and that you had potential
15     to earn upwards of a hundred, in the
16     neighborhood of 130,000.  Is that
17     right?
18        A.   I mean I don't know if the
19     potential for that was there.  I didn't
20     know, but I was going to take the
21     chance.
22              And I also had my consulting
23     business on the side so...
24        Q.   Has your consulting business
```



1      taken a hit because of the pandemic?

2          A.   No.  I've done okay and I've

3      actually been concentrating on building

4      that up because I don't really want to

5      work for anybody.

6          Q.   Okay.  Have you taken any steps

7      to build that business up such as

8      advertising or networking, for example?

9          A.   Networking.

10         Q.   Networking.  And are you

11     continuing to try to build that

12     business up?

13         A.   Yes.

14         Q.   And what was your expected start

15     date for the new position?

16              Was it 1 Construction?  Was

17     that the name of it?

18         A.   I think it was March 16th.

19         Q.   2020?

20         A.   Mm-hmm.

21         Q.   I need you to say yes.

22         A.   Yes.  Yes, 2020.

23         Q.   Okay.  That was our first little

24     practice there.



```
 1              So it was March what again?
 2    I'm sorry.
 3        A.    16th.
 4        Q.    Okay.
 5        A.    I believe.  I think it was the
 6    Monday of that, so it might have been
 7    15th, 16th, 17th, but it was the
 8    Monday.  I believe it was the exact day
 9    that quarantine started.
10        Q.    March 16th -- I'm looking at my
11    calendar -- is a Monday so that would
12    correspond with that.  Okay.
13              And when did you -- did they
14    delay your start date when the
15    quarantine hit?  Initially did they
16    delay it?
17        A.    They delayed it inevitably.
18        Q.    Okay.
19        A.    Like they delayed it -- I'm
20    sorry.  Not inevitably.  That's the
21    wrong word.
22              But they delayed --
23        Q.    Go ahead.  Tell me what they
24    said when they called.  That would
```



1    probably be easier than me suggesting a

2    word for you.

3        A.   They said that they were shut

4    down because they were custom homes.

5    Even though they were I guess a

6    business that could still operate, they

7    were kind of handcuffed because they

8    couldn't get CO's.  They couldn't get

9    approvals.  They were having trouble

10   getting supplies.

11              So they were just completely

12   jammed up and they weren't in a

13   position to have somebody new come in.

14       Q.   Okay.  Did they tell you whether

15   they hoped -- was there is sort of a

16   tentative check-in date, like we will

17   see, hopefully we will be able to get

18   started again or was it just -- how was

19   it left?

20       A.   They said -- well, I mean it was

21   quarantine.  Nobody really knew what

22   was going to happen.  I think all of us

23   were expecting that the world was going

24   to end and everyone was going to die at

1       that point.

2                So they left it that we'll

3       see and then we touched base, you know,

4       every so often.  And then I just

5       started trying to focus on my

6       consulting.

7          Q.   And this is likely stating the

8       obvious.  But am I correct to say that

9       it never did come to fruition, they

10      never --

11         A.   Correct.

12         Q.   I'm correct?

13         A.   Yes.

14         Q.   Okay.  Is that door still open

15      with them, in other words, if things

16      were to change in the pandemic in let's

17      say six months?

18         A.   I think so.

19         Q.   Okay.  So nothing you did caused

20      you to not proceed with that job,

21      correct?

22         A.   No.

23                MS. SHIKUNOV:  Molly, can

24      reask that because you had a double



1       negative in it and I think --

2                    MS. DIBIANCA:  Sure.  Sure.

3       Absolutely.

4                    MS. SHIKUNOV:  Thank you.

5       BY MS. DIBIANCA:

6         Q.   So you did not cause -- I'll say

7       it actually in a better way.

8                    The pandemic was the reason

9       you're not working for that company,

10      correct?

11        A.   Yes.

12        Q.   Now, at this time do you have

13      any plans to look for another job or

14      are you just sticking, planning to

15      stick with the consulting business?

16        A.   I'm planning to stick with the

17      consulting business.  If there was an

18      opportunity that presented itself and I

19      was comfortable with the person that

20      wanted to hire me, then I would think

21      about it.  But right now my plan is

22      just to try to be growing the client

23      list for my consulting business and to

24      try to do some real estate on the side.



1      Q.   Okay.  Other than with 1

2   Construction, did you have any other

3   employment opportunities other than

4   your consulting business since leaving

5   MEF?

6      A.   I had gotten a new client who

7   talks about hiring me in, but he is

8   either going to go out of business

9   or -- it's not, it's not a solid

10   business.  There's a really good chance

11   he's going to go out of business.

12             So I said that I wanted to

13   continue consulting and then we could

14   talk about employment if he got to a

15   position where I would have a job

16   security.

17      Q.   Is his question with regard to

18   going out of business or not, is that

19   also pandemic related?

20      A.   I don't know what that is.  He

21   was in bad shape before the pandemic so

22   I don't really know what the problem

23   was.

24      Q.   All right.  Let's talk about



1      your real estate license.

2                    When did you obtain your

3      real estate license?

4         A.   I can't -- I don't know exactly.

5      I know that I was supposed to go -- I

6      had told Gregg that I had wanted to do

7      that and the only way that I could do

8      it is I had to take a class.  And I

9      could do it nights for like a month and

10     a half or something like that or I

11     could take two weeks and do a two-week

12     stint.

13                    So it was too much for me.

14     I have two kids.  I couldn't work all

15     day and then go to school all night

16     like that.

17                    So I had asked him if I

18     could not be in the office and I just

19     worked in the morning before I went and

20     took care of my responsibilities for

21     work.  That's what I planned to do and

22     then just do the class for the two

23     weeks.

24                    And he had given me



```
 1    permission to do that.  And I was
 2    supposed to start right when everything
 3    happened.  So Daniel was -- it was
 4    actually the day, it was November 1st I
 5    think that I was supposed to start that
 6    class.  And Daniel Pipes called a
 7    mandatory meeting so I ended up pushing
 8    the class back and I can't remember
 9    exactly when I did it.  I think I'm
10    going to say like maybe February or
11    March of 2019.  I'm not exactly sure.
12       Q.   Okay.
13       A.   And I had asked Daniel Pipes if
14    he would be okay with me doing that and
15    I had explained to him that Gregg had
16    approved it and that I wasn't able to
17    do it because of everything that
18    happened and he okayed it.
19       Q.   What state do you hold your
20    license in?
21       A.   Jersey.
22       Q.   And who are you affiliated with
23    as far as being a broker?  What
24    organization or organizations?
```



1        A.    Berkshire Hathaway.

2        Q.    Okay.  Have you been affiliated

3    with any other firm?

4        A.    No.  I am under -- in Berkshire

5    Hathaway I am under the Randy Knowles

6    team.

7        Q.    Randy Miller?  Is that what you

8    said?

9        A.    Randy Knowles.

10       Q.    Knowles, K-n-o-w-l-e-s?

11       A.    Yes.

12       Q.    How much of your time now is

13   devoted to real estate?

14       A.    Very little.  I got a few deals

15   just from people I know that asked me

16   to help them and I'm still learning it.

17   So I'm trying to do classes for that

18   like to learn more, but the Randy

19   Knowles team has an admin who when I

20   would get a deal she would basically

21   walk me through it.

22       Q.    Do you know about how many deals

23   you've had since you've --

24       A.    Three.



```
1        Q.   Three total?

2        A.   Mm-hmm.

3        Q.   Is that a yes?

4        A.   Yes.  Sorry.

5        Q.   That's okay.

6             Tell me why you thought

7    about getting your real estate license

8    in the first place.  What prompted

9    that?

10       A.   I always was interested in it

11   and I was doing the books for Lisa

12   Knowles because they have rental

13   properties.  And so I was just always

14   interested in house flipping and rental

15   properties so I wanted to kind of

16   dabble in that.

17       Q.   Was it ever your intention to do

18   that as a full-time job?

19       A.   I mean if I got great at it

20   maybe, but I wanted to try it.

21       Q.   You said that Mr. Roman and

22   Mr. Pipes or Dr. Pipes separately both

23   gave you approval to take that course

24   even though it required time away from
```



1    work, correct?

2        A.    Yes.

3        Q.    And did Mr. Roman at some point

4    during your employment also permit you

5    at your request to meet with clients

6    for your consulting business through

7    the workweek?

8        A.    When I originally was hired he

9    told me that I would have flexibility

10   in my schedule, that I wouldn't have to

11   be pinned to my desk 9:00 to 5:00, that

12   Daniel's way of running an office is

13   that you're an adult.  If your work is

14   done, then you can do what you want.

15   You can manage your time yourself.

16           He didn't care if you worked

17   in the middle of the night as long as

18   you were available if he needed you and

19   if your responsibilities were handled.

20           After I started it became

21   very clear to me that I felt like it

22   was a bait and switch because if I

23   wasn't at my desk at 9:00 o'clock, he

24   was on my phone where are you, where



1    are you, where are you, where are you?

2              So it really did fall off

3    and I didn't grow my business at all

4    while I worked there.  I was just at

5    MEF and, you know, he was talking about

6    growing that to a 20-million-a-year

7    organization.  So I was -- you know, I

8    enjoy startups and I was all in for

9    that.

10   Q.   So during your employment with

11   MEF did you ask Mr. Roman for

12   permission to meet with your consulting

13   clients during the workweek?

14   A.   I don't know that I did meet

15   with them during the workweek.  There

16   may have been times, but I don't know

17   that I felt like I had -- if I didn't

18   or I did, I don't know that I needed

19   to.  I was told that I could manage my

20   time myself.

21   Q.   Okay.  Again, just to be clear,

22   I'm not asking whether you did meet

23   with the clients.

24              I'm asking if you asked for



```
 1     permission to be able to have the

 2     flexibility to do that?

 3        A.   Yes.  I told him when I started

 4     that I had a consulting business and I

 5     would need flexibility.  It was after I

 6     started that the flexibility was pulled

 7     from me.

 8        Q.   Were you able to meet with

 9     clients during the workweek?

10        A.   No.  Very rarely.  If I did,

11     maybe, you know, rarely.  I can't

12     remember at the time.  I may have had

13     one that I would go to but...

14        Q.   Did you maintain your consulting

15     business throughout your employment

16     with MEF?

17        A.   Yes.

18        Q.   And how did you do that without

19     meeting with your clients?

20        A.   I would wake up at 5:00 o'clock

21     in the morning every morning.  I would

22     meet with them at night.  But, again, I

23     was supposed to have flexibility with

24     my job so I would try to be flexible
```



```
1    and maybe ask for a late start.
2                A lot of times instead of,
3    you know, I would start later, start
4    later, stay later or maybe start
5    earlier and leave early so that I could
6    get to the other client.
7        Q.   During your employment with MEF
8    you had planned to go into business
9    with Mr. Roman at some point.  Is that
10   correct?
11       A.   He would take me to lunch and
12   say that he was going to start his own
13   business.  And it was like I never
14   really understood what his business was
15   going to be because he never really was
16   clear about it.  It was like secret spy
17   stuff and he was going to -- you know,
18   and I was like okay, you know, I am
19   okay with that, like let's do it.
20               And then he would have
21   another meeting about it and say
22   basically the same thing and not do
23   anything about it and then nothing
24   would happen.
```



1      Q.   What kind of an organization was

2   it, was it for tax purposes?  Was it a

3   501?

4      A.   What organization?

5      Q.   The one that he started, that he

6   had talked to you about starting.

7      A.   I have no idea.  He wasn't very

8   clear about what it was.  He told me --

9      Q.   Who -- go ahead.

10      A.   He asked me if I would be

11   willing to take envelopes and deliver

12   them to people.

13           I said is it illegal?  And

14   he said no.

15           I said well, then, why

16   wouldn't I?

17      Q.   Was there any conversation about

18   how you would be compensated for that?

19      A.   I don't remember.  I mean he was

20   talking about an entrepreneurial

21   startup.  I didn't put much stock into

22   it because he never gave any substance

23   to what they was doing.  It was almost

24   like when I grow up I'm going to have



```
 1    my own business.  Do you want to be

 2    landscapers?  Do you know what I mean?

 3              It just was not -- I didn't

 4    put much effort or thought into it.  I

 5    didn't put any effort into it.  I

 6    didn't put much thought into it because

 7    he didn't do anything.

 8      Q.   Did you discuss it with Matt

 9    Bennett as well?

10      A.   Yeah.  He was always there.  He

11    was going to be in the business too.

12      Q.   You interviewed with the Kimmel

13    Center at some point, correct?

14      A.   I did.

15      Q.   And that was while you were

16    employed with MEF.  Is that correct?

17      A.   Yes.

18      Q.   What was the position for which

19    you were interviewing?

20      A.   It was an accounting position or

21    controller.  I don't remember exactly.

22      Q.   Who interviewed you?

23      A.   I think there were two different

24    people, the HR person and then I don't
```



1    remember.

2       Q.   But your recollection is that

3    there were two people in the room?

4       A.   Yes.

5       Q.   A man or a woman?

6       A.   One was a woman and one was a

7    man.

8       Q.   And the HR person was male or

9    female?

10      A.   Female.

11      Q.   And you got that interview

12   through a recruiter, correct?

13      A.   Yes.

14      Q.   What was the name of the

15   recruiter?

16      A.   PeopleShare, I think.

17      Q.   And of the individual recruiter?

18      A.   I'd have to look.  I don't

19   remember her name off the top of my

20   head.

21      Q.   It was a woman though?

22      A.   Yes.

23      Q.   And how did you come to find the

24   recruiter?



1          A.    They found me.  And they were in

2     the building that MEF's offices were.

3     So I was -- I thought it was so

4     strange.  And I had a severe sense of

5     paranoia at that point and I just

6     didn't know how they would have picked

7     my name out of a hat.  And it was very

8     nerve-racking because we had the NDA

9     and we had to protect Savannah.

10                    So even though we worked for

11    MEF, we had to pretend in the building

12    that we worked for Savannah.  And it

13    was made very clear to us if you blew

14    your cover for Savannah that you would

15    be sued and take your first born child.

16                    So it was very nerve-racking

17    to me that out of a hat with all these

18    resumes this place pulled my resume and

19    they were right in the building so then

20    I was scared somebody would see me and

21    ask me if I was in there because on my

22    resume --

23          Q.    You're breaking up a little bit

24    for me.  Could you maybe lean a little



1    closer perhaps?  I'm not sure what's

2    happening, but suddenly you're awfully

3    I quiet.

4              MS. SHIKUNOV:  There's two

5    other --

6              MS. DIBIANCA:  Can I have

7    the two people who are not on mute go

8    ahead and mute their lines, please?

9    And I understand if you're on mute on

10   your phone that's great, but if you can

11   mute on Zoom at the bottom of the Zoom

12   screen that would be helpful because

13   it's interfering with the video event.

14              Or, Chris, if you are able

15   to do it from your end, that would be

16   fine with me too.

17              One more, a 248 number.

18              Thank you.

19   BY MS. DIBIANCA:

20     Q.   Okay.  Ms. O'Brien, sorry about

21   that.

22              Would you mind restating

23   your answer?  And I apologize.  I don't

24   know where you left off because I lost



1    the audio there.

2         A.   Can you tell me --

3         Q.   I can try.  Oh, you were talking

4    about the recruiter and you said you

5    were paranoid about why they got your

6    resume.

7         A.   Right.  You asked me how I got

8    the recruiter.  They found me.  They

9    were in the building that MEF's offices

10   were, which was concerning to me

11   because I signed an NDA that I was

12   supposed to protect the identity of

13   MEF.  No one was supposed to know where

14   our geographic footprint was.

15            So within the building and

16   anyone that knew us in the building, we

17   had to present ourselves as if we

18   worked for Savannah Mercantile.  And,

19   you know, I had on my resume that I

20   worked for the Middle East Forum and I

21   had to go two floors down and go in and

22   out of the elevators every day with all

23   these people that worked at PeopleShare

24   who saw my resume and knew I worked at



1      the Middle East Forum.

2              So then I was nervous that I

3      was going to have to explain why I was

4      in the building and I was nervous that

5      I was going to, you know, out MEF and

6      blow the cover and then be sued for a

7      gazillion dollars.

8      Q.   So is it fair to say that the

9      answer to the question is that the

10     recruiter found you?

11     A.   Yes.

12     Q.   Okay.  Did you pay the

13     recruiter?

14     A.   No.

15     Q.   What other interviews besides

16     from the Kimmel Center did the

17     recruiter line up for you?

18     A.   They wouldn't touch me with a

19     ten-foot pole after that because they

20     got a call from the Kimmel Center and

21     they said that someone had called and

22     told them that I was a drug addict and

23     suing my boss for sexual harassment and

24     that they shouldn't hire me.



1              So they called to tell me

2      that that happened and then they washed

3      their hands of me.

4         Q.   Okay.  So there was several

5      pronouns in there so I just want to

6      make sure the record is clear.

7              So am I correct to say that

8      the Kimmel Center called PeopleShare,

9      your recruiter, and said that the

10     Kimmel Center had received a phone call

11     that was speaking negatively of you --

12     and we'll go into detail about that --

13     and they conveyed, Kimmel Center

14     conveyed that phone call to the

15     recruiter, the recruiter called you and

16     said we're not going to have anything

17     to do with you now, something to that

18     effect?

19        A.   No, they didn't say that.  But I

20     never got another call from them.

21        Q.   Okay.  Okay.  Did you sign a

22     contract with the recruiter agency?

23        A.   I don't recall.  I wasn't paying

24     them.  They were being paid by the



1        Kimmel Center so they were just trying

2        to send people there.

3           Q.   Now, are you aware that the

4        Kimmel Center has stated that -- let me

5        ask you this:  Did you talk badly about

6        the Forum during your interview with

7        the Kimmel Center?

8           A.   I don't think I talked badly

9        about any specifics.  I said that I

10       wasn't -- I said that what I was

11       looking for was a positive work

12       environment because I had experienced

13       an unpleasant work experience.  I

14       remember that, but I don't -- I think

15       when I was asking them questions I was

16       really trying to get a sense of what

17       their culture was like because it was

18       important to me not to get stuck in

19       that same culture.

20               To say that I bad-mouthed

21       them, I'm pretty sure that I would not

22       have done that specifically because I

23       was nervous about that NDA.

24          Q.   Are you aware that the Kimmel



1    Center says that they decided to not

2    hire you during the interview because

3    you spoke so badly of your then current

4    employer?

5        A.   I guess I knew that at some

6    point, but I would -- I mean when you

7    say I spoke so badly of my employer, I

8    can't recall specifically saying

9    anything bad about any specific person.

10              I remember being very

11   unhappy in the culture that I

12   experienced and I remember wanting to

13   make sure that if I took a position I

14   wouldn't be in a culture like that

15   again.

16       Q.   Okay.  So I'm not asking, I'm

17   not asking you to change your mind

18   about your recollection of the

19   interview.

20              I'm just asking if you're

21   aware that the Kimmel Center has taken

22   the position that the phone call they

23   received after your interview did not

24   influence their decision; they made



1    their decision to not hire you or not

2    proceed with your potential employment

3    during your interview as a result of

4    your interview?

5              Are you aware of that?

6      A.   The recruiter told me that that

7    night, so yes.

8      Q.   The recruiter told you what that

9    night?  What night?

10     A.   That they said that it wasn't,

11   it wasn't the phone call that they

12   didn't like.  It was they weren't happy

13   with the way I -- you know, they didn't

14   want me.

15     Q.   And the recruiter told you the

16   night that the recruiter called you to

17   convey that there had been the phone

18   call?

19     A.   Yes.

20     Q.   Okay.  I just want to make sure

21   I've got it correct.

22              So you had the interview and

23   at some point after the interview the

24   recruiter called you and said that the

1      Kimmel Center, Ms. O'Brien, the Kimmel

2      Center has decided not to proceed; they

3      received -- they decided not to proceed

4      because of the way the interview went,

5      but I think you should know that they

6      also received a phone call saying that

7      you were a drug addict and were suing

8      your former or your employer?

9              Is that about right?

10     A.   More or less.

11     Q.   Okah.  All right.  Other than

12     you, the recruiter and the Kimmel

13     Center, who else knew that you were

14     going to interview at the Kimmel Center

15     in advance of the interview, not after

16     the fact?

17     A.   I had some friends, probably my

18     family.  Delaney and Caitriona were the

19     only ones in the office -- I think

20     Caitriona was in the office still at

21     that point, so they knew.

22              It was in my computer.  It

23     was in my calendar as well.

24     Q.   You put it in your calendar that



```
1      you were interviewing for another job?

2         A.    My personal calendar.

3         Q.    Okay.  Okay.  Did you tell

4      Mr. Roman?

5         A.    Did I tell Mr. Roman?

6         Q.    Yes.

7         A.    No.

8         Q.    Did you tell Dr. Pipes?

9         A.    No.

10        Q.    Did you tell Matthew Bennett?

11        A.    No.

12        Q.    Did you tell Mr. Ebert?

13        A.    Yes, he knew.

14        Q.    And Mr. Ebert is your domestic

15     partner, correct?

16        A.    Correct.

17        Q.    You and he are not married,

18     correct?

19        A.    No.

20        Q.    And you live together currently,

21     correct?

22        A.    Correct.

23        Q.    And how long have you lived

24     together?
```



1        A.   I moved in February, I think

2    February 15th of 2020, almost a year.

3        Q.   And you said you moved in, you

4    moved into his home.  Is that correct?

5        A.   Yes.

6        Q.   You said yes, right?

7        A.   Yes.

8        Q.   Okay.  And where did you live

9    prior to moving in with Mr. Ebert?

10       A.   I have a townhouse.  I lived

11   there.

12       Q.   Do you still own the townhouse?

13       A.   Yes.

14       Q.   And is it rented out at this

15   point?

16       A.   Currently, yes.

17       Q.   Currently.  Okay.

18            Do you have any other

19   residences other than Mr. Ebert's home?

20       A.   No.

21       Q.   When is the rental agreement,

22   when does the rental agreement expire

23   on your townhouse?

24       A.   March 31st.



```
1         Q.   Of 2021?

2         A.   Yes.

3         Q.   And do you know if the renter is

4    intending to renew the lease?

5         A.   I have told them that I'm not,

6    I'm not renewing the lease.

7         Q.   Okay.  Are you returning, are

8    you planning to return to the

9    townhouse?

10        A.   I'm not.  My son and his

11   girlfriend will be renting it, along

12   with Mr. Ebert's daughter.

13        Q.   Okay.  Do you have any plans to

14   move out of Mr. Bennett's home at this

15   point?

16        A.   No.

17             MS. SHIKUNOV:  Molly, I'm

18   sorry.  Molly, you said Mr. Bennett and

19   I know --

20        Q.   I'm so sorry.  Thank you.  I

21   meant Mr. Ebert.  Let me try that

22   again.

23             Do you have any plans to

24   move out of Mr. Ebert's home at this
```



1    point?

2        A.    No.

3              MS. DIBIANCA: Thank you,

4    Erica.

5        Q.    About how long was that

6    interview at the Kimmel Center?

7        A.    Oh, I don't know.

8        Q.    Let me ask this:  At the end of

9    the interview with Kimmel Center, how

10   did you think it had gone?

11       A.    Not well.

12       Q.    Okay.  You didn't have a good

13   feeling about it?

14       A.    I didn't -- I wasn't interested

15   in the position.

16       Q.    What do you mean?

17       A.    I didn't, I didn't have a good

18   feeling about it, I didn't have a good

19   feeling about taking the job there if I

20   was offered it.  I would have taken it

21   but...

22       Q.    Explain that to me.

23       A.    Explain what?

24       Q.    You said you didn't think it



```
1    would be a good fit for you but you
2    would have taken it anyway.  Is that
3    correct?
4        A.   Yes.  It just didn't seem like
5    an environment -- it seemed like -- I
6    don't know.  It didn't seem like it had
7    a good culture there either.  Not -- it
8    just seemed stiff and I wasn't really
9    like oh, excited about it, but I would
10   have taken it to get out of MEF.
11       Q.   At the time that you left the
12   interview, at the conclusion of the
13   interview did you think that you were
14   going to get a second call or get a
15   call back from them?
16       A.   I didn't know.
17       Q.   I know you didn't know but how
18   did you feel about it?
19       A.   I felt like you always feel when
20   you leave a job interview.  You're
21   waiting to hear how it went.
22       Q.   Okay.  So tell me, let's talk
23   now about what the recruiter told you
24   when he -- I'm sorry.  Did you say the
```



```
 1    recruiter was a male?
 2       A.   So the original recruiter was a
 3    female.  The person that called me to
 4    tell me about the phone call was a
 5    male.
 6       Q.   Had you spoken to that person
 7    before?
 8       A.   I don't think so.  And he was
 9    never there when I was there.  He was a
10    boss and I guess he just wasn't there
11    when I was there or if he was he was
12    with someone else and I didn't speak
13    with him.
14       Q.   Okay.  So tell me what -- you
15    you don't happen to remember his name,
16    do you?
17       A.   No.
18       Q.   Tell me what your recollection
19    of that phone call was.  And by "that
20    phone call" I mean what the boss at the
21    recruiting agency said to you when he
22    called you about your Kimmel Center
23    interview.
24       A.   He said that the Kimmel Center
```



1    decided not to move forward with me;

2    that there was a phone call that came

3    in shortly after I left saying horrible

4    things about me and that they wanted

5    him to tell me because he felt like

6    they wanted -- he wanted me to know

7    that somebody in my inner circle had it

8    out for me but that wasn't the reason

9    that they were not going to move

10   forward with me.

11       Q.   Okay.  You said they said the

12   person had said horrible things about

13   you.

14              Do you recall what the

15   horrible things were?

16       A.   Yes.  I said them earlier.  I

17   said that they said I was a drug addict

18   and suing my boss for sexual

19   harassment.

20       Q.   Suing your boss for sexual

21   harassment, that was correct, wasn't

22   it?

23       A.   Yes.

24       Q.   Right.  So would you say that's



```
 1    a horrible thing?  It's true.
 2        A.   Well, it doesn't make me look
 3    good to an employer.
 4        Q.   Okay.  But it was true?
 5        A.   Yes, that was true.  That one
 6    was true.
 7        Q.   And to say that you are a drug
 8    addict is untrue, correct?
 9        A.   It is untrue.
10        Q.   And I apologize.  That was also
11    I threw a lot of negatives in there.
12             But you do use drugs,
13    correct?
14        A.   I use prescribed Adderall.
15        Q.   And your boyfriend testified
16    that you are a daily marijuana user.
17    Is that true or not true?
18             MS. SHIKUNOV:  Molly, did
19    you say she was dealing marijuana?
20             MS. DIBIANCA:  No.  I said
21    your boyfriend testified -- I didn't.
22    Your boyfriend testified that you are a
23    daily -- maybe that's what you heard --
24    a daily marijuana user.
```



1    BY MS. DIBIANCA:

2        Q.   Is that true or untrue?

3        A.   I don't consider marijuana a

4    drug.  It's decriminalized and mostly

5    legal or it's almost legal in Jersey.

6    It's supposed to be legal so I don't

7    see that as a drug, but I do use

8    marijuana.

9        Q.   Okay.  Do you have a medical

10   marijuana card?

11       A.   I do not.

12       Q.   Have you ever had one?

13       A.   No.

14       Q.   Where do you get your marijuana

15   from?

16       A.   I don't know.  Matt gets it.

17       Q.   You get it from your boyfriend?

18       A.   Yes.

19       Q.   Does he have a medical marijuana

20   card?

21       A.   He does.

22       Q.   So you're using his lawfully

23   prescribed marijuana?

24       A.   I believe.  I don't know where



```
1      it comes from so...
2         Q.   Other than to say from
3      Mr. Ebert?
4         A.   Yes.
5         Q.   Okay.  Got it.
6              You said that you were
7      prescribed Adderall.  For how long have
8      you been prescribed Adderall?
9         A.   I don't remember the exact day
10     or date or even time.  It was probably
11     in 2015.
12        Q.   And what was the condition for
13     which you were being prescribed the
14     drug?
15        A.   ADHD.
16        Q.   When were you first diagnosed
17     with ADHD?
18        A.   At that time, like in 2015.
19        Q.   Do you take any other
20     medications for that condition?
21        A.   No.
22        Q.   And what's the dosing that you
23     take on Adderall?
24        A.   I take 10 milligrams.
```



1      Q.   Once a day?

2      A.   Yes.

3      Q.   And is that in the same since

4    2015?

5      A.   I'm sorry?  What?

6      Q.   I'm sorry.  Has that been the

7    same since 2015?

8      A.   Originally she prescribed me 10

9    milligrams and she said see how you

10   feel with it.  And then she bumped me

11   up to 20 milligrams so I did that for a

12   while.  And she bumped me up to 30

13   milligrams and I didn't feel

14   comfortable with it.  I didn't like it.

15   I don't really like to take medication.

16             So I backed it down and I

17   only do 10.

18     Q.   Okay.  Okay.

19     A.   If I'm like doing like a longer

20   day --

21     Q.   I didn't hear you.  I'm so

22   sorry.

23     A.   If I have a long day and I'm

24   working for a long period and I start



1    to feel my concentration slip, I'll

2    bump to 20, but that's rare.

3        Q.   Okay.  Have you ever shared your

4    Adderall with another person?

5        A.   Lisa and I had the same

6    prescription and if she was waiting for

7    a prescription or whatever, I would,

8    you know, give her a few of mine and

9    then she would give them back to me

10   when she got her prescription filled.

11           I didn't give her any more

12   than she was prescribed for and I

13   didn't do it often.

14       Q.   Okay.  Have you ever snorted

15   Adderall?

16       A.   No.  I heard it's a thing

17   though.

18       Q.   Other than Adderall, are you

19   currently taking any other medication?

20       A.   Yes.

21       Q.   And what are they?

22           THE WITNESS:  Is she allowed

23   to ask me about my medication?

24           MS. SHIKUNOV:  Yes.  Go



1    ahead.

2        A.   I don't really know the name of

3    it.  I starts with a V.

4        Q.   What condition is it for?

5        A.   It's for an STD.

6        Q.   Okay.  Anything else?

7        A.   No.

8        Q.   And how about since you left

9    MEF, other than the medication that

10   started with a V and the Adderall,

11   anything else that you've taken since

12   leaving MEF?

13       A.   Not that I recall.

14       Q.   And I don't mean to say like an

15   antibiotic or something like that where

16   it's a short course but for a

17   condition.

18       A.   No.

19            MS. DIBIANCA: Do you know

20   what?  We've gone for about fifty

21   minutes.

22            So, Erica, is this a good

23   time to take a couple of minutes?

24            MS. SHIKUNOV:  Yes.  That's



1    fine.  And then, Molly, I just want to

2    ask you -- let's go off the record

3    first.

4                THE VIDEOGRAPHER:  Going off

5    the record at 9:57.

6                (A brief recess was taken.)

7                THE VIDEOGRAPHER:  We're

8    rolling and back on the record at 10:10

9    Eastern Time.

10   BY MS. DIBIANCA:

11     Q.   All right.  So, Ms. O'Brien,

12   we're back from break so I'm just going

13   to continue with the questioning that

14   we left off, which was the Kimmel

15   Center.

16                Who made the anonymous call

17   to the Kimmel Center, Ms. O'Brien?

18     A.   My boyfriend did, Matt Ebert.

19     Q.   When did you learn that

20   Mr. Ebert made that call?

21     A.   I learned that -- so he took

22   ownership of that call when he filed

23   paperwork because he was served

24   something.  He never admitted it until



