IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **LISA BARBOUNIS,**<br><br>*Plaintiff,*<br><br>v.<br><br>**THE MIDDLE EAST FORUM, et al.,**<br><br>*Defendants.* | **Case No. 2:19-cv-05030-JDW** |

## MEMORANDUM

The counterclaims in this case have all the trappings of a bingeworthy (or cringeworthy) primetime soap opera: infidelity; recorded phone calls; British slang; possibly stolen money; political ambitions; jealousy; international travel; casual drug use; and a cast of colorful characters. But drama does not a federal case make. Spoiler alert: the Middle East Forum has not offered evidence to make out its claims against Lisa Barbounis, and she is entitled to summary judgment on each one.

**I.  BACKGROUND**

Between October 2017 and August 2019, Lisa Barbounis worked at the Middle East Forum as an executive liaison and, later, the Director of Communications. MEF is a research institute designed "to promote American interests in the Middle East and to protect Western values from Middle East threats." (ECF No. 111-1 at ¶ 3.) At times, MEF's work generates controversy.

### A. MEF Grant Money

In May 2017, MEF began working with Tommy Robinson, a UK-based political activist, to support Mr. Robinson's free speech rights on controversial subjects. By Spring 2018, MEF tasked Ms. Barbounis with managing its relationship with Mr. Robinson. One of his associates, Daniel Thomas, organized rallies and fundraising efforts on Mr. Robinson's behalf and served as the primary point of contact for Mr. Robinson. MEF agreed to give Mr. Thomas a $32,000 grant to fund a rally in London in support of Mr. Robinson. The grant agreement between MEF and Mr. Thomas required Mr. Thomas to return any unused portion of the grant or the proceeds to MEF. In addition, if Mr. Thomas violated the grant agreement, MEF could recoup the full amount of the grant.

On June 4, 2018, five days before the rally was scheduled to take place, Mr. Thomas emailed MEF's Director, Gregg Roman, a breakdown of the various costs to fund the rally. In that email, Mr. Thomas indicated that production expenses (*i.e.* a PA system, stage, video screens, crowd barriers, etc.) would cost a total of £17,700. However, the accompanying invoice from the vendor indicated that those expenses would only cost £15,198. Mr. Thomas told MEF that the whole event would cost £22,450.

The rally took place on Saturday, June 9, 2018, and Ms. Barbounis attended. The following Monday, Mr. Thomas emailed Mr. Roman and confirmed that he received £23,454 in his bank account for the rally and provided Mr. Roman with another breakdown of all the associated costs. As part of that breakdown, Mr. Thomas

advised MEF that he was charging £130 for a hotel room from the night before the event, and he also charged £120 to cover his travel expenses to and from London. In addition, Mr. Thomas explained that he was invoicing MEF £1,204 for having to liaise with various individuals as part of his efforts organizing and managing the event. In the breakdown of costs, Mr. Thomas characterized this line item as "[m]yself for the management of the event." (ECF No. 111-3 at Ex. 74.) He concluded by explaining that he would be "taking a step back, and [would not] be dealing with any further events." (*Id.*) Mr. Roman forwarded Mr. Thomas's invoicing emails to Ms. Barbounis.

On June 22, 2018, a few weeks after the event, a representative from Breitbart London forwarded another budget to Mr. Roman and Ms. Barbounis for a second event for Tommy Robinson in July. Ms. Barbounis then told Mr. Roman that she had "a bad taste in [her] mouth from the last event." (*Id.* at Ex. 73.) She explained that Mr. Thomas "applied for the grant but hasn't supplied, to my standard, a proper account of the money disbursements" and expressed concern that she had "2 'vendors' asking for money . . . ." (*Id.*) MEF took no action based on Ms. Barbounis's concern.

At some point after the first rally, Ms. Barbounis and Mr. Thomas began having an affair. In later text conversations with Mr. Thomas's domestic partner, Jazmin Bishop, Ms. Barbounis admitted that "it was always in the back of [her] mind" that Mr. Thomas took grant money from MEF "because it didn't add up." (*Id.* at Ex. 105.) Though Ms. Barbounis told Ms. Bishop that she had to tell MEF that Mr. Thomas took the funds, she never did.

