**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| LISA BARBOUNIS<br><br>          Plaintiff,<br><br>     v.<br><br>MIDDLE EAST FORUM, et al.,<br><br>          Defendants. | Civil Action No. 2:19-cv-05030-JDW<br><br>**Brief in Support of Plaintiffs' <u>Daubert</u> Motion to Exclude Opinion Testimony of Dr. Barbara Ziv**<br><br>**Federal Rule of Evidence 702** |

## I.    INTRODUCTION

The purported expert conclusions of Defendants' expert, Dr. Barbara Ziv ("Dr. Ziv"), who has had her opinion thrown out in the past[1], reflects a critical misunderstanding of expert testimony in civil litigation.  Dr. Ziv's report is comprised of example after example of what an expert *is never permitted to do*.  Dr. Ziv may be an experienced psychiatrist, however, not all "opinions" held by an experts are "expert opinions."  Even a supremely qualified expert cannot waltz into the courtroom and render opinions unless those opinions are based upon some recognized scientific method and are reliable and relevant under the test set forth by the Supreme Court in <u>Daubert v. Merrell Dow Pharm.</u>, 509 U.S. 579 (1993).  Dr. Ziv is not qualified to testify as an expert in this case because her opinions are not based on scientific knowledge, but instead were garnered from a single discussion with Lisa Barbounis where Dr. Ziv broke every conceivable rule and concept applied to the rendering of expert testimony.  Dr. Ziv's conclusions are based on highly biased inferences, hypotheticals, conjecture and supposition; and sets an example as a cautionary guide of everything an expert should never do.

---

[1] <u>See</u> <u>Bistrian v. Levi</u>, 443 F. Supp. 3d 576 (E.D. Pa. 2019) ("A doctor cannot pass judgment on an examinee's truthfulness in the guise of an expert medical opinion, because it is the jury's function to decide credibility.").

**II     HISTORY OF ZR. ZIV'S EXPERT REPORT**

Dr. Barbara Ziv scheduled a zoom call to meet with Lisa Barbounis for a single session on August 31, 2020, purportedly to conduct a forensic examination of Lisa Barbounis in connection with the instant matter.  Due to technical difficulties, Lisa Barbounis logged into the Zoom meeting on August 31, 2020, at approximately 9:30 A.M., however, the scheduled start time was 9:00 A.M.  Apparently Lisa Barbounis had received more than one zoom invite and logged into the wrong meeting before she contacted counsel and the issue was corrected.  Still, Dr. Ziv requested the zoom meeting be rescheduled and a subsequent zoom call was agreed upon for September 22, 2020.  On September 22, 2021, Lisa Barbounis met with Dr. Barbara Ziv for approximately six (6) hours by zoom conferencing.  This was the only meeting between Lisa Barbounis and Dr. Ziv.  The entire session consisted of a conversation.  No tests or testing measures were administered.  No scientifically accepted evaluations were administered.  No validity testing was administered including testing to determine malingering.  Therefore, none of Dr. Ziv's conclusions were derived from scientifically objective measures, making it impossible to test Dr. Ziv's methodology.  This is critical because Dr. Barbara Ziv has admitted that she believed Lisa Barbounis to be a liar before Dr. Ziv even met Lisa Barbounis.  See deposition testimony of Dr. Barbara Ziv ("Tr Ziv") attached as Exhibit "A"

> A.    … "but she misrepresented herself even before I interviewed her when she said that she was on the Zoom call and she wasn't. I was on the Zoom call -- so, I mean, that's neither here nor there, but –
> Q.    Did that affect the evaluation?
> A.    Did it affect the evaluation, no, but it's a data point, right?
>
> P 24: L8-18.
>
> …
>
> Q.    Is it possible she clicked on the wrong link or that she thought she was on and she wasn't?

> A.   No, not that she would have been in my -- in my -- in my
>        Zoom, no.
> Q.   So you decided that she lied to you.
> A.   I decided that she misrepresented herself, yes, under those
>        circumstances she misrepresented herself.
> Q.   Excuse me. What's the difference between misrepresented
>        herself and lied?
> A.   I don't know.
> Q.   Is there a difference –
> A.   You know, lie has -- lie has a – you know, has this pejorative
>        connotation, but she did not tell the truth.

Id. P25:L5-19

With "data points" established before they even met, Dr. Barbara Ziv conducted the entire

evaluation of Lisa Barbounis' under this unprofessional cloud of suspicion that Lisa Barbounis

was not credible.

