Barry Zakireh, Ph.D.
Clinical & Forensic Psychologist
2101 Pine Street
Philadelphia, PA 19107
267-496-9588
Email: drzakireh@forensicpsychdr.com
Website: www.forensicpsychdr.com

THIS INFORMATION HAS BEEN DISCLOSED TO YOU FROM RECORDS WHOSE CONFIDENTIALITY IS PROTECTED BY FEDERAL LAW.  FEDERAL REGULATIONS PROHIBIT YOU FROM MAKING ANY FURTHER DISCLOSURES OF IT WITHOUT THE CONSENT OF THE PERSON TO WHOM IT PERTAINS, OR AS OTHERWISE PERMITTED BY SUCH REGULATIONS.  A GENERAL AUTHORIZATION FOR THE RELEASE OF MATERIAL OR OTHER INFORMATION IS NOT SUFFICIENT FOR THIS PURPOSE [42 CFR S2.32 (A)].

CONFIDENTIAL: FOR PROFESSIONAL USE ONLY

# Forensic Psychological Evaluation

**Name:** Lisa Barbounis
**Date of Birth:** 10/07/1981
**Age at Evaluation:** 38-Years
**Date of Report:** 10/30/2020

### Reason for Referral

Ms. Barbounis was referred by her attorney (Seth Carson, Esq.) at the Derek Smith Law Group for a psychological evaluation to assess the extent, if any, to which she has been psychologically impaired by alleged discrimination and retaliation by her employer in violation of her civil rights when she was employed at the Middle East Forum ("Defendants") in Philadelphia, PA from October 2017 to October 2019.  On October 27, 2019, a complaint was filed at the United States District Court, Eastern District of Pennsylvania, with Ms. Barbounis as the Plaintiff in the case against the specified employer, including several individual defendants.

### Process & Scope of Evaluation

This evaluation report is based on a clinical, diagnostic, and forensic assessment of Ms. Barbounis, review of available collateral and medical/psychiatric records, a comprehensive interview focusing on biopsychosocial history, and administration of relevant psychological measures.  It must be noted that this assessment is not intended to address the veracity of the allegations made in the complaint in whole or in part, which lies beyond the scope of the evaluation.  The evaluation involves a psychological or clinical assessment of the client in terms of current functioning, history, and present or past symptoms.  Work-related events are considered as potential causes, contributory or complicating factors to the extent that they were perceived or experienced in a coherent or reasonable manner by the individual, independent of the specific factual details of alleged incidents that are relevant in a juridical context.

Informed Consent

At the outset of the meeting, it was explained to Ms. Barbounis that the evaluation focused on investigating her mental status, socio-emotional history and current functioning, the impact of the alleged work incidents, and any other relevant data.  She was informed of the limits of confidentiality in the present forensic context relative to standard clinical psychologist/patient privileges.  It was explained to Ms. Barbounis that anything she discussed with the examiner can be referenced in a written report or relayed and to her attorney or released as permitted by law.  Ms. Barbounis indicated that she understood the limits of confidentiality, the context of the evaluation, and fully consented to participate in the evaluation.

Records Reviewed & Measures Administered

1. Clinical/forensic interview with Ms. Lisa Barbounis, via Zoom (09/02/29)
2. Civil Action Complaint (Case 2:19-cv-05030-JDW), Derek Smith Law Group (Seth Carson, Esq.), Lisa Barbounis (Plaintiff) v. The Middle East Forum (Defendant) (10/27/19)
3. Psychiatric and Case Management Records and Progress Notes, Mindoula Health (Visits spanning 01/28/20 to 08/25/20)
4. Psychiatric Consultation Records and Progress Notes, Mindoula Health (Visits spanning 11/20/19 to 09/11/20)
5. Medical Records & Laboratory Results, Main Line Health (02/21/18 to 03/09/20)
6. Beck Depression Inventory-Second Edition (BDI-II; Current Evaluation)

