# Barbara Ziv, M.D.

1107 Bethlehem Pike
Suite 101
Flourtown, PA  19031
Tel: (215) 242-4802
Fax: (215) 248-1847

**November 17, 2020**

Sidney Gold, Esq
SIDNEY L. GOLD & ASSOC., P.C.
1835 Market Street, Ste. 515
Philadelphia, PA 19103

Since submitting my evaluation of Lisa Babounis, I have had the opportunity to review the forensic psychological evaluation conducted by Barry Zakireh, Ph.D., submitted October 30, 2020 and records from Mindoula.

**REVIEW OF AVAILABLE PSYCHIATRIC RECORDS**
**Mindoula**

Ms. Barbounis was seen on the following dates:

- *__January 28, 2020.__* According to a Care Manager Summary, Ms. Barbounis had a history of generalized anxiety, depression and ADHD. She had been taking Adderall 10mg bid since 2012 and Zoloft 40mg daily since 2018. Ms. Barbounis reported that over the previous six months, she found "it increasingly difficult [to] maintain her concentration and focus thus impacting her job performance as well as enabling her to staying (sic) on simple tasks." Ms. Barbounis said that she did not feel that Zoloft helped her anxiety and said she felt "more irritable more often." She was seeking an increase in Adderall to three times daily as well as an anxiolytic. At the time of this assessment, Ms. Barbounis reported difficulty staying asleep.

  Ms. Barbounis took a variety of psychometric screening tests. She had negative results on tests for PTSD, anxiety, depression and self-harm. She was low risk for bipolar disorder but was positive for "impairment risk."

  Ms. Barbounis was diagnosed with generalized anxiety disorder and ADHD. The assessor noted that Ms. Barbounis' "main complaints" were trouble with focus and concentration, which she attributed to ADHD. Her anxiety was thought to be "due to family and work situation leading to acting out behavior."

  Adderall was increased to 10 mg tid and Lexapro 10mg qd was initiated. Ms. Barbounis was advised to "find a therapist to help [her] cope with the current stressors in her marriage and forced separation from her family and help her gain some emotional stability."

Supplemental Report on Lisa Barbounis

- ***February 18, 2020.*** Ms. Barbounis had a phone session. She said that she was feeling well. She reported that she was "currently in Texas and will be going on vacation to Las Vegas in two days with her boyfriend." Ms. Barbounis scored 4 on the GAD7. Records indicated:

   > Pt reported issues/stressors include: job-related (political position with congressman; boss made sexual advances – spring 2017, felt retaliation and that was the difficult part to deal with, filed lawsuit and there was a countersuit) and is also anticipating a promotion, married with two children and husband is a great friend but haven't been intimate in two years (anticipating divorce); Pt and husband are dealing with IRS troubles and are not financially sound. Two kids live in Philly while Pt lives in DC for work (only see (sic) the on the weekends; dealing with social role as mother); Pt is hearing negative feedback about her parenting so they haven't been speaking for two months. Pt has a boyfriend also who is not stable in his interactions with Pt even though she's in love with him. Pt added that a constant fear of abandonment consumes her life but she has been working on this for the last 10 years. Now, Pt reported that she has been more excessive in sexuality and drinking.

   > In terms of alcohol consumption, Pt reported that she goes out approx. 2-3x per week and will drink socially, noting that she doesn't drink at home by herself. Pt feels the need to go out and meet people. She added that if her boyfriend is not around, she will date someone else (bring them out with her).

   > Pt is now going horseback riding to get away from thoughts and it's been helpful. Pt stated that self-care is drinking with friends occasionally.

   > Pt reported that she's been "a little edgier" with her children.

   The case manager indicated that Ms. Barbounis should work on a coping skills workbook and exercises. In addition, she was to complete a PHQ-9.

- ***March 3, 2020.*** Ms. Barbounis had a phone session with Stefanie DeBernardo and said that she felt "good" and had a "really good vacation last week." She had a negative mental health screen. Ms. DeBernardo wrote:

   > Pt reported issues/stressors include campaign season; still thinking about prior work history (conflict with old boss). Pt reported that she is up for a promotion. CM and Pt talked about Pt's reservations about the promotion. Pt shared that she still feels "imposter syndrome" every so often. CM encouraged Pt to use positive self-talk. Pt also shared that her on-off relationship with boyfriend adds stress occasionally. Pt shared that her relationship with her boyfriend is good right now.

   > Pt reported that she has been sexually abused when she was younger.

Supplemental Report on Lisa Barbounis

> Pt reported that she is open to in-person therapy. Pt shared that she prefers tele-therapy.
>
> Pt was not compliant with last week's action plan which included: Pt did not review coping skills.

Ms. DeBernardo compiled a list of therapists for Ms. Barbounis.

- ***March 10, 2020.*** Stefanie DeBernardo had a phone session with Ms. Barbounis. Ms. Barbounis said that her week was "truly chaos." She had discontinued Lexapro after she "blacked out and vomited" after drinking approximately three glasses of wine on two occasions. Ms. Barbounis had a mental health screen, on which she scored "low risk." Ms. DeBernardo wrote:

> Pt had to appear in court this past Friday for deposition related to sexual harassment case (some feelings of 'trauma' were brought forward) someone hacked into Pt's social medica accounts and shared intimate, personal details with the court; Pt's dog passed away on Saturday; Pt had to fire staff on campaign team and is now struggling with a higher-volume workload.
>
> CM and Pt discussed best time management practices, coping skills, etc. CM and Pt discussed pt's goals and objectives for the next week (see below)
>
> This Week's Action Plan:
> ❖ Pt will organize schedule for next 3 weeks with boyfriend's input.
> ❖ Pt will review therapy referrals.
> ❖ Pt will focus on self-care this week during vacation.
> ❖ Pt will comply with GAD7 assessment next appointment.

- ***March 17, 2020.*** Stephanie DeBernardo had a phone session with Ms. Barbounis. Ms. Barbounis had extended her vacation in Puerto Rico and said that she was "less stressed about work" and "hasn't been thinking about the lawsuit." Ms. Barbounis had been working on self-care "eating well, shopping, etc." but said that she was in a "weird mood" with respect to her boyfriend. She felt that she may not be "super compatible" with him.

> Ms. Barbounis scored a 1 on the PHQ-9 and 4 on the GAD-7. Ms. DeBernardo wrote, "Pt shared that she is feeling bad about something bad happening in terms of her relationship and the opinions from family."

- ***March 24, 2020.*** Stephanie DeBernardo had a phone session with Ms. Barbounis. Ms. Barbounis remained in Puerto Rico but said that she felt "terrible" after discovering that her "sh*thead boyfriend" was seeing two other people. She was concerned about STDs "due to his indiscretions" and was in "friend move (sic)" with her boyfriend. Ms. Barbounis did not want to return home and told Ms. DeBernardo that she had been "avoiding lawsuit." Ms. Barbounis had self-discontinued Lexapro. Among her other plans for the week, Ms. Barbounis would review therapy referrals "in preparation of leaving Ryan."

Supplemental Report on Lisa Barbounis

- ***March 31, 2020.*** Stephanie DeBernardo had a phone session with Ms. Barbounis. Ms. Barbounis said that she "hasn't been in a really great place," and that she had been "doing things that are emotionally unhealthy." Ms. DeBernardo wrote:

  > Pt spoke about her boyfriend Ryan, noting that she found out that she (sic) had a whole "other relationship with another girl." She noted that she and Ryan began arguing over this other woman. Pt shared that she recorded the conversation with Ryan (when he was nasty) so she could share it with the other girl. Pt explained that she left PR the day after the blowout on 3/28 noting that she's "been crying ever since." CM and Pt discussed ways to cope with this situation, talked about gaslighting in relation to Ryan's current behavior.

  > Pt reported that she did try dating Steve, however, she "doesn't feel the same about him."

  > Pt shared that she feels like him not "loving her" is adding to her ongoing feeling that she feels "unlovable."

