# AAPL Practice Guideline for the Forensic Assessment[*]

## 1. Statement of Intent

This document is intended as a review of legal and psychiatric factors to offer practical guidance in the performance of forensic evaluations. It is a guideline developed through the participation of forensic psychiatrists who routinely conduct a variety of forensic assessments and who have expertise in conducting these evaluations in a variety of practice settings. The developmental process incorporated a thorough review that integrated feedback and revisions into the final draft. The final version was reviewed and approved by the Council of the American Academy of Psychiatry and the Law on October 26, 2014. Thus, the Guideline reflects a consensus among members and experts about the principles and practices applicable to the conduct of forensic assessments. However, it should not be construed as dictating the standard for forensic evaluations. While it is intended to inform practice, it does not present all currently acceptable ways of performing forensic evaluations, and following its recommendations does not lead to a guaranteed outcome. Differing facts, clinical factors, relevant statutes, administrative and case law, and the psychiatrist's judgment determine how to proceed in any individual forensic assessment.

The Guideline is for psychiatrists and other clinicians working in a forensic role who conduct evaluations and provide opinions in legal and regulatory matters. Any clinician who agrees to perform forensic assessments in any domain is expected to have the qualifications necessary to meet the professional standards in the relevant jurisdiction and to complete the evaluation at hand.

## 2. Introduction

Forensic assessment is one of the basic building blocks that form the foundation of the practice of psychiatry and the law, in addition to report-writing and giving testimony in court. Similar to any foundation, the integrity of the process depends on how well each brick is laid upon the other. In psychiatry and the law, the quality of the final product depends on the quality of the assessment, regardless of the practitioner's report-writing skills.

Forensic psychiatrists are often called on to act as consultants to the courts, lawyers, regulatory agencies, or other third parties. The referring agent has a specific psycholegal question that requires an expert opinion, generally to advance a legal requirement. To respond to that question, forensic psychiatrists generally conduct an assessment.

This Guideline is the product of a consensus based on the available literature and knowledge in a broad range of forensic assessments. The field of psychiatry and the law, along with the rest of medicine, is increasingly using an evidence-based approach.[1] Evidence-based medicine is defined by Sackett et al. as "the conscientious, explicit, and judicious use of current best evidence in making decisions about the care of individuals" (Ref. 2, p 2). Sackett and collaborators made the point that all clinical assessments are, to a certain extent, individualized, based on the unique factors of each case.

[*] The AAPL Task Force on a Forensic Assessment Guideline consisted of: Graham D. Glancy, MBChB, FRCP(C) (Chair); Peter Ash, MD; Erica PJ Bath, MD; Alec Buchanan, PhD, MD; Paul Fedoroff, MD; Richard L. Frierson, MD; Victoria L. Harris, MD; Susan J. Hatters Friedman, MD; Mark J. Hauser, MD; James Knoll, MD; Mike Norko, MD; Debra Pinals, MD; Marilyn Price, MD, CM; Patricia Recupero, MD, JD; Charles L. Scott, MD; and Howard V. Zonana, MD.

The following members of the Task Force composed a Steering Committee for development of the Guideline: Drs. Glancy, Buchanan, Norko, Pinals, and Zonana.

Acknowledgments: The authors thank the following for their assistance and advice in preparing this Guideline: Jacquelyn Coleman, Elizabeth Ferris, Stefan Treffers, Dylan Glancy, and Kirsten Donovan.

Disclosures of financial or other potential conflicts of interest: None.

**Summary 2**   Objectives of the Guideline

- To provide practical guidance for the performance of forensic psychiatric assessments.
- To provide information for clinicians and trainees.
- To improve resources for teaching and training.
- To create a template to improve consistency of assessments.
- To help identify future research directions.

The recommendations in the Guideline do not set a standard of practice and are not a substitute for

knowledge-seeking, experience, or training among practitioners. It is the individual responsibility of each clinician to make appropriate decisions and judgments that are based on the circumstances of each case. It is also recognized that policies and procedures change with the passage of time and from one setting to another.

The writing of forensic psychiatric reports is beyond the scope of this Guideline. Report-writing is a vast topic in itself that has been covered in several other publications.[3–9]

The text provides an overview that is applicable to various types of assessments: for criminal cases (competence to stand trial and culpability); for risk or dangerousness (of violence, sexual violence, or criminal recidivism); and for civil proceedings (disability, fitness for duty, testamentary capacity, guardianship, child custody, malpractice, and civil commitment). It is intended to complement, not replace, existing practice guidelines published by the American Academy of Psychiatry and the Law (AAPL) that focus in more depth on particular areas of evaluation.

## 3. Quality Improvement in Forensic Practice

Several studies and articles have assessed the quality of forensic psychology and psychiatry practice.[10–16] A review of the literature concluded that the level of practice falls short of professional aspirations for the field, although there have been incremental improvements during the 1990s.[12] No studies to date have observed forensic psychiatric interviews, although some, mainly in the field of psychology and the law, have looked at the content of forensic reports. In particular, these have examined the psychological tests used in criminal forensic evaluations,[13] emotional injury cases,[14] child custody assessments,[17] and neuropsychological assessments.[16] The results demonstrated significant inconsistencies and variable standards. One study,[15] for instance, noted poor agreement on such basic points as the presence of a mental disorder and the psychiatric diagnoses submitted by opposing experts. Given these findings, it is important to enhance the potential for consistent practices that can inform forensic assessment.

In 2010, Griffith and colleagues[4] conceptualized the forensic psychiatric report as a performative narrative. Although their article concentrated on the written report, it suggested that psychiatrists "listened hard to the voices they heard" (Ref. 4, p 42).

The authors also drew attention to aspects of the interpersonal relationships between parties, which may be significant. Kenneth Appelbaum,[18] commenting on the article, cautioned mental health experts to ensure the accuracy and veracity of their assessments. Mossman and colleagues[19] attempted to measure the accuracy of assessments in a quantitative manner. They compared multiple ratings per evaluee and concluded that evaluators are very accurate. However, recent research has examined the quality of forensic reports and rated them as mediocre, noting that there was fair agreement between the evaluators' conclusions and court findings.[20]

Wettstein struck an optimistic note, stating, "in the long-term future, we expect that quality improvement at a more sophisticated level will transcend anything discussed heretofore" (Ref. 11, p 172). This view built on his previous work with Simon,[21] in which they described general guidelines, shaped by the ethics principles of general and forensic psychiatry, as well as case law and statutes. Such guidance was intended to help practitioners maintain the integrity of forensic psychiatric consultation and examination.

## 4. Ethics Foundation

The American Medical Association's Code of Ethics states that "physicians have an obligation to assist in the administration of justice."[22] Forensic psychiatrists are physicians who are trained to diagnose and treat patients within the ethics principles embedded in the doctor–patient relationship. However, as Paul Appelbaum[23] has stated, the role of the forensic psychiatrist in assisting court and other agents sometimes demands that the psychiatrist step outside of the doctor–patient relationship. The psychiatrist is primarily serving the interests or needs of the court, the retaining attorney, or another third party, but their interests may or may not serve those of the evaluee.[24] Therefore, in this context, the forensic practitioner strives for objectivity in seeking to answer a psycholegal question.

The ethical practice of forensic psychiatry has therefore been a subject of significant discussion in the psychiatric literature, with competing, complementary, and sometimes conflicting models of ethical practice offered.[23,25–36] Stone[37] has stated that the role of the forensic psychiatrist is so framed that the formulation of ethics guidelines is impossible. This view was countered by Paul Appelbaum,[23] who attested that the primary value of forensic psychiatry

is to advance the interests of justice. With this in mind, ethical practice can be guided by the two principles of truth-telling and respect for persons. Bearing these principles in mind, we can distinguish between our clinical therapeutic and forensic roles. Weinstock and colleagues[38] noted that the conflicting values of law and medicine make balancing these roles a formidable task. They argued that traditional medical ethics remains the ideal goal and that the individual practitioner must attempt to resolve the ethics-related problems that arise. Griffith[27] introduced the notion of cultural formulation. The forensic evaluator seeks the sociocultural truth about the subject in the formulation of the particular behavior before the court. By using cultural formulation in this context, the forensic psychiatrist can come to a better understanding of the evaluee's experience, while appreciating the evaluee's psychosocial environment, thereby constructing a fuller and more accurate presentation of the data.

Other authors have developed syntheses of these frameworks based on compassion,[35] robust professionalism,[28,29,31] and an acknowledgment of the tension in holding simultaneously to both medical ethics and the demands of the criminal justice system.[32,33] The AAPL Ethics Guidelines call for adherence to honesty, striving for objectivity, and respect for persons in the organization's attempt to generate a workable code of ethics for forensic psychiatric practice.[39]

In a general psychiatric practice, the patient presents signs and symptoms to a psychiatrist. The psychiatrist then makes a diagnosis and formulation to help the patient understand the symptoms, with a view to treatment that will help to resolve the symptoms. In forensic psychiatry, the situation may be complicated by the attempt to apply specific signs and symptoms to legal criteria. Furthermore, evaluees in forensic contexts may exaggerate or minimize their symptoms for several reasons: for example, to maximize their injury in civil cases or to minimize their involvement or culpability in criminal cases. Forensic psychiatrists are concerned with the accuracy of the received information that forms the basis for their conclusions. Consequently, in performing assessments, they are particularly concerned about dissimulation and malingering of symptoms and disorders (discussed in Section 10.5, Malingering and Dissimulation).

Because the accuracy of the information received enhances the validity of the psychiatrist's conclusions, Heilbrun *et al.*[24] likened the forensic psychiatrist to an investigative journalist, recommending that third-party information be elicited from a variety of sources. Although collateral information may be helpful in general psychiatry, its importance is magnified in forensic psychiatry. Section 5.3, Collateral Information, is devoted to the collection of third-party (or collateral) information.

# 5. Assessment Process

## 5.1. Setting the Stage

The success of the forensic assessment begins with careful attention to detail in the initial agreement with the retaining party. In the initial contact with the referring agent, there are several determinations to be made by the forensic expert, such as whether there are any conflicts of interest, limitations to objectivity for the psychiatrist in the circumstances, and limitations based on state medical boards' rules regarding licensure to provide expert evaluation or testimony. As well, the expert must determine whether he has the requisite knowledge, skill, and experience to accept the case. The psychiatrist's qualifications in relation to a specific case can be evaluated by a discussion with the referring party concerning the precise psychiatric question(s) to be answered and the expert's role in the case.[7,40−42] In addition, experts must evaluate whether they have the time and resources necessary to respond to the retaining attorney within the required time frame. Establishing with the referring party a time frame for the completion of the evaluation is an important detail in properly setting the stage for the assessment. If the expert does not have the time or resources, a referral to a colleague may be in order. Summary 5.1A outlines the variables that the expert must consider in setting the stage for a case.

---

**Summary 5.1A**   Setting the Stage

Before conducting an assessment, the expert must:
- Determine whether there is any conflict of interest.
- Determine whether there are limitations to objectivity.
- Identify limitations regarding licensure.
- Determine what expertise is necessary.
- Estimate the time and resources needed to respond to the referring agent.
- Understand the role of the expert in the case.

---

The potential for a conflict of interest, or even the appearance of one, can compromise objectivity. Conflicts may be legal (when the expert has participated in a case for the other party), monetary (when the expert has a financial interest in the outcome), administrative (when the expert serves in an official capacity that may create an interest in the outcome), educational (e.g., when the expert is a member of a training program and thus may be privy to information about the case from multiple perspectives), and personal (when the expert has a relationship with an individual involved in the case).[7] An examiner may also have political or ideological conflicts of interest. The possibility of conflicts should be explored during the initial contact with the referring agent, but conflicts may come to light only later in the case. In those situations, the expert should determine whether the conflict warrants recusal and referral to a colleague.

In many jurisdictions, plaintiffs cannot be required to travel more than a specified distance to attend an assessment. As a result, the retained expert may be required to travel to a mutually agreed upon location to assess the plaintiff. If the assessment is to take place in a state where the expert does not hold a medical license, the expert must determine whether the state requires that a forensic psychiatrist hold a medical license to conduct an assessment before agreeing to accept the case.[43]

Discussions with the referring agent typically include asking what collateral information is available and will be provided by the referring agent (see Section 5.3, Collateral Information). These discussions should not be treated as sources of data or listed as such in the final report.[44] Throughout the assessment process, the expert should seek to identify gaps in the available data and make efforts to obtain the appropriate data from the referring agent or through releases of information signed by the evaluee.

The initial discussion is often followed by a written letter of agreement between the retaining agent and the expert. In general, written terms of agreement specify the expert's hourly rate, an estimate of the time needed for the consultation, and the arrangements for payment of a retainer fee, against which the work will be charged and which will be replenished as necessary. Examples of such retainer letters are available.[40,41] Fixed fees are common in some jurisdictions for some types of assessments, such as competence to stand trial.[36]

### 5.2. Confidentiality

The flow of information in a forensic assessment is a central concern. As noted in the AAPL Ethics Guidelines, "the practice of forensic psychiatry often presents significant problems regarding confidentiality" because information is always released to the retaining party and may be released to other parties.[39] Thus, evaluees must always be informed of the limits of confidentiality, the persons with whom the information will be shared, and the purpose of the interview. Evaluees may require frequent reminders of the limits of confidentiality during the course of an assessment, especially when multiple interviews are conducted over a prolonged period.

Closely associated with the notice about the intended disclosure of the assessment results is the need to make clear to the evaluee the unusual role of the examiner. Many evaluees are accustomed to dealing with health care professionals under a set of expectations appropriate to a treatment relationship. A limited physician–patient relationship may still be present, even in forensic assessments, placing continued obligation on the physician-examiner.[36,45] However, the forensic expert must make it clear that the assessment is not for the purposes of treatment and that the rules of confidentiality are different and governed by the requirements of the legal system.[36,46]

---

**Summary 5.1B**   Retainer Letter

The retainer letter might include:
- The specific psycholegal question.
- The role of expert.
- The time frame, with any deadline.
- An estimation of the time needed for the assessment (when appropriate).
- The fee structure (where appropriate).

---

**Summary 5.2**   Confidentiality

Evaluees must be informed of:
- The limits of confidentiality, including:
  - That the evaluation will be sent to retaining party.
  - That the evaluation is not for treatment.
- Legal matters, including:
  - The mandatory and permissible reporting requirements.
  - The possibility of disclosure in open court.
  - The right to decline to answer questions.

The limits of confidentiality are determined, in part, by which of the legal participants in the matter has retained the psychiatrist, with different warnings being appropriate, depending on whether the psychiatrist is working for the defense, the prosecution, or the court.[47] Specifically, the defense expert can inform the evaluee that, if the assessment is not going to be helpful to the case, the attorney may be able to keep it confidential as part of attorney work product. In some jurisdictions, the evaluee's understanding of the limits of confidentiality is assessed before proceeding.[48] In addition, use of an evaluee's self-incriminating statements given during a certain type of forensic assessment may be limited or excluded at subsequent criminal trials.[48–50] In some jurisdictions, reports written in one context may be used years later in other contexts. Although forensic reports are often initially protected, if they are introduced as evidence in testimony, they become accessible in the public domain.

The limits of confidentiality were complicated by passage of the Health Insurance Portability and Accountability Act of 1996 (HIPAA),[51] which introduced the Privacy Rule mandating confidentiality of all medical assessments by covered entities (i.e., health care providers who electronically transmit information). There are some exceptions to the Privacy Rule for assessments ordered by a court, but these exceptions do not apply to assessments requested by an evaluee's attorney or some other third-party requestors, such as the Social Security Administration.[45] Thus, it is prudent to secure a release of information from the evaluee and to provide a Notice of Privacy Practices if the evaluation is not ordered by a court.[52] These forms can be found in the literature.[41,47] Some state laws may create more stringent confidentiality requirements, and evaluators should be familiar with their jurisdiction's requirements. Other limits of confidentiality may include an evaluator's duty to report child or elder abuse or neglect,[53] a duty of disclosure related to serious threat of harm to the evaluee or to third parties (the duty to warn),[54] and other duties related to a specific jurisdiction.[55,56] If any of these duties arises, the expert should consult with supervisors, peers, or an attorney and discuss the potential release of information with the referring agent before making the disclosure. Collateral sources interviewed should also be given notice of the limits of confidentiality, the purpose of the assessment, and the likely uses of the assessment results.[7]

Written documentation of the discussion about confidentiality should be made to establish a record regarding what the evaluee was told about the nature of the assessment.[47,57]

Opinions vary regarding whether an evaluee should be warned that malingering on his part will be assessed. Such warnings are generally not recommended immediately before administering a test for malingering, because the effectiveness of the test may be compromised.[57–59] If the evaluator decides to provide a caution regarding the assessment of malingering, statements to the evaluee can be included in the informed-consent section of the written report. For example, the evaluator may state that the evaluee was informed at the beginning of the interview that methods of detecting exaggeration and poor effort would be part of the assessment process, or that the evaluator was assessing the evaluee's diagnosis and that it was important that all questions be answered as accurately as possible (Ref. 56, p 244).

After the expert obtains informed consent for the assessment, the evaluee should be given an opportunity to ask questions regarding the process. If there are unanticipated questions, such as a request to make an audio- or video-recording of the examination or to have a third party present during the assessment, the examiner should consider contacting the retaining attorney with this new information before proceeding. In general, if an evaluee is seeking to record the interview, the examiner should do the same and retain a recording of the session. The evaluee also has the right to contact counsel regarding questions about the assessment process and should be allowed to do so before resuming the examination.

Although the informed consent of the evaluee is not necessary for some types of assessments (e.g., court-ordered assessments for competence to stand trial or involuntary commitment), the evaluator must avoid coercion in the interview. Regardless of its subtlety, coercion is inappropriate, and the evaluee or any collateral source should be free to decline to answer any or all questions.[60] However, the evaluator must also give the evaluee appropriate notice that refusal to participate in some or all of the assessment may be noted in the report in a court-ordered assessment.[46]

### 5.3. Collateral Information

Collateral sources of information, when available, are usually an important element of the forensic assessment. With the consideration of multiple data sources, varying points of view may have to be reconciled. Memory deficits, effects of treatment, and malingering may affect the evaluee's statements. Collateral information may add to or complement the evaluee's account and may be compared with the evaluee's account to help detect malingering and assess reliability. However, the biases of various reporters also should be considered.[16]

Collateral information for the expert's review may include written records, recordings, and collateral interviews. Records from police, psychiatric and medical treatment, school, the military, work, jail, and financial institutions may be appropriate, depending on the type of assessment. Reviewing assessments performed by other experts may help determine the consistency of reporting; as well, psychological testing scores and brain imaging may be relevant.[46]

The expert opinion may benefit from interviews with several sources, including family members, colleagues, friends, victims, and witnesses, and the sources will vary by type of assessment. The interviews may be arranged through the referring agent or through the court. At the start of the interviews, participants should be warned about the limits of confidentiality, and the purpose of the interview should be explained. The warning should include informing the source of how the information may be used. It is advisable to inform collateral contacts that everything said is on the record and may be used in open court and made public, so that they can consider in advance what information to share. As with interviews of evaluees, interviews of collateral informants should involve open-ended questions with varying focal points. Leading questions should be avoided.

The collateral information to be sought depends on the specific question posed by the referring agent and the circumstances of the case. Collateral data are especially important in reconstructive assessments, such as those for sanity, testamentary capacity, and disability, in which the evaluee's mental state in the past is the focus.[6] Alternatively, in a competency assessment, police reports and allegations against the evaluee, as well as the reasons the court or attorney are requesting the assessment, are particularly relevant. A review of these materials may lead the psychiatrist to request additional materials or interviews.

Experts should endeavor to obtain all necessary and relevant information as early in the process as possible, as subsequent revelations of contradictory or inconsistent data may change the expert's opinion.

---

**Summary 5.3A**   Collateral Information

Collateral information is obtained from:
- Written records collected from various sources.
- Medical and psychiatric records.
- Interviews with various sources who are familiar with the patient.

---

If the psychiatrist is retained by the court or by the attorney of the evaluee whose medical records are being sought (e.g., a defendant in a criminal matter, a former patient in a malpractice case, or a litigant seeking damages), the psychiatrist may obtain written consent directly from the evaluee. However, in most cases, requests for information or collateral interviews generally should be made through the retaining attorney. If hired by the court, the psychiatrist may also contact both attorneys as required. In some situations, the retaining attorney may have to pursue a court order to obtain collateral information requested by the expert.

The expert should perform a personal review of relevant information whenever possible and avoid relying on summaries prepared by attorneys, which may contain distortions or omit clinically important details. The psychiatrist may identify additional sources of information that is missing from an attorney's summary, which should then be sought. If the psychiatrist works with a team, other members of the team may summarize large volumes of information, although the psychiatrist signing the report accepts responsibility for its content. However, while the psychiatrist should be prepared to address the content of the report, team members who have gathered or generated information may also, although rarely, have to testify.

In general, the evaluator should review relevant documents as they become available. Reviewing collateral data before conducting interviews provides the expert with a more comprehensive understanding of the case, so that the expert may ask additional appropriate questions and note any inconsistencies.[42] However, in certain circumstances, reviewing information before an interview may not be desirable because of, for example, concerns that the written information may bias the evaluator. In some cases, a

review may not be possible. For example, in civil cases, a judge may rule to exclude a plaintiff's history of civil litigation, including previous alleged damages or awards, if the judge finds that the prejudicial value of a prior lawsuit outweighs its probative value. The forensic evaluator should therefore clarify with the referring agent whether there have been rulings that exclude any evidence. Furthermore, some records may not be available or may not be reviewed because of time constraints. Additional sources of information, such as medical records, may not be available or reviewed in some types of evaluations, such as competence assessments, although regional practices may vary.[11]

Collateral data facilitate objectivity and may aid in opinion formulation, furthering understanding of the evaluee's mental state at various points in time, such as before an accident or at the time of the offense. Criminal defendants' or civil plaintiffs' reports and recollections may differ from more objective and contemporaneous records. Such data may also help in assessing accuracy or malingering.

All relevant sources of information should be listed in the report, as well as any information that was requested but not received. The expert may modify the opinion should relevant additional information become available later.

### 5.3.1. Interviews by Other Mental Health Professionals

In certain jurisdictions, and particularly in multidisciplinary team settings, interview data gathered by ancillary mental health professionals may be used and incorporated into the forensic evaluator's report. These additional mental health professionals may assemble data from collateral informants. For example, they may gather psychosocial data by interviewing multiple sources, such as family, teachers, and other social contacts of the evaluee. When relying on data collected by another professional, the primary evaluator should be able to attest to the general reliability of the ancillary professional's work in contributing to the evaluator's opinion. In some cases, aspects of the data may be lacking in sufficient detail at critical junctures, or points may need further clarification. In such cases, the primary evaluator may ask the ancillary professional to supply further information or to reinterview a source, or the primary evaluator may follow up by reviewing data or reinterviewing sources.

**Summary 5.3B**   Useful Records in Criminal and Civil Evaluations

Personal records:
- Past and present mental health treatments
- Substance abuse treatment
- Medical history and treatments
- Psychological testing results
- Expert declarations and prior forensic reports
- Educational history
- Occupational history
- Military history
- Arrest history
- Histories of detention and incarceration
- Personal notes
- Diaries
- Computer files
- Cellular telephone records and text messages

Criminal assessments:
- Police reports
- Grand jury minutes
- Investigation reports
- Witness interviews
- Police interrogation tapes and interview transcripts
- Tapes of jail conversations

Civil assessments:
- Job description
- Work investigations and employment hearings
- Educational history
- Depositions of the plaintiff, treatment providers, and other relevant parties
- History of lawsuits
- Undercover investigation reports or videotapes
- Financial institution records

### 5.3.2. Additional Sources

The evaluator must decide which collateral sources to contact. In determining how many collateral contacts are sufficient, the potential yield of additional contacts must be balanced with the expenditure of effort to contact them. For example, if a particular source can provide critical information, concerted efforts and several attempts to pursue this source may be appropriate. There are no rules about which collateral contacts are necessary in any given case, although, generally, the closer an individual is to the evaluee and the closer he was to the evaluee during the time frame of the incident, the more useful his information will be in helping to understand the context. Collateral sources should be selected because they will provide information directly relevant to the questions at hand. Such sources typically include family, friends, partners, coworkers, and witnesses.

Internet searches regarding the evaluee can also provide useful information. Social networking sites and other Internet social forums may contain information about the evaluee that conflicts with data provided by the evaluee or others, warranting further examination to contextualize this apparent conflict. An evaluee's online persona may constitute impression management or posturing, as people often behave or present themselves differently online than in person. It is also possible that the online information is more accurate than what the evaluee is telling the police and experts.

