**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| LISA BARBOUNIS | : | CIVIL ACTION |
| | : | NO. 2:19-cv-05030-JDW |
| Plaintiff, | : | NO. 2:20-cv-02946 |
| -vs- | : | |
| | : | |
| THE MIDDLE EAST FORUM, et al. | : | |
| | : | |
| | : | |
| Defendants. | : | |
| | : | |

**DEFENDANTS' RESPONSE IN OPPOSITION TO**
**PLAINTIFF'S OMNIBUS MOTION *IN LIMINE***

Defendants Middle East Forum, Daniel Pipes, and Gregg Roman, by and through their

undersigned counsel, respond in opposition to Plaintiff's Omnibus Motion *In Limine* (Doc. No.

157).  For the reasons below, Plaintiff's motion should be denied.

**INTRODUCTION**

Plaintiff's Omnibus Motion *In Limine* seeks to exclude a range of relevant evidence

inconvenient to Plaintiff's case. Plaintiff relies heavily on Federal Rule of Evidence 403 to argue

that such evidence is more prejudicial than probative, but in doing so, Plaintiff ignores the fact

that when a claim of emotional distress is pursued, a defendant is entitled to explore alternative

sources of the purported distress. Moreover, in support of her motion, Plaintiff falsely claims that

Defendants' expert, Dr. Barbara Ziv, found that Plaintiff does not suffer from emotional distress

(thus reducing the relevance of the evidence concerning Plaintiff's emotional state). In fact, Dr.

Ziv concluded the opposite, and unsurprisingly, many of the sources she identified as causing

Plaintiff's distress are the same as those Plaintiff now seeks to exclude. These alternative sources

of emotional distress cover a range of factors in Plaintiff's life including her estranged marriage,

her stressful (and, at times, violent) dating life, and her long feud with co-worker Marnie

O'Brien while employed at MEF. In many instances, Plaintiff herself specifically identified these areas of her life as causing her emotional distress, either in testimony given under oath or in conversations with friends such as Patricia McNulty. For the reasons argued at length below, Plaintiff's motion should be denied in full, and Defendant should be permitted to put forward evidence at trial demonstrating that to the extent Plaintiff has suffered emotional distress, Defendant was not the proximate cause.

**ARGUMENT**

A. **Evidence of alternative sources of Plaintiff's alleged emotional distress is highly relevant and not unduly prejudicial and therefore should be admitted.**

Plaintiff seeks to exclude thirteen distinct categories of evidence plus a catch-all category, all of which are highly relevant evidence of alternative sources of her emotional distress. Many of these categories are also relevant for additional reasons. None are unduly prejudicial. Plaintiff claims these are "collateral issues without a proffer of probative value." *See* Doc. No. 157 at p.1. The case law is clear, however, that when, as here, "Plaintiff place[s] her mental health and emotional condition directly in issue," matters pertaining to "Plaintiff's mental health and emotional distress are . . . relevant." *Spagnoli v. Brown & Brown, Inc.*, Civil Action No. 06-414 (FLW), 2006 WL 8457915, at *1 (D.N.J. Sep. 20, 2006).

It is precisely because alternative sources of emotional distress are relevant that this Court has long allowed discovery and use of even highly sensitive information by defendants when plaintiffs have asserted emotional distress claims arising under Title VII and the PHRA. *See e.g., McCarthy v. Se. Pa. Transp. Auth.*, No. 92-7188, 1993 WL 409858, at *2 (E.D. Pa. Oct. 13, 1993) (in a case in which marital stress was indicated in psychotherapy records, the court noted "when [Plaintiff] put her stress at issue in this lawsuit . . . she abandoned whatever privacy interest she had in keeping these records confidential . . . The information sought meets the

2

relevancy test of Rule 26"). In this case, the alternative sources of Plaintiff's emotional distress Defendants intend to raise "are relevant and . . . provide evidence concerning whether [these] were the source of or contributed to Plaintiff's stress which she attributed to the unlawful conduct of Defendants." *Id.*, at *5.