```
 1     that point despite the fact that it was
 2     pulled from his phone records.
 3        Q.   Okay.  So I'm going to break
 4     that down a little.
 5              So is it correct to say that
 6     the first time Mr. Ebert admitted to
 7     you that he had made the phone call to
 8     the Kimmel Center was when he put it
 9     into a pleading which he filed with the
10     court in this case?
11        A.   Yes.
12        Q.   Prior to that, had you asked him
13     if he had been the anonymous caller to
14     the Kimmel Center?
15        A.   Yes.
16        Q.   And --
17        A.   Go ahead.  He denied it.
18        Q.   When did you first ask him if he
19     had made that call?
20        A.   I don't, I don't recall.
21     Erica --
22              MS. SHIKUNOV:  Don't tell
23     her anything that I said.  If you're
24     going to say that I showed you phone
```



1    records that's fine, but other than

2    that don't talk about our

3    conversations.

4       Q.   Let me restate it in a way that

5    doesn't tend to invoke the counsel

6    part.

7              Prior to -- is it fair to

8    say that you did not suspect Mr. Ebert

9    made the phone call at the time it was

10   made?

11      A.   Yes.

12      Q.   At the time you filed -- let me

13   ask you this:  You filed a charge of

14   discrimination with the EEOC.  You

15   filed two of them, correct?

16      A.   Yes.

17      Q.   And the first one was alleging

18   sexual harassment, correct?

19      A.   Mm-hmm.  Yes.

20      Q.   And the second one alleged

21   retaliation, correct?

22      A.   Correct.

23      Q.   And the retaliation charge, when

24   you filed that charge did you suspect



1     it was your boyfriend at that time?

2         A.   I wouldn't have filed that if I

3     thought so, so no, I did not.

4         Q.   Did you attend Mr. Ebert's

5     deposition in this case?  We had it

6     earlier this week.

7         A.   No.

8         Q.   You didn't dial in for that at

9     all?

10        A.   No.

11        Q.   Do you know, what is your

12    understanding of the reason that

13    Mr. Ebert made that phone call?

14        A.   When I learned that he did it

15    and I -- actually, when I learned that

16    the phone number was in his phone

17    records and when I had confronted him

18    about that, he had a very genuine

19    reaction of shock and said that he

20    thought he was better at that point and

21    he didn't remember calling them and he

22    didn't know why he would have called

23    them.

24                  So -- I'm sorry.  Can you



1      repeat the question again?

2          Q.   Sure.  No problem.

3                What is your understanding

4      of the reason he did call them?

5          A.   Oh, yeah.  So why now do I think

6      he called?

7          Q.   Sure.  Sure.

8          A.   Now I think he's a very insecure

9      person and I think he didn't want me to

10     have that job and I think he suffers

11     from impulse problems and he took it

12     upon himself to make sure I didn't get

13     it.  That's what I think.

14         Q.   So I'll represent to you that he

15     testified that he made the call at

16     least in part to get back at you for

17     giving him an STD.

18         A.   And then there's that.

19         Q.   Would that be consistent with

20     the information that you know?

21         A.   I felt that that was a different

22     problem, but I thought that -- I don't

23     know.  I guess, I guess, I guess that

24     makes sense, but I just kind of thought



1    that there was a gap in between the

2    phone calls.

3              I didn't think at that point

4    that he would still be -- I felt like,

5    I guess I felt our relationship was at

6    a different point because I didn't know

7    any of this happened, but looking back

8    I thought our relationship was at a

9    different point that he wouldn't have

10   done something spiteful like that to me

11   and that it was more about controlling

12   where I worked.  But it makes -- you

13   know, if that's what he said, then I

14   guess that's why he did it.

15     Q.   When you say gap between the

16   phone calls, what's the other phone

17   call you're talking about?

18     A.   The one that he made to

19   Mr. Roman.

20     Q.   And when did you first learn

21   about that?

22              Just to be clear, I'm not

23   asking you if you learned it from

24   counsel.  Don't tell me that you



1    learned it from counsel.  Just when?

2        A.   I don't know the exact date, so

3    I don't know.  I'm not sure of the date

4    that I found out that he had called

5    him.

6              Again, I found out that it

7    was from -- I was just told that his

8    phone records showed that he made a

9    call to Gregg Roman.

10       Q.   Do you recall when you -- by

11   "when" I don't mean an exact date but

12   the best approximation you can give.

13             When did you tell Mr. Ebert

14   that you had an STD?

15       A.   I think I found out in like late

16   June or early July and the day I found

17   out I went and told him.

18       Q.   When you learned that Mr. Ebert

19   had sabotaged, well, that's too -- let

20   me strike that.

21             When you found out that

22   Mr. Ebert had made the phone call to

23   the Kimmel Center, did you consider

24   moving out of his home?



1        A.    When he sabotaged my job

2    opportunity?  Yes.

3        Q.    Okay.  Did you move out of his

4    home at that time?

5        A.    I was not able to move out of

6    his home at that time.

7        Q.    And why is that?

8        A.    Because quarantined had happened

9    and I had nowhere to go.  I had rented

10   out my house so I couldn't go back

11   there.  I couldn't go to my mom because

12   we were quarantining and I thought she

13   would die if I went near her.  So I had

14   to stay there.

15       Q.    Did you continue to share a

16   bedroom?

17       A.    No.  We were keeping space.  He

18   was definitely keeping space from me.

19       Q.    I'll represent to you that he

20   testified that he slept on the couch

21   maybe one or two nights but that was

22   about it.  Is that correct?

23       A.    Maybe.  I don't know.

24       Q.    So what did you mean when you



1        said he was definitely keeping space

2        from you?

3            A.   There was -- we weren't talking.

4        We weren't hanging out.  If he came --

5        we kept different, you know, did our

6        own things during the day.  So if he

7        came to bed I might have already been

8        asleep.  It wasn't like we were, you

9        know, snuggled up.

10           Q.   And at this point -- go ahead.

11       Sorry.

12           A.   I think the kids had no idea

13       what was going on and it was more about

14       not upsetting or alarming the kids.

15           Q.   And do you both have children

16       that reside in that home?

17           A.   Yes.

18           Q.   But you and Mr. Ebert have

19       worked it out since then, correct?

20           A.   We continue to work it out.

21           Q.   But you're not keeping space

22       from one another at this point,

23       correct?

24           A.   We're working on our



1    relationship.

2        Q.   And how long have you two been

3    together?

4        A.   Almost two years.

5        Q.   So this is October -- I'm sorry.

6    I looked at my clock and it says 10.

7    It's actually January.  It's January

8    2021, so almost two years.

9             Do you remember about what

10   month it was when you first became I'll

11   say -- I know you knew each other in

12   high school so I don't want to say when

13   you met.

14            But when you became a couple

15   about two years ago do you remember

16   about what month?

17       A.   We started dating, our first

18   date was May 5th of 2020 and we dated

19   for a few months.  I wouldn't say we

20   were a couple until later, but I was

21   seeing him exclusively at the time but,

22   you know, I wasn't so quick to jump in

23   all in.

24       Q.   Can you hold on for just a



1    minute?  I apologize.

2              THE VIDEOGRAPHER:  Do you

3    want to go off?

4              MS. DIBIANCA:  There's no

5    need to go off.  It was the FedEx had

6    come in.  Sorry.

7    BY MS. DIBIANCA:

8     Q.   So you said May 5th.  What was

9    the year?

10    A.   It was 2019.

11    Q.   Thanks.

12              Your first charge of

13    discrimination, let's go ahead and I'm

14    going to pull that document up now so

15    that it's available on the screen to

16    me, but I think Erica is going to give

17    you a copy of it as well so you have a

18    paper copy.

19              Give me just a minute to

20    navigate to that.

21              MS. SHIKUNOV:  The July 24,

22    2019 EEOC you're asking about?

23              MS. DIBIANCA:  Yes.

24



1   BY MS. DIBIANCA:

2       Q.   Ms. O'Brien, because we've been

3   able to get, your counsel has been kind

4   enough to give you a paper copy of that

5   I'm not going to share my screen.

6              MS. DIBIANCA:  Unless,

7   Erica, you prefer me to do so so you

8   can see it.

9              MS. SHIKUNOV:  I have it.

10             MS. DIBIANCA:  Okay.

11  Perfect.  So if you want me to put it

12  on the screen at any time just let me

13  know but since we all have a copy I'm

14  going to skip that challenging

15  technology stuff.

16             All right.  So the document

17  that we're referring to right now and

18  that we're going to mark as Exhibit 1

19  for the court reporter's purpose is

20  dated July 24th, 2019.

21             (O'Brien Deposition Exhibit

22  No. 1 was marked for identification.)

23  BY MS. DIBIANCA:

24      Q.   And this is your charge of



1    discrimination filed with it says

2    Pennsylvania Human Relations Commission

3    on the top, but I understand it was

4    duly filed with the EEOC as well.

5              And is that the document

6    that you have got in front of you?

7       A.   Yes.

8       Q.   And is this to the best of your

9    knowledge a true and correct copy of

10   the document you filed with the EEOC?

11      A.   I believe so.

12      Q.   Were you represented by counsel

13   at the time you filed this?

14      A.   Yes.

15      Q.   It says on the first paragraph

16   in the section titled The Particulars,

17   it says, in part, that your job duties

18   included handling human resource

19   issues.

20              Did you handle human

21   resource issues for the Forum?

22      A.   Yes.

23      Q.   And then the next paragraph says

24   that throughout your employment with



1     the Forum -- and I'm paraphrasing --

2     you had been subjected to crude

3     comments from Gregg Roman, director.

4        A.   Yes.

5        Q.   He would make comments to you

6     such as, quote, I like older women,

7     quote, or, quote, non-Jewish women were

8     made for sex, quote.  These comments

9     made you feel extremely uncomfortable.

10              When did Mr. Roman say that

11    he liked older women?

12       A.   That was pretty early on in my

13    employment.

14       Q.   Who else was present when he

15    said that?

16       A.   I don't recall.  Matt Bennett

17    may have been present, but I'm not

18    sure.

19       Q.   Was that statement said in the

20    office?

21       A.   Yes.

22       Q.   And what did you say in

23    response, if anything?

24       A.   I don't recall.  I probably just



1    said oh or tried to move the

2    conversation elsewhere would probably

3    be how I would handle something like

4    that, but I don't recall specifically.

5        Q.   Okay.  And then the second

6    comment is non-Jewish women were made

7    for sex.  Do you recall when Mr. Roman

8    allegedly said that?

9        A.   Yes.  That was when he had

10   asked, he suggested that we start going

11   out on quarterly like management

12   meetings and have a more relaxed

13   atmosphere, go get a couple of drinks

14   and talk about shop.

15              And he didn't talk very much

16   shop.  It became very personal where he

17   was telling me about his marital

18   problems and how he was unhappy and I

19   suggested that he get a divorce or

20   think about leaving.

21              MS. DIBIANCA: We lost your

22   audio.  I can't hear you, Erica.

23   Sorry.

24              (A discussion was held off



```
1     the record.)

2     BY MS. DIBIANCA:

3        Q.   All right.  Let's go back.  We

4     did have some audio issues.  So just to

5     make sure we've got the testimony,

6     let's go ahead and do it again.  Okay,

7     Ms. O'Brien?

8              Actually, we'll just start

9     in the beginning of that and we'll just

10    break it down.

11             What was the year or month

12    that Mr. Roman allegedly said that

13    non-Jewish women were made for sex?

14       A.   I'm not sure.  It was probably

15    earlier in 2019.

16       Q.   Are you Jewish?

17       A.   No.

18       Q.   And where did he say this?

19    Where was he when he said that

20    allegedly?

21       A.   I believe it was Misconduct,

22    which was where he had taken me for a

23    quarterly management meeting that he

24    said he wanted to have with me where we
```



1      would just go relax and talk shop and

2      strategize about, you know, the future.

3         Q.   When you say Misconduct, is that

4      a place?

5         A.   Yes.

6         Q.   Okay.  Sorry.  I'm a Delawarean.

7              Okay.  So you were outside.

8      You were not in the office at that

9      time.  Is that correct?

10        A.   Correct.

11        Q.   Was there anyone present with

12     you other than you and Mr. Roman?

13        A.   No.

14        Q.   And when you say quarterly

15     management meetings, how many times did

16     a quarterly management meeting outside

17     of the office between you and Mr. Roman

18     occur?

19        A.   One time.

20        Q.   And how long did that meeting

21     last?

22        A.   I couldn't say.

23        Q.   And when he said that non-Jewish

24     women were made for sex, what did you



1    say, if anything?

2       A.   I don't, I don't remember.

3    Again, I probably just was

4    uncomfortable because he was talking

5    about his marriage and stuff like that.

6    I wasn't comfortable.

7       Q.   So you said early 2019 but

8    Mr. Roman wasn't in the office in early

9    2019, was he?

10      A.   Oh, 2018 maybe.  Yeah.  I'm not

11   sure.  That's why I said I'm not sure.

12      Q.   Well, you didn't interact with

13   him in early 2019, did you?

14      A.   No.

15      Q.   So it would would have to have

16   been -- can you think about when it

17   was?  Was it early 2018?

18      A.   I would have to look, I guess.

19   I don't recall.

20      Q.   Where would you look?

21      A.   I actually don't know where I

22   would look.  Maybe my Google calendar.

23   I don't know.  I don't, I don't recall.

24      Q.   And I apologize because I'm



1     going to ask a question that we've

2     already discussed but just so we have a

3     clear record.

4                At this time you do not

5     recall the month or time period when

6     Mr. Roman allegedly made the comment

7     that non-Jewish women were made for

8     sex, correct?

9        A.   It was at that meeting.

10       Q.   Okay.

11       A.   I know that.

12       Q.   But you don't know the date of

13    that meeting, right?

14       A.   Mm-mm.

15       Q.   All right.  And you need to say

16    yes or no.

17       A.   Oh, I'm sorry.  No.

18       Q.   Okay.  And you believe it was in

19    2018?

20       A.   Yes.

21       Q.   But you don't know -- do you

22    know the season?  Was it warm outside?

23    Was it cold outside?

24       A.   He had when he took me to the



```
 1      meeting the first stop that -- we were

 2      walking outside.  He walked me to the

 3      parking garage where his car was

 4      because he said he needed to get

 5      something.  And what he needed to get

 6      was some little thing that he had

 7      bought that was like a marijuana

 8      diffuser and he was like do you want to

 9      get high?

10              So I was like okay, just,

11      you know, took one or two hits.  When

12      I'm working I don't want to be,

13      especially one on one in a parking

14      garage with a man I wouldn't want to

15      let my defenses be too far down.

16      Q.   So does that help you remember

17      what time of year it was?

18      A.   So it was warm was my point

19      because of the walking.

20      Q.   Okay.  All right.  To the best

21      of your knowledge, has Mr. Roman had

22      sex with non-Jewish women?

23      A.   I'm not sure.  He told me that

24      he had sex in the office at work.  He
```



1    told me that he had sex with Leah

2    Merville.  I'm not sure what she is.

3       Q.   Let's go to the next paragraph

4    of the charge.  It says "In or around

5    September 2018 Ms. O'Brien and

6    Mr. Roman went to dinner to discuss the

7    office, staff and operations."

8              Do you recall where you went

9    to dinner?

10      A.   That was Misconduct so it was

11   then.

12      Q.   So is that -- so I'm getting the

13   facts right, it would have been

14   September 2018 was the meeting at

15   Misconduct where he also said that

16   non-Jewish women were made for sex?

17      A.   Yes.  I guess that's when I

18   thought it was.  At the time I said

19   that I must have thought that was when

20   it was.  That was that same time.

21      Q.   And is that also -- okay.

22              So it says you went to

23   dinner at Misconduct.  Did you sit at

24   the bar or did you sit at a table?  I



1        don't even know if there are tables.

2           A.    Table.

3           Q.    Table.  Okay.  About how long

4        did the dinner last?

5           A.    I don't think it lasted that

6        long.  I don't recall.  It was...

7           Q.    So "During that same dinner at

8        Misconduct in or around September 2018

9        Mr. Roman discussed various

10       inappropriate topics that were

11       unrelated to work, specifically, sex,

12       relationships, and current problems he

13       was having with his wife."

14          A.    Yes.

15          Q.    So let's take that one at a

16       time.

17                    What did he discuss with

18       regard to sex?

19          A.    That was when he made the

20       comment about sex being for Jewish

21       women and he was telling me that he

22       needed a release.

23          Q.    Why didn't you put that in the

24       charge?



1        A.    Why didn't I put what in the

2    charge?

3        Q.    That he made that comment about

4    a release.

5        A.    I guess that's the sex

6    reference.

7        Q.    Anything else referencing sex?

8        A.    I'm sure, but I would have to --

9    I can't think of it right now.

10       Q.    This is your chance so that's

11   why we're here.

12       A.    Right.  He told me he was having

13   problems with his wife.  He was asking

14   me about my relationships, about how I

15   was like getting out of my marriage and

16   was I seeing anyone and talking about

17   how he needed a release.

18       Q.    Okay.

19       A.    He also kept telling me that he

20   forgot to sign papers because he wanted

21   to switch banks and there was paperwork

22   that had to be signed.  I had sent it

23   to him and asked him to sign it

24   electronically, but he kept saying



1     several times throughout the night that

2     oh, we need, we can stop back to the

3     office, I forgot to sign those papers

4     for you, but we can stop back to the

5     office, we can sign those papers for

6     you.

7               And between those comments

8     and between the release comments and

9     the topic of the conversation, I became

10    so uncomfortable that I stopped and I

11    said you know I'm not going to fuck

12    you, right?

13       Q.   Okay.  And that was in the

14    restaurant?

15       A.   That was when we were walking.

16       Q.   Walking back from the

17    restaurant?

18       A.   I think we might have been

19    walking -- I'm not sure where we were

20    walking.  I think it was when we were

21    walking.  I think we might have

22    switched locations, but I can't

23    remember exactly.

24       Q.   What do you mean "switched



1    locations"?

2        A.    I don't know.  I think we might

3    have had a drink somewhere and then

4    went to Misconduct.  I can't remember

5    if we were in one location the entire

6    time.

7        Q.    So is it your testimony that you

8    left the office with Mr. Roman, stopped

9    at the parking garage, had a couple of

10   hits of weed and then went where?

11       A.    To eat.  I believe we went

12   somewhere initially and maybe he didn't

13   like it and then we switched and then

14   went to Misconduct.  I believe that's

15   where we went and ate.

16             And then walking he may have

17   mentioned, I think he kept mentioning

18   the papers and I made that comment.

19       Q.    When you made the comment about

20   you're not going to fuck him?

21       A.    Yes.

22       Q.    Are you sure this wasn't 2017?

23       A.    It may have been.  I told you

24   I'm not sure of the date.



1        Q.   He's asked you if you were

2    getting out of -- you discussed you

3    were getting a divorce.  Is that right?

4        A.   Yes.  I was not -- I think my

5    divorce wasn't final at that point but

6    I had, you know, I was separated and

7    living in my own place.

8        Q.   Does that help you remember the

9    year?

10       A.   It really doesn't.

11       Q.   When did you separate from your

12   husband?

13       A.   In 2014.

14       Q.   And when was your divorce

15   finalized?

16       A.   I don't -- I stayed married for

17   a while because I stayed on his

18   benefits.  Maybe -- I don't know.

19   Maybe 2017.

20       Q.   So if your divorce was finalized

21   in 2017, does that help you recall

22   whether it was 2017 that you had this

23   dinner with Mr. Roman at Misconduct?

24       A.   No.  Because he was just prying



1     about my personal life.  It wasn't like

2     he was asking me about like the

3     specifics of my divorce.  It was more

4     about like my marriage and what was it

5     like and what did you do and stuff like

6     that.

7              So it doesn't help me

8     remember.  I know that I went to dinner

9     with him one on one and that was my

10    evening, was uncomfortable.

11       Q.   And did you tell him at that

12    dinner about your son having a drug

13    problem?

14       A.   A drug problem?  My son doesn't

15    have a drug problem so I wouldn't have

16    told him that.

17       Q.   Did you tell him anything about

18    your son at that dinner?

19       A.   My son has struggled with issues

20    and I think I had to take time off

21    because of that and so he may have

22    asked me about that, so I may have told

23    him some of those issues.

24       Q.   Do you mean take off work at MEF



1    or prior to working at MEF?

2       A.   At MEF.

3       Q.   Okay.  Then did you walk back to

4    the office after that dinner?

5       A.   I didn't go back to the office

6    with him.  I went home.

7       Q.   Where was your car parked?

8       A.   I don't remember.  I generally

9    took PATCO in, so I may have taken the

10   train.  If I drove in, I don't know.  I

11   would have probably parked at Liberty

12   One.

13      Q.   So after the dinner the two of

14   you left separately, correct?

15      A.   I didn't -- yeah.  I didn't go

16   back to the office with him.  I didn't

17   go anywhere.  I went home.

18      Q.   You didn't go to the parking

19   garage with him?

20      A.   After?

21      Q.   Yes.

22      A.   I don't think so.

23      Q.   Okay.  I'm just asking just so

24   my questions are clear.



1              And you say in your charge

2         that he continued to make advances

3         throughout the dinner.  What were the

4         advances?  Was there something?  Did he

5         proposition you?

6         A.   He talked about -- no, I don't

7         remember saying there was a

8         proposition.  I recall saying that he

9         kept leading the conversation to

10        marital problems, asking me about what

11        it's like dating, what the dating scene

12        is like and him saying how he needed a

13        release.

14              I said that the topic of

15        conversation made me feel so

16        uncomfortable that I said to him you

17        know I'm not going to fuck you, right?

18              And he said why would you

19        say that?

20              I said because I felt like I

21        needed to.

22        Q.   And what did he say?

23        A.   He changed the topic.

24        Q.   Did he change the topic back to



1    work?
2        A.   I don't recall.  There wasn't
3    much work talk.
4        Q.   After he changed the topic did
5    you feel -- was there anything else
6    that he said after that that evening
7    that made you feel uncomfortable?
8        A.   I don't recall.  I believe the
9    release comment came after that.
10       Q.   Was that the only time you went
11   to dinner with Mr. Roman?
12       A.   I believe so.
13       Q.   Let's go to the next page of the
14   charge.  It says "A few weeks later
15   Mr. Roman invited Ms. O'Brien on a
16   business trip to Israel with him."
17            So tell me what you mean by
18   that, he invited you on a business
19   trip.  How did he invite you on a
20   business trip?
21       A.   He said that, you know, they
22   were working on some secret project and
23   it was top secret and high security and
24   high security like -- I don't know why



1     but whatever.

2               He said that he needed help

3     because he needed someone to take notes

4     for him or something, and he asked me

5     if I would want to go.  It would be

6     about a week.

7               And I did want to go.  And

8     he said I got an Airbnb, it's two

9     bedrooms and you'll have your own room.

10              And I said I'm not

11    comfortable with that at all and I

12    would want to go, but I want a hotel

13    room.

14       Q.   Okay.  What did he say?

15       A.   He said he would ask someone

16    else.

17       Q.   So that trip -- did he ask

18    someone else?

19       A.   He asked Lisa Barbounis.

20       Q.   So the trip that Lisa Barbounis

21    took to Israel I'll represent to you

22    was in March of 2018.

23              Does that sound correct to

24    you?



```
 1        A.    Okay.  Yeah.
 2        Q.    So your dinner at Misconduct was
 3   prior to March 2018.  Is that correct?
 4        A.    I believe.  I'm not entirely
 5   sure, but I believe that it was.
 6        Q.    In other words, the dinner at
 7   Misconduct was before he talked to you
 8   about Israel?
 9        A.    I am not sure which came first.
10        Q.    Well, you put in your charge a
11   few weeks later.  That's the first --
12        A.    Okay.  Then I guess that's what
13   it was.  I'm not sure now.  If I said
14   that then, then that's when I thought
15   it happened.
16        Q.    Okay.  Now, had you stayed at an
17   Airbnb with anyone from the Forum
18   during your employment?
19        A.    I had been invited to go help at
20   AIPAC.  They were going to AIPAC and
21   they were having dinner and they needed
22   help with that.  So I went with -- I
23   don't know how I got there -- I guess
24   with Lisa Barbounis and Trish McNulty
```



1    and we had a hotel room that we were

2    supposed to stay in, one room.  We

3    shared, the three of us, one hotel

4    room.

5              And Matt and Gregg were also

6    there and they had I think a three

7    bedroom, it was a three bedroom Airbnb.

8              And so we had gone out

9    afterwards to I guess different

10   functions.  The different organizations

11   hold functions trying to network.  And

12   Gregg invited some people back to the

13   Airbnb for like an after party after

14   that, so we all went back there.

15      Q.   And did you stay there that

16   night?

17      A.   I did.  We had been drinking and

18   actually when we first got there he

19   said here, come here, I want to show,

20   here come back here, come back here and

21   I followed him.  I didn't know the

22   layout.

23              So I was just following him

24   and he took me right into his bedroom



1    and shut the door.  And I was

2    uncomfortable and he's like here, you

3    know, he had pot.  So I was like ahhh,

4    I don't want to be back here;

5    everybody's going like be wondering

6    what we're doing.  And I went out on

7    the terrace because I was

8    uncomfortable.

9           After that everyone was

10   hanging out and I remember it was

11   getting later and there were grantees

12   there.  There were a couple of fellows

13   there.  And at one point he was sitting

14   on the couch in between Lisa and Tricia

15   and he put his arms around them and

16   they both -- Lisa just looked like

17   uncomfortable, like all right, go away.

18   And Tricia was more visibly

19   uncomfortable and then he pulled her up

20   onto his lap.  And she was, she was

21   visibly shaken by that.  I remember the

22   look on her face.

23      Q.   You were intoxicated at that

24   time, correct?



```
1        A.    Excuse me?

2        Q.    You were intoxicated at the

3    time, correct?

4        A.    We had definitely all been

5    drinking.

6        Q.    Answer my question.  That wasn't

7    my question.

8              My question was:  Were you

9    intoxicated at the time?

10       A.    Was I?  Well, what's drunk?  I

11   didn't take -- I mean I had been

12   drinking so I was buzzed at the very

13   least.

14       Q.    Okay.  So in let's say early

15   March 2018 you were intoxicated after

16   AIPAC and stayed in Mr. Roman's Airbnb,

17   correct?

18       A.    So Lisa had fallen asleep on the

19   couch and we were wanting to leave and

20   they were like no, no, no, stay here,

21   stay here, just stay here, there's an

22   extra bedroom.

23             And so Tricia and I flipped

24   a coin for the bedroom and she won so
```



1    she went into the bedroom.  And I was

2    like I didn't really -- I really wanted

3    to go back to the hotel room.

4            And I was like screw her.

5    There's a big bed in here.  I'm not

6    going to sleep on the couch.  I'm going

7    to go sleep in there with her.  There's

8    plenty of room.

9            And as I was walking away --

10   I was by myself at that point.  She was

11   asleep and everybody was gone.  And as

12   I was walking away, I looked and Lisa

13   was like swearing a skirt and she was

14   asleep on the couch and I was like do

15   you know what?  I didn't feel

16   comfortable leaving her alone on the

17   couch.

18           And I thought Tricia has a

19   lock on her door, so I'll just sleep on

20   the couch and we'll just leave early in

21   the morning.  So that's what we did.

22   Q.   Was there any incident after you

23   went to sleep?

24   A.   I don't think so.  We woke up



1    early in the morning and went back to

2    our hotel room.

3              MS. SHIKUNOV:  Molly, when

4    you're done this line of questioning

5    can we take a cbreak?

6              MS. DIBIANCA:  Yes.

7    Definitely.  I mean we can do it now if

8    you want.

9              MS. SHIKUNOV:  I don't want

10   to interrupt your line of questioning.

11   If you want to finish this topic and

12   then we can go.

13   BY MS. DIBIANCA:

14     Q.   So in the first paragraph of the

15   second page of your charge the last

16   sentence says that, quote, "Because of

17   his inappropriate advances Ms. O'Brien

18   missed out on the opportunity to

19   further her career and participate on

20   the business trip."

21              I guess I don't follow that

22   so help me unwind that if you can.

23     A.   Where is it?

24     Q.   This is the second page of your



1       charge on the first paragraph, last

2       sentence.  It begins "Because of his

3       inappropriate advances."

4           A.   Oh.  Well, I felt like the

5       Israel trip was an opportunity to, you

6       know, I guess become more, you know,

7       involved in the business, what was

8       going on.  And I didn't -- I wasn't

9       able, I wasn't comfortable taking the

10      opportunity because I was uncomfortable

11      at the thought of being alone with him

12      for a week.

13              So that's what that means.

14          Q.   Now, sitting here today do you

15      think that you lost out on a business

16      opportunity or a career opportunity by

17      not going on that trip?

18          A.   I don't think there was a career

19      opportunity.  I think it was an

20      opportunity for Mr. Roman to try to get

21      in someone's pants.

22          Q.   The next paragraph describes

23      Lisa Barbounis as an administrative

24      assistant.



```
 1                  Is that your understanding
 2      of what her title was at the Forum?
 3         A.   Her title changed several times.
 4      She was hired in to be an executive
 5      assistant.  I'm not sure.  She didn't
 6      want that title.  She was very worried
 7      about the title.
 8                  So I'm not sure what her
 9      title was when she started, but the
10      role that we were hiring for was for an
11      administrative assistant and that's
12      where she started.
13         Q.   Then it says "When Ms. Barbounis
14      returned from Israel she made a comment
15      to you about, quote, the shit Mr. Roman
16      pulled in Israel."
17                  Were those her exact words?
18      They're in quotation marks here.
19         A.   Yeah.
20         Q.   And you followed up and she did
21      not -- did you respond to that
22      sentence?
23         A.   When they first got back they
24      were very weird with each other, so I
```



1        kind of thought something might have

2        happened and then she made that

3        comment.

4                    And I said was he

5        inappropriate while you were there?

6        And she was like oh, nevermind, it's

7        nothing.  And she like made a bee line

8        for the door and got out of the office.

9        Q.   It says that she did not address

10       the trip again.  Is that correct?

11       A.   I don't, I don't know what you

12       mean.

13       Q.   I'm looking at your charge.

14       A.   She never, she never said any

15       more comments like that around me

16       anyway.

17       Q.   And then subsequently Mr. Roman

18       told you that Ms. Barbounis had hit on

19       him during the Israel trip?

20       A.   That was actually before, I

21       think.  He was in my office for

22       something and he was like she hit on me

23       in Israel.

24                    And I was like she did?  Are



```
1     you sure about that?

2               And he was like oh, I don't

3     know, maybe.

4               It was, it was weird.

5       Q.   When you say it was before that,

6     you mean it was before Lisa's comment

7     to you?

8       A.   I think it was.

9       Q.   Okay.  And then it says "Soon

10    after her trip to Israel," which I'm

11    assuming means Ms. Barbounis's trip to

12    Israel, "in March of 2018 Mr. Roman

13    asked you to document everything

14    Ms. Barbounis did wrong while working

15    for the Forum, including when she was

16    late or when she spoke too loudly.

17    Ms. O'Brien was directed by Mr. Roman

18    to look for reasons to discipline

19    Ms. Barbounis."

20              Is that a true and accurate

21    statement?