3

Over two years later, in July 2020, Mr. Roman had a phone conversation with Mr. Thomas about this lawsuit. During that conversation, Mr. Roman confronted Mr. Thomas about whether he had misappropriated money from MEF to fund a personal vacation in Ibiza, stating that "if it happened, it happened. It's the past." (*Id.* at Ex. 81.) Mr. Thomas denied using the money for a vacation but acknowledged that he used some of the money for personal purposes.

### B.     Tommy Robinson Political Activity

Over the course of her work with MEF regarding Tommy Robinson's free speech issues, Ms. Barbounis developed a personal interest in Mr. Robinson's political activities, including his campaign to win a seat in the European Union parliament. During her free time, Ms. Barbounis volunteered to assist the Robinson campaign. By August 2018, however, MEF's president, Daniel Pipes, expressed that he was "leery of associating too much with Tommy Robinson" and cautioned that MEF would be better off keeping a distance from him. (ECF No. 111-3 at Ex. 77.) In the Fall of 2018, Mr. Pipes "became concerned that [Ms. Barbounis's] support for Robinson was causing her to neglect her responsibilities to [MEF] and causing potential problems for [MEF]." (ECF No. 111-1 at ¶ 58.) Between December 2018 and July 2019, Mr. Pipes "had numerous exchanges with [Ms. Barbounis] wherein [he] repeatedly warned her about her work with Robinson, informed her of the problems that it could cause for her and for [MEF], and cautioned her that her work for [MEF] must be her priority." (*Id.* at ¶ 60.) Mr. Pipes eventually told Ms. Barbounis that she needed his permission for any personal travel that included a political agenda. (ECF No. 111-5

at Exs. 125 & 129.) MEF contends that Ms. Barbounis lied about her travels to Europe to conceal the fact that she was working on Tommy Robinson's political activities.

C. **Other Fundraising Efforts**

In addition to assisting Tommy Robinson's efforts and advocating for him to MEF, Ms. Barbounis also passed other proposals to MEF. For example, Ms. Barbounis advocated on behalf of other potential MEF grantees, including a woman named Janice Atkinson. (ECF No. 111-3 at Ex. 98.) She also advised a woman named Katie Hopkins that MEF might be interested in getting involved with an "anti-Islamist bus tour" that Ms. Hopkins had proposed. (*Id.* at Ex. 99.) MEF also contends that Ms. Barbounis drafted a proposal on behalf of TheRebel.media in order to secure $1,000,000 from an individual named Terry Giles and stood to earn a 10% commission if the proposal was successful. Ms. Barbounis advised MEF that Mr. Giles might be interested in supporting MEF as well. She also forwarded a grant request to Mr. Pipes from a woman named Amy Mekelburg on behalf of the RAIR Foundation. Ms. Barbounis did not reveal her level of involvement with these various proposals. There is no evidence that MEF made any grants based on these proposals.

D. **Procedural History**

On October 27, 2019, Ms. Barbounis initiated this litigation by filing an employment discrimination lawsuit against MEF, Daniel Pipes, Gregg Roman, and Matthew Bennett. On July 28, 2020, MEF moved to amend its Answer in order to assert counterclaims against Ms. Barbounis based on newly discovered evidence. The new evidence stemmed from Mr. Roman's conversation with Mr. Thomas regarding

5

this lawsuit. On September 9, 2020, the Court granted MEF leave to assert counterclaims against Ms. Barbounis for breach of the duty of loyalty, fraudulent misrepresentation, and civil conspiracy based upon Ms. Barbounis's alleged concealment of Mr. Thomas's misappropriation of funds and her travels to Europe under false pretenses. However, because Ms. Barbounis's alleged political activities on behalf of Tommy Robinson are the subject of one of MEF's claims against her in a separate lawsuit, *The Middle East Forum v. Lisa Reynolds-Barbounis*, No. 19-cv-5697 (the "MEF Case"), the Court held that MEF could not pursue any counterclaims against Ms. Barbounis in this action based upon that same alleged conduct. The Court also found that MEF could not raise those claims here because it waited too long to do so and therefore lacked good cause. On September 16, 2021, MEF filed its amended answer with counterclaims against Ms. Barbounis.