## III.   LEGAL ARGUMENT

### A.   Legal Standard

The admission of expert testimony is governed by Federal Rule of Evidence 702,

explained and refined by the United States Supreme Court in Daubert v. Merrell Dow Pharm.,

509 U.S. 579 (1993) and its progeny. FRE 702 and Daubert articulate the trial court's mandatory

gatekeeping role focused on the facts, reasoning and methodology used by a witness to ensure

that speculative, unreliable expert testimony does not reach the jury. Daubert, 509 U.S. at 597;

General Elec. Co. v. Joiner, 522 U.S. 136, 146 (1997).

FRE 702 provides that a witness qualified as an expert by knowledge, skill, experience,

training, or education may testify in the form of an opinion or otherwise if:

> (a) the expert's scientific, technical, or other specialized knowledge will help the
> trier of fact to understand the evidence or to determine a fact in issue; (b) the
> testimony is based on sufficient fats or data; (c) the testimony is the product of
> reliable principles and methods; and (d) the expert has reliably applied the
> principles and methods to the facts of the case.

Fed. R. Evid. 702.

To fulfill its obligation under Daubert, a trial court must ensure that expert testimony satisfies a "trilogy of restrictions": qualification, reliability and fit. Id. The overriding consideration with regard to these three requirements is that expert testimony should be admitted if it will assist the trier of fact. See United States v. Valasquez, 64 F.3d 844, 850 (3d Cr. 1995). The party offering the expert must prove each of these requirements by a preponderance of the evidence. In re TMI Litig., 193 F.3d 613, 663 (3d Cir. 1999).

In Walker v. Gordon, 46 F. App'x. 691 (3d Cir.2002), the Third Circuit Court of Appeals set forth the role of this Court in performing its gatekeeping function, and, in particular, in deciding whether an expert's report meets the reliability factor of the Daubert and Rule 702 analysis. 46 F. App'x. 691, 695. The Court advised that the trial court is not to weigh the evidence relied upon or determine whether it agrees with the conclusions reached therein, rather, the district court's role "is simply to evaluate whether the methodology utilized by the expert is reliable, i.e., whether, when correctly employed, that methodology leads to testimony helpful to the trier in fact." Id. (citing Daubert, 509 U.S. at 591–93 (noting that the testimony must "assist the trier of fact to understand the evidence or to determine a fact in issue" and that the trial court's determination "entails a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue")). This is because FRE 702 and Daubert **prohibit expert opinions based on "subjective belief or unsupported conjecture."** In re Paoli R.R. Yard PCB Litig., 35 F.3d 717, 742 (3d Cir. 1994) (quoting Daubert, 509 U.S. at 590).

While the trial court exercises "broad latitude" in determining how to assess the reliability of an expert opinion, see Kumho Tire Co. v. Carmichael, 526 U.S. 137, 141-42 (1999),

assessing the admissibility of proposed opinion testimony using the principles articulated in FRE 702 and Daubert is crucial because so-called "expert" testimony "can be both powerful and quite misleading." Daubert, 509 U.S. at 595. Although the trial court's threshold inquiry is "flexible," the touchstone established by Daubert is the employment of the scientific method. 509 U.S. at 590.

The starting point for the challenge to expert testimony begins with the burden of proof. The procedural linchpin is Rule 104(a) of the Federal Rules of Evidence, which allows a court to determine "preliminary questions concerning the qualifications of a person to be a witness." Fed. R. Evid. 104(a). Although a Daubert challenge is made by the party challenging the expert's admissibility, the moving party does not bear the burden of proof: the party offering expert testimony bears the burden to establish the admissibility of this testimony by a preponderance of the evidence. See Daubert, 509 U.S. at 592 n. 10; Bourjaily v. United States, 483 U.S. 171 (1987); In re Paoli R.R. Yard PCB Litig., 35 F.3d at 744 & n. 11.

The testimony of Defendants' expert, Dr. Goldstein, does not meet the Daubert standard because it is so fundamentally unsupported that it can offer no assistance to the jury and therefore must be excluded. Elcock v. Kmart Corp., 233 F.3d 734, 755 (3d Cir. 2000) (noting that an opinion overly reliant on assumptions absent "sufficient factual predicates" is a "castle made of sand"); General Electric Co. v. Joiner, 522 U.S. 136, 146 (1997) (excluding expert testimony where there was "simply too great an analytical gap between the data and the opinion proffered"); In re Paoli R.R. Yard PCB Litig., 35 F3d at 765  (excluding expert testimony where the expert "place[d] heavy reliance on unreliable . . . data").

ii.      **Rebuttal Witness Standard**

Federal Rule of Civil Procedure 26(a)(2) provides that a party must disclose to the other parties the identity of any witness it may use at trial. Fed. R. Civ. P. 26(a)(2)(A). A party who intends to offer expert testimony is required to disclose a written report for each expert witness, which includes a "complete statement of all opinions the witness will express and the basis and reasons for them." Fed. R. Civ. P. 26(a)(2)(B)(i). A party is required to make these disclosures at the time and in the sequence that the court orders. Fed. R. Civ. P. 26(a)(2)(D).