Case Information & Summary of Complaint Allegations

The following is a summary of the events leading to the present claim according to Civil Action Complaint and Ms. Barbounis' self-report during this evaluation.  Ms. Barbounis began her employment for Defendant, The Middle East Forum ("MEF") sometime around October 16, 2017.  She was hired as an Executive Liaison and began her employment at MEF working with supervisors, Defendants DP, GR, and MB, all males.  At all times relevant to this civil action, Defendant GR was the direct supervisor to Ms. Barbounis, and portrayed as the principle individual in the discrimination and harassment to which Ms. Barbounis was subjected including the sexual assault, sexual misconduct, sexual harassment, gender and sex discrimination and retaliation by the Defendants.  During Ms. Barbounis' employment for MEF, Defendant GR subjected her to severe and pervasive discrimination and harassment based upon her sex and gender.  It is further alleged and described that GR has a history of discrimination and harassment of women based on their sex and gender.

Sometime around the weekend of March 1st through March 3rd, 2018, Ms. Barbounis and a female coworker, PM attended an American Israel Public Affairs Committee ("AIPAC") conference in Washington D.C.  Defendant, GR sexually assaulted PM at the AIPAC conference, where he violently yanked PM across the couch, onto his lap, and whispered

inappropriate, unwelcome sexual advances in her ear.  Defendant GR attempted to yank Ms. Barbounis toward him as well.  Ms. Barbounis witnessed firsthand GR's violent and aggressive sexual assault of coworker PM.

In April 2018, GR lured Ms. Barbounis to travel to Israel with him by promising that the work trip would be an invaluable opportunity for her.  GR ordered Ms. Barbounis not to tell anyone that she was accompanying him on the trip.  Upon arrival, Ms. Barbounis was surprised when she discovered that GR had booked a small space with only one bathroom.  Due to GR's sexual advances, sexual harassment, sexual assault, and sexually inappropriate behavior, Ms. Barbounis spent much of the time while in Israel during this trip scared and emotionally distressed.  While in Israel, Ms. Barbounis texted a coworker messages indicating that she did not feel safe in the same living space with GR.  The messages included, "I am going to put a knife in my room;" "He's creepy; Talking about stuff he shouldn't be and too drunk;" "I'm so uncomfortable;" "I can't wait to come home;" "He drank too much;" "The shit he is saying is so strange I can't type it all anyway;" "Talking about women and his wife and conquests and graphic."

While on the same trip, Ms. Barbounis was sitting a couch in the living space.  The couch was positioned on the terrace with large sliding glass doors leading out.  GR asked Ms. Barbounis to join him while he smoked a cigarette.  Ms. Barbounis joined GR on the terrace and sat down on the far end of one side of the couch.  GR sat down next to Ms. Barbounis, then put his legs on the couch and his feet under her buttocks.  GR used his feet to unlawfully subject Ms. Barbounis to unwelcome sexually inappropriate touching.  Other examples of GR subjecting Ms. Barbounis to unwelcome sexual advances included remarking to her, "I just need a sexual release;" "I really need a blowjob."

GR subjected Ms. Barbounis to unwelcome sexual advances including quid pro quo sexual suggestions which she rejected.  The rejection of GR's sexual advances by Ms. Barbounis resulted in the work environment becoming more hostile as GR reacted to her rejections by using his proxy authority to retaliate against her with tangible employment actions.  GR continued his inappropriate unwelcome sexual misconduct and sexual harassing behaviors after he and Ms. Barbounis returned to the United States from their trip to Israel.  For instance, he made inappropriate comments to Ms. Barbounis including but not limited to, "You know you are my work wife, right;" or "I got your back you know I will always take care of you."  This discrimination and harassment escalated significantly after the Israel trip and after Ms. Barbounis rejected GR's unwelcome sexual advances.  During the period of her employment, GR also engaged in sexually harassing behaviors such as requesting Ms. Barbounis to visit his home to work at nighttime; calling or texting her late at night; and making sexually suggestive, unwelcome comments to her.