- ***April 7, 2020.*** A psychiatry note indicated that Ms. Barbounis was advised to decrease her alcohol consumption and to consider Trintellix. On this date, Ms. Barbounis had a phone session with Ms. DeBernardo. Ms. Barbounis said that she was feeling "pretty good." She was using the "Calm app" to meditate in the morning and began to journal. Ms. Barbounis had written a letter to Ryan and he apologized for the "pain that he caused." According to Ms. Barbounis, Ryan "isn't really her issue." She said "that she feels that her negative emotions/actions have developed due to the lawsuit that is pending."

  Ms. Barbounis scored 14 on the PHQ-9 and said that for two nights, she had difficulty sleeping. She also reported that she had not been eating "as much" for two weeks and felt "bad about herself most days, noting that she also has issues with concentrating." Ms. DeBernardo wrote:

  > Pt shared that she feels like she may be experiencing panic attacks. She explained that on about 3 days where her heart was racing ("felt like it was going to jump out of my chest"). Pt stated that she may want to go back to Zoloft because it doesn't make her feel the same as Lexapro. Pt did explain that it's not a constant feeling, does she need something just for panic attacks? She noted that she has never had panic attacks before.

  > Pt reported an incident with husband where she was hurt by the fact that he was going to see his girlfriend and was "out of her mind," noting that she felt like she had a panic attack. She explained that she was crying and was upset.

- ***April 14, 2020.*** Stephanie DeBernardo had a phone session with Ms. Barbounis. Ms. Barbounis said that she had "good days and bad days." She told Ms. DeBernardo that she compared herself unfavorably to her friend Courtney. Ms.

Supplemental Report on Lisa Barbounis

Barbounis scored 5 on the GAD-7. She reported that she had trouble getting to sleep because she was preoccupied with her phone and was irritable with her husband and children. Ms. Barbounis said that her family was "bothering her while she's working."

- ***April 21, 2020.*** Stephanie DeBernardo had a phone session with Ms. Barbounis. Ms. Barbounis said that she felt "alright." However, Ms. Barbounis had not been sleeping well and had not showered for four days. She told Ms. DeBernardo that she had been contacted by an acquaintance who was going to testify against her in the lawsuit. Ms. DeBernardo wrote:

  > Pt explained that she feels that she is always mixed in with the wrong individuals, noting that she doesn't like the drama/conflict. [Pt shared that she feels that she can be her authentic self around individuals that share similar upbringing.] Pt shared that she might go to Hawaii next week. Pt expressed the triggers for her leaving her husband, noting that he has blamed her for many things throughout their relationship.

- ***April 24, 2020.*** Maximilian Oshalim, M.D. saw Ms. Barbounis and prescribed Adderall 10mg tid.

- ***April 28, 2020.*** Stephanie DeBernardo had a phone session with Ms. Barbounis. Ms. Barbounis said that she was feeling "good." Her sleep and ADLs had improved but Ms. Barbounis missed an appointment with her therapist, Joanne Kim. Ms. DeBernardo wrote:

  > [Ms. Barbounis] explained that she's not focusing on Ryan, the lawsuit, her relationship, etc. Pt stated that she has been concentrating on work noting that she received a compliment from her boss today. She stated that she is also looking for an apartment in DC, is looking to file taxes, etc. Pt stated that she has been enjoying her time at home with her children. Pt shared that she has also stayed connected to her friends and Pt discussed different coping skills and self-esteem as a theme in her life. Pt explained that she would hang out with friends that "weren't similar," noting that she worried about physical appearances when going to school ("maybe because I was tall").

- ***May 5, 2020.*** Stephanie DeBernardo had a phone session with Ms. Barbounis. Ms. Barbounis said that she felt "good," and told Ms. DeBernardo that she had spent from Wednesday through Saturday of that week with Ryan, describing their relationship as a friendship. Ms. DeBernardo wrote:

  > Pt stated that she was concerned with her behavior (Ryan called and she jumped, no regard for family, friend Courtney, and blew off work on Friday), noting that she felt like a junky ("addicted to Ryan"). Also, Pt stated that she hung out with Courtney in between. Pt explained that she puts people on a pedestal, however, is something gets on her nerves, she starts to pull away from them. Pt stated that she is aware that her behavior is destructive. CM and Pt discussed behavioral patterns as they relate. She stated that maybe it has to do with validation. She observed that every single

one of her boyfriends were addicts or alcoholics. Pt stated that alcoholism runs in her family. Pt reported that she loves her therapist Joanne Kim. She noted that her homework assignment was to list 10 things that she is grateful for, 10 things that she likes about herself and why does pt feel she deserves certain treatment in relationships.

- *__May 12, 2020.__* Stephanie DeBernardo had a phone session with Ms. Barbounis. Ms. Barbounis said that she had a hard time saying "no" to people. She told Ms. DeBernardo that she had obtained a new apartment in Arlington and went furniture shopping. In addition, Ms. Barbounis had planned an "impromptu trip." Ms. Barbounis described going through "highs and lows" and she said that a therapist friend told her that she was addicted to the affection of men. Her friend, Courtney, had messaged Ryan's ex-wife with Ms. Barbounis' knowledge. Ms. Barbounis reported that she used "strategies to manipulate the situation with ex Ryan" but did not message his ex-wife because she "didn't want Ryan to have a real reason to hate her." She wanted Ryan to validate her and described a "pattern in her past romantic relationship she has been with me that she "loves more than" they love her." Pt stated that if she can overcome a man "not wanting" her, and then "they do," she feels validated." Ms. DeBernardo wrote that Ms. Barbounis was unable to control her "emotions/excessive emotion." Ms. Barbounis scored 2 on the GAD-7.

- *__May 15, 2020.__* Maximillian Oshalim, M.D. saw Ms. Barbounis and diagnosed her with GAD and ADHD. He prescribed Adderall 10mg tid and Zoloft 50mg qd.

- *__May 19, 2020.__* Stephanie DeBernardo had a phone session with Ms. Barbounis. Ms. Barbounis said that she felt "alright…good actually" during the week. She was back in Texas, said that she was "over the Ryan thing," and described "a little tiff" with her parents over her children. She continued to be in weekly therapy and said that she was "Mentally handling things well." Ms. DeBernardo wrote:

  > Pt would like her children to move with her to VA full-time. CM encouraged Pt to explore her core beliefs as the relate to her parents to explore where conflict may be arising from. CM and Pt discussed the underlying issues (e.g. wants mother to be there for her when needed). Pt expressed that she doesn't want to share why she is sad because she feels her mother will blame her instead of just being there for her.

- *__May 26, 2020.__* Stephanie DeBernardo had a phone session with Ms. Barbounis. Ms. Barbounis said that she was in Texas with Courtney and reported that she had "really good news" to share with Ms. DeBernardo, who wrote:

  > Pt explained that she used to compare herself to other people, noting that she sees really nice people who have issues to deal with, so she should be kind to herself too (for not being perfect). She stated that this past week, she focused on herself and doing things that are healthy for her. She shared an anecdote about crop farmers (eliminating certain stressors). She explained that she is being positive and is subscribing to positive mantras. Pt explained that when she returns to stressors, she will still have stress, however, she stated that the "trick" is to use information that she learned (e.g., cognitive distortions) to manage her thoughts. Pt shared that she did move forward

Supplemental Report on Lisa Barbounis

with trying to resolve conflict with her mother.

Ms. Barbounis told Ms. DeBernardo that she was moving from weekly to bi-weekly meetings with her therapist. Ms. Barbounis scored 2 on the PHQ-9. She had been off Adderall for two weeks and was on Zoloft 50g.