### 5.3.3. Criminal Assessments

*Police reports and other official criminal records.*   In criminal assessments, documentation of the criminal allegations constitutes key data. Generally, this documentation is found in a police report or a series of police reports from the different officers involved in an arrest. Additional sources may include grand jury records or transcripts of grand jury proceedings. These reports can be critical to forensic assessment because they provide the factual allegations that serve as the basis for criminal charges. For a pretrial assessment, these data can be used to help ascertain whether the evaluee understands the nature and meaning of the charges.[36] In some cases, it may be helpful or necessary to read or to have the evaluee read the actual police report, so that the evaluator can be sure that the evaluee has accurate information about the allegations and the identity of the witnesses. An evaluator's review of the content of the police report can also help in assessing the evaluee's rational and factual understanding of the charges.

The police report and other official documentation of the charges, such as witness statements, may provide critical information related to the evaluee's conduct or thinking at the time of the alleged offense. Such documentation can help the evaluator construct a picture of whether the defendant may have demonstrated symptoms of a mental disorder relevant to the question of criminal responsibility. Similarly, in sentencing assessments, the evaluator should use police reports and official documentation of the offense to enhance understanding of the details of the criminal conduct and in elucidating patterns of conduct and the relationship of mental illness or substance use to the crime. This understanding, in turn, can help inform treatment recommendations if needed.

---

**Summary 5.3.3**   Criminal Assessments

Collateral information to assess criminal responsibility:
- Police reports
- Witness statements
- Contemporaneous medical and psychiatric records
- Collateral sources

---

Although the evaluator in any criminal case should be familiar with the officially documented criminal allegations, whether the content of the police report is included in a specific criminal forensic evaluation report depends on the type of case (e.g., competence to stand trial or criminal responsibility) and differences in jurisdictional practice. In evaluations to determine criminal responsibility and aid in sentencing, evaluators may provide a succinct summary of the police report or official allegations in the body of the report, to help the reader understand the direction of the opinion. When summarizing police reports or allegations, the expert risks misrepresenting aspects of the allegations by quoting selectively or by omitting details that may prove to be relevant later in the proceedings. Thus, evaluators should recognize that such summaries must be carefully constructed, to avoid bias. Other approaches are to append the full police report or to simply list it as a source of information.

*Contact with law enforcement and legal officials.*   In criminal contexts, one of the important collateral sources can be information obtained from police officers and witnesses to alleged criminal conduct. However, there are some difficulties posed by telephoning police officers and other officials. It may be necessary to call a police officer outside of the evaluator's regular business hours, as officers may be available only during evening or night shifts. Officers may be surprised to receive a cold call from a forensic evaluator and may not be willing to speak. Some may want to review the request for an interview with their superior before agreeing to it. For all of these reasons, the evaluator may have to discuss such calls with the referring attorney before making a call to a police officer. The prosecuting attorney may not want the evaluator to interview the officer, and jurisdictional provisions may dictate how to proceed.

Once an interview with a police officer has been granted, it is important to remind the officer of the evaluator's role. Although police officers and witnesses may not have the same confidentiality con-

cerns as evaluees, they should understand that the information revealed could be used in open court and in the court report. In interviewing a police officer, it is important to avoid leading questions and to probe the officer's recollection to draw out facts in detail (e.g., how the criminal defendant was acting, such as observations that the defendant was mumbling to himself or making unusual or bizarre statements). Also, evaluators should understand that, because officers face numerous situations involving persons with apparent mental conditions, their recollection of what, for them, is a routine event may be limited.[61,62] When they do remember offenses in detail, they typically and appropriately describe their observations in lay terms, and a skilled evaluator will attempt to understand these descriptions in clinical terms where appropriate. It may also be necessary to pursue questions more rigorously if an officer recounts only the basic facts and fails to address aspects of the encounter relevant to the evaluee's mental state.

### 5.3.4. Civil Assessments

When performing civil assessments that involve the workplace, it is often helpful to obtain a job description and a personnel file, which may include investigations and employment proceedings. In addition, it may be possible to obtain extensive data such as personal notes and diaries, computer files, and video recordings or undercover investigational reports. Counsel may also be able to supply data from lawsuits as well as transcripts from depositions.[46]

For litigation involving claimed mental harm, the expert should request important legal documents. For example, the plaintiff's complaint outlines the emotional damage claimed and its relationship to the event or circumstance that is the subject of litigation. The complaint is usually countered by a list of specific questions (interrogatories) from the defense, followed by the plaintiff's answers to these interrogatories. Additional records are commonly requested and may be useful (see the list in Summary 5.3B).

### 5.4. The Interview

#### 5.4.1. Physical Setting

The physical setting for forensic assessment interviews can vary from the private office of the forensic psychiatrist, to an attorney's office, to a correctional facility. The site is often determined by the purpose of the assessment. For example, for an assessment for a civil proceeding, the interview would generally be scheduled in an office, but for an assessment stemming from a violent crime, the interview may be held in the correctional facility where the evaluee is detained. As with all psychiatric interviews, attention must be given to the environmental aspects of the setting, such as lighting, ambient temperature, seating arrangements, safety, and the presence of a desk or table so that the interviewer can take notes by hand or on computer.

---

**Summary 5.4.1**   Interview Process: Physical Setting

- Ensure safety of evaluator and evaluee.
- Establish entry and exit strategies.
- Ensure maximum privacy.
- Consider and negotiate the presence of third parties.

---

Each specific setting gives rise to unique considerations for the interview. In one survey of state-certified forensic experts, distressing incidents were seen no more frequently in forensic practices than in nonforensic clinical work.[63] That said, forensic professionals should attend to areas of possible concern and seek consultation as needed to help identify strategies for safety, if necessary. Strategies noted by respondents to the survey by Leavitt and coworkers[63] included keeping doors to the interview room open, having a third party close by, and informing others of one's whereabouts.

In a private office, consideration should be given to entrance and exit strategies for the evaluee, who, like many psychiatric patients, may wish to remain anonymous and avoid other patients and office staff or who may wish to terminate the assessment abruptly. This consideration may be particularly important for evaluees attending sensitive assessments, such as those for complicated cases involving parental rights or sex offenses. In an attorney's office, the setting must also provide privacy for the evaluator and evaluee.

Exit strategies should also be considered for the evaluator. An evaluee may become threatening or aggressive as the result of an anger management problem, substance use, paranoid delusions, or the conflict-laden circumstances underlying the assessment.[45] The objectivity of the assessment may be affected if the evaluator does not feel safe, either because of the environment or because of the evaluee's conduct.

Correctional facilities offer unique challenges as a setting for forensic assessments. Arrangements must be made in advance to secure entry into the facility and to ensure that the evaluator is allowed to bring appropriate recording materials such as paper, writing instruments, a computer or tablet, and audio or video equipment. Safety is of fundamental importance for both the evaluee and the evaluator. If needed for the safety of the evaluator, assessments may be conducted by telephone, with the interviewer and the evaluee separated by a Plexiglas partition. In certain circumstances, the psychiatrist may wish to have a third party present to ensure safety or to have an objective observer in case of a litigious or difficult evaluee. If the presence of a correctional officer is necessary for safety, efforts should be made to preserve the confidentiality of the evaluee (e.g., by having the officer observe through a window).[6]

The presence of others during the forensic assessment must be considered in advance. The evaluee's attorney may ask to be present, or the evaluee may request that a spouse be present. Teaching institutions often request that students, residents, interns, or fellows be allowed to observe as part of their learning process. All of these possibilities should be considered before conducting the assessment, not only to accommodate others physically in the setting, but also to avoid potential skewing or biasing of the interview because of the presence of others. Discussions about these factors with retaining attorneys may be necessary before the interview.

### 5.4.2. Interview Style

In establishing a style and structure for the interview, the evaluator may wish to begin by gathering general background information and mental status data. Alternatively, an evaluator may cover the most critical material first, and then fill in other areas subsequently. This approach is especially well-suited to certain situations: for example, when the evaluee is unlikely to remain cooperative over an extended period, when the evaluee may become unduly emotional, or when the evaluee may become impatient

---

**Summary 5.4.2**   Interview Process: Interview Style

- In general, open-ended questions
- Neutral attitude
- Forensic empathy
- Awareness of countertransference
- Repeated interviews, if necessary

---

with what he deems to be irrelevant questions about the past. In many cases, evaluators must be flexible, as, even with a planned agenda for the interview schedule, there may be a need to reverse the order in which data are gathered. For some types of assessments (e.g., competence to stand trial), only one interview may be necessary. In other assessments, multiple interviews may be needed to cover the breadth and depth of the terrain in a complex case. The evaluator must decide on a plan for the course of the interviews.

Although focused questions or forensic assessment instruments may be used in the interview, the general style should consist of open-ended questions. This strategy enables a neutral exploration of the evaluee's narrative, state of mind, and style of presentation.[7,64] Open-ended questions can help the individual to become comfortable with talking to the evaluator and enable the examiner to establish a rapport with the evaluee before moving to more difficult material about the forensic matter at hand.[36,45] Closed questions, which demand a yes-or-no answer, may have their place in specific matters, but, as part of the strategy for seeking objectivity and honesty, the evaluator should guard against leading questions or questions that limit responsiveness from the evaluee.

It is an important characteristic of the forensic assessment that the evaluator, unlike a clinical interviewer, must take a questioning or skeptical approach to the interview.[7] It is also important not to be judgmental or biased against an evaluee. The approach, then, must include ongoing hypothesis testing until conclusions can be reached. Some support is necessary, for example, in ensuring the comfort of the evaluee. Likewise, empathy is not entirely off limits in a forensic assessment. Kenneth Appelbaum describes "forensic empathy" as the quest for "awareness of the perspectives and experiences of interviewees," (Ref. 18, p 44) to allow their voices and concerns to be aired in the assessment process. Shuman[65] offers a complementary perspective on empathy, which is to differentiate receptive from reflective empathy. The former corresponds to Appelbaum's description, in that Shuman describes receptive empathy as the "perception and understanding of the experiences of another person." Reflective empathy, however, is problematic, in that it involves communicating an "interpretation or understanding to the defendant in a manner that implies a therapeutic alliance" (Ref. 65, p 298). Such an implication may

undermine objectivity and respect for persons, as it may work against the warnings about limits of confidentiality and the lack of a therapeutic relationship that are critical to ethical forensic practice. Recent work has concluded that empathy may help promote rapport, and therefore experts may use a moderate degree of empathy.[66] Thus, the use of clinical skill is essential to the assessment process, but the expert must be vigilant about the manner in which such skills are deployed in the forensic assessment.

The evaluator must also be vigilant for signs in himself of emotional reaction to the evaluee or the circumstances of the case. Awareness of inappropriate emotional responses to the case may well lead the expert to self-examination of those reactions.[7,67] The feelings and attitudes of the evaluator prompted by a case can be described as a forensic example of countertransference. Gutheil and Simon offer several examples of such a phenomenon in forensic practice, characterized by preoccupation with the examinee, secondary posttraumatic stress disorder (PTSD) symptoms in the examiner, overimmersion in the evaluee's world view, personal conflict with the attorney, overidentification with and overacceptance of the attorney, and defensiveness in response to an attorney (Ref. 67, pp 84–7).

The review of symptoms with a forensic evaluee is one area in which there is a close connection to ordinary clinical work.[7] The review of symptoms should be conducted in a manner similar to the way in which the expert conducts it in clinical practice, to assure the reliability of the evaluator's findings and to foster credibility about the assessment process leading to a forensic opinion. Since questions about symptoms by their very nature are leading questions, endorsement of new symptoms at this stage should merit careful consideration and due explanation.

### 5.4.3. Recording

It is generally considered important to make a thorough record of interviews. This is most often accomplished by taking careful, detailed notes during the interview, but may include audio- and video-recording. Interview notes and recordings are the property of the evaluator but are usually protected as the referring attorney's work product. If requested by the referring attorney or the court, copies of notes and recordings should be provided. If the expert testifies, the cross-examiner may also request these notes and recordings. As well, evaluators should be aware

that written notes added to the records or materials may be subject to cross-examination. Therefore, care should be taken when recording in writing the content of discussions with attorneys, *ad hoc aides-mémoire*, or memoranda.

---

**Summary 5.4.3**  Interview Process: Recording

- Take careful notes.
- Consider audio- or video-recording the interview.
- Notify evaluee of the recording.
- Retain all materials, as per jurisdiction.

---

There is a debate over recording interviews. The concerns raised regarding audio- and video-recording of interviews are similar. A review of case law for the report of the AAPL task force on video-recording concluded that recording is an acceptable but not a mandatory procedure.[68] The usual purpose of recording is the creation of a complete record that may be reviewed at a later date for the expert's report or testimony preparation or as evidence at trial. In particular, a contemporaneous recording of the evaluee in a disturbed mental state that is produced at trial some time later, after he has recovered, can significantly enhance the credibility of the testimony.

Although the AAPL task force determined that video-recording the forensic interview is ethical, it did not offer a blanket endorsement of the practice. The advantages and disadvantages are reviewed in the guideline.[68] Video recordings are routinely used in cases of child sexual abuse, as they allow the victim's early statements to be preserved, and they may protect the child from the stress of repeated evaluations and testifying. Recordings may be required by case law when hypnosis is used.[69] In addition to allowing data to be preserved precisely, recording the interview allows it to be scrutinized for leading questions and examined for integrity and protects the evaluator against claims of inappropriate behavior.

Certain matters must be addressed well in advance of proceeding with video-recording of an interview. Some institutions do not allow video-recording, in which case an alternative approach may be chosen or, if possible, the interview should be conducted at another location. Recording may produce logistical problems, such as finding a suitable interview location and transporting valuable equipment, incurring considerable expense and inconvenience. Recording should not be done surreptitiously. In addition to

warnings concerning the lack of confidentiality routinely made in forensic assessments, an evaluator who is recording an interview should inform the evaluee in advance that the interview will be recorded and that the recording becomes a legal document that may be introduced in court if the evaluator is used as an expert.

Evaluees may wish to record interviews for their own purposes. They may even attend an interview with a recording device. Without knowing the plans for use of a recording, the evaluator would be prudent to discourage or refuse to allow a one-sided recording of an interview by the evaluee. If the evaluee insists on recording the interview, the evaluator may need to consider audio- or video-recording as well. It may also be prudent to contact the lawyers involved before proceeding.

The evaluator should retain all materials, including written records or recordings of interviews, for the duration of the trial and appeals, and should contact the referring agent about discarding these materials after all proceedings are concluded. Materials supplied by the referring agent may be retained, shredded, or returned by agreement with the agent. As a general rule, interview notes and reports should be retained for the time mandated in each jurisdiction or in the pertinent organizational policy.

### 5.5. Assessments Without an Interview

If an assessment is limited to a record review with no interview, this limitation should be discussed in the report and testimony, which should indicate why a personal interview was not performed. The AAPL Ethics Guidelines state:

> For certain assessments (such as record reviews for malpractice cases), a personal examination is not required. In all other forensic evaluations, if, after appropriate effort, it is not feasible to conduct a personal examination, an opinion may nonetheless be rendered on the basis of other information. Under these circumstances, it is the responsibility of psychiatrists to make earnest efforts to ensure that their statements, opinions, and reports or testimony based on those opinions, clearly state that there was no personal examination and note any resulting limitations to their opinions [Ref. 39, Section IV]. Experts are advised to consult the Ethics Guideline should this situation arise.

## 6. Assessment Content

### 6.1. Introduction

Forensic psychiatric assessments may be requested in a wide variety of civil and criminal cases.

**Summary 6.1**   Types of Assessments in Civil and Criminal Proceedings

| Civil | Criminal |
|---|---|
| Psychic trauma | Competence or fitness to stand trial |
| Medical malpractice | Insanity/not criminally responsible due to mental disorder |
| Disability, fitness for duty, or worker's compensation | Competence to waive *Miranda* rights |
| Child custody | Aid in sentencing |
| Civil commitment | Sexually violent predator (United States) |
| Psychological autopsy | Dangerous or long-term offender (Canada) |
| Competence | |
|   Testamentary capacity | |
|   Competence to make health care decisions | |
|   Competence to manage financial affairs | |
|   Competence to enter into a contract | |
| Guardianship assessments | |

Regardless of whether the matter is civil or criminal, the general purpose of forensic assessment is to answer a legal question. Questions can range widely: on the criminal side, from competence to stand trial to criminal responsibility and sentence mitigation, and, on the civil side, from psychic harm, malpractice, or standard of care to evaluation of asylum-seekers. Some assessments do not usually include an interview, but others generally do. Some require a report, and some do not. Some cases will await a preliminary opinion before an attorney decides that a report is needed. Some assessments are contemporaneous, and others require a retrospective review.

In civil cases, after clarifying the type of litigation with the referring agent, the expert should inquire whether there are statutory definitions, case law, or both that provide relevant definitions or guidance. For example, for disability cases, the definition of disability varies according to the responsible agency (e.g., Veteran's Administration, Social Security Administration, private insurance, or workers' compensation). It is critical that the forensic evaluator know which definitions of disability and work impairment are being applied to the referred case.

Two aspects of civil forensic psychiatric assessments may not be encountered in criminal assessments. First, if retained by the respondent, the evaluator may be asked to prepare a declaration outlining the nature and scope of the proposed forensic assessment of the plaintiff. Common components of such declarations include the length of the assessment, anticipated areas of inquiry, the specific psychological testing or assessment instruments that will be used,

and whether the examination will be audio or video recorded. Second, civil psychiatric assessments conducted in the U.S. federal court system must follow Rule 26 of the Federal Rules of Civil Procedure.[70] Rule 26(2)(B) outlines specific requirements in federal court for expert witnesses.

In criminal cases, the law and statutes may vary according to the jurisdiction, and the expert must become familiar with the requisite law in a particular jurisdiction. Forensic psychiatrists should also be aware that when they are retained as independent experts in criminal matters, either by defense or prosecution, a report may not be requested initially, giving the evaluator time to assess the case and formulate an opinion without a concrete work product that could later be used in court. Some jurisdictions protect the content of these assessments from disclosure, but others do not.

### 6.2. Information Gathering

#### 6.2.1. Psychiatric History

The psychiatric history is an important element in all forensic assessments. First, it can help to establish any pre-existing context for a mental illness, clarifying the diagnosis and substantiating reported symptoms.[36] For example, the evaluee may reveal an episode or illness that was treated, which was not previously known, leading to the discovery of further relevant sources of information. Second, it can provide information that can be examined in light of the psycholegal matter at hand. For example, if a defendant reports that his criminal conduct was the result of his recently hearing voices but he has no history of mental illness, it would be important to assess new-onset symptoms.

The psychiatric history should include reports concerning onset, duration, and severity of symptoms, as well as those requiring hospitalization. When there is a pre-existing illness, the evaluator can assess the impact of a specific event in the longitudinal course of the illness, which may have bearing on causation. Inquiry about response to treatment and remission or improvement, if any, can help in estimating the persistence of impairment.[54]

The referring agent may ask whether the evaluee's mental state has stabilized or whether further impairment is likely. To respond to this inquiry, the course of the illness and the response to treatment must be thoroughly reviewed. Disability insurance carriers often ask for an opinion concerning the adequacy of treatment. This necessitates detailed inquiry about the various treatment modalities used, the response to treatment, the adequacy of medication trials (dose and duration), the evaluee's adherence to the medication schedule, the side effects of medication, and the reasons for any discontinuation of treatment. A full history may also suggest the presence of a personality disorder or traits or suggest somatization.

Details of both a formal history of mental health treatment and symptoms that may never have been brought to the attention of a mental health professional should be elicited. Some symptoms may have been treated in the context of nonspecialist medical care (e.g., symptoms of depression or anxiety), and this possibility should not be overlooked.

A criminal or civil case leading to a forensic psychiatric examination may involve an evaluee with no psychiatric history. It is not uncommon for first-episode illnesses to be seen in forensic contexts.[71] In these cases, collateral sources of information, such as observation by family, friends, or other laypersons, may be the only information outside of the defendant's own account. Psychiatric opinions may be viewed with skepticism in court in the absence of psychiatric records corroborating the presence of a mental illness. This eventuality does not preclude the introduction of such data, but it does make it challenging at times, and the evaluator will therefore have to explain the derivation of conclusions and the inherent limitations of the data.

#### 6.2.2. Personal History

The personal history obtained in the course of a forensic assessment is similar to that obtained in clinical settings, although some aspects may warrant extra attention. If the evaluee is intellectually or developmentally disabled or has a physical disability or neurological disorder, prenatal, perinatal, and neonatal illnesses and events may be relevant. Information on the achievement of developmental milestones is important when the evaluee is a child or adolescent. The preceding information is best obtained from, or corroborated by, collateral sources: for instance, parents, other caregivers, school records, or contemporaneous reports.

The history should provide a longitudinal review of personal, academic, social, and occupational functioning.[54] An individual's account of early developmental delays, even in the absence of corroborating collateral information, combined with evidence of

functional impairments, may provide information relevant to case formulation. There should be an inquiry about the family of origin, including parents and siblings. The results should establish who raised the evaluee; whether the parents were separated or divorced; whether the family moved frequently; history of domestic violence that the evaluee witnessed; history of emotional, physical, or sexual abuse or neglect; and social service involvement and the reasons for it. Evaluees should be asked how they perceived their childhood and their relationships to parental figures, authority figures, and peers.

Educational history adds to a longitudinal focus on functioning, which is particularly relevant to assessments of occupational impairment. The evaluator should determine whether the evaluee was a good or poor student; moved frequently, interrupting his education; had a learning disability or needed special accommodations; had early behavioral problems or symptoms of conduct disorder; had a history of truancy, suspension, or expulsion; related well to peers and teachers; was involved in school life; had special educational placements or individual educational plans; graduated on time; and attended postsecondary institutions. Finally, the evaluee's academic performance and highest level of education should be determined.

An inquiry about the criteria for conduct disorder in childhood should be conducted. Interviews of the evaluee, a review of school and social agency records, and, if possible, interviews with caregivers are sometimes helpful.

In disability-related cases, the interview data should be sufficient to allow for an assessment of occupational performance.[72] The assessment should determine whether the evaluee is a valued worker who has a stable work history, as evidenced by promotions to positions of increased authority, consistently high job performance ratings, steady pay increases and bonuses, and commendations, or, alternatively, whether the evaluee has a poor work history, as evidenced by dismissal from numerous jobs, difficulty maintaining a job for a significant amount of time, poor job performance ratings, and numerous conflictual relationships with supervisors, coworkers, peers, and members of the public. The evaluee should provide an explanation for probationary periods, discipline, sanctions, and complaints by supervisors, coworkers, and customers and clients.[45,73] This information may also be helpful in both civil and criminal assessments.

The forensic evaluator should ask about the character of the evaluee's personal relationships and should obtain thorough marital and religious histories. In many cases, a more detailed sexual history is important (e.g., cases involving sexual offenses and certain civil claims). Inquiry should also be made about the evaluee's financial status, current living arrangement, children, and custody and access arrangements for the children. Responses to questions about divorce, marriage, and the death of parents or other significant figures, can demonstrate the evaluee's capacity to establish and maintain relationships.[36]

### 6.2.3. Previous Trauma

As with psychiatric assessments, forensic assessments include an exploration of previous trauma and coping mechanisms. In forensic assessments, it is particularly important to identify all occurrences and ascertain whether and to what degree they have contributed to the evaluee's presentation and prognosis.

Traumatic events may be of increased significance in particular types of forensic cases. For example, a mother who had been involved in a traumatic car accident as a child might be overprotective in her relationships with her children, and this information would be significant (although not dispositive) in a custody assessment. Similarly, an evaluee who had been disabled by a work-related accident might have PTSD as a result of a second accident, and the interrelationships between the two events might be of overriding forensic importance. Traumatic experiences may affect the way in which an evaluee interprets others' behavior; a survivor of physical or sexual assault may interpret another's behavior as hostile or aggressive. For example, a female evaluee in a sexual harassment case who was stalked by an ex-boyfriend may be especially offended or unnerved when a male coworker absentmindedly stares in her direction, although the coworker's behavior was not intended to be discriminatory or threatening.

An individual with a history of victimization may be vulnerable to exploitation (such as sexual misconduct by a professional). It should be kept in mind that such a history (and the fact that an evaluee was vulnerable) does not necessarily mean that that the defendant is blameless or that the claimant does not have a legitimate case. It may, however, be relevant to the formulation.[74]

In evaluating cases of recovered memory and early trauma, such as sexual abuse in childhood by a family member, the veracity and authenticity of the memories are often in question.[75] In taking a trauma history, the forensic psychiatrist should consider the relevance of particular types of traumatic events in light of the claims being raised. Examples of trauma that may be relevant to a case include physical or sexual abuse or neglect; natural disaster, motor vehicle accident, fire, or other dangerous event; and military combat or violent events. In criminal cases, a positive history of abuse and neglect, verified with collateral sources, may be important in formulating cases, especially those involving sexually anomalous or violent behavior. This history may also be helpful when victimization (e.g., battered-woman syndrome) is relevant to cases that involve mitigation of sentencing or defense of criminal conduct. In these types of cases, traumatic events may have implications for the causes of behavior, treatment planning, risk management, and risk assessment.

### 6.2.4. Medical History

The evaluator should record all serious illnesses, operations, and accidents as well as details of current medication and related adverse effects. The medication history may include a review of nonpharmacological somatic treatments (e.g., electroconvulsive therapy, transcranial magnetic stimulation) and over-the-counter, natural, and herbal preparations. The evaluator should note allergies and adverse drug reactions, if relevant.