Unable to furnish a viable argument against the relevancy of such evidence, Plaintiff leans heavily on Rule 403 to argue that even if such evidence is relevant, it is more prejudicial than probative. Once again, however, Plaintiff's arguments fall short. The Third Circuit has held that "*pretrial* Rule 403 exclusions should rarely be granted." *Landau v. Lamas*, No. 3:15-CV-1327, 2021 WL 2930078, at *1 (M.D. Pa. July 12, 2021) (quoting *In re Paoli R.R. Yard PCB Litig.*, 916 F.2d 829, 859 (3d Cir. 1990) (emphasis in original). Despite this, Plaintiff makes little attempt to furnish case law or cogent argument demonstrating why this matter is the rare exception to the Third Circuit's rule. In fact, the case law weighs heavily in favor of allowing admission of the evidence Plaintiff seeks to exclude. In examining alternative sources of emotional distress, "evidence that other stress factors . . . were more significant contributors to Plaintiff's emotional pain and suffering than the alleged problems at work [are] highly probative." *Herbert v. Architect of the Capitol*, 920 F. Supp. 2d 33, 40 (D.D.C. 2013) (emphasis added). So probative, in fact, that despite Rule 403 objections similar to those raised here, the court in *Herbert* permitted the jury to consider the extent to which plaintiff's arrest and conviction best explained any purported emotional distress, explaining, "Plaintiff cannot on the one hand attempt to claim damages for employment induced emotional distress . . . without subjecting [herself] to cross-examination about other stress factors present in [her] life during that time." *Id*.

In many instances, Plaintiff's own words explain exactly how the evidence she now hopes to exclude in fact contributed to her claimed emotional distress.  She spoke about the emotional impact of these life events in contemporaneous text messages, at her depositions and in her interview with Defendants' expert, which only serves to amplify probative importance of this evidence and to minimize or eliminate any claimed "unfairly" prejudicial effect.

B. **Plaintiff distorts Defendant's expert's findings on Plaintiff's emotional state in her effort to preclude Defendant from offering relevant evidence on alternative sources of Plaintiff's emotional distress.**

Plaintiff baldly asserts that "Defendants' own expert has concluded that Plaintiff does not suffer from emotional distress." This is false - in fact, Defendants' expert, Dr. Ziv, concluded precisely the opposite. In her conclusions, Dr. Ziv first indicated a mere lack of causation between Defendants and any emotional distress Plaintiff may be experiencing, without denying that Plaintiff might have been subjected to emotional distress: "Lisa Barbounis does not display any psychiatric symptoms *that can be attributed to her tenure at the Middle East Forum*." Exhibit 1, Ziv Report, at p. 33. emphasis added. Dr. Ziv then went on to acknowledge that Plaintiff did, in fact, have emotional difficulties: "*Lisa Barbounis has problems related to self-esteem and emotional regulation* that are unrelated to and were not exacerbated by events at the Middle East Forum." *Id.* (emphasis added). In an effort to exclude evidence of alternative causes of her distress, Plaintiff seems to have at best confused and at worst intentionally distorted Dr. Ziv's  unambiguous conclusion that Defendants are not the proximate cause of Plaintiff's emotional distress.

C. **Plaintiff's Omnibus Motion in Limine Should Be Denied.**

1. **Evidence pertaining to Plaintiff's volatile (and, at times, violent) dating and social life is relevant to her claims of emotional distress and should be admitted.**

Plaintiff seeks to exclude "all evidence related to Plaintiff's sexual history and past sexual partners." Taken at face value, this overly broad request not only excludes Plaintiff's bedroom activities—something Defendants have no interest or intent in exploring—but also any evidence unrelated to sex if it merely relates to someone with whom Plaintiff has had an intimate relationship. The result would be an absurd prohibition on topics like Plaintiff's challenging dynamic with her estranged husband, something Plaintiff herself has routinely identified as adversely impacting her emotional state, and her physically abusive relationships with other men. In fact, Plaintiff even indicated to Defendant Roman and others at MEF that her marriage included domestic violence, an undeniable source of potentially severe emotional distress that has nothing to do with her allegations against Defendants.

The purpose of introducing evidence of Plaintiff's chaotic romantic life is not to demonstrate that "she is a slut or a whore," as erroneously and crudely stated by Plaintiff, but to allow the jury to weigh factors that Plaintiff readily and routinely admits impact her emotionally. Even if the jury determines that Plaintiff has experienced injury (emotional distress) at some point over the relevant time frame, it must then determine whether her alleged experiences involving Defendants were the proximate cause of this injury. This can only be done by investigating and considering alternative causes, which Defendants have every right to proffer via documentary evidence and testimony.