22      A.   It is.

23      Q.   Tell me the context of that.

24      A.   So --
```



1       Q.   When did it happen?

2       A.   I'm sorry.  What?

3       Q.   Let's start with when it

4    happened.  When did he say that?

5       A.   I'm not good with like actual

6    like at this point remembering the

7    exact moment that these things

8    happened.  He -- when she was hired,

9    she had zero skills for being an admin

10   assistant.

11              What was the question again?

12   Oh, when he -- okay.

13              So he wanted to fire her.

14   So he told me that we needed to start

15   gearing up to get her out because she

16   wasn't doing her job, which she wasn't

17   good at it, I guess.  But he asked me

18   to basically start documenting when she

19   was late.

20              She's a very big personality

21   and she can be disruptive in the

22   office.  He was asking me to document

23   that and just start gathering, you

24   know, a reason to fire her.



1              MS. DIBIANCA:  Okay.  Let's

2       go ahead and pause there -- Erica, I

3       forgot we were going to take a break --

4       before I carry on.  Sorry.

5              We can go off.

6              THE VIDEOGRAPHER:  Going off

7       the record at 10:56.

8              (A brief recess was taken)

9              THE VIDEOGRAPHER:  We are

10      now rolling and recording and we're on

11      the record at 11:08 Eastern Time.

12      BY MS. DIBIANCA:

13        Q.  So we're going to stick with the

14      same line or the chain of events here.

15              You said, your testimony was

16      that Ms. Barbounis did not have the

17      qualifications that she needed for the

18      position for which she was hired at

19      MEF.  Is that correct?

20        A.  Yes.

21        Q.  And at the time she was hired

22      did you disagree with her being hired?

23        A.  I did.

24        Q.  Because of her lack of



1    qualifications?

2        A.   I thought she was smart and

3    seemed like a hard worker and, you

4    know, but there was another woman who

5    had previously interviewed who was an

6    older woman, like a bit matronly, and

7    she was a lifelong executive assistant.

8    Her resume was perfect for what we were

9    hiring for.  She knew MEF.  She was a

10   fan of Daniel Pipes and she wanted the

11   job.

12             So I wanted her and he

13   insisted on hiring Lisa for the job.

14   And I said to her in the interview you

15   know you're not going to like this job,

16   right?  Because this isn't the job that

17   you want.

18             And she said oh, I'll learn

19   it, I'll be good at it.  And, you know,

20   so she got the job.

21       Q.   And when she was hired and

22   started to work for the Forum, in your

23   opinion did she do a good job at first?

24       A.   I wouldn't have any knowledge of



1    how well she did her job firsthand.  I

2    only know what Gregg told me.  And I

3    would ask him often like -- because I

4    felt like it was doomed because she was

5    hired for a job she didn't have the

6    skill set for.

7            So I asked him often, you

8    know, is she doing a good job?  How's

9    it going?

10           And he would say oh, she's

11   doing good, she's getting it, she's

12   doing great.  So he was always

13   defending her.

14           So I said if she's not doing

15   a good job you need to let her know so

16   she can fix it because you can't --

17   when you decide that she's not doing a

18   good job and you're going to try to rip

19   the rug out from under her it's going

20   to be a problem, so if she's not doing

21   a good job you need to tell me.

22   Q.   And did he tell you that she

23   wasn't doing a good job at some point?

24   A.   He always said that she was



1    doing well.  He would complain about

2    her and then he would say she was doing

3    well and it's good, everything's fine.

4              It wasn't until after they

5    got back from Israel that he said that

6    she wasn't doing a good job and that he

7    needed her to go.

8    Q.   And did you agree with him at

9    the time that he said that, that Lisa

10   was not doing a good job at that time?

11   A.   I still don't know.  I know that

12   she wasn't happy in the position.  I

13   know that she was always struggling and

14   feeling like she wasn't doing well.

15             And then I would ask him

16   about it and he'd say say no, she's

17   fine, it's good, it's good, it's good.

18             So I wouldn't have any

19   firsthand knowledge of the job that she

20   did because our jobs didn't interact.

21   They didn't really cross too much so I

22   really don't know how she did.

23   Q.   So at the time that Mr. Roman

24   told you when they returned from



```
1    Israel -- let me just go over that a
2    bit because it's a little unclear to
3    me.
4              When they returned from
5    Israel in March of 2018 Mr. Roman told
6    you that Ms. Barbounis -- what did he
7    tell you about Ms. Barbounis?
8       A.   He said she hit on me, like
9    that.  And that was really it.  Because
10   I went she did?  Are you sure about
11   that?
12             And then he's like oh, I
13   don't know, maybe and then that was it.
14      Q.   What about this piece about
15   telling you to document the things that
16   Ms. Barbounis did wrong?
17      A.   After he decided -- I didn't
18   realize it at the time but it was after
19   the Israel trip.  I didn't really put
20   two and two together.  He asked me to
21   start documenting all of her, you know,
22   things that she did wrong, she was loud
23   in the office, when she showed up late,
24   anything that she did, you know, that
```



1    was wrong or not okay.

2        Q.   Prior to March of 2018 you had

3    already told Ms. Barbounis that she had

4    tardiness issues, correct?

5        A.   Yeah.

6        Q.   Yeah.  So what he was telling

7    you was not news to you, correct?

8        A.    No.  But he wanted it documented

9    at this point.

10        Q.   Well, wasn't that your job as HR

11    to document when people are doing

12    things that are not in line with their

13    performance obligations?

14        A.   We didn't have a time clock and

15    I wasn't her boss.  And we also --

16    again we're told that we didn't have to

17    be 9:00 to 5:00, that we could flex and

18    do different, you know, schedules if we

19    needed to so --

20        Q.   You talked to her about being

21    late prior to the Israel trip, correct?

22    That's what your testimony was.

23        A.   Yes.  I believe I did.

24        Q.   Okay.  So there was obviously



1    some mechanism by which you determined

2    that she was late.

3        A.   He was the mechanism.

4        Q.   No.  My question was and your

5    testimony was that prior to the Israel

6    trip you yourself had said to

7    Ms. Barbounis you're late, right?

8        A.   She did show up late a lot.

9    But, again, I wasn't her boss so it

10   wouldn't -- I wouldn't have had a

11   discussion with her about her lateness

12   unless Gregg asked me to.

13       Q.   So the testimony you gave just a

14   few minutes ago when you said that

15   prior to Israel in March of 2018 you

16   had, in fact, talked with Ms. Barbounis

17   with regard to her tardiness, is that

18   correct or is that incorrect testimony?

19            Do you want to change that

20   testimony or are you sticking with

21   that?

22       A.   I think, I think it probably was

23   addressed at some point.

24       Q.   Okay.  And you said that she



1   was, he felt that she was not doing a

2   good job.  That's what he told you,

3   correct?

4       A.   Yes, when he, when he asked me

5   to start documenting it.

6       Q.   Did you think there was anything

7   wrong with him asking you to document

8   when an employee is not doing a good

9   job?

10      A.   He didn't ask me to document her

11  not doing a good job.  He asked me to

12  document her latenesses, her loudnesses

13  because I didn't have really the

14  ability to gauge her work performance.

15            No, there's nothing wrong

16  with that because when somebody is not

17  doing a good job and you don't want

18  them to be part of your team anymore

19  you have to document reasons for that.

20      Q.   And she was loud from time to

21  time, correct?

22      A.   Yes.

23      Q.   And it was loud in a way that

24  was disruptive, correct?



1          A.   Yes.

2          Q.   And she was tardy from time to

3     time, correct?

4          A.   Yes, I believe.

5          Q.   Did you document it?

6          A.   I did.  I started keeping a

7     list, yeah.

8          Q.   Did you ever speak to

9     Ms. Barbounis after Mr. Roman made the

10    request that you document it about --

11    let me say that in a better way.

12               After Mr. Roman asked you in

13    March of 2018 to document

14    Ms. Barbounis's various employment

15    failings, loudness, tardiness,

16    et cetera, you did so, correct?

17         A.   Document it?

18         Q.   Yes.

19         A.   I started keeping a list.

20         Q.   And did you address those issues

21    with Ms. Barbounis directly at any

22    time?

23         A.   She would disrupt me a lot, so

24    yes.  If she was loud, I would call her



```
 1       out on it.
 2          Q.   And you went into her office and
 3       told her that she was late, correct?
 4          A.   I may have.
 5          Q.   Then the next paragraph of your
 6       charge you say "Additionally, when he
 7       returned from Israel" -- when you said
 8       that did you mean in March of 2018?
 9          A.   That was a prior trip to Israel.
10          Q.   So when was that?
11          A.   That trip when he came back and
12       told me he slept with Leah?
13          Q.   Yes.
14          A.   I'm not sure.  It was prior to
15       the trip with Lisa though.
16          Q.   Okay.
17          A.   And I only know that because she
18       had told me that while he was screaming
19       about needing a blow job that he called
20       Leah and she wasn't taking his calls.
21          Q.   Who is "she"?
22          A.   Leah wasn't taking his calls.
23       So he had already slept with her prior
24       to that trip was my point.
```



1     Q.   You got to unpack that a bit.

2    You said that she told you.  Who told

3    you what?

4     A.   Lisa when she told me about what

5    happened in Israel said that when she

6    was declining his advances he was

7    calling Leah and she wasn't taking his

8    calls.  That's how I know of him

9    sleeping with Leah happened prior to

10   that trip.  It had already happened.

11    Q.   And I thought you said that Lisa

12   didn't talk to you more about that

13   trip.  So are you changing that

14   testimony now?

15         MS. SHIKUNOV:  I'm going to

16   object to the form of the question

17   because it's mischaracterizing what she

18   said previously.

19    Q.   Would you like me to rephrase

20   it?

21         MS. SHIKUNOV:  She can

22   answer it or you can rephrase it,

23   whatever you prefer.

24    A.   So when you asked --



```
 1              MS. SHIKUNOV:  Hold on.  Let
 2      her ask her question.
 3         Q.   I'm asking you if you would like
 4      me to rephrase it?
 5              MS. SHIKUNOV:  You can
 6      rephrase it or she can answer it.  I
 7      put my form objection on the record so
 8      whatever you want to do.
 9              MS. DIBIANCA:  I meant the
10      witness.
11         A.   Oh, me?  So when you asked me if
12      she talked to me about it again, I
13      thought you meant like that day in the
14      office brought it up again.  We did
15      talk about it again and it was when she
16      told me about what happened and that
17      ended up with me filing a complaint
18      with Daniel Pipes and Marc Fink.
19         Q.   So Lisa Barbounis just -- we got
20      a lot of pronouns on the record.
21              So when Lisa Barbounis got
22      back from Israel she made a comment to
23      you about, quote, the shit he pulled in
24      Israel, quote.
```



1              After that she did not

2      address the trip again until October 30

3      or 31st, 2018.  Is that correct?

4      A.    That's correct.

5      Q.    Okay.  Got it.

6              So in this next paragraph

7      where you say "Additionally when he

8      returned from Israel," that is not

9      correct then?  Tell me what I'm

10     supposed to understand from that

11     sentence.

12     A.    So additionally when he returned

13     from Israel from a prior trip Mr. Roman

14     had told me how he had slept with Leah

15     Merville.

16     Q.    And when did he say exactly?

17     A.    He said that she was there

18     interning for IVP and he was there  and

19     they went out for drinks.  And he said

20     that they got a little fired up and he

21     forgot her paperwork back in his hotel

22     room to sign her internship papers,

23     which that's the only intern that he's

24     ever signed their internship papers.



```
1    Matt Bennett usually handled that.

2              So he had her papers up in

3    his hotel room and she went up there

4    and they -- one thing led to another

5    and they slept together.

6    Q.   When did he tell you that?

7    A.   It was prior to that Israel trip

8    and prior to the invitation to go to

9    Israel.

10             I thought I was the only one

11   that knew and then I found out later

12   that he had told other people as well.

13   Q.   So is it correct to say that he

14   told you, your testimony is that

15   Mr. Roman told you that he slept with

16   Ms. Merville and that he made that

17   comment, he made that statement prior

18   to your dinner at Misconduct in

19   September 2018?

20   A.   I'm not sure if it was prior to

21   that or not.

22   Q.   You said it was prior to when he

23   asked you to go to Israel, right?

24   A.   Yes.  I'm not sure where that,
```



```
 1      when that happened.  I'm not sure of
 2      the time frame of when he slept with
 3      Leah or when he told me.
 4         Q.   So just so we're clear and we're
 5      talking about the same question, I'm
 6      only talking about when he told you
 7      that.  Okay?
 8         A.   I'm unclear.  I don't know.
 9         Q.   But you do know it was prior to
10      his trip to Israel in March 2018 with
11      Ms. Barbounis, correct?
12         A.   Yeah.  I'm pretty sure it was.
13         Q.   And are you pretty sure that it
14      was before he asked you to go to
15      Israel?
16         A.   Well, probably, yeah.
17         Q.   So as HR what did you do about
18      it when he told you that?  You kept it
19      to yourself?
20         A.   I did keep it to myself, but she
21      wasn't -- he said that she wasn't
22      working for us.  He said that --
23      actually I didn't know at that time
24      that she was interning for IVP Israel.
```

1     I thought it was, you know, she was

2     just coincidentally there.

3            That's kind of how he framed

4     it to me, but I told him that that's

5     stupid and you shouldn't be doing that.

6        Q.   So at the time of the alleged

7     incident when he, Mr. Roman, and

8     Ms. Merville had sex in Israel, was

9     Ms. Merville an intern for IVP at that

10    time?

11       A.   I believe that's what I found

12    out later.  I thought, I thought at the

13    time that he told me that she was

14    interning for somewhere else and that

15    maybe he helped her get the internship.

16           I'm really not that clear on

17    that.

18       Q.   She wasn't interning for the

19    Forum, correct?

20       A.   She wasn't?

21       Q.   Was she I guess?

22       A.   I'm unclear.  He told me that

23    she was not and then I heard later that

24    she was.  And if he was signing her



1    internship papers, I would have to

2    guess that she was.

3         Q.   But as the HR person you did not

4    know whether she was interning for the

5    Forum?

6         A.   No.  They didn't always update

7    me to that.  There would just be

8    somebody -- Matt really, Matt managed

9    the interns.

10        Q.   Was Ms. Merville working in the

11   office at that time, the MEF office in

12   Philadelphia?

13        A.   She was in Israel.

14        Q.   Did she ever work in the MEF

15   office in Philadelphia?

16        A.   Yes.

17        Q.   When?

18        A.   I'm going to guess --

19             MS. SHIKUNOV:  Don't guess.

20             THE WITNESS:  Okay.

21        Q.   Well, yeah, I want you to guess.

22   You can just say it's a guess, but I

23   still want you to try to figure it out.

24             MS. SHIKUNOV:  If you can



1     approximate, you can.  Just make sure

2     it's clear for the record that it is an

3     approximation.

4         A.   I'm going to say in 2017, I

5     believe.

6         Q.   So at the time that he told you

7     that he had sex with Ms. Merville, did

8     he tell you right after he returned

9     from the trip that they allegedly had

10    sex?

11        A.   He went -- he flew and traveled

12    often so I'm not sure if it was right

13    when he got back from that trip or not.

14        Q.   Well, your charge says when he

15    returned from Israel.

16        A.   Well, I mean I don't know if it

17    was the day he returned.  It was after

18    he returned and after it happened.

19        Q.   It wasn't long afterwards, in

20    other words?

21        A.   I don't think so.  It doesn't

22    seem like he would want to keep that

23    quiet since he was telling everyone.

24        Q.   Well, you didn't know that he



1    was, quote, telling everyone.  Those

2    are your words after the fact, correct?

3      A.   Yes.

4              MS. SHIKUNOV:  Sorry, Molly.

5    Can we take two seconds?

6              MS. DIBIANCA:  Yes.

7              MS. SHIKUNOV:  Can we take

8    two seconds?

9              MS. DIBIANCA:  We're going

10   off the record.

11             THE VIDEOGRAPHER:  Going off

12   the record at 11:28.

13             (A brief recess was taken.)

14             THE VIDEOGRAPHER:  We are

15   going back on the record at 11:29.

16   BY MS. DIBIANCA:

17     Q.   At the time that Mr. Roman

18   allegedly had sex with Ms. Merville in

19   Israel, was Ms. Merville an MEF intern?

20     A.   Not MEF.  I believe she was an

21   IVP intern.

22     Q.   Was she an intern with MEF after

23   you learned, allegedly learned from

24   Mr. Roman that he had sex with



1          Ms. Merville in Israel?

2          A.   No.

3          Q.   Did you do Ms. Barbounis's

4     performance review?

5          A.   I wouldn't think so.  I usually

6     sat in on them and Gregg did them.

7          Q.   Do you remember if he did a

8     midyear review for Ms. Barbounis?

9          A.   I think we did, yeah.

10         Q.   When you say "we," who do you

11    mean?

12         A.   Gregg and I.

13         Q.   It says that "On October" -- I'm

14    looking at your charge again --

15    "October 30th, 2018 Ms. O'Brien and

16    Ms. Barbounis got into an argument due

17    to Ms. O'Brien continuing to document

18    Ms. Barbounis's minor mishaps."

19              Is it true to say that

20    before October 30th, 2018 you and

21    Ms. Barbounis had gotten into arguments

22    before that?

23         A.   Yes.

24         Q.   Was this a particularly bigger



1        argument than what you normally had?

2          A.   Yes.

3          Q.   And are you aware now -- and I'm

4        not asking if you were aware at the

5        time.  But now sitting here today are

6        you aware of some of the messages that

7        Ms. Barbounis sent about you during her

8        employment at the Forum, various

9        derogatory messages with words that I'm

10       not inclined to use on the record but I

11       will if you need me to?

12         A.   I need you to.

13         Q.   Okay.  So there's one where she

14       called you a fucking cunt.

15         A.   Ohhh, no.

16         Q.   One where she called you a

17       fucking bitch.

18         A.   I think she might have called me

19       that to my face a couple of times.

20         Q.   Okay.  So is it fair to say that

21       prior to October 30th, 2018 you and

22       Ms. Barbounis did not have a friendly

23       relationship?

24         A.   I liked her.  I didn't not like



1    her.  She was difficult to work with

2    and we would have differences.

3              So I would say, you know, it

4    would fluctuate.  We would get along

5    well and then when we didn't, we

6    didn't.

7       Q.   Why didn't you when you didn't?

8       A.   Gregg would tell me, like when

9    he was leaving on a trip or something

10   he had told me that him and Daniel saw

11   me as management and he wanted me to

12   act as a supervisory person when he

13   wasn't in the office.

14             So when I would try to do

15   that it would piss her off and she

16   would say you're not my boss.  And I

17   was like I'm doing my job; that's what

18   I was told to do.

19             And she would just

20   repeatedly tell me you're not my boss,

21   you're not my boss.

22             So on one hand he's telling

23   me to act as a supervisor, you know,

24   make sure she's toeing the line and



1    doing her job. And not just her. It

2    happened with other people as well.

3              And then I found out after

4    the fact when they would complain to

5    him that I told them to do something

6    that he would say don't listen to her,

7    she's not your boss. Like so he would

8    then was basically pitting me against

9    everyone.

10   Q.   When did you find that out?

11   A.   After the fact. After, you

12   know, he was out of the office.

13   Q.   So after November 1st, 2018?

14   A.   Yes.

15   Q.   And who did you find that out

16   from?

17   A.   I think it was Lisa and maybe

18   Tricia.

19   Q.   So the October 30th, 2018

20   argument with Ms. Barbounis, describe

21   to me how that happened.

22   A.   I was documenting, so I guess I

23   was on her a little bit. And she was

24   very stressed out I guess because she,



1    she was always worried about her job at

2    that point.

3              So I think she was being

4    loud outside of the office and I told

5    her to be quiet.  And she just lost it

6    and she kind of squared up, walked into

7    my office telling me I was a bitch and

8    I needed to mind my own business and

9    who do you think you are?

10             And I was like I stood up

11   out of my desk and I squared right back

12   up and I walked her -- we argued.  I

13   can't remember what was said at that

14   point.  And I backed her right into her

15   office and shut the door and I walked

16   out.

17             She came back out.  I

18   remember feeling like Matt Bennett had

19   fueled the fire on that as well and I

20   think he told them that I told Gregg

21   something.

22             So he was in the bathroom

23   when that happened and I finished

24   yelling at her and he came in and I



1    told him that he was an asshole and I

2    left for the day.

3        Q.   Okay.  You said Matt Bennett

4    told them.

5             Are you talking about your

6    coworkers?

7        A.   Tricia and Lisa.

8        Q.   I ask just because the pronouns

9    make it hard to follow later so I just

10   try to get names associated with them

11   if we can.

12            So the October 30th incident

13   was in your opinion fueled by

14   Mr. Bennett.  Is that correct?

15       A.   Yeah.  He threw fire on it for

16   sure.

17       Q.   Then it says -- you said you

18   left for the day.  In other words, you

19   walked out, right?

20       A.   I was pissed.  I left, yeah.

21       Q.   Do you have knowledge of whether

22   Ms. Barbounis uses drugs?

23       A.   I mean she takes Adderall.

24       Q.   I mean illegal drugs.



1      A.   I don't.

2      Q.   Including marijuana?

3      A.   I don't think she smoked

4    marijuana.

5      Q.   The next day, October 31, 2018,

6    you arranged to meet with Ms. Barbounis

7    to address the argument that happened

8    the previous day.  Is that correct?  It

9    was your idea to meet to address the

10   argument?

11     A.   Yeah.  So I had yelled at Matt

12   and I had yelled at Lisa.  And Gregg

13   called me and was like, you know, what

14   happened or whatever?

15            And he told me to write it

16   up and --

17     Q.   Excuse me.  When you say "he,"

18   do you mean Bennett or Roman?

19     A.   Gregg told me to write up the

20   situation, what happened before the end

21   of the night or whatever, and get it to

22   him.

23            He also told me that I

24   needed to call Matt and smooth it over



1       with him because we all had to work

2       together and everything.

3                    So they were going to be

4       at -- they were doing a radio show at

5       the time, so they were going to be at

6       the radio show in the morning.  He

7       wouldn't be --

8          Q.   Who is "they"?

9          A.   "They" are Gregg and Matt.

10         Q.   Okay.

11         A.   So it would have been me in the

12      office, me, Lisa, Tricia, Delaney,

13      Caitriona and Thelma.  I'm not sure if

14      Thelma was in on either of those days,

15      but that's who would have been in the

16      office.

17                   And so he had told me to

18      call Matt and smooth it over or maybe

19      he told Matt to tell me.  I think he

20      told Matt to call me and smooth it

21      over.

22                   So during the course of that

23      conversation, you know, we were talking

24      about it and I think he alluded to me



1    that something had happened between

2    Gregg and Lisa in Israel and that she

3    didn't report it.  So whatever.  I

4    guess we smoothed it over somewhat.

5                And then Gregg had asked me

6    about it.  I think he called me the

7    next morning or something.  And I had

8    said yeah, that we smoothed it over and

9    that I was a little bit uncomfortable

10   going back to the office after that and

11   just with everybody I thought it would

12   be uncomfortable for everyone.

13               So I said I'm going to have

14   coffee with her and just try to get to

15   a place where we're going to be civil

16   to each other.  I don't want it to be

17   weird when we go into the office or,

18   you know, for the day.

19               So I went and I think we met

20   at the Starbucks right down the street

21   and we grabbed a cup of coffee.  And we

22   were so I guess hostile or I guess

23   angry that we didn't even speak the

24   entire time we were waiting in line for



1     coffee.  We didn't really talk to each

2     other at all.  We got the coffees and

3     we walked down the street and sat on a

4     bench.  And I was like you know, look,

5     I was doing my job or whatever we were

6     talking about.

7               And she became completely

8     unhinged, which wasn't like her because

9     she's really more of the angry,

10    aggressive alpha person.  And she was

11    like unhinged and crying and saying how

12    she was worried about her job, they're

13    always coming at her that she didn't do

14    this and she didn't do that and she

15    felt like I was persecuting her and

16    harassing her.  And I don't know.  I

17    think I might have said Matt said this.

18               And then she told me the

19    story of what had happened in Israel,

20    that they were on the couch or whatever

21    and I think he stuck his foot under her

22    butt and then it just escalated to

23    where he was angry and yelling about

24    wanting a blow job and calling Leah.



1                And she had said that she

2      was so scared that she went into the

3      bedroom and locked -- she took a knife

4      from the kitchen and went into --

5      because he's a bigger guy and I guess

6      he was angry and screaming and he

7      usually tries to make you fearful of

8      him anyway.

9                So she took a knife and she

10     said she went into the bedroom, put the

11     knife under her pillow and that she was

12     texting her husband and Tricia and

13     telling them what was happening and

14     that she was scared.

15               And she said to me that she

16     didn't want to say anything.  She said

17     I don't want to tell anybody.

18               And I was like look -- and

19     at that point there was a big shift in

20     our relationship because now I am like

21     the HR person and I know it's my job

22     that I can't not say anything because

23     then I'm not doing my job and that

24     could hurt the Forum.



1             So I told her just take a

2     breath.  I was like let's go to work.

3     I was like you do your thing.  I'm

4     going to do my thing and just take the

5     day and think or whatever.

6                   And I think we had talked on

7     the phone that night and I said Daniel

8     Pipes needs to know that this is

9     happening because it's not the first

10    time that he's been accused of it.  He

11    needs to know that it's happening and

12    I'm going to report it to him.

13    Q.   Your testimony is that the two

14    of you didn't agree to report it to

15    Dr. Pipes until that evening of October

16    31st?

17    A.   It wasn't really an agreement.

18    She had told me she didn't want to

19    report it and then that evening I let

20    her know that I was going to report it.

21                   MS. SHIKUNOV:  Hold on.  Can

22    we go off for a minute, please?

23                   MS. DIBIANCA:  Yes.

24                   THE VIDEOGRAPHER:  Going off



```
 1    the record at 11:43.

 2                 (A brief recess was taken.)

 3                 THE VIDEOGRAPHER:  We are

 4    back on the record at 11:50 Eastern

 5    Time.

 6                 MS. DIBIANCA:  We're back

 7    after that brief break.  Sorry about

 8    that.

 9                 All right.  So I'm trying to

10    think.

11                 Actually, Kurt, could you

12    just remind us where we left off, just

13    a couple of sentences or two?

14                 THE COURT REPORTER:

15    Certainly.

16                 (The reporter read back the

17    last question and answer).

18                 MS. DIBIANCA:  Terrific.

19    Thanks so much.

20    BY MS. DIBIANCA:

21       Q.  So on the bench outside of

22    Starbucks when you and Ms. Barbounis

23    had this conversation and she became,

24    in your words, unhinged, did you tell
```



1    her at that time that as HR you had an
2    obligation to report anything that was
3    or could be inappropriate?
4        A.   I believe so.  I don't remember.
5    But she was just so upset and scared
6    that I just wanted her to calm down and
7    I honestly was shocked.  I mean I'm not
8    a certified HR person and they knew
9    that.  So this was something that I had
10   never dealt with and I wanted to make
11   sure that I handled it the way I was
12   supposed to, but I just wanted her to
13   calm down too.  And I think I just
14   needed a minute to take it all in and
15   figure out what I was supposed to do.
16       Q.   And when did you decide what you
17   were supposed to do?
18       A.   And what?
19       Q.   When did you decide what you
20   were supposed to do?
21       A.   I went home and I just -- it was
22   Halloween so like my kids were out and
23   everything.  I think it was Halloween.
24   It was right around there.  And I --



1     oh, yeah.  Okay.  So that was

2     Halloween.

3               And I was busy that night or

4     whatever, so I just was like putting it

5     aside and then, you know, I was

6     thinking on it and thinking about

7     everything.  And I said that, you know,

8     it needs to be reported so that's what

9     I did.

10       Q.   Didn't you tell Ms. O'Brien --

11    I'm so sorry.

12               Didn't you tell

13    Ms. Barbounis after you left the park

14    bench that the other people in the

15    office were going to ask you what you

16    talked about and you needed to come up

17    with an agreed-upon story?

18       A.   I didn't -- I think everyone in

19    the office knew that this happened.  I

20    did not want Gregg to get wind of what

21    was happening.  His sister worked in

22    the office as well and he would send

23    her around to see who was at their

24    desks and just I always felt like she



1    was kind of creeping on everybody to

2    give him information.

3              There was a situation with

4    two women who were unhappy with him and

5    they never reported anything to me.

6    They took it upon themselves to meet

7    and they were like, it was like they

8    were conspiring against Gregg.  And

9    that's what he said that they were

10   doing.

11             And then they were like, it

12   did come out that they were taking

13   stuff.  I didn't want her and I to come

14   off like we were conspiring.  I didn't

15   want there to be gossip.  I didn't know

16   that everybody had already known this

17   and the only one that pretty much

18   didn't know it was me.

19             So I just wanted to keep

20   separate while I figured out what to do

21   because I was scared.

22   Q.   And the two women were named

23   Lara and Laura, correct?

24   A.   Yes.



1      Q.   So do you recall sending a

2   message to Ms. Barbounis shortly after

3   your meeting on the park bench telling

4   her they're going to ask what we talked

5   about?

6      A.   I don't, but I think I probably

7   did.  I was very nervous.  I didn't

8   want, again I didn't want to seem like

9   Lara and Laura, like all of a sudden

10   like we were making stuff up about

11   Gregg.  Like it was a real, real

12   problem.

13           And I was nervous and didn't

14   want -- it's a small office and you say

15   oh, don't tell anyone and then everyone

16   in the office knows.

17      Q.   Did you tell her that -- didn't

18   you tell Ms. Barbounis right after your

19   meeting on the park bench that the two

20   of you should if asked should say that

21   you discussed your similar

22   personalities and how you needed to

23   respect each other's space?

24      A.   And we did actually.

1        Q.   No, that's not my question.

2              My question is limited to

3   did you tell her that?

4        A.   Yes.  Maybe.  I don't have the

5   text in front of me so I can't see it.

6        Q.   Well, do you recall telling,

7   coming up with a story of what you

8   thought Ms. Barbounis and you should

9   tell others at the office about what

10  you discussed?

11       A.   I remember encouraging her to

12  keep this -- my intention was to keep

13  it quiet until we could figure out how

14  we were handling it.  Again, because

15  she said she didn't want -- she was

16  saying at that point that she did not

17  want to report it.

18              And I felt like it needed to

19  be reported, but at the same time I

20  didn't want to report it because it

21  was -- I was afraid.  So --

22       Q.   It was your job to report it

23  though, correct?  You are HR?

24       A.   I did.



1      Q.   Okay.  Also that day you told

2    Ms. Barbounis that the two of you

3    needed to steer clear of each other

4    around everyone else, correct?

5      A.   She kept like talking to me,

6    like she was, she was -- I didn't want

7    to seem like we were buddy buddy at

8    that point.  I felt like I needed space

9    from her because of this as well.

10     Q.   I don't follow that at all.

11   Could you explain that?

12     A.   Well, I'm HR and she reported it

13   to me.  I didn't want it to seem like

14   all of a sudden I was like buddy buddy

15   with her and there was a conspiracy, is

16   what I was afraid of, oddly enough,

17   because that's what happened with Lara

18   and Laura and I did not want to repeat

19   that.

20            I wanted to figure out how I

21   wanted to handle it and I wanted to do

22   it and I didn't want office gossip.  I

23   didn't want Stacey reporting back to

24   them they're talking, they're talking,



1      dah-dah-dah.

2               I just was trying to --

3      Q.   Hide it?

4      A.   No, not hide it.  That's not

5      what I said.

6      Q.   You said to her that --

7      A.   What I said was I didn't want

8      everybody in the office to know and I

9      didn't want everybody in the office to

10     wonder why all of a sudden we had a big

11     secret.

12              I was trying to maintain

13     professionalism.

14     Q.   You said, quote, they need to

15     think we are at odds though; they are

16     trying to pit us against each other,

17     probably to get rid of us both.

18     A.   Yes.

19     Q.   Does that sounds like a

20     conspiracy?

21     A.   It sounds like I was nervous

22     about my job because I had knowledge

23     now that now I know why he would want

24     to get rid of me.

1         Q.    And that you were attempting to

2    have Ms. Barbounis go along with you to

3    hide your knowledge from the Forum,

4    correct?

5                   MS. SHIKUNOV:   I'm going to

6    object to form.

7                   This is a, first of all,

8    mischaracterization of text messages

9    that you're not presenting to the

10   witness.  You're asking --

11                  MS. DIBIANCA:   I'll present

12   them.  Let me just put them up.

13                  MS. SHIKUNOV:   Let me finish

14   my objection.  If you want to put them

15   up, you can put them up.

16                  But also it's mis-

17   characterizing what she just said to

18   the point that you said you were hiding

19   it and she specifically said no and now

20   you're saying that she said that again.

21                  That's my objection on the

22   record.

23                  THE COURT REPORTER:   I'm

24   sorry.  I couldn't pick up all the



```
1     words you said.
2                MS. SHIKUNOV:  I was
3     clarifying I was done speaking for
4     Molly's sake so that we didn't speak
5     over one another because it's clunky.
6                MS. DIBIANCA:  What was the
7     last word, Erica?
8                MS. SHIKUNOV:  I said
9     clunky, awkward.
10               (A discussion was held off
11    the record)
12               MS. DIBIANCA:  Let's just go
13    back and we'll clarify so that your
14    counsel's objection -- let me try to
15    make that right.
16    BY MS. DIBIANCA:
17       Q.   So after the park bench, I'm
18    still talking October 31st, 2018,
19    following your conversation with
20    Ms. Barbounis that day, did you want
21    Ms. Barbounis to hide what you two had
22    discussed from the others at MEF?
23       A.   Keep it private?
24       Q.   Sure.
```



1          A.    Yes.

2          Q.    And you wanted her to steer

3     clear of you in the office, correct?

4          A.    I did.

5          Q.    And was that because you did not

6     want people to suspect that the two of

7     you had knowledge of something that the

8     others did not have knowledge of?

9          A.    Well, they all did have

10    knowledge of it actually.

11         Q.    At the time you did not know

12    that, correct?

13         A.    Yes.

14         Q.    Okay.  So I'm talking about at

15    that time on October 31st, 2018 you

16    wanted her to steer clear of you in the

17    office because you did not want her by

18    being around you to raise suspicions

19    with the others at MEF.  Is that

20    correct?

21         A.    I didn't want the entire office

22    to know that there was a potential,

23    more specifically Gregg's sister, to

24    know that there was the potential of

1     this claim being filed before I filed

2     it.

3        Q.   Okay.  And did you think that

4     they were trying to pit you and

5     Ms. Barbounis against one another?

6        A.   Who's "they"?

7        Q.   Did you think anyone at MEF was

8     trying to pit the two of you against

9     each other?

10       A.   Yes.

11       Q.   Who?

12       A.   Gregg Roman.

13       Q.   And who else?

14       A.   Possibly Matt Bennett, but

15    that's it.

16       Q.   Did you think they were trying

17    to get rid of you both, meaning you and

18    Ms. Barbounis?

19       A.   I after the quarterly meeting

20    where I had --

21       Q.   I have to interrupt.  I'm still

22    talking about just October 31st on

23    2018.  On that date did you think that

24    they were probably trying to get rid of



1    both you and Ms. Barbounis?

2       A.   I was going to explain that I

3    was fearful for that myself and now I

4    realized why they were trying to get

5    rid of her because after the quarterly

6    meeting and I guess me not agreeing to

7    go to Israel with him he became less of

8    like -- I was not his right hand

9    anymore.  It was all of a sudden it

10   shifted and Matt Bennett was like Matt

11   and him were having conversations and

12   it was like there was stuff going on

13   that I didn't know.  Like I was out of

14   the loop.  I noticed that all of a

15   sudden I was out of the loop.

16              And then I realized -- first

17   off, I thought all of what he was doing

18   was because he had a crush on me.  I

19   didn't realize that he was doing it to

20   everybody in the office.

21              So yes, I was fearful at

22   that point realizing he's gearing up to

23   get rid of her and I'm probably next,

24   so I was nervous.