After the close of a discovery period beset with disputes, both sides filed dispositive motions. Defendants sought summary judgment on Ms. Barbounis's employment discrimination claims, and the Court denied that aspect of their motion in a separate order. Both Ms. Barbounis and MEF seek summary judgment on MEF's counterclaims, and their cross-motions are ripe for disposition.

## II. LEGAL STANDARD

Federal Rule of Civil Procedure 56(a) permits a party to seek, and a court to enter, summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "[T]he plain language of Rule 56[(a)] mandates the entry of summary

judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (quotations omitted). In ruling on a summary judgment motion, a court must "view the facts and draw reasonable inferences 'in the light most favorable to the party opposing the [summary judgment] motion.'" *Scott v. Harris*, 550 U.S. 372, 378 (2007) (quotation omitted). However, "[t]he non-moving party may not merely deny the allegations in the moving party's pleadings; instead he must show where in the record there exists a genuine dispute over a material fact." *Doe v. Abington Friends Sch.*, 480 F.3d 252, 256 (3d Cir. 2007) (citation omitted); *see also* Fed. R. Civ. P. 56(c)(1)(A)-(B).

The filing of cross-motions does not change this analysis. *See Transportes Ferreos de Venezuela II CA v. NKK Corp.*, 239 F.3d 555, 560 (3d Cir. 2001). It "does not constitute an agreement that if one is rejected the other is necessarily justified or that the losing party waives judicial consideration and determination whether genuine issues of material fact exist." *Id.* at 560 (quotation omitted). Rather, "[w]hen confronted with cross-motions for summary judgment 'the court must rule on each party's motion on an individual and separate basis, determining, for each side, whether a judgment may be entered in accordance with the Rule 56 standard.'" *Canal Ins. Co. v. Underwriters at Lloyd's London*, 333 F. Supp. 2d 352, 353 n.1 (E.D. Pa. 2004), *aff'd*, 435 F.3d 431 (3d Cir. 2006).

## III. ANALYSIS

### A. Hearsay Issues

MEF bases its counterclaims in no small part on unsworn, out-of-court statements by several individuals, many of whom live in the United Kingdom, including Daniel Thomas, Jazmin Bishop, Russel Thomas, Tommy Robinson, Vinney Sullivan, and Twin Walton. MEF does not dispute that these statements fall within the definition of "hearsay." *See* Fed. R. Evid. 801(c). Even though their statements are hearsay, the Court can consider them "if they are *capable of being admissible at trial.*" *Fraternal Ord. of Police, Lodge 1 v. City of Camden*, 842 F.3d 231, 238 (3d Cir. 2016) (quotation omitted) (original emphasis). MEF "need only 'explain the admissible form that is anticipated.'" *Id.* (quotation omitted).

To satisfy that burden, MEF invokes two exceptions to the rule against hearsay: 1) statements against interest (*see* Fed. R. Evid. 804(b)(3)); and 2) wrongfully causing a declarant's unavailability (*see* Fed. R. Evid. 804(b)(6)). Both exceptions apply only if the declarant is "unavailable."

#### 1. Daniel Thomas

To invoke the statement-against-interest exception, MEF must show that it has not been able to obtain Mr. Thomas's attendance or testimony, including a deposition. *See* Fed. R. Evid. 804(a) But to invoke the wrongfully-causing-unavailability exception, MEF only has to show that it could not procure Mr. Thomas's attendance at trial. *See id.* Although MEF might have shown that Mr.

8

Thomas is unavailable to testify at either a deposition or a trial, the Court need not to decide that because MEF has not demonstrated that either exception applies.

*First*, MEF has not demonstrated that the statement-against-interest exception applies. A statement against interest is one that "a reasonable person in the declarant's position would have made only if the person believed it to be true because, when made, it was so contrary to the declarant's proprietary or pecuniary interest or had so great a tendency … to expose the declarant to civil or criminal liability[.]" Fed. R. Evid. 804(b)(3)(A). "The conclusion that a 'reasonable man in (the declarant's) position would not have made the statement unless he believed it to be true,' often requires, therefore, a sensitive analysis of the circumstances in which the statement was made and the precise nature of the statement." *United States v. Palumbo*, 639 F.2d 123, 127 (3d Cir. 1981).