If the court's scheduling order allows for rebuttal reports, a party may submit expert rebuttal testimony if the evidence is "intended solely to contradict or rebut" other expert testimony. Fed. R. Civ. P. 26(a)(2)(D)(ii). At trial, rebuttal evidence is limited "to that which is precisely directed to rebutting new matter or new theories presented by the [opposing party's] case in chief." Step-Saver Data Sys., Inc. v. Wyse Tech., 752 F. Supp. 181, 193 (E.D. Pa. 1990), aff'd in relevant part and rev'd in part on other grounds, 939 F.2d 91 (3d Cir. 1991); see also In re Asbestos Prod. Liab. Litig. v. Fiberboard Corp., Nos. 09-74351x, 09-74410, 2012 WL 661673, at *3 (E.D. Pa. Feb. 8, 2012) (striking rebuttal report for "presenting few, if any, refuting arguments made by the opposing party").  Rebuttal evidence is only admissible when it will "explain, repel, counteract or disprove the evidence of the adverse party." United States v. Chrzanowski, 502 F.2d 573, 576 (3d Cir. 1974). It is not "an opportunity for the correction of any oversights in the plaintiff's case in chief." Step-Saver Data Sys., 752 F. Supp. at 193.

While rebuttal and reply reports may cite new evidence and data so long as the new evidence and data is offered to directly contradict or rebut the opposing party's expert, expert reports that simply address the same general subject matter as a previously submitted report, do not qualify as proper rebuttal. Withrow v. Spears, No. 12-06, 2013 WL 4510305, at *12 (D. Del.

6

Aug. 22, 2013); see also Blake v. Securitas Sec. Servs., 292 F.R.D. 15, 18 (D.D.C. 2013)

("Where a party attempts to designate as a 'rebuttal' expert someone whose proposed testimony

goes beyond the scope of appropriate rebuttal, that witness may be viewed as an initial expert

who was not timely designated and whose testimony may be struck by the Court for violating

Rule 26(a) and the Court's governing scheduling order."); In re Trasylol Products Liability

Litig., 2010 WL 4065436, at *2 (S.D. Fla. Aug. 6, 2010) ("Rebuttal testimony should not be

allowed if it logically belongs in the party's case in chief and goes to the central issue of

causation."); Tuscumbia City School System v. Pharmacia Corporation, 2014 WL 12605648, at

*1 (N.D. Ala. Sept. 3, 2014) ("rebuttal" testimony should be excluded where expert testifies to a

central issue in the case that belongs in the party's case-in-chief).

Under Rule 37(c)(1), exclusion is both "automatic and mandatory" when the disclosed

testimony is inadequate unless the proponent of the expert witness can establish that its violation

of Rule 26 was either justified or harmless. Fed. R. Civ. P. 37(c)(1); see also Wright, Miller and

Marcus, Federal Practice and Procedure: Civil 2d §2031.1 (Rule 37(c)(1) provides for automatic

exclusion of information that should have been revealed but was not).

**B.      Under Rule 702 and Daubert, Dr. Ziv should not be permitted to testify because she omitted significant facts, argues the merits of Defendants' case, and employed questionable methods in reaching her conclusions.**

Dr. Ziv should be barred from testifying because her opinions are not the result of

scientific methodology; rather, she reached some of her conclusions, particularly with regard to

credibility, before ever examining Plaintiff or reviewing any records in this matter.  An expert

who "starts her analysis with a conclusion that needs to be established"—rather than an expert

who starts with research or testing and then ends with a conclusion—does not utilize

methodology that can pass muster under Daubert. See Ind. Ins. Co. v. Valmont Elec., Inc., 2001

WL 1823587, 2001 U.S. Dist. LEXIS 23256, *24-25 (S.D. Ind. Dec. 27, 2001).  As the Seventh
Circuit has explained, an expert may not "start[] her analysis based upon the assumption that the
product failed (the very question that he was called upon to resolve)." Clark v. Takata Corp., 192
F.3d 750, 757 (7th Cir. 1999).

Consequently, courts across the country have refused to admit testimony when the expert
"reasoned from an end result in order to hypothesize what needed to be known but was not"
instead of "reasoning from known facts to reach a conclusion." Mitchell v. Gencorp Inc., 165
F.3d 778, 783 (10th Cir. 1999) (quoting Sorensen by and through Dunbar v. Shaklee Corp., 31
F.3d 638, 649 (8th Cir. 1994)); see also Marsh v. W.R. Grace & Co., 80 F. App'x 883, 886 (4th
Cir. 2003); Ill. Cent. R.R. v. Dupont, No. 00-500-D-M2, 2006 WL 6855107, 2006 U.S. Dist.
LEXIS 100793, at *9 (M.D. La. June 30, 2006); In re Meridia Prods. Liab. Litig., 328 F.Supp.2d
791, 805 (N.D. Ohio 2004), aff'd 447 F.3d 861 (6th Cir. 2006); Agee v. Purdue Pharms., Inc.,
No. CIV-03-0787-HE, 2004 WL 5352989, 2004 U.S. Dist. LEXIS 30551, at *11-13 (W.D. Okla.
Nov. 22, 2004); Lake Michigan Contractors, Inc. v. Manitowoc Co., Inc., 225 F.Supp.2d 791,
803 (W.D. Mich. 2002).