In November 2018, Ms. Barbounis reported GR's sexual harassment and sexual misconduct during the Israel trip; the sexual harassment, sexual misconduct and sexual assault during the AIPAC Conference, including instances of unwelcome lewd sexual advances or sexual

touching.  Prior to November 1, 2018, and by at least December 2016, Defendant, DP was notified about a Charge of Discrimination filed with the Equal Employment Opportunity Commission alleging that Defendant GR subjected female employees to sexual harassment and sexual misconduct.  Defendant, DP responded to the reports of sexual harassment, sexual misconduct, and sexual assaults by telling Ms. Barbounis, and several other female complainant employees that GR's conduct was not that big a deal.  On November 3, 2018, Ms. Barbounis received an email from Defendant DP instructing her to attend a group meeting scheduled Monday, November 5, 2018.  After the November 5, 2018 meeting, Defendant DP decided that GR would retain his position, title, pay, and employment with the MEF.  For the next few months, Ms. Barbounis was forced to continue working with GR.

Circa March 2019, Defendant DP held a meeting with Ms. Barbounis and two other female employees.  The meeting was about bringing GR back to a position where he would resume almost all of his former responsibilities as Director of the MEF.  After this meeting, GR began working directly with the staff again, including the female staff who GR had systemically victimized.  During the same meeting, DP announced that he was going to eliminate the purported safe measures initiated to protect the female staff from GR's severe and pervasive discrimination, harassment, and retaliation.  GR reportedly engaged in a campaign of retaliation after March 2019 aimed at effecting Plaintiff's termination from MEF.

Ms. Barbounis subsequently resigned her position at MEF in August 2019, which was void of free will as the Defendants made her working conditions so onerous, abusive, and intolerable.  As a result of Defendants' actions, Ms. Barbounis felt extremely humiliated, degraded, victimized, embarrassed and emotionally distressed.  As a result of Defendants' conduct, Ms. Barbounis was caused to sustain serious and permanent personal injuries, including permanent psychological injuries.  The severe and pervasive discrimination and harassment in the workplace has caused her to suffer an acerbation and aggravation of any preexisting condition involving emotional distress.

Ms. Barbounis' self-reports during this evaluation were consistent with and statements as outlined in the filed complaint.  She indicated that she endured the toxic work environment and sexually harassing behaviors manifested by GR, despite the negative impact and extreme distress it had caused for an extended period.  Ms. Barbounis identified a number of factors for the delay in reporting or disclosing the harassment she had been experiencing.  These include low self-esteem coupled with the desire to prove herself and to be the best employee; avoidant personality traits; the need to consolidate a sense of professional and personal identity; "latching on" to feeling that she was professionally thriving due to the accolades she received especially in the initial six months of the job; and the convenience of her job in terms of the fact that it allowed her to remain in Philadelphia as opposed to previous government related jobs where she was required to work in Washington, D.C.  She stated that she remained a reliable employee and had never experiences any similar difficulties, disciplined, or sanctioned by any previous employers.  She reported that she continues to experience significant distress and anxiety as she believes that MEF has responded to her lawsuit and

complaints in an ongoing retaliatory manner by attacking her reputation, referring to her promiscuous or a "whore," wrongfully accusing her of "embezzlement" or "stealing intellectual property," and attempting to damage or "destroy" her professional career.  She described GR as a physically imposing individual, with sociopathic characteristics, prior military and cyber training, and feels chronically threatened or terrified that he will retaliate against her ("come after me") her regardless of the outcome of the present civil case.  She indicated that as a result of the situation or actions of her employer in this case, she has experienced ongoing and variable chronic moods and cognitions including anxiety, fear, panic, depression, and distress particularly beginning in 2018 and since her resignation in August 2019.

### Clinical Assessment and Relevant History

Ms. Barbounis was interviewed via videoconferencing due to the restrictions caused by the COVID-19 pandemic.  The interview was conducted over a three-hour period.  Ms. Barbounis was oriented in all spheres such as to her identity, place, context, and time.  She is a Caucasian female, with average height and slim build, who presented close to her chronological age and appropriately groomed or attired.  She was cooperative and appeared candid, direct, and provided relatively elaborate responses to questions.  Ms. Barbounis did not manifest any difficulties with speech/language expression or comprehension, communicated properly, presented cooperatively, and made appropriate eye contact.  Speech was of normal tone, but with a rapid rate and tangential responding at times, which was responsive to redirection.  Affect was full in range and remained appropriate to the content and context of evaluation and interview.  Her mood was marked by anxiety and she manifested several crying spells while recounting her experiences, thoughts, or feelings regarding the events in the instant case.