- ***June 19, 2020.*** Stephanie DeBernardo had a phone session with Ms. Barbounis. Ms. Barbounis said that she felt "pretty good." She told Ms. DeBernardo that she made a poor decision by giving someone her rental car and the car was not returned. Ms. DeBernardo described Ms. Barbounis' stressors as "ongoing lawsuit with previous employer, no hope of a settlement (just want it over with). Pt stated that despite having other stressors, she is really enjoying activities and is paying more attention to herself, her emotions and behaviors, etc."

- ***June 19, 2020.*** Stephanie DeBernardo had a phone session with Ms. Barbounis. Ms. Barbounis said that she felt "pretty good." Ms. DeBernardo wrote:

> Pt shared that she has an "addiction" problem (narcissistic, sociopathic relationships). Pt explained that this past weekend Ryan contacted her and she got ready to go meet him. Pt stated that she had plans with Courtney on Thursday and Friday (left Wednesday night to try and meet up with Ryan), etc. Pt explained that she was at Courtney's house and was upset because he didn't f/u with calling her to hang out. Pt stated that she left Courtney to see him, noting that she also didn't go to work on Friday. Pt explained that she has zero impulse control when it comes to these situations.

> CM and Pt discussed managing expectations, healthy boundaries, Ryan objectifying women, seeking validation from other (despite dating 5-6 people). Pt shared that she is talking to a man named Kyle, however, he started sending sexual texts so she stopped talking to him. Pt stated that she did take Pt (sic) out on a date and they did not have physical interactions up to date #3. Pt expressed that she knows that Ryan doesn't want her yet she still wants him. CM and Pt discussed what would override Pt's intense feelings of needing to see Ryan despite his disrespect. Pt expressed that she was comparing this urge to the pending lawsuit, noting that she observes a pattern in her own behavior.

> In regards to her lawsuit, Pt reported anecdotes surrounding court and interactions with the various lawyers. Pt expressed that she feels her former employer Greg is going the same thing to his lawyers that he did to Pt. Pt explained that she was good for "10 years before" her kids were born (e.g., finished master's degree, didn't go out a lot, was eating well, etc). Pt explained that she feels her behavior changed after working with Greg.

> In response to CM inquiry, Pt reported that she is still seeing therapist Joanne Kim (she will not point out that it's an irrational behavior). Pt noted that Joanne does help her try to rationalize her thinking, however, in the moment Pt stated that she was impulsive and didn't remember anything

Supplemental Report on Lisa Barbounis

(e.g., distortions, etc). Pt explained that she knew what she was doing but she couldn't stop. Pt expressed that she is not sure if she is getting to the root of the issue. CM encouraged Pt to communicate her concerns with therapist…

- ***July 10, 2020.*** Maximilian Oshalim, M.D. saw Ms. Barbounis and diagnosed her with GAD and ADHD. He prescribed Adderall 10mg tid and Zoloft 50mg qd.
- ***July 14, 2020.*** Stephanie DeBernardo had a phone session with Ms. Barbounis. Ms. Barbounis said that she felt "okay." She had not followed-up with her therapist as Ms. DeBernardo had recommended by. Ms. DeBernardo wrote:

> Lawsuit – trying to build a case against Pt's character. Further allegations were made against Pt. Pt shared that she did find camaraderie with former colleague who validated Pt's feelings. Pt stated that the thought of her former employer's name, she feels ill. Pt expressed distress because they are trying to "embarrass her," noting that she is trying to focus on herself and setting up her new apartment (distraction techniques). Pt stated that she feels like when discussing this issue, she feels like she's reliving it. Additionally, Pt shared that her husband is travelling to see his father as he is terminally ill. CM and Pt strategized about actively choosing to do something else other than seeing Ryan. Pt noted that there is progress in her relationship with her mother, noting that she felt her mother had her "back."
>
> …
>
> Over the last two weeks, Pt reported that she didn't experience disinterest in doing things. Pt shared that she felt down 1-2 times (e.g., related to lawsuit). Pt stated that her sleep has been "great." Pt shared that she doesn't feel tired due to Adderall (she explained that if she didn't take it, she doesn't feel as active). Pt stated that she feels bad about herself often (e.g., mad at herself for allowing other side to have "ammo" against her, was crying because her daughter stated that she hates pt's job because she doesn't get to kiss/hug her). Pt added that she feels everything started with Middle East forum. Pt also stated that she is frustrated that she is still talking to Ryan. Pt expressed that she struggles with cognitive distortions (e.g., catastrophizing).

- ***July 28, 2020.*** Stephanie DeBernardo had a phone session with Ms. Barbounis. Ms. Barbounis said that she felt "okay, same stress level." She told Ms. DeBernardo that she cried all day because her car had been towed and said she had the "worst luck in the world." Ms. Barbounis told Ms. DeBernardo that she then wrote to Ryan and professed her love. Ms. DeBernardo wrote:

> [Ms. Barbounis] is avoiding lawyer because thinking about her case upsets her. Pt stated that she had two sad days where she sat on the couch "not doing anything." Pt noted that yesterday she had a "good work day." Pt noted that today she didn't think about Ryan and didn't miss him. Pt shared anecdote surrounding a work event. Pt expressed that she believes she's

looking for validation despite knowing that he will most likely not change.

CM and Pt discussed avoidance behaviors in depth. Pt observes a pattern of seeking Ryan when avoiding the major stressor (e.g., lawsuit). CM also encouraged Pt to remember healthy boundaries.

Was in car got into argument with boyfriend in cab, was sitting on curb for a ride home, some guy in a pick up truck drove her home, but had his hands inside of her, but pretended she was asleep so she can get home. Pt also brought the rental car situation. "People please too much." Blur the boundaries to obtain the validation. Pt explained that she realized in these circumstances, she has blurred boundaries while others would not. Pt described her difficulties proactively setting boundaries/severing toxic ties, when needed.

In response to CM inquiry, Pt has set boundaries with friend Courtney, noting that she has grown apart from her. CM provided "refresher" course on cognitive distortions. Pt expressed that she believes that she loves Ryan and 5 reason: 1. Way he makes her feel when they are together (funny, smart, etc) 2. Can talk about everything etc. Pt stated that perhaps she is now "chasing him" to get back that good feeling.

- *__August 10, 2020.__* Maximillan Oshalim, M.D. saw Ms. Barbounis in a telehealth visit. She reported increased stress and anxiety "with work and COVID19 related issues." He prescribed Adderall 10mg tid and Zoloft 50mg qd. He diagnosed her with GAD and ADHD.
- *__August 11, 2020.__* Stephanie DeBernardo had a phone session with Ms. Barbounis. Ms. Barbounis said that she felt "alright." However, she reported feeling depressed the following week, during which time she binge watched the *Vampire Diaries*. Ms. Barbounis described a "big fight" with her husband about the status of her relationship. She "got dressed up and went out Saturday," after which time she was more motivated. Ms. Barbounis discussed her marriage and noted that she spoke with Ryan.
- *__August 12, 2020.__* Stephanie DeBernardo had a phone session with Ms. Barbounis after Ms. Barbounis reached out to her. She said that she was "freaking out" over "some new information regarding her lawsuit. Pt expressed discomfort in having to debrief wither her current boss to protect his integrity. Pt expressed distress as a recent publication has slandered her."
- *__August 25, 2020.__* Stephanie DeBernardo had a phone session with Ms. Barbounis, who scored 7 on the GAD-7. She said that she was doing "really well at home" with her children. Ms. Barbounis reported that she had a "potential new love interest." She discussed her emotional volatility and told Ms. DeBernardo that she felt that she was "not a normal emotional person."
- *__September 11, 2020.__* Dr. Oshalim saw Ms. Barbounis in a telehealth visit. He renewed Adderall 20mg bid and Zoloft 50mg qd and diagnosed her with ADHD.