In civil litigation, general medical causes may produce or exacerbate relevant symptoms. A recent deterioration in the evaluee's condition could be related to a history of traumatic brain injury, concussion, or other injury. The forensic psychiatrist should be alert to the presence of degenerative brain diseases such as multiple sclerosis or dementia, which can easily mimic psychiatric presentations. Episodic confusion and forgetfulness could be associated with postictal states following a seizure. Other medical factors that may be relevant to the forensic assessment include intellectual or developmental disability, narcolepsy, and sleep apnea. Some symptoms, such as complaints of depression and lack of energy, may be due to a remediable medical problem. Sleep apnea, for example, may cause daytime somnolence that prompts an employer to request a fitness-for-duty assessment of an employee on the grounds of suspected substance abuse.

The psychiatrist should try to determine the interaction between medical conditions and other physical factors and their relationship to the evaluee's current functioning. For example, individuals with substance use disorders have a higher risk of head injury, but withdrawal syndromes or the substance use itself can cause or exacerbate the psychiatric presentation. Furthermore, some evaluees may overstate or exaggerate their level of functioning before the incident in question, particularly in cases in which a head injury is the alleged cause of disability.[76,77] As with the psychiatric history, the forensic evaluator should determine what treatment the evaluee received (or is currently receiving) for relevant medical conditions, with a view to assessing whether the condition or the treatment may have contributed to related psychiatric disorders.

Psychiatric symptoms or disorders may have a close relationship to disease processes such as neurologic disorders, including traumatic brain injury and its sequelae; endocrine diseases, such as diabetes or thyroid dysfunction; and a host of other diseases more peripherally related, such as rheumatoid arthritis, cancer, coronary artery disease, anemia, chronic obstructive pulmonary disease, congestive heart failure, and chronic pain. Symptoms associated with these conditions may also contribute to the development or exacerbation of substance use disorders.[53] The forensic evaluator should also inquire about current medications and adverse effects that may confound the presentation. The presence of comorbid medical or physical conditions may contribute to significant impairment or disability.[78] They may also contribute to criminal behavior and help the evaluator to understand it. In particular, neurological disorders, such as seizures, the sequelae of traumatic brain injury, and certain endocrine disorders, should always be considered when formulating cases involving impulsivity, violence, or sexually anomalous behavior.

**Summary 6.2.4**   Previous Medical and Surgical History
- Neurological illnesses
- Head injuries and sequelae
- Endocrine diseases
- Chronic diseases or chronic pain
- Hospitalizations
- Relevant medications

When more information is needed about possible medical causes or factors, additional laboratory testing, imaging studies, collateral verification, or referral for neurological or psychological testing may be indicated. Typically, the psychiatrist completing the forensic assessment need not personally order the tests or make the referrals but may recommend that the referring agent or court arrange these additional assessments (see Section 8, Adjunctive Tests).

### 6.2.5. Family History

Mental disorders among first-degree relatives may reflect genetic or environmental influences that have also affected the evaluee. The personality of the parents, their financial situation, and the status of the family in the local community are all likely to have affected the environment in which the evaluee grew up. Events occurring within the family may be continuing sources of stress. An evaluee's experience of illness in the family may affect the way in which he presents symptoms.

The evaluator may gather information about the parents, including current age or age at death (and if deceased, the cause), health when alive, occupation, personality, and quality of relationship with the evaluee. For siblings, the evaluator may determine their ages, marital status, occupation, personality, psychiatric illness, and quality of relationship with the evaluee.

The evaluator may also inquire about histories of mental illness and substance abuse within the family, including attempted or completed suicide and hospitalization for psychiatric problems. The presence of symptoms that meet criteria for antisocial personality disorder in one or both parents could provide significant information. A positive family history can help in formulating an accurate diagnosis. The family history can also contribute to the diagnosis of an undetected mental illness that could be resolved through treatment, thereby mitigating or eliminating a current disability. Sometimes the family history reveals potential medical causes of the evaluee's symptoms. For example, the emergence of psychotic symptoms following a traumatic event may be caused by the early stages of Huntington's disease arising independently of the accident.

The family history may yield clues about the evaluee's early development and other psychosocial considerations. A history of psychosis (such as schizophrenia) in the family should prompt the psychiatrist

to determine whether the evaluee has any symptoms of a thought disorder and whether these symptoms might have affected his behavior or his perception of what happened during the incident at issue. The presence of severe mental illness in a parent may not only suggest a genetic predisposition, but also raises the question of an absent parent or a chaotic household. Discussions with the evaluee about the current family structure and relationships with significant others can provide information relevant to treatment recommendations and prognostic observations.

An evaluee's family history can be significant in several additional ways, such as helping to explain how an individual developed beliefs about the effects or symptoms of a particular illness. For example, if someone within the evaluee's family has a seizure disorder and the evaluee has witnessed the seizures, the evaluee may consciously or unconsciously reproduce those symptoms. Such facts can be pertinent in cases of suspected malingering or somatization.

In medical malpractice cases, the forensic evaluator should determine whether the treating physician took a full family history and whether relevant family history may have been ignored or overlooked: for example, whether the physician inquired about a family history of suicide when conducting a suicide risk assessment.[79]

In general, the forensic psychiatrist should not rely solely on the evaluee's self-reported family history. Whenever possible, the evaluator should use collateral sources of information, which may provide facts or clues that aid in the assessment, such as a family history of suicide or suicide attempts, violent behavior, criminal involvement, and legal difficulties.

### 6.2.6. Substance Use

The assessment of drug and alcohol use should include, for each substance used, the date of first use; average daily use; and symptoms, signs, and severity of the substance use disorder. For presentence assessments, the evaluee's treatment for a substance use disorder and related problems is likely to be particularly important.

The psychiatrist may not be able to rely on the evaluee's self-report. Evaluees may deny past problematic substance use, and even forthcoming evaluees may not disclose all relevant substance use. Some evaluees may deny problematic use of prescription medications, believing that, since drugs are prescribed, they are not substances in the sense described

by the term substance use disorder. Similarly, the evaluee may be unaware of the nature of over-the-counter and prescription drugs. For example, the evaluee may not know that hydrocodone is an opioid with addictive potential. Hence, rather than asking evaluees whether they have taken specific medications or specific classes of drugs, the evaluators can inquire whether evaluees have taken pain pills or anything to help them sleep and investigate further if the response is positive. Some nutraceuticals (such as ginkgo biloba or St. John's wort) may be significant, and the evaluator may learn of their use by asking questions such as, "Are you taking any pills or supplements for your health?"

In civil and criminal cases involving incidents in the evaluee's past, the psychiatrist should also consider the possibility that the evaluee was intoxicated at the time of the incident in question and that substance use may have been involved during the claimant's legal involvement or conflicts. In civil cases, current withdrawal or substance use may also have implications for the evaluee's involvement and participation in the litigation in question. Gendel[80] provided an excellent introduction to the importance of substance use disorders in forensic psychiatry and litigation.

Systematic inquiries are especially helpful in obtaining a full substance use history. As well, self-report measures are available to aid in investigating or screening for substance use disorders.[81–83]

It is especially important to consider whether any of the evaluee's reported symptoms may be related to substance use. For example, in a claim for intentional infliction of emotional distress, an evaluee, the plaintiff, may report that the defendant's belligerent conduct has caused significant anxiety, but the anxiety symptoms may be primarily attributable to a substance withdrawal syndrome or the use of a particular drug. An individual who drinks during the evening may experience tremors and sweating during the day and may interpret these symptoms as anxiety. On the other hand, anxiety resulting from the defendant's threatening behavior may provoke the evaluee to use sedatives or other substances in an attempt to self-medicate. In either case, evaluees may be guarded and may not be forthcoming about the substance use, fearing that such information may harm their credibility as plaintiffs or damage their case. The evaluator should consider these possibilities in conducting a complete and accurate psychiatric assessment.

A careful review of the evaluee's medical records can be especially helpful. Records from pharmacies or physicians' order forms may identify commonly abused prescription medications. The records may also indicate illnesses, injuries, or treatment related to substance use. A review of the evaluee's medical record could reveal signs of drug or alcohol use disorder, such as increased mean corpuscular volume or elevated liver function enzyme levels.[80] When reviewing these records, the forensic evaluator might also look for signs of pre-existing disability that may stem from substance use, such as head trauma. In a personal-injury suit, the plaintiff could be claiming side effects of traumatic brain injury characterized by memory loss, but his existing memory loss may be a consequence of chronic alcohol use. Similarly, memory difficulties could also derive from intoxication-induced blackouts. An evaluee's substance use may also increase the likelihood of developing a particular psychiatric disorder or symptom or even neuropsychiatric impairment. For example, alcohol may contribute to memory and word-finding deficiencies, whereas chronic marijuana use has been shown to increase the risk of early-onset psychosis.[84]

Collateral sources such as treatment records should be cited when possible. Courts are likely to take a skeptical view of an evaluee's description of a positive response to treatment, especially if the offense or claim seems to be related to substance use.

### 6.2.7. Information Gathering in Criminal Cases

In obtaining various types of histories, there are special considerations in criminal cases. These constitute mainly differences in emphasis, depending on the forensic evaluee's clinical presentation and the offense.

The assessment should note neurological conditions, head injuries, seizures, and any illnesses that led to substantial periods of separation from the family. From the personal history, the nature, source, and character of family arguments probably carry more significance than their simple occurrence. Early risk factors for conduct, such as inconsistent parenting, neglectful or severe discipline, absent parents, and parental substance use should be subject to inquiry.[85] Parental unemployment and marital problems, including family violence, are particularly important.[86] School performance can offer information concerning attitude toward authority, attentional deficits, and intelligence level. Occupational history

can provide insight into the evaluee's personality, including attitude toward authority. Repeated terminations of employment can reflect aggressiveness, antiauthority attitudes, paranoia, or awkwardness, although the evaluator should not assume that this is the case. Alternatively, a decline in the status of jobs held can be a sign of developing mental illness or of substance use disorder.

Particular judgment is required in eliciting a sexual history. In certain cases, detailed information is necessary (see also Section 11.4, Risk Assessment for Sexual Offenses), but in others it may be inappropriate to follow this line of questioning. As with occupational history, a client's relationship history may provide clues relating to traits such as jealousy, suspiciousness, or violent propensities, but cannot be taken as indicative without further information.

In criminal assessments, the history of offenses by the evaluee may be included. Many evaluees have extensive arrest and conviction records. In describing these, a balance must be struck between completeness and excessive detail. Generally, the offense history should include the types and number of offenses. Individual charges may be described, or, if there are several, they may be grouped (e.g., "The defendant has been convicted four times of robbery, and six times of assault and battery, dating back to 2002. Of the assault convictions, one last year involved the use of a weapon.") When clustering the offenses together, the evaluator should provide enough detail to describe patterns that are discernible in the nature and timing of the offenses. In addition to the types of offenses, it is often helpful to include their outcomes, length of incarceration ("incarcerated 2 years after being found guilty in a jury trial"), and defaults or probation violations. This approach may be useful in revealing and setting out the length of time in the community before recidivism, or, alternatively, in delineating periods of stability.

In addition to the usual psychiatric history and interview, for criminal forensic assessments, the interview of the evaluee must include the elements that focus on the criminal psycholegal question at hand. As a result, the interview is structured around the purpose of the assessment and the forensic question. Criminal assessments may require interviews that explore present-state examinations (e.g., competence to stand trial) or that elucidate past mental states (e.g., criminal responsibility and competence to waive *Miranda* rights).[85]

In the latter case, the psychiatric history should be related to temporal elements in the criminal assessment. For example, the interview might ascertain that an evaluee was gradually developing manic symptoms in the weeks before an alleged offense, leading to the hypothesis that, at the time of the offense, the defendant was manic with psychotic features. When the evaluee is interviewed several weeks later, after the initiation of treatment, the manic symptoms may or may not be evident.

In this regard, the timing of the interview may in some cases make a critical difference. Hence, in certain cases it is important to attempt to interview the evaluee as soon as possible after the crime, to observe the evaluee's mental state as close as possible to the alleged commission of the crime. Obtaining the interview close to the arrest can be a challenge, because access to evaluees depends on when the referral is made and logistical factors.

Depending on the type of criminal forensic assessment, there may be a need for more or less information related to the circumstances leading to the criminal charge(s). Thus, more information regarding the index offense is needed to determine criminal responsibility or to aid in sentencing, whereas less is needed to determine competence to stand trial or to proceed *pro se*. When more information is needed, it is as important to review the story from the evaluee's perspective as it is to have access to the case against him. For that matter, in any assessment related to mental status at a particular time point (e.g., competence to waive *Miranda* rights), the evaluator should understand the history and context of the time in question and relate it to the thoughts, perceptions, feelings, and psychological functioning of the evaluee at that time.

These point-in-time analyses are best conducted by asking the evaluee to reflect on the months, weeks, days, hours, and even minutes before, during, and after the offense. The need for such detail is one of the reasons that forensic evaluations are often more time-consuming than regular psychiatric consultations. Different styles of approach in the interview can be used in gathering the required information. The evaluator can first ask for a full, uninterrupted account of the events in question, followed by a secondary review with questions probing for detail, consistencies, contradictions, and relevant facts. Another approach is to allow a first broad-brush account and then gather a full account with questions interjected,

followed by a third, more detailed, full account. Sometimes it is necessary to interrupt an evaluee who may want to move on to other subjects, to ensure that he accurately describes his memories of to the time point of interest. An evaluee may resist this process, tending instead to gloss over the details. It is the role of the evaluator to keep the evaluee on task, even if it is sometimes difficult for the evaluee to stay focused. With any approach, it is important to avoid leading questions and to ensure that the evaluee can convey his story without suggestion. Suggestibility may be particularly relevant when interviewing children and persons with intellectual disabilities (see Section 10.2, Child and Adolescent Forensic Assessments, and Section 10.3, Assessments of Persons with Intellectual Disability).

For assessments in which a full, detailed self-description of the crime would not always be needed (e.g., competence to stand trial or to waive *Miranda* rights), the evaluator may nonetheless have reason to ask about the evaluee's account of the alleged crime in general terms. For example, in an evaluation of competence to stand trial, the evaluator may want to assess the defendant's ability to provide a rational account of the charges and to appreciate the nature of the allegations, to elucidate whether the evaluee has the capacity to confirm or refute the allegations when instructing the defense attorney and when appearing in court.

When performing assessments regarding competence to waive *Miranda* rights, the evaluator must delineate psychiatric symptoms and state of mind at the time that the rights were presented or identify chronic deficits that affect the evaluee's capacity to appreciate or understand the warning. Making this determination requires a history of psychiatric symptoms before and right up to the time that the evaluee waived his rights. Observations made immediately afterward by professionals or lay witnesses should be obtained and taken into account. It is often helpful to question the evaluee regarding any statements or contemporaneous observations made, to understand fully and recreate retrospectively the evaluee's mental state at the time, in relation to competence.[87] Competence of youths to waive *Miranda* rights is a common concern, and there are adjunctive instruments available for juvenile populations that an evaluator may find helpful in focusing the inquiry.

The assessment of competence to stand trial requires specific questions regarding whether the eval-

uee is competent to assist or instruct counsel and can participate in making decisions during the instant legal case. This area is comprehensively reviewed in the Practice Guideline for the Forensic Psychiatric Evaluation of Competence to Stand Trial.[36]

### 6.2.8. Aid in Sentencing Evaluations

Mental health professionals can lend guidance in clinical matters regarding sentencing in a case. These evaluations are referred to differently in various jurisdictions and may be called aid in sentencing, presentencing, or probation evaluations. There are several principles of sentencing that may be articulated and emphasized differently in different jurisdictions, and the expert should be mindful that it is up to the court to weigh these. In addressing one of the principles of sentencing (i.e., rehabilitation), mental health experts typically offer opinions on the treatment needs and treatability of the offender. The expert may address whether the custodial environment could perpetuate the disordered state and therefore militate against the goals of sentencing. Such evaluations may include whether a particular treatment is available in custody, and whether this treatment might reduce the likelihood of recidivism. However, in some jurisdictions, the matter of treatment while in custody is not addressed. The expert may offer an opinion on whether successful treatment furthers the goal of making the community safer. Another matter is culpability at the time of the crime, based on an analysis of mental health or substance use factors that may have been contributory (even if they were insufficient for an insanity defense), thereby mitigating culpability. The expert can also assist the court by assessing the risk of reoffending, violence, or suicide.[6] Depending on the jurisdiction (e.g., federal versus state), there may be a need to contact a referral source, such as probation, to clarify the questions the court may want to have answered.

Special considerations in sentencing include young-offender statutes that require consideration of developmental disabilities; sexual offenses, which may involve a period of civil commitment after the sentence; and special assessments, which determine the appropriateness of a drug court, mental health court, or other special program for an offender with a mental disorder. The evaluator in the latter case must understand the admission criteria, referral process,[88] and focused goals of participation in these special programs, to determine whether a defendant is a

good candidate for any of them. In some jurisdictions (such as Canada), mental health experts commonly address deterrence in presentencing evaluations. The evaluation may guide the court in determining whether an individual who has a mental disorder, or the diagnostic group to which an evaluee belongs (for example, people with schizophrenia), would be deterred by a sentence.[89] A thorough forensic psychiatric evaluation should not include an actual sentencing recommendation; that responsibility falls to the judge.[90] Rather, the evaluation must take into account the nature of the offender's mental disorder and the nuances of the sentencing options in helping to formulate opinions.

### 6.2.9. Death Penalty

The death penalty presents an ethics-related dilemma for forensic psychiatrists, because involvement in a case that may lead to a death sentence may conflict with strongly held beliefs about its morality. Some psychiatrists have resolved this dilemma by refusing to participate in any way in a potential death-penalty case. Others have drawn the line at a point in the legal process where they feel involvement is equivalent to participation in the infliction of capital punishment. The Council on Ethical and Judicial Affairs of the American Medical Association, in consultation with the American Psychiatric Association (APA), has developed an ethics policy providing guidance for psychiatrists and physicians who deal with death row inmates in either a forensic or a treatment role.[91] These guidelines, which have also been adopted by the APA, should be consulted when the psychiatrist is considering treatment to restore competency for an inmate to be executed or is unsure of what constitutes unethical participation in an execution. One survey showed that most physicians were unaware of these guidelines.[92]

In different states and jurisdictions, the availability of competent legal representation varies greatly. Some states have special capital defense units as part of the public defender's office; other states assign private attorneys who may never have handled a capital case. Although some funding should be available for evaluations by experts, the amount of funding also varies considerably in different states. Once a psychiatrist accepts a case for evaluation, there may be a contractual obligation to complete that evaluation.

The criteria for competency to be executed have had to be defined since the Supreme Court held in *Ford v. Wainwright* that execution of the "insane", as people with severe mental illness are referred to in the decision, is constitutionally impermissible.[93] The Court was unable to agree on a standard for incompetence, but Justice Powell, in a concurring opinion, offered the following, "I would hold that the Eighth Amendment forbids the execution only of those who are unaware of the punishment they are about to suffer and why they are to suffer it" (Ref. 93, p 422). This standard became the *de facto* one in most states until 2007, when the Supreme Court, in *Panetti v. Quarterman*, stated that, "the *Ford* opinions nowhere indicate that delusions are irrelevant to comprehension or awareness if they so impair the prisoner's concept of reality that he cannot reach a rational understanding of the reason for the execution" (Ref. 94, p 958). Thus, the Court held that a "prisoner's awareness of the state's rationale for an execution is not the same as a rational understanding of it" (Ref. 94, p 959). However, the Court did not go on to define a specific competence standard. How much of a difference *Panetti* has made has depended entirely on how broadly the courts construe rationality. It is difficult to determine whether a prisoner rationally understands his punishment if it is unclear what renders a perception rational or irrational. A narrow conception of rationality would result in the execution of individuals who do not truly understand their sentences, whereas an expansive view would result in overprotection, shielding individuals who are capable of understanding the retributive dimensions of their execution. Although the Supreme Court left open the possibility that psychiatrists could be the final decision-makers in competence determinations, the AMA Ethics Guidelines prohibit that role.[91]

Another facet of death penalty cases involves a jury's deciding whether the sentence is warranted after it has found the defendant guilty of a capital felony. This decision is made in a separate sentencing hearing involving a review of aggravating and mitigating factors. Psychiatrists are often asked to evaluate the defendant to explore what might be viewed as mitigation. These broad-ranging evaluations review an individual's history in great detail so that factors such as child abuse or neglect, even if unrelated to the crime, can be considered by the jury. These evaluations should therefore be thorough and often include

psychological testing, brain scans, and collateral interviews of individuals who knew the defendant. In some cases, psychiatrists have testified about the future dangerousness of a defendant, whereas in others, they have been asked about the methodology of such risk assessments for the defense.

During the mandatory appeal of these cases, it is also common for psychiatrists be asked to review the defendant's history to ensure that no psychiatric factor has been overlooked by the original trial attorneys, who may not have asked for a psychiatric evaluation. This assessment may include a retrospective chart review, with or without an interview.

### 6.2.10. Information-Gathering in Civil Assessments

Personal-injury cases involving psychic trauma generate a frequently encountered type of civil assessment. In such cases, important areas of inquiry regarding the evaluee's claim include a detailed description of the alleged precipitating factors and their time course; the duration and amount of exposure to any alleged trauma; and the evaluee's thoughts, feelings, and behavior before, during, and immediately after the traumatic event. Reviewing the evaluee's specific claims outlined in the complaint and other legal documents may assist in addressing the concerns that are the focus of the litigation. In addition, a spouse or significant other, family members, or witnesses to the event can provide additional information on the evaluee's alleged exposure to trauma. This information can be obtained through direct interviews, depositions, or other available records. Any discrepancies in the evaluee's account of circumstances may be clarified through collateral records or statements.

---

**Summary 6.2.10A**   Content of Assessment: Civil (Psychic Injury)

- Duration and amount of exposure to trauma
- Evaluee's perception of the event
- Impact of the trauma
  - Immediate
  - Medium-term
  - Long-term
- Treatment provided
- Factors that aggravate or relieve symptoms

---

After gathering the evaluee's account, the psychiatrist should take a detailed history regarding the emotional impact, if any, of the alleged incident or trauma and the reasons for the evaluee's disability, if any. The effects of the incident can be reviewed in the immediate period (from the day of to a month after the incident); the medium term (more than one month to one year after the incident); and the long term (more than one year after the incident). When evaluating the claimed psychological effects of the alleged incident, the evaluator should carefully review collateral records (such as psychiatric, medical, and rehabilitation records or newspaper accounts), to assess the symptoms, their severity, and their time course. Questioning the evaluee about incidents and inconsistencies in the collateral contribution may aid in coming to conclusions. Areas to be covered include psychological and pharmacological treatments, adherence to treatment recommendations, reported treatment failures, adverse consequences of treatment interventions, factors that precipitate or aggravate symptoms, and measures that have been successful in relieving symptoms. Disability assessments generally require an evaluation of how the claimed psychological symptoms (such as a depressed mood or impaired concentration) affect the person's ability to work.

The evaluee's social functioning is important when assessing claims of emotional damage. Areas to explore include the status of current personal relationships, participation in exercise and hobbies, daily activities on each day of the week, recent or planned vacations, and scheduled activities (such as educational classes, attendance at religious institutions, and social groups). Regular activities, including those of daily living (such as cleaning, shopping, cooking, paying bills, driving or taking transportation, and maintaining a residence), are likewise relevant. The evaluator should compare the evaluee's current level of social functioning to the level before and immediately after the alleged incident. Finally, other potential social stressors that may independently cause emotional distress should be thoroughly explored. Such social stressors include loss of a family member or loved one, separation or difficulties in a relationship, family problems, criminal arrest, or exposure to an unrelated traumatic incident.

---

**Summary 6.2.10B**   Evaluation of Social Functioning

- Social activities
- Activities of daily living
- Relationships
- Other social stressors

---

Current occupational functioning should be reviewed when assessing a person's claimed emotional damage or disability. Specific questions to review with the evaluee include occupational activities and sources of income, attempts to return to work, and perceived emotional or situational barriers to resuming work. The evaluator should obtain a detailed employment history to determine whether an alleged incident has resulted in a subsequently claimed occupational impairment. Important areas include jobs and assigned duties, length of employment for each job, ability to work with others and accept or provide supervision, reasons for leaving employment, disciplinary actions related to employment, prior civil lawsuits regarding employment, and previous claims for occupational disability (such as workers' compensation, social security disability insurance, or private disability insurance).