With the exception of a single instance in which Plaintiff herself squarely placed her sex life at issue in this case (discussed *infra*), Defendant will neither bring into evidence nor

reference matters related to the specifics of Plaintiff's sexual activity. Rather, Defendants will produce evidence on Plaintiff's emotionally taxing interpersonal dynamics with a variety of people, some of whom happened to be her intimate partners.

Plaintiff's text message thread with Tricia McNulty reveals the extent to which her dating and social life, rather than her allegations against Defendants, explain Plaintiff's purported emotional distress. For example, shortly after Mr. Roman was removed from the MEF office, Plaintiff texted Ms. McNulty: "I'm losing my mind. This has been the worst month. I'm irritated that a person [Daniel Thomas] I'm not even supposed to be talking to hasn't texted or called me. Can you please remind me that I have a husband and a family and responsibilities." Exhibit 2, Selected Texts with Patricia McNulty, at p. 691. It is quite telling that, in the month Plaintiff's allegations against Defendants reached a crescendo, she chose to reference her dating life rather than anything having to do with Defendants in describing her "worst month."

In another exchange, Plaintiff agonized over whether another individual would accept her Facebook friend request and how adding him on Facebook would look to other men in her life. Exhibit 2 at pp. 754-57. Such texts and expressions of anxiety over being "ghosted"[1] are not isolated, but rather form a persistent theme in Plaintiff's detailed first-hand account of her emotional state: Plaintiff's lifestyle, especially dating, caused her emotional distress. Comparatively, Plaintiff's messages attribute little to no residual distress to her work at the Forum, and none to her allegations against Defendants.

Plaintiff claims that "whether Plaintiff had . . . sexual relations with . . . persons in her past is not relevant to any pending action pertaining to the sexual harassment at issue." While

---

[1] According to Merriam-Webster, "ghosting" is "the act or practice of abruptly cutting off all contact with someone (such as a former romantic partner) usually without explanation by no longer accepting or responding to phone calls, instant messages, etc."

Defendant is inclined to wholeheartedly agree and would prefer that examination of Plaintiff's emotionally challenging dating life not include matters of her sexuality, Plaintiff herself placed the sexual component of dating directly at issue by blaming Defendants, under oath, for causing her to date and sleep with men other than her husband:

> I never cheated on my husband or had an affair or anything. This is what happened, The Middle East Forum beat me down. They beat me down so bad, so bad. I never so much [as] looked at another man, okay, until The Middle East Forum. And did you know that sexual abuse survivors and sexual assault victims and sexual people that have been attacked by sexual predators, like Gregg Roman, one in four have extra things like what I do, right. It's a classic trauma symptom. So don't you go and start blaming my sex life on what happened to me. Exhibit 3, 11/4/20 Barbounis Deposition, at pp. 62-63.

Plaintiff cannot blame Defendant for an indisputably distressing aspect of her life while demanding that Defendant be prohibited from exploring this issue. It is now irreversibly part of the record that Plaintiff's extramarital liaisons are one of the injuries she claims were caused by Defendants' alleged actions. Plaintiff's own prior words, however, make clear that there is a lack of causation between Defendants and this injury, calling into question Plaintiff's credibility. When discussing the very same issue with Patricia McNulty in mid-December of 2018, months after the alleged sexual harassment had occurred, blaming Defendants was the last thing on Plaintiff's mind:

> I think that all my life I have been attracted to man's men, but they were never acceptable for where I wanted to be in society. Vasili was the first normal guy, and I do love him, but I think I'm missing the manly thing. Danny [Thomas] has no money. It's the roughness. The bad boy thing. Exhibit 2 at p. 765.

Plaintiff's messages provide a thoroughly, and at times, painfully, honest account of her personal life, and her dating decisions (and the resulting emotional fallout) were influenced by factors having nothing to do with Defendants. To the extent that sex is relevant, it is only so because Plaintiff went out of her way to make it relevant by testifying that an injury she

purportedly suffered from Defendants' alleged actions had an impact on her marriage and "sex life."   Defendant has no interest in discussing sex beyond the exact text of Plaintiff's accusation made under oath and the discrepancy between this testimony and what she said in private when the prospects of a multi-million dollar lawsuit were not on the table.