```
 1        Q.   Do you remember the Pittsburgh
 2    synagogue shooting?
 3        A.   Yeah.
 4        Q.   Do you remember that that was
 5    just a few days before your meeting
 6    with Ms. Barbounis?
 7        A.   I don't remember the date of
 8    that happening, but I do remember it.
 9        Q.   Do you remember how Mr. Roman
10    reacted to that event?
11        A.   I do.  He was yelling that
12    nobody cared how he felt about it and
13    he was emotionally distraught.  And
14    then he wrote an article and prior to
15    that every time he wrote an article he
16    would write, he would sign it, you
17    know, Gregg Roman, director of MEF and
18    that article was signed Gregg Roman,
19    former director of blah, blah, blah
20    Pittsburgh.
21        Q.   You're saying it with a very
22    cavalier tone in your voice.
23             Are you making light of the
24    tragedy that occurred in Pittsburgh?
```



```
1        A.   Of the tragedy?  No, I'm not
2    making light of a tragedy.
3             What I'm saying is his
4    response was that he was trying to get
5    attention for himself from it.
6        Q.   Oh, so you're disputing his
7    grieving of that?
8             MS. SHIKUNOV:  I'm going to
9    object to that as argumentative.
10            But you can answer.
11            MS. DIBIANCA:  That's fine.
12       A.   I don't remember him grieving.
13       Q.   And you knew at the time,
14   October 31st, 2018, that just a few
15   days before Ms. Barbounis had engaged
16   in an extramarital affair, correct?
17       A.   I don't -- I knew that she
18   engaged in extramarital affairs.  I
19   think she had told her husband that she
20   didn't want to be married anymore.  So
21   my understanding of that was more that
22   they were taking a break from their
23   marriage as opposed to that being an
24   extramarital affair, but I don't
```



1     remember who it was with or anything.

2         Q.   If I said it was with Danny

3     Tommo, would that help you recall?

4         A.   Okay.

5         Q.   Yes?

6         A.   Yeah.

7         A.   I do know that she had a

8     relationship with him.

9         Q.   You testified earlier that Matt

10    Bennett, quote, alluded, quote, to

11    something happening in Israel.

12              What do you mean he alluded

13    to it?

14        A.   That Gregg was inappropriate.

15        Q.   And when did he make such an

16    allusion?

17        A.   When I spoke to him the night

18    before I had coffee with her.  That was

19    the first time I had ever heard of it

20    since I kind of got that inkling

21    before.

22        Q.   And the inkling you got was

23    because of what?

24        A.   When they got back from the trip



1        they were awkward around each other and

2        he had made that comment and she had

3        made the comment about the shit he

4        pulled in Israel.

5            Q.    The shitty what in Israel?

6            A.    The shit he pulled in Israel.

7            Q.    Okay.  Sorry.  I thought you

8        used a noun.

9                    And as HR director you

10       didn't follow up with Mr. Bennett about

11       that, what you felt he was alluding to?

12           A.    No.  Because I talked with her

13       about it the next day.

14           Q.    But I'm talking about during

15       your call with Mr. Bennett on the

16       evening of October 30th you just let it

17       go?

18           A.    I mean he said don't say

19       anything, don't say anything, don't say

20       anything.

21                   I didn't let it go.  I met

22       with her the next morning and discussed

23       it.

24           Q.    Well, when you say alluded to,



1    what do you mean by alluded?

2        A.   He said that he was hit on her

3    in Israel or something happened in

4    Israel.  I think that's what he said.

5    Something happened in Israel between

6    the two of them is what he said,

7    something along those lines.

8        Q.   And you didn't follow up with

9    him during that call to say what do you

10   mean, Matt?

11       A.   Yeah.

12            MS. SHIKUNOV:  I object to

13   form.  That's asked and answered.

14       A.   I did.

15            MS. SHIKUNOV:  She just said

16   three times now that she met with Lisa

17   Barbounis and discussed it with her the

18   next morning.

19       Q.   My question was:  You didn't

20   follow up with Mr. Bennett during the

21   call with Mr. Bennett?

22       A.   I did.  I'm sure I was asking

23   him questions and he just was saying I

24   don't know, I don't know, like ask Lisa



1    or whatever.

2        Q.   But you don't have a specific

3    recollection of that or you do?

4        A.   I do.  I mean I wouldn't have

5    him tell me something like that and

6    then not even ask one question about

7    it.

8        Q.   Okay.  Let's return to your

9    charge, please.  We'll go to the third

10   page of it.  This is Exhibit 1.

11             "As a result of

12   Ms. O'Brien's letter," I don't know

13   that we talked about that so let's go

14   back to page 2.  The last sentence on

15   page 2 says "She notified Dr. Pipes."

16   I'm sorry.  Let me go backwards.  I

17   apologize.

18             "Upon hearing this

19   information on November 1st, 2018,

20   Ms. O'Brien wrote a letter to Daniel

21   Pipes, respondent's president, to

22   address how Mr. Roman came onto her

23   when they went to dinner, how Mr. Roman

24   tried sleeping with Ms. Barbounis and



1     how Mr. Roman slept with Ms. Merville,

2     a young, female intern, when she went

3     to Israel."

4                So let's take that piece by

5     piece.  Is it correct to say that on

6     November 1st, 2018 you wrote a letter

7     to Dr. Pipes?

8        A.   Yes.

9        Q.   You gave it to him on November

10    1st or you wrote it on November 1st?

11       A.   I wrote it that morning.  Let me

12    look.  Let me think.

13                Yeah.  Because I slept on it

14    and I went in the office and I wrote

15    it.  I wanted to report it, but Gregg

16    had access to my computer.  There were

17    many times where my mouse would just

18    jump across or there were times where I

19    felt like he was on while I was on.

20                There were other times where

21    I know that he went into my computer

22    when I wasn't there and had been

23    through my social media that I left

24    opened on there so --



1          Q.   How do you know that?

2          A.   Well, one day he asked me to get

3     office chairs because we had really bad

4     office chairs.  So he sent me this ad

5     and said there were all these like --

6     he saw it on Facebook, he got it on his

7     Facebook.  All these office chairs that

8     were needed came up on his Facebook

9     Marketplace.

10               Facebook Marketplace puts

11    stuff in your area and the ad that he

12    had was like near me.  Like he

13    shouldn't have been getting ads from my

14    area.

15               He made it known that he was

16    able to get information, that he was

17    able to hack into people's computers

18    and phones.  There was a widespread

19    sense of paranoia about social or your

20    personal information and the fact that

21    he bragged about being able to get to

22    it if he wanted to.

23               He also would go through I

24    think my -- he had the ability and the



1        right to go through my work e-mail.
2        And he would do that and he would give
3        me a hard time more than once if I was
4        having any kind of correspondence with
5        Daniel without his knowing about it.
6        He did not want me corresponding with
7        Daniel at all unless he knew about it.
8        And he was always going, you know, into
9        my -- I felt like he was always going
10       into my e-mail and stuff.
11              So I was afraid to put it on
12       my computer because I didn't want him
13       to see it.  I didn't want him to know.
14       I was like really scared.  Again, I'm
15       HR, but this is like way above what I
16       had ever dealt with so I was really
17       trying to be mindful to handle it
18       properly.
19              So I ended up writing the
20       note, writing everything down, and I
21       was trying to give him a really clear
22       picture of all the shenanigans that
23       were going on there because he was so
24       far removed from it he just didn't seem



```
 1        to care about it.

 2                    So I wrote it down by hand

 3        and then I took pictures of it and I

 4        sent it to him and Marc I think through

 5        telegram, but then they weren't able to

 6        read it.  So then my next thing was I

 7        did it in my phone, I took the pictures

 8        and I sent them from my personal gmail

 9        to Marc's and Daniel's personal gmail.

10        Q.   You don't have any actual

11        knowledge of Mr. Roman accessing your

12        computer without your knowledge,

13        correct?

14        A.   No.  He -- no.

15        Q.   Those are your suspicions,

16        correct?

17        A.   Yes.

18        Q.   When you say you sent it, you

19        sent the pictures of the handwritten

20        complaint to him, you mean Dr. Pipes,

21        correct?

22        A.   Dr. Pipes and Marc Fink.

23        Q.   Okay.  You said the word "he" so

24        I just want to make sure we get a clear
```



```
 1        record.

 2                   Have you reviewed that

 3        handwritten complaint in preparation

 4        for today?

 5          A.   No.

 6          Q.   What did you review in

 7        preparation for today?

 8          A.   I don't know.  Just trying to

 9        remember --

10                   MS. SHIKUNOV:  She's asking

11        you specifically documents you

12        reviewed.  Don't tell her about

13        conversations that we had.

14          A.   Oh, documents?  I guess we

15        looked at the charges.  I don't know

16        that we looked at any specific

17        documents.

18          Q.   All right.  So you handwrote

19        your complaint.  Did you put everything

20        in that handwritten complaint that you

21        were aware of?

22                   Was it a complete recitation

23        of the issues?

24          A.   No.
```



1        Q.   Why not?

2        A.   What I put took six pages.  I

3    didn't, I didn't put down every

4    occurrence of every little thing that

5    happened.  I tried to give him a good

6    overview of what was happening.

7        Q.   "Him" meaning Dr. Pipes?

8        A.   Dr. Pipes, yes.

9        Q.   And you gave it to Dr. Pipes and

10   Mr. Fink on November 1st, 2018.  And

11   then what was the next -- let me ask

12   you this:  Did Lisa review the document

13   before you sent it to them?

14       A.   I did let her read it.  She was

15   terrified and I think Gregg was

16   painting a picture of her.  He actually

17   said to me one day what do you think of

18   her?  Stacey think she's crazy.  Do you

19   think she's crazy?

20            So that was kind of the

21   narrative I think that he was trying to

22   run or create.  And I think she was

23   afraid that -- you know, she didn't

24   really trust me.  She didn't trust me

1      100 percent.  She was afraid I think

2      maybe that I would, you know, turn the

3      tables and present it a different way

4      and that she was going to get fired.

5      She didn't trust me at all.

6                So I did let her read it.  I

7      didn't change a thing on it.  I didn't

8      add anything to it.  It went as I wrote

9      it.

10        Q.   Do you know that Ms. Barbounis

11     recorded a telephone call without your

12     knowledge?

13        A.   I do know that now, yeah.

14        Q.   Do you think Ms. Barbounis is

15     crazy?

16        A.   No.

17        Q.   Do you think she's stable?

18        A.   I'm not -- she seems fine.  She

19     seems high-strung.

20        Q.   Is it fair to say that you

21     coached Ms. Barbounis with regard to

22     what she should or should not say to

23     Dr. Pipes after --

24        A.   There's no --



1        Q.   I've got to finish my question.

2   All right?

3             Is it fair to say that you

4   coached Ms. Barbounis on what she

5   should or should not say to Dr. Pipes

6   after the complaint was submitted on

7   November 1st, 2018?

8        A.   I don't know.  I may have made

9   recommendations to her because she

10  flies off the handle, but I doubt she

11  listened to them.

12       Q.   Okay.  What happened after you

13  submitted the complaint to Dr. Pipes?

14       A.   I think he came in later that

15  day and he went around and interviewed

16  everybody separately and asked them,

17  you know, what happened, their

18  experiences I guess with Gregg, if they

19  knew anything, if they experienced

20  anything and then he left.

21             Originally I think he said

22  that he was going to tell them not to

23  do that anymore and then he must have

24  like researched or maybe he talked to



1     somebody and he started to take it more

2     seriously at that point.

3        Q.   So is it correct to say that

4     Dr. Pipes interviewed each of the

5     employees in the Forum, that worked in

6     the office after he received the

7     complaint?

8        A.   Yes.

9        Q.   Did that include you?

10       A.   I believe, but I mean we had

11    spoken.  I don't know if he maybe

12    called -- yeah, it did.

13       Q.   Did you tell him that there were

14    other things of concern to you outside

15    of the five pages or six pages that you

16    submitted?

17       A.   I don't recall.  I think we were

18    probably focusing on what was written

19    there at that point.

20       Q.   At that time did you tell Matt

21    Ebert what was going on?

22       A.   No.

23       Q.   When did you first tell

24    Mr. Ebert about the situation at work?



```
1          A.   I don't know exactly.  I mean I
2     think at one point I was talking with a
3     friend on the phone and he maybe asked
4     me a question and then I, you know, may
5     have answered it.  And he overheard I
6     guess some of what I was saying and
7     maybe kind of got the gist that there
8     was something going on and I just said
9     I have an issue at work or whatever.
10               But I was -- you know, I had
11     just been dating him, I guess.  Do you
12     know what I mean?  So I didn't say too
13     much to him early on and I certainly
14     didn't confide in him for help with it
15     or anything.
16          Q.   You had been dating him for six
17     months at that point, right?
18          A.    Yeah.
19          Q.   According to the complaint.  So
20     did a time come that you eventually did
21     tell Mr. Ebert about the issues you
22     were having at work?
23          A.   Wait.  I didn't start dating him
24     until 2019.
```



1        Q.    Okay.

2        A.    I wasn't dating him at the time

3     that this was all happening.

4        Q.    Okay.  And so Daniel Pipes spoke

5     with the individuals in the office and

6     then what happened?

7        A.    I said that he said that he was

8     going to tell Gregg not to do that

9     anymore.  And then he must have had,

10    you know, conferred with somebody and

11    decided to take it more seriously and

12    then he called a meeting.

13       Q.    What was he going to tell Gregg

14    not to do anymore?

15       A.    I guess be sexually harassing

16    people.

17       Q.    You're going to have to explain

18    that to me.

19       A.    That is what he said.  I think

20    he actually said it to Lisa.  So I gave

21    him the complaint written with all of

22    that stuff in it and he went around and

23    interviewed everybody and he said he

24    was going to tell Gregg to act right.

1      I don't know.  He said he was going to

2      have a talk with him.

3          Q.   And he told Lisa that, correct?

4          A.   I believe, yeah.

5          Q.   And then you said he called a

6      meeting.

7          A.   Yes.

8          Q.   So Dr. Pipes called a meeting.

9      When was the meeting held, who was

10     there and what happened?

11         A.   The meeting was on --

12         Q.   I'm sorry to interrupt.  But

13     what document are you looking at right

14     now?

15         A.   The charges.

16         Q.   Okay.

17         A.   Because I wanted to be sure of

18     the dates because I don't know them off

19     the top of my head.

20         Q.   That's fine.  Feel free to refer

21     to it at any time.

22         A.   November 5th he called a staff

23     meeting and it was just the office

24     people and Marc.  So Marc was invited,



1     Matt, me, Lisa, Tricia, Caitriona,

2     Delaney, Stacey, Gregg's sister, and

3     Thelma.

4        Q.   And Stacey Roman was an employee

5     of the Forum at that time, correct?

6        A.   Yes.

7        Q.   So Mr. Roman did not attend,

8     correct?

9        A.   No.  He was supposed to and then

10    Daniel told him he didn't want him

11    there.

12       Q.   What do you mean he was supposed

13    to?

14       A.   Originally I was told that he

15    was inviting Gregg to attend and then I

16    was told later that he didn't want him

17    to attend.

18       Q.   Dr. Pipes told you that or that

19    was in an e-mail?

20       A.   I don't know.  Maybe it was in

21    an e-mail, but I learned that he

22    wouldn't be attending.

23       Q.   As an HR professional do you

24    think it was appropriate for Mr. Roman



1    to not be present at that meeting?

2       A.   At that point -- so, again, I

3    said that I wasn't certified in HR and

4    this was all above my head.  And at

5    that point Marc was the one, you know,

6    he has had experience in this.  And so

7    I was no longer -- he was the one

8    handling it at that point.

9       Q.   Okay.  But my question is at the

10   time was it your opinion that Mr. Roman

11   should have attended?

12      A.   I thought it was weird that he

13   wasn't but, again, Marc and Daniel took

14   it out of my hands.  I wasn't consulted

15   about who should attend or what I

16   thought.  I was told to be there.

17      Q.   Were you upset that you weren't

18   consulted?

19      A.   I just thought that because I

20   had shared my experiences that they

21   probably were taking me away from it,

22   but no, I wasn't upset.  I wanted Marc

23   to be involved.  That's why I cc'd him.

24      Q.   And you wanted him to be



1    involved because you thought it would

2    be handled with seriousness, correct?

3       A.   Correct.

4       Q.   You say you're not certified in

5    HR.  Does that mean that you're not

6    competent in HR?

7       A.   I'm not competent?  No.  It

8    means that I don't have certifications.

9    I have experience, but I don't have a

10   certification in it.

11      Q.   But you're qualified as an HR

12   person, in other words?

13      A.   They seemed to think so.  They

14   hired me.

15      Q.   You represented to them that you

16   were, didn't you?

17      A.   I think I did a lot there to

18   create the foundation of an HR

19   department that they did not have prior

20   to that so --

21      Q.   Didn't your cover letter

22   specifically say that you had

23   significant HR experience?

24      A.   I did.  And I do.



1      Q.   At the time you were hired you

2   represented to the Forum that you were

3   a qualified HR professional, correct?

4      A.   When we had our discussions they

5   knew that I did not have

6   certifications.  I --

7      Q.   Certification is not what I'm

8   asking.

9           I'm asking whether you were

10  qualified, whether you had enough

11  experience and background as an HR

12  professional to perform the duties of

13  an HR professional.

14           Did you or did you not tell

15  them that?

16           MS. SHIKUNOV:  I would just

17  ask that the witness be permitted to

18  complete her answer in full before the

19  next question comes.

20           But with that, Marnie, you

21  can answer the question.

22      A.   I told them that I had

23  experience in HR, that I helped create

24  an HR department foundation where I had



1    worked before, that I did onboarding

2    and offboarding.  I did do sexual

3    harassment trainings and I did like

4    performance reports and initiated and

5    implemented those practices.

6                    And they said that that is

7    what they wanted as well.

8        Q.  Did you ever tell MEF that you

9    were not qualified to handle HR duties?

10       A.  I believe I may have said that

11   this was out of my wheelhouse and then

12   I presented it to them.

13       Q.  Were you competent to handle HR

14   duties?

15       A.  I felt like I handled it exactly

16   like I was supposed to.

17                   MS. SHIKUNOV:  Molly, it

18   doesn't have to be right this minute

19   but at some point can we take like a

20   longer break for lunch?

21                   MS. DIBIANCA:  Yes.  We

22   definitely can.  Let me get through the

23   meeting, the meeting we're about to

24   talk about, and then we can break, if



```
1        that works.
2                    MS. SHIKUNOV:  Okay.
3        BY MS. DIBIANCA:
4           Q.   So, Ms. O'Brien, at the meeting
5        you've described this would have been
6        November -- I'm sorry.  Was it the 1st
7        or the 5th?
8           A.   I think it was the 5th.
9           Q.   Okay.  You already identified
10       who was present for the meeting.  Who
11       led the meeting, who spoke?
12          A.   Daniel.
13          Q.   And what did he say?
14          A.   Gosh, I don't remember any exact
15       words or anything like that, but he
16       felt that I guess upon speaking with
17       everyone and what was presented to him
18       that he felt that Gregg behaved poorly
19       and that he was going to remove him
20       from the office and that he would, you
21       know, not -- I can't remember if it was
22       then that he laid down like what he was
23       going to do or if it was in an e-mail.
24                    And I kind of think he may
```



1      have just like wanted to know

2      everybody's story.  We were all talking

3      about it, I guess, what happened, and

4      everybody really didn't say too much.

5      Matt Bennett, who had been very verbal

6      prior to that about an anti-Gregg and

7      not feeling that he was a good

8      executive director, he was very verbal

9      about that.  He was very verbal about

10     the way that he felt he treated people

11     poorly and the stories that he had told

12     that he said he knew he didn't say

13     anything in front of Stacey.  And I

14     think everybody was kind of hesitant to

15     say anything in front of Stacey because

16     it was her brother.

17                So he just had the meeting

18     and everybody kind of told their

19     stories.  And then I think he followed

20     up with an e-mail.  I don't think he

21     decided then how he was handling it,

22     but he just took that and went.

23                And then he came back later

24     with an e-mail to everyone telling them



```
1     what he was going to do.
2         Q.   Did everyone who wanted the
3     opportunity to speak, was everyone
4     given an opportunity to speak who
5     wanted to speak at that meeting?
6         A.   They were.  Again, I think that
7     everybody probably didn't say as much
8     as they would have if Stacey wasn't
9     there.
10        Q.   And why do you think that?  Did
11    anyone say that or imply that?
12        A.   Yes.  Everyone was uncomfortable
13    to talk about, to say too much about
14    what he did.  You know, he's married.
15    He has kids.  That's her brother and
16    sister-in-law.  I think everybody was
17    uncomfortable with that.
18        Q.   You say everybody was
19    uncomfortable you think.  Did anyone
20    tell you --
21        A.   I was and I know that other
22    people had mentioned that they didn't
23    say everything that they might have
24    said if she wasn't there.  And I know
```



1        everybody mentioned that they were kind

2        of confused by how quiet Matt was.

3            Q.   And you say "everybody."  Do you

4        mean that literally, that every person

5        other than Daniel Pipes and Marc Fink

6        told you after the meeting that they

7        were not comfortable?

8            A.   Probably not Thelma.

9            Q.   Mr. Bennett?

10           A.   Oh, no.  Actually, Lisa told him

11       he was a pussy and he didn't say

12       anything, you know, he didn't talk and

13       say what he should have said.  And she

14       said that in front of everybody.

15           Q.   How does that get us to him

16       saying that he didn't say anything, say

17       more because of Stacey?

18           A.   I didn't say that he said that.

19       I said that we felt that we didn't say

20       anything and everybody commented how

21       Matt didn't say anything.

22           Q.   Okay.  So when you say

23       "everybody," give me the names of the

24       people who told you that they did not



1      feel comfortable speaking out during

2      the meeting because of the presence of

3      Stacey Roman.

4                  Identify those people for

5      me, please.

6         A.   I know, I believe it was like

7      discussed by a group of us after the

8      meeting and it was like in the office

9      afterwards.  I think Stacey left

10     directly after and everybody was kind

11     of like oh, it was weird with Stacey

12     being there; I didn't want to say

13     anything to upset her.

14                  MS. SHIKUNOV:  Give her

15     names.  She's asking you for names.

16        A.   Caitriona, Delaney, Tricia,

17     Lisa, probably not Thelma because

18     Thelma just, she doesn't like drama and

19     she stays out of it and she doesn't

20     want to be a part of it it seemed.  But

21     no, Matt didn't say that.  Everybody --

22     Lisa told him he was a pussy because he

23     didn't, you know, say everything that

24     he said he was going to say.



1        Q.   What do you mean everything he

2    said he was going to say?

3        A.   Well, he was talking to Daniel a

4    lot.  As soon as, as soon as this

5    happened, I think Daniel had called

6    Matt and I into his office or whatever

7    and Matt was on the edge of his seat.

8    He was gunning for Gregg's job from the

9    get, from that minute, on the edge of

10   the seat, Daniel, whatever you need,

11   whatever you need, Daniel, whatever you

12   need I'll help you, I got it, I got

13   this, Daniel, don't worry about it, I

14   got this, dah-dah-dah.

15       Q.   Slow down.

16       A.   What?

17       Q.   Slow down because the court

18   reporter can't get it when you go that

19   fast.

20            THE COURT REPORTER:   Agreed.

21       Q.   So the meeting where you got a

22   whole lot of things getting jumbled

23   together now in my mind, so you said

24   that -- did any of the women tell you



1    directly hey, Marnie, I was not

2    comfortable sharing but I had more to

3    share?

4        A.   They said they were

5    uncomfortable talking about anything in

6    front of Stacey.

7        Q.   Okay.  And did you say to them

8    well, look, I gave Dr. Pipes the prior

9    complaint, so go ahead and tell me what

10   the complaint is and I'll convey it to

11   Dr. Pipes?

12       A.    No.  Because at that point I

13   felt like I had been removed from the

14   HR component because Marc Fink was

15   handling it.  Marc was reaching out to

16   everybody.  Marc was sending an e-mail

17   that said what are your needs?  Like do

18   you have -- like he was reaching out to

19   people and Daniel was reaching out to

20   people.

21             So no, I mean I didn't.  I

22   don't think I did.

23       Q.   Did you think that any employee

24   had an issue that had not been



1       addressed in the meeting on November

2       5th?

3          A.   Do I think that every employee

4       brought up every single thing that

5       Gregg ever said or did to them during

6       that meeting?  No.  It wasn't long

7       enough.

8          Q.   Every material thing?

9          A.   I wouldn't know.  They can only

10      tell that.

11         Q.   You're saying that they told

12      you that they --

13         A.   They told me that they did not

14      feel comfortable speaking freely in

15      front of Stacey.  That's what they told

16      me.

17         Q.   Okay.  And by "they" you mean

18      the people you've already identified by

19      name, correct?

20         A.   Yes.

21         Q.   And then you talked about a

22      meeting with Matt Bennett and

23      Dr. Pipes.  When did that occur and

24      yourself?



1        A.   I'm not sure.  It might have

2     been the day that he came in to talk to

3     everybody.  It might have been after

4     that.  It was, you know, in the days

5     following everything.

6        Q.   And what was the purpose of that

7     meeting?

8        A.   Well, Daniel was very removed

9     from anything office related.  So now

10    with all of these allegations he was

11    probably trying to figure out what to

12    do because the daily operations were

13    going to be affected.

14            So I can't tell you exactly

15    why we were meeting with him but, you

16    know, he was trying to figure out what

17    to do and he and I were helping him.

18       Q.   "He" meaning Daniel Pipes was

19    trying to figure out what to do and you

20    and Matt Bennett were helping him?

21       A.   Yes.

22       Q.   Okay.

23       A.   He asked for mine and Matt

24    Bennett's help, I guess, or maybe he



1    didn't specifically say I need you to

2    help me but was asking us questions and

3    trying to I guess figure out what

4    needed to be done.

5        Q.   At that meeting where it was

6    you, Dr. Pipes and Mr. Bennett, did you

7    tell Dr. Pipes that you felt that

8    employees had refrained from sharing

9    everything with him because of the

10   presence of Stacey Roman at the

11   November 5th meeting?

12       A.   I may have.  I'm pretty sure I

13   mentioned more than once how

14   uncomfortable I was with Stacey and

15   that I'm pretty sure Matt said it too,

16   that you just didn't want to say

17   anything to upset her.

18       Q.   Didn't everyone at the meeting

19   share something?  The November 5th

20   meeting I'm referring to.

21       A.   I'm not sure.

22       Q.   Following the meeting on

23   November 5th is it correct that

24   Dr. Pipes announced that Mr. Roman



1    would no longer be returning to the

2    office?

3      A.   Yes.

4            NS, DIBIANCA: Erica, I'm

5    going to do a few more but not many, so

6    you don't think I forgot again.

7            MS. SHIKUNOV:  All right.  I

8    get hangry.

9            MS. DIBIANCA:  Me too.

10   BY MS. DIBIANCA:

11     Q.   Now, Dr. Pipes also informed

12   Mr. Roman that Mr. Roman would no

13   longer be running the administration of

14   the Forum, correct?

15     A.   That's my understanding.

16     Q.   And Dr. Pipes, effective

17   November 5, 2018 Dr. Pipes also imposed

18   certain restrictions on Mr. Roman's

19   activities, didn't he?

20     A.   What do you mean "activities"?

21     Q.   For example, Mr. Roman was to

22   have no involvement in the approval of

23   expenses or initiatives?

24     A.   Yes.



1        Q.   Mr. Roman was to have no

2    involvement in the hiring or firing of

3    employees, including project directors,

4    correct?

5        A.   I believe.  He was not supposed

6    to have any supervisory role over staff

7    members.

8        Q.   No authority over administrative

9    staff, correct?

10       A.   Or any staff, hiring, anything.

11       Q.   Okay.  Mr. Roman was also

12   instructed to not offer or approve

13   contracts on behalf of the Forum,

14   correct?

15       A.   I believe so, yeah.

16       Q.   And he was instructed to not

17   have involvement in the Forum's

18   accounting, finances, office affairs

19   and personnel issues and property

20   management, correct?

21       A.   I believe so.  As far as the

22   accounting went, I didn't want him to

23   have access to my work product.  So I

24   think, you know, it might have been



1        that for the accounting issues.

2                    But we shared passwords and

3        there was a lot of money, investments

4        and whatchamacallit, you know, just in

5        the bank accounts that I didn't want

6        anything to happen to because I was

7        afraid he would do something to make it

8        look like I stole or that I, you know,

9        did something wrong.

10                   So I didn't want him having

11       access to my work product.

12         Q.   And he was instructed by

13       Dr. Pipes, that authority was removed

14       from him after November 5th, correct?

15         A.   Yes.

16         Q.   And he was also instructed that

17       he had no authority over the Forum's

18       education fund monies anymore, correct?

19         A.   Yes.  Well, he didn't really

20       have any -- Daniel had given him a

21       certain amount to allocate to

22       organizations and I think he revoked

23       that.

24         Q.   And Dr. Pipes also told



1      Mr. Roman that Mr. Roman was to no

2      longer have access, physical access to

3      the Philadelphia office, correct?

4          A.   I think he had to make -- he had

5      to request access to make sure that

6      basically there are no female staff

7      members there or if they were they were

8      comfortable with him being there.

9                So I don't know.  He was

10     told to work remotely and I don't know

11     that he was never allowed back, but it

12     was more that he had to make sure that

13     I guess we were comfortable with him

14     being there.

15         Q.   And Dr. Pipes also instructed

16     Mr. Roman to not have contact with the

17     Forum's female employees outside of

18     business hours other than via Forum

19     e-mail, correct?

20         A.   Yes.

21         Q.   And Dr. Pipes also instructed

22     Mr. Roman that Mr. Roman was to, any

23     e-mails he sent must be business

24     related, correct?



1          A.   I'm sorry.  What?

2          Q.   Dr. Pipes also instructed

3     Mr. Roman that any e-mails Mr. Roman

4     sent to any employees at the Forum must

5     be business related, correct?

6          A.   I believe, yeah.

7          Q.   After November 5th, 2018 through

8     the end of your employment did you

9     personally observe Mr. Roman in the MEF

10    office?

11         A.   He did come back and it wasn't

12    like right away.  He I'm going to

13    say -- I know one time he came back to

14    pack up his office.  I didn't feel he

15    should be allowed to do that.  I felt

16    like we should just pack it up and send

17    it to him, but Daniel arranged for him

18    to come in and pack his things.

19         Q.   Were you there for that?

20         A.   No.

21         Q.   So my question was:  From

22    November 5th, 2018 through the end of

23    your employment at MEF, did you

24    personally observe Mr. Roman in the MEF



1    office?

2        A.    There was a point when it first

3    happened that he was not allowed in the

4    office and then he was given back I

5    guess some of his authority or tasks or

6    responsibilities.  So he then would

7    come into the office, but Daniel would

8    make sure that he gave -- the agreement

9    I think -- there was a new agreement.

10   There was an original agreement and

11   then there was a secondary agreement.

12   And I think after the secondary

13   agreement it was that he would come to

14   the office but he had to -- you know,

15   we had to be given notice to know that

16   he was coming or something like that.

17              So I did see him one time, I

18   think one time in the office.

19       Q.    To the best of your knowledge,

20   to the best of your recollection from

21   November 5, 2018 until the end of your

22   employment at MEF you personally

23   observed Mr. Roman in the office on one

24   occasion to the best of your



1    recollection.  Is that correct?

2       A.   Possibly two, but yes.

3       Q.   And at the time of the one or

4    possibly two instances were you

5    notified in advance that he would be in

6    there?

7       A.   I think so, yeah.  I mean I

8    think there was one time where I

9    thought he was going to be there and I

10   was like upset because I didn't know,

11   but then he ended up not coming or it

12   was misinformation or something.

13             But yeah, I think I knew he

14   was going to be there or whatever.

15      Q.   And so the one time that -- I'm

16   understanding your testimony now, just

17   so I'm clear, I'm understanding what

18   you're saying is that you do have a

19   specific recollection of him returning

20   to the workplace on one instance and on

21   that one instance you were notified in

22   advance.

23             Am I understanding your

24   testimony correctly?



1       A.    Yes.

2       Q.    Yes?

3       A.    Yes.

4       Q.    And during the one instance that

5    he did return to the office when you

6    were there and you had received

7    advanced notice, was there any issue

8    with Mr. Roman's behavior during that

9    visit?

10      A.    I didn't, I didn't like hang out

11   or sit in a meeting.  I stayed mostly

12   in my office.  I think he was -- I

13   think they were rehiring Gary Gamble

14   and they were having a meeting with

15   Gary and he walked around and was

16   introducing Gary to people and he just

17   walked right by my office and didn't

18   introduce me.

19      Q.    So -- sorry.

20      A.    So no, I wouldn't have been able

21   to notice any behavior because I wasn't

22   around him.

23      Q.    So there was no -- you didn't

24   interact with him during that visit, is



1      that right, other than him -- I guess

2      did you interact with him at all during

3      that visit?

4        A.   I don't think so.  I don't

5      recall.

6        Q.   Okay.

7             MS. DIBIANCA:  All right.  I

8      drug it out long enough so let's go

9      ahead and take lunch.

10            We can go off the record.

11            THE VIDEOGRAPHER:  Going off

12     the record at 12:47.

13            (Recessed for lunch at 12:47

14     p.m.)

15            -  -  -  -  -

16            AFTERNOON SESSION

17            1:23 p.m.

18            THE VIDEOGRAPHER:  We are

19     back on the record at 1:23 p.m. Eastern

20     time.

21     BY MS. DIBIANCA:

22       Q.   Ms. O'Brien, after November 5,

23     2018 through the end of your employment

24     with the Middle East Forum, did you



```
 1    ever have contact with Mr. Roman

 2    outside of business hours?

 3       A.   I don't believe so.

 4              There was one time when

 5    there was an issue with Gary Gamble and

 6    I think he texted, he might have texted

 7    me.  I don't know.  But I think that

 8    might have been one time.

 9       Q.   Was it a problem?

10       A.   With his health insurance.

11       Q.   Was there any issue, did

12    anything inappropriate occur?

13       A.   I don't think so.  I think he

14    didn't have his card and I remember I

15    had sent it to him and Gregg was

16    looking for the card or something and

17    he asked me if he had it or whatever.

18              And I resent, I sent it to

19    him.