According to MEF, Mr. Thomas made statements against interest during his call with Mr. Roman in July 2020, when he admitted to procuring and/or using illicit drugs and misappropriating MEF's grant funds. Even if these statements are exceptions to the rule against hearsay, only the statements themselves would be admissible. The fact that Mr. Thomas may have made discrete statements against interest during a longer conversation does not make the entire conversation admissible. Mr. Thomas's drug use has no bearing on the allegations in this case. Nor does his alleged misuse of MEF funds, because MEF makes clear in its papers that its counterclaims are not about whether Mr. Thomas misused those funds but whether, sometime later, Ms. Barbounis had an obligation to tell MEF about her

9

suspicions. MEF does not identify any statements against interest in Mr. Thomas's call with Mr. Roman that bear on that question.

In fact, the Court questions whether Mr. Thomas's statements regarding his retention of 5% of MEF's grant money qualify as statements against his interest. When Mr. Thomas provided Mr. Roman with a breakdown of the final expenses two days after the Tommy Robinson rally took place, he made plain that he was charging MEF £250 for hotel and travel expenses and an additional £1,204 for coordinating and managing the event. Thus, of the total £23,454 he received from MEF to run the event, Mr. Thomas kept £1,454—roughly 6%—for himself and told MEF he was doing so. MEF did nothing about it. Mr. Thomas's consistent statement to Mr. Roman, over two years later, that he kept 5% for himself was not so contrary to his pecuniary interest and did not have so great a tendency to expose him to liability as to render it a statement against his interest.

*Second*, MEF has not demonstrated that the wrongfully-causing-unavailability exception applies. Because Mr. Thomas lives in the United Kingdom, MEF cannot compel his attendance at trial. But to invoke this exception, MEF must show that Ms. Barbounis "wrongfully caused--or acquiesced in wrongfully causing--the declarant's unavailability as a witness, and did so intending that result." Fed. R. Evid. 804(b)(6). "To admit a statement against a [party] under the rule, therefore, the [proponent] must show (1) that the [party] engaged or acquiesced in wrongdoing, (2) that the wrongdoing was intended to procure the declarant's unavailability, and (3) that the wrongdoing did procure the unavailability." *United States v. Baskerville*, 448 F. App'x

243, 249 (3d Cir. 2011) (quoting *United States v. Scott*, 284 F.3d 758, 762 (7th Cir.2002)). While the alleged "wrongdoing need not consist of a criminal act[,]" the rule is designed to "deal with abhorrent behavior 'which strikes at the heart of the system of justice itself.'" Fed. R. Evid. 804(b)(6) advisory committee's note to 1997 amendment (quotation omitted). Thus, in the usual case, the rule applies when a party has caused a declarant's unavailability "through threats, actual violence or murder." *United States v. Dhinsa*, 243 F.3d 635, 651 (2d Cir. 2001).

MEF argues that Mr. Thomas likely does not want to testify against Ms. Barbounis "because he is concerned that [she] will retaliate against him and his family[,]" as a result of Ms. Barbounis's history of sending harassing and/or demeaning messages to Mr. Thomas's domestic partner, Ms. Bishop. (*See, e.g.*, ECF No. 111-5 at Exs. 138, 141-42.) Though Ms. Barbounis's text messages to Ms. Bishop are disrespectful and undignified, her mean-spirited tormenting does not rise to the level of abhorrent behavior necessary to trigger the hearsay exception for forfeiture by wrongdoing. In any event, this exception does not apply because MEF has not demonstrated that Ms. Barbounis engaged in this alleged wrongful conduct with the intent to prevent Mr. Thomas from testifying against her in this matter. *See United States v. Adoma*, 781 F. App'x 199, 204 (4th Cir. 2019) ("In order for the exception to apply, the desire to keep the witness from testifying must be a reason for procuring the unavailability of the declarant[.]"). Mr. Barbounis's conduct was not directed at Mr. Thomas, and it occurred months before Ms. Barbounis filed this case. Thus, the

11

exception does not apply, and the Court will not consider any of Mr. Thomas's hearsay statements when resolving the summary judgment motions.