Defendants retained Dr. Ziv for the purpose of rebutting and contradicting the evidence
offered on behalf of Plaintiff.  Her objective was to find a way to contradict Plaintiffs' expert.
Dr. Ziv cannot even claim she performed an independent forensic evaluation in this matter as Dr.
Ziv has bent backwards to rebut the evidence in this case or view the evidence in a matter that is
detrimental to Plaintiff's case.  Dr. Ziv does this through highly inappropriate credibility
determinations.  Dr. Ziv even explains that she does not agree with the concept that an expert is
not permitted to decide issues related to credibility.

> "Well, part of -- I mean, if you're going to make a determination whether
> something causes something, you have to make a determination to the best of

your ability whether something actually happened, so I did assess her -- her -- I didn't – I assessed her analysis of events at the Middle East Forum."

Q.      Did you find Lisa to be credible?
A.      No.


Id. P23:L6-14.

Dr. Ziv continued to testify that Lisa Barbounis was specifically not to be trusted in areas

surrounding Lisa Barbounis' claims in this case.

I don't think that she was credible about -- about the emotional symptoms that she attributed to her interaction with Gregg Roman, and I don't think that she was credible in terms of her discussion of -- of all of her background. I think that she -- I think that she kept salient information about things that she was involved in out. And I think that she was not credible about interpreting -- about feeling afraid of Gregg Roman or feeling sexually harassed by Gregg Roman. I think that's a -- something that she developed --

Id. P30:L9-19.

Dr. Ziv then testified that the origin of Dr. Ziv's opinions about Lisa Barbounis' credibility were

born from the missed zoom call on August 31, 2020.  This actually places Dr. Ziv's credibility at

issue as Dr. Ziv testified previously that the zoom call did not effect Dr. Ziv's evaluation.  See

supra ("Did it affect the evaluation, no, but it's a data point, right?") P 24: L8-18.  Contra,

A. -- kept salient information out, that

she said that she didn't -- you know, that she had been faithful to her husband. That's not true.

She said other things about drug use that were not -- which were not true. She said things like "I

never lie," which is not true. So –

Q.      How do you know that's not true?
A.      -- no, it's not just about that, no,  it's not just about that. So, again, please do not misrepresent what I said.
Q.      I don't think I misrepresented at all, but what -- how do you know that she lies?
A.      What do you mean how do I know that she lies --
Q.      You said that she said "I never lie" and that's not true, so you're saying she's a liar.  So how do you know that she's a liar?

    A.    Because -- we've just gone through that, right? I --
    Q.    Oh, because of the Zoom call.
    A.    First of all -- first of all, first of all, when you call somebody a liar, nobody is either all or nothing, nobody lies about everything that comes out of their mouth, and -- so -- we've established that she lied, she lied before I even met her when she said that she was on this call, on this Zoom call, which she was not on, so then and there…

Id. P31:L9 – P32:L10.

When pressed, Dr. Ziv failed to support her conclusions about Lisa Barbounis' credibility with objective, measurable scientific methodology.  Instead, Dr. Ziv offered subjective observations that in no way led to the conclusions offered.  For example, Dr. Ziv testified that Lisa Barbounis and her husband were never separated and certainly not separated at the time of the evaluation.  Dr. Ziv did not base these conclusions on information provided by Lisa Barbounis and recorded in Dr. Ziv's report.  Instead, Dr. Ziv pointed at that Lisa Barbounis happened to be visiting her children on the date of the zoom call, and "was in the house with him during my interview."  See Tr Ziv,

    A.    She was not separated at the time that I interviewed her. She was distraught about the fact that he was -- was or had been having an affair with his -- the assistant in his office. They weren't separated. And she said that she was trying to work on her relationship with her husband.
    Q.    My question was, are you familiar with whether or not her and her husband ever separated?
    A.    I don't know what you -- formally, legally separated? They have had -- she's lived in -- you know, she's had an apartment in Washington. I mean, I don't know what you mean by that.
    Q.    They don't live together, right? She lives in Washington, he lives in Philadelphia.
    A.    No, she was living in Philadelphia, she had a place -- the way she represented it was that she had -- they were not formally separated and that she had a place in Washington for her job, as many people do who work remotely, and -- but that she was working on her marriage with her husband, that they were not separated.
    Q.    Is it possible to work on your marriage and be separated at the same time?
    A.    They weren't separated. I'm telling you that -- she told me they were not separated, so I don't --
    Q.    Where is that in your report, that she told you that? Can you point to that line --
    A.    The negative?