Ms. Barbounis described her mood as anxious, worried, sad, irritable, emotional, and overwhelmed.  She reported chronic and variably intense anxiety, depressed mood, sadness, ruminating thoughts, multiple episodic or spontaneous crying spells beginning in the months after she began working at MEF, particularly in after March 2018.  She reported moderate improvement in her symptoms since she began psychotherapy and psychiatric treatment since late 2019 to the present.  Though variable, she indicated that on most days she continues to feel predominantly anxious, worried, and irritable related to the latter work events and the impact on her mental, emotional, marital, family, occupational, and financial stability or functioning.  She indicated that the latter affective states have significantly interfered with or impaired her functioning in various social, interpersonal, or occupational domains.  These include loss of interest or pleasure in previously routine, leisurely, or necessary interpersonal, family, or social activities.  While previously active, outgoing, motivated, and involved in family and community activities, she has been withdrawn from engaging in activities with various friends and family members (including her husband) due to her negative emotional states over the specified periods.  Ms. Barbounis also indicated occasional insomnia, disrupted sleep, nightmares, reduced concentration, and fatigue in the same period.  Ms. Barbounis indicated that she never previously experienced any period in the past characterized by the intensity or

persistence of negative moods or emotional distress as in the latter two years or consequent to her employment at MEF.

The results of the Beck Depression Inventory (BDI-II) were also consistent with her other self-reports and indicated a notable depression at present. BDI-II is a 21-item, self-report rating inventory that measures characteristic attitudes and symptoms of depression in the two weeks prior to assessment. The BDI is the most widely used index of depression worldwide, and uses criterion referenced items which categorize an individual's total score using a scale anchored according to a continuum from "Minimal" to "Severe." Ms. Barbounis' score (19) on this measure corresponds to the category of Moderate Depression (range=17-20) with the level of Borderline Clinical Depression. Items that were endorsed with the highest rankings included extreme sense of being punished, feelings of failure, and self-dislike or self-loathing. She also endorsed sadness, pessimism, loss of pleasure or interest, indecisiveness, concentration difficulty, irritability, sleep disturbance, fatigue, feelings of guilt, and self-criticalness. She indicated occasional suicidal thoughts but described these as fleeting morbid thoughts such as "better off dead" or driving her car off road. She stated that she experienced these thoughts when working at MEF including with respect to retaliation from her supervisor or her complaint against him.

Ms. Barbounis did not manifest any gross, excessive, or unusual motor activity, but she was occasionally restless or fidgety associated with anxious mood or behavior such as biting her fingernails. There was no evidence of thought or perceptual disorders including paranoid ideations, delusions, hallucinations, or ideas of reference. She denied having ever harbored any suicidal or self-injurious plans or acts, or any aggressive/homicidal thoughts, plans, or behaviors. Ms. Barbounis presented with generally adequate cognitive skills, and her fund of information, short-term memory, and abstract thinking appeared in the average range with no noted impairments.

Ms. Barbounis indicated a history of Attention Deficit/Hyperactivity Disorder, with symptoms evident as early as elementary school, including poor attention span, concentration, or focus, and difficulty finishing tasks or organizing activities. She was diagnosed formally in 2008 when she began attending University of Pennsylvania for her bachelor's degree and one of her professors suggested that she seek consultation. She has been treated with anti-hyperactivity psychotropic agents since 2008 (Vyvanse and mostly Adderall). She is currently administered Adderall (10 mgs., TID) by her psychiatrist. Ms. Barbounis indicated that she has sought treatment for her psychological symptoms since October 2018 when she began receiving psychiatric services and individual counseling at Mindoula Health in Silver Spring, MD. Records and self-reports indicate that she has been cooperatively and consistently attending virtual weekly counseling sessions with several case managers and monthly psychiatric management. She has been diagnosed with Generalized Anxiety Disorder and ADHD. In addition to Adderall, she has been prescribed antidepressants or mood stabilizers including Zoloft (Sertraline, 50 mg. daily). She was placed on Lexapro (10 mg.) for several weeks in March 2020, which was discontinued due to side effects and she was placed back on Zoloft.