Supplemental Report on Lisa Barbounis

**REVIEW OF EXPERT REPORT**
**Barry Zakireh, Ph.D.**
**October 30, 2020**

Dr. Zakireh interviewed Ms. Barbounis on September 2, 2020 (typo corrected, Dr. Zakireh listed the date as 09/02/29) and reviewed records, listed on page two of his report. He documented "Case Information & Summary of Complaint Allegations," and wrote:

> Ms. Barbounis' self-reports during this evaluation were consistent with and statements as outlined in the filed complaint. She indicated that she endured the toxic work environment and sexually harassing behaviors manifested by GR, despite the negative impact and extreme distress it had caused for an extended period. Ms. Barbounis identified a number of factors for the delay in reporting or disclosing the harassment she had been experiencing. These include low self-esteem coupled with the desire to prove herself and to be the best employee; avoidant personality traits; the need to consolidate a sense of professional and personal identity; "latching on" to feeling that she was professionally thriving due to the accolades she received especially in the initial six months of the job; and the convenience of her job in terms of the fact that it allowed her to remain in Philadelphia as opposed to previous government related jobs where she was required to work in Washington, D.C. She stated that she remained a reliable employee and had never experiences any similar difficulties, disciplined, or sanctioned by any previous employers. She reported that she continues to experience significant distress and anxiety as she believes that MEF has responded to her lawsuit and complaints in an ongoing retaliatory manner by attacking her reputation, referring to her promiscuous or a "whore," wrongfully accusing her of "embezzlement" or "stealing intellectual property," and attempting to damage or "destroy" her professional career. She described GR as a physically imposing individual, with sociopathic characteristics, prior military and cyber training, and feels chronically threatened or terrified that he will retaliate against her ("come after me") her regardless of the outcome of the present civil case. She indicated that as a result of the situation or actions of her employer in this case, she has experienced ongoing and variable chronic moods and cognitions including anxiety, fear, panic, depression, and distress particularly beginning in 2018 and since her resignation in August 2019.

Under the heading "Clinical Assessment and Relevant History," Dr. Zakireh wrote, in part:

> Ms. Barbounis described her mood as anxious, worried, sad, irritable, emotional, and overwhelmed. She reported chronic and variably intense anxiety, depressed mood, sadness, ruminating thoughts, multiple episodic or spontaneous crying spells beginning in the months after she began working at MEF, particularly in after March 2018. She reported moderate improvement in her symptoms since she began psychotherapy and psychiatric treatment since late 2019 to the present. Though variable, she indicated that on most days she continues to feel predominantly anxious, worried, and irritable related to the latter work events and the impact on

Supplemental Report on Lisa Barbounis

her mental, emotional, marital, family, occupational, and financial stability or functioning. She indicated that the latter affective states have significantly interfered with or impaired her functioning in various social, interpersonal, or occupational domains. These include loss of interest or pleasure in previously routine, leisurely, or necessary interpersonal, family, or social activities. While previously active, outgoing, motivated, and involved in family and community activities, she has been withdrawn from engaging in activities with various friends and family members (including her husband) due to her negative emotional states over the specified periods. Ms. Barbounis also indicated occasional insomnia, disrupted sleep, nightmares, reduced concentration, and fatigue in the same period. Ms. Barbounis indicated that she never previously experienced any period in the past characterized by the intensity or persistence of negative moods or emotional distress as in the latter two years or consequent to her employment at MEF.

The results of the Beck Depression Inventory (BDI-II) were also consistent with her other self-reports and indicated a notable depression at present…. Ms. Barbounis' score (19) on this measure corresponds to the category of Moderate Depression (range=17-20) with the level of Borderline Clinical Depression. Items that were endorsed with the highest rankings included extreme sense of being punished, feelings of failure, and self-dislike or self-loathing. She also endorsed sadness, pessimism, loss of pleasure or interest, indecisiveness, concentration difficulty, irritability, sleep disturbance, fatigue, feelings of guilt, and self-criticalness. She indicated occasional suicidal thoughts but described these as fleeting morbid thoughts such as "better off dead" or driving her car off road. She stated that she experienced these thoughts when working at MEF including with respect to retaliation from her supervisor or her complaint against him.

Dr. Zakireh noted that Ms. Barbounis was psychiatrically hospitalized for 72 hours in 2004, had a history of ADHD, diagnosed in 2008, treatment with Paxil for a month when she was in 12th grade and DBT in 2011. Dr. Zakireh reviewed Ms. Barbounis' treatment records from Mindoula Health. He did not summarize them but wrote:

Records and self-reports indicate modest improvement in Ms. Barbounis' symptoms since receiving treatment in October 2019 to the present. She appears to show variable but overall moderate response to her treatment goals. The latter have included ameliorating anxiety, depressed affect, poor self-image and self-loathing, impulsive sexual behaviors, extramarital relationships, labile mood, alcohol use, sleep problems, legal stressors (current ongoing civil lawsuit), parenting abilities, marital relationship, as well as increasing positive cognitions, behaviors, physical exercise, and meditation.

Dr. Zakireh noted that Ms. Barbounis denied any history of substance abuse but that she "acknowledged occasional excessive consumption of alcohol, particularly in her late teens or early adulthood." He recorded Ms. Barbounis' medical history and documented Ms. Barbounis' assertion "that her PVC's have increased variably correlating with anxiety and

Supplemental Report on Lisa Barbounis

emotional stressors while working at MEF, as well as related to the depositions scheduled as part of her civil lawsuit."

Dr. Zakireh documented a brief developmental and family history for Ms. Barbounis. With respect to Ms. Barbounis' marriage, he wrote:

> However, Ms. Barbounis indicated that they have experienced marital difficulties in the last several years, in part due to the work stressors associated with the instant case as well as financial difficulties with on the part of her husband. Ms. Barbounis further indicated that she has felt insufficient emotional support from her husband and perceived him as "downplaying" her difficulties with her supervisors at MEF. She reported that these marital difficulties have led to decreased intimacy and sexual relationship with her husband. She stated that they engaged in sexual relations sporadically after the birth of their son (2016) and none since April 2018. According to collateral records and self-report, Ms. Barbounis has engaged in extramarital sexual relations with several men or "boyfriends" since diminished intimacy with her husband. She has acknowledged and related the extramarital relations to diminished self-esteem, seeking validation by dating multiple individuals often in both a compulsive or impulsive manner, feeling "unlovable," coping with emotional stressors by sexually acting out in a maladaptive or self-destructive manner, and a sense of "addiction" in "narcissistic" relationships.

With respect to Ms. Barbounis' relationship with her children, Dr. Zakireh noted:

> Ms. Barbounis reported an affectionate relationship with her children, but acknowledged that her work stressors, schedule, and distance have interfered with her ability to spend the desirable amount of time or muster sufficient energy with caring or interacting with her children. Due to her symptoms and impaired emotional functioning over the last two years, she has experienced difficulty maintaining previous levels of involvement and interaction with her children or her husband and she has been more withdrawn and less motivated in social or family activities. Ms. Barbounis currently lives in an apartment in Arlington, Virginia on weekdays due to her current job, and in West Chester, PA on weekends with her husband and children. While the couple have no current plans to separate or divorce, Ms. Barbounis expressed uncertainty as to the long-term prospects of her marriage.

Dr. Zakireh diagnosed Ms. Barbounis with Generalized Anxiety Disorder (GAD), Major Depressive Disorder (MDD), Moderate, with Anxious Distress, ADHA, Combined Presentation, by History, and Other Specified Personality Disorder, with Borderline Features. He concluded:

> Ms. Barbounis meets the DSM-5 criteria for Generalized Anxiety Disorder; Major Depressive Disorder, Moderate; ADHD, and Personality Disorder, with Borderline features. While the latter two disorders are principally historical and signal variable long-term vulnerabilities, the symptoms of Generalized Anxiety Disorder and

Supplemental Report on Lisa Barbounis

Major Depressive Disorder have been evident, chronic, or persistent over the period spanning approximately two-years, with onset in the course of work-related incidents and events in the instant matter. The symptoms reactions emerged and were chronically exacerbated by the work-related issues as detailed in her complaint, including multiple unsupportive, hostile, discriminatory, sexually harassing, unresponsive, and retaliatory actions by her employer. The latter affective states have been severe, chronic with some variable but relatively high intensity, and have interfered with or impaired her functioning in various social, interpersonal, or occupational domains. Her psychological symptoms were intensified progressively in the course of her employment leading to formal diagnosis of anxiety disorder by her medical providers, including commencement of psychotropic treatment specifically since latter part of 2019. Prior to this period, Ms. Barbounis had not experienced a similar level, intensity, or persistence of negative moods or emotional distress for an extended period compared to the latter two years or consequent to her employment at MEF.