---

**Summary 6.2.10C**   Evaluation of Occupational Functioning

- Detailed occupational history
  - Current work and income
  - Previous work and income
- Problems encountered in the workplace
- Attempts to return to work
- Perceived barriers to return to work

---

In another area of civil assessment, disability and fitness-for-duty evaluations , an expanded inquiry into the evaluee's educational and employment histories is necessary.[54,73,95] Evaluees should be asked to describe problematic situations encountered in the workplace or in attempts to obtain employment. An evaluee's own account of work-related functioning can be helpful when assessing claims of previous high functioning or when interpersonal problems are involved.[54]

Evaluees may be referred for fitness-for-duty assessments inappropriately. The evaluee should have the opportunity to explain any work-related conflict that may provide an alternative explanation for the behavior that triggered the assessment.[96] The evaluator should gather information about previous workers' compensation or public or private disability claims, including length of time out of work and whether any accommodations were necessary upon return.

In disability or fitness-for-duty assessments, sufficient information about functioning in the current job should be gathered to relate an impairment to a specific job responsibility. A formal job description obtained from the employer can be used to define essential tasks. The evaluee should be asked to provide descriptions of situations in which occupational functioning was impaired. Lists of work functions can be helpful in organizing inquiries about possibly related impairments.[54] It is important to correlate the essential job requirements with the evaluee's claimed or observed impairments.

Military history and juvenile and adult legal histories are especially helpful in assessing risk of violence, which is often a facet of fitness-for-duty assessments. Military history should include the type of discharge and a description of disciplinary actions, if any. The evaluee's litigation history should also be explored in the assessment.

### 6.2.11. Assessment of Specific Civil Competence

Forensic psychiatrists are often retained to assess the psychiatric competence or capacity of an evaluee to engage in a specific act. In general competence, there are essential elements that should be considered, including the evaluee's awareness of the situation, factual understanding of the problems involved, appreciation of the likely consequences, ability to manipulate information rationally, ability to function in his own environment, and ability to perform the tasks demanded of him. Specific competence entails four elements, some of which are the same as general competence: communication of a choice sustained long enough to implement it, factual understanding of the problems involved, appreciation of the situation and its consequences, and rational manipulation of information.[97]

Some of these specific competence assessments may involve consent to treatment,[98] guardianship evaluations,[99] testamentary capacity,[100] financial competence, and competence to enter into a contract.[97]

The forensic psychiatric examination of competence follows the general principles of other assessments and includes a thorough psychiatric assessment, with an interview and a mental status examination, if possible, and an examination of collateral information. An exploration of how psychiatric diagnosis and various symptoms may interfere with any or all of the types of competence is essential.

Competence to consent to or refuse treatment involves an assessment of whether the evaluee can give informed consent.[98] This evaluation includes

whether the evaluee understands information regarding the risks, benefits, and alternatives to treatment. Further, it is important to assess whether there is a mental disorder that interferes with the evaluee's decision-making capacity. Finally, his consent must be free and voluntary. This process requires that the treatment team disclose sufficient information to the evaluee.[97]

An assessment of an evaluee's competence to manage financial affairs requires questioning about his awareness of his financial situation, as well as broader questioning about areas that may be affected by specific psychiatric symptoms. For example, a delusion that some organization is trying to steal an evaluee's money may affect financial decision-making. Having established the presence of delusions, it would still be necessary, as in this example, for the psychiatrist to identify a clear link between the delusion or other psychopathology and the financial decision-making task.

Evaluations for testamentary capacity (competence to compose a will) are generally retrospective, since the evaluee in most cases is a decedent whose will is being contested postmortem. The evaluator should make note, if writing a report or testifying, of the inability to conduct a personal interview and the resulting limitations of the assessment. The assessment relies on a retrospective assembly of information concerning the evaluee's mental state at the time of writing the will. It is important to attempt to assess whether the individual had the capacity to be aware of the value of the estate. A pertinent question is whether the evaluee was having delusions, which could directly affect his capacity to compose a realistic will. Another concern is whether the testator was subjected to undue influence: that is, was directly and deliberately manipulated or deceived by a party. The evaluator may be in a position to comment on whether a psychiatric condition or symptom(s) made the testator susceptible to manipulation that could legally constitute undue influence.

### 6.3. Mental Status Examination

A thorough mental status examination should be performed in most types of assessments. Information from direct inquiry related to aspects of functioning (e.g., basic cognitive assessments) adds to clinical observations and general interview data. The examination will elicit information about the frequency and severity of psychiatric symptoms, including mood, anxiety, trauma-related symptoms, thought content, thought form, delusional beliefs, perceptual disturbances, cognition, and concentration and relevant comments, insights, and judgment.[36] The mental status assessment is usually helpful in formulating a diagnosis and in assessing the evaluee's strengths and vulnerabilities resulting from psychiatric symptoms or cognitive impairments. In considering the presence of malingering, the evaluator may focus on the inconsistencies between reporting and behavior (see Section 10.5, Malingering and Dissimulation).[36]

---

**Summary 6.3**   Aspects of a Mental Status Examination

- Appearance, attitude, and behavior
- Mood and affect
- Speech and thought form
- Speech and thought content
- Perception
- Cognition
- Insight and judgment

---

Particular care is necessary in addressing several aspects of mental status that are important in a criminal forensic assessment. Ideas of harming others are sometimes revealed through a series of questions relating to troubling or intrusive thoughts. Direct questions may still be needed, especially if a client gives indirect or evasive answers. Delusions can be difficult to ascertain and are often best elicited by using cues from the history or by inquiring about the possible causes of the symptoms. Testing the strength of delusional beliefs during an assessment, particularly when the interview is conducted in a correctional facility, requires tact and careful listening to the defendant, who may become argumentative or aggressive.

Some aspects of psychiatric phenomenology that are of significance in forensic assessments are listed in Summary 6.3. In other respects, the assessment should address the same aspects that are assessed in general psychiatric settings.

The observations of hospital staff or of professionals in a correctional setting often complement the evaluee's presentation in the course of an interview; hence, any such useful observations may be included in the report. The evaluator should consider that evaluees detained in a correctional facility may not have undergone a detailed mental status examination, and it is not unusual for a forensic assessment to

reveal genuine symptoms and signs that have not been identified in that setting.

## 7. Diagnosis

It is important to develop a diagnostic formulation that explains the evaluee's symptoms and signs and their relevance to the psycholegal question at issue. If symptoms and signs allow a diagnosis that is in accordance with the current categories of the Diagnostic and Statistical Manual of Mental Disorders (DSM) or the International Classification of Diseases (ICD), it should be so assigned. In North America, the DSM is the most frequently used reference, is familiar to attorneys and courts, and should therefore be used wherever possible. A discussion of the current diagnosis may be included in the report, depending on jurisdictional practices and the legal standards for an evaluation type. When diagnoses are offered, the expert should outline the reasoning leading to the current diagnosis and why it may differ from previous diagnoses on file.

There have been concerns about the misuse of DSM diagnoses in areas of litigation, as information conveyed by a diagnosis may not meet the requirements necessary to arrive at a legal decision.[101] The fifth edition of the DSM (DSM-5), in its "Cautionary Statement for Forensic Use of DSM-5" (Ref. 102, p 25), warns experts and others that a specific diagnosis may not be consistent with the legal criteria that may be used to draw conclusions relevant to a particular legal standard. The statement continues by advising that additional information is elicited about the evaluee's functional impairments that may be related to the specific legal standard. Experts are advised to read this disclaimer and take note of it. The relationship between diagnosis and impairment is complex, and there can be psychiatric and legal overemphasis and reliance on diagnosis rather than on the assessment of functioning.[101] Providing a DSM diagnosis does not substitute for conducting a careful functional assessment. In personal injury litigation, assessment of damages should not be based on diagnosis alone, but rather on pre- and postincident functioning and whether a functional impairment was causally related to a defendant's conduct. Special caution is warranted when considering a diagnosis of PTSD in the context of personal injury cases. Unlike most of the alternatives, a diagnosis of PTSD assumes a causal event that was most likely the contributing factor.[103] Causality is also an area where

the criteria for diagnoses may shift over time, necessitating reference to different versions of the DSM (e.g., DSM-IV-TR[104] versus DSM-5). If malingering or exaggeration of symptoms is suspected, the formal diagnosis (if any) requires careful consideration of alternative explanations for the evaluee's presentation.[105] Furthermore, a plaintiff may have subthreshold symptoms but still have impairment or, conversely, have a DSM diagnosis but little impairment.[101]

Regardless of these reservations, as noted elsewhere in this document, competence evaluations are point-in-time assessments, in which forensic evaluators should attempt to make a DSM or ICD diagnosis, depending on the type of evaluation and the jurisdictional requirements. For example, in evaluations of competence to stand trial, most states require a diagnostic assessment.[36] Nevertheless, the evaluator must concentrate on the evaluee's contemporaneous level of functioning rather than rely on a specific diagnosis that is insufficient to reach a conclusion regarding the legal standard of competence. Once the diagnosis is made, it is important to consider the nexus between the diagnosis and the psycholegal questions. For example, many disability insurance carriers require a multiaxial DSM diagnosis, although this may change with the application of DSM-5. If there is insufficient information for a definitive diagnosis, a differential diagnosis with an explanation of the diagnostic uncertainty should be provided.[101]

## 8. Adjunctive Tests

### 8.1. Introduction

Forensic assessments are strengthened by independent data, including results of standardized tests, which can augment clinical forensic evaluations in some cases. Evaluators should be aware that standardized tests have varying degrees of reliability. When a psychologist has performed the test and scoring and provides a report, unless the psychiatrist has specialized training, he should not claim expertise in the area. Rather, the psychiatrist in this situation should have a general understanding of the use of the individual test. A psychologist can be called to provide testimony, if necessary. By contrast, when testing is performed by a psychiatrist, a greater degree of knowledge about the test is required. Furthermore, some new instruments being used in the field, such as

those for risk assessment, do not require psychological training, *per se*, for their administration or interpretation, but their use may nonetheless require specific training. In criminal contexts, adjunctive testing may include forensic assessment instruments (FAIs) specific to the forensic question at hand (see Summary 8.1). Several measures that assess aspects of competence to stand trial in either general or specific (e.g., developmentally disabled) populations have been devised.[106,107] In addition, Rogers[108] has created an instrument for assessment of criminal responsibility. The use of FAIs is not required, and no FAI is universally used in any type of forensic assessment. Evaluators who choose to use these instruments should be familiar with their applicability to each type of assessment.

**Summary 8.1**  Sample Forensic Assessment Instruments for Competence to Stand Trial

- Georgia Court Competency Test–Mississippi State Hospital version[109]
- The Competence Assessment for Standing Trial for Defendants with Mental Retardation[110,111]
- Interdisciplinary Fitness Interview–Revised[112]
- MacArthur Competence Assessment Tool–Criminal Adjudication[113]
- Fitness Interview Test (Revised Edition)[114]
- Evaluation of Competency to Stand Trial–Revised (ECST-R)[115]
- The METFORS Fitness Questionnaire (MFQ)[116]

## 8.2. Psychological Testing

It is important that psychological testing be conducted by an examiner with the level of training and professional qualifications required by the test developers and that terms of reporting be established before testing begins. In some cases, the forensic psychiatrist subcontracts psychological testing; in other cases, a psychologist may conduct psychological testing independently or as part of a hospital team. It is important that the evaluee understand for whom the tester is working and to whom the examiner will report. As well, the examiner must adhere to the specific rules for use of the test. For example, forensic experts should not administer a psychological test to evaluees outside the standardization sample of the test (e.g., the Static 99 cannot be used to assess risk in female sex offenders).[117]

Psychological testing can be subclassified by the required qualifications of the administrator (psychologist versus nonpsychologist versus trained specialist versus self), the psychological properties being assessed (e.g., neuropsychology versus personality), and whether the instrument is under copyright (proprietary versus nonproprietary). Testing without a specific question is rarely productive. For example, conducting intelligence testing on a university professor may make no sense. If dementia is in the differential diagnosis, formal neuropsychological testing combined with focused diagnostic testing to identify the cause of the suspected dementia may be a better use of resources.

Obstructions to the validity of the results of a forensic psychiatric assessment include deception, malingering, simulation, and dissimulation. Psychological testing may be useful in identifying the presence of such misrepresentations (see Section 10.5, Malingering and Dissimulation).[118]

Selected tests are administered by a psychiatrist and may provide useful information pertinent to an assessment. The use of psychiatric rating scales can help quantify symptoms and measure changes in severity. Many are accompanied by a manual that provides reliability and validity measures for the scale; hence, such scales lend a measure of objectivity to the assessment. A full discussion of these scales is outside the scope of this Guideline.

## 8.3. Actuarial Tests and Structured Professional Judgment

The quintessential actuarial tests are those established by the life insurance industry to assign insurance rates to its clients. Actuarial tables are designed to distinguish people with long life expectancies from those with short ones. The tests are highly effective because they are based on large samples that represent the population to which the individual belongs. The accuracy of actuarial tables decreases as the size of the sample decreases and as the individual differs from the standardization sample.

By contrast, most forensic actuarial instruments are based on smaller samples with unique characteristics, which may limit their generalizability. Therefore, experts should be aware of how closely the evaluee resembles the sample on which a given test is based. Instruments are valid only if the individual resembles the group for which the scale was developed. Evaluators should be aware of both the strengths and limitations of actuarial tests, given that the tests support probabilistic statements concerning large groups, but do not permit determinations

about the risk of recidivism, guilt, or innocence of an individual or support statements about the individual's predicted actions in the ensuing years. Claims made for tests on web sites established by the tests' authors should be treated with caution. Forensic psychiatrists should review both supportive and critical peer-reviewed literature concerning any actuarial instrument that they use to formulate their opinions. They should also be prepared to articulate, in testimony or in a report, why they have not used instruments that other experts have employed.

Structured professional judgment methods have evolved as a response to the acknowledged limitations of actuarial tests. This approach incorporates clinical judgment without assigning numeric probabilities.[119]

As actuarial scales and guides to clinical assessment proliferate, it is useful to consult the scientific literature as well as sites that provide links to information about specific instruments (e.g., the Psychopathy Checklist, Revised,[120] the Static-99R,[117] the Violence Risk Appraisal Guide,[121] the Sex Offender Risk Appraisal,[122] and the Historical, Clinical, and Risk Management-20[119]). Again, experts are cautioned against relying solely on web sites of developers of the instruments. Attending training sessions on the use of these guides is helpful and may be required for certification to use the instrument (see Section 11, Risk Assessment).[123,124] A useful review text on this subject is available.[125]

### 8.4. Physical Examination

General physical examinations are typically conducted as part of the routine protocol during hospital admission to hospitals, including forensic assessment or rehabilitation units. Although forensic psychiatrists have training in medical examination, they are typically consulted or retained to provide an expert psychiatric opinion. In most cases, the physical examination is best conducted by medical colleagues, and the psychiatrists order, analyze, interpret and synthesize the results based on their broad medical training. For example, if the forensic psychiatrist's opinion depends on a hypothesis that the evaluee has undiagnosed myxedema, it is advisable to seek some comment or confirmation by an independent endocrinologist who is knowledgeable in thyroid disease. However, in some cases, examinations such as those to detect tardive dyskinesia or cogwheel rigidity would be performed by the psychiatrist.

### 8.5. Clinical Testing and Imaging

Clinical tests such as electroencephalography and neuroimaging are attractive to the legal world because they give the impression of independent objective evidence of an altered brain. Forensic psychiatrists should be familiar with both current and past techniques used to assess neurophysiological function; more important, they should be aware of the substantial limitations that have been ascribed to these methods to date. A standard reference textbook can assist in putting a visually dramatic finding in context.[126] In some circumstances, consultation with a colleague expert in the specific area may be desirable. Similarly, if there is an unexpected or incidental finding, it is wise to obtain independent verification from an expert in neuroimaging. The relevance (if any) of such findings to the legal questions in a case should be carefully evaluated in the context of the overall assessment.

### 8.6. Penile Plethysmography and Visual Reaction Time Screening

Penile plethysmography (PPG) and visual reaction time (VRT) are examples of tests based on validated psychophysiologic observations: in penile volume and circumference increase when men are sexually aroused; and evaluees tend to look longer at pictures of people whom they find sexually attractive than at pictures of those to whom they are not attracted. There is a substantial body of peer-reviewed discussion of PPG[127,128] and some literature on VRT.[129] Experts who use either method to assess sexual preference should be aware that neither test is designed to determine guilt or innocence.[128,130] These tests are currently of most use in assessing suitability for treatment and in tracking response to treatment, but are also useful in assessing anomalous sexual preference, particularly for risk assessments.[131] PPG is available in both Canada and the United States, but with different stimulus sets, as sets used in Canada that involve children cannot be used in the United States because of concerns that such material might violate prohibitions against possessing child pornography.

For PPG, reliability and validity statistics have been published, but can vary between laboratories and among test stimuli.[132,133] This test should be conducted and interpreted only by qualified specialists, with the voluntary, informed consent of the evaluee.

VRT is another test that has gained some, if not widespread, acceptability in the field.[132] It has the advantage of being administered fairly easily by a trained administrator using only a laptop computer. Recent research has suggested acceptable sensitivity and specificity, and it has been ruled admissible in some (but not all) jurisdictions.[134] Some contend that VRT measures can easily be voluntarily manipulated by the evaluee, especially since the mechanism of the test is widely available on the Internet.

---

**Summary 8.6**   Adjunctive Testing

- Forensic assessment instruments
- Psychological testing
- Actuarial tests and structured professional judgment guides
- Physical examination and investigation
- Neuroimaging and electroencephalogram
- Penile plethysmography and visual reaction time

---

# 9. Opinions

Once all pertinent information has been obtained, the forensic evaluator formulates an opinion. The opinion should be substantiated and its foundation clearly delineated.[8] The evaluator should keep in mind that the scientific foundation for the opinion may have to withstand a *Daubert*[135] challenge in court. In other words, the evaluator should ensure that the scientific technique used is reliable and generally accepted, among other factors.[1]

Many forensic evaluators provide a caveat that their opinions are based on the information currently available and that additional information may require further consideration and therefore could alter the opinion rendered. When an opinion cannot be rendered to a reasonable degree of medical certainty, the referral source should be notified before the evaluator writes a report. In some cases, further information or testing may be needed before the evaluator can render a final opinion. The referring source may nevertheless ask for a preliminary opinion. Although these opinions can be problematic and are not generally recommended, if a preliminary opinion is given, its limitations should be explained and the need for further information described.

## 9.1. Nature of Psychic Harm

In civil cases alleging psychic harm, the evaluee typically argues that psychiatric symptoms or current disability is due to a tortious event that is the subject

of the litigation. A forensic psychiatrist can help courts to address whether the alleged negligent act or omission proximately caused the claimed injury, but the psychiatrist should be careful not to attempt to address questions beyond the specific one(s) asked by the court or retaining attorney.[136]

Common cases in which psychic harm may be at issue include allegations of disability due to medical intervention, discrimination or harassment in employment, or PTSD or related illness due to a traumatic event.[136] In cases in which intentional or negligent infliction of emotional distress is alleged, the forensic psychiatrist is typically asked to assess and describe the evaluee's level of disability, which can help the court evaluate the level of damages.[45] Gerbasi[137] recommends paying special attention to somatization, pre-existing conditions, diagnosable personality disorders, and malingering (see Section 10.5, Malingering and Dissimulation).

---

**Summary 9.1**   Psychic Harm and Special Concerns

- Preexisting conditions
- Personality disorders
- Malingering
- Somatization
- Genetic predisposition
- Effects of litigation
- Causality

---

The evaluee may have a genuine psychiatric disorder that is nonetheless unrelated to the alleged injury.[76] For example, the claimant in a personal-injury lawsuit may have had a major depressive disorder before the accident that is the subject of the litigation, with no change in the severity of symptoms after the event. In another example, a claimant may have a genetic predisposition toward developing a particular mental illness, and finding whether that illness was triggered by the event that is the subject of the litigation usually requires a multifactorial analysis. The psychiatrist should also consider whether the litigation may be affecting the claimant's psychiatric symptoms.[76,138] Hence, the forensic examiner must consider multiple potential causes to determine what role, if any, the tortious event played.

If an evaluee has a pre-existing illness that was exacerbated or worsened by the tortious event, the court may require evidence that the change was caus-

ally linked to the event. During the assessment, the forensic psychiatrist should consider differential diagnoses and be prepared to testify concerning the reason for the diagnosis *vis-à-vis* other possible diagnoses that would be more or less favorable to the evaluee's case.

### 9.2. Disability

For disability determinations, opinions should address the link between signs and symptoms, if any, of a mental illness and occupational impairment.[139] In workplace-related disability claims, the assessment is conducted to answer one of the following concerns: "[w]hether the employee has a psychiatric diagnosis, and if so, its duration, symptoms, and prognosis; the etiology or causation of the disorder and, specifically, its relationship to work; and whether the disorder has resulted in a work-related impairment" (Ref. 72, p 307). For determining the degree of impairment, the American Medical Association's *Guides to the Evaluation of Permanent Impairment* can be an invaluable resource, and some disability determinations, such as examinations for workers' compensation, require or recommend its use in the assessment and report.[45,76,140]

---

**Summary 9.2**   Disability

- Link between the mental disorder and occupational impairment
- Etiology of the mental disorder
- Restrictions
- Limitations
- Prognosis
- Adequacy of treatment
- Secondary gain/malingering

---

Disability insurance carriers generally provide a list of questions for the expert, and the report should respond to these specific concerns.[54] The questions may vary, but they ordinarily center on whether the evaluee is impaired as a result of mental illness or substance abuse to the degree that occupational functioning is compromised.[54,73] The first question is usually about the diagnosis and its foundation, including the signs and symptoms that support the diagnosis. The psychiatric history can be used as supporting evidence, as well. The next questions normally deal with the relationship between the symptoms and signs of the mental illness and the degree of impairment, if any, in occupational functioning.

Many carriers ask about evidence of residual functioning. The evaluator should review the evaluee's job description to respond with examples relevant to the specific occupation.[54]

If the evaluee's employer has a same-occupation policy (a policy that mandates that the evaluee cannot be moved to a different type of employment), then there will be a question about restrictions or limitations in relation to the essential tasks of that occupation. A restriction is an activity that an evaluee should not engage in because of the risk of exacerbating or precipitating psychiatric symptoms, whereas a limitation is an activity that an evaluee cannot engage in because of psychiatric symptoms (documented loss of function). There may be questions about how long the impairments are likely to last, whether further improvement is likely if treatment is optimized, and whether the evaluee has reached maximum medical improvement. The side effects of medication, the relapsing nature of an illness, the effect of the workplace on the disorder, and the presence of a substance use disorder should be considered.[54]

Disability insurance policies may require claimants to be receiving treatment appropriate for their condition. Therefore, questions about the adequacy of treatment are usually posed. The evaluator may be asked to make recommendations about optimizing treatment and to offer an opinion about whether a medical condition could be affecting the response to treatment and whether further assessment would be helpful.[54] The additional assessment may include recommendations for psychological or neuropsychological testing and for medical testing or consultation.

There are likely to be questions about secondary gain, exaggeration, and malingering.[54,72] Alternative causes of current claimed impairment should be considered.[73] Evaluees may have a history of positive motivation to return to work, reflected by unsuccessful attempts to return, use of strategies to optimize performance, and efforts to find alternative, less stressful positions.[72] Others may have taken the position, from the onset of symptoms, that they can never work and may have applied for long-term disability insurance before receiving any treatment, or they may not have been compliant with treatment. The evaluator should summarize information about job performance, attitude about working in current and previous jobs, consistency between reported symptoms and descriptions of daily activities, and the results of psychological and neuropsychological

tests in assessing secondary gain, exaggeration, or malingering. If there are no specific questions, then the directions given above can be used as a framework for organizing the overall opinion.

### 9.3. Fitness for Duty

As for other types of reports, a fitness-for-duty (also called fitness-to-work or fitness-to-practice) report should address the referral questions. The employer is seeking information about whether the employee is currently fit for duty, whether the employee can return to work with or without restrictions or accommodations on a full- or part-time basis, whether there is a need for workplace monitoring, and whether treatment is necessary to maintain occupational functioning. In many cases, there are concerns about whether the employee poses a serious risk of harm to self or others.

The answer may not be a simple yes or no. The evaluator's opinion may be that the employee is temporarily unfit for duty, but that the impairments are expected to resolve with treatment. Under these circumstances, the opinion should include an estimate of the time that should be allowed for improvement sufficient to enable a safe return to work. The evaluator may recommend placing conditions on a return to work, such as the employee's continued acceptance of treatment and implementation of a workplace monitoring agreement.[45]

Alternatively, improvement sufficient to enable a return to work may be unlikely. In that situation, there may be a conclusion that the employee is permanently unfit for duty. In other cases, an employee may be currently unfit, but further assessment may be necessary to determine whether response to treatment will be sufficient to enable a return to work.

In recommending accommodations, the evaluator should consult with the employer concerning which accommodations are available to the employee. In many cases, the employee may be able to return to an alternative position permanently or temporarily. Many employers allow a return on a part-time basis as long as the accommodation is time limited. If a workplace monitor is recommended, then there should be instructions for the monitor concerning the symptoms or signs indicating a relapse that necessitates intervention.[54]

There may be questions about safety considerations related to the occupation of the evaluee. For example, fitness-for-duty assessments of law enforcement officers address whether the evaluee can safely carry a firearm.[95] A fitness-for-duty assessment of a physician examines whether the physician has psychiatric impairments that would negatively affect the ability to practice safely and whether oversight and monitoring of the practice is indicated.[42,52,96] However, the evaluating forensic psychiatrist does not offer an opinion about the physician's ability to practice according to the standards of the physician's specialty; that matter is decided by peer review.