The sparse case law provided by Plaintiff does not establish a basis for precluding relevant evidence related to a Plaintiff's sex life when Plaintiff has implicated her sex life as an area of injury, and the case law certainly does not provide justification for excluding evidence related to *non-sexual* aspects of dating and Plaintiff's first-hand accounts of how these adversely impacted her emotions. Indeed, Plaintiff herself told Dr. Ziv that her confession to her husband about her extramarital affairs caused her emotional distress, and that her husband's lukewarm reaction to her confession made her feel "like he didn't love me." Exhibit 1 at p. 16. This evidence of clear emotional distress unrelated to any alleged conduct by Defendants should be admitted so that the jury can determine what, if any, emotional distress suffered by Plaintiff stems from her allegations in this case.

### 2. Evidence related to Plaintiff's substance use is relevant to her credibility and claims of a hostile work environment and should be admitted.

Defendants anticipate that Plaintiff will argue that Mr. Roman began treating her punitively following their trip to Israel, where she alleges Mr. Roman made unwanted advances. She can further be expected to argue that this change in demeanor is evidence that something nefarious happened in Israel. However, there are a range of alternative explanations as to why not only Mr. Roman's treatment of Plaintiff changed but also how other MEF administrators dealt with her. One such explanation centers on Plaintiff's possible abuse of prescription drugs. In an exchange with Patricia McNulty, which occurred after the Israel trip, Plaintiff revealed that she was sending emails to Mr. Roman and Mr. Pipes "high as shit." Exhibit 2 at p. 567. To the

extent that Defendants' attitudes toward Plaintiff changed over time, her interactions with MEF administrators while under the influence of controlled substances is something the jury should be allowed to consider. Likewise, using controlled substances to the point that Plaintiff was "high as shit" may have affected the quality of her work, further explaining why Defendants became less enthusiastic about Plaintiff's role as an employee over time.

Plaintiff's use of controlled substances additionally sheds light on alternative sources of emotional distress and a willingness to contemplate intricate acts of deceit to achieve her objectives. On April 9th, 2018, for example, Plaintiff texted Patricia McNulty "I'm thinking of ramping up my heart and taking a trip to the ER to postpone" turning in a school assignment, something Plaintiff acknowledged as "insane." She attributed this "insane" idea to a state of affairs brought about by her use of Adderall and several other factors. Equally telling, however, is Plaintiff's own acknowledgment that this partially substance-induced "insane" state of mind could adversely impact her work at MEF: "If Gregg calls or emails today I may get fired or quit."  Exhibit 2 at p. 197.  In short, Plaintiff not only admitted to interacting with MEF administrators while under the influence of controlled substances but also acknowledged that such interactions could adversely impact her work or attitude in a way detrimental to her career. Therefore, evidence of Plaintiff's substance use, especially pertaining to whether she was under the influence while on the job, is highly relevant and should be admitted as they provide an explanation for a change in attitude toward Plaintiff that has nothing to do with rebuffed sexual advances.

Plaintiff requests that the term "drug use" not be used, but that very term has been used in this District by the judiciary itself in the related case of *O'Brien v. Middle East Forum*. Document 123, 7/28/21, para. 3. With this is mind, Defendants request that counsels' language

not be constrained in such a way, and that to the extent relevant, evidence of Plaintiff's drug use

be admitted at trial.

### 3. Plaintiff's political ideology is an alternative source of her emotional distress and related evidence should be admitted.

Plaintiff is not an ordinary citizen with political views that she keeps private or personal.

Rather, she is a high profile staff member to a United States congressman and an active political

commentator on social media.  At the present time, Defendants are unclear as to what, if any,

evidence or testimony Plaintiff intends to introduce concerning her current work or activism or

the associations that she holds, but to the extent she opens this door, Defendants should be

permitted to rebut any such evidence.  Furthermore, to the extent evidence of her political

activities, activism or associations may be relevant to her emotional distress claims, Defendants

should be permitted to explore these matters. By way of example, in one of her depositions,

Plaintiff claimed to have been working on the day of the January 6 riots at the Capitol and stated

that she was severely upset by her proximity to the events of that day; by way of further

example, Plaintiff has had physical confrontations with individuals at political rallies

documented on social media. Exhibit 4, 1/8/21 Barbounis Deposition, at pp. 2-4.  As it is

premature to determine whether all such evidence should be admitted or precluded, and because

the context of such evidence impacts its admissibility, Defendants request that the Court defer

decision on this matter until trial.[2]

---

[2] Should the Court decide to do so, Defendants will raise the matter with the Court before introducing any such evidence at trial.