20       Q.   So with regard to that

21    situation, there was nothing that

22    bothered you about Mr. Roman's conduct,

23    correct, as it relates to that

24    communication?
```



1        A.   I don't think so.  There was an

2    issue that had to be handled and it

3    seemed like it was important and it was

4    for an employee, so I don't remember

5    complaining about it.

6        Q.   Okay.  After November 5th, 2018

7    did Mr. Roman, and other than the

8    incident that you just discussed with

9    Mr. Gamble, did Mr. Roman ever text

10   you?

11       A.   I don't recall.

12       Q.   If he had, would you have

13   reported it to Dr. Pipes?

14       A.   I probably would have, yeah.

15       Q.   Because it would have --

16       A.   I don't recall if he texted me

17   or not.  I was instructed to work with

18   him.  So if I felt like it was a work

19   matter -- I don't recall.  If there is

20   an instance, show me and I'll tell you

21   if it bothered me or not.

22            But, you know, I do recall

23   that one thing and if he did contact me

24   it wasn't very often.



1        Q.   There was never a situation

2    after November 5th, 2018 where

3    Mr. Roman conducted himself

4    inappropriately with you.  Is that

5    correct?

6        A.   I don't believe so.

7        Q.   Okay.  I know that Mr. Roman was

8    involved in the Forum's audit at some

9    point, correct?

10       A.   Yes, he was.

11       Q.   Other than that audit, did

12   Mr. Roman after November 5, 2018 ever

13   again have involvement in the Forum's

14   accounting that you're aware of?

15       A.   I don't know.  I don't know.

16   While I was there I don't think so.

17       Q.   If he had, you would have

18   reported it to Dr. Pipes, correct?

19       A.   It was hard to report stuff to

20   him because there were a lot of things

21   that he said he wasn't going to have

22   access to or be doing.  It was said

23   that he wasn't going to be part of

24   hiring people, but then when they were



1     trying to hire somebody he was like the

2     one calling the shots and wanting,

3     telling Thelma to send him all the

4     e-mails, resumes so he could read them.

5              So his involvement was more

6     than it should have been, but it was

7     very small, it was little.  He'd come

8     back an inch at a time.  So the biggest

9     problem I had was when he was given

10    access to my work product.

11    Q.   Which is the audit, correct?

12    A.   Correct.

13    Q.   Did you answer?

14             MS. SHIKUNOV:  She said

15    correct.

16             MS. DIBIANCA:  Okay.  I

17    didn't hear her.

18    BY MS. DIBIANCA:

19    Q.   So just for the record, could

20    you say your answer, Ms. O'Brien, again

21    for me, please?

22    A.   I said that he --

23             MS. SHIKUNOV:  You just said

24    correct.



```
1         A.   Correct.   Correct.

2         Q.   So I'll just do it one more

3     time.

4              I believe your testimony was

5     that your biggest problem was that he

6     had access, "he" meaning Mr. Roman had

7     access to your work product.  Is that

8     correct?

9         A.   Well, I complained other times

10    where he was becoming involved where I

11    thought that he wasn't going to be.

12    When he told -- when Dr. Pipes sent me

13    an e-mail telling me to basically shut

14    up and give Gregg the reports and that

15    Gregg would be taking care of the

16    audit, that was when I went to Erica

17    and --

18              MS. SHIKUNOV:  Don't talk

19    about what you talked to me about.

20        A.   That is when I decided I needed

21    help from Erica.

22        Q.   Okay.  After November 5, 2018

23    did you ever hear Mr. Roman make any

24    sexual comment?
```



```
 1        A.   I wasn't in his presence.

 2        Q.   I need you to give a yes or no

 3   to the question.

 4             So the question is:  After

 5   November 5th, 2018 did you ever observe

 6   Mr. Roman make a sexual comment?

 7        A.   No.

 8        Q.   After November 5, 2018 did any

 9   employee report to you in your capacity

10   as an HR manager that Mr. Roman had

11   made a sexual comment to that employee?

12        A.   I don't recall.

13        Q.   After November 5th, 2018 did

14   Mr. Roman ever make a sexual advance

15   towards you?

16        A.   No.

17        Q.   After November 5, 2018 that you

18   are aware of in your HR, in your

19   capacity as an HR manager, did

20   Mr. Roman make any advance, any sexual

21   advance toward any other employee, any

22   employee at MEF?

23        A.   Not that I know of.

24        Q.   After November 5th, 2018 did
```



1    Mr. Roman contact you at times that

2    were inappropriate in your opinion?

3       A.   No.

4       Q.   After November 5th, 2018 did

5    Mr. Roman speak to you in a manner that

6    you thought was inappropriate?

7       A.   No.

8       Q.   So is it correct to say that

9    after November 5th, 2018 any concerns,

10   any and all concerns you had about --

11   I'll start over.

12             After November 5th, 2018 is

13   it correct to say that any concerns you

14   had about Mr. Roman with regard to any

15   kind of sexual harassment did not

16   continue after November 5th, 2018?  Is

17   that correct?

18      A.   He never made a pass at me after

19   that.  There was a rumor that he

20   apparently started about me.

21      Q.   Okay.  Let's talk about that.

22      A.   I found out about it after

23   November 5th, 2018.  I'm not sure when

24   he started it.



1      Q.   Okay.  So we can jump to that

2    topic next.  That's fine.

3              In the interest of time, I'm

4    going to try to give you some yes or

5    no's here just because I'm worried of

6    not being able to get through my whole

7    outline.

8              So sometime after November

9    5th, 2018 is it correct to say that you

10   heard from a coworker about a rumor

11   that the coworker believed to have been

12   started about you?

13     A.   I'm sorry?  Can you say that

14   again.

15     Q.   Sure.  I'll say it in a better

16   way.

17              Did you hear at some point

18   that Mr. Roman had started a rumor

19   about you that was untrue?

20     A.   Yes.

21     Q.   And did you hear that after

22   November 5th, 2018?

23     A.   I heard it after that, but I

24   don't know when he started it.



1        Q.   Okay.  And the rumor, am I

2    correct to say that the rumor was that

3    you had slept with a Mr. Brady?

4        A.   My former employee.  He said

5    that I slept with him to get my

6    position at my job.

7        Q.   Your former employee or your

8    former employer?

9        A.   My former employer.

10       Q.   So the rumor was that you had

11   slept with your former employer in

12   order to get your job.  Is that

13   correct?

14       A.   Correct.

15       Q.   And who told you about the

16   rumor?

17       A.   Lisa told me that Gregg had told

18   her that and Tricia was there and

19   Tricia said that she had heard it from

20   Matt.

21       Q.   Okay.  When you say Tricia was

22   there, you mean Tricia was present when

23   Lisa told you that Lisa had heard Gregg

24   make that statement?  Is that correct?



1      A.    Yes.

2      Q.    And are you aware that

3  Ms. Barbounis has testified that the

4  rumor, she heard Gregg say that rumor

5  before November 2018?

6      A.    No, I didn't hear that.

7      Q.    Are you aware that there's an

8  e-mail from Ms. Barbounis to Dr. Pipes

9  in which he states that she heard the

10 rumor from Mr. Roman prior to November

11 5th, 2018?

12     A.    Yes.  I'm not aware.

13          Did you ask me if I was

14 aware of it?

15     Q.    I did.

16     A.    Okay.  No, I didn't know.

17     Q.    Do you have any reason to

18 believe that Mr. Roman initiated or

19 repeated that rumor after November 5th,

20 2018?

21     A.    I didn't know anything about it

22 until after and when I raised it I was

23 told that it wasn't going to be

24 addressed.



1        Q.   And why not?

2        A.   Because he had been good since

3     then.

4        Q.   Because it had occurred prior to

5     the time that his job duties had been

6     changed, correct?

7        A.   It was still something that he

8     did.  Yes.

9        Q.   Okay.  So I don't know that I

10    got a straight answer to my question so

11    let me just ask it again in case I

12    didn't.

13              So do you have any reason to

14    believe that Mr. Roman stated, repeated

15    or initiated the rumor at any time

16    after November 5th, 2018?

17       A.   I do not.

18       Q.   Other than Mr. Roman's

19    involvement in the audit, which I

20    promise to you that we are going to

21    talk about, other than that was there

22    anything that Mr. Roman did to which

23    you took offense after November 5th,

24    2018?



```
1        A.   I don't believe so.

2        Q.   All right.  Let's see.

3             Did you change any of your

4    Forum passwords to something along the

5    lines of fuck you Gregg?

6        A.   Yes.

7        Q.   When did you do that?

8        A.   Right after everything happened.

9        Q.   Right after what everything

10   happened?

11       A.   After I had to report him, after

12   all of this.

13       Q.   So sometime after October 31st,

14   2018?

15       A.   Yes.

16       Q.   And did you tell other people in

17   the workplace that you had done that?

18       A.    I don't think so, but some of

19   them needed my passwords, like Thelma

20   did.

21       Q.   Right.  So Thelma knew that you

22   had changed your password to that,

23   correct?

24       A.    Yes.  She was using it.
```



```
 1        Q.    Was that the mature way to
 2    handle that?
 3        A.    I was angry and it was a
 4    password so that's --
 5        Q.    Was it the mature way to handle
 6    it?
 7              MS. SHIKUNOV:  I'm going to
 8    object to that as argumentative.
 9              But you can answer.
10        A.    Probably not.
11        Q.    Okay.
12        A.    I was very angry.
13        Q.    If you had to do it again would
14    you do that?
15        A.    (Pause)
16        Q.    You're laughing.  So is it
17    funny?
18        A.    I was angry.  I mean you're
19    telling me.  I was angry.  I was
20    emotional.  I had just -- you know, my
21    job path just completely changed
22    because of his behavior, because of his
23    manipulation and his bullshit so I was
24    angry.
```



1           So was it mature?  No.

2           Would I do it again?  I mean

3    right now while I'm calm and I'm not as

4    angry, no, not as angry or it's just

5    time has passed, no, I wouldn't do it

6    again.

7       Q.   You said your job path had

8    changed.  How had your job path

9    changed?

10      A.   He was telling me that he was

11   going to build -- I thought he was

12   sincere and wanted to build that

13   organization into a $20 million a year

14   organization and we were going to, you

15   know, grow it and he wanted me to

16   retire from there and I was going to

17   have job security.

18           And then because of it was

19   all bullshit my job security had

20   changed and I felt scared about my job

21   every day going to work.

22      Q.   After November 5th, 2018 you

23   felt scared?

24      A.   It probably started earlier than



1    that when I started to figure out and

2    get an inkling of what was going on,

3    but yes, after that I still felt that

4    way.

5        Q.    Even though you didn't have to

6    interact with him anymore?

7        A.    Correct.

8        Q.    If you didn't have to interact

9    with him anymore, why would you feel

10   scared that you were going to lose your

11   job?

12       A.    Because it was apparent that

13   Daniel really didn't care about any

14   other employee.  He valued Gregg more

15   than he valued everyone else.  And

16   after, you know, those things were set

17   in place, like I said, there were

18   little inches where he was creeping

19   back and taking back some of his

20   authority, some of his duties.  So I

21   felt like it was just a matter of time

22   before Gregg got himself back into a

23   position where he could kick me out the

24   door.



```
1                    I also, you know, when it
2        first happened I was told to, you know,
3        everyone was told to work from home and
4        then we went back and we were back in
5        the office.
6                    And then as people started
7        getting other jobs and leaving, I was
8        the last one there.  And I was told to
9        work from home; administrative staff
10       wasn't needing to be in the office
11       anymore.  So I could work from home
12       permanently because they were figuring
13       out what to do with the office or
14       whatever.
15                   And then they hired a new
16       director of development that I had zero
17       part in the process and formerly I was
18       a part of that process.
19                   And I went one day and he
20       was, you know, probably not knowing
21       everything that happened, a little bit
22       in the dark and he was showing up.  He
23       seemed like a nice guy.  He seemed like
24       he was trying to work hard and he was
```



```
1        asking me for help.

2               So I was trying to help him

3        with like, you know, different things

4        that he needed.  And he basically told

5        me that he was working out of the

6        office every single day where I was

7        told to stay home.

8          Q.   Who was that?

9          A.   Who?

10         Q.   Yes. What was the person's name?

11         A.   I don't remember his name.  He

12       was hired as the director of

13       development.

14         Q.   And do you remember

15       approximately when he was hired as

16       director of development?

17         A.   No.

18         Q.   Was it at the end of your

19       employment?

20         A.   It was closer towards the end of

21       my employment.  I was the only one left

22       at that point.

23         Q.   And who was the previous

24       director of development?
```



1        A.   It was Matt Bennett.  And then

2    after that Tricia became the acting, I

3    think the acting director of

4    development or something like that.

5        Q.   You and Mr. Bennett started on

6    the same day?

7        A.   A couple of days apart.

8        Q.   So you didn't have any role

9    whatsoever in hiring Matt Bennett.

10   Isn't that correct?

11       A.    Yeah.

12       Q.   Yes.  So you testified that you

13   had previously been involved in the

14   hiring and selection of director of

15   development but, in fact, that is not

16   true at all, correct?

17       A.   Hiring and selection of staff

18   members.

19       Q.   No.  You said director of

20   development, so I'm specifically asking

21   about that.

22       A.   The hiring process is what I

23   meant.

24       Q.   Okay.  Were there other people



1    who were hired that you thought you

2    should have participated in the

3    selection and hiring process but you

4    were not able to do so?

5        A.   After?  That was like the first

6    person I think that was hired really

7    that I know of.

8        Q.   So what do you mean when you say

9    you were not permitted to hire, be

10   involved in the hiring process?  No one

11   was hired.

12       A.   He was and I wasn't a part of

13   the process.

14       Q.   But you had never been part of

15   the process for director of development

16   selection, correct?

17       A.   I didn't say selecting the

18   director of development.  What I said

19   was I wasn't a part of the hiring

20   process.  I usually, no matter who they

21   were, I was given the offer letter that

22   Marc would write and then I would have

23   to put them into Zenefits and get them

24   their benefits and all that stuff.  I



1      was part of that process.

2                  I wasn't a part of that

3      process.

4          Q.   You did that, you put the new

5      director of development input, new hire

6      information?

7          A.   Exactly.  But what I'm saying is

8      that my normal level of involvement

9      wasn't where it was prior to this

10     incident.

11         Q.   And the entirety of that

12     sentence is based on this individual

13     director of development position,

14     correct?

15         A.   Yeah.

16         Q.   All right.  Let's turn to the

17     audit since we've sort of talked about

18     that a little bit but not in detail.

19                  The audit was in I'll call

20     it June 2019.  Does that sound right to

21     you?

22         A.   It started earlier than that.

23     It's a longer process.  They collect

24     information.  They ask for information.



```
1              So the process started way
2      earlier than that, but yeah, that's
3      about when it was starting to get to
4      the end of it, I guess.
5         Q.   In June of 2019 you told
6      Dr. Pipes that you did not want
7      Mr. Roman to be involved in the audit,
8      correct?
9         A.   I didn't want him a part of my
10     work product is all I didn't want.  And
11     there were financial statements and
12     that stuff that I didn't, I didn't
13     trust him.
14        Q.   When you say your work product,
15     so lawyers have a very specific
16     definition of work product.  It's sort
17     of a term of art for lawyers.
18              So tell me what you mean
19     when you say work product just so I
20     know that we're understanding, we're
21     operating with the same definition.
22              What do you mean when you
23     say you didn't want --
24        A.   What I worked on.  What I worked
```



1    on, the financials.  I just didn't want

2    him to have any excuse to retaliate

3    against me.  I was trying to limit my

4    exposure to him.

5         Q.   So when you say you didn't want

6    him to have access to anything you

7    worked on --

8         A.   Yes.

9         Q.   -- does that mean that you did

10   not want him to be able to review

11   financial statements for the

12   organization?

13        A.   I don't know why they would want

14   him to.  He blew hundreds of thousands

15   of dollars.  He --

16        Q.   I'm going to try to get you to

17   answer that question, Ms. O'Brien.

18        A.   I'm sorry?  What?

19        Q.   I'm going to get you to try to

20   answer that question because I've got a

21   limited number of hours so --

22             MS. SHIKUNOV:  She can

23   answer to the best of her ability and I

24   think we can agree that none of your



1       witnesses were particularly responsive

2       and I let them finish their answer so I

3       just ask that Ms. O'Brien be given the

4       same courtesy.

5                  MS. DIBIANCA: As long as you

6       don't cut me off at the end of the day

7       I'm happy to let her talk away.

8                  MS. SHIKUNOV:  I mean that's

9       not how this works.  If you're asking

10      questions, she's going to answer them.

11      Because you're not getting the answer

12      you want doesn't mean that she's not

13      giving you a complete answer to your

14      question.

15                 MS. DIBIANCA:  Well, it's a

16      yes or no question.  So I don't need a

17      narrative.  I just need a yes or no.

18                 MS. SHIKUNOV:  I mean my

19      objection stands.  It's the same thing.

20      You are not entitled to the answer you

21      want.  You're entitled to the answer

22      you get.

23                 MS. DIBIANCA:  Okay.

24



1    BY MS. DIBIANCA:

2        Q.   In early June of 2019 you

3    complained to Dr. Pipes that you did

4    not want Mr. Roman involved in the

5    Forum's annual financial audit.  Is

6    that correct?

7        A.   Yeah, I would say it is.

8        Q.   And Dr. Pipes responded that he

9    did not have the requisite knowledge to

10   be able to assist you with the audit so

11   that Mr. Roman would have to be

12   involved in some capacity.  Is that

13   correct?

14       A.   Yes, that's what he said.

15       Q.   Did he tell you to shut up?

16       A.   Those weren't his words.  That

17   was my paraphrasing of his words.

18       Q.   That was your interpretation of

19   his response?

20       A.   It was terse, yes.  That was my,

21   that was how I interpreted it just

22   then, yes.

23       Q.   All right.  So Dr. Pipes said

24   no, Mr. Roman is going to have to be



1    involved; he's the only one that has

2    the knowledge.

3              What was the extent of

4    Mr. Roman's involvement with the audit?

5        A.   He --

6        Q.   Or I should say in the audit?

7    Sorry.

8        A.   He took it over so I didn't have

9    any really other interactions with him

10   at all.  And normally as the bookkeeper

11   I did the audit.  In every other

12   organization as well I would handle the

13   audit and then at the end of it maybe

14   they do their report and their results.

15       Q.   So what period of time was

16   Mr. Roman involved in the audit?

17       A.   I don't think it was completed

18   when I was there, to my knowledge.  I

19   never really had another involvement in

20   it after that, so I wouldn't know what

21   he did or didn't do.

22       Q.   Did Mr. Roman do anything

23   inappropriate with regard to the audit?

24       A.   I don't know.



1        Q.   And you don't know, am I

2    understanding correctly you don't know

3    because he took it over?  You said they

4    took it over.

5        A.   Right.

6        Q.   And who is "they"?  He and the

7    auditors?

8        A.    No.  The auditors do the audit.

9    He became the point person, I guess.  I

10   don't recall really having much

11   involvement in it after that.

12       Q.   At some point, you would agree

13   with me that at some point in the

14   spring of 2019 Ms. Barbounis and others

15   requested that Mr. Roman return to some

16   of his duties that had been stripped

17   from him as a result of your complaint

18   on October 31st, correct?

19       A.   They did, yes.

20       Q.   Yes?

21       A.   Yes.

22       Q.   Sorry?

23       A.   Yes.

24            MS. SHIKUNOV:  She said yes.



1        Q.   Okay.  Did other employees other

2    than Ms. Barbounis agree with her

3    request?

4        A.   Tricia I think wanted him to be

5    somewhat involved, but I think she was

6    a little more hesitant than Lisa was,

7    but I don't think anybody else other

8    than that wanted him back.

9        Q.   Let's talk about your

10   socialization with coworkers.

11            Did you go out with

12   coworkers in a social context during

13   your employment with MEF?

14       A.   Every once in a while.  It was,

15   it was -- when I first started Gregg

16   and Tiffany would kind of initiate

17   everybody going out because it's nice

18   to go out with your coworkers.  It's

19   good to blow off steam or whatever.

20            So yeah, it was throughout

21   my entire employment there occasionally

22   there would be times where some or all

23   or whatever went out.

24       Q.   When you would go out in a



```
1    social setting was Mr. Roman present?
2       A.   Occasionally.
3       Q.   Do you know, could you estimate
4    how many times that happened?
5       A.   No.  We really -- I mean as
6    whole group we didn't really do it that
7    often.  I don't know.  I couldn't say
8    how many times he was there or not.
9       Q.   Did you go out with Mr. Bennett
10   and Mr. Roman, did the three of you go
11   out together?
12      A.   We would go to lunches often.  I
13   don't recall really going out after-
14   hours.  Like maybe once.
15      Q.   Was that for drinks?
16      A.   Probably.
17      Q.   Is it correct to say that those
18   instances did not occur after November
19   5th, 2018?
20      A.   Yeah.
21      Q.   Did the three of you see a movie
22   together?
23      A.   Matt?
24      Q.   You, Matt and Gregg.
```



1        A.    I don't recall seeing a movie

2    with them.

3        Q.    Star Wars, would that help

4    refresh your recollection?

5        A.    No.  Gregg actually in the

6    middle of the workday invited me to go

7    see -- he said he didn't want to work.

8    He was stressed out.  He had something.

9    He wanted to see Star Wars.  He said

10   let's go see Star Wars.

11             I said no, I have work to do

12   and I'm not comfortable going to the

13   movies alone with you.

14             And he was like well, you

15   know, he wanted to go.  And he was like

16   all right, let's get Tricia, Tricia can

17   go.  And she really didn't want to go

18   either because she wanted to finish her

19   work.  She was really overwhelmed and

20   he insisted.  So we went and saw the

21   movie with him.

22       Q.    Who?

23       A.    With Gregg.

24       Q.    You said "we."



1      A.    Tricia and I, not Matt Bennett.

2      Q.    Matt Bennett was not there?

3      A.    No.

4      Q.    And when was that?  Was that

5   before November 5th?

6      A.    Yes.

7      Q.    Did you take a trip to the

8   Jersey Shore with some of your female

9   colleagues in July 2019?

10     A.    Yes.

11     Q.    Who was present?

12     A.    That was Lisa, Tricia, Caitriona

13   and I.

14     Q.    Did you have a girls night out

15   on Saturday, September 28th that you

16   recall?

17     A.    Saturday --

18          MS. SHIKUNOV:  Of what year?

19          MS. DIBIANCA: I'm sorry.

20   Thank you, Erica.

21   BY MS. DIBIANCA:

22     Q.    That would have been of 2018.

23     A.    Did we go out on a Saturday?  I

24   don't know.  I don't recall that.  If I



```
1     went out with them it was normally

2     after work.

3        Q.   Did you go out with them

4     normally on the weekends?

5        A.   No.  That's what I'm saying.  If

6     I went out with them it was normally

7     after work.  We did the beach trip was

8     more because Matt had had a comp room

9     and I think Tricia was getting, had

10    just gotten a job offer.  And so we

11    were excited for her and we all felt

12    like we had been through a horrible

13    experience and we wanted to celebrate.

14              So we went to just more like

15    a going away party for Tricia.

16       Q.   Was --

17       A.   That's what it was for.

18       Q.   I didn't mean to cut you off.

19    Were you finished?

20       A.   Yes.

21       Q.   You said Matt got a comp room.

22    Did you mean Matt Ebert?

23       A.   Matt Ebert, yes.

24       Q.   Just so the record is clear.
```



1              Did you hear any of your

2    coworkers make sexual comments in the

3    workplace?

4        A.   Like what?  Like what kind?

5        Q.   Like did Lisa Barbounis talk

6    about her sex life?

7        A.   Yes.

8        Q.   And you said earlier that you

9    are aware that Ms. Barbounis had had

10   multiple extramarital affairs while

11   employed at MEF, correct?

12       A.   Correct.

13       Q.   And you were aware that one of

14   those was with Danny Tommo, correct?

15       A.   Correct.

16       Q.   And another one was with Tommy

17   Robertson, correct?

18       A.   Oh, I didn't know that.

19       Q.   And that one of them was with a

20   man named Twin?

21       A.   I knew, yeah.

22       Q.   And a Mr. Baird?

23       A.   Yes.

24       Q.   And those were all individuals



1    that had some connection to the Forum,

2    correct?

3        A.   Yeah.

4        Q.   And in your capacity as HR, did

5    you ever report to Dr. Pipes that

6    Ms. Barbounis was having sexual

7    relationships with individuals who were

8    connected to the Forum?

9        A.   Dr. Pipes was marrying a

10   grantee.  He was leaving his wife.  He

11   left his wife who --

12       Q.   It's a yes or no.

13       A.   -- was a former intern of the

14   Forum for a grantee.  So I didn't

15   really see the point in letting him

16   know that.

17       Q.   So you took it upon yourself to

18   make the decision to not report it to

19   Dr. Pipes, correct?

20       A.   I didn't think it was something

21   that was reportable.

22       Q.   I'm going to repeat it again.

23            Did you report it to

24   Dr. Pipes?



1            MS. SHIKUNOV:  She said she

2      didn't think it was something that was

3      reportable.  Again, you're not entitled

4      to the answer you want.  You're

5      entitled to the answer that you get.

6         Q.   Did you ever report it to

7      Dr. Pipes?

8         A.   No.

9         Q.   Returning to my question about

10     Lisa Barbounis, do you recall that Lisa

11     Barbounis discussed her sex life in the

12     workplace?

13        A.   Yeah.

14        Q.   Did you ever report that to

15     Dr. Pipes?

16        A.   No.

17        Q.   And you were the HR professional

18     at that time, correct?

19        A.   Actually, I would have to say I

20     would think I wasn't the HR

21     professional at that point because

22     prior to the day that everything was

23     reported I really -- Lisa Barbounis had

24     a very different lifestyle that she



1    lived.  She was married.  I didn't know

2    that her and -- I'm not exactly sure

3    when they started having marital

4    problems and that they decided to see

5    other people.

6                  So she was very different

7    prior to that.  She was married.  She

8    was going to school.  She was working

9    hard at the Forum and a mom.  And then

10   afterwards was when all of this

11   started.  So I actually felt like my HR

12   duties had been more or less given to

13   Marc at that point.

14                 So after November 5th I

15   would say that I wasn't really feeling

16   like I was the HR professional.

17       Q.   Okay.  So Ms. Barbounis made

18   those comments long before November

19   5th, right?

20       A.   I don't really, I don't really

21   recall her telling me sex stories.  I

22   thought that she was married and

23   happily married up until -- and I'm not

24   sure what that exact date was.



1           But I know her behavior

2      after was so different that I suggested

3      that maybe she go see a psychiatrist

4      because her behavior seemed to me like

5      when they say a girl is sexually abused

6      she becomes promiscuous.  It was like

7      this happened and now all of a sudden

8      she was off to the races.

9               So I don't really recall her

10     talking about that stuff prior.

11     Q.   When you said this happened to

12     her, you mean she had this break with

13     her husband?

14     A.   Yes.

15     Q.   Okay.

16     A.   No.  No.  The behavior seemed to

17     escalate after we filed the charge

18     against Gregg.

19     Q.   Well, we already discussed that

20     she had had an extramarital affair with

21     Danny Tommo just days before your

22     meeting with her on the park bench,

23     right?

24     A.   Okay.  So I didn't maybe know



```
 1      about that at that point.  So I guess

 2      maybe she wasn't talking to me at that

 3      point about that type of thing.

 4          Q.   So is it your testimony that

 5      Lisa Barbounis was promiscuous?

 6          A.   Sure.

 7          Q.   And is it your testimony that

 8      she was promiscuous, based on what you

 9      know now she was promiscuous throughout

10      her employment at MEF?

11          A.   No.  That's exactly the opposite

12      of what I said.  I said based on my

13      knowledge now it seemed like she was

14      promiscuous after everything else, not

15      the entire time she worked there.  Most

16      of the time she seemed like she was

17      happily married.

18          Q.   But she had the relationship

19      with Mr. Tommo prior to November or

20      prior to October 30th, correct?

21          A.   Right.  I don't know how much

22      knowledge I had of that prior to that

23      point.

24          Q.   But sitting here today?
```



1      A.   I guess.

2      Q.   Okay.  In March of 2018 did you

3    suggest that you, Ms. Barbounis,

4    Ms. McNulty and Ms. Patel take a group

5    pole dancing class?

6      A.   It was an exercise class, yeah.

7      Q.   Did you take that class?

8      A.   No.

9      Q.   In your opinion is it

10   appropriate for the HR manager to

11   socialize with employees outside of

12   work?

13     A.   I was never asked not to.  I was

14   included in every after-work function.

15   It wasn't very often so I mean...

16     Q.   In your opinion, is it

17   appropriate for the HR manager to

18   socialize with employees outside of

19   work?

20     A.   I don't think it's

21   inappropriate.

22     Q.   You do not think it is

23   inappropriate.

24           You do think it is



```
 1      appropriate?
 2        A.   I think it's fine.  It wouldn't
 3      stop me from doing my job.
 4        Q.   Having personal friendships with
 5      employees in the workplace does not
 6      interfere with an HR professional's
 7      ability to do his or her job?  Is that
 8      your testimony?
 9              MS. SHIKUNOV:  I'm going to
10      object to the form of the question
11      because it mischaracterizes what she
12      just said.
13              But, Marnie, you can answer
14      the question.
15        A.   I don't -- can you ask the
16      question again?
17        Q.   By socializing with employees
18      outside of workplace, does that
19      interfere with your ability as an HR
20      professional to do your job?
21        A.   No.
22        Q.   You arranged a sexual harassment
23      training at the Forum in April 2018,
24      correct?
```



1        A.    At Gregg's request, yes.

2        Q.    Great.  And you conducted that

3    training, correct?

4        A.    I did.

5        Q.    And was that conducted in an

6    all-staff meeting?

7        A.    I believe it was.  And then

8    there were some people that didn't make

9    it so they maybe had to do it

10   afterwards.

11       Q.    Did Mr. Roman attend the

12   training?

13       A.    I would assume he did, yeah.

14       Q.    Do you have a specific

15   recollection?

16       A.    I don't recall.  I think

17   everybody signed a paper so there's

18   probably a paper somewhere with his

19   signature if he did.

20       Q.    If I said that he was present at

21   the beginning and made the introduction

22   and then left so that you could conduct

23   the training without him present, does

24   that help refresh your recollection?



1          A.   It really doesn't.   I mean if

2     that's -- it could be that's what

3     happened.   I don't remember.

4          Q.   Do you recall whether Mr. Roman

5     gave the employees one of the board

6     member's phone numbers so that they

7     could reach out to the board member

8     directly in the event that there was an

9     issue?

10         A.   Wait.   What?

11         Q.   Do you recall whether Mr. Roman

12    gave the employees the phone number for

13    Steven Levy specifically?

14         A.   No.   No.

15         Q.   You don't have that

16    recollection?

17         A.   I don't recall that, no.

18         Q.   And then in planning for your

19    sexual harassment training did you

20    suggest that Forum employees get an

21    Airbnb?

22         A.   He had talked about doing, he

23    had talked about doing off-site,

24    off-site like I guess team building



1        things.

2              So do I recall suggesting

3        that?  No.  Airbnb seemed to be his

4        thing, so I don't recall suggesting

5        that.  But, you know, if that's the

6        route that he was going and saying that

7        he wanted to do off-site trainings or

8        team building things, then -- I think

9        there was another thing that was being

10       discussed to do that would have been

11       something similar.

12             So maybe I was trying to go

13       along with that but...

14         Q.   Let me move Exhibit 2.  It's

15       going to be Bates stamped D, as in

16       defendant, D6695.

17             MS. DIBIANCA:  And I'm going

18       to ask Jakob to make a note of that for

19       Kurt, please.

20             (O'Brien Deposition Exhibit

21       No. 2 was marked for identification.)

22       BY MS. DIBIANCA:

23         Q.   So it should be on the screen,

24       Ms. O'Brien.



1              Do you see a document on the

2     screen?

3        A.   Yeah.

4        Q.   Let me just scroll down just so

5     we have a nice clean record.  Since you

6     don't have the document in front of you

7     I just want you to see --

8        A.   Oh, okay.

9        Q.   Let me just scroll down so I can

10    show you at the bottom here is that

11    Bates stamp D6695.

12       A.   So I guess we had staff members

13    that weren't just office members coming

14    in and we needed a spot for them.  So I

15    guess he would do the Airbnb, so I

16    guess that's why I said that.

17       Q.   So you suggested that you get an

18    Airbnb for them, correct?

19       A.   I should say I was asking if we

20    should.  So I don't know that I

21    initially suggested it, but I was

22    asking, it looks like I was confirming

23    whether or not we were doing that.

24       Q.   You were confirming it.  It



1    actually says "Should we get them an

2    Airbnb?"

3              It doesn't sound like you're

4    confirming.

5        A.   Well, he said that he was

6    talking about it.  Then I would have

7    said should we do that?  So I don't

8    know that I suggested it.  But it looks

9    like I was definitely trying to get the

10   plans in order.

11       Q.   Okay.  Do you remember telling a

12   coworker that Ms. Barbounis was a

13   cancer in the workplace?

14       A.   Probably, yeah.

15       Q.   Do you recall when you said

16   that?

17       A.   No.

18       Q.   Have you heard the phone call

19   that Ms. Barbounis recorded of you two?

20       A.   Yes.

21       Q.   And what is your opinion of that

22   phone call?

23       A.   I think you need to -- I think

24   it was illegal.  I think -- I didn't



1    know it was happening and I think it

2    was wrong that she went around playing

3    it for people.  That's my opinion.

4       Q.  And you're aware that she did

5    play it for others in the workplace,

6    right?

7       A.  I was told that, yeah.

8       Q.  What is your knowledge of

9    Ms. Barbounis's proposal to Mr. Terry

10   Giles?

11               And for the record that's

12   G-i-l-e-s.

13      A.  I'm not sure I know who he is.

14      Q.  Knowing everything that you know

15   today, is it your opinion that

16   Ms. Barbounis is an honest person?

17      A.  I didn't ask -- I mean I think

18   if you ask her a question she tells the

19   truth.

20               Was she forthcoming by

21   telling me that she recorded me and

22   then played it for everyone?  No.  But

23   I never asked her either.  So I guess I

24   always felt that she was truthful.