### 2. Other witnesses

MEF does not identify which, if any, hearsay exception applies to the statements from Ms. Bishop and Messrs. Russel Thomas, Robinson, Sullivan, and Walton. Therefore, MEF has not satisfied its burden to demonstrate that these declarants' statements are capable of being admissible at trial. Moreover, MEF has not indicated that it has attempted to procure (by process or other reasonable means) any of these declarants' attendance at trial or their deposition testimony. As a result, these declarants are not unavailable witnesses under Federal Rule of Evidence 804(a)(5), and none of the hearsay exceptions for unavailable witnesses apply.

### B. Duty of Loyalty

In Pennsylvania, employees owe a duty of loyalty to their employers. *See Colgate-Palmolive Co. v. Tandem Indus.*, 485 F. App'x 516, 518 (3d Cir. 2012) (citing *Reading Radio, Inc. v. Fink*, 833 A.2d 199, 211 (Pa. Super. Ct. 2003)). This means that "in all matters affecting the subject of the agency, the agent must act with the utmost good faith in furthering and advancing the principal's interests, including a duty to disclose to the principal all relevant information." *Basile v. H & R Block, Inc.*, 761 A.2d 1115, 1120 (Pa. 2000). An employee must also "refrain from competing with the principal and from taking action on behalf of, or otherwise assisting, the principal's competitors throughout the duration of the agency relationship" and refrain from using "property or confidential information of the principal for the

12

agent's own purpose or those of a third party." *Teva Pharms. USA, Inc. v. Sandhu*, 291 F. Supp. 3d 659, 678 (E.D. Pa. 2018) (citing *Synthes, Inc. v. Emerge Med., Inc.*, 25 F. Supp. 3d 617, 667 (E.D. Pa. 2014)). To establish its breach of the duty of loyalty claim, MEF must prove "(1) that [Ms. Barbounis] negligently or intentionally failed to act in good faith and solely for the benefit of [MEF] in all matters for which ... she was employed; (2) that [MEF] suffered injury; and (3) that [Ms. Barbounis's] failure to act solely for [MEF's] benefit ... was a real factor in bring[ing] about [its] injuries." *Synthes*, 25 F. Supp. 3d at 667 (quotation omitted).

MEF's claim is premised upon Ms. Barbounis's alleged failure to tell MEF that Mr. Thomas may have misappropriated some of the grant money that was meant to fund the Tommy Robinson rally on June 9, 2018. Even if Mr. Thomas misappropriated any funds (which is not clear), MEF could not succeed on its claim against Ms. Barbounis for at least two reasons.

*First*, MEF already had the information it claims Ms. Barbounis failed to disclose. Mr. Thomas told Mr. Roman that he was keeping £1,454 for himself for travel, hotel, and management expenses related to the event, and MEF took no action. To the extent MEF claims that Mr. Thomas claimed that the rally was more expensive than it actually was and pocketed the difference, that claim also fails. Five days before the rally took place, Mr. Thomas advised Mr. Roman that production costs for the event would be £17,700, but the vendor invoice he provided to Mr. Roman was for less than that amount—£15,198. Thus, MEF had all of the information it needed to question Mr. Thomas about the apparent discrepancy, and its own lack of diligence—

13

rather than any omission by Ms. Barbounis—was the real factor in bringing about its alleged injuries.

*Second*, in the weeks following the Tommy Robinson event, Ms. Barbounis told Mr. Roman that she had "a bad taste in [her] mouth from the last event[,]" because Mr. Thomas had not yet supplied a proper accounting of the disbursement of funds and two vendors were asking to be paid. (ECF No. 111-3 at Ex. 73.) As a result, Ms. Barbounis recommended that any grant money for future events should be paid to someone other than Mr. Thomas to ensure the proper disbursement and accounting for the funds. Again, MEF took no further action, despite Ms. Barbounis's statement to Mr. Roman: "[l]et me know how you wish to proceed." (*Id.*) Having raised a concern about Mr. Thomas's accounting once, Ms. Barbounis had no obligation to raise the same issue again and again going forward.