> Q.   Yeah, show me in your report where you wrote that my client told you they were not separated.
> A.   She was in the house with him during my interview.

Id. P33:L12 – P34:L22.

Dr. Ziv's improperly arrived at conclusions were in fact incorrect as Lisa Barbounis and her husband did not live together at the time of the evaluation.  Lisa lived and worked in Virginia and Washington D.C., respectively and her husband lived and worked in Philadelphia.  Lisa Barbounis visited her children on the weekends.  Dr. Ziv admitted that Lisa Barbounis spoke about divorce during the evaluation (Tr. Ziv P36:L23) but refused to consider a separation despite the fact that Ms. and Mr. Barbounis did not even live together at the time.  Dr. Ziv reached these conclusions to support another improper conclusion that Ms. Barbounis was engaged in "extramarital affairs."

> Q.   Right. So you don't know if that makes -- that would be a lie, right?
> A.   No, that's not true. Asking -- I didn't say how many men have you had sex with. I asked about extramarital relationships, and that would constitute an extramarital relationship. She also mentions --
> Q.   If a guy sent her a text message of a sexual nature, that constitutes --
> A.   No, no, no, no. No. No. She was communicating with him in a romantic or -- way, yes --
> Q.   How do you know that? A. -- that's -- because that's what she told her therapist.
> Q.   Read me what she told her therapist that you're basing that on.
> A.   "Ms. Barbounis described going through highs and lows." "Reported she used 'stratagems to manipulate the situation with ex Ryan' but did not message ex-wife because she 'didn't want Ryan to have real reason to hate her.'" "Wanted Ryan to validate her and described a 'pattern in her past romantic relationship'" –

Id. P40:L1-25.

Dr. Ziv continued to explain that because an individual named Kyle sent Lisa Barbounis text messages of a sexual nature, that constituted an "extra marital" affair that Lisa Barbounis attempted to hide from Dr. Ziv.  Dr. Ziv did not consider that there was no evidence that the text

messages were welcome, and in fact they were unwelcome.  Dr. Ziv reached another of her

improper conclusions without the application of any testable or verifiable scientific

methodology.

> Q.    What? I didn't hear anything that demonstrated an extramarital
> relationship. What line precisely demonstrates this extramarital
> relationship with Kyle?
>
> A.    Precisely? Well, first of all, I mean -- hang on. Let me see if I can find the
> name Kyle. Okay. "Shared she's talking to a man Kyle, however, he started
> sending sexual texts." This is obviously not a work relationship they're
> talking about and it's in the context of talking about her relationship with
> Ryan. So it doesn't take a Freud to understand that in this context that
> they're -- she's talking about Kyle in the -- as a -- somebody that she might
> date.

> Id. P42:L1-15.

Dr. Ziv's testimony confirms that her conclusions are not based on science but supposition.  Lisa

Barbounis did not discuss any of these issues with Dr. Ziv.  Dr. Ziv is pulling experts from a

medical record and drawing false conclusions from the information.  Dr. Ziv is actually investing

an entire storyline that never occurred.  It would be impossible for Plaintiff to respond to expert

testimony of this nature.  Dr. Ziv cannot be permitted to make up her own false narrative and

present it to a jury.   In the next bit of testimony offered by Dr. Ziv, Defendants' expert does not

even attempt to hide that she is just making it up as she goes.  Plaintiff's counsel asks Dr. Ziv

whether there are any additional examples where Plaintiff was not credible.  Dr. Ziv cannot

identify any, but testifies nonetheless, "I'm sure there are…"  Id. P44:L22-23.

Dr. Ziv continues her departure from the scientific method by reaching conclusions about

information reported by Lisa Barbounis that require interpretation of individuals with whom Dr.

Ziv had no contact.

> Q.    What were the ones that were not accurate?
>
> A.    I think that she -- and I point this out in my report if you read it, that she
> alternates between -- I think that she has at times an idealized view of

herself, I think that she talked about sort of the glory that she received when she was a student at Penn and then at various times, you know, when she went to Europe that I think represent probably an exaggeration of the way that she is viewed.

Q.    Wasn't she talking about the way she felt during those periods of time?

A.    No, no, she was talking about her perception of the way that she was viewed.

Q.    So how about her -- so you're saying her perception was wrong?

A.    I'm saying that her perception -- wrong or right, her perception does not accurately reflect  what people likely thought.