Ms. Barbounis indicated that she was placed on an antidepressant on one other occasion, which consisted of Paxil for approximately one month when she was in 12th grade. She recalled adjustment difficulties at the time due to strains in the relationship between her parents. Ms. Barbounis also stated that she reattended several family therapy sessions when younger. She enrolled in a six-month group treatment program of Dialectical Behavior Therapy (DBT) in 2011 when she was a student at the University of Penn. This was designed as a voluntary program to enhance coping and problem-solving skills, and she recalled being motivated and benefiting from the program. Ms. Barbounis reported that she was hospitalized in an acute psychiatric facility (unable to specify) for 72-hours in 2004 (age 21), with her consent in order to undergo a psychiatric evaluation. She stated that this was precipitated when she had been drinking alcohol at an Eagles football game and became involved in an argument with her boyfriend at the time. While angry with her boyfriend, she punched and broke a mirror causing a cut to her hands. A friend contacted police because of concern that she might cause further injury to herself due to her anger. She was discharged without incident or need for further intervention after the three-day hospitalization.

Records and self-reports indicate modest improvement in Ms. Barbounis' symptoms since receiving treatment in October 2019 to the present. She appears to show variable but overall moderate response to her treatment goals. The latter have included ameliorating anxiety, depressed affect, poor self-image and self-loathing, impulsive sexual behaviors, extramarital relationships, labile mood, alcohol use, sleep problems, legal stressors (current ongoing civil lawsuit), parenting abilities, marital relationship, as well as increasing positive cognitions, behaviors, physical exercise, and meditation.

Ms. Barbounis denied any history of substance abuse. She acknowledged occasional excessive consumption of alcohol, particularly in her late teens or early adulthood. Ms. Barbounis indicated that when under stress in the last two years, she consumed alcohol 2-3 times per week though generally in moderate amounts. However, she acknowledged that such consumption would ultimately interfere with her ability to cope with anxiety or other negative affect in an adaptive manner and consistent with her therapeutic goals. She denied any history of severe impairment associated with alcohol use, including any "blackouts," alcohol poisoning, legal difficulties such as DUI, or any period of requiring inpatient or outpatient treatment related to drug or alcohol use.

Self-reports and available medical records indicate medical conditions including a history of kidney stones, (benign) premature ventricular contractions (PVCs) palpitations, and irritation of the cornea. She has undergone surgical interventions to treat kidney stones (December 2019), tonsillectomy (age 18), c-sections (both pregnancies leading to childbirth (January 2014 and August 2016), and an appendectomy (early twenties). She is not currently prescribed any medication for any physical condition. Ms. Barbounis indicated that her PVC's have increased variably correlating with anxiety and emotional stressors while working at MEF, as well as related to the depositions scheduled as part of her civil lawsuit.

In terms of developmental and family history, Ms. Barbounis was born in Philadelphia and raised mostly in Washington Township, New Jersey. Her parents were never separated or divorced. Her mother (born 1955) and her father (born 1950) reside in New Jersey and she maintains regular contact with them. She has a younger brother (33) and reported a very close relationship with him. Ms. Barbounis acknowledged a strained relationship with her mother in her childhood or adolescence and perceived her as critical. She indicated that her parents loved her and took care of her, but they were not overtly affectionate, rendering her "hungry" and longing for such displays and closer emotional ties. She reported much improved communication and relationships with her parents in her adulthood. Ms. Barbounis denied any known problems or deficits related to her birth and subsequent motor, language, or cognitive development. Ms. Barbounis denied any family history of mental health problems, domestic violence, and criminal behavior. She described her father as a "functional alcoholic" and her maternal grandfather as well as maternal uncles as "binge drinkers." Ms. Barbounis denied any history of physical, sexual, or emotional abuse or victimization in the context of family relationships or during her development in childhood and adolescence. She did not report any history of behavioral problems such as bedwetting, animal cruelty, fire setting, or vandalism in her childhood and adolescence. She acknowledged occasional fighting with peers, and two to three episodes of running away or leaving home unauthorized beginning in the 8th grade.