Ms. Barbounis manifests some maladaptive personality characteristics or tendencies that affect her emotional or interpersonal functioning and act as distant, historical, or premorbid factors that tend to increase her vulnerability to psychological maladjustment or distress. However, the constellation of symptoms, conditions, the onset, or severe exacerbation of mood disorders or persistent negative moods in this case appear distinctly associated with the traumatic interactions, stressors, and chronic distress while at MEF, and specifically related to her work events stemming from the deleterious effects of the actions or responses of her employer. The intensity, severity, and persistence of negative affects including depression anxiety, irritability, emotional distress and their impact on social, occupational, and leisure activities are manifested in an unprecedented manner compared to her life previous to the events related to the instant case.

In fact, for several years prior to the latter period, Ms. Barbounis had demonstrated a steadily upward, positive, and stable trend in her affective, social, educational, occupational experiences, development, adaptation, and management. She had also manifested increasing positive and stable interpersonal, marital, and social relationships. There is also no indication that she had ever experienced significant problems with any other persons, authority, or entity at any of her jobs or employment contexts. Hence, it is evident that her work related stressors in the instant matter actually aggravated or led to the manifestation or recurrence of maladaptive personality features or behaviors.

There is also indication that Ms. Barbounis has tried to positively cope with the distress caused by her negative experiences such as by seeking psychological counseling and psychotropic treatment as well as seeking further education and immediate employment with responsibilities consistent with her educational and vocational experiences. The latter activities may have helped reduce or prevent increased severity of her emotional distress since the apex of her symptoms. Nevertheless, she has been experiencing ongoing and chronic symptoms despite

reasonable capacity for resilience, stability, or adjustment in interpersonal, social, and occupational functioning given her overall history.

Altogether, within a reasonable degree of psychological certainty, there is a direct connection (nexus) between the exacerbated or severity of the subject's current mood disorders or impairments in emotional, interpersonal, or occupational domains of functioning and the "work events" and incidents subsequent to the specified actions of her employer in the Instant matter.

## DISCUSSION

Dr. Zakireh's conclusions are not supported by Ms. Barbounis' available treatment records, which do not document signs or symptoms of either Major Depressive Disorder (MDD) or Generalized Anxiety Disorder (GAD). From January 28, 2020 through September 11, 2020, Ms. Barbounis saw a mental health counselor regularly. She talked about her chaotic relationship with her boyfriend, her need for affirmation and approval, feeling "unlovable," conflicts with her mother, her habit of negatively comparing herself to others, financial stress, a fear of abandonment that "consumes her life," and on which she had been working for "the last 10 years," her troubled marriage, "acting out" behaviors, stresses in her current job, poor self-esteem, impulsivity, "addiction" to "narcissistic, sociopathic relationships," and other problems.

Notably absent from Ms. Barbounis' discourse to her therapist is any discussion of Gregg Roman's allegedly sexually harassing behavior. Ms. Barbounis rarely mentioned Mr. Roman to Ms. DeBernardo. On February 18, 2020, Ms. DeBernardo wrote "boss made sexual advances – spring 2017, felt retaliation and that was the difficult part to deal with, filed lawsuit and there was a countersuit." This is the only time Ms. DeBernardo documented any statement made by Ms. Barbounis regarding Mr. Roman's alleged sexual misconduct.

Tellingly, the most detailed note about Mr. Roman in Ms. Barbounis' records was on June 19, 2020. At that time, Ms. Barbounis told Ms. DeBernardo that "she feels her former employer Greg is doing the same thing to his lawyers that he did to Pt." This comparison is puzzling if one accepts Ms. Barbounis' assertion that she was sexually assaulted and/or harassed by Mr. Roman. Is she saying that Mr. Roman behaved similarly inappropriately with his lawyers? Taking the sexual misconduct allegations out of consideration, Ms. Barbounis' comment makes more sense; it is likely that she viewed Mr. Roman as either insufficiently appreciative of his lawyers or too demanding. Either way, Ms. Barbounis' comparison of her situation with that of Mr. Roman's lawyers undermines both her assertions regarding Mr. Roman's sexual behaviors and the claim of retaliation. If Mr. Roman was treating his lawyers as he had Ms. Barbounis, it would not be due to either of these issues.

In dramatic contrast to the absence of Mr. Roman from her narrative, Ms. Barbounis spoke at length, and in detail, about her emotional response to her boyfriend, Ryan. On March 24, 2020, she told Ms. DeBernardo that her "sh*thead boyfriend" made her feel "terrible"

Supplemental Report on Lisa Barbounis

when she found that he was seeing two other women. A week later, Ms. Barbounis reported that she was "crying ever since" she had a fight with Ryan and left Puerto Rico. Ryan remained a constant focus in Ms. Barbounis' therapy, even as she attempted to distance herself from him. This perseveration indicates that Ms. Barbounis did not neglect to speak about Gregg Roman because the relationship was too emotionally charged for her to address, but the opposite. Ms. Barbounis did not speak about Mr. Roman because he did not have a powerful psychological impact on her.

However, records make it clear that the lawsuit initiated by Ms. Barbounis does have emotional valiance for her. Again showing that issues that cause her distress come up in therapy, Ms. Barbounis spoke of "the lawsuit," repeatedly to Ms. DeBernardo. On March 24, 2020, Ms. Barbounis brought up the suit even as she said that she was "avoiding." She noted the connection between her undesirable feelings and psychological symptoms, attributing her "negative emotions/actions" to "the lawsuit that is pending." On June 19, 2020, Ms. Barbounis told Ms. DeBernardo that there was "no hope of a settlement" with MEF and that she "just want[ed] it over with." As noted previously, Ms. Barbounis never talked to Ms. DeBernardo about problems she had with Mr. Roman, let alone any psychiatric symptoms she developed as a result of negative interactions with him. Indeed, on July 14, 2020, Ms. Barbounis noted that the cause of her distress as related to Mr. Roman and the MEF was that she "[felt] ill" at the thought of her former employer's name… because they are trying to "embarrass her."

Consistent with an underlying character disorder, which will be discussed further below, Ms. Barbounis demonstrated affective reactivity during her sessions with Ms. DeBernardo; when she had positive experiences, her mood was uplifted and when she had unpleasant interactions with people, her mood declined. However, at no time, did Ms. Barbounis ever develop signs or symptoms of a Major Depressive Disorder.

The DSM-V provides the following diagnostic criteria for Major Depressive Episode:

A.  Five (or more) of the following symptoms have been present during the same 2-week period and represent a change from previous functioning; at least one of the symptoms is either (1) depressed mood or (2) loss of interest or pleasure.

1.  Depressed mood most of the day, nearly every day, as indicated by either subjective report or observation made by others.
2.  Markedly diminished interest or pleasure in all, or almost all, activities most of the day, nearly every day.
3.  Significant weight loss when not dieting or weight gain or decrease or increase in appetite nearly every day.
4.  Insomnia or hypersomnia nearly every day.
5.  Psychomotor agitation or retardation nearly every day (observable by others, not merely subjective feelings of restlessness or being slowed down.)
6.  Fatigue or loss of energy nearly every day.
7.  Feelings of worthlessness or excessive or inappropriate guilt nearly every day.
8.  Diminished ability to think or concentrate, or indecisiveness, nearly every day.