### 9.4. Prognosis

An opinion concerning prognosis is essential to most civil forensic assessments because it has bearing on the assessment of damages. In many cases, an evaluee may not have had adequate treatment, and the prognosis should be given under two scenarios: first, assuming that the evaluee remains on the current treatment regimen and, second, considering the likely improvement with enhanced treatment.[54] In formulating an opinion, it is helpful to consider the natural history of the disorder; including the positive and negative prognostic signs; residual functional capacity; psychiatric history, including response to treatment; and personal history.[45,54] Other considerations include motivation, psychosocial circumstances, physical illness, adverse effects of medication, and comorbidity. Factors other than a psychiatric disorder may contribute to the evaluee's claim of impairment.

### 9.5. Treatment Recommendations

The psychiatrist should determine and describe any treatment the evaluee received before the forensic assessment, the evaluee's adherence to treatment, and the evaluee's response to treatment. The forensic psychiatrist also may have to determine the treatment necessary to improve the evaluee's level of functioning and whether additional or different treatment is likely to help.[136] This analysis could be appropriate in a variety of civil (e.g., disability, fitness for duty) and criminal (e.g., sentence mitigation, risk for recidivism) evaluations.

The outlook may depend on the evaluee's willingness to undergo treatment. "Sometimes a consultant has to report that further improvement of the [evaluee's] physical or emotional symptoms is unlikely unless the [evaluee] is able and willing to enter psychiatric treatment. This is frequently indicated when

[an evaluee] is immobilized by anger or depression" (Ref. 141, p 169).

Whenever possible, treatment recommendations should be evidence based. The practice guidelines published by the American Psychiatric Association[142] can help the evaluator to identify appropriate treatments for the evaluee's condition.[136]

## 10. Special Situations

### 10.1. Challenging Assessments

Certain evaluee presentations can make forensic assessment more challenging. The approach to assessing these evaluees must be tailored to the assessment setting, the type of assessment being performed, and the need for clinical intervention for the evaluee. In such difficult assessments, the safety of the evaluee and evaluator must be of paramount concern.

#### 10.1.1. Evaluees with Psychosis

In certain forensic assessments, the evaluation of an acutely psychotic client may present challenges, especially if the assessment focuses on past mental status (e.g., mental status at the time of a criminal offense or of a personal injury), rather than present status. Nevertheless, it is important to perform and preferably record results of a mental status examination as soon after the original offense or event as possible, although current psychotic symptoms may prevent evaluees from accurately reporting the events around the time of a personal injury or their mental status at the time of an alleged offense. Evaluees with psychotic symptoms may also demonstrate impairment in their interactions with the interviewer. If paranoid, they may withhold information from the evaluator that would be crucial to formulating the forensic opinion. If delusional, they may incorporate the evaluator into the delusional system. Having recorded the original mental status examination, the expert should conduct follow-up visits to obtain the information needed for a complete assessment. In criminal responsibility assessments conducted long after the arrest, psychotic symptoms may impair a criminal defendant's ability to remember the events accurately. Conversely, if the forensic assessment focuses on a present mental status assessment (e.g., competence to stand trial or disability), the presence of psychotic symptoms is a particularly relevant and primary consideration in the formulation of an opin-

ion. For these reasons, it is most appropriate to consider the degree of impairment the symptoms are causing and the degree of disability affecting the competence or capacity under evaluation.

---

**Summary 10.1.1**   Evaluees with Psychosis

- Accuracy of history
- Contemporaneous record (notes, recordings)
- Referral for treatment
- Prevention of possible violence

---

For evaluees with severe mental illness, the evaluator may find it necessary to arrange for treatment. Although forensic psychiatrists do not function as treating psychiatrists, they should act responsibly concerning evaluees' health needs, similar to physicians' duties, as set out in the American Medical Association's *Opinion on Medical Testimony*.[22] The evaluator may have to initiate an assessment for hospitalization of an evaluee or to refer the evaluee to an outpatient psychiatrist or mental health clinic for treatment. If at all possible, unless there is an emergency, forensic evaluators should avoid providing direct treatment to evaluees (acting as both the treating psychiatrist and the assessor[143]), in accordance with the ethics guidelines established by AAPL.[39]

Finally, for safety reasons, careful preparation before the interview can be helpful in case of unpredictable behavior in a psychotic evaluee. Section 5.4.1, Physical Setting, and the following section review the physical setting and other factors relevant to aggressive evaluees and safety.

#### 10.1.2. Aggressive Evaluees

In the course of their practice, all forensic psychiatrists have to deal with evaluees with a history of aggression. In one study examining aggression toward forensic evaluators, 42 percent reported having received threats of physical harm or nonviolent injury.[144] When aggressive behavior toward clinicians occurs in forensic settings, it may be related to psychosis or may be precipitated by situational factors, such as the denial of an evaluee's demands.

Dealing with aggressive evaluees can be stressful, and various management strategies are available. These include informing coworkers that an evaluation is going take place, carefully confronting the evaluee when indicated, avoiding the evaluee, seeking consultation from a peer, and notifying available

security personnel. Confronting the evaluee about aggressive behavior has its advantages and disadvantages, but it should always be done with caution.

Anticipation of potential aggression is an important strategy for enhancing clinician safety. Clinical, psychological, and historical factors increase the potential for violence. Such factors include a history of repeated violence, agitation, anger, disorganized behavior, intoxication, personality disorder, noncompliance with psychiatric treatment, threat-control-override delusions, and poor impulse control.

Several techniques can be useful in enhancing safety. First, forensic examiners should always maintain a humane and respectful approach to evaluees. Recognizing affect, validating it when appropriate, and encouraging the evaluee to discuss feelings can reduce the risk of violence. It is also important to keep an appropriate physical distance from potentially violent evaluees, at least an arm's length. Ideally, an interview with a potentially violent evaluee should occur in a quiet, comfortable setting with both parties seated. Access to an exit door should be unimpeded for both the clinician and the evaluee. Particular care and preventive planning are necessary if a potentially violent evaluee is interviewed in a private office. If a private office is the only available location, the presence of family members and staff can be useful in preventing or defusing violence.

Finally, in dealing with aggressive evaluees, evaluators must learn to recognize and manage countertransference. If an evaluator has feelings of arousal, attraction, or anger during an assessment, the reaction may be due to countertransference. Methods useful in managing countertransference include consultation with a colleague, clinical case conferences, ethics training, and training in managing aggressive behavior. Bringing a colleague to the interview is sometimes helpful in diffusing the transference and providing security. When an evaluator becomes aware during an interview of strong feelings of countertransference that interfere with the process or its objectivity or with safety, he may wish to bring the interview to a close and resort to one of these methods.

If an evaluee assaults the forensic evaluator, the evaluator should consider withdrawing from the assessment, as his objectivity may be compromised. The prosecution of such assaults is controversial, especially if the evaluator has been hired by the defense attorney. Before deciding whether to file a formal complaint with the police, consultation is recommended with another clinician, the retaining party, or legal and administrative staff (if the evaluation is conducted in a facility setting).

### 10.1.3. Uncooperative Evaluees

In forensic practice, clients frequently fail to attend the assessment or refuse assessment. This behavior can be particularly troublesome when an assessment is ordered by the court. A court order is not a guarantee of compliance. The first approach to refusal is a determination of whether it is purposeful and competent. If the client understands the nature and purpose of the assessment, the agency of the evaluator, and the potential consequences of refusing the assessment and if he has a nondelusional motive for refusing, his decision may be a competent one. Once this determination has been made, the evaluator should inform the retaining attorney or judge of the situation. Because of the medicolegal context for forensic assessments, malingering is a consideration in evaluees who do not cooperate (see Section 10.5, Malingering and Dissimulation).

If a forensic evaluee remains uncooperative, the evaluator may have to resort to conducting an assessment through the use of collateral sources (see Section 5.3, Collateral Information). If a forensic opinion is offered through the sole use of collateral sources, the evaluator must inform the court in both writing and testimony that a personal examination was attempted and was unsuccessful and that the opinion is being offered through the use of collateral sources. Limitations of the opinion should also be disclosed.

In some jurisdictions, depending on the type of assessment, courts allow the presence of counsel at psychiatric examinations in criminal forensic assessments, which can facilitate participation of an uncooperative evaluee. It is important to consult the statutes or case law in the jurisdiction if this is considered.[145] In civil assessments, the retaining attorney or the evaluee's attorney may be asked to facilitate the evaluee's participation, but there is no clear guidance on whether counsel can be present at the assessment. If present, the attorney should not be allowed to disrupt the assessment in any way. Consideration should be given to ensuring that the evaluee is unable to make eye contact with counsel before answering questions, to avoid nonverbal cues that could, either intentionally or unintentionally, sug-

gest answers. For example, video-recording equipment can be set up in the assessment room and a monitor in an adjoining room to permit the attorney to observe the evaluation without intruding.

Some forensic evaluees are uncooperative through concealing their genuine psychiatric symptoms in an attempt to appear mentally healthy. This phenomenon, referred to as dissimulation, is described in Section 10.5.5, Dissimulation.

### 10.1.4. Mute Evaluees

When evaluating mute clients, the main challenge lies in the determination of the etiology of the mutism (congenital aphasia, neurologically acquired aphasia, catatonia, conversion disorder, or selective aphasia). These assessments often involve consultation with other nonpsychiatric clinicians and interviews with collateral sources.

Evaluees with congenital, nonselective mutism usually have a well-established medical history of the disorder and present particular challenges, primarily due to communication limitations. Forensic assessment may be possible only if the client can communicate with formal American Sign Language. Mutism has been well recognized as a limitation to criminal competence.[146] Mute evaluees cannot be tried without meeting a threshold of competence for which the standards have been articulated. Mutism in an evaluee remains a rare and complicated psycholegal situation.

The differentiation between neurologically acquired aphasia and selective mutism usually requires consultation with a neurologist and may necessitate neuroimaging. Difficulty with word-finding and speech organization are more common than complete mutism. Catatonia generally includes additional findings, including posturing, negativism, waxy flexibility, and other symptoms. In depressive stupors, prominent psychomotor impairment is also present. Careful observations of the evaluee should be documented and records and collateral information reviewed. It is within the expertise of a psychiatrist to make a diagnosis that will be of help to the court.

The most difficult differential diagnosis of mutism is in distinguishing a conversion disorder from malingering (i.e., whether the evaluee's mutism is under voluntary control). In conversion disorder, there is often a history of conversion symptoms and evidence of repression and dissociative phenomena,

**Summary 10.1.4** Causes of Mutism

- Congenital aphasia
- Neurologically acquired aphasia
- Catatonia
- Conversion disorder
- Selective
- Malingering

with mutism being one of many symptoms. By contrast, in malingering, there is frequently a history of antisocial conduct, an extensive criminal record, and a refusal to submit to psychological testing. Inpatient assessment is often necessary to distinguish between these entities.

## 10.2. Child and Adolescent Forensic Assessments

Psychiatrists may be requested to conduct a forensic psychiatric assessment of a child or adolescent for criminal or civil proceedings. Generally, all assessments of children should be conducted by clinicians with training or qualification in child psychiatry. Although the general principles outlined in the sections regarding the assessment of adults also apply to the assessment of children and adolescents, there are some important additional areas to consider.

**Summary 10.2** Child and Adolescent Assessments: Special Considerations

- Informed consent or assent
- Observation by third parties
- Avoidance of leading questions in interviews
- Published standards for sexual abuse or custody

### 10.2.1. Informed Consent

In most circumstances, minors cannot provide informed consent. Therefore, consent for the assessment and release of information must be sought from those legally empowered to provide them: typically parents or guardians, or, if the minor is a ward of the state, an appropriate representative.[147,148] Parents and guardians may also be required to provide consent for audio- or video-recording. There are exceptions: cases in which minors may provide informed consent include minors waived to adult criminal court, emancipated minors, minors undergoing parental bypass evaluations for abortion, and mature minors. Also, fundamental rights may not be waived by anyone other than the person who holds them, even if that person is a minor (e.g., a parent cannot

waive a minor's right to avoid self-incrimination). When application of these exceptions and rights becomes complicated, states may appoint a guardian *ad litem* to help the court weigh the various factors and consider the various interests in a case. State evaluators investigating an abuse or neglect report do not need consent in most jurisdictions.

Nevertheless, informed assent should be sought at the outset of an interview of a child or adolescent, even if the minor cannot consent. Minors should be given information in developmentally appropriate terms, regarding the nature of the assessment, who will read the report, and other limits on confidentiality; as well, they should be notified that they do not have to answer questions. The evaluator should ask child evaluees to state their understanding of the purpose of the assessment and whether anyone has told them what to say. Child evaluees should be informed that they can ask questions about the process at any point during the examination and that they can take breaks and speak with their parent or parents whenever they wish to do so. Again, there are exceptions: psychiatrists evaluating possible sexual abuse generally do not tell minors exactly what they are evaluating because it would be a suggestive intervention, nor do they reveal what the likely outcome of the assessment could be, as the minor may want to protect the parent.

Interviews of children give rise to some particular ethics-related problems that the evaluator should consider.[148,149] The person giving consent may not be acting in the best interest of the child. For example, a parent in a custody dispute may act in the parent's own interest. If the child is a state ward, the state's interest and child's interest may diverge. Because of their immaturity, minors are less likely than adults to understand the rights that are described to them. For example, a child may feel more obliged to cooperate because of deference to authority,[150] be less likely to understand the consequences of certain admissions, or be overly trusting of the interviewer.

### 10.2.2. Observation by Others

Requests from a third party (such as a parent, therapist, or attorney) to observe a child's or adolescent's forensic assessment are much more common than requests to observe an adult assessment. Honoring such requests should be discouraged, as the presence of third parties may substantially influence the assess-

ment process. Arguments for others being present are often made on the basis that the child needs protection or support because of the risk of harm during the assessment. The presence of a third party may be appropriate when a young child has significant separation difficulties, has demonstrated an inability to be interviewed alone, or needs an interpreter.[151] If others are to observe, it is important to set appropriate ground rules (such as whether the observers will be in view of the child and whether they can participate). For some types of assessments (especially sexual abuse investigations), video-recording is recommended and is becoming the standard (see Section 5.4.3, Recording).

Assessments of children and adolescents for civil suits often involve observations of the parent–child relationship and sometimes a child–sibling relationship. In general, the nature and length of these collateral observations are negotiated in advance with all parties.

### 10.2.3. Collateral Interviews and Information

In clinical work with children and adolescents, their parents, guardians, or other caretakers are routinely interviewed to obtain additional history because children are not mature historians or reporters.[151] In cases in which the parents are not parties to the litigation, whether the evaluator can have access to parents is often decided by the court. In some forensic assessments of minors, involving parents and others in the evaluation is crucial (e.g., custody assessments).[152] In some legal situations, including those that are particularly contentious, the parent, guardian, or caretaker may refuse to provide collateral information about the child during the assessment. In this case, the forensic evaluator should consider alternative methods of obtaining important collateral data. Such methods include having the parent, guardian, or caretaker questioned during a deposition or requesting a court order that the party complete relevant child-assessment forms. Because a significant portion of a child's daily life involves school, forensic evaluators may require a detailed review of a child's academic records.

### 10.2.4. Interviewing Style

Interviewing children and adolescents involves techniques different from those used in interviewing adults, and therefore requires special training. Of particular relevance in forensic interviews of children are the significantly greater effects of leading ques-

tions and prior suggestion, since children are more suggestible than adults.[153,154]

### 10.2.5. Published Standards for Sexual Abuse and Child Custody Assessments

Because sexual abuse and child custody assessments focus on children, but children are formal parties to the litigations, evaluations of children have a different structure than the one used in the typical individual-focused forensic assessment. Some professional organizations have published standards or practice parameters for the conduct of these assessments.[152,155] Several published sources provide guidance for child abuse and custody assessments, a subject that is beyond the scope of this Guideline. Forensic evaluators should be aware that new allegations of child abuse made by a child or adolescent during the course of the assessment necessitate referral to child protection services.

### 10.2.6. Civil Litigation Involving Children and Adolescents

There are common situations in which a psychiatric assessment of a child or adolescent may be relevant during the course of civil litigation. First, the psychiatrist may be asked to evaluate whether the child was affected emotionally as a result of an event. The plaintiff's complaint outlines the alleged cause of injury and claims mental injury with phrases such as emotional distress, extreme emotional distress, emotional damages, psychic harm, or mental anguish. The relationship between an event and the resulting emotional injury can be grouped into two broad categories: a physical injury causing emotional harm (physical–mental) and emotional injuries causing emotional harm (mental–mental).

Common examples of physical injuries that can lead to mental injury include nonvehicular accidents, vehicular accidents (e.g., motor vehicle, airplane), natural disasters (flood, fires, earthquakes), and physical or sexual abuse. Emotional injuries that can result in a mental injury are wide-ranging and include the loss of a parent or close relative, witnessing harm caused to others, and being verbally victimized (such as taunts associated with sexual harassment, bullying, or threats from others).

A second important category of civil litigation involves medical malpractice or negligence. In this situation, the psychiatrist is asked to review a case to determine whether any providers (e.g., doctors, psychologists, nurses, social workers) or institutions (e.g., hospitals, detention facilities) were negligent in the care that was provided to the child or adolescent. As in adult cases, medical malpractice consists of four key components, often referred to as the 4 Ds: a *duty* to the patient, and a *dereliction* of that duty, which *directly* results in *damages*. For negligence to be established, all four components must be present. Therefore, the forensic assessment determines not only whether there were deviations from the standard of care through acts of omission or commission, but also whether the deviations were directly or proximately related to the claimed emotional damage.

Third, a psychiatrist may be requested to conduct a psychological autopsy of a young person for the purpose of retrospectively evaluating mental status at the time of death. In some situations, although the actual cause of death (such as a gunshot wound to the head) may be clear, the manner or mode of death may be unclear. Mode of death is classified into four types—natural, accidental, suicide, or homicide—and is directly relevant to civil litigation involving insurance policies, which do not provide coverage for suicide-related deaths, and to investigations into whether a third party or a product caused the death.

Fourth, disability assessments (such as Social Security assessments) may lead to civil litigation when the evaluated child or adolescent is denied financial benefits and coverage. Fifth, special education assessments in a school setting may also be legally challenged when there is a disagreement between the parents or guardian and the school concerning its assessment or recommended education plan.

Finally, child custody assessments nearly always require a forensic assessment of the child, of each parent's or guardian's current ability to provide care for the child, and of the child–parent relationship, of child–sibling relationships, and of the best interest of the child.

## 10.3. Assessments of Persons with Intellectual Disability

Forensic psychiatrists are likely to encounter individuals with intellectual disability (ID). Competent assessment of an evaluee with ID requires the evaluator to adapt the approach to account for the unique characteristics of the evaluee.[156]

Laws surrounding and defining ID are specific in different jurisdictions, and the forensic evaluator should be familiar with such laws before conducting an assessment.

---

**Summary 10.3**   Definition of Intellectual Disability

- An intellectual disabilities (ID) were a developmental impairment that results in cognitive ability and adaptive functioning that are substandard to a significant degree. More specifically, ID is defined by a combination of three factors:
  - Deficits in intellectual functioning confirmed by both clinical assessment and individualized standardized intelligence testing.
  - Deficits in adaptive functioning in one or more of the following adaptive skills areas:
    - Communication
    - Social participation
    - Independent living
  - Onset during the developmental period.

Unlike the the DSM-IV-TR, the DSM-5 rates severity of ID by severity of adaptive functioning, not by IQ score.

---

### 10.3.1. Nomenclature

The nomenclature regarding persons with ID has evolved over time. Recently, there has been a change from use of mental retardation (DSM-IV-TR) to intellectual disability (DSM-5). In light of this shift in terminology, this document uses the current term. An important concept to remember when talking about people with ID is people first. For example, using the phrase a person with ID is more respectful and less stigmatizing than an ID person.

### 10.3.2. Conducting the Assessment

When conducting an assessment of a person with ID, the psychiatrist must take into account not only the current presentation but also the underlying condition. These considerations do not require evaluators to abandon their usual approach completely; rather, they should adapt their usual approach to fit the unique circumstances. There are several strategies that can improve the likelihood of a successful assessment.[157,158]

Identify an appropriate location for the assessment in a safe setting that is quiet and private, if possible. The assessment and surrounding circumstances can be frightening, distracting, or overstimulating to a person with ID. A confounding variable is that some individuals with ID enjoy the attention they receive for disruptive behavior, especially when other family members or staff members constitute the audience. Finding a quiet, private place can limit this confounding factor.

Seek collateral sources of information. Persons with ID have difficulty providing a history, and their reliability as reporters may be compromised. Contacting family members, coworkers, teachers, and any other involved person is vital to achieving an accurate assessment. Both recent and long-term histories of the individual, including their prior level of functioning and usual behavior, are helpful in understanding the context of the situation. Use of previous records and reports are likely to be helpful. School and vocational records and, in the United States, Individualized Education Plans (IEPs), should be obtained.

During the clinical assessment, explore the advantage of including family members or familiar staff in some situations. Having caregivers present serves a dual purpose: first, the evaluee benefits from the predictability fostered by the presence of someone familiar; second, the evaluee's regular caregivers are needed to provide history. Hence, a caregiver's presence may be helpful in an initial interview, but may not be necessary as the evaluation proceeds or in subsequent interviews. It is, however, beneficial to have caregivers available nearby throughout the evaluation to provide assistance or collateral information. As noted earlier, in some cases the presence of family members or staff can encourage disruptive behavior by providing an audience.

The presence of an ID often renders the evaluee poorly equipped to provide a history. Limitations in the person's capacity to communicate verbally and to articulate the nature of the problem pose a challenge. The caregiver's vantage point may be comprehensive or may provide only limited information. In addition, caregivers or family members of a person who is undergoing a forensic assessment may be reluctant to provide accurate or complete information if they are concerned that full information may harm their interests.

During the assessment, the psychiatrist should take time to explain tests and procedures as simply and clearly as needed for the evaluee to follow what is happening and to reduce the evaluee's anxiety. A person with ID may not be able to give consent for the assessment or understand its implications; however, it may be helpful to obtain assent. The evaluator may have to obtain full and informed legal consent from a guardian or obtain a judicial order.

An interdisciplinary team approach to assessment and treatment planning is often necessary when evaluating persons with ID. Similarly, in the forensic assessment, it may be necessary to engage staff from other disciplines, such as a psychologist skilled at

conducting psychological or neuropsychological testing.

### 10.3.3. Direct Observation of Behavior

Consideration should be given to a suitable environment for the assessment of evaluees with ID. It is often difficult to obtain a reliable or comprehensive picture of persons with ID in an office or other location outside their familiar environment. Observing evaluees in their normal, everyday surroundings can yield a wealth of information.

### 10.3.4. Complications in Assessment

Dual diagnosis is a phrase in psychiatry that usually means the co-occurrence of mental illness and substance use. In the context of ID, however, it has an alternative meaning: the co-occurrence of ID and psychiatric illness.

In a standard psychiatric practice, a patient would have been identified as having ID, and longitudinal records would provide a frame of reference. In contrast, in forensic psychiatry, individuals encountered may have ID that has not yet been diagnosed. The characteristic signs and symptoms of ID may be masked or enhanced intentionally by the evaluee. For example, evaluees who believe they will benefit from feigning ID may try to hide their intellectual and social capabilities. Alternatively, individuals may try to appear intelligent to conceal their disability. Collateral sources of information are integral to accurate assessment (see also Section 10.5, Malingering and Dissimulation).[159,160]

---

**Summary 10.3.4**   Strategies for Assessments of Persons with Intellectual Disability

---

- Choose an appropriate location.
- Have family and caregivers present.
- Obtain a reliable history.
- Ensure informed consent.
- Use a team approach.
- Use direct observation in a familiar environment.

---

It is essential to distinguish among underlying medical illness, environmental stressors, and the onset or exacerbation of a psychiatric disorder as potential causes of behavioral decompensations. Such a differential diagnosis requires a thorough history and physical examination, using collateral sources to compensate for the patient's potential difficulties with self-reporting.[161] The evaluee's regular caregivers can contribute data to aid in comparing the evaluee's acute presentation with baseline condition and level of function.

### 10.3.5. Degree of Suspicion About Intellectual Disability

The evaluator's degree of suspicion about ID during the assessment can increase the likelihood that ID will become a relevant factor. If there is a low degree of suspicion, the evaluator may overlook or minimize deficits. If there is a high degree of suspicion, the evaluator may be inclined to look for clarification of abilities and deficits, obtain specific testing, and seek collateral sources of information. Evaluators should have a high degree of suspicion if there are any indications of ID, to ensure that complete information is obtained and a complete assessment is conducted.