**4.   Plaintiff's relationship with Daniel Thomas is an alternative source of her emotional distress and related evidence should be admitted.**

Plaintiff argues "the only reason Defendants would even consider presenting evidence related to Daniel Thomas would be to present evidence of sexual promiscuity to the jury." Again, this is false.  In fact, Defendants have no wish to discuss specific sexual acts involving Plaintiff and Mr. Thomas.  Rather, Defendants wish to present evidence that Plaintiff's relationship with Mr. Thomas was a substantial cause of her purported emotional distress. In fact, it was Daniel Thomas to whom Plaintiff referred *supra* about having the worst month of her life.

As revealing as the above statement is, however, it is just one of numerous instances in which Plaintiff indicated the detrimental effect their relationship had on her well-being. For example, Mr. Thomas caused Plaintiff tremendous distress when he failed to repay a debt owed to Plaintiff or even engage with her on the matter.  Plaintiff indicated to Patricia McNulty that "I'll be next level if he doesn't answer." Exhibit 2 at p. 775. As more time elapsed without a response, Plaintiff's emotional distress amplified, beginning with "I'm very nervous right now," (*Id.* at p. 784) gradually escalating to "I'm getting really mad about Danny the more I think about it," (*Id.* at p. 785) and crescendoing with "I should send him a dick pic and be like don't fuck with me . . . but that's psycho." *Id.* at p. 786. Least there be any confusion over Plaintiff's emotional state at the time, she spelled it out for Ms. McNulty: "I'm getting really pissed. He's going to make me do something I regret." *Id.* at p. 788. Plaintiff has placed her emotions directly at issue, and exchanges like this regarding her relationship with Daniel Thomas provide a critical picture of the emotionally difficult factors in Plaintiff's life that are far removed from her allegations. Indeed, this evidence appears to be the most emotionally impactful thing that happened to Plaintiff during the relevant time, and it should be admitted at trial.

**5.   Plaintiff's relationship with Jazmine Bishop is an alternative source of her emotional distress and related evidence should be admitted for this and other reasons.**

Jazmine Bishop is the mother of Daniel Thomas' children and his on-again-off-again domestic partner. Plaintiff had a very contentious relationship with Ms. Bishop that appears to have caused her significant emotional distress. When Ms. Bishop followed Plaintiff on Instagram, Plaintiff texted Patricia McNulty "All too messy. This puts it over the top for me." Exhibit 2 at p. 748. Under oath, Plaintiff described her encounters with Ms. Bishop as harassment. Exhibit 3 at p. 302. Plaintiff has alleged that she was essentially a victim of cyberbullying at the hands of Ms. Bishop, which included the use of fake accounts on multiple social media channels to contact Plaintiff frequently over the course of two years. *Id.* Plaintiff even alleged that this cyberbullying included threats of violence. *Id.* at p. 346. For her part, Plaintiff acknowledges that there were times when she "yelled and screamed at her." *Id.* at p. 304. While Plaintiff initially attempted to portray her encounters with Ms. Bishop as a mere minor annoyance, Plaintiff ultimately contextualized this by noting that breaking her own foot would be "extremely painful" in the moment but a minor annoyance in the grand scheme of her entire life. *Id.* at p. 312. Plaintiff's emotional well-being in the grand scheme of her life, however, is not at issue in this case but rather her emotional well-being during a window largely coextensive with Ms. Bishop's alleged frequent and prolonged harassment.

**6.   Plaintiff's work and relationship with Tommy Robinson is an alternative source of her emotional distress and should be admitted as evidence.**

Plaintiff's work and relationship with Tommy Robinson served as a substantial source of emotional distress for Plaintiff as she was constantly butting heads with MEF administrators regarding her work on issues related to Mr. Robinson. Moreover, Plaintiff herself had to deal

with a range of stressful situations in her capacity as a volunteer advisor and press liaison for Mr. Robinson.