```
 1        Q.   Except for the extramarital

 2   affairs?

 3        A.   I was under the impression that

 4   her and Vasilli were on a break.  She

 5   had told him that she didn't want to be

 6   married anymore.

 7        Q.   And the people that she was

 8   sleeping with, they were married,

 9   weren't they?

10        A.   I don't know about that.

11        Q.   If you knew that they were,

12   would that change your opinion of

13   Mrs. Barbounis's veracity or

14   truthfulness?

15        A.   I mean her -- is it truthful?  I

16   mean truth to me is if you ask somebody

17   a question and they tell you a lie.  I

18   think, if I remember correctly I think

19   she had some kind of exchange with one

20   of their girlfriends or whatever and

21   she was pretty open with the girl about

22   what was going on.

23             Truthful?  I think she is.

24             Do I think she makes a lot
```



1    of good choices?  No.

2        Q.  Do you trust her?

3        A.  Not after she played and taped

4    me probably I wouldn't trust her right

5    now, no.

6        Q.  And she filed a complaint at the

7    Forum about you, correct?

8        A.  Yeah.  She told me that Matt

9    Bennett instructed her that it had to

10   be done before she left that day that

11   we argued and demanded that she submit

12   that.

13              MS. SHIKUNOV:  Can you give

14   me just two seconds and go off the

15   record?  Somebody is yelling in the

16   hallway.  I don't know who it is, but I

17   just need a minute.

18              THE VIDEOGRAPHER:  Should we

19   go off the record?

20              MS. DIBIANCA:  Just wait a

21   minute.

22              (A discussion was held off

23   the record.)

24



1    BY MS. DIBIANCA:

2        Q.   After November 5th, 2018 -- I'm

3    sorry.  Strike that.  You already

4    answered this question.  I apologize.

5              Do you recall a meeting in

6    the MEF office in January of 2018 where

7    it was an all-staff meeting with

8    Mr. Bennett, he brought his young

9    daughter and said that all

10   communications with Mr. Roman from that

11   point forward were to go through

12   Mr. Bennett?

13             Do you have a recollection

14   of that meeting?

15     A.   Yes.

16             MS. SHIKUNOV:  Before you

17   answer that.

18             Molly, you said 2018.

19             MS. DIBIANCA:  I'm sorry.  I

20   should have said 2019.  I thought I

21   did.  I apologize.

22   BY MS. DIBIANCA:

23     Q.   So in January of 2019 there was

24   a meeting with Mr. Bennett.  Can you



1    tell me about that meeting?

2        A.   He was the -- I'm not sure if he

3    was like the acting director at that

4    point or not, but there was a point

5    where Daniel had given him, you know,

6    the opportunity to be the acting

7    director.  And he called that meeting

8    and told everyone exactly -- I don't

9    remember anything else from that

10   meeting, but I do remember him saying

11   that he didn't want anyone talking to

12   Gregg.  If there was anything to be

13   discussed with Gregg, it went through

14   him.

15       Q.   Do you have an understanding of

16   why he gave that directive?

17       A.   No.  I don't recall.

18       Q.   Did you comply with that

19   directive?

20       A.   I think Daniel Pipes nullified

21   that directive very shortly after it

22   was given.

23       Q.   Okay.  At some point in time you

24   took your boyfriend Mr. Ebert into the



1      MEF office, correct?

2         A.    I did.

3         Q.    And when was that?

4         A.    It was I went out after work one

5      night.  I had expressed to him concerns

6      that Gregg had a camera in my office.

7      I felt that he might have a camera in

8      everyone's office because we went to --

9      well, first of all, there were cameras

10     everywhere.

11                  And he had a camera in his

12     office pointed directly at his desk so

13     that if you went in to the room it

14     would set off some kind of motion

15     sensor and the video would start

16     recording and then he would call and be

17     like why are you in my office?

18                  And then I just felt

19     completely paranoid and creeped out and

20     felt that there was a camera in my

21     office.

22                  We all used to get changed

23     for work or for the gym.  There was a

24     gym there.  A lot of us would get



1    changed from our offices sometimes.  So

2    I just felt very strongly that he had

3    set something up that was

4    inappropriate.

5              And Matt had had experience

6    with that stuff and I said do you think

7    you could, you know, do you think you

8    could check for it?

9              So we had went out, I think

10   we had like one drink and then we went

11   back and he went up into Gregg's office

12   and looked up over and he said he did

13   see something.  I actually have

14   pictures of it.  He did see something

15   that was hanging that looked like it

16   didn't belong there, but he couldn't

17   see anything.

18             And then he looked up above

19   my office to see if he could see

20   anything that looked like a camera and

21   he said no, that he couldn't see

22   anything.

23        Q.   When was that?

24        A.   I don't recall.



1      Q.   Was it before November 5th, 2018

2    or after?

3      A.   Well, it had to be after because

4    I didn't start dating him until May.

5      Q.   And you knew that Mr. Roman did

6    have a camera in his office, correct?

7      A.   I did.

8      Q.   But you still had Mr. Ebert look

9    in Mr. Roman's office.  Why is that?

10     A.   He looked above his desk up in

11   the ceiling to see if there was any

12   wires running.

13     Q.   Did you tell anyone at the Forum

14   that you had brought in your boyfriend

15   to look around?

16     A.   No.  But I did follow the

17   protocols and I did have him sign an

18   NDA.

19     Q.   Why didn't you tell anyone that

20   you were concerned that there could

21   be --

22     A.   I was --

23     Q.   -- surveillance?

24          MS. SHIKUNOV:  Let her



1      finish her question.

2          A.    I'm sorry.  Say that again.

3          Q.    That's okay.

4                Why didn't you tell anyone

5      at the Forum that you were concerned

6      about potentially being, there being

7      potentially surveillance in the office?

8          A.    I don't know that I didn't.  And

9      I think, I'm pretty sure that I had

10     mentioned to Daniel that at one point

11     after the Israel trip and Gregg had his

12     top secret mission stuff he bought

13     Alexas.  I know that I told Daniel

14     this.  He bought Alexas, one for my

15     office and one for Lisa's office.  That

16     was so that he could communicate with

17     us secretly like off the grid about his

18     secret stuff.

19                And I had heard prior to

20     that that those could be hacked and

21     that you could listen in to people and

22     like turn cameras on and all that kind

23     of stuff.  And when he gave it to me I

24     said I'm not using that.



```
1                    And he said yeah, you are

2          and he said -- I said no, I think you

3          hacked it and I think you're going to

4          eavesdrop in my office and I'm not

5          using it.  And we were laughing about

6          it, but I was pretty blunt about the

7          fact that I thought the whole intention

8          of him putting that into my office was

9          so that he could listen to me.

10                   And one time Lisa told --

11         Lisa was fine with it.  She didn't

12         care.  She was using it right away.

13         And she did tell me that one time she

14         was talking and it wasn't on and she

15         said his name and something happened,

16         it flickered the lights or something

17         like that.  And I was like I told you,

18         he hacked it.

19                   So I always had a paranoia

20         that -- and he fostered that -- that he

21         was hacking into your phone, your

22         computer.  He knew everything.  He

23         could watch everything.

24                   And I believe that I may
```



```
1      have said that to them.  I definitely
2      talked about the Alexa.
3           Q.   You talked about it to who?
4           A.   Daniel.
5           Q.   And what did you tell him?
6           A.   Exactly what I just told you.
7           Q.   Did you tell Dr. Pipes that you
8      did not want to use the Alexa?
9           A.   He never knew about the Alexa
10     until after the fact.  We probably
11     discussed the Alexa when Gregg was
12     cleaning up his office and wanted his
13     stuff from his office because I had put
14     my Alexa in there.
15               So Daniel didn't pay much
16     attention to anything that was going on
17     in the office so he wouldn't have
18     known.
19          Q.   Did you use the Alexa?
20          A.   He told me I had to.  I think I
21     had it on my desk for like a day and I
22     didn't actually like plug it in.  I
23     just wanted it to be off.
24               And then I might have, I
```



1    might have dabbled with it and I think

2    I kind of decided like I would just

3    keep it off and unplugged unless I

4    wanted to like listen to something or

5    whatever.

6             But it didn't even last

7    long.  I took it out.  I wasn't

8    comfortable with it.

9       Q.   It did not have a camera,

10   correct?

11      A.   I don't know what it had.

12      Q.   Are you aware that it did have a

13   camera?

14      A.   No, I'm not aware that it did.

15      Q.   It didn't have a display,

16   correct?

17      A.   Right.  No, it didn't.

18      Q.   So you let your -- well, let's

19   just back up.

20             Mr. Ebert is a convicted

21   criminal, correct?

22      A.   I don't believe so.

23      Q.   You're not aware that your

24   boyfriend has a criminal history?



1        A.   I know that he lost his job, but

2    I don't think he was convicted.   I

3    think it was expunged from his record.

4        Q.   Okay.  So he was convicted and

5    then it was later expunged.  Is that

6    correct?

7        A.   I don't know how that works.   I

8    know that he lost his job for gambling.

9    And I also know that he was good at his

10   job because we ran into a bunch of his

11   old coworkers and they were absolutely

12   thrilled to see him and couldn't say

13   enough about what a good cop he was.

14       Q.   Are you aware that he was

15   terminated from his position with the

16   police department as a result of being

17   charged and convicted with illegal

18   bookmaking?

19       A.   Yes.

20       Q.   So you let Mr. Ebert into the

21   MEF office and specifically into

22   Mr. Roman's office to look around

23   without prior permission from anyone at

24   the Forum, correct?



1      A.   Yes. His office was empty.  None

2    of his stuff was in there though.

3      Q.   When was this?

4      A.   I don't know.  The NDA is

5    probably dated.

6      Q.   Where is the NDA?

7      A.   Probably in their records.

8      Q.   Whose records?

9          MS. SHIKUNOV:  Molly, that

10   NDA is among the approximately 500 that

11   were produced

12          MS. DIBIANCA:  No, I don't

13   believe it was.

14   BY MS. DIBIANCA:

15     Q.   What NDA did you have him sign?

16     A.   The NDA that anybody who visited

17   the office signed.

18     Q.   And was that with the security

19   desk?

20     A.   What?  No.  It was we took -- we

21   managed that.  We just had people sign

22   when they visited.

23     Q.   Mr. Ebert testified that he

24   signed something at the security desk.



1      So is his recollection correct?

2          A.   I don't know.  I don't think so.

3      I think he signed it at the desk in the

4      office.  I don't think he had to sign

5      in to get there.  He might have had to

6      sign in to get past security.

7          Q.   Had you already retained counsel

8      by the time, at the time that you gave

9      Mr. Ebert access to the MEF office?

10         A.   Yes.

11         Q.   Had you filed your charge at

12     that time?

13         A.   I believe so.  It was filed

14     before I met him, I believe.

15         Q.   It was filed July 24th.

16         A.   I think I had gone to Erica's

17     office to request that it was filed.  I

18     know that when --

19              MS. SHIKUNOV:  Don't talk

20     about conversations at my office.  If

21     you don't remember if your charge was

22     filed at that point just say you don't

23     remember.

24         A.   I don't remember.



1      Q.   No.   I don't think you're

2    answering the question.

3              You had a charge, you had

4    signed the document that is the charge

5    of discrimination marked as Exhibit 1

6    on July 24, 2019, correct?

7      A.   Yeah.

8      Q.   And did you allow Mr. Ebert

9    access to the MEF office before or

10   after July 24th, 2019?

11     A.   I don't know.   I'm not sure what

12   the date was.   Again, the date would be

13   on the NDA.

14     Q.   And was Mr. Roman's office empty

15   at that time?

16     A.   I think it was, but I'm not

17   sure.

18              But I also want to clarify

19   that I didn't allow him entry.   I

20   escorted him into the office.   He

21   jumped up on the desk, he looked around

22   and he did that in a couple of offices

23   and he checked mine and then we left.

24              I didn't like -- he wasn't



1    like running around in there.

2        Q.   But which part of the statement

3    that you allowed him into the office,

4    which part of that do you disagree

5    with?

6        A.   The word "allowed," like you

7    said I allowed him access, like I gave

8    him full rein to do whatever he wished

9    in there.  I escorted him in, I walked

10   him to the specific spots that I wanted

11   him to look at and then we left.

12       Q.   He did that with your

13   permission, correct?

14       A.   Yes.

15       Q.   Okay.  And at no time did you

16   ever tell Dr. Pipes that you had

17   invited Mr. Ebert into the office,

18   correct?

19       A.   I don't think so.

20       Q.   Did you ever tell Mr. Marc Fink

21   that you had brought Mr. Ebert into the

22   office?

23       A.   I don't think so.

24       Q.   Did you tell any of your



1    coworkers that you had done that?

2       A.    I think I may have.

3       Q.    Like who?

4       A.    Probably the people that also

5    were very paranoid, Lisa, Tricia,

6    Delaney and Caitriona.  And I don't

7    even know if I would have told Delaney

8    and Caitriona but...

9       Q.    We talked about the AIPAC

10   conference earlier.  The AIPAC

11   conference was in March of 2018.

12            Did you report to Dr. Pipes

13   after that conference that you thought

14   there was something that had happened

15   that made you uncomfortable or was

16   inappropriate in any way?

17      A.    No.

18      Q.    And why not?

19      A.    I don't know.  I probably should

20   have.  I don't know that he would have

21   cared but...

22      Q.    Well, you certainly don't know

23   if you didn't tell him, right?

24            MS. SHIKUNOV:  Is there a



```
1     question?
2                 MS. DIBIANCA:  Yes.  She
3     heard the question.
4        A.   No.  Correct.
5        Q.   Let's talk about your
6     boyfriend's call to Mr. Roman.
7                 You are aware now that
8     Mr. Ebert made an anonymous phone call
9     to Mr. Roman, correct?
10       A.   Correct.
11       Q.   Are you aware how many times
12    Mr. Ebert called Mr. Roman?
13       A.   No.
14       Q.   Have you seen the phone records?
15       A.   I think I did.  I probably knew
16    at some point how many times but I
17    don't recall.
18       Q.   If I told you that there were
19    eleven phone calls, would that sound
20    correct to you?
21       A.   I think, yeah.
22       Q.   And the phone call that was
23    recorded from Mr. Ebert to Mr. Roman,
24    that was in late September 2019.  Would
```



1        you agree with that?

2           A.    I'm sorry.  Say it again.

3           Q.    Sure.

4                  The phone call from

5        Mr. Ebert to Mr. Roman was in late

6        September 2019, correct?

7           A.    If that's what you're saying.

8        I'm not sure of the exact date.

9           Q.    Okay.  I'll make that

10       representation to you that it was -- I

11       apologize.  I don't know if it was the

12       25th or the 29th, but it was around

13       that time in September of 2019 just so

14       we have a decent chronology.

15          A.    Okay.

16          Q.    So before September 25th we'll

17       call it, September 25th, 2019, prior to

18       that what had you told Mr. Ebert about

19       your work, about MEF?

20          A.    Not much.  I did -- he knew I

21       guess that there was a lawsuit.  I

22       never discussed it with him

23       specifically, the details of it.  I

24       might have glossed over some stuff, but



```
1    we weren't dating for that long at that

2    point.  I guess at that point I just

3    didn't confide that stuff in him.

4        Q.   Okay.  Have you heard the tape

5    of that phone call?

6        A.   I heard a piece of it.

7        Q.   I am going to play the tape here

8    in a moment, but actually if you could

9    just hold for me for one minute I'm

10   going to adjust the blinds in my office

11   because I'm currently being blinded.

12   Hold on.

13            Okay.  Thanks so much.

14            Had you told Mr. Ebert prior

15   to his phone call to Mr. Roman in

16   September 2019 that Mr. Roman had been

17   excluded from the office at the

18   direction of Dr. Pipes?

19       A.   I don't know that I told him

20   directly, but I have friends that I

21   talk to and, you know, work calls and

22   stuff so I don't know what he may have

23   overheard.

24       Q.   What are the names of the
```



1     friends that you talked to about it?

2         A.   I'll be honest, I was really

3     nervous for the longest time to say

4     very much to anybody because I was so

5     afraid of the NDA and getting in

6     trouble for talking about MEF business.

7     So I really was very quiet about what I

8     said about it because I was afraid of

9     that on top of everything else that I

10    was afraid of.

11              But I do have certain

12    friends, Tracy McKinley, Monica Vona

13    that I talked to about it, Bill

14    Schlosky, my girlfriend Peggy Reese

15    probably would be who I really

16    consulted and cried to.

17        Q.   You supported the decision to

18    terminate Tiffany Lee, correct?

19        A.   I guess I did.

20        Q.   What is Ms. Reese's phone

21    number, please?

22        A.   Phone number?

23        Q.   Phone number.

24              MS. SHIKUNOV:  Molly, I



1      don't have a problem giving that to

2      you, but can we do that off the record?

3          A.   Did you hear Erica?

4          Q.   I did.

5          A.   She asked if we could give that

6      to you off the record.

7                  MS. DIBIANCA: Erica, can you

8      e-mail it to me?

9                  MS. SHIKUNOV:  Yes.

10                 MS. DIBIANCA:  Yes, that

11     would be fine.

12                 THE VIDEOGRAPHER:  Do you

13     want me to go off the record?

14                 MS. DIBIANCA:  Nope.  That's

15     okay.  We're going to carry on.  Thank

16     you for asking.

17     BY MS. DIBIANCA:

18         Q.   Did you tell Mr. Ebert -- so

19     your testimony is that you didn't tell

20     Mr. Ebert about the happenings in the

21     workplace prior to September 25, 2019?

22         A.   I don't know how much I told him

23     to be honest or if I told him anything.

24     Like I just kept that -- I didn't, like



1       I said, I didn't talk about it that

2       much.  I was afraid to talk about it.

3       I didn't know who it was okay to talk

4       about it with.

5               I don't know what I may have

6       said or not said.  I'm sure there were

7       some inklings of there being like a

8       lawsuit, but I didn't really go into it

9       with him.

10      Q.   At some point Mr. Roman was

11      considering promoting Ms. Barbounis,

12      correct?

13      A.   What do you mean "promoting"?  I

14      think he was going to move her or at

15      least give her some content work.

16              Is that what you mean?

17      Q.   Okay.  And did you support that

18      idea?

19      A.   I believe I did.

20      Q.   What about was she going to be

21      made deputy chief of staff at some

22      point?

23      A.   Wait.  Gregg was promoting her

24      to that?



1        Q.   Did Gregg discuss that with you?

2        A.   I think that was a title that

3    she got or something like that.  I

4    remember thinking that it was a weird

5    title.  I remember thinking that she

6    should be in the context of that's what

7    she wanted to do at the beginning

8    anyway.

9              I don't remember about the

10   title or what the job was.  I think she

11   wanted a title that was in line with

12   like the government jobs that she had

13   before.

14       Q.   I'm going to represent to you

15   this was around the time that Daniel

16   was considering promoting Mr. Roman to

17   CEO.

18              Does that help you refresh

19   your recollection?

20       A.   Not really.  There was a lot of

21   title talk all the time.  Everybody was

22   talking about their titles.  He was

23   telling me that I was going to be the

24   CFO.



1              So I mean if that was her

2       title, then I guess yeah.  Actually, I

3       think he was going to make me the COO

4       and then it changed and then Daniel was

5       going to be the CEO, Gregg was going to

6       be the CFO -- or COO and I was going to

7       be the CFO.

8          Q.   Okay.

9          A.   I don't remember what Lisa was

10      going to be.

11         Q.   Okay.  When Ms. Barbounis

12      requested that Mr. Roman be allowed to

13      return to some of his administrative

14      duties that had been stripped from him

15      in November of 2018, were you surprised

16      by that request or did she tell you

17      that that was her intent prior to

18      making it?

19         A.   I don't think she told me that

20      prior.  I was shocked.  And I could see

21      that Daniel needed for the good of the

22      organization for Gregg to be involved

23      and at least keep his position, his

24      title.  He was the face of the



1    organization almost as much as Daniel

2    was at that point.

3                So it definitely would have

4    hurt to not have his face on there, but

5    I don't think leopards change their

6    spots and I didn't want him in the

7    office.  And yes, I was surprised that

8    she would want more involvement with

9    him.

10   Q.   On July 24th, 2019 at around

11   1:00 p.m. you deleted more than a

12   thousand documents from Dropbox.  Why

13   is that?

14   A.   I deleted?  Did we move them

15   into Google Drive?  Because there was a

16   point where we were changing platforms

17   and we were moving out of Dropbox and

18   then everything was getting mirrored

19   into Google Drive, I think, and we were

20   supposed to be using that.

21                And then I don't know what I

22   would have deleted.  If I did, I might

23   have done it unintentionally.

24   Q.   So that was the same day you



1        filed your charge of discrimination.

2                    Does that help you refresh

3        your recollection?

4            A.   It really doesn't.  It's not --

5        it doesn't seem like something that I

6        would do.

7            Q.   And why doesn't it?

8            A.   Because I don't know why I would

9        get rid of a thousand -- what were

10       they?

11           Q.   Why wouldn't you have deleted a

12       thousand documents?  What makes you say

13       that, it doesn't sound like something

14       that you would do?

15           A.   Because I wouldn't destroy that.

16       I don't know what I would have been

17       getting rid of.

18           Q.   And at that point you already

19       had a litigation hold letter, correct,

20       instructing you to preserve documents

21       and evidence, correct?

22           A.   Yes.

23           Q.   Okay.  So you would agree with

24       me if, in fact, you did delete more



1    than a thousand documents from Dropbox

2    on July 24th, 2019 at 12:53 p.m. that

3    would have been in violation of that

4    litigation hold letter, correct?

5        A.   Yeah.  It's another reason I

6    wouldn't have done it.  But it should

7    also be there because everything was

8    mirrored into Google Drive so then it

9    should be in the Google Drive if it's

10   not in the Dropbox.

11       Q.   You also blind copied your

12   personal gmail account on multiple MEF

13   e-mails, correct?

14       A.   Yes, I did.

15       Q.   Why did you do that?

16       A.    It was when I was feeling

17   persecuted and felt like I was being

18   harassed and I felt like Daniel was

19   going back on his word, so I was

20   sending myself proof of that.

21       Q.   So let's break that down a

22   little.

23            When did you start blind

24   copying your personal e-mail?



1        A.   I don't know.

2        Q.   Did you do that -- once you

3    started doing it, did you keep doing it

4    throughout the rest of your employment?

5        A.   I don't, I don't know.  I mean

6    if you want to show me what I blind

7    copied, I'll tell you what my thought

8    process was.  I don't know.

9             I know that I was scared all

10    the time and that I was nervous and

11    that I felt like I needed to protect

12    myself.

13        Q.   And at that point there was no

14    harassment, correct?

15             MS. SHIKUNOV:  At what point

16    are we talking about?

17             MS. DIBIANCA:  Whenever she

18    started blind copying herself.  She

19    testified that she felt she was being

20    harassed, but I'm confused why that is.

21        A.   Well, prior to the complaint

22    being filed to Daniel and Gregg being

23    pushed out of the office, I was just

24    given like -- it was just if they asked



1    me for something I would do it.  Now

2    all of a sudden every time I was asked

3    for something it was by close of

4    business, by close of business and I

5    had to -- it basically felt like they

6    were trying to document anything that I

7    was doing that they thought was wrong,

8    anything that they could get on me.  I

9    felt like I was being documented.

10       Q.   But you weren't even interacting

11   at that point with Mr. Roman, correct?

12            MS. SHIKUNOV:  Again, I'm

13   going to ask you at what point?

14   Because you're giving her random times

15   and space.  You're not limiting your

16   questions at all.  You're just saying

17   at that point, at that point.

18            I don't even know when we're

19   talking about.

20       Q.   Ms. O'Brien, when did you start

21   blind copying yourself, your personal

22   e-mail account?

23       A.   I don't recall.

24       Q.   So if you don't recall when you



1    started to do it, do you recall why you

2    started to do it?

3       A.   Because I felt like I needed to

4    document stuff, Daniel going against

5    what he had originally said he was

6    going to do and different things that I

7    felt were representative of harassment

8    and stuff that I felt protected me.

9              That's what I was doing.

10      Q.   What did Daniel do to go against

11   what he was going to do?  What do you

12   mean by that?

13      A.   When he told me that I had to

14   send Gregg the work.  He was paying

15   Marc Fink $2,000 a month to pick up

16   extra responsibilities in regard to the

17   office.  I was supposed to be reporting

18   to Marc, so all of a sudden Gregg was

19   the one that was handling the audit.  I

20   was told that he was not going to be

21   taking part in the finances and he was.

22      Q.   He was only insofar as the

23   audit, correct?

24              I'm sorry.  I didn't mean to



```
 1    cut you off.  Go ahead.
 2       A.   It's fine.  What?
 3       Q.   Mr. Roman was involved in the
 4    finances only as far as the audit,
 5    correct?
 6       A.   I think.
 7       Q.   And once he got involved in the
 8    audit you were no longer involved in
 9    the audit, correct?
10       A.   Correct.  I felt Marc Fink
11    should have been doing that because he
12    was getting paid extra money to be the
13    point person at the office.
14       Q.   Right.  But Mr. Fink is in-house
15    counsel.  So you're saying that you
16    thought Mr. Fink's job should have been
17    to run the organization's audit?
18       A.   When everything happened and
19    Gregg was removed from his
20    responsibilities, I was not to be under
21    Gregg, my work was not to be under
22    Gregg.  Marc was the one that was
23    supposed to be handling -- he was my
24    report to, him and Daniel and, as such,
```



1      you know, Daniel had asked me to be, he

2      actually asked me to be a point person

3      at the office.

4                    And this was after he asked

5      Tricia to be the point person for the

6      development and he offered Tricia an

7      extra thousand dollars to pick up those

8      extra responsibilities.  He didn't

9      offer me any money.  And I said well,

10     you're giving Tricia extra money.  Why

11     wouldn't I get extra money?

12                   And then I said okay, well,

13     then, I guess I'm not doing it.

14                   After that he said he would

15     think about it.  And then the next time

16     I heard of it he had put out to the

17     office staff and said we're going to

18     have a vote to see who's the point

19     person for the office.

20                   So the vote happened.  And I

21     said okay, I'm going to put myself up

22     because I've already told him that I

23     want to get paid for it.  So if they

24     vote for me, then he would have to pay



1     me for it because he knows I'm not

2     doing it otherwise.

3                So they had the vote.  They

4     picked Lisa for it, which was

5     completely weird because she didn't

6     want any administrative

7     responsibilities so I didn't even

8     understand why she put herself up for

9     it.  And I would have thought that if

10    they were going to vote for somebody to

11    be the point person on the

12    administrative stuff they would have

13    picked me since most of it fell under

14    my umbrella anyway.

15                I flipped out.  I thought it

16    was bullshit.  I said it was bullshit

17    to Daniel.  And he said to me that he

18    suspected Lisa must have been

19    campaigning behind the scenes.  And

20    then he didn't give her the job.  He

21    gave Marc Fink the job and he paid him

22    $2,000 extra a month to do it.

23                So I feel like if somebody

24    was going to pick up the audit it



1    should have been him.

2         Q.   Who's "him"?

3         A.   Marc Fink.

4         Q.   Okay.  By blind copying your

5    personal e-mail -- what is your

6    personal e-mail address, by the way?

7         A.   Marniem03@gamail.com.

8         Q.   By blind copying that e-mail

9    address you were in violation of the

10   Forum's policies, correct?

11        A.   I didn't know that.

12        Q.   You revised the handbook,

13   correct?

14        A.   I was requested to do that.

15        Q.   Ma'am, you signed an NDA or

16   multiple NDA's, correct?

17        A.   Mm-hmm.

18        Q.   Yes?

19        A.   Yes.  Sorry.

20        Q.   That's quite all right.

21             And do you understand that

22   part of a non-disclosure agreement, the

23   purpose of a non-disclosure agreement

24   is so that Forum information does not



1    go outside the Forum?

2        A.   Okay.  Well, then I guess I was

3    in violation of it.

4        Q.   Have you produced the e-mails

5    that you blind copied to your personal

6    gmail account?

7             Have you produced those to

8    counsel in this case?

9        A.   Yes.

10       Q.   And how did you go about

11   collecting those?

12       A.   I don't know what you mean.  You

13   just said that I e-mailed them to

14   myself.

15       Q.   No.  That's okay.  I meant with

16   regard to this litigation.

17            Once the litigation started

18   at some point did you go into your

19   gmail account and collect the e-mails

20   that you had sent to it, blind copied

21   to it and turn them over to counsel?

22       A.   Yes.

23       Q.   And approximately how many were

24   there?



```
 1        A.   I don't recall.

 2        Q.   Do you recall if it was more

 3    than five?

 4        A.   Yeah.

 5        Q.   Do you recall if it was more

 6    than fifty?

 7        A.   I don't think so.

 8        Q.   Okay.  Was the rumor true about

 9    you having slept with your previous

10    employer?

11        A.   No.

12        Q.   Okay.  Did you communicate with

13    Ms. Barbounis via WhatsApp?

14        A.   I don't think so.  I never

15    really used WhatsApp.

16              NS, DIBIANCA: Let's take,

17    Erica, is it okay if we take five

18    minutes?

19              MS. SHIKUNOV:  Yes.

20              MS. DIBIANCA:  So we'll go

21    off.

22              THE VIDEOGRAPHER:  Going off

23    the record the record at 2:50.

24              (A brief recess was taken.)
```



```
 1              THE VIDEOGRAPHER:  We are on

 2      the record at 3:01.

 3      BY MS. DIBIANCA:

 4        Q.   Ms. O'Brien, have you sought any

 5      kind of therapy for what you claim to

 6      be the harassment?

 7        A.   No.

 8        Q.   Are you medicated as a result of

 9      what you claim to have been harassment?

10        A.   I didn't -- no.  No.

11        Q.   Has this lawsuit been stressful

12      for you?

13        A.   Yes.

14        Q.   Very?

15        A.   Yes.

16        Q.   Has the pandemic been stressful

17      for you?

18        A.   Sure.  Yeah.  It's been

19      stressful for everyone, yeah.

20        Q.   And losing your employment with

21      1 Construction, that was stressful for

22      you as well, correct?

23        A.   Yes.

24        Q.   Finding out that your domestic
```



1      partner/boyfriend Mr. Ebert

2      intentionally sabotaged your job

3      opportunity with the Kimmel Center,

4      that was stressful for you as well,

5      correct?

6         A.    Stressful and heartbreaking.

7         Q.    And the fact that Mr. Ebert

8      called Mr. Roman behind your back, that

9      also was stressful for you?

10        A.    Correct.

11        Q.    How do you deal with these

12     stressors?

13        A.    What do you mean?  Are you

14     asking about my marijuana use?  Because

15     that's how I deal with it.

16        Q.    Okay.  You are aware that you

17     have made an initial demand for $3

18     million in emotional distress, pain and

19     suffering and physical injury, correct?

20             MS. SHIKUNOV:  I am going to

21     object to that insofar as it asks for

22     communications with counsel, that the

23     demand has been withdrawn and that that

24     was not the initial demand that was



1        conveyed to Mr. Walton last winter.

2                    That was a demand that was

3        put forth in disclosures.

4                    MS. DIBIANCA:  And that's

5        actually what I'm referring.  So let me

6        pull that up so we're all on the same

7        page.  Okay?  Hold on.

8                    So I believe this will be

9        Exhibit 3 and I'll let Jakob correct us

10       if I'm wrong.

11                   MR. WILLIAMS:  That's

12       correct.

13                   MS. DIBIANCA:  Great.  Thank

14       you.

15                   (O'Brien Deposition Exhibit

16       No. 3 was marked for identification.)

17       BY MS. DIBIANCA:

18          Q.   Ms. O'Brien, can you see the

19       exhibit that's on my screen?

20          A.   No.

21          Q.   No?

22          A.   Mm-mm.

23          Q.   Sorry.

24          A.   No.



```
 1        Q.   That's why I asked.  How about
 2    now?
 3        A.   Yes.
 4        Q.   Okay.  So Erica and Marnie, you
 5    must have dueling mikes because we have
 6    an echoe again.
 7        A.   Oh, I think I -- there we go.
 8             MS. SHIKUNOV:  You just said
 9    something we didn't hear.
10             MS. DIBIANCA:  I think
11    because, Erica, you need to turn your
12    mike off.
13        A.   I think we're good now.
14        Q.   Yep.
15             So can you see the document,
16    Ms. O'Brien, that's on my screen that
17    says Rule 26(a)(1) Initial Disclosures
18    Of Plaintiff?
19        A.   Yes.
20        Q.   Have you seen this document
21    before?
22        A.   Yes.
23        Q.   I'm going to scroll down into
24    section III where it says Computation
```



1      of Damages.  And it states "At this

2      juncture, Plaintiff is claiming the

3      following damages:"

4                   And I will just tell you

5      that this is dated December 31, 2020.

6      So as of December 31, 2020, is it

7      correct to say that you are seeking

8      emotional distress and physical injury

9      in the amount of $3 million?

10                  MS. SHIKUNOV:  I'm going to

11     instruct her not to answer that because

12     that goes to attorney-client privilege.

13     Molly, you can't ask her how she

14     computed her damages.

15                  MS. DIBIANCA:  Actually,

16     there is a wealth of case law on that,

17     Erica, that I absolutely can ask her

18     how she calculated the damages, but I'm

19     not asking her to calculate them.

20                  All I'm asking her is to

21     confirm that as of December 31, 2020

22     she was demanding $3 million for

23     emotion distress and physical injury.

24                  Is that correct?