The record does leave open the possibility that after Ms. Barbounis raised her concerns about Mr. Thomas's accounting for the event, she received additional information that confirmed her suspicions. But none of the information she received suggested that anything happened other than what she had already flagged for Mr. Roman. One can debate whether a good employee would have raised the issue again at that point without crossing the line from diligence to nagging. But even if Ms. Barbounis's decision on that score was wrong (and the Court cannot make that determination), it did not fall short of her duty of loyalty to MEF.

14

## C. Fraudulent Misrepresentation

To prevail on its intentional misrepresentation claim, MEF must establish the following elements: "(1) [a] representation; (2) which is material to the transaction at hand; (3) made falsely, with knowledge of its falsity or recklessness as to whether it is true or false; (4) with the intent of misleading another into relying on it; (5) justifiable reliance on the misrepresentation; and, (6) the resulting injury was proximately caused by the reliance." *Bortz v. Noon*, 729 A.2d 555, 560 (Pa. 1999) (citation omitted). MEF bases its claim on three categories of alleged misrepresentations: 1) Ms. Barbounis's statement that MEF funds meant to support Tommy Robinson were actually used for that purpose (and not misappropriated by Mr. Thomas for his personal use); 2) Ms. Barbounis's statement that her seven trips to the United Kingdom between June of 2018 and July of 2019 were for legitimate MEF purposes as opposed to personal reasons; and 3) Ms. Barbounis's statements that she was working with Tommy Robinson on his free speech issues only, rather than attempting to fundraise for non-MEF purposes and/or for personal gain. MEF has failed to establish liability based on any of these alleged misrepresentations.

As an initial matter, the Court doubts that any of these alleged misrepresentations provides the basis for an independent tort action. Under Pennsylvania law, the gist of the action doctrine precludes plaintiffs from recasting ordinary breach of contract claims into tort claims. *See eToll, Inc. v. Elias/Savion Advertising, Inc.*, 811 A.2d 10, 14 (Pa. Super. 2002). Under that doctrine, tort actions "lie for breaches of duties imposed by law as a matter of social policy, while contract

actions lie only for breaches of duties imposed by mutual consensus agreements between particular agreements." *Id.* MEF's misrepresentation claims do not stem from an independent legal duty; they stem from the contractual relationship that it had with Ms. Barbounis. The gist of the action doctrine likely bars the claims. But the Court need not decide that question because MEF does not have facts to support any of its fraudulent misrepresentation claims.

*First*, MEF has failed to identify any evidence in the record where Ms. Barbounis made an affirmative representation to MEF that Mr. Thomas used all of MEF's grant funds to support Tommy Robinson or that Mr. Thomas did not misappropriate some of the money. To the contrary, she expressed concern about Mr. Thomas's accounting. In addition, to the extent MEF is pursuing a claim for intentional concealment or fraud by omission, those claims fail as well. Although distinct, each claim involves some level of preventing a plaintiff from acquiring material information, whether through active efforts to conceal that information or by failing to disclose the information despite a legal duty to do so. *See Gnagey Gas & Oil Co. v. Pennsylvania Underground Storage Tank Indemnification Fund*, 82 A.3d 485, 500-503 (Pa. Commw. Ct. 2013). The record does not contain any evidence that Ms. Barbounis concealed Mr. Thomas's alleged misappropriation of funds from MEF or remained silent once she suspected something was not right. Instead, the record demonstrates that Ms. Barbounis raised her suspicions shortly after the first Tommy Robinson event and recommended that MEF not distribute additional funds to Mr. Thomas or any other group assisting Tommy Robinson. Nor did Ms. Barbounis

prevent MEF from obtaining information about Mr. Thomas's use of the grant money. In fact, Mr. Thomas himself sent MEF an accounting and told MEF how he was using the money.