Id. P60:L10 – P61:L1.

…

Q.    You made a determination of how my client presented to others when she was in college?

A.    I made a determination about how she presented now, and the way that she presented in college there is no reason to believe that she presented much differently, so yes.

Id. P62:L13 - L18.

Dr. Ziv expanded upon her non-scientific conclusions and applied the same bias, credibility determinations to the people she works with presently in the United States Congress. Accordingly, Dr. Ziv concluded that people in college did not see Lisa Barbounis in a positive light, and people in Lisa Barbounis' professional life also do not see Lisa Barbounis in a positive light.

Q.    So you don't believe that the way she described her current position at her job today i accurate?

A.    I don't think it's -- I don't think it is completely accurate, no.

Q.    So if everyone that she works with told you it is accurate, would that change your assessment?

A.    That it is -- that it is as she describes, that she's --

Q.    Yeah.

A.    -- the best thing since sliced bread?

Q.    She said best thing since sliced bread?  Can you show me that part of her --

A.      I'm paraphrasing.

Id. P65:19 – 66:8

Dr. Ziv continued to "paraphrase" Lisa Barbounis in order to reach her improper

conclusions.   Dr. Ziv even applies this to Lisa Barbounis' so-called view of Defendant, Greg

Roman.  Dr. Ziv claims that she is able to conclude that Greg Roman did not engage in sexually

harassing conduct or comments because sexual harassment would be out of character with Lisa

Barbounis' description of Defendant, Greg Roman.  The leaps and mental gymnastics required to

reach this conclusion are so inappropriate as to render Dr. Ziv's entire report untrustworthy.

A.      I don't have a conclus- -- a conclusion about Gregg Roman. I'm just -- to
        the extent that I talked about Gregg Roman, I talked about her view of
        Gregg Roman and her description of him, and I pointed out that she
        described him as a forthright, demanding person who was forthright in all
        circumstances except when she's making assumptions about his
        motivations in terms of wanting to have a sexual relationship with her, and
        I'm -- point out the fact that she didn't describe him in any other -- in any
        other situation as being nuanced or not direct, she described him as being
        very direct, and the only time that she describes him as being indirect or
        making inferences about what he wants is in respect to this evening in
        Israel.
Q.      So what does that mean to you?
A.      It means that she's described very contradictory things. You know, either
        he's this forceful directive huge guy who uses his size and his direct nature
        to get what he wants, in which case you would expect him to behave in a
        way -- I mean, for her to say that she feels threatened by him and is
        making inferences about him wanting to have sex with her when he -- she
        also is describing him as going out trying to have sex and talking in a very
        forthright way about sexual matters is inconsistent.
Q.      Why is that inconsistent?
A.      What do you mean why -- because it is.
Q.      Explain to me why. This is your expert opinion?
A.      Because somebody who goes out of their way and says I want to have sex
        and I'm going out to meet one person and then another person to have sex
        and don't I deserve this and has no inhibition about talking about what his
        sexual needs are and there is absolutely no reason to believe that if he
        wanted to have sex with Lisa Barbounis he would not say to her "I want to
        have sex with you" in some more direct way, and there is nothing by word
        or deed, there is no action and there is no comment, that he -- any
        suggestion that she engage in sexual behavior with him.

Id. P76 – 77.

Dr. Ziv continued to clarify the reasons for reaching her opinions presented in

Defendants' expert report by arguing that when Defendant, Greg Roman is screaming at Lisa

Barbounis about needing a blowjob and deserving a release, it was not sexual harassment.  Dr.

Ziv also explains that it was not sexual harassment when Defendant, Greg Roman shoved his

foot into Lisa Barbounis' butthole.

A.  There is no comment or deed. He doesn't say, "Can you give me a blow job" or, "What about us" or, "Come here" or touch her, there is nothing in his -- she doesn't describe anything that can be interpreted as him wanting to have sex with her.

Q.  Is that your expert opinion? You're deciding --

A.  All of my opinions that I am expressing are my expert opinions, yes.

…

Q.  And your testimony is that -- what, that -- what -- that you don't believe Gregg Roman sexually harassed my client?

A.  She does not describe any sexually harassing behaviors. As I say in my report, you know, whether the discussion about his sexual desires related to somebody else are appropriate or not is not what I'm addressing. She talked about the fact that she mentioned things that were inappropriate such as blow jobs in a work-related situation. So that's not what I'm addressing. I'm addressing the plausibility of her feeling that she -- that he wanted to have sex with her. That's not what she describes. She didn't describe it then during the course of the evening and she didn't describe his behavior as being anything that she had to guess at. So it's inconsistent. So I'm talking about her perspective of her interactions with Gregg Roman.