Ms. Barbounis reported that she has been married to her current husband (age 43) since 2012. They met in 2006 and dated for several months "on and off" before developing a steadier relationship. They have two children, including a 6-year old daughter, and a 4-year old son. The couple have never been separated, or previously married. However, Ms. Barbounis indicated that they have experienced marital difficulties in the last several years, in part due to the work stressors associated with the instant case as well as financial difficulties with on the part of her husband. Ms. Barbounis further indicated that she has felt insufficient emotional support from her husband and perceived him as "downplaying" her difficulties with her supervisors at MEF. She reported that these marital difficulties have led to decreased intimacy and sexual relationship with her husband. She stated that they engaged in sexual relations sporadically after the birth of their son (2016) and none since April 2018. According to collateral records and self-report, Ms. Barbounis has engaged in extramarital sexual relations with several men or "boyfriends" since diminished intimacy with her husband. She has acknowledged and related the extramarital relations to diminished self-esteem, seeking validation by dating multiple individuals often in both a compulsive or impulsive manner, feeling "unlovable," coping with emotional stressors by sexually acting out in a maladaptive or self-destructive manner, and a sense of "addiction" in "narcissistic" relationships.

Ms. Barbounis reported an affectionate relationship with her children, but acknowledged that her work stressors, schedule, and distance have interfered with her ability to spend the desirable amount of time or muster sufficient energy with caring or interacting with her children. Due to her symptoms and impaired emotional functioning over the last two years, she has experienced difficulty maintaining previous levels of involvement and interaction with her children or her husband and she has been more withdrawn and less motivated in social or

family activities. Ms. Barbounis currently lives in an apartment in Arlington, Virginia on weekdays due to her current job, and in West Chester, PA on weekends with her husband and children. While the couple have no current plans to separate or divorce, Ms. Barbounis expressed uncertainty as to the long-term prospects of her marriage.

Ms. Barbounis denied any history of domestic violence or protective orders within her marriage or other intimate relationships. She indicated occasional loud arguments with her husband. She did indicate that she was physically assaulted by boyfriend in the past, who had been drinking and struck her in the face causing a bruise. She stated that police arrested him, but she did not seek any restraining order. Ms. Barbounis also stated that she dated a male acquaintance and was involved sexually with him while in England circa October 2018. However, he unexpectedly engaged in rough sex with her, became extremely physical and caused a bruised eye to her. She terminated the relationship and had no further contact with the latter individual.

In terms of educational and work history, Ms. Barbounis reported that she graduated from a parochial high school in Washington Township, NJ in 1999. She denied ever being required to repeat any grades, or any history of special education placement for academic or behavioral difficulties. She described her grades as above average throughout her school years. However, Ms. Barbounis acknowledged occasional difficulties in adjustment beginning elementary school chiefly due to ADHD symptoms. She reported a few disciplinary problems or suspensions in middle and high school years for smoking, tardiness, and being "mouthy" with teachers. She engaged in extracurricular activities in school, including playing wide receiver on the Boys high school football team. After graduating from high school, she worked at various jobs including as a bartender for several years. She enrolled in Philadelphia Community College in 2006 and completed three semesters. She excelled and was accepted to University of Pennsylvania in 2008. It was at this time that her academic abilities flourished in unprecedented ways as she was diagnosed and began receiving treatment for ADHD symptoms. She obtained her Bachelor of Arts degree from UPenn in 2012, with a concentration in philosophy, politics, and economics.

From 2012 to 2017, she worked as an intern and staff case worker in the offices of two U.S. congressmen in Washington DC, before seeking the position at MEF. Ms. Barbounis described a particularly good adjustment and emotional contentment ("it was the happiest time of my life") in the years 2008-2017 spanning her time as a student at UPenn through her graduation, her first job after graduation for several years, and her marriage and birth of her children. She believes that it was only after she started working at MEF that her life unraveled and spiraled negatively out of control. It is also notable that in 2015, Ms. Barbounis started a part-time graduate/Master's program at UPenn in public policy and attended until early 2019. She was three classes short of her degree when she discontinued the program due to the stressors and events, which she had been experiencing at MEF. After resigning from MEF on 08/19/19, Ms. Barbounis was hired as the Director of Communication, a full-time position at the U.S. House of Representatives with Congressman Randy Weber from Texas. She resides in Washington DC

during weekdays due this position which she has continuously held since August 2019.  Ms. Barbounis indicated that she is satisfied with her current positron and denied any history of interpersonal or disciplinary difficulties in her present job, or any work-related or employment context beyond the instant matter.