Supplemental Report on Lisa Barbounis

9. Recurrent thoughts of death, recurrent suicidal ideation without a specific plan, or a suicide attempt or a specific plan for committing suicide.

There is no documentation in Ms. Barbounis' treatment records that she had a depressed mood most of the day nearly every day during the same two-week period. In fact, records indicate that her mood was situationally dependent. This indicates that Ms. Barbounis' mood is reactive, not persistently influenced by biologic neurotransmitter dysregulation. Had Ms. Barbounis MDD, her mood would be persistently low regardless of external events.

At the time of her initial intake on January 28, 2020, Ms. Barbounis had negative screening tests for PTSD, anxiety, depression and self-harm. On March 17, 2020, Ms. Barbounis scored 1 on the PHQ-9, a depression rating scale, indicating absent or minimal depression. On April 7, 2020 Ms. Barbounis scored 14 on the PHQ-9. This score, which suggests moderate depressive symptoms occurred in the context of Ms. Barbounis' sense of feeling betrayed by her boyfriend, Ryan, and after she felt "out of her mind" when her husband was going to see his girlfriend. Available records did not include PHQ-9 scores during Ms. Barbounis' weekly sessions until May 26, 2020, at which time she scored 2, consistent with minimal or absent depression. Although it may be tempting to attribute this improvement to Zoloft, Ms. Barbounis had only been on this medication for two weeks, which is generally considered too short a time to be efficacious, and she also told Ms. DeBernardo that she planned to space out her visits to her psychotherapist, suggesting that the seriousness of her depression was not sufficient for the therapist to need to monitor her closely.

Not only did Ms. Barbounis not demonstrate persistently depressed mood most of the day, nearly every day for a two-week period, she did not exhibit other signs or symptoms of MDD. Ms. Barbounis continued to pursue interests such as traveling, socializing, and recreational activities. She took a trip to Puerto Rico with her boyfriend in March 2020, at the beginning of which she told Ms. DeBernardo that she was "eating well, shopping, etc." On April 21, 2020, Ms. Barbounis told Ms. DeBernardo that she was considering a vacation to Hawaii the following week. On May 12, 2020, Ms. Barbounis told Ms. DeBernardo that she planned an "impromptu trip" and that she had gone furniture shopping for her new apartment in Arlington, Virginia.

Ms. Barbounis also continued to exhibit interest in relationships. After her relationship with Ryan ended, Ms. Barbounis began to date Steve, which she did not pursue because she did not "feel the same about him [as she had about Ryan]." In the following months, Ms. Barbounis continued to pursue Ryan, dropping everything to meet him when he reached out to her. However, she did not stop looking for partners, she dated a man, Kyle, briefly and told Ms. DeBernado that she had a "potential new love interest" on August 25, 2020.

In addition to focusing on her love life, throughout 2020, Ms. Barbounis continued to maintain relationships with friends. She talked extensively about her frequent interactions with a female friend, Courtney. Although this relationship was characterized by the same volatility present in of all Ms. Barbounis' interactions, she continued to socialize with, and

Supplemental Report on Lisa Barbounis

rely upon, her during the months she was in therapy with Ms. DeBernardo. Ms. Barbounis also intermittently focused attention on her children, telling Ms. DeBernardo on April 28, 2020 that she "had been enjoying her time at home with her children. Pt shared that she has also stayed connected to her friends." Similarly, on August 25, 2020, Ms. Barbounis told Ms. DeBernardo that she was doing "really well at home" with her children."

With respect to other MDD criteria, there is no indication that Ms. Barbounis' weight fluctuated, and she did not report persistent sleep problems. Further, Ms. Barbounis' records do not indicate that she ever demonstrated psychomotor agitation or retardation and she never complained of ongoing issues related to fatigue or loss of energy. Indeed, Ms. Barbounis travelled between Pennsylvania, Texas, Virginia and Washington, D.C. for her work. She also cared for an apartment as well as her home in Pennsylvania, travelled for pleasure, and cared for her children. All of these activities indicate that Ms. Barbounis did not have problems with energy. Similarly, Ms. Barbounis' objective functioning at work demonstrates that her thinking and ability to concentrate were unimpaired and there is no indication that Ms. Barbounis suffered from indecisiveness at any time. Although Ms. Barbounis had feelings of worthlessness at times, this was a long-standing problem and, consistent with her underlying personality disorder, waxed and waned depending on external circumstances. Lastly, although Ms. Barbounis occasionally discussed feeling despondent when she was faced with difficulties, she never reported suicidal ideation.

In sum, there is no evidence in either Ms. Barbounis' history or treatment records that she had MDD over the course of two years, as asserted by Dr. Zakireh. Further, there is nothing in any of Ms. Barbounis' treatment records that suggested she experienced "multiple unsupportive, hostile, discriminatory, sexually harassing, unresponsive, and retaliatory actions by her employer," nor did Dr. Zakireh independently document that such incidents were described to him by Ms. Barbounis.

With respect to comparing Ms. Barbounis' affective states before, during, and after her tenure with MEF, there is no objective information to suggest any difference during these time periods. While Dr. Zakireh appears to be relying on Ms. Barbounis' self-report, as noted in my previous assessment, this is an insufficient basis upon which to render an opinion. Ms. Barbounis was on Zoloft prior to her treatment at Mindoula and was only intermittently compliant with this medication when it was prescribed in 2020. Further, it should be noted that Ms. Barbounis' psychiatrist did not prescribe this medication for treatment of MDD, a diagnosis that he did not render, but for anxiety. All objective information indicates that Ms. Barbounis' social, emotional, and psychological functioning was consistent throughout her adult life.

Although Dr. Oshalim diagnosed Ms. Barbounis with GAD, she does not meet criteria for this disorder. Ms. Barbounis The DSM-V diagnostic criteria for Generalized Anxiety Disorder are as follows:

A. Excessive anxiety and worry (apprehensive expectation), occurring more days than not for at least 6 months, about a number of events or activities (such as work or school performance.

Supplemental Report on Lisa Barbounis

B. The person finds it difficult to control the worry.
C. The anxiety and worry are associated with three (or more) of the following six symptoms (with at least some symptoms present for mare days than not for the past 6 months).

    (1) restlessness or feeling keyed up or on edge
    (2) being easily fatigued
    (3) difficulty concentrating or mind going blank
    (4) irritability
    (5) muscle tension
    (6) sleep disturbance

D. The anxiety, worry, or physical symptoms cause clinically significant distress or impairment in social, occupational, or other important areas of functioning.
E. The disturbance is not due to the direct physiological effects of a substance or a general medical condition and does not occur exclusively during a Mood Disorder, a Psychotic Disorder, or a Pervasive Developmental Disorder.
F. The disturbance is not better explained by another mental disorder (e.g., anxiety or worry about having panic attacks in panic disorder, negative evaluation in social anxiety disorder [social phobia], contamination or other obsessions in obsessive-compulsive disorder, separation from attachment figures in separation anxiety disorder, reminders of traumatic events in posttraumatic stress disorder, gaining weight in anorexia nervosa, physical complaints in somatic symptom disorder, perceived appearance flaws in body dysmorphic disorder, having a serious illness in illness anxiety disorder, or the content of delusional beliefs in schizophrenia or delusional disorder).

The Generalized Anxiety Disorder (GAD) Assessment (GAD-7) is a screening tool for GAD. Scores of 5, 10, and 15 are taken as the cut-off points for mild, moderate and severe, anxiety, respectively. Further assessment of symptoms of anxiety is recommended when a patient scores 10 or higher. At the time of her intake on January 28, 2020, Ms. Barbounis had a negative screening test for anxiety. On February 18, 2020 and March 4, 2020, her GAD-7 score was 4, and she scored 5 on this measure on April 14, 2020. On May 12, 2020, Ms. Barbounis scored 2 on the GAD-7. Despite the fact that Ms. Barbounis episodically reported feeling anxious, usually in response to a specific stressor, her anxiety was neither generalized nor persistent.