### 10.3.6. Evaluator Bias

Evaluator bias may also play a significant role in the formulation of the forensic opinion.[162] The evaluator may cast the findings in a better or worse light based on a expectations, desired outcome, political considerations, or pressure from the referring agent. The attitude and conduct of the evaluee may also contribute to bias. An adversarial evaluee may be evaluated differently from a cooperative one, despite their having the same underlying diagnoses.

To avoid bias, it is important to keep in mind that an evaluee with ID may demonstrate poor tolerance of frustration, may become irritable and exhibit behavioral decompensation, or may develop psychiatric symptoms that become the focus of an assessment. ID often results in increased vulnerability to stress and in sensitivity to changes in the environment. In fact, the presence of ID may lead to vulnerabilities or set the stage for the decompensation that causes the situation that necessitates a forensic psychiatric assessment.

Short- and long-term stressors that may trigger such behavioral problems in individuals with ID or dual diagnosis include frustration with difficulty communicating, using problematic behavior as a means of communication, or both; alterations in conditions, such as medication changes, loss of caretakers or loved ones, physical discomfort or illness, stigmatization, or bullying; emotional conditions resulting from psychiatric disorders (in cases of dual diagnosis); and frustration due to realization of mental deficits.[161]

If disruptive behavior has been effective in removing a person with ID from an uncomfortable situation in the past, the use of such behavior may be reinforced and repeated. Every effort should be made to understand and contextualize this behavior.

## 10.4. Cultural Factors in Forensic Evaluations

### 10.4.1. Contextualizing Culture, Race, and Ethnicity in Forensic Assessments

An understanding of race, culture, and ethnicity plays an important role in the medicolegal system.[163] Regardless of whether they are attorneys, probation officers, judges, experts, witnesses, or jurors, people who participate in legal proceedings bring their own preconceived notions, attitudes, and value systems to the table.[164] These preconceptions affect their relationships with others, especially during interpersonal interactions and decision-making.

It is widely accepted that mental health clinicians must possess an ability to provide a cultural context and formulation for clinical and forensic work, to provide effective assessment and treatment of diverse populations. Cultural formulation skills are rapidly becoming accepted in all aspects of psychiatric practice, including forensic psychiatry.[165] Overcoming potential language barriers and comprehending the cultural beliefs and values held by an evaluee, may be important when providing a comprehensive and meaningful assessment of the evaluee's mental health and overall functioning. Cultural considerations should inform the forensic assessment of psychological and behavioral problems, since the legal matters prompting such assessments, whether civil, criminal, or family-related, often have serious consequences.[164]

### 10.4.2. Disparities in Diagnosis

Several researchers have identified disparities in how psychiatric disorders are diagnosed in racial and ethnic minorities. For example, blacks are diagnosed more frequently than whites with psychotic disorders and less often with mood and anxiety disorders.[166,167] These diagnostic differences may be influenced by cultural differences in communication and interaction styles, values, and belief systems in the doctor–patient dyad. It has been asserted that this is especially true when patients from minority groups receive treatment and care from members of dominant groups.[168–172] A physician may hold a preconceived notion that a patient has a certain condition and may preferentially or subconsciously skew his (the physician's) beliefs according to the strength of the information received in the assessment.[173] If not carefully managed, these preconceived notions may result in misattributions and reinforcement of cultural stereotypes. Racial and cultural biases not only influence the ways in which clinicians diagnose disorders, but also affect the types of treatment proposed.

### 10.4.3. Culture as Part of Formulation

When considering culture as part of the case formulation process, the forensic psychiatrist must first identify the traditions, values, and behavioral norms of the evaluee that are pertinent to the consultation questions. Asking evaluees questions that explore the different complex components of their identity and self-concept may reveal their culturally syntonic belief systems and help the psychiatrist to situate them in their social world.[163]

Culture should be considered in appreciating the evaluee's distinctiveness, with care taken to avoid stereotyping.[174] The psychiatrist should take into account that many people have had religious or cultural "personal experiences that have contributed to the shaping of [their] moral life" (Ref. 34, p 372). Most people believe that the legal system is fair, but some disagree[46] and may have complex sociocultural reasons for their belief.[175] Even personal concepts of wrongfulness may be steeped in cultural and social definitions, and these concepts may be taken into consideration in certain situations, such as evaluations for mitigating factors in sentencing.[164]

Aggarwal[163] and Kirmayer[174] both argued that situating behavior in its cultural context often provides insight and clarification into an individual's reasoning process. Through careful assessment, the forensic psychiatrist's role in exploration of the cultural contexts of behavior may also help explain the behavior.[176]

In addition to the forensic psychiatrist's duty to provide culturally informed assessments, cultural concerns arise in other forensic settings. Various authors have commented on the cultural context of the forensic psychiatrist's role in the courtroom.[25,26,177] Conveying the nuances of culture and identity in the courtroom may facilitate increased empathy that could affect the assessment of a defendant's culpability.[163,174,178]

### 10.4.4. Cultural Identity

Cultural identity should not be assumed but should be explored.[172] Culture may have a strong influence on boundaries and what is considered acceptable behavior during the assessment.[177] Some cultures use more physical touching, whereas in other cultures, an evaluee may think it inappropriate to shake hands with an evaluator of the opposite sex.[36,164] Looking directly at a person is considered disrespectful in some Arabic and Asian cultures. Extra caution may be needed in the nonconfidentiality warning of some patients because of potential difficulty in their understanding that there is no doctor–patient relationship between them and their examiner. The evaluator should be even more careful to ask open-ended questions, rather than closed questions, as in some cultures a yes reply may simply acknowledge that the evaluee is listening.[164]

Competence in cultural formulation includes respect for and knowledge of other cultures, as well as self-assessment to guard against cultural biases.[36] Culture should be integrated into assessment and service delivery. In the United States, the evaluator is often of the dominant group while the forensic evaluee may be of a minority ethnic or racial group, and the effect of this diversity should be considered in interactions with the evaluee. The forensic psychiatrist's knowledge of different cultures should include verbal and nonverbal communication styles, professional values, and power relationships.[36] Respect for personal space, volume of speech, eye contact, gestures, and physical contact should be considered. Distress may manifest in culturally specific ways in individuals with different life histories.[179]

Religion, culture, and race may affect a psychiatrist's worldview, causing bias (or the appearance of bias). The cultural background of the evaluee must not affect the objectivity of the forensic examiner. Transference and countertransference may require additional attention in cross-cultural contexts; self-examination of bias regarding ethnicity and belief systems should be conducted.[178] The psychiatrist should also be aware that attitudes toward mental illness and the stigma that it carries differ across groups. In complicated cases, it may be useful to consult colleagues or others in an effort to broaden understanding of the defendant's background.[178,179]

### 10.4.5. Culture and Diagnosis

There are many cultural differences in the expression of mental illness. As previously discussed, members of various nondominant groups may experience mental illness differently or communicate their distress in different ways.[164] Defining entities as culture-bound syndromes can be helpful in conceptualization, but concerns have been raised as well. Including culture-bound syndromes in the DSM raises the question of whether these syndromes meet criteria for mental illness sufficient to be used in a defense of not guilty by reason of insanity.[179] For example, *latah* is a startle-induced dissociative reaction described in the Malay culture.[164] Although *amok* is often regarded as a Malaysian culture-bound syndrome, *amok*-like indiscriminate massacre behavior after a stressor has been observed in other cultures.[164,180] Belief in *voodoo* death, which is thought to occur when a person breaks a taboo and then suddenly dies, has been observed in multiple cultures.[164]

### 10.4.6. Language Differences

The evaluator should arrange for the interview to occur in the evaluee's primary language or bilingually, as misunderstandings due to language differences may lead to improper diagnosis.[179] However, the presence of the interpreter may alter the assessment. The interpreter may have a bias, for example, if he is a relative of or is known by the evaluee and is interpreting information that may be embarrassing to the family.[172] Even a neutral, qualified translator may introduce distortions into the process. Translation choices may alter some of the content of questions and responses, with substitutions, omissions, or distortions.[36,179] Hence, the interpreter should be asked to translate verbatim, and the evaluator should maintain eye contact with the evaluee throughout the interview.[179]

### 10.4.7. Culture and Psychological Testing and Mental Status Examination

Although psychological testing can provide valuable insight, care should be taken to ensure that the test is interpreted in a culturally meaningful way. Language disparities, cross-cultural meanings, test environment, and tester biases should be considered.[178] The attitude of the evaluee toward testing is also important: some evaluees may merely be acquiescent or may provide socially desirable replies.[164]

It is argued that there is no culture-neutral, universally acceptable test.[164] The influence of culture on various tests must be acknowledged. It affects the changes in norms, special translations, equivalency efforts, and modifications.[164] Evaluations of the MMPI (Minnesota Multiphasic Inventory)[180] revealed cross-ethnic differences among whites, blacks, and Native Americans, whereas a new version (MMPI-2) shows the "relative unimportance of ethnic group difference" (Ref. 147, p 80). A Chinese test similar to the MMPI has also been developed to account for cultural differences with Americans.[164] Similarly, Chinese and Vietnamese depression scales have been developed because of somatic and emotional experiences of depression in these cultures that are poorly captured by Western scales. There is some concern that the Mini Mental State Examination overclassifies blacks as having dementia, but the evidence of this phenomenon is mixed.[179] Tests should be administered with care in evaluees from cultural backgrounds for which there are no standardized data available for interpretation of the results.[178] It is important to consult test manuals for further information.

It has been argued that the Psychopathy Checklist, Revised (PCL-R),[120] has limited generalizability cross-culturally. The test was originally standardized among only Western populations that were almost exclusively white in origin; therefore, some suggest that the PCL-R should be used with caution in non-white and non-Western groups, although the manual of the test addresses the possibility and counters the argument.[164] Because the administration of the PCL-R requires semistructured interviews and examiner rating, some argue that knowledge of cultural concerns is essential when using the test.[120]

In addition, even parts of the formal mental status assessment may require adaptation. Mood and affect may be expressed differently across cultures. In particular, different groups may display different affects in the presence of strangers.[164] An expressed belief might be interpreted as a delusion by an evaluator who is unfamiliar with religious beliefs in another culture. Similarly, a report of hearing a deceased relative's voice in a bereaved Latino, Native American, or an Inuk may be a culturally sanctioned expression of grieving rather than a psychotic symptom. Some cautious suspiciousness, as distinguished from paranoia, is adaptive among those of some minority ethnic groups.[172]

Expressions of various types of distress, regardless of whether they meet the criteria for a specific psychiatric disorder, may be affected by culture. Tseng and colleagues[164] note several cultural concepts of distress, including culture-bound syndromes, idioms of distress, and cultural explanations of symptoms. Idioms of distress (i.e., ways in which sociocultural groups convey affliction) are particularly relevant to considerations of religious culture.[182,183] As well, in some cultures, including those in China, somatization complaints are used as idioms of distress, unlike Western conceptualizations.[164]

### 10.4.8. Culture in Specific Types of Assessments

Specific forensic assessments with cultural overtones may be requested of an evaluator, such as discrimination torts and parental fitness in transracial adoptions.[184] However, regardless of the type of assessment, the forensic psychiatrist must be aware of cultural manifestations of distress and potential biases in performing assessments, to make accurate diagnoses. There is some literature on how to conduct an assessment of a claim of emotional distress due to psychological harm caused by racism.[185] In addition, although there is an emerging body of literature that examines transracial adoptions, views vary on approaches to performing these assessments and to arriving at an opinion that reflects the best interests of the child.[184,186] Literature is also available on the effect of religious beliefs on capacity evaluations[187,188] and on distinguishing religious views from psychopathology.[189–192] A full discussion of these types of assessments is beyond the scope of this Guideline.

**Summary 10.4.8**  Importance of Culture in Assessment

- Diagnosis
- Identification of relevant cultural factors
- Consideration of evaluee's distinctiveness
- Avoidance of stereotyping
- Validation of testing
- Consideration of the meaning of language
- Respect for and knowledge of cultures

## 10.5. Malingering and Dissimulation

The detection of malingered mental illness requires a thorough knowledge of the clinical characteristics of genuine illness and a systematic approach to the forensic assessment. A conclusion of malinger-

ing is the result of a process of careful analysis, identification of objective indicators, clinical judgment, and use of scientifically validated psychological tests when necessary.[193] Despite recent advances in neuroscience, there remain significant limitations to the use of neurotechnology for detecting malingering, and its application is not yet recommended outside of research settings.[194] Hence, clinical detection of malingered mental illness remains a fundamental skill in forensic psychiatry.

### 10.5.1. Malingering

Malingering is described in DSM-5 as a condition that the clinician may encounter that is not attributable to a mental disorder, consisting of the intentional production of false or grossly exaggerated physical or psychological symptoms, motivated by external incentives.[102] Malingering requires differentiation from factitious disorder, which is also the deliberate simulation of illness, but for the purpose of seeking to adopt a sick role.[195] The motivation to assume a sick role can be thought of as an internal (i.e., psychological) incentive.

Malingering may be further categorized as pure malingering, partial malingering, or false imputation.[196] Pure malingering is used to describe feigning a nonexistent disorder. If the individual has actual symptoms, but consciously exaggerates them, it is called partial malingering. False imputation refers to ascribing actual symptoms to a cause that the individual consciously recognizes as having no relationship to the symptoms.

There is an extensive body of literature about malingered hallucinations,[197] delusions,[198] and cognitive symptoms.[199] A review of this topic is beyond the scope of this Guideline, but can be found in the references cited.

Motives to malinger fall into two general categories: avoiding difficult real-life situations or punishment (avoiding pain) and obtaining compensation or medications (seeking pleasure). In criminal assessments, evaluees may seek to avoid punishment by feigning insanity at the time of the act or incompetence to stand trial after the act.[200] In civil actions, evaluees may malinger to seek financial gain from social security disability, veteran's benefits, workers' compensation, or damages after alleged accidents.[201]

### 10.5.2. Clinical Indicators of Malingering

Evaluees who are malingering may be detected clinically when they have inadequate or incomplete knowledge of the illness they are feigning, or they overact the part[202] in a mistaken belief that the more bizarre the behavior, the more convincing it will be (Summary 10.5.2). Such evaluees give a greater number of evasive answers and may repeat questions or answer questions slowly to give themselves time to think about how to deceive the evaluator.[201]

Evaluees who are malingering are more likely to be eager to thrust forward their illness, in contrast to those with, for example, genuine schizophrenia, who are often reluctant to discuss their symptoms.[203] Malingering evaluees may attempt to take control of the interview or otherwise behave in an intimidating or hostile manner in an effort to cause the psychiatrist to terminate the interview prematurely. They are unlikely to give a successful imitation of the subtle signs of schizophrenia, such as symptoms of deficits (e.g., flat affect, alogia, and avolition), impaired relatedness, digressive speech, or peculiar thinking.

**Summary 10.5.2**   Clinical Factors Suggestive of Malingering

- Marked inconsistencies and contradictions
- Improbable psychiatric symptoms
- Mixed symptom profile: endorsement of depressive symptoms while mood is euphoric
- Overly dramatic behavior
- Extremely unusual responses to questions about improbable situations
- Evasiveness or noncooperation
- Excessively guarded or hesitant responses
- Frequent repetition of questions
- Frequent declaration of ignorance ("I don't know") in response to simple questions
- Hostile, intimidating behavior, seeking to control or refusing to participate in the interview
- Overemphasis of positive symptoms of schizophrenia

The detection of malingering also requires special attention to rare or improbable symptoms that are almost never reported, even in severely disturbed patients.[204,205] Examiners may ask evaluees suspected of malingering about improbable symptoms to see whether they will endorse them. For example, "When people talk to you, do you see the words they speak spelled out?"[205] or "Have you ever believed that automobiles are members of an organized religion?"[206]

Malingering evaluees may give a false or incomplete history during an assessment, with excessively guarded, hesitant, or "I don't know" responses to even simple questions. The current self-report of

symptoms should be compared with descriptions in the medical, psychiatric, or correctional mental health records.[193,200] Such evaluees often indicate current psychiatric symptoms that are inconsistent with their recent level of functioning[208] or with other professed symptoms or observed behavior. Inconsistencies or disparities between self-reported and real-world observations should be carefully investigated. Repeated testing may be necessary to explain inconsistency over time, since malingering is not a stable trait.[207]

### 10.5.3. Comprehensive Malingering Assessment

Because of the complexities involved in concluding with reasonable medical certainty that a patient is malingering, a comprehensive malingering assessment may be considered, particularly in difficult cases.[193,207,209,210] An outline for the comprehensive assessment of malingering is given in Summary 10.5.3.

Any information that will assist in supporting or refuting alleged symptoms should be carefully reviewed (e.g., prior treatment records, insurance records, police reports, and interviews of family and social contacts). Interview technique is critical in the detection of malingering. It is important to avoid verbal or nonverbal communication of suspicion to the evaluee. Careful attention to the principles of interviewing is essential (see Section 5.4, The Interview). In very difficult cases, inpatient assessment should be considered, if possible, as psychotic symptoms are extremely difficult to fabricate and sustain while under constant, intensive observation.

The evaluation of malingering or exaggeration of symptoms by individuals with mild ID can present particular challenges (see Section 10.3, Assessments of Persons with Intellectual Disability). Psychological testing can be very helpful in the detection of malingering. For example, the Test of Memory Malingering (TOMM) has demonstrated a high rate of detection of malingering in groups of subjects with ID.[199]

Rogers et al.[198] noted that several measures are available for identifying feigned cognitive impairment. In selecting a measure, it is important to find one that uses multiple detection strategies. A measure that reveals repeated failures on very simple items is insufficient, as malingering evaluees may successfully mimic mild to moderate impairment, which is

enough to achieve their objective. The single-measure approach is also susceptible to changes in strategies by evaluees as a result of simple coaching. Therefore, referral to an expert in this area, with whom an effective approach to detecting malingering can be discussed and implemented, is recommended.

Psychological testing for malingering may be specialized, using such tests as the Structured Interview of Reported Symptoms, 2nd edition (SIRS-2),[211] or can rely on an embedded approach, such as in the MMPI-2. The SIRS-2 relies on endorsement of clinical characteristics rarely found or observed in genuine patients. In addition, feigners may endorse indiscriminate symptoms, an excessive degree or magnitude of symptoms, or rare symptom combinations. The validity of the test is established across the sexes and ethnic groups. It should be noted, however, that the text is somewhat cumbersome to administer and score. The Miller Forensic Assessment of Symptoms Test (M-FAST),[212] was developed specifically as a screening instrument for feigned mental disorders in forensic settings. It can also be used to detect malingering of intellectual disability or cognitive impairment, as evaluees tend to take a broad-based approach to malingering across the spectrum of disorders. The advantage of this test is its brevity and ease of administration and scoring, but it should always be used in conjunction with other methods of detecting malingering.

Two examples of tests with embedded validity scales are the MMPI-2 and the Personality Assessment Inventory.[198] The MMPI-2 has multiple validity scales, some of which are particularly useful in detecting feigned mental disorder.[213] Rogers et al.[198] outlined some useful points, as well as numerous pitfalls to avoid, in the use of this instrument. The Personality Assessment Inventory (PAI)[214] is also useful in the detection of malingering, although it lacks the extensive database of the MMPI-2. Readers are directed to a useful meta-analysis that suggests very high specificity, but warns about the modest sensitivity of the PAI, concluding that it should be used along with other measures.[215]

The MMPI-2 is also useful in detecting feigned medical complaints, which may be the subject matter of forensic assessment. This test should generally be used in conjunction with a medical examination by an expert specialist.[118]

### 10.5.4. Malingered Posttraumatic Stress Disorder

Resnick[216] pointed out that malingering should be considered in all claimants who are seeking damages after personal injury. In his experience, supported by research in this area, feigning symptoms of PTSD is not difficult. Even in naïve subjects presented with a checklist of symptoms, close to 90 percent can accurately endorse PTSD symptoms. In the real world, evaluees can easily research the diagnostic symptoms before an evaluation and in some circumstances may be coached to give the desired answers. In addition, in some claims of PTSD the evaluee may have symptoms of the disorder but exaggerate them for the purposes of the evaluation, making detection even more difficult. Nevertheless, the literature reveals some particular strategies that the clinician may include in a comprehensive evaluation, to differentiate malingerers from genuine claimants.

For instance, in an interview, evaluees may give a history of an inability to work, while contemporaneously being able to enjoy recreation.[185] They may be sullen, resentful, uncooperative, suspicious,[216] evasive, and inconsistent.[185] They may have antisocial traits and a poor work record.

Collateral information may be helpful. Significant others and close family members may have something to gain from the claim and may therefore corroborate the evaluee's account, but other acquaintances, such as coworkers and employers, may be more frank. Sometimes lawyers will obtain video recordings of evaluees engaging in various activities that may be inconsistent with their history.

Psychological testing may be helpful as part of a comprehensive evaluation. The MMPI-2 has several

---

**Summary 10.5.3**  Comprehensive Malingering Assessment

- Review psychiatric records.
- Review all relevant sources of collateral information.
- Identify plausible external incentives to malinger.
- Conduct forensic psychiatric assessment(s) (may require several sessions and/or extended length).
- Conduct behavioral observations (especially over time and/or on inpatient unit).
- Determine specific period for which evaluee may be attempting to malinger symptoms (e.g., currently, at time of offense, or both).
- Carefully analyze all clinical indicators of malingering.
- Apply model criteria for the assessment of malingering in defendants (Summary 10.6).
- Obtain psychological testing if necessary (e.g., MMPI-2, SIRS-2, M-FAST, PAI, TOMM).
- Support conclusion of malingering with multiple factual bases.

---

validity scales that may be helpful. Rogers and colleagues,[217] in a comprehensive meta-analysis, concluded that the Fp and D scales are the most useful. The PAI[214] may also be pertinent. Specific trauma inventories are less helpful, since they are more transparent. Evaluators should use open-ended questions to elicit symptoms in the interview before using symptom checklists, which may serve to suggest symptoms to the evaluee. Resnick and Knoll[216] proposed a model that incorporates many of the above-noted factors, thereby serving as a useful guide for experts. The book provides a more comprehensive review of testing for malingering.

### 10.5.5. Clinical Assessment of Malingering in Criminal Defendants

When evaluating criminal defendants in a forensic setting, the psychiatrist must always consider malingering.[46] In addition to conducting a thorough review and preparing for the assessment of the criminal defendant, the psychiatrist should gather information about the defendant and the crime. Comparing this information with the evaluee's self-report upon questioning may be a method of assessing veracity.

Attempts should be made to evaluate the defendant as soon as possible after the crime. Although it is not always possible, early evaluation reduces the likelihood that the evaluee has been coached or has had sufficient time to observe genuine psychosis in a hospital setting, plan a deceptive strategy, craft a consistent story, or rehearse fabrications. As well, normal memory distortions are less likely to occur.

When symptoms such as memory loss, dissociation, or depersonalization during an offense are claimed, it is important to consider whether the symptoms, if genuine, were precipitated by the offense itself. Memory impairment is commonly claimed by those who have committed a violent crime and may represent truthful reporting. (In contrast, memory in one who commits a homicide may be enhanced by the powerful emotion associated with its perpetration.[218])

Offenders commonly report dissociation during a violent crime. The veracity and intensity of the dissociation must be carefully explored, as research has suggested that such symptoms may not constitute a mental disease and that dissociation may be a normal response of some offenders to the traumatic events that they have caused.[219] That is, violent offenders may be traumatized by their own acts and may go on to develop mental disorders as a result of the offense

they have committed.[220] Thus, such symptoms occur only after the offense.

A crime without an apparent motive (e.g., the killing of a stranger) may lend credence to the presence of genuine mental illness. In Canadian law, the Supreme Court of Canada has addressed the defense of automatism and set forth specific criteria related to credibility that should be considered.[221] Several clues can assist the psychiatrist in the detection of fraudulent insanity defenses.[222] For example, a psychotic explanation for a crime should be questioned if the crime fits the same pattern as previous criminal convictions. Evaluees who malinger are likely to have nonpsychotic, rational, alternative motives for their behavior that flow from the more commonplace human passions such as revenge, jealousy, greed, and anger. They are also more likely to have a history of murder or rape, a diagnosis of antisocial personality disorder or sexual sadism, and greater levels of psychopathy.[223]

Malingering defendants may present themselves as doubly blameless within the context of their feigned illness. In such cases, the defendant's version of the offense may demonstrate what is called a double denial of responsibility.[216] Common examples include some type of disavowal of having committed the crime, yet a simultaneous attribution of the crime to psychosis. Allegations involving double denial conform to the following theme: "I am not responsible because of reason one, and, if this is not accepted, I am also not responsible because of reason two." Genuine insanity defenses are usually associated with only one psychotic explanation of why the defendant did not appreciate the wrongfulness of the act, not with dual explanations. Thus, the presence of dual explanations should prompt the psychiatrist to consider the possibility that the defendant has supplemented his claims of mental illness at the time of the offense.