On the MEF front, Plaintiff was reprimanded on multiple occasions for affiliating with Mr. Robinson in ways that raised eyebrows with MEF administrators. For example, MEF President Daniel Pipes' number one rule is "no surprises," and when a UK newspaper contacted Mr. Pipes about Plaintiff's involvement with Mr. Robinson, Mr. Pipes was quick to express his dissatisfaction with Plaintiff's actions. Defendant has introduced a number of emails into evidence that detail the extent to which Plaintiff's relationship with Mr. Robinson was a recurring problem during her time at MEF. At times, Plaintiff herself lamented to Patricia McNulty over how MEF managed her relationship with Robinson:

> "I'm getting shut out of the Tommy Robinson stuff . . . Apparently they have all been talking about what they are going to do with him and left me completely out of the conversation . . . *I'm so bummed right now*. I'm going to quit. Gregg does it on purpose . . . *I'm so upset right now*. Like Cliff [Smith] is the fucking TR person right now? They can all go fuck themselves . . . Gregg doesn't want anything to do with the Tommy stuff." Exhibit 2 at pp. 448-452 (emphasis added)

Not only do Plaintiff's own words make clear that her dynamic with Mr. Robinson was emotionally distressing when MEF was involved, but it also served as a source of animosity against Defendants, particularly Mr. Roman.

Even when MEF was not involved, Plaintiff's affiliation with Mr. Robinson served as a source of emotional distress. "I feel like their nagging mom and I'm telling them what to do all the time. I feel terrible they must hate me now," Plaintiff wrote to Patricia McNulty. Exhibit 2 at p. 745. Defendants should be permitted to explore these sources of Plaintiff's emotional distress at trial.

**7.   Evidence related to Plaintiff's job performance is relevant on several grounds and should be admitted.**

As discussed *supra*, Plaintiff's job performance is relevant for explaining why the attitudes of MEF administrators, especially that of Mr. Roman, towards Plaintiff may have changed over time. Plaintiff can be expected to argue that Mr. Roman's purported change in attitude toward Plaintiff, following the alleged AIPAC and Israel incidents, is evidence that Plaintiff rebuffed Mr. Roman's advances. However, in addition to alternative explanations as to why such attitudes may have shifted, there is also evidence that Mr. Roman may have had concerns about Plaintiff's job performance before the incidents in question even occurred. For example, a month before the AIPAC conference and Israel trip, Plaintiff told Tricia McNulty that "Gregg told Marnie to watch me." Exhibit 2 at p. 109. Additionally, as discussed in more detail above, Plaintiff's difference of opinion with MEF administrators on the Tommy Robinson project served as a source of emotional distress as did being reprimanded for her work on the matter. Finally, Plaintiff's deteriorating job performance, and her fear that she would be terminated, certainly impacted her emotionally and caused her distress.  Evidence of her job performance is thus highly relevant and not unfairly prejudicial, and should be admitted.

**8.   Evidence related to Plaintiff's current job for Congressman Randy Weber should be admitted as it is relevant both as an alternative source of emotional distress and as a matter related to Plaintiff's credibility.**

Plaintiff seeks to exclude "any and all evidence related to Plaintiff's current job" with Congressman Randy Weber. This overly broad request, however, would exclude at least two highly relevant categories of evidence related respectively to (1) Plaintiff's alternative sources of emotional distress and (2) her credibility. Plaintiff is expected to argue that she continued to experience emotional distress even after leaving MEF and that this distress continues to this day. However, Plaintiff has been exposed to events of significant emotional distress related to her

current job, and Defendant will argue that these events (in conjunction with a number of other factors) best explain the distress she claims to experience. Most notably Plaintiff, in her capacity as a congressional staffer, was a witness to the January 6th incident at the Capitol Building and she described under oath how this event adversely impacted her emotional state. Exhibit 4 at pp. 3-4.