```
 1        A.   Yes.
 2        Q.   And what's the basis for you to
 3    say that you have a physical injury?
 4             What is the physical injury
 5    that you sustained, Ms. O'Brien, as a
 6    result of defendants?
 7        A.   I think I thought -- I don't
 8    have a physical injury.  Isn't that
 9    just like both of them together?  I
10    don't know.
11        Q.   Do you have $3 million in
12    emotional distress damages?
13        A.   I probably have more than that.
14        Q.   It says "Lost Wages.  The annual
15    salary at the time of Plaintiff's date
16    of termination times 10 years, plus
17    bonuses, commissions, health insurance,
18    pension, profit sharing and all other
19    expected raises and benefits."
20             You did not have health
21    insurance with the Forum, correct?
22        A.   I did originally.  It was taken
23    from me.
24        Q.   When was it taken from you?
```



1          A.    When Daniel learned that I had

2     it.

3          Q.    You said, you testified earlier

4     that you stayed married to your husband

5     so you could stay on his benefits,

6     correct?

7          A.    Right.  And when I went off I

8     went onto the Forum's plan.

9          Q.    And how long did you have it

10     through the Forum?

11          A.    I don't know.  A couple of

12     years, I guess.

13          Q.    So two of the three years that

14     you were employed there?

15          A.    That sounds about right.

16          Q.    And at the time of your

17     separation, at the time you resigned

18     you did not have health insurance,

19     correct?

20          A.    The time I resigned from the

21     Forum?

22          Q.    Yes.

23          A.    Well, generally when someone

24     leaves you offer them a COBRA.  In



1      PA -- the federal if you're over fifty

2      employees it's mandatory that you offer

3      I think 18-month COBRA.

4               PA has it's called a mini-

5      COBRA and you're supposed to offer it

6      for nine months.

7               I was never offered it and I

8      was never told I was removed from the

9      benefits.  I found out -- I forget how

10     I found out, but I needed to scramble

11     to get insurance right in the middle of

12     the epidemic.

13        Q.   So your testimony is confusing

14     me because I thought you said that

15     Daniel Pipes had you removed from the

16     benefit plan when he found out that you

17     were enrolled in it.

18        A.   No.  I had to pay for it.  I was

19     being -- it was being paid for.  Gregg

20     knew that I had wanted a higher salary

21     when I started there and he I think was

22     afraid I was going to jump, which is

23     actually what I was going to do, and I

24     needed, you know, I wanted to have my

```
 1    benefits paid for.

 2              Well, actually he said how

 3    about if I pay for your benefits?

 4              And I said are you allowed

 5    to do that?

 6              And he said I am doing that.

 7              And then he decided that he

 8    would get his benefits fully paid, I

 9    would get my benefits fully paid and

10    Daniel, I think his ex-wife and his

11    daughter were on the plan so theirs was

12    fully paid as well.

13      Q.   At the time you gave your notice

14    of resignation to the Forum, were you

15    enrolled in the Forum's healthcare

16    plan?

17      A.   Yes.  And I was paying for it by

18    myself at that point, well, whatever

19    the split was.

20      Q.   At the time you separated from

21    the Forum did you have a pension plan

22    with the Forum?

23      A.   No.

24      Q.   At the time that you were
```



1     separated from the Forum did you have a

2     profit sharing plan with the Forum?

3        A.   No.

4        Q.   At any time during your

5     employment did you have a pension or

6     profit sharing plan with the Forum?

7        A.   No.

8        Q.   Okay.  Did you ever earn

9     commissions from the Forum?

10        A.   No.

11        Q.   Did you ever have any

12     expectation to earn a commission at the

13     Forum?

14        A.   No.

15        Q.   So let's talk about the

16     emotional distress $3 million number.

17              What is the basis for that

18     claim?

19        A.   I was sexually harassed.  I was

20     intimidated.  I was bullied.  I was

21     after the fact continued to be

22     harassed.

23        Q.   At what point?

24        A.   After I reported it.



1      Q.   I'm sorry.  You're saying now

2   that you were continued to be harassed?

3      A.   No.  After I reported the issue

4   to Daniel for my entire, for my entire

5   work life there I think I was bullied

6   to some degree and sexually, and

7   definitely sexually harassed.

8              And after the complaint was

9   filed I felt like I was being

10   retaliated against.

11     Q.   So, Ms. O'Brien, you've

12   testified today several times that you

13   basically had no contact with Mr. Roman

14   after your November 5th complaint.  So

15   how is it that you were sexually

16   harassed for the entirety of your

17   employment?

18     A.   Well --

19     Q.   Who sexually harassed you after

20   November 5th, 2018?

21     A.   Well, I felt harassed.

22              MS. SHIKUNOV:  I'm going to

23   object because you just asked her two

24   questions at the same time without



1     allowing her to answer.

2               So what is your question?

3        Q.   Who harassed you after November

4     5th, 2018?  Who sexually harassed you?

5        A.   I felt harassed by the rumor

6     about Kevin Brady, me sleeping with

7     Kevin Brady.  He may have started it

8     before, but it was now being talked

9     about around by everyone again.

10              I also know that someone was

11    shouting about my sex life and I suck

12    big black cock.  Those are issues to

13    me.

14       Q.   You're aware that Ms. Barbounis

15    said that, correct?

16       A.   Yes.

17       Q.   And you're aware that that was

18    long before November 5, 2018, correct?

19       A.   I didn't hear about it until

20    after.

21       Q.   Okay.  So after November 5, 2018

22    did Mr. Roman sexually harass you?

23       A.   No.

24       Q.   Did Daniel Pipes at any time



1       sexually harass you?

2          A.    No.

3          Q.    Did Ms. Barbounis tell you that

4       when she went to Israel with Mr. Roman

5       Mr. Roman attempted to force himself on

6       her?

7          A.    Not -- I guess she said that he

8       was trying to get her to have sex with

9       him and he was very aggressive and she

10      was scared.

11         Q.    So my question is:  At any time

12      did Ms. Barbounis tell you that

13      Mr. Roman had tried to force himself on

14      her?

15         A.    She felt like he was forcing it.

16      He was screaming and yelling and she

17      had to go in and lock the door so she

18      felt like she was -- he was trying

19      force her.

20         Q.    Okay.  Ms. Barbounis testified

21      that they were sitting on a couch when

22      this incident occurred.  She didn't

23      testify anything about him yelling or

24      screaming.



1              So are you sure about your

2       recollection of what she told you?

3           A.   Yes.  She told me that when she

4       declined and she wasn't going to have

5       sex with him he became irate and he was

6       yelling and screaming, yelling and

7       screaming and she was scared.

8           Q.   Okay.  And she did not tell you

9       that he tried to force himself on her?

10      I'm asking about those words

11      specifically.

12              Did she say --

13          A.   So --

14          Q.   I'm going to finish my question.

15              Did she say to you Gregg

16      tried to force himself on me?

17          A.   I don't recall her exact words,

18      but I know that she felt forced, like

19      he was trying to force it.  He was

20      yelling and pressuring her and she was

21      scared and had a knife under her

22      pillow.

23          Q.   When you say force himself on

24      her, to me that sounds like an



1    attempted sexual assault.  Would you

2    agree with me?

3        A.   Yeah.  Yeah.  That's what I was

4    trying to say.  So maybe he was being

5    forceful.

6        Q.   So to the best of your

7    recollection, Ms. Barbounis did not

8    tell you that when she went to Israel

9    with Mr. Roman Mr. Roman attempted to

10   force himself on her?

11              MS. SHIKUNOV:  Objection.

12   Asked and answered.  She said, she's

13   answered this question now seven times.

14              MS. DIBIANCA:  Yeah.  But it

15   hasn't been -- I'm going to let her

16   answer it again.  If you want to count

17   to eight, I'm happy to let you do that.

18       A.   I don't remember her exact

19   words.  So forced may not have been

20   used properly, but I don't, I don't

21   recall her exact words.

22       Q.   Okay.  Would you agree with me

23   that it's a pretty serious allegation

24   to say that a man forced himself or

1    attempted to force himself on a woman?

2       A.   Yes.

3       Q.   Yes.  Okay.  If your son was

4    accused of attempting to force himself

5    on a woman, would you be seriously

6    offended by that?

7       A.   Yes.

8       Q.   Yes.  Okay.

9               At the meeting on November

10   1st, 2018 were employees pressured to

11   sign a non-disclosure agreement?

12      A.   Well, the meeting was deemed

13   mandatory and it was mandatory that

14   everyone sign the NDA prior to the

15   meeting.

16      Q.   So the answer is no then?

17              MS. SHIKUNOV:  She didn't

18   answer no.  You're putting words in her

19   mouth.

20              If you want to ask a

21   question, her answer stands.

22      Q.   All employees at the meeting --

23   tell me if you agree or disagree with

24   this:  At the November 1st, 2018



1     meeting all employees were pressured to

2     sign a non-disclosure agreement?

3         A.   I agree with that.

4         Q.   And how were they pressured to

5     sign a non-disclosure agreement at the

6     meeting?

7         A.   Because he gave it, I think he

8     sent it prior to the meeting, but they

9     were pressured to sign it before

10    participating in the meeting and the

11    meeting was mandatory.

12        Q.   So was the NDA discussed at the

13    meeting?

14        A.   I don't recall.  It was

15    discussed, there was discussion about

16    it before because it wasn't the same

17    NDA that we had signed and there were

18    additional items in there.  And one of

19    them was that if somebody at the Forum

20    behaved inappropriately we weren't

21    allowed to tell anybody.

22        Q.   At the meeting were employees

23    pressured to sign a non-disclosure

24    agreement?



1          A.   Yes.   They had to sign it to

2     participate in the meeting and the

3     meeting was mandatory, so they were

4     pressured.

5          Q.   At the meeting --

6               MS. SHIKUNOV:  I'm going to

7     object to asked and answered at this

8     point.

9               And I'm going to instruct

10    you not to answer this question any

11    further.

12              You've now asked it upwards

13    of ten times.

14              MS. DIBIANCA:  Erica, you

15    understand why I'm asking though,

16    correct?

17              MS. SHIKUNOV:  No, I don't.

18    Because she's answered you several

19    times.   I feel like I'm listening to a

20    broken record.

21              MS. DIBIANCA:  They're not

22    even close because what she's saying is

23    completely different than what I'm

24    asking.   She is saying repeatedly -- if



1    you want to call it ten times, go for

2    it, let's call it ten times.

3              She has said that they were

4    pressured to sign it at the meeting but

5    that they could not attend it without

6    signing it.  So they either signed it

7    before they showed up or they discussed

8    it afterwards.  But if they couldn't

9    come to the meeting unless they had an

10   non-disclosure agreement, then how

11   could they have been pressured to sign

12   it at that meeting?

13     A.   I said that they were pressured

14   into signing it.  I said that he sent

15   it prior and they weren't allowed in

16   unless it was signed.

17     Q.   Right.  Exactly.  And so I'll

18   say my question for, according to

19   Ms. Shikunov, my 11th time.

20              At the meeting, if you

21   prefer I can say during the meeting,

22   was anyone pressured to sign a non-

23   disclosure agreement?

24     A.   No.



1       Q.   Okay.  After your report to

2    Dr. Pipes on November 1st, 2018, would

3    you agree with me that Mr. Roman was

4    disciplined?

5       A.   I mean he kept his job.  He got

6    to work from home.

7       Q.   Please answer the question.

8       A.   He had less responsibility.  It

9    didn't seem like severe discipline.

10      Q.   After your report to Dr. Pipes

11   on November 1st, 2018 was Mr. Roman

12   disciplined?

13      A.   Yes.

14      Q.   In March of 2019 was Mr. Roman

15   considered for a promotion?

16      A.   I don't know what you mean a

17   promotion.

18      Q.   To the best of your knowledge,

19   in March of 2019 was Mr. Roman

20   considered for a promotion?

21      A.   Where was he going to get

22   promoted to?  He was a director and the

23   only person ahead of him was Daniel.

24      Q.   In March of 2019 was there



1    discussion about Mr. Roman becoming

2    your supervisor again?

3              What are you referring to

4    right now, Ms. O'Brien, what document?

5       A.   The charges thing.

6       Q.   Okay.

7       A.   What are you --

8       Q.   Let me ask it this way:  At any

9    time after November 1st, 2018 --

10      A.   Okay.  All right.  I don't know

11   that it was a promotion.  Essentially I

12   guess, I guess he was, I would say the

13   wording is more that he was being

14   invited to have some of his

15   responsibilities back.

16      Q.   At any time after November 1st,

17   2018 did Mr. Roman ever again become

18   your supervisor?

19      A.   No.

20      Q.   You would agree with me that you

21   have no knowledge or -- I'm sorry.

22   Strike that.

23              Do you contend that

24   Mr. Roman spread any other rumors other



1   than the one about you and Mr. Brady?

2       A.   I think that's the only one that

3   I know of.

4       Q.   Did Dr. Pipes ever tell you that

5   Mr. Roman was going to become your

6   supervisor again?

7       A.   No.

8       Q.   I believe in your complaint you

9   have some allegations regarding equal

10  pay so I would like to address those,

11  please.

12          Do you allege that you were

13  paid less than male counterparts?

14      A.   Yes.

15      Q.   And who is the male counterpart

16  or counterparts that you're referring

17  to when you say that you were paid less

18  than?

19      A.   My job was a little bit

20  different than most people's, but I

21  mean if I was like the director of

22  finance, all the other directors -- and

23  I think that was my title at one

24  point -- all the other directors made



1      much more than I did, at least like

2      10,000.

3          Q.   How much?

4          A.   Like 10,000.

5          Q.   You're not aware of any other

6      director of finance who was paid more

7      or less than you, correct?

8          A.   Correct.

9          Q.   And your predecessor in that

10     position, was that a female or a male?

11         A.   It was a female.

12         Q.   And did you make more than she

13     made or less than she made?

14         A.   I believe I made more.  But I

15     also picked up the HR and then I also

16     picked up the grant management and was

17     responsible for tracking the grants and

18     creating the grant contracts and stuff

19     like that.

20              So I had more responsibility

21     than she did so that the position that

22     I held was different than hers.

23         Q.   You do not have any background

24     or expertise in Middle East policy,



1        correct?

2            A.   Correct.

3            Q.   You don't have any background or

4        expertise in foreign policy at all,

5        correct?

6            A.   Correct.

7            Q.   You do not speak a second

8        language, correct?

9            A.   Correct.

10           Q.   You do not have any background

11       or experience with database migration,

12       correct?

13           A.   Correct.

14           Q.   You filed a second charge of

15       discrimination against the Forum,

16       correct?

17           A.   Correct.

18           Q.   And in that charge you alleged

19       that Mr. Roman called the Kimmel

20       Center, correct?

21           A.   Correct.

22           Q.   And what document are you

23       referring to now?

24                    MS. SHIKUNOV:   I gave her



1    the second charge, Molly, and I'm

2    holding it now.

3        Q.   We're not going to go into that

4    so you can put it down.  You certainly

5    can hold it, but I'm not going to ask

6    you about the charge.  I'm going to

7    open the complaint for you.

8              MS. DIBIANCA:  Erica, do you

9    want to give her the retaliation

10   complaint?

11             MS. SHIKUNOV:  I think I

12   only pulled the active complaint, but

13   I'm going to double-check what we have

14   here.  Just a second.

15             Molly, I'm sorry.  I only

16   pulled the active complaint.  You're

17   going to have to put it on the screen

18   I'm sorry.

19             MS. DIBIANCA:  That's okay..

20   BY MS. DIBIANCA:

21       Q.   Can you see my screen, Ms.

22    O'Brien, paragraph 27?

23       A.   Yes.

24             NS, DIBIANCA: Kurt, we're



1    not going to need to mark this.  This

2    is a pleading with the court so I'm not

3    going to mark this as an exhibit.

4    BY MS. DIBIANCA:

5       Q.   This is it says at the top the

6    case number.  Paragraph 27 says "Upon

7    information and belief, Defendant has

8    deliberately interfered with

9    Plaintiff's ability to find employment

10   elsewhere."

11            You signed this complaint,

12   correct?

13      A.   Yes.

14      Q.   And where is it that you

15   believed that defendant had

16   deliberately interfered with your

17   ability to find employment?

18      A.   I believed that he had made the

19   call to the Kimmel Center.

20      Q.   Was there anywhere else that you

21   believed that defendant had interfered

22   with your ability to find employment

23   elsewhere?

24      A.   No.



1       Q.   So there were no other

2    prospective employees that you believed

3    Mr. Roman spoke with?

4       A.   No.

5       Q.   Were you subject to any sexual

6    comments or remarks after November 5,

7    2018?

8       A.   No.

9       Q.   Were you subject to any unwanted

10   sexual advances by Mr. Roman or anyone

11   else at the Forum after November 5th,

12   2018?

13      A.   No.

14      Q.   Other than the Israel trip that

15   we discussed at the very beginning of

16   your deposition that Ms. Barbounis

17   ended up taking, were you offered or

18   invited to take any other business

19   trips that you declined to take?

20      A.   I don't believe so.

21      Q.   Were you denied any -- were

22   there opportunities to go on a business

23   trip that you thought you should have

24   been given and that you weren't, other



```
 1      than that one?
 2         A.   I don't think so.
 3         Q.   Mr. Roman's -- I'm sorry.
 4      Strike that.
 5              Mr. Roman was never allowed
 6      to return to the workplace -- let me
 7      state it a different way.  I apologize.
 8              After November 5th, 2018
 9      Mr. Roman continued to work remotely at
10      least through the end of your
11      employment, correct?
12         A.   Yes.
13         Q.   Okay.  And are you aware --
14         A.   Actually, actually I don't know.
15      I can't say yes or no to that as I'm
16      thinking about it because I was told to
17      work from home.
18              After I think Lisa got
19      employment, then Tricia, then Caitriona
20      and then Delaney, I was the last one
21      left and I was told that the
22      administrative staff wouldn't need to
23      work in the office anymore, that I
24      could work from home.  So I wasn't in
```



1        the office.

2                  I did find out later that

3        the new director of development was

4        working out of the office every day,

5        but I was told to work from home.  So I

6        wouldn't know if Gregg was there or

7        not.  I don't know if he was there

8        after that.

9           Q.   So you don't have any personal

10       knowledge that Mr. Roman ever returned

11       to the workplace, correct?

12          A.   Correct.

13          Q.   Okay.  So as far as you know he

14       could be still working remotely today,

15       correct?

16          A.   Correct.

17          Q.   Did you ever talk to Matt Ebert

18       about Ms. Barbounis's sexual conduct?

19          A.   I don't remember specifically

20       having a conversation with him about

21       it.  He might have overheard, you know,

22       me talking about it to her possibly.

23       Maybe I might have made an off-color

24       comment about her or something, but I



```
1    don't remember having a specific

2    conversation with him about that.

3        Q.   Were you aware that after your

4    November complaint that Tricia McNulty

5    often complained about your work

6    product?

7        A.   No.

8        Q.   Are you aware that she

9    complained that you didn't know how to

10   run payroll?

11       A.   No.

12       Q.   Are you aware that Lisa

13   Barbounis did not appreciate that you

14   were trying to boss her around still?

15       A.   I don't -- that doesn't surprise

16   me.  I don't know that I was bossing

17   her around but...

18       Q.   If the Forum migrated or at

19   least partially migrated to the Google

20   G Suite in March of 2019, would you

21   agree with me that that was before you

22   deleted the materials from Dropbox in

23   October 2019?

24       A.   Yeah.  So we were in Google
```



1      Drive at that point.

2         Q.   Not everyone, correct?

3         A.   He was -- I think Daniel had

4      said that everyone could choose what

5      they wanted.

6         Q.   Okay.  I am not asking about

7      anything you discussed with counsel so

8      please keep that instruction in mind

9      when you answer this next question.

10              Why did you not want to have

11      the same lawyer as Lisa Barbounis?

12         A.   I never said I didn't want to

13      have the same lawyer as Ms. Barbounis.

14      I made the decision to file on my own

15      because I felt persecuted and I made

16      the decision to file.  I chose my

17      lawyer.

18         Q.   Did Ms. Barbounis, did she tell

19      you that she did not want to have the

20      same lawyer as you?

21         A.   I don't remember discussing

22      that.  I don't remember talking about

23      lawyers.  I made my decision.  I didn't

24      even know that I was going to do it



1   until that day.  I knew that I was

2   speaking to Erica because I wanted to

3   make sure that I was protecting myself.

4   And the friends that I had talked to

5   instructed me that I should be

6   protecting myself.  So I had a

7   conversation with her and that's why I

8   went with my lawyer.

9           I actually do remember at

10  some point Lisa saying well, why don't

11  you come with my lawyer?

12          And I was like because I

13  have my lawyer; I don't want to be with

14  you.

15     Q.   Did you transfer money from the

16  Forum's bank account after you left the

17  Forum in the amount of $500?

18     A.   No.  I didn't touch any of the

19  Forum's bank accounts after I left.  I

20  did actually have an automatic check

21  set up for myself because I was -- they

22  had asked me to do the books for

23  Savannah and they were paying me $500 a

24  month to do it under my LLC.



1          So like it was a recurring

2     bill and it would take a while to get

3     there because it was processed through

4     the bank.  So I set it up as recurring,

5     so I actually still get checks from the

6     Forum.

7          The last check that I got I

8     remember going back and looking to see

9     if I should have been paid for that, if

10    that was one if I should have cashed it

11    or not.  And I determined that that

12    $500 was for services rendered for

13    February.  So I think I did cash one,

14    but the rest of them that I get,

15    continue to get I shred them.

16    Q.   When was the last time you got a

17    check from the Forum?

18    A.    I actually got three of them not

19    too long ago.  They must have been hung

20    up in my mail forwarding and I got

21    three of them not too long ago and I

22    shredded them all.

23    Q.   Did you notify the Forum that

24    you had gotten checks from them?



```
1        A.    No.

2        Q.    So did you get a $500 check from

3    Savannah then after you left the Forum?

4        A.    That's what I got, yeah.

5        Q.    And that one you cashed?

6        A.    Yes.

7        Q.    And you determined that that was

8    provided to you for services rendered?

9        A.    It was for the prior month and I

10   had worked the entire month so I cashed

11   it.

12       Q.    Okay.  Did you ever threaten

13   Daniel Pipes that you were going to

14   quit the Forum?

15       A.    I said if he made -- I think, if

16   I remember correctly, I said that if he

17   made Matt Bennett the director I would

18   quit.

19       Q.    If he made Matt Bennett the

20   director?

21       A.    He made him the deputy director

22   or made him like the director

23   intermittent or whatever.  And so I

24   don't know what -- he was like going
```



```
 1        give him a chance to prove he could be
 2        the director.
 3            Q.   And did you tell Dr. Pipes that
 4        you would have no trouble finding
 5        another job if you were to quit?
 6            A.   I don't remember.  I'm sure I
 7        thought that.
 8            Q.   At your meeting at Misconduct,
 9        the one we discussed much earlier
10        today, at that time you were human
11        resources, correct?
12            A.   Yes.
13            Q.   Did you ever discuss with Daniel
14        Pipes that dinner or meeting?
15            A.   No.  I felt that, I felt that he
16        had a crush on me and I felt like I
17        could just keep him at arm's length.  I
18        didn't realize that he was a predator.
19            Q.   You're referring to who?
20            A.   Gregg Roman.
21            Q.   And you say he is a predator.
22        Did you -- I'll use your word,
23        predatory behavior.  You did not
24        experience any such behavior after
```



1       November 5th, 2018, correct?

2          A.   Yes.

3          Q.   And you've identified today all

4       the instances that you felt were

5       predatory behavior prior to November

6       5th, 2018, correct?

7          A.   No.

8          Q.   No?  Anything -- well, you

9       summarized them in your charge,

10      correct?

11         A.   Some of them.

12         Q.   Okay.  Are you aware that

13      anything that's not in your charge is

14      not something that can be the basis for

15      your claim now?

16         A.   Yes.

17         Q.   Okay.

18              MS. DIBIANCA:  All right.

19      I'm going to take about ten minutes.

20      Let's take fifteen minutes because I

21      think I can wrap up after if I get

22      fifteen minutes to just review my

23      outline.

24              Okay, Erica?



```
1              MS. SHIKUNOV: Yes.  Sorry.
2      I can't figure out when I'm on mute or
3      video, so yes.
4              THE VIDEOGRAPHER:  Going off
5      the record at 3:42.
6              (A brief recess was taken.)
7              THE VIDEOGRAPHER:  We are
8      recording and on the record at 4:00
9      o'clock.
10     BY MS. DIBIANCA:
11       Q.   Ms. O'Brien, you're aware that
12     Ms. Barbounis alleges that she
13     destroyed or she deleted electronic
14     files at your instruction, correct?
15       A.   Yes, I'm aware of that.
16       Q.   And you disagree with that
17     claim, correct?
18       A.   I don't recall instructing her
19     to do that.  I was very worried about
20     any personal information being left on
21     the laptop because I was afraid that
22     Gregg would get access to it.
23              I remember encouraging her
24     to buy it, but I don't remember, you
```



1    know, instructing her to do that.

2        Q.   Instructing her to wipe the

3    device?

4        A.   Correct.

5             MS. DIBIANCA:  Erica, I have

6    one, two, three, about six separate

7    text messages.  My proposal would be

8    this.  I would like to admit them as a

9    single exhibit just to save the hassle

10   of marking them.  But how about we go

11   through them first and then you can let

12   me know if you think that's appropriate

13   or not?  Okay?

14            MS. SHIKUNOV:  That's fine

15   with me.

16            MS. DIBIANCA:  Okay.

17   BY MS. DIBIANCA:

18       Q.   All right.  Ms. O'Brien, I'm

19   going to attempt to share my screen

20   here.  Let's see if I can do it this

21   time.

22            You should see a document.

23   This is a text message.  It's a

24   printout, an electronic printout.  I'm



1    not sure what's the best way to say it

2    is.  But, in other words, it's not on a

3    phone but it came from a phone.

4              The date on the top is 2018,

5    October 31.  Do you see that?

6       A.   Mm-hmm.

7              MS. SHIKUNOV:  You have to

8    say yes.

9       A.   Yes.  Sorry.

10      Q.   That's all right.  It's late in

11   the day.  It gets a little harder.

12             And this is from you to

13   Ms. Barbounis.  Is that correct?

14      A.   Yes.

15      Q.   And it's 11:49 a.m. when it was

16   sent, correct?

17      A.   I'm sorry.  What did you say?

18      Q.   It was sent at 11:49 a.m.?

19      A.   Yes.

20      Q.   Okay.  It states "They are going

21   to ask what we talked about."

22             Who were you referring to

23   when you said "they"?

24      A.   The other staff members.  This



1        was, this was I believe after we had

2        had coffee and we were going back to

3        the office.  And I was -- I think I had

4        said earlier that I was nervous because

5        of what I had just kind of found out

6        and I was trying to figure out how to

7        handle it.  I was afraid that they were

8        going to think that we were like Lara

9        and Laura and conspiring when really we

10       weren't conspiring.

11              She told me something that

12       happened and I was trying to figure out

13       how to handle it.  And I wanted her to

14       give me space and I said that the other

15       ones, because they knew we were going

16       to get coffee, were going to ask what

17       we talked about.

18              So I had wanted her to just

19       say we were talking about that we

20       are -- I don't know how to say it --

21       our personalities, we do have similar

22       personalities.  We're very different,

23       but we just -- I think our similarities

24       make it hard, were making it hard for



1    us to get along and we did talk about

2    that.

3              So I think I just was

4    thinking rather than tell anybody all

5    the stuff that was going on it was

6    better that the office not be talking

7    about it, that it not be gossip and

8    that it just be kept between us until

9    we figured out what to do with it.

10             And they actually I think

11   were probably -- now that I'm thinking

12   about it, including in that would

13   probably have been Matt and Gregg

14   because they also knew that we were

15   going to coffee.  So I just wanted to

16   not have anybody's input on it, but

17   also I didn't trust Matt or Gregg and

18   was afraid that it would be handled

19   inappropriately if I wasn't able to

20   report it.

21     Q.   Were your other coworkers at

22   that time aware of Laura and Lara?

23     A.   Yeah.  Some of them were because

24   it was talked about, so I think mostly

```
1    everybody was.
2        Q.   And mostly, you think mostly all
3    of your coworkers were aware that Laura
4    and Lara were conspiring against the
5    Forum?
6        A.   Stacey was because I think
7    Stacey worked with them, as well as
8    Thelma, so they definitely did.  And
9    other people knew what had happened.
10             And, again, I don't know
11   that they were conspiring against the
12   Forum.  I think at this point, and
13   hindsight being 20/20, I think they
14   probably had a gripe and I probably
15   think that, because Gregg was always
16   promoting to everybody like that we
17   were like friends, that they weren't
18   comfortable coming to me and they were
19   just handling it inappropriately.
20       Q.   And this, so we have a nice
21   clean transcript, is D9917.
22             The next one I would like
23   you to look at is marked or has been
24   stamped D9928.  This is the same day,
```



1    less than an hour later you text Lisa

2    Barbounis and say "We both need to be

3    model employees right now."

4        A.    Right when we got back from

5    coffee, like I said, I was already on

6    edge and Gregg, like I said earlier,

7    they were at a taping of the radio show

8    that they did, Matt and Gregg were.

9              And the minute, I felt like

10   the minute we got back from coffee

11   Gregg called her and I could hear her

12   talking and saying like, you know,

13   answering whatever questions he was

14   asking.  And then he called me and I

15   was really stressed out and I didn't

16   want to talk to him because I just was

17   overwhelmed I guess with everything

18   that was going on, but he did call my

19   office right after he spoke with her

20   and he was asking me, you know, what

21   happened?

22             And I said we were talking

23   about that stuff.  And then right at

24   the end of the conversation -- well, I



```
1    have to back up for a second because
2    the day that Lisa and I talked, right
3    before we left she said to me wait a
4    minute.  Before we leave I've got to
5    tell you something.  I wrote you up.
6    Matt told me that I had to write it up.
7    He told me I had to before close of
8    business.  They were demanding that I
9    write up the issue.  She said I really
10   didn't want to do it because I didn't
11   want to like report you but they told
12   me I had to.
13              She said that Matt told her
14   that.  And Gregg had asked me to do the
15   same, but I refused because I told him
16   I didn't think he would like what I was
17   going to write.
18              So she had told me that when
19   we went back.
20              So now going back to where I
21   was, he has me on the phone and he
22   said, you know, was asking me how
23   everything was.  And then he goes all
24   right; listen, I want you to act calm.
```



```
 1     I don't want you to lose your mind or
 2     anything, but I got to tell you.  Lisa
 3     filed a complaint against you, but
 4     don't worry.  It's okay.  I can make it
 5     go away.  Marc Fink is going to come in
 6     on Friday and he is going to interview
 7     everybody in the office to see about
 8     your behavior.  So, you know, don't
 9     worry.  It's going to be okay.  I can
10     make it go away.
11               And I was immediately
12     concerned that I was now going to be
13     targeted to be fired and that is why I
14     said that I would imagine.
15        Q.   When you say he said that Marc
16     Fink would come in, was that Matt
17     Bennett?
18        A.   No.  Gregg Roman.  That's who I
19     was speaking with on the phone.  Gregg
20     told me that Marc Fink was, that he was
21     going to have Marc Fink come in and
22     interview all the employees about my
23     behavior.
24               And then at the point at
```



1    which we had the meeting and Marc was

2    in the office a few times and I had

3    asked him about that and Marc said I

4    had no idea, no one ever asked me to

5    come in and interview anything about

6    that.

7       Q.   Okay.  The next text message is

8    stamped as D9938.  And this is, let's

9    see how far, less than ten minutes

10   later after the one we just reviewed.

11           You say to Mr. Barbounis "We

12   need to steer clear of each other

13   around everyone else.  I believe you.

14   They need to think we are at odds

15   though.  They are trying to pit us

16   against each other, probably to get rid

17   of us both."

18           Did I read that correctly?

19      A.   Yes.

20      Q.   And you were at this point

21   hiding information from Daniel Pipes

22   and Gregg Roman, correct?

23      A.   I was deciding how to handle the

24   information that was given to me.  I



1      wasn't hiding it.  I was trying to

2      handle the situation and figure out the

3      best way to handle the situation

4      because, again, she was telling me that

5      she didn't want to report it.

6          Q.   Okay.  Well, you two were not at

7      odds, correct, you and Ms. Barbounis?

8          A.   We were generally at odds all

9      the time.  And I said I believe you

10     there because, well, she kept trying to

11     talk to me in the office and I needed

12     her to stay away from me.  I just

13     didn't want that because then she would

14     remember this or remember that or want

15     to say this.

16              And I just said we need

17     steer clear of everyone else or around

18     everyone.  I did believe her.  She

19     didn't trust me at that point that I

20     was going to do the right thing, that I

21     was going to do my job.

22              And I just wanted everyone

23     to think the situation hadn't changed

24     until I figured out how to handle it.



```
1      And they were trying to pit us against

2      each other because they told us both to

3      write each other up.

4                   And I felt that they're

5      trying to get rid of us.