*Second*, MEF cannot maintain its misrepresentation claim based on Ms. Barbounis's statements about her travels. According to Mr. Pipes, if he had known that Ms. Barbounis was going to the United Kingdom to engage in political activity with Mr. Robinson, he would have terminated her employment with MEF. However, the undisputed evidence demonstrates that Mr. Pipes knew about Ms. Barbounis's involvement with Tommy Robinson's political efforts, and he did not terminate her employment once he became of aware of it.  Indeed, on at least one occasion, Ms. Barbounis told Mr. Pipes and Mr. Roman that she attended multiple Tommy Robinson rallies and volunteered her time on his campaign. (*See* ECF No. 111-4 at Ex. 121; ECF No. 111-5 at Ex. 130.)  Mr. Pipes did not terminate her employment when she made these disclosures. And, prior to Ms. Barbounis's trip to London in July 2019, Mr. Pipes knew that she planned to do work for Mr. Robinson while she was there, yet he still did not terminate her.  Instead, he said: "So, go if you wish but know I will be very upset with major consequences if your presence becomes known outside Tommy Robinson's own circles."  (ECF No. 111-5 at Ex. 132.)  MEF cannot now contend that Ms. Barbounis's political work in July 2019 or earlier was material or even that she concealed it from MEF. In fact, Mr. Pipes's failure to terminate Ms. Barbounis after learning of her political work for Mr. Robinson demonstrates that that knowledge was not material to MEF at any point.

17

*Third*, nothing in the record supports MEF's claim based on Ms. Barbounis's alleged efforts to persuade MEF to award grant money to other people or organizations or her efforts to earn a commission from another organization. Like MEF's claim about the alleged misappropriated funds, nothing in the record demonstrates that Ms. Barbounis made an affirmative representation to MEF regarding her efforts to raise money from and for other organizations for non-MEF purposes or for personal gain.

To the extent MEF is pursuing a claim for intentional concealment and/or fraud by omission, those claims also fail. Like intentional misrepresentation, both claims require that: 1) the concealed or omitted fact be material to the transaction; 2) the defendant concealed or omitted the fact with the intent of misleading the plaintiff into relying on it; 3) the defendant's reliance was justified; and 4) that reliance was the proximate cause of the defendant's injury. *See Bortz*, 729 A.2d at 560 (quotation omitted); *Gnagey*, 82 A.3d at 500-503. There is no evidence that Ms. Barbounis concealed or omitted her involvement with those fundraising pitches with the intent of misleading MEF into relying on it. Nor is there evidence that MEF awarded any grants based on Ms. Barbounis's actions. Nor is there evidence to suggest that MEF would have terminated Ms. Barbounis if it had known about her involvement in those efforts. The only evidence suggesting that MEF would have terminated Ms. Barbounis for any transgression is Mr. Pipes's declaration, and even that document does not suggest that this particular conduct would have led to her termination. (*See* ECF No. 111-1 at Ex. 1, ¶¶ 68-82.)

### D.   Civil Conspiracy

"A civil conspiracy claim merely serves to connect the actions of other defendants with the actionable tort of one defendant." *Haymond v. Haymond*, No. 99-cv-5048, 2001 WL 74630, at *2 (E.D. Pa. Jan. 29, 2001), *aff'd sub nom.*, *Lundy v. Hochberg*, 79 F. App'x 503 (3d Cir. 2003). Because it is "a means of establishing vicarious liability for the underlying tort[,]" this claim serves little purpose in this case, where Ms. Barbounis is the only alleged defendant. *Id.* In any event, absent an actionable underlying tort on which to base this claim, MEF cannot prevail on its claim for civil conspiracy. *See In re Orthopedic Bone Screw Prod. Liab. Litig.*, 193 F.3d 781, 789 (3d Cir. 1999) ("[T]he law uniformly requires that conspiracy claims be predicated upon an underlying tort that would be independently actionable against a single defendant."); *Nix v. Temple Univ. of Com. Sys. of Higher Educ.*, 596 A.2d 1132, 1137 (Pa. Super. Ct. 1991) ("Absent a civil cause of action for a particular act, there can be no cause of action for civil conspiracy.") (quotation omitted). Because Ms. Barbounis is entitled to summary judgment on MEF's claims for breach of the duty of loyalty and fraudulent misrepresentation, MEF's claim for civil conspiracy necessarily fails.

### IV.   CONCLUSION

MEF has presented a deluge of facts regarding Ms. Barbounis's dramatic personal life and how she spent her free time away from MEF, but none of those facts establishes that she breached a duty of loyalty to MEF or made fraudulent

19

misrepresentations to it. Thus, Ms. Barbounis is entitled to summary judgment on those claims. An appropriate Order follows.

**BY THE COURT:**

*/s/ Joshua D. Wolson*
JOSHUA D. WOLSON, J.

Date: June 8, 2021