…

A.  -- that -- no, she actually didn't say that she thought he was -- she thought -- she said he was talking about don't I deserve this, don't I deserve a blow job, don't I deserve a hot wife, don't I deserve -- she never said that he said anything to her to suggest that he was talking about her. So, no, I mean, she didn't say "and he was coming on to me."

…

Q.  Is it appropriate for a supervisor to put his foot on his employee's ass?

A.  She didn't describe it as that. She described it as him putting his foot underneath her butt. And is that appropriate? No.

Q.  Right.

A.  But --

Q.  It's sexual harassment, right?

A.      -- again -- the boundaries -- the boundaries between Lisa Barbounis and Gregg Roman went both ways, the boundary problems.

Q.      What are you talking about? How did they go both ways?

A.      She talks about having oral sex, she talks about a blow job in front of Gregg Roman and his -- you know, and other people who are at the AIPAC conference.

Q.      Is it your testimony that because my client made a comment about oral sex in Washington DC that she caused herself to be subjected to inappropriate conduct by Gregg Roman?

A.      It's my testimony that -- as I wrote at great length in my report, that there were boundary problems that she participated in, and do I think that -- and so do I think that her behavior was great? No. Do I think that his behavior was, you know, perfect? No. Do I think that it rises to the level of sexual harassment? No, I don't. And I don't --

Q.      You don't think it's sexually harassing to cause your body to come into physical contact with another person's body without it being welcome.

A.      I don't understand the question.

Q.      Sure. I'll be more direct. You think it's not sexual harassment when a supervisor puts his foot up an employee's ass?

A.      I don't think that that's what happened. I don't think he -- I don't think he put

A.      No, what -- no, that's not what she told me. She told me that she was sitting down and he was sitting next to her and he slid his foot and it -- and his foot went underneath her butt as they  were sitting down and she says, you know, back off, and he did. So do I think that's appropriate? No.  But do I think that that constitutes sexual harassment? Not really.

Q.      No? That doesn't constitute sexual harassment.

A.      No, I don't think that it constitutes sexual harassment.

…

A.      -- why do you think that that's a sexual touch. Putting your foot underneath somebody's butt, kids do that to parents all the time to get warm. Of all the sexual interactions, sliding your feet when you're laying down on a couch underneath somebody's bottom is not generally considered to be a sexual overture. That is -- that would be very rare for it to be a sexual overture.


Id. P78 – 86.


Dr. Ziv's departure from an expert witness retained on the issue of Plaintiff's emotional distress

damages is legally significant.  Dr. Ziv is explaining that her conclusions are based on a

subjective, non-scientific, untestable, conclusion that Lisa Barbounis' allegations about

Defendant, Greg Roman's behavior is "not plausible."  Plaintiff has no idea why Dr. Ziv feels

entitled to offer testimony about the plausibility of Lisa Barbounis' case, but this is not evidence

that a jury can consider without dramatically impacting and prejudicing Plaintiff's case.   Dr. Ziv

continues along with line of reasoning.

> A.    That's not how she described him, so it's not possible that under every
>        other circumstance he would be this directed person with her and that's
>        how she would experience him and yet in this one area that he would be
>        different, no, that's not possible.
> Q.    What one area?
> A.    With making a sexual overture to her.
> Q.    Have you ever reviewed all the allegations of sexual misconduct that
>        women have attributed to Gregg Roman?
> A.    No.

Id. P92:12-20.

Dr. Ziv continues to opine about the reasons why allegations by various women involving

Defendant, Greg Roman man be consistent, while refusing to concede that the consistency might

be caused by credibility of the women presenting claims.

> Again, you know, you can't -- you can't say that. I mean, I interviewed every
> person who has been evaluated -- or the vast majority of people who have made
> allegations against Jerry Sandusky, and I can tell you that while many of them
> were credible, especially the early ones, there are plenty of people who read
> things about it who come in and say the things that they've read, so if other people
> had read allegations against Gregg Roman and then came in with an allegation of
> their own, doesn't necessarily mean that they're credible. Id. P92.

There are no limits to Dr. Ziv's arguments against Lisa Barbounis' case.  Dr. Ziv testified that

none of Lisa Barbounis' allegations are credible including the allegations that Lisa Barbounis

was scared and slept with a knife under her pillow.  In qualifying these far from expert opinions,

Dr. Ziv explains what Lisa Barbounis did wrong.  Dr. Ziv lists the things that Lisa Barbounis

would have done had Lisa Barbounis truly been scared by Defendant, Greg Roman's sexually

harassing conduct and comments.