In terms of legal and criminal history, Ms. Barbounis denied any history of juvenile delinquency or any arrests or sanctions as an adult for criminal or unlawful behaviors.

## DSM-5 Diagnoses:

300.02 (F41.1) Generalized Anxiety Disorder
296.2 (F32.1) Major Depressive Disorder, Moderate, with Moderate Anxious Distress
314.01 (F90.2) Attention Deficit/Hyperactivity Disorder, Combined Presentation, by History
301.89 (F60.89) Other Specified Personality Disorder, with Borderline Features

## Discussion & Forensic Conclusions

Ms. Barbounis meets the DSM-5 criteria for Generalized Anxiety Disorder; Major Depressive Disorder, Moderate; ADHD, and Personality Disorder, with Borderline features.  While the latter two disorders are principally historical and signal variable long-term vulnerabilities, the symptoms of Generalized Anxiety Disorder and Major Depressive Disorder have been evident, chronic, or persistent over the period spanning approximately two-years, with onset in the course of work-related incidents and events in the instant matter.  The symptoms reactions emerged and were chronically exacerbated by the work-related issues as detailed in her complaint, including multiple unsupportive, hostile, discriminatory, sexually harassing, unresponsive, and retaliatory actions by her employer.  The latter affective states have been severe, chronic with some variable but relatively high intensity, and have interfered with or impaired her functioning in various social, interpersonal, or occupational domains.  Her psychological symptoms were intensified progressively in the course of her employment leading to formal diagnosis of anxiety disorder by her medical providers, including commencement of psychotropic treatment specifically since latter part of 2019.  Prior to this period, Ms. Barbounis had not experienced a similar level, intensity, or persistence of negative moods or emotional distress for an extended period compared to the latter two years or consequent to her employment at MEF.

Ms. Barbounis manifests some maladaptive personality characteristics or tendencies that affect her emotional or interpersonal functioning and act as distant, historical, or premorbid factors that tend to increase her vulnerability to psychological maladjustment or distress.  However, the constellation of symptoms, conditions, the onset, or severe exacerbation of mood disorders or persistent negative moods in this case appear distinctly associated with the traumatic interactions, stressors, and chronic distress while at MEF, and specifically related to her work events stemming from the deleterious effects of the actions or responses of her employer.  The intensity, severity, and persistence of negative affects including depression,

anxiety, irritability, emotional distress and their impact on social, occupational, and leisure activities are manifested in an unprecedented manner compared to her life previous to the events related to the instant case.

In fact, for several years prior to the latter period, Ms. Barbounis had demonstrated a steadily upward, positive, and stable trend in her affective, social, educational, occupational experiences, development, adaptation, and management. She had also manifested increasing positive and stable interpersonal, marital, and social relationships. There is also no indication that she had ever experienced significant problems with any other persons, authority, or entity at any of her jobs or employment contexts. Hence, it is evident that her work related stressors in the instant matter actually aggravated or led to the manifestation or recurrence of maladaptive personality features or behaviors.

There is also indication that Ms. Barbounis has tried to positively cope with the distress caused by her negative experiences such as by seeking psychological counseling and psychotropic treatment as well as seeking further education and immediate employment with responsibilities consistent with her educational and vocational experiences. The latter activities may have helped reduce or prevent increased severity of her emotional distress since the apex of her symptoms. Nevertheless, she has been experiencing ongoing and chronic symptoms despite reasonable capacity for resilience, stability, or adjustment in interpersonal, social, and occupational functioning given her overall history.

Altogether, within a reasonable degree of psychological certainty, there is a direct connection (nexus) between the exacerbated or severity of the subject's current mood disorders or impairments in emotional, interpersonal, or occupational domains of functioning and the "work events" and incidents subsequent to the specified actions of her employer in the Instant matter.

Prepared By,

Barry Zakireh, Ph.D.
Licensed Psychologist
Clinical & Forensic Psychology