The allegations of psychological problems attributed to Ms. Barbounis' experiences at the MEF generally, and Mr. Roman specifically, do not stand up to objective scrutiny. To the extent that Ms. Barbounis endorses the symptoms listed in her complaint, her presentation is consistent with malingering. Malingering is defined by the American Psychiatric Association in the following manner:

> The essential feature of malingering is the intentional production of false or grossly exaggerated physical or psychological symptoms, motivated by external incentives such as avoiding military duty, avoiding work, obtaining financial compensation, evading criminal prosecution, or obtaining drugs. Under some circumstances, malingering may represent adaptive behavior—for example, feigning illness while

Supplemental Report on Lisa Barbounis

a captive of the enemy during wartime. Malingering should be strongly suspected if any combination of the following is noted:

1. Medicolegal context of presentation;
2. Marked discrepancy between the person's claimed stress or disability and the objective findings;
3. Lack of cooperation during the diagnostic evaluation and in complying with the prescribed treatment regimen;
4. The presence of Antisocial Personality Disorder.

Malingering differs from factitious disorder in that the motivation for the symptom production in malingering is an external incentive, whereas in factitious disorder external incentives are absent. Malingering is differentiated from conversion disorder and somatic symptom-related mental disorders by the intentional production of symptoms and by the obvious external incentives associated with it. Definitive evidence of feigning (such as clear evidence that loss of function is present during the examination but not at home) would suggest a diagnosis of factitious disorder if the individual's apparent aim is to assume the sick role, or malingering if it is to obtain an incentive, such as money.

Malingering is a well-known problem facing the U.S. For example, Chafetz and Underhill noted in a 2013[11] study:

The feigning of disabling illness for the purpose of disability compensation, or "malingering," is common in Social Security Disability examinations, occurring in 45.8% – 59.7% of adult cases.

Similarly, Mittenberg, et al.[12] investigated base rates of probable malingering in a neuropsychological population. They wrote:

29% of personal injury, 30% of disability, 19% of criminal, and 8% of medical cases involved probable malingering and symptom exaggeration. Thirty-nine percent of mild head injury, 35% of fibromyalgia/chronic fatigue, 31% of chronic pain, 27% of neurotoxic, and 22% of electrical injury claims resulted in diagnostic impressions of probable malingering.

Because it is impossible to recognize malingering based solely on a clinical interview, it is essential for evaluators to collect as much objective information as possible. Only by looking at a patient's longitudinal history, carefully reviewing all diagnostic tests and evaluations, and assessing symptoms in the context of the individual's complete bio/psycho/social environment, which includes occupational and litigation history, can one either rule in, or out, either factitious disorder or malingering.

As detailed above, Ms. Barbounis' treatment records do not support either the presence of GAD or MDD. Ms. Barbounis' claims of psychological damage occurred in the context of a lawsuit and her overall functioning is not consistent with her allegations. Objective

Supplemental Report on Lisa Barbounis

information indicates that Ms. Barbounis' psychological claims in relation to events at MEF and with Mr. Roman are malingered. [n.b. It is curious that Ms. Barbounis asserted in her Complaint that she suffered from psychiatric symptoms as a result of Mr. Roman's behavior with her when they went to Israel in the spring of 2017, even though the only physical action directed towards Ms. Barbounis was Mr. Roman sliding his feet under Ms. Barbounis' legs when they were sitting on a couch conversing, yet blithely told Ms. DeBernardo on July 28, 2020 that she accepted a ride home from a man who "had his hands inside of her." Ms. Barbounis did not describe this interaction with a stranger as traumatic but told Ms. DeBernardo that she "pretended she was asleep so she can get home."]

Although Ms. Barbounis does not have an affective or anxiety disorder that can be attributed to her interactions at MEF, her history and treatment records are consistent with the diagnosis of Borderline Personality Disorder. Personality in the context of psychiatric diagnoses is distinct from the definition of this word in common parlance. Personality disorders refer to:

> An enduring pattern of inner experience and behavior that deviates markedly from the expectations of the individual's culture, is pervasive and inflexible, has an onset in adolescence or early adulthood, is table over time, and leads to distress or impairment.[1]

The etiology of personality disorders is complex and is, at its core, a failure of ego maturation. Ego, as used in psychiatry, represents a different concept than that when the word is used colloquially. The ego refers to the psychological core of self. It is responsible for self-image, perception of the world, problem solving, adaptation to reality, managing conflicting impulses and ideas, and regulating both the experience and expression of emotion. Ego development is a directed process that begins in early childhood and is largely complete by adolescence or early adulthood. However, unlike the development of a purely biologic function, such as height, ego maturation is influenced by a wide variety of biologic, cognitive, and environmental factors. It is not the case that every individual will progress through the steps from a primitive ego structure to a well-organized, adaptive, functional ego. If family forces stymie, pervert, distort, or fail to nurture this complex process, personality disorders develop.

One of the functions of the ego is the creation of defense mechanisms. Simply stated, these are unconscious responses to threats to identity or self-esteem and serve to protect the self from being overwhelmed by negative emotions, experiences, or cognitions. Defense mechanisms protect the self from being devastated by shame, anxiety, or other difficult reactions.[2] [3] [4] [5] [6] [7] Effective defense mechanisms, referred to as mature defenses, protect the self while also allowing enough of the experience to be felt so that reality is not denied, and effective adaptation follows. Mental health requires not only the use of mature defenses, but the ability to use multiple defenses flexibly.

A discussion of the processes by which individuals develop "mature" coping strategies is beyond the scope of this report; but it is largely dependent on a child's relationship to primary care givers and the overall environment in which they grow from childhood to

Supplemental Report on Lisa Barbounis

adolescence. However, it is necessary to be aware of the hierarchies of psychological adaptive mechanisms. Vaillant[14] provided a simple model of ego responses to stress, noted in the table below. While there have been modifications and elaborations on this basic structure over time, the main categories hold true. Generally, or ideally, individuals progress through these domains as they mature. However, many people lack either the internal or external resources to psychologically advance and continue to respond to stress in primitive, immature, or neurotic ways throughout their lives.

PSYCHOLOGICAL ADAPTIVE MECHANISM BY DOMAINS

| Primitive | Immature | Neurotic | Mature |
| --- | --- | --- | --- |
| Denial (concrete) | Acting Out | Repression | Suppression |
| Avoidance/Distortion | Passive Aggression | Isolation of Affect | Anticipation |
| | Hypochondriasis | Dissociation | Altruism |
| Projection (concrete) | Schizoid fantasy | Displacement | Sublimation |
| | Neurotic projection | Reaction Formation | Humor |

Borderline personality disorder was one of the first personality disorders to be described by psychiatrists. Individuals with this condition were thought to function somewhere along the continuum from normal to neurotic to psychotic. Otto Kernberg, one of the most influential scholars of borderline personality, introduced the term "Borderline Personality Organization" in 1967, and this concept has largely framed the discussion of borderline personality disorder since that time. Borderline organization is characterized by the following:

➢ Splitting: thinking in black/white, good/bad terms.
➢ Primitive idealization: creation of unrealistic almighty figures in the individual's life.
➢ Projective identification: an unconscious fantasy about a person with whom the individual is in a relationship.
➢ Denial: an inability to see reality and/or opposing views about a situation, person, or idea.
➢ Omnipotence and devaluation of self: unstable self-image.

The DSM-V discusses diagnostic features of Borderline Personality Disorder:

Individuals with borderline personality disorder may display impulsivity in at least two areas that are potentially self-damaging (Criterion 4). They may gamble, spend money irresponsibly, binge eat, abuse substances, engage in unsafe sex, or drive recklessly. Individuals with this disorder display recurrent suicidal behavior, gestures, or threats, or self-mutilating behavior (Criterion 5). Completed suicide occurs in 8%-10% of such individuals, and self-mutilative acts (e.g., cutting or burning) and suicide threats and attempts are very common. Recurrent suicidality

Supplemental Report on Lisa Barbounis

is often the reason that these individuals present for help. These self-destructive acts are usually precipitated by threats of separation or rejection or by expectations that the individual assumes increased responsibility. Self-mutilation may occur during dissociative experiences and often brings relief by reaffirming the ability to feel or by expiating the individual's sense of being evil.