### 10.5.6. Dissimulation

Dissimulation is the concealment of genuine symptoms of mental illness in an effort to portray psychological health.[224] Forensic psychiatrists are trained to detect malingering, but they must be equally vigilant for the possibility that a defendant will attempt to conceal genuine illness. There is a paucity of research concerning defendants who seek to suppress signs of mental illness, or otherwise simulate sanity.[225] However, the denial of psychiatric

symptoms has been reported anecdotally in persons who have committed crimes.[226]

## 11. Risk Assessment

### 11.1. Introduction

Forensic psychiatrists are often asked to perform risk assessments. The most frequent types of assessment are for risk of violence, inappropriate sexual behavior, and criminal recidivism. Psychiatric risk assessment is a broad and varied topic, and a full commentary on all types of risk assessment is outside the scope of this Guideline. Detailed descriptions of the process are available in the academic and professional literature and are referenced in a resource document on psychiatric violence risk assessment published by the American Psychiatric Association in 2012.[227]

Risk assessment takes place in a variety of contexts. Assessment of risk of future violent or sexual offenses is an important element of sexually violent predator proceedings in the United States and of the equivalent dangerous offender criminal sentencing hearings in Canada. Risk assessments are also used in other tribunals in which future dangerousness is a significant factor. These include criminal sentencing hearings, probation or parole assessments, death penalty aggravation or mitigation, child custody, disposition assessments involving people found insane or not criminally responsible because of mental illness, hospital civil commitment proceedings, threat assessments, and assessment of potential violent self-harm.

It is important to ensure that all parties understand the type of risk that is being appraised, the methods used, and limitations of the assessment. Clarifying the question is often an important preliminary step in conducting an assessment. Risk assessments usually include appraisal of what could happen, under what circumstances, and over how long a time. Offering an opinion about management interventions and whether they may change risk is often part of the task.

### 11.2. Ethics

In risk assessment, a psychiatric opinion can affect the evaluee's interests. Courts sometimes increase the length of a prison sentence, for instance, in response to the content of a forensic report.[32] Ethics guidelines do not preclude evaluations that may contrib-

ute to an outcome, such as a longer sentence, that the evaluee would regard as unfavorable, provided the purpose of the evaluation has been explained to the evaluee in advance.[228,229] Broadly speaking, two justifications have been offered for mental health professionals' provision of risk assessments in these circumstances. The first is that psychiatrists and psychologists, when they are working for attorneys and courts, are serving not as clinicians but as evaluators, guided by an alternative ethic based on respecting others, truthfulness, and justice[23,26,31] (see also Section 4, Ethics Foundation). The second is that mental health professionals have a duty, not only to their patients but also to the medical profession and to society as a whole, as exemplified by assisting in the administration of justice.[229] These duties have to be balanced according to the circumstances of the case. Depending on the nature of this balance, it may be ethical to conduct a medical evaluation with an outcome that the evaluee regards as contrary to his interests. It would be prudent to consult the AAPL Ethics Guidelines for forensic psychiatric practices that apply to risk assessments in legal settings.[39]

### 11.3. Conducting the Evaluation and Writing the Report

One of the most important elements of the background information is the evaluee's past behavior. In general, the more independent the sources of information about past behavior, the better. It is important to inform all the potential providers of information about the limits to confidentiality, especially when the evaluee is also providing information. The principles summarized in Section 5.2, Confidentiality, are designed to ensure that the evaluee understands the principles and limits of confidentiality in the forensic assessment. Particular care should be taken to be clear about the limits of confidentiality when the evaluator is retained by the prosecution.

As with other types of forensic psychiatric evaluation, examiners should strive for objectivity in risk assessments. The assessment should be as complete as possible under the circumstances. It should include an interview; however, if permission is not given for a personal interview, the refusal and the reason for it should be mentioned in the report. The limitations that the lack of a personal interview imposes on the final conclusions should also be noted. The use of

structured assessment tools in risk assessment has increased in recent years, and their predictive validity has now been demonstrated in a range of settings. These tools can act as an *aide-mémoire* for the evaluator. The factors that affect risk in an individual case cannot always be captured by an instrument, however, and the clinical and forensic roles of these techniques remain a subject of debate.[230]

Conclusions regarding the likelihood of risk are usually best expressed in probabilistic terms that make clear the level of confidence with which the opinion is held.[231,232] They should take into account factors that reduce the risk and those that increase it.[232–234] Depending on the question asked, they should also include some discussion of how the case can best be managed.

Conclusions should be informed by empirical research on the correlates of violence, but also by the skills that psychiatrists learn in training and develop in their clinical practice. The validity of a psychiatric report is greatest when those skills can be applied. When they cannot, for instance, because the subject will not be in treatment during the period of risk or does not have a condition that psychiatrists are accustomed to managing, the conclusion should be qualified accordingly.[235]

### 11.4. Risk Assessment for Sexual Offenses

Sexually violent predator statutes require specialist evaluations that address the risk of sexual offense. For risk assessments concerning sexual reoffense, emphasis should be placed on paraphilic acts and interests. The evaluee should be questioned about the nature and frequency of this behavior. In particular, evidence of escalation or de-escalation should be sought. The evaluator should question the evaluee about fantasies and impulses in the sexual domain. Careful inquiry about the evaluee's thoughts, feelings, and intent at the time of the alleged acts is important. Questions about the evaluee's attitude toward what he has allegedly done should also be part of the assessment.

Defensiveness, denial, and minimization are common in sex offenders.[236] Sometimes, multiple interviews are necessary to make a full evaluation of the offender. Concern about being labeled a sex offender should be acknowledged, especially for first-time sex offenders and for those who expect to face lengthy sentences. In the assessment of risk for sexual recidivism, a thorough sexual history should be taken. In

particular, it is helpful to learn about early sexual experiences, especially whether the evaluee was sexually abused as a child.

Early sexual behavior may be the *forme fruste* of a paraphilia. A sexual history should include an assessment of gender identity, sexual orientation, and sexual dysfunctions. A history of known sexually transmitted infections and treatment should also be obtained. Questions about impulsivity, judgment, and antisocial behavior before the age of 15 are significant. In addition, it is helpful to try to elicit information regarding attitudes toward women and toward engaging in sex acts with children, as well as evidence of sexual entitlement and preoccupation.[124] A history of the evaluee's ability to form and maintain relationships is also important, especially if it can be independently verified. Similarly, ascertaining the evaluee's ability to follow through on commitments such as education and career helps to complete the picture. These factors are also pertinent when evaluating the presence or absence of antisocial personality disorder or psychopathy.

Assessment of substance use is particularly relevant because of its relationship to sexual offenses. It includes careful interviewing of the evaluee and providers of collateral information and the use of screening tools.[237] Formal mental status examination and functional inquiry about psychiatric symptoms are important for determining whether the sexual behavior is linked to mental illness, a significant factor in risk assessment and management.[238] Adjunctive testing is generally considered important in these assessments. Psychometric testing, usually in collaboration with a psychologist, is often advisable as well.

Tests of endocrine function, which may include tests for diabetes and thyroid disease and specific levels of sex hormones, are sometimes indicated.[239] Neuropsychological testing by a psychologist, electroencephalography, and imaging studies can identify a variety of brain diseases that may have prognostic implications. Self-report measures of sexual behavior and attitudes provide another window into the mind of the evaluee.[240] Other investigations include sexual preference testing by PPG and VRT (see Section 8.6, Penile Plethysmography and Visual Reaction Time Screening). Regardless of the approach, experts should be familiar with the psychometric properties of the technique.

## 12. Conclusion

This Guideline has set the groundwork for forensic assessments, which form the basis for reports and court testimony. The background and approaches provided here are intended to contribute to training new forensic psychiatrists, assist experienced forensic experts in improving their skills and handling complex situations, provide a menu of considerations when undertaking an assessment, and identify gaps in knowledge for further research.

Forensic psychiatrists have a unique role. They must step outside of the usual parameters of the confidential physician–patient relationship in a variety of ways, providing information about the evaluee to lawyers or courts, maintaining a neutral attitude toward the evaluee interview, investigating the evaluee's account through other interviews and reports, recording interviews, and referring the evaluee to colleagues for needed treatment to avoid conflict of interest. The expert thus must tread a fine line between the referring agent and the evaluee, seeking to answer the psycholegal question as objectively as possible.

Preparing this Guideline has also involved finding balances between the weight of evidence and the wealth of experience that the authors, informed by members of AAPL, have brought to it; between providing prescriptive advice and fostering experts' judgment based on their training and experience; and between best practices (empirically or experientially determined) and the need to cope with practical and logistical constraints. The approach offered herein is intended to support forensic psychiatrists with information and guidance, while empowering them to develop analytical capabilities to make decisions on a case-by-case basis.

This document is therefore a roadmap through the process, content, and considerations relevant to civil and criminal cases. Because of differences among jurisdictions and in practice, certain protocols are not clear cut. Differing conceptions of the purpose of the assessment, the expert's role, standards, and ethics-related requirements can lead to honest but varying approaches to the task. Where there are wider discrepancies in practice, the Guideline provides options with advantages and disadvantages, or remains deliberately open-ended in its conclusions. Such areas are excellent topics for further research; as well, the experience of the community of

experts can lead to further shared knowledge of best practices and alternative approaches.

This document does not cover report-writing or testifying. Many of the subjects given brief treatment here are covered in more depth in published texts and journal articles. Some areas, such as developmental disability and cultural competence in forensic psychiatric contexts, as well as risk assessment, have come to the fore in recent years and continue to be the subject of intensive research. The reference list is a resource for further reading. For useful, more in-depth coverage of particular areas of forensic assessment, refer to the other AAPL Practice Guidelines.[36,39,45,46,68]

As with other guidelines, it is hoped that this one will contribute to practice improvement and professional development in forensic assessment and, ultimately, to better outcomes in justice and mental health.

## References

1. Glancy GD, Saini M: The confluence of evidence-based practice and Daubert within the fields of forensic psychiatry and the law. J Am Acad Psychiatry Law 37:438–41, 2009
2. Sackett DL, Straus SE, Richardson WS, et al: How to practice and teach EBM. New York: Churchill Livingstone, 2000
3. Greenfield DP, Gottschalk JA: Writing Forensic Reports: A Guide for Mental Health Professionals. New York: Springer, 2008
4. Griffith EE, Stankovic A, Baranoski M: Conceptualizing the forensic psychiatry report as performative narrative. J Am Acad Psychiatry Law 38:32–42, 2010
5. Griffith EEH, Baranoski MV: Commentary: the place of performative writing in forensic psychiatry. J Am Acad Psychiatry Law 35:27–31, 2006
6. Melton GB: Psychological Evaluations for the Courts: A Handbook for Mental Health Professionals and Lawyers. New York: Guilford Press, 2007
7. Wettstein RM: The forensic psychiatric examination and report, in The American Psychiatric Publishing Textbook of Forensic Psychiatry. Edited by Simon RI, Gold LH. Washington DC: American Psychiatric Publishing, 2010
8. Wettstein RM: Commentary: conceptualizing the forensic psychiatry report. J Am Acad Psychiatry Law 38:46–8, 2010
9. Buchanan A, Norko MA: The Psychiatric Report: Principles and Practice of Forensic Writing. Cambridge, UK: Cambridge University Press, 2011
10. Dietz PE: The quest for excellence in forensic psychiatry. J Am Acad Psychiatry Law 24:153–63, 1996
11. Wettstein RM: Quality and quality improvement in forensic mental health evaluations. J Am Acad Psychiatry Law 33:158–75, 2005
12. Nicholson RA, Norwood S: The quality of forensic psychological assessments, reports, and testimony: acknowledging the gap between promise and practice. Law Hum Behav 24:9–44, 2000
13. Borum R, Grisso T: Establishing standards for criminal forensic reports: an empirical analysis. J Am Acad Psychiatry Law 24: 297–317, 1996

14. Boccaccini MT, Brodsky SL: Diagnostic test usage by forensic psychologists in emotional injury cases. Prof Psychol 30:253–9, 1999
15. Large MM, Nielssen O: Factors associated with agreement between experts in evidence about psychiatric injury. J Am Acad Psychiatry Law 36:515–21, 2008
16. Heilbrun K, Marczyk GR, DeMatteo D, et al: Principles of forensic mental health assessment: implications for neuropsychological assessment in forensic contexts. Assessment 10:329–43, 2003
17. Kraus LJ, Thomas CR: Practice parameter for child and adolescent forensic evaluations. J Am Acad Psychiatry Law 50:1299–312, 2011
18. Appelbaum KL: Commentary: the art of forensic report writing. J Am Acad Psychiatry Law 38:43–5, 2010
19. Mossman D, Bowen MD, Vanness DJ, et al: Quantifying the accuracy of forensic examiners in the absence of a "gold standard". Law Hum Behav 34:402–17, 2010
20. Fuger KD, Acklin MW, Nguyen AH, et al: Quality of criminal responsibility reports submitted to the Hawaii judiciary. Int J Law Psychiatry 37:272–80, 2014
21. Simon RI, Wettstein RM: Toward the development of guidelines for the conduct of forensic psychiatric examinations. J Am Acad Psychiatry Law 25:17–30, 1997
22. Opinion E-9.07, Medical Testimony. Chicago: American Medical Association, 1994
23. Appelbaum PS: A theory of ethics for forensic psychiatry. J Am Acad Psychiatry Law 25:233–47, 1997
24. Heilbrun K, Warren J, Picarello K: Third party information in forensic assessment; in Handbookof Psychology. Edited by Goldstein AM. Hoboken, NJ: Wiley, 2003
25. Stone AA: The ethical boundaries of forensic psychiatry: a view from the ivory tower. J Am Acad Psychiatry Law 36:167–74, 2008
26. Appelbaum PS: The parable of the forensic psychiatrist: ethics and the problem of doing harm. Int J Law Psychiatry 13:249–59, 1990
27. Griffith EE: Ethics in forensic psychiatry: a cultural response to Stone and Appelbaum. J Am Acad Psychiatry Law 26:171–84, 1998
28. Candilis PJ, Martinez R, Dording C: Principles and narrative in forensic psychiatry: toward a robust view of professional role. J Am Acad Psychiatry Law 29:167–73, 2001
29. Candilis PJ: The revolution in forensic ethics: narrative, compassion, and a robust professionalism. Psychiatr Clin North Am 32:423–35, 2009
30. Martinez R, Candilis PJ: Ethics, in The Psychiatric Report: Principles and Practice of Forensic Writing. Cambridge: Cambridge University Press, 2011
31. Martinez R, Candilis PJ: Commentary: toward a unified theory of personal and professional ethics. J Am Acad Psychiatry Law 33:382–5, 2005
32. O'Grady JC: Psychiatric evidence and sentencing: ethical dilemmas. Crim Behav Ment Health 12:179–84, 2002
33. O'Grady JC: Psychiatry and ethics in UK criminal sentencing, in The Psychiatric Report: Principles and Practice of Forensic Writing. Edited by Buchanan A, Norko MA. Cambridge: Cambridge University Press, 2011
34. Griffith EE: Personal narrative and an African-American perspective on medical ethics. J Am Acad Psychiatry Law 33:371–81, 2005
35. Norko MA: Commentary: compassion at the core of forensic ethics. J Am Acad Psychiatry Law 33:386–9, 2005
36. Mossman D, Noffsinger SG, Ash P, et al: AAPL Practice Guideline for the Forensic Psychiatric Evaluation of Competence to

Stand Trial. J Am Acad Psychiatry Law 35(Suppl 4):S3–S72, 2007

37. Stone AA: Law, Psychiatry, and Morality: Essays and Analysis. Washington, DC: American Psychiatric Publishing, 1985

38. Weinstock R, Leong GB, Silva JA: Ethical guidelines, in Principles and Practice of Forensic Psychiatry. Edited by Rosner R. London: Oxford University Press, 2003

39. American Academy of Psychiatry and the Law Ethics guidelines for the practice of forensic psychiatry. Section IV. Adopted May, 2005. Available at http://www.aapl.org/ethics.htm. Accessed November 6, 2009

40. Berger SH: Establishing a Forensic Psychiatric Practice: A Practical Guide. New York: WW Norton, 1997

41. Gutheil TG: The Psychiatrist as Expert Witness. Washington, DC: American Psychiatric Publishing, 2009

42. Wills CD: Preparation, in The Psychiatric Report: Principles and Practice of Forensic Writing. Edited by Buchanan A, Norko MA. Cambridge: Cambridge University Press, 2011

43. Zonana H: AMA pursues ethics positions (excerpt): forensic psychiatry affected—with little opportunity for input. Am Acad Psychiatry Law Newslett 24:3, 1999

44. Resnick PJ, Soliman S: Draftsmanship, in The Psychiatric Report: Principles and Practice of Forensic Writing. Edited by Buchanan A, Norko MA. Cambridge: Cambridge University Press, 2011

45. Gold LH, Anfang SA, Drukteinis AM, et al: AAPL Practice Guideline for the Forensic Evaluation of Psychiatric Disability. J Am Acad Psychiatry Law 36(Suppl 4):S3–S50, 2008

46. Giorgi-Guarnieri D, Janofsky J, Keram E, et al: AAPL Practice Guideline for Forensic Psychiatric Evaluation of Defendants Raising the Insanity Defense. J Am Acad Psychiatry Law 30(Suppl 2):S3–S40, 2002

47. Zonana H: Confidentiality and record keeping, in The Psychiatric Report: Principles and Practice of Forensic Writing. Edited by Buchanan A, Norko MA. Cambridge: Cambridge University Press, 2011

48. Commonwealth v. Lamb, 311 N.E.2d 47 (Mass. 1974)

49. Estelle v. Smith, 451 U.S. 454 (1981)

50. Jaffee v. Redmond, 518 U.S. 1 (1996)

51. Health Insurance Portability and Accountability Act of 1996 (HIPAA)

52. Janofsky JS: Competency to practice and licensing, in The Psychiatric Report: Principles and Practice of Forensic Writing. Edited by Buchanan A, Norko MA. Cambridge: Cambridge University Press, 2011

53. Kapoor R, Zonana H: Forensic evaluations and mandated reporting of child abuse. J Am Acad Psychiatry Law 38:49–56, 2010

54. Gold LH, Shuman DW: Taking the high road: ethics and practice in disability and disability-related evaluations, in Evaluating Mental Health Disability in the Workplace: Model, Process, and Analysis. Edited by Gold LH, Shuman DW. New York: Springer, 2009

55. Glancy G, Regehr C, Bryant A: Confidentiality in crisis: Part I: the duty to inform. Can J Psychiatry 43:1001–5, 1998

56. Chaimowitz GA, Glancy GD, Blackburn J: The duty to warn and protect: impact on practice. Can J Psychiatry 45:899, 2000

57. Scott C, McDermott B: Malingering, in The Psychiatric Report: Principles and Practice of Forensic Writing. Edited by Buchanan A, Norko MA. Cambridge: Cambridge University Press, 2011

58. Gervais RO, Green P, Allen LM III, et al: Effects of coaching on symptom validity testing in chronic pain patients presenting for disability assessments. J Forensic Neuropsychol 2:1–19, 2001

59. Iverson GL: Ethical issues associated with the assessment of exaggeration, poor effort, and malingering. Appl Neuropsychol 13:77–90, 2006

60. Sadoff RL: Ethical issues in forensic psychiatry: minimizing harm. Hoboken, NJ: Wiley, 2011

61. Lamb HR, Weinberger LE, DeCuir WJJ: The police and mental health. Psychiatr Serv 53:6, 2002

62. Teplin LA, Pruett NS: Police as streetcorner psychiatrist: managing the mentally ill. Int J Law Psychiatry 15:139–56, 1992

63. Leavitt N, Presskreischer H, Maykuth PL, et al: Aggression toward forensic evaluators: a statewide survey. J Am Acad Psychiatry Law 34:231–9, 2006

64. Recupero PR: The mental status examination in the age of the internet. J Am Acad Psychiatry Law 38:15–26, 2010

65. Shuman DW: The use of empathy in forensic examinations. Ethics Behav 3:289–302, 1993

66. Brodsky SL, Wilson JK: Empathy in forensic evaluations: a systematic reconsideration. Behav Sci Law 31:192–202, 2013

67. Gutheil TG, Simon RI: Mastering Forensic Psychiatric Practice: Advanced Strategies for the Expert Witness. Washington, DC: American Psychiatric Publishing, 2002

68. AAPL Task Force: Videotaping of forensic psychiatric evaluations. J Am Acad Psychiatry Law 27:345–58, 1999

69. State v. Hurd, 86 N.J. 525 (1981)

70. Fed. R. Civ. P. 26

71. Bourget D, Labelle A, Gagné P, et al: First-episode psychosis and homicide: a diagnostic challenge. Can Psychiatr Assoc Bull September 2004, pp 6–9

72. Gold LH: The workplace, in Textbook of Forensic Psychiatry (ed 2). Edited by Simon RI, Gold LH. Washington, D. C: American Psychiatric Publishing, 2010

73. Anfang SA, Wall BW: Psychiatric fitness-for-duty evaluations. The Psychiatric clinics of North America 29:675, 2006

74. Binder RL, McNiel DE: "He said—she said": the role of the forensic evaluator in determining credibility of plaintiffs who allege sexual exploitation and boundary violations. J Am Acad Psychiatry Law 35:211–8, 2007

75. Taub S: Recovered Memories of Child Sexual Abuse: Psychological, Social, and Legal Perspectives on a Contemporary Mental Health Controversy. Springfield, IL: Charles C. Thomas, Publishers, 1999

76. Ciccone JR, Jones JCW: Personal injury litigation and forensic psychiatric assessment, in Textbook of Forensic Psychiatry (ed 2). Edited by Simon RI, Gold LH. Washington, DC: American Psychiatric Publishing, 2010

77. Greiffenstein MF, Baker WJ, Johnson-Greene D: Actual versus self-reported scholastic achievement of litigating postconcussion and severe closed head injury claimants. Psychol Assess 14: 202–8, 2002

78. Merikangas KR, Ames M, Cui L, et al: The impact of comorbidity of mental and physical conditions on role disability in the US adult household population. Arch Gen Psychiatry 64:1180–8, 2007

79. Simon RI: Clinical risk management of the suicidal patient, in Clinical Psychiatry and the Law (ed 2). Edited by Simon RI, Gold LH. Washington, DC: American Psychiatric Publishing, 1992

80. Gendel MH: Substance misuse and substance-related disorders in forensic psychiatry. Psychiatr Clin North Am 29:649–73, 2006

81. Lazowski LE, Miller FG, Boye MW, et al: Efficacy of the Substance Abuse Subtle Screening Inventory-3 (SASSI-3) in identifying substance dependence disorders in clinical settings. J Pers Assess 71:114–28, 1998

82. Gibbs LE: Validity and reliability of the Michigan Alcoholism Screening Test: a review. Drug Alcohol Depend 12:279–85, 1983

83. Yudko E, Lozhkina O, Fouts A: A comprehensive review of the psychometric properties of the Drug Abuse Screening Test. J Subst Abuse Treat 32:189–98, 2007

84. Large M, Sharma S, Compton MT, et al: Cannabis use and earlier onset of psychosis: a systematic meta-analysis. Arch Gen Psychiatry 68:555–61, 2011

85. Scott C, Pinals DA: Insanity defense, in Encyclopedia of Forensic Sciences. Chichester, UK: John Wiley & Sons, Ltd., 2009

86. Farrington DP, Welsh B: Saving Children From a Life of Crime: Early Risk Factors and Effective Interventions. Oxford, UK: Oxford University Press, 2007

87. Goldstein NES, Romaine CLR, Zelle H, et al: Psychometric properties of the Miranda Rights Comprehension Instruments with a juvenile justice sample. Assessment 18:428–41, 2011

88. Steadman HJ, Redlich AD, Griffin P, et al: From referral to disposition: case processing in seven mental health courts. Behav Sci Law 23:215–26, 2005

89. Atkins EL, Watson C, Drogin EY, et al: Sentencing, in Handbook of Forensic Assessment: Psychological and Psychiatric Perspectives. Edited by Drogin EY, Dattilio FM, Sadoff RL, et al. Hoboken, NJ: John Wiley and Sons, 2011

90. Appelbaum KL, Zaitchik MC: Mental health professionals play critical role in presentencing evaluations. Ment Phys Disabil Law Rep 19:677–84, 1995

91. Opinion 2.06: Capital Punishment. Chicago: American Medical Association, 2000

92. Farber NJ, Aboff BM, Weiner J, et al: Physicians' willingness to participate in the process of lethal injection for capital punishment. Ann Intern Med 135:884–8, 2001

93. Ford v. Wainwright, 477 U.S. 399 (1986)

94. Panetti v. Quarterman, 551 U.S. 930 (2007)

95. Pinals DA, Price M: Forensic psychiatry and law enforcement, in Textbook of Forensic Psychiatry (ed 2). Edited by Simon RI, Gold LH. Washington, DC: American Psychiatric Publishing, 2010

96. Meyer DJ, Price M: Forensic psychiatric assessments of behaviorally disruptive physicians. J Am Acad Psychiatry Law 34:72–81, 2006