In addition to Plaintiff's current job contributing to her claimed emotional distress, Defendant has uncovered evidence that she lied on her Congressional job application, despite her averment that all information included was true, by exaggerating (and, at times, fabricating) her role at MEF on her resume and submitting a writing sample as her own work that was actually written by Daniel Pipes and Gregg Roman. Defendants should be permitted to explore these exaggerations and fabrications pursuant to Federal Rule of Evidence 608(b) when cross-examining Plaintiff.

**9.    Defendants do not intend to introduce any recordings or transcripts of a telephone call between Mr. Roman and Daniel Thomas into evidence at trial.**

Plaintiff's request to exclude such evidence is moot.  To the extent relevant based on Plaintiff's case and testimony, Mr. Roman may testify about the impact that phone calls he received from Mr. Thomas had on him, how it impacted decisions with respect to the Forum, this litigation and the counterclaims ultimately filed against Plaintiff.  To the extent Plaintiff preserves her objection to such testimony, this Court should decide any remaining admissibility issues at trial.

**10.   Evidence related to Plaintiff's recorded call with MEF co-worker Marnie O'Brien, and their relationship overall, is relevant as it relates to alternative sources of Plaintiff's emotional distress and should be admitted.**

Plaintiff requests to exclude a highly relevant recorded phone call between co-worker Marnie O'Brien and herself. This phone call—essentially a shouting match—encapsulates their

difficult relationship and sheds substantial light on how it was largely Marnie O'Brien, rather

than Defendants, who caused Plaintiff emotional distress during her tenure at MEF. To place this

phone call in its proper context, a brief examination of Plaintiff's relationship with Ms. O'Brien

is useful. Just several months into her job at MEF, Plaintiff noted to Patricia McNulty: "I've had

it with Marnie. I do not trust her." Exhibit 2 at p. 103. Less than a month after the alleged

incidents with Mr. Roman, Plaintiff texted Patricia McNulty:

> "I'm going to punch Marnie and quit . . . She sent me an email asking for minutes
> from last year when I wasn't here and for this year which I didn't do.  FUCKING
> LOOK IN DROPBOX BITCH. I'm actively looking for a new job. I hate this type
> of work any way." *Id.* at p. 189.

Plaintiff will argue that what she experienced at AIPAC and in Israel left her so traumatized that

she had no recourse but to file a lawsuit against Defendants in an attempt to make her life whole

again. It is telling, however, that her confrontation with Ms. O'Brien, rather than the alleged

incidents in question, would be the focal point of Plaintiff wanting to leave MEF.  The jury

should be permitted to consider a real-time recording of confrontation between Plaintiff and Ms.

O'Brien in order to determine the extent to which Plaintiff's emotional distress related to MEF

could be attributed to this ongoing conflict rather than incidents she will allege left her severely

traumatized.

> **11. Recordings between Plaintiff and Jazmine Bishop are part of the relevant
> evidence on Plaintiff's relationship with Ms. Bishop as it relates to alternative
> sources of emotional distress.**

As discussed *supra*, ample evidence suggests that Plaintiff's relationship with Ms. Bishop

served as a substantial source of Plaintiff's emotional distress, and this relationship in addition to

other factors having nothing to do with the allegations against Defendants fully explain

Plaintiff's emotional distress. Recorded audio messages that Plaintiff sent to Ms. Bishop are part

of this evidence and are no less probative than the written messages. Contrary to Plaintiff's

assertion, these recordings have little to nothing to do with Plaintiff's job performance and

everything to do with her emotional state and mindset during a highly relevant timeframe.

**12. Plaintiff's effort to preclude "any and all evidence discovered solely due to Defendants' counterclaims[3] is nonsensical and should be denied.**

Plaintiff moves to exclude all such evidence on the sole basis that this "information

relates to Plaintiff's job performance and therefore has no probative value and would be

presented only to inflame the passions of the jury."  This non-descript objection is groundless

and unsupported by law.  Defendants intend to present any and all relevant evidence obtained

through lawful discovery, as set forth in its affirmative motion in limine and throughout this

response.  Whether such relevant evidence was discovered "solely due to Defendants'

counterclaims" is as unascertainable as it is irrelevant.  Plaintiff's nonsensical blanket objection

to undefined, undescribed evidence should be denied.