6         Q.   You and Ms. Barbounis had had

7      a pretty heated argument in the

8      workplace, correct?

9         A.   Yes.

10        Q.   Yes.  And so did you find it

11     unusual that following a heated

12     altercation in the workplace that the

13     involved employees would be asked to

14     write up a report about it?

15                  As HR, did you think that

16     was unusual?

17        A.   I felt that Gregg asked for

18     things to be written up when it suited

19     him.

20        Q.   Well, didn't Mr. Bennett ask

21     you?  I thought that was your

22     testimony.

23        A.   No.  Gregg instructed me to do

24     it and Matt instructed Lisa and he
```



```
1     instructed her because Gregg told him
2     to.  She said that Gregg told him to
3     tell her.
4         Q.   That's thirdhand knowledge to
5     you, correct?
6         A.   Lisa said Matt told me Gregg
7     wanted me to write you up; it had to be
8     done by close of business.
9              So I don't know what kind of
10    knowledge that is.
11        Q.   You heard from Lisa who heard
12    from Matt who heard from Gregg, right?
13        A.   Yes.
14        Q.   Okay.  So you were not at odds
15    with Lisa Barbounis at the time you
16    sent this text message, correct?
17        A.   I was, well, at odds thinking
18    that we were still fighting and I just
19    wanted them to think that we were still
20    fighting.
21        Q.   Were you still fighting with
22    Ms. Barbounis at the time you sent this
23    text message?
24        A.   No.  She had handed me a big
```



1        problem and I believed her.

2            Q.   So when you said they need to

3        think we are at odds, you were not at

4        odds, correct?

5            A.   No.  I don't know what we were.

6        We weren't like in cahoots.  We were

7        handling a situation.  So I wouldn't

8        say we were at odds, no.  But we were

9        both in the middle of a problem.

10           Q.   But you instructed your coworker

11       to pretend that you were at odds to

12       hide it from your supervisors, correct?

13           A.   I told her to steer clear of me

14       and to leave me alone so that we could

15       figure out what it was.  And I wanted

16       them to think that we were still at

17       odds because I was afraid that if they

18       thought that we were speaking and

19       sharing information that they would try

20       to fire us.

21           Q.   So you wanted her to give a

22       false impression.  Is that correct?

23           A.   At that moment, yes.

24           Q.   Let's go to the next one.  This



1     one has been stamped D9941.

2                    The same day, this is two

3     minutes, actually less than two minutes

4     later and you say "We need to play our

5     cards together so we can get out and

6     not be broke or scumbags."

7                    Do you want to explain that

8     one?

9        A.   Yes.  They were trying to fire

10    us and we both felt like we were trying

11    to be fired.

12                   Scumbags are people that do

13    the shit that Gregg Roman does and I

14    didn't want to do anything underhanded.

15    I wanted to do my job and I wanted to

16    keep it.

17       Q.   You said you thought you were

18    being fired at that time?

19       A.   I felt like he was gearing up to

20    line me up to get rid of me because,

21    remember, I had said after, after the

22    quarterly meeting and I told him I

23    wouldn't fuck him and after I said I

24    wouldn't go to Israel, remember I said



1    that I had been his right-hand man and

2    then all of a sudden Matt was his

3    right-hand man, I felt like I was being

4    teed up to be the next one out the

5    door.

6        Q.   So did you see Ms. Barbounis's

7    complaint as a way to retain your job?

8        A.   I felt like Gregg Roman was

9    trying to get rid of people that

10   wouldn't fuck him.  And I felt like if

11   we played our cards right and took it

12   to Daniel and took it to Marc that we

13   would not get fired and Gregg would.

14             That's what I thought.

15       Q.   Okay.  Didn't you ask Mr. Roman

16   on the same day about the real estate

17   course, taking time off for the real

18   estate course?

19       A.   Oh, yeah.  Do you know what?  I

20   did because I wanted to make sure -- I

21   was planning at that point to go to it.

22   It was supposed to start on November

23   5th and I knew that I was going to

24   report it, so I wanted to make sure



1       that Daniel knew that Gregg had already

2       approved it and I wanted it in writing.

3            Q.   No.   My question was you asked

4       Gregg?

5            A.   I wanted Gregg to confirm that

6       he had told me I could take the class.

7       I wanted it in writing because it was

8       another reason I was going to be out

9       for two weeks after all this.   I wanted

10      Daniel to know that Gregg had

11      previously approved it.   That is why I

12      reached out to him.

13                I wanted it in writing so

14      that he couldn't say that I wasn't at

15      work for two weeks.

16           Q.   So you were so scared that you

17      were going to lose your job that you

18      wanted to, you instructed your coworker

19      to give your bosses a false impression,

20      but on the same day you asked your boss

21      for confirmation that you were going to

22      be allowed two weeks off, correct?

23           A.   I was confirming with him that I

24      could take those -- that he had given



1    me the permission for those two weeks

2    because I was afraid for my job and I

3    didn't want to give Gregg any

4    ammunition that he could say to Daniel

5    oh, she didn't show up; she was yelling

6    at employees.

7        Q.   Were you yelling at employees?

8        A.   You know that I was.  Lisa and I

9    had a fight.

10       Q.   You said "employees."  So were

11   there others?

12       A.   No.

13            Yeah.  I yelled at Matt.

14       Q.   The next one is D9949.  It looks

15   like this one was sent about 30 minutes

16   later.  You say "We just need to be

17   smart and no one else can know that we

18   have each other's backs."

19            So would you agree with me

20   that in this text message you were

21   instructing Ms. Barbounis that you

22   should hide information from your

23   superiors?

24       A.   I didn't want -- I was trying to



```
1      be smart about it because Gregg's

2      incredibly smart and Gregg was already

3      geared up to get Lisa fired and I felt

4      like he was positioning me to be the

5      next one out the door.  And I was

6      trying to protect -- as you can tell,

7      all of these happened the day that I

8      found out about that, the day that she

9      told me what he did to her.

10         Q.   That's my point exactly.

11         A.   It was fear and panic and it was

12     trying to keep our heads above water

13     until I could figure out how to handle

14     it because, again, she kept saying she

15     didn't want to tell him.

16              But after thinking about it,

17     I realized there's really no question

18     for me.  It's my job.  I have to tell

19     him.

20         Q.   After you told Dr. Pipes, made

21     the report to Dr. Pipes, at that point

22     did you tell him that you and Lisa,

23     that you have Lisa's back?

24         A.   Well, having her back is -- I
```



Marnie O'Brien - January 14, 2021                    318

```
1    don't even know that I told him that or

2    not, but I believed her, I believed

3    her.  I believed her story so that's

4    having her back.

5      Q.   The next one is D9985.  And let

6    me see, the same day.  It looks like

7    ten hours later, if I'm doing the math,

8    but I'm not sure that I am.

9              You say "Honestly, I figured

10   you would.  I think you should consult

11   your people and see how they guide you.

12   I think together we could have an

13   impact with DP.  I'd like to look out

14   for MEF but I'm in your corner in the

15   meantime.  I will be looking to cover

16   my ass.  Apparently I'm going to need a

17   new job.  Ugh.  So disappointing.  I

18   really think DP and Marc would hear us

19   if we went together and spoke from the

20   heart."

21             So I would like to focus on

22   the sentence that says "I'd like to

23   look out for MEF but."

24             So at that point you were
```



1      not looking out for MEF, correct?

2         A.   I was concerned that MEF was

3      going to just be worrying about Gregg

4      and looking out for Gregg.  I was

5      taking a stand that I believed Lisa and

6      I was trying to cover my ass with them

7      not to lose my job, although I figured

8      I was going to.  As you can see, I was

9      nervous about it.

10               I was hoping that if we took

11     our stories to him and told him

12     everything, like not just her story,

13     what had happened to me, I felt like

14     they would have to see that, coupled

15     with the fact that Tiffany Lee had

16     already alleged that he was sexually

17     harassing her.  Lara and Laura were

18     alleging that he was harassing them.

19               I said if, I thought that if

20     the two of us stood together strong,

21     told our stories, because again she

22     didn't want to tell her story, I

23     thought that they would hear us and

24     that we could make it through it and



1      potentially keep our jobs.

2                 I was wrong.

3      Q.   You did keep your job, didn't

4      you?

5      A.   -ish.

6      Q.   You did continue to work there,

7      right?

8      A.   I did.  From home.

9      Q.   From home.  At the end of your

10     employment, correct?

11     A.   Yes.

12     Q.   And you resigned, correct?

13     A.   Yes.

14     Q.   After you had obtained another

15     job, correct?

16     A.   Yes.

17     Q.   Where you believed you would be

18     making approximately $30,000 up to

19     $80,000 more per year, correct?

20     A.   Not to start.  I was taking a

21     pay cut.

22     Q.   You said that you expected to

23     earn a hundred -- you wanted to earn a

24     hundred but that you thought you could



1    go up to 150 I think it was?

2      A.   It was goal that I would be

3    reaching for.  They were hiring me at

4    fifty.  There was an opportunity for

5    other stuff and I said that my goal

6    would have been 130.

7      Q.   130.  But you took the job

8    because you knew that there were these

9    other earning opportunities that would

10   get you to a hundred, correct?

11     A.   That could potentially get me

12   there.

13     Q.   Well, you believed it would,

14   right?

15     A.   I believed I would rather take a

16   try at that than stay where I was.

17     Q.   Did you believe that you were

18   going to earn, you could use the

19   earning potential of the new job and

20   that you would earn at least a hundred

21   thousand?

22          That was your testimony

23   earlier so I'm asking you if that's no

24   longer true.



```
 1                MS. SHIKUNOV:  Objection to
 2       the characterization of her testimony
 3       because it's a mischaracterization.  It
 4       speaks for itself.
 5                And I think we're at the end
 6       of a deposition getting bogged down in
 7       semantics, but that's a mis-
 8       characterization of your testimony.
 9       A.    What's the question again?
10       Q.    You accepted the position, the
11       new position because you believed you
12       were going to earn at least $100,000,
13       correct?
14       A.    No.  I accepted the position
15       because I could leave.  The salary that
16       I was offered was $50,000 and there was
17       a potential to earn more and I had set
18       a goal of about 130.
19                They had never really done
20       this with anybody before so it wasn't
21       like there was other people that had
22       already done that.
23       Q.    What cuts in your budget did you
24       make to accommodate for the difference
```



1        in salary between the seventy-one that

2        you were earning at MEF and the fifty

3        that you were going to earn at the new

4        place?

5            A.    I had moved in with Matt and I

6        was renting my townhouse and --

7            Q.    You had done that before you got

8        that job offer, correct?

9            A.    Yeah.  But that's why I felt

10       like I could take it.  My expenses were

11       less.  I was gaining -- you know, my

12       household expenses, we were sharing

13       those.

14                 And I was having a little

15       bit of income from my townhouse to

16       cover those expenses.

17           Q.    Let's go to the next one, D9204.

18       This is November 2nd, so this is after

19       you made the complaint to Dr. Pipes

20       after Dr. Pipes spoke with you about

21       your complaint but before the November

22       5th meeting.

23                 And you say to Ms.

24       Barbounis "I don't think we should



```
1    write grants.  I think you should run

2    for an office or something and I should

3    be your campaign manager.  Fuck it.  Go

4    big or go home.  Let's rule the world."

5         A.   We felt, I felt really good --

6    I'm sorry.  Go ahead.  Ask your

7    question.

8         Q.   I was going to ask you to tell

9    me what this means.

10        A.    I can't remember what -- oh, so

11   this was after I had given Daniel the

12   complaint.  So I guess -- I'm trying to

13   remember like what this scenario was.

14             I guess -- I'm trying to

15   think what DP -- I think DP must have

16   shut down Gregg a little bit.  So I

17   felt good about that.  And we had been

18   talking about doing like something --

19   we liked working together.  As much as

20   we hated each other at times, I felt

21   like she was a hard worker and she

22   wanted to write grants or something

23   like that for -- I don't know -- like a

24   non-profit or whatever.
```



1              And I said -- we didn't want

2       to work there anymore and we were

3       trying to think of what we could do.

4       And I guess I thought she was, I said

5       she was -- she certainly shouldn't run

6       for office that's for sure, knowing

7       what I know now.

8                   But let's rule the world.

9       We felt good, I felt good because I

10      felt like I stood up to a bully.

11         Q.   What did you mean by "Go big or

12      go home"?

13         A.   I don't know.  I guess like her

14      being for an office or something

15      because she likes politics.  Go big or

16      go home, like that's what you like,

17      let's do that.

18                  And I also had two beers so

19      I don't really know.

20         Q.   This is marked or stamped

21      D10090.  It's the same day, Friday,

22      November 2nd, 2018.  This is Lisa to

23      you:  "Anyone talk to Delaney or

24      Caitriona?"



1            When did you involve Delaney

2    and Caitriona in your efforts?

3      A.   Well --

4            MS. SHIKUNOV:  I'm going to

5    object to the form of that question.

6    And I'm going to instruct her not to

7    answer because there were no efforts.

8            If you want to ask her when

9    they were made aware of her reporting

10   the sexual assessment, I'll allow her

11   to answer that question.

12           MS. DIBIANCA:  Counsel, I

13   appreciate you suggesting the question

14   that I should ask, but my question is

15   pending and I'm not taking it back.

16           So you can go ahead and have

17   your witness answer.

18           MS. SHIKUNOV:  I just told

19   you I instructed her not to answer

20   because that is a completely

21   argumentative question.  So you can

22   rephrase it or she's not going to

23   answer.

24



1    BY MS. DIBIANCA:

2       Q.   Ms. O'Brien, when did you

3    involve Delaney and Caitriona in the

4    sexual harassment allegations?

5       A.   I never involved them in the

6    sexual harassment allegations.

7              Looking at the dates,

8    Friday -- so Thursday was when Daniel

9    came in and was interviewing all the

10   people, I think.  And the next day I

11   think there was a day where Gregg was

12   going into the office or they were

13   going to be in the office and they just

14   really didn't know what was going on

15   and I guess she was asking if anyone

16   told them.

17      Q.   And had anyone told them?

18      A.   I don't remember.  What was the

19   next text message?

20      Q.   I'm asking you to the best of

21   your knowledge.

22      A.   I know I didn't.  I don't know.

23   I think, I think that they knew what

24   had happened in Israel.  Like I said, I



1        think everybody knew, but I don't know.

2                I guess they knew I had

3        reported it because Daniel was talking

4        or I guess they knew something was up

5        because Daniel was going around.  So I

6        guess she was trying to find out what

7        they knew or if they knew because that

8        was their first job, that was their

9        first big girl job, and Delaney spent

10       every day being terrified.

11          Q.   Are you finished with your

12       answer?

13          A.   Yep.

14          Q.   This is D10092 and it's Friday,

15       November 2, 2018.  You text Lisa and

16       Tricia McNulty and ask them to call you

17       in a three-way phone call.

18                Do you recall that?

19          A.   I don't recall it, but it looks

20       like I did.

21          Q.   And do you recall if you had the

22       three-way call?

23          A.   I'm sure that we did.  And,

24       again, I'm looking at this time frame



```
 1        because after Daniel kind of
 2        interviewed everybody he just went away
 3        and there was nothing.  I didn't know
 4        what was going on.  I didn't know
 5        anything.  I didn't know if I was
 6        getting fired.  I didn't know if Lisa
 7        was getting fired.  I didn't know what
 8        Gregg had said.  It was just in limbo.
 9                 It was actually probably the
10        worst weekend of my life because I just
11        didn't know what was going on.
12                 And I also -- I'm not sure
13        when I found out.  But I didn't know --
14        again, like we never discussed AIPAC
15        amongst, amongst the three of us.  Like
16        they never really discussed that AIPAC
17        moment with me.  And apparently Tricia
18        had other instances.  I found out that
19        she had lodged a complaint with him at
20        that point.
21        Q.   At what point?
22        A.   Somewhere, somewhere in there.
23        So I guess I was just trying to
24        figure -- we were all trying to figure
```



```
1    out what was going on.  We didn't know.
2        Q.   So in your HR capacity you had
3    an off-duty call with your two
4    coworkers to discuss the complaint that
5    you had brought to the Forum, correct?
6        A.   I think I had said earlier that
7    I felt like I was immediately relieved
8    of my HR duties when I reported that.
9        Q.   Did you tell anyone at the Forum
10   that you thought you had been relieved
11   of your HR duties once you reported the
12   complaint?
13       A.   Well, since they never discussed
14   it with me again until, you know, later
15   on with the group, no, I didn't have an
16   official conversation about it.  But
17   Marc Fink had definitely stepped in and
18   was taking the lead on it.
19       Q.   And Marc Fink for the record is
20   the Forum's in-house counsel, correct?
21       A.   Yes. And he was really the top
22   of the line for HR because he is a
23   lawyer and he has experience and all of
24   that.  In the Forum like he was a part
```



1      of HR and when things were above me

2      they went to him.

3                  MS. DIBIANCA:  Erica, do you

4      have a preference on how we move these?

5                  MS. SHIKUNOV:  Nope.

6                  MS. DIBIANCA:  Nope.  Okay.

7      So what I'm going to do is I will move

8      these as one exhibit but, Kurt, I can't

9      recall what number we're on.

10                 Is it 4?

11                 MR. WILLIAMS:  4 is correct.

12                 MS. DIBIANCA:  Jakob, you

13     said 4?

14                 MR. WILLIAMS:  Yes, 4 is

15     correct.

16                 MS. DIBIANCA:  We can't hear

17     you, pal.

18                 MR. WILLIAMS:  Yes, 4 is

19     correct.

20                 MS. DIBIANCA:  Okay.

21     Thanks.

22                 (O'Brien Deposition Exhibit

23     No. 4 was marked for identification.)

24                 MS. SHIKUNOV:  Molly, do you



1    know how much longer you have?  Because

2    I just want to refill my water bottle

3    unless you are wrapping up.

4              MS. DIBIANCA:  I'm going to

5    do the Ebert phone call now so --

6              MS. SHIKUNOV:  Do you mind

7    if I take two just to run to the

8    kitchen?

9              MS. DIBIANCA:  Absolutely.

10   Go ahead.  No problem at all.

11             THE VIDEOGRAPHER:  Going off

12   the record at 4:35.

13             (A brief recess was taken.)

14             THE VIDEOGRAPHER:  We are on

15   the record at 4:39 Eastern Time.

16   BY MS. DIBIANCA:

17     Q.   So, Ms. O'Brien, I'm going to

18   now play the audio recording of the

19   phone call that we discussed earlier

20   from your boyfriend, Mr. Ebert, to

21   Mr. Roman in September 2019.

22             The court reporter is not

23   going to transcribe the actual phone

24   call.  In the transcript it will just



1        say audio recording was played.

2                    So it's reasonably brief,

3        but I think it's like nine minutes or

4        something.  So I'll just ask that you

5        be patient and listen to the whole

6        thing and then I'll ask you some

7        questions about it at the end.

8           A.   Okay.

9           Q.   Actually, I have to do some

10       magic thing, don't I, Chris, to get

11       people to hear that, right?

12                    THE VIDEOGRAPHER:  You

13       should be able -- as long as it's

14       opened first, go to screen share, it

15       should play properly.

16                    MS. DIBIANCA:  Oh, yes,

17       share computer sound.  There you go.  I

18       didn't know if there was some other

19       thing I had to do.

20                    Erica or Ms. O'Brien, if

21       somebody can just nod in just a moment

22       to indicate that you can hear the

23       recording so I know that it's actually

24       working on your end for you to hear.



1                    (The audio recording was

2         played at this time)

3         A.    (The witness nodded.)

4         Q.    Okay.  Thank you.

5                    So that ends the call there.

6         Who was the woman he was talking about

7         in D.C. with the long sexual history?

8         A.    I would have to assume that's

9         Lisa.

10        Q.    And he said that she was out on

11        the prowl -- I'm using his words -- on

12        Fridays and Saturdays.

13                    How was he aware of that?

14        A.    I don't know that she was out on

15        the prowl on Fridays and Saturdays.

16        You would have to ask him how he knows

17        that.

18        Q.    He said that she was the one

19        that got the ball rolling and everybody

20        jumped in.

21                    Would you agree with that

22        description?

23        A.    No.

24        Q.    Why not?



1        A.    Because there was no ball

2    rolling.  There was an inappropriate

3    behavior that was followed up with an

4    intention to fire someone.  So it

5    wasn't a ball to be rolled.  It was

6    calling out a bully and a predator.  It

7    wasn't a ball rolling.

8        Q.    Who was the person he was

9    talking about who was leaving in the

10   next month?

11       A.    I don't remember.  I don't know.

12   They were all getting jobs and job

13   offers, more so than I was.  I didn't

14   get anything really except for that

15   one.

16       Q.    And he knew that Mr. Roman was

17   on Mr. Ebert described it as work

18   leave.

19               How did Mr. Ebert know that

20   Mr. Roman was not in the workplace at

21   that time?

22       A.    Again, I'm sure I must have

23   mentioned some of it to him, so I guess

24   he picked that up that he wasn't



1    allowed in the office.

2        Q.   "He," meaning Mr. Ebert, picked

3    up that he, Mr. Roman, was not allowed

4    in the office?

5        A.   Yes.

6             And I wasn't at a high-end

7    dinner so I don't know anything about

8    that.

9        Q.   Where were you with Mr. Ebert

10   and some of your coworkers?

11       A.   I think one night we had gone

12   out for drinks and I called him and he

13   met up.  By the time he got there

14   everyone had left and Lisa was the only

15   one there and she left pretty much

16   immediately after he got there

17   because -- I don't know why but she

18   didn't stick around.

19       Q.   How did he know, how did he,

20   meaning Mr. Ebert, know that there were

21   four women involved in the suit?

22       A.   I told you I don't know what I

23   told him or I didn't.  I was dating

24   him.  I didn't confide in him.  I



1    didn't -- you know, I did ask him to

2    come in and look at the ceiling.  I

3    think that's the night that I did it.

4    I had told him that there were issues

5    and I asked him to come in and look at

6    the ceiling or whatever.

7             So obviously I had given him

8    some information, but I certainly

9    wasn't confiding in him all of it.  I

10   actually didn't like talking about it

11   because it was upsetting and I was

12   trying to not talk about it.

13      Q.   Did you smoke marijuana with

14   your coworkers?

15      A.   They don't really smoke.  I

16   don't know why he said that because I

17   don't think I was even smoking that

18   night.  I actually -- I don't remember.

19      Q.   Do you remember if you ever

20   smoked marijuana with your coworkers?

21      A.   I smoked with Tricia at the gala

22   because somebody had had something

23   there and Gregg obviously and Matt.

24             But the others, like Lisa



1      and Delaney and Caitriona, didn't

2      really do that.  Tricia really didn't

3      do it either, but she actually started

4      to after because she was so stressed

5      out.

6          Q.   When did she start smoking

7      marijuana?

8          A.   I don't -- I mean I know she was

9      talking about trying to use it to go to

10     sleep or something like that and it was

11     after all, after November 5th when

12     everybody was really stressed.

13         Q.   How did Mr. Ebert know that

14     Dr. Pipes was only in about once a

15     week?

16         A.   Well, I'm sure I told him that

17     because he, you know, knew that I

18     could -- you know, it wasn't like the

19     wild west.  Daniel said we could come

20     and go as we needed to and work from

21     home.

22              And I think -- you know, I

23     know I did it more after Gregg left

24     because Gregg would demand us to be in



1    the office, but I would work from home.

2    So I guess he was painting it like, you

3    know, everything was, we were all

4    running the streets, but we were all

5    actually still working.

6       Q.   And how did Mr. Ebert know that

7    Lisa had recorded you?

8       A.   That wasn't me.  That was a

9    different recording.  And that wasn't

10   made up.  I don't think -- if I didn't

11   know it, he couldn't have known it.

12   And I didn't find it out until much

13   later.  So he definitely wasn't talking

14   about that.

15              But I do know that when Lisa

16   was in D.C. she was out to dinner with

17   a bunch of girlfriends.  And I was

18   afraid to tell people that I had this

19   suit because, again, the NDA scared me.

20   I was afraid to say very much about it

21   to anybody.  Lisa would tell anybody

22   that walked down the street.

23              And she was telling all

24   these girls at dinner and one of the



```
 1      girls had said to her that she had
 2      experienced sexual harassment as well
 3      and coincidentally it was someone that
 4      you work with.  And I don't know -- I'm
 5      not even sure if Lisa had told her the
 6      whole story, but I guess she had
 7      alluded to it.  And then this girl
 8      started telling a story about Gregg and
 9      Lisa got a recording, she recorded her
10      speaking without her knowledge as well
11      the whole conversation with that girl.
12                  So I believe that's what he
13      was referring to.  I don't think she
14      made it up.  Actually, I believe that
15      girl too because all the shit that he
16      was saying is bullshit anyway.  He had
17      a couple facts and then he sprinkled in
18      what he wanted to paint.
19         Q.   You're talking about Mr. Ebert
20      right now?
21         A.   Yes.
22         Q.   The recording that you're
23      talking about with Lisa, that Lisa made
24      of another person, not you, have you
```



1       heard that recording?

2          A.   I did, yeah.  And she told the

3       story of how Gregg was trying to get

4       her to leave the party and go to his

5       hotel room and he was going to give her

6       a story but he would only give it to

7       her if she came to the hotel room and

8       then he was peeing on the side of the

9       building -- I don't know -- on the way

10      out the door.

11                 That's what I remember of

12      that when I heard it.

13         Q.   Did you tell Mr. Ebert about the

14      recording?

15         A.   I must have said something like

16      she had a recording of somebody else,

17      yes.  Either that or he overheard it on

18      the phone because, again, I didn't go

19      into detailed conversations with him

20      about it because, number one, I don't

21      like talking about it.  I had to talk

22      about it enough at work and just

23      dealing with it.  I liked to be away

24      from it.



1                    And the people that I

2       confided in or consulted or tried to,

3       like their shoulders that I cried on,

4       if he had overheard me talking to one

5       of them because a lot of them would

6       call and check on me so, you know, he

7       might have picked that up there.  I

8       don't really know how he knows.

9          Q.   So some of what he said was true

10      and some was not true.  Is that right?

11         A.   Yeah.  Most of it seems like

12      what he said wasn't true and what he

13      did say was kind of just like very

14      basic.

15         Q.   Okay.

16         A.   Like the girl in D.C. and a girl

17      that got recorded, like he didn't even

18      get that right.

19         Q.   Okay.  When you hear the tape

20      now is it pretty clear that that is his

21      voice?  Is it clear to you?

22         A.   That's him.  That's him.

23         Q.   Okay.

24                    MS.  DIBIANCA: All right.



1          Let's go off the record, please, if

2      that's okay, Erica.

3                   THE VIDEOGRAPHER:  Going off

4      the record at 5:00 o'clock.

5                   (A brief recess was taken.)

6                   THE VIDEOGRAPHER:  We're

7      recording and back on the record at

8      5:04 Eastern time.

9                   MS. DIBIANCA:  We're back

10     on, Chris, when you're ready.

11                  THE VIDEOGRAPHER:  Yes.  Can

12     you hear me?  We're back on the record

13     at 5:04.

14                  (A discussion was held off

15     the record)

16     BY MS. DIBIANCA:

17        Q.   So, Ms. O'Brien, I would like

18     to play the recording now that

19     Ms. Barbounis made without your

20     knowledge.  And I may stop it at some

21     point to ask questions because it's a

22     bit long so just bear with me there.

23                  (The audio recording was

24     played at this time.)



1    BY MS. DIBIANCA:

2        Q.   I'm going to stop the tape there

3    and just ask you to identify who was

4    who.  So who was speaking last just

5    there where somebody said "I'm not

6    happy"?

7            Was that you?

8        A.   Yes, that was me.

9        Q.   Okay.  I'm going to continue it

10   now.

11           (The audio recording was

12   played at this time)

13   BY MS. DIBIANCA:

14       Q.   Let me ask a question.  I'll put

15   the tape on pause and I'll ask a

16   question.

17           At this point in the

18   conversation, Ms. O'Brien, did you

19   think that Ms. Barbounis and some of

20   the other women that you worked with

21   were ganging up on you?

22       A.   No, I didn't think they were

23   ganging up on me.  I think that, you

24   know, with Gregg out of the office we



1    were all still afraid that we were

2    going to get fired and I wanted to keep

3    my job and I wanted everybody to keep

4    their job.

5              So I felt like they should

6    have picked me for that and I knew

7    background information.  I think I

8    actually mentioned it earlier.  He

9    had -- you know, I sat with him while

10   he was trying to distribute duties and

11   cover everything and he gave Tricia

12   extra money.  And then he asked me to

13   take on extra responsibilities and

14   offered me no money.  And I said, you

15   know, I wanted money, extra.

16             He had just taken away my --

17   I had just taken a $6,000 hit for not

18   having my benefits paid and now he

19   wanted to give me extra responsibility

20   and not pay me for it.

21             So I didn't feel like they

22   were ganging up on me.  He told me when

23   he told me that Lisa won he told me it

24   seems that she was campaigning behind



```
1     the scenes.

2               So I was just irritated

3     because I was -- you know, she was very

4     worried about her job.  So I was trying

5     to help her get responsibilities and

6     show her value.  And then when there

7     was a moment for her to say yeah,

8     Marnie can handle that, I thought they

9     would just pick me.  And then Daniel

10    already knew that if I was going to do

11    it he was going to pay me for it or

12    that I wanted money for it.

13              So I felt like her trying to

14    take an opportunity that should have

15    been mine was screwing me out of money

16    and out of showing my worth and my

17    value because, you know, we all wanted

18    to do that at that point.

19    Q.  At the time of the call did you

20    think that Lisa was conspiring against

21    you with the other women?

22    A.   No.  I thought she was

23    campaigning for the position.

24    Q.  Okay.  And they all voted --
```



1      nobody voted for you except for

2      yourself, correct?

3         A.   Yeah.

4         Q.   You did?

5         A.   I did.

6              (The audio recording was

7      played back at this time.)

8    BY MS. DIBIANCA:

9         Q.   Okay.  Ms. O'Brien, the tape

10     that you just heard, after hearing that

11     tape what is your current opinion of

12     Ms. Barbounis?

13        A.   I'm not happy that she taped me

14     without me knowing it.  I'm not happy

15     that she played it.  I don't know.  I

16     mean are you -- I don't know what

17     you're asking really.  Because I mean

18     are you asking about then or now?  I

19     don't know.

20        Q.   Now.

21        A.   I think it was pretty screwed up

22     that she taped me without me knowing

23     it, but she taped that other lady too

24     so it shouldn't be surprising.



```
 1                 MS. DIBIANCA:  Okay.  I
 2      don't have any further questions.
 3                 If Erica wants to do any
 4      cross, I'm sorry, rebuttal, you know
 5      what I mean, you're happy to do it.
 6                 Did you say something?
 7                 MS. SHIKUNOV:  I'm sorry.  I
 8      need to project and my throat is
 9      killing me.
10                 We're good, caput.
11                 MS. DIBIANCA:  We can go off
12      the record.
13                 THE VIDEOGRAPHER:  Going off
14      the record at 5:32.
15                 THE COURT REPORTER: Counsel,
16      just to confirm, as requested I will
17      deliver an expedited transcript to
18      Molly and, Erica, you would like to
19      order your transcript just regular
20      turnaround?
21                 MS. SHIKUNOV:  Yes.
22                 MS. DIBIANCA:  Yes.
23                 (Deposition concluded at
24      5:32 p.m.)
```



```
1                  - - - - -

2                   I N D E X

3
   DEPONENT:  MARNIE O'BRIEN          PAGE
4
        Examination by Ms. DiBianca   4
5
                  E X H I B I T S
6

7    O'BRIEN DEPOSITION EXHIBITS       MARKED

8    Exhibit 1    Charge of

9                 Discrimination           64

10   Exhibit 2    Document Bates stamped

11                D0006695                 222

12   Exhibit 3    Rule 26(a)(1) Initial

13                Disclosures of

14                Plaintiff               265

15   Exhibit 4    Printouts of text

16                Messages               331

17

18                  - - - - -

19

20

21

22

23

24
```



1

2      DIRECTIONS NOT TO ANSWER       PAGE   LINE

3
                                      267    10
4                                     280     9
                                      326     4
5
       REQUESTS MADE FOR DOCUMENTS    PAGE   LINE
6
                   NONE
7

8      READING AND SIGNING INSTRUCTIONS PAGE 351
       ERRATA SHEET                      PAGE 352
9      CERTIFICATE OF REPORTER           PAGE 353

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24



1    State of Delaware   )

2                         )
     New Castle County   )
3


4                CERTIFICATE OF REPORTER

5

6        I, Kurt A. Fetzer, Registered
     Diplomate Reporter and Notary Public,
7    do hereby certify that there came
     before me on Thursday, January 14,
8    2021, the deponent herein, MARNIE
     O'BRIEN, who was duly sworn by me and
9    thereafter examined by counsel for the
     respective parties; that the questions
10   asked of said deponent and the answers
     given were taken down by me in
11   Stenotype notes and thereafter
     transcribed by use of computer-aided
12   transcription and computer printer
     under my direction.

13

         I further certify that the foregoing
14   is a true and correct transcript of the
     testimony given at said examination of
15   said witness.

16       I further certify that I am not
     counsel, attorney, or relative of
17   either party, or otherwise interested
     in the event of this suit.

18

19

20
         Kurt A. Fetzer, RDR, CRR
21

22

23

24