Q.      You think she lied to you that she was scared.

A.      I don't think that she was scared that he was going to sexually assault her, no.

Q.      Well, what do you think she was scared about?

A.      I don't know that she was scared.

Q.      Why --

A.      She's got a lawsuit.

Q.      Tell me the --

A.      So --

Q.       -- facts that she demonstrated to you that showed that she wasn't really scared.

A.      She didn't leave, she didn't go to a hotel room. He leaves her there twice. Right? He goes out one time, he comes back drunk, then he goes out again. When he goes out again, if she was, quote, legit scared, she could have gotten herself  cab to a hotel room, she could have -- you know, she didn't act in any way to demonstrate that she was, quote, legit scared.

Q.      He's telling her that it's a dangerous city and she can't walk around alone and she's in another country that she's never been to and your testimony is she's not scared because she didn't leave the Airbnb by herself and just walk around a strange country?

A.      I didn't say walk around, did I? I don't believe I said walk around, did I? I said she could have gotten a cab --

Q.      Drive around. Sorry --

A.      -- to a hotel.

Id. P100 – 101.

Dr. Ziv also testified that Dr. Ziv did not believe that Lisa Barbounis actually slept with a knife under her pillow.   Even if Lisa Barbounis did sleep with a knife under her pillow, Dr. Ziv explains that this does in any way demonstrate that Lisa Barbounis was actually scared, because people use knives every day.  The absurdity of Dr. Ziv's arguments to avoid saying anything that would support Lisa Barbounis' claims indicates Dr. Ziv's total departure from science and legally accepted principles to support opinion testimony.

Q.      But it does demonstrate that she's really scared, right?

A.      No.

Q.      It doesn't? People get knives when they're just feeling normal every day?

A.      People get knives or they text people that they're getting knives when they want attention, and she has demonstrated over and over and over again her need for attention from her husband. She talked

> at length about that. She talked at length about feeling so
> disappointed when she told her husband about her sexual
> relationship with Danny Thomas and he didn't respond in the same
> -- way that she wanted –
>
> Id. P105.

Dr. Ziv slipped up by admitting that you do not have to be a scientist to reach the conclusions

offered by Dr. Ziv.  This is because Dr. Ziv's conclusions required no methodology, no clinical

analysis, and no expertise.

> A.   Yeah, you don't have to be -- you don't have to be a rocket scientist to
>      know that when you go to a conference there are other people in the -- at a
>      conference, and if you are meeting with other people in a conference and
>      you are afraid, that, you know, you would have the ability to reach out to
>      somebody who was there.
> Q.   Are you sure they went to a conference?
> A.   Whatever work kind of meetings there are.
> Q.   It wasn't a conference, though, was it?
> A.   I don't know what the -- what the title of the work experience was.
>
> Id. P108:1-8.

It did not matter to Dr. Ziv that Lisa Barbounis and Defendant, Greg Roman did not attend a

conference during the Israel trip.  Dr. Ziv's conclusions requires no accuracy in thought or

outcome.  Dr. Ziv's report is not based on science or an arguable scientific methodology that can

be analyzed and explained.  Dr. Ziv's conclusions are based entirely on Lisa Barbounis' lack of

credibility.

## IV.   CONCLUSION

Based on the above arguments Plaintiff suggests that Defendants' expert report, prepared

by Dr. Barbara Ziv, related to the extent of Plaintiff's emotional distress must be deemed

inadmissible.  Dr. Ziv's report does not pass the standards promulgated in Daubert v. Merrell

Dow Pharm., 509 U.S. 579 (1993).

**DEREK SMITH LAW GROUP, PLLC**

BY:_____/s Seth D. Carson_____

Seth D. Carson, Esq.
Attorney ID. No. 319886
1845 Walnut Street, Suite 1601
Philadelphia, PA 19103
(215) 391-4790
seth@dereksmithlaw.com
*Attorney for Plaintiff*

DATED: October 1, 2021

## <u>CERTIFICATE OF SERVICE</u>

I, Seth D. Carson, hereby certify that on this date the foregoing Motion in Limine has

been electronically filed with the Court and is available for viewing and downloading from the

ECF System and thereby have been served upon the following counsel of record, electronically:

TO:     Jon Cavalier
Cozen O'Connor
1650 Market Street, Suite 2800
Philadelphia, PA 19103
P: 215-665-2000
F: 215-665-2013
dwalton@cozen.com
lbenson@cozen.com

Sidney L. Gold sgold@discrimlaw.
Sidney L. Gold & Associates P.C.
1835 Market Street, Suite 515
Philadelphia, PA 19103
Tel: (215) 569-1999
Fax: (215) 569-3870
Counsel for The Middle East Forum

**DEREK SMITH LAW GROUP, PLLC**

BY:_____**/s/ Seth D. Carson**_____
Seth D. Carson, Esq.
Attorney ID. No. 319886
1845 Walnut Street, Suite 1601
Philadelphia, PA 19103
(215) 391-4790
seth@dereksmithlaw.com
*Attorney for Plaintiff*

DATED: October 1, 2021