Individuals with borderline personality disorder may display affective instability that is due to a marked reactivity of mood (e.g., intense episodic dysphoria, irritability, or anxiety usually lasting a few hours and only rarely more than a few days) (Criterion 6). The basic dysphoric mood of those with borderline personality disorder is often disrupted by periods of anger, panic, or despair and is rarely relieved by periods of well-being or satisfaction. These episodes may reflect the individual's extreme reactivity to interpersonal stresses. Individuals with borderline personality disorder may be troubled by chronic feelings of emptiness (Criterion 7). Easily bored, they may constantly seek something to do. Individuals with this disorder frequently express inappropriate, intense anger or have difficulty controlling their anger (Criterion 8). They may display extreme sarcasm, enduring bitterness, or verbal outbursts. The anger is often elicited when a caregiver or lover is seen as neglectful, withholding, uncaring, or abandoning. Such expressions of anger are often followed by shame and guilt and contribute to the feeling that they have of being evil. During periods of extreme stress, transient paranoid ideation or dissociative symptoms (e.g., depersonalization) may occur (Criterion 9), but these are generally of insufficient severity or duration to warrant an additional diagnosis. These symptoms tend to be transient, lasting minutes or hours. The real or perceived return of the caregiver's nurturance may result in a remission of symptoms.

There is voluminous literature about individuals with primitive personality disorders, such as Borderline Personality Disorder. While a detailed discussion of the problems created by the fragmented egos of individuals with personality disorders is far beyond the scope of this report, it is essential to understand this concept generally, in order to make sense of Lisa Barbounis' emotional responses. De Meulemeester, et al.[8] provide a concise summary of a central problem for individuals with Borderline Personality Disorder:

…identity diffusion is thought to explain many of the interpersonal problems that BPD patients typically experience. Identity diffusion is fundamentally characterized by problems with self–other boundaries, which may also be expressed in binary thinking (e.g., either extremely positive or extremely negative) about self and others, leading to the typical turbulent relationships of BPD patients. This idea is supported by empirical studies that have found high correlations between identity diffusion and interpersonal problems in BPD (Lowyck et al., 2013; Sollberger et al., 2012).

Emotions such as shame, disappointment, and embarrassment are poorly tolerated by individuals with fragmented ego structures, as in the case of primitive personality disorders, and often lead to elaborate plans for revenge. Dr. Celani[9] writes of this

Supplemental Report on Lisa Barbounis

phenomenon, incorporating the work of others who have studied individuals with borderline personality structure:

> The desire for revenge is one of the most common aspects of the antilibidinal ego, and, as mentioned, it gives purpose and meaning to this functional part-self. Indeed, the antilibidinal ego can overpower the central ego precisely because it has a strongly held mission and well-developed strategies, whereas, in comparison, the lost and depleted central ego has had too few interactions with the idealized aspect of the parent to give it direction or purpose. (pp. 88, 89)

Ms. Barbounis' treatment records are consistent with a diagnosis of Borderline Personality Disorder and descriptions of the maladaptive defensive strategies she used are seen throughout Ms. DeBernardo's notes. For example, Ms. Barbounis demonstrated splitting and primitive idealization to Ms. DeBernardo when she discussed her relationships on May 5, 2020:

> Pt stated that she was concerned with her behavior (Ryan called and she jumped, no regard for family, friend Courtney, and blew off work on Friday), noting that she felt like a junky ("addicted to Ryan"). Also, Pt stated that she hung out with Courtney in between. Pt explained that she puts people on a pedestal, however, is something gets on her nerves, she starts to pull away from them.

Ms. Barbounis' unstable self-image is evidenced throughout her treatment records and her sense of omnipotence was discussed in my previous report. Her primitive denial can be seen in her inability to accurately perceive her relationship with Ryan. All of these pathological ways of relating to herself and the world are relevant to Ms. Barbounis' allegations against Gregg Roman and the MEF.

As discussed in detail in my previous report, Ms. Barbounis' allegations of sexual assault and/or harassment by Gregg Roman are difficult to credit. However, what is clear is that Ms. Barbounis did not feel sufficiently celebrated at the MEF. It is likely that Ms. Barbounis' underlying sense of shame and disappointment combined with her characteristic reliance on pathological, primitive defense strategies led her to seek revenge on those whom she sought as culpable for failing to elevate her to a status to which she aspired.

Ms. Barbounis' history demonstrates several instances during which she aimed to "get at" others who disappointed her, most often by failing to "love her enough." On May 12, 2020, Ms. Barbounis told Ms. DeBernardo that she used "strategies to manipulate the situation with ex Ryan," enjoining her friend Courtney to participate in an elaborate plot that involved Ryan's ex-wife. This is not the only example of Ms. Barbounis manipulating a situation in order to increase her standing in the eyes of a lover while simultaneously punishing him by involving others; she also displayed this pattern in her relationship with Danny Thomas. These relationships highlight Ms. Barbounis' intense need for approbation, her fury when she is denied what she either feels is her due or what she longs for, and her attempts to retaliate against men who disappoint her. While these two

Supplemental Report on Lisa Barbounis

relationships provide dramatic examples of Ms. Barbounis' pathological inability to maintain a sense of self when she is not reflected in the idealized image of another, this pattern almost certainly plays out in most of Ms. Barbounis' relationships because it is rooted in her character pathology. When viewed dispassionately, Ms. Barbounis' interactions with Gregg Roman reflect the same psychological pattern: idealized self→ devalued self→ revenge.

**CONCLUSIONS**

In summary, the treatment records reviewed provide additional support for the opinions rendered in my previous report on Lisa Barbounis. They expose significant characterologic pathology in Ms. Barbounis and an absence of acute or new psychiatric symptoms. Further, that Ms. Barbounis failed to discuss Mr. Roman's allegedly abusive or harassing behaviors even once in therapy calls into question Ms. Barbounis' allegations.

All available information indicates that Ms. Barbounis did not suffer from either Generalized Anxiety Disorder or Major Depressive Disorder during the time she was in treatment at Mindoula. Her underlying personality disorder is unrelated to events at the MEF.

These opinions have been rendered with a reasonable degree of medical certainty. I reserve the right to amend this report should I receive additional medical records or information.

Barbara Ziv, M.D.

Supplemental Report on Lisa Barbounis

[1] American Psychiatric Association (2013). Diagnostic and statistical manual of mental disorders (5th ed.). Washington, DC.

[2] Kernberg, O. F. (1970). A psychoanalytic classification of character pathology. J. *Am. Psychoanal. Assoc.* 18, 800–822.

[3] Kernberg, O. F. (2005). Unconscious conflict in the light of contemporary psychoanalytic findings. *Psychoanal*. Q. 74, 65–81.

[4] Kohut, H. (1977). The Restoration of the Self. New York, NY: International Universities Press.

[5] Cramer, P. (2006). Protecting the Self: Defense Mechanisms in Action. New York, NY: Guilford Press.

[6] Cramer, P. (2008). Seven pillars of defense mechanism theory. *Soc. Pers. Psychol. Compass* 2, 1963–1981.

[7] McWilliams, N. (2011). Psychoanalytic Diagnosis: Understanding Personality Structure in the Clinical Process. New York, NY; London: The Guilford Press.

[8] De Meulemeester, Lowyck, Vermote, Verhaest, & Luyten. (2017). Mentalizing and interpersonal problems in borderline personality disorder: The mediating role of identity diffusion. *Psychiatry Research, 258*, 141-144.

[9] Celani, D. (2010). *Fairbairn's object relations theory in the clinical setting*. New York: Columbia University Press.