97. Appelbaum PS, Gutheil TG: Clinical Handbook of Psychiatry and the Law. New York: Lippincott Williams & Wilkins, 2007

98. Foubister N, Connell M: Competency to consent to treatment, in Handbook of Forensic Assessment: Psychological and Psychiatric Perspectives. Edited by Drogin EY, Dattilio FM, Sadoff RL. Hoboken, NJ: Wiley, 2011

99. Drogin EY, Gutheil TG: Guardianship, in Handbook of Forensic Assessment: Psychological and Psychiatric Perspectives. Edited by Drogin EY, Dattilio FM, Sadoff RL, et al. Hoboken, NJ: Wiley, 2011

100. Rosner R: Principles and Practice of Forensic Psychiatry. Boca Raton, FL: Taylor & Francis Group, 2003

101. Simon RI, Gold LH: The American Psychiatric Publishing Textbook of Forensic Psychiatry. Washington, DC: American Psychiatric Publishing, 2010

102. American Psychiatric Association: Diagnostic and Statistical Manual of Mental Disorders, Fifth Edition. Washington, DC: American Psychiatric Association, 2013

103. Spitzer RL, Rosen GM, Lilienfeld SO: Revisiting the Institute of Medicine report on the validity of posttraumatic stress disorder. Compr Psychiatry 49:319, 2008

104. American Psychiatric Association: Diagnostic and Statistical Manual of Mental Disorders, Fourth Edition, Text Revision. Washington, DC: American Psychiatric Association, 2000

105. LeBourgeois HW, Thompson JW, Black FW: Malingering, in Textbook of Forensic Psychiatry (ed 2). Edited by Simon RI, Gold LH. Washington, DC: American Psychiatric Publishing, 2010

106. Grisso T: Competence to stand trial, in Evaluating Competencies: Forensic Assessments and Instruments. Edited by Grisso T. New York: Kluwer Academic, 2003

107. Pinals DA, Tillbrook CE, Mumley DL: Practical application of the MacArthur competence assessment tool-criminal adjudication (MacCAT-CA) in a public sector forensic setting. J Am Acad Psychiatry Law 34:179–88, 2006

108. Rogers R: Rogers Criminal Responsibility Assessment Scales (RCRAS) and Test Manual. Odessa, FL: Psychological Assessment Resources, 1984

109. Nicholson RA, Briggs SR, Robertson HC: Instruments for assessing competency to stand trial: how do they work? Prof Psychol 19:383–94, 1988

110. Everington CT: The competence assessment for standing trial for defendants with mental retardation (Cast-MR): a validation study. Crim Just Behav 17:147–68, 1990

111. Everington CT, Luckasson R: Competence Assessment for Standing Trial for Defendants with Mental Retardation: Test Manual. Worthington, OH: IDS Publishing, 1992

112. Golding SL: Interdisciplinary Fitness Interview-Revised: A Training Manual. Salt Lake City, UT: State of Utah Division of Mental Health, 1993

113. Otto RK, Poythress NG, Nicholson RA, et al: Psychometric properties of the MacArthur Competence Assessment Tool: Criminal Adjudication. Psychol Assess 10:435–43, 1998

114. Roesch R, Zapf PA, Eaves D: Fitness Interview Test (Revised Edition). Burnaby, British Columbia, Canada: Mental Health, Law and Policy Institute, Simon Fraser University, 1998

115. Rogers R, Tillbrook CE, Sewell KW: Evaluation of Competency to Stand Trial-Revised (ECST-R) and Professional Manual. Lutz, FL: Psychological Assessment Resources, 2004

116. Nussbaum D, Mamak M, Tremblay H, et al: The METFORS Fitness Questionnaire (MFQ): a self-report measure for screening competency to stand trial. Am J Forensic Psychol 16:41–65, 1998

117. Hanson K: Static-99 FAQ. Available at http://www.static99.org/pdfdocs/faq.pdf. Accessed June 23, 2013

118. Rogers R: Clinical Assessment of Malingering and Deception. New York: Guilford Press, 2008

119. Douglas K, Guy LS, Weir J: HCR-20 Violence Risk Assessment Scheme. Available at http://78.158.56.101/archive/psychology/miniprojects/riskassessment/Violence%20RA/violence_risk_assessment_guide_vrag.html. Accessed June 23, 2013

120. Hare R: Without Conscience. Available at http://78.158.56.101/archive/psychology/miniprojects/riskassessment/Violence%20RA/the_psychopathy_checklist__revised.html. Accessed March 23, 2011

121. Quinsey VL, Harris GT, Rice ME: Violence Risk Appraisal Guide (VRAG), in Violent Offenders: Appraising and Managing Risk (ed 2). Edited by Quinsey VL, Vernon L, Harris GT. Washington, DC: American Psychological Association, 2006

122. Quinsey VL, Harris GT, Rice ME: Risk Assessment. Available at http://78.158.56.101/archive/psychology/miniprojects/riskassessment/Sexual%20Violence%20RA/sex_offence_risk_appraisal_guide_sorag.html. Accessed March 23, 2011

123. Glancy G, Regehr C: A step by step guide to assessing sexual predators, in Social Worker's Desk Reference. Edited by Roberts A, Greene G. New York: Oxford University Press, 2002

124. Doren DM: Evaluating Sex Offenders: A Manual for Civil Commitments and Beyond. Thousand Oaks, CA: SAGE Publications, 2002

125. Otto RK, Douglas KS (editors): Handbook of Violence Risk Assessment. New York: Routledge, 2010

126. David AS, Fleminger S, Kopelman MD, *et al*: Lishman's Organic Psychiatry: A Textbook of Neuropsychiatry. Chichester, UK: Wiley-Blackwell, 2009

127. Marshall W, Fernandez Y: Phallometric Testing with Sexual Offenders: Theory, Research, and Practice. Brandon, VT: Safer Society Press, 2003

128. Fedoroff J, Kuban M, Bradford J: Laboratory measurement of penile response in the assessment of sexual interests, in Sex Offenders: Identification, Risk Assessment, Treatment and Legal Issues. Edited by Saleh FM, Grudzinskas AJ, Bradford JM, *et al*. Oxford, UK: Oxford University Press, 2009

129. Abel G, Wiegel M: Visual reaction time: development, theory, empirical evidence and beyond, in Sex Offenders: Identification, Risk Assessment, Treatment, and Legal Issues. Edited by Saleh FM, Grudzinskas AJ, Bradford JM, *et al*. Oxford, UK: Oxford University Press, 2009

130. Zonana H: Dangerous Sex Offenders: A Task Force Report of the American Psychiatric Association. Washington, DC: American Psychiatric Publishing, 1999

131. Hanson RK, Bussiere MT: Predicting relapse: a meta-analysis of sexual offender recidivism studies. J Consult Clin Psychol 66: 348–62, 1998

132. Abel GG, Lawry SS, Karlstrom E, *et al*: Screening tests for pedophilia. Crim Just Behav 21:115–31, 1994

133. Bourget D, Bradford JM: Evidential basis for the assessment and treatment of sex offenders. Brief Treat Crisis Intervent 8:130, 2008

134. Johnson SA, Listiak A: The measurement of sexual preference: a preliminary comparison of phallometry and the Abel assessment, in The Sex Offender: Theoretical Advances, Treating Special Populations and Legal Developments. Edited by Schwartz BK. Kingston, NJ: Civic Research Institute, 1999

135. Daubert v. Merrell Dow Pharmaceuticals, 509 U.S. 579 (1993)

136. Recupero PR, Price M: Civil Litigation, in The Psychiatric Report: Principles and Practice of Forensic Writing. Edited by Buchanan A, Norko MA. Cambridge, UK: Cambridge University Press, 2011

137. Gerbasi J: Forensic assessment in personal injury litigation, in Textbook of Forensic Psychiatry. Edited by Simon RI, Gold LH. Washington, DC: American Psychiatric Publishing, 2004

138. Hall RC, Hall RC: Compensation neurosis: a too quickly forgotten concept? J Am Acad Psychiatry Law 40:390–8, 2012

139. Drukteinis A: Disability, in Textbook of Forensic Psychiatry (ed 2). Edited by Simon RI, Gold LH. Washington, DC: American Psychiatric Publishing, 2010

140. Guides to the Evaluation of Permanent Impairment. Chicago: American Medical Association, 2008

141. Hoffman BF: How to write a psychiatric report for litigation. Am J Psychiatry 143:164–9, 1986

142. Practice Guideline for the Psychiatric Evaluation of Adults. Washington, DC: American Psychiatric Association, 2006

143. Strasburger L, Gutheil TG, Brodsky A: On wearing two hats: role conflict in serving as both psychotherapist and expert witness. Am J Psychiatry 154:448–56, 1997

144. Linhorst DM, Scott LP: Assaultive behavior in state psychiatric hospitals: differences between forensic and nonforensic patients. J Interpers Violence 19:857–74, 2004

145. Rachlin S, Schwartz H: The presence of counsel at forensic psychiatric examinations. J Forensic Sci 33:1008–14, 1988

146. Jackson v. Indiana, 406 U.S. 715 (1972)

147. Sankaran VS, Macbeth JE: Legal issues in the treatment of minors, in Principles and Practice of Child and Adolescent Forensic Mental Health. Edited by Benedek EP, Ash P, Scott CL. Washington, DC: American Psychiatric Publishing, 2010

148. Soulier MF: Ethics of child and adolescent forensic psychiatry, in Principles and Practice of Child and Adolescent Forensic Mental Health. Edited by Benedek EP, Ash P, Scott C. Washington, DC: American Psychiatric Publishing, 2010

149. Schetky DH: Ethical issues in forensic child and adolescent psychiatry. J Am Acad Child Adolesc Psychiatry 31:403–7, 1992

150. Grisso T: Forensic Evaluation of Juveniles. Sarasota, FL: Professional Resource Press, 1998

151. Schetky DH: Introduction to forensic evaluations, in Principles and Practice of Child and Adolescent Forensic Mental Health. Edited by Benedek EP, Ash P, Scott C. Washington, DC: American Psychiatric Publishing, 2010

152. Herman SP: Practice parameters for child custody evaluation. J Am Acad Child Adolesc Psychiatry 36:57S–68S, 1997

153. Ceci SJ, Huffman MC: How suggestible are preschool children?—cognitive and social factors. J Am Acad Child Adolesc Psychiatry 36:948–58, 1997

154. Ceci SJ, Kulkofsky S, Klemfuss JZ, *et al*: Unwarranted assumptions about children's testimonial accuracy. Ann Rev Clin Psychol 3:311–28, 2007

155. Bernet W: Practice parameters for the forensic evaluation of children and adolescents who may have been physically or sexually abused. J Am Acad Child Adolesc Psychiatry 36:423–42, 1997

156. Hauser MJ, Olson E, Drogin EY: Psychiatric disorders in people with intellectual disability (intellectual developmental disorder): forensic aspects. Curr Opin Psychiatry 27:117–21, 2014

157. Luckasson R, Schalock RL: What's at stake in the lives of people with intellectual disability? Part II: Recommendations for naming, defining, diagnosing, classifying, and planning supports. Intellect Dev Disabil 51:94–101, 2013

158. Schalock RL, Luckasson R: What's at stake in the lives of people with intellectual disability? Part I: The power of naming, defining, diagnosing, classifying, and planning supports. Intellect Dev Disabil 51:86–93, 2013

159. Weiss RA, Rosenfeld B, Farkas MR: The utility of the structured interview of reported symptoms in a sample of individuals with intellectual disabilities. Assessment 18:284–90, 2011

160. Everington C, Notario-Smull H, Horton ML: Can defendants with mental retardation successfully fake their performance on a test of competence to stand trial? Behav Sci Law 25:545–60, 2007

161. Hogue TE, Mooney P, Morrissey C, *et al*: Emotional and behavioural problems in offenders with intellectual disability: comparative data from three forensic services. J Intellect Disabil Res 51:778–85, 2007

162. Werner S, Stawski M: Mental health: knowledge, attitudes and training of professionals on dual diagnosis of intellectual disability and psychiatric disorder. J Intellect Disabil Res 56:291–304, 2012

163. Aggarwal NK: Adapting the cultural formulation for clinical assessments in forensic psychiatry. J Am Acad Psychiatry Law 40:113–8, 2012

164. Tseng W, Matthews D, Elwyn TS: Cultural competence, in Forensic Mental Health: A Guide for Psychiatrists, Psychologists and Attorneys. New York: Brunner-Routledge, 2004

165. Tseng W-S, Strelzer J: Introduction: culture and psychiatry, in Cultural Competence in Clinical Psychiatry. Edited by Tseng W-S, Strelzer J. Washington, DC: American Psychiatric Publishing, 2004

166. Williams DR, Gonzalez HM, Neighbors H, *et al*: Prevalence and distribution of major depressive disorder in African Americans, Caribbean blacks, and non-Hispanic whites: results from the

National Survey of American Life. Arch Gen Psychiatry 64:305, 2007

167. Breslau J, Kendler KS, Su M, et al: Lifetime risk and persistence of psychiatric disorders across ethnic groups in the United States. Psychol Med 35:317–27, 2005

168. Adebimpe VR, Klein HE, Fried J: Hallucinations and delusions in black psychiatric patients. J Natl Med Assoc 73:517–20, 1981

169. Adebimpe VR: Race, racism, and epidemiological surveys. Hospital Community Psychiatry 45:27–31, 1994

170. Jones BE, Gray BA: Problems in diagnosing schizophrenia and affective disorders among blacks. Hospital Community Psychiatry 37:61–5, 1986

171. Bell CC, Mehta H: The misdiagnosis of black patients with manic depressive illness. J Natl Med Assoc 72:141, 1980

172. Cultural Assessment in Clinical Psychiatry. Washington, DC: American Psychiatric Publishing, 2008

173. Miranda J, McGuire T, Williams D, et al: Mental health in the context of health disparities. Am J Psychiatry 165:1102–8, 2008

174. Kirmayer LJ, Rousseau C, Lashley M: The place of culture in forensic psychiatry. J Am Acad Psychiatry Law 35:98–102, 2006

175. Pinals DA, Packer IK, Fisher W, et al: Relationship between race and ethnicity and forensic clinical triage dispositions. Psychiatr Serv 55:873–8, 2004

176. Kirmayer LJ: Failures of imagination: the refugee's narrative in psychiatry. Anthropol Med 10:167–85, 2003

177. Miller PM, Commons ML, Gutheil TG: Clinicians' perceptions of boundaries in Brazil and the United States. J Am Acad Psychiatry Law 34:33–42, 2006

178. Boehnlein JK, Schaefer MN, Bloom JD: Cultural considerations in the criminal law: the sentencing process. J Am Acad Psychiatry Law 33:335–41, 2005

179. Hicks JW: Ethnicity, race, and forensic psychiatry: are we colorblind? J Am Acad Psychiatry Law 32:21–33, 2004

180. Butcher JN, Graham JR, Ben-Porath, YS, et al: Minnesota Multiphasic Personality Inventory-2 Manual. Minneapolis, MN: University of Minnesota Press, 2001

181. Fischer C, Marchie A, Norris M: Musical and auditory hallucinations: a spectrum. Psychiatry Clin Neurosci 58:96–8, 2004

182. Greenberg D, Witztum E: Content and prevalence of psychopathology in world religions, in Religion and Mental Health. Edited by Schumaker JF. New York: Oxford University Press, 1992

183. Witztum E, Buchbinder JT: Strategic culture sensitive therapy with religious Jews. Intl Rev Psychiatry 13:117–24, 2001

184. Griffith EE, Bergeron RL: Cultural stereotypes die hard: the case of transracial adoption. J Am Acad Psychiatry Law 34:303–14, 2006

185. Carter RT, Forsyth JM: A guide to the forensic assessment of race-based traumatic stress reactions. J Am Acad Psychiatry Law 37:28–40, 2009

186. Wills CD, Norris DM: Custodial evaluations of native American families: implications for forensic psychiatrists. J Am Acad Psychiatry Law 38:540–6, 2010

187. Waldfogel S, Meadows S: Religious issues in the capacity evaluation. Gen Hospital Psychiatry 18:173–82, 1996

188. Stotland NL: When religion collides with medicine. Am J Psychiatry 156:304–7, 1999

189. Barnhouse R: How to evaluate patients' religious ideation, in Psychology and Religion: Overlapping Concerns. Edited by Robinson LH. Washington, DC: American Psychiatric Publishing, 1986

190. Josephson AM, Wiesner IS: Worldview in assessment. Washington, DC: American Psychiatric Publishing, 2004

191. Josephson AM, Peteet JR: Worldview in diagnosis and case formulation. Washington, DC: American Psychiatric Publishing, 2004

192. Pierre JM: Faith or delusion?—at the crossroads of religion and psychosis. J Psychiatr Pract 7:163–72, 2001

193. Heilbronner RL, Sweet JJ, Morgan JE, et al: American Academy of Clinical Neuropsychology consensus conference statement on the neuropsychological assessment of effort, response bias, and malingering. Clin Neuropsychol 23:1093–129, 2009

194. Wolpe PR, Foster KR, Langleben DD: Emerging neurotechnologies for lie-detection: promises and perils. Am J Bioeth 10: 40–8, 2010

195. Kanaan RA, Wessely SC: The origins of factitious disorder. Hist Hum Sci 23:68–85, 2010

196. Resnick PJ: Malingering of posttraumatic disorders, in Clinical Assessment of Malingering and Deception. Edited by Rogers R. New York: Guilford Press, 1988

197. McCarthy-Jones S, Resnick PJ: Listening to voices: the use of phenomenology to differentiate malingered from genuine auditory verbal hallucinations. Int J Law Psychiatry 37:183–9, 2014

198. Rogers R, Granacher RP, Drogin EY, et al: Conceptualization and assessment of malingering, in Handbook of Forensic Assessment: Psychological and Psychiatric Perspectives 2011, pp 659–78

199. Shandera AL, Berry DT, Clark JA, et al: Detection of malingered mental retardation. Psychol Assess 22:50–6, 2010

200. Soliman S, Resnick PJ: Feigning in adjudicative competence evaluations. Behav Sci Law 28:614–29, 2010

201. Knoll J, Resnick PJ: The detection of malingered post-traumatic stress disorder. Psychiatr Clin North Am 29:629–47, 2006

202. Wachspress M, Berenberg AN, Jacobson A: Simulation of psychosis. Psychiatr Q 27:463–73, 1953

203. Ritson B, Forrest A: The simulation of psychosis: a contemporary presentation. Br J Med Psychol 43:31–7, 1970

204. Thompson JW, LeBourgeois HW, Black FW: Malingering, in Textbook of Forensic Psychiatry. Edited by Simon RI, Gold LH. Washington, DC: American Psychiatric Publishing, 2004

205. Rogers R, Bagby RM, Dickens SE: SIRS, Structured Interview of Reported Symptoms: Professional Manual. Lutz, FL: Psychological Assessment Resources, 1992

206. Miller HA: M-Fast Interview Booklet. Odessa, FL: Psychological Assessment Resources, 2001

207. Rogers R, Vitacco MJ, Kurus SJ: Assessment of malingering with repeat forensic evaluations: patient variability and possible misclassification on the SIRS and other feigning measures. J Am Acad Psychiatry Law 38:109–14, 2010

208. Kucharski LT, Ryan W, Vogt J, et al: Clinical symptom presentation in suspected malingerers: an empirical investigation. J Am Acad Psychiatry Law 26:579–85, 1998

209. Vitacco MJ, Rogers R: Malingering in corrections, in Handbook of Correctional Mental Health. Edited by Scott C. Washington, DC: American Psychiatric Publishing, 2009

210. Drob SL, Meehan KB, Waxman SE: Clinical and conceptual problems in the attribution of malingering in forensic evaluations. J Am Acad Psychiatry Law 37:98–106, 2009

211. Rogers R, Sewell KW, Gillard N: Structured Interview of Reported Symptoms-2 (SIRS-2) and Professional Manual. Odessa, FL: Psychological Assessment Resources, 2010

212. Miller HA: M-Fast: Miller Forensic Assessment of Symptoms Test. Odessa, FL: Psychological Assessment Resources, 2001

213. Rogers R, Sewell KW, Martin MA, et al: Detection of feigned mental disorders: a meta-analysis of the MMPI-2 and malingering. Assessment 10:160–77, 2003

214. Morey LC: The Personality Assessment Inventory Professional Manual. Lutz, FL: Psychological Assessment Resources, 2007

215. Hawes SW, Boccaccini MT: Detection of overreporting of psychopathology on the Personality Assessment Inventory: a meta-analytic review. Psychol Assess 21:112–24, 2009

216. Resnick PJ, Knoll J: Malingered psychosis, in Clinical Assessment of Malingering and Deception. Edited by Rogers R. New York: The Guilford Press, 2008

217. Resnick PJ: Guidelines for evaluation of malingering in PTSD, in Posttraumatic Stress Disorder in Litigation: Guidelines for Forensic Assessment (ed 2). Edited by Simon RI. Washington, DC: American Psychiatric Publishing, 2003, pp 187–206

218. Woodworth M, Porter S, ten Brinke L, et al: A comparison of memory for homicide, non-homicidal violence, and positive life experiences. Int J Law Psychiatry 32:329–34, 2009

219. Rivard JM, Dietz P, Martell D, et al: Acute dissociative responses in law enforcement officers involved in critical shooting incidents: the clinical and forensic implications. J Forensic Sci 47: 1093–100, 2002

220. Harry B, Resnick PJ: Posttraumatic stress disorder in murderers. J Forensic Sci 31:609–13, 1986

221. Glancy GD, Bradford JM, Fedak L: A comparison of R. v. Stone with R. v. Parks: two cases of automatism. J Am Acad Psychiatry Law 30:541–7, 2002

222. Warren JI, Murrie DC, Chauhan P, et al: Opinion formation in evaluating sanity at the time of the offense: an examination of 5175 pre-trial evaluations. Behav Sci Law 22:171–86, 2004

223. Gacono CB, Meloy JR, Sheppard K, et al: A clinical investigation of malingering and psychopathy in hospitalized insanity acquittees. J Am Acad Psychiatry Law 23:387–97, 1995

224. Caruso K, Benedek D, Auble P, et al: Concealment of psychopathology in forensic evaluations: a pilot study of intentional and uninsightful dissimulators. J Am Acad Psychiatry Law 31:444–50, 2003

225. Rogers R: Current status of clinical methods, in Clinical Assessment of Malingering and Deception (ed 3). Edited by Rogers R. New York: The Guilford Press, 2008

226. Diamond B: The psychiatrist in the courtroom, in Selected Papers of Bernard L. Diamond, MD. Hillsdale, NJ: The Analytic Press, 1994

227. Buchanan A, Binder RL, Norko MA: Resource document on psychiatric violence risk assessment. Washington D.C: American Psychiatric Association, 2012

228. American Psychiatric Association: The principles of medical ethics with annotations especially applicable to psychiatry. Washington, DC: American Psychiatric Association, 2013

229. College Report CR 147. London, UK: Royal College of Psychiatrists, 2008

230. Buchanan A: Risk of violence by psychiatric patients: beyond the actuarial versus clinical assessment debate. Psychiatr Serv 59: 184–90, 2008

231. Pollock N, McBain I, Webster C: Clinical decision making and the assessment of dangerousness, in Clinical Approaches to Violence. Edited by Howells K, Hollin CR. Chichester, UK: John Wiley and Sons, 1989

232. Dvoskin J, Heilbrun K: Risk assessment and release decision-making: toward resolving the great debate. J Am Acad Psychiatry Law 29:6–10, 2001

233. Dvoskin J: Knowledge is not power–knowledge is obligation. J Am Acad Psychiatry Law 30:533–40, 2002

234. Webster CD: How much of the clinical predictability of dangerousness issue is due to language and communication difficulties?—some sample courtroom questions and some inspired but heady answers. Intl J Offend Ther Comp Criminol 28:159–67, 1984

235. Buchanan A, Norko MA: Violence risk assessment, in The Psychiatric Report: Principles and Practice of Forensic Writing. Edited by Buchanan A, Norko MA. Cambridge: Cambridge University Press, 2011

236. Vitacco MJ, Rogers R: The assessment of psychopathy and response styles in sex offenders, in Sex Offenders: Identification, Risk Assessment, Treatment, and Legal Issues. Edited by Saleh FM, Grudzinskas JA, Bradford J, et al. Oxford, UK: Oxford University Press, 2009

237. Selzer ML: The Michigan Alcoholism Screening Test: the quest for a new diagnostic instrument. Am J Psychiatry 127:1653–8, 1971

238. Berlin FS, Saleh FM, Malin HM: Mental illness and sex offending, in Sex Offenders: Identification, Risk Assessment, Treatment, and Legal Issues. Edited by Saleh FM, Grudzinskas JA, Bradford J, et al. Oxford, UK: Oxford University Press, 2009

239. Langevin R, Watson R: Major factors in the assessment of paraphilics and sex offenders. J Offend Rehabil 23:39–70, 1996

240. Davis CM, Yarber WL, Bauserman R: Sexuality-Related Measures: A Compendium. Thousand Oaks, CA: Sage Publishing, 1996