**13. Evidence related to alternative theories of emotional distress is relevant and should be admitted.**

After requesting the exclusion of twelve categories of evidence all touching on alternative

sources of emotional distress, Plaintiff issues a catch-all request seeking to prohibit any and all

evidence related to this matter.  This breathtakingly broad objection is based on Plaintiff's false

assertion Defendants' expert, Dr. Barbara Ziv, claimed that Plaintiff did not experience

emotional distress. This was dispensed with above, and substantial detail was provided on why

evidence related to a range of topics substantially touch on alternative causes of Plaintiff's

emotional distress. Furthermore, even if it were true (it is not) that Dr. Ziv found that Plaintiff

suffered no emotional distress whatsoever, *Plaintiff* nevertheless intends to prove that she did,

---

[3] Presumably, Plaintiff's reference to "counterclaims" refers to the claims filed by Defendants against Plaintiff for breach of duty of loyalty, fraudulent misrepresentation and civil conspiracy. *See* Doc. No. 53.

and that it was caused by Defendants.  Regardless of the testimony of Dr. Ziv, Defendants have

every right to rebut Plaintiff's assertion about the causes of her emotional distress.

As argued in Defendants' own Motion *in Limine* and briefly reiterated in this response,

courts have consistently held as admissible evidence related to alternative sources of emotional

distress. Defendant requests that the Court do so here as well.

### 14. Plaintiff's financial troubles are an alternative source of emotional distress and a motive for filing this lawsuit, therefore related evidence should be admitted

In her effort to exclude information relating to her financial troubles, Plaintiff makes

several false assertions.  First, she asserts that her tax problems are not hers, but her husband's –

Plaintiff herself directly and repeatedly contradicts this assertion in her deposition testimony,

where she acknowledges that the numerous IRS liens and penalties are her responsibility as

much as her husband's.  Second, Plaintiff asserts that "Defendants have no way to raise this issue

other than inadmissible hearsay or by presenting information to the jury that has no probative

value" – again, this is simply untrue, as Plaintiff herself testified about her tax and financial

issues. Exhibit 3 at p. 437. To the extent Defendants wish to explore this avenue, they will do so

on cross-examination of the Plaintiff with documentary support.  Notably, the timing of

Plaintiff's financial troubles align with her decision to bring suit against Defendants, and

Plaintiff has produced evidence concerning a desire by her and her husband for a financial

settlement from Defendants.

Even if, however, Defendants were precluded from offering evidence of Plaintiff's

precarious financial situation to explore Plaintiff's ulterior motive for this lawsuit (referred to by

Plaintiff herself as the "Gregg Plan"), Plaintiff's situation is an alternative source of emotional

distress by her own admission. In her deposition, Plaintiff said "that's true" when Defendants'

counsel noted that she reported "experienc[ing] mental difficulties in the last several years . . . due to the work stressors associated with the instant case a*s well as financial difficulties on the part of her husband*." Exhibit 3 at p. 437. Thus, Plaintiff herself acknowledges that these financial difficulties are an alternate source of her own emotional distress, making such evidence highly probative and admissible at trial.

**CONCLUSION**

Because the alternative sources of emotional distress described above are relevant and their probative value outweighs any prejudice, Plaintiff's Motion *in Limine* should be denied.

Respectfully submitted,

By: */s/ Jonathan R. Cavalier*
Jonathan R. Cavalier
Leigh Ann Benson
COZEN O'CONNOR
One Liberty Place
1650 Market Street
Philadelphia, PA 19103
Phone: (215) 665-2000

*Attorneys for Defendant*
*The Middle East Forum and*
*Daniel Pipes*

By: */s/ Sidney L. Gold*
Sidney L. Gold
William Riser
SIDNEY L. GOLD & ASSOCIATES P.C.
1835 Market Street, Suite 515
Philadelphia, PA 19103
(215) 569-1999

CLARK HILL PLC
Kevin Levine, Esq. (PA Bar No. 326492)
Clark Hill PLC
Two Commerce Square
2001 Market Street, Ste. 2620
Philadelphia, PA 19103
(215) 640-8500

Margaret M. DiBianca, Esq. (DE No. 4539)
CLARK HILL PLC
824 N. Market Street, Ste. 710
*Admitted Pro Hac Vice*
Wilmington, DE  19801
P:  (302) 250-4748

*Attorneys for Defendant*
*Gregg Roman*

Dated: November 